**PAUL HASTINGS**

1(212) 318-6046
kennethgage@paulhastings.com

August 21, 2020                                                                                                   59605.00060

**VIA ECF**

The Honorable Gabriel W. Gorenstein
United States District Court
Southern District of New York
500 Pearl Street
New York, New York 10007

Re:     *Ulku Rowe v. Google LLC*, Case No. 19-cv-08655 (LGS)(GWG)

Dear Judge Gorenstein:

We represent Defendant Google LLC in the above-referenced matter and write in response to Plaintiff's letter requesting a pre-motion conference (Dkt. 52).  So much of Plaintiff's letter is filled with inaccuracies and assumptions about Google's good faith efforts to conduct discovery in this case—assumptions which Google could have addressed without Court intervention if Plaintiff had only first followed Your Honor's specific meet and confer protocols.

Section 2.A of Your Honor's Individual Practices states clearly that the parties must "first confer in good faith <u>by telephone or in person</u> with all other relevant parties in an effort to resolve the dispute" (emphasis in original).  It is also clear that if the conference does not resolve that dispute, "the moving party must confirm this fact and must inform the opposing party <u>during the conference</u> that as a result of the impasse the moving party intends to seek relief from the Court regarding the dispute" (emphasis supplied).

As you can see from her letter, Plaintiff did not follow this procedure.  The only telephone conference referenced occurred last month, on July 30, 2020.  (Pl.'s Ltr. at 2.)  After that, Google made two additional productions, one of which (on August 3, 2020) contained several of the documents germane to the disputes Plaintiff raised in her letter.  Plaintiff unilaterally declared the parties had reached impasse in subsequent email correspondence, but that does not excuse her non-compliance with Your Honor's Individual Practices.  At no time after July 30, 2020, did Plaintiff attempt to arrange the required conference.  Nevertheless, Google responds to each of the items she raises in her letter *seriatim.*

1.  **Electronically Stored Information**

    a.  **Google made extensive ESI productions well before Plaintiff insisted it run her additional email searches.**

Plaintiff's August 17, 2020 letter conveniently ignores the fulsome productions Google made prior to the instant discovery dispute.  This case is governed by the Court's Pilot Project Regarding Initial Discovery Protocols for Employment Cases Alleging Adverse Action (the "Initial Protocols"), which call for the identification and production of: "[a]ll communications concerning the factual allegations or claims at issue in this lawsuit," "[d]ocuments relied upon to make the employment decision(s) at issue in this lawsuit," and "[d]ocuments showing the plaintiff's compensation and benefits," among other things.  At the outset, Google searched for and produced responsive communications and other electronically-stored documents to satisfy its obligations under these protocols.  As part of that effort, Google constructed broad e-mail searches to capture relevant communications (Google shared these search terms with Plaintiff).  It created a detailed document review protocol to assist with a review of those emails.  That guidance purposefully took a broad approach to relevance, consistent with the Initial Protocols.  As of April 27, 2020, Google produced 147 last-in-time emails from key custodians that directly address the claims and defenses in the case. This figure does not include the numerous policy documents and other ESI Google reviewed and produced by that date, which totaled tens of thousands of pages.  (*See* Dkt. 31 (parties' joint status letter dated April 27,



The Honorable Gabriel W. Gorenstein
August 21, 2020
Page 2

2020).)[1]

Plaintiff's claims, by their very nature, do not suggest a voluminous email record. Plaintiff challenges four distinct and isolated employment decisions: the decision to hire and compensate Plaintiff commensurate with her experience; the decision to award her equity refresh grants; the decision to temporarily move someone other than Plaintiff into the Financial Services Vertical Lead role while the department experienced a turnover in management; and Google's response to plaintiff's two complaints of alleged discrimination. (*See* Amended Compl., Dkt. 12.) There are a discrete number of documents associated with each of these events, and those have already been produced. For example, Google produced Plaintiff's entire file maintained in the gHire system, a centralized database for hiring decisions and a repository for nearly 200 communications about Plaintiff's hiring and compensation package, including notes of calls and interviews. (*See* Exh. 1.) It produced documents reflecting compensation paid to Plaintiff's alleged comparators identified in her early demands, including management's rationale for those compensation decisions. (*Id.*) It produced emails and gHire documents concerning the candidacy of individuals considered for the Financial Services Vertical Lead role. (*Id.*) And it produced non-privileged documents and emails from both investigations into Plaintiff's complaints of alleged discrimination. Despite all this, Plaintiff insisted on a secondary e-mail search for more information. (*Id.*)

### b. Plaintiff has failed to identify what, if anything, is missing from the productions.

As Plaintiff concedes, Google conducted additional e-mail searches. Google negotiated those terms in good faith because the Court ordered it to do so, but also to minimize the burden of reviewing irrelevant information. It never agreed that the searches Plaintiff constructed were likely to result in the identification and production of discoverable material beyond what it had already produced.

