UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| ULKU ROWE,<br><br>          Plaintiff,<br><br>-against-<br><br>GOOGLE LLC,<br><br>          Defendant. | No. 1:19-cv-08655 (LGS)(GWG)<br><br>**DECLARATION OF TARIQ SHAUKAT IN SUPPORT OF GOOGLE LLC'S MOTION TO QUASH SUBPOENA** |

      I, TARIQ SHAUKAT, subject to the penalties by law for perjury, do hereby declare the following to be true and correct on the basis of my personal knowledge. If called upon to do so, I would be competent to testify to the matters set forth in this declaration.

      1.     From approximately June 2016 through July 2020, I was a Vice President in Google's Cloud organization.

      2.     My responsibilities in that role shifted over time. Beginning in late 2017, I was primarily responsible for building and managing a mix of commercial and product and engineering teams, including Cloud's customer-facing product teams and the team responsible for forming partnerships for Cloud with companies in the technology industry.

      3.     In that role I initially reported to Diane Greene, the Senior Vice President and Chief Executive Officer of Google Cloud.

      4.     In or around June 2018, Ulku Rowe, the plaintiff in this action, began reporting to me.

      5.     In early 2018, Google Cloud started an executive search for a Head of Financial Services, someone who would lead the vertical within my organization focused on that industry (the "Financial Services Vertical").

6. I was the hiring manager for this role. I partnered with Google's Leadership Staffing Team within Google's Human Resources department to identify and assess both internal and external candidates.

7. The Leadership Staffing Team and I initially identified and screened a slate of potential candidates for the role. Next, a panel for four Google employees interviewed the candidates to formally assess them against Google's criteria for leadership hires. The Leadership Staffing Team then collected and presented to me the feedback on each candidate for my consideration. Based on that information, I determined whether I believed the candidate could fulfill the requirements of the position and do the job well.

8. In or around June 2018, Ms. Rowe told me she was interested in the Head of Financial Services role. I told her that if she wanted to apply, I would consider her for the position as I would any other internal candidate. Ms. Rowe suggested that she might resign from Google if she did not get the Head of Financial Services role in my organization.

9. A panel of interviewers interviewed Ms. Rowe for the position in summer 2018. I received feedback on Ms. Rowe's candidacy from the Leadership Staffing Team.

10. Ms. Rowe's interviewers felt confident in her technical capability, I was told, but they also reported that she could not articulate a vision for how Google Cloud's products and services could address the business needs of the financial services industry. Her interviewers did not believe she had the ability to develop a vision for a cloud-based product in this sector. Based on this feedback and my previous observations of Ms. Rowe, I determined that Ms. Rowe would not likely be a finalist for the Head of Financial Services role.

11. From time to time I updated Ms. Greene on the status of the search. It was not Ms. Greene's normal practice to meet with candidates unless the candidate had reached or was

close to the offer stage in the process. In September and October 2018, Ms. Greene met with two candidates that I considered finalists for the Head of Financial Services role. At all times, however, it was my decision which candidate to hire for the role, subject Ms. Greene's sign-off and, ultimately, approval from the hiring committee.

12. I thought that a courtesy meeting with Ms. Greene would be helpful in retaining Ms. Rowe, if she was not given the role. Further, I considered at the time that Ms. Rowe's candidacy might have become much stronger if, after meeting Ms. Rowe, Ms. Greene thought Ms. Rowe would be a good fit for the Head of Financial Services role.

13. Ms. Greene initially was not inclined to make an exception to her normal practice for Ms. Rowe, but she eventually agreed to schedule a meeting.

14. On November 7, 2018, Ms. Rowe sent an email to me and Ms. Greene expressing her concern that she was hired at a more junior level relative to her peers, and that this fact might negatively impact her candidacy for the Head of Financial Services role. Attached to my declaration as Exhibit 1 is a true and complete copy of Ms. Rowe's email to me and my subsequent correspondence with Human Resources.

15. I forwarded the communication to Human Resources the same day I received it. (*Id.*) Human Resources promptly responded that they were aware of Ms. Rowe's concerns, had investigated similar concerns she had raised previously, and were actively investigating the concerns articulated in the November 7, 2018 email. (*Id.*)

16. Ms. Greene and I briefly discussed whether she needed to take any action with respect to Ms. Rowe's November 7, 2018 email. I told her that I had already involved Human Resources to look into Ms. Rowe's concerns, so no further action was necessary.

LEGAL_US_W # 105683428.5

17. On November 17, 2018, Ms. Greene publicly announced that she would be leaving Google, something she had told me previously. Her successor, Thomas Kurian, joined Google at the end of November 2018.

18. Ms. Greene informed me that she would be stepping out of her day-to-day role as CEO of Google Cloud, especially on forward-looking matters, and as a result no longer wanted to meet with any potential candidates Ms. Rowe was informed that her upcoming meeting with Ms. Greene was cancelled on December 4, 2018.

19. In light of the leadership changes referenced in paragraph 17 above, I made the decision not to proceed further with the hiring process for the Head of Financial Services role until we had greater clarity around Mr. Kurian's strategy for the various verticals in Cloud.

20. I asked Stuart Breslow, one of my direct reports and the then-Director of Technology and Policy within Google Cloud, to lead the Financial Services Vertical on an interim basis.

21. Mr. Breslow was not hired into the Head of Financial Services role; rather, I expanded his then-current role on a short-term basis to include "caretaker" responsibility for the existing Financial Services Vertical team until more definite plans for the vertical had been finalized under Mr. Kurian's leadership.

22. Ms. Greene was not involved in my decision to appoint Mr. Breslow as interim lead of the Financial Services Vertical.

23. On December 5, 2018, I informed Ms. Rowe that our search for the Head of Financial Services had been paused in light of a change in leadership. I also told her that if the organization were to reopen the position, I would not be moving forward with her candidacy. I explained that her interviewers were impressed with her technical capabilities, but they did not

LEGAL_US_W # 105683428.5

feel that she had the necessary depth or breadth of experience on the business side to be successful in the role. I also told her that she was still valuable to the team, even if I did not think she was the right candidate for the Head of Financial Services role. Attached to this declaration as Exhibit 2 is a true and complete copy of my email to Human Resources summarizing my discussion with Ms. Rowe.

      **I DECLARE UNDER PENALTY OF PERJURY UNDER THE LAWS OF THE UNITED STATES THAT THE FOREGOING IS TRUE AND CORRECT.**

Signed on the __16__ day of November, 2020 in __Austin__, __Texas__.

                                                                     _Tariq Shaukat_
                                                                      Tariq Shaukat