

PAUL

HASTINGS

1(212) 318-6046
kennethgage@paulhastings.com

December 23, 2020                                                                                               59605.00060

**VIA ECF**

The Honorable Gabriel W. Gorenstein
United States District Court
Southern District of New York
500 Pearl Street
New York, New York 10007

Re:     *Ulku Rowe v. Google LLC*, Case No. 19-cv-08655 (LGS)(GWG)

Dear Judge Gorenstein:

We represent Defendant Google LLC and write in response to Plaintiff's letter requesting a pre-motion
conference (ECF 79).  Plaintiff already has received substantial discovery relevant to approximately 28
other employees who report to the same manager as Plaintiff, perform similar functions, or share the exact
same job code as Plaintiff.  Plaintiff is highly compensated for her role as compared to the majority of her
male peers.  That is undisputed.  Given this, Plaintiff requests information for over 200 additional employees
in entirely different job codes, on the baseless theory that all engineering roles at Google are the same.

In May, 2020, Judge Schofield instructed Google to produce limited information concerning these
engineering employees and directed Plaintiff to take 30(b)(6) depositions about them so the parties, and if
necessary, the Court could determine whether any of these other individuals are potential comparators
warranting further discovery.  None of them are, and the discovery to date shows that clearly.  The Court
should therefore deny Plaintiff's request for additional discovery for employees in the disputed positions.[1]

**1.   Plaintiff's Role as Technical Director, Office of the CTO Is A Unique, Relatively New Function**

Plaintiff's role at Google – Technical Director, Office of the CTO ("OCTO") – was "a new function," created
in late 2016.  (Exh. 1 (Deposition of Will Grannis ["Grannis Dep."]), 23:16–24:9; Exh. 2 (Deposition of Brian
Stevens, ["Stevens Dep."]), 27:8–13.)  When Will Grannis, Managing Director of OCTO, designed the
features of this "experimental function," he took a job family[2] from another part of the business "that allowed
for a blend of customer facing, customer impact-type work," and added an engineering component.
(Grannis Dep., 25:2-16.)  The result was a unique role that existed nowhere else in Google Cloud.

The role has three core "pillars" of responsibility: (1) customer work, serving as the key point of contact for a
customer's technical C-suite executives seeking to migrate their systems to Google Cloud, and identifying
how Google's technology will add value to their company's performance; (2) engineering impact, identifying
hurdles in a customer's adoption of Cloud technology and influencing the engineering teams who build
Google's Cloud products to adapt Google's offerings to meet those customer needs; and (3) evangelism, or
"conveying the power of [Google Cloud's] technology to the outside world."  (Grannis Dep. 32:6–33:4; Exh.
5 (Position Description: Technical Director, Office of the CTO); *see also* Lucas Dep., 78:16–79:6.)  The role

---

[1] Google is submitting concurrently a motion for leave to retain documents submitted in connection with
Plaintiff's December 17, 2020 letter and this response under seal.  To the extent that Google is requesting
documents be redacted of confidential, sensitive, or proprietary information, a redacted version has been
filed in connection with this letter response.

[2] A job family is a grouping of jobs with the same focus, *e.g.*, application engineering.  (Exh. 3 (Deposition of
Adam Lief ["Lief Dep."]), 114:15-23.)  A job ladder organizes those jobs by seniority or "level" (usually level
1 through level 8) and reflects the expectations of employees within that job family at different levels.  (*Id.,*
40:22-25.)  An employee's job code identifies the specific level that person occupies on their respective job
ladder.  (Exh. 4 (Deposition of Kevin Lucas ["Lucas Dep."]), 16:22–17:14.)



PAUL
HASTINGS

The Honorable Gabriel W. Gorenstein
December 23, 2020
Page 2

of the Technical Director was "to engage externally with customers to make their move to Cloud successful." (Stevens Dep., 27:8–28:13).)  The Technical Director role was scoped as a Level 8 position, and most individuals in that role were hired at that level, including Plaintiff; in some instances, individuals with greater experience were hired into the role at Level 9, and more was expected of them than employees at Level 8.  (Exh. 6 (Technical Solutions Consultant Job Ladder) at GOOG-ROWE-00017717; Stevens Dep., 60:25–61:9.)

