

Advocates for Workplace Fairness

Cara E. Greene, Esq.
ceg@outtengolden.com

January 15, 2021

**Via ECF:**
The Honorable Gabriel W. Gorenstein
United States District Court
for the Southern District of New York
500 Pearl Street
New York, New York 10007

Re:   *Ulku Rowe v. Google LLC*, Case No. 19-cv-08655 (LGS)(GWG)

Dear Judge Gorenstein:

        We represent Plaintiff Ulku Rowe in the above-referenced matter.  Pursuant to Your Honor's
January 8, 2021 Order (ECF No. 96), Plaintiff submits this Reply and Declaration[1] in opposition to
Defendant's response (ECF 84) to Plaintiff's pre-motion letter (ECF 79).[2] Plaintiff requests that the
Court compel Defendant to produce comparator information related to the Global Client Lead role
and the Eng Director roles, specifically: (1) Application Engineer I & II (Job codes: 3948, 3949);
(2) Director, SWE (Job codes: 8317, 8319); (3) Director, Product Management ("PM") (Job
codes: 5007, 5013); (4) DNU- Director, Software Engineering (Job codes: 3412, 3414).[3]

        Defendant's minimal production of comparator information thus far supports Plaintiff's
motion to compel. Defendant, instead of producing relevant information, including job
descriptions and postings in a format consistent with its prior production for Plaintiff's role,
produced an attorney-created compilation of data. *See* Ex. 1, GOOG-ROWE-00058501. The
spreadsheet excluded significant portions of relevant data, including, but not limited to, the
"preferred qualifications," "minimum qualifications," "requirements," and "description details"
which contained the word "null." (*See* Ex. 1, GOOG-ROWE-00058501). Defendant's further
manipulation of Exhibit 17 (*See* ECF 84, Ex. 17) demonstrates the minimal utility of the
spreadsheet and the dearth of critical, relevant information necessary to Plaintiff's comparator
showing.

---

[1] *See* Declaration of Ulku Rowe, submitted herewith, and which Plaintiff incorporates by
reference in its entirety.

[2] Plaintiff submits a number of the exhibits cited herein under separate cover to the Court, as they
have been marked by Defendant as confidential pursuant to the Protective Order in this case.
Plaintiff has conferred with Defendant and provided Defendant with a copy of these documents.
Defendant has indicated that it intends to move to seal some of these documents and that it
continues to assess its position regarding the confidentiality of other documents.

[3] Plaintiff directs the Court to her pre-motion letter (ECF 79) with respect to the Application
Engineer Director (p. 4) and Global Client Lead (p. 5) roles and focuses on the Eng Director
roles in this reply.

**New York**  685 Third Avenue  25th Floor   New York, NY 10017   Tel (212) 245-1000   Fax (646) 509-2060
**San Francisco**  One California Street  12th Floor   San Francisco, CA 94111   Tel (415) 638-8800   Fax (415) 638-8810
**Washington DC**  601 Massachusetts Ave NW  Suite 200W   Washington, DC 20001   Tel (202) 847-4400   Fax (202) 847-4410

www.outtengolden.com

The Honorable Gabriel W. Gorenstein
January 15, 2021
Page 2 of 6

Further, Defendant's refusal to timely produce other relevant and responsive documents also supports Plaintiff's request. For example, following the first 30(b)(6) deposition of Adam Lief, Google refused to produce the Engineering-wide Leveling Guide (Ex. 2, P001584), even though Mr. Lief testified that hiring managers used that rubric across Engineering positions. Plaintiff herself was forced to search through Google's Magnet system to find and subsequently produce the document to Defendant. Plaintiff requested that Google search for and produce other relevant and responsive policy documents that it had failed to produce. Only then did Defendant produce relevant job ladders for the SWE and PM roles and ladder transfer statements of support - five days prior to the second 30(b)(6) deposition, despite the fact that Plaintiff had requested that information months prior.

Given Defendant's dilatory discovery practices with respect to comparator information, Plaintiff is well-justified in seeking the Court's intervention to compel the following information for compactor information: compensation data, resumes, offer letters, gHire feedback, offer packets, gComp data, and performance reviews (in color). *See Bobo v. United Parcel Serv., Inc.*, 665 F.3d 741, 753 (6th Cir. 2012) ("The refusal of a defendant to disclose requested comparator information denies plaintiff the opportunity to determine whether the evidence actually reveals comparator status and different treatment, critical elements of the claim that the trier of fact must determine.").  Defendant's refusal to produce information of which it alone is in possession unfairly disadvantages Plaintiff and delays the proceedings in this matter.

