```
                    UNITED STATES DISTRICT COURT
                    SOUTHERN DISTRICT OF NEW YORK


In re:                               :
                                          Docket #1:19-cv-08655-
 ROWE, ULKU,                         : LGS-GWG

                    Plaintiff,       :

   - against -                       :

 GOOGLE LLC,                         : New York, New York
                                       February 3, 2021
                    Defendant.       :
                                       TELEPHONE CONFERENCE
------------------------------------ :


                   PROCEEDINGS BEFORE
         THE HONORABLE JUDGE GABRIEL W. GORENSTEIN,
              UNITED STATES MAGISTRATE JUDGE

APPEARANCES:

For Plaintiff:          OUTTEN & GOLDEN, LLP
                        BY:  CARA ELIZABETH GREENE, ESQ.
                             MAYA JUMPER, ESQ.
                             SHIRA GELFAND, ESQ.
                        685 Third Avenue, 25th Floor
                        New York, New York 10017
                        212-245-1000
```

Transcription Service:  Carole Ludwig, *Transcription Services*
                        155 East Fourth Street #3C
                        New York, New York 10009
                        Phone:  (212) 420-0771
                        Email:  Transcription420@aol.com

Proceedings conducted telephonically and recorded by
electronic sound recording;
Transcript produced by transcription service

APPEARANCES CONTINUED:

For Defendant:                PAUL HASTINGS LLP
                              BY:  SARA BRADY TOMEZSKO, ESQ.
                              200 Park Avenue
                              New York, New York 10166
                              212-318-6000

                              PAUL HASTINGS LLP
                              BY:  KENNETH WILLIAM GAGE, ESQ.
                              191 North Wacker Drive 30th Floor
                              Chicago, Illinois 60606
                              312-499-6046

## INDEX

### E X A M I N A T I O N S

| Witness | Direct | Cross | Re-Direct | Re-Cross |
|---------|--------|-------|-----------|----------|
| None    |        |       |           |          |

### E X H I B I T S

| Exhibit Number | Description | ID | In | Voir Dire |
|----------------|-------------|----|----|-----------|
| None           |             |    |    |           |

```
 1                        PROCEEDINGS                    4

 2            THE CLERK:  In the matter of Rowe v. Google, LLC,

 3   docket number 19-cv-8655.

 4            Counsel, state your names for the record, please,

 5   starting with the plaintiff.

 6            MS. CARA GREENE:  Cara Greene of Outten & Golden

 7   for the plaintiff, Ulku Rowe; and together with me today is

 8   Maya Jumper and Shira Gelfand, also of Outten & Golden.

 9            MR. KENNETH GAGE:  For Google, this is Kenneth

10   Gage from Paul Hastings. And also on the line for Google is

11   Sara Tomezsko.

12            MS. SARA TOMEZSKO:  And Elliot Fink, as well, from

13   Paul Hastings.

14            MR. GAGE:  Oh, my apologies.  Elliot Fink, your

15   Honor, is a new associate. He just started. He does not

16   have an appearance, but he is observing.

17            HONORABLE GABRIEL W. GORESNSTEIN (THE COURT):

18   All right, we're here based upon two applications. One is

19   for discovery, Docket 79; and the other is a motion to file

20   a supplemental pleading. We'll start with the discovery

21   dispute.

22            I guess I would like a little bit of the big

23   picture here in terms of -- and maybe I need to get it from

24   the defendant. I'm trying to understand what -- I'd like to

25   understand more about burden before we get to relevance. So
```

```
 1                          PROCEEDINGS              5

 2   your letter really didn't articulate any, well, at least

 3   not specifically.  And it may be that that's not your main

 4   argument, but I want to just get an answer to that

 5   question.

 6             MS. TOMEZSKO:  Sure, your Honor.  And this is Sara

 7   Tomezsko from Paul Hastings on behalf of Google. The

 8   discovery that plaintiff is requesting here is for, you

 9   know, approximately 300 people at Google in various

10   positions that we would argue --

11             THE COURT:  I'm surprised to hear the number 300,

12   only because your letter said 200. It did say over 200, but

13   I didn't realize it was that high.

14             MS. TOMEZSKO:  Right. So we said over 200. At that

15   time we were sure that there were over 200. We have since

16   gone back and recalculated to get a more exact number, and

17   it is closer to about 300 people.

18             But to answer your particular question about

19   burden, your Honor, the documents that they are requesting

20   and the information they are requesting for these

21   individuals is stored in several different places at

22   Google. We have asked the client to articulate, okay, if we

23   were going to get this information, what would it entail

24   and how long would it take. So the most burdensome item to

25   collect would be workday profiles which demonstrate the job
```

```
 1                          PROCEEDINGS                    6
 2   history for these people and their compensation history,
 3   which falls into a couple of buckets of documents and
 4   information that they have requested and also Perf, so
 5   their performance reviews across the time when they held
 6   these alleged similarly situated positions and G-Hire
 7   Dossier data. Now, the G-Hire Dossier, just so your Honor
 8   has context, would illustrate the positions that these
 9   people applied for or interviewed for and the feedback that
10   they received on their qualifications for the role.  That
11   will take us --
12          THE COURT:  For the particular job at issue or in
13   their entire lives?
14          MS. TOMEZSKO:  It's difficult, if not impossible,
15   to isolate just the information for the particular job at
16   issue, unfortunately.  And so the way the data is stored
17   and the way the data would have to be pulled necessarily
18   requires that it would be the entire length of time that
19   they have sought a position at Google. We're unable, at
20   this point, to isolate just the particular job at issue.
21          THE COURT:  Okay. Were you done or --
22          MS. TOMEZSKO:  No, I just wanted to add that we're
23   going to have to get this from multiple places, access
24   multiple teams at Google to pull the information.  And for
25   this number of people, it would take a minimum of 30 days
```

1

2  to collect, perhaps more.  And that's if the people on the

3  ground are putting in a substantial amount of their workday

4  to actually do the collection and review.

