KENNETH W. GAGE
SARA B. TOMEZSKO
PAUL HASTINGS LLP
200 Park Avenue
New York, New York 10166
(212) 318-6000
kennethgage@paulhastings.com
saratomezsko@paulhastings.com

*Attorneys for Defendant*
GOOGLE LLC

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| ULKU ROWE, | No. 1:19-cv-08655 (LGS)(GWG) |
| Plaintiff, | |
| -against- | |
| GOOGLE LLC, | |
| Defendant. | |

**DEFENDANT GOOGLE LLC'S MEMORANDUM OF LAW**
**<u>IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT</u>**

**TABLE OF CONTENTS**

**Page**

I.     INTRODUCTION ................................................................................................ 1

II.    THE MATERIAL FACTS ARE UNDISPUTED ............................................ 2

    A.    Google Creates an Innovative New Function ...................................... 2

    B.    Grannis Builds the OCTO Team ........................................................ 3

    C.    A Reorganization Impacts Plaintiff's Reporting Relationship ............ 6

    D.    Plaintiff Chooses To Return to OCTO ................................................ 8

    E.    Plaintiff Expresses Interest In A Vice President Sales Role ................ 9

    F.    Plaintiff's Performance Appraisals Have Remained Consistent Throughout ........ 9

    G.    Plaintiff Has Been Well Compensated Throughout Her Time at Google ............ 9

    H.    Her Other "Comparators" Do Not Do Equal or Substantially Similar Work ...... 11

        1.    L9 Technical Directors have greater engineering impact than Plaintiff .......... 11

        2.    Director-level Software Engineers code and build Google's products ........... 13

        3.    Director-level Application Engineers build and maintain internal Google applications ......... 14

        4.    Product Managers develop multi-year roadmaps for Google products from inception through deployment ........... 14

        5.    Plaintiff made more than the Global Client Technical Leads, and never performed the work of the Global Client Lead role ........ 15

III.    SUMMARY JUDGMENT STANDARD ...................................................... 15

IV.    THE NYC DISCRIMINATION CLAIM FAILS AS A MATTER OF LAW ............... 16

    A.    Plaintiff's Relative Experience With Cloud, Not Her Sex, Resulted In Her Hire As An L8 ........ 16

    B.    Plaintiff Was Not Underpaid Because of Sex ...................................... 17

    C.    Plaintiff's Sex Had Nothing To Do with Decisions Concerning the FSVL Role ........ 20

    D.    Plaintiff Was Not Excluded from Meetings Or Treated Differently After Her Transfer in 2018 ........ 20

V.    THE FAIR PAY CLAIM FAILS AS A MATTER OF LAW ........................ 21

VI.    THE RETALIATION CLAIM FAILS AS A MATTER OF LAW ................ 23

VII.    CONCLUSION .................................................................................... 25

# **TABLE OF AUTHORITIES**

**Cases**                                                                                                    **Page(s)**

*Abdu-Brisson v. Delta Air Lines, Inc.,*
   239 F.3d 456 (2d Cir. 2001)...................................................................................15

*Anderson v. Liberty Lobby, Inc.,*
   477 U.S. 242 (1986).........................................................................................16

*Ben-Levy v. Bloomberg, L.P.,*
   518 F. App'x 17 (2d Cir. 2013) .........................................................................16

*Britt v. Merrill Lynch & Co.,*
   No. 08 CV 5356 (GBD), 2011 WL 4000992 (S.D.N.Y. Aug. 26, 2011) ...............................22

*Campbell v. Cellco P'ship,*
   860 F. Supp. 2d 284 (S.D.N.Y. 2012)....................................................................20

*Chiaramonte v. Animal Med. Ctr.,*
   677 F. App'x 689 (2d Cir. 2017) ........................................................................22

*Dodd v. City Univ. of New York,*
   489 F. Supp. 3d 219 (S.D.N.Y. 2020)....................................................................15

*Drury v. Waterfront Media, Inc.,*
   No. 05 Civ. 10646 (JSR), 2007 U.S. Dist. LEXIS 18435 (S.D.N.Y. Mar. 7,
   2007) ........................................................................................16, 22

*EEOC v. Port Auth. of N.Y. & N.J.,*
   768 F.3d 247 (2d Cir. 2014)..........................................................................21, 22

*Fay v. Oxford Health Plan,*
   287 F.3d 96 (2d Cir. 2002)...............................................................................16

*Fenner v. News Corp.,*
   No. 09 CIV. 09832(LGS), 2013 WL 6244156 (S.D.N.Y. Dec. 2, 2013) .........................17, 21

*Garcia v. Barclays Capital, Inc.,*
   281 F. Supp. 3d 365 (S.D.N.Y. 2017)...........................................................15, 20, 23

*Holt v. Dynaserv Indus., Inc.,*
   No. 14 CIV. 8299 (LGS), 2016 WL 5108205 (S.D.N.Y. Sept. 19, 2016)........................23, 24

*Jimenez v. City of New York,*
   605 F.Supp.2d 485 (S.D.N.Y. 2009)......................................................................24

*Kemp v. Metro-N. R.R.*,
    316 F. App'x 25 (2d Cir. 2009) ..........................................................................25

*Melman v. Montefiore Med. Ctr.*,
    98 A.D.3d 107, 946 N.Y.S.2d 27 (1st Dep't 2012) ...........................................18, 19

*Miller v. City of New York*,
    No. 15cv7563, 2018 U.S. Dist. LEXIS 73238 (S.D.N.Y. May 1, 2018), *aff'd*
    *sub nom. Bloise v. City of New York*, 768 F. App'x 103 (2d Cir. 2019)....................15, 18, 19

*Moccio v. Cornell Univ.*,
    889 F. Supp. 2d 539 (S.D.N.Y. 2012), *aff'd*, 526 F. App'x 124 (2d Cir. 2013)
    (unpublished) ..............................................................................................21, 22, 23

*Quartararo v. J. Kings Food Serv. Prof'ls, Inc.*,
    No. 17-CV-7390 (RRM), 2021 WL 1209716 (E.D.N.Y. Mar. 31, 2021) ........................23, 24

*Rogers v. Bank of N.Y. Mellon*,
    No. 09 Civ. 8551 (HBP), 2017 U.S. Dist. LEXIS 152130 (S.D.N.Y. Sept. 19,
    2017) ..............................................................................................................17

*Shah v. Wilco Sys., Inc.*,
    27 A.D.3d 169, 806 N.Y.S.2d 553 (1st Dep't 2005) .............................................19

*Sobol v. Kidder, Peabody & Co.*,
    49 F. Supp. 2d 208 (S.D.N.Y. 1999)..................................................................21

*Talwar v. Staten Island Univ. Hosp.*,
    No. 12-CV-33 (CBA), 2016 WL 1298969 (E.D.N.Y. Mar. 31, 2016)..........................17, 22

*Ware v. L-3 Vertex Aerospace, LLC*,
    No. 16 CIV. 8067 (LAP), 2020 WL 783764 (S.D.N.Y. Feb. 18, 2020), *aff'd*,
    833 F. App'x 357 (2d Cir. 2020) ......................................................................25

*Williams v. New York City Hous. Auth.*,
    61 A.D.3d 62, 872 N.Y.S.2d 27 (1st Dep't 2009) ................................................16

*Zimmer v. Warner Bros. Pictures, Inc.*,
    No. 103732/2012, 2016 WL 9331304 (Sup. Ct., N.Y. Cty. Dec. 23, 2016)
    (unpublished) ..................................................................................................24

**Statutes**

N.Y. Lab. Law § 194(1)......................................................................................21

N.Y. Lab. Law § 194(3)......................................................................................22

**Other Authorities**

FED. R. CIV. P., Rule 56 ....................................................................................................16

Pursuant to Rule 56 of the Federal Rules of Civil Procedure and the Court's Order dated August 9, 2021, (ECF 128), Defendant Google LLC ("Google" or the "Company") submits this Memorandum of Law in Support of Motion for Summary Judgment.

