**OUTTEN & GOLDEN LLP**
Cara E. Greene
Maya S. Jumper
Shira Z. Gelfand
685 Third Avenue, 25th Floor
New York, New York 10017
(212) 245-1000

## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

ULKU ROWE,

Plaintiff,

v.

GOOGLE LLC,

Defendant.

No. 19-cv-08655 (LGS)

## PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT AND IN SUPPORT OF PLAINTIFF'S CROSS-MOTION FOR SUMMARY JUDGMENT

## TABLE OF CONTENTS

I.    INTRODUCTION ................................................................................................ 1

II.   STATEMENT OF FACTS ................................................................................ 2

    A.    Google Hires Rowe and a Cohort of Male Comparators as Technical Directors... 2

    B.    Google Denies Rowe a Promotion to VP of Financial Services Despite Her Qualifications and Demotes Her to a Lesser Role .................................................. 7

    C.    Google Denies Rowe Consideration for the VP Financial Services Industry Lead and Retaliates Against Her for Complaining of Discrimination ............................ 8

III.  SUMMARY JUDGMENT STANDARD ...................................................... 10

IV.  ARGUMENT ................................................................................................... 11

    A.    Summary Judgment in Rowe's Favor on her NYEPL Claim is Warranted. ........ 11

        i.    Google paid Mr. Harteau more than Rowe in each year of her employment ............................................................................................. 11

        ii.    Rowe and Nicholas Harteau Performed Substantially Similar Work. ...... 11

    B.    Summary Judgment on Google's Fourth Affirmative Defense is Warranted ....... 14

        i.    Google did not utilize a seniority-based or merit-based compensation system. ................................................................................................... 14

        ii.    Google did not use a bona fide business-related factor other than gender in choosing to pay Mr. Harteau more than Rowe. ...................................... 16

    C.    Disputed Facts Preclude Summary Judgment on the Discrimination Claim. ....... 17

        i.    Leveling and pay discrimination in violation of NYCHRL. .................... 19

            a.    Other Google Directors are comparable to Rowe ......................... 19

                1.    Technical Directors ............................................................ 20

                2.    Engineering Directors ....................................................... 21

                3.    Global Client Leads .......................................................... 22

                 4.    Stuart Breslow .................................................................. 23

            b.    Google's leveling and pay decisions were motivated, at least in part, by Rowe's gender. .............................................................. 23

c.      Google's asserted reasons for paying Rowe less than her male comparators are pretextual. ........................................................... 27

ii.      Discrimination in the GCTL Position ........................................................ 30

iii.      Failure to Consider Rowe for the VP of Financial Services Position ....... 31

D.      Disputed Facts Preclude Summary Judgment on Rowe's Retaliation Claims. .... 33

i.      Rowe opposed Google's unlawful acts. .................................................... 34

ii.      Google retaliated against Rowe because of her complaints. ..................... 35

a.      Google unlawfully denied Rowe the Head of Financial Services role, transferred her, and reduced her responsibilities. ................. 35

b.      Google unlawfully denied Rowe the VP Financial Services Industry Leader position. ................................................................. 37

E.      Disputed Facts Preclude Summary Judgment In Defendant's Favor on Rowe's NYEPL Claim ................................................................................................. 38

V.      CONCLUSION ................................................................................................... 39

## <u>TABLE OF AUTHORITIES</u>

**CASES**                                                                 **PAGE(S)**

*Akinyemi v. Chertoff*,
  No. 07 Civ. 4048, 2008 WL 1849002 (S.D.N.Y. Apr. 25, 2008)............................................22

*Albunio v. City of New York*,
  16 N.Y.3d 472 (2011) ............................................................................................................31

*Bennett v. Health Management Systems, Inc.*,
  936 N.Y.S.2d 112 (App. Div. 1st Dep't 2011) ...............................................................23, 29

*Benzinger v. Lukoil Pan Americas, LLC*,
  447 F.Supp.3d 99 (S.D.N.Y. 2020) ......................................................................................34

*Brinkley-Obu v. Hughes Training, Inc.*,
  36 F.3d 336 (4th Cir. 1994) ...................................................................................................13

*Brown v. Henderson*,
  257 F.3d 246 (2d Cir. 2001)...................................................................................................21

*Carlton v. Mystic Transp., Inc.*,
  202 F.3d 129 (2d Cir. 2000)...................................................................................................10

*Collins v. Cohen Pontani Lieberman & Pavane*,
  No. 04 Civ. 8983, 2008 WL 2971668 (S.D.N.Y. July 31, 2008) ..........................................26

*Crawford v. ExlService.com, LLC*,
  No. 16 Civ. 9137, 2019 WL 5887214 (S.D.N.Y. Nov. 12, 2019) .........................................10

*E.E.O.C. v. Bloomberg L.P.*,
  967 F. Supp. 2d 816 (S.D.N.Y. 2013)....................................................................................10

*E.E.O.C. v. Maryland Insurance Admininstration*,
  879 F.3d 114 (4th Cir. 2018) ...........................................................................................13, 17

*Espinal v. Goord*,
  558 F.3d 119 (2d Cir. 2009)...................................................................................................37

*Feingold v. New York*,
  366 F.3d 138 (2d Cir. 2004)...................................................................................................31

*Fenner v. News Corp.*,
  No. 09 Civ. 09832 LGS, 2013 WL 6244156 (S.D.N.Y. Dec. 2, 2013) ..................................35

*Gambale v. Deutsche Bank AG*,
  No. 02 Civ. 4791, 2003 WL 21511851 (S.D.N.Y. July 2, 2003) ..........................................24

*Giannone v. Deutsche Bank Securities, Inc.*,
  No. 03 Civ. 9665, 2005 WL 3577134 (S.D.N.Y. Dec. 30, 2005)...........................................26

*Goka v. Bobbitt*,
  862 F.2d 646 (7th Cir. 1988) ....................................................................................................2

*Golston-Green v. City of New York*,
  123 N.Y.S.3d 656 (App. Div. 1st Dep't 2020) ........................................................................25

*Gorzynski v. JetBlue Airways Corp.*,
  596 F.3d 93 (2d Cir. 2010)...........................................................................................24, 36, 38

*Graham v. Long Island R.R.*,
  230 F.3d 34 (2d Cir. 2000)....................................................................................................32, 35

*Hinton v. City College of New York*,
  No. 5 Civ. 8951, 2008 WL 591802 (S.D.N.Y. Feb. 29, 2008) ...............................................35

*Husser v. New York City Department of Education*,
  137 F. Supp. 3d 253 (E.D.N.Y. 2015) ...............................................................................18, 29

*Juarez v. Northwestern Mutual Life Insurance Company, Inc.*,
  69 F. Supp. 3d 364 (S.D.N.Y 2014).........................................................................................35

*Kellman v. Metropolitan Transportation Authority*,
  8 F. Supp. 3d 351 (S.D.N.Y. 2014) ..........................................................................................27

*Kessler v. Westchester County. Department of Social Services*,
  461 F.3d 199 (2d Cir. 2006)......................................................................................................37

*Lavin-McEleney v. Marist College*,
  239 F.3d 476 (2d Cir. 2001).....................................................................................................14

*Lefort v. Kingsbrook Jewish Medical Center*,
  116 N.Y.S.3d 499 (N.Y. Sup. Ct. June 20, 2019)....................................................................18

*Mandell v. County of Suffolk*,
  316 F.3d 368 (2d Cir. 2003)......................................................................................................10

*Marseille v. Mount Sinai Health System, Inc.*,
  No. 18 Civ. 2136, 2021 WL 3475620 (S.D.N.Y. Aug. 5, 2021) .......................................24, 32

*McGuinness v. Lincoln Hall*,
  263 F.3d 49 (2d Cir. 2001).................................................................................19, 20, 22, 30

*Melman v. Montefiore Medical Center*,
  137, 946 N.Y.S.2d 27 (App. Div. 1st Dep't 2012) ..................................................................21

*Mickelson v. New York Life Insurance Co.,*
460 F.3d 1304 (10th Cir. 2006) ..................................................................17

*Mihalik v. Credit Agricole Cheuvreux North America, Inc.,*
715 F.3d 102 (2d Cir. 2013)...................................................................18, 31, 33, 34

*Moazzaz v. MetLife, Inc,*
No. 19 Civ. 10531, 2021 WL 827648 (S.D.N.Y. Mar. 4, 2021) ......................................19, 20

*Reed v. Nike, Inc.,*
No. 17 Civ. 7575, 2019 WL 2327519 (S.D.N.Y. May 31, 2019)..................................18, 34

*Rinsky v. Cushman & Wakefield, Inc.,*
918 F.3d 8 (1st Cir. 2019).........................................................................28

*Rizo v. Yovino,*
950 F.3d 1217 (9th Cir. 2020) ..............................................................14, 17

*Rotger v. Montefiore Medical Center,*
No. 15 Civ. 7783, 2019 WL 1429556 (S.D.N.Y. Mar. 29, 2019) ...........................................18

*Ryduchowski v. Port Authority of New York & New Jersey,*
203 F.3d 135 (2d Cir. 2000).........................................................................14

*Ryduchowski v. Port Authority of New York & New Jersey,*
No. 96 Civ. 5589, 1998 WL 812633 (E.D.N.Y. Nov. 19, 1998)...........................................12

*Sandiford v. City of New York Department of Education,*
943 N.Y.S.2d 48 (2012), *aff'd*, 999 N.E.2d 1144 (2013) ......................................28

*Shah v. Wilco System, Inc.,*
806 N.Y.S.2d 553 (App. Div. 1st Dept. 2005).......................................................20

*Spires v. MetLife Group, Inc.,*
No. 18 Civ. 4464, 2019 WL 4464393 (S.D.N.Y. Sept. 18, 2019) ...........................................32

*Stanziale v. Jargowsky,*
200 F.3d 101 (3d Cir. 2000).........................................................................17

*Talwar v. Staten Island Univiversity Hospital,*
610 F. App'x 28 (2d Cir. 2015) ..................................................................11

*Vega v. Hempstead Union Free School District,*
801 F.3d 72 (2d Cir. 2015)...........................................................................35

*Vivenzio v. City of Syracuse,*
611 F.3d 98 (2d Cir. 2010)...........................................................10, 17, 18

*Walsh v. New York City Housing Authority*,
   828 F.3d 70 (2d Cir. 2016) ........................................................................18, 24, 25

*White v. Home Depot Inc.*,
   No. 04 Civ. 401, 2008 WL 189865 (E.D.N.Y. Jan. 17, 2008) ................................36

*William v. Morrison & Foerster LLP*,
   No. 18 Civ. 2542, 2021 WL 3012739 (N.D. Cal. Mar. 12, 2021) ........................13, 14, 20, 34

*Williams v. New York City Housing Authority*,
   872 N.Y.S.2d 27 (App. Div. 1st Dep't 2009) ......................................10, 19, 21, 34

