# Exhibit 18

Page 23

```
                        U. ROWE
1
2    knowledge, already provided your lawyers
3    with all documents and information that you
4    have in your possession that relates to
5    this case?
6         A.    Yes.
7               MR. GAGE:  Sara, could you mark
8    tab 6 as Exhibit 3.
9               (Defendant's Exhibit 3 marked
10   for identification.)
11              MS. TOMEZSKO:  It should be
12   available now on the drive.
13        Q.    Let me know when you have a PDF
14   that is labeled tab 6, Ms. Rowe, and the
15   Bates number on this, for the record, is
16   P001586-1587.
17        A.    Yeah, I have it.
18        Q.    What is this?
19        A.    I believe these are some notes
20   that I took during the conversation with
21   Melissa, Melissa Lawrence.
22        Q.    And these notes were recently
23   provided to us in discovery.  When did you
24   give these to your lawyer?
25        A.    My lawyers had them for a while
```

Page 26

```
                        U. ROWE
1
2    knowledge, does this reflect notes that you
3    took close in time to that conversation
4    taking place?
5         A.    Correct.
6         Q.    Did you record everything that
7    was said in the conversation?
8         A.    It is not a transcription of
9    the conversation, it's the highlights of
10   like what stuck with me, the summary of the
11   conversation.
12        Q.    So this reflects what stuck
13   with you from the conversation?
14        A.    Correct.
15        Q.    But not necessarily everything
16   that was said?
17        A.    It was meant to represent a
18   summary of the conversation, yes.
19        Q.    But not necessarily everything
20   that was said?
21        A.    It doesn't capture every single
22   sentence as it was said, but it was also
23   not meant to leave out, you know, major
24   topics.
25        Q.    And Melissa -- what is
```

Page 25

```
                        U. ROWE
1
2    happened.
3         Q.    And when was the conversation?
4         A.    So sometime in November of
5    2017.
6         Q.    At the top of the document it
7    says 20 November 2017.  Do you see that?
8         A.    I do.
9         Q.    Did you write that date to
10   represent the date you wrote the notes?
11        A.    I don't remember that.  I don't
12   remember if it was the date of the
13   conversation or the date of the notes.
14        Q.    And the first line says
15   "Summary of the items we discussed today."
16              Who is the "we"?
17        A.    Melissa and I.
18        Q.    And how did this conversation
19   take place, was this face to face, was this
20   over the phone?
21        A.    I believe this was
22   videoconference, video conversation.
23        Q.    Who initiated it?
24        A.    I did.
25        Q.    And to the best of your
```

Page 149

```
                        U. ROWE
1
2    presence that you would deem to be sexist?
3         A.    Again, it's not -- it's not the
4    individual words, you know, but it's how
5    people behaved and how people reacted to me
6    that led me to believe.
7               MR. GAGE:  Could you reread my
8    question, please.
9               (The record was read.)
10        Q.    Can you answer that question?
11        A.    So I can't point to one
12   conversation.
13        Q.    Can you point to any
14   conversation in which someone said
15   something that you would consider to be
16   sexist?
17        A.    So, again, it's not just one
18   conversation, but, you know, when I was
19   working for Tariq, the fact that, you know,
20   he would include his other direct reports,
21   he would have one-on-ones with them, he
22   wouldn't have one-on-ones with me, the fact
23   that I wasn't involved in his -- in his --
24   in his staff meetings, you know, all of
25   those things, like the way I was treated
```

**Page 150**

```
                          U. ROWE
 1
 2    differently because of people's actions,
 3    are part of what led me to believe that I
 4    was discriminated against.
 5              So if you are asking me has
 6    anyone said because of your sex we're doing
 7    X and Y, no.  But have their actions led me
 8    to believe that, yes.
 9         Q.   Let's try this again.
10              I'm not asking about people's
11    actions, Ms. Rowe.  I'm asking about
12    people's words.  Do you understand the
13    distinction I'm making?
14         A.   I do.
15         Q.   So let's focus on people's
16    words.
17              Has anyone, in your time at
18    Google, anyone at Google, said anything to
19    you or in your presence that you would
20    consider to be sexist?
21         A.   Again, I can't remember
22    individual instances or words, no, but it
23    is the collective experience.
24         Q.   So are you saying that you
25    cannot, sitting here today, point to
```

