# Exhibit 18

Page 23

U. ROWE

1  U. ROWE
2  knowledge, already provided your lawyers
3  with all documents and information that you
4  have in your possession that relates to
5  this case?
6      A.    Yes.
7            MR. GAGE:  Sara, could you mark
8  tab 6 as Exhibit 3.
9            (Defendant's Exhibit 3 marked
10 for identification.)
11           MS. TOMEZSKO:  It should be
12 available now on the drive.
13     Q.    Let me know when you have a PDF
14 that is labeled tab 6, Ms. Rowe, and the
15 Bates number on this, for the record, is
16 P001586-1587.
17     A.    Yeah, I have it.
18     Q.    What is this?
19     A.    I believe these are some notes
20 that I took during the conversation with
21 Melissa, Melissa Lawrence.
22     Q.    And these notes were recently
23 provided to us in discovery.  When did you
24 give these to your lawyer?
25     A.    My lawyers had them for a while

Page 25

1  U. ROWE
2  happened.
3      Q.    And when was the conversation?
4      A.    So sometime in November of
5  2017.
6      Q.    At the top of the document it
7  says 20 November 2017.  Do you see that?
8      A.    I do.
9      Q.    Did you write that date to
10 represent the date you wrote the notes?
11     A.    I don't remember that.  I don't
12 remember if it was the date of the
13 conversation or the date of the notes.
14     Q.    And the first line says
15 "Summary of the items we discussed today."
16           Who is the "we"?
17     A.    Melissa and I.
18     Q.    And how did this conversation
19 take place, was this face to face, was this
20 over the phone?
21     A.    I believe this was
22 videoconference, video conversation.
23     Q.    Who initiated it?
24     A.    I did.
25     Q.    And to the best of your

Page 26

1  U. ROWE
2  knowledge, does this reflect notes that you
3  took close in time to that conversation
4  taking place?
5      A.    Correct.
6      Q.    Did you record everything that
7  was said in the conversation?
8      A.    It is not a transcription of
9  the conversation, it's the highlights of
10 like what stuck with me, the summary of the
11 conversation.
12     Q.    So this reflects what stuck
13 with you from the conversation?
14     A.    Correct.
15     Q.    But not necessarily everything
16 that was said?
17     A.    It was meant to represent a
18 summary of the conversation, yes.
19     Q.    But not necessarily everything
20 that was said?
21     A.    It doesn't capture every single
22 sentence as it was said, but it was also
23 not meant to leave out, you know, major
24 topics.
25     Q.    And Melissa -- what is

