Page 1

1

2    IN THE UNITED STATES DISTRICT COURT

3    FOR THE SOUTHERN DISTRICT OF NEW YORK

4    Civil No.: 19 Civ. 08655 (LGS)(GWG)

5    -----------------------------------x

     ULKU ROWE,

6

              Plaintiff,

7

8

         - against -

9

10

     GOOGLE LLC,

11

              Defendant.

12   -----------------------------------x

                 October 14, 2020

13               9:39 a.m.

14

15        Videotaped Deposition of ULKU ROWE,

16   taken by Defendant, pursuant to Notice,

17   held via Google Hangouts videoconference,

18   before Todd DeSimone, a Registered

19   Professional Reporter and Notary Public of

20   the States of New York and New Jersey.

21

22

23

24

25

Page not submitted in support of
Google's motion for summary judgment

Page not submitted in support of
Google's motion for summary judgment

U. ROWE

1
2  knowledge, already provided your lawyers
3  with all documents and information that you
4  have in your possession that relates to
5  this case?
6      A.   Yes.
7          MR. GAGE:  Sara, could you mark
8  tab 6 as Exhibit 3.
9          (Defendant's Exhibit 3 marked
10 for identification.)
11         MS. TOMEZSKO:  It should be
12 available now on the drive.
13     Q.   Let me know when you have a PDF
14 that is labeled tab 6, Ms. Rowe, and the
15 Bates number on this, for the record, is
16 P001586-1587.
17     A.   Yeah, I have it.
18     Q.   What is this?
19     A.   I believe these are some notes
20 that I took during the conversation with
21 Melissa, Melissa Lawrence.
22     Q.   And these notes were recently
23 provided to us in discovery.  When did you
24 give these to your lawyer?
25     A.   My lawyers had them for a while

U. ROWE

1
2  happened.
3      Q.   And when was the conversation?
4      A.   So sometime in November of
5  2017.
6      Q.   At the top of the document it
7  says 20 November 2017.  Do you see that?
8      A.   I do.
9      Q.   Did you write that date to
10 represent the date you wrote the notes?
11     A.   I don't remember that.  I don't
12 remember if it was the date of the
13 conversation or the date of the notes.
14     Q.   And the first line says
15 "Summary of the items we discussed today."
16         Who is the "we"?
17     A.   Melissa and I.
18     Q.   And how did this conversation
19 take place, was this face to face, was this
20 over the phone?
21     A.   I believe this was
22 videoconference, video conversation.
23     Q.   Who initiated it?
24     A.   I did.
25     Q.   And to the best of your

7 (Pages 22 - 25)

1           U. ROWE
2   knowledge, does this reflect notes that you
3   took close in time to that conversation
4   taking place?
5       A.    Correct.
6       Q.    Did you record everything that
7   was said in the conversation?
8       A.    It is not a transcription of
9   the conversation, it's the highlights of
10  like what stuck with me, the summary of the
11  conversation.
12      Q.    So this reflects what stuck
13  with you from the conversation?
14      A.    Correct.
15      Q.    But not necessarily everything
16  that was said?
17      A.    It was meant to represent a
18  summary of the conversation, yes.
19      Q.    But not necessarily everything
20  that was said?
21      A.    It doesn't capture every single
22  sentence as it was said, but it was also
23  not meant to leave out, you know, major
24  topics.
25      Q.    And Melissa -- what is

Page not submitted in support of
Google's motion for summary judgment

Page not submitted in support of
Google's motion for summary judgment

Page not submitted in support of
Google's motion for summary judgment

8 (Pages 26 - 29)

Page 86

Page not submitted in support of
Google's motion for summary judgment

Page 87

Page not submitted in support of
Google's motion for summary judgment

Page 88

Page not submitted in support of
Google's motion for summary judgment

Page 89

```
 1          U. ROWE
 2     A.   I don't know the exact time
 3  that he had the cloud experience.  No, I
 4  don't know that.
 5     Q.   So does that mean you do not
 6  know whether he had more cloud experience
 7  at the point he joined Google than you had
 8  when you joined Google?
 9     A.   I don't know that.
10     Q.   What was his prior cloud
11  experience before he joined Google?
12     A.   So I believe he worked at GE
13  and worked on their AWS migration.
14     Q.   What was your cloud experience
15  before you joined Google?
16     A.   I was at J.P. Morgan working on
17  their AWS migration.
18     Q.   What were you doing working on
19  the AWS migration at J.P. Morgan?  What was
20  your job on that project?
21     A.   I ran risk systems, I ran
22  credit risk systems, and we were migrating
23  high credit risk systems to the cloud.
24     Q.   And what was your role in that
25  process of migration?
```

23 (Pages 86 - 89)

Page 90

```
1              U. ROWE
2      A.    I ran the team that was working
3  on the migration.
4      Q.    You identified Royal Hansen as
5  someone you believe is similarly situated
6  to you.  Who is Royal Hansen?
7      A.    Royal is an eng VP.
8      Q.    What does Royal Hansen do at
9  Google?
10     A.    He works in the security area.
11     Q.    What does he do?
12     A.    He runs an engineering team in
13 security.
14     Q.    And what does it mean to run an
15 engineering team in security?
16     A.    I don't know what -- I don't
17 know the exact specifics, but, you know,
18 his focus is on security, security
19 products.
20     Q.    And what about security
21 products, designing them, building them?
22     A.    I believe those would be
23 included, yes.
24     Q.    What else does he do?
25     A.    I don't know -- I don't know
```

Page 92

Page not submitted in support of
Google's motion for summary judgment

Page 91

Page not submitted in support of
Google's motion for summary judgment

Page 93

Page not submitted in support of
Google's motion for summary judgment

24 (Pages 90 - 93)

U. ROWE

1
2  you know, just we're in the same company
3  and I have, you know, I hear his name, and
4  to my knowledge he is still a VP.
5      Q.    By the way, while you were at
6  J.P. Morgan, did you -- did J.P. Morgan
7  complete the AWS migration before you left?
8      A.    No.
9      Q.    When did it start?
10     A.    I'm a little hazy on dates,
11 but, you know, I think somewhere around a
12 year before I left is when we started.
13     Q.    And prior to working on the AWS
14 migration at J.P. Morgan, had you had any
15 other cloud experience in any of your jobs?
16     A.    So before then I didn't
17 actively work on a cloud migration.  You
18 know, financial services is an area that
19 has been late to the cloud.  It has been a
20 very conservative industry.  I had
21 personally read and studied the cloud.
22     Q.    Just for your own personal
23 professional interest, correct?
24     A.    Correct, while I was at J.P.
25 Morgan.

