**OUTTEN & GOLDEN LLP**
Cara E. Greene
Maya S. Jumper
Shira Z. Gelfand
685 Third Avenue, 25th Floor
New York, New York 10017
(212) 245-1000

**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| ULKU ROWE, <br><br>                    Plaintiff, <br> v. <br><br> GOOGLE LLC, <br><br>                    Defendant. | No. 19-cv-08655 <br><br> **PLAINTIFF'S STATEMENT OF UNDISPUTED FACTS PURSUANT TO LOCAL CIVIL RULE 56.1** |

Pursuant to Local Civil Rule 56.1, Plaintiff Ulku Rowe hereby submits the following

statement of undisputed material facts in support of Plaintiff's Motion for Partial Summary

Judgment.[1]

**I.  Plaintiff Rowe's Background and Qualifications**

1.      Plaintiff is a woman and member of a protected category. (Declaration of Ulku

Rowe in Opposition to Defendant's Motion for Summary Judgment and in Support of Plaintiff's

Cross-Motion for Summary Judgment ("Rowe Decl.") ¶ 1.)

2.      Plaintiff resides in New York and is employed by Google in their New York

---

[1] All exhibits and citations referenced therein, other than those which are noted as exhibits to the Declaration of Sara Tomezsko, ECF No. 143, ("Tomezsko Decl.") or the Declaration of Cara E. Greene in Opposition to Defendant's Motion for Summary Judgment and in Support of Plaintiff's Cross-Motion for Summary Judgment ("Greene Decl."), are attached to the Declaration of Shira Z. Gelfand ("Gelfand Decl.").

office. (Rowe Decl. ¶ 1.)

3.      Plaintiff holds a Master of Science ("MS") in Computer Science from the University of Illinois at Urbana-Champaign, where she was a Fulbright Scholar, and has a Bachelor of Science ("BS") degree in Computer Engineering from Bogazici University. (Tomezsko Decl., Ex. 15; Ex. 51, GOOG-ROWE-P-00004556.)

4.      Prior to joining Google, Plaintiff was a Managing Director at JPMorgan Chase, where she was the Global Head and Chief Technical Officer ("CTO") of Credit Risk Technology for JPMorgan from September 2012 to March 2017. (Tomezsko Decl., Ex. 15; Rowe Decl. ¶ 5; Ex. 51, GOOG-ROWE-P-00004556.)

5.      In that role, Plaintiff led the migration of risk systems to the cloud, was responsible for the global technology platforms for managing JPMorgan's credit risk across all its lines of businesses, countries and asset classes, the world's largest financial services portfolio with $3.7 trillion in total assets and $129 billion revenue. (Rowe Decl. ¶ 7.)

6.      JPMorgan recruited Plaintiff as a "game-changer technology" leader to build the next-generation risk management systems for JPMorgan to enable them to scale up their business growth, ensure regulatory compliance and bring in technical innovation. (Rowe Decl. ¶ 8.)

7.      While at JPMorgan, Plaintiff was an advocate for the public cloud, a member of JPMorgan's Cloud strategy council, and an advisor to the COO on the Company's cloud strategy. (Rowe Decl. ¶ 9.)

8.      Plaintiff was directly responsible for strategy, design, product management, engineering, testing, support, and day to day management of the entire technology platforms globally. (Rowe Decl. ¶ 6; Ex. 51, GOOG-ROWE-P-00004556.)

9.      From August 2009 to June 2012, Plaintiff was a Managing Director at Bank of

America Merrill Lynch, where she was the Global Head of Market Risk Technology. (Rowe Decl. ¶ 11; Tomezsko Decl., Ex. 15; Ex. 51, GOOG-ROWE-P-00004556.)

10.     In that role, Plaintiff was responsible for the global technology platforms, managing Bank of America's market risk across all its businesses, countries and asset classes – the world's second largest financial services portfolio with $2.5 trillion in total assets. She led a global, diverse team of 500+ engineers, product managers, business analysts, testers, support personnel across multiple locations in the US, Europe and Asia. (Rowe Decl. ¶ 12.)

