# Exhibit 18

Page 23

```
 1                 U. ROWE
 2   knowledge, already provided your lawyers
 3   with all documents and information that you
 4   have in your possession that relates to
 5   this case?
 6       A.    Yes.
 7             MR. GAGE:  Sara, could you mark
 8   tab 6 as Exhibit 3.
 9             (Defendant's Exhibit 3 marked
10   for identification.)
11             MS. TOMEZSKO:  It should be
12   available now on the drive.
13       Q.    Let me know when you have a PDF
14   that is labeled tab 6, Ms. Rowe, and the
15   Bates number on this, for the record, is
16   P001586-1587.
17       A.    Yeah, I have it.
18       Q.    What is this?
19       A.    I believe these are some notes
20   that I took during the conversation with
21   Melissa, Melissa Lawrence.
22       Q.    And these notes were recently
23   provided to us in discovery.  When did you
24   give these to your lawyer?
25       A.    My lawyers had them for a while
```

Page 26

```
 1                 U. ROWE
 2   knowledge, does this reflect notes that you
 3   took close in time to that conversation
 4   taking place?
 5       A.    Correct.
 6       Q.    Did you record everything that
 7   was said in the conversation?
 8       A.    It is not a transcription of
 9   the conversation, it's the highlights of
10   like what stuck with me, the summary of the
11   conversation.
12       Q.    So this reflects what stuck
13   with you from the conversation?
14       A.    Correct.
15       Q.    But not necessarily everything
16   that was said?
17       A.    It was meant to represent a
18   summary of the conversation, yes.
19       Q.    But not necessarily everything
20   that was said?
21       A.    It doesn't capture every single
22   sentence as it was said, but it was also
23   not meant to leave out, you know, major
24   topics.
25       Q.    And Melissa -- what is
```

Page 25

```
 1                 U. ROWE
 2   happened.
 3       Q.    And when was the conversation?
 4       A.    So sometime in November of
 5   2017.
 6       Q.    At the top of the document it
 7   says 20 November 2017.  Do you see that?
 8       A.    I do.
 9       Q.    Did you write that date to
10   represent the date you wrote the notes?
11       A.    I don't remember that.  I don't
12   remember if it was the date of the
13   conversation or the date of the notes.
14       Q.    And the first line says
15   "Summary of the items we discussed today."
16             Who is the "we"?
17       A.    Melissa and I.
18       Q.    And how did this conversation
19   take place, was this face to face, was this
20   over the phone?
21       A.    I believe this was
22   videoconference, video conversation.
23       Q.    Who initiated it?
24       A.    I did.
25       Q.    And to the best of your
```

Page 149

```
 1                 U. ROWE
 2   presence that you would deem to be sexist?
 3       A.    Again, it's not -- it's not the
 4   individual words, you know, but it's how
 5   people behaved and how people reacted to me
 6   that led me to believe.
 7             MR. GAGE:  Could you reread my
 8   question, please.
 9             (The record was read.)
10       Q.    Can you answer that question?
11       A.    So I can't point to one
12   conversation.
13       Q.    Can you point to any
14   conversation in which someone said
15   something that you would consider to be
16   sexist?
17       A.    So, again, it's not just one
18   conversation, but, you know, when I was
19   working for Tariq, the fact that, you know,
20   he would include his other direct reports,
21   he would have one-on-ones with them, he
22   wouldn't have one-on-ones with me, the fact
23   that I wasn't involved in his -- in his --
24   in his staff meetings, you know, all of
25   those things, like the way I was treated
```

## Page 150

```
 1                  U. ROWE
 2   differently because of people's actions,
 3   are part of what led me to believe that I
 4   was discriminated against.
 5           So if you are asking me has
 6   anyone said because of your sex we're doing
 7   X and Y, no.  But have their actions led me
 8   to believe that, yes.
 9       Q.    Let's try this again.
10             I'm not asking about people's
11   actions, Ms. Rowe.  I'm asking about
12   people's words.  Do you understand the
13   distinction I'm making?
14       A.    I do.
15       Q.    So let's focus on people's
16   words.
17             Has anyone, in your time at
18   Google, anyone at Google, said anything to
19   you or in your presence that you would
20   consider to be sexist?
21       A.    Again, I can't remember
22   individual instances or words, no, but it
23   is the collective experience.
24       Q.    So are you saying that you
25   cannot, sitting here today, point to
```

