**OUTTEN & GOLDEN LLP**
Cara E. Greene
Maya S. Jumper
Shira Z. Gelfand
685 Third Avenue, 25th Floor
New York, New York 10017
(212) 245-1000

## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| ULKU ROWE,<br><br>               Plaintiff,<br>    v.<br><br>GOOGLE LLC,<br><br>               Defendant. | No. 19-cv-08655<br><br>**PLAINTIFF'S RESPONSE TO DEFENDANT's RULE 56.1 STATEMENT** |

Pursuant to Local Civil Rule 56.1, Plaintiff Ulku Rowe submits this opposition to Defendant Google LLC's ("Defendant" or "Google" or "the Company") statement of material and undisputed facts.[1]

## I.    PLAINTIFF'S RESPONSE

Paragraph 1:

In 2016, Will Grannis and Brian Stevens, Chief Technology Officer ("CTO") of Google Cloud, established the Office of the CTO ("OCTO") within Google's Cloud organization.

---

[1] Citations within this document are to the Declaration of Cara E. Greene ("Greene Decl.") and the Declaration of Shira Z. Gelfand ("Gelfand Decl."), the Declaration of Maya S. Jumper ("Jumper Decl.") and exhibits attached thereto ("Ex."), the Declaration of Ulku Rowe ("Rowe Decl."); the Declaration of Nicholas Harteau ("Harteau Decl."); Plaintiff's Statement of Material Facts Pursuant to Local Rule 56.1 ("Aff. 56.1"); the Declaration of Sara Tomezsko ISO Motion for Summary Judgment, ECF No. 143 ("Tomezsko Decl."); and Declaration of Sara Tomezsko ISO Motion to Retain Documents Under Seal (ECF No. 149 ("Tomezsko Sealing Decl.")

OCTO was an innovative new function that did not exist anywhere else within Google. (Declaration of Will Grannis, ["Grannis Decl."], ¶ 4.)

<u>Plaintiff's Response to Paragraph 1</u>: Plaintiff **admits** but **avers** that Mr. Grannis utilized job descriptions from other areas of Google in crafting the OCTO function. (Ex. 1, Grannis Tr. 24:7-23.)

Paragraph 2:

The vision for OCTO was a team of employees with CTO-like qualities (a unique blend of product, sales, and marketing focus) to represent Google Cloud externally as the technical face of the organization, and be the liaison between clients and Google's engineering teams. They would advise C-level executives at Google's clients on the technical aspects of how to leverage the power of Google Cloud for their business, with the goal of generating interest in Google Cloud and increasing its market share in the cloud computing space. (Grannis Decl., ¶ 5.)

<u>Plaintiff's Response to Paragraph 2:</u> Plaintiff **admits.**

Paragraph 3:

The business title[2] for this new role was and still is Technical Director. Grannis and Stevens identified three key "pillars" of responsibility for the job: customer impact, engineering impact, and evangelism or thought leadership. (Grannis Decl., ¶ 6; Declaration of Sara B. Tomezsko ["Tomezsko Decl."] ¶ 2, Exh. 1 ["Rowe Dep."] at 193:8–18; *id.*, ¶ 11, Exh. 10 at P000436–37.)

[2] A business title at Google can be used across multiple job codes and employees have latitude to adjust their business title without changing their role. In contrast, a job title reflects the official label associated with the employee's job code, which is specific to the job family and level. (Lucas Decl., ¶¶ 9, 14.)

<u>Plaintiff's Response to Paragraph 3:</u> Plaintiff **admits**.

Paragraph 4:

Customer impact requires Technical Directors to work with Google's most important clients, understand their business needs, and convey how Google Cloud's technology could help them achieve their goals. (Rowe Dep. at 194:6–22; Tomezsko Decl., ¶ 11, Exh. 10 at P000436–37.)

<u>Plaintiff's Response to Paragraph 4:</u> Plaintiff **admits**.

Paragraph 5:

> Engineering impact requires Technical Directors to guide and advise Google engineers on how to build products that meet industry needs. (Rowe Dep. at 193:21–194:5; Tomezsko Decl., ¶ 11, Exh. 10 at P000437.)

> Plaintiff's Response to Paragraph 5: Plaintiff **admits**.

Paragraph 6:

> Technical Directors do not build or develop Google Cloud products or manage the teams that do, nor are they responsible for the roadmap or budget for any particular product. Those are the responsibilities of Google Cloud's software engineers and product managers. (Grannis Decl., ¶ 7.)

> Plaintiff's Response to Paragraph 6: Plaintiff **admits** but **avers** that Technical Directors

were hired because they had undertaken these responsibilities in past positions and therefore

understood how to advise both customers and Google's internal teams. Moreover, Google

Cloud's SWE's and PM's at levels 8 and 9 similarly do not themselves build Google Cloud

products. (Rowe Decl. ¶ 21; Ex. 2, GOOG-ROWE-00061501-02; Ex. 3, GOOG-ROWE-

00061511-12; Tomezsko Sealing Decl. ¶ 21, Exh. T at GOOG-ROWE-00061510.)

Paragraph 7:

> Evangelism or thought leadership requires Technical Directors to convey the power of Google's products externally, and provide strategic thinking into how the industry is changing. Examples include keynote speeches at industry events or publication of whitepapers. (Rowe Dep. 194:23–195:14; Tomezsko Decl., ¶ 11, Exh. 10 at P000437.)

> Plaintiff's Response to Paragraph 7: Plaintiff **admits**.

Paragraph 8:

> Rowe concedes that the job description for the Technical Director role fairly describes the responsibilities of the job she performed in OCTO. (Rowe Dep., 192:19–193:7, 205:15–24; Tomezsko Decl., ¶ 11, Exh. 10 at P000437.)

> Plaintiff's Response to Paragraph 8: Plaintiff **admits** and **avers** that from the time the job

description was created in 2016 through the present, Google used the same job description to

facilitate the hiring and recruitment of all Technical Directors, including Plaintiff and Mr.

Harteau, who were "being hired for the same role." (Gelfand Decl. ¶ 2; Ex. 1, Grannis Tr. 74:23-75:2.)

Paragraph 9:

> The ideal candidate for the role would have held a CTO role in an industry Google was targeting for cloud adoption (*e.g.*, financial services, healthcare, energy, media and entertainment, manufacturing, etc.) or a VP Engineering role at a technology company. Prior experience with cloud migration was relevant to a candidate's ability to perform the job. (Grannis Decl., ¶ 8; Tomezsko Decl., ¶ 11, Exh. 10 at P000437.)

Plaintiff's Response to Paragraph 9: Plaintiff **denies** and **avers** that the ideal candidate for the role would have held a CTO, SVP of Engineering, or equivalent technical leader role that has delivered significant business outcomes through cloud related innovation. Plaintiff **admits** that that a candidate's prior experience with cloud migration may be relevant to a candidate's ability to perform the job but **avers** that there are additional skills and experience requirements relevant to the role. (Tomezsko Decl., Ex. 10.)

Paragraph 10:

> Technical Directors perform roles associated with the Technical Solutions Consultant job family and job ladder. (Declaration of Kevin Lucas ["Lucas Decl."], ¶ 17.)

Plaintiff's Response to Paragraph 10: Plaintiff **admits** but **avers** that there were other roles outside of OCTO and outside of Google Cloud that used the TSC family and ladder as well. The OCTO Technical Directors perform roles that are distinct from the TSC families and ladders that exist outside of OCTO.  The TSC ladder, as it was used in OCTO, was not developed when Plaintiff was first hired; rather Mr. Grannis developed it over time. When Plaintiff was hired, there was no separate entry on the TSC ladder for Level 8 and Level 9's. Mr. Grannis understood at that time that "once [an employee] reached L8 there was a general categorization of leadership on the technical solutions consultant ladder, leadership meaning 8 plus." (Ex. 4, Lucas Tr. 104:7-105:11; Ex. 1, Grannis Tr. 29:6-13, 35:16-36:12.)

Paragraph 11:

A job family at Google is a group of jobs with a common set of general attributes. Job families are not unique to specific organizations or product areas. Generally, jobs within a job family are organized into a job ladder, which serve as general guidelines to identify general expectations and criteria for jobs within a job family as one progresses in seniority and responsibility. (Lucas Decl., ¶¶ 5, 6, 17.)

Plaintiff's Response to Paragraph 11: Plaintiff **admits.**

Paragraph 12:

Within a job ladder, jobs are organized in ascending order by level. Employees are assigned a job level ranging from L1 (entry level) to L9 (the highest director-level position before Vice President). The job level reflects the scope and complexity of the work, the expertise and experience necessary to succeed in the job, and the expected impact the job on the organization. Each grows as an employee's level increases.  (Lucas Decl., ¶¶ 8, 9.)

Plaintiff's Response to Paragraph 12: Plaintiff **denies** and **avers** that "a level refers to the

scope and complexity within a role and is defined by the knowledge, skills, and abilities that a

Googler needs to perform well." Plaintiff **admits** that within a job ladder, jobs are organized in

ascending order by level, and that employees are assigned a job level ranging from Level 1

(entry level) to Level 9 (the highest director-level position before Vice President), but **avers** that

the applicable job ladder for Technical Directors in OCTO ended at "L8+", meaning the highest

level in the job ladder was comprised of both Level 8 and Level 9. (Ex. 5, GOOG-ROWE-

00052153; Ex. 6, GOOG-ROWE-00017719.)

Paragraph 13:

Each level within a job family is associated with a unique job code. A job code broadly identifies individuals performing similar functions, but not every individual in a single job code does the same work. Within a job code, employees may have different responsibilities, report to different supervisors, work in different product areas, and perform unique work within their respective organizations. (Lucas Decl., ¶ 4.)

Plaintiff's Response to Paragraph 13: Plaintiff **denies,** except **admits** that each level within

a job family is associated with a unique job code and that a job code broadly identifies individuals

performing similar functions, and **avers** that all Technical Directors hired from June 2016 until

August 2018 reported to the same supervisor, Mr. Grannis, worked in the same product area, and

had the same responsibilities. (Ex. 7, GOOG-ROWE-00058304-05.)

Paragraph 14:

In late 2016, Grannis and Stevens determined that the scope, experience, and impact of individuals needed in the newly created Technical Director role in OCTO was commensurate with a L8 or L9 employee within Google. (Grannis Decl., ¶ 9.)

Plaintiff's Response to Paragraph 14: Plaintiff **admits**.

Paragraph 15:

All employees hired to perform the Technical Director role were initially hired as individual contributors. Individual contributors are not people managers. Over time, some (but not all) took on people manager responsibilities, and their job codes changed in or around May 2021 as a result. (Grannis Decl., ¶ 13; Lucas Decl., ¶ 17.)

Plaintiff's Response to Paragraph 15: Plaintiff **objects** on the grounds that Defendant has

not produced any discovery relating to employees' job code change in or around May 2021 but

otherwise **admits** that all Technical Directors were initially hired as individual contributors and

that individual contributors are not people managers.

Paragraph 16:

Plaintiff has always been an individual contributor. (Rowe Dep. at 99:14–24.)

Plaintiff's Response to Paragraph 16: Plaintiff **admits**.

Paragraph 17:

Plaintiff has been in job code 5560 (level 8 on the TSC job ladder) since her hire. (Lucas Decl., ¶ 18.)

Plaintiff's Response to Paragraph 17: Plaintiff **admits**.

Paragraph 18:

All Technical Directors hired into OCTO between 2016 and 2020 reported either directly or indirectly to Will Grannis. (Grannis Decl., ¶ 14.)

Plaintiff's Response to Paragraph 18: Plaintiff **admits,** but **avers** that she and all Level 9

Technical Directors reported directly to Mr. Grannis. (Ex. 7, GOOG-ROWE-00058304-05.)

Paragraph 19:

> Plaintiff has never hired anyone, participated in the process to level someone, or been involved in any levelling discussions at Google. (Rowe Dep., 288:22–289:23.)

Plaintiff's Response to Paragraph 19: Plaintiff **admits** that she never participated in the process of leveling a candidate but **avers** that she participated in the hiring process with respect to other Google candidates, such as ███████, a Global Client Lead candidate, as well as other more junior candidates. (Ex. 8, GOOG-ROWE-00059863, 75-76; Ex. 9, GOOG-ROWE-P-00000780.)

Paragraph 20:

> When scheduling interviews with candidates for the Technical Director role, the recruiter made an initial leveling recommendation. (Tomezsko Decl., ¶ 7, Exh. 6 ["Burdis Dep."] at 30:15-21.)

Plaintiff's Response to Paragraph 20: Plaintiff **denies** that the recruiter made an initial leveling recommendation for each of the Technical Director candidates and **avers** that Google changed its policy in October 2019 to state that, as of that point, all interviews scheduled will be assigned a proposed level. (Ex. 10, Burdis Tr. 87:18-88:2; Ex. 11, GOOG-ROWE-00053464.)

Paragraph 21:

> The nature and amount of the candidate's relevant experience; relevant experience with regard to the specific area of technology required for the role; and educational background were all factors in that initial leveling assessment. (Burdis Dep., 18:4–16, 29:11–30:18, 33:5–16, 95:3–13.)

Plaintiff's Response to Paragraph 21: Plaintiff **denies** and **avers** that the nature and amount of the candidate's relevant experience; relevant experience with regard to the specific area of technology required for the role; and educational background were all factors in deciding whether a candidate be brought in for an interview. Google's policy is not to "make leveling recommendations based on factors outside of interview process, such as years of experience,

education level, and previous job title or company." The Recruiter for the Technical Director role understood Google's policy not to rely on company names and job titles to level a candidate when she was recruiting for the role. (Ex. 10, Burdis Tr. 29:11-30:6, 43:19-44:3; Ex. 11, GOOG-ROWE-00053464.)

Paragraph 22:

> How a candidate performed in interviews informed the leveling recommendation for that candidate as well. (Burdis Dep., 53:23–54:9.)

> Plaintiff's Response to Paragraph 22: Plaintiff **admits**, but **avers** that Google's policy

states that "it assesses candidates against structured rubrics during the interview process to ensure consistency and reduce bias when evaluating candidates" and advises to "base your recommendation on how the candidate's interview performance aligns with the level expectations of the job family and interview rubrics." With respect to the Technical Director role, Google used the same interview rubrics for each candidate at Level 8 and Level 9. (Ex. 11, GOOG-ROWE-00053464; Ex. 5, GOOG-ROWE-00052153; Ex. 10, Burdis Tr. 42:9-43:18.)

Paragraph 23:

> After interviews, the hiring manager made a leveling recommendation. Two Senior Vice Presidents of Google Cloud evaluated the leveling recommendations provided and made the final leveling determination. (Burdis Dep., 53:23–54:9; Grannis Decl., ¶ 12.)

> Plaintiff's Response to Paragraph 23: Plaintiff **admits** that the hiring manager provided a

leveling recommendation after the candidate's interviews. Plaintiff **denies** that the Senior Vice Presidents of Google Cloud evaluated the leveling recommendations or made a final leveling recommendation with respect to the Technical Directors.  (Declaration of Diane Greene ISO Defendant's Motion to Quash the Deposition of Diane Greene (ECF 62-1), at ¶¶ 5-11; Ex. 12, Stevens Tr. 61:10-24, 63:7-21.)

Paragraph 24:

A majority of candidates for the Technical Director role, including Plaintiff, were hired as L8s. (Grannis Decl., ¶ 10. Lucas Decl., ¶¶ 17–39.)

Plaintiff's Response to Paragraph 24: Plaintiff **admits** but **avers** that 5 individuals were hired at Level 9 and 12 individuals were hired at Level 8. Although Rowe asked as part of the interview process whether she should be a Level 9, Mr. Grannis told her that all Technical Directors were being hired at Level 8. (Tomezsko Decl., Ex. 18; Ex. 13, GOOG-ROWE-00018014.)

Paragraph 25:

Google hired **Even Eryurek** as an L9 Technical Director effective October 31, 2016. He is based in California. (Lucas Decl., ¶¶ 17, 23.)

Plaintiff's Response to Paragraph 25: Plaintiff **admits**.

Paragraph 26:

Eryurek has a Masters' of Science and doctoral degree in nuclear engineering. He had over 25 years of experience in the healthcare industry, an industry targeted for cloud adoption. He had extensive experience developing cloud products and leading large software engineering organizations at GE Healthcare where he spent six years as a CTO in two separate divisions. He was a member of GE's digital leadership team and the senior executive leader responsible for managing GE Software Technologies' $20 billion business. (Grannis Decl., ¶ 33; Tomezsko Decl., ¶ 12, Exh. 11 at GOOG-ROWE-00061917, 20, 24–29.)

Plaintiff's Response to Paragraph 26: Plaintiff **denies** and **avers** that Mr. Eryurek only had six years of experience in the healthcare industry. His gHire packet notes that his previous experience was in the transportation and process management industry. Moreover, Mr. Eryurek was not the only CTO of GE and ran technology systems supporting parts of the $20 billion business (not the entire business). Plaintiff **admits** that Mr. Eryurek developed cloud products and led large software engineering organizations at GE Healthcare where he spent six years as a CTO in two separate divisions, and that he was a member of GE's digital leadership team.

(Tomezsko Decl. Ex. 11.)

Paragraph 27:

Eryurek's cloud experience began in 2005. At GE Healthcare, he was a champion for cloud technology in the healthcare industry and worked on the successful release of GE's Health Cloud product using Amazon's cloud platform. (Tomezsko Decl., ¶ 9, Exh. 8 ["Eryurek Dep."] at 36:22–37:17.)

Plaintiff's Response to Paragraph 27: Plaintiff **admits** but **avers** that Mr. Eryurek did not work in the healthcare industry until 2010. Moreover, one of his interviewers noted "I think it would be risky to hire him as he seems too disconnected from the details of cloud computing" and noted that "he might get 'rejected' culturally by Googlers because of the details unless he works hard to catch up quickly." (Tomezsko Decl. Ex. 11.)

Paragraph 28:

Grannis recommended Google hire Eryurek as a L9 Technical Director, and the basis of that recommendation is reflected in Eryurek's hiring packet. (Tomezsko Decl., ¶ 12, Exh. 11 at GOOG-ROWE-00061920.)

Plaintiff's Response to Paragraph 28: Plaintiff **denies** and **avers** that Grannis outlined the reasons why he supported Mr. Eryurek's hire, but did not specify the basis for leveling him as a Level 9, as opposed to a Level 8. (Ex. 14, GOOG-ROWE-00061920.)

Paragraph 29:

Google hired **Scott Pernberthy** as a L8 Technical Director effective December 5, 2016. He remains in that role currently. Penberthy was based in New York City until October 2, 2017, when he relocated to California. (Lucas Decl., ¶¶ 17, 34.)

Plaintiff's Response to Paragraph 29: Plaintiff **admits**.

Paragraph 30:

Penberthy earned a doctoral degree in artificial intelligence from the University of Washington and a Masters' of Science in computer science from M.I.T. He had over 31 years of professional experience before joining Google, including as a Managing Director, Technology at PricewaterhouseCoopers, and 18 years of leadership positions at IBM. (Grannis Decl., ¶ 24.)

