**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK**

---

ULKU ROWE,

                              Plaintiff,

            v.

GOOGLE LLC,

                              Defendant.

No. 19-cv-08655

**<u>DEFENDANT GOOGLE LLC'S
REPLY IN SUPPORT OF ITS
STATEMENT OF UNDISPUTED
MATERIAL FACTS</u>**

---

Pursuant to Local Civil Rule 56.1, and in further support of its motion for summary judgment on Plaintiff's remaining claims, defendant Google LLC ("Google" or "Defendant") hereby submits this Reply In Support of its Statement of Undisputed Material Facts and response to Plaintiff's Statement of Additional Material Facts Pursuant to Rule 56.1 (ECF 154). Google has organized its responses in accordance with Plaintiff's statement in order to facilitate this Court's review. Google's incorporation of the headings and subheadings in Plaintiff's statement, for example, does not signify that Google admits, concedes, stipulates, or agrees to any express or implied fact, characterization, allegation or argument in those headings or subheadings. Google does not admit, concede, stipulate, or agree to any express or implied fact, characterization, allegation, or argument contained in Plaintiff's responses to Google's statement of facts except as expressly stated and only for purposes of the pending motions for summary judgment.

A genuine issue of material fact exists only if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Pollard v. N.Y. Methodist Hosp.*, 861 F.3d 374, 378 (2d Cir. 2017). Plaintiff must offer "some hard evidence showing that [her] version of the events is not wholly fanciful[.]" *Miner v. Clinton Cnty., N.Y.*, 541 F.3d 464, 471 (2d Cir. 2008). A court must

draw all *permissible* factual inferences in favor of the nonmovant, but "conclusory statements, conjecture, or speculation by the party resisting the motion will not defeat summary judgment[.]" *Flores v. United States*, 885 F.3d 119, 122 (2d Cir. 2018).

Consistent with this requirement, "Local Rule 56.1 clearly states that the moving party's 56.1 statement 'will be deemed to be admitted unless controverted,'" *Universal Calvary Church v. City of New York*, 2000 WL 1745048, at *2 n.5 (S.D.N.Y. Nov. 28, 2000), and requires that "*each statement controverting any statement of material fact[] must be followed by citation to evidence which would be admissible.*" Local R. 56.1(d) (emphasis supplied). Facts that are not contradicted by specific, admissible evidence are deemed admitted for purposes of summary judgment. *Holtz v. Rockefeller & Co., Inc.*, 258 F.3d 62, 73-74 (2d Cir. 2001) (collecting cases), *abrogated on other grounds by Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167 (2009).

Where Plaintiff's citations fail to support the proposition for which they are cited, Plaintiff is "in effect, inviting this Court to peruse a haystack looking for needles" which is "not only inconsistent with the plain requirements of Local Civil Rule 56.1 but, if accepted, would eviscerate summary judgment as an efficient tool for distinguishing claims that should be tried from those that need not be tried." *Fernandez v. DeLeno*, 71 F. Supp. 2d 224, 227-28 (S.D.N.Y. 1999); *see also Estate of Keenan v. Hoffman-Rosenfeld,* 2019 WL 3416374, at *7 (E.D.N.Y. July 29, 2019) ("[I]t is not the role of the Court to search the summary judgment record for evidence supporting a nonmovant's opposition.")

To the extent that Plaintiff asserts any additional facts in response to Google's statement of facts without identifying those facts in additional paragraphs contained in a separate, short and concise statement of additional material facts as to which it is contended that there exists a genuine issue to be tried, Google moves to strike those portions of Plaintiff's responses as failing to comply with Local Rule 56.1(b). The Court should decline to consider those portions of Plaintiff's responses.

*See Birchmore v. Granville Central School Dist.*, No. 18-cv-1456 (GLS)(CFH), 2021 WL 22606, at

*1 (N.D.N.Y. Jan. 4, 2021) (declining to consider additional facts asserted along with Plaintiff's

admissions unless those facts had been submitted through the procedure outlined in nearly identical

local rule). The Court should also decline to consider additional facts asserted in response to that do

not actually challenge the substance of Google's asserted facts. *See Baity v. Kralik*, 51 F Supp. 3d

414, 418 (S.D.N.Y. 2014) ("Many of Plaintiff's purported denials—and a number of his

admissions—improperly interject arguments and/or immaterial facts in response to facts asserted by

Defendants, often speaking past Defendants' asserted facts without specifically controverting those

same facts.") (citations omitted).

1. <u>**DEFENDANT'S REPLY IN FURTHER SUPPORT OF ITS RULE 56.1 STATEMENT OF UNDISPUTED MATERIAL FACT**</u>

### *Google Creates an Innovative New Function*

<u>Def.'s SMF 1:</u>

> In 2016, Will Grannis and Brian Stevens, Chief Technology Officer ("CTO") of Google Cloud, established the Office of the CTO ("OCTO") within Google's Cloud organization. OCTO was an innovative new function that did not exist anywhere else within Google. (Declaration of Will Grannis, ["Grannis Decl."], ¶ 4.)

> <u>Plaintiff's Response to Def.'s SMF 1</u>: Plaintiff **admits** but **avers** that Mr. Grannis utilized job descriptions from other areas of Google in crafting the OCTO function. (Ex. 1, Grannis Tr. 24:7-23.)

> <u>Reply to Def.'s SMF 1</u>: **Remains undisputed**. Google **moves to strike** Plaintiff's additional "facts" asserted in response to Def.'s SMF 1 as unsupported by Plaintiff's citation to the record. Mr. Grannis testified that he "utilized a technical *job family* that had been used elsewhere in Google and put it in engineering for the first time." (Jumper Decl., Exh. 1 at 24:7 – 23 (emphasis supplied).) Plaintiff concedes that a job family is broader than a unique job within that family. (Def.'s SMF 11.)

Def.'s SMF 2:

The vision for OCTO was a team of employees with CTO-like qualities (a unique blend of product, sales, and marketing focus) to represent Google Cloud externally as the technical face of the organization, and be the liaison between clients and Google's engineering teams. They would advise C-level executives at Google's clients on the technical aspects of how to leverage the power of Google Cloud for their business, with the goal of generating interest in Google Cloud and increasing its market share in the cloud computing space. (Grannis Decl., ¶ 5.)

Plaintiff's Response to Def.'s SMF 2: Plaintiff **admits.**

Reply to Def.'s SMF 2: **Remains undisputed.**

Def.'s SMF 3:

The business title[1] for this new role was and still is Technical Director. Grannis and Stevens identified three key "pillars" of responsibility for the job: customer impact, engineering impact, and evangelism or thought leadership. (Grannis Decl., ¶ 6; Declaration of Sara B. Tomezsko ["Tomezsko Decl."] ¶ 2, Exh. 1 ["Rowe Dep."] at 193:8–18; *id.*, ¶ 11, Exh. 10 at P000436–37.)

[1] A business title at Google can be used across multiple job codes and employees have latitude to adjust their business title without changing their role. In contrast, a job title reflects the official label associated with the employee's job code, which is specific to the job family and level. (Lucas Decl., ¶¶ 9, 14.)

Plaintiff's Response to Def.'s SMF 3: Plaintiff **admits**.

Reply to Def.'s SMF 3: **Remains undisputed.**

Def.'s SMF 4:

Customer impact requires Technical Directors to work with Google's most important clients, understand their business needs, and convey how Google Cloud's technology could help them achieve their goals. (Rowe Dep. at 194:6–22; Tomezsko Decl., ¶ 11, Exh. 10 at P000436–37.)

Plaintiff's Response to Def.'s SMF 4: Plaintiff **admits**.

Reply to Def.'s SMF 4: **Remains undisputed.**

Def.'s SMF 5:

Engineering impact requires Technical Directors to guide and advise Google engineers on how to build products that meet industry needs. (Rowe Dep. at 193:21–194:5; Tomezsko Decl., ¶ 11, Exh. 10 at P000437.)

<u>Plaintiff's Response to Def.'s SMF 5:</u> Plaintiff **admits**.

<u>Reply to Def.'s SMF 5:</u> **Remains undisputed.**

<u>Def.'s SMF 6:</u>

Technical Directors do not build or develop Google Cloud products or manage the teams that do, nor are they responsible for the roadmap or budget for any particular product. Those are the responsibilities of Google Cloud's software engineers and product managers. (Grannis Decl., ¶ 7.)

<u>Plaintiff's Response to Def.'s SMF 6</u>: Plaintiff **admits** but **avers** that Technical Directors were hired because they had undertaken these responsibilities in past positions and therefore understood how to advise both customers and Google's internal teams. Moreover, Google Cloud's SWE's and PM's at levels 8 and 9 similarly do not themselves build Google Cloud products. (Rowe Decl. ¶ 21; Ex. 2, GOOG-ROWE-00061501-02; Ex. 3, GOOG-ROWE-00061511-12; Tomezsko Sealing Decl. ¶ 21, Exh. T at GOOG-ROWE-00061510.)

<u>Reply to Def.'s SMF 6</u>: **Remains undisputed**. Google **moves to strike** Plaintiff's additional "facts" asserted in response to Def.'s SMF 6 on the grounds they are not supported by Plaintiff's citation to the record. Jumper Decl., Exhs. 2 and 3 are excerpts of the Software Engineering and Product Manager job ladders for L3 and L4 employees and provide no detail whatsoever about the expectations of Director-level Software Engineers and Product Managers. (Jumper Decl., Exhs. 2, 3.) As Lucas Decl., Exh. 4 (also submitted under seal as Tomezsko Sealing Decl., Exh. T) shows, an L8 Product Manager "own an entire Product Line (or multiple product lines) and is responsible for guiding the PA-level product strategy." (Tomezsko Sealing Decl., Exh. T at GOOG-ROWE-00061525.) Plaintiff is not competent to testify about why Technical Directors in OCTO were hired at any level, as she was not involved in those decisions. Her testimony is therefore inadmissible.

<u>Def.'s SMF 7:</u>

Evangelism or thought leadership requires Technical Directors to convey the power of Google's products externally, and provide strategic thinking into how the industry is changing. Examples include keynote speeches at industry events or publication of whitepapers. (Rowe Dep. 194:23–195:14; Tomezsko Decl., ¶ 11, Exh. 10 at P000437.)

Plaintiff's Response to Def.'s SMF 7: Plaintiff **admits**.

Reply to Def.'s SMF 7: **Remains undisputed.**

Def.'s SMF 8:

Rowe concedes that the job description for the Technical Director role fairly describes the responsibilities of the job she performed in OCTO. (Rowe Dep., 192:19–193:7, 205:15–24; Tomezsko Decl., ¶ 11, Exh. 10 at P000437.)

Plaintiff's Response to Def.'s SMF 8: Plaintiff **admits** and **avers** that from the time the job description was created in 2016 through the present, Google used the same job description to facilitate the hiring and recruitment of all Technical Directors, including Plaintiff and Mr. Harteau, who were "being hired for the same role." (Gelfand Decl. ¶ 2; Ex. 1, Grannis Tr. 74:23-75:2.)

Reply to Def.'s SMF 8: **Remains undisputed**. Plaintiff's additional "facts" asserted in response to Def.'s SMF 8 are **immaterial**; although Google used the same job description to hire both L8 and L9 Technical Directors for the newly created role in OCTO, Plaintiff concedes that roles at varying levels differ in their scope and complexity and knowledge, skills, and abilities that a Googler needs to perform well. (Def.'s SMF 12.)

Def.'s SMF 9:

The ideal candidate for the role would have held a CTO role in an industry Google was targeting for cloud adoption (*e.g.*, financial services, healthcare, energy, media and entertainment, manufacturing, etc.) or a VP Engineering role at a technology company. Prior experience with cloud migration was relevant to a candidate's ability to perform the job. (Grannis Decl., ¶ 8; Tomezsko Decl., ¶ 11, Exh. 10 at P000437.)

Plaintiff's Response to Def.'s SMF 9: Plaintiff **denies** and **avers** that the ideal candidate for the role would have held a CTO, SVP of Engineering, or equivalent technical leader role that has delivered significant business outcomes through cloud related innovation. Plaintiff **admits** that that a candidate's prior experience with cloud migration may be relevant to a candidate's ability to perform the job but **avers** that there are additional skills and experience requirements relevant to the role. (Tomezsko Decl., Ex. 10.)

Reply to Def.'s SMF 9: **Remains undisputed** that the ideal candidate for the role would have held a CTO, SVP of Engineering, or equivalent technical leader role that has delivered significant business outcomes through cloud related innovation, and that a candidate's prior

experience with cloud migration may be relevant to a candidate's ability to perform the job.

Google **moves to strike** Plaintiff's additional "facts" asserted in response to Def.'s SMF 9

that the role required additional skill and experience beyond prior experience with cloud

migration as **immaterial**.

Def.'s SMF 10:

Technical Directors perform roles associated with the Technical Solutions Consultant job family and job ladder. (Declaration of Kevin Lucas ["Lucas Decl."], ¶ 17.)

Plaintiff's Response to Def.'s SMF 10: Plaintiff **admits** but **avers** that there were other roles outside of OCTO and outside of Google Cloud that used the TSC family and ladder as well. The OCTO Technical Directors perform roles that are distinct from the TSC families and ladders that exist outside of OCTO. The TSC ladder, as it was used in OCTO, was not developed when Plaintiff was first hired; rather Mr. Grannis developed it over time. When Plaintiff was hired, there was no separate entry on the TSC ladder for Level 8 and Level 9's. Mr. Grannis understood at that time that "once [an employee] reached L8 there was a general categorization of leadership on the technical solutions consultant ladder, leadership meaning 8 plus." (Ex. 4, Lucas Tr. 104:7- 105:11; Ex. 1, Grannis Tr. 29:6-13, 35:16-36:12.)

Reply to Def.'s SMF 10: **Remains undisputed**. Google **moves to strike** the additional "fact"

asserted in response to Def.'s SMF 10 that there are other TSCs that exist outside OCTO as

**immaterial** to the present motions. The remainder of Plaintiff's additional facts are also

**immaterial** because Plaintiff concedes that roles at varying levels differ in their scope and

complexity and knowledge, skills, and abilities that a Googler needs to perform well. (Def.'s

SMF 12.)

Def.'s SMF 11:

A job family at Google is a group of jobs with a common set of general attributes. Job families are not unique to specific organizations or product areas. Generally, jobs within a job family are organized into a job ladder, which serve as general guidelines to identify general expectations and criteria for jobs within a job family as one progresses in seniority and responsibility. (Lucas Decl., ¶¶ 5, 6, 17.)

Plaintiff's Response to Def.'s SMF 11: Plaintiff **admits.**

Reply to Def.'s SMF 11: **Remains undisputed**.

Def.'s SMF 12:

Within a job ladder, jobs are organized in ascending order by level. Employees are assigned a job level ranging from L1 (entry level) to L9 (the highest director-level position before Vice President). The job level reflects the scope and complexity of the work, the expertise and experience necessary to succeed in the job, and the expected impact the job on the organization. Each grows as an employee's level increases.  (Lucas Decl., ¶¶ 8, 9.)

Plaintiff's Response to Def.'s SMF 12: Plaintiff **denies** and **avers** that "a level refers to the scope and complexity within a role and is defined by the knowledge, skills, and abilities that a Googler needs to perform well." Plaintiff **admits** that within a job ladder, jobs are organized in ascending order by level, and that employees are assigned a job level ranging from Level 1 (entry level) to Level 9 (the highest director-level position before Vice President), but **avers** that the applicable job ladder for Technical Directors in OCTO ended at "L8+", meaning the highest level in the job ladder was comprised of both Level 8 and Level 9. (Ex. 5, GOOG-ROWE-00052153; Ex. 6, GOOG-ROWE-00017719.)

Reply to Def.'s SMF 12: **Remains undisputed** that "a level refers to the scope and complexity within a role and is defined by the knowledge, skills, and abilities that a Googler needs to perform well;" that "within a job ladder, jobs are organized in ascending order by level," and that "employees are assigned a job level ranging from Level 1(entry level to Level 9 (the highest director-level position before Vice President." Google disputes the remainder of the additional "facts" asserted in response to Def.'s SMF 12. (*See* Defendant's Response to Plaintiff's 56.1 Statement of Undisputed Material Facts (ECF 155) ["Pl.'s SMF"] 15.)

Def.'s SMF 13:

Each level within a job family is associated with a unique job code. A job code broadly identifies individuals performing similar functions, but not every individual in a single job code does the same work. Within a job code, employees may have different responsibilities, report to different supervisors, work in different product areas, and perform unique work within their respective organizations. (Lucas Decl., ¶ 4.)

Plaintiff's Response to Def.'s SMF 13: Plaintiff **denies,** except **admits** that each level within a job family is associated with a unique job code and that a job code broadly identifies individuals performing similar functions, and **avers** that all Technical Directors hired from June 2016 until August 2018 reported to the same supervisor, Mr. Grannis, worked in the same product area, and had the same responsibilities. (Ex. 7, GOOG-ROWE-00058304-05.)

Reply to Def.'s SMF 13: **Remains undisputed** that each level within a job family is

associated with a unique job code and that a job code broadly defines individuals performing

similar functions. Plaintiff has failed to cite documentary evidence supporting to refute the

statement that "not every individual in a single job code does the same work," and therefore

admits it. Plaintiff's additional "fact" that all Technical Directors hired from June 2016 until

August 2018 reported to the same supervisor, Mr. Grannis, worked in the same product area,

and had the same responsibilities is not supported by Plaintiff's citation to the record ,and the

Court should disregard it.

Def.'s SMF 14:

In late 2016, Grannis and Stevens determined that the scope, experience, and impact of individuals needed in the newly created Technical Director role in OCTO was commensurate with a L8 or L9 employee within Google. (Grannis Decl., ¶ 9.)

Plaintiff's Response to Def.'s SMF 14: Plaintiff **admits**.

Reply to Def.'s SMF 14: **Remains undisputed**.

Def.'s SMF 15:

All employees hired to perform the Technical Director role were initially hired as individual contributors. Individual contributors are not people managers. Over time, some (but not all) took on people manager responsibilities, and their job codes changed in or around May 2021 as a result. (Grannis Decl., ¶ 13; Lucas Decl., ¶ 17.)

Plaintiff's Response to Def.'s SMF 15: Plaintiff **objects** on the grounds that Defendant has not produced any discovery relating to employees' job code change in or around May 2021 but otherwise **admits** that all Technical Directors were initially hired as individual contributors and that individual contributors are not people managers.

Reply to Def.'s SMF 15: **Remains undisputed**.  Discovery closed prior to the job code change

taking place and before the parties submitted pre-motion letters requesting the opportunity to

file summary judgment motions on April 28, 2021. (ECF 112, 113.)

Def.'s SMF 16:

Plaintiff has always been an individual contributor. (Rowe Dep. at 99:14–24.)

Plaintiff's Response to Def.'s SMF 16: Plaintiff **admits**.

Reply to Def.'s SMF 16: **Remains undisputed.**

Def.'s SMF 17:

Plaintiff has been in job code 5560 (level 8 on the TSC job ladder) since her hire. (Lucas Decl., ¶ 18.)

Plaintiff's Response to Def.'s SMF 17: Plaintiff **admits**.

Reply to Def.'s SMF 17: **Remains undisputed.**

Def.'s SMF 18:

All Technical Directors hired into OCTO between 2016 and 2020 reported either directly or indirectly to Will Grannis. (Grannis Decl., ¶ 14.)

Plaintiff's Response to Def.'s SMF 18: Plaintiff **admits,** but **avers** that she and all Level 9 Technical Directors reported directly to Mr. Grannis. (Ex. 7, GOOG-ROWE-00058304-05.)

Reply to Def.'s SMF 18: **Remains undisputed**. Google **moves to strike** the additional "facts"

asserted in response to Def.'s SMF 9 because they are unsupported by the Plaintiff's citation

to the record. The cited document says nothing about the reporting relationship between Mr.

Grannis and Plaintiff or L9 Technical Directors in OCTO, other than the fact that Plaintiff,

Evren Eryurek, Ben Wilson, and Jeff Kember had recently started reporting to Tariq Shaukat.

(Jumper Decl., Exh. 7 at GOOG-ROWE-00058305.)

### *Grannis Builds the OCTO Team and Most Candidates Are Hired at L8*

Def.'s SMF 19:

Plaintiff has never hired anyone, participated in the process to level someone, or been involved in any levelling discussions at Google. (Rowe Dep., 288:22–289:23.)

Plaintiff's Response to Def.'s SMF 19: Plaintiff **admits** that she never participated in the process of leveling a candidate but **avers** that she participated in the hiring process with respect to other Google candidates, such as ████████, a Global Client Lead candidate, as well as other more junior candidates. (Ex. 8, GOOG-ROWE-00059863, 75-76; Ex. 9, GOOG-ROWE-P-00000780.)

Reply to Def.'s SMF 19: **Remains undisputed** that Plaintiff has never participated in the

process of leveling a candidate and has never been involved in any levelling discussions at Google. Google **moves to strike** the additional "facts" asserted in response to Def.'s SMF 19 as **immaterial** because whether Plaintiff interviewed junior candidates says nothing about her knowledge of Google's leveling process and decisions, given her admission here. Separately, the Court should not consider these additional "facts" as they have not been submitted through the appropriate procedure outlined in Local Rule 56.1(b).

Def.'s SMF 20:

When scheduling interviews with candidates for the Technical Director role, the recruiter made an initial leveling recommendation. (Tomezsko Decl., ¶ 7, Exh. 6 ["Burdis Dep."] at 30:15-21.)

Plaintiff's Response to Def.'s SMF 20: Plaintiff **denies** that the recruiter made an initial leveling recommendation for each of the Technical Director candidates and **avers** that Google changed its policy in October 2019 to state that, as of that point, all interviews scheduled will be assigned a proposed level. (Ex. 10, Burdis Tr. 87:18-88:2; Ex. 11, GOOG-ROWE-00053464.)

Reply to Def.'s SMF 20: **Remains undisputed**. Plaintiff's "dispute" with Def.'s SMF 20 is **not genuine** because it is controverted by the record. Ms. Burdis expressly testified that by the time candidates came in for an interview, she had made an initial assessment about their level. (Tomezsko Decl., Exh. 6 at 30:15 – 21.) It is also **immaterial** that Google allegedly changed its policy in 2019 because that policy could not have formed the basis for any decision by Google with respect to Plaintiff's hiring and leveling in 2016 and 2017.

Def.'s SMF 21:

The nature and amount of the candidate's relevant experience; relevant experience with regard to the specific area of technology required for the role; and educational background were all factors in that initial leveling assessment. (Burdis Dep., 18:4–16, 29:11–30:18, 33:5–16, 95:3–13.)

Plaintiff's Response to Def.'s SMF 21: Plaintiff **denies** and **avers** that the nature and amount of the candidate's relevant experience; relevant experience with regard to the specific area of technology required for the role; and educational background were all factors in deciding whether a candidate be brought in for an interview. Google's policy is not to "make leveling

recommendations based on factors outside of interview process, such as years of experience, education level, and previous job title or company." The Recruiter for the Technical Director role understood Google's policy not to rely on company names and job titles to level a candidate when she was recruiting for the role. (Ex. 10, Burdis Tr. 29:11-30:6, 43:19-44:3; Ex. 11, GOOG-ROWE-00053464.)

Reply to Def.'s SMF 21: **Remains undisputed**. Plaintiff's "dispute" with Def.'s SMF 21 is

**not genuine** because it is controverted by the record. Ms. Burdis testified that she made an

initial assessment about a candidate's level pre-interview. (Def.'s SMF 20.) The criteria she

considered when making that assessment were the same criteria used when determining

whether to bring the candidate in for an interview for a L8 or L9 position within OCTO.

(Tomezsko Decl., Exh. 6 at 18:4–16, 29:11–30:18, 33:5–16, 95:3–13.) Google **moves to**

**strike** additional "facts" asserted in response to Def.'s SMF 21 based on the 2020 policy,

(Jumper Decl., Exh. 11), as **immaterial** because that policy could not have formed the basis

for any decision by Google with respect to Plaintiff's hiring and leveling in 2016 and 2017.

Def.'s SMF 22:

How a candidate performed in interviews informed the leveling recommendation for that candidate as well. (Burdis Dep., 53:23–54:9.)

Plaintiff's Response to Def.'s SMF 22: Plaintiff **admits**, but **avers** that Google's policy states that "it assesses candidates against structured rubrics during the interview process to ensure consistency and reduce bias when evaluating candidates" and advises to "base your recommendation on how the candidate's interview performance aligns with the level expectations of the job family and interview rubrics." With respect to the Technical Director role, Google used the same interview rubrics for each candidate at Level 8 and Level 9. (Ex. 11, GOOG-ROWE-00053464; Ex. 5, GOOG-ROWE-00052153; Ex. 10, Burdis Tr. 42:9-43:18.)

Reply to Def.'s SMF 22: **Remains undisputed**. Google **moves to strike** additional "facts"

asserted in response to Def.'s SMF 22 as **immaterial**. Jumper Decl., Exh. 11 is a 2020 policy

that could not have formed the basis of any decision by Google with respect to Plaintiff's

hiring and leveling in 2016 and 2017. (Jumper Decl., Exh. 11.)

Def.'s SMF 23:

> After interviews, the hiring manager made a leveling recommendation. Two Senior Vice Presidents of Google Cloud evaluated the leveling recommendations provided and made the final leveling determination. (Burdis Dep., 53:23–54:9; Grannis Decl., ¶ 12.)

> Plaintiff's Response to Def.'s SMF 23: Plaintiff **admits** that the hiring manager provided a leveling recommendation after the candidate's interviews. Plaintiff **denies** that the Senior Vice Presidents of Google Cloud evaluated the leveling recommendations or made a final leveling recommendation with respect to the Technical Directors. (Declaration of Diane Greene ISO Defendant's Motion to Quash the Deposition of Diane Greene (ECF 62-1), at ¶¶ 5-11; Ex. 12, Stevens Tr. 61:10-24, 63:7-21.)

> Reply to Def.'s SMF 23: **Remains undisputed**. Plaintiff's "dispute" with Def.'s SMF 23 is **not genuine** because it is controverted by the record. Ms. Burdis testified that the two Senior Vice Presidents she identified in her deposition, Urs Hoelzle and Sridhar Ramswamy, were the two SVP reviewers who made the final decisions on leveling for L8 and L9 Technical Directors in OCTO. (Jumper Decl., Exh. 10 at 53:23–54:21; *see also* Supplemental Declaration of Sara B. Tomezsko In Further Support of Google's Motion for Summary Judgment ["Tomezsko Supp. Decl."], ¶ 14, Exh. 10.) The Court should not consider these additional "facts" as they have not been submitted through the appropriate procedure outlined in Local Rule 56.1(b).

Def.'s SMF 24:

> A majority of candidates for the Technical Director role, including Plaintiff, were hired as L8s. (Grannis Decl., ¶ 10. Lucas Decl., ¶¶ 17–39.)

> Plaintiff's Response to Def.'s SMF 24: Plaintiff **admits** but **avers** that 5 individuals were hired at Level 9 and 12 individuals were hired at Level 8. Although Rowe asked as part of the interview process whether she should be a Level 9, Mr. Grannis told her that all Technical Directors were being hired at Level 8. (Tomezsko Decl., Ex. 18; Ex. 13, GOOG-ROWE-00018014.)

> Reply to Def.'s SMF 24: **Remains undisputed**. Google **moves to strike** additional "facts" asserted in response to Def.'s SMF 24 as **immaterial** and both unsupported or controverted by the record. Google hired five L9 Technical Directors and 19 L8 Technical Directors in

OCTO in the United States between 2016 and the end of 2020. (Lucas Decl., ¶¶ 17–39.) Plaintiff's own notes of the November 20, 2017 conversation with Melissa Lawrence do not attribute the alleged statement that all Technical Directors in OCTO were being hired at L8 to anyone in particular, and certainly not to Mr. Grannis. (Tomezsko Decl., Exh. 18 at P001586.) Separately, the Court should not consider these additional "facts" as they have not been submitted through the appropriate procedure outlined in Local Rule 56.1(b).

Def.'s SMF 25:

> Google hired **Even Eryurek** as an L9 Technical Director effective October 31, 2016. He is based in California. (Lucas Decl., ¶¶ 17, 23.)

> Plaintiff's Response to Def.'s SMF 25: Plaintiff **admits**.

> Reply to Def.'s SMF 25: **Remains undisputed**.

Def.'s SMF 26:

> Eryurek has a Masters' of Science and doctoral degree in nuclear engineering. He had over 25 years of experience in the healthcare industry, an industry targeted for cloud adoption. He had extensive experience developing cloud products and leading large software engineering organizations at GE Healthcare where he spent six years as a CTO in two separate divisions. He was a member of GE's digital leadership team and the senior executive leader responsible for managing GE Software Technologies' $20 billion business. (Grannis Decl., ¶ 33; Tomezsko Decl., ¶ 12, Exh. 11 at GOOG-ROWE-00061917, 20, 24–29.)

> Plaintiff's Response to Def.'s SMF 26: Plaintiff **denies** and **avers** that Mr. Eryurek only had six years of experience in the healthcare industry. His gHire packet notes that his previous experience was in the transportation and process management industry. Moreover, Mr. Eryurek was not the only CTO of GE and ran technology systems supporting parts of the $20 billion business (not the entire business). Plaintiff **admits** that Mr. Eryurek developed cloud products and led large software engineering organizations at GE Healthcare where he spent six years as a CTO in two separate divisions, and that he was a member of GE's digital leadership team. (Tomezsko Decl. Ex. 11.)

> Reply to Def.'s SMF 26: **Remains undisputed** that Mr. Eryurek has a Masters' of Science and doctoral degree in nuclear engineering; that he had extensive experience developing cloud products and leading large software organizations at GE Healthcare where he spent six years as a CTO in two separate divisions; and that he was a member of GE's digital leadership team.

Plaintiff's "dispute" is **not genuine** to the extent it disputes facts or statements supported by

Mr. Eryurek's résumé and hiring packet contemporaneously created during his hiring process.

(Tomezsko Decl., Exh. 11 at GOOG-ROWE-00061917, 20, 24 – 29.)  The Court should not

consider these additional "facts" as to Mr. Eryurek's background as they have not been

submitted through the appropriate procedure outlined in Local Rule 56.1(b).

<u>Def.'s SMF 27:</u>

Eryurek's cloud experience began in 2005. At GE Healthcare, he was a champion for cloud technology in the healthcare industry and worked on the successful release of GE's Health Cloud product using Amazon's cloud platform. (Tomezsko Decl., ¶ 9, Exh. 8 ["Eryurek Dep."] at 36:22–37:17.)

<u>Plaintiff's Response to Def.'s SMF 27:</u> Plaintiff **admits** but **avers** that Mr. Eryurek did not work in the healthcare industry until 2010. Moreover, one of his interviewers noted "I think it would be risky to hire him as he seems too disconnected from the details of cloud computing" and noted that "he might get 'rejected' culturally by Googlers because of the details unless he works hard to catch up quickly." (Tomezsko Decl. Ex. 11.)

<u>Reply to Def.'s SMF 27:</u> **Remains undisputed**.  The Court should not consider the additional

"facts" asserted in response to Def.'s SMF 27 as they have not been submitted through the

appropriate procedure outlined in Local Rule 56.1(b).

<u>Def.'s SMF 28:</u>

Grannis recommended Google hire Eryurek as a L9 Technical Director, and the basis of that recommendation is reflected in Eryurek's hiring packet. (Tomezsko Decl., ¶ 12, Exh. 11 at GOOG-ROWE-00061920.)

<u>Plaintiff's Response to Def.'s SMF 28:</u> Plaintiff **denies** and **avers** that Grannis outlined the reasons why he supported Mr. Eryurek's hire, but did not specify the basis for leveling him as a Level 9, as opposed to a Level 8. (Ex. 14, GOOG-ROWE-00061920.)

<u>Reply to Def.'s SMF 28:</u> **Remains undisputed**. Plaintiff's "dispute" with Def.'s SMF 28 is

**not genuine** because it is controverted by the record. Mr. Grannis' statement of support in

Mr. Eryurek's hiring packet makes explicit reference to his reasons for recommending Google

hire Mr. Eryurek as an L9 Technical Director. (Tomezsko Decl., Exh. 11 at GOOG-ROWE-

00061920.) The Court should not consider the additional "facts" asserted in response to Def.'s

SMF 28 as they have not been submitted through the appropriate procedure outlined in Local

Rule 56.1(b).

Def.'s SMF 29:

Google hired **Scott Pernberthy** as a L8 Technical Director effective December 5, 2016. He remains in that role currently. Penberthy was based in New York City until October 2, 2017, when he relocated to California. (Lucas Decl., ¶¶ 17, 34.)

Plaintiff's Response to Def.'s SMF 29: Plaintiff **admits**.

Reply to Def.'s SMF 29: **Remains undisputed**.

Def.'s SMF 30:

Penberthy earned a doctoral degree in artificial intelligence from the University of Washington and a Masters' of Science in computer science from M.I.T. He had over 31 years of professional experience before joining Google, including as a Managing Director, Technology at PricewaterhouseCoopers, and 18 years of leadership positions at IBM. (Grannis Decl., ¶ 24.)

Plaintiff's Response to Def.'s SMF 30: Plaintiff **admits** but **avers** that Brian Stevens, his interviewer, noted that "he didn't seem to be able to convey architectural choices a customer would need to make to integrate cloud." Another interviewer rated him as a "weak hire." Penberthy never built Enterprise platforms in any industry. His most recent experience was as a Managing Director at PwC, a consulting firm that does not build platforms or operate large technology systems. (Ex. 15, GOOG-ROWE-00063516, 28, 31.)

Reply to Def.'s SMF 30: **Remains undisputed**. The Court should not consider the additional

"facts" asserted in response to Def.'s SMF 30 as they have not been submitted through the

appropriate procedure outlined in Local Rule 56.1(b)

Def.'s SMF 31:

Google hired **Paul Strong** as a L9 Technical Director effective January 9, 2017. Strong is and always has been based in California. (Lucas Decl., ¶ 38.)

Plaintiff's Response to Def.'s SMF 31: Plaintiff **admits.**

Reply to Def.'s SMF 31: **Remains undisputed**.

Def.'s SMF 32:

Strong had over 25 years of experience working at technology companies. He had been a CTO, Global Field at VMWare, a cloud computing and virtualization technology company. At VMWare, Strong led the strategy for building virtual machines (a virtualized version of a physical server), a concept which some consider synonymous with cloud today. He was considered a top candidate to become VMWare's Global CTO. He is an expert in the physical infrastructure and virtualization layers that support cloud-based applications. (Grannis Decl., ¶ 37; Tomezsko Decl., ¶ 13, Exh. 12 at GOOG-ROWE-00061880, 83–86.)

Plaintiff's Response to Def.'s SMF 32: Plaintiff **admits** but **avers** that Strong worked as a field CTO at VMWare in an external-facing role as an evangelist and did not build any products, oversee engineers building things, or own production systems. Brian Stevens, one of Mr. Strong's interviewers noted that he wasn't "able to determine whether he's grounded enough to lead customer engagements in a principled fashion." Another interviewer noted that "for an L8, however, I was hoping or more presence and overall gravitas during the interview…he's not as  strong as the other candidates I've interviewed for this role." Google then hired him at a Level 9.  Another interviewer noted that "I perhaps wish he had known more about GCP specifically." And another noted that "his view of containers was a little out of date." (Ex. 16, GOOG-ROWE-00061883; https://octo.vmware.com/author/paul_strong/; Ex. 16, GOOG-ROWE-00061880, 87-88, 90, 93; Tomezsko Decl. Ex. 12.)

Reply to Def.'s SMF 32: **Remains undisputed**. The Court should not consider the additional "facts" asserted in response to Def.'s SMF 32 as they have not been submitted through the appropriate procedure outlined in Local Rule 56.1(b).

Def.'s SMF 33:

Grannis recommended Google hire Strong as a L9 Technical Director, and the basis of that recommendation is reflected in Strong's hiring packet. Tomezsko Decl., ¶ 13, Exh. 12 at GOOG-ROWE-00061880.)

Plaintiff's Response to Def.'s SMF 33: Plaintiff **denies** and **avers** that Grannis outlined the reasons why he supported Mr. Strong's hire, but did not specify the basis for leveling Mr. Strong at a Level 9, as opposed to a Level 8. (Ex. 16, GOOG-ROWE-00061880; Tomezsko Decl. Ex. 12.)

Reply to Def.'s SMF 33: **Remains undisputed**. Plaintiff's "dispute" with Def.'s SMF 33 is **not genuine** because it is controverted by the record. Mr. Grannis' statement of support in Mr. Strong's hiring packet makes explicit reference to his reasons for recommending Google hire Mr. Strong as an L9 Technical Director. (Jumper Decl., Exh. 16 at GOOG-ROWE-00061880.) The Court should not consider the additional "facts" asserted in response to Def.'s

SMF 33 as they have not been submitted through the appropriate procedure outlined in Local Rule 56.1(b).

Def.'s SMF 34:

Google hired **Jonathan Donaldson** as L9 Technical Director effective February 13, 2017. Donaldson is and has always been based in Oregon. (Lucas Decl., ¶¶ 17, 21.)

Plaintiff's Response to Def.'s SMF 34: Plaintiff **admits.**

Reply to Def.'s SMF 34: **Remains undisputed**.

Def.'s SMF 35:

Donaldson had over 22 years of experience working at technology companies, and had demonstrated expertise in containers (packages of software that virtualize operating systems and enable them to run anywhere) as the lead executive at Intel Corporation responsible for strategy in this area. He also founded the Cloud Native Computing Foundation, the most successful open source foundation for containers and modern compute architectures. He has had experience developing cloud products and setting strategy for cloud adoption since at least 2010. (Grannis Decl., ¶ 39; Tomezsko Decl., ¶ 14, Exh. 13 at GOOG-ROWE-00063078, 81–82.)

Plaintiff's Response to Def.'s SMF 35: Plaintiff **admits** but **avers** that Donaldson only worked at Intel for four years, during which time he was a Vice President (not a senior executive), and Google did not consider Donaldson's container experience when it leveled him or determined his compensation. Plaintiff **denies** that Donaldson founded the Cloud Native Computing Foundation, but **avers** that Intel was a founding member. (Tomezsko Decl. Ex. 13.)

Reply to Def.'s SMF 35: **Remains undisputed**. Plaintiff's "dispute" with portions of Def.'s SMF 35 is **not genuine** to the extent it disputes facts or statements supported by Mr. Donaldson's résumé and hiring packet contemporaneously created during his hiring process. (Tomezsko Decl., Exh. 13 at GOOG-ROWE-00063078, 81 – 21.)   The Court should not consider the additional "facts" asserted in response to Def.'s SMF 35 as they have not been submitted through the appropriate procedure outlined in Local Rule 56.1(b).

Def.'s SMF 36:

Grannis recommended Google hire Donaldson as a L9 Technical Director, and the basis of that recommendation is reflected in Donaldson's hiring packet. (Tomezsko Decl., ¶ 14, Exh.

13 at GOOG-ROWE-00063078.)

Plaintiff's Response to Def.'s SMF 36: Plaintiff **denies** and **avers** that Grannis outlined the reasons why he supported Mr. Donaldson's hire, but did not specify the basis for leveling Mr. Donaldson at a Level 9, as opposed to a Level 8. (Tomezsko Decl. Ex. 13.)

Reply to Def.'s SMF 36: **Remains undisputed**. Plaintiff's "dispute" with Def.'s SMF 36 is

**not genuine** because it is controverted by the record. Mr. Grannis' statement of support in

Mr. Donaldson's hiring packet makes explicit reference to his reasons for recommending

Google hire Mr. Donaldson as an L9 Technical Director. (Tomezsko Decl., Exh. 13 at GOOG-

ROWE-00063078.) The Court should not consider the additional "facts" asserted in response

to Def.'s SMF 36 as they have not been submitted through the appropriate procedure outlined

in Local Rule 56.1(b).

Def.'s SMF 37:

Google hired **Ben Wilson** as a L9 Technical Director effective February 6, 2017. Wilson was and had always been based in Texas. (Lucas Decl., ¶¶ 17, 39.)

Plaintiff's Response to Def.'s SMF 37: Plaintiff **admits.**

Reply to Def.'s SMF 37: **Remains undisputed**.

Def.'s SMF 38:

Wilson had over 25 years of experience at energy and professional services firms, including over 3 years as the CTO – GE Cloud Leader at GE's Oil and Gas decision, and over 6 years as the CIO and Business Transformation Executive at Siemens Energy Sector. There, he demonstrated impressive knowledge in large-scale cloud operations. Wilson understood how to execute cloud migrations and how to instrument cloud platforms from having migrated thousands of applications to the Cloud at GE. (Grannis Decl., ¶ 31; Tomezsko Decl., ¶ 15, Exh. 14 at GOOG-ROWE-00062214, 17–19.)

Plaintiff's Response to Def.'s SMF 38: Plaintiff **admits** but **avers** that Wilson only had three years of cloud experience before joining Google. (Ex. 17, Wilson Tr. 31:3-17; Tomezsko Decl. Ex. 14.)

Reply to Def.'s SMF 38: **Remains undisputed**. Google **moves to strike** Plaintiff's additional

"facts" asserted in response to Def.'s SMF 38 to the extent they are inconsistent with Mr.

Wilson's résumé and hiring packet contemporaneously created during his hiring process. (Tomezsko Decl., Exh. 14 at GOOG-ROWE-00062214, 17–19.) The Court should not consider the additional "facts" asserted in response to Def.'s SMF 38 as they have not been submitted through the appropriate procedure outlined in Local Rule 56.1(b).

Def.'s SMF 39:

Grannis recommended Google hire Wilson as a L9 Technical Director, and the basis of that recommendation is reflected in Wilson's hiring packet. (Tomezsko Decl., ¶ 15, Exh. 14 at GOOG-ROWE-00062214.)

Plaintiff's Response to Def.'s SMF 39: Plaintiff **denies** and **avers** that Grannis outlined the reasons why he supported Mr. Wilson's hire, but did not specify the basis for leveling Mr. Wilson at a Level 9, as opposed to a Level 8. (Tomezsko Decl. Ex. 14.)

Reply to Def.'s SMF 39: **Remains undisputed**. Plaintiff's "dispute" with Def.'s SMF 39 is **not genuine** because it is controverted by the record. Mr. Grannis' statement of support in Mr. Wilson's hiring packet makes explicit reference to his reasons for recommending Google hire Mr. Donaldson as an L9 Technical Director. (Tomezsko Decl., Exh. 13 at GOOG-ROWE-00063078.) The Court should not consider the additional "facts" asserted in response to Def.'s SMF 39 as they have not been submitted through the appropriate procedure outlined in Local Rule 56.1(b).

Def.'s SMF 40:

Google hired **Plaintiff** as a level 8 Technical Director, OCTO, effective March 13, 2017. Plaintiff is and always has been based in New York City. (Lucas Decl., ¶¶ 17, 18.)

Plaintiff's Response to Def.'s SMF 40: Plaintiff **admits.**

Reply to Def.'s SMF 40: **Remains undisputed**.

Def.'s SMF 41:

Plaintiff earned a Masters' of Science degree in computer science from the University of Illinois and had 19 years of experience in financial services, then-most recently at JP Morgan managing the teams that built and maintained the company's credit risk systems. (Tomezsko Decl., ¶ 16, Exh. 15 at GOOG-ROWE-00019097.R, 100.R–01.R.)

<u>Plaintiff's Response to Def.'s SMF 41</u>: Plaintiff **admits** but **avers** that she previously worked at JPMorgan as the Global Head and CTO of Credit Risk Technology, where she led the migration of risk systems to the cloud, was responsible for the global technology platforms for managing JPMorgan's credit risk across all its lines of businesses, countries and asset classes, the world's largest financial services portfolio with $3.7 trillion in total assets and $129 billion revenue. JPMorgan recruited Plaintiff as a "game-changer technology leader" to build the next-generation risk management systems for JPMorgan to enable them to scale up their business growth, ensure regulatory compliance and bring in technical innovation. While at JPMorgan, Plaintiff was an advocate for the public cloud, a member of JPMorgan's Cloud strategy council, and an advisor to the COO on the Company's cloud strategy. Plaintiff was directly responsible for strategy, design, product management, engineering, testing, support, and day to day management of the entire technology platforms globally. Prior to that, Plaintiff was a Managing Director at Bank of America Merrill Lynch, where she was the Global Head of Market Risk Technology. In that role, she was responsible for the global technology platforms managing Bank of America's market risk across all its businesses, countries and asset classes – the world's second largest financial services portfolio with $2.5 trillion in total assets. She led a global, diverse team of 350+ engineers, product managers, business analysts, testers, support personnel across multiple locations in the US, Europe and Asia. Earlier in her career, she held a variety of technology leadership positions at UBS building trading and analytics systems. (Rowe Decl. ¶¶ 5-12.)

<u>Reply to Def.'s SMF 41</u>: **Remains undisputed**. Google **moves to strike** the additional "facts" asserted in response to Def.'s SMF 41 to the extent they are inconsistent with Plaintiff's résumé and the hiring packet contemporaneously created during her hiring process, and therefore **immaterial** as they could not have formed a basis for any decision by Google.

(Tomezsko Decl., Exh. 15 at GOOG-ROWE-00019097.R, 100.R–01.R.)

<u>Def.'s SMF 42</u>:

Plaintiff concedes that the financial services industry had generally been slower to adopt cloud technology than other industries, and that this context matters to the evaluation of her expertise in cloud computing. (Rowe Dep., 94:17–20; 204:11–23.)

<u>Plaintiff's Response to Def.'s SMF 42</u>: Plaintiff **admits** that the financial services industry had generally been slower to adopt cloud technology than other industries but **avers** that while she didn't actively work on a cloud migration until she worked at JPMorgan, she had read and studied the cloud in order to stay current in technology for her role there. Plaintiff otherwise **denies** and **avers** that she stated that the context of being a cloud computing expert in a cloud native company can mean something different than being a cloud expert in financial services. Plaintiff did consider herself an expert in using the cloud in the financial services industry. (Rowe Decl. ¶¶ 3,6-10, 14.)

Reply to Def.'s SMF 42: **Remains undisputed**. Plaintiff's "dispute" with Def.'s SMF 42 is

**not genuine** because it is controverted by the record. Plaintiff testified, "Again, context is

important here. Like being an expert in cloud computing in financial services versus being an

expert in cloud computing in a cloud native company can mean different things, so context is

important." (Tomezsko Decl., Exh. 1 at 204:11 – 23.) Google **moves to strike** the additional

facts asserted in response to Def.'s SMF 42 as **immaterial** to the extent they are inconsistent

with Plaintiff's résumé and hiring packet contemporaneously created during her hiring

process. Tomezsko Decl., Exh. 15 at GOOG-ROWE-00019097.R, 100.R–01.R.) The Court

should not consider the additional "facts" asserted in response to Def.'s SMF 42 to the extent

they have not been submitted through the appropriate procedure outlined in Local Rule

56.1(b).

Def.'s SMF 43:

> Before joining Google, Plaintiff had never completed a successful cloud migration. Rather, she had approximately one year of experience actively working on a cloud migration before she left JP Morgan. Plaintiff had no prior experience building cloud products because JP Morgan did not sell them. (Rowe Dep., 89:14-90:3, 94:5-12, 210:3–9.)

> Plaintiff's Response to Def.'s SMF 43: Plaintiff **denies** and **avers** that at the time she was hired, she was one of the leading people in cloud in financial services and was considered an expert in the field. While at JPMorgan, Plaintiff ran credit risk systems and ran the team that migrated those systems to the cloud. Plaintiff **admits** that had not completed the migration at JPMorgan prior to joining Google. (Rowe Decl. ¶¶ 7-10.)

Reply to Def.'s SMF 43: **Remains undisputed** that Plaintiff had not completed the migration

at JPMorgan prior to joining Google. Plaintiff's "dispute" with the remainder of Def.'s SMF

43 is **not genuine** because it is controverted by the record. Plaintiff testified that JPMorgan

only started its cloud migration "somewhere around a year before [she] left," and "J.P.

Morgan does not sell cloud, so I did not have experience building cloud products." (Rowe

Dep., 89:14-90:3, 94:5-12, 210:3–9.) Google **moves to strike** any portions of Plaintiff's 2021

declaration cited in support of her response to Def.'s SMF 43 that are inconsistent with her

2020 deposition testimony.

Def.'s SMF 44:

Plaintiff told a recruiter for the Technical Director, OCTO position that she was not a cloud expert. (Rowe Dep., 206:5–24, 209:5–9; Tomezsko Decl., ¶ 17, Exh. 16 at P000550.)

Plaintiff's Response to Def.'s SMF 44: Plaintiff **admits** but **avers** that she was coming from an industry that had been late to adopting the cloud, and that when she told the recruiter she was not a cloud expert, she was referring to building cloud products. While JPMorgan didn't build cloud products, it sold products, and Plaintiff considered herself to be a cloud expert within the financial services industry. (Rowe Decl. ¶¶ 6-10.)

Reply to Def.'s SMF 44: **Remains undisputed**. Google **moves to strike** any portions of

Plaintiff's 2021 declaration cited in support of her response to Def.'s SMF 44 that are

inconsistent with her 2020 deposition testimony. Separately, the Court should not consider

the additional "facts" asserted in response to Def.'s SMF 44 as they have not been submitted

through the appropriate procedure outlined in Local Rule 56.1(b).

Def.'s SMF 45:

One of Plaintiff's interviewers noted that she was "a bit more junior than other candidates interviewed for the role," and that "[s]he has experience mostly with one team in one part of the industry and has not done as much on the leadership side because of this." (Tomezsko Decl., ¶ 16, Exh. 15 at GOOG-ROWE-00019103.R.)

Plaintiff's Response to Def.'s SMF 45: Plaintiff **admits** that one interviewer wrote those statements, but **objects** that this interviewer's statement is admissible when offered for the truth of the matter asserted. Plaintiff **avers** that the same interviewer noted that his opinion that she was a "bit more junior" was the only reason for his slightly lower rating. He further noted that Plaintiff had a "long history in this space and should be very good and understanding what can move to Cloud easily and how to address a range of anxieties in the sector" and that "she has already been pushing her company to use the Cloud, well before it was viewed as a reasonable path." Plaintiff **denies** that she was more junior than other candidates interviewed for the role, that her experience was mostly with one team in one part of the industry, or that she had not done as much on the leadership side because of this. (Ex. 19, GOOG-ROWE-00019103.R, 04; Tomezsko Decl. Ex. 15.)

Reply to Def.'s SMF 45: **Remains undisputed**. The contemporaneously-recorded

impressions of Plaintiff's interviewer are not offered for the truth of the matter asserted, but

for the fact that the statements were made. *See United States v. Dupree*, 706 F.3d 131, 136

(2d Cir. 2013) ("If the significance of an offered statement lies solely in the face that it was

made, no issue is raised as to the truth of anything asserted, and the statement is not hearsay.")

In any event, the interviewer who made the comment was Eric Brewer, who interviewed

Plaintiff on November 1, 2016. (Tomezsko Decl., Exh. 15 at GOOG-ROWE-00019103.R.)

By then he had already interviewed Evren Eryurek and Paul Strong, who both held themselves

out as having CTO experience and demonstrated cloud expertise. (Jumper Decl., Exh. 14 at

GOOG-ROWE-00061918; *id.*, Exh. 16 at GOOG-ROWE-00061888.)

Def.'s SMF 46:

> Brian Stevens interviewed Plaintiff and wrote that Plaintiff was "likely not one to drive CxO
> relationships;" that she "may not be the person to broker CIO meetings;" and that it was
> "unclear whether she is senior enough to be a trusted advisor to the CxO and expert enough
> to counsel those that need to make architecture choices." (Tomezsko Decl., ¶ 16, Exh. 15 at
> GOOG-ROWE-00019108.R–09.R, 14.R.)

> Plaintiff's Response to Def.'s SMF 46: Plaintiff **admits** that Mr. Stevens wrote these
> comments, but **objects** that this interviewer's statement is admissible when offered for the
> truth of the matter asserted. Plaintiff **avers** that Mr. Stevens noted that the "strong blend of
> LOB + IT makes her a great add." He also stated that Plaintiff was a "strong communicator
> which will be important internally and externally" and that she was able to "clearly enumerate
> all the reasons why [JPMorgan] should be more aggressively on cloud" and "articulate the
> challenges of legacy firms in moving faster," that she was "well-versed in IT as she used to
> run some portion of it as UBS" and that he could "see her actively sponsoring projects at firms
> and making sure they are successful." Plaintiff **denies** that she was not one likely to drive
> CxO relationships, that she may not be the person to broker CIO meetings, and that it was
> unclear whether she was senior enough to be a trusted advisor to the CxO and expert enough
> to counsel those that need to make architecture choices. (Ex. 19, GOOG-ROWE-
> 00019108.R.)

> Reply to Def.'s SMF 46: **Remains undisputed**. The contemporaneously-recorded
> impressions of Plaintiff's interviewer are not offered for the truth of the matter asserted, but
> for the fact that the statements were made. *See United States v. Dupree*, 706 F.3d 131, 136
> (2d Cir. 2013) ("If the significance of an offered statement lies solely in the face that it was
> made, no issue is raised as to the truth of anything asserted, and the statement is not hearsay.")

Plaintiff's "dispute" with Def.'s SMF 46 is **not genuine** because Google is not offering the statement to prove the truth of the matter asserted.

Def.'s SMF 47:

Hiring manager Will Grannis interviewed Plaintiff and asked her what she knew about Google Cloud Platform. He recorded that her answer was "[n]ot very much." (Tomezsko Decl., ¶ 16, Exh. 15 at GOOG-ROWE-00019115.R–16.R.)

Plaintiff's Response to Def.'s SMF 47: Plaintiff **admits** that Will Grannis wrote that her answer was "not very much," but **avers** that at the time of Plaintiff's interview, Google Cloud Platform ("GCP") had no presence and was not seen as a player in financial services, something Google was trying to address by hiring Technical Directors in the financial services vertical. At that time, Plaintiff had experience with a GCP competitor, Amazon Web Services (AWS) and Mr. Grannis noted that Plaintiff "described knowledge of AWS at high level." Another interviewer noted that Plaintiff "was able to compare GCP to AWS and Azure [another GCP competitor] in a credible way." (Rowe Decl. ¶ 10; Ex. 19, GOOG-ROWE-00019106.R; Tomezsko Decl. Ex. 15.)

Reply to Def.'s SMF 47: **Remains undisputed**. The Court should not consider the additional "facts" asserted in response to Def.'s SMF 47 to the extent they have not been submitted through the appropriate procedure outlined in Local Rule 56.1(b).

Def.'s SMF 48:

Grannis recommended Google hire Plaintiff as an L8 Technical Director "[b]ased on the positive, consistent feedback from the panel, the criticality of financial services as a vertical for Google Cloud, and the candidate's clear demonstration of readiness to make an immediate impact as an L[level]-8. . . ." (Tomezsko Decl., ¶ 16, Exh. 15 at GOOG-ROWE-00019097.R.)

Plaintiff's Response to Def.'s SMF 48: Plaintiff **admits** but **avers** that while Grannis outlined the reasons why he supported Ms. Rowe's hire, he did not specify the basis for leveling her at Level 8, as opposed to a Level 9. (Ex. 19, GOOG-ROWE-00019107.R.)

Reply to Def.'s SMF 48: **Remains undisputed**. Plaintiff's "dispute" with Def.'s SMF 48 is **not genuine** because it is controverted by the record. Mr. Grannis' statement of support in Plaintiff's hiring packet makes explicit reference to his reasons for recommending Google hire her as an L8 Technical Director. (Tomezsko Decl., Exh. 15 at GOOG-ROWE-00019197.R.)

<u>Def.'s SMF 49:</u>

Google hired **Nicholas Harteau** as a L9 Technical Director effective May 15, 2017. Harteau was based in New York City. (Lucas Decl., ¶¶ 17, 27.)

<u>Plaintiff's Response to Def.'s SMF 49:</u> Plaintiff **admits**.

<u>Reply to Def.'s SMF 49:</u> **Remains undisputed.**

<u>Def.'s SMF 50:</u>

Harteau had approximately 19 years of experience working for technology companies including Spotify, a Google Cloud client. (Tomezsko Decl., ¶ 18, Exh. 17 at GOOG-ROWE-00056318.R, 21.R–22.R.)

<u>Plaintiff's Response to Def.'s SMF 50:</u> Plaintiff **admits** but **avers** that Mr. Harteau did not finish high school or have a college degree. (Ex. 20, GOOG-ROWE-00056318.R, 27R; Tomezsko Decl. Ex. 17.)

<u>Reply to Def.'s SMF 50:</u> **Remains undisputed.**

<u>Def.'s SMF 51:</u>

He was among a very small group of people to have both leadership and engineering experience deploying and migrating products to the cloud at such a large scale. (Grannis Decl., ¶ 35.)

<u>Plaintiff's Response to Def.'s SMF 51:</u> Plaintiff **denies** and **avers** that Mr. Grannis believed that Mr. Harteau was among few people in the industry to have both leadership experience engineering knowledge of how to scale an enterprise with public cloud. Plaintiff further **denies** that Mr. Grannis considered this information when deciding to hire Mr. Harteau at a Level 9. (Ex. 20, GOOG-ROWE-00056318.R; Tomezsko Decl. Ex. 17.)

<u>Reply to Def.'s SMF 51:</u> **Remains undisputed**. Plaintiff's "dispute" with Def.'s SMF 51 is

**not genuine** because Plaintiff's citations to the record do not support the proposition for which

they are cited. Plaintiff is not competent to say what Mr. Grannis considered when deciding

to hire Mr. Harteau at L9 because she concedes she was not involved in any hiring or leveling

decisions at Google, and she certainly was not involved in decisions with respect to Mr.

Harteau. (Def.'s SMF 19.) Whether or not Plaintiff agrees with the description of Mr.

Harteau's credentials is also **immaterial** if, as she concedes, the hiring manager for the role

believed that description to be true.

Def.'s SMF 52:

One of Harteau's interviewers noted that Harteau's "leadership circle talk in March 2016 was one of the best talks I've seen on transformation and migration to the cloud. It seems almost a coup to get him as a candidate in the OCTO." (Tomezsko Decl., ¶ 18, Exh. 17 at GOOG-ROWE-00056326.R.)

Plaintiff's Response to Def.'s SMF 52: Plaintiff **admits** but **avers** that this interviewer noted that Mr. Harteau "hasn't done real customer facing roles." Another interviewer noted that he was "not entirely unbiased" in his interview and that he "tried to be impartial, but its hard" since they previously had worked together. (Ex. 20, GOOG-ROWE-00056326.R, 33R; Tomezsko Decl. Ex. 17.)

Reply to Def.'s SMF 52: **Remains undisputed**. The Court should not consider the additional

"facts" asserted in response to Def.'s SMF 47 as they have not been submitted through the

appropriate procedure outlined in Local Rule 56.1(b).

Def.'s SMF 53:

Stevens recommended that Google hire Harteau as a L9 Technical Director because Harteau's candidate packet was "one of the strongest . . . [he had] ever seen." (Tomezsko Decl., ¶ 18, Exh. 17 at GOOG-ROWE-00056318.R.)

Plaintiff's Response to Def.'s SMF 53: Plaintiff **admits** but **avers** that while Grannis outlined the reasons why he supported Mr. Harteau's hire, he did not specify the basis for leveling Mr. Harteau at a Level 9, as opposed to a Level 8. (Ex. 20, GOOG-ROWE-00056318.R; Tomezsko Decl. Ex. 17.)

Reply to Def.'s SMF 53: **Remains undisputed**. Google disputes the additional "facts"

asserted in response because they are controverted by the record. (*See* Defendant's Response

to Pl.'s SMF 61.)

Def.'s SMF 54:

Google hired **Eric Schenk** as a L8 Technical Director effective December 4, 2017. He remains in that role currently. He is based in Washington State. (Lucas Decl., ¶¶ 17, 35.)

Plaintiff's Response to Def.'s SMF 54: Plaintiff **admits**.

Reply to Def.'s SMF 54: **Remains undisputed**.

Def.'s SMF 55:

Schenk earned a doctoral degree in computer science from the University of Toronto and a Masters' of Science degree in computer science from the University of Calgary. He had over 23 years of professional experience working at technology companies like Amazon.com and Electronic Arts where he was the CTO of EATech. (Grannis Decl., ¶ 25.)

Plaintiff's Response to Def.'s SMF 55: Plaintiff **admits**.

Reply to Def.'s SMF 55: **Remains undisputed**.

Def.'s SMF 56:

Plaintiff concedes that Schenk's experience and skills are comparable to her own. (Rowe Dep., 130:23–131:10.)

Plaintiff's Response to Def.'s SMF 56: Plaintiff **admits**.

Reply to Def.'s SMF 56: **Remains undisputed**.

Def.'s SMF 57:

Google hired **Mark Kropf** as a L8 Technical Director effective January 6, 2020. He is based in New York City. (Lucas Decl., ¶¶ 17, 29.) He had a technology background and a competing offer for a Managing Director role at a large financial institution. (Grannis Decl., ¶ 19.)

Plaintiff's Response to Def.'s SMF 57: Plaintiff **admits**.

Reply to Def.'s SMF 57: **Remains undisputed**.

Def.'s SMF 58:

Between November 2016 and year-end 2020, Google hired 11 others into the Technical Director role as L8s in the United States. Aside from Kropf and Penberthy, only one, Jeff Sternberg, was based in New York City at any point during the relevant time period. (Lucas Decl., ¶¶ 17–37.)

Plaintiff's Response to Def.'s SMF 58: Plaintiff **admits**.

Reply to Def.'s SMF 58: **Remains undisputed**.

Def.'s SMF 59:

Others hired as L8 Technical Directors have varied years of experience, ranging from approximately 14 years to over 31 years working in various industries before coming to

Google. (Grannis Decl., ¶¶ 15–27.)

Plaintiff's Response to Def.'s SMF 59: Plaintiff **admits** but **avers** that Google does not consider years of experience when leveling Technical Directors. (Ex. 11, GOOG-ROWE-00053464.)

Reply to Def.'s SMF 59: **Remains undisputed**. Google **moves to strike** the additional "facts" asserted in response to Def.'s SMF 59 as **immaterial** because they are based on a 2020 policy that could not have formed the basis for any decisions by Google with respect to the hiring and leveling of any L8 and L9 Technical Directors hired before that policy came into effect. (Jumper Decl., Exh. 11 at GOOG-ROWE-00053464.)

Def.'s SMF 60:

Others hired as L8 Technical Directors include individuals that possess advanced degrees in computer science like Plaintiff. (Grannis Decl., ¶¶ 15, 18, 24, 25.)

Plaintiff's Response to Def.'s SMF 60: Plaintiff **admits** but **avers** that some Technical Directors at Level 8 and Level 9 do not have advanced degrees, or any degrees at all. Plaintiff **denies** that Google considered candidates' advanced degrees when making leveling or pay decisions. (Ex. 20, GOOG-ROWE-00056318.R, 27R; Tomezsko Decl. Ex. 17.)

Reply to Def.'s SMF 60: **Remains undisputed**. Plaintiff's "dispute" with a portion of Def.'s SMF 60 is **not genuine** because it is unsupported by Plaintiff's citation to the record. Neither Jumper Decl., Exh. 20 nor Tomezsko Decl., Exh. 17 reference Google's consideration (or lack thereof) of anyone's advanced degrees when making leveling or pay decisions. Plaintiff also is not competent to testify as to what Google considered when making leveling or pay decisions because she concedes she was not involved in any hiring or leveling decisions at Google. (Def.'s SMF 19.)

Def.'s SMF 61:

Others hired as L8 Technical Directors include individuals with prior experience as a CTO at a technology company. (Grannis Decl., ¶¶ 15, 17, 19, 25.)

Plaintiff's Response to Def.'s SMF 61: Plaintiff **admits** but **avers** that some Technical Directors at Level 8 and Level 9 did not have prior experience as a CTO at a technology

company or at any company. Plaintiff **denies** that Google considered candidates' prior experience as a CTO at a technology company when making leveling or pay decisions. (Ex. 20, GOOG-ROWE-00056318.R; Ex. 11, GOOG-ROWE-00053464; Tomezsko Decl. Ex. 17.)

Reply to Def.'s SMF 61: **Remains undisputed**. Plaintiff's "dispute" with a portion of Def.'s

SMF 61 is **not genuine** because it is unsupported by Plaintiff's citation to the record. Neither

Jumper Decl., Exh. 20 nor Tomezsko Decl., Exh. 17 reference Google's consideration (or lack

thereof) of anyone's prior experience as a CTO when making leveling or pay decisions.

Plaintiff also is not competent to testify as to what Google considered when making leveling

or pay decisions because she concedes she was not involved in any hiring or leveling decisions

at Google. (Def.'s SMF 19.) Google **moves to strike** the additional "facts" asserted in

response to Def.'s SMF 61 to the extent they are based on a 2020 policy, as that policy could

not have formed the basis of any decision by Google with respect to Technical Directors in

OCTO hired before that policy took effect. (Jumper Decl., Exh. 11 at GOOG-ROWE-

00053464.) Separately, the Court should not consider the additional "facts" asserted in

response to Def.'s SMF 61 as they have not been submitted through the appropriate procedure

outlined in Local Rule 56.1(b).

Def.'s SMF 62:

Others hired as L8 Technical Directors include individuals who spent years actively working on cloud products or performing cloud migrations. (Grannis Decl., ¶¶ 17, 18, 19, 20, 21, 22, 25, 26, 27.)

Plaintiff's Response to Def.'s SMF 62: Plaintiff **admits** but **avers** that some Technical Directors at Level 8 and Level 9 had not spent years actively working on cloud products or performing cloud migrations. Plaintiff **denies** that Google considered candidates' prior experience spending years actively working on cloud products or performing cloud migrations when making leveling or pay decisions. (Ex. 15, GOOG-ROWE-00063516 Tomezsko Decl. Ex. 12-13; Ex. 16, GOOG-ROWE-00061880.)

Reply to Def.'s SMF 62: **Remains undisputed**. Plaintiff's "dispute" with a portion of Def.'s

SMF 62 is **not genuine** because it is controverted by the record. Google plainly considered

prior experience actively working on cloud products or performing cloud migrations when making leveling decisions. (Tomezsko Decl., Exh. 11 at GOOG-ROWE-00061920; *id.*, Exh. 12 at GOOG-ROWE-00061880; *id.*, Exh. 14 at GOOG-ROWE-00062214; Exh. 17 at GOOG-ROWE-00056318.R;  *id.*, Exh. 16 at P000550 (recruiter reporting that role of Technical Director in OCTO may not be right for Plaintiff given her admissions she was not a cloud expert). Plaintiff also is not competent to testify as to what Google considered when making leveling or pay decisions because she concedes she was not involved in any hiring or leveling decisions at Google. (Def.'s SMF 19.) Separately, the Court should not consider the additional "facts" asserted in response to Def.'s SMF 62 as they have not been submitted through the appropriate procedure outlined in Local Rule 56.1(b).

Def.'s SMF 63:

Plaintiff's leveling at hire is the only basis for her belief that her compensation and equity refresh grants are lower than certain men. (Rowe Dep., 284:5–22.)

Plaintiff's Response to Def.'s SMF 63: Plaintiff **denies** and **avers** that her basis for her belief that her compensation and equity refresh grants are lower than certain men include the leveling at hire, Google's practices with respect to paying higher compensation to people at higher levels, and information learned in the course of discovery in this lawsuit. (Ex. 18, Rowe Tr. 158:5-162:20; 284:5-22.)

Reply to Def.'s SMF 63: **Remains undisputed**. Plaintiff's "dispute" with Def.'s SMF 63 is **not genuine** because it is controverted by the record and Plaintiff's testimony. Plaintiff's testimony is clear:

> Q:   Tell me everything that leads you to believe that the equity refreshes you got, the amount of them, or when you didn't get equity refreshes, what leads you to believe that that was because of your sex.

> A:   Well, I was down-leveled on hire, and that translated into lower compensation as well as lower equity refreshes compared to my male peers.

> Q:   Is there anything else that leads you to believe that your equity awards were based on your sex?

> A:  Well, yeah, I can't think of anything else, it's basically the way that I was leveled, and that carried on, you know, that continued to haunt me, so to speak, through my time at Google.

(Jumper Decl., Exh. 18 at 284:5 – 22.) The Court should not consider the additional "facts" asserted in response to Def.'s SMF 63 as they have not been submitted through the appropriate procedure outlined in Local Rule 56.1(b).

<u>Def.'s SMF 64</u>:

Plaintiff does not believe that Will Grannis or Brian Stevens treated her differently because of her sex, other than the fact that they participated in the decision to hire her as an L8 Technical Director. (Rowe Dep., 313:2–22.)

<u>Plaintiff's Response to Def.'s SMF 64</u>: Plaintiff **admits**.

<u>Reply to Def.'s SMF 64</u>: **Remains undisputed**.

<u>Def.'s SMF 65</u>:

The fact that she was hired as an L8 and Eryurek, Strong, Wilson, Donaldson, and Harteau were hired as L9s is the only reason Plaintiff believes her leveling at hire was because of her sex. (Rowe Dep., 238:5–239:11.)

<u>Plaintiff's Response to Def.'s SMF 65</u>: Plaintiff **denies** and **avers** that she believes Google's leveling decision was based on sex because her experience and qualifications were commensurate with, or exceeded, the Level 9 male Technical Directors; she was performing the same role as Level 9 male Technical Directors; she was told that all Technical Directors were being hired as Level 8, but then subsequently learned that Google had hired certain men at Level 9; and subsequent discriminatory behavior against Plaintiff and information learned in the course of discovery in this lawsuit suggest the existence of bias. (¶ 8, 12-13, 22, 24, 63, 68, *supra*.)

<u>Reply to Def.'s SMF 65</u>: **Remains undisputed**. Plaintiff's "dispute" with Def.'s SMF 65 is **not genuine** because it is controverted by the record and Plaintiff's testimony.  Plaintiff's testimony is clear:

> Q:  So other than the fact that you have identified these men as your comparators, other than the fact that you believe that you are sufficiently similar to them in terms of your qualifications, your experience and your job, other than that, is there anything else that leads you to believe that your leveling at hire was because of your sex?
>
> A:  I can't think of anything else right now.

(Tomezsko Decl., Exh. 1 at 239:2 – 11.)

Def.'s SMF 66:

Plaintiff testified that she is only comparing herself to L9 Technical Directors for purposes of her pay claims and when she learned that one of her alleged comparators she identified in discovery was an L8, she changed her testimony as to whether she was comparable to that employee. (Rowe Dep., 109:4–21.)

Plaintiff's Response to Def.'s SMF 66: Plaintiff **admits** but **avers** that she is not a lawyer and that the question of who her comparators are for purposes of pay claims concerns questions of law. Plaintiff further **avers** that her comparators for purposes of her equal pay claims include not only the L9 Technical Directors who were and are paid more than her, but also a broader group of individuals. (¶¶ 196-282, *supra*.)

Reply to Def.'s SMF 66: **Remains undisputed**. Google **moves to strike** the additional "facts" asserted in response to Def.'s SMF 66 as unsupported by the record and improperly asserting counsel's argument under the guide of a "fact." Plaintiff's purported lack of understanding as to what makes someone a comparator for purposes of her equal pay claims is **immaterial** given that Plaintiff was represented by counsel when she submitted her interrogatories her alleged comparators, under oath. (Tomezsko Decl., Exh. 1 at 109:4–21.)

### Plaintiff Makes Her First Complaint to Human Resources

Def.'s SMF 67:

In November 2017, Plaintiff complained to Human Resources that she believed she was under-leveled at hire. (Rowe Dep., 23:9–21, 25:3–26:11; Tomezsko Decl., ¶ 19, Exh. 18.)

Plaintiff's Response to Def.'s SMF 67: Plaintiff **admits** but **avers** that in November 2017, Plaintiff raised complaints of discrimination to Melissa Lawrence in Human Resources with respect to her leveling at hire, Google's decision to deny her an equity refresh in 2017, and that she wanted to be considered for the VP Financial Services role, as she was told at her hire that she would be the obvious choice to lead it. (Ex. 18, Rowe Tr., 23:9–21, 25:3–26:11; Tomezsko Decl. Ex. 18.)

Reply to Def.'s SMF 67: **Remains undisputed**. The Court should not consider the additional "facts" asserted in response to Def.'s SMF 60 to the extent that they have not been submitted through the appropriate procedure outlined in Local Rule 56.1(b).

Def.'s SMF 68:

> Human Resources investigated her complaint and concluded that she was hired at the appropriate level. (Tomezsko Decl., ¶ 20, Exh. 19.)

Plaintiff's Response to Def.'s SMF 68: Plaintiff **denies** and **avers** that HR conducted only a conclusory investigation, did not question her interviewers, did not review the basis for initial leveling decisions, and told Plaintiff that "there is no process to revisit leveling decisions after hire. The only way to address concerns with level is to seek promotion." While HR wrongly concluded that she was hired at the appropriate level, it had twice compared her experience and qualifications to the Level 9 Technical Directors and noted that Ms. Rowe had similar, if not equal, experience and qualifications to the Level 9 Technical Directors, specifically that "1 Male was hired into an L9 role with 18.9 years of experience, about the same as - or 0.2 years less than - the complainant." (Tomezsko Decl. Ex. 19; Ex. 13, GOOG-ROWE-00018014, Ex. 21, GOOG-ROWE-00058500.)

Reply to Def.'s SMF 68: **Remains undisputed**. Plaintiff's "dispute" with Def.'s SMF 68 is

**not genuine** because it is controverted by the record and Plaintiff's opinion about the

sufficiency of the investigation is **immaterial**. As Plaintiff's own exhibits show, the

investigation summary includes the conclusion, "Overall we did not find evidence that the

complainant had significantly more work experience at the time she was hired than her male

peers hired within a year of her hire date," (Jumper Decl., Exh. 21), and Melissa Lawrence in

Human Resources told Plaintiff, "I did review your concerns with Will [Grannis] before the

break and we felt comfortable with the leveling decision made at hire." (Tomezsko Decl.,

Exh. 19 at GOOG-ROWE-00017406.) Employee Relations also noted, "Tech versus non-tech

experience was the most heavily considered factor when gauging L8 versus L9 for similar

years of work experience." (Jumper Decl., Exh. 40 at GOOG-ROWE-00018015.) The Court

should not consider the additional "facts" asserted in response to Def.'s SMF 68 to the extent

that they have not been submitted through the appropriate procedure outlined in Local Rule

56.1(b).

***Plaintiff Is Well Compensated Throughout Her Time at Google***

Def.'s SMF 69:

The main components of total compensation at Google are salary, bonus, and equity awards ("Total Annual Compensation"). (Declaration of Chris Humez ("Humez Decl."), ¶ 4.)

Plaintiff's Response to Def.'s SMF 69: Plaintiff **admits**.

Reply to Def.'s SMF 69: **Remains undisputed**.

Def.'s SMF 70:

Salary range is a function of job code, level, and location, and individual salary also takes into account experience and performance. (Humez Decl., ¶¶ 5–6.)

Plaintiff's Response to Def.'s SMF 70: Plaintiff **admits** but **avers** that hiring managers and compensation analysts may deviate from the modeled amount, but that the hiring manager, Mr. Grannis, did not know any of the Technical Directors' compensation packages at hire, and therefore did not do so. There is no evidence that discretion was used to determine compensation for the Level 9 Technical Directors. (Ex. 1, Grannis Tr. 130:19-131:2.)

Reply to Def.'s SMF 70: **Remains undisputed**. The Court should not consider the additional

"facts" asserted in response to Def.'s SMF 70 as they have not been submitted through the

appropriate procedure outlined in Local Rule 56.1(b).

Def.'s SMF 71:

Annual bonus is backward looking and rewards employees for their performance and contributions over the past year. Target bonus is generally expressed as a percentage of an employee's salary, which generally increases with the employee's level. Actual bonus received is a function of performance each year and the amount of time worked during the review cycle. (Humez Decl., ¶ 8.)

Plaintiff's Response to Def.'s SMF 71: Plaintiff **admits** but **avers** that Technical Directors at Level 8 had a 30% bonus target while Technical Directors at Level 9 had a 40% bonus target. (Ex. 22, GOOG-ROWE-00054266.)

Reply to Def.'s SMF 71: **Remains undisputed**. Google **moves to strike** the additional "facts"

asserted in response to Def.'s SMF 71 as **immaterial** given that Plaintiff received a larger

bonus payment than L9 Technical Director in OCTO Nicholas Harteau in 2017, (Pl.'s SMF

82, 84), and actual bonus amounts are entirely discretionary. (Defendant's Rule 56.1 Counterstatement of Facts In Opposition to Plaintiff's Partial Motion for Summary Judgment ["Def.'s Counter. SMF"] 161.)

Def.'s SMF 72:

> Annual equity awards are called "equity refresh grants" at Google. Equity refresh grants reward performance and contributions over the past year but are also intended to be a forward-looking incentive reflecting the employee's criticality and potential. Equity is valued at date of grant. (Humez Decl., ¶ 13.)

> Plaintiff's Response to Def.'s SMF 72: Plaintiff **admits** but **avers** that equity refresh grants have guidelines based on job code. Technical Directors at Level 8 had lower equity refresh grant potential than Level 9 Technical Directors. (Ex. 22, GOOG-ROWE-00054266.)

> Reply to Def.'s SMF 72: **Remains undisputed**. Google **moves to strike** the additional "facts" asserted in response to Def.'s SMF 72 as **immaterial** given that Plaintiff received a larger equity refresh grant than certain L9 Technical Directors in OCTO in 2020. (*See* Defendant's Response to Pl.'s SMF 93.)

Def.'s SMF 73:

> Before she accepted her offer to join Google, Plaintiff negotiated a total compensation package that was significantly above Google's modeled compensation recommendation for her job code in her compensation region. (Humez Decl., ¶¶ 19–21.)

> Plaintiff's Response to Def.'s SMF 73: Plaintiff **admits** but **avers** that other Technical Directors at Level 8 and Level 9 negotiated or were offered higher compensation packages, yet Google's recruiter negatively commented that Plaintiff "put up a fight" when it came to compensation. (Greene Decl. ¶¶ 2-8; Ex. 23, GOOG-ROWE-00017999.)

> Reply to Def.'s SMF 73: **Remains undisputed**. Google **moves to strike** the additional "fact" that other L8 and L9 Technical Directors negotiated higher compensation packages unsupported by the record and Plaintiff's citation. Google also **moves to strike** the additional "fact" regarding the alleged statement by a recruiter as supported by inadmissible hearsay if offered for the truth of the matter asserted. *See* Fed. R. Civ. P., Rule 56(c)(2); Local Rule 56.1(d).

Def.'s SMF 74:

Plaintiff received the second-highest sign-on bonus offered to any Technical Director, regardless of level or gender. (Humez Decl., ¶ 45.)

Plaintiff's Response to Def.'s SMF 74: Plaintiff **admits** but **avers** that Google granted her a sign-on bonus as a replacement for the bonus she forfeited by leaving JPMorgan before her annual bonus was to be paid. Further, Google paid other Technical Directors, at Level 8 and Level 9, higher annual total compensation packages. (Ex. 24, P000235; Greene Decl. ¶¶ 2-8; ¶ 77, *supra*.)

Reply to Def.'s SMF 74: **Remains undisputed**. The purported reasons for Google's decision to pay Plaintiff a sign-on bonus are **immaterial**. The Court should not consider this additional "fact" asserted in response to Def.'s SMF 74 as it has not been submitted through the appropriate procedure outlined in Local Rule 56.1(b).

Def.'s SMF 75:

She received two new hire equity grants collectively worth more than $2.3 million at the time of grant. This was one of the highest new hire equity grant packages offered to any Technical Director regardless of level or gender. (Humez Decl., ¶ 45.)

Plaintiff's Response to Def.'s SMF 75: Plaintiff **admits** but **avers** that Google granted her additional equity to replace the equity she forfeited by leaving JPMorgan before her equity vested. Further, Google paid other Technical Directors, at Level 8 and Level 9, higher annual total compensation packages. (Greene Decl. ¶¶ 2-8; Ex. 24, P000235; ¶ 77, *supra*.)

Reply to Def.'s SMF 75: **Remains undisputed**. The purported reasons for Google's decision to award Plaintiff lucrative new hire equity grants are **immaterial**. The Court should not consider this additional "fact" asserted in response to Def.'s SMF 75 as it has not been submitted through the appropriate procedure outlined in Local Rule 56.1(b).

Def.'s SMF 76:

In 2017, no employees hired between January 1 and August 28, 2017, were eligible to receive a new hire equity grant that calendar year. Grannis made an exception for Plaintiff and three other employees on his team and awarded them equity refresh grants. (Tomezsko Decl., ¶ 19, Exh. 18; *id.*, ¶ 21, Exh. 20.)

<u>Plaintiff's Response to Def.'s SMF 76:</u> Plaintiff **admits** but **avers** that Google changed its equity refresh grant policy after Plaintiff's hire, and she was told at the time of hire she would be eligible based on prior years' criteria. As a result, Google granted equity refreshes to the four Technical Directors hired in Q1 2017 with an Exceeds Expectations rating. Mr. Grannis noted to Melissa Lawrence in HR that "[p]rivately, this did feel a bit like moving goal posts" and that "for a company that projects the values of fairness and transparency, it's really poor form in how and when it changed." When Google changed course and decided to award a fraction – $60,000 – of the equity refreshes it had promised to Plaintiff, Mr. Grannis pointed out that "the new rules should apply to [a male and female employee] equitably" and proposed pulling a male employee's down and "mak[ing] Ulku's 90." (Tomezsko Decl. Ex. 20.)

<u>Reply to Def.'s SMF 76</u>: **Remains undisputed**. What Plaintiff expected to receive in terms of future equity refresh grants is **immaterial** in light of the fact that there is no evidence she was contractually guaranteed any amount of future equity. (Tomezsko Decl., Exh. 27 at GOOG-ROWE-00017920.) The Court should not consider the additional "facts" asserted in response to Def.'s SMF 76 as they have not been submitted through the appropriate procedure outlined in Local Rule 56.1(b).

<u>Def.'s SMF 77:</u>

Plaintiff is one of the most highly compensated L8 Technical Directors. She earned more in Total Annual Compensation each year than all male L8 Technical Directors hired into OCTO between 2016 and 2020 except Scott Penberthy, Kawaljit Gandhi, and Massimo Mascaro. (Humez Decl., ¶¶ 24–38.)

<u>Plaintiff's Response to Def.'s SMF 77</u>: Plaintiff **admits** that three Level 8 Technical Directors earned more in Total Annual Compensation between 2016 and 2020 but **avers** that all Level 9 Technical Directors earned more in Total Annual Compensation in that same period. Plaintiff was equally or better qualified than Mr. Penberthy, Mr. Gandhi, and Mr. Mascaro. (Ex. 26, GOOG-ROWE-00063692; Greene Decl. ¶¶ 2-9.)

<u>Reply to Def.'s SMF 77</u>: **Remains undisputed**. Google **moves to strike** the additional "facts" about Mr. Penberthy, Mr. Ghandi, and Mr. Mascaro as unsupported by Plaintiff's citation to the record. It is also controverted by Plaintiff's admissions. (Def.'s SMF 78, *infra*.) The Court should not consider these additional "facts" asserted in response to Def.'s SMF 77 as they have not been submitted through the appropriate procedure outlined in Local Rule 56.1(b).

<u>Def.'s SMF 78:</u>

Gandhi, Mascaro, and Penberthy all do specialized work in applied artificial intelligence ("Applied AI") and machine learning. In addition to fulfilling the other aspects of the Technical Director role, they work with TensorFlow, an end-to-end open source platform for machine learning, a critical area for Google. Penberthy created the canonical reference for all of Google on Applied AI. Mascaro has helped develop a new product category for the Cloud AI platform, and consistently earned Strongly Exceeds Expectations ratings. (Grannis Decl., ¶ 28.)

Plaintiff's Response to Def.'s SMF 78: Plaintiff **admits** but **avers** that Penberthy only specialized in Applied AI starting in or around October 2019. Further, Google did not take these factors into account when making pay decisions regarding Ms. Rowe, Mr. Penberthy, Mr. Gandhi, or Mr. Mascaro, and Penberthy and Mascaro and Plaintiff were all hired into the same job code. (Ex. 26, GOOG-ROWE-00063692.)

Reply to Def.'s SMF 78: **Remains undisputed**. Google **moves to strike** the additional "facts" asserted in response to Def.'s SMF 78 as unsupported by Plaintiff's citations and controverted by the record. Plaintiff's own documents show that Mr. Penberthy was focused on Applied AI as early as July 2018, (Jumper Decl., Exh. 7 at GOOG-ROWE-00058304), and other documents in the record indicate that he was working on Applied AI projects in 2017 as well. (Tomezsko Supp. Decl., ¶ 18, Exh. 14 (noting Mr. Penberthy's accomplishments for Q3 2017 include being the "AI lead for OCTO" and creating "the canonical reference for all of Google on Applied AI").) Plaintiff has similarly introduced no evidence to suggest that Google did not take specialization in Applied AI into account when making pay decisions. The Court should not consider the additional "facts" asserted in response to Def.'s SMF 78 as they have not been submitted through the appropriate procedure outlined in Local Rule 56.1(b).

Def.'s SMF 79:

Gandhi joined OCTO from GBO, Google's sales organization. He has a unique understanding of Google Ads that no one else in OCTO has. He was instrumental in building a joint engagement framework of how Cloud and Ads work together from a technical perspective. He now leads the team working on Applied AI and machine learning. (Grannis Decl., ¶ 28.)

Plaintiff's Response to Def.'s SMF 79: Plaintiff **admits**.

Reply to Def.'s SMF 79: **Remains undisputed**.

<u>Def.'s SMF 80</u>:

Plaintiff does not work on Applied AI and machine learning. (Grannis Decl., ¶ 28.)

<u>Plaintiff's Response to Def.'s SMF 80</u>: Plaintiff **admits** but **avers** that other Level 8 and Level 9 Technical Directors also did or do not work on Applied AI and machine learning, such as Paul Strong and Jonathan Donaldson. (Rowe Decl. ¶ 13.)

<u>Reply to Def.'s SMF 80</u>: **Remains undisputed**. The fact that other L8 or L9 Technical Directors do not work on Applied AI like Mr. Ghandi, Mr. Penberthy, or Mr. only enforces Google's argument that individuals in different job codes and even in the same job code do different work. (Def.'s SMF 13.) The Court should not consider the additional "facts" asserted in response to Def.'s SMF 80 as they have not been submitted through the appropriate procedure outlined in Local Rule 56.1(b).

<u>Def.'s SMF 81</u>:

Except for Gandhi and Grannis, all L8 Technical Directors in OCTO were assigned job code 5560 at the time they were hired. (Lucas Decl., ¶¶ 17–37.)

<u>Plaintiff's Response to Def.'s SMF 81</u>: Plaintiff **admits**.

<u>Reply to Def.'s SMF 81</u>: **Remains undisputed**.

<u>Def.'s SMF 82</u>:

Only the following Technical Directors (both L8 and L9) were based in New York City from 2016 through the present: Penberthy (until November 2017), Jeff Sternberg, Nicholas Harteau, and Mark Kropf. (Lucas Decl., ¶¶ 18–39.)

<u>Plaintiff's Response to Def.'s SMF 82</u>: Plaintiff **admits**.

<u>Reply to Def.'s SMF 82</u>: **Remains undisputed**.

<u>Def.'s SMF 83</u>:

Plaintiff's Total Annual Compensation was also greater than ███Comp1███ in 2017. (Humez Decl., ¶¶ 24, 41.)

Plaintiff's Response to Def.'s SMF 83: Plaintiff **denies** and **avers** that when Google hired Comp1 in 2017, it offered Mr. Comp1 an annual salary of $325,000.00, an annual bonus target of 40%, and a total equity award of 2500 restricted stock units. Google pro-rated his annual bonus because he only worked 3.5 months in 2017. Mr. Comp1 annualized performance bonus for 2017 was approximately $162,666. When Google hired Plaintiff in 2017, it offered her an annual salary of $290,000.00, an annual bonus target of 30%, and a total equity award of 2,500 restricted stock units. In 2017, Google paid Ms. Rowe a performance bonus of $116,000.00, $46,666 less than Mr. Comp1 annualized bonus. While Google also paid Plaintiff a one-time cash payment of $250,000.00 and an additional award of restricted stock units in the aggregate amount of $550,000, this was compensation for the performance bonus and equity she forfeited upon departure from her prior job. (Greene Decl. ¶¶ 2-3; Ex. 27, GOOG-ROWE-00017920.)

Reply to Def.'s SMF 83: **Remains undisputed**. Plaintiff's "dispute" with Def.'s SMF 83 is

**not genuine** because it is controverted by the record. As the Humez Declaration shows, the

total salary, actual bonus award, and equity refresh grant paid to or awarded to Plaintiff for

work performed in 2017 was greater than the same paid to Mr. Comp1 that year. (Humez

Decl., ¶¶ 24, 41.) Plaintiff worked for 42 weeks in 2017, given her March 17, 2017 start date.

(Pl.'s SMF 17.) During 2017, Plaintiff received a weekly salary of approximately $5,577, and

for her work that partial year she received a cash bonus of $116,000 and a stock award valued

at $60,000. (Pl.'s SMF 78, 84; Declaration of Cara E. Greene (ECF 156) ["Greene Decl."] at

¶ 2.) Therefore, her total weekly rate of compensation was $9,766. Comp1 worked

approximately 19.5 weeks in 2017, given his May 15, 2017 start date and leave of absence

ending in mid-August, 2017. (Pl.'s SMF 19, 76, 81.) During 2017, he received a weekly salary

of $6,250, and for his work that partial year he received a cash bonus of $61,000 but no equity

award. (Pl.'s SMF 79, 82, Greene Decl., ¶ 3.) His total weekly rate of compensation in 2017

was $9,378, approximately $400 per week less than Plaintiff's.

### *Plaintiff's Relative Performance at Google*

Def.'s SMF 84:

Plaintiff received a rating of Exceeds Expectations from 2017 through 2020, the equivalent of a 3 on a 5-point scale. (Tomezsko Decl., ¶¶ 22–25, Exhs. 21–24.)

Plaintiff's Response to Def.'s SMF 84: Plaintiff **admits** but **avers** that her performance ratings were commensurate with, or exceeded, other Technical Directors at L8 and L9. (Greene Decl. ¶ 9-17.)

Reply to Def.'s SMF 84: **Remains undisputed**. The Court should not consider the additional "facts" asserted in response to Def.'s SMF 84 to the extent they have not been submitted through the appropriate procedure outlined in Local Rule 56.1(b).

Def.'s SMF 85:

Plaintiff excelled at the first and third pillars of responsibility for the Technical Director position (customer impact and evangelism), but consistently under-performed on the second pillar of responsibility (engineering impact). Failure to have a meaningful impact on engineering prevents those in OCTO from receiving a higher performance rating. (Tomezsko Decl., ¶ 3, Exh. 2 ["Grannis Dep."] at 31:5–21, 183:19–185:3.)

Plaintiff's Response to Def.'s SMF 85: Plaintiff **admits** that she excelled in the first and third pillars of responsibility for the Technical Director position (customer impact and evangelism). Plaintiff **denies** that she consistently underperformed in the engineering pillar. (Ex. 28, GOOG-ROWE-00017918; Ex. 29, GOOG-ROWE-00017889-90; Ex. 30, GOOG-ROWE-00017932-33; Ex. 28, GOOG-ROWE-00017918; Tomezsko Decl. Ex. 21-22.)

Reply to Def.'s SMF 85: **Remains undisputed**. Plaintiff's "dispute" with Def.'s SMF 85 is **not genuine** because it is not supported by the cited evidence. Jumper Decl., Exh. 28 shows that both Plaintiff and Mr. Grannis identified greater impact on engineering to be one thing Plaintiff could do better that year. (Jumper Decl., Exh. 28 at GOOG-ROWE-00017918.) Jumper Decl., Exh. 29 shows that one of Plaintiff's strengths was in customer interactions, but says nothing about any alleged impact on engineering. (*Id.*, Exh. 29 at GOOG-ROWE-00017889.) Jumper Decl., Exh. 30 shows that an L6 software engineer noted that Ulku should "provide more guidance to our strategic leaders, especially as we develop new products and technologies." (*Id.*, Exh. 30 at GOOG-ROWE-00017933.)

Def.'s SMF 86:

Plaintiff was consistently told in her performance reviews that she needed to make greater engineering impact. Plaintiff conceded that engineering impact was an area of opportunity for

her in 2017 and 2018. (Tomezsko Decl., ¶ 22, Exh. 21, at 000201; *id.*, ¶ 23, Exh. 22 at P000010; *id.*, ¶ 24, Exh. 25; *id.*, ¶ 25, Exh. 24, at P001697.)

Plaintiff's Response to Def.'s SMF 86: Plaintiff **denies** and **avers** that every performance review asked employees for "one thing you plan to do to have more impact?" Mr. Grannis did not state that she needed to make a greater engineering impact in response in 2017. In 2018, Mr. Grannis advised Plaintiff to "pick a specific area of the platform/technology stack to drive impact based on knowledge of market needs, enterprise customers, and financial services adoption patterns." Plaintiff herself stated that she wanted "more focus on engineering" in 2017 and 2018. (Ex. 28, GOOG-ROWE-00017918; Ex. 29, GOOG-ROWE-00017889-90; Ex. 30, GOOG-ROWE-00017932-33; Tomezsko Decl. Ex. 21-22.)

Reply to Def.'s SMF 86: **Remains undisputed**, as "Plaintiff herself stated that she wanted 'more focus on engineering' in 2017 and 2018." Plaintiff does not and cannot dispute that she identified more focus on engineering as an area where she could have more impact in her 2017 and 2018 performance reviews. The documents speak for themselves. Separately, the Court should not consider the additional "facts" asserted in response to Def.'s SMF 86 to the extent they have not been submitted through the appropriate procedure outlined in Local Rule 56.1(b).

Def.'s SMF 87:

As a Technical Director in OCTO, Wilson made significant contributions to the Google Cloud organization and platform. He advised on multiple large-scale mergers and acquisition for Google, and worked directly with Google Cloud's senior leadership on these initiatives. In connection with these acquisitions, he was the subject matter expert on cloud migrations and infrastructure necessary to understand how the target application was performing. His work directly informed Alphabet board-level decision making in 2017. (Grannis Decl., ¶ 32.)

Plaintiff's Response to Def.'s SMF 87: Plaintiff **admits** but **avers** that Plaintiff also made significant contributions to the Google Cloud organization and platform, advised on multiple large-scale mergers and acquisitions for Google, and worked directly with Google Cloud's senior leadership on these initiatives. Mr. Grannis considered Plaintiff one of Cloud's most credible and authentic representatives to the market. (Ex. 28, GOOG-ROWE-00017918; Rowe Decl. ¶¶ 14-17; Tomezsko Decl. Ex. 22.)

Reply to Def.'s SMF 87: **Remains undisputed**. Google **moves to strike** the additional "facts" asserted in response to Def.'s SMF 87 because they are not supported by anything other than Plaintiff's subjective declaration. The evidence in the record, including the documents

Plaintiff cites here, do not show that Plaintiff advised on multiple large-scale mergers and acquisitions for Google; worked directly with Google Cloud's senior leadership on these initiatives; served as a subject matter expert for Google on cloud migrations and infrastructure for Google's acquisitions; or that her work directly informed Alphabet board-level decision making in 2017. (Jumper Decl., Exh. 28; Tomezsko Decl., Exh. 22.)

Def.'s SMF 88:

Eryurek's leadership in the healthcare industry brought enterprise C-suite-level credibility to the organization, and at least five healthcare clients signed deals with Google Cloud in his first year. He leveraged his knowledge and experience in running software engineering teams to make an immediate impact on the roadmap for Google Cloud's streaming products, creating business opportunities and providing feedback on product development. (Grannis Decl., ¶ 34.)

Plaintiff's Response to Def.'s SMF 88: Plaintiff **admits**, but **denies** that Technical Directors' duties involved having clients sign deals and **avers** that she too has leveraged her knowledge and experience in running software engineering teams to make an immediate impact on the roadmap for Google Cloud's products, creating business opportunities and providing feedback on product development. (Rowe Decl. ¶ 15.)

Reply to Def.'s SMF 88: **Remains undisputed**. Her "dispute" that Technical Director's duties involved having clients sign deals, coupled with her admission that Mr. Eryurek actually performed that work only enforces the differences between them.  Google **moves to strike** the additional "facts" asserted in response to Def.'s SMF 88 because they are not supported by anything other than Plaintiff's subjective declaration.

Def.'s SMF 89:

While he was still in OCTO, Harteau became deeply involved with Google's engineering teams to improve their monitoring and logging systems, and give clients greater confidence in Google Cloud's monitoring capabilities. (Grannis Decl., ¶ 36.)

Plaintiff's Response to Def.'s SMF 89: Plaintiff **admits**.

Reply to Def.'s SMF 89: **Remains undisputed**.

Def.'s SMF 90:

Strong leveraged his deep experience in cloud computing to secure important partnerships

with some of the largest companies in the world, including a multinational chemical company where he acts as a technical advisory board member. He is currently working with Google's area tech leads on an engineering initiative of massive scope and potentially industry-wide implications. (Grannis Decl., ¶ 38.)

Plaintiff's Response to Def.'s SMF 90: Plaintiff **admits** but **avers** that she is working alongside Strong on this same engineering initiative (███████████) and that Plaintiff's work on this initiative was promoted and publicized by Google. (Rowe Decl. ¶ 16, https://www.linkedin.com/posts/google-cloud_ttechgooglecloud-activity-6851840357764759552-OZrQ.)

Reply to Def.'s SMF 90: **Remains undisputed**. Google **moves to strike** the additional "facts" asserted in response to Def.'s SMF 90 because they are not supported by the evidence cited other than Plaintiff's subjective declaration. The LinkedIn article Plaintiff cites (in a foreign language, no less) says nothing about the actual work Plaintiff is allegedly doing on ████ ████████ initiatives. It is promotional material in which Plaintiff merely "conveys . . . what the workplaces of future will be like and the role of the #cloud in them."  The Court should not consider these additional "facts" asserted in response to Def.'s SMF 90 as they have not been submitted through the appropriate procedure outlined in Local Rule 56.1(b).

Def.'s SMF 91:

Donaldson makes significant contributions to engineering to advance the roadmap for the Google Kubernetes Engine, the internet's first fully manage service on Kubernetes. He people manages other Technical Directors. He created a hybrid cloud working group to set Google's strategy in this space; stood up the first OCTO engineering pillar group for Cloud Services Platform; and authored a whitepaper Google leadership terms a "must read" on hybrid cloud. (Grannis Decl., ¶ 40.)

Plaintiff's Response to Def.'s SMF 91: Plaintiff **admits**.

Reply to Def.'s SMF 91: **Remains undisputed**.

### *Plaintiff Transfers to Different Team Under a Different Manager Within Cloud*

Def.'s SMF 92:

Google Cloud attempted to "verticalize," *i.e.*, consolidate teams and resources devoted to advancing Cloud within a particular industry (or "vertical"). OCTO and the Global Alliances Industry Partnership ("GAIP") team reporting to Tariq Shaukat had each made separate efforts

to verticalize, but in or around late 2017, leadership decided that Shaukat's GAIP team would exclusively own the strategy for industry verticals within Cloud. (Tomezsko Decl., ¶ 4, Exh. 3 ["Shaukat Dep."] at 42:20–43:11, 82:8–83:10.)

Plaintiff's Response to Def.'s SMF 92: Plaintiff **admits.**

Reply to Def.'s SMF 92: **Remains undisputed**.

Def.'s SMF 93:

Google transferred four employees from OCTO with an industry vertical focus—Plaintiff (financial services), Wilson (energy), Eryurek (healthcare), and Jeff Kember (media and entertainment)—to report to Shaukat effective June 25, 2018. (Lucas Decl., ¶¶ 18, 23, 39; Tomezsko Decl., ¶ 26, Exh. 25, at GOOG-ROWE-P-00000774.)

Plaintiff's Response to Def.'s SMF 93: Plaintiff **admits**.

Reply to Def.'s SMF 93: **Remains undisputed**.

Def.'s SMF 94:

The transfer did not impact compensation or result in a change to Plaintiff's, Wilson, or Eryurek's job code or level. (Humez Decl., ¶¶ 24, 40, 43; Lucas Decl., ¶¶ 18, 23, 29.)

Plaintiff's Response to Def.'s SMF 94: Plaintiff **admits**.

Reply to Def.'s SMF 94: **Remains undisputed**.

Def.'s SMF 95:

On multiple occasions, Plaintiff expressed her displeasure at being transferred out of OCTO and she even attempted to decline the transfer. (Shaukat Dep., 94:7–98:21; Tomezsko Decl., ¶ 26, Exh. 25 at GOOG-ROWE-P-00000773; *id.*, ¶ 27, Exh. 26; *id.*, ¶ 28, Exh. 27, at GOOG-ROWE-00017425.)

Plaintiff's Response to Def.'s SMF 95: Plaintiff **denies** and **avers** that she raised complaints about Google's failure to meaningful consider her for the VP Financial Services role and respectfully declined the transfer after Mr. Shaukat's indicated that the GCTL role to which she would be assigned was more junior than her then-current role. Mr. Shaukat later clarified that the role would be the same as what she was already doing in OCTO. (Tomezsko Decl. Ex. 26.)

Reply to Def.'s SMF 95: **Remains undisputed**. Plaintiff does not address the evidence demonstrating that she expressed displeasure at being transferred out of OCTO, and therefore admits that portion of Def.'s SMF 95. *See* Fed. R. Civ. P., Rule 56(e); Local Rule 56.1(c).

Plaintiff's "dispute" with Def.'s SMF 95 is **not genuine** because it is controverted by the very document Plaintiff cites in which she writes, "I respectfully decline the Global Client role." (Tomezsko Decl., Exh. 26 at GOOG-ROWE-00000726.) Google **moves to strike** the additional "facts" asserted in response to Def.'s SMF 95 because they are not supported by the document cited. Nowhere in the document does Plaintiff "raise[] a complaint about Google's failure to meaningfully consider her for the VP Financial Services role;" in fact, it shows that Mr. Shaukat agreed to give her fair consideration. (*Id.*)

Def.'s SMF 96:

Plaintiff's male colleagues were also excluded from e-mail distributions lists after transferring out of OCTO to GAIP.  (Tomezsko Decl., ¶ 29, Exh. 28.)

Plaintiff's Response to Def.'s SMF 96: Plaintiff **denies** and **avers** that Mr. Shaukat left Ms. Rowe off of group emails and excluded her from meetings that included all his other male direct reports. In contrast, Ms. Rowe's male colleagues' initial exclusion from distribution lists was not intentional, but rather was the result of a system error after their reporting line changed. (Tomezsko Decl. Ex. 29; Ex. 31, P0000194; Ex. 32, GOOG-ROWE-P-00017418.R.)

Reply to Def.'s SMF 96: **Remains undisputed**. Plaintiff's "dispute" with Def.'s SMF 96 is **not genuine** because it is unsupported by the documents cited. The cited documents merely indicate that Plaintiff had difficulty finding time to connect with Mr. Shaukat between June 6, 2018 and June 8, 2018. (Jumper Decl., Exh. 31 at P0000194; *id*, Exh. 32 at GOOG-ROWE-P-00017418.R.) Tomezsko Decl., Exh. 96 in no way supports Plaintiff's statement that "Ms. Rowe's male colleagues initial exclusion from distribution lists was not intentional, but rather was the result of a system error after the reporting line changed." (Tomezsko Decl., Exh. 29 at GOOG-ROWE-00017554.) The document Google cites speaks for itself, and shows that the system error to which Plaintiff refers impacted both her and her male colleagues. (Tomezsko Decl., Exh. 28 at GOOG-ROWE-00059676 – 77.)

<u>Def.'s SMF 97:</u>

Plaintiff raised that she had not been invited to Shaukat's staff meeting in August 2018. Shaukat asked that she be added, and thereafter Plaintiff appeared on staff meeting invitations. (Tomezsko Decl., ¶¶ 30–32, Exhs. 29–31.)

<u>Plaintiff's Response to Def.'s SMF 97:</u> Plaintiff **admits** that she complained directly to Mr. Shaukat on August 20, 2018 that she was his only direct report that he had not included on his staff meeting invite and that she had previously raised the issue with others. Plaintiff **avers** that over a month later, on September 21, 2018, Mr. Shaukat asked his assistant to add Plaintiff to his staff emails. (Tomezsko Decl. Ex. 29, 30.)

<u>Reply to Def.'s SMF 97</u>: **Remains undisputed**.

<u>Def.'s SMF 98:</u>

Plaintiff has no reason to believe that any of these explanations for the failure to include her in e-mails lists of Shaukat's staff meetings are false. (Rowe Dep., 174:21–175:24.)

<u>Plaintiff's Response to Def.'s SMF 98:</u> Plaintiff **denies** and **avers** that Mr. Shaukat's explanations for why she was excluded from his email lists changed over time. While Ms. Rowe did not have a specific reason to believe Mr. Shaukat's shifting explanations were false, she knew that her male peers were in these meetings and she was not, and that Mr. Shaukat treated her differently. (Ex. 18, Rowe Tr. 174:21–175:24.)

<u>Reply to Def.'s SMF 98</u>: **Remains undisputed** that Plaintiff had no reason to believe that the explanations she received for failure to include her in e-mail lists was false. (Jumper Decl., Exh. 18 at 174:21 – 175:24 ("Look, I don't have any reason to believe the responses were false. . . .").)

<u>Def.'s SMF 99:</u>

Shaukat held an offsite meeting for his team in October, 2018. Plaintiff attended that offsite meeting and said she enjoyed it. (Tomezsko Decl., ¶ 33, Exh. 32.)

<u>Plaintiff's Response to Def.'s SMF 99:</u> Plaintiff **admits**.

<u>Reply to Def.'s SMF 99</u>: **Remains undisputed**.

<u>Def.'s SMF 100:</u>

Plaintiff is not aware of any other offsite meetings that occurred while she reported to Shaukat that she was not invited to. (Rowe Dep., 170:3–15.)

**Plaintiff's Response to Def.'s SMF 100**: Plaintiff **admits** but **avers** that Mr. Shaukat also excluded her from staff meetings at least four or five times where financial services was being discussed. Mr. Shaukat also excluded Plaintiff from customer discussions where financial services clients were discussed. (Ex. 18, Rowe Tr. 170:16-172:12.)

**Reply to Def.'s SMF 100**: **Remains undisputed**. Google **moves to strike** the additional "facts" asserted in response to Def.'s SMF 100 as **immaterial** given Plaintiff's admission that she does not believe she should have been in every meeting with Mr. Shaukat held with anyone who worked on his team or in any meeting with Mr. Shaukat where financial services were discussed. (Jumper Decl., Exh. 18 at 174:10 – 20.)

### Plaintiff Expresses Interest In the Financial Services Vertical Lead Role

Def.'s SMF 101:

On June 13, 2018, Plaintiff expressed interest in a role on Shaukat's team as the head of the financial services industry vertical ("FSVL Role"). (Tomezsko Decl., ¶ 27, Exh. 26)

**Plaintiff's Response to Def.'s SMF 101**: Plaintiff **admits** but **avers** that she had previously expressed interest in the role and she was told at hire that she would be the obvious choice for the role. (Ex. 18, Rowe Tr. 211:6-24.)

**Reply to Def.'s SMF 101**: **Remains undisputed**. Google **moves to strike** Plaintiff's additional "facts" asserted in response to Def.'s SMF 101 because Plaintiff has failed to produce any evidence suggesting that she was actually guaranteed or promised any role at Google other than the one she was hired to perform.

Def.'s SMF 102:

Shaukat was the hiring manager for this role. (Shaukat Dep., 16:5–17:2.) He considered both internal and external candidates, and permitted Plaintiff to skip the initial screening interviews as she was already a Google employee. (Tomezsko Decl., ¶ 27, Exh. 26.)

**Plaintiff's Response to Def.'s SMF 102**: Plaintiff **admits**.

**Reply to Def.'s SMF 102**: **Remains undisputed**.

Def.'s SMF 103:

Defining and executing a cohesive global strategy for the financial services industry vertical

was the expectation for the FSVL Role. That individual would need the business acumen to drive Google Cloud's go-to-market strategy, and sufficient technical skills to identify market opportunities and oversee product strategy. (Tomezsko Decl., ¶ 34, Exh. 33, at GOOG-ROWE-00017500)

Plaintiff's Response to Def.'s SMF 103: Plaintiff **admits** and **avers** that Ms. Rowe was qualified for the role. (Tomezsko Decl. Ex. 16, 33.)

Reply to Def.'s SMF 103: **Remains undisputed**. Google **moves to strike** Plaintiff's additional "facts" asserted in response to Def.'s SMF 103 because whether Plaintiff believed she was qualified for the role is **immaterial**.

Def.'s SMF 104:

Plaintiff was interviewed for the FSVL role in or around August 2018 and the feedback was mixed. Two of her four interviewers felt she struggled to articulate a compelling vision for developing the financial services industry vertical. (Shaukat Dep., 146:8–147:9, 149:17–151:8, 153:12–24; Tomezsko Decl., ¶ 35, Exh. 34.)

Plaintiff's Response to Def.'s SMF 104: Plaintiff **denies** and **avers** that in August 2018, she was interviewed by four men (Sebastien Marotte, Jason Martin, Darryl Willis, and Vats Srivatsan) for the VP Financial Services. Mr. Stevens was supposed to interview Plaintiff but recused himself given his earlier statement that he thought she was a good candidate for the role, but he shared his support for Plaintiff's candidacy with Mr. Shaukat. None of her interviewers provided interview feedback or a formal written hiring recommendation in gHire. The recruiter for the role, Stuart Vardaman, reached out to her interviewers nearly three months later to request feedback. Only one of her interviewers provided written feedback over email, which did not state that Plaintiff struggled to articulate a compelling vision for developing the financial services industry vertical. (Ex. 33, GOOG-ROWE-00017410-11; Gelfand Decl. ¶ 9-11; Ex. 35, Shaukat Tr. 144:17- 147:9; Ex. 36, GOOG-ROWE-00017639; Tomezsko Decl. Ex. 34.)

Reply to Def.'s SMF 104: **Remains undisputed**. Plaintiff's "dispute" with Def.'s SMF 104 is **not genuine** because it is controverted by one of the documents Plaintiff cites, which speaks for itself. (Tomezsko Decl., Exh. 34.) Google **moves to strike** the additional "fact" that Mr. Stevens recused himself and the reasons therefore, and the additional "fact" that none of her interviewers recorded their formal feedback in gHire as **immaterial**; the record shows they provided feedback through other means. (Tomezsko Supp. Decl., ¶ 11, Exh. 7.)  The Court should not consider these additional "facts" asserted in response to Def.'s SMF 104 to the extent that they have not been submitted through the appropriate procedure outlined in Local

Rule 56.1(b).

Def.'s SMF 105:

Based on this feedback, Shaukat concluded that she was not a good fit for the role. Nevertheless, he asked Diane Greene, then-CEO of Google Cloud, to meet with Plaintiff because she had done so for other finalist candidates for the role. If Ms. Greene thought that Plaintiff would be a good fit for the role, Shaukat was willing to revisit his initial conclusion. (Shaukat Dep., 162:10–163:24.)

Plaintiff's Response to Def.'s SMF 105: Plaintiff **denies** and **avers** that Mr. Shaukat did not rely on any of Plaintiff's interview feedback when he decided to deny her the role, and rather had decided even before receiving interview feedback that she would not be given the role. Mr. Shaukat asked Ms. Greene to interview Plaintiff because Mr. Stevens felt strongly about her candidacy and also as a "retention" exercise. (Ex. 37, GOOG-ROWE-00017565.R; Ex. 35, Shaukat Dep. 161:14-162:20.)

Reply to Def.'s SMF 105: **Remains undisputed** that Mr. Shaukat concluded Plaintiff was not a good fit for the role after he received feedback about her candidacy, and that Mr. Shaukat asked Diane Greene to meet with Plaintiff. Plaintiff's "dispute" with Def.'s SMF 105 is **not genuine** because it is controverted by the record. As Plaintiff's own evidence shows, after Plaintiff's interviews in August 2018 and after Mr. Shaukat received feedback from Mr. Marotte, the recruiter for role noted "[i]t doesn't sound like she is viable for the VP role." (Jumper Exh. Decl., 37 at GOOG-ROWE-00017565.R.)

Def.'s SMF 106:

As of November 2018, the two finalists for the FSVL Role were women, one external and one internal. (Tomezsko Decl., ¶ 36, Exh. 35.) Plaintiff does not know enough about either candidate's qualifications to say whether she is more or less qualified than they were for the FSVL Role. (Rowe Dep., 264:18–265:23, 267:3–11.)

Plaintiff's Response to Def.'s SMF 106: Plaintiff **admits** that Google considered two women as finalists for the VP Financial Services role, which ultimately went to a man – Mr. Breslow, and **avers** that she knew enough about Mr. Breslow's experience and qualifications to know that she was more qualified than him for the role. (Ex. 18, Rowe Tr. 264:6-17.)

Reply to Def.'s SMF 106: **Remains undisputed**. Google **moves to strike** the additional "facts" asserted in response to Def.'s SMF 106 as **immaterial** because Plaintiff admits that in light of leadership changes in Google Cloud in November 2018, Mr. Shaukat paused hiring on the FSVL role. (Def.'s SMF 111). Plaintiff's subjective opinion of her qualifications relative to Mr. Breslow is similarly **immaterial**.

Def.'s SMF 107:

On November 7, 2018, Plaintiff sent an email to Shaukat and Ms. Greene raising that her interview with Ms. Greene had not yet been scheduled, and that she had been underleveled at hire. Shaukat immediately forwarded the email to Human Resources, who investigated Plaintiff's concern. (Tomezsko Decl., ¶ 37, Exh. 36.)

Plaintiff's Response to Def.'s SMF 107: Plaintiff **admits** that she emailed Mr. Shaukat and Ms. Greene raising that her interview with Ms. Greene had not yet been scheduled, that her background was particularly well-suited for the role and was actually the role she was told she would eventually take on when she was hired. She also raised concerns that leveling decisions made at hire prevented her from being meaningfully considered for the role and expressed that she was the most qualified candidate for the role. Plaintiff **denies** that HR investigated her complaint and **avers** that rather than investigate the matter, Melissa Lawrence stated that they had already "looked into it" and stood by Google's original leveling decisions. (Tomezsko Decl. Ex. 36.)

Reply to Def.'s SMF 107: **Remains undisputed**. Plaintiff's "dispute" with portions of Def.'s SMF 107 are **not genuine** because they are controverted by the record. As Tomezsko Decl., Exh. 37 shows, April Beaupain, a member of Employee Relations, indicated she met with Plaintiff and investigated her concerns after Plaintiff sent her November 7, 2018, email. (Tomezsko Decl., Exh. 37 at P000102.)

Def.'s SMF 108:

Human Resources investigated and concluded that the concern was unsubstantiated. (Tomezsko Decl., ¶ 38, Exh. 37.)

Plaintiff's Response to Def.'s SMF 108: Plaintiff **denies** and **avers** that Google's policy was to refer complaints of discrimination to Employee Relations for investigation, which HR did not do at that time. HR did not interview Mr. Grannis at that time as to the reason or basis for initial leveling decisions. Rather, HR compared Plaintiff to her male peers at L8 and L9. HR concluded that her "work experience [was] consistent with the average years of work experience for those hired as L8 directors" and that they determined she "had male peers with both fewer years and more years of work experience also hired as L8 directors." Moreover, HR's notes indicated that Plaintiff had similar experience but that "Tech versus non-Tech experience was the most heavily considered factor when gauging L8 versus L9 for similar years of work experience" HR's review also showed that there was at least one L9 director who had fewer years of experience. Moreover, the lead recruiter for the Technical Director role, Ms. Burdis, considered the boundaries between candidates' years of experience as "not concrete" and didn't ascribe any meaningful difference to candidates with 19 to 20 years of experience, 19 to 21 years of experience, or 23 to 25 years of experience. Google's compensation policies and practices explicitly provide that decision makers are not to "make leveling recommendations based on factors outside of interview process, such as years of experience…" (Ex. 11, GOOG-ROWE-00053464; Ex. 38, Jamison Tr. 15:8-18; Ex. 39,

52

P000102; Ex. 40, GOOG-ROWE-00018015; Ex. 21, GOOG-ROWE-00058500; Ex. 10, Burdis Tr. 30:7-14, 44:6- 46:6.)

Reply to Def.'s SMF 108: **Remains undisputed**. Plaintiff's "dispute" with Def.'s SMF 108 is **not genuine** because it is controverted by the record. As Tomezsko Decl., Exh. 37 shows, April Beaupain, a member of Employee Relations, indicated she met with Plaintiff and investigated her concerns after Plaintiff sent her November 7, 2018, email. (Tomezsko Decl., Exh. 37 at P000102.) Employee Relations reported that it was not only Plaintiff's years of experience, but the "type of work experience" that supported the decision to hire her as an L8 Technical Director. (*Id.*) Plaintiff concedes in her lengthy response to Def.'s SMF 108 that Employee Relations stated that "[t]ech versus non-Tech experience was the most heavily considered factor when gauging L8 versus L9 for similar years of work experience." Google **moves to strike** the additional "facts" asserted in response to Def.'s SMF 108 as **immaterial** because they have no bearing on whether Employee Relations investigated Plaintiff's complaint and reached the conclusion they did.

### *A Change In Leadership Causes Shaukat To Pause Hiring for the FSVL Role*

Def.'s SMF 109:

Ms. Greene announced that she was leaving Google on November 16, 2018. Thomas Kurian, then-an executive at Oracle, would replace Ms. Greene as the CEO of Google Cloud at the end of the year. (Tomezsko Decl., ¶ 39, Exh. 38.)

Plaintiff's Response to Def.'s SMF 109: Plaintiff **admits**.

Reply No. 109: **Remains undisputed**.

Def.'s SMF 110:

Plaintiff's scheduled meeting with Ms. Greene about the FSVL Role was cancelled as a result of Ms. Greene's announced departure. (Tomezsko Decl., ¶ 40, Exh. 39.)

Plaintiff's Response to Def.'s SMF 110: Plaintiff **admits**.

Reply to Def.'s SMF 110: **Remains undisputed**.

Def.'s SMF 111:

> In light of this news, Shaukat paused the search for the FSVL Role so he would have more time to understand Kurian's plans for the future of Google Cloud. He was reluctant to proceed with an offer to his preferred candidate for the role, asking her to give up her current job for what was an uncertain future. (Tomezsko Decl., ¶ 41, Exh. 40.)

> Plaintiff's Response to Def.'s SMF 111: Plaintiff **admits**.

> Reply to Def.'s SMF 111: **Remains undisputed**.

Def.'s SMF 112:

> In December 2018, Shaukat informed Plaintiff that he was pausing the search to fill the FSVL Role, but that she would not have gotten the role anyway given the feedback he received about her candidacy during the interview process. (Shaukat Dep., 210:3–211:14; Tomezsko Decl., ¶ 42, Exh. 41;

> Plaintiff's Response to Def.'s SMF 112: Plaintiff **admits** that Mr. Shaukat met with Plaintiff in December 2018 after Mr. Shaukat received talking points and a general script from HR on how to communicate to Plaintiff that she would not be getting the role. (Ex. 41, GOOG-ROWE-00017638.)

> Reply to Def.'s SMF 112: **Remains undisputed**.

Def.'s SMF 113:

> There were clients who were still interested in certain of Google Cloud's products and services for the financial services industry. Shaukat did not want to lose those opportunities, so in or around late 2018 or early 2019, he limited the scope of the financial services industry vertical to these specific initiatives and asked one of his direct reports, Stuart Breslow, to oversee them on an interim basis. (Shaukat Dep. 239:11–242:23.)

> Plaintiff's Response to Def.'s SMF 113: Plaintiff **denies** that the scope of Mr. Breslow's role as the VP Financial Services was limited to specific initiatives and **avers** that his role was the same as the other vertical leads. Mr. Shaukat required Plaintiff to report to Mr. Breslow during this time. Mr. Shaukat appointed Mr. Breslow to the role in November 2018 before he communicated to Plaintiff that she would not be getting the role. (Ex. 35, Shaukat Tr. 239:11-241:11; Ex. 42, Breslow Tr. at 149:11-14, 133:3-134:15, 142:2-20.)

> Reply to Def.'s SMF 113: **Remains undisputed**. Plaintiff does not dispute that Mr. Breslow

> took on responsibilities for the financial services industry vertical on an interim basis only, so

> that portion of Def.'s SMF 113 must be deemed admitted. In fact, Plaintiff's cited evidence

*supports* Google's statement. (Jumper Decl., Exh. 42 at 142:2 – 20.) Plaintiff's specific dispute with portions of Def.'s SMF 113 is **not genuine** because it is not supported by the documents cited and controverted by the record. Plaintiff offers nothing to support the notion that Mr. Breslow's role was "the same as the other vertical leads," and indeed other evidence she submitted in support of her motion indicates that the scope of the role had been reduced during Mr. Breslow's service. (Jumper Decl., Exh. 97 at GOOG-ROWE-00051965 (noting that the financial services vertical would "focus mostly on financial crimes use cases," which were Mr. Breslow's specialty.) Google **moves to strike** the additional "fact" regarding the timing of Mr. Shaukat's communication to Plaintiff that she would not be getting the role as **immaterial**.

Def.'s SMF 114:

> Google had hired Breslow in June 2018 as an L9 Managing Director of Technology and Policy based in New York City. He served as the main point of contact for senior executives in regulated industries who wanted to explore a partnership with Google Cloud. (Lucas Decl., ¶ 96; Tomezsko Decl., ¶ 43, Exh. 42 at GOOG-ROWE-P00000827.)

> Plaintiff's Response to Def.'s SMF 114: Plaintiff **admits** but **avers** that Mr. Breslow's job title was Director, Solutions Consultant and that he served in this role for approximately four months before Mr. Shaukat appointed him the VP Financial Services. (Ex. 43, GOOG-ROWE-00054267.)

> Reply to Def.'s SMF 114: **Remains undisputed** that Google hired Mr. Breslow in June 2018 as an L9 with the job title Director, Solutions Consultant and the business title Managing Director, Technology and Policy, (Lucas Decl., ¶ 96; Jumper Decl., Exh. 43 at GOOG-ROWE-00054267), and that his role was to serve as the main point of contact for senior executive in regulated industries who wanted to explore a partnership with Google Cloud. (Tomezsko Decl., Exh. 43 at GOOG-ROWE-P-00000827.)

Def.'s SMF 115:

Breslow was an industry-recognized authority on anti-money laundering, having spent over

30 years in financial services, including as Chief Compliance Officer at Morgan Stanley and a partner at McKinsey, focusing on issues facing the financial services industry. (Shaukat Dep., 72:2–19, 242:24-243:6; Tomezsko Decl., ¶ 43, Exh. 42 .)

Plaintiff's Response to Def.'s SMF 115: Plaintiff **admits** that Mr. Breslow had thirty years of experience in consulting roles and within the financial services industry, but **avers** that Mr. Breslow had no demonstrated leadership or experience in Technology, Google Cloud technology, or customer engagement. Mr. Breslow admitted he did not satisfy the requirements for the VP Financial Services role. (Ex. 44, GOOG-ROWE-00018551; Ex. 42, Breslow Tr. 44:12- 47:25.)

Reply to Def.'s SMF 115: **Remains undisputed**. Plaintiff has not controverted any portion of Def.'s SMF 115 with citations to the record, so it must be deemed admitted. Google **moves to strike** the additional "facts" asserted in response to Def. SMF 115 as **immaterial** given Plaintiff's concession that Mr. Shaukat paused the search for the FSVL role in November 2018 and Mr. Breslow took on certain responsibilities for the role on an interim basis only. (Def.'s SMF 111, 113.)

Def.'s SMF 116:

Breslow was not promoted in connection with Shaukat's request and his level and job code did not change as a result. (Lucas Decl., ¶ 96.)

Plaintiff's Response to Def.'s SMF 116: Plaintiff **denies** that Mr. Breslow was not promoted in connection with the VP Financial Services role and **avers** that the position had greater responsibilities, prestige, and exposure than Mr. Breslow's prior role. Plaintiff **admits** that his level and job code did not change. (Tomezsko Decl. Ex. 33.)

Reply to Def.'s SMF 116: **Remains undisputed**. Plaintiff's "dispute" with Def.'s SMF 116 is **not genuine** given Plaintiff's concession that Mr. Breslow's level and job code did not change.  It is also unsupported by the citation to the record, so the Court should disregard it.

Def.'s SMF 117:

Kurian's strategy for the industry verticals within Google Cloud ultimately resulted in organizational changes, and both Breslow and Shaukat left Google in or around July 2020. (Shaukat Dep., 281:18–283:14; Lucas Decl., ¶ 96.)

Plaintiff's Response to Def.'s SMF 117: Plaintiff **admits**.

Reply to Def.'s SMF 117: **Remains undisputed**.

### *Plaintiff Chooses To Return to OCTO in April 2019*

Def.'s SMF 118:

Shaukat believed that Plaintiff was unhappy about not getting the FSVL Role. She also expressed dissatisfaction with Shaukat's insistence that she focus on specific clients, and that she limit the frequency of her international speaking engagements. (Shaukat Dep., 257:3–258:12.)

Plaintiff's Response to Def.'s SMF 118: Plaintiff **admits** but **avers** that her unhappiness stemmed from the way Mr. Shaukat had diminished her role and responsibilities and had asked her to report to Mr. Breslow, who was less qualified than her for the VP Financial Services role. (Rowe Decl. ¶ 32.)

Reply to Def.'s SMF 118: **Remains undisputed**. Google **moves to strike** the additional

"facts" asserted in response to Def.'s SMF 118 as unsupported by the citation to the record.

The Court should disregard it.

Def.'s SMF 119:

In response, Shaukat gave Plaintiff three options: (a) stay on Shaukat's team in the financial services industry vertical working on specific initiatives with Breslow; (b) find a new role on Shaukat's team that would allow Plaintiff to continue being an individual contributor like she had been in OCTO; or (c) return to OCTO reporting to Will Grannis, but in a horizontal role. (Shaukat Dep., 257:3–259:4, 261:2–10; Rowe Dep., 279:7–24.)

Plaintiff's Response to Def.'s SMF 119: Plaintiff **denies** and **avers** that Shaukat offered three options: (a) stay on Shaukat's team in the financial services industry vertical working on specific initiatives under and reporting to Breslow, who she was more qualified than; (b) look for a new role in Google; or (c) return to OCTO reporting to Will Grannis, but without a focus on financial services. (Ex. 18, Rowe Tr. 279:7-24.)

Reply to Def.'s SMF 119: **Remains undisputed**. There is no material difference between the

parties' description of the three options, save for Plaintiff's subjective characterization of her

qualifications with respect to Breslow.

Def.'s SMF 120:

A horizontal role meant that Plaintiff would work across multiple industries in an area like hybrid cloud which had universal applicability. If she wanted to pursue opportunities in the financial services industry, she would have to coordinate with Shaukat's team, which

remained responsible for setting the strategy for all industry verticals (including financial services) since the reorganization in late 2017. (Shaukat Dep., 261:2–10; Grannis Dep., 191:4–192:12.)

Plaintiff's Response to Def.'s SMF 120: Plaintiff **admits** but **avers** that the horizontal role offered by Google would not allow Plaintiff to work in financial services. Mr. Shaukat did not explain what focusing on hybrid cloud meant. (Ex. 18, Rowe Tr. 280:3-15.)

Reply to Def.'s SMF 120: **Remains undisputed**. Google **moves to strike** the additional "fact" that "Mr. Shaukat did not explain what focusing on hybrid cloud meant" as it has not been submitted through the appropriate procedure outlined in Local Rule 56.1(b). It is also **immaterial** given Plaintiff's professed expertise in cloud technology.

Def.'s SMF 121:

Plaintiff chose to return to OCTO reporting to Will Grannis, and to focus on hybrid cloud. That change became effective April 26, 2019. (Rowe Dep., 280:16–18; Lucas Decl., ¶ 18.)

Plaintiff's Response to Def.'s SMF 121: Plaintiff **admits**.

Reply to Def.'s SMF 121: **Remains undisputed**.

Def.'s SMF 122:

Plaintiff admittedly does not know why she was asked to focus exclusively on hybrid cloud. (Rowe Dep., 298:9–299:17.)

Plaintiff's Response to Def.'s SMF 122: Plaintiff **admits** that she does not know why she was asked to focus exclusively on hybrid cloud but **avers** that Google removed all of her financial services related responsibilities in doing so. (Ex. 18, Rowe Tr. 298:9-24.)

Reply to Def.'s SMF 122: **Remains undisputed**. Google **moves to strike** the additional "facts" asserted in response as **immaterial** given that they could not support an inference of retaliatory animus. Plaintiff concedes that the decision to move all industry-specific work to Shaukat's organization occurred in late 2017. (Def.'s SMF 92.)

Def.'s SMF 123:

None of the other employees who transferred out of OCTO and onto Shaukat's team were given the option to return to OCTO. (Shaukat Dep., 257:3–258:12.)

<u>Plaintiff's Response to Def.'s SMF 123</u>: Plaintiff **admits** and **avers** that other employees who transferred out of OCTO were able to move into different roles. (Ex. 17, Wilson Tr. 148:16-22; Ex. 45, GOOG-ROWE-00060462-63.)

<u>Reply to Def.'s SMF 123</u>: **Remains undisputed**. Google **moves to strike** the additional "facts" asserted in response as they have not been submitted through the proper procedure outlined in Local Rule 56.1(b).

<u>Def.'s SMF 124:</u>

Plaintiff's level did not change after she moved back to OCTO in 2019. (Lucas Decl., ¶ 18.)

<u>Plaintiff's Response to Def.'s SMF 124:</u> Plaintiff **admits**.

<u>Reply to Def.'s SMF 124</u>: **Remains undisputed.**

<u>Def.'s SMF 125:</u>
Plaintiff's Total Annual Compensation did not decrease after she moved back to OCTO in 2019. Her Total Annual Compensation increased each year. (Humez Decl., ¶ 24.)

<u>Plaintiff's Response to Def.'s SMF 125:</u> Plaintiff **admits** but **avers** that her annual compensation in each year was lower than her L9 peers. (Greene Decl. ¶¶ 2-8.)

<u>Reply to Def.'s SMF 125</u>: **Remains undisputed.**

***Plaintiff Expresses Interest In a Vice President Sales Role***

<u>Def.'s SMF 126:</u>

In February 2020, Plaintiff met Kirsten Kliphouse, head of North American Sales at Google. Kliphouse mentioned she was recruiting for a Vice President-level sales role on her team. Plaintiff expressed interest, and Kliphouse told her to email Human Resources. (Rowe Dep., 289:24–290:17, 335:25–336:3, 342:2–343:2.)

<u>Plaintiff's Response to Def.'s SMF 126:</u> Plaintiff **admits** that she met with Ms. Kliphouse in February 2020 but **avers** that Ms. Kliphouse told her she was hiring for a Vice President – Financial Services Industry Lead. Plaintiff expressed interest in the role and Ms. Kliphouse told Plaintiff to email the recruiter. (Ex. 18, Rowe Tr. 342:2-343:2.)

<u>Reply to Def.'s SMF 126</u>: **Remains undisputed**. Google **moves to strike** the additional "fact" about the nature or title of the open role asserted in response as they are inconsistent with Plaintiff's testimony. (Jumper Decl., Exh. 18 at 342:4 – 5 ("She said that she was looking for

a BP of sales for financial services . . . .").)

<u>Def.'s SMF 127:</u>

Plaintiff emailed the executive recruiter, Stuart Vardaman, about the role on February 4, 2020. Vardaman responded by sending Plaintiff a job description for the role. (Tomezsko Decl., ¶ 44, Exh. 43, at GOOG-ROWE-00060572.)

<u>Plaintiff's Response to Def.'s SMF 127:</u> Plaintiff **admits** but **avers** that after Mr. Vardaman forwarded her the job description, he did not respond to her request to provide her with guidance on next steps. Days later, after being unresponsive to Plaintiff's emails requesting follow-up on the application process, Mr. Vardaman told Plaintiff that he would schedule a meeting to discuss an "update" with her, where he told her she would not be considered for the role. (Ex. 18, Rowe Tr. 291:2-23; Tomezsko Decl. Ex. 43.)

<u>Reply to Def.'s SMF 127:</u> **Remains undisputed**.

<u>Def.'s SMF 128:</u>

The role required leading the sales team in Ms. Kliphouse's organization and managing that team to meet or exceed a sales quota. One of the expressed qualifications for the role was "[p]roven success managing a sales/business development organization to meet and exceed revenue goals." (Tomezsko Decl., ¶ 8, Exh. 7 ["Vardaman Dep."] at 134:5–19; *id.*, ¶ 45, Exh. 44 at GOOG-ROWE-00060561.)

<u>Plaintiff's Response to Def.'s SMF</u> <u>128:</u> Plaintiff **denies** and **avers** that Ms. Kliphouse and Rob Enslin were "open to 'thinking differently' about this role, so it is not necessarily a prerequisite that someone has carried a sales revenue number." (Tomezsko Decl. Ex. 43.)

<u>Reply to Def.'s SMF 128:</u> **Remains undisputed**. The fact that Ms. Kliphouse might have

been willing to consider a candidate who themselves had not carried a quota is **immaterial**;

the job description clearly indicates that proven success managing a sales/business

development organization to meet and exceed revenue goals was a qualification for the role.

(Tomezsko Decl., Exh. 44.)

<u>Def.'s SMF 129:</u>

Plaintiff never managed a sales team and her primary responsibilities are not in sales. (Rowe Dep., 347:19–348:2, 358:24–360:20, 363:9–14.)

<u>Plaintiff's Response to Def.'s SMF 129:</u> Plaintiff **admits** but **avers** that she is involved with sales at Google and has sales experience. (Ex. 18, Rowe Tr. 358:24-359:6.)

Reply to Def.'s SMF 129: **Remains undisputed**. Google **moves to strike** the additional

"facts" asserted in response to Def.'s SMF 129 as **immaterial**.

Def.'s SMF 130:

In late February 2020, Vardaman told Plaintiff that Google would not be moving forward with her candidacy because they wanted someone with more commercial experience, which Plaintiff understood to mean more sales experience. (Rowe Dep., 388:24–389:10, 394:8–16.)

Plaintiff's Response to Def.'s SMF 130: Plaintiff **admits** that in February 2020, Vardaman told Plaintiff that Google would not be considering her for the role, but **avers** that he stated the reason was because they wanted someone with more <u>direct</u> sales experience, and also claimed that the decision was based on Plaintiff's "two-hour interview" with Ms. Kliphouse. Plaintiff had never been interviewed by Ms. Kliphouse and had only met with Ms. Kliphouse on one prior occasion – an informal coffee meeting that Plaintiff had requested. (Ex. 18, Rowe Tr. 389:11-390:2, 394:8-16.)

Reply to Def.'s SMF 130: **Remains undisputed**. Google **moves to strike** the additional "fact"

regarding what Stuart Vardaman alleged told her about the "interview" with Kirsten

Kliphouse, as it has not been submitted through the proper procedure outlined in Local Rule

56.1(b).

Def.'s SMF 131:

The person ultimately hired into the role was Yolanda Piazza, who was listed as one of *American Banker's* most powerful women in 2019, and whom Vardaman considered to be more of an "industry titan" in financial services than Plaintiff. (Vardaman Dep. 140:9–141:6, 143:4–13.)

Plaintiff's Response to Def.'s SMF 131: Plaintiff **admits** that Yolanda Piazza was ultimately hired into the role and that she was listed as one of *American Banker's* most powerful women in 2019. Plaintiff **avers** that Mr. Vardaman did not know what Plaintiff's reputation was externally with respect to her job, could not recall if Google had even interviewed Piazza at that point, could not recall a basis to compare Plaintiff and Ms. Piazza, and was not aware of Plaintiff's external recognition. (Ex. 47, Vardaman Tr. 140:20-141:9, 143:4-144:21.)

Reply to Def.'s SMF 131: **Remains undisputed**.

Def.'s SMF 132:

Plaintiff is not aware of Piazza's qualifications for the role, and cannot say whether she was more qualified for the role than Piazza. (Rowe Dep., 373:9–374:10.)

Plaintiff's Response to Def.'s SMF 132: Plaintiff **denies** and **avers** that she is not aware of all of Ms. Piazza's qualifications, but believed herself to be well-qualified for the role. (Ex. 18, Rowe Tr. 373:19-374:2.)

Reply to Def.'s SMF 132: **Remains undisputed**. Plaintiff's "dispute" with Def.'s SMF 132

is **not genuine** because it is controverted by the record and Plaintiff's own testimony:

Q:      Do you know anything about her qualifications for the job?

A:      I don't know too much about her. I know she came from Citibank and she had been there for a long time and I don't know much  beyond that.

Q:      Do you have an opinion as to whether you're better qualified, equally qualified or less qualified than Miss Piazza?

A:      I don't know all of her qualifications, I can't speak to that.

(Jumper Decl., Exh. 18 at 373:13 – 24.)

### *Plaintiff's Alleged "Comparators"*

Def.'s SMF 133:

**Nick Harteau** left OCTO in September 2018, to focus exclusively on managing a product team working on Stackdriver, a cloud computing system providing performance and diagnostics data to public cloud users. In his new role he reported to different managers and took on responsibility for managing direct reports. (Grannis Decl., ¶ 36; Lucas Decl., ¶ 27.)

Plaintiff's Response to Def.'s SMF 133: Plaintiff **admits**.

Reply to Def.'s SMF 133: **Remains undisputed**.

Def.'s SMF 134:

Harteau completed a ladder transfer to the Software Engineering job ladder effective February 6, 2020. He became an L8 on the new job ladder. (Lucas Decl., ¶ 27.)

Plaintiff's Response to Def.'s SMF 134: Plaintiff **admits**, but **avers** that Harteau's compensation did not decrease as a result of the transfer and continued to exceed Plaintiff's year over year. (Greene Decl. ¶¶ 2-3.)

Reply to Def.'s SMF 134: **Remains undisputed**. Google **moves to strike** the additional

"facts" asserted in response to Def.'s SMF 134 as **immaterial** given that Plaintiff concedes

he was performing a different role in a different job ladder. It is also controverted by the

record. Harteau's compensation did not "continue[] to exceed Plaintiff's year over year after he completed a ladder transfer in 2020. He left Google shortly thereafter. (Lucas Decl. ¶ 27.)

Def.'s SMF 135:

A ladder transfer occurs when an employee applies for a role in a new job family. As part of the process, an employee performs the job in the target job ladder for a trial period (which can last several months) to demonstrate that they have the requisite skill and domain knowledge to succeed in the new role. If successful, transfers may result in a downward adjustment to level, as the employee's level is calibrated to the target job ladder. (Lucas Decl., ¶¶ 10–11.)

Plaintiff's Response to Def.'s SMF 135: Plaintiff **admits.**

Reply to Def.'s SMF 135: **Remains undisputed**.

Def.'s SMF 136:

In August 2018, **Evren Eryurek** started working in the Data Analytics organization reporting to Sudhir Hasbe in a product manager role.  He completed a ladder transfer to the Product Manager job ladder in March 2019. He became an L8 as a result. (Lucas Decl., ¶ 23.) He now leads all streaming data platform product management for Cloud. (Grannis Decl., ¶ 34.)

Plaintiff's Response to Def.'s SMF 136: Plaintiff **admits**, but **avers** that Eryurek's compensation did not decrease as a result of the transfer and continued to exceed Plaintiff's year over year. (Greene Decl. ¶¶ 2-4.)

Reply to Def.'s SMF 136: **Remains undisputed**. Google **moves to strike** the additional "facts" asserted in response to Def.'s SMF 136 as **immaterial** given that Plaintiff concedes he was performing a different role in a different job ladder.

Def.'s SMF 137:

Comp4 transferred to the Google Cloud Technology Solutions team reporting to Roslyn Litchfield, Senior Director Product Management, effective February 2020. In August 2020, he started working as a Product Manager and began the process to transfer to the Product Manager job ladder. He left Google before that ladder transfer was complete, but expected his level to decrease to L8 as a result. (Lucas Decl., ¶ 39; Tomezsko Decl., ¶ 10, Exh. 9 ["Comp4 Dep."] at 159:16–161:25.)

Plaintiff's Response to Def.'s SMF 137: Plaintiff **admits**, but **avers** that Comp4 compensation did not decrease as a result of the transfer and continued to exceed Plaintiff's year over year. (Greene Decl. ¶¶ 2, 4.)

Reply to Def.'s SMF 137: **Remains undisputed**. Google **moves to strike** the additional "facts" asserted in response to Def.'s SMF 137 as **immaterial** given that Plaintiff concedes

he was performing a different role in a different job ladder. It is also controverted by the record. Not only did Mr. ▮Comp4▮ Total Annual Compensation decrease from 2019 to 2020, but Plaintiff out-earned him in 2020 after his level was adjusted to L8 on his new job ladder. (Humez Decl., ¶ 43; Greene Decl., ¶ 2.)

Def.'s SMF 138:

Plaintiff does not know the day-to-day responsibilities of Director-level Application Engineers, Software Engineers, or Product Managers. (Rowe Dep., 324:21–325:19.)

Plaintiff's Response to Def.'s SMF 138: Plaintiff **admits** but **avers** that it was "normal course of business within Google" for individuals in Engineering Director roles to move into other ladders because Engineering directors had transferable skills that facilitated internal mobility. (Ex. 35, Shaukat Tr. 87:19-90:5.)

Reply to Def.'s SMF 138: **Remains undisputed**. Google **moves to strike** the additional "facts" asserted in response to Def.'s SMF 138 as **immaterial** because whether certain skills are transferrable between jobs is not dispositive that the jobs are substantially similar under the law.

Def.'s SMF 139:

Plaintiff has identified 31 L8 and L9 employees in the **Director, Software Engineer role ("Directors, SWE")**. (Lucas Decl., ¶ 40–71.) They work in job codes associated with either the Software Engineering job ladder if they are individual contributors, or the Tech Manager job ladder if they are people managers. (*Id.*, ¶ 40 & Exhs. 1, 2.)

Plaintiff's Response to Def.'s SMF 139: Plaintiff **admits.**

Reply to Def.'s SMF 139: **Undisputed**.

Def.'s SMF 140:

The core responsibility of a Director, SWE is actually writing the code to build Google's products, services, and infrastructure, or (in the case of a people manager) reviewing and approving code written by other engineers. (Tomezsko Decl.,¶ 6, Exh. 5 ["Lucas Dep."], 107:13–109:16.)

Plaintiff's Response to Def.'s SMF 140: Plaintiff **denies** and **avers** that a SWE Director's main responsibility is not to write code, review code, or approve code themselves. Those duties are associated with lower level employees on the SWE ladder. (Ex. 2, GOOG-ROWE-

00061501-02; Tomezsko Sealing Decl. ¶ 18, Ex. Q.)

Reply to Def.'s SMF 140: **Remains undisputed**. Plaintiff's "dispute" with Def.'s SMF 140

is controverted by the record and Plaintiff's own affirmative statement. (*See* Pl.'s SMF 231

(stating that core job responsibilities include, *inter alia*, "code design and review.") The SWE

job ladder for individual contributors is replete with references to coding, reviewing code

written by others, or making direct technical contributions at the Director (L8 and L9) level.

(*See, e.g.,* Lucas Decl., ¶ 40, Exh. 1 at GOOG-ROWE-00061506 (designing hardware

innovations that power significant parts of Google); *id.* at GOOG-ROWE-00061507 (L8's

contribution is "primarily through designing, directing and contributing to technical

accomplishments"); *id.* (sustaining and developing the software community at Google via

code and design reviews).) As the document states, these are merely expectations for the job

ladder, (*id.*, at GOOG-ROWE-00061497), and it does not cover all responsibilities associated

with the role. Plaintiff's statements are also **immaterial** to Director SWEs who are people

managers, as they perform roles associated with the Tech Manager job ladder, which Plaintiff

does address here. (Lucas Decl., ¶ 40, Exh. 2.)

Def.'s SMF 141:

Directors, SWE create innovative new algorithms, libraries, or services that power Google's products and features. They design software and hardware innovations that power parts of Google. They work with data and signals impacting product quality, reliability, precision/recall, usage, revenue, etc. They create development infrastructure that increases productivity, quality, and efficiency across Google. They reduce Google's "technical debt" by merging or deprecating portions of Google's infrastructure. (Lucas Decl., ¶ 40, Exh. 1 at GOOG-ROWE-00061506–09.)

Plaintiff's Response to Def.'s SMF 141: Plaintiff **denies** that all SWE Directors perform these duties and **avers** that all SWE Directors drive major technical, product, and business strategies, operate at a high level and strongly influence executive decisions.  Lower-level employees on the SWE ladder actually make direct technical contributions. (Ex. 2, GOOG-ROWE-00061501-02; Tomezsko Sealing Decl. ¶ 18, Ex. Q.)

Reply to Def.'s SMF 141: **Remains undisputed**. The fact that *all* SWE Directors may not

perform these duties is **immaterial** and only reinforces the notion that two people with the same job title can perform different work.  The fact that lower-level employees on the SWE ladder also make direct technical contributions is similarly **immaterial**. Plaintiff's statements are also **immaterial** to Director SWEs who are people managers, as they perform roles associated with the Tech Manager job ladder, which Plaintiff does address here. (Lucas Decl., ¶ 40, Exh. 2.)

Def.'s SMF 142:

They contribute to Product Requirement Documents, documents that define what products the engineer or team will build and how they will build them. (Lucas Dep., 173:14–19.)

Plaintiff's Response to Def.'s SMF 142: Plaintiff **denies** and **avers** that this role description is applicable to lower-level employees on the SWE ladder. (Ex. 2, GOOG-ROWE-00061501-02; Tomezsko Sealing Decl. ¶ 18, Ex. Q.)

Reply to Def.'s SMF 142: **Remains undisputed**. Plaintiff's "dispute" is **not genuine** because it is controverted by the record and unsupported by Plaintiff's citation to the record. As Lucas Decl., ¶ 40, Exh. 1 shows, lower-level employees on the SWE job ladder also make direct contributions, but their tasks are "defined and refined by others (TL [team leads], manager, etc.)." *Id.* at GOOG-ROWE-00061501. Plaintiff's statements are also **immaterial** to Director SWEs who are people managers, as they perform roles associated with the Tech Manager job ladder, which Plaintiff does address here. (Lucas Decl., ¶ 40, Exh. 2.)

Def.'s SMF 143:

Those who apply for a Director, SWE position must submit code for review during the application process. (Lucas Dep., 174:18–24.)

Plaintiff's Response to Def.'s SMF 143: Plaintiff **denies** and **avers** that Google interviewed Plaintiff for a SWE Director role and did not ask her to submit code for review during the application process. (Rowe Decl. ¶ 19.)

Reply to Def.'s SMF 143: **Disputed** but Google **moves to strike** the additional "facts" asserted in response because they were not submitted through the proper procedure outlined

by Local Rule 56.1(b).

<u>Def.'s SMF 144</u>:

Plaintiff has not contributed code to Google's products, services, or infrastructure at any point during her employment. (Rowe Dep., 327:15–24.)

<u>Plaintiff's Response to Def.'s SMF 144</u>: Plaintiff **admits** and **avers** that SWE Directors similarly do not contribute code, as that is a job duty applicable to lower-level employees on the SWE ladder. (Ex. 2, GOOG-ROWE-00061501-02; Tomezsko Sealing Decl., Ex. Q.)

<u>Reply to Def.'s SMF 144</u>: **Remains undisputed**. Google **moves to strike** the additional "facts" asserted in response because they are not supported by the citation to the record. Plaintiff's statements are also **immaterial** to Director SWEs who are people managers, as they perform roles associated with the Tech Manager job ladder, which Plaintiff does address here. (Lucas Decl., ¶ 40, Exh. 2.)

<u>Def.'s SMF 145</u>:

A majority of Directors, SWE Plaintiff identified are people managers (25 of 31), and supervise(d) production engineering teams at Google. (Lucas Decl., ¶¶ 41–71.) What percentage of time is spent on people management versus making technical contributions varies, but Google expects between 20% and 50% of an employee's time be spent managing others. (Lucas Decl., ¶ 40, Exh. 2 at GOOG-ROWE-00061490.)

<u>Plaintiff's Response to Def.'s SMF 145</u>: Plaintiff **admits**, but **avers** that Google does not distinguish between People Managers and Individual Contributors for purposes of leveling or compensation. (Ex. 4, Lucas Tr. 123:22-23.)

<u>Reply to Def.'s SMF 145</u>: **Remains undisputed**. Google **moves to strike** the additional "facts" asserted in response to Def.'s SMF 145 as **immaterial** because whether Google decides to pay someone more for their people-management responsibilities is not relevant to the question of whether they work they perform is substantially similar to Plaintiff's. Moreover, Plaintiff's "question" at the 30(b)(6) deposition was, "I'm trying to understand everything that may be implicated by someone having the designation of individual contributor versus manager." Google objected to the form of the question. The witness

explained, "it's a structural decision or a functional decision, right. . . . I can't say too much because when I think about it from a performance or promotion perspective you're still evaluated on the expectations of your—your role and ladder regardless of people manager versus IC's." (Jumper Decl., Exh. 4 at 122:19-123:23.)

Def.'s SMF 146:

None of the Directors, SWE Plaintiff identified ever worked in OCTO reporting to Will Grannis, or on the GAIP team reporting to Tariq Shaukat. (Lucas Decl., ¶¶ 41–71.)

Plaintiff's Response to Def.'s SMF 146: Plaintiff **admits**.

Reply to Def.'s SMF 146: **Remains undisputed**.

Def.'s SMF 147:

Plaintiff has identified three L8 and L9 employees in the **Director, Application Engineer role ("Directors, AE")**. These individuals work in job codes associated with the Application Engineering job ladder. All are people managers. (Lucas Decl., ¶¶ 72–75 & Exh. 3.)

Plaintiff's Response to Def.'s SMF 147: Plaintiff **admits**.

Reply to Def.'s SMF 147: **Remains undisputed**.

Def.'s SMF 148:

As of November 4, 2019, only one of the Directors, AE identified by Plaintiff, Srivats Ramaswami, worked in Google Cloud. The remainder had moved to a different area of Google called Core Development. (Tomezsko Decl., ¶ 5, Exh. 4 ["Leif Dep."] at 71:18–73:6.)

Plaintiff's Response to Def.'s SMF 148: Plaintiff **admits.**

Reply to Def.'s SMF 148: **Remains undisputed**.

Def.'s SMF 149:

Directors, Application Engineer operate across the entire product lifecycle, starting with deployment, design, testing and release, and continuing through implementation and enhancement. They own a portfolio of applications and are responsible for all aspects of developing and maintaining the applications in the portfolio. (Leif Dep., 80:9–81:6.)

Plaintiff's Response to Def.'s SMF 149: Plaintiff **denies** that Application Engineer ("AE") Directors work on the entire product lifecycle, and deploy, design, test, and release. These are functions of lower-level employees on the Application Engineer ladder. Moreover, Application Engineer Directors do not own portfolios and rather work alongside PM's and

Site Reliability Engineers who also own the portfolios. Both the AE Director and Technical Director roles shared the same experience and skills requirements and the role involved working directly with customers and stakeholders, engaging in whiteboarding sessions, identifying friction points in design, development, and deployment from stakeholders' perspectives, and collaborating across functional and product area boundaries within Google. (Tomezsko Sealing Decl., Ex. S; Ex. 69, P001584-85.)

Reply to Def.'s SMF 149: **Remains undisputed**. Plaintiff's "dispute" with Def.'s SMF 149 is **not genuine** because the cited testimony speaks for itself. So do Plaintiff's cited documents; Lucas Decl., ¶ 72, Exh. 3 indicates that L8 Directors, AE work with other teams across Google to integrate and advance their application portfolios. Google **moves to strike** the additional "facts" asserted in response to Def.'s SMF 149 on the grounds that they are not supported by the citation to the record, and to the extent they are based on the 2020 Engineering-wide Leveling guide. That document expressly states that it is not representative of any particular job, job family, or job ladder, and instructs users to consult the details of the unique job family for more detailed information. (Jumper Decl., Exh. 69 at P001584.)

Def.'s SMF 150:

These internal systems can be proprietary products built and deployed for internal use, or third-party products integrated into Google's systems. (Lief Dep., 42:15–21, 134:8–12.)

Plaintiff's Response to Def.'s SMF 150: Plaintiff **admits**.

Reply to Def.'s SMF 150: **Remains undisputed**.

Def.'s SMF 151:

The applications on which Directors, AE and their teams work are almost exclusively internal to Google and are not marketed or sold to customers; for this reason, developing go-to-market strategy is not integral to the role. Directors, AE's stakeholders are more often than not Google employees without a technical background. (Lief Dep., 134:13–17.)

Plaintiff's Response to Def.'s SMF 151: Plaintiff **admits** that AE Directors work on internal products but **avers** that the software development process is similar for internal and external products and follows the same process of coding, integrating, testing, and support. Further, many of Google Cloud's products have started as internal products and then are later offered externally, such as BigQuery, Spanner, and Kubernetes, which are the flagship products of the Google Cloud portfolio and were internal products before being packaged as external

products. (Rowe Decl. ¶ 28.)

Reply to Def.'s SMF 151: **Remains undisputed**. Google **moves to strike** the additional "facts" asserted in response to Def.'s SMF 151 as based upon inadmissible evidence. Plaintiff admits she is not competent to testify about the day-to-day responsibilities of Director-level AEs. (Def.'s SMF 138.) Separately, the Court should disregard these additional facts as they have not been submitted through the proper procedure outlined in Local Rule 56.1(b).

Def.'s SMF 152:

The role has significant people management responsibilities, and Directors, AE spend up to 40% of their time managing others. (Leif Dep., 125:11–25.)

Plaintiff's Response to Def.'s SMF 152: Plaintiff **admits**.

Reply to Def.'s SMF 152: **Remains undisputed**.

Def.'s SMF 153:

None of the Directors, AE Plaintiff identified ever worked in OCTO reporting to Will Grannis, or in the GAIP organization reporting to Tariq Shaukat. (Lucas Decl., ¶¶ 72–75.)

Plaintiff's Response to Def.'s SMF 153: Plaintiff **admits**.

Reply to Def.'s SMF 153: **Remains undisputed**.

Def.'s SMF 154:

Plaintiff has identified 11 L8 and L9 employees in the **Director, Product Manager role ("Directors, PM")**. These individuals work in job codes associated with the Product Management job ladder. (Lucas Decl., ¶ 76 & Exh. 4.)

Plaintiff's Response to Def.'s SMF 154: Plaintiff **admits**.

Reply to Def.'s SMF 154: **Remains undisputed**.

Def.'s SMF 155:

Directors, PM manage teams of individuals to develop Google's technology products from inception through development and deployment. Directors, PM develop a multi-year roadmap for the deployment of a specific product or products in their relevant product area, and manage the process against that roadmap on a quarterly basis. (Eryurek Dep., 119:14–120:4.)

<u>Plaintiff's Response to Def.'s SMF 155</u>: Plaintiff **denies** that all PM Directors manage teams. Further, PM Directors do not develop products, as that is part of the job responsibilities of lower-level employees on the Product Manager ladder. (Ex. 3, GOOG-ROWE-00061511-12; Tomezsko Sealing Decl., Ex. T.)

<u>Reply to Def.'s SMF 155</u>: Google concedes that in rare instances, a Director-level PM does not manage a team.   The remainder of Def.'s SMF 155 **remains undisputed** because Plaintiff's has failed to cite to any evidence controverting the statement. Lucas Decl., ¶ 76, Exh. 4 clearly shows that an L8 Director PM "owns an entire Product line (or multiple product lines)" and the skills associated with the role include "Product Insight, Vision, Design." (*Id.* at GOOG-ROWE-00061525.)

<u>Def.'s SMF 156</u>:

Their success is partially measured by ability of their products to meet certain metrics they specify at the start of the product roadmap, frequency of product adoption and user engagement, and user satisfaction. (Lucas Decl., ¶ 76, Exh. 4, at GOOG-ROWE-00061525–28.)

<u>Plaintiff's Response to Def.'s SMF 156</u>: Plaintiff **admits** but **avers** that their success is not exclusively measured by those metrics and the PM ladder specifies that success is measured by personal impact and impact of the project on Google. (Tomezsko Sealing Decl., Ex. T.)

<u>Reply to Def.'s SMF 156</u>: **Remains undisputed**. Google **moves to strike** the additional "facts" asserted in response as **immaterial.**

<u>Def.'s SMF 157</u>:

It is not uncommon for level 8 Directors, PM to manage a single product or a small group of products. At level 9, Directors, PM may manage a portfolio of over half a dozen products and must balance competing priorities across their entire portfolio. (Lucas Dep., 179:7–25.)

<u>Plaintiff's Response to Def.'s SMF 157</u>: Plaintiff **admits** but **avers** that the PM role also included evangelism, private whiteboarding sessions, and experience with multiple software design methodologies. (Ex. 17, Wilson Tr. 158:12-159:2.)

<u>Reply to Def.'s SMF 157</u>: **Remains undisputed**. Google **moves to strike** the additional "facts" asserted in response because shared common tasks like those described here are insufficient to show that two roles require substantially similar skills, responsibilities, and

effort.

Def.'s SMF 158:

A Director, PM sets overall priorities for their product area, and allocates resources across the product area in annual planning.  They manage the allocation of resources against those priorities over the course of the year. (Lucas Decl., ¶ 76, Exh. 4, at GOOG-ROWE-00061526.)

Plaintiff's Response to Def.'s SMF 158: Plaintiff **admits.**

Reply to Def.'s SMF 158: **Remains undisputed**.

Def.'s SMF 159:

Directors, PM have profit-and-loss responsibilities, and must ensure that they are projecting revenue for their product area appropriately and delivering on those projections each quarter. (Eryurek Dep., 120:5–8; Lucas Dep., 178:21–179:2.)

Plaintiff's Response to Def.'s SMF 159: Plaintiff **denies** that PM Directors have profit-and-loss responsibilities. (Def's Decl., Ex. T.)

Reply to Def.'s SMF 159: **Remains undisputed**. Plaintiff's "dispute" with Def.'s SMF 159 is **not genuine** because it is not supported by Plaintiff's citation to the record, and is controverted by Mr. Eryurek's and Mr. Lucas' testimony.

Def.'s SMF 160:

Directors, PM are overwhelmingly people managers and are responsible for managing teams. All but one of the Directors, PM Plaintiff identified are people managers. (Lucas Decl., ¶ 76, Exh. 4, at GOOG-ROWE-00061525; Lucas Decl., ¶¶ 77–87.)

Plaintiff's Response to Def.'s SMF 160: Plaintiff **admits**, but **avers** that Google does not differentiate between People Managers and Individual Contributors for purposes of determining level or compensation. (Ex. 4, Lucas Tr. 123:22-23.)

Reply to Def.'s SMF 160: **Remains undisputed**.  Google **moves to strike** the additional "facts" asserted in response to Def.'s SMF 160 as **immaterial** because whether Google decides to pay someone more for their people-management responsibilities is not relevant to the question of whether they work they perform is substantially similar to Plaintiff's. Google **moves to strike** the additional "facts" asserted in response to Def.'s SMF 160 as **immaterial**

because whether Google decides to pay someone more for their people-management responsibilities is not relevant to the question of whether they work they perform is substantially similar to Plaintiff's. Moreover, Plaintiff's "question" at the 30(b)(6) deposition was, "I'm trying to understand everything that may be implicated by someone having the designation of individual contributor versus manager." Google objected to the form of the question. The witness explained, "it's a structural decision or a functional decision, right. . . . I can't say too much because when I think about it from a performance or promotion perspective you're still evaluated on the expectations of your—your role and ladder regardless of people manager versus IC's." (Jumper Decl., Exh. 4 at 122:19-123:23.)

Def.'s SMF 161:

None of the Directors, PM Plaintiff identified ever worked in OCTO reporting to Will Grannis, or on the GAIP team reporting to Tariq Shaukat. (Lucas Decl., ¶¶ 77–87.)

Plaintiff's Response to Def.'s SMF 161: Plaintiff **admits**, but **avers** that Ben Wilson and Evren Eryurek both worked as Directors, PM and previously reported to Will Grannis and Tariq Shaukat. (Tomezsko Decl. ¶ 19, 93.)

Reply to Def.'s SMF 161: **Remains undisputed**. Google **moves to strike** the additional "facts" asserted in response to Def.'s SMF 161 as **immaterial** because neither Mr. Wilson nor Mr. Eryurek reported to Mr. Grannis or Mr. Shaukat while they were performing work associated with the Product Manager role. (Lucas Decl., ¶¶ 39, 23.)

Def.'s SMF 162:

Plaintiff earned more in Total Annual Compensation than each of the individuals she identified as Global Client Technical Leads. (Lucas Decl., ¶¶ 92–95; Humez Decl., ¶ 47.)

Plaintiff's Response to Def.'s SMF 162: Plaintiff **denies** and **avers** that Ben Wilson and Evren Eryurek, who worked as GCTLs with Plaintiff, earned more in Annual Compensation. (Greene Decl. ¶¶ 2, 4-5.)

Reply to Def.'s SMF 162: **Remains undisputed** as to the Global Client Technical Leads identified in discovery. Whether Mr. Wilson and Mr. Eryurek earned more than Plaintiff in

Total Annual Compensation is **immaterial** given Plaintiff's admissions at deposition and other evidence submitted in opposition to Google's motion that they performed the Global Client Technical Lead role differently than Plaintiff.  Plaintiff testified that her role and responsibilities were diminished while she was a Global Client Technical Lead. (Jumper Decl., Exh. 18 at 247:13 – 21.) Mr. Wilson testified that he and his supervisor, Darryl Willis, essentially defined for themselves what the GCTL role was going to be because it was not entirely clear to them what their responsibilities were:

Q:    Did anyone ever explain to you what the difference was between those two roles?

A:    Yes. Darryl Willis tried to explain the difference, but I was left with the impression he was confused also.

Q:    Do you recall what Mr. Willis told you?

A:    Since he and I were senior people in the organization our thought was that we were going to say yes, sir, a little bit overlapping, but our goal is to go serve the customer and so we should work together and find a way to go serve the customers with each one of our capabilities and do that to the best of our ability. That was what we settled on, not a specific set of role of who does what.

(Jumper Decl., Exh. 17 at 119:3 – 19.) Ultimately, the GCTL role as Mr. Wilson performed it was similar to his role as an L9 Technical Director in OCTO:

Q:    So once you were in the role, what did your day-to-day responsibilities look like?

A:    I think they were pretty much unchanged.

Q:    Unchanged from the role in OCTO?

A:    Yes. I think that was due to the lack of clarity in the roles that we discussed earlier.

(*Id.* at 127:2 – 10.) Similarly, Mr. Eryurek discussed with Greg Moore, his supervisor in Tariq Shaukat's GAIP organization, how his role would be "essentially what I do in OCTO," (Jumper Decl., Exh. 49 at 82:3 – 83:4), but Plaintiff concedes that within weeks of the transfer, Mr. Eryurek starting reporting to Sudhir Hasbe and began the trial period to transfer to the Product Manager job ladder. (Def.'s SMF 136.)

Def.'s SMF 163:

Plaintiff identified three individuals performing the Global Client Lead role. (Lucas Decl., ¶¶ 88–91.) She earned more in Total Annual Compensation than all of them but one, Anil Jain. (Humez Decl., ¶ 47.)

Plaintiff's Response to Def.'s SMF 163: Plaintiff **admits**.

Reply to Def.'s SMF 163: **Remains undisputed**.

Def.'s SMF 164:

Jain is based in California, is a people manager and supervises at least one Plaintiff's other alleged comparators, Caleb Weinstein. (Lucas Decl., ¶ 89.)

Plaintiff's Response to Def.'s SMF 164: Plaintiff **admits** but **avers** that Google identified Mr. Jain as "Ulku['s] peer." Moreover, when Mr. Shaukat met with Plaintiff to discuss the new role, he explained that the GCTL's on his team "would be peers of the GCL's, as we referred to them Global Client Lead." Mr. Shaukat further explained to Ms. Rowe that he was "expecting her to come in and build a team and lead a team of global client leads." (Ex. 50, GOOG-ROWE-0056872; Ex. 35, Shaukat Tr. 95:10-11, 98:2-4.)

Reply to Def.'s SMF 164: **Remains undisputed**. The fact that two individuals at Google described Mr. Jain as "Ulku['s] peer" is **immaterial** given that Google also repeatedly referred to lower-level employees as Plaintiff's peers in corporate documents. (Jumper Decl., Exh. 28 at GOOG-ROWE-00017918; *id.*, Exh. 29 at GOOG-ROWE-00017889; *id.*, Exh. 30 at GOOG-ROWE-00017932, 33.) It is also **immaterial** that Shaukat told Plaintiff he expected her to build and lead a team of global client leads because she admits she never did. (Def.'s SMF 167.)

Def.'s SMF 165:

Shaukat envisioned the creation of a new role he referred to as Global Client Lead in or around June 2018. Global Client Leads would be focused on business development for a specific list of priority clients. They were expected to be the sponsors and actively engaged in a persistent manner. (Shaukat Dep., 94:7–98:21.)

Plaintiff's Response to Def.'s SMF 165: Plaintiff **admits.**

Reply to Def.'s SMF 165: **Remains undisputed**.

Def.'s SMF 166:

> The Global Client Lead was supposed to operate in tandem with the Global Client Technical Lead, who would be focused more on the technical aspect of the client relationship. The Global Client Lead was expected to build a team to help them manage the client accounts assigned to them. (Shaukat Dep., 94:7–98:21.)

> Plaintiff's Response to Def.'s SMF 166: Plaintiff **admits** but **avers** that the only difference between the two was that the GCTL role was "a more technical version versus the business version." Mr. Wilson, who was in the GCTL role, was not aware of any distinction between the GCTL and GCL role and his supervisor, Darryl Willis, told him the roles were "overlapping" and that the GCTL's and the GCL's would "work together" to serve customers. Mr. Eryurek, who was also moved into the GCTL role with Plaintiff, said that that "Global client leads versus global client technical leads was definitely an ambiguity at best." (Ex. 35, Shaukat Tr. 202:15-19; Ex. 17, Wilson Tr. 118:16-119:19; Ex. 49, Eryurek Tr. 86:4-6.)

Reply to Def.'s SMF 166: **Remains undisputed**. Google **moves to strike** the additional

"facts" asserted in response to Pl.'s SMF 166 as **immaterial** given Mr. Eryurek and Mr.

Wilson's testimony. Mr. Wilson testified that he and his supervisor, Darryl Willis, decided

for themselves how they would "go serve the customers with each one of our capabilities and

do that to the best of our ability," and did not define a specific set of responsibilities for

themselves in that role. (Jumper Decl., Exh. 17, at 119:3 – 19.) He also testified that the

division of roles and responsibilities between the GCTL and GCL in the energy vertical in

which he worked was different from those same roles in the healthcare industry vertical:

Q:     And with respect to your conversations with Mr. Ery – Eryurek, did it also seem to you that the -- he was having the same sort of issues with respect to overlapping roles in Health that you were having in energy?

A:     That was a more mature organization and they had rough -- I -- I can't remember the number, more than 25 people. So because they had more people, it was clear what kind of the roles and responsibilities would be. Also they had a different mission coming into the org working for Tariq, so I think it was easier for them to define it. So it wasn't as -- it didn't stand out as much.

(*Id.*, 121:9 – 23.) Mr. Eryurek similarly testified that Mr. Wilson's role and responsibilities in

the energy vertical were distinct from his own in the healthcare vertical and Plaintiff's in the

financial services vertical. (Jumper Decl., Exh. 49 at 87:11 – 88:4.) In any event, Mr. Eryurek

performed the role for mere "weeks" before reporting to Sudhir Hasbe and beginning his trial

period for eventual transfer to the Program Manager job ladder. (*Id.*, 86:18 – 21; Def.'s SMF

136.)

Def.'s SMF 167:

Plaintiff never built and managed a team while she reported to Shaukat. (Shaukat Dep., 102:14–103:17.)

Plaintiff's Response to Def.'s SMF 167: Plaintiff **admits** but **avers** that when she first moved into the role, Mr. Shaukat explained to Plaintiff that he was expecting her to come in and build a team and lead a team of GCL's. She moved back to OCTO before she could undertake those responsibilities. (Ex. 35, Shaukat Tr. 98:2-4.)

Reply to Def.'s SMF 167: **Remains undisputed**.

Def.'s SMF 168:

Plaintiff did not consistently meet with a specific set of clients consistent with the vision for the Global Client Lead or Global Client Technical Lead role. (Shaukat Dep., 257:3–15.) Plaintiff concedes that she did not develop a regular cadence of meeting with specific clients, that the nature of the client relationships was sporadic, and that most of the client meetings she attended were at the initiative or request of the accounts team. (Rowe Dep., 186:21–189:23.)

Plaintiff's Response to Def.'s SMF 168: Plaintiff **denies** and **avers** that Mr. Shaukat did not share his vision for what the role entailed. Mr. Shaukat never requested that Plaintiff meet with specific clients. By contrast, he asked her male colleagues to accompany him to customer meetings. Mr. Shaukat never assigned Plaintiff a specific customer. (Rowe Decl. ¶ 30; Ex. 18, Rowe Tr. 294:20-296:22.)

Reply to Def.'s SMF 168: **Remains undisputed**. Plaintiff's "dispute" is **not genuine** because

it is controverted by the record. Plaintiff expressly thanked Shaukat for "taking the time to

share your vision for the financial services vertical, and the approach for working with

strategic customers." (Jumper Decl., Exh. 66 at GOOG-ROWE-00017428.) Plaintiff also

affirmatively alleges that Shaukat provided her "clarity" about what the role entailed, (Def.'s

SMF 95), and in her deposition she testified that Shaukat did explain the role to her and "[t]he

way he described the role was a much more junior role." (Jumper Decl., Exh. 246:8 – 14.)

Def.'s SMF 169:

The Global Client Lead generally lacked the technical or engineering skills required of the Global Client Technical Lead role. (Shaukat Dep., 202:3–25.)

Plaintiff's Response to Def.'s SMF 169: Plaintiff **denies** and **avers** that Google never set any skills or expectations for the GCL or GCTL role, and rather the GCTL role was "more technical" than the GCL role. (Ex. 35, Shaukat Tr., 202:3–25.)

Reply to Def.'s SMF 169: Plaintiff's "dispute" with Def.'s SMF is **not genuine** because it is controverted by the record. Plaintiff affirmatively alleges that Shaukat provided her "clarity" about what the role entailed, (Def.'s SMF 95), and in her deposition she testified that Shaukat did explain the role to her and "[t]he way he described the role was a much more junior role." (Jumper Decl., Exh. 246:8 – 14.)

## DEFENDANT'S RESPONSE TO "PLAINTIFF'S STATEMENT OF ADDITIONAL MATERIAL FACTS PURSUANT TO RULE 56.1"

### "Plaintiff's Background and Employment at Google"

Pl.'s Add. SMF 170:

Plaintiff is a highly educated woman with over 26 years of experience in computer engineering, including, but not limited to, managing and directing the innovation, engineering, production, and development of computer software, databases, cloud-based technologies, and other tools, primarily for clients in the financial services industry. (Declaration of Ulku Rowe (ECF 158) ["Rowe Decl."] ¶¶ 1, 3.)

Def.'s Response to 170: **Undisputed** to the extent Plaintiff's 2021 description of her credentials is consistent with the résumé she submitted to Google in connection with the Technical Director position, or the record contemporaneously created during Plaintiff's recruiting and hiring process, both of which speak for themselves. (Declaration of Sara B. Tomezsko (ECF 143) ["Tomezsko Decl."], Exh. 15.) To the extent there are discrepancies, those discrepancies are **immaterial** because they could not have formed a basis for any decision by Google.

Pl.'s Add. SMF 171:

During her employment as a CTO at JPMorgan, Plaintiff led a team of over 500 engineers, product managers, and quantitative researchers building risk management systems and led the team responsible for migrating high credit risk systems to the cloud for the company. (Tomezsko Decl. Ex. 19; Rowe Decl. ¶ 7.)

Def.'s Response to 171: **Undisputed** to the extent Plaintiff's 2021 description of her credentials is consistent with the résumé she submitted to Google in connection with the Technical Director position, or the record contemporaneously created during Plaintiff's recruiting and hiring process, both of which speak for themselves. (Tomezsko Decl., Exh. 15.) To the extent there are discrepancies, those discrepancies are **immaterial** because they could not have formed a basis for any decision by Google.

Pl.'s Add. SMF 172:

While at JPMorgan, Plaintiff managed a 400+ member team and an $80 million technology budget. (Tomezsko Decl. Ex. 15.)

Def.'s Response to 172: **Undisputed** to the extent Plaintiff's 2021 description of her credentials is consistent with the résumé she submitted to Google in connection with the Technical Director position, or the record contemporaneously created during Plaintiff's recruiting and hiring process, both of which speak for themselves. (Tomezsko Decl., Exh. 15.) To the extent there are discrepancies, those discrepancies are **immaterial** because they could not have formed a basis for any decision by Google.

Pl.'s Add. SMF 173:

At the time of hire, Plaintiff had 22 years of experience in the financial services industry, an industry targeted for cloud adoption. While she was pursuing a masters degree in science, Plaintiff worked for a bank in Turkey in a technical role and as a Research Assistant for Caterpillar, Inc. (Rowe Decl. ¶ 4; Ex. 21, GOOG-ROWE-00058500; Tomezsko Decl. Ex. 15.)

Def.'s Response to 173: **Undisputed** to the extent Plaintiff's 2021 description of her credentials is consistent with the résumé she submitted to Google in connection with the

Technical Director position, or the record contemporaneously created during Plaintiff's recruiting and hiring process, both of which speak for themselves. (Tomezsko Decl., Exh. 15.) To the extent there are discrepancies, those discrepancies are **immaterial** because they could not have formed a basis for any decision by Google.

Pl.'s Add. SMF 174:

Google did not have a policy that the number of years of work experience dictated the level that someone would come in at. (Exhibit 10, Burdis Tr. 44:6-20.)

Def.'s Response to 174: **Undisputed.**

Pl.'s Add. SMF 175:

Someone with 17 years of experience could come in as a Level 9 if they were being hired for a Level 9 role. (Exhibit 10, Burdis Tr. 44:21-45:5.)

Def.'s Response to 175: **Undisputed** that someone with 17 years of experience could come in as a L9 if they were being hired for a L9 role *and they met the criteria for the role*, as Ms. Burdis testified. (Jumper Decl., Exh. 10 at 44:21 – 45:5.)

Pl.'s Add. SMF 176:

The lead recruiter for the Technical Director role, Jennifer Burdis, considered boundaries between years of experience as "not concrete" and did not ascribe any meaningful difference to candidates with 19 to 20 years of experience, 19 to 21 years of experience, or 23 to 25 years of experience.  (Exhibit 10, Burdis Tr. 30:7-14, 44:6-46:6.)

Def.'s Response to 176: **Disputed in part**, but there is **no genuine issue to be tried** because the dispute is **not genuine.** Pl.'s Add. SMF 176 misconstrues Ms. Burdis' testimony. It is **undisputed** that Ms. Burdis considered boundaries between years of experience as "not concrete," and that Google policy did not prescribe a different level of candidates with varying years of experience. (Jumper Decl., Exh. 10 at 30:7 – 14, 45:11 – 46:6.) Ms. Burdis did not testify that she failed to ascribe a meaningful difference to candidates based on years of experience, and in fact testified that years of experience was "one factor" considered in

leveling decisions with respect to Technical Directors hired into OCTO in 2016 and 2017. (*Id.*, 46:21 – 47:3.)

Pl.'s Add. SMF 177:

Other senior leaders at Google, like Tariq Shaukat, did not consider years of experience to be determinative of a candidate's level. (Ex. 25, GOOG-ROWE-00059824-26.)

Def.'s Response to 177: **Undisputed** as to Mr. Shaukat's understanding and beliefs as of October 27, 2018, but **immaterial** as Plaintiff has not established that Mr. Shaukat was involved in Plaintiff's initial hire or setting Plaintiff's level or starting compensation in 2016 or 2017. (*See* Def.'s SMF 47 (Mr. Grannis was the hiring manager for the Technical Director position in OCTO).)

Pl.'s Add. SMF 178:

Prior to joining Google, Plaintiff possessed significant cloud experience and led a team at JPMorgan as an industry leader in actualizing cloud migration in the financial services industry – an industry that was more hesitant to transition to cloud technology than others at the time. (Rowe Decl. ¶ 10.)

Def.'s Response to 178: It is **undisputed** that prior to joining Google Plaintiff started JPMorgan's cloud migration, and that the financial services industry was more hesitant to transition to cloud technology than others at the time. (Def.'s SMF 42, 43.) Google **disputes** that Plaintiff "possessed significant cloud experience" but there is **no genuine issue to be tried** because the dispute is **not genuine**. Plaintiff admitted during her hiring process that she was "not a cloud expert" and that her cloud experience at JPMorgan was limited to merely starting the company's cloud migration, which was not completed before she left to join Google. (Def.'s SMF 43, 44.)

Pl.'s Add. SMF 179:

At JPMorgan, Plaintiff led the company in its efforts to migrate numerous applications and systems to Amazon Web Services ("AWS"), a more widely used cloud-based system in the

financial services industry at the time and a Google Cloud Products ("GCP") competitor. (Rowe Decl. ¶ 10.)

<u>Def.'s Response to 179:</u> **Undisputed** to the extent Plaintiff's 2021 description of her credentials is consistent with the résumé she submitted to Google in connection with the Technical Director position, or the record contemporaneously created during Plaintiff's recruiting and hiring process, both of which speak for themselves. (Tomezsko Decl., Exh. 15.) To the extent there are discrepancies, those discrepancies are **immaterial** because they could not have formed a basis for any decision by Google.

### "Compensation Policies"

<u>Pl.'s Add. SMF 180</u>:

Google considers a candidate's role, level, and location in determining his or her compensation.  (Ex. 52, GOOG-ROWE-00029597.)

<u>Def.'s Response to 180:</u> **Undisputed** that Google considers those factors when determining a candidate's starting salary and new hire equity grant (if applicable). (Jumper Decl., Exh. 52 at GOOG-ROWE-00029597; Humez Decl."], ¶¶ 5, 9.) Google **disputes** that location is used to determine a candidate's annual bonus target, but there is **no genuine issue to be tried** because the dispute is **not genuine**. Annual bonus target is a function of an employee's role and level only. (Humez Decl., ¶ 8.)

<u>Pl.'s Add. SMF 181</u>:

Google uses an algorithm to determine an employee's target compensation based on a Market Reference Point ("MRP"), which is "Google's internal pay rate for a given role/location that targets the top of the local market's cost of labor."  (Ex. 4, Lucas Tr. 138:2-141:6; Ex. 53, GOOG-ROWE-00019290.)

<u>Def.'s Response to 181:</u> **Undisputed** that Google uses an algorithm to determine a candidate's starting salary and new hire equity grant (if applicable) based on MRP, which is "Google's internal pay rate for a given role/location that targets the top of the local market's cost of

labor." (Jumper Decl., Exh. 4 at 138:2 – 141:6; Humez Decl., ¶¶ 5, 6, 9.) Google **disputes** that location is used to determine a candidate's annual bonus target but there is **no genuine issue to be tried** because the dispute is **not genuine**. Annual bonus target is a function of an employee's role and level only, and is not dictated by MRP. (Humez Decl., ¶ 8.)

Pl.'s Add. SMF 182:

> At hire, Google pays its employees 80% of the MRP. The total MRP associated with each job role is not known to employees or used by Google's compensation team.  (Ex. 4, Lucas Tr. 138:2-141:6.)

> Def.'s Response to 182: It is **undisputed** that total MRP associated with each job code is not widely disclosed to Google employees. (Jumper Decl., Exh. 4 at 139:22 – 140:2.) Google **disputes** the remainder of Pl.'s Add. SMF 182 but there is **no genuine issue to be tried** because the dispute is **not genuine**. There is no evidence in the record to suggest that the MRP for each job code is "not . . . used by Google's compensation team;" the record clearly demonstrates that it is. (Def.'s SMF 70.) The majority of (but not all) starting salary offers are set at 80% MRP for that job code; in, fact, Plaintiff's starting salary was 98% of the MRP for her job code. (Def.'s SMF 73.)

Pl.'s Add. SMF 183:

> Google ascribes levels for each role at the Company, which is determined based on "the scope and complexity" of a role and defined based on "the knowledge, skills, and abilities that a Googler needs to perform well."  (Ex. 5, GOOG-ROWE-00052153.)

> Def.'s Response to 183: **Undisputed**.

Pl.'s Add. SMF 184:

> After a candidate's level is determined, their level is a significant factor used to determine initial compensation and is considered as a factor in all subsequent compensation determinations throughout their entire term of employment. (Ex. 54, GOOG-ROWE-00034417.)

> Def.'s Response to 184: **U**ndisputed.

Pl.'s Add. SMF 185:

In order to determine a new hire's salary using Google's algorithm, the compensation analyst will enter the individual's location and job code – which represents an individual's job role and job level.  (Ex. 4, Lucas Tr. 142:6-143:25.)

Def.'s Response to 185: **Undisputed**.

Pl.'s Add. SMF 186:

Google may then use discretion to adjust the compensation. (Humez Decl. ¶ 6)

Def.'s Response to 186: **Undisputed** that compensation analysts and hiring managers may deviate from modeled starting compensation for a particular job code and location for legitimate business reasons and within reasonable limits. (Humez Decl., ¶ 6.)

Pl.'s Add. SMF 187:

As a function of Google's compensation policies and practices, individuals hired by Google for the same role and at the same level may be offered different pay for performance of the same or similar job duties.  (Ex. 4, Lucas Tr. 140:17-22.)

Def.'s Response to 187: Mr. Lucas testified that it is possible for individuals hired into the same role at the same level in the same geographic market may be paid the same salary, and that it is possible for an external candidate to negotiate that offer; those facts are **undisputed**. (Jumper Decl., Exh. 4 at 140:17 – 22.) Google **disputes** the remainder of Pl.'s Add. SMF 187 but there is **no genuine issue to be tried** because the dispute is **not genuine**. Plaintiff has cited no evidence in support of this statement.

Pl.'s Add. SMF 188:

At her hire, Google placed Plaintiff in job code 5560 and Mr. Harteau in job code 5578.  (Ex. 20, GOOG-ROWE-00056318.R; Tomezsko Decl. Ex. 15, 17.)

Defendant's Response to 188: **Undisputed.**

Pl.'s Add. SMF 189:

The MRP for job code 5560 (Principal Technical Solutions Consultant) in New York City was $330,000.00, the bonus target was 30%, the new hire equity guideline was $795,000.00, and the refresh equity guideline was $265,000.00. (Ex. 22, GOOG-ROWE-00054266.)

Defendant's Response to 189: **Undisputed.**

Pl.'s Add. SMF 190:

The MRP for job code 5578 (Distinguished Technical Solutions Consultant) in New York City was $405,000.00, the bonus target was 40%, the new hire equity guideline was $1,620,000.00, and the refresh equity guideline was $540,000.00. (Exhibit 22, GOOG-ROWE-00054266.)

Defendant's Response to 190: **Undisputed.**

Pl.'s Add. SMF 191:

Because Plaintiff and Mr. Comp1 were assigned different job codes due to Google's leveling assignments at hire, their MRPs were calculated differently, which resulted in a greater compensation award for Mr. Comp1. (Ex. 22, GOOG-ROWE-00054266.)

Defendant's Response to 191: It is **undisputed** that because Plaintiff was hired into the job code for an L8 Technical Director and Mr. Comp1 into the job code for an L9 Technical Director, their starting salaries, target annual bonus, and potential for future equity refresh grants were different. (Jumper Decl., Exh. 22; *id.*, Exh. 27 at GOOG-ROWE-00017920; *id.*, Exh. 34 at GOOG-ROWE-00054161.) Google therefore **disputes** that "their MRPs were calculated differently," but there is **no genuine issue to be tried** because the dispute is **not genuine**. Plaintiff concedes that MRP is not separately calculated for each individual, but instead is tied to a particular job code in a particular geographic region. (Pl.'s Add. SMF 189, 190.)

Pl.'s Add. SMF 192:

Google paid each male Level 9 Technical Director more than Plaintiff in base salary in every year, with the exception of Jonathan Donaldson in 2017. (Greene Decl. ¶¶ 2-8; Humez Decl. ¶ 35.)

Defendant's Response to 192: **Undisputed** as to 2017 – 2021 for every male candidate initially hired as an L9 Technical Director in 2017 or 2017. (Humez Decl., ¶¶ 24, 39, 40, 41, 42, 43.)

Pl.'s Add. SMF 193:

Google paid male Level 9 Technical Directors more in bonus payments and equity awards in every year, with the exception of the 2017 bonus payment. (Greene Decl. ¶¶ 2-8.)

Defendant's Response to 193: **Disputed in part** but there is **no genuine issue to be tried** because the dispute is **not genuine**. In 2017, Google paid Plaintiff a larger annual bonus payment than Comp5 and Comp1, and granted Plaintiff a larger equity refresh award than Comp5 and Comp4. (Humez Decl., ¶¶ 24, 39, 41, 43.) In 2020, Google granted Plaintiff more in equity refresh awards than Comp5, Comp1, and Comp4, and Plaintiff received the same total value in equity refresh awards as Comp3 that year. (*Id.*, ¶¶ 24, 39, 41, 42, 43.) The remainder of Pl.'s Add. SMF 193 is **undisputed**.

Pl.'s Add. SMF 194:

In response to compensation negations of another woman being considered for a role in Google Cloud, Melissa Lawrence in ER characterized the woman's negotiations and concerns of equitable compensation as "not Googley," "quibbling," and a "turn off." (Ex. 56, GOOG-ROWE-00056473.)

Defendant's Response to 194: **Disputed in part,** but there is **no genuine issue to be tried** because the dispute is **not genuine.** There is no suggestion in the exhibit that the other female candidate was concerned about inequitable compensation on the basis of sex. (Jumper Decl., Exh. 56; Tomezsko Supp. Decl., ¶ 8, Exh. 4 at GOOG-ROWE-00056743-46.) Later correspondence reveals that the female candidate's compensation concerns were related not

to potential sex discrimination, but to her concern over losing unvested equity at her then-current employer. (Jumper Decl., Exh. 57 at GOOG-ROWE-00059503.) Ms. Lawrence's comments were a response to the candidate's questionable judgment in going over the hiring manager's head to get better leverage in compensation negotiations. (Tomezsko Supp. Decl., ¶ 8, Exh. 4 at GOOG-ROWE-00056473.) Nowhere in the document does Ms. Lawrence refer to that candidate as "not Googley." That statement is clearly attributed to another individual, who Plaintiff has not established was involved in Plaintiff's hiring. (*Id.*)

<u>Pl.'s Add. SMF 195</u>:

In addition to Plaintiff, other women at Google complained to Will Grannis about having to "fight[] for fair comp." (Ex. 57, GOOG-ROWE-00059503.)

<u>Defendant's Response to 195</u>: It is **undisputed** that according to Mr. Grannis, Plaintiff and one other woman in OCTO expressed they did not feel like they fought hard enough for themselves and that "[T]his is also the number one area where women ask for my advice/mentoring (respectfully fighting for what they think is fair comp.)" (Jumper Decl., Exh. 57 at GOOG-ROWE-00059503.) It is otherwise **immaterial** because there is no evidence to suggest that this other female employee made an internal complaint of unequal pay or sex discrimination.

**"Comparator Roles"**

<u>Pl.'s Add. SMF 196</u>:

Google hired 17 individuals into the Technical Director position between March 2016 and March 2018.  Plaintiff was the only woman Google hired for the role. (Greene Decl. ¶ 17.)

<u>Defendant's Response to 196</u>: **U**ndisputed that Google hired 17 individuals into L8 and L9 Technical Director positions globally March 2016 and March 2018 and that Plaintiff was the only woman hired in that period. (Jumper Decl., Exh. 21.) As the evidence shows, only 13 of those individuals, including Plaintiff, were hired in the United States. (Lucas Decl., ¶¶ 18, 19,

21, 23, 27, 28, 31, 32, 34, 35, 37, 38, 39.) Google also hired individuals into the Technical Director role at L7 during the same period. (Grannis Decl., ¶ 10.) Google hired another woman as a Technical Director in the United States as an L8 in 2020, (Lucas Decl., ¶ 24), and was negotiating an offer with another woman outside the United States for the Technical Director position at L9 in 2018, but she ultimately did not accept that offer. (Tomezsko Supp. Decl., ¶ 9, Exh. 5, at GOOG-ROWE-00059393; *Id.*, ¶ 8, Exh. 4.)

Pl.'s Add. SMF 197:

Among all Engineering Directors (i.e., Technical, SWE, Application Engineer, and Product Management), there are only 45 women out of 541 Directors.  (Greene Decl. ¶ 18).

Defendant's Response to 197: **Disputed** but **immaterial**. The "snapshots" to which the Greene Declaration refers identify the number of individuals holding L8 and L9 positions in positions classified as Engineering, Product Management, or Operations within Google Cloud at three distinct points of time in 2017, 2018 and 2019. (Tomezsko Supp. Decl., ¶ 2.) There are 406 unique individuals in that list who held L8 and L9 Technical Director, Software Engineer, Application Engineer, and Product Management roles. (*Id.*)

*"Technical Directors"*

Pl.'s Add. SMF 198:

Google did not articulate to hiring and leveling decision-makers any distinction between the responsibilities of Level 8 and Level 9 Technical Directors.  (Ex. 1, Grannis Tr. 35:10-36:14.)

Defendant's Response to 198: It is **undisputed** that at the time Mr. Grannis and others created the Technical Director position in OCTO, the job ladder for the Technical Solutions Consultant job family borrowed for that purpose did not have include a separate entry for L9. (Jumper Decl., Exh. 1 at 35:10 – 36:14.) Plaintiff has failed to cite to admissible evidence supporting the remainder of Pl.'s Add. SMF 198.

Pl.'s Add. SMF 199:

There is a "ton of gray areas between the levels" at Google. (Ex. 23, GOOG-ROWE-00017999.)

<u>Defendant's Response to 199</u>: **Objects and moves to strike** Pl.'s Add. SMF 199 as inadmissible hearsay if offered to prove the truth of the matter asserted.  Alternatively, it is **undisputed** as to Ms. Burdis' opinion as of the date she expressed that sentiment to Employee Relations.

<u>Pl.'s Add. SMF 200</u>:

Technical Directors in both Levels 8 and 9 were required to possess a "[d]emonstrated ability to understand and advance customers usually in the form of experience—firsthand experiences with Cloud, Cloud migration, second engineering experience sufficient to demonstrate ability to influence engineering groups without authority, and then third demonstrated thought leadership or some form of evangelism." (Ex. 1, Grannis Tr. 51:3-10.)

<u>Defendant's Response to 200</u>: **Undisputed**.

<u>Pl.'s Add. SMF 201</u>:

All Technical Directors possessed similar skill sets and performed the same job responsibilities consistent with three pillars. (Harteau Decl. ¶¶ 4, 9-10, 13-14.)

<u>Defendant's Response to 201</u>: It is **undisputed** that all Technical Directors in OCTO at L8 and L9 were expected to perform the three main pillars of responsibility associated with those roles. Google **disputes** that all L8 and L9 Technical Directors in OCTO possessed similar skill sets and performed the same job responsibilities, but there is **no genuine issue to be tried** because Plaintiff concedes that jobs at varying levels differ in their scope and complexity and knowledge, skills, and abilities that a Googler needs to perform well. (Def.'s SMF 12.)

Further, Mr. Harteau is not competent to testify to the work performed by Technical Directors in OCTO at any level prior to his employment with Google commencing in May 2017 and his return from leave in August 2017, or after he stopped reporting to Will Grannis in September 2018. (Harteau Decl., ¶¶ 1, 2, 3.) Mr. Harteau similarly has not established that he is competent to testify as to the work performed by Plaintiff and other Technical Directors after

June 2018 when they transferred from OCTO to the GAIP organization reporting to Tariq Shaukat. (Lucas Decl., ¶ 18, 23, 39.)

Pl.'s Add. SMF 202:

Some Technical Directors specialized in specific industries, which Google referred to as "verticals," and some were generalists, but all performed the same general work. (Ex. 1, Grannis Tr. 43:17-24, Harteau Decl. ¶ 9.)

Defendant's Response to 202: It is **undisputed** that some Technical Directors specialized in specific industries and others were generalists. Google **disputes** the remainder of Pl.'s Add. SMF 202, but the dispute is **not genuine** because Pl.'s Add. SMF 202 is based on inadmissible evidence. Mr. Harteau is not competent to testify to the work performed by Technical Directors in OCTO at any level prior to his employment with Google commencing in May 2017 and his return from leave in August 2017, or after he stopped reporting to Will Grannis in September 2018. (Harteau Decl., ¶¶ 1, 2, 3.) Mr. Harteau similarly has not established that he is competent to testify as to the work performed by Plaintiff and other Technical Directors after June 2018 when they transferred from OCTO to the GAIP organization reporting to Tariq Shaukat. (Lucas Decl., ¶ 18, 23, 39.) The record refutes that they all performed "the same general work." (Def.'s SMF 85, 86, 87, 88, 89, 90, 91.)

Pl.'s Add. SMF 203:

Benjamin Wilson specialized in the oil & gas industry, Evren Eryurek specialized in the healthcare industry, and Plaintiff specialized in financial services. (Ex. 17, Wilson Tr. 76:24-77:5.)

Defendant's Response to 203: **Undisputed.**

Pl.'s Add. SMF 204:

Mr. Wilson considered Plaintiff as his corollary in financial services. Mr. Wilson worked closely with Plaintiff and would approach her for advice on the evangelism pillar of the role, since Plaintiff was a "prolific speaker on behalf of Google and [he] was not, so [he] looked to her on . . . what she presented on and how she did it and what were the things Google was looking for us to present on." (Exhibit 17, Wilson Tr. 91:7-25.)

Defendant's Response to 204: **Undisputed** as to Mr. Wilson's belief expressed during his 2020 deposition, but **immaterial** because Google's leveling decisions and Plaintiff's burden to show that she and her alleged comparators performed equal or substantially similar work is based on the work actually performed, not Mr. Wilson's personal beliefs.

Pl.'s Add. SMF 205:

Mr. Grannis believed that Technical Directors "who had demonstrated a high acumen of particular industry" should be assigned to separate verticals and identified Plaintiff as a Technical Director qualified for such assignment based on her financial services expertise. (Ex. 1, Grannis Tr. 92:14-24.)

Defendant's Response to 205: **Undisputed.**

Pl.'s Add. SMF 206:

Mr. Grannis decided to create a team of industry specialist Technical Directors ("Verticals Group") and he identified Plaintiff as the Technical Director who would head the Verticals Group. (Ex. 58, GOOG-ROWE-00058796.)

Defendant's Response to 206: **Undisputed**, but **immaterial** as Plaintiff admits that the plan for the Verticals Group never came to fruition and instead, Technical Directors in OCTO that specialized in a particular vertical were moved over to the GAIP organization reporting to Tariq Shaukat. (Def.'s SMF 92.)

Pl.'s Add. SMF 207:

Mr. Grannis's selection of Plaintiff to lead the Verticals Group would have resulted in one level inversion in the Verticals group, i.e. a Level 8 supervising a Level 9. (Ex. 58, GOOG-ROWE-00058796.)

Defendant's Response to 207: **Undisputed**, but **immaterial** as Plaintiff admits that the plan for the Verticals Group never came to fruition and instead, Technical Directors in OCTO that specialized in a particular vertical were moved over to the GAIP organization reporting to Tariq Shaukat. (Def.'s SMF 92.)

Pl.'s Add. SMF 208:

Mr. Grannis and others believed that Plaintiff was the best person for the role. (Ex. 58, GOOG-ROWE-00058796.)

Defendant's Response to 208: **Undisputed**, but **immaterial** as Plaintiff admits that the plan for the Verticals Group never came to fruition and instead, Technical Directors in OCTO that specialized in a particular vertical were moved over to the GAIP organization reporting to Tariq Shaukat. (Def.'s SMF 92.)

Pl.'s Add. SMF 209:

Plaintiff joined Google with nearly five years of CTO experience. (Rowe Decl. ¶ 5.)

Defendant's Response to 209: **Disputed** to the extent that Plaintiff's 2021 description of her credentials and work history is inconsistent with the résumé she submitted in connection with her application for the Technical Director role in OCTO, or the record contemporaneously created during her hiring process in 2016 and 2017, both of which speak for themselves. (Tomezsko Decl., Exh. 15.) To the extent there are discrepancies, those discrepancies are **immaterial** because they could not have formed the basis for any decision by Google.

Pl.'s Add. SMF 210:

Several of the Level 9 Technical Directors lacked CTO experience. (Tomezsko Decl. Ex. 13, 17.)

Defendant's Response to 210: **Undisputed**, but **immaterial** because the job description for the Technical Director role in OCTO specified that "the ideal candidate" for the role would have "been a CTO, SVP of Engineering or equivalent technical leader that has delivered significant business outcomes through cloud related innovation," and both Mr. Donaldson and Mr. Harteau held themselves out as possessing that relevant experience. (Def.'s SMF 9, 34, 35, 36, 49, 50, 51, 52, 53.)

Pl.'s Add. SMF 211:

Plaintiff had more years of relevant experience as a senior technologist prior to joining Google and managed a larger team than some of the male Level 9 Technical Directors.  (Tomezsko Decl. Ex. 13.)

Defendant's Response to 211: It is **undisputed** that Mr. Donaldson's résumé reflects that the largest team he managed was smaller than the largest team Plaintiff managed according to her résumé, but it is **immaterial** because Google did not hire Mr. Donaldson or Plaintiff to be people managers. (Def.'s SMF 15; Harteau Decl., ¶ 5.) The sole L9 Technical Director in OCTO to which Plaintiff refers in support of this fact is Jonathan Donaldson.  Google understood Mr. Donaldson to have 22 years of prior relevant experience before joining Google compared to Plaintiff's 19 years. (Def.'s SMF 35, 50.)

Pl.'s Add. SMF 212:

Plaintiff holds more advanced and more relevant degrees than some of the male Level 9 Technical Directors, some of whom did not possess a college degree or degrees in the computer science or engineering. (Tomezsko Decl. Ex. 12-15, 17.)

Defendant's Response to 212: **Undisputed**, but **immaterial** because the job description for the Technical Director role in OCTO did not specify a minimum education requirement for either the L8 or the L9 job. (Tomezsko Decl., Exh. 10 at P000437.)

Pl.'s Add. SMF 213:

Other Level 9 Technical Directors, who had equal or fewer years of experience than Plaintiff, were not seen as a "bit more junior" than other candidates during the interview process. (Tomezsko Decl. Decl., Ex. 15, 17.)

Defendant's Response to 213: **Undisputed** that Mr. Harteau, the only L9 Technical Director in OCTO that equal or fewer years of prior work experience than Plaintiff was not described as a "bit more junior" during his interview process. (Tomezsko Decl., Exh. 17; Jumper Decl., Exh. 20.)

<u>Pl.'s Add. SMF 214</u>:

Mr. Harteau did not have any advanced degrees or an education past high school, his hire packet indicates that he "did not attend University, he is self-taught." (Ex. 20, GOOG-ROWE-000056318.R; Tomezsko Decl. Ex. 17.)

<u>Defendant's Response to 214</u>: **Undisputed**, but **immaterial** because the job description for

the Technical Director role in OCTO did not specify a minimum education requirement for

either the L8 or the L9 job. (Tomezsko Decl., Exh. 10 at P000437.)

<u>Pl.'s Add. SMF 215</u>:

Prior to his role at Google, Mr. Harteau worked for Spotify as VP of Engineering, Infrastructure and Director of Engineering from December 2011 until May 2017. Previously, he worked as an Engineering Manager at Yahoo!, Inc. from September 2005 to November 2011. He worked at Statis Engineering as an Engineer/Partner from March 2004 to August 2005 and CoreComm as Director of Technology from February 1998 to February 2004. (Exhibit 20, (GOOG-ROWE-00056318.R.)

<u>Defendant's Response to 215</u>: **Undisputed.**

<u>Pl.'s Add. SMF 216</u>:

In terms of interview scores, Plaintiff scored higher than other male candidates for the Technical Director role who were then leveled at Level 9.  (Tomezsko Decl. Ex. 15; Ex. 14, GOOG-ROWE-00061918-20.)

<u>Defendant's Response to 216</u>: **Undisputed** that Plaintiff's average interview score for the

Technical Director role in OCTO was 0.1 point higher than the score given to Evren Eryurek,

the only other L9 Technical Director in OCTO identified in support of Pl.'s Add. SMF 216.

It is **immaterial** because Plaintiff has failed to identify any evidence explaining the

significance of those interview scores or how they were used in the leveling process, if at all.

<u>Pl.'s Add. SMF 217</u>:

Will Grannis and Melissa Laurence raised performance criticisms of Nicholas Harteau in 2017. (Ex. 59, GOOG-ROWE-00017404.RR.)

<u>Defendant's Response to 217</u>: It is **undisputed** that Ms. Lawrence observed to Will Grannis

at one point in 2017 that Mr. Harteau did not seem particularly engaged. (Jumper Decl., Exh.

59 at GOOG-ROWE-00017404.RR.) The remainder of Pl.'s Add. SMF 217 is unsupported by the citation to the record.

Pl.'s Add. SMF 218:

In 2018, Mr. Grannis raised performance criticisms of Mr. Harteau. (Ex. 60, GOOG-ROWE-00017708.R.)

Defendant's Response to 218: **Objects and moves to strike** Pl.'s Add. SMF 218 as inadmissible hearsay if these unattributed notes are offered for the truth of the matter asserted. Alternatively, it is **undisputed** but **immaterial** because Harteau was being evaluated at the scope and complexity of an L9 and Plaintiff at the scope and complexity of an L8, and Plaintiff concedes that roles at varying levels differ in their scope and complexity and knowledge, skills, and abilities that a Googler needs to perform well. (Def.'s SMF 12.)

Pl.'s Add. SMF 219:

In 2018, Mr. Grannis raised performance criticisms of Scott Penberthy.  (Ex. 61, GOOG-ROWE-00078058.)

Defendant's Response to 219: **Disputed** but ultimately **immaterial** because Plaintiff and Mr. Penberthy both received an "Exceeds Expectations" rating for work performed at the L8 scope for Technical Directors in OCTO that year. (Jumper Decl., Exh. 61.)

Pl.'s Add. SMF 220:

In 2018, Mr. Grannis raised performance criticisms of Paul Strong.  (Ex. 60, GOOG-ROWE-00017706-08.R.)

Defendant's Response to 220: **Objects and moves to strike** Pl.'s Add. SMF 220 as inadmissible hearsay if these unattributed notes are offered for the truth of the matter asserted. Alternatively, it is **undisputed** but **immaterial** as Plaintiff concedes that Mr. Strong received a performance rating of "Exceeds Expectations" for work performed at an L9 scope and complexity that year. (Greene Decl., ¶ 14.)

Pl.'s Add. SMF 221:

In 2019, Mr. Grannis raised performance criticisms of Jonathan Donaldson.  (Ex. 60, GOOG-ROWE-00017706.R.)

Defendant's Response to 221: **Objects and moves to strike** Pl.'s Add. SMF 221 as

inadmissible hearsay if these unattributed notes are offered for the truth of the matter asserted.

Alternatively, Google **disputes** Pl.'s Add. SMF 221 but **there is no issue to be tried** because

the dispute **is not genuine.** Jumper Decl., Exh. 60 does not support the proposition for which

it is cited and only says that Mr. Donaldson "needs more leadership." (Jumper Decl., Exh. 60

at GOOG-ROWE-00017706.R.)

Pl.'s Add. SMF 222:

While in the role of Technical Director, Plaintiff has matched or exceeded the male Level 9 Technical Directors in overall job performance in every year of her employment, and Google gave all of them the same instructions, guidelines, and job description to complete their performance self-assessments. (Greene Decl. ¶¶ 9-14; Ex. 55, GOOG-ROWE-00017356-57.)

Defendant's Response to 222: It is **undisputed** that Melissa Lawrence in Human Resources

provided Plaintiff and other Technical Directors (at various levels) the same general guidance

on how to complete their performance self-assessments in 2017. (Jumper Decl., Exh. 55 at

GOOG-ROWE-00017357 in this one instance, but it is **immaterial** because comparability is

based on similarity of job content, not on use of consistent evaluative criteria. In any event,

Plaintiff concedes that "a level refers to the scope and complexity within a role and is defined

by the knowledge, skills, and abilities that a Googler needs to perform well." (Def.'s SMF

12.) Plaintiff also concedes that she and the L9 Technical Directors in OCTO were assigned

different levels, (Def.'s SMF 25, 26, 27, 28, 31, 32, 33, 34, 35, 36, 37, 38, 39, 49, 50, 51, 52,

53), and as such, Plaintiff concedes that the expectations of their roles varied in scope and

complexity. A performance rating for work performed at the scope and complexity of an L8

is not equivalent to that same performance rating for work performed at the scope and

complexity of an L9, even in the same job family. (Tomezsko Supp. Decl., ¶ 5, Exh. 1 at 166:23–167:24.) Pl.'s Add. SMF 222 is also **immaterial** to the extent that the Engineering leveling guide referenced in Ms. Lawrence's email is consistent with the 2020 Engineering-wide Leveling Guide, which contains differing expectations for L8 and L9 employees. (Jumper Decl., Exh. 69.)

Pl.'s Add. SMF 223:

With respect to cloud and industry expertise and engineering, Plaintiff made substantial contributions, such as co-leading the largest financial services deal for Google Cloud in over 10 years and the 2nd largest cloud deal ever and spearheading corporate deals as a financial services cloud expert. (Tomezsko Decl. Ex. 24.)

Defendant's Response to 223: It is **undisputed** that Plaintiff's self-authored summary of her contributions that year include co-leading the largest financial services deal to date for Google Cloud and the second largest Cloud deal ever. (Tomezsko Decl., Exh. 24 at P001690.) Google **disputes** that it was the largest financial services deal for Google Cloud in over 10 years, because that is not what the document says; it states that the deal was worth "X.XB over 10 years." (*Id.*) The document otherwise does not support the remainder of Pl.'s Add. SMF 223 for which it is cited. Therefore, the dispute is **not genuine**.

Pl.'s Add. SMF 224:

In 2017, Plaintiff's supervisor, Will Grannis noted that Plaintiff "quickly established thought leadership on Cloud and Financial services, earning critical impact ratings from Sales, Product and Marketing" and demonstrated "heavy influence and trusted advisor status at ████████ █████████████████████████" and "[t]ook on a leadership role for regulatory work with ██████████████████████." (Ex. 61, GOOG-ROWE-00078058.)

Defendant's Response to 224: **Undisputed.**

Pl.'s Add. SMF 225:

In 2018, Mr. Grannis acknowledged Plaintiff's contributions in the Technical Director role, noting that many were significant "even by OCTO standards" and noted that Plaintiff "gives our outreach to markets wrt FinSrv deep credibility and interest." (Ex. 61, GOOG-ROWE-00078058.)

Defendant's Response to 225: **Undisputed.**

Pl.'s Add. SMF 226:

In 2019, Mr. Grannis noted that even though Plaintiff only spent half of the period in OCTO, she had made very important contributions to external thought leadership. (Ex. 61, GOOG-ROWE-00078058.)

Defendant's Response to 226: **Undisputed.**

Pl.'s Add. SMF 227:

In 2019, in addition to Plaintiff's internal contributions, Mr. Grannis noted that Plaintiff made significant external contributions presenting at large sessions at ▮▮▮▮▮▮▮, ▮▮▮▮▮, ▮▮▮▮▮▮, and ▮▮▮▮▮▮▮▮▮▮▮▮, and presenting keynotes at leaders' circle in numerous locations. (Ex. 61, GOOG-ROWE-00078058.)



Defendant's Response to 227: **Undisputed.**

### *"Director-level Software Engineers ('SWES')"*

Pl.'s Add. SMF 228:

Significant overlap exists in the requisite skill set and qualifications for the Technical Director and SWE Directors, including significant technical depth, strategic product development and systems design experience, and coding ability. Google used the same Engineering-wide Leveling Guide and Leadership Rubrics in hiring Technical Directors and SWE Directors and the Engineering-wide Leveling guide accurately reflected the skills and expectations across all Engineering roles, regardless of ladder. (Rowe Decl. ¶¶ 20, 22-25; Tomezsko Sealing Decl., Exh. Q; Ex. 69, P001584-85.)

Defendant's Response to 228: **Disputed in part,** but there is **no triable issue** because the

dispute is **not genuine.** Plaintiff is not competent to testify about the requisite skill set and

qualifications of Director-level SWEs, as she admits that she does not know what their day-

to-day responsibilities are. (Def.'s SMF 138, *supra*.) *See* Fed. R. Civ. P., Rule 56(c)(2), (4),

Local Rule 56.1 (d). Plaintiff has submitted no evidence that anyone consulted the 2020

Engineering-wide Leveling Guide at Jumper Decl., Exh. 69 in connection with hiring any

Technical Directors in OCTO or Director-level SWEs. Based on the date alone, it could not

have been used in hiring Plaintiff as a L8 Technical Director in 2017. (Jumper Decl., Exh. 69

at P001584.) The 2020 Engineering-wide Leveling Guide expressly states that it is "not a representation of expectations for any specific ladder," and specifically directs users to consult the separate job ladder for Software Engineers for information about that job family. (*Id.*) Will Grannis, the hiring manager for the Technical Director role in OCTO, also stated that the document does not represent the specific expectations for any job role, including Technical Directors or Director-level SWEs. (Jumper Decl., Exh. 1 at 122:14 – 123:13.) Plaintiff's citations to the record do not support the proposition that "Google used the same . . . Leadership Rubrics in hiring Technical Directors and SWE Directors." In any event, that portion of Pl.'s Add. SMF 228 is **undisputed** but **immaterial** because all senior-level candidates (L8+) are assessed against the same Leadership rubric, regardless of the candidate's role or job family. (Tomezsko Supp. Decl., ¶ 5, Exh. 1, at 133:13 – 19.)

Pl.'s Add. SMF 229:

Plaintiff possesses coding ability. (Rowe Decl. ¶ 17.)

Defendant's Response to 229: **Undisputed**, but **immaterial** because Plaintiff admits that the work she performed while employed by Google did not include contributing code to Google's products. (Def.'s SMF 144.)

Pl.'s Add. SMF 230:

Prior to her hire as a Technical Director, Plaintiff herself was initially recruited and interviewed for a SWE Director position. (Tomezsko Decl. Ex. 15; Rowe Decl. ¶ 18.)

Defendant's Response to 230: **Undisputed** but **immaterial** because Plaintiff was not offered that role in light of concerns about her lack of relevant technical expertise. (Defendant's Counterstatement of Undisputed Material Facts ["Def.'s Counter. SMF"] 162.)

Pl.'s Add. SMF 231:

Technical Directors, including Plaintiff, and SWE Directors share core job responsibilities such as driving technical and business development, collaborating with product managers,

serving as the external face of Google to industry stakeholders, code design and review, and engineering development.  (Ex. 6, GOOG-ROWE-00017719; Tomezsko Sealing Decl., Ex. T.)

Defendant's Response to 231: **Disputed**, but the dispute is **not genuine** because Plaintiff's citations to the record do not support the proposition for which they are cited. Jumper Decl., Exh. 6 is not a job description of the core responsibilities for the Technical Director role Plaintiff performed; rather, it is a pre-existing job ladder for the Technical Solutions Consultant job family borrowed for the purpose of creating the Technical Director role in OCTO in 2016 that identifies in relevant part the knowledge and experience individuals at various levels are expected to possess. (Jumper Decl., Exh. 6 at GOOG-ROWE-00017719; Kevin Lucas Decl., ¶¶ 6, 18; Def.'s SMF 11.) Tomezsko Sealing Decl., Exh. T is an excerpt of the job ladder for the Product Manager job ladder, which does not address the core responsibilities for Director-level SWEs whatsoever. (Lucas Decl., Exh. 4 (filed under seal as Tomezsko Sealing Decl., Exh. T).)

Pl.'s Add. SMF 232:

Technical Directors, including Plaintiff, and SWE Directors both serve as technical leads or advisors on Google technology products that Google Cloud sells to customers: products like databases, networking, and storage. Both roles require Directors to use their expertise to ensure Google products meet the needs of clients.  (Rowe Decl. ¶ 23.)

Defendant's Response to 232: **Objects and moves to strike** because Plaintiff is not competent to testify about the qualifications of or work performed by Director-level SWEs, as she admits she does not know what their day-to-day responsibilities are. (Def.'s SMF 138.) Alternatively, Google **disputes** Pl.'s Add. SMF 232 but the dispute is **not genuine** because the statement is unsupported by a citation to admissible evidence. *See* Fed. R. Civ. P., Rule 56(c)(2), (4); Local Rule 56.1(d). The core job responsibilities of L8 and L9 Technical Directors in OCTO differ

greatly from those of Director-level SWEs. (Def.'s SMF 3, 4, 5, 6, 7, 139, 140, 141, 142, 143, 144, 145, 146.)

Pl.'s Add. SMF 233:

Plaintiff and SWE Directors possess substantially similar understanding of Google's products, including but not limited to databases, networking, and storage and consistently collaborate with internal and external stakeholders to solve technical problems and translate that to product design and delivery; and develop innovative solutions and products. (Rowe Decl. ¶ 25.)

Defendant's Response to 233: **Objects and moves to strike** because Plaintiff is not competent to testify about the qualifications of or work performed by Director-level SWEs, as she admits she does not know what their day-to-day responsibilities are. (Def.'s SMF 138.) Alternatively, Google **disputes** Pl.'s Add. SMF 233 but the dispute is **not genuine** because the statement is unsupported by a citation to admissible evidence. *See* Fed. R. Civ. P., Rule 56(c)(2), (4). The core job responsibilities of L8 and L9 Technical Directors in OCTO differ greatly from those of Director-level SWEs. (Def.'s SMF 3, 4, 5, 6, 7, 139, 140, 141, 142, 143, 144, 145, 146.)

Pl.'s Add. SMF 234:

Technical Directors, including Plaintiff, and SWE Directors have common skill sets, educational backgrounds and prior experience, with many starting their careers as software engineers. (Ex. 4, Lucas Tr. 174:18-24.)

Defendant's Response to 234: **Disputed**, but the dispute is **not genuine** because Plaintiff's citation to the record does not support the proposition for which it is cited and misconstrues Mr. Lucas' testimony. That passage is Mr. Lucas' response to the question, "What are the skills necessary for an L8 software engineer?" Mr. Lucas testified, "Coding ability is probably the -- the fore -- the forerunner there for which they still have to go through coding interviews when code is submitted in their interview packets, et cetera, so that is probably the largest one." (Jumper Decl., Exh. 4 at 174:18 – 24.) Plaintiff has also failed to submit a single piece of evidence about the educational background, prior experience, or skill set of any of her

alleged comparators who hold Director-level SWE positions.  In any event, the skills sets necessary to perform the L8 and L9 Technical Director roles in OCTO and the Director-level SWE roles differ greatly. (Def.'s SMF 3, 4, 5, 6, 7, 139, 140, 141, 142, 143, 144, 145, 146.)

Pl.'s Add. SMF 235:

According to Google's job description for SWE Directors, coding is not a primary job requirement for hire. (Tomezsko Sealing Decl., Ex. Q.)

Defendant's Response to 235: **Disputed**, but the dispute is **not genuine** because the statement is unsupported by the evidence cited. The document to which Plaintiff cites, Lucas Decl., ¶ 40, Exh. 1 (also submitted under seal as Tomezsko Sealing Decl., Exh. Q) is not a job description that sets forth minimum requirements for hire, but a job ladder for Director-level SWEs who are individual contributors. (Lucas Decl., ¶ 40.) Plaintiff admits that job ladders merely "serve as general guidelines to identify general expectations and criteria for jobs within a job family as one progresses in seniority and responsibility." (Def.'s SMF 11.)

Pl.'s Add. SMF 236:

Technical Directors, including Plaintiff, and SWE Directors are highly technical strategic leaders with cross product impact. (Rowe Decl. ¶ 26.)

Defendant's Response to 236: **Objects and moves to strike** because Plaintiff is not competent to testify about the qualifications of or work performed by Director-level SWEs, as she admits she does not know what their day-to-day responsibilities are. (Def.'s SMF 138.) Alternatively, it is **undisputed** that that all engineering roles at L6 and above are expected to have cross-product impact. (Jumper Decl., Exh. 69 at P001585.) In any event, the skills sets necessary to perform the L8 and L9 Technical Director roles in OCTO and the Director-level SWE roles differ greatly. (Def.'s SMF 3, 4, 5, 6, 7, 139, 140, 141, 142, 143, 144, 145, 146.)

Pl.'s Add. SMF 237:

Engineering is one of the three pillars that comprise the Technical Director position. (Ex. 1, Grannis Tr. 116:4-8.)

Defendant's Response to 237: **Disputed**, but the dispute is **not genuine** because Pl.'s Add. SMF 237 is controverted by the record. Plaintiff admits that the "engineering impact," not engineering, is one of the three pillars that comprise the L8 and L9 Technical Director roles in OCTO. (Def.'s SMF 4, 5.) Engineering impact required L8 and L9 Technical Directors in OCTO to guide and advise Google engineers on how to build products that meet industry needs. (*Id.*) Plaintiff admits that L8 and L9 Technical Directors in OCTO do not actually build products or manage the teams that build Google's cloud offerings, nor are they responsible for the roadmap or budget for any particular product (although L8 and L9 Technical Directors in OCTO who succeed in the engineering impact pillar can and do make significant contributions to product roadmaps). (Def.'s SMF 6.) Those are software engineer and product manager responsibilities found in other areas of Google Cloud. (*Id.*)

Pl.'s Add. SMF 238:

Engineering skills are transferable to a SWE Director role. (Ex. 1, Grannis Tr. 116:4-8.)

Defendant's Response to 238: **Undisputed**, but **immaterial** as Plaintiff admits that L8 Technical Directors in OCTO do not actually build products or manage the teams that build Google's cloud offerings. (Def.'s SMF 6.) Additionally, the first and third pillars of responsibility for the L8 and L9 Technical Directors roles in OCTO, customer advancement and evangelism, are not "core valuable pieces" of the Software Engineer manager position and "largely negligible" if someone wanted to transfer from the OCTO to a Software Engineering manager role. (Jumper Decl., Exh. 1 at 115:15 – 116:15.)

Pl.'s Add. SMF 239:

Technical Directors and SWE Directors could either be individual contributors or people managers. (Tomezsko Decl. ¶ 15, 16, 139.)

Defendant's Response to 239: **Undisputed**. The vast majority of Director-level SWEs

Plaintiff identified as her alleged comparators are people managers. (Def.'s SMF 145.)

Pl.'s Add. SMF 240:

Both Technical Directors, including Plaintiff, and SWE Directors guide and consult external clients on technical decisions, organizational decisions and more that impact their companies. Internally, both roles involve working across different groups like product, compliance, regulatory policy, marketing etc., to help drive solutions for our customers. (Tomezsko Sealing Decl., Ex. Q.)

Defendant's Response to 240: **Disputed in part**, but the dispute is **not genuine** because Pl.'s

Add. 240 is not supported by the cited evidence. Google **disputes** the first sentence, as the

only reference to interaction with external clients in the cited document are two references to

*examples* of how Director-level SWEs who are individual contributors can demonstrate

leadership in their respective roles:

While they may or may not be people managers, [Principal Engineers] are expected to lead, engage, inspire and collaborate superbly with others. Examples of this include: […] Representing Google externally to customers, academic, and industry.

[Distinguished Engineers] may work in tandem with Directors and VPs to define and execute technical process and arbitrate technical process and decisions at a high level. Examples of this include: […] Representing Google externally to customers, academic, and industry, and informing Google's strategy with respect to key external issues such as security, privacy, hardware development and many other fields.

(Lucas Decl., Exh. 1 at GOOG-ROWE-00061507, 08 (also filed as Tomezsko Sealing Decl.,

Exh. Q).) Plaintiff has submitted no evidence that Director-level SWEs *actually perform* the

work described in Statement No. 240. Nor could she; Plaintiff is not competent to testify about

the qualifications of or work performed by Director-level Software Engineers, as she admits

she does not know what their day-to-day responsibilities are. (Def.'s SMF No. 138, *supra*.)

The second sentence is **undisputed**, but **immaterial** because all engineering roles at L6 and above are expected to have cross-product impact. (Jumper Decl., Exh. 69 at P001585). In any event, the job responsibilities of L8 and L9 Technical Director roles in OCTO and the Director-level SWE roles differ greatly. (Def.'s SMF 3, 4, 5, 6, 7, 139, 140, 141, 142, 143, 144, 145, 146.)

Pl.'s Add. SMF 241:

> Both Technical Directors, including Plaintiff, and SWE Directors work with customers to understand their business needs, develop new business ideas with them, and work with them on how to transform their businesses using technology, how to solve their large technical challenges. (Rowe Decl. ¶ 25; Tomezsko Sealing Decl., Ex. Q.)

Defendant's Response to 241: **Disputed in part**, but the dispute is **not genuine** because Pl.'s Add. 241 is not supported by the cited evidence. The only reference to interaction with external customers in the cited document are two references to *examples* of how Director-level SWEs who are individual contributors can demonstrate leadership in their respective roles:

> While they may or may not be people managers, [Principal Engineers] are expected to lead, engage, inspire and collaborate superbly with others. Examples of this include: […] Representing Google externally to customers, academic, and industry.

> [Distinguished Engineers] may work in tandem with Directors and VPs to define and execute technical strategy and arbitrate technical process and decisions at a high level. Examples of this include: […] Representing Google externally to customers, academic, and industry, and informing Google's strategy with respect to key external issues such as security, privacy, hardware development and many other fields.

(Lucas Decl., Exh. 1 at GOOG-ROWE-00061507, 08 (also filed as Tomezsko Sealing Decl., Exh. Q).) Plaintiff has submitted no evidence that Director-level SWEs *actually perform* the work described in Statement No. 241. Nor could she; Plaintiff is not competent to testify about the qualifications of or work performed by Director-level Software Engineers, as she admits she does not know what their day-to-day responsibilities are. (Def.'s SMF No. 138, *supra*.)

In any event, the job responsibilities of L8 and L9 Technical Director roles in OCTO and the Director-level SWE roles differ greatly. (Def.'s SMF 3, 4, 5, 6, 7, 139, 140, 141, 142, 143, 144, 145, 146.)

### *"Director-level Application Engineers"*

Pl.'s Add. SMF 242:

Technical Directors, including Plaintiff, and Application Engineer (AE) Directors share job requirements. Google used the same Engineering-wide Leveling Guide and leadership rubrics in hiring Technical Directors and AE Directors and the Engineering-wide Leveling guide accurately reflected the skills and expectations across all Engineering roles, regardless of ladder. (Ex. 69, P001584.)

Defendant's Response to 242: **Disputed in part**, but the dispute is **not genuine** because Pl.'s Add. 242 is not supported by the cited evidence or the record generally.  Plaintiff has submitted no evidence that anyone consulted the 2020 Engineering-wide Leveling Guide at Jumper Decl., Exh. 69 in connection with hiring any L8 or L9 Technical Directors in OCTO or Director-level Application Engineer's ("AEs"). Based on the date alone, it could not have been used in hiring Plaintiff as a L8 Technical Director in 2017. (Jumper Decl., Exh. 69 at P001584.) The 2020 Engineering-wide Leveling Guide expressly states that it is "not a representation of expectations for any specific ladder." (*Id.*) Will Grannis, the hiring manager for the Technical Director role in OCTO, also stated that the document does not represent the specific expectations for any job or role, including Technical Directors or Director-level SWEs. (Jumper Decl., Exh. 1 at 122:14 – 123:13.) Plaintiff's citations to the record also do not support the proposition that "Google used the same . . . Leadership Rubrics in hiring Technical Directors and AE Directors," and therefore Plaintiff has failed to support this portion of Pl.'s Add. SMF 242 as an undisputed material fact. *See* 56(c)(1)(B). In any event, that portion of Pl.'s Add. SMF 242 is **undisputed** but **immaterial** because all senior-level candidates (L8+) are assessed against the same Leadership rubric, regardless of the

candidate's role or job family. (Tomezsko Supp. Decl., ¶ 5, Exh. 1, 133:13 – 19.) In any event, the job responsibilities of L8 and L9 Technical Director roles in OCTO and the Director-level AE roles differ greatly. (Def.'s SMF 3, 4, 5, 6, 7, 147, 148, 149, 150, 151, 152, 153.)

Pl.'s Add. SMF 243:

Technical Directors, including Plaintiff, and AE Directors work directly with customers and stakeholders, engage in whiteboarding sessions, identify friction points in design, development, and deployment from stakeholders' perspectives, and collaborate across functional and product area boundaries within Google. (Ex. 69, P001584-85.)

Defendant's Response to 243: **Disputed in part**, but the dispute is **not genuine** because Jumper Decl., Exh. 69 does not support the proposition for which it is cited. The 2020 Engineering-wide Leveling Guide expressly states that it is "not a representation of expectations for any specific ladder." (Jumper Decl., Exh. 69 at P001585.) Will Grannis, the hiring manager for the Technical Director role in OCTO, also stated that the document does not represent the specific expectations for any job role, including Technical Directors or Director-level SWEs. (Jumper Decl., Exh. 1 at 122:14 – 123:13.) In any event, the job responsibilities of L8 and L9 Technical Director roles in OCTO and the Director-level AE roles differ greatly. (Def.'s SMF 3, 4, 5, 6, 7, 147, 148, 149, 150, 151, 152, 153.)

*"Director-level Product Managers"*

Pl.'s Add. SMF 244:

Technical Directors, including Plaintiff, and Product Management ("PM") Directors provide product and engineering guidance, engage in thought leadership collaborate and work with others across the organization, engage with clients, and possess an understanding of product development responsibilities. Google used the same Engineering-wide Leveling Guide and leadership rubrics in hiring Technical Directors and PM Directors and the Engineering-wide Leveling guide accurately reflected the skills and expectations across all Engineering roles, regardless of ladder. (Ex. 18, Rowe Tr. 327:9-14; Ex. 69, P001584.)

Defendant's Response to 244: **Disputed in** part but the dispute is **not genuine** because Plaintiff is not competent to testify about the responsibilities of Director-level Product Managers ("PMs"), as she admits that she does not know what their day-to-day responsibilities are. (Def.'s SMF 138, supra.) See Fed. R. Civ. P. 56(c)(2), (4). Plaintiff has otherwise submitted no evidence that anyone consulted the 2020 Engineering-wide Leveling Guide at Jumper Decl., Exh. 69 in connection with hiring any L8 or L9 Technical Directors in OCTO or Director-level PMs. Based on the date alone, it could not have been used in hiring Plaintiff as a L8 Technical Director in 2017. (Jumper Decl., Exh. 69 at P001584.) The 2020 Engineering-wide Leveling Guide expressly states that it is "not a representation of expectations for any specific ladder." (*Id*.) Will Grannis, the hiring manager for the Technical Director role in OCTO, also stated that the document does not represent the specific expectations for any job role, including Technical Directors or Director-level PMs. (Jumper Decl., Exh. 1 at 122:14 – 123:13.) Plaintiff's citations to the record do not support the proposition that "Google used the same . . . Leadership Rubrics in hiring Technical Directors and PM Directors," and therefore Plaintiff has failed to support this portion of Pl.'s Add. SMF 244 as an undisputed material fact. *See* 56(c)(1)(B). In any event, that portion of Pl.'s Add. SMF 244 is **undisputed** but **immaterial** because all senior-level candidates (L8+) are assessed against the same Leadership rubric, regardless of the candidate's role or job family. (Tomezsko Supp. Decl., ¶ 5, Exh. 1, 133:13 – 19.) In any event, the job responsibilities of L8 and L9 Technical Director roles in OCTO and the Director-level PM roles differ greatly. (Def.'s SMF 3, 4, 5, 6, 7, 154, 155, 156, 157, 158, 159, 160, 161.)

Pl.'s Add. SMF 245:

Technical Directors, including Plaintiff, and PM Directors require a deep understanding of Google's products, collaborate with internal and external stakeholders to solve technical

problems and translate that to product design and delivery, come up with innovative solutions and products, and set business strategy for a product. (Ex. 18, Rowe Tr. 327:9-14.)

Defendant's Response to 245: **Objects and moves to strike**, as Plaintiff is not competent to testify about the responsibilities of Director-level PMs and admits that she does not know what their day-to-day responsibilities are. (Def.'s SMF 138, supra.) *See* Fed. R. Civ. P. 56(c)(2), (4). Alternatively, Google **disputes** Pl.'s Add. SMF 245 but the dispute is **not genuine** because the citation to the record does not support the proposition for which it is cited. (Jumper Decl., Exh. 18 at 327:9 – 14.) In any event, the job responsibilities of L8 and L9 Technical Director roles in OCTO and the Director-level PM roles differ greatly. (Def.'s SMF 3, 4, 5, 6, 7, 154, 155, 156, 157, 158, 159, 160, 161.)

Pl.'s Add. SMF 246:

Technical Directors, including Plaintiff, and PM Directors share the following core job duties, among others: "identifying AI-related design deployment friction points from customer's perspective," "rallying teams to work through deployment hurdles, product updates, new product offerings, and solutions," working with customers on joint initiatives, collaboration across functional and product area boundaries, deep dives with the internal engineering team, working on cross-Google technical working teams, getting hands-on with customer projects, among others. (Tomezsko Decl. Ex. 10.)

Defendant's Response to 246: **Disputed**, but the dispute is **not genuine** because Pl's Add. SMF 246 is not supported by the citation to the record. Tomezsko Decl., Exh. 10 is the job description used for hiring L8 and L9 Technical Directors in OCTO and says nothing about the "core job duties" of Director-level PMs. (Tomezsko Decl., Exh. 10.) In any event, the job responsibilities of L8 and L9 Technical Director roles in OCTO and the Director-level PM roles differ greatly. (Def.'s SMF 3, 4, 5, 6, 7, 154, 155, 156, 157, 158, 159, 160, 161.)

Pl.'s Add. SMF 247:

Technical Directors, including Plaintiff, and PM Directors perform job duties associated with evangelism, private whiteboarding sessions, and experience with multiple software design methodologies. (Ex 17, Wilson Tr. 158:12-159:2; Ex. 1, Grannis Tr. 122:7-13; Tomezsko Decl. Ex. 10.)

<u>Defendant's Response to 247</u>: It is **undisputed** that Pl.'s Add. SMF 247 accurately describes Mr. Wilson's testimony about how he performed the Director-level PM role. Google **disputes** that the testimony applies to all Director-level PMs Plaintiff has identified as alleged comparators, because Plaintiff has not established that Mr. Wilson is competent to testify to that. Mr. Wilson also testified that the Director-level PM role as he performed it involved "[c]oming up with a vision of where the product is going to go, to find a kind of three-year road map, and then going down to a yearlong road map with quarterly deliverables that drove an outcome that was positive for customers," (*id.*, at 154:14 – 20), which is not work performed by Technical Directors in OCTO. (Def.'s SMF 6.) Therefore, the dispute is **not genuine** because it is not supported by admissible evidence. In any event, the job responsibilities of L8 and L9 Technical Director roles in OCTO and the Director-level PM roles differ greatly. (Def.'s SMF 3, 4, 5, 6, 7, 154, 155, 156, 157, 158, 159, 160, 161.)

<u>Pl.'s Add. SMF 248</u>:

Several Technical Directors transferred into PM Director roles. (¶¶ 136-37, *supra*.)

<u>Defendant's Response to 248</u>: **Undisputed** that two L9 Technical Directors, Mr. Wilson and Mr. Eryurek, successfully completed or started the ladder transfer process to become L8 Product Managers after demonstrating they possessed the necessary skills, role-related knowledge, and qualifications for the L8 Product Manager role. (Def.'s SMF 35, 36, 37.)

<u>Pl.'s Add. SMF 249</u>:

Individuals who performed both the Technical Director and PM Director roles confirm that the job responsibilities and skill sets required for the role, particularly their product development background and industry expertise, were transferrable. (Ex. 17, Wilson Tr. 153:7-20.)

<u>Defendant's Response to 249</u>: **Disputed**, but the dispute is **not genuine** because the portion of Mr. Wilson's deposition does not support the proposition for which hit is cited. (Jumper

Decl., Exh. 17 at 153:7 – 20.) In any event, Mr. Wilson testified that he believed his skill set was transferable to the product management role "[g]iven [he] had run product management organizations in [his] prior two companies." (Jumper Decl., Exh. 17 at 154:21 – 24.) He also testified that his technology experience up until that point in time was relevant to the PM role he moved into because, "Basically we were building what I had built at GE and at P2 and we were building that for Cloud, so there was a direct applicability." (*Id.*, 155:25 – 156:8.) Plaintiff does not possess the same prior experience as Mr. Wilson. (Def.'s SMF 38, 41.)

<u>Pl.'s Add. SMF 250</u>:

Technical Directors, including Plaintiff, consistently performed product development and management work. (Ex. 49, Eryurek Tr. 82:19-83:4; Rowe Decl. ¶ 15.)

<u>Defendant's Response to 250</u>: It is **undisputed** that after Mr. Eryurek left OCTO in June 2018, he and Greg Moore *discussed* how his role reporting to Mr. Moore would be "essentially what I do in OCTO and how I have these external engagement and I would be much more in front of the customers and kind of continue to do the product development efforts with the engineers and PMs, and that a [*sic*] maybe we should build a team around me and so forth. Those were all discussed, but I was still on the fence." (Jumper Decl., Exh. 49 at 82:3 – 83:4.) Plaintiff concedes that within weeks of transferring to the GAIP organization under Mr. Shaukat, Mr. Eryurek starting reporting to Sudhir Hasbe and began the trial period to transfer to the Product Manager job ladder. (Def.'s SMF 136.) It is also **undisputed** that Mr. Eryurek's unique knowledge and experience in running software engineering teams to make an immediate impact on the roadmap for Google Cloud's products, creating business opportunities and providing feedback on product development in the L9 Technical Director role in OCTO. (Def.'s SMF 88.) These contributions set him apart from L8 Technical Directors in OCTO. (Grannis Decl., ¶ 30.) Google **disputes** that Plaintiff "consistently

performed product development and management work," but the dispute is **not genuine** because Plaintiff offers no evidence—other than her subjective declaration parroting the language in Def.'s SMF 88—to support that proposition. Rather, the evidence demonstrates that she consistently underperformed in the engineering impact pillar of the L8 Technical Director role. (Def.'s SMF 85, 86.)

Pl.'s Add. SMF 251:

Mr. Eryurek's probationary period for the PM Director role was to determine whether Mr. Eryurek's skill set as a Technical Director was transferrable to PM Director; ultimately, Google answered that question in the affirmative. (Ex. 1, Grannis Tr. 121:24-122:23.)

Defendant's Response to 251: **Undisputed** that Mr. Eryurek successfully completed a ladder transfer from his L9 Technical Director role to an L8 Director role on the PM job ladder after a trial probationary period, the purpose of which was to determine whether his skill set and domain knowledge were in fact transferrable to the new job ladder. (Def.'s SMF 135, 136.)

Pl.'s Add. SMF 252:

In his statement of support for Mr. Wilson's transfer from Technical Director to the PM Director role, Mr. Grannis noted, "I hired him into Google almost three years ago with the idea that he'd help our customers and product teams" and described Mr. Wilson's role as a Technical Director as "a product strategy and CTO like role." (Ex. 63, GOOG-ROWE-00062099.)

Defendant's Response to 252: **Undisputed** that Pl.'s Add. SMF accurately states portions of Mr. Grannis' description of his rationale for hiring Mr. Wilson for the L9 Technical Director role in OCTO, and his general description of the work Mr. Wilson was hired to perform in that role. (Jumper Decl., Exh. 63 at GOOG-ROWE-00062099.)

Pl.'s Add. SMF 253:

Diane Greene, the former CEO of Google Cloud, acknowledged that there was significant overlap in the Technical Director and PM Director role, noting that the Technical Director role "seems part Product management, part vertical, part product marketing." (Ex. 64, GOOG-ROWE-00058837.)

<u>Defendant's Response to 253</u>: **Disputed in part**. It is **undisputed** that Diane Greene wrote those words in an email to Brian Stevens on December 13, 2017. (Jumper Decl., Exh. 64 at GOOG-ROWE-00058837.) Google **disputes** the remainder of Pl.'s Add. SMF 253 but the dispute is **not genuine** because Pl.'s Add. SMF 253 is controverted by the remainder of the document. Mr. Stevens wrote back to Ms. Greene on December 19, 2017, in that same e-mail thread to correct her misperception, stating, "Product Mgmt: This part has had some efforts but IMO mostly not very successful." (Tomezsko Supp. Decl., ¶ 10, Exh. 6 at GOOG-ROWE-00058834–35.) In that same conversation, he also noted that "Evren and Ben are much more technical than Ulku, as both were former CTOs." (*Id.*)

### *Global Client Leads*

<u>Pl.'s Add. SMF 254</u>:

> The Global Client Technical Lead ("GCTL") position, as performed by Plaintiff and other Technical Directors, was virtually identical to the Technical Director position in OCTO. (Ex. 65, GOOG-ROWE-00017429.)

<u>Defendant's Response to 254</u>: **Disputed in part**, but the dispute is **not genuine** because Jumper Decl., Exh. 65 does not support the proposition for which it is cited and it is controverted by other evidence in the record. It is a draft communication from Tariq Shaukat to Plaintiff explaining his *intent* to have Plaintiff perform responsibilities similar to those she performed in OCTO with certain differences: (1) "more targeted focus on FSI [financial services industry] clients;" and (2) the "opportunity … to take on people management responsibility." (Jumper Decl., Exh. 65 at GOOG-ROWE-00017429.) But Plaintiff testified that she perceived differences between the two roles:

> Q:     But my question to you was what were you doing when you worked in OCTO that you were no longer doing when you were in Tariq's organization?

A:      I thought I answered that. But basically my focus on product and eng was limited or reduced. My client engagements, you know, were reduced. And my thought leadership was also not as big as before.

(Jumper Decl., Exh. 18 at 247:13 – 21.) Pl.'s Add. SMF 254 is **undisputed** as to Mr. Wilson.

Mr. Wilson testified that he and his supervisor, Darryl Willis, essentially defined for themselves what the GCTL role was going to be because it was not entirely clear to them what their responsibilities were:

Q:      Did anyone ever explain to you what the difference was between those two roles?

A:      Yes. Darryl Willis tried to explain the difference, but I was left with the impression he was confused also.

Q:      Do you recall what Mr. Willis told you?

A:      Since he and I were senior people in the organization our thought was that we were going to say yes, sir, a little bit overlapping, but our goal is to go serve the customer and so we should work together and find a way to go serve the customers with each one of our capabilities and do that to the best of our ability. That was what we settled on, not a specific set of role of who does what.

(Jumper Decl., Exh. 17 at 119:3 – 19.) Ultimately, the GCTL role as Mr. Wilson performed it was similar to his role as an L9 Technical Director in OCTO:

Q:      So once you were in the role, what did your day-to-day responsibilities look like?

A:      I think they were pretty much unchanged.

Q:      Unchanged from the role in OCTO?

A:      Yes. I think that was due to the lack of clarity in the roles that we discussed earlier.

(*Id.* at 127:2 – 10.)

Pl.'s Add. SMF 254 is **undisputed** with respect to Mr. Eryurek for the brief period of time he was in the GTCL role. Mr. Eryurek discussed with Greg Moore, his supervisor in Tariq Shaukat's GAIP organization, how his role would be "essentially what I do in OCTO" (Jumper Decl., Exh. 49 at 82:3 – 83:4.) It is **immaterial**, however, because Plaintiff concedes

that within weeks of the transfer, Mr. Eryurek starting reporting to Sudhir Hasbe and began

the trial period to transfer to the Product Manager job ladder. (Def.'s SMF 136.)

Pl.'s Add. SMF 255:

Plaintiff was told by the GCTL and Global Client Lead ("GCL") supervisor, Tariq Shaukat, that she would "continue doing the role you're doing" in OCTO as a Technical Director, "but moving over to my vertical team" as a GCL. (Tomezsko Decl. Ex. 26; Ex. 66, GOOG-ROWE-00017427-28.)

Defendant's Response to 255: **Undisputed** that Mr. Shaukat told Plaintiff that she would

"continue doing the role you're doing" as a L8 Technical Director "but with the more targeted

focus on the FSI global clients." (Jumper Decl., Exh. 66 at GOOG-ROWE-00017427.) In that

same email he told her she would have the opportunity to lead a team, but gave her the option

to remain an independent contributor if she wanted. (*Id.*) What Mr. Shaukat told Plaintiff,

however, is **immaterial** because it is the work performed, not the description of the role, that

matters.

Pl.'s Add. SMF 256:

Mr. Shaukat informed Plaintiff that she would be working with individuals in the GCL role as "peers." (Ex. 35, Shaukat Tr. 95:10-11.)

Defendant's Response to 256: **Undisputed**, but what Shaukat may have called Plaintiff and

her co-workers is **immaterial** to the question of whether they performed substantially similar

work.

Pl.'s Add. SMF 257:

Google identified a Level 9 Global Client Lead, Anil Jain, as Plaintiff's peer. (Ex. 50, GOOG-ROWE-00056872.)

Defendant's Response to 257: **Undisputed** that the Employee Relations investigator who

looked into Plaintiff's complaints of alleged discrimination described Anil Jain as Plaintiff's

peer for purposes of the investigation. (Jumper Decl., Exh. 50, GOOG-ROWE-00056872.)

That description is **immaterial**, however, because Plaintiff concedes Mr. Jain has different responsibilities in his role than those Plaintiff had as a GCTL, including people management responsibilities. (Def.'s SMF 164, 167.)

Pl.'s Add. SMF 258:

Individuals in the GCL role worked alongside Plaintiff and other GCTLs who were transferred from the Technical Director role in OCTO to "complement the sales team, and will be responsible for the agenda, key transformation relationships, and end-to-end success at each Global Client." (Ex. 67, GOOG-ROWE-00017439.)

Defendant's Response to 258: It is **undisputed** that Pl.'s Add. SMF 258 accurately quotes a portion of the announcement Tariq Shaukat released when he announced the new Global Client Program and created the GCTL and GCL roles. (Jumper Decl., Exh. 67 at GOOG-ROWE-00017439.) Mr. Shaukat's description of the role, however, is **immaterial** because it is the work performed, not the description of the role, that matters.

Pl.'s Add. SMF 259:

Mr. Shaukat instructed Plaintiff upon transfer that he was "expecting her to come in and build a team and lead a team of global client leads." (Ex. 35, Shaukat Tr. 98:2-4.)

Defendant's Response to 259: **Undisputed**, but **immaterial** as Plaintiff admits that she never built that team or became a people manager. (Def.'s SMF 167.)

Pl.'s Add. SMF 260:

Mr. Shaukat described the GCTL role as the "technical peer" and "a more technical version versus the business version" of the GCL position. (Ex. 35, Shaukat Tr. 202:17-19; Ex. 68 GOOG-ROWE-00056994.)

Defendant's Response to 260: **Undisputed** that Mr. Shaukat conceived of the GCTL role as "a more technical version" of the GCL role. (Def.'s SMF 166.) Mr. Shaukat's description of the role, however, is **immaterial** because it is the work actually performed that matters.

<u>Pl.'s Add. SMF 261</u>:

Neither Plaintiff, nor other individuals in the GCTL role, were aware of any distinction between their role and the GCL role. (Ex. 17, Wilson Tr. 119:3-19; Ex. 49, Eryurek Tr. 86:4-6.)

<u>Defendant's Response to 261</u>: **Undisputed** as to Mr. Wilson and Mr. Eryurek's initial understanding (or lack thereof) of the differences between the GCTL and GCL roles, but **immaterial**. Mr. Wilson testified that he and his supervisor, Darryl Willis, decided for themselves how they would "go serve the customers with each one of our capabilities and do that to the best of our ability," and did not define a specific set of responsibilities for themselves in that role. (Jumper Decl., Exh. 17, at 119:3 – 19.) He also testified that the division of roles and responsibilities between the GCTL and GCL in the energy vertical in which he worked was different from those same roles in the healthcare industry vertical:

Q:  And with respect to your conversations with Mr. Ery – Eryurek, did it also seem to you that the -- he was having the same sort of issues with respect to overlapping roles in Health that you were having in energy?

A:  That was a more mature organization and they had rough -- I -- I can't remember the number, more than 25 people. So because they had more people, it was clear what kind of the roles and responsibilities would be. Also they had a different mission coming into the org working for Tariq, so I think it was easier for them to define it. So it wasn't as -- it didn't stand out as much.

(*Id.*, 121:9 – 23.) Mr. Eryurek similarly testified that Mr. Wilson's role and responsibilities in the energy vertical were distinct from his own in the healthcare vertical and Plaintiff's in the financial services vertical. (Jumper Decl., Exh. 49 at 87:11 – 88:4.) In any event, Mr. Eryurek performed the role for mere "weeks" before reporting to Sudhir Hasbe and beginning his trial period for eventual transfer to the Program Manager job ladder. (*Id.*, 86:18 – 21; Def.'s SMF 136.)

<u>Pl.'s Add. SMF 262</u>:

Darryl Wilson, a supervisor for both GCTL and GCL roles, characterized the roles as "overlapping." (Ex. 17, Wilson Tr. 119:3-19; Ex. 49, Eryurek Tr. 86:4-6.)

<u>Defendant's Response to 262</u>: Assuming "Darryl Wilson" refers to Darryl Willis, **undisputed** that Mr. Willis described the role to Mr. Wilson as "a little bit overlapping," but **immaterial** because Mr. Willis and Mr. Wilson ultimately defined for themselves how the roles would be performed. (Jumper Decl., Exh. 17, at 119:3 – 19.)

<u>Pl.'s Add. SMF 263</u>:

Mr. Eryurek, who also moved with Plaintiff from the Technical Director role into the GCTL role stated that the differences between the GCL and GCTL role were "ambiguous" at best. (Ex. 49, Eryurek Tr. 86:4-6.)

<u>Defendant's Response to 263</u>: **Undisputed** as to Mr. Eryurek's understanding of the roles as they were envisioned when they were created in June 2018, but **immaterial** because Mr. Eryurek agreed with his supervisor that his role would be similar to what he did as an L9 Technical Director in OCTO. (Jumper Decl., Exh. 49 at 82:3 – 83:4.) In any event, Plaintiff concedes that within weeks of the transfer, Mr. Eryurek starting reporting to Sudhir Hasbe and began the trial period to transfer to the Product Manager job ladder. (Def.'s SMF 136.)

<u>Pl.'s Add. SMF 264</u>:

In 2018, Google hired Stuart Breslow as Managing Director, Technology and Policy. (Ex. 42, Breslow Tr. 57:20-23.)

<u>Defendant's Response to 264</u>: **Undisputed** that in 2018, Google hired Stuart Breslow as Managing Director, Technology and Policy as an L9. (Def.'s SMF 114.) Mr. Breslow was hired into a position in a different job family than Plaintiff. (Jumper Decl., Exh. 21 ("Stuart Breslows [*sic*], called out by the complainant, was hired into a different job family than the complainant (5552). . . .").)

Pl.'s Add. SMF 265:

Mr. Breslow's job title within Google was Director, Solutions Consultant. (Ex. 21, GOOG-ROWE-00058500.)

Defendant's Response to 265: **Undisputed.**

Pl.'s Add. SMF 266:

Google hired Mr. Breslow as an individual contributor, reporting to Tariq Shaukat. (Ex. 42, Breslow Tr. 57:15-19; 69:2-4.)

Defendant's Response to 266: **Undisputed.**

Pl.'s Add. SMF 267:

Mr. Breslow's role as a Director, Solutions Consultant involved selling and promoting Google Cloud to customers. (Ex. 42, Breslow Tr. 57:4-14.)

Defendant's Response to 267: **Disputed** but the dispute is **not genuine** because Pl.'s Add. SMF 267 is not supported by Breslow's cited testimony. The cited passage is Mr. Breslow's testimony about discussions regarding "what the role might look like in two years, five years" when he was being recruited. (Jumper Decl., Exh. 42 at 56:16 – 14.)

Pl.'s Add. SMF 268:

In his role as Director, Solutions Consultant, Mr. Breslow worked closely with the product and engineering teams. (Ex. 42, Breslow Tr. 70:5-9.)

Defendant's Response to 268: It is **undisputed** that at the time Mr. Breslow was hired he understood that he was expected to work closely with the product and engineering teams, as he testified, (Jumper Decl., Exh. 42, at 70:5 – 9), but **immaterial** as Plaintiff has failed to submit evidence that Mr. Breslow actually performed that work in his role as L9 Director, Solutions Consultant.

Pl.'s Add. SMF 269:

Both Mr. Breslow's and Plaintiff's job roles involved serving as a technical advisor to clients and their senior executives in regulated industries. (Ex. 42, Breslow 77:8-78:6; GOOG-ROWE-00055478.)

<u>Defendant's Response to 269</u>: It is **undisputed** that Plaintiff's role as an L8 Technical Director in OCTO involved partnering closely with a few top global companies as their most trusted Google technical advisor, and that Mr. Breslow served as a point of contact for clients in regulated industries and their senior executives. (Tomezsko Decl., Exh. 10, at P000436; Jumper Decl., Exh. 42 at 77:8 – 78:6.) Mr. Breslow disagreed, and Google **disputes**, that he was a "technical advisor" and testified that "if someone is calling -- calling me to talk about, you know, how do you program something, the answer is no." (Jumper Decl., Exh. 42 at 77:13 – 78:3.) The dispute is **not genuine** because it is not supported by the cited testimony.

<u>Pl.'s Add. SMF 270</u>:

Both Mr. Breslow's and Plaintiff's job roles involved identifying Cloud-related designs, development, or deployment friction points from the customers' perspective and working through solutions. (Ex. 42, Breslow 78:7-24; Tomezsko Decl. Ex. 10.)

<u>Defendant's Response to 270</u>: **Undisputed** that Plaintiff's role as Technical Director in OCTO involved that responsibility at the scope of an L8, and Mr. Breslow's role as Director, Solutions Consultant involved that responsibility at the scope of an L9 on their respective job ladders. (Jumper Decl., Exh. 42 at 78:7 – 24; Tomezsko Decl., Exh. 10 at P000437; Def.'s SMF 10, 12, 114; Jumper Decl., Exh. 21.) It is **immaterial**, however, because evidence of some shared job responsibilities is insufficient to show substantially equal or substantially similar work.

<u>Pl.'s Add. SMF 271</u>:

Both Mr. Breslow's and Plaintiff's job roles involved working with customers and partners to define joint initiatives and co-create their transformation roadmap. (Ex. 42, Breslow 78:24-79:5; Tomezsko Decl. Ex. 10.)

<u>Defendant's Response to 271</u>: **Undisputed** that Plaintiff's role as Technical Director in OCTO involved that responsibility at the scope of an L8, and Mr. Breslow's role as Director, Solutions Consultant involved that responsibility at the scope of an L9 on their respective job

ladders. (Jumper Decl., Exh. 42 at 78:25 – 79:5; Tomezsko Decl., Exh. 10 at P000437; Def.'s

SMF 10, 12, 114; Jumper Decl., Exh. 21.) It is **immaterial**, however, because evidence of

some shared job responsibilities is insufficient to show substantially equal or substantially

similar work.

Pl.'s Add. SMF 272:

> Both Mr. Breslow's and Plaintiff's job roles involved telling the Google innovation story and
> helping translate it into actionable steps global companies can take towards adoption. (Ex. 42,
> Breslow 79:6-10; Tomezsko Decl. Ex. 10.)

Defendant's Response to 272: **Undisputed** that Plaintiff's role as Technical Director in

OCTO involved that responsibility at the scope of an L8, and Mr. Breslow's role as Director,

Solutions Consultant involved that responsibility at the scope of an L9 on their respective job

ladders. (Jumper Decl., Exh. 42 at 78:6 – 10; Tomezsko Decl., Exh. 10 at P000437; Def.'s

SMF 10, 12, 114; Jumper Decl., Exh. 21.) It is **immaterial**, however, because evidence of

some shared job responsibilities is insufficient to show substantially equal or substantially

similar work.

Pl.'s Add. SMF 273:

> Both Mr. Breslow's and Plaintiff's job roles involved collaborating across functional and
> product area boundaries to bring the best of Google to the customer. (Ex. 42, Breslow 79:11-
> 15; Tomezsko Decl., Ex. 10.)

Defendant's Response to 270: **Undisputed** that Plaintiff's role as Technical Director in

OCTO involved that responsibility at the scope of an L8, and Mr. Breslow's role as Director,

Solutions Consultant involved that responsibility at the scope of an L9 on their respective job

ladders. (Jumper Decl., Exh. 42 at 79:11 – 15; Tomezsko Decl., Exh. 10 at P000437; Def.'s

SMF 10, 12, 114; Jumper Decl., Exh. 21.) It is **immaterial**, however, because evidence of

some shared job responsibilities is insufficient to show substantially equal or substantially

similar work.

<u>Pl.'s Add. SMF 274</u>:

Both Mr. Breslow's and Plaintiff's job roles involved private whiteboarding sessions with Google customers. (Ex. 42, Breslow 79:16-24; Tomezsko Decl. Ex. 10.)

<u>Defendant's Response to 274</u>: **Undisputed** that Plaintiff's role as Technical Director in OCTO involved that responsibility at the scope of an L8, and Mr. Breslow's role as Director, Solutions Consultant involved that responsibility at the scope of an L9 on their respective job ladders. (Jumper Decl., Exh. 42 at 79:16 – 24; Tomezsko Decl., Exh. 10 at P000437; Def.'s SMF 10, 12, 114; Jumper Decl., Exh. 21.) It is **immaterial**, however, because evidence of some shared job responsibilities is insufficient to show substantially equal or substantially similar work.

<u>Pl.'s Add. SMF 275</u>:

Both Mr. Breslow's and Plaintiff's job roles involved public evangelism for emerging technologies and speaking publicly on those issues. (Ex. 42, Breslow 79:25-80:5; Tomezsko Decl. Ex. 10.)

<u>Defendant's Response to 275</u>: **Undisputed** that Plaintiff's role as Technical Director in OCTO involved that responsibility at the scope of an L8, and Mr. Breslow's role as Director, Solutions Consultant involved that responsibility at the scope of an L9 on their respective job ladders. (Jumper Decl., Exh. 42 at 79:25 – 80:5; Tomezsko Decl., Exh. 10 at P000437; Def.'s SMF 10, 12, 114; Jumper Decl., Exh. 21.) It is **immaterial**, however, because evidence of some shared job responsibilities is insufficient to show substantially equal or substantially similar work.

<u>Pl.'s Add. SMF 276</u>:

Both Mr. Breslow's and Plaintiff's job roles involved deep dives with internal engineering teams on the key cases for a given launch. (Ex. 42, Breslow Tr. 80:6-9; Tomezsko Decl. Ex. 10.)

<u>Defendant's Response to 276</u>: **Undisputed** that Plaintiff's role as Technical Director in OCTO involved that responsibility at the scope of an L8, and Mr. Breslow's role as Director, Solutions Consultant involved that responsibility at the scope of an L9 on their respective job ladders. (Jumper Decl., Exh. 42 at 80:6 – 9; Tomezsko Decl., Exh. 10 at P000437; Def.'s SMF 10, 12, 114; Jumper Decl., Exh. 21.) It is **immaterial**, however, because evidence of some shared job responsibilities is insufficient to show substantially equal or substantially similar work.

<u>Pl.'s Add. SMF 277</u>:

Both Mr. Breslow's and Plaintiff's job roles involved leading a cross-Google technical working team through critical engagements to customers. (Ex. 42, Breslow Tr. 80:15- 18; Tomezsko Decl. Ex. 10.)

<u>Defendant's Response to 277</u>: **Undisputed** that Plaintiff's role as Technical Director in OCTO involved that responsibility at the scope of an L8, and Mr. Breslow's role as Director, Solutions Consultant involved that responsibility at the scope of an L9 on their respective job ladders. (Jumper Decl., Exh. 42 at 80:15 – 18; Tomezsko Decl., Exh. 10 at P000437; Def.'s SMF 10, 12, 114; Jumper Decl., Exh. 21.) It is **immaterial**, however, because evidence of some shared job responsibilities is insufficient to show substantially equal or substantially similar work.

<u>Pl.'s Add. SMF 278</u>:

Both Mr. Breslow's and Plaintiff's job roles involved being comfortable presenting publicly in his role. (Ex. 42, Breslow Tr. 77:13- 81:6; Tomezsko Decl. Ex. 10.)

<u>Defendant's Response to 278</u>: **Undisputed**.

<u>Pl.'s Add. SMF 279</u>:

Mr. Breslow's role involved the same knowledge and experience requirements as Plaintiff's role as a Technical Director. (Ex. 69, P001584; Ex. 42, Breslow Tr. 73:9-74:3.)

<u>Defendant's Response to 279</u>: **Disputed**, but the dispute is **not genuine** because Pl.'s Add. SMF 279 is not supported by the cited evidence. Mr. Breslow testified that his role as an L9 Director, Solutions Consultant required the knowledge and experience expectations associated with both L8 and L9 engineering roles as reflected in the 2020 Engineering-wide Leveling Guide. (Jumper Decl., Exh. 42 at 73:9 – 74:3; *id.*, Exh. 69 at P001585.) Plaintiff has failed to establish that the knowledge and experience expectations reflected in the 2020 Engineering-wide Leveling Guide describe the requirements for her role as L8 Technical Director in OCTO. The 2020 Engineering-wide Leveling Guide expressly states that it is "not a representation of expectations for any specific ladder." (*Id.*, Exh. 69 at P001584.) Will Grannis, the hiring manager for the Technical Director role in OCTO, also stated that the document does not represent the specific expectations for any job, including Technical Directors in OCTO. (*Id.*, Exh. 1 at 122:14 – 123:13.) Even if Plaintiff could establish that the knowledge and experience expectations reflected in the 2020 Engineering-wide Leveling Guide for *L8* employees were applicable to her role as an L8 Technical Director in OCTO, Mr. Breslow testified that the separate *L9* expectations were applicable to his role, and therefore distinguishable. (Jumper Decl., Exh. 42 at 73:9 – 74:3; *id.*, Exh. 69 at P001585.)

<u>Pl.'s Add. SMF 280</u>:

Mr. Breslow's role involved the same complexity and scope requirements as Plaintiff's role as a Technical Director. (Ex. 69, P001584; Ex. 42, Breslow Tr. 74:4-75:5.)

<u>Defendant's Response to 280</u>: **Disputed**, but the dispute is **not genuine** because Pl.'s Add. SMF 280 is not supported by the cited evidence. Mr. Breslow testified that his role as an L9 Director, Solutions Consultant required the complexity and scope expectations associated with both L8 and L9 engineering roles as reflected in the 2020 Engineering-wide Leveling Guide. (Jumper Decl., Exh. 42 at 74:4 – 75:5; *id.*, Exh. 69 at P001585.) Plaintiff has failed to

establish that the complexity and scope expectations reflected in the 2020 Engineering-wide Leveling Guide describe the requirements for her role as L8 Technical Director in OCTO. The 2020 Engineering-wide Leveling Guide expressly states that it is "not a representation of expectations for any specific ladder." (*Id.*, Exh. 69 at P001584.) Will Grannis, the hiring manager for the Technical Director role in OCTO, also stated that the document does not represent the specific expectations for any job, including Technical Directors in OCTO. (*Id.*, Exh. 1 at 122:14 – 123:13.) Even if Plaintiff could establish that the complexity and scope expectations reflected in the 2020 Engineering-wide Leveling Guide for *L8* employees were applicable to her role as an L8 Technical Director in OCTO, Mr. Breslow testified that the separate *L9* expectations were applicable to his role, and therefore distinguishable. (Jumper Decl., Exh. 42 at 74:4 – 75:5; *id.*, Exh. 69 at P001585.)

Pl.'s Add. SMF 281:

Mr. Breslow's role involved the same leadership and influence requirements as Plaintiff's role as a Technical Director.  (Ex. 69, P001584; Ex. 42, Breslow Tr. 75:6-76:11.)

Defendant's Response to 281: **Disputed**, but the dispute is **not genuine** because Pl.'s Add. SMF 281 is not supported by the cited evidence. Mr. Breslow testified that his role as an L9 Director, Solutions Consultant required the leadership and influence expectations associated with both L8 and L9 engineering roles as reflected in the 2020 Engineering-wide Leveling Guide. (Jumper Decl., Exh. 42 at 75:6 – 76:11; *id.*, Exh. 69 at P001585.) Plaintiff has failed to establish that the leadership and influence expectations reflected in the 2020 Engineering-wide Leveling Guide describe the requirements for her role as L8 Technical Director in OCTO. The 2020 Engineering-wide Leveling Guide expressly states that it is "not a representation of expectations for any specific ladder." (*Id.*, Exh. 69 at P001584.) Will Grannis, the hiring manager for the Technical Director role in OCTO, also stated that the

document does not represent the specific expectations for any job, including Technical Directors in OCTO. (*Id.*, Exh. 1 at 122:14 – 123:13.) Even if Plaintiff could establish that the leadership and influence expectations reflected in the 2020 Engineering-wide Leveling Guide for *L8* employees were applicable to her role as an L8 Technical Director in OCTO, Mr. Breslow testified that the separate *L9* expectations were applicable to his role, and therefore distinguishable. (Jumper Decl., Exh. 42 at 75:6 – 76:11; *id.*, Exh. 69 at P001585.)

<u>Pl.'s Add. SMF 282</u>:

Mr. Breslow's role involved the same organizational impact requirements as Plaintiff's role as a Technical Director. (Ex. 69, P001584; Ex. 42, Breslow Tr. 76:12-77:12.)

<u>Defendant's Response to 282</u>: **Disputed**, but the dispute is **not genuine** because Pl.'s Add. SMF 282 is not supported by the cited evidence. Mr. Breslow testified that his role as an L9 Director, Solutions Consultant required the organizational impact expectations associated with both L8 and L9 engineering roles as reflected in the 2020 Engineering-wide Leveling Guide. (Jumper Decl., Exh. 42 at 76:12 – 77:7; *id.*, Exh. 69 at P001585.) Plaintiff has failed to establish that the organizational impact expectations reflected in the 2020 Engineering-wide Leveling Guide describe the requirements for her role as L8 Technical Director in OCTO. The 2020 Engineering-wide Leveling Guide expressly states that it is "not a representation of expectations for any specific ladder." (*Id.*, Exh. 69 at P001584.) Will Grannis, the hiring manager for the Technical Director role in OCTO, also stated that the document does not represent the specific expectations for any job, including Technical Directors in OCTO. (*Id.*, Exh. 1 at 122:14 – 123:13.) Even if Plaintiff could establish that the organizational impact expectations reflected in the 2020 Engineering-wide Leveling Guide for *L8* employees were applicable to her role as an L8 Technical Director in OCTO, Mr.

Breslow testified that the separate *L9* expectations were applicable to his role, and therefore distinguishable. (Jumper Decl., Exh. 42 at 76:12 – 77:7; *id.*, Exh. 69 at P001585.)

### D.   "PLAINTIFF'S INEQUITABLE TREATEMENT IN TARIQ SHAUKAT'S ORGANIZATION"

Pl.'s Add. SMF 283:

Google transferred Plaintiff to Mr. Shaukat's organization in or around June 2018. (Tomezsko Decl. Ex. 26.)

Defendant's Response to 283: **Undisputed**.

Pl.'s Add. SMF 284:

After over one month into Plaintiff's role as a GCL, Mr. Shaukat had not added her to staff meeting calendar invites and email distribution lists, despite multiple prior requests from Plaintiff. (Tomezsko Decl. Ex. 29.)

Defendant's Response to 284: **Undisputed** that in August 2018, Plaintiff asked her assistant to speak with Mr. Shaukat's assistant about adding Plaintiff to staff meetings and email distribution lists for his team. (Tomezsko Decl., Exh. 29.) After this request, Plaintiff appeared on meeting invites for Mr. Shaukat's staff meetings. (Def.'s SMF 97.) The remainder of Pl.'s Add. SMF 284 is unsupported by citation to the record.

Pl.'s Add. SMF 285:

Mr. Shaukat consistently omitted Plaintiff from relevant email correspondence and excluded or gave her limited access to relevant strategic meetings.  (Ex. 18, Rowe Tr.  149:17-150:4, 162:21-163:23; Ex. 73, GOOG-ROWE-00017449.)

Defendant's Response to 285: It is **undisputed** that Plaintiff believes she heard about approximately four to five meetings to which she was allegedly not invited, but she also admits that she does not believe she should have been invited to every meeting with Mr. Shaukat that had anything to do with financial services. (Jumper Decl., Exh. 18 at 171:11 – 19; 174:14 – 18.) Google **disputes** that Plaintiff was "consistently" excluded or given access to relevant strategic meetings but the dispute is **not genuine** because it is not supported by the

cited evidence. As Jumper Decl., Exh. 73 shows, Mr. Shaukat did not exclude Plaintiff from strategic financial services meetings in connection with the Google NEXT conference. He explicitly told Plaintiff that there were "few finserv meetings" and that he would be attending mostly "press and partner stuff this time around." (Jumper Decl., Exh. 73 at GOOG-ROWE-00017449.) He also told Plaintiff he did not object to her asking for a full pass to the event. (*Id.*) Plaintiff otherwise submits no evidence to demonstrate that Mr. Shaukat consistently excluded her from meetings of any kind.

Pl.'s Add. SMF 286:

In contrast to his treatment of Plaintiff, Mr. Shaukat quickly added to staff meetings and email lists a male who had recently joined his organization. (Ex. 18, Rowe Tr. 163:6-23.)

Defendant's Response to 286: **Disputed**, but the dispute is **not genuine** because Pl.'s Add. SMF 287 is not supported by Plaintiff's citation to the record. There is no reference whatsoever in the cite deposition testimony to Mr. Shaukat's treatment of a male who had recently joined his organization. (Jumper Decl., Exh. 18 at 163:6 – 23.)

Pl.'s Add. SMF 287:

Two former Technical Director who were also transferred to Mr. Shaukat's organization acknowledged that Plaintiff was treated less well and excluded from meetings on at least one occasion. (Ex. 17, Wilson Tr. 127:2-6; Ex. 49, Eryurek Tr. 91:8-18.)

Defendant's Response to 287: **Disputed**, but the dispute is **not genuine** because Pl.'s Add. SMF 288 misconstrues Mr. Wilson's and Mr. Eryurek's testimony. Mr. Wilson testified that he heard from Plaintiff that she was being excluded from meetings, but he did not personally observe that to be true because he was not at those meetings himself. (Jumper Decl., Exh. 17 at 147:11 – 148:15.) Plaintiff also told Mr. Wilson that Mr. Shaukat's staff meetings "are useless" and "she was better off" not attending. (*Id.*, at 147:20 – 148:6.) Similarly, Mr. Eryurek testified that Plaintiff expressed to him that she was frustrated that "she wasn't being

included," but Plaintiff has submitted no evidence that Mr. Eryurek himself believed or understood that to be the case. (*Id.*, Exh. 49 at 89:3 – 10.) To the extent that Plaintiff offers Mr. Wilson's and Mr. Eryurek's statements about what Plaintiff told them for the truth of the matter asserted, Google **objects and moves to strike** the portions of Pl.'s Add. SMF 288 based on those statements as based on inadmissible hearsay. *See* Fed. R. Civ. P., Rule 56(c)(2); Local Rule 56.1(d).

Pl.'s Add. SMF 288:

As a result of the limited communication Plaintiff had with her supervisor, Mr. Shaukat, she did not have adequate insight on his strategy or overall vision for the GCTL role or the organization, while other men in the organization, like Mr. Breslow were consistently included. (Ex. 18, Rowe Tr. 246:8-248:13.)

Defendant's Response to 288: **Disputed**, but the dispute is **not genuine** because Pl.'s Add. SMF 288 is controverted by other record evidence. Plaintiff's evidence demonstrates that Mr. Shaukat shared his strategy and overall vision for the GCTL role and the organization with Plaintiff right when she transferred to his organization. (Jumper Decl., Exh. 75 at GOOG-ROWE-00017420.) In an email dated June 13, 2018, Plaintiff wrote to Mr. Shaukat, "Thank you for the conversation yesterday, appreciate you taking the time to share your vision for the financial services vertical, and the approach for working with strategic customers." (*Id.*)

Pl.'s Add. SMF 289:

On June 6, 2018, Plaintiff requested her first one-on-one with Mr. Shaukat, her direct supervisor, to discuss expectations for the role, but Mr. Shaukat declined the meeting. (Ex. 74, GOOG-ROWE-P-00000714.)

Defendant's Response to 289: **Undisputed** that Plaintiff told Brian Stevens that Mr. Shaukat declined the meeting she requested on June 6, 2018, and Mr. Stevens responded, "I know he really wants to talk to you." (Jumper Decl., Exh. 74 at GOOG-ROWE-P-00000714.) It is **immaterial** because within a week, Plaintiff and Mr. Shaukat met and Plaintiff wrote to him,

"Thank you for the conversation yesterday, appreciate you taking the time to share your vision

for the financial services vertical, and the approach for working with strategic customers."

(*Id.*, Exh. 75 at GOOG-ROWE-00017420.)

Pl.'s Add. SMF 290:

Plaintiff informed her prior supervisor in OCTO, Will Grannis, about the unequal treatment she was experiencing under Mr. Shaukat's organization, and Mr. Grannis informed Melissa Lawrence and Brian Stevens. (Ex. 32, GOOG-ROWE-00017418.R.)

Defendant's Response to 290: **Undisputed** that after Mr. Shaukat allegedly cancelled a June

6, 2018, meeting with Plaintiff, Plaintiff complained to Mr. Grannis about it. (Jumper Decl.,

Exh. 32 at GOOG-ROWE-00017418.R.) Google **disputes**, and the document does not show,

that Plaintiff informed Mr. Grannis that she was being treated unequally in Mr. Shaukat's

organization on the basis of her sex. (*Id.*) In any event, it is **immaterial** because former

members of OCTO were upset about the transfer regardless of sex. Mr. Grannis informed

Brian Stevens and Melissa Lawrence that he would continue to "make [himself] available to

take some of the heat coming off" Plaintiff and Evren Eryurek, an L9 Technical Director in

OCTO who was also upset about being transferred to Mr. Shaukat's organization. (*Id.*;

Tomezsko Decl., Exh. 27 at GOOG-ROWE-00017425.)

Pl.'s Add. SMF 291:

Mr. Shaukat finally met with Plaintiff on June 12, 2018. (Ex. 75, GOOG-ROWE-00017420.)

Defendant's Response to 291: **Undisputed** that Mr. Shaukat met with Plaintiff within a week

of Plaintiff's first attempt to schedule a meeting with him. (Jumper Decl., Exh. 75 at GOOG-

ROWE-00017420; Pl.'s Add. SMF 290.)

Pl.'s Add. SMF 292:

Plaintiff reached out to Mr. Shaukat again in August to schedule a second one-on-one, but received no response to her emails. Three months after her first request, Mr. Shaukat's

administrative assistant finally contacted Plaintiff to schedule a one-on-one on September 21 for 30 mins. (Tomezsko Decl. Ex. 29, 30.)

Defendant's Response to 292: It is **undisputed** that Plaintiff emailed Mr. Shaukat in August about being invited to staff meetings or email distribution lists, (Tomezsko Decl., Exh. 29 at GOOG-ROWE-00017554), and that in September Mr. Shaukat emailed Kimberly Scott requesting that Ulku be added to his staff email distribution list. (*Id.*, Exh. 30 at GOOG-ROWE-00017568.) Google **disputes** the remainder of Pl.'s Add. SMF 293 but the dispute is **not genuine** because the documents do not support the proposition for which they are cited.

Pl.'s Add. SMF 293:

Only after this meeting was Plaintiff was added to staff meetings and email distribution lists. (Tomezsko Decl. Ex. 30.)

Defendant's Response to 293: **Undisputed** that Plaintiff was added to Mr. Shaukat's staff email distribution list in September 2018. (Tomezsko Decl., Exh. 30 at GOOG-ROWE-00017568.)

Pl.'s Add. SMF 294:

In November 2018, after the announcement of Diane Greene's departure from Google Cloud, Plaintiff requested another one-on-one with Mr. Shaukat. (Ex. 76, GOOG-ROWE-00017640.)

Defendant's Response to 294: **Undisputed.**

Pl.'s Add. SMF 295:

After receiving no response and following up again, a meeting was scheduled for December 5. (Ex. 77, GOOG-ROWE-00017643.)

Defendant's Response to 295: **Disputed**, but the dispute is **not genuine** because it is controverted by other evidence in the record. Mr. Shaukat responded to Plaintiff's November 2018 request for a one-on-one meeting within five days. (Jumper Decl., Exh. 75 at GOOG-ROWE-00017640.) At that time, he told Plaintiff, "This week is likely going to be tough

before of Thomas [Ms. Greene's successor] starting – will ask +Jess Murphy-True to find us time either this week or more likely the week after." (*Id.*)

<u>Pl.'s Add. SMF 296</u>:

During that meeting, Mr. Shaukat informed Plaintiff that the search for the vertical lead role was paused, and that he would not consider her for the VP Financial Services role, even if it did actualize. (Ex. 77, GOOG-ROWE-00017643.)

<u>Defendant's Response to 296</u>: **Undisputed.**

### E.   "PLAINTIFF'S UNEQUAL CONSIDERATION FOR THE VP FINANCIAL SERVICES ROLE"

<u>Pl.'s Add. SMF 297</u>:

As part of Google's verticalization efforts, in or about March 2018, Google sought to hire a Vice President, Financial Services ("VP Financial Services") in Mr. Shaukat's organization, and scoped the position as a Level 10. (Ex. 35, Shaukat Tr. 71:2-9.)

<u>Defendant's Response to 297</u>: It is **undisputed** that in or about March 2018, there was an active search for the Financial Services Vertical Lead ("FSVL") role in Mr. Shaukat's organization. (Jumper Decl., Exh. 35 at 71:2 – 9.) Whether the role was originally scoped as a Level 10 role is **immaterial** because, even if Plaintiff can prove that Stuart Breslow was "promoted" into that role, she concedes his level did not change as a result. (Def.'s SMF 116.)

<u>Pl.'s Add. SMF 298</u>:

Mr. Shaukat was the hiring manager for the VP Financial Services role. (Ex. 35, Shaukat Tr. 16:22-17:2.)

<u>Defendant's Response to 298</u>: **Undisputed.**

<u>Pl.'s Add. SMF 299</u>:

Mr. Shaukat did not immediately consider Plaintiff for the role, despite her expertise and demonstrated work promoting Google Cloud in the financial services industry.  (Ex. 66, GOOGLE-ROWE-00017427-8.)

<u>Defendant's Response to 299</u>: **U**ndisputed that Mr. Shaukat did not immediately interview Plaintiff for the Head of the Financial Services Vertical role because, as he told Plaintiff in

Jumper Decl., Exh. 66, "I personally believe in having 2 or 3 finalists for these roles before putting people through the final decision process, and we're still settling on the externals . . . once that is done, we will kick off the process for you as well (as you of course don't need to go through the initial assessment phases)." (Def.'s SMF 102.)

Pl.'s Add. SMF 300:

It was not until Plaintiff directly requested that Mr. Shaukat consider her for the position based on her qualifications that Mr. Shaukat included Plaintiff as a candidate for the role. (Ex. 78, GOOG-ROWE-00017435-36.)

Defendant's Response to 300: **Undisputed** that after Plaintiff expressed interest in the Head of Financial Services role, Mr. Shaukat committed to give her "a fair shot at the Vertical Lead role, with the same process and consideration as external candidates." (Jumper Decl., Exh. 78 at GOOG-ROWE-00017435.)

Pl.'s Add. SMF 301:

Although Mr. Shaukat told Plaintiff that he planned to give her a fair shot at the Vertical Lead role, prior to Plaintiff's application for the VP Financial Services role, and just weeks into any formal professional interaction with Plaintiff, Mr. Shaukat had already formed the opinion that Plaintiff was not "likely right . . . for the role." (Ex. 35, Shaukat Tr. 129:2-14; Ex. 79, GOOG-ROWE-00056487.)

Defendant's Response to 301: **Undisputed** that as of June 22, 2018, Mr. Shaukat believed Plaintiff was likely not a good fit for the Head of Financial Services Vertical role. (Jumper Decl., Exh. 79 at GOOG-ROWE-000056487.)  It is **immaterial**, however, in light of the fact that he asked a panel of interviewers to evaluate her candidacy anyway. (*Id.*, Exh. 89 at GOOG-ROWE-00056512.) At the time, he was also considering a number of external female candidates for the role, and spoke highly of them. (Jumper Decl., Exh. 79 at GOOG-ROWE-000056487.)

Pl.'s Add. SMF 302:

> As early as May 2018, in discussion with Brian Stevens about Plaintiff leading the financial services vertical, Mr. Shaukat stated that after one meeting with Plaintiff he "wasn't blown away" by Plaintiff and had been considering other candidates for the lead position. (Ex. 33, GOOG-ROWE-00017410.)

> Defendant's Response to 302: **Undisputed** that On May 8, 2018, Mr. Shaukat told Mr. Stevens about Plaintiff, "Would love to discuss on Ulku – I met with her once in a very exploratory fashion on the FSI lead role and wasn't blown away vs. some of the folks I've been talking to in this space, but I've had very few interactions with her so perhaps I am missing something. I'm very happy to meet her again to keep discussing. . . ." (Jumper Decl., Exh. 33 at GOOG-ROWE-00017410.)   It is **immaterial**, however, because this conduct occurred before Shaukat became aware that Plaintiff had engaged in protected activity. (Def.'s SMF 107.)

Pl.'s Add. SMF 303:

> Prior to Plaintiff's transfer to his organization, Mr. Shaukat had only met Plaintiff once and had "very few interactions" with her. (Ex. 33, GOOG-ROWE-00017410-11.)

> Defendant's Response to 303: **Undisputed**.

Pl.'s Add. SMF 304:

> Plaintiff spoke with Mr. Grannis regarding her concerns that she was not being fairly considered for the VP Financial Services role and Mr. Grannis confirmed that he considered her to be the most qualified candidate. (Ex. 80, P000706.)

> Defendant's Response to 304: It is **undisputed** that Plaintiff spoke with Mr. Grannis regarding concerns about her candidacy for the FSVL role. (Jumper Decl., Exh. 80 at P000706.) Google **disputes** that Mr. Grannis considered Plaintiff to be the most qualified candidate for the role, but the dispute is **not genuine** because the statement is not supported by the record. Mr. Grannis did not know the identities of the other candidates, and testified that Jumper Decl., Exh. 80 was "a motivation note to -- in support of an employee of [his]

who was going up for something, for another job." (Tomezsko Supp. Decl., ¶ 6, Exh. 2 at 161:8–162:6.) When asked if he believed Plaintiff was qualified for the FSVL role, Mr. Grannis testified, "I certainly believed that if she thought she was qualified for and she's being given an opportunity to interview for, she should go out and do it to the best of her ability which is why I start the thing with 'you're awesome, go get it.'" (*Id.*, at 162:7 – 15.)  Pl.'s Add. SMF 305 is **immaterial** because Mr. Grannis was not the hiring manager for the FSVL role; Mr. Shaukat was. (Pl.'s Add. SMF 299.)

Pl.'s Add. SMF 305:

Brian Stevens suggested to Mr. Shaukat that Plaintiff should be considered for the VP Financial Services role. (Ex. 33, GOOG-ROWE-17410-11.)

Defendant's Response to 305: **Undisputed**, but **immaterial** because Mr. Stevens was not the hiring manager for the FSVL role; Mr. Shaukat was. (Pl.'s Add. SMF 299.)

Pl.'s Add. SMF 306:

In June 2018, Melissa Lawrence, a recruiter for the role, indicated to Plaintiff that even if Plaintiff was selected for the VP Financial Services role, Plaintiff would remain a Level 8. (Ex. 81, GOOG-ROWE-00017423.)

Defendant's Response to 306: **Undisputed**. As Mr. Grannis also told Plaintiff, "it is unheard of in Google to go up a level nevermind two for an internal transfer." (Jumper Decl., Exh. 80 at P000706.)

Pl.'s Add. SMF 307:

In July 2018, Stuart Vardaman, a recruiter, informed Plaintiff that she would start the interview process for the VP Financial Services role. (Ex. 82, GOOG-ROWE-00017446.)

Defendant's Response to 307: **Undisputed** that Plaintiff started the interview process for the FSVL role, which at that time was known as the Head of Financial Services, in July 2018. (Jumper Decl., Exh. 82 at GOOG-ROWE-00017446.)

Pl.'s Add. SMF 308:

> Google did not follow its standard interview process for Plaintiff and did not apply the same interview process to Plaintiff that it did for other candidates for the VP Financial Services role, including by not collecting interview feedback, not having her interview with Diane Greene, and deciding before the interview process that she was not right for the role. (Ex. 35, Shaukat Tr. 129:2-14; Ex. 93, GOOG-ROWE-00017583.)

Defendant's Response to 308: **Disputed,** but the dispute is **not genuine** because Plaintiff's

citations to the record offer nothing to explain the process that was followed for other

candidates for the FSVL position, so she has no basis to draw comparisons to the process

followed with respect to her. As Jumper Decl., Exh. 93 clearly shows, the recruiter for the

position, Mr. Vardaman, anticipated that Plaintiff would meet with Diane Greene, like the

other finalist candidates. (Jumper Decl., Exh. 93 at GOOG-ROWE-00017583.) It is

**undisputed** that Ms. Greene left Google shortly after the email at Jumper Decl., Exh. 93 and

before she could meet with Plaintiff. (Def.'s SMF 109, 110.) It is also undisputed that despite

Mr. Shaukat's initial impressions of Plaintiff's candidacy, he nevertheless asked a panel of

interviewers to evaluate her for the role. (Pl.'s Add. SMF 311.)

Pl.'s Add. SMF 309:

> Given her concerns about differential treatment in consideration for the VP Financial Services, on August 28, 2018, Plaintiff emailed her initial recruiters, Melissa Lawrence and Kevin Lucas, to inform them that she perceived that her under-leveling at hire was negatively impacting her consideration for the VP role. (Ex. 86, GOOG-ROWE-00017556.)

Defendant's Response to 309: Google **disputes** that Melissa Lawrence and Kevin Lucas were

Plaintiff's "initial recruiters." The dispute is **not genuine**, however, because Plaintiff has

offered no evidence to establish that fact, and instead asserts (correctly) that Jennifer Burdis

was the lead recruiter for the Technical Director role in OCTO. (Pl.'s Add. SMF 176.) It is

**undisputed** that on August 28, 2018, Plaintiff emailed Ms. Lawrence and Mr. Lucas that she

believed the level assigned to her at hire was disadvantaging her candidacy. (Jumper Decl.,

Exh. 86 at GOOG-ROWE-00017556.)

Pl.'s Add. SMF 310:

In August of 2018, Plaintiff was interviewed by Sebastian Marotte, Darryl Willis, Vats
Srivatsan, and Jason Martin for the VP Financial Services roles. (Tomezsko Decl. Ex. 34.)

Defendant's Response to 310: **Undisputed** that those four individuals interviewed Plaintiff

for the FSVL role in August 2018. (Tomezsko Decl., Exh. 34; Jumper Decl., Exh. 89.)

Pl.'s Add. SMF 311:

Each interviewer was supposed to focus on a different aspect of her candidacy including role-
related knowledge ("RRK"), leadership, and general cognitive ability ("GCA"). (Ex. 89,
GOOG-ROWE-00056512.) .)

Defendant's Response to 311: **Undisputed**.

Pl.'s Add. SMF 312:

Contrary to Google's standard practice, feedback from Plaintiff's interviewers was not
formally captured in writing and uploaded to gHire. (Ex. 36, GOOG-ROWE-00017639.)

Defendant's Response to 312: **Undisputed** that as of November 27, 2018, interviewers had

not entered the feedback they had previously provided into gHire. (Jumper Decl., Exh. 36 at

GOOG-ROWE-00017639.) It is **immaterial**, however, because interviewers had provided

feedback to recruiter Stuart Vardaman and hiring manager Tariq Shaukat in other forms.

(Tomezsko Supp. Decl., ¶ 11, Exh. 7 at GOOG-ROWE-00017839.RR; *see also id.*, ¶ 7, Exh.

3 at 98:10 – 22; Tomezsko Decl., Exh. 34.)

Pl.'s Add. SMF 313:

Mr. Shaukat's Q3/Q4 weekly updates through the end of 2018 show that Google were
"chasing feedback for Ulku" week after week. (Ex. 90, GOOG-ROWE-00017731.RR.)

Defendant's Response to 313: **Undisputed** that Mr. Vardaman noted the need to follow up

with interviewers for their feedback, but **immaterial** as a full version of the cited exhibit

shows that interviewers provided feedback to recruiter Stuart Vardaman in various forms as early as late summer 2018. (Tomezsko Supp. Decl., ¶ 11, Exh. 7 at GOOG-ROWE-00017839.RR; *see also id.*, ¶ 7, Exh. 3 at 98:10 – 22.) Hiring manager also Tariq Shaukat testified that Mr. Vardaman relayed interview feedback to him in standing meetings. (Tomezsko Decl., Exh. 3 at 147:10 – 151:17.) One of Plaintiff's interviewers, Mr. Marotte, also shared his interview feedback with Mr. Shaukat directly. (*Id.*, Exh. 34 at GOOG-ROWE-00017533.)

Pl.'s Add. SMF 314:

On November 12, 2018, Diane Greene's daily briefing notes stated that Plaintiff was interviewed and that "the feedback has been positive, but it sounds as though there were general concerns about her being successful at the VP level - she is currently a director" and continues with very positive feedback like 'Executive poise, confident (but not ego-driven), forthright with a quick operating cadence.'" (Ex. 91, GOOG-ROWE-00056632.)

Defendant's Response to 314: **Undisputed**.

Pl.'s Add. SMF 315:

For role related knowledge, interviewers noted that Plaintiff possessed experience "in the financial services industry since 1997, with a focus on . . . has lead sizable teams, seems to have a relevant network in FSI." (Ex. 91, GOOG-ROWE-00056632.)

Defendant's Response to 315: **Disputed**, but the dispute is **not genuine** because Pl.'s Add. SMF 315 is not supported by the record. As Plaintiff's own documents show, this statement does not reflect interview feedback from Plaintiff's interviewers, but background information that recruiter Stuart Vardaman shared with interviewers *prior to* their interviews with Plaintiff on August 8, 2018. (*Compare* Jumper Decl., Exh. 91 at GOOG-ROWE-00056632 *with id.*, Exh. 100 at GOOG-ROWE-00017507 (dated August 7, 2018); *id.*, Exh. 89 at GOOG-ROWE-00056512 (indicating that Plaintiff's interview with Darryl Willis to evaluate her role-related knowledge, or RRK, was scheduled for the following day, August 8, 2018).)

<u>Pl.'s Add. SMF 316</u>:

As of November 2018, neither Mr. Shaukat nor Mr. Vardaman had received formal written feedback from any of Plaintiff's interviewers in response to her candidacy for the VP Financial Services role. (Ex. 36, GOOG-ROWE-00017639.)

<u>Defendant's Response to 316</u>: **Disputed**, but the dispute is **not genuine** because it is not supported by the record. Mr. Shaukat received written feedback on Plaintiff's candidacy for the FSVL role from at least Sebastien Marotte. (Tomezsko Decl., Exh. 34 at GOOG-ROWE-00017533; Pl.'s Add. SMF 318.)

<u>Pl.'s Add. SMF 317</u>:

Of the four individuals who interviewed Plaintiff for the role, Mr. Shaukat only recalls receiving direct feedback from one interviewer – Mr. Marotte. (Tomezsko Decl. Ex. 34; Ex. 35, Shaukat Tr. 145:3-11.)

<u>Defendant's Response to 317</u>: **Disputed**, but the dispute is **not genuine** because it is not supported by the record. Mr. Shaukat testified that he recalls receiving feedback from at least Sebastien Marotte and Jason Martin, but could not recall specifically what feedback came from which interviewer over two years later. (Jumper Decl., Exh. 35 at 146:8 – 147:9.)

<u>Pl.'s Add. SMF 318</u>:

Mr. Shaukat did not recall receiving direct interview feedback from Mr. Willis and did not even recall that Mr. Srivatsan and Mr. Martin were members of Plaintiff's interview panel and did not recall their feedback. (Ex. 35, Shaukat Tr. 151:25-152:13.)

<u>Defendant's Response to 318</u>: **Undisputed** as to Mr. Shaukat's testimony over two years after the events occurred, (Jumper Decl., Exh. 35 at 151:25 – 152:13), but **immaterial** as Mr. Shaukat's present recollection is not dispositive as to whether he actually received feedback from these two interviewers at the time.

<u>Pl.'s Add. SMF 319</u>:

All candidates, except Plaintiff, were personally interviewed by the CEO of Google Cloud at the time, Diane Greene, who was integral to the final hiring decision for the role prior to her departure from Google.  (Ex. 93, GOOG-ROWE-00017583.)

Defendant's Response to 319: **Disputed,** but the dispute is **not genuine** because Pl.'s Add. SMF is not supported by the record. Diane Greene interviewed two other female finalist candidates for the FSVL role, and she agreed to meet Plaintiff as well. (Jumper Decl., Exh. 93 at GOOG-ROWE-00017583.) Plaintiff has submitted no evidence to demonstrate that any other candidate for the FSVL position met with Ms. Greene, nor does she support the remainder of Pl.'s Add. SMF 320 with citations to the record.

Pl.'s Add. SMF 320:

In November of 2018, Plaintiff emailed Mr. Shaukat and Diane Greene, the CEO of Google Cloud, to raise concerns regarding her treatment during the VP Financial Service interview process – highlighting that she had not completed the interview process with Mr. Greene as the final interviewer, and her belief that her original under-leveling was impacting her candidacy. (Ex. 94, GOOG-ROWE-P-00001737.)

Defendant's Response to 320: It is **undisputed** that on November 7, 2018, Plaintiff emailed Tariq Shaukat and Diane Greene and expressed concern "that certain decisions made in connection with my initial hiring are impeding me in this process, and I want to make sure that you know the full context." (Jumper Decl., Exh. 94 at GOOG-ROWE-P-00001737.) Google **disputes** that Plaintiff's email highlighted concerns of mistreatment during the FSVL role interview process on the basis of her sex, but the dispute is **not genuine** as there is no suggestion of that in the document itself. (*Id.*) Plaintiff concedes that Mr. Shaukat forwarded Plaintiff's email to Human Resources to investigate the claim that she had been under-leveled at hire. (Def.'s SMF 107.)

Pl.'s Add. SMF 321:

On November 26, 2018, Mr. Shaukat emailed Kevin Lucas asking, "how do we message to Ulku that she's not getting the role . . . she didn't come out on top of the exiting interviews even without Diane." (Ex. 95, GOOG-ROWE-00056910.)

<u>Defendant's Response to 321</u>: **Undisputed** that as of November 26, 2018, Mr. Shaukat had determined that Plaintiff was not his preferred candidate for the FSVL role and sought counsel from human Resources on how to message that appropriately to Plaintiff. (Jumper Decl., Exh. 95 at GOOG-ROWE-00056910.) In that same email, Mr. Shaukat noted that with the recent departure of then-CEO Diane Greene and new CEO Thomas Kurian joining Google Cloud, the hiring process for the FSVL role would be paused. (*Id.*)

<u>Pl.'s Add. SMF 322</u>:

On November 27, 2018, Mr. Vardaman emailed Plaintiff's interviewers asking them to submit written feedback and noted that "Ulku *was* an internal candidate for the VP, Financial Services role on Tariq's team." (Ex. 36, GOOG-ROWE-00017639 (emphasis added).)

<u>Defendant's Response to 322</u>: **Undisputed** that On November 27, 2018, after Mr. Shaukat officially determined that he would not proceed with Plaintiff's candidacy for the FSVL role in light of her interviews, (Jumper Decl., Exh. 95 at GOOG-ROWE-00056910), Mr. Vardaman followed up with interviewers again with a request that they formally document the feedback they relayed previously in Google's gHire system. (*Id.*, Exh. 36 at GOOG-ROWE-00017639.)

<u>Pl.'s Add. SMF 323</u>:

Overall, Mr. Shaukat testified that "there was no negative feedback" from Plaintiff's interviewers, "[t]here was only positive feedback on the technical side and there were questions and concerns on the nontechnical side, and . . . product management." (Ex. 35, Shaukat Tr. 151:3-8.)

<u>Defendant's Response to 323</u>: **Undisputed** that Pl.'s Add. SMF 324 accurately describes that portion of Mr. Shaukat's 2020 deposition testimony.

<u>Pl.'s Add. SMF 324</u>:

The feedback from Mr. Marotte, which reflected questions about Plaintiff's presentation "on the business side," was provided with the caveat that his interview with Plaintiff "was only 30mn." (Tomezsko Decl. Ex. 34.)

Defendant's Response to 324: **Undisputed** that Mr. Marotte provided Mr. Shaukat written

feedback on his interview with Plaintiff that he "found her very solid on the technical part but

not that strong on the business side when asking which pbs [problems] can large FSI [financial

services industry] organizations solve with AI, ML and Cloud. However it was only 30mn

[minutes]." (Jumper Decl., Exh. 34 at GOOG-ROWE-00017533.)

Pl.'s Add. SMF 325:

Mr. Shaukat made the determination that Plaintiff was not "going to be a finalist for the role." (Ex. 35, Shaukat Tr. 161:14-23.)

Defendant's Response to 325: **Undisputed** that once Mr. Shaukat received negative feedback

from Mr. Marotte and Mr. Martin on Plaintiff's qualifications on the business-side component

of the FSVL role, he "started suspecting that she was not going to end up being the finalist

for the role." (Jumper Decl., Exh. 35 at 161:14 – 162: 2.)

Pl.'s Add. SMF 326:

On December 5, 2018, Mr. Shaukat informed Plaintiff that he was "pausing the hiring of a full time person for a few weeks" but that even if the position reopens, her selection for the role was "not going to happen." Mr. Shaukat informed Plaintiff that the person they would place in the role would have "more sales and business development orientation."  (Ex. 77, GOOG-ROWE-00017643.)

Defendant's Response to 326: **Undisputed**. In that same conversation, Mr. Shaukat told

Plaintiff, "However, you're an incredibly valuable part of the team and I really would love

for you to be engaged on the technical side of our work and I expect that you will need to

build out a team to do that." (Jumper Decl., Exh. 77 at GOOG-ROWE-00017643.)

Pl.'s Add. SMF 327:

On December 6, 2018, Mr. Vardaman noted to other recruiters that "feedback is that she is junior for the VP role." (Ex. 96, GOOG-ROWE-00017644.)

Defendant's Response to 327: **Undisputed.**

F.   **"GOOGLE HIRES A LESS QUALIFIED MAN FOR THE VP FINANCIAL SERVICES ROLE"**

Pl.'s Add. SMF 328:

In January of 2019, Mr. Shaukat selected ▮Comp6▮ as the new lead for financial services. (Ex. 97, GOOG-ROWE-00051965.)

Defendant's Response to 328: **Disputed** but the dispute is **not genuine** because it is controverted by other evidence in the record. Plaintiff admits that Mr. Shaukat paused the search for the FSVL role in light of the changes in leadership in Google Cloud, (Def.'s SMF 111), and as Jumper Decl., Exh. 97 shows, the effort to appoint leads for the various verticals within his organization was "on hold as we do a broader strategic review within cloud as part of 2019/2020 planning." (Jumper Decl., Exh. 97 at GOOG-ROWE-00051965.) As the document also shows, the work in the financial services vertical was narrowed during this strategic review to "focus mostly on financial crimes use cases. . . ." (*Id.*) Plaintiff does not dispute that Mr. ▮Comp6▮ appointment in this role was on an interim basis only. (Def.'s SMF 113.)

Pl.'s Add. SMF 329:

Mr. ▮Comp6▮ did not interview for the position. (Ex. 42, Breslow Tr. 134:25-135:2.)

Defendant's Response to 329: **Undisputed** that Mr. ▮Comp6▮ did not interview for the position, as it was on an interim basis only. (Def.'s SMF 113.)

Pl.'s Add. SMF 330:

Mr. Shaukat and others repeatedly referred to Mr. ▮Comp6▮ as the "lead" of the financial services vertical, internally and externally, and Mr. ▮Comp6▮ had the responsibility and headcount associated with the VP Financial Services role. (Ex. 35, Shaukat Tr. 256:15-23.)

<u>Defendant's Response to 330</u>: **Disputed**, but the dispute is **not genuine** because Plaintiff has not submitted that portion of Mr. Shaukat's testimony in support of her motion, and has not otherwise supported Pl.'s Add. SMF 331 with a citation to admissible evidence. Even if she had submitted this portion of Mr. Shaukat's deposition to the Court, it does not support the proposition for which it is cited; Mr. Shaukat testified that he "internally and in casual conversation" referred to Mr. [Comp6] as leading the financial services team, but "[i]f I was ever asked officially I would point it out, the interim, but that wasn't -- that was extra information that was not needed in this context." (Shaukat Tr., 256:15 – 257:2.) Pl.'s Add. SMF 331 is otherwise **immaterial** because how Mr. Shaukat referred to Mr. [Comp6] internally or otherwise has no bearing on what his actual role and work entailed.

<u>Pl.'s Add. SMF 331</u>:

In or around January 2019, Google officially announced its selection of [Comp6] to lead Google's Financial Services vertical. (Ex. 42, [Comp6] Tr. 84:18-85:4.)

<u>Defendant's Response to 331</u>: **Disputed**, but the dispute is **not genuine** because Plaintiff has not submitted that portion of Mr. [Comp6] testimony in support of her motion, and has not otherwise supported Pl.'s Add. SMF 332 with a citation to admissible evidence.

<u>Pl.'s Add. SMF 332</u>:

Just six months prior to his selection for the VP Financial Services role, Mr. [Comp6] had joined Google as Managing Director, Technology and Policy. (Ex. 42, [Comp6] Tr. 57:20-23.)

<u>Defendant's Response to 332</u>: **Disputed in part.** It is **undisputed** that Google hired Mr. [Comp6] as an L9 Managing Director of Technology and Policy. (Def.'s SMF 114.) Google **disputes** that Mr. [Comp6] was "select[ed] for the VP Financial Services role." (Def.'s SMF 113.) Plaintiff concedes that to the extent he oversaw some limited responsibilities of the

financial service vertical during a period of strategic review, it was on an interim basis only.

(Def.'s SMF 113.)

Pl.'s Add. SMF 333:

At time of hire, Google paid Mr. [Comp6] a base salary of $325,000.00, with a 40% bonus target and two equity awards totaling $4,100,000.00 at hire. (Ex. 42; [Comp6] Tr. 64:11-65:7.)

Defendant's Response to 333: **Undisputed** that in connection with his hire, Google set Mr. [Comp6]'s salary at $325,000; that his annual bonus target was 40% of his base salary as the result of him being leveled at hire as an L9; and that he was awarded two new hire equity grants worth $4,100,000 at the time of grant. (Jumper Decl., Exh. 42 at 64:11 – 65:7; Humez Decl., ¶ 8.) It is **immaterial** because he and Plaintiff were not similarly situated as a matter of law.

Pl.'s Add. SMF 334:

Mr. [Comp6] did not negotiate his offer package and was leveled as a Level 9 at hire. (Ex. 42, [Comp6] Tr. 46:5-47:25.)

Defendant's Response to 334: **Undisputed** but **immaterial.**

Pl.'s Add. SMF 335:

Mr. [Comp6] does not possess any technical, computing, or scientific educational background. (Ex. 42, [Comp6] Tr. 46:17-47:25; Ex. 44, GOOG-ROWE-0018551.)

Defendant's Response to 335: **Undisputed** that Mr. [Comp6] possesses no technical, computing, or scientific degrees. (Jumper Decl., Exh. 42 at 44:12 – 45:5.)

Pl.'s Add. SMF 336:

Mr. [Comp6] holds a Bachelor's degree in Public Policy and a law degree. (*Id*.)

Defendant's Response to 336: **Undisputed.** (Jumper Decl., Exh. 44.)

Pl.'s Add. SMF 337:

Prior to joining Google, Mr. [Comp6] most senior title was Managing Director. (Ex. 44, GOOG-ROWE-00018551-52.)

Defendant's Response to 337: **Disputed**, but the dispute is **not genuine** because Pl.'s Add. SMF 337 is not supported by the document cited. As Mr. ▉Comp6▉ s résumé clearly shows, he held the following titles prior to joining Google: Chief Compliance Officer and Managing Director at Morgan Stanley; Senior Advisor and Managing Director at Morgan Stanley; Partner, Rick Practice at McKinsey. (Jumper Decl., Exh. 44 at GOOG-ROWE-00018551.)

Pl.'s Add. SMF 338:

Mr. ▉Comp6▉ had no cloud technology experience prior to joining Google. (Ex. 44, GOOG-ROWE-00018551-52.)

Defendant's Response to 338: **Undisputed**, however Mr. ▉Comp6▉ s role at Morgan Stanley exposed him to machine learning, which had become foundational to the compliance systems for which he was responsible, and he explored ways to use machine learning to support those systems. (Jumper Decl., Exh. 42 at 43:14 – 44:6.)

Pl.'s Add. SMF 339:

Mr. ▉Comp6▉ did not have any CTO experience prior to hire. (Ex. 44, GOOG-ROWE-00018551-52.)

Defendant's Response to 339: **Undisputed**.

Pl.'s Add. SMF 340:

Mr. ▉Comp6▉ did not build engineering products or directly manage engineering teams in his prior role, and did not have technical training with respect to computer science, computer engineering, coding, or programming. (Ex. 42, ▉Comp6▉ Tr. 46:5-47:25.)

Defendant's Response to 340: **Disputed**. At Morgan Stanley, Mr. ▉Comp6▉ provided the strategic direction for a team of 250 people that included a mix of programmers, engineers, solutions architects, and product managers within the IT department.  (Jumper Decl., Exh. 42 at 42:4 – 43:5.)

Pl.'s Add. SMF 341:

Plaintiff met the requirements of the VP Financial Services role, which included: (i) 15 + years' deep financial services industry experience, with explicit experience commercial/investment banking and/or major brokerage firms; (ii) 10+ years' executive experience; (iii) extensive experience managing information technology and computer systems that support enterprise goals (including exposure to Cloud technologies and machine learning); (iv) established, actionable global executive/C-suite relationships and a sterling reputation within the FS sector; and (v) a PhD or Master of Science degree in Computer Science or related technical field.  (Tomezsko Decl. Ex. 33.)

Defendant's Response to 341: **Undisputed** that Plaintiff met some of the minimum requirements for the FSVL role, but **immaterial** because she concedes that the search for a permanent incumbent for the FSVL role was paused in light of leadership changes that occurred in November 2018, (Def.'s SMF 110, 111), and that as of that time she was the most qualified candidate for the role (regardless of sex). (Def.'s SMF 106.)

Pl.'s Add. SMF 342:

Among others, the VP Financial Services role qualifications included, "acting as a technical advisor to several project teams," "recognition as a world-class expert and guru both internally and externally for the role," "influencing the function, business and industry through advice related to Google technologies and business strategies," and "shaping the direction and future of the organization and industry by designing, developing and implementing groundbreaking technologies." (Tomezsko Decl. Ex. 33.)

Defendant's Response to 342: **Disputed**, but the dispute is **not genuine** because the quoted passages appear nowhere in the position description for the FSVL role. (Tomezsko Decl., Exh. 33.)

Pl.'s Add. SMF 343:

The VP Financial Services role required "an appropriate technical acumen," "an ability to execute strategies from a technical and business perspective," and "extensive experience managing information technology."  (Tomezsko Decl. Ex. 33.)

Defendant's Response to 343: **Disputed** to the extent that Pls.' Add. SMF 344 is inconsistent with the contents of Tomezsko Decl., Exh. 33. The description for the FSVL role stated that "[a]ppropriate technical acumen is also crucial to identify the specific market opportunities where Google's technologies can benefit our clients while creating a user experience second

to none." (Tomezsko Decl., Exh. 33 at GOOG-ROWE-00017500.) One of the qualifications for the role was "[e]xtensive experience managing information technology and computer systems that support enterprise goals (including exposure to Cloud technologies and machine learning)." (*Id.* at GOOG-ROWE-00017501.) Responsibilities for the role included "[r]ecruit, build, and lead a high-performing team that will execute the strategy from a technical and business perspective." (*Id.* at GOOG-ROWE-00017500.)

### G.    GOOGLE DEMOTES PLAINITFF

Pl.'s Add. SMF 344:

In April 2019, after denying her the VP Financial Services role, Mr. Shaukat offered Plaintiff three alternative employment options:  1) a role under and reporting to Stuart Breslow; 2) an undefined, "horizontal" role in the Office of the CTO as an individual contributor, where Plaintiff would be prohibited from working on the financial services vertical; 3) or a different role that she would have to identify and pursue on her own within Google. (Ex. 18, Rowe Tr. 279:7-24.)

Defendant's Response to 344: **Disputed in part.** Mr. Shaukat gave Plaintiff three options: (a) stay on Mr. Shaukat's team in the financial services industry vertical working on specific initiatives with Mr. Breslow; (b) find a new role on Mr. Shaukat's team that would allow Plaintiff to continue being an individual contributor like she had been in OCTO; or (c) return to OCTO reporting to Will Grannis, but in a horizontal role. (Def.'s SMF 119.) A horizontal role in OCTO meant that Plaintiff would work across multiple industries in an area like hybrid cloud which had universal applicability. If she wanted to pursue opportunities in the financial services, industry, she would have to coordinate with Mr. Shaukat's team, which remained responsible for setting the strategy for all industry verticals (including financial services) since the reorganization in late 2017. (Def.'s SMF 120.) The fact is **immaterial** because Plaintiff chose to return to OCTO. (Def.'s SMF 121.)

Pl.'s Add. SMF 345:

All three of these options were less desirable roles than her role in Mr. Shaukat's organizations and involved decreased scope, visibility, and industry-specific impact. (Ex. 18, Rowe Tr. 216:20-217:7, 294:20-295:14, 298:9-24.)

Defendant's Response to 345: **Disputed**, but the dispute is **not genuine** because although

Plaintiff now describes the options she was given as "less desirable," she admits that her level

(which dictates the scope and complexity of her role) did not change after she selected one of

the options Mr. Shaukat gave her, and her compensation has only increased year-over-year

since she returned to OCTO. (Def.'s SMF 12, 124, 125.)

Pl.'s Add. SMF 346:

With no meaningful alternative, Rowe returned to OCTO under Will Grannis in a hybrid cloud role in April 2019 after expressing that none of the options were attractive given her experience and the role she was hired to perform. (Ex. 83, GOOG-ROWE-00056975-76.)

Defendant's Response to 346: It is **undisputed** and Plaintiff admits that she chose to return

to OCTO in a hybrid cloud role in April 2019. (Def.'s SMF 121.) Google **disputes** that the

role she returned to in OCTO was different from the role she was hired to perform, but the

dispute is **not genuine** because she admits, "I was hired as an individual contributor in OCTO

to do, you know, the three -- the role that you and I have discussed that has these elements of,

you know, advisory for product and eng, it has client engagements, thought leadership."

(Jumper Decl., Exh. 18 at 216:11 – 17.) Google also **disputes** that Plaintiff had "no

meaningful alternative," as she admits that Mr. Shaukat gave her three options to choose from.

(Pl.'s Add. SMF 345.)

## H.   GOOGLE DENIES PLAINTIFF EQUITABLE CONSIDERATION FOR VP FINANCIAL SERVICES INDUSTRY LEAD ROLE

Pl.'s Add. SMF 347:

In his role as head recruiter for the VP Financial Services role, Mr. Vardaman communicated with Mr. Shaukat regarding Plaintiff and met directly with Plaintiff, during which Plaintiff expressed her continued interest in the VP Financial Services role and her concerns regarding equitable consideration for the position.  (Ex. 68, GOOG-ROWE-00057001-02, 04.)

<u>Defendant's Response to 347</u>: **Objects and moves to strike** Pl.'s Add. SMF 348 as based on inadmissible hearsay. *See* Local Rule 56.1; Fed. R. Civ. P., Rule 56(c)(2). Alternatively, it is **undisputed** that in his role as head recruiter for the FSVL role, Mr. Vardaman communicated with Mr. Shaukat regarding Plaintiff and himself had a conversation with Plaintiff about the FSVL role and the recruiting process. (Tomezsko Supp. Decl., ¶ 7, Exh. 3 at 43:22 – 45:12.) Google **disputes** the remainder of Pl.'s Add. SMF 348 but the dispute is **not genuine** because nowhere in the cited document does it indicate that Plaintiff expressed concerns to Mr. Vardaman regarding equitable consideration for the position. (Jumper Decl., Exh. 68.) In fact, Mr. Vardaman's testimony reflects the exact opposite. (Tomezsko Supp. Decl., ¶ 7, Exh. 3 at 108:16 – 109:20.)

<u>Pl.'s Add. SMF 348</u>:

> In January 2019, after Plaintiff raised internal complaints of discrimination in October 2018 of unequitable consideration for the VP Financial Services role, Stuart Vardaman, the lead recruiter for the role, unilaterally entered data into Google's applicant feedback database, Thrive, indicating that Plaintiff was rejected from the VP Financial Services position because she lacked "Googleyness" (an opinion unsupported by any record evidence or the assessment of Plaintiff's interviewers), and further describing Plaintiff as "overly self-oriented" and record that Plaintiff "was not qualified for the role in addition to ego concerns." (Ex. 99, GOOG-ROWE-00056273.)

<u>Defendant's Response to 348</u>: It is **undisputed** that in November 2018, Plaintiff raised concerns to Mr. Shaukat that she had allegedly been "underleveled" upon hire and she believed it was impacting her candidacy for the FSVL role, which Mr. Shaukat forwarded to Human Resources for investigation. (Def.'s SMF 107.) Mr. Vardaman was not aware of Plaintiff's communication with Mr. Shaukat, or any investigation into Plaintiff's purported concerns. (Tomezsko Supp. Decl., ¶ 7, Exh. 3 at 108:16 – 109:20.) It is also **undisputed** that Plaintiff's Thrive profile reflects that user svardaman@ updated the status of Plaintiff's candidacy for the FSVL role on January 7, 2019, and the document speaks for itself with

regards to the content of that update. (Jumper Decl., Exh. 99 at GOOG-ROWE-00056273.) It is **immaterial**, however, because the record demonstrates his legitimate, non-discriminatory and non-retaliatory reasons for making the statement. In his conversations with Plaintiff, Mr. Vardaman felt dismissed and like Plaintiff spoke down to him because his lower level, which he felt was not Googley. (Tomezsko Supp. Decl., ¶ 7, Exh. 3 at 68:8 – 70:25.)

Pl.'s Add. SMF 349:

On September 17, 2019, Plaintiff filed this lawsuit. ECF No. 1.

Defendant's Response to 349: **Undisputed.**

Pl.'s Add. SMF 350:

On January 22 and 29, 2020, ER interviewed Stuart Vardaman in connection with Plaintiff's complaints of discrimination.  (Ex. 68, GOOG-ROWE-00057001-02, 04.)

Defendant's Response to 350: **Undisputed.**

Pl.'s Add. SMF 351:

Mr. Vardaman understood that the ER investigation was related to Plaintiff's complaints regarding unequal pay and leveling and her consideration for the VP Financial Services role. (Ex. 68, GOOG-ROWE-00057001-02, 04.)

Defendant's Response to 351: **Objects and moves to strike** Pl.'s Add. SMF 352 as supported by inadmissible hearsay. *See* Local Rule 56.1; Fed. R. Civ. P., Rule 56(c)(2). Alternatively, it is **undisputed** that during the interview with Employee Relations, Mr. Vardaman formed the understanding that the interview was about Plaintiff. (Tomezsko Supp. Decl., ¶ 7, Exh. 3 at 46:15 – 24.)

Pl.'s Add. SMF 352:

Mr. Vardaman described Plaintiff in his ER interview as "abrasive," "cantankerous," and "bristly." (Ex. 68, GOOG-ROWE-00057001-02, 04.)

Defendant's Response to 352: **Objects and moves to strike** Pl.'s Add. SMF 352 as supported

by inadmissible hearsay. *See* Local Rule 56.1; Fed. R. Civ. P., Rule 56(c)(2). Alternatively,

the cited document speaks for itself.


Pl.'s Add. SMF 353:

In August 2018, prior to learning of Plaintiff's complaints, Mr. Vardaman had described Plaintiff as a candidate with "executive poise," who was "confident (but not ego-driven)," and "forthright with a quick operating cadence."  (Ex. 100, GOOG-ROWE-00017507.)

Defendant's Response to 353: **Undisputed** that Mr. Vardaman described Plaintiff using those

words to her interviewers, but it did not reflect his personal opinion of Plaintiff. (Tomezsko

Supp. Decl., ¶ 7, Exh. 3 at 68:8 – 69:2.)

Pl.'s Add. SMF 354:

In February 2020, Plaintiff expressed interest in a Vice President Financial Services Industry Lead ("VP-FSIL") position and met with the Head of the North American Sales, Kirsten Kliphouse, who then instructed her to follow up with Mr. Vardaman, the recruiter for the VP Sales role as well, in order to apply.  (Tomezsko Decl. Ex. 43.)

Defendant's Response to 354: It is **undisputed** that in February 2020, Plaintiff met with

Kirsten Kliphouse, head of North American Sales, and Ms. Kliphouse mentioned she was

recruiting for a Vice President-level sales role on her team. (Def.'s SMF 126.) Google

**disputes** that Ms. Kliphouse told Plaintiff to apply; rather, after Plaintiff expressed interest in

the role, Ms. Kliphouse told her to email Human Resources. (*Id.*)

Pl.'s Add. SMF 355:

Qualifications for the VP-FSIL role included:  (i) 15 years of experience in the financial services industry (or FSI related) firms; (ii) 10-years of executive experience; (iii) proven success managing a sales/business development organization; (iv) experience with information technology and computer systems to support enterprise goals (including exposure to Cloud technologies and machine learning); and (v) established, actionable executive/C-suite relationships and a sterling reputation within the financial services sector. (Ex. 46, GOOG-ROWE-00060560-62.)

**Defendant's Response to 355**: **Disputed** to the extent that Plaintiff's description of the qualifications for the role is inconsistent with the job description. (Jumper Decl., Exh. 46.) Specifically, Plaintiff misconstrues the third qualification listed in Pl.'s Add. SMF 356. The job description clearly shows that the qualification in full requires "[p]roven success managing a sales/business development organization *to meet and exceed revenue goals*." (*Id.* (emphasis supplied).) Because Pl.'s Add. 355 contradicts the documentary evidence to which it cites for support, the dispute is **not genuine**.

Pl.'s Add. SMF 356:

Plaintiff possessed the requisite qualifications for the VP-FSIL role. (Tomezsko Decl. Ex. 15.)

**Defendant's Response to 356**: **Disputed,** but the dispute is **not genuine** because it is controverted by the evidence. Plaintiff never managed a sales team and her primary responsibilities are not in sales, which was one of the qualifications for the role. (Def.'s SMF 128, 129.)

Pl.'s Add. SMF 357:

Ms. Kliphouse indicated that it was "not necessarily a prerequisite that someone has carried a sales revenue number" for her or him to be considered for the role. (Tomezsko Decl. Ex. 43.)

**Defendant's Response to 357**: **Disputed**, but the dispute is **not genuine** to the extent that Pl.'s Add. SMF 358 is inconsistent with the document cited in support of that statement. Mr. Vardaman wrote to Plaintiff when he sent her the job description, "It sounds like she [Kirsten] and Rob are open to 'thinking differently' about this role, so it is not necessarily a prerequisite that someone has carried a sales revenue number." (Tomezsko Decl., Exh. 43 at GOOG-ROWE-00060572.) It is **undisputed** that the role would require the incumbent to lead a sales team and manage them to meet/exceed quota, as Mr. Vardaman confirmed in that email. (*Id.*)

Pl.'s Add. SMF 358:

On February 4, 2020, Plaintiff sent an email to Mr. Vardaman expressing that she would like to be considered for the VP-FSIL role, which he acknowledged by forwarding the job description to her. (Tomezsko Decl. Ex. 43.)

Defendant's Response to 358: **Disputed in part.** It is **undisputed** that on February 4, 2020, Plaintiff sent an email to Mr. Vardaman asking for a copy of the job description. (Tomezsko Decl., Exh. 43 at GOOG-ROWE-00060572.) Google otherwise **disputes** the remainder of Pl.'s Add. SMF 359 as inconsistent with the document cited to support it, and therefore the dispute is **not genuine**.

Pl.'s Add. SMF 359:

On February 5, 2020, Plaintiff reiterated to Mr. Vardaman her desire to be considered for the VP-FSIL and requested that the Mr. Vardaman provide her with guidance on the next steps in the application process. Mr. Vardaman did not respond to Plaintiff's request for additional information.  (Tomezsko Decl., Ex. 43, GOOG-ROWE-00060571-2.)

Defendant's Response to 359: It is **undisputed** that on February 5, 2020, Plaintiff told Mr. Vardaman she was interested in the VP sales role and asked him what the next steps would be. (Tomezsko Decl., Exh. 43 at GOOG-ROWE-00060572.) Google **disputes** that Mr. Vardaman never responded, but the dispute is **not genuine** because five days later and after Plaintiff followed up, Mr. Vardaman responded that he was attempting to connect with Ms. Kliphouse to discuss next steps on the search. (*Id.* at GOOG-ROWE-00060571.)

Pl.'s Add. SMF 360:

On February 10, Plaintiff reached out to Mr. Vardaman again for an update, and received an email from him indicating that he would be scheduling a meeting with her to discuss an "update." (Tomezsko Decl. Ex. 43.)

Defendant's Response to 360: Disputed, but the dispute is **not genuine** as Pl.'s Add. SMF 360 is controverted by the very document cited to support it. As Tomezsko Decl., Exh. 43 clearly shows, Plaintiff followed up with Mr. Vardaman on February 20, 2022, after she had returned from being out of office the week prior. (Tomezsko Decl., Exh. 43 at GOOG-ROWE-

00060571.) That same day, Mr. Vardaman responded he did not have any updates and was trying to schedule a meeting with Ms. Kliphouse the following day. (*Id.*)

Pl.'s Add. SMF 361:

On February 25, 2020, Mr. Vardaman informed Plaintiff that they "were looking for someone at a VP level scope and scale and with actual C level executive contacts" and she would not be considered for the VP-FSIL role.  (Ex. 47, Vardaman Tr. 138:3-13.)

Defendant's Response to 361: **Undisputed** that Plaintiff admits that Mr. Vardaman told her that Google would not be moving forward with her candidacy because they wanted someone with more commercial experience, which Plaintiff understood to mean more sales experience. (Def.'s SMF 130.)

Pl.'s Add. SMF 362:

Mr. Vardaman never gave Plaintiff instructions for how to apply for the position, despite her repeated requests for the information, and does not recall telling Plaintiff she needed to submit a formal application. (Ex. 47, Vardaman Tr. 138:19-25.)

Defendant's Response to 362: **Undisputed** that Mr. Vardaman did not give Plaintiff instructions on how to apply for the position in their email exchange because he believed everyone at Google knew to apply for open positions through the internal GROW website. (Jumper Decl., Exh. 47 at 138:14 – 139:21.)

Pl.'s Add. SMF 363:

Mr. Vardaman unilaterally determined that Plaintiff was not qualified for a VP level role. (Ex. 47, Vardaman Tr. 139:22-141:9.)

Defendant's Response to 363: **Disputed**, but the dispute is **not genuine** because Mr. Vardaman testified that his determination that Plaintiff was not qualified for the position based on "her comparison to candidates we had in play at the time," and a "review of information

with -- with Kirsten" that would have included as a matter of practice "publicly-available information like a LinkedIn profile. . . ." (Jumper Decl., Exh. 47 at 144:22 – 14.)

Pl.'s Add. SMF 364:

Mr. Vardaman asserts that this determination was made based on comparison to other external candidates, but he does not recall if he had actually interviewed any external candidates at the time he made that determination with respect to Plaintiff's qualifications.  Plaintiff was never interviewed for the role. (Ex. 47, Vardaman Tr. 142:5-145:23.)

Defendant's Response to 364: **Disputed in part**.  It is **undisputed** that Plaintiff was not interviewed for the role, and the determination was based on Plaintiff's comparison to other external candidates, and that at the time of his deposition he could not recall whether interviews with candidates in the pipeline had already occurred as of February 2020. (Jumper Decl., Exh. 47 at 140:9 – 141:9.) Google **disputes** the implication that Mr. Vardaman did not recall there being external candidates in the pipeline at the time. He testified that Yolanda Piazza, the ultimately successful female candidate, was likely involved as of February 2020. (*Id.*, 141:3 – 6.)  It is **immaterial**, however, because Plaintiff was not qualified for the role. (Def.'s SMF 128, 129.)

Pl.'s Add. SMF 365:

Mr. Vardaman did not review any written materials regarding Plaintiff's qualifications for the VP-FSIL role.  (Ex. 47, Vardaman Tr. 142:5-145:23.)

Defendant's Response to 365: **Disputed**, but the dispute is **not genuine** because although Mr. Vardaman could not recall whether he reviewed Plaintiff's LinkedIn profile at the time of his deposition, he testified that his determination that Plaintiff was not qualified for the position was based on "her comparison to candidates we had in play at the time," and a "review of information with -- with Kirsten" that would have included as a matter of practice "publicly-available information like a LinkedIn profile. . . ." (Jumper Decl., Exh. 47 at 144:22 – 14.)

Pl.'s Add. SMF 366:

Mr. Vardaman did not recall receiving any instruction from Ms. Kliphouse or anyone else involved in the application process to reject Plaintiff for consideration. (Ex. 47, Vardaman Tr. 142:5-145:23.)

Defendant's Response to 366: **Disputed**, but the dispute is **not genuine** because Mr.

Vardaman testified that "my direction as it pertains to the search will -- will comes from the

hiring manager that -- that I'm supporting." (Jumper Decl., Exh. 47 at 141:19 – 142:4.)

Pl.'s Add. SMF 367:

Mr. Vardaman admits that he made no effort to inquire into Plaintiff's C-level network, external reputation as an expert or "industry titan," and that he does not recall whether he even looked at Plaintiff's LinkedIn profile before determining that she was not qualified for the VP-FSIL role. (Ex. 47, Vardaman Tr. 142:5-145:23.)

Defendant's Response to 367: **Disputed** to the extent Pl.'s Add. SMF is inconsistent with Mr.

Vardaman's testimony is purports to cite. As of the date of his deposition, Mr. Vardaman did

not recall whether he knew what Plaintiff's C-level network was at the time, did not recall

doing anything to ascertain was Plaintiff's external reputation was professionally, and did not

recall whether he consulted her LinkedIn profile, although also testified that he would have

as a matter of practice. (Jumper Decl., Exh. 47 at 142:25 – 144:16.) He also testified that there

was a "wide space" between Plaintiff's qualifications as an "industry titan" and those of the

successful candidate, Yolanda Piazza. (*Id.*, 143:9 – 13.)

Dated:  Jersey City, New Jersey
        December 24, 2021

PAUL HASTINGS LLP

By:    Kenneth W. Gage
        Sara Tomezsko

200 Park Avenue
New York, NY 10166
Tel:  (212) 318-6000
Fax:  (212) 319-4090
kennethgage@paulhastings.com
saratomezsko@paulhastings.com

*Attorneys for Defendant*
GOOGLE LLC

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that, on this December 24, 2021, I caused a true and exact copy of the foregoing DEFENDANT GOOGLE LLC'S REPLY IN SUPPORT OF ITS STATEMENT OF UNDISPUTED MATERIAL FACTS to be filed electronically and served by mail on anyone unable to accept electronic filing. Notice and copies of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing. Parties may access this filing through the Court's CM/ECF System.

Dated: Jersey City, New Jersey
          December 24, 2021

_____
Sara B. Tomezsko