N9LDROWC

1    UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
2    ------------------------------x

3    ULKU ROWE,

4                   Plaintiff,

5              v.                              19 CV 08655

6    GOOGLE, LLC,

7                   Defendant.
                                              Conference
8    ------------------------------x
                                              New York, N.Y.
9                                             September 21, 2023
                                              11:00 a.m.
10
     Before:
11
                          HON. JENNIFER H. REARDEN,
12
                                              District Judge
13

14                            APPEARANCES

15   OUTTEN & GOLDEN, LLP
          Attorneys for Plaintiff
16   BY:  CARA ELIZABETH GREENE
          SHIRA ZAHAVA GELFAND
17        GREGORY SCOTT CHIARELLO

18   PAUL HASTINGS, LLP
          Attorneys for Defendant
19   BY:  KENNETH WILLIAM GAGE
          SARA BRADY TOMEZSKO
20

21

22

23

24

25

N9LDROWC

| | |
|---|---|
| 1 | THE DEPUTY CLERK:  The case of 19-8655, *Rowe v.* |
| 2 | *Google, LLC*. |
| 3 | This is a reminder that this is a public proceeding. |
| 4 | Members of the public and press are able to access the |
| 5 | proceeding with a public dial in number.  All participants are |
| 6 | reminded that any re-recording or re-broadcasting of this |
| 7 | proceeding is strictly prohibited. |
| 8 | Go ahead, Judge. |
| 9 | THE COURT:  Good morning.  Sorry to keep you waiting. |
| 10 | I don't like to keep busy lawyers and court reporters waiting. |
| 11 | Why don't you go ahead and make your appearances. |
| 12 | MS. GREENE:  Your Honor, Cara Greene from Outten & |
| 13 | Golden for the plaintiff.  And with me today is Shira Gelfand |
| 14 | and Gregory Chiarello from Outten & Golden as well. |
| 15 | THE COURT:  Hello. |
| 16 | For Google? |
| 17 | MR. GAGE:  Good morning, your Honor.  This is Ken |
| 18 | Gage.  With me is my partner, Sarah Tomezsko, and also on is |
| 19 | our client attending today, Mr. Andrew Velazquez from Google. |
| 20 | THE COURT:  All right.  Welcome all, so to speak. |
| 21 | Welcome via Teams. |
| 22 | All right.  So we're here for a final pretrial |
| 23 | conference in this case, which is scheduled for trial on |
| 24 | October 4.  The case was reassigned to me by Judge Schofield. |
| 25 | It was already trial ready by the time it came to me.  I have |

N9LDROWC

reviewed the docket, including Judge Schofield's summary

judgment opinion, and I would like to start by outlining what I

understand the basic facts to be, the allegations, based on

what I've seen from what I've reviewed on the docket.

        In 2016, the CTOs of Google Cloud, William Grannis and

Brian Stevens established the office of the CTO, referred to as

OCTO.  Between March 2016 and March 2018, they hired 17

technical directors, a position they felt was commensurate with

either a level 8 or a level 9 on Google's salary scale.

However, according to plaintiff, she was told that all

technical directors would be hired at a level 8.  Five

technical directors were hired at a level 9.  Plaintiff, who

had significant experience in the financial services industry,

was hired at a level 8.  She was the only woman technical

director when she was hired, and she alleges that she had the

same duties as the level 9 technical directors.

        On June 13, 2018, plaintiff expressed interest in

being the head of the financial services industry vertical, the

FSVL role under Tariq -- is it Shaukat?

        MR. GAGE:  Shaukat.

        THE COURT:  Shaukat.  She claimed that she was told by

Grannis, Stevens and Jennifer Burdis, a recruiter, that based

on her experience, she was the obvious person for the role.

Shaukat told plaintiff he would interview her.

        On June 25, 2018, as part of a larger reorganization,

N9LDROWC

1   plaintiff and three other OCTO employees were transferred from

2   OCTO to report to Shaukat.  Their titles were changed to global

3   client technical lead.

4        After plaintiff started her new role, Shaukat wrote

5   that she was not, quote, likely right . . . for the FSVL role.

6   Plaintiff raised concerns with Grannis that she was not being

7   treated fairly.  Plaintiff interviewed for the FSVL role in

8   August 2018.  She was interviewed by four men, and her

9   interviewers' lack of feedback on the G-Hire platform is the

10  subject of numerous evidentiary objections.

11       That month, Shaukat determined that plaintiff was not

12  going to be a finalist for the role.  Plaintiff emailed Melissa

13  Lawrence and Kevin Lucas, two internal recruiters, that she

14  thought her hiring at a level 8 was negatively impacting her

15  consideration for the FSVL role.

16       In November 2018, plaintiff emailed Shaukat and Diane

17  Greene, then CEO of Google Cloud, raising concerns about her

18  treatment during the interview process, and reiterating her

19  belief that her under-leveling impacted her candidacy.  That

20  complaint was escalated to HR, which responded that the

21  leveling process was not discriminatory.

22       The same month, November 2018, Greene announced she

23  was leaving Google, and Shaukat elected not to proceed with his

24  preferred candidate for the FSVL role to give him time to

25  understand the new CEO's plans for Google Cloud.  In December

N9LDROWC

2018, Shaukat told plaintiff that he was pausing the search, but that she was not a finalist.

In January, 2019, Shaukat hired Stuart Breslow, who had not been interviewed, as the interim head.  Stuart Vardaman, the lead recruiter for the FSVL role, entered feedback on plaintiff that she was rejected because she lacked Googliness," was overly self-oriented, and was not qualified for the role.  During an internal investigation following the filing of this lawsuit, Vardaman further added that plaintiff was abrasive, cantankerous, and bristly, despite having described her months earlier as competent, but not ego-driven, forthright, with a quick operating cadence, and as someone with executive poise.

In February 2020, after the suit had already been filed, Kirsten Kliphouse, head of North American sales, informed plaintiff about a new vice president for the financial services industry lead position.  Plaintiff reached out to Vardaman to apply, and he informed her that she would not be considered.

Does that basically capture what's in dispute here? Is there anything else I should know?

MS. GREENE:  Your Honor, for --

THE COURT:  Go ahead.

MS. GREENE:  The Court has accurately captured the allegations here.

N9LDROWC

1           THE COURT:  Mr. Gage?

2           MR. GAGE:  Your Honor, I think that fairly

3     characterizes the allegations, yes.

4           THE COURT:  So there are four claims to be tried, two

5     under New York's Equal Pay Law, and two under the New York City

6     Human Rights Law, correct?

7           MS. GREENE:  Yes, your Honor.

8           THE COURT:  All right.  Each has a discrimination

9     claim and a retaliation claim.  The discrimination claims

10    differ, in that under New York state law, plaintiff alleges

11    that she was paid less on the basis of her sex than men for

12    equal work, whereas under the New York City law, plaintiff

13    alleges that she was subject to discriminatory treatment

14    because of her gender.

