NAAVROW1

1    UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
2    ------------------------------x

3    ULKU ROWE,

4                    Plaintiff,

5              v.                              19 Civ. 8655 (JHR)

6    GOOGLE LLC,

7                    Defendant.                Trial

8    ------------------------------x
                                               New York, N.Y.
9                                              October 10, 2023
                                               10:15 a.m.
10
     Before:
11
                        HON. JENNIFER H. REARDEN,
12
                                               District Judge
13                                             -and a jury-

14                             APPEARANCES

15   OUTTEN & GOLDEN, LLP
          Attorneys for Plaintiff
16   BY:  CARA E. GREENE
          GREGORY S. CHIARELLO
17        SHIRA Z. GELFAND

18   PAUL HASTINGS LLP
          Attorneys for Defendant
19   BY:  KENNETH W. GAGE
          SARA B. TOMEZSKO
20
     Also Present:  Vincent Yang, Paralegal (Outten & Golden)
21                   Andrew Velazquez, Google Rep.
                     Jean Gutierrez, Paralegal (Paul Hastings)
22

23

24

25

NAAVROW1

1              (Case called)

2              THE DEPUTY CLERK:  Counsel, please state your name for

3    the record, starting with plaintiff counsel.

4              MS. GREENE:  Cara E. Greene of Outten & Golden, for

5    the plaintiff, Ulku Rowe.

6              MR. CHIARELLO:  Gregory Chiarello from Outten &

7    Golden, for plaintiff, Ulku Rowe.

8              MS. GELFAND:  Shira Gelfand from Outten & Golden, for

9    the plaintiff, Ulku Rowe.

10             THE COURT:  Hello.

11             And for the defendant?

12             MR. GAGE:  Ken Gage, for Google.

13             MS. TOMEZSKO:  Sara Tomezsko, for Google.

14             MR. VELAZQUEZ:  And Andrew Velazquez, on behalf of

15   Google.

16             THE COURT:  Good morning.  Welcome to everybody.

17             Please be seated.

18             THE DEPUTY CLERK:  I'm sorry, I just need you guys to

19   speak into the mic so that the person on the phone can hear

20   what is being said.  Thank you.

21             THE COURT:  I know you wanted to see me before the

22   prospective jurors are brought in, and that worked out well

23   because I wanted to see you, too.

24             So why don't you go ahead and let me know what's on

25   your mind that we can hopefully take care of before the jurors

NAAVROW1

1      come in.  Is there anything?

2              MS. GREENE:  Your Honor, there are a few evidentiary

3      issues.

4              THE COURT:  Yes.

5              MS. GREENE:  And a few which are pertinent to

6      Ms. Rowe's testimony that we anticipate will begin later today.

7      So we can do that now, if your Honor wishes, but we did want to

8      let you know that there are some things that require advanced

9      rulings.

10             THE COURT:  Okay.  Why don't you tell me -- just a

11     moment.  Okay.  Tell me -- I thought that there were now -- the

12     number of exhibits as to which you were hoping for advanced

13     rulings has now dwindled to eight; is that correct?  Why don't

14     you just tell me the exhibits that you want me to focus on.

15             MS. GREENE:  Sure.

16             One issue, your Honor, is with respect to actual

17     testimony and not with respect to --

18             THE COURT:  Okay.

19             MS. GREENE:  And that is Judge Schofield's response to

20     defendant's second motion *in limine* excluded testimony about

21     protests principally concerning sexual harassment.

22             THE COURT:  Yes.

23             MS. GREENE:  Which is not at issue in this case as a

24     result of the 2018 walkout.

25             THE COURT:  Right.

NAAVROW1

1          MS. GREENE:  It's our understanding that that should

2     not preclude plaintiff from testifying about her own

3     involvement and how that motivated her subsequent decision with

4     respect to filing a second complaint of discrimination just a

5     few days later.  But given the motion *in limine*, we wanted to

6     seek a ruling in advance of that testimony being offered.

7          THE COURT:  Okay.  Mr. Gage.

8          MS. TOMEZSKO:  It will actually be me, your Honor,

9     Ms. Tomezsko.

10          THE COURT:  All right.

11          MS. TOMEZSKO:  We would object to the introduction of

12     that testimony.  It's clearly covered by the second motion *in*

13     *limine* that defendant filed.

14          The Court has taken already a very narrow view of what

15     evidence may come into this trial concerning other complaints.

16     There is one that is being permitted.  The December 19th

17     complaint of a Level 6 employee, who was re-leveled to Level 7

18     simply for the purpose to show that re-leveling was possible.

19     We don't think that she should be able to -- Ms. Rowe should be

20     able to testify about the walkout, given that it has already

21     been covered and is the law of the case.

22          THE COURT:  All right.  I'm going to ponder these

23     before I give you a ruling, but why don't we go through all of

24     them now.

25          MS. GREENE:  There are five documents that are

NAAVROW1

1    relevant to Ms. Rowe's testimony to which there are objections.

2    Those are P-6, P-76, P-104B.

3              THE COURT:  One second.  104B, is that what you said?

4              MS. GREENE:  Yes, your Honor.  That may be one the

5    parties reached an agreement to divide --

6              THE COURT:  Okay.

7              MS. GREENE:  We have those courtesy copies here with

8    us.

9              THE COURT:  Okay.  I'm not seeing -- what I'm looking

10   at, I believe, came from the third amended joint pretrial

11   order, and I'm not seeing -- I'm seeing a 1012B, but not a

12   104B.  So if you have copies, that would be helpful.

13             MS. GREENE:  We do, your Honor.  With permission,

14   we'll pass them up.

15             THE COURT:  Yes, please.

16             MS. GREENE:  In addition, plaintiff designated two

17   exhibits yesterday in response to recent developments in this

18   case, one that pertains to today's testimony as Plaintiff's

19   153.  We also have a courtesy copy of that exhibit as well.

20             THE COURT:  What are the recent developments that led

21   to this?

22             MS. GREENE:  Following Ms. Florissi's deposition,

23   defendant made a subsequent production.  And in response to

24   that production, plaintiff made a supplemental production of

25   documents that very recently came into existence and relate to

NAAVROW1

1    this case.  And so that is why they've just been offered at

2    this time.

3              THE COURT:  All right.  And there was one more?

4              MS. GREENE:  There's one document that is not relevant

5    to today's testimony, but that defense counsel indicated that

6    they intended to raise with the Court today.  And that is

7    Exhibit 154, the other of the two exhibits that were just

8    recently designated.

9              THE COURT:  Okay.  Why don't I -- with the possible

10   exception -- oh, no, you said 154 you're looking for a ruling

11   today also.  Why don't I hear you out on these exhibits now and

12   then I'll be in a position to make a ruling later today before

13   any testimony.  You said these would all be used as part of

14   Ms. Rowe's testimony, these documents?

15             MS. GREENE:  Correct, your Honor, with the exception

16   of 154.

17             THE COURT:  Okay.

18             MS. TOMEZSKO:  Your Honor, may I -- just to clarify,

19   will argument on those exhibits be later or would you like to

20   argue those exhibits now?  Specifically, 154 and 153.

21             THE COURT:  Well, I can do whatever people prefer.  To

22   the extent we can at least get started, it's helpful to me

23   because then I can think about it while we're doing other

24   things.

25             MS. TOMEZSKO:  I'm happy to offer Google's position on

NAAVROW1

1    it for your Honor to consider.

2              THE COURT:  Okay.

3              MS. TOMEZSKO:  So Exhibit 153, we have a copy that we

4    can present — get closer to the microphone — and show you.

5              What it is is a collection of emails in response to

6    Ms. Rowe's broadside to a number of LISTSERVs within Google,

7    explaining the claims that she's asserted in this case and

8    seeking support from her colleagues to participate in watching

9    the trial, to be here today for the rest of the week.

10             Google has no problem with her actually making those

11   statements; I mean, she is within her right to do so.  However,

12   the responses to those by people who are not witnesses in this

13   case, there's no suggestion that they have knowledge of the

14   underlying facts of this case.  In fact, one of them says they

15   don't even know Ms. Rowe.  And so the idea that she can offer

16   these exhibits to prove the truth of the matter asserted in

17   them not only is hearsay, it's irrelevant to the claimants that

18   will be tried in this case, and it's prejudicial to defendant.

19   Defendant will be then required to produce and argue responsive

20   information, devolving into mini trials.

21             The reason that it is considered a new development in

22   this case is, as your Honor knows, Ms. Florissi was deposed for

23   three hours on October 2nd.  During that deposition, counsel

24   for plaintiff requested the production of certain documents.

25   We don't think Google had an obligation to produce them, given

NAAVROW1

1   that the order only allowed a deposition.  However, we were

2   very forthcoming and produced the documents requested.  That

3   was earlier -- at the end of last week.

4           And frankly, Ms. Florissi was not -- she's not

5   testified about the substance of any of the documents that

6   we've produced that they seek to enter into evidence today.

7   We're not sure of the relevance.  And we only received them on

8   Sunday around 6 p.m., only to find out the next day at around 3

9   in the afternoon that they would be offered as exhibits in this

10  case.

11          So, again, they're irrelevant, they're prejudicial,

12  they're hearsay.  And to the extent that they contain

13  statements by other individuals at Google supporting Ms. Rowe

14  in saying that they too feel that they have experienced some of

15  the same treatment, that is covered by the second order on the

16  motion *in limine*, which, again, takes a very narrow view of

17  what other employee complaints may be at issue.  And that's

18  exhibit --

19          THE COURT:  153.

20          MS. TOMEZSKO:  Yes, 153.

21          Now, Exhibit 154 --

22          THE COURT:  Can I just stop you there one second.

23          MS. TOMEZSKO:  Of course.

24          THE COURT:  Ms. Greene, what are you offering 153 for?

25          MS. GREENE:  Yes, your Honor.

NAAVROW1

1          It's being offered for the state of mind and impact on

2     the listener.  It's relevant to Ms. Rowe's emotional distress

3     claims and with respect to her testimony about how this case

4     has impacted her.  It's not being offered for the truth of the

5     matter asserted, but, again --

6          THE COURT:  Can't she talk here about how the case has

7     impacted her?

8          MS. GREENE:  Yes, your Honor.  But this portion of it

9     with respect to the response that she's received from others is

10    important with respect to her own state of mind in the way that

11    it has had an emotional impact on her.  And that's the purpose

12    for which it's being offered.

13         THE COURT:  All right.  I think I got that one.

14         All right.  Ms. Tomezsko, you were going to talk about

15    154?

16         MS. TOMEZSKO:  Yes.  154, your Honor, you may recall

17    the letter-writing that has been over the weekend regarding

18    Mr. Stuart Vardaman's decision to participate in this trial.

19         THE COURT:  On that note, when am I going to be

20    getting a witness list?  Because I'm mindful that you need a

21    ruling on Ms. Florissi, but I don't know when, if I have her

22    come, she would be likely coming.

23         MS. TOMEZSKO:  I can answer the question as to

24    Ms. Florissi.  She is only defendant's witness; plaintiff does

25    not intend to call her.  So it would be after we start our

NAAVROW1

1    presentation of evidence, which I believe at this point might

2    be, the earliest, Friday afternoon.

3                THE COURT:  Okay.  That's what I thought, too.

4                And Mr. Vardaman, go ahead.

5                MS. TOMEZSKO:  Yes.  Mr. Vardaman will appear before

6    Friday afternoon; he's being called by plaintiff's counsel.

7    You might remember from our letters that he has recently

8    decided to cooperate.  I have an -- the copy of that

9    communication, if your Honor would like to examine it *in*

10   *camera*.  We don't think that the wired article itself that he

11   referenced and influenced his desire to come here and

12   participate live is relevant.

13               First of all, it's an advocacy piece.  It contains --

14               THE COURT:  Oh, I'm sorry, 154 is the wired article?

15               MS. TOMEZSKO:  Yes.

16               THE COURT:  Okay.  Go ahead.

17               MS. TOMEZSKO:  It's an advocacy piece.  It contains

18   statements of plaintiff's counsel, and it also contains

19   references to things like the walkout, which is absolutely

20   covered by the second motion *in limine* that the judge granted

21   in part.

22               The other thing I would note is there's a proposed

23   jury instruction that jurors are not supposed to research any

24   of the witnesses or the facts in this case or read the news

25   about it.  And so introducing a news article, which they are

NAAVROW1

1    instructed not to read as evidence, which, frankly, it's not

2    evidence of anything, is directly contravening what they'll

3    hear from you during trial.

4              THE COURT:  All right.

5              And as to all of the other documents, Ms. Greene, you

6    went through P-6 and whatnot, I have the parties' positions on

7    those, right?

8              MS. GREENE:  Your Honor, yes.  But may I just briefly

9    speak to the wired article?

