NABHRow1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------x

ULKU ROWE,

              Plaintiff,

        v.                            19 Civ. 8655 (JHR)

GOOGLE LLC,

              Defendant.            Trial

------------------------------x

                                New York, N.Y.
                                October 11, 2023
                                8:45 a.m.

Before:

                  HON. JENNIFER H. REARDEN,

                                District Judge
                                -and a jury-

                      APPEARANCES

OUTTEN & GOLDEN, LLP
     Attorneys for Plaintiff
BY:  CARA E. GREENE
     GREGORY S. CHIARELLO
     SHIRA Z. GELFAND

PAUL HASTINGS LLP
     Attorneys for Defendant
BY:  KENNETH W. GAGE
     SARA B. TOMEZSKO

Also Present:  Vincent Yang, Paralegal (Outten & Golden)
              Andrew Velazquez, Google Rep.
              Jean Gutierrez, Paralegal (Paul Hastings)

NABHRow1

1              (Trial resumed; jury not present)

2              THE COURT:  Good morning, all.  Please be seated.

3         We are here to talk about P-108.  I have a few

4    questions, Ms. Greene or —— go ahead, Mr. Gage.

5              MR. GAGE:  Sure.  I thought you said you had some

6    questions.

7              THE COURT:  Yes, I do.  Why don't you go ahead and

8    tell me what you want to tell me.

9              MR. GAGE:  OK.  So P-108, your Honor, are notes that

10   were taken by a note-taker during interviews that were

11   conducted by employee relations.  They're not a transcript.

12   They were not intended to be a transcript.  It's not sworn

13   testimony, and we believe that plaintiff's counsel wants to use

14   that as if it were a transcript to cross-examine witnesses.

15   It's hearsay.  They are clearly trying to offer it for the

16   truth of the matter asserted.  There are other witnesses who

17   were present, other witnesses who will testify at trial,

18   Ms. Beaupain —— Ms. Tessier, I'm sorry, who was there, but she

19   didn't write the notes, and she can certainly testify as to

20   what was said in that interview.

21             THE COURT:  All of the interviewees are testifying,

22   are they not, Grannis, Shaukat, Lawrence, Lucas, and Rowe?

23             MR. GAGE:  Yes, I believe so.  I'm just trying to

24   remember if there's somebody in the notes who isn't testifying,

25   but I believe that's true.  Again, plaintiff's counsel

NABHRow1

1    apparently wants to use this like it was a deposition

2    transcript, and it's not sworn testimony.  It's clearly

3    hearsay, and it's being offered for the truth of the matter

4    asserted.  And it shouldn't be allowed into evidence.

5         THE COURT:  What about — well, Ms. Rowe is offering

6    it, so her own statements wouldn't be the statement of a party

7    opponent.  But what about the rest of the notes?

8         MR. GAGE:  They're not statements, your Honor.

9    They're not statements.  Those witnesses did not write these,

10   and they will — they will testify as to their recollection of

11   what they said in these interviews.  Remember, your Honor, it's

12   also — frankly, it's multiple levels of hearsay because the

13   object would be the events that occurred prior to the

14   interview, the financial services vertical lead search, the

15   leveling decision, all of those things which occurred in the

16   past, and people were being asked about it during the ER

17   interview.

18        So it's double levels of hearsay because, again,

19   plaintiff's counsel is trying to use these like a transcript,

20   and it's not a statement of the witnesses who will testify.

21   They didn't write them, and they have their own recollection of

22   what they said in the interview.  But what's really at issue

23   for the jury is not what was said in the interview, it was what

24   happened and the reasons for the leveling decision and the

25   reasons why she didn't get the financial services vertical lead

NABHRow1

1    role, etc.  So there's multiple levels of hearsay, and it

2    doesn't fall into any exceptions.

3              THE COURT:  Do you know if these notes were taken

4    contemporaneously with the interviews or if they were drafted

5    afterwards?

6              MR. GAGE:  I believe the witness who will testify, as

7    she was present, will testify that the notes —— the note-taker

8    was taking notes during the interview.  I can't say —— I don't

9    know if they were necessarily completed then or not.  They

10   certainly were being taken at the time.

11             THE COURT:  All right.  Thank you.

12             Mr. Chiarello or Ms. Greene.

13             MS. GREENE:  Yes, your Honor.

14             THE COURT:  What are you hoping to show with these

15   notes?

16             MS. GREENE:  Your Honor, there are multiple important

17   things, including statements that were made by the adverse

18   witnesses as to why they did certain things.  There's —— just

19   to speak first to the general hearsay argument, this is clearly

20   a business record, and the case law is well-settled in the

21   Second Circuit that investigative notes qualify as business

22   records.

23             THE COURT:  Do you have a cite?

24             MS. GREENE:  I have several sites, your Honor, but I

25   would start by pointing to Google's own policy on harassment,

NABHRow1

1    discrimination, and retaliation.  And this is Plaintiff's

2    Exhibit 99.  On the third page of that document when they

3    discuss how a concern is handled, it says:

4         "We'll also gather information about the issue.  To do

5    that, we'll need to talk with you.  During the meeting, there

6    generally will be two members of the investigations team in the

7    room.  One person will be taking notes.  It's important that

8    you be open and honest in your responses to questions.  The

9    investigations teams are committed to being respectful,

10   impartial, and professional during the meeting."

11        So Google has established that as part of its business

12   practice, to take investigative notes.  Further, and looking at

13   the case law that your Honor requested, I would direct your

14   Honor's attention first to *Accely v. Consolidated Edison.*  The

15   case cite for that —— and we can pass this case up to your

16   Honor after —— is 2023 WL 3045795, April 20, 2023, here in the

17   S.D.N.Y., and this is a decision by Justice Denny Chin who was

18   sitting in the district courts.

19        THE COURT:  What is your take on that case?

20        MS. GREENE:  On pages 5 and 6, he said that, broadly

21   speaking, the question is whether the report satisfies an

22   exclusion, and then further on says that the —— there's settled

23   law in this circuit —— and, I'm sorry, I'm looking for the

24   exact cite.  Subject to the applicable Federal Rules of

25   Evidence, courts have routinely admitted the reports of human

NABHRow1

1    resources investigations ——

2              THE COURT:  This is not a report.  These are notes.

3              MS. GREENE:  Well, this is part of the report, your

4    Honor.  This is one piece of the broader report, which is the

5    investigative notes, and there are other pieces that speak

6    specifically to investigative notes themselves.

7              THE COURT:  OK.  What are those cases?

8              MS. GREENE:  So this is a Fifth Circuit case, your

9    Honor, 260 F.App'x 634, *Brauninger v. Motes*.  In this case,

10   they're talking about the reports containing statements by

11   employees to Williamson and Ellison during the course of the

12   interviews.  The district court correctly found that those

13   statements are not hearsay.  There's a few reasons.  One is the

14   business record exception.  The second is that they're not

15   being —— well, and for that reason they're reliable, the notes

16   that were taken.

17             But they're also not being offered for the truth of

18   the matter asserted.  They're being offered as statements as to

19   what individuals claimed or stated were their reasons for doing

20   certain things.  To that extent, witnesses who made that

21   statement would be party admissions as well, but it's also for

22   the effect on the listener.  They came back, the investigation

23   came back, there was no conclusion of discrimination that was

24   shared with Ms. Rowe.  So those statements that were made

25   contribute to the conclusion of the investigator.

NABHRow1

1          So, again, there are multiple reasons that speak to

2     the reliability of the case.  There are multiple reasons as to

3     why it doesn't constitute hearsay, either on a first or second

4     level.

5          THE COURT:  How can we be sure that the interview

6     notes reflect the witness' own words as opposed to the

7     note-taker's characterizations?

8          MS. GREENE:  Well, they can be asked about that,

9     right?

10          THE COURT:  They could just be asked period, right?

11     Why do we have to — these people are going to be on the stand.

12          MS. GREENE:  Your Honor, this is extremely probative

13     to this case, and denying this sort of record where it is a

14     contemporaneous record made by Google itself as to comments

15     that Google employees made to investigators is a critical piece

16     of evidence in this case and would be highly prejudicial to

17     plaintiff if it were excluded.

18          THE COURT:  Well, the witnesses — you have cited to

19     me an unreported Fifth Circuit case as, it sounds like, your

20     lead authority for your position.

21          MS. GREENE:  There's *Accely* that also speaks — that's

22     the district court, New York district court, case — as to the

23     circumstances of the report and that it was a thorough

24     investigation with interviews of nearly 20 employees and a

25     contemporaneous documentation of those interviews in written

NABHRow1

1    and typed notes.  That was the report, it was those written and

2    typed notes.  Judge Chin looked at both the issue of statements

3    in there that were not being offered for the truth of the

4    matter asserted, but rather, what statements were made by

5    witnesses at that time as to their motivation, as to their

6    understanding, also for the effect on the listener as to what

7    steps they took or what conclusions they made following those

8    interviews.  So I think the *Accely* case, that's this year, is

9    directly on point as to these issues.  And again, we're

10   prepared to hand this case up to the Court.

11            THE COURT:  OK.  I'll take the case.

12            Mr. Gage, I have a few more questions for you.  Is

13   this a business record?

14            MR. GAGE:  No, your Honor, we don't see it — we do

15   not think this is a business record, and I'll explain to you

16   why.

17            All of the exceptions to the hearsay rule, including

18   the business records exception, are designed to allow evidence

19   in that bears certain indicia of reliability.  A classic

20   business record would be, for example, if company X engages in

21   a transaction with company Y and their accounting department

22   contemporaneously records that in their records and maintains

23   that in the ordinary course of business, it's recorded

24   contemporaneously with the event, that's the classic business

25   record.

NABHRow1

1          Here, we're talking about something, (a) it's not a

2     report, (b) it's not a statement, so it's not — there's no

3     evidence — and I don't believe there will be any evidence; I

4     don't think there is any evidence — that any of these

5     witnesses had a chance to look at these notes, let alone review

6     them, comment on them, indicate whether it's what they actually

7     said.  These are impressions of a note-taker during the course

8     of the investigation talking about events that occurred years

9     earlier.

10          So these do not bear the indicia of reliability of a

11    business record.  And plaintiff's counsel can ask every one of

12    these witnesses what they said to the investigators.  They're

13    all going to be under oath.  The investigator's going to be

14    under oath as well.

15          THE COURT:  And the name of the investigator was?

16          MR. GAGE:  Ms. Tessier.

17          THE COURT:  OK.

18          MR. GAGE:  Tessier, as your Honor correctly pronounced

19    it, not Tessier.  She'll take the witness stand.  They can ask

20    her.  They can even, if they want to, use it to refresh her

21    recollection, but the jury should not see it because the rule

22    against hearsay is designed for exactly this purpose, to keep

23    things out that are clearly offered, they're clearly offered,

24    for the truth of the matter contained therein, not statements.

25    Witnesses didn't — the witnesses in the ER investigation, the

NABHRow1

1     people whose statements plaintiff's counsel claims they are,

2     never even had a chance to look at them.

3                THE COURT:  All right.  Now, when those witnesses are

4     on the stand, if they are asked, your position is going to be

5     that those are statements of a party opponent and they come in?

6                MR. GAGE:  I'm sorry, if ——

7                THE COURT:  So we're talking about the possibility of

8     Grannis, Shaukat, Lawrence, Lucas, and not Rowe.

9                MR. GAGE:  Yeah, Mr. Grannis, for example.

10               THE COURT:  If they're asked, you said the plaintiff

11    can put on these witnesses and ask questions.  So what

12    questions would you not object to that could be asked about to

13    these witnesses about those interviews?

14               MR. GAGE:  Were you interviewed?  Were you asked this?

15    Were you asked that?  What did you say?

16               THE COURT:  That's hearsay.  So you're saying they

17    would be subject to a hearsay exception?

18               MR. GAGE:  No, that's not hearsay, your Honor.  To ask

19    Mr. Grannis, Were you asked whether the light was red? that's a

20    factual question of what he was asked in the interview.

21               THE COURT:  Yes.  What did you tell the interviewer?

22               MR. GAGE:  What did you tell the interviewer?  It's

23    the fact of what he said to the interviewer.

24    Plaintiff's counsel's claiming that this bears on whether or

25    not the company's conclusions after the investigation were

NABHRow1

1    valid.  OK.  Then what the witness, Mr. Grannis in your

2    hypothetical, said to Ms. Tessier, that's something that bears

3    on that.  What he said to Tessier bears on what Tessier thought

4    when she reached her conclusions.  I have no problem with that.

5    That's not hearsay.

6           THE COURT:  I just want to make sure we're not trading

7    one problem for another.

8           MR. GAGE:  No, absolutely.  That's all fine.  But

9    they've got this document that says Will Grannis said the light

10   was red, and he never saw that.  And that's not his statement,

11   and the jury shouldn't see it.

12          THE COURT:  Are you familiar with the cases cited by

13   Ms. Greene?

14          MR. GAGE:  I have to took at them, your Honor.

15          THE COURT:  All right.  How soon is this —— did you

16   intend to bring this up today?

17          MS. GREENE:  Your Honor, the first witness with whom

18   it will be used is Mr. Shaukat, who is the witness who follows

19   Ms. Rowe.

20          I want to direct your Honor's attention to a few other

21   cases that I think are important for your Honor to consider.

22   One is *Malek v. Federal Insurance Company*.  This is a Second

23   Circuit case, 994 F.2d 49.  Page 53 speaks about notes, case

24   notes, from a social worker and the business record exception

25   there.  And notes that are taken in the normal course of

NABHRow1

1    business are —— and made close in time to the events they were

2    recorded, in part based on the note-taker's personal knowledge,

3    are business records exceptions.  And so, here, it's the same

4    sort of instance.  The person who's taking it is taking it as

5    part of Google's clearly defined policy to take these notes.

6    They were taken at the same time.  There is every indicia of

7    reliability.

8          Now, the fact that Mr. Gage does not want this

9    evidence into the record because it is probative, it's

10   extremely relevant, and frankly, it's very damaging to their

11   case is not a reason to keep it out.  People —— you know, they

12   should be asked —— the jury should see whether the statements

13   they made to the investigator align with the statements that

14   they're saying in court, whether it's an inconsistent prior

15   statement.  They should be able to see what the HR and ER folks

16   were relying on when they were investigating this matter.

17         And that also relates, then, your Honor, to the issue

18   of willfulness and punitive damages for purposes of the

19   liquidated damages under New York Labor Law and punitive

20   damages under New York City Human Rights Law.  There are

21   multiple layers on which it is relevant and probative.  There

22   are multiple layers in which an exception exists under the

23   federal rules.  There is simply no reason to exclude this

24   document.

25         THE COURT:  What steps were taken to vet these notes?

NABHRow1

```
 1    Do you know?  You keep talking about the reliability, but how
 2    do you —— Mr. Gage made the point that these were taken by an
 3    investigator.  We're going to have an investigator on the
 4    stand; that these —— and this would be typical, I think —— that
 5    these interviewees were never shown the notes and said do you
 6    agree?  Did I capture this accurately?  Is this actually what
 7    you said?  Do you have any concerns about the way I
 8    characterized it?  Did that happen here?
 9              MS. GREENE:  Ms. Tessier can testify to that, but it's
10    not relevant to the issue of whether it's a business record.
11    It's relevant to —— sorry, it's the question of whether the
12    investigator who was taking that notes —— those notes was doing
13    it in the course of their business activities and whether, in
14    fact, they were doing it contemporaneously.  There is case law,
15    and I'd have to find it, that says the fact that they don't do
16    it in every single circumstance does not mean that it's not a
17    business record.  Again, here, when they have a clear policy
18    that this is a required step in their investigation, it falls
19    within the business records.  That's why the business record
20    exception exists.
21              And, again, as to the statements themselves, any
22    statements that would be offered for the truth of the matter
23    asserted are a party admission.  The majority of them are not
24    being offered for the truth of the matter asserted.  It's being
25    offered with respect to what statements were previously made,
```

NABHRow1

1    whether they're consistent with the statements that are made

2    here in court.  And a witness is free to say, no, I didn't say

3    that; no, that's not true.  But we should be able to question

4    and the jury should be able to look at the business record and

5    draw their own conclusions.

6              THE COURT:  Anything else, Mr. Gage?

7              MR. GAGE:  Just a couple of points.  I would like to

8    take a look at the cases that they've cited if we can, your

9    Honor.  I'll do that quickly and maybe during the break.

10             THE COURT:  I'm not going to — we need to do more

11   thinking and more reading now.  I'm not ruling on this in the

12   next 15 minutes.  I'm sorry.  Who did you say this was going to

13   come up with?  Mr. —

14             MS. GREENE:  Mr. Shaukat.

15             THE COURT:  You said yesterday that you have —

16   there's about two-and-a-half more hours with Ms. Rowe, right?

17   So we're going to have at least one other break.

18             MR. GAGE:  And he's — I think, your Honor, after

19   lunch is when, because we'll have cross-examination of the

20   plaintiff.

21             THE COURT:  All right.  I'm sorry.  You were going to

22   take a look at the cases, you said?

23             MR. GAGE:  I'd like to take a look at the cases.

24   Again, I want to clarify.  These notes were not vetted by any

25   of the people that they want to cross-examine.

NABHRow1

```
1              THE COURT:  All right.  Anything else?

2              MR. GAGE:  Just one other issue, your Honor.  I just

3     want to raise that I don't know for sure whether it will become

4     an issue during Ms. Rowe's testimony, but it might, and I say

5     that because of something Mr. Chiarello said during his open

6     statement.

7              One of the exhibits that is in dispute relates to a

8     leveling decision affecting a woman named Jen Bennett in the

9     office of the CTO.

10             THE COURT:  Bennett?

11             MR. GAGE:  Bennett, exactly.

12             OK.  We believe that plaintiff's counsel —— because

13    Mr. Chiarello mentioned her in his opening, we believe that

14    they're going to try to force Google to litigate the decision

15    to level Ms. Bennett.  We believe this is inadmissible.  We

16    have an objection to that which need not be resolved, I don't

17    think, until Mr. Grannis testifies, and he won't be here until

18    tomorrow.  But I want to make sure that Ms. Rowe is not

19    permitted to testify about it because she's not a competent

20    witness.  She was not involved in anything to do with the

21    decision to hire Ms. Bennett or the decision to level her.

22             And, your Honor, I am very concerned.  I don't want

23    them presenting evidence through Ms. Rowe about Ms. Bennett,

24    consistent with counsel's opening statement, in effect then

25    forcing us to have to litigate the issue of Jen Bennett's
```

NABHRow1

1    leveling decision, which we don't think we should have to.

2    But, again, she's not a competent witness to speak to anything

3    about Ms. Bennett, so I don't think she should be permitted to

4    testify about that.

5            THE COURT:  Ms. Greene, is that your plan, to ask

6    Ms. Rowe about Ms. Bennett, or Mr. Chiarello?

7            MS. GREENE:  Your Honor, the issue with Ms. Bennett is

8    that she was a coworker, and just as we're discussing the other

9    coworkers and their levels and what their leveling were and

10   when they learned about each other's levels, there's no

11   difference with respect to Ms. Bennett than there is to

12   Mr. Eryurek or Mr. Penberthy.  She was part of the group of

13   nine that were hired together.  She's the only other woman.

14   And so those —— that testimony as to when she learned

15   Ms. Bennett's level, the circumstances in which she learned

16   Ms. Bennett's level, and what other people knew about

17   Ms. Bennett's level is relevant in the same way that all of

18   those comparators' levels are relevant.  As the only other

19   woman, the —— Google's treatment towards her more generally is

20   relevant, and that will be a part of the testimony of other

21   witnesses.  It is certainly testimony in a bias case, a gender

22   bias case, that an employee can talk about how other people in

23   the immediate group reporting to the same manager were also

24   treated.

25           THE COURT:  Mr. Gage.

NABHRow1

1          MR. GAGE:  Your Honor, whether or when Ms. Rowe

2     learned about Ms. Bennett's level is completely irrelevant to

3     this case.  It has nothing to do with the validity of the

4     leveling decision at all.

5          Second of all, she's not the only other woman in the

6     office of the CTO.  And so, again, what plaintiff's counsel is

7     trying to do is force Google to litigate cases that are not

8     before this jury, and we shouldn't have to.  And the fact that

9     Ms. Rowe happened to learn other people's level, that's

10     irrelevant to the issues before the jury.  She wasn't involved

11     in any of those leveling decisions.  There's nothing wrong with

12     her testifying that, you know, she learned that she was an

13     8 and there were some men that were a 9.  That's the core of

14     this case, but then for her to go on and testify about levels

15     of other people, it's unfairly prejudicial to Google, and it

16     has, we say, no probative value.  But to the extent that it has

17     any probative value, it's outweighed by the prejudice of then

18     forcing Google to have to litigate that decision.

19          THE COURT:  All right.  When were you planning to

20     bring this up with Ms. Rowe?

21          MR. CHIARELLO:  First off, your Honor, she's going to

22     have testimony — well, let me take a step back.

23          To the extent Mr. Gage is concerned that Ms. Rowe's

24     going to testify about a hiring decision concerning

25     Ms. Bennett, that's not going to be a part of her testimony.

NABHRow1

```
 1   She's going to testify about the group that she was hired with
 2   that we talked about in our opening.  Nine individuals, seven
 3   men, two women, that is the group that we're looking at for
 4   comparison, so she's going to talk about all of those people.
 5          THE COURT:  All right.  I think that Ms. Rowe is
 6   litigating her own lack of promotion, not anything having to do
 7   with Ms. Bennett, and I find that any probative value bringing
 8   up Ms. Bennett and testifying about her is substantially
 9   outweighed by the risk of confusing the issues.  So that will
10   not be raised with Ms. Rowe.
11          MR. CHIARELLO:  Your Honor, can I then clarify?
12          THE COURT:  Are you going to keep arguing this after I
13   just gave me my ruling?  I don't think you are.
14          MR. CHIARELLO:  I have a question related to other
15   evidence based on that ruling.  I understand your Honor's
16   ruling.  Does that mean other individuals besides Ms. Rowe and
17   the five she's comparing herself to are also not going to be
18   admissible?
19          THE COURT:  What other ⸺ this case has been going on
20   for four years, and you had motion in limine practice in front
21   of Judge Schofield where she considered certain other people
22   and the extent to which evidence about them could come in.  Are
23   you now talking about other people?
24          MS. GREENE:  Your Honor, this issue was ⸺ defendant
25   had a chance to bring it up in motions in limine.  They did
```

NABHRow1

1  not.  The question is not a complaint or other leveling

2  decisions.  The question is who is the cohort that was hired

3  with Ms. Rowe and where did they place them on the leveling

4  scale?  They certainly are focusing very much on the 9s, as are

5  we.  They're also trying to inject all of the Level 8s.  To

6  exclude the one woman who was also in that role and leveled as

7  a Level 7 gives unfair weight to defendant's evidence, or

8  purported evidence, in support of their defense without

9  allowing plaintiff the opportunity to rebut that defense by

10  pointing to a leveling decision in the same group.  And, again,

11  it also goes to the issue of transparency and business

12  necessity.

13       THE COURT:  Why can't this be brought up with the

14  people who are responsible for hiring and promotion?  Why does

15  this have to be brought up with Ms. Rowe?

16       MS. GREENE:  It should and will be brought up with the

17  people responsible for the decision, and I think that was what

18  Mr. Chiarello was asking for clarification on.

19       With respect to Ms. Rowe, it's only relevant to when

20  she learned when people were hired, and that goes to the issue

21  of transparency and it also goes to the issue of what she was

22  told at the time she was hired.  She was told that everyone was

23  being brought in at a Level 8.  At some point she learned that

24  that was not the case, and that is part of the fact pattern

25  here.  So when she learned that Ms. Bennett was not a Level 8

NABHRow1

```
 1   and when she learned that Mr. Wilson and Mr. Eryurek were not

 2   Level 8s is all relevant to whether Google was transparent and

 3   genuine in what it said to her or whether there was the

 4   operation of bias or something else taking place at that time.

 5         THE COURT:  All right.  Well, this is a little bit

 6   complicated to decide in the next seven minutes or so.

 7         Go ahead, Mr. Gage.

 8         MR. GAGE:  Yeah, I just wanted to say just that, your

 9   Honor.  I would prefer that if we get to Ms. Rowe's testimony,

10   your Honor's ruled on that part of this, and we just address

11   this issue with respect to the other witnesses as they come.

12         But I just want to note we did make that argument in

13   our motion in limine, and plaintiff's counsel, for the vast

14   majority of this case, has insisted that the only comparators

15   the jurors should hear about are the Level 9s.  So your Honor

16   is right in remembering this motion practice and Judge

17   Schofield's ruling, but you're correct, we can address this

18   later.

19         THE COURT:  This seems to me something I might need

20   writing on, and I don't know how we're going to do that because

21   you're talking about a witness who's already on the stand, and

22   you're looking for resolution right away.  I mean, I just

23   don't ——

24         MR. GAGE:  I thought your Honor had already ruled with

25   respect to Ms. Rowe.
```

NABHRow1

1          THE COURT:  Right, but then we segued from Bennett to

2     other people.  I do think that this can be brought up with the

3     people who were responsible for hiring and promotion and that

4     doesn't seem to be in dispute, correct?

5          MR. GAGE:  Well, it is a dispute as to an exhibit that

6     I think Mr. Grannis would be asked about tomorrow.  But it's a

7     single exhibit, and I think it's something easy enough for us

8     to address either later today during a break or tomorrow

9     morning during a break.

10          THE COURT:  Look, all I can say right now is Ms. Rowe

11     is not going to testify about Ms. Bennett, and as for the rest

12     of it, it will have to await decision till we have time to

13     think about it and read about it.  And she's going to be done

14     this morning.  I don't know what you think we're going to do.

15     I can't ——

16          MR. GAGE:  I ——

17          THE COURT:  This should have been litigated before,

18     and it sounds like it was in part.

19          MR. GAGE:  All due respect, your Honor, I think it

20     was, and our objections were stated in the final pretrial

21     order.  So the issue has been joined and, again, doesn't

22     pertain to Ms. Rowe.  She'll be on the stand, I think, until

23     right after lunch.  And Mr. Shaukat was not involved in these

24     decisions, so he's not a witness that —— I don't expect they'll

25     ask him about it because he wasn't involved.

NABHRow1

```
 1            THE COURT:  All right.  Why don't you tell me,
 2   Ms. Greene or Mr. Chiarello, give me again the names of the
 3   people or the group that you want discussed.
 4            MS. GREENE:  Your Honor, this will come up in the
 5   testimony of Mr. Grannis, Mr. Stevens, Mr. Wilson, and I
 6   believe Mr. Eryurek.  And with respect to Ms. Rowe, we, your
 7   Honor, would be prepared to present an offer of proof with
 8   respect to what her testimony would be as to Jen Bennett.
 9            I'm sorry, were you asking for the group of nine
10   that ——
11            THE COURT:  Well, it's helpful to know the witnesses,
12   but, yes, I'm trying to get the parameters of the group you
13   want.
14            MS. GREENE:  Sure.
15            THE COURT:  You mentioned Bennett by name, but who are
16   the others?
17            MS. GREENE:  So, your Honor, Mr. Grannis has testified
18   that there was an initial —— my word not his —— cohort of eight
19   to nine individuals who were hired at the beginning when he did
20   not have a clear sense of what differentiated a Level 8 from a
21   Level 9.  That cohort consists of Evren Eryurek, Jonathan
22   Donaldson, Paul Strong, Nick Harteau, Ben Wilson, Scott
23   Penberthy, Brian Steikes, Ulku Rowe, and Jennifer Bennett.
24            THE COURT:  All right.  I think that's all we can do
25   for now.  We'll see everybody back here in ten minutes.
```

NABHRow1

1          MR. CHIARELLO:  Your Honor, can I ask for a quick

2     clarification of your ruling?

3          THE COURT:  Yes.

4          MR. CHIARELLO:  I understand the ruling with respect

5     to Ms. Rowe's testimony.  Is she permitted to identify the

6     individuals that Ms. Greene just gave you as the people she was

7     hired with without discussing anything further, in other words,

8     saying these are the other eight individuals?

9          THE COURT:  The people she was hired with meaning

10    what?

11         MR. CHIARELLO:  Meaning the other eight individuals

12    that Ms. Greene just identified for the Court.

13         THE COURT:  No, but I mean what do you mean by "hired

14    with"?  They were all hired at the same time or ——

15         MR. CHIARELLO:  Correct, as Ms. Greene —— Mr. Grannis

16    said there was an initial cohort of hires, and those are the

17    nine individuals that Ms. Greene just read off to you.  So she

18    was just placing herself within that and identifying for the

19    jury who the other eight are.  Are we able to do that?

20         THE COURT:  One second.

21         Mr. Gage.

22         MR. GAGE:  Let me clarify.  This is an arbitrarily

23    defined cohort that plaintiff's counsel has arbitrarily

24    defined.  Mr. Grannis will testify that he began hiring people

25    in 2016 and then he hired people continuously through the end

NABHRow1

```
 1    of '16, through '17.  And he did not testify that there was
 2    some arbitrary cohort that they just identified, and so it was
 3    a continuous series of hires.  And so that's a completely
 4    arbitrary distinction that they're making, that there was nine
 5    and not seven and not 12 and not —— there was an arbitrary
 6    cutoff, and Mr. Grannis won't say there was.
 7              THE COURT:  Why can't she say —— she can be asked ——
 8    sorry, I did not write it down —— do you know Mr. Donaldson?
 9    Yes, I do.
10              Do you know —— when was Mr. Donaldson hired?  He was
11    hired in 2017.
12              What about Steikes?
13              MR. GAGE:  I have no problem, your Honor, saying he
14    was hired, she was hired, but she should not be permitted to
15    say anything about Ms. Bennett's leveling.  And she could
16    certainly —— yes, I don't have a problem with her saying these
17    people were hired around the same time as her.
18              THE COURT:  Or she knows the dates.
19              MR. GAGE:  Or if she knows the dates.
20              THE COURT:  She could say the dates.
21              MR. GAGE:  If she knows the dates yes, your Honor.
22    I'd be surprised if she did, but if she does, she can testify
23    as to the dates they were hired.
24              THE COURT:  Ms. Greene.
25              MS. GREENE:  Your Honor, opposing counsel is
```

NABHRow1

1    attempting to litigate this case and be a finder of fact of

2    what's important for the jury to consider and what's not and

3    what the evidence will show and what it won't.  Plaintiff, in

4    order to be able to meet her burden of proof, needs to be able

5    to put on her case for the jury to draw conclusions around was

6    it a group of nine, was it a group of eight, was it much

7    broader, what were the decisions made around the time she was

8    hired, was she leveled appropriately or not as compared to the

9    broader group that was hired around her?  This is all the crux

10   of this case, and Mr. Gage's representations as to what the

11   evidence is is really for the jury to decide.

12          And so, your Honor, I would ask that plaintiff be able

13   to put their case forward in a way that will allow the jury to

14   draw those conclusions.  It's like a puzzle, right?  Any one

15   piece by itself doesn't show the picture.  It's only when you

16   put those pieces together that the picture becomes evident.  We

17   need to have our pieces to be able to put the puzzle together,

18   your Honor.

19          THE COURT:  What more do you want to be able to say

20   besides if she knows these people and when they were hired?

21          MS. GREENE:  So that's with respect to Ms. Rowe.  The

22   only other thing Ms. Rowe would have testified to —— and if I

23   may offer an offer of proof on this —— is that she learned

24   Ms. Bennett was a Level 7 when she asked about whether

25   Ms. Bennett was going to a conference where she would be

NABHRow1

1    attending, if they could have a drink together.  And it was for

2    attendees at Level 8 and above, and Ms. Bennett said, I'm not

3    invited.  I'm not a Level 8, and that was the first time

4    Ms. Rowe had learned in the course of her employment that

5    Ms. Bennett, who worked alongside of her, who worked alongside

6    Mr. Wilson, who worked alongside Mr. Eryurek, was not a

7    Level 8.  That is the testimony that Ms. Rowe would present.

8            As to other witnesses, they will testify generally

9    about when they learned what their levels were, what the other

10   levels were.  This goes to business necessity and the business

11   necessity defense and whether it's job related, and the

12   argument being if witnesses don't even know their own level,

13   how is it a necessary component of the job that they're doing?

14   So this all becomes relevant testimony as to that particular

15   defense, as well as the establishment of bias in terms of how

16   levels were allocated across the group.

17           MR. GAGE:  Again, your Honor, Ms. Rowe is not

18   competent to speak to a leveling decision.  We have no problem

19   with her testifying as to when certain people were hired if

20   counsel wants to have her articulate their argument for this

21   arbitrary group of people, but it's plaintiff's counsel who's

22   trying to, you know, rein in the evidence, because Mr. Grannis

23   did not define an arbitrary cohort of nine people in his

24   deposition.

25           So, again, we have no problem with her saying these

NABHRow1

1    people were hired, I worked with them, but she should not be

2    allowed to testify about Ms. Bennett's leveling.

3            THE COURT:  Was this your plan to go right to this at

4    9:30 this morning, or do we have a little more time?  Because

5    we need to go back to the case law.

6            MR. CHIARELLO:  I anticipate we'll get to it fairly

7    quickly into her testimony this morning.

8            THE COURT:  I mean, then we're going to have to delay?

9            MR. CHIARELLO:  Your Honor, give me one second.  Let

10   me see if there's a way to push this out.

11           THE COURT:  OK.

12           MR. CHIARELLO:  Your Honor, as I understand what

13   Mr. Gage just said, if we're able to identify these

14   individuals, I think for this morning that's fine, and the

15   issue of whether or not the brief offer of proof that

16   Ms. Greene gave can be something Ms. Rowe can testify to, that

17   can happen later in her testimony after we break this morning.

18           THE COURT:  All right.  I think that takes care of

19   this for now.

20           Ms. Williams, why don't we not bring the jury in until

21   9:35, just because it's 9:28 right now.

22           THE DEPUTY CLERK:  OK, Judge.

23           THE COURT:  All right.

24           (Recess)

25           THE COURT:  Please be seated.

NABHRow1

1              All right.  Ms. Williams, are you going to bring in

2      the jury?

3              THE DEPUTY CLERK:  Yes, Judge.

4              THE COURT:  OK.

5              (Continued on next page)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1              (Jury present)

 2              THE COURT:  Good morning, everybody.  Please be

 3   seated.

 4              Thank you all for arriving here on time today and also

 5   for your attention throughout a very long day yesterday.  That

 6   was appreciated.

 7              Ms. Williams, how much time was used with Ms. Rowe

 8   yesterday?

 9              THE DEPUTY CLERK:  Twenty-two minutes, Judge.

10              THE COURT:  All right.  We're going to resume

11   plaintiff's direct examination now of Ms. Rowe.

12              Are you ready?

13              MR. CHIARELLO:  We are.  Thank you, your Honor.

14              THE COURT:  All right.  Good morning.

15              THE WITNESS:  Good morning.

16              THE COURT:  I remind you that you're still under oath.

17              THE WITNESS:  Yes, thank you.

18              THE COURT:  OK.

19   ULKU ROWE, resumed.

20   DIRECT EXAMINATION CONTINUED

21   BY MR. CHIARELLO:

22   Q.  Good morning, Ms. Rowe.

23   A.  Good morning.

24   Q.  When we finished yesterday, we were talking about your

25   hiring at Google, and I'd like to start today by taking a look
```

1    at Plaintiff's 142.

2              Mr. Yang, if you can put that up on the screen.

3              Ms. Rowe, this is your offer letter from Google,

4    correct?

5    A.  Yes.

6    Q.  Just taking a look at the second page, this was signed by

7    you on March 13 of 2017, correct?

8    A.  Might I scroll?  OK.  Yes.

9    Q.  Ms. Rowe, how were you to be paid by Google for your work?

10   A.  There were three pieces to the compensation: a base salary;

11   a bonus; and equity, stock, Google stock.

12   Q.  And the package that Google offered you, how did that

13   compare to the compensation package you had at JPMorgan Chase

14   before joining Google?

15   A.  JPMorgan also had those three components of base salary, a

16   performance bonus, as well as company stock.  And, you know, I

17   negotiated an offer that was pretty along the same lines.

18   Q.  Ms. Rowe, was there any financial consequences to you

19   leaving JPMorgan and joining Google at the time that you did?

20   A.  Yes.  Because I work in the financial services industry, I

21   have a three-month notice period.  So Google asked me to resign

22   right away in December to start as soon as possible, but by

23   resigning in December, I was forfeiting the majority of my

24   compensation for 2016, and I was also forfeiting unvested

25   equity that I had acquired until then.

1    Q.  Ms. Rowe, when you're talking about equity, are you

2    referring to stock?

3    A.  Yes, stock.  Yeah, company —— JPMorgan stock.

4    Q.  So losing those two components, what did that mean in

5    dollars and cents?

6    A.  So that was about $600,000 that I was giving up for 2016

7    compensation, plus another 600,000 that I was leaving behind in

8    equity.  So I was forfeiting $1.2 million by joining Google at

9    that point.

10   Q.  Did Google do anything to address that you were leaving

11   behind compensation at JPMorgan?

12   A.  Yes.  So they offered me $250,000 in sign-on cash, and they

13   —— that was a one-time payment, plus a one-time stock award of

14   $550,000 worth $550,000.  So, in total, they were giving me a

15   one-time payment of $800,000 for the 1.2 that I was forfeiting.

16              MR. CHIARELLO:  Mr. Yang, can you just call out those

17   two sections for the jury.

18              THE COURT:  I'm sorry, what are we waiting for?

19              MR. CHIARELLO:  We're just calling out two sections of

20   the exhibit for the jury, your Honor.

21              THE COURT:  OK.

22   Q.  So the makeup compensation was reflected in your offer

23   letter, correct?

24   A.  Say that again, Greg.

25   Q.  The makeup compensation, the sign-on bonus and the equity,

NABHRow1                    Rowe - Direct

1  was reflected in your offer letter?

2  A.  Yes, by these two pieces.

3  Q.  Did you receive a separate stock award from Google ——

4  A.  Yes.

5  Q.  —— as part of your compensation?

6  A.  Yes.

7  Q.  How much equity were you granted as part of your hire

8  separate from the sign-on bonus?

9  A.  So that was about 2,200 Google shares, and this is stock

10  that vests over four years, the first piece vesting after I've

11  been at Google for one year.  So that was about, you know,

12  $1.6 million over four years.

13  Q.  What was the approximate value of the initial vesting?

14  A.  $400,000 the first year after I've been there a year.

15  Q.  Did you understand that as part of your employment at

16  Google there would be future equity awards?

17  A.  Yes, there would be.  Every year there would be annual

18  stock awards that were awarded.

19  Q.  Ms. Rowe, how much was your base salary starting at Google?

20  A.  So that was —— that was the $290,000.

21  Q.  Did anyone explain how Google determined what your starting

22  salary would be?

23  A.  No.

24  Q.  I think you said there was also an annual bonus component

25  to your compensation, is that correct?

NABHRow1                          Rowe – Direct

1    A.   Correct.

2    Q.   How is your annual bonus determined?

3    A.   Thirty percent of my base salary.

4         MR. CHIARELLO:  Mr. Yang, can we put up

5    Plaintiff's 134, please.

6    Q.   Ms. Rowe, are you able to flip through this exhibit on your

7    screen?

8    A.   I don't know.  I don't know if I'm flipping or someone else

9    is flipping.

10   Q.   I think Mr. Yang is.

11        These are your compensation statements from Google

12   from 2017 to the present, is that right?

13   A.   Correct.

14   Q.   Let's take a look at the first page that's marked

15   Plaintiff's 134.

16        When did you receive this document?

17   A.   So this was December of 2017.

18   Q.   And looking at this, what are we looking at?

19   A.   So we're looking at those three parts of compensation that

20   we've talked about: the salary, the bonus, the equity.

21   Q.   What does the top box depict?

22   A.   So this is my new salary going forward.

23   Q.   OK.  The middle box, what does that reflect?

24   A.   This was my annual bonus for 2017.

25   Q.   So that —— for what period of time did that reflect?

NABHRow1                        Rowe - Direct

1    A.  So from the time that I started until the end of the year

2    in 2017.

3    Q.  The 295,000 reflected what your compensation would be the

4    following year, 2018?

5    A.  Correct.

6    Q.  Then the larger box at the bottom, what are we looking at

7    there?

8    A.  So this is an equity grant, a stock grant that is going to

9    be vested over four years.  As shown here, $15,000 every year

10   going forward.

11   Q.  The four boxes within that box, what do they represent?

12   A.  They represent the part of equity that's vesting every

13   year.  And by "vesting," that means, you know, they give me the

14   stock, but I don't actually have access to it until it vests.

15   But it's not mine until that point, yeah.

16   Q.  So in total, Ms. Rowe, what is the approximate value of

17   your compensation package in your first year at Google?

18   A.  So my first year my salary was $290,000.  The bonus was

19   $116,000.  And at the end of the first year, that first equity

20   grant was vesting for $400,000.  So the sum of those three ——

21   the 290 base, the 116 bonus, plus the 400 stock —— that was

22   about $800,000 I received at the end —— for my 2017

23   compensation.

24   Q.  Ms. Rowe, have you received increases in compensation since

25   you were hired?

NABHRow1                         Rowe - Direct

1    A.   Some.   Some modest, but, you know, it's mostly stayed flat.

2    Q.   Ms. Rowe, when did you officially begin working at Google?

3    A.   I started March of 2017.

4            MR. CHIARELLO:   Mr. Yang, can we put up Plaintiff's 6.

5    Q.   Ms. Rowe, what are we looking at here?

6    A.   This was my social media post on the first day I started at

7    Google.

8    Q.   How did you feel on that day?

9    A.   You can tell from my face, you know, I was happy.   I was

10   excited.   I felt, you know, very optimistic.

11   Q.   Ms. Rowe, were you the only technical director hired at

12   that time?

13   A.   No.   This was a new group that Google was setting up with

14   some very senior people, and I was hired along with eight other

15   people.

16   Q.   At the time you were hired, were you given a level?

17   A.   Yes.   I learned that I was a Level 8.

18   Q.   What are levels at Google?

19   A.   Levels are a way of determining, like, where you are in the

20   corporate hierarchy.

21   Q.   When did you learn what your level was?

22   A.   So it wasn't discussed early on.   It wasn't in the job

23   description.   It didn't come up during the interview process.

24   It wasn't in the offer letter.   I don't remember exactly how I

25   learned, but it might have been through a conversation with the

NABHRow1                          Rowe - Direct

1    recruiter.

2    Q.  Who was the recruiter?

3    A.  Jennifer Burdis.

4    Q.  And what conversation did you have with Ms. Burdis about

5    your level?

6    A.  So I was coming in as a managing director from JPMorgan and

7    a CTO, you know, kind of coming from the highest level of the

8    corporate hierarchy.  So I asked her if Level 8 was

9    appropriate.  I wasn't familiar, you know, with the leveling at

10   Google at all.  And she said everyone that's hired into this

11   role is coming up as a Level 8.

12   Q.  So was it your understanding that the technical directors

13   in OCTO at that time were all functioning as Level 8?

14   A.  Yes.

15   Q.  Was OCTO at that time just the nine technical directors

16   that were hired at that time?

17   A.  No, there were some other more junior people with, you

18   know, less scope and responsibility, mostly ex-Googlers or

19   enlisting Googlers, but those of us that were coming in were

20   coming in as directors.

21   Q.  Ms. Rowe, can we agree when we talk about technical

22   directors in your testimony as I'm examining you that we're

23   referring to the director-level technical directors and not the

24   more junior folks you just described?

25   A.  Yes.

NABHRow1                     Rowe – Direct

Q.  Now, did Google hire other technical directors after that
group you were hired with?

A.  Yes.  After we came in, there was a pause, and they did
hire other batches of —— or cohorts of technical directors.

Q.  Who were the technical directors that were hired with and
that came in around the same time as you?

A.  The first one to come in was Evren Eryurek, and then the
last one to come ins with Nick Harteau.  And in between it was
Benjamin Wilson, Scott —— Jonathan Donaldson, Paul Strong,
Scott Penberthy, Brian Steikes, myself, and Jennifer Bennett.

Q.  Ms. Rowe, can you describe generally what your job entailed
on a day-to-day basis as a technical director in OCTO.

A.  Yes.  It was a new role and a very senior role.  A lot of
the work we did was very self-directed, and our work spanned
three pillars.  You know, it was about customer work, it was
about engineering and product work, and thought leadership.

Q.  Was the customer work described sometimes as customer
engagement?

A.  Yes.

Q.  So what was your understanding of what customer engagement
meant in OCTO?

A.  Customer engagement meant working with Google's cloud
customers, or mostly potential customers, to build, you know,
trusted relationships with them so that they understood our
products and they knew how to use our products, our Google

1   Cloud products, to use them to make their own businesses

2   better.

3   Q.  Can you give us an example of what your work in customer

4   engagement looked like.

5   A.  These were — you know, Google was early in the financial

6   services industry when I started.  So a lot of our early work

7   with our customers was about building credibility with them and

8   educating them on what Google Cloud meant.  So it was about,

9   you know, telling them about our products, telling them what we

10  have to offer.  And some of the early work there was — you

11  know, kind of spanned three different things, you know, with

12  the customers.  One of them was, you know, building a strategy

13  for — for the industry that I was working in.  And that meant,

14  because we were new, you know, we really wanted to go after the

15  financial services customers.  We wanted to be credible.  We

16  wanted them to sign and buy our product, but we really didn't

17  have a strategy to go after it.

18        So I started with putting together a group of people

19  to meet on a regular basis to start putting together that

20  strategy, you know, what are we going to do?  How are we going

21  to prioritize things?  So we had people from our account teams,

22  our sales teams.  We had people from our engineering teams,

23  from our marketing teams, from our public policy teams, you

24  know, everybody that had a piece of this to come together to

25  figure out, you know, how do we really address this market?  So

NABHRow1                          Rowe – Direct

1    it was a lot of strategy work.

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

NABVROW2                    Rowe - Direct

1    BY MR. CHIARELLO:

2    Q.  And what about beyond strategy?

3    A.  So beyond strategy was the actual customer engagement, you

4    know, really working with the customers.

5           In the early days, you know, in financial services, a

6    lot of our customers' questions were around security,

7    compliance, and whether Google Cloud was enterprise-ready.

8    People kind of knew Cloud as the search engine, they knew

9    Google Ads.  But in the clouds business, we really didn't have

10   that credibility in those days.  So it was really working with

11   them to help them understand both what we had to offer in terms

12   of security and compliance offerings, but also our enterprise

13   readiness.

14   Q.  Was there anything else?

15   A.  Yes.  There was also the work that I did around regulatory

16   engagement.  And this was important because financial services

17   is a very heavily regulated industry.  It's really important

18   that if you're going to do a technical change of like this size

19   and this complexity, it's really important with the financial

20   regulators to understand what the product has to offer so they

21   can regulate the space and they can tell the financial

22   institutions whether it's okay or not to adopt a technical

23   change of this size.

24          So I started working very closely with our public

25   policy team to put together an engagement program with the

NABVROW2                     Rowe - Direct

1   financial regulators.  And we started reaching out and meeting

2   with the financial regulators across the globe.  You know, this

3   meant, you know, I went and talked to the Federal Reserve

4   Board, I talked to the SEC, the Securities and Exchange

5   Commission, the FDIC, Federal Depository Insurance Corp., CFTC.

6   You name it, every financial regulator in the U.S.

7            I also did this in Europe with institutions like the

8   European Central Bank, the European Banking Association, the

9   regulators in the UK, the FCA and the PRA.  Did the same thing

10  in Asia, including Australia.

11           I also traveled to Washington, D.C. to meet with

12  Congress people.  I met with congressmen that were

13  representatives in the house of -- in the house committee of

14  financial services, congressmen that were part of the AI task

15  force in the Congress.  I also met with the Federal Reserve

16  Board in Washington, D.C., including with the vice chair,

17  Governor Brainard herself.

18  Q.  Okay.  And all the work you just described in customer

19  engagement, was that focused on financial services customers

20  specifically?

21  A.  Yes.

22  Q.  Was every technical director in OCTO focused on an industry

23  like financial services?

24  A.  No, there were others that were more horizontally focused

25  or product-focused as well.

NABVROW2                        Rowe - Direct

1   Q.  Why did Google have some people focus on industries?

2            MS. TOMEZSKO:  Objection.  Lacks foundation.

3            THE COURT:  State your basis again.

4            MS. TOMEZSKO:  Your Honor, I said lacks foundation.

5   He was asking what Google understood.  We don't know if

6   Ms. Rowe understood what Google expected or what they

7   understood.

8            MR. CHIARELLO:  I can revise the question, your Honor.

9            THE COURT:  Sustained.

10  BY MR. CHIARELLO:

11  Q.  What did you understand to be the reason why Google focused

12  on industries?

13  A.  Industries are very important because they hold a lot of

14  financial potential.  You know, if Google Cloud can break into

15  an industry and, you know, start doing sales in that space,

16  that could, you know, mean a lot of revenue for Google Cloud.

17  Q.  And how did the financial services industry compare to some

18  of the other industries Google was looking at in terms of

19  potential revenue?

20  A.  Financial services industry is the number one priority

21  industry for Google Cloud.  You know, there is a term, total

22  addressable market, kind of is a measure of how much an

23  industry spends on technology, into technology services.  Each

24  year financial services spends about $650 billion on

25  technology.  The next largest is about $250 billion with

NABVROW2                        Rowe - Direct

1   healthcare.  You know, financial services technology spend is

2   bigger than every other industry combined.

3   Q.  Ms. Rowe, you mentioned another aspect of your work in OCTO

4   was working with engineering.  Can you just describe generally

5   what that pillar is.

6   A.  Yes.  So it's really important for our products, if we're

7   going to -- if we're going to sell them to our customers in the

8   financial services space, that our products satisfy the needs

9   of the financial industry.  So that meant working very closely

10  with the product and engineering teams so that they understood,

11  you know, what needs to be built into those products.

12  Q.  Can you give us an example of some of the work you

13  specifically did with the product and engineering teams?

14  A.  For example, in financial services, it's a very

15  document-heavy industry.  You know, if anyone has opened a bank

16  account or applied for a mortgage, there's a lot of documents,

17  there's a lot of paper documents.  So I worked very closely

18  with our engineering teams on document digitization, how can we

19  do this in a way so that we can take the paper out of the

20  financial services workflows.

21          I also worked very closely with our data center team.

22  Because in financial services, it's really important where your

23  data is kept.  This is important for, like, both backup-type

24  purposes, you know, where do I keep my primary data if

25  something happens to it; there's a flood, there's an

1    earthquake, there's a war, where does the backup data sit?  And

2    these are things very heavily regulated.  And also there's

3    privacy concerns around where your data is located.  So I

4    worked very closely with them so that the data centers

5    understood some of the needs of the financial services

6    customers.

7            I also worked very closely with our storage teams.

8    They are on something called a bitemporal data, and that really

9    refers to when you do a transaction in financial services, you

10   need to know the exact time that that transaction has been

11   made.  But later, if there's a change to that data, you need to

12   also be able to understand at what time it was made and as of

13   what time that transaction was captured.  Because it is really

14   important, especially, you know -- you know, one, you need to

15   keep track of, you know, all the changes that have happened;

16   but also it's very important from our regulatory reporting

17   perspectives.  But those are some examples.

18   Q.  And in those examples, that was work that involved you

19   working directly with the engineering teams?

20   A.  Yes.  Absolutely.

21   Q.  Ms. Rowe, can you tell us what thought leadership is as it

22   related to your work in OCTO.

23   A.  Thought leadership was all about creating credibility in

24   the market for Google Cloud.  You know, in the early days,

25   people didn't even know that we had a cloud business.  That

NABVROW2                          Rowe - Direct

enterprise readiness, which means, like, does Google Cloud get our business, do they get what we're trying to do?  Are they just a search engine or can they really provide these complicated complex technology products to us as an enterprise?

So thought leadership was really about, you know, getting out there and doing speaking engagements and writing about it, you know, talking at industry events all about, like, getting our customers in the markets to understand, you know, what Google Cloud has to offer in this space.

Q.  And can you give the jury some examples of some of the work you did in OCTO related to thought leadership.

A.  Yes.  So I was a very regular speaker in Google Cloud's most important events, like Google Cloud Next and Google Cloud Summits.

I was a regular keynote speaker, very sought after by Google, to come and speak and keynote these events all over the world.  In my first two years, I think I traveled 15 countries, went to 30 cities, just giving keynotes in various parts of the world, you know, putting my credibility on stage to talk about Google Cloud's product.

I also got a chance to speak on very small, very curated events.  Google had these things called leader's circle, which were invitation-only events for just the C-suite customers, where they come in and we had a chance to talk to them one-on-one about what they had to offer.  So I was a

NABVROW2                          Rowe - Direct

1    regular speaker in those events as well.

2            I also spoke very regularly at industry events,

3    financial services industry events.  The largest events in

4    financial services industry are things like the Sibos event,

5    the Money 2020, the Forbes, Fortune, regular keynote speaker in

6    those events.  And many of these events I spoke to had

7    audiences of like a few thousand to 10,000 people in

8    attendance.

9            I also spoke a lot at our customers' events.  So, you

10   know, our customers like J.P. Morgan Chase or Goldman Sachs or

11   Chicago Mercantile Exchange, they would invite me to come talk

12   at their events to their customers, their investors at times

13   about the cloud and what technology has to offer.

14           I also wrote profusely about the cloud.  I wrote white

15   papers, I wrote blog posts.  I also did regular briefings with

16   press.  I was featured in *New York Times*, *Business Insider*,

17   *Harvard Business Review*.  I also regularly gave briefings to

18   industry analysts themselves.

19           And I remember one event in 2019.  This was our

20   biggest event, Google Cloud's biggest event in Europe, in

21   Paris.  This was our Google Cloud Summit.  And I think we had

22   about 5,000 people in attendance.  I was asked to do all four

23   keynotes of the event.  The only other, you know, keynote

24   speaker on stage with me was Thomas Kurian, Google Cloud's CEO.

25           I was just so much sought after that I was turning

NABVROW2                        Rowe - Direct

1    down so many more engagements than I could possibly do.

2    Q.  You used the word "keynote" a number of times.  Can you

3    just define what a keynote is for the jury.

4    A.  A keynote is usually the most important speech of either

5    like a daylong or a multi-day event.  It usually happens really

6    right at the beginning and it's highlighted as the keynote.

7    It's the main attraction.

8    Q.  And did you have an understanding as to how the public

9    speaking you were doing would benefit Google?

10   A.  Yes.  It was all about building market credibility.  You

11   know, as part of our business development exercise, you know,

12   getting the market to know and understand what we had to offer.

13   So it was a very integral part of us addressing the industry.

14   Q.  Ms. Rowe, did Will Grannis ever give you performance

15   reviews?

16   A.  Yes.

17   Q.  And how often would that occur?

18   A.  About twice a year.

19   Q.  And what feedback did Mr. Grannis provide in those reviews?

20   A.  Always stellar.  My reviews were always glowing.  I got

21   "exceeds expectations" on every single one of them.

22   Q.  And "exceeds expectations" is a rating?

23   A.  Yes.

24   Q.  Did he ever give you constructive feedback?

25   A.  Yes.  You know, constructive feedback is part of Google's

1    process.

2    Q.  Did Mr. Grannis ever tell you that you were

3    underperforming?

4    A.  No, never.

5    Q.  Did he ever tell you that you were not meeting the

6    expectations of the role?

7    A.  No.

8    Q.  Ms. Rowe, when did you learn that not everyone you had been

9    hired with was a Level 8?

10   A.  That was in the summer of 2017, my first year there.

11   Q.  What did you learn in the summer of 2017?

12   A.  Ben and Evren, we were having a casual conversation, and

13   they told me they were Level 9s.

14   Q.  When you say Ben and Evren, is that Ben Wilson and Evren

15   Eryurek?

16   A.  Yes, Ben Wilson and Evren Eryurek.

17   Q.  What was your reaction learning that Mr. Wilson and

18   Mr. Eryurek were leveled at Level 9?

19   A.  I was surprised and I was very disappointed.

20   Q.  And have you since come to learn that there were other

21   individuals leveled at Level 9 in that group?

22   A.  Yes.

23   Q.  And who were those individuals?

24   A.  Other than Ben and Evren, Nick Harteau, Jonathan Donaldson,

25   and Paul Strong had also been leveled at 9.

NABVROW2                      Rowe - Direct

1    Q.   Looking at the technical director group that you were hired

2    with, the other individuals that you mentioned, were you able

3    to observe their work?

4    A.   Yes, routinely.  You know, we worked very closely together.

5    Q.   And of those you observed, whose work was most similar to

6    yours?

7    A.   Those of us that focused on industries, you know, because

8    we each had our -- and those were Evren Eryurek, he was

9    focusing on healthcare; Benjamin Wilson, he was focusing on

10   energy; Nick was our start-up person; Jen Bennett was focusing

11   on manufacturing.

12   Q.   And what about the other technical directors in OCTO, did

13   you have an opportunity to observe what they were doing?

14   A.   Yes.  You know, we were doing very similar things.  You

15   know, we all worked across those three pillars that I

16   mentioned:  Customer engagement, engineering, thought

17   leadership.  We collaborated a lot.  We compared notes.  We

18   were in meetings together.  You know, we covered each other's

19   customers.  I got a chance to observe their work a lot, just

20   not as much as the industry people that I worked very closely

21   with.

22   Q.   Ms. Rowe, can you give the jury a sense of how your work

23   compared to that of the industry focused technical directors

24   you mentioned, Mr. Eryurek, Mr. Wilson, Mr. Harteau, and

25   Ms. Bennett?

NABVROW2                    Rowe - Direct

A.   We worked very closely because all of us were focusing on

these industries.  So we were comparing notes on how to address

the industries, you know, what kind of strategy should we do,

while obviously trying to build this cohort of people in

financial services to come up with things like strategy.  Evren

was doing exactly the same thing in healthcare; Ben was doing

the same thing in energy.  We were, you know, covering our

customers.

There were a lot of issues that also cut across

industries that were important, like financial services

regulated, so it was healthcare and energy.  So we were working

very closely together both, you know, comparing notes, but like

addressing -- addressing big problems in our industries and

doing thought leadership in the various industries and so on.

Q.   Ms. Rowe, specifically, can you tell us how your work

compared to Mr. Harteau's?

A.   Yeah.  Nick and I were both based in New York, so we had a

lot of chance to collaborate.  We were talking about how to

address the industries that we were in.  We were talking and

comparing notes on how to accelerate the adoption of Google

Cloud, you know, what are the various creative things that we

can do, partnerships, you know, product acceleration.  So we

shared ideas and exchanged thoughts very frequently together,

you know, we covered for our customers.

And also, you know, I traveled quite a bit.  And

NABVROW2                           Rowe - Direct

everywhere I'd go, I tried to meet the largest customers in

those regions.  And one of those places I traveled quite

frequently was Stockholm, and our biggest customer there is

Spotify.  And Nick had come from Spotify to Google, so he was

always gracious enough to brief me on Spotify before I met

them, you know, on one of these business trips.

Q.  Ms. Rowe, did you have an opportunity to present, to speak

publicly with any of the OCTO Level 9s?

A.  Yes, I did.  I spoke quite frequently, as we have

discussed.  On some of these speaking engagements I would do it

with other L9s, especially the events that covered multiple

industries.  For example, Gartner is -- the Gartner symposium

every year covers multiple industries.  So I'd go along with

other L9 technical directors.  We also did a lot of industry

analyst engagements together speaking about, you know, Google

Cloud's progress in each of our industries.

Q.  And did any of the OCTO Level 9s ever come to you for

advice?

A.  Yes.  They would regularly consult me on various topics.

You know, for example, regulation.  You know, in financial

services, we were doing all this regulatory outreach to get the

regulators to understand our businesses.  Healthcare was also

regulated.  Energy is also regulated.  So they would routinely

ask my thoughts about, you know, how I was going about the

engagement in financial services.

NABVROW2                          Rowe - Direct

1          There was also, you know, things that cut across our
2     industries, as I mentioned.  For example, mainframe workloads.
3     Main frames are very heavily used in financial services.
4     They'd ask my thoughts on how we were addressing it in
5     financial services, how can you modernize those workloads using
6     the cloud.
7     Q.  And did any of the OCTO Level 9s ever consult with you on
8     strategy?
9     A.  Yes.  You know, in addition to, you know, our strategies
10    for the industries that we were focusing on, you know, there
11    were other things that we would strategize on, like what are
12    some common problems that's across our industries.  We talked
13    about document digitization.  I talked about that financial
14    services being very paper heavy, while the other industries
15    that are very paper heavy, healthcare, the customer records
16    being faxed, there's just so much paperwork there.  They would
17    consult together; we would figure out how to address some of
18    these problems that are common to many industries.
19    Q.  And did any of the OCTO Level 9s ever ask you to cover
20    accounts for them?
21    A.  Yes, regularly.  You know, I was traveling extensively,
22    both, you know, to meet customers, to meet product and
23    engineering teams and, you know, to do thought leadership.  And
24    every time I went to one of these cities, I would make -- I
25    would make sure, like, I'd meet the customers of other OCTOs

1    that were covered by other OCTOs.  For example, I remember a

2    couple of them.  I was meeting Iron Mountain that Ben was

3    covering.  And I also met with Amadeus, which is a travel

4    company in Europe, travel infrastructure company.  And I was

5    doing that for Paul.

6    Q.  Ms. Rowe, two of the men that you were hired with were

7    Scott Penberthy and Brian Steikes; is that correct?

8    A.  That's correct.

9    Q.  And did you come to learn their level at some point?

10   A.  Yes.

11   Q.  What level were they?

12   A.  They were Level 8.

13   Q.  How did your qualifications, to your understanding, compare

14   to Mr. Penberthy's and Mr. Steikes'?

15            MS. TOMEZSKO:  Objection.  Lacks foundation.

16            THE COURT:  Sustained.  Rephrase.

17   Q.  Ms. Rowe, do you have an understanding of what

18   Mr. Penberthy's qualifications were for the technical director

19   role?

20   A.  Yes.

21   Q.  How would -- and you have an understanding of your own

22   qualifications for the role?

23   A.  I do.

24   Q.  How did your qualifications compare with Mr. Penberthy's,

25   as you understand it?

NABVROW2                    Rowe - Direct

1          MS. TOMEZSKO:  Objection.  She hasn't stated the basis

2    of her knowledge.  She says she knows, but I think the jury is

3    entitled to know how she knows, if she does.

4          THE COURT:  Sustained.

5    Q.  Ms. Rowe, how were you aware of Mr. -- what Mr. Penberthy's

6    qualifications were?

7    A.  Both from conversations with himself and also from his

8    hiring package.

9    Q.  What kind of information is in his hiring package?

10   A.  Like his resume.

11   Q.  So based on what you know about Mr. Penberthy, how did your

12   qualifications compare with his?

13   A.  I was more qualified than Scott Penberthy.  Scott is a

14   great colleague, I like working with him, I have a lot of

15   respect for him.  But, you know, one, I came from the financial

16   services industry, the number one target for Google Cloud.

17   Scott came from PWC, an accounting firm that's not even in the

18   target list for Google Cloud.

19          I came in as a CTO with deep technical background

20   actually building these large-scale systems, have hands-on

21   experience with both creating systems and the cloud.  Scott

22   came in as a consultant.  Consultants, I think, are great

23   advisors, but they don't do the actual work.

24          So by having this like hands-on experience myself put

25   me in a position with our customers that I can speak to them

NABVROW2                         Rowe – Direct

1   from a place of experience and having been in their shoes

2   before.

3              I had experienced managing very large teams, up to

4   1,000 people, direct and indirect.  Scott didn't have that

5   experience.

6              In terms of cloud migration, I had experience, you

7   know, migrating some of the most complex, largest scale

8   technology setups in financial services.  Scott's cloud

9   migration experience was related to office applications.  So

10  migrating things like, you know, Excel and Power Point into

11  things like Google Docs and Google Sheets.  And there is, you

12  know, an order of magnitude of complexity in those two tasks.

13  Q.  Ms. Rowe, do you have an understanding of what Mr. Steikes'

14  qualifications were to be technical director in OCTO?

15  A.  I do.

16  Q.  And what is your basis for that understanding?

17  A.  From conversations, as well as, you know, his resume.

18  Q.  And to your understanding, how do your qualifications

19  compare with Mr. Steikes'?

20  A.  So I have one -- you know, two advanced -- I have an

21  advanced degree, two degrees in computer science.  Brian didn't

22  have an advanced degree.  I came with deep industry experience.

23  Brian didn't have that.  Brian didn't have any CTO experience.

24  Brian didn't have any cloud experience.  And Brian only managed

25  teams of up to 30 people.

NABVROW2                    Rowe - Direct

1   Q.   Now, Ms. Rowe, did you have an understanding of the

2   qualifications for the five men who had been leveled at Level 9

3   in OCTO?

4   A.   Yes.

5   Q.   And what is your basis for your knowledge and understanding

6   of the qualifications of those five individuals?

7   A.   My general knowledge of their background, as well as their

8   CVs, the hiring packages that were used as part of their hire.

9   Q.   And did you ever speak with any of them about their prior

10  work?

11  A.   Yes.

12  Q.   Before joining Google?

13  A.   Yeah.  Absolutely.  Yeah.

14  Q.   Ms. Rowe, how did your qualifications compare to the Level

15  9 men?

16  A.   With respect to the Level 9 men, I believe that I was just

17  as qualified, if not more qualified in certain aspects.  I had

18  come in as a CTO from J.P. Morgan Chase, and Ben and Evren came

19  as CTOs from enterprise companies.  Nick and Jonathan didn't

20  have a CTO title.  Paul was called a field CTO, but that's a

21  very different thing than a traditional CTO that has hands-on

22  work.

23         In terms of our, you know, degrees, I had -- I had

24  both an undergrad and a grad degree in computer science and

25  computer engineering.  Some of the L9 men, you know, did have

1    advanced degrees, but none of them were in computer science.

2    They were in other fields.

3          I had experience, you know, managing very large teams,

4    so did Ben and Evren.  But Jonathan and Nick and Paul had

5    managed smaller teams.  I had come in from financial services,

6    the number one target industry, you know, with the total

7    addressable market that's bigger than any other industry.  I

8    had also hands-on cloud experience.  And Ben and Evren and Nick

9    had that experience; Jonathan and Paul did not.

10   Q.  What do you understand to be the difference between Level 8

11   and Level 9 technical directors in OCTO?

12   A.  In terms of the job that we did on a day-to-day basis,

13   there wasn't a difference.  We were all doing the same thing,

14   same kind of things.  But, you know, there was a lot of

15   difference in terms of compensation and, you know,

16   opportunities for career advancement.

17   Q.  When you say difference in compensation, can you give the

18   jury a sense of an order of magnitude in the difference between

19   a Level 8 and a Level 9.

20   A.  It's different for every person, but hundreds of thousands

21   of dollars.

22   Q.  And what is the difference between Level 8 and Level 9

23   technical directors in OCTO in terms of career advancement

24   opportunities?

25   A.  You know, whatever level you're in, it's easier to get to

NABVROW2                        Rowe - Direct

```
 1   the next level.  You know, if you're in Level 9, it's going to
 2   be much easier to get to Level 10.
 3   Q.  Ms. Rowe, did you speak to anyone after learning that
 4   Mr. Eryurek and Mr. Wilson were leveled as Level 9?
 5   A.  Yes, I talked to Will Grannis.
 6   Q.  And what did you discuss with Mr. Grannis with respect to
 7   what you had learned about Mr. Eryurek and Mr. Wilson?
 8   A.  So I told him, you know, about my concerns that, you know,
 9   when I was being hired, you know, that I had raised this --
10   this issue with Jen, that I was coming in as level -- as a
11   managing director, as a CTO from JPMorgan, and I was told that
12   everyone was coming in as a Level 8.  And I had come in and
13   found out that some of the men had come in as a Level 9.  And I
14   asked for his help in correcting that because I believed, like,
15   the L9 men had, you know, the same qualifications, if not
16   lesser qualifications than me.
17   Q.  And did Mr. Grannis say anything to you?
18   A.  He told me that I should speak to Melissa Lawrence.
19   Q.  Who is Melissa Lawrence?
20   A.  Melissa Lawrence is the HR person that supports OCTO.
21   Q.  Did you speak with Melissa Lawrence?
22   A.  I did.
23   Q.  Before we talk about that, at the time you reached out to
24   Ms. Lawrence, when was that?
25   A.  That was about -- that was December, I think, of 2017.
```

1    Q.  And at the time you spoke with Ms. Lawrence, did you

2    believe that your gender had anything to do with Google's

3    decision to level you at Level 8?

4    A.  I did.  You know, I was told everyone was coming in as

5    Level 8.  And I had come in and found, you know, some of the

6    men were brought in as Level 9s, when we had very, very similar

7    qualifications.

8    Q.  And did you share that belief with anyone at that time?

9    A.  Not at that time.  You know, bringing up gender is a risky

10   topic.  You know, I just -- I was really focused on getting the

11   issues sorted, resolved, and I wanted to just move on.

12   Q.  Now, when you did speak with Ms. Lawrence, what did you and

13   she talk about?

14   A.  We talked about a few things.  You know, we discussed my

15   leveling concerns.  We talked about an equity refresh issue.

16   We also talked about, you know, earlier in the year, Will and I

17   had a discussion.  You know, Will was thinking about taking all

18   the industry-focused technical directors in OCTO and putting

19   them into a group, and he wanted me to run the group.  And that

20   hadn't, you know, materialized.  I mentioned that.

21        And I also mentioned one more topic.  I can't remember

22   the topic.

23        MR. CHIARELLO:  Mr. Yang, can you put up Plaintiff's

24   11 just for the witness.

25   Q.  Does Plaintiff's 11 refresh your recollection as to

NABVROW2                    Rowe - Direct

1    anything else that you might have discussed with Ms. Lawrence?

2    A.  Yes.  I had heard that Tariq Shaukat was hiring some VPs

3    for industries.  And, you know, during my initial hiring

4    discussions, you know, Will and Brian -- you know, we had

5    conversations that, you know, if and when Google Cloud does

6    verticalize, that -- you know, that I would be the obvious

7    person with the, you know, best qualifications for the role.

8    So now that I heard that Tariq was hiring these VPs for

9    industries, I asked Melissa if she knew anything about that.

10   Q.  And this conversation with Mr. Grannis that you just

11   referenced, is this the same conversation that you had

12   testified about previously that occurred when you were hired

13   about the vertical lead process?

14   A.  Yes.

15   Q.  You also mentioned that there was a conversation -- let me

16   step back.

17        You mentioned that you had said to Ms. Lawrence that

18   there was a conversation with Mr. Grannis about leading the

19   industry leads in OCTO.  Can you just tell us what your

20   understanding of that was from speaking to Mr. Grannis?

21   A.  So he was thinking about putting all the industry-focused

22   people, so people like Ben, who was leading healthcare, Evren

23   who was leading energy, Jen from manufacturing, and others,

24   just into that industry group and have me as the lead for the

25   group, the others reporting to me.

NABVROW2                         Rowe - Direct

1    Q.   And would that have meant that as a Level 8 there would

2    have been some Level 9s reporting to you?

3    A.   Yes.

4    Q.   Now, what did Ms. Lawrence say about the leveling concerns

5    that you raised with her in the meeting?

6    A.   He said -- she said that he would -- she would check into

7    what might have happened and come back to me.

8    Q.   And did Ms. Lawrence respond to your concerns?

9    A.   Not immediately, but I did follow up with an email.

10            MR. CHIARELLO:  Mr. Yang, can you put up Plaintiff's

11   13, please, and publish to the jury.

12   Q.   Ms. Rowe, is Plaintiff's 13 the email response you received

13   from Ms. Lawrence to the email you sent her asking for an

14   update?

15   A.   Yes.

16   Q.   I just want to draw your attention to the first small

17   paragraph in the bottom email dated January 10, 2018.  Below

18   where it says "Hi Melissa," you say:  I would like to pick up

19   the conversation we had right before the holidays about my

20   level.

21            What was the conversation that you had before the

22   holidays about your level?

23   A.   Just that conversation that we have just discussed, where I

24   raised the four concerns.

25            MR. CHIARELLO:  You can close that out, Mr. Yang.

NABVROW2                      Rowe - Direct

Q.  Above there is an email from Ms. Lawrence to you that

begins with "Happy new year," also dated January 10th.  And she

writes:  Unfortunately, as I relayed to you before the

holidays, there is no process to revisit leveling decisions

after hire.  The only way to address concerns with level is to

seek promotion via the tech process.

        Had Ms. Lawrence relayed this to you before the

holidays, that information?

A.  No.

Q.  Had you spoken to Ms. Lawrence since the initial meeting

that you described where you provided your concerns to her?

A.  No, this was our first exchange after the meeting.

        MR. CHIARELLO:  Thanks, Mr. Yang.  You can take that

down.

Q.  Ms. Rowe, at some point in 2018, did your reporting

structure change?

A.  Yes.

Q.  And you began reporting to Tariq Shaukat; correct?

A.  Correct.

Q.  Who did Mr. Shaukat report to?

A.  He reported to Diane Greene, the CEO of Google Cloud.

Q.  And when did this change in reporting take place?

A.  About June, June of 2018.

Q.  Now, were you the only OCTO technical director to move into

Mr. Shaukat's organization?

1  A.  No, it was Ben, Evren, me, and another junior person, Jeff

2  Kember.

3  Q.  And did the role in Mr. Shaukat's organization have a

4  title?

5  A.  It was called global clients technical lead.

6  Q.  And what did you understand or come to understand that that

7  role would be?

8  A.  Initially, there was some confusion about what the role

9  was.  But Tariq told me that it would be the same job that I

10  was doing in OCTO, just reporting to him.

11  Q.  And was that in a conversation you had with Mr. Shaukat?

12  A.  Yes.

13  Q.  When did you have the conversation with Mr. Shaukat?

14  A.  In June.

15  Q.  And was there anything else that you discussed with

16  Mr. Shaukat during that June conversation?

17  A.  Yes.  I told him that, you know, I heard that there was an

18  open position for VP of financial services, and that I'm

19  interested in that position.  And he told me he didn't really

20  know me at all.  So I offered, you know, to spend time with

21  him.

22         You know, I said, Let's rectify that.  Let's spend

23  some time together so you can get to know me.

24         And with respect to the position, he told me he was

25  open to considering me.  But he did sound discouraging.  I

NABVROW2                        Rowe - Direct

1  asked him, you know, how would the process be.

2           He said, I need to have two external candidates

3  already vetted before I can introduce you into the process.

4           I asked him how long it's going to take.  He said it

5  might take six months.

6  Q.  Okay.  Now, this VP of financial services role, did you

7  understand this to be the vertical lead role you had discussed

8  with Will Grannis at the time you were hired?

9  A.  Yes.

10 Q.  This conversation in June with Mr. Shaukat, how much time

11 did you spend talking about the vertical lead role?

12 A.  Very little.  Five minutes, ten minutes tops.  The whole

13 conversation was 30 minutes, so --

14 Q.  Okay.  Had you ever spoken to Mr. Shaukat prior to the June

15 conversation?

16 A.  I think I had just one conversation with him before, maybe

17 in like February that year, just a meet-and-greet saying hi,

18 you know, just senior people getting to know each other.

19 Q.  Ms. Rowe, I want to talk a little bit about your time

20 working with Mr. Shaukat.  I think you said a moment ago

21 Mr. Shaukat in June had said he didn't know much about you.  In

22 the time you reported to him, did he ever reach out to you to

23 set up a meeting to get to know you better?

24 A.  No, he did not.

25 Q.  Did he ever ask you about your background?

1    A.  No.

2    Q.  Did he ever ask you about your prior work experience?

3    A.  No.

4    Q.  Did he ever ask you what work you had been doing in OCTO

5    before joining his organization?

6    A.  No.

7    Q.  Did he ever reach out to you to schedule meetings, like

8    one-on-ones?

9    A.  No.  And I tried to schedule meetings with him.  You know,

10   I reached out to him many times directly through my admin,

11   through his admin.  The first time after the June meeting that

12   we had a one-on-one was in September.  And the entire time, you

13   know, the ten months that I reported to him, we had maybe like

14   three one-on-ones together.

15   Q.  And in the time you -- how long were you in Mr. Shaukat's

16   organization?

17   A.  Ten months.

18   Q.  In that time, how much interaction did you have with him?

19   A.  Very little.

20   Q.  Were you able to speak with him in team meetings, group

21   meetings?

22   A.  I had a lot of difficulty getting on a staff meeting.  I

23   couldn't get on it for a long time.  Once I got on it, at least

24   one time I got dropped off the meetings.  And he didn't include

25   me in customer meetings or strategy meetings or any type of

NABVROW2                    Rowe - Direct

1   meetings.

2   Q.  Now, in your observation, is that how Mr. Shaukat

3   interacted with everyone?

4   A.  No, no.  He had a very different relationship with my male

5   peers.  He would talk to them, he would hang out with them.

6          And I was sharing an admin with one of my New York

7   peers, and so I knew that he would come to New York.  And, you

8   know, they would, you know, have meetings together.  And I

9   would -- I didn't even know he was in New York; he wouldn't

10  even say hi to me if I hadn't heard secondhand that he was in

11  town.

12  Q.  The New York peer that you shared an admin with, who is

13  that?

14  A.  That was Stuart Breslow.

15  Q.  And what was Mr. Breslow's role in Mr. Shaukat's

16  organization?

17  A.  Mr. Breslow was a new joiner hired by Tariq to focus on

18  compliance.  And he was doing a small project on anti-money

19  laundering.

20  Q.  Did Mr. Shaukat at least keep you involved by email even if

21  he wasn't meeting with you?

22  A.  No.  I had, again, a lot of difficulty getting on his staff

23  email lists.  And I wasn't being included in the email

24  correspondence either.

25  Q.  Did he ever email you about work business?

1  A.  No.  Maybe once.  No.

2  Q.  How did Mr. Shaukat's treatment of you make you feel?

3  A.  Terrible.  I mean, just terrible.  You join a new team, and

4  your supervisor's completely ignoring you.  It made me feel

5  pretty terrible.

6  Q.  Ms. Rowe, let's go back to the financial services vertical

7  lead role that you had discussed with Mr. Shaukat.

8          How did you first become aware of that role?

9  A.  Mostly word-of-mouth.  People were talking about it.

10  Q.  Do you need a second?

11  A.  Mostly word-of-mouth.  People were just talking about it.

12  People in OCTO, people in the sales teams.  It was a pretty

13  well-known office conversation.

14  Q.  Now, Ms. Rowe, the conversation you had with Mr. Shaukat in

15  June, did you understand that to be a job interview for the

16  vertical lead role?

17  A.  No, definitely not.

18  Q.  Why not?

19  A.  Well, first of all, it was like a five, ten-minute

20  conversation.  It didn't have any of the things that would

21  happen at an interview.  You know, he didn't ask me any

22  questions.  He didn't -- you know, we mostly talked about the

23  fact that he would consider me, not anything beyond that.

24  Q.  Did Mr. Shaukat ever interview for the role?

25  A.  He did not.

NABVROW2                          Rowe - Direct

1    Q.  Ms. Rowe, did you ever see a job description for the

2    financial services vertical lead role?

3    A.  I did.

4    Q.  How did you come to see that?

5    A.  Stuart Vardaman sent me a copy of the job description.

6    Q.  Who is Stuart Vardaman?

7    A.  He was the internal recruiter supporting Tariq's

8    organization.

9    Q.  And an internal recruiter is a position within Google to

10   Google employee?

11   A.  Yes, it's a Google employee that focuses on both recruiting

12   both internally and externally into a particular group.

13          MR. CHIARELLO:  Mr. Yang, can we put up Plaintiff's

14   31, please.

15   Q.  Looking at the first page --

16          MR. CHIARELLO:  Actually, just for Ms. Rowe's sake,

17   can you just flip through it quickly.

18   Q.  Ms. Rowe, is this the job description that Mr. Vardaman

19   sent you and the cover email to it?

20   A.  Yes.

21   Q.  Let's take a look at the cover email for a second.

22          Now, Mr. Vardaman writes to you on July 12th of 2018:

23   Nice to meet you today.

24          And let's start there.  Had you met Mr. Vardaman prior

25   to July 12th of 2018?

NABVROW2                        Rowe - Direct

1    A.   Just a small short videoconference.

2    Q.   He writes:  Here is the position spec for the FS role.

3    Please don't be thrown by the head of title, it's just a

4    placeholder.

5              What did you and Mr. Vardaman talk about in that

6    meeting as it related to what the title would be?

7    A.   We discussed the position as VP of financial services.  You

8    know, we talked about the fact, you know, I could not be

9    included in the process, but the role was always the VP of

10   financial services.

11   Q.   And subsequent to this email, did you have any other

12   conversation with Mr. Vardaman about how the role would be

13   titled?

14   A.   Yeah.  He told me that it would be either director or

15   managing director of financial services.

16             MR. CHIARELLO:  Mr. Yang, let's turn to the next page.

17   And if you can just call out the bottom portion of that page.

18   Q.   And Ms. Rowe, the role we've been calling head of financial

19   services, but within Google, it was also discussed as a

20   financial services vertical lead; is that right?

21   A.   Yes.

22   Q.   Let's take a look at the third page, the section marked

23   qualifications.

24             Ms. Rowe, what were your qualifications for the

25   financial services vertical lead role?

1    A.  You know, at this point I've been at Google for about a

2    year, more than a year, and I knew Google's products.  You

3    know, I was talking to Google's most important customers about

4    our products.

5            I knew the industry.  I knew our strengths and I knew

6    our weaknesses.  I had been in this space.  I had been kind of

7    doing this role in a smaller scale, so this kind of -- when I

8    looked at the job description, it was an extension of what I

9    was doing already.

10           And then secondly, you know, I had come in as a CTO of

11   J.P. Morgan.  And so I had, like, you know, at this point, you

12   know, like 25 years of deep technical expertise in the industry

13   building technology systems.  I had, you know -- I had years

14   and years of experience engaging the C-suites and working with

15   them to understand their needs.

16           And at this point, you know, I was -- I was -- I was

17   recognized by Google to be the person, you know, leading the

18   financial services effort; the person that's the executive that

19   they were putting in front of, you know, the most important

20   customers, the most important regulators.  And I had a master's

21   degree in computer science.  I was a Fulbright scholar in

22   computer science.

23   Q.  So I just want to go through these qualifications quickly.

24   I think you touched on them, but just for clarity.

25           You had more than 15 years of deep financial services

NABVROW2                          Rowe – Direct

1   industry experience?

2   A.   Yes, way more than that.

3   Q.   And did you have more than ten years of executive

4   experience?

5   A.   Two decades, yes.

6   Q.   Did you have extensive experience managing information

7   technology and computer systems and support enterprise goals?

8   A.   Yes, you know, including the technologies and machine

9   learning that I've been doing at Google and prior to Google.

10  Q.   And did you have established actionable global executive

11  and C-suite relationships?

12  A.   Absolutely.  Both the institutions I previously worked with

13  — at Bank of America, at JPMorgan — and at Google Cloud.

14  Q.   And to your understanding, how was your reputation in the

15  financial services sector?

16  A.   I was very well-known at the industry at this point.

17  Q.   And I believe you said you had a master's of computer

18  science at that point.

19         Ms. Rowe, you testified that this -- you understood

20  this to be a VP role.  Did you have an understanding of the

21  level that is associated with a VP role?

22  A.   A VP role is a Level 10 role.

23  Q.   And given that you were a Level 8 at the time, did you

24  understand that your level would change if you did receive the

25  financial services vertical lead role?

NABVROW2                         Rowe - Direct

1    A.  Yes.  You know, when I had raised my initial concerns with

2    Melissa and Will, they told me the only way they can address

3    corrections in the level are through getting a promotion.  So I

4    thought that if I was, you know, promoted to get the role, that

5    my level would change at least to a Level 9.

6              MR. CHIARELLO:  Mr. Yang, can you please put up

7    Plaintiff's 26 and publish to the jury.

8    Q.  Ms. Rowe, do you recognize this to be a set of email

9    communications between you and Melissa Lawrence dated June 14th

10   of 2018?

11   A.  Yes.

12   Q.  I'm going to focus on --

13             MR. CHIARELLO:  And Mr. Yang, can you call out that

14   larger paragraph towards the bottom of the page.

15   Q.  So about halfway through that larger paragraph,

16   Ms. Lawrence writes to you:  For the vertical lead role, I am

17   very happy that Tariq has committed to consider you for the

18   role.  I do want to flag that if you were to be selected for

19   this role, you would do it at your current level.  We do not

20   uplevel candidates when taking on a new role.  Now, there would

21   be an increased scope and opportunity for impact, which could

22   naturally lead to promotion, but I did want to flag this.

23             After you received this email, Ms. Rowe, what did you

24   take away from Ms. Lawrence's statement?

25   A.  Well, that even if I were to be promoted to the VP level

NABVROW2                    Rowe - Direct

1   role, my level would stay at that Level 8.

2   Q.  Now, taking a look at your response to Ms. Lawrence above

3   that.

4        MR. CHIARELLO:  Mr. Yang, if you can just call that

5   out.  Thank you.

6   Q.  You write to her:  I do find it troubling that all the

7   external candidates to date have been considered for the VP

8   role and I would not be.  I know the two finalists to date, and

9   I firmly believe I am more qualified and bring more to the

10  table than both of them.

11       You said that you were more qualified than the two

12  external candidates.  Who were you referring to?

13  A.  I was referring to Ranjanna Clark and Tais Dwyer.

14  Q.  And what's your basis for saying that you were more

15  qualified than both of them?

16  A.  Most importantly, I knew my own qualifications.  You know,

17  I knew that I had been at Google, I had been kind of doing

18  this -- this role for the last, you know, over -- over a year,

19  close to a year and a half at this point.  And, you know, I met

20  every qualification in the job description.

21       And I knew that Ranjanna Clark, her experience, she

22  only had a banking background, like no technology background.

23  She was a banker.  And I knew that Tais Dwyer, she came more

24  from a program management background, and she was actually

25  subsequently hired to a Level 7 role under Stuart Breslow.

1  Q.  Now, Ms. Rowe, did Google interview for the financial

2  services vertical lead role?

3  A.  Yes.

4  Q.  And when was that?

5  A.  That was in August of 2018.

6  Q.  So a couple months after you had first expressed interest?

7  A.  Yes.

8  Q.  Can you describe for us the interview process.

9  A.  The interview process felt weird.  It didn't feel right.

10  Q.  Before we get into that, can you describe what the

11  actual --

12  A.  What the process?  Okay, yeah.

13          So I had an interview with Sebastien Marotte, who was

14  the head of sales, VP of sales for Europe.  And then I had

15  three more interviews on Monday with three other people:

16  Darryl Willis, I believe is the name, who was the VP of energy;

17  Vats, who was leading up strategy for Tariq; and Jason Martin,

18  who was the VP of professional services.

19  Q.  Okay.  Let's talk about the interview with Mr. Marotte.

20          Do you remember when in August that took place?

21  A.  Very early in August, maybe August 2nd or thereabouts.

22  Q.  And tell us about the interview with Mr. Marotte.

23  A.  So we had a 30-minutes videoconference scheduled.  When I

24  logged into the videoconference, Sebastien said, Why are we

25  meeting today?  He didn't even know it was an interview.  I had

1    to tell him that he was there to interview me for the VP of

2    financial services role.  And Sebastien and I had worked

3    together pretty closely.  He said that, like, you and I know

4    each other, so we kind of had a friendly chat for 30 minutes.

5    And that was -- that was -- that was the totality of the

6    interview.

7             THE COURT:  Mr. Chiarello, I'm just going to interject

8    briefly with a note about scheduling.

9             So it's 10:52 right now, and we have our mid-morning

10   break at 11.  So just for your planning purposes and for the

11   sake of the jury, we have about eight minutes left until we're

12   going to take a brief break.

13            MR. CHIARELLO:  Okay.  When I finish this section, if

14   you think that's a good time, or I'll use the time however your

15   Honor wishes.

16            THE COURT:  I'm also mindful that we started about ten

17   minutes late today, through no fault of the jury and with

18   apologies to the jury.  If you are coming to a point that's

19   around 11 that's a good place to stop, let me know.  We can do

20   it a couple minutes before or after, I think that's fine.

21            MR. CHIARELLO:  Okay.  I appreciate that, your Honor.

22   BY MR. CHIARELLO:

23   Q.  You told us about the interview with Mr. Marotte.

24            Ms. Rowe, can you tell us about the interview with the

25   three other individuals?  Just first, do you remember the date

NABVROW2                          Rowe - Direct

1    of those interviews?

2    A.  About a week later, I think August 8.

3    Q.  Okay.

4    A.  Probably.

5    Q.  And what occurred in those interviews?

6    A.  So I flew to California for those interviews.  But the

7    interviews themselves felt very perfunctory.  I'm quite

8    familiar with the way that Google interviews, especially senior

9    candidates.  And these interviews just didn't feel right.

10   Q.  Can you give us a little more detail about what didn't feel

11   right about the interviews?

12   A.  Yes.  So at Google we usually follow a rubric.  You know,

13   there's four dimensions that the candidates get assessed.  You

14   know, role-related knowledge, general cognitive ability,

15   leadership, Google NS.  Usually they have a set of questions

16   that they follow.  Each interviewer is testing you for a

17   different quality.  They've got the questions in front of them.

18   They take notes when they're talking to you.  You know, so it's

19   a pretty well-defined process.

20   Q.  And did you observe any of the interviewers taking notes?

21   A.  No.

22   Q.  Did you observe any of the interviewers using a rubric?

23   A.  No.

24   Q.  Did you observe whether the interviewers were working off a

25   list of questions?

1    A.  No.

2    Q.  How long were the interviews with Mr. Willis and the other

3    two individuals, Mr. Martin and Mr. Srivatsan?

4    A.  They were about 45 minutes.

5    Q.  And how long are typical interviews?

6    A.  Usually they are about an hour.

7    Q.  Was sales or sales experience discussed in your interview?

8    A.  No.

9    Q.  Was business development or business development experience

10   discussed in your interviews?

11   A.  No.

12   Q.  Following the interviews with Mr. Marotte and the three

13   following later that week, how did you feel?

14   A.  I felt very dejected.  You know, I -- I had taken this

15   seriously.  You know, I had prepared for the interviews and,

16   you know, I flew to California for these interviews.  And I

17   felt like they weren't taking it seriously.

18           MR. CHIARELLO:  Your Honor, it may not be 11, but this

19   would be a good breaking point.

20           THE COURT:  All right.  That's fine.

21           MR. CHIARELLO:  Thank you.

22           THE COURT:  Ms. Rowe, you may step down from the

23   stand.

24           And just to the jury, a reminder that you are not to

25   discuss the case with one another or anyone else.  Do not,

NABVROW2                          Rowe - Direct

1    please, communicate about the case in person, by email, by

2    Twitter, by Facebook, by any means.  And keep an open mind

3    until you have heard all of the evidence in the case.

4              We will resume at 11:11.

5              (Recess)

6              (Continued on next page)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

NABHRow3

```
1              THE COURT:  Please be seated.

2              The offer of proof that you're going to be giving me,

3    is that going to relate only to Ms. Bennett?

4              MS. GREENE:  Your Honor, with respect to what her

5    testimony would have been as to Ms. Bennett and learning about

6    her — when she was in L8, I'm sorry, an L7, it's only going to

7    relate to Ms. Bennett.

8              THE COURT:  There were not other Google employees you

9    were going to have her testify to?  She's obviously spoken

10   about many of those, but the new issue that you raised today,

11   was new to me anyway, relates to her testifying about

12   Ms. Bennett, is that right?

13             MS. GREENE:  Correct.

14             THE COURT:  OK.

15             MS. GREENE:  Yes.

16             THE COURT:  All right.  Thank you.

17             All right.  Go ahead, Khalilah.

18             (Continued on next page)

19

20

21

22

23

24

25
```

 1              (Jury present)

 2              THE COURT:  Please be seated.

 3              All right.  Plaintiff is now going to resume its

 4    examination of Ms. Rowe.

 5              MR. CHIARELLO:  Thank you, your Honor.

 6              THE COURT:  You're still under oath, Ms. Rowe.

 7              THE WITNESS:  Thank you.

 8              MR. CHIARELLO:  Mr. Yang, can we put up and publish

 9    for the jury Plaintiff's 42.

10    BY MR. CHIARELLO:

11    Q.  Ms. Rowe, this is an email that you sent to Melissa

12    Lawrence and Kevin Lucas on August 28, 2018, is that correct?

13    A.  Yes, that's correct.

14    Q.  Remind us who Melissa Lawrence is.

15    A.  Melissa Lawrence was the HR person supporting OCTO.

16    Q.  Who is Kevin Lucas?

17    A.  And Kevin is the HR person supporting Tariq's team.

18              MR. CHIARELLO:  Mr. Yang, can you call out the text of

19    the email so that it's a little bit easier for the jury to

20    read.

21    Q.  Now, Ms. Rowe, why did you send this email to HR?

22    A.  I sent this email because this was now end of August.  The

23    interviews didn't really feel right.  It had been weeks since

24    the interviews, and I had heard nothing.  I didn't —— I

25    couldn't get ahold of Tariq.  He was continuing to ignore me.

NABHRow3                    Rowe – Direct

1    The last time I talked to him was in June.  And even though I
2    was pinging him, I was hearing nothing.  I was, like,
3    completely in the dark.  And I wanted to reiterate my concerns
4    that I was hired as a Level 8, the men were hired as a Level 9
5    with very similar qualifications, and that now I felt like that
6    legacy was following me.
7    Q.  Ms. Rowe, when you write in the middle:  "I was told that
8    everyone hired for the role was being hired at a Level 8.  I
9    later learned that my male peers were all hired at Level 9.  I
10   feel like that legacy is now following me as I'm being
11   considered for this new role."
12       What did you mean exactly by this "legacy"?
13   A.  Well, you know, I at this point was feeling like the —— I
14   was under-leveled at hire and now, you know, I wasn't getting a
15   consideration for the role because of the way that I was, you
16   know, being —— I was hired initially into the position.
17   Q.  And how long after the interviews you had did you send this
18   email?
19   A.  This was about three weeks, few weeks.
20   Q.  And, Ms. Rowe, why did you mention your male peers were
21   hired at Level 9?  Why did you use the word "male"?
22   A.  At this point I felt like the reason that I was being
23   treated differently was because I was a woman.  Had I been a
24   man, I would have gotten a different consideration.  I came in
25   being told everyone is Level 8.  I was the only female

NABHRow3                         Rowe - Direct

1   technical director.  Some of the men, they were hired as Level

2   9.  Tariq had a very different relationship with my male peers,

3   and so that's why I sent —— I said what I said.

4   Q.  Did employee relations contact you after this email?

5   A.  Not immediately.  They reached out to me about a month

6   later.

7   Q.  And what is employee relations at Google?

8   A.  Employee relations is the internal team that investigates

9   employee concerns.

10  Q.  And did you speak with someone in employee relations?

11  A.  Yes.

12  Q.  Who was that?

13  A.  April Beaupain.

14  Q.  When did you speak with Ms. Beaupain?

15  A.  That was in October, I think.

16  Q.  What did you discuss with Ms. Beaupain?

17  A.  We discussed my leveling concerns.

18  Q.  Now, in the time following the August 28 email that you

19  sent, did you have conversations with anyone about the status

20  of your consideration for the financial services vertical lead

21  role?

22  A.  I was pinging Stuart Vardaman to get a status update, and

23  he told me, you know, he was still collecting feedback.  This

24  was, I think, in September that I talked to him.  He was still

25  collecting feedback and that if everything looks good, he, you

1   know, Tariq would have a more formal conversation with me and

2   then the next thing would be for me to meet Diane.

3   Q.  And Diane referring to whom?

4   A.  Diane Greene, the CEO of Google Cloud.

5   Q.  Did you have any communication Mr. Shaukat during this time

6   about your candidacy for your financial services vertical lead

7   role?

8   A.  We had a one-on-one in September.

9   Q.  What did you discuss with Mr. Shaukat in September?

10  A.  One, I told him about my concerns getting integrated into

11  his team.  That I wasn't in staff meetings.  I was having

12  trouble, difficulty, getting on his email list.  I also asked

13  for a status update on the —— on my role —— my progression with

14  my candidacy for the VP of financial services role.

15  Q.  What did he tell you with respect to your candidacy for the

16  financial services vertical lead role?

17  A.  He told me the next step would be for me to meet with

18  Diane.

19  Q.  Approximately when did you have this conversation with

20  Mr. Shaukat?

21  A.  This was September.

22  Q.  Early?  Late?  Middle?  Do you have a sense?

23  A.  Middle, I think.

24  Q.  At that point did you believe that you were still being

25  considered for the vertical lead role?

NABHRow3                        Rowe - Direct

1    A.  Yes.  You know, I trusted that I was still a candidate.

2              MR. CHIARELLO:  Mr. Yang, can you please put up

3    Plaintiff's 54 and publish it for the jury, and can you please

4    call out the text of the email.

5    Q.  Ms. Rowe, this is an email that you sent to Tariq Shaukat

6    and Diane Greene on November 7, 2018.  Are you familiar with

7    this email?

8    A.  Yes.

9    Q.  Now, as of November 7, how long had it been since the

10   conversation with Mr. Shaukat where you asked him for an update

11   on the status of your candidacy?

12   A.  I asked for a status update in September, so this was two

13   months later.

14   Q.  Why did you choose Mr. Shaukat and Ms. Greene to be the

15   recipients of this email?

16   A.  Well, Tariq was my boss and also the hiring manager for the

17   vertical lead position, and Diane was my skip-level manager,

18   and she was also the person I was supposed to interview with

19   and, you know, the final decision-maker on the vertical lead

20   position.

21   Q.  And without necessarily reading it to the jury, what's the

22   sum and substance of this email?

23   A.  You know, I reiterated my interest in the role, the head of

24   financial services role.  I reiterated that my background makes

25   me well suited for the role.  I had the qualifications.  But my

1    concerns that, you know, my misleveling at my initial hiring

2    were now affecting my candidacy and that I continued to believe

3    that I'm the most qualified person for the position.

4    Q.  Ms. Rowe, why did you send this email?

5    A.  Well, this was now in November.  You know, I had first

6    raised my hand for this position in June.  I had the interviews

7    in August.  The ER meeting was in October, and I was, like,

8    still being told the interview with Diane is getting scheduled.

9    It wasn't getting scheduled.  I was told in September it was

10   going to get scheduled.  It didn't.  I was escalating.  I was

11   escalating.  I was sitting in the dark not knowing what was

12   happening, so I was letting people know.

13   Q.  Did either Mr. Shaukat or Ms. Greene respond to this email?

14   A.  No.

15   Q.  Did employee relations respond to this email?

16   A.  Not to this email, but they came back to me two days later.

17   Q.  And what did employee relations convey to you two days

18   later?

19   A.  They told me that they had looked into my allegations, and

20   they found them to be unfounded.  And they told me that they

21   had looked into, you know, the L9 men, and they either had more

22   years of experience than me or they came from tech companies,

23   and that's why they were at Level 9.  And —— and that they

24   didn't think gender had anything to do with it.

25   Q.  Did Ms. Beaupain provide you —— was it Ms. Beaupain that

1    you spoke with?

2    A.   Yes.

3    Q.   Did she provide you with any backup or support for that

4    conclusion?

5    A.   No.  She did mention that, you know, she talked to Will,

6    and he believed it to be appropriate.

7    Q.   Did Ms. Beaupain send you an email concerning the outcome

8    of employee relation's investigation?

9    A.   She did.

10           MR. CHIARELLO:  Mr. Yang, can you put up

11   Plaintiff's 60, please.  If you could please call out the top

12   email.

13   Q.   So, Ms. Rowe, this is an email from Ms. Beaupain to you

14   dated November 13, 2018.  And in relation to the meeting you

15   had with Ms. Beaupain, in what proximity did this email get

16   sent?

17   A.   Shortly after the meeting.

18   Q.   And Ms. Beaupain writes:

19           "As we shared, we looked into the concerns you raised

20   regarding your level at hire and whether gender played a role

21   in the consideration of your level.  As we shared, we did not

22   find gender influenced your leveling decision and that your

23   years and/or type of work experience were consistent with the

24   average years of work experience for those hired as L8

25   directors in your org.  We shared that through our review we

1    determined that you had male peers with both fewer years and

2    more years of work experience also hired as L8 directors in

3    your org.  As we shared, this concludes our review.  We

4    consider this matter closed at this time."

5             Now, what Ms. Beaupain writes here, in terms of the

6    explanation for your level, is that what she had shared with

7    you when you met with her a few days earlier?

8    A.  No.  She — in our meeting she talked about L9 men, how

9    they had more years of experience or they came from tech

10   companies, whereas in this email she was only talking about the

11   L8 people.

12   Q.  Now, subsequent to this email, what was the next

13   communication with you from Google about the financial services

14   vertical lead role?

15   A.  It was a meeting with Tariq in December.

16   Q.  And what did Mr. Shaukat say to you in the meeting that

17   took place in December?

18   A.  So Tariq told me that they're pausing the hiring on the

19   financial services lead role because Diane Greene was stepping

20   down as CEO.  There was a new CEO coming in, Thomas Kurian.

21   And he said when they do resume the role, you know, that they

22   were going to look for a more sales-oriented person.  That I

23   was too technical.

24   Q.  And following this conversation, what did you understand

25   the state of your candidacy for the financial services vertical

NABHRow3                    Rowe - Direct

1  lead role to be?

2  A.  That I was no longer a candidate.

3  Q.  Ms. Rowe, did someone ultimately fill the role of financial

4  services vertical lead?

5  A.  Yes.

6  Q.  Who was that?

7  A.  That was Stuart Breslow.

8       MR. CHIARELLO:  Mr. Yang, you can take down the

9  exhibit.  Thank you.

10  Q.  When did you learn that Mr. Breslow was going to be the

11  financial services vertical lead?

12  A.  Very shortly after the conversation with Tariq.

13  Q.  Now, up to that point had you had an opportunity to observe

14  Mr. Breslow working?

15  A.  Yes.

16  Q.  What kind of work had Mr. Breslow been performing prior to

17  becoming the vertical lead?

18  A.  So Tariq was a new joiner to Google.  He had just joined

19  about six months ago, and he was focusing mostly on compliance,

20  and he was also doing a small project on anti-money laundering.

21  Q.  And in your view, how did your work, the work you were

22  performing, compare to Mr. Breslow's?

23  A.  They had a lot of similarities.  You know, Mr. Breslow was

24  talking to the customers and understanding —— mostly in the

25  financial services space and understanding their needs in the

1   regulatory and compliance space.  He was talking to product and

2   engineering teams in terms of, you know, what needs to be built

3   into their products for regulatory and compliance, doing

4   thought leadership, but he was doing it more on a

5   compliance/regulatory basis.  I had been doing it on a more

6   broad basis.

7   Q.  And, Ms. Rowe, did you have an understanding of

8   Mr. Breslow's background prior to joining Google?

9   A.  Yes.

10  Q.  And how did your qualifications for the financial services

11  vertical lead role compare to his?

12          MS. TOMEZSKO:  Objection.  Lack of foundation.  Can

13  she explain, please, how she has that understanding.

14  Q.  Ms. Rowe, can you explain your basis for your understanding

15  of Mr. Breslow's background?

16  A.  Both, you know, my conversations with Mr. Breslow,

17  information available in his hiring packet, and just general

18  industry experience.

19  Q.  So given your understanding of Mr. Breslow's background,

20  how did your qualifications for the vertical lead role compare

21  to his?

22  A.  Mr. Breslow was a lawyer who had spent an entire career in

23  compliance.  I was an engineer who had spent an entire career

24  building technology systems.  Mr. Breslow's spent a long time

25  in his career focusing on things like setting up internal

1   policies, doing risk assessments, audits, reporting compliance

2   breaches.  I had spent an entire career, you know, building

3   very large-scale technology systems, and I had built some of

4   the largest financial technology platforms in the industry that

5   we were in.

6           You know, finally, Mr. Breslow had been at Google less

7   than six months doing a very nontechnical role.  At this point

8   I had been at Google almost two years, you know.  I knew our

9   product.  You know, I knew our customers.  You know, I was

10  doing thought leadership.  You know, I had market credibility,

11  and I'd been there.  And I met every qualification for the

12  role.  Mr. Breslow didn't.

13  Q.  How did you learn that Mr. Breslow had become the financial

14  services vertical lead?

15  A.  There was no announcement, but shortly after, like days

16  after, all the financial services head count was moved under

17  Mr. Breslow; Stuart Breslow started introducing himself as the

18  head of financial services, both internally and externally,

19  talking to customers saying he's the head of financial

20  services; others had started referring to Mr. Breslow as head

21  of financial services; spoke at events as the head of financial

22  services.

23  Q.  Now, Ms. Rowe, can you describe for us in the time period

24  following the time Mr. Breslow was made vertical lead what kind

25  of work you were doing?

1  A.  I continued doing the same thing, you know, focusing on

2  financial services, meeting with our customers, focusing on

3  product and engineering work, and doing thought leadership.

4  Q.  During that time that you were reporting to Mr. Shaukat,

5  did you have any speaking engagements?

6  A.  Yes, many.

7         MR. CHIARELLO:  Mr. Yang, can you put up and publish

8  Plaintiff's 104A, and if you could just quickly flip through

9  for Ms. Rowe.

10 Q.  Ms. Rowe, for Plaintiff's 104A, what are we looking at?

11 A.  These are my speaking engagements from when I started at

12 Google till the end of 2019.

13 Q.  And approximately how many speaking engagements are on this

14 document?

15 A.  About 45 to 50.

16 Q.  Any of these stand out specifically for you?

17 A.  I think the one I mentioned previously, the Google Cloud

18 Summit where I did all four keynotes, and the only other

19 keynote speaker on stage was Thomas Kurian.

20 Q.  Now, the speaking engagements, some of these speaking

21 engagements are after the time that Mr. Breslow became the

22 vertical lead, correct?

23 A.  Yes.

24        MR. CHIARELLO:  OK.  Mr. Yang, you can take that down.

25        THE COURT:  Mr. Chiarello, excuse.  Me, are you coming

NABHRow3                         Rowe - Direct

1    to 104B?

2                MR. CHIARELLO:  I am.

3                THE COURT:  Because I need to say something to the

4    jury before you put that up.  So are you coming to it now?

5                MR. CHIARELLO:  I am.  Thank you.

6                THE COURT:  Members of the jury, the plaintiff is

7    about to show you an exhibit that consists of articles prepared

8    by Ms. Rowe and a speech that she gave, and you are to consider

9    those materials only for the fact that she wrote articles and

10   gave a speech.  You are not to consider them for the truth of

11   any of the matters addressed within those materials.  OK.

12               All right.  Go ahead, Mr. Chiarello.

13               MR. CHIARELLO:  Thank you, your Honor.

14   Q.  Ms. Rowe, did you publish any articles in 2019?

15   A.  Yes.

16               MR. CHIARELLO:  Mr. Yang, can you please put up and

17   publish for the jury Plaintiff's 104B, and if you could just

18   cycle through that for the jury.

19   Q.  Ms. Rowe, what is Plaintiff's 104B?

20   A.  These are a number of articles that I wrote for Google

21   Cloud.  Yeah, some of these are published on Google Cloud's

22   website, some of them on industry publications.

23   Q.  Ms. Rowe, in 2019 did you receive any appointments?

24   A.  I did.

25               MR. CHIARELLO:  Your Honor, am I OK to publish

NABHRow3                    Rowe - Direct

1   Plaintiff's 76?  I don't know if there was an instruction you

2   wanted to give with respect to that.

3              THE COURT:  Just a moment.  Thank you.

4              I might need to speak to you for a moment because I

5   don't remember where we left things on Plaintiff's 76.  I

6   thought we had resolved that yesterday.

7              MR. CHIARELLO:  I believe it was — I believe that

8   your Honor wanted to give an instruction with respect to that

9   as well.

10             THE COURT:  Yes, I'm trying to remember what that was

11  is the issue.

12             MR. CHIARELLO:  May I approach?

13             THE COURT:  You may.

14             (Continued on next page)

15

16

17

18

19

20

21

22

23

24

25

NABHRow3                        Rowe – Direct

1            (At sidebar)

2            MR. CHIARELLO:  Your Honor, there are three pages to

3    the exhibit.  The third is a press release.

4            THE COURT:  Right.

5            MR. CHIARELLO:  I believe you were going to give an

6    instruction that the press release was also not for the truth

7    but the fact that it was released.

8            MS. TOMEZSKO:  I thought it was more than that.  It

9    was the fact that this was information publicly available about

10   Ms. Rowe.

11           THE COURT:  Right, that is how I remember it.

12           OK.  Let me just think about that for a second, make

13   sure I don't have any more questions.  This was considering it

14   only for the fact that it constitutes information that was

15   available to the public about her at that time but not for the

16   truth of what is in there.

17           MR. CHIARELLO:  That's my understanding.

18           (Continued on next page)

19

20

21

22

23

24

25

1          (In open court; jurors present)

2          THE COURT:  Members of the jury, Mr. Chiarello and

3   Mr. Yang are about to publish to you an exhibit, and there is a

4   page in the exhibit that captures a press release.  You are to

5   consider that press release only for the fact that it shows

6   information that was available to the public about Ms. Rowe at

7   that time.  You are not to consider the press release for the

8   truth of the matters described within the press release.

9          Thank you.

10          MR. CHIARELLO:  Thank you, your Honor.

11          Mr. Yang, can you please publish Plaintiff's 76 and

12   just cycle through it.

13   BY MR. CHIARELLO:

14   Q.  Ms. Rowe, what is contained in Plaintiff's 76?

15   A.  This is an invitation letter and a press release from the

16   Federal Reserve Bank of New York from the president of the

17   Federal Reserve Bank of New York, President Williams, to sit on

18   the technical advisory committee of the New York Fed.

19   Q.  What is the Federal Reserve Bank of New York?

20   A.  The Federal Reserve Bank is the central bank of the United

21   States government, and it's made of 12 different Federal

22   Reserve banks.  And New York is the largest one.

23   Q.  And what is the Fintech Advisory Group of the Federal

24   Reserve Bank of New York?

25   A.  This is an advisory group that works directly with

1    President Williams to advise him on certain topics in

2    technology and how they affect the economy; to advise him on

3    the effects of technology like cloud and AI but much more

4    broadly than that, you know, how technology impacts the

5    economy; and to help him with monetary policymaking.

6    Q.  Ms. Rowe, are you still on this advisory group?

7    A.  No, not right now.  I served three terms on it.

8    Q.  OK.  During the time you were —— Mr. Yang, you can keep the

9    letter up for a second —— during the time you were on the

10   advisory group, what did that appointment entail?  What did you

11   do?

12   A.  That meant, you know, regular meetings with President

13   Williams on various topics that would have either been picked

14   by President Williams or topics that were current.  We'd

15   discuss and bring our opinions to the table, each of the

16   advisory board members, on what does that mean for the New York

17   Fed, and I would educate President Williams but also offer

18   opinions.

19   Q.  Ms. Rowe, how did you come to receive the appointment to

20   the Fintech Advisory Group for the Federal Reserve?

21   A.  I was nominated by Google's public policy team.

22   Q.  To your knowledge, was Mr. Breslow nominated for this

23   position?

24   A.  He was not.

25            MR. CHIARELLO:  Mr. Yang, can we look at the last page

1    of the press release.

2    Q.  Ms. Rowe, is this the press release associated with your

3    appointment to the advisory group?

4    A.  Yes.

5            MR. CHIARELLO:  Mr. Yang, can we put up

6    Plaintiff's 109 and publish for the jury, please.

7    Q.  Ms. Rowe, what is Plaintiff's 109?

8    A.  This was my speaker's bio in 2019.

9    Q.  By whom was it prepared?

10   A.  By Google's PR and marketing teams.

11   Q.  And it notes that you're at the forefront of Google's cloud

12   and machine learning capabilities and enables the financial

13   services industry to take advantage of Google's technology to

14   fuel their digital transformation, correct?

15   A.  Correct.

16   Q.  This is something that Google published, correct?

17   A.  Correct.

18   Q.  Now, during the time —— Mr. Yang, you can take that down.

19           During the time that you were reporting to

20   Mr. Shaukat, did he provide you with any formal or informal

21   performance feedback?

22   A.  He did not.

23   Q.  Did you receive a poor performance evaluation from him?

24   A.  No, I did not.

25   Q.  Did you receive a performance evaluation from anyone?

NABHRow3                         Rowe – Direct

1    A.  I did.

2    Q.  Who was that from?

3    A.  Will Grannis.

4    Q.  And did anyone tell you why Mr. Grannis conducted your

5    performance evaluations?

6    A.  Tariq told me that he didn't know me enough, and I was

7    still working on financial services, and it would be more

8    appropriate to —— because Will was more familiar with my work,

9    for him to do the performance review.

10   Q.  What rating did Mr. Grannis give you?

11   A.  "Exceeds expectations."

12   Q.  Following the December conversation in which Mr. Shaukat

13   told you you wouldn't be further considered for the head of

14   financial services role, to what extent did you interact with

15   Mr. Shaukat?

16   A.  Not much at all.

17   Q.  When's the next time you spoke with him?

18   A.  In March.

19   Q.  What was the conversation that you had with Mr. Shaukat in

20   March?

21   A.  So this was the first time that Tariq and I were talking

22   since he told me I wasn't going to be a candidate for the

23   financial services role.  It was over videoconference.  He told

24   me that I had three options in front of me.  He said that I

25   could stay in this organization but work for Stuart Breslow in

1   a small project on anti-money laundering or I could go back to

2   OCTO, but if I go back to OCTO, I could not do any work on

3   financial services.  The third option wasn't even an option.

4   He said I could choose to stay in his team, he would park me

5   under Stuart Breslow, and I could find another job at Google.

6   He gave me those three options.

7   Q.  And which option did you choose?

8   A.  I chose to move back to OCTO.

9   Q.  When you moved back to OCTO, what was the scope of the work

10  you were to perform?

11  A.  I had to pick something, so it was hybrid cloud.

12  Q.  And what is hybrid cloud?

13  A.  Hybrid cloud is institutions are moving to the cloud.

14  They're still halfway on prem, they're halfway on the cloud,

15  and so it's just like a hybrid state.

16  Q.  And after you returned to OCTO, did you have any

17  involvement in financial services?

18  A.  Not at first because I was told not to touch financial

19  services.  I was told not to do anything, but people kept

20  pinging me.  I kept getting requests from the account teams,

21  the public policy team, you know, the marketing teams, and the

22  engineering teams, even Stuart Breslow about requests.  So I

23  started doing a little bit.  And then both Stuart Breslow and

24  Tariq left, so I started doing more.

25  Q.  Now, Ms. Rowe, at some point did you retain an attorney?

NABHRow3                    Rowe - Direct

1    A.  I did.

2    Q.  When was that?

3    A.  That was January of 2019.

4    Q.  And who did you retain?

5    A.  Cara Greene with Outten & Golden.

6    Q.  What caused you to retain legal counsel?

7    A.  At that point I had tried really hard and I wasn't going

8    anywhere.  So I thought I needed some help.

9    Q.  And what happened after you retained legal counsel?

10   A.  My counsel reached out to Google to try to reach a

11   resolution.

12   Q.  Were they successful?

13   A.  No.

14   Q.  What did you do next to address your concerns?

15   A.  We filed a lawsuit in September of 2019.

16   Q.  I want to look ahead just a little bit to 2000 —— early

17   2020.  At that time did you receive any recognitions or

18   nominations?

19   A.  Yes.

20   Q.  What recognitions did you receive?

21   A.  At that point I think I was —— one, nominated or

22   short-listed for the CTO of the year award by Women in IT, and

23   I was one of the five on the short list.

24   Q.  And what are —— I guess what are the Women in IT awards,

25   what is that?

1   A.  Those are, you know, the —— those are awards that both

2   celebrate and recognize women in technology leadership that are

3   doing great work.

4   Q.  Now, around that time did you express interest in another

5   role at Google?

6   A.  I did.

7   Q.  What role was that?

8   A.  That was the VP of sales for financial services.

9   Q.  How did you learn that Google was looking to fill that

10  role?

11  A.  It was in a casual meeting with Kirsten Kliphouse, who was

12  the hiring manager.

13  Q.  So tell us about your conversation with Kirsten Kliphouse.

14  A.  So Kirsten was relatively new to Google, so I reached out

15  to her for a meet and greet to kind of say hi, introduce

16  myself.  And Kirsten and I met actually outside of the office

17  at a coffee shop and kind of just talked about each other, just

18  getting to know each other, the kind of stuff that you talk

19  when you're first meeting a person.

20  Q.  Anything else you discussed with her?

21  A.  Yes.  During this conversation, she mentioned that she was

22  looking for a VP of sales for financial services.  She

23  mentioned she didn't really have luck with people with

24  traditional sales backgrounds, so she was looking more broadly

25  with people that are —— that are different than just the sales

1   background, and I told her I'd be interested.

2   Q.  Did you discuss anything with her about your background?

3   A.  No.

4   Q.  Now, the portion of this conversation around the VP of

5   sales role, how long did that last, approximately?

6   A.  That was very short.  Like, just she mentioned that there

7   was a role, that she was looking more broadly than just the

8   sales background, and she just —— you know, just told me to

9   reach out to the recruiter for next steps.  So very short.

10  Q.  Had you ever spoken with Ms. Kliphouse before that time?

11  A.  No.  This was our first conversation.

12  Q.  In that conversation did she ask you anything about your

13  qualifications?

14  A.  No.

15  Q.  Did she ask you anything about your background?

16  A.  No.

17  Q.  Did you discuss with specificity the qualifications for the

18  role?

19  A.  No.

20  Q.  Did you apply for this role, the VP of sales position?

21  A.  I did.  I did.

22  Q.  How did you apply?

23  A.  I did reach out to the recruiter.

24  Q.  And who is the recruiter?

25  A.  Stuart Vardaman.

1    Q.  Did Mr. Vardaman send you a job description?

2    A.  Yes.

3            MR. CHIARELLO:  Mr. Yang, can you please put up

4    Plaintiff's 101.  And, Mr. Yang, if you could please just cycle

5    through it for the witness.

6    Q.  Ms. Rowe, is this the job description that Mr. Vardaman

7    sent to you along with the cover email attaching it?

8    A.  Yes.

9    Q.  Let's take a look at the first page, the cover email.

10           Now, Mr. Vardaman writes to you, this is February 4 of

11   2020.  With respect to the role, he writes:  "It sounds like

12   she and Rob are open to 'thinking differently' about this role,

13   so it is not necessarily a prerequisite that someone has

14   carried a sales revenue number."

15           Is that consistent with the conversation that you had

16   with Ms. Kliphouse during the meeting you described?

17   A.  Yes.

18   Q.  Take a look at the description itself.  Ms. Rowe, what was

19   your understanding of the functions of what the financial

20   services industry leader role would be?

21   A.  So this would be a role, you know, setting strategy for the

22   sales organization.  It would be, you know, focusing on the big

23   customers in the financial services space, doing like leading

24   the growing market function.

25   Q.  Ms. Rowe, do you have an opinion about whether you're

1    qualified for this role?

2    A.  Yes.

3    Q.  What is your opinion?

4    A.  I think I was uniquely qualified.

5    Q.  Why do you believe that?

6    A.  You know, at this point I've been at Google for three

7    years, and sales is all about knowing the products, getting the

8    customers to understand the products, and being in that sales

9    cycle, building the credibility in the market, doing business

10   development.  I've been doing this at Google for three years,

11   and at this point I was a recognized leader in the industry.  I

12   was serving on the board of —— on the technical advisory group

13   of New York Fed.  At this point Google had also appointed me to

14   the advisory group for Capital G.  Capital G is Google's

15   private equity arm.  So Google actually uses Google's own money

16   to do investments of $50 million and above into technology

17   companies.  So they had invited me to the board to advise them

18   on what companies to invest, you know, Google's dollars in the

19   financial services space.  And so for me, I thought I was

20   uniquely qualified.

21   Q.  Well, let's take a look at the actual qualifications.

22         Mr. Yang, can you start with the bottom of 60561.

23   And, Mr. Yang, can you just call out the bottom of that so we

24   can see it better.  Perfect.

25         Now, Ms. Rowe, at this point in time, how many years

1    of experience did you have in financial services?

2    A.  So this was 2020.  I had 26 years of experience.

3    Q.  And how many years of experience did you have as an

4    executive?

5    A.  Two decades.

6    Q.  And in what way did you have proven success managing a

7    sales/business development organization to meet and exceed

8    revenue goals?

9    A.  So I didn't have the traditional sales background.  You

10   know, I never ran a sales team with a quota.  But at Google,

11   you know, the role that I've been doing was spanning across

12   engineering and sales, and I had been working with our most

13   important customers as their adviser, helping them understand

14   our products.  I've been part of sales pitches, and I've been

15   part of the sales process in a really big way to close with

16   some of our largest financial services customers.  So while I

17   didn't have the traditional sales background, I was very much a

18   big part of the sales cycle, and I had a very deep

19   understanding of how that process worked and how to execute it

20   in that process.

21   Q.  And in what ways did you have experience with information

22   technology and computer systems that support enterprise goals,

23   including exposure to cloud technologies and machine learning?

24   A.  I mean, I've been doing this — this has been my entire

25   career, building information technology systems.  And exposure

1    to cloud technologies and machine learning, I'd been working at

2    Google for three years.

3    Q.  And in what way did you have established actionable

4    executive/C-suite relationships?

5    A.  At this point I had a very large network of C-suite

6    relationships, both from places I worked prior to the Google,

7    from places like Bank of America, UBS, and JPMorgan Chase, and

8    also during my time at Google working with, you know, Google

9    Cloud's customers.

10   Q.  And in what way do you believe you had a sterling

11   reputation within the financial services sector?

12   A.  I was advising President Williams on financial technology

13   issues.  I was sitting on Capital G's board.  Google was, you

14   know, having me speak at their most important events, talking

15   to their most important customers.

16          MR. CHIARELLO:  Mr. Yang, we can take that down, and

17   can you please put up Plaintiff's 106.

18   Q.  Ms. Rowe, what is Plaintiff's 106?

19   A.  This is me pinging Stuart Vardaman on a status update for

20   the next step for my candidacy for the role.

21   Q.  It looks like as of the most recent email on February 25

22   you had scheduled a time to speak with Mr. Vardaman, correct?

23   A.  Correct.

24   Q.  Did you actually speak with Mr. Vardaman?

25   A.  Yes.

NABHRow3                           Rowe - Direct

1    Q.  When did that call occur?

2    A.  Shortly after when it was scheduled.

3    Q.  What did Mr. Vardaman tell you in that conversation?

4    A.  He told me that I wasn't going to be considered because I

5    wasn't a good fit.

6    Q.  And did you say anything to him?

7    A.  I asked him —— I asked him what that was based on, and he

8    told me it was based on the two-hour interview I had with

9    Kirsten.

10   Q.  When did you have a two-hour interview with Ms. Kliphouse?

11   A.  I did not have a two-hour interview with Ms. Kliphouse.

12   Q.  Had you ever met with Ms. Kliphouse beyond the coffee

13   meeting that you described earlier?

14   A.  No.

15   Q.  In that meeting how long had you discussed the role?

16   A.  It was very short.  Ten minutes, maybe.

17   Q.  Did you understand that short meeting with Ms. Kliphouse to

18   be an interview for the role?

19   A.  No, definitely not.

20   Q.  Now, Ms. Rowe, are you aware of who —— whether anyone

21   ultimately received the financial services sales role?

22   A.  Yes.  It went to Yolande Piazza.

23   Q.  And are you familiar with Ms. Piazza's background,

24   qualifications for the role?

25   A.  Yes.

1  Q.  How are you familiar with her background and qualifications

2  for the role?

3  A.  From talking to her, from industry, and also from her

4  hiring packet.

5  Q.  So on that basis, how would you compare your qualifications

6  for the sales role to Ms. Piazza's?

7  A.  I think that, first and foremost, you know, I was at Google

8  for three years doing, you know, this role, engaging with

9  customers, influencing the industry, building the market for

10  financial services so our customers understood who we are, what

11  we have to offer, what our products had to offer.  You know,

12  all the thought leadership I had done in that space, all the

13  regulatory outreach I had done in that space, and all the

14  customer work I had done in that space.  This was now three

15  years.  I had that.  Yolanda, she was coming from the outside.

16       In terms of our qualifications, I had two degrees in

17  computer science, undergrad and grad.  Ms. Piazza didn't have

18  any degrees.  I was coming in as a CTO that had vast amounts of

19  experience building technology systems at a global scale, large

20  distributed complex systems.  Having done that, you know,

21  allows me to work with our customers in a way that I understand

22  what they're going through.  They can talk to me as someone

23  who's been in their shoes.  I had — you know, I had a lot of

24  experience doing that.

25       Third, I had worked in three different financial

1   institutions before I came to Google.  I worked at UBS.  I

2   worked at Bank of America.  I worked at JPMorgan Chase.  You

3   know, these are some of the largest financial institutions in

4   the world, JPMorgan being the number one, Bank of America being

5   number two in the world outside of China.  Having worked at

6   these institutions gave me a very varied understanding of the

7   kinds of things, the businesses in financial services.  It

8   spanned everything from retail banking, corporate investment

9   banking, from exchanges, and I kind of got to observe and live

10  and breathe and work on this very different parts of financial

11  services.  Ms. Piazza worked for Citibank for 30 years.

12  Citibank, while they're on every street corner, we see them,

13  it's predominantly a retail bank.  Their presence in other

14  parts is a lot smaller and their international footprint is

15  also significantly smaller compared to some of the institutions

16  that I've worked in.

17          And you know, when it came to, you know, cloud

18  experience, I had a lot of that.  Ms. Piazza did not.  And

19  having worked at these financial institutions and having worked

20  at Google Cloud with our customers, I had built a very large

21  network of C-suite relationships.

22  Q.  Ms. Rowe, it's 2023, I think, what have you been doing at

23  Google since 2020, since the time you learned you would not

24  receive the sales role?

25  A.  I'm still in OCTO.  I am still focusing on financial

services, although over time, you know, my role has diminished,

and they started bringing people like Ms. Piazza.  My

contributions are now diluted, not — not what they used to be.

Q.  Are you still a technical director?

A.  I am.

Q.  And what have your performance evaluations been since the

time that you moved back to OCTO?

A.  It's always been "exceeds expectations."  In 2022, Google

changed the way they did ratings.  Until then it was always

"exceeds expectations."

Q.  To what degree are you focusing on financial services?

A.  I'm still focusing on financial services.

Q.  Do you still report to Will Grannis?

A.  No.  I've been layered.  Last year, in 2022, Will decided

to introduce regional managers.  I raised my hand for

the East Coast regional manager role.  I was passed over, and

Patricia Florissi was given that role, and now she sits between

me and Will.

Q.  And how long had Ms. Florissi been working in OCTO at the

time Mr. Grannis made her your manager?

A.  She was hired in 2020, so she had been at Google for two

years.

Q.  In the time that Ms. Florissi become your manager, any

notable successes in your work?

A.  Yes.  Yes, many.

NABHRow3                          Rowe – Direct

1   Q.  Can you share a few with us.

2   A.  Yes.  Last year, in 2022, I was nominated to the technology

3   advisory group of the CFTC.  The CFTC is the main regulatory

4   body for derivatives trading, so things like futures, options,

5   swaps, including cryptocurrencies.

6           And when AI started taking off, you know, it became ——

7   ChatGPT came along.  Everyone started talking about AI and what

8   a great impact it's going to have on humanity.  I started

9   focusing on the responsible use of AI.  So I've been doing that

10  this year, really focusing on how do you assess the risks of AI

11  and how do you do it in a responsible way.

12          Last year we also signed one of our biggest deals in

13  financial services with Goldman Sachs, multi-hundred million

14  dollars, multiyear deal.  And yeah, many others.

15          (Continued on next page)

16

17

18

19

20

21

22

23

24

25

NABVROW4                          Rowe - Direct

1    BY MR. CHIARELLO:

2    Q.  Have you received any promotions since 2020?

3    A.  No, I have not.  On the contrary, I've been layered.

4    Q.  And since bringing this lawsuit, has Mr. Grannis discussed

5    with you having you undertake any leadership roles?

6    A.  No, he did not.

7    Q.  Are you still a Level 8?

8    A.  I am.

9    Q.  What role is Mr. Penberthy today?

10   A.  He's a Level 9.

11   Q.  Ms. Rowe, you continue to be a Google employee; correct?

12   A.  Correct.

13   Q.  What has it been like to continue working at Google while

14   pursuing this lawsuit?

15   A.  There is this thing that -- this lawsuit.  And I go to work

16   every day pretending it doesn't exist, but it's there.

17   Everyone knows it.  Everyone just ignores it.  And I do my

18   best.

19           I talk to my customers.  I go do these thought

20   leadership events.  But it's there.  It's there every day.  I

21   carry the burden of it every day.  I know my relationships with

22   my coworkers, I used to have great relationships with Will, all

23   the OCTO people.  Now people don't want to talk to me anymore.

24   They're afraid.  You know, I go to team off-sites, I'm usually

25   sitting by myself.  Like people are afraid.

1          I miss those work relationships.  And my career is

2    completely stalled.  My peers blow past me.  They're getting

3    promoted and I'm here exactly where I was.

4    Q.  There's tissues on your left.

5    A.  Thank you.

6    Q.  How has the pursuit of your claims impacted your view of

7    yourself?

8    A.  You showed me that photo, my social media.  I was so happy

9    and optimistic when I started at Google.  Now I have so much

10   self-doubt, like, I don't know where to go from here anymore.

11   I don't know what the future holds.  It's really hurt my

12   self-confidence.  I'm sorry.  Yeah.

13   Q.  Because I also want to ask you how your experiences at

14   Google has impacted you in your personal life.

15   A.  This thing, it colors everything in my life.  My

16   relationship with my friends and my husband, my family, it's

17   been this cloud that's like hanging over us.

18          It's been four years since I filed the lawsuit.  Since

19   then, my oldest is in college now.  My younger one is in high

20   school.  It's like their best years that I could have spent

21   with them has been in the shadow of this.  I'm not getting

22   those days back.

23   Q.  Let me ask you, Ms. Rowe, is there a reason that you've

24   stayed at Google?

25   A.  Yes.  You know, I never meant to leave Google.  I wanted to

NABVROW4                        Rowe - Direct

```
 1   stay and make it right.  That is why I tried so hard to make it
 2   right.  I'm sorry.
 3   Q.  Take your time.
 4   A.  You know, why should I leave?  Why should it be me that
 5   leaves, when it's them that did all this.  Even if I wanted to
 6   leave, I used to get calls from recruiters, I don't get calls
 7   from recruiters anymore.  I just -- I don't know if I --
 8   Q.  Take a breath.
 9   A.  Yes.  I'm okay.  I'm okay.
10   Q.  If it's helpful, I'm almost done.
11   A.  Okay.
12   Q.  Ms. Rowe, did you ever discuss your claims with Will
13   Grannis?
14   A.  He brought them up.
15   Q.  And can you tell us about the conversation you had with
16   Mr. Grannis about your claims?
17   A.  This was April, shortly after I moved in OCTO.
18   Q.  I'm sorry, April of what year?
19   A.  Sorry?
20   Q.  I'm sorry.  April of what year?
21   A.  Shortly after I moved back, so that was 2019.  I moved back
22   to OCTO.  And I think it was April.  We were having Google
23   Cloud Next, our biggest customer meeting in San Francisco.  We
24   were all at a bar because, you know, Will put together a team
25   meeting for all the OCTOs that were there for the event.  And
```

1    he approached me and later, kind of late at the event, he

2    approached me and he said, you know, that he'd been approached

3    by Google's counsel about the lawsuit.  He asked me how he

4    could help and whether I wanted to stay at Google.

5              I said, Yes, you know, of course I want to stay at

6    Google.

7              He asked me things like how much time I have and --

8    and then he said to me, he said, You don't know how much

9    respect people have for you.  You don't know, like, how many

10   people look up to you.  Said to me that if it was his own

11   daughters that were going through what I was going through, he

12   would tell them to do exactly what I'm doing.  That's what he

13   told me.

14             MR. CHIARELLO:  No further questions.

15             MS. TOMEZSKO:  Would you like to begin now?

16             THE COURT:  Yes, please.  We'll go now until 12:45, at

17   which point we'll take a lunch break.

18             JUROR:  Excuse me.  Pen.

19             THE DEPUTY CLERK:  A pen?

20             MS. TOMEZSKO:  May I question the witness, your Honor?

21             THE COURT:  You may.

22   CROSS-EXAMINATION

23   BY MS. TOMEZSKO:

24   Q.  Good afternoon, Ms. Rowe.

25   A.  Good afternoon.

NABVROW4                         Rowe - Cross

1   Q.  Now, I think you just testified that you had spoken with

2   Will Grannis, and I think you said April 2019?

3   A.  Yes.

4   Q.  And that was about your -- he said, as I understand your

5   testimony, that he had been contacted about your lawsuit?

6   A.  Yes.

7   Q.  Against Google?

8   A.  Sorry, it was -- yeah.

9   Q.  You filed a lawsuit in September of 2019; is that right?

10  A.  So sorry.  It was about the -- the lawyers had approached

11  him because I had retained lawyers in January.

12  Q.  And earlier, I believe you said your compensation has

13  remained relatively flat at Google; is that right?

14  A.  I had some increases.

15  Q.  And do you recall the testimony from Mr. Chiarello

16  yesterday that you are earning about approximately $750,000; is

17  that right?

18          MR. CHIARELLO:  Objection.

19          She characterized my testimony.

20  Q.  Was there a reference yesterday to the compensation you

21  were making at Google; correct?

22  A.  Can you ask the question again?  Sorry.

23  Q.  Let me just jump to the point, Ms. Rowe.

24  A.  Yes.

25  Q.  How much did Google pay you last year?

NABVROW4                      Rowe - Cross

1    A.  I can't remember the exact number, but, you know, I think

2    it was about 900.

3    Q.  940,000, does that sound right?

4    A.  I think it might be about right.  But if you have the

5    compensation letter, I can verify it.

6    Q.  I think if we agree on the amount, I think -- or the range,

7    that probably sounds good.

8    A.  Yeah, that's right.

9    Q.  Okay.  Now, I want to go back to sort of where we all

10   started at this point.

11          Let's look at your resume.  If I understood your

12   testimony earlier, you said you had established your knowledge

13   of other people's credentials through both conversations with

14   them and looking at their hiring packets; is that right?

15   A.  Correct.

16   Q.  Okay.  So let's look at your resume then, if we can.

17   A.  Yes.

18          MS. TOMEZSKO:  I'd like to pull up Plaintiff's 119.

19          Jean, can you please pull that up.

20          MS. GREENE:  While that's being done, your Honor,

21   we've lost our realtime feed.

22          THE COURT:  Okay.

23          MS. TOMEZSKO:  I just need to know when I can proceed.

24          THE COURT:  Is it restored?

25          THE DEPUTY CLERK:  No, someone has to come up.  Can

1    they continue without it, is it okay, or do we have to wait?

2              THE COURT:  Google, do you have your LiveNote feed?

3              MS. TOMEZSKO:  We didn't order it.

4              I'd be happy to share if we did.

5              THE COURT:  Okay.  Because I have it, so it's odd.  It

6    must be something with a wire.

7              MS. GREENE:  Your Honor, just to respect the jury's

8    time, we can go forward without it, and at lunchtime perhaps

9    have it rectified.

10             THE COURT:  Yes, we will make sure that the people who

11   know how to fix such issues come then.

12             MS. GREENE:  Thank you.

13             MS. TOMEZSKO:  Thank you, Ms. Greene.

14   BY MS. TOMEZSKO:

15   Q.  So, Ms. Rowe, do you recognize this as your resume?

16   A.  So this was my resume that I submitted to Google for a

17   prior role.  But, yes, this was my resume, I believe, in 2015.

18   Q.  And do you have any reason to doubt that this is the resume

19   that was considered with your candidacy for the technical

20   director in OCTO role?

21   A.  This is the resume they looked at since they haven't asked

22   for an updated resume.

23   Q.  Right.  And you didn't submit an updated resume, do I have

24   that right?

25   A.  I wasn't asked for one.

1   Q.  No, you did not?

2   A.  Correct.

3   Q.  Okay.  Now, I just want to take a look at what it says in

4   your resume here.  We've heard several times that you were a

5   chief technology officer at J.P. Morgan.  This resume does not

6   use the words "chief technology officer" to describe your role

7   at J.P. Morgan, does it?

8   A.  No, it does not.  In financial services, you know, this is

9   a resume --

10  Q.  Ms. Rowe, I'm sorry.  I'm so sorry to interrupt, but I am

11  on a clock; and your counsel has the ability to question you

12  about why it doesn't say that.

13  A.  Okay.

14  Q.  I apologize for interrupting.

15  A.  Yes.

16  Q.  Now, and the words "cloud computing," they don't appear on

17  this resume either; is that right?

18  A.  Correct.

19  Q.  The words "cloud migration," they are not on this resume

20  anywhere?

21  A.  Correct.

22  Q.  Actually, the word "cloud" doesn't appear anywhere in this

23  description of your background, does it?

24  A.  Correct.

25  Q.  Now, you had mentioned that there was another role that you

1   had applied for earlier, and that this resume was submitted in

2   connection with that; is that right?

3   A.  I didn't submit any resumes for the roles.

4   Q.  I believe you said that this was the resume that you

5   submitted in 2015; is that right?

6   A.  Oh, so -- sorry.  I thought you were talking about the

7   future roles.

8   Q.  No.  The prior role, the prior role, Ms. Rowe.

9   A.  Oh, the prior role.  Yes.

10  Q.  Okay.  And that was a Level 8 engineering director role;

11  correct?

12  A.  Yes, was a engineering role, yeah, in the software space --

13  in the storage space, yes.

14  Q.  And you had interviewed for that role from approximately

15  November 2015 to February 2016, does that sound about right?

16  A.  Sounds about right because it was in 2015, yes.

17  Q.  Okay.  And so that was about seven months before your first

18  interview for the technical director role?

19  A.  Yes.  Correct.

20  Q.  Google did not offer you that engineering director role,

21  did it?

22  A.  The hiring manager left, the role didn't pan out, but I

23  went through all the interviews with success.

24  Q.  So no, there was no offer associated with that role?

25  A.  Correct.

NABVROW4                         Rowe - Cross

1   Q.   Some other things I want to discuss on your resume.

2          It says here that the size of your organization that

3   you oversaw was approximately 400 people; is that right?

4   A.   Yes.  That includes just the direct head count.  You know,

5   when my comparators were talking about their head counts, they

6   included both direct and indirect, so --

7   Q.   I'm going to stop you there, Ms. Rowe, again.  I'm on a

8   clock.

9   A.   Okay.

10  Q.   And if you look at the next page on your resume, we could

11  just turn to that, your earliest experience listed is June

12  1997; is that right?

13  A.   Correct.

14  Q.   And you accepted the offer from Google to become a

15  technical director in late 2016; is that right?

16  A.   Correct.

17  Q.   So if my math is correct, you had 19 years of professional

18  experience in financial services at that time; is that right?

19  A.   No, that's not correct.  Because when I finished my

20  undergrad in 1994, I started working for a local bank in

21  Turkey.  I did that for a year.

22  Q.   And that's not reflected on your resume, is it?

23  A.   It's not reflected on this resume, no.

24  Q.   Okay.  So just according to this resume --

25  A.   It doesn't change my experience.

1    Q.  I'm not saying it does, Ms. Rowe.  I don't mean to

2    discredit your experience in any way.

3          But it does say 1997 is your first professional

4    experience on this resume, does it not?

5    A.  I included just my U.S. experience, right.  This resume is

6    descriptive, not exhausted.

7          MS. TOMEZSKO:  You can take this down, Jean, please.

8    Q.  So when you came to J.P. Morgan in 2012, I think you said

9    yesterday that certain industries were starting to adopt cloud

10   enterprise technology, do you recall that testimony?

11   A.  I remember my testimony.

12   Q.  But the financial services industry, that had been late to

13   adopt cloud technology, right?

14   A.  Correct.

15   Q.  Because it was a very conservative and heavily regulated

16   industry; is that right?

17   A.  Correct.

18   Q.  And so yesterday you testified that you were working on

19   migrating J.P. Morgan's credit risk systems to the cloud, do

20   you recall that?

21   A.  I do.

22   Q.  J.P. Morgan had only started that process roughly a year

23   before you left in early 2016; is that right?

24   A.  Correct.

25   Q.  And so when Google hired you, you did not have any

NABVROW4                        Rowe - Cross

1  experience building cloud products; is that right?

2  A.  J.P. Morgan is not a cloud company; so yeah, I did not

3  build cloud products like Google did.

4  Q.  Okay.  And was that one of the reasons you told Krista

5  Callaghan, one of your recruiters, for the technical director

6  role, that you were not a cloud expert?

7  A.  Well, I told her that was very early on in the process,

8  they reached out to me and they said, you know, We're looking

9  for someone senior in the cloud space.  I wanted to be

10 up-front, so I said I'm not a cloud expert, meaning I didn't,

11 like, build in a cloud service provider, building cloud

12 products.

13 Q.  So you wanted to set her expectations, if I'm understanding

14 that correctly?

15 A.  I wanted to be up-front.

16 Q.  And is being a cloud expert in cloud computing in financial

17 services different from being an expert in cloud computing at a

18 cloud native company?

19 A.  Can you repeat the question?

20 Q.  Sure.  Is being an expert in cloud computing and financial

21 services, is that different from being an expert in cloud

22 computing at a cloud native company?

23 A.  I think context matters, right, you know, in the sense

24 that, you know, are you a cloud expert working for a company

25 that's like working in building cloud products.  It's a

NABVROW4                     Rowe - Cross

1   different thing than being an expert in financial services

2   industry.  And I had a lot of experience in the financial

3   services industry with cloud.

4   Q.  Okay.  So there is a difference.  Yes?  You would agree

5   with me there is a difference?

6   A.  I agree with you.

7   Q.  Okay.  And VMware is an example of a cloud native company,

8   right?

9   A.  No.

10  Q.  No?

11  A.  No.

12  Q.  Okay.

13  A.  VMware is a virtualization company; actually predates the

14  cloud.

15  Q.  Okay.  Now, I'd like to ask you some questions about your

16  offer letter, Ms. Rowe, if I may.

17  A.  Sure.

18         MS. TOMEZSKO:  Can we show what's been marked as

19  P-142, Jean.

20  Q.  This is Plaintiff's Exhibit 142.  We've looked at this

21  earlier, Ms. Rowe.

22  A.  Yes.

23  Q.  So you recognize this as the offer letter you accepted on

24  December 16th -- oh, sorry, December 2016; is that right?

25  A.  Yes.

NABVROW4                          Rowe - Cross

Q.  And so the first line says here:  Thank you for your

interest in Google, Inc.  We are delighted to offer you the

exempt position of technical director, office of the CTO,

Google Cloud platform.  Am I reading that correctly?

A.  Yes.

Q.  And there's no mention of a vertical lead role in this

offer letter, is there?

A.  No, there isn't.

Q.  There's no mention of any vice president role of any kind;

is that right?

A.  That's right.

Q.  And there's no promises about a future role at Google at

all in this offer letter; is that right?

A.  That's right.

Q.  Now, I'd like you to just take a look at the last paragraph

under "equity compensation" on the first page, just above the

section on benefits.  Do you see that?

        MS. TOMEZSKO:  Jean has highlighted it there.

A.  Yeah, just reading.

        Okay.  Yes.

Q.  And so what this says is that all future equity awards are

contingent upon approval by the board, right?

A.  Yes.

Q.  And that, as you understand it, is the board of directors

of Alphabet Inc., Google's parent company?

NABVROW4                        Rowe - Cross

1   A.  Yes.

2   Q.  And it also says that the equity program can be changed at

3   any time at the discretion of the board?

4   A.  Yes.

5   Q.  And so I think earlier there was some testimony about what

6   you were leaving on the table at J.P. Morgan; is that right?

7   A.  Yes.

8   Q.  The stock that you left on the table, so to speak, at J.P.

9   Morgan, that would vest over time, right?

10  A.  Correct.

11  Q.  And so you would have to have stayed at J.P. Morgan for

12  three years for that to vest, right?

13  A.  Yeah, it was unvested stock that was earned stock.

14  Q.  Earned or unvested?

15  A.  Both, earned and unvested.  That means that was

16  compensation work for I had already done, and it was also

17  unvested, meaning that I had to stay for a period to

18  actually -- in order to vest.

19  Q.  But you wouldn't be able to access it right away, right?

20  A.  Correct.  Yeah.  It was unvested stock.

21  Q.  Now -- okay.  So we have covered the offer letter.  Now

22  we're going to get to your actual start at Google.

23        So you started work at Google on March 13th, 2017; is

24  that right?

25  A.  Yes.

NABVROW4                          Rowe - Cross

1   Q.  Since that date, you've never hired anyone at Google;

2   correct?

3   A.  Correct, except, you know, for an --

4   Q.  And you've never participated in the process of leveling

5   someone at Google; is that right?

6   A.  Correct.

7   Q.  And before I get to the next question, I'd just like you to

8   define a term of art that's used at Google just for the benefit

9   of the jury.  It's the term "individual contributor."  So an

10  individual contributor is someone who doesn't have any direct

11  reports at Google, right?

12  A.  Correct.

13  Q.  So like the opposite of a people manager?

14  A.  Correct.

15  Q.  And you've been an individual contributor for your entire

16  employment at Google?

17  A.  Correct.  I mean, we were all hired as individual

18  contributors at the beginning.

19  Q.  And you've never managed a team at Google; is that right?

20  A.  Correct.

21  Q.  And managers at Google complete performance evaluations for

22  their direct reports; correct?

23  A.  Correct.

24  Q.  For example, Will Grannis and Patricia Florissi, they would

25  have completed your performance evaluations at Google?

 1   A.  Correct.

 2   Q.  Now that we're on the topic of performance evaluations, I'd

 3   like to just talk about those a little bit.

 4           I'd like to show you what's been marked as P-126.

 5           MS. TOMEZSKO:  Jean, can you pull that up, please.

 6   Q.  This is your exhibit, Ms. Rowe.  We can flip through it.

 7   But is this a collection of your performance reviews at Google

 8   over the years?

 9   A.  Yes.  Although the font is really small, so I can't really

10   see it.

11   Q.  I know.  We're going to actually skip ahead to another

12   version of this exact thing, but it's a little bigger.

13   A.  Okay.

14   Q.  I find it easier to see, too.

15   A.  Okay.

16   Q.  And so I think you mentioned up until late 2022, the

17   performance review happened -- it happened twice a year at

18   Google; is that right?

19   A.  Correct.  Yes.

20   Q.  Okay.  So once in the first quarter and once in the third

21   quarter?

22   A.  Correct.

23   Q.  And each performance review would generally cover about the

24   preceding six months?

25   A.  Yes.

1   Q.  Are Google employees asked to complete self-assessments

2   each performance cycle?

3   A.  Yes.

4   Q.  Okay.  So let's look at your first performance review here.

5   Jean has very helpfully called it up so we can see.

6         So this is from the third quarter of 2017, right?

7   A.  Correct.

8   Q.  And so this would cover the first few months of your

9   employment at Google?

10  A.  First six months.

11  Q.  And at that time you received a rating of three out of

12  five, right, exceeds expectations?

13  A.  I received exceeds expectations.  The distributions of the

14  ratings are not even.  I did receive an exceeds expectations.

15  Q.  No, and that's -- didn't mean to suggest that they were

16  distributed.

17        And so if you receive a three out of five here, that

18  means there were two higher scores that you could have earned

19  that year; is that right?

20  A.  There were two higher ratings.

21  Q.  There were also two lower ratings, but we agree that three

22  is right in the middle between those?

23  A.  That is correct.  Although majority of the employees are

24  expected to get consistently meets expectations.

25  Q.  Ms. Rowe, I thought you testified that you have never

NABVROW4                        Rowe - Cross

1   actually done a performance review because you were not a

2   people manager; is that right?

3   A.  I'm not, but that doesn't mean I don't know the

4   distributions ratings at Google.

5   Q.  So I want to flip forward to ten pages in.  It's going to

6   be your -- this is still your Q3 2017 review.  Do you recognize

7   it as such?

8   A.  I can't see it on this screen.

9           THE COURT:  It's hard to see.

10          MS. TOMEZSKO:  Let's pull up --

11  Q.  Is that easier for you to see that section?

12  A.  Yes.

13  Q.  Do you see where it says, No. 3, Google onboarding, right

14  there?

15  A.  Yes.

16  Q.  And under summary of contributions -- those are your words,

17  right, under summary of my contribution?

18  A.  Yes.

19  Q.  And in the third quarter of 2017, you wrote:  Building

20  network, relationships, getting up to speed on Google products

21  and organization.  Is that right?

22  A.  Yes.

23  Q.  So in the first six months of your employment in OCTO,

24  then, you were taking trainings to better understand Google

25  Cloud's products; is that right?

NABVROW4                    Rowe - Cross

1   A.   I was.  That wasn't the only thing I was doing, but yes.

2   Q.   And so you completed the Google Cloud platform fundamentals

3   by this time, Q3 2017, right?

4   A.   Yes.

5   Q.   You had started a training in computing, storage, and

6   security with Google Cloud platform, but that was still in

7   progress at the time of this review; is that right?

8   A.   Correct.

9   Q.   And same with Google Cloud platform big data and machine

10  learning fundamentals, that was also still in progress in the

11  third quarter of 2017, right?

12  A.   Correct.

13  Q.   Now, through that training or otherwise, you later came to

14  learn that BigQuery is one of the flagship products of the

15  Google Cloud platform?

16  A.   Correct.  But it's not just through the training.  I mean,

17  there's a lot of other learning that I was doing in my first

18  six months and before.

19  Q.   Of course.

20  A.   And I'm familiar with BigQuery even before I started at

21  Google.

22  Q.   And then same with Kubernetes, that's also a flagship

23  product for Google Cloud?

24  A.   Yes.

25  Q.   Now, just for the benefit of the jury, Kubernetes -- I am

1    not an engineer, so you'll forgive me if this is somewhat of a

2    basic definition.  But it, in sum or substance, is an automated

3    system for deploying and operating containerized applications,

4    is that fair to say?

5    A.  Kubernetes, yeah, is a container orchestration platform.

6    Q.  And that was originally designed by Google; is that right?

7    A.  Correct.  It was open source by Google.

8    Q.  After it became open-sourced, it was now maintained by the

9    cloud native computing foundation, right?

10   A.  Correct.

11   Q.  Do you know who one of the co-founders of the cloud native

12   computing foundation is?

13   A.  So Jonathan Donaldson represented Intel on the cloud native

14   foundation.

15   Q.  He was a co-founder of that foundation, right?

16   A.  It was founded by a number of companies, right,

17   individuals.  They didn't start that foundation.  So to the

18   extent Jonathan did represent Intel on that foundation on

19   containers.

20   Q.  And is that information that you got from reviewing his

21   resume?

22   A.  Yes.

23   Q.  Now, back to your performance reviews, if we can, Ms. Rowe.

24   We talked a bit before about a lot of the advocacy and the

25   keynote speeches you were giving, but not so much about the

NABVROW4                         Rowe - Cross

1    engineering aspect.  I wanted to focus on that a little bit.

2                Now, earlier you had testified there were really three

3    pillars of the technical director role in OCTO:   In

4    engineering -- an impact on engineering was one of them?

5    A.  Yes.

6    Q.  This was an engineering job at Google, right?  Is that in

7    the engineering organization?

8    A.  Yes.

9    Q.  So engineering was a core component of what it was you and

10   maybe others were doing?

11   A.  Yes.

12   Q.  Okay.  Now, before we go back and look at anything

13   specific, I just wanted to understand one thing.  Was it your

14   understanding that Google took performance into account when

15   modeling compensation each year?

16   A.  Yes.

17   Q.  And then, therefore, you had the opportunity in each of

18   these performance reviews to describe the work and highlight

19   your major contributions in your self-assessments; is that

20   right?

21   A.  Highlight the major ones, yes.

22   Q.  And you took that opportunity almost every year, right?

23   A.  Yeah, I -- I did self-assessment on every review.

24   Q.  So let's just look at one.  For example, the first quarter

25   of 2018, if we could move forward to that, Jean, please.

1           So here we are, 2018, Q1.  And again, you received the

2      same rating here, three of five, exceeds expectations; is that

3      right?

4      A.  Yes.  Exceeds expectations is what I reviewed -- got on

5      every review.

6      Q.  So let's look at this a little bit more closely.  One to

7      one on the first page.

8           MS. TOMEZSKO:  Jean, if you could move back -- no, no

9      problem.

10     Q.  One to one, that refers to the customer aspect, the

11     customer interactions that you were describing earlier, right?

12     A.  Yes.

13     Q.  Now, if we could flip to the next page.

14          One to many, that refers to the, let's call it,

15     evangelism of the product, right?

16     A.  Thought leadership.

17     Q.  Thought leadership.

18          And let's go to the next one.  Three, PM and Eng.  Can

19     you tell the jury what PM and Eng represents.

20     A.  That's product management and engineering.

21     Q.  So that's the engineering and engineering impact pillar of

22     the position that we described?

23     A.  Correct.

24     Q.  There's a reference to blockchain here, Ms. Rowe.  Just for

25     the benefit of the jury, blockchain more or less is a

NABVROW4                          Rowe – Cross

1    decentralized distributed database that allows secure

2    information to be shared among different parties at a very

3    basic level?

4    A.   That's correct.  You did a good job.

5    Q.   Thank you.

6            And blockchain, what that does is it creates a

7    decentralized network of nodes that share on processing, right?

8    A.   Yes.

9    Q.   And so part of that, and the beauty of blockchain, if you

10   will, is that it allows better security and scale of customer

11   data; is that right?

12   A.   Not necessarily.

13   Q.   Is security -- let me rephrase that.

14           Security is a central component of blockchain in its

15   use in the industry; correct?

16   A.   Not necessarily.  There's been a lot of blockchain breaches

17   in the industry.

18   Q.   Oh, sure.  For sure.

19   A.   Yeah.

20   Q.   But one of the things that you describe here is you're

21   looking at blockchain; is that right?

22   A.   Yes.

23   Q.   And so your summary of contributions at this point in time

24   under product and engineering was working very closely with

25   Leonard Law and looking at blockchain; is that right?

NABVROW4                          Rowe - Cross

1    A.  Yes.

2    Q.  Now, let's take a look at your performance assessment for

3    the third quarter of 2021, if we can.  We'll flip to that.

4    A.  2021?

5    Q.  And do you see it's Q3 2021?

6    A.  Yes.

7    Q.  Okay.  In this cycle too you received the three out of five

8    rating?

9    A.  I received exceeds expectations.

10          MS. TOMEZSKO:  Let's look under role description at

11   the top of this page, if we can, Jean.

12   Q.  And it says:  No input received from Ulku, though input was

13   requested.

14          So this cycle you chose not to complete a

15   self-assessment; is that right?

16   A.  I don't remember this.  To my knowledge, I've included

17   every time, you know, maybe when it was optional, but I --

18   every time it was requested, I put it in, so I don't really

19   recognize this, but --

20   Q.  This is your performance review from 2021?

21   A.  Yeah, that's what it says, yeah.

22   Q.  And if you look towards the bottom where it explains your

23   rating, where it says, why not higher, why not lower, do you

24   see that?

25   A.  Sorry.  This is -- this is not my performance review that

1    we're looking at.  Because this section is usually not included

2    in the performance review.  You might be looking at the notes

3    that Will has done offline, because this wasn't something that

4    was shared to me as part of the performance review.

5    Q.  No, I'm not asking if you wrote this.

6    A.  No, but you told me this is in your performance review.

7    Like it wasn't, is what I'm saying.

8    Q.  Do you have any reason to doubt that this document reflects

9    your performance review, whether it's notes or any of your

10   self-assessment, but your performance review on record for

11   Google from 2021 Q3?

12   A.  All I'm saying is, you know, when you go to the performance

13   system as an employee, you kind of see, you know, everything

14   that you wrote, everything your manager wrote.  What I'm saying

15   is, like, I didn't see these notes.  I'm just trying to

16   differentiate between what I see in my performance review

17   versus what you're showing me.

18   Q.  Of course.  But again, this is Google's record of at least

19   your assessment of performance.

20   A.  Okay.

21   Q.  Whether it's your self-assessment or not.

22   A.  Okay.  Yeah.

23   Q.  In this section it says:  Why not higher?  Why not lower?

24   Do you see that?

25   A.  Yes.

1   Q.  And that refers to why not a higher rating, why not a lower

2   rating?

3   A.  Yes.

4   Q.  And so under here where it says why not higher, it says:

5   No clear stateful sponsorship of complex CI projects.  No CI

6   stories.  Is that correct?

7   A.  Yeah, that's what it says.  You know, why didn't I get an

8   even better rating than exceeds expectations.

9   Q.  We can agree that's what it says?

10  A.  Yeah, it does say that.

11  Q.  And does that refer -- if we just back up a second to where

12  it says right above that --

13          MS. TOMEZSKO:  Jean, if you can call out the other

14  section under key accomplishments, OCTO OKRs.

15  Q.  Now, the reference to CI and CI stories, does that refer to

16  collaborative innovation in this section here?

17  A.  I don't know what you want me to look at.  Sorry.

18  Q.  Where it says "collaborative innovation meets," do you see

19  that?

20  A.  Yeah.  These are notes that I've never seen, but yes.

21  Q.  Do you understand the term "CI stories" to refer to

22  collaborative innovation?

23  A.  Yes.

24  Q.  And did you understand that that was 60 percent -- I'm

25  sorry.  Okay.  Did you understand that that was worth 60

1    percent of your rating that year?

2    A.   No, these were never disclosed.

3    Q.   These OKRs were never disclosed with you?

4    A.   The weights of those were never disclosed.

5    Q.   Were the OKRs themselves disclosed?

6    A.   Yes.

7    Q.   Do you have any reason to doubt that they consisted 60

8    percent of your performance rating that year?

9    A.   I mean this is what it says here, so --

10             MR. CHIARELLO:  Your Honor, I'm going to object.  The

11   witness has never seen this document.

12             THE COURT:  I agree.  Move on, please.

13             MS. TOMEZSKO:  Sure.

14             THE COURT:  By the way, for my edification and perhaps

15   some of the members of the jury, OKRs.

16             THE WITNESS:  Objectives and key results.  Sorry.

17             MS. TOMEZSKO:  I'll let the witness answer.  It is

18   objectives and key results.

19             THE COURT:  Thank you.

20             By the way, we have two minutes until the lunch break.

21             MS. TOMEZSKO:  I can stop now, your Honor.  We're at a

22   good place.

23             THE COURT:  I think that that makes sense.  Thank you.

24             So, Ms. Rowe, you may step down.

25             It is 12:43.  We're going to take our lunch break now.

NABVROW4                          Rowe – Cross

1          What I'd like to do is come back here with the lawyers

2   at 1:15 to discuss a legal issue briefly, and then have you

3   come in at 1:20.

4          And I'll just remind you, as always, not to discuss

5   the case, including with each other.

6          And I want to ask you, as well, to the extent that you

7   use rest rooms in the courthouse, please use the ones that are

8   in the jury room, because the ones that are in the hallways are

9   often occupied by counsel, parties, witnesses, etc.

10         So that's all for now.  Have a good lunch, everybody.

11         (Jury not present)

12         (Luncheon recess)

13         (Continued on next page)

14

15

16

17

18

19

20

21

22

23

24

25

NABHRow5

AFTERNOON SESSION

1:20 p.m.

(In open court; jury not present)

THE COURT:  Actually, I just have a couple more questions for you right now.

Mr. Gage, on the notes issues was a report prepared from those notes?  Is there actually a formal report?

MR. GAGE:  There was a formal report, your Honor, but it's not an exhibit.  Yeah, it's a privileged report, and it's not an exhibit.

And, your Honor, if I can, I just want to address the cases that they cited.

THE COURT:  Yes, I want to ask both sides, actually, how they reconcile the Second Circuit decision and Judge Chin's decision because —— well, go ahead.

MR. GAGE:  Yeah, I guess I don't think any of those cases that they cited, including the ones you just mentioned, your Honor, dictate that this thing is admissible.  In the cases that they cite (a) what was at issue was the reports themselves and (b) the employer had acted on those reports.  The employer had acted on those reports.  Here, the subject of these interview notes, the object of these interviews, was events that had occurred in the past about decisions that had been made in the past that the jury is going to be evaluating.

And in contrast, in these cases that they cited, for

NABHRow5

1    example, in one of them, the plaintiff was fired after an

2    investigation because the employer relied on the report.  Even

3    the Fifth Circuit case they cited, Fifth Circuit said it's not

4    even hearsay because it's not offered for the truth of the

5    matter, it's offered for the effect on the listener, on the

6    employer, because the decision that was at issue in those cases

7    was a decision that was informed by the reports and potentially

8    at the interviews that were done underlying those reports.

9    That's not the case here.

10          THE COURT:  All right.  Ms. Greene, I know you talked

11   about the business records exception.  Did you also say

12   something about prior inconsistent statements?

13          MS. GREENE:  Your Honor, putting aside the business

14   record exceptions, which would go to whether the notes

15   themselves are hearsay, as to statements that were made and

16   reflected on those notes, those are party admissions to the

17   extent that they were employees of Google acting in their

18   capacity as Google managers, decision-makers.  And so the

19   statements that they made are party admissions and are outside

20   of the hearsay rule for those purposes.

21          Does that answer your Honor's question?

22          THE COURT:  So you're now relying on that exception.

23   Is business records exception off the table?

24          MS. GREENE:  No, business records addresses the first

25   layer of whether it's hearsay or not.  That first —— the

NABHRow5

1   document itself is not hearsay because it's a business record.

2   To the extent that defendant argues that the statements —— it's

3   double hearsay, it's hearsay within hearsay, that hearsay

4   within hearsay is, in fact, not hearsay because it was

5   statements by a party.  It's party admissions.  And so, for

6   instance, what Mr. Shaukat said to ER, those ER notes are

7   business records.  What he said to them is a party admission.

8   So that's what the courts have looked at in terms of are both

9   layers of purported hearsay addressed, and that's the case.

10          In addition, again, it's not being offered for the

11  truth of the matter asserted.  So Mr. Vardaman in telling ER

12  that she was cantankerous.  We're not offering it for the fact

13  that she was, in fact, cantankerous.  We're offering it with

14  respect to Mr. Vardaman's perception of Ms. Rowe and his

15  retaliatory bias against her, and so that's the distinguishment

16  here again.  Nobody's saying we're offering it to prove that

17  Ms. Rowe is, in fact, cantankerous.  That's not the use of this

18  document, but it is very much about showing what Mr. Vardaman

19  said in a way that exhibits his own retaliatory bias.

20          THE COURT:  All right.  Mr. Gage, you're standing up.

21          MR. GAGE:  I am, your Honor.  I want to clarify

22  something.  These are not statements of witnesses.  These are

23  —— these are notes written by someone else during the course of

24  an interview.  I will absolutely grant counsel that what the

25  person verbally said to the employee relations person, they can

1    ask the witness about that.  They can ask the employee

2    relations person about what he said.  Plaintiff is trying to

3    use the notes written by someone who sat in the meeting to show

4    that those things were said.  That's not the statement of a

5    party opponent.  These people never even saw these notes until

6    counsel put them in front of them in their depositions.

7         THE COURT:  Is there a requirement ⸺ the statement of

8    party opponent exception or exclusion, whichever it is, is

9    there a requirement of the sort that you're describing here

10   where it has to be ⸺ it had to have been reviewed and adopted

11   or approved?

12        MR. GAGE:  It needs to be a statement of the party.

13   This is something that was written by a lower level employee.

14   They're suggesting that Mr. Grannis, Mr. Shaukat, absolutely,

15   they're high-level employees, and absolutely under many

16   circumstances things they say or things they may have written

17   may qualify as a statement of a party opponent.  But that's not

18   what we're talking about.  We're talking about notes that were

19   taken by a lower level employee who sat and listened to these

20   conversations.  And they've asked us to bring to court to

21   testify one of the other people in the room, the investigator.

22   They can ask the investigator what the person said.  They're

23   not statements of a party opponent.

24        THE COURT:  All right.  Listen, hindsight is 20/20,

25   but we cannot have this again.  Yesterday, at the end of the

NABHRow5

```
 1    day, we talked about letters, and it ended up being decided it
 2    would be argued this morning.  You all have better visibility
 3    into your case and the issues and the complexity of the issues
 4    at any given time than I do, and if we have something like this
 5    where it's important to decide before someone takes the stand
 6    the next day and people are pulling in case law from other
 7    circuits and arguments are evolving, arguments by counsel are
 8    evolving over the course of the day, that puts the Court in a
 9    very bad position.
10          So it looks like Ms. Rowe is going to be on for a
11    while more now, right, and then this is relevant for
12    Mr. Shaukat's testimony, is that right?  Is he going to come on
13    before the 2:45 break?
14          MS. GREENE:  I certainly hope so, your Honor.
15          THE COURT:  I mean, you may have to adapt and steer
16    around this just for today so we can come to ground on it in my
17    chambers and give you a ruling.
18          MS. GREENE:  Your Honor, I think that's completely
19    possible for me to do.  Again, Ms. Tessier, the author of these
20    notes, will appear later in this trial.  I would think that
21    that's kind of the outside limits of when we can ⸺
22          THE COURT:  When is she coming?
23          MS. GREENE:  I believe she's come on Friday.
24          THE COURT:  That's not a problem.
25          MS. GREENE:  We have time.  And for today, I can work
```

1  around asking him whether he recalls making such statements,

2  whether they were accurate statements, but without showing him

3  the document itself.

4          THE COURT:  OK.  I think that sounds good.  Two more

5  quick things.  Ms. Greene, now going back to the issue about

6  Ms. Rowe's testimony and Ms. Bennett, I understood you to say

7  you could give me an offer of proof, and I thought that you

8  meant you were going to give me something in writing, which

9  often happens.  But were you saying that you were making the

10  offer of proof right there?  I just want to know if we're

11  waiting for something from you or you think it's already been

12  done.

13          MS. GREENE:  I think that the record is sufficient,

14  but if your Honor would like us to formalize that in a written

15  offer of proof, we could do that.

16          THE COURT:  I would because the transcript is not

17  available, and so I can't go back and read what you said this

18  morning.  We won't have that transcript in time to give you a

19  ruling as promptly as I would like.  So I would prefer to get

20  something in writing.  It could be short.

21          MS. GREENE:  We can certainly do that.  I don't know

22  if it's going to be possible to have it printed.  Is

23  handwritten sufficient if we can't get it printed?

24          THE COURT:  I mean, you can do it outside of court.

25  Ms. Rowe is going to be here the whole time, right?

NABHRow5

```
 1            MS. GREENE:  Right.  I'm sorry.  I misunderstood.  I
 2    thought you wanted it today.  We'll certainly bring it to the
 3    Court and submit it to the Court separately.
 4            THE COURT:  Yes, or you can —— yes, exactly.  It
 5    doesn't have to be handwritten.  It can be typed, yes.  I'm
 6    thinking for after the end of the trial day.
 7            MS. GREENE:  Understood, your Honor.
 8            THE COURT:  One more thing, and that is that, trying
 9    to be respectful of the jury's time and sticking to the
10    schedule for each day that we're trying to adhere to, I do
11    think, to try to not fall very far behind, we should keep them
12    today until 4:45.  So I just wanted to let people know that for
13    your own planning purposes that that's my intention.  We're not
14    looking at a hard stop at 4:30 today.
15            Ms. Williams, could you please bring them in.
16            (Continued on next page)
17
18
19
20
21
22
23
24
25
```

1           (Jury present)

2           THE COURT:  Please be seated.

3           All right.  Ms. Rowe, would you please return to the

4    stand.  And, Ms. Rowe, you're still under oath.

5           THE WITNESS:  Thank you, your Honor.

6           MS. TOMEZSKO:  May I proceed, your Honor?

7           THE COURT:  Yes, you may.

8           MS. TOMEZSKO:  Thank you.

9    ULKU ROWE, resumed.

10   CROSS-EXAMINATION CONTINUED

11   BY MS. TOMEZSKO:

12   Q.  Before the lunch break, Ms. Rowe, we were talking about

13   your performance reviews.  You recall that?  And I just want to

14   make something clear.

15          We were looking at Plaintiff's Exhibit 119, correct?

16   I could put it back up for you.

17   A.  I don't remember the number.

18   Q.  You see towards the bottom it's Plaintiff's Exhibit 119?

19   A.  Yes, that's the document.

20   Q.  And this is an exhibit that your counsel has offered into

21   evidence in this case?

22   A.  I don't know, but if you say so.

23          MR. CHIARELLO:  Objection.  I think you are —— I'm

24   sorry, I think she's identifying the wrong exhibit.

25          MS. TOMEZSKO:  Oh, I'm sorry.  It's 126, right?  126,

NABHRow5                          Rowe – Cross

1   yeah.

2   A.   What I see is 119.

3          MS. TOMEZSKO:   So 126, there we go.   Thank you,

4   Mr. Chiarello.

5   A.   OK.

6   Q.   This is Plaintiff's Exhibit 126?

7   A.   Yes.

8   Q.   Again, this is an exhibit that your counsel has offered

9   into evidence in this case?

10  A.   I'm not aware of it, but, I mean, if it says plaintiff's

11  exhibit, yes.

12  Q.   And you had not reviewed this, this exhibit, in its

13  entirety, is that right?

14  A.   No, I have not.

15  Q.   And before the lunch we were discussing the hiring packet,

16  the one I put up earlier, 119.

17         Jean, you can take down this one.

18  A.   Yes.

19  Q.   You had testified this morning that your understanding of

20  the qualifications and background of your colleagues in OCTO,

21  that came from both your conversations with them and your

22  review of their hiring packets.   Do I have that right?

23  A.   Yes.

24  Q.   But you didn't participate in any hiring decisions while

25  you were — while you are employed at Google, right?

 1    A.  Correct.

 2    Q.  So you didn't hire any of your colleagues in OCTO?

 3    A.  I did not hire any of my colleagues.

 4    Q.  And so you would not as an employee have access to their

 5    hiring packets in the course of your employment, right?

 6    A.  Not as an employee, but during the course of this ──

 7    Q.  This lawsuit?

 8    A.  ── this lawsuit, yes.

 9    Q.  So am I correct that you reviewed the hiring packets for

10    the first time in the course of this lawsuit, is that right?

11    A.  That's correct.

12    Q.  Not in 2018 or 2019, correct?

13    A.  I had not, but what I was suspecting to be true turned out

14    to be true.

15    Q.  It's just a simple yes-or-no question, Ms. Rowe.

16    A.  OK.

17    Q.  Earlier you had testified that you worked pretty closely

18    with your colleagues in OCTO, right?

19    A.  Correct.

20    Q.  And you had a chance to observe their work?

21    A.  Correct.

22    Q.  And your colleague, Ben Wilson, he worked in Texas, right?

23    A.  Correct.

24    Q.  Evren Eryurek worked in California?

25    A.  Correct.

1    Q.   Paul Strong worked in California?

2    A.   Correct.

3    Q.   John Donaldson worked in Oregon?

4    A.   Correct.

5    Q.   Brian Steikes, we didn't really talk about him much, but he

6    worked in Michigan, right?

7    A.   Correct.

8    Q.   And during the COVID pandemic, everyone was working from

9    home for several years, correct?

10   A.   That's correct.

11   Q.   I just want to switch to a different topic very quickly.

12        You had briefly mentioned in your conversation with

13   Melissa Lawrence in 2017, you discussed a couple things that

14   you had talked about, and you briefly mentioned an issue about

15   an equity refresh.  Do you recall that?

16   A.   I do.

17   Q.   Was that issue that you were referring to the fact that

18   during your first year at Google, Google made a company-wide

19   change such that any employees hired in 2017 were not eligible

20   for an equity refresh that year?  Do I have that correct?

21   A.   That's correct.

22   Q.   So you had begun in March 2017, and you were not eligible

23   for an equity refresh that year?

24   A.   I was trying to clarify it because, you know, I was made an

25   offer in December, and it applied to the people that started in

1   the first quarter.  So I was trying to figure out if it applied

2   to me or not, and it turned out, yes, it did.

3   Q.  So it did?

4   A.  Yeah.

5   Q.  But, nevertheless, Will Grannis granted you an equity

6   refresh grant that year, did he not?

7   A.  Yes, he did.

8   Q.  And you were one of the only four people on his team that

9   he granted an equity refresh grant to that year?

10   A.  I don't know who else he reported to, but it was much less

11   equity grant than I would have normal been awarded, but yes.

12   Q.  But you got one from Will Grannis that year, right?

13   A.  Correct.

14   Q.  Now I want to skip ahead a little bit in time to June 2018,

15   and I think you testified that was around the time that you

16   moved into Tariq Shaukat's organization?

17   A.  Correct.

18   Q.  So cloud leadership at that point had decided that four

19   members of OCTO, including you, would move into Tariq's

20   organization, correct?

21   A.  I don't know how the decision came about, but, yeah, I was

22   told that we were moving into Tariq's organization.

23   Q.  So you don't know who made that decision?

24   A.  I don't know who specifically made that decision, no.

25   Q.  That change that we're talking about, that affected you,

1    Evren Eryurek, Ben Wilson, and Jeff Kember, correct?

2    A.  Yes, uh-huh.

3    Q.  Was there general dissatisfaction among the group about

4    that move?

5    A.  People in general weren't happy.

6    Q.  And would it be fair to say that you weren't happy about

7    the move at the time?

8    A.  Yes.

9    Q.  Then I do want to pull up another exhibit.  This is

10   Plaintiff's 125 — no, I'm sorry, Plaintiff's 25.  I need new

11   glasses.  All right.  Plaintiff's 25.

12          Ms. Rowe, do you recognize this document?

13   A.  I do.

14   Q.  Is this an email exchange between you and Mr. Shaukat in or

15   around June 2018?

16   A.  Correct.

17   Q.  I just want to focus on the bottom here, the Wednesday,

18   June 13, 2018, email.

19          Jean, if you could make that a little bit bigger.

20          And in this email, Ms. Rowe, you thanked Tariq for

21   meeting you yesterday and taking the time to share his vision

22   for the financial services vertical with you, right?

23   A.  Yes.

24   Q.  As I understand it, the plan for you to move into his

25   organization, the idea was that you would be pretty much doing

1   the same role that you were doing in OCTO at the time, is that

2   right?

3   A.   No, that wasn't immediately clear from the meeting, you

4   know, because he initially said it's — I'm offering you this

5   role.  It's called global client technical lead.  It had a

6   different name.  So there was some confusion about what the

7   role was, but eventually, you know, after I think I sent this

8   email, he cleared it up.

9   Q.   So you eventually came to understand that it was just

10   supposed to be the same role just lifted and shifted under

11   another manager, is that right?

12   A.   Eventually, yes.

13          MS. TOMEZSKO:   Now, if we could just back up a little

14   bit and close out this blowup, Jean, please.  Then if you could

15   blow up the email in response from Tariq Shaukat also on the

16   same day, June 13, 2018.

17   Q.   So I want to direct your attention to the last sentence in

18   the first paragraph, Ms. Rowe, the role, responsibility is the

19   same.  Do you see that?

20   A.   Yes.

21   Q.   And then he says:  "An opportunity that I see is for you to

22   take on people management responsibility, though I recognize

23   your current role as an IC" — does "IC" stand for individual

24   contributor?

25   A.   Correct.

NABHRow5                        Rowe – Cross

1   Q.  And he says, "So if you'd prefer not to do that, we can

2   certainly adjust," correct?

3   A.  Correct.

4   Q.  So was it your understanding that Mr. Shaukat was giving

5   you the opportunity to build a team within his organization if

6   you so chose?

7   A.  Yeah, I mean, he said this in this meeting, but I can —— IC

8   teams at Google didn't matter, plus I have managed teams of

9   thousands of people.  Him offering ——

10  Q.  But not at Google, right?

11  A.  No, not at Google.

12         MS. TOMEZSKO:  OK.  Jean, if you could close that for

13  just a moment.

14  Q.  I want to go back to your initial response to Mr. Shaukat

15  on the bottom where it says here you respectfully decline the

16  global client role.

17  A.  Yes.

18  Q.  Do you see that?

19  A.  I do.

20  Q.  Then you said instead that what you wanted was the VP role

21  in his organization.  Is that the financial services vertical

22  lead role we've been talking about?

23  A.  Yes.

24  Q.  That was a much bigger job than the one that you had in

25  OCTO, is that right?

NABHRow5                          Rowe – Cross

1    A.  It's a bigger role.

2    Q.  But more scope, would you agree?

3    A.  Correct.

4    Q.  And greater opportunity for impact?

5    A.  Correct.  But it was an extension of the role that I was

6    already doing, so I was asking for a shot at it, yes.

7    Q.  So an extension, so more responsibility?

8    A.  Yes.

9    Q.  More ——

10   A.  Yeah.

11   Q.  Now, when Mr. Shaukat told you that he would consider you

12   for the role that we've been talking about —— Jean, you could

13   close the callout there —— he told you that you would get the

14   same chance to interview as the external candidates already

15   under consideration, is that right?

16   A.  He told me that.

17   Q.  Did he tell you that the reason that he wanted to get the

18   external candidates done first was you already had passed the

19   initial phases by becoming a Googler, right, so you didn't need

20   initial screening or anything like that?

21   A.  No.

22   Q.  So he didn't tell you that?

23   A.  No, he told me that like —— on the contrary, he told me

24   that I would have to go through the interview process.

25        MS. TOMEZSKO:  Jean, can you call up the second

1   paragraph under the June 13 response from Mr. Shaukat.

2   Q.  So I see here it says:  "As I mentioned, I personally

3   believe in having two to three finalists for the role."  You

4   see that part?

5   A.  I do.

6   Q.  And then at the end it says:  "You know, once that's done,

7   we'll kick off the process for you as well, as you, of course,

8   don't need to go through the initial assessment phases."

9   A.  OK.  Yeah, that's what this says in the email.

10   Q.  OK.  Does that refresh your recollection that he had told

11   you you wouldn't need to go through the initial assessment

12   phase?

13   A.  No, he didn't say that in the meeting.

14   Q.  But he said it in this email?

15   A.  Yes.

16   Q.  Now, after he sent this email, you had four interviews for

17   the financial services vertical lead role, right?

18   A.  Correct.

19   Q.  One was over the phone or GVC with Sebastien Marotte?

20   A.  Videoconference.

21   Q.  GVC stands for Google videoconference?

22   A.  Correct.

23   Q.  For the benefit of the jury.

24   A.  Correct.

25   Q.  But for the other two —— sorry, the other three, Google

1    flew you to California for in-person interviews with three VPs?

2    A.   Yeah, I flew to California for those, yes.

3    Q.   Now, during those interviews, you had the opportunity to

4    present your vision for the financial services vertical, right?

5    A.   To the extent that I was asked, I did present that.

6    Q.   You did at that time present your vision for the financial

7    services vertical?

8    A.   No, A lot of these conversations were like

9    meet-and-greet-type conversations, and that's why I felt not

10   right about the interview, because these interviews at Google

11   are supposed to be about, you know, role-related knowledge.  We

12   talked about this in my direct, right, you know?

13   Q.   You did, so we don't need to go over it again.

14   A.   Yes.

15   Q.   But you remember those interviews with a fair level of

16   detail, right?

17   A.   Not too much detail because what I remember was the

18   highlights that made me really concerned was, like, they didn't

19   — they didn't feel right.

20   Q.   Uh-huh.

21   A.   But, you know, I'm happy to share what I remember.

22   Q.   Sure.  But you do remember having the opportunity to say

23   this is what I want to do as the vertical, this is how I want

24   to do it?

25   A.   I do not remember being asked that question.

1  Q.  Are you saying you don't remember being asked or you were

2  not asked?

3  A.  I don't remember being asked that question, but I was

4  certainly ready to give the answer.

5  Q.  Do you remember giving that answer?

6  A.  I don't remember.  I don't remember being asked that

7  question.

8  Q.  Ms. Rowe, earlier I think you testified that Mr. Shaukat

9  had indicated to you that filling the role of the financial

10  services vertical lead, that would take some time, right?

11  A.  Correct.

12  Q.  And I think you said it would take about six months?

13  A.  Yeah.  He would take —— he said that it would probably take

14  six months for me to be introduced to the process initially.

15  Q.  Now I wanted to call up another exhibit, if I may.  This is

16  Plaintiff's 26.

17          Jean, can you pull that up, please.  Can you scroll to

18  the second page —— oh, no, I'm sorry.  You could just right

19  here highlight the conversation on June 14 between Ms. Rowe and

20  Ms. Lawrence.

21          Do you recognize this email, Ms. Rowe?  Is it a

22  correspondence between you and Ms. Lawrence in June of 2018?

23  A.  Yes.

24  Q.  And right in the middle it says:  "I know the two finalists

25  to date, and I firmly believe I am more qualified and bring

1   more to the table than both of them."

2           Do you see that?

3   A.  Yes.

4   Q.  Ms. Rowe, you can't say with 100 percent certainty that you

5   knew the identity of the other candidates for this role at the

6   time that you made this statement, can you?

7   A.  I do know the ones that we've talked about in my direct,

8   yes.

9   Q.  At the time, Ms. Rowe, you can't say that you knew with

10  100 percent certainty who those were, right?

11  A.  Well, I know the candidates that I based the email on.

12  Q.  You knew who they were?

13  A.  Ranjana Clark and Tais O'Dwyer.

14  Q.  At the time you knew Ranjana Clark was under consideration?

15  A.  Yes.

16  Q.  One moment.

17          Ms. Rowe, do you think there's a chance that you first

18  learned of Ranjana Clark's identity and her qualifications

19  during the pendency of this lawsuit?

20  A.  No.

21  Q.  So you could say with 100 percent certainty you knew

22  Ranjana Clark was a candidate at the time?

23  A.  One hundred percent is very definitive, but I'm pretty sure

24  that it was Ranjanna and Tais that I was thinking when I ——

25  when I wrote the email.

1    Q.  So is it fair to say that when you sat for your deposition

2    in 2020, you knew the qualifications of Ranjana Clark?

3    A.  You know, I don't know a lot of their qualifications,

4    right?  What I did know about Ranjana was she was a pure

5    banking person, and I knew that Tais was a more program

6    manager-based person.  For me, the more important thing in this

7    email when I said it is I knew my own qualifications.

8    Q.  It was a very straightforward question.  I'm sorry to

9    interrupt.

10          So you can then — you know, at the time that you made

11   this email, you had an opinion as to whether you were more,

12   less, or equally qualified to Ranjana Clark for the role?

13   A.  Yes.

14   Q.  Ms. Rowe, you remember giving a deposition in this case,

15   correct?

16   A.  I remember giving a deposition, yes.

17   Q.  And you told the truth under that —

18   A.  I did.

19   Q.  — when you were under oath in that deposition?

20          OK.  I'd like to just pull up a clip from that

21   deposition.  Jean, it's clip 33.

22          MR. CHIARELLO:  Ms. Tomezsko, before you put something

23   up, can you let us know what the —

24          MS. TOMEZSKO:  Absolutely.  So this is page 267,

25   lines 3 to line 11.

1            Go ahead, Jean.

2            (Video played)

3   Q.  Now, Ms. Rowe, after your initial interviews for the

4   financial services vertical lead role, the four interviews that

5   you had, you were scheduled for an interview with the then-CEO

6   of Google Cloud, Diane Greene, is that right?

7   A.  I was scheduled for one.

8   Q.  And it was scheduled to take place on December 13, 2018, is

9   that right?

10  A.  Yes, I was — you know, I was told that it was going to be

11  scheduled in September, and by December, I finally got it on

12  the calendar.

13  Q.  It was scheduled for December 13, 2018, yes?

14  A.  I don't remember the exact date, but sounds right.

15  Q.  OK.  You have no visibility into whether any of the other

16  candidates for that position were also scheduled for an

17  interview with Diane Greene, right?

18  A.  I think I had heard that some of them had already talked to

19  Diane, but I can't remember.

20  Q.  So did you have visibility into whether every other

21  candidate who was under consideration talked to Ms. Greene as

22  part of the process?

23  A.  Not every candidate, no.

24  Q.  And do you know — I think earlier you said Ms. Greene was

25  the ultimate decision-maker, is that right?

1    A.  Correct, she was, you know —— she was both the CEO of

2    Google Cloud and the person that had my last interview.  That's

3    what we were waiting for, for the decision, I was told.

4    Q.  Did you have —— you didn't have visibility into how that

5    decision-making process worked, though, right?

6    A.  No.  But both Stuart and Tariq told me, you know, that the

7    next step, the final step, was for me to meet Diane.  So, yeah,

8    I didn't have full ——

9    Q.  So you assumed that she was the decision-maker for the

10   role, is that right?

11              MR. CHIARELLO:  Objection.

12              THE COURT:  Sustained.

13   Q.  But before you could meet with Diane Greene in December,

14   she announced her resignation from Google Cloud in around

15   November 16.  Does that sound about right?

16   A.  I don't remember the exact date, but sounds right.

17   Q.  Her planned departure was the reason your interview was

18   canceled, right?

19   A.  That's what I was told.

20   Q.  Then let's see.

21              After it was canceled, did you ask Mr. Shaukat what

22   that meant for your candidacy?

23   A.  I did.

24   Q.  And then shortly thereafter you had a scheduled meeting

25   with Mr. Shaukat to discuss the answer to that question, right?

NABHRow5                         Rowe - Cross

1    A.  Correct.

2            MS. TOMEZSKO:  I'd like to show what's been marked as

3    Defendant's 57, please.  Thank you, Jean.

4    Q.  Ms. Rowe, do you recognize this document?

5    A.  I do.

6            MR. CHIARELLO:  Ms. Tomezsko, can you hang on one

7    second.  Sorry.  Has this been published to the jury?

8            THE COURT:  Take it down, please.

9            MS. TOMEZSKO:  I don't believe there's an objection.

10   Is there?

11           MR. CHIARELLO:  There is an objection to this

12   document.

13           MS. TOMEZSKO:  Take it down, please.

14           THE COURT:  Take it down.

15           MS. TOMEZSKO:  You want to sidebar on the nature of

16   the objection?

17           THE COURT:  Yes.

18           MR. CHIARELLO:  It's up to you, your Honor.

19           THE COURT:  Do you want to continue down this road

20   or ——

21           MS. TOMEZSKO:  I'd like to know the basis for the

22   objection, and if it's an authentication or hearsay objection,

23   I could ask her what it is and we could establish that basis.

24   I'm just not sure what's the basis.

25           THE COURT:  Mr. Chiarello, can you say in a word or

1   two what the basis is for the objection.

2            MR. CHIARELLO:  Hearsay, your Honor.

3            MS. TOMEZSKO:  Hearsay.  OK.  I think with a few

4   questions we could establish that there is an exception to the

5   hearsay rule, if I may.

6            THE COURT:  So let's keep the document off the screen

7   until that's been done.

8            MS. TOMEZSKO:  Sure.  Apologies.  I did not realize

9   there was an objection.

10            Is Ms. Rowe able to see the document?

11            MS. GUTIERREZ:  I want to make sure I hit it right.

12            MS. TOMEZSKO:  We could hand up a hard copy if it's

13   quicker, your Honor.

14            THE COURT:  That's fine with me.

15            MR. CHIARELLO:  Ms. Tomezsko, my apologies.  I was

16   looking at a different exhibit number.  I was looking at the

17   257.  There's no objection.  My apologies.

18            MS. TOMEZSKO:  I thought so.  Thank you for

19   clarifying, Mr. Chiarello.

20            May I publish to the jury now, your Honor?

21            THE COURT:  Yes, you may.

22            MS. TOMEZSKO:  D57, yes.

23   BY MS. TOMEZSKO:

24   Q.  Ms. Rowe, do you recognize this document?

25   A.  Yes.

NABHRow5                          Rowe - Cross

1  Q.  Do you recognize these as the notes that you prepared for

2  your discussion with Mr. Shaukat?

3  A.  Yes.

4  Q.  Now, here, too, you say you were the most-qualified

5  candidate for the role, right?

6  A.  Yes.

7  Q.  But we just heard your testimony from your deposition under

8  oath that you really didn't have an opinion as to whether

9  Ms. Clark was more, less, or equally qualified to you for the

10 role, is that right?

11 A.  I said that I'm more qualified than Ms. Clark.

12 Q.  So I just want to ask, did these notes accurately reflect

13 what you intended to say to Mr. Shaukat in that meeting?

14 A.  Yes.

15 Q.  You said some or most of these things to Mr. Shaukat during

16 the meeting, is that right?

17 A.  Yes.

18 Q.  Did you tell him that he should just give you the role in

19 that conversation?

20 A.  I did.  I was so exhausted at this point.

21        MS. TOMEZSKO:  OK.  We could take this document down,

22 Jean.  Thank you.

23 Q.  Now, Ms. Rowe, we had talked earlier about some

24 conversations you had with human resources, Melissa Lawrence, I

25 think you said, right?

NABHRow5                          Rowe - Cross

1    A.  Yes.

2    Q.  And that was in late 2017?

3    A.  Yes.

4         MS. TOMEZSKO:  Jean, can you please publish

5    Plaintiff's Exhibit 11.

6         I don't believe there's an objection to this one

7    either, but it would be good to confirm.  This is plaintiff's

8    exhibit, so there shouldn't be an objection that plaintiff has

9    asserted here.  So let's publish it to the jury, please.

10   Q.  Ms. Rowe, do you recognize this document?

11   A.  Yes.

12   Q.  Is this your notes, your summary of the discussion with

13   Melissa Lawrence that you had on 20th of November 2017?

14   A.  Yes.

15   Q.  Do these accurately reflect the substance of your

16   conversation, at least what you said to Ms. Lawrence?

17   A.  Yes.

18   Q.  And in this document, in your notes, it doesn't appear to

19   indicate that you thought or at least communicated that gender

20   was the basis for your opinion or disagreement with your level,

21   is that right?

22   A.  Yes.

23   Q.  And so Ms. Lawrence, you didn't communicate to her that you

24   thought it might be unlawful discrimination on the basis of

25   gender, at least at this point?

1   A.  Not at this point, no.  As I said earlier, you know, I just

2   wanted to have things corrected at that point.  I didn't want

3   to mention gender.

4   Q.  Thank you.

5          So here it says you recently learned that other

6   external hires were brought in at a Level 9, right?

7   A.  Yes.

8   Q.  And you were saying that you believe that you should have

9   been brought in as a Level 9, right?

10  A.  Yes.

11  Q.  "I'm hoping we could fix this and align my level to the

12  other external director hires brought in at Level 9"?

13  A.  Yes.

14  Q.  Now I want to just go forward in time a bit to August 2018.

15  I think we had talked about the second email that you had sent.

16  We looked at that earlier.

17          Jean, could we pull that up.  That's Plaintiff's 42.

18          Now, this is approximately eight months after the

19  earlier conversation that you had with Melissa Lawrence?

20  A.  Yes.

21  Q.  And the notes where you indicated you believed that you

22  should be brought in as a Level 9?

23  A.  Yes.

24  Q.  Now, here it says, at least in this email, that this is the

25  time you're interviewing for the much larger role in

1   Mr. Shaukat's organization, right?

2   A.   Correct.

3   Q.   And here it says, as you wrote to Melissa, you should have

4   been hired as a vice president, right?

5   A.   That's what I wrote, because ⸺

6   Q.   And a vice president is a Level 10 job ⸺

7   A.   Correct.

8   Q.   ⸺ at Google?

9        So that's a level higher than some of the male

10   colleagues that you were referring to earlier in OCTO?

11   A.   So the reason I wrote this was ⸺

12   Q.   Is it a level ⸺

13        THE COURT:  Excuse me.  If you're looking for a

14   yes-or-no answer to a question, it would be helpful if you

15   would say that up front ⸺

16        MS. TOMEZSKO:  Sure.

17        THE COURT:  ⸺ as opposed to when you're talking over

18   each other.  The court reporter cannot ⸺ cannot deal with

19   that, among other concerns that I have.

20        MS. TOMEZSKO:  I certainly want to make sure that the

21   court reporter gets this down accurately, so I will try to

22   preface my questions with a yes or no.

23   Q.   Let's see.  It says also here, "My background and

24   experience suggested that I should actually come in as a VP,"

25   right?  That's a yes-or-no question, I apologize?

1    A.  Yes, that's what I wrote, yes.

2    Q.  This is also a yes-or-no question.

3         You've never participated in the process for hiring a

4    VP at Google, right?

5    A.  Yes.

6    Q.  And you're not aware of what Google is looking for in a

7    candidate for a vice president role, yes or no?

8    A.  Yes, I saw the job description.

9    Q.  But you've never participated in that process, correct?

10   A.  I have never participated in hiring a VP, that's correct,

11   but I did see the job description for the VP role.

12   Q.  And you also wrote here, if we could highlight it, "I later

13   learned that my male peers were all hired at Level 9."  Do you

14   see that?

15   A.  Correct.

16   Q.  At that point you were aware that Google had hired several

17   Level 8 technical directors who were men, right?

18   A.  Correct.  When I talked about my peers, I'm talking about

19   those that have similar background and experiences as I am.

20   Q.  So you're selecting which of the individuals you refer to

21   as your peers in that email, yes or no?

22   A.  Yes.

23        MS. TOMEZSKO:  OK.  Now, we could take this one down,

24   Jean.

25   Q.  Now, in November you had sent —— I think we talked about

1    this earlier too — an email to Diane Greene and Tariq Shaukat

2    reiterating the same concerns that we previously saw in the

3    August email, right?

4    A.  Yes, although I don't see it yet.

5    Q.  Yeah, I'm about to pull it up, yeah.

6              Can we take a look at that exhibit.  It's

7    Plaintiff's 54.  Let's make it a little bit bigger, please.

8              So in the first line, Ms. Rowe, you say:  "Since it

9    seems to be taking a long time for HR to schedule my meeting

10   with Diane, I thought I would send you both this note."

11             And that's the reason you were writing this email,

12   correct?  Yes or no?

13   A.  No, there were other reasons.

14   Q.  OK.  But at least that's how you started the email.  The

15   words that I read are an accurate start of the email that you

16   wrote right here, is that right, yes or no?

17   A.  Yes.

18   Q.  And you also said later on in this email the head of

19   financial services role was actually the position you were

20   hired for.  You wrote that in this email, right, yes or no?

21   A.  Yes.

22   Q.  We looked at your offer letter earlier, Ms. Rowe, yes?

23   A.  Yes.

24   Q.  And it doesn't say anything about the head of financial

25   services in that email, does it — or that offer letter, does

1   it?

2   A.  Not in the offer letter, but we certainly discussed it.

3   Q.  Sure.  So let's see.

4         Oh, and then in the last paragraph it says —— you

5   reminded Mr. Shaukat and Ms. Greene that HR was actively

6   investigating the issue you had previously raised.  Do you see

7   that, yes or no?

8   A.  Yes.

9   Q.  OK.  So at this point there was nothing further for Diane

10  and Tariq to do in relation to that concern other than perhaps

11  schedule your interview with Diane, correct?

12  A.  Diane was my skip level.  I mean, I could —— I was

13  informing him.  I was escalating it to her.

14  Q.  But it was previously —— you know it was being investigated

15  by employee relations.  You sat with an investigator and

16  participated in an interview, right?

17  A.  Yeah, I was just letting her know that, yeah, HR is

18  investigating, but they haven't come back to me.

19  Q.  It doesn't say they haven't come back to you in that email,

20  does it?

21  A.  No, it doesn't say that in the email, but that's why I was

22  writing it, you know, that the ER meeting happened in October,

23  and I hadn't heard back anything.

24  Q.  And that investigation meeting, that was an interview that

25  you had with a woman named April Beaupain, right?

1   A.  Correct.

2   Q.  And you sat for an interview with her, correct?

3   A.  I don't know how to characterize it, but it was a

4   videoconference.

5   Q.  So you had a discussion with her about what your ──

6   A.  Yes.

7   Q.  ── concerns were?

8   A.  Yes.

9   Q.  Did you tell the truth in that discussion?

10  A.  Yes.

11          MS. TOMEZSKO:  Jean, you can take this document down.

12  Q.  Now, Ms. Rowe, I would like to show you what has been

13  marked as Plaintiff's 145.

14          Could we publish that, please.

15          This is your second amended complaint in this case and

16  Google's answer and affirmative defenses to your second amended

17  complaint, right?

18          Is that what the caption on the document says, "Google

19  LLC's Answer and Affirmative Defenses to Second Amended

20  Complaint"?

21  A.  Yes, that's what it says.

22  Q.  Again, this is a plaintiff's exhibit, correct?

23  A.  That's what it says.

24  Q.  Do you see here that the way this is structured, there is a

25  paragraph that has ──

```
1    A.  Sorry.  Is there a date on this document so I can place it
2    in time?
3    Q.  Yeah.  If you look right on the top, it says filed
4    February 26, 2021.
5         Does that give you the date range you need?
6    A.  Yes, thank you.
7    Q.  Do you see here that the allegations in your complaint are
8    listed here and Google provides an answer underneath, correct?
9    A.  Yes.
10        MS. TOMEZSKO:  Let's go to paragraph 34, if we can,
11   Jean.
12   Q.  Ms. Rowe, this is paragraph 34 of your allegations in the
13   complaint, in this second amended complaint, yes?
14   A.  Just give me a minute to read it.
15   Q.  Of course.
16   A.  Yes.
17   Q.  And the VP here that you're referring to in this paragraph,
18   that's Tariq Shaukat?
19   A.  Yes.
20   Q.  So the last sentence says:  "The VP also regularly excluded
21   plaintiff but not her male colleagues from staff meetings,
22   email distribution lists, team off-sites and one-on-one
23   meetings."
24        Do you see that?
25   A.  Yes.
```

NABHRow5                        Rowe - Cross

1    Q.  And that's your allegation in this lawsuit, correct?

2    A.  Yes.

3    Q.  So you're claiming that Mr. Shaukat excluded you from email

4    distribution lists on the basis of your sex, yes or no?

5    A.  Look, you know, he was excluding ——

6    Q.  Yes or no, please.

7    A.  Yes.

8    Q.  But, in fact, the male employees who moved over to OCTO

9    into Tariq's organization with you, they also complained about

10   being excluded from distribution lists too, is that right?

11   A.  Which distribution lists?

12   Q.  The ones that you're alleging you were left off too —— off

13   of on the basis of your sex.

14   A.  Not to my knowledge.

15           MS. TOMEZSKO:  OK.  Let's publish —— well, is there an

16   objection to D59, Mr. Chiarello?

17           MR. CHIARELLO:  No objection.

18           MS. TOMEZSKO:  No objection.  OK.  May I publish D59

19   to the jury, please?

20   Q.  You recognize this document, Ms. Rowe?  We could scroll

21   through it.

22   A.  Yeah, if you could scroll so I can see what I'm looking at.

23   Q.  Sure.

24   A.  Can I see, like, the very beginning of it?  Scroll for me.

25           THE COURT:  You can let us know when you're ready.

1        How many pages are in this document?

2              MS. TOMEZSKO:  I think there's only about maybe six or

3      seven.

4              THE COURT:  OK.

5              MS. TOMEZSKO:  I would just like to get to the first

6      page, if we can.

7              THE COURT:  If she wants a chance to ——

8              MS. TOMEZSKO:  Oh, of course.

9              THE COURT:  —— to read it ——

10     A.  No, it's actually OK.  I now know what you're talking

11     about.

12     Q.  OK.

13     A.  Can I tell you what this is?  This has nothing to do with

14     Tariq's email list.  When we moved under Tariq ——

15     Q.  Ms. Rowe, can I ask the question, please?

16     A.  I thought you asked the question.  You said —— please ask

17     the question.

18     Q.  Thank you.

19          Now, on this page you'll see under July 3, it's your

20     colleague Evren Eryurek.  He moved into the —— in Tariq's

21     organization with you, right, from OCTO?

22     A.  Yes.

23     Q.  Yes.  And he writes here that "I'm sure Ulku and Ben will

24     also agree one of the biggest fears we have is being

25     disconnected from the rest of cloud, and it's already

1    happening."

2            So he was reiterating —— and Will, that's Will

3    Grannis, correct?

4    A.  Yes.

5    Q.  So, yes or no, he was writing here that you and Ben would

6    agree one of the fears that you had was being disconnected from

7    the rest of the cloud, and it's already happening.  For

8    example, we are no longer in the cloud director's distribution

9    list.

10           Is that, yes or no, an accurate description of the

11   words that are on this page?

12   A.  It's an accurate description, but this has nothing to do

13   with Tariq's team.  He's talking about —— distribution list.

14           MS. TOMEZSKO:  Your Honor.

15           THE COURT:  You have to ask the questions that —— with

16   an eye toward drawing out the testimony you want and no more.

17   And so I'm just looking again at the question.

18           OK.  The question was, "Is that, yes or no, an

19   accurate description of the words that are on this page?"  Can

20   you just tell us yes or no.

21           THE WITNESS:  Yes, that's what this page says.

22           THE COURT:  OK.  So now go ahead and ask your next

23   question.

24           MS. TOMEZSKO:  OK.  Thank you.

25   Q.  I'm actually —— if we could look up on the same page Will

1   Grannis' response explained to you —— if we can make that

2   bigger —— it has to do with the cost centers and reporting

3   orgs.  Cloud directors is limited to URS's line of reporting.

4   Do you see that?

5   A.  I do.

6   Q.  Do you have any reason to —— or, rather, withdrawn.

7         We could take this document down.

8         Ms. Rowe, you're also claiming that Tariq excluded you

9   from staff meetings on the basis of your sex, is that right?

10  A.  Yes.

11  Q.  And Mr. Shaukat had a standing staff meeting every two

12  weeks, is that right?

13  A.  Yeah, I don't remember the exact frequency, but sounds

14  right, yeah.

15  Q.  That sounds about right to you?

16  A.  Yeah.

17  Q.  OK.  I'd like to show you what's been marked as

18  Exhibit defendant's 60.

19        Ms. Rowe, this is the calendar invite for

20  Mr. Shaukat's weekly staff meeting every two weeks, yes or no?

21  A.  Yes, dated September 21.

22  Q.  And that's when this particular calendar invite was sent,

23  correct?

24  A.  Yes.  And before then was I included in those meetings?

25  Q.  Actually, my next question was going to be where it says

NABHRow5                         Rowe – Cross

 1    "calendar" on the bottom, "Ulku Rowe," that indicates that this

 2    is from your calendar, correct?

 3    A.  Correct, as of September.

 4          MS. TOMEZSKO:  OK.  Jean, we could take this down.

 5    Q.  And you also claimed that Mr. Shaukat excluded you from

 6    off-site meetings on the basis of your sex, is that right?

 7    A.  Yes.

 8    Q.  But you attended Tariq's off-site for his staff in October

 9    of 2018, didn't you?

10    A.  I did.  I wasn't on the initial invite list.  I only found

11    out when my admin told me that Stuart Breslow and others were

12    going.

13    Q.  But you attended that meeting, is that right?

14    A.  When I raised the concern, I was invited.

15          MS. TOMEZSKO:  And, Jean, assuming there's no

16    objection to D61 —— and we'll wait for that confirmation.

17          MR. CHIARELLO:  Yes, there's no objection.

18          MS. TOMEZSKO:  Jean, can you publish Defendant's 61 to

19    the Court and the jury, please.

20    Q.  This is you reaching out to Mr. Shaukat to say great couple

21    days at the off-site this week, right?

22    A.  Yes.

23    Q.  And you wrote that getting to know everyone in person and

24    aligning the vision strategy across the verticals was super

25    valuable, right?

NABHRow5                       Rowe - Cross

1    A.  Yes.

2           MS. TOMEZSKO:  Now we could take this one down, Jean.

3    Q.  You were also invited to a meeting in January of 2019 with

4    the new CEO of Google Cloud at that point, Thomas Kurian.  Did

5    you attend that meeting?

6    A.  Yes.

7    Q.  OK.

8    A.  Yes.

9    Q.  And the purpose of that meeting, as you understood it, was

10   to talk about the current and future state of financial

11   services within Tariq's organization, correct?

12   A.  Correct.

13   Q.  And that was in light of the fact that Ms. Greene had

14   resigned, Mr. Kurian was coming in, and it was sort of up in

15   the area what the future of that vertical would be, correct?

16   A.  Correct.

17   Q.  We're going to jump ahead in time again.  So now we're

18   going to go to March of 2019.  I believe earlier you testified

19   that Mr. Shaukat and Mr. Grannis — or, rather, Mr. Shaukat

20   gave you the opportunity to return to OCTO at that time?

21   A.  I wouldn't characterize it as an opportunity.  They gave me

22   three options.

23   Q.  You were given the option to return to OCTO at that time?

24   A.  Yes.  Not to focus on financial services, that was one of

25   the options.

NABHRow5                         Rowe – Cross

1    Q.  And to your knowledge, did Mr. Shaukat give that same

2    option to any of the other individuals who had moved over from

3    OCTO into his organization with you?

4    A.  None of those individuals were reporting to Tariq, and at

5    that point I think they either had different roles or doing

6    different things, so —

7    Q.  So you're not aware whether he gave them the option?

8    A.  No, I'm not aware that they were presented with any

9    options —

10   Q.  OK.

11   A.  — like the kind that he presented to me.

12   Q.  And you chose to return to OCTO?

13   A.  With the three options, the three options were being under

14   Stuart, you know, reporting to him.  Option two was going into

15   OCTO but do not touch financial services.  Option three was

16   I'll let you stay on my team, but you're going to have to go

17   find another job.  So, yes, I did pick the option to go back to

18   OCTO.

19             THE COURT:  Ms. Rowe, so the question there was, "And

20   you chose to return to OCTO?"  If you could, try to stick with

21   what is being asked.

22             THE WITNESS:  I'll do my best, your Honor.

23             THE COURT:  OK.

24             MS. TOMEZSKO:  We're both trying here.

25             I'd like to publish what is Plaintiff's 77, please.

NABHRow5                          Rowe - Cross

1   Q.  And, Ms. Rowe, do you recognize this as an email from you

2   to Mr. Shaukat in March of 2019?

3   A.  Yes.

4   Q.  And this is the email where you chose to return to OCTO, is

5   that right?

6   A.  Yes.

7   Q.  And you say none of the options that he was presenting to

8   you were attractive, correct?

9   A.  Correct.

10  Q.  But earlier you testified that you were not happy to leave

11  OCTO, correct?

12  A.  Well, I wasn't happy — my words were I wasn't happy to

13  leave OCTO.  I wasn't happy with just being moved over.  And it

14  was abrupt, and I didn't have a lot of insight into why it was

15  happening.

16  Q.  After you moved back into OCTO, your level didn't change as

17  a result of that move, did it?

18  A.  No.

19  Q.  Your compensation did not go down after that move, did it?

20  A.  No.

21  Q.  You remained an individual contributor when you returned to

22  OCTO as you were in Tariq's organization, correct?

23  A.  Yes.

24  Q.  All right.  So skipping again to — we're going to jump in

25  time here again to early 2020.

NABHRow5                          Rowe - Cross

1              You had the opportunity to meet Kirsten Kliphouse for

2    coffee in early 2020 as a meet and greet, correct?

3    A.  Yes, I met with Kirsten.

4    Q.  And she was the president of North American sales at Google

5    Cloud at the time?

6    A.  Yes.

7    Q.  When you met Kirsten over coffee, you discussed the open

8    position in her sales organization, is that right?

9    A.  She mentioned that there was an open position, yes.

10   Q.  During that conversation, you described your background in

11   technology both at Google and prior to Google, right?

12   A.  Only in terms of, like, a meet and greet, just where I came

13   from, what I'd been doing.

14   Q.  So you described to her where you came from and what you

15   had been doing?

16   A.  As a meet and greet, you know, when you meet someone new,

17   you kind of tell them a little bit of your background, yes.

18   Q.  So you described to her your background?

19   A.  High level, yes.

20   Q.  Did you also describe to her your expertise in financial

21   services and your industry networking credibility?

22   A.  No.

23   Q.  No, you did not?

24              THE COURT:  I think she answered that question.

25              (Continued on next page)

NABVROW6                        Rowe – Cross

1          MS. TOMEZSKO:  One moment.

2          Jean, I'd like to play a clip 105, please.  And for

3    counsel's benefit, it is page 344, 18 to 345, 8.

4          MR. CHIARELLO:  Ms. Tomezsko, give me a second.

5          MS. TOMEZSKO:  Of course.

6          MR. CHIARELLO:  Can you repeat the page range.

7          MS. TOMEZSKO:  Sure.  344, 18 to 345, 8.

8          Please let me know when you're ready.

9          Can we play it please.

10          MR. CHIARELLO:  Objection.

11          MS. TOMEZSKO:  On what basis?

12          MR. CHIARELLO:  Not proper impeachment.  I don't think

13    that's the question that was asked.

14          MS. TOMEZSKO:  I think the question I asked was:  You

15    described to her your expertise in financial services in your

16    industry networking credibility.  Is that not --

17          THE COURT:  I don't have this in front of me, so I'm

18    trying to wait to see if you're going to work it out or not.

19          MR. CHIARELLO:  Withdrawn.

20          MS. TOMEZSKO:  May I play the exhibit?

21          THE COURT:  You may.

22          (Video played)

23    BY MS. TOMEZSKO:

24    Q.  And you were aware that the role in Kirsten's sale

25    organization was a sales role; correct?

1    A.  It was a sales role.

2    Q.  And you had not previously led sizable technology sales

3    teams, had you?

4    A.  I had not led sales teams, correct.

5    Q.  You never managed a team of field sales executives and

6    sales managers towards a quota?

7    A.  I have not managed sales executives with a quota.

8    Q.  And you've never managed a sales team at all; is that

9    right?

10   A.  Correct.

11   Q.  And you had not demonstrated proven success managing a

12   sales business development organization to meet or exceed

13   revenue goals; is that right?

14   A.  I have not met -- as I talked earlier, that I didn't have

15   the traditional sales background, but that's not what Kristen

16   was looking for.

17   Q.  But it's accurate to say that you didn't demonstrate proven

18   success managing a sales business development organization to

19   meet revenue goals, is that an accurate statement?

20   A.  Correct.

21   Q.  Sitting here today, you don't know who made the decision

22   not to proceed with your candidacy for the sales position in

23   Kirsten's organization; is that right?

24   A.  I don't know who made the decision.

25   Q.  I think we testified earlier -- or you testified earlier

1    that the position went to a woman named Yolande Piazza; is that

2    right?

3    A.  Correct.

4    Q.  Now, around the time Ms. Piazza joined Google, you didn't

5    know much about her other than she had spent a number of years

6    at Citibank, right?

7    A.  I knew enough.

8    Q.  Enough -- never mind.  Withdrawn.  I'm sorry.  Withdrawn.

9    Withdrawn.

10          You are not in a position to comment on her

11   qualifications for the role in Kirsten's organization, right?

12   A.  What do you mean by that?

13   Q.  Did you know enough about her to make an assessment as to

14   her qualifications for the role, is that your testimony?

15   A.  No.  I knew what the qualifications for the role was, and I

16   knew my qualifications.  So like, I kind of could make an

17   assessment; but yeah, no, I wasn't the hiring manager.

18   Q.  Okay.

19   A.  Okay.

20   Q.  And earlier you testified that you had spoken with Stuart

21   Vardaman, and he told you they were not going to proceed with

22   the candidacy for -- your candidacy for that role; is that

23   right?

24   A.  Correct.

25   Q.  After that conversation with Mr. Vardaman — and this is a

NABVROW6                          Rowe – Cross

1    yes-or-no question — you never followed up with Kirsten about

2    the role, did you?

3    A.   Correct.

4    Q.   I just have a few wrap-up questions and then we'll be

5    finished.

6            You're claiming in this case that you were denied

7    equity refreshes or that you received smaller equity refreshes

8    than you were expecting based on your sex; is that right?

9    A.   Compared to my peers, yes.

10   Q.   And the only thing that leads you to believe that sex

11   played a role in the fact and the amount of the equity

12   refreshes you received is the fact that you were hired at a

13   Level 8; is that right?

14   A.   Ask that question again.

15           MR. CHIARELLO:  Objection.

16           MS. TOMEZSKO:  Basis?

17           THE COURT:  Can we ask it as an open-ended question,

18   what leads you.

19           MS. TOMEZSKO:  Well, if we're going to do open-ended,

20   I'll withdraw the question.  I'll just proceed to the next one.

21   BY MS. TOMEZSKO:

22   Q.   Other than the fact that Will Grannis and Brian Stevens

23   were involved in the decision to hire you at a Level 8, you

24   can't think of anything else that they have said or done that

25   leads you to believe they would treat you differently on the

1    basis of your sex; is that right?

2    A.  I've been subjected to this for a long time at Google; so

3    it wasn't just initial leveling decision and what I lived

4    through at Google the entire time I've been there.

5    Q.  At the time of your deposition in 2020, were you able to

6    think of anything other than your level that Will Grannis or

7    Brian Stevens said or did that leads you to believe they would

8    treat you differently on the basis of your sex?

9    A.  So in my deposition did I think?

10   Q.  At the time of your deposition --

11   A.  Sorry, I don't -- I don't remember what I thought at the

12   time.

13   Q.  In fact, Will Grannis and Brian Stevens have been

14   supportive of you while you've been at Google; is that right?

15   A.  They've been supportive.

16           MS. TOMEZSKO:  Your witness, Mr. Chiarello.

17           Thank you, Ms. Rowe.

18           THE WITNESS:  Thank you.

19           MR. CHIARELLO:  Your Honor, we have no redirect.

20           THE COURT:  Ready to call your next witness?

21           Ms. Rowe, you may step down from the stand.

22           THE WITNESS:  Thank you, your Honor.

23           (Witness excused)

24           MS. GREENE:  Plaintiff calls Tariq Shaukat.

25           MR. GAGE:  Your Honor, may I step out in the hallway?

NABVROW6                          Shaukat – Direct

1              THE COURT:  You may.

2     TARIQ SHAUKAT,

3          called as a witness by the Plaintiff,

4          having been duly sworn, testified as follows:

5     DIRECT EXAMINATION

6     BY MS. GREENE:

7     Q.  Good afternoon, Mr. Shaukat.

8     A.  Hello.

9     Q.  Let's go back to 2018.  Back in 2018, your team had a

10    problem with diversity when it came to women; isn't that right?

11    A.  In 2018, I had just inherited a new team.  And one of our

12    objectives was to improve the diversity on the team I

13    inherited, that's correct.

14    Q.  Right.  And there was a lack of senior women -- or women in

15    senior positions on your team; correct?

16    A.  In the beginning of 2018, that would be true.  Not at the

17    end.

18    Q.  And in 2018, you had 12 direct reports approximately; is

19    that right?

20    A.  The number varied considerably throughout the year.

21    Q.  Okay.  Let's look at mid 2018.  You had about 12 direct

22    reports at that time?

23    A.  Approximately.  Some of the direct reports were temporary

24    while we recruited full-time bosses for them, yes.

25    Q.  And at that time, only two of your direct reports were

1   women; correct?  One of those being Ms. Rowe?

2   A.  It was Ms. Rowe, there was Nan Boden.  And then I had a

3   number of people who were dotted line directs, who attended my

4   staff meeting and participated in various activities like

5   Olivia Nottebohm and Kim Scott as well.

6   Q.  But Nan Boden and Ms. Rowe were your only two direct

7   reports who were female; correct?

8   A.  As I said, there were a couple who shared direct reports

9   with other organizations, but the ones that directed -- that

10  reported only to me were those two, yes.

11  Q.  Now, Nan Boden was at Google before you got there; correct?

12  A.  Nan was, yes.

13  Q.  So you didn't hire her; isn't that right?

14  A.  I did not hire her into the company, no.

15  Q.  And you weren't responsible for promoting her to Level 9

16  either; isn't that right?

17  A.  No, that is not correct.  I was an endorser for her.

18  Throughout, she, I think when I joined, was probably L7.  So I

19  was an endorser for her a number of times throughout her

20  promotions.

21  Q.  So as of the time she was reporting to you in mid 2018,

22  what was her level?

23  A.  I don't recall exactly.  I would assume it was L9.

24  Q.  You hired several men into your organization in 2018;

25  correct?

1    A.  I did, yes.

2              MR. GAGE:  Before the next question, your Honor, can

3    we just ask the witness to lean a little bit closer to the

4    microphone so everyone can hear him.

5              THE COURT:  Yes.  I can hear him.

6              MR. GAGE:  I suspected you could, Judge, but I'm not

7    sure about the rest of us.

8              THE WITNESS:  My apologies.

9              THE COURT:  I understand.

10   Q.  You hired several men into your organization as L9s in

11   2018; correct?

12   A.  I hired several -- I mean, my organization was several 100

13   people, so I've hired a large number of people.  In terms of

14   people who reported directly to me, there were some L9s, as

15   well as some female L10s, I believe, who were hired.

16   Q.  You hired Domenic Wee in 2018; is that right?

17   A.  No.  Tarun Bhatnagar, who reported to me on my team hired

18   Domenic Wee.

19   Q.  And what was Domenic's level?

20   A.  When he came in, I believe it was an L9.

21   Q.  And Anil Jain, did he join your organization in December of

22   2018 or thereabouts?

23   A.  Anil would have joined before then, but he did join my

24   organization in 2018, yes.

25   Q.  He was an L9 as well; correct?

1  A.  Correct.  Although, again, he was not a direct report, and

2  not intended to be a direct report of mine.

3  Q.  Stuart Breslow you hired in 2018 as an L9 too; is that

4  correct?

5  A.  That is correct, yes.

6  Q.  And it wasn't until actually August of 2019 that you hired

7  your first woman as an L9; correct?

8  A.  No.  As I mentioned, Carrie Tharp, who I believe is who

9  you're referring to, was a vice president, so that's an L10.

10 Q.  Okay.  But she wasn't hired until 2019; correct?

11 A.  She was -- no, I believe she was hired in 2018, but I don't

12 recall exactly.  I believe it was 2018 though.  At least she

13 was in the interview process at that point.

14 Q.  Okay.  We'll come back to that with some documentation to

15 help refresh your recollection on that.

16          Now, in 2018, you had about 400 reporting directly

17 and -- I'm sorry, you had about 400 people reporting indirectly

18 to you; correct?

19 A.  By indirectly, if you mean reporting through other people

20 to me, that's correct.

21 Q.  Okay.  And how many direct reports did you have?

22 A.  In what year again?

23 Q.  In 2018.

24 A.  I don't remember exactly.  The 12 number you mentioned

25 earlier is probably about correct.

1   Q.  Do you recall in 2018 how many L9 women you had reporting

2   to you, L9 or above?

3   A.  In the entire organization?

4   Q.  Of those 400.

5   A.  I don't recall.

6   Q.  Do you recall anyone besides Nan Boden?

7   A.  L9 -- I don't actually know most people's level in my

8   organization, so I wouldn't be able to pinpoint that for you,

9   no.

10  Q.  Okay.  How many men at Level 9 or Level 10 reported to you?

11  A.  Again, in terms of the specific year, that's what I'm

12  having trouble with at the moment.  I had a number of vice

13  presidents who were men reported to me.  As I mentioned, Carrie

14  Tharp reported to me and Nan Boden did as well.  I had -- but I

15  don't -- so L9 and L10, I don't recall the exact number.  But

16  my direct reports were typically a mix of L9 and L10.

17  Q.  Okay.  And tell me, if you can, which L9 men you recall in

18  your organization in 2018?

19  A.  In my organization of the 400 people?

20  Q.  Mm-hmm.

21  A.  I mean, there would be -- again, I don't recall the exact

22  levels of the people.  Anil Jain would be one person I recall

23  being L9.  Domenic Wee, as you mentioned, would be L9.  I'm

24  having trouble -- I don't -- I wasn't -- it was not my routine

25  to pay attention to what level somebody was at in my

1    organization.  I didn't go around asking that question.

2    Q.  So level wasn't something that was -- something that was

3    regularly discussed within your organization?

4    A.  Not to me, no.  I mean, I dealt with individuals on a

5    project basis.  With 400 people and with fairly broad

6    responsibilities, I just dealt with teams as they came to me,

7    as opposed to asking what level is such-and-such person.

8    Q.  So the level --

9            MR. GAGE:  Your Honor, I'd like to object.  This is

10    relating to a ruling and a motion *in limine* that limits the

11    leveling decisions that they can ask Mr. Shaukat about.

12            THE COURT:  Just a moment.

13            Which motion *in limine* was that, do you know?

14            MR. GAGE:  It's defendant's first, your Honor.  So if

15    you have that ruling in front of you.

16            THE COURT:  I do.

17            MR. GAGE:  It's just that first paragraph, that's all

18    I'm referring to.

19            MS. GREENE:  And, your Honor, I'm happy to speak to

20    this in a sidebar, if necessary.

21            THE COURT:  Yes, I think we should.  Thank you.

22            (Continued on next page)

23

24

25

1            (At sidebar)

2            THE COURT:  So this says that motion was denied,

3       except plaintiff may introduce evidence of leveling decisions

4       by Shaukat.

5            MS. TOMEZSKO:  The question was about individuals in

6       Mr. Shaukat's organization.

7            MR. GAGE:  Which is broad.

8            MS. TOMEZSKO:  He did not participate in the leveling

9       decisions of all of those people.  And the reason it was

10      allowed into evidence is because probative of his intent.  The

11      leveling determinations made by others who are not Mr. Shaukat

12      are not probative of his intent, so are not relevant to

13      anything.

14           THE COURT:  Hasn't she just been asking about this one

15      and that one, what was this level and that level?  I mean, I

16      don't think I've heard you trying to delve into the decisions.

17           MR. GAGE:  The point, your Honor, is she's asking

18      about people for whom she hasn't established he made those

19      leveling decisions.

20           MS. GREENE:  Your Honor, we started with a question

21      about whether diversity on his team was a problem.  And this is

22      something he talked about and discussed with ER in that

23      investigation.  It goes with respect to why certain candidates

24      were selected to be on the panel.  And so establishing that he

25      understood there was a problem in his organization with the

NABVROW6                        Shaukat - Direct

1    lack of women at the senior levels is important.

2              As to Mr. Wee and Mr. Jain, Mr. Shaukat pointed to him

3    in his ER conversations as peers of Ms. Rowe and as evidence

4    that she was not demoted because she was doing the same work as

5    Level 9 men.

6              So this is all very relevant to -- and is completely

7    outside of the motion *in limine* or the subject of the motion *in*

8    *limine.*

9              MS. TOMEZSKO:  I would disagree.  I think if you can

10   establish that he was responsible for those leveling decisions,

11   then it would be outside the scope, but you haven't established

12   that.

13             MS. GREENE:  Not talking about the leveling decisions.

14   I'm talking about the levels of people in his organization.

15             MR. GAGE:  He just said he doesn't know the levels of

16   people in his organization, with exceptions.

17             THE COURT:  Well, no, he said most of the people.

18             MR. GAGE:  Most of the people.

19             THE COURT:  Most of the people.

20             And I think -- I'm not sure where you're planning to

21   go from here, but asking, you know, this one and that one, what

22   was this one's level, what was that one's level, I don't -- I

23   don't read that as running afoul of this ruling.  I just --

24             MS. GREENE:  I don't have much more on this subject.

25   It's just establishing the contours of his group at the time

1    Ms. Rowe entered his group.

2            THE COURT:  The wording of this decision is a little

3    bit -- it says "denied to the extent that."  Plaintiff may

4    introduce evidence of leveling decisions by --

5            MS. TOMEZSKO:  Tariq Shaukat.

6            THE COURT:  Tell me, Ms. Tomezsko, your point again.

7            MS. TOMEZSKO:  My point is that the leveling

8    determinations by Mr. Shaukat, the judge ruled -- or, rather,

9    Judge Schofield has ruled are relevant and probative of his

10   intent in leveling.

11           Now, the fact that there is someone in his

12   organization hired and leveled by someone else — and this is an

13   organization of hundreds of people — is not probative to

14   Mr. Shaukat's intent and his attitude or any decision that he's

15   taken with respect to Ms. Rowe on the basis of her gender.  How

16   could it be?  These are decisions made by other people in an

17   organization that he just testified he inherited.

18           MS. GREENE:  And if I can put a finer point on it.

19           Defendant has defended -- is using as a defense

20   against bias.  There are two other female candidates being

21   considered for this vice president, head of financial services

22   sales.  Ultimately, he didn't go with any of those.  The reason

23   there were two female candidates, as he said to ER, was because

24   diversity was a problem in his group.  There was a lack of

25   senior women essentially.

1           And so This goes to establishing that it wasn't about

2       a lack of bias in having these women candidates; it was because

3       there was a problem and they needed to get women.  And

4       ultimately, they didn't hire any of those women.  So I need to

5       be able to present that case.  And again, we're not talking

6       about the leveling decisions, we're talking about the lack of

7       women within his organization at the time he inherited it and

8       what steps he has taken to rectify them.

9           THE COURT:  I also think what this says is that

10      leveling decisions by Shaukat come in.

11          MS. GREENE:  Yes.

12          MR. GAGE:  Correct.

13          THE COURT:  Okay.  Sorry.  This is not my order.

14          So you tell me again now what your point was,

15      Mr. Gage.

16          MR. GAGE:  I agree that they can ask him about

17      leveling decisions he made.  But counsel is asking him about

18      the level of people for whom he didn't make those decisions.

19          THE COURT:  Yes.  But she's not asking him — not that

20      I've heard — how was it decided that this person was an L9.  I

21      think she's saying, you know, who is an L9 and who wasn't and

22      what about this person and that sort of thing.  I haven't heard

23      her ask for him to explain leveling decisions about people in

24      his group that he wasn't involved in.  Is that accurate?

25          MS. GREENE:  That is accurate.

1            THE COURT:  Okay.  All right.

2            You don't have much more on this anyway?

3            MS. GREENE:  I do not.

4            THE COURT:  All right.  Thank you.

5            (Continued on next page)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                    (In open court)

2       BY MS. GREENE:

3       Q.  Mr. Shaukat, do you recall being interviewed by Google's

4       employee relations team in connection with Ms. Rowe's lawsuit?

5       A.  I do, in early 2020, yes.

6       Q.  And do you recall telling ER that it was a fairly explicit

7       role to add diversity to the team; did send them back a number

8       of times to bring in diverse candidates; this has been a

9       problem for my team and in the cloud?  Do you recall in sum or

10      substance saying that to ER?

11      A.  In general, as I mentioned, we -- in Google Cloud in

12      general, we had an objective to increase the gender

13      representation inside of Cloud.  And the team I inherited

14      inside of -- inside of Cloud had a similar problem to the rest

15      of Cloud.  I had already addressed a number of issues related

16      to this in the prior organization that I had been in, so this

17      was something we were very focused on when I joined.

18                  THE COURT:  Mr. Shaukat, for clarity, would you tell

19      us please what "ER" is.

20                  THE WITNESS:  I'm sorry.  Employee relations.

21                  Thank you.

22      Q.  Now, Ms. Rowe joined your organization in June 2018;

23      correct?

24      A.  It would be in early to mid 2018, I don't remember the

25      date, yes.

1   Q.  Shortly before she joined, you had a conversation with her

2   to discuss her transition to your organization; correct?

3   A.  Yes.

4   Q.  And as part of that conversation, she told you a little bit

5   about her background, right?

6   A.  I don't recall any substance, but we had a conversation

7   about her experience at Google and prior to that.

8   Q.  So she explained at a fairly high level some of the nature

9   of her work at J.P. Morgan Chase; is that right?

10  A.  At probably an extremely high level.  I knew that she had

11  come from J.P. Morgan Chase, but I couldn't tell you what she

12  had done at J.P. Morgan Chase.  I think it was more what level

13  was she at at J.P. Morgan.

14  Q.  So the two of you didn't speak extensively in that

15  conversation about her qualifications; correct?

16  A.  Not that I recall.

17  Q.  It was just a very high level that you spoke about it?

18  A.  Yeah, we were focused more on what she had done since she

19  joined Google is my recollection, not what she had done prior.

20  Q.  How long did that conversation last all together?

21  A.  I don't have any recollection.  Normally, my meetings were

22  about 30 to 45 minutes, so I would assume that was part of one

23  of those meetings.

24  Q.  And do you recall that a lot of that meeting you spent

25  talking also explaining to her what your organization looked

1  like and what your vision was?

2  A.  I don't have a specific recollection about the meeting like

3  that.

4  Q.  In that meeting, you explained to Ms. Rowe that she had the

5  opportunity to move into your organization as a client lead,

6  right?

7  A.  As a what we called the global client technical lead.  And

8  I wouldn't characterize it as she had an opportunity; her group

9  was moving into my team, that's her and three other of her

10  colleagues from a group we called the office of the CTO, was

11  moving into this team.  And the role that they were being given

12  was essentially being retitled as a global client technical

13  lead, GCTL.

14  Q.  But you didn't explain all of that to her in that meeting;

15  isn't that right?

16  A.  As I mentioned, I don't remember specifically, but there

17  was an email that was sent around explaining all of this

18  shortly -- around that same time.

19  Q.  Right.  And that's because of the meeting itself, you

20  didn't explain that there wasn't a choice, that there was a

21  lift and -- lift and whatever the other set in terms of group;

22  is that right?

23  A.  Yes, which is fairly routine inside of Google.  And I

24  believe the entire team knew that they were moving as a block

25  into my team.  It wasn't an individual-by-individual decision.

1          THE COURT:  Ms. Greene, we're going to take a break

2     soon.  Just letting you know.

3          MS. GREENE:  Okay.  I've got maybe one more question

4     for this.

5          THE COURT:  Sure.

6     Q.  So Ms. Rowe initially declined the move; correct?

7     A.  After receiving the email, she wrote back saying she was

8     declining, that's right.

9     Q.  Wasn't it, in fact, before she received her email

10    explaining the position that she declined; and then once you

11    had explained to her what the position entailed and that it was

12    just a change of reporting line and just doing the same job

13    going forward, at that point she understood and moved forward

14    with the position?

15    A.  And my recollection is that I sent the email.  She

16    responded to the email saying that she declines the role.  I

17    then clarified that it isn't a new role for her to accept or

18    not; it was a lift and shift, as you mentioned earlier, with a

19    change in title.  And then she agreed to move forward on that

20    basis.

21         MS. GREENE:  Okay.  Can we take a look at a document

22    and then we'll break just after.

23         THE COURT:  Yes.

24         MS. GREENE:  Mr. Yang, can you put up Plaintiff's 25.

25    Q.  Okay.  And at the bottom of that, the June 13th 5:08 a.m.

NABVROW6                         Shaukat - Direct

1   email, she, at the bottom, says:  I respectfully decline the

2   global client role.  Do you see that?

3   A.  I do, yes.

4   Q.  Okay.

5         MS. GREENE:  Let's take that down now.

6   Q.  And let's look at your email at 8:17 p.m., beginning with:

7   Just to make sure we're using the same language here.

8         MS. GREENE:  Mr. Yang, you can pull that out.

9   Q.  So here you explain:  The plan for the realignment is to

10  have you continue doing the role you're doing, but moving over

11  to my vertical team, where we would be applying the program

12  name technical director.

13        Going on:  The role responsibility is the same.

14        That was your response to her email; correct?

15  A.  That was, yes.

16  Q.  Okay.

17        MS. GREENE:  Now, if we can take that down.  And if we

18  can pull up Ms. Rowe's response.

19  Q.  And this was her response to you; correct?

20  A.  That is correct, yes.

21  Q.  Does that refresh your recollection that her declining of

22  the role was before you had explained to her that it was just a

23  realignment of managers?

24  A.  No, I -- again, I -- there was an email that had been sent

25  previously that I think she was confused about.  And so I would

1    describe it more as I clarified to her that where I thought her

2    confusion was coming from.  But I thought the previous note

3    where she did decline the role had been explicit.  And I should

4    note, her other colleagues did not have the same confusion.  So

5    she was the only one who raised the -- who had that confusion

6    at that time.

7              MS. GREENE:  Okay.  This would be a good time to take

8    a break before we continue on with this.

9              THE COURT:  Okay.  Very good.

10             Mr. Shaukat, you may step down.

11             And members of the jury, again, please do not talk to

12   each other or to anyone else about the case while you are on

13   break.

14             We will -- it's 2:45.

15             You may step down.

16             We'll resume at 3.  And I did want to mention that

17   because we needed some time today for the Court and the lawyers

18   to confer about legal issues, that I'd like to go today until

19   4:45.  And so just for planning purposes, I'm mentioning that.

20             So we'll resume at 3 and we'll go to 4:45 and then

21   we'll adjourn for the day.  All right?

22             (Jury not present)

23             THE COURT:  And another question on one of our issues,

24   just quickly -- Mr. Shaukat, would you mind stepping out of the

25   courtroom?  Thank you.

1          THE DEPUTY CLERK:  You can be seated.

2          THE COURT:  Yes, you can.

3          So back to the notes issue.  I have a question about

4     the business records exception.

5          It explicitly sets out several requirements that must

6     be met, one of which is that "all these conditions," referring

7     to all the previously enumerated requirements under 803, "are

8     shown by the testimony of the custodian or another qualified

9     witness or by a certification that complies with Rule 902(11)

10    or (12) or with a statute permitting certification."

11         So my question is how do you intend to satisfy that

12    with respect to the notes that you wish to introduce in P-108?

13    Do you have a qualified witness or the custodian of this record

14    or a certification ready that comports with 803(g)(D)?

15         MS. GREENE:  Ms. Tessier, your Honor, was the other

16    person.  There was two people in that meeting per Google

17    policy.  So Ms. Tessier is the person.  And I don't have the

18    rule off the top of my head, I'm sure my colleague can tell me,

19    but the document, subject to qualification by a later witness,

20    can be offered into evidence.  And Ms. Tessier will be that

21    witness.

22         THE COURT:  All right.  That was my only question for

23    right now.  Let's all take a break and we'll be back here at 3.

24         Thanks.

25         (Recess)

 1             (Jury present)

 2             THE COURT:  You may be seated.

 3             Mr. Shaukat, I remind you, you're still under oath.

 4             THE WITNESS:  Thank you.

 5             MS. GREENE:  May I continue?

 6             THE COURT:  Yes, you may.

 7   BY MS. GREENE:

 8   Q.  Mr. Shaukat, we were talking about the meeting that you had

 9   with Ms. Rowe at the time she moved over into your

10   organization.  During that meeting, Ms. Rowe expressed an

11   interest in the VP of financial services role; correct?

12   A.  Yes.

13   Q.  And you knew that as of the time she was joining your

14   organization, Ms. Rowe was a Level 8; correct?

15   A.  I believe I knew that at that time, yes.

16   Q.  And you knew that Ms. Rowe had raised a concern about being

17   under-leveled; correct?

18   A.  I don't believe I did at that time.  She pointed that out

19   to me in November of that year, as I recall.

20   Q.  Well, she expressed to you, didn't she, a concern that it

21   would hurt her chances of getting the VP of financial services

22   role?

23   A.  That her level would?

24   Q.  Correct.

25   A.  I believe, if it wasn't in that meeting, she did at some

1   point raise that concern, yes.

2   Q.  She raised a concern of the fact that she as a Level 8

3   would disqualify her from the VP of financial services role;

4   correct?

5   A.  I believe so, yes.

6   Q.  And you told her that you would consider her irrespective

7   of her level; correct?

8   A.  Yes.

9   Q.  And you told her that she would be given a fair shot

10  irrespective of her level; is that right?

11  A.  Sounds like what I would say, yes, or how I would say it.

12  Q.  At the time you had this conversation about whether her

13  level would disqualify her and her concerns about her level,

14  did you have a conversation with Will Grannis and Brian Stevens

15  about it?

16  A.  About her level?  Disqualifying her?  I don't recall having

17  a conversation, no.

18  Q.  So do you recall going to Brian and Will and asking

19  whether, in fact, was the case that she had been under-leveled?

20  A.  No.  As I mentioned, I don't believe I learned that she was

21  under-leveled until she pointed it out later on that year.  And

22  I raised it to HR, not to Brian and Will at that point.

23  Q.  Wasn't it actually at the time she threw her hat in the

24  ring that she raised this to you?

25  A.  Again, that is not my -- I don't believe she did, no.

1            MS. GREENE:  Okay.  Let's go to transcript page 166,

2       line 4.  166, line 4.  If we can go ahead and play that for the

3       jury.

4            THE COURT:  This is his deposition transcript?

5            MS. GREENE:  It is.

6            MR. GAGE:  Just one second.  I just want to read it.

7            THE COURT:  Yes.

8            MR. GAGE:  Go ahead.

9            MS. GREENE:  Okay.  Can you go ahead and play 166,

10      line 4 through 16, please.

11           (Video played)

12           MS. GREENE:  You can stop right there, please.

13      BY MS. GREENE:

14      Q.  Do you recall giving that testimony at your deposition?

15      A.  Yes.

16      Q.  Now, at the time Ms. Rowe threw her hat in the ring and

17      raised a question about her level, did you contact anyone in HR

18      about that?

19      A.  Again, until just now, I didn't remember even raising it

20      with Will and Brian, so I don't believe I did, no.

21      Q.  And you also didn't raise it with ER that she had raised

22      this question about her level; correct?

23      A.  That -- in Google you don't reach out to ER, you reach out

24      to HR, and HR decides what to do.

25      Q.  Okay.  This might be a good time to just clarify HR versus

1  ER.  HR is human resources; correct?

2  A.  Human resources, that's right.

3  Q.  And what's the responsibility of human resources?

4  A.  They have broad responsibility to take care of the people

5  inside of Google.  So everything from recruiting, performance

6  reviews, advising on talent, those sorts of things.

7  Q.  And what is the role of ER, employee relations, within

8  Google?

9  A.  ER, my understanding, and this may not be all that they do,

10 is that they do investigations when there is a credible

11 complaint that has been made.

12 Q.  Okay.  So ER is the one that's in charge of investigating

13 concerns or complaints of discrimination, not HR; correct?

14 A.  That is true.  Except the process in Google is that you

15 raise these to HR, who then will raise it to ER, as opposed to

16 you reaching out to ER itself.  Just the process that they

17 have.

18 Q.  Okay.  But as of the time Ms. Rowe threw her hat in the

19 ring, you didn't raise it with either HR or ER; correct?

20 A.  This suggests I did not, no.

21 Q.  Now, the role you were hiring for was a VP-level role;

22 correct?

23 A.  It was originally scoped as a VP-level role, yes.

24 Q.  And a VP-level role is a Level 10?

25 A.  That's correct.  Or this role was scoped as a Level 10.

1   There's multiple levels of VP.

2   Q.   The meeting we've been discussing with Ms. Rowe in June

3   2018, that was not an interview for the VP financial services

4   role; correct?

5   A.   It was not, no.

6   Q.   You did not tell her you were interviewing her; correct?

7   A.   I was not interview her; correct.

8   Q.   You weren't doing any sort of evaluation with her with

9   respect to that VP role in that meeting; correct?

10  A.   I mean, every interaction I have with people who report to

11  me I evaluate, their performance, what they say, things like

12  that.  It's part of being the manager of the team.  But I was

13  not thinking of her specifically for that role, no.

14  Q.   In fact, you never interviewed Ms. Rowe for the VP

15  position; correct?

16  A.   I did not formally interview her.  She did work for me for

17  a long period of time, so I got to evaluate her work

18  performance during that process, yes.

19  Q.   But to be clear — and this is a yes-or-no question — you

20  never interviewed her for the position; correct?

21  A.   Correct.  Yes.

22  Q.   Now, during that June meeting with Ms. Rowe, she told you

23  that when she was recruited to Google, Mr. Grannis had told her

24  that she would be the obvious choice to lead financial services

25  vertical once it was verticalized; correct?

1    A.  At some point she said that to me.  I couldn't say for sure

2    that it was in that meeting, but there's an email to that

3    effect and she asserted that.

4    Q.  Well, at your deposition do you recall saying that it was

5    when she threw her hat in the ring that she raised that with

6    you?

7    A.  If I said it, that was three years ago, so yes, it's

8    probably correct.

9    Q.  Well, she told you again in December 2018, in a meeting

10   where you told her she wasn't getting the role.  She said again

11   in that meeting that when she joined, Mr. Grannis had told her

12   she would be the obvious choice to lead; correct?  Do you

13   remember that?

14   A.  I don't remember that, no.  I know she had said that in

15   October or November of that year, but I don't remember her

16   saying that in that meeting.

17   Q.  But you do recall her saying it in October or November?

18   A.  Yes.

19   Q.  So in your ER interview relating to Ms. Rowe's lawsuit, you

20   denied to ER that she had ever told you that, isn't that the

21   case?

22   A.  That she had ever told me what?  I'm sorry.

23   Q.  Ever told you that Mr. Grannis had told her she would be

24   the obvious choice.

25   A.  What I'm referring to right now is she sent an email.  I

1    don't believe I ever denied the existence of that email.  But

2    if I did, I just hadn't seen it; it was not fresh in my memory.

3    Q.  My question is this:  On at least two occasions, Ms. Rowe

4    told you that she had been told she would be the obvious

5    candidate for the VP position; correct?

6    A.  As I mentioned, I have specific recollection of that one

7    email she sent.  If I said three years ago that she had also

8    mentioned it earlier, then I'm sure that that was true, but I

9    don't recall that right now.

10   Q.  Now, do you recall ER asking you in the interview, Did Ulku

11   at any point share that this argument that she would be the

12   lead of financial services, do you recall being asked that

13   question?

14   A.  I don't, no.

15   Q.  Do you recall telling ER that, no, she never said that and

16   you were surprised when you saw that in the lawsuit?

17   A.  I don't remember saying that in ER.  It would not have been

18   Will's place to promise a future job that was not in his

19   organization, so I would have been surprised when I did learn

20   that she was claiming that, yes.

21   Q.  So she told you that she -- Mr. Grannis had indicated that,

22   and you told ER the first time you heard about it was in the

23   lawsuit, is that fair?

24   A.  I don't recall what I told ER, no.

25   Q.  Now, prior to the meeting you had with Ms. Rowe in June of

NABVROW6                          Shaukat – Direct

1    2018, Brian Stevens, the chief technology officer for Google

2    Cloud, had identified Ms. Rowe to you as someone with financial

3    services industry cred; correct?

4    A.  Yes.

5    Q.  And in May of 2018, a month before your meeting with

6    Ms. Rowe, Mr. Stevens, the CTO, had asked you to consider

7    Ms. Rowe for the VP position; correct?

8    A.  He did, yes.

9                (Continued on next page)

1   Q.  Let's look at Plaintiff's Exhibit 16.  And if we can look

2   down at the bottom.

3           And, actually, Mr. Yang, if you can just pull up the

4   part that says "Ulku is getting recruited away."

5           Do you recall Mr. Stevens writing this to you?

6   A.  I do.

7   Q.  And "CX level," that refers to C-suite level, correct?

8   A.  Yes, I assume so.

9   Q.  So Mr. Stevens, the CTO of Google Cloud, is telling you

10  that Ms. Rowe had great respect from the C-suite level at the

11  banks, correct?

12  A.  That's what he's saying here, yes.

13  Q.  He's asking you to give her a swing at the bat to lead FSI.

14  That's to be that vice president role, correct?

15  A.  Yes.

16  Q.  And he says she's really calibrated and all of that and has

17  the right connections, correct?

18  A.  That's what he says, yes.

19  Q.  And then he suggests, hey, give it to her for six months,

20  and if not delivering, you can still hire an overall lead,

21  correct?

22  A.  Correct.

23           MS. GREENE:  If you can take that down and go up to

24  the next paragraph.  Thanks.  That one exactly, Mr. Yang.

25  Q.  Now, this was your response to him, correct?

1    A.  Yes, it was.

2    Q.  You said you met with her once in a very exploratory

3    fashion on the FSI lead role, correct?

4    A.  Yes.

5    Q.  And this is before that June meeting that Mr. Stevens is

6    sending this to you, correct?

7    A.  This is May 8, yes, so it's before the June meeting.

8    Q.  So it's not the conversation you just talked about before,

9    correct?

10   A.  Yes, that was in June, that's right.

11   Q.  There wasn't another interview you had done before May 9,

12   correct?

13   A.  I don't — I mean, as we just discussed, I did not

14   interview Ulku for the role.

15   Q.  You said you weren't blown away with her, but you hadn't —

16   you'd had very few interactions with her, is that right?

17   A.  Yes.

18          MS. GREENE:  OK.  If you can take that down, and let's

19   look at Mr. Stevens' response.

20   Q.  Mr. Stevens said:  "Maybe she had an off day.  Not sure,

21   but there's a wealth of knowledge in her head.  It would mean a

22   lot to me if you pinged her to talk again, especially since

23   she'd be joining your group nonetheless."

24          That was what Mr. Stevens, the CTO, wrote to you about

25   Ms. Rowe's consideration for the vice president position,

1   correct?

2   A.  Yes, that's right.

3            MS. GREENE:  You can take that down.

4   Q.  Let me ask you, after Mr. Stevens sent that email, did you

5   have any discussions with him beyond that about Ms. Rowe's

6   qualifications for the role?

7   A.  I don't remember having any with him.  Brian and I talked a

8   lot, so it may be that we had something, but I don't remember

9   any, no.

10  Q.  You never spoke to Mr. Stevens about Ms. Rowe's

11  qualifications or experience, did you?

12  A.  No, her prior —— her qualifications and experience prior to

13  joining Google, I did not.

14  Q.  Well, you didn't ask about the nature of Ms. Rowe's C-suite

15  relationships that Mr. Stevens had alluded to, correct?

16  A.  I don't remember asking that, no.

17  Q.  You didn't talk to Will Grannis, her immediate manager in

18  OCTO, about her qualifications or her performance either, did

19  you?

20  A.  Not that I recall, no.

21  Q.  Back in that email, P-25, that we looked at, you told

22  Ms. Rowe that you were committed to giving her a fair shot at

23  the vertical lead role, correct?

24  A.  Yes.

25  Q.  But you never interviewed Ms. Rowe for the position,

1    correct?

2    A.   I was the final interview, so I did two roles in the

3    search.  I was the —— what I call the gatekeeper interview,

4    which is somebody unknown to Google or unknown to the

5    organization, I was the screener to make sure it was worth ——

6    it was calibrated for the role, and then for the very end

7    finalists, I would have typically interviewed.  Because Ulku is

8    internal and Brian had essentially asked for her to be in

9    consideration, I didn't feel the need for the gatekeeper

10   interview.  We put her straight into the full interview panel

11   that all the other candidates got.

12   Q.   And you never did the end interview either, correct?

13   A.   She was never in the top two of the people we were

14   considering for the role, so no.

15   Q.   You never did anything to learn what qualifications

16   Ms. Rowe had for the VP of financial services role, did you?

17   A.   I did not look at her résumé, if that's what you mean, no.

18   Q.   Well, did you do anything to learn what her experience was

19   beyond that she'd worked at JPMorgan Chase generally?

20   A.   I did not, no.

21   Q.   So you didn't know that she had a B.S. and an M.S. in

22   computer science and engineering, did you?

23   A.   I assumed as much because she got the job in OCTO, but I

24   didn't verify it, no.

25   Q.   And you didn't know that by that point in time, she had

1   almost 25 years of experience in the financial services and

2   technology industry, did you?

3   A.   Again, the role of being a member of the office of the CTO

4   at Google Cloud is a prestigious role, so I assume a certain

5   level of technical experience and gravitas.  We don't hire

6   people with five years of experience into that team.  So I did

7   know that she was experienced in the financial services world.

8   Q.   Was it because the exact number of years of experience

9   really wasn't relevant to how somebody performed their job at

10  that high level?

11  A.   We did not give the most senior jobs to the most tenured

12  people, so no.  At some point you look at the impact that

13  people are having, not at the number of years of experience

14  that they have.

15  Q.   You had no idea how old Ms. Rowe was, correct?

16  A.   I did not, no.

17  Q.   So you didn't know that she's approximately the same age as

18  you, correct?

19  A.   No.

20          MR. GAGE:  Objection to relevance, your Honor.

21          THE COURT:  I'm not seeing the relevance either.  Are

22  you moving on now from that?

23          MS. GREENE:  That's the only question that I asked,

24  your Honor.

25  Q.   You didn't know that Ms. Rowe had worked in both the United

1   States and Europe, correct?

2   A.  I did not, no.

3   Q.  And you didn't know what her experience was managing large

4   teams, did you?

5   A.  I did not.

6   Q.  You didn't know what other financial institutions she had

7   worked for besides JPMorgan Chase, correct?

8   A.  At —— at this moment in time, in 2018, you're asking?

9   Q.  Correct.

10  A.  No, I did not.

11  Q.  In fact, throughout 2018 into 2019, you didn't know either,

12  did you?

13  A.  That's probably true.  At some point I learned, but I think

14  maybe when she was bringing it up towards the end of the

15  process, but I don't —— for most of the 2018, I did not know.

16  Q.  So you didn't have a lot of depth of experience or depth

17  about Ms. Rowe's experience outside of Google, correct?

18  A.  Correct.

19  Q.  You didn't know that she'd been a senior executive at Bank

20  of America, correct?

21  A.  Correct.

22  Q.  Bank of America was one of Google's top ten targets for

23  financial services, correct?

24  A.  Yes.

25  Q.  And you didn't know what her relationships were with the

1   C-suites at Bank of America, correct?

2   A.  I knew that they didn't ask for her by name, which they did

3   for other members of my team.  So I didn't know what her

4   experience was, but I knew that they weren't asking and looking

5   for Ulku when they came to visit us.

6   Q.  You don't know if Ms. Rowe was meeting with those C-suites

7   at Bank of America before she came into our organization,

8   correct?

9   A.  That would be very unusual.  I ran the customer team.  Any

10  interactions with our customers was supposed to be reported

11  through me, and as you mentioned, Bank of America was a very

12  high target for us.  They weren't a customer.  They were a very

13  high target, so I would have expected to know if anyone, Ulku

14  or others, was meeting with senior people at Bank of America.

15  Q.  Well, did you know all of the work that Ms. Rowe was doing

16  when she was in OCTO on financial services?

17  A.  I did not know all of the work she was doing, though again

18  for target, high priority accounts, it was expected that they

19  would report that through Will Grannis to the client teams who

20  then reported up to me.

21  Q.  You didn't really know what Ms. Rowe's C-suite

22  relationships were in the financial services at all, correct?

23  A.  Again, I did not know what —— who she knows in there.  All

24  I know is what customers were asking for, and there was not

25  explicit demand for Ulku to be in certain meetings and that

1   sort of thing.

2   Q.  So it's not to say that she doesn't have it, it's just that

3   you weren't aware of it, correct?

4   A.  She — I was not aware whether or not she had it.  None of

5   the customers I talked to mentioned her to me.  So the absence

6   of that led me to believe that she didn't have — know the

7   people that I was speaking to who were senior in those banks.

8   Q.  Well, you never asked her about her C-suite relationships,

9   did you?

10  A.  I did not, no.

11  Q.  And you didn't know what relationships she had with

12  financial regulators in the U.S. or Europe or Australia, did

13  you?

14  A.  I didn't know.  I didn't ask her about that for sure.

15  Q.  You didn't know she had previously been a chief technology

16  officer at JPMorgan Chase, did you?

17  A.  I knew she'd been a managing director.  I didn't know what

18  — what her title was and what part of the bank, no.

19  Q.  You actually didn't even know what a CTO at a financial

20  institution is, right?

21  A.  I'm not sure what you mean by that.  I routinely met with

22  CTOs of financial institutions, and every financial institution

23  defines the CTO role differently.  In our largest customer,

24  HSBC, the CTO ran ten, 15,000 people inside of HSBC.  They

25  didn't have other CTOs.  In Bank of America, they may have had

1    other CTOs.  But it's not an industry standard term, so I don't

2    think it's a correct characterization.

3    Q.  JPMorgan Chase was actually Google's No. 1 target, right,

4    for financial services, or at least in the top three, isn't

5    that right?

6    A.  They are the largest bank.  We definitely wanted to go

7    after them.  They were certainly in the top five.  They were a

8    hard one to crack.  So we, you know, kept figuring out where

9    they should be on the priority list.

10   Q.  You didn't know or ask what Ms. Rowe's experience was with

11   the C-suite at JPMorgan Chase, correct?

12   A.  I did not.  Again, we have an account team who worked with

13   JPMorgan Chase day in and day out, and I would expect they

14   would have chased down anyone with relevant contact in

15   JPMorgan, but that wasn't my role to get that specific in each

16   and every customer that we have.

17   Q.  Ms. Rowe was your direct report, correct?

18   A.  In — as of June of 2018, that's right.

19   Q.  Right.  And you didn't have any conversations with her

20   about what are your connections?  What's your experience?  What

21   can you bring to this?  You didn't have that conversation with

22   her, did you?

23   A.  That is correct with her.  But, again, what I just

24   mentioned is before the role I had run the entire

25   customer-facing team which was responsible for JPMorgan.  I met

1    with the account team regularly, and sometimes in my ——

2    sometimes in my role you hear who is actually involved in an

3    account and who is not involved in an account, and Ulku's name

4    did not come up that I recall as having been involved in any of

5    these accounts.

6    Q.  Now, as of June 22, just ten days after you met with

7    Ms. Rowe, you had already decided that she was not likely right

8    for the position, correct?

9    A.  As I had mentioned on May 8 to Brian, I did not have an

10   opinion that she was right for the position, so I don't know

11   why that would have changed by June.

12   Q.  Let's look at Plaintiff's 150.

13          Down at the bottom there's some discussion about

14   bringing in Ranjana Clark to interview for the VP of financial

15   services role, and then there's a conversation around another

16   —— you're corresponding with Ms. Greene, Diane Greene, the CEO,

17   correct?

18   A.  Yes.

19   Q.  And you're discussing the financial services lead role,

20   correct?

21   A.  I believe so, yes.

22          MS. GREENE:  OK.  Let's pull out the paragraph,

23   Mr. Yang, that you're on, Ulku from OCTO.

24   Q.  So as of June 22, you wrote Diane Greene, your manager,

25   that "Ulku is very interested.  I don't think she is likely

1   right, but I told her I would formally interview her for the

2   role," correct?

3   A.   Correct.

4   Q.   To be clear, you told Ms. Greene that Ms. Rowe wasn't right

5   without knowing Ms. Rowe's qualifications, her experience, her

6   C-suite relationships, or what work she had been doing at

7   Google up until that point, isn't that right?

8   A.   Again, on the third one, that is not correct.  I was

9   broadly aware of the work she was doing at Google.  I couldn't

10  say I knew what she was doing every day while she was there,

11  but I was not completely ignorant of the work that she was

12  doing.

13          Again, for this role, for internal candidates, we tend

14  to look at what is the impact, what are the ideas.  They know

15  us better, and the bar is ─── it's not the bar.  What you expect

16  to see is a little bit different.  Other peers who threw their

17  hat in the ring, they came with plans, they came with

18  proposals, they came with product ideas, they came with using

19  the knowledge that we had ─── or that they had about us and put

20  themselves forward as, hey, here's what I would do on the job,

21  not here's how many years of experience I had.  That's what we

22  cared about was what would you do if you were in the job, and

23  given how well you know us and you know our users, what do you

24  think the priorities should be?

25  Q.   You didn't interview Ms. Rowe, you didn't give her the

1    opportunity to come in and tell you what her vision for the

2    financial services were, and you didn't have a conversation

3    with Mr. Stevens and Mr. Grannis who she'd been working with

4    about what her impact had been up until that time either,

5    correct?

6    A.   Correct.  Other members of my senior staff did interview

7    her formally for the role.

8    Q.   Let's take a detour for a minute and talk about your

9    qualifications.

10             You have a B.S. and M.S. ──

11             MR. GAGE:  Go ahead.

12   Q.   You have a B.S. and M.S. in mechanical engineering,

13   correct?

14   A.   I do.

15   Q.   But you don't consider yourself to be an expert in computer

16   engineering or computer science, correct?

17   A.   Correct.

18   Q.   You finished your M.S. in public policy in 1997 and then

19   entered the workforce, is that right?

20   A.   Yes.

21   Q.   And prior to joining Google, you were the chief commercial

22   officer for Caesars Entertainment, correct?

23   A.   Correct.

24   Q.   And Caesars is the casino company we know of?

25   A.   Casino, entertainment, hospitality, that's right.

1    Q.  And you left Caesars in 2016, correct?

2    A.  Yes, that's right.

3    Q.  And prior to working for Caesars, you were a management

4    consultant, is that right?

5    A.  I was a partner at McKinsey, a strategy consulting firm.

6    Q.  You never worked for a technology company, is that right?

7    A.  No, that's not true.  I had worked at Trilogy Software

8    prior to joining McKinsey.  I had done a technology startup in

9    the social media space prior to joining McKinsey.  And at

10   Caesars I oversaw IT and analytics for a Fortune 500 company

11   with several hundred technology engineers, software developers,

12   etc., etc.  So it's not a technology company in that case, but

13   I oversaw a large engineering organization and technology

14   organization.

15   Q.  But you yourself are not an engineer, so you weren't doing

16   the hands-on work yourself?

17   A.  No, I'm an engineer.  I'm, as you said, a mechanical

18   engineer from MIT and Stanford.

19   Q.  But you're not a computer engineer, correct?

20   A.  I have done programming.  I'm not a computer engineer, that

21   is correct.

22   Q.  You were a VP at Google, correct?

23   A.  Correct.

24   Q.  And that's a Level 10?

25   A.  I was, at the time we're talking, about between an L10 and

1  an L11.

2  Q.  And as a VP Level 10, you were paid millions of dollars a

3  year, is that right?

4  A.  I was well compensated, yes.

5  Q.  To the tune of 6.5 to $7 million a year, is that right?

6            MR. GAGE:  Objection to the relevance, your Honor.

7            THE COURT:  Sustained.

8  Q.  Moving on, if we do the math, at the time you joined

9  Google, you had 19 years, about, of professional experience,

10  correct?

11            MR. GAGE:  Objection as to relevance, your Honor.

12            THE COURT:  You've done a lot on professional

13  experience.

14            MS. GREENE:  Well, this is important to, your Honor —

15            THE COURT:  Wait.  If we're going to have argument

16  about it, we're going to have to have a sidebar.

17            MS. GREENE:  Sure.

18            (Continued on next page)

19

20

21

22

23

24

25

1           (At sidebar)

2           THE COURT:  Why don't we hear first about your

3    objection.

4           MR. GAGE:  The objection is he's — Ms. Rowe was not

5    competing with Mr. Shaukat for anything, so his years of

6    experience, his educational background, as impressive as it is,

7    I don't think we need to elicit any more comments.

8           MS. GREENE:  Your Honor, this goes to two things:  One

9    is with respect to what Google's policy and practices were with

10   respect to leveling and the number of years of experience,

11   which Google has asserted as a defense in this case, and also

12   with respect to business necessity.  It's not about the

13   decision with him.  This goes more broadly to Google's policies

14   around whether years of experience means anything with respect

15   to leveling.

16          MR. GAGE:  May I respond, your Honor?

17          THE COURT:  Yes.

18          MR. GAGE:  We have not asserted any specific defense.

19   Our affirmative defenses are clearly stated in the answer.

20   None of them says anything like counsel is suggesting.

21          There is no concrete policy at Google that X number of

22   years of experience means Y level.  It doesn't exist, it's

23   never existed, and we've never asserted that.  So this is a

24   straw man that plaintiff's trying to create to make this

25   argument.

1          MS. GREENE:  Except, your Honor, that HR came back

2     after the complaints and said that the leveling was justified

3     based on the number of years of experience that she and the

4     other men had.  That's the HR explanation that was offered.  We

5     should be able to discredit it and show it's pretextual.

6          MR. GAGE:  Your Honor, that is not correct.  The years

7     of experience is one of many factors that's pointed to as the

8     gut check of, gee, does this look right?  And they looked at

9     her years of experience and said, yeah, they are similar to the

10    8s; 9s are generally higher.  But it was a multifactor analysis

11    when they were responding to her assertion that she should have

12    been leveled a 9 with this small cohort of people.  It was not

13    a statement of policy.

14         This is ⸺ there is absolutely nothing.  There's no

15    evidence, there's certainly been no testimony so far, to create

16    a foundation for this argument.  And, again, he wasn't ⸺ she

17    wasn't competing with him for anything.

18         MS. GREENE:  Your Honor, Mr. Gage is again trying to

19    testify, and the record will show what the record will show.

20    But we have to be able to get into the record to establish that

21    this is their policy or what their policies were and to confirm

22    ⸺ testimony that relates directly to the issue around what

23    Google's policies were with respect to years of experience and

24    leveling goes to the heart of the issue.

25         MS. TOMEZSKO:  Might I make a suggestion that might

1   streamline this?  We're going to have the recruiter talk about

2   this.  It's been in the designated testimony.  We're going to

3   have the PR person talk about what exactly it was that they

4   told Ms. Rowe and the basis for it.  I think it should come in

5   through those witnesses.

6              MR. GAGE:  Yeah.

7              MS. GREENE:  Your Honor ——

8              THE COURT:  Are you planning to compare Ms. Rowe with

9   every witness in Google who takes the stand and their leveling

10  and their experience and qualifications and hers?

11             MS. GREENE:  No, but there is ——

12             MR. GAGE:  Hope not.

13             MS. GREENE:  —— an important piece of this here which

14  is Mr. Shaukat and Ms. Rowe have the same number of years of

15  experience, and he's saying she's too junior.  So that's

16  relevant in terms of how he's evaluating her as a woman if

17  someone with the same number of years of experience is saying,

18  you know what, she's too junior.  That does go to some evidence

19  of bias.

20             MR. GAGE:  No, it absolutely doesn't.  I'm older than

21  both of you, and he made a lot more money than me.  That's the

22  absurdity of the argument they're making.  She was not compared

23  with him.  He was —— and he will testify about the job he was

24  hiring for and what he was looking for, and he can explain what

25  he meant by more junior.

1          MS. TOMEZSKO:  To the extent he said it.

2          MR. GAGE:  To the extent he said it.  But I'm highly

3     confident that it was not the number of years of experience

4     that she had.  So counsel's argument is shifting here.  That is

5     not —— she can ask him why he didn't think she was right for

6     the role.  I'm going to.

7          MS. GREENE:  Your Honor, I'm just mindful of the

8     clock, and I'd —— rather than have Mr. Gage testify, I'd like

9     to continue to question the witness, and I'll skip over the ——

10         THE COURT:  You already have drawn out a lot in this

11    regard, including all the points you're telling me you wanted

12    to make.  We know what his different jobs were and the

13    background.  We know how long he was there.  We know ——

14         MS. GREENE:  Right.  That's why I'm suggesting I'm

15    prepared to just move on.

16         THE COURT:  Yes, let's do that.  No more.  Thank you.

17         (Continued on next page)

18

19

20

21

22

23

24

25

1              (In open court; jurors present)

2   BY MS. GREENE:

3   Q.  Mr. Shaukat, we discussed that Ms. Rowe was a Level 8 and

4   that you had represented to her that that would not be a

5   barrier to her receiving fair consideration for the VP-level

6   position, is that what your testimony has been?

7   A.  Yes.

8   Q.  And you also did not believe that the number of years of

9   experience that Ms. Rowe had was a barrier to her consideration

10  for the VP-level role either, correct?

11  A.  Correct.

12  Q.  And that's because you understand that at Google leveling

13  decisions are based on the scope of the role and the level max

14  to that, correct?

15  A.  That's at least one of the considerations for it, yes.

16  Q.  And you've explained that when leveling, Google first

17  determines what is the scope of the role and then tries to find

18  somebody who can perform that role, correct?

19  A.  Yes.

20  Q.  So as an example, if a role was scoped as a Level 7 and

21  someone was qualified to perform the role and was hired to do

22  so, they would come in as a Level 7 without respect to the

23  actual number of years they had been working, correct?

24  A.  Correct.

25  Q.  And there are plenty of people that come in —— with many,

NABHRow7                           Shaukat - Direct

1    many years of experience who come in as lower level managers,

2    and there are people with relatively little experience compared

3    to the average person who come in as a higher level, right?

4              MR. GAGE:  Objection, your Honor.  Objection.

5    Relevance to the comparison to the average person.

6              THE COURT:  I'll allow it.

7    A.  Could you repeat the question, please.

8    Q.  Have you said before, in explaining how the leveling system

9    works at Google, that there's plenty of people who come in with

10   many, many years of experience, who come in as managers, and

11   that we get relatively little experience —— and we get people

12   with relatively little experience compared to the average

13   person who would come in at a higher level, and it's much more

14   about what is the role scoped for and do we believe this person

15   could perform that role?

16   A.  That's right.

17   Q.  And that's true whether someone's at a Level 5 or a role is

18   a Level 5 role or a Level 7 role or a Level 9 role or a Level

19   10 role, correct?

20   A.  I believe so.  I wasn't involved with leveling at any of

21   those lower levels, but the only involvement I had was at

22   promotion cycles, and that's how it works for promotion cycles

23   for directors and vice presidents.

24   Q.  With respect to the Level 10 vice president role you were

25   considering the question is someone capable of performing that

1  role at a Level 10, and if they were, they'd come in at a Level

2  10, correct?

3  A.  If the role is scoped at that level and we thought that the

4  person could fulfill the scope at that level, yes.  You'd

5  mentioned Dominik Wee earlier.  We had originally scoped that

6  role that he came into as a Level 10.  We thought that he

7  wasn't quite ready for the full scope of the role, so we

8  de-scoped it and brought him in as a Level 9.  So it was a

9  little more interactive than just we had a role, and we looked

10 for someone to fill it.

11 Q.  Now, Mr. Wilson and Mr. Eryurek also came into your

12 organization at the same time Ms. Rowe did, correct?

13 A.  There were three other people, so the two of them and

14 Mr. Kember as well.

15 Q.  And Mr. Kember was more junior than Ms. Rowe and Mr. Wilson

16 and Mr. Eryurek, correct?

17 A.  The title they gave him was technical director, the same

18 as.  In terms of his level, I believe it was an L5 or an L6 at

19 the time, but he was in the same group, my understanding was,

20 as a peer.  He was always represented to me as a peer to Evren,

21 Ben, and Ulku.

22 Q.  And you understood that Mr. Wilson and Mr. Eryurek had been

23 performing a role similar to Ms. Rowe's when they were all in

24 OCTO, correct?

25 A.  They all — all three of the individuals I mentioned were,

1   yes.  So we moved all four of them in.

2   Q.  And all three —— Mr. Wilson, Mr. Eryurek, and Ms. Rowe ——

3   were being brought into your organization to continue with the

4   same role they had had in OCTO, correct?

5   A.  Yes, although I'm not sure why you're not including

6   Mr. Kember who was the fourth of the people who came over from

7   OCTO.  So all four of them came over to do the same role.

8   Q.  Right.  But Mr. Kember was not a Level 8 or Level 9

9   director, correct?

10  A.  He was not, but he was in the same role and we brought him

11  into the same role.

12  Q.  But not at the same level, correct?

13  A.  Not at the same level, correct.

14  Q.  So we talked about earlier that you knew Ms. Rowe was a

15  Level 8 and you also learned that Mr. Wilson and Mr. Eryurek

16  were Level 9s, correct?

17  A.  At the time in which they —— I didn't know beforehand.  As

18  they were slated to move into my organization, I was briefed on

19  all the people and their levels, yes.

20  Q.  But you couldn't say what the differences were between

21  Ms. Rowe and Mr. Wilson and Mr. Eryurek, could you?

22  A.  No.  And as I mentioned, that is generally true for all of

23  the people in my organization.  I look at the scope of impact

24  they have, not the level that they have.

25  Q.  Now, you mentioned Dominik Wee and Anil Jain earlier.  You

1    considered them to be peers of Ms. Rowe, correct?

2    A.   I did in different roles.  So, I mean, they were global

3    client directors as opposed to —— in one case, Anil Jain was a

4    global director.  Dominik, I believe, was an industry lead.

5    And Ulku was a global client technical lead.  So they were

6    different roles, but I considered them all to be roughly the

7    same level.

8    Q.   So between the global client lead and the global technical

9    leads, there was Mr. Eryurek, Mr. Wilson, Ms. Rowe, Mr. Jain,

10   Mr. Wee, correct?

11   A.   And Mr. Kember again.

12   Q.   OK.  Of the director levels, the men were all Level 9s and

13   Ms. Rowe row was a Level 8, correct?

14   A.   Yes, although I think it's selective to say that because,

15   as I mentioned, Mr. Kember performed the same role with the

16   same reporting structure, and he was a level 6.

17   Q.   Do you think Mr. Kember should have been a Level 9?  Was he

18   performing at the Level 9 level?

19   A.   He was —— again, when he moved into my organization, I

20   didn't have that much experience with him.  He was in the same

21   role, and he moved into the same role.  We did end up promoting

22   him to, I believe, L7 or considering him, and then he left the

23   company.

24   Q.   Now, Ms. Rowe reported directly to you during the time she

25   was in your organization, correct?

NABHRow7                          Shaukat - Direct

1    A.  Yes, that's right.

2    Q.  And Ms. Rowe raised concerns to you that she thought you

3    were treating her differently than you treated your other

4    reports, correct?

5    A.  I believe she did, yes.

6    Q.  She expressed concern that you weren't meeting with her as

7    frequently as you met with your other direct reports, correct?

8    A.  She did, yes.

9    Q.  Putting aside that meeting in June that we talked about and

10   the meeting in December when you told her she would not be

11   receiving the VP role, how many times did you meet with

12   Ms. Rowe one-on-one?

13   A.  I don't recall.  My general policy, unless somebody

14   specifically had a need for it, was not to hold standing

15   one-on-ones with most of my direct reports.  It was more —— I

16   always called it a pull system if they needed help.  I know I

17   met with Ulku when she asked for the time, but I don't believe

18   that —— I would say it was every eight weeks maybe as opposed

19   to weekly.

20   Q.  You didn't have any sort of standing call with her,

21   correct?

22   A.  I think at the beginning we did, and then we found travel

23   schedules hard to map together.  I don't recall exactly.  When

24   she first came into the organization, things were a little bit

25   different than as they progressed.

1   Q.  Is it your testimony that whenever she reached out to meet

2   with you, you did meet with her?

3   A.  I at least tried to.  I mean, I had a very global and

4   expansive role, and so like with all of my direct reports, I

5   did my best to respond to whatever they needed.  Sometimes it

6   was a meeting, sometimes it was a phone call, sometimes it was

7   a text message, but I tried to make myself available to them.

8   Q.  Did you text Ms. Rowe?

9   A.  There's a Google system called Hangouts, and so I'm sure

10  that I sent her pings, as we called it.  I didn't routinely

11  text any of my team in, like, traditional text messaging.

12  Q.  Do you have any memory of sending Ms. Rowe any pings?

13  A.  I mean, I sent hundreds of pings a day to different people.

14  I have no specific memory or memory of not doing so.  It just

15  would be routine.

16  Q.  Did you ever arrange to meet with her in person either in

17  New York or California one-on-one?

18  A.  In California, I don't remember doing so.  In New York, I

19  would only make it to New York every — on fairly rare

20  occasions, and when I did, I don't believe she was in the

21  office at least one or two times that I recall.  I normally

22  went for client meetings, not to visit my team.  So I was

23  rarely in the New York office even if I was in New York.

24  Q.  When you were in New York, did you stop by her office to

25  see if she was there?

1   A.  I went to the cloud floor, and I assumed she would be on

2   the cloud floor.  And I generally would walk around and say hi

3   to everybody who was on the cloud floor, but recall

4   specifically going to her office, no.

5   Q.  Did you ever go to dinner with her?

6   A.  No.

7   Q.  Did you ever go to lunch with her?

8   A.  Lunch, not —— not one-on-one for sure.  There may have been

9   a group something.

10  Q.  Ever speak with her on the phone about a client matter?

11  A.  Speak?  I don't believe so, no.

12  Q.  Do you recall ever emailing her about client work?

13  A.  No.

14  Q.  You ever recall asking her to participate in client

15  meetings?

16  A.  For sure indirectly.  So I had —— now, if we're talking

17  about —— only the time that she reported to me or the entire

18  time that I was at Google?

19  Q.  During the time she reported to you.

20  A.  Yeah, so there was at least, I recall, a meeting with

21  BlackRock, not Blackstone but BlackRock, which, as you probably

22  know, is one of the largest financial institutions in the

23  world.  It was proposed that Ulku should be one of the people

24  there, and I approved it.  I generally approved any of the sort

25  of pursuit teams for a deal like that.  As an example, there

1   were other circumstances during Google Cloud Next where I would

2   — Google Cloud Next, I'm sorry, is the conference that we

3   threw in different parts of the world — and I would sit with

4   our customer teams and recommend who they should pull in.

5   Again, my scope was much broader than financial services, so I

6   wouldn't spend a lot of time on each individual person as

7   opposed to the accounts that we were focusing on.

8   Q.  But even at BlackRock, you never communicated directly with

9   Ms. Rowe about that client meeting, correct?  You never had a

10  conversation with her about that?

11  A.  It wouldn't have been my normal practice to do so, no.

12  Q.  Even though she was your direct report?

13  A.  At that time I'm not sure she was, but, yes, I had — like

14  I said, I had a fairly broad scope.  And, you know, we got

15  things done as efficiently as we could.

16  Q.  It took her months to be added to your team emails,

17  correct?

18  A.  I believe she was added and then accidentally removed, but

19  I actually am not — I know there was a case when we switched

20  up who was in the emails that she was accidentally removed.

21  When she pointed it out, she was added back.  There was some

22  calendar confusion there.

23  Q.  OK.  Let's look at Plaintiff's Exhibit 30.

24          OK.  Mr. Yang, if you can call out that email, "hi

25  Tariq."

1          And do you see this where it says:  "In the meantime,

2    would be great to start getting included in any email

3    distributions, team meeting invites, etc.?"  Do you see that?

4    A.  I do.

5    Q.  That's July 1, correct?

6    A.  Yes.

7          MS. GREENE:  OK.  Let's take that down, and if we can

8    go now to Plaintiff's Exhibit 40.

9    Q.  So this email's dated August 20.  That is more than six

10   weeks later, correct?

11   A.  Yes.

12   Q.  And she says, "Hi Tariq.  I'm still not on any staff

13   meetings or email distribution lists for your team.  Today I

14   asked Morgan to double-check with Jess."

15          Are those the assistants?

16   A.  Jess was my assistant.  I believe Morgan was hers.

17   Q.  "And Jess told her she just needs to check with you.  I

18   believe I am your only direct report who is not on the staff

19   meeting invite."

20          Do you see that?

21   A.  I do.

22   Q.  And let's now go to Plaintiff's Exhibit 51.

23          Now, this is September 21.  That first email we looked

24   at was July 1, and you're saying, "Please add Ulku to Tariq

25   staff email," correct?

1   A.  Yes, although I would note that in the first email, I had

2   copied my assistant into that, and she must have forgotten to

3   do it, which is what led to this.

4   Q.  OK.  But for basically the first three months Ms. Rowe was

5   in your organization, she wasn't getting your team invites,

6   your team emails, correct?

7   A.  Correct, yes.

8   Q.  You told her ——

9   A.  But when I recognized it —— Kim Scott is my chief of staff,

10  not my assistant, so I directed my chief of staff to make sure

11  this was fixed once and for all.

12  Q.  Did you notice that Ms. Rowe wasn't responding to any

13  emails from you for over three months ——

14  A.  We ——

15  Q.  Just let me finish.

16        Just over three months you hadn't had any direct

17  communications with her.  Did you notice the absence of that?

18  A.  To be honest, no.  We did not do a lot of emails on the

19  Tariq staff email list.  It was for coordination purposes.

20  Largely used by assistants, not by me, to communicate with my

21  team.

22  Q.  Did you tell Ms. Rowe that you were only meeting with your

23  direct reports every four to six weeks?

24  A.  I don't remember that, but it would be —— as I said, my

25  general average was every six weeks or so.

```
 1    Q.  You met with Mr. Breslow much more frequently than that,
 2    didn't you?
 3    A.  I don't remember how often I met with Stuart, with
 4    Mr. Breslow.
 5    Q.  And you talked to him a lot more than never, correct?
 6    A.  So Stuart actively complained that I was not giving him the
 7    time he needed given some of the regulator — his job was
 8    regulatory and compliance.  He should had some issues with
 9    regulators that he needed help on, and I told him that he could
10    reach me during my commute, and he would sometimes call me
11    during my commute to work.  I told him roughly the time, and if
12    he needed to reach me, he was free to call me.
13    Q.  You talked about client engagement, correct?
14    A.  As I said, it was mostly regulator engagements or specific
15    clients he was assigned to, but it was that pull system I was
16    talking about.  If he had a question, he was free to reach out
17    like everyone else was.
18    Q.  And you met with him in New York and you met with him in
19    California, correct?
20    A.  I don't remember meeting him in California.  In New York we
21    had some client meetings, some meetings associated with the
22    work that he was doing that we met with, yes.
23    Q.  And you went out to dinner with him, correct?
24    A.  No, I don't believe I ever had dinner with Mr. Breslow,
25    again, as a one-on-one.
```

1    Q.  Did you ever invite Ms. Rowe to a client meeting with you?

2    A.  Again, as I mentioned earlier, my role was not to figure

3    out who comes to client meetings.  That was the client teams.

4    I came as the executive sponsor, and who they asked to come

5    generally came.

6    Q.  You hired Stuart Breslow in 2018, correct?

7    A.  Yes.

8    Q.  And it was about July of 2018, isn't that right?

9    A.  I'm sure, I believe so.

10   Q.  And you hired him as a Level 9 director solutions

11   consultant, correct?

12   A.  The title that we hired him for was director of technology

13   and policy.

14   Q.  Mr. Breslow was educated as an attorney, correct?

15   A.  I think so, yes.

16   Q.  And his background was in compliance, correct?

17   A.  Regulatory and compliance.  He had been chief compliance

18   officer at Morgan Stanley and Credit Suisse.

19   Q.  And he was not a technology expert, correct?

20   A.  He was not — to my knowledge, not a technology expert.

21   Q.  And he was not an expert in the cloud before joining Google

22   either, correct?

23   A.  In the technical parts of the cloud, no.  He had written

24   some very influential papers on the use of advanced analytics,

25   which we define as cloud, in anti-money laundering, and that's

1    how he came on my radar.  So he was well-known for the

2    application of cloud, but he was not a cloud technologist.

3    Q.  He was well-known for his work in anti-money laundering,

4    not for his work in Google — not for his work in the cloud,

5    correct?

6    A.  As I mentioned, he was well-known for his work in applying

7    next generation analytic capabilities, which are enabled by

8    cloud, for anti-money laundering.

9    Q.  Directors at Google can be either L8 or L9, correct?

10   A.  Yes.

11   Q.  Did Mr. Breslow ask to be leveled as a L9?

12   A.  I don't remember ever having leveling conversations with

13   any candidates who were coming in.

14   Q.  Were you the one recommending Mr. Breslow be hired at a L9?

15   A.  I was the one approving, which is different than

16   recommending.  I generally asked our recruiting team to level

17   the role.  There's a formal process that Google goes through to

18   determine the level of different roles.  I didn't participate

19   in that process.  I — I'm sorry.  I describe what the job

20   entailed and then trusted the environment there, the system, to

21   determine the right level.

22   Q.  So who made the decision to level Mr. Breslow as a Level 9?

23   A.  I don't know.

24   Q.  And so you also don't know what that decision was based on,

25   is that right?

1   A.  Again, to the earlier conversation, we leveled the role and

2   then we determined could Stuart, or anybody, fulfill the role

3   as leveled.  So I'm assuming it was the same process we

4   described for everybody.  I just wasn't a part of Stuart's

5   process.

6   Q.  Do you know whether there's any documentation anywhere for

7   the rationale for leveling Mr. Breslow as a Level 9?

8   A.  Again, I'm not involved with the leveling process, so I

9   don't know what documentation they typically have or in

10  Stuart's case.

11  Q.  Are you aware that Mr. Breslow was given an initial equity

12  award in his offer letter of $4 million in Google equity?

13          MR. GAGE:  Objection to the relevance, your Honor.

14          THE COURT:  I'll allow it.  Go ahead.

15  A.  No.  One of the things that Google has is a little bit of

16  what I'll call a church and state.  The hiring managers don't

17  get involved in compensation decisions to keep the —— they

18  don't get involved in compensation decisions, so I was not

19  aware.

20  Q.  So we talked earlier about the VP of financial services

21  vertical position.  You recall that?

22  A.  Yes.

23  Q.  We're going to go back to talking about that position.

24          So we looked at that email where you told Diane Greene

25  that you didn't think Ulku was likely right for the role.  Do

1   you recall that document?

2   A.  I do.

3   Q.  Now, at some point people began referring to the VP of

4   financial services role as the head of financial services

5   vertical role, correct?

6   A.  Yes.

7   Q.  But we're talking about the same position, correct?

8   A.  Yes.

9   Q.  Stuart Vardaman was the recruiter with whom you were

10  working on that search, correct?

11  A.  Yes.

12  Q.  And you met regularly with Mr. Vardaman, usually once a

13  week, to discuss the searches he was handling for you, correct?

14  A.  All of the searches, yes.

15  Q.  And you would speak with him more frequently as needed as

16  to any particular search, correct?

17  A.  Yes, it was typically in that weekly meeting, but if

18  something came up, I would speak to him.

19  Q.  Now, you told Mr. Vardaman that Ms. Rowe was not senior

20  enough and didn't have the network, but that he should go ahead

21  and put her through the full process anyway, correct?

22  A.  I don't remember that.  So I — if you could refresh my

23  memory, that would be helpful.  I just don't remember.

24  Q.  You don't remember not saying that, though.  It's possible

25  you said that?

1    A.  There's a lot of things I don't remember not saying.  I

2    don't know how to answer that question.

3    Q.  You decided who would be the panelists for the VP of

4    financial services interviews, correct?

5    A.  I made suggestions to Stuart.  There's always a problem of

6    availability and are people willing to be on the panel.  So I

7    suggested certain people, but Stuart eventually had to go and

8    make the final determination.  Stuart Vardaman, I'm sorry.

9    Q.  Now, all the panelists who interviewed Ms. Rowe were men,

10   correct?

11   A.  I don't recall — so Becky Bucich, I thought, was part of

12   the — she was the VP of HR.  I thought she was part of the

13   panel, but I don't recall if she was.  The others were men,

14   yes.

15   Q.  If I told you that Ms. Rowe was interviewed by Sebastien

16   Marotte, Jason Martin, and Vats Srivatsan, and Darryl Willis,

17   does that strike a bell for you?

18   A.  I know that the four of them did.  I had assumed that Becky

19   had also, but I don't know.

20   Q.  Now, as part of the normal Googling hiring process, as you

21   understand it, interview panelists are supposed to record their

22   feedback in gHire, correct?

23   A.  Yes.

24   Q.  And gHire is the internal system that Google uses in the

25   recruitment process to record feedback, track applicants, etc.,

1  correct?

2  A.   Yes.

3  Q.   And panelists are supposed to assign a score and rate a

4  candidate as strong hire, hire, leaning hire, weak hire, no

5  hire, correct?

6  A.   Correct.

7  Q.   They're also supposed to provide narrative feedback for how

8  they reach that decision, correct?

9  A.   Yes.

10 Q.   Now, it wasn't your practice to go into gHire and review

11 feedback from panelists, correct?

12 A.   I typically got a summary from the recruiter, so that is

13 correct.

14 Q.   So in that case you didn't go into gHire and review the

15 panelists' feedback for Ms. Rowe, did you?

16 A.   I did not, although I remember at least Mr. Marotte,

17 Sebastien, emailing me his feedback as well.

18 Q.   Do you know whether there is any panelist feedback for the

19 VP position in gHire for Ms. Rowe?

20 A.   I know that we had ── across all of cloud, I suspect across

21 all of Google, a large part of Stuart Vardaman's job was

22 chasing down the feedback to put in there, and I believe in

23 this case I know there was a constant discussion of can we

24 please get people to put the feedback in.  I don't know whether

25 they eventually ended up getting the feedback put in formally.

1          MS. GREENE:  Let's look at Plaintiff's Exhibit 151.  I

2     don't believe there's an objection to this.

3          MS. TOMEZSKO:  No.

4     Q.  OK.  Do you recognize this to be a gHire report?

5     A.  Yes.

6     Q.  And this is for Ms. Rowe, correct?

7     A.  It is for her, yes.

8     Q.  And if we can go to the second page, we see interview

9     feedback, financial services vertical lead.  Do you see that?

10    A.  Yes, I do.

11    Q.  And here we see for Darryl Willis — was that one of the

12    interviewers who interviewed Ms. Rowe?

13    A.  Yes.  He was my vice president of energy.

14    Q.  And we see "draft not yet submitted," correct?

15    A.  Yes.

16    Q.  And if we go to the next page, we see N/A and a blank for

17    him, correct?

18    A.  Yes.

19    Q.  And if we look at Vats Srivatsan, that was another one of

20    the people that interviewed Ms. Rowe?

21    A.  Yes.

22    Q.  And we also have a draft N/A for him, correct?

23    A.  Correct.

24    Q.  And let's go on to Jason Martin.  Do you see that?

25    A.  Jason Martin?  Yes.

1    Q.  And he's also draft?

2    A.  Yes.

3    Q.  N/A, correct?

4    A.  Correct.

5    Q.  And then let's go to Sebastian Marotte.  We can flip ahead.

6    He's also draft.  And if we go to the next page, he's also N/A,

7    correct?

8    A.  He is.

9        I would just —— I'm a little confused because there

10   were comments listed under Jason's.  So even though it said

11   N/A, there were actual comments on the previous page, so I'm

12   not sure what exactly that means.

13   Q.  Those were his interview notes, but he didn't put anything

14   in with respect to his position or whether he recommended

15   hiring or what score, correct?

16   A.  So the N/A is the recommendation.  I didn't remember that.

17   So, yes, that's correct, but he did put his interview notes in,

18   it looks like.

19   Q.  Now let's look at Plaintiff's 46.

20       Have you seen emails like this before?

21   A.  Yes.

22   Q.  And this is an email that's automatically generated to an

23   interviewer to remind them to submit their feedback into gHire,

24   correct?

25   A.  Correct.

NABHRow7                          Shaukat – Direct

1    Q.  And this one is for Mr. Marotte with respect to Ms. Rowe's

2    interview, correct?

3    A.  Yes, it is.

4    Q.  OK.  So this one's dated August 6.

5          And if we can slowly just scan through these

6    documents, Mr. Yang.

7          We see the 7th, we see the 8th, we see the 9th, we see

8    the 10th, we see the 13th, we see the 14th, we see the 15th,

9    the 16th, the 17th, the 20th, and I'm not going to make you go

10   through them all, but they go through the 31st.

11         So every day Mr. Marotte was getting a reminder to put

12   in his gHire feedback, correct?

13   A.  Yes.

14   Q.  And let's go now to Exhibit 47.

15         Exhibit 47.  This is a reminder to Jason, Jason

16   Martin, reminding him to put in his feedback for Ms. Rowe,

17   correct?

18   A.  Correct.

19   Q.  And this starts at August 15, and if we go to the last

20   page, it's September 7.  And in between are all the other daily

21   reminders.  That's what this document is, correct?

22   A.  Yes.

23   Q.  OK.  If we can go to 48.

24         This is the same bundle for Mr. Willis, correct?

25   A.  Correct.

1    Q.  And if we go to the last page, it's dated Friday,

2    September 7, correct?

3    A.  Yes.

4           MS. GREENE:  OK.  You can take that down.

5    Q.  Now, you don't recall having a conversation — I'm talking

6    about a conversation in person or over VC or on the telephone,

7    an actual conversation — with Jason or Sebastien or Darryl or

8    Vats, any of the four of them, where they directly shared with

9    you feedback about their interview with Ms. Rowe, correct?

10   A.  Apart from the email that I mentioned with Sebastien, I

11   don't recall a conversation with any of them.  Normal practice

12   would have been for them to debrief with the recruiter, so

13   Stuart Vardaman in this case.

14   Q.  And you don't recall any of them sending you a Google

15   Hangout message with feedback either, correct?

16   A.  Correct, that's right.

17   Q.  Let's look at P-149.  You'd referenced an email you got

18   from Sebastien Marotte.

19   A.  Yes.

20   Q.  Is this the email you were referencing?

21   A.  Yes, I think it is.

22          MS. GREENE:  OK.  If we, Mr. Yang, call out that

23   message at 1:06 p.m. starting with "hi, Tariq."

24   Q.  This is the feedback that Mr. Marotte gave to you, correct?

25   A.  Correct.

1    Q.  He said, "I found her very solid on the technical part but

2    not that strong on the business side."  That was his feedback?

3    A.  Correct.

4    Q.  But he put a caveat in there, right, that it was only 30

5    minutes.  That's what the "mn" is?

6    A.  Yes.

7    Q.  His meeting with her was only 30 minutes, correct?

8    A.  According to this note, yes.

9    Q.  And he never sent you more detailed notes than this,

10   correct?

11   A.  Not that I remember, no.  But, again, the normal practice

12   would have been to debrief with Stuart Vardaman, not with

13   myself.

14   Q.  So any other feedback apart from this email that you may

15   have heard would have come indirectly from Stuart Vardaman, is

16   that your testimony?

17   A.  If indirectly — by indirectly you mean that it would have

18   come them to Stuart to me, yes, that's correct.

19   Q.  But you can't recall whether Mr. Vardaman ever shared with

20   you specifically what each panelist said about Ms. Rowe,

21   correct?

22   A.  No, I — Stuart did debrief me on the feedback that he did

23   receive in these weekly meetings that we talked about.  I can't

24   tell you that he said Vats said this and Jason said this and

25   Darryl said this, but he did share whatever feedback he

1    received.  It would be his normal practice to share that

2    feedback.

3    Q.  Do you recall Vardaman telling you there was no negative

4    feedback about Ms. Rowe?

5    A.  I don't recall that, no.

6    Q.  Do you recall him saying there was only positive feedback

7    on the technical side?

8    A.  Again, I don't recall that, no.

9    Q.  Did he tell you that some of the panelists liked Ms. Rowe

10   as a candidate?

11   A.  I mean, we all liked Ms. Rowe in general, and I think we

12   thought she was strong on the technical side.  That wasn't in

13   huge amount of dispute.

14   Q.  You don't know how Mr. Vardaman got any feedback with

15   respect to Ms. Rowe, do you?

16   A.  I don't know how he got any feedback.  I don't know how he

17   got feedback, no.

18   Q.  In fact, Mr. Vardaman repeatedly told you that he was

19   chasing — that was his word — chasing feedback from

20   everybody, correct?

21   A.  Yes.  But I would characterize 30 percent of Stuart's job

22   on every search is chasing feedback.  It wasn't an unusual

23   thing for him to be doing, unfortunately.

24   Q.  But if he's chasing feedback, that implies that there's not

25   the feedback yet, correct?

1   A.  No, no.  Sorry, that's very different.  When he says he's

2   chasing feedback, he's chasing people formally recording it in

3   the system, not that he's chasing the feedback itself.  That's

4   the way that we talked about it was in order to make an offer

5   on anybody, the packet, as we called it, needed to be complete.

6   That meant that all of the holes that you're mentioning now

7   needed to be filled in before you could submit something to the

8   hiring committee.

9           So Stuart —— so we made it a practice to try and

10  always have the feedback there so you weren't chasing at the

11  end.  So when Stuart says he's chasing the feedback, typically

12  that would be he's chasing, you know, the gaps that you were

13  highlighting here of people not entering their notes into the

14  system.

15  Q.  Well, Mr. Vardaman never told you that any of the panelists

16  had told him that Ms. Rowe was too junior for the role,

17  correct?

18  A.  He never told me that any of the panelists said she was too

19  junior.  I don't know that anybody said she was too junior in

20  those words, yes.

21  Q.  And no one ever told you that they thought she was too

22  junior for the role, correct?

23          MR. GAGE:  Objection.  Asked and answered.

24          THE COURT:  Sustained.

25          MS. GREENE:  Well, let me rephrase that because it was

1    a slightly different question.

2    Q.  Did anyone apart from Mr. Vardaman ever tell you that they

3    thought Ms. Rowe was too junior for the role?

4    A.  I don't recall anyone using the words "too junior."  I do

5    recall people talking about whether she had the access to the

6    C-level executives, whether she had the business vision to

7    chart the entire organization on the business, marketing, and

8    technical side.  I wouldn't characterize that as too junior.

9    Sometimes you don't have the requisite skills and you're

10   perfectly senior.

11   Q.  Mr. Vardaman never told you that any of the panelists told

12   him that Ms. Rowe was not VP ready, correct?

13   A.  No.  And as you mentioned, we stopped referring to the role

14   as necessarily a VP role, as we did with manufacturing and

15   other searches as well.

16   Q.  Mr. Vardaman never told you that any of the panelists had

17   told him that Ms. Rowe was not senior enough, correct?

18   A.  Again, I don't think anyone used those words, but they did

19   describe some of the gaps that I was talking about, about not

20   having a vision for the space, not necessarily us having

21   confidence that she can interact with the C-level executives in

22   that organization.  Again, I wouldn't characterize that as not

23   senior enough.  It's just a different role, per se.

24   Q.  Who had that feedback ——

25   A.  Well ——

1  Q.  —— about these gaps?

2  A.  Sebastien, for one, in that email did say he found her

3  lacking on the business side.  The email came down, so I can't

4  read it back, but that was, in essence, the feedback that I

5  recall on Ulku's candidacy was very strong technically, didn't

6  demonstrate an understanding or a vision for what should she do

7  with the industry.  If you looked at Jason Martin's interview

8  notes that were captured in there, there was a lot in those

9  notes, I would —— what would you do?  I would do this, I would

10  do that, not from having spent two years in Google here's my

11  idea of what you would do.  That's a gap in our mind, or at

12  least in Jason's mind and in my mind.  When I see that type of

13  feedback, that's a gap because you expect somebody to walk in

14  with a perspective of what would they do, not I'll figure it

15  out, trust me.

16  Q.  But you never saw Jason's notes.  We already established

17  that, correct?

18  A.  I never saw his notes.  But you asked what feedback did I

19  get from Stuart, and Stuart certainly saw those notes because

20  he had access to the gHire system.

21  Q.  Nobody made any comments, as far as you know, about her

22  C-suite relationships as the reason why she couldn't get this

23  role, correct?

24  A.  No one made any comments to that, no.

25  Q.  No feedback on that, correct?

NABHRow7                         Shaukat – Direct

1    A.  No, just my observations that I'd mentioned earlier.

2    Q.  Your observations based on the fact that you didn't know

3    what her C-suite relationships were?

4    A.  And that none of our customers had asked for her, which is

5    in contrast to all of the other vertical leads we ended up

6    having in the organization.

7    Q.  None of the panelists ever told —— Mr. Vardaman never told

8    you that any of the panelists had told him that Ms. Rowe lacked

9    Googliness, did he?

10   A.  Lacked Googliness?  I don't believe so, no.

11   Q.  And Mr. Vardaman never told you that any of the panelists

12   had told him that Ms. Rowe was overly self-oriented or that

13   there were ego concerns about her, correct?

14   A.  I don't recall anyone saying that, no.

15                  (Continued on next page)

16

17

18

19

20

21

22

23

24

25

1          MS. GREENE:  Okay.  Mr. Yang, can you bring up for us
2     Plaintiff's Exhibit 69.
3     BY MS. GREENE:
4     Q.  Now, Mr. Shaukat, do you recognize this as Mr. Vardaman's
5     reports to you with respect to the different recruitment roles
6     he was working on for you?
7     A.  Yes.
8          MS. GREENE:  Okay.  I'd like us to go to page 118 of
9     this PDF, and it's Bates stamped 17839.  Okay.  And I think we
10    might have to go a page earlier to see the date on this.
11    Q.  Okay.  So this is August 10th, 2018; correct?
12    A.  Yes.
13         MS. GREENE:  And if we can go to the next page then.
14    Can we call out the section on Ulku Rowe for the financial
15    services lead.
16    Q.  And this is what Mr. Vardaman's report to you documented,
17    right?  Awaiting complete feedback, met with Sebastien eight
18    second; Darryl, Jason, Vats 8/8; Vats liked her, Darryl liked
19    her, had some questions, followership.
20         That was what was reported in his report to you on
21    August 10th; correct?
22    A.  In the written report we did meet for an hour over this, so
23    he would have -- this was just his notes; he would have
24    expanded typically on this.
25    Q.  He would have expanded?  Do you recall him actually

1    expanding?

2    A.  I don't -- I mean, this was a weekly meeting; so whether he

3    did in this particular meeting, it's hard to say.  But it was

4    an hour-long meeting in which we discussed every candidate, so

5    it would be normal.

6    Q.  It would be normal, but sitting here today, you don't

7    recall anything that Mr. Vardaman said to you in any of those

8    meetings with respect to Ms. Rowe; correct?

9    A.  No, sorry.  I cannot tell you what he said on August 10th

10   is what I'm saying, which is what this is from.  We had regular

11   conversations.  And as I mentioned, some of the feedback from

12   Jason was relayed through Stuart to me; I just couldn't tell

13   you what date that was on as an example.

14   Q.  But it's your testimony that Mr. Vardaman spoke to you

15   directly about Jason's feedback, is that your testimony?

16   A.  Yes, in one of the weekly meetings that we had; correct.

17             MS. GREENE:  Okay.  Let's go to the entry for August

18   17th.  This is on page 111 of the PDF.  We see August 17th.  If

19   we can go to the next page then and pull out the section for

20   Ulku Rowe.

21   Q.  We see again chasing feedback:  Met with Sebastien, Jason,

22   Vats.  Vats liked her, Darryl liked her.  And then there's a

23   note here:  Would Tariq like to send a note to the panel to get

24   feedback?

25             Did you send a note?

1   A.  I don't remember one way or the other.

2          MS. GREENE:  Okay.  Let's go to August 24th.  And if

3   we can go to the next page and pull out Ms. Rowe.

4   Q.  It's the same entry, and now there's a question:  Did Tariq

5   send a note to panel members?  And is that because you hadn't

6   sent a note?

7   A.  I think it was a question.  I don't know if I sent a note

8   or not, so I don't know how I would have answered it.

9          MS. GREENE:  Now, this is August 24th.  So, Mr. Yang,

10  if you can go just back to the page before this.

11  Q.  August 24th, 2018.  Keep that date in mind.

12         MS. GREENE:  I want you now, Mr. Yang, please, to go

13  to Plaintiff's Exhibit 42.

14  Q.  This is an email dated August 28th, 2018; correct?

15  A.  August 28, 2018, yes.

16  Q.  So this is four days after those notes we just looked at;

17  correct?

18  A.  Yes, that's right.

19  Q.  And if we look at the middle, Ms. Rowe is raising a concern

20  to Melissa Lawrence and Kevin Lucas that I later learned that

21  my male peers were all hired at Level 9.  I feel like that

22  legacy is now following me as I'm being considered for this new

23  role.  Do you see that?

24  A.  I do, yes.

25  Q.  Mr. Lucas was your HR rep; correct?

1    A.  He was one of them, yes.

2    Q.  And Ms. Lawrence was Mr. Grannis's and Mr. Stevens' HR rep?

3    A.  I believe that's right, yeah.

4    Q.  So this under-leveling concern is similar to the one that

5    she'd raised with you back at the time she "threw her hat in

6    the ring"; correct?

7    A.  Yes, it would be the same concern, I think.

8            THE COURT:  For clarification, the throwing her hat in

9    the ring, what was that time period again?

10           THE WITNESS:  That would have been May/June of 2018, I

11   believe.

12           THE COURT:  Thank you.

13   Q.  Now, you had asked -- or you did ask Mr. Lucas to look into

14   these leveling concerns; correct?

15   A.  Yes, but after this date, I believe.

16           MS. GREENE:  Let's go back to P-69.  So this is August

17   28th.  We looked at August 24th.  Now let's look at August

18   31st.

19           We're having a computer revolt.

20           Are we having technical difficulties, Mr. Yang?

21           Okay.  If we need to, we can go the old-fashioned Elmo

22   route.  I prefer not to, if we can avoid it.

23           Okay.  So now we're looking at page 97 of this PDF,

24   Bates stamped 818 as the last final three numbers.  And if we

25   can go to the page before so we see the dates.

1          Okay.  And then I think one more page, so we see this

2    is August 31st.

3          Okay.  August 31st.  Now, let's go back to that two

4    pages later where we see Ms. Rowe.  Can you bring that out for

5    us?

6    A.  I'm sorry, what date was this again?

7    Q.  August 31st.

8    A.  Thank you.

9    Q.  So we saw the 24th, we saw the email on the 28th, and now

10   we're looking at the August 31st report of Mr. Vardaman.  And

11   he writes:  Sounds like she is not viable for the role.  And

12   then he asks:  Did Tariq send a note to panel members?

13         Had you sent a note?

14   A.  I don't recall, again, if I ever sent a note to panel

15   members.

16   Q.  So as of August 31st, 2018, had you determined that

17   Ms. Rowe was not viable for the role?

18   A.  I think Stuart -- this was Stuart's recommendation to me

19   based on the feedback that he had received at that point.

20   Q.  And you don't recall what that specific feedback was beyond

21   what you've testified to here today; correct?

22   A.  What I testified to would be the same, yes.

23   Q.  And you, yourself, just to be clear, at this point in time

24   had not spoken to Ms. Rowe directly in connection with the VP

25   role; correct?

1    A.   Correct.

2    Q.   Now, do you know whether as of August 31st, any of the

3    panelists had provided the feedback that Mr. Vardaman had been

4    chasing?

5    A.   Again, there's -- I would assume, based on what's written

6    here, as well as what had been written in previous weeks, that

7    they had provided verbal feedback to him.  Maybe written, but

8    not in the G Hire system.

9         Typically, when you either, as I said, are trying to

10   present a hiring packet to the hiring committee or when you're

11   trying to close out the documentation, you chase the feedback

12   to make sure it's in the system.  So at this point no one

13   had -- not no one, but it looks like we were still waiting for

14   the documentation.  I would assume that had received the

15   feedback, given the previous notes, as well as this one.

16   Q.   Do you know whether he'd received any written feedback,

17   whether it was in G Hire or not?

18   A.   Again, in -- I don't know about the date exactly, but Jason

19   Martin's notes he had access to is my understanding.  We should

20   double-check that, but I think Stuart had access to G Hire, so

21   Jason Martin's notes would have been visible to him.  And then

22   Sebastien's feedback to me, I would assume he also shared with

23   Stuart, but I don't know if that was written or verbal.

24   Q.   Stuart's takeaway from Jason's notes was that Jason liked

25   Ms. Rowe; correct?  We saw that earlier.

1           MR. GAGE:  Objection.

2   A.  No, that was not what we saw earlier.  Jason's name was not

3   listed there as somebody who liked her, to use your expression.

4   Q.  Oh, you're right.  It was Vats and Darryl who liked her;

5   correct?

6   A.  And Vats had questions on followership and Vats liked her,

7   that was what it said, yes.

8   Q.  And that's the totality of what you knew, together with

9   Mr. Marotte's email, about the feedback on Ms. Rowe; correct?

10  A.  No, that is the totality of what was captured in writing in

11  this document.  As I mentioned, I met with Stuart for an hour

12  weekly to walk through -- I mean it's, as you mentioned, I

13  think, 180 pages or something like that.  There's a lot of

14  detail in here.  But we did spend real time talking through

15  each of the candidates.  The level of feedback in this document

16  on every other candidate is the same as well, generally

17  speaking.

18  Q.  But you can't remember exactly what he told you, when he

19  told you, what he told you with respect to Ms. Rowe; correct?

20  A.  I can remember generally what he told me.  I can't remember

21  what date he told me those different points.

22  Q.  Do you know what changed between August 8th and August

23  31st, when she was not viable?

24  A.  I'm assuming he had gotten the full set of feedback from

25  the rest of the team.

1    Q.  But you knew at a minimum there was no feedback in G Hire;

2    correct?  No recommendations in G Hire?

3    A.  No recommendations in G Hire; correct.  Again, that would

4    not be unusual in this stage of research either.

5    Q.  Did you agree with Mr. Vardaman that as of August 31st, she

6    was not viable for the role?

7    A.  I think for, you know, this role, as you mentioned earlier,

8    financial services was probably the single most important

9    industry vertical, maybe the second most important industry

10   vertical that we were focusing on.  If we had concerns from the

11   interview panel about -- like we saw with Sebastien, she would

12   not have been a viable candidate at that point.

13   Q.  Now, even though you determined she wasn't a viable

14   candidate, you told Mr. Vardaman that the next step was for

15   Ms. Rowe to meet with Diane Greene; correct?

16   A.  At some point, and I don't remember the exact time, Ulku

17   had asked to meet with Diane Greene.  And as Brian Stevens had

18   mentioned, I think it was back in May, we had a lot of concern

19   about retention risk with Ulku, and very high on my mind.

20            As I mentioned, we actually valued Ulku's technical

21   capabilities.  We valued what she had done in OCTO.  And we

22   were trying to retain her.  A meeting with the CEO of Google

23   Cloud, Diane had 30,000 people, I believe it was, in her

24   organization.  It was a big deal.  Ulku requested it and we

25   tried to make it happen.

NABVROW8                          Shaukat - Direct

        So but I would characterize it as mostly a retention
type of meeting.  Of course, Diane had overruled me on occasion
when she met with people, so there was a chance that she would
overrule me in this case as well.
Q.  So you thought of it as a retention exercise, but you told
Ms. Rowe it was an interview in connection with her
consideration for VP of financial services; correct?
A.  As I just mentioned, Diane has a very independent mind, and
she sometimes overruled me.  If you recall the other email you
showed with her on it, she was questioning the caliber of all
the candidates I was putting forward.  At one point we had a
fairly independent perspective.  So it was an interview that I
suspected the likely outcome would be could we retain Ms. Rowe
in another capacity.
Q.  And you had told Ms. Greene way back before Ms. Rowe was in
the candidacy, that she wasn't likely right; you had already
kind of poisoned the well there, correct?
A.  I'm not sure I'd characterize it as poisoned the well.
Diane, as I mentioned, has -- in that same email, she threw
back at me that it didn't look like any of the candidates were
terribly high-caliber.  We had a very independent relationship,
and Diane felt free to speak her mind when she disagreed with
me, as she often did.
Q.  Between August 31st and December -- I think it was December
8th that you met with Ms. Rowe, did you tell her that she was

1   not a viable candidate anymore for the position?

2   A.  No, I don't believe I gave her any feedback at that point,

3   in part because we had been hoping that she would meet with

4   Diane, who may actually see things differently.

5   Q.  Well, you wanted her to meet with Diane so she wouldn't

6   leave and get another job; correct?

7   A.  No.  As I mentioned, I wanted her to meet with Diane so

8   Diane could make sure she agreed with my assessment, and then

9   we could try and pivot into retaining Ulku in another role.

10          Very few people in the organization got to meet with

11  Diane Greene.  And I thought it would go a long way if Diane

12  was -- had a different perspective than she's the boss.  It

13  would have been perfectly fine, we would have moved forward.

14  If not, then it would have been a good opportunity for Ulku to

15  have a discussion with Diane about what else could she do in

16  the organization.

17  Q.  And between the time that you assess that she was not

18  viable and when you communicated that to her some number of

19  months later, you never did yourself anything more to assess

20  her viability as a candidate, including interviewing her;

21  correct?

22  A.  Well, I think you need to understand, if I may, how the

23  Google hiring process works.

24          So hiring decisions are recommended to a hiring panel.

25  The hiring panel is independent of any of the people involved

1    with the search.  Based on the feedback that we had gotten, to

2    date she would not have been approved by the hiring panel was

3    my determination; and so we didn't continue to chase that down.

4            Again, if the CEO of Google Cloud disagrees with our

5    assessment, we can make that case to the hiring panel.  But as

6    it stood at that point, I didn't think it was likely that it

7    would have gotten through the hiring panel, hence, "viable"

8    being the word that Stuart used.

9    Q.  Let's look at plaintiff's 54.

10           Now, on November 7th, Ms. Rowe raised a concern of

11   bias directly to you and Ms. Greene; correct?

12   A.  Yes, in the last paragraph here.

13   Q.  And she notes again that when she joined Google, it was

14   with the understanding that when cloud verticalizes, she would

15   be the person leading financial services; correct?

16   A.  She states that here, yes.

17   Q.  So to the extent that you say anything differently in your

18   ER interview about never having heard that before, that would

19   be inaccurate; correct?

20   A.  If I said it -- I mean, again, this is five years later.

21   If I said it in 2020, it's likely more correct than what I

22   remember in 2023, yes.

23   Q.  If you said in 2020 that you had never heard about this

24   till the filing of the lawsuit, this email is to the contrary;

25   correct?  You had, in fact, heard this assertion?

NABVROW8                         Shaukat - Direct

1   A.  I don't recall -- I don't recall the details of my ER

2   interview.  However, I did hear of it and, in fact, I escalated

3   this to HR.  The first time that you had called out, I

4   escalated to Brian and Will, who were her managers.  She did

5   not report to me at that point.  At this point she did report

6   to me, and I immediately reported it HR to check on whether

7   there was truth to the situation that she is highlighting.  It

8   had nothing to do with the VP role; this was an assertion of

9   her original hiring back in 2016/2017, I assume.

10  Q.  Let's go to plaintiff's 55.  Let's look at the email at

11  3:19 -- well, first of all, if we can turn to the next page

12  just to give the context.

13          So that's that email we just looked at; correct?

14  A.  Correct.

15  Q.  Okay.  So we turn to the next page, and look at the email

16  from 3:19 p.m.  This is your email response internally, not to

17  Ms. Rowe; correct?

18  A.  Correct.  Yes.  This was to HR.

19  Q.  And so you're saying:  Would be good to have data on

20  whether her point on being brought in at a lower level is true.

21  I don't think it is and would be good for me or Will Grannis to

22  set her straight on that.

23          That was your response; correct?

24  A.  Yes.

25          MS. GREENE:  Okay.  Let's look at the 3:49 email from

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

1   Melissa Lawrence.  And just the section that starts -- oh,

2   actually, we can look at the whole thing.  Thank you.

3   Q.  This is a consistent refrain Melissa Lawrence writes.

4   She's the HR person in Mr. Grannis's organization; correct?

5   A.  Melissa Lawrence -- sorry, Melissa Lawrence was the HR VP,

6   as we called it, business partner, and to Will's organization,

7   yes.

8   Q.  And she writes:  She wanted us to re-level her in OCTO, and

9   I told her quite directly that the only way that a level

10  changes at Google is via the promotion process.  Correct?

11  A.  Yes, that's what she says.

12          MS. GREENE:  So let's look at P-64 again.  I'm

13  sorry -- yes, this is P-64.

14  Q.  Again, this is the first time.  This is an email from

15  Stuart Vardaman to Jason, Vats, Darryl, and Sebastien, and

16  copying you; correct?

17  A.  Yes.

18  Q.  And this is November 27th, 2018; correct?

19  A.  November 27th, yes, that's right.

20  Q.  And Mr. Vardaman writes:  Can you please email me your

21  feedback on Ulku Rowe to Tariq -- I'm sorry, can you please

22  email your feedback on Ulku Rowe to Tariq as soon as your

23  schedule permits.  Ulku was an internal candidate for the VP

24  financial services role on Tariq's team.  Do you see that?

25  A.  I do.

1  Q.  So at that point Ms. Rowe was not a candidate anymore;

2  correct?

3  A.  At that point we had selected the person we were offering

4  the job to, Diana Layfield.

5  Q.  But Mr. Vardaman was still trying to get the feedback;

6  correct?  He didn't have it yet?

7  A.  No, as I mentioned, he had the verbal feedback, but we like

8  to have the documentation in order, so he was chasing the

9  written feedback in the formal G Hire system.  When it gets

10  emailed to me, he would have then manually input it into the G

11  Hire system.

12  Q.  Nobody sent you any feedback; correct?

13  A.  Not that I recall, no.

14  Q.  So once you decided Ms. Rowe was not going to be a

15  finalist, you'd moved into retention mode; correct?

16  A.  As I mentioned, we arranged the meeting with Diane Greene,

17  in case Diane disagreed, and also to try and retain, yes.

18  Q.  Okay.  But you definitely did not tell Ms. Rowe that she

19  was not getting through to the next round at the time you were

20  setting up that meeting; correct?

21  A.  I mean, the next round, in any event, would have been

22  meeting with Diane Greene.  So technically she did get through

23  to the next round; it was just she was the third priority

24  candidate of the three that we had.

25  Q.  Okay.  On November 27th, she was a candidate?

1   A.  On November 27th, as I mentioned, we had selected Diana

2   Layfield as the person we wanted to make the offer to.

3   Q.  And you didn't tell Ms. Rowe that; correct?

4   A.  I believe I told her the following week.  On the 27th I had

5   not yet told her; correct.

6   Q.  You told her that she could meet with Ms. Greene because

7   you wanted her to believe she had a fair shot; correct?

8   A.  No.  As I mentioned, I wanted her to meet Ms. Greene in

9   part because she requested to meet with Ms. Greene.  And out of

10  respect for her, I did something that very few people in Google

11  Cloud had an opportunity to.  Diane Greene, the CEO, refused to

12  at first.  I requested that she do so as a personal favor to

13  me, and she agreed on the basis of a personal favor to me.

14  Q.  Right.  And so you told ER that her panel came back mixed,

15  she asked to meet Diane as part of it.  I said okay as a

16  courtesy.  I wanted her to feel like she had a fair shot.

17  Diane refused to meet with her based on the interview feedback;

18  is that right?

19  A.  Yes.  And the fair shot was she had a chance to make her

20  case to Diane Greene that she was the right person for the job.

21  Q.  But she didn't know that she had to make her case because

22  you had already decided she wasn't getting the job.  You didn't

23  communicate that to her; correct?

24  A.  I mean, when you meet with the CEO of Google Cloud about a

25  job, I assume you expect to make your case.  So I'm not sure

1    that there was any other expectation.  It wasn't a coffee and

2    how do you do; it was a meeting about that job.

3    Q.  On December 5th, you told Ms. Rowe that she was not going

4    to get the head of financial services position; correct?

5    A.  I believe that was the date, yes.  It was early December.

6    Q.  You told her that you were pausing the search?

7    A.  Yes.

8    Q.  You told her you weren't putting anyone in the position;

9    correct?

10   A.  We had just had a CEO change the week before.  And so at

11   that moment in time we had paused the search.  We had a

12   finalist we had been prepared to make an offer to, and we

13   paused making that offer.

14   Q.  You did not tell her you were putting Stuart Breslow in the

15   head of financial services position, did you?

16   A.  I was not at that time putting Stuart Breslow in as the

17   interim head of the financial services vertical.  That decision

18   was made later.  As I mentioned, the week before Diane Greene

19   left Google or announced that she was leaving Google, and

20   Thomas Kurian came in as CEO, all priorities for the company

21   were influx at that time.  Thomas, as the new CEO, had the

22   right to make a different decision.  So when we said "pause"

23   here, the intention was to pick up in January and offer to

24   Diana Layfield the job of head of financial services.

25             THE COURT:  Ms. Greene, I intend to adjourn for the

1   day in four minutes.

2           MS. GREENE:  I just have a few questions on this

3   subject and I think we'll be done with this topic.

4   Q.  You actually had decided to put Mr. Breslow in that

5   position in October/early November; correct?

6   A.  That is false.

7   Q.  Well, you made the decision to put Mr. Breslow in before

8   you communicated it to Ms. Rowe that she was not getting the

9   position; correct?

10  A.  That is false, as I just stated.

11          As I stated, Diana Layfield — and there is emails to

12  this effect — was the selected candidate.  We paused the

13  search.  I communicated to Diana Layfield that we would be

14  likely reopening the position in Q1 once Thomas, the new CEO,

15  had made his decision.  When Thomas -- that he was going to

16  fund it.  When Thomas decided to keep it paused, I put in an

17  interim head of financial services until Thomas made a final

18  determination.

19          MS. GREENE:  Okay.  We're going to play two quick

20  clips, and then we'll be done.

21          Can we look at 239, page 239, line 11, through 240, 8.

22  240, line 8.  239, 11 to 240, 8.

23          Okay.  If you can go ahead and play that.

24          (Video played)

25          MS. GREENE:  Okay.  And then if we can go to page 240,

NABVROW8                          Shaukat - Direct

1    line 24, through 241, line 11.

2              (Video played)

3    BY MS. GREENE:

4    Q.  That was your testimony at deposition; correct?

5    A.  Correct.

6              MS. GREENE:  This is a good time to break.

7              THE COURT:  Members of the jury, it is 4:45 p.m., so

8    we'll break for the day.  Thank you so much for your attention.

9    It's been another long day and we are all grateful.

10             Please be sure to arrive on time tomorrow, as you did

11   today, so that we can try to stay on schedule.  Breakfast will

12   again be provided beginning by 8 a.m. at the latest.  Whether

13   you avail yourself of breakfast or not, please be here and

14   ready to go at 9:15 a.m.

15             Please remember my continuing instructions.  Keep an

16   open mind until all the evidence is in.  Don't reach any

17   conclusions.  Please do not talk about this case at all, not

18   with one another or anyone else, including any inquiring minds

19   at home.  Please remember also not to look at or listen to

20   anything relating to this case.  Do not consult any social

21   media, do not go to any websites or use the internet, anything

22   like that.

23             You can bring your notepads to the jury room and leave

24   them in there, please, overnight.  Thank you.

25             Have a wonderful evening and a safe trip home.

 1              (Jury not present)

 2              THE COURT:  Mr. Shaukat, you can step down.

 3              THE WITNESS:  Thank you.

 4              (Witness steps down)

 5              THE COURT:  Everyone else can be seated.

 6         Ms. Williams, she's in the jury room.  I was going to

 7    give people the amount of time that had been used.

 8         Ms. Williams, do you have the times, how much time

 9    plaintiff has used and defendant?

10              THE DEPUTY CLERK:  Yes, Judge, I have it.  Not right

11    now.

12              THE COURT:  Okay.  All right.  So we'll kick off the

13    day tomorrow with that.  And why don't we, this group, convene

14    at 9 a.m.  And I will have at least one ruling for you then.

15    And we'll see where it goes from there, I think.

16              MR. GAGE:  Your Honor, can I inquire how much longer

17    counsel expects with Mr. Shaukat?  Because we had originally

18    planned two more witnesses for today who now are changing

19    travel schedules, but we've got people lined up and we have

20    people who have flown in for tomorrow.  So I just want to get a

21    sense of what we're expecting here and maybe how much time they

22    have left as a function, as a matter that bears on that, I

23    don't know.

24              THE COURT:  Ms. Greene, is there anything you can tell

25    us about how much longer you expect to question Mr. Shaukat?

1          MS. GREENE:  I mean, I would say I'm 85 to 90 percent

2    of the way through his examination.  Just it goes a little

3    longer than you sometimes need to when you need to impeach.

4    But I do think we'll be able to wrap up pretty quickly in the

5    morning.

6          I would note though that he's still on direct

7    examination, so would ask for an instruction that he not --

8    that the content of his direct examination not be discussed

9    with him while he remains on direct.

10         THE COURT:  Absolutely.

11         MR. GAGE:  Absolutely.

12         THE COURT:  Looks like there's no objection there.

13         MR. GAGE:  The only thing I need to do is text him and

14   tell him what time to show up and what time we think he might

15   leave, which is the reason I'm asking the question, because

16   he's flying out of town.

17         THE COURT:  How long do you think you will take with

18   him, any idea?

19         MR. GAGE:  Well, I think that based on what's happened

20   today, I will be able to materially shorten what I had

21   anticipated.  So I would think that I'm less than an hour.  I

22   had originally thought that I would be more than an hour, but I

23   anticipate I'll be less than an hour.  But I don't know how

24   much more -- is counsel going to have 20 minutes, 45 minutes,

25   an hour?  I would think that, you know, she can give us some

NABVROW8                        Shaukat - Direct

1   prediction.  And again, we've got multiple witnesses who have

2   come in from out of town, and people need to make travel --

3   change their travel arrangements for tomorrow.

4               THE COURT:  It sounds like he'll be off, he'll be

5   finished after the morning.

6               MR. GAGE:  I'm talking about other folks.

7               THE COURT:  Okay.

8               MS. GREENE:  I have approximately 20 questions left.

9   It will just depend on what kind of answers I get from him,

10  whether I have to do follow-up questions or not.  But again, I

11  am getting through it as quickly as I can.

12              THE COURT:  I think we now have the best information

13  we're going to be able to get from anyone at this point about

14  that.

15              You're still standing, Mr. Gage.

16              What else?

17              MR. GAGE:  I am.  I see Ms. Williams is sitting.

18  She's back.  I thought she might have times for us, that's why

19  I'm standing.

20              THE COURT:  I don't know.  Ms. Williams?

21              THE DEPUTY CLERK:  No.

22              THE COURT:  No.  It looks like no.

23              THE DEPUTY CLERK:  I'll give it to you early in the

24  morning.  I promise.

25              MR. GAGE:  Okay.  Okay.

1          THE COURT:  All right.  Hearing nothing further, we

2     are adjourned and -- yes.

3          MR. GAGE:  Yes, I am standing for another reason,

4     because your Honor specifically asked that we alert you to

5     things that will be coming up.

6          THE COURT:  Yes.

7          MR. GAGE:  There are deposition transcript objections,

8     and Ms. Burdis is in the lineup, although we're way behind

9     schedule here.  So I don't know if we'll reach Ms. Burdis

10    tomorrow or not, that's why I'll see what plaintiff's counsel

11    thinks.  We've got Mr. Grannis tomorrow, too.

12         MS. TOMEZSKO:  The reason we're asking, your Honor, is

13    plaintiff's counsel requested that we place a document up along

14    with the witness's testimony if they're being presented via

15    video.  There are objections to certain portions that we will

16    either need to excise an exhibit or redo the video.  And so

17    it's easier if we could do that while the jury is not here and

18    so that would be the request.

19         THE COURT:  Okay.  But I don't know -- I mean, I don't

20    know anything about this, what you're asking me right now.

21         MR. GAGE:  We're not asking you anything.  We're just

22    alerting you, your Honor, these are objections that have been

23    presented to the Court in the form the Court's requested them

24    in.  And these are issues that will come up when Ms. Burdis

25    rolls into the lineup.

1            THE COURT:  Okay.  So we're going to need to deal with

2       this outside the presence of the jury.  So when are we going to

3       do it is the question?  Maybe what we need to do is can we air

4       this out in the morning, and then -- because it's better for us

5       to come earlier as opposed to cutting into any time they have.

6       So we do this in the morning before the jury comes in and she

7       won't be going on the stand then, but at least we'll have and

8       I'll have a chance to think about it.

9            MS. GREENE:  Your Honor, just anticipating that you'll

10      need some time, I might suggest that this evening we send to

11      you some explanation of what the testimony is that's being

12      objected to in the documents so that you have the benefit of

13      that.

14           THE COURT:  That would be better.  Thank you.

15           MR. GAGE:  That will help you look at the transcripts

16      that have been highlighted, which I think you should have those

17      already.

18           THE COURT:  We have many deposition transcripts.  But

19      we have -- I'm sorry, go ahead.

20           MS. TOMEZSKO:  We have a copy to pass up to you.

21           THE COURT:  That would be great.

22           MS. TOMEZSKO:  The most recent.

23           THE COURT:  Thank you.  This will be helpful.

24           All right.  Anything else?

25           MR. GAGE:  I'm just still standing because I expect

NABVROW8                        Shaukat – Direct

1    you're going to stand up.

2              THE COURT:  I'm hoping I am, yes.  Okay.

3              (Adjourned to October 12, 2023 at 9 o'clock a.m.)

INDEX OF EXAMINATION

Examination  of:                                    Page

ULKU ROWE

Direct Continued By Mr. Chiarello  . . . . . . 115

Cross By Ms. Tomezsko . . . . . . . . . . . 200

 TARIQ SHAUKAT

Direct By Ms. Greene . . . . . . . . . . . . 274