NACVROW1

```
1    UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
2    -------------------------------x

3    ULKU ROWE,

4               Plaintiff,

5          v.                                19 Civ. 8655 (JHR)

6    GOOGLE LLC,

7               Defendant.                   Trial

8    -------------------------------x
                                             New York, N.Y.
9                                            October 12, 2023
                                             9:10 a.m.
10
     Before:
11
                    HON. JENNIFER H. REARDEN,
12
                                             District Judge
13                                           -and a jury-

14                       APPEARANCES

15   OUTTEN & GOLDEN, LLP
          Attorneys for Plaintiff
16   BY:  CARA E. GREENE
          GREGORY S. CHIARELLO
17        SHIRA Z. GELFAND

18   PAUL HASTINGS LLP
          Attorneys for Defendant
19   BY:  KENNETH W. GAGE
          SARA B. TOMEZSKO
20
     Also Present:  Vincent Yang, Paralegal (Outten & Golden)
21                  Andrew Velazquez, Google Rep.
                    Jean Gutierrez, Paralegal (Paul Hastings)
22

23

24

25
```

NACVROW1

1             (Trial resumed; jury not present)

2             THE COURT:  Good morning, everybody.

3             Please be seated.

4             MR. GAGE:  Good morning, Judge.

5             THE COURT:  Please be seated.

6             I'm going to start with a ruling on Plaintiff's 108.

7             MR. GAGE:  Sorry, your Honor.  I didn't hear.  I

8    couldn't hear.

9             THE COURT:  I'm going to start with a ruling on

10   Plaintiff's 108.  I'm hoping the mics are not also failing in

11   addition to the LiveNote.

12            MR. GAGE:  It seems to be working now.

13            THE COURT:  Oh, okay.  Good.

14            I'm going to allow in all of Plaintiff's 108, both the

15   record as a whole and the statements contained therein, with

16   the exception of Ms. Rowe's statements which I determine are

17   inadmissible.  I'll provide the parties with a brief

18   explanation for this ruling.

19            At bottom, P-108 involves two levels of hearsay.

20   There is the record, in and of itself, that's layer one; and

21   then there are the statements within reflecting notes from the

22   interviews conducted by Google's employee relations, and that's

23   layer two.

24            Starting with layer one, I conclude that it falls

25   within Rule 803(6)'s business records exception, as they are

NACVROW1

1    notes created contemporaneously with interviews as part of a

2    regular business practice.  What is key here is that these

3    notes were prepared pursuant to Google's own policies provided

4    for contemporaneous note-taking when conducting interviews

5    during ER investigations, as memorialized in P-99.  This is a

6    meaningful point and evinces a regularly conducted business

7    activity.

8            In this regard, *Crimm v. Missouri Pacific Railroad*

9    *Company*, 750 F.2d 703, 709 (8th Cir. 1984) is instructive.

10   There, a manager at the company interviewed various "staff" in

11   connection with an employee's allegations of sexual

12   discrimination.  Over the opposing party's objections, the

13   court found the notes admissible as subject to the business

14   records exception, reasoning, in relevant part, that the

15   company "had a written policy requiring that in an

16   investigation of sexual harassment, the conversations of those

17   interviewed should be documented through written memoranda."

18   Furthermore, plaintiff represents that the ER investigator,

19   April Beaupain, who was present at the meeting, will establish

20   that this document is a business record, in accordance with

21   803(6)(d).

22            Now, my first question this morning is how, if at all,

23   is P-57 distinguishable from P-108?

24            MS. GREENE:  Your Honor, P-107 is distinguishable --

25            THE COURT:  57.

NACVROW1

1          MS. GREENE:  I'm sorry, 57.  P-57 is distinguishable

2      only by the note-takers being two different members of ER than

3      the other two members of ER in 108, and the individuals

4      interviewed being Ms. Rowe and Ms. Burdis.

5          THE COURT:  Okay.  What is on the first -- there's

6      some -- there's like a paragraph and another sentence or two at

7      the top of the first page of P-57, allegation for reference.

8      It looks like something that maybe Ms. Rowe wrote.

9          MS. GREENE:  Your Honor, my understanding is that

10     that's ER's notes to itself so that it understood what the

11     allegation was that it was investigating.  And in that, it

12     copies the role -- the complaint that Ms. Rowe made.  So it's

13     ER's notation as to the complaint that Ms. Rowe made so that

14     that's available to ER as they ask these investigative

15     questions.

16         THE COURT:  Okay.  Mr. Gage.

17         MR. GAGE:  Your Honor, I would agree that they are not

18     distinguishable in any material way, in light of your Honor's

19     ruling.  Ms. Beaupain will be able to explain what that top

20     paragraph is.

21             I did want to ask a question about your Honor's

22     ruling.  I thought I heard you say that -- something about the

23     admissibility of statements made by the plaintiff in here.

24         THE COURT:  So I'm going to need this in redacted form

25     because the statements -- hang on.  I don't have the document

NACVROW1

1    in front of me.  But the interview of Ms. Rowe does not come in

2    as part of that -- as part of P-108.  It's the rest of the

3    document.

4              MR. GAGE:  And your Honor, I thought plaintiff was

5    moving to admit the entire document.  And Ms. Rowe, as a party

6    opponent, and clearly her statements to an investigator would

7    be an admission to a party opponent.

8              THE COURT:  No.  They are trying to offer the

9    document.  Hang on.

10             MR. GAGE:  I understand that, your Honor.  But in the

11   interests of completeness, the rule of completeness, and in

12   light of your Honor's ruling against us, we think the jury

13   should hear what all of the witnesses interviewed said,

14   including the party opponent who made a very clear admission

15   in -- as reflected in P-57, that she could not think of

16   anything that indicated gender played a role in her hiring

17   process.  And that was something she said to the investigator.

18             So for all of the reasons that your Honor has ruled

19   the document is admissible, it should be admissible for those

20   reasons as well, that her statements to the investigator were

21   an admission of a party opponent.

22             THE COURT:  So Google can offer that against Rowe.

23   It's just that Rowe is not a party opponent to herself.

24             Let me just pull out the document.

25             MR. GAGE:  I can hand your Honor a copy.

NACVROW1

```
 1              THE COURT:  That would be great.

 2              MR. GAGE:  We'll give you 57 and 108.

 3              THE COURT:  Thank you.

 4              MR. GAGE:  And what I was just referring to, your

 5     Honor, is on 57.  It's literally on the last page at the

 6     bottom.

 7              THE COURT:  Oh, 57 of -- sorry.

 8              MR. GAGE:  I'm sorry, P-57, what I was just referring

 9     to when I was just talking about Ms. Rowe's statements to the

10     investigator.  It's an example.

11              THE COURT:  Okay.  Are you still asking me a question

12     about 108 or are you arguing about 57?

13              MR. GAGE:  I'm not arguing, your Honor.  You've ruled

14     that 108 and 57 come in, and I accept your Honor's ruling.

15              THE COURT:  Well, I hadn't actually ruled on 57; I was

16     just asking questions about it.

17              MR. GAGE:  Oh, I'm sorry.  I presumed --

18              THE COURT:  No, that's why I was asking if it's

19     distinguishable, because I'm making my way to a ruling.

20              MR. GAGE:  As far as we're concerned, it's not

21     distinguishable.  I'm sorry, I should have just answered your

22     question, not presuming where you were going.

23              THE COURT:  That's quite all right.

24              Ms. Greene.

25              MS. GREENE:  I would just note that Ms. Rowe was on
```

NACVROW1

1    the stand yesterday, and they had the opportunity to ask her

2    about the content of it, just as I did with Mr. Shaukat and

3    asked him about the content of statements to ER.  In fact, they

4    did ask her specifically about that phrase, whether she could

5    think of anything that indicates gender played a role in her

6    hiring process.  And so that's already been asked and answered,

7    and they should not have another opportunity -- I am not

8    opposed to them offering the document in that unredacted form

9    for their own purposes, but I am opposed to them recalling

10   Ms. Rowe to the stand to examine her on something they had the

11   opportunity to ask her about in their cross-examination.

12            MR. GAGE:  We're not going to ask for that.

13            THE COURT:  Okay.  I have to make a decision on 57,

14   and you --

15            MR. GAGE:  Your Honor, if I may.

16            THE COURT:  Yes.

17            MR. GAGE:  Since you're letting 108 in, we will

18   withdraw our objection to 57.

19            THE COURT:  All right.

20            MR. GAGE:  In light of your Honor's ruling on 108.

21            THE COURT:  All right.  Well, that simplifies it.

22            So then both come in.

23            Now, where are we on the testimony though?  You're not

24   asking to recall her.

25            MR. GAGE:  No.

NACVROW1

1              THE COURT:  Okay.

2              MR. GAGE:  No.

3              THE COURT:  All right.

4              MR. GAGE:  We asked all the questions we cared to ask.

5              THE COURT:  Okay.  So these two documents, now we have

6    resolution.

7              Let me go to the proposed offer of proof regarding

8    Bennett.  I have some questions about that.

9              First of all, setting aside for the moment competency

10   and relevance, which I have questions about as well, don't we

11   have a hearsay problem here, Ms. Greene, with what Ms. Bennett

12   told Ms. Rowe?

13             MS. GREENE:  I'm sorry, your Honor, I'm just going to

14   that section of the letter.

15             THE COURT:  All right.  It's on page 7 of 9, in fact.

16             MS. GREENE:  It is not hearsay because it's relevant

17   to Ms. Rowe's understanding about the relative levels of her

18   peers and the effect on the listener, not as to the truth of

19   the matter asserted.

20             THE COURT:  Why is her understanding relevant to her

21   claims?

22             MS. GREENE:  Your Honor, her understanding as to the

23   relative leveling and qualifications of her peers is what gives

24   rise to these claims.

25             THE COURT:  So you're not -- let me see if you said

NACVROW1

1    this.  It sounds like what you just said is that you're not
2    offering it for the truth; is that correct?
3              MS. GREENE:  Correct.  So we're offering it for the
4    circumstances in which she learned, but, more importantly, the
5    impact on the listener.  Ms. Rowe was surprised to learn of
6    that fact.
7              THE COURT:  Why are the circumstances in which she
8    learned important or relevant?
9              MS. GREENE:  It's just the context for what she
10   learned that caused that impact.  So the fact that she learned
11   there was a Google women's leadership summit in California for
12   all eight women at Google, the fact that she assumed
13   Ms. Bennett would be in attendance and that they would have a
14   meet-up, the only portion of that that's hearsay is what
15   Ms. Bennett said, that she told Ms. Rowe that she was an L7
16   and, therefore, was not invited to the event.  That's the only
17   portion of that that could arguably be considered hearsay.  And
18   for that portion, it's being offered for the effect on the
19   listener that Ms. Rowe was surprised and the knowledge that
20   Ms. Rowe believed for purposes of assessing her legal claims.
21             THE COURT:  Hang on, Mr. Gage.
22             So evidence of discrimination against other employees
23   is -- may be relevant to proving discrimination if that's
24   established.  But you didn't list Bennett as a witness.  And
25   you seem to want the jury to draw an inference of

NACVROW1

1  discrimination from this.  But Ms. Rowe does not have personal

2  knowledge that Bennett's leveling resulted from discrimination.

3          We are going to have an HR person on the stand, right?

4          MS. GREENE:  At least one, yes.

5          MR. GAGE:  A couple of them, your Honor.

6          THE COURT:  I mean, the HR person may have personal

7  knowledge of Bennett's leveling.

8          MS. GREENE:  Your Honor, we do have the hiring

9  manager, who -- Mr. Grannis, who also can testify as to the

10  circumstances of Ms. Bennett's leveling.  This goes to support

11  Ms. Rowe's conclusion that gender was what was driving the

12  decision-making process.

13          THE COURT:  But we have no information of what drove

14  the leveling decision on Ms. Bennett.

15          MS. GREENE:  Because that evidence has not yet come

16  in.

17          THE COURT:  All right.  So this is -- when is

18  Mr. Grannis taking the stand?

19          MS. GREENE:  I believe he's scheduled to take the

20  stand later this afternoon.

21          THE COURT:  All right.  We'll make a decision on this

22  before he takes the stand.

23          MS. GREENE:  Okay.

24          THE COURT:  Did you want to say anything else?

25          MR. GAGE:  If I could just respond briefly just for

NACVROW1

1   the record, your Honor.

2          THE COURT:  Yes.

3          MR. GAGE:  First, there is no relevance exception to

4   the hearsay rule.  And there's clearly hearsay --

5          THE COURT:  But she's not offering it for the truth,

6   she says.

7          MR. GAGE:  Well, I frankly disagree.  But let's accept

8   for the sake of argument that she's not.  It is unduly and

9   unfairly prejudicial to Google.  And the relevance is minimal,

10  if any, here, because it is going to essentially cause Google

11  to have to go down the rabbit hole of defending the leveling

12  decision for someone who's not a plaintiff in this case.  This

13  is a single-plaintiff case, not a class case, and, you know, it

14  has no bearing on whether Ms. Rowe was improperly leveled.  And

15  so it shouldn't come in.

16         THE COURT:  So you dispute that evidence of

17  discrimination against other employees would be relevant?

18         MR. GAGE:  I absolutely dispute that this evidence

19  they're proffering is relevant.  I don't think this is evidence

20  of discrimination against another person, and I think the case

21  law is clear that in some circumstances it may be relevant.

22  But this isn't proof of discrimination against another person.

23  This is -- this proffer here -- first of all, it contains

24  hearsay.  So, you know, I don't think, you know, this proffer

25  suggests or shows there's discrimination.  The fact that

1     someone was a 7 and not an 8, or a 6 and not a 7, does not

2     prove discrimination.

3                THE COURT:  Yes.  But are you objecting also to any

4     testimony that might come in?  So you're also objecting to

5     questions to Mr. Grannis about Ms. Bennett.

6                MR. GAGE:  Absolutely.

7                THE COURT:  Okay.  Well, all right.  We're going to

8     have to -- I'll get back to you on that.

9                MS. GREENE:  May I quickly make a revision to the

10    offer of proof?

11               THE COURT:  Yes.

12               MS. GREENE:  I think it's very possible for us to

13    remove Ms. Bennett's statement and preserve the purpose of the

14    statement, which was Ms. Rowe's knowledge and the effect that

15    it had on her, without including Ms. Bennett's out-of-court

16    statement, if that would resolve the issue.

17               With respect to this particular piece, I would just

18    note Ms. Bennett's name is going to come up on documents and

19    testimony throughout this case.  And it's going to support a

20    pattern that allows an inference of discrimination to be drawn

21    in Ms. Rowe's favor.  And so this is just one piece again of

22    the broader puzzle in the broader picture that supports what

23    Ms. Rowe alleges with respect to gender bias.

24               THE COURT:  You want to say Ms. Rowe knows

25    Ms. Bennett's level was a 7.  And then the jury is what, they

NACVROW1

1    are going to -- you think that that's appropriate for them to

2    draw an inference that that was based on discrimination?

3            MS. GREENE:  Your Honor, Ms. Rowe learned that she was

4    a 7.  That informed her decision about whether bias was

5    operating.  When the jury is able to see the documents

6    surrounding Ms. Bennett's leveling decision, the players

7    involved, who were the same decision-makers with respect to

8    Ms. Rowe, what Ms. Burdis, the recruiter, said about it, what

9    Mr. Wilson, Mr. Eryurek said about Ms. Bennett, it's going to

10   tell a very similar story to what Ms. Bennett -- I mean

11   Ms. Rowe alleges was the discrimination that she encountered.

12           THE COURT:  Just a second.

13           So it sounds like Bennett is coming up all over the

14   place.  Are we going to -- no?

15           MR. GAGE:  I disagree.  It all hinges on your Honor's

16   ruling, frankly.  I don't believe the plaintiff has alleged

17   this is a pattern or practice case.  And it's clear that, you

18   know, plaintiff wants to get Bennett's name in here at every

19   possible opportunity, in part because Mr. Chiarello went out on

20   a limb in his opening statement and mentioned her name.

21           And how another person was leveled, particularly

22   Ms. Bennett, is not at all relevant.  Frankly, plaintiff has

23   all along insisted the only people who the jury should hear

24   about are the five L9s.

25           THE COURT:  All right.  Well, I also am not convinced

NACVROW1

1    that the plaintiff -- that I can accept the plaintiff's own

2    testimony regarding other employees alleged discrimination as

3    competent evidence.  So I have to still think about that.

4           But it would be helpful to know how many -- which

5    witnesses -- this is going to bear on my ruling and whether we

6    have -- if you could point out to me if there are other

7    exhibits where there's an objection having to do with

8    Ms. Bennett, that would be helpful.  You don't have to do it

9    immediately, I just need --

10          MS. GREENE:  Yes, your Honor.

11          THE COURT:  Thank you.

12          Turning to the joint limiting instruction, Mr. Gage

13   and Ms. Tomezsko, I wasn't sure -- oh, I'm sorry, you offered

14   your own.

15          MR. GAGE:  Yes.

16          THE COURT:  Okay.  Can anyone hand me the page where

17   you offered your --

18          MR. GAGE:  I guess 29.

19          THE COURT:  Okay.  While we do that, I'm going to ask

20   you about the severance agreement, Mr. Shaukat's separation

21   agreement.

22          Okay.  So Ms. Greene, that agreement is dated July

23   2020, right?  That's three years ago.  So what does that have

24   to do with what he's saying now?

25          MS. GREENE:  So that was in July 2020, shortly after

NACVROW1

1    Ms. Rowe filed her lawsuit.  And Google was on notice of her

2    lawsuit and Mr. Shaukat's involvement in that.  There was a

3    unilateral offer to pay him $2.75 million as he left for

4    another job.  And the agreement included a favorable

5    cooperation provision related to litigation that applied to

6    this lawsuit.  And so it absolutely goes to the motivation and

7    bias of a witness.  In other circumstances, maybe not; but in

8    these unique circumstances where it was entered after the

9    initiation of litigation, where the consideration was

10   unilaterally offered and where it was done in exchange for a

11   cooperation provision related to this litigation --

12            THE COURT:  Where is that?  I'm looking at the

13   agreement.

14            MS. GREENE:  Your Honor, let me pull up the agreement

15   itself.

16            MS. TOMEZSKO:  Your Honor, may I hand up the hard

17   copy?

18            THE COURT:  Yes, please.

19            MS. GREENE:  The paragraph, the relevant paragraph, is

20   No. 5 in Exhibit 148.  And importantly, it requires the

21   cooperation with Google and explicitly excludes Mr. Shaukat

22   from talking to anyone but Google, unless legally compelled to

23   do so.  So it's a lockup, in addition to a cooperation

24   provision.  They're paying him, in addition to the

25   consideration of 2.775 million for this agreement, they are

NACVROW1

1    covering his costs, his out-of-pocket expenses, and his legal

2    fees.

3         THE COURT:  Okay.  But I'm looking at that now, at

4    paragraph 5.  The problem I have is that the *Morgan Art*

5    *Foundation* case that you cited, the settlement agreement there

6    was about the exact dispute.  This does not reference the

7    dispute with Rowe; this looks like boilerplate, what goes in

8    every severance agreement.

9         MS. GREENE:  Your Honor, Mr. Shaukat left voluntarily

10   to go to another job.  He was not -- that was his testimony.

11   He was not terminated, he was not fired, there was no

12   settlement.  Instead, Mr. Kurian offered him separation pay at

13   $2.775 million in an agreement that required him to continue to

14   cooperate.

15        The litigation he was involved in at that time was

16   this case.  It goes to, you know, his credibility and bias as a

17   witness.  And, you know, honestly, your Honor, I don't have to

18   use the document if I can question him about the circumstances

19   of a separation and whether he entered into that sort of an

20   agreement and the value that was paid to him.  I don't have to

21   use the document.  Testimony is sufficient for that.

22        THE COURT:  Mr. Gage.

23        MR. GAGE:  If they are not pushing the exhibit, then I

24   guess that makes it moot, your Honor.  But your Honor is

25   correct, this is boilerplate language; it is a standard

NACVROW1

1     separation package.  And while the number is eye-popping to

2     most of us, this is Google.

3             THE COURT:  I find this to be distinguishable from the

4     *Morgan Art Foundation* case and the document will not come in.

5             So now we have the question about the testimony.

6     Mr. Gage, what's your position on that?

7             MR. GAGE:  I don't have a problem with them asking

8     Mr. Shaukat --

9             THE COURT:  I think we all know what his answer is

10    going to be.

11            MR. GAGE:  About circumstances of his departure.  And

12    he'll explain that Mr. Kurian made a decision he was going in a

13    different direction, they agreed on his departure and

14    transition, and everything like that.  It's pretty

15    straightforward.

16            THE COURT:  Right.  So that's resolved.

17            I think now we ought to bring the jury in and we'll

18    continue today.  If somebody can work on the list relating to

19    Bennett, that would be helpful.

20            MR. GAGE:  We've got someone working on it, Judge.

21            THE COURT:  Okay.  Thank you.

22            Oh, wait a second.  We didn't do the stipulation -- or

23    the instruction.  Do we need that now?  We need to decide that

24    now, right?

25            MS. GREENE:  We do need to decide that now, your

NACVROW1

1    Honor.

2              MR. GAGE:  I think so, your Honor.

3              THE COURT:  Hang on.

4              MR. GAGE:  Dueling paragraphs there, Judge.

5         Should I wait to have Mr. Shaukat take the stand or is

6    it okay if while you're doing this --

7              THE COURT:  I don't want him to hear this.

8              MR. GAGE:  Okay.  That's fine.

9              THE COURT:  Thank you.

10             MR. GAGE:  I just want to keep things moving.

11             THE COURT:  I understand.

12             MS. GREENE:  Your Honor?

13             THE COURT:  Yes, I'm about to read it to you.

14        Go ahead.

15             MS. GREENE:  Oh, we were just going to ask for the

16   time check.

17             THE COURT:  Oh, yes.  Ms. Williams, if you could do

18   that.  If you could provide that, please.

19             THE DEPUTY CLERK:  So far, plaintiff counsel have used

20   271 minutes, total remaining is 449.  Defense counsel, you have

21   used 119 minutes, total, 601; 601 remaining.

22             THE COURT:  Okay.  I have blended these two

23   paragraphs.  And I do want to use the effect on language from

24   Judge Schofield's ruling on the second motion *in limine* because

25   that's the language that she chose and I think it makes sense.

NACVROW1

1              So here's what I'm going to read:

2              In certain instances, evidence may be admitted only

3    for a limited purpose.  You have heard evidence from Tariq

4    Shaukat and you may hear evidence from Stuart Vardaman that --

5    it says "he," I think we mean "they," right, they received

6    interview feedback about Ms. Rowe concerning her consideration

7    for the financial services vertical lead position.

8              This evidence is admitted for a limited purpose.  It

9    is admitted only for its effect on Tariq Shaukat or Stuart

10   Vardaman upon hearing the alleged feedback.  You have may not

11   consider evidence of alleged interview feedback concerning the

12   financial services vertical lead position for its truth,

13   meaning you may not consider any evidence of alleged interview

14   feedback as evidence of Ms. Rowe's actual qualifications for

15   the financial services vertical lead position or that the

16   interviewers actually held those views.  You may give such

17   evidence, if received, such weight as you feel it deserves, but

18   only for the limited purpose for which it has been offered.

19   You may not use the evidence for any other purpose.

20             All right.  Let's bring the jury in.

21             MR. GAGE:  Shall we have Mr. Shaukat take the stand

22   while that's happening?

23             THE COURT:  Yes, yes, we should.

24             MR. GAGE:  And your Honor, it's Tariq.

25             THE COURT:  Tariq.

NACVROW1

1          MR. GAGE:  Not Tariq.

2          THE COURT:  Oh, okay.  Thank you.

3          MR. GAGE:  But you've got the last name down.

4          THE COURT:  I think I will -- when is Vardaman taking

5     the stand?

6          MR. GAGE:  After Mr. Shaukat.

7          THE COURT:  All right.  So I'm going to start with

8     this, because why not.  Otherwise we'll have to find a good

9     time later.  This seems like a good a time as any.

10         (Jury present)

11         THE COURT:  Good morning.  You may be seated.  Thank

12    you all again, members of the jury for your service.  In a

13    moment, we'll resume testimony, but first I have an instruction

14    for you.

15              In certain instances, evidence may be admitted only

16    for a limited purpose.  You have heard evidence from Tariq

17    Shaukat and you may hear evidence from Stuart Vardaman that

18    they received interview feedback about Ms. Rowe concerning her

19    consideration for the financial services vertical lead

20    position.  This evidence is admitted for a limited purpose.  It

21    is admitted only for its effect on Tariq Shaukat or Stuart

22    Vardaman upon hearing the alleged feedback.

23              You may not consider evidence of alleged interview

24    feedback concerning the financial services vertical lead

25    position for its truth, meaning you may not consider any

NACVROW1                          Shaukat - Direct

1    evidence of alleged interview feedback as evidence of

2    Ms. Rowe's actual qualifications for the financial services

3    vertical lead position or that the interviewers actually held

4    those views.  You may give such evidence, if received, such

5    weight as you feel it deserves, but only for the limited

6    purpose for which it has been offered.  You may not use the

7    evidence for any other purpose.

8              All right.  Ms. Greene.

9     TARIQ SHAUKAT,

10         called as a witness by the Plaintiff,

11         having been previously duly sworn, testified as follows:

12    DIRECT EXAMINATION (continued)

13    BY MS. GREENE:

14    Q.  Good morning, Mr. Shaukat.

15    A.  Good morning.

16    Q.  We concluded your testimony yesterday watching a clip of

17    your deposition where you said:  I decided that Stuart would be

18    the interim lead before I told Ulku that we were shutting down

19    that search; and if we reopened it, that she would not be a

20    candidate in it -- for it in the future.  Do you recall that?

21    A.  Yes, I do.

22    Q.  Okay.  So when you appointed Mr. Breslow as the head of

23    financial services, you didn't refer to him as the interim head

24    when talking about him with customers or people outside of

25    Google, did you?

1    A.  First of all, I appointed him as interim head, just to be

2    clear.  Externally, Stuart asked me what he should say.  He was

3    very careful to represent himself accurately.  And I told him

4    that for customers only, he was to refer to himself as the

5    person leading financial services.  So I told him to not use

6    "interim," because I thought it would raise questions with

7    customers about the stability of our financial services

8    organization.

9    Q.  Okay.  This is a yes-or-no question:  You, yourself, did

10   not refer to him as the interim head when talking about him

11   with customers or people outside of Google; correct?

12   A.  I can't answer that question yes or no, because I don't

13   recall ever referring to him by his title with customers.

14   Q.  But you did tell him very directly to introduce himself as

15   the head of financial services; correct?

16   A.  In response to his question about whether he should or not,

17   yes.

18   Q.  Now, again, this is a yes-or-no question:  You did not tell

19   people internally — internally now — that he was the interim

20   head unless you were asked officially; isn't that correct?

21   A.  I don't believe that is correct, no.  I did -- in any

22   announcement that we made about the lead -- the leadership of

23   the financial services vertical, and with all my other

24   verticals where I had interim leads, I was very careful to, in

25   the official communications, try and say that.  In informal

NACVROW1                    Shaukat - Direct

1   communications we don't -- I don't recall when I did or did not

2   use "interim."  But it was not -- I was very careful to point

3   out where it was interim and where it was not in official

4   communications.

5   Q.  So you would say to people, our financial services team is

6   led by Stuart Breslow typically; correct?

7   A.  When you say "people," you mean people internally to the

8   company?

9   Q.  Yes.

10  A.  Again, when it was an informal communication, I think I

11  probably dropped the "interim" from time to time.  Yes, I

12  likely referred to him in both -- in both ways.

13  Q.  Generally, not some of the time, generally, you framed it

14  as without that "interim" title in discussing Mr. Breslow's

15  role *vis-à-vis* the financial services; correct?

16  A.  No, I would say that is incorrect.  As I mentioned, I

17  didn't normally refer to people by their title, and I don't

18  recall introducing Stuart all that often to people inside of

19  the company.

20          MS. GREENE:  Let's pull up deposition 256, line 15,

21  through 257, line 2.

22          MS. TOMEZSKO:  I'm sorry, can you repeat that.

23          MS. GREENE:  256, line 15, through 257, line 2.

24          MR. CHIARELLO:  Would your Honor like a copy of

25  Mr. Shaukat's deposition?

1              THE COURT:  I'll watch it.  You're going to play it,

2       right?  Thank you, Mr. Chiarello.

3              MS. GREENE:  You may go ahead.

4              Thank you, Vincent, Mr. Yang.

5              THE WITNESS:  I'm sorry, my monitor is not working.

6              THE COURT:  Oh, okay.

7              THE WITNESS:  I have it now.  Thank you.

8              (Video played)

9              MS. GREENE:  Okay.  You can take that down.

10      BY MS. GREENE:

11      Q.  Let's look now at Plaintiff's Exhibit 82.  Do you recognize

12      this as correspondence between you and Mr. Ladd from September

13      of 2019?

14      A.  September 2019, yes.

15             MS. GREENE:  Okay.  If we can go to the page ending in

16      5, Mr. Yang.  And if we can call out the section international,

17      so the first one under that.

18      Q.  It's an announcement of an article that was in *Vogue*; is

19      that correct?

20      A.  Yes.

21      Q.  That says:  Following an interview with Ulku Rowe, Google's

22      technical director of financial services, Varela discusses one

23      strength of the cloud is that companies no longer need to

24      invest in large teams.  And then it goes on to talk more about

25      what Ms. Rowe explained.  Do you see that?

NACVROW1                         Shaukat - Direct

```
 1   A.  I do.
 2           MS. GREENE:  Let's take that down.  Not the full
 3   document, just that.  And if we can flip back a page.  And if
 4   we can call out the 12:30 p.m. for Mr. Shaukat.
 5   Q.  This says:  Just a note — we have to stop using Ulku as a
 6   financial services person, given she has moved off of the
 7   financial services team and is now supposed to be our OCTO
 8   hybrid cloud person.
 9           That's what you wrote; correct?
10   A.  Correct.
11           MS. GREENE:  And then let's flip back another page --
12   oh, I'm sorry.  If you can go back to where we were, Mr. Yang.
13   Q.  And up at the top, do you see --
14           MS. GREENE:  And can you call out "good flag."
15   A.  I do.
16   Q.  It says:  Good flag.  Agreed.  We're media training Stuart
17   on Tuesday, so we can start to use him with the press.
18           Do you see that?
19   A.  I do.
20   Q.  So as of September of 2019, ten months after you decided
21   Mr. Breslow was going to have the interim role, he still wasn't
22   media trained in order to work with the press on issues of
23   financial services; correct?
24   A.  The primary job description is not to meet with the press
25   in his role, so correct.
```

NACVROW1                    Shaukat - Direct

1   Q.  So he didn't have the qualifications of speaking with the

2   press about the financial services role in the same way that

3   Ms. Rowe did; isn't that right?

4   A.  No, that's incorrect.  Again, media training has nothing to

5   do with his qualifications to speak about financial services.

6   It was not media training in the financial services space.

7           Media training is training that Google and every

8   company gives people who speak to the press on how to handle

9   press questions.  We had assumed and I had assumed that Stuart,

10  given his experience, had been media trained previously.  But

11  he had not gone through the Google media training and they

12  wanted to put him through that training.

13  Q.  So after ten months, he still wasn't in a position to speak

14  with the press on issues of financial services?

15  A.  Correct.  Which was not his job.

16  Q.  Mr. Shaukat, you left Google in 2020; correct?

17  A.  July of 2020, yes.

18  Q.  And you did so because you had another job at Bumbl;

19  correct?

20  A.  I left and went to another job at Bumbl.  But I had decided

21  to leave Google for other reasons.

22  Q.  And when you left, Google gave you a severance package;

23  correct?

24  A.  They did, yes.

25  Q.  Thomas Kurian came, the CEO of Google Cloud, and offered

1   you severance of $2.775 million; is that right?

2   A.  I don't recall the exact amount, but that sounds roughly

3   about right, yes.

4   Q.  You didn't negotiate for that amount, right?

5   A.  I did not negotiate that amount, no.

6   Q.  Mr. Kurian made an offer and you accepted it, that's how it

7   went; correct?

8   A.  I didn't negotiate that amount.  I negotiated other parts

9   of my severance agreement with him, but not the amount, no.

10  Q.  So, for instance, you negotiated COBRA; correct?

11  A.  I did negotiate COBRA, yes, which is ongoing health

12  insurance coverage.

13  Q.  Now, one of the conditions of that -- well, in exchange for

14  the $2.775 million that you received as you were leaving to go

15  to Bumbl, you had to enter into a separation agreement;

16  correct?

17  A.  I did, yes.

18  Q.  And one of those conditions of the separation agreement was

19  that you would provide continued litigation assistance to

20  Google; correct?

21  A.  I think that would be normal.  I don't recall my specific

22  separation agreement, but I think that would be normal, yes.

23  Q.  Well, one of the conditions was that you would continue to

24  provide Google with assistance related to its legal matters;

25  correct?

1   A.  Again, I believe that would be correct.  It would be

2   normal.  I don't remember the agreement in particular.

3   Q.  And in 2020, this litigation was already happening;

4   correct?

5   A.  I believe so, yes.

6   Q.  And you had already been interviewed by ER in connection

7   with this lawsuit; correct?

8   A.  I had been.  Whether that was prior to Thomas making the

9   offer -- the back and forth between Thomas and I went on for

10  several months.  But it was around that same time, yes.

11  Q.  The lawsuit was filed in September of 2019.  So does that

12  refresh that this lawsuit was ongoing at the time --

13  A.  Again, you had asked about when I was interviewed by ER as

14  opposed to when the lawsuit was there.  And I don't recall the

15  timing in relation to the ER interview.

16  Q.  And were you involved in any other litigation on Google's

17  behalf at that time?

18  A.  I had a large number of legal holds because I dealt with

19  customers.  And other areas of the cloud business that were --

20  there were various legal matters associated with them, customer

21  contract disputes, that sort of thing.  There was no active

22  litigation as I'm aware of, but there were legal holds, as they

23  call it.

24  Q.  No active litigation other than this litigation; correct?

25  A.  That I'm aware.  But it wasn't -- yeah, that I was aware of

NACVROW1                          Shaukat - Direct

1   at the time.

2   Q.  And one of the provisions of that continued litigation

3   assistance was that you would give information and cooperate

4   with Google, but that you wouldn't do it with anybody else;

5   correct?

6   A.  I don't remember the specifics of the agreement.

7   Q.  Well, let's look at it just for the purpose of refreshing

8   recollection, not to publish to the jury, if we may.

9              THE COURT:  Hold on.

10             Mr. Gage, are you -- okay.  So we're going to --

11             MR. GAGE:  Just show it to the witness; correct.

12             THE COURT:  Correct.

13             MS. GREENE:  Not to publish to the jury.

14             THE COURT:  Correct.

15             MS. GREENE:  And not to be offered into evidence.

16  Q.  Can you see this on your screen, Mr. Shaukat?

17  A.  I can.

18  Q.  Can you go to the second page and look at the paragraph

19  "Continued Litigation Assistance," paragraph 5?

20  A.  I see it.

21  Q.  And do you see where it says:  You agree to discuss

22  litigation, such litigation or litigation-related matters with

23  and give information about such matters to the company's legal

24  department or its outside counsel or both, but not with anyone

25  else, including other nonlegal department company employees,

1    unless legally compelled to do so.

2              Does that refresh your recollection about your

3    agreement that you would cooperate with Google, but nobody

4    else, about litigations in which you were involved?

5    A.  That is -- that is what the document says, yes.

6              MS. GREENE:  No further questions.

7    CROSS-EXAMINATION

8    BY MR. GAGE:

9    Q.  Good morning, Mr. Shaukat.

10   A.  Good morning.

11   Q.  I've got a few things I want to cover.  We'll try to do it

12   efficiently.  There are a couple that I want to follow up on

13   from your testimony yesterday in response to Ms. Greene's

14   questions.

15             Were you at all involved in the decision to hire

16   Ms. Rowe and set her level when she was hired?

17   A.  I was not.

18   Q.  Were you at all involved in the leveling decisions for

19   Evren Eryurek, Paul Strong, Ben Wilson, Nick Harteau, or any

20   other technical directors hired in OCTO?

21   A.  I was not.

22   Q.  And do you have any reason to believe that Ms. Rowe was

23   under-leveled at hire?

24   A.  I do not.

25   Q.  Changing topics for a second.

NACVROW1                          Shaukat - Cross

1            Ms. Greene asked you some questions about some big

2    banks.  And do you remember yesterday being asked some

3    questions about Bank of America?  And I believe you testified

4    that people from Bank of America were not calling you looking

5    for Ms. Rowe, do you remember that testimony?

6    A.   I do.

7    Q.   Who were they calling looking for, if you recall?

8    A.   Bank of America, I don't recall any specific asks that they

9    made.

10   Q.   Do you recall any large banks making specific asks for

11   individuals on your team?

12   A.   I do recall several large banks making asks for

13   Mr. Breslow, largely their legal and compliance officers and

14   their financial crimes divisions.  HSBC, Société Générale — I'm

15   butchering the French name — were two examples of companies

16   that did.