The parties eventually agreed upon 10 (not 11) search terms and 10 custodians on or around June 15, 2020 largely based on Plaintiff's proposal. Google ran those searches and prepared a detailed document review protocol to govern first-level review, bearing in mind both the requests for production Plaintiff herself associated with each of the searches (*see* Exh. 1), and the relevant claims and defenses in this case. Google then conducted second-level review for relevance and privilege. As this was now the <u>second</u> ESI review conducted in this matter, Google took an even broader view of relevance this round. It reviewed a sample of documents initially marked non-responsive to determine whether first-level reviewers had inadvertently excluded any relevant documents. If any documents initially marked non-responsive were in fact relevant to the parties' claims and defenses, Google produced those documents and others like them. This second review resulted in the production of 347 additional last-in-time emails.

Google communicated these efforts to Plaintiff, but none of that mattered. Plaintiff demanded a hit count report for each of the search terms to assess whether, in her view, Google had produced enough.[2] Google invited Plaintiff to identify what specifically was missing from the productions so that it could search for and locate anything she reasonably believed exists but had not been produced. <u>Not once</u> did Plaintiff identify anything missing from production. Plaintiff's mere suspicions that something must be missing, not grounded in any fact or good faith belief that Google's efforts resulted in an under-inclusive production, do not entitle her to go on a fishing expedition for evidence of discrimination and retaliation where none exists.

---

[1] Google reviewed and produced "last in time" communications (i.e., a single thread containing the relevant material as opposed to multiple, standalone communications found in the same thread). Had Google not conducted a "last in time" analysis, the email production would have consisted of a greater number of documents. Google offered to produce each of the separate emails contained in the responsive email threads on August 6, 2020. Plaintiff never responded.
[2] The burden associated with providing the hit count report Plaintiff requested is laid out in Exh. 1 (email from Caitlin Brown to Maya Jumper, dated May 21, 2020 at 6:50 p.m.).



The Honorable Gabriel W. Gorenstein
August 21, 2020
Page 3

Google is not required to produce all emails picked up by one of Plaintiff's search terms, regardless of relevance. That is absurd. Plaintiff has identified no authority for this outlandish proposition, and it utterly ignores the well-established principle that "[r]elevancy is, of course, the touchstone for obtaining nonprivileged matter through the discovery process." *Shim-Larkin v. City of New York*, No. 16-CV-6099(AJN)(KNF), 2019 WL 2548133, at *6 (S.D.N.Y. June 20, 2019) (denying motion to compel production of documents where "the motion record before the Court is devoid of evidence establishing that [the document] 'is relevant to any party's claim or defense and proportional to the needs of the case'"). The only reason her e-mail searches yielded any documents is because Google took an especially broad view of relevance the second time around.

Plaintiff's fixation on the volume of documents—regardless of substance—is exemplified in her misguided representation of the percentage of documents ultimately produced. (Pl.'s Ltr. at 2.) Plaintiff admits she is comparing the number of produced documents to the initial hit counts provided in the early stages of negotiation. For example, her reference to 3,093 initial hits for search term #10 is lifted from a May 20, 2020, communication between the parties on when Plaintiff's proposed searches returned 60,000 documents. (*See* Exh. 1.) Clearly, 60,000 hits for a single plaintiff discrimination case is an overly broad universe containing tens of thousands of irrelevant documents. Plaintiff cannot seriously argue that the percentage ultimately produced from this vastly overbroad universe provides the Court with any meaningful information. Nor should Plaintiff feign suspicion over the number of documents produced. Google told her early on that much of what she sought had already been produced to her, and that email searches were an inefficient way to locate further responsive documents. (*See id.*)

Plaintiff's request for relief is long on assumptions and short on substance. It should be denied in its entirety. Should the Court doubt Google's efforts to comply with its discovery obligations, however, Google requests the opportunity to provide its privileged document review protocols for an *in camera* inspection so the Court may see how broadly Google defined the universe of relevant documents.