Technical Directors do not directly build the products Google markets to clients; Plaintiff does not contribute code to Google's products. (Exh. 7 (Deposition of Ulku Rowe ["Rowe Dep."]), 327:15–24.)  Instead, Technical Directors partner with engineering teams "to monitor products' performance, develop tools and identify opportunities to scale and grow Google's business."  (Exh. 6 at GOOG-ROWE-00017717.) Additionally and significantly, Plaintiff is and always has been an "individual contributor"; she is not responsible for managing other employees. (Rowe Dep., 99:14–100:4.)  Of the three pillars identified above, Plaintiff excelled in Cloud evangelism, yet exhibited a consistent lack of meaningful engineering impact since joining Google.  (Grannis Dep., 168:23–169:11, 183:19–185:3.)

   2.   **Judge Schofield Permitted Plaintiff To Take Limited Discovery Regarding Certain Engineering Roles; Plaintiff Distorts What that Discovery Revealed.**

Judge Schofield ordered 30(b)(6) depositions regarding the disputed engineering roles, and ordered the parties to meet and confer in good faith to identify potential comparators based on the evidence adduced. (Exh. 8 (Excerpts of Transcript of May 14, 2020 Conference), at 7, 11.)  The parties started with a list of individuals in 54 different PM/Eng/Ops[3] job codes in Google Cloud U.S. on three dates in 2017, 2018, and 2019 (the "Snapshots").  On June 18, 2020, plaintiff selected 14 job codes held by the majority of the individuals listed in the Snapshots to be covered at the 30(b)(6) depositions:[4]

| *Application Engineering Roles (collectively, "Director, AE")* | *Software Engineering Roles (collectively, "Director, SWE")* |
|---|---|
| • Director, Application Engineer I<br>• Director Application Engineer II | • Director, SWE<br>• Director, SWE (8319)<br>• DNU – Director, Software Engineer<br>• Principal Software Engineer<br>• Distinguished Software Engineer<br>• DNU – Director, Software Engineering (3414) |
| *Product Management Roles (collectively, "Director, PM")* | *Technical Solutions Consultant Roles (collectively, "Technical Solutions Consultant")* |
| • Director, Product Management<br>• Director, Product Management (5013) | • Director, Technical Solutions Consultant<br>• Director, Technical Solutions Consultant (5566)<br>• Principal Technical Solutions Consultant<br>• Distinguished Technical Solutions Consultant |

Google produced job descriptions associated with each of the openings filled by the individuals identified in the Snapshots (to the extent such data exists), despite not being ordered to do so.[5]  Plaintiff thereafter

---

[3] "PM/Eng/Ops" refers to Product Management, Engineering, and Operations roles within Google Cloud.
[4] The label "DNU" (*e.g.*, DNU – Director, Software Engineer) refers to a job code that is no longer in use at Google.   All of these job codes except for the Technical Solutions Consultant roles are the subject of Plaintiff's December 17, 2020 letter.
[5] Plaintiff argues that these job description data are incomplete, which is precisely what she argued in her prior pre-motion letter seeking to compel additional job description data in August. (Exh. 9 (Pl.'s Aug. 18, 2020 Pre-Motion Letter, ECF 52), at 4.)  Google maintains that these data accurately reflect what is centrally stored and available in Google's gHire system for the job openings filled by the individuals



The Honorable Gabriel W. Gorenstein
December 23, 2020
Page 3

sought permission to compel production of job ladders and job families for the Director, AE, Director, SWE, and Director, PM roles, arguing that the information was relevant and "necessary for Plaintiff to ascertain the comparability of positions." (Exh. 9, at 4.) Your Honor denied the request and directed the parties to meet and confer in an effort to resolve their disputes. (Exh. 10.) Google subsequently produced the requested job ladders on August 3, 2020, and October 22, 2020, before the 30(b)(6) depositions on October 2, 2020, and October 27, 2020.  <u>Plaintiff did not ask a single question of either 30(b)(6) deponent about the content of the job descriptions or job ladders.</u>[6]  As shown below, those documents undermine Plaintiff's request for more discovery.