**The Technical Director Role and the Eng Roles**

Despite Defendant's assertions to the contrary, the Eng roles and Technical Director role are comparable for purposes of New York Equal Pay Law, when viewed as a composite of skill, effort, and responsibility, and performed under similar working conditions. *See* N.Y. Labor Law § 194. The Technical Director role was created in late 2016 within Google Cloud's Office of the CTO ("OCTO"). As Defendant concedes (ECF 84, p. 1), the Technical Director role is comprised of three "pillars:" customer advancement, engineering, and evangelism. (Ex. 3, Grannis Tr. 115:20-25). The Technical Director role requires a "[d]emonstrated ability to understand and advance customers usually in the form of experience—firsthand experiences with Cloud, Cloud migration, second engineering experience sufficient to demonstrate ability to influence engineering groups without authority, and then third demonstrated thought leadership or some form of evangelism." (Ex. 3, Grannis Tr. 51:3-10).

Defendant's attempt to distinguish the job responsibilities and skills of individuals employed as Technical Directors from other Eng Directors is replete with inaccuracies. Specifically, the Technical Director position was scoped as a Level 8-9 position, not a Level 8 as Defendant argues, and, as the job ladder shows, Level 8s and 9s performed the same job duties, responsibilities, and skills. (*See* Ex. 3, Grannis Tr. 35:10-36:6) (noting that the level 8 entry on the job ladder refers to 8+). While Defendant relies overwhelmingly on the deposition testimony of its 30(b)(6) witness, Kevin Lucas, Mr. Lucas admitted that he had never seen the job description for Technical Director, did not know how the position was scoped, how the job description was created, and could not speak specifically as to the criteria and responsibilities, or

The Honorable Gabriel W. Gorenstein
January 15, 2021
Page 3 of 6

employees covered by the position. In fact, Plaintiff's counsel noted on the record that Mr. Lucas lacked sufficient knowledge to testify with certainty about the specifications of the position. (*See* Ex. 4, Lucas Tr. 74:9-78:3).

Further, there is sufficient overlap between all relevant Eng Director roles, including Technical Directors. *See*. e.g. Rowe Decl. ¶¶ 8-25. Defendant makes much of the various job titles assigned to the technical Eng roles performed at Google, however, "it is well established that the presence of differing job titles does not exclude a finding that two jobs are substantially equal for Equal Pay Act purposes." *Rizzo v. Kraus Org.*, No. 10 Civ. 272, 2010 WL 2427434, *3 (E.D.N.Y. 2010). While Technical Directors do not directly build the products Google markets to clients or contribute code, the absence of the job responsibility is simply another similarity shared among Eng Directors. The record shows that no Level 8 or 9 Eng Director would perform such a "hands-on" role. (*See* Ex 5, Eryurek Tr. 116:15-17). Documents and testimony to date reveal that the Technical Director role and the other Eng Director roles were subject to the very same leveling expectations. Specifically, an Eng Director, regardless of ladder, was subject to the same evaluation in terms of "knowledge and experience," "complexity and scope," "leadership and influence," and "organizational impact." (Ex. 2, P001584). Mr. Lucas testified that he was not aware of any differences in leveling between Technical Directors and other Eng Director roles. (Ex. 4, Lucas Tr. 44:5-25). Google also applied the same leadership rubrics across Eng roles throughout the interview process (Ex. 4, Lucas Tr. 133:3-8). Eng Directors moved easily between job ladders; Google valued "internal mobility" within Eng and it was "normal course of business" for directors to "apply for other positions and be accepted for those positions and change organizations as a result of that." (Ex. 6, Shaukat Tr. 88:4-8). Mr. Shaukat testified that there were transferable skills across Eng. (Ex. 6, Shaukat Tr. 88:15-90:5) ("[I]f you can develop software for one area, I think the belief within Google is you can develop software for another area."). Defendant states that transferring between ladders "requires a month-long trial period to determine whether the individual's skills and experience actually are transferable to a new role" (ECF 84, p. 4), thus the ease with which Plaintiff's peers transferred from Technical Directors into other Eng ladders such as PM and SWE demonstrates the relative comparability of the positions.