5          THE COURT:  Okay. I mean, I guess, you know, I'm a

6  little surprised it's of that level of burden.  And maybe

7  you can tell me some aspects are more burdensome than

8  others.  But all the email I understand when you need to

9  charge to search terms and engines and so forth -- I'm

10  sorry -- search terms and culling and often, you know,

11  privilege issues and so forth. This stuff doesn't seem to

12  involve any of that. It's just a question of pulling them

13  out and -- but probably not terribly voluminous, I don't

14  know. Some of it may be perhaps beyond relevant. I'm not

15  sure why someone's personal history at other jobs or

16  applications they made to other jobs would have any bearing

17  on this. And maybe there's some way to reduce it. But it's

18  sort of hard to understand why it could be characterized as

19  being burdensome.

20          MS. TOMEZSKO:  Well, the way the data is stored in

21  the traditional course, your Honor, it's not normally

22  stored as a document that we could easily find and pull

23  from the shelf. It is stored in what's called the G-Hire

24  system most of the time, depending on what we're talking

25  about here.  So let's just focus on the dossier data, which

```
 1                        PROCEEDINGS                8
 2   would say for the positions that we're talking about, the
 3   interview feedback that they got and their assessment of
 4   the qualifications for the role, right.
 5              THE COURT:  Can I just -- can you stop right
 6   there? Because I'm not sure I'm following this. Let me try
 7   to put it in my terms, and you tell me where I got it
 8   wrong.
 9              MS. TOMEZSKO:  Sure.
10              THE COURT:  What I understand is that there are
11   certain job codes -- I'm probably using the wrong word --
12   but they had a four-digit code associated with them. There
13   are certain people who, in the right time period, occupied
14   that code. And that's a finite number of people, and you
15   tell me it's [indiscernible] or whatever it is.  But for a
16   particular -- so if the plaintiffs are now looking to that
17   person and trying to [indiscernible] with them, it seems to
18   me she needs to know what he's supposed to be doing on that
19   job, certainly; needs to know the salary; needs to know the
20   content and the salary. But I don't understand why she
21   would need to know where that incumbent, where that person
22   had -- if that's what you're talking about -- had applied
23   to other positions in his life at Google and how people saw
24   him -- [indiscernible] and how people saw him or perceived
25   him to be qualified for those other positions.
```

```
 1                      PROCEEDINGS              9
 2           MS. TOMEZSKO:  Well, I would say there's two
 3   responses to that question, your Honor. Number one is we
 4   would agree with you that the other positions that they
 5   applied for that are outside the scope of the positions for
 6   which they're requesting information are not relevant here.
 7   Unfortunately, the way that the data is stored is such that
 8   we can't separate their qualifications as they were
 9   reviewed in the interview process for the roles that
10   plaintiff is seeking from anything else. When it's
11   exported, it's exported as one.
12           THE COURT:  I see.
13           MS. TOMEZSKO:  And we could talk about, you know,
14   whether redactions are necessary or not, but that is
15   essentially the process for how the data will be exported
16   in terms of it being collected.
17           Now, why they need that data --
18           THE COURT:  And could I just understand, you know,
19   unlike email review, which requires a lot of judgment, why
20   isn't this a question essentially of someone, you know,
21   pushing buttons and having things be spit out? What
22   judgment has to be brought to bear in producing these
23   documents? That's what I don't understand.
24           MS. TOMEZSKO:  I don't know if it's a question of
25   judgment; I think it's a question of mechanical process.
```

1                              PROCEEDINGS                    10

2   So do they -- well, first of all, it's not as simple as,

3   you know, pushing a button because the data is raw data.

4   Right? In order to get it into a format where it looks

5   like, you know, a PDF, similar to the way it was produced

6   for plaintiff and other technical solutions consultants is

7   an additional step.  But if we're going to do it manually

8   for 300 people, that's 300 times you have to push the

9   button. Alternatively, we can ask the team over at Google

10  to write a code, essentially, that says, like, we're

11  looking for these people, collect this data from the G-Hire

12  system, the raw data as it is stored in the back end.  And

13  then that process takes time to actually run, and then the

14  results need to be validated to make sure it worked

15  accurately. So that's --

16             THE COURT:  Okay. That sounds better than someone

17  pushing 300 buttons, writing a program to do it, I agree.

18             MS. TOMEZSKO:  Exactly.

19             THE COURT:  Go ahead.

20             MS. TOMEZSKO:  But to return to your other

21  question about why they need the data that they're

22  requesting here for the G-Hire dossiers and things like

23  that, I would respectfully say that that's probably a

24  question for plaintiff, as it is within the scope of the

25  documents that they requested. If we were ordered to

1                              PROCEEDINGS                    11

2    produce that, I just described to you, you know, the burden

3    that would be associated with the collection; but, as you

4    might imagine, our position is that they don't necessarily

5    need it. But it is what they asked for, so I was responding

6    to the scope of discovery that is being sought here.

7              THE COURT:  Yes. I didn't want to take you down a

8    road that's really not what I'm trying to get at because if

9    some irrelevant data is produced, that's not my problem.

10   What I was trying to figure out is if we narrowed the

11   document request, would there be some easier way to do it.

12   And it sounds like there is no narrowing other than lopping

13   off job codes and titles; there isn't a way to make the

14   production easier for you once -- if I were to order as to

15   any specific titles, is that a fair thing to say?