## I.   <u>INTRODUCTION</u>

Plaintiff Ulku Rowe has been employed by Google since 2017 as a level 8 Technical Director in Google Cloud. The majority of Technical Directors (men and women) were hired as level 8 employees. Five men with greater and more relevant experience than the others were hired at level 9. The fact that some men were hired as level 9, ***and only that fact***, led Plaintiff to believe that she was hired at level 8 because of intentional sex discrimination.

Her job duties have largely remained the same throughout her employment. Her reporting relationship has changed twice since she was hired, but neither change was a demotion. In 2018, she and others transferred to a different team to perform largely the same jobs they were hired to do. Less than one year later, Plaintiff chose to return to her original team. Her total annual compensation has increased every year, and her performance ratings have remained consistent.

Twice since she was hired, Plaintiff expressed interest in other jobs. The first time, in 2018, her interview feedback was mixed, and the hiring manager preferred two better qualified ***female*** candidates over her. A sudden change of leadership in Google Cloud caused the hiring manager to pause the search indefinitely. The second time, in 2020, she informally expressed interest in a senior sales position. She had no direct sales experience, and Google hired another, better qualified female candidate for the role.

Following extensive discovery, three claims remain in this case. Plaintiff alleges Google violated the New York Labor Law ("NYLL") by paying her less than male employees in the same establishment (the "NY Fair Pay Claim"), some of whom are Technical Directors but most of whom are not. Plaintiff also alleges Google intentionally discriminated against her because of sex in

violation of the New York City Human Rights Law ("NYCHRL"), in setting her pay and in not promoting her (the "NYC Discrimination Claim"). Finally, Plaintiff alleges Google retaliated against her in violation of both statutes because she made complaints (both internally at Google and in this action) (the "Retaliation Claim").

None of these claims should proceed to trial because the material facts are undisputed. There is no evidence to support a reasonable inference that decisions concerning her job level, compensation, and sought-after promotions had anything to do with sex. Plaintiff's alleged "comparators" were not doing equal or substantially similar work and, therefore, NY law allows Google to pay them differently.  Finally, there is no evidence to permit a reasonable inference that any decisions taken with respect to Plaintiff were connected to her alleged protected activity.

This Court should therefore enter summary judgment for Google.

## II.     THE MATERIAL FACTS ARE UNDISPUTED

### A.     Google Creates an Innovative New Function

Cloud technology is evolving at a rapid pace. In 2016, Will Grannis and Brian Stevens (then the Chief Technology Officer "CTO" of Google Cloud) established a new function in Google Cloud that did not exist anywhere else in the company: the Office of the CTO ("OCTO") (SMF[1] 1.) OCTO is neither a traditional software engineering, nor a traditional sales organization; these employees have a truly unique blend of product, sales, and marketing focus. (SMF 2.) Their business title is "Technical Director," and they were expected to assume three key "pillars" of responsibility: customer impact, engineering impact, and evangelism or thought leadership. (SMF 3, 4, 5, 7, 8.)

Technical Directors do not actually build products or manage product teams. (SMF 6.) Nor do they have planning or budgetary responsibility for any particular product. (*Id.*) Instead, their job is to drive impact, externally with clients and internally by influencing the engineering teams to

---

[1] "SMF" refers to Google's Local Rule 56.1 Statement of Undisputed Material Facts, filed herewith.

innovate products that anticipate and meet clients' needs. (SMF 5, 8.) The work that each of them does is, in many cases, unique.

The ideal candidate for the Technical Director role has prior experience as a CTO in an industry targeted for cloud adoption (*e.g.*, financial services, healthcare, energy, media and entertainment, manufacturing, etc.) or as a VP of Engineering at a technology company. (SMF 9.) Prior direct experience with cloud technology is relevant to a candidate's ability to make meaningful contributions on the job. (*Id.*) As shown below, Technical Directors' varied experiences and skills manifest in substantially **different** contributions—*i.e.* different work performed for Google. All Technical Directors were initially hired as individual contributors, *i.e.*, those without people management responsibilities. (SMF 15.) Over time, some (but not Plaintiff) became people managers. (SMF 15, 16.)

Technical Directors perform work associated with the Technical Solutions Consultant job family and job ladder, which provides a general guide of the responsibilities for the role.[2] (SMF 10.) As the hiring managers, Grannis and Stevens determined that the newly-created OCTO role was commensurate with a level 8 ("L8") or level 9 ("L9")[3] in Google. (SMF 14.) All Technical Directors reported either directly or indirectly to Grannis. (SMF 18.)

### B.    Grannis Builds the OCTO Team

Google began hiring Technical Directors in 2016. (SMF 25.) Most, including Plaintiff, were hired as L8s. Five candidates, however, were hired as L9s. (SMF 24, 25, 31, 34, 37, 49.)

Leveling determinations are made in a systematic and principled way. Based upon the

---

[2] A job family at Google is a group of jobs with a common set of general attributes. A job ladder is a guideline used to identify general expectations and criteria for jobs within a job family as one progresses in seniority and responsibility. (SMF 11.)
[3] Within a job ladder, jobs are organized in ascending order by level. Level reflects the scope and complexity of the work, the expertise and experience necessary to succeed in the job, and the expected impact of the job on the organization. Each level within a job family is associated with a unique job code, which broadly identifies employees performing similar functions, but not every individual in a single job code does the same work. (SMF 12, 13.)

requirements for the role established by Grannis and Stevens, the recruiter made an initial recommendation for the employee's level based on the relevant experience and educational background of the candidates. (SMF 20, 21.) That recommendation is evaluated throughout the hiring process based on the candidate's interview performance. (SMF 22.) Grannis or Stevens then made a leveling recommendation, which more senior managers reviewed and approved. (SMF 23.)

The five employees hired as L9s had all been directly involved in building cloud products or led efforts to complete successful large-scale cloud migrations. (SMF 25–27, 31–39, 49–53.) Plaintiff had not. (SMF 42–44.)

**Evren Eyrurek** (hired October 31, 2016, based in California) had over 25 years of experience in technology roles at healthcare and manufacturing companies and previously led large-scale software development and cloud deployment teams of over 2000 engineers. He spent six years as a CTO in two divisions of GE Healthcare, and managed GE Software Technologies' $20 billion business. His cloud computing experience began in 2005, and he led the release of GE's Health Cloud product. (SMF 25–27.)