*Xanthakos v. City University of New York*,
   No. 17 Civ. 9829, 2020 WL 5026930 (S.D.N.Y. Aug. 24, 2020) ...........................37

*Ya-Chen Chen v. City University of New York*,
   805 F.3d 59 (2d Cir. 2015) .................................................................................18

*Zann Kwan v. Andalex Group LLC*,
   737 F.3d 834 (2d Cir. 2013) ..........................................................................35, 38

**STATUTES**

New York Labor Law § 194 ............................................................................1, 11

N.Y.C. Admin. Code §§ 8-101 ............................................................................1

**OTHER AUTHORITIES**

29 C.F.R. § 1620.13(b)(2) ...................................................................................13

29 C.F.R. § 1620.13(b)(4) ...................................................................................13

29 C.F.R. § 1620.13(b)(5) ...................................................................................13

Equal Employment Opportunity Comm'n, EEOC-CVG-2001-3, *Revised Guidance on "Compensation Discrimination" Section of Compliance Manual* (Dec. 5, 2000), https://www.eeoc.gov/laws/guidance/section-10-compensation-discrimination ....................................................................14, 15

# I.    INTRODUCTION

Plaintiff Ulku Rowe submits this Memorandum of Law in Opposition to Defendant's

Motion for Summary Judgment ("Def's MOL"), ECF No. 138, on her claims of unequal pay and

retaliation under the New York Equal Pay Law ("NY EPL"), N.Y. Lab. L. Art. 6 §§ 194, 215,

and discrimination and retaliation under the New York City Human Rights Law ("NYCHRL"),

N.Y.C. Admin. Code §§ 8-101 *et seq*.[1] and in Support of Rowe's Cross-Motion for Summary

Judgment on the NYEPL claim and Defendant's related affirmative defenses.

While the Parties appear to agree that the NYEPL claim is ripe for summary adjudication,

the record clearly establishes that summary judgment should be entered *in Rowe's favor*; no

material facts are in dispute regarding Google's indefensible decision to pay Rowe less

(including salary, bonus, and equity) than men Google employed in the same job and other job

roles involving substantially similar or equal work. Further, the record is devoid of any evidence

establishing that Google maintains any seniority-, or merit-based compensation system that

justifies its unequal payment of Rowe relative to her male comparators. Based on the evidentiary

record, Google cannot meet its burden to prove that it had a job-related bona fide reason other

than sex/gender to pay Rowe less. Accordingly, awarding partial summary judgment in Rowe's

favor on Count Four of her Second Amended Complaint (ECF No. 108) and dismissing

Defendant's Fourth Affirmative Defense (Answer, ECF No. 111) is appropriate and prudent to

further efficiency purposes and present only disputed issues to the jury.

Notwithstanding undisputed evidence that Google paid Rowe less than her male

comparators for the performance of equal or substantially similar work and ample evidence that

---

[1] Rowe dismissed with prejudice her First, Second, Third, and Seventh Causes of Action for claims under Title VII and the Equal Pay Act, with the understanding that the Court intends to exercise jurisdiction over Rowe's remaining claims. (ECF Nos. 130, 132.)

Google discriminated and retaliated against Rowe, Google seeks summary adjudication pursuant to Federal Rule of Civil Procedure 56 in its favor on all claims. In making its motion, Defendant submits conclusory affidavits in place of documentary evidence, and improperly seeks to construe all facts in its favor by identifying "only those portions of the record [supporting its] position on summary judgment, although there exists evidence to the contrary of which defendants are aware." *Goka v. Bobbitt*, 862 F.2d 646, 650 (7th Cir. 1988). Defendant's motion, which ignores known, material and disputed facts, must fail. As this Court has previously observed, it is clear "that there are questions of fact as to whether the defendant had discriminatory or retaliatory intent." (May 27, 2021 Hearing Transcript, ECF No. 125 at 2.) Accordingly, Defendant's Motion for Summary Judgment should be denied in its entirety.

## II.     STATEMENT OF FACTS

### A.     <u>Google Hires Rowe and a Cohort of Male Comparators as Technical Directors.</u>

In December 2016, Google extended an offer of employment to Rowe for the position of Technical Director ("Technical Director") in the Office of the Chief Technical Officer ("OCTO")  within Google Cloud. (Aff 56.1 ¶ 17; Opp 56.1 ¶ 40.) Rowe was and remains highly qualified for the position; she holds a Bachelor of Science in Computer Science, a Master of Science in Computer Engineering, and has more than 26 years of experience in the financial services industry, including as the Global Head and Chief Technical Officer ("CTO") of Credit Risk Technology at JPMorgan Chase. (Aff 56.1 ¶¶ 3, 4; Opp 56.1 ¶170.) Rowe is recognized as an expert in cloud technology in the banking industry. (Aff 56.1 ¶¶ 3-4, 7, 134-137; Opp 56.1 ¶¶ 41-44, 223.)

Although Google hired Rowe as a Technical Director, it originally recruited her for a Software Engineering ("SWE") Director role, for which she successfully completed the round of interviews. (Opp 56.1 ¶¶ 143, 230.) After interviewing for the SWE Director role, a recruiter

offered Rowe an opportunity to pursue a similar role within Google's engineering team – the Technical Director position. (Opp 56.1 ¶ 230.) In March 2017, Rowe commenced her employment and began performing the job duties and responsibilities associated with the Technical Director role. (Aff 56.1 ¶ 17; Opp 56.1 ¶ 40.)

The Technical Director position was created by Google in 2016 and functioned under the supervision and direction of William Grannis, Managing Director of OCTO, and Brian Stevens, Chief Technology Officer of Google Cloud. (Aff. 56.1 ¶ 13; Opp 56.1 ¶¶ 1, 18.) Technical Directors have three primary job responsibilities: 1) customer advancement, 2) engineering, and 3) evangelism. (Aff 56.1 ¶ 22; Opp 56.1 ¶¶ 3, 201.) The first pillar – customer advancement, requires Technical Directors to advance the progress of companies by facilitating their migration to Google's Cloud technology. (Aff 56.1 ¶ 23, Opp 56.1 ¶ 4.) The second pillar – engineering, requires Technical Directors to understand the technical aspects and issues relating to customer migration to the Cloud, and to work with the engineering teams to meet customer needs. (Aff 56.1 ¶ 24, Opp 56.1 ¶ 5.) The third pillar—evangelism, requires speaking publicly and externally on Google Cloud's technology. (Aff 56.1 ¶ 25, Opp 56.1 ¶ 7.)

Google required all candidates for the Technical Director position to possess the same requisite qualifications and skills and its recruitment process utilized the same job description, qualification criteria, and interview rubrics for all Technical Director hires. (Aff 56.1 ¶¶ 28, 31-33, 35-45; Opp 56.1 ¶¶ 8, 22, 200-01.) Mr. Grannis, as the hiring manager, was primarily responsible for the hiring decisions for the Technical Director role. (Aff 56.1 ¶ 13, 123.) In hiring and recruiting Technical Directors, Mr. Grannis sought to hire individuals with a demonstrated ability to "advance customers," "influence engineering . . . and convey complex ideas externally to instigate action." (Opp 56.1 ¶ 200.) With an eye towards verticalizing, Mr. Grannis also

identified candidates with significant experience in defined industries, such as banking, healthcare, retail, media, entertainment, and gaming during the interview process. (Aff 56.1 ¶ 26.) As a result, all candidates, including Rowe, were considered to have significant "industry-depth experience in a particular industry" by Mr. Grannis at hire. (Aff 56.1 ¶ 26; Opp 56.1 ¶¶ 205-206.)

Google designated the Technical Director position as a Level 8+, meaning that a Technical Director could be leveled as either an 8 or 9. (Aff 56.1 ¶ 15; Opp 56.1 ¶ 12.) At the time Google hired Rowe and her male comparators, Google made no distinction between the job qualifications required or criteria applied during the interview process for candidates hired at either level. (Aff 56.1 ¶¶ 33-34, 36-42, 45.) Each candidate was interviewed using the same interview template and rubrics. (Aff 56.1 ¶¶ 39, 45; Opp 56.1 ¶ 22.)  Once hired, all Technical Directors were supervised by Mr. Grannis and evaluated using the same performance rubrics. (Aff 56.1 ¶¶ 69, 42-44; Opp 56.1 ¶ 222.) All Technical Director were hired as individual contributors ("ICs"). (Aff 56.1 ¶ 27, Opp 56.1 ¶ 15.) All Technical Directors were "being hired for the same role." (Aff 56.1 ¶ 34, 66; Opp 56.1 ¶¶ 8, 13.)

Within months of hiring Rowe as a Technical Director, Google hired five other men as Technical Directors: Evren Eryurek, Benjamin Wilson, Jonathan Donaldson, Paul Strong, and Nicholas Harteau. (Opp 56.1 ¶¶ 25, 31, 34, 37, 49.) Although Rowe inquired into the leveling process of Technical Directors at Levels 8 and 9, Mr. Grannis told her that all Technical Directors were being hired as Level 8. (Aff 56.1 ¶ 59; Opp 56.1 ¶ 24.) In reality, Google hired Rowe – the only woman – at a Level 8, while it hired male comparators as Level 9s. (Aff 56.1 ¶¶ 46, 57; Opp 56.1 ¶¶ 24.)

While Google has a policy with respect to how leveling decisions are made, Google did not follow that policy with respect to the leveling decisions for Rowe and the other Technical Directors. (Aff 56.1 ¶¶ 49, 51, 54, 63.) Among the deviations from its policy, interviewers were not asked to provide leveling recommendations for the candidates, and thus none of the interviewers did. (*Id.* ¶¶ 50.) Further, although the policy requires the recruiter to submit a leveling rationale explaining why they are submitting the candidate at the proposed level, Ms. Burdis provided no such rationales. (*Id.* ¶ 51.) While Mr. Grannis or Mr. Stevens did include statements of support that included a leveling recommendation, they did not articulate a specific reason for why they were recommending a Level 8 or 9, even though the role was scoped as a Level 8+. (*Id.* ¶¶ 55-58, 68.) Further, Google is unable to identify who made the leveling decision with respect to the Technical Directors, as Mr. Grannis, Mr. Stevens, Ms. Burdis, and Diane Greene, Google's former SVP and CEO of Google Cloud, all deny direct responsibility for the decision. (*Id.* ¶¶ 53, 63-65.)