**Page 159**

```
                          U. ROWE
 1
 2    time at Google.
 3         Q.   Anything else?
 4         A.   Those are the high-level ones
 5    that I -- those are the high-level ones,
 6    yes.
 7         Q.   Are there any others?
 8         A.   Those are the ones I can
 9    remember right now.
10         Q.   So you can't right now identify
11    any other ways in which you believe you
12    have been discriminated against at Google?
13         A.   Not right now.
14         Q.   Is there anything that you
15    think you might look at to refresh your
16    recollection?
17         A.   No, not right now.
18         Q.   So let's take the second one
19    you mentioned.  You said that you believe
20    on a day-to-day basis you have been
21    discriminated against.  Tell me all of the
22    things that have happened to you on a
23    day-to-day basis that you believe indicate
24    that Google has been discriminating against
25    you on the basis of your sex.
```

**Page 158**

```
                          U. ROWE
 1
 2              MS. GREENE:  Objection, asked
 3    and answered.
 4         A.   Yes.
 5         Q.   So now let's talk about deeds.
 6    We talked about words, now let's talk about
 7    deeds.  Please describe for me all of the
 8    deeds or actions that people at Google have
 9    taken that lead you to believe that you
10    have been discriminated against on the
11    basis of your sex.
12         A.   So I was -- so Google
13    discriminated against me on hiring, you
14    know, by bringing me in at a lower level
15    and paying compensation at a lower level
16    than my male peers.  Google discriminated
17    against me by the way I was treated on a
18    day-to-day basis.  Google discriminated
19    against me by, you know, denying me a
20    promotion for which I was the most
21    qualified candidate.  And I was also
22    discriminated against by Google by the
23    continued pay and compensation during my --
24    by paying me less compensation, you know,
25    equity refreshes and otherwise during my
```

**Page 160**

```
                          U. ROWE
 1
 2         A.   So, you know, I think, first of
 3    all, about my leveling and compensation,
 4    you know, that was an ongoing --
 5         Q.   I said I wouldn't interrupt
 6    you.  I'm going to apologize and interrupt
 7    you here.
 8              So in your answer a minute ago
 9    you identified four things.  You identified
10    your hiring at a lower level and at lower
11    compensation, the second thing you
12    identified was that you have been
13    discriminated against on a day-to-day basis
14    you said, the third thing you mentioned was
15    denied promotion, then the fourth thing you
16    mentioned was the denial of equity
17    refreshes and compensation on an ongoing
18    basis, right?
19         A.   Yes.
20         Q.   That's four things.  I want to
21    first start with the second of those
22    things.
23         A.   And also, you know, other
24    opportunities as well, I was denied other
25    opportunities.
```

Page 161

U. ROWE

1
2      Q.      Other opportunities, and are
3  those other job opportunities that you
4  sought and did not get?
5      A.      There was at least one of
6  those.
7      Q.      And when was that?
8      A.      So the denied promotion was the
9  VP of financial services, and later I
10  raised my hand for a VP of sales role in
11  financial services, the head of financial
12  services and sales, that was the role.
13      Q.      So the first one is the
14  financial services vertical head job,
15  correct?
16      A.      Correct, VP of -- yes.
17      Q.      And that was the job that you
18  claim was given to Stuart Breslow, right?
19      A.      Correct.
20      Q.      Just to make sure we're talking
21  about the same thing, okay.  Tell me again,
22  what was the second opportunity that you
23  were denied?
24      A.      I raised my hand for the VP of
25  financial services role and sales.

Page 163

U. ROWE

1
2  item only, I want you to tell me everything
3  that anyone did to you at Google that you
4  believe reflected discrimination against
5  you on the basis of your sex.
6      A.      When I worked for Tariq, he
7  would, you know, regularly have one-on-ones
8  with other male peers but not with me.  I
9  was frequently left out of team meetings,
10  left out of customer discussions.  I was
11  left out of off-sites.  Those are some of
12  the ways I remember.
13      Q.      What other ways?
14      A.      Those are the ones I remember
15  right now.
16      Q.      Were there others?
17      A.      Well, you know, obviously being
18  left out of these meetings and some of
19  these in-sites also meant that I was no
20  longer, you know, part of some of the
21  strategic discussions, while my male peers
22  were.  So, you know, I think that is a
23  second order of facts.
24      Q.      Well, we will come back to each
25  of those.  But I want to know, were there