Page 149

1  U. ROWE
2  presence that you would deem to be sexist?
3      A.    Again, it's not -- it's not the
4  individual words, you know, but it's how
5  people behaved and how people reacted to me
6  that led me to believe.
7            MR. GAGE:  Could you reread my
8  question, please.
9            (The record was read.)
10     Q.    Can you answer that question?
11     A.    So I can't point to one
12 conversation.
13     Q.    Can you point to any
14 conversation in which someone said
15 something that you would consider to be
16 sexist?
17     A.    So, again, it's not just one
18 conversation, but, you know, when I was
19 working for Tariq, the fact that, you know,
20 he would include his other direct reports,
21 he would have one-on-ones with them, he
22 wouldn't have one-on-ones with me, the fact
23 that I wasn't involved in his -- in his --
24 in his staff meetings, you know, all of
25 those things, like the way I was treated

```
                                                   Page 150
 1                    U. ROWE
 2   differently because of people's actions,
 3   are part of what led me to believe that I
 4   was discriminated against.
 5             So if you are asking me has
 6   anyone said because of your sex we're doing
 7   X and Y, no.  But have their actions led me
 8   to believe that, yes.
 9        Q.   Let's try this again.
10             I'm not asking about people's
11   actions, Ms. Rowe.  I'm asking about
12   people's words.  Do you understand the
13   distinction I'm making?
14        A.   I do.
15        Q.   So let's focus on people's
16   words.
17             Has anyone, in your time at
18   Google, anyone at Google, said anything to
19   you or in your presence that you would
20   consider to be sexist?
21        A.   Again, I can't remember
22   individual instances or words, no, but it
23   is the collective experience.
24        Q.   So are you saying that you
25   cannot, sitting here today, point to
```

```
                                                   Page 159
 1                    U. ROWE
 2   time at Google.
 3        Q.   Anything else?
 4        A.   Those are the high-level ones
 5   that I -- those are the high-level ones,
 6   yes.
 7        Q.   Are there any others?
 8        A.   Those are the ones I can
 9   remember right now.
10        Q.   So you can't right now identify
11   any other ways in which you believe you
12   have been discriminated against at Google?
13        A.   Not right now.
14        Q.   Is there anything that you
15   think you might look at to refresh your
16   recollection?
17        A.   No, not right now.
18        Q.   So let's take the second one
19   you mentioned.  You said that you believe
20   on a day-to-day basis you have been
21   discriminated against.  Tell me all of the
22   things that have happened to you on a
23   day-to-day basis that you believe indicate
24   that Google has been discriminating against
25   you on the basis of your sex.
```

```
                                                   Page 158
 1                    U. ROWE
 2             MS. GREENE:  Objection, asked
 3   and answered.
 4        A.   Yes.
 5        Q.   So now let's talk about deeds.
 6   We talked about words, now let's talk about
 7   deeds.  Please describe for me all of the
 8   deeds or actions that people at Google have
 9   taken that lead you to believe that you
10   have been discriminated against on the
11   basis of your sex.
12        A.   So I was -- so Google
13   discriminated against me on hiring, you
14   know, by bringing me in at a lower level
15   and paying compensation at a lower level
16   than my male peers.  Google discriminated
17   against me by the way I was treated on a
18   day-to-day basis.  Google discriminated
19   against me by, you know, denying me a
20   promotion for which I was the most
21   qualified candidate.  And I was also
22   discriminated against by Google by the
23   continued pay and compensation during my --
24   by paying me less compensation, you know,
25   equity refreshes and otherwise during my
```

```
                                                   Page 160
 1                    U. ROWE
 2        A.   So, you know, I think, first of
 3   all, about my leveling and compensation,
 4   you know, that was an ongoing --
 5        Q.   I said I wouldn't interrupt
 6   you.  I'm going to apologize and interrupt
 7   you here.
 8             So in your answer a minute ago
 9   you identified four things.  You identified
10   your hiring at a lower level and at lower
11   compensation, the second thing you
12   identified was that you have been
13   discriminated against on a day-to-day basis
14   you said, the third thing you mentioned was
15   denied promotion, then the fourth thing you
16   mentioned was the denial of equity
17   refreshes and compensation on an ongoing
18   basis, right?
19        A.   Yes.
20        Q.   That's four things.  I want to
21   first start with the second of those
22   things.
23        A.   And also, you know, other
24   opportunities as well, I was denied other
25   opportunities.
```

```
                                                  Page 161
 1                    U. ROWE
 2       Q.     Other opportunities, and are
 3   those other job opportunities that you
 4   sought and did not get?
 5       A.     There was at least one of
 6   those.
 7       Q.     And when was that?
 8       A.     So the denied promotion was the
 9   VP of financial services, and later I
10   raised my hand for a VP of sales role in
11   financial services, the head of financial
12   services and sales, that was the role.
13       Q.     So the first one is the
14   financial services vertical head job,
15   correct?
16       A.     Correct, VP of -- yes.
17       Q.     And that was the job that you
18   claim was given to Stuart Breslow, right?
19       A.     Correct.
20       Q.     Just to make sure we're talking
21   about the same thing, okay.  Tell me again,
22   what was the second opportunity that you
23   were denied?
24       A.     I raised my hand for the VP of
25   financial services role and sales.
```

```
                                                  Page 163
 1                    U. ROWE
 2   item only, I want you to tell me everything
 3   that anyone did to you at Google that you
 4   believe reflected discrimination against
 5   you on the basis of your sex.
 6       A.     When I worked for Tariq, he
 7   would, you know, regularly have one-on-ones
 8   with other male peers but not with me.  I
 9   was frequently left out of team meetings,
10   left out of customer discussions.  I was
11   left out of off-sites.  Those are some of
12   the ways I remember.
13       Q.     What other ways?
14       A.     Those are the ones I remember
15   right now.
16       Q.     Were there others?
17       A.     Well, you know, obviously being
18   left out of these meetings and some of
19   these in-sites also meant that I was no
20   longer, you know, part of some of the
21   strategic discussions, while my male peers
22   were.  So, you know, I think that is a
23   second order of facts.
24       Q.     Well, we will come back to each
25   of those.  But I want to know, were there
```

```
                                                  Page 162
 1                    U. ROWE
 2       Q.     And when was that?
 3       A.     I don't remember the exact
 4   timing, but I think it was earlier this
 5   year.
 6       Q.     So you think sometime in 2020,
 7   early 2020?
 8       A.     Yes.
 9       Q.     Before or after the pandemic
10   shut down the country, can you place it
11   that way?
12       A.     Before.
13       Q.     Before, okay, so sometime
14   before the middle of March, is that fair to
15   say?
16       A.     Yes.
17       Q.     And was that a job that was
18   posted internally at Google?
19       A.     I don't know if there was a job
20   posting.  I didn't see a posting.
21       Q.     We will come back to that.
22              But I want to go back to the
23   second item that you mentioned, and that is
24   you said that you were discriminated
25   against on a day-to-day basis.  So on that
```

```
                                                  Page 170
 1                    U. ROWE
 2   Stuart was included and I wasn't.
 3       Q.     How many off-sites took place
 4   while you worked for Tariq that you were
 5   not invited to?
 6       A.     I don't know.
 7       Q.     Do you know how many off-sites
 8   Tariq had during the time you worked for
 9   him?
10       A.     I don't know.
11       Q.     Do you know if -- do you know
12   if Tariq had any off-sites during the time
13   you worked for him that you were not
14   invited to?
15       A.     I don't know.
16       Q.     You indicated that you believed
17   you were left out of team meetings.  What
18   team meetings were you left out of?
19       A.     So Tariq would have regular
20   team meetings that he would use his team
21   e-mail to send invitations to, so I was
22   left out of those, and other meetings where
23   he met with his team members but I wasn't
24   there.
25       Q.     How many times did that happen,
```