Page not submitted in support of
Google's motion for summary judgment

Page not submitted in support of
Google's motion for summary judgment

Page not submitted in support of
Google's motion for summary judgment

25 (Pages 94 - 97)

Page 98

Page not submitted in support of
Google's motion for summary judgment

Page 100

Page not submitted in support of
Google's motion for summary judgment

Page 99

1          U. ROWE
2   you know, someone that provides thought
3   leadership, so, you know, a leadership role
4   outside of OCTO.
5      Q.    But when he left OCTO, he also
6   took on responsibility for managing a team
7   of people, correct?
8      A.    Correct.  That's my
9   understanding.
10     Q.    When he was in OCTO, was he
11  managing other people?
12     A.    I don't remember if -- I don't
13  remember if he did.
14     Q.    Have you at any point in time
15  since you have been at Google managed other
16  people?
17     A.    I have not.
18     Q.    Is that sometimes referred
19  to --
20     A.    Well, other than my executive
21  assistant.
22     Q.    Is that sometimes referred to
23  as an individual contributor?
24     A.    Yes.
25     Q.    So you have been an individual

Page 101

Page not submitted in support of
Google's motion for summary judgment

26 (Pages 98 - 101)

Page 106

Page not submitted in support of
Google's motion for summary judgment

Page 108

Page not submitted in support of
Google's motion for summary judgment

Page 107

Page not submitted in support of
Google's motion for summary judgment

Page 109

1           U. ROWE
2    A.    We have similar
3  responsibilities.
4    Q.    Sufficient for you to consider
5  Mr. Penberthy to be similarly situated to
6  you, correct?
7    A.    So I have since learned that,
8  you know, Scott is at level 8, but I think,
9  what I believe, is my experience and my
10 qualifications are in line with the level 9
11 men in OCTO.
12   Q.    But he is similarly situated to
13 you, correct, Mr. Penberthy?
14   A.    Incorrect.
15   Q.    You gave an answer under the
16 penalty of perjury in your interrogatory
17 response that Scott Penberthy is similarly
18 situated to you, right?
19   A.    Well, at that time, you know, I
20 thought he was a level 9, and through
21 discovery I learned that he was a level 8.
22   Q.    So that changes your answer,
23 right?
24   A.    So, look, I don't know every
25 single qualification and everything that

28 (Pages 106 - 109)

Page 130

1           U. ROWE
2  skills, qualifications and job duties,
3  right?
4        MS. GREENE:  Objection.
5    A.    Ask me the question again.
6    Q.    Let's take -- let's take it
7  differently.  Tell me everything that you
8  know about Eric Schenk's job duties and
9  responsibilities.
10    A.    I don't know everything that
11  Eric does.
12    Q.    I'm asking you to tell me
13  everything that you know.
14    A.    But I do know that he works on
15  security.  I do know that he does, you
16  know, product and engineering leadership.
17  I do know that he does -- he does client
18  engagements.  And I do know that he does
19  some thought leadership.
20    Q.    And you do know that he manages
21  people, right?
22    A.    I do, yes.
23    Q.    What do you know about Eric
24  Schenk's background, experience,
25  qualifications and education?

Page 131

1           U. ROWE
2    A.    Again, I don't know everything
3  about Eric's background and qualifications,
4  but I do believe that in terms of, you
5  know, his experience and skills, they are
6  comparable to mine.
7    Q.    So based upon what you know,
8  sitting here right now, do you believe Eric
9  Schenk is similarly situated to you?
10    A.    Yes.
11    Q.    Now, if you were to find out
12  that he is a level 8, would your answer
13  change?
14    A.    I don't know.  I don't know.
15    Q.    But you found out that Scott
16  Penberthy is a level 8 and your answer did
17  change, so why wouldn't it change for Eric
18  Schenk?
19        MS. GREENE:  Objection.
20    A.    Look, I don't know.
21    Q.    Okay, you don't know.
22        Let's talk about Paul Strong.
23  Tell us everything you know about Paul
24  Strong's background, experience, and
25  education.

Page 132

Page not submitted in support of
Google's motion for summary judgment

Page 133

Page not submitted in support of
Google's motion for summary judgment

34 (Pages 130 - 133)

Page 170

```
 1            U. ROWE
 2  Stuart was included and I wasn't.
 3      Q.   How many off-sites took place
 4  while you worked for Tariq that you were
 5  not invited to?
 6      A.   I don't know.
 7      Q.   Do you know how many off-sites
 8  Tariq had during the time you worked for
 9  him?
10      A.   I don't know.
11      Q.   Do you know if -- do you know
12  if Tariq had any off-sites during the time
13  you worked for him that you were not
14  invited to?
15      A.   I don't know.
16      Q.   You indicated that you believed
17  you were left out of team meetings.  What
18  team meetings were you left out of?
19      A.   So Tariq would have regular
20  team meetings that he would use his team
21  e-mail to send invitations to, so I was
22  left out of those, and other meetings where
23  he met with his team members but I wasn't
24  there.
25      Q.   How many times did that happen,
```

Page 172

Page not submitted in support of
Google's motion for summary judgment

Page 171

Page not submitted in support of
Google's motion for summary judgment

Page 173

Page not submitted in support of
Google's motion for summary judgment

44 (Pages 170 - 173)

Page 174

1          U. ROWE
2 believed you should have been invited to?
3     A.    I don't know what the meeting
4 was about, but it was about financial
5 services.
6     Q.    Was that at a point at which
7 you were still in Tariq's organization when
8 Leonard Law shared that with you?
9     A.    I believe so, yes.
10     Q.    Did you believe you should have
11 been in every meeting that Tariq held with
12 anyone who worked on his team?
13     A.    No.
14     Q.    Did you believe that you should
15 have been invited to every meeting with
16 Tariq that had anything to do with
17 financial services?
18     A.    No.  But I do believe that I
19 should have been in every staff meeting
20 that he had.
21     Q.    When you first came to believe
22 you were not on the e-mail list for his
23 staff meetings, what did you do?  Did you
24 tell anyone?
25     A.    Yes.

Page 176

Page not submitted in support of
Google's motion for summary judgment

Page 175

1          U. ROWE
2     Q.    Who did you tell?
3     A.    So, first, I asked my admin to
4 check with Tariq's admin to make sure it
5 was okay, then I asked -- I believe I asked
6 Tariq's admin directly, and, finally, I
7 asked Tariq.
8     Q.    And what did you learn?
9     A.    The responses changed over
10 time, but it was, you know, first, I
11 think -- I think some of the answers were
12 they were working on the e-mail lists, so,
13 you know, it was in flight.  Other times it
14 was an oversight.  Other times it was, you
15 know, they forgot.  You know, so the
16 answers changed.
17     Q.    Do you have any reason to
18 believe that any of the responses you got
19 were false?
20     A.    Look, I don't have any reason
21 to believe the responses were false, but I
22 knew that my male peers were in these
23 meetings and I wasn't, so I was being
24 treated differently.
25     Q.    What male peers?