11.     Before that, Plaintiff worked at UBS from January 1998 to August 2009, progressing in the ranks from Associate Director/ Developer to Director to Executive Director. Earlier in her career, she worked at Swiss Bank Corporation as an Associate Director/ Developer from June 1997 to June 1998.  (Tomezsko Decl., Ex. 15.)

12.     Plaintiff currently serves on the Board of Directors of the Fulbright Association, the Federal Reserve Bank of New York Fintech Advisory Group, and the University of Illinois at Urbana- Champaign College of Engineering Board of Visitors.  (Ex. 51, GOOG-ROWE-P-00004556.)

## II.  Technical Director, Office of the Chief Technology Officer ("OCTO") Position

13.     In 2016, Google created a Technical Director position within OCTO ("Technical Director"), with William Grannis as the Hiring Manager and Jennifer Burdis as the Lead Recruiter.  (Ex. 10, Deposition of Jennifer Burdis ("Burdis Tr.") 16:3-13.)

14.     The newly-created Technical Director position was developed by Mr. Grannis. (Ex. 1, Deposition of Will Grannis ("Grannis Tr.") 23:16-22.)

15.     In 2016 and 2017, the Technical Director position was scoped as a Level 8/9. (Ex. 1, Grannis Tr. 36:3-6.)

16.     In 2016 and 2017, hiring and recruiting decisions related to the Technical Director position were facilitated by Jennifer Burdis as the Lead Recruiter, among others. (Ex. 10, Burdis Tr.16:3-13.)

17.     On March 13, 2017, Plaintiff started at Google as a Technical Director, Office of the CTO, Google Cloud Platform in Google's New York City office, after receiving an offer in December 2016. (Ex. 27, GOOG-ROWE-00017920.)

18.     Google hired Plaintiff as a Level 8. (Tomezsko Decl., Ex. 15.)

19.     On April 12, 2017, Nicholas Harteau started at Google as a Technical Director, Office of the CTO, Google Cloud Platform in Google's New York City Office. (Declaration of Nicholas Harteau ("Harteau Decl.") ¶ 1; Ex. 34, GOOG-ROWE-00054161; Gelfand Decl. ¶ 5.)

20.     Google hired Mr. Harteau as a Level 9. (Tomezsko Decl., Ex. 17; Harteau Decl. ¶ 1.)

21.     During the period of September 2016 through July 2018, all individuals employed as Technical Directors at Levels 8 and 9, including Plaintiff and Mr. Harteau, reported to William Grannis. (Harteau Decl. ¶ 3.)

22.     The primary job responsibilities of the Technical Director position consist of three "pillars:" customer advancement, engineering, and evangelism. (Harteau Decl. ¶ 4; Ex. 1, Grannis Tr. 31:24-33:15, 50:2-17; Ex. 17, Deposition of Ben Wilson ("Wilson Tr.") 105:20-106:12.)

23.     The first pillar, customer advancement, required Technical Directors to advance the progress of companies by facilitating their migration to Google's Cloud technology.  (Ex. 1, Grannis Tr. 32:9-14.)

24.     The second pillar, engineering, required Technical Directors to understand the

technical aspects and issues relating to customers migration to the Cloud, and to work with the engineering teams to meet customer needs. (Ex. 1, Grannis Tr. 32:15-23.)

25.     The third pillar, evangelism, required speaking publicly and externally on Google Cloud's technology.  (Ex. 1, Grannis Tr. 32:24-33:7.)

26.     With an eye towards "verticalizing", Mr. Grannis also identified candidates with significant experience in defined industries, such as banking, healthcare, retail, media, entertainment, and gaming during the interview process. As a result, all candidates, including Rowe, were considered to have significant "industry-depth experience in a particular industry" by Mr. Grannis at hire.  (Ex. 1, Grannis Tr. 55:4-14, 57:4-12.)