## Page 158

```
 1                  U. ROWE
 2       MS. GREENE:  Objection, asked
 3   and answered.
 4       A.    Yes.
 5       Q.    So now let's talk about deeds.
 6   We talked about words, now let's talk about
 7   deeds.  Please describe for me all of the
 8   deeds or actions that people at Google have
 9   taken that lead you to believe that you
10   have been discriminated against on the
11   basis of your sex.
12       A.    So I was -- so Google
13   discriminated against me on hiring, you
14   know, by bringing me in at a lower level
15   and paying compensation at a lower level
16   than my male peers.  Google discriminated
17   against me by the way I was treated on a
18   day-to-day basis.  Google discriminated
19   against me by, you know, denying me a
20   promotion for which I was the most
21   qualified candidate.  And I was also
22   discriminated against by Google by the
23   continued pay and compensation during my --
24   by paying me less compensation, you know,
25   equity refreshes and otherwise during my
```

## Page 159

```
 1                  U. ROWE
 2   time at Google.
 3       Q.    Anything else?
 4       A.    Those are the high-level ones
 5   that I -- those are the high-level ones,
 6   yes.
 7       Q.    Are there any others?
 8       A.    Those are the ones I can
 9   remember right now.
10       Q.    So you can't right now identify
11   any other ways in which you believe you
12   have been discriminated against at Google?
13       A.    Not right now.
14       Q.    Is there anything that you
15   think you might look at to refresh your
16   recollection?
17       A.    No, not right now.
18       Q.    So let's take the second one
19   you mentioned.  You said that you believe
20   on a day-to-day basis you have been
21   discriminated against.  Tell me all of the
22   things that have happened to you on a
23   day-to-day basis that you believe indicate
24   that Google has been discriminating against
25   you on the basis of your sex.
```

## Page 160

```
 1                  U. ROWE
 2       A.    So, you know, I think, first of
 3   all, about my leveling and compensation,
 4   you know, that was an ongoing --
 5       Q.    I said I wouldn't interrupt
 6   you.  I'm going to apologize and interrupt
 7   you here.
 8             So in your answer a minute ago
 9   you identified four things.  You identified
10   your hiring at a lower level and at lower
11   compensation, the second thing you
12   identified was that you have been
13   discriminated against on a day-to-day basis
14   you said, the third thing you mentioned was
15   denied promotion, then the fourth thing you
16   mentioned was the denial of equity
17   refreshes and compensation on an ongoing
18   basis, right?
19       A.    Yes.
20       Q.    That's four things.  I want to
21   first start with the second of those
22   things.
23       A.    And also, you know, other
24   opportunities as well, I was denied other
25   opportunities.
```

Page 161

```
 1                    U. ROWE
 2      Q.    Other opportunities, and are
 3  those other job opportunities that you
 4  sought and did not get?
 5      A.    There was at least one of
 6  those.
 7      Q.    And when was that?
 8      A.    So the denied promotion was the
 9  VP of financial services, and later I
10  raised my hand for a VP of sales role in
11  financial services, the head of financial
12  services and sales, that was the role.
13      Q.    So the first one is the
14  financial services vertical head job,
15  correct?
16      A.    Correct, VP of -- yes.
17      Q.    And that was the job that you
18  claim was given to Stuart Breslow, right?
19      A.    Correct.
20      Q.    Just to make sure we're talking
21  about the same thing, okay. Tell me again,
22  what was the second opportunity that you
23  were denied?
24      A.    I raised my hand for the VP of
25  financial services role and sales.
```

Page 162

```
 1                    U. ROWE
 2      Q.    And when was that?
 3      A.    I don't remember the exact
 4  timing, but I think it was earlier this
 5  year.
 6      Q.    So you think sometime in 2020,
 7  early 2020?
 8      A.    Yes.
 9      Q.    Before or after the pandemic
10  shut down the country, can you place it
11  that way?
12      A.    Before.
13      Q.    Before, okay, so sometime
14  before the middle of March, is that fair to
15  say?
16      A.    Yes.
17      Q.    And was that a job that was
18  posted internally at Google?
19      A.    I don't know if there was a job
20  posting. I didn't see a posting.
21      Q.    We will come back to that.
22            But I want to go back to the
23  second item that you mentioned, and that is
24  you said that you were discriminated
25  against on a day-to-day basis. So on that
```

Page 163

```
 1                    U. ROWE
 2  item only, I want you to tell me everything
 3  that anyone did to you at Google that you
 4  believe reflected discrimination against
 5  you on the basis of your sex.
 6      A.    When I worked for Tariq, he
 7  would, you know, regularly have one-on-ones
 8  with other male peers but not with me. I
 9  was frequently left out of team meetings,
10  left out of customer discussions. I was
11  left out of off-sites. Those are some of
12  the ways I remember.
13      Q.    What other ways?
14      A.    Those are the ones I remember
15  right now.
16      Q.    Were there others?
17      A.    Well, you know, obviously being
18  left out of these meetings and some of
19  these in-sites also meant that I was no
20  longer, you know, part of some of the
21  strategic discussions, while my male peers
22  were. So, you know, I think that is a
23  second order of facts.
24      Q.    Well, we will come back to each
25  of those. But I want to know, were there
```