Plaintiff's Response to Paragraph 30: Plaintiff **admits** but **avers** that Brian Stevens, his interviewer, noted that "he didn't seem to be able to convey architectural choices a customer would need to make to integrate cloud." Another interviewer rated him as a "weak hire." Penberthy never built Enterprise platforms in any industry. His most recent experience was as a Managing Director at PwC, a consulting firm that does not build platforms or operate large technology systems. (Ex. 15, GOOG-ROWE-00063516, 28, 31.)

Paragraph 31:

Google hired **Paul Strong** as a L9 Technical Director effective January 9, 2017. Strong is and always has been based in California. (Lucas Decl., ¶ 38.)

Plaintiff's Response to Paragraph 31: Plaintiff **admits.**

Paragraph 32:

Strong had over 25 years of experience working at technology companies. He had been a CTO, Global Field at VMWare, a cloud computing and virtualization technology company. At VMWare, Strong led the strategy for building virtual machines (a virtualized version of a physical server), a concept which some consider synonymous with cloud today. He was considered a top candidate to become VMWare's Global CTO. He is an expert in the physical infrastructure and virtualization layers that support cloud-based applications. (Grannis Decl., ¶ 37; Tomezsko Decl., ¶ 13, Exh. 12 at GOOG-ROWE-00061880, 83–86.)

Plaintiff's Response to Paragraph 32: Plaintiff **admits** but **avers** that Strong worked as a field CTO at VMWare in an external-facing role as an evangelist and did not build any products, oversee engineers building things, or own production systems. Brian Stevens, one of Mr. Strong's interviewers noted that he wasn't "able to determine whether he's grounded enough to lead customer engagements in a principled fashion." Another interviewer noted that "for an L8, however, I was hoping or more presence and overall gravitas during the interview…he's not as strong as the other candidates I've interviewed for this role." Google then hired him at a Level 9. Another interviewer noted that "I perhaps wish he had known more about GCP specifically." And another noted that "his view of containers was a little out of date." (Ex. 16, GOOG-ROWE-

00061883; https://octo.vmware.com/author/paul_strong/; Ex. 16, GOOG-ROWE-00061880, 87-88, 90, 93; Tomezsko Decl. Ex. 12.)

Paragraph 33:

Grannis recommended Google hire Strong as a L9 Technical Director, and the basis of that recommendation is reflected in Strong's hiring packet. Tomezsko Decl., ¶ 13, Exh. 12 at GOOG-ROWE-00061880.)

Plaintiff's Response to Paragraph 33: Plaintiff **denies** and **avers** that Grannis outlined the

reasons why he supported Mr. Strong's hire, but did not specify the basis for leveling Mr. Strong

at a Level 9, as opposed to a Level 8. (Ex. 16, GOOG-ROWE-00061880; Tomezsko Decl. Ex.

12.)

Paragraph 34:

Google hired **Jonathan Donaldson** as L9 Technical Director effective February 13, 2017. Donaldson is and has always been based in Oregon. (Lucas Decl., ¶¶ 17, 21.)

Plaintiff's Response to Paragraph 34: Plaintiff **admits.**

Paragraph 35:

Donaldson had over 22 years of experience working at technology companies, and had demonstrated expertise in containers (packages of software that virtualize operating systems and enable them to run anywhere) as the lead executive at Intel Corporation responsible for strategy in this area. He also founded the Cloud Native Computing Foundation, the most successful open source foundation for containers and modern compute architectures. He has had experience developing cloud products and setting strategy for cloud adoption since at least 2010. (Grannis Decl., ¶ 39; Tomezsko Decl., ¶ 14, Exh. 13 at GOOG-ROWE-00063078, 81–82.)

Plaintiff's Response to Paragraph 35: Plaintiff **admits** but **avers** that Donaldson only

worked at Intel for four years, during which time he was a Vice President (not a senior

executive), and Google did not consider Donaldson's container experience when it leveled him

or determined his compensation. Plaintiff **denies** that Donaldson founded the Cloud Native

Computing Foundation, but **avers** that Intel was a founding member. (Tomezsko Decl. Ex. 13.)

Paragraph 36:

Grannis recommended Google hire Donaldson as a L9 Technical Director, and the basis of that recommendation is reflected in Donaldson's hiring packet. (Tomezsko Decl., ¶ 14, Exh. 13 at GOOG-ROWE-00063078.)

Plaintiff's Response to Paragraph 36: Plaintiff **denies** and **avers** that Grannis outlined the

reasons why he supported Mr. Donaldson's hire, but did not specify the basis for leveling Mr.

Donaldson at a Level 9, as opposed to a Level 8. (Tomezsko Decl. Ex. 13.)

Paragraph 37:

Google hired **Ben Wilson** as a L9 Technical Director effective February 6, 2017. Wilson was and had always been based in Texas. (Lucas Decl., ¶¶ 17, 39.)

Plaintiff's Response to Paragraph 37: Plaintiff **admits.**

Paragraph 38:

Wilson had over 25 years of experience at energy and professional services firms, including over 3 years as the CTO – GE Cloud Leader at GE's Oil and Gas decision, and over 6 years as the CIO and Business Transformation Executive at Siemens Energy Sector. There, he demonstrated impressive knowledge in large-scale cloud operations. Wilson understood how to execute cloud migrations and how to instrument cloud platforms from having migrated thousands of applications to the Cloud at GE. (Grannis Decl., ¶ 31; Tomezsko Decl., ¶ 15, Exh. 14 at GOOG-ROWE-00062214, 17–19.)

Plaintiff's Response to Paragraph 38: Plaintiff **admits** but **avers** that Wilson only had

three years of cloud experience before joining Google. (Ex. 17, Wilson Tr. 31:3-17; Tomezsko

Decl. Ex. 14.)

Paragraph 39:

Grannis recommended Google hire Wilson as a L9 Technical Director, and the basis of that recommendation is reflected in Wilson's hiring packet. (Tomezsko Decl., ¶ 15, Exh. 14 at GOOG-ROWE-00062214.)

Plaintiff's Response to Paragraph 39: Plaintiff **denies** and **avers** that Grannis outlined the

reasons why he supported Mr. Wilson's hire, but did not specify the basis for leveling Mr.

Wilson at a Level 9, as opposed to a Level 8. (Tomezsko Decl. Ex. 14.)

Paragraph 40:

Google hired **Plaintiff** as a level 8 Technical Director, OCTO, effective March 13, 2017. Plaintiff is and always has been based in New York City. (Lucas Decl., ¶¶ 17, 18.)

Plaintiff's Response to Paragraph 40: Plaintiff **admits.**

Paragraph 41:

Plaintiff earned a Masters' of Science degree in computer science from the University of Illinois and had 19 years of experience in financial services, then-most recently at JP Morgan managing the teams that built and maintained the company's credit risk systems. (Tomezsko Decl., ¶ 16, Exh. 15 at GOOG-ROWE-00019097.R, 100.R–01.R.)

Plaintiff's Response to Paragraph 41: Plaintiff **admits** but **avers** that she previously worked at JPMorgan as the Global Head and CTO of Credit Risk Technology, where she led the migration of risk systems to the cloud, was responsible for the global technology platforms for managing JPMorgan's credit risk across all its lines of businesses, countries and asset classes, the world's largest financial services portfolio with $3.7 trillion in total assets and $129 billion revenue. JPMorgan recruited Plaintiff as a "game-changer technology leader" to build the next-generation risk management systems for JPMorgan to enable them to scale up their business growth, ensure regulatory compliance and bring in technical innovation. While at JPMorgan, Plaintiff was an advocate for the public cloud, a member of JPMorgan's Cloud strategy council, and an advisor to the COO on the Company's cloud strategy. Plaintiff was directly responsible for strategy, design, product management, engineering, testing, support, and day to day management of the entire technology platforms globally. Prior to that, Plaintiff was a Managing Director at Bank of America Merrill Lynch, where she was the Global Head of Market Risk Technology. In that role, she was responsible for the global technology platforms managing Bank of America's market risk across all its businesses, countries and asset classes – the world's second largest financial services portfolio with $2.5 trillion in total assets. She led a global, diverse team of 350+ engineers, product managers, business analysts, testers, support personnel

across multiple locations in the US, Europe and Asia. Earlier in her career, she held a variety of

technology leadership positions at UBS building trading and analytics systems. (Rowe Decl. ¶¶

5-12.)

Paragraph 42:

> Plaintiff concedes that the financial services industry had generally been slower to adopt
> cloud technology than other industries, and that this context matters to the evaluation of
> her expertise in cloud computing. (Rowe Dep., 94:17–20; 204:11–23.)

> Plaintiff's Response to Paragraph 42: Plaintiff **admits** that the financial services industry

had generally been slower to adopt cloud technology than other industries but **avers** that while

she didn't actively work on a cloud migration until she worked at JPMorgan, she had read and

studied the cloud in order to stay current in technology for her role there. Plaintiff otherwise

**denies** and **avers** that she stated that the context of being a cloud computing expert in a cloud

native company can mean something different than being a cloud expert in financial services.

Plaintiff did consider herself an expert in using the cloud in the financial services industry.

(Rowe Decl. ¶¶ 3,6-10, 14.)

Paragraph 43:

> Before joining Google, Plaintiff had never completed a successful cloud migration. Rather,
> she had approximately one year of experience actively working on a cloud migration before
> she left JP Morgan. Plaintiff had no prior experience building cloud products because JP
> Morgan did not sell them. (Rowe Dep., 89:14-90:3, 94:5-12, 210:3–9.)

> Plaintiff's Response to Paragraph 43: Plaintiff **denies** and **avers** that at the time she was

hired, she was one of the leading people in cloud in financial services and was considered an

expert in the field. While at JPMorgan, Plaintiff ran credit risk systems and ran the team that

migrated those systems to the cloud. Plaintiff **admits** that had not completed the migration at

JPMorgan prior to joining Google. (Rowe Decl. ¶¶ 7-10.)

Paragraph 44:

Plaintiff told a recruiter for the Technical Director, OCTO position that she was not a cloud expert. (Rowe Dep., 206:5–24, 209:5–9; Tomezsko Decl., ¶ 17, Exh. 16 at P000550.)

Plaintiff's Response to Paragraph 44: Plaintiff **admits** but **avers** that she was coming from an industry that had been late to adopting the cloud, and that when she told the recruiter she was not a cloud expert, she was referring to building cloud products. While JPMorgan didn't build cloud products, it sold products, and Plaintiff considered herself to be a cloud expert within the financial services industry. (Rowe Decl. ¶¶ 6-10.)

Paragraph 45:

One of Plaintiff's interviewers noted that she was "a bit more junior than other candidates interviewed for the role," and that "[s]he has experience mostly with one team in one part of the industry and has not done as much on the leadership side because of this." (Tomezsko Decl., ¶ 16, Exh. 15 at GOOG-ROWE-00019103.R.)

Plaintiff's Response to Paragraph 45: Plaintiff **admits** that one interviewer wrote those statements, but **objects** that this interviewer's statement is admissible when offered for the truth of the matter asserted. Plaintiff **avers** that the same interviewer noted that his opinion that she was a "bit more junior" was the only reason for his slightly lower rating. He further noted that Plaintiff had a "long history in this space and should be very good and understanding what can move to Cloud easily and how to address a range of anxieties in the sector" and that "she has already been pushing her company to use the Cloud, well before it was viewed as a reasonable path." Plaintiff **denies** that she was more junior than other candidates interviewed for the role, that her experience was mostly with one team in one part of the industry, or that she had not done as much on the leadership side because of this. (Ex. 19, GOOG-ROWE-00019103.R, 04; Tomezsko Decl. Ex. 15.)

Paragraph 46:

Brian Stevens interviewed Plaintiff and wrote that Plaintiff was "likely not one to drive CxO relationships;" that she "may not be the person to broker CIO meetings;" and that it was "unclear whether she is senior enough to be a trusted advisor to the CxO and expert

enough to counsel those that need to make architecture choices." (Tomezsko Decl., ¶ 16, Exh. 15 at GOOG-ROWE-00019108.R–09.R, 14.R.)

Plaintiff's Response to Paragraph 46: Plaintiff **admits** that Mr. Stevens wrote these comments, but **objects** that this interviewer's statement is admissible when offered for the truth of the matter asserted. Plaintiff **avers** that Mr. Stevens noted that the "strong blend of LOB + IT makes her a great add." He also stated that Plaintiff was a "strong communicator which will be important internally and externally" and that she was able to "clearly enumerate all the reasons why [JPMorgan] should be more aggressively on cloud" and "articulate the challenges of legacy firms in moving faster," that she was "well-versed in IT as she used to run some portion of it as UBS" and that he could "see her actively sponsoring projects at firms and making sure they are successful." Plaintiff **denies** that she was not one likely to drive CxO relationships, that she may not be the person to broker CIO meetings, and that it was unclear whether she was senior enough to be a trusted advisor to the CxO and expert enough to counsel those that need to make architecture choices. (Ex. 19, GOOG-ROWE-00019108.R.)

Paragraph 47:

Hiring manager Will Grannis interviewed Plaintiff and asked her what she knew about Google Cloud Platform. He recorded that her answer was "[n]ot very much." (Tomezsko Decl., ¶ 16, Exh. 15 at GOOG-ROWE-00019115.R–16.R.)

Plaintiff's Response to Paragraph 47: Plaintiff **admits** that Will Grannis wrote that her answer was "not very much," but **avers** that at the time of Plaintiff's interview, Google Cloud Platform ("GCP") had no presence and was not seen as a player in financial services, something Google was trying to address by hiring Technical Directors in the financial services vertical. At that time, Plaintiff had experience with a GCP competitor, Amazon Web Services (AWS) and Mr. Grannis noted that Plaintiff "described knowledge of AWS at high level." Another interviewer noted that Plaintiff "was able to compare GCP to AWS and Azure [another GCP

competitor] in a credible way." (Rowe Decl. ¶ 10; Ex. 19, GOOG-ROWE-00019106.R;

Tomezsko Decl. Ex. 15.)

Paragraph 48:

> Grannis recommended Google hire Plaintiff as an L8 Technical Director "[b]ased on the positive, consistent feedback from the panel, the criticality of financial services as a vertical for Google Cloud, and the candidate's clear demonstration of readiness to make an immediate impact as an L[level]-8. . . ." (Tomezsko Decl., ¶ 16, Exh. 15 at GOOG-ROWE-00019097.R.)

> Plaintiff's Response to Paragraph 48: Plaintiff **admits** but **avers** that while Grannis

outlined the reasons why he supported Ms. Rowe's hire, he did not specify the basis for leveling

her at Level 8, as opposed to a Level 9. (Ex. 19, GOOG-ROWE-00019107.R.)

Paragraph 49:

> Google hired **Nicholas Harteau** as a L9 Technical Director effective May 15, 2017. Harteau was based in New York City. (Lucas Decl., ¶¶ 17, 27.)

> Plaintiff's Response to Paragraph 49: Plaintiff **admits**.

Paragraph 50:

> Harteau had approximately 19 years of experience working for technology companies including Spotify, a Google Cloud client. (Tomezsko Decl., ¶ 18, Exh. 17 at GOOG-ROWE-00056318.R, 21.R–22.R.)

> Plaintiff's Response to Paragraph 50: Plaintiff **admits** but **avers** that Mr. Harteau did not

finish high school or have a college degree. (Ex. 20, GOOG-ROWE-00056318.R, 27R;

Tomezsko Decl. Ex. 17.)

Paragraph 51:

> He was among a very small group of people to have both leadership and engineering experience deploying and migrating products to the cloud at such a large scale. (Grannis Decl., ¶ 35.)

> Plaintiff's Response to Paragraph 51: Plaintiff **denies** and **avers** that Mr. Grannis

believed that Mr. Harteau was among few people in the industry to have both leadership

experience engineering knowledge of how to scale an enterprise with public cloud. Plaintiff

further **denies** that Mr. Grannis considered this information when deciding to hire Mr. Harteau at

a Level 9. (Ex. 20, GOOG-ROWE-00056318.R; Tomezsko Decl. Ex. 17.)

Paragraph 52:

> One of Harteau's interviewers noted that Harteau's "leadership circle talk in March 2016 was one of the best talks I've seen on transformation and migration to the cloud. It seems almost a coup to get him as a candidate in the OCTO." (Tomezsko Decl., ¶ 18, Exh. 17 at GOOG-ROWE-00056326.R.)

> Plaintiff's Response to Paragraph 52: Plaintiff **admits** but **avers** that this interviewer

noted that Mr. Harteau "hasn't done real customer facing roles." Another interviewer noted that

he was "not entirely unbiased" in his interview and that he "tried to be impartial, but its hard"

since they previously had worked together. (Ex. 20, GOOG-ROWE-00056326.R, 33R;

Tomezsko Decl. Ex. 17.)

Paragraph 53:

> Stevens recommended that Google hire Harteau as a L9 Technical Director because Harteau's candidate packet was "one of the strongest . . . [he had] ever seen." (Tomezsko Decl., ¶ 18, Exh. 17 at GOOG-ROWE-00056318.R.)

> Plaintiff's Response to Paragraph 53: Plaintiff **admits** but **avers** that while Grannis

outlined the reasons why he supported Mr. Harteau's hire, he did not specify the basis for

leveling Mr. Harteau at a Level 9, as opposed to a Level 8. (Ex. 20, GOOG-ROWE-00056318.R;

Tomezsko Decl. Ex. 17.)

Paragraph 54:

> Google hired **Eric Schenk** as a L8 Technical Director effective December 4, 2017. He remains in that role currently. He is based in Washington State. (Lucas Decl., ¶¶ 17, 35.)

> Plaintiff's Response to Paragraph 54: Plaintiff **admits**.

Paragraph 55:

> Schenk earned a doctoral degree in computer science from the University of Toronto and

a Masters' of Science degree in computer science from the University of Calgary. He had over 23 years of professional experience working at technology companies like Amazon.com and Electronic Arts where he was the CTO of EATech. (Grannis Decl., ¶ 25.)

Plaintiff's Response to Paragraph 55: Plaintiff **admits**.

Paragraph 56:

Plaintiff concedes that Schenk's experience and skills are comparable to her own. (Rowe Dep., 130:23–131:10.)

Plaintiff's Response to Paragraph 56: Plaintiff **admits**.

Paragraph 57:

Google hired **Mark Kropf** as a L8 Technical Director effective January 6, 2020. He is based in New York City. (Lucas Decl., ¶¶ 17, 29.) He had a technology background and a competing offer for a Managing Director role at a large financial institution. (Grannis Decl., ¶ 19.)

Plaintiff's Response to Paragraph 57: Plaintiff **admits**.

Paragraph 58:

Between November 2016 and year-end 2020, Google hired 11 others into the Technical Director role as L8s in the United States. Aside from Kropf and Penberthy, only one, Jeff Sternberg, was based in New York City at any point during the relevant time period. (Lucas Decl., ¶¶ 17–37.)