15          Can you flesh out a bit more for me how the two

16    retaliation claims differ?

17          MS. GREENE:  Yes, your Honor.

18          THE COURT:  In your opinion.

19          MS. GREENE:  The New York Equal Pay Law is a strict

20    liability statute, and there's no requirement that there be

21    discriminatory bias or motivation.  Rather, the law looks to

22    whether a man and a woman, or whatever the two protected

23    category -- whatever the protected category is, are treated

24    differently in compensation for performing equal work with

25    respect to responsibilities, so qualifications and skills.

N9LDROWC

1          Once that is established, then the burden shifts to

2     the defendants to put forward an affirmative defense that is

3     recognized by the law.  And so that's a different structure

4     than the New York City Human Rights Law, which requires

5     plaintiff to bear the burden with respect to establishing a

6     discriminatory or retaliatory modus and the existence of bias.

7     So that is the biggest distinction between the two.  There are

8     others with respect to the evaluation of comparators, and the

9     slightly different analysis under the New York Equal Pay Law

10     than the New York City Human Rights Law.  And who is a

11     comparator for both of those laws differs slightly.  So those

12     are the most material differences between the two.

13          There are also differences with respect to damages

14     that are available under the two laws.

15          THE COURT:  What are the differences in damages?

16          MS. GREENE:  Under the New York Equal Pay Law,

17     there's, first, damages with respect to the difference in

18     compensation.  There, under the New York Labor Law, is a 100

19     percent liquidated damages provision that is applicable, and --

20     unless the defendant puts forward certain defenses, and a 300

21     percent liquidated damages provision where the employee is able

22     to show that there was willfulness as defined by the law.

23          So under the New York Equal Pay Law, it's a liquidated

24     damages scheme.  Under the New York City Human Rights Law, in

25     addition to the economic losses covered by the individuals,

N9LDROWC

| | |
|---|---|
| 1 | there is compensatory damages and punitive damages, both of |
| 2 | which are unpassed under the New York City Human Rights Law. |
| 3 | THE COURT:  All right.  Mr. Gage, do you have anything |
| 4 | to add or quibble with in terms of what Ms. Greene explained? |
| 5 | MR. GAGE:  I think that was generally an accurate |
| 6 | description of the differences between the claims, your Honor, |
| 7 | and the differences between the damages.  And to the extent |
| 8 | there are any subtle differences, those are kind of flushed out |
| 9 | in our competing charges. |
| 10 | I think we agreed on charges for much of this, but |
| 11 | then there are a couple of them where there's a slight |
| 12 | variation.  But I think there's a couple where the issues are |
| 13 | crystallized, which is in the jury charges. |
| 14 | THE COURT:  Well, so far this is going very well.  I'm |
| 15 | not sure you actually need me.  But let's keep going and see |
| 16 | what happens. |
| 17 | All right.  I want to turn to some housekeeping |
| 18 | matters.  So, first, I notice in the joint pretrial order, you |
| 19 | say that you submitted your proposed demonstratives over the |
| 20 | summer, that we're on top of it.  You also say on August 4th, |
| 21 | you submitted objections, that we're not finding, so I'm not |
| 22 | sure what happened to -- |
| 23 | MS. GREENE:  Your Honor, may I speak on that? |
| 24 | THE COURT:  Yes. |
| 25 | MS. GREENE:  Yes, your Honor.  The parties exchanged |

N9LDROWC

1    with each other any objections they had with respect to

2    demonstratives.  The nature of the objections that the parties

3    raised are not any that require your Honor's rulings today.

4              THE COURT:  Oh, okay.  So where it stands with the

5    Court is that you -- did you propose them to us or to each

6    other?

7              MS. GREENE:  Your Honor, I believe it was just

8    exchanged between the parties and not provided to --

9              THE COURT:  Okay.  So we haven't seen them at all

10   then.  All right.  Well, I'll have to take a look at them.  It

11   doesn't need to be now, but it would be good to get those a day

12   or two in advance.

13             MS. GREENE:  Your Honor, absolutely.  And if I may,

14   the nature of the objections that the parties have raised

15   relate to whether the underlying evidence comes into the

16   record, and to the extent that it does, there are no objections

17   to demonstratives.

18             THE COURT:  I see.  Now I'm being told that we do

19   actually have your demonstratives.

20             MS. GREENE:  Okay.

21             MR. GAGE:  Yes, your Honor.  You have the

22   demonstratives, not the objections --

23             THE COURT:  Got it.

24             MR. GAGE:  -- that were exchanged between us, and I

25   anticipate the objections will probably be obviated as

N9LDROWC

```
 1    Ms. Greene suggests once you've actually ruled on the actual

 2    evidence and the exhibits.

 3         THE COURT:  I understand.  That seems like enough on

 4    that for now.

 5         I want to talk to you a little bit about the mechanics

 6    of jury selection.  I use the struck panel method, which is

 7    pretty common in this district, as you know.  So, in brief, I

 8    will ask questions of the potential jurors, and I will

 9    periodically excuse jurors for cause.  I'll incorporate the

10    questions that I think appropriate in my voir dire, and as I go

11    through the voir dire, I will ask if you believe there is any

12    follow-up that I need to do, and then I'll ask any additional

13    questions.  If anyone is not comfortable speaking in front of

14    the whole group, we'll do it at sidebar or I'll adjourn to the

15    robing room.

16         I will qualify a panel of 14 prospective jurors, and

17    then you will each exercise your peremptory challenges, three

18    per side.  You will exercise those challenges simultaneously,

19    by writing them down on a list.  You will exchange those lists,

20    and present them to me.  If there are duplicates on your list,

21    that is to say each of you strikes the same juror, then so be

22    it.  The jury will be the lowest 8 jurors who remain after the

23    exercise of peremptory challenges.  So if there are no

24    duplicates, there will be only 8 jurors remaining in the box,

25    and that will be the jury.  If there are duplicates, juror 14
```

N9LDROWC

1    would not be part of the jury, even if that person were not

2    struck.  That is to say, it's the lowest eight numbers that

3    remain.

4            In that regard, in the civil system, there are no

5    longer alternates, so, again, there will just be eight jurors,

6    and we can go down to six.  There have to be at least six, but

7    with eight, in case we lose anyone after several days, we'll

8    have some wiggle room.

9            Unanimity will be required in light of your statement

10   to that effect in the joint pretrial order.  In terms of

11   timing, when the jurors first report, they will have to take

12   care of some preliminary matters, so they likely will not

13   arrive in the courtroom until around 10:00 or 10:30.  I tell

14   you that because there will likely be some time on Wednesday

15   morning to take up matters before the jury -- the prospective

16   jurors come in if we need to.