10             THE COURT:  Yes.

11             MS. GREENE:  Mr. Vardaman -- it is counsel's

12   representation, that it was a direct response to reading that

13   article that precipitated his appearance in this court.  We

14   should be able to testify -- we should be able to examine him

15   with respect to his motivation and potential bias so that the

16   jury can consider that in assessing how much weight to give to

17   his testimony.

18             The defense counsel is the one who's introduced this

19   and pointed to this particular article and, thus, we should be

20   able to examine him on it.

21             MS. TOMEZSKO:  May I briefly respond, your Honor?

22             THE COURT:  Yes.

23             MS. TOMEZSKO:  As you could see and as we explained in

24   the email, the wired article accuses Mr. Vardaman — although he

25   is named as the executive recruiter — of engaging in bad

1    conduct.  It's not surprising at all that he would read that

2    and be reminded, yes, he is being accused of misconduct in this

3    trial and have that reaction.

4            Ms. Greene or her colleague Mr. Chiarello can ask him

5    about why he decided to come; but that doesn't make the article

6    itself relevant evidence.  It's hearsay, it's irrelevant, and

7    it's very prejudicial.

8            THE COURT:  On Mr. Vardaman, Ms. Greene, you already

9    had set aside three-quarters of an hour for him right before he

10   decided to come to New York.  And now you're asking for an

11   additional hour on top -- are you asking for an hour and

12   three-quarters or an hour?

13           MS. GREENE:  An hour and three-quarters, your Honor;

14   though I would hope we wouldn't need all of that.

15           Part of the challenge that we have is that when we had

16   designated his deposition testimony, we knew exactly how long

17   it would last and we knew what his answers would be.  When a

18   witness appears in court, you know, depending on how

19   obstructive they are, how much they remember, how much we have

20   to go back to the deposition testimony to refresh or to

21   impeach, it can turn what would have otherwise been a 45-minute

22   exercise into something twice that long.  And so that's the

23   challenge that we're facing here.

24           THE COURT:  Okay.

25           MS. TOMEZSKO:  May I, your Honor?

NAAVROW1

1        THE COURT:  Yes.

2        MS. TOMEZSKO:  We would suggest that the Court wait

3   and see to order whether there's going to be additional time

4   based on the pace of the trial, the nature of the evidence, and

5   indeed Mr. Vardaman's own testimony.  And I will note that he

6   was deposed for a full day in this trial, so it would hardly be

7   surprising what it is he's going to testify about.

8        THE COURT:  And when -- I understand, Ms. Florissi,

9   we're looking likely at Friday, if she comes.  Mr. Vardaman,

10   when would you expect him to go on?

11       MS. TOMEZSKO:  I believe on our list he is scheduled

12   for the end of the day tomorrow.

13       THE COURT:  Okay.

14       MS. TOMEZSKO:  In plaintiff's case, your Honor.  But

15   we have also listed him as a witness.

16       THE COURT:  Right.  Okay.  Okay.

17       And I'm going to get a list with the likely order of

18   witnesses?

19       MS. GREENE:  Your Honor, the parties have agreed on a

20   witness order through the end of the week; so we can certainly

21   provide you with that.

22       THE COURT:  Okay.  That would be helpful.  Thank you.

23       All right.  So does that cover it now?  We can have

24   the prospective jurors come in when they're ready?  Okay.

25       MS. GREENE:  For plaintiffs, yes.  I think the other

NAAVROW1

1      documents can be addressed as they're sought to be used.

2                THE COURT:  We'll address those later today.

3                MS. TOMEZSKO:  Nothing from defendant.

4                THE COURT:  Okay.

5                MS. GREENE:  Thank you.

6                THE COURT:  All right.  Thank you.

7                Ms. Williams, are they ready to come in?

8                THE DEPUTY CLERK:  I'll call them.

9                THE COURT:  I'm going to -- I'm just going to get a

10     couple other things while we wait.

11               (Recess)

12               (Jury selection commenced)

13               (Continued on next page)

14

15

16

17

18

19

20

21

22

23

24

25

NAAVROW1

```
 1                A F T E R N O O N   S E S S I O N

 2                          3:00 P.M.

 3              (A jury of eight was impaneled and sworn)

 4              THE COURT:  Please be seated.

 5              All right.  I want to give some quick rulings before

 6      the jury comes in.

 7              All right.  First, the question about Ms. Rowe's

 8      testimony and whether she can testify about her own

 9      involvement.  Ms. Greene, I think you said, not having the

10      benefit of a transcript, her own involvement in protests

11      concerning sexual harassment and/or the resulting 2018 walkout,

12      was that a question?

13              MS. GREENE:  It's with respect to her participation in

14      the walkout, which also included issues of pay equity, her own

15      participation, and the motivation then for her complaint six

16      days later.

17              THE COURT:  All right.  I view that as covered by

18      Judge Schofield's ruling on defendant's second motion *in*

19      *limine*, and provided that the probative value, if any, is

20      likely to confuse a jury in a way that would prejudice the

21      defendant.  So no, she may not testify about that.

22              All right.  As for the --

23              MS. GREENE:  Your Honor --

24              THE COURT:  That's my ruling.  Thank you.

25              I'm moving on to the documents now.
```

NAAVROW1

1          For P-6, this is the Facebook post made by Rowe on her

2     first day at Google.  Google's objection to P-6 is overruled.

3     You can use that document.

4          Third is P-76.  I want to get a little more

5     information about this.  So Google, you object to the press

6     release solely on the grounds of authenticity; is that correct?

7          MS. TOMEZSKO:  Your Honor, I believe it's the second

8     part of P-76.

9          THE COURT:  But it's the press release, is that the

10    issue?

11         MS. TOMEZSKO:  No, was the one -- I believe it is just

12    her letter that she received from the Federal Reserve.

13         THE DEPUTY CLERK:  Please talk into the mic.

14         MS. TOMEZSKO:  I'm sorry.

15         As we understand it, it doesn't look like a press

16    release as much as it does a letter from -- if Ms. Rowe may

17    testify as to where it is from, what it is, we have no

18    objection.  It's just unclear to us the source of this

19    information.

20         THE COURT:  Okay.

21         MS. TOMEZSKO:  We also have a copy, your Honor, if you

22    would like me to hand it up.

23         THE COURT:  Yes.  Thank you.

24         So the objection is only to a letter dated March 7,

25    2019 to Ms. Rowe from John Williams, the president of the

NAAVROW1

1    Reserve Bank of New York; is that correct?

2             MS. TOMEZSKO:  I apologize, your Honor.  The objection

3    is to the following page.  Sorry, there are three documents

4    here.  The first is the email, the second is the letter.  If we

5    treat those as one document, the objection is to the last page,

6    with P-752 to P-753.

7             THE COURT:  Okay.  So that is a press release.

8             MS. TOMEZSKO:  Yes, that is a press release.

9             THE COURT:  Okay.  Okay.

10            How do you plan to authenticate this document?

11   Ms. Rowe?

12            MS. GREENE:  Ms. Rowe will be able to testify as the

13   recipient to the document with its attachments.  This was, we

14   understand, the press release that was going out in connection

15   with that.  However -- yes, your Honor, so for purposes of

16   authenticity, our client can speak to the authentic nature of

17   the documents that she received.

18            THE COURT:  So she was -- according to this document,

19   she was a Fintech advisory group member, it looks like; is that

20   right?

21            MS. GREENE:  Yes, your Honor.  I don't believe there's

22   any dispute that, in fact, she was nominated and appointed to

23   that advisory group.

24            THE COURT:  Is there any dispute about that?

25            MS. TOMEZSKO:  No, your Honor.

NAAVROW1

1          THE COURT:  Okay.  Did she know ahead of time that

2     this was going to be issued, this press release?  Do we know

3     that or --

4          MS. GREENE:  Yes, your Honor.  And this was the

5     announcement that was placed on the federal New York -- the

6     Federal Reserve New York website, to accompany the announcement

7     of the creation of this group and the members in this group.

8          THE COURT:  Okay.  Ms. Tomezsko, can you say a little

9     bit more about your concern.  In light of what we just heard,

10     take that into account.

11          MS. TOMEZSKO:  Yes.  Exactly, your Honor.

12          Now that we know what the document is, Ms. Rowe can

13     certainly testify as to the first couple pages.  We have no

14     problem with that.

15          THE COURT:  Wait.  I'm sorry.  I'm only looking at

16     this press release.  Are you now talking about the beginning of

17     the --

18          MS. TOMEZSKO:  No, I'm just saying that that is off

19     the table.  We have no problem with that.

20          This document from apparently the Federal Reserve Bank

21     of New York is, at this point, duplicative and cumulative of

22     everything that's in the preceding pages in this document.  As

23     we said, there is no dispute that she was a member of this

24     particular Fintech advisory group.  And so this, I guess, press

25     release now is hearsay, in addition to being cumulative to

NAAVROW1

1    what's already in the document and what we think we'll hear in

2    testimony.

3              THE COURT:  I'm going to circle back to that one.

4              All right.  Next we have P-104B, which includes, I

5    believe, the November 2019 article written by Ms. Rowe titled

6    *The Buck Starts Here*, as well as a web page that captures a

7    speech that Ms. Rowe gave, and a March 2019 article written by

8    Rowe entitled *Five Habits of Highly Effective Capital Markets*

9    *Firms* who run in the cloud; correct?  Is that what's included

10   in 104B?

11             MS. TOMEZSKO:  Yes, your Honor.

12             THE COURT:  Okay.  Okay.  These two speeches -- no,

13   excuse me.  These two articles and this speech may be used to

14   establish that Ms. Rowe wrote two articles and gave a speech.

15   It may not be used for the truth.  And I will instruct the jury

16   accordingly on the items that are introduced.

17             MS. TOMEZSKO:  Thank you, your Honor.

18             THE COURT:  Is there one more?

19             MR. CHIARELLO:  Your Honor, can I just clarify for the

20   record, I believe it's three articles and the page with the

21   speech.  So I just want the record to be clear about what the

22   exhibit is.

23             THE COURT:  All right.  I agree.

24             So does that also include -- what's the third article?

25             MR. CHIARELLO:  This is an article, *The Buck Starts*

NAAVROW1

1   *Here*.   There's an article, *Five Ways Financial Services*

2   *Organizations Will Move Faster in the Cloud.*   There's the

3   screenshot of the presentation.   And then the last one is *Five*

4   *Habits of Highly Effective Capital Markets Firms*.

5           THE COURT:   Okay.   So understanding that that is what

6   is included in Plaintiff's Exhibit 104B, my ruling stands

7   covering those four items.

8           Was there anything else that you raised with me this

9   morning relating to exhibits or testimony in anticipation that

10  Ms. Rowe might end up taking the stand today?   I think that was

11  it.

12          MS. TOMEZSKO:   Yes, your Honor, that was it.

13          In addition, we have some stipulations that we would

14  like to hand up to you, including the admission of some

15  undisputed exhibits.   If we could get those in at the start of

16  the trial, we think that would make the presentation of

17  evidence go more swiftly.

18          THE COURT:   Yes.   Certainly.

19          I have one more question about the press release as I

20  continue to think about that.

21          For what additional purpose is Ms. Rowe seeking to

22  have that admitted, assuming that, as defense counsel seems to

23  have stated, there's no dispute as to her selection to this

24  advisory group as established by the preceding pages in the

25  exhibit?

NAAVROW1

1          MS. GREENE:  Your Honor, this press release is dated

2     February of 2020, the same time period in which Ms. Rowe was

3     seeking consideration for the vice president of financial

4     services sales role.

5          Defendant has pointed to Ms. Yolande Piazza's

6     inclusion in a magazine as evidence of her qualifications.

7     This press release goes to what information was publicly

8     available at the same time regarding Ms. Rowe and her placement

9     and position within the industry.

10          THE COURT:  I think you just said 2020.  Did you mean

11     2019?

12          MS. GREENE:  I'm sorry, I said 2019; correct.  It was

13     2019.  So this is preceding the time that she asked for

14     consideration for that role.  And it does go to establishing

15     what was known in the industry as to her *bona fides*.

16          MS. TOMEZSKO:  Your Honor?

17          THE COURT:  Yes.

18          MS. TOMEZSKO:  I don't believe we've heard any

19     evidence or that we will hear any evidence that any

20     decision-maker who is attributed to have made a challenged

21     decision in this role has seen those articles, was aware of

22     those articles and, therefore, there's no basis to believe that

23     they were the foundation of any decision that they made to be

24     tried in this case.

25          MS. GREENE:  Your Honor, if I may respond to that.

NAAVROW1

1          It's the fact that no effort was made.  And had effort

2     been made, there was information that they would have

3     discovered.  And the entire point with respect to the vice

4     president of financial service sales position is that she

5     wasn't considered at all.  There was no effort made.

6          So to the extent they intend to argue, as they've

7     indicated to the Court, that Ms. Piazza's credentials are

8     somehow relevant or a defense to this case, we should be able

9     to introduce evidence that likewise establishes our client's

10    credentials.

11         THE COURT:  All right.  I'm going to continue thinking

12    about that one briefly.