17   Q.   Now, change topics again here.

18            You used the phrase yesterday "a poll system."  Do you

19   remember referring to a poll system?

20   A.   Yes.

21   Q.   Can you tell the ladies and gentlemen of the jury what you

22   meant by a poll system?

23   A.   Sure.  In that context, I believe it was that I make myself

24   available to my team as they request it.  So they have to pull

25   for it.  There are times, I think in September of 2018, I had

NACVROW1                    Shaukat - Cross

1   25 or 26 people in my staff meeting.  It's impossible -- I

2   would spend my whole week doing one-on-ones with people if I

3   had to schedule all of them.  So I basically made it known that

4   if they needed me, they could let me know and I would make the

5   time available for them.  So they had to pull on a demand.

6   Q.  And did you expect people on your team to act

7   independently?

8   A.  I did.  It's one of the requirements of the job.

9   Q.  And were the people on your team generally executives or

10  considered by you to be executives?

11  A.  For the most part.  There were some who were more earlier

12  in their career; but for the most part, yes.

13  Q.  Was Ms. Rowe among the people you expected to act

14  independently?

15  A.  She was, yes.

16  Q.  Shift to another topic that you talked about yesterday.

17          Is it fair to say that the first time you ever learned

18  that Ms. Rowe thought her level may relate to her gender was

19  when you received the November 7th email that went to you and

20  Ms. Greene?

21  A.  I believe that is correct.  As we said yesterday, I think

22  she had raised that she thought she was misleveled.  But I

23  don't recall her ever referring to that as being because of her

24  gender.

25  Q.  And prior to that earlier in the year, I think you

NACVROW1                          Shaukat - Cross

1    testified that she had told you that she was promised the role

2    as the head of the vertical -- the financial services vertical;

3    is that correct?

4    A.  I think that's right, yes.

5    Q.  And is that something that you followed back up with

6    Mr. Grannis and/or Mr. Stevens about, that is, her assertion to

7    you that she had been promised the role?

8    A.  I was surprised.  So I'd asked them if they had recalled

9    doing that, and they said they had not or that they did not

10   recall doing that.

11   Q.  I want to pivot to some general questions.

12           I think you talked about your educational background

13   yesterday; is that correct?

14   A.  Yes.

15   Q.  And you have a bachelor's and master's; correct?

16   A.  I have a bachelor's and two master's degrees.

17   Q.  And two master's degrees.

18           And the two master's degrees are from where?

19   A.  M.I.T. and Stanford.  Massachusetts Institute of Technology

20   and Stanford University.

21   Q.  Okay.  And what are those two master's degrees?

22   A.  From Stanford, it was mechanical engineering; and from

23   M.I.T., it was in what they call technology and policy, largely

24   a public policy and engineering degree.

25   Q.  Now, prior to joining -- well, could you just please

NACVROW1                        Shaukat - Cross

1    briefly describe your employment history from the time that you

2    finished your two master's until the time that you arrived at

3    Caesars, which is your job just prior to Google?

4    A.   Sure.  So I left school.  I joined a data and analytics

5    manufacturing company for a very brief period of time, they

6    unfortunately went out of business.

7         I then joined a consulting company focused on the

8    technology industry, where I advised companies on growth

9    strategies for their technology products, companies like IBM,

10   Eli Lilly, and the like.

11        I then joined an enterprise software company that was

12   quite well-known at the time called Trilogy Software.  And

13   there I was in the product and solutions world; so I helped

14   design products and sell them to customers.

15        Following that, I did a start-up that was unsuccessful

16   in the social media space.  And then I worked at a company

17   called McKinsey & Company, which is a global strategy

18   consulting company.  Rose to the level of partner there, stayed

19   there for approximately seven years or so.  There I focused on

20   technology-enabled businesses, like financial services, media

21   and entertainment.

22        And then I was recruited away to be first chief

23   marketing officer and then chief commercial officer of Caesars

24   Entertainment.

25   Q.   And you mentioned the Caesars job yesterday.  Can you

1    explain to the ladies and gentlemen of the jury what the scope

2    of your responsibilities at Caesars was at the time you left?

3    A.  At the time I left -- so Caesars, if you're not familiar

4    with the company, is a casino entertainment company.  It

5    controlled 40 percent of the hotel and casino market in

6    Atlantic City, about a third of the casino and hotel market in

7    Las Vegas, and a number of other areas around the country.  I

8    think it was considered the largest casino company at the time.

9         I ran all of the centralized functions of the company

10   which would be five, 6,000 people, I think.  And that included

11   marketing, sales, information technology, data analytics, the

12   live concert business, the catering business, the gaming

13   business.  "Gaming" meaning the gambling business inside of

14   Caesars.  And I reported to the CEO of the company.

15   Q.  Who hired you at Google?

16   A.  Diane Greene.

17   Q.  And what was the first job you were hired to do at Google?

18   A.  I was hired as president of enterprise sales was the title

19   when I joined.

20   Q.  And at the time you joined as president of enterprise

21   sales, where was Google, if you will, in the marketplace for

22   cloud, enterprise cloud services?

23   A.  Depending on how you counted it, we were number eight or

24   number nine in the market.  We had less than a billion dollars

25   in revenue in the cloud.  And we had two parts of the business,

NACVROW1                    Shaukat - Cross

1   the primary part that we're referring to today is called Google
2   Cloud Platform.  We had about 50 salespeople in Google Cloud
3   Platform at that time.
4   Q.  And how long did you do that job?
5   A.  Approximately a year and a half, maybe a year -- between a
6   year and a quarter, a year and a half.
7   Q.  Okay.  Did there come a point where Ms. Greene asked you to
8   do something different?
9   A.  She did, yes.
10  Q.  What did Ms. Greene ask you to do next?
11  A.  She asked me to help recruit my successor as head of
12  enterprise sales.  And then having built that function, she
13  wanted to build a number of other functions, including our
14  partnerships with other people in the cloud ecosystem,
15  including our data center and geographic expansion strategy,
16  including our pricing strategies and including these industry
17  verticals that they were making central to the strategy of the
18  business.
19  Q.  And before we go on to talk about that, you indicated how
20  big the sales team was when you started as president of
21  enterprise sales.  Can you tell us the size of the sales team
22  when you handed off that responsibility and the size of the
23  business at that point?
24          MS. GREENE:  Objection.  Relevance.  Especially in
25  light of your Honor's ruling yesterday.

NACVROW1                         Shaukat - Cross

1          THE COURT:  Mr. Shaukat was questioned quite

2    extensively yesterday on his background and his different

3    roles.  And now I'm going to allow Mr. Gage to do the same.

4          Overruled.

5    A.  Can you repeat the question, please.

6    Q.  Sure.  At the time Ms. Greene asked you to take a different

7    job, what was the size of the sales force and approximately the

8    size of sales or the amount of sales annually?

9    A.  At that time, roughly speaking, it would -- that 50-people

10   sales team would have been several 100, perhaps approaching

11   1,000.  I'm a little fuzzy on the exact dates.  And the

12   business would have grown from about a billion to maybe two and

13   a half billion.  Again, that was by the end of that year, so

14   not the exact time frame.

15   Q.  When you say "by the end of that year," was it towards the

16   end of 2017 that Ms. Greene asked you to take on this new job?

17   A.  The middle to end of 2017, that's right.

18   Q.  And I've seen the term "global alliances and industry

19   platforms."  What does that refer to?

20   A.  That was an attempt to have a shorthand for all of the

21   disparate functions that was in my team.  So global alliances

22   being partnerships.  Industry platforms was meant to indicate

23   that the industry teams were not just sales teams but, in fact,

24   these business units essentially.

25   Q.  And how was this different than the sales job you had?

NACVROW1                      Shaukat – Cross

1   A.   In a number of ways.   The industry -- you mean the industry

2   piece or the job itself?

3   Q.   The industry piece.

4   A.   Industry piece.

5        We were attempting, as I mentioned, to make this the

6   central differentiation for Google in the cloud business, as we

7   were trying to become number three, the number two, the number

8   one.   We set these up as business units.   And this was, to my

9   knowledge, the only place in Google that was set up as business

10  units at this time.

11       What that meant was that reporting to me very

12  atypically for Google was product engineering and what we call

13  business development, which is different from sales because

14  it's about cultivating relationships as opposed to, you know,

15  sign on the dotted line for a piece of technology equipment.

16  So it was really meant to be a comprehensive approach to each

17  of the industry verticals.

18       (Continued on next page)

19

20

21

22

23

24

25

NACHRow2                          Shaukat - Cross

1          THE COURT:  Mr. Gage, are you approaching the

2     conclusion of this line of questioning?

3          MR. GAGE:  Yes.  In other words, could I wrap it up

4     quickly for our quarter after break?

5          THE COURT:  Actually, we don't have a break for a

6     little bit, but I'm wondering if you're going to reach the end

7     of this line soon.

8          MR. GAGE:  Oh, I don't know if it's an official line,

9     but I am transitioning and it's evolving, your Honor, I'll put

10     it that way.

11          THE COURT:  OK.

12     BY MR. GAGE:

13     Q.  Were you planning to hire something referred to as a

14     vertical lead?

15     A.  I was, yes.

16     Q.  And what ─── am I moving on sufficiently, Judge?

17          THE COURT:  I'll let you know in a minute.

18          MR. GAGE:  OK.

19     Q.  What did you expect from these vertical leads?

20     A.  Because this was early in cloud and we were trying to

21     establish ourselves, we needed somebody who could articulate a

22     vision, because in most cases ─── on the product side, because

23     in most cases there was not a product strategy in place for

24     these industries.  We wanted somebody who had the commercial

25     acumen.  These were not technology sales.  These were sales

NACHRow2                          Shaukat - Cross

1   that were meant to feel more like partnerships.  We were

2   solving a business problem as opposed to a technology problem,

3   so we wanted somebody who could handle the business side, if

4   you will, as well the technology side.  And because we were

5   trying to establish ourself, the lead role should have some

6   level, if you'll pardon the expression, of issue clout.  They

7   should be a known entity in the industry.

8   Q.  Who was the first vertical lead that joined your team?

9   A.  His name was Greg Moore.  He joined for health care.

10  Q.  For health care.

11        And briefly, if you could describe for the jury what

12  Mr. Moore's background was at the time he took that role.

13  A.  He was a medical doctor with a specialty, I believe, in

14  neurology.  He also had a Ph.D. in nuclear physics from MIT.  I

15  don't recall where his medical degree was from.  He had then

16  worked as the chief innovation officer at a health system in

17  Pennsylvania called Geisinger, which is the largest health

18  system in Pennsylvania.  And he was a known authority on the

19  application of artificial intelligence in the health care

20  world.

21  Q.  I'll come back to the vertical leads in a little bit, but

22  you were asked a number of questions yesterday about

23  Mr. Breslow, and I want to give that a little bit more context.

24        Did you hire someone into a role called director of

25  technology and policy?

NACHRow2                          Shaukat - Cross

1    A.  Yes, that was Mr. Breslow.

2            MR. GAGE:  I'd like to show the witness an exhibit,

3    your Honor, without showing the jury, D54.

4            THE COURT:  For what reason are you showing it to him

5    without showing it to the jury?

6            MR. GAGE:  Because I'm going to lay a foundation, and

7    then I'm going to move to admit it, your Honor.

8    Q.  Mr. Shaukat, do you recognize this document?  That's just a

9    yes-or-no question.

10   A.  Yes.

11   Q.  Is this a document that you considered at the time you

12   hired Mr. Breslow?

13   A.  I would have seen it at that time, yes.

14           MR. GAGE:  Your Honor, I'd move the admission of

15   Exhibit 54.

16           THE COURT:  Any objection?

17           MS. GREENE:  There's no objection to this exhibit.

18           THE COURT:  It's admitted.

19           MR. GAGE:  May I publish to the jury?

20           THE COURT:  Yes, you may.

21           (Defendant's Exhibit 54 received in evidence)

22           MR. GAGE:  I apologize I asked again.  There was an

23   objection previously, so I was proceeding cautiously.

24           THE COURT:  Caution is the better part of valor.

25           MR. GAGE:  Thank you, your Honor.

NACHRow2                              Shaukat – Cross

1    BY MR. GAGE:

2    Q.  I'd like you to take a look at this quickly.  Mr. Shaukat,

3    could you just briefly describe to the jury what about

4    Mr. Breslow's background led you to hire him for this role.

5    A.  Well, there are a number of different aspects.  Primarily,

6    it wasn't as much the McKinsey & Company, which was the most

7    recent part of the work experience, though I'll come back to

8    that in a moment, but he was a C-level executive, chief

9    compliance officer at one of the largest banks in the world,

10   Morgan Stanley, and he had done that role for over a decade.

11   So he was deeply known and experienced.

12           One of the areas that we were hiring him for was

13   relationships with financial regulators, or with regulators in

14   general, and experience dealing with them.  As you can see in

15   here, he refers to his work with financial regulators like the

16   Federal Reserve fairly continuously — fairly often in this

17   document.

18           The other piece that was interesting was the mention

19   of AML, which stands for anti-money laundering, and this was an

20   area that a number of our clients were starting to ask about,

21   whether we could help them with compliance with anti-money

22   laundering laws, and this was something that was of interest, I

23   would say probably secondary interest, to his experience with

24   regulators.

25   Q.  If you know, could you briefly explain to the jury what

1    anti-money laundering laws are.

2    A.   Sure.  So my layman's understanding of this is banks have

3    an obligation to determine the source of any funds that go to

4    the bank and to ensure that it is not money that is being

5    laundered for illicit purposes, for terrorism or drug

6    smuggling, and the like.

7              MR. GAGE:  We can take down D54.  I'd like to now turn

8    to Plaintiff's Exhibit 115, and I believe the jury can see that

9    it's a plaintiff's exhibit.

10             I'd like to just page through this slowly, if we

11   could, Jean.  Go to the second page.

12   Q.   Mr. Shaukat, is this the hiring packet for Mr. Breslow?

13   A.   It appears to be, yes.

14   Q.   Now I'd like to go back to the first page, and on page 1

15   I'd just like to — is it page 1?  I'd like to go where it says

16   "internal references."  Maybe that's page 2.

17   A.   I don't see internal references, I'm sorry.

18   Q.   There we go, page originals.

19   A.   Oh, yes.

20   Q.   You see where it says Ruth Porat?

21   A.   I do.

22   Q.   Who is Ruth Porat and what was she doing at the time?

23   A.   Ruth Porat at the time was the chief financial officer of

24   Google and its parent company, Alphabet.  She had previously

25   been the chief financial officer of Morgan Stanley.

NACHRow2                          Shaukat - Cross

1   Q.  OK.  Morgan Stanley, is that where Mr. Breslow worked

2   previously?

3   A.  It was, yes.

4   Q.  Does this reflect her internal reference for him at the

5   time he was being considered for the position?

6   A.  Yes.

7   Q.  I'd like to turn to the next section.  Does this reflect

8   that Brian Stevens interviewed Mr. Breslow?

9   A.  It does, yes.

10  Q.  And can you remind the jury who Brian Stevens was at Google

11  at the time.

12  A.  At the time I believe he was chief technology officer of

13  Google Cloud.

14        MR. GAGE:  If we could go to the next page, if we can

15  highlight at the top that section so the jury can see it.

16  Q.  It says:  "More than qualified.  Good grasp of requirements

17  we'd need to manage.  Only open question I had was on cultural

18  fit, as he'd been in a very different company org and role than

19  he's been used to," and it says, "Lean hire."

20        What does that mean in the context of Google's hiring

21  process?

22  A.  Meaning that —— leaning hire means that Brian was a

23  positive on his hire, but not, as I would call, a table

24  pounding for it.

25  Q.  Did you have any questions in your mind as to whether

NACHRow2                        Shaukat - Cross

1   Mr. Breslow would be a cultural fit?

2   A.  It's something that we always considered, and I think it

3   was a little bit of a risk in hiring anybody from industry, and

4   Stuart was no exception to that.

5   Q.  When you say a little risk of hiring someone from industry,

6   what do you mean when you say "from industry"?

7   A.  Oh, I'm sorry.  Google is a very eclectic place culturally

8   speaking, and sometimes if you grow up in a very

9   command-and-control environment in, for example, a company like

10  Morgan Stanley, people have trouble adapting to the more

11  free-flowing ways of Google, if you will.  So with that, that's

12  essentially what we screen for.

13        MR. GAGE:  I'd like to just flip to the next page.

14  Jean, if you could highlight where it begins the word "lawyer."

15  That's what I was looking for.  Thank you.

16  Q.  You see it says, "Lawyer then joined MSWD.  Led compliance

17  at CSFB.  Recruited by John Mack.  John went back to MS and

18  recruited him back to again lead compliance.  Retired in 2016.

19  Then went to McKinsey."

20        My question is simple.  Do you know who John Mack is?

21  A.  He was, I'll call it, legendary CEO of, at first, Credit

22  Suisse First Boston, which is CSFB, and then Morgan Stanley.

23  Q.  What does this say to you about Mr. Breslow as a candidate

24  that you were hiring him into?

25  A.  Again, we were looking for people who had deep industry

NACHRow2                            Shaukat – Cross

credibility, and I used the word "clout" earlier.  And if

someone like John Mack, the CEO of two of the largest financial

services companies in the world, actively brought Stuart with

him from place to place, that spoke volumes, in my mind.

Q.  Now I'd like to go to Dr. Moore's — we could skip that,

Jean.  We'll go to Dr. Moore's comments.

            Did Dr. Moore interview Mr. Breslow?

A.  I believe so.  Yes, it looks like he did.

            MR. GAGE:  If we could just go, Jean, to — I think

it's the next page of interview notes.

            MS. GREENE:  Your Honor, I'm going to object as to the

relevance of this line of questioning.

            MR. GAGE:  May I respond, your Honor?

            THE COURT:  Let's have a sidebar.

            (Continued on next page)

NACHRow2                         Shaukat - Cross

1            (At sidebar)

2            THE COURT:  Mr. Breslow is one of Ms. Rowe's

3    comparators, is he not?

4            MR. GAGE:  Correct.

5            THE COURT:  We're talking about Mr. Breslow going

6    through the interview and evaluation process, right?  What's

7    the ——

8            MS. GREENE:  So the issue with respect to Mr. Breslow

9    as a comparator is one that is related to whether the equal pay

10   law, whether they were performing the same work and receiving

11   the same pay and similarly situated, and I'm curious for what

12   purpose Mr. Gage is offering it.

13           MR. GAGE:  Well, off the top of my head, I'll give you

14   two good ones:  One, Ms. Greene and through Ms. Rowe's

15   testimony, they spent a fair amount of time trying to

16   essentially disparage him and his qualifications, suggesting

17   that he wasn't qualified to later become the acting or interim,

18   or whatever, financial services vertical lead.  So I should be

19   entitled to show his qualifications to do that.

20           Second, plaintiff is claiming that he's doing the same

21   work and being paid more.  And on that claim, an essential

22   element of our defense is to show that Google had non-gender

23   reasons for paying him differently.  We dispute that they were

24   doing the same thing, but we also are entitled to show that

25   we've got all these non-gender reasons for paying him

1   differently than Ms. Rowe, and that relates to his

2   qualifications.  And so all of this is relevant to our defense,

3   it's relevant to their claims, and they already attacked this

4   guy's qualifications.

5          THE COURT:  Yes, you did question extensively on

6   Breslow's qualifications.

7          MS. GREENE:  So these documents, as they're being

8   offered, then, are hearsay they're.

9          MR. GAGE:  It's your document.

10          MS. GREENE:  For the purpose that we intended to use

11   it, it wasn't a hearsay purpose.

12          MR. GAGE:  It's in evidence now.

13          MS. GREENE:  I'm just pointing out —— let me finish my

14   statement, Mr. Gage —— it's being offered for the truth of the

15   matter asserted, and there's not been any foundation laid that

16   Mr. Shaukat reviewed or considered these documents in making a

17   decision about whether to put Mr. Breslow in the interim role.

18          MR. GAGE:  Judge, I hate to use the legal term, but

19   the ship has sailed.  They put this in evidence, so I can read

20   from it.  Counsel actually read from a document before she used

21   to refresh the witness' recollection.  That was inappropriate,

22   but I didn't call it out because I didn't want to interrupt the

23   proceedings.  But you read from a document that was not in

24   evidence, and that wasn't proper.  This is in evidence.

25          THE COURT:  Yes, the objection's overruled.

NACHRow2                          Shaukat – Cross

1           (In open court; jurors present)

2           MR. GAGE:  Where were we.  Let's move on to

3    Dr. Moore's interview notes, briefly.

4           I believe, Jean, these are on page 8 of the exhibit,

5    says "Interview notes."

6    Q.  See where it says:  Able to easily pivot from his core

7    background/training expertise finance into a discussion on

8    health care with creative thinking" —— if we could highlight

9    the top of the next page —— "exhibited great leadership

10   presence."

11          Was the job Mr. Breslow was hired to do broader than

12   just financial services?

13   A.  It was, yes.

14   Q.  How so?

15   A.  The role of director of technology and policy was meant to

16   help us with our regulatory and compliance stance across all

17   industries.  And financial services is one highly regulated

18   industry, but health care's an example.  The federal

19   government, the Department of Defense is another example.

20   Energy is another example.  Stuart's remit was really to cover

21   the full range of industries.

22          MR. GAGE:  Just one last thing on this exhibit, Judge,

23   then I'll move on.

24          If we can go to page 12, the interview notes from

25   Fiona O'Donnell.

NACHRow2                          Shaukat - Cross

1   Q.  Who is Fiona O'Donnell?

2   A.  She was my lead HR business partner at the time.

3           MR. GAGE:  Now, if we could go to —— see where she

4   asked him a question about mentoring and in part says:  "Look

5   at his team and MS.  Don't focus on who is what but had an even

6   distribution on gender.  Senior stakeholder relationship was

7   with someone he hired in 2003.  At the time she was a closet

8   lesbian.  No reason why need to be that way and worked with her

9   to create a safe environment where she felt supported.  He

10  sponsored and advocated for her as she grew in her career and

11  she eventually assumed a leadership role.  Got her promoted to

12  MD.  She had competencies that he didn't, so it was a

13  relationship that could benefit both from."

14          I have a simple question, what does this tell you

15  about Mr. Breslow?

16  A.  That he's good coach and manager, somebody who helps to

17  develop his people.

18  Q.  Was that important to you?

19  A.  It was in general for every role that we hired.

20          MR. GAGE:  OK.  I'd like to show the witness

21  Exhibit D40.  Your Honor, I don't believe there should be an

22  objection to this, but let's just show the witness now and see

23  if plaintiff's counsel objects.

24          Just to the witness.

25          Counsel, is there an objection?

NACHRow2                          Shaukat - Cross

1              MS. GREENE:  I believe so, but we're just

2     double-checking.

3              MR. GAGE:  Let me know.  If I need to lay a

4     foundation, I will.

5              MS. GREENE:  Yes, there's an objection.

6     BY MR. GAGE:

7     Q.  Mr. Shaukat, without reading from the document, can you

8     just tell us what this is?

9     A.  It is the internal memo I sent to my team announcing the

10    arrival of Stuart Breslow and Sunil Rayan to the team.

11    Q.  And what does this —— without reading the document, what

12    were you informing your team of about Mr. Breslow?

13             MS. GREENE:  Objection.  Hearsay.

14             MR. GAGE:  I'm not asking him to read from the

15    document, your Honor.  I'm asking him what he, as the author of

16    the email, was intending to convey to his team.

17             THE COURT:  Overruled.

18    A.  I was intending to convey a couple of things in general.

19    One of them was what is the scope of the role that Mr. Breslow

20    and Mr. Rayan in this email had, and the second was what their

21    background and qualifications were so that people would have an

22    easier time getting to know them and onboard them.

23             MR. GAGE:  Your Honor, I'd move the admission of

24    Exhibit 40, D40.

25             MS. GREENE:  Objection on hearsay.

NACHRow2                           Shaukat — Cross

1           THE COURT:  We're going to have to talk now.  Can you

2    bring a copy of the document, please.

3                (Continued on next page)

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

NACHRow2                          Shaukat - Cross

1              (At sidebar)

2              THE COURT:  OK.  Ms. Greene, talk to me.

3              MS. GREENE:  So this is Mr. Shaukat's email.

4   Mr. Shaukat is intending to introduce this email for the truth

5   of Mr. Breslow's qualifications as he wrote them up.  It can't

6   be as to the impact on him.  He's the author and recipient of

7   this.  It's clearly meant for the purpose of the truth, that

8   this is his qualifications.  And he said that he was writing it

9   to transmit the qualifications.

10             THE COURT:  Mr. Gage.

11             MR. GAGE:  A couple of things, Judge.  First of all,

12  we've already fought over whether or not the jury can hear

13  evidence of the qualifications of the plaintiff's comparators

14  and Judge Schofield ruled on that a long time ago.

15             Second, your Honor just let the last exhibit in that

16  says the same thing as this does about his qualifications.

17             And third, he's telling his team what Mr. Breslow's

18  job was, what the scope of his job was and what he was going to

19  be doing, which is precisely the core of the plaintiff's claim.

20  I'm doing the same thing as Breslow, so I should be paid the

21  same.  And this shows to the contrary, and this is her lawsuit

22  to a tee.  So it's a contemporaneous statement of what the job

23  is.

24             THE COURT:  So is your position that this is not

25  hearsay or that it comes in under an exception?

NACHRow2                              Shaukat – Cross

1          MR. GAGE:  It is not hearsay because it is him telling

2    internally a team what the scope of the job was.  That's not

3    hearsay.

4          Second, to the extent that it's hearsay about

5    Mr. Breslow's qualifications, Judge Schofield ruled on that a

6    long time ago and said they can hear evidence of the

7    qualifications of the plaintiff's comparators.

8          THE COURT:  Is that the motions *in limine* order?

9          MR. GAGE:  It had to do with the Level 8 –– or

10   Level 9s, specifically, that issue.  Plaintiff tried to keep

11   out the evidence of, for example, Mr. Eryurek's qualifications,

12   etc., but they are also claiming Mr. Breslow was a comparator.

13   So, to be more specific, Judge Schofield didn't specifically

14   speak to Mr. Breslow, but she spoke to the issue of whether or

15   not the jury could hear evidence about the comparators'

16   qualifications, and plaintiff is saying he's a comparator.

17         MS. GREENE:  And if I could just respond.  Judge

18   Schofield's ruling did not say anything with respect to

19   hearsay, whether hearsay could be offered in support of that,

20   and he just –– Mr. Gage just said that it was being offered to

21   show what the job was as it was described.  That's the truth of

22   the matter asserted.  They're offering it that this is the job

23   that he performed, and ––

24         MR. GAGE:  It's a contemporaneous statement that this

25   witness crafted to describe the very thing they are contesting

NACHRow2                         Shaukat - Cross

1   in the case.  It's not hearsay.

2           MS. GREENE:  It's an out-of-court statement being

3   offered for the truth of the matter asserted.  That's classic

4   hearsay, and you've not — Mr. Gage has not articulated an

5   exception to the hearsay rule.

6           MR. GAGE:  Your Honor, they put in job descriptions

7   that talk about what the scope of the plaintiff's job was.

8           THE COURT:  I get that.

9           MR. GAGE:  It's the same thing.  What's the

10  distinction?

11          MS. GREENE:  The distinction is that the job

12  description was a business record, having fought that fight.

13          MR. GAGE:  No.

14          MS. GREENE:  You didn't object to it on that grounds.

15          MR. GAGE:  And you didn't put it in as a business

16  record.

17          MS. GREENE:  We didn't have to.  There was no

18  objection.

19          MR. GAGE:  So it's not a business record.  It was a

20  written document that describes the job.  This is no different.

21  This is highly prejudicial, Judge, if they can put documents in

22  describing what jobs are and we can't.

23          THE COURT:  Let me see one of those documents.

24          MS. GREENE:  Is there a job description for the role

25  that Mr. Breslow came in with?

NACHRow2                          Shaukat - Cross

1          MR. GAGE:  No.  No, frankly, there was no job

2    description.  This was the only thing.  This was the only thing

3    that existed.  And we —— if you'll remember, there were issues

4    in discovery where we said we can't find it.  There isn't a job

5    description, and this was the only statement produced in

6    discovery.

7          MS. GREENE:  Relevance is not an exception to hearsay.

8          MR. GAGE:  Your Honor, what's good for the goose is

9    good for gander.  When they put documents in that are exactly

10   the same as this, descriptions of jobs ——

11         THE COURT:  All right.  Let me see one of those

12   documents, please.

13         MS. GREENE:  So this is a document that ——

14         MR. GAGE:  Financial services vertical lead.

15         MS. GREENE:  —— that the defendant drafted.  It's ——

16   there's evidence about that we didn't need to because there was

17   no production that we could have offered about this was a

18   Google's regular practice was to draft this sort of press

19   release or the job qualifications ——

20         MR. GAGE:  None of that was established.

21         MS. GREENE:  We didn't have to because there was no

22   objection.

23         MR. GAGE:  But there was none of that ——

24         MS. GREENE:  I'm sorry.

25         MR. GAGE:  I'm sorry.  They are both documents drafted

NACHRow2                        Shaukat - Cross

1    by Google.  Mr. Shaukat was a senior leader in the company.  He

2    drafted this document.  He conceived of the role.  This is

3    highly prejudicial if this is kept out, Judge.

4              THE COURT:  Listen, this one was offered by the

5    plaintiff.

6              MR. GAGE:  Yes.

7              THE COURT:  Right?  And it was a statement of a party

8    opponent.  This is offered by you, written by Mr. Shaukat.

9              MR. GAGE:  It's offered for proof of the fact that on

10   this date Mr. Shaukat said his job involves X, Y and Z.

11             THE COURT:  All right.

12             MR. GAGE:  The fact —— so it's not hearsay.

13             THE COURT:  Well, I will let you use it with that

14   limiting instruction.

15             MR. GAGE:  And is your Honor going to give the same

16   limiting instruction for all these other documents that they

17   introduced?  Because if not, that's highly prejudicial.

18             MS. GREENE:  They're not hearsay.

19             THE COURT:  I don't see this as the same.  This is

20   subject to a hearsay exception.

21             MR. GAGE:  That's not how it came in, Judge.  It just

22   came in, because it's a job description.

23             THE COURT:  It depends on who uses it.

24             MS. GREENE:  But also ——

25             THE COURT:  And who's offering it.

NACHRow2                        Shaukat - Cross

1               MS. GREENE:  Also, the defendant waived those

2     objections.  He could have objected on the basis of hearsay.

3     He chose not to.

4               MR. GAGE:  This is highly prejudicial.

5               MS. GREENE:  He can't now argue that —— we could have

6     established that it wasn't hearsay at the time.  The fact that

7     he didn't raise that objection or maintain that objection, it's

8     waived.

9               MR. GAGE:  This is highly prejudice to say that the

10    defendant's evidence on the same topic is worth less than the

11    plaintiff's.

12              THE COURT:  Have you used this yet or planning to use

13    it?

14              MR. GAGE:  She has used it.

15              MS. GREENE:  We have not.

16              MR. GAGE:  You have uses used it.  You asked ——

17              MS. GREENE:  I'm sorry.  This has been used.  Again,

18    there was no objection ——

19              THE COURT:  Yes.

20              MS. GREENE:  —— against it.

21              Your Honor, to the extent that you suggested that you

22    would allow it in with a limiting instruction, we're

23    comfortable with that.

24              THE COURT:  I will let it in with a limiting

25    instruction.

NACHRow2                          Shaukat - Cross

1          MR. GAGE:  I would just note our exception.  It's
2     highly prejudicial, your Honor, to say that our evidence on the
3     exact same topic is worth less than the plaintiff's.  I think
4     if you're going to give a limiting instruction, you should give
5     it as here are the exhibit numbers.  All of these documents
6     were offered for a limited purpose, for the effect on the
7     listener, and the listener being his entire team.  The
8     listeners being his team.

9          THE COURT:  So this document is different.  This is
10    offered by the plaintiff and it's subject to a hearsay
11    exception, number one.

12         Number two, you yourself have said we do not object to
13    this document, so the objection to this document is waived.

14         This document, I believe, is hearsay.  You may use it
15    with a limiting instruction.  So let's talk now about what the
16    limiting instruction is going to be.

17         MR. GAGE:  I would suggest a similar instruction to
18    the one that we proposed.

19         THE COURT:  On this document?

20         MR. GAGE:  Well, we can slop a few words ——

21         THE COURT:  Yes.

22         MR. GAGE:  —— because that was —— you know what I
23    mean, your Honor?

24         THE COURT:  Yes.

25         MR. GAGE:  That was speaking about, I think, what

NACHRow2                          Shaukat – Cross

1   people said or ——

2              THE COURT:  But tell me what you want to use it for,

3   so that part.

4              MR. GAGE:  The purpose of introducing this document is

5   to show the jury what Mr. Shaukat told his team would be

6   Mr. Breslow's job responsibilities and duties, but it's not

7   offered for the truth of the matter asserted therein.

8              THE COURT:  All right.

9              MR. GAGE:  Does that work, Cara?

10              MS. GREENE:  Yes.

11              THE COURT:  OK.  That's what we're going to do.  I

12   will hand this back to you.

13              MS. GREENE:  I believe this is your copy.

14              THE COURT:  May I take this?

15              MR. GAGE:  You can keep it.  We can give you more

16   copies if you want.  We have plenty.

17              THE COURT:  OK.  Thank you.

18              (Continued on next page)

19

20

21

22

23

24

25

NACHRow2                        Shaukat - Cross

1          (In open court; jurors present)

2          THE COURT:  I need a moment because I need to give you

3    an instruction.  I'm preparing it now.

4          In certain instances evidence may be admitted only for

5    a limited purpose.  You are about to see a document marked

6    Defendant's 40.  This evidence is admitted for a limited

7    purpose.  It is admitted only for the purpose of showing you

8    what Mr. Shaukat told his team would be Mr. Breslow's job

9    responsibilities and duties.  You may not consider this

10   document for the truth of the matters asserted therein.  You

11   may give this evidence such weight as you feel it deserves, but

12   only for the limited purpose for which it has been offered.

13   You may not use the evidence for any other purpose.

14          All right.  Mr. Gage.

15          MR. GAGE:  We can show the jury?

16          THE COURT:  Yes.

17          MR. GAGE:  If you can just publish that to the jury.

18          We'll be quick with this, your Honor.

19   BY MR. GAGE:

20   Q.  Mr. Shaukat, did you write this email and send it?

21   A.  I sent it.  I would have had an internal communication team

22   to help me draft it.

23   Q.  In here it describes that among the things that Mr. Breslow

24   was supposed to be doing was developing and maintaining the

25   business requirements for regulatory and compliance across GCP

1   and GSuite.  What does that refer to?

2   A.   GCP and GSuite were the two primary products we were

3   offering inside of Google Cloud.  And maintaining the business

4   requirements means providing business input into the product

5   roadmap, so, essentially, what are the requirements that the

6   product has to fulfill.

7   Q.   Also indicates he would be responsible for building a

8   global team to work with customers and partners across

9   industries to ensure that Google Cloud meets their compliance

10  and regulatory needs.

11          What is that referring to?

12  A.   That there's a number of things that a client has to do to

13  make sure that they can use the cloud in a compliant way.  So

14  Stuart and the team he was to build was to help them do that.

15  And then also to take their requirements and make sure that

16  areas where we could build a problem so that it was compliant;

17  for example, there's HIPAA in health care and there's special

18  requirements for a database.  So Stuart's team's responsible

19  for gathering those regulatory requirements and feeding it to

20  our product team so that they could build a compliant database.

21  Q.   OK.  Thank you.

22          Jean, you can take this down.

23          Was this a director or a vice president position?

24  A.   Stuart came in as a director.

25  Q.   And was giving public speeches part of this job?

NACHRow2                          Shaukat - Cross

1   A.  It was not.

2   Q.  You told the jury a little while ago what anti-money

3   laundering laws refer to.  Did Mr. Breslow actually work on any

4   projects relating to anti-money laundering?

5   A.  While he was at Google?

6   Q.  Yes.

7   A.  Yes.  As I mentioned, we had a number of customers who were

8   interested in anti-money laundering, and our largest financial

9   services prospect was a bank called HSBC.  It's a global bank.

10  And they in particular had kicked off a project on anti-money

11  laundering that Stuart took the lead on for us.

12  Q.  And when you say he took the lead on it, what was his role?

13  What was he expected to do on that project?

14  A.  He was expected to do a number of different things.  One of

15  them was meet with the senior staff over at HSBC and make sure

16  that we understood their requirements.  So in this case it

17  would be their head of financial crimes, I guess financial

18  crimes prevention, and their head of compliance and regulatory.

19  He was to make sure that we understood their requirements and

20  they understood the capabilities of the cloud.  And then he had

21  a number of teams across Google that he had to marshal to help

22  specify and start building the product, including our AI

23  engineering team, artificial intelligence engineering team, our

24  product management team and others.

25  Q.  When you refer to teams he had to marshal, are you

NACHRow2                              Shaukat – Cross

1    referring to people who reported directly to him?