2. **"Comparator" Evidence**

    a. **The Court never ordered, and Plaintiff herself never asked, for some of the information she now seeks to compel.**

During the May 14, 2020 hearing, the Court very clearly laid out a staged approach to comparator discovery in this matter. (*See* Dkt. 41 (Hearing Transcript).) First, Google would produce the job codes and job titles of those in Level 8 and Level 9 engineering roles in Google Cloud. (*Id.* at 9:9-10:21.) Then the parties would hold a 30(b)(6) deposition to clarify which of those roles were allegedly comparable to Plaintiff's. (*Id.* at 11:2-15.) Only after that corporate deposition and further negotiation on the subject of comparators would Google be required to produce the documents Plaintiff prematurely seeks. (*Id.*) Google produced "snapshots" of individuals in Level 8 and Level 9 Engineering positions Eng/PM/Ops in Google Cloud on June 5, 2020, which included the individual's name, level, job code, and job title.

The Court ordered the parties to meet and confer on the appropriate scope of information to produce for the six Level 10 positions in Google Cloud reporting to Tariq Shaukat. (Dkt. 39.) On June 10, 2020, Plaintiff requested "snapshots" for those positions similar to those provided for the Level 8 and Level 9 employees, and Google complied on June 12, 2020. Google then offered to produce two corporate witnesses to testify about those positions and associated leveling, promotion, and compensation policies. Those depositions were scheduled for August 12, 2020 and August 14, 2020.

Those "snapshots" were the only documents the Court ordered Google to produce prior to the 30(b)(6) deposition. Google could have insisted that Plaintiff conduct the contemplated 30(b)(6) deposition based on those documents alone. Google never agreed, and the Court never ordered it, to produce job ladder and job family data. However, in an effort to get the 30(b)(6) depositions underway, Google agreed to produce



The Honorable Gabriel W. Gorenstein
August 21, 2020
Page 4

job descriptions for a subset of the 54 Level 8 and Level 9 job titles at issue. Plaintiff selected 14 Level 8 and Level 9 job titles on June 18, 2020, but did <u>not</u> request job descriptions for any of the Level 10 positions for which Google provided "snapshot" data. Plaintiff waited until August 5, 2020 to request additional data for these Level 10 positions, and even then, the request did not specify that Plaintiff was seeking job descriptions for these positions.

On August 3, 2020, Google produced job description information for the 14 identified positions. The task was not as simple as pulling job descriptions off a shelf. Job descriptions at Google are created at the time of a job opening and are tailored to the particular needs of that specific opening. There is no guarantee that two people with the same title have the same job responsibilities and, therefore, the same job description. As an additional layer of complication, a formal job title and job code may be associated with multiple informal job titles. For example, Google produced data for eight job descriptions for the formal title Director, Technical Solutions Consultant, associated with job code 5565. There are no less than seven informal titles associated with this position.[3]

What Plaintiff assumes is a simple request actually required Google to: 1) identify each of the individuals from the "snapshots" who held one of the 14 positions Plaintiff selected; 2) search two of its systems—its gHire database and its decommissioned predecessor system—for the job opening associated with that individual's position; 3) identify the information within those systems that comprise the job description (including job title; job role; location for the role; general role description; job responsibilities; minimum qualifications; preferred qualifications; and department overview (where applicable)); and 4) assemble that information in a usable format. Google provided Plaintiff a key so she could easily tell which of the 155 informal titles reflected in the job opening data are associated with each of the 14 formal job title and job codes she identified.

On August 10, 2020, less than 48 hours before the first witness was scheduled to testify, Plaintiff cancelled the scheduled 30(b)(6) depositions because Google's production was allegedly "incomplete." If Plaintiff had questions about the job description data or believed fields were "missing," she could have met and conferred with Google to resolve these issues. She never did. In fact, Google learned for the first time from Plaintiff's August 18, 2020, submission that its production "appears to be missing several fields related to these job descriptions," or that "another spreadsheet is missing data regarding Level 9 positions entirely." (Pl.'s Ltr. at 4.) What is "missing" remains a mystery; Google firmly believes it produced all data fields that comprise the job description as it understands the term, and its version of the produced data covers both Level 8 and Level 9 positions. Plaintiff should have, at the very least, identified this phantom data to Google before seeking Court intervention.

### b. Production of job description information in the format Plaintiff seeks is burdensome, unnecessary, and, in some instances, impossible.