Of the nearly 400 pages of 30(b)(6) testimony, only twenty pages cover the actual differences between Plaintiff's role and the roles held by Directors, AE, SWE, or PM. None of this testimony is attached to Plaintiff's December 17, 2020, submission, however, because it demonstrates that these jobs are quite different from Plaintiff's and require different skills not needed for the Technical Director role, as shown in section 3 below.  To be sure, Plaintiff explored very generally the skills, responsibilities, and requirements of the Director, AE, SWE, or PM role, asking if general statements in the job description for the Technical Director role were also applicable to those other roles. (*Compare* Lief Dep., 50:11–63:3 *with* Exh. 5.)  Many of her questions were so general as to be applicable to nearly any role at Google:

- "[W]ould you agree that individuals in that position would be expected to have the [quality] of innovative thinking?" (Lief Dep., 50:11–15; *see also* Lucas Dep., 115:19–116:11);
- "[W]ould they be expected to have the quality of collaboration?" (Lief Dep., 50:20-22; *see also* Lucas Dep., 116:12–16);
- "[A]re they expected or is the criteria that they have the ability to work independently with minimal guidance?" (Lief Dep., 53:6–11; *see also* Lucas Dep., 117:14–118:3);
- "[D]oes a large part of their work require the use of a computer?" (Lief Dep., 66:9–16);
- "[O]n average, do application engineering directors work more than 40 hours in a week?" (Lief Dep., 49:6–8; *see also* Lucas Dep., 111:25–112:16.)

The Engineering Leveling Guide on which Plaintiff relies contains general descriptions in areas like leadership and organizational impact that a large portion of Engineering employees are expected to exhibit at varying levels of seniority.  (Exh. 11.)  But the document contains a disclaimer; it is "not a representation of expectations for any specific ladder," (*id.*, P001584), and as Will Grannis pointed out, "that's also why we have job families that are more descriptive in terms of requirements" for the role.  (Grannis Dep., 117:15–119:21, 122:14–123:5.)  Again, Plaintiff ignores the evidence.

For Plaintiff, comparator discovery is not about discovering information about jobs that are substantially (or even remotely) similar.  It is a results-oriented exercise.  Plaintiff's own testimony illustrates this point.  In response to Google's interrogatories, Plaintiff identified a number of employees she considers to be similarly situated to her for purposes of her pay discrimination claims.  But when she learned that at least one of those employees had <u>the exact same job code</u>, she disavowed him as a comparator, stating, "Well, at that time, you know, I thought he was a level 9, and through discovery I learned that he was a level 8,"

_____

identified in the Snapshots.  For some job openings, the data available in gHire is more fulsome than others for a variety of reasons (*e.g.*, there will likely be no job description for an opening filled by an individual hired through an acquisition, because the opening may not have been externally posted).  Plaintiff would know this if she followed the Court's order to meet and confer with Google about these data and other discovery issues.  (Exh. 10 (Order dated Aug. 24, 2020, ECF 56).)  Plaintiff never did, and now repeats the same objections she lodged months ago.

[6] Plaintiff's question about the job descriptions to deponent Adam Lief, Google's first 30(b)(6) witness regarding the Director, Application Engineering roles, was limited to asking him if he recognized the document and the titles associated with job openings for a Director, AE position.  (Lief Dep., 85:22–86:23.) Plaintiff briefly introduced the Application Engineering job ladder as Exhibits 3 and 5 during the Lief 30(b)(6) deposition, but never asked substantive questions about its content.  (*Id.*, 82:16-84:4, 91:14-93:9.)



The Honorable Gabriel W. Gorenstein
December 23, 2020
Page 4

"what I'm comparing myself is to L9 men."  (Rowe Dep., 108:24-122:5.)

Nearly a month after completing the 30(b)(6) depositions, instead of engaging in the meet and confer
process ordered by Judge Schofield, Plaintiff unilaterally declared in a November 25th letter that all 14 of
the initially-identified roles were comparable to her own, and <u>adding two new positions to the list of allegedly
comparable roles</u>.  The evidence she marshalled in that letter and her December 17, 2020 submission is a
gross distortion of the record in many instances.  There is insufficient space to detail each instance here,
but two examples are illustrative.

- Plaintiff states that "Mr. Wilson, who transferred from the Technical Director role to the [Product
  Manager] role, testified that every single job responsibility listed for the Technical Director role
  overlapped with the [Product Manager] role…." (Pl.'s Ltr. [ECF 79] at 4.)  Mr. Wilson was comparing
  the technology experience <u>he gained in prior, non-Google roles</u> to the requirements of the Product
  Manager position in some instances, and he testified that at least two of the requirements for the
  Technical Director role did <u>not</u> apply to Product Management.  (Exh. 12 (Deposition of Benjamin
  Wilson ["Wilson Dep."], 154:21-158:4.)