Defendant's alleged "individual contributor" distinction (ECF 84, p. 2) is also baseless. Mr. Lucas testified that individual contributors and people managers are subjected to the same performance and promotion expectations and that there was no compensation or leveling differences attributable to one's designation as an individual contributor or manager. (Ex. 4, Lucas Tr. 123:13-124:6). The evidence supports that the Eng roles are "substantially similar" under the relevant legal standards at issue, such to justify further discovery into comparability. *See* N.Y. Labor Law § 194 (1). In addition to the points outlined in her pre-motion letter, Plaintiff points to additional evidence which supports her position with respect to particular positions:

**Director, Product Management**

The Technical Director and Product Management Director positions significantly overlap, so as to warrant additional discovery. Both positions required the Directors to have a

The Honorable Gabriel W. Gorenstein
January 15, 2021
Page 4 of 6

deep understanding of Google's products, collaborate with internal and external stakeholders to solve technical problems and translate that to product design and delivery, come up with innovative solutions and products, and set business strategy for a product. *See* Rowe Decl. ¶¶ 24-25. While Defendant relies on the deposition testimony of its 30(b)(6) witness, who could not give basic answers to questions about the Technical Director role, *See* Ex. 4, Lucas Tr. 74:9-78:3, individuals who actually performed in the role testified as to the significant overlap in responsibilities and duties between the two. Importantly, "job content and not job title or description" is the relevant standard under the EPA. *King v. James,* No. 14 Civ. 974, 2016 WL 8715674, *7 (W.D.N.Y. Nov. 18, 2016) (denying Defendant's motion for summary judgment and finding that Plaintiff raised an issue of fact as to whether jobs are substantially equal for purposes of the EPA.)

The overlap in the job duties and responsibilities, according to Ben Wilson and Evren Eryurek, both of whom transferred from Technical Director to PM Director roles, included "identifying AI-related design deployment friction points from customer's perspective," "rallying teams to work through deployment hurdles, product updates, new product offerings, and solutions," working with customers on joint initiatives, collaboration across functional and product area boundaries, deep dives with the internal engineering team, working on cross-Google technical working teams, getting hands-on with customer projects, among others. The PM role also included evangelism, private whiteboarding sessions, and experience with multiple software design methodologies. (Ex. 7, Wilson Tr. 154:12- 159:8; Ex. 5, Eryurek Tr. 116:2-120:16). Mr. Wilson testified that both the Technical Director and PM role involved "identifying gaps in our product lines and features and functions that were missing." Mr. Wilson further testified that his work as a Technical Director involved product management work. (Ex. 7, Wilson Tr. 155:5-17.) Mr. Eryurek testified that his work as a Technical Director involved "product development efforts with the engineers and PMs…" (Ex. 5, Eryurek Tr. 82:19-83:4).

According to Mr. Grannis, Mr. Eryurek's probationary period for the PM Director role was to determine whether Mr. Eryuek's skill set for Technical Director was transferrable to PM Director; ultimately, Google answered that question in the affirmative. (Ex. 3, Grannis Tr. 121:24-122:23). In his statement of support for Mr. Wilson's transfer, Mr. Grannis noted, "I hired him into Google almost three years ago with the idea that he'd help our customers and product teams" and described Mr. Wilson's role as a Technical Director as "a product strategy and CTO like role" (Ex. 8, GOOG-ROWE-00062099). Indeed, the Technical Directors "leverage insights gained from working with external customers to align and influence roadmaps and product development plans across Google Product and Engineering teams" (Ex. 9, GOOG-ROWE-00058501, Job Opening ID 900873). The Technical Director role required candidates to be "at home. . . discussing the technical trade-offs in product development with engineers." *Id.* Diane Greene, the former CEO of Google Cloud, agreed that there was significant overlap in the positions when she noted to Brian Stevens that she met with Mr. Grannis to discuss how the Technical Director role "seems part Product management, part vertical, part product marketing." (Ex. 10, GOOG-ROWE-00058837) (emphasis added). It is clear that there is sufficient evidence to suggest that these roles are substantially similar as to warrant additional comparator discovery.