16             MS. TOMEZSKO:  I think it is fair, your Honor.

17   And we have been focusing specifically on the G-Hire data.

18   But I would also note for the compensation data, I mean,

19   that is stored in a couple of places. It could be stored in

20   G-Comp.  And, again, that is -- it's similar to the G-Hire

21   system in which that exists as raw data.  And so we would

22   have to either press that button 300 times, to use the

23   analogy I used before, or write code. But the equity

24   portion of the compensation, which is also something that

25   plaintiffs are seeking, we have to go to a different source

1                            PROCEEDINGS                    12

2  to get that.  And that's not as easy to collect because we

3  would have to say, you know, we need the information for

4  these people, their equity account summaries, the equity

5  that they were granted, the vesting date, and whether any

6  of it was withheld.  And that is a little bit more of --

7  it's not as easy a process as writing a code, necessarily,

8  to pull that data from the back end of a system in which

9  it's stored in the ordinary course as raw data.

10          THE COURT:  All right. Let me turn to plaintiff,

11  just on this sort of related topic before we get to other

12  parts of this. So let me ask the plaintiff -- and,

13  Ms. Greene, you're speaking for plaintiff?

14          MS. GREENE:  Yes, your Honor.

15          THE COURT:  Okay. If I allow any of this to

16  proceed and I allow you to get documents, are we done; or

17  are you expecting depositions or more or what happens?

18          MS. GREENE:  No, your Honor, at this point in

19  time, this is the last remaining issue with respect to

20  discovery, and we're not anticipating seeking additional

21  depositions in response to the production.

22          THE COURT:  Okay. All right. So I guess we should

23  get a little bit into the substance.

24          MS. GREENE:  Your -- I'm sorry.

25          THE COURT:  Go ahead.

```
1                          PROCEEDINGS                    13

2              MS. GREENE:  I was wondering if I may just briefly

3    note that Google has produced the data that we're seeking

4    with respect to other individuals that they have agreed are

5    comparators.  So they know what information exists, they

6    know how to get this information. In many respects, the

7    burden is so minimal because of Google's method of having

8    systems where the information is stored. It has a

9    compensation information where all this is, it has a hire

10   system where it retains all this information. So here,

11   really, the burden, it is quite minimal.

12             MS. TOMEZSKO:  If I may respond to that, your

13   Honor?

14             THE COURT:  Sure.

15             MS. TOMEZSKO:  As you might imagine, I disagree

16   with Ms. Greene's assessment. The burden is as we

17   described. You know, whether that's minimal in plaintiff's

18   view or not, the burden is what the burden is; and it's the

19   mechanical process I just described. We do not agree that

20   all of the people for whom we produced information are

21   comparators. We did produce information for those

22   individuals -- and this includes people who are technical

23   solutions consultants -- the job that Ms. Rowe, the

24   plaintiff, holds at Level 9.  And we understand that there

25   is a dispute amongst the parties as to whether those are
```

```
 1                        PROCEEDINGS                   14
```

 2  truly comparable positions, and we know that we're going to

 3  have to hash that out on motions for summary judgment, but

 4  we agree that there is at least enough similarity to make

 5  the information discoverable.

 6          It also includes Global Technical Client Leads,

 7  which is one of the positions that is raised initially in

 8  plaintiff's letter motion.  And so we have produced data

 9  for that small number of people. I think it's, you know,

10  between 28 and 30.  But the reason that we have produced

11  that information in the format that we has is that was a

12  small subset. It's a lot easier to create it and present it

13  in a way that's easily digestible in a PDF format because

14  it's a small number. If we're required to do that for, you

15  know, 300 people, that's a much, much greater burden to

16  actually present it in that format.  So I don't think it's

17  accurate to say that it is stored that way and there's

18  minimal burden associated with producing it that way,

19  particularly when we're talking about the number of people

20  at issue here.

21          THE COURT:  Well, let's talk about numbers a

22  little more. I think, you know, burden is part of the issue

23  here.  And it's a little jarring to have, you know, a

24  change from 20 comparators to 300 comparators. I mean,

25  that's not, in my experience in equal-pay cases -- we don't

```
 1                        PROCEEDINGS                  15
 2   get that many of them, but I've had enough -- I mean, the
 3   numbers of comparators that are trying to be fit into this
 4   universe is kind of off the charts. So I'd like to
 5   understand -- and it may help me in paring this down -- to
 6   understand the numbers that go with each of these different
 7   codes. I don't know -- I hate to spring this on you -- does
 8   someone here -- I guess it's the defendants who would have
 9   the answer to this question, if I start going through --
10   I'm trying to think -- I can either use your letter or
11   their letter.  They group this into five pieces,
12   Application Engineer 1 and 2 through job codes, and then
13   Director SWE, Director of Product Management, BNU Director,
14   and then finally, the Global Client Leads, can you
15   associate numbers with each of those five categories?
16             MS. TOMEZSKO:  Your Honor, I don't have exact
17   numbers right now. I can certainly provide them if given
18   time to look at the data.  But what I can tell you is
19   Global Client Leads, smallest amount.  And that's because
20   of the nature of the role, right? It was conceptualized in
21   June of 2018, and we can't go into Google's HRIS system and
22   look for that job title because it's not a job title that
23   is necessarily stored in that system. Its something of a
24   business title whereby someone's job title is something
25   else but they call themselves a Global Client Technical
```

1

2  Lead. So for that --

3          THE COURT:  Well, didn't I read somewhere that

4  someone identified seven of them, or was that something

5  else?