**Paul Strong** (hired January 9, 2017, based in California) had over 25 years of experience working at technology companies. He spent six years as the CTO, Global Field of VMWare, a cloud computing company, where he created virtual machines considered synonymous with cloud computing today. He is considered an expert in physical infrastructure and virtualization layers to support cloud-based applications. (SMF 31–32.)

**Jonathan Donaldson** (hired February 13, 2017, based in Oregon) had over 22 years of experience working at technology companies, and had led Intel Corporation's strategy on cloud containers (packages of software that virtualize operating systems and enable them to run anywhere). He founded the Cloud Native Compute Foundation, the single most successful open-source foundation for containers and modern computer architectures. (SMF 34–35.)

**Ben Wilson** (hired February 6, 2017, based in Texas) had over 25 years of experience at energy and professional services firms, including over 3 years as the CTO–GE Cloud Leader of GE's Oil and Gas division and over 6 years as the CIO and Business Transformation Executive at Siemens Energy Sector. At GE, he migrated thousands of applications to the cloud. (SMF 37–38.)

**Nicholas Harteau** (hired May 15, 2017, based in New York City) had 19 years of experience working for technology companies, including a role as VP of Engineering at Spotify, a Google Cloud client. He is among a very small group of people to have both leadership and engineering experience deploying and migrating products to the cloud at such a large scale. His presentations on cloud migration were noted by some who interviewed him for the Technical Director role as "one of the best talks I've seen." (SMF 49–53.)

Google hired **Plaintiff** as an L8, effective March 13, 2017, based in New York City. (SMF 40.) She had 19 years of experience working in financial services, then-most recently at JP Morgan managing its credit risk systems. (SMF 41.) Plaintiff concedes that the financial services industry had generally been slow to adopt cloud technology, and as a result, she had just one year of experience starting a then-incomplete cloud migration before joining Google. (SMF 42–43.) She even told a Google recruiter she was not a cloud expert. (SMF 44.) Grannis interviewed Plaintiff and noted she knew "[n]ot very much" about the Google Cloud Platform; another interviewer noted she was "a bit more junior than other candidates interviewed for the role." (SMF 45, 47.) Still, the financial services industry was and is a great business opportunity for Google Cloud, and Plaintiff knew it well having worked for one of the world's largest financial institutions. (SMF 48.) Because of her background, Plaintiff does not consider her knowledge of cloud technology on par with someone who previously worked at a cloud technology company. (SMF 42.)[4]

---

[4] In November 2017, Plaintiff complained to Human Resources that she believed she had been under-leveled upon hire. Google investigated her complaint and determined she was hired at the appropriate level. (SMF 67, 68.)

Others whom Plaintiff concedes had comparable skills and experience were hired at L8. For example, Google hired Eric Schenk at L8. He had over 23 years of experience working at technology companies like Electronic Arts, where he was the CTO of EATech. (SMF 54–56.) Mark Kropf, another L8 hire, had a technology background and a competing offer for a Managing Director role at a large financial institution, just like Plaintiff. (SMF 57.) Scott Pernberthy, another L8 hire, had two advanced degrees in computer science and over 31 years of experience, including as Managing Director, Technology at PwC, and 18 years at IBM. (SMF 29–30.)

### C.      A Reorganization Impacts Plaintiff's Reporting Relationship

Google Cloud attempted to "verticalize," *i.e.*, consolidate teams and resources devoted to advancing Cloud within a particular industry (or "vertical"). (SMF 92.) OCTO and the Global Alliances Industry Partnership ("GAIP") team reporting to Tariq Shaukat, had each made separate efforts to verticalize, but in or around late 2017, Google Cloud leadership decided Shaukat's GAIP team would exclusively own the strategy for industry verticals within Cloud. (*Id.*) The four industry-focused Technical Directors in OCTO—Plaintiff (financial services), Wilson (energy), Eryurek (healthcare), and Jeff Kember (media and entertainment)—began reporting to Shaukat effective June 25, 2018 as a result.[5] (SMF 93.)

This was not a demotion for Plaintiff, as her level, job code, and compensation were unchanged. (SMF 94.) On multiple occasions, however, Plaintiff complained; she even attempted to decline the transfer. (SMF 95.) She told Shaukat that the role she really wanted was the Financial Services Vertical Lead role ("FSVL Role"), a position for which Shaukat was the hiring manager. (SMF 101, 102.) The person selected for the FSVL Role would define and execute a cohesive global strategy for the financial services industry vertical within GAIP. (SMF 103.) That individual would

---

[5] Issues with including these employees on email distribution lists that occurred as a result of the transfer were not unique to Plaintiff and equally impacted the male employees reporting to Shaukat. (SMF 96.) Plaintiff claims she was also excluded from meetings and off-sites on the basis of sex, but the evidence shows otherwise. (SMF 97–100.)

need the business acumen to drive Google Cloud's go-to-market strategy, and sufficient technical skills to identify market opportunities and oversee the product strategy. (*Id.*)

Plaintiff was interviewed in or around August 2018.  The feedback was mixed. (SMF 104.) Specifically, two of her four interviewers felt she struggled to articulate a compelling vision or strategy for the financial services industry vertical. (*Id.*) Based on this feedback, Shaukat concluded Plaintiff was not a fit for the role. (SMF 105.)[6] Nevertheless, Shaukat asked Diane Greene, then-CEO of Google Cloud, to meet Plaintiff as she had done for other finalist candidates; if Greene believed Plaintiff was right for the role, Shaukat would revisit his opinion. (*Id.*)

As of November 2018, two women other than Plaintiff were finalists for the FSVL Role, one external and one internal to Google. (SMF 106.) On November 7, 2018, Plaintiff sent an email to Shaukat and Greene complaining that her interview with Greene had not yet been scheduled, and asserting that she had been under-leveled at hire. (SMF 107.) Human Resources thoroughly investigated and found her concern unsubstantiated. (SMF 108.)

Before Plaintiff could meet with Greene, however, Greene announced on November 16, 2018, that she was leaving Google. (SMF 109.) Thomas Kurian, then-an executive at Oracle, would replace Ms. Greene as the CEO of Google Cloud at the end of the year. (*Id.*) Shaukat elected not to proceed with an offer to his preferred candidate for the FSVL Role; he wanted more time to understand Kurian's plans for Google Cloud before asking the candidate to give up her current job for what was an uncertain future. (SMF 111.) In December 2018, Shaukat also told Plaintiff he was pausing the search but that she was not a finalist given the feedback he received about her candidacy during the interview process. (SMF 112.)