Once in the role, Rowe and her male comparators had the same duties and responsibilities. (*Id.* ¶¶ 69-72.) Google's own internal job ladders belie any distinction between the work performed at both levels of the role. (*Id.* ¶¶ 33.) No internal policy documents outline any distinction in the job requirements associated with the Technical Director role at Level 8 and Level 9. (*Id.* ¶ 34-40.) Other Technical Directors in the role confirmed that Technical Directors at Levels 8 and 9 were considered peers and no distinction was made by Google or other Technical Directors between the work performed by and job responsibilities of individuals hired into the Technical Director role in OCTO. (*Id.* ¶¶ 69-72.) Technical Directors consistently collaborated with each other in the role, assisted each other with client engagements, and would fill in or substitute for other Technical Directors on speaking engagements or client

engagements. (*Id.* ¶ 70.)  Rowe's performance in the Technical Director position was equal to or greater than that of her male colleagues. (*Id.* ¶¶ 115, 117; Opp 56.1 ¶¶ 84, 222.) In fact, Mr. Grannis proposed that Rowe lead the team of Technical Directors who were industry specialists, even though it would have resulted in a Level 8 managing Level 9s, as "we all feel that she is the best person for the role." (Opp 56.1 ¶ 206.)

Nevertheless, the record reflects, and Google concedes, that it paid the male Level 9 Technical Directors more than Rowe. *See* ECF 113 (Def's Pre-Letter Mot.) at 1 ("The undisputed evidence shows, however, that these individuals were hired at L9 (and paid more)"). For example, Google paid Mr. Harteau, one of the male Technical Director hired into the exact same job role just weeks after Rowe, a higher base salary, higher bonus, and more equity than Rowe. (Aff 56.1 ¶¶ 74-110; Opp 56.1 ¶ 83.) In every year Google paid Rowe less than Mr. Harteau, she either matched or outperformed him in performance ratings. (Aff 56.1 ¶¶ 74-110.)

In 2018, Rowe, and three other Technical Directors were transferred out of OCTO and into Tariq Shaukat's organization as Global Client Technical Leads ("GCTLs"). (Opp 56.1 ¶¶ 93, 283.) Individuals in the GCTL role ███████████████████████████ ███████████████ (*Id.* ¶ 164.) Global Client Leads ("GCLs") and GCTLs worked side-by-side in "overlapping" roles to service a shared global client. (*Id.* ¶ 166.) GCLs and individuals in the GCTL role performed substantially similar job responsibilities, which included driving and creating ███████████████████████████████████ ███████ (*Id.* ¶ 258.) GCLs were considered the ██████████████ of Rowe and others GCTLs, so much so that other GCTLs could not distinguish any meaningful difference between the two job roles. (*Id.* ¶ 260-261.) In the GCTL role, Mr. Shaukat treated Rowe less well than her male counterparts. (*Id.* ¶¶ 97, 284-289.)

**B.**     **Google Denies Rowe a Promotion to VP of Financial Services Despite Her Qualifications and Demotes Her to a Lesser Role**

Over the course of 2018, Google sought to verticalize and hire a Vice President, Financial Services ("VP Financial Services"). (Opp 56.1 ¶ 297.) Mr. Grannis had previously indicated that Rowe would be the obvious person to lead the Financial Services vertical based on her expertise in the industry. (*Id.* ¶ 67.) Mr. Shaukat was the hiring manager for the VP Financial Services role. (*Id.* ¶¶ 102, 298.) Both Mr. Grannis and Mr. Stevens considered Rowe to be qualified for the role, but Mr. Shaukat did not in good faith consider Rowe for the role, despite her expertise and demonstrated work promoting Google Cloud in the financial services industry. (*Id.* ¶¶ 296, 304-305.) Although Mr. Shaukat told Rowe he planned to give her a fair shot, he later admitted that in June 2018, prior to Rowe's application for the VP Financial Services role, and just weeks into any formal professional interaction with Rowe, he formed the opinion that Rowe was not ███████████████████████████ (*Id.* ¶ 301.)

In June 2018, Rowe spoke with Will Grannis regarding her concerns that she was not being fairly considered for the VP Financial Services role. (*Id.* ¶ 304.) She also emailed the Google internal recruiters she had worked with, Melissa Lawrence and Kevin Lucas, to inform them that she perceived that her under-leveling at hire was negatively impacting her consideration for the VP role. (*Id.* ¶¶ 107, 309.)

In August 2018, four individuals interviewed Rowe for the VP Financial Services role. (Opp 56.1 ¶¶ 104, 310.) Contrary to Google's standard practice, their feedback was not formally captured in writing and uploaded to gHire. (*Id.* ¶ 311-313.) Rather, their limited feedback, to the extent it was provided at all, was only shared verbally and informally, and only one provided his feedback directly to Mr. Shaukat. (*Id.* ¶ 316-318.) Overall, "there was no negative feedback" from Rowe's interviewers; "[t]here was only positive feedback on the technical side," and while

one raised some questions on the "on the business side," it was with the caveat that his interview with Rowe was only 30 minutes. (*Id.* ¶ 323-324.) Nevertheless, Mr. Shaukat confirmed in August, after receiving Mr. Marotte's email, that Rowe "was not going to be a finalist for the role," though he did not communicate the decision to Rowe at that time because of a retention concern. (*Id.* ¶ 325.)

In November of 2018, Rowe emailed Mr. Shaukat and Ms. Greene to raise concerns regarding her treatment during the VP Financial Service interview process – highlighting that she (unlike other candidates) had not been interviewed by Ms. Greene, and her belief that her original under-leveling was impacting her candidacy. (*Id.* ¶ 320.) They escalated her complaint to HR, who responded that they had looked into it and the leveling process was not discriminatory. (*Id.* ¶¶ 107-08.) In January 2019, Mr. Shaukat selected Mr. Breslow, who had not interviewed for the position, was less-qualified than Rowe, and did not even meet the core requirements for the role, as the new head of financial services. (*Id.* ¶¶ 328, 335-343.) Mr. Shaukat then forced Rowe to choose one of three undesirable employment options, each of which entailed decreased scope, visibility, and industry-specific impact. (*Id.* ¶¶ 344-46.)

## C.   <u>Google Denies Rowe Consideration for the VP Financial Services Industry Lead and Retaliates Against Her for Complaining of Discrimination</u>

In January 2019, two months after Rowe raised internal complaints of discrimination related to the VP Financial Services role, Stuart Vardaman, the lead recruiter for the role, unilaterally entered data into Google's applicant feedback database, Thrive, indicating that Rowe was rejected from the VP Financial Services position because she lacked "Googleyness" (an opinion unsupported by any record evidence or the assessment of Rowe's interviewers), and further describing Rowe as "overly self-oriented" and recording that Rowe "was not qualified for the role in addition to ego concerns." (Opp 56.1 ¶ 348.) These statements directly contradict his earlier description of Rowe in email

correspondence dated before Rowe's complaints of discrimination, and are unsupported by feedback about Rowe during the interview process. (*Id.* ¶ 353.)

After Rowe filed this lawsuit on September 17, 2019, Google, through its Employee Relations ("ER") team undertook an internal investigation of Rowe's claims, which lasted from approximately October 2019 until April 2020. (*Id.* ¶ 349-350.) On January 22 and 29, 2020, ER interviewed Mr. Vardaman, who had led the recruitment process for the VP Financial Services position. (*Id.* ¶ 350.) Mr. Vardaman was aware that the ER investigation related to Rowe's prior complaints regarding unequal pay and leveling and her consideration for the VP Financial Services role. (*Id.* ¶ 351.) Mr. Vardaman described Rowe in his ER interview as ██████████ ███████████ and ██████ despite months earlier having described Rowe as a candidate with "executive poise," who was "confident (but not ego-driven)," and "forthright with a quick operating cadence." (*Id.* ¶ 352-353.)

Just two weeks later, in February 2020, Rowe learned of a Vice President – Financial Services Industry Lead position from the Head of the North American Sales, Kristen Kliphouse. Ms. Kliphouse instructed Rowe to follow up with Mr. Vardaman, the recruiter for the position, in order to apply. (*Id.* ¶¶ 354, 357.) While Rowe reached out to Mr. Vardaman on multiple occasions and asked for guidance on the next steps in the application process, Mr. Vardaman did not respond to Rowe's request for additional information, other than providing her with the job description. (*Id.* ¶¶ 358-359.) On February 10, Rowe reached out to Mr. Vardaman again for an update, and received an email from him indicating that he would be scheduling a meeting with her to discuss an "update." (*Id.* ¶ 360.)

On February 25, 2020, Mr. Vardaman informed Rowe that she would not be considered for the VP Financial Services Lead position. (Opp 56.1 ¶ 361.) Mr. Vardaman never gave Rowe instructions for how to apply for the position, despite her repeated requests, and he did not tell

Rowe she needed to submit a formal application. (*Id.* ¶ 362.) Mr. Vardaman did not review any written materials related to Rowe in connection with her consideration for the role. (*Id.* ¶ 365-366.) Mr. Vardaman made no effort to inquire into Rowe's C-level network or external reputation as an expert or "industry titan," and he does not recall whether he even looked at Rowe's LinkedIn profile before determining that she was not qualified for the role. (*Id.* ¶ 367.) Google never interviewed Rowe for the role. (*Id.*)

## III.    SUMMARY JUDGMENT STANDARD

At the summary judgment stage, courts must "determine (a) whether there is a genuine issue as to any material fact, and (b) whether, in light of the undisputed facts, the movant is entitled to judgment as a matter of law." *Vivenzio v. City of Syracuse*, 611 F.3d 98, 106 (2d Cir. 2010). "The movant bears the burden of demonstrating the absence of a genuine dispute of fact, and, to award summary judgment, the court must be able to find after drawing all reasonable inferences in favor of a non-movant that no reasonable trier of fact could find in favor of that party." *Crawford v. ExlService.com, LLC*, No. 16 Civ. 9137, 2019 WL 5887214, at *1 (S.D.N.Y. Nov. 12, 2019). "[Summary] judgment should normally be denied to a defendant if there exist triable issues of fact as to whether such conduct occurred." *E.E.O.C. v. Bloomberg L.P.*, 967 F. Supp. 2d 816, 837 (S.D.N.Y. 2013) (quoting *Williams v. N.Y. City Hous. Auth.*, 872 N.Y.S.2d 27 (App. Div. 1st Dep't 2009)). Courts caution that summary judgment for employers should be granted "sparingly because careful scrutiny of the factual allegations may reveal circumstantial evidence to support the required inference of discrimination." *Mandell v. County of Suffolk*, 316 F.3d 368, 377 (2d Cir. 2003) (internal quotation marks and citation omitted); *see also Carlton v. Mystic Transp., Inc.*, 202 F.3d 129, 134 (2d Cir. 2000) ("[A] trial court should exercise caution . . . where, as here, [the employer's] intent is a genuine factual issue.").