Page 162

U. ROWE

1
2      Q.      And when was that?
3      A.      I don't remember the exact
4  timing, but I think it was earlier this
5  year.
6      Q.      So you think sometime in 2020,
7  early 2020?
8      A.      Yes.
9      Q.      Before or after the pandemic
10  shut down the country, can you place it
11  that way?
12      A.      Before.
13      Q.      Before, okay, so sometime
14  before the middle of March, is that fair to
15  say?
16      A.      Yes.
17      Q.      And was that a job that was
18  posted internally at Google?
19      A.      I don't know if there was a job
20  posting.  I didn't see a posting.
21      Q.      We will come back to that.
22      But I want to go back to the
23  second item that you mentioned, and that is
24  you said that you were discriminated
25  against on a day-to-day basis.  So on that

Page 170

U. ROWE

1
2  Stuart was included and I wasn't.
3      Q.      How many off-sites took place
4  while you worked for Tariq that you were
5  not invited to?
6      A.      I don't know.
7      Q.      Do you know how many off-sites
8  Tariq had during the time you worked for
9  him?
10      A.      I don't know.
11      Q.      Do you know if -- do you know
12  if Tariq had any off-sites during the time
13  you worked for him that you were not
14  invited to?
15      A.      I don't know.
16      Q.      You indicated that you believed
17  you were left out of team meetings.  What
18  team meetings were you left out of?
19      A.      So Tariq would have regular
20  team meetings that he would use his team
21  e-mail to send invitations to, so I was
22  left out of those, and other meetings where
23  he met with his team members but I wasn't
24  there.
25      Q.      How many times did that happen,

Page 171

U. ROWE

1   that is, that he held a team meeting that
2   you were not invited to?
3       A.      I don't know.
4       Q.      Was it more than once?
5       A.      Yes.
6       Q.      Was it more than twice?
7       A.      Yes.
8       Q.      Was it more than three times?
9       A.      Yes.
10      Q.      How many times was it?
11      A.      Look, obviously I don't know
12  every meeting that I wasn't invited to.
13  But I know that I have regularly heard
14  about these meetings that people were at
15  where I wasn't at.  So I have heard about
16  it probably at least four or five times, I
17  don't know the exact number of the meetings
18  that actually did happen.
19      Q.      Who is the -- tell me by name
20  the team members who were invited to these
21  meetings that you say you were not invited
22  to.
23      A.      Well, I think some of them were
24  his direct reports, you know, his staff

Page 172

U. ROWE

1   meetings, where I wasn't included.  Now, I
2   don't know who was included, because I
3   wasn't there.  And the other meetings were
4   either, you know, talking about financial
5   services or a specific client or other
6   topics.  Again, I don't know how many of
7   these I wasn't invited to, but I heard
8   from -- sometimes I would hear from Stuart
9   himself that the meetings had happened,
10  sometimes I would hear it from other
11  participants.
12      Q.      Who?  What other participants?
13      A.      Again, because I wasn't in
14  these meetings, I don't know exactly who
15  were in these meetings, but I know that --
16      Q.      You just said you heard it from
17  other participants.  I want to know who you
18  heard it from.
19      A.      Yeah, I'm not done.  You know,
20  I heard it sometimes from Stuart Breslow.
21  Sometimes I heard it from, you know, the
22  account teams, if they were talking about a
23  client.  Sometimes, you know, I would hear
24  it from, you know, other peers.

Page 173

U. ROWE

1       Q.      Give me names.  Who?
2       A.      Look, I don't actually recall
3   the individuals that told me, but, you
4   know, I heard it, I heard it from people
5   that these meetings were happening.
6       Q.      So you can't give me a single
7   name of someone that you heard about these
8   meetings from?
9           MS. GREENE:  Objection.
10      A.      I just said Stuart Breslow was
11  one of them, and also, you know, some of
12  Tariq's other direct reports.
13      Q.      Other than Stuart, can you give
14  me the name of a single other individual
15  who shared information with you that led
16  you to believe that he or she had been
17  invited to a meeting with Tariq that you
18  were not invited to?
19      A.      Look, another person I heard it
20  from was Leonard Law.
21      Q.      When was that?
22      A.      I don't remember the exact.
23      Q.      What was the meeting that
24  Leonard Law told you about that you

Page 174

U. ROWE

1   believed you should have been invited to?
2       A.      I don't know what the meeting
3   was about, but it was about financial
4   services.
5       Q.      Was that at a point at which
6   you were still in Tariq's organization when
7   Leonard Law shared that with you?
8       A.      I believe so, yes.
9       Q.      Did you believe you should have
10  been in every meeting that Tariq held with
11  anyone who worked on his team?
12      A.      No.
13      Q.      Did you believe that you should
14  have been invited to every meeting with
15  Tariq that had anything to do with
16  financial services?
17      A.      No.  But I do believe that I
18  should have been in every staff meeting
19  that he had.
20      Q.      When you first came to believe
21  you were not on the e-mail list for his
22  staff meetings, what did you do?  Did you
23  tell anyone?
24      A.      Yes.