Page 171

U. ROWE

1
2  that is, that he held a team meeting that
3  you were not invited to?
4      A.   I don't know.
5      Q.   Was it more than once?
6      A.   Yes.
7      Q.   Was it more than twice?
8      A.   Yes.
9      Q.   Was it more than three times?
10     A.   Yes.
11     Q.   How many times was it?
12     A.   Look, obviously I don't know
13 every meeting that I wasn't invited to.
14 But I know that I have regularly heard
15 about these meetings that people were at
16 where I wasn't at.  So I have heard about
17 it probably at least four or five times, I
18 don't know the exact number of the meetings
19 that actually did happen.
20     Q.   Who is the -- tell me by name
21 the team members who were invited to these
22 meetings that you say you were not invited
23 to.
24     A.   Well, I think some of them were
25 his direct reports, you know, his staff

Page 172

U. ROWE

1
2  meetings, where I wasn't included.  Now, I
3  don't know who was included, because I
4  wasn't there.  And the other meetings were
5  either, you know, talking about financial
6  services or a specific client or other
7  topics.  Again, I don't know how many of
8  these I wasn't invited to, but I heard
9  from -- sometimes I would hear from Stuart
10 himself that the meetings had happened,
11 sometimes I would hear it from other
12 participants.
13     Q.   Who?  What other participants?
14     A.   Again, because I wasn't in
15 these meetings, I don't know exactly who
16 were in these meetings, but I know that --
17     Q.   You just said you heard it from
18 other participants.  I want to know who you
19 heard it from.
20     A.   Yeah, I'm not done.  You know,
21 I heard it sometimes from Stuart Breslow.
22 Sometimes I heard it from, you know, the
23 account teams, if they were talking about a
24 client.  Sometimes, you know, I would hear
25 it from, you know, other peers.

Page 173

U. ROWE

1
2      Q.   Give me names.  Who?
3      A.   Look, I don't actually recall
4  the individuals that told me, but, you
5  know, I heard it, I heard it from people
6  that these meetings were happening.
7      Q.   So you can't give me a single
8  name of someone that you heard about these
9  meetings from?
10         MS. GREENE:  Objection.
11     A.   I just said Stuart Breslow was
12 one of them, and also, you know, some of
13 Tariq's other direct reports.
14     Q.   Other than Stuart, can you give
15 me the name of a single other individual
16 who shared information with you that led
17 you to believe that he or she had been
18 invited to a meeting with Tariq that you
19 were not invited to?
20     A.   Look, another person I heard it
21 from was Leonard Law.
22     Q.   When was that?
23     A.   I don't remember the exact.
24     Q.   What was the meeting that
25 Leonard Law told you about that you