Page 177

Page not submitted in support of
Google's motion for summary judgment

45 (Pages 174 - 177)

Page 186

U. ROWE

1
2  meetings with any of the institutions you
3  just listed, ███████████████████,
4  ███████████████████, and ████
5  ████ during the time that you worked with
6  Tariq?
7      A.   Look, I don't remember the
8  individual meetings.  Again, like I have a
9  lot of customer meetings, so I can't -- I
10 don't know how many or what time with what
11 customers.  It is hard for me to remember
12 right now.
13     Q.   So you don't know one way or
14 the other whether you met with any of those
15 banks during the time you worked for Tariq?
16     A.   I just don't remember, yeah.  I
17 do remember, you know, having client
18 meetings during my time working for Tariq,
19 I just couldn't tell you with what customer
20 over what period.
21     Q.   How many months did you work
22 for Tariq, approximately?
23     A.   I think roughly it was about
24 ten months.
25     Q.   During that ten-month period,

Page 187

U. ROWE

1
2  how many customer meetings did you
3  participate in with the customers we have
4  just been talking about?
5      A.   I don't remember the exact.
6  Yeah, I don't remember.
7      Q.   Was it something you did once a
8  month with each of them?  Withdrawn.
9           Did you have regular meetings
10 with each of these customers?
11     A.   No.  A lot of these are not
12 like, you know, most of these customers you
13 don't meet, you know, every day on an
14 ongoing basis.  Usually it changes with the
15 demand that is coming from the customer
16 team and where that relationship is.  So I
17 know that like on a given week or on a
18 given month I have multiple customer
19 meetings usually a week, but like I can't
20 remember what customer I met with what week
21 or what month during this time.
22     Q.   During the time that you worked
23 for Tariq, did you develop any sort of a
24 regular cadence with any of the priority
25 clients?

Page 188

U. ROWE

1
2      A.   I just can't remember what type
3  of clients I was working with during
4  Tariq's time, so it is hard for me to
5  answer.
6      Q.   But my question, I wasn't
7  asking you which ones, I was asking you
8  whether during the time you worked with
9  Tariq you developed any sort of a regular
10 schedule or regular cadence of having
11 meetings with priority clients?
12     A.   So, again, you know, a lot of
13 the meetings are not on a cadence.  They
14 depend on the account team wanting to have
15 that meeting at a customer.  They are not
16 like weekly recurring meetings all the
17 time.  But during my time working for
18 Tariq, I did have many customer meetings
19 with the priority accounts.  I just, again,
20 can't remember which customer when.
21     Q.   So when you say the accounts
22 team, are those the folks in sales?
23     A.   Yes.
24     Q.   So the sales folks would come
25 to you and they would essentially dictate

Page 189

U. ROWE

1
2  when these customer meetings took place; is
3  that fair?
4      A.   Well, they wouldn't dictate,
5  no.
6      Q.   Then did you go to the accounts
7  team and tell them to schedule meetings
8  with customers?
9      A.   No.
10     Q.   Well, tell me how it worked.
11     A.   Usually they would come with a
12 request to say, you know, we're trying to
13 do something with this customer, like we
14 are trying to talk to this team, that team,
15 this team, and would collectively figure
16 out what the right time would be, who the
17 right individuals would be, and what the
18 meeting would look like.
19     Q.   And was it the account team
20 that took the initiative to get these
21 going?
22     A.   Usually the requests come from
23 the account teams.
24     Q.   Did you yourself target any
25 particular clients, particular, you know,

48 (Pages 186 - 189)

Page not submitted in support of
Google's motion for summary judgment

1          U. ROWE
2  storage engineering.
3      Q.    Did you get that job?
4      A.    So that job didn't pan out,
5  because the hiring manager left Google.
6      Q.    What was the second opportunity
7  at Google that you pursued?
8      A.    So after that Google would call
9  me every few months with different
10  opportunities, but I don't think, you know,
11  any of them were right, so Office of the
12  CTO was the first one, after the role in
13  storage engineering, that I actually came
14  in and interviewed for.
15      Q.    And is that job, the one in
16  OCTO, the one you ultimately got, is that
17  the one you are referring to?
18      A.    Yes.
19          MR. GAGE:  Sara, can we share
20  tab 15, and, Mr. Court Reporter, what
21  exhibit are we up to?
22          THE COURT REPORTER:  This
23  should be 5.
24          (Defendant's Exhibit 5 marked
25  for identification.)

Page not submitted in support of
Google's motion for summary judgment

1          U. ROWE
2      Q.    Mr. Rowe, let me know when you
3  have that.
4      A.    Yes, I have that.
5      Q.    Is this the description of the
6  job that you ultimately were hired for?
7      A.    Yes.
8      Q.    And when you were hired for
9  this position, the position of technical
10  director, Office of the CTO, Google Cloud,
11  what was your understanding of what your
12  job duties would be?
13      A.    There would be three main
14  components to it, one around product and
15  eng, second around client engagements at
16  the CXO level, and third, thought
17  leadership in the industry, so outward
18  facing and also internal facing.
19      Q.    Let's take those apart one at a
20  time.
21          The first one, you said product
22  and engineering.  Now, those are two nouns,
23  as I understand them.  Can you translate
24  that into what that means for job duties?
25      A.    So it means that providing

49 (Pages 190 - 193)

U. ROWE

1
2 guidance and advice into the product teams
3 in terms of, you know, how to build Google
4 Cloud's products so that they served the
5 industry needs.
6    Q.    And then the second thing you
7 mentioned was client engagement at the CXO
8 level.  Can you expand on that?
9    A.    So that means working with
10 Google's, you know, most important clients
11 to understand their business needs, you
12 know, what they want the future of their
13 businesses to look like, and then to work
14 with them to plot out a strategy on how
15 Google Cloud's technology could help them
16 achieve that, you know, again, providing
17 them guidance, advisory, working with a
18 collaborative group of Googlers, not just
19 about Google Cloud's technology, but Google
20 technology broader, to solve the big
21 customer problems and to help them use
22 Google Cloud.
23    Q.    And then the last component you
24 said was thought leadership.  Can you
25 explain what you understood that to mean?

Page not submitted in support of
Google's motion for summary judgment

U. ROWE

1
2    A.    So thought leadership is
3 basically having credibility in the
4 marketplace, you know, both again
5 externally and industry, to provide a
6 direction and strategic thinking into how
7 the industry is changing, how technology is
8 enabling that change, you know, be the
9 voice of Google, be the technical voice of
10 Google, the industry voice of Google, to
11 actually shape how the future of the
12 industry is going to work, you know, go
13 through like an industry perspective on the
14 way the technology supports that.
15    Q.    And when you were hired into
16 this job, what was your understanding of
17 who you would report to?
18    A.    Will Grannis.
19    Q.    And what was your understanding
20 at the time you were hired into this job of
21 Will Grannis' job duties and
22 responsibilities?
23    A.    So obviously Will was leading
24 the team, and other than that, you know,
25 his responsibilities were similar to what I

Page not submitted in support of
Google's motion for summary judgment

50 (Pages 194 - 197)

Page 202

Page not submitted in support of
Google's motion for summary judgment

Page 204

U. ROWE

2  A.   Well, Google has asked me on
3 their behalf to speak on Google and Google
4 Cloud on many, many occasions, describing
5 me as a Google Cloud expert.
6     Q.    Are you aware of any documents
7 that existed at the time you were hired by
8 Google that described you as an expert in
9 cloud computing?
10    A.   I am not aware of that.
11    Q.    During the hiring process that
12 we are talking about that led to you being
13 hired as a technical director in the Office
14 of the CTO, didn't you at one point
15 indicate that you were not an expert in
16 cloud computing?
17    A.   I don't remember that.  Again,
18 context is important here.  Like being an
19 expert in cloud computing in financial
20 services versus being an expert in cloud
21 computing in a cloud native company can
22 mean different things, so context is
23 important.
24    Q.    Well, let's go back to that for
25 a minute.  You described a minute ago what