27.     Google initially hired all of the Technical Directors as individual contributors who did not have direct reports. (Def's 56.1 ¶ 15; Harteau Decl. ¶ 5.)

28.     Google utilizes rubrics and guidelines to outline the relative job responsibilities for respective roles within a job family. (Ex. 5, GOOG-ROWE-00052153, Ex. 69, P001584.)

29.     The Technical Director position sits within the Technical Solutions Consultant ("TSC") job family. (Ex. 1, Grannis Tr. 24:19-25:20.)

30.     There is a separate Technical Solutions Consultants job family outside of OCTO that had less of an emphasis on engineering. (Ex. 1, Grannis Tr. 25:21-26:10.)

31.     Mr. Grannis decided this other TSC job family was the closest fit to what he envisioned for the OCTO role and used it when creating the job description. (Ex. 1, Grannis Tr. 25:2-26:4.)

32.     Mr. Grannis modified the job description to include emphasis on the three pillars. (Ex. 1, Grannis Tr. 34:14-35:9.)

33.     At the time of Plaintiff and Mr. Harteau's hire until 2018, the TSC job family

ladder that applied to OCTO did not differentiate the job skills, effort, or responsibilities required by Technical Directors at Levels 8 and 9.  (Ex. 1, Grannis Tr. 35:10-36:14.)

34.     In the late 2016, early 2017 time period, when Plaintiff and Mr. Harteau were hired, Mr. Grannis did not have a sense of what distinguished a Level 8 and Level 9 Technical Director and "hired [everyone] for the same role." (Ex. 1, Grannis Tr. 62:19-63:8, 74:23-75:2.)

35.     During the period of September 2016 through June 2018, Technical Directors at Levels 8 and 9 had the same general categorization of leadership responsibilities. (Ex. 1, Grannis Tr. 35:10-36:14.)

36.     During the period of September 2016 through August 2018, the TSC job family ladder contained the same knowledge and experience requirements for all Technical Directors at Levels 8 and 9, including Plaintiff and Mr. Harteau.  (Ex. 6, GOOG-ROWE-00017719.)

37.     During the period of September 2016 through August 2018, the TSC job family ladder contained the same complexity and scope requirements for all Technical Directors at Levels 8 and 9, including Plaintiff and Mr. Harteau.  (Ex. 6, GOOG-ROWE-00017719.)

38.     During the period of September 2016 through August 2018, the TSC job family ladder contained the same scope and impact requirements for all Technical Directors at Levels 8 and 9, including Plaintiff and Mr. Harteau.  (Ex. 6, GOOG-ROWE-00017719.)

39.     From the time the job description was created in 2016 through the present, Google used the same job description to facilitate the hiring and recruitment of all Technical Directors, including Plaintiff and Mr. Harteau. (Gelfand Decl. ¶ 2.)

40.     During the period of 2016 through the present, Google used the same external job posting to hire all Technical Directors, including Plaintiff and Mr. Harteau.  (Gelfand Decl. ¶ 2.)

41.     During the period of 2016 through present, Google used the same interview

rubrics to evaluate candidates for Technical Directors, including Plaintiff and Mr. Harteau
(Gelfand Decl. ¶ 3.)

42.     During the period of 2016 through present, Google evaluated all Technical
Directors, including Plaintiff and Mr. Harteau, against the same leadership rubrics.  (Gelfand
Decl. ¶ 3.)

43.     During the period of 2016 through present, Google evaluated all Technical
Directors, including Plaintiff and Mr. Harteau, against the same "Googliness" rubrics.  (Gelfand
Decl. ¶ 3.)

44.     During the period of 2016 through present, Google evaluated all Technical
Directors, including Plaintiff and Mr. Harteau, against the same general cognitive ability rubrics.
(Gelfand Decl. ¶ 3.)