Page 170

```
 1                    U. ROWE
 2  Stuart was included and I wasn't.
 3      Q.    How many off-sites took place
 4  while you worked for Tariq that you were
 5  not invited to?
 6      A.    I don't know.
 7      Q.    Do you know how many off-sites
 8  Tariq had during the time you worked for
 9  him?
10      A.    I don't know.
11      Q.    Do you know if -- do you know
12  if Tariq had any off-sites during the time
13  you worked for him that you were not
14  invited to?
15      A.    I don't know.
16      Q.    You indicated that you believed
17  you were left out of team meetings. What
18  team meetings were you left out of?
19      A.    So Tariq would have regular
20  team meetings that he would use his team
21  e-mail to send invitations to, so I was
22  left out of those, and other meetings where
23  he met with his team members but I wasn't
24  there.
25      Q.    How many times did that happen,
```

Page 171

```
 1                  U. ROWE
 2   that is, that he held a team meeting that
 3   you were not invited to?
 4         A.    I don't know.
 5         Q.    Was it more than once?
 6         A.    Yes.
 7         Q.    Was it more than twice?
 8         A.    Yes.
 9         Q.    Was it more than three times?
10         A.    Yes.
11         Q.    How many times was it?
12         A.    Look, obviously I don't know
13   every meeting that I wasn't invited to.
14   But I know that I have regularly heard
15   about these meetings that people were at
16   where I wasn't at.  So I have heard about
17   it probably at least four or five times, I
18   don't know the exact number of the meetings
19   that actually did happen.
20         Q.    Who is the -- tell me by name
21   the team members who were invited to these
22   meetings that you say you were not invited
23   to.
24         A.    Well, I think some of them were
25   his direct reports, you know, his staff
```

Page 172

```
 1                  U. ROWE
 2   meetings, where I wasn't included.  Now, I
 3   don't know who was included, because I
 4   wasn't there.  And the other meetings were
 5   either, you know, talking about financial
 6   services or a specific client or other
 7   topics.  Again, I don't know how many of
 8   these I wasn't invited to, but I heard
 9   from -- sometimes I would hear from Stuart
10   himself that the meetings had happened,
11   sometimes I would hear it from other
12   participants.
13         Q.    Who?  What other participants?
14         A.    Again, because I wasn't in
15   these meetings, I don't know exactly who
16   were in these meetings, but I know that --
17         Q.    You just said you heard it from
18   other participants.  I want to know who you
19   heard it from.
20         A.    Yeah, I'm not done.  You know,
21   I heard it sometimes from Stuart Breslow.
22   Sometimes I heard it from, you know, the
23   account teams, if they were talking about a
24   client.  Sometimes, you know, I would hear
25   it from, you know, other peers.
```

Page 173

```
 1                  U. ROWE
 2         Q.    Give me names.  Who?
 3         A.    Look, I don't actually recall
 4   the individuals that told me, but, you
 5   know, I heard it, I heard it from people
 6   that these meetings were happening.
 7         Q.    So you can't give me a single
 8   name of someone that you heard about these
 9   meetings from?
10               MS. GREENE:  Objection.
11         A.    I just said Stuart Breslow was
12   one of them, and also, you know, some of
13   Tariq's other direct reports.
14         Q.    Other than Stuart, can you give
15   me the name of a single other individual
16   who shared information with you that led
17   you to believe that he or she had been
18   invited to a meeting with Tariq that you
19   were not invited to?
20         A.    Look, another person I heard it
21   from was Leonard Law.
22         Q.    When was that?
23         A.    I don't remember the exact.
24         Q.    What was the meeting that
25   Leonard Law told you about that you
```