Plaintiff's Response to Paragraph 58: Plaintiff **admits**.

Paragraph 59:

Others hired as L8 Technical Directors have varied years of experience, ranging from approximately 14 years to over 31 years working in various industries before coming to Google. (Grannis Decl., ¶¶ 15–27.)

Plaintiff's Response to Paragraph 59: Plaintiff **admits** but **avers** that Google does not

consider years of experience when leveling Technical Directors. (Ex. 11, GOOG-ROWE-

00053464.)

Paragraph 60:

Others hired as L8 Technical Directors include individuals that possess advanced degrees in computer science like Plaintiff. (Grannis Decl., ¶¶ 15, 18, 24, 25.)

Plaintiff's Response to Paragraph 60: Plaintiff **admits** but **avers** that some Technical Directors at Level 8 and Level 9 do not have advanced degrees, or any degrees at all. Plaintiff **denies** that Google considered candidates' advanced degrees when making leveling or pay decisions. (Ex. 20, GOOG-ROWE-00056318.R, 27R; Tomezsko Decl. Ex. 17.)

Paragraph 61:

> Others hired as L8 Technical Directors include individuals with prior experience as a CTO at a technology company. (Grannis Decl., ¶¶ 15, 17, 19, 25.)

Plaintiff's Response to Paragraph 61: Plaintiff **admits** but **avers** that some Technical Directors at Level 8 and Level 9 did not have prior experience as a CTO at a technology company or at any company. Plaintiff **denies** that Google considered candidates' prior experience as a CTO at a technology company when making leveling or pay decisions. (Ex. 20, GOOG-ROWE-00056318.R; Ex. 11, GOOG-ROWE-00053464; Tomezsko Decl. Ex. 17.)

Paragraph 62:

> Others hired as L8 Technical Directors include individuals who spent years actively working on cloud products or performing cloud migrations. (Grannis Decl., ¶¶ 17, 18, 19, 20, 21, 22, 25, 26, 27.)

Plaintiff's Response to Paragraph 62: Plaintiff **admits** but **avers** that some Technical Directors at Level 8 and Level 9 had not spent years actively working on cloud products or performing cloud migrations. Plaintiff **denies** that Google considered candidates' prior experience spending years actively working on cloud products or performing cloud migrations when making leveling or pay decisions. (Ex. 15, GOOG-ROWE-00063516 Tomezsko Decl. Ex. 12-13; Ex. 16, GOOG-ROWE-00061880.)

Paragraph 63:

> Plaintiff's leveling at hire is the only basis for her belief that her compensation and equity refresh grants are lower than certain men. (Rowe Dep., 284:5–22.)

Plaintiff's Response to Paragraph 63: Plaintiff **denies** and **avers** that her basis for her

belief that her compensation and equity refresh grants are lower than certain men include the

leveling at hire, Google's practices with respect to paying higher compensation to people at

higher levels, and information learned in the course of discovery in this lawsuit. (Ex. 18, Rowe

Tr. 158:5-162:20; 284:5-22.)

Paragraph 64:

> Plaintiff does not believe that Will Grannis or Brian Stevens treated her differently because
> of her sex, other than the fact that they participated in the decision to hire her as an L8
> Technical Director. (Rowe Dep., 313:2–22.)

> Plaintiff's Response to Paragraph 64: Plaintiff **admits**.

Paragraph 65:

> The fact that she was hired as an L8 and Eryurek, Strong, Wilson, Donaldson, and Harteau
> were hired as L9s is the only reason Plaintiff believes her leveling at hire was because of
> her sex. (Rowe Dep., 238:5–239:11.)

> Plaintiff's Response to Paragraph 65: Plaintiff **denies** and **avers** that she believes

Google's leveling decision was based on sex because her experience and qualifications were

commensurate with, or exceeded, the Level 9 male Technical Directors; she was performing the

same role as Level 9 male Technical Directors; she was told that all Technical Directors were

being hired as Level 8, but then subsequently learned that Google had hired certain men at Level

9; and subsequent discriminatory behavior against Plaintiff and information learned in the course

of discovery in this lawsuit suggest the existence of bias. (¶ 8, 12-13, 22, 24, 63, 68, *supra*.)

Paragraph 66:

> Plaintiff testified that she is only comparing herself to L9 Technical Directors for purposes
> of her pay claims and when she learned that one of her alleged comparators she identified
> in discovery was an L8, she changed her testimony as to whether she was comparable to
> that employee. (Rowe Dep., 109:4–21.)

> Plaintiff's Response to Paragraph 66: Plaintiff **admits** but **avers** that she is not a lawyer

and that the question of who her comparators are for purposes of pay claims concerns questions of law. Plaintiff further **avers** that her comparators for purposes of her equal pay claims include not only the L9 Technical Directors who were and are paid more than her, but also a broader group of individuals. (¶¶ 196-282, *supra*.)

Paragraph 67:

> In November 2017, Plaintiff complained to Human Resources that she believed she was under-leveled at hire. (Rowe Dep., 23:9–21, 25:3–26:11; Tomezsko Decl., ¶ 19, Exh. 18.)

Plaintiff's Response to Paragraph 67: Plaintiff **admits** but **avers** that in November 2017, Plaintiff raised complaints of discrimination to Melissa Lawrence in Human Resources with respect to her leveling at hire, Google's decision to deny her an equity refresh in 2017, and that she wanted to be considered for the VP Financial Services role, as she was told at her hire that she would be the obvious choice to lead it. (Ex. 18, Rowe Tr., 23:9–21, 25:3–26:11; Tomezsko Decl. Ex. 18.)

Paragraph 68:

> Human Resources investigated her complaint and concluded that she was hired at the appropriate level. (Tomezsko Decl., ¶ 20, Exh. 19.)

Plaintiff's Response to Paragraph 68: Plaintiff **denies** and **avers** that HR conducted only a conclusory investigation, did not question her interviewers, did not review the basis for initial leveling decisions, and told Plaintiff that "there is no process to revisit leveling decisions after hire. The only way to address concerns with level is to seek promotion." While HR wrongly concluded that she was hired at the appropriate level, it had twice compared her experience and qualifications to the Level 9 Technical Directors and noted that Ms. Rowe had similar, if not equal, experience and qualifications to the Level 9 Technical Directors, specifically that "1 Male was hired into an L9 role with 18.9 years of experience, about the same as - or 0.2 years less than

- the complainant." (Tomezsko Decl. Ex. 19; Ex. 13, GOOG-ROWE-00018014, Ex. 21, GOOG-ROWE-00058500.)

Paragraph 69:

>   The main components of total compensation at Google are salary, bonus, and equity awards ("Total Annual Compensation"). (Declaration of Chris Humez ("Humez Decl."), ¶ 4.)

>   Plaintiff's Response to Paragraph 69: Plaintiff **admits**.

Paragraph 70:

>   Salary range is a function of job code, level, and location, and individual salary also takes into account experience and performance. (Humez Decl., ¶¶ 5–6.)

>   Plaintiff's Response to Paragraph 70: Plaintiff **admits** but **avers** that hiring managers and

compensation analysts may deviate from the modeled amount, but that the hiring manager, Mr.

Grannis, did not know any of the Technical Directors' compensation packages at hire, and

therefore did not do so. There is no evidence that discretion was used to determine compensation

for the Level 9 Technical Directors. (Ex. 1, Grannis Tr. 130:19-131:2.)

Paragraph 71:

>   Annual bonus is backward looking and rewards employees for their performance and contributions over the past year. Target bonus is generally expressed as a percentage of an employee's salary, which generally increases with the employee's level. Actual bonus received is a function of performance each year and the amount of time worked during the review cycle. (Humez Decl., ¶ 8.)

>   Plaintiff's Response to Paragraph 71: Plaintiff **admits** but **avers** that Technical Directors

at Level 8 had a 30% bonus target while Technical Directors at Level 9 had a 40% bonus target.

(Ex. 22, GOOG-ROWE-00054266.)

Paragraph 72:

>   Annual equity awards are called "equity refresh grants" at Google. Equity refresh grants reward performance and contributions over the past year but are also intended to be a forward-looking incentive reflecting the employee's criticality and potential. Equity is valued at date of grant. (Humez Decl., ¶ 13.)

Plaintiff's Response to Paragraph 72: Plaintiff **admits** but **avers** that equity refresh grants have guidelines based on job code. Technical Directors at Level 8 had lower equity refresh grant potential than Level 9 Technical Directors. (Ex. 22, GOOG-ROWE-00054266.)

Paragraph 73:

Before she accepted her offer to join Google, Plaintiff negotiated a total compensation package that was significantly above Google's modeled compensation recommendation for her job code in her compensation region. (Humez Decl., ¶¶ 19–21.)

Plaintiff's Response to Paragraph 73: Plaintiff **admits** but **avers** that other Technical Directors at Level 8 and Level 9 negotiated or were offered higher compensation packages, yet Google's recruiter negatively commented that Plaintiff "put up a fight" when it came to compensation. (Greene Decl. ¶¶ 2-8; Ex. 23, GOOG-ROWE-00017999.)

Paragraph 74:

Plaintiff received the second-highest sign-on bonus offered to any Technical Director, regardless of level or gender. (Humez Decl., ¶ 45.)

Plaintiff's Response to Paragraph 74: Plaintiff **admits** but **avers** that Google granted her a sign-on bonus as a replacement for the bonus she forfeited by leaving JPMorgan before her annual bonus was to be paid. Further, Google paid other Technical Directors, at Level 8 and Level 9, higher annual total compensation packages. (Ex. 24, P000235; Greene Decl. ¶¶ 2-8; ¶ 77, *supra*.)

Paragraph 75:

She received two new hire equity grants collectively worth more than $2.3 million at the time of grant. This was one of the highest new hire equity grant packages offered to any Technical Director regardless of level or gender. (Humez Decl., ¶ 45.)

Plaintiff's Response to Paragraph 75: Plaintiff **admits** but **avers** that Google granted her additional equity to replace the equity she forfeited by leaving JPMorgan before her equity vested. Further, Google paid other Technical Directors, at Level 8 and Level 9, higher annual

total compensation packages. (Greene Decl. ¶¶ 2-8; Ex. 24, P000235; ¶ 77, *supra*.)

Paragraph 76:

> In 2017, no employees hired between January 1 and August 28, 2017, were eligible to receive a new hire equity grant that calendar year. Grannis made an exception for Plaintiff and three other employees on his team and awarded them equity refresh grants. (Tomezsko Decl., ¶ 19, Exh. 18; *id.*, ¶ 21, Exh. 20.)

> Plaintiff's Response to Paragraph 76: Plaintiff **admits** but **avers** that Google changed its

equity refresh grant policy after Plaintiff's hire, and she was told at the time of hire she would be

eligible based on prior years' criteria. As a result, Google granted equity refreshes to the four

Technical Directors hired in Q1 2017 with an Exceeds Expectations rating. Mr. Grannis noted to

Melissa Lawrence in HR that "[p]rivately, this did feel a bit like moving goal posts" and that "for

a company that projects the values of fairness and transparency, it's really poor form in how and

when it changed." When Google changed course and decided to award a fraction – $60,000 – of

the equity refreshes it had promised to Plaintiff, Mr. Grannis pointed out that "the new rules

should apply to [a male and female employee] equitably" and proposed pulling a male

employee's down and "mak[ing] Ulku's 90." (Tomezsko Decl. Ex. 20.)

Paragraph 77:

> Plaintiff is one of the most highly compensated L8 Technical Directors. She earned more in Total Annual Compensation each year than all male L8 Technical Directors hired into OCTO between 2016 and 2020 except Scott Penberthy, Kawaljit Gandhi, and Massimo Mascaro. (Humez Decl., ¶¶ 24–38.)

> Plaintiff's Response to Paragraph 77: Plaintiff **admits** that three Level 8 Technical

Directors earned more in Total Annual Compensation between 2016 and 2020 but **avers** that all

Level 9 Technical Directors earned more in Total Annual Compensation in that same period.

Plaintiff was equally or better qualified than Mr. Penberthy, Mr. Gandhi, and Mr. Mascaro. (Ex.

26, GOOG-ROWE-00063692; Greene Decl. ¶¶ 2-9.)

Paragraph 78:

> Gandhi, Mascaro, and Penberthy all do specialized work in applied artificial intelligence ("Applied AI") and machine learning. In addition to fulfilling the other aspects of the Technical Director role, they work with TensorFlow, an end-to-end open source platform for machine learning, a critical area for Google. Penberthy created the canonical reference for all of Google on Applied AI. Mascaro has helped develop a new product category for the Cloud AI platform, and consistently earned Strongly Exceeds Expectations ratings. (Grannis Decl., ¶ 28.)

Plaintiff's Response to Paragraph 78: Plaintiff **admits** but **avers** that Penberthy only

specialized in Applied AI starting in or around October 2019. Further, Google did not take these

factors into account when making pay decisions regarding Ms. Rowe, Mr. Penberthy, Mr.

Gandhi, or Mr. Mascaro, and Penberthy and Mascaro and Plaintiff were all hired into the same

job code. (Ex. 26, GOOG-ROWE-00063692.)

Paragraph 79:

> Gandhi joined OCTO from GBO, Google's sales organization. He has a unique understanding of Google Ads that no one else in OCTO has. He was instrumental in building a joint engagement framework of how Cloud and Ads work together from a technical perspective. He now leads the team working on Applied AI and machine learning. (Grannis Decl., ¶ 28.)

Plaintiff's Response to Paragraph 79: Plaintiff **admits**.

Paragraph 80:

> Plaintiff does not work on Applied AI and machine learning. (Grannis Decl., ¶ 28.)

Plaintiff's Response to Paragraph 80: Plaintiff **admits** but **avers** that other Level 8 and

Level 9 Technical Directors also did or do not work on Applied AI and machine learning, such

as Paul Strong and Jonathan Donaldson. (Rowe Decl. ¶ 13.)

Paragraph 81:

> Except for Gandhi and Grannis, all L8 Technical Directors in OCTO were assigned job code 5560 at the time they were hired. (Lucas Decl., ¶¶ 17–37.)

Plaintiff's Response to Paragraph 81: Plaintiff **admits**.

Paragraph 82:

Only the following Technical Directors (both L8 and L9) were based in New York City from 2016 through the present: Penberthy (until November 2017), Jeff Sternberg, Nicholas Harteau, and Mark Kropf. (Lucas Decl., ¶¶ 18–39.)

Plaintiff's Response to Paragraph 82: Plaintiff **admits**.

Paragraph 83:

Plaintiff's Total Annual Compensation was also greater than Comparator 1 's in 2017. (Humez Decl., ¶¶ 24, 41.)

Plaintiff's Response to Paragraph 83: Plaintiff **denies** and **avers** that when Google hired Comparator 1 in 2017, it offered Mr. Comparator 1 an annual salary of $325,000.00, an annual bonus target of 40%, and a total equity award of 2500 restricted stock units. Google pro-rated his annual bonus because he only worked 3.5 months in 2017. Mr. Comparator 1 's annualized performance bonus for 2017 was approximately $162,666.  When Google hired Plaintiff in 2017, it offered her an annual salary of $290,000.00, an annual bonus target of 30%, and a total equity award of 2,500 restricted stock units.  In 2017, Google paid Ms. Rowe a performance bonus of $116,000.00, $46,666 less than Mr. Comparator 1 's annualized bonus. While Google also paid Plaintiff a one-time cash payment of $250,000.00 and an additional award of restricted stock units in the aggregate amount of $550,000, this was compensation for the performance bonus and equity she forfeited upon departure from her prior job.  (Greene Decl. ¶¶ 2-3; Ex. 27, GOOG-ROWE-00017920.)

Paragraph 84:

Plaintiff received a rating of Exceeds Expectations from 2017 through 2020, the equivalent of a 3 on a 5-point scale. (Tomezsko Decl., ¶¶ 22–25, Exhs. 21–24.)

Plaintiff's Response to Paragraph 84: Plaintiff **admits** but **avers** that her performance

ratings were commensurate with, or exceeded, other Technical Directors at L8 and L9. (Greene

Decl. ¶ 9-17.)

Paragraph 85:

> Plaintiff excelled at the first and third pillars of responsibility for the Technical Director
> position (customer impact and evangelism), but consistently under-performed on the
> second pillar of responsibility (engineering impact). Failure to have a meaningful impact
> on engineering prevents those in OCTO from receiving a higher performance rating.
> (Tomezsko Decl., ¶ 3, Exh. 2 ["Grannis Dep."] at 31:5–21, 183:19–185:3.)

> Plaintiff's Response to Paragraph 85: Plaintiff **admits** that she excelled in the first and

third pillars of responsibility for the Technical Director position (customer impact and

evangelism). Plaintiff **denies** that she consistently underperformed in the engineering pillar. (Ex.

28, GOOG-ROWE-00017918; Ex. 29, GOOG-ROWE-00017889-90; Ex. 30, GOOG-ROWE-

00017932-33; Ex. 28, GOOG-ROWE-00017918; Tomezsko Decl. Ex. 21-22.)

Paragraph 86:

> Plaintiff was consistently told in her performance reviews that she needed to make greater
> engineering impact. Plaintiff conceded that engineering impact was an area of opportunity
> for her in 2017 and 2018. (Tomezsko Decl., ¶ 22, Exh. 21, at 000201; *id.*, ¶ 23, Exh. 22 at
> P000010; *id.*, ¶ 24, Exh. 25; *id.*, ¶ 25, Exh. 24, at P001697.)

> Plaintiff's Response to Paragraph 86: Plaintiff **denies** and **avers** that every performance

review asked employees for "one thing you plan to do to have more impact?" Mr. Grannis did

not state that she needed to make a greater engineering impact in response in 2017. In 2018, Mr.

Grannis advised Plaintiff to "pick a specific area of the platform/technology stack to drive impact

based on knowledge of market needs, enterprise customers, and financial services adoption

patterns." Plaintiff herself stated that she wanted "more focus on engineering" in 2017 and 2018.

(Ex. 28, GOOG-ROWE-00017918; Ex. 29, GOOG-ROWE-00017889-90; Ex. 30, GOOG-

ROWE-00017932-33; Tomezsko Decl. Ex. 21-22.)

Paragraph 87:

As a Technical Director in OCTO, Wilson made significant contributions to the Google Cloud organization and platform. He advised on multiple large-scale mergers and acquisition for Google, and worked directly with Google Cloud's senior leadership on these initiatives. In connection with these acquisitions, he was the subject matter expert on cloud migrations and infrastructure necessary to understand how the target application was performing. His work directly informed Alphabet board-level decision making in 2017. (Grannis Decl., ¶ 32.)

Plaintiff's Response to Paragraph 87: Plaintiff **admits** but **avers** that Plaintiff also made significant contributions to the Google Cloud organization and platform, advised on multiple large-scale mergers and acquisitions for Google, and worked directly with Google Cloud's senior leadership on these initiatives. Mr. Grannis considered Plaintiff one of Cloud's most credible and authentic representatives to the market. (Ex. 28, GOOG-ROWE-00017918; Rowe Decl. ¶¶ 14-17; Tomezsko Decl. Ex. 22.)