17           With respect to the schedule, on Wednesday the 4th,

18   I'd like you to be in the courtroom at 9:00.  As I noted a

19   moment ago, the hope is that the jury pool will be ready around

20   10:00 or 10:30, and we will continue until 5:00 p.m. that day.

21   Ideally, we will get through jury selection, as well as

22   openings.  The first day we may even get into the presentation

23   of evidence that day.  So please be ready with your first

24   witnesses.  If not, we'll pick up with that on day two.

25           For every other day of trial, the trial itself will

N9LDROWC

1    begin at 9:30 a.m., but I'd like the parties to be in the

2    courtroom by 9:00 in case there are any pre-testimony issues

3    that need to be resolved.  So just to clarify.  We, that is the

4    parties and myself, will meet from 9:00 to 9:30 each day,

5    unless there's no reason to do that, but I think we should all

6    reserve that time for hashing out issues before the jury comes

7    in.  I will then have the witness on the stand starting at 9:30

8    a.m., with two 20-minute breaks.  The first break will take

9    place 11:00 to 11:20, and the other in the afternoon from

10   approximately 12:50 to 1:10.  We will going until approximately

11   2:40 p.m. each day.

12           I'm going to provide breakfast in the morning, and

13   snacks for the later two breaks, so that there is no need for

14   anyone to leave the courthouse.  It just doesn't work well for

15   people to leave the courthouse for lunch, go out, try to find

16   food, eat the food, and then have to go back through security

17   to resume in the afternoon.  The length of time that we would

18   ideally want to carve out for that is not an amount of time

19   than ends up working well.  So that's part of the reason for

20   the schedule that I'm going to follow.

21           Just a review, the first day of trial, which will be,

22   you know, jury selection, et cetera, will be a regular 9:00 to

23   5:00 day, with all other days of trial running from 9:00 to

24   9:30 for this group, 9:30 to 2:40 p.m. for the jury, and,

25   again, 9:00 to 2:40 p.m. for counsel.

N9LDROWC

1          Please note that if for some reason you find yourself

2     without witnesses on a given day, then you shall rest.  We are

3     not going to have continuances to wait for someone to show up.

4     So, you know, please proceed with that in mind.  I don't want

5     to waste your witnesses' time by having them wait around only

6     for it to turn out that they will not be testifying until the

7     next day, but, by the same token, I don't want to send the jury

8     home at 1:00 p.m. or whatever time it is because we don't have

9     any more witnesses for the day.

10          The Joint Pretrial Order outlines a host of objections

11    to designations and exhibits.  We will address those later in

12    the mornings, at lunch, or at the end of the day as they become

13    relevant.  I would like to have as few side bars as possible,

14    but by the same token, I want to wait to see how the evidence

15    is unfolding before I make rulings on much of what you have put

16    forward at this point.  If you can anticipate issues in advance

17    of them arising during trial, it would be much better for

18    everybody, you guys, me, and the jury, to raise them before we

19    start the trial day, or at the end of the trial day, or in

20    advance of trial starting.  I'm just going to rely on you to

21    make sure that the issues that need to be resolved and teed up

22    are, in fact, teed up, so we have as few surprises as possible.

23          Regarding using depositions, I expect that you will

24    have copies for me the day of trial, when deposition testimony

25    is likely to arise, so that if there are any objections with

N9LDROWC

respect to the usage of the deposition transcript or

introduction of prior testimony, I can review at the

appropriate time.  I know that corrected deposition transcripts

have been sent in, and so you'll just bring them on the

appropriate day.  We were starting to try to keep up with the

corrections that are coming in, and it's really difficult for

us to do this, because of the volume of what has been provided

in hard copy, which I know we asked for, but it's an enormous

volume, and to try to figure out where to slot in corrected and

whatever, it's just too hard.  I certainly don't want people

resubmitting everything just so that we can have a few

deposition transcripts in their most current version, but I'll

get them the day that they're going to come up.

        Exhibits, I wanted to note that you'll be required to

premark the exhibits, so label them in advance of the trial so

that you're not fumbling through exhibit stickers in front of

the jury and wasting time that way.  Just be prepared and have

them ready to go.

        To the extent that you're planning to use the

electronic system in the courtroom, which I believe you are,

that tends to work well.  You can show whatever you have to the

witness on the witness screen and counsel screen, and then if

the -- whatever it is is admitted, and you request permission

to publish it to the jury, then my deputy and I can show it on

the jurors' screens as well.  I would recommend that you have

N9LDROWC

hard copies of anything as a backup plan, because there's

always the risk that the electronic system fails.  So it's good

to have a plan B.

In terms of laying a foundation for exhibits, and

specifically for those where there has been no objection,

unless there is actually a stipulation, pursuant to which they

would be admitted, this is always helpful.  In that case, you

would write the stipulation down and mark it as an exhibit.

Then you can offer other exhibits pursuant to it, saying that

they qualify as business records or what have you.  So I'd like

to do as much of that by stipulation as possible.

Objections to questions, I don't want to have speaking

objections in front of the jury, so what I'd like to do is have

you say objection, and a single word or two to identify the

basis for your objection, foundation, relevance, hearsay, et

cetera.  If I feel a need to have a sidebar, I will, but that's

not going to be generally the practice in this trial.  So,

again, please raise things in advance each day if you see

issues coming.

Witnesses, I don't want witnesses to be called twice,

so to the extent there is overlap between the parties'

respective lists, and I do think there are ten overlapping

witnesses between your lists, I will allow the defendant on

cross to go beyond the scope of the direct, as, obviously, they

would be permitted to do that on their own direct, given that I

N9LDROWC

1    think we can proceed much more efficiently, and it will be

2    better for everybody.  So if there's any issues with that,

3    hopefully you can talk to each other and work that out.

4            Now, that is a segue into the next issue I wanted to

5    address today, and that is timing.  You've identified 29

6    witnesses in total, and you're asking, for plaintiff, around 20

7    hours, and defendant around 25 hours.  I know that you have --

8    both of you have may call lists, and between the two of them,

9    though, that testimony only amounts to a couple of hours.  So

10   it's a very tiny percentage of what you are looking for

11   overall.

12           There seems to me to be ten or so key people who have

13   been involved in the decision-making at issue.  To me, 29 and

14   45 hours seems excessive in a single plaintiff, single

15   defendant case, so I want to hear you out today on who you

16   consider to be the key witnesses, and how much time you think

17   they need.  Also, I want you to tell me if, apart from what's

18   listed in the joint pretrial order -- whom you actually plan to

19   call.  I want to hear you out on all of that today, but I think

20   this list is going to need to be pared down.  What I will do

21   is, in the end, I will establish an amount of time that we're

22   going to use, and I'll let you figure out for yourselves how

23   you want to use that time.