13         Do you believe that we might reach testimony today at

14    this point?  You do?  Okay.

15         MS. TOMEZSKO:  A few preliminary other matters, your

16    Honor.

17         THE COURT:  Yes.

18         MS. TOMEZSKO:  Does the discussion of Ms. Rowe's

19    testimony relating to the walkout in 2018, I'm not sure if that

20    also -- if your Honor is still reserving judgment on the

21    related emails, P-153, or if that --

22         THE COURT:  Oh, I'm sorry.  I was trying to remember

23    if I had other documents I was ruling on now.  Oh, yes, now I

24    remember.

25         MS. TOMEZSKO:  P-154 as well.

NAAVROW1

1          THE COURT:  Right.  Okay.

2          So regarding P-154, the wired article, I view that --

3  that any probative value is substantially outweighed by the

4  danger of unfair prejudice from that article.  That article

5  will not come in.

6          P-153, the collection of emails, the Court takes the

7  same view:  To the extent that it has any probative value, it

8  is substantially outweighed by the danger of unfair prejudice

9  to Google.

10          All right.  With that --

11          MS. TOMEZSKO:  I'm sorry.

12          THE COURT:  Yes.

13          MS. TOMEZSKO:  One more quick, maybe, housekeeping

14  issue.

15          Your Honor had requested a list of witnesses

16  previously.

17          THE COURT:  Yes.

18          MS. TOMEZSKO:  Given that we are still expecting a

19  ruling on whether Ms. Florissi may testify, if that's something

20  we can decide, and we'll be able to get you a witness list.

21          THE COURT:  Okay.  Well, we know that she's not

22  testifying before Friday at the earliest is what you said

23  before, right?

24          MS. TOMEZSKO:  Correct.  Right.

25          But to the extent your Honor would like a witness

NAAVROW1

1      list, we could put her as potential, I guess.  It's just

2      clarity in terms of, you know, the witness list and witness

3      order.

4               THE COURT:  What I'm most interested in at the moment

5      is a witness list for tomorrow.  Is there --

6               MS. TOMEZSKO:  Oh, that's not a problem.

7               THE COURT:  Okay.  I don't need it for the whole way

8      through trial; I'm just trying to figure out what tomorrow

9      looks like.

10              All right.  So with that, Ms. Williams, I think we're

11     ready to bring the jury in.

12              They don't relate to instructions, do they?  Did you

13     say they related to documents, those stipulations that you just

14     handed up?

15              MS. TOMEZSKO:  There is one that we asked for a

16     proposed instruction.  Given the introduction of evidence at

17     the beginning of trial, we just ask that the Court provide --

18              (Jury present)

19              THE COURT:  Good afternoon, everybody.

20              You are now a jury.  There is no higher function in

21     our legal system.  Some of this you have -- we're going to be

22     talking more now about instructions.  And because we broke for

23     the lunch break before I got to this part earlier, I gave you a

24     summary of important things to keep in mind in general and also

25     during the lunch break, but I'm going to talk more about that

1    now.

2           From now on, whenever you enter or leave the courtroom

3    as a jury, my deputy, Ms. Williams, will instruct the parties

4    and the audience to rise, the same as she does for me, because

5    you're every bit as important as any judge, and powerful.

6           I'm going to reintroduce you now to some of the people

7    in the courtroom.  As I told you, I will be the judge presiding

8    over the trial.  I'm Jennifer Rearden.  We're in courtroom 12B.

9    If you forget at any point what courtroom we're in or how to

10   get here, just ask the security people downstairs where Judge

11   Rearden's courtroom is and they'll be happy to direct you.

12          I have already introduced you -- although you're free

13   to stand up again, if you like, I've already introduced you to

14   Ms. Rowe, the plaintiff, and her lawyers Ms. Greene, Mr.

15   Chiarello, and Ms. Gelfand.  You have also met the lawyers for

16   Google:  Mr. Gage, Ms. Tomezsko, and Mr. Dabashi.  And as you

17   know, my courtroom deputy well already, that's Ms. Khalilah

18   Williams, she's going to be the person to speak to if you have

19   any difficulties or questions during the trial.

20          As I told you at the outset, in the American system of

21   justice, the judge and jury have separate roles.  My job as the

22   judge is to instruct you as to the law that governs or controls

23   this case.  I'm going to give you some instructions now, and I

24   will give you other instructions during the trial from time to

25   time.  At the end of the trial, I will give you detailed

NAAVROW1

1    instructions about the law that you will need to apply when you

2    deliberate.  For now, I'm going to explain how the trial will

3    proceed.

4            The first step in the trial will be opening

5    statements.  First, the plaintiff's lawyer will make an opening

6    statement.  Then the defendant's lawyer may make an opening

7    statement.  Opening statements are neither evidence nor

8    argument; they are simply outlines to help you understand the

9    evidence that is going to be presented.

10           After opening statements, the plaintiff will present

11   her evidence.  The plaintiff's evidence will consist of the

12   testimony of witnesses, as well as documents and exhibits.  The

13   plaintiff's lawyer will examine the witnesses, and then the

14   defendant's lawyer may cross-examine them.  Following the

15   plaintiff's case, the defendant may present a case.  If it

16   does, the plaintiff's lawyer will have the opportunity to

17   cross-examine any witnesses testifying for the defendant.

18           After the presentation of evidence is completed, the

19   lawyers will deliver their closing arguments to summarize and

20   interpret the evidence.  Just as the lawyers' opening

21   statements are not evidence, their closing arguments are not

22   evidence either.

23           Following closing arguments, I will instruct you on

24   the law that applies to the case.  Then you will retire to

25   deliberate on your verdict, which must be based solely on the

1    evidence presented at trial.  All of you must agree on any

2    verdict.  And while that verdict will obviously be public, your

3    deliberations are secret.

4          Please do not make up your mind about what the verdict

5    should be until you have heard all the evidence.  I have

6    instructed you on the law and you have gone to the jury room

7    and heard the views of all of your fellow jurors.  This is very

8    important because the parties deserve and the law requires that

9    you give them an opportunity to be fully heard.  So please keep

10   an open mind until you sit down to deliberate.

11         In either case, the order in which witnesses are

12   presented to you may be affected by the witness's availability

13   to appear.  So you should not assign any particular weight to

14   any witness's testimony because of when that individual

15   testifies.  You should assess each of the witnesses

16   individually.

17         Also, please be aware that from time to time during

18   the trial, as you have already experienced, it may become

19   necessary for me to talk with the attorneys out of the hearing

20   of the jury, either by having a conference at the bench when

21   the jury is present in the courtroom, as we did earlier today,

22   or by calling a recess.  To reiterate what I stated earlier,

23   please understand that while you are waiting, we are working.

24   The purpose of these conferences is not to keep relevant

25   information from you, but to decide how certain evidence is to

be treated under the rules of evidence and to avoid confusion and error.  Of course, we will do what we can to keep the number and length of these conferences to a minimum.

I may not always grant an attorney's request for a conference.  Do not consider my granting or denying a request for a conference as any indication of my opinion of the case or of what your verdict should be.

Your job as jurors is to determine the facts based on the evidence presented at the trial.  You are the sole and exclusive triers of fact.  You pass upon the weight of the evidence, you determine the credibility of the witnesses, you resolve such conflicts as there may be in testimony, you draw whatever reasonable inferences you decide to draw from the facts as you determine them.  You will then have to apply those facts to the law as the Court will give it to you.  You must follow that law whether you agree with it or not.  Nothing the Court may say or do during the trial is intended to indicate or should be taken by you as indicating what your verdict should be.

You must not take anything that I may say or do during the trial as indicating what your verdict should be.  Don't be influenced by my taking notes.  What I write down or type might have nothing to do with this trial or with those matters that you have to be concerned about.

You are to perform your role as jurors with complete

NAAVROW1

1    fairness and impartiality and without bias, prejudice, or

2    sympathy for or against the plaintiff or the defendant.

3           You must pay close attention to all of the evidence

4    presented.  Evidence consists only of the testimony of

5    witnesses, the exhibits that were received into evidence, as

6    well as any facts that the parties agreed to or stipulate to or

7    that the Court may instruct you to find.

8           Certain things are not in evidence and must not be

9    considered by you.  I will list them for you now:

10          First, statements, arguments, and questions by lawyers

11   are not evidence, nor are my own statements to you evidence.

12   Only the answers given by the witnesses and the documents

13   admitted into evidence are evidence.

14          Second, during the trial, I may sustain objections to

15   questions that are asked.  When that happens, I will not permit

16   a witness to answer; or if the witness has already answered, I

17   will instruct that the answer be stricken from the record and

18   that you disregard it and dismiss it from your minds.  In

19   reaching your decision, you may not draw any inference from an

20   unanswered question, nor may you consider testimony that I have

21   ordered stricken from the record.  You should not show any bias

22   against any attorney or their client because the attorney

23   objected to the admissibility of evidence, asked for a

24   conference outside the hearing of the jury, or asked the Court

25   for a ruling of law.

NAAVROW1

1          Third, testimony that the Court has excluded or told

2    you to disregard is not evidence and must not be considered.

3          Fourth, exhibits marked for identification, but not

4    received into evidence, may not be considered as evidence.

5          Finally, anything you may have seen or heard outside

6    of this courtroom is not evidence and must be disregarded

7    entirely.  You are to decide the case solely on the evidence

8    presented here in the courtroom.

9          I'm now going to talk to you about the two kinds of

10   evidence that may be presented throughout the trial:  Direct

11   and circumstantial.

12         Direct evidence is direct proof of a fact, such as the

13   testimony of an eyewitness.  Circumstantial evidence is proof

14   of facts from which you may infer or conclude that other facts

15   exist.  The word "infer" or the expression "to draw an

16   inference" means to find that a fact exists from proof of

17   another fact.  An inference is to be drawn only if it is

18   logical and reasonable to do so, and not by speculation or

19   guesswork.

20         In deciding whether to draw an inference, you must

21   look at and consider all of the facts in the light of reason,

22   common sense, and experience.  Whether a given inference is or

23   is not to be drawn is entirely a matter for you, the jury, to

24   decide.  Circumstantial evidence does not necessarily prove

25   less than direct evidence, nor does it necessarily prove more.

NAAVROW1

1          Here's an example to help you think about the

2     difference between direct and circumstantial evidence:  Assume

3     that when you came into the courthouse this morning, the sun

4     was shining and it was a nice day outside.  Also assume that

5     the courtroom blinds were drawn and you could not look outside.

6     Assume further that as you were sitting here, someone walked in

7     with an umbrella that was dripping wet; and then, a few moments

8     later, someone else walked in with a raincoat that was also

9     dripping wet.

10          Now, because you could not look outside the courtroom

11     and you could not see whether it was raining, and because no

12     witness had testified that it was raining, you would have no

13     direct evidence of the fact that it was raining.  But on the

14     combination of facts that I have asked you to assume, it would

15     be reasonable and logical for you to conclude that it was

16     raining.

17          That is all there is to circumstantial evidence.  You

18     infer on the basis of reason, experience, and common sense from

19     one established fact the existence or the nonexistence of some

20     other fact.  I will give you further instructions on this, as

21     well as other matters, at the end of the case, but keep in mind

22     that you may consider both kinds of evidence.

23          In deciding the facts of the case, you will have to

24     make decisions concerning the credibility of witnesses, that

25     is, how truthful and believable they are.  Listen carefully as

NAAVROW1

each witness testifies during both direct and cross-examination and consider whether the witness is telling the truth.  It will be up to you to decide which witnesses to believe, which witnesses not to believe, and how much of any witness's testimony to accept or reject.

Now, how do you decide what to believe and what not to believe?  You are to listen to the witnesses, observe their testimony, and then decide as you would decide such questions in your own life.

Did they know what they were talking about?  Were they candid, honest, open, and truthful?  Did they have a reason to falsify, exaggerate, or distort their testimony?

Sometimes it is not what a witness says, but how he or she says it that may give you a clue as to whether or not to accept that witness's version of an incident or an event as credible or believable.  In short, the way a witness testifies may play an important part in your reaching a decision as to whether or not you can accept the witness's testimony as reliable.

You need to use your common sense and life experience in evaluating each witness's testimony.  As the trial proceeds, you may develop impressions of a witness or a particular issue. You must not allow these impressions to become fixed or hardened.  In other words, you should not make up your mind right away.  If you do, in a sense, you prevent yourself from

NAAVROW1

1    considering the testimony of other witnesses or other evidence

2    that may be presented after the witness or witnesses you have

3    heard.  That would be unfair to one side or the other.

4        A case can only be presented step-by-step,

5    witness-by-witness.  We know from experience that frequently

6    one person's initial description of an event might sound

7    impressive and even compelling; but when we hear another

8    person's version of the same event, or even the same witness

9    cross-examined about the event, what seemed to be very

10   compelling and impressive may fall apart or become less

11   convincing.