2    A.  No, there were very few people who reported directly to

3    Stuart at this time.

4    Q.  So what do you mean by he had to marshal them?

5    A.  So we had some product and engineering people in my team

6    who did not report to Stuart but they were in my team, but the

7    prime —— but the majority, I would say, of the resources,

8    particularly the product and engineering resources, that we

9    needed to build this product sat in other departments inside of

10   Google.  So he had to go and both convince them this was a

11   priority as well as then educate them on what the needs of the

12   customer were.

13   Q.  One last question on this AML matter.

14        Ms. Rowe testified the other day about she was aware

15   that he was working on this project.  She characterized it as a

16   small project.  Would you agree with that characterization?

17   A.  I would not.

18   Q.  Why not?

19   A.  It was a project —— so, as I mentioned, HSBC ended up

20   being, I think still is to this day, the largest financial

21   services client inside of Google Cloud.  Certainly at the time

22   it was the largest deal that we had done.  It was a

23   billion-dollar-plus deal.  Their reason for selecting us

24   hinged, if you will, on us being able to do this anti-money

25   laundering project.  It was a core differentiator for us versus

NACHRow2                    Shaukat – Cross

1    others.

2    Q.  Now I want to pivot to something called OCTO.  The jury's

3    heard a little about OCTO, but in your role at the time, were

4    you aware what OCTO was?

5    A.  I was, yes.

6    Q.  Who was the chief technology officer at Google Cloud at the

7    time?

8    A.  Brian Stevens.

9    Q.  Did you know Brian Stevens?

10   A.  I did.

11   Q.  Did you and Brian Stevens both report to Diane Greene?

12   A.  We did, yes.

13   Q.  Now, the jury has heard that there were four technical

14   detectors in OCTO —— Evren Eryurek, Jeff Kember, Ben Wilson,

15   and Ms. Rowe —— who moved into your organization.  Is that what

16   happened?

17   A.  It is, yes.

18   Q.  What were the four of them expected to do in your

19   organization when they moved over?

20   A.  So part of the rationale for having them move over was we

21   were building these industry teams, and we wanted a unified

22   message and value proposition for our customers.  So they were

23   expected to come and be part of the team and to help develop

24   and promote, if you will, the strategy.  So that was

25   number one.

NACHRow2                        Shaukat - Cross

1              One of the main areas of conflict that we had had

2      previously was that OCTO, particularly the industry-specific,

3      the four individuals you were talking about, had spent more of

4      their time, I'll characterize it, as going from customer to

5      customer as opposed to deep engagement.  So it was broad

6      shallow work as opposed to deep engagement with specific

7      priority clients.  And one of the expectations I set for each

8      of the team as they moved over was that they would adopt

9      specific clients that we would agree upon, and they would spend

10     their time really getting to know and influencing and working

11     with those particular clients.

12     Q.  Did you expect them to spend a lot of their time giving

13     speeches?

14     A.  No, it was explicitly what we were trying to stop from

15     happening.

16     Q.  At the time they moved over, did you have any plans to

17     consider any of the four of them for the vertical lead roles?

18     A.  I did not.

19     Q.  Why was that?

20     A.  In general, the —— as I mentioned, the office of the CTO,

21     as it implies, were deeply technical people who could, I'm

22     sure, handle the technical part of the job, but these were

23     business unit head roles where you needed to have the business

24     understanding of business processes inside of these different

25     industries, as well as the C-level relationships that,

1   generally speaking, the people in OCTO did not —— did not walk

2   in with.

3   Q.  Did Ben Wilson meet with you to talk about the vertical

4   lead role?

5   A.  He did when he joined my team, yes.

6   Q.  Can you describe to us what, if anything, he came to you

7   with in that meeting.

8   A.  So Ben came asking what my plans were for the industry.

9   Ben was focused on a combination of manufacturing and energy at

10  the time.  He walked in with a —— I was quite surprised,

11  actually —— with a fully fleshed out plan for what he would

12  prioritize if he was to be in charge of the industry, what he

13  thought —— his advice to me, given we were starting this

14  industry, on what we should prioritize, what partners we should

15  work with, what solutions we should develop, that sort of

16  thing.  It was a fairly detailed plan that he walked in with.

17  Q.  Did you appreciate it?

18  A.  I did very much.

19  Q.  Was it good?

20  A.  It was good.

21  Q.  Did you give him the job?

22  A.  I did not.

23  Q.  Why not?

24  A.  Because, and as I explained this to Ben as well, he had a

25  very good understanding of the technical requirements in

1    energy, for example, but he did not have a great level of depth

2    or the executive relationships that we were looking for, level

3    of depth on the business side or the executive relationships we

4    were looking for.

5    Q.   Who did you hire for that vertical?

6    A.   We ended up splitting that vertical into two.  We hired

7    Darryl Willis, who had been —— for energy.  And Darryl had been

8    the president of several markets for British Petroleum, BP.  He

9    had also done some —— it's called seismic exploration work, so

10   the use of data and analytics to find new oil fields and the

11   like.  So we hired Darryl Willis, and we subsequently hired

12   Dominik Wee for manufacturing.

13   Q.   Mr. Kember also came over to your organization from OCTO,

14   is that right?

15   A.   He did.

16   Q.   Did he meet with you to talk about that vertical?

17   A.   He did, yes.

18   Q.   And can you tell us what, if anything, he presented to you

19   in that meeting.

20   A.   There were a number of meetings with Jeff.  He walked in,

21   very similar to Ben, with here's the solution areas that he's

22   hearing from customers, here's what he thinks we should focus

23   on.  And a little bit different from Ben, he walked in with, I

24   think it was, LinkedIn profiles of people he would consider

25   hiring for different roles on the team as well.

NACHRow2                         Shaukat - Cross

1    Q.   Did you give him the job for the vertical he was talking

2    about?

3    A.   I did not.

4    Q.   Who got that job?

5    A.   For meeting and entertainment, it was John Honeycutt.

6    Q.   What was Mr. Honeycutt doing, as you understand it, before

7    you gave him that vertical lead role?

8    A.   John Honeycutt was chief technology officer of Discovery

9    Networks.  So — well, Discovery Network's a large TV network

10   and channel, Shark Week and that sort of thing.  And he was a

11   very well-known figure in the industry.  Had been doing this

12   sort of work for a long time.

13   Q.   One last question on this topic, Mr. Shaukat.

14           Did you treat your meeting with Ms. Rowe any

15   differently than you treated the meetings with Ben or Jeff?

16   A.   No, I did not.

17   Q.   And did you give Ms. Rowe the exact same opportunity to

18   present her ideas, her thoughts, her credentials as you gave to

19   Ben and Jeff?

20   A.   I did.  All the meetings were set up as get-to-know-you

21   meetings, and Jeff and Ben took the initiative differently than

22   Ms. Rowe did.

23           MR. GAGE:  I'd like to move on to Exhibit P-31.  Your

24   Honor, this is plaintiff's exhibit, so I don't think there's

25   any issue with this.  If we could just go to the second page.

1   Q.  Is this a description of the head of financial services

2   role?

3   A.  It is, yes.

4   Q.  It indicates that "The financial services vertical lead

5   will be the executive responsible for creating and executing

6   Google Cloud's strategy in the financial services industry."

7           Didn't you already have a strategy for financial

8   services at the time, Mr. Shaukat?

9   A.  No.  We had some specific initiatives, like the financial

10  crimes initiative that I mentioned, but we didn't have a

11  comprehensive strategy.

12  Q.  Who did you expect to develop that?

13  A.  The vertical lead that we were hiring.

14          MR. GAGE:  We can take that down.

15  Q.  Can you describe — well, in the beginning of 2018, in

16  March of 2018, were you already considering candidates?

17  A.  March of 2018?  I believe so, yes.

18          MR. GAGE:  I'd like to show the witness an exhibit,

19  D55, but just show it to the witness.

20          THE COURT:  Is there an objection on this document?

21          MS. GREENE:  Yes.

22          MR. GAGE:  Can I just ask a couple of questions,

23  foundational questions, Judge?

24          THE COURT:  Yes, you may.

25  BY MR. GAGE:

NACHRow2                            Shaukat - Cross

Q.  Mr. Shaukat, does this document reflect information that
was shared with you in March of 2018 that related to decisions
you were making about the various vertical lead positions,
including the financial services vertical lead?
A.  It does.

          MR. GAGE:  Your Honor, I would move the admission of
this document.

          MS. GREENE:  Your Honor, we believe that this should
be subject to the same instruction.

          MR. GAGE:  I disagree, your Honor.  I hate to provoke
a sidebar, but it is a very different document.

          THE COURT:  All right.  We'll have to talk over here.

          (Continued on next page)

1           (At sidebar)

2           THE COURT:  All right.  Now, this appears to be a

3    document that's being offered by the defendant and prepared by

4    the defendant.  So tell me how you think this is different.

5           MR. GAGE:  Well, it's different.  It's a document that

6    shows the various people that were under consideration for

7    these various jobs.

8           THE COURT:  OK.  Ms. Greene.

9           MS. GREENE:  That sounds like the truth of the matter

10   asserted.  These various people that were —— and like I said,

11   if it's a limiting instruction for the ——

12          MR. GAGE:  I'm sorry for interrupting.  I'll solve

13   this, Judge.  Can I just use it to refresh his recollection?

14          THE COURT:  Does he say he doesn't remember?

15          MR. GAGE:  No, no, he said exactly that it was a

16   document that reflects the people that he was considering for

17   the various vertical lead positions, including the financial

18   services vertical lead.  I'll just use it to refresh his

19   recollection.

20          THE COURT:  What's your position on that?

21          MS. GREENE:  As long as he's not reading from the

22   document.

23          MR. GAGE:  Like you did?  I mean, I can use a ham

24   sandwich to refresh his recollection.

25          MS. GREENE:  Which document —— we'll come back to that

NACHRow2                          Shaukat – Cross

1   later.

2              THE COURT:  All right.  Yes.

3              MR. GAGE:  I just want to move it along, Judge.

4              THE COURT:  Yes, you may do that.

5              (Continued on next page)

1              (In open court; jurors present)

2              MR. GAGE:  We'll just move this along, Mr. Shaukat.

3         May I continue, Judge?

4              THE COURT:  Yes, you may.

5    BY MR. GAGE:

6    Q.  Mr. Shaukat, were you considering candidates for the

7    financial services vertical lead job in March of 2018?

8    A.  I was, yes.

9    Q.  I'd just like, just for the witness, flip to the second

10   page, and just ask the witness a simple question.

11             Does this refresh your recollection, yes or no, as to

12   the consideration — the candidates that you were considering

13   at the time?

14   A.  Yes.

15   Q.  Were you considering someone named Ranjana Clark at the

16   time?

17   A.  I was.

18   Q.  Were you familiar with Ms. Clark's background and

19   experience?

20   A.  Yes.  She had been a client of mine at McKinsey a decade

21   before.

22   Q.  What was your understanding at the time of Ms. Clark's

23   background?

24   A.  She was an extremely extraordinarily qualified or

25   experienced candidate in the financial services world.  She was

NACHRow2                        Shaukat - Cross

1   the head of what's called transaction banking at a bank called

2   MUFG, which is one of the largest banks in the world.  It's

3   Mitsubishi bank in Japan.  She was the president of the Bay

4   Area for them.  As well previously, she had been in senior

5   roles reporting to the CEO of Western Union, PayPal, Wachovia

6   Bank.  She had been on the list, I think this year, of the 30

7   or 50 most powerful women in banking as well.

8   Q.  Were you at the time also looking at someone named Yolande

9   Piazza?

10  A.  Yes.

11  Q.  And did you have an understanding at the time of what

12  Ms. Piazza's background was?

13  A.  I didn't know her personally at the time, but my

14  understanding had been that she was in charge of what's called

15  fintech, so financial innovation, essentially, at Citigroup,

16  including blockchain and use of cloud.

17          MR. GAGE:  You can take this document down.

18  Q.  Just a couple of questions about something that Ms. Greene

19  asked you about yesterday.

20          Do you remember being asked a number of questions

21  about meetings and email lists, and so on?

22  A.  Yes.

23  Q.  Did you have regular meetings with everyone on your team?

24  A.  Individually, no.

25  Q.  And did you treat Ms. Rowe any differently than anyone on

NACHRow2                           Shaukat - Cross

1   your team?

2   A.  No, exactly the same.

3   Q.  I'd like to move to the point at which —— well, did

4   Mr. Stevens ever reach out to you and ask you to consider

5   Ms. Rowe for the financial services vertical lead?

6   A.  He did.  I believe he requested it as a personal favor.

7               THE COURT:  Excuse me, Mr. Gage, I just want to get a

8   sense of your time.  It's two minutes to 11:00, and I need to

9   give the jury a break and the court reporter.  What are you ——

10              MR. GAGE:  Can I just use those two minutes and

11  then ——

12              THE COURT:  That was my question.

13              MR. GAGE:  If I use my 90 seconds.

14  Q.  And did you do him that personal favor?

15  A.  I did, yes.

16  Q.  Why?

17  A.  I deeply respected Brian Stevens.  He was a peer of mine at

18  Google.  He is a generally very thoughtful person who I work

19  very closely with, and he thought it was worth asking for that

20  personal favor.  We didn't do that very often, so I thought it

21  was worth meeting his request, yes.

22  Q.  Were there any other reasons why you considered Ms. Rowe?

23  A.  No.  As mentioned, I gave her the same opportunities as

24  others who came in, but she got a deeper opportunity because of

25  Brian's request.

NACHRow2                              Shaukat – Cross

1            MR. GAGE:  Your Honor, can we take the break now?

2            THE COURT:  Yes.  How much more do you have with

3    Mr. Shaukat, do you think?

4            MR. GAGE:  Can I just take a few minutes to look at my

5    notes and then tell your Honor?

6            THE COURT:  Yes.  Yes, you can.

7            MR. GAGE:  While the jury's out on the break, or do

8    you want me to do that right now?

9            THE COURT:  Well, actually, it doesn't really matter

10   because I want to give them a break and the court reporter.  So

11   we'll take our midmorning break now, members of the jury, and

12   we'll come back in 15 minutes.  Please do not discuss the case

13   and please keep an open mind.  Thank you.

14            (Jury excused)

15            (Continued on next page)

16

17

18

19

20

21

22

23

24

25

1           (Jury not present)

2           THE COURT:  Please sit down.

3           Do people want to — I have more questions about

4    pending issues.  Do you want to deal with those now?  I don't

5    want to eat up your whole break if you need a break, but I'm

6    trying to keep things moving.

7           What else needs to be decided today?

8           MS. GREENE:  Your Honor, there's one issue that came

9    up, and it relates to Mr. Shaukat's testimony.

10          THE COURT:  Wait a second.  I'm sorry.  I forgot that

11   he was here.

12          I'm sorry, Mr. Shaukat.  I think you need to —

13          THE WITNESS:  Sorry.  I don't know what to do.

14          THE COURT:  I'm sorry.

15          MR. GAGE:  Don't take it personally.

16          (Witness temporarily excused)

17          THE COURT:  OK.

18          MR. GAGE:  Just a comfort break, your Honor, if that's

19   OK.

20          THE COURT:  Sure, sure.

21          MR. GAGE:  I'll stick around.

22          MS. GREENE:  Your Honor, Mr. Gage introduced testimony

23   with respect to Mr. Breslow's cultural fit, his — in the

24   hiring packet, his work on behalf of a lesbian woman, if you

25   recall that testimony.  He's now opened the door with respect

NACHRow2                          Shaukat – Cross

1    to Mr. Breslow's cultural fit and Googliness, as Google refers

2    to it.  There was a motion *in limine* related to a complaint

3    that was directed against Mr. Breslow relating to his cultural

4    fit and of which Mr. Shaukat was aware, and we believe that the

5    door has now been opened, and we should be able to introduce

6    that testimony.

7               THE COURT:  Mr. Gage.

8               MR. GAGE:  It won't shock you, Judge, I disagree.

9    Mr. Breslow ── the purpose for which they want to offer that

10   testimony is to suggest that Mr. Breslow is someone who might

11   discriminate.  The specific evidence they're talking about that

12   was already excluded by Judge Schofield is ── I believe it's an

13   email exchange.  I might be a little off on that.  But it was

14   his assistant who expressed, I believe to Ms. Rowe, some

15   frustration with Mr. Breslow, and they wanted to use that to

16   suggest that Mr. Breslow would somehow discriminate.

17              He's not a decision-maker in this case, and the

18   information that I brought out through Mr. Shaukat related to

19   Mr. Shaukat's decision-making about why he hired him.  And one

20   of the reasons he hired him is because he values the fact that

21   he understood Mr. Breslow is someone who mentored people and

22   tried to develop people.  And there will be testimony in this

23   case from other witnesses that they tried to assist Ms. Rowe,

24   including that Mr. Breslow had a conversation with Ms. Rowe.

25              So what they're offering it to show is precisely the

NACHRow2                         Shaukat - Cross

1    reasons why Judge Schofield said it should be inadmissible, and

2    that has nothing to do with Mr. Shaukat's decision-making

3    because Mr. Shaukat was not aware of and he had no reason to be

4    aware of the evidence they're talking about because it didn't

5    exist for several months, maybe even a year plus.

6         THE COURT:  All right.  I need to see Judge

7    Schofield's ruling on that motion *in limine*.  And I had it

8    right there, and now I don't know where it is.  So if somebody

9    — yes, please.

10        MS. GREENE:  And, your Honor, may I address something

11   in particular?

12        THE COURT:  Yes.

13        MS. GREENE:  I believe Mr. Gage has represented that

14   this also goes and will be evidence related to Mr. Shaukat's

15   selection for the interim role — I'm sorry, Mr. Breslow for

16   the interim role.  Mr. Shaukat was aware of these concerns

17   related to Mr. Breslow before making the decision to put

18   Mr. Breslow in that interim role.  So to the extent they're

19   talking about, you know, positive information that he had

20   available to him about Mr. Shaukat's treatment of a woman that

21   he'd worked with in the past, we should also be able to bring

22   out that Mr. Shaukat was aware of a complaint against

23   Mr. Breslow related to his treatment of a woman with whom he

24   was directly working with under Mr. Shaukat prior to the time

25   he selected Mr. Shaukat for the financial services vertical

NACHRow2                          Shaukat – Cross

1    lead role.

2           And, again, your Honor, it was the subject of a motion

3    *in limine*, but they have now opened the door, and we should be

4    able to present evidence that contradicts that testimony that

5    they've solicited.

6           (Continued on next page)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1              THE COURT:  All right.

2              Which is the motion *in limine* in this order?

3              MS. TOMEZSKO:  I believe the first one, your Honor.

4              MR. CHIARELLO:  Your Honor, I think it's the third

5    part of the second motion.

6              THE COURT:  Okay.  So why don't we take a brief break

7    and come back here a couple minutes ahead of 11:15, and I'll

8    give you an answer.

9              (Recess)

10             THE COURT:  Please be seated.

11             All right.  I agree that the door has been opened to

12   this testimony.  However, I am going to limit it.  I went back

13   and looked at the briefs underlying the motion *in limine*

14   ruling.  And plaintiff did not seek to offer this evidence for

15   the truth of the matters asserted, that Mr. Breslow took these

16   actions, but as evidence probative of Mr. Shaukat's state of

17   mind when considering Mr. Breslow for the FSVL role.

18             So I will instruct the jury accordingly.

19             Yes, Mr. Gage.

20             MR. GAGE:  Shall I have Mr. Shaukat take the stand?

21             THE COURT:  No, because I need a moment to --

22             MR. GAGE:  I'm sorry.

23             THE COURT:  I need a moment to put together the

24   instruction.

25             MR. GAGE:  I'm sorry.

NACVROW3                    Shaukat - Cross

1          THE COURT:  No, no, no.

2          MR. GAGE:  Just trying to save time.

3          THE COURT:  I understand.

4          MR. GAGE:  And for what it's worth, it seems to me

5     from the one you just gave, swap out some objects.

6          THE COURT:  Yes, I don't disagree.  It's just that the

7     one I just gave is on like scraps of paper, and so I just need

8     to put that together.

9          MR. GAGE:  We can sympathize with piles of Post-It

10    notes, Judge.  Also, I don't expect you to need it anytime soon

11    because I need to finish my examination.  To answer your

12    question earlier, I expect 25 minutes, I think.

13         THE COURT:  The problem is if I try to do that while

14    you're --

15         MR. GAGE:  Okay.

16         THE COURT:  I've got to listen.  So I appreciate the

17    suggestion.  Is Mr. Shaukat the only one who will be questioned

18    about this?

19         MS. GREENE:  The document itself?  I mean this subject

20    area?

21         THE COURT:  This subject area.

22         MS. GREENE:  Yes.

23         THE COURT:  Okay.  We don't have a document, right?

24    This is only about testimony?  What is the document?

25         MS. GREENE:  P-39.  I believe it was removed though

NACVROW3                          Shaukat - Cross

1    from what was submitted to you.  We have an electronic version,

2    but no means of printing it off.  We could though put it on

3    your Honor's computer.

4              THE COURT:  It's not in the binder.  Can you put it up

5    there now?

6              MS. GREENE:  Yes.

7              THE COURT:  So what do you want to do about the

8    document?

9              MS. GREENE:  Here it is, your Honor.  I'd like to ask

10   him if it was a document that he received, and note that he's a

11   recipient on it.  Go down to the concerns that were raised

12   about Mr. Breslow, including --

13             THE COURT:  Where?

14             MS. GREENE:  So beginning on the third page of the

15   PDF.

16             THE COURT:  Okay.  8/13 meeting, is that --

17             MS. GREENE:  Correct.  That's the only portion of this

18   document with respect to the concerns that Morgan raised that I

19   intend to call out.

20             THE COURT:  What else is in -- since I haven't seen

21   this before, what else is in this document?

22             MS. GREENE:  Well, the first two pages or the last two

23   pages, I should say, are the concerns that Morgan, who at the

24   time was Ms. Rowe's and Mr. Breslow's assistant, raised with

25   respect to Mr. Breslow.

NACVROW3                        Shaukat - Cross

1          The next portion of the document relates to steps that

2     they were taking to address Mr. Breslow's behavior, including

3     agenda that he would participate, company culture, leadership

4     trainings.

5          And then moving up to the first page, the email from

6     Ms. Rowe making sure that Tariq's in the loop.

7          THE COURT:  All right.

8          Mr. Gage, what is your position on the document?

9          MR. GAGE:  It's just filled with all sorts of hearsay

10    about things that may or may not have happened.  And I think if

11    the jury sees anything, it should only be the email and not

12    that attachment.  It's not being offered for the truth of the

13    matter.

14         And I would also ask, as your Honor is crafting the

15    charge, that when you say to the jury this is not offered for

16    the truth of the matter, in particular we're talking about a

17    complaint.  The fact that it refers to a concern does not mean

18    there was a basis for that concern.  Because this is not

19    offered for the truth.  Counsel has said that.  And so I would

20    ask that in this context, because that's one of the reasons why

21    Judge Schofield kept it out in the first place is because it

22    can be unfairly prejudicial.  I don't think it is, but I know

23    your Honor has ruled.

24         THE COURT:  Okay.  So Ms. Greene, so the document

25    seems to go into other areas that you mentioned steps that are

NACVROW3                     Shaukat - Cross

 1  being taken to address the complaint, so I do not think they
 2  will come in.  They will not come in.
 3          Let's see.  Take me back to page 3.
 4          MS. GREENE:  This page broadly outlines the concerns
 5  that Morgan was raising with respect to Mr. Breslow's behavior
 6  and gives several different examples.  To the extent I would
 7  call out one, it would be with respect to the one about
 8  Ms. Rowe and Mr. Breslow's comments related to Morgan about her
 9  support for Ms. Rowe.  That overlaps with the gender complaints
10  that Ms. Rowe was asserting.  But it's an example of the type
11  of thing.  And it's a question for Mr. Shaukat, having seen
12  this document, did it have any effect on your view of
13  Mr. Breslow, his cultural fit and his qualifications for the
14  financial services vertical lead role.
15          THE COURT:  Point me on page 3 to the part that you
16  were just reading from.  Is it back to the 8/13 meeting?
17          MS. GREENE:  Correct.  That would be the paragraph.
18          THE COURT:  I tell Stuart.  Who's "I"?
19          MS. GREENE:  Morgan.
20          MR. GAGE:  We don't know, Judge.  That's part of the
21  problem with this document.  This document has not been
22  authenticated, particularly this last part.  We don't know who
23  wrote it.  We don't know who the speaker is.  We don't even
24  know who all these pronouns refer to.  It's highly and unfairly
25  prejudicial.

1          MS. GREENE:  I believe that they are Morgan's notes.

2     The point is not who wrote these notes, it's whoever wrote

3     these notes, Mr. Shaukat received them.  It is part of the

4     email string that he received.

5          THE COURT:  Okay.  Well, this document --

6          MR. GAGE:  We don't know that.

7          THE COURT:  This document is unauthenticated, and I do

8     think that it is unfairly prejudicial.  So the witness can be

9     questioned -- the witness can be questioned about the complaint

10    with the appropriate instruction to the jury.

11         MS. GREENE:  Can I, your Honor, question him about the

12    complaint and the first email, which is a correspondence

13    between him and Mr. Shaukat and Ms. Rowe, making sure that he's

14    in the loop?

15         MR. GAGE:  Sorry, what was the question?  And I'll

16    hear the answer.  But Cara, what was the question?

17         MS. GREENE:  Whether I may question him as to the

18    email, that first email, where he's a recipient.

19         MR. GAGE:  The top email.

20         MS. GREENE:  Correct.

21         THE COURT:  What about showing him the email, but only

22    him, to refresh his recollection and then he can testify.

23         MR. GAGE:  I have no problem with her showing him just

24    the email to see if it refreshes his recollection and asking

25    him questions about it.  But I would ask, if you would, your

NACVROW3                          Shaukat - Cross

Honor, to give a very clear instruction to counsel that you

can't read from it.  Because last time when she refreshed

recollection, she read from the document.

       THE COURT:  All right.  So you're okay with her

reading -- no, not reading.  We're going to -- we would show

this document -- I guess it's going to have to be redacted.

       MR. GAGE:  Just that first -- from the top, from Ulku

Rowe down through "Let me know what you think."  I have no

problem with them showing him that and asking him if it

refreshes his recollection about anything.

       MS. GREENE:  Well, your Honor, it's not sufficient

only to refresh his recollection.  If he says he doesn't

recollect, we should be able to show the jury that, in fact, he

did receive this email, even if we're only showing him the

email and not the rest of the document.

       MR. GAGE:  That gets back to the authentication

problem.

       THE COURT:  Yes, we do have an authentication problem.

       MS. GREENE:  I don't understand how we have an

authentication problem when -- first of all, can we look and

see whether an authenticity objection was raised?  But this is

an email that Mr. Shaukat received.

       MR. GAGE:  We don't know that.

       MS. GREENE:  Produced by Google from their Google

systems.  So I'm confused why there's any question as to the

NACVROW3                          Shaukat - Cross

1    authenticity of that first email, which, again, was produced by

2    Google from their systems, where Ms. Rowe is the sender,

3    Mr. Shaukat is the recipient on their Google email addresses.

4              MR. GAGE:  Your Honor, this has not been

5    authenticated.  No witness has testified.  Again, and to the

6    extent that we did or didn't raise authentication, Judge

7    Schofield ruled this out a long time ago, so we didn't think we

8    had to argue about it.

9              Again, I have no problem with them showing that top

10   email to Mr. Shaukat and ask him if it refreshes his

11   recollection; but otherwise we're going down a rabbit hole of

12   something that's wholly irrelevant to the case and potentially

13   unfairly prejudicial.

14             THE COURT:  All right.  So go back to page 3, please.

15             MS. GREENE:  Yes.

16             MR. GAGE:  I would note, your Honor, I'm not even sure

17   that it looks like Morgan is the author of this document,

18   because at the top it says Morgan set up a one-on-one, and then

19   later it uses pronouns in here.  So it's really unclear to me

20   who wrote this thing.

21             THE COURT:  The document is not coming in.  You may

22   question Mr. Shaukat about the complaint.  Both sides are okay

23   with showing it to him without publishing it to the jury; is

24   that right?

25             MS. GREENE:  I'm fine.

1          MR. GAGE:  I'm fine with them showing the email at the

2     top and asking him if it refreshes his recollection about

3     anything.  And then if it -- you know, he can answer questions

4     about it, but I don't think the jury should see the document.

5          THE COURT:  I agree with that.

6          All right.  I just need another minute to work on the

7     instruction.

8          MR. GAGE:  Your Honor, may I take a quick comfort

9     break?

10          THE COURT:  Yes, you may.

11          MS. GREENE:  May I, as well?

12          MR. CHIARELLO:  Judge, can we clarify something about

13     the order you just gave, which is that if we're showing the top

14     portion to Mr. Shaukat, would you like plaintiff to redact the

15     bottom, the rest of that email?  Or if it's just showing it to

16     Mr. Shaukat and not the jury, do we not need to do that?

17          THE COURT:  I believe -- I wish there were a way that

18     I could flip through this, but I don't think there is.  Go to

19     page 2, please.  Okay.  And then the next page.  All right.

20     It's just three pages?

21          MR. CHIARELLO:  I believe it's five pages, your Honor.

22          THE COURT:  Okay.  Mr. Gage, tell me again your

23     position on -- we're only -- you're only showing Mr. Shaukat

24     that this document is not going to be published to the jury.

25     But your position is that he should only be shown the top

1  email?

2          MR. GAGE:  That was my suggestion, yes.

3          THE COURT:  Okay.  Why can't -- what is your argument

4  as to why Mr. Shaukat can't flip through the whole document?

5          MR. GAGE:  I thought your Honor had already ruled that

6  the attachment was not coming in and couldn't be used, and that

7  was the only reason I was suggesting that he see the email.

8  But if your Honor is saying he could be shown the whole thing,

9  show him the whole thing.  I just don't want the jury to see

10 it.

11         THE COURT:  No, of course.  I got that part of your

12 argument.  I can't tell there is an attachment here.

13         MR. GAGE:  It's unclear.

14         THE COURT:  Yes, just because -- well, because also I

15 can't touch it.

16         MR. GAGE:  It's not an attachment.

17         MS. TOMEZSKO:  In fact, the Bates number is different,

18 the handle, which indicates that it is actually a separate

19 document that they have compiled into this document that you're

20 seeing before you.

21         MR. GAGE:  Oh.  So that's a reason why the attachment

22 should not be shown to the witness because I didn't realize

23 that.

24         THE COURT:  I don't know if I can see -- I have

25 something here blocking my view of the Bates number.

NACVROW3                         Shaukat - Cross

1          MR. GAGE:  The sequence of the Bates numbers, let's

2     just go through it, if Mr. Yang could.

3          MS. TOMEZSKO:  It's not the sequence.

4          MS. GREENE:  Your Honor, there's a linked document in

5     this email.  We asked Google to present the linked document,

6     and this was the document that Google sent.  That's why they

7     are together.  Google is the one that represented that this

8     document was the document referenced in the email.  But beyond

9     that, any document can be used to refresh a witness's

10    recollection.  So, you know, to the point that that's all it's

11    being used for, it's either going to refresh his recollection

12    or not.

13         THE COURT:  Mr. Gage, based on that representation

14    from Ms. Greene, the whole document can be shown to

15    Mr. Shaukat, but only to him.

16         MR. GAGE:  Understood, your Honor.  We can just move

17    on.  I can't recall, and I trust counsel's representation on

18    that point, that skipped Bates numbers I had forgotten about

19    since we thought this document --

20         THE COURT:  I'm almost ready now.

21         MR. GAGE:  Shall we have Mr. Shaukat sit then?

22         THE COURT:  Yes, he can sit.

23         MR. GAGE:  Your Honor, I'm going to do my best to

24    finish in 25 or so.

25         THE COURT:  Okay.  All right.  I'm ready.

1            Let's go till 1 instead of 12:45.

2            MR. GAGE:  Mr. Shaukat, I think you can stay where you

3       are.

4            THE COURT:  Ms. Williams, can you please get the jury.

5            THE DEPUTY CLERK:  Sure.

6            THE COURT:  I am not -- no, I'm not going to do this

7       now.

8            (Jury present)

9            MR. GAGE:  May I begin, your Honor?

10           THE COURT:  You may.

11      BY MR. GAGE:

12      Q.   Mr. Shaukat, did you hire someone for the retail vertical?

13      A.   I did.

14      Q.   Who did you hire for the retail vertical?

15      A.   Carrie Tharp.

16      Q.   And at the time you hired her, what was your understanding

17      of Ms. Tharp's background?

18      A.   She had most recently been the chief digital officer at

19      Neiman Marcus, the department store chain.  Previously, she had

20      had a long career in retail and consulting.

21      Q.   I'm going to pivot to another topic.  I think you talked

22      about this yesterday with Ms. Greene.

23           Did there come a time that you understood that

24      Ms. Rowe might leave Google Cloud if she was not given the

25      financial services vertical lead?

NACVROW3                           Shaukat - Cross

1    A.  I believe Brian Stevens had referenced that she was

2    starting to look at other roles outside of Google Cloud, yes.

3    Q.  And to your knowledge, did any of the other four -- any of

4    the other three OCTOs who came into your organization indicate

5    that they would leave if they didn't get the vertical lead

6    role?

7    A.  They did not, no.

8    Q.  Did you want Ms. Rowe to leave?

9    A.  I did not.

10   Q.  Why not?

11   A.  From everything I had heard in my -- from the teams, etc.,

12   I thought that she was very capable in adding value in her OCTO

13   role.  And I was hoping that she would be able to do the same

14   in the financial services role.

15   Q.  Pivot to a different topic.

16         Do you remember you were asked by Ms. Greene about an

17   email that you got from Ms. Rowe where she respectfully

18   declined the role in your organization?  Do you remember that?

19   A.  I do.

20         MR. GAGE:  I'd like to show the witness -- this is a

21   plaintiff's exhibit, so I think the jury can see it, P-24.

22   Q.  If you could just take a moment and take a look at this,

23   Mr. Shaukat.  And then could you -- if you need to see the

24   second page, we can flip to the second page.

25         My question will be, can you tell us what this is?

NACVROW3                        Shaukat - Cross

1    A.  If you don't mind flipping to the second page just very

2    quickly, please.  Oh, okay.  Great.  Thank you.

3            Would you like me to answer?

4    Q.  Yes.  Can you tell us what this is?

5    A.  Yes.  This is an email from myself to Melissa Lawrence, who

6    was Brian Stevens' and Will Grannis's HR business partner, and

7    copying Fiona O'Donnell, who was my HR business partner, that

8    was a response to, I believe, Ulku's response in which she said

9    that she was declining the role on my team.

10   Q.  And so why did you ask Ms. Lawrence for feedback on this?

11   A.  So there was not a change in -- it was unclear to me.  I

12   had interpreted Ulku's "no" back to me as a resignation from

13   Google.  Because to use the term we used yesterday, this was a

14   lift and shift of an entire team from one place to another.  So

15   it was a manager change, as we called it.  By respectfully

16   declining, as I think the words were, it was -- it seemed to me

17   that she may be resigning.  And I wanted to make sure there was

18   no confusion about -- in the communication that accidentally

19   led to the resignation.

20   Q.  And did you ultimately come to a final email response that

21   you sent to Ms. Rowe?

22   A.  Yes.

23   Q.  And I think we saw that yesterday.  We don't need to put

24   that up again.

25           In that communication to Ms. Rowe, did you give her

1    the opportunity to build a team?

2    A.  I believe I did, yes.

3    Q.  And what did you mean when you offered her the opportunity

4    to build a team?

5    A.  Well, she, like the other folks who came over, were being

6    designated the head of that global client technical lead

7    department.  In most cases, that department was just themselves

8    at that point.  So they had the opportunity to build out that

9    team.

10   Q.  And did Ms. Rowe ever do anything, to your knowledge, to

11   take advantage of that opportunity?

12   A.  Not to my knowledge.

13   Q.  I'd like to go to Exhibit P-69, which is a document that

14   you were questioned about yesterday.

15           MR. GAGE:  And Jean, if we could go to on page 133 of

16   this.  Pause there.

17   Q.  I'm going to show you, Mr. Shaukat, this is the entry for

18   July 20th.

19           And now I'm going to ask that we go down to page 135,

20   where it addresses the financial services vertical lead, so you

21   can see it.  There's a name on here, Diana Leyfield.  Was

22   Ms. Leyfield someone under consideration for the financial

23   services vertical lead role?

24   A.  She was.

25   Q.  And what was -- at the time, what was your understanding of

NACVROW3                          Shaukat – Cross

1    Ms. Leyfield's role?

2    A.   She was an internal candidate from Google.  She had run and

3    very successfully built a large payments business for Google

4    starting in India and then in a number of other countries.  And

5    prior to that, my understanding had been she was a CEO of a

6    large bank in Africa, a division of a global bank called

7    Standard Chartered.

8    Q.   And so at the time you were considering her, she was

9    already at Google?

10   A.   She was, yes.

11   Q.   And what level was she?  What was your understanding of her

12   level at the time?

13   A.   I believe she was the vice president.

14              (Continued on next page)

15

16

17

18

19

20

21

22

23

24

25

NACHRow4                        Shaukat - Cross

1    MR. GAGE:  Now, I'd like, Jean, if we could go to

2    page 117 of P69.