Google's only obligation is to produce electronically stored information "in a form or forms in which it is ordinarily maintained or in a reasonably usable form or forms." Fed. R. Civ. P. 34(b)(2)(E)(ii). It need not "produce the same electronically stored information in more than one form," Fed. R. Civ. P. 34(b)(2)(e)(iii), nor must it produce it in Plaintiff's preferred format if it otherwise satisfies the requirements of the Federal Rules. Here, Google produced the data as it exists in the ordinary course of business. The data provided in the job description spreadsheet was pulled from the administrative view or "backend" of the gHire system where this information is centrally stored. It shows all of the data for a job description visible in the end-user

---

[3] These titles include Director, Standard Support, Google Cloud; Director of Enterprise Field Operations, Americas; Director, Google Cloud Platform Support; Director, Cloud Advanced Support; Director, Solutions Architecture, Google Cloud; and Director, Product Success, Google Cloud Platform Business. Two of those positions are identified as internal transfers and thus do not have an informal title associated with an external job opening.



The Honorable Gabriel W. Gorenstein
August 21, 2020
Page 5

facing view (or "frontend"), and then some. The legacy data (i.e., data from gHire's predecessor system) that Google produced is accessible only through the backend and is not readily accessible in any format other than the one in which it was produced. Plaintiff insists she has "no way of authenticating or verifying [the data's] accuracy," but she does: that's what the (now cancelled) 30(b)(6) depositions were for, among other things. (Pl.'s Ltr. at 4.)

Plaintiff has not articulated why the data provided is unusable.  This alone is a basis for denying her request. It is also impossible to satisfy Plaintiff's request that Google produce job descriptions in a single format similar to a document she identifies as GOOG-ROWE-00017717.  (Pl.'s Ltr. at 5.)  As an initial matter, the document she cites is not a job description but a job ladder.[4]  A job description is usually separate and distinct from a job ladder in the normal course, and not every position is associated with a job ladder.  To the extent a job ladder for a given position even exists, there is no standard format in which it must be maintained "in the ordinary course of business," as Plaintiff assumes.  (*Id.*)

Moreover, to reconstruct and produce the job description data in a standalone document format, Google would have to locate each of the 155 individual job postings on gHire's frontend (an impossible task for information stored in gHire's legacy system, which only exists on the backend).  Google would then need to manually screenshot the gHire user interface for all 155 of these positions.  These screenshots would necessarily also capture irrelevant information beyond just the job description data, including personally-identifying information for recruiters, sourcers, and hiring managers.  Alternatively, Google could identify and approach 155 recruiters for the job description document he or she used to recruit for each of these positions to see if they still exist or are readily accessible, but that is an overly burdensome task for all of these positions, many of which Plaintiff may ultimately conclude are not comparable to her position after the contemplated 30(b)(6) deposition.  Google is under no obligation to undertake such extraordinary efforts to produce the documents in this alternative format when the data it already gave Plaintiff is more than sufficient.  Her mistaken assumptions even as to what job description data Google stores in the ordinary course demonstrate precisely why a 30(b)(6) deposition is necessary to focus Plaintiff's requests for comparator discovery.

### 3.  Impact of Plaintiff's Conduct On Discovery Schedule

At the May 14, 2020 hearing, Hon. Schofield made clear that the parties were to proceed to depositions in a timely fashion: "Clearly, some further ESI is appropriate here, but it needs to be proportional and we also need to have some end in sight.  The point of the discovery is not to go on for months and months in the future, we need to get the additional documents and then get on with depositions." (Dkt. 41, at 17:14-18.)  To date, Plaintiff has cancelled three scheduled depositions because of alleged deficiencies in Google's productions.  (Pl.'s Ltr. at 5.)  Plaintiff acted on her ill-founded belief that Google's productions are somehow deficient, but these accusations have no merit for the reasons described above.  Given Plaintiff's conduct, Google agrees that some extension of time is likely necessary to complete depositions in this matter.

Google respectfully submits that this Court should deny Plaintiff's unfounded requests for additional fact discovery and allow the parties to meet and confer about an appropriate extension of time to complete discovery thereafter.

---

[4] Job ladders are not relevant or required to determine whether a position is comparable to Plaintiff's. Plaintiff admits, "Job ladders show, within a position, the progression to higher levels of pay, skill, responsibility, or authority."  (Pl.'s Ltr. at 4) (emphasis supplied).  The requirements for upward progression within a single position have no bearing on whether two separate positions are comparable.



The Honorable Gabriel W. Gorenstein
August 21, 2020
Page 6

Sincerely,

Kenneth W. Gage
of PAUL HASTINGS LLP


KWG

cc:     All counsel of record (via ECF)