- Plaintiff argues that employee movement between Director-level roles shows transferability of skills,
  (Pl.'s Ltr. [ECF 79] at 4), but she ignores the fact that the transfer process requires a months-long
  trial period to determine whether the individual's skills and experience actually are transferrable to
  the new role.  (Grannis Dep., 117:15-118:5, 121:24-122:13.)  Moreover, individuals who transfer
  from Plaintiff's job into Product Manager and Software Engineer roles are <u>down-leveled</u> with the
  transfer, further reflecting the differences between these roles.  (Wilson Dep., 159:9-15; Exh. 13 at
  GOOG-ROWE-00060436.)[7]

Judge Schofield ordered the parties to engage in meaningful discovery on the comparator issue already.
Plaintiff has squandered that opportunity by failing to examine witnesses on key documents—documents
that she insisted she needed to assess comparability in the first instance.  Notwithstanding the significant
undertaking Google has made to participate in this process in good faith, the parties are back to where they
were before the 30(b)(6) depositions took place.  The only difference is that now, Plaintiff is asking for <u>more</u>
than what she originally requested, by adding two new roles to her list of allegedly comparable positions.
There is no reason to think that additional discovery for these unrelated positions will further inform whether
any of these positions are comparable for purposes of Plaintiff's pay discrimination claims.

### 3.   No Further Discovery Is Warranted For These Allegedly Comparable Roles.

Google acknowledges that recent amendments to the New York State Equal Pay Law now prohibits
unlawful pay differentials for "equal work" or "substantially similar work."  N.Y. Lab. L. § 194(1).  But one
thing has not changed: the focus of the inquiry must still be on the actual work required of the jobs.
Plaintiff's own authority support this conclusion.  *Moccio v. Cornell Univ.*, 889 F. Supp. 2d 539, 571
(S.D.N.Y. 2012) (dismissing equal pay claims on summary judgment; evidence demonstrated that alleged
comparators "work in different fields, were placed in different thematic groups, and directed institutes with
quite different missions from" plaintiff's), *aff'd*, 526 F. App'x 124 (2d Cir. 2013) (unpublished); *Corpes v.
Walsh Constr. Co.*, No. 3:14-CV-181(MPS), 2015 WL 5331725, at *5 (D. Conn. Sept. 14, 2015) (requiring
plaintiff to establish that "jobs had common duties or content," and emphasizing alleged comparators actual
job responsibilities.).  It simply cannot be the case that recent amendments require employers to pay all
employees within a single broad discipline like Engineering consistently, regardless of what their jobs
actually require and what value they add to the organization.  This Court should not adopt the absurd result

---

[7] Even if this Court agrees that (1) Plaintiff should have been hired as a level 9 Technical Director, and (2)
the Product Manager and Software Engineer roles are comparable to Plaintiff's, she should only be entitled
to information about level 8 employees in those roles because that is the level her alleged comparators
were assigned post-transfer.



The Honorable Gabriel W. Gorenstein
December 23, 2020
Page 5

Plaintiff now advocates.

### a. The Contents of the Allegedly Comparable Roles Differ In Significant and Material Respects from the Technical Director Role.

Plaintiff's December 17, 2020, submission is devoid of any details about the work done by individuals in the allegedly comparable roles, and for obvious reason: there are significant differences between those roles and Plaintiff's that make a comparison for pay discrimination claims inappropriate.

The first and most obvious distinction is that the Directors, AE, SWE, and PM are overwhelmingly people managers, and a meaningful percentage of their responsibilities includes managing teams. (See Lucas Dep., 121:12-122:10 (noting that the "vast majority" of Directors at level 8 and above are people managers "unless your role is maybe a bit nuanced or specialized or divergent [in] some way"); Lief Dep., 124:7-125:25 (testifying he spends 40% of his time as a Director, AE managing other engineers on his team); Exh. 14 (Application Engineer Job Ladder) (requiring level 8 Application Engineers to "demonstrate success at managing multiple teams and business partnerships, covering large domain areas"); Exh. 15 (Tech Manager Job Ladder) at GOOG-ROWE-00061490 (specifying that Software Engineers and other technical managers may spend only 20%-50% of their time on technical contributions, and the rest managing their teams); Exh. 16 (Product Manager Job Ladder) at GOOG-ROWE-00061525 (stating that Product Managers are individual contributors only in "rare cases").