The Honorable Gabriel W. Gorenstein
January 15, 2021
Page 5 of 6

**Director, SWE and DNU-Director, SWE**

The evidence to date also supports that the SWE Director roles are comparable to the Technical Director role. The Technical Director and SWE Directors both serve as technical leads or advisors on Google technology products that Google Cloud sells to customers: products like databases, networking, and storage. Both roles require Directors to use their expertise to ensure Google products meet the needs of clients. *See* Rowe Decl. ¶¶ 24-25.  Defendant admits that "some portion of the engineering impact skills required for the Technical Director role is transferable to a Director-level Software Engineering role" as engineering accounts for one of the three pillars that comprise the Technical Director position. (Def's Response at 6). The fact that Plaintiff's role included the engineering component in addition to the customer engagement and evangelism does not preclude the SWE Director from being a comparable role. *See Riser v. QEP Energy*, 776 F.3d 1191, 1197 (10th Cir. 2015) ("the fact that a female employee performed additional duties beyond a male comparator does not defeat the employee's prima facie case under the EPA.") (citing 29 C.F.R. § 1620.14(a)). This is especially true when applying the New York Equal Pay Law standard of comparability as a composite of skill, effort, and responsibility, and performed under similar working conditions. *See* N.Y. Labor Law § 194.

Mr. Lucas testified that the skills necessary for a SWE Director involved coding ability, consistent with the skills necessary for the Technical Director role, which looked for candidates who "probably started as a software engineer, data scientist or algorithmic trader" ((Ex. 4, Lucas Tr. 174:18-24), Ex. 11, GOOG-ROWE-58501, Job ID 720171)). While Mr. Lucas testified that the bulk of SWE Directors' time was spent on coding or approving code, his testimony is contradicted by Google's own job ladder, which does not include coding as a primary duty for SWE Directors. (*See* Ex. 4, Lucas Tr. 172:20-10, Ex. 12, GOOG-ROWE-00061497); *see* 29 C.F.R. § 1620.15(a) ("equal skill is defined as including "such factors as experience, training, education, and ability," as measured "in terms of the performance requirements of the job" at issue) (emphasis added).

Mr. Grannis testified that at least some of the skills, specifically the engineering component of the Technical Director role, were transferable from the Technical Director to SWE Director role. (Ex. 3, Grannis Tr. 115:15-18, 122:7-13). Specifically, OCTO was "heavily index[ed] towards engineering" and had "many, many hiring steps around validating technical skills." (Ex. 3, Grannis Tr. 146:22-147:9). Plaintiff herself was interviewed by a SWE Director for the Technical Director role. (*See* Rowe Decl. ¶¶ 7). Moreover, one of the Technical Director job postings was identified as "software engineering" under the job role category and all contained "engineering". (*See, e.g.,* Ex. 13, GOOG-ROWE-58501, Job Opening ID 726132). The Technical Director ladder also includes software engineering and coding as a "knowledge and experience" requirement. (Ex. 14, GOOG-ROWE-00061495). Furthermore, the DNU- SWE Director required skills in candidates that are consistent with all three Technical Director pillars, such as "deep expertise in industry best practices for Sales, . . . strong software engineering and product development background, to ability to drive business transformations." Moreover, the role also required candidates to "have a passion for identifying technical solutions for business problems and a track record in delivering innovative systems, rooted in user experience research and engineering excellence." (Ex. 15, GOOG-ROWE-58501, Job Opening ID 1016358). While

The Honorable Gabriel W. Gorenstein
January 15, 2021
Page 6 of 6

Defendant claims a "rigorous transfer process" is necessary to move into the SWE ladder (Def's Response at 6), Google advocated for Plaintiff's peer to move from a Technical Director to SWE Director without an interview. (Ex. 16, GOOG-ROWE-00058806).

      For the reasons set forth herein and in Plaintiff's pre-motion letter, Plaintiff requests that the Court order Defendant to produce responsive information for individuals in the aforementioned positions, in both Level 8 and Level 9, including, but not limited to compensation data, resumes, offer letters, gHire feedback, offer packets, gComp data, and performance reviews (in color).

      Respectfully submitted,

Cara E. Greene

c:     All counsel of record via ECF