6          MS. TOMEZSKO:  No, I think you did read somewhere

7  that -- and I think that was in plaintiff's letter, if I'm

8  not mistaken -- plaintiff can confirm.  But that's taken

9  from recollection of witnesses who were deposed on that

10  particular issue, because that's the best source of

11  information for just determining who actually held that

12  position.

13          THE COURT:  Right. And that may be perfectly

14  satisfactory, from my point of view, if that's the best way

15  to do it.  Anyway, so that's probably --

16          MS. TOMEZSKO:  That's the smallest

17          THE COURT:   -- in the range of seven. How about

18  these other categories?

19          MS. TOMEZSKO:  The largest group by far is

20  Software Engineers and Directors of Software Engineer. I

21  apologize; I don't have the exact number at my fingertips

22  right now, but I would say that it's -- I don't want to say

23  half, but it's roughly -- you know, I would say it's a

24  majority of the people on the list. I think the second

25  highest is probably Product Manager and the Director of

```
 1                        PROCEEDINGS                  17
 2   Product Manager roles with Application Engineering being a
 3   close follower to that; but I would say the overwhelming
 4   number of the people that we're talking about are Software
 5   Engineer Directors.
 6              THE COURT:  You skipped Director SWE, and that's
 7   the --
 8              MS. TOMEZSKO:  Oh, I'm sorry, yes.  That is
 9   synonymous with Software Engineering Directors. It's
10   referred to as Director SWE, Software Engineer.
11              THE COURT:  Oh, so what about DNU Directors?
12              MS. TOMEZSKO:  DNU is essentially like the same
13   position as a Software Engineer Director, but the DNU
14   indicates that it is a code that is no longer used at
15   Google. So this was someone who perhaps during the period
16   of time that we're talking about still acts as a Software
17   Engineer Director but their job code has been deprecated.
18   So they filled that job code much earlier than the time
19   period at issue here and they're still in it but do not use
20   or DNU indicates that as of, you know, the date that it was
21   deprecated, no one is actually stepping into that job code
22   anymore.  So that is a small number of people as compared
23   to the rest of everyone else.
24              THE COURT:  How many in the Application Engineer
25   role, do you know?
```

```
 1                          PROCEEDINGS                    18

 2            MS. TOMEZSKO:  I, unfortunately, don't have that

 3   number offhand.

 4            THE COURT:  Okay. I've sprung this on everyone.

 5            Well --

 6            MS. TOMEZSKO:  I would like to be able to tell

 7   you, your Honor, but --

 8            THE COURT:  No, I understand.

 9            You know, this is the worst possible forum in

10   which to make these judgments because this is discovery;

11   this is not a Motion for Summary Judgment on comparatives.

12   And, you know, I've read your letters, and it doesn't seem

13   like plaintiff has a strong case with any of these

14   [indiscernible]. But that doesn't mean that -- it was

15   presented in a sufficient forum in the letters because this

16   wasn't a Motion for Summary Judgment. I don't think that

17   everything possible out there was marshaled, and it was

18   very hard to get a good understanding. And I'm very loath

19   to try to figure this out in the context of a discovery

20   motion, which is why, you know, burden is so important.

21            On the other hand, the numbers, to me they're just

22   through the roof in terms of comparators. And now that I

23   know there's at least some burden associated with this, you

24   know, the notion of getting data on 300 people is not

25   acceptable. But I would like to try another way to handle
```

```
 1                        PROCEEDINGS                  19
 2   this; and if people tell me it's impossible, then I'll have
 3   to do something else. My thought is to put plaintiff in the
 4   driver's seat and say I'm prepared to give you a certain
 5   number additional, and the number I have in my head is 50,
 6   which I think is an extremely generous number, and say you
 7   know what, you figure out how to do this. You can tell them
 8   to randomly select among a code, you can give them specific
 9   names, you can do whatever you want, but you can't make
10   them go down this road for more than 50 people. And also on
11   the understanding there's no further discovery beyond the
12   things that are requested here.  And also, if there's some
13   particularly burdensome aspect that gets identified as to
14   some particular individual or code or whatever it is, the
15   defendants will have the right to come back to me.
16              So turning to the plaintiff now, I'm not asking
17   you to say you agree with the ruling, but do you -- are you
18   going to have a mechanism to get this to 50? And if not, I
19   can try to figure out a way to do it.
20              MS. GREENE:  Yes, your Honor. I believe that, you
21   know, looking at the information we have thus far, there's
22   a way that we could get to that across the different job
23   codes that we've identified.
24              THE COURT:  Okay. All right, well, that's my
25   ruling, then.  Any questions about it before we move to the
```

```
 1                          PROCEEDINGS                    20
 2   next thing; any questions from defendant's side?
 3               MS. TOMEZSKO:  Yes, your Honor. I just want one
 4   point of clarification, and I think it addresses a
 5   materially substantive issue here in terms of which jobs
 6   we're actually going to be targeting for collection. One
 7   point that we made in our letter is in response to
 8   plaintiff's argument that the jobs are in a sense fungible
 9   because they're easily transferrable from one job ladder to
10   the next.  And what I wanted to highlight here, and I think
11   it's particularly relevant for selecting a subset of jobs
12   is that in the three instances that plaintiff presented in
13   terms of someone transferring from a Technical Solutions
14   Consultant role to either a project management role or a
15   software engineering role, these are three individuals who
16   are at Level 9; and upon transfer, they were down-leveled
17   in their new ladder to a Level 8.  And --
18               THE COURT:  Can I give you another way to look at
19   this?
20               MS. TOMEZSKO:  Sure.
21               THE COURT:  The more irrelevant comparators they
22   select in their group of 50, the better for you.  So if you
23   tell me to take out these people, they're going to
24   substitute them with three other people, and then you're
25   going to be in a worse position. What do you think?
```