Despite the uncertainty around the future of GAIP, there were still companies who remained

---

[6] Plaintiff's former supervisors in OCTO thought highly of her, however, they were not the hiring managers for the FSVL Role; Shaukat was. (SMF 102.)

interested in certain of Google Cloud's initiatives for the financial services industry. (SMF 113.) Shaukat asked another Google employee already on his team, Stuart Breslow, to oversee this initiative and some functions of the financial services industry vertical on a temporary basis until Shaukat could align with Kurian on strategy for Google Cloud. (*Id*.) Google had hired Breslow in June 2018 as an L9 Managing Director of Technology and Policy. (SMF 114.) He served as the main point of contact for senior executives in regulated industries who wanted to explore a partnership with Google Cloud. (*Id.*) He was an industry-recognized authority on anti-money laundering, having previously spent 30 years in financial services, including as Chief Compliance Officer at Morgan Stanley. (SMF 115.) Breslow was not promoted, nor did his level or job code change when he took on this temporary assignment. (SMF 116.)[7]

### D.     Plaintiff Chooses To Return to OCTO

Plaintiff was frustrated about the FSVL Role and the fact that she had been transferred to GAIP in the first place. (SMF 118.) She also routinely expressed dissatisfaction with Mr. Shaukat's insistence that she focus on a specific set of clients, and that she limit the frequency of her international speaking engagements. (SMF 118.) Shaukat wanted Plaintiff to be a valued and contributing member of the team, so he gave her three options: (1) remain on his team in the financial services vertical working on specific initiatives with Mr. Breslow; (2) find a new role on Shaukat's team where she could continue to be an individual contributor; or (3) return to OCTO reporting to Grannis but in a horizontal role focusing on hybrid cloud. (SMF 119.)[8]

Plaintiff chose to return to OCTO effective April 26, 2019. (SMF 121.) No other employees who transferred from OCTO were provided the option to return. (SMF 123.) Neither Plaintiff's level nor her pay changed with the transfer. (SMF 124, 125.) She continues to report to Grannis in OCTO

---

[7] Breslow and Shaukat were separated from Google in July 2020 when Kurian reorganized Google Cloud. (SMF 117.)

[8] A horizontal role would require Plaintiff to work across multiple industries in an area like hybrid cloud, which had universal applicability. Her pursuit of financial services opportunities would need to be coordinated with Shaukat's team, which was responsible for setting the strategy for industry verticals (including financial services). (SMF 120.)

to this day, and her total annual compensation has only increased over time. (SMF 125.)

### E.     Plaintiff Expresses Interest In A Vice President Sales Role

In February 2020, Plaintiff met with Kirsten Kliphouse, head of North American Sales. (SMF 126.) Kliphouse was recruiting for a Vice President-level sales role on her team, and Plaintiff expressed interest. (*Id.*) Plaintiff contacted the recruiter who provided her with the job description. (SMF 127.) The role involved leading a sales team and managing that team to meet or exceed a sales quota. (SMF 128.) "Proven success managing a sales/business development organization to meet and exceed revenue goals" was one of the qualifications. (*Id.*) Plaintiff never managed a sales team or held a job where her primary responsibilities were in sales. (SMF 129.)

Later that month, Plaintiff learned that Google would not be moving forward with her candidacy because Kliphouse's team wanted someone with more sales experience. (SMF 130.) The person ultimately hired into the role was listed as one of *American Banker's* most powerful women in 2019. (SMF 131.)

### F.     Plaintiff's Performance Appraisals Have Remained Consistent Throughout

Plaintiff received a rating of Exceeds Expectations, a three out of five, each year from 2017 through 2020. (SMF 84.) She excelled at the first and third pillars of responsibility for the Technical Director position (customer impact and evangelism), but consistently under-performed on the second pillar of responsibility (engineering impact). (SMF 85.) She was repeatedly told in her performance reviews that she needed to make greater engineering impact, something she herself conceded in at least two of her reviews. (SMF 86.) Failure to have a meaningful impact on Google's engineering teams and products prevents Plaintiff (and others in OCTO) from receiving a higher performance rating. (SMF 85.)

### G.     Plaintiff Has Been Well Compensated Throughout Her Time at Google

The three main components of Plaintiff's compensation are salary, bonus, and equity awards

(together, "Total Annual Compensation"). (SMF 69.) Salary range is a function of job code, level, and location, and individual salary also takes into account experience and performance. (SMF 70.) Annual bonus is a cash reward for performance over the prior year; target annual bonus is a percentage of base salary which varies by level, and actual bonus paid depends in part on one's performance rating. (SMF 71.) Equity awards, or "equity refresh grants," consider performance and contributions over the prior year but are designed as a forward-looking incentive reflecting the employee's criticality and potential. (SMF 72.)

Plaintiff has been well paid, without regard to her sex, and she is not paid less than employees who do equal or substantially similar work. Plaintiff negotiated a total compensation package significantly above Google's modeled compensation recommendation for her job code and location. (SMF 73.) She received the second-highest sign-on bonus offered to any Technical Director, without regard to level. (SMF 74.) She received two new hire equity grants collectively worth more than $2.3 million. (SMF 75.) Hers was one of the highest new hire equity grant packages offered to any Technical Director, without regard to level. (*Id.*) In 2017, Grannis granted Plaintiff an exception to Google's policy for newly-hired employees and awarded her an equity refresh grant that year to which she otherwise would not have received had Grannis followed policy. (SMF 76.)

Plaintiff has been one of the most highly compensated L8 Technical Directors each year.[9] She earned more in Total Annual Compensation than all but three of the 14 male L8 Technical Directors (only one of whom was based in New York). (SMF 77.) Plaintiff's Total Annual Compensation was even greater than Harteau's (an L9) in 2017. (SMF 83.)

Three L8 Technical Directors— Scott Penberthy, Kawaljit Gandhi, and Massimo Mascaro —have ***at times*** earned more in Total Annual Compensation than Plaintiff, but they do not perform

---

[9] Plaintiff's claims in this case have been less than clear, as she has pursued discovery to find employees to call comparators. In her deposition, Plaintiff insisted that the object of her pay claims is employees at L9, and she insisted that she is not similarly situated to level 8 employees generally, even to the point of changing her sworn testimony about an employee whom she thought was an L9 but actually is a L8. (SMF 66.)

equal or substantially similar work to Plaintiff. (SMF 77.) They specialize in applied artificial intelligence and machine learning, a critical area for Google. (SMF 78.) Penberthy created the canonical reference for all of Google on Applied AI. (*Id.*) Gandhi has been instrumental in building a joint engagement framework between OCTO and Cloud for Ads, the team responsible for creating cloud-based solutions for managing workflows associated with online advertising; he also leads the Applied AI team. (SMF 79.) Mascaro has helped develop a new product category for the Cloud AI platform, and earned Strongly Exceeds Expectations ratings year over year. (SMF 78.)

Plaintiff does not do this work. She has neither Applied AI or machine learning expertise, nor people management responsibilities. (SMF 16, 80.)

### H.    Her Other "Comparators" Do Not Do Equal or Substantially Similar Work

Through discovery, Plaintiff has aggressively searched for higher paid employees to call "comparators." She has identified five groups: (1) L9 Technical Directors in OCTO, (2) L8 and L9 Software Engineers, (3) L8 and L9 Application Engineers, (4) L8 and L9 Product Managers, and (5) Global Client Technical Leads and Global Client Leads the parties identified over the course of discovery. None of these employees do equal or substantially similar work.

### 1.    L9 Technical Directors have greater engineering impact than Plaintiff

Each of the L9 Technical Directors not only excelled in the customer impact and evangelism pillars envisioned for the role, but also made significant engineering contributions in unique ways by leveraging their prior extensive cloud experience.