# IV.     ARGUMENT

## A.     Summary Judgment in Rowe's Favor on her NYEPL Claim is Warranted.

No genuine dispute of fact remains as to any element of Rowe's NYEPL claim, rendering it well-suited for summary disposition. To prevail under the NYEPL, Rowe must demonstrate that Google failed to pay her equally to a man in the same geographic area for (a) equal work on a job the performance of which requires equal skill, effort and responsibility, and which is performed under similar working conditions, or (b) substantially similar work, when viewed as a composite of skill, effort, and responsibility, and performed under similar working conditions. *See* N.Y. Lab. L. § 194(1); *see also Talwar v. Staten Island Univ. Hosp.*, 610 F. App'x 28, 31 n.2 (2d Cir. 2015) ("An equal pay claim under New York Labor Law § 194 is analyzed under the same standards applicable to the federal Equal Pay Act."). Here, the undisputed evidence establishes each prong.

### i.     *Google paid Mr. Harteau[2] more than Rowe in each year of her employment.*

Defendant concedes the first element (Google failed to pay Rowe equally to Mr. Harteau) of Rowe's NYEPL claim for years 2017-2020, with the exception of one bonus payment in 2020. *See* Def's MOL at 17; Humez Decl, ECF No. 140 at 11. The undisputed evidence also establishes that Google paid Mr. Harteau more than Rowe in 2017, when considered on a pro rata basis. (Aff 56.1 ¶ 78-85.)

### ii.     *Rowe and Nicholas Harteau Performed Substantially Similar Work.*

The uncontroverted evidence establishes that Rowe and Mr. Harteau were hired into the same job and performed substantially similar, if not equal, work. Google hired Rowe and Mr.

---

[2] For purposes of this motion, Plaintiff only seeks summary judgment on the NYEPL with respect to Nicholas Harteau, who worked in the New York City office with Ms. Rowe, without prejudice to asserting at trial that other individuals are comparators with respect to the NYEPL claim.

Harteau for the same posted position, within a few months of each other, based on the same interview criteria. (Aff 56.1 ¶¶ 17-20, 33-41.) Both Rowe and Mr. Harteau were supervised by Mr. Grannis and evaluated by him using the same evaluation rubrics, including their ability to meet the same job requirements and primary job responsibility pillars. (*Id.* ¶¶ 22, 33-34, 36-38, 42-44, 47.) Technical Directors hired into both Levels 8 and 9 were required to possess a "[d]emonstrated ability to understand and advance customers usually in the form of experience—firsthand experiences with Cloud, Cloud migration, second engineering experience sufficient to demonstrate ability to influence engineering groups without authority, and then third demonstrated thought leadership or some form of evangelism." (Opp 56.1 ¶ 200.) At the time of Rowe's and Mr. Harteau's hire, Mr. Grannis did not have a sense of what distinguished Level 8 and 9 Technical Directors. (Aff 56.1 ¶ 34.) Other Technical Directors also confirm that Technical Directors at Levels 8 and 9 performed the same job, and that all Technical Directors in OCTO were considered peers and covered for one another. (*Id.* ¶ 70-72.)

The record belies any distinctions that Google attempts to create. Rowe "need not demonstrate that her job is identical to a higher paid position, but only must show that the two positions are substantially equal in skill, effort, and responsibility." 239 F.3d 476, 480 (2d Cir. 2001) (internal quotation marks and citations omitted). Courts routinely find that plaintiffs satisfy this element of the *prima facie* showing establishing equal or substantially similar work where the comparator job role is "the same position plaintiff held." *See, e.g.*, *Ryduchowski v. Port Auth. of N.Y. & N.J.*, No. 96 Civ. 5589, 1998 WL 812633, at *12 (E.D.N.Y. Nov. 19, 1998).

Further, Google is unable to point to any evidence in the record demonstrating that the *actual work* required of Rowe and Mr. Harteau diverged in any meaningful way. Its self-serving assertion that Mr. Harteau had additional responsibilities is belied by Mr. Harteau's own

12

testimony that he and Rowe performed the same job role, (Aff 56.1 ¶ 69), and even if his position changed at some point in time (*i.e.*, when he transferred to the SWE Director position), he remains her comparator for purposes of the law. *See Brinkley-Obu v. Hughes Training, Inc.*, 36 F.3d 336, 343 (4th Cir. 1994) ("A plaintiff may make her *prima facie* case by comparing her salary to that of her predecessor or successor" and *citing* 29 C.F.R. § 1620.13(b)(2), (4), and (5).); 29 CFR § 1620.13(b)(5) ("It is immaterial that a member of the higher paid sex ceased to be employed prior to the period covered by the applicable statute of limitations period for filing a timely suit under the EPA.").

Any assertion that the Level 9 Technical Directors possessed greater qualifications is untrue, but more importantly, is irrelevant to whether the work performed by Technical Directors at Levels 8 and 9 was substantially similar or equal. *See E.E.O.C. v. Maryland Ins. Admin.*, 879 F.3d 114, 122 (4th Cir. 2018) ("the fact that the male comparators were hired at higher step levels than at least one of the claimants, allegedly based on their background experience, relevant professional designations, and licenses or certifications" [is irrelevant to establishment prima facie case]. "Such experience and other factors are relevant only to any affirmative defense . . . at this initial stage we ask only whether the claimants and the identified comparators worked jobs requiring "equal skill, effort, and responsibility," and whether each claimant was paid less than one or more comparators."). Rationales that attempt to distinguish comparators based on "experience" and "in-demand specialties" are irrelevant to the question of "whether the work they performed [in the comparable] positions was substantially the same." *William v. Morrison & Foerster LLP*, No. 18 Civ. 2542, 2021 WL 3012739, at *14 (N.D. Cal. Mar. 12, 2021) (interpreting NYEPL).

13

While, on other factual records, courts in this Circuit have chosen to reserve the question

of comparability for the jury, *see Lavin-McEleney v. Marist College*, 2239 F.3d 476, 480 (2d Cir.

2001), here there is no evidence present in the record on which a jury could find in Defendant's

favor on the issue of whether the core skills, responsibilities and duties associated with the jobs

performed was substantially similar or equal, and thus summary judgment in Rowe's favor is

warranted.

**B.**   **Summary Judgment on Google's Fourth Affirmative Defense is Warranted.**

Where a plaintiff has satisfactorily established her *prima facie* case, the burden shifts to

the employer to show that an affirmative defense exists. *Ryduchowski*, 203 F.3d at 143. "The

burden of establishing one of the four affirmative defenses is 'a heavy one,' because the statutory

exemptions are 'narrowly construed.'" *Id.* (citations omitted). Defendant's burden requires it to

prove "not simply that the employer's proffered reasons *could* explain the wage disparity, but

that the proffered reasons *do in fact* explain the wage disparity." *Rizo v. Yovino*, 950 F.3d 1217,

1222 (9th Cir. 2020) (emphasis in original). In other words, the defense cannot be an after-the-

fact creation, but rather must have been the reason at the time the decision was made. The record

is devoid of any evidence sufficient to establish that Google used a seniority-, or merit- based

system, or any other bona fide, job-related factor other than gender, in setting Rowe and Mr.

Harteau's compensation.

> **i.**   ***Google did not utilize a seniority-based or merit-based compensation system.***

Google cannot point to any internal documentation or testimony demonstrating the

existence of a seniority-based compensation system. A bona fide seniority-based system is one

that rewards employees according to the length of their employment. *See* Equal Employment

Opportunity Comm'n, EEOC-CVG-2001-3, *Revised Guidance on "Compensation*

*Discrimination" Section of Compliance Manual* (Dec. 5, 2000),

https://www.eeoc.gov/laws/guidance/section-10-compensation-discrimination ("EEOC

Guidance").  Because there is no evidence that such a system exists at Google, (Aff 56.1 ¶ 112),

Google will be unable to meet its burden and Summary Judgment should be granted.

     Likewise, Google does not determine total compensation using a merit-based

compensation system. (Aff 56.1 ¶¶ 112-118.) While Google has a performance review process

that nominally impacts compensation, it is not a bona fide performance-based system under the

law. In order to qualify as a bona fide defense, a performance-based system must be a structured

procedure in which employees are evaluated at regular intervals according to predetermined

criteria, such as efficiency, accuracy, and ability. EEOC Guidance,

https://www.eeoc.gov/laws/guidance/section-10-compensation-discrimination. Here, however,

salary increases during the performance review cycles are based not only on performance ratings,

but on market pay for role, level, and location, as well as "manager discretion- adjusting pay

relative to peers, trajectory, retaining critical talent, and more."  (*Id.* ¶ 114.)

     Even if Google were able to establish the existence of such a system, an impossible task

on this record, it cannot establish that the system explains the pay differentials between Rowe

and her comparators. Google cannot point to any merit-based justification for the disparity in

compensation <u>at the time of hire</u>, at which point neither Rowe nor her comparators had begun to

perform. Further, because Rowe's performance matched or exceeded her comparators in each

year, where identical evaluation rubrics and criteria were used to evaluate each of them, such a

system cannot explain the pay disparity. (Opp. 56.1 ¶ 84.)

ii.     *Google did not use a bona fide business-related factor other than gender in choosing to pay Mr. Harteau more than Rowe.*

The undisputed evidence also makes clear that there is no means by which Google can establish the existence of any other bona fide business-related factor other than gender as the reason for the pay disparity between Rowe and Mr. Harteau. Fatally, Google cannot identify who made the leveling decision with respect to Rowe, Mr. Harteau, and the other L9 Directors, nor can they articulate the reason why that unidentified person leveled Rowe as an 8 and Mr. Harteau as a 9. Ms. Burdis was unequivocal in her deposition that she did not play any role in deciding at what level a Technical Director would be hired. (Aff 56.1 ¶ 53.) Likewise, Mr. Grannis testified that he did not make the leveling determinations, and only made a recommendation as to whether a candidate was qualified at the level being proposed. (*Id.* ¶ 65.) While Ms. Burdis testified that it was the Diane Greene, the Senior Vice President, who made the leveling decision, Ms. Greene disavowed any involvement in that decision. SF 56. (*Id.* ¶ 64.)

Further, there is no documentation substantiating the reasons why, even though the Technical Director position was scoped as a Level 8+ and all candidates were deemed qualified and hired, a recommendation was made to hire Rowe as a Level 8 (as opposed to a Level 9) and certain men as a Level 9 (as opposed to a Level 8). For Rowe, Mr. Grannis wrote only, "Based on the positive, consistent feedback from the panel, the criticality of financial services as a vertical for Google Cloud, and the candidate's clear demonstration of readiness to make an immediate impact as an L-8, I enthusiastically endorse the hire recommendation." (*Id.* ¶ 57.) When asked at his deposition why he made such a recommendation, Mr. Grannis tried to ███████ ███████████████ to determine what factors he would have considered, but testified it was ███████████████████████████████████████████ (*Id.* ¶ 56.)