Page 175

U. ROWE

```
1                  U. ROWE
2      Q.    Who did you tell?
3      A.    So, first, I asked my admin to
4  check with Tariq's admin to make sure it
5  was okay, then I asked -- I believe I asked
6  Tariq's admin directly, and, finally, I
7  asked Tariq.
8      Q.    And what did you learn?
9      A.    The responses changed over
10 time, but it was, you know, first, I
11 think -- I think some of the answers were
12 they were working on the e-mail lists, so,
13 you know, it was in flight.  Other times it
14 was an oversight.  Other times it was, you
15 know, they forgot.  You know, so the
16 answers changed.
17     Q.    Do you have any reason to
18 believe that any of the responses you got
19 were false?
20     A.    Look, I don't have any reason
21 to believe the responses were false, but I
22 knew that my male peers were in these
23 meetings and I wasn't, so I was being
24 treated differently.
25     Q.    What male peers?
```

Page 211

U. ROWE

```
1                  U. ROWE
2  process, was it important to you to clearly
3  understand the terms and conditions of
4  employment that Google was offering to you?
5      A.    Yes.
6      Q.    And was it important to you to
7  have all of the details of the job offer
8  you were getting put in writing?
9      A.    Yes, but there were -- there
10 were elements that were not in writing.
11     Q.    Can you tell me all of the
12 elements that were not in writing?
13     A.    So when we had the initial
14 conversations during hiring, you know, I
15 was -- there were a couple of things.  One
16 of them was the fact that, you know, that
17 when Google verticalized, that I would be
18 the obvious person to be the head of that
19 vertical as the VP of financial services.
20 And there was also another element that the
21 equity refreshes that I would get over
22 time, you know, would put me in a place
23 that is on par with my peers and at a level
24 that I was making more than J.P. Morgan.
25     Q.    You just mentioned two things,
```

Page 216

U. ROWE

```
1                  U. ROWE
2      A.    No.  I mean, we didn't have a
3  discussion on whether this would be in OCTO
4  or elsewhere.
5      Q.    Was there not a function at the
6  time you were hired at Google that was
7  responsible for strategy and product
8  development in Cloud for financial
9  services, did that function not exist?
10     A.    It did not exist.
11     Q.    So what were you hired to do?
12     A.    So I was hired as an individual
13 contributor in OCTO to do, you know, the
14 three -- it's the role that you and I have
15 discussed that has these elements of, you
16 know, advisory for product and eng, it has
17 client engagements, thought leadership.
18 But I certainly was not the VP of financial
19 services.
20     Q.    How is that different than the
21 function you just described when you told
22 me what you understood the verticalization
23 to mean?
24     A.    So the verticalization has
25 multiple components.  You know, I think it
```

Page 217

U. ROWE

```
1                  U. ROWE
2  has, one, the strategy for the vertical.
3  It has, you know, also building products
4  elements of it, and also, you know, a
5  connection to sales.  You know, it's a --
6  it's a -- it's a -- it's a -- it's a role
7  with bigger decision-making capabilities.
8      Q.    So did you understand
9  verticalization to be a reference to a
10 future role within Google Cloud, a job?
11     A.    So yes, yeah, that would be a
12 different role, you know, and that
13 function, this does get created, that's
14 what I had been led to understand.
15     Q.    Did either Mr. Grannis,
16 Mr. Stevens, or Ms. Burdis, anyone, did
17 anyone indicate to you that there was going
18 to be a vice president job in the future at
19 the head of the financial services
20 vertical?
21     A.    They didn't use those exact
22 words, but the words that they used were,
23 you know, when and if Google verticalizes,
24 who but you would be the obvious person for
25 that role.  Again, I'm not quoting, these
```

Page 246

```
 1              U. ROWE
 2  videoconference?
 3      A.      Yes.
 4      Q.      And you later learned that it
 5  wasn't a different role, it was just a
 6  change in reporting relationships, correct?
 7      A.      Incorrect.
 8      Q.      So is it your testimony that
 9  when you moved into Tariq's organization
10  your role changed?
11      A.      So it is true that Tariq said
12  that the role is not going to change.  The
13  way he described the role was a much more
14  junior role.  And this exchange was the
15  last time that Tariq and I talked about the
16  role, so I continued to do certain aspects
17  of what I did in OCTO, but because I wasn't
18  included in any of -- in many of the
19  financial services discussions and other
20  things, so I ended up, you know, my scope
21  ended up being reduced from what I used to
22  do over at OCTO.
23      Q.      What did you do when you were
24  in OCTO that you were no longer doing when
25  you were working in Tariq's organization?
```