Page 174

U. ROWE

1
2  believed you should have been invited to?
3      A.   I don't know what the meeting
4  was about, but it was about financial
5  services.
6      Q.   Was that at a point at which
7  you were still in Tariq's organization when
8  Leonard Law shared that with you?
9      A.   I believe so, yes.
10     Q.   Did you believe you should have
11 been in every meeting that Tariq held with
12 anyone who worked on his team?
13     A.   No.
14     Q.   Did you believe that you should
15 have been invited to every meeting with
16 Tariq that had anything to do with
17 financial services?
18     A.   No.  But I do believe that I
19 should have been in every staff meeting
20 that he had.
21     Q.   When you first came to believe
22 you were not on the e-mail list for his
23 staff meetings, what did you do?  Did you
24 tell anyone?
25     A.   Yes.

```
                                                    Page 175
 1                       U. ROWE
 2       Q.     Who did you tell?
 3       A.     So, first, I asked my admin to
 4   check with Tariq's admin to make sure it
 5   was okay, then I asked -- I believe I asked
 6   Tariq's admin directly, and, finally, I
 7   asked Tariq.
 8       Q.     And what did you learn?
 9       A.     The responses changed over
10   time, but it was, you know, first, I
11   think -- I think some of the answers were
12   they were working on the e-mail lists, so,
13   you know, it was in flight.  Other times it
14   was an oversight.  Other times it was, you
15   know, they forgot.  You know, so the
16   answers changed.
17       Q.     Do you have any reason to
18   believe that any of the responses you got
19   were false?
20       A.     Look, I don't have any reason
21   to believe the responses were false, but I
22   knew that my male peers were in these
23   meetings and I wasn't, so I was being
24   treated differently.
25       Q.     What male peers?
```

```
                                                    Page 216
 1                       U. ROWE
 2       A.     No.  I mean, we didn't have a
 3   discussion on whether this would be in OCTO
 4   or elsewhere.
 5       Q.     Was there not a function at the
 6   time you were hired at Google that was
 7   responsible for strategy and product
 8   development in Cloud for financial
 9   services, did that function not exist?
10       A.     It did not exist.
11       Q.     So what were you hired to do?
12       A.     So I was hired as an individual
13   contributor in OCTO to do, you know, the
14   three -- the role that you and I have
15   discussed that has these elements of, you
16   know, advisory for product and eng, it has
17   client engagements, thought leadership.
18   But I certainly was not the VP of financial
19   services.
20       Q.     How is that different than the
21   function you just described when you told
22   me what you understood the verticalization
23   to mean?
24       A.     So the verticalization has
25   multiple components.  You know, I think it
```

```
                                                    Page 211
 1                       U. ROWE
 2   process, was it important to you to clearly
 3   understand the terms and conditions of
 4   employment that Google was offering to you?
 5       A.     Yes.
 6       Q.     And was it important to you to
 7   have all of the details of the job offer
 8   you were getting put in writing?
 9       A.     Yes, but there were -- there
10   were elements that were not in writing.
11       Q.     Can you tell me all of the
12   elements that were not in writing?
13       A.     So when we had the initial
14   conversations during hiring, you know, I
15   was -- there were a couple of things.  One
16   of them was the fact that, you know, that
17   when Google verticalized, that I would be
18   the obvious person to be the head of that
19   vertical as the VP of financial services.
20   And there was also another element that the
21   equity refreshes that I would get over
22   time, you know, would put me in a place
23   that is on par with my peers and at a level
24   that I was making more than J.P. Morgan.
25       Q.     You just mentioned two things,
```

```
                                                    Page 217
 1                       U. ROWE
 2   has, one, the strategy for the vertical.
 3   It has, you know, also building products
 4   elements of it, and also, you know, a
 5   connection to sales.  You know, it's a --
 6   it's a -- it's a -- it's a -- it's a role
 7   with bigger decision-making capabilities.
 8       Q.     So did you understand
 9   verticalization to be a reference to a
10   future role within Google Cloud, a job?
11       A.     So yes, yeah, that would be a
12   different role, you know, and that
13   function, this does get created, that's
14   what I had been led to understand.
15       Q.     Did either Mr. Grannis,
16   Mr. Stevens, or Ms. Burdis, anyone, did
17   anyone indicate to you that there was going
18   to be a vice president job in the future at
19   the head of the financial services
20   vertical?
21       A.     They didn't use those exact
22   words, but the words that they used were,
23   you know, when and if Google verticalizes,
24   who but you would be the obvious person for
25   that role.  Again, I'm not quoting, these
```

Page 246

U. ROWE

1
2  videoconference?
3      A.   Yes.
4      Q.   And you later learned that it
5  wasn't a different role, it was just a
6  change in reporting relationships, correct?
7      A.   Incorrect.
8      Q.   So is it your testimony that
9  when you moved into Tariq's organization
10 your role changed?
11     A.   So it is true that Tariq said
12 that the role is not going to change. The
13 way he described the role was a much more
14 junior role. And this exchange was the
15 last time that Tariq and I talked about the
16 role, so I continued to do certain aspects
17 of what I did in OCTO, but because I wasn't
18 included in any of -- in many of the
19 financial services discussions and other
20 things, so I ended up, you know, my scope
21 ended up being reduced from what I used to
22 do over at OCTO.
23     Q.   What did you do when you were
24 in OCTO that you were no longer doing when
25 you were working in Tariq's organization?