Page 203

Page not submitted in support of
Google's motion for summary judgment

Page 205

U. ROWE

2 you understood Google was looking for.
3 What was the basis for that understanding,
4 was it the job description?
5     A.    It was the job description and
6 my conversations with Will and other
7 interviewers.
8     Q.    Will and who else, what other
9 people?
10    A.    Will, HR person, Jenny, the
11 people that have interviewed me, I think
12 Brian was one of them, Salman was I think
13 another interviewer.  I can't remember all
14 the names of the interviewers.
15    Q.    Does the document that we have
16 marked here as Exhibit 5, Position
17 Description for Technical Director, Office
18 of the CTO, does it fairly describe the
19 responsibilities of the job that you were
20 hired for and then performed in the Office
21 of the CTO?
22    A.    So this is tab 15, right?
23    Q.    Yes, tab 15, yes, I'm sorry.
24    A.    Yes, it's fair.
25    Q.    Do you know who Krista

52 (Pages 202 - 205)

U. ROWE

1           U. ROWE
2  Callaghan is?
3      A.   I think Krista was an HR
4  person.
5      Q.    And she was somebody that you
6  communicated with during the recruiting and
7  hiring process, correct?
8      A.   I believe so.
9          MR. GAGE:  Sara, can we put up
10 tab 16, and this will be Exhibit 7, and
11 this is Bates stamped P000550 through 552.
12         (Defendant's Exhibit 7 marked
13 for identification.)
14     A.   Okay.
15     Q.   Do you have it?
16     A.   Yes.
17         MS. GREENE:  I'm sorry, can you
18 just repeat what tab we are looking at?
19         MR. GAGE:  Tab 16.
20         MS. GREENE:  Thank you.
21     Q.   Ms. Rowe, this is an e-mail
22 exchange between you and Krista Callaghan
23 at Google, right?
24     A.   Yes.
25     Q.   Do the dates indicate that this

Page not submitted in support of
Google's motion for summary judgment

Page not submitted in support of
Google's motion for summary judgment

1           U. ROWE
2      Q.   So is that a yes?
3      A.   So the question was?  Ask your
4  question again.
5      Q.   So does this refresh your
6  recollection that you told Krista Callaghan
7  that you were not a cloud expert?
8      A.   Yes.  Yeah, it refreshes my
9  memory.
10     Q.   Right, okay.  So you did,
11 during this process of being recruited to
12 Google, say to Google you were not a cloud
13 expert, right?
14         MS. GREENE:  Objection.
15     A.   In this e-mail, yes, I said
16 that in this e-mail.
17     Q.   Well, actually she said this in
18 this e-mail, right?  She was describing the
19 conversation she had with you, right?
20     A.   Correct.
21     Q.   And you just indicated that you
22 were coming from an industry that had been
23 late to adopting the cloud, and that's one
24 of the reasons you were not a cloud expert,
25 correct?

53 (Pages 206 - 209)

1              U. ROWE
2      A.     Correct.
3      Q.     And at the point at which you
4  were hired by Google, did you have any
5  experience at all building cloud products?
6      A.     So I had experience using cloud
7  products, but J.P. Morgan does not sell
8  cloud, so I did not have experience
9  building cloud products.
10     Q.     And was your cloud experience,
11 at the time you were hired by Google,
12 limited to your work on the cloud migration
13 project at J.P. Morgan that you described
14 earlier today?
15     A.     Incorrect.
16     Q.     I think you said incorrect, but
17 we had a frozen screen here.  So am I
18 right, you said incorrect?
19     A.     I said incorrect because, you
20 know, my experience wasn't just limited to
21 that.  Obviously, you know, we are reading,
22 you know, and catching up with the industry
23 as things were happening, but, broadly
24 speaking, yes.
25     Q.     Now, during the recruiting

Page not submitted in support of
Google's motion for summary judgment

Page not submitted in support of
Google's motion for summary judgment

Page not submitted in support of
Google's motion for summary judgment

Veritext Legal Solutions
212-267-6868          www.veritext.com          516-608-2400

Page 238

```
 1          U. ROWE
 2       MS. GREENE:  Objection.
 3    Q.    And you can't think of anything
 4  else right now other than the fact that
 5  some men were hired as level 9's, and what
 6  you believe to be their relative level of
 7  experience and qualifications, you can't
 8  think of anything else that leads you to
 9  believe that your hiring -- your leveling
10  at hire was because of your sex?
11       MS. GREENE:  Objection.
12    A.    That's not what I said.  You
13  know, I said it was because of my own
14  qualifications, what I know to be true
15  about myself.  I know the qualifications of
16  the men.  And I know, you know, the roles
17  that they are playing.  And I know, you
18  know, the expectations of a level 9 at
19  Google.  So all of those are part of the
20  reasons that led me to believe.
21    Q.    You are talking about the
22  people who you believe are your
23  comparators, correct?
24    A.    Yes.
25    Q.    So other than the fact that you
```

Page 240

Page not submitted in support of
Google's motion for summary judgment

Page 239

```
 1          U. ROWE
 2  have identified these men as your
 3  comparators, other than the fact that you
 4  believe that you are sufficiently similar
 5  to them in terms of your qualifications,
 6  your experience and your job, other than
 7  that, is there anything else that leads you
 8  to believe that your leveling at hire was
 9  because of your sex?
10    A.    I can't think of anything else
11  right now.
12    Q.    At the time you were offered
13  the job, did you raise any questions or
14  issues regarding your level?
15    A.    I did.
16    Q.    With whom?
17    A.    So before the hiring, you know,
18  before I signed the offer, I did raise
19  concerns that, you know, that I was a
20  managing director, you know, I was the
21  highest level of promotion in the financial
22  services industry, and I wasn't sure if
23  level 8 was the right level.  The first
24  time I raised that was with Jenny Burdis.
25    Q.    With who, I'm sorry?
```

Page 241

Page not submitted in support of
Google's motion for summary judgment

61 (Pages 238 - 241)

Page not submitted in support of
Google's motion for summary judgment

1          U. ROWE
2      MS. GREENE:  Objection.
3      A.   Well, I knew what kind of
4  individuals were, and based on that I made
5  the statement that I was better qualified.
6      Q.   Now, you have since, in the
7  course of discovery, come to know who some
8  of the other candidates were, correct?
9      A.   I saw some of the names, yes.
10     Q.   Were you better qualified than
11  all of them?
12     A.   Look, I don't know, and I can't
13  speak to all of their qualifications, but I
14  know who the role ultimately went to, and
15  I -- and I kind of know my qualifications
16  with respect to that individual, so I can
17  speak to that.
18     Q.   Do you know who ██████████
19  is?
20     A.   I have heard the name.
21     Q.   Do you know anything about her
22  qualifications?
23     A.   I don't know much.  I know that
24  at some point she ████████████████████
25  ████████ -- I don't know if she is still

Page not submitted in support of
Google's motion for summary judgment

1          U. ROWE
2  a VP, I don't know if she is still at
3  Google.
4      Q.   Based upon what you know about
5  her, do you think you are better qualified,
6  equally qualified, or lesser qualified than
7  she would be for the head of financial
8  services role?
9      A.   I can't comment on that.
10     Q.   Why not?
11     A.   I don't know.
12     Q.   But you don't hesitate to
13  comment about your relative qualifications
14  compared to somebody's whose identity you
15  don't even know?
16         MS. GREENE:  Objection.
17     Q.   Right?
18     A.   I know the qualifications that
19  they were missing.
20     Q.   What qualifications was ███████
21  ████████ missing?
22     A.   I don't know ████████████████
23  enough to talk about.
24     Q.   What qualifications were these
25  other unnamed candidates missing?