45.     During the period of 2016 through present, Google used the same interview
questions for all Technical Director candidates, including Plaintiff and Mr. Harteau. (Ex. 10,
Burdis Tr. 52:13-16; Ex. 1, Grannis Tr. 49:4-24.)

46.     Google hired 17 individuals into the Technical Director position between March
2016 and March 2018.  Plaintiff was the only woman Google hired for the role. (Ex. 21, GOOG-
ROWE-00058500.)

47.     All Technical Directors hired in late 2016/early 2017, including Plaintiff and Mr.
Harteau, were required to possess similar skill sets in order to "meet those three pillars."  (Ex. 1,
Grannis Tr. 50:18-51:10.)

48.     During the period of 2016 through 2018, in staff meetings for Technical
Directors, there was no distinction made between Technical Directors at Levels 8 and 9. (Harteau
Decl. ¶ 9.)

49.     Google's policy states that when a role is scoped at two levels, like the Technical Director role, interviewers must recommend a level based on the interview. (Ex. 48, GOOG-ROWE-00022669.)

50.     When hiring for the Technical Director role, none of the interviewers provided a leveling recommendation for the candidates, including Plaintiff and Mr. Harteau. (Tomezsko Decl., Ex. 15, GOOG-ROWE-00019097.R; Tomezsko Decl., Ex. 17, GOOG-ROWE-00056318.R.)

51.     Google's policy states that the recruiter must also summarize the reason they chose the interview rubric and proposed level for each candidate in a leveling rationale. (Ex. 48, GOOG-ROWE-00022669.)

52.     When hiring for the Technical Director role, Ms. Burdis, the recruiter did not provide a leveling rationale with respect to the candidates, including Plaintiff and Mr. Harteau. (Tomezsko Decl., Ex. 15, GOOG-ROWE-00019097.R, Tomezsko Decl., Ex. 17, GOOG-ROWE-00056318.R, Ex. 10, Burdis Tr. 48:18-49:2.)

53.     Ms. Burdis did not play any role in deciding what level a Technical Director would be hired at. (Ex. 10, Burdis Tr. 55:15-17.)

54.     Google's policy states that the hiring manager should submit a statement of support to explain their position as to a candidate's proposed level. (Ex. 48, GOOG-ROWE-00022669-70.)

55.     When hiring for the Technical Director role, Mr. Grannis's statement of support for Plaintiff did not articulate why he supported Plaintiff's hire at a Level 8 and not a Level 9. (Tomezsko Decl., Exs. 15, 17.)

56.     When asked at his deposition why he made such a recommendation, Mr. Grannis

tried to "work backwards in time" to figure out what factors he would have considered, but testified that, it was "hard to recall four years ago. . . what I may have been considering or not." (Ex. 1, Grannis Tr. 68:20-70:22.)

57.     In his statement of support for Plaintiff's hire, Mr. Grannis wrote "[b]ased on the positive, consistent feedback from the panel, the criticality of financial services as a vertical for Google Cloud, and the candidate's clear demonstration of readiness to make an immediate impact as a L-8, I enthusiastically endorse the hire recommendation." (Tomezsko Decl., Ex. 15.)

58.     Aside from what in his statement of support, there was no other documentation as to why Mr. Grannis recommended Plaintiff as a Level 8.  (Tomezsko Decl., Ex. 15, GOOG-ROWE-00019097.R)

59.     Although Rowe asked as part of the interview process whether she should be a Level 9, Mr. Grannis told her that all Technical Directors were being hired at Level 8. (Tomezsko Decl., Ex. 18, P001586.)

60.     Mr. Grannis could not recall whether he considered Plaintiff for hire at a Level 9. (Ex. 1, Grannis Tr. 68:20-70:22.)

61.     Mr. Grannis's statement of support for Mr. Harteau included a leveling recommendation, but did not articulate why Mr. Grannis supported Mr. Harteau's hire at a Level 9 and not a Level 8. (Tomezsko Decl., Ex. 17.)