Page 174

```
 1                  U. ROWE
 2   believed you should have been invited to?
 3         A.    I don't know what the meeting
 4   was about, but it was about financial
 5   services.
 6         Q.    Was that at a point at which
 7   you were still in Tariq's organization when
 8   Leonard Law shared that with you?
 9         A.    I believe so, yes.
10         Q.    Did you believe you should have
11   been in every meeting that Tariq held with
12   anyone who worked on his team?
13         A.    No.
14         Q.    Did you believe that you should
15   have been invited to every meeting with
16   Tariq that had anything to do with
17   financial services?
18         A.    No.  But I do believe that I
19   should have been in every staff meeting
20   that he had.
21         Q.    When you first came to believe
22   you were not on the e-mail list for his
23   staff meetings, what did you do?  Did you
24   tell anyone?
25         A.    Yes.
```

```
                                              Page 175
 1                    U. ROWE
 2       Q.     Who did you tell?
 3       A.     So, first, I asked my admin to
 4   check with Tariq's admin to make sure it
 5   was okay, then I asked -- I believe I asked
 6   Tariq's admin directly, and, finally, I
 7   asked Tariq.
 8       Q.     And what did you learn?
 9       A.     The responses changed over
10   time, but it was, you know, first, I
11   think -- I think some of the answers were
12   they were working on the e-mail lists, so,
13   you know, it was in flight.  Other times it
14   was an oversight.  Other times it was, you
15   know, they forgot.  You know, so the
16   answers changed.
17       Q.     Do you have any reason to
18   believe that any of the responses you got
19   were false?
20       A.     Look, I don't have any reason
21   to believe the responses were false, but I
22   knew that my male peers were in these
23   meetings and I wasn't, so I was being
24   treated differently.
25       Q.     What male peers?
```

```
                                              Page 216
 1                    U. ROWE
 2       A.     No.  I mean, we didn't have a
 3   discussion on whether this would be in OCTO
 4   or elsewhere.
 5       Q.     Was there not a function at the
 6   time you were hired at Google that was
 7   responsible for strategy and product
 8   development in Cloud for financial
 9   services, did that function not exist?
10       A.     It did not exist.
11       Q.     So what were you hired to do?
12       A.     So I was hired as an individual
13   contributor in OCTO to do, you know, the
14   three -- the role that you and I have
15   discussed that has these elements of, you
16   know, advisory for product and eng, it has
17   client engagements, thought leadership.
18   But I certainly was not the VP of financial
19   services.
20       Q.     How is that different than the
21   function you just described when you told
22   me what you understood the verticalization
23   to mean?
24       A.     So the verticalization has
25   multiple components.  You know, I think it
```

```
                                              Page 211
 1                    U. ROWE
 2   process, was it important to you to clearly
 3   understand the terms and conditions of
 4   employment that Google was offering to you?
 5       A.     Yes.
 6       Q.     And was it important to you to
 7   have all of the details of the job offer
 8   you were getting put in writing?
 9       A.     Yes, but there were -- there
10   were elements that were not in writing.
11       Q.     Can you tell me all of the
12   elements that were not in writing?
13       A.     So when we had the initial
14   conversations during hiring, you know, I
15   was -- there were a couple of things.  One
16   of them was the fact that, you know, that
17   when Google verticalized, that I would be
18   the obvious person to be the head of that
19   vertical as the VP of financial services.
20   And there was also another element that the
21   equity refreshes that I would get over
22   time, you know, would put me in a place
23   that is on par with my peers and at a level
24   that I was making more than J.P. Morgan.
25       Q.     You just mentioned two things,
```

```
                                              Page 217
 1                    U. ROWE
 2   has, one, the strategy for the vertical.
 3   It has, you know, also building products
 4   elements of it, and also, you know, a
 5   connection to sales.  You know, it's a --
 6   it's a -- it's a -- it's a -- it's a role
 7   with bigger decision-making capabilities.
 8       Q.     So did you understand
 9   verticalization to be a reference to a
10   future role within Google Cloud, a job?
11       A.     So yes, yeah, that would be a
12   different role, you know, and that
13   function, this does get created, that's
14   what I had been led to understand.
15       Q.     Did either Mr. Grannis,
16   Mr. Stevens, or Ms. Burdis, anyone, did
17   anyone indicate to you that there was going
18   to be a vice president job in the future at
19   the head of the financial services
20   vertical?
21       A.     They didn't use those exact
22   words, but the words that they used were,
23   you know, when and if Google verticalizes,
24   who but you would be the obvious person for
25   that role.  Again, I'm not quoting, these
```

Page 246

U. ROWE

videoconference?

A. Yes.

Q. And you later learned that it wasn't a different role, it was just a change in reporting relationships, correct?

A. Incorrect.

Q. So is it your testimony that when you moved into Tariq's organization your role changed?

A. So it is true that Tariq said that the role is not going to change. The way he described the role was a much more junior role. And this exchange was the last time that Tariq and I talked about the role, so I continued to do certain aspects of what I did in OCTO, but because I wasn't included in any of -- in many of the financial services discussions and other things, so I ended up, you know, my scope ended up being reduced from what I used to do over at OCTO.

Q. What did you do when you were in OCTO that you were no longer doing when you were working in Tariq's organization?

---

Page 247

U. ROWE

A. So when I was in Tariq's organization, I was regularly left out of discussions about the financial services space, you know, what was going on there. I was left out of, you know, customer meetings. I was left out of, you know, the strategy setting for that vertical. So that was what I was doing on a day-to-day basis. Now, the description of the global client role itself was even more restrictive.