Paragraph 88:

Eryurek's leadership in the healthcare industry brought enterprise C-suite-level credibility to the organization, and at least five healthcare clients signed deals with Google Cloud in his first year. He leveraged his knowledge and experience in running software engineering teams to make an immediate impact on the roadmap for Google Cloud's streaming products, creating business opportunities and providing feedback on product development. (Grannis Decl., ¶ 34.)

Plaintiff's Response to Paragraph 88: Plaintiff **admits**, but **denies** that Technical Directors' duties involved having clients sign deals and **avers** that she too has leveraged her knowledge and experience in running software engineering teams to make an immediate impact on the roadmap for Google Cloud's products, creating business opportunities and providing feedback on product development. (Rowe Decl. ¶ 15.)

Paragraph 89:

While he was still in OCTO, Harteau became deeply involved with Google's engineering teams to improve their monitoring and logging systems, and give clients greater confidence in Google Cloud's monitoring capabilities. (Grannis Decl., ¶ 36.)

Plaintiff's Response to Paragraph 89: Plaintiff **admits**.

29

Paragraph 90:

> Strong leveraged his deep experience in cloud computing to secure important partnerships with some of the largest companies in the world, including a multinational chemical company where he acts as a technical advisory board member. He is currently working with Google's area tech leads on an engineering initiative of massive scope and potentially industry-wide implications. (Grannis Decl., ¶ 38.)

> Plaintiff's Response to Paragraph 90: Plaintiff **admits** but **avers** that she is working

alongside Strong on this same engineering initiative (███████████████) and that Plaintiff's

work on this initiative was promoted and publicized by Google. (Rowe Decl. ¶ 16,

https://www.linkedin.com/posts/google-cloud_ttechgooglecloud-activity-

6851840357764759552-OZrQ.)

Paragraph 91:

> Donaldson makes significant contributions to engineering to advance the roadmap for the Google Kubernetes Engine, the internet's first fully manage service on Kubernetes. He people manages other Technical Directors. He created a hybrid cloud working group to set Google's strategy in this space; stood up the first OCTO engineering pillar group for Cloud Services Platform; and authored a whitepaper Google leadership terms a "must read" on hybrid cloud. (Grannis Decl., ¶ 40.)

> Plaintiff's Response to Paragraph 91: Plaintiff **admits**.

Paragraph 92:

> Google Cloud attempted to "verticalize," *i.e.*, consolidate teams and resources devoted to advancing Cloud within a particular industry (or "vertical"). OCTO and the Global Alliances Industry Partnership ("GAIP") team reporting to Tariq Shaukat had each made separate efforts to verticalize, but in or around late 2017, leadership decided that Shaukat's GAIP team would exclusively own the strategy for industry verticals within Cloud. (Tomezsko Decl., ¶ 4, Exh. 3 ["Shaukat Dep."] at 42:20–43:11, 82:8–83:10.)

> Plaintiff's Response to Paragraph 92: Plaintiff **admits.**

Paragraph 93:

> Google transferred four employees from OCTO with an industry vertical focus—Plaintiff (financial services), Wilson (energy), Eryurek (healthcare), and Jeff Kember (media and entertainment)—to report to Shaukat effective June 25, 2018. (Lucas Decl., ¶¶ 18, 23, 39; Tomezsko Decl., ¶ 26, Exh. 25, at GOOG-ROWE-P-00000774.)

Plaintiff's Response to Paragraph 93: Plaintiff **admits**.

Paragraph 94:

The transfer did not impact compensation or result in a change to Plaintiff's, Wilson, or Eryurek's job code or level. (Humez Decl., ¶¶ 24, 40, 43; Lucas Decl., ¶¶ 18, 23, 29.)

Plaintiff's Response to Paragraph 94: Plaintiff **admits**.

Paragraph 95:

On multiple occasions, Plaintiff expressed her displeasure at being transferred out of OCTO and she even attempted to decline the transfer. (Shaukat Dep., 94:7–98:21; Tomezsko Decl., ¶ 26, Exh. 25 at GOOG-ROWE-P-00000773; *id.*, ¶ 27, Exh. 26; *id.*, ¶ 28, Exh. 27, at GOOG-ROWE-00017425.)

Plaintiff's Response to Paragraph 95: Plaintiff **denies** and **avers** that she raised

complaints about Google's failure to meaningful consider her for the VP Financial Services role

and respectfully declined the transfer after Mr. Shaukat's indicated that the GCTL role to which

she would be assigned was more junior than her then-current role. Mr. Shaukat later clarified that

the role would be the same as what she was already doing in OCTO. (Tomezsko Decl. Ex. 26.)

Paragraph 96:

Plaintiff's male colleagues were also excluded from e-mail distributions lists after transferring out of OCTO to GAIP.  (Tomezsko Decl., ¶ 29, Exh. 28.)

Plaintiff's Response to Paragraph 96: Plaintiff **denies** and **avers** that Mr. Shaukat left Ms.

Rowe off of group emails and excluded her from meetings that included all his other male direct

reports. In contrast, Ms. Rowe's male colleagues' initial exclusion from distribution lists was not

intentional, but rather was the result of a system error after their reporting line changed.

(Tomezsko Decl. Ex. 29; Ex. 31, P0000194; Ex. 32, GOOG-ROWE-P-00017418.R.)

Paragraph 97:

Plaintiff raised that she had not been invited to Shaukat's staff meeting in August 2018.

Shaukat asked that she be added, and thereafter Plaintiff appeared on staff meeting invitations. (Tomezsko Decl., ¶¶ 30–32, Exhs. 29–31.)

Plaintiff's Response to Paragraph 97: Plaintiff **admits** that she complained directly to Mr.

Shaukat on August 20, 2018 that she was his only direct report that he had not included on his

staff meeting invite and that she had previously raised the issue with others. Plaintiff **avers** that

over a month later, on September 21, 2018, Mr. Shaukat asked his assistant to add Plaintiff to his

staff emails. (Tomezsko Decl. Ex. 29, 30.)

Paragraph 98:

Plaintiff has no reason to believe that any of these explanations for the failure to include her in e-mails lists of Shaukat's staff meetings are false. (Rowe Dep., 174:21–175:24.)

Plaintiff's Response to Paragraph 98: Plaintiff **denies** and **avers** that Mr. Shaukat's

explanations for why she was excluded from his email lists changed over time. While Ms. Rowe

did not have a specific reason to believe Mr. Shaukat's shifting explanations were false, she

knew that her male peers were in these meetings and she was not, and that Mr. Shaukat treated

her differently. (Ex. 18, Rowe Tr. 174:21–175:24.)

Paragraph 99:

Shaukat held an offsite meeting for his team in October, 2018. Plaintiff attended that offsite meeting and said she enjoyed it. (Tomezsko Decl., ¶ 33, Exh. 32.)

Plaintiff's Response to Paragraph 99: Plaintiff **admits**.

Paragraph 100:

Plaintiff is not aware of any other offsite meetings that occurred while she reported to Shaukat that she was not invited to. (Rowe Dep., 170:3–15.)

Plaintiff's Response to Paragraph 100: Plaintiff **admits** but **avers** that Mr. Shaukat also

excluded her from staff meetings at least four or five times where financial services was being

discussed. Mr. Shaukat also excluded Plaintiff from customer discussions where financial

services clients were discussed. (Ex. 18, Rowe Tr. 170:16-172:12.)

Paragraph 101:

On June 13, 2018, Plaintiff expressed interest in a role on Shaukat's team as the head of the financial services industry vertical ("FSVL Role"). (Tomezsko Decl., ¶ 27, Exh. 26)

Plaintiff's Response to Paragraph 101: Plaintiff **admits** but **avers** that she had previously

expressed interest in the role and she was told at hire that she would be the obvious choice for

the role. (Ex. 18, Rowe Tr. 211:6-24.)

Paragraph 102:

Shaukat was the hiring manager for this role. (Shaukat Dep., 16:5–17:2.) He considered both internal and external candidates, and permitted Plaintiff to skip the initial screening interviews as she was already a Google employee. (Tomezsko Decl., ¶ 27, Exh. 26.)

Plaintiff's Response to Paragraph 102: Plaintiff **admits**.

Paragraph 103:

Defining and executing a cohesive global strategy for the financial services industry vertical was the expectation for the FSVL Role. That individual would need the business acumen to drive Google Cloud's go-to-market strategy, and sufficient technical skills to identify market opportunities and oversee product strategy. (Tomezsko Decl., ¶ 34, Exh. 33, at GOOG-ROWE-00017500)

Plaintiff's Response to Paragraph 103: Plaintiff **admits** and **avers** that Ms. Rowe was

qualified for the role. (Tomezsko Decl. Ex. 16, 33.)

Paragraph 104:

Plaintiff was interviewed for the FSVL role in or around August 2018 and the feedback was mixed. Two of her four interviewers felt she struggled to articulate a compelling vision for developing the financial services industry vertical. (Shaukat Dep., 146:8–147:9, 149:17–151:8, 153:12–24; Tomezsko Decl., ¶ 35, Exh. 34.)

Plaintiff's Response to Paragraph 104: Plaintiff **denies** and **avers** that in August 2018,

she was interviewed by four men (Sebastien Marotte, Jason Martin, Darryl Willis, and Vats

Srivatsan) for the VP Financial Services. Mr. Stevens was supposed to interview Plaintiff but

recused himself given his earlier statement that he thought she was a good candidate for the role,

but he shared his support for Plaintiff's candidacy with Mr. Shaukat. None of her interviewers

provided interview feedback or a formal written hiring recommendation in gHire. The recruiter

for the role, Stuart Vardaman, reached out to her interviewers nearly three months later to

request feedback. Only one of her interviewers provided written feedback over email, which did

not state that Plaintiff struggled to articulate a compelling vision for developing the financial

services industry vertical. (Ex. 33, GOOG-ROWE-00017410-11; Gelfand Decl. ¶ 9-11; Ex. 35,

Shaukat Tr. 144:17- 147:9; Ex. 36, GOOG-ROWE-00017639; Tomezsko Decl. Ex. 34.)

Paragraph 105:

> Based on this feedback, Shaukat concluded that she was not a good fit for the role.
> Nevertheless, he asked Diane Greene, then-CEO of Google Cloud, to meet with Plaintiff
> because she had done so for other finalist candidates for the role. If Ms. Greene thought
> that Plaintiff would be a good fit for the role, Shaukat was willing to revisit his initial
> conclusion. (Shaukat Dep., 162:10–163:24.)

> Plaintiff's Response to Paragraph 105: Plaintiff **denies** and **avers** that Mr. Shaukat did

not rely on any of Plaintiff's interview feedback when he decided to deny her the role, and rather

had decided even before receiving interview feedback that she would not be given the role.  Mr.

Shaukat asked Ms. Greene to interview Plaintiff because Mr. Stevens felt strongly about her

candidacy and also as a "retention" exercise. (Ex. 37, GOOG-ROWE-00017565.R; Ex. 35,

Shaukat Dep. 161:14-162:20.)

Paragraph 106:

> As of November 2018, the two finalists for the FSVL Role were women, one external and
> one internal. (Tomezsko Decl., ¶ 36, Exh. 35.) Plaintiff does not know enough about either
> candidate's qualifications to say whether she is more or less qualified than they were for
> the FSVL Role. (Rowe Dep., 264:18–265:23, 267:3–11.)

> Plaintiff's Response to Paragraph 106: Plaintiff **admits** that Google considered two

women as finalists for the VP Financial Services role, which ultimately went to a man – Mr.

Breslow, and **avers** that she knew enough about Mr. Breslow's experience and qualifications to know that she was more qualified than him for the role. (Ex. 18, Rowe Tr. 264:6-17.)

Paragraph 107:

> On November 7, 2018, Plaintiff sent an email to Shaukat and Ms. Greene raising that her interview with Ms. Greene had not yet been scheduled, and that she had been underleveled at hire. Shaukat immediately forwarded the email to Human Resources, who investigated Plaintiff's concern. (Tomezsko Decl., ¶ 37, Exh. 36.)

> Plaintiff's Response to Paragraph 107: Plaintiff **admits** that she emailed Mr. Shaukat and

Ms. Greene raising that her interview with Ms. Greene had not yet been scheduled, that her background was particularly well-suited for the role and was actually the role she was told she would eventually take on when she was hired. She also raised concerns that leveling decisions made at hire prevented her from being meaningfully considered for the role and expressed that she was the most qualified candidate for the role. Plaintiff **denies** that HR investigated her complaint and **avers** that rather than investigate the matter, Melissa Lawrence stated that they had already "looked into it" and stood by Google's original leveling decisions. (Tomezsko Decl. Ex. 36.)

Paragraph 108:

> Human Resources investigated and concluded that the concern was unsubstantiated. (Tomezsko Decl., ¶ 38, Exh. 37.)

> Plaintiff's Response to Paragraph 108: Plaintiff **denies** and **avers** that Google's policy

was to refer complaints of discrimination to Employee Relations for investigation, which HR did not do at that time. HR did not interview Mr. Grannis at that time as to the reason or basis for initial leveling decisions. Rather, HR compared Plaintiff to her male peers at L8 and L9. HR concluded that her "work experience [was] consistent with the average years of work experience for those hired as L8 directors" and that they determined she "had male peers with both fewer

years and more years of work experience also hired as L8 directors." Moreover, HR's notes

indicated that Plaintiff had similar experience but that "Tech versus non-Tech experience was the

most heavily considered factor when gauging L8 versus L9 for similar years of work experience"

HR's review also showed that there was at least one L9 director who had fewer years of

experience. Moreover, the lead recruiter for the Technical Director role, Ms. Burdis, considered

the boundaries between candidates' years of experience as "not concrete" and didn't ascribe any

meaningful difference to candidates with 19 to 20 years of experience, 19 to 21 years of

experience, or 23 to 25 years of experience. Google's compensation policies and practices

explicitly provide that decision makers are not to "make leveling recommendations based on

factors outside of interview process, such as years of experience…" (Ex. 11, GOOG-ROWE-

00053464; Ex. 38, Jamison Tr. 15:8-18; Ex. 39, P000102; Ex. 40, GOOG-ROWE-00018015; Ex.

21, GOOG-ROWE-00058500; Ex. 10, Burdis Tr. 30:7-14, 44:6- 46:6.)

Paragraph 109:

> Ms. Greene announced that she was leaving Google on November 16, 2018. Thomas Kurian, then-an executive at Oracle, would replace Ms. Greene as the CEO of Google Cloud at the end of the year. (Tomezsko Decl., ¶ 39, Exh. 38.)

> Plaintiff's Response to Paragraph 109: Plaintiff **admits**.

Paragraph 110:

> Plaintiff's scheduled meeting with Ms. Greene about the FSVL Role was cancelled as a result of Ms. Greene's announced departure. (Tomezsko Decl., ¶ 40, Exh. 39.)

> Plaintiff's Response to Paragraph 110: Plaintiff **admits**.

Paragraph 111:

> In light of this news, Shaukat paused the search for the FSVL Role so he would have more time to understand Kurian's plans for the future of Google Cloud. He was reluctant to proceed with an offer to his preferred candidate for the role, asking her to give up her current job for what was an uncertain future. (Tomezsko Decl., ¶ 41, Exh. 40.)

Plaintiff's Response to Paragraph 111: Plaintiff **admits**.

Paragraph 112:

In December 2018, Shaukat informed Plaintiff that he was pausing the search to fill the FSVL Role, but that she would not have gotten the role anyway given the feedback he received about her candidacy during the interview process. (Shaukat Dep., 210:3–211:14; Tomezsko Decl., ¶ 42, Exh. 41;

Plaintiff's Response to Paragraph 112: Plaintiff **admits** that Mr. Shaukat met with

Plaintiff in December 2018 after Mr. Shaukat received talking points and a general script from

HR on how to communicate to Plaintiff that she would not be getting the role. (Ex. 41, GOOG-

ROWE-00017638.)

Paragraph 113:

There were clients who were still interested in certain of Google Cloud's products and services for the financial services industry. Shaukat did not want to lose those opportunities, so in or around late 2018 or early 2019, he limited the scope of the financial services industry vertical to these specific initiatives and asked one of his direct reports, Stuart Breslow, to oversee them on an interim basis. (Shaukat Dep. 239:11–242:23.)

Plaintiff's Response to Paragraph 113: Plaintiff **denies** that the scope of Mr. Breslow's

role as the VP Financial Services was limited to specific initiatives and **avers** that his role was

the same as the other vertical leads. Mr. Shaukat required Plaintiff to report to Mr. Breslow

during this time. Mr. Shaukat appointed Mr. Breslow to the role in November 2018 before he

communicated to Plaintiff that she would not be getting the role. (Ex. 35, Shaukat Tr. 239:11-

241:11; Ex. 42, Breslow Tr. at 149:11-14, 133:3-134:15, 142:2-20.)

Paragraph 114:

Google had hired Breslow in June 2018 as an L9 Managing Director of Technology and Policy based in New York City. He served as the main point of contact for senior executives in regulated industries who wanted to explore a partnership with Google Cloud. (Lucas Decl., ¶ 96; Tomezsko Decl., ¶ 43, Exh. 42 at GOOG-ROWE-P00000827.)

Plaintiff's Response to Paragraph 114: Plaintiff **admits** but **avers** that Mr. Breslow's job

title was Director, Solutions Consultant and that he served in this role for approximately four

months before Mr. Shaukat appointed him the VP Financial Services. (Ex. 43, GOOG-ROWE-

00054267.)

Paragraph 115:

> Breslow was an industry-recognized authority on anti-money laundering, having spent
> over 30 years in financial services, including as Chief Compliance Officer at Morgan
> Stanley and a partner at McKinsey, focusing on issues facing the financial services
> industry. (Shaukat Dep., 72:2–19, 242:24-243:6; Tomezsko Decl., ¶ 43, Exh. 42 .)

> Plaintiff's Response to Paragraph 115: Plaintiff **admits** that Mr. Breslow had thirty years

of experience in consulting roles and within the financial services industry, but **avers** that Mr.

Breslow had no demonstrated leadership or experience in Technology, Google Cloud technology,

or customer engagement. Mr. Breslow admitted he did not satisfy the requirements for the VP

Financial Services role. (Ex. 44, GOOG-ROWE-00018551; Ex. 42, Breslow Tr. 44:12- 47:25.)

Paragraph 116:

> Breslow was not promoted in connection with Shaukat's request and his level and job code
> did not change as a result. (Lucas Decl., ¶ 96.)

> Plaintiff's Response to Paragraph 116: Plaintiff **denies** that Mr. Breslow was not

promoted in connection with the VP Financial Services role and **avers** that the position had

greater responsibilities, prestige, and exposure than Mr. Breslow's prior role. Plaintiff **admits**

that his level and job code did not change. (Tomezsko Decl. Ex. 33.)