24           So, Ms. Greene, do you want to start talking about

25   your key people, and also whether you actually intend to call

N9LDROWC

```
 1    everybody on your "will call" list?

 2              MS. GREENE:  Thank you, your Honor.

 3              In terms of our key witnesses, we have Ms. Rowe,

 4    obviously, the plaintiff; we have her comparators, Nick

 5    Harteau, Ben Wilson, and Evren Eryurek.  Wilson and Eryurek are

 6    both deponent testimony, deposition testimony, so they won't be

 7    appearing live.  We have Will Grannis and Tariq Shaukat.  We

 8    have Mr. Breslow, Mr. Vardaman, and Ms. Lawrence.  We have,

 9    your Honor, worked together as the parties to schedule a

10    potential witness order, and to make sure that we are

11    efficiently using our time.

12              I'll say that when we did that, I don't know that we

13    took into account an ending time of 2:40 each day.  Our time

14    estimates, we've estimated the time for a witness using --

15    considering both plaintiff's time and defendant's time.  With

16    Ms. Rowe, we would anticipate, if she began on the 4th, that

17    her testimony would end on the 5th.  Mr. Harteau would follow

18    her, and that is -- his testimony is quite brief.

19              THE COURT:  Mr. Harteau, what's his role?

20              MS. GREENE:  Mr. Harteau is a comparator for purposes

21    of the New York Equal Pay Law, as well as the New York City

22    Human Rights Law.  He offered a --

23              THE COURT:  Okay.

24              MS. GREENE:  -- declaration in support of summary

25    judgment.  His testimony we estimate to be brief, approximately
```

N9LDROWC

1   30 minutes, if not less.

2              Ashley Tessier --

3              THE COURT:  Okay.

4              MS. GREENE:  I'm sorry, your Honor.

5              THE COURT:  No.  Go ahead.

6              MS. GREENE:  On Friday the 6th, we would expect to

7   call Ms. Tessier, who's being offered for the limited purposes

8   of establishing a hearsay exception to the investigative notes.

9   We have asked for a stipulation.  At most, we expect her

10  testimony to last approximately 15 to 30 minutes.

11             Jenny Burdis, who was the recruiter for the technical

12  directors and OCTO, her testimony is by deposition.

13  Ms. Spokan, who did the ER investigation; and Brian Stevens,

14  who was the chief technology officer, head of OCTO, would also

15  appear on Friday.  And, again, we estimate approximately an

16  hour total time for Ms. Spokan, and approximately 30 to 45

17  minutes for Mr. Stevens.

18             On the 10th, we would call Will Grannis, Melissa

19  Lawrence, and Ben Wilson by deposition.  Mr. Grannis' testimony

20  I think we anticipate in total being somewhere in the three to

21  four-hour range for both parties.  That's our estimate.

22  Ms. Lawrence I think we estimate to be in the hour to hour and

23  a half range.  Mr. Wilson, I don't know that we've timed how

24  long the parties' designations will be in total.

25             The 11th, we anticipate calling Tariq Shaukat; Kevin

N9LDROWC

1   Lucas, who is being offered for a limited purpose; and Evren

2   Eryurek.  Mr. Shaukat's testimony will be somewhere in the two-

3   to three-hour range.  Kevin Lucas, less than an hour, and Mr.

4   Eryurek is a brief witness as well.

5           On Thursday the 12th, we anticipate calling Stuart

6   Breslow, who, from your Honor's recounting of the facts, was a

7   comparator under Tariq Shaukat, and also was given the head of

8   financial services role.  Stuart Vardaman, the recruiter for

9   purposes of the head of financial services role and the VP

10  sales role, the retaliation claim, is appearing by deposition.

11          And then on the 12th, we anticipate also calling

12  Ostrofe, our expert.  And on the 12th is when plaintiff

13  anticipates resting her case.

14          THE COURT:  All right.  Is that everything that you

15  put in your joint pretrial order for the plaintiff's side?

16          MS. GREENE:  Your Honor, it depends on which version

17  of the joint pretrial order you're looking at.  The last

18  version I think is very consistent with that.

19          THE COURT:  It is the second, second amended.

20          MS. GREENE:  Correct, your Honor.  Yes, your Honor.

21          We have some "may call" witnesses.  It's dependent on

22  whether underlying exhibits are stipulated to or not.  For

23  instance, we've identified Mr. Kurian.  He is being called for

24  a very limited purpose, which is to establish corporate

25  knowledge of Ms. Rowe's complaints.  If it's possible, the

N9LDROWC

1    parties may be able to stipulate to that knowledge, in which

2    case we would not need to call him as a witness.

3            Diane Greene is dependent on, again, certain testimony

4    that may or may not come in.

5            THE COURT:  All right.  So, in other words, what

6    you've just run through is about 20 hours.

7            MS. GREENE:  Yes, your Honor.  Approximately.

8            THE COURT:  I think that's too much.  I think that's

9    too much.  Why can you not do this as -- it's a single

10   plaintiff case.  I understand there are different scenarios

11   here, but why can you not do that in ten hours?

12           MS. GREENE:  Because these claims -- first of all,

13   there's multiple claims, standing mirrors, and so, you know,

14   there's key testimony with respect to comparators with respect

15   to what we refer to as the bad actors, the recruiters, and the

16   ER and HR investigators.  So, you know, we have tried to keep

17   this as focused as possible, and have eliminated any extraneous

18   witnesses, especially when there's documents that could replace

19   that deposition -- examination testimony, but, you know, for

20   purposes of the burden that we bear, on all four of the claims,

21   this is the evidence that's necessary to meet our burden.

22           And, your Honor, just to be clear, our estimates of

23   time include, again, both direct and cross-examination, and

24   defendant's examination exceeds cross-examination.

25           THE COURT:  All right.  So that time, 20 hours,

N9LDROWC

1    doesn't even include your openings?

2            MS. GREENE:  No, your Honor.  We would estimate

3    openings to be less than 30 minutes for plaintiff.  I don't

4    know how long defendant would intend to give for the opening,

5    but we believe in opening in the 15- to 30-minute range is

6    sufficient for the claims here.

7            THE COURT:  All right.  Mr. Gage, let me segue to you.

8    You're asking for 25 hours.  Why can't you do this in ten to --

9    ten hours.