12       Please remember that there may be another side to any

13   witness's story.  You will use your common sense and good

14   judgment to evaluate each witness's testimony based on all of

15   the circumstances.  You must keep an open mind until the trial

16   is over.  As I stated previously, you should not reach any

17   conclusions until you have all of the evidence before you.

18       It is important to remember that this is a civil case.

19   You may have heard the term "beyond a reasonable doubt" in

20   criminal cases.  That standard does not apply here because this

21   is a civil case and you should put it out of your mind

22   entirely.  The evidentiary standard that is used in civil cases

23   and which we will, therefore, use in this case is the

24   preponderance of the evidence.  Where, as here, the

25   preponderance of the evidence standard applies, the party with

NAAVROW1

1    the burden of proof must produce evidence which, when

2    considered in light of all of the facts, leads you to believe

3    that what that party claims is more likely than not true; that

4    when the evidence is weighed, the scales tip — however slightly

5    — in favor of that party.

6           As the plaintiff in this case, the person who brought

7    the claims, Ms. Rowe, has the burden to prove her claims;

8    however, Google has the burden of proving certain defenses.  I

9    will give you additional instructions concerning burden of

10   proof once all of the evidence has come in.

11          Now, a few words about your conduct as jurors.

12          First, during the trial, you are not to discuss the

13   case with anyone, nor are you to permit anyone to discuss it

14   with you.  This includes any members of your family and your

15   friends.  We've talked about some of this before, but I'm going

16   to go back over it for emphasis.

17          You may tell your family that you are a juror in a

18   case, but don't tell them anything else until after you have

19   been discharged by me.

20          Second, please do not, while you are serving as jurors

21   in this trial, have any conversations with the parties, the

22   attorneys, or any witnesses in this case, whether in the

23   courtroom, in the hallways, in the elevators, outside, or

24   anywhere else.  By this, I mean not only to avoid talking about

25   the case, do not talk at all, even to say good morning or to

NAAVROW1

acknowledge any of these people.  Someone seeing a juror in

conversation with a party, lawyer, or witness, might think that

something improper was being discussed.  To avoid even the

appearance of impropriety, then avoid any such contact or

conversations.  I can tell you that when parties, lawyers, or

witnesses pass you in the halls, as I said earlier, without

even acknowledging your presence, they are not intending to be

rude; they are simply following this instruction.

          In a similar vein, don't let anyone speak to you about

the case.  If you are approached by anyone to speak about it,

politely, but firmly, tell that person that the judge has

directed you not to do so.  If any person should attempt to

communicate with you about this case at any time throughout the

trial, either in or outside of the courthouse, you must

immediately report that to my deputy, Ms. Williams, and no one

else.  When I say report that communication to no one else, I

mean that you should not tell anyone, including your fellow

jurors.

          Furthermore, it is critically important that you not

read, listen to, or watch media reports, television, newspaper,

radio, the internet or any social media sites or apps about

this case.  And the reason for this, of course, is that you

must not be influenced by anything that you may see or hear

outside of this courtroom.  Failing to follow this rule would

constitute a violation of your promise, oath, and

NAAVROW1

1    responsibility to decide this case based solely on the evidence

2    that will be presented in this courtroom.  If you inadvertently

3    come across a news report relating to this case, just

4    immediately stop reading, listening, or watching, and then tell

5    Ms. Williams — again, no one else, just Ms. Williams — about

6    that fact.

7          Similarly, do not do any research or make any

8    investigation about the case or the issues presented by this

9    case.  Do not look for information about the parties or

10    anything else related to the case on the internet or use Google

11    or Yahoo or some other search engine to find information about

12    the parties or the case.  Do not go visit any place you might

13    hear described during the trial.  Do not call up any lawyer

14    friends to ask about the type of matters at issue in the case.

15          Also, I know that many of you use cell phones,

16    smartphones, social media, the internet, and other tools of

17    technology.  You must not use these tools to communicate

18    electronically with anyone about the case.  This includes your

19    family and friends.  You may not communicate with anyone about

20    the case on your cell phone, which includes smartphones through

21    email, text messaging, Twitter, any blog or website, any

22    internet chat room, or by way of any other social networking

23    websites, including Facebook, LinkedIn, and YouTube.

24          If at any point in the trial you recognize someone in

25    the courtroom, including a friend, significant other, relative,

NAAVROW1

1    or acquaintance, please send a note to me through Ms. Williams

2    at your earliest opportunity.

3            Finally, do not form any opinion until all of the

4    evidence is in.  A case can be presented only step-by-step,

5    witness-by-witness, until all the evidence is before you.  Keep

6    an open mind until you start your deliberations at the end of

7    the case.

8            You may take notes during the trial, if you wish.  If

9    you do take notes, be sure that your note-taking does not

10   interfere with listening to and considering all of the

11   evidence.  Your notes are to be used solely to assist you and

12   are not to substitute for your recollection of the evidence in

13   this case.  Any notes that you may take are not evidence.  The

14   fact that a particular juror has taken notes entitles that

15   juror's views to no greater weight than those of any other

16   juror, and your notes are not to be shown to any other juror.

17   If you do take notes, you must leave your notes in the jury

18   room at the end of each day.

19           During the course of the trial, exhibits will be

20   received into evidence.  They will be marked by exhibit number.

21   To expedite the proceedings, the parties agreed in advance on

22   the admissibility of many exhibits.  This means that exhibits

23   may be shown to you at the same time they are shown to

24   witnesses.  You should not presume the witness is familiar with

25   the document presented to her or him or its contents.

NAAVROW1

1          If, during the trial, there is an exhibit that you're

2    particularly interested in seeing, you should feel free to

3    write down that exhibit number and you can ask to see the

4    exhibit once you're in deliberations.  That said, you should

5    know that at the end of the trial, I'm going to give you a list

6    of all of the exhibits that were received in evidence, as well

7    as a list of all of the witnesses who testified.  Therefore,

8    you need not make notes to keep track of things unless you want

9    to.

10          I'm just going to pause here momentarily to check on

11   whether I want to tell you one or two more things before we

12   conclude this portion of the proceeding.

13          Okay.  That concludes my preliminary instructions to

14   you.

15          Now we will begin with the initial stage of the case,

16   which, as I said to you, is opening statements.  And we are

17   going to begin with the plaintiff.  So at this time, I'm going

18   to ask all of you to give your undivided attention to the

19   lawyers as they make their opening statements.

20          We will begin with the plaintiff's opening statement.

21          MR. CHIARELLO:  Thank you, your Honor.

22          Your Honor, may I adjust the podium slightly to

23   address the jury?

24          THE COURT:  Yes, you may.

25          Ms. Williams?

1          THE DEPUTY CLERK:  He should have asked me first.

2     There's wirings that could be pulled.  That's fine.

3          MR. CHIARELLO:  This is as far as I'm going to take

4     it.

5          THE COURT:  Okay.

6          MR. CHIARELLO:  Thank you.  And thank you in advance

7     for your service in this case.

8          Consider with me what it would feel like to have your

9     worth, your value, determined not by your ability or your

10    intellect or your experience, but by the simple fact of being a

11    woman.  This case is about Ulku Rowe, a Google employee who

12    experienced exactly that, who Google paid less than men who

13    were performing the exact same job as her.  Google undervalued

14    Ms. Rowe at her hire in 2017, and paid her a pay grade called a

15    level that was lower than the level given to five men who were

16    hired to do the exact same job, even though she had greater

17    qualifications than some of those men.

18          This case is also about how, in 2018, Google similarly

19    undervalued Ms. Rowe when she applied for a promotion to a role

20    to which Google had said she was the obvious fit; and how,

21    instead, it just tapped a man on the shoulder and gave him that

22    job, even though he was less qualified than Ms. Rowe.

23          This case is also about how Google then retaliated

24    against Ms. Rowe for speaking up about her mistreatment by

25    denying her promotion and advancement opportunities, and by

NAAVROW1                      Opening - Mr. Chiarello

1   ultimately sidelining an employee that Google once said had

2   huge potential within the company.

3          Finally, this case is about holding accountable an

4   industry giant for setting far too low a bar for how women in

5   tech should be treated and paid.

6          And let me give you some of the facts that you're

7   going to hear at this trial that support Ms. Rowe's case.

8          Ms. Rowe came to this country when she was in her 20s

9   and, over the next two decades, built an impressive career in

10  financial services in the technology space.  She's going to

11  tell you all about it.

12         In late 2016, she was a chief technology officer at

13  J.P. Morgan Chase, working on technology solutions at the

14  highest level in the company.  Google knew about Ms. Rowe's

15  work experience; and they recruited her into a role called

16  technical director at Google in something called the Office of

17  the Chief Technology Officer of Google Cloud.

18         At this time, in late 2016, Google was very new to

19  large-scale cloud technology, and was hiring technical

20  directors to work with external customers and internal

21  programmers to develop the Google Cloud market.

22         Let me pause.  I'll give you a definition of some of

23  the terms you're going to hear, because it's a fairly technical

24  company.  Some of it can be a bit confusing.

25         Google Cloud is a subset of Google, the company we all

1    know.  It focuses on developing and offering products companies

2    can access and use over the internet.  Google Cloud has its own

3    CEO.  And below them a CTO, known as a chief technology

4    officer.  And the technical directors I mentioned, including

5    Ms. Rowe, worked in something called the Office of the Chief

6    Technology Officer, O-C-T-O, OCTO.

7              Ms. Rowe's manager in OCTO was a man named Will

8    Grannis.  You'll hear from him in this trial.  Mr. Grannis told

9    Ms. Rowe when she got hired that she would be the obvious

10   choice to lead the financial services vertical once it was

11   created.  "Vertical" here just means a role dedicated to a

12   specific industry, like financial services, healthcare, energy.

13             And this made sense.

14             Ms. Rowe had extensive experience in financial

15   services, in technology, had industry prominence, had lots of

16   industry connections.  I should also note that Google was very

17   interested at this time in trying to break into the financial

18   services market because it's an industry with huge amounts of

19   money, over 600 billion available for spend on something like

20   Google Cloud.  And when Ms. Rowe joined, financial services was

21   the top focus for Cloud.  And as I said, technical director was

22   a new role.

23             And in late 2016/early 2017, over a span of about six

24   or eight months, Google hired eight other technical directors

25   besides Ms. Rowe, so nine in total.

1          The evidence will be indisputable that these nine

2     hires were all hired for the same job.  They were recruited by

3     the same Google recruiter.  They were interviewed using the

4     same interview metrics.  They all reported to the same manager,

5     Will Grannis.  They were all evaluated against the same

6     criteria.  And, of course, you're going to hear how all nine

7     technical directors performed the same work.

8          As you'll hear from the evidence, although they were

9     all doing the same work, they didn't all get the same pay.  And

10    even though they were all doing the same work, they were not

11    given the same level.  You're going to hear how Google

12    intentionally concealed that fact from Ms. Rowe.

13         When she was hired, they told her everyone being hired

14    was going to be a Level 8, including her.  That wasn't true.

15    Of the nine hired, seven of the nine were men, and five of

16    those seven were brought in at Level 9, a level above Ms. Rowe.

17    Ms. Rowe was leveled as Level 8, and the other woman they

18    hired, a woman named Jennifer Bennett, was hired as a Level 7.

19         So why were really all the men hired at Level 9?

20    Google, who should have the answer, can't really say.  They'll

21    try to split hairs about qualifications, they'll try to

22    disparage Ms. Rowe.  But you'll hear Google didn't have any

23    explanation for why it leveled some men as a Level 9 and

24    Ms. Rowe as a Level 8 at that time.  In fact, you're going to

25    hear from Mr. Grannis that at the time he was doing the hiring,

NAAVROW1                    Opening – Mr. Chiarello

1   those first nine technical directors, he wasn't sure what

2   distinguished a Level 8 from a Level 9.

3           Now, these five Level 9 men are important in two ways:

4   We're going to be comparing Ms. Rowe to all five to show that

5   she was discriminated against on the basis of her gender.  One

6   of those five, a man named Nicholas Harteau, is also important

7   for purposes of Ms. Rowe's New York Equal Pay Act claim.  Judge

8   Rearden will instruct you on the differences between those

9   claims.  Part of your job will be to determine whether Google

10  made those leveling decisions legally.

11          Let me give you a little context on Nicholas Harteau,

12  who worked right along Ms. Rowe in New York City.  He'll be

13  here and he'll tell you he didn't see any difference between

14  himself and Ms. Rowe; that he thought all along she was a Level

15  9, just like him.

16          Ms. Rowe also worked extensively with the other Level

17  9 men.  For one, as I mentioned, given her background in

18  financial services, she focused on that as a specific industry.

19  There were some other Level 9 men who focused on specific

20  industries as well.  A man named Evren Eryurek, a Level 9 man,

21  focused on a specific industry, healthcare.  Big industry, not

22  as big as financial services.  Ben Wilson is another Level 9

23  man that you'll hear from.  He also focused on an industry,

24  energy; a large industry, but not as large as financial

25  services.