3    Q.  We're going to move forward in time, Mr. Shaukat, to

4    August 10.

5         And then now if we can pivot, Jean, to page 118.

6         Now, as of mid-August, Mr. Shaukat, did you have any

7    — did you prefer any of the candidates that were listed here

8    at the time?

9    A.  I don't believe so.  We had agreed to advance Ranjana

10   Clark, who was the first person here, to Diane, Diane Greene,

11   that is.  She had not yet agreed to meet with Ranjana Clark,

12   but there was no frontrunner, per se.

13   Q.  At the time what was your view of the likelihood that

14   Ms. Rowe would get the financial services vertical lead role?

15   A.  As we covered yesterday, I had had some reservations

16   myself.  The feedback that I had received at this time said

17   essentially what was here, was that one of the interview panel

18   had liked her and one had liked her but had some questions.  So

19   I — she was still in contention, but she was not the

20   frontrunner in my mind at this point.

21   Q.  Relative to Ms. Rowe as a candidate, did you have any

22   leanings towards any others?

23   A.  So we had — Ranjana Clark was very high on our list, as

24   was Diana Layfield.  Tais O'Dwyer, who's listed, here

25   originally interviewed for that lead role.  She ended up

NACHRow4                        Shaukat – Cross

1   joining my team as a member of the team, the global client

2   lead, so the nontechnical counterpart, if you will.

3           MR. GAGE:  Now, we could stay on this document.  We're

4   going to come back to it.  You can take the highlight away,

5   Jean.

6   Q.  Yesterday, or could have been today, you were asked some

7   questions about Sebastien Marotte, Jason Martin, and others who

8   interviewed Ms. Rowe.  Were you familiar with them as

9   colleagues at Google?

10  A.  Yes.  They had all reported to me at some point.

11  Q.  And in your experience, did they take their

12  responsibilities seriously when you asked them to interview

13  candidates?

14  A.  Extremely, yes.

15  Q.  Did you ever say or do anything to any of the interviewers

16  that might have led them to not take Ms. Rowe's interview

17  seriously?

18  A.  No.  And we treat the interviews with a high level of

19  confidentiality in general; meaning they're not supposed to be

20  discussed amongst each other until the interview happens.

21  Q.  Do you have any reason to believe that any of those

22  interviewers approached Ms. Rowe's interview differently than

23  they approached any others?

24  A.  I do not.

25          MR. GAGE:  Jean, if we could just go to page 95, just

NACHRow4                          Shaukat – Cross

1   so we can see the date.  So August 31.  Now, if we can just
2   jump to page 97.
3   Q.  Is this table here a list of candidates potentially in the
4   running for financial services vertical lead?
5   A.  Yes.
6   Q.  At the bottom I see a name Jane Fraser.  Who does that
7   refer to?
8   A.  At the time I had forgotten we had talked to her.  At the
9   time, she was CEO of Latin America at Citigroup.  She is now
10  the CEO of Citigroup.
11              MR. GAGE:  We can take this down.
12  Q.  Did there come a point in time that you started to focus on
13  one candidate as your preferred candidate in this process?
14  A.  Yes.  Towards —— I think it was September, October of this
15  year, we decided that Diana Layfield was the likely
16  frontrunner.
17  Q.  I think you testified already —— well, I'll just ask you
18  the question.
19              Did you ever at any point get to a place where you
20  were ready to make an offer to anyone?
21  A.  We had decided on —— by October/November time frame, we had
22  decided on Diana as the candidate we wanted to make an offer
23  to.  We then put that on hold because of some of the
24  organizational changes inside of Google.
25              MR. GAGE:  Right.  Just trying to economize here,

NACHRow4                          Shaukat — Cross

1    Judge.

2    Q.  Mr. Shaukat, do you remember ── you testified earlier about

3    Diane Greene leaving Google.  Do you remember when you first

4    learned that Diane Greene was going to be leaving Google?

5    A.  Mid-October of 2018.

6    Q.  How did you find out?

7    A.  From Diane Greene.

8    Q.  And did you learn who her replacement was going to be?

9    A.  Yes, Thomas Kurian.

10   Q.  At the time did you have an understanding, even generally,

11   about what you might expect from Mr. Kurian as your new boss?

12   A.  I had never met Thomas.  At that time there had been,

13   coincidentally, a number of press releases about him at roughly

14   that same time in prominent magazines and publications in

15   Silicon Valley that described him as an extraordinarily tough

16   boss.

17   Q.  And did that change affect the plans that you had as a

18   leader in the company for your organization?

19   A.  They did, yes.  It did, yes.

20   Q.  How so?

21   A.  So as I had mentioned earlier, my organization was really a

22   strategic build for the ── for the company.  This was not

23   something that many of the cloud providers had at that time.

24   It was really a core pillar of our strategy, and it felt like

25   Thomas, coming from Oracle, which he did, at one of our

NACHRow4                        Shaukat – Cross

competitors, might have a different view of strategy.  And so

as a result, I was quite concerned about two things.  One is

making sure we didn't move forward with individuals who Thomas

may then come and say, no, we no longer need that job.  So I

wanted to make sure of that.  I also wanted to make sure my

team was fairly represented as he joined the company so he

understood what it did.

Q.  Mr. Shaukat, also around this same time you gave some

testimony earlier about a November 7 email that you received

from Ms. Rowe that was sent to you and Diane Greene.  Do you

remember that?

A.  I do.

Q.  I think you testified earlier this morning that that was

the first time, when you got that email, that you understood

that Ms. Rowe was relating her concerns about her level to her

gender, correct?

A.  Correct.

          MR. GAGE:  If we could pull that up.  I have the

defendant's, but —— there we go, P55.  I believe we've seen

this.  If we could go to the bottom email and just highlight

the bottom email so folks can see that.  Thank you, Jean.

Q.  You see where you wrote, "I don't think it is good for her

to have that perception if that is correct."

          Why did you think that?

A.  I mean, in general it seemed to be causing her quite a lot

NACHRow4                         Shaukat - Cross

1   of distress, and if the team had looked into it and resolved

2   it, then I thought that they should communicate the results to

3   her.

4               MR. GAGE:  You can take that down.

5   Q.  Did you want Ms. Rowe to be happy in your organization?

6   A.  Yes.

7   Q.  Ms. Rowe testified about some options that she was given

8   after you asked Mr. Breslow to lead the effort on financial

9   services.  What were the three options that you gave to her?

10  A.  I believe they were — this is after I appointed Stuart as

11  the interim head.  I believe they were she could take the role

12  that we had slotted her into, which is that global client

13  technical lead role with the option of building the team.

14  There was — that was a change.  That was an expansion of the

15  scope that she had had in OCTO, which was an individual

16  contributor role.

17              So I also offered the opportunity to be an IC, to let

18  someone else build the team and not take on managerial

19  responsibilities.  That was the second option.

20              And the third option was that I would essentially help

21  her if she found another role inside of Google that she

22  preferred by — I don't remember if this was in that exchange,

23  but by offering head count for the role, so, in other words,

24  offering the budget for her role so that someone else could —

25  could offer her a position.

NACHRow4                        Shaukat - Cross

1   Q.   When you say offer head count, what does "head count" refer

2   to?

3   A.   So in Google you budgeted on two different dimensions.  You

4   budgeted on operating expense, so marketing costs and travel

5   and things like that, and then you budgeted on head count.  So

6   every team was given a certain number of people that they could

7   hire.  Generally wasn't by level or anything like that.  It was

8   just you get to hire ten people; you get to have ten people on

9   your team.  It was probably the scarcest commodity at Google.

10  People really protected the head count that they had because

11  it's a people-intensive business.  So it's very important.

12  Q.   Like cigarettes in prison, as they say?

13  A.   Yes, exactly.

14  Q.   Did you ultimately end up giving up head count for

15  Ms. Rowe?

16  A.   I did.

17  Q.   And who did you give that head count to?

18  A.   To Will Grannis when she —— and Will made an agreement that

19  she could move back to OCTO in a different role.

20  Q.   And may I assume you had discussions with Mr. Grannis about

21  this?

22  A.   For the most part, he and Ulku sort of sorted it out

23  themselves, and then I said that I would give the head count,

24  which is something I had not previously done for anyone else.

25  Q.   Did you do it for Mr. Kember, Mr. Wilson?

1    A.  I did not.

2    Q.  And when you agreed to let her go back to OCTO, were there

3    any restrictions on what she should be doing in OCTO?

4    A.  Yes.  The industry-specific work had to be done on my team.

5    So by opting to move to a different team, she had to choose a

6    focus area that was not industry-specific.  And I believe that

7    they chose —— she and Will agreed on what's called hybrid

8    cloud, which is basically how do you use the cloud technologies

9    in the cloud as well as on premises in your own data center.

10   Q.  And was Ms. Rowe in any way being punished by the decision

11   that if she went back to OCTO, she had to focus on hybrid cloud

12   instead of focusing on financial services?

13   A.  I don't believe it was a punishment.  In fact, hybrid cloud

14   was one of the major strategic growth paths for the business at

15   the time.  We had just —— either just before or just after

16   launched a number of innovations in that area.  So it was a

17   critical focus area for us.

18   Q.  And did you hope that this would make Ms. Rowe happy?

19   A.  I did.

20   Q.  Just a couple more questions for you, Mr. Shaukat.

21        You were asked about your severance package earlier

22   today.  Were you paid well at Google while you were there?

23   A.  I was, yes.

24   Q.  Do you have an understanding of whether the severance

25   package that you were given was a standard package for someone

NACHRow4                         Shaukat - Redirect

1   at your level?

2   A.   That was my understanding, yes.

3   Q.   Have you told the truth here today?

4   A.   I have.

5   Q.   And yesterday?

6   A.   Yes.

7   Q.   You were here testifying yesterday.

8            And did the separation agreement that you have with

9   Google in any way affect the content of your testimony?

10  A.   Absolutely not.

11           MR. GAGE:   No further questions, your Honor.

12  REDIRECT EXAMINATION

13  BY MS. GREENE:

14  Q.   Mr. Shaukat, I just want to ask you a few follow-up

15  questions.

16           Mr. Gage asked you if you were at all involved in

17  leveling Ms. Rowe, Mr. Eryurek, Mr. Strong, Mr. Wilson.  Do you

18  recall that?

19  A.   I do.  At the time of hiring, yes.

20  Q.   And you said you weren't, correct?

21  A.   As best as I can recall, yes.

22  Q.   Now, at the time that you learned that Ms. Rowe had

23  concerns about being underleveled back in June of 2018, did you

24  yourself do anything or undertake any efforts to see whether

25  Ms. Rowe was underleveled?

NACHRow4                        Shaukat - Redirect

1   A.  No, I asked her hiring manager and his boss to look into

2   it, but apart from that —— or I asked —— I raised the concern

3   with them, but I did not do anything separate.

4   Q.  Did you raise a concern with HR?

5   A.  I did not.

6   Q.  Do you know whether Google's employee relations group has a

7   special category for investigating underleveling complaints?

8   A.  I did not know that.

9   Q.  Now, you were asked about the vice president roles in your

10  organization.  Do you recall Mr. Gage asking you about that?

11  A.  Yes.

12  Q.  And those are the vice president roles other than the VP of

13  financial services that he was questioning you about, correct?

14  A.  I believe Carrie Tharp, in particular, and John Honeycutt.

15  Q.  Before we get there, he was talking about the importance of

16  a vice president being able to articulate vision.  Do you

17  recall testifying about articulating a vision?

18  A.  Yes.

19  Q.  Do you know what questions the interviewers asked of

20  Ms. Rowe in her interviews?

21  A.  I do not.

22  Q.  Do you know whether any of them asked what her vision for

23  financial services were?

24  A.  From the notes that I saw from Jason Martin, it appears

25  that he asked because he has notes about what she would do to

NACHRow4                    Shaukat - Redirect

1    develop a vision, but apart from that, I have no direct

2    knowledge, no.

3    Q.  You don't know whether any of the interviewers gave her the

4    opportunity to articulate a vision, correct, because you don't

5    know what they asked her?

6    A.  As I mentioned, the interviews were confidential, so I do

7    not know what they asked her.

8    Q.  So you don't know whether, in fact, Ms. Rowe did have an

9    articulated vision for the financial services, correct?

10   A.  I — sorry, could you repeat the question.

11   Q.  You did not know whether Ms. Rowe had an articulated vision

12   for the financial services?

13   A.  I had seen no evidence that she had an articulated vision

14   for the financial services, correct.

15   Q.  After that first meeting you had with her when you said

16   that you didn't know her well and she said she'd like to fix

17   that and tried to schedule meetings with you, did you meet with

18   her to give her the opportunity to articulate that vision?

19   A.  I'm sure I've met with her a couple of times as you pointed

20   out yesterday, but I don't recall how many times.

21   Q.  Isn't the first time you met with her September 13, 2018, a

22   month after these interviews had taken place?

23   A.  Again, I don't recall the details of my calendar during

24   that summer.

25   Q.  So Ms. Rowe did not have the opportunity to present you

1    with anything related to her vision or plan for financial

2    services between the time of June and September because you

3    hadn't met with her, correct?

4    A.   Again, I don't know the details of my calendar, but she did

5    not ask for time to present that either, so ——

6    Q.   Is it your testimony that she didn't ask to meet with you

7    in that three-month period?

8    A.   No.  My —— what I was saying is I don't recall the details

9    of my calendar during that time.  The same introductory meeting

10   that I had with her I had with others who did present their

11   vision for this space.  In that meeting she did not say, I have

12   a vision for the space, and I would like to come and present

13   that to you.  I do not recall her saying that, which is

14   something her colleagues had done.

15   Q.   Well, she did say I'd like to meet with you to —— so you

16   can get to know me better more and know what my qualifications

17   are with respect to that specific role.  She did tell you that,

18   correct?

19   A.   I recall her saying that she wanted to meet with me, and as

20   I mentioned, I copied in my assistant to try to schedule those

21   meetings.

22   Q.   It's your testimony that you copied in your assistant to

23   try to schedule meetings with Ms. Rowe during the period of

24   June through September?

25   A.   As we saw in the email you presented yesterday, I plussed

1   in my assistant when she asked, and normally that is an

2   indication that my assistant is to schedule those meetings,

3   yes.

4   Q.  Was that actually with respect to just getting her on your

5   emails?  That wasn't with respect to scheduling meetings,

6   correct?

7   A.  I don't recall the specific.  I think she wanted to get

8   into my — into the staff meetings, and so that was with

9   respect to scheduling meetings, yes.

10  Q.  We can look back at those documents if necessary in just

11  one moment.

12          You talked, though, about Ben Wilson and Jeff Kember

13  coming in with a plan?

14  A.  Yeah.

15  Q.  And who were the vice presidents who ultimately were put

16  into those roles?

17  A.  So for Jeff Kember, it was John Honeycutt who I mentioned

18  in the meeting and entertainment space.  And for Ben Wilson, as

19  I mentioned, we hired two different people.  One was a vice

20  president named Darryl Willis for energy, and one of them was a

21  director named Dominik Wee for manufacturing.  We split that

22  industry into two.

23  Q.  When was Darryl Willis hired?

24  A.  I don't recall.

25  Q.  Well, it was before Mr. Wilson moved into your

1    organization, correct?

2    A.  I don't recall when Darryl joined the company.

3    Q.  Well, Mr. Willis was one of the people that interviewed

4    Ms. Rowe, correct?

5    A.  Yes, later on that summer, correct.

6    Q.  So it's possible that Mr. Wilson didn't get the role

7    because you'd already filled the role, correct?

8    A.  It's possible yes.

9    Q.  Isn't the same also possible with respect to Mr. Honeycutt

10   and Jeff Kember?

11   A.  John Honeycutt joined in November of 2018, so that would

12   not be the case, no.

13   Q.  You knew that Jeff Kember, I think you testified yesterday,

14   was a Level 5 or 6, correct?

15   A.  I thought he was a Level 6 or 7, but yes.

16   Q.  Do you think a Level 6 or 7 could do a Level 10 job?

17   A.  As I mentioned yesterday, I —— if someone internally puts

18   their hat in the ring, I assess them based on —— on what they

19   bring to the opportunity.  And I didn't look at people's levels

20   when deciding whether they could do the job.  I looked at the

21   content of what they discussed with me and made my assessment

22   from there.

23   Q.  You were talking about, in defending your choice of

24   Mr. Breslow, his regulatory connections.  Do you recall that?

25   A.  His regulatory experience, I believe, yes.

1    Q.   And the importance of that, correct?

2    A.   Yes.

3    Q.   Did you know anything about Ms. Rowe's regulatory

4    experience?

5    A.   No, but he was — no, I do not.

6    Q.   So you don't know if she regularly met with the SEC or the

7    CFTC or the Federal Reserve or the European counterparts or the

8    Australian regulatory agencies.  You didn't know at all what

9    her relationships were with the regulators, correct?

10   A.   No, that's not correct exactly.  At Google I oversaw

11   regulatory interactions, and so interactions she had during her

12   time at Google I would have been aware of because it rolled up

13   through me.  That was not the — I have no knowledge of what

14   she did before Google, but during her time at Google, I had a

15   fair amount of oversight over the compliance and regulatory

16   operations.

17   Q.   And so is it your testimony that Ms. Rowe didn't meet with

18   those regulators?

19   A.   No, that is not what I said.  What I said is I would have

20   awareness of who she would have met.  That's different from

21   having relationships, per se.

22   Q.   What do you know about her relationships or meetings with

23   regulators?

24   A.   On occasion client teams would pull all sorts of people

25   into meeting with regulators.  I have a faint recollection, but

1   I couldn't say it's absolutely certain, that while she was in

2   OCTO, she met with both the Australian and, I think, the UK

3   regulators as part of some introduction to cloud types of

4   presentations, but I don't have a specific — she was in the

5   mix because part of the financial — part of talking to

6   regulators about financial services was them understanding the

7   technical capabilities of cloud.  So, at a minimum, she was

8   discussed as somebody who could do that.

9   Q.  You understood that she had that capability; you may not

10  know the full extent of her meetings with regulators?

11  A.  Again, within Google I think I — I don't recall the

12  specifics because it was many years ago, but at the time I

13  would have known.

14  Q.  Didn't regulatory relationships roll up to public policy?

15  A.  To Pablo Chavez, it did, correct.

16  Q.  Is that in your organization?

17  A.  I helped hire Pablo, and I was, I will call it, the

18  executive sponsor, like the business sponsor.  Pablo Chavez

19  reported into, I believe, our legal department outside of

20  cloud.  So I was the cloud lead for regulatory, which is why I

21  hired a role and Mr. Breslow to do that.

22  Q.  With respect to Mr. Chavez, he was the one — the public

23  policy group was the one that had the knowledge of the

24  regulatory relationships because he was the one that rolled up

25  to, correct?  So you would not have had a full picture?

NACHRow4                        Shaukat - Redirect

A.   It rolled up to him, but as I just said, he reported to

another part of Google.  And within the cloud, I was the lead

for regulatory engagement in general.

Q.   Do you know whether Ms. Rowe's performance evaluations

highlighted and called out her regulatory work as something

that was exceeding what others in OCTO were doing?

A.   I — I do not believe I saw her performance reviews, no.

Q.   Would you doubt if Mr. Grannis and others praised her

regulatory work and relationships, that wasn't true?

A.   No, I — financial services is a regulated industry.  It is

hard to work in financial services without having some

experience with regulators.

Q.   And do you know that in March of 2019, while she was still

in your organization, she was appointed to the Federal Reserve

Bank of New York's fintech advisory committee?

A.   Yes, I believe at my recommendation, in fact.

Q.   That's your testimony, that it was at your recommendation?

A.   I believe I was consulted on who should be put forward for

that, and I suggested or someone suggested Ulku, and I agreed.

I can't remember the order of that, but, yes, I was part of the

discussion about whether Ulku should be Google's representative

to — within that committee at the fed.

Q.   So you believe that she was well-qualified to represent

Google with the Federal Reserve Bank of New York?

A.   On technical matters, yes.  I've never doubted, as I

1   mentioned, Ulku's technical qualifications.

2   Q.  Well, let's talk more about the qualifications that you

3   covered with Mr. Gage today.  I want you to look at

4   Plaintiff's 14.

5           Is there an objection to this document?

6           (Counsel confer)

7           MS. TOMEZSKO:  No objection.

8           MS. GREENE:  OK.  We can go ahead and put that up.

9   Q.  This is an email between you and Mr. Stevens from February

10  of 2018, correct?

11  A.  February 2018, yes.

12  Q.  In the bottom email there's a discussion about the 2018 S&P

13  Global Leadership Forum?

14  A.  Correct.

15  Q.  And it's a small group of curated panelists, correct?

16  A.  Correct.

17  Q.  And you reached out to Brian Stevens, correct?

18  A.  Looks like it, yes.

19  Q.  And Brian said, "Could always offer to Ulku or someone else

20  in OCTO," and you answered, "Yes.  Who do you think would be

21  best?  Ulku?"

22          That was your question, correct?

23  A.  Yes.

24  Q.  And Mr. Stevens said, "Ulku, if we feel they must have FSI

25  cred, so start with her."

NACHRow4                           Shaukat – Redirect

1           What is FSI cred?

2   A.   Credibility in financial services.

3   Q.   Do you know if Ms. Rowe did participate in that S&P global

4   leadership summit?

5   A.   I don't recall.

6   Q.   Let's look at another document that we looked at yesterday

7   for a different purpose related to your testimony today.  Let's

8   pull up P16.

9           Now, you mentioned that one of the problems with

10  people coming from OCTO is that they didn't have deep C-level

11  relationships.  Do you recall giving that testimony earlier?

12  A.   Yes.  I don't think I framed it that way, but yes.

13  Q.   And you, I think, testified yesterday that you didn't

14  actually know the nature or extent of Ms. Rowe's C-level

15  relationships, correct?

16  A.   Correct.

17  Q.   In this document, though, when Mr. Stevens, the CTO, was

18  asking you to consider Ms. Rowe for the position, he

19  specifically called out, if we can look at the bottom, "She has

20  great respect from Cx level at the banks."

21          So you did have some knowledge about the deep level of

22  respect that she had from the C-suite, correct?

23  A.   No, I had one line from Brian Stevens suggesting it, but,

24  again, I had an absence of evidence from other sources to that

25  effect.

NACHRow4                          Shaukat - Redirect

1   Q.  And you didn't do anything to fill that absence, correct?

2   A.  I didn't see a need to, no.

3   Q.  Because you'd already decided she wasn't right for the

4   role, correct?

5   A.  She had not come in with the other —— this was not a

6   résumé.  This was a do you have a vision?  What would you do?

7   You've been in here for a couple of years.  You know, let's

8   hear what you have to say.  And she did not, as I said, blow me

9   away with that.

10  Q.  Well, you talked earlier about Mr. Breslow being

11  recommended by Ruth Porat, correct?

12  A.  Yeah.  She was an internal reference, which is different

13  than recommended by, but yes.

14  Q.  OK.  Mr. Stevens actually recommended Ms. Rowe for this

15  role, correct?

16  A.  He asked me to consider her for this role, yes.

17  Q.  He said she's really calibrated and has the right

18  connections, correct?

19  A.  That was his opinion, yes.

20  Q.  You mentioned Carrie Tharp?

21  A.  Carrie Tharp.

22  Q.  Yeah.  She was actually hired in August of 2019, correct?

23  A.  I don't recall the date that she was hired.

24  Q.  And that was after Ms. Rowe had obtained legal counsel and

25  approached Google about her concerns, isn't that right?

NACHRow4                          Shaukat - Redirect

1    A.  I don't know when Ms. Rowe got legal counsel or approached
2    Google.
3    Q.  Were you given a litigation hold at that time?
4    A.  I got, as I mentioned, a lot of litigation holds.  I don't
5    recall if I got one specifically for this or not.
6    Q.  Given your involvement in the case, would you expect you
7    would have gotten a litigation hold at that time?
8              MR. GAGE:  Object.
9              THE COURT:  Sustained.
10   Q.  Let me ask you a different question.
11             How long do interviews for a high-level VP role
12   typically last?
13   A.  Thirty to 45 minutes would be typical.
14   Q.  You were asked if you had any reason to believe that those
15   interviews were not typical, correct?
16   A.  I don't remember that, but I don't believe they were
17   atypical.
18   Q.  Did Sebastien Marotte's email saying it was only 30
19   minutes, that caveat, suggest to you that maybe it wasn't the
20   fulsome interview that would be necessary for him to reach a
21   conclusion as to Ms. Rowe's qualifications?
22   A.  No.  As I just mentioned, 30 to 45 minutes would not be
23   atypical.  I think that he said that he was open to other
24   people, like, getting to a different conclusion, which is
25   different.

NACHRow4                        Shaukat - Redirect

1   Q.  Is it typical for interviewers to not in any form or

2   fashion give any feedback into the gHire system?

3   A.  Unfortunately, it was.  Yes, it was not the most easy to

4   use system, and people tended to fill it out only when an offer

5   was about to be made or their cases were being closed out.

6   Q.  Is it typical not to send any written communications about

7   the review on a candidate?

8   A.  Honestly, you'd have to ask recruiting.  I got most of my

9   feedback through recruiting, and I don't know if that was

10  verbal or written typically.

11  Q.  Do you know whether Diane Layfield had gHire feedback?

12  A.  I don't recall if she did or not.

13  Q.  Do you know if Ranjana Clark had gHire feedback?

14  A.  Again, I don't recall if she did or not.

15  Q.  Do you know if Tais Dwyer had it?

16  A.  Tais O'Dwyer?  No, I don't know if she had it either.

17  Q.  You understood that as of November 7, that Ms. Rowe was

18  raising a complaint of gender bias, correct?

19  A.  Through that email, yes.

20  Q.  And that was before you decided to have Mr. Breslow take on

21  the interim role, correct?

22  A.  As we established, I think, yesterday, I had started

23  considering putting in Stuart in October/November of that year,

24  and then I officially announced it in January subsequent to

25  that, yeah.

NACHRow4                    Shaukat - Redirect

1   Q.  When we've heard two different versions of that story?

2   A.  Yes, I can explain, if you would like me to explain, the

3   different versions of that.

4   Q.  You want to — no, I mean, I think the jury heard for

5   themselves your absolutely contradictory testimony on a very

6   straightforward question.

7   A.  It was, unfortunately, not a straightforward —

8        THE COURT:  Ms. Greene.

9   A.  So I can explain, if you would like, the apparent

10  contradiction that is not, in fact, a contradiction.  I'm happy

11  to do so.

12       THE COURT:  I think you've opened the door to that

13  now.

14  Q.  Sure.  Please explain.

15  A.  So as we just heard, in October I found out that Diane

16  Greene was leaving Google; Thomas Kurian was coming into

17  Google.  At the time in my staff meeting, I had 25 people

18  reporting in to me or coming in to my staff meeting.  One of

19  the things that we had to do was clean up my direct reports.

20  So that did not mean that we were appointing anyone officially.

21  It was what we call a span breaker.

22       So as a part of my direct report line in here, I also

23  in financial services had Leonard Law, who is our product

24  manager for financial services, as an example, attending my

25  staff meetings at this time.  So there were numerous people who

NACHRow4                          Shaukat - Redirect

1    would eventually report to somebody who were in my staff

2    meeting.  I made a decision in October, for what I thought was

3    the good of the organization to be able to show to Thomas that

4    we were not ── that we were running a disciplined organization,

5    to put Stuart in as a span breaker to help me reduce the number

6    of direct reports and to make it look like it was a coherent,

7    lack of a better word, organization.

8            What was implied yesterday was that I then shut down

9    the searches for Ranjana Clark or Diana Layfield, which was not

10   true.  We assumed that this would be a very temporary

11   appointment as interim, and Diana Layfield was still somebody

12   that we were planning to hire.  We only reversed that decision

13   later on in December.  I believe November/December after I met

14   Thomas, and that's when we decided that the Stuart interim

15   appointment would go on longer than we had initially said.

16           So I got confused between the span breaker versus the

17   other.  In my mind, those are two separate appointments,

18   essentially.

19   Q.  OK.  So before you told Ms. Rowe that she was not getting

20   the job, you had decided that Mr. Breslow was going to perform

21   it on an interim basis, correct?

22   A.  Until I had gotten an opportunity to meet with Thomas

23   Kurian, yes.

24   Q.  And you didn't tell Ms. Rowe that, correct?

25   A.  Correct.

1    Q.   Then after, you decided to make it more permanent, correct?

2    A.   After Thomas said he was not willing to invest in financial

3    services beyond financial crimes until further review, and that

4    review would happen in January or February of 2019 at that

5    point, and so at that time I decided it would be unfair to

6    Ms. Layfield to offer her the job given so much uncertainty and

7    to extend Stuart into the interim lead for a longer period of

8    time.

9    Q.   How long was he the interim lead?

10   A.   To my knowledge, until he left Google, which would have

11   been in 2020, because as, in fact, the strategy evolved, we

12   ended up focusing purely on financial crimes and financial

13   services during that time period.

14   Q.   Google was still doing work elsewhere on financial

15   services, weren't they?

16   A.   Google had sales efforts in financial services, yes.

17   Q.   And so that was still work that was necessary, in fact,

18   important to business development with respect to financial

19   services, correct?

20   A.   Yes.  But it's important to understand the nature of my

21   team, and my team is not a sales team.  So we were not involved

22   with that work typically.

23   Q.   Did you tell Ms. Breslow —— I'm sorry, Ms. Rowe, at the

24   time that you told her she wasn't going to get the job was

25   because you wanted to focus on someone who had more business

1    development?  Was that the reason you gave her?

2    A.  I don't believe I gave her that reason, no.

3    Q.  Let's look at Plaintiff's 67.

4            Do you recognize this document?

5    A.  I do.

6    Q.  I want to draw your attention to that first paragraph where

7    you said "I told Ulku the following."

8    A.  Uh-huh.

9    Q.  And you say:  "I think in finserv we will likely be looking

10   for someone with more sales and business development

11   orientation."

12           That's what you told her in that meeting, correct?

13   A.  That's what this says, likely in the future, as the

14   strategy evolved, that that's what we would be looking for,

15   yes.

16   Q.  That's what you said to Ms. Rowe and documented here,

17   correct?

18   A.  Yes.

19           MS. GREENE:  No further questions.

20           MR. GAGE:  Just briefly, your Honor, a couple of

21   points.

22           THE COURT:  Yes.

23   RECROSS EXAMINATION

24   BY MR. GAGE:

25   Q.  Almost done, Mr. Shaukat.

NACHRow4                          Shaukat - Recross

1              When Ms. Greene got back up here, she began with one

2      of her first questions suggesting that the first time you met

3      with Ms. Rowe was in September.

4              Can we bring up P16, please, on the screen.  Let's

5      see.  Could you highlight in the middle email there, May 8,

6      2018.

7              "I met with her once in a very exploratory fashion."

8      Does this suggest you met with her before September?

9      A.  Yes.

10     Q.  And when does this suggest you met with her?

11     A.  Either in very early May or, I would assume, April or March

12     before that.

13             MR. GAGE:  We can take this down.  Can we go to P30,

14     please.

15     Q.  You see this is an email that Ms. Rowe sent to you on

16     July 1?

17     A.  Yes.

18     Q.  In this email, Ms. Rowe asks you for help to get started.

19     You see that?

20     A.  Yes.

21     Q.  Then at the top above that, you respond to her saying:

22     "Sounds great.  Look forward to connecting."

23             And Jess Murphy-True is on the "to" line here.  Who is

24     she?

25     A.  She was my assistant.

NACHRow4                              Shaukat – Recross

1   Q.  Why'd you add her to this?

2   A.  She's responsible for all scheduling and managing my

3   calendar, so she was —— this is my way of telling her to please

4   go ahead and schedule.

5   Q.  Does this suggest to you that you met again with Ms. Rowe

6   before September?

7   A.  It suggests certainly that that was my intention.  Whether

8   I met again, I don't remember the calendar for that summer.

9            MR. GAGE:  You can take that down.

10  Q.  Just one last question.

11           In your experience, Mr. Shaukat, is the length of an

12  interview for a senior role at Google in part a function of how

13  much information the candidate has to share?

14  A.  Yes.

15           MR. GAGE:  Thank you.

16           No further questions, your Honor.

17           MS. GREENE:  Your Honor, before we dismiss with the

18  witness, may we have a short sidebar?

19           THE COURT:  Yes.

20           (Continued on next page)

21

22

23

24

25

1              (At sidebar)

2              MS. GREENE:  I neglected to ask Mr. Breslow about ——

3     Mr. Shaukat about his knowledge of Mr. Breslow's concerns.  It

4     just wasn't in my outline after the late ruling.  I'd like to

5     be able to just ask him three questions related to that.

6              MR. GAGE:  I strenuously object.  Excuse the adverb,

7     Judge, but that's not the way trials work.  She can't go beyond

8     the scope of what I asked him about.  That's not the way trials

9     are conducted.

10             MS. GREENE:  Alternatively ——

11             MR. GAGE:  She didn't do it.  There are other

12    witnesses I presume she may ask about this, but that was ——

13    that is not Google's problem.

14             MS. GREENE:  Alternatively ——

15             MR. GAGE:  I was very careful in narrowing the scope I

16    asked about.  She can ask about the two things I discussed.

17             MS. GREENE:  Alternatively, there are two other

18    witnesses who could testify that Mr. Shaukat had been given

19    notice of this, one being Mr. Breslow and one being Ms. Rowe.

20    So we could ask them, but it would make sense to ask

21    Mr. Shaukat while he's here on the stand.

22             MR. GAGE:  No, it doesn't.  Ms. Rowe can come back on

23    rebuttal if she wants.  That's the way trials work.

24             MS. GREENE:  Yeah.

25             THE COURT:  Yes.

NACHRow4                            Shaukat – Recross

1              MR. GAGE:  OK.

2              THE COURT:  Wait.  Who was the other person?

3              MS. GREENE:  Mr. Breslow.

4              THE COURT:  Yes, we're going to move on now.

5    Mr. Shaukat is finished.

6              MS. GREENE:  OK.

7              (Continued on next page)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

NACHRow4

1              (In open court; jurors present)

2              THE COURT:  All right.

3              MR. GAGE:  May Mr. Shaukat leave?

4              THE COURT:  Yes, he may.

5              Mr. Shaukat, you're excused.

6              THE WITNESS:  Thank you, your Honor.

7              (Witness excused)

8              THE COURT:  Now, because there was a longer break this

9      morning, we were thinking about going until 1:00 before

10     breaking for lunch.  But does that make sense?  It's now almost

11     quarter of 1:00.

12             MR. GAGE:  I would suggest breaking for lunch now,

13     letting the jury go to quarter after, or whatever.

14             THE COURT:  I think we need —— because I need to talk

15     to you all, I think we need a bit of a longer lunch break

16     today.

17             So it is now 12:43.  We will be back in here at 1:30.

18     I would remind you:  Please keep an open mind.  Do not talk to

19     each other about the case.  Do not talk to anybody else about

20     the case.  Do not do any research into the case.  And please

21     steer clear of the public restrooms and avail yourselves of the

22     facilities in the jury room.  I hope you have a good lunch.

23             Thank you.

24             (Jury excused)

25             (Continued on next page)

NACHRow4

```
 1              (Jury not present)
 2              THE COURT:  All right.  You may be seated.  I just
 3    have a few questions for you about pending issues.
 4              So first about Ms. Florissi.  The New York equal pay
 5    claim and in the second amended complaint is quite broad.  For
 6    the sake of argument, if the jury found that Ms. Rowe was not
 7    paid less for equal work in the years 2017 through when she
 8    began reporting to Ms. Florissi, could it then find that
 9    Ms. Rowe was paid less for equal work in the last year?
10              MR. GAGE:  If you're asking hypothetically, your
11    Honor, could the jury make those distinctions and say yes in
12    one year, no in another year?  I suppose they could.  I don't
13    think the evidence will show that, but I suppose they could
14    because she is seeking damages for that entire period of time.
15    And so it is her burden, Ms. Rowe's burden, to prove that
16    during this period of time, up until the end of the period of
17    time for which her expert is calculating damages, she needs to
18    prove that she was doing equal work to men who were paid more.
19              THE COURT:  So, Ms. Greene, you want me to state the
20    proposition again?
21              MS. GREENE:  I can read it here, your Honor.
22              That's just a fundamental misunderstanding of the law.
23    Ms. Rowe has pointed to two comparators for the purposes of the
24    New York equal pay law:  Nick Harteau and Stuart Breslow.  The
25    question is whether she was performing substantially similar
```

1    work to them and being paid less for that.  Once she

2    establishes that, so long as she remains in that role, the

3    damages accrue.

4          It's not about looking at other people.  That's why

5    the law recognizes that there's an equal pay law claim where a

6    predecessor was performing the same role for more money.  The

7    fact that Google now brought in other people and otherwise does

8    not change the fact that Ms. Rowe was paid less than

9    Mr. Harteau and Mr. Breslow, and that is a continuing

10   disadvantage to her and continuing damages.

11         So her comparison to anybody other than Mr. Breslow

12   and Mr. Harteau is completely irrelevant and has nothing to do

13   with the assessment of damages.  That's just the law.