Plaintiff has never managed any employees at Google and therefore is not comparable on this basis alone to the vast majority of other Directors whose roles require significant people management responsibilities. See Boatright v. U.S. Bancorp, No. 18-cv-7293(LJL), 2020 WL 7388661, at *13 (S.D.N.Y. Dec. 16, 2020) (plaintiff not similarly situated to alleged comparator for purposes of federal equal pay claim where, inter alia, comparator supervised employees and plaintiff had no supervisory responsibilities); Chiaramonte v. Animal Med. Ctr., No. 13 Civ. 5117(KPF), 2016 WL 299026, at *12 (S.D.N.Y. Jan. 22, 2016), aff'd, 677 F. App'x 689 (2d Cir. 2017) (Summary Order) (plaintiff could not sustain equal pay claims under federal and state law because she had oversight over single on-site technician and alleged comparator's responsibilities included overseeing large numbers of employees; "[N]o reasonable jury could conclude that the jobs performed by [comparator] and Plaintiff were substantially equal given the differences in specialization and supervisory responsibilities").

Second, the job content differs from Plaintiff's as well:[8]

- **Directors, PM** manage a team of individuals to develop Google's technology products from inception through development and deployment. (Exh. 17 (Selected & Excerpted Job Descriptions)[9], Job Opening ID 11210.) These employees develop a multi-year roadmap for the deployment of a specific product or products in their relevant product area, and manage the progress against that roadmap on a quarterly basis. (Exh. 18, Deposition of Evren Eryuek ["Eryurek Dep."], 119:14-120:4.) Unlike a Technical Director who is expected to influence engineering teams to adapt products to a broad set of customer needs, a Director, PM "own[s] and drive[s] the product lifecycle from product strategy to go-to-market strategy." (Exh. 17, Job Opening ID 991702.) Given their level of involvement in product development, they have the ability to "cancel or pivot the entire product." (Exh. 16 at GOOG-ROWE-00061526.)

---

[8] Generally speaking, Directors, AE, Directors, SWE, and Directors, PM report to managers other than Will Grannis or Tariq Shaukat, Plaintiff's current and former manager, an additional factor the Court should consider when assessing whether they are similarly situated to Plaintiff.

[9] Exhibit 17 consists of excerpts from a much larger file produced in native Excel spreadsheet format that contains job description information centrally stored in gHire for openings filled by individuals identified in the Snapshots. Google has selected six illustrative examples of job descriptions for the Directors, PM, SWE, and AE roles. Select columns of information for these six job openings have been excerpted from that larger file and reformatted for ease of reference and filing.



PAUL
HASTINGS

The Honorable Gabriel W. Gorenstein
December 23, 2020
Page 6

Plaintiff has never had such responsibilities.  To execute on these tasks, a Director, PM "sets overall priorities for their area, allocating resources across the [Product Area] in annual planning and managing them through the year."  (*Id.*)  There is also a profit-and-loss component to the role; a Director, PM must "make sure that our revenue mark targets and so forth are projected accordingly and we deliver on our expected numbers."  (Eryurek Dep., 120:5-8.)  Nowhere in the Technical Director job description are these responsibilities even mentioned.  (*See also* Lucas Dep., 105:12-107:12, 176:3-179:25.)

• **Directors, SWE** can be either individual contributors or people managers, although Plaintiff draws no distinction between the two.  (*See* Exh. 15 (identifying expectations of Director, SWE role for manager employees); Exh. 19 (Software Engineering Job Ladder for Individual Contributors); *see also* Lucas Dep., 172:20-173:14.)The key responsibility of a Director, SWE is actually writing the code to build Google's products, services, and infrastructure, or (in the case of a people manager) reviewing and approving code written by other engineers.  (Lucas Dep., 107:13-109:16, Exh. 17, Job Opening IDs 5, 654941.)  A candidate for the role must also submit code to be reviewed in the application process.  (Lucas Dep., 174:18-24.)  Plaintiff, in contrast, has not contributed code to Google's products in the entire time since she was hired, nor was she evaluated on her ability to code at hire. (Rowe Dep., 327:15-24.)  A Director, SWE also contributes to Product Requirement Documents, artifacts that define what products the engineer or team will build and how they will build them.  (Lucas Dep., 173:14-19.)  The job ladder lists examples of organizational impact that vary wildly from the expectations of the Technical Director role, including "[e]stablishing innovative new algorithms, libraries, or services that power a range of new products and features," "[d]esigning hardware innovations that power significant parts of Google," and "[m]anifesting new data / signals that significantly increase product quality, reliability, precision/recall, usage, revenue, etc."  (Exh. 19 at GOOG-ROWE-00061506.)  To be sure, some portion of the engineering input skills required for the Technical Director role was be transferrable to a Director-level Software Engineering role, but the similarities account for only one-third of the job content.  The Software Engineering job ladder "doesn't recognize the skills of large-customer advancement and evangelism as [] core valuable pieces of their job description."  (Grannis Dep., 115:15-116:8.)  These substantial differences explain why an individual hired initially into a Technical Director role within OCTO is required to complete the rigorous ladder transfer process to become a Director-level Software Engineer and "lead a production engineering team, something we don't do in OCTO."  (*Id.*, 115:2-14; *see generally* Lucas Dep., 172:20-176:2.)