1                          PROCEEDINGS                    21

2              MS. TOMEZSKO:  Well, I'm not necessarily saying

3    that they should take out those three people.  The reason I

4    highlighted it is because we don't -- like, we're concerned

5    as to getting the relevant data here, as well, right? Like,

6    so we're not trying to lead plaintiff down a route where

7    she's requesting irrelevant data; but I think it is a

8    relevant fact that when someone transfers into these roles,

9    they're generally down-leveled.  So to the extent that

10   we're looking at jobs to consider here and individuals or

11   perhaps, you know, a subset of individuals in each job

12   ladder, it's probably fair to say that we should be looking

13   only at Level 8 in those project management role, in the

14   software engineer role, or, you know, the Application

15   Engineer role because in no reality is a Level 9 individual

16   in those roles comparable.

17             THE COURT:  Well, you didn't answer my point.

18             MS. TOMEZSKO:  The point being that --

19             THE COURT:  Why isn't it good for you if she uses

20   up three of her selections on these Level 9 people?  That's

21   good for you.  She's wasted three of her --

22             MS. TOMEZSKO:  I mean, it can be -- right, but

23   then we'd have to be arguing about those people on summary

24   judgment, and --

25             THE COURT:  Right. I don't want to have that

```
 1                        PROCEEDINGS                    22
```

2   argument here; I want you to have it on summary judgment.

3   That's my point.

4           MS. TOMEZSKO:  If that's how your Honor wants to

5   proceed, I am completely fine with that. I just wanted to

6   throw this out there as a consideration to possibly

7   further, maybe even between the parties, limit how we do

8   this and see if your Honor found some value in directing

9   the parties to limit it in that way.

10          THE COURT:  Yes, I'm really looking at this as an

11  effort to not make these decisions in the context of a

12  discovery motion.  And it seems to me the defendant's

13  interest is in not being burdened on discovery -- right now

14  that's their interest, at least.  And I've solved it by

15  vastly cutting down the request, and it's no more

16  burdensome to search for the documents on these Level 9

17  people, the pre-Level 9 people, than it is for anyone else.

18  So I'm just putting this off to the summary judgment. I

19  mean, if this becomes -- you know, I suspect that Judge

20  Schofield has limits on pages of summary judgment motions,

21  and the plaintiff's going to have to make some decisions

22  about what comparators she's willing to, you know, try to

23  shoot for.  And maybe you'll persuade them, you know,

24  outside of this phone call that this is not the way they

25  want to go.  But if they decide to go that way, they will

1

2  have, in a sense, wasted something in your view by focusing

3  their effort on that. So I'm going to adhere to the

4  decision.

5          Any other questions about the decision from

6  plaintiff's side?

7          MS. TOMEZSKO:  Just one clarifying question. And

8  understood on your point that we just discussed. I just

9  want to make certain that the order is that we produce all

10 of the information that plaintiff has requested for these

11 50 people that they pick, or are there limits being placed

12 right now on the --

13         THE COURT:  There's nothing being replaced right

14 now.  What I said was they pick the 50; they should do it

15 as soon as possible, and then you should produce the

16 requested documents. However, I'm letting you come back to

17 me on burden. If it turns out that if [indiscernible]

18 something else, that it's just too burdensome, then you are

19 absolutely welcome to come back to me, because I don't

20 think that we've been able to flesh that out enough now.

21 And I'd rather have a discussion between the parties about

22 it once I've set parameters for how many people we're

23 talking about.  And there's a different argument on burden

24 when we're talking about 50 people than talking about 300

25 people.  So the presumption is yes, produce everything; but

```
 1                        PROCEEDINGS                    24
 2   if there's a burdensome issue, you should talk about it
 3   with the plaintiffs.  And if you think you've got it --
 4   have a good shot with me because it truly is, you know, a
 5   burden that Google cannot possibly bear or should not be
 6   required to bear, then you're welcome to come back to me.
 7             MS. TOMEZSKO:  Understood.  Thank you for the
 8   clarification, your Honor.
 9             THE COURT:  Okay.  Any questions from plaintiff's
10   side?
11             MS. GREENE:  None from plaintiff.
12             THE COURT:  Okay. Let's move [indiscernible].
13             MS. GREENE:  Ms. Jumper will be handling this
14   argument, your Honor.
15             THE COURT:  Okay. [Indiscernible]
16             MR. GAGE:  Your Honor, are you still there? You're
17   breaking up.
18             THE COURT:  Could the plaintiff's counsel spell
19   the last name? It's not in the letter.
20             MS. MAYA JUMPER:  Sure. Yeah, it's Jumper, J-u-m-
21   p-e-r.
22             THE COURT:  Okay.  And --
23             MS. JUMPER:  And I'm also having a little bit
24   of -- okay, I can hear you now.
25             THE COURT:  Okay. I'm going to try to speak up.
```

```
 1                      PROCEEDINGS                25
 2   And who's speaking for defendant?
 3             MR. GAGE:  Your Honor, this is Ken Gage. I'll take
 4   this motion.
 5             THE COURT:  Okay. All right, well, it's -- well,
 6   let me start with the same question. If you get this claim
 7   in, am I to understand from the plaintiffs that that's it,
 8   you're not seeking any further discovery?
 9             MS. JUMPER:  That's correct at this time, your
10   Honor.
11             THE COURT:  Okay, well, you say "at this time." If
12   I allow it, that's it; I mean, you're not going to get
13   anything further.  Now, whether I allow the defendant to
14   redepose the plaintiff is another question, but I just
15   wanted to understand what the prejudice argument is.
16             All right, so from defendant's point of view,
17   your prejudice is that you feel you would have to redepose
18   the plaintiff?
19             MR. GAGE:  That's correct, your Honor.
20             THE COURT:  All right, so now we have to balance
21   that -- I mean, let me just address utility. I'm not, at
22   this stage, going to find it's futile. I don't know that
23   you have to go through a formal application process in
24   order to make a claim like this.  So we're left with -- I
25   don't see any bad faith, either -- we're left with undue
```

 1

 2   delay. So why don't I hear from plaintiff on that and then

 3   on defendant -- hear from the defendant?