**Eryurek** capitalized on his knowledge and experience leading software engineering teams to drive immediate impact on the roadmap for Google Cloud's streaming products by creating new business opportunities and providing feedback on product development. (SMF 88.) In summer 2018, he started reporting to a senior product manager on the Data Analytics team, and completed a job

ladder transfer to the product manager job ladder in March 2019.[10] (SMF 136.) He now leads all streaming data platform product management for Cloud. (*Id.*)

**Strong** leveraged his deep cloud experience to secure important partnerships for Google with some of the largest companies in the world, where he serves as a technical advisory board member. He works with Google's area tech leads (some of the most accomplished senior engineers within Google Cloud and Core Development) on an engineering initiative of massive scope and potentially industry-wide implications. (SMF 90.)

**Donaldson** made significant contributions to engineering to advance the roadmap for the Google Kubernetes Engine, the industry's first fully managed services on Kubernetes, the container-centric management software for cloud-based applications. He also leads a team which includes other Technical Directors. He created a hybrid cloud working group, the first OCTO engineering pillar group for Google's software-based hybrid offering, and authored a paper Google leadership termed a "must read" on hybrid cloud. (SMF 91.)

**Wilson** advised senior leadership on multiple large-scale mergers and acquisitions for Google, and, in connection with these deals, was the subject matter expert on cloud migrations and infrastructure necessary to understand how the target applications were performing. His work directly informed Alphabet board-level decision making in 2017. (SMF 87.) After leaving OCTO, he started doing product management work and was in the process of completing a ladder transfer to the product manager job ladder when he left Google in 2021. (SMF 137.)

**Harteau** became deeply involved in Google's engineering teams while in OCTO and helped improve their monitoring and logging systems, which gives Google Cloud clients greater confidence

---

[10] Employees may transfer from one job ladder or job family to another. Employees must generally apply for a transfer and undergo a set of interviews with hiring managers in their target job family or job ladder. Job ladder transfers can take several months as the employee undergoes a trial period to demonstrate that they can perform the work required of, and has the requisite skill and domain knowledge to succeed in, the new role. Ladder transfers may result in a salary increase or decrease based on the compensation parameters associated with the target job code, a downward adjustment in level, or a new bonus structure. (SMF 135.)

in the company's monitoring capabilities. (SMF 89.) He left OCTO in fall 2018 to focus exclusively on this work and manage a product team working on Stackdriver, a cloud computing system providing performance and diagnostics data to public cloud users. (SMF 133.) He completed a transfer to the Software Engineering job ladder before leaving Google. (SMF 134.)

Plaintiff did not do any of the work described above. She did not make significant contributions to any product roadmap, did not build any teams or working groups within OCTO or elsewhere, did not perform any work typically performed by software engineers or product managers in an effort to complete a ladder transfer, and presents no evidence that she would have been successful in that endeavor even if she tried.

### 2. Director-level Software Engineers code and build Google's products

Some director-level Software Engineers ("Directors, SWE") are individual contributors, but most (25 of 31 Plaintiff identified) are people managers. (SMF 145.) Their core responsibility is writing computer code for Google's products, services, and infrastructure, or (in the case of a people manager) reviewing and approving code written by other engineers. (SMF 140.) Directors, SWE create innovative new algorithms, libraries, or services that power Google's products and features; they design software and hardware innovations that power parts of Google; they work with data and signals impacting product quality, reliability, precision/recall, usage, revenue, *etc*. (SMF 141.) Directors, SWE contribute to Product Requirement Documents that define the products engineering teams will build and how to build them. (SMF 142.) Coding is so integral to the role that candidates must submit coding samples for evaluation. (SMF 143.)

Plaintiff, in contrast, admits she has not contributed any code to Google's products at any point in her career. (SMF 144.) None of the Directors, SWE Plaintiff identified ever worked in OCTO reporting to Grannis, or in GAIP reporting to Shaukat. (SMF 146.)

3.      **Director-level Application Engineers build and maintain internal Google applications.**

The work performed by director-level Application Engineers ("Directors, AE") is also significantly different than Plaintiff's work. First, they actually build and maintain applications, something Plaintiff never did at Google. (SMF 149, 150.) Second, these applications are exclusively for Google's internal use, so responsibility for market or sales strategy is not part of the role. (SMF 151.) Third, they perform engineering work across the entire product lifecycle, starting with deployment, design, testing and release, and continuing through implementation and enhancement for the internal applications in their portfolio. (SMF 149.) Fourth, the role has significant people management responsibilities, and Directors, AE spend up to 40% of their time managing others. (SMF 152.) Fifth and finally, none of the Directors, AE Plaintiff identified ever worked in OCTO reporting to Grannis, or in GAIP reporting to Shaukat. (SMF 153.) In fact, all but one were moved to another organization called Core Development in 2019. (SMF 148.)

4.      **Product Managers develop multi-year roadmaps for Google products from inception through deployment.**

Unlike Technical Directors like Plaintiff who may collaborate with engineering teams to suggest ways in which Google's products can address client needs, Director-level Product Managers ("Directors, PM") manage teams that do the work to develop Google's cloud products from inception through development and deployment. (SMF 155.) To do so, they develop a multi-year roadmap for the deployment of a specific product or products in their relevant product area. (*Id.*) They then manage the development and deployment process against that roadmap on a quarterly basis, allocating and adjusting resources as necessary and based on the product area's priorities. (SMF 155, 158.) Directors, PM have a portfolio of products they manage; at L8 it may be a single product or a small group of products, but L9s may manage over half a dozen products and must balance competing priorities across their entire portfolio. (SMF 157.) Directors, PM have profit-and-

-14-

loss responsibilities, and must ensure their products remain financially successful. (SMF 159.) They are overwhelmingly people managers, and none Plaintiff identified ever worked in OCTO reporting to Grannis, or in GAIP reporting to Shaukat. (SMF 160, 161.)

    **5.**    **Plaintiff made more than the Global Client Technical Leads, and never performed the work of the Global Client Lead role**

Plaintiff earned more in Total Annual Compensation than each of the employees she identified as Global Client Technical Leads ("GCTLs") (SMF 162.) She identified three employees performing the Global Client Lead ("GCL") role. (SMF 163.) She earned more in Total Annual Compensation than all of them but one, Anil Jain, a people manager in California. (SMF 163, 164.)

Mr. Jain's work as a CGL is different from Plaintiff's. GCLs are responsible for a specific list of priority clients and expected to engage them actively and persistently. (SMF 165.) Their role is primarily business development, and are the non-technical counterpart to the GCTL who serve as technical advisors to the client. (SMF 166, 169.) Both the GCL and GCTL were expected to build a team to help manage their client accounts. (SMF 166.)