16

Thus, as a matter of law, Google cannot meet its burden to prove that the "proffered reasons *do in fact* explain the wage disparity." *Rizo*, 950 F.3d at 1222; *see also EEOC v. Md. Ins. Admin.*, 879 F.3d 114, 121 (4th Cir. 2018) (citing *Stanziale v. Jargowsky*, 200 F.3d 101, 107-08 (3d Cir. 2000)); *Mickelson v. N.Y. Life Ins. Co.*, 460 F.3d 1304, 1312 (10th Cir. 2006). The Fourth Circuit's decision *in E.E.O.C. v. Maryland Insurance Administration*, an EPA case, is particularly illustrative. 879 F.3d at 114. There, like here, the defendant argued that that the observed pay disparities were justified by differences between the experience and qualifications of the comparators and the plaintiff. *Id.* at 123. But the court, in overturning summary judgment in favor of the defendant, rightly noted:

> [C]ertainly, the factors cited by [defendant] *could* explain the wage disparity between the claimants and the comparators. Nevertheless, as we have emphasized, a viable affirmative defense under the EPA requires more than a showing that a factor other than sex *could* explain or *may* explain the salary disparity. Instead, the EPA requires that a factor other than sex *in fact* explains the salary disparity. The present record does not show, as a matter of law, that the reasons proffered by [employer] do *in fact* explain the salary disparities. In particular, the record does not contain any contemporaneous evidence showing that the decisions to award [male comparators] their respective starting salaries were *in fact* made pursuant to their aforementioned qualifications.

*Id.* (emphasis in original). Because it cannot establish the actual basis for the leveling decision, Defendant's Fourth Affirmative Defense should be dismissed on summary judgment.

## C.     <u>Disputed Facts Preclude Summary Judgment on the Discrimination Claim.</u>

Google has failed to demonstrate the absence of material disputed facts with respect to its discriminatory treatment of and retaliation against Rowe. Contrary to Google's assertions, ample evidence supports Rowe's claims of discrimination under the NYCHRL, and a reasonable jury could find in Rowe's favor. "[I]f there is any evidence in the record from any source from which a reasonable inference could be drawn in favor of the nonmoving party, summary judgment is

improper." *Vivenzio*, 611 F.3d at 106; *see also Walsh v. N.Y. City Hous. Auth.*, 828 F.3d 70, 74 (2d Cir. 2016) (at summary judgment, court must construe the facts in the light most favorable to the non-moving party and must resolve all ambiguities and draw all reasonable inferences against the movant).

In order to prevail on a gender discrimination claim under the NYCHRL, a plaintiff need only show that she was "treated less well than other employees because of her sex." *Husser v. N.Y. City Dep't of Educ.*, 137 F. Supp. 3d 253, 270 (E.D.N.Y. 2015). "The NYCHRL must be construed broadly in favor of discrimination plaintiffs, to the extent that such a construction is reasonably possible." *Rotger v. Montefiore Med. Ctr.*, No. 15 Civ. 7783, 2019 WL 1429556, at *10 (S.D.N.Y. Mar. 29, 2019) (internal quotations omitted). "Plaintiff's burden to initially establish a *prima facie* discrimination case is not onerous and direct evidence is not necessary." *Lefort v. Kingsbrook Jewish Med. Ctr.*, 116 N.Y.S.3d 499 (N.Y. Sup. Ct. June 20, 2019).

Once a plaintiff has prima facie case, "the employer has the burden of proving the conduct's triviality under the NYCHRL," *Mihalik v. Credit Agricole Cheuvreux N. Am., Inc.*, 715 F.3d 102, 111 (2d Cir. 2013), or "offer legitimate reasons for its actions." *Ya-Chen Chen v. City Univ. of New York*, 805 F.3d 59, 75 (2d Cir. 2015). "If the defendant satisfies that burden, summary judgment is appropriate if no reasonable jury could conclude either that the defendant's reasons were pretextual, or that the defendant's stated reasons were not its sole basis for taking action, and that its conduct was based at least in part on discrimination." *Reed v. Nike, Inc.*, No. 17 Civ. 7575, 2019 WL 2327519, at *1 (S.D.N.Y. May 31, 2019). "A defendant is entitled to summary judgment only if the record establishes as a matter of law that discrimination played *no* role in its actions." *Id.*

18

Google's contention that Rowe has demonstrated "no evidence that could support an inference of discrimination" is false. Def's MOL at 16. As outlined below, Rowe has adduced sufficient evidence in support of her NYCHRL claims to raise disputes of material fact regarding Google's:  a) failure to pay her the same as her male counterparts; b) discriminatory treatment of Rowe in the GCTL position; and (c) discriminatory failure to meaningfully consider Rowe for the VP Financial Services position and selection of a less-qualified man for the position.

### i.      Leveling and pay discrimination in violation of NYCHRL.

Disputed issues of fact preclude summary judgment on Rowe's NYCHRL claim relating to Google's decision to level Rowe lower and pay her less than similarly situated men, including Technical Directors and other Director-level positions at Google. To survive a motion for summary judgment seeking dismissal of a NYCHRL claim, Rowe need only show that "she has been treated less well than other employees" at least in part because of her sex. *Williams*, 872 N.Y.S.2d at 39.

### a.      Other Google Directors are comparable to Rowe.

 Contrary to Defendant's argument, when viewing the evidence in the light most favorable to Rowe, a jury could conclude that Rowe was similarly situated to other male Directors at Google. To establish a claim of discrimination, "[a] plaintiff is not obligated to show disparate treatment of an *identically* situated employee . . . it is sufficient that the employee to whom plaintiff points be similarly situated in all material respects." *McGuinness v. Lincoln Hall*, 263 F.3d 49, 53-54 (2d Cir. 2001) (emphasis in original). "Perhaps unsurprisingly, given the broad array of factors that bear on [w]hether two positions are substantially equivalent . . . this fact-intensive analysis is typically conducted after discovery and treated as a question for the

jury." *Moazzaz v. MetLife, Inc*, No. 19 Civ. 10531, 2021 WL 827648, at *6 (S.D.N.Y. Mar. 4, 2021) (internal quotation marks omitted).

### 1.    *Technical Directors*

Rowe and other Technical Directors are comparators for purposes of the NYCHRL claim. While Google argues that Rowe did not do equal or substantially similar work to the Level 9 Technical Directors (Def's MOL at 11), the evidence shows that Rowe and the Level 9 Technical Directors were all hired within same time period by the same hiring manager, were evaluated for hire based on the same rubrics and job description, irrespective of level, held the same job title ("Technical Director"), and performed the same core work responsibilities. (Opp 56.1 ¶¶ 8, 10, 12-14, 22.) That Rowe was performing work comparable to her male peers is further evidenced by the fact that both Mr. Grannis selected her to lead a group of fellow Technical Directors, even though doing so would result in a Level 8 managing Level 9s. (Opp 56.1 ¶¶ 206-207.) Courts routinely find employees to be similarly situated on similar factual records. *See Shah v. Wilco System, Inc.*, 806 N.Y.S.2d 553 (App. Div. 1st Dept. 2005) (finding employees to be similar situated where "they held the same position"); *see also William*, 2021 WL 3012739, at *8 (finding that employee's possession of unique, industry specific "experience demonstrates that she has comparable unique skills"); *McGuinness*, 263 F.3d at 54 (finding employees similarly situated where challenged decision occurred at the same time and by the same managers).

In an attempt to rebut this showing, Google argues, without citation, that "the work L9 Technical Directors in OCTO performed was materially different and they indisputably made greater and more meaningful contributions to engineering than Rowe." Def's MOL at 18. Not only is this argument patently false, (Opp 56.1 ¶¶ 8, 10, 12-14, 22.), it is wholly irrelevant to

Rowe's showing of comparability at time of hire. In any event, three of her male Level 9 comparators offered testimony as to the comparability of their roles (Aff. 56.1 ¶¶ 70-72), which at a minimum creates a dispute of material fact. *Williams*, 872 N.Y.S.2d at 39 (under the NYCHRL, summary "judgment should normally be denied to a defendant if there exist triable issues of fact as to whether [plaintiff was treated less well than other employees because of her gender]").

Likewise, those Level 8 Technical Directors who earned more than Rowe are also Rowe's comparators, as they performed the same core job duties as all Technical Directors at Level 8+. (Opp 56.1 ¶¶ 8, 10, 12-14, 22.) And as with the Level 9 Technical Directors, a jury should resolve disputes of fact related to whether Google's asserted reason for paying them more is pretextual and whether Rowe's and her male comparators' experience and qualifications were comparable. Further, Google's argument that Rowe's unequal pay claim is nullified by the fact that Rowe was compensated higher than select male Level 8 Technical Directors is contrary to established case law. *Melman v. Montefiore Med. Ctr.*, 137, 946 N.Y.S.2d 27, 48 (App. Div. 1st Dep't 2012) (the fact that defendant paid plaintiff more than *some* men does not nullify its discriminatory treatment); *see also Brown v. Henderson*, 257 F.3d 246, 253-54 (2d Cir. 2001) ("what matters in the end is not how the employer treated other employees, if any, of a different sex, but how the employer would have treated the plaintiff had she been of a different sex"); *C.f. EEOC v. Md. Ins. Admin.*, 879 F.3d at 121-22 ("The fact that other male employees . . . performed substantially identical work but made less money than the claimants does not require us to reach a different conclusion.").

### 2.    *Engineering Directors*

While Google argues none of the Software Engineering ("SWE"), Application Engineering ("AE"), and Product Management ("PM") Directors performed equal or substantially similar work, the evidence viewed in the light most favorable to Rowe establishes that she is similarly situated to Engineering Directors in Software Engineering, Application Engineering, and Product Management. Google did not differentiate between these roles in its hiring rubrics, and as with the Technical Director position, it used the same Engineering-wide Leveling Guide and Google Leadership rubrics for these positions. (Opp 56.1 ¶¶ 228, 242, 244). The Engineering-wide Leveling guide accurately reflects the skills and expectations across all Engineering roles, regardless of ladder. (*Id.* ¶¶ 228, 242, 244). The comparability of these roles is further demonstrated by the frequency with which Engineering Directors transfer between job roles. Mr. Shaukat testified that it was ████████████████████████ for individuals in Engineering Director roles to move into other ladders because Engineering Directors had transferable skills that facilitated internal mobility. (*Id.* ¶ 138.) Case law makes clear that Rowe need not show that employees are *identical*, but rather that the individuals are similar in material respects. *See McGuinness*, 263 F.3d at 54.