Page 248

```
 1              U. ROWE
 2  account teams, sometimes directly from --
 3  through Will and Brian.
 4      Q.      And then when you were in
 5  Tariq's team, who was initiating the client
 6  engagement?
 7      A.      So still I wasn't getting much
 8  from Tariq, so whatever I got was from the
 9  sales team.  But, you know, Stuart was the,
10  you know, placed in a -- in a role and he,
11  you know, most of the time he was the one
12  that Tariq pinged for some of these
13  engagements.
14      Q.      And when you talk about Stuart
15  being placed in the role, you are talking
16  about the head of financial services role?
17      A.      Even before then, Stuart was
18  being included in discussions that I wasn't
19  in.
20      Q.      And is that anything other than
21  what you previously testified about?  Are
22  you talking about something different than
23  what I asked you about earlier?
24      A.      I don't know what earlier
25  conversation you are referring to.
```

Page 247

```
 1              U. ROWE
 2      A.      So when I was in Tariq's
 3  organization, I was regularly left out of
 4  discussions about the financial services
 5  space, you know, what was going on there.
 6  I was left out of, you know, customer
 7  meetings.  I was left out of, you know, the
 8  strategy setting for that vertical.  So
 9  that was what I was doing on a day-to-day
10  basis.  Now, the description of the global
11  client role itself was even more
12  restrictive.
13      Q.      But my question to you was what
14  were you doing when you worked in OCTO that
15  you were no longer doing when you were in
16  Tariq's organization?
17      A.      I thought I answered that.  But
18  basically my focus on product and eng was
19  limited or reduced.  My client engagements,
20  you know, were reduced.  And my thought
21  leadership was also not as big as before.
22      Q.      Now, on the client engagement,
23  when you were working in OCTO, who was
24  initiating the client engagement?
25      A.      Most of the time from the sales
```

Page 264

```
 1              U. ROWE
 2      MS. GREENE:  Objection.
 3      A.      Well, I knew what kind of
 4  individuals were, and based on that I made
 5  the statement that I was better qualified.
```



```
18      Q.      Do you know who Diana Layfield
19  is?
20      A.      I have heard the name.
21      Q.      Do you know anything about her
22  qualifications?
23      A.      I don't know much.  I know that
24  at some point she worked in Google Pay and
25  she is a VP -- I don't know if she is still
```

## Page 279

U. ROWE

```
1                    U. ROWE
2         A.    After Stuart got the job, is
3  that what you are asking, did I discuss
4  with Tariq?
5         Q.    Yes.
6         A.    No.
7         Q.    Did you ever have any
8  discussions with Mr. Shaukat about what
9  your role would be in his organization
10 going forward?
11        A.    So in, I think it was in
12 February, I was told that my role was being
13 changed.  I was given, you know, three
14 options.
15        Q.    What were those three options?
16        A.    I was given an option to work
17 on a focused small project, working for
18 Stuart Breslow.  I was given the option to
19 go back to OCTO without a financial
20 services focus.  And third option wasn't
21 really even real, it was that I could stay
22 and he could park me under Stuart until I
23 found a different role.  And I considered
24 all of these three as demotions.
25        Q.    You had all of these, I'm
```

## Page 284

U. ROWE

```
1                    U. ROWE
2         Q.    You indicated that -- you
3  testified earlier today that you believe
4  you were denied equity refreshes because of
5  ████████████████████████████████████████
   ...
23        Q.    Now, you used a term a minute
24 ago that I don't think either of us have
25 used in today's deposition until now, and
```

## Page 280

U. ROWE

```
1                    U. ROWE
2  sorry?
3         A.    I considered all of those
4  options as demotions.
5         Q.    As demotions, okay.  Why did
6  you consider them demotions?
7         A.    Well, one of them wasn't even a
8  role, it was go find another job, like I
9  would have no job, the other one was a much
10 more junior role, you know, working as a,
11 you know, in a much smaller focus project,
12 I think the AML project at the time, much
13 more junior role, or I would go back to
14 OCTO, but Google would remove all of my
15 financial services focus.
16        Q.    And you chose to go back to
17 OCTO, correct?
18        A.    Correct.
19        Q.    Now, when you first moved over
20 into Tariq Shaukat's organization from
21 OCTO, Ben and Evren also moved from OCTO
22 into Tariq's organization, correct?
23        A.    So they were also told that
24 they were moving.  I believe Evren never
25 actually moved.
```