Page 247

U. ROWE

1
2      A.   So when I was in Tariq's
3  organization, I was regularly left out of
4  discussions about the financial services
5  space, you know, what was going on there.
6  I was left out of, you know, customer
7  meetings. I was left out of, you know, the
8  strategy setting for that vertical. So
9  that was what I was doing on a day-to-day
10 basis. Now, the description of the global
11 client role itself was even more
12 restrictive.
13     Q.   But my question to you was what
14 were you doing when you worked in OCTO that
15 you were no longer doing when you were in
16 Tariq's organization?
17     A.   I thought I answered that. But
18 basically my focus on product and eng was
19 limited or reduced. My client engagements,
20 you know, were reduced. And my thought
21 leadership was also not as big as before.
22     Q.   Now, on the client engagement,
23 when you were working in OCTO, who was
24 initiating the client engagement?
25     A.   Most of the time from the sales

Page 248

U. ROWE

1
2  account teams, sometimes directly from --
3  through Will and Brian.
4      Q.   And then when you were in
5  Tariq's team, who was initiating the client
6  engagement?
7      A.   So still I wasn't getting much
8  from Tariq, so whatever I got was from the
9  sales team. But, you know, Stuart was the,
10 you know, placed in a -- in a role and he,
11 you know, most of the time he was the one
12 that Tariq pinged for some of these
13 engagements.
14     Q.   And when you talk about Stuart
15 being placed in the role, you are talking
16 about the head of financial services role?
17     A.   Even before then, Stuart was
18 being included in discussions that I wasn't
19 in.
20     Q.   And is that anything other than
21 what you previously testified about? Are
22 you talking about something different than
23 what I asked you about earlier?
24     A.   I don't know what earlier
25 conversation you are referring to.

Page 264

U. ROWE

1
2      MS. GREENE:  Objection.
3      A.   Well, I knew what kind of
4  individuals were, and based on that I made
5  the statement that I was better qualified.
6      [redacted]
7      [redacted]
8      [redacted]
9      [redacted]
10     [redacted]
11     [redacted]
12     [redacted]
13     [redacted]
14     [redacted]
15     [redacted]
16     [redacted]
17     [redacted]
18     Q.   Do you know who [redacted]
19 is?
20     A.   I have heard the name.
21     Q.   Do you know anything about her
22 qualifications?
23     A.   I don't know much. I know that
24 at some point she worked in [redacted]
25 [redacted] -- I don't know if she is still

Page 279

```
 1                  U. ROWE
 2       A.    After Stuart got the job, is
 3  that what you are asking, did I discuss
 4  with Tariq?
 5       Q.    Yes.
 6       A.    No.
 7       Q.    Did you ever have any
 8  discussions with Mr. Shaukat about what
 9  your role would be in his organization
10  going forward?
11       A.    So in, I think it was in
12  February, I was told that my role was being
13  changed.  I was given, you know, three
14  options.
15       Q.    What were those three options?
16       A.    I was given an option to work
17  on a focused small project, working for
18  Stuart Breslow.  I was given the option to
19  go back to OCTO without a financial
20  services focus.  And third option wasn't
21  really even real, it was that I could stay
22  and he could park me under Stuart until I
23  found a different role.  And I considered
24  all of these three as demotions.
25       Q.    You had all of these, I'm
```

Page 280

```
 1                  U. ROWE
 2  sorry?
 3       A.    I considered all of those
 4  options as demotions.
 5       Q.    As demotions, okay.  Why did
 6  you consider them demotions?
 7       A.    Well, one of them wasn't even a
 8  role, it was go find another job, like I
 9  would have no job, the other one was a much
10  more junior role, you know, working as a,
11  you know, in a much smaller focus project,
12  I think the AML project at the time, much
13  more junior role, or I would go back to
14  OCTO, but Google would remove all of my
15  financial services focus.
16       Q.    And you chose to go back to
17  OCTO, correct?
18       A.    Correct.
19       Q.    Now, when you first moved over
20  into Tariq Shaukat's organization from
21  OCTO, Ben and Evren also moved from OCTO
22  into Tariq's organization, correct?
23       A.    So they were also told that
24  they were moving.  I believe Evren never
25  actually moved.
```