Page 266

Page not submitted in support of
Google's motion for summary judgment

Page 268

Page not submitted in support of
Google's motion for summary judgment

Page 267

1         U. ROWE
2  experience.
3      Q.    What about ████████, do
4  you know anything about her?
5      A.    I don't.
6      Q.    So is it fair to say you don't
7  have an opinion as to whether you are
8  better, equal, or lesser qualified for the
9  head of financial services role than her?
10     A.    Look, I can't comment on
11 individuals.
12     Q.    Because you would be
13 speculating, right?
14         MS. GREENE:  Objection.
15     A.    Because my claims and concerns
16 are about how I have been treated, not how
17 other candidates have been treated in this
18 process.
19     Q.    Let's move on to another topic.
20         You on multiple occasions have
21 said that Stuart Breslow got the head of
22 financial services job that you were being
23 considered for, right?
24     A.    Yes.
25     Q.    Do you know whether Stuart

Page 269

Page not submitted in support of
Google's motion for summary judgment

Page 278

Page not submitted in support of
Google's motion for summary judgment

Page 280

U. ROWE

1
2 sorry?
3     A.    I considered all of those
4 options as demotions.
5     Q.    As demotions, okay.  Why did
6 you consider them demotions?
7     A.    Well, one of them wasn't even a
8 role, it was go find another job, like I
9 would have no job, the other one was a much
10 more junior role, you know, working as a,
11 you know, in a much smaller focus project,
12 I think the ███ project at the time, much
13 more junior role, or I would go back to
14 OCTO, but Google would remove all of my
15 financial services focus.
16     Q.    And you chose to go back to
17 OCTO, correct?
18     A.    Correct.
19     Q.    Now, when you first moved over
20 into Tariq Shaukat's organization from
21 OCTO, Ben and Evren also moved from OCTO
22 into Tariq's organization, correct?
23     A.    So they were also told that
24 they were moving.  I believe Evren never
25 actually moved.

Page 279

U. ROWE

1
2     A.    After Stuart got the job, is
3 that what you are asking, did I discuss
4 with Tariq?
5     Q.    Yes.
6     A.    No.
7     Q.    Did you ever have any
8 discussions with Mr. Shaukat about what
9 your role would be in his organization
10 going forward?
11     A.    So in, I think it was in
12 February, I was told that my role was being
13 changed.  I was given, you know, three
14 options.
15     Q.    What were those three options?
16     A.    I was given an option to work
17 on a focused small project, working for
18 Stuart Breslow.  I was given the option to
19 go back to OCTO without a financial
20 services focus.  And third option wasn't
21 really even real, it was that I could stay
22 and he could park me under Stuart until I
23 found a different role.  And I considered
24 all of these three as demotions.
25     Q.    You had all of these, I'm

Page 281

Page not submitted in support of
Google's motion for summary judgment

71 (Pages 278 - 281)

Page 282

Page not submitted in support of
Google's motion for summary judgment

Page 284

1            U. ROWE
2      Q.    You indicated that -- you
3  testified earlier today that you believe
4  you were denied equity refreshes because of
5  your sex.  Tell me everything that leads
6  you to believe that the equity refreshes
7  you got, the amount of them, or when you
8  didn't get equity refreshes, what leads you
9  to believe that that was because of your
10  sex.
11      A.    Well, I was down-leveled on
12  hire, and that translated into lower
13  compensation as well as lower equity
14  refreshes compared to my male peers.
15      Q.    Is there anything else that
16  leads you to believe that your equity
17  awards were based on your sex?
18      A.    Well, yeah, I can't think of
19  anything else, it's basically the way that
20  I was leveled, and that carried on, you
21  know, that continued to haunt me, so to
22  speak, through my time at Google.
23      Q.    Now, you used a term a minute
24  ago that I don't think either of us have
25  used in today's deposition until now, and

Page 283

Page not submitted in support of
Google's motion for summary judgment

Page 285

Page not submitted in support of
Google's motion for summary judgment

72 (Pages 282 - 285)

Page not submitted in support of
Google's motion for summary judgment

1          U. ROWE
2          MS. GREENE:  Objection.
3     A.   I don't -- I don't know for a
4 fact.
5     Q.   You don't know at all, do you?
6          MS. GREENE:  Objection.
7     A.   Well, I do know -- I do know
8 the level 9 men and my qualifications with
9 respect to them.
10    Q.   And the level 9 men are the
11 only ones that you looked at, right?
12         MS. GREENE:  Objection.
13    Q.   Right?
14    A.   Look, I didn't look at people
15 individually.  Like this is broader than
16 just me comparing myself to four or five
17 individuals, this is me knowing my
18 qualifications and the kind of experience
19 that Google looks for in a L9 eng director
20 and knowing that, you know, I have those
21 similar qualifications.
22    Q.   Have you ever hired a level 9
23 at Google?
24    A.   I have not.
25    Q.   Have you ever hired anyone at

Page not submitted in support of
Google's motion for summary judgment

1          U. ROWE
2 Google?
3     A.   I have not.
4     Q.   Have you ever been through the
5 leveling process at Google, as a
6 participant in the process of leveling
7 someone?
8     A.   I have not.
9     Q.   Have you ever participated in a
10 hiring committee?
11    A.   I have not.
12    Q.   Have you ever participated in
13 any way in the decision-making process that
14 leads to the leveling of someone at hire at
15 Google?
16    A.   I have done a lot of
17 interviews, but no, I have not specifically
18 been involved in leveling discussions, no.
19    Q.   And in any of those interviews,
20 were you asked to offer an opinion as to
21 the level that someone was supposed to --
22 that someone might get?
23    A.   I have not.
24    Q.   You indicated earlier in your
25 testimony that there was another

73 (Pages 286 - 289)

Page 290

```
 1            U. ROWE
 2  opportunity, VP, financial services and
 3  sales, that you applied for in 2020.  Do
 4  you recall that testimony?
 5      A.    I raised my hand for it.
 6      Q.    What do you mean when you say
 7  you raised your hand for it?
 8      A.    I expressed interest in it.
 9      Q.    And how did you express
10  interest in it?
11      A.    I heard from Kristen, and I'm
12  completely blanking on her last name,
13  Kristen runs sales for U.S., and I had -- I
14  had a one-on-one with her, and she
15  mentioned that she was thinking of hiring a
16  VP of sales for financial services, and I
17  told her that I would be interested.
18      Q.    And what, if anything, happened
19  next in connection with your interest in
20  that job?
21      A.    So she asked me to reach out to
22  HR, so I reached out to HR.
23      Q.    Who did you reach out to in HR?
24      A.    I think it was Stuart Weidman,
25  I'm not 100 percent sure.
```