62.     Google's policy states that a recruiter must submit a candidate's packet to the Hiring Committee and "recommend a level for them to consider using signals from interviews." The leveling rationale must include why the recruiter is submitting the packet at the level they chose. (Ex. 48, GOOG-ROWE-00022669-70.)

63.     When hiring for the Technical Director role, there was no hiring committee. (Ex.

10, Burdis Tr. 47:19-48:11.)

64.     Diane Greene, Senior Vice President, stated that she did not have any input into any Technical Director candidates' level upon hire. (Diane Greene Decl. ("D. Greene Decl.") ¶¶ 5-6, ECF 62-1.)

65.     Mr. Grannis stated that he did not know who made the leveling decision with respect to the Technical Directors, but he did not make the leveling determination and only made a recommendation as to whether a candidate was qualified at the level being proposed. (Ex. 1, Grannis Tr. 58:17-19, 60:24-61:14.)

66.     When hiring for the Technical Director role, Mr. Stevens was not aware of what factors supported a hire at a Level 9 as opposed to a Level 8. (Ex. 12, Stevens Tr. 61:10-63:21.)

67.     Mr. Stevens did not ask for any leveling documentation and did not know what Mr. Grannis or Human Resources considered when leveling the Technical Director candidates. (Ex. 12, Stevens Tr. 61:10-63:21.)

68.     Mr. Stevens was only "indirectly" involved in the leveling process as he was Mr. Grannis' supervisor, and did not inquire as to whether the proper process had been followed with respect to leveling. (Ex. 12, Stevens Tr. 61:10-63:21.)

69.     In 2017, all Technical Directors, including Plaintiff and Mr. Harteau, were given the same instructions, guidelines, and job description to complete their performance self-assessments. (Ex. 55, GOOG-ROWE-00017356-57.)

70.     During the period of 2016 through 2018, Technical Directors, including Plaintiff and Mr. Harteau, consistently collaborated with each other, participated in meetings together, assisted each other with client engagements, and consistently filled in or substituted for each other on speaking engagements or client engagements.  (Harteau Decl. ¶ 9.)

71.     Technical Directors considered each other to be peers and understood all Technical Directors to be performing the same role.  (Harteau Decl. ¶ 9.)

72.     All Technical Directors met with Google customers, collaborated with Google engineering teams, and engaged in evangelism. (Harteau Decl. ¶ 9.)

73.     While working as Technical Directors in New York, Plaintiff and Mr. Harteau's job duties have been performed under similar working conditions. (Gelfand Decl. ¶ 4.)

**III.  Compensation**

74.     In connection with its hiring of Plaintiff as a Technical Director, Google offered Plaintiff an annual salary of $290,000.00, an annual bonus target of 30%, and a total equity award of 2,500 restricted stock units.  (Greene Decl. ¶ 2; Ex. 27, GOOG-ROWE-00017920-22.)

75.     In connection with its hiring of Mr. [Comparator 1] as a Technical Director, Google offered Mr. [Comparator 1] an annual salary of $325,000.00, an annual bonus target of 40%, and a total equity award of 2500 restricted stock units. (Greene Decl. ¶ 3; Ex. 34, GOOG-ROWE-00054161-62.)

76.     In the 2017 Q3 review, Google did not give Mr. [Comparator 1] a performance rating because he "was on leave for 3.5 months, so not enough data to support a rating."  ([Comparator 1] Decl. ¶ 2; Ex. 62, GOOG-ROWE-00053811.R.)

77.     In the 2017 Q3 review, Google gave Plaintiff a performance rating of "exceeds expectations."  (Greene Decl. ¶ 9.)

78.     In 2017, Google paid Plaintiff an annual salary of $290,000. (Greene Decl. ¶ 2.)

79.     In 2017, Google paid Mr. [Comparator 1] an annual salary of $325,000. (Greene Decl. ¶ 3.)

80.     In 2017, Google paid Plaintiff $35,000 less in annual salary than Mr. [Comparator 1].

(Greene Decl. ¶¶ 2-3.)