Q. But my question to you was what were you doing when you worked in OCTO that you were no longer doing when you were in Tariq's organization?

A. I thought I answered that. But basically my focus on product and eng was limited or reduced. My client engagements, you know, were reduced. And my thought leadership was also not as big as before.

Q. Now, on the client engagement, when you were working in OCTO, who was initiating the client engagement?

A. Most of the time from the sales

---

Page 248

U. ROWE

account teams, sometimes directly from -- through Will and Brian.

Q. And then when you were in Tariq's team, who was initiating the client engagement?

A. So still I wasn't getting much from Tariq, so whatever I got was from the sales team. But, you know, Stuart was the, you know, placed in a -- in a role and he, you know, most of the time he was the one that Tariq pinged for some of these engagements.

Q. And when you talk about Stuart being placed in the role, you are talking about the head of financial services role?

A. Even before then, Stuart was being included in discussions that I wasn't in.

Q. And is that anything other than what you previously testified about? Are you talking about something different than what I asked you about earlier?

A. I don't know what earlier conversation you are referring to.

---

Page 264

U. ROWE

MS. GREENE: Objection.

A. Well, I knew what kind of individuals were, and based on that I made the statement that I was better qualified.

Q. Now, you have since, in the course of discovery, come to know who some of the other candidates were, correct?

A. I saw some of the names, yes.

Q. Were you better qualified than all of them?

A. Look, I don't know, and I can't speak to all of their qualifications, but I know who the role ultimately went to, and I -- and I kind of know my qualifications with respect to that individual, so I can speak to that.

Q. Do you know who ▇▇▇▇ ▇▇▇▇▇▇▇▇ is?

A. I have heard the name.

Q. Do you know anything about her qualifications?

A. I don't know much. I know that at some point she worked in Google ▇▇▇ and she is a VP -- I don't know if she is still

```
                                                      Page 279
 1                      U. ROWE
 2        A.    After Stuart got the job, is
 3   that what you are asking, did I discuss
 4   with Tariq?
 5        Q.    Yes.
 6        A.    No.
 7        Q.    Did you ever have any
 8   discussions with Mr. Shaukat about what
 9   your role would be in his organization
10   going forward?
11        A.    So in, I think it was in
12   February, I was told that my role was being
13   changed.  I was given, you know, three
14   options.
15        Q.    What were those three options?
16        A.    I was given an option to work
17   on a focused small project, working for
18   Stuart Breslow.  I was given the option to
19   go back to OCTO without a financial
20   services focus.  And third option wasn't
21   really even real, it was that I could stay
22   and he could park me under Stuart until I
23   found a different role.  And I considered
24   all of these three as demotions.
25        Q.    You had all of these, I'm
```

```
                                                      Page 280
 1                      U. ROWE
 2   sorry?
 3        A.    I considered all of those
 4   options as demotions.
 5        Q.    As demotions, okay.  Why did
 6   you consider them demotions?
 7        A.    Well, one of them wasn't even a
 8   role, it was go find another job, like I
 9   would have no job, the other one was a much
10   more junior role, you know, working as a,
11   you know, in a much smaller focus project,
12   I think the ▇ project at the time, much
13   more junior role, or I would go back to
14   OCTO, but Google would remove all of my
15   financial services focus.
16        Q.    And you chose to go back to
17   OCTO, correct?
18        A.    Correct.
19        Q.    Now, when you first moved over
20   into Tariq Shaukat's organization from
21   OCTO, Ben and Evren also moved from OCTO
22   into Tariq's organization, correct?
23        A.    So they were also told that
24   they were moving.  I believe Evren never
25   actually moved.
```

```
                                                      Page 284
 1                      U. ROWE
 2        Q.    You indicated that -- you
 3   testified earlier today that you believe
 4   you were denied equity refreshes because of
 5   your sex.  Tell me everything that leads
 6   you to believe that the equity refreshes
 7   you got, the amount of them, or when you
 8   didn't get equity refreshes, what leads you
 9   to believe that that was because of your
10   sex.
11        A.    Well, I was down-leveled on
12   hire, and that translated into lower
13   compensation as well as lower equity
14   refreshes compared to my male peers.
15        Q.    Is there anything else that
16   leads you to believe that your equity
17   awards were based on your sex?
18        A.    Well, yeah, I can't think of
19   anything else, it's basically the way that
20   I was leveled, and that carried on, you
21   know, that continued to haunt me, so to
22   speak, through my time at Google.
23        Q.    Now, you used a term a minute
24   ago that I don't think either of us have
25   used in today's deposition until now, and
```

```
                                                      Page 291
 1                      U. ROWE
 2        Q.    What happened next?
 3        A.    He said that he would talk to
 4   Kristen and come back to me.
 5        Q.    And did he?
 6        A.    He did.
 7        Q.    And what happened next?
 8        A.    He said that based on the
 9   conversations with Kristen, that they
10   weren't going to go ahead with me.
11        Q.    Did he tell you anything more,
12   did he give you any more details?
13        A.    I don't remember a lot of the
14   details, but I was surprised when he said
15   based on your interview with Kristen, I did
16   not have an interview with Kristen, this
17   was like a casual one-on-one get-together,
18   I found out about the opportunity during
19   that meeting, and that, you know, he told
20   me that based on that conversation that I
21   was being discounted, I was surprised.
22        Q.    And was that the end of it?
23        A.    Yes.
24        Q.    Did you ever follow up with
25   Kristen?
```