Paragraph 117:

> Kurian's strategy for the industry verticals within Google Cloud ultimately resulted in
> organizational changes, and both Breslow and Shaukat left Google in or around July 2020.
> (Shaukat Dep., 281:18–283:14; Lucas Decl., ¶ 96.)

> Plaintiff's Response to Paragraph 117: Plaintiff **admits**.

Paragraph 118:

> Shaukat believed that Plaintiff was unhappy about not getting the FSVL Role. She also

expressed dissatisfaction with Shaukat's insistence that she focus on specific clients, and that she limit the frequency of her international speaking engagements. (Shaukat Dep., 257:3–258:12.)

Plaintiff's Response to Paragraph 118: Plaintiff **admits** but **avers** that her unhappiness stemmed from the way Mr. Shaukat had diminished her role and responsibilities and had asked her to report to Mr. Breslow, who was less qualified than her for the VP Financial Services role. (Rowe Decl. ¶ 32.)

Paragraph 119:

In response, Shaukat gave Plaintiff three options: (a) stay on Shaukat's team in the financial services industry vertical working on specific initiatives with Breslow; (b) find a new role on Shaukat's team that would allow Plaintiff to continue being an individual contributor like she had been in OCTO; or (c) return to OCTO reporting to Will Grannis, but in a horizontal role. (Shaukat Dep., 257:3–259:4, 261:2–10; Rowe Dep., 279:7–24.)

Plaintiff's Response to Paragraph 119: Plaintiff **denies** and **avers** that Shaukat offered three options: (a) stay on Shaukat's team in the financial services industry vertical working on specific initiatives under and reporting to Breslow, who she was more qualified than; (b) look for a new role in Google; or (c) return to OCTO reporting to Will Grannis, but without a focus on financial services. (Ex. 18, Rowe Tr. 279:7-24.)

Paragraph 120:

A horizontal role meant that Plaintiff would work across multiple industries in an area like hybrid cloud which had universal applicability. If she wanted to pursue opportunities in the financial services industry, she would have to coordinate with Shaukat's team, which remained responsible for setting the strategy for all industry verticals (including financial services) since the reorganization in late 2017. (Shaukat Dep., 261:2–10; Grannis Dep., 191:4–192:12.)

Plaintiff's Response to Paragraph 120: Plaintiff **admits** but **avers** that the horizontal role offered by Google would not allow Plaintiff to work in financial services. Mr. Shaukat did not explain what focusing on hybrid cloud meant. (Ex. 18, Rowe Tr. 280:3-15.)

Paragraph 121:

Plaintiff chose to return to OCTO reporting to Will Grannis, and to focus on hybrid cloud. That change became effective April 26, 2019. (Rowe Dep., 280:16–18; Lucas Decl., ¶ 18.)

<u>Plaintiff's Response to Paragraph 121:</u> Plaintiff **admits**.

Paragraph 122:

Plaintiff admittedly does not know why she was asked to focus exclusively on hybrid cloud. (Rowe Dep., 298:9–299:17.)

<u>Plaintiff's Response to Paragraph 122:</u> Plaintiff **admits** that she does not know why she

was asked to focus exclusively on hybrid cloud but **avers** that Google removed all of her

financial services related responsibilities in doing so. (Ex. 18, Rowe Tr. 298:9-24.)

Paragraph 123:

None of the other employees who transferred out of OCTO and onto Shaukat's team were given the option to return to OCTO. (Shaukat Dep., 257:3–258:12.)

<u>Plaintiff's Response to Paragraph 123:</u> Plaintiff **admits** and **avers** that other employees

who transferred out of OCTO were able to move into different roles. (Ex. 17, Wilson Tr. 148:16-

22; Ex. 45, GOOG-ROWE-00060462-63.)

Paragraph 124:

Plaintiff's level did not change after she moved back to OCTO in 2019. (Lucas Decl., ¶ 18.)

<u>Plaintiff's Response to Paragraph 124:</u> Plaintiff **admits**.

Paragraph 125:

Plaintiff's Total Annual Compensation did not decrease after she moved back to OCTO in 2019. Her Total Annual Compensation increased each year. (Humez Decl., ¶ 24.)

<u>Plaintiff's Response to Paragraph 125:</u> Plaintiff **admits** but **avers** that her annual

compensation in each year was lower than her L9 peers. (Greene Decl. ¶¶ 2-8.)

Paragraph 126:

In February 2020, Plaintiff met Kirsten Kliphouse, head of North American Sales at

Google. Kliphouse mentioned she was recruiting for a Vice President-level sales role on her team. Plaintiff expressed interest, and Kliphouse told her to email Human Resources. (Rowe Dep., 289:24–290:17, 335:25–336:3, 342:2–343:2.)

Plaintiff's Response to Paragraph 126: Plaintiff **admits** that she met with Ms. Kliphouse

in February 2020 but **avers** that Ms. Kliphouse told her she was hiring for a Vice President –

Financial Services Industry Lead. Plaintiff expressed interest in the role and Ms. Kliphouse told

Plaintiff to email the recruiter. (Ex. 18, Rowe Tr. 342:2-343:2.)

Paragraph 127:

Plaintiff emailed the executive recruiter, Stuart Vardaman, about the role on February 4, 2020. Vardaman responded by sending Plaintiff a job description for the role. (Tomezsko Decl., ¶ 44, Exh. 43, at GOOG-ROWE-00060572.)

Plaintiff's Response to Paragraph 127: Plaintiff **admits** but **avers** that after Mr.

Vardaman forwarded her the job description, he did not respond to her request to provide her

with guidance on next steps. Days later, after being unresponsive to Plaintiff's emails requesting

follow-up on the application process, Mr. Vardaman told Plaintiff that he would schedule a

meeting to discuss an "update" with her, where he told her she would not be considered for the

role. (Ex. 18, Rowe Tr. 291:2-23; Tomezsko Decl. Ex. 43.)

Paragraph 128:

The role required leading the sales team in Ms. Kliphouse's organization and managing that team to meet or exceed a sales quota. One of the expressed qualifications for the role was "[p]roven success managing a sales/business development organization to meet and exceed revenue goals." (Tomezsko Decl., ¶ 8, Exh. 7 ["Vardaman Dep."] at 134:5–19; *id.*, ¶ 45, Exh. 44 at GOOG-ROWE-00060561.)

Plaintiff's Response to Paragraph 128: Plaintiff **denies** and **avers** that Ms. Kliphouse and

Rob Enslin were "open to 'thinking differently' about this role, so it is not necessarily a

prerequisite that someone has carried a sales revenue number." (Tomezsko Decl. Ex. 43.)

Paragraph 129:

Plaintiff never managed a sales team and her primary responsibilities are not in sales.

(Rowe Dep., 347:19–348:2, 358:24–360:20, 363:9–14.)

Plaintiff's Response to Paragraph 129: Plaintiff **admits** but **avers** that she is involved

with sales at Google and has sales experience. (Ex. 18, Rowe Tr. 358:24-359:6.)

Paragraph 130:

> In late February 2020, Vardaman told Plaintiff that Google would not be moving forward with her candidacy because they wanted someone with more commercial experience, which Plaintiff understood to mean more sales experience. (Rowe Dep., 388:24–389:10, 394:8–16.)

Plaintiff's Response to Paragraph 130: Plaintiff **admits** that in February 2020, Vardaman

told Plaintiff that Google would not be considering her for the role, but **avers** that he stated the

reason was because they wanted someone with more direct sales experience, and also claimed

that the decision was based on Plaintiff's "two-hour interview" with Ms. Kliphouse. Plaintiff had

never been interviewed by Ms. Kliphouse and had only met with Ms. Kliphouse on one prior

occasion – an informal coffee meeting that Plaintiff had requested.  (Ex. 18, Rowe Tr. 389:11-

390:2, 394:8-16.)

Paragraph 131:

> The person ultimately hired into the role was Yolanda Piazza, who was listed as one of *American Banker's* most powerful women in 2019, and whom Vardaman considered to be more of an "industry titan" in financial services than Plaintiff. (Vardaman Dep. 140:9–141:6, 143:4–13.)

Plaintiff's Response to Paragraph 131: Plaintiff **admits** that Yolanda Piazza was

ultimately hired into the role and that she was listed as one of *American Banker's* most powerful

women in 2019. Plaintiff **avers** that Mr. Vardaman did not know what Plaintiff's reputation was

externally with respect to her job, could not recall if Google had even interviewed Piazza at that

point, could not recall a basis to compare Plaintiff and Ms. Piazza, and was not aware of

Plaintiff's external recognition. (Ex. 47, Vardaman Tr. 140:20-141:9, 143:4-144:21.)

Paragraph 132:

Plaintiff is not aware of Piazza's qualifications for the role, and cannot say whether she was more qualified for the role than Piazza. (Rowe Dep., 373:9–374:10.)

Plaintiff's Response to Paragraph 132: Plaintiff **denies** and **avers** that she is not aware of

all of Ms. Piazza's qualifications, but believed herself to be well-qualified for the role. (Ex. 18,

Rowe Tr. 373:19-374:2.)

Paragraph 133:

**Nick Harteau** left OCTO in September 2018, to focus exclusively on managing a product team working on Stackdriver, a cloud computing system providing performance and diagnostics data to public cloud users. In his new role he reported to different managers and took on responsibility for managing direct reports. (Grannis Decl., ¶ 36; Lucas Decl., ¶ 27.)

Plaintiff's Response to Paragraph 133: Plaintiff **admits**.

Paragraph 134:

Harteau completed a ladder transfer to the Software Engineering job ladder effective February 6, 2020. He became an L8 on the new job ladder. (Lucas Decl., ¶ 27.)

Plaintiff's Response to Paragraph 134: Plaintiff **admits**, but **avers** that Harteau's

compensation did not decrease as a result of the transfer and continued to exceed Plaintiff's year

over year. (Greene Decl. ¶¶ 2-3.)

Paragraph 135:

A ladder transfer occurs when an employee applies for a role in a new job family. As part of the process, an employee performs the job in the target job ladder for a trial period (which can last several months) to demonstrate that they have the requisite skill and domain knowledge to succeed in the new role. If successful, transfers may result in a downward adjustment to level, as the employee's level is calibrated to the target job ladder. (Lucas Decl., ¶¶ 10–11.)

Plaintiff's Response to Paragraph 135: Plaintiff **admits.**

Paragraph 136:

In August 2018, **Evren Eryurek** started working in the Data Analytics organization reporting to Sudhir Hasbe in a product manager role.  He completed a ladder transfer to the

Product Manager job ladder in March 2019. He became an L8 as a result. (Lucas Decl., ¶ 23.) He now leads all streaming data platform product management for Cloud. (Grannis Decl., ¶ 34.)

Plaintiff's Response to Paragraph 136: Plaintiff **admits**, but **avers** that Eryurek's

compensation did not decrease as a result of the transfer and continued to exceed Plaintiff's year

over year. (Greene Decl. ¶¶ 2-4.)

Paragraph 137:

Comparator 4 transferred to the Google Cloud Technology Solutions team reporting to Roslyn Litchfield, Senior Director Product Management, effective February 2020. In August 2020, he started working as a Product Manager and began the process to transfer to the Product Manager job ladder. He left Google before that ladder transfer was complete, but expected his level to decrease to L8 as a result. (Lucas Decl., ¶ 39; Tomezsko Decl., ¶ 10, Exh. 9 ["Comparator 4 Dep."] at 159:16–161:25.)

Plaintiff's Response to Paragraph 137: Plaintiff **admits**, but **avers** that Comparator 4's

compensation did not decrease as a result of the transfer and continued to exceed Plaintiff's year

over year. (Greene Decl. ¶¶ 2, 4.)

Paragraph 138:

Plaintiff does not know the day-to-day responsibilities of Director-level Application Engineers, Software Engineers, or Product Managers. (Rowe Dep., 324:21–325:19.)

Plaintiff's Response to Paragraph 138: Plaintiff **admits** but **avers** that it was "normal

course of business within Google" for individuals in Engineering Director roles to move into

other ladders because Engineering directors had transferable skills that facilitated internal

mobility. (Ex. 35, Shaukat Tr. 87:19-90:5.)

Paragraph 139:

Plaintiff has identified 31 L8 and L9 employees in the **Director, Software Engineer role ("Directors, SWE")**. (Lucas Decl., ¶ 40–71.) They work in job codes associated with either the Software Engineering job ladder if they are individual contributors, or the Tech Manager job ladder if they are people managers. (*Id.*, ¶ 40 & Exhs. 1, 2.)

Plaintiff's Response to Paragraph 139: Plaintiff **admits.**

Paragraph 140:

The core responsibility of a Director, SWE is actually writing the code to build Google's products, services, and infrastructure, or (in the case of a people manager) reviewing and approving code written by other engineers. (Tomezsko Decl.,¶ 6, Exh. 5 ["Lucas Dep."], 107:13–109:16.)

Plaintiff's Response to Paragraph 140: Plaintiff **denies** and **avers** that a SWE Director's

main responsibility is not to write code, review code, or approve code themselves. Those duties

are associated with lower level employees on the SWE ladder. (Ex. 2, GOOG-ROWE-00061501-

02; Tomezsko Sealing Decl. ¶ 18, Ex. Q.)

Paragraph 141:

Directors, SWE create innovative new algorithms, libraries, or services that power Google's products and features. They design software and hardware innovations that power parts of Google. They work with data and signals impacting product quality, reliability, precision/recall, usage, revenue, etc. They create development infrastructure that increases productivity, quality, and efficiency across Google. They reduce Google's "technical debt" by merging or deprecating portions of Google's infrastructure. (Lucas Decl., ¶ 40, Exh. 1 at GOOG-ROWE-00061506–09.)

Plaintiff's Response to Paragraph 141: Plaintiff **denies** that all SWE Directors perform

these duties and **avers** that all SWE Directors drive major technical, product, and business

strategies, operate at a high level and strongly influence executive decisions.  Lower-level

employees on the SWE ladder actually make direct technical contributions. (Ex. 2, GOOG-

ROWE-00061501-02; Tomezsko Sealing Decl. ¶ 18, Ex. Q.)

Paragraph 142:

They contribute to Product Requirement Documents, documents that define what products the engineer or team will build and how they will build them. (Lucas Dep., 173:14–19.)

Plaintiff's Response to Paragraph 142: Plaintiff **denies** and **avers** that this role

description is applicable to lower-level employees on the SWE ladder. (Ex. 2, GOOG-ROWE-

00061501-02; Tomezsko Sealing Decl. ¶ 18, Ex. Q.)

Paragraph 143:

> Those who apply for a Director, SWE position must submit code for review during the application process. (Lucas Dep., 174:18–24.)

> Plaintiff's Response to Paragraph 143: Plaintiff **denies** and **avers** that Google

interviewed Plaintiff for a SWE Director role and did not ask her to submit code for review

during the application process. (Rowe Decl. ¶ 19.)

Paragraph 144:

> Plaintiff has not contributed code to Google's products, services, or infrastructure at any point during her employment. (Rowe Dep., 327:15–24.)

> Plaintiff's Response to Paragraph 144: Plaintiff **admits** and **avers** that SWE Directors

similarly do not contribute code, as that is a job duty applicable to lower-level employees on the

SWE ladder. (Ex. 2, GOOG-ROWE-00061501-02; Tomezsko Sealing Decl., Ex. Q.)

Paragraph 145:

> A majority of Directors, SWE Plaintiff identified are people managers (25 of 31), and supervise(d) production engineering teams at Google. (Lucas Decl., ¶¶ 41–71.) What percentage of time is spent on people management versus making technical contributions varies, but Google expects between 20% and 50% of an employee's time be spent managing others. (Lucas Decl., ¶ 40, Exh. 2 at GOOG-ROWE-00061490.)

> Plaintiff's Response to Paragraph 145: Plaintiff **admits**, but **avers** that Google does not

distinguish between People Managers and Individual Contributors for purposes of leveling or

compensation. (Ex. 4, Lucas Tr. 123:22-23.)

Paragraph 146:

> None of the Directors, SWE Plaintiff identified ever worked in OCTO reporting to Will Grannis, or on the GAIP team reporting to Tariq Shaukat. (Lucas Decl., ¶¶ 41–71.)

> Plaintiff's Response to Paragraph 146: Plaintiff **admits**.

Paragraph 147:

> Plaintiff has identified three L8 and L9 employees in the **Director, Application Engineer**

role (**"Directors, AE"**). These individuals work in job codes associated with the Application Engineering job ladder. All are people managers. (Lucas Decl., ¶¶ 72–75 & Exh. 3.)

<u>Plaintiff's Response to Paragraph 147:</u> Plaintiff **admits**.

Paragraph 148:

As of November 4, 2019, only one of the Directors, AE identified by Plaintiff, Srivats Ramaswami, worked in Google Cloud. The remainder had moved to a different area of Google called Core Development. (Tomezsko Decl., ¶ 5, Exh. 4 ["Leif Dep."] at 71:18–73:6.)

<u>Plaintiff's Response to Paragraph 148:</u> Plaintiff **admits.**

Paragraph 149:

Directors, Application Engineer operate across the entire product lifecycle, starting with deployment, design, testing and release, and continuing through implementation and enhancement. They own a portfolio of applications and are responsible for all aspects of developing and maintaining the applications in the portfolio. (Leif Dep., 80:9–81:6.)

<u>Plaintiff's Response to Paragraph 149</u>: Plaintiff **denies** that Application Engineer ("AE") Directors work on the entire product lifecycle, and deploy, design, test, and release. These are functions of lower-level employees on the Application Engineer ladder. Moreover, Application Engineer Directors do not own portfolios and rather work alongside PM's and Site Reliability Engineers who also own the portfolios. Both the AE Director and Technical Director roles shared the same experience and skills requirements and the role involved working directly with customers and stakeholders, engaging in whiteboarding sessions, identifying friction points in design, development, and deployment from stakeholders' perspectives, and collaborating across functional and product area boundaries within Google. (Tomezsko Sealing Decl., Ex. S; Ex. 69, P001584-85.)

Paragraph 150:

These internal systems can be proprietary products built and deployed for internal use, or third-party products integrated into Google's systems. (Lief Dep., 42:15–21, 134:8–12.)

Plaintiff's Response to Paragraph 150: Plaintiff **admits**.

Paragraph 151:

The applications on which Directors, AE and their teams work are almost exclusively internal to Google and are not marketed or sold to customers; for this reason, developing go-to-market strategy is not integral to the role. Directors, AE's stakeholders are more often than not Google employees without a technical background. (Leif Dep., 134:13–17.)

Plaintiff's Response to Paragraph 151: Plaintiff **admits** that AE Directors work on

internal products but **avers** that the software development process is similar for internal and

external products and follows the same process of coding, integrating, testing, and support.

Further, many of Google Cloud's products have started as internal products and then are later

offered externally, such as BigQuery, Spanner, and Kubernetes, which are the flagship products

of the Google Cloud portfolio and were internal products before being packaged as external

products. (Rowe Decl. ¶ 28.)

Paragraph 152:

The role has significant people management responsibilities, and Directors, AE spend up to 40% of their time managing others. (Leif Dep., 125:11–25.)