10           MR. GAGE:  Well, your Honor, I will play Name that

11   Tune.  We can do it in a lot less than the original prediction.

12   Indeed, over the last few weeks, opposing counsel and we

13   collaborated on an order, and agreed -- I thought agreed on an

14   order which was almost exactly as Ms. Greene described.  She's

15   listed a couple of them in terms of order.  In addition to the

16   witnesses she's just described, we would have five witnesses in

17   our case, each of whom is very brief, none of whom would be

18   more than one hour.  And so beyond the testimony that

19   Ms. Greene just described, beyond those witnesses and our

20   examination of them, I would anticipate we would have, you

21   know, five, six hours of a defense case.

22           And I would just reiterate, in terms of what

23   Ms. Greene said earlier, we had spent a fair amount of time

24   trying to agree on the order, so we knew who needed to be

25   where, when, because many witnesses, some are no longer

N9LDROWC

1    employed by the company, many are coming from out of town, so

2    we've been coordinating travel arrangements.  We did not

3    anticipate ending at 2:40, and so I -- and I don't know what

4    Ms. Greene thinks about this, but I think, given that we're not

5    going past 2:40 on any given day, except the first day, I

6    suspect that some of those days might have to shift.

7              THE COURT:  All right.  I just lost the camera.  One

8    second.

9              MR. GAGE:  And one other thing, and I think Ms. Greene

10   will try her case however she sees fit, and your Honor allows,

11   but we do have a few witnesses whose testimony is presented by

12   deposition, which I think allows us some flexibility to move

13   around if the schedule shifts a little bit and a witness is

14   flying in, but we have, you know, testimony to be presented by

15   a deposition.

16             THE COURT:  All right.  So what you've just told me,

17   is that different in any way from what you've laid out in the

18   joint pretrial order?

19             MR. GAGE:  It's much shorter.  It's much shorter.

20             THE COURT:  Okay.  So instead of 25 hours, you just

21   said 5 to 6 hours of defense case, right?

22             MR. GAGE:  Exactly, your Honor.  But that does -- the

23   five to six hours does not count the time for us to examine the

24   witnesses that Ms. Greene is calling.  The days that she laid

25   out are consistent with the days that we had agreed would be

N9LDROWC

1   necessary for the witnesses she described.  Is that --

2   hopefully, that answers your question.

3            THE COURT:  I think so.  I'm trying to get to a total

4   -- so five to six hours, not including the time that you need

5   to examine the plaintiff's witnesses.  Where do you think you

6   end up in terms of total hours?

7            MR. GAGE:  I haven't calculated that, your Honor.

8   Maybe 15 to 20, your Honor?  I hadn't thought about it that

9   way, because we had agreed on the order and the amount of days

10  it would take.

11           THE COURT:  All right.  Fifteen to 20, that brings us

12  down to as many as 40 still.  I'm going to give thought to what

13  you've said today.  Does anyone want to say anything else about

14  the number of hours, the need for the hours, and the prejudice

15  you believe you would experience if they were shorter?  Because

16  I do think that even 40 hours for a -- this is a single

17  plaintiff, single defendant case.  That is a lot of court time

18  in a case like this.  So I want to hear you now.

19           I'm not going to decide this is at the moment.  I'll

20  get back to you about the amount of time.  But anything else

21  anyone wants to say to me, please tell me now about timing.

22           MS. GREENE:  Your Honor, in my experience, and this is

23  my -- my experience, trial -- between arbitration and jury

24  trials, 7 days tends to be the average for a single plaintiff

25  case in trial, and that is, you know, using the time as

N9LDROWC

1    efficiently as possible.  So experience suggests that 7 hours

2    -- or 7 days is a timeframe that is manageable and does not

3    include unnecessary and inefficient testimony.

4          So we also take into account that I believe the Court

5    is closed on Monday the 9th for Columbus and Indigenous Persons

6    Day.  If that's not the case, we'd like to know.  But with our

7    parties working cooperatively to set a realistic schedule, I

8    think places us finishing the case around the 16th or 17th of

9    October.  I think there is -- I can speak for plaintiff.  I

10   know we've discussed it some with defendant, some value in

11   doing the cost method, where both sides have, you know, a

12   specific amount of time for their case, and to use as they

13   need.  I think that encourages the parties to be efficient.

14   And I would certainly rather schedule more time, and be able to

15   dismiss the jury early than to find that we would be prejudiced

16   by not being able to call certain witnesses and exceed the time

17   that we indicated to the jury would be the time of service in

18   this case.

19         THE COURT:  All right.  Well, in terms of keeping

20   track -- go ahead, Mr. Gage.

21         MR. GAGE:  I would agree with Ms. Greene that the

22   number of days, the days that Ms. Greene laid out, is

23   consistent with single plaintiff cases that I've tried over the

24   last 30 years in terms of the amount of time.  And I think we

25   have, particularly compared to our original estimates and our

N9LDROWC

original lists of witnesses, we have worked cooperatively to

make this an efficient presentation, cut down the number of

witnesses, and get them scheduled on days so that we can make a

presentation to the jury that's sufficient.

THE COURT:  All right.  In terms of the mechanics of

keeping track of time, unless you'd like to agree on someone

else to keep track of the time, I'll keep the clock, and I will

-- I don't know about a chess clock, but I will give you a

sense at the end of each day how much -- each trial day how

much time you have left.

MR. GAGE:  And if I could ask, your Honor, does that

mean each side?

THE COURT:  Yes.

MR. GAGE:  Give each an amount we have left?

THE COURT:  Yes.  I do want to ask a more specific

question about potential issue of cumulativeness.  It seems

that there -- and, again, the description's kind of high level,

but there are numerous witnesses that -- who are on the list to

describe the hiring level and job responsibilities of technical

directors in OCTO.  How are they not cumulative, those

witnesses?

MS. GREENE:  Your Honor, with respect to the

comparators, they're not cumulative, because, you know, as to

whether any one individual is a comparator for purposes of

either the New York Equal Pay Law or the New York City Human

N9LDROWC

1    Rights Law, will be dependent on the specific performance of

2    duties for that comparator.  That being said, those witnesses I

3    think are very brief in terms of their own description of their

4    own job duties.

5         Beyond that, there is evidence that relates to the

6    leveling decisions, and that relates most to plaintiff's case,

7    establishing the comparability of the work that's being

8    performed, and Ms. Rowe's skills, judged against the leveling

9    mechanism.  But, also, that goes to plaintiff's ability to

10   defeat any affirmative defenses as to non-discriminatory

11   reasons that defendant may assert are the reasons for their

12   leveling decisions, so those witnesses that have been

13   identified for those purposes, the parties still intend to

14   call.  The testimony is unique, and is not duplicative.

15        THE COURT:  All right.  Mr. Gage, do you have anything

16   to say about that?