NAAVROW1                    Opening - Mr. Chiarello

1          You'll hear how these three collaborated to address
2    common issues to all of them in their work.  They often covered
3    for each other in client meetings.  But most importantly, what
4    you're going to hear over and over in this trial is that all
5    technical directors, Mr. Eryurek, Mr. Harteau, Mr. Wilson,
6    Ms. Rowe, were all performing the same job.  They were all
7    hired for the same role; they all had the same job
8    requirements.

9          You're also going to hear evidence that, in fact,
10   Ms. Rowe was more qualified than some of these Level 9 men, and
11   definitely more qualified than the Level 8 men.  For one,
12   Nicholas Harteau, the Level 9 man, didn't have any advanced
13   degrees, had less work experience than Ms. Rowe.  When it comes
14   to comparing Ms. Rowe to the other technical directors, her
15   qualifications are comparable or better as well.

16         You will hear how men who had not previously been
17   chief technology officers, like Ms. Rowe had, were Level 9s.
18   Men who came from smaller organizations than Ms. Rowe had been
19   leveled at Level 9.  Men who had not managed large teams as
20   Ms. Rowe had were Level 9.  Men who had no cloud experience,
21   especially compared to Ms. Rowe, were Level 9.  And men without
22   any particular vertical expertise had been leveled as Level 9.

23         You'll see that Ms. Rowe consistently performed at a
24   very high level, receiving "exceeds expectations" performance
25   ratings in every one of her reviews.  Not all of the other nine

1      men can say that.  Mr. Grannis, her boss, considered Ms. Rowe

2      as someone with -- who had demonstrated rapidly increased

3      potential, potentially L10-plus.  He also decided she should

4      lead a cohort of technical directors focused on specific

5      industries, which would have meant she would have been

6      supervising Level 9 men that included Mr. Eryurek and

7      Mr. Wilson.  And yet, despite her qualifications, despite her

8      deep and specific expertise, Google leveled Ms. Rowe below the

9      men.  It held her to a different standard than it held the men.

10             And here's the thing:  You're not going to hear at

11     this trial that Google had any business need for hiring five

12     men as Level 9s and Ms. Rowe as a Level 8.  You're not going to

13     hear how hiring five men at Level 9 at a different pay scale

14     somehow related to the work OCTO was doing.  Rather, Google

15     didn't tell many of the technical directors what their level

16     was; they found out after they had started working.  How

17     important could it be?

18             Now, to the Level 8s, Google will tell you that they

19     hired many men at Level 8 after they hired Ms. Rowe.  Google's

20     correct, but only because after the initial group of nine that

21     Ms. Rowe was hired with, Google decided that every technical

22     director hired would be hired as a Level 8.  So in terms of

23     hiring level decisions, the Level 8 men after that initial

24     group just aren't comparable to her.

25             I should also point out that Google points to men that

1    it hired after Ms. Rowe, because with one or two exceptions, it

2    only hired men after it hired Ms. Rowe.  And as for the other

3    two Level 8 men hired with Ms. Rowe, you'll see that she was

4    more qualified than them as well.

5            Now, it may go without saying, but Google's illegal

6    leveling decisions had real consequences for Ms. Rowe.  Being a

7    Level 9 man meant being paid more, meant a higher bonus target,

8    meant larger stock awards.  In other words, these Level 9 men

9    were paid more.  It also had greater advancement opportunity.

10   It's much easier to move up to a Level 10 role as a Level 9

11   than it was as a Level 8.

12           Now, Ms. Rowe is a senior executive and, in fact,

13   pretty much everyone you're going to see in this case is a

14   senior executive at Google.  And at those levels, everyone

15   earns a lot of money.

16           Ms. Rowe earns over $750,000 a year.  It's a lot of

17   money.  You're going to hear that the men that we're talking

18   about, these Level 9 men, earned over a million dollars a year

19   for doing the same job she did.

20           I want to give one quick clarification on compensation

21   before we continue.  You're likely to hear Google claim that in

22   2017, Ms. Rowe was the second highest paid technical director.

23   But that's not accurate.  Google gave Ms. Rowe a hiring bonus,

24   some cash, some stock, to compensate for money she had lost

25   leaving her prior job, coming to Google.  And she wasn't the

NAAVROW1                     Opening – Mr. Chiarello

only one.  Most of the technical directors got this.  A lot of
sign-on bonuses among all the technical directors.  So when you
strip that away, when you compare apples to apples, the actual
annual compensation between each of these individuals, between
the Level 9 men and Ms. Rowe, you'll see that they earn much
more than she did.

         So as I mentioned, this is a case about unequal pay.
As you listen to the evidence, think about how similar
Mr. Harteau and Ms. Rowe's work was to each other, whether
Google had any business need to be hiring five men at a Level 9
and Ms. Rowe at a Level 8.  Because this case is also about
gender discrimination.  Think about whether Ms. Rowe's gender
impacted at all the decision to level her as a Level 8 rather
than a Level 9.

         I've given you the background.  Now let me tell you
about how Google's leveling decisions impacted Ms. Rowe
throughout her career until this day.

         You're going to hear how in late 2017, after learning
some of her colleagues had been leveled at Level 9, Ms. Rowe
spoke to human resources.  She wanted to know why that was.
What HR told her was, Sorry, there isn't a process to revisit
your level.  If you want to correct your level, you need to get
a promotion.  But, in fact, there was a process to correct it.
HR didn't trigger that process.

         You'll also see how Ms. Rowe applied for a new role

1    six months later.  She applied for that promotion in June 2018,

2    and Google made sure she didn't get it.

3           Now, in June of 2018, Ms. Rowe's manager changed.  She

4    began reporting to a man named Tariq Shaukat.  You'll hear from

5    him as well.  Mr. Shaukat ran a group parallel to Cloud that

6    was focused on industry verticals.  He knew that Ms. Rowe was a

7    Level 8, and he knew she had raised concerns about her level.

8           When Ms. Rowe joined Mr. Shaukat's organization in

9    June of 2018, she learned he was hiring for a vice president of

10   the financial services vertical, the exact role that

11   Mr. Grannis had told Ms. Rowe about when she was hired and said

12   she would be the perfect candidate.  This was it.  Cloud was

13   finally verticalizing.  Ms. Rowe was the logical candidate.

14   The role would have been an extension of the work she was

15   already doing, putting aside that she was already qualified for

16   the job.

17          In addition, Brian Stevens, Mr. Shaukat's peer and the

18   chief technology officer in OCTO, the CTO, supported Ms. Rowe

19   for the role.  So as a promotion decision, this was a

20   no-brainer.

21          As Ms. Rowe will tell you, there was something very

22   off about working with Mr. Shaukat.  There was something very

23   off about his consideration of her for the vertical lead role.

24          When you get a new manager, you expect to have some

25   communication with that manager, right?  You expect that

NAAVROW1                          Opening – Mr. Chiarello

1   manager to bring you in on the work that they are doing.

2              Now, Mr. Shaukat, Mr. Shaukat acted as if Ms. Rowe

3   wasn't even there.  He barely met with her.  It's a struggle

4   for her to get on his calendar for even a few meetings.  He

5   didn't invite her to larger team meetings, didn't include her

6   on emails, he didn't bring her to meet with customers.

7              (Continued on next page)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1            MR. CHIARELLO:  Now, Google will say Mr. Shaukat

2     didn't meet with any of his reports.  It's not a big deal.

3     That's not true.  There's at least one man that Mr. Shaukat

4     spoke with and met with regularly, a man named Stuart Breslow,

5     another New York-based employee.  Mr. Breslow will tell you he

6     met with Mr. Shaukat weekly.  They had frequent phone calls.

7     He had meals with Mr. Shaukat.  They went out for steak.  At

8     the same time, Mr. Shaukat wouldn't even let Ms. Rowe know when

9     he was coming to New York, let alone stop by and say hello.

10    You'll see that quite dismissively Mr. Shaukat said from the

11    very beginning Ms. Rowe wasn't likely right for the financial

12    services vertical lead role.

13           He didn't know a thing about her.  Even though, when

14    it came to financial services, Ms. Rowe had been the go-to

15    person at Google Cloud for more than a year, he didn't think

16    she was a good fit, but for six months at the end of 2018,

17    Mr. Shaukat strung Ms. Rowe along, telling her she was being

18    considered for the role.  Even though, as you'll see in

19    Google's own documents, as early as September 1, 2018, he had

20    already decided she wouldn't be a finalist for the role.

21           Ms. Rowe's interviews for the vertical lead role were

22    another red flag.  She knew what to expect in the interview

23    process.  She'd interviewed before and she'd been interviewed.

24    They were different.  They were shorter.  There's no real

25    structure or depth to them.  One of her interviewers didn't

1   even know why he was there and asked what's interview about?

2   Why are we here?  And you'll see none of the interviewers

3   submitted their feedback, even though they received constant

4   requests to do so.

5          Now, after months of slow rolling the vertical lead

6   search, Mr. Shaukat said he was pausing after a woman named

7   Diane Greene, the then-CEO of Google Cloud, left.  But he still

8   wanted to fill the role, and he did, but not through the normal

9   hiring process.  He could have put Ms. Rowe in the role.  She

10  had the qualifications.  But as we know, he already decided it

11  wasn't going to her.  He could have put one of the other two

12  female candidates he ostensibly was considering for the role

13  into it, which, by the way, wasn't an accident.  Mr. Shaukat,

14  when he was interviewed by employee relations for this case,

15  admitted that he and his organization and Google Cloud

16  generally had a bit of a problem hiring women.

17         So he had options, but what did he do?  He put

18  Mr. Breslow in the role.  Mr. Breslow, who hadn't even been a

19  candidate for the position, who hadn't been interviewed by

20  anyone, who had not worked with cloud before joining Google

21  Cloud.  He'd only been with Google six months.  He was an

22  attorney.  He had advised on compliance issues when he wasn't

23  litigating before he joined Google.

24         Mr. Breslow knew so little about this space that even

25  though he was supposed to be the go-to person after he became

the vertical lead, people in engineering and sales at Google
still came to Ms. Rowe seeking answers and to be the voice of
the product.  Why?  Because she knew what she was doing.  She
knew what she was talking about.  But she never had steak with
Mr. Shaukat.

        This case is also about retaliation.  You're going to
see that Ms. Rowe slowly began to voice her concerns louder and
louder and that the retaliatory response from Google became
stronger and stronger.  And remember, at the end of 2017,
Ms. Rowe spoke to HR about whether she had been properly
leveled, and they told her there is nothing she could do about
it.  Remember how I told you that during the vertical lead
promotion process Ms. Rowe felt something wasn't right?  She
decided to do something about her situation, and on August 28,
2018, she sent an email to human resources expressing concern
that men had been leveled at Level 9 and she had not.  Why did
she send the email?  She thought this was discrimination.  And
as you'll see, just three days later, September 1, 2018, the
internal recruiter notes for the vertical lead role suddenly
changed to reflect that Ms. Rowe was now not a viable candidate
for the role.

        And of course, no one told Ms. Rowe that.  Everyone
pretended like she was still being considered.  But by
November 2018, Ms. Rowe still didn't have much clarity on
whether the vertical lead role —— what in that process was

1   happening, and she didn't have much clarity about what was

2   happening with her discrimination complaint.

3          So on November 7, Ms. Rowe made another written

4   complaint.  This time she sent it to her manager, Mr. Shaukat.

5   She sent it to the then CEO, Diane Greene.  Then she got a

6   response.  This time, instead of telling her that her level

7   couldn't be changed, Google gave a very different explanation.

8   They told Ms. Rowe that she was a Level 8 because the Level 9

9   men had a greater number of years of experience than her.  That

10  also was not true.  Even Google's own documents, which you'll

11  see, don't support that explanation.  Ms. Rowe, in fact, had a

12  greater number of years of experience than some of the L9 men,

13  including Mr. Harteau.  She had the same years of experience as

14  both her bosses, Mr. Grannis and Mr. Shaukat.

15         You'll see from the data throughout OCTO technical

16  directors had varying numbers of years of experience.  It was

17  just something Google didn't consider, and it's something they

18  admit is not part of their criteria for establishing level.

19  Specifically, you're not going to see any evidence that at the

20  time Ms. Rowe was hired it considered, her years of experience,

21  in determining her level.  So why is Google so focused on

22  numbers of years of experience now?

23         After Ms. Rowe's November 7 email, you're going to see

24  something else interesting that Google did.  So the internal

25  recruiter started asking interviewers for feedback about

NAAHRow2                        Opening - Mr. Chiarello

1    Ms. Rowe's interview, even though the system noted she was a

2    candidate, as in past tense, as in Google was asking for

3    feedback about Ms. Rowe after it had already decided she's not

4    going to get the job.