14         THE COURT:  All right.  Well, you responded to

15   Mr. Gage, but I'm not sure that you answered my question.  If

16   the jury found that Ms. Rowe was not paid less for equal work,

17   not paid less for equal work, from 2017 through when she began

18   reporting to Ms. Florissi in April 2022, I believe, could the

19   jury then find that Ms. Rowe was paid less for equal work in

20   the last year?

21         MS. GREENE:  Respectfully, those aren't claims we've

22   asserted, so it's not something we've asked the jury.  It's not

23   something we've alleged in our complaint.  It's not in the jury

24   instructions.  It's not in the verdict form.  So, again, our

25   claim is one that's predicated on Mr. Harteau and Mr. Breslow.

NACHRow4

 1    If the jury finds that she's not performing equal work and not

 2    entitled to equal pay, the claim no longer exists.

 3                THE COURT:  Mr. Gage.

 4                MR. GAGE:  Needless to say, I completely disagree with

 5    Ms. Greene's characterization of the law.

 6                Let me explain it this way:  Ms. Rowe is claiming that

 7    her comparators were doing, let's call it, X, Y, and Z, and

 8    she's claiming she was doing X, Y, and Z.  She needs to prove

 9    that she was doing X, Y, and Z for the entire period that she's

10    claiming damages, because let's assume, for example, that

11    Mr. Harteau and Mr. Breslow were doing X, Y, and Z and she

12    proves in 2017 and 2018 she was doing X, Y, and Z, but she

13    doesn't prove in 2019, 2020, 2021, '22, '23.  If all the jury

14    sees is she did X, she is absolutely not entitled to damages

15    under any statute I'm aware of.  It is her burden to prove, for

16    the entire period for which she's seeking damages under

17    New York's fair pay law, that she was doing substantially

18    equal, not substantially similar, substantially equal work to

19    her comparators.

20                THE COURT:  All right.  I think this goes to the next

21    question I was going to ask which relates to Section 198 of the

22    New York Labor Law.  It permits an employee to recover the full

23    amount of any underpayment, all reasonable attorney's fees,

24    prejudgment interest, plus the potential for liquidated

25    damages.  If Ms. Rowe prevails, isn't it for the jury to decide

NACHRow4

1   how much she was underpaid by each year?  Doesn't the jury need

2   Ms. Florissi's testimony to assess that for the past year?

3              MR. GAGE:  Absolutely.  And it relates to Google's

4   defense to the fair pay claim, which is that even if she can

5   prove that she was continuously doing X, Y, and Z in my

6   hypothetical, that Google had reasons other than gender, bona

7   fide reasons other than gender, for paying her differently.

8   And there's already been ample evidence of that, and there will

9   be more, including from Ms. Florissi.

10             MS. GREENE:  Your Honor, Ms. Florissi is not the

11  proper person to whom to bring in Ms. Rowe's compensation,

12  which is the only thing that is relevant with respect to 2022

13  and 2023.  Nondiscriminatory reasons are not a defense under

14  the New York equal pay law.  There are very narrow and very

15  explicit defenses.  It has to be job related, it has to be paid

16  on business necessity, and it has to be a bona fide need.  They

17  do not have a production-based system.  They do not have a

18  performance-based system as the law defines that.  They do not

19  have a tenure system, a seniority-based system.  So they only

20  can rely on that fourth affirmative defense which requires a

21  bona fide nondiscriminatory reason that's job related and

22  consistent with business necessity.  So, you know, that's the

23  defense.

24             And, your Honor, yesterday in Ms. Rowe's —— or

25  Mr. Gage's opening, he made a factually inaccurate statement of

NACHRow4

1   the law to the jury when he said the law doesn't require equal

2   pay, it only requires equal opportunity.  That's not the case.

3   The law requires equal opportunity —— I'm sorry, equal pay when

4   it's established that two people in two different categories

5   that are protected by the law are being paid differently for

6   substantially similar work.  How Ms. Rowe is performing as

7   compared to Level 9s or Level 8s in 2023 is not relevant to

8   whether Ms. Rowe is still performing the same job that she was

9   performing back in 2017, in 2018 when the pay disparity

10  manifested.

11             THE COURT:  All right.  At this point Ms. Florissi, if

12  she comes, would not be coming tomorrow, right?

13             MS. GREENE:  That's correct.

14             MR. GAGE:  I assume plaintiff's case will still be

15  continuing, your Honor.

16             But just to make the record clear, Ms. Florissi is not

17  —— we do not intend to call her to testify about Ms. Rowe's

18  compensation.  We are calling her to testify about what

19  Ms. Rowe has been doing during the time that Ms. Florissi has

20  supervised her.  It will be a continuation of testimony that

21  plaintiff's counsel has not disputed that Mr. Grannis is going

22  to give about the things that Ms. Rowe has been doing.  And

23  we've heard her testify about what she's been doing, and he's

24  also going to testify about things she hasn't been doing.  And

25  Ms. Florissi is just going to pick up as of that point when she

1    took over, which is a continuing period for which the plaintiff

2    is seeking damages.

3              Second, the defense under the fair pay law absolutely

4    contemplates this.  It absolutely contemplates this.  And this

5    testimony from Ms. Florissi and Mr. Grannis will absolutely

6    demonstrate the bona fide non-gender-related reasons that we

7    will be able to argue to the jury are absolutely consistent

8    with business necessity given what the Office of the Chief

9    Technology Officer at Google Cloud does.  And Ms. Rowe has not

10   been doing part of her job for a long time, and counsel just

11   doesn't want the jury to hear that.

12             THE COURT:  All right.  I'm going to move on now to

13   the Bennett issue.

14             So a court in evaluating a plaintiff's case of

15   discrimination may consider evidence of discrimination faced by

16   other employees at the company.  But that evidence of other

17   employees' discrimination typically, if not always, comes in

18   through those other employees' testimony; through the testimony

19   of relevant personnel, such as HR and those directly

20   responsible for hiring, promotion, and other such decisions;

21   and other individuals who are specially situated to speak to

22   those other employees' circumstances.

23             Do you have any authority in which the court allowed

24   the plaintiff's own testimony to come in regarding those other

25   employees' discrimination in order to support the

NACHRow4

1  plaintiff's discrimination claim?

2          MS. GREENE:  Your Honor, I've not looked into that for

3  the reason that what we've offered is not with respect to

4  discrimination Ms. Bennett has experience.  Ultimately, I think

5  the jury will be able to draw that inference.  Her limited

6  testimony is about when she found out Ms. Bennett was a Level 7

7  and the circumstances surrounding that.  Other witnesses, I

8  think you noted those responsible for hiring, promotion, and

9  other such decisions, are going to be asked about Ms. Bennett

10  and will be able to give testimony around Ms. Bennett's

11  treatment.  Other observers, other witnesses to Ms. Bennett's

12  testimony will be able to give treatment.  We're not asking for

13  Ms. Rowe to be able to testify that Jenn Bennett was

14  discriminated against.

15          THE COURT:  So why ── I know, Mr. Gage, just a moment.

16  We have to resolve the extent to which other witnesses are

17  going to be questioned about Bennett, but to the extent other

18  witnesses are questioned about her, why do you need that from

19  Ms. Rowe?

20          MS. GREENE:  Because it goes, your Honor, to

21  Ms. Rowe's understanding about what the leveling picture looked

22  like in OCTO.  There were five men at Level 9.  There were two

23  women in that group.  One was an 8, one was a 7.  It was

24  relevant to the assessment of, hmm, maybe gender has something

25  to do with this, and that's important testimony.  We've not

NACHRow4

1   been able to touch that testimony yet because of awaiting, you

2   know, the Court's decision on Jenn Bennett.

3          But it motivated Ms. Rowe in terms of her belief that

4   gender was a part of this, and that's — and what the

5   composition was of the group.  It's as straightforward as that.

6   And, again, we don't need to state specifically what

7   Ms. Bennett said to Ms. Rowe.  You know, that's the hearsay

8   concern that there was.  We're happy to take that out.  But,

9   again, in the context of an offer of proof, it's our offer of

10  proof as to what the circumstances would be and what

11  Ms. Bennett said and what Ms. Rowe understood as of that time.

12          THE COURT:  All right.  Mr. Gage.

13          MR. GAGE:  And I must confess, your Honor, I don't

14  remember specifically — we're looking at the transcript right

15  now — but I don't recall counsel ever making this proffer

16  before Ms. Rowe got off the stand.  Ms. Rowe is off the stand.

17  And so as trials work, if she puts on a rebuttal case, she can

18  only respond to evidence that Google presents in its case.  So

19  that's one issue.

20          Second issue is because Ms. Rowe's now off the stand,

21  we're really only talking about whether or not counsel can ask

22  other witnesses that she's calling about Jenn Bennett's

23  circumstances, and they clearly cannot offer any testimony

24  about what was in Ms. Rowe's head at any point in time, to the

25  extent that that's even relevant.

NACHRow4

<table>
<tr><td>1</td><td>THE COURT:  I don't think that's what Ms. Greene is</td></tr>
<tr><td>2</td><td>intending or hoping to do with the other witnesses, but go</td></tr>
<tr><td>3</td><td>ahead.</td></tr>
<tr><td>4</td><td>MR. GAGE:  But that's what I'm unsure of, your Honor.</td></tr>
<tr><td>5</td><td>Since Ms. Rowe is already off the stand and can't talk about</td></tr>
<tr><td>6</td><td>the effect that that email had on her, the listener, so now</td></tr>
<tr><td>7</td><td>we're talking about some other purpose.  And so counsel says</td></tr>
<tr><td>8</td><td>she's not offering it for the truth of the matter, and so now</td></tr>
<tr><td>9</td><td>I'm completely confused about what counsel is intending to do</td></tr>
<tr><td>10</td><td>with this exhibit that relates to Jenn Bennett with any of the</td></tr>
<tr><td>11</td><td>other witnesses that are called.</td></tr>
<tr><td>12</td><td>THE COURT:  All right.  Ms. Greene, why don't you tell</td></tr>
<tr><td>13</td><td>us.</td></tr>
<tr><td>14</td><td>MS. GREENE:  I'm not sure what the reference was to</td></tr>
<tr><td>15</td><td>the exhibit you were talking about, Mr. Gage.</td></tr>
<tr><td>16</td><td>MR. GAGE:  Reference to what?</td></tr>
<tr><td>17</td><td>MS. GREENE:  The exhibit that you're referencing.</td></tr>
<tr><td>18</td><td>MR. GAGE:  I thought we were talking about a document</td></tr>
<tr><td>19</td><td>that relates to a conversation that Ms. Rowe had with</td></tr>
<tr><td>20</td><td>Ms. Bennett and learning about ——</td></tr>
<tr><td>21</td><td>THE COURT:  We're talking about the offer of proof.</td></tr>
<tr><td>22</td><td>MS. GREENE:  Correct.</td></tr>
<tr><td>23</td><td>THE COURT:  Which you referenced.</td></tr>
<tr><td>24</td><td>MS. GREENE:  We have not waived because we brought the</td></tr>
<tr><td>25</td><td>issue up, and you were reserving judgment.</td></tr>
</table>

NACHRow4

1          MR. GAGE:  I guess, your Honor, I'm unclear what we're

2    talking about, then.

3          MS. GREENE:  We presented the offer of proof at the

4    appropriate time, and the Court was reserving judgment on that

5    issue, and so that's where we are at this moment in time.

6    We're not seeking to show Ms. Rowe any document and bring her

7    up.  We've offered an offer of proof in response to your

8    Honor's judgment on that issue.

9          THE COURT:  Was this raised for the first time

10   yesterday morning, yesterday morning before we brought the jury

11   in?

12         MS. GREENE:  Your Honor, the days have run together.

13   I would have to look back at the transcript.

14         THE COURT:  So you're representing that she was still

15   on the stand when this came up?

16         MS. GREENE:  Yes, your Honor.

17         MR. GAGE:  OK.  My apologies for that, your Honor.

18         THE COURT:  That's OK.

19         MS. GREENE:  That's why we offered an offer of proof,

20   because she was not permitted to testify as to that issue.

21         MR. GAGE:  I'm just unclear on what it is specifically

22   counsel wants to introduce into evidence.  Is it something

23   about Jenn Bennett's leveling, the underlying decision, or is

24   it something different?  I'm unclear on that.

25         MS. GREENE:  We've made an offer of proof.

NACHRow4

1            MR. GAGE:  I apologize.  I don't have it in front of

2      me.  Can you just tell me what it is.

3            THE COURT:  You know what, actually, you were going to

4      modify it anyway, Ms. Greene.

5            MS. GREENE:  Right.

6            THE COURT:  So why don't you do that so we can all see

7      where this currently stands.

8            And then I think the other issue is that Ms. Greene is

9      hoping to ask other witnesses about Jenn Bennett, correct?

10           MS. GREENE:  Yes, your Honor.

11           MR. GAGE:  So I assume, but I just don't ——

12           THE COURT:  But I don't think —— all right.  Rather

13     than speculate, I'm going to ask Ms. Greene to tell us what she

14     intends to question these other witnesses on relating to

15     Ms. Bennett.

16           MS. GREENE:  Your Honor, Ms. Bennett's leveling

17     packet, which relates to the testimony of Will Grannis and

18     Brian Stevens, who is a defense witness, who were the two

19     people involved in that leveling decision, there are things

20     said in that document and about her hiring that are indicia of

21     bias, bias by the decision-makers.  That is relevant and

22     probative to Ms. Rowe's establishing bias.

23           There are —— there's testimony from other witnesses

24     about their understanding and belief that Ms. Bennett was at

25     least a Level 8, if not higher.  And, again, it wasn't

NACHRow4

1    transparent.  Nobody knew their roles.  But they believed her

2    to be performing that role.

3         There's reference in the investigative notes about

4    Ms. Bennett and the leveling decision relating to Ms. Bennett.

5    It's all over.  The fact that defense hasn't picked up on it in

6    the documents and the testimony of these witnesses, it's still

7    there, and it is — it is powerful evidence that there was a

8    double standard that decision-makers applied with respect to

9    men and women.

10        MR. GAGE:  Your Honor, I am familiar with the

11   exhibits.  I know and it has always been an issue in the case,

12   which is why we're arguing it right now.

13        Clearly, Ms. Greene wants to litigate Google's

14   decision to level Jenn Bennett.  It's a different decision, and

15   there's nothing about that document that suggests bias.

16   Ms. Bennett was a manager-level employee at GE at the time she

17   came in, and they made a thoughtful decision about how to level

18   her.  And counsel is just trying to distract from the central

19   issues in this case, which are the leveling decisions of

20   Ms. Rowe.  And it is not relevant, and to the extent that it

21   has any relevance, it's unduly prejudicial and confusing for

22   the jury to put Google in a position of now having to go down a

23   rabbit hole of explaining yet another leveling decision and

24   taking more time in the course of this trial.  She was leveled

25   for perfectly legitimate nondiscriminatory reasons.

NACHRow4

1          THE COURT:  All right.  Ms. Greene, can we get that

2     list of all witnesses where this issue is arising and any

3     documents relating to Ms. Bennett.  I'm sure it's all in the

4     joint pretrial order, but if you could highlight for me any

5     documents that are in dispute where Ms. Bennett is raised.

6          Mr. Gage, are you saying that discrimination against

7     other employees, alleged discrimination, cannot be considered

8     as part of this case?

9          MR. GAGE:  There is no alleged discrimination ——

10          THE COURT:  Well, she's trying to ask about ——

11     Ms. Greene is trying to ask about the leveling decision on

12     Ms. Bennett because she suspects that —— or she's trying to

13     show that discrimination was involved in setting her at a

14     Level 7.

15          MR. GAGE:  I don't think —— I don't think it's

16     relevant, your Honor, and I think there's plenty of case law.

17     As I said earlier, there is case law that stands for the

18     general proposition that "me too" type of evidence may be

19     admissible.  It may be admissible.  But there isn't a

20     sufficient connection here.  There's never any suggestion by

21     anyone, except Ms. Rowe's counsel, that there was something

22     wrong with Ms. Bennett's leveling, not to mention, your Honor,

23     the plaintiff in this case has consistently taken the position

24     that the only comparators the jury should hear about are the

25     five Level 9s.

NACHRow4

1          Plaintiff's counsel has consistently opposed Google's

2     efforts to show people who were similarly situated to her, the

3     Level 8s.  Counsel is, even I suspect, going to suggest there

4     should be a limiting instruction about that, that, oh, you

5     can't consider it for —— because counsel thinks it should all

6     be about the 9s, and then they want to say, selectively, we

7     want to also do this too.  It goes down another rabbit hole and

8     unnecessarily continues the case on something that's not

9     probative of the reasons why Ms. Rowe was Level 8.

10          THE COURT:  So, wait, there was no motion practice on

11     this, no motion *in limine*?

12          MS. GREENE:  There was not.  Your Honor, I want to

13     just point you to one exhibit ——

14          THE COURT:  Yes.

15          MS. GREENE:  —— that I think is just an example of the

16     probative value of this testimony.  This is Plaintiff's

17     Exhibit 17, and it's from Will Grannis to Melissa Lawrence, the

18     HR head.  Mr. Grannis, of course, being the hiring manager, he

19     says ——

20          THE COURT:  Wait just a moment.  I'm going to try to

21     read it with you.  17?

22          MS. GREENE:  Yes.

23          MS. TOMEZSKO:  May I approach, your Honor?

24          THE COURT:  Thank you.  You know what, I've now taken

25     so much of your stuff, Ms. Tomezsko, that I'm OK.  I'm just

NACHRow4

```
 1    going to look at it in a binder.

 2              MS. TOMEZSKO:  We have lots of copies.  I don't mind.

 3              THE COURT:  It's OK.  I've got it.

 4              MS. GREENE:  We could also put it on the screen, your

 5    Honor.

 6              THE COURT:  You can do that.  Thank you.

 7              MS. TOMEZSKO:  Trying to be helpful.

 8              THE COURT:  Appreciate it.  I have your — this motion

 9    in limine decision to give back to you —

10              MS. TOMEZSKO:  Thank you.

11              THE COURT:  — when we actually break for lunch.

12              MS. GREENE:  As you can see, this is an email from

13    Will Grannis to Melissa Lawrence and he says:  "I agree.  I

14    also know that every woman who came to Google/OCTO (Jen" —

15    being Jenn Bennett — "Ulku) has told me that they feel like

16    they didn't fight hard enough for themselves.  So I'm torn."

17              Then he goes back and says:  "This is also the

18    number one area where women ask for my advice/mentoring,

19    respectfully fighting for what they think is fair comp."

20              This is the hiring manager grouping Ms. Rowe and Jenn

21    Bennett together about their feelings like they didn't fight

22    hard enough for themselves when they came in the door.  This is

23    just one document among many that is relevant and shows that

24    there was a difference with respect to the women that

25    Mr. Grannis was acknowledging, sentiments that Mr. Grannis was
```

NACHRow4

1    acknowledging.

2          There are other documents that really speak and show

3    to the circumstances around Ms. Bennett's de-leveling.  She was

4    actually interviewed for an 8/9 position, and they brought her

5    in as a Level 7.  There's lots of documents about it.  We'd

6    like to be able to test it, question the hiring managers about

7    it, because it was a significant change, and it's outside of

8    Google's practices to de-level someone like that.  It's

9    mentioned in the ER notes as an example.

10          This is — again, this is probative testimony as to

11   whether Google was applying a double standard to the people it

12   was interviewing and hiring for that director-level role.

13          MR. GAGE:  Your Honor, a few responses.

14          THE COURT:  So this exhibit is one of the ones in

15   dispute because of the references to Bennett, is that right?

16          MR. GAGE:  Yes.

17          THE COURT:  OK.

18          MR. GAGE:  For a number of reasons here, but I'll

19   touch on a big one here.  First of all, this is hearsay.  This

20   is hearsay.  This is Mr. Grannis writing about what other

21   people have told him.  And second of all, there is absolutely

22   nothing in this document that suggests that Google ever did

23   anything wrong.  He's speaking to what someone else told him

24   that they thought about their own actions.  That's what this is

25   saying.

NACHRow4

1          And Mr. Grannis, you'll see him testify.  He is an

2     incredibly supportive manager/mentor and he coaches people, so

3     on, so forth.  This does not speak to any suggestion of

4     discrimination, and it's plainly hearsay.  The jury shouldn't

5     hear that other women thought they should have fought harder

6     for compensation.  That's totally irrelevant and highly

7     prejudicial to Google's position here.

8          And second, your Honor, I want to go back to my point

9     about opposing counsel's continuing objections.  Judge

10     Schofield ruled that we can introduce evidence about the

11     credentials of Ms. Rowe's Level 8 peers, yet counsel persists

12     in their objections.  And I'm assuming I'm going to have to go

13     for a sidebar every time I want to ask a witness about the

14     credentials of Level 8s who were hired around the same time as

15     Ms. Rowe.  Yet they want to go down this rabbit hole which will

16     invite us to then also present testimony from our witnesses

17     about men whom Google considered for an 8 and then decided to

18     make a 7 or whom Google decided —— considered they should be a

19     7 and made them a 6 because Google wanted to set reasonable and

20     fair expectations for these folks based upon what Google

21     expected they could do.

22          And so "de-leveling" is counsel's term.  There was no

23     de-leveling here.  And this is a complete sideshow that would

24     simply allow plaintiff's counsel to just say, well, there's a

25     woman over there, there's a woman over there, and they're

NACHRow4

1    different, and that's not what this case is about.  It has

2    nothing to do with the leveling decision about Ms. Rowe which

3    focused on her qualifications relative to others who were hired

4    around the same time.

5                 (Continued on next page)

NACVROW5

1          THE COURT:  Okay.  So, Ms. Greene, you referred to

2    Ms. Bennett and Ms. Rowe as similarly situated.  How is that

3    defined in the case law?  How do courts evaluate that?  Does it

4    have to do with role, seniority, compensation, something else?

5          MS. GREENE:  With respect to the evidence of other

6    women supporting an inference of bias, it really looks to the

7    decision-maker, right.  Are these other women in the same group

8    who are subject to the same decision-makers?

9          Mr. Gage confuses two issues.  One is with respect to

10   who Ms. Rowe is comparing herself to for purposes of the equal

11   pay law.  This is discrimination, this is evidence of

12   discrimination to support an inference of bias for her

13   discrimination claim.  I think that Ms. Burdis, in the ER

14   notes, where she is asked about gender's role in leveling

15   points to Jen Bennett and says another female in that group --

16         THE COURT:  I'm sorry, which document is this?

17         MS. GREENE:  This is 57.  It's one of the documents we

18   looked at earlier today.  And we can put that up, as well.

19         And if we can go to the second page, and if we can

20   look to -- I'm sorry, the third page.  And if we can look to

21   the second bullet from the bottom, it says:  Another female in

22   that group was Jen Bennett and also got down-leveled — I'm

23   sorry, it wasn't de-leveled, it was down-leveled — because she

24   just didn't have the level of experience the others has and it

25   was very obvious.

NACVROW5

1          Well, you can look at the gHire packet and see what

2     her levels of experience were.  You can read about the decision

3     to down-level her.  You can hear and will hear from other

4     witnesses testifying about the role that she was playing, what

5     they thought her level was given the impact that she was having

6     and the qualifications she brought to the role.  She was

7     down-leveled.

8          Ms. Rowe similarly came in with equal or better

9     qualifications, similar experience, was performing in the role

10    at the same level, and was down-leveled to an 8, as compared to

11    the men who were brought in as 9s.  It's the same fact pattern,

12    and it supports an inference of bias because of who's involved.

13         Who gets the benefit?  The men.  Who gets the higher

14    standard?  The women.

15         And in a group, a small group — and this hiring cohort

16    was 9 — the only two women were the ones that got that

17    treatment.  That is probative.  That is highly probative of the

18    existence of bias.

19         THE COURT:  Mr. Gage, what is your take on similarly

20    situated?

21         MR. GAGE:  Well, I don't think Ms. Bennett is

22    similarly situated, inasmuch as her years of experience, the

23    nature of her experience, the level of her experience is

24    different, less than, Ms. Rowe's, as well as significantly less

25    than others.

NACVROW5

1        I also want to point out, your Honor, that there is no

2   cohort.  At the time Mr. Eryurek, one of the first external

3   hire as an L9, was hired in OCTO, I believe they already about

4   20 people on the team.  So there is no cohort.

5        A cohort is the group of people around which

6   plaintiff's counsel wants to draw a circle for purposes of

7   presenting what they believe is the most convincing case to the

8   jury.  And so I don't think we should have to go down the

9   rabbit hole, because we will then have to talk about other men

10  beyond the men that plaintiff's counsel wants to talk about,

11  beyond the Level 8 men that we already are expecting to talk

12  about, to show that men who were similar to Ms. Bennett were

13  similarly hired as 7s; men who had -- who had similar

14  experience were even brought in at lower grades for other

15  reasons.

16       And so we're going to go down this rabbit hole where

17  the jury is going to be evaluating leveling decisions about a

18  few dozen people, when the only leveling decision that they are

19  supposed to be evaluating — and your Honor, I presume -- I

20  shouldn't presume, but I hope and expect that in the jury

21  charge to the jury, you're going to tell them their job is not

22  to second-guess the business judgment of Google, and the case

23  law is well-established for that.  The only leveling decision

24  that's at issue in this case is a leveling decision about

25  Ms. Rowe.  The jury can look at evidence of her comparators,

NACVROW5

appropriate comparators, to decide whether or not the

differences between them, these 9s and her, suggest gender

bias.

   Counsel is now saying this is not about the fair pay

claim, it's about the New York City claim.  Great.  Ms. Bennett

didn't work in New York.  She worked in California.  So that's

yet another reason.  She's not even within the cohort that is

potentially at issue here.  The New York pay claim only allows

them to compare Ms. Rowe to Mr. Harteau, who worked in New

York.  Mr. Breslow worked in New York too.  Ms. Bennett didn't

even work in New York.

   MS. GREENE:  Your Honor, there's so much to address

there.

   THE COURT:  Hang on a second, Ms. Greene.

   Mr. Gage, did you not say at some point that it was

for the jury to decide who Ms. Rowe's comparators are?

   MR. GAGE:  No.  I don't believe I said it's for the

jury to decide, because that -- I think your Honor in the first

instance — and that's what we're arguing here — has to draw a

circle around it so there's not just this infinite flow of

potential comparators coming in here.

   And so I don't think the jury gets to decide -- they

get to decide whether or not differences between Ms. Rowe and

the people about whom your Honor let's us introduce evidence,

whether those differences suggest that the way she was paid and

NACVROW5

1    the way she was treated was because of her sex as opposed to

2    those other differences.  That's what the jury gets to decide.

3    But your Honor, in the first instance, has to decide the

4    admissibility of whose information the jury gets to see to

5    decide whether or not those differences are indicative of

6    discrimination.

7              THE COURT:  All right.  Ms. Greene.

8              And then I think we're going to break.

9              MS. GREENE:  Mr. Gage is wrong; that the New York City

10   human rights law for purposes of establishing bias allow you to

11   look to comparators outside of the geographic range.  The New

12   York equal pay law has a geographic-specific requirement

13   because of the nature of that law.  But it is well-established

14   that similarly situated people for purposes of showing

15   behaviors or drawing inferences of bias don't have to be in the

16   same office.  They were working in the same group, they

17   reported to the same manager.

18             Mr. Gage wants to make decisions of fact, find

19   decisions of fact.  The jury is going to get to decide if

20   there's a cohort or not based on the evidence.  The jury is

21   going to decide is it this group of nine that we should be

22   looking at or is it a broader group.

23             We lost on a motion *in limine* about whether defendant

24   can present evidence on Level 8 comparators, Level 8s.  We lost

25   on that.  They get to bring in that evidence.  They are putting

NACVROW5

1    it into the record; we are maintaining our objections to it.

2    But it's a little disingenuous to say they have to do that.

3    They intend to do that; they intend to look at the Level 8s.

4          So to exclude Ms. Bennett from this group that we're

5    going to be looking at, where it's in the documents and people

6    are voluntarily mentioning her as someone else who, you know,

7    the circumstances around her leveling were raised an issue, it

8    was a question, notably, Ms. Bennett still works there.  They

9    could bring her in if they wanted.  So there's no -- you know,

10   if they want to bring her in as a rebuttal witness, they could.

11         But this testimony, these documents, should go before

12   the jury.  And the presumption is that relevant probative

13   testimony will go to the jury unless there's some material

14   prejudice and a reason to exclude it.  And the fact that

15   defendant doesn't like the evidence, the fact that they think

16   that there's some bias it creates, the law says all evidence

17   creates a bias, that's why it's in for the jury to determine

18   the validity of it and to draw inferences and to give weight to

19   it.

20         So, you know, it just -- I know that was long-winded,

21   but this is a very important issue.  And as your Honor

22   requested, we will outline for you, you know, the documents --

23         THE COURT:  Just a list.  I just want to know the

24   scope of the issue.  I know you're going to tell me that this

25   is in the joint pretrial order, and that may be.  No, it isn't?

NACVROW5

1            MR. GAGE:  No, I was going to say I'm not going to say

2       that.  I've said that enough.

3            THE COURT:  Along with scores of other issues.  This

4       is a considerable issue to be coming up in the middle of trial,

5       the jurors missing work and what have you.

6            How long until we run headlong into this issue?

7            MR. GAGE:  Your Honor, just to be clear, they only

8       designated those exhibits at the last minute.  This is

9       something that --

10           THE COURT:  But when were they produced?

11           MR. GAGE:  Oh, everything was produced in discovery.

12           MS. GREENE:  2020.

13           MR. GAGE:  But we had a universe of designated

14      exhibits back in December when we were first scheduled for

15      trial.  And then we did motions *in limine*.  And then this was

16      brought up more recently.  I just wanted to make that clear.

17           And also, for the record, Google has absolutely no

18      problem with explaining Jen Bennett's leveling.  It was not

19      discriminatory.  There were perfectly good reasons.  The

20      question then becomes, then how many other people do we get to

21      present evidence about to show not only that Ms. Rowe was

22      fairly leveled, but also that Ms. Bennett was fairly leveled.

23      And that I just pose as a question for your Honor to consider

24      as you're evaluating this decision, because that's what we're

25      talking about.

NACVROW5

1          THE COURT:  Some of the same witnesses can address the

2    leveling decisions as to both of them; is that right?

3          MR. GAGE:  Some of them can.  But then there may be

4    additional documents that we want to show the jury.  And it

5    just unnecessarily prolongs the trial and confuses and

6    distracts the jury.

7          MS. GREENE:  Your Honor, every document, with the

8    exception of one, has been on the list from the first joint

9    pretrial order.  Every witness who will testify, whose

10   depositions were taken, have been on the list since the joint

11   pretrial order.

12         There is one document that was inadvertently missed on

13   the joint pretrial order, and it's Jen Bennett's gHire packet.

14   All of the other gHire packets for the L8s and L9s and people

15   hired during that time period were put in mostly by defendant

16   into the record.  Jen Bennett's wasn't.  We rectified that.

17         THE COURT:  When did you rectify that?

18         MR. GAGE:  On the eve of trial, your Honor.

19         THE COURT:  Okay.  Well, that's a big one to omit from

20   the joint pretrial order until the eve of trial.

21         MR. GAGE:  It's a huge one.

22         THE COURT:  That's why we're here doing this now, I

23   think.

24         MS. GREENE:  Your Honor?

25         THE COURT:  Yes.

NACVROW5

1          MS. GREENE:  That document was overlooked, but that

2    document doesn't determine the testimony.  Even without that

3    document, we could question Mr. Will Grannis and Mr. Brian

4    Stevens as to the issues and the circumstances around it.

5    Again, other people in their deposition, in the ER notes,

6    Mr. Grannis in his email communications have raised

7    Ms. Bennett.  They've long been on notice.  They could have

8    moved *in limine* to exclude any conversation around Ms. Bennett,

9    the other woman in the group.  And they didn't.

10          THE COURT:  All right.

11          MR. GAGE:  Was of the nature of this document, your

12   Honor, P-17, Mr. Grannis's email, the one that's hearsay, where

13   he's talking about what someone else told him about their

14   feelings, it was not.  These documents, we're not suggesting,

15   that they were trying to relitigate the leveling decision for

16   Ms. Jen Bennett.  They offered that exhibit, her hiring packet,

17   at the last minute, long after we had not only designated all

18   of our witnesses, but also arranged all the travel that we've

19   had to arrange for people to come to this trial.

20          This will be -- we'll be severely prejudiced if we

21   have to litigate that issue and identify all these other

22   comparators.  Now we've got to find comparators for Jen

23   Bennett, people who were hired at a 7, like her.  We'll find

24   them if we have to, but it's just going to unnecessarily

25   prolong the trial.

NACVROW5

1          THE COURT:  All right.

2          MS. GREENE:  I just wanted to make clear that the

3     Plaintiff's Exhibit 17 is not just about what they told her.

4     It is in the context of a conversation of another woman who was

5     trying to negotiate her salary and who was running up against

6     obstacles.

7          MR. GAGE:  No.

8          MS. GREENE:  Melissa Lawrence was saying, I don't want

9     to be a Debbie-downer, but it concerns me.  There's much of a

10    disconnect and focus on comp.  You know this.  In the end, they

11    need to come for the opportunity, not the comp.

12         And Mr. Grannis's response is:  I agree.  But I also

13    know that every woman has told me they didn't fight hard enough

14    for themselves.  And they ask for my advice.

15         It's in the context of questions around how women who

16    are trying to negotiate for themselves are treated on their way

17    in.

18         THE COURT:  You're referring to Katia now?

19         MR. GAGE:  Yes, your Honor.

20         THE COURT:  You're not doing anything with Katia,

21    right?

22         MR. GAGE:  Well, that's what they are suggesting they

23    want to, your Honor.

24         MS. GREENE:  No, your Honor.

25         MR. GAGE:  That's yet another one.

NACVROW5

1              MS. GREENE:  No, we are not.

2              MR. GAGE:  But to that point, your Honor, Katia Walsh

3    in that email shows very clearly, was being brought in -- or

4    offered a Level 9 job.  She was offered a very generous package

5    of compensation, which she negotiated, google responded, they

6    put more money on the table.  But in the end, she decided to

7    reject the offer.

8              THE COURT:  I'm sorry, we are talking -- wait a

9    minute.

10             MR. GAGE:  This is Katia Walsh.  I'm not even

11   suggesting we want to go down that rabbit hole.

12             MS. GREENE:  We're not.

13             MR. GAGE:  I just want to be clear.  So counsel is

14   abandoning any effort to offer the evidence regarding Katia

15   Walsh?  Because if that's the case, I'll shut up and sit down.

16             MS. GREENE:  I've made clear the document that we are

17   offering and for what purpose we are offering it, your Honor.

18   I will provide you with a list.  Again, these are decisions --

19             THE COURT:  Witnesses and documents.

20             MS. GREENE:  Witnesses and documents.

21             These are the things for the jury to decide, what

22   these documents mean, what this testimony means, whether

23   there's any value at all in how one person was treated versus

24   another.  These are all questions of facts.  That's for the

25   jury to decide.  This is relevant and probative.  It's not

NACVROW5

1    being offered in a way that excludes it under the Federal Rules

2    of Evidence.  And again, the fact that they don't like it isn't

3    reason to keep it out.

4              But I will say no more and I will provide you with the

5    list.

6              THE COURT:  All right.  Thank you.

7              MR. GAGE:  Hearsay in these documents, it's --

8    anyways.

9              THE COURT:  When was the last time this group talked

10   about settlement?

11             MS. GREENE:  Your Honor, we mediated or had a

12   settlement conference before Judge Willis in March.  And that

13   was the last formal settlement discussions.  And any informal

14   discussions since that point in time have gone nowhere.

15             THE COURT:  All right.  Settlement should be

16   contemplated often is my view.

17             All right.  I'll see you at 1:45.

18             (Luncheon recess)

19             (Continued on next page)

20

21

22

23

24

25

NACVROW5

```
 1                    A F T E R N O O N   S E S S I O N

 2                             2:00 P.M.,

 3              THE COURT:  Ms. Williams, let's bring the jury right

 4    in.

 5              MS. GREENE:  Should we bring in the next witness, your

 6    Honor?

 7              THE COURT:  Who is it?

 8              MS. GREENE:  Kevin Lucas.

 9              We had to make some adjustments to the planned

10    schedule to fit in people's travel plans.

11              THE COURT:  Meaning you were planning to call someone

12    else next?

13              MS. GREENE:  Meaning I think this is different than

14    the order we may have indicated to you earlier today.

15              THE COURT:  Okay.

16              MR. GAGE:  We're just juggling schedules and counsel

17    are cooperating to get people --

18              MS. GREENE:  Where they need to be and when.

19              MR. GAGE:  Where to be and when.

20              (Jury present)

21              THE COURT:  All right.  Are you ready to call your

22    next witness, Ms. Greene?

23              MS. GREENE:  Yes.

24              Plaintiff calls Kevin Lucas, please.

25
```

1    KEVIN LUCAS,

2          called as a witness by the Plaintiff,

3          having been duly sworn, testified as follows:

4    DIRECT EXAMINATION

5    BY MS. GREENE:

6    Q.  Good afternoon, Mr. Lucas.

7    A.  Hi.

8    Q.  I'm over here.  I'll be the one asking you the questions.

9    A.  Thank you.

10   Q.  You were Mr. Shaukat's HR manager in 2018; correct?

11   A.  That is correct.

12   Q.  And you were deposed in connection with this lawsuit;

13   correct?