• The **Director, AE** role currently sits outside the Google Cloud organization, and within the Core System organization in Google.  (Lief Dep., 26:9-27:22.)  The role requires focus on application "support, deployment, implementation of internal systems for Google, managing large programs, and interacting with stakeholders and partners," as well as significant people management responsibility (*Id.*, 80:9-82:2, 125:18-25; Exh. 17, Job Opening ID 967308, Exh. 14.)  These internal systems can be proprietary products built and deployed for internal Google use, or third-party products that are integrated into Google's internal systems.  (Lief Dep., 42:15-21, 134:8-12.)  The Director and his team operate across the entire product lifecycle, starting with deployment, design, testing, and release, and continuing through implementation and enhancement.  (*Id.*, 80:9-81:6.)  Unlike the Technical Director who interfaces with an external C-suite executive with technical experience, the Director, Application Engineer's stakeholder may not have a technical background and is, more often than not, another Google employee.  (*Id.*, 134:13-17; Exh. 17, Job Opening ID 705207, 967308.)  The products they work on are almost exclusively internal to Google and are not marketed or sold to customers; for this reason, the go-to-market strategy required to pitch or sell a product to a Google Cloud customer is not a core component of the Director, AE's role.  (*Id.*)  Where a Technical Director interfaces with a variety of customers (sometimes across multiple industries), the Director, AE is aligned to a specific business operation within Google, like Human Resources, Finance, Marketing or Legal.  (Lief Dep., 134:4-134:17.)



The Honorable Gabriel W. Gorenstein
December 23, 2020
Page 7

> **b.   Plaintiff Has Not Demonstrated She Is Entitled to Discovery Of Information Pertaining to Global Client Leads.**

Plaintiff transferred from OCTO to the organization led by Tariq Shaukat, and she was expected to perform a newly-created Global Client Technical Lead role.  Google has agreed to produce information about individuals identified through testimony as holding the Global Client Technical Lead role.[10]  She is not entitled, however, to discovery relevant to individuals who may have held the Global Client Lead role. Plaintiff represented to the Court that she is "not interested in the level 8 or level 9s in an unrelated role so things like marketing or operations or other types of non-engineering roles."  (Exh. 8 at 7.)  The Global Client Lead role is exactly that; it was a "business development" function. (Exh. 20, Deposition of Tariq Shaukat ["Shaukat Dep."], 95:3-12; Grannis Dep. 147:10-17 (Mr. Shaukat "was building an organization that was in sales, a sales or a business development-like function").  The Global Client Lead role did not require the technology skills and knowledge required of the Global Client Technical Lead.  (Shaukat Dep., 95:3-12.) It makes little sense for Plaintiff to argue that her role is comparable to a traditional Engineering role, like a Director, Software Engineer, because the roles both share overlapping technological expertise and knowledge, but simultaneously argue that she is sufficiently similar to a Global Client Lead, whose business development role requires no technology component at all.

### 4.   Conclusion

Plaintiff has not made a factual showing that she is entitled to comparator discovery for any of the disputed roles.  She has not demonstrated that the work performed by individuals who hold the disputed titles is sufficiently similar to the work that she does.  The Court should deny Plaintiff's request for additional comparator discovery in its entirety.

Respectfully,

Kenneth W. Gage
of PAUL HASTINGS LLP


KWG

cc:      All counsel of record (via ECF)

---

[10] The evidence demonstrates that the Global Client Technical Lead and Global Client Lead roles were nascent concepts articulated in a June 2018 email from Tariq Shaukat.  The only evidence available to identify who may have been placed in these roles (if anyone) is deposition testimony and the recollection of Google's witnesses, as neither is a formal business title reflected in Google's HRIS system.