 4              MS. JUMPER:  Sure, your Honor. So plaintiffs have

 5   moved under Rule 15(d), which allows a party to serve

 6   supplemental pleadings, setting out any event that's taken

 7   place after the filing of the pleadings here.  And that's

 8   what's occurred. In February of 2020, plaintiff was the

 9   subject of retaliatory action; and as a result of that

10   action, we took steps to further undertake discovery and

11   have set forth claims of retaliation arising from that

12   conduct. It's our position that plaintiff has moved

13   promptly to not only notice those potential retaliatory

14   claims to defendant, but that defendant was also aware of

15   them far in advance of the filing of the motion.

16   Plaintiffs have, since the beginning of discovery, made the

17   VP of Sales role a part of their requested discovery, and

18   that's acknowledged in numerous exchanges between

19   plaintiff's counsel and opposing counsel, one of which was

20   exemplified or attached as an exhibit to defendant's

21   opposition, where in October of 2020, defendant essentially

22   forecasted future retaliation claims arising from that

23   conduct.

24              Furthermore, it's our position that defendant was

25   also on the email correspondence --

```
 1                       PROCEEDINGS                    27

 2             THE COURT:  I'm sorry, what did you mean by

 3   "forecasted"?  I couldn't quite follow that.

 4             MS. JUMPER:  Sure. So, in Exhibit A of defendant's

 5   opposition, there's a statement that says, "It seems to us

 6   that the only documents relevant to any retaliation claim

 7   Ms. Rowe might assert with respect to this opportunity

 8   would be limited to her candidacy only." So in that

 9   articulation or assertion, defendants essentially have

10   forecasted that a potential retaliation claim might be

11   forthcoming.

12             And so, you know, defendant's argument that these

13   retaliation claims were coming out of nowhere or that they

14   weren't noticed of them is just simply belayed by the

15   record.

16             And, you know, further, in terms of undue delay,

17   you know, the Court's jurisprudence is pretty clear that,

18   you know, mere delay, even if the Court were to consider,

19   you know, the nine months that elapsed to be unduly or to

20   represent or constitute undue delay, the case law says that

21   mere delay is not sufficient grounds to deny a supplemental

22   request alone.

23             THE COURT:  I think, you know, part of their

24   contention is that you had everything you needed, at the

25   latest, in July, when you learned about, I think, whatever
```

```
 1                        PROCEEDINGS              28
 2   that entry was being made in the system characterizing the
 3   plaintiff in this unfavorable, what you view as an
 4   unfavorable way. So there was a six-month delay, it seems.
 5   I would say it seems measurable from July, not October.
 6            MS. JUMPER:  Well, it's also plaintiff's position
 7   that the deposition of Stuart Vardaman was essential to
 8   plaintiff's ability to fully lay out her new allegations.
 9   The information that plaintiff wanted to discover and
10   glean from that deposition go clearly to developing
11   plaintiff's prima facie case for retaliation primarily to
12   the factors of retaliatory motive or animus.  And so it's
13   our position that it was not until after the deposition of
14   Stuart Vardaman that plaintiffs were able to fully
15   understand the universe and fully understand all the
16   details of the alleged conduct to be able to put forth a
17   detailed allegation for the Court.
18            THE COURT:  All right. I'll hear from defendant on
19   this.
20            MR. GAGE:  Thank you, your Honor.  And I
21   appreciate that your Honor is rejecting our futility
22   argument, but I think it's relevant to the question you
23   asked about delay to look at the allegations in the
24   operative Complaint regarding retaliation compared to these
25   supplemental allegations. And there's a stark contrast. We
```

1                              PROCEEDINGS                      29

2   were on notice of the allegations in the operative

3   Complaint where the plaintiff alleged that she sought this

4   VP of Financial Services job that lesser-qualified external

5   finalists were being considered, she alleged. She alleged

6   in her operative Complaint that a less-qualified man was

7   selected for the job.  She alleges that Google did not

8   follow its normal procedures in filling that job. And she

9   alleges that these things happened in retaliation for her

10  complaints.  Those are in the operative Complaint.  That's

11  what we were on notice of, and we had to explore all of

12  those things in her deposition.

13          When you contrast the specificity there with the

14  proposed supplemental allegations -- again, we don't even

15  believe the supplemental allegations rise to a plausible

16  claim of retaliation.  All they add is that the recruiter,

17  who was involved in that VP of Financial Services search in

18  2018, was interviewed by Employee Relations in 2020.  They

19  allege in the supplemental allegations that he thought she

20  was cantankerous.  They allege that she asked him

21  thereafter for the job description of this sales position.