Plaintiff never built and managed a team while she reported to Mr. Shaukat. (SMF 167.) She also did not consistently meet with a specific set of clients consistent with the vision for either the GCL or GCTL role. (SMF 168.) Plaintiff concedes her interactions with clients were sporadic, and the accounts team initiated most of the meetings she attended. (*Id.*)

## III.   <u>SUMMARY JUDGMENT STANDARD</u>

Summary judgment is just as appropriate in fact-intensive discrimination and retaliation cases as it is in other contexts. *See Dodd v. City Univ. of New York*, 489 F. Supp. 3d 219, 245 (S.D.N.Y. 2020); *Abdu-Brisson v. Delta Air Lines, Inc.*, 239 F.3d 456, 466 (2d Cir. 2001).[11] It is

---

[11] *See also Miller v. City of New York*, No. 15cv7563, 2018 U.S. Dist. LEXIS 73238, at *107–08, *114 (S.D.N.Y. May 1, 2018) (granting summary judgment to employer on class claims brought under the federal equal pay act), *aff'd sub nom. Bloise v. City of New York*, 768 F. App'x 103 (2d Cir. 2019); *Garcia v. Barclays Capital, Inc.*, 281 F. Supp. 3d 365, 387 (S.D.N.Y. 2017) (granting summary judgment to employer on both federal and New York equal pay claims);

warranted when "there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law." *Fay v. Oxford Health Plan*, 287 F.3d 96, 103 (2d Cir. 2002) (citing FED. R. CIV. P., Rule 56). A fact is "material" if it "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A factual dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

## IV.   THE NYC DISCRIMINATION CLAIM FAILS AS A MATTER OF LAW

Plaintiff must demonstrate by a preponderance of the evidence she "has been treated less well than other employees *because of*" her gender, race or national origin. *See Williams v. New York City Hous. Auth.*, 61 A.D.3d 62, 78, 872 N.Y.S.2d 27, 39 (1st Dep't 2009) (emphasis added); *see also Ben-Levy v. Bloomberg, L.P.*, 518 F. App'x 17, 20 (2d Cir. 2013) (affirming grant of summary judgment for employer on employee's discrimination claims under the NYCHRL). Here, there is no evidence that could support an inference of discrimination. In fact, the record developed through extensive discovery militates ***against*** a finding discrimination played a role in any decision concerning Plaintiff's employment.

### A.   Plaintiff's Relative Experience With Cloud, Not Her Sex, Resulted In Her Hire As An L8

Plaintiff concededly has no reason to believe Grannis or Stevens treated her any differently on the basis of her sex, other than their participation in the decision to hire her as an L8. (SMF 64.) Her sole reason for claiming the decision to hire her as an L8 was motivated by her sex is that five men were hired as L9s. (SMF 65.) No reasonable jury could find in her favor.

There is no dispute a candidate's relevant work history, education, and experience with cloud technology factor into determining employees' levels upon hire. Plaintiff never hired anyone at

---

*Drury v. Waterfront Media, Inc.*, No. 05 Civ. 10646 (JSR), 2007 U.S. Dist. LEXIS 18435, at *10 (S.D.N.Y. Mar. 7, 2007) (same).

Google or participated in any leveling discussions, so she has no basis to claim otherwise. (SMF 19.) Fourteen men were hired as L8 Technical Directors, including men with skills, experience, education, and backgrounds similar to Plaintiff's. (SMF 29–30, 54–55, 57, 60–62.) By her own admission, she was not treated less well than similarly situated candidates.

Further, Plaintiff's one year of experience with cloud migration in an industry she admits was slow to adopt cloud pales in comparison to the L9s' years of experience leading large-scale cloud migrations and building cloud products at sophisticated technology companies. Their vastly superior qualifications are a legitimate basis for hiring them at a higher level than Plaintiff, and her own opinions are insufficient to withstand Google's properly supported motion. *Rogers v. Bank of N.Y. Mellon*, No. 09 Civ. 8551 (HBP), 2017 U.S. Dist. LEXIS 152130, at *15 (S.D.N.Y. Sept. 19, 2017) ("Plaintiff's 'personal belief that she was the most qualified person for the various positions,' without evidentiary support, is insufficient to create a genuine issue of material fact to defeat summary judgment.") (citations omitted).

### B.    Plaintiff Was Not Underpaid Because of Sex

Plaintiff earns more than most L8 Technical Directors in OCTO. (SMF 77.) This alone makes it highly implausible that sex is a factor in the challenged compensation decisions. *See, Talwar v. Staten Island Univ. Hosp.*, No. 12-CV-33 (CBA), 2016 WL 1298969, at *9 (E.D.N.Y. Mar. 31, 2016) (granting summary judgment for employer on NYCHRL discriminatory pay claim where similarly situated men, as a group, did not earn more than plaintiff).

To the extent some male employees earned more in Total Annual Compensation than Plaintiff, these men are not sufficiently similar. Plaintiff and her alleged comparators must be "similarly situated with respect to [Plaintiff] in terms of the jobs performed." *Fenner v. News Corp.*, No. 09 CIV. 09832(LGS), 2013 WL 6244156, at *19 (S.D.N.Y. Dec. 2, 2013) (granting summary judgment for employer on disparate pay claim under NYCHRL). Merely pointing to some work

duties that overlap is insufficient; courts must consider "myriad factors, such as education, training, job requirements, job responsibilities, hours worked, and similar working conditions." *Miller*, 2018 WL 2059841, at *7 (granting summary judgment for employer on disparate pay claim under both state and local law). She cannot make this showing for several reasons.

First, the work L9 Technical Directors in OCTO performed was materially different and they indisputably made greater and more meaningful contributions to engineering than Plaintiff. She consistently underperformed in the area of engineering impact. (SMF 85.) She acknowledged in her performance reviews that meaningful engineering impact as an area of opportunity. (SMF 86.) The L9 Technical Directors made engineering contributions to Google Cloud that Plaintiff never did, whether it was participating in corporate deals for Google as a cloud migration subject matter expert (Wilson); or improving Cloud's monitoring and logging capabilities (Harteau); or contributing to Cloud's streaming data services (Eryurek); or working with area tech leads on critical engineering initiatives (Strong); or establishing the first OCTO engineering pillar group for Google's software-based hybrid offering (Donaldson). (SMF 86–91.)

She cannot plausibly claim sex had anything to do with her earning less than certain L8 Technical Directors, either. They all had expertise in Applied AI that Plaintiff lacked. (SMF 78–79.) These men perform work that has a unique value proposition to Google—work that Plaintiff does not do—and therefore Google is justified in paying them differently. *Melman v. Montefiore Med. Ctr.*, 98 A.D.3d 107, 115–16, 946 N.Y.S.2d 27, 31–33 (1st Dep't 2012) (granting summary judgment on NCYHRL discriminatory pay claim where alleged comparator's skill set was unique and highly valuable).

Plaintiff's arguments as to those outside OCTO fairs no better. Stuart Breslow was performing a substantially different role than Plaintiff at all times. While Plaintiff's industry expertise was focused on financial services, Breslow's initial work advising clients was not so

limited and extended to all regulated industries. (SMF 114.) Plaintiff also claims in 2019 through Breslow's separation, he was doing a job Plaintiff wanted **but did not get**. It defies logic to suggest their roles and responsibilities were comparable.

Software Engineers, Application Engineers, and Product Managers also are different. None of them reported to the same managers as Plaintiff. (SMF 146, 153, 161.) The vast majority had significant people management responsibilities that Plaintiff did not have. (SMF 160.) They build and develop cloud products, but Plaintiff does not even contribute code. (SMF 144.) They are not similarly situated as a matter of law. *See Shah v. Wilco Sys., Inc.*, 27 A.D.3d 169, 177–78, 806 N.Y.S.2d 553, 559–60 (1st Dep't 2005) (summary judgment on NYCHRL disparate pay claim granted where plaintiff failed to show "reasonably close resemblance of facts and circumstances" between his role and responsibilities and that of alleged comparator; proper comparators were those who held same position and reported to same supervisor as plaintiff).