### 3.    *Global Client Leads*

Contrary to Google's argument that individuals in the Global Client Lead ("GCL") position were not similarly situated to Rowe and performed incomparable job duties, Def's MOL at 19, the record evidence demonstrates that GCLs were similarly situated to Rowe for the purposes of the NYCHRL. Global Client Technical Leads ("GCTL"), like Rowe, and GCLs performed similar core functions, including assignment to the same global clients, responsibility for the agenda, key transformation relationships, and end-to-end success at each Global Client, and served in Director Level roles. (Opp 56.1 ¶¶ 164, 254, 258.) Both Rowe and GCLs were

supervised by Mr. Shaukat, evidencing the roles' similarity. (*Id.* ¶ 255.) *See Akinyemi v. Chertoff*, No. 07 Civ. 4048, 2008 WL 1849002, at *5 (S.D.N.Y. Apr. 25, 2008) ("Whether or not a plaintiff reports to the same supervisor as her comparator is an important factor in finding that a plaintiff and the comparator are similarly situated."). It is clear that the roles were substantially similar as Mr. Shaukat testified that the only difference between the two was that the GCTL role was ████████████████████████████████ (Opp 56.1 ¶¶ 166, 260.) Further, Rowe's male GCTL comparators said the roles were "overlapping" and "Global client leads versus global client technical leads was definitely an ambiguity at best," (*Id.* ¶¶ 6, 166.) Google considered Anil Jain, a Level 9 GCL to be a peer of Rowe's. (*Id.* ¶ 164.)

### 4.    *Stuart Breslow*

Likewise, there are triable issues of disputed fact related to whether Stuart Breslow is a comparator. Mr. Breslow was hired as a Director, Solutions Consultant, reporting to Mr. Shaukat as an IC. (Opp 56.1 ¶¶ 264-267.) His role involved the same requirements as the Technical Director position, as they related to knowledge and experience, complexity and scope, leadership and influence, and organizational impact. (*Id.* ¶¶ 279-282.)  Moreover, he testified that the key responsibilities of the Technical Director role applied to his role. (*Id.* ¶¶ 268-278.)

### b.    *Google's leveling and pay decisions were motivated, at least in part, by Rowe's gender.*

The evidence viewed in the light most favorable to Rowe sufficiently establishes that Google's leveling and pay decisions were motivated, at least in part, by Rowe's gender. The existence of bias can be established through a variety of direct and indirect evidence. *See Bennett v. Health Mgmt. Sys., Inc*., 936 N.Y.S.2d 112, 121 (App. Div. 1st Dep't 2011) (A plaintiff can demonstrate "pretext and independent evidence of the existence of an improper discriminatory motive" through direct or circumstantial evidence demonstrating "that discrimination was [at

least][] one of the motivations for the [discriminatory] conduct."); *see also Marseille v. Mount Sinai Health Sys., Inc.*, No. 18 Civ. 2136, 2021 WL 3475620, at *5 (S.D.N.Y. Aug. 5, 2021) ("Put differently, a defendant is entitled to summary judgment . . .only if the record establishes as a matter of law that discrimination played no role in its actions."). Here, the disparate treatment of Rowe and her male comparators, the complete lack of women in Director roles, evidence of sex-stereotyping, and Google's dissembling and shifting rationales all establish bias.

As an initial matter, Google's disparate treatment of Rowe in leveling and compensation in comparison to similarly situated comparators is sufficient to establish an inference of bias. *See Gorzynski v. JetBlue Airways Corp*., 596 F.3d 93, 108 (2d Cir. 2010) (finding the employers' treatment of similarly situated co-workers evidence of discrimination). Google's own internal investigation into Rowe's complaints of discrimination found that Rowe possessed more relevant experience (both in years and technical substance) than at least one male hired as a Level 9 into the role of Technical Director in OCTO. (Opp 56.1 ¶¶ 68, 108.)

Further, gender bias is evidenced by the complete absence of women in the Technical Director role; of the 17 individuals Google hired as Technical Directors, Rowe was the only women. (Aff 56.1 ¶ 46; Opp 56.1 ¶ 196.) *See Walsh*, 828 F.3d at 77 (2d Cir. 2016) (evidence of the dearth of female hires is relevant evidence of discriminatory motive); *see also Gambale v. Deutsche Bank AG*, No. 02 Civ. 4791, 2003 WL 21511851, at *2 (S.D.N.Y. July 2, 2003) (evidence of the lack of women in management positions supported inference of discrimination). Likewise, among all Engineering Directors (i.e., Technical, SWE, Application Engineer, and Product Management), there are only 45 women out of 541 Directors. (Opp 56.1 ¶ 197.)  In the context of compensation negotiations, Rowe's supervisor, William Grannis, reported to Melissa Lawrence that █████████████████████████████████████████████████

███████ and felt ██████████████████████ for equal compensation. (Opp 56.1 ¶ 195.) In contrast, male hires like Stuart Breslow, were offered total compensation packages of over ███████ dollars without having to negotiate compensation at all. (Opp 56.1 ¶¶ 328-9, 333-34.)

Additionally, comments made by decision makers during Rowe's initial hire and level setting process raise inferences of discrimination based on gender. For example, one interviewer characterized Rowe's experience as "more junior" and questioned "whether [Rowe] is senior enough" when compared to other Level 9 Technical Directors they interviewed, despite the fact that Rowe possessed equal or more years of experience than some of the other men interviewed and hired by Google as Level 9. (Opp 56.1 ¶¶ 45-46, 211, 213.) The biased narrative of Rowe's lack of seniority persisted and resulted in subsequent discriminatory harm in her pursuit of the VP Financial Services role. (*Id.* ¶¶ 320, 327.) Based on her initial under-leveling, Mr. Shaukat and other interviewers described Rowe as too "junior" to be considered for the role (*id.*), although Rowe possessed more relevant experience and comparable years of prior experience to the man to whom Google ultimately gave the role. (*Id.* ¶¶ 335-41.) Courts have found that "a single comment being made in circumstances where that comment would, for example, signal views about the role of women in the workplace" constitute actionable harm under the City Human Rights Law." *Golston-Green v. City of New York*, 123 N.Y.S.3d 656, 670 (App. Div. 1st Dep't 2020). Further, gendered comments made by individuals involved in Rowe's compensation and leveling decisions characterized other women who attempted to negotiate salary as "not Googley," "quibbling," and a "turn off." (Opp 56.1 ¶ 194). Stereotyped remarks, like these, "can certainly be evidence that gender played a part in an adverse employment

decision." *Walsh*, 828 F.3d at 80. Together and alone, these comments create an inference of discrimination.

Next, the fact that Mr. Grannis told Rowe that all individuals hired into the role would be a Level 8, a known lie given that Google had already hired Mr. Eryurek as a Level 9, is further evidence of bias. (Aff 56.1 ¶ 59; Opp 56.1 ¶ 24, 25.) Once Rowe discovered that her male counterparts were hired as Level 9, she emailed Melissa Lawrence, who told her that ▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮ and that she could get ▮▮▮▮▮▮▮▮▮▮ (Opp 56.1 ¶ 68.) Obviously, these assurances offered by Google were falsehoods. Google's knowing misrepresentation to Rowe regarding the level of male Technical Directors and the appropriate procedure for re-leveling considerations further support an inference of discriminatory motive. *See Collins v. Cohen Pontani Lieberman & Pavane*, No. 04 Civ. 8983, 2008 WL 2971668, at *10 (S.D.N.Y. July 31, 2008); *Giannone v. Deutsche Bank Sec., Inc.*, No. 03 Civ. 9665, 2005 WL 3577134, at *1-2 (S.D.N.Y. Dec. 30, 2005).

Finally, Google's shifting rationales for why Rowe was leveled as a Level 8 while other male Technical Directors were leveled as a Level 9 also evidences bias. In fact, credible evidence regarding the *actual* basis of Rowe's hire at Level 8 is absent from the record. As outlined in Section II.A., *supra*, Mr. Grannis's statement of support did not articulate the reason for Rowe's hire as a Level 8 and not a Level 9, and witnesses struggled to remember their reason for hiring Rowe at a lower level compared to her male counterparts. (Aff 56.1 ¶¶ 55-56; Opp 56.1 ¶ 48.) Later, when investigating Rowe's complaint that she had been under-leveled, the investigation team failed to interview Mr. Grannis or other interviewers to discern their leveling rationale, and instead relied on "years of experience" to determine whether Rowe's initial level was appropriate, even while recognizing that at least one of Rowe's male comparators had less

experience and education. (Opp 56.1 ¶ 108.) Further, testimony of Google recruiters and internal

policy documents clearly direct that years of experience should not determine level. (*Id*; Aff 56.1

¶¶ 119-121.) Now, Google claims yet another reason for why Rowe was leveled lower than her

male peers – their "vastly superior qualifications" and her purported lack of "experience with

cloud technology." Def's MOL at 22.  This is not only new, but is patently false, as discussed in

Section IV(C)(1)(c). Google's unsupported and shifting rationales for Rowe's underpayment and

under-leveling at hire alone are sufficient evidence of discrimination. *See Kellman v. Metro.*

*Transp. Auth.*, 8 F. Supp. 3d 351, 380 (S.D.N.Y. 2014).

###### c.    *Google's asserted reasons for paying Rowe less than her male comparators are pretextual.*

Google offers just one "non-discriminatory" justification for treating Rowe less well than

male comparators. Citing to no record evidence, Google baldly asserts that Rowe's male

comparators possessed "vastly superior qualifications."  Def's MOL at 23. Google's justification

is an after-the-fact creation and is false. As outlined in Section II.A., *supra*, Google cannot

articulate any specific rationale for leveling and paying Rowe and her comparators differently.

(Opp 56.1 ¶ 48.)  While Mr. Grannis, the hiring manager, submitted a declaration in support of

summary judgment, nowhere in it does he state that leveling decisions for Rowe and other

Technical Directors were based on their relative experience or qualifications. (Aff 56.1 ¶¶ 52-56,

123-24, 129; Opp 56.1 ¶ 108.) Likewise, he articulated no such rationale in either his statements

of support or his deposition testimony. (Aff 56.1 ¶¶ 55, 58, 61; Opp 56.1 ¶ 28, 33, 36, 39, 48.)

Google fares no better with identifying documentary evidence in support of its "non-

discriminatory" reasoning. In its affirmative brief, Google asserts that "[t]here is no dispute a

candidate's relevant work history, education, and experience with cloud technology factor into

determining employees' levels upon hire." Def.'s MOL at 16. Not only is this statement strongly

disputed (Aff 56.1 ¶¶ 121, 129-30), it is directly contradicted by Google's own internal policies, which instruct that leveling and compensation decision makers must *not* "make leveling recommendations based on factors outside of [the] interview process, such as years of experience, education level, and previous job title or company." (*Id.* ¶ 119.)

Courts have "made clear that where a plaintiff responds [to a motion for summary judgment] with some evidence that at least one of the reasons proffered by defendant is false, misleading or incomplete, a host of determinations properly made only by a jury come into play, and thus such evidence of pretext should in almost every case indicate to the court that a motion for summary judgment must be denied." *Sandiford v. City of N.Y. Dep't of Educ.*, 943 N.Y.S.2d 48, 51 (2012), *aff'd*, 999 N.E.2d 1144 (2013). Further, the falsity of Google's position is strong evidence, not just of pretext, but of underlying bias. "Proof that the defendant's explanation is unworthy of credence is simply one form of circumstantial evidence that is probative of intentional discrimination, and it can be quite persuasive." *Rinsky v. Cushman & Wakefield, Inc.*, 918 F.3d 8, 28-29 (1st Cir. 2019), *cert. denied sub nom. Cushman & Wakefeld, Inc. v. Rinsky*, 140 S. Ct. 455, 205 L. Ed. 2d 272 (2019).