## Page 291

U. ROWE

```
1                    U. ROWE
2         Q.    What happened next?
3         A.    He said that he would talk to
4  Kristen and come back to me.
5         Q.    And did he?
6         A.    He did.
7         Q.    And what happened next?
8         A.    He said that based on the
9  conversations with Kristen, that they
10 weren't going to go ahead with me.
11        Q.    Did he tell you anything more,
12 did he give you any more details?
13        A.    I don't remember a lot of the
14 details, but I was surprised when he said
15 based on your interview with Kristen, I did
16 not have an interview with Kristen, this
17 was like a casual one-on-one get-together,
18 I found out about the opportunity during
19 that meeting, and that, you know, he told
20 me that based on that conversation that I
21 was being discounted, I was surprised.
22        Q.    And was that the end of it?
23        A.    Yes.
24        Q.    Did you ever follow up with
25 Kristen?
```

Page 294

```
 1                  U. ROWE
 2  happened.
 3      Q.    So, again, other than the
 4  sequence of timing, is there anything else
 5  that leads you to believe that anything
 6  that happened to you at Google was because
 7  of your complaints of discrimination?
 8          MS. GREENE:  Objection.
 9      A.    I think it's not just the
10  sequence of events, but actually what
11  happened as well.
12      Q.    And the "what" is you say you
13  were demoted, you say you were isolated,
14  and you were denied this other job that was
15  given to Yolande Piazza?
16      A.    Correct.
17      Q.    Those are the things that
18  happened?
19      A.    Correct.
20      Q.    And my question to you is other
21  than the sequence of timing between your
22  complaints of discrimination and the timing
23  of those things I just mentioned, other
24  than the timing, is there anything else
25  that leads you to believe that those events
```

Page 296

```
 1                  U. ROWE
 2  events, right?
 3      A.    That's another one of those.
 4      Q.    Not being invited to off-sites,
 5  right?
 6      A.    That's also one of those.
 7      Q.    Okay, what else was there?
 8  What else constitutes the isolations?
 9      A.    I was isolated, one, because I
10  was told that I couldn't focus on financial
11  services anymore, so Google removed that
12  responsibility from me.  And that meant
13  that I was isolated from any discussions
14  around, you know, go to market, around
15  customer interactions, around, you know,
16  press and media appearances, and I was
17  isolated on, you know, what events I could
18  go talk to.
19          So there was a lot of these
20  things that I was isolated by whereas, you
21  know, my male peers, Stuart Breslow and
22  others, weren't.
23      Q.    When were you told that you
24  were no longer to focus on financial
25  services?
```

Page 295

```
 1                  U. ROWE
 2  were because of your complaints of
 3  discrimination?
 4          MS. GREENE:  Objection.
 5      A.    Again, it's not just the
 6  timing, you know, I was isolated.
 7      Q.    Then what else is it?
 8      A.    Because like I was isolated
 9  when my male peers were not isolated.  When
10  they were given opportunities, I wasn't
11  given opportunities.  So it is not just,
12  you know, the sequence of what happened,
13  but like what I experienced during that
14  time.
15      Q.    So what you describe as
16  isolating, being isolated, what leads,
17  other than the sequence of timing, other
18  than those events occurring which you
19  already testified about today -- withdrawn.
20  Let me ask you more specifically.
21          When you say being isolated,
22  you are talking about your testimony about
23  not being invited to meetings, correct?
24      A.    That's one of the things.
25      Q.    Not being invited to client
```

Page 298

```
 1                  U. ROWE
 2  the three options that were presented to
 3  me.
 4      Q.    You had three options, and you
 5  chose, no one else chose for you, correct?
 6      A.    Of the options that were given
 7  to me, yes, going back to OCTO was what I
 8  chose.
 9      Q.    And Google had decided that
10  when you were in OCTO, you were going to be
11  focused on hybrid cloud, correct?
12      A.    Yes.
13      Q.    Do you have any reason to
14  believe that that decision to have you
15  focus on hybrid cloud was made because you
16  had raised complaints of discrimination?
17          MS. GREENE:  Objection.
18      A.    So I don't know what went into
19  that discussion, but what I have
20  experienced was Google removed all my
21  financial services related
22  responsibilities, Google isolated me
23  internally and externally, and I know that
24  I was also denied further opportunities.
25      Q.    I'm talking right now about
```