Page 284

```
 1                  U. ROWE
 2       Q.    You indicated that -- you
 3  testified earlier today that you believe
 4  you were denied equity refreshes because of
 5  [REDACTED]
   ...
23       Q.    Now, you used a term a minute
24  ago that I don't think either of us have
25  used in today's deposition until now, and
```

Page 291

```
 1                  U. ROWE
 2       Q.    What happened next?
 3       A.    He said that he would talk to
 4  Kristen and come back to me.
 5       Q.    And did he?
 6       A.    He did.
 7       Q.    And what happened next?
 8       A.    He said that based on the
 9  conversations with Kristen, that they
10  weren't going to go ahead with me.
11       Q.    Did he tell you anything more,
12  did he give you any more details?
13       A.    I don't remember a lot of the
14  details, but I was surprised when he said
15  based on your interview with Kristen, I did
16  not have an interview with Kristen, this
17  was like a casual one-on-one get-together,
18  I found out about the opportunity during
19  that meeting, and that, you know, he told
20  me that based on that conversation that I
21  was being discounted, I was surprised.
22       Q.    And was that the end of it?
23       A.    Yes.
24       Q.    Did you ever follow up with
25  Kristen?
```

Page 294

```
 1                U. ROWE
 2   happened.
 3       Q.    So, again, other than the
 4   sequence of timing, is there anything else
 5   that leads you to believe that anything
 6   that happened to you at Google was because
 7   of your complaints of discrimination?
 8           MS. GREENE:  Objection.
 9       A.    I think it's not just the
10   sequence of events, but actually what
11   happened as well.
12       Q.    And the "what" is you say you
13   were demoted, you say you were isolated,
14   and you were denied this other job that was
15   given to Yolande Piazza?
16       A.    Correct.
17       Q.    Those are the things that
18   happened?
19       A.    Correct.
20       Q.    And my question to you is other
21   than the sequence of timing between your
22   complaints of discrimination and the timing
23   of those things I just mentioned, other
24   than the timing, is there anything else
25   that leads you to believe that those events
```

Page 295

```
 1                U. ROWE
 2   were because of your complaints of
 3   discrimination?
 4           MS. GREENE:  Objection.
 5       A.    Again, it's not just the
 6   timing, you know, I was isolated.
 7       Q.    Then what else is it?
 8       A.    Because like I was isolated
 9   when my male peers were not isolated.  When
10   they were given opportunities, I wasn't
11   given opportunities.  So it is not just,
12   you know, the sequence of what happened,
13   but like what I experienced during that
14   time.
15       Q.    So what you describe as
16   isolating, being isolated, what leads,
17   other than the sequence of timing, other
18   than those events occurring which you
19   already testified about today -- withdrawn.
20   Let me ask you more specifically.
21           When you say being isolated,
22   you are talking about your testimony about
23   not being invited to meetings, correct?
24       A.    That's one of the things.
25       Q.    Not being invited to client
```

Page 296

```
 1                U. ROWE
 2   events, right?
 3       A.    That's another one of those.
 4       Q.    Not being invited to off-sites,
 5   right?
 6       A.    That's also one of those.
 7       Q.    Okay, what else was there?
 8   What else constitutes the isolations?
 9       A.    I was isolated, one, because I
10   was told that I couldn't focus on financial
11   services anymore, so Google removed that
12   responsibility from me.  And that meant
13   that I was isolated from any discussions
14   around, you know, go to market, around
15   customer interactions, around, you know,
16   press and media appearances, and I was
17   isolated on, you know, what events I could
18   go talk to.
19           So there was a lot of these
20   things that I was isolated by whereas, you
21   know, my male peers, Stuart Breslow and
22   others, weren't.
23       Q.    When were you told that you
24   were no longer to focus on financial
25   services?
```

Page 298

```
 1                U. ROWE
 2   the three options that were presented to
 3   me.
 4       Q.    You had three options, and you
 5   chose, no one else chose for you, correct?
 6       A.    Of the options that were given
 7   to me, yes, going back to OCTO was what I
 8   chose.
 9       Q.    And Google had decided that
10   when you were in OCTO, you were going to be
11   focused on hybrid cloud, correct?
12       A.    Yes.
13       Q.    Do you have any reason to
14   believe that that decision to have you
15   focus on hybrid cloud was made because you
16   had raised complaints of discrimination?
17           MS. GREENE:  Objection.
18       A.    So I don't know what went into
19   that discussion, but what I have
20   experienced was Google removed all my
21   financial services related
22   responsibilities, Google isolated me
23   internally and externally, and I know that
24   I was also denied further opportunities.
25       Q.    I'm talking right now about
```