Page 292

Page not submitted in support of
Google's motion for summary judgment

Page 291

Page not submitted in support of
Google's motion for summary judgment

Page 293

Page not submitted in support of
Google's motion for summary judgment

74 (Pages 290 - 293)

Page 298

```
1           U. ROWE
2  the three options that were presented to
3  me.
4     Q.    You had three options, and you
5  chose, no one else chose for you, correct?
6     A.    Of the options that were given
7  to me, yes, going back to OCTO was what I
8  chose.
9     Q.    And Google had decided that
10 when you were in OCTO, you were going to be
11 focused on hybrid cloud, correct?
12    A.    Yes.
13    Q.    Do you have any reason to
14 believe that that decision to have you
15 focus on hybrid cloud was made because you
16 had raised complaints of discrimination?
17       MS. GREENE:  Objection.
18    A.    So I don't know what went into
19 that discussion, but what I have
20 experienced was Google removed all my
21 financial services related
22 responsibilities, Google isolated me
23 internally and externally, and I know that
24 I was also denied further opportunities.
25    Q.    I'm talking right now about
```

Page 299

```
1           U. ROWE
2  what you have described as the isolation.
3  And you previously testified about you
4  described was the isolation while you were
5  on Tariq's team.  I'm now focused on you
6  being back in OCTO and being told that you
7  were to focus on cloud -- hybrid cloud.
8     A.    Yes.
9     Q.    Do you have any reason to
10 believe that the decision to have you focus
11 on hybrid cloud was because you had raised
12 complaints of discrimination?
13       MS. GREENE:  Objection.
14    A.    I don't know what actually went
15 into that decision.  I know the net effect
16 was Google removed all my financial
17 services responsibilities.
18    Q.    Do you have any reason to
19 believe that that decision was because you
20 raised complaints of discrimination?
21       MS. GREENE:  Objection.
22    A.    Look, I don't know for a fact,
23 but I do know what happened to me.
24    Q.    Right.  You were told to focus
25 on hybrid cloud, right?
```

Page 300

Page not submitted in support of
Google's motion for summary judgment

Page 301

Page not submitted in support of
Google's motion for summary judgment

76 (Pages 298 - 301)

Page 310

Page not submitted in support of
Google's motion for summary judgment

Page 312

Page not submitted in support of
Google's motion for summary judgment

Page 311

Page not submitted in support of
Google's motion for summary judgment

Page 313

```
 1        U. ROWE
 2  specific than that.  Did Will Grannis ever
 3  say or do anything that leads you to
 4  believe that he would intentionally treat
 5  you differently because of your gender?
 6     A.    So to my recollection, he
 7  hasn't said anything.  I think when it
 8  comes to doing, you know, he was my hiring
 9  manager and I was down-leveled and paid
10  lower than my peers in hiring, so by that
11  action, yes, he was a part of it.
12     Q.    So other than the fact that he
13  was your hiring manager and he was involved
14  in the decision about your leveling, other
15  than that fact, is there anything else that
16  Will Grannis has ever done or said that
17  leads you to believe that he would treat
18  you differently because of your sex?
19     A.    I can't think of any other.
20     Q.    Is that also true for Brian
21  Stevens?
22     A.    Yes.
23     Q.    At some point after you joined
24  Google you started looking for another job,
25  correct?
```

Veritext Legal Solutions

212-267-6868                www.veritext.com                516-608-2400

Page not submitted in support of
Google's motion for summary judgment

1          U. ROWE
2  are both eng jobs, so they are both under
3  the same eng leveling guide.  They both
4  attend the eng leadership meetings.  They
5  attend, you know, quarterly tech leadership
6  summits.  So for many purposes they are
7  treated similarly, they are considered eng
8  leadership roles.
9      Q.    Have you ever seen the
10  engineering leveling guide?
11      A.    Yes.
12      Q.    When was the first time you saw
13  that?
14      A.    I don't remember the date.
15      Q.    Was it in connection with
16  discovery in this case?
17      A.    No.  I don't know if I saw it
18  as part of discovery, but I saw it at
19  Google, you know, as part of my being an
20  employee at Google.
21      Q.    Do you know what a director,
22  product management, does at Google?
23      A.    So, sorry, there is something
24  going on with my lighting.  I apologize for
25  that.

Page not submitted in support of
Google's motion for summary judgment

1          U. ROWE
2          So director, product
3  management, are similar, they are
4  considered eng roles.  They have, you know,
5  similar -- they require similar
6  qualifications, you know, similar
7  responsibilities to what I just said for
8  the other two.
9      Q.    So as far as you're concerned
10  they are the same as director, software
11  engineering, and director, application
12  engineering?
13      A.    No, I did not say they are
14  exactly the same.
15      Q.    How are they different?
16      A.    I don't know how, you know, the
17  day-to-day responsibilities of those roles
18  are, but I do know that they are pretty
19  comparable.
20      Q.    Are you qualified to be a
21  director, software engineering?
22      A.    I believe so.
23      Q.    Are you qualified to be a
24  director of application engineering?
25      A.    I believe so.

82 (Pages 322 - 325)

Page 326

Page not submitted in support of
Google's motion for summary judgment

Page 328

Page not submitted in support of
Google's motion for summary judgment

Page 327

```
 1           U. ROWE
 2   comparable.
 3       Q.    How are they different?
 4       A.    I don't know what he does on a
 5   day-to-day basis, so I don't know, you
 6   know, what he does that might be different,
 7   but what I do know is that, you know, he
 8   does provide, you know, product and
 9   engineering guidance.  He does provide
10   thought leadership.  He works across the
11   organization.  And he does have -- he does
12   have, you know, client facing, and
13   understanding his clients and building
14   product type responsibilities.
15       Q.    Does he write code as part of
16   his job?
17       A.    I don't know.
18       Q.    Do you?
19       A.    I don't, not production code.
20       Q.    Have you ever, since you have
21   been at Google?
22       A.    So I have written code, but I
23   have not contributed code to Google's
24   products, if that's what you are asking.
25       Q.    Do you know anyone else who is
```

Page 329

Page not submitted in support of
Google's motion for summary judgment

Page not submitted in support of
Google's motion for summary judgment

Page not submitted in support of
Google's motion for summary judgment

Page not submitted in support of
Google's motion for summary judgment

```
 1
 2              U L K U   R O W E,
 3      having been first duly sworn by the Notary Public,
 4      was examined and testified as follows:
 5   EXAMINATION CONDUCTED BY MR. GAGE:
 6      Q.   Good morning, Miss Rowe.
 7      A.   Good morning.
 8      Q.   Tell us what did you do to prepare
 9   for today's continued deposition?
10      A.   I talked to my lawyer and I
11   reviewed some documents.
12      Q.   What documents did you review?
13      A.   I reviewed parts of my testimony,
14   my deposition and Stuart Vardaman's and looked
15   a some e-mails.
16      Q.   Stuart Vardaman's deposition, is
17   that what you're referring?  To
18      A.   Yes.
19      Q.   What e-mails did you look at?
20      A.   The e-mails he and I exchanged.
21      Q.   The e-mails you and he exchanged
22   regarding what?
23      A.   The VP of financial services sales
24   role.
25      Q.   How do you know Kirsten Kliphouse?
```