81.     After accounting for his 3.5 months of leave, Mr. [Comparator 1] only worked at Google

for 4.5 months in 2017. (Harteau Decl. ¶ 2.)

82.     In 2017, Google paid Mr. [Comparator 1] a pro-rated performance bonus of $61,000.00.

(Greene Decl. ¶ 3.)

83.     Mr. [Comparator 1]'s annualized performance bonus for 2017 was approximately

$162,666. (Greene Decl. ¶ 3.)

84.     In 2017, Google paid Plaintiff a performance bonus of $116,000.00. (Greene

Decl. ¶ 2.)

85.     In 2017, Google paid Plaintiff a performance bonus that was $46,666 less than

Mr. [Comparator 1]'s annualized bonus. (Greene Decl. ¶¶ 2-3.)

86.     In the 2018 Q3 review, Google gave Plaintiff a performance rating of "exceeds

expectations." (Greene Decl. ¶ 9; Ex. 29, GOOG-ROWE-00017889-90.)

87.     In the 2018 Q3 review, Google gave Mr. [Comparator 1] a performance rating of

"consistently meets expectations." (Greene Decl. ¶ 10.)

88.     In 2018, Google paid Plaintiff an annual salary of $295,000.00. (Greene Decl. ¶

2.)

89.     In 2018, Google paid Mr. [Comparator 1] an annual salary of $334,000.00. (Greene Decl.

¶ 3.)

90.     In 2018, Google paid Plaintiff $39,000 less in annual salary than Mr. [Comparator 1].

(Greene Decl. ¶¶ 2-3.)

91.     In 2018, Google paid Plaintiff a performance bonus of $125,000.00. Greene Decl.

¶ 2.)

92.     In 2018, Google paid Mr. [Comparator 1] a performance bonus of $143,000.00. (Greene Decl. ¶ 3.)

93.     In 2018, Google paid Plaintiff a performance bonus that was $18,000 less than Mr. [Comparator 1]'s. (Greene Decl. ¶¶ 2-3.)

94.     In 2018, Google awarded Plaintiff an equity refresh of $318,000.00. (Greene Decl. ¶ 2.)

95.     In 2018, Google awarded Mr. [Comparator 1] an equity refresh of $500,000.00. (Greene Decl. ¶ 3.)

96.     In 2018, Google awarded Plaintiff $182,000 less in equity than Mr. [Comparator 1]. (Greene Decl. ¶¶ 2-3.)

97.     In the 2019 Q3 review, both Plaintiff and Mr. [Comparator 1] received a rating of "exceeds expectations."  (Greene Decl. ¶¶ 9-10.)

98.     In 2019, Google paid Plaintiff an annual salary of $310,000.00. (Greene Decl. ¶ 2.)

99.     In 2019, Google paid Mr. [Comparator 1] an annual salary of $348,000.00. (Greene Decl. ¶ 3.)

100.    In 2019, Google paid Plaintiff $38,000 less in annual salary than Mr. [Comparator 1]. (Greene Decl. ¶¶ 2-3.)

101.    In 2019, Google paid Plaintiff a performance bonus of $125,000.00. (Greene Decl. ¶ 2.)

102.    In 2019, Google paid Mr. [Comparator 1] a performance bonus of $182,000.00. (Greene Decl. ¶ 3.)

103.    In 2019, Google paid Plaintiff a performance bonus that was $57,000 less than

Mr. [Comparator 1]'s. (Greene Decl. ¶¶ 2-3.)