Page 294

U. ROWE

```
 1                   U. ROWE
 2  happened.
 3      Q.    So, again, other than the
 4  sequence of timing, is there anything else
 5  that leads you to believe that anything
 6  that happened to you at Google was because
 7  of your complaints of discrimination?
 8            MS. GREENE:  Objection.
 9      A.    I think it's not just the
10  sequence of events, but actually what
11  happened as well.
12      Q.    And the "what" is you say you
13  were demoted, you say you were isolated,
14  and you were denied this other job that was
15  given to Yolande Piazza?
16      A.    Correct.
17      Q.    Those are the things that
18  happened?
19      A.    Correct.
20      Q.    And my question to you is other
21  than the sequence of timing between your
22  complaints of discrimination and the timing
23  of those things I just mentioned, other
24  than the timing, is there anything else
25  that leads you to believe that those events
```

Page 295

```
 1                   U. ROWE
 2  were because of your complaints of
 3  discrimination?
 4            MS. GREENE:  Objection.
 5      A.    Again, it's not just the
 6  timing, you know, I was isolated.
 7      Q.    Then what else is it?
 8      A.    Because like I was isolated
 9  when my male peers were not isolated.  When
10  they were given opportunities, I wasn't
11  given opportunities.  So it is not just,
12  you know, the sequence of what happened,
13  but like what I experienced during that
14  time.
15      Q.    So what you describe as
16  isolating, being isolated, what leads,
17  other than the sequence of timing, other
18  than those events occurring which you
19  already testified about today -- withdrawn.
20  Let me ask you more specifically.
21            When you say being isolated,
22  you are talking about your testimony about
23  not being invited to meetings, correct?
24      A.    That's one of the things.
25      Q.    Not being invited to client
```

Page 296

```
 1                   U. ROWE
 2  events, right?
 3      A.    That's another one of those.
 4      Q.    Not being invited to off-sites,
 5  right?
 6      A.    That's also one of those.
 7      Q.    Okay, what else was there?
 8  What else constitutes the isolations?
 9      A.    I was isolated, one, because I
10  was told that I couldn't focus on financial
11  services anymore, so Google removed that
12  responsibility from me.  And that meant
13  that I was isolated from any discussions
14  around, you know, go to market, around
15  customer interactions, around, you know,
16  press and media appearances, and I was
17  isolated on, you know, what events I could
18  go talk to.
19            So there was a lot of these
20  things that I was isolated by whereas, you
21  know, my male peers, Stuart Breslow and
22  others, weren't.
23      Q.    When were you told that you
24  were no longer to focus on financial
25  services?
```

Page 298

```
 1                   U. ROWE
 2  the three options that were presented to
 3  me.
 4      Q.    You had three options, and you
 5  chose, no one else chose for you, correct?
 6      A.    Of the options that were given
 7  to me, yes, going back to OCTO was what I
 8  chose.
 9      Q.    And Google had decided that
10  when you were in OCTO, you were going to be
11  focused on hybrid cloud, correct?
12      A.    Yes.
13      Q.    Do you have any reason to
14  believe that that decision to have you
15  focus on hybrid cloud was made because you
16  had raised complaints of discrimination?
17            MS. GREENE:  Objection.
18      A.    So I don't know what went into
19  that discussion, but what I have
20  experienced was Google removed all my
21  financial services related
22  responsibilities, Google isolated me
23  internally and externally, and I know that
24  I was also denied further opportunities.
25      Q.    I'm talking right now about
```