Plaintiff's Response to Paragraph 152: Plaintiff **admits**.

Paragraph 153:

None of the Directors, AE Plaintiff identified ever worked in OCTO reporting to Will Grannis, or in the GAIP organization reporting to Tariq Shaukat. (Lucas Decl., ¶¶ 72–75.)

Plaintiff's Response to Paragraph 153: Plaintiff **admits**.

Paragraph 154:

Plaintiff has identified 11 L8 and L9 employees in the **Director, Product Manager role ("Directors, PM")**. These individuals work in job codes associated with the Product Management job ladder. (Lucas Decl., ¶ 76 & Exh. 4.)

Plaintiff's Response to Paragraph 154: Plaintiff **admits**.

Paragraph 155:

> Directors, PM manage teams of individuals to develop Google's technology products from inception through development and deployment. Directors, PM develop a multi-year roadmap for the deployment of a specific product or products in their relevant product area, and manage the process against that roadmap on a quarterly basis. (Eryurek Dep., 119:14–120:4.)

> Plaintiff's Response to Paragraph 155: Plaintiff **denies** that all PM Directors manage

teams. Further, PM Directors do not develop products, as that is part of the job responsibilities of

lower-level employees on the Product Manager ladder. (Ex. 3, GOOG-ROWE-00061511-12;

Tomezsko Sealing Decl., Ex. T.)

Paragraph 156:

> Their success is partially measured by ability of their products to meet certain metrics they specify at the start of the product roadmap, frequency of product adoption and user engagement, and user satisfaction. (Lucas Decl., ¶ 76, Exh. 4, at GOOG-ROWE-00061525–28.)

> Plaintiff's Response to Paragraph 156: Plaintiff **admits** but **avers** that their success is not

exclusively measured by those metrics and the PM ladder specifies that success is measured by

personal impact and impact of the project on Google. (Tomezsko Sealing Decl., Ex. T.)

Paragraph 157:

> It is not uncommon for level 8 Directors, PM to manage a single product or a small group of products. At level 9, Directors, PM may manage a portfolio of over half a dozen products and must balance competing priorities across their entire portfolio. (Lucas Dep., 179:7–25.)

> Plaintiff's Response to Paragraph 157: Plaintiff **admits** but **avers** that the PM role also

included evangelism, private whiteboarding sessions, and experience with multiple software

design methodologies. (Ex. 17, Wilson Tr. 158:12-159:2.)

Paragraph 158:

> A Director, PM sets overall priorities for their product area, and allocates resources across

the product area in annual planning.  They manage the allocation of resources against those priorities over the course of the year. (Lucas Decl., ¶ 76, Exh. 4, at GOOG-ROWE-00061526.)

Plaintiff's Response to Paragraph 158: Plaintiff **admits.**

Paragraph 159:

Directors, PM have profit-and-loss responsibilities, and must ensure that they are projecting revenue for their product area appropriately and delivering on those projections each quarter. (Eryurek Dep., 120:5–8; Lucas Dep., 178:21–179:2.)

Plaintiff's Response to Paragraph 159: Plaintiff **denies** that PM Directors have profit-

and-loss responsibilities. (Def's Decl., Ex. T.)

Paragraph 160:

Directors, PM are overwhelmingly people managers and are responsible for managing teams. All but one of the Directors, PM Plaintiff identified are people managers. (Lucas Decl., ¶ 76, Exh. 4, at GOOG-ROWE-00061525; Lucas Decl., ¶¶ 77–87.)

Plaintiff's Response to Paragraph 160: Plaintiff **admits**, but **avers** that Google does not

differentiate between People Managers and Individual Contributors for purposes of determining

level or compensation. (Ex. 4, Lucas Tr. 123:22-23.)

Paragraph 161:

None of the Directors, PM Plaintiff identified ever worked in OCTO reporting to Will Grannis, or on the GAIP team reporting to Tariq Shaukat. (Lucas Decl., ¶¶ 77–87.)

Plaintiff's Response to Paragraph 161: Plaintiff **admits**, but **avers** that Ben Wilson and

Evren Eryurek both worked as Directors, PM and previously reported to Will Grannis and Tariq

Shaukat. (Tomezsko Decl. ¶ 19, 93.)

Paragraph 162:

Plaintiff earned more in Total Annual Compensation than each of the individuals she identified as Global Client Technical Leads. (Lucas Decl., ¶¶ 92–95; Humez Decl., ¶ 47.)

Plaintiff's Response to Paragraph 162: Plaintiff **denies** and **avers** that Ben Wilson and

Evren Eryurek, who worked as GCTLs with Plaintiff, earned more in Annual Compensation.

(Greene Decl. ¶¶ 2, 4-5.)

Paragraph 163:

Plaintiff identified three individuals performing the Global Client Lead role. (Lucas Decl., ¶¶ 88–91.) She earned more in Total Annual Compensation than all of them but one, Anil Jain. (Humez Decl., ¶ 47.)

Plaintiff's Response to Paragraph 163: Plaintiff **admits**.

Paragraph 164:

Jain is based in California, is a people manager and supervises at least one Plaintiff's other alleged comparators, Caleb Weinstein. (Lucas Decl., ¶ 89.)

Plaintiff's Response to Paragraph 164: Plaintiff **admits** but **avers** that Google identified Mr. Jain as "Ulku['s] peer." Moreover, when Mr. Shaukat met with Plaintiff to discuss the new role, he explained that the GCTL's on his team "would be peers of the GCL's, as we referred to them Global Client Lead." Mr. Shaukat further explained to Ms. Rowe that he was "expecting her to come in and build a team and lead a team of global client leads." (Ex. 50, GOOG-ROWE-0056872; Ex. 35, Shaukat Tr. 95:10-11, 98:2-4.)

Paragraph 165:

Shaukat envisioned the creation of a new role he referred to as Global Client Lead in or around June 2018. Global Client Leads would be focused on business development for a specific list of priority clients. They were expected to be the sponsors and actively engaged in a persistent manner. (Shaukat Dep., 94:7–98:21.)

Plaintiff's Response to Paragraph 165: Plaintiff **admits.**

Paragraph 166:

The Global Client Lead was supposed to operate in tandem with the Global Client Technical Lead, who would be focused more on the technical aspect of the client relationship. The Global Client Lead was expected to build a team to help them manage the client accounts assigned to them. (Shaukat Dep., 94:7–98:21.)

Plaintiff's Response to Paragraph 166: Plaintiff **admits** but **avers** that the only difference

between the two was that the GCTL role was "a more technical version versus the business version." Mr. Wilson, who was in the GCTL role, was not aware of any distinction between the GCTL and GCL role and his supervisor, Darryl Willis, told him the roles were "overlapping" and that the GCTL's and the GCL's would "work together" to serve customers. Mr. Eryurek, who was also moved into the GCTL role with Plaintiff, said that that "Global client leads versus global client technical leads was definitely an ambiguity at best." (Ex. 35, Shaukat Tr. 202:15-19; Ex. 17, Wilson Tr. 118:16-119:19; Ex. 49, Eryurek Tr. 86:4-6.)

<u>Paragraph 167:</u>

> Plaintiff never built and managed a team while she reported to Shaukat. (Shaukat Dep., 102:14–103:17.)

> <u>Plaintiff's Response to Paragraph 167:</u> Plaintiff **admits** but **avers** that when she first

moved into the role, Mr. Shaukat explained to Plaintiff that he was expecting her to come in and

build a team and lead a team of GCL's. She moved back to OCTO before she could undertake

those responsibilities. (Ex. 35, Shaukat Tr. 98:2-4.)

<u>Paragraph 168:</u>

> Plaintiff did not consistently meet with a specific set of clients consistent with the vision for the Global Client Lead or Global Client Technical Lead role. (Shaukat Dep., 257:3–15.) Plaintiff concedes that she did not develop a regular cadence of meeting with specific clients, that the nature of the client relationships was sporadic, and that most of the client meetings she attended were at the initiative or request of the accounts team. (Rowe Dep., 186:21–189:23.)

> <u>Plaintiff's Response to Paragraph 168:</u> Plaintiff **denies** and **avers** that Mr. Shaukat did

not share his vision for what the role entailed. Mr. Shaukat never requested that Plaintiff meet

with specific clients. By contrast, he asked her male colleagues to accompany him to customer

meetings. Mr. Shaukat never assigned Plaintiff a specific customer. (Rowe Decl. ¶ 30; Ex. 18,

Rowe Tr. 294:20-296:22.)

Paragraph 169:

>The Global Client Lead generally lacked the technical or engineering skills required of the Global Client Technical Lead role. (Shaukat Dep., 202:3–25.)

>Plaintiff's Response to Paragraph 169: Plaintiff **denies** and **avers** that Google never set any

skills or expectations for the GCL or GCTL role, and rather the GCTL role was "more technical"

than the GCL role. (Ex. 35, Shaukat Tr., 202:3–25.)

## II.    PLAINTIFF'S STATEMENT OF ADDITIONAL MATERIAL FACTS PURSUANT TO RULE 56.1

### A.    PLAINTIFF'S BACKGROUND AND EMPLOYMENT AT GOOGLE

170.    Plaintiff is a highly educated woman with over 26 years of experience in computer

engineering, including, but not limited to, managing and directing the innovation, engineering,

production, and development of computer software, databases, cloud-based technologies, and

other tools, primarily for clients in the financial services industry.  (Rowe Decl. ¶¶ 1, 3.)

171.    During her employment as a CTO at JPMorgan, Plaintiff led a team of over 500

engineers, product managers, and quantitative researchers building risk management systems and

led the team responsible for migrating high credit risk systems to the cloud for the company.

(Tomezsko Decl. Ex. 19; Rowe Decl. ¶ 7.)

172.    While at JPMorgan, Plaintiff managed a 400+ member team and an $80 million

technology budget. (Tomezsko Decl. Ex. 15.)

173.    At the time of hire, Plaintiff had 22 years of experience in the financial services

industry, an industry targeted for cloud adoption. While she was pursuing a masters degree in

science, Plaintiff worked for a bank in Turkey in a technical role and as a Research Assistant for

Caterpillar, Inc. (Rowe Decl. ¶ 4; Ex. 21, GOOG-ROWE-00058500; Tomezsko Decl. Ex. 15.)

174.    Google did not have a policy that the number of years of work experience dictated the level that someone would come in at. (Exhibit 10, Burdis Tr. 44:6-20.)

175.    Someone with 17 years of experience could come in as a Level 9 if they were being hired for a Level 9 role. (Exhibit 10, Burdis Tr. 44:21-45:5.)

176.    The lead recruiter for the Technical Director role, Jennifer Burdis, considered boundaries between years of experience as "not concrete" and did not ascribe any meaningful difference to candidates with 19 to 20 years of experience, 19 to 21 years of experience, or 23 to 25 years of experience.  (Exhibit 10, Burdis Tr. 30:7-14, 44:6-46:6.)

177.    Other senior leaders at Google, like Tariq Shaukat, did not consider years of experience to be determinative of a candidate's level. (Ex. 25, GOOG-ROWE-00059824-26.)

178.    Prior to joining Google, Plaintiff possessed significant cloud experience and led a team at JPMorgan as an industry leader in actualizing cloud migration in the financial services industry – an industry that was more hesitant to transition to cloud technology than others at the time.  (Rowe Decl. ¶ 10.)

179.    At JPMorgan, Plaintiff led the company in its efforts to migrate numerous applications and systems to Amazon Web Services ("AWS"), a more widely used cloud-based system in the financial services industry at the time and a Google Cloud Products ("GCP") competitor.  (Rowe Decl. ¶ 10.)

## B. <u>COMPENSATION POLICIES</u>

180.    Google considers a candidate's role, level, and location in determining his or her compensation.  (Ex. 52, GOOG-ROWE-00029597.)

181.    Google uses an algorithm to determine an employee's target compensation based on a Market Reference Point ("MRP"), which is "Google's internal pay rate for a given

role/location that targets the top of the local market's cost of labor." (Ex. 4, Lucas Tr. 138:2-141:6; Ex. 53, GOOG-ROWE-00019290.)

182.    At hire, Google pays its employees 80% of the MRP. The total MRP associated with each job role is not known to employees or used by Google's compensation team. (Ex. 4, Lucas Tr. 138:2-141:6.)

183.    Google ascribes levels for each role at the Company, which is determined based on "the scope and complexity" of a role and defined based on "the knowledge, skills, and abilities that a Googler needs to perform well." (Ex. 5, GOOG-ROWE-00052153.)

184.    After a candidate's level is determined, their level is a significant factor used to determine initial compensation and is considered as a factor in all subsequent compensation determinations throughout their entire term of employment. (Ex. 54, GOOG-ROWE-00034417.)

185.    In order to determine a new hire's salary using Google's algorithm, the compensation analyst will enter the individual's location and job code – which represents an individual's job role and job level. (Ex. 4, Lucas Tr. 142:6-143:25.)

186.    Google may then use discretion to adjust the compensation. (Humez Decl. ¶ 6)

187.    As a function of Google's compensation policies and practices, individuals hired by Google for the same role and at the same level may be offered different pay for performance of the same or similar job duties. (Ex. 4, Lucas Tr. 140:17-22.)

188.    At her hire, Google placed Plaintiff in job code 5560 and Mr. Harteau in job code 5578. (Ex. 20, GOOG-ROWE-00056318.R; Tomezsko Decl. Ex. 15, 17.)

189.    The MRP for job code 5560 (Principal Technical Solutions Consultant) in New York City was $330,000.00, the bonus target was 30%, the new hire equity guideline was $795,000.00, and the refresh equity guideline was $265,000.00. (Ex. 22, GOOG-ROWE-00054266.)

190.    The MRP for job code 5578 (Distinguished Technical Solutions Consultant) in New York City was $405,000.00, the bonus target was 40%, the new hire equity guideline was $1,620,000.00, and the refresh equity guideline was $540,000.00. (Exhibit 22, GOOG-ROWE-00054266.)

191.    Because Plaintiff and Mr. Comparator 1 were assigned different job codes due to Google's leveling assignments at hire, their MRPs were calculated differently, which resulted in a greater compensation award for Mr. Comparator 1. (Ex. 22, GOOG-ROWE-00054266.)

192.    Google paid each male Level 9 Technical Director more than Plaintiff in base salary in every year, with the exception of Jonathan Donaldson in 2017. (Greene Decl. ¶¶ 2-8; Humez Decl. ¶ 35.)

193.    Google paid male Level 9 Technical Directors more in bonus payments and equity awards in every year, with the exception of the 2017 bonus payment. (Greene Decl. ¶¶ 2-8.)

194.    In response to compensation negations of another woman being considered for a role in Google Cloud, Melissa Lawrence in ER characterized the woman's negotiations and concerns of equitable compensation as "not Googley," "quibbling," and a "turn off." (Ex. 56, GOOG-ROWE-00056473.)

195.    In addition to Plaintiff, other women at Google complained to Will Grannis about having to "fight[] for fair comp." (Ex. 57, GOOG-ROWE-00059503.)

## II.    COMPARATOR ROLES

196.    Google hired 17 individuals into the Technical Director position between March 2016 and March 2018.  Plaintiff was the only woman Google hired for the role. (Greene Decl. ¶ 17.)

197.    Among all Engineering Directors (i.e., Technical, SWE, Application Engineer, and Product Management), there are only 45 women out of 541 Directors.  (Greene Decl. ¶ 18).

***Technical Directors***

198.    Google did not articulate to hiring and leveling decision-makers any distinction between the responsibilities of Level 8 and Level 9 Technical Directors.  (Ex. 1, Grannis Tr. 35:10-36:14.)

199.    There is a "ton of gray areas between the levels" at Google. (Ex. 23, GOOG-ROWE-00017999.)

200.    Technical Directors in both Levels 8 and 9 were required to possess a "[d]emonstrated ability to understand and advance customers usually in the form of experience—firsthand experiences with Cloud, Cloud migration, second engineering experience sufficient to demonstrate ability to influence engineering groups without authority, and then third demonstrated thought leadership or some form of evangelism." (Ex. 1, Grannis Tr. 51:3-10.)

201.    All Technical Directors possessed similar skill sets and performed the same job responsibilities consistent with three pillars. (Harteau Decl. ¶¶ 4, 9-10, 13-14.)

202.    Some Technical Directors specialized in specific industries, which Google referred to as "verticals," and some were generalists, but all performed the same general work. (Ex. 1, Grannis Tr. 43:17-24, Harteau Decl. ¶ 9.)

203.    Benjamin Wilson specialized in the oil & gas industry, Evren Eryurek specialized in the healthcare industry, and Plaintiff specialized in financial services.  (Ex. 17, Wilson Tr. 76:24-77:5.)

204.    Mr. Wilson considered Plaintiff as his corollary in financial services. Mr. Wilson worked closely with Plaintiff and would approach her for advice on the evangelism pillar of the role, since Plaintiff was a "prolific speaker on behalf of Google and [he] was not, so [he] looked

to her on . . . what she presented on and how she did it and what were the things Google was looking for us to present on." (Exhibit 17, Wilson Tr. 91:7-25.)

205.    Mr. Grannis believed that Technical Directors "who had demonstrated a high acumen of particular industry" should be assigned to separate verticals and identified Plaintiff as a Technical Director qualified for such assignment based on her financial services expertise. (Ex. 1, Grannis Tr. 92:14-24.)

206.    Mr. Grannis decided to create a team of industry specialist Technical Directors ("Verticals Group") and he identified Plaintiff as the Technical Director who would head the Verticals Group. (Ex. 58, GOOG-ROWE-00058796.)

207.    Mr. Grannis's selection of Plaintiff to lead the Verticals Group would have resulted in one level inversion in the Verticals group, i.e. a Level 8 supervising a Level 9. (Ex. 58, GOOG-ROWE-00058796.)

208.    Mr. Grannis and others believed that Plaintiff was the best person for the role. (Ex. 58, GOOG-ROWE-00058796.)

209.    Plaintiff joined Google with nearly five years of CTO experience. (Rowe Decl. ¶ 5.)

210.    Several of the Level 9 Technical Directors lacked CTO experience. (Tomezsko Decl. Ex. 13, 17.)

211.    Plaintiff had more years of relevant experience as a senior technologist prior to joining Google and managed a larger team than some of the male Level 9 Technical Directors. (Tomezsko Decl. Ex. 13.)

212.    Plaintiff holds more advanced and more relevant degrees than some of the male Level 9 Technical Directors, some of whom did not possess a college degree or degrees in the computer science or engineering. (Tomezsko Decl. Ex. 12-15, 17.)

213.    Other Level 9 Technical Directors, who had equal or fewer years of experience than Plaintiff, were not seen as a "bit more junior" than other candidates during the interview process. (Tomezsko Decl. Decl., Ex. 15, 17.)

214.    Mr. Harteau did not have any advanced degrees or an education past high school, his hire packet indicates that he "did not attend University, he is self-taught." (Ex. 20, GOOG-ROWE-000056318.R; Tomezsko Decl. Ex. 17.)