17        MR. GAGE:  Sure, your Honor.

18        Each of the witnesses that Google intends to call,

19   either in our own case or to examine during plaintiff's case,

20   offers something unique, and to the extent that in our joint

21   pretrial order, we do mention some subjects that overlap, we

22   absolutely do not intend to beat any dead horses.  And as the

23   testimony comes in, when a second witness comes in, we're going

24   to offer that witness' unique testimony, and we do not intend

25   to plow ground previously plowed.  But when we did the list and

N9LDROWC

1   we identified the subjects, we did not know what the order was

2   going to be, and so in order to accurately inform the Court of

3   a general description of what these folks had to say, it

4   appears there's some duplication.  But rest assured, I do not

5   want to present repetitive testimony in front of a jury.

6          THE COURT:  I'm sure that's true.  Now, I'm going to

7   think a little bit more.  In listening to you now, I'm going to

8   think a little bit more.  Don't have people change flights and

9   whatever yet, because I'm going to think a little more about

10  the trial day.  I do want to have it structured so people don't

11  have to go out of the courthouse for lunch, because that just

12  ends up, as I mentioned, resulting in a lot of problems with

13  people coming in late, and they can't help it.  They're stuck

14  at security and whatnot.  But I'm going to give that a little

15  more thought.

16         Let's talk about Thomas Kurian.  It looks like the

17  plaintiff wants him to talk about P-83, which is an e-mail

18  thread sending articles reporting about the filing of this

19  lawsuit, and Google objects under Rules 401 and 403.  The

20  emails seem at least arguably relevant since part of

21  plaintiff's retaliation claim is that she was not interviewed

22  for the vice president, financial services industry lead

23  position after filing this suit.  But I'd like to hear from

24  both of you now on him.

25         MR. GAGE:  Sure.  I'll go first, your Honor, in the

N9LDROWC

1    face of silence from Ms. Greene.

2         Mr. Kurian had absolutely nothing to do with any of

3    the decisions at issue in this case.  Mr. Kurian is the CEO of

4    Google Cloud.  He joined the company after much of the events

5    in this -- at issue in this case occurred.  He was not involved

6    in any decisions.  And the fact -- and all that email shows is

7    that somebody told him that there was a press article about the

8    lawsuit that Ms. Rowe filed, and so he, as a witness, has

9    absolutely nothing relevant to say for the jury.

10        And the exhibit itself, I mean, the parties can

11   stipulate to the fact that Ms. Rowe filed a lawsuit in I think

12   it was August of 2019, or whenever it was.  That's a matter of

13   record.  But there's absolutely no reason for Mr. Kurian, plus,

14   he's in California.  He hasn't been subpoenaed.  He has nothing

15   relevant to say.  And the exhibit itself is not relevant to the

16   case.

17        THE COURT:  All right.  Ms. Greene.

18        MS. GREENE:  Your Honor, if I may, yes, my colleague,

19   Ms. Gelfand, who was admitted in 2019, is prepared to argue

20   this issue if it's acceptable to your Honor.

21        THE COURT:  I'd be pleased to hear from Ms. Gelfand.

22   Go ahead.

23        MS. GELFAND:  Thank you, your Honor.

24        While Mr. Kurian was not a decision-maker with respect

25   to Ms. Rowe's claims, this -- you know, this document

N9LDROWC

1    demonstrates he was knowledgeable about her complaints, he

2    sought a conversation about it, and this is directly relevant

3    to the issue of the jury determining liquidated damages under

4    the Equal Pay Law and punitive narcotics damages under New York

5    City's Human Rights Law.

6            This document demonstrates corporate knowledge at the

7    highest level, and that Mr. Kurian was knowledgeable about it,

8    spoke about it.  And, you know, Google did not remedy

9    Ms. Rowe's complaints.

10           We also note that we have offered a stipulation to

11   defendant to note Mr. Kurian's knowledge as to Ms. Rowe's

12   complaint, and the complaint filed, and defendant declined that

13   stipulation.  And that's why we have offered him as a witness

14   to testify as to this document.

15           THE COURT:  All right.  Diane Greene.  So the

16   plaintiff wants Ms. Greene to testify about P-147, which is a

17   declaration Ms. Greene wrote in this case as part of an

18   application for protective order preventing the taking of her

19   deposition.  Defendant objects to P-147 on hearsay grounds, and

20   to the witness under Rules 401 and 403.

21           Let's start with P-147.  Isn't this hearsay?  The most

22   relevant exception is 804(b)(1)(A), for testimony that was

23   given as a witness at a trial, hearing, or lawful deposition,

24   which this was not.  Regarding the residual exception,

25   Ms. Greene's affidavit says, in effect, that she doesn't

N9LDROWC

1    remember any of this, so to the extent her declaration is

2    probative of anything, how are statements in her declaration

3    more probative on the point for which it is offered than

4    Shaukat's testimony?

5          MS. GREENE:  Your Honor, the declaration would be

6    offered not with respect to Mr. Shaukat and the hiring process

7    for the financial services head.  Rather, it would be offered

8    with respect to the initial leveling and hiring decision.

9          Mr. Grannis testified at his deposition, as did

10   Ms. Burdis, as to who the decision-maker was, and points to

11   Ms. Greene.  The fact that Ms. Greene in her declaration has

12   asserted that she does not recall nor does she believe that she

13   was part of that decision making, undermines that assertion of

14   Mr. Grannis and Ms. Burdis, and that's relevant with respect to

15   the affirmative defenses.

16         The defendant is required to show what the decision

17   was at -- you know, why the decision was what it was at the

18   time the decision was made.  In this case, they can't say who

19   even was the decision-maker.  There's disagreement amongst the

20   parties as to who the decision-maker was.  They're not able to

21   meet that defense.  It is only intended to be offered if that

22   becomes relevant.

23         So it's more in the nature of rebuttal evidence than

24   direct evidence, and so we put it on the list and put her as a

25   witness out of an abundance of caution, so that Google would be

N9LDROWC

```
 1   on notice of our intent.  But, again, it's really intended and
 2   would be used as rebuttal evidence.
 3            THE COURT:  All right.  Mr. Gage, anything else from
 4   you on this?
 5            MS. TOMEZSKO:  I would like to speak on that, your
 6   Honor.
 7            THE COURT:  I'm sorry.  Just so that I can refer to
 8   you by name, you are Ms. Tomezsko
 9            MS. TOMEZSKO:  Tomezsko, yes.  Exactly.
10            THE COURT:  Okay.  Go ahead.
11            MS. TOMEZSKO:  If you look at the testimony that
12   plaintiff herself has identified in this case as relevant
13   testimony from Ms. Burdis as to who made the decision, the
14   ultimate approval of the recommended level that Will Grannis
15   recommended with the input of others, that testimony shows that
16   Diane Greene -- and if you're able to access the deposition
17   testimony, it's on page 53 to 54 of Jennifer Burdis'
18   deposition.  It's clear from her testimony that the final
19   decision was made by two SVPs within the organization, senior
20   vice presidents, if you will.
21            Diane Greene had access to all those packets, but so
22   did Irv Holvil and Sridhar Rajishami.  And if you look at the
23   testimony, the question is, so who made the final decision with
24   respect to Ms. Rowe's level.  The answer is the SVPs I just
25   listed.  She had previously listed, Irv, Mr. Holvil, and
```

N9LDROWC

1    Mr. Rajishami, and said Diane Greene had access to the packet.

2                So I don't believe it's correct that Ms. Burdis

3    testified that Ms. Greene was the final decision-maker.  I

4    think you could look at her testimony and determine that.