5              Now I want to talk about this internal recruiter for a

6    minute because he's a key figure in this case.  His name is

7    Stuart Vardaman, different Stuart.  You'll hear from him also.

8    After Ms. Rowe's complaints in August and November 2018, you're

9    going to see he suddenly didn't like her very much.  Shortly

10   after those complaints in January of 2019, he made a note in

11   the HR system that Ms. Rowe had been rejected for the vertical

12   lead role because she lacked Googliness, was overly

13   self-oriented, was not qualified for the role, in addition to

14   ego concerns.

15             What you're also going to see is that back in August,

16   before Ms. Rowe had complained about gender inequitable but she

17   had complained to Mr. Shaukat and the CEO, Mr. Vardaman

18   described Ms. Rowe in very different terms.  He said she had

19   executive poise, that she was confident but not ego-driven, and

20   was forthright with a quick operating cadence.  So what

21   happened to all that positivity?  Before her complaint,

22   Ms. Rowe had executive poise, and after, she lacked Googliness

23   and was suddenly not qualified.  Before her complaint, she was

24   confident but not ego-driven, and after, she was overly

25   self-oriented and had ego concerns.

1          So as you listen to the evidence, I want you to

2     consider whether Ms. Rowe's complaints had any impact on

3     Google's decision not to make her the vertical lead.

4          There's one more chapter in this retaliation story.

5     After Mr. Breslow was made the financial services vertical

6     lead, Mr. Shaukat gave Ms. Rowe an ultimatum which resulted in

7     her moving back to OCTO but without any responsibility for

8     financial services because, remember, that's Mr. Breslow's job

9     now.

10         At this point, it's now 2019.  Ms. Rowe was

11    frustrated.  She's disappointed.  She took the only option that

12    she saw in front of her.  She filed this lawsuit.  That

13    decision didn't come without consequences.  There were

14    consequences that she felt almost immediately.

15         In February of 2020, some five months after she filed

16    this lawsuit, another VP role opened up.  This was a sales VP

17    role specifically for cloud users in financial services.

18    You'll see that the qualifications for this role were very

19    similar to the qualifications for the vertical lead role.

20    You'll see the qualifications for this role were also very

21    similar to the job Ms. Rowe already was performing and had been

22    performing since 2017.

23         Ms. Rowe learned about this sales VP role incidentally

24    while having coffee with the hiring manager, Kirsten Kliphouse

25    in February 2020.  The meeting was short, but the description

1   for the role resonated with Ms. Rowe in her current work, so

2   she immediately expressed interest.

3            Now, the recruiter for this role was Stuart Vardaman,

4   the same Stuart Vardaman that suddenly didn't like Ms. Rowe

5   after she complained about discrimination.  In February 2020,

6   he had an additional reason not to like Ms. Rowe.  He had just

7   a week earlier been interviewed by employee relations in

8   connection with this lawsuit, and you'll see in that interview

9   he was downright hostile about Ms. Rowe.  In that interview he

10  described her as abrasive, cantankerous, bristly — words

11  completely contrary to any description anyone had ever given of

12  Ms. Rowe at any point in her employment.  What you're going to

13  hear is that Mr. Vardaman decided on his own that he would not

14  even consider Ms. Rowe for this role.  Not only did Ms. Rowe

15  not get a fair shot, she didn't get any shot.

16           Google doesn't exactly deny these facts.  Google will

17  tell you instead that the VP sales job went to a woman named

18  Yolande Piazza.  Google claims it doesn't matter if Ms. Rowe

19  wasn't considered; Ms. Piazza would have gotten the job anyway.

20  This argument is a distraction.  First, that Ms. Piazza is a

21  woman really isn't the point here.  The point is that at this

22  point in 2020, after Ms. Rowe had complained, the question is

23  whether — was it retaliation to not even consider her in the

24  first place?

25           But in any case, as it turns out, Ms. Rowe had some

1   very key qualifications that Ms. Piazza did not.  Foremost,

2   Ms. Rowe was familiar with the product.  In addition to her

3   long career leading up to joining Google, she had already been

4   in the role for three years focusing on cloud products for

5   financial institutions, the exact role that they brought in

6   Ms. Piazza for.  Ms. Piazza didn't have cloud experience at

7   all.  Ms. Rowe had worked across multiple financial

8   institutions in her career, knew the industry.  Ms. Piazza had

9   been at one bank her entire career, and it's a critical

10  distinction when we're talking about industry recognition.

11  Ms. Piazza also didn't have any sales experience, the very

12  thing Google claims is key to the role and why Ms. Rowe didn't

13  get the job, wasn't even considered for the job.

14          So the evidence will show it was far from a foregone

15  conclusion that Ms. Piazza would have gotten the job over

16  Ms. Rowe had Ms. Rowe been given a fair shot in the first

17  place.  But of course, Ms. Rowe never gave ─── I'm sorry, of

18  course, Google never gave Ms. Rowe a fair shot.

19          These pieces: Ms. Rowe's underleveling at hire

20  compared to the male technical directors; her underpayment

21  compared to men doing the same work, Mr. Harteau and

22  Mr. Breslow; her treatment as a woman in the leveling process

23  for the financial services vertical lead just generally; and

24  how Google treated Ms. Rowe after she complained of

25  discrimination are what this case is about.  Of course, it is

NAAHRow2                         Opening – Mr. Chiarello

1    about the consequences to Ms. Rowe, the millions of dollars in

2    lost compensation, the stymied career progression while being

3    trapped at Google, and the impact on her personally.

4         Look, you as the jury, you're the ones that get to

5    hear this case and right this wrong.  After you've heard the

6    evidence, after you've heard Judge Rearden's instructions, I

7    trust that you'll return a verdict in Ms. Rowe's favor,

8    awarding her fair and just compensation.

9         Thank you.

10        THE COURT:  Mr. Gage.

11        MR. GAGE:  Thank you, Judge Rearden.

12        Ladies and gentlemen, on behalf of Google and my

13   colleagues, Sara and Andrew and Jean, I really want to thank

14   you for giving of your time to help us decide this case.

15        We have a dispute, Ms. Rowe and Google, and I know you

16   didn't really have a choice.  You have to be here.  I recognize

17   that, but I sincerely appreciate you taking this case

18   seriously.  I sincerely appreciate you taking to heart what

19   Judge Rearden told you earlier about how what I say, what

20   Mr. Chiarello says is not evidence.  I want you to remember

21   that.

22        Now, your time is precious, and so I'm going to be

23   brief.  This case is about three things, and I want you ——

24   because I can't write it on a piece of paper, I want you to

25   look at those screens in front of you and I want you to imagine

NAAHRow2                      Opening - Mr. Chiarello

1    these three things on the screen:  First is equal opportunity,

2    the second one is expectations, and the third is performance.

3    Imagine those on your screen.

4         And here's what I mean by that.  This case is all

5    about equal opportunity.  That's what the antidiscrimination

6    and fair pay laws are all about.  If two people actually

7    perform equal work, they should be paid the same.  We agree

8    with that.  The law, however, does not guarantee equal outcomes

9    just because people share a job title.  It requires equal

10   opportunity.

11        Now, you will hear that in 2016 Google Cloud was a bit

12   behind the competition.  You think of Google as this big, huge

13   behemoth, but in 2016 it was way behind.  There's this other

14   little company you've heard of, Amazon.  Ever heard of Amazon

15   Web Services, AWS?  Amazon was the 800-pound gorilla in the

16   cloud field, and Google was way behind.  And Google's

17   leadership had this idea called OCTO.  You'll hear that acronym

18   a lot.  It's called the Office of the Chief Technology Officer.

19        And Brian Stevens, Mr. Stevens will sit there.  You'll

20   hear from him.  He was the head of product at the time within

21   Google Cloud, and he was the chief technology officer.  He

22   asked Will Grannis, a Level 8 employee, to build it.  And so in

23   that year Will started building OCTO, and in this early phase,

24   Will hired over one dozen, over a dozen of them, smart,

25   talented people, including Ms. Rowe, into this very senior role

1    called technical director.

2              And it was a new position.  I'll agree with

3    Mr. Chiarello about that, not much else, but I agree with him

4    about that.  It was a new position.  And many of these folks,

5    including Ms. Rowe, are still in this senior role.  But while

6    all of them are smart and talented, each of them was unique in

7    what they brought to the table.  And I want you to pay close

8    attention to the evidence, and I want you to think carefully

9    about what Mr. Chiarello promised you, and I want you to wait

10   and see if he presents evidence to support all of the promises

11   he made to you.

12             Now, Mr. Grannis hired some of these technical

13   directors at a level above his own, at Level 9.  And he will

14   sit up there in the witness stand, and he will tell you why.

15   And he does have reasons.  And what you will hear is that

16   gender played no role whatsoever in the process.  You will hear

17   how each of these technical directors, Level 8s and Level 9s

18   had unique qualifications.  I want you to pay close attention

19   to Mr. Harteau and what you hear about his experience and what

20   he brought to the table at Google compared to what Ms. Rowe

21   brought to the table, Mr. Eryurek and some of these other folks

22   that Mr. Chiarello talked about.

23             Now, you will also hear about how each of these

24   technical directors, Level 8s and Level 9s, forged their own

25   paths in OCTO, taking the opportunity that Google gave them to

NAAHRow2                         Opening - Mr. Chiarello

1  do the things that they were best at doing.  And then again I

2  want you to pay close attention to the evidence and see whether

3  or not Mr. Chiarello's promise to you that they were all doing

4  exactly the same thing comes true.

5        Now, the evidence will show that Brian Stevens, Will

6  Grannis, Tariq Shaukat, and others extended opportunities to

7  Ms. Rowe, and they genuinely supported her.  And the evidence

8  will show that all of those opportunities were fair

9  opportunities.  In all cases she was judged solely on her

10  merits and qualifications compared to others who were pursuing

11  the same opportunities and not based on her gender, not based

12  on the fact that she had raised concerns about her level, not

13  based upon the filing of her lawsuit.  That is what the

14  evidence will show.  She was given equal opportunity.

15        Now, what's the second thing I said to visualize on

16  your screen?  Expectations.  Now, this case is about

17  expectations in two ways:  First, some of the evidence you will

18  hear relates to what Ms. Rowe expected of Google.  Now, you may

19  hear that she expected Google to change her level because she

20  disagreed with that decision that was made when she was hired.

21  You will absolutely hear the evidence around that disagreement.

22  She thought she should be an 8, but Will Grannis and others

23  thought she was properly leveled at a 9 based upon her relative

24  — or properly leveled as an 8 properly leveled as an

25  8 relative to the qualifications of others who were Level 9s.

NAAHRow2                         Opening - Mr. Chiarello

1   You may hear that she expected Google to give her two different

2   vice president level jobs, both of which were different from,

3   were not the same job, were different from the job she was

4   doing in OCTO.  And the evidence will show that Google

5   legitimately believed that others were better qualified, that

6   they had more cloud experience, that they had built cloud

7   products.

8          Now, this case is about expectations in a second way

9   too.  You will hear evidence regarding Google's expectations of

10  the technical directors.  Google expected these senior

11  engineers to be self-starters, to initiate action, to lead, and

12  to drive innovation.  And that's one of the really special

13  things about OCTO, and you'll hear that.  You'll hear it from

14  Brian Stevens.  You'll hear from Will Grannis.  OCTO is an

15  engine to drive innovation.  Let's get back to levels in a

16  minute.

17         The evidence will show that, yes, higher level means

18  higher expectations, and that means potentially higher pay.

19  For example, you will hear that an L9 is eligible for a cash

20  bonus of 40 percent, target cash bonus of 40 percent of base

21  pay, and that a Level 8 is eligible for a cash bonus that is

22  30 percent of base pay.  Why is that?  It's because Google

23  holds a Level 9 to higher expectations.  It expects that Level

24  9s will do more, have greater impact, drive more innovation

25  than a Level 8.

1          Now, finally, this case is about performance.  The

2     last thing on the screen is performance.  The evidence will

3     show that Google is a performance-based culture, particularly

4     when it comes to pay.  Ms. Rowe's pay comes in three parts:

5     There's a base salary, a cash bonus, and a stock award.  And

6     the evidence will show that Google each year algorithmically

7     determines each one of these items.  So what they earn in total

8     compensation is a function of how they perform, their

9     performance, against the expectations for the role, what did

10     they do.  People who do more, get paid more.  People who do

11     less, get paid less.

12          And the evidence will show —— you will see this

13     evidence —— that in some years Google did pay some technical

14     directors in OCTO more than it paid Ms. Rowe, but you are also

15     going to see that in some years Google paid Ms. Rowe more than

16     it paid Level 9 technical directors in OCTO.  Why is that?  You

17     will see in the evidence that these differences relate to how

18     each of these people performed.  How they perform against

19     expectations is what drives pay.  And you will see in the

20     evidence that the variation in pay, up and down, in total

21     compensation are because of employee performance and not

22     because of sex.