14   A.  Correct.

15   Q.  And you were designated as a corporate witness to testify

16   on Google's behalf, do you recall that?

17   A.  Correct.

18   Q.  And that means when you answered, you were answering on

19   behalf of the company with respect to the subject areas for

20   which you had been designated; correct?

21   A.  Correct.

22   Q.  Now, in the context of that deposition, you gave testimony

23   regarding the difference between an individual contributor and

24   a people manager, as those terms are used by Google; correct?

25   A.  Correct.

1   Q.  Okay.  Let's play into the record your testimony on this

2   subject.

3           MS. GREENE:  And it's, Vincent, Mr. Yang, line 122, 19

4   through 124, 6.

5           (Video played)

6           MS. GREENE:  Thank you, Mr. Yang.

7   Q.  And with respect to leveling guides for technical directors

8   in the office of the CTO, I also want to play your testimony

9   into the record on that.  And that is 126, line 18, through

10  127, line 16.

11          (Video played)

12          MS. GREENE:  I think it's frozen.

13          Okay.  We'll stop there.

14  Q.  Do you remember giving testimony about whether number of

15  years was a factor that was used to determine level for the

16  technical solutions consultant director in OCTO?

17  A.  Yes, I believe we spoke about that in my deposition.

18  Q.  And you said that no, you didn't have any knowledge that

19  the number of years was a factor that was used to determine

20  level for the technical solutions consultant directors in OCTO;

21  correct?

22  A.  As a decision, no.

23  Q.  Just for the clarity of the record, when we're talking

24  about technical solutions consultant directors in OCTO, it's

25  also referred to as technical directors; correct?

1   A.  That is -- it's a common public-facing job title, yes.  But

2   from an HR systems perspective, it is not.

3   Q.  Right.  So the job ladder for those in OCTO are the

4   technical solutions consultants; correct?  That's the ladder?

5   A.  I believe that is -- most of the people in that

6   organization are on the TSC ladder.

7   Q.  Okay.  So the testimony you just gave about the technical

8   directors in OCTO, also technical solutions directors, those

9   are the same thing; correct?

10  A.  Yes, one's a public-facing title, one's kind of an HR

11  systems.

12  Q.  Okay.  Mr. Lucas, on approximately August 28th, 2018, you

13  received a written complaint from Ms. Rowe; correct?

14  A.  I believe so, yeah.

15  Q.  And that was addressed to both you and Ms. Lawrence; is

16  that right?

17  A.  If I remember correctly, I think it was addressed to

18  Ms. Lawrence and I was kind of maybe a cc or just like an FYI.

19  Q.  Let's actually take a look at it.  We're going to go to

20  Plaintiff's 43.

21          MS. GREENE:  And if we can turn to the second page on

22  this document, please.

23  Q.  Do you recognize this as Ms. Rowe's complaint on August

24  28th, 2018?

25  A.  I do.

NACVROW5                         Lucas – Direct

1    Q.  And you are a plus Kevin, is that you?

2    A.  Yes, plus me.

3    Q.  And Ms. Rowe was raising a concern with being leveled at

4    Level 8 and later learning that her male peers were all hired

5    at Level 9; correct?

6    A.  That's how she outlined it in the note, yes.

7    Q.  Okay.  Let's turn to the first page on this document and

8    start at the bottom email at 4:49 p.m.

9            Ms. Lawrence wrote to you:  Hey, I don't know of any

10   way to address this.  It is true that some of the OCTO folks

11   were hired in as L9, but they had much more experience than she

12   did.  When I talked to Will, he was unequivocal that we hired

13   her in the right level.

14           Do you see that?

15   A.  I do.

16           MS. GREENE:  And if you can take that down.

17   Q.  Then you asked if she could send you the thread confirming

18   the levels, right?

19   A.  Yes.

20   Q.  Okay.  Let's look at the next email, the 7:42 p.m. email.

21           So you say:  I pulled TSC L8/9 hires in OCTO since

22   2016, and then pulled approximate years of experience and

23   education from gHire.  Data is here.  Do you see that?

24   A.  Yes, I do.

25   Q.  So explain to me what you did as you've described it here.

NACVROW5                          Lucas - Direct

A.   So we have an internal reporting tool that you can identify

people who were hired into a specific organization or reporting

hierarchy within a specific time stamp, if you will.  And you

can narrow that down by job family, in this example, TSC Level

8 and 9.  So that's what I did.

          So I pulled the short list of people who fulfilled

those kind of attributes and then migrated over to gHire, which

is our internal applicant tracking system whereby we process

all hiring and transfers across Google, and went person by

person to loosely see the significance of the complaint.

Q.   Okay.  You worked in HR, not ER; correct?

A.   Correct.

Q.   So your job did not entail undertaking investigations into

complaints; correct?

A.   That is correct.

Q.   Did you ask anyone before you did this data analysis if

years of experience and education were something that had been

considered in leveling at the time the leveling decisions were

made?

A.   I don't recall specifically asking anyone.

Q.   Did you do anything to look at whether years of experience

and education were factors that were used at the time the

leveling decisions were made?

A.   No, I generally went on what I had seen to be true in my

experience at Google.

NACVROW5                        Lucas - Direct

1    Q.  And, in fact, your prior testimony was that you have no
2    knowledge that number of years was a factor used to determine
3    level for the technical directors in OCTO; correct?
4    A.  I don't recall that testimony; but if you're reading it, my
5    assumption is it's true.
6    Q.  Well, sitting here today, do you know if that's true, that
7    number of years was not a factor that was considered in
8    leveling in OCTO?
9    A.  I can't speak specifically to OCTO.  So when I step back
10   about our hiring process more broadly, years of experience is
11   an input that forms an initial level recommendation that
12   ultimately is a decision.  It just determines essentially the
13   hiring rubrics for which someone is assessed.
14   Q.  And do you know if that process you just described was used
15   in OCTO during the time that Ms. Rowe was being hired?
16   A.  It has been part of our staffing process across Google
17   since I joined the organization ten years ago.
18   Q.  Okay.  But my question is do you have knowledge that it
19   was, in fact, used with Ms. Rowe at the time she was hired?
20   A.  No direct knowledge.
21   Q.  Now, let's look at the data that you pooled, and that's
22   going to be Plaintiff's Exhibit 88.
23            MS. GREENE:  Can you pull out for us, Mr. Yang, the
24   column's name through hire date.  Maybe make it a little bit
25   bigger for everybody.

NACVROW5                        Lucas - Direct

1   Q.   Okay.  And the first six people are men who were Level 9s

2   in OCTO; correct?

3   A.   If he can slide over and I can see the level column of the

4   spreadsheet.  But my assumption is -- one, two, three, four,

5   five, six.  Yes, the first six people are Level 9s.

6   Q.   Okay.  And if we can look at the hire dates for those six

7   individuals, we see that the first -- we have Will Grannis, the

8   leader of that group.  And then the next one coming in was

9   Evren Eryurek on October 31st, 2016; correct?

10  A.   Yes.

11          THE COURT:  Ms. Greene, where are you?  I'm sorry, I'm

12  trying to follow along here.

13          MS. GREENE:  I'm looking at the hire dates on the

14  right-hand side to establish the order in which people were

15  hired.

16          THE COURT:  I see it.  Thank you.

17  BY MS. GREENE:

18  Q.   So we have Mr. Eryurek, then we have Paul Strong, then we

19  have Jonathan Donaldson.  Oh, no, then Ben Wilson, then

20  Jonathan Donaldson, then Nicholas Harteau; correct?

21  A.   Yes.

22  Q.   And then if we look down at Ms. Rowe, she was March 13,

23  2017; correct?

24  A.   Correct.

25  Q.   And the next person to come in after Nicholas Harteau was

1   Mauro Sauco on June 5th; correct?

2   A.  There's -- oh, you said after.  Yes.

3   Q.  Okay.  So all of the uncolored names are L8s; correct?

4   A.  Yes, that's correct.

5   Q.  And all of those L8s, with the exception of Ms. Rowe, were

6   hired June 5th, 2017 or later; correct?  I'm sorry.

7           MS. TOMEZSKO:  Objection.

8   Q.  I'm sorry.  There's two, Scott Penberthy and Brian Steikes.

9           With the exception of Scott Penberthy and Brian

10  Steikes, everyone else was hired after June 5th, 2017; correct?

11  A.  Yes, that's correct.

12  Q.  Let's look at years of experience.  Years at hire.  Where

13  did you draw these numbers from?

14  A.  This was the data I pulled from gHire.

15  Q.  And where did that data come from in gHire?

16  A.  One of two ways.  It's most often captured when a candidate

17  completes an application, so essentially they kind of transpose

18  their resume into a form that feeds into gHire.

19  Q.  Did you do anything to verify that Ms. Rowe's years of

20  experience were 19 at the time of hire?

21  A.  I looked in gHire, which is our source of record.

22  Q.  You didn't do anything independently to make sure that the

23  number that was in gHire was correct; is that right?

24  A.  Correct.  Yeah.

25  Q.  Now, Ms. Rowe had experience equal to Mr. Harteau; correct?

1          MS. TOMEZSKO:  Objection.

2     Q.  In terms of years of hire?

3          THE COURT:  Sustained.

4     Q.  Ms. Rowe had the same number, 19, as Nicholas Harteau,

5     under the column years at hire; correct?

6     A.  Correct.

7     Q.  And Mr. Grannis had 18 years at hire; correct?

8     A.  That is correct.

9     Q.  And what is the "experience in" column?

10    A.  The experience -- so if I remember correctly, I think the

11    experience in was simply post college or school; so kind of a

12    totality of experience.  So almost the difference between

13    domain experience versus overall working experience.

14    Q.  Did you do anything to verify whether those numbers were

15    correct?

16    A.  No.

17    Q.  Okay.  If we look at education, Paul Strong, B.S. in

18    physics; correct?

19    A.  Sorry.  Yes.

20    Q.  And none of the men who are listed as Level 9s have

21    computer engineering degrees; correct?

22    A.  Computer engineering.

23    Q.  Or computer science.

24    A.  Not based on this data, the translatable.

25    Q.  Okay.  Do you know if Nicholas Harteau had any degrees?

1    A.  I'm not familiar with Nick specifically.

2    Q.  And Jonathan Donaldson had not received his master's, but

3    was six hours short; correct?

4    A.  That's what it appeared, yeah.

5    Q.  And Paul Strong only had a bachelor's; is that correct?

6    A.  As far as I can tell.

7    Q.  And Ms. Rowe had a B.S. and M.S. in computer science;

8    correct?

9    A.  That's what I see, yeah.

10   Q.  So do you know if this analysis you did in any way follows

11   any sort of established investigative process for someone who's

12   raised a concern about their level?

13   A.  No, which is why I didn't lead the investigation; I passed

14   it to our employee relations team who manages that process.

15   Q.  Do you know if this information was shared with Ms. Rowe

16   that she was leveled the same by years of experience and

17   education as these other people so she was not under-leveled?

18   Do you know if that was shared with her?

19   A.  I don't know.

20   Q.  Do you know if ER relied on the data that you pooled as

21   part of its investigation into Ms. Rowe's concern?

22   A.  I don't know.  You would need to ask our ER partner on

23   that.

24          MS. GREENE:  Okay.  You can take that down, Mr. Yang.

25   Q.  Okay.  I want to bring your attention to a document.  We're

1   not going to publish it to the jury at this time.  It's P-102.

2              Do you recognize this document?

3   A.  Yes, it appears like something that's posted on an internal

4   hiring site.

5   Q.  And do you recognize the substance and the content of this

6   document?

7   A.  Is there a way for me to make it bigger on my screen?

8   Apologies.

9   Q.  Sure.

10             MS. GREENE:  Vincent, can you call up the text of it,

11  please.

12  A.  Apologize.  Can you repeat the question again?

13  Q.  Sure.  Do you recognize the substance of this document?

14  A.  Generally, yeah.

15  Q.  Does this document accurately reflect Google's leveling

16  approach as it existed in 2016/2017?

17  A.  I don't know because there's not a date stamp on it.

18  Q.  I'm asking you that question specifically because we don't

19  have the version that existed in 2016 and 2017.  So I'm asking

20  you if this, as far as you remember, was the policy that was in

21  place during that time period?

22  A.  Can you give me a moment to read it all?

23  Q.  Please.  And I'm actually going to ask you specifically

24  about the section that says "do not," if you want to look

25  there.

NACVROW5                          Lucas - Direct

1   A.   Okay.

2   Q.   And so what's reflected under "do not"?  Was that Google's

3   general approach to leveling as it existed in 2016 and 2017?

4   A.   So as I'm interpreting this document, this document is

5   about the feedback through the interview process for which we

6   typically -- I don't recall us ever making note of that in the

7   interview feedback, specifically in gHire, because that

8   decision would have been made later in the process.

9   Q.   Okay.  Let me ask you a different question.

10  A.   Okay.

11  Q.   Do you know if in 2016 and 2017, Google had a policy that

12  leveling recommendations should not be based on outside

13  factors, outside of the performance interview, outside factors

14  like years of experience should not be considered?  Do you know

15  if that was Google's policy in 2016/2017?

16  A.   I can't say definitively.

17  Q.   Do you know if it was Google's policy in 2016/2017 that

18  education level was something that should not be used, should

19  not be a factor for setting level?

20  A.   I can't say definitively.

21       So how leveling would work from an external candidate

22  perspective is experience, education would typically be the

23  guideline that would inform the process that you followed from

24  an interview rubric's perspective and the questions you would

25  subsequently ask.  So that became kind of the initial guide of

1    the process.  But the actual decision wasn't made until it went

2    to hiring committee at the end of the process after the

3    candidate had completed the interviews and feedback was

4    submitted.

5    Q.  But you don't know, again, whether years of experience were

6    considered at all for OCTO; correct?

7    A.  I can't say definitively.

8              MS. GREENE:  We can take that document down, please.

9              And now I want to look at Plaintiff's Exhibit 103,

10   which I believe there's no objections to.

11             MS. TOMEZSKO:  No objections.

12             MS. GREENE:  Okay.  If we can look at Plaintiff's

13   Exhibit 103.  And if you can pull out the text of that,

14   Mr. Yang.

15             THE WITNESS:  Thank you.

16   Q.  So this was -- if you pull down that screen just a slight

17   amount, Mr. Yang.  Do you see that it's our leveling

18   philosophy?

19   A.  On the subject?  Yes.

20   Q.  Okay.  And that first paragraph, "Our Philosophy and

21   Approach," do you see that?

22   A.  I do.

23   Q.  Does that accurately reflect Google's philosophy and

24   approach to leveling?

25   A.  Yeah, it's -- it's a relatively high-level statement, but I

1   think directionally, yeah, it captures it.

2   Q.  Okay.  And so can you just share for purposes of the record

3   what the philosophy and approach for Google is with respect to

4   leveling?

5   A.  In my own words or would you like me to read it?

6   Q.  You can put it in your own words.

7   A.  I think leveling usually starts by the scope of the role,

8   and that's typically where we started.  We look at a few

9   different attributes that would inform the level at which we

10  would want to hire.  As we move through the process, that

11  becomes kind of the target level for the candidates that we

12  would try to source.  The way in which it's written here, it

13  also speaks about the future potential of it as well.

14          So when you look at the candidate's perspective,

15  you're evaluating them for the role, but you're also evaluating

16  them for kind of the future potential at Google.  So how I like

17  to think about it, can they do this role, but can they do five

18  other roles beyond this role is kind of how I would paraphrase

19  it.

20  Q.  Let's look at the star be consistent.  It says:  When we're

21  consistent in how we initially level like roles across groups

22  and regions, we foster equity throughout Google and create a

23  fair and level playing field for perf and promo.  That's

24  performance and promotion, right?

25  A.  Correct.

NACVROW5                    Lucas - Direct

1    Q.  So Google understood that it was important to like level,

2    like level -- I'm sorry, to initially level like roles across

3    groups and regions the same if they wanted to foster equity at

4    the company; correct?

5    A.  Correct.  An important distinction there is if a set of

6    roles share the same job family, they can still be scoped

7    differently.

8           So for example, if there are ten roles within the same

9    job family, some are Level 8, some are Level 9.  The Level 9

10   roles I would expect to have an increased opportunity for

11   impact, perhaps a more direct link to the company's strategic

12   priorities, perhaps a level of complexity that you wouldn't

13   necessarily see at that same scale for a Level 8 employee.

14          So it's an important distinction that while they may

15   carry the same job title, the scopes are certainly different,

16   and the subsequent expectations and impact you would expect

17   from those roles, and the individuals in those roles would be

18   different.

19   Q.  Do you know whether OCTO had a leveling guide that went

20   past Level 8?

21   A.  I can't think of one offhand, but I wasn't supporting OCTO

22   at the time.

23   Q.  Okay.  Do you know whether OCTO had done anything to

24   articulate what the differences were between Level 8 and Level

25   9 in the 2016/2017 time period?

1  A.  I would assume so, because when we are standing up new

2  teams, that typically becomes the way in which we structure the

3  organization and identify the roles that we need to hire.  But

4  I don't know specifically because I wasn't working with OCTO in

5  2016, I believe is when you said.

6  Q.  Okay.  So you don't know whether OCTO made any distinction

7  between Level 8 and Level 9; correct?

8  A.  Correct.  I think Will Grannis can probably answer that

9  question for you.

10  Q.  Now, would you agree that you've never seen a time when

11  someone has moved from a Level 8 to a Level 10?

12  A.  Yeah, I can definitively say that.

13  Q.  That's just not something that happens, right, at Google?

14  A.  I haven't seen it happen and I haven't heard of it

15  happening.

16  Q.  So the decision to level someone at a Level 8 would have

17  significant implications with respect to their ability to then

18  move to a Level 10 without first going to Level 9; correct?

19  A.  That's the way in which our levels are structured; correct.

20  Q.  Let's look at D-63.

21       Do you have an understanding of what this document is?

22  A.  Yeah, it appears to articulate or differentiate the TSC job

23  ladder by level.

24  Q.  Okay.  And so this is basically the leveling guide for the

25  technical directors in OCTO; correct?

1   A.   The technical directors in OCTO, I think, would be captured

2   in this; but this document is for the broader technical

3   solutions consultant ladder.  So while OCTO had roles within

4   that ladder, there were many other organizations in Google that

5   also had roles within the TSC ladder.

6   Q.   Okay.  If we can go to the third page, we see L8 principal

7   or director technical solutions consultant.  Do you see that?

8   A.   I do.

9   Q.   And I want us now then to go to the last page.  So this

10  ladder and this leveling guide for this ladder ends at Level 8;

11  correct?

12  A.   If -- oh, so is what I just saw, was that the preceding

13  page?

14  Q.   It was.

15  A.   Yes, it appears as though it stops at Level 8 in this

16  document.

17  Q.   So there's nothing in that ladder that distinguishes what

18  is different between a Level 8 and a Level 9; correct?

19  A.   For TSC, no.

20  Q.   Okay.  And do you know if in OCTO there was any other

21  document that for OCTO specifically described, again, what the

22  differences were between Level 8 and Level 9 back in 2016 and

23  2017?

24  A.   I think at that point in time we had leveling guidance

25  through Level 9 that focused on scope, contribution, influence,

1   and I think it was impact as well.  So that would actually draw

2   the differentiation across them because that would encompass

3   basically any technical role at Google.

4   Q.  Do you know if that was used in OCTO?

5   A.  I don't know specifically.  I wasn't supporting OCTO at the

6   time, I'm sorry.

7   Q.  Do you know if anyone in OCTO looked at that?

8   A.  You would have to ask the individuals in OCTO.  I don't

9   know what they did.

10  Q.  So would you agree that without knowing what factors OCTO

11  considered at the time it made leveling decisions, and without

12  knowing how OCTO distinguished between Level 8s and Level 9s,

13  you weren't in a position to draw any conclusions with respect

14  to whether Ms. Rowe was leveled correctly; isn't that right?

15  A.  I'm not the decision-maker in that; correct.

16          MS. GREENE:  No further questions.

17  CROSS-EXAMINATION

18  BY MS. TOMEZSKO:

19  Q.  Good afternoon, Mr. Lucas.  How are you?

20  A.  I'm well, thank you.

21  Q.  We've been hearing a lot about the term "level" in this

22  trial.  Can you define what a level is at Google?

23  A.  Yes.  So it is essentially a framework by which we

24  architect jobs that help us hire and move people throughout the

25  organization, as well as develop and promote them.

NACVROW5                        Lucas - Cross

1   Q.  And I think earlier you said there were four things that go

2   into a level, am I getting that correct?

3   A.  Yes.  If I remember correctly, it was scope, contribution,

4   influence, and impact.

5   Q.  You said scope, contribution, influence, and impact?

6   A.  Correct.

7   Q.  Can you describe what scope refers to when it comes to

8   level?

9   A.  Yup.  Scope typically looks at quantitative and qualitative

10  factors of the role.  From a quantitative perspective, it would

11  look at things like reporting hierarchy and how many layers you

12  are away from the CEO.  In this case it would be Thomas.

13          Size of the organization is sometimes a consideration,

14  particularly for people leaders in the organization.

15  Oftentimes we can consider things like attachment to strategic

16  priorities of the broader organization as well.  So those are

17  just kind of a few of the factors that would inform it.

18  Q.  You also mentioned contribution.  Can you explain what

19  contribution means in the context of a level at Google?

20  A.  Yeah.  It's almost like the value that individual brings to

21  the role or can bring to the role.  So maybe a different way to

22  say it is kind of the opportunity for that person's individual

23  opportunity to have impact.

24  Q.  You also mentioned influence.  Can you describe influence

25  and how it relates to a level at Google?

1    A.   Yeah.  So we look at this internally and externally.  From

2    an internal perspective, we think about the stakeholders and

3    partners for which that person is going to interact with across

4    Google most frequently and the level at which they're

5    interacting with.

6         Externally, we look at customer and partner

7    relationships.  So does the role -- to kind of exaggerate, does

8    the role interact primarily with C-level executives at a

9    customer's organization or is it more midlevel management.

10   That informs it.

11   Q.   And finally, impact.  Can you explain what impact means as

12   it relates to level at Google?

13   A.   Yeah.  This is actually what the individual delivers and

14   the value that it actually has on Google.  So for example, in

15   sales roles, this would be largely around revenue and pipeline

16   and booking.  So are they continuing to generate a business

17   that's growing at a reasonable pace.

18        From an engineering or product perspective, it could

19   be things like the innovation you're driving within a respected

20   product.  It could be kind of cleaning up technical debt to

21   make things more efficient for our products to run.

22   Q.   Now, those four things you mentioned, scope, contribution,

23   influence, and impact, do those change as the level changes?

24   A.   Yes, they generally increase with each hire level.

25   Q.   Do each of those four increase as the level gets higher?

NACVROW5                          Lucas - Cross

1   A.  In most cases, yes.  The one that might not could be scope,

2   because it depends on the role.  Again, we have -- on the

3   engineering side of the house, we have really, really senior

4   individual contributors who are kind of known to be the

5   technical experts in a respective system or platform.  By

6   contrast, you could have a people leader who's leading an

7   organization of 100, 200, 300 people.  So that's probably the

8   one that is a little more different.  But arguably the other

9   three just continue to increase.

10  Q.  Thank you.  And I'm glad you brought up the individual

11  contributor people manager distinction.  I was actually about

12  to go there, so let's stay there.

13          I think earlier we heard your testimony about how that

14  distinction, individual contributor versus people manager,

15  doesn't necessarily have -- rather, I wish I had your testimony

16  in front of me so I can quote you accurately, but you can tell

17  me if I'm wrong.  It does not play a role in the actual

18  compensation setting for that position; is that right?

19  A.  Correct.  So from a compensation perspective, we don't

20  differentiate between people managers and individual

21  contributors.  They're fundamentally different jobs.

22          How I like to describe it is if you are an individual

23  contributor, you have a set of responsibilities that you are

24  uniquely positioned to deliver.  When you are a people manager

25  at Google, a part of your job is individual contributor

NACVROW5                         Lucas - Cross

1    activities, whereby you are doing individual work to deliver

2    something.  But another big part of your job is actually how

3    are you managing, leading, and developing the team.  So there

4    are different jobs with different expectations, but we don't

5    differentiate them from a compensation perspective.

6    Q.  Can you give us just a few examples of something that a

7    people manager is expected to do that an individual contributor

8    is not?

9    A.  Yes.  So our performance management process, while it's

10   evolved over time, it's principally remained rooted in

11   communicating and setting expectations for the team, checking

12   in throughout the year, communicating progress and sharing

13   feedback, both positive and developmental, assessing and rating

14   the individual at the year interview process.  That's kind of

15   the performance-related one.  There are obvious compensation

16   processes that a manager would have that an individual

17   contributor would not.

18   Q.  Thank you.

19        And does the concept of level play any role in the

20   performance process that you just mentioned?

21   A.  Yes.  So as we move through the performance process,

22   there's kind of two anchor points.  At the beginning of the

23   year is when we set expectations for individual roles across

24   the organization.  And at the end of the year, we assess that

25   individual Googler against the expectations of that job.

NACVROW5                         Lucas - Cross

1            At both of those points, those expectations and the

2       assessment of impact are aligned to their level and role in the

3       organization.  So for example, a manager who's assessing an L7,

4       an L8, and an L9, all three of those individuals would have

5       different expectations in subsequent different levels of impact

6       and you would assess them according to the level.

7       Q.  So is it fair to say that a Level 8 employee is assessed

8       against a different set of expectations than a Level 9

9       employee, even if they are in the same job family?

10      A.  Absolutely.

11      Q.  Now, I think there was some earlier testimony about making

12      sure that the leveling process is fair and equitable.  Do you

13      remember that?

14      A.  Yes.

15      Q.  Are you familiar with a group within Google that is

16      referred to as CESO, with the acronym C-E-S-O?

17      A.  Yeah.  So it's a re-brand of what used to be the offer

18      review team.  I think it stands for Candidate Evaluation Strat

19      Ops.  This is essentially the team that historically would be

20      kind of the capstone of the hiring process that would look at

21      everything that's led up to that decision, things like

22      interview feedback, leveling.  Compensation is really kind of

23      where they spent most of their time.  But that came at the end

24      of the process before we would ever extend an offer.

25      Q.  If I understand you correctly then, the purpose of CESO,

NACVROW5                         Lucas - Cross

1   its function, is to make sure that leveling is fair and

2   equitable, am I getting that right?

3   A.  Correct.  That is one of them, yes.

4   Q.  Now, we looked at an email earlier, and it was an exchange

5   between you and Melissa Lawrence regarding a concern that

6   Ms. Rowe had raised with respect to her level.  Do you recall

7   that?

8   A.  Correct.  Yes.

9   Q.  And you pulled some data from gHire you said?

10  A.  Yes.

11  Q.  Would you have any reason to doubt the accuracy of the data

12  in gHire?

13  A.  No.  Most of it is self-reported by the candidate that is

14  transposed from their resume.

15  Q.  And when you pulled that data from gHire and the other

16  sources, why?  Why did you do it?

17  A.  Quite candidly, when I would receive an email like that,

18  it's important to me to take it seriously, and I wanted to see

19  the kind of scope and significance of it all.  Because the way

20  in which it was positioned in the note to Melissa and myself,

21  it concerned me, right.  So if this is a materially substantive

22  thing, then we wanted to address it, which I think is why I

23  responded so quickly to it.

24          MS. TOMEZSKO:  Let's actually pull up that exhibit so

25  we could look at the response.  I don't have the plaintiff's

NACVROW5                          Lucas - Cross

1   number, but I do know it is D-9.  Can we pull up defendant's --

2   and I assume there's no objection.

3            MS. GREENE:  I'm sorry, what was the document?

4            MS. TOMEZSKO:  D-9.

5            MS. GREENE:  No objection.

6            MS. TOMEZSKO:  Yes.  Can you please publish it, Jean.

7   Q.  Okay.  So if we could scroll down, Mr. Lucas, to the first

8   page -- actually, Jean can do it for you.  So this is the email

9   that Ms. Rowe sent to Melissa Lawrence and plus you into on

10  August 28, 2018?

11  A.  Correct.

12           MS. TOMEZSKO:  If we can look at the date and the time

13  stamp please, Jean.  Can you make that bigger.  Thank you.

14  Q.  What time was this email sent, according to this document?

15  A.  4:29 p.m. on August 28.

16  Q.  Okay.  Let's scroll up to the next communication in this

17  email, and let's look at Melissa Lawrence's response.

18           What time did Melissa Lawrence respond?

19  A.  About 4:49 p.m.

20  Q.  Okay.  So that's about --

21  A.  Twenty minutes.

22  Q.  -- 20 minutes later, same day?

23  A.  Yeah.

24           MS. TOMEZSKO:  Now, can we go up to the next email.

25  Q.  And this is you responding at what time?

NACVROW5                    Lucas - Cross

1   A.  5:02 p.m., same day; so 13 minutes after Melissa's

2   response.

3   Q.  And again, why did you respond this rapidly you said?

4   A.  It's a concern that someone is raising, so we always take

5   them seriously.  So for me it was important to, like, get the

6   process started as quickly as possible.

7   Q.  And after you pulled the gHire data that we looked at

8   earlier, did you stop there?

9   A.  No.  That's when I think what I mentioned earlier is we

10  have an employee relations team who looks into investigations

11  that would look into things like Ms. Rowe's concern.  So that's

12  when I started partnering with, I believe it was, April at the

13  time, and actually transferred it to her.  So after I passed it

14  to her, I wasn't involved in the investigation per se.

15          MS. TOMEZSKO:  If we could scroll down to the email

16  initially from Ms. Rowe, the next page of this document.

17  Q.  Was there something in here specifically that caused you to

18  escalate this concern to employee relations?

19  A.  I think one of the first things was the comparator to her

20  male peers, that was probably the first thing that kept me --

21  or kind of flagged it to me.  Then when she got into the

22  leveling concern about kind of being brought in as an 8,

23  there's this VP of financial services role, to me it signaled

24  that it was broader than maybe just this isolated issue.

25  Q.  Is that why you escalated it to employee relations?

1    A.   Mm-hmm.

2    Q.   Now, once you escalated it to employee relations, what was

3    your role in the process of the investigation that ensued?

4    A.   For a large part, I didn't have too much of a role.  Like

5    employee relations manages and runs the entire process.

6            So what typically happens in these situations is

7    whenever there's a concern, it is either raised directly to

8    them, funneled through our anonymous channels, or passed to

9    them from the HR team.  They typically take a period of time to

10   do a little bit of context gathering and understanding some of

11   the data that's around this.

12           So once I passed it to employee relations, I was

13   largely done with it until the conclusion of the investigation.

14   Q.   During the pendency of the investigation, even though you

15   were not involved, would April, I believe you said -- is that

16   April Beaupain?

17   A.   Yes.

18   Q.   Would Ms. Beaupain provide you periodic updates on where

19   they were in the process of the investigation?

20   A.   I seem to remember updates, but not specific updates, more

21   so just we're continuing to look into it.  Nothing that was

22   substantive.

23   Q.   I'd like to take a look at a document, P-55.  Mr. Lucas, if

24   you could look at the top of this document, it's the first

25   communication.  What do you recognize this to be?

NACVROW5                        Lucas - Cross

1   A.  So this was a note between April, Melissa Lawrence, Fiona

2   O'Donnell, who was my manager at the time, and Tariq Shaukat.

3   And it appears as though it was sent when I was out of office.

4   So I was redirecting them while I was on vacation.

5   Q.  And it says here in the last sentence:  I think April is

6   almost done with the investigation, so I'll defer to her for

7   resolution confirmation.  Do you see that?

8   A.  Yes.

9   Q.  Is that one of the kinds of status updates that you were

10  referring to earlier?

11  A.  Yeah.

12  Q.  Now, when you learned that Ms. Rowe had a concern about her

13  leveling, did you share that information with anyone outside of

14  employee relations?

15  A.  No.  I wouldn't necessarily have a need to.

16  Q.  To be more specific, did you have any discussions with

17  Stuart Vardaman about Ms. Rowe's leveling concerns that she had

18  raised in August of 2018?

19  A.  No.

20  Q.  Did you have any discussions with Tariq Shaukat about the

21  leveling concerns that Ms. Rowe raised in 2018?

22  A.  Just like some kind of process-related discussions about

23  it, but nothing like substantive.

24  Q.  If I could streamline here.  Oh, I'm sorry.

25  A.  I was just going to say, my conversations with Tariq were

NACVROW5                        Lucas - Cross

1   helping him manage through the process, but it was in the

2   context of the role that Ms. Rowe was interested in.  So

3   helping him kind of navigate that, I guess.

4   Q.  Let's see.  Oh, just one more question about seeking new

5   roles within Google.

6          When someone is transferred into a position that might

7   be scoped at a higher level than the level that person's at

8   currently, if they are transferred into that position, would

9   their level automatically change at that time with the

10  transfer?

11  A.  No.  So at Google, when people transfer into roles at --

12  how we describe it, L plus one or at a higher level, they

13  transfer at their current level, demonstrate their required

14  performance and subsequent impact of that level, and then are

15  promoted at some point once that is kind of warranted through

16  their contributions.

17  Q.  And I think you had mentioned earlier -- we were discussing

18  the interview process and what factors go into leveling.  You

19  had mentioned rubrics.  Can you explain what a rubric is?

20  A.  Yes.  So whenever we interview candidates at Google, we

21  interview them on kind of four broad attributes.  The first one

22  is what we call general cognitive ability.  It's basically

23  problem-solving.  Your ability to identify a problem, find data

24  to actually test the hypothesis, work towards a solution, maybe

25  iterate on that solution, and go back and look at feedback.  So

NACVROW5                      Lucas - Cross

1    it's kind of problem-solving at its core.

2            The second one is around leadership.  And it's less

3    about people leadership and more about individual and personal

4    leadership.  So how I often describe this is are you the person

5    that sees a problem and run towards it and solves it, even if

6    it's outside of your core responsibilities or scope.

7            Googliness is kind of the third one.  This is kind of

8    the one that's more teamwork and collaboration focused.  I

9    often describe it as are you a good person and would be a great

10   partner and teammate.

11           And then the last one is role-related knowledge.  And

12   this is simply can you do the job for which we're hiring you or

13   considering you.

14   Q.  Are those four competencies generally used to evaluate

15   candidates across all positions at Google regardless of job

16   family?

17   A.  Yes.

18   Q.  Are there any differences in which rubrics are used based

19   on the job family?

20   A.  Based on the job family, no.  For leadership roles, we --

21   there's kind of a second layer, if you will, of attributes that

22   we assess.  I hope I'm going to remember all five.

23           One is around adapts.  So this is can they flex to the

24   situation or the environment and still make progress on

25   whatever body of work they are trying to do.

1           Delivers.  So this is literally are you delivering

2     results and having the impact that we would expect from this

3     role.

4           Includes.  So do you lead from an inclusive

5     perspective; are you bringing people into the conversation and

6     kind of bringing them along with you.

7           And now I'm blanking on four and five.

8     Q.  That's good enough for me.

9     A.  Sorry.

10    Q.  I have no further questions, Mr. Lucas.

11          Thank you for your time.

12    A.  Thank you.

13    REDIRECT EXAMINATION

14    BY MS. GREENE:

15    Q.  Just a few follow-up questions, Mr. Lucas.

16    A.  Sure.

17    Q.  You talked about level being a reflection of scope,

18    contribution, influence, and impact.  Correct?

19    A.  Yes.

20    Q.  Did you have any understanding of how Ms. Rowe's scope

21    compared to that of her L9 colleagues?

22    A.  Not specifically about Ms. Rowe.  I was not supporting OCTO

23    at the time.

24          (Continued on next page)

25

1  BY MS. GREENE:

2  Q.  Do you have any information about how Ms. Rowe's

3  contributions compared to her L9 male comparators?

4  A.  I don't.  Again, I was not supporting OCTO at the time.

5  Q.  Do you or did you have any understanding of Ms. Rowe's

6  influence as compared to her L9 comparators in OCTO?

7  A.  I do not.

8  Q.  Do you have or did you have any understanding of Ms. Rowe's

9  impact with respect to her L9 male comparators in OCTO?

10  A.  I do not.

11  Q.  Those four factors —— scope, contributions, influence, and

12  impact —— do you know whether those were the four that were

13  used in OCTO?

14  A.  Not specifically for OCTO.  The four that are used across

15  the tech families.

16  Q.  But you don't know if they were used in OCTO, correct?

17  A.  Correct.

18  Q.  And you don't know whether there were any differing

19  expectations outlined anywhere from L8s and L9s in OCTO,

20  correct?

21  A.  Correct.  I wasn't supporting them.

22  Q.  And you can't say where differences between L8 and L9 as

23  they existed in 2016 and 2017 would be articulated?

24  A.  They are articulated.  I can see the document itself

25  because it has levels on the left-hand side and the four

NACHRow6                         Lucas – Direct

1    attributes on the top, and it's inclusive of all technical

2    roles.

3    Q.   But do you know whether that was used for OCTO?

4    A.   Sorry.  I thought you asked if I was aware of something.

5    Q.   No, I'm saying do you know whether anything like that was

6    actually used in OCTO in 2016, in 2017 at the time the leveling

7    decisions at issue were made?