22  They allege that he gave it to her.  They allege that she

23  was interested in the job, and they allege that she wasn't

24  considered.  And that doesn't even plausibly rise to the

25  level of a retaliation claim.

```
 1                        PROCEEDINGS              30
 2              But, again, I recognize your Honor's view on the
 3  futility argument, but we didn't have notice of this until
 4  after her deposition. And, frankly, your Honor, this
 5  plaintiff claims that she's comparable to upwards of 300
 6  other people.  We had our work cut out for us in seven
 7  hours. And so, yes, I asked her some questions about this
 8  job, but at that point, plaintiff had not put us on notice
 9  that she was adding a complaint or a claim regarding that
10  sales job.  Again, she alleges in the operative Complaint
11  that she's an engineer or technologist and alleges that
12  she's comparable to all these technical positions and
13  engineering positions.  Well, now she's saying that she was
14  deprived a sales job.
15              We were not given timely notice of this. They
16  waited until after her deposition.  They waited until
17  nearly the end of discovery to file this motion.  And,
18  therefore, we believe there was delay; we believe there is
19  prejudice.
20              MS. JUMPER:  If I could respond to that, your
21  Honor --
22              THE COURT:  No, it's not necessary.
23              MS. JUMPER:  Okay.
24              THE COURT:  Maybe I wasn't clear. I'm trying to
25  focus on -- I was trying to focus on the delay issue.  And
```

```
1                      PROCEEDINGS                   31
```

I'm sorry if I wasn't clear on that.  And we'll get to

prejudice.

            MR. GAGE:  I'm sorry --

            THE COURT:  Hold on. Let me just finish.

            MR. GAGE:  Yes, your Honor.

            THE COURT:  So what I'm trying to figure out is at

what point did they have -- maybe we have to back up. I

understand you don't think there's a claim, and I just want

to make clear I'm not ruling there is a claim. Futility is

just one of several factors to be considered, and you're

free to make a Motion to Dismiss or a Summary Judgment

Motion or whatever else saying that this does not legally

constitute retaliation.  But if it were to come in as a

Complaint, I still need to figure out if they had what they

needed to know to make these allegations, you know, much

earlier than when they did, in December. I mean, I know you

could say, Well, she knew she was rejected in February, or

whatever the right word is; and they said, Well, we didn't

know that there was some, you know, improper animus behind

it until we got some of this other discovery.  That's the

issue I was trying to get you to answer.

            MR. GAGE:  And to that question specifically, your

Honor, you said it earlier:  They had everything they

needed to articulate what is in the proposed supplemental

```
 1                         PROCEEDINGS              32
```

```
 2   allegations back in July.  They knew Mr. Vardaman had been

 3   interviewed by Employee Relations.  They knew that in July

 4   of 2020; they knew that before we took Ms. Rowe's

 5   deposition.  Everything in the proposed supplemental

 6   allegations is something they've known for months.  And the

 7   fact that they didn't take his deposition until later, that

 8   doesn't add anything. It doesn't add anything at all to the

 9   supplemental allegations.

10             THE COURT:  Well, I mean, let's put it to the

11   plaintiff that way.  Are there any allegations in here that

12   weren't within your knowledge after July?

13             MS. JUMPER:  Surely, your Honor. The retaliatory

14   motive or any bias that was present when Mr. Vardaman was

15   considering Ms. Rowe, that information, while there was

16   email correspondence that exhibited or demonstrated that

17   Mr. Vardaman did not give Ms. Rowe fair and fulsome

18   consideration for the role, the deposition of Mr. Vardaman

19   was clearly the place where plaintiff was able to really

20   glean and understand whether there was animus or any

21   retaliatory motives that Mr. Vardaman was carrying towards

22   Ms. Rowe. The use of the documentary evidence --

23             THE COURT:  What is it you found out at the

24   deposition that you didn't have already in July?

25             MS. JUMPER:  Sure. During the deposition,
```

```
 1                        PROCEEDINGS                    33
 2  Mr. Vardaman expressed that he -- he expressed that he
 3  viewed Ms. Rowe as communicating with him in a manner that
 4  felt demeaning. He used alternate disparaging words to
 5  describe their interaction and said that, you know, based
 6  off of these interactions, he felt as though Ms. Rowe was
 7  not, like, a kind person, looked down on him because of his
 8  level.  So there was further information that we understood
 9  through the testimony of Mr. Vardaman that describes or
10  sets the basis for a potential retaliatory motive.
11            THE COURT:  But why -- I think you need to be a
12  little more precise, because if the reason she looked down
13  on him was prior to her, you know, EEO activity, then it
14  wouldn't support your motive.  So what specifically came up
15  in the deposition that showed the retaliatory motive?
16            MS. JUMPER:  Sure. I mean, additionally --
17            THE COURT:  I'm sorry -- that you didn't have
18  already?
19            MS. JUMPER:  Sure. He also testified about his
20  interaction with Ms. Rowe with respect to the VP of Sales
21  role.  During that conversation --
22            THE COURT:  With respect to -- you're going a
23  little fast. If you could slow down, that would help.
24            MS. JUMPER:  Sure. Of course. He also gave
25  additional context for his consideration of Ms. Rowe for
```

```
 1                         PROCEEDINGS                34
 2   the VP of Sales role.  During that time, Vardaman said
 3   that -- you know, he described why he didn't select
 4   Ms. Rowe for the VP of Sales role. He also testified that,
 5   you know --
 6            THE COURT:  You're not really answering my --
 7   you're not answering my question. You're telling me he
 8   testified about why he didn't select her. I'm asking a very
 9   specific question:  What was his specific testimony that
10   supports retaliation that you didn't have as of July?
11            MS. JUMPER:  Well, I apologize if I'm not
12   answering your question, your Honor, but the piece about
13   his consideration of Ms. Rowe for the VP of Sales role is
14   information that we did not have prior to the --
15            THE COURT:  I see.  The fact --
16            MS. JUMPER:  -- the deposition.
17            THE COURT:  -- the fact that he considered her for
18   the role; is that your point?
19            MS. JUMPER:  No, your Honor, it's the context of
20   the consideration.  During Mr. Vardaman's testimony, he
21   described what information he actually evaluated to
22   consider Ms. Rowe, and it was nothing but a search of her
23   LinkedIn profile. He went through the steps that he took to
24   consider or not consider, in our position, Ms. Rowe for the
25   position.  And so it was laying out sort of the non-steps
```

1                              PROCEEDINGS                    35

2    or the inaction that he took in furtherance of Ms. Rowe's

3    consideration for the VP of Sales role that demonstrates

4    further retaliatory animus based off of his prior comments

5    that are demonstrated in the record about his displeasure

6    or his dislike or potential retaliatory animus towards her.