Plaintiff argues that because she has an engineering background, she is similarly situated to broad categories of engineers at Google. But counterintuitively, Plaintiff also compares herself to Anil Jain, the sole CGL to earn more than her during the relevant time period. The CGL role did not require the same technical expertise as the CGTL role,[12] and was largely a business development function. (SMF 165, 169.) The fact that Plaintiff's job at Google is a blend of various duties requiring different skills does not mean that all employees who also have any single one of her duties is a meaningful comparator. *See Miller*, 2018 WL 2059841, at *7. In any event, Plaintiff did not perform the core functions of the CGL role: engage in systematic contacts with clients and build a team to assist with that function. (SMF 167, 168.) Therefore, Jain is not similarly situated.

Finally, the undisputed evidence does not support the inference that anyone at Google

---

[12] Plaintiff earned more in Total Annual Compensation than the GCTL employees she identified as alleged comparators. (SMF 162.) She has no discriminatory pay claim as to them. *See, e.g.*, *Melman*, 98 A.D.3d at 116.

intentionally compensated Plaintiff less well because she is a woman. Her Total Annual Compensation increased year over year. (SMF 125.) She received the second-highest sign-on bonus and one of the highest new hire equity grants of any Technical Director, regardless of sex or level. (SMF 74, 75.) Her supervisor, Grannis, made an exception for her and a handful of other Technical Directors (of both sexes) in Plaintiff's first year of employment by awarding her an equity refresh grant when she was not eligible per Google policy. (SMF 76.) Google treated Plaintiff favorably in each instance, without regard to sex.

### C.     Plaintiff's Sex Had Nothing To Do with Decisions Concerning the FSVL Role

Plaintiff claims she was denied the FSVL Role in 2018 on account of her sex, but it is undisputed that two women were the finalist candidates while the search was still active. (SMF 106.) The fact that preferred candidates were in the same protected class as Plaintiff undercuts her claim of sex discrimination. *See Campbell v. Cellco P'ship*, 860 F. Supp. 2d 284, 299 (S.D.N.Y. 2012) (granting summary judgment on plaintiff's failure to promote claim where successful employee was member of same protected class as plaintiff).[13]

Plaintiff also does not dispute two of her four interviewers felt she lacked the strategic vision for the role. Inferior interview performance and an assessor's good faith belief that a plaintiff is not the best candidate for the role are both legitimate, non-discriminatory reasons for failure to promote as a matter of law. *See id.*; *Garcia v. Barclays Cap., Inc.*, 281 F. Supp. 3d 365, 378 (S.D.N.Y. 2017). Ultimately, the FSVL Role search was paused in late 2018. (SMF 111, 112.) The role she allegedly was denied never materialized for anyone, so she was not treated less well than anyone else.

### D.     Plaintiff Was Not Excluded from Meetings Or Treated Differently After Her Transfer in 2018

Plaintiff claims after she and three others from OCTO transferred to GAIP in 2018, she was

---

[13] To the extent that Plaintiff intends to pursue a sex discrimination claim with respect to her failure to secure the Vice President-level sales role in 2020, that claim must fail for the same reason: a woman was hired into the role. (SMF 131.)

excluded from meetings, off-sites, and email distribution lists because of her sex. The undisputed evidence shows her male colleagues were inadvertently left off email distribution lists, too. (SMF 96.) There is no disparate treatment under the NYCHRL if a plaintiff is treated the same as others outside her protected class. *See Fenner*, 2013 WL 6244156, at *19 (summary judgment granted; members of both races received verbal abuse and were excluded from newsroom).

Plaintiff was, in fact, invited to Shaukat's offsite meetings and wrote to Shaukat that she enjoyed them. (SMF 99, 100.) In August 2018, Plaintiff informed Shaukat she was not on his team meeting invitations, and Shaukat remedied that within the month. (SUMF 97.) *Cf. id.* (no disparate treatment based on alleged exclusion from newsroom where evidence demonstrated that requests for access were granted). In any event, Plaintiff admittedly has no reason to believe this conduct was anything other than inadvertent. (SUMF 98.)

## V.  THE FAIR PAY CLAIM FAILS AS A MATTER OF LAW

To prevail on her NY Fair Pay Claim, Rowe must first establish Google paid her less than men in the same establishment who performed equal work on jobs requiring equal skill, effort, and responsibility, under similar working conditions, *Sobol v. Kidder, Peabody & Co.*, 49 F. Supp. 2d 208, 219 (S.D.N.Y. 1999) (citation omitted) (emphasis in original), or, *after October 8, 2019*, less than men in the same establishment who performed "substantially similar work, when viewed as a composite of skill, effort and responsibility, . . ." N.Y. Lab. Law § 194(1). She cannot do so for any of her alleged comparators.

The standard for establishing equal or substantially similar work is "demanding," and plaintiffs must show that the specific jobs being compared "entail common duties or content, and do not simply overlap in titles or classifications." *EEOC v. Port Auth. of N.Y. & N.J.*, 768 F.3d 247, 255 (2d Cir. 2014). The focus of the inquiry must remain on **the actual work**. *See Moccio v. Cornell Univ.*, 889 F. Supp. 2d 539, 571 (S.D.N.Y. 2012) (dismissing equal pay claims on summary

judgment; alleged comparators "work in different fields, were placed in different thematic groups, and directed institutes with quite different missions from" plaintiff's), *aff'd*, 526 F. App'x 124 (2d Cir. 2013) (unpublished). "[B]road generalizations drawn from job titles, classifications, or divisions, and conclusory assertions of sex discrimination" are insufficient to avoid summary judgment. *Port Auth.*, 768 F.3d at 256; *see also Chiaramonte v. Animal Med. Ctr.*, 677 F. App'x 689, 691 (2d Cir. 2017) (affirming summary judgment on equal pay claims where employee only provided "mere generalizations" of equal work).

As described above, none of the Directors SWE, Directors AE, Directors PM, GCTLs or GCLs perform equal or substantially similar work, when considering "skill, effort and responsibility." Indeed, each of these jobs is substantially different from Plaintiff's. The majority of these employees manage other employees; Plaintiff does not. *See Britt v. Merrill Lynch & Co.*, No. 08 CV 5356 (GBD), 2011 WL 4000992, at *7 (S.D.N.Y. Aug. 26, 2011) (managerial status is relevant to disparate pay claims under NYCHRL and may warrant dissimilar treatment). Aside from the GCTLs and GCLs, the rest are responsible for building products and programming, something Plaintiff does not do. *Drury*, 2007 U.S. Dist. LEXIS 18435, at *10–11. Moreover, Plaintiff "out-earned" all of her GCTL and GCL alleged comparators working in the same establishment. *Moccio*, 889 F. Supp. 2d at 571. Plaintiff has nothing but sweeping generalizations to assert otherwise, which is plainly insufficient to avoid summary judgment.