Even assuming that consideration of such factors was standard procedure at the time of the Technical Directors' hire, which it was not, Rowe possessed the same experience and skill Google highlighted with respect to her male comparators. (Aff 56.1 ¶¶ 131-37; Opp 56.1 ¶¶ 170-175, 178-79.) For example, Rowe came to Google with years of industry experience and had been tasked with migrating risk systems at JPMorgan to AWS Cloud (a Google Cloud competitor). (Opp 56.1 ¶ 179.) While Rowe had not completed a total cloud migration prior to her hire at Google, neither had Ben Wilson whom Google hired as a Level 9. (Aff 56.1 ¶ 133.) Rowe had more years of relevant experience and a higher level of relevant education than

Nicholas Harteau, whom Google hired as a Level 9, (*Id.* ¶ 127; Opp 56.1 ¶ 214) and had equal years of relevant experience to Jonathan Donaldson, whom Google also leveled as a Level 9. (Opp 56.1 ¶ 34.) Last, Rowe worked as a Chief Technology Officer for JPMorgan prior to joining Google; experience that other Level 9 Technical Directors did not possess. (Opp 56.1 ¶ 171, 209-10.) In any event, whether Rowe and her male comparators had similar qualifications for purposes of discrimination law is a disputed question of fact for the jury to determine. *Husser*, 137 F. Supp. 3d at 271.

Google's assertion that Rowe was less qualified further demonstrates discriminatory motive and pretext. Google's continued refusal to acknowledge and credit documentation and testimony in the record showing Rowe's extensive experience in cloud technology, well-established financial services expertise, and advanced degrees and aptitude in computer science and engineering, both now and throughout Rowe's employment (Opp 56.1 ¶¶ 170-73,178-79, 205, 222-27) further evidences the discriminatory nature of Google's decision and demonstrates that Google's stated reasons for under-leveling her are pretextual. Even accepting Google's assertion that Rowe lacked some of these qualifications and skill sets, the fact that male Technical Directors who also lacked the same qualifications, skill sets, or prior experience were still hired at Level 9 nullifies any argument that Google's proffered "non-discriminatory" reason is a legitimate one. (Aff 56.1 ¶¶ 127,133; Opp 56.1 ¶¶ 210-14.)

In a final attempt to differentiate Rowe and her Level 9 Technical Director comparators, Google turns to the relative engineering "contributions" made by Rowe and her Level 9 Technical Director comparators once at Google. This argument is inapposite. Where, as here, the discriminatory act took place at hire, and compounded over time as a result of the initial discriminatory act, any evidence meant to distinguish Rowe from her more highly compensated

comparators based on divergences in work after hire is wholly irrelevant. *See Bennett*, 936

N.Y.S.2d at 117 (defendant must "articulate through competent evidence non-

discriminatory reasons that actually motivated defendant at the time of its action"). At the time

Google decided to pay Rowe unequally for performance of the same job role, no Technical

Director had contributed anything to the role that would justify paying him more than Rowe.

But even if the Court were to consider this argument, Rowe made similar contributions to

her male peers. (Opp 56.1 ¶¶ 223-227.) Contrary to Google's recitation of facts, Rowe matched

or exceeded the majority of her Level 9 comparators in overall job performance in every year of

her employment. (*Id.* ¶ 222). With respect to cloud and industry expertise and engineering, Rowe

made similar contributions. (*Id.* ¶ 223.) Further, to the extent that Google argues that Rowe's

performance was in any way deficient, Def's MOL at 9, this is belied by the record evidence –

Rowe's performance reviews were uniformly excellent, and she was rated as "Exceeds

Expectations" in every cycle. (*Id.* ¶ 84, 222.) She consistently outperformed the Level 9

Technical Directors, all of whom Mr. Grannis rated lower in at least one cycle, raising

performance concerns and claiming they underperformed in certain pillars. (*Id.* ¶¶ 217-21.)

Accordingly, Google has failed to demonstrate a justifiable non-discriminatory basis for

under-leveling and paying Rowe less. The case law in this Circuit affirms that "a *prima facie*

case plus falsity of the employer's explanation can, without more, be enough to support a

reasonable finding that an employee was treated differently on the basis of race or gender." *See*

*McGuinness*, 263 F.3d at 55.

### ii.    *Discrimination in the GCTL Position*

Upon her transfer to the GCTL role, Mr. Shaukat began treating Rowe differently than

her male peers. (Opp 56.1 ¶¶ 283-88.) For example, Mr. Shaukat uniquely excluded Rowe from

staff meetings, distribution lists, and ignored her requests for one-on-one meetings. (*Id.*) Additionally, while Rowe was supposed to focus on financial services, Mr. Shaukat excluded her from all financial services-related discussions, financial services customer meetings, and strategy setting meetings for the financial services vertical. (*Id.*) Mr. Shaukat's exclusion caused the scope of her role to diminish significantly. (Opp 56.1 ¶ 288.) Instead of Rowe, Mr. Shaukat included Mr. Breslow in the financial services-related engagements. (*Id.* ¶ 286.) Further, none of the other GCTLs reported being excluded from their vertical focus, but did notice Rowe being excluded from Mr. Shaukat's meetings on at least one occasion. (*Id.* ¶ 287.)

Google's treatment of Rowe, including excluding her from meetings, diminishing her role, and subjecting her to worse conduct than her male counterparts, was discriminatory. *See Mihalik*, 715 F.3d at 110 (under the NYCHRL, a plaintiff need only show, by a preponderance of the evidence, that she was "treated less well than other employees because of her" protected characteristics); *see also Albunio v. City of New York*, 16 N.Y.3d 472, 476 (2011) (being "shunned and excluded from meetings" by a supervisor constituted an adverse employment action). *Feingold v. New York*, 366 F.3d 138, 152 (2d Cir. 2004) (adverse employment actions include "significantly diminished material responsibilities").

### iii.    *Failure to Consider Rowe for the VP of Financial Services Position*

The record, at a minimum, raises disputes of material facts related to Rowe's *prima facie* showing of gender discrimination arising from Google's failure to treat her equitably in consideration for the role of VP of Financial Services. The substantial record evidence of both Rowe's qualifications for the VP of Financial Services role and the unequal treatment to which she was subjected relative to similarly situated men in consideration for the VP of Financial Services role, is sufficient to raise an inference of discrimination at the *prima facie* stage in an

NYCHRL case. (Opp 56.1 ¶¶ 170-73, 284-302, 305-06, 309-34, 331, 334-35, 337-39.) Courts in this Circuit have found that promotion or consideration of an individual outside of the protected class for a role for which a plaintiff was superiorly qualified satisfies a plaintiff's *prima facie* showing. *See Spires v. MetLife Grp., Inc*., No. 18 Civ. 4464, 2019 WL 4464393, at *5 (S.D.N.Y. Sept. 18, 2019) (finding plaintiff established a *prima facie* case of discrimination where defendant declined to consider or promote the plaintiff in favor of an individual outside of protected class); *see also Marseille*, 2021 WL 3475620, at *6 (plaintiff's showing does not require proof that the alleged replacement filled the plaintiff's exact role, but only that "some of [her] former responsibilities were delegated to another employee, in addition to that other employee's own responsibilities.").

Here, Rowe adduced evidence, not "opinions" as Google asserts, establishing her superior qualifications for the VP of Financial Services role, particularly with respect to cloud experience and technical aptitude, relative to Mr. Breslow. (Opp 56.1 ¶¶ 170-73, 335-40.) The record also reflects that Google failed to meaningfully consider Rowe and subjected her to a different consideration and interview process than Mr. Breslow. (*Id.* ¶ 308-309.)

As a counter to Rowe's *prima facie* showing, Defendant offers two unavailing "non-discriminatory" reasons for its failure to consider Rowe for, or promote her to, the VP Financial Services role. Def's MOL 18. First, Google erroneously asserts that its consideration of two other female candidates (*Id.* ¶ 106) invalidates Rowe's allegations of discrimination on the basis of gender. The case law clearly rejects this assertion. *See Graham v. Long Island R.R.*, 230 F.3d 34, 43 (2d Cir. 2000) ("[A]n employer may not escape liability for discriminating against a given employee on the basis of [gender] simply because it can prove it treated other members of the employee's group favorably"). In any event, Google did not hire either of the women.

Second, Google's contention that alleged comments in Rowe's interview feedback regarding her "strategic vision" constitute "inferior interview performance" is unsupported by the record. There is evidence in the record suggesting that no such negative feedback was given, and that Google ignored favorable feedback concerning Rowe. (Opp 56.1 ¶¶ 323-324.) In reality, email correspondence from Mr. Shaukat to other decision-makers indicates that he never intended to meaningfully consider Rowe for the role and only did so as a retention exercise. (Opp 56.1 ¶¶ 301-306, 321-23, 326.) Further, Stuart Breslow did not interview for the position at all, so there is no basis to suggest there her interview performance was inferior to Mr. Breslow's. (*Id.* ¶ 329.)

Google's final argument – that Rowe's claim fails because the VP of Financial Services role was never filled – is also meritless. A plaintiff need not prove a "tangible" adverse action (*i.e.*, denied promotion), but instead need only demonstrate that she was treated less well than an individual outside of her protected classification because of her gender. *See Mihalik*, 715 F.3d at 114 ("[T]he NYCHRL does not require either materially adverse employment actions or severe and pervasive conduct," but "[i]nstead, a focus on unequal treatment based on gender— regardless of whether the conduct is tangible (like hiring or firing) or not—is in fact the approach that is most faithful to the uniquely broad and remedial purposes of the local statute."). By demonstrating that she was denied equal consideration for the role, Rowe has proffered sufficient evidence to support an inference of discriminatory motive and rebut Google's proffered "non-discriminatory" reason.