Page 327

```
 1                    U. ROWE
 2   comparable.
 3        Q.     How are they different?
 4        A.     I don't know what he does on a
 5   day-to-day basis, so I don't know, you
 6   know, what he does that might be different,
 7   but what I do know is that, you know, he
 8   does provide, you know, product and
 9   engineering guidance.  He does provide
10   thought leadership.  He works across the
11   organization.  And he does have -- he does
12   have, you know, client facing, and
13   understanding his clients and building
14   product type responsibilities.
15        Q.     Does he write code as part of
16   his job?
17        A.     I don't know.
18        Q.     Do you?
19        A.     I don't, not production code.
20        Q.     Have you ever, since you have
21   been at Google?
22        A.     So I have written code, but I
23   have not contributed code to Google's
24   products, if that's what you are asking.
25        Q.     Do you know anyone else who is
```

Page 342

```
 1                    ULKU ROWE
 2        Q.     What did she tell you about the
 3   role she was planning to hire for?
 4        A.     She said that she was looking for
 5   a VP of sales for financial services and she
 6   also said that she is looking for people that
 7   are not from -- she was looking for people that
 8   don't have the traditional sales background.
 9   Those were not necessarily a good fit for the
10   first time role either so she was looking more
11   broadly.
12        Q.     Did she use those words and
13   what I mean by that is not looking for someone
14   in the traditional sales background?
15        A.     I don't remember her exact words,
16   but she was definitely saying they are
17   broadening to include nonsales background
18   people, but I don't remember if those were her
19   exact words.
20        Q.     What if anything else do you
21   remember about what Miss Kliphouse told you
22   concerning this position and what she was
23   looking for?
24        A.     I told her I was interested in the
25   role and she asked me to reach out to HR about
```

Page 343

```
 1                    ULKU ROWE
 2   the role.
 3        Q.     Did she tell you who specifically
 4   to reach out to by name?
 5        A.     She said Stuart Vardaman but she
 6   may have mentioned another person.  I don't
 7   remember the number.
 8        Q.     Did you say she said Stuart
 9   Vardaman?
10        A.     That is my recollection.
11        Q.     Did Miss Kliphouse tell you
12   whether this job had been posted yet,
13   advertised?
14        A.     I don't remember that.  I don't
15   think so.
16        Q.     Did Miss Kliphouse say anything to
17   you about whether she had looked at or considered
18   candidates as of that point?
19        A.     I don't remember that.  For your
20   earlier question I think I said she didn't tell
21   me it was posted, I don't know if it was posted
22   internally in Google.  She indicated that it
23   was an active job search.
24        Q.     As of the point at which you had
25   coffee with her she told you that it was at
```

Page 358

```
 1                    ULKU ROWE
 2   that you would not be considered further for
 3   the role.
 4              He sent you the job posting;
 5   correct?
 6        A.     He did.
 7        Q.     And do you have that available to
 8   you now?  I think it should be shared with you
 9   I think it is previously marked as Plaintiff's
10   Exhibit 115.
11        A.     In the shared drive, yes.
12        Q.     So you have it in front of you?
13        A.     Yes.
14        Q.     You received this after your
15   conversation with Miss Kliphouse, correct?
16        A.     Correct.
17        Q.     Can you read to me the two lines
18   at the bottom of the first page starting with
19   the word "drawing"?
20        A.     "Drawing upon previous
21   demonstrable success leading sizeable
22   technology sales teams that served he financial
23   services industry."
24        Q.     Did you have previous demonstrable
25   success leading sizable technology sales teams
```

Page 359

```
                                    ULKU ROWE
 1
 2    that served the financial services industry?
 3          A.     I had sales experience.  I didn't
 4    directly lead sales teams, but based on how
 5    Kirsten was describing the role, I thought it
 6    was appropriate for me to raise my hand.
 7          Q.     I didn't ask you whether it was
 8    appropriate for you to raise your hand.  I just
 9    asked you in fact if you had "previous
10    demonstrable success leading sizable technology
11    sales teams that served the financial services
12    industry."  Did you?
13          A.     No.
14          MS. GREENE:    Objection, asked and
15          answered.
16          A.     No, but I had relative experience
17    that would be useful.
18          Q.     Did you have what you just read?
19          A.     No.
20          Q.     Were you discouraged when you read
21    that?
22          A.     No.
23          Q.     Did you -- I want to flip over to
24    the second page of this document in the middle
25    below the words "The financial services leader
```