Page 327

```
 1                U. ROWE
 2   comparable.
 3       Q.    How are they different?
 4       A.    I don't know what he does on a
 5   day-to-day basis, so I don't know, you
 6   know, what he does that might be different,
 7   but what I do know is that, you know, he
 8   does provide, you know, product and
 9   engineering guidance.  He does provide
10   thought leadership.  He works across the
11   organization.  And he does have -- he does
12   have, you know, client facing, and
13   understanding his clients and building
14   product type responsibilities.
15       Q.    Does he write code as part of
16   his job?
17       A.    I don't know.
18       Q.    Do you?
19       A.    I don't, not production code.
20       Q.    Have you ever, since you have
21   been at Google?
22       A.    So I have written code, but I
23   have not contributed code to Google's
24   products, if that's what you are asking.
25       Q.    Do you know anyone else who is
```

Page 343

```
 1              ULKU ROWE
 2   the role.
 3       Q.    Did she tell you who specifically
 4   to reach out to by name?
 5       A.    She said Stuart Vardaman but she
 6   may have mentioned another person.  I don't
 7   remember the number.
 8       Q.    Did you say she said Stuart
 9   Vardaman?
10       A.    That is my recollection.
11       Q.    Did Miss Kliphouse tell you
12   whether this job had been posted yet,
13   advertised?
14       A.    I don't remember that.  I don't
15   think so.
16       Q.    Did Miss Kliphouse say anything to
17   you about whether she had looked at or considered
18   candidates as of that point?
19       A.    I don't remember that.  For your
20   earlier question I think I said she didn't tell
21   me it was posted, I don't know if it was posted
22   internally in Google.  She indicated that it
23   was an active job search.
24       Q.    As of the point at which you had
25   coffee with her she told you that it was at
```

Page 342

```
 1              ULKU ROWE
 2       Q.    What did she tell you about the
 3   role she was planning to hire for?
 4       A.    She said that she was looking for
 5   a VP of sales for financial services and she
 6   also said that she is looking for people that
 7   are not from -- she was looking for people that
 8   don't have the traditional sales background.
 9   Those were not necessarily a good fit for the
10   first time role either so she was looking more
11   broadly.
12       Q.    Did she use those words and
13   what I mean by that is not looking for someone
14   in the traditional sales background?
15       A.    I don't remember her exact words,
16   but she was definitely saying they are
17   broadening to include nonsales background
18   people, but I don't remember if those were her
19   exact words.
20       Q.    What if anything else do you
21   remember about what Miss Kliphouse told you
22   concerning this position and what she was
23   looking for?
24       A.    I told her I was interested in the
25   role and she asked me to reach out to HR about
```