2 (Pages 332 - 335)

Page 336

```
1              ULKU ROWE
2      A.    She is the head of North American
3  sales at Google.
4      Q.    When did you first come to know
5  Miss Kliphouse?
6      A.    I don't remember the exact date,
7  but shortly after she joined Google.
8      Q.    When was that?
9      A.    I think it was like beginning of
10 the year.
11     Q.    Beginning of what year?
12     A.    2020.
13     Q.    How did you first meet Miss
14 Kliphouse?
15     A.    She and I had a one-on-one meet
16 and greet.
17     Q.    How did that one-on-one meet and
18 greet come about?
19     A.    I reached out to her.  She was new
20 at Google and I said I would like to meet and
21 say Hi and introduce myself.
22     Q.    Why did you reach out to her?
23     A.    It's customary, she is head of
24 sales, I do a lot of work with sales, so it was
25 a kind of say Hi meeting.
```

Page 338

Page not submitted in support of
Google's motion for summary judgment

Page 337

Page not submitted in support of
Google's motion for summary judgment

Page 339

Page not submitted in support of
Google's motion for summary judgment

3 (Pages 336 - 339)

Page 340

Page not submitted in support of
Google's motion for summary judgment

Page 341

Page not submitted in support of
Google's motion for summary judgment

Page 342

ULKU ROWE
1
2      Q.     What did she tell you about the
3   role she was planning to hire for?
4      A.     She said that she was looking for
5   a VP of sales for financial services and she
6   also said that she is looking for people that
7   are not from -- she was looking for people that
8   don't have the traditional sales background.
9   Those were not necessarily a good fit for the
10  first time role either so she was looking more
11  broadly.
12     Q.     Did she use those words and
13  what I mean by that is not looking for someone
14  in the traditional sales background?
15     A.     I don't remember her exact words,
16  but she was definitely saying they are
17  broadening to include nonsales background
18  people, but I don't remember if those were her
19  exact words.
20     Q.     What if anything else do you
21  remember about what Miss Kliphouse told you
22  concerning this position and what she was
23  looking for?
24     A.     I told her I was interested in the
25  role and she asked me to reach out to HR about

Page 343

ULKU ROWE
1
2   the role.
3      Q.     Did she tell you who specifically
4   to reach out to by name?
5      A.     She said Stuart Vardaman but she
6   may have mentioned another person.  I don't
7   remember the number.
8      Q.     Did you say she said Stuart
9   Vardaman?
10     A.     That is my recollection.
11     Q.     Did Miss Kliphouse tell you
12  whether this job had been posted yet,
13  advertised?
14     A.     I don't remember that.  I don't
15  think so.
16     Q.     Did Miss Kliphouse say anything to
17  you about whether she had looked at or considered
18  candidates as of that point?
19     A.     I don't remember that.  For your
20  earlier question I think I said she didn't tell
21  me it was posted, I don't know if it was posted
22  internally in Google.  She indicated that it
23  was an active job search.
24     Q.     As of the point at which you had
25  coffee with her she told you that it was at

4 (Pages 340 - 343)

Page not submitted in support of
Google's motion for summary judgment

Page not submitted in support of
Google's motion for summary judgment

Page not submitted in support of
Google's motion for summary judgment

```
1                ULKU ROWE
2        A.    No.
3        Q.    It does not?
4        A.    No.
5        Q.    Does it fairly describe your role
6   in the sales process at Google?
7        A.    No.
8        Q.    Does the phrase business
9   development describe in any way the work that
10  you do at Google?
11       A.    It is part of what I do.  I do get
12  involved in the business development process
13  with the sales teams, but it's not my title.
14       Q.    Okay.  I didn't ask you if it was
15  your title.
16       A.    Right.  But my primary role is not
17  business development, if that is what you're
18  asking.
19       Q.    What your primary role?
20       A.    I'm an engineering director with
21  the office of the CTO at Google.
22       Q.    Is it fair to say that your
23  primary role is not sales?
24       A.    Well, I get involved quite a bit
25  with sales, but yes, that is not my primary
```

5 (Pages 344 - 347)

Page 348

```
1              ULKU ROWE
2    role.
3         Q.   You also get involved in business
4    development, is that true?
5         A.   True.
6         Q.   But it is your testimony that your
7    primary role is an engineering role; is that
8    right?
9         A.   Correct.
10        Q.   When Miss Kliphouse indicated to
11   you in this conversation over coffee that she
12   was considering people who did not have
13   traditional sales backgrounds, how did you
14   react, if at all?
15        A.   I don't remember.
16        Q.   Did hearing that lead you to think
17   that you might be qualified for the job that
18   she was trying to fill?
19        A.   Yes.
20        Q.   If she had instead told you that
21   it was a traditional sales background she was
22   looking for, would you have expressed interest?
23        A.   I think I would have asked her
24   more questions.
25        Q.   What more questions would you have
```

Page 350

Page not submitted in support of
Google's motion for summary judgment

Page 349

Page not submitted in support of
Google's motion for summary judgment

Page 351

Page not submitted in support of
Google's motion for summary judgment

6 (Pages 348 - 351)

Page 356

Page not submitted in support of
Google's motion for summary judgment

Page 358

ULKU ROWE

1
2  that you would not be considered further for
3  the role.
4          He sent you the job posting;
5  correct?
6      A.   He did.
7      Q.   And do you have that available to
8  you now?  I think it should be shared with you
9  I think it is previously marked as Plaintiff's
10 Exhibit 115.
11     A.   In the shared drive, yes.
12     Q.   So you have it in front of you?
13     A.   Yes.
14     Q.   You received this after your
15 conversation with Miss Kliphouse, correct?
16     A.   Correct.
17     Q.   Can you read to me the two lines
18 at the bottom of the first page starting with
19 the word "drawing"?
20     A.   "Drawing upon previous
21 demonstrable success leading sizeable
22 technology sales teams that served he financial
23 services industry."
24     Q.   Did you have previous demonstrable
25 success leading sizable technology sales teams

Page 357

Page not submitted in support of
Google's motion for summary judgment

Page 359

ULKU ROWE

1
2  that served the financial services industry?
3      A.   I had sales experience.  I didn't
4  directly lead sales teams, but based on how
5  Kirsten was describing the role, I thought it
6  was appropriate for me to raise my hand.
7      Q.   I didn't ask you whether it was
8  appropriate for you to raise your hand.  I just
9  asked you in fact if you had "previous
10 demonstrable success leading sizable technology
11 sales teams that served the financial services
12 industry."  Did you?
13     A.   No.
14          MS. GREENE:   Objection, asked and
15     answered.
16     A.   No, but I had relative experience
17 that would be useful.
18     Q.   Did you have what you just read?
19     A.   No.
20     Q.   Were you discouraged when you read
21 that?
22     A.   No.
23     Q.   Did you -- I want to flip over to
24 the second page of this document in the middle
25 below the words "The financial services leader