104.    In 2019, Google awarded Plaintiff, an equity refresh of $318,000.00. (Greene Decl. ¶ 2.)

105.    In 2019, Google awarded Mr. [Comparator 1] an equity refresh of $620,000.00. (Greene Decl. ¶ 3.)

106.    In 2019, Google awarded Plaintiff $302,000 less in equity than Mr. [Comparator 1]. (Greene Decl. ¶¶ 2-3.)

107.    In 2020, Google paid Plaintiff an annual salary of $324,000.00. (Greene Decl. ¶ 2.)

108.    In 2020, Google paid Mr. [Comparator 1] an annual salary of $370,000.00. (Greene Decl. ¶ 3.)

109.    In 2020, Google paid Ms. Google $46,000 less in annual salary than Mr. [Comparator 1]. (Greene Decl. ¶¶ 2-3.)

110.    Mr. [Comparator 1] left Google in May 2020 and did not receive a performance bonus or equity refresh award for that year. (Harteau Decl. ¶ 3.)

## IV.  Google's Affirmative Defenses

### A.    Google Does Not Maintain a Bona Fide Seniority Based System.

111.    Google does not utilize a seniority system that rewards employees according to the length of their employment. (Ex. 70, GOOG-ROWE-00034048.)

### B.    Google Does Not Maintain a Bona Fide Merit-Based Compensation System.

112.    Google's compensation structure for Technical Directors was and is comprised of three components: annual salary, performance bonus, and equity awards. (Rowe Decl. ¶ 12; Ex. 52, GOOG-ROWE-00029597-8.)

113.    Specific compensation amounts for Technical Directors, including initial salary and target bonus percentage, was and is set at time of hire and based on assigned job code and job level. (Ex. 52, GOOG-ROWE-00029597-8.)

114.    Google's policy is that subsequent compensation increases are determined by an employee's "perf ratings, pay for your role, level and location" as well as "manager discretion-adjusting pay relative to peers, trajectory, retaining critical talent, and more." (Ex. 70, GOOG-ROWE-00034048.)

115.    In 2018, Plaintiff outperformed Mr. Harteau and received an "Exceeds Expectations" rating, while Mr. Harteau received a "Consistently Meets Expectations" rating. (Greene Decl. ¶¶ 9-10.)

116.    In 2018, Mr. Harteau's salary, bonus, and equity award exceeded Plaintiff's. (Greene Decl ¶¶ 2-3.)

117.    In 2019, Plaintiff and Mr. Harteau both received performance ratings of "exceeds expectations." (Greene Decl. ¶¶ 9-10; Ex. 71, GOOG-ROWE-00017919.)

118.    In 2019, Mr. Harteau's salary, bonus, and equity refresh exceeded Plaintiff's. (Greene Decl. ¶¶ 2-3.)

**C.    Google Did Not Use Any Bona Fide Factor Other Than Sex In Determining Plaintiff's and Mr. Harteau's Compensation.**

119.    Google's compensation policies provide that decision makers are not to "make leveling recommendations based on factors outside of interview process, such as years of experience, education level, and previous job title or company." (Ex. 11, GOOG-ROWE-00053464.)

120.    Google's policies provide that past years of experience should never be used as the determining factor when assigned job level.  (Ex. 72, GOOG-ROWE-00053761.) ("[W]hile

past experience can signal the candidate's level of RRK ("role-related knowledge") required for the role, total [years of experience] should never be the determining factor for leveling. A candidate's level should be selected based primarily on the scope of the role, but also take the candidate's strengths –as demonstrated throughout the hiring process—into consideration.")

121.     Google does not maintain any directive or policy that compensation or leveling decisions for the Technical Director position be made based on a candidate's specific years of experience or seniority. (Ex. 4, Lucas Tr. 126:18-25.)

122.     The external job posting used in connection with hiring and recruiting for the Technical Director position did not specify a level of seniority or years of experience required for the role, at either Level 8 or Level 9. (Tomezsko Decl., Ex. 44.)

123.     The hiring manager for the Technical Director position, Mr. Grannis, was not provided with any sort of metrics that equated years of experience to a particular job level or job code.  (Ex. 1, Grannis Tr. 72:16-20.)

124.     The lead recruiter for the Technical Director role, Jennifer Burdis, considered boundaries between years of experience as "not concrete" and did not ascribe any meaningful difference to candidates with 19 to 20 years of experience, 19 to 21 years of experience, or 23 to 25 years of experience.  (Exhibit 10, Burdis Tr. 30:7-14, 44:6-46:6.)