Page 327

```
 1                U. ROWE
 2    comparable.
 3        Q.    How are they different?
 4        A.    I don't know what he does on a
 5    day-to-day basis, so I don't know, you
 6    know, what he does that might be different,
 7    but what I do know is that, you know, he
 8    does provide, you know, product and
 9    engineering guidance.  He does provide
10    thought leadership.  He works across the
11    organization.  And he does have -- he does
12    have, you know, client facing, and
13    understanding his clients and building
14    product type responsibilities.
15        Q.    Does he write code as part of
16    his job?
17        A.    I don't know.
18        Q.    Do you?
19        A.    I don't, not production code.
20        Q.    Have you ever, since you have
21    been at Google?
22        A.    So I have written code, but I
23    have not contributed code to Google's
24    products, if that's what you are asking.
25        Q.    Do you know anyone else who is
```

Veritext Legal Solutions
212-267-6868            www.veritext.com            516-608-2400

Page 343

```
 1                ULKU ROWE
 2    the role.
 3        Q.    Did she tell you who specifically
 4    to reach out to by name?
 5        A.    She said Stuart Vardaman but she
 6    may have mentioned another person.  I don't
 7    remember the number.
 8        Q.    Did you say she said Stuart
 9    Vardaman?
10        A.    That is my recollection.
11        Q.    Did Miss Kliphouse tell you
12    whether this job had been posted yet,
13    advertised?
14        A.    I don't remember that.  I don't
15    think so.
16        Q.    Did Miss Kliphouse say anything to
17    you about whether she had looked at or considered
18    candidates as of that point?
19        A.    I don't remember that.  For your
20    earlier question I think I said she didn't tell
21    me it was posted, I don't know if it was posted
22    internally in Google.  She indicated that it
23    was an active job search.
24        Q.    As of the point at which you had
25    coffee with her she told you that it was at
```

Veritext Legal Solutions
800-567-8658                                    973-410-4098

Page 342

```
 1                ULKU ROWE
 2        Q.    What did she tell you about the
 3    role she was planning to hire for?
 4        A.    She said that she was looking for
 5    a VP of sales for financial services and she
 6    also said that she is looking for people that
 7    are not from -- she was looking for people that
 8    don't have the traditional sales background.
 9    Those were not necessarily a good fit for the
10    first time role either so she was looking more
11    broadly.
12        Q.    Did she use those words and
13    what I mean by that is not looking for someone
14    in the traditional sales background?
15        A.    I don't remember her exact words,
16    but she was definitely saying they are
17    broadening to include nonsales background
18    people, but I don't remember if those were her
19    exact words.
20        Q.    What if anything else do you
21    remember about what Miss Kliphouse told you
22    concerning this position and what she was
23    looking for?
24        A.    I told her I was interested in the
25    role and she asked me to reach out to HR about
```

Veritext Legal Solutions
800-567-8658                                    973-410-4098

Page 358

```
 1                ULKU ROWE
 2    that you would not be considered further for
 3    the role.
 4              He sent you the job posting;
 5    correct?
 6        A.    He did.
 7        Q.    And do you have that available to
 8    you now?  I think it should be shared with you
 9    I think it is previously marked as Plaintiff's
10    Exhibit 115.
11        A.    In the shared drive, yes.
12        Q.    So you have it in front of you?
13        A.    Yes.
14        Q.    You received this after your
15    conversation with Miss Kliphouse, correct?
16        A.    Correct.
17        Q.    Can you read to me the two lines
18    at the bottom of the first page starting with
19    the word "drawing"?
20        A.    "Drawing upon previous
21    demonstrable success leading sizeable
22    technology sales teams that served he financial
23    services industry."
24        Q.    Did you have previous demonstrable
25    success leading sizable technology sales teams
```