215.    Prior to his role at Google, Mr. Harteau worked for Spotify as VP of Engineering, Infrastructure and Director of Engineering from December 2011 until May 2017. Previously, he worked as an Engineering Manager at Yahoo!, Inc. from September 2005 to November 2011. He worked at Statis Engineering as an Engineer/Partner from March 2004 to August 2005 and CoreComm as Director of Technology from February 1998 to February 2004. (Exhibit 20, (GOOG-ROWE-00056318.R.)

216.    In terms of interview scores, Plaintiff scored higher than other male candidates for the Technical Director role who were then leveled at Level 9.  (Tomezsko Decl. Ex. 15; Ex. 14, GOOG-ROWE-00061918-20.)

217.    Will Grannis and Melissa Laurence raised performance criticisms of Nicholas Harteau in 2017. (Ex. 59, GOOG-ROWE-00017404.RR.)

218.    In 2018, Mr. Grannis raised performance criticisms of Mr. Harteau. (Ex. 60, GOOG-ROWE-00017708.R.)

219.    In 2018, Mr. Grannis raised performance criticisms of Scott Penberthy.  (Ex. 61, GOOG-ROWE-00078058.)

220.    In 2018, Mr. Grannis raised performance criticisms of Paul Strong.  (Ex. 60, GOOG-ROWE-00017706-08.R.)

221.    In 2019, Mr. Grannis raised performance criticisms of Jonathan Donaldson.  (Ex. 60, GOOG-ROWE-00017706.R.)

222.    While in the role of Technical Director, Plaintiff has matched or exceeded the male Level 9 Technical Directors in overall job performance in every year of her employment, and Google gave all of them the same instructions, guidelines, and job description to complete their performance self-assessments. (Greene Decl. ¶¶ 9-14; Ex. 55, GOOG-ROWE-00017356-57.)

223.    With respect to cloud and industry expertise and engineering, Plaintiff made substantial contributions, such as co-leading the largest financial services deal for Google Cloud in over 10 years and the 2nd largest cloud deal ever and spearheading corporate deals as a financial services cloud expert. (Tomezsko Decl. Ex. 24.)

224.    In 2017, Plaintiff's supervisor, Will Grannis noted that Plaintiff "quickly established thought leadership on Cloud and Financial services, earning critical impact ratings from Sales, Product and Marketing" and demonstrated "heavy influence and trusted advisor status at ███████, ███████, [and] ████████████" and "[t]ook on a leadership role for regulatory work with ██████████████████." (Ex. 61, GOOG-ROWE-00078058.)

225.    In 2018, Mr. Grannis acknowledged Plaintiff's contributions in the Technical Director role, noting that many were significant "even by OCTO standards" and noted that Plaintiff "gives our outreach to markets wrt FinSrv deep credibility and interest." (Ex. 61, GOOG-ROWE-00078058.)

226.    In 2019, Mr. Grannis noted that even though Plaintiff only spent half of the period in OCTO, she had made very important contributions to external thought leadership. (Ex. 61, GOOG-ROWE-00078058.)

227.    In 2019, in addition to Plaintiff's internal contributions, Mr. Grannis noted that Plaintiff made significant external contributions presenting at large sessions at ▮▮▮▮▮▮▮▮, ▮▮▮▮▮▮▮, ▮▮▮▮▮, and ▮▮▮▮▮▮▮▮▮▮▮▮, and presenting keynotes at leaders' circle in numerous locations. (Ex. 61, GOOG-ROWE-00078058.)

### *Director-level Software Engineers ("SWES")*

228.    Significant overlap exists in the requisite skill set and qualifications for the Technical Director and SWE Directors, including significant technical depth, strategic product development and systems design experience, and coding ability. Google used the same Engineering-wide Leveling Guide and Leadership Rubrics in hiring Technical Directors and SWE Directors and the Engineering-wide Leveling guide accurately reflected the skills and expectations across all Engineering roles, regardless of ladder. (Rowe Decl. ¶¶ 20, 22-25; Tomezsko Sealing Decl., Exh. Q; Ex. 69, P001584-85.)

229.    Plaintiff possesses coding ability. (Rowe Decl. ¶ 17.)

230.    Prior to her hire as a Technical Director, Plaintiff herself was initially recruited and interviewed for a SWE Director position. (Tomezsko Decl. Ex. 15; Rowe Decl. ¶ 18.)

231.    Technical Directors, including Plaintiff, and SWE Directors share core job responsibilities such as driving technical and business development, collaborating with product managers, serving as the external face of Google to industry stakeholders, code design and review, and engineering development.  (Ex. 6, GOOG-ROWE-00017719; Tomezsko Sealing Decl., Ex. T.)

232.    Technical Directors, including Plaintiff, and SWE Directors both serve as technical leads or advisors on Google technology products that Google Cloud sells to customers: products like databases, networking, and storage. Both roles require Directors to use their expertise to ensure Google products meet the needs of clients.  (Rowe Decl. ¶ 23.)

233.    Plaintiff and SWE Directors possess substantially similar understanding of Google's products, including but not limited to databases, networking, and storage and consistently collaborate with internal and external stakeholders to solve technical problems and translate that to product design and delivery; and develop innovative solutions and products. (Rowe Decl. ¶ 25.)

234.    Technical Directors, including Plaintiff, and SWE Directors have common skill sets, educational backgrounds and prior experience, with many starting their careers as software engineers. (Ex. 4, Lucas Tr. 174:18-24.)

235.    According to Google's job description for SWE Directors, coding is not a primary job requirement for hire. (Tomezsko Sealing Decl., Ex. Q.)

236.    Technical Directors, including Plaintiff, and SWE Directors are highly technical strategic leaders with cross product impact. (Rowe Decl. ¶ 26.)

237.    Engineering is one of the three pillars that comprise the Technical Director position. (Ex. 1, Grannis Tr. 116:4-8.)

238.    Engineering skills are transferable to a SWE Director role. (Ex. 1, Grannis Tr. 116:4-8.)

239.    Technical Directors and SWE Directors could either be individual contributors or people managers. (Tomezsko Decl. ¶ 15, 16, 139.)

240.    Both Technical Directors, including Plaintiff, and SWE Directors guide and consult external clients on technical decisions, organizational decisions and more that impact their companies. Internally, both roles involve working across different groups like product, compliance, regulatory policy, marketing etc., to help drive solutions for our customers. (Tomezsko Sealing Decl., Ex. Q.)

241.   Both Technical Directors, including Plaintiff, and SWE Directors work with customers to understand their business needs, develop new business ideas with them, and work with them on how to transform their businesses using technology, how to solve their large technical challenges. (Rowe Decl. ¶ 25; Tomezsko Sealing Decl., Ex. Q.)

### *Director-level Application Engineers*

242.   Technical Directors, including Plaintiff, and Application Engineer (AE) Directors share job requirements. Google used the same Engineering-wide Leveling Guide and leadership rubrics in hiring Technical Directors and AE Directors and the Engineering-wide Leveling guide accurately reflected the skills and expectations across all Engineering roles, regardless of ladder. (Ex. 69, P001584.)

243.   Technical Directors, including Plaintiff, and AE Directors work directly with customers and stakeholders, engage in whiteboarding sessions, identify friction points in design, development, and deployment from stakeholders' perspectives, and collaborate across functional and product area boundaries within Google. (Ex. 69, P001584-85.)

### *Director-level Product Managers*

244.   Technical Directors, including Plaintiff, and Product Management ("PM") Directors provide product and engineering guidance, engage in thought leadership collaborate and work with others across the organization, engage with clients, and possess an understanding of product development responsibilities. Google used the same Engineering-wide Leveling Guide and leadership rubrics in hiring Technical Directors and PM Directors and the Engineering-wide Leveling guide accurately reflected the skills and expectations across all Engineering roles, regardless of ladder. (Ex. 18, Rowe Tr. 327:9-14; Ex. 69, P001584.)

245.   Technical Directors, including Plaintiff, and PM Directors require a deep understanding of Google's products, collaborate with internal and external stakeholders to solve

technical problems and translate that to product design and delivery, come up with innovative solutions and products, and set business strategy for a product. (Ex. 18, Rowe Tr. 327:9-14.)

246.    Technical Directors, including Plaintiff, and PM Directors share the following core job duties, among others: "identifying AI-related design deployment friction points from customer's perspective," "rallying teams to work through deployment hurdles, product updates, new product offerings, and solutions," working with customers on joint initiatives, collaboration across functional and product area boundaries, deep dives with the internal engineering team, working on cross-Google technical working teams, getting hands-on with customer projects, among others. (Tomezsko Decl. Ex. 10.)

247.    Technical Directors, including Plaintiff, and PM Directors perform job duties associated with evangelism, private whiteboarding sessions, and experience with multiple software design methodologies. (Ex 17, Wilson Tr. 158:12-159:2; Ex. 1, Grannis Tr. 122:7-13; Tomezsko Decl. Ex. 10.)

248.    Several Technical Directors transferred into PM Director roles. (¶¶ 136-37, *supra*.)

249.    Individuals who performed both the Technical Director and PM Director roles confirm that the job responsibilities and skill sets required for the role, particularly their product development background and industry expertise, were transferrable. (Ex. 17, Wilson Tr. 153:7-20.)

250.    Technical Directors, including Plaintiff, consistently performed product development and management work. (Ex. 49, Eryurek Tr. 82:19-83:4; Rowe Decl. ¶ 15.)

251.    Mr. Eryurek's probationary period for the PM Director role was to determine whether Mr. Eryurek's skill set as a Technical Director was transferrable to PM Director; ultimately, Google answered that question in the affirmative. (Ex. 1, Grannis Tr. 121:24-122:23.)

252.     In his statement of support for Mr. Wilson's transfer from Technical Director to the PM Director role, Mr. Grannis noted, "I hired him into Google almost three years ago with the idea that he'd help our customers and product teams" and described Mr. Wilson's role as a Technical Director as "a product strategy and CTO like role." (Ex. 63, GOOG-ROWE-00062099.)

253.     Diane Greene, the former CEO of Google Cloud, acknowledged that there was significant overlap in the Technical Director and PM Director role, noting that the Technical Director role "seems part Product management, part vertical, part product marketing." (Ex. 64, GOOG-ROWE-00058837.)

### *Global Client Leads*

254.     The Global Client Technical Lead ("GCTL") position, as performed by Plaintiff and other Technical Directors, was virtually identical to the Technical Director position in OCTO. (Ex. 65, GOOG-ROWE-00017429.)

255.     Plaintiff was told by the GCTL and Global Client Lead ("GCL") supervisor, Tariq Shaukat, that she would "continue doing the role you're doing" in OCTO as a Technical Director, "but moving over to my vertical team" as a GCL. (Tomezsko Decl. Ex. 26; Ex. 66, GOOG-ROWE-00017427-28.)

256.     Mr. Shaukat informed Plaintiff that she would be working with individuals in the GCL role as "peers." (Ex. 35, Shaukat Tr. 95:10-11.)

257.     Google identified a Level 9 Global Client Lead, Anil Jain, as Plaintiff's peer. (Ex. 50, GOOG-ROWE-00056872.)

258.     Individuals in the GCL role worked alongside Plaintiff and other GCTLs who were transferred from the Technical Director role in OCTO to "complement the sales team, and

will be responsible for the agenda, key transformation relationships, and end-to-end success at each Global Client." (Ex. 67, GOOG-ROWE-00017439.)

259.    Mr. Shaukat instructed Plaintiff upon transfer that he was "expecting her to come in and build a team and lead a team of global client leads." (Ex. 35, Shaukat Tr. 98:2-4.)

260.    Mr. Shaukat described the GCTL role as the "technical peer" and "a more technical version versus the business version" of the GCL position. (Ex. 35, Shaukat Tr. 202:17-19; Ex. 68 GOOG-ROWE-00056994.)

261.    Neither Plaintiff, nor other individuals in the GCTL role, were aware of any distinction between their role and the GCL role. (Ex. 17, Wilson Tr. 119:3-19; Ex. 49, Eryurek Tr. 86:4-6.)

262.    Darryl Wilson, a supervisor for both GCTL and GCL roles, characterized the roles as "overlapping." (Ex. 17, Wilson Tr. 119:3-19; Ex. 49, Eryurek Tr. 86:4-6.)

263.    Mr. Eryurek, who also moved with Plaintiff from the Technical Director role into the GCTL role stated that the differences between the GCL and GCTL role were "ambiguous" at best. (Ex. 49, Eryurek Tr. 86:4-6.)

***Stuart Breslow***

264.    In 2018, Google hired Stuart Breslow as Managing Director, Technology and Policy.  (Ex. 42, Breslow Tr. 57:20-23.)

265.    Mr. Breslow's job title within Google was Director, Solutions Consultant. (Ex. 21, GOOG-ROWE-00058500.)

266.    Google hired Mr. Breslow as an individual contributor, reporting to Tariq Shaukat. (Ex. 42, Breslow Tr. 57:15-19; 69:2-4.)

267.    Mr. Breslow's role as a Director, Solutions Consultant involved selling and promoting Google Cloud to customers. (Ex. 42, Breslow Tr. 57:4-14.)

268. In his role as Director, Solutions Consultant, Mr. Breslow worked closely with the product and engineering teams. (Ex. 42, Breslow Tr. 70:5-9.)

269. Both Mr. Breslow's and Plaintiff's job roles involved serving as a technical advisor to clients and their senior executives in regulated industries. (Ex. 42, Breslow 77:8-78:6; GOOG-ROWE-00055478.)

270. Both Mr. Breslow's and Plaintiff's job roles involved identifying Cloud-related designs, development, or deployment friction points from the customers' perspective and working through solutions. (Ex. 42, Breslow 78:7-24; Tomezsko Decl. Ex. 10.)

271. Both Mr. Breslow's and Plaintiff's job roles involved working with customers and partners to define joint initiatives and co-create their transformation roadmap. (Ex. 42, Breslow 78:24-79:5; Tomezsko Decl. Ex. 10.)

272. Both Mr. Breslow's and Plaintiff's job roles involved telling the Google innovation story and helping translate it into actionable steps global companies can take towards adoption. (Ex. 42, Breslow 79:6-10; Tomezsko Decl. Ex. 10.)

273. Both Mr. Breslow's and Plaintiff's job roles involved collaborating across functional and product area boundaries to bring the best of Google to the customer. (Ex. 42, Breslow 79:11-15; Tomezsko Decl., Ex. 10.)

274. Both Mr. Breslow's and Plaintiff's job roles involved private whiteboarding sessions with Google customers. (Ex. 42, Breslow 79:16-24; Tomezsko Decl. Ex. 10.)

275. Both Mr. Breslow's and Plaintiff's job roles involved public evangelism for emerging technologies and speaking publicly on those issues. (Ex. 42, Breslow 79:25-80:5; Tomezsko Decl. Ex. 10.)

276.     Both Mr. Breslow's and Plaintiff's job roles involved deep dives with internal engineering teams on the key cases for a given launch. (Ex. 42, Breslow Tr. 80:6-9; Tomezsko Decl. Ex. 10.)

277.     Both Mr. Breslow's and Plaintiff's job roles involved leading a cross-Google technical working team through critical engagements to customers. (Ex. 42, Breslow Tr. 80:15-18; Tomezsko Decl. Ex. 10.)

278.     Both Mr. Breslow's and Plaintiff's job roles involved being comfortable presenting publicly in his role. (Ex. 42, Breslow Tr. 77:13- 81:6; Tomezsko Decl. Ex. 10.)

279.     Mr. Breslow's role involved the same knowledge and experience requirements as Plaintiff's role as a Technical Director. (Ex. 69, P001584; Ex. 42, Breslow Tr. 73:9-74:3.)

280.     Mr. Breslow's role involved the same complexity and scope requirements as Plaintiff's role as a Technical Director. (Ex. 69, P001584; Ex. 42, Breslow Tr. 74:4-75:5.)

281.     Mr. Breslow's role involved the same leadership and influence requirements as Plaintiff's role as a Technical Director.  (Ex. 69, P001584; Ex. 42, Breslow Tr. 75:6-76:11.)

282.     Mr. Breslow's role involved the same organizational impact requirements as Plaintiff's role as a Technical Director. (Ex. 69, P001584; Ex. 42, Breslow Tr. 76:12-77:12.)

### D.     PLAINTIFF'S INEQUITABLE TREATEMENT IN TARIQ SHAUKAT'S ORGANIZATION

283.     Google transferred Plaintiff to Mr. Shaukat's organization in or around June 2018. (Tomezsko Decl. Ex. 26.)

284.     After over one month into Plaintiff's role as a GCL, Mr. Shaukat had not added her to staff meeting calendar invites and email distribution lists, despite multiple prior requests from Plaintiff. (Tomezsko Decl. Ex. 29.)

285.    Mr. Shaukat consistently omitted Plaintiff from relevant email correspondence and excluded or gave her limited access to relevant strategic meetings.  (Ex. 18, Rowe Tr. 149:17-150:4, 162:21-163:23; Ex. 73, GOOG-ROWE-00017449.)

286.    In contrast to his treatment of Plaintiff, Mr. Shaukat quickly added to staff meetings and email lists a male who had recently joined his organization. (Ex. 18, Rowe Tr. 163:6-23.)

287.    Two former Technical Director who were also transferred to Mr. Shaukat's organization acknowledged that Plaintiff was treated less well and excluded from meetings on at least one occasion.  (Ex. 17, Wilson Tr. 127:2-6; Ex. 49, Eryurek Tr. 91:8-18.)

288.    As a result of the limited communication Plaintiff had with her supervisor, Mr. Shaukat, she did not have adequate insight on his strategy or overall vision for the GCTL role or the organization, while other men in the organization, like Mr. Breslow were consistently included. (Ex. 18, Rowe Tr. 246:8-248:13.)

289.    On June 6, 2018, Plaintiff requested her first one-on-one with Mr. Shaukat, her direct supervisor, to discuss expectations for the role, but Mr. Shaukat declined the meeting. (Ex. 74, GOOG-ROWE-P-00000714.)

290.    Plaintiff informed her prior supervisor in OCTO, Will Grannis, about the unequal treatment she was experiencing under Mr. Shaukat's organization, and Mr. Grannis informed Melissa Lawrence and Brian Stevens. (Ex. 32, GOOG-ROWE-00017418.R.)

291.    Mr. Shaukat finally met with Plaintiff on June 12, 2018. (Ex. 75, GOOG-ROWE-00017420.)

292.    Plaintiff reached out to Mr. Shaukat again in August to schedule a second one-on-one, but received no response to her emails. Three months after her first request, Mr. Shaukat's

administrative assistant finally contacted Plaintiff to schedule a one-on-one on September 21 for 30 mins. (Tomezsko Decl. Ex. 29, 30.)

293.    Only after this meeting was Plaintiff was added to staff meetings and email distribution lists. (Tomezsko Decl. Ex. 30.)

294.    In November 2018, after the announcement of Diane Greene's departure from Google Cloud, Plaintiff requested another one-on-one with Mr. Shaukat. (Ex. 76, GOOG-ROWE-00017640.)