5                THE COURT:  All right.  Thank you.

6                I want to talk now about Patricia Florissi, if that's

7    the way you say it.  Plaintiff objects to Ms. Flurisy

8    testifying under Rules 401 and 403, and because she was not

9    identified at any point in discovery allegedly, and was only

10   identified in the last month.  Part of plaintiff's case is that

11   she has been paid at level 8, but has been doing work

12   equivalent to level 9.

13               Is there anyone else already testifying to plaintiff's

14   work since the spring of 2022?

15               MR. GAGE:  No, your Honor.  Ms. Flurisy has been

16   Ms. Rowe's manager since the spring of 2022.  Ms. Rowe is

17   seeking, as you said, to recover back pay up to the date of

18   trial, and she's arguing that she's performing level 9 work.

19   And because this case has lasted for a long time, time has

20   passed, things change.  Mr. Grannis managed Ms. Rowe up until

21   that point, and so there's nothing -- there is no surprise

22   here.  Ms. Flurisy will testify as to the work that Ms. Rowe

23   has done and hasn't done, and it will be very brief.  It's not

24   cumulative, and I think we're -- we should be entitled to

25   present them.

N9LDROWC

1    THE COURT:  Why didn't you disclose her earlier?

2    MR. GAGE:  She's been known to the plaintiff for a

3    long time, your Honor, and I believe we did identify her quite

4    some time ago.  And, again, Ms. Rowe has known since the spring

5    of 2022 that she was working for Ms. Flurisy, so there's no --

6    there's no surprise.  There's no prejudice here.  And,

7    presumably, Ms. Rowe is going to take the witness stand and

8    talk about all of the things that she claims to be doing.  We

9    should be entitled to have Ms. Flurisy come in and offer

10   Google's version of what's been -- what she's been doing and

11   not doing relative to level 8 versus level 9.

12   THE COURT:  All right.  Ms. Gelfand, if you're taking

13   this one, or back to Ms. Greene.

14   MS. GREENE:  It will have to be me, your Honor.

15   There's multiple points here.  One is that Ms. Rowe,

16   plaintiff, was not on notice that defendant considered her to

17   be a witness or have relevant testimony in this matter.  And

18   Google has not supplemented their discovery at any point in

19   time to include information that relates to Ms. Flurisy.

20   Further, the allegation is that the leveling decision at the

21   time that it was made, and the compensation decision at the

22   time it was made give rise to the Equal Pay Law claims, and the

23   New York City Human Rights Law claims.

24   There is case law that I would direct your Honor to,

25   including *Rifkinson v. CBS*, and that case cite is *Crawford v.*

N9LDROWC

1    *Western Electric Company*, and I can certainly provide your

2    Honor with those citations separately, but it says, because an

3    employer's intent is measured at the time it makes the

4    challenged employment decision, post-decision performance of

5    either the plaintiff or the more favorably treated employee is

6    generally not relevant.  *Crawford v. Western Electric Company*

7    said, plaintiff's performance after adverse employment action

8    is not probative of legitimate non-discriminatory basis for the

9    action.

10           Here, again, the role has changed and shifted over

11   time.  The real measurement of whether claims exist under the

12   New York Equal Pay Law or the New York City Human Rights Law is

13   whether, at the time the decisions were made, and at the time

14   that work was being performed, Ms. Rowe was performing work

15   that was equal to Mr. Harteau and Mr. Breslow's.  And so

16   together with the relevance, as well as the lack of defendant

17   providing any notice or discovery or supplemental discovery as

18   to Ms. Flurisy, plaintiff objects.

19           MR. GAGE:  Your Honor, may I respond?

20           THE COURT:  Yes.

21           MR. GAGE:  Again, there was ample notice that

22   plaintiff knew that she had been managed by Ms. Florissi for

23   quite some time.  Also, Defendant's Exhibit 98, which has long

24   been on the various iterations of defendant's exhibit list,

25   makes clear that Ms. Flurisy was in this role.  So there's no

N9LDROWC

1    prejudice.

2              As to the arguments that counsel made about the law, I

3    just want to address those very specifically.  The New York

4    Labor Law is being referred to as New York City's Equal Pay

5    Statute, does not govern leveling decisions.  It governs pay

6    decisions.  And the evidence will show, as you will see during

7    the course of the trial, that all of the L-8 and L-9 technical

8    directors hired in OCTO, Ms. Rowe's hiring package or

9    compensation package was the second highest.

10             And Ms. Rowe is claiming under the New York Labor Law

11   that she is doing equal work, equal work to people who are

12   level 9, and that she should be paid the same as people who are

13   level 9, and she is seeking back pay up to the present.  And so

14   she needs to prove that she is doing equal work with people who

15   are paid more than her.  And Ms. Flurisy is going to describe,

16   if she testifies, she will describe the nature of the work that

17   Ms. Rowe is doing, and how it differs from work that is

18   performed by people who are level 9 employees.  And that is a

19   core part of Google's defense throughout this entire period of

20   time to their claim that she was paid inconsistent with the

21   law, and that she should have been paid what level nines were

22   paid.

23             And Ms. Flurisy also had input into comp decisions

24   that are at issue in this case, which will be before the jury.

25   She offered performance reviews, which the jury will hear

N9LDROWC

1   about.  And this is a key part of Google's defense.  Ms. Rowe

2   can't claim that, oh, I was misleveled at the time, you know,

3   six years ago, and that since then the jury should just assume

4   that she's doing equal work to people who are paid more.  And

5   they've had all that discovery, the performance reviews.

6              MS. GREENE:  Your Honor, if I could?

7              THE COURT:  Yes.

8              MS. GREENE:  If I may briefly address, we have not had

9   full discovery.  And if this were such a key aspect of

10  defendant's case, we would expect him to fully supplement the

11  record, at a minimum offer Ms. Florissi for a deposition if

12  she's a key witness and became a key witness outside of the

13  discovery period.  And that is why parties have an obligation

14  to update their initial disclosures, and, certainly, even in a

15  formal way, put the other side on notice.  And so without

16  having full discovery, without having the benefit of all of the

17  compensation, related documents for the past year, not just the

18  outcomes, the underlying decision-making process, plaintiff is

19  severely prejudiced at offering assistance.