23          I said your time is precious, and it is.  So now I'm

24     just going to ask you for a favor.  I want you to keep these

25     three things in mind:

1          Equal opportunity.  Was she given equal opportunity?

2          What were Google's expectations of her and the other

3     technical directors?

4          And what was her performance and what was their

5     performance relative to those expectations?

6          And I want you to keep these three things in mind as

7     you consider Ms. Rowe's now seven-year really good career at

8     Google and think carefully about why Google made the various

9     decisions it made about her relative to the qualifications and

10    experience of the people that she was competing with for the

11    two jobs that she sought, what her performance was against

12    expectations relative to the technical directors that she and

13    Mr. Chiarello promised you that she's doing exactly the same

14    work.  I want you to listen carefully to the evidence and see

15    whether all of Mr. Chiarello's promises come true.

16         Now, I said I would be brief, so thank you for your

17    time.

18         THE COURT:  Is the plaintiff ready to call her first

19    witness?

20         MR. CHIARELLO:  We are, your Honor.  We call Ulku

21    Rowe.

22    ULKU ROWE,

23         the plaintiff, called as a witness on her own behalf,

24         having been duly sworn, testified as follows:

25         MR. CHIARELLO:  Your Honor, may I examine?

NAAHRow2                         Rowe - Direct

1          THE COURT:  You may.

2     DIRECT EXAMINATION

3     BY MR. CHIARELLO:

4     Q.  Good afternoon, Ms. Rowe.

5     A.  Good afternoon, Greg.

6     Q.  Ms. Rowe, where are you currently employed?

7     A.  At Google.

8     Q.  What is your profession?

9     A.  I'm a computer engineer/technology executive.  Over the

10    years, I've had a lot of roles and titles, but currently I'm

11    employed at Google as a technical director with the Office of

12    the CTO at Google Cloud.

13    Q.  How many years have you been working in the financial

14    technology space?

15    A.  About 29 years.

16    Q.  And how many years old does that make you?

17    A.  I'm almost 51.

18    Q.  Ms. Rowe, where were you born?

19    A.  I was born in Istanbul, Turkey.

20    Q.  Can you tell us a little bit about your personal

21    background.

22    A.  I was born to a middle class family in Istanbul in a

23    residential neighborhood.  My father worked for a local bank.

24    My mom was a homemaker.  I am the oldest of three kids and the

25    only girl.  I have two brothers.  I lived in Turkey until I

1    finished college.  When —— and then after, I moved to the

2    United States.  I'm married, and I have two sons, one of them

3    in college, the other one in high school.

4    Q.  And, Ms. Rowe, you mentioned college.  Where did you go to

5    college?

6    A.  I went to college in Istanbul.  I went to Bogaziçi

7    University, and I got a bachelor of science degree in computer

8    engineering.

9    Q.  And what year was that?

10   A.  That was 1994.

11   Q.  Where did you go to graduate school?

12   A.  I went to graduate school at the University of Illinois in

13   Champagne Urbana, and I got a master's degree in computer

14   science in 1997.

15   Q.  Was that master's in computer science, did it have any

16   focus attached to it?

17   A.  Yes.  I focused on virtual reality and 3D modeling.

18   Q.  And why did you choose to go to the University of Illinois?

19   A.  The computer science department at the University of

20   Illinois was one of the top five in the country.

21   Q.  Ms. Rowe, how did you pay for graduate school?

22   A.  I was a Fulbright Scholar.

23   Q.  Did you work while you were in graduate school?

24   A.  I did.  I worked as a research assistant at the National

25   Center for Supercomputing Applications.

NAAHRow2                        Rowe - Direct

1   Q.  And had you worked at all prior to graduate school?

2   A.  Yeah.  For a year, after finishing my bachelor's and before

3   starting my master's, I worked for a local bank in Turkey in

4   their information technology department.

5   Q.  I'm going to talk a little about your work history after

6   graduate school and before you joined Google.

7           What was your first job after graduate school?

8   A.  I worked for a company at the time was called Swiss Bank

9   Corporation.  Today it's known as UBS.

10  Q.  What is the business of UBS?

11  A.  UBS is an international financial services institution.

12  They provide services in retail banking, in corporate and

13  investment banking, as well as wealth management to

14  individuals, governments, and corporations.

15  Q.  How long were you employed at UBS?

16  A.  I was there for 12 years.

17  Q.  Between which years would that have been?

18  A.  That was — sorry, that was 1997 to 2009.

19  Q.  Can you summarize for us briefly what your career was at

20  UBS.

21  A.  I started as a junior programmer.  I was building

22  mathematical models for quantitative trading.  I got a series

23  of promotions up to executive director level through the time I

24  worked there.  By the time I left UBS, I was managing a team of

25  about 100 people, building trading platforms for mortgage

NAAHRow2                      Rowe – Direct

1   products.

2   Q.  And you said your last role was executive director.  Was

3   that a leadership position?

4   A.  Yes.  I ran a team of more than 100 people there.

5   Q.  During the time you were at UBS, did you have any other

6   accomplishments?

7   A.  I did, biggest accomplishments in life.  I had my two kids

8   there.

9   Q.  OK.  Where were you employed next after UBS?

10  A.  I worked for Bank of America.

11  Q.  And what were you doing at Bank of America?

12  A.  At Bank of America, I was a managing director and I was

13  head of market risk systems.

14  Q.  How did you come to be employed at Bank of America?

15  A.  Bank of America recruited me.  This was in 2009.  As you

16  may recall, we had the largest financial crisis in 2008.  This

17  was after 2008, and Bank of America had suffered some major

18  losses.  And they had also acquired a couple of pretty troubled

19  institutions, like Countrywide and Merrill Lynch.  So in the

20  new world after the crisis, they needed someone to come in and

21  build for them the next generation of market risk platforms.

22  So they needed someone to come and help them do that.

23  Q.  Was Bank of America aware of the work you had done at UBS?

24  A.  Yes.  I mean, that was specifically why they were looking

25  for me, because of my experience in the various financial

1  instruments and the risk management of them.

2  Q.  When did you join Bank of America?

3  A.  That was 2009.

4  Q.  Just remind us what your title was.

5  A.  I was a managing director.

6  Q.  Was that an executive role?

7  A.  Yes, absolutely.

8  Q.  Was there a corporate title at Bank of America beyond

9  managing director?

10  A.  No, after that is the C-suite.  It's the last highest level

11  in the corporate hierarchy.

12  Q.  You talked a little bit about why you were hired.  Can you

13  summarize your career at Bank of America.

14  A.  I was responsible from the global technology platforms for

15  managing the firm's market risk across all of its products and

16  geographies and business units.  Bank of America had about

17  $2.5 trillion on their assets, so the systems that I ran was

18  doing market risk management for that portfolio.  I worked very

19  closely with the senior leadership at Bank of America to build

20  for them the next generation of market risk systems for them.

21  Q.  And when you say "senior leadership," who are you talking

22  about?

23  A.  The C-suite, and I was working pretty closely with the

24  chief risk officers, the chief operating officers, the chief

25  financial officers, and others in that — in the same

NAAHRow2                      Rowe - Direct

1   seniority.

2   Q.  How long were you at Bank of America?

3   A.  I was there for three years.

4   Q.  Between which years was that approximately?

5   A.  That was 2009 to 2012.

6   Q.  Where were you employed next?

7   A.  JPMorgan Chase.

8   Q.  What role were you hired into at JPMorgan Chase?

9   A.  I was hired as the global head and CTO of credit risk

10  systems.

11  Q.  When you say "CTO," that's the acronym for chief technology

12  officer?

13  A.  Yes.

14  Q.  How was it you came to be employed at JPMorgan?

15  A.  Very similar to Bank of America.  They recruited me away,

16  and they had a very specific problem that they needed my help

17  with.  This was now 2012, and JPMorgan had just suffered some

18  major credit losses to the tune of about $2 billion.  This

19  incident was known as the London Whale, and they needed someone

20  to come in and help build the next generation of credit risk

21  systems so that they wouldn't have similar issues going forward

22  in the future.

23  Q.  You mentioned whale.  How big is JPMorgan Chase?

24  A.  JPMorgan Chase is the largest financial institution in the

25  world outside of China.  They have about $3.7 trillion of

NAAHRow2                        Rowe – Direct

1    assets under management.  They have about 250,000 employees.

2    Of these 250,000, about 50,000 of them work in technology, and

3    in my team alone, I had about 1,000 direct and indirect reports

4    in my team.

5    Q.  Now, Ms. Rowe, what were your functions as the managing

6    director and chief technology officer of credit risk at

7    JPMorgan?

8    A.  I had direct responsibility for the entire stack of

9    technology that we used for managing the firm's credit risk,

10   and that meant I had ownership over everything from strategy to

11   design to actually overseeing the team that builds the products

12   and the technology systems to day-to-day management and

13   administration of those systems and the people.

14   Q.  Sort of the role you described, is it the only thing you

15   did at JPMorgan?

16   A.  I did a lot of things at JPMorgan.  So I did build for them

17   the next generation of technology platforms.  I was also

18   responsible from regulatory compliance for all the geographies

19   that JPMorgan operated in for our credit risk systems.  That

20   was more than 50 countries, but we had to comply with, you

21   know, local and regional regulations.  I also managed a very

22   large team.  And similar to Bank of America, I worked very

23   closely with senior leadership there, with the C-suite while I

24   was doing all of this.

25   Q.  OK.  So the last piece you mentioned, the C-suite, who are

NAAHRow2                         Rowe - Direct

1    we talking about?

2    A.  Chief risk officers, the chief financial officer, chief

3    data officer, and many others like that.

4    Q.  Did your job at JPMorgan Chase entail any public speaking?

5    A.  Yes.  I worked —— I spoke frequently at industry events in

6    financial services and financial services technology events,

7    events like the Global Association of Risk Professionals, the

8    GARP events, the *Risk* magazine events.  I was also a pretty

9    regular speaker at JPMorgan's own events.  You know, these are

10   like recruiting events, leadership events, our external

11   customer events.  And, finally, when I was at JPMorgan, I was

12   the co-lead of women in technology, so I spoke quite frequently

13   on those issues.

14   Q.  Ms. Rowe, was your job based solely in the U.S.?

15   A.  No, it's a global —— it's a global role both in terms of

16   the businesses I supported and also the team that I managed.

17   Q.  And had you worked outside the U.S. in any of the other

18   roles that you had prior to JPMorgan?

19   A.  Yes.  When I was at UBS, I worked in London for three

20   years.

21   Q.  Now, in total, how long were you employed at JPMorgan

22   Chase?

23   A.  About five years.

24   Q.  Sort of between which years was that?

25   A.  That was 2012 to 2017.

NAAHRow2                        Rowe - Direct

1   Q.   Is it correct that your next job was at Google?

2   A.   Yes.

3   Q.   When were you hired by Google?

4   A.   I was hired at the end of 2016, December of 2016.

5   Q.   What was the position that Google hired you for in late

6   2016?

7   A.   That was technical director in the office of the CTO at

8   Google Cloud.

9   Q.   Was that a new position at the time?

10  A.   Yes, they were building a new team.

11  Q.   Who was the CTO of Google Cloud at that time?

12  A.   It was Brian Stevens.

13  Q.   And I think we've mentioned it between Mr. Gage a few

14  times, but is there a shorthand for the office of chief

15  technology officer that Google used?

16  A.   Yes.  We called it OCTO.

17  Q.   Before we talk more about your work, we said cloud a few

18  times.  What is cloud as we talk about it in relation to your

19  work at Google?

20  A.   So it used to be that if you were a company, regardless of

21  your size, if you're using technology, you had to buy and build

22  that technology in house, you know.  So you really had to buy

23  things like data centers and networking equipment and databases

24  and, you know, reporting tools on top of that.  So you had to

25  kind of have everything on prem.  We call it "on prem";

1    meaning, you're running and maintaining and buying all of

2    these.

3           With the cloud, cloud service providers like Amazon

4    Web Services, Microsoft Azure, and Google Cloud, the cloud

5    service providers now provide those services over the internet.

6    So you kind of just go use however much technology that you

7    need and just pay for as much as you use over the Internet.

8           And if I were to make an analogy, it's kind of like

9    the Industrial Revolution.  It used to be that factories, you

10   know, to power their factories, they used to have power

11   generators in house.  These were like steam engines that were

12   coal operated.  They used to produce electricity to, like, run

13   the factories.  Then what happened was the central power grids

14   came along, and they started producing electricity centrally.

15   So the factories no longer had to run their own setup, but they

16   could just connect to the power grid to get their electricity.

17   So cloud's kind of doing that with technology today just like

18   the power grids did that with electricity in the past.

19   Q.  So when we're talking about cloud, this is not the cloud

20   like I store my photos on on my phone and stuff like that?

21   A.  No.  When we talk about the cloud for the enterprise, it's

22   a lot more complex and expansive.

23   Q.  You used the term "enterprise."  Can you just define that

24   for us.