8    A.   I don't have visibility into that.

9    Q.   You discussed four broad attributes that are generally part

10   of the rubrics that are used in interviewing.  Did I get that

11   right?

12   A.   There are five.  I could remember three of them offhand.

13   Sorry.

14   Q.   Those attributes, do you know whether those attributes ——

15   go ahead.  I'm sorry.

16   A.   I apologize.  There was a distinction.  You were asking

17   about the four attributes: the GCA, leadership, Googliness, and

18   RRK.  Those are kind of the universal ones across Google.  For

19   leadership ones, those are the ones I was referencing.

20   Q.   So for someone who was interviewing for a VP-level role,

21   are those the types of rubric attributes that would be used or

22   should be used in the context of interviewing them?

23   A.   Yes, we would focus on those.

24   Q.   So not asking questions relating to that would be a

25   deviation of the normal interviewing process for someone at

1   that level?

2   A.   It's difficult to say because there are some questions that

3   are mapped to multiple attributes.  So you can ask one question

4   and provide feedback in that specific attribute, but it also

5   touches on other attributes as well.  Does that make sense?

6   Q.   Would it be a deviation to do an interview for an L10 and

7   not use rubrics at all?

8   A.   I'm not aware of —— I'm not aware of a time in which a VP

9   has been interviewed and not used a rubric.

10   Q.   That would be unusual?

11   A.   Yeah.

12   Q.   Do you know whether the people who interviewed Ms. Rowe for

13   the VP financial services position used any rubrics in the

14   interview?

15   A.   For Ms. Rowe specifically or all of them?

16   Q.   For Ms. Rowe.

17   A.   I remember us talking about rubrics when we were having

18   our, I think, biweekly staffing meetings.  So we would talk

19   about it in context of the rubrics.  I don't specifically

20   remember, like, each individual candidate, though.  But we

21   definitely talked about rubrics in the context of the role.

22   Q.   Do you know if those rubrics were used with Ms. Rowe when

23   she was interviewed?

24   A.   I don't know specifically for Ms. Rowe, but, again, I can't

25   remember for each individual candidate.

1           MS. GREENE:  No further questions.

2           MS. TOMEZSKO:  Just one follow-up, your Honor.

3    RECROSS EXAMINATION

4    BY MS. TOMEZSKO:

5    Q.  Mr. Lucas, who is in the best position to explain to the

6    jury how leveling within OCTO worked, both generally and as to

7    Ms. Rowe?

8           MS. GREENE:  Objection.

9    Q.  To your knowledge, who would be the best person to explain

10   to the jury how leveling worked within OCTO and how it worked

11   with respect to Ms. Rowe?

12   A.  Will Grannis.

13          MS. TOMEZSKO:  Thank you.

14          THE COURT:  All right.  Well, I was going to have you

15   take a break at 3:15, but it's 3:02, so that probably doesn't

16   make sense.  Should we just take a break now?

17          All right.  Is Mr. Lucas excused?

18          You may step down.

19          THE WITNESS:  Thank you.

20          (Witness excused)

21          THE COURT:  All right.  Members of the jury, it is

22   3:03 p.m.  If you could, please be back here at 3:18 p.m.

23   There will be refreshments for you for this midafternoon break.

24   And please do not talk to each other or anyone else about the

25   case.  Keep an open mind.  Do not do any research about the

NACHRow6                          Lucas – Recross

1    case.

2              All right.  Thank you.

3              (Jury excused)

4              (Continued on next page)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

NACHRow6

```
 1              (Jury not present)

 2              THE COURT:  Have a seat.

 3              Just one question, and then we'll actually take a

 4    break.

 5              Ms. Greene, which of plaintiff's claims is the

 6    Bennett-related evidence relevant to?

 7              MS. GREENE:  Her New York City Human Rights Law

 8    discrimination claim.

 9              THE COURT:  OK.  Let's take a break.

10              (Recess)

11              THE COURT:  All right.  Ms. Williams, would you bring

12    in the jury, please.

13              MR. GAGE:  Your Honor, shall we have the witness come

14    in the courtroom?

15              THE COURT:  Yes, please.

16              (Continued on next page)

17

18

19

20

21

22

23

24

25
```

1              (Jury present)

2              THE DEPUTY CLERK:  You can all be seated except for

3     the witness.

4              THE COURT:  All right.  Let's proceed.  You may be

5     seated —— oh, no, you're going to be sworn in.

6     STUART VARDAMAN,

7          called as a witness by the Plaintiff,

8          having been duly sworn, testified as follows:

9     DIRECT EXAMINATION

10    BY MS. GREENE:

11    Q.  You can have a seat, Mr. Vardaman.

12             THE DEPUTY CLERK:  I'm sorry, sir.  I should have said

13    that.

14    Q.  Good afternoon.

15    A.  Good afternoon.

16    Q.  Mr. Vardaman, you were the recruiter for the financial

17    services vertical lead role as well as the VP sales financial

18    services role, correct?

19    A.  That is correct.

20    Q.  You weren't originally going to show up in person here

21    today, correct?

22             MS. TOMEZSKO:  Objection to relevance.

23             THE COURT:  Ask your next question.

24    Q.  Why did you decide to come here and testify today?

25             MS. TOMEZSKO:  Same objection.

1              THE COURT:  Overruled.

2    A.   Because I believe it to be the right thing to do, show up

3    in person.  I came here to tell the truth about what I know in

4    this case.  And I did also see a piece of media that attributed

5    words I don't recall.

6              THE COURT:  Wait a second.

7              Can we sidebar on this.

8              (Continued on next page)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1           (At sidebar)

2           THE COURT:  This worries me because I don't want them

3    going to look up that article and I don't want them knowing

4    what's in that article.  So any proposals?

5           MS. GREENE:  Here's the trouble.  He's presently

6    sitting there because he feels like he has to personally defend

7    himself.  That's something the jury should be able to know in

8    terms of assessing his credibility and whether he's biased.  He

9    feels and he testifies that ── he feels like he has skin in

10   this game, that's important.  And I'm not intending and I

11   didn't ask him specifically about that article for the reasons

12   that we discussed before, but I do need to have a way to get

13   out that he's here because he feels that he's personally been

14   accused of wrongdoing and he needs to defend himself.

15          THE COURT:  Is that in the *Wired* article?  Is he

16   specifically mentioned in the *Wired* article.

17          MS. TOMEZSKO:  The *Wired* article refers to an

18   executive recruiter.  It does not refer to him by name.  And

19   frankly, your Honor, I think he just testified as to why he's

20   here.

21          MS. GREENE:  But he started to go and elaborate about

22   why he's here.  I mean, it was unusual circumstances where he

23   wasn't going to come, and three days before, he changed his

24   mind.  And I think the jury should know why.

25          MS. TOMEZSKO:  Again, I think he just said that.

1            THE COURT:  He was about to go into it in the article,

2     and I don't want them hearing that.  When we voir dire them,

3     they talked about press.  They all said they didn't know about

4     the case.  I'm paraphrasing now, but they hadn't done research

5     about the case, whatever.  And if we mention a specific

6     article, I'm worried about the risk that they're going to look

7     for the article.

8            MS. TOMEZSKO:  I'm worried about that too, your Honor.

9            MS. GREENE:  Maybe can I ask him the more general

10    question, are you here because you feel that you need to

11    defend ——

12            THE COURT:  Yes.

13            MS. GREENE:  —— decisions that you made and to defend

14    your reputation?

15            MS. TOMEZSKO:  I'm fine with that.

16            THE COURT:  Yes, I'm fine with that.

17            MS. GREENE:  OK.

18            (Continued on next page)

19

20

21

22

23

24

25

1          (In open court; jurors present)

2    BY MS. GREENE:

3    Q.  Mr. Vardaman, I'm going to ask you a yes-or-no question.

4          Are you here because you feel the need to defend

5    actions that you yourself took in the course of Ms. Rowe's

6    employment?

7    A.  No.

8    Q.  Are you here because you believe that Ms. Rowe has accused

9    you wrongly of wrongdoing?

10   A.  No.

11   Q.  You're here simply to tell the truth?

12   A.  Correct.

13   Q.  And without telling us anything about anything more than

14   your own change of heart about testifying here in person, what

15   was your change of heart?  Why were you originally not going to

16   testify?  And, again, I don't want you to tell me anything that

17   precipitated it, but tell me just about your change of heart.

18   A.  Sure.  I was intended to —— I was intending to show up in

19   person the entire time.  The court date moved around quite a

20   bit, as did my schedule for travel and all that.  The last time

21   I recall it was landing during my kid's first week of school,

22   and I wasn't going to miss that.

23   Q.  All right.  We'll see if we come back to that later.

24          Mr. Vardaman, in the course of your recruitment for

25   the financial services vertical lead position, you did not

1    discuss with Mr. Shaukat what Ms. Rowe's qualifications were,

2    correct?

3    A.  As a matter of process for internal Googlers, my job was to

4    raise candidacy to the hiring manager who made the decision to

5    include them in process or not.

6    Q.  OK.  So, yes-or-no question, is it correct that you did not

7    discuss with Mr. Shaukat what Ms. Rowe's qualifications were?

8    A.  Correct.

9    Q.  Is it correct that the extent of your knowledge about her

10   background was that she had worked at JPMorgan Chase?

11   A.  Incorrect.  We ended up spending time talking about her

12   background.

13   Q.  When?

14   A.  I'm sorry?

15   Q.  When?

16   A.  Over the course of —— after I was asked to include her in

17   process, I recall we had a videoconference.

18   Q.  What did you know about her industry background?

19   A.  I walked through her background at a high level so that I

20   could ascertain enough information to send the prep note to the

21   panel members.  But, again, once the decision had been made to

22   include her into panel, that was my intention to deliver on

23   that to the decision-maker.

24   Q.  Mr. Vardaman, do you recall me deposing you in this case?

25   A.  Yes, I recall.

1   Q.  And you recall giving testimony under oath in that case?

2   A.  I do.

3   Q.  I'd like to now play for you a portion of that testimony.

4   A.  OK.

5   Q.  It's going to be page 42, line 5 through 14.

6           Once you have it, Mr. Yang, you can go ahead and play.

7           (Video played)

8           MS. GREENE:  You can stop it there.

9   Q.  Was that your testimony?

10  A.  That was, in fact, my testimony.

11  Q.  Did you give true testimony when you testified?

12  A.  I did.

13  Q.  Now, you didn't know what role Ms. Rowe had had at JPMorgan

14  Chase, correct?

15  A.  That's correct.

16  Q.  And you didn't know how many years she had worked in the

17  financial services industry, correct?

18  A.  That's correct.

19  Q.  You didn't know what her technological background was,

20  correct?

21  A.  Correct.

22  Q.  And you didn't know what advance degrees she held, correct?

23  A.  Correct.

24  Q.  You did not know what her experience was managing teams,

25  correct?

1    A.  That is correct.

2    Q.  And you did not speak with Brian Stevens about her

3    qualifications for the role, correct?

4    A.  No, I did not.

5    Q.  And you did not speak with Will Grannis about Ms. Rowe's

6    qualifications for the role, correct?

7    A.  That is correct.

8    Q.  In fact, you never learned what her qualifications were for

9    the financial services vertical lead role, isn't that right?

10   A.  As I mentioned earlier, the decision was made to involve

11   her in process, and that is my job, as steward of the process

12   for recruiting, to involve her in that process.

13   Q.  Let's go back to your deposition testimony, and we're going

14   to look at page 43:2 through 7.

15            Mr. Yang, if you could play that.

16            (Video played)

17            MS. GREENE:  And if we can play the answer.

18   Q.  I think we locked up, but was your answer to that question

19   no?

20   A.  Yes, it's right there.

21            (Video played)

22            MS. GREENE:  OK.  We can leave it, Mr. Yang.  Thank

23   you.  Sometimes technology is not our friend, even when we're

24   trying our best.

25   Q.  Was that truthful testimony when you gave it at your

NACHRow6                          Vardaman - Direct

1   deposition?

2   A.  Yes.

3   Q.  But that's different than what you just testified here

4   today, correct?

5   A.  As I recall, later on in the deposition, I provided

6   additional context.

7   Q.  My question was the testimony we just heard was different

8   than what you just said here in court about what you knew about

9   her qualifications, correct?

10  A.  That was my testimony, yes, ma'am.

11  Q.  OK.  Now, before the panel of interviews, you sent the

12  interviewers information about Ms. Rowe, correct?

13  A.  That is correct.

14  Q.  OK.  Let's look at Plaintiff's 37.

15          Do you recognize this as an email from you to Jason

16  Martin?

17  A.  I do.

18  Q.  And Mr. Martin was one of the individuals who interviewed

19  Ms. Rowe, correct?

20  A.  As I recall, yes.

21  Q.  And under context and competencies —— Mr. Yang, if you can

22  call those two bullet points out —— it says:  "Ulku was on

23  Brian Stevens' team before the reorg occurred that resulted in

24  some of the vertical OCTO folks transitioning to Tariq's

25  organization."  And then going on, it says:  "Brian Stevens is

NACHRow6                              Vardaman - Direct

1    supportive of her interviewing for the lead role."

2              That's what you told Mr. Martin, correct?

3    A.   That is correct.

4    Q.   And then it says:  "Please assess the leadership VP level

5    and GCA competencies.  If you'd like to review a list of

6    questions, please see here."

7              Do you see that?

8    A.   I do.

9    Q.   Do you know whether Mr. Martin in fact did assess the

10   leadership and GCA competencies?

11   A.   That was his focus areas.

12   Q.   Do you know whether he reviewed a list of questions before

13   interviewing Ms. Rowe?

14   A.   I do not know if he clicked on that link.  He was an

15   experienced interviewer.

16   Q.   My question is do you know whether he in advance and in

17   preparation for Ms. Rowe's interview assessed those competences

18   or looked at a list of interview questions?

19             MS. TOMEZSKO:  Objection.  Asked and answered.

20             THE COURT:  I'll allow it.  Overruled.

21   A.   You're asking me if I had personal knowledge of a separate

22   human being going through that list of questions.  The answer

23   is no.  No, ma'am.

24             MS. GREENE:  OK.  Let's take that down, and let's go

25   now to the section on Ulku Rowe and call that out, please.

1    Q.  It says:  "Impression:  Executive poise, confident (but not

2    ego-driven) forthright with a quick operating cadence."

3           You wrote that, correct?

4    A.  I did.

5    Q.  And then "RRK," what does that stand for?

6    A.  It's role-related knowledge is what it stands for.

7    Q.  And under concerns you noted "no major concerns are noted,"

8    correct?

9    A.  That is correct.

10          MS. GREENE:  Let's take down that document.

11   Q.  Then, Mr. Vardaman, did you send the same sort of email to

12   each of Ms. Rowe's interviewers?

13   A.  Yes.

14   Q.  Now, in Ms. Rowe's case, none of the four interviewers

15   provided feedback into the gHire system, isn't that right?

16   A.  We'd sometimes receive feedback outside of gHire, but it

17   was not entered, to my knowledge, in the gHire system, correct.

18   Q.  So I just want to make sure it's clear.  It's a yes-or-no

19   question.  You know that none of the four interviewers provided

20   feedback into the gHire systems for Ms. Rowe, correct?

21   A.  I don't recall them having entered it the last time I saw

22   the system.

23   Q.  And you yourself did not make any notes, written notes or

24   typed notes, of any informal feedback you may have received

25   from interviewers, correct?

1   A.  I believe that's correct.

2   Q.  And you yourself did not do anything to document any

3   internal feedback you may have received, correct?

4   A.  That is correct.

5   Q.  And you didn't share any informal feedback you may have

6   received with Mr. Shaukat, isn't that right?

7   A.  I — I don't recall.  I don't think so.

8   Q.  And Mr. Shaukat didn't share with you any feedback that he

9   may have reviewed, correct?

10  A.  No.

11  Q.  No, that's not correct, or no, he didn't share that with

12  you?

13  A.  Sorry.  No, I don't recall him sharing that with me.

14  Q.  Did anybody tell you that they thought Ms. Rowe was

15  abrasive?

16  A.  No.

17  Q.  Did anyone tell you that they thought Ms. Rowe was

18  cantankerous?

19  A.  No.

20  Q.  Did anyone tell you that they thought Ms. Rowe was not

21  Googly?

22  A.  No.

23  Q.  Did anyone express to you that they had ego concerns about

24  Ms. Rowe?

25  A.  No, not that I recall.

NACHRow6                        Vardaman - Direct

1    Q.  Do you believe Ms. Rowe to be self-oriented?

2    A.  Not that I recall.

3    Q.  Did anyone communicate to you that they thought Ms. Rowe

4    was self-oriented?

5    A.  No, not that I recall.

6    Q.  And had Mr. Shaukat ever told you that he had gotten that

7    sort of feedback about Ms. Rowe?

8    A.  No, he wouldn't have shared something like that with me.

9    Q.  Let's look at Plaintiff's Exhibit 111.

10           Now, you're familiar with the Thrive system at Google,

11   correct?

12   A.  Yes, ma'am, I am.

13   Q.  And Thrive is another system that recruiters use at Google,

14   is that right?

15   A.  That is correct.

16           MS. GREENE:  Now, if we can go to the second page ——

17   actually, if you could go back to the first page, Mr. Yang.

18   Q.  You see where it says "related to" and then it says

19   "candidate information for Ulku Rowe"?  Do you see that?

20   A.  Yes, yes.

21   Q.  So this is a Thrive printout related to Ms. Rowe, is that

22   right?

23   A.  That is correct.

24           MS. GREENE:  Let's go to the second page of this

25   document, and if we can call out the financial services

1  vertical lead.

2  Q.  This is the vertical lead position for which you were the

3  recruiter, correct?

4  A.  That is correct.

5  Q.  And on January 7, 2019, the status moved to rejected due to

6  panel Googliness, correct?

7  A.  That is what it says.

8  Q.  And it says —— has the following note:  "Across the board,

9  Ulku was viewed as overly self-oriented.  Recruiter expressed

10  she was not qualified for the role in addition to ego concerns.

11  The decision was made to run her through the full panel

12  anyway."

13         Do you see that?

14  A.  I do see that.

15  Q.  And that's what you wrote in Thrive on January 7, 2019,

16  correct?

17  A.  I believe I said I did not recall writing this.  Given that

18  my name is next to it, it's leading me to believe that I did

19  write that, and this is not my best work.

20  Q.  Now, this —— if we can take that down for a second,

21  Mr. Yang.

22         This shows all of the positions for which Ms. Rowe has

23  been considered at Google, correct?

24  A.  Up until the date it was run, that is correct.

25  Q.  So any recruiter in the future would be able to look at

1    this and see the notes from her prior interactions with other

2    roles at Google, correct?

3    A.  Not any recruiter.  A very limited number of executive

4    recruiters.  They would have access to it, but whether or not

5    they were involved in process would come down to the hiring

6    manager, the decision-maker, for a given requisition.

7    Q.  One of the purposes of this document was to create a record

8    of past consideration for roles so that in the future someone

9    would be able to look back on it, correct?

10   A.  That is correct.

11   Q.  Now, you understood that Ms. Rowe was not ready for the

12   VP-level role, but a decision was made to run her through the

13   process anyway, correct?

14   A.  At which point in time?

15   Q.  At the time she was put into the process, there was an

16   understanding that she wasn't VP ready, but they were still

17   going to run her through the process, correct?

18   A.  I recall that being my perspective.

19   Q.  Now, as a side note, you were involved in recruiting

20   Mr. Breslow too, weren't you?

21   A.  For a separate and distinct search, yes.

22   Q.  So Mr. Breslow was not recruited for the financial services

23   vertical lead position, correct?

24   A.  It was a managing director of compliance role, as I recall,

25   that is correct.

1   Q.  And that's a different position altogether?

2   A.  It is.

3   Q.  And Mr. Breslow was never interviewed in connection with

4   the financial services vertical lead role, correct?

5   A.  I can't speak to whether he was ever interviewed.  He did

6   not come through my process for this role at this juncture.

7   This role, again, was ultimately canceled.

8   Q.  Now, on January 22, 2020, you were interviewed by Google's

9   employee relations team in connection with Ms. Rowe's lawsuit,

10  correct?

11  A.  I had no idea what I was interviewing with ER for at the

12  time.  Looking back on it, yeah, I guess that's a fair

13  statement.

14  Q.  Well, you do recall speaking with employee relations in

15  January — January 22, 2020, correct?

16  A.  I recall it being early in 2020, yes, ma'am.

17  Q.  And the focus of those conversations were centered on

18  Ms. Rowe, correct?

19  A.  They were on a wide variety of topics, as I recall.

20  Q.  You were interviewed again a week later on January 29,

21  2020, correct?

22  A.  I think the second meeting was also in January, perhaps

23  early February.

24  Q.  And although you may not have known at the outset of the

25  meeting that it was about Ms. Rowe, the content of the

NACHRow6                          Vardaman - Direct

1    conversation centered on Ms. Rowe as a topic, correct?

2    A.   I believe there were questions that led me to think that

3    there —— that might have been, yeah, a topic.

4    Q.   And you were interviewed by employee relations because you

5    were the recruiter for that role, right?

6    A.   I think so.  Yeah, I think that's why they reached out to

7    me.

8    Q.   OK.  Let's go to Plaintiff's Exhibit 108.

9            MS. TOMEZSKO:  Your Honor, may we have a brief

10   sidebar?  I just want to clarify the Court's earlier ruling.

11           (Continued on next page)

1          (At sidebar)

2          MS. TOMEZSKO:  I just wanted to make sure, like, did

3    we actually ⸺ was there a ruling ⸺ I simply can't remember ⸺

4    that this comes?

5          THE COURT:  I may have to talk to you guys.

6          MS. GREENE:  You read a ruling into the record this

7    morning.

8          THE COURT:  Yes, I know, but there were some follow-up

9    questions.

10         MS. TOMEZSKO:  That's exactly my confusion.

11         MS. GREENE:  I think it was with reference to P57.  I

12   think an order had been entered with respect to P108.

13         THE COURT:  You guys come over here one second.

14         MS. TOMEZSKO:  I apologize.

15         THE COURT:  No, it's all right.

16         (Discussion off the record)

17         THE COURT:  Yes, the whole document comes in.  It was

18   ruled earlier that the whole document will come in.  Thanks.

19         MS. TOMEZSKO:  Thank you.

20         (Continued on next page)

21

22

23

24

25

1              (In open court; jurors present)

2              MS. GREENE:   OK.   If we can publish 108 to the jury,

3    please.   Now, if we can go to page 17 of this document.

4              Actually, I'm sorry, if we can go back to page 15 of

5    this document.

6    BY MS. GREENE:

7    Q.   And if you look at the bottom, it says:   "Meeting with

8    Stuart Vardaman January 22, 2020, 1 p.m. Pacific, via GVC,

9    Ashley lead, Jordan notes."

10             Do you see that?

11   A.   I do.

12   Q.   Were Ashley and Jordan the ER representatives with whom you

13   met on January 22, 2020?

14   A.   They must have been.

15   Q.   And do you recall Ms. Jordan taking notes of your meeting?

16   A.   Yeah, I recall someone taking notes.

17   Q.   OK.   Let's go now to page 17.

18             Do you see the section, the bullet, that second bullet

19   and its sub-bullets — can you call that out, Mr. Yang —

20   that's what you shared with ER on January 22, correct?

21   A.   That is the synthesis of the notetaker, what he wrote —

22   what he or she wrote down.

23   Q.   "It was shared with me that she was not senior enough,

24   didn't have the network, but we should put her through the full

25   process anyway," correct?

1   A.  I recall that being my personal thinking.

2   Q.  Well, shared with you, correct?

3   A.  That's what the notetaker took down, ma'am.  I can't speak

4   to that.

5   Q.  Let's go down to the fifth bullet, its sub-bullets, and

6   pull that out.

7           Now, that line "Ulku, by the time connected with her

8   struck me as a bit abrasive," that's what you told ER, correct?

9   A.  I believe I testified that I did not recall using that word

10  specifically.  What I was trying to impart was that over the

11  course of my meeting with Ulku, I felt disrespected, and

12  whatever notes or words the notetaker took down, again, I can't

13  speak to.

14  Q.  So you don't remember if you did or did not use the word

15  "abrasive"?

16  A.  No, I don't recall.

17  Q.  Now, if we can go down to the second to last bullet on this

18  page, you were asked if you remembered what the feedback from

19  the other interviews were, and you said:  "Not senior enough.

20  Expectation that she should have driven more value.  Everything

21  was pretty lackluster."

22          Is that what you told ER?

23  A.  Again, those were the notes that were taken down.  I think

24  what — where this came from was what I mentioned earlier about

25  sometimes feedback coming from outside the gHire system, and

1   that is what I was providing there, my recollection on it.

2   Q.  You were interviewed again on January 29, correct?

3   A.  Yeah, I think that's the date you mentioned earlier, yes,

4   ma'am.

5           MS. GREENE:  Now let's go to page 12 of this document,

6   if we could, please.

7   Q.  Just so I'm clear, before we do that, that feedback that

8   you said came into you through means other than gHire, again,

9   that wasn't actually written down or documented anywhere,

10  correct?

11  A.  I really don't recall.

12  Q.  Now, if we can look to the third bullet under the

13  January 29, 2020, meeting, you said you ended up —— well, you

14  recall Tariq saying do a full panel, and we need everything in

15  the system.  Is that accurate?

16  A.  For every search we try to get everything in the system,

17  so. . .

18  Q.  But with respect to Ms. Rowe, is it accurate you said,

19  "Going through the emails with Peter, mentioned the panel

20  members, and then it is interesting because you recall Tariq

21  saying do a full panel and we need everything in the system"?

22          That's what you told ER, correct?

23  A.  In sum and substance, I suppose, but for every single

24  process that we run for every candidate, we really try to get

25  the feedback in the system.

1   Q.  And is it always interesting when you're asked to do that?

2   A.  I don't recall ——

3          MS. TOMEZSKO:  Objection.

4   A.  —— using the word.

5          THE COURT:  Sustained.

6   Q.  OK.  You then ended up spending three to four weeks chasing

7   folks for feedback.  Do you see that?

8   A.  Yes, I do.

9   Q.  Then you say:  "This came in from a ping.  History not

10  turned on.  Ulku is not ready, is junior, would have expected

11  more."

12         Now, what's a ping?

13  A.  It's Google's internal instant messaging platform.  We call

14  it ping, although it's called something else.

15  Q.  And you told ER that the history wasn't turned on for

16  pings, correct?

17  A.  That's correct.

18  Q.  And the significance of the history not being turned on is

19  that there would not be any record of any alleged pings,

20  correct?

21  A.  No.  I didn't have —— that's a setting that each user has,

22  and I didn't keep my history turned on.

23  Q.  So you had no way to go back to look at those pings to see

24  what they said, correct?

25  A.  That would be correct, yes, ma'am.

1   Q.  And you didn't make any notes of the alleged pings when

2   they came in, correct?

3   A.  That is correct.  When I receive feedback like that ——

4   again, it's not unusual to receive feedback outside the system

5   —— we direct our panel members to go to gHire and put it in the

6   system.

7   Q.  You didn't note in any of your weekly update charts to

8   Mr. Shaukat that you had gotten feedback from panelists via

9   ping, correct?

10  A.  I don't recall.

11  Q.  And you didn't tell him exactly what the feedback was that

12  you got either, correct?

13  A.  Like in a live conversation?

14  Q.  Well, you shared and you testified earlier that you didn't

15  share with Mr. Shaukat any feedback that you received.  Is that

16  still your testimony?

17  A.  I believe I said I didn't recall.

18  Q.  But more than a year later after those pings you say came

19  through, you were telling ER about the negative feedback that

20  you'd supposedly gotten from panelists via ping, right?

21  A.  I was telling them what I recalled from —— from those

22  pings, correct.

23          MS. GREENE:  If we can go to page 15, and if we can

24  pull out the first full bullet, "does anything stand out to

25  you"

1  Q.  So here, at the end of the interview, your second

2  interview, you were asked a general question:  "Does anything

3  stand out to you about financial services lead process that was

4  out of the ordinary or a flag, so to speak?"  You said:  "It

5  wasn't out of the ordinary.  I think he treats people well."

6         Talking about Mr. Shaukat there?

7  A.  Yes, I would have.

8  Q.  And you say:  "I recall by the time Ulku met with me, she

9  was bristly with me."

10         Is that what you told ER in response to their question

11  about whether anything else stood out for you?

12  A.  I believe that I said and I testified that I didn't recall,

13  again, using a word, that word or the previous words that

14  you've highlighted.  I was trying to convey that I felt

15  disrespected as a result of meeting with Ulku.

16  Q.  Did you note that anywhere besides in your conversation

17  with ER?

18  A.  Again, that's someone taking notes and synthesizing what

19  I'm saying.  And no, everything that I tried to document was

20  for the benefit of candidates.  I think you see that in the

21  prep note to panel members.

22  Q.  So, to be clear, when you felt disrespected by Ms. Rowe,

23  you didn't document that anywhere, correct?

24  A.  I don't — I don't recall.

25  Q.  You didn't make a complaint to HR, did you?

1    A.  Feeling disrespected, I don't believe, is protected, a

2    feeling.

3    Q.  You didn't tell Mr. Shaukat that you felt disrespected by

4    Ms. Rowe, did you?

5    A.  Again, I was trying to position Ms. Rowe in the best

6    possible light so that, as she went through panels, she had the

7    best possible chance to show up in the best possible way that

8    only she could do.

9    Q.  So did the fact that you felt disrespected by Ms. Rowe play

10   any part in how you considered Ms. Rowe's candidacy for the

11   financial services vertical lead position?

12   A.  Objectively, no, I don't think so.

13   Q.  Do you recall, when meeting with ER, referring to Ms. Rowe

14   as cantankerous?

15   A.  That's another one, no, I did not.  I do not recall.

16        MS. GREENE:  OK.  We can take this down.  Actually,

17   I'm sorry, Mr. Yang, if you can put that back up for one more

18   minute, and if we can go ahead back to the January 29 entry.

19   Q.  And if you can look on page 13, the section "So you were

20   involved in Stuart recruitment."  Do you see that?

21   A.  Yes, I do.

22        MS. GREENE:  OK.  Let's pull that out.

23   Q.  And this is discussing Stuart Breslow versus Ms. Rowe,

24   correct?

25   A.  I'm sorry.  Can you repeat that again.

NACHRow6                        Vardaman – Direct

1   Q.  The subject of discussion here with ER was about

2   Mr. Breslow and Ms. Rowe, correct?

3   A.  It looks like it was primarily about Mr. Breslow.

4             (Continued on next page)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1    BY MS. GREENE:

2    Q.  Okay.  And you told ER that Ms. Rowe's risk technology

3    group and not as broad as Stuart.  And then you said, coupled

4    with Ulku's cantankerous style further undermined her changes.

5    Is that supposed to be chances?

6    A.  I didn't take those notes.  You keep saying that I said

7    these things.  I don't recall using that word.  That was

8    someone else taking those notes.

9    Q.  Okay.  That's what ER wrote down in response to your

10   conversation with them; correct?

11   A.  I guess.

12        MS. GREENE:  Okay.  We can take that down, please.

13   Q.  Now, those notes we were just looking at were January 29th,

14   2022; correct?

15   A.  Was that the second date?

16   Q.  Yes.

17   A.  Okay.

18   Q.  You heard from Ms. Rowe less than a week after that

19   interview on February 4th, 2020; correct?

20   A.  I don't recall the specific dates.  Something tells me

21   you're about to show me something that will reinforce that

22   date.

23   Q.  Well, let's go to P-101.  And does this refresh your

24   recollection as to -- well, not refresh your recollection, but

25   do you see here that on February 1st, 2020, Ms. Rowe reached

1    out to you?

2    A.   February 4th, yes.  Yes, ma'am.

3    Q.   So this is less than a week after you just had your second

4    interview with ER about Ms. Rowe's consideration for the

5    financial services vertical lead position; correct?

6    A.   I believe you're drawing a line between two unrelated

7    events.

8    Q.   I'm simply asking about the timing.  This is less than a

9    week after the second of two interviews you had with ER;

10   correct?

11   A.   February 4th does strike me as later in time than January

12   29th.

13   Q.   Less than a week in time; correct?

14   A.   Correct.

15   Q.   And Ms. Rowe was reaching out about the VP financial

16   services sales position; correct?

17   A.   That is correct.

18   Q.   And you were the lead recruiter for that role; is that

19   right?

20   A.   That is correct.

21   Q.   And Kirsten Kliphouse was the hiring manager?

22   A.   She was indeed.

23   Q.   And in response to Ms. Rowe's request here, you sent her

24   the job description for that role; correct?

25   A.   Yes, I believe it was a draft at the time.

NACVROW7                        Vardaman - Direct

1   Q.  Now, you only had one conversation with Ms. Kliphouse about
2   Ms. Rowe; correct?
3   A.  I don't recall the specific number of conversations, I
4   really don't.
5   Q.  Well, do you recall having testified at your deposition
6   about a conversation you had with Ms. Kliphouse?
7   A.  I recall letting her know that Ulku is interested in the
8   role.  I do.
9   Q.  And do you recall saying that -- well, did you tell
10  Ms. Kliphouse that Ms. Rowe had contacted you?
11  A.  That probably came up by the time I was connecting -- and I
12  was connecting with Ms. Kliphouse regularly, or semi regularly.
13  I -- yes, at some point in time after Ulku reached out, I would
14  have surfaced that with the hiring manager, Ms. Kliphouse.
15  Q.  And Ms. Kliphouse confirmed that she and Ms. Rowe had had
16  coffee; isn't that right?
17  A.  As I recall, by the time I had reached out, Kirsten had
18  mentioned -- Ms. Kliphouse had mentioned that she had coffee
19  with Ulku; correct.
20  Q.  And as of the time of your deposition, that's the only
21  conversation you recalled having with Ms. Kliphouse about
22  Ms. Rowe; correct?
23  A.  I believe that's right.
24  Q.  Now, you had a call with Ms. Rowe eventually with respect
25  to this position; correct?

1    A.  Yes.

2    Q.  And that was later in February?

3    A.  Yes.

4    Q.  Now, in between the time that you sent Ms. Rowe the job

5    description and the videoconference you had with her -- was it

6    a videoconference?

7    A.  It was a videoconference.

8    Q.  You didn't do anything to find out about Ms. Rowe's

9    qualifications for this position; correct?

10   A.  That is correct.  I recall providing that testimony in the

11   deposition.

12   Q.  And you didn't do anything to find out about her

13   qualifications not just for this position, but at all; correct?

14   A.  It would have been relative to this specific position I was

15   working on.  No, I don't believe I had another conversation

16   with Ulku, no.  Ms. Rowe.

17   Q.  And you can't remember whether you even looked at her

18   LinkedIn profile between the time you sent her the financial

19   services sales -- VP sales financial services job description

20   and the time you told her she wasn't going to be considered;

21   isn't that right?

22   A.  As a matter of process, I am sure I looked at her LinkedIn

23   profile.  Ultimately, by the time I raised Ms. Rowe's candidacy

24   to Ms. Kliphouse, Ms. Kliphouse said they had met for coffee

25   and that she wanted me to focus on another candidate.

1  Q.  You didn't testify at your deposition about Ms. Kliphouse

2  telling you that she wanted to focus on another candidate, did

3  you?

4  A.  No, I did not.

5  Q.  So that's new testimony; correct?

6  A.  Yeah, I guess you can say that.

7  Q.  And do you recall me at your deposition asking you to tell

8  me everything about the conversation you had with

9  Ms. Kliphouse?

10 A.  Yes, ma'am.  "Everything" is quite big.

11 Q.  And do you recall me asking you at your deposition if you'd

12 had any other conversations about Ms. Rowe that you hadn't

13 testified to?  Do you recall me asking you that?

14 A.  I do.  I was quite nervous and ready to jump off the video.

15 Q.  Okay.  So you remember now today what you didn't remember

16 three years ago, when it was the same year in which this had

17 happened, is that what you're saying?

18 A.  Yes.

19 Q.  And when you were deposed in 2020, do you recall giving

20 testimony about whether you'd reviewed her LinkedIn profile?

21 A.  I don't recall.

22 Q.  So do you or do you not have a specific recollection of

23 even just looking at her LinkedIn profile before you had a

24 videoconference where you told her she wasn't going to be

25 considered?

1    A.  Again, as a matter of process, I would have looked at her

2    LinkedIn profile.  I do not have a specific recollection of

3    having done that for that search, no, ma'am.

4    Q.  Now, it would have been impossible for you to tell

5    Ms. Kliphouse anything about Ms. Rowe's qualifications or

6    experience or background or expertise or reputation or network

7    when you didn't know anything about those things yourself;

8    correct?

9    A.  I had assumed that Ms. Rowe was the best -- she was the

10   best possible person -- person, excuse me, to talk about her

11   background with the hiring manager.

12   Q.  Did you set up an interview for Ms. Rowe with

13   Ms. Kliphouse?

14   A.  No, I did not.

15   Q.  Did you set up a telephone conversation with Ms. Rowe and

16   Ms. Kliphouse?

17   A.  No, I did not.  Ms. Kliphouse, again, told me that she had

18   connected with Ulku over coffee.