7         THE COURT:  Okay.  So it was the methodology he

8    used to evaluate her that you learned at the deposition,

9    and that in itself showed the retaliatory motive?

10        MS. JUMPER:  I would say yes, but it's not just

11   the methodology, your Honor. His deposition testimony

12   clearly shows that he did not give Ms. Rowe fair

13   consideration or follow the traditional sort of Google

14   steps to consider her for the VP of Sales role, despite her

15   numerous requests to be considered for it.

16        It also -- we also learned additional information

17   about sort of the scope of the role and what Ms. Clubhouse

18   was looking for for someone to fill that role, and someone

19   who may not have been a traditional salesperson.  And that

20   further goes to Ms. Rowe's qualifications for the position.

21        THE COURT:  All right, I'll hear from defendant on

22   this.

23        MR. GAGE:  Your Honor, Ms. Rowe knew in February

24   of 2020 that she was not being considered for that sales

25   job. She knew in February that, because Mr. Vardaman told

```
1                          PROCEEDINGS                      36
2   her that in February. There's nothing they learned in the
3   deposition that adds to or supports the supplemental
4   allegations.  They knew in July of 2020 that the ER
5   investigator who spoke to Mr. Vardaman recorded that
6   Mr. Vardaman thought she was cantankerous -- and I can't
7   remember the other adjectives that were in those notes --
8   but they knew that in July.  And the testimony that
9   Ms. Rowe's counsel just referred to about him feeling
10  talked-down to by Ms. Rowe was his testimony explaining
11  what the ER investigator may have been referring to in the
12  notes that Ms. Rowe had since July. There is nothing they
13  learned in Mr. Vardaman's deposition that they didn't know
14  already that appear in these supplemental allegations.
15  They could have filed this months before; they could have
16  filed it before Ms. Rowe's deposition.
17              THE COURT:  All right.
18              MS. JUMPER:  If I --
19              THE COURT:  No, that's all right. No, that's okay.
20  All right, this is a little bit of a close question, but in
21  the end, the prejudice here is so minimal to the defendants
22  that I don't think that whatever delay here is sufficiently
23  undue that I'm going to prevent them from including this
24  claim.
25              We're going to have no further discovery from the
```

 1

 2  plaintiff's point of view. The defendants are going to be

 3  burdened by having to take a deposition of the plaintiff if

 4  they want on this very narrow topic. It will probably be

 5  very small solace to them, but I'm going to require the

 6  plaintiff to pay the costs of the deposition.  That's not

 7  attorney's costs; the actual fee for the court reporter,

 8  and if you're doing video, the fee for that.  Because the

 9  delay -- it was enough delay that I think that they did

10  occasion that problem, but not enough that I'm going to bar

11  it altogether. This is without prejudice to any arguments

12  about not stating a claim or summary judgment or anything

13  like that.

14          Any questions about my ruling from the defendant's

15  side?

16          MR. GAGE:  No, your Honor.

17          THE COURT:  From the --

18          MR. GAGE:  Thank you.

19          THE COURT:  -- from the plaintiff's side?

20          MS. JUMPER:  No, your Honor.

21          THE COURT:  Okay, so I think we've taken care of

22  that. I'm going to grant the motions to seal. I gather

23  they're unopposed [indiscernible].

24          And I think we have a little bit of discovery

25  that's filling out. Is there a deadline right now for

```
 1                         PROCEEDINGS                    38

 2    summary judgment requests or anything like that or

 3    conferences before Judge Schofield?

 4              MS. GREENE:  Your Honor, this is Cara Greene.  The

 5    last Scheduling Order that your Honor filled had a rolling

 6    deadline based on your Honor's decision.  And now that we

 7    have received guidance and orders from your Honor on these

 8    points, I would ask that the plaintiff and defendant have a

 9    chance to confer and submit an updated Scheduling Order to

10    your Honor.

11              THE COURT:  All right, that makes sense.  So when

12    do you think you could do that by? I'm not rushing you.

13    Just give me an idea.

14              MR. GAGE:  Early next week, maybe.

15              THE COURT:  Next week? How about a week from

16    today?

17              MS. GREENE:  That's fine, your Honor. Thank you.

18              THE COURT:  Okay. All right, I'll expect a joint

19    letter; if you can't reach agreement, separate letters, a

20    week from today.

21              Anything else from the plaintiff's side?

22              MS. GREENE:  Nothing for plaintiff, your Honor.

23              THE COURT:  From defendant?

24              MR. GAGE:  Nothing here, your Honor. Thank you.

25              THE COURT:  Okay.  Thank you. Good-bye.
```

1                         PROCEEDINGS                    39

2              MS. GREENE:  Bye-bye.

3              (Whereupon, the matter is adjourned.)

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

40

# C E R T I F I C A T E

        I, Carole Ludwig, certify that the foregoing

transcript of proceedings in the case of Rowe v. Google

LLC, Docket #19-cv-08655-LGS-GWG, was prepared using

digital transcription software and is a true and accurate

record of the proceedings.




Signature_____

                Carole Ludwig

Date:      February 13, 2021