The L9 Technical Directors also are not proper comparators. Only one of them, Harteau, ever worked in the same establishment performing the Technical Director role,[14] and for the brief period he did, the standard was "equal work." In 2017, the first year of his employment, he earned ***less than*** Plaintiff, which forecloses an equal pay claim for that time period. *Talwar*, 610 F. App'x at 31

---

[14] "Same establishment" for purposes of the NYLL refers to "workplaces located in the same geographical region, no larger than a county." N.Y. Lab. Law § 194(3) (McKinney 2021).

(affirming summary judgment on federal and state EPA claims where plaintiff earned more than two male comparators). During the nine months of 2018 that he remained in OCTO, he performed substantially different work by collaborating closely with Google's engineering teams, as described above (something Plaintiff still to this day does not do). As of September 2018, he was managing an engineering team building a Google Cloud product, something Plaintiff never did.[15]

There are obvious and clear differences between the work Plaintiff performed at Google and the work performed by her alleged comparators. The fact that their jobs are all broadly titled "Engineering" jobs at a technology company is simply not enough to warrant a trial, even under the amended NYLL. The case law is clear: where allegedly comparable jobs "are so different that no reasonable juror could conclude that they are 'substantially equal,'" a court can dispose of the claim as a matter of law. *Garcia*, 281 F. Supp. 3d at 387 (citation omitted); *see also Moccio*, 889 F. Supp. 2d at 570 (granting summary judgment where extensive discovery failed to show that alleged comparators did not perform work that was "substantially equal in skill, effort, and responsibility" to plaintiff).

## VI.    THE RETALIATION CLAIM FAILS AS A MATTER OF LAW

Plaintiff may only prevail on her retaliation claim under NYCHRL or the NYLL if Google engaged in conduct reasonably likely to deter a person from engaging in protected activity, and there is a causal connection between the protected activity and the allegedly retaliatory conduct. *See Holt v. Dynaserv Indus., Inc.*, No. 14 CIV. 8299 (LGS), 2016 WL 5108205, at *11 (S.D.N.Y. Sept. 19, 2016) (articulating plaintiff's burden under the NYCHRL); *Quartararo v. J. Kings Food Serv. Prof'ls, Inc.*, No. 17-CV-7390 (RRM), 2021 WL 1209716, at *14 (E.D.N.Y. Mar. 31, 2021) (under NYLL, plaintiff must engage in activity protected by the statute, suffer some penalty or adverse

---

[15] Breslow was also based in New York. (SMF 114.) To the extent Plaintiff claims that Breslow is an appropriate comparator, her NY Fair Pay Claim fails as to him for the same reasons articulated above in section IV.B.

action, and show nexus between protected activity and employer's conduct). Plaintiff cannot make such a showing, but if she could, Google can articulate a legitimate, non-retaliatory reason for its actions. *Holt*, 2016 WL 5108205, at *11; *Quartararo*, 2021 WL 1209716, at *14. Plaintiff must then prove pretext or that the conduct was motivated in part by an intent to retaliate. *Holt*, 2016 WL 5108205, at *11; *Quartararo*, 2021 WL 1209716, at *14.

There is no causal connection between Plaintiff's complaints that she was under-leveled on hire and any decisions concerning her. Plaintiff's most recent internal complaint was in November 2018 to Shaukat and Greene.[16] (SMF 107.) She was not selected for the FSVL shortly thereafter, but it was not because she complained. She was not the preferred candidate because of her mixed interview feedback, and even if that were not the case, the search was paused in light of unforeseen leadership changes in Google Cloud. (SMF 104–06, 111–12.) These are legitimate reasons for the decision, and Plaintiff cannot dispute either of those facts.

Plaintiff was then given a choice to return to OCTO in April 2019, five months after her November 2018 complaint. This passage of time is too great to support a retaliation claim. *See Jimenez v. City of New York*, 605 F.Supp.2d 485, 528 (S.D.N.Y. 2009) (evidence insufficient to raise issue of fact concerning causation when more than three months have passed between protected activity and allegedly retaliation). More importantly, Plaintiff **chose** to return to OCTO, and an employer's "decision[] to allow plaintiff to switch positions if [s]he chose" will not support a retaliation claim under the NYCHRL. *Zimmer v. Warner Bros. Pictures, Inc.*, No. 103732/2012, 2016 WL 9331304, at *7 (Sup. Ct., N.Y. Cty. Dec. 23, 2016) (unpublished).

Plaintiff expressed displeasure about leaving OCTO for months, (SMF 95); giving her the

---

[16] Prior to filing this lawsuit, Plaintiff's internal complaints concerned her under-leveling at hire, not complaints about unequal pay. (SMF 67–68, 107–108). To the extent she claims that denial of the FSVL Role was in retaliation for engaging in activity protected by the NYLL, summary judgment is warranted because leveling is not an employment action protected by state labor law, and is more appropriately styled as a claim for retaliation under the NYCHRL only. *Quartararo*, 2021 WL 1209716, at *15 (granting summary judgment on plaintiff's NYLL retaliation claim; obligation to provide reasonable accommodations not employment action protected by NYLL).

option to return cannot possibly dissuade a reasonable person from engaging in protected activity. *See Kemp v. Metro-N. R.R.*, 316 F. App'x 25, 27 (2d Cir. 2009) (no retaliation where "individuals involved in transferring [plaintiff] were motivated by their desire to find her a comparable position, and that they thought she was amenable to taking the position that was found for her"). In fact, it did not even deter Plaintiff; she filed this lawsuit months later in fall 2019, and amended her complaint to add new causes of action multiple times. (ECF 1, 12, 108.) The request she focus on hybrid cloud was not retaliatory, either. Plaintiff admits she does not know what motivated this request, but the reason is clear: the decision to keep the strategy for the financial services industry exclusively within Shaukat's organization had been made years prior. (SMF 92.)

Plaintiff filed her Complaint in September 2019, and was denied the Vice President-level sales role five month later, in February 2020. Plaintiff had no experience managing a sales team, which was a requirement for the role. (SMF 128, 129.) Her obvious lack of qualifications, not her protected activity, motivated the decision. *Accord Ware v. L-3 Vertex Aerospace, LLC*, No. 16 CIV. 8067 (LAP), 2020 WL 783764, at *3 (S.D.N.Y. Feb. 18, 2020) (summary judgment granted on retaliatory failure-to-hire claim under federal, state and local law; no evidence causally linked failure to hire to protected activity where, *inter alia*, defendant rejected applications because plaintiff did not meet basic qualifications, despite plaintiff's insistence that he possessed relevant experience), *aff'd*, 833 F. App'x 357 (2d Cir. 2020). She cannot opine on the successful candidate's qualifications, and therefore cannot show that Google's explanation was pretextual. (SMF 131–132.)

VII.   **CONCLUSION**

For the foregoing reasons, Google is entitled to summary judgment.  The parties do not dispute any fact that is material to the resolution of the claims asserted in this action, and discovery—including Rowe's deposition testimony—has conclusively shown that those claims are meritless.

-25-

Dated: New York, New York
      November 1, 2021

PAUL HASTINGS LLP

By:    Kenneth W. Gage
        Sara Tomezsko

200 Park Avenue
New York, NY 10166
Tel: (212) 318-6000
Fax: (212) 319-4090
kennethgage@paulhastings.com
saratomezsko@paulhastings.com

*Attorneys for Defendant*
GOOGLE LLC