D.   **Disputed Facts Preclude Summary Judgment on Rowe's Retaliation Claims.**

To establish a retaliation claim under the NYCHRL, "a plaintiff must show that she took an action opposing her employer's discrimination, . . . and that, as a result, the employer engaged

in conduct that was reasonably likely to deter a person from engaging in such action[.]" *Mihalik*, 715 F.3d at 112 (internal citations omitted). Proffered evidence must also demonstrate that "there is a causal connection between the protected activity and the alleged retaliatory conduct." *Reed*, 2019 WL 2327519, at *3 (internal citations omitted). "The causal link can be inferred from circumstantial evidence such as the employer's knowledge of the protected activities and the proximity in time between the protected activity and the adverse action." *William*, 2021 WL 3012739, at *12. Retaliation claims under the NYLL follow a similar analysis. *See*, *e.g.*, *Benzinger v. Lukoil Pan Americas, LLC*, 447 F.Supp.3d 99, 130 (S.D.N.Y. 2020). The Court must assess Rowe's retaliation claims, "with a keen sense of workplace realities, of the fact that the "chilling effect" of particular conduct is context-dependent, and of the fact that a jury is generally best suited to evaluate the impact of retaliatory conduct in light of those realities." *See Williams*, 872 N.Y.S.2d at 34.

### i. *Rowe opposed Google's unlawful acts.*

Rowe has undisputedly engaged in protected activity. (Opp 56.1 ¶¶ 67, 107, 349.) In November 2017, Rowe raised complaints of discrimination to Ms. Lawrence in HR.[3] (*Id.* ¶ 67.) In October 2018, Rowe filed a formal complaint with Google's Employment Relations division. (*Id.* ¶ 343.) Again, in November 2018, Rowe complained to Mr. Shaukat and Ms. Greene about the impact of Google's original under-leveling decisions and about Google's inequitable consideration of her for the VP Financial Services role. (Opp 56.1 ¶ 320.)  Finally, on September 17, 2019, Rowe initiated a lawsuit alleging claims of unequal pay, discrimination, and retaliation. Google does not dispute that the aforementioned complaints constitute protected activity and that

---

[3] While Rowe did not specifically mention unequal pay, her under-leveling complaint was inextricably connected to compensation and thus would be protected activity under the NYLL.

Google was aware of these complaints. (*Id.* ¶ 350.)

  **ii. *Google retaliated against Rowe because of her complaints.***

   Evidence here provides a basis for a jury to determine that a causal connection exists between Rowe's complaints of unequitable consideration and Google's denial of the Head of Financial Services role, transfer of Rowe and reduction of responsibilities, and denial of the VP Financial Service Industry Lead role.

   **a. *Google unlawfully denied Rowe the Head of Financial Services role, transferred her, and reduced her responsibilities.***

   Less than two months after Rowe complained to Mr. Shaukat and Ms. Greene about her concerns of inequitable treatment during the consideration process for the VP of Financial Service role, Mr. Shaukat denied her the Head of Financial Services and selected a less-qualified man for the role. (Opp 56.1 ¶¶ 331-40.) Mr. Shaukat further retaliated against Rowe by demoting her and removing from her core responsibilities related to the financial services industry. (*Id.* ¶¶ 344-46.) The close temporal proximity between her protected activities and these acts is strong evidence of retaliation. *See Hinton v. City Coll. of N.Y.*, No. 5 Civ. 8951, 2008 WL 591802, at *25 (S.D.N.Y. Feb. 29, 2008)) ("[I]t cannot be doubted that a denial of promotion is the sort of adverse action that could dissuade[ ] a reasonable worker from making or supporting a charge of discrimination."); *see also Vega v. Hempstead Union Free Sch. Dist.*, 801 F.3d 72, 90 (2d Cir. 2015) ("A retaliatory purpose can be shown indirectly by timing: protected activity followed closely in time by adverse employment action."); *Zann Kwan v. Andalex Grp. LLC*, 737 F.3d 834, 845 (2d Cir. 2013) (affirming temporal proximity between a protected activity and adverse action is sufficient to demonstrate causation at the prima facie stage of a retaliation claim).

   Google makes no effort to rebut this evidence, other than to quote *Fenner v. News Corp.*, No. 09 Civ. 09832 LGS, 2013 WL 6244156, at *18 (S.D.N.Y. Dec. 2, 2013) for the proposition

that a plaintiff cannot sustain a NYCHRL treatment claim "if a plaintiff is treated the same as others outside her protected class," which Rowe has already refuted. *See Graham*, 230 F.3d at 43 (2d Cir. 2000); *see also Juarez v. Nw. Mut. Life Ins. Co., Inc.*, 69 F. Supp. 3d 364, 369 (S.D.N.Y 2014).

In response to Rowe's *prima facie* showing that the denial of consideration for and promotion to the VP Financial Services role was causally related to Rowe's prior complaints, Google now asserts that Rowe's "mixed interview feedback" was the non-discriminatory reason why Rowe was denied the VP Financial Service position. Def's MOL at 24. Google's defense is unsupported by any evidence in the record and courts commonly reject such arguments. (Opp 56.1 ¶ 324-25.) *See White v. Home Depot Inc.*, No. 04 Civ. 401, 2008 WL 189865, at *7 (E.D.N.Y. Jan. 17, 2008) (excessive scrutiny of plaintiff's performance post-complaint was evidence of pretext). Google's failure to attain, compile, and evaluate formal interview feedback from Rowe's interviewers demonstrates that it was not meaningfully considering Rowe for the position and instead was subjecting her to a sham interview process as a result of her engagement in protected activity. (Opp 56.1 ¶¶ 310-327.) Less than three weeks following Rowe's November 2018 complaint of discrimination, the recruiter requested feedback from her interviewers, noting that she "was" – in other words, no longer – a candidate for the role. (*Id.* ¶ 322.)

Further, given that the person Google selected for the position – Mr. Breslow – did not even interview for the position (*Id.* ¶ 329), a jury could conclude that the reason is pretextual. *Gorzynski*, 596 F.3d at 99, 108-09 (preferential treatment of individuals outside plaintiff's protected class "is both prima facie evidence of discrimination . . . and evidence that the reasons given by [defendant] . . . were pretextual."). Accordingly, Google's request for summary adjudication on this claim must fail.

36

Months after being denied the VP of Financial Services interim role, in April of 2019, Google informed Rowe that her job role would be changed again. She was presented with three undesirable options. All three positions afforded less prestige, responsibility, and opportunity for upward advancement. (Opp 56.1 ¶ 344-45.) With no meaningful alternative, Rowe returned to OCTO under Will Grannis in a hybrid cloud role in April 2019. (*Id.* ¶ 346.) In that role, however, Rowe's job responsibilities were reduced in scope; she no longer was involved in strategy or direction of the financial services vertical, and she had to run "anything in finserv" by Stuart Breslow. (*Id.* ¶ 345.) Such a change constitutes unlawful retaliation. *See Kessler v. Westchester Cty. Dep't of Soc. Servs.*, 461 F.3d 199, 209-10 (2d Cir. 2006) (removing responsibilities and functions was adverse action, even if title and pay remained the same).

Because it cannot deny the change in Rowe's position, Google instead challenges temporal proximity and asserts that Rowe's return to OCTO in April of 2019 was "her choice." But courts readily recognize temporal proximity on similar records. *See*, *e.g*., *Espinal v. Goord*, 558 F.3d 119, 129 (2d Cir. 2009) (finding six month proximity sufficient to show causation, noting defendant may have "waited to exact the[] retaliation at an opportune time"). Further, Rowe's return to OCTO was not "desired." (Opp 56.1 ¶ 346.) In fact, Rowe explicitly stated that none of the options offered were "attractive given [her] experience and the role [she] was hired to perform." (Opp 56.1 ¶ 346). Such a reduction in job role in close temporal proximity to Rowe's November 2018 complaint is adequate evidence of an adverse action or harm likely to deter protected activity. *See Xanthakos v. City Univ. of N.Y.*, No. 17 Civ. 9829, 2020 WL 5026930, at *7 (S.D.N.Y. Aug. 24, 2020) (being "stripped of responsibility" and "excluded from department meetings" constitutes adverse action).

> **b.      *Google unlawfully denied Rowe the VP Financial Services Industry Leader position.***

Google's refusal to consider Rowe for the Vice President – Financial Services Industry Leader ("VP-FSIL") position also constitutes retaliation. (Opp 56.1 ¶¶ 363-367.) After Rowe filed this lawsuit, ER interviewed Mr. Vardaman on January 22 and 29, 2020, in relation to its investigation into Rowe's claims. Less than one month later, Mr. Vardaman refused to consider Rowe for the VP-FSIL role. (*Id.* ¶ 363-367.) The temporal proximity between Rowe's protected activity and Mr. Vardaman's action is clear evidence of causality. *See Gorzynski*, 596 F.3d at 110-11; *Zann Kwan*, 737 F.3d at 845.

In addition to temporal causality, Rowe has presented circumstantial evidence of animus. A reasonable jury could find that Mr. Vardaman's alteration of Rowe's internal file relating to interview feedback from the VP Financial Services interview process in January 2019 (Opp 56.1 ¶ 348.), less than two months after Rowe complained to Mr. Shaukat and Ms. Green, is sufficient evidence of retaliatory animus. Further, Mr. Vardaman's inaccurate descriptions of Rowe in the HR interview (*Id.* ¶¶ 352.) is further evidence of retaliatory bias.

While Google asserts that Rowe did not meet the requisite qualifications for the role, Rowe met each qualification articulated in the job description. (*Id.* ¶ 355.) Record evidence also reveals that Ms. Kliphouse was "open to 'thinking differently' about this role, so it [was] not necessarily a prerequisite that someone has carried a sales revenue number." (*Id.* ¶ 357.) In any event, Mr. Vardaman did not undertake any efforts to determine Rowe's qualifications prior to dismissing her from consideration for the position. (*Id.* ¶¶ 363-367.)

E.   **Disputed Facts Preclude Summary Judgment In Defendant's Favor on Rowe's NYEPL Claim**

While there are no disputed facts with respect to the NYEPL claim relating to Google's underpayment of Rowe vis-à-vis Mr. Harteau, making it suited for summary judgment in Rowe's favor, *see* Section IV.A., *supra*, there are disputed facts with respect to Rowe's other NYEPL

comparators and summary judgment for Defendant should be denied. As outlined in Section

IV(C)(i)(a), *supra*, Rowe and the Level 9 Technical Directors, SWE Directors, AE Directors, PM

Directors, GCTLs, GCLs, and Stuart Breslow are similarly situated with respect to the work that

they performed when evaluating the roles as a composite of "skill, effort, and responsibility."

(Opp 56.1 ¶¶ 196-282.) Google internal policies disavow any distinctions Google attempts to

draw regarding individual contributors and people managers. (Opp 56.1 ¶ 145.)

## V.   CONCLUSION

For the foregoing reasons, Rowe respectfully request that the Court grant Rowe's motion

for summary judgment as to her *prima facie* case of unequal pay under NY EPL and Defendant's

Fourth affirmative defenses and deny Defendant's motion for summary judgment in its entirety.

Dated: December 6, 2021
       New York, NY

*/s/ Cara E. Greene*
**Cara E. Greene**
Maya S. Jumper
Shira Z. Gelfand
OUTTEN & GOLDEN LLP
685 Third Avenue, 25th Floor
New York, NY 10017
Telephone: (212) 245-1000