Page 374

```
                                    ULKU ROWE
 1
 2    role.
 3          Q.     Have you ever met Miss Piazza?
 4          A.     We have been in meetings together,
 5    yes.
 6          Q.     Do you have an opinion as to her
 7    qualifications for this sales role based upon
 8    your interactions with her?
 9          A.     Look, I can't speak to her
10    qualifications.  I don't know enough about her.
11          Q.     When she joined Google did you set
12    up a meet and greet with her?
13          A.     I didn't, but she and I have been
14    in quite a few meetings together.
15          Q.     Is there a reason why you didn't
16    set up a meet and greet with her when she
17    joined?
18          A.     Look, I think -- I don't think
19    there is a specific reason.
20          Q.     Was it your practice to set up
21    meet and greets with new leaders who had joined
22    Google from outside the company?
23          A.     Sometimes, especially like if I
24    don't have reason to work with them on a
25    day-to-day basis.  Others I work together all
```

Page 373

```
                                    ULKU ROWE
 1
 2          use a phrase I want to know what she means
 3    by it.  It's a different question, Cara
 4          A.     I'm just saying I don't know a
 5    hundred percent.  She may.
 6          Q.     But you're speculating about that,
 7    correct?
 8          A.     Correct.
 9          Q.     Do you know who was hired for that
10    position?
11          A.     I think at the end it went to
12    Yolanda Piazza.
13          Q.     Do you know anything about her
14    qualifications for the job?
15          A.     I don't know too much about her.
16    I know she came from Citibank and she had been
17    there for a long time and I don't know much
18    beyond that.
19          Q.     Do you have an opinion as to
20    whether you're better qualified, equally
21    qualified or lesser qualify than Miss Piazza
22    for the role?
23          A.     I don't know all of her
24    qualifications, I can't speak to that.  I can
25    speak to the fact that I was qualified for the
```

Page 389

```
                                    ULKU ROWE
 1
 2    me on the VP of sales role.  So he told me that
 3    I would not be considered for the role.
 4          Q.     What did you say in response?
 5          A.     I asked some questions.
 6          Q.     What questions did you ask?
 7          A.     I asked him why.
 8          Q.     What did he say?
 9          A.     He said that they were looking for
10    someone that has a more commercial background.
11          Q.     What else did you ask?
12          A.     I asked him like what made them
13    think that I wasn't qualified for the role.
14          Q.     What did he say?
15          A.     He said that it was based on a
16    two-hour meeting that I had with Kirsten.
17    Two-hour interview actually he said.
18          Q.     What else did you ask?
19          A.     I think I added some more prodding
20    questions.  I don't remember all the questions.
21    I said to him that I wasn't aware that the
22    meeting that I had with Kirsten was an
23    interview.  I said to him that it was like a
24    meet and greet and that it was actually in this
25    meeting that I found out about this role.  I
```

```
1              ULKU ROWE
2   was surprised.  I expressed surprise.
3              He also mentioned there is a VP of
4   solutions role that might be opening up that I
5   might be a candidate for.
6        Q.   How did you react to that?
7        A.   I asked him what the role was and
8   he said like we don't really know yet.  It's a
9   head of industry solutions that is coming up,
10  but he will have more details then.  But he did
11  say that they -- he mentioned I think -- I
12  can't remember her name.  He mentioned I think
13  Carrie the retail person that she would also be
14  considered for the head of solutions for the
15  retail position.
16       Q.   Is that Carrie Farb?
17       A.   Yes, I think that is the name.
18       Q.   Did you ever express interest in
19  this other role that he said might become
20  available?
21       A.   Well, I never heard about it
22  subsequently until someone was announced.
23       Q.   Did you tell Mr. Vardaman in that
24  conversation that you were or might be
25  interested in the position?
```

```
1              ULKU ROWE
2   do you have any reason to believe that the
3   e-mail that you sent to your lawyers contains
4   any additional details about the conversation
5   with Mr. Vardaman that you've not already
6   shared?
7        A.   I don't believe so.
8        Q.   I think you testified that
9   Mr. Vardaman told you that they were looking
10  for someone with a more commercial background
11  for the position that Miss Kliphouse was
12  filling.
13             What did you understand that
14  phrase to mean, a more commercial background?
15       A.   That they were looking for someone
16  with a direct sales experience.
17       Q.   Was that statement that
18  Mr. Vardaman made to you consistent with the
19  description of the job that he sent to you?
20       A.   Yes, but it wasn't how Kirsten
21  described the role.
22       Q.   Well, how did Kirsten describe the
23  role in a manner inconsistent with that?
24       A.   Because she said they are looking
25  beyond the pure sales experience, the
```