Page 358

```
 1              ULKU ROWE
 2   that you would not be considered further for
 3   the role.
 4             He sent you the job posting;
 5   correct?
 6       A.    He did.
 7       Q.    And do you have that available to
 8   you now?  I think it should be shared with you
 9   I think it is previously marked as Plaintiff's
10   Exhibit 115.
11       A.    In the shared drive, yes.
12       Q.    So you have it in front of you?
13       A.    Yes.
14       Q.    You received this after your
15   conversation with Miss Kliphouse, correct?
16       A.    Correct.
17       Q.    Can you read to me the two lines
18   at the bottom of the first page starting with
19   the word "drawing"?
20       A.    "Drawing upon previous
21   demonstrable success leading sizeable
22   technology sales teams that served he financial
23   services industry."
24       Q.    Did you have previous demonstrable
25   success leading sizable technology sales teams
```

```
                                                Page 359
 1                    ULKU ROWE
 2      that served the financial services industry?
 3           A.     I had sales experience.  I didn't
 4      directly lead sales teams, but based on how
 5      Kirsten was describing the role, I thought it
 6      was appropriate for me to raise my hand.
 7           Q.     I didn't ask you whether it was
 8      appropriate for you to raise your hand.  I just
 9      asked you in fact if you had "previous
10      demonstrable success leading sizable technology
11      sales teams that served the financial services
12      industry."  Did you?
13           A.     No.
14                  MS. GREENE:  Objection, asked and
15           answered.
16           A.     No, but I had relative experience
17      that would be useful.
18           Q.     Did you have what you just read?
19           A.     No.
20           Q.     Were you discouraged when you read
21      that?
22           A.     No.
23           Q.     Did you -- I want to flip over to
24      the second page of this document in the middle
25      below the words "The financial services leader
```

```
                                                Page 374
 1                    ULKU ROWE
 2      role.
 3           Q.     Have you ever met Miss Piazza?
 4           A.     We have been in meetings together,
 5      yes.
 6           Q.     Do you have an opinion as to her
 7      qualifications for this sales role based upon
 8      your interactions with her?
 9           A.     Look, I can't speak to her
10      qualifications.  I don't know enough about her.
11           Q.     When she joined Google did you set
12      up a meet and greet with her?
13           A.     I didn't, but she and I have been
14      in quite a few meetings together.
15           Q.     Is there a reason why you didn't
16      set up a meet and greet with her when she
17      joined?
18           A.     Look, I think -- I don't think
19      there is a specific reason.
20           Q.     Was it your practice to set up
21      meet and greets with new leaders who had joined
22      Google from outside the company?
23           A.     Sometimes, especially like if I
24      don't have reason to work with them on a
25      day-to-day basis.  Others I work together all
```

```
                                                Page 373
 1                    ULKU ROWE
 2      use a phrase I want to know what she means
 3      by it.  It's a different question, Cara
 4           A.     I'm just saying I don't know a
 5      hundred percent.  She may.
 6           Q.     But you're speculating about that,
 7      correct?
 8           A.     Correct.
 9           Q.     Do you know who was hired for that
10      position?
11           A.     I think at the end it went to
12      Yolanda Piazza.
13           Q.     Do you know anything about her
14      qualifications for the job?
15           A.     I don't know too much about her.
16      I know she came from Citibank and she had been
17      there for a long time and I don't know much
18      beyond that.
19           Q.     Do you have an opinion as to
20      whether you're better qualified, equally
21      qualified or lesser qualify than Miss Piazza
22      for the role?
23           A.     I don't know all of her
24      qualifications, I can't speak to that.  I can
25      speak to the fact that I was qualified for the
```

```
                                                Page 389
 1                    ULKU ROWE
 2      me on the VP of sales role.  So he told me that
 3      I would not be considered for the role.
 4           Q.     What did you say in response?
 5           A.     I asked some questions.
 6           Q.     What questions did you ask?
 7           A.     I asked him why.
 8           Q.     What did he say?
 9           A.     He said that they were looking for
10      someone that has a more commercial background.
11           Q.     What else did you ask?
12           A.     I asked him like what made them
13      think that I wasn't qualified for the role.
14           Q.     What did he say?
15           A.     He said that it was based on a
16      two-hour meeting that I had with Kirsten.
17      Two-hour interview actually he said.
18           Q.     What else did you ask?
19           A.     I think I added some more prodding
20      questions.  I don't remember all the questions.
21      I said to him that I wasn't aware that the
22      meeting that I had with Kirsten was an
23      interview.  I said to him that it was like a
24      meet and greet and that it was actually in this
25      meeting that I found out about this role.  I
```

```
                                          Page 390
 1                ULKU ROWE
 2       was surprised.  I expressed surprise.
 3                He also mentioned there is a VP of
 4       solutions role that might be opening up that I
 5       might be a candidate for.
 6            Q.   How did you react to that?
 7            A.   I asked him what the role was and
 8       he said like we don't really know yet.  It's a
 9       head of industry solutions that is coming up,
10       but he will have more details then.  But he did
11       say that they -- he mentioned I think -- I
12       can't remember her name.  He mentioned I think
13       Carrie the retail person that she would also be
14       considered for the head of solutions for the
15       retail position.
16            Q.   Is that Carrie Farb?
17            A.   Yes, I think that is the name.
18            Q.   Did you ever express interest in
19       this other role that he said might become
20       available?
21            A.   Well, I never heard about it
22       subsequently until someone was announced.
23            Q.   Did you tell Mr. Vardaman in that
24       conversation that you were or might be
25       interested in the position?
```

```
                                          Page 394
 1                ULKU ROWE
 2       do you have any reason to believe that the
 3       e-mail that you sent to your lawyers contains
 4       any additional details about the conversation
 5       with Mr. Vardaman that you've not already
 6       shared?
 7            A.   I don't believe so.
 8            Q.   I think you testified that
 9       Mr. Vardaman told you that they were looking
10       for someone with a more commercial background
11       for the position that Miss Kliphouse was
12       filling.
13                What did you understand that
14       phrase to mean, a more commercial background?
15            A.   That they were looking for someone
16       with a direct sales experience.
17            Q.   Was that statement that
18       Mr. Vardaman made to you consistent with the
19       description of the job that he sent to you?
20            A.   Yes, but it wasn't how Kirsten
21       described the role.
22            Q.   Well, how did Kirsten describe the
23       role in a manner inconsistent with that?
24            A.   Because she said they are looking
25       beyond the pure sales experience, the
```