8 (Pages 356 - 359)

Page 360

ULKU ROWE

1          ULKU ROWE
2   will".  Do you see that?
3      A.   I do.
4      Q.   Had you ever previously or had you
5   ever "managed a team of field sales executives
6   and sales managers to meet quarterly and annual
7   bookings objectives."?
8      A.   I have not.
9      Q.   Have you ever "Recruited top
10  talent and coached a team with a focus on
11  providing actionable forthright feedback."?
12     A.   Absolutely.
13     Q.   Can you give me some examples when
14  you have done that?
15     A.   I have managed many teams in my
16  background at JP Morgan, Bank Of America, at
17  UBS, I coached teams, I managed large teams, I
18  recruited top talent, I coached the teams.
19     Q.   Any sales teams?
20     A.   I have not managed sales teams.
21     Q.   So have you ever coached sales
22  teams?
23     A.   I have not, but that's not what it
24  says here.
25     Q.   Where it says coach the team,

Page 361

Page not submitted in support of
Google's motion for summary judgment

Page 362

Page not submitted in support of
Google's motion for summary judgment

Page 363

ULKU ROWE

1          ULKU ROWE
2      A.   Correct.
3      Q.   And that is not a qualification
4   that you have, correct?
5      A.   Well, that's not correct.  I have
6   not directly managed sales business development
7   teams, but I do have the qualifications to be
8   able to manage such a team.
9      Q.   But the qualification described
10  here is "Proven success managing a sales
11  business development organization to meet and
12  exceed revenue goals."  Do you have that
13  qualification?
14     A.   No.
15     Q.   When you read that as one of the
16  listed qualifications for this position, did
17  that concern you at all?
18     A.   No, as I said before, I have a lot
19  of qualifications both working in the sales
20  area with the sales team, both building teams,
21  both experience in the financial services
22  industry.  Experience in the technology
23  industry, understanding how Google works.  I
24  have plenty of qualifications for the role.
25     Q.   Can you describe all of your

9 (Pages 360 - 363)

Page 372

Page not submitted in support of
Google's motion for summary judgment

---

Page 374

ULKU ROWE

1
2     role.
3          Q.    Have you ever met Miss Piazza?
4          A.    We have been in meetings together,
5     yes.
6          Q.    Do you have an opinion as to her
7     qualifications for this sales role based upon
8     your interactions with her?
9          A.    Look, I can't speak to her
10    qualifications.  I don't know enough about her.
11         Q.    When she joined Google did you set
12    up a meet and greet with her?
13         A.    I didn't, but she and I have been
14    in quite a few meetings together.
15         Q.    Is there a reason why you didn't
16    set up a meet and greet with her when she
17    joined?
18         A.    Look, I think -- I don't think
19    there is a specific reason.
20         Q.    Was it your practice to set up
21    meet and greets with new leaders who had joined
22    Google from outside the company?
23         A.    Sometimes, especially like if I
24    don't have reason to work with them on a
25    day-to-day basis.  Others I work together all

---

Page 373

ULKU ROWE

1
2     use a phrase I want to know what she means
3     by it.  It's a different question, Cara
4          A.    I'm just saying I don't know a
5     hundred percent.  She may.
6          Q.    But you're speculating about that,
7     correct?
8          A.    Correct.
9          Q.    Do you know who was hired for that
10    position?
11         A.    I think at the end it went to
12    Yolanda Piazza.
13         Q.    Do you know anything about her
14    qualifications for the job?
15         A.    I don't know too much about her.
16    I know she came from Citibank and she had been
17    there for a long time and I don't know much
18    beyond that.
19         Q.    Do you have an opinion as to
20    whether you're better qualified, equally
21    qualified or lesser qualify than Miss Piazza
22    for the role?
23         A.    I don't know all of her
24    qualifications, I can't speak to that.  I can
25    speak to the fact that I was qualified for the

---

Page 375

Page not submitted in support of
Google's motion for summary judgment

---

12 (Pages 372 - 375)

ULKU ROWE

1
2    verbal conversation not an e-mail exchange?
3        A.    Yes.
4        Q.    I want to make sure that we are
5    both on the same page.
6             How long was that conversation?
7        A.    I don't remember exactly how long
8    it was, but less than half an hour probably.
9        Q.    What's your best estimate as to
10   how much less than a half an hour it was?
11       A.    I don't remember.  Maybe 20
12   minutes, I don't know.
13       Q.    Was it more than five minutes?
14       A.    I think so, yes.
15       Q.    Do you think it was more than 15
16   minutes?
17       A.    Maybe 15, 20 minutes, I don't
18   remember the exact length.
19       Q.    Who called whom, if you recall?
20       A.    I think it was a video conference
21   so we both dialed into the conference.
22       Q.    Who spoke first?
23       A.    I don't remember.
24       Q.    What did he tell you?
25       A.    So, this was a meeting to update

ULKU ROWE

1
2    me on the VP of sales role.  So he told me that
3    I would not be considered for the role.
4        Q.    What did you say in response?
5        A.    I asked some questions.
6        Q.    What questions did you ask?
7        A.    I asked him why.
8        Q.    What did he say?
9        A.    He said that they were looking for
10   someone that has a more commercial background.
11       Q.    What else did you ask?
12       A.    I asked him like what made them
13   think that I wasn't qualified for the role.
14       Q.    What did he say?
15       A.    He said that it was based on a
16   two-hour meeting that I had with Kirsten.
17   Two-hour interview actually he said.
18       Q.    What else did you ask?
19       A.    I think I added some more prodding
20   questions.  I don't remember all the questions.
21   I said to him that I wasn't aware that the
22   meeting that I had with Kirsten was an
23   interview.  I said to him that it was like a
24   meet and greet and that it was actually in this
25   meeting that I found out about this role.  I

Page not submitted in support of
Google's motion for summary judgment

Page not submitted in support of
Google's motion for summary judgment

16 (Pages 388 - 391)

Page not submitted in support of
Google's motion for summary judgment

1        ULKU ROWE
2   do you have any reason to believe that the
3   e-mail that you sent to your lawyers contains
4   any additional details about the conversation
5   with Mr. Vardaman that you've not already
6   shared?
7        A.    I don't believe so.
8        Q.    I think you testified that
9   Mr. Vardaman told you that they were looking
10  for someone with a more commercial background
11  for the position that Miss Kliphouse was
12  filling.
13          What did you understand that
14  phrase to mean, a more commercial background?
15       A.    That they were looking for someone
16  with a direct sales experience.
17       Q.    Was that statement that
18  Mr. Vardaman made to you consistent with the
19  description of the job that he sent to you?
20       A.    Yes, but it wasn't how Kirsten
21  described the role.
22       Q.    Well, how did Kirsten describe the
23  role in a manner inconsistent with that?
24       A.    Because she said they are looking
25  beyond the pure sales experience, the

Page not submitted in support of
Google's motion for summary judgment

Page not submitted in support of
Google's motion for summary judgment

17 (Pages 392 - 395)