125.     As outlined in Google's own investigation findings related to Plaintiff's leveling complaint, Mr. Harteau was hired into the position at a Level 9 with less years of experience than Plaintiff.  (Ex. 21, GOOG-ROWE-00058500.)

126.     Upon hire, Plaintiff had 22 years of experience, including two years during which she was pursuing a MS degree in computer science and working for a bank in Turkey in a technical role and as a Research Assistant for Caterpillar, Inc. (Rowe Decl. ¶ 4, Tomezsko Decl.,

Ex. 15.)

127.    Mr. Harteau only had nineteen years of experience and did not have any educational degrees. (Ex. 21, GOOG-ROWE-00058500.)

128.    At her interview, Plaintiff was considered for the Technical Director role at both Levels 8 and 9. (Ex. 10, Burdis Tr. 42:22-43:18.)

129.    Google directs that "candidates are leveled at hire based on their relevant experience and the skills they demonstrate during the interview process for a given role." (Ex. 11, GOOG-ROWE-00053464.)

130.    Google explicitly instructs that leveling decisions regarding all roles, including the Technical Director, not take into consideration previous experience or job titles. (Ex. 11, GOOG-ROWE-00053464.)

131.    Prior to joining Google, Plaintiff served as a CTO at JPMorgan, which involved navigating and integrating relevant Cloud technologies, as well as leading the team responsible for AWS cloud migration at JPMorgan. (Rowe Decl. ¶ 6; Ex. 51, GOOG-ROWE-P-00004556.)

132.    Google knew of Plaintiff's previous CTO experience. (Ex. 51, GOOG-ROWE-P-00004556.)

133.    Another Technical Director, Benjamin Wilson, worked at two companies prior to his employment at Google – neither of which jobs were cloud technology-based roles – and he worked on migrating both to the cloud. (Ex. 17, Wilson Tr. 30:24-31:8.)

134.    At hire, Plaintiff's interviewers noted that she possessed expertise in cloud technology within the financial services industry. (Ex. 19, GOOG-ROWE-00019104.R, 113, 115; Tomezsko Decl., Ex. 15, GOOG-ROWE-00019097.R.)

135.    One interviewer noted that Plaintiff possessed "long history in this space and

should be very good and understanding what can move to Cloud easily and how to address a range of anxieties in this sector." (Ex. 19, GOOG-ROWE-00019104.R, 113, 115; Tomezsko ML Decl., Ex. 15, GOOG-ROWE-00019097.R.)

136.   Another interviewer noted that Plaintiff "demonstrated an in-depth knowledge of public cloud" and that "had a great command of the challenges financial firms face in adopting any cloud solution, both from a personnel standpoint as well as nuts and bolts technical challenges." (Ex. 19, GOOG-ROWE-00019104.R, 113, 115; Tomezsko Decl., Ex. 15, GOOG-ROWE-00019097.R.)

137.   Plaintiff's manager, Will Grannis, acknowledged her cloud technology acumen within the financial services industry as relevant for the Technical Director role in OCTO.  (Ex. 19, GOOG-ROWE-00019104.R, 113, 115; Tomezsko Decl., Ex. 15, GOOG-ROWE-00019097.R.) ("Moving applications to the cloud right now and so has very relevant and timely experience within a finsrv enterprise adopting public cloud.")


DATED:   New York, New York            Respectfully submitted,
              December 6, 2021

                                                   */s/ Cara E. Greene*____
                                                   OUTTEN & GOLDEN LLP
                                                   Cara E. Greene
                                                   Maya S. Jumper
                                                   Shira Z. Gelfand
                                                   685 Third Avenue, 25th Floor
                                                   New York, New York 10017
                                                   Telephone: (212) 245-1000
                                                   Facsimile: (646) 509-2060

                                                   *Attorneys for Plaintiff*