Veritext Legal Solutions
800-567-8658                                    973-410-4098

```
                                                  Page 359
 1                    ULKU ROWE
 2       that served the financial services industry?
 3            A.    I had sales experience.  I didn't
 4       directly lead sales teams, but based on how
 5       Kirsten was describing the role, I thought it
 6       was appropriate for me to raise my hand.
 7            Q.    I didn't ask you whether it was
 8       appropriate for you to raise your hand.  I just
 9       asked you in fact if you had "previous
10       demonstrable success leading sizable technology
11       sales teams that served the financial services
12       industry."  Did you?
13            A.    No.
14                  MS. GREENE:  Objection, asked and
15            answered.
16            A.    No, but I had relative experience
17       that would be useful.
18            Q.    Did you have what you just read?
19            A.    No.
20            Q.    Were you discouraged when you read
21       that?
22            A.    No.
23            Q.    Did you -- I want to flip over to
24       the second page of this document in the middle
25       below the words "The financial services leader
```

```
                                                  Page 374
 1                    ULKU ROWE
 2       role.
 3            Q.    Have you ever met Miss Piazza?
 4            A.    We have been in meetings together,
 5       yes.
 6            Q.    Do you have an opinion as to her
 7       qualifications for this sales role based upon
 8       your interactions with her?
 9            A.    Look, I can't speak to her
10       qualifications.  I don't know enough about her.
11            Q.    When she joined Google did you set
12       up a meet and greet with her?
13            A.    I didn't, but she and I have been
14       in quite a few meetings together.
15            Q.    Is there a reason why you didn't
16       set up a meet and greet with her when she
17       joined?
18            A.    Look, I think -- I don't think
19       there is a specific reason.
20            Q.    Was it your practice to set up
21       meet and greets with new leaders who had joined
22       Google from outside the company?
23            A.    Sometimes, especially like if I
24       don't have reason to work with them on a
25       day-to-day basis.  Others I work together all
```

```
                                                  Page 373
 1                    ULKU ROWE
 2       use a phrase I want to know what she means
 3       by it.  It's a different question, Cara
 4            A.    I'm just saying I don't know a
 5       hundred percent.  She may.
 6            Q.    But you're speculating about that,
 7       correct?
 8            A.    Correct.
 9            Q.    Do you know who was hired for that
10       position?
11            A.    I think at the end it went to
12       Yolanda Piazza.
13            Q.    Do you know anything about her
14       qualifications for the job?
15            A.    I don't know too much about her.
16       I know she came from Citibank and she had been
17       there for a long time and I don't know much
18       beyond that.
19            Q.    Do you have an opinion as to
20       whether you're better qualified, equally
21       qualified or lesser qualify than Miss Piazza
22       for the role?
23            A.    I don't know all of her
24       qualifications, I can't speak to that.  I can
25       speak to the fact that I was qualified for the
```

```
                                                  Page 389
 1                    ULKU ROWE
 2       me on the VP of sales role.  So he told me that
 3       I would not be considered for the role.
 4            Q.    What did you say in response?
 5            A.    I asked some questions.
 6            Q.    What questions did you ask?
 7            A.    I asked him why.
 8            Q.    What did he say?
 9            A.    He said that they were looking for
10       someone that has a more commercial background.
11            Q.    What else did you ask?
12            A.    I asked him like what made them
13       think that I wasn't qualified for the role.
14            Q.    What did he say?
15            A.    He said that it was based on a
16       two-hour meeting that I had with Kirsten.
17       Two-hour interview actually he said.
18            Q.    What else did you ask?
19            A.    I think I added some more prodding
20       questions.  I don't remember all the questions.
21       I said to him that I wasn't aware that the
22       meeting that I had with Kirsten was an
23       interview.  I said to him that it was like a
24       meet and greet and that it was actually in this
25       meeting that I found out about this role.  I
```

```
                                        Page 390
 1                  ULKU ROWE
 2      was surprised.  I expressed surprise.
 3               He also mentioned there is a VP of
 4      solutions role that might be opening up that I
 5      might be a candidate for.
 6          Q.   How did you react to that?
 7          A.   I asked him what the role was and
 8      he said like we don't really know yet.  It's a
 9      head of industry solutions that is coming up,
10      but he will have more details then.  But he did
11      say that they -- he mentioned I think -- I
12      can't remember her name.  He mentioned I think
13      ▇▇▇▇ the retail person that she would also be
14      considered for the head of solutions for the
15      retail position.
16          Q.   Is that ▇▇▇▇▇▇▇ ?
17          A.   Yes, I think that is the name.
18          Q.   Did you ever express interest in
19      this other role that he said might become
20      available?
21          A.   Well, I never heard about it
22      subsequently until someone was announced.
23          Q.   Did you tell Mr. Vardaman in that
24      conversation that you were or might be
25      interested in the position?
```

```
                                        Page 394
 1                  ULKU ROWE
 2      do you have any reason to believe that the
 3      e-mail that you sent to your lawyers contains
 4      any additional details about the conversation
 5      with Mr. Vardaman that you've not already
 6      shared?
 7          A.   I don't believe so.
 8          Q.   I think you testified that
 9      Mr. Vardaman told you that they were looking
10      for someone with a more commercial background
11      for the position that Miss Kliphouse was
12      filling.
13               What did you understand that
14      phrase to mean, a more commercial background?
15          A.   That they were looking for someone
16      with a direct sales experience.
17          Q.   Was that statement that
18      Mr. Vardaman made to you consistent with the
19      description of the job that he sent to you?
20          A.   Yes, but it wasn't how Kirsten
21      described the role.
22          Q.   Well, how did Kirsten describe the
23      role in a manner inconsistent with that?
24          A.   Because she said they are looking
25      beyond the pure sales experience, the
```