295.     After receiving no response and following up again, a meeting was scheduled for December 5. (Ex. 77, GOOG-ROWE-00017643.)

296.    During that meeting, Mr. Shaukat informed Plaintiff that the search for the vertical lead role was paused, and that he would not consider her for the VP Financial Services role, even if it did actualize. (Ex. 77, GOOG-ROWE-00017643.)

**E.    PLAINTIFF'S UNEQUAL CONSIDERATION FOR THE VP FINANCIAL SERVICES ROLE**

297.    As part of Google's verticalization efforts, in or about March 2018, Google sought to hire a Vice President, Financial Services ("VP Financial Services") in Mr. Shaukat's organization, and scoped the position as a Level 10. (Ex. 35, Shaukat Tr. 71:2-9.)

298.    Mr. Shaukat was the hiring manager for the VP Financial Services role. (Ex. 35, Shaukat Tr. 16:22-17:2.)

299.    Mr. Shaukat did not immediately consider Plaintiff for the role, despite her expertise and demonstrated work promoting Google Cloud in the financial services industry. (Ex. 66, GOOGLE-ROWE-00017427-8.)

300.    It was not until Plaintiff directly requested that Mr. Shaukat consider her for the position based on her qualifications that Mr. Shaukat included Plaintiff as a candidate for the role. (Ex. 78, GOOG-ROWE-00017435-36.)

301.    Although Mr. Shaukat told Plaintiff that he planned to give her a fair shot at the Vertical Lead role, prior to Plaintiff's application for the VP Financial Services role, and just weeks into any formal professional interaction with Plaintiff, Mr. Shaukat had already formed the opinion that Plaintiff was not "likely right . . . for the role." (Ex. 35, Shaukat Tr. 129:2-14; Ex. 79, GOOG-ROWE-00056487.)

302.    As early as May 2018, in discussion with Brian Stevens about Plaintiff leading the financial services vertical, Mr. Shaukat stated that after one meeting with Plaintiff he "wasn't blown away" by Plaintiff and had been considering other candidates for the lead position. (Ex. 33, GOOG-ROWE-00017410.)

303.    Prior to Plaintiff's transfer to his organization, Mr. Shaukat had only met Plaintiff once and had "very few interactions" with her. (Ex. 33, GOOG-ROWE-00017410-11.)

304.    Plaintiff spoke with Mr. Grannis regarding her concerns that she was not being fairly considered for the VP Financial Services role and Mr. Grannis confirmed that he considered her to be the most qualified candidate. (Ex. 80, P000706.)

305.    Brian Stevens suggested to Mr. Shaukat that Plaintiff should be considered for the VP Financial Services role. (Ex. 33, GOOG-ROWE-17410-11.)

306.    In June 2018, Melissa Lawrence, a recruiter for the role, indicated to Plaintiff that even if Plaintiff was selected for the VP Financial Services role, Plaintiff would remain a Level 8. (Ex. 81, GOOG-ROWE-00017423.)

307.    In July 2018, Stuart Vardaman, a recruiter, informed Plaintiff that she would start the interview process for the VP Financial Services role. (Ex. 82, GOOG-ROWE-00017446.)

308.    Google did not follow its standard interview process for Plaintiff and did not apply the same interview process to Plaintiff that it did for other candidates for the VP Financial Services role, including by not collecting interview feedback, not having her interview with Diane Greene, and deciding before the interview process that she was not right for the role. (Ex. 35, Shaukat Tr. 129:2-14; Ex. 93, GOOG-ROWE-00017583.)

309.    Given her concerns about differential treatment in consideration for the VP Financial Services, on August 28, 2018, Plaintiff emailed her initial recruiters, Melissa Lawrence and Kevin Lucas, to inform them that she perceived that her under-leveling at hire was negatively impacting her consideration for the VP role. (Ex. 86, GOOG-ROWE-00017556.)

310.    In August of 2018, Plaintiff was interviewed by Sebastian Marotte, Darryl Willis, Vats Srivatsan, and Jason Martin for the VP Financial Services roles. (Tomezsko Decl. Ex. 34.)

311.    Each interviewer was supposed to focus on a different aspect of her candidacy including role-related knowledge ("RRK"), leadership, and general cognitive ability ("GCA"). (Ex. 89, GOOG-ROWE-00056512.)

312.    Contrary to Google's standard practice, feedback from Plaintiff's interviewers was not formally captured in writing and uploaded to gHire. (Ex. 36, GOOG-ROWE-00017639.)

313.     Mr. Shaukat's Q3/Q4 weekly updates through the end of 2018 show that Google were "chasing feedback for Ulku" week after week. (Ex. 90, GOOG-ROWE-00017731.RR.)

314.    On November 12, 2018, Diane Greene's daily briefing notes stated that Plaintiff was interviewed and that "the feedback has been positive, but it sounds as though there were general concerns about her being successful at the VP level - she is currently a director" and continues with very positive feedback like 'Executive poise, confident (but not ego-driven), forthright with a quick operating cadence.'" (Ex. 91, GOOG-ROWE-00056632.)

315.    For role related knowledge, interviewers noted that Plaintiff possessed experience "in the financial services industry since 1997, with a focus on . . . has lead sizable teams, seems to have a relevant network in FSI." (Ex. 91, GOOG-ROWE-00056632.)

316.    As of November 2018, neither Mr. Shaukat nor Mr. Vardaman had received formal written feedback from any of Plaintiff's interviewers in response to her candidacy for the VP Financial Services role. (Ex. 36, GOOG-ROWE-00017639.)

317.    Of the four individuals who interviewed Plaintiff for the role, Mr. Shaukat only recalls receiving direct feedback from one interviewer – Mr. Marotte. (Tomezsko Decl. Ex. 34; Ex. 35, Shaukat Tr. 145:3-11.)

318.    Mr. Shaukat did not recall receiving direct interview feedback from Mr. Willis and did not even recall that Mr. Srivatsan and Mr. Martin were members of Plaintiff's interview panel and did not recall their feedback.  (Ex. 35, Shaukat Tr. 151:25-152:13.)

319.    All candidates, except Plaintiff, were personally interviewed by the CEO of Google Cloud at the time, Diane Greene, who was integral to the final hiring decision for the role prior to her departure from Google.  (Ex. 93, GOOG-ROWE-00017583.)

320.    In November of 2018, Plaintiff emailed Mr. Shaukat and Diane Greene, the CEO of Google Cloud, to raise concerns regarding her treatment during the VP Financial Service interview process – highlighting that she had not completed the interview process with Mr. Greene as the final interviewer, and her belief that her original under-leveling was impacting her candidacy. (Ex. 94, GOOG-ROWE-P-00001737.)

321.    On November 26, 2018, Mr. Shaukat emailed Kevin Lucas asking, "how do we message to Ulku that she's not getting the role . . . she didn't come out on top of the exiting interviews even without Diane." (Ex. 95, GOOG-ROWE-00056910.)

322.    On November 27, 2018, Mr. Vardaman emailed Plaintiff's interviewers asking them to submit written feedback and noted that "Ulku *was* an internal candidate for the VP, Financial Services role on Tariq's team." (Ex. 36, GOOG-ROWE-00017639 (emphasis added).)

323.    Overall, Mr. Shaukat testified that "there was no negative feedback" from Plaintiff's interviewers, "[t]here was only positive feedback on the technical side and there were questions and concerns on the nontechnical side, and . . . product management." (Ex. 35, Shaukat Tr. 151:3-8.)

324.    The feedback from Mr. Marotte, which reflected questions about Plaintiff's presentation "on the business side," was provided with the caveat that his interview with Plaintiff "was only 30mn." (Tomezsko Decl. Ex. 34.)

325.    Mr. Shaukat made the determination that Plaintiff was not "going to be a finalist for the role." (Ex. 35, Shaukat Tr. 161:14-23.)

326.    On December 5, 2018, Mr. Shaukat informed Plaintiff that he was "pausing the hiring of a full time person for a few weeks" but that even if the position reopens, her selection for the role was "not going to happen." Mr. Shaukat informed Plaintiff that the person they would place in the role would have "more sales and business development orientation."  (Ex. 77, GOOG-ROWE-00017643.)

327.    On December 6, 2018, Mr. Vardaman noted to other recruiters that "feedback is that she is junior for the VP role." (Ex. 96, GOOG-ROWE-00017644.)

**F.    GOOGLE HIRES A LESS QUALIFIED MAN FOR THE VP FINANCIAL SERVICES ROLE**

328.    In January of 2019, Mr. Shaukat selected ▮Comparator 6▮ as the new lead for financial services. (Ex. 97, GOOG-ROWE-00051965.)

329.     Mr. ⬛Comparator 6 did not interview for the position. (Ex. 42, ⬛Comparator 6 Tr. 134:25-135:2.)

330.     Mr. Shaukat and others repeatedly referred to Mr. ⬛Comparator 6 as the "lead" of the financial services vertical, internally and externally, and Mr. ⬛Comparator 6 had the responsibility and headcount associated with the VP Financial Services role. (Ex. 35, Shaukat Tr. 256:15-23.)

331.     In or around January 2019, Google officially announced its selection of ⬛Comparator 6 ⬛Comparator 6 to lead Google's Financial Services vertical. (Ex. 42, ⬛Comparator 6 Tr. 84:18-85:4.)

332.     Just six months prior to his selection for the VP Financial Services role, Mr. ⬛Comparator 6 had joined Google as Managing Director, Technology and Policy.  (Ex. 42, ⬛Comparator 6 Tr. 57:20-23.)

333.     At time of hire, Google paid Mr. ⬛Comparator 6 a base salary of $325,000.00, with a 40% bonus target and two equity awards totaling $4,100,000.00 at hire. (Ex. 42; ⬛Comparator 6 Tr. 64:11-65:7.)

334.     Mr. ⬛Comparator 6 did not negotiate his offer package and was leveled as a Level 9 at hire. (Ex. 42, ⬛Comparator 6 Tr. 46:5-47:25.)

335.     Mr. ⬛Comparator 6 does not possess any technical, computing, or scientific educational background.  (Ex. 42, ⬛Comparator 6 Tr. 46:17-47:25; Ex. 44, GOOG-ROWE-0018551.)

336.     Mr. ⬛Comparator 6 holds a Bachelor's degree in Public Policy and a law degree. (*Id*.)

337.     Prior to joining Google, Mr. ⬛Comparator 6 's most senior title was Managing Director. (Ex. 44, GOOG-ROWE-00018551-52.)

338.     Mr. ⬛Comparator 6 had no cloud technology experience prior to joining Google. (Ex. 44, GOOG-ROWE-00018551-52.)

339.     Mr. ⬛Comparator 6 did not have any CTO experience prior to hire. (Ex. 44, GOOG-ROWE-00018551-52.)

340.    Mr. [Comparator 6] did not build engineering products or directly manage engineering teams in his prior role, and did not have technical training with respect to computer science, computer engineering, coding, or programming. (Ex. 42, [Comparator 6] Tr. 46:5-47:25.)

341.    Plaintiff met the requirements of the VP Financial Services role, which included: (i) 15 + years' deep financial services industry experience, with explicit experience commercial/investment banking and/or major brokerage firms; (ii) 10+ years' executive experience; (iii) extensive experience managing information technology and computer systems that support enterprise goals (including exposure to Cloud technologies and machine learning); (iv) established, actionable global executive/C-suite relationships and a sterling reputation within the FS sector; and (v) a PhD or Master of Science degree in Computer Science or related technical field.  (Tomezsko Decl. Ex. 33.)

342.    Among others, the VP Financial Services role qualifications included, "acting as a technical advisor to several project teams," "recognition as a world-class expert and guru both internally and externally for the role," "influencing the function, business and industry through advice related to Google technologies and business strategies," and "shaping the direction and future of the organization and industry by designing, developing and implementing groundbreaking technologies." (Tomezsko Decl. Ex. 33.)

343.    The VP Financial Services role required "an appropriate technical acumen," "an ability to execute strategies from a technical and business perspective," and "extensive experience managing information technology."  (Tomezsko Decl. Ex. 33.)

## G.  GOOGLE DEMOTES PLAINITFF

344.    In April 2019, after denying her the VP Financial Services role, Mr. Shaukat offered Plaintiff three alternative employment options:  1) a role under and reporting to Stuart Breslow; 2) an undefined, "horizontal" role in the Office of the CTO as an individual

contributor, where Plaintiff would be prohibited from working on the financial services vertical;

3) or a different role that she would have to identify and pursue on her own within Google. (Ex.

18, Rowe Tr. 279:7-24.)

345.    All three of these options were less desirable roles than her role in Mr. Shaukat's

organizations and involved decreased scope, visibility, and industry-specific impact. (Ex. 18,

Rowe Tr. 216:20-217:7, 294:20-295:14, 298:9-24.)

346.    With no meaningful alternative, Rowe returned to OCTO under Will Grannis in a

hybrid cloud role in April 2019 after expressing that none of the options were attractive given her

experience and the role she was hired to perform. (Ex. 83, GOOG-ROWE-00056975-76.)

**H.    GOOGLE DENIES PLAINTIFF EQUITABLE CONSIDERATION FOR VP FINANCIAL SERVICES INDUSTRY LEAD ROLE**

347.    In his role as head recruiter for the VP Financial Services role, Mr. Vardaman

communicated with Mr. Shaukat regarding Plaintiff and met directly with Plaintiff, during which

Plaintiff expressed her continued interest in the VP Financial Services role and her concerns

regarding equitable consideration for the position.  (Ex. 68, GOOG-ROWE-00057001-02, 04.)

348.    In January 2019, after Plaintiff raised internal complaints of discrimination in

October 2018 of unequitable consideration for the VP Financial Services role, Stuart Vardaman,

the lead recruiter for the role, unilaterally entered data into Google's applicant feedback

database, Thrive, indicating that Plaintiff was rejected from the VP Financial Services position

because she lacked "Googleyness" (an opinion unsupported by any record evidence or the

assessment of Plaintiff's interviewers), and further describing Plaintiff as "overly self-oriented"

and record that Plaintiff "was not qualified for the role in addition to ego concerns." (Ex. 99,

GOOG-ROWE-00056273.)

349.    On September 17, 2019, Plaintiff filed this lawsuit. ECF No. 1.

350.    On January 22 and 29, 2020, ER interviewed Stuart Vardaman in connection with Plaintiff's complaints of discrimination.  (Ex. 68, GOOG-ROWE-00057001-02, 04.)

351.    Mr. Vardaman understood that the ER investigation was related to Plaintiff's complaints regarding unequal pay and leveling and her consideration for the VP Financial Services role. (Ex. 68, GOOG-ROWE-00057001-02, 04.)

352.    Mr. Vardaman described Plaintiff in his ER interview as "abrasive," "cantankerous," and "bristly." (Ex. 68, GOOG-ROWE-00057001-02, 04.)

353.    In August 2018, prior to learning of Plaintiff's complaints, Mr. Vardaman had described Plaintiff as a candidate with "executive poise," who was "confident (but not ego-driven)," and "forthright with a quick operating cadence."  (Ex. 100, GOOG-ROWE-00017507.)

354.    In February 2020, Plaintiff expressed interest in a Vice President Financial Services Industry Lead ("VP-FSIL") position and met with the Head of the North American Sales, Kirsten Kliphouse, who then instructed her to follow up with Mr. Vardaman, the recruiter for the VP Sales role as well, in order to apply.  (Tomezsko Decl. Ex. 43.)

355.    Qualifications for the VP-FSIL role included:  (i) 15 years of experience in the financial services industry (or FSI related) firms; (ii) 10-years of executive experience; (iii) proven success managing a sales/business development organization; (iv) experience with information technology and computer systems to support enterprise goals (including exposure to Cloud technologies and machine learning); and (v) established, actionable executive/C-suite relationships and a sterling reputation within the financial services sector. (Ex. 46, GOOG-ROWE-00060560-62.)

356.    Plaintiff possessed the requisite qualifications for the VP-FSIL role. (Tomezsko Decl. Ex. 15.)

357.    Ms. Kliphouse indicated that it was "not necessarily a prerequisite that someone has carried a sales revenue number" for her or him to be considered for the role.  (Tomezsko Decl. Ex. 43.)

358.    On February 4, 2020, Plaintiff sent an email to Mr. Vardaman expressing that she would like to be considered for the VP-FSIL role, which he acknowledged by forwarding the job description to her. (Tomezsko Decl. Ex. 43.)

359.    On February 5, 2020, Plaintiff reiterated to Mr. Vardaman her desire to be considered for the VP-FSIL and requested that the Mr. Vardaman provide her with guidance on the next steps in the application process. Mr. Vardaman did not respond to Plaintiff's request for additional information.  (Tomezsko Decl., Ex. 43, GOOG-ROWE-00060571-2.)

360.    On February 10, Plaintiff reached out to Mr. Vardaman again for an update, and received an email from him indicating that he would be scheduling a meeting with her to discuss an "update." (Tomezsko Decl. Ex. 43.)

361.    On February 25, 2020, Mr. Vardaman informed Plaintiff that they "were looking for someone at a VP level scope and scale and with actual C level executive contacts" and she would not be considered for the VP-FSIL role.  (Ex. 47, Vardaman Tr. 138:3-13.)

362.    Mr. Vardaman never gave Plaintiff instructions for how to apply for the position, despite her repeated requests for the information, and does not recall telling Plaintiff she needed to submit a formal application. (Ex. 47, Vardaman Tr. 138:19-25.)

363.    Mr. Vardaman unilaterally determined that Plaintiff was not qualified for a VP level role. (Ex. 47, Vardaman Tr. 139:22-141:9.)

364.    Mr. Vardaman asserts that this determination was made based on comparison to other external candidates, but he does not recall if he had actually interviewed any external

candidates at the time he made that determination with respect to Plaintiff's qualifications. Plaintiff was never interviewed for the role. (Ex. 47, Vardaman Tr. 142:5-145:23.)

365.    Mr. Vardaman did not review any written materials regarding Plaintiff's qualifications for the VP-FSIL role.  (Ex. 47, Vardaman Tr. 142:5-145:23.)

366.    Mr. Vardaman did not recall receiving any instruction from Ms. Kliphouse or anyone else involved in the application process to reject Plaintiff for consideration. (Ex. 47, Vardaman Tr. 142:5-145:23.)

367.    Mr. Vardaman admits that he made no effort to inquire into Plaintiff's C-level network, external reputation as an expert or "industry titan," and that he does not recall whether he even looked at Plaintiff's LinkedIn profile before determining that she was not qualified for the VP-FSIL role. (Ex. 47, Vardaman Tr. 142:5-145:23.)


DATED:   New York, New York
             December 6, 2021

Respectfully submitted,

*/s/ Cara E. Greene*
OUTTEN & GOLDEN LLP
Cara E. Greene
Maya S. Jumper
Shira Z. Gelfand
685 Third Avenue, 25th Floor
New York, New York 10017
Telephone: (212) 245-1000
Facsimile: (646) 509-2060

*Attorneys for Plaintiff*