20             THE COURT:  All right.  Well, have you asked for that

21  additional discovery?  Have you asked to take her deposition?

22             MR. GAGE:  They have not asked to take the deposition,

23  your Honor.  And they asked us to supplement compensation

24  information for the most recent comp cycle, which was the end

25  of '22, into '23.  We did supplement all of that information,

N9LDROWC

1    not just for Ms. Rowe, but for the alleged comparators, so we

2    have supplemented the discovery they asked for.  And they have

3    not asked for Ms. Florissi's deposition.

4             THE COURT:  All right.  So, Mr. Gage, we have a couple

5    weeks remaining now until trial starts.  Are you willing to

6    present Ms. Flurisy for a deposition?

7             MR. GAGE:  I don't know what her availability is and

8    opposing counsel's availability is for that deposition, but we

9    certainly would be willing to work with them for some time

10   limited deposition, if that's what your Honor is telling us we

11   need to do.

12            THE COURT:  Well, I think to the extent that that

13   could resolve the issue here, then I think it should be done.

14   It's not that uncommon to, you know, when someone is being

15   disputed at this late point, there's really a lot of time still

16   before trial, so I would like the two sides to confer further

17   about Flurisy, and figure out whether a deposition -- it seems

18   to me, if her deposition is taken, that should cure the

19   objection.  It seems to me -- what day is this?  It's Thursday.

20   Send me a joint letter by the close of business tomorrow, and

21   update me on your discussions about Ms. Flurisy, and whether

22   your positions as to her have evolved at all at that point, and

23   also whether she is available to be deposed over the next I

24   guess week and a half, and what the plaintiff's decision is on

25   that.

N9LDROWC

1          But, to me, it seems like that could be a solution as

2     to this witness.

3          MS. GREENE:  Thank you, your Honor.  We'll do so.

4          THE COURT:  All right.  I just have a couple of

5     additional matters for today.  One is, if you told me when the

6     third amended pretrial order is coming, I lost track of what

7     you said.  When do you propose to submit that?

8          MS. TOMEZSKO:  Your Honor, we have --

9          MS. GREENE:  Your Honor, there --

10         MS. TOMEZSKO:  Oh, I'm sorry.  We sent it to

11    plaintiff's counsel this morning, with a redline I believe,

12    and, if not, we could supplement with a redline.  We have it

13    waiting for their sign off.  Understandably, we've all been

14    preparing to be here, so they haven't seen it yet.  I don't

15    fault that, but as soon as we have that sign off, we can get

16    that on file.  It's a very minor change.

17         THE COURT:  Okay.  So the corrections that chambers

18    have been alerted to in the past I think it's like 24 hours,

19    one category was corrected deposition transcripts, and then I

20    thought there was a second categorially which is deposition

21    designations; is that right?  Is that what has given rise to

22    the need for the third amended joint pretrial order?

23         MS. TOMEZSKO:  Yes.  What's given rise to the need for

24    the third amended joint pretrial order is the inadvertent

25    omission of some objections to Ms. Burdis' deposition

N9LDROWC

1    transcript.  These are objections we had asserted earlier, but

2    we apologize for the inadvertent omission in this round, or the

3    last round.  And so it corrects for that.

4            THE COURT:  That is fine.  Thank you.

5            Now, I notice there are other lawyers on the docket,

6    but I am assuming insofar as any other lawyers did not attend

7    today's conference, you're going to be the lawyers trying this

8    case, correct?

9            MR. GAGE:  That's correct, yes.

10           MS. TOMEZSKO:  Yes, your Honor.

11           THE COURT:  All right.  A word about transcripts.

12   Now, have you thought about whether you plan to order the daily

13   transcripts?

14           MS. GREENE:  We are, your Honor.

15           THE COURT:  Okay.  I was going to recommend that in

16   case the jury asks for a note for all evidence bearing on a

17   particular topic.

18           Finally, today's transcript, if you would please order

19   it and split the cost, and, with apologies to our court

20   reporter, I would like that to be available on an expedited

21   basis.

22           All right.  Is there anything else either side would

23   like to raise today?

24           MS. GREENE:  If I may, and I appreciate the Court's

25   busy schedule, but with respect to the jury charge --

N9LDROWC

1          THE COURT:  Yes.

2          MS. GREENE:  -- when might we expect to know the final

3    jury charge?

4          THE COURT:  Sitting here at the moment, I don't know,

5    but I will consider that and let you know.

6          MS. GREENE:  Okay.  I assume the same is true then,

7    your Honor, with respect to the jury verdict form?

8          THE COURT:  Yes, that is correct.

9          MS. GREENE:  Your Honor, just a few small notes then.

10   Will the courtroom be available on October 3rd for a technology

11   run through, so that we can iron out any kinks ahead of time

12   before the jury is there?

13         THE COURT:  I thought there was already a technology

14   run through, or was that --

15         MS. GREENE:  Your Honor, we met with the technician

16   and your Honor's courtroom deputy, and familiarized ourselves

17   with it.  We've not yet had a chance to actually hook up our

18   computers and monitors and make sure we're able to publish

19   electronic documents to the jury.  And I think both sides would

20   like the opportunity to do so.  Again, just to make sure that

21   prior to the jury being seated and the presentation of

22   evidence, we've worked out any technological issues.

23         THE COURT:  Well, I'm certainly in favor of that.  Let

24   me just look at the calendar one second.

25         Yes, that should be fine.

N9LDROWC

1          MR. GAGE:  One logistical question, your Honor.  Would

2     we be able to leave things in the courtroom each night or will

3     we need to vacate the premises of all of our -- we brought in

4     every day.

5          THE COURT:  Oh, no.  You can leave -- I used to do

6     what you do.  I understand these problems.

7          MR. GAGE:  I know you do.

8          THE COURT:  You can leave things in the courtroom.  It

9     will be locked, and it should be fine.  So --

10          MR. GAGE:  Okay.

11          THE COURT:  All right.  Ms. Greene anything else?  It

12     sounded like you had a bit of a list, or have we exhausted it?

13          MS. GREENE:  Your Honor, I think everything else can

14     wait until the trial is -- your Honor has indicated she prefers

15     to handle it on a daily basis.

16          THE COURT:  All right.  Then I'll look forward to

17     hearing from you tomorrow evening, and getting the third

18     amended joint pretrial order, and anything else you might need

19     the Court for between now and October 4.

20          I wish you well in between now and then.

21          So hearing nothing further, we're adjourned.  Thank

22     you.

23          (Adjourned)

24

25