25   A.  "Enterprise" means just companies that have great size,

NAAHRow2                          Rowe - Direct

1    scale, complexity.  Kind of like JPMorgan Chase.

2    Q.  How long has the cloud been around?

3    A.  Cloud is relatively new in the technical advancements.  The

4    public cloud really started when AWS, Amazon Web Services,

5    started offering their services in 2006.  The enterprise

6    adoption, you know, started happening later in the 2010s, in

7    that time.  When I was at JPMorgan, really the only credible

8    cloud provider in financial services was AWS.  Google Cloud

9    came, you know, much later.

10   Q.  So it's fair to say that when Google got into the cloud, as

11   we're talking about in this enterprise level, it was fairly

12   late in the game?

13   A.  Yes.

14   Q.  Now, as of late 2016 when you were hired at Google, how

15   much technology and financial services experience did you have

16   at that point?

17   A.  So that was about 23 years — 23 years.

18   Q.  And at that time how much familiarity with the cloud did

19   you have?

20   A.  A fair amount.

21   Q.  What experience did you have with cloud before you joined

22   Google?

23   A.  Cloud is a pretty transformative technology in terms of

24   technical advancement, so I've been following it pretty closely

25   ever since it showed up in the horizon.  When I came into

NAAHRow2                        Rowe - Direct

1   JPMorgan, the enterprise adoption was beginning to happen in

2   certain industries, so we started looking at it more seriously.

3   But a technical change of this size requires a lot of planning,

4   requires due diligence and understanding.  And so, you know, we

5   spent a lot of time doing that.  And at JPMorgan I was also

6   sitting at JPMorgan's cloud strategy council.  This is a

7   council that looks at how should we think about using the

8   cloud, you know, how should we go about migrating our own

9   systems to it.

10              At JPMorgan I was also advising JPMorgan's COO, the

11  chief operating officer, the number two person after Jamie

12  Dimon, JPMorgan's CEO, on the cloud.  And I was also working on

13  migrating our own systems into the cloud, you know, the credit

14  risk systems that I was responsible for.

15  Q.  So of the time you joined Google, how many years of

16  experience would you say that you had with the cloud?

17  A.  So a few years I think leading up to 2015, and then the

18  actual hands-on experience migrating the systems after that.

19  Q.  Let's go back to your hiring for a minute.  When you were

20  recruited for the technical director role, did you interview

21  for that position?

22  A.  Yes.

23  Q.  Who did you interview with?

24  A.  Will Grannis and Brian Stevens and a few others.

25  Q.  Remind us who Brian Stevens is.

NAAHRow2                         Rowe - Direct

1    A.   Brian was the CTO of Google Cloud.

2    Q.   And who is Will Grannis?

3    A.   Will Grannis was the hiring manager and also my first boss.

4    And Will reported to Brian.

5    Q.   Do you remember what was discussed in your interviews?

6    A.   Yeah.  We talked about my experience building these large,

7    you know, complex IT platforms in financial services.  We

8    talked about my experience working with business customers and

9    clients and understanding their needs and how to translate into

10   technology that satisfies those needs.  And we also talked

11   about the applicability of cloud for financial services.

12   Q.   Now, at the end of 2016 when you interviewed with Google,

13   were you qualified to be a technical director?

14            MS. TOMEZSKO:  Objection.

15            THE COURT:  Sustained.

16   Q.   Ms. Rowe, in your view at the time that you were hired at

17   Google, were you qualified for that position?

18   A.   Yes.

19   Q.   And what did you understand your qualifications were for

20   the job?

21   A.   We talked about my cloud experience, but in addition, at

22   this point now I was a CTO at JPMorgan Chase, one of the

23   largest financial institutions in the world.  I had 23 years of

24   hands-on technical experience building these large global

25   systems.  And, you know, with cloud experience, that was

NAAHRow2                    Rowe - Direct

1    probably more than anyone else in the financial services at

2    that point.  And I had experience managing very large teams.

3    You know, my team was about 1,000 people, direct and indirect.

4    I had a lot of experience engaging the C-suites, and I also at

5    this point was well-known as a very credible industry leader in

6    financial services technology.

7              THE COURT:  Mr. Chiarello, excuse me, I just want to

8    note that I do intend to release the jury promptly at 5:00.  It

9    is now 4:47, and I'm going to need about five minutes with them

10   before they leave the room just to provide some final

11   instructions for the day.  Just wanted to give you a heads-up.

12             MR. CHIARELLO:  I appreciate that, your Honor.  I was

13   momentarily going to do a time check with my colleagues anyway.

14   I think I have a few more questions, and then we can break.

15             THE COURT:  That's fine.  Thank you.

16             MR. CHIARELLO:  Thank you, your Honor.

17   BY MR. CHIARELLO:

18   Q.  Ms. Rowe, did you have any expectations upon your hire

19   regarding your advancement at Google?

20   A.  I did.  Based on conversations with Will and Brian, when we

21   were talking about the role, one of the things they said was,

22   you know, they were building this new team of very senior

23   hires.  We're all going to be on the same team, but when and if

24   Google Cloud does verticalize, I would be the obvious person to

25   lead that vertical.

NAAHRow2                          Rowe - Direct

1   Q.  When we talk about a vertical, what is does a vertical or

2   verticalization means in this context?

3   A.  Vertical means an industry.  So it means having —— building

4   a team for that team focusing on that industry with the

5   resources, with the remit to set strategy.  So just addressing

6   that industry as a whole.

7   Q.  At the time you were hired at Google was there a financial

8   services vertical lead?

9   A.  No.

10          MR. CHIARELLO:  We can stop here, your Honor, if

11  that's OK.

12          THE COURT:  Absolutely.

13          (Witness excused)

14          THE COURT:  All right.  Members of the jury, as a

15  reminder, please do not discuss this case with one another or

16  with anyone else.  Do not communicate about the case in person,

17  by email, by Twitter, by Facebook, by any means.  And keep an

18  open mind until you have heard all the evidence in this case.

19          Tomorrow we will begin with testimony at 9:30 a.m.  In

20  order to ensure that this trial runs as smoothly and

21  efficiently as possible, something that will benefit all of you

22  as well as the parties, it is crucial that we begin on time,

23  and we cannot start until all of you are here.  To ensure that

24  we start on time, I'm going to ask you to arrive no later than

25  9:15, and ideally even earlier.  As I mentioned, I have

NAAHRow2                         Rowe - Direct

1    arranged for breakfast, and that will be available to you

2    certainly by 8 a.m. and possibly a bit before then.

3           Given the short lunch break that we're going to be

4    taking and the fact that you won't be able to go out for food

5    in that amount of time, you may want to bring a snack or a

6    light lunch with you.  You should also use the bathroom right

7    before the proceedings begin so that we can go straight through

8    without the need to take restroom breaks.

9           If you develop any COVID-19 symptoms overnight or, for

10   that matter, during the trial, I want you to let us know

11   immediately so that we can take appropriate action and keep

12   everybody safe.  In the unlikely event that you are running

13   late in the morning, please let us know so that we can plan

14   accordingly.  You should let Ms. Williams know.

15          But to reiterate, please do not arrive late.  I need

16   all of you here to start.  We can't start until you're all here

17   and seated, and I want to begin on time so that we can make the

18   most of your time.

19          Also, just a reminder to have your juror card handy as

20   you enter the courthouse and show it to the security officers

21   downstairs.  While you will still have to go through security

22   in the mornings, the card will allow you to go to the front of

23   the line and get you in more quickly.

24          And with that, I wish you a good rest of the day and

25   evening.  We'll see you tomorrow.

NAAHRow2                        Rowe - Direct

1          (Jurors excused)

2          THE COURT:  You may be seated.

3          I have a couple of matters I wanted to close the loop

4    on with you before the end of the day.  Did anyone have

5    anything to raise with me?  No.

6          OK.  Going back to Plaintiff's 76, Ms. Tomezsko, I

7    just want to confirm you told me that Google's objection on

8    authentication grounds is withdrawn, is that correct?  I

9    understand there are other grounds for objecting, but the

10   authentication concern has been withdrawn, is that right?

11         MS. TOMEZSKO:  I think that's fair to say, and the

12   other objections stand.

13         THE COURT:  So Google's objection to the press release

14   that's at page 752 is overruled to the following extent.  It

15   may be used to establish information about Ms. Rowe that was

16   publicly available at the time the article was published and

17   only to that extent.  It may not be used for the truth of the

18   matters asserted.

19         Now, in terms of Mr. Vardaman, Ms. Greene and

20   Mr. Chiarello, you expect him to be on tomorrow, correct?

21         MS. GREENE:  Your Honor, I think we are running a bit

22   behind our anticipated, but, yes, that is still the

23   expectation, that he will be testifying tomorrow.

24         THE COURT:  So we can deal with that issue now.  You

25   should use the 45 minutes with him and go beyond that if you

NAAHRow2                        Rowe - Direct

1  wish, and then at the end of the day, if you want to take it up

2  with me and argue that you should be permitted additional time,

3  by however much you went over with Mr. Vardaman, then you're

4  free to do that.

5           He was deposed, is that what you said, correct?  How

6  long was he deposed?

7           MS. GREENE:  He was deposed for a full day, your

8  Honor.

9           THE COURT:  So there shouldn't be surprises with him,

10  but I like to handle it that way.

11           All right.  Hearing nothing further —— yes.

12           MR. GAGE:  Your Honor, may I presume that if they get

13  additional time, Google will get the same amount of additional

14  time on our 12 hours that you've allocated?

15           THE COURT:  Yes.

16           MR. GAGE:  I thought it was a safe presumption, but

17  thought I should ask.

18           THE COURT:  Yes, yes, yes.

19           All right.  Yes.

20           MS. GREENE:  Your Honor ——

21           MR. GAGE:  I was just going to say, your Honor, you

22  asked who's coming tomorrow.  It's my understanding that

23  following plaintiff we will have Mr. Shaukat and then

24  Mr. Breslow followed by Mr. Vardaman.  That's the order that

25  counsel has shared with us, and we will have people here.

NAAHRow2                        Rowe - Direct

1          THE COURT:  Ms. Greene, I see you have —— before you

2    go on, Ms. Rowe, how much —— how long do you expect Ms. Rowe to

3    —— how much longer do you expect her to testify, Mr. Chiarello?

4          MR. CHIARELLO:  I would say in the neighborhood of two

5    to two and a half hours.

6          THE COURT:  All right.  Ms. Greene.

7          MS. GREENE:  Yes, your Honor.  One of the documents

8    that is at issue and that is intended to be used across the

9    case is P-108, and that is the internal notes from Google's ER

10   investigation into this matter.  We do expect that that

11   document will be used tomorrow, and if helpful to your Honor,

12   we're prepared to this evening submit a letter outlining our

13   support or basis for believing that that document should be

14   offered into evidence.

15         THE COURT:  That would be helpful.  By what time can

16   you get it in, because I want Google to have an opportunity to

17   respond?

18         MS. GREENE:  I would expect by 8:00 or 8:30.

19         THE COURT:  And Mr. Gage, by when can you submit your

20   response?  You can send it to me early in the morning, if you

21   like.

22         MR. GAGE:  That would be appreciated, your Honor.

23         THE COURT:  Can you send it —— I do want to have time

24   to reflect on the arguments, though.  Can you send it, like, by

25   —— yes.

NAAHRow2                        Rowe - Direct

1          MS. GREENE:  Your Honor, this is an objection that

2     defendant raised, so they should know the basis of their

3     objection.  It may be preferable to do a joint letter to the

4     Court with each side outlining their positions.  It is

5     defendant's objection.  So that may be a way to expedite things

6     and get it before your Honor.

7          THE COURT:  That sounds good to me, but — yes,

8     Mr. Gage.

9          MR. GAGE:  I was just going to suggest that we argue

10    it before your Honor at 9 o'clock tomorrow morning.

11         THE COURT:  It sounds like — how long is this

12    exhibit?

13         MS. GREENE:  I believe it's about 17 pages, I want to

14    say.

15         THE COURT:  And everything within the 17 pages, it's

16    all of the same nature and it's all subject to the same

17    objection, is that right?

18         MS. TOMEZSKO:  Yes, your Honor.

19         THE COURT:  Why don't we argue it at 8:45 tomorrow

20    morning so that I have a chance before the jury comes in to

21    think about it.

22         MR. GAGE:  Thank you, your Honor.  I think we've

23    killed enough digital trees in this case so far.

24         THE COURT:  All right.  Is anyone else going to stand

25    up again?  No.

NAAHRow2                        Rowe - Direct

1              MR. GAGE:  Not until you do, Judge.

2              THE COURT:  All right.  Hearing nothing further, we

3    are adjourned for today.  Thank you all.

4              (Adjourned to October 10, 2023, at 8:45 a.m.)

INDEX OF EXAMINATION

Examination  of:                              Page

ULKU ROWE

Direct By Mr. Chiarello  . . . . . . . . . . .65