19   Q.  Did she tell you how long that had lasted?

20   A.  I don't recall.

21   Q.  Did she tell you whether they discussed her qualifications?

22   A.  I don't recall.

23   Q.  But again, you weren't in a position to tell Ms. Kliphouse

24   anything because you didn't know anything about her

25   qualifications, experience, background, expertise, reputation,

1    network, anything; correct?

2    A.   When it comes to internal Googlers, my job is to take their

3    interest to the hiring manager and then go from there.

4    Q.   Do you recall testifying at your deposition that your basis

5    for determining that Ms. Rowe was not qualified to be

6    considered for the VP role was largely driven by her comparison

7    to external candidates?

8    A.   I believe so, yes.

9    Q.   You would agree, wouldn't you, that it would have been

10   impossible to do a fair comparison of Ms. Rowe to anyone if you

11   or Ms. Kliphouse did not know anything about Ms. Rowe's

12   experience or qualifications or background or expertise or

13   reputation or network; correct?

14   A.   I was told to focus on other candidates, and I did.

15             MS. GREENE:  No further questions.

16             THE COURT:  Ms. Williams, can we have some water for

17   the witness.

18   CROSS-EXAMINATION

19   BY MS. TOMEZSKO:

20   Q.   Good afternoon, Mr. Vardaman.

21   A.   Good afternoon.

22   Q.   Earlier Ms. Greene played some clips from your deposition.

23   Do you recall that?

24   A.   I do.

25   Q.   Is that your first time sitting for a deposition?

1    A.   It was.

2    Q.   And I think earlier you said you were nervous; is that

3    right?

4    A.   Very.

5    Q.   Are you nervous now?

6    A.   I am.

7    Q.   And you have mentioned previously that the trial date had

8    been moved, and the reason that you did not come was because

9    your kids were starting school; is that right?

10   A.   That's right.  I wasn't going to miss my kids' first week

11   of school.  And I saw that it moved.

12   Q.   Where do you live, Mr. Vardaman?

13   A.   Austin, Texas.

14   Q.   Would you have had to have traveled out of state to arrive

15   here during the first week of your kids' school?

16   A.   I would have, yes.

17   Q.   Are you still employed at Google?

18   A.   I am not.

19   Q.   When did you leave Google?

20   A.   It would have been January of 2022.

21   Q.   Earlier Ms. Greene played some testimony for you and asked

22   whether you knew anything about Ms. Rowe's background.  Do you

23   remember that testimony?

24   A.   I do.

25   Q.   Was that the only time Ms. Greene asked you that question

1    in that deposition?

2    A.  I don't think so.

3    Q.  Do you recall whether she asked you that question later in

4    the deposition?

5    A.  I believe that's correct.

6    Q.  And do you recall what you testified to when you were asked

7    subsequently that question?

8    A.  Yes, that we spent time on her background.

9    Q.  When you say you spent time on her background, what

10   precisely are you referring to there?

11   A.  That's essentially everything leading up to that point.  So

12   her career history, her even joining Google, education history,

13   all that stuff.

14   Q.  In relation to the process that you ran for Ms. Rowe, when

15   did that conversation occur?

16   A.  In relation to the process?

17   Q.  Correct.

18   A.  So that was before -- so after I was instructed to involve

19   Ms. Rowe in process, I scheduled a meeting with her as a get to

20   know each other, get to know her background, so that I could

21   write the prep note to the panel members that I ultimately

22   ended up writing.

23   Q.  Is that your standard process for a requisition like this?

24   A.  It is.  I do think for a external candidate it would have

25   been a much deeper dive.  But after the decision had been made

1    to put Ms. Rowe in process, my job was to make that happen.

2    Q.  I want to just step back for a second and let's talk about

3    your role in the recruiting process at Google around this time.

4           So now we're talking about 2018, okay?  I think you

5    had referenced earlier that you said you are the steward of the

6    process; is that right?

7    A.  That's how I think of myself, yes.

8    Q.  Can you explain a little bit more about that and what that

9    means for your role in the process?

10   A.  Yeah.  So the recruiting process at Google is pretty

11   straightforward.  But there's a lot of nuance based upon the

12   panel members that we're trying to schedule and all that stuff.

13   So a lot of what I end up doing or recruiters at Google end up

14   doing is managing, trying to manage a candidate's expectations

15   as to what the process will look like as it unfolds.  It can

16   take some time.

17   Q.  Who decides in the recruiting process which candidates are

18   put through the interview process for an open role?

19   A.  The hiring manager.

20   Q.  Who decides which candidates get an offer for an open

21   position?

22   A.  That would be on the heels of panel interview feedback.

23   And there would be a targeted candidate on the heels of going

24   through the entire process.

25   Q.  And who makes the decision about which candidate -- the

1   targeted candidate is going to get the offer?

2   A.  That would be the hiring manager, after soliciting and

3   reviewing the feedback from the rest of the panel members.

4   Q.  As a recruiter at Google, do you have any authority to

5   determine which candidates go through the interview process?

6   A.  I don't.  Definitely not for internals.

7   Q.  And as a recruiter at Google, do you have any authority to

8   make hiring decisions for the open positions that you're asked

9   to fill?

10  A.  I do not.

11  Q.  And was that true for the positions that you were filling

12  in Tariq Shaukat's organization in 2018, as well?

13  A.  Correct.

14  Q.  Do you recall for how long the open -- the opening for the

15  financial services vertical lead role, how long that was open?

16  A.  I want to say at least a year, almost the entirety of 2018.

17  Q.  Did you focus on external candidates for the role before

18  turning your attention to internal candidates?

19  A.  There were external -- yes, we started looking external.

20  And then by the time Ms. Rowe was involved, we had internals

21  and externals involved in that, in that search, yes.

22  Q.  Is there a reason that you focus on external candidates

23  first before turning to internal candidates?

24  A.  I think given the scope and scale of the search, we were

25  looking for candidates that would allow us to catch up from a

1    market perspective in the Google Cloud organization.  We were

2    looking for candidates who essentially could ask giant

3    corporations in the financial services industry for business.

4    Q.  And the candidates that you are considering for this

5    financial services vertical lead role, did all of them get to

6    the step of going through panel interviews?

7    A.  No.

8    Q.  Were there some that did not even get interviews at all?

9    A.  That is correct.

10   Q.  Typically, how many interviewers are on a panel for those

11   that make it to that step in the process?

12   A.  We try to have at least four.  We want to be cognizant of

13   what we call interview fatigue.  We don't want to put people

14   through 15 interviews.  We try to manage it.  And that

15   typically manifests about four panel members.

16   Q.  And do you recall how many panel interviewers interviewed

17   Ms. Rowe for the financial services vertical lead role?

18   A.  I believe it was four.

19   Q.  Did all of the candidates that went through the panel

20   interview step get to meet with Diane Greene?

21   A.  No.

22   Q.  And who is Diane Greene?

23   A.  Diane Greene was the CEO for Google Cloud at the time.

24   Q.  Do you recall how many candidates got the chance to meet

25   with Diane Greene?

1   A.  I believe it was two.

2   Q.  And who were they?

3   A.  Both females.  One by the name of Ranjanna Clark, and the

4   other by the name of Diana Leyfield.

5   Q.  Was Ms. Rowe scheduled to meet with Diane Greene, to your

6   knowledge?

7   A.  She was indeed.

8   Q.  Can you describe your experience in trying to get time on

9   Diane Greene's calendar?

10  A.  Next to impossible.  Truly.  She was running a -- at that

11  time I think Cloud was a $5 billion organization.  She was

12  reporting into Sundar Pichai.  He's the CEO of Alphabet.  It

13  was exceptionally difficult to get on her calendar.  And as I

14  recall at the time and toward the end of that year, it was

15  announced at some point that Diane Greene was going to be

16  stepping out and a gentleman by the name of Thomas Kurian was

17  going to be taking over as CEO of Google Cloud.

18  Q.  Now, you said Ms. Rowe was scheduled to meet with

19  Ms. Greene.  But do you know whether she, in fact, did meet

20  with Ms. Greene?

21  A.  I believe that meeting was canceled.

22  Q.  And do you know why it was canceled?

23  A.  I think because Diane was stepping out of the organization

24  and wasn't going to be there anymore.

25  Q.  Was the process that you ran for Ms. Rowe for the financial

NACVROW7                         Vardaman - Cross

1    services vertical lead role any different than the process you

2    ran for other candidates for that role?

3    A.   I did a deeper dive with the external candidates than I did

4    on the get-to-know-you, get-to-know-your-background

5    conversation than I did with Ms. Rowe.  But everything else

6    would have been the same.

7    Q.   Why did you do a deeper dive on the external candidates?

8    A.   I think the philosophy at Google is that if someone wants

9    to, you know, run at a role, and the hiring manager, if he or

10   she is supportive of that candidate, then the notion is to let

11   them run and try to show up as best as possible to the panel.

12   Q.   Now, earlier you mentioned you had had a conversation with

13   Ms. Rowe at the beginning of the process.  Do you recall

14   approximately how long that conversation lasted?

15   A.   I believe over the course of the testimony and as a result

16   of my process, I would have ballparked about 45 minutes.

17   Q.   And again, what was the purpose of you reaching out to

18   Ms. Rowe for that conversation?

19   A.   Really it was to let her know the process, that we were --

20   essentially provide insight on the process that we were going

21   to run with her.  It is a little bit different because she was

22   internal, so she was going to launch into panel just as quickly

23   as we could schedule it.  And as I mentioned earlier, the

24   reason I wanted to spend time with her was to get enough

25   information so that I could send the prep note that was

1    displayed earlier.

2    Q.  I'd like to show you a document, Mr. Vardaman.

3           MS. TOMEZSKO:  Can we pull up Plaintiff's 35, please.

4    Q.  Mr. Vardaman, do you recognize this document?

5    A.  I do.

6    Q.  And what is it?

7    A.  It's the -- it's the prep note it looks like I sent to

8    Darryl Willis.  Lisa Orr is his EVP.

9    Q.  And is this the same prep note that you were just

10   testifying about?

11   A.  Yes, it even looks -- the competencies might have been a

12   little bit different.  As a matter of practice, we ask panel

13   members to focus on different competencies, at least two each

14   time, so that there's some degree of overlap in case they don't

15   get to both competencies.

16   Q.  And when you say "competencies," what in this email are you

17   referring to when you use the word "competencies"?  Can you

18   point us to what it is you're referring to there?

19   A.  Yes.  So it's the second bullet under context and

20   competencies.  It says:  Please assess role-related knowledge.

21   And I think it's such a bad name, but GCA stood for general

22   cognitive ability, strategic thinking.

23   Q.  I'm sorry, I didn't mean to interrupt.

24          Are those also known as rubrics within Google?

25   A.  Those were the competencies.  Regardless of which level, we

1    had four main competencies at Google.  Those are two of them.

2    And they were defined based upon the level of the given role.

3    So yeah, rubric, matrix, but yes.

4              MS. TOMEZSKO:  Now, I'd like to switch quickly to

5    another document.  It's Plaintiff's 151.

6              Jean, can you please pull that up.

7    Q.  Mr. Vardaman, do you recognize this document?  If it would

8    be helpful for us to scroll through to make sure that you know

9    what it is you're looking at I'm about to ask you about, we're

10   happy to do so.

11   A.  Wait.  But the first page was for a role I didn't

12   recognize.

13             MS. TOMEZSKO:  Can we go back to --

14   A.  Back to the first page.

15   Q.  This page here?

16   A.  I'm just looking for where the title for the role would be.

17   Q.  Let's flip to the second page.

18   A.  Sorry.

19   Q.  No problem.

20   A.  Been a while since I looked at this.

21             Financial services vertical lead.  Got it.

22   Q.  What is this document?

23   A.  So this is an output from gHire.  And so this -- this would

24   be on the heels of a panel interview.  We would take

25   information here.  In this case it would show who the panel

NACVROW7                    Vardaman - Cross

1   members were, how they were -- how they rated the candidate.

2   And then that would go into what we call the packet.  The

3   packet would ultimately be submitted to hiring committee, and

4   hiring committee would say yay or nay.

5          MS. TOMEZSKO:  If we could just slowly scroll through

6   a couple pages.  Okay.  Let's stop here for a second.

7   Q.  Do you see here where it says n/a, not answered.  Interview

8   questions asked, not answered.  Do you see that?

9   A.  I do.

10  Q.  What do you conclude from the absence of that information

11  in this packet?

12  A.  I'm not sure what I can conclude from it aside from the

13  fact that I believe that's under Mr. Willis's heading that

14  Mr. Willis had not entered his feedback.

15  Q.  Is that atypical for the processes that you ran at Google,

16  when Mr.  -- at least in Mr. Shaukat's organization in 2018?

17  A.  I can say across Google this is very common.

18         MS. TOMEZSKO:  If we could flip another page, Jean,

19  please.  Okay, I just want to stop here for a second.

20  Q.  Do you see in the middle of the page the name Jason Martin?

21  A.  I do.

22  Q.  And does this indicate to you that we're about to get to

23  the portion of the packet or the document that would reflect

24  Jason Martin's entry into gHire?

25  A.  Yes.

1           MS. TOMEZSKO:  Can we go to the next page, please,

2    Jean.

3    Q.  And do you see what's on the screen, Mr. Vardaman?

4    A.  I do.

5    Q.  What are those?  What are these words we're looking at?

6    A.  These -- I believe it's titled just -- it's the interview

7    notes.  Some executives get a head start on entering feedback,

8    and so they will either, in the course of an interview or

9    immediately after, start typing in notes because they know that

10   we're going to follow up with them pretty quick and ask for

11   them to put them in.

12   Q.  Now, do you see right under interview notes where it says

13   "leadership includes," do you see that?

14   A.  I do see that.

15   Q.  What does "leadership includes" refer to?

16   A.  So leadership would be the competency, includes would be a

17   key aspect of that competency.  So like inclusive leadership.

18   Q.  So one of the competencies or rubrics that we talked about

19   earlier?

20   A.  Correct.  So under the four main headings of competencies,

21   with the exception of RRK, role-related knowledge, leadership,

22   I think, had three forms of leadership.

23   Q.  And right below that it says CGA strategic mindset.  Do you

24   see that?

25   A.  I do.  That's general cognitive ability.  And the

1   sub-competency underneath that main heading was strategic

2   mindset.

3   Q.  Is that the same CGA acronym that you referred to earlier

4   when we were looking at the prep document?

5   A.  Yeah, GCA, yeah.

6   Q.  Thank you.  I switched it around.

7             Mr. Vardaman, if an interviewer enters information

8   into gHire but does not submit the feedback, it is in draft

9   form; is that right?

10  A.  That is correct.

11  Q.  Do you have access to the draft notes in gHire as the

12  recruiter for the role?

13  A.  I do not.  That is locked down.

14  Q.  I also want to show you some of the similar documents that

15  we've seen -- or that we were just looking at for two of the

16  other names that you mentioned.

17            MS. TOMEZSKO:  And I just want to pause here because I

18  want to check and make sure there is no objection to D-71 or

19  D-70; or if there is, we should figure that out.

20            MS. GREENE:  Your Honor, I believe this is a document

21  that would be subject to a limiting instruction.

22            MS. TOMEZSKO:  Can we put it on --

23            THE COURT:  D-71, is that what you said?

24            MS. TOMEZSKO:  D-71 and D-70.  And I believe

25  Ms. Greene is correct that it would be subject to a limiting

1    instruction.

2             THE WITNESS:  Not supposed to look at it yet.

3             THE COURT:  It shouldn't be up for the jury yet.

4             We're going to have to have a sidebar.

5             MS. TOMEZSKO:  Sure.

6             (At sidebar)

7             THE COURT:  Tell me, I'm not --

8             MS. GREENE:  I think this would be subject to the same

9    limiting instruction about feedback, and that it can be

10   considered for the impact on the effect of a listener, but as

11   to the --

12            MS. TOMEZSKO:  The truth of the feedback as to that

13   candidate's qualifications.

14            THE COURT:  So you're agreeing on that.

15            MS. TOMEZSKO:  Yes.

16            I believe it would be a similar instruction to the one

17   that you delivered to the jury, I think it was, this morning

18   about feedback received by Mr. Shaukat and Mr. Vardaman about

19   Ms. Rowe's candidacy.

20            These are candidates for the same role.  And so we

21   would agree that the same limiting instruction as to the

22   feedback, that it is offered for the purpose of the effect on

23   the listener, in this case Mr. Vardaman, and not for the truth

24   of the substance of the feedback as to that candidate's

25   qualifications for the role.  Are you okay with that?

1                MS. GREENE:  Yes.

2                MS. TOMEZSKO:  Okay.

3                THE COURT:  All right.  I was going to let them go at

4      4:30.  How much more do you have?

5                MS. TOMEZSKO:  Oh, 15 minutes.

6                THE COURT:  I don't -- so why don't we call it a day

7      now for the jury.  I'll have this ready in the morning and

8      we'll start there.

9                MS. TOMEZSKO:  Okay.

10               THE COURT:  All right.

11               MS. TOMEZSKO:  Okay.

12               (Continued on next page)

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1            (In open court)

 2            THE COURT:  Members of the jury, we're going to

 3    adjourn now for the day.  So we thank you again for your

 4    service.

 5            I'm going to give my reminders again.  Do not discuss

 6    the case with each other.  Do not discuss the case with anyone

 7    else.  Do not do any research about the case.  And keep an open

 8    mind about the evidence until all of it is in.

 9            And with that, I wish you a good evening.  And please

10    come back tomorrow morning at 9:15.  Thank you.

11            (Jury not present)

12            THE COURT:  Mr. Vardaman, you can step down now.  And

13    if you would please leave the courtroom.  I need to talk with

14    the lawyers for a few minutes.  Thank you.

15            (Witness not present)

16            THE COURT:  All right.  Everybody please be seated.

17            All right.  I just want to ask a couple of questions

18    about the Burdis issues.

19            Ms. Williams, can you update us on time?

20            THE DEPUTY CLERK:  Oh, that's what I'm doing right

21    now.

22            THE COURT:  Okay.  So we'll come back to that.

23            THE DEPUTY CLERK:  Yes.  I'm putting in the last one.

24            THE COURT:  All right.  And plaintiff, you'll have for

25    me some time soon a list of documents and witnesses as to which
```

1   the Bennett issue arises, yes?

2               MS. GREENE:  Yes, we'll prepare that as soon as we're

3   back in the office.

4               THE COURT:  Okay.  Thank you.

5               Okay.  So now for Burdis-related questions, if you

6   could look at 102B.  That is the Google policy titled "Our

7   Leveling Approach."  Do you have it?

8               MR. GAGE:  What can I do for you, Judge?  What's the

9   question?

10              THE COURT:  I want to ask a question, but I don't

11   think that Ms. Greene has the document in front of her.

12              MR. GAGE:  It's up on the screen, your Honor.

13              THE COURT:  Oh, it is.  Okay.  Okay.

14              In seeking to admit Google's policy titled "Our

15   Leveling Approach," plaintiff claims that, quote, defendant was

16   on notice of plaintiff's claims as of January 2019.  And to the

17   extent it failed to maintain spoliated records, it cannot now

18   rely on its own spoliation to deprive plaintiff of the ability

19   to enter into evidence Google's policies, especially when

20   defendant has itself offered into evidence policy documents

21   dated 2020.

22              What is your response to that?

23              MS. TOMEZSKO:  This one is going to be me, your Honor.

24              THE COURT:  All right.  Ms. Tomezsko.

25              MS. TOMEZSKO:  I think it goes to the nature of how

NACVROW7                        Vardaman - Cross

1    policies are maintained at Google.  As we've explained to

2    plaintiff's counsel at the beginning of discovery in this case,

3    these are static pages and they are frequently refreshed and

4    updated.  And we had a great amount of trouble pulling and, we

5    call it, scraping the system to find all the versions because

6    they could be updated once a year, once a week, sporadically.

7         And so I wouldn't agree that it was a spoliation

8    issue.  I would agree that we don't have all the versions of

9    the policy.  We do have versions of the policy that exist in

10   other forms and are stored in other places that are not this

11   static.  It's an internal site.

12        So at Google, you just type in — and I'm just

13   simplifying this — go/whatever, and it pulls up the policy.  So

14   this is an ever-evolving page that is continuously updated

15   whenever there is a tweak in the policy.

16        We provided a lot of versions of them, but we provided

17   what we could find at the time that these were requested.  And

18   as soon as the lawsuit was filed and, in fact, I think before

19   that even, when we had a demand letter, we issued a legal hold.

20   And, you know, that was in 2019/2020.  And we produced the

21   policies from 2019/2020, like this one.  We also produced any

22   policies that we could find previously, including one of them I

23   think was shown to Mr. Lucas.  But that is not stored in the

24   same system as this one.

25        THE COURT:  All right.  Well, on the subject of

1    versions, so the plaintiff has also noted that, quote, this

2    document is a version of a policy that witnesses will testify

3    were in place at the time decisions were made.  And goes on to

4    note as an example that, "Ms. Burdis testified that policies

5    contained within this version of the document were in effect at

6    the time she made the leveling decision."

7              Which policies exactly?

8              MS. TOMEZSKO:  Are you asking me or the plaintiff?

9              THE COURT:  Yes.

10             MS. TOMEZSKO:  So if I could guess at Ms. Burdis's

11   testimony, I think the fact that there is a leveling approach,

12   the fact that leveling has been a system at Google for many

13   years, I think Mr. Lucas said for the last ten years, that

14   there is independent review and consistent evaluation of all

15   candidates.  But the details about how that is documented in

16   the rigor around documentation for that has evolved over the

17   years.

18             And so I think the issue here, your Honor, is that to

19   the extent a policy in 2019 or 2020 reflects a more evolved

20   process, because Google continuously reviews and revisits

21   these, as does any employer, the fact that there is a policy in

22   2019 or 2020 that requires something to be recorded at the time

23   might not have been something in place in 2016 and 2017.  And

24   what I would like to avoid is the jury drawing an inference or

25   an adverse inference for the absence of information that was

1   not required at the time.

2            Certainly the overall policy about generally how

3   leveling works and the checks and balances that were in place,

4   I think that's fair.  But to the extent that they are going

5   into details about documentation, they can ask the witnesses

6   whether the documentation itself was something that was in

7   place, and the witnesses are perfectly able to testify to that.

8   But to the extent they can't remember the fact that a policy in

9   2020 says these are generally recorded, doesn't necessarily

10  mean that the absence of that recording in 2017 means that a

11  policy was violated.

12           THE COURT:  The concern is how does this not run a

13  very real risk of causing juror confusion?

14           MS. GREENE:  Is that a question for me, your Honor?

15           THE COURT:  I'm throwing it out for both sides.

16           MS. GREENE:  Because Ms. Burdis testified to what

17  about this document was consistent with what she was doing back

18  in 2016.  We have her deposition.  It's only coming in in the

19  context of her deposition testimony.  So she can and did say

20  what about this was in play at the time she made the decision

21  or was involved in the decision, I should say.

22           I mean, your Honor, the fact that Google does not

23  retain its policies when it has been on notice of the

24  litigation, right, it could have made screenshots, it could

25  have saved them elsewhere.  It's a leveling case.

1              There was also a class action.  I know it's not

2    mentioned, we're not mentioning it in the case at all, but *L.S.*

3    *v. Google* was in existence long before 2020.  And these

4    documents should have been retained in connection with that

5    lawsuit, which was only settled -- it was only settled after

6    discovery in this matter.

7              So the fact that they are saying they don't have the

8    actual policies at the time is not an issue for plaintiff.

9    Plaintiff should be able to use what they produced and use it

10   with the witness who was produced to testify about it.  So, you

11   know, to the extent that there is any prejudice to them, it's

12   of their own creation by failing to preserve the actual

13   policies that were in place.

14             THE COURT:  Why can't Ms. Burdis simply be questioned

15   about the policies that were in effect at the time without

16   admitting P-102B?

17             MS. GREENE:  Here's the challenge, your Honor:

18   Ms. Burdis is testifying by deposition.  So it's her

19   deposition.  The document was the document shown to her.  She's

20   testifying about the document that was shown to her.  The jury

21   needs to see the document to understand the questions that were

22   being asked of her.  If, your Honor, we had her here in person,

23   this would not be an issue, but we don't.  And we're relying on

24   her deposition testimony.  And that's the real problem we have.

25             THE COURT:  All right.  I understand.

1            Let me ask a question about one of the designations,

2       the deposition designations.  It's 94, 7 to 12.  So just

3       reading from the transcript:

4       "Q.  Do you recall telling ER that some of the candidates that

5       had come in got down-leveled to a Level 7?

6       "A.  I don't recall the exact conversation verbatim, but what

7       is written here certainly rings true to likely how the

8       conversation went, yes."

9            So my question is, what is the purpose for which

10      you're seeking to offer that testimony and why is it not

11      hearsay?

12            MS. GREENE:  Well, your Honor, the document that is

13      being referenced here and she's being asked about is 108.  And

14      her comments to ER about the down-leveling of an individual,

15      and she's testifying about -- I asked her a question, who were

16      the individuals that had been down-leveled?  And she answers --

17      I'm sorry, this was P-57, not P-108.

18            THE COURT:  But I don't think that the -- the fact

19      that P-57 has now been admitted, I didn't think that the

20      objection to the designation stood or fell based on the

21      admission of 57.  I thought there was a separate objection; is

22      that right?

23            MS. TOMEZSKO:  Let me just short-circuit this, your

24      Honor.

25            We acknowledge that your ruling on P-57 stands.  And

NACVROW7                         Vardaman - Cross

1    so it was based on the admissibility of that document.

2              THE COURT:  I see.

3              MS. TOMEZSKO:  So I think this is a moot point.

4              THE COURT:  Okay.  So we're down to 102B, as far as

5    documents go in connection with Ms. Burdis.  And I think there

6    might be some other deposition designations too, is that right,

7    that you object to?

8              MR. GAGE:  In Burdis?

9              THE COURT:  Yes.

10             MS. GREENE:  Your Honor, we have a proposal with

11   respect to 102B, given the situation we're in.

12             THE COURT:  Yes.

13             MS. GREENE:  We would be amenable to some sort of

14   limiting instruction that allows Ms. Burdis's testimony to come

15   in.  But the jury understands that the document itself is only

16   being offered in connection with the testimony that she's

17   providing and should not be considered on its own as proof of

18   any particular policy.  Something along those lines that would

19   allow the jury to make the distinction it's her testimony about

20   the policy that's important, not the actual document.  But I

21   don't see any other way to get in her testimony and leave the

22   document out of it.

23             THE COURT:  All right.  Google, what do you think

24   about that?  So the document would not be offered for the

25   truth.

1          MS. GREENE:  Your Honor, it would be offered as not

2     for the truth, but for the context in which Ms. Burdis is

3     answering these questions.

4          MR. GAGE:  I'm making this up on the fly.  So the

5     instruction counsel is suggesting, I think, would be something

6     along the lines of the document was being shown to the jury so

7     the jury can understand what the witness is speaking about, but

8     not for purposes of showing --

9          THE COURT:  What the policies actually were.

10          MR. GAGE:  Policies actually were.  Something like

11     that would work for us, your Honor, to speed this along.

12          MS. GREENE:  And I might suggest, your Honor, since

13     we're in general agreement, perhaps the parties can look at the

14     actual testimony in the document and work cooperatively to come

15     up with a limiting instruction for your Honor.

16          THE COURT:  All right.  Well, thank you.  That would

17     be appreciated, if it's possible.

18          Now, tell me what the lineup is for tomorrow.

19          MS. TOMEZSKO:  The million-dollar question, your

20     Honor.

21          MR. GAGE:  We were hoping it was going to start with

22     Mr. Harteau, but now it's going to start with --

23          THE COURT:  We have 15 more minutes with Mr. Vardaman

24     kicking off with an instruction.

25          MR. GAGE:  Re-booking flights.

NACVROW7                          Vardaman - Cross

1            THE COURT:  Don't look at me.  I'm looking at you

2    guys.

3            MR. GAGE:  Judge, we were willing to finish him up

4    today.

5            THE COURT:  No, but I can't --

6            MR. GAGE:  I understand.

7            THE COURT:  We have not really been sticking to any

8    kind of schedule with the jury, and I kept them late yesterday,

9    so --

10           MR. GAGE:  My understanding is that Mr. Grannis will

11   follow Mr. Harteau, or has that changed?  Okay.  So go straight

12   to Mr. Grannis.  Okay.  So we'll go straight to Mr. Grannis.  I

13   suspect the jury wants to know who Mr. Grannis is by now.  So

14   he'll follow Mr. Vardaman.  And then who's next?  Mr. Breslow.

15           MS. GREENE:  I think we'll have to see the timing and

16   discuss it.  But what we do know are the first two witnesses

17   tomorrow:  Mr. Vardaman, followed by Mr. Grannis.  And again,

18   the parties, as we have throughout, are working cooperatively

19   to make sure there is no interruption to the trial and there is

20   a witness waiting to go.

21           THE COURT:  All right.  Thank you.

22           Mr. Grannis, the Bennett issue comes up with him; is

23   that correct?

24           MS. GREENE:  Yes, your Honor.

25           MR. GAGE:  I think so.

1      THE COURT:  So I'm going to have to decide that by the

2  morning.  It would be helpful to have some -- of course, there

3  are a lot of cases about comparators, right?  Some

4  noncomparator cases where this type of evidence comes in

5  because it's deemed relevant.

6      MS. GREENE:  I'm not sure I understand, your Honor,

7  with respect to noncomparator evidence.

8      THE COURT:  This is not officially a comparator of

9  Rowe's.

10      MS. GREENE:  Not a comparator for the purpose of

11  establishing a pay claim, but a comparator for purposes of

12  establishing that behavior to which they were subjected is

13  proof of bias.

14      THE COURT:  Yes.  What comes to my mind from the

15  earlier back and forth is similarly situated, okay, for this

16  type of -- this claim.

17      MS. GREENE:  Yes, your Honor.  There's many cases on

18  this that we can pull for you to give you that case law.

19      THE COURT:  Okay.  Let's talk about timing.

20      I know what you all are doing.  But I mean for me, if

21  I'm going to rule on this in the morning, I need to be able to

22  read it and think about it.

23      Mr. Gage and Ms. Tomezsko, do you want to respond to

24  this letter setting out case law?  I imagine that you do.

25      MR. GAGE:  I would make a suggestion, Judge:  Both

NACVROW7                     Vardaman - Cross

1    simultaneously file something at a certain time tonight.

2              THE COURT:  That's fine.  That would work for us.

3              What time can you do it?

4              MR. GAGE:  9?

5              THE COURT:  I was going to say 9, so that's fine.

6              MS. GREENE:  That's fine for plaintiff.

7              THE COURT:  So there's one other point that I would

8    like addressed in these letters, and that is the argument that

9    plaintiff is surfacing on the eve of trial a new theory, a new

10   argument, whatever you want to call it.  But I would like to

11   get authorities from both of you in these letters as to that

12   point.

13             MS. GREENE:  I'm not sure I understand, your Honor.

14   What is the new theory or argument that plaintiff has

15   surfacing?

16             THE COURT:  I heard you say earlier that Bennett is --

17   references to her are sprinkled throughout documents that were

18   produced long ago.  But my understanding is that this approach

19   that you now want to pursue, where you're going to question

20   several witnesses about the -- about her leveling and what went

21   into leveling her as a 7 and whether discrimination was

22   involved in that, that that has not been part of this case at

23   this point; is that correct?

24             MS. GREENE:  Your Honor, it was not an issue for

25   summary judgment, so it would not have come in as part of that,

1   nor is it necessarily required that we do so.  This is really

2   an issue of how the plaintiff presents her evidence.  It's not

3   a new theory.  It's not a new claim.  It's simply an

4   evidentiary route to establishing a part of her *prima facie*

5   case with respect to the New York City human rights law

6   discrimination claim.

7            So again, it's not a new claim.  It's not a new legal

8   argument.  It doesn't change the jury instructions in any way.

9   It's just evidence from which the jury can infer the existence

10  of bias.

11           MR. GAGE:  Your Honor, we'll put the detail in the

12  letter.  But this was not raised in the summary judgment motion

13  and they proffered Ms. Bennett's hiring packet on the eve of

14  trial as an exhibit.  And so this is a new theory of trying to

15  prove that Mr. Grannis is a bad guy who discriminates against

16  people.

17           THE COURT:  All right.  So this is what I'm saying I

18  want in the letters.

19           MR. GAGE:  Yes.

20           THE COURT:  And, you know, what you, Google, might

21  have/would have done if you had known about this earlier

22  arguably.

23           All right.  Just going back to Burdis for a second.

24  It was said yesterday that the video would have to be redone,

25  depending on the rulings on the various issues.  So I wish you

NACVROW7                      Vardaman - Cross

1   a lot of luck in resolving this because, you know --

2          MS. TOMEZSKO:  I direct that luck to Jean over here.

3          THE COURT:  Because Jean is not going to be happy.  If

4   you fail to reach agreement, you know, what about Jean?

5          MR. GAGE:  The consequence, I think, your Honor — and

6   Jean can correct me.  The consequence, I think, will just mean

7   that she'll have to manually fast forward.  Am I right?  No.

8          MS. GUTIERREZ:  Adjust the start and end times.

9          MR. GAGE:  We need to come to an agreement.

10          MS. TOMEZSKO:  We'll resolve it with the parties.

11          THE COURT:  That was where I was -- all right.

12          MS. TOMEZSKO:  Might I just ask one logistical

13   question, your Honor?  I understand Mr. Vardaman is still under

14   oath and I'm not allowed to speak with him about the substance

15   of his testimony.

16          THE COURT:  Correct.

17          MS. TOMEZSKO:  I do need to tell him he needs to be

18   here tomorrow.

19          THE COURT:  Of course.  This is what we went through

20   with Mr. Shaukat also.  You need to tell him what time he needs

21   to be here.  Is that it?  Nothing else?

22          MR. GAGE:  Yes.  The only other thing I'm going to

23   raise, just so your Honor knows, given where we are and the

24   time, we're not anticipating the defendant's case is going to

25   start tomorrow based on everything we're hearing, and the

1    defendant's case will probably start on --

2              THE COURT:  Wednesday.

3              MR. GAGE:  On Wednesday, the 18th, which I think,

4    based on the pace we've been going, almost certainly means that

5    we'll at least have deliberations on the 19th.  We'll finish on

6    the 18th.

7              THE COURT:  Thank you.

8              MS. GREENE:  Your Honor?

9              MR. GAGE:  Sorry for being Captain Obvious, but --

10             MS. GREENE:  A related question with respect to the

11   dismissal time tomorrow.  Because there's four days in between

12   tomorrow and the resumption of the trial, what is your Honor's

13   preference with respect to going a bit later to finish up a

14   witness before the long weekend, or maybe stopping a little

15   sooner so that we're not starting a witness, doing ten minutes,

16   and having the jury come back four days later.

17             THE COURT:  So Friday evening in New York City is not

18   a good time to get to where people live.  I don't know where

19   these jurors are coming from, but I imagine some of them are

20   not right in Manhattan.  It's just -- I would rather end a

21   little bit early than push later, especially because it's a

22   Friday.

23             MS. GREENE:  Thank you.

24             THE COURT:  All right.

25             MS. TOMEZSKO:  Might we get that time check?

NACVROW7                          Vardaman – Cross

1           THE COURT:  Oh, yes.

2           THE DEPUTY CLERK:  Plaintiff used 120 minutes today,

3    which is a total of 391 minutes, which you have remaining of

4    329.  I'm sorry, a total of 391 minutes, which you have a total

5    of 329 minutes remaining.

6           Defendant used 105 minutes, which is a total of 224

7    minutes that you've used, and you have a remaining of 496

8    minutes.

9           THE COURT:  All right.

10          MS. TOMEZSKO:  Just because you're about to stand up,

11   your Honor.

12          THE COURT:  Oh, that's it?

13          MS. TOMEZSKO:  That's it.

14          THE COURT:  Okay.

15          MR. GAGE:  Good night.

16          THE COURT:  Good night, till 9.

17          (Adjourned to October 13, 2023 at 9 o'clock a.m.)

18

19

20

21

22

23

24

25

```
 1                         INDEX OF EXAMINATION

 2    Examination of:                          Page

 3     TARIQ SHAUKAT

 4    Direct By Ms. Greene . . . . . . . . . . . . . 391

 5    Cross By Mr. Gage  . . . . . . . . . . . . . 400

 6    Redirect By Ms. Greene . . . . . . . . . . . 476

 7    Recross By Mr. Gage  . . . . . . . . . . . . 493

 8     KEVIN LUCAS

 9    Direct By Ms. Greene . . . . . . . . . . . . 530

10    Cross By Ms. Tomezsko  . . . . . . . . . . . 547

11    Redirect By Ms. Greene . . . . . . . . . . . 560

12    Recross By Ms. Tomezsko  . . . . . . . . . . 564

13    STUART VARDAMAN

14    Direct By Ms. Greene . . . . . . . . . . . . 567

15    Cross By Ms. Tomezsko  . . . . . . . . . . . 599

16                        DEFENDANT EXHIBITS

17    Exhibit No.                             Received

18     54   . . . . . . . . . . . . . . . . . . . 411

19

20

21

22

23

24

25
```

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300