NADHRow1

```
1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x

3   ULKU ROWE,

4              Plaintiff,

5         v.                        19 Civ. 8655 (JHR)

6   GOOGLE LLC,

7              Defendant.           Trial

8   ------------------------------x
                                    New York, N.Y.
9                                   October 13, 2023
                                    9:30 a.m.
10
    Before:
11
                   HON. JENNIFER H. REARDEN,
12
                                    District Judge
13                                  -and a jury-

14                   APPEARANCES

15  OUTTEN & GOLDEN, LLP
         Attorneys for Plaintiff
16  BY:  CARA E. GREENE
         GREGORY S. CHIARELLO
17       SHIRA Z. GELFAND

18  PAUL HASTINGS LLP
         Attorneys for Defendant
19  BY:  KENNETH W. GAGE
         SARA B. TOMEZSKO
20
    Also Present:  Vincent Yang, Paralegal (Outten & Golden)
21                 Andrew Velazquez, Google Rep.
                   Jean Gutierrez, Paralegal (Paul Hastings)
22

23

24

25
```

NADHRow1

```
 1              (Trial resumed; jury not present)

 2              THE COURT:  I have a couple of housekeeping items I

 3    wanted to raise before I give you a ruling on the Bennett

 4    issue.

 5              So, first, earlier this week you handed up three

 6    stipulations.  Two of them related to instructions to the jury

 7    which I delivered to the jury.  The third is a stipulation of

 8    fact, which is the upshot of the motion practice over Thomas

 9    Kurian.  So we need to know how you'd like to mark that, first

10    of all.  And also, if you want me to read it to the jury, you

11    just need to let me know when.  That doesn't have to be dealt

12    with immediately.  I didn't want to lose sight of it.

13              Second, I wanted to just quickly go over with you the

14    limiting instruction that I will be giving when Ms. Tomezsko

15    resumes her examination of Mr. Vardaman.

16              So how would you like me to refer to these packets?

17    We have two of them, 70 and 71, and one relates to Diana

18    Layfield and one is Ranjana Clark.

19              MS. TOMEZSKO:  Your Honor, we've conferred between us

20    counsel, and the limiting instruction would also cover any

21    other document that I introduced to Stuart Vardaman today

22    during the rest of his examination.  So would it be sufficient

23    to say it covers —— maybe we could just say the documents other

24    candidates for the various positions that Ms. Rowe competed for

25    or sought, or something like that.
```

NADHRow1

1          THE COURT:  It's all candidates for the financial

2    services vertical lead position, right?

3          MS. TOMEZSKO:  And the financial services sales

4    position, the second one as well.

5          THE COURT:  And/or, I would say, I guess, right, or

6    are they all candidates for both?  No.

7          MS. TOMEZSKO:  No, no.

8          THE COURT:  And/or the financial services —— sorry,

9    what was that second one?

10         MS. TOMEZSKO:  The —— how did we refer to it?  The

11   vice president financial services sales position.

12         THE COURT:  Oh, yes.  OK.

13         How many exhibits do you have?

14         MS. TOMEZSKO:  I think it's —— that would cover the

15   limiting instruction?  I think it's five.

16         THE COURT:  I'll just say several.

17         OK.  You're about to see several exhibits defendant ——

18   I guess it's better to put the numbers in there for clarity.

19   Do you know, 70, 71 ——

20         MS. TOMEZSKO:  D70.

21         THE COURT:  D70, OK.

22         MS. TOMEZSKO:  D71.

23         THE COURT:  Yes.

24         MS. TOMEZSKO:  D79, D77, D78, and D74.

25         THE COURT:  70, 71, 74, 77, 78, 79.

NADHRow1

1          MS. GREENE:  I apologize, but with respect to those

2    documents, I do —— they are outside the motions in limine, and

3    so I do have a question.

4          MS. GREENE:  Your Honor, as to those documents, 77,

5    74, 77, 76, 78 ——

6          THE COURT:  I don't think she said 76, but ——

7          MS. TOMEZSKO:  I'll just repeat the numbers so we're

8    all on the same page.  It's D70, D71, D74, D77, D78, and D79.

9          THE COURT:  So 74, 77, 78, Ms. Greene, is that your ——

10          (Counsel confer)

11          MS. GREENE:  So as to the documents that are 74 and

12    above, with the exception of 79, so 74 through 78, those

13    objections —— or those documents, and we have an objection on

14    the basis of hearsay and relevance.  The relevance objection

15    was one that was part of motions *in limine* and Judge Schofield

16    ruled against us on that, but we would like to maintain that

17    relevance objection.

18          Apart from that, there's a hearsay objection with

19    respect to these documents.  I believe they're being offered

20    for the truth of the matter asserted with respect to these

21    different candidates, and so that's our objection on the basis

22    of hearsay.

23          THE COURT:  Why isn't that covered by the same

24    limiting instruction?  The point of the limiting instructions

25    is that they're not being considered for the truth.

NADHRow1

1          MS. GREENE:  Because, your Honor, unlike some of the

2     other documents, it's not —— this is not effect on listener

3     because it's a record of the process itself as opposed to

4     feedback materials, which is for impact or effect on listener.

5     So these are not materials that are, you know, offered for

6     effect on listener.  They're records of conversations and

7     discussions that were had in the process itself.  So it's

8     straight-up hearsay being offered for the fact that these were

9     the conversations that took place around this process.

10          THE COURT:  Let me ask a couple questions.

11          So 74, 77, and 78, are they all the same nature such

12     that if I look at 74, I can assume that I'm ——

13          MS. TOMEZSKO:  Yes, your Honor.

14          MS. GREENE:  74, 77, 78 are all of the same nature.

15     Mr. Yang, if you're able to pull up D74.

16          THE COURT:  So looking at 74, this is an internal

17     Google person recording questions, thoughts, and looks like

18     asking questions of other individuals at Google, how did your

19     conversation go with her, that sort of thing.

20          MS. TOMEZSKO:  Your Honor —— sorry.

21          MS. GREENE:  This is Mr. Vardaman's status report with

22     Kirsten Kliphouse with respect to the financial services sales

23     position.  That's the 2020 position.

24          THE COURT:  So this records —— these notes are his

25     preparation for that meeting with Kliphouse, or is it recording

NADHRow1

1    her statements?

2             MS. TOMEZSKO:  No, it's the fact that he had the

3    meeting with Kirsten Kliphouse.  I don't think it's any

4    different than P69, your Honor, the long document we've been

5    looking at that records he had status updates with Tariq

6    Shaukat about the candidates and the process for the financial

7    services vertical lead position.

8             THE COURT:  How is it different from 69, Ms. Greene?

9             MS. GREENE:  We're offering it against a party

10   opponent, and so it's outside of hearsay.

11            THE COURT:  You offered it?

12            MS. GREENE:  We offered it, yes.

13            THE COURT:  I understand.

14            So, Ms. Tomezsko, does this record what Ms. Kliphouse

15   conveyed to Mr. Vardaman?

16            MS. TOMEZSKO:  I don't believe so.  I believe that

17   what it records is the fact that on this date the agenda

18   reflects what was discussed.  The notes and the status, they ——

19   I mean, we could ask Mr. Vardaman about what that reflects, but

20   my understanding is those are his notes from the meeting.

21            THE COURT:  Ms. Greene, what about putting it up only

22   for Mr. Vardaman and asking him, does this reflect

23   Ms. Kliphouse's comments to you or does it capture your

24   preparation for a meeting with Ms. Kliphouse?  Can we do that?

25            MS. GREENE:  Your Honor, if it's his notes in

NADHRow1

1    preparation, it's still hearsay.

2              THE COURT:  Why?  You don't consider this a business

3    record?

4              MS. GREENE:  I don't consider this —— I don't think

5    it's been asserted as a business record, and this is not a

6    record of something that has happened.  These are notes about

7    things that he might discuss with her, questions he has for

8    her, and so the indicia of reliability that exists with some of

9    those other records are different.  I think that there could be

10   a limiting instruction that allows this to come in, but it

11   would be a different limiting instruction than the ones that

12   relate to feedback.

13             THE COURT:  OK.

14             MS. GREENE:  I'd have to think through what that

15   limiting instruction is.

16             THE COURT:  Sounds like we're getting to the right

17   place, but let me ask something else about business records.

18             Is this part of —— this almost looks like a form to

19   me.  Is this part of Google's regular process in connection

20   with considering candidates?

21             MS. TOMEZSKO:  I think there are one or two questions

22   I could ask Mr. Vardaman to establish that, why he created

23   this, for what purpose, is it part of his standard practice?

24   He's going to be here today.  He could testify as to the

25   purpose of this document.  Ms. Kliphouse will show up at trial.

NADHRow1

1    She could testify as to whether she saw this document, what she

2    understood it to be.  I think all of that will provide the

3    adequate context for what is in this document.

4            THE COURT:  I think what I'm hearing is there's a

5    concern about two levels of hearsay.  So you have to ask him

6    not only the questions designed to get at whether this is a

7    business record, but you also have to ask him whether, in the

8    notes and status column, he's capturing his own thoughts and

9    preparation for a meeting, or is he recording communications

10    from the person with whom he was speaking?

11            MS. GREENE:  Your Honor, there's a second piece of

12    this, and I'm just looking through Mr. Vardaman's ── I believe

13    I asked him about whether these sorts of documents existed at

14    the time of his deposition.  I'm looking back through.  These

15    documents were not produced ── if I'm correct, Ms. Gelfand ──

16    until November 22, 2022, so more than two years after I had

17    deposed Mr. Vardaman.

18            THE COURT:  OK.

19            MS. GREENE:  So I'm looking for his testimony where I

20    believe I asked him about whether there was this sort of

21    document that existed.

22            MS. TOMEZSKO:  I believe that issue was dealt with in

23    the motion *in limine* practice.  Plaintiff had raised the

24    concern that she was prejudiced by the timing of the production

25    of these documents, and Judge Schofield determined that, no,

NADHRow1

1    that was not the case.

2           MS. GREENE:  But with respect to the indicia of

3    reliability, if he said it didn't exist and then two and a half

4    years later, two ——

5           THE COURT:  What exactly did he say?

6           MS. GREENE:  I'm sorry.  I just need one moment to

7    find his testimony.

8           MS. TOMEZSKO:  While Ms. Greene is looking, if I might

9    make a suggestion.  We could publish it just to the witness

10   without showing the jury, lay a proper foundation for what this

11   is and what it reflects, whether it's his preparation, whether

12   it's capturing notes contemporaneous with the meeting, and we

13   could move for its admission after that.  If we haven't

14   satisfied that with the answers that he gives, then we could

15   show it to Kirsten Kliphouse when she shows up too.

16          THE COURT:  So then does that mean, since these

17   documents represent three of the six, you'd be showing

18   Mr. Vardaman?

19          MS. TOMEZSKO:  Correct.

20          THE COURT:  So it would be —— you'd be wrapping up

21   more quickly with him?

22          MS. GREENE:  I found his testimony, your Honor.

23          THE COURT:  OK.

24          MS. GREENE:  I'm on page 150, line 24:

25   "Q.  Is there any documentation you made with respect to

NADHRow1

1    Ms. Rowe asking to be considered for the role in Kirsten's

2    organization?

3    "A.  I don't know.

4    "Q.  Did you make any notes in gHire with respect to that?

5    "A.  I — I don't know.  That would have hinged — I — I don't

6    know.

7    "Q.  Did you make any notes in Thrive with respect to that?

8    "A.  Not that I recall.

9    "Q.  Do you create updates for Kirsten similar to the — to the

10   updates you made for Mr. Shaukat?

11   "A.  Each executive has a different way they like to go about

12   things.  As I recall, in supporting Kirsten it was much more ad

13   hoc, kind of a key indicator of the pace at which we're having

14   market activity as a recruiting team and, like, at the drop of

15   a hat being expected to jump on a — on a call with a senior

16   executive like Kirsten to provide a little bit of a status

17   update.  But it's much more ad hoc, I would say.

18   "Q.  Do you recall anything in writing regarding Ms. Rowe that

19   you communicated to Kirsten?

20

21   "A.  I don't recall."

22            THE COURT:  OK.

23            MS. GREENE:  And that was on, just to be clear,

24   November 17, 2022, two years before the documents were

25   produced.

NADHRow1

 1              MS. TOMEZSKO:  I don't recall ——

 2              MS. GREENE:  I'm sorry, November 17, 2020.

 3              THE COURT:  I understand, but I think he was focused

 4     on something narrower there than I have in front of me now.  So

 5     the questions were about documentation relating to Ms. Rowe.

 6     This is a document that goes through like a dozen or more

 7     candidates.  I'm not convinced that he would have been thinking

 8     about a document like this in response to that question.

 9              MS. GREENE:  This is the question:  "Do you create

10     updates for Kirsten similar to the —— to the updates you made

11     for Mr. Shaukat?"  That's P69, and that was the one that

12     defense counsel noted this document's like P69.  So we looked

13     at P69 in his deposition, and I asked him:  "Do you create

14     updates for Kirsten similar to the —— to the updates you made

15     for Mr. Shaukat?"  He said:  "Each executive has a different

16     way.  As I recall, in supporting Kirsten" —— and this is just

17     months after he had this process.

18              THE COURT:  I know, but ——

19              MS. GREENE:  He said it was much more ad hoc, kind of

20     a key indicator at the pace.  It was about a drop of a hat

21     being expected to jump on a call, to provide a little bit more

22     of a status update.

23              So if they're saying this is a business record that

24     was maintained like the others, it's not.  He testified that

25     it's ad hoc; he would jump on a call.  So it's not —— it's not

NADHRow1

1  the same sort of document by his testimony, and it's a document

2  that was produced two years later, which goes to the question

3  of its reliability when he testified at the time these events

4  were happening, or shortly thereafter, that this didn't exist.

5  THE COURT:  I have to say I'm amazed that you pulled

6  out that deposition testimony from however many years ago in

7  this moment, but I see a distinction between 69 and 74. I think

8  he just said, from what you read to me, that 69 was an update

9  prepared for Mr. Shaukat, is that correct?  Whereas this looks

10  like something —— something prepared for his own purposes.  And

11  at least without hearing his answers to a couple questions, I'm

12  not convinced that it's not that.

13  So I would like to go ahead with the questions, but I

14  will say, Ms. Tomezsko, if he does not give us the answers that

15  we need in order to view this document as qualifying as a

16  business record and also getting at the second potential layer

17  of hearsay here, meaning that if he does not tell us that this

18  reflects his own thoughts in preparation for a meeting and does

19  not in any way capture her input during a meeting, unless we

20  get both of those things, I'm sustaining the objection.

21  MS. TOMEZSKO:  On hearsay grounds, your Honor, just so

22  I understand?

23  THE COURT:  Yes.

24  MS. GREENE:  I —— withdrawn.

25  THE COURT:  All right.  I don't know where that leaves

NADHRow1

1   me with my limiting instruction, but ——

2          MS. TOMEZSKO:  I think still the limiting instruction

3   applies to the other documents.

4          THE COURT:  So we're going to take 74, 77, and 78 out

5   of the limiting instruction.

6          So we're back to Ms. Layfield and Ms. Clark's

7   interview feedback in gHire.  Is that what we're calling —— you

8   all agreed on this limiting instruction, so how do you want me

9   to refer to these documents?

10          MR. GAGE:  I'm just trying to look at what you're

11   showing.

12          THE COURT:  Oh, it's 70 and 71.

13          MR. GAGE:  Records from gHire.

14          THE COURT:  OK.

15          MS. GREENE:  Yes.

16          THE COURT:  That's what 79 is also.

17          MS. GREENE:  Yes.

18          MS. TOMEZSKO:  79 is a hiring packet.

19          MR. GAGE:  79 is a hiring packet.

20          THE COURT:  Why don't I say "hiring-related

21   materials," OK?

22          MR. GAGE:  That works for us.

23          THE COURT:  "All of this is admitted for its effect on

24   Stuart Vardaman upon reviewing the materials."

25          MR. GAGE:  How about "effect on anyone who reviewed

NADHRow1

1   it"?  And then the jury can decide, based on the testimony, who

2   reviewed it.

3           THE COURT:  OK.  So we don't have to do this again.

4           MR. GAGE:  That's my idea.

5           THE COURT:  I figured.  OK.  I'm going to read this

6   now:

7           You are about to see several exhibits, Defendant's

8   Exhibits 70, 71, and 79, all of which consist of hiring-related

9   materials.  This evidence is admitted for a limited purpose.

10  It is admitted only for its effect on anyone who reviewed these

11  materials.  You may not consider evidence of these hiring ——

12  you may not consider these hiring-related materials for their

13  truth; meaning, you may not consider them as evidence of the

14  substance of any applicant's qualifications for the financial

15  services vertical lead position and/or the VP financial

16  services sales position.  You may give this evidence such

17  weight as you feel it deserves, but only for the limited

18  purpose for which it has been offered.

19          Yes.

20          MS. TOMEZSKO:  I would just say, rather than "evidence

21  of the substance of any applicant's qualifications" perhaps

22  "evidence of the truth of those applicant's qualifications."  I

23  think that's —— or "evidence that they actually had those

24  qualifications."

25          THE COURT:  All right.  I thank both parties for their

NADHRow1

very thoughtful and fulsome submissions which were instructive
and necessary in reaching the decision that I will now
announce.

Having carefully considered the parties' submission,
as well as the significant issues and authorities implicated by
this matter, I am granting defendant's application to preclude
evidence with respect to the leveling and treatment of Jennifer
Bennett.

At bottom, Rule 403 compels this conclusion.  Any
probative evidence of Ms. Bennett's alleged discriminatory
treatment is substantially outweighed by the overwhelming
prejudice and juror confusion that would result from allowing
that evidence in.  And I cite here, of course, to the
foundational evidentiary standard set forth in 403 that
evidence may be excluded if its probative value is
substantially outweighed by a danger of unfair prejudice,
confusing the issues, and misleading the jury, among other
factors.

To begin, both parties' submissions drive into sharp
relief the sheer scale and scope of the evidence involving
Ms. Bennett and the tremendous impact it would have on this
trial.  Specifically, to allow in the evidence of Ms. Bennett
would affect, by plaintiff's own count, the testimony of eight
trial witnesses, none of whom was deposed on this subject, as
well as the admissibility of ten trial exhibits.  That is to

NADHRow1

1    say, Bennett-related evidence would, if allowed in, effectively

2    pervade this trial.  It is against that backdrop that I make

3    this ruling.

4           The parties have been litigating this case for four

5    years.  During that time, there was extensive discovery, motion

6    practice, and joint discussions and submissions between the

7    parties regarding the shape and scope of trial, and yet for an

8    issue that has since been presented as constituting a

9    significant part of plaintiff's strategy at trial, the issues

10   surrounding Ms. Bennett were not meaningfully raised and

11   identified for defendant and, in fact, were not truly

12   crystallized until trial had already started.

13          Indeed, nearly three years ago plaintiff deposed

14   recruiter Jennifer Burdis, an individual who had referenced

15   Ms. Bennett's level in response to questions from employee

16   relations two years prior.  According to defendant, Ms. Burdis

17   did not allege during that deposition that Ms. Bennett's level

18   was probative of discriminatory animus.

19          Furthermore, plaintiff did not make that argument

20   during summary judgment motion practice, which was completed

21   well over a year ago in early 2022.  Since then the parties

22   have filed four joint pretrial orders, throughout which time

23   plaintiff did not include Ms. Bennett's hiring packet on her

24   list of trial exhibits despite having had nearly a year to do

25   so since the filing of the first joint pretrial order on

NADHRow1

December 12, 2022, and at the same time, it bears noting,

adding at least four other exhibits over that time period.

         As a result of these circumstances, defendant was

unable to subject Ms. Bennett herself, as well as other

potential trial witnesses, to adversarial testing on the issues

surrounding Ms. Bennett, nor to make targeted discovery

requests that it may have otherwise made.  Nor did defendant

have an opportunity to address and brief these issues at

summary judgment or at any other stage before trial.

         I find plaintiff's arguments to the contrary, such as

its reliance on a fleeting unclear reference to "Jen"

unavailing.  To spring an evidently key part of

plaintiff's case on defendant in the thick of trial would be

unduly prejudicial.  For this reason, courts will not

countenance the eleventh-hour assertion of new key arguments

and facts at trial.  I cite here as an example,

*Busher v. Barry*, 2019 WL 6895281 (S.D.N.Y. Dec. 18, 2019), in

which the Court cited other cases for the proposition that

courts will not endorse "a party without explanation for the

delay springing new facts and legal theories on the eve of

trial."

         I cite also to *Balogun v. Board of Regents of the

University of Wisconsin System* in which the Court determined

that plaintiff's "undeveloped argument is too little too late.

Plaintiff could and have had developed its newly raised

NADHRow1

argument in opposition to defendant's motion" but did not and

therefore could not present it at trial.  2019 WL 3387769, at

*3, n. 3 (W.D. Wis. July 26, 2019).  By way of further example,

I point to an oral ruling issued by another court in this

district which would not allow a certain piece of evidence to

be presented at trial that had been raised by plaintiff late in

the case without first giving defendant an opportunity to "try

to poke holes in that evidence."  *See* April 26, 2013,

transcript in 10 Civ. 3229.  This is a critical opportunity

that defendant did not have in this case.

Furthermore, to allow the introduction of this

evidence at this stage would create a so-called trial within a

trial with unwelcome consequences.  In effect, defendant would

be forced not only to present its case with respect to

plaintiff but also would in connection with the examination of

eight trial witnesses be forced to defend its decisions at

every turn with respect to Ms. Bennett.  That would, for one

thing, substantially delay trial, requiring witness after

witness not only to testify and address a multitude of exhibits

regarding plaintiff herself but also about Ms. Bennett.

Moreover, and critically, this would run a real risk

of creating juror confusion amid the mid-trial introduction of

an entirely new employee's circumstances without defendant

having had any meaningful opportunity to frame and address

these issues in its opening statement and in earlier stages of

NADHRow1

1    testimony*, see, for example*, *Martin v. Reno*, 2000 WL 1863765,

2    at *4 (S.D.N.Y. Dec. 19, 2000,) in which the Court declined

3    plaintiff's request to "call one or more witnesses to testify

4    about alleged incidents of discrimination by the company that

5    did not involve plaintiff himself," finding in part that "such

6    testimony would merely protract the trial by taking the

7    testimony too far afield from plaintiff's actual claims."  As a

8    result, the court concluded plaintiff is precluded from

9    submitting any evidence about claims of discrimination other

10   than his own.  For these reasons, evidence related to

11   Ms. Bennett will not be allowed in.

12          All right.  Ms. Williams, would you now bring in the

13   jury, please.

14          MS. GREENE:  Your Honor, before that happens, we just

15   have one quick question for the Court.

16          There is a witness — we've struggled, both sides,

17   with the witness order.  There's one witness who flew in from

18   California to testify today.  Other witnesses have flown in

19   from Texas and other places.  If that particular witness is not

20   able to testify, she would be able to testify remotely on

21   Wednesday if the Court has those capabilities, and we've been

22   discussing this with defendant.

23          So the question is does the Court have the capability

24   for remote testimony?  And we can discuss more at lunch time

25   perhaps, but I just wanted to tee that up as a question related

NADHRow1

1    to one particular witness.

2            THE COURT:  Sure.  We absolutely have that capability.

3            Right, Ms. Williams?

4            THE DEPUTY CLERK:  Yes.

5            THE COURT:  And if both sides are agreeable, then we

6    can make that happen.

7            (Continued on next page)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

NADVROW2

1          MR. GAGE:  Your Honor, I just want to work out --

2    understand how it's going to work with exhibits and what the

3    witness can see.  I don't know why the witness can't be here.

4    We've got people flown here, left, and are coming back.  I just

5    want to make sure we know how this is going to work.

6          THE COURT:  You know, this was regular way at the

7    height of COVID during lockdown.  So there is a way to do it, I

8    am sure.  I wasn't doing it then, but I know it can be done.

9          So you all continue talking and let me know where you

10   come out, and then we'll make the arrangements.

11         MR. GAGE:  Should we get the witness?

12         THE COURT:  Oh, yes, you should.

13         MS. GREENE:  While he is doing that, would it be

14   possible to speak with the technician at lunchtime just to

15   understand what that might entail so we can make a decision?

16         THE COURT:  Yes.  Ms. Williams, can you help make that

17   happen?  I guess that's AV, right?

18         MS. GREENE:  Yes.

19         THE COURT:  Okay.

20         MS. GREENE:  Thank you.

21         THE COURT:  Sure.

22         (Jury present)

23         THE COURT:  Good morning.  The weekend is almost here.

24         Thank you for your close attention.

25         All right.  Everybody be seated, please.

NADVROW2                    Vardaman - Cross

1           Ms. Tomezsko.

2           MS. TOMEZSKO:   Thank you.

3    STUART VARDAMAN,

4         called as a witness by the Plaintiff,

5         having been previously duly sworn, testified as follows:

6    CROSS-EXAMINATION (continued)

7    BY MS. TOMEZSKO:

8    Q.  Good morning, Mr. Vardaman.

9    A.  Good morning.

10   Q.  Can you just move a little bit closer to the microphone.

11   A.  Is that better?

12   Q.  Yes, that's better, thank you.

13   A.  Good morning.

14   Q.  Good morning.

15           Mr. Vardaman, yesterday we talked about Ms. Rowe

16   completing panel interviews for the financial services vertical

17   lead role, do you recall that?

18   A.  Yes, I do.

19   Q.  Do you recall whether at any point Ms. Rowe circled back

20   with you about those interviews to tell you how they went?

21   A.  I really don't recall.

22   Q.  I'd like to show you a document, if I can.  It is

23   Plaintiff's 50.

24           MS. TOMEZSKO:   May we publish that to the jury.

25           Jean, can you scroll to the next page, please.

NADVROW2                    Vardaman - Cross

1    Q.  Mr. Vardaman, do you recognize this document as an email

2    between you and Ms. Rowe in or around the August 8th, 2018 time

3    frame?

4    A.  I see the date and my name and Ms. Rowe's name, yes.

5    Q.  On August 8th, 2018, does this reflect that Ms. Rowe wrote

6    to you:  Hi, Stuart.  Had good conversations today with Darryl,

7    Vats, and Jason.  On my way back to New York now.

8    A.  Yes, that's what it says.

9    Q.  Does that refresh your recollection that Ms. Rowe circled

10   back with you to update you on how those interviews went after

11   she completed them?

12   A.  Yes, ma'am, it's -- it's here.

13   Q.  At any point did Ms. Rowe ever indicate to you that she

14   felt that those interviews were odd or a little off in any way?

15   A.  No, not that I recall.

16   Q.  After those interviews, did you receive feedback from those

17   interviewers about Ms. Rowe?

18   A.  I believe I alluded to that I'd received feedback outside

19   of the gHire system via ping.

20   Q.  When you received that feedback, what did you do with it?

21   A.  In that situation, which is pretty common at Google, we ask

22   our hiring managers to take that feedback and put it into

23   gHire, along with their complete notes.

24   Q.  I'd like to show you what's been marked as Plaintiff's 69.

25          MS. TOMEZSKO:  Can we pull that up, please, Jean.

NADVROW2                     Vardaman - Cross

1  Q.  Mr. Vardaman, do you recognize this document?

2  A.  This is a -- the cadence of meetings with Mr. Shaukat was

3  on a weekly basis; and I tended to produce this document on a

4  weekly basis for our meetings.

5  Q.  And we can scroll through the document, if you like,

6  Mr. Vardaman, but could you, to the best of your recollection,

7  summarize to the jury what is in this document as it relates to

8  the financial services vertical lead role?

9  A.  As it relates to the financial services vertical lead role,

10  this would be the updates that I had access to at any given

11  point in time, any given date.  I tried to keep the document as

12  a historical document and update it on a weekly basis with a

13  new entry.

14  Q.  Would a summary of the feedback that you had received about

15  any of the candidates for the role be reflected anywhere in

16  this document?

17  A.  It's certainly possible.  In order to spur movement on the

18  searches, it's certainly possible.

19  Q.  You alluded to weekly meetings with Mr. Shaukat.  Did you

20  discuss the content of this document with Mr. Shaukat during

21  those meetings?

22  A.  Yes.  This would be -- so because Mr. Shaukat was in

23  California, I was in Texas, we would meet via Google

24  videoconference.  And I would typically project this, share my

25  screen, show this, and this would be the backdrop for going

NADVROW2                    Vardaman - Cross

1   through the various searches.

2           MS. TOMEZSKO:  I'd like to flip to page 103 of this

3   document, please.  And this is just to establish -- 103.  Can

4   we go to the August 31st; I think it's a few pages back.

5           No problem.  I can streamline.  It's okay.  It's okay.

6   Q.  Did you ever email this document to Mr. Shaukat?

7   A.  Yes.  As a result of Mr. Shaukat's schedule, which was

8   about as busy as Diane Greene's, sometimes our weekly hold

9   would evaporate; and so I would send it to him just so that as

10  he had time on a plane or something along those lines, he still

11  had access to what was going on across the searches I was

12  working on.

13          MS. TOMEZSKO:  Can you pull that up, please.

14  Q.  Mr. Vardaman, do you recognize this as an email from you to

15  Mr. Shaukat in or around the 1st of September, 2018?

16  A.  I do.

17  Q.  I'd just like to look at the first couple lines of this

18  email where it says:  Hi, Tariq.  I hope you are looking

19  forward to a nice holiday weekend.  Please see here for the

20  full report.  Do you see that?

21  A.  I do.

22  Q.  The word "here" appears to be a hyperlink.  Do you agree

23  with that characterization?

24  A.  It is.

25  Q.  That hyperlink, is it linked to the document we were just

NADVROW2                      Vardaman - Cross

1  looking at, the status updates?

2  A.  That would be my practice, yes.

3  Q.  And so would Mr. Shaukat be able to click on that link and

4  access the document that we were just looking at, P-69?

5  A.  He would.

6  Q.  Just flipping back to the document that we were just

7  looking at, P-69, just very briefly, I'd like to go to page 81

8  of the document, I think.  Yes.

9       Okay.  Do you see under "Tariq active searches" the

10  second entry for financial services chasing feedback for Ulku?

11  Do you see that?

12  A.  I do.

13  Q.  When you said "chasing feedback," what are you referring to

14  there?

15  A.  I'm really trying to get the executive panel members to

16  input their formal feedback in the gHire system.

17  Q.  Did you intend to reflect that you were chasing feedback

18  just broadly for Ulku, whether it was in the gHire system or

19  otherwise?

20  A.  Our orientation as recruiting, in recruiting, is to really

21  spur the entry into gHire.

22  Q.  And so just to be clear, are there any limitations on who

23  can enter feedback and hiring recommendations into gHire?

24  A.  Yes, it's the sole individual, the panel member, his or

25  herself.

NADVROW2                          Vardaman - Cross

Q.  If you were to receive any feedback in another format, for

example, over a ping or during a Google videoconference, would

you be able to enter that feedback that you received into the

gHire system?

A.  No.

Q.  I'd like to show you --

          MS. TOMEZSKO:  Oh, and perhaps this is a good time for

the limiting instruction, your Honor.

          THE COURT:  Members of the jury, you are about to see

several exhibits marked Defendant's Exhibit 70, 71, and 79, all

of which consist of hiring-related materials.

          This evidence is admitted for a limited purpose.  It

is admitted only for its effect on anyone who reviewed these

materials.  You may not consider these hiring-related materials

for their truth, meaning you may not consider them as evidence

that any applicant actually had those qualifications for the

financial services vertical lead position and/or the VP

financial services sales position.

          You may give this evidence such weight as you feel it

deserves, but only for the limited purpose for which it has

been offered.  You may not use this evidence for any other

purpose.

BY MS. TOMEZSKO:

Q.  I'd like to show you what's been marked as Defendant's 71,

please.  Mr. Vardaman, do you recognize this document?

NADVROW2                           Vardaman - Cross

1   A.  This would be an output from gHire for candidate Ranjanna

2   Clark.

3              MS. TOMEZSKO:  If we could scroll through and flip

4   through a few pages.

5   Q.  Do you see, is there any feedback missing from Ms. Clark's

6   packet here?

7   A.  Yes.  The triangle with the exclamation point indicates

8   that a draft not yet submitted.  That means that the panel

9   member may have opened it but had not submitted their feedback

10  as of the time this report was run.

11  Q.  And again, was that common or unusual at Google for

12  feedback not to be entered into the gHire system?

13  A.  Absolutely not.  It was very, very common.

14  Q.  Would that preclude a candidate from advancing through the

15  process?

16  A.  It would not.

17             MS. TOMEZSKO:  I don't believe this exhibit is subject

18  to any stipulations of admissibility, so I would like to

19  formally move for the admission of D-71 into evidence, your

20  Honor.

21             MS. GREENE:  No objection.

22             THE COURT:  Yes.  It's admitted into evidence.

23             (Defendant's Exhibit 71 received in evidence)

24  Q.  I'd like to show you now D-70.

25             Mr. Vardaman, do you recognize this document?

NADVROW2                    Vardaman - Cross

1    A.  Yes, this would be a similar document, but for candidate

2    Diana Leyfield.

3    Q.  And scrolling through this document, if we can, does this

4    also reflect that there are -- there's missing feedback that

5    was not entered into gHire for Ms. Leyfield as well?

6    A.  Correct.  The triangle with the exclamation point is there

7    as well.

8    Q.  And this would not have precluded her from advancing

9    through the process either?

10   A.  I didn't see the title, but that looks like the role in

11   which she joined Google.

12         MS. TOMEZSKO:  I just want the record to be clear.

13   Can we scroll through till we get to the financial services

14   vertical lead position.

15   Q.  Do you see on the bottom where it says financial services

16   vertical lead?

17   A.  Yes, ma'am.

18   Q.  And would the subsequent pages following this reflect the

19   feedback for that particular role?

20   A.  Yes, that's correct.

21   Q.  And scrolling through those, do you see that this is

22   also -- that's missing some of the information entered for the

23   candidate in gHire?

24   A.  Yes, the triangle with the exclamation point is present.

25   Q.  And again, would that preclude Ms. Leyfield from moving

NADVROW2                     Vardaman - Cross

1   through the process?

2   A.  No, ma'am.

3   Q.  Similarly, if there was gHire feedback missing for Ms. Rowe

4   as a candidate for the financial services vertical lead role,

5   would that in itself have precluded her from moving and

6   advancing through the process?

7   A.  No, ma'am, not in practice.

8          MS. TOMEZSKO:  I'd also like to move for the admission

9   of this document as well, D-70.

10          THE COURT:  Ms. Greene?

11          MS. GREENE:  No objection.

12          THE COURT:  Admitted into evidence.

13          (Defendant's Exhibit 70 received in evidence)

14          MS. TOMEZSKO:  We could take this document down.

15   Q.  Mr. Vardaman, you were also the recruiter for an open

16   position in Kirsten Kliphouse's organization in 2020, is that

17   right?

18   A.  That is correct.

19   Q.  That was the VP of financial services sales position?

20   A.  That is correct.

21   Q.  What was your role in helping Ms. Kliphouse to fill that

22   position?

23   A.  I was the lead executive recruiter running the process for

24   Ms. Kliphouse.

25   Q.  And in that capacity, were you the person making decisions

NADVROW2                    Vardaman - Cross

1   about which candidates would be put into the interview process?

2   A.  No.

3   Q.  Who was making those decisions?

4   A.  It would be Ms. Kliphouse.

5   Q.  Do you recall who was ultimately hired into that position,

6   the VP of financial services sales?

7   A.  Yes, a female by the name of Yolande Piazza.

8   Q.  I'd like to, if we may, show you Defendant's 79.

9           MS. GREENE:  To be clear, this is just for the

10  witness.

11          MS. TOMEZSKO:  I thought this one was subject to the

12  limiting --

13          MS. GREENE:  I'm sorry.  You're right.  My apologies.

14          THE COURT:  Can you remind us of Ms. Kliphouse's

15  title, do you remember?

16          THE WITNESS:  She was VP North American sales, as I

17  recall.

18          THE COURT:  Okay.  Thank you.

19  BY MS. TOMEZSKO:

20  Q.  Mr. Vardaman, do you recognize this document?

21  A.  Yes, I do.

22  Q.  And what is it?

23  A.  It would be -- it looks like output from gHire and/or the

24  documents that we put together for her packet, her hiring

25  packet.

NADVROW2                          Vardaman - Cross

1   Q.  Hiring packet.  Okay.  And --

2           MS. TOMEZSKO:  Oh, may I move for the admission of

3   this document as well, your Honor, D-79.

4           THE COURT:  Plaintiff?

5           MS. GREENE:  No objections.

6           THE COURT:  Admitted into evidence.

7           (Defendant's Exhibit 79 received in evidence)

8           MS. TOMEZSKO:  Thank you.

9   Q.  Mr. Vardaman, did you discuss with Kirsten Kliphouse the

10  candidates for the vice president financial services sales

11  position?

12  A.  In discussing, my job was to help her understand which

13  candidates were in process, walk through backgrounds at a high

14  level, and ultimately defer to who she'd like to move forward

15  in the process.

16          MS. TOMEZSKO:  We could take this document down.  And

17  I'd like to publish a document only to the witness, please.

18  Defendant's 77.

19  Q.  Mr. Vardaman, do you see the document here?

20  A.  I do.

21  Q.  Without reading from the document, do you recognize it?

22  A.  Well, it looks like a status report.

23  Q.  Did you create these?

24  A.  Yes.

25  Q.  For what purpose did you create this document?

NADVROW2                      Vardaman - Cross

```
 1   A.  To keep track of the searches -- of the search and its --
 2   and its updates on an ongoing basis.
 3   Q.  Did you create them in preparation for any meetings or
 4   discussions with Ms. Kliphouse about the position?
 5   A.  Typically, yes.  The way that it manifested for
 6   Ms. Kliphouse in particular is our meetings, she would
 7   sometimes just call me.  She's like, Hey, I'll call you this
 8   week.  And so it was on me to, on a daily basis, if I had
 9   updated information, to kind of keep this running so that if I
10   got a call from her, I could provide her the most relevant
11   information, updated information.
12   Q.  Does this document reflect the notes that you made in
13   preparation for those meetings with Ms. Kliphouse?
14   A.  Yes, these would be the high-level distilled notes.
15   Q.  And does it at all reflect the -- any of your notes of the
16   conversations that you actually had with Ms. Kliphouse when you
17   would update her on the role?
18   A.  I don't -- I don't see it here.
19   Q.  Would it help if we should scroll through?
20   A.  Possibly.
21           MS. TOMEZSKO:  Can you go to the next page.
22   Q.  In practice, would these documents reflect the discussion
23   of the -- about the role that you had with Ms. Kliphouse?
24           MS. GREENE:  Objection.
25           THE COURT:  Can you restate that please.
```

NADVROW2                    Vardaman – Cross

1              MS. TOMEZSKO:  Sure.

2     Q.  Was it your practice to record in these types of documents

3     the substance of your conversations with Ms. Kliphouse during

4     those discussions?

5     A.  I certainly could have.  I do not see the separate column

6     where I actually have those notes listed out for -- during the

7     meeting itself.

8     Q.  If I understand you correctly, this is a document created

9     specifically in preparation for your discussions with

10    Ms. Kliphouse, and it is your notes and impressions that you

11    see reflected here?

12    A.  I think that's accurate, yes, ma'am.

13    Q.  And if you could place in time when these notes were

14    created in relation to your discussions with Ms. Kliphouse.

15    A.  Can I read from it now?

16              THE COURT:  Not out loud.

17    Q.  Not out loud.

18    A.  I tried to provide the date that I had last updated it.

19    And with the intention that I could receive a phone call from

20    Kirsten either at our standing time or not on an *ad hoc* basis.

21              MS. TOMEZSKO:  We could take that document down.  I

22    just want to ask some general questions, if we may.

23    Q.  Did you, in fact, discuss Ms. Rowe with Ms. Kliphouse

24    during any of your meetings with her concerning the VP

25    financial services sales role?

1  A.  I recall that I mentioned to Kirsten that Ms. Rowe is

2  interested.  And that is the response where Ms. Kliphouse told

3  me that she had met Ms. Rowe for coffee.

4  Q.  Did Ms. Kliphouse tell you anything else other than that

5  she had met Ms. Rowe for coffee?

6  A.  No, not that I recall.

7  Q.  Did Ms. Kliphouse indicate to you whether she should

8  advance Ms. Rowe through the process of interviewing for the

9  financial services -- the VP financial services sales position?

10          MS. GREENE:  Objection.

11          THE COURT:  Objection, just in a word or two.

12          MS. GREENE:  Leading.

13          THE COURT:  Rephrase.

14  Q.  Did Ms. Kliphouse express to you her opinion on Ms. Rowe's

15  candidacy for the VP financial services sales position?

16  A.  Ms. Kliphouse asked me to focus on Yolande Piazza and wind

17  down other candidates.

18  Q.  When you say "wind down other candidates," what do you mean

19  specifically?

20  A.  That can mean putting on hold or closing out, and I

21  interpreted that mean to close out.

22  Q.  And I want to just skip ahead -- or, rather, back to

23  something you mentioned yesterday.  And that was a conversation

24  that you had with Ms. Rowe back in June 2018, when Mr. Shaukat

25  asked you to put her through the process for the financial

NADVROW2                    Vardaman - Cross

1  services vertical lead position.  Do you recall that?

2  A.  I do.

3  Q.  And what was the word you used yesterday to describe your

4  feeling about that conversation?

5  A.  I believe I used the word "disrespected."

6  Q.  Can you explain to the jury why you felt disrespected?

7  A.  I had connected with Ms. Rowe so that I could highlight the

8  process with her and get enough information on her background

9  so that I could write the prep note that I believe came up

10  yesterday.  And over the course of that conversation, I was

11  taken aback by feeling dismissed that I was interrupted and

12  largely disrespected, I felt, at the core of it being my level

13  at Google relative to Ms. Rowe's.

14  Q.  What about your level relative to Ms. Rowe's led you to

15  feel that way?

16  A.  Sorry, I don't understand.

17  Q.  You said your level relative to Ms. Rowe's.  I just want to

18  understand what that means and how that led you to feel

19  disrespected.

20  A.  I think I said it yesterday.  As steward of the process, my

21  job, my ownership, my pride, for lack of better terms, centers

22  on running the process, the recruiting process, for Google.

23  That is what I do.  And I felt largely dismissed as a result of

24  the conversation that I had with Ms. Rowe.

25  Q.  During that conversation, was it your understanding that

NADVROW2                        Vardaman - Cross

1   Ms. Rowe was accusing you of any wrongdoing whatsoever?

2            MS. GREENE:  Objection.  Leading.

3            THE COURT:  Overruled.  Open-ended question.

4   A.  I'm sorry, can you restate it?

5   Q.  Sure.  Was it your understanding as a result of that

6   conversation that Ms. Rowe was accusing you of any wrongdoing?

7   A.  No, ma'am.

8   Q.  The feeling that you just expressed, feeling disrespected

9   and dismissed, did you allow that to impact how you ran the

10  process for the financial services vertical lead position for

11  Ms. Rowe?

12  A.  I did not.

13  Q.  After your conversation with Ms. Rowe, did you schedule

14  panel interviews with her with four vice presidents?

15  A.  I did.

16  Q.  Did you ever share how you felt in that conversation or

17  that the conversation even happened with any of those

18  interviewers?

19  A.  I did not.

20  Q.  And after that, did you work to get Ms. Rowe a meeting with

21  Diane Greene in December of 2018?

22  A.  Yes.

23  Q.  And did you share with either Ms. Greene or anyone on her

24  staff that you had that conversation with Ms. Rowe and how it

25  made you feel?

NADVROW2                    Vardaman - Cross

1   A.  I did not.

2   Q.  Did you ever share that conversation and your personal

3   feelings about it with Mr. Shaukat?

4   A.  I did not.

5   Q.  Just to be clear, at any point while you were working on

6   the financial services vertical lead role from 2018 through

7   early 2019, when I believe you said the search was canceled,

8   did you have any reason to believe that Ms. Rowe had raised a

9   concern of gender discrimination?

10  A.  No.

11  Q.  In early 2020, you mentioned yesterday that you had met

12  with employee relations.  Do you recall that testimony?

13  A.  Yes, I do.

14  Q.  And I believe you said you discussed a number of topics

15  during that meeting; is that right?

16  A.  Yes.

17  Q.  Did you cooperate with employee relations during that

18  process?

19  A.  Yes, of course.

20  Q.  Were you forthcoming in your interview with employee

21  relations?

22  A.  Yes.

23  Q.  During the interview with employee relations, did you

24  believe that you were being accused of doing anything improper?

25  A.  No.

NADVROW2                    Vardaman - Cross

1   Q.  Subsequently when you were running the process for

2   Ms. Kliphouse's role, the VP of financial services sales, did

3   you tell her that you had been interviewed by employee

4   relations?

5   A.  I did not.

6   Q.  Did you reference at all the fact that you had spoken with

7   employee relations at all?

8   A.  No.

9   Q.  Did you tell Ms. Kliphouse about the conversation that you

10  had with Rowe -- Ms. Rowe in 2018?

11  A.  I did not.

12  Q.  And did you share with her at all your personal feelings

13  about that conversation?

14  A.  I did not.

15  Q.  Did your interview with employee relations have any effect

16  on how you did your job with respect to the VP financial

17  services sales position?

18  A.  No.

19  Q.  Did your personal feelings about that conversation that you

20  had back in 2018, did that at all impact the way you did your

21  job with respect to the financial services sales role?

22  A.  No.

23  Q.  In your opinion, Mr. Vardaman, was Ms. Rowe given a fair

24  opportunity to compete for the financial services vertical lead

25  role?

NADVROW2                    Vardaman – Redirect

1   A.  She was.

2   Q.  And in your opinion, was she given a fair opportunity to

3   compete for the VP financial services sales role?

4   A.  She was.

5   Q.  Thank you.

6   REDIRECT EXAMINATION

7   BY MS. GREENE:

8   Q.  Mr. Vardaman, you're represented by Google's counsel;

9   correct?

10  A.  Yes, that's correct.

11  Q.  And did they pay you for the cost of flying here?

12  A.  For the cost of flying here?

13  Q.  Yes.

14  A.  Yes, I understand I am to be reimbursed.

15  Q.  And did they meet with you in preparation for your

16  testimony?

17  A.  Tuesday night I met with them, yes.

18  Q.  And had you spoken to them at other times leading up to

19  your testimony yesterday and today?

20  A.  Prior to Tuesday?

21  Q.  Yes.

22  A.  No.  Email communication.

23  Q.  You did speak with them in preparation for your deposition;

24  correct?

25  A.  In preparation for my deposition, yes, ma'am.

NADVROW2                        Vardaman - Redirect

1   Q.  And they represented you at your deposition as well;

2   correct?

3   A.  Yes, they were there on the video.

4           MS. GREENE:  Let's look back at those hiring packets

5   for Diane Leyfield and Ranjanna Clark.  We can start with D-70.

6   Thank you.  And if we could go to the page Bates stamped 403.R.

7   Q.  This represents and notes that on September 10th, 2018,

8   Mr. Shaukat interviewed Ms. Leyfield; correct?

9   A.  Yes, ma'am, that's what it looks like.

10          MS. GREENE:  Okay.  Let's take that down.  And if we

11  can go now to D-71.

12  A.  Forgive me.  I have red marks all over my screen.  Is it --

13  oh, thank you.

14  Q.  How's that?

15          D-71.  And if we can go to the page that ends with 43.

16          And this shows that Mr. Shaukat had interviewed

17  Ms. Clark as well, correct, in this case in April of 2018?

18  A.  Yes, ma'am.  That looks like when it was scheduled.

19  Q.  Mr. Shaukat did not interview Ms. Rowe; correct?  That was

20  your testimony yesterday?

21  A.  Yeah.  That's right.  He wanted the -- as I recall, the

22  panel members to go first.

23  Q.  Now, you said that you received feedback via ping; correct?

24  A.  Yes, ma'am.

25  Q.  And how many times did Darryl Willis ping you about

NADVROW2                    Vardaman - Redirect

1    Ms. Rowe?

2    A.  I really don't remember.  I probably pinged him more often

3    to say, You met with Ms. Rowe, you met with any other

4    candidates, please make sure you're entering the feedback in

5    gHire.

6    Q.  And how many pings did he actually give you feedback?

7    A.  I don't know.  At least one.

8    Q.  And what about the other candidates, how many pings did you

9    get from them where they actually provided you with feedback?

10   A.  At least one.  If I had an inclination that it went well,

11   it's highly possible that it would have come via ping.

12   Q.  Okay.  And were those pings where they give you their

13   feedback on the meeting, were those close in time to when the

14   interviews actually happened?

15   A.  It depended on when -- how busy they were.  Sometimes if --

16   so immediately after an interview, the system -- like, if

17   it's -- if it's scheduled for 9 in the morning, at 10 in the

18   morning that day, the system automatically starts sending

19   emails prompting the executives answer their EBPs to enter the

20   feedback.  When that doesn't happen quickly, that's typically

21   when a recruiter like myself will follow up via ping.  And so

22   there's really -- I think it's hard to provide an estimate as

23   to when the ping that actually resonated and got a response

24   occurred.

25   Q.  Okay.

NADVROW2                     Vardaman - Redirect

1              MS. GREENE:  So P-69, let's go back there.  And if we

2    can go to the page that ends with 838.

3    Q.  This is August 10th; correct?

4    A.  Yes, ma'am, that's the date.

5    Q.  And so this is after Ms. Rowe had been interviewed by the

6    panelists; correct?

7    A.  I don't recall the exact date of Ms. Rowe's interviews.

8              MS. GREENE:  Okay.  Let's go to the next page, if we

9    can.  And we see Ms. Rowe's entry.  If we can call that out

10   again.

11   Q.  Awaiting complete feedback.  Vats liked her, Darryl liked

12   her, had some questions, followership.

13             Is that information you got via ping?

14   A.  Yes, I would say that's a reasonable conclusion.

15   Q.  Okay.  If you had gotten additional information via ping,

16   would you have included it in these updates?

17   A.  It's likely, yes.

18   Q.  Okay.  And you didn't share with Mr. Shaukat the specifics

19   of any pings that you received; correct?

20   A.  I don't recall the specifics.

21   Q.  Well, you testified yesterday that you didn't share with

22   Mr. Shaukat the feedback you got via pings; correct?

23   A.  I believe I said I didn't recall sharing that.  I'd be

24   happy to be proven wrong if I said that yesterday.

25   Q.  We'll come back to that.

1            MS. GREENE:  But for the time being, let's take that

2      down and let's go to the document 825.RR.

3      Q.  And here for Ms. Rowe we see that same entry:  Chasing

4      feedback.  Met with Sebastien, Darryl, Jason, Vats.  Vats liked

5      her, Darryl liked her, had some questions, followership.

6            Correct?

7      A.  Yes, that's what's written there.

8      Q.  I believe the testimony you gave yesterday, we looked at

9      your deposition as well about whether you shared feedback.  And

10     you answered no, not for an internal candidate.

11           And for a candidate for whom Tariq was interested in

12     running the full process, do you recall now that testimony that

13     you did not provide him with feedback?

14     A.  I don't recall that testimony.  But again, if I said that

15     in a deposition and you're going to show it to me, I understand

16     that.  I think feedback here -- I'm clearly still chasing

17     feedback.  That is formal feedback in the system.  I would say

18     that Vats liking her, Darryl liking her is a pretty common

19     refrain at Google.  Hey, yeah, I liked her.  I'll get to my

20     full feedback at some point.  And so I provided it here.

21     Q.  Okay.  So that's the nature of the ping that you got, "I

22     liked her," not a full recitation of their feedback for her;

23     correct?

24     A.  By default, ping being instant messaging, it would have

25     been, you know, relatively high level; certainly not as

NADVROW2                      Vardaman - Redirect

1   detailed as I would expect the entry into gHire to be.  That's

2   correct.

3   Q.  Okay.  I think this was August 24th; is that right?

4          MS. GREENE:  If we can take that down and just turn to

5   the page before.

6   Q.  I'm sorry, this is August 24th that you noted Vats liked

7   her, Jason liked her.

8          Okay.  Let's go to August 31st, 818.  And if we can go

9   to see the date on this.  This is 8/31.  And if we can go to

10  818 again.

11         We see now:  Sounds like she is not viable for the

12  role.  That was Sebastien, Darryl, Jason, Vats.  There's

13  nothing in here that's additional ping feedback that you got

14  from any of these individuals; correct?

15  A.  That's correct.  There's nothing in there.  I believe I

16  testified that this was me trying to prompt action for a

17  candidate who had been in process.

18  Q.  Okay.  So nobody had given you additional feedback between

19  August 24th and August 31st, when you said she was not viable

20  for the role; correct?

21  A.  I believe I testified that Mr. Martin had also provided

22  feedback.  I don't recall the specific date that that occurred.

23  Q.  And nobody had provided you with any sort of extensive

24  feedback, correct, at any point in time?

25  A.  It would -- the extensive feedback would have been listed

NADVROW2                     Vardaman - Redirect

1   in gHire.

2   Q.  And it wasn't there; correct?

3   A.  Correct.

4          MS. GREENE:  Let's go back to D-10.

5   Q.  This is September 1st; correct?

6   A.  Yes, ma'am, that's the date.

7   Q.  And it says:  It doesn't sound like she is viable for the

8   VP role.  And you're asking.

9          But just to be clear, you haven't gotten any other

10  feedback via ping about Ms. Rowe; correct?

11  A.  The only other feedback that I recall getting was from

12  Jason Martin via ping.  And as I just said, I don't recall

13  exactly what date that had occurred.  Again, this was me -- and

14  you can see there that I mention that Ulku has been in the

15  ether for a bit.

16         One of the dings, I feel like are critiques of

17  recruiting processes in general, is that people -- candidates

18  in particular can feel like they are just hanging out without

19  updates, and I'm very sensitive to that.  And I tend to believe

20  that candidates like to know one way or the other.  And so that

21  really is me trying to get some type of clear decision for

22  Ms. Rowe.

23  Q.  Ranjanna Clark had been hanging out for a while, too,

24  right?  She was interviewed by Mr. Shaukat in April?

25  A.  And I was wildly uncomfortable about that, too.

NADVROW2                        Vardaman - Redirect

1   Q.  You don't call that out in this email though, do you?

2   A.  No, because she -- I believe I had already told her that it

3   was going to be a while.  And so my cadence in following up

4   with her, an external candidate, would be on probably a

5   three-to-four-week basis.

6   Q.  Just to be clear, you're saying it was your opinion she

7   wasn't viable, and that was based on a handful of short pings

8   that you received from some of the panelists; is that right?

9   A.  It's not my opinion.  Again, this is me trying to prompt

10  action.  And if you're asking if I took the information I

11  received via ping to formulate this exact sentence, then yes,

12  ma'am, that's a reasonable conclusion.

13  Q.  Well, Mr. Shaukat did decide that Ms. Rowe indeed was not

14  viable; correct?  That she was not a candidate going forward?

15  A.  I don't recall exactly when that was, but at some point I

16  recall Tariq mentioning -- Mr. Shaukat mentioning that he would

17  connect with Ms. Rowe.

18  Q.  And no additional feedback had come in before Mr. Shaukat

19  made that decision; correct?

20  A.  I recall Mr. Shaukat asking me to send an email to the

21  panel members to ask them to send email feedback to

22  Mr. Shaukat.

23  Q.  Mr. Shaukat didn't get any email feedback; correct?

24          MS. TOMEZSKO:  Objection.

25  Q.  Do you know whether Mr. Shaukat got any email feedback?

1    THE COURT:  I'll allow that.

2    A.  Sorry.

3    Q.  Do you know whether Mr. Shaukat got any email feedback?

4    A.  No, ma'am, I don't have access to Mr. Shaukat's email.

5    Q.  Let's take a moment to look at D-79.  And this is Yolande

6    Piazza's hiring packet?

7    A.  Yes, ma'am, that's what it looks like.

8    Q.  And what was her education status?

9    A.  As I recall, Ms. Piazza did not -- did not have an

10   undergraduate degree.

11   Q.  And so she obviously then didn't also have a graduate

12   degree; correct?

13   A.  I believe that's correct.

14   Q.  Okay.  And under work history, it notes that she spent 32

15   years progressing with the same company; correct?

16   A.  Yes, ma'am.

17   Q.  Let's go to the third page.

18        Do you see in the first full paragraph where it says:

19   "She will need support from a sales leader."

20        MS. GREENE:  If you can just highlight that line,

21   Vincent.

22   Q.  She will need support from a sales leader who comes from a

23   software sales background.

24        THE COURT:  Can you highlight that?

25   Q.  And we can certainly provide her with that resource.

1          Do you see that?

2    A.  Yes, I do.

3    Q.  Okay.  So Ms. Piazza didn't have a sales background;

4    correct?

5    A.  She was responsible for the sales organization in her job

6    as CEO of City Fintech, as I recall.

7    Q.  So she was going to have to get sales support from within

8    Google in order to be a candidate or considered for the role;

9    correct?

10   A.  It's not uncommon for an executive who joins Google to have

11   an area where they need additional support from the

12   organization.  As I recall, Ms. Kliphouse, given Yolande's

13   seniority and relationship, she was prepared to provide that to

14   her, yes, ma'am.

15          MS. GREENE:  Okay.  You can take that down.

16          THE WITNESS:  May I grab another water?

17          MS. GREENE:  Oh, please do.

18   Q.  I'm going to show you a document that is only for your

19   eyes; it's not to share with the jury at this time.

20   A.  And forgive me, the rules on this is that I can't read from

21   it but I can talk to it?

22   Q.  Correct.

23   A.  Okay.

24   Q.  I'm just going to ask you -- well, before we do that, do

25   you recall when Ms. Rowe reached out to you?  I think we saw

NADVROW2                    Vardaman - Redirect

1    some emails earlier about the financial services sales role.

2    A.  I don't recall the specific date, no, ma'am.

3    Q.  Do you recall when you raised with Ms. Kliphouse Ms. Rowe's

4    candidacy?

5    A.  As I alluded to earlier, the *ad hoc* nature of working with

6    Ms. Kliphouse was -- it was just that, it was *ad hoc*; so I

7    can't say the exact date.

8    Q.  Would you ever initiate a meeting with her when a new

9    candidate arose?

10   A.  We tried to have a schedule whereby she thought and her

11   executive assistant thought that she had a reasonably good

12   chance of making the meeting.  If a customer meeting or

13   something else came up, an email from Thomas, it wasn't unusual

14   for that to get punted and to receive an email saying, Hey,

15   I'll call you later or something along those lines.

16   Q.  My question is a little different.  If in between your

17   conversations with Ms. Kliphouse you identified a new

18   candidate, someone that hadn't been discussed before, would you

19   raise that with her, Hey, we found this person outside or this

20   other, would you raise that with her proactively?

21   A.  Yes, that was part of providing the status on the search to

22   her.

23   Q.  Okay.  So as of February 5th, Ms. Rowe had raised with you

24   her interest in the role; correct?

25   A.  Again, the specific date — and I'm not looking at anything

1   here yet — it sounds about right.

2   Q.  Actually, I think it was -- I think it was February 4th,

3   there was a communication on February 5th.

4          Take a look -- let me ask you, do you remember as of

5   February 7th, whether you had let Ms. Kliphouse know that

6   Ms. Rowe was a candidate?

7   A.  Again, the exact date, I feel like it was in pretty close

8   proximity, because when I did mention Ms. Rowe's candidacy,

9   Ms. Kliphouse had mentioned that she had met Ms. Rowe for a

10  coffee.

11  Q.  Let's look for your own information, not to be shared, at

12  D-78.  Again, not to be shared with the jury.

13         Does this refresh your recollection, if you look at

14  the date and you look at what's listed with respect to active

15  candidates, whether you had by February 7th raised with

16  Ms. Kliphouse Ms. Rowe's candidacy?

17  A.  Is there another page to this?

18  Q.  There is.

19         MS. GREENE:  Can we just keep it small and flip to the

20  next page, Mr. Yang.

21  A.  So I'm not sure how to answer the question if I'm not

22  supposed to talk about what's on the document.

23  Q.  I'm asking if it refreshes your recollection about whether

24  as of February 7th — so this is three days after Ms. Rowe had

25  reached out to you — you had raised with Ms. Kliphouse the

NADVROW2                    Vardaman - Redirect

1   possibility of Ms. Rowe's candidacy?

2               THE COURT:  Can you go back to the first page, please.

3   A.  If this document is two pages long, Ms. Rowe is not listed

4   on the document.  Am I allowed to say that?

5               MS. GREENE:  Actually, Mr. Yang, I believe there's

6   four pages.  Can we go through all four pages.

7               Okay.  So that's the totality of the document.

8   Q.  Had you, by February 7th, raised with Ms. Kliphouse the

9   fact that Ms. Rowe had asked to be considered for the role, had

10  raised her hand?

11  A.  She is not listed on this document.  That's all I can speak

12  to.

13  Q.  Okay.  Do you know whether as of February 14th, you had

14  alerted Ms. Kliphouse that Ms. Rowe was interested or might be

15  a prospect for the role?

16  A.  You're using specific dates, and I've said that I don't

17  recall the specific date.  I recall getting a live conversation

18  with Ms. Kliphouse where I mentioned Ms. Rowe, and that's how I

19  recall that she responded, that she had grabbed coffee with

20  Ms. Rowe.

21  Q.  If you had proactively alerted Ms. Kliphouse to Ms. Rowe's

22  candidacy, would it have shown up on the update list that you

23  created yourself?

24  A.  It depends on the last time that I updated this, taking

25  into account the other number of searches that I had open and

1   active at any given point in time.

2   Q.  So just to refresh your recollection, let's look at D-76.

3           MS. GREENE:  And if we can just slowly skim through

4   the document for the witness.

5           THE COURT:  This one you're also not going to read

6   from.

7           THE WITNESS:  Yes, ma'am.

8   Q.  Does that refresh your recollection as to whether as of

9   February 14th, you had raised with Ms. Kliphouse that Ms. Rowe

10  was either a prospect or a candidate for the position?

11  A.  I don't see her name on here.  It's possible there could be

12  another document that does have that.  I don't remember.

13  Q.  Now, Ms. Rowe had emailed you on February 10th, asking

14  about her candidacy; correct?

15  A.  I feel like you're going to show me something that's going

16  to reference February 10th; so again, on the outset, I don't

17  recall if it was February 10th.

18  Q.  Okay.  We've looked at P-106 before.  We can bring it up

19  again just to remind you of the dates here.

20  A.  Okay.

21          MS. GREENE:  Mr. Yang, can you bring up P-106.

22          And this is the email correspondence.  And if we can

23  go to the first page.  And we can go back in time to the first

24  email.  My apologies.

25  Q.  So February 4th, she reaches out.  February 5th, she

NADVROW2                    Vardaman - Redirect

1    reaches out, you see.  February 10th, she's reached out to you;

2    correct?

3    A.  Yes, ma'am.

4    Q.  And you're not aware as of February 14th, having done

5    anything to let Ms. Kliphouse know that Ms. Rowe had been

6    reaching out and was interested and wanted to be considered for

7    the position; correct?

8    A.  No, I believe I said I don't recall when my conversation

9    with Ms. Kliphouse was.

10   Q.  Let's, if we can, go to -- well, let me ask you, do you

11   recall -- when was the first time that you alerted or even

12   thought to alert Ms. Kliphouse that Ms. Rowe was interested?

13            MS. TOMEZSKO:  Objection.  Asked and answered.

14            THE COURT:  Sustained.

15   Q.  Okay.  Let's turn to the first page of this document,

16   P-106.  So on February 20th, Ms. Rowe reaches out again to

17   check on updates; correct?

18   A.  February 20th.  Yes, yes, ma'am.

19   Q.  And you say:  Hi, Ulku.  Not yet.  We are trying to get on

20   Kirsten's calendar tomorrow.  Thank you.

21            Do you see that?

22   A.  I do.

23   Q.  Okay.  Now, do you recall if that caused you to do

24   something in terms of alerting Ms. Kliphouse that Ms. Rowe was

25   interested for the position?

NADVROW2                          Vardaman – Redirect

1   A.  It looks like we have a meeting, a scheduled meeting with

2   Kirsten the next day, February 21st.

3   Q.  And do you recall what you did in preparation for that

4   meeting?

5   A.  I may have updated a document.

6   Q.  Did you do anything with respect to identifying Ms. Rowe's

7   qualifications or her experience or talking with anyone

8   internally about Ms. Rowe or the work that she'd been doing?

9   Did you do anything of that nature?

10  A.  I believe I testified yesterday that I did not.

11                  (Continued on next page)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

NADHRow3                     Vardaman - Redirect

1   Q.  Now, was February 21 the first time you let Ms. Piazza know

2   that — I'm sorry, Ms. Kliphouse know that Ms. Rowe was

3   interested in the position?

4              MS. TOMEZSKO:  Objection.  Asked and answered.

5              THE COURT:  Sustained.

6   Q.  Do you recall whether February 21 was the date on which you

7   let Ms. Kliphouse know?

8              MS. TOMEZSKO:  Same objection.  Asked and answered.

9              THE COURT:  Sustained.

10  Q.  Let me show you a document to refresh your recollection,

11  D74, and this is just to refresh your own recollection.

12             Does this refresh your recollection as to whether on

13  February 25 you were alerting — I'm sorry, February 21 you

14  were alerting Ms. Kliphouse that Ms. Rowe had raised her hand

15  to be considered for the role?

16             MS. TOMEZSKO:  Same objection.  Asked and answered,

17  your Honor.

18             THE COURT:  I'll allow it now.

19  A.  I do see her name on this document, along with Tais

20  O'Dwyer.

21  Q.  How many other internal candidates were being considered at

22  that point in time?

23  A.  Is there another page?  It looks like that's a — OK.  It

24  looks like those two at that juncture.

25  Q.  That were being considered for the role?

NADHRow3                        Vardaman - Redirect

1   A.  They're listed here so that I could, hopefully, get a

2   response from Ms. Kliphouse.

3   Q.  I'm sorry.  My question is a little different.

4          How many candidates in total were being considered for

5   the role at that time?

6   A.  Oh, my gosh.  I'd have to look at the —— the entry for the

7   search itself and the number of candidates that were tagged to

8   the search.

9          MS. GREENE:  OK.  If we can turn to the next two pages

10  on this document.

11  Q.  Let me ask you, does this refresh your recollection on how

12  many active candidates there were for the role?

13  A.  Because a candidate is listed here, what I tried to do, in

14  working with Google executives, was have a distilled document

15  that we could discuss.  That doesn't necessarily mean that this

16  distilled document reflects everyone that I've looked at,

17  reached out to.  In general, these were people that had gotten

18  back to me, so some —— or I've had a conversation with or

19  something along those lines such that it —— we could —— we

20  could really pick a hiring manager's brain about whether or not

21  someone's background looked compelling.

22  Q.  So how many of those people were there with respect to the

23  financial services sales position as of February 21, 2020?

24  A.  I have no idea without looking at the system.  Certainly,

25  these people should have been tagged to the search and probably

1    some others that I had identified, that our team had identified

2    and reached out to but may not have gotten back to us yet.

3    Q.  How many people were on the list that you were prepared to

4    discuss with Ms. Kliphouse?

5    A.  Just because you are listed here doesn't mean that we would

6    talk about them in the meeting.  Again, this is a distilled

7    report, and I —— in some ways I wouldn't know which way a

8    conversation with Ms. Kliphouse or a hiring manager would go.

9    Q.  This is a different question.

10           MS. TOMEZSKO:  Your Honor, before we proceed, may I

11   have a sidebar?

12           (Continued on next page)

13

14

15

16

17

18

19

20

21

22

23

24

25

1        (At sidebar)

2        MS. TOMEZSKO:  This is the precise reason I wanted to

3   show Mr. Vardaman these documents, to establish what was

4   discussed and at what time both as to Ms. Rowe and the other

5   candidates who were under consideration.  The plaintiff has

6   objected on that basis on hearsay grounds.  She is now using

7   the document for the exact same purpose.

8        THE COURT:  I think she established with him earlier

9   that it's a business record and that there is not a second

10  level of hearsay, but then you didn't move it into admission.

11  You took it down after showing it to him, so we didn't get

12  there.

13       MS. TOMEZSKO:  But now that she's opened at door and

14  we've discussed this document, like, at length, I think, and

15  she's asking questions about when it was, who is in the

16  document, and what it indicates, I think I should be able to

17  ask him questions about it as well.

18       THE COURT:  I don't — I think that the hearsay issues

19  that were flagged earlier were resolved by your questions of

20  the witness earlier, and you may use the document.

21       MS. GREENE:  Well, your Honor, I've only asked to use

22  the document in the context of refreshing is recollection.  She

23  didn't move it in, and now she's attempting to introduce new

24  evidence.

25       THE COURT:  Now she's going to do redirect.

1            MS. GREENE:  OK.  All right.

2            MS. TOMEZSKO:  Just a clarification, I would assume

3      that — well, how would your Honor react if I moved it for

4      admission now that we've discussed it, that we've established a

5      foundation for it?

6            MS. GREENE:  I'm confused why you keep asking to move

7      into evidence, because my understanding was that once the

8      evidence was before the jury, it was moved in.  It was

9      considered to be moved into evidence.

10           MS. TOMEZSKO:  The jury has not seen this.

11           MS. GREENE:  No, I know, but when you keep saying, can

12     I move it into evidence, and you're asking if there's an

13     objection, we just started that this morning because the

14     understanding was any documents that was shown to the jury was

15     moved into evidence.  So if you're able to show it to the jury,

16     it's moved into evidence.

17           MS. TOMEZSKO:  I apologize.  My understanding was that

18     we made a list of the exhibits that would be moved into

19     evidence at the beginning of the trial.  It was Exhibit A to

20     the stipulation that we provided to your Honor at the beginning

21     of the trial.  I was being cautious because I wanted to make

22     sure that documents not in that list were affirmatively moved

23     into evidence, as I understood that was your Honor's preference

24     if we did not so stipulate.  That's exactly why I was doing

25     that.

1          MS. GREENE:  OK.  Well, we have not done it at this

2     point.  We would need, then, to go back to all of the other

3     documents that both parties have used and ——

4          MS. TOMEZSKO:  I'm certainly willing to stipulate to

5     that.  If you want to go through the documents, I will

6     absolutely stipulate to those that have been shown to the jury.

7          MS. GREENE:  Let's stipulate now that if it's shown to

8     the jury, it's moved into evidence.

9          MS. TOMEZSKO:  I'm willing to make that stipulation.

10          MS. GREENE:  OK.

11          THE COURT:  So it sounds like —— are you planning to

12     review it with Mr. Vardaman?

13          MS. TOMEZSKO:  Well, I would like to show the jury now

14     this document and just do a very brief redirect.

15          THE COURT:  So what we're going to do, you're going to

16     do a redirect, you'll indicate that you want to publish the

17     document, I assume you'll make your objection, I'll make my

18     ruling, and then we'll go from there.

19          MS. TOMEZSKO:  All right.

20          MS. GREENE:  Your Honor, if she's going to do it, I

21     may just bring it in now.

22          MS. TOMEZSKO:  OK.

23          THE COURT:  OK.

24          MS. TOMEZSKO:  I'd be fine with that.

25          THE COURT:  Let's do that.

```
 1              (In open court; jurors present)

 2    BY MS. GREENE:

 3    Q.  Let's go ahead and look at D74.

 4              Sir, these are your status reports, right?  This is

 5    the status report you described?

 6    A.  Yes, ma'am.

 7    Q.  And the ones that you had looked at prior did not include

 8    any mention of Ms. Rowe, correct?

 9    A.  Nor of Tais O'Dwyer, as I recall.

10              MS. GREENE:  Is this published to the jury?  Let's go

11    ahead and publish this to the jury, please.  Now the jury has

12    it.

13    Q.  So this is as of February 21, and this is the first time

14    Ms. Rowe has shown up on the list of potential candidates,

15    correct?

16    A.  Internal candidates, Ms. Rowe and Ms. O'Dwyer are both

17    listed here for the first time, I believe.

18    Q.  Let's go through the second and third pages now.

19              So the second page has one, two, three, four, five,

20    six — seven candidates?  And then the eight, nine, ten, 11, 12

21    — 13 other individuals are listed here beyond Ms. Rowe and

22    Ms. Dwyer, correct?

23    A.  If that's the last page, yes, ma'am.

24    Q.  And with respect to Ms. Piazza — let's go back to the

25    prior page — she was still in the interviewing stage, correct?
```

1   A.  It looks like she's being scheduled with Rob Henslin,

2   Mr. Henslin

3   Q.  And Ms. Neely was still in the interview stage, correct?

4   A.  Yes.  Looks like she's being scheduled with Ms. Kennedy.

5   Q.  And Mr. Alam and Mr. Trevisani both were having meetings

6   with Kirsten, correct?

7   A.  Those are question marks.

8   Q.  Then there's others like Mr. O'Malley who —— there's still,

9   I assume, a conversation about whether to have interviews with

10  them and things, correct?

11  A.  That seemed to be what's represented here, yes, ma'am.

12  Q.  So it's fair to say that as of February 21, 2020, there was

13  no selected candidate for this role, correct?

14  A.  Yes.  It looks like there are candidates of focus, and that

15  would be indicated by them starting to meet other Google

16  executives.

17  Q.  But no decision had been made as to who would get this

18  role, correct?

19  A.  As to who would get the role, no, that would come later.

20          MS. GREENE:  You can take that down.

21  Q.  Did you tell employee relations that you had felt dismissed

22  and disrespected and talked down to by Ms. Rowe because of your

23  level?

24  A.  I believe that's what I was trying to impart to employee

25  relations.

NADHRow3                     Vardaman - Redirect

1    Q.  You didn't ever mention your level or anything to do with

2    leveling as it relates to you and Ms. Rowe in your conversation

3    with ER, did you?

4    A.  No, not that I recall.

5    Q.  And when you said to ER that it was Ulku's cantankerous

6    style that further undermined her chances, you were suggestive

7    — you didn't let ER know that you were talking about a

8    personal experience you had with her —

9    A.  No, I believe —

10   Q.  — did you?

11   A.  I believe yesterday I said that my — I believe I said

12   yesterday that my personal feeling may have come across in

13   that, but that I certainly don't recall using the word

14   "cantankerous."

15   Q.  But you were asked — or you spoke with ER about the

16   consideration of Mr. Stuart Breslow and Ms. Ulku Rowe, and we

17   looked at this yesterday, I believe, and you said that Ulku was

18   in the risk technology group and didn't have as broad as

19   Stuart, and between the two internals there was white space

20   between Stuart's seniority and Ulku's in the industry, coupled

21   with Ulku's cantankerous style, it undermined her chances.  So

22   you said that style was one of the reasons why she didn't get

23   the role?

24   A.  Again, I don't recall saying that.  Again, there was

25   notetaker in the room taking notes.

NADHRow3                        Vardaman - Redirect

1   Q.  And today you said your personal perceptions of Ms. Rowe

2   had nothing to do with any of the decisions or involvement that

3   you had as the recruiter, is that right?

4   A.  They didn't because I don't have the authority to make

5   decisions.

6            MS. GREENE:  No further questions.

7            MS. TOMEZSKO:  We have no further questions for the

8   witness, your Honor.

9            THE COURT:  You have no further questions?

10           MS. TOMEZSKO:  No.

11           THE COURT:  OK.  Mr. Vardaman, you may step down.

12  Thank you.

13           (Witness excused)

14           THE COURT:  Why don't you let me know so I can figure

15  out timing of the break for the jury.  What is your plan now?

16           MS. GREENE:  The plaintiff will be calling Stuart

17  Breslow.

18           THE COURT:  Do you want to ——

19           MS. GREENE:  Mr. Chiarello expects that it will be

20  about a half an hour of examination time.

21           THE COURT:  Then I think we should take our break now

22  and resume at 11:30.  I think that will have the continuity.

23           MS. GREENE:  Thank you.

24           THE COURT:  So, members of the jury, we're going to

25  take our midmorning comfort break now.  It's 11:14.  We'll

1    resume at 11:30.

2              Please remember, don't talk to each other or anyone

3    else about the case, don't do any research about the case, and

4    the avail yourself of the facilities in the jury room and not

5    the public bathroom.

6              Thank you.

7              (Jury excused)

8              (Continued on next page)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

NADHRow3

1            (Jury not present)

2            THE COURT:  Have a seat.

3            Just one question.  We're going to have a limiting

4    instruction now?  Are we having a limiting instruction coming

5    up relating to Mr. Breslow?  I just want to be ready for that.

6            MR. GAGE:  I don't anticipate the need for one.

7            THE COURT:  OK.

8            MR. GAGE:  I'm just doing cross-examination, though.

9            THE COURT:  Yes.

10           MR. CHIARELLO:  And I don't think so either, your

11   Honor.

12           THE COURT:  All right.  Very good.  See you in a few.

13           (Recess)

14           (Continued on next page)

15

16

17

18

19

20

21

22

23

24

25

1          (Jury present)

2          THE COURT:  Hello.  You may be seated.  Thank you.

3    STUART BRESLOW,

4        called as a witness by the Plaintiff,

5        having been duly sworn, testified as follows:

6          MS. GREENE:  Your Honor, I'm sorry, but our real time

7    seems to have frozen.

8          MR. GAGE:  Can we proceed without it, Judge?

9          THE COURT:  If it's not a quick fix, then ——

10   Ms. Williams, do you know, perhaps we learned something from

11   that.

12         MS. GREENE:  It's on the screen, but it's --

13         (Discussion off the record)

14   DIRECT EXAMINATION

15   BY MR. CHIARELLO:

16   Q.  Good morning, Mr. Breslow.

17   A.  Good morning.

18   Q.  Mr. Breslow, is it correct you do not have any formal

19   education in computer science and computer engineering?

20   A.  Yes.

21   Q.  Is it correct that you don't hold any degrees in computer

22   engineering?

23   A.  Yes.

24   Q.  And you're trained as a lawyer, correct?

25   A.  Yes.

1   Q.   And you had a career at Morgan Stanley, the first part of

2   which was doing litigation work, is that right?

3   A.   Yes.

4   Q.   Then you spent some time advising on compliance issues as

5   the chief compliance officer?

6   A.   I was Morgan Stanley's chief compliance officer.

7   Q.   Was that for around 16, 17 years?

8   A.   It was from 1995 to 2001 and 2005 to 2016.

9   Q.   The office of the chief compliance officer did not create

10  or maintain any technology within Morgan Stanley, is that

11  correct?

12  A.   Well, as chief compliance officer, the key —— one of the

13  key elements of making a compliance program work is technology.

14  So I did have at various times between 125 to 250 technologists

15  who supported my work as chief compliance officer at Morgan

16  Stanley.

17  Q.   Did you or any of those individuals create technology

18  within that group?

19  A.   Yes.

20  Q.   Did you personally create technology?

21  A.   No.

22  Q.   Now, compliance was a business partner to the IT group at

23  Morgan Stanley, is that correct?

24  A.   Not quite sure what you mean by "business partner," I'm

25  sorry.

NADHRow3                        Breslow - Direct

1   Q.  It's a term you used in your deposition.  As you understand

2   the term business partner.

3   A.  Sure.

4   Q.  Mr. Breslow, have you ever held an engineering role?

5   A.  No.

6   Q.  And have you had any technical training with respect to

7   computer science?

8   A.  No.

9   Q.  Have you had any technical training with respect to

10  computer engineering?

11  A.  No.

12  Q.  And you haven't had any training with respect to coding or

13  programming, correct?

14  A.  Correct.

15  Q.  Did you ever build an engineering team prior to joining

16  Google?

17  A.  No.

18  Q.  And is it correct that you did not work with cloud

19  technology in any of the roles you held prior to joining

20  Google?

21  A.  Correct.

22  Q.  Now, you were hired at Google into a role called the

23  managing director of technology and policy within Google Cloud,

24  is that right?

25  A.  Correct.

NADHRow3                        Breslow - Direct

1   Q.  And that was in May of 2018?

2   A.  I started in Google, I thought, in July of 2018, but I may

3   have been hired in May.

4   Q.  And at that time were you based in New York?

5   A.  Yes.

6   Q.  Throughout your tenure at Google, were you based in

7   New York?

8   A.  Correct.

9   Q.  The managing director of technology and policy was a

10  Level 9 role, correct?

11  A.  Correct.

12  Q.  Did you know that when you were hired, that it was a

13  Level 9 role?

14  A.  Probably not.

15          MR. CHIARELLO:  I'd like to put up Plaintiff's 137.

16  And, Mr. Yang, do not publish it to the jury yet.  I don't know

17  if there's an objection.

18          MR. GAGE:  I'm sorry.  Is there a question?

19          MR. CHIARELLO:  I'm waiting for you.  Is there an

20  objection?

21          MR. GAGE:  No.

22          MR. CHIARELLO:  Can you please publish 137 to the

23  jury.

24  BY MR. CHIARELLO:

25  Q.  Mr. Breslow, is this your offer letter from Google?

1    A.  It appears to be, yes.

2    Q.  And according to your offer letter, you received an annual

3    salary of $325,000, is that correct?

4    A.  Correct.

5    Q.  And you had an annual bonus target of 40 percent, is that

6    correct?

7    A.  Correct.

8    Q.  And you received an equity compensation award equal to $4

9    million, is that correct?

10   A.  Correct.

11   Q.  Now, the $4 million equity award, that was something that

12   Google offered to you, correct?  You didn't ask for that?

13   A.  Correct.

14   Q.  And that award was not to offset any compensation that you

15   were forfeiting by coming to Google, correct?

16   A.  Correct.

17   Q.  You were not forfeiting any equity from McKinsey or Morgan

18   Stanley by joining Google?

19   A.  Correct.

20   Q.  And it's correct that you actually didn't negotiate any

21   aspect of the package.  This is the package that Google offered

22   you, correct?

23   A.  Not to my recollection.

24   Q.  Now, after you joined Google as managing director of

25   technology and policy, was it your understanding that in that

NADHRow3                              Breslow – Direct

1    role, you would be responsible for working with customers and

2    partners to explain how Google Cloud meets their compliance and

3    regulatory needs?

4    A.   Among other things, yes.

5    Q.   And did you understand that your role was global and

6    cross-vertical?

7    A.   Correct.

8    Q.   Do you understand one of your responsibilities to be to

9    work with customers and partners to define joint initiatives

10   and co-create their transformation roadmap?

11   A.   Yes.

12   Q.   Was one of your responsibilities to collaborate across

13   functional and product area boundaries to bring the best of

14   Google to the customer?

15   A.   Absolutely.

16   Q.   Was it your understanding that your role was to lead

17   regulatory and compliance on the business and customer side for

18   Google Cloud?

19   A.   No.

20   Q.   That was not part of your role?

21   A.   Not to my recollection, no.

22        MR. CHIARELLO:  Mr. Yang, can we play —— I'm sorry.

23   Q.   You were deposed in this matter, correct?

24   A.   Yes.

25   Q.   And you gave testimony under oath at your deposition?

1   A.  Yes.

2   Q.  Testimony was truthful?

3   A.  Yes.

4        MR. CHIARELLO:  Mr. Yang, can we play for the jury

5   72:20 to 73:8.

6        (Video played)

7        MR. CHIARELLO:  Thanks, Mr. Yang.

8   Q.  Mr. Breslow, did you understand that one of your

9   responsibilities was to identify cloud-related design,

10  development, or deployment friction points from the customer's

11  perspectives and to rally your teams to work through solutions?

12  A.  Sorry, could you repeat that.

13  Q.  Sure.  Did you understand that one of your responsibilities

14  as managing director of technology and policy was to identify

15  cloud-related design, development, or deployment friction

16  points from the customer's perspective and to rally your teams

17  to work through solutions?

18  A.  Yes.

19  Q.  Did you understand the function of your role that you were

20  expected to work closely with the product engineering teams in

21  GT and GPT?

22  A.  I'm sorry.  I didn't catch the two.  In what?  In G?

23  Q.  GT and GPT.

24  A.  I don't remember what those acronyms stand for.  Sorry.

25  Q.  OK.

1   A.  The answer's probably yes.  I just don't remember what

2   those acronyms are.

3   Q.  You don't have any reason to think that wasn't part of your

4   role?

5   A.  No, probably was.

6   Q.  And the role, as you understood it, also included doing

7   deep dives with internal engineering teams on key cases for a

8   given launch, correct?

9   A.  Yes.

10   Q.  In your role did you understand that your responsibility

11   included partnering closely with top global companies as their

12   most-trusted Google technical adviser?

13   A.  Absolutely.

14   Q.  Was part of your responsibility to tell the Google

15   innovation story and help translate it to actionable steps

16   global companies can take towards adoption of the cloud?

17   A.  Absolutely.

18   Q.  And did you understand one of your responsibilities to be

19   — to include public evangelism for emerging technologies and

20   speaking publicly on those issues?

21   A.  Absolutely.

22   Q.  Now, Tariq Shaukat was your manager while you were employed

23   at Google, correct?

24   A.  Correct.

25   Q.  And in your managing director of technology and policy

1    role, you met with Mr. Shaukat on a frequent basis, correct?

2    A.  I think "frequent" is in the eye of the beholder, but, yes,

3    we did meet a fair amount.

4    Q.  And "frequent" is a word that you used in your deposition,

5    correct?

6    A.  If I did, I did.  Deposition was a couple years ago.

7    Q.  And you had a standing call with Mr. Shaukat every week or

8    every other week?

9    A.  Correct.

10   Q.  And ——

11   A.  His name is pronounced Shaukat, not Shaukat.

12   Q.  OK.  I believe Mr. Shaukat used Shaukat, but appreciate the

13   clarification.

14           If Mr. Shaukat could not keep a call with you, he

15   would reschedule it relatively proximate to the scheduled time

16   you were supposed to speak, is that right?

17   A.  Depended, but generally, yes.

18   Q.  And he was available to you and would speak to you whenever

19   needed, correct?

20   A.  Yes.

21   Q.  He was always accessible to you?

22   A.  Yes.

23   Q.  And in addition to speaking with him, you also met with him

24   in New York or California approximately every month or so,

25   correct?

1   A.  No.  I'm assuming you mean in person in California or New

2   York —

3   Q.  Yes.

4   A.  — as opposed to a videoconference?

5   Q.  Correct.  You would meet with him in person in either

6   California or New York approximately every month to six weeks?

7   A.  No.

8          MR. CHIARELLO:  Mr. Yang, can we play for the jury

9   89:10 — I'm sorry.  Just give me one second.  It's going to be

10  86:15 to 87:4.

11          (Video played)

12          MR. CHIARELLO:  Thank you, Mr. Yang.

13  Q.  When you met with Mr. Shaukat person, you would meet for

14  meals, correct?  For breakfast, lunch, or dinner?

15  A.  We met once in New York for breakfast, once in New York for

16  lunch, and once in New York for dinner.  We didn't meet in

17  California for any of those meals.

18  Q.  And Mr. Shaukat initiated those meetings with you, correct?

19  A.  I don't recall whether he initiated them or I initiated

20  them.  They happened.

21          MR. CHIARELLO:  Mr. Yang, can we put up

22  Plaintiff's 72, please.

23  Q.  Mr. Breslow, this is an email exchange between you and

24  Mr. Shaukat between February 28, 2019, and March 1, 2019.

25          And, Mr. Yang, if we could take a look at the second

1    page.

2            In the email from you to Mr Shaukat —— if we can just

3    call out the top two lines there.

4    A.   I'm sorry, you're talking about the middle of the page or

5    sort of down the page?

6            MR. CHIARELLO:   Mr. Yang, it's the February 28 at 5 ——

7    7:57.

8    A.   OK.  Got it.

9    Q.   The first two lines there.

10   A.   Thank you.

11   Q.   And you write to Mr. Shaukat:  "Great catching up with you

12   over lunch yesterday.  If only there were more hours in the day

13   and we were in the same city, we could do it more often,"

14   correct?

15   A.   Correct.

16   Q.   That's what you wrote him?

17   A.   Yeah, I wrote that.

18           MR. CHIARELLO:   And, Mr. Yang, can we call out the

19   bottom two lines of that same email.

20   Q.   You write to Mr. Shaukat:  "Safe travels.  I'm assuming

21   you'll have high quality BBQ in KC and not froufrou steak

22   frites as you were subjected to in New York yesterday,"

23   correct?

24   A.   I wrote that, yes.

25   Q.   And is that the lunch you were catching up with him over

1    that you referenced at the beginning of the email?

2    A.  I'm sorry.  I'm confused.  The first part was about the

3    lunch I referenced.  The second part, I don't know when — I do

4    not recall that he had a steak at lunch.

5    Q.  So the froufrou steak frites you had with him was a

6    separate meal that you subjected him to the day prior?

7    A.  He might have had a meal with someone else.  I had one more

8    meal with him.  By the way, I'm a lacto-ovo-pesco vegetarian.

9    I haven't had steak in 25 years.

10   Q.  I see.  So your testimony is the steak frites you were

11   referring to is not a meal you had with him?

12   A.  He may have had that meal.  This was in 2019.  It's four

13   years later.  I don't recall him eating steak at lunch, but

14   maybe he had a steak at lunch.  Maybe he had a steak later in

15   the day with someone else.  I don't recall.

16          MR. CHIARELLO:  OK.  Mr. Yang, you can take that down.

17   Q.  Now, Mr. Breslow, in December of 2018, Mr. Shaukat made you

18   the head of financial — head of the financial services

19   vertical, correct?

20   A.  I'm sorry, the time frame was what?  December of 2018, is

21   that what you said?

22   Q.  Yes.

23   A.  I don't recall the precise time, but in that time period.

24   Q.  And the responsibilities for the head of financial services

25   role included driving Google's business by developing product

1  solutions for cloud, correct?

2  A.  Correct.

3  Q.  And it also involved you working with engineering to

4  develop products related to financial services and to find ways

5  to bring financial services providers to Google Cloud?

6  A.  Yes.

7  Q.  Is that correct?

8          Mr. Breslow, you hadn't expected to be considered for

9  this role, correct?

10  A.  Yes.

11  Q.  And you never asked to be considered for the role, correct?

12  A.  Yes.

13  Q.  And no one interviewed you for the role, correct?

14  A.  Correct.

15  Q.  And you spoke to Mr. Shaukat and he just gave you the role,

16  correct?

17  A.  No.  He asked me —— he said to me that with the arrival of

18  a new CEO for Google Cloud, the role had been open for a while.

19  And it was a time when, as the organization might be in

20  transition, would I consider taking on that role while the

21  organization sorted itself out?  And so I said, if that's what

22  you think is an appropriate role for me, I'm happy to take it

23  on.

24          MR. CHIARELLO:  Nothing further.

25  CROSS-EXAMINATION

1    BY MR. GAGE:

2    Q.  Good morning, Mr. Breslow.  It is still morning for a few

3    more.

4            Mr. Breslow, you were shown a short while ago

5    Plaintiff's Exhibit 37, and we don't need to put it up on the

6    screen.  It was your offer letter.  Do you remember that?

7    A.  Correct.

8    Q.  You were asked about a stock award.  Do you remember that?

9    A.  Yes, I was.

10   Q.  Did that stock award vest over time?

11   A.  Yeah, it vested 1/48.  It was a four-year stock award, 1/48

12   each month for 48 months.

13   Q.  When you left Google, did you forfeit any of the stock that

14   you had been granted by Google?

15   A.  $2 million worth.

16   Q.  So you never saw the full value of that initial award,

17   correct?

18   A.  That would be correct.

19   Q.  I want to take a step back so the jury can understand a

20   little bit more about your background.

21           Where are you from, by the way?

22   A.  So I am a native New Yorker, born and bred in Queens.  Went

23   to Queens P.S. 26, J.H.S. 216, and the Bronx High School of

24   Science.

25   Q.  And what's your educational background?

1   A.   So after Bronx Science, I went to Princeton, graduated

2   Princeton in three years.  I majored in public and

3   international affairs.  And then I went to Columbia Law School,

4   and I have a JD from Columbia Law School.

5   Q.   In what year did you graduate from law school?

6   A.   I graduated in 1981.

7   Q.   Mr. Chiarello asked you about your time at Morgan Stanley.

8   You started there as a lawyer in litigation?

9   A.   Correct.

10  Q.   And at the time you left, what was your role at Morgan

11  Stanley?

12  A.   So I was —— the very last job I had was, I was advising the

13  chief legal officer for a year because I had a garden leave

14  period.  Before that, for most of my term at Morgan Stanley, I

15  was chief compliance officer of the company.  At the time I

16  stopped filling that role, we had a thousand people in the

17  group.  I was on the management committee of the firm, the

18  firm's risk committee.  I was on the firm's franchise

19  committee, and I was also on the firm's culture, values, and

20  conduct committee.  So very senior role at the firm.

21  Q.   Tell the ladies and gentlemen of the jury what it actually

22  means to be on the management committee.  What's the management

23  committee?

24  A.   So Morgan Stanley at that time had about 55,000 employees.

25  There were 40 of us on the management committee who were

NADHRow3                      Breslow - Cross

responsible for the overall organization of the company.  And

the management committee was convened —— I don't remember the

frequency.  It was frequent, but it was convened by the CEO of

the company.

Q.   Now, I think Mr. Chiarello made a reference to the fact

that you had two stints as chief compliance officer at Morgan

Stanley.  Can you explain why you had two stints in that role.

A.   Yes.  So I became chief compliance officer at Morgan

Stanley in 1995.  In 1997, Morgan Stanley merged with a company

called Dean Witter Discover.  Many of you may know Discover

Card.  And it was not —— and I became chief compliance officer

of Morgan Stanley, Dean Witter Discover.  It was not a happy

merger between the two companies.

        In 2000, the guy who was president of Morgan Stanley,

a guy named John Mack, left.  A year later he surfaced at

Credit Suisse First Boston as the CEO of Credit Suisse First

Boston.  And on a combination of challenges I had with the

leadership at Morgan Stanley and my desire to work with John

and other leaders at Credit Suisse First Boston, I left and

became chief compliance officer at Credit Suisse First Boston.

That lasted four years.  And in 2005, John returned to Morgan

Stanley as the chief executive officer of Morgan Stanley, and

on his first day back, he called me and asked if I wanted to

return to Morgan Stanley.  And I said yes, and I returned to

Morgan Stanley as chief compliance officer.

NADHRow3                    Breslow – Cross

1    Q.  Thank you.

2            Mr. Chiarello also made a couple of points or asked

3    you a couple of questions about the —— your absence of any

4    formal training in technology.  You remember that?

5    A.  I do.

6    Q.  As chief compliance officer at Morgan Stanley, what exactly

7    were your responsibilities that related to technology at Morgan

8    Stanley?

9    A.  So there were twofold.  The one that I think is most

10   relevant is there are —— at its height there were a 1,000

11   employees in the compliance department, and there were over

12   55,000 employees at the firm.  In order for us to do our jobs

13   effectively, we had to use technology.  And so, basically, when

14   I returned to Morgan Stanley in 2005, the technology

15   infrastructure for compliance had been materially degraded

16   while in my absence.  So we came up with a five-year roadmap

17   for the rebuilding of the compliance technology infrastructure

18   at Morgan Stanley.  It comprehended all the firm's businesses,

19   all the firm's geographies, and at times I had as many as 250

20   technologists working, supporting my group.

21           I met with the senior technology person every week.  I

22   provided the strategic direction to them.  I also reviewed all

23   kinds of business requirements, documents.  I was involved in

24   tactical execution of programs.  But for this to —— for

25   compliance to succeed, I needed to have technology.  I also had

NADHRow3                          Breslow – Cross

1    a group working with me in the compliance department of about a

2    half dozen people who covered technology, and I met with them

3    every week as well to make sure we stayed on course for a very

4    large rebuild of the infrastructure.

5                  (Continued on next page)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1   BY MR. GAGE:

2   Q.  Thank you.  I want to pivot to your joining Google.

3           Did you know Tariq Shaukat before you came to Google?

4   A.  I did not.

5           MR. GAGE:  I'd like to show the witness, your Honor,

6   D-40.  This has been shown before.

7   Q.  Mr. Breslow, if you could just take a look at this.  Is

8   this the announcement of your arrival at Google?

9   A.  Yes.

10  Q.  And --

11          THE COURT:  Mr. Gage, this was subject to an

12  instruction; is that right?

13          MR. GAGE:  Yes.

14          THE COURT:  This document.

15          MR. GAGE:  Yes.

16          THE COURT:  Okay.  I'm just going to remind the jury

17  that there was an instruction about this document.  You're

18  shaking your heads yes.

19          Okay.  Go ahead.

20          MR. GAGE:  Jean, could you just focus on -- yes, that

21  paragraph right there.  And bring it out so that -- that is

22  much easier.

23          THE WITNESS:  Thank you.

24  Q.  Mr. Breslow, can you take a look at this.

25          Does this, to the best of your recollection,

1   accurately describe the job that you agreed to do at Google?

2   A.  Yes.

3        MR. GAGE:  You can take that down, Jean.

4   Q.  There was some testimony yesterday about an individual

5   named Ruth Porat.  Do you know Ruth Porat?

6   A.  Yes.  So Ruth Porat, I think her current title is she's

7   president of Google -- or Alphabet, rather.  She was the chief

8   financial officer of Alphabet before that.  But also she worked

9   at Morgan Stanley.

10        We started working together in either 1988 or 1989,

11   when we were both associates at Morgan Stanley.  And we had a

12   long relationship, and I knew her through the management

13   committee as well.

14   Q.  I want to talk just a little bit about the actual -- the

15   work that you actually did while you were at Google.

16        Did you work on any projects related to anti-money

17   laundering?

18   A.  I did.  That was one of the primary focuses that we had.

19   Q.  And can you describe for us the work that you did in the

20   area of anti-money laundering at Google.

21   A.  So at Google, in order to get traction in the organization,

22   you had to be addressing a big problem.  And financial crime is

23   a big problem.  There is probably trillions of dollars a year

24   of money laundering that occurs in the financial system.  And

25   financial services providers spend billions of dollars not

1  finding it.

2          And the way regulators look at financial crime is

3  there's a couple of technologies that are very rule-based.  And

4  they say if you do this, then -- if this activity occurs in

5  your account, we'll see that activity and we'll flag it.  And

6  then you can follow up and figure out whether it's money

7  laundering.

8          And so what happens is the primary systems that exist

9  right now basically create now about almost 100 percent false

10  positives, because I somewhat improvidently said at a Google

11  conference that was recorded that only stupid crooks get caught

12  by the current anti-money laundering systems.  Because if you

13  know exactly what they are looking for, it's pretty easy to

14  figure out what not to do.  Don't put the money in today and

15  take it out tomorrow; put it in today and take it out five days

16  later.

17          So what we wanted to do at Google was to say, Let's

18  take -- and it had two -- two imperatives at Google.  One was

19  in order to engage engineers and thought leaders, it had to be

20  a big problem.  But also, like, why would this matter for

21  Google Cloud?  The idea was when you looked at money laundering

22  and trying to identify money laundering, it was probably the

23  largest data -- the largest data set that banks have.  It

24  involves transactions, it involves customer information, it

25  involves positions at the bank.  And so the idea was it would

1   be a center of gravity to bring data into the bank from the

2   bank's -- from Google's banking customers.

3              And ultimately, the idea as well was if you think

4   about money laundering, money laundering is really the movement

5   of money through the financial system; it's from one bank to

6   another.  And it's almost a bit of a fool's errand in trying to

7   find money laundering within any single bank; because the whole

8   idea is you're putting it in one bank and route it to another

9   bank.

10             So the idea too was to get enough of a critical mass

11  of banks and find a way to anonymize data between the banks so

12  you could actually look for activity as it moved from one bank

13  to another and then try and trace it through the financial

14  system.  And so rather than looking for these rules-based

15  things, which are, Did you put $10,000 in today and take

16  $10,000 out tomorrow, it was looking for much more

17  sophisticated patterns of behavior.  And that was a very

18  interesting problem to Google engineers and it was a very

19  interesting problem to solve for Google's customers.  And I'd

20  had long experience with this.

21             And in addition, when Thomas Kurian came to Google

22  Cloud, one of the two major products was a product that was

23  owned by Oracle, where he had come from; so a product called

24  Mantas, M-A-N-T-A-S.  And when we went to talk to him about

25  what we were up to in the financial services group, we talked

NADVROW4                          Breslow - Cross

1  about that.  And he knew that Mantas was a failed product.  And

2  he knew that this would be a real opportunity for Google Cloud,

3  if we could get it -- if we get it done right.  So he was -- he

4  was both feet in on that as an idea for something we would do.

5  Q.  Were you what's called an executive sponsor of that project

6  at Google?

7  A.  Yeah, I was the executive sponsor.

8  Q.  Can you tell the ladies and gentlemen of the jury what it

9  means to be the executive sponsor of a project at Google?

10 A.  Sure.  So Google is a world unto itself, which you might or

11 might not imagine from the outside looking in.  But part of

12 being executive sponsor was, one, I became the champion for a

13 given product, in this case, the financial crime products.  But

14 there were others as well; we can talk about those separately,

15 if Mr. Gage asks.

16        But then, in addition, as executive sponsor, I was the

17 point of contact for the potential customers, particularly, in

18 this case, HSBC Bank.  But then there were also other customers

19 that were considering how to enhance their own financial crimes

20 profiles and programs.  And it was also connecting the dots

21 within Google and making sure there were resources aligned to

22 the project and serving as a champion for it in the

23 organization.

24 Q.  And in that capacity, did you work with Google engineers?

25 A.  I did.

NADVROW4                          Breslow - Cross

1    Q.  Did you work with Google product managers?

2    A.  I did.

3    Q.  Did you work with anyone else?

4    A.  Well, on the team there were people -- on the financial

5    services team there were people who had direct responsibility

6    for the product, so I worked with them as well.

7    Q.  By the way, when did you leave Google?

8    A.  I left Google in July of '20.

9    Q.  And have you ever heard of what came of that project?

10   A.  Yeah.  There was an announcement probably three, four

11   months ago that HSBC had adopted -- had gone live on this

12   product.

13   Q.  Did you work on any projects while you were at Google with

14   Ruth Porat?

15   A.  I did.  So a couple different -- well, a couple different

16   things.  So again, my role was as in the -- either as

17   technology and policy for Cloud or for the financial services

18   vertical.  But at some point in time, the guy who was chief

19   compliance officer at Google Pay, gPay, left, and left very

20   suddenly.

21          And Ruth called me on a Friday night and said, I'm

22   concerned about that.  I want to make sure we have good

23   controls in place.  Can you help us think through how we might

24   evaluate the state of compliance in the gPay business, and also

25   help us in terms of identifying a consultant who might help us,

NADVROW4                          Breslow - Cross

1   and also, if you can do this, to replace that person.

2          In addition, maybe not surprisingly, Google did not

3   have a chief risk officer and didn't really have a risk

4   management -- a formal risk management program.  And so there

5   was an internal consulting group that had been charged with

6   figuring out what the contours of that looked like.  And Ruth

7   said to me, Could you please support them as well.

8          And so I probably met with them a couple of times a

9   month for about a year to talk about what the contours of good

10  look like from a risk management perspective.  Because in

11  between Morgan Stanley and Google, I also worked as a partner

12  at McKinsey, which is a management consulting firm.  And so I

13  had broad exposure to what good looked like in terms of risk

14  management.

15  Q.  Thank you.

16         Mr. Chiarello asked you some questions about your

17  conversations with Mr. Shaukat in which you agreed to take on

18  the responsibility for financial services.

19         How long did you -- at that time, how long did you

20  expect to be in that role?

21  A.  I expected to be in that role until things -- well, two

22  different ways to look at it.  One was maybe somewhat

23  politically incorrectly.  I was in my 60s when I went to work

24  at Google.  I didn't expect to be working at Google much past

25  about 65.  So that was one limiter on what I thought my time in

1      the role would be.

2              The second was it wasn't clear what Thomas Kurian had

3      in mind for organizational structure.  So in that period, I

4      felt comfortable filling the role while it was being sorted as

5      to what was, in fact, the overall organizational design of

6      Google Cloud would look like.

7      Q.  By the way, just one last question on the anti-money

8      laundering work that you did there.  Did Ms. Rowe ever work

9      with you on the anti-money laundering project that you recall?

10     A.  Not that I recall, no.

11     Q.  Did she ever offer to assist on it that you recall?

12     A.  Not that I recall.

13     Q.  Since we're talking about Ms. Rowe, did you ever have any

14     conversations with Ms. Rowe about how long you planned to be in

15     that interim role over financial services?

16     A.  I talked to her about the idea that I really didn't view

17     this -- I viewed her as someone who could succeed me in that

18     role.  I really didn't view it as something that I was going to

19     be doing for a prolonged period of time; and that when -- when

20     things developed, that she would certainly be a credible

21     candidate; and that I thought that it would be good for us to

22     work together; and that she -- you know, I spent a lot of my

23     time as an executive.  And some of the things that I thought we

24     could work on together were things around, you know, what it

25     means to be a senior executive, you know, promoting programs

NADVROW4                        Breslow - Redirect

1    and stuff like that.

2    Q.  And how did she react, if you recall?

3    A.  She said -- the conversation lasted a couple minutes and

4    she didn't say much in response.  And then she left the group.

5    Q.  Were you disappointed when she left the group?

6    A.  Yeah.

7    Q.  Why?

8    A.  Because I thought she -- I had seen her around; I had seen

9    her make presentations in group settings.  I thought she was

10   very articulate, very fluent.  I thought she understood -- she

11   had more of a technology background than I did.  I thought she

12   could -- I've always worked with people who had complimentary

13   skills to mine.  I thought she would be a good compliment to my

14   skill set, and I thought it would really be a lot of fun to

15   work with her.

16            MR. GAGE:  Give me one second, your Honor.

17            I have no further questions, your Honor.

18            MR. CHIARELLO:  Just some redirect, your Honor.

19   REDIRECT EXAMINATION

20   BY MR. CHIARELLO:

21   Q.  Mr. Breslow, you recall your testimony a few moments ago

22   concerning anti-money laundering projects that you had worked

23   on?

24   A.  Yes.

25   Q.  Approximately how many developers did Google assign to that

1   project?

2   A.  Well, I left -- I left Google in July of '20.  It took

3   until sometime in '23 for it to come to fruition.  I don't know

4   ultimately how many developers were working on it.

5   Q.  But it was about a handful, not a lot; correct?

6   A.  I don't know.

7   Q.  You don't know if any developers were working on it?

8   A.  Well, I assume developers had to be working on it in order

9   for it to come to fruition, but I don't know how many there

10  were.

11  Q.  You had some testimony about your time at Morgan Stanley

12  that you would -- and correct me if I'm misstating, but meet

13  with folks in technology as part of your role?

14  A.  Correct.

15  Q.  Those technology individuals you met with didn't report to

16  you; correct?  They reported to IT?

17  A.  Correct.

18  Q.  And just a point of clarification.  So you were the chief

19  compliance officer at Morgan Stanley.  Did they also have a

20  chief technology officer?

21  A.  Yeah, they did.  But I was an important part of their

22  compensation, promotion, hiring.  The chief technology -- I had

23  a managing director in the IT group who worked -- who I met

24  with every week who we discussed the technology roadmap we had

25  for compliance.  And so when his -- first it was a woman, then

1  it was a man.  And each time I was a key voice in their hiring,

2  firing, promotion, staffing, budget, etc.

3  Q.  There was also a chief technology officer at Morgan

4  Stanley; correct?

5  A.  Yeah.

6  Q.  That was not you?

7  A.  Right.

8          MR. CHIARELLO:  Nothing further.

9          MR. GAGE:  I have no additional questions, Judge.

10          THE COURT:  Okay.  Thank you, Mr. Breslow.

11          You are excused.

12          THE WITNESS:  Thank you.

13          (Witness excused)

14          THE COURT:  Okay.  Next.

15          MS. GREENE:  The next witness that plaintiff calls is

16  Will Grannis.

17          THE COURT:  For your planning purposes, I was going to

18  break for lunch at 1.

19          MS. GREENE:  I was going to ask.  Thank you.

20          THE COURT:  Okay.

21   WILLIAM GRANNIS,

22      called as a witness by the Plaintiff,

23      having been duly sworn, testified as follows:

24  DIRECT EXAMINATION

25  BY MS. GREENE:

1   Q.  Hello, Mr. Grannis.

2   A.  Hello.

3   Q.  You are responsible for hiring the technical directors into

4   OCTO in the 2016/2017 time frame; correct?

5   A.  Correct.

6   Q.  And between late September 2016 and mid April 2017, you

7   hired nine people into that technical director position in

8   OCTO; correct?

9   A.  I'd have to look at the data, but that generally sounds

10  correct in terms of volume.

11  Q.  Okay.  Let me go through and you can tell me if this sounds

12  about right in terms of who came in at what point in time.

13          Mr. Eryurek, he was the first that was hired; correct?

14  A.  He was the first external hire.  We had roughly 17 people

15  that we had hired by December of 2016, and then Evren was the

16  first external hire.

17  Q.  Of the 17, were any of them levels 8 or 9?

18  A.  Yes.

19  Q.  And who was that?

20  A.  Off the top of my head, Jamie Herbs was a technical

21  director.  She came from another part of Google.

22  Q.  What was her level?

23  A.  8.

24  Q.  And when did she join OCTO?

25  A.  She was the second hire.  First hire was Solomon Boulos.

1   Q.  She joined your organization as a Level 8; correct?

2   A.  Yes.

3   Q.  Okay.  So Mr. Eryurek was the first person you hired at the

4   technical director Level 8/Level 9 role; correct?

5   A.  Externally, yes.

6   Q.  And -- well, do you hire someone if they are already

7   working at Google or is it just they transfer into your

8   organization?

9   A.  There's a hiring process.  Everybody goes through a

10  process, whether it's external or internal.

11  Q.  Okay.  And that's the interview process?

12  A.  Yes.

13  Q.  Okay.  So you hired Mr. Eryurek in September 2016, does

14  that sound about right?

15  A.  Sounds about right, yeah.

16  Q.  And you hired Mr. Penberthy around December 5th, 2016;

17  correct?

18  A.  That sounds about right in terms of timing.  I don't

19  remember all the dates.

20  Q.  Approximately December 9th, 2016, was when you made an

21  offer to Ms. Rowe?

22  A.  That sounds about right.

23  Q.  Okay.  In that same month, in December of 2016, was when an

24  offer was made to Paul Strong?

25  A.  Sounds about right.

1    Q.  And in January, offers were made to Ben Wilson, Jen

2    Bennett, Brian Steikes, and Jonathan Donaldson.  Does that

3    sound about right?

4    A.  Yeah, sounds right.

5    Q.  And then Nick Harteau joined in early April 2017, is that

6    right?

7    A.  Yeah, sounds about right.

8    Q.  And all of those nine were hired into OCTO; correct?

9    A.  Yes.

10   Q.  And they were all hired using the same job description?

11   A.  Yes.

12   Q.  And that job with description and the role itself outlined

13   what's generally been referred to as three different pillars;

14   correct?

15   A.  That's correct, yeah.

16   Q.  For the record, what are those pillars?

17   A.  Sure.  The first pillar is customer impact, customer

18   expertise.  This really manifested mostly as vertical expertise

19   in the early going.

20        Second bucket was engineering expertise, so deep

21   technical expertise in a field, such as AI or infrastructure.

22        And then the third was the evangelism, sharing what we

23   know and what we learn with the broad audiences.

24   Q.  And together with evangelism, that also included thought

25   leadership as a third pillar; correct?

1    A.  Yes, thought leadership, blogs, videos, conference

2    attendance, things like that.

3    Q.  Okay.  Now, all of the nine individuals that we just

4    discussed, they all reported to you; correct?

5    A.  Correct.

6    Q.  And they all had the same responsibilities?

7    A.  Generally, all three were -- all three buckets were part of

8    their job responsibilities, but we certainly had higher

9    expectations or expectations that were level appropriate.

10        Because at that time, I mean, when we got to about

11    April, May, June, a year in, we had 30 people in the team that

12    ranged from Level 5, 6, 7, 8, and 9.  So, of course, we would

13    have different expectations of Level 9 in terms of the impact

14    that they were able to create and their experience and

15    expertise than we would for a Level 6 or a 7 or Level 8.

16    Q.  Between Level 8 and Level 9, prior to April/May 2017, you

17    didn't really know what the difference was between those two,

18    right?  You were still sorting out that?

19    A.  Yeah.  What we had done is we had adopted -- it's a job

20    family.  It's like a description of work to be done in our HR

21    system; so like a software engineer has a job family, or a

22    salesperson has like a job family.  And it codifies their

23    responsibilities.

24        OCTO is an entirety new function.  So we were just

25    trying to figure out, candidly, how adopting a job family from

NADVROW4                    Grannis - Direct

1   one part of Google and bringing it over into engineering, how

2   that would even work.  And so, yeah, at the time that we were

3   hiring, we had not yet hired and observed people in action, you

4   know, over a long period of time, to be able to go back and

5   update that ladder or that job family very specifically.  So we

6   used one centralized role and then, based on experience,

7   expertise, likelihood to create, you know, impact across one or

8   multiple pillars, that's really what we were looking for in the

9   hiring process.

10  Q.  Okay.  So when you were hiring during that time frame, you

11  did not have a job ladder that had been adopted for OCTO;

12  correct?

13  A.  We had a job ladder, but it only had one entry, because

14  again, we didn't know -- we didn't have the context for, you

15  know, should we have five levels, should we have four, should

16  we have three, should we have two.

17  Q.  That was still being developed?

18  A.  Absolutely.

19  Q.  Now, I'm going to focus again on those nine people that

20  came in that time period.  They all had generally the same

21  skill sets; correct?

22  A.  That's not correct.

23  Q.  Well, didn't they all need to have similar skill sets to be

24  able to meet the three pillars?

25  A.  Well, I don't want to conflate job responsibilities and

1    skills and expertise that someone has coming in the door.

2    Because those can be two different things, and I'll give you an

3    example.

4            Scott Penberthy, he is a Ph.D. in computer science and

5    a deep AI expert, world expert in AI.

6            Let's see.  Ben Wilson came from the energy sector and

7    was a world expert in application migration; led the first

8    migration of many applications, I think, at GE, like hundreds

9    of applications at GE into the public cloud.  I think he's

10   still a reference for Amazon, as a matter of fact, which is

11   ironic.

12           So they all had these different backgrounds and

13   expertise.

14           And the composition of the team from the very

15   beginning, when we first envisioned it, was we would hire

16   people with a broad range of experience expertise, you know,

17   this kind of diverse skill set of we need people in AI, we need

18   people in networking, we need people in storage, we need people

19   who understand financial services, we need people who

20   understand energy, we need people who understand media and

21   telco.

22           So by definition, we were hiring people with

23   dissimilar backgrounds and expertise.  When they came to the

24   team, over time they were expected to perform across those

25   three pillars of impact.

1    Q.  Okay.  I'm going to ask you a yes-or-no question.

2    A.  Okay.

3    Q.  Each of the candidates that were hired into the role at

4    that time needed to have similar skill sets to be able to meet

5    those three pillars; correct?

6    A.  No.

7    Q.  Okay.  Let's go to your deposition.  Do you recall having

8    sat for your deposition --

9            (Indiscernible crosstalk)

10   A.  Recall sitting through a deposition, yes.

11           MS. GREENE:  Okay.  Let's go to 50, page 50, lines 18

12   through 23.  Page 50, lines 18 through 23.

13           And go ahead, Mr. Yang.

14           (Video played)

15   Q.  Okay.  There was an objection, but your answer there at

16   your deposition was yes; correct?

17   A.  That was, yeah.

18   Q.  And that was the testimony that you gave under oath at your

19   deposition?

20   A.  It was.

21   Q.  Now, you used the same interview questions with each of

22   those nine candidates during that time; correct?

23   A.  Yes.

24   Q.  And if we can, let's go to Plaintiff's Exhibit 93.  This is

25   the L8 assessment -- L8 plus assessment-based interview

1   questions that were used for the hiring of those technical

2   directors into OCTO; correct?

3   A.  Yes.  These would have been similar across all candidates.

4   Q.  Okay.

5           MS. GREENE:  And if we can just go to the next page,

6   as well, Mr. Yang.  And then to the final page for the jury.

7   Q.  So this included leadership questions, Googliness

8   questions, and GCA questions; correct?

9   A.  Correct.

10  Q.  And what is GCA?

11  A.  It's general cognitive ability.

12  Q.  Okay.  And so these types of questions, leadership,

13  Googliness, GCA, those are pretty standard for at the L8 plus

14  level; correct?  I mean, in other words, leadership,

15  Googliness, and GCA are something that's asked of all

16  senior-level candidates across Google; correct?

17  A.  They are the same categories.

18  Q.  Okay.  And if we go to the first page, this is L8 plus;

19  correct?  There weren't a separate set of questions for L8 and

20  a separate set of questions for L9?

21  A.  No.  L8 plus, I think at the time these would have been

22  relevant to L8, L9, that's why it has the plus after it.

23  Q.  Now, each of those nine were all hired for the same role;

24  correct?

25  A.  The technical director role, yeah.

1   Q.  And it's definitely true that everyone was being hired for

2   the same role, technical director solutions; correct?  Of those

3   nine?

4   A.  Of the people you mentioned, yes.  We did have different

5   roles.  We had some ops roles; we had, like, executive support,

6   things like that.

7   Q.  The technical director position, it was scoped for between

8   Level 8 and Level 9; correct?

9   A.  Correct.

10  Q.  And the job ladder that you were developing didn't go

11  beyond Level 8; correct?  At that time?

12  A.  At the time, correct.

13  Q.  And, in fact, at that time, again, the late 2016/early 2017

14  period, there was less definition in the job ladder at those

15  higher levels; correct?

16  A.  Yeah.  We'd been operating for a year-ish, so certainly

17  still learning; in fact, we still are.

18  Q.  Now, if it we can go to Plaintiff's Exhibit 8.  And this is

19  email that you're copied on from August 28th, 2017; correct?

20  A.  Yeah.

21  Q.  And it's from Melissa Lawrence, who was your HR lead in

22  OCTO for OCTO; correct?

23  A.  Yes.

24  Q.  And those names that are mentioned here, those were the

25  technical directors in OCTO; correct?

1    A.  Yes.

2    Q.  Okay.  And if we can pull out Ms. Lawrence's email, "Hi

3    all," through her signature.

4            She says:  One of you asked, but for the benefit of

5    all, there is very little documented for L8 plus expectations

6    at Google for general leveling.  This is the best guide

7    available for generic engineering.

8            Was OCTO generic engineering?

9    A.  Yes.

10   Q.  Did it have an engineering component?

11   A.  Yes.

12   Q.  Was it limited to just an engineering component; correct?

13   A.  Well, we were in the engineering hierarchy, so that's what

14   these job families are tied to.  So like we have a sales

15   hierarchy, and there are job families that tie to a sales

16   hierarchy.  And there's an engineering hierarchy, and there are

17   job roles -- this was specifically actually taken -- this job

18   family originally existed in go-to-market, which is kind of

19   like sales and marketing.  And it was brought to engineering to

20   focus on engineering.  So it was primarily engineering.

21   Q.  OCTO had not adopted an engineering leveling guide or job

22   ladder for itself at that point in time; correct?

23   A.  Correct.

24            MS. GREENE:  Okay.  We can take that down.

25   Q.  You, yourself, in this time frame did not have a great

NADVROW4                        Grannis - Direct

1   distinction between Levels 8 and 9; isn't that right?

2   A.  I don't know what you mean by I didn't have a great

3   distinction between them.

4   Q.  You really weren't sure what distinguished a Level 8 from a

5   Level 9 during this time frame; correct?

6   A.  We certainly had a hypothesis in that we were testing it

7   based on the candidates that we -- that we were interviewing.

8   So we had an initial sense of it and then we were testing it

9   all along.

10  Q.  Well, early on, during this time frame that we're talking

11  about, you didn't have a super strong sense of what

12  distinguished a Level 8 and a Level 9; correct?

13              MR. GAGE:  Objection.  Vague, your Honor.

14              THE COURT:  Sustained.

15  Q.  Mr. Grannis, do you recall being interviewed by employee

16  relations at Google in connection with this matter?

17  A.  Yes.  Maybe.  I think.  It's been a long -- it's been a

18  long time, so probably.

19  Q.  You're not sure if you were interviewed or not?

20  A.  By employee relations specifically related to this,

21  probably.

22  Q.  Do you recall meeting with Ashley Tessier and having two

23  people there and them taking notes?

24  A.  Oh, yeah, that sounds familiar, yeah.

25  Q.  That was "yeah"; correct?

NADVROW4                    Grannis - Direct

1    A.  Sorry.  Just trying to be very clear, yes.

2    Q.  Do you recall telling them that you were trying to remember

3    the exact sequence of hires; eight to nine people got hired

4    right in a cluster of months.  They came in at multiple levels.

5    People were sharing openly about a level and there was high

6    frustration around her level.  That was Ms. Rowe that you're

7    referring to; correct?

8    A.  I don't remember if it was her -- if it was just limited to

9    Ms. Rowe.  I think that there's always been -- I mean, we're a

10   very transparent culture, and so people share their levels

11   pretty openly with each other.  So I don't know if it was

12   referring specifically to Ms. Rowe, if there were multiple

13   people that had asked about it or were talking about it.

14   Sorry, I just don't remember the exact context of that exact

15   comment from that conversation.

16   Q.  Well, do you recall -- let me ask you, were people told

17   their levels when they came into OCTO?

18   A.  They would have to know their level when they came into

19   OCTO.

20   Q.  Do you know if the recruiters told them what their level

21   would be?

22   A.  I'm not -- I have no idea about the exact conversations

23   that every recruiter had with every single person coming into

24   OCTO.

25   Q.  Do you know if HR told people what their levels would be?

NADVROW4                    Grannis - Direct

1   A.  I don't know.  I imagine it would show up.  When you show

2   up, there's a job code that's assigned to you, so they would

3   know.

4   Q.  Are people told what their job codes are and how that

5   corresponds to a level?

6   A.  Again, I can't -- I can only speak from, you know,

7   experience.  I certainly was told mine coming in.

8   Q.  Is the level put in an offer letter?

9   A.  I don't know.  I'd have to -- I'd have to see.  I don't

10  think it is.

11  Q.  Is it possible that the directors that you were hiring

12  during that time frame, in fact, did not know what their levels

13  were?

14          MR. GAGE:  Objection.

15  Q.  At the time they were hired.

16          MR. GAGE:  Objection to "possible," your Honor.  Not

17  relevant.

18          THE COURT:  I'll allow it.

19  A.  So the question is was it possible that someone didn't know

20  their level at hire?

21  Q.  Correct.

22  A.  I'd find that highly unlikely.  I mean --

23  Q.  Do you recall ER asking you what was your assessment of her

24  level at the time, and you said, No assessment.  Do you recall

25  that?

NADVROW4                          Grannis - Direct

1    A.  I didn't do a level assessment explicitly.  The process,

2    the way it worked, is recruiting would find a candidate.  They

3    would have initial hypothesis about leveling.  And then they

4    would go through an interview panel.  Purpose of the panel was

5    to determine, you know, is this person qualified — you already

6    mentioned the questions — and to look for any disconnects.

7            Then I'd review it.  We'd go through the packet and

8    the results.  And then, you know, there was a -- there was a

9    third step, which is after I'd reviewed it and provided a

10   statement of support or gone back and asked more questions, if

11   there was a disconnect, there was at the time a SVP review,

12   which was our form of a hiring committee.  Because everybody

13   was so senior coming in, our hiring committee was a couple of

14   SVPs, we didn't know who they were.  But we'd submit the

15   results, they'd review them for consistency or anything that

16   caught their eye.  And if it was a go, it was a go; and if it

17   wasn't, then we'd have to redo it.

18   Q.  So who made the decision to level Ms. Rowe as an 8?

19   A.  Well, I guess that expectation was initially set when it

20   came to us from recruiting.  And throughout the hiring process

21   there was nothing that indicated it should be different.

22   Q.  But it wasn't you who made the decision Ms. Rowe is going

23   to be an 8, Mr. Eryurek is going to be 9, Mr. Wilson is going

24   to be a 9; is that your testimony?

25   A.  No, my role was to validate or invalidate the initial

1   hypothesis of where that person's level should be based on the

2   evidence presented in the interview panel.

3   Q.  And you don't know what criteria the initial hypothesis was

4   based on, do you?

5   A.  Well, the initial hypothesis was ours, was mine; it was

6   part of the design.  So I -- absolutely I knew what the

7   original hypothesis was, whether someone would likely be an L9

8   or an L8.

9   Q.  I'm sorry, a different question.

10          The recruiter who was making that initial assessment,

11  you didn't know what they were considering or valued or

12  weighting or anything else when you got the assessment, right?

13  They just gave the assessment to you.  Did you have a

14  conversation with them?

15  A.  Well, when we first started OCTO, one of the things that we

16  did is we built a job description.  And the recruiters really

17  wanted to understand that job description, they want to

18  understand what we were looking for.  And so they wanted to

19  be -- they wanted to be knowledgeable so that the people that

20  they're bringing to us would be the right type of people they

21  are looking for.

22          So I mean, absolutely there were conversations between

23  recruiting, myself.  You know, we really wanted to make sure we

24  got it right.

25  Q.  Well, that question ER asked you, what was your assessment

1   of her level at the time, you said no assessment.

2           Do you also recall saying:  All of our hires in OCTO

3   early on in building the function didn't have a super strong

4   sense, didn't know Level 8s from 9s; didn't say we are only

5   going to hire 8s, etc., take a person's qualifications and

6   skills and run through the process, and then have a

7   recommendation on the other side.  Didn't have any preconceived

8   notions about level; had only been at Google at the time for

9   one year; didn't have a straight super-calibrated reference

10  frame.

11          Do you recall in sum or substance saying that to ER?

12  A.  I think it's absolutely fair to say that, because we had

13  not -- we hadn't hired a bunch of people; this was a brand-new

14  ladder.  It was a new function within engineering.  We

15  absolutely couldn't be super confident in all aspects.

16          But as we started hiring people, especially when we

17  were getting to that stage, I mean, we had already had 17, 18,

18  19, 20 people by the time we were hiring most of the external

19  candidates.  We definitely started to see -- we started to

20  learn a little bit more about what we were looking for.

21          So for example, when we first started, we didn't know

22  what the balance or how we would think about impact for someone

23  coming in.  Would they have more impact or the ability to

24  create, like, stronger impact early on if they were a little

25  more on the engineering side, or are they a little bit more on

1   the customer side.  We didn't know that.

2          But it certainly became clear, you know, six months,

3   five months, six months in, attributes that would make someone

4   more effective or less effective.

5   Q.  The people who joined you from internal -- internally in

6   Google, their levels were already preset; correct?

7   A.  Correct.

8   Q.  So you didn't make any leveling decisions around that

9   group; correct?

10  A.  Correct.

11  Q.  So the first group you were making leveling decisions about

12  were those eight or nine -- the nine folks we talked about,

13  Evren through Nick Harteau; correct?

14  A.  Correct.

15  Q.  And you'd never hired someone externally where you were

16  making the leveling decision up until that point in time.  And

17  at that point in time, you didn't know what distinguished a

18  Level 8 from a Level 9; correct?  You were still figuring it

19  out?

20  A.  We were still figuring it out.

21  Q.  And you weren't provided with any sort of leveling guide;

22  correct?

23  A.  There was no leveling guide for that position in

24  engineering.

25  Q.  And you weren't provided with any sort of metrics that

1    equated years of experience to a particular level; correct?

2    A.  We didn't have that, no.

3    Q.  And those first eight or nine people, you have less of a

4    sense of the differences between what would make one an 8 and a

5    9; correct?

6    A.  No, we were still figuring it out.

7    Q.  The additional expansion of the team from an external hire

8    perspective happened following additional budget being

9    allocated to the group; correct?

10   A.  Yeah.  Original plan was to have roughly 10 to 12; and it

11   was proving so in demand that we expanded it.  We had almost --

12   by August of that year we probably had 30, 32, 34 people,

13   something like that.

14   Q.  Okay.  So there was a first wave and then a second wave;

15   correct?

16   A.  Yeah.

17   Q.  And it was that first wave where you didn't have the

18   calibrated sense of the L8 and L9.  And by the time you started

19   with the second wave, you had a better sense; correct?

20   A.  Oh, I'm sorry.  I thought you meant -- by "wave," I thought

21   you meant like the internal versus external.  The first wave

22   was the internal hires; we hired 17 people in six months

23   internally.  The second wave I was thinking of is the external

24   hires.

25   Q.  But you already testified that those external hires, you

1    didn't have a strong sense at that time; correct?

2    A.  For the external hires, because all the other ones had come

3    through with their levels, yes, that's correct.

4    Q.  Now, your job in the hiring process was to ensure that the

5    candidates were qualified at the L8 plus level; correct?

6    A.  Correct.

7    Q.  You didn't make the final leveling decision, you just made

8    a recommendation; correct?

9    A.  I don't think -- I'm just trying to think back.  Like

10   discrete leveling recommendations -- my job was really to

11   confirm or if there was like an issue.

12          So let's say in the process of an interview, let's say

13   we were given someone who, hey, we think that this person

14   should be -- you know, this might be interviewing for L9.

15   Well, if someone is going to be interviewing for L9, we'd have

16   significant expectations around, you know, their expertise,

17   background, and what they'd be able to create in terms of

18   impact right away.

19          And so throughout the hiring process, you know, there

20   would be that kind of, like, set looking for those

21   expectations.  Of course, as you mentioned before, we were

22   still trying to figure it out.  But if someone was coming

23   through as an L8, we'd also have certain expectations.  We'd be

24   looking for their acumen along these dimensions that we thought

25   would match with an L8.

1    Q.  Okay.  I'm going to give you a yes-or-no question.

2         You don't know who made the final leveling decision

3    with respect to those nine individuals, do you?

4    A.  No.

5    Q.  And you also don't know whoever the person was that made

6    that final decision, what they were basing that on; correct?

7    A.  Correct.  Because final decision was really at the

8    committee.  And the committee, we don't know who they are, and

9    we are not privy to the debate that they have about the

10   candidates and the recommendation.

11   Q.  Now, your leveling recommendations were based on the

12   following things:  Demonstrated experience, background, acumen

13   across the core elements of the role, the role-related

14   knowledge, as well as the three other categories:  Googliness,

15   GCA, and leadership; correct?  Those were the categories, the

16   things you were considering in making your recommendation?

17   A.  Sounds right.

18   Q.  Just because I'm sure the jury is interested, what is

19   Googliness?

20   A.  Humility, curiosity, really interested in helping solve the

21   problems of our customers, you know, for users.  It's like a

22   really deep sense of empathy for how technology might actually

23   make, you know, the world a better place in whatever category

24   we were trying, whether it's healthcare, financial services,

25   media, government.  It was the qualities that show through in

1    terms of curiosity, humility, asking questions, being careful

2    about making assumptions, being data driven.  Those things are

3    all aspects of Googliness.

4    Q.  And so at the time you hired Ms. Rowe, you thought she was

5    Googly; correct?

6    A.  Yes.

7    Q.  Did that opinion of her ever change?

8    A.  No.

9    Q.  Now, with respect to your thought process with respect to

10   leveling those nine individuals, you didn't do anything or

11   document anything outside of gHire; correct?

12   A.  All our notes are in gHire.

13   Q.  And beyond interviewing them, you didn't do anything else

14   to determine whether someone should come in as a Level 8 or

15   Level 9; correct?

16   A.  No.  I'm sorry, I didn't do anything.  So yes, I agree with

17   your statement.  Sorry.

18   Q.  Let's go back to that initial nine, that cohort that came

19   in externally.

20            Mr. Eryurek, he was a Level 9; correct?

21   A.  He was.

22   Q.  And Mr. Penberthy was a Level 8; correct?

23   A.  He was.

24   Q.  And Ms. Rowe was a Level 8?

25   A.  Yes.

1   Q.  And Mr. Strong was a Level 9?

2   A.  Correct.

3   Q.  And Ben Wilson was a Level 9; correct?

4   A.  Correct.

5   Q.  And Jen Bennett was a Level 7?

6   A.  Correct.

7   Q.  And Brian Steikes was a Level 8?

8   A.  Correct.

9   Q.  And Jonathan Donaldson was a Level 9?

10  A.  Correct.

11  Q.  And Nick Harteau was a Level 9 as well; correct?

12  A.  Correct.

13  Q.  So five of the seven men hired into the initial group were

14  leveled as a 9; correct?

15  A.  Yeah.  I'd have to do the math, but it sounds right.

16  Q.  And the women were not hired as Level 9s; correct?

17          MR. GAGE:  Objection, your Honor.

18          May we have a sidebar?

19          (Continued on next page)

20

21

22

23

24

25

1          (At sidebar)

2          MR. GAGE:  Your Honor very clearly ruled that we were

3   not permitted to get into litigating Jen Bennett's level.  And

4   counsel asked him what Ms. Bennett's level was.  I hesitated to

5   object because I don't want prejudice we were trying to avoid

6   by excluding the evidence in the first place.  She's now

7   continuing to go down this path.  There should be no discussion

8   about Jen Bennett's level.

9          THE COURT:  Yes.

10          MS. GREENE:  Your Honor, I'm sorry, but I'm not

11   intending to ask anymore questions about Jen Bennett.  But in

12   establishing the level of the group that he's testified was the

13   external first eight, nine candidates he brought in, I just

14   have to establish what the record is.  I'm not going any

15   further to ask anything about Jen Bennett at all.  But I can't

16   exclude from what he's defined as the first group of nine he

17   hired in, that's just basic foundational evidence.  And again,

18   we're not going any further.

19          MR. GAGE:  Here's why it's not, Judge.  Counsel is the

20   only one who's calling it a cohort.  Counsel is the one who

21   arbitrarily defined the nine people she asked him about.  And

22   if you look at the record, if you look at that transcript, he

23   doesn't use the word "cohort"; counsel keeps calling it a

24   cohort.  And counsel keeps saying I'm asking about these nine.

25          She's doing exactly, exactly, what I said they were

1    trying to do.  And she should not ask another single question

2    about Jen Bennett.

3              MS. GREENE:  I'm not intending to.

4              MR. GAGE:  And Mr. Grannis is going to testify there

5    was no cohort and that he was continuously hiring.

6              MS. GREENE:  Your Honor --

7              MR. GAGE:  They are doing --

8              MS. GREENE:  -- he testified about the initial eight

9    or nine people.

10             MR. GAGE:  Because you asked him about it.

11             MS. GREENE:  Because it's in ER.

12             MR. GAGE:  No, it's not.

13             MS. GREENE:  If he testified to ER --

14             MR. GAGE:  No, he didn't testify to ER.  That's the

15   whole point.  She's reading from that document as if it's a

16   deposition transcript.  I know you admitted it, not for the

17   truth of the matter.  She's reading from it and he's saying he

18   didn't remember the darn conversation, pardon me.  He doesn't

19   remember the conversation.  So he did not testify that there

20   was some cohort.

21             MS. GREENE:  It doesn't matter.  It's a word I can use

22   in asking a question.

23             MR. GAGE:  I'm not saying you can't use it.

24             MS. GREENE:  He did testify that outside of any notes,

25   he testified that at the beginning, when those eight or nine

1    came in, he wasn't sure about the levels.

2           I'm not going to ask another question about Jen

3    Bennett, but as to defining who he was talking about and what

4    their levels were during this ambiguous time when he didn't

5    know.  That's always been in this case.  We're not going any

6    further than that.  It's not about why he leveled Jen Bennett

7    or not.  But it's just a simple question as to who was he

8    hiring during this period of time.

9           MR. GAGE:  So then if that's true, then your Honor

10   should strike the last question, and counsel should instead ask

11   what was Ms. Rowe's level, not what level were the women who

12   were hired in her arbitrary cohort.

13          MS. GREENE:  You can strike it.

14          THE COURT:  I am going to strike it.

15          MR. GAGE:  She should not be talking about Jen's

16   level.  This is outrageous.  It's unfair prejudice.  It's

17   already putting me in a position where I've either got to jump

18   up and interrupt, and all I can do is ask for a sidebar.

19          MS. GREENE:  May I ask another question?

20          MR. GAGE:  Can I ask for a curative instruction that

21   says the only --

22          THE COURT:  One moment.

23          MS. GREENE:  I want one question of clarification.

24          MR. GAGE:  Go ahead, ask for clarification.

25          MS. GREENE:  There is another document that's already

1    in the record with respect to the women, Will Grannis saying

2    that this is what I hear from all the women who have come in

3    and complained, Ulku, Jen, that they don't fight heard enough

4    for themselves.  Like, are we not allowed to use that document

5    now because it references Jen Bennett?  It's already in

6    evidence.

7              MR. GAGE:  That document, I don't think -- first of

8    all, the document is hearsay; it doesn't -- the document --

9              THE COURT:  Wait a second.  It's in evidence.  Then I

10   don't think you objected to it.  Or if you did --

11             MR. GAGE:  We did object to it.

12             MS. GREENE:  But it came in.

13             MR. GAGE:  This is the email --

14             THE COURT:  Yes.

15             MR. GAGE:  -- where Mr. Grannis says --

16             THE COURT:  Jen/Ulku, that one.

17             MS. GREENE:  Ulku/Jen.

18             MR. GAGE:  Yes, he doesn't say that women have

19   complained about their level.  He doesn't say women have

20   complained about discrimination.  He says women have complained

21   to him about their own state of mind in that they didn't push

22   hard enough for themselves.  That is wholly irrelevant to the

23   case.

24             MS. GREENE:  It is not.

25             MR. GAGE:  What other women were thinking has no

NADVROW4                        Grannis – Direct

1    bearing on whether Ms. Rowe can prove discrimination in this

2    case.

3              The instruction I would ask your Honor is that the

4    jury be reminded that this case is about Ms. Rowe, and only

5    about Ms. Rowe, not any other individuals at Google.  Something

6    simple like that.

7              MS. GREENE:  I presume I can show Mr. Grannis the

8    email and talk about that with respect to Ms. Rowe.

9              THE COURT:  Yes.  You may not bring out Jen.

10             MS. GREENE:  I do not intend to.

11             THE COURT:  Okay.  Okay.

12             So Mr. Gage, tell me again -- or Ms. -- the

13   instruction you agreed on.

14             MR. GAGE:  I just want to remind the jury that this

15   case concerns Ms. Rowe and not any other individuals who work

16   at Google.  I will give you more instructions at the time of

17   the charge at the end of the case.  Something like that.

18             MS. GREENE:  Do you also want to ask for the question

19   and answer to be struck?

20             MR. GAGE:  No.  Just move on to another question.

21             MS. GREENE:  I am.

22             THE COURT:  Okay.

23             MS. GREENE:  Okay.

24             (Continued on next page)

25

1                (In open court)

2                THE COURT:  Members of the jury, I just want to remind

3      you that this case is about Ms. Rowe and not about any other

4      individuals at Google.

5      BY MS. GREENE:

6      Q.  Mr. Grannis, we talked about how the candidates were all

7      interviews using the same interview questions; correct?

8      A.  Correct.

9      Q.  Okay.  Just so we're clear, because I know it's difficult

10     with the people who moved over into your group and the

11     different ladder, when I talk about technical directors, I'm

12     talking about levels 8 and 9 within OCTO, the director level

13     technical directors.

14     A.  Okay.

15     Q.  And also when I'm talking about those eight or nine, I'm

16     referring to that group that we talked about in the beginning,

17     those first nine external hires, okay?

18                The panel of interviewers for those nine candidates

19     were all men.  Was that intentional?

20     A.  One, I don't remember who all the panel members were for

21     every single interview, so I don't know.  But the panel members

22     were selected based on people who had expertise in the area

23     that were already at Google and could evaluate those areas and

24     were calibrated.

25     Q.  Were there any women at Google who satisfied those

1   criterias to qualify as interviewers for the panel?

2   A.  I don't know.  I wouldn't know everybody at Google.

3   Q.  Sitting here right now, do you know of anyone during that

4   time period, a woman during that time period who was qualified

5   to be a panelist?

6   A.  It's quite possible.  I was still pretty new to Google; I

7   didn't have an extensive network of knowledge of who everybody

8   at Google was.

9   Q.  Had you received any sort of antibias training at the time

10  you hired Ms. Rowe?

11  A.  Had a range of training at Google.  When I took it and -- I

12  certainly have taken that type of training.  I've taken

13  probably hundreds of training courses, if not many hundreds of

14  training courses over the years, so --

15  Q.  Do you recall whether -- okay.  Let me ask you another

16  question.  Do you recall whether in any of the training you've

17  received it's been noted that the language bossy, abrasive, and

18  aggressive can be gendered terms?

19  A.  That's certainly something that we're on the lookout for.

20  Q.  Now, going back to your leveling recommendations, you

21  didn't compare any of the candidates against each other when

22  making leveling recommendations, did you?

23  A.  No, the candidates were evaluated solely on how they

24  performed in the interview.

25  Q.  Do you recall whether you considered hiring Mr. Eryurek,

1   Mr. Wilson, Mr. Donaldson, Mr. Strong, or Mr. Harteau as Level

2   8s?

3   A.  You know, I'm sure we had thought about it and considered

4   it at some point as a collective, you know, from the recruiters

5   to the panels; because they all knew that we were hiring both

6   L8s and L9s.

7   Q.  Are you sure or do you, in fact, know that they were

8   considered as Level 8s?

9   A.  I don't -- I'm not 100 percent sure for every single one of

10  them that that conversation occurred.

11  Q.  None of those five Level 9 men asked to be leveled as a 9;

12  correct?

13  A.  I have yet to ever meet a candidate who has asked for or

14  requested a level coming in.

15  Q.  And so none of them said they would only come to Google if

16  they were hired as a Level 9; correct?

17  A.  That would be very unusual, so I don't recall any of that.

18  Q.  And so you don't recall Mr. Harteau telling you that he had

19  to come in at a Level 9; is that right?

20  A.  He may have, honestly, I don't remember.  The thing that

21  was unusual about Nick is that he knew Google really, really

22  well.  Most of the other technical directors that we hired

23  really didn't know Google.  So it's totally conceivable and

24  totally possible that Nick knowing Google and having a sense of

25  networking at Google would be more familiar with the levels,

1    and so may be more insistent on a level.  That's absolutely

2    possible.

3    Q.  Do you recall discussing leveling with Mr. Harteau at all?

4    A.  I remember discussing him coming to Google quite a few

5    times.  I don't know if we talked about level or not.

6                THE COURT:  Ms. Greene, it's three minutes after 1.

7                MS. GREENE:  Okay.  This is a good a place as any to

8    stop.

9                THE COURT:  Okay.  So members of the jury, we're going

10   to take a lunch break now.  And I want to remind you not to

11   speak with each other or anyone else about the case, not to do

12   any research on the case, and to use the rest rooms in the jury

13   room.

14               Just a question for counsel.  Is there a technology

15   issue to work on over lunch?

16               MS. GREENE:  Yes.

17               THE COURT:  Okay.  So then why don't we resume at

18   1:45.

19               MS. GREENE:  Your Honor, is a technician going to come

20   during the lunch period to meet with us?

21               MR. GAGE:  Maybe we can release the jury first, Judge.

22               THE COURT:  I just want to tell them when to come

23   back.

24               MR. GAGE:  That's fine, 45 minutes.

25               THE COURT:  Okay.  So let's come back in 40 minutes,

1   at 1:45.

2              (Jury not present)

3              THE COURT:  Okay.  Mr. Grannis, you may step down.

4   And you may sit down or go out or whatever you would like.  And

5   I will see you at 1:45.

6              THE WITNESS:  Okay.

7              (Luncheon recess)

8              (Continued on next page)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

NADHRow5

| | |
|---|---|
| | AFTERNOON SESSION |
| 1 | |
| 2 | 1:45 p.m. |
| 3 | (In open court; jury not present) |
| 4 | THE COURT:  I was going to ask Ms. Greene a question. |
| 5 | I don't think P17 is in the record. |
| 6 | MR. GAGE:  I was going to put that on the record, your |
| 7 | Honor.  It's not, and I'll wait till Ms. Greene comes back to |
| 8 | say what I want to say. |
| 9 | THE COURT:  So it was used to refresh someone's |
| 10 | recollection, but it was not — let's wait for Ms. Greene. |
| 11 | Ms. Greene. |
| 12 | MS. GREENE:  Yes. |
| 13 | THE COURT:  I did not think that P17 was in the |
| 14 | record, and I went back and checked.  It's not in the record, |
| 15 | which Mr. Gage has also confirmed. |
| 16 | MS. GREENE:  Yes, I went back and checked as well. |
| 17 | THE COURT:  OK. |
| 18 | MS. GREENE:  So — |
| 19 | MR. GAGE:  Your Honor, if I may. |
| 20 | THE COURT:  Yes. |
| 21 | MR. GAGE:  I just want to make my record.  We believe |
| 22 | this is clearly excluded by your ruling.  Counsel knew that P17 |
| 23 | was not admitted because counsel submitted a letter to your |
| 24 | Honor last night, less than 24 hours ago, arguing this exhibit |
| 25 | should be introduced into evidence, and then your Honor ruled |

NADHRow5

1    this morning that this topic would not be covered.  And then

2    not only did counsel go down the path towards this issue,

3    putting Google in a position of having to stand up and object

4    in front of the jury, running the risk of the unfair prejudice

5    we were concerned about, then we go to a sidebar and then

6    counsel tells the Court that the document is in evidence.  And

7    that's outrageous.  I would like counsel admonished for this

8    because this type of conduct is putting us in a position here

9    trying to defend Google worrying about what's going to happen

10   next.

11            THE COURT:  OK.  Mr. Gage, let me make one comment

12   about the events immediately preceding lunch, which is that

13   when Ms. Greene went through the entire group, both men and

14   women, you did not object at that point, and there would have

15   been no way for the jury to know why you were objecting to a

16   recitation of names and level numbers of men and women.

17            MR. GAGE:  Your Honor, and I told you at the sidebar

18   the reason I didn't is because I made a calculated judgment

19   that I wanted to allow counsel —— to see where counsel was

20   going.  And the entire time those questions were being asked,

21   your Honor, the question was going through my mind, do I object

22   or not?  And I made a calculated decision to object when I

23   did ——

24            THE COURT:  Yes.

25            MR. GAGE:  —— instead of five minutes earlier or two

NADHRow5

1    minutes later.

2            THE COURT:  Yes, I understand.  So ——

3            MS. GREENE:  Your Honor, may I just say something very

4    briefly?

5            THE COURT:  Can I have a copy of the document, because

6    I don't —— that binder is not here.

7            MS. GREENE:  Would you like us to put it up on the

8    computer for you, P17?

9            THE COURT:  Yes.

10           MS. GREENE:  I just want to acknowledge, your Honor.

11   I absolutely was wrong.  I went back at the break and checked,

12   myself, because I did intend to use it with him to make sure

13   that it had been admitted.  It was not.  I checked to see if

14   there was objections, and that was one of the things I was

15   going to ask your Honor to rule on or so I knew going in.

16           So we'd say that Mr. Grannis brought up a woman by the

17   last name of Herbs and mentioned she was a Level 8 when I was

18   asking him about who these technical directors were.  In that

19   context, him having talked about these technical directors, the

20   internal hires, as he referred to them, in bringing up a woman

21   who was a Level 8, I thought it necessary and important to

22   clarify who the group we were talking with and distinguish it

23   from that group that he kept referring back to, and that was

24   the context in which then I talked about these level —— these

25   nine individuals and brought in their level.

NADHRow5

1          And I'm sorry, your Honor, I did not understand it at

2     that time to be in violation of the rules or the spirit,

3     certainly didn't mean to be in violation of the spirit of the

4     rule, your ruling, so ——

5          THE COURT:  You represented on the record that you're

6     not asking any more questions at all relating to Jen Bennett,

7     correct?  I believe you made that representation —— well, the

8     record speaks for itself.

9          MS. GREENE:  Yes, that is the representation.  I mean,

10    that is the truth.  I think the question that I had for you at

11    the sidebar, again, was whether I can use a document ——

12         THE COURT:  Yes.

13         MS. GREENE:  —— that makes reference to Jen Bennett if

14    I'm not calling her out or asking questions about her or in any

15    other way referring to her.

16         THE COURT:  OK.  Yes.

17         MR. GAGE:  I object.  This document should not come

18    into evidence.

19         MS. GREENE:  OK.

20         THE COURT:  I'm sorry.  You were waving a copy of the

21    document.  Did that come up here?

22         MR. GAGE:  I'm sorry, your Honor.  I handed it up.

23         THE COURT:  I'm sorry.  All right.  Let me look at the

24    document.

25         MR. GAGE:  This document should not come into evidence

NADHRow5

1    in light of your Honor's ruling.  Because it talks about Jen

2    Bennett, the jury should not see it.

3           THE COURT:  What are you trying to use this document

4    for, Ms. Greene?

5           MS. GREENE:  Your Honor, this is a document where Will

6    Grannis, her hiring manager, says that every woman who came to

7    Google OCTO, one of them Ulku who he names, has told me they

8    feel like they didn't fight hard enough for themselves.  That

9    relates directly to her concerns and her complaints.  He's

10   making a reference that she told him that they feel like they

11   didn't fight hard enough for themselves, and then he goes on

12   and says this is also the number one area where women ask for

13   my advice/mentoring, respectfully fighting for what they think

14   is fair comp.  I think this document in and of itself is

15   absolutely relevant, probative, and is not hearsay.

16           I will suggest that if we want to take Jen Bennett's

17   name out of it and redact her name from there and perhaps only

18   use that portion of the email and not use anything else, you

19   know, underneath that, the other emails and things as well, we

20   could do that as a way to make sure that Jen nor any other

21   woman comes into this conversation.

22           But as to Mr. Grannis' direct recollections of

23   conversations he's had with Ms. Rowe and generally the

24   conversations that he's had about women fighting for

25   themselves, it's absolutely relevant to this conversation and

NADHRow5

the claims, and the jury should be able to hear it.  And the
way to address it is not by keeping the document out but by
redacting anything that could potentially be unduly
prejudicial, which is the standard.

THE COURT:  But when you redact, then clearly —— if
you have a sentence, "I also know that every woman who came to
Google/OCTO" parenthetical redaction, doesn't that in itself
say something to the jury?

MS. GREENE:  Your Honor, we can't keep out something
that is directly relevant in referencing our client because
Mr. Grannis happened to mention another woman, and this is a
document that he was asked about at his deposition.  They've
been on notice of this document.  This was something that ——

THE COURT:  That doesn't mean it comes into evidence
at trial.

MS. GREENE:  It's true, but there's no surprise to
Google about this document because it's always been something
that we have focused on.  I believe we concluded it at summary
judgment.  We included it in our 56.1 statement and in our
brief.  This document has always been an important part of the
case as to Mr. Grannis' knowledge of Ms. Rowe's concerns about
not fighting hard enough.

MR. GAGE:  May I briefly respond, your Honor?

THE COURT:  Yes, yes.

MR. GAGE:  And I will be very brief, because let's

NADHRow5

1    talk for a second about what folks in this room are on notice

2    of.

3            Ms. Greene wrote your Honor a letter last night

4    specifically asking you to allow the admission of P17.  She was

5    on notice of the request, and then she was on notice this

6    morning that you said, no, it doesn't come in.  That's one

7    reason it should not come in.

8            The second reason it shouldn't come in is because, as

9    I said at the sidebar and I have said repeatedly, this is

10   hearsay.  It is Mr. Grannis writing about what other people

11   told him about how they felt about their own behavior, and if

12   —— Ms. Greene, if I could please finish.  I allowed you to

13   finish.

14           MS. GREENE:  I didn't say anything.

15           MR. GAGE:  Your Honor, if counsel believes that it is

16   somehow relevant, and I don't think it is, but if counsel

17   believes that it is somehow relevant for the jury to know that

18   Ms. Rowe said to Mr. Grannis she thinks she didn't fight hard

19   enough for her comp, they can ask Mr. Grannis the question.

20   And they could have asked Ms. Rowe, but I don't think they did.

21   I haven't read all of the transcript, but —— or, no, I did read

22   the rough transcript, and I don't remember them asking her

23   that.

24           So if this was so highly relevant, why didn't they ask

25   her?  The only reason they want this in is to poison the well.

NADHRow5

1   They want it to unfairly prejudice the jury to suggest that

2   women at Google feel unfairly treated.  That is evidence of

3   nothing relevant to the questions before the jury ——

4               MS. GREENE:  Your Honor.

5               MR. GAGE:  —— as you've already ruled, your Honor.

6               MS. GREENE:  May I just note, again, I have not

7   introduced this document in contradiction of any order.

8               THE COURT:  Was this document shown to refresh?  I'm

9   not ——

10              MR. GAGE:  It wasn't, your Honor.  None of the people

11  around it have testified yet.

12              MS. GREENE:  I just have a possible solution here

13  because, again, it's not with the intent of mentioning Jen

14  Bennett at all.  I think the fact that Mr. Grannis was on

15  notice of conversations with Ms. Rowe —— and, frankly, that

16  everything —— "I agree, I also know that every woman who came

17  to Google OCTO have told me they didn't feel like they fought

18  hard enough for themselves," that goes to willfulness and

19  punitive damages under liquidated damages and punitive damages.

20  He's on notice that women have told them.

21              What I would suggest, rather than the document, your

22  Honor, if I could just be able to ask him whether he's ever ——

23  whether he's ever stated that every woman who came to Google

24  OCTO have told him they felt like they didn't fight hard

25  enough, omit names, use the document, if necessary, to refresh

NADHRow5

1    his recollection, but not enter the document and make no

2    mention of Ms. Bennett.

3            THE COURT:  But this is not a case about women at

4    Google.  This is not a pattern or practice case.

5            MS. GREENE:  Your Honor, but his notice of this

6    absolutely goes to the willfulness standard for liquidated

7    damages and punitive damages.  And I appreciate and respect

8    your Honor's order, but it can't be that documents that

9    specifically mention our client in the context of women

10   complain about this and come to me about this can be excluded

11   when it's evidence of a standard we have to meet for certain

12   damages.  And, yes, it's prejudicial, but the question is, is

13   it unduly prejudicial?  All evidence is prejudicial to one

14   party or the other.

15           MR. GAGE:  The this, your Honor, that counsel keeps

16   referring to is what some unnamed women and some named women

17   thought about themselves.  It is not even their own thinking

18   about whether they are paid fairly at Google.  They didn't

19   think they pushed hard enough.  That's entirely different.

20   That does not put Google on any notice that its practices in

21   any way are unfair or unlawful.  It has nothing to do with

22   willfulness.  This is not a complaint.  Counsel is trying to

23   characterize this as somehow a complaint about Google's

24   practices.  It's not.

25           MS. GREENE:  Your Honor.

NADHRow5

1          MR. GAGE:  Apparently it's a complaint about

2     themselves and how they acted.

3          MS. GREENE:  If I may put this into context.  In

4     December of 2017, Ms. Rowe raised a concern with Ms. Lawrence

5     and Mr. Grannis about her leveling.  This is some five, six

6     months later.  Mr. Grannis, as of this point in time, as of the

7     prior point in time but certainly at the time he's

8     acknowledging that, yes, they've raised this concern, Ulku in

9     particular, is on notice.  The fact that he did not notify HR

10    when Ms. Rowe told him this, the fact that he didn't do

11    anything about this is important evidence.  He didn't act on

12    it.

13         Ms. Rowe came with a particular concern in November

14    and December.  He's acknowledging that she told him something

15    about not fighting hard enough for themselves and not —— the

16    number one thing he's asked for advice and mentoring is

17    respectfully fighting for what you think is fair, and he didn't

18    do anything ——

19         THE COURT:  OK.

20         MS. GREENE:  —— with respect to Ms. Rowe.  This is

21    probative, relevant evidence to the existence of her

22    complaints, his acknowledgment of the complaints, and his

23    complicity in not doing anything about them.

24         MR. GAGE:  Your Honor, counsel is mischaracterizing

25    the record.  Ms. Rowe specifically testified that in November

NADHRow5

1   of 2017, when she raised her concerns about her leveling, she

2   did not — she did not, she explicitly told the jury she did

3   not connect it to gender.  Indeed, you may remember her words.

4   She said she didn't because she was concerned it was risky.  So

5   this is not a situation where Ms. Rowe raised a discrimination

6   complaint and then Mr. Grannis did nothing about it.

7            Counsel is now misrepresenting the record from her own

8   client's testimony.  She conceded that.  She specifically said

9   that to make the impact to the jury that, oh, I was afraid and

10  it was too risky, she suggesting, even though there's no

11  evidence to suggest.  She raised it HR later after May, and

12  this is five months later.  It has nothing to do with any women

13  at Google saying that they thought Google did something wrong.

14  This email is about women saying to Mr. Grannis that they think

15  they did something wrong.

16           MS. GREENE:  Your Honor, if I may respond to that,

17  there's two important things here.  One is it's a fair question

18  whether Mr. Grannis understood that Ms. Rowe had been raising a

19  concern about equal pay.

20           THE COURT:  You're going to ask him that.

21           MS. GREENE:  I am absolutely going to ask him that,

22  but it is for the jury to decide what the relevance of evidence

23  is.  It's for the jury ——

24           MR. GAGE:  It's for the Court to decide.

25           MS. GREENE:  Excuse me, Mr. Gage.

NADHRow5

1              There is going to be evidence offered in this case

2    that a concern of underleveling, whether discrimination or

3    gender is referenced at all, is a matter that's reported or

4    reportable to ER, and there's an investigative process for

5    that.  And that is evidence that's going to come in, and it's

6    going to help paint the picture for the jury of what people

7    did, whether they used the processes that were available to

8    them or not, or whether they acted in a way that rises to the

9    level of justifying the liquidated damages and punitive damages

10   that are available under the law.

11              So here we have —— and, again, my suggestion was that

12   I be able to question him about it without showing the document

13   to the jury and without making any reference to Ms. Bennett.

14   But the fact that he knows that there's a concern that she

15   raised about not fighting hard enough for herself in connection

16   with the underleveling issue she raised is something that could

17   have or should have resulted in him taking this another step

18   and going to ER on it.

19              MR. GAGE:  Your Honor ——

20              MS. GREENE:  And that is part of the story that the

21   jury should be able to hear as they weigh the evidence and as

22   they think about motive and as they think about pretext and as

23   they think about willfulness and negligence and all of those

24   other things.  So, again, what I would —— I'm not going to

25   recommend anything to the Court, but what I would be prepared

NADHRow5

1      to do is question Mr. Grannis, as I did at his deposition, but

2      not — only show the document if necessary to refresh his

3      recollection and not seek to publish it to the jury and not

4      reference Ms. Bennett in any way.

5              MR. GAGE:  Your Honor, I feel like I'm playing

6      whack-a-mole.  The argument keeps shifting.  Now let's talk

7      about ER.  First, counsel is mischaracterizing the evidence and

8      mischaracterizing what is going to come in.  Now, counsel did

9      not take depositions of the ER people that they are calling to

10     testify at trial.  So maybe, if what's taken in discovery

11     determines admissibility, that means they shouldn't even

12     testify, but as your Honor pointed out, what comes out in

13     discovery is not necessarily admissible.  But those witnesses

14     will testify differently than what Ms. Greene has just said.

15             We had no problem with counsel asking Mr. Grannis if

16     Ms. Rowe expressed these concerns to him about whether she

17     fought hard enough for herself and for her compensation.  Fine,

18     they can ask those questions.  They can absolutely ask those

19     questions.

20             THE COURT:  OK.

21             MR. GAGE:  This document is inadmissible.

22             THE COURT:  I'm going to stop this now, OK, because

23     you, Ms. Greene, can ask Mr. Grannis whatever you want about

24     Ms. Rowe.  Any probative value of this document is outweighed

25     by the risk of unfair prejudice to Google, and it is not coming

NADHRow5

```
 1    in.
 2            Now, are you using deposition designations with
 3    Mr. Grannis?
 4            MR. GAGE:  I presume —— if he contradicts himself
 5    only, I assume.
 6            THE COURT:  Yes.
 7            MS. GREENE:  Thank you for answering for me, Mr. Gage.
 8            Your Honor, I would not be using depo designations
 9    that make reference to Ms. Bennett or the document.
10            THE COURT:  You cannot.
11            MS. GREENE:  Right.
12            THE COURT:  No deposition ——
13            MS. GREENE:  No, I won't.
14            THE COURT:  —— about this document.
15            MS. GREENE:  I'm not going to.  No, your Honor.  I
16    understand.
17            THE COURT:  All right.  Ms. Williams, can we bring the
18    jury in, please.
19            Yes, Mr. Grannis.
20            MR. GAGE:  He's right out in the hallway, so we'll get
21    him in.
22            THE COURT:  OK.
23            (Continued on next page)
24
25
```

1        (Jury present)

2    WILLIAM GRANNIS, resumed.

3    DIRECT EXAMINATION CONTINUED

4    BY MS. GREENE:

5    Q.  Hello again, Mr. Grannis.

6    A.  Hello.

7    Q.  We were talking about the levels of the men in OCTO before

8    the break.  Do you recall that and whether you had considered

9    leveling any of them as a Level 8?

10   A.  Yes, we were talking about that, yes.

11   Q.  Do you recall whether you considered hiring Ms. Rowe as a

12   Level 9?

13   A.  I don't.

14   Q.  Now, you knew at the time of hiring that L8 and L9 had

15   different compensation models, correct?

16   A.  Yes.

17   Q.  And you knew that the salary range for L9s was higher than

18   the salary range for L8s, correct?

19   A.  That's not exactly true.  There are —— there are bands and

20   they overlap somewhat.  I know this because I've been both an

21   L8 and an L9 at Google.  So they're not —— there's not, like,

22   one that's a progression to the other.  There's a certain band

23   at which they will overlap.  So there are L8s, for example,

24   that make more than L9s.

25   Q.  Correct.  But my question was the salary range was higher

1    for an L9?

2    A.  The top of the range.

3    Q.  Than L8?

4    A.  The top of the range, yes.

5    Q.  So L8 would hit a limit on the salary?

6    A.  Right.

7    Q.  While an L9 would have additional room on their salary,

8    correct?

9    A.  Correct, the band would extend further, yes.

10   Q.  And the target bonus for L9s you knew was higher for L8s,

11   correct?

12   A.  Yes.

13   Q.  And it's 40 percent for L9s, correct?

14   A.  That sounds right.

15   Q.  And 30 percent for L8s?

16   A.  That sounds right too.

17   Q.  And the target is keyed off of what the salary is, correct?

18   A.  Yes.

19   Q.  So if an L9 has a higher salary by virtue of being an L9,

20   the bonus target is not only larger, the overall effect of the

21   target is larger by virtue of the larger salary, correct?

22   A.  Correct.  They're multiplied by each other, yes.

23   Q.  And you also understand and knew at that time that it's

24   easier to move from an L9 to an L10 than it would be to move

25   from an L8 to an L10, correct?

NADHRow5                          Grannis – Direct

1   A.  I had about a year into Google.  I didn't really have much

2   context for movement across levels.  I mean, I was an L8, so I

3   didn't really have much context for, you know, what a 9 or even

4   a 10, like, the path to that would be internally.

5   Q.  During this time that you were hiring, you were promoted to

6   L9, correct?

7   A.  No.  I was — I was an 8.

8   Q.  When were you promoted to L9?

9   A.  Probably like a year-and-a-halfish after I started.

10  Q.  It wasn't in 2017?

11  A.  No.  If it was, it would have been, like, middle or late

12  '17, so right about the time I was hiring people more senior to

13  me.

14  Q.  You did not move from L8 to L10, correct?

15  A.  Correct.

16  Q.  Are you aware of a single instance when someone has moved

17  from an L8 to an L10?

18  A.  No.

19  Q.  You are aware of instances where people have moved from L9

20  to L10, correct?

21  A.  Absolutely.

22  Q.  Now, you considered Ms. Rowe to be overall qualified for

23  the OCTO technical director position because she had both a

24  technical background and a financial services background,

25  correct?

1    A.  Correct.

2    Q.  And if you date back to her first job in fintech before she

3    got her master's, she had been in the financial services tech

4    industry for 22 years by the time you were considering her,

5    correct?

6    A.  I'd have to look at her résumé again.  I don't know it as

7    well as you do, but that sounds right.  She had very deep

8    experience in financial services.

9    Q.  And the time that someone worked before they received an

10   advance degree is time that Google would include in looking at

11   their overall years of experience, correct?

12   A.  Yeah, I would assume that all experience that was relevant

13   would be considered.

14   Q.  And you knew that while she was getting her master's, she

15   was working for the National Center for Supercomputing

16   Applications?

17   A.  I don't remember that now, but sounds right.

18   Q.  Do you know what the National Center for Supercomputing

19   Applications is?

20   A.  That is —— I think it's a University of Illinois advance

21   computing center, if I recall right, but I don't know much of

22   the details.  I never worked there.

23   Q.  Well, you understood that working for the National Center

24   for Supercomputing Applications was a technology-related job,

25   correct?

NADHRow5                        Grannis - Direct

1  A.  Absolutely.

2  Q.  And in fact, you viewed her as an expert on technology in

3  the financial services, isn't that right?

4  A.  That's correct.

5  Q.  And that's one of the key reasons that you hired her,

6  correct?

7  A.  Yes.  We wouldn't have hired her if she didn't have both

8  technical acumen and financial services background.

9  Q.  Now, she was someone who was considered to have high

10 credibility when it came to matters pertaining to financial

11 services, correct?

12 A.  Yes.

13 Q.  In fact, there was no one in OCTO who was more qualified

14 than her with respect to the financial services industry,

15 correct?

16 A.  In fact, we —— I purposely was looking for someone with the

17 financial services expertise because at the time we had other

18 verticals that we had covered from a recruiting standpoint, and

19 financial services was a gap we had.  So I was purposefully

20 looking for someone with deep financial services expertise.

21 Q.  And the financial services was a big potential market for

22 Google, correct?

23 A.  Absolutely.

24 Q.  And so this was a critical hire for you, correct?

25 A.  All of the hires have been critical hires.

1  Q.  Including Ms. Rowe's, correct?

2  A.  Yes.

3  Q.  Let's pause for a minute and talk about your background a

4  little bit.

5  A.  OK.

6  Q.  You graduated with your B.S. in 1999, correct?

7  A.  Correct.

8  Q.  As of 2017, you had 19 years of work experience, correct?

9  A.  If you don't count me slinging pizzas when I was a

10  teenager, I guess that's about right.

11  Q.  That wouldn't be something that Google would normally count

12  towards years of experience, right?

13  A.  Probably not.

14  Q.  And that 19 years of work experience includes the time when

15  you were getting your MBA, correct?

16  A.  Yes, because I was doing executive MBA.

17  Q.  And during the time that you were in OCTO, you —— during

18  that time you worked from Austin, Texas, is that right?

19  A.  No.

20  Q.  Where did you work from?

21  A.  I was in the Bay Area.  I was in California when I started

22  at Google.  I moved from Virginia to California with my family

23  for the first job that I had at Google, which actually wasn't

24  OCTO.  So for the first year, I did another role, and then I

25  moved to Austin about two, two and a half years ago for my

NADHRow5                              Grannis - Direct

1   oldest daughter, so she could go to high school there.

2   Q.  People in OCTO worked around the United States, correct?

3   A.  All over the world, five out of seven continents.

4   Q.  Google is a technology company.  Did they have good

5   technology even pre-pandemic for allowing for virtual

6   conferences and communications?

7   A.  We do.  We did, absolutely.

8   Q.  So your team still operated as a team, though, functionally

9   even if you weren't geographically in the same office, correct?

10  A.  Correct.

11  Q.  And you mentioned that you —— you're still in Austin,

12  Texas, is that right?

13  A.  I am.

14  Q.  And that's where you live with your family?

15  A.  Well, my oldest daughter is here now in New York City, but,

16  yes, my youngest daughter and my wife are with me.

17  Q.  Do you have two daughters?

18  A.  I do.

19  Q.  How old are they?

20  A.  21 as of last week and 17.

21  Q.  Very good.  Now, as part of Ms. Rowe's recruitment, you had

22  a conversation with her about what her next steps for her

23  career might be after OCTO, correct?

24  A.  Yes, she asked about, like perspective on career paths at

25  Google.

1   Q.  And so you had a conversation with her about the future and

2   where she might go in Google, correct?

3   A.  Yeah, absolutely.  I had all sorts of hypotheticals about

4   where — because the whole function — OCTO's function was

5   designed to be kind of like a place where people who weren't,

6   like, steeped in one area of technology or business, they could

7   come, they could be with a peer group, they'd expand their

8   skill set, and then that would create optionality for them

9   either internally or externally.

10  Q.  And you told her that if Google were to stand up a

11  financial services vertical, she would be a strong candidate

12  for that, correct?

13  A.  I don't know if I'd word it exactly like that, but we

14  definitely had a conversation about — because with her

15  background and the business was obviously going to verticalize

16  at some point.  We just didn't know when.  It didn't exist at

17  the time when, sorry, Ms. Rowe was asking me the question.  So,

18  yeah, I mean, I figured, if the business was going to

19  verticalize at some point in the future, being in OCTO would

20  certainly be, you know, a wise move in my opinion.

21  Q.  And you told her that when Google did stand up a financial

22  services vertical, she had a lot of qualifications to compete

23  for the role, correct?

24  A.  Well, first, there were no plans when she and I had this

25  conversation about a financial services vertical.  This was

1   based on my experience knowing that as companies get bigger,

2   especially tech companies, when they get bigger, they go from

3   kind of generally selling to everybody and they specialize.  So

4   they would specialize and they would stand up a manufacturing,

5   probably stand up an energy, probably stand up a financial

6   services vertical, but I couldn't make any guarantee at that

7   time because we didn't have them.

8   Q.  So let me qualify that.  You told her that if and when

9   Google stood up a financial services vertical she had a lot of

10  qualifications to compete, correct?

11  A.  She would definitely have qualifications to compete.

12  Q.  And in fact, you told people that if we're going to get

13  serious about financial services, Ulku is the type of person

14  who could really help us in the vertical, correct?

15  A.  Absolutely.

16  Q.  And you believed that, correct?

17  A.  I still do.

18  Q.  And that's something you expressed to Ms. Rowe as well,

19  correct?

20  A.  Yes, absolutely.

21  Q.  Now, you reviewed Ms. Rowe in every performance cycle from

22  2017 through mid-2022, correct?

23  A.  That sounds about right.  I'd have to double-check because

24  she has a different manager that covered about an 18-month time

25  frame from now, so maybe mid-'20.  That sounds about right.

1   Q.  And you rated her as exceeds expectations in every year you

2   reviewed her, correct?

3   A.  Correct.

4   Q.  And with respect to the other technical directors at

5   Level 9, those men, they didn't all get exceeds expectations

6   while they were reporting to you, did they?

7   A.  No, they did not.

8   Q.  In fact, you were thinking about putting together a

9   vertical lead team in your group, and you wanted to make her

10  the head of that group, correct?

11  A.  Yeah, that was very early on.  We were thinking about, you

12  know, what would it look like if we actually kind of clustered

13  up — so stepping back, I had, like, a bunch of direct reports.

14  By this point I had like 30 direct reports, and my number one

15  priority is success of everybody that joins our team.  It's a

16  very unusual group.

17          So we were putting together plans for how we would

18  cluster the team together.  We were looking at options like,

19  well, should we cluster by product area, by product knowledge,

20  but that really didn't represent the full breadth of our team

21  because we also hired people like Ms. Rowe and, you know, you

22  mentioned a bunch of them earlier that also had, like, their

23  super-strength was more of like a vertical area.  And based on

24  what I had seen from Ulku so far, you know, leadership, great

25  impact with — you know, outside in the market with customers

1   and at events and with public policy, I thought she'd make a

2   great lead for —— if we had a vertical organization in OCTO,

3   thought she'd make a great lead.

4   Q.  And you talked about that with Melissa Lawrence, your HR

5   head, right?

6   A.  Oh, I'm sure I talked to her about that, yeah.

7   Q.  And you talked to Ms. Rowe about it as well, correct?

8   A.  Probably.

9   Q.  And you talked to some of the men in the vertical spaces

10  about it as well, correct?

11  A.  Probably.

12  Q.  And Mr. Eryurek and Mr. Wilson were two of the men who

13  would have moved under Ms. Rowe in that verticals group,

14  correct?

15  A.  Correct.

16  Q.  And they were both L9s, correct?

17  A.  Correct.

18  Q.  And so that meant a L9 —— well, let me ask you this:  That

19  would have resulted in a level inversion, correct?

20  A.  Correct.

21  Q.  And what's an inversion in this context?

22  A.  An inversion is when someone that reports to you is at a

23  higher level than you.

24  Q.  So in this case, two of the L9 men would have been

25  reporting to Ms. Rowe as an L8, correct?

1    A.  Yes.

2    Q.  But even with that inversion, you and others believed she

3    was the best person for the role of that group leader, correct?

4    A.  Absolutely.  I mean, I was inverted.  So, you know, I know

5    that an inversion doesn't necessarily dictate the outcome.

6    Certainly, she had demonstrated the leadership to be able to do

7    it.

8    Q.  Mr. Grannis, in connection with the performance review

9    process, did you participate in any sessions to calibrate

10   ratings across your —— across your group?

11   A.  Yeah, calibration was conducted across the team every

12   performance review period.

13   Q.  And did Melissa Lawrence participate in those calibration

14   meetings with you?

15   A.  Just trying to think back.  Probably.

16   Q.  And do you recall her taking any notes in those meetings?

17   A.  We had to enter —— I think we had to enter —— this is a

18   while back.  We had to enter notes in, like, a system that we

19   had, a tool, on ratings and justification for ratings.  That's

20   what I remember.

21             MS. GREENE:  I want you to put up a document just for

22   the witness, not yet for the jury.

23             THE COURT:  Which document is this?

24             MS. GREENE:  Oh, I'm sorry.  That would be helpful.

25   Plaintiff's 87.

1    Q.  Mr. Grannis, do you recognize what type of document this

2    is?

3    A.  Looks like calibration notes.

4    Q.  I want you to look through it, and we'll slowly page.  I

5    want you to tell me if, as a combination of who's mentioned in

6    this document and any other information, you can place this in

7    time.

8    A.  Well, it says 9/29 at the top.

9    Q.  I want to see if we can place it in a year.

10             And, Mr. Yang, if you can scroll through it slowly.

11             And, Mr. Grannis, if you can look to help us place

12   what year this might have been.

13             THE COURT:  Mr. Grannis, just to caution you not to

14   read anything from the document out loud.

15             THE WITNESS:  Oh, sorry.

16             THE COURT:  OK.

17             THE WITNESS:  Apologize.

18             THE COURT:  I don't know that you did that, but I'm

19   just letting you know now not to.

20             THE WITNESS:  Thank you.  I appreciate that.

21             MS. GREENE:  And if you can go to the next page,

22   Mr. Yang.  OK.  If you can go back to the first page.

23   BY MS. GREENE:

24   Q.  Are you able to place this in the 2017 time frame?

25   A.  I don't know if this is 2017 or early 2018.

1    Q.   But it would have been in that time frame?

2    A.   Would have been in the —— probably the first few years.

3    Q.   And does this reflect the individuals in your organization?

4    A.   I would really need to see a —— like, a list of —— I would

5    need to check, like, the HR record of all the people that were

6    in like —— I can't say with 100 percent clarity.  We hired so

7    many people so fast.

8    Q.   Understood.  Do you recognize names in here as names of

9    people who were in your org unit?

10   A.   Yes.

11   Q.   And you participated in calibration meetings in that time

12   frame for these people in your organization unit, correct?

13   A.   Yeah, I participate in every calibration.

14   Q.   Do you have any reason to think that these are not accurate

15   notes of what happened and was discussed in the calibration

16   meeting that you participated in?

17             MR. GAGE:  Objection, your Honor.

18             THE COURT:  Sustained.

19             MS. GREENE:  OK.

20             THE COURT:  We're using this to refresh his

21   recollection?

22             MS. GREENE:  Well, I'm actually laying a foundation to

23   bring this document into evidence, which is ——

24             THE COURT:  Is there an objection on this document?

25             MR. GAGE:  There is, your Honor.  We don't know who

NADHRow5                          Grannis - Direct

1   the author is.  It's hearsay.

2              MS. GREENE:  Actually, your Honor, we do know who the

3   author is.  If we need to have a sidebar, we can.

4              THE COURT:  Yes.

5              (Continued on next page)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

NADHRow5                    Grannis - Direct

1          (At sidebar)

2          MS. GREENE:  So this is an actual issue that we raised

3     with Google back in July of 2023.  We asked about this

4     document, and Google said Melissa Lawrence —— Melissa Lawrence

5     is the custodian.  As you can see from the metadata you have,

6     the title of the document is copy_of_OCTO_calibration_YE_17,

7     which would indicate that it was created in connection with the

8     team meeting 9/29 during the year-end 2017 perf. cycle.

9     Ms. Lawrence can confirm this at trial.

10         Ms. Lawrence is going to be a witness later in trial,

11    so this document, at the time Ms. Lawrence can authenticate it,

12    is going to come into evidence, but I need to be able to ask

13    Mr. Grannis about it now as a participant in that meeting.

14         THE COURT:  Hang on.  Is that your objection,

15    authentication?

16         MR. GAGE:  No.  My objection is —— there are multiple

17    objections.  It's hearsay.  Second —— and I don't think they

18    can establish that it's a business record of any sort.

19         Second, the witness who is on the stand right now

20    apparently doesn't recognize it, and so there's no foundation

21    to show that this contains relevant information.  They can ask

22    Ms. Lawrence about what it was and how it was created and try

23    to establish it's a business record and it gets in as not being

24    hearsay or it gets in through a hearsay exception.  They can

25    try.  I don't think they can establish that given what we know

1    about the document, but they haven't established it for this

2    witness.

3          MS. GREENE:  Well, at the time Ms. Lawrence brings it

4    in, it won't be hearsay because it will be offered against the

5    party.  It will be outside of the hearsay rules.  I believe ——

6    I will just note that Mr. Gage just represented that they

7    didn't know who it came from or who authored this document

8    when, in fact, they had told us exactly that.

9          MR. GAGE:  I missed it.

10         THE COURT:  In the joint pretrial order this was

11   identified as a document as to which there's an objection.

12         MR. GAGE:  Yes.

13         MS. GREENE:  Which is why I was laying the foundation.

14         THE COURT:  But you can't authenticate it with him.

15   So you have to wait until Melissa Lawrence comes.

16         MS. GREENE:  Your Honor, the federal rules do provide

17   that documents can come in subject to later authentication and

18   foundation with a later witness.  So that is —— there is a

19   provision in the FRE for that.

20         THE COURT:  But there's also a hearsay objection, and

21   it sounds like she is the one who can answer questions you

22   might ask about whether it's a business record.

23         MR. GAGE:  Correct.

24         MS. GREENE:  OK.

25         MR. GAGE:  And you've already established, I think

NADHRow5                    Grannis - Direct

1    pretty thoroughly, this witness doesn't recognize the document.

2              MS. GREENE:  It's not the document.  I want to be able

3    to ask him about the statements in the document.

4              MR. GAGE:  But then the jury gets to hear them, and

5    it's hearsay.

6              MS. GREENE:  I understand how things work, and if I'm

7    not — if I'm going to move it in and you're going to object,

8    then that's what will happen, and we'll talk about it with

9    Ms. Lawrence.

10             MR. GAGE:  You can ask about him about calibration

11   session and move on.

12             MS. GREENE:  I understand how to ask the questions.  I

13   was moving to make a motion to admit it in.  You would have

14   objected.  We would have been right here.  That's where we are.

15   I suggest we continue with the questioning.

16             MR. GAGE:  OK.

17             THE COURT:  Yes.  Thank you.

18             (Continued on next page)

19

20

21

22

23

24

25

1    (In open court; jurors present)

2  BY MS. GREENE:

3  Q.  Mr. Grannis, in 2017, was Jonathan Donaldson's performance

4  score changed from an "exceeds expectations" to a "consistently

5  meets expectations"?

6  A.  I don't remember that.  I'd have to see the documentation.

7  Q.  OK.  Take a look at P87 in front of you and for the purpose

8  of just refreshing your recollection.

9    Again, without reading the document, does this refresh

10  your recollection as to whether Jonathan Donaldson's rating was

11  changed from exceeds expectation to consistently meets

12  expectation?

13  A.  Yes.

14  Q.  And what do you recall now?

15  A.  I mean, it doesn't —— how ——

16  Q.  I'm sorry.  Does it refresh your recollection or does it

17  not?

18  A.  It doesn't —— it doesn't change the fact that I don't

19  remember what was in the system back then.

20  Q.  OK.  That's fine.

21    I want to ask you, in 2017 did you consider Ms. Rowe

22  to be a model for the sales team?

23  A.  Certainly in her first —— I'd even say six months, she

24  demonstrated significant impact and acumen in sales

25  engagements, marketing engagements, forums, broad forums for

1  customers.  So, yeah, that's — you know, that's — those are

2  all sales-related activities.

3  Q.  Okay.  Did you consider Ms. Rowe to be a mentor and coach

4  to Leonard Law?

5  A.  I — I guess Leonard would have to describe whether he

6  thought he was a mentor — or she was a mentor or coach.

7  That's really his opinion, not mine.

8  Q.  Who's Leonard Law?

9  A.  He was a PM.  In that period of time, we had product

10  managers — sorry, PM is a product manager.  And a product

11  manager was responsible for actually building the software that

12  we would sell to clients.  And Leonard Law was the financial

13  services — if I remember right, financial services product

14  manager at that time.  We had specialized PMs for each — or

15  for a couple high potential verticals at the time.

16  Q.  Do you recall what his level was at that time?

17  A.  I have no idea.

18  Q.  Was it a Level 8 or was it below that?

19  A.  I don't think it was a Level 8.  Level 8 PMs were pretty

20  rare.

21  Q.  Would you agree that mentoring and coaching are Googly

22  activities?

23  A.  Yeah, absolutely.

24          MR. GAGE:  Before your next question, your Honor,

25  could the witness just tip the microphone down a little bit,

1    because every once in a while I'm having trouble hearing.

2              THE WITNESS:  Sorry.

3    Q.  Would you agree in 2017 you considered Ms. Rowe to be a

4    fantastic hire?

5    A.  Yes.

6    Q.  And would you agree that you saw her as someone who could

7    move fluidly between tech and business for financial services?

8    A.  Yes.

9    Q.  Product managers are also in Google's engineering — it's

10   an eng role, correct?

11   A.  Yes.  The hierarchy has product managers, it has software

12   engineers, it has OCTO, couple other functions.

13   Q.  And did you give special weight or recognition to the work

14   that Ms. Rowe was doing with regulatory in 2017?

15   A.  I don't — I don't recall if I did anything, but it

16   wouldn't surprise me if I did because she's been a consistent

17   — consistently impactful member of the team in regulatory

18   concerns.

19   Q.  She was a real leader, thought leader, when it came to

20   working with regulators amongst OCTO, correct?

21   A.  Yes, I'd say she still is.

22   Q.  And you saw her as a known commodity or a known quantity to

23   PM and eng, correct?

24   A.  Yeah, for the financial services vertical for sure.

25   Q.  And she — you thought that at that time period she

1   understood the platform well, correct?

2   A.   Yeah.

3   Q.   Now, with respect to 2017, did you have performance

4   concerns with any of the L9 OCTO men?

5   A.   2017?  Six months in?  I don't know.  I don't know if I

6   would have had enough visibility or enough data, but maybe.

7   Certainly possible.  It's a high bar.

8   Q.   Do you remember if you leveled in 2017 all of the L9 men as

9   exceeds expectations?

10  A.   I have —— I don't remember what I rated someone six years

11  ago.

12  Q.   I'm going to put up another document only for your

13  identification, not for the jury, and that's going to be P113.

14  And this is a document to which I believe there's an objection.

15           Is it an objection that defendants are maintaining?

16           MR. GAGE:  Yes, there is, your Honor.

17           MS. GREENE:  Where are we on time?  When is our next

18  break?

19           THE COURT:  In an hour.  In about an hour.  In a word,

20  what is the objection?

21           MR. GAGE:  Among other things, I don't know who

22  created this document, your Honor.

23           MS. GREENE:  What would your Honor like to do?  Should

24  we have a sidebar to discuss?

25           THE COURT:  Google, what is your position on —— you

NADHRow5                    Grannis - Direct

1    want to move this into evidence, is that ——

2                MS. GREENE:  Yes, your Honor.

3                THE COURT:  OK.  We're going to have to have a

4    sidebar.

5                (Continued on next page)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1        (At sidebar)

2            MS. GREENE:  If I may give context for this document.

3            THE COURT:  Yes.

4            MS. GREENE:  This is the document that Google produced

5    to us.  Google was the creator/author of this document.  It was

6    produced to us as an Excel spreadsheet in an extremely small,

7    incomprehensible way for the jury to look at.  What we did was

8    we reformatted it in a way that allowed the jury to see

9    something that was more accessible as a summary document.

10           THE COURT:  OK.  But that's all you did was blow it

11   up?

12           MR. GAGE:  No.

13           MS. GREENE:  We rearranged the columns.  It's a

14   summary document.  We've put them on notice of the summary

15   document.  The information in there is accurate information.

16   There's no suggestion that it does not comport with the

17   document from which we created this summary.  We created the

18   summary; they created the underlying evidence and information.

19   It's complete as to the information that we're including, but

20   it is in a form and function that allows the jury to quickly

21   and easily see what is important about this document.

22           THE COURT:  Just because Google produced it doesn't

23   mean it's admissible.

24           MR. GAGE:  No, let me clarify something.  That is not

25   something we produced.  We were asked to produce data regarding

NADHRow5                          Grannis - Direct

1  these employees.

2                 MS. GREENE:  Yes.

3                 MR. GAGE:  We produced the data.  Outten & Golden

4  created their summary of the data.

5                 MS. GREENE:  Correct.

6                 MR. GAGE:  The data that we produced that are

7  summarized there includes information from data systems that I

8  don't even know that this witness has access to because it's

9  got a lot of information that —— we have a comp witness who's

10 going to testify later who can testify to some of it.  We've

11 produced —— if counsel wants to ask about people's performance

12 ratings, they've got them as exhibits.  They've got other

13 exhibits that are actual documents.  This is a document of

14 counsel's creation that contains information from a lot of

15 different systems.

16                 MS. GREENE:  Your Honor, we can use the output that

17 Google produced.  I mean, data is ——

18                 MR. GAGE:  He can't authenticate it.

19                 MS. GREENE:  Excuse me one moment, Mr. Gage.

20                 The document is a document that Google produced of

21 downloaded information from their data systems.  If they're

22 going to object to the authenticity of that, that raises real

23 questions when it was their —— let me finish —— their document.

24                 We can use the document that they produced to us.

25 We're prepared to do that.  We have it available.  There won't

1    be any objection to authenticity when they know it's their own

2    document created.  To suggest otherwise would be disingenuous.

3    It will, I think, be more difficult for the jury to read and

4    see, but ——

5          THE COURT:  Are you familiar with that document that

6    she's referring to?

7          MR. GAGE:  I'm familiar with the data we produced.

8          THE COURT:  Yes.

9          MR. GAGE:  I'm sorry I haven't been clear enough on

10   that point.

11         This witness has never seen that dataset, and so if

12   you want to show it to him, ask him all the questions you want

13   about it, but I have a feeling he's going to say:  I don't know

14   what this is.  I don't —— I've not seen it before.  But if you

15   want to ask him questions about it, fine.  I just don't think

16   that this document should come in through this witness.  And

17   under 1003, I think it is, whatever the Federal Rule of

18   Evidence is for summaries, they need to have someone who can

19   say this was created.

20         THE COURT:  Yes, agreed.  Use the data that you got

21   from Google.

22         MS. GREENE:  We'll use the spreadsheet that they gave.

23   Is this your copy?

24         THE COURT:  I'm sorry.  I steal copies.  Apologize.

25         MR. GAGE:  I burn copies.

1          MS. GREENE:  Your Honor, I just —— I don't want to be

2     back up here.  If we use the dataset, the Excel spreadsheet

3     that they produced to us ——

4          THE COURT:  I assume there's no objection.

5          MS. GREENE:  And we'll be able ——

6          MR. GAGE:  You can use it.  But what I don't want you

7     to do is speaking to the content of it and telling the jury

8     about what it is.  You can ask the witness.  You can ask the

9     witness.

10         MS. GREENE:  Bring it into evidence ——

11         THE COURT:  She wants to move it into evidence.

12         MR. GAGE:  Sure.

13         THE COURT:  OK.

14         MR. GAGE:  Whether he can answer questions is a

15     separate issue.

16         THE COURT:  Yes, right.

17         MS. GREENE:  Your Honor, I'm going to have them mark

18     it as 113.

19         MR. GAGE:  Wait.  Actually, I'm not because I haven't

20     —— they didn't mark that as an exhibit, so I haven't had the

21     opportunity to go back through that entire spreadsheet to see

22     whether or not we agree to all the data we produced in

23     discovery is relevant.

24         MS. GREENE:  OK.  It's ——

25         MR. GAGE:  No, I can't agree with that.

1           MS. GREENE:  I'm going —— OK.  We gave them ample

2    notice, pointed exactly to the document from which this summary

3    was made.  They had a chance to go back through it.

4           MR. GAGE:  And we objected.

5           MS. GREENE:  I'm sorry, Mr. Gage, if I may.

6           We need to be able to get this evidence in.  It's

7    maintained in Google in a format that they produced in an Excel

8    spreadsheet.  We'll put the Excel spreadsheet.  There is

9    information on this —— in this document that Mr. Grannis will

10   be able to speak to.  To the extent he can't, he can say I

11   can't speak to that.

12          THE COURT:  If it's a Google-generated document, then

13   what is your concern about the data on there?

14          MR. GAGE:  Because, frankly, your Honor, they didn't

15   proffer it.  They proffered this, which means I never went back

16   to this file to see what else is in there.  They've summarized

17   and taken some of the information from it, and I have no reason

18   to believe they've done it inaccurately.  But there was other

19   stuff in there, and standing here right now, I have no idea

20   what it is.

21          THE COURT:  So how much more do you have with

22   Mr. Grannis?

23          MR. GAGE:  I mean, sure, they could ask other

24   witnesses.  Again, they've got ——

25          MS. GREENE:  I'm sorry, my outline is back there.

1          MR. GAGE:  They have performance reviews of all these

2     people.  They can use that.

3          (Discussion off the record)

4          MS. GREENE:  Your Honor, I can tell you that the only

5     information that was omitted from the spreadsheet to the

6     summary document was information that said "null" or the ⸺ I

7     think there was a username entry, otherwise there was no other

8     document ⸺

9          THE COURT:  OK.  Stop.  I'm reading from your

10     objection, which is ⸺

11          MR. GAGE:  I was just doing the same thing.  Go ahead.

12     I was just doing the same thing.  We also had a relevance

13     objection because ⸺ and I don't have my glasses, I'm sorry.

14          There's information in here about people in the years

15     in which they were clearly not performing the technical

16     director job.  So there's irrelevant information in here, and

17     counsel was on notice that we had that objection and didn't

18     advance the issue before this witness came on the stand and

19     again.

20          MS. GREENE:  Your Honor, the underlying document was

21     on the JPTO in December, and they did not raise any objections

22     as to relevance or anything else at that time.

23          MR. GAGE:  Which exhibit is this?

24          THE COURT:  When did this objection come in, because

25     I'm looking at?

1          MS. GREENE:  With the summary document when we decided

2     instead of --

3          MR. GAGE:  Where?

4          MS. GREENE:  I said in the original JPTO that we

5     submitted in December.

6          MR. GAGE:  I'm operating off the current one.

7          MS. GREENE:  I'm telling you and representing that the

8     original JPTO in December included the underlying document, and

9     there were no objections to relevance on that document.

10          MR. GAGE:  But you're missing my point.  I came to

11     this trial to try the case that was presented in the most

12     recent JPTO.  I did not look at other document in a long time

13     because Ms. Rowe didn't proffer it as among the things that she

14     was going to offer.

15          THE COURT:  Yes, but, Mr. Gage, you said:  "Should the

16     Court admit the summary into evidence, defendant respectfully

17     requests that the underlying document also be admitted."  So —

18          MR. GAGE:  I don't have all these memorized.

19          MS. GREENE:  With respect to the relevance issue, they

20     have submitted and intend to use in their defendant's exhibits

21     lots of things from the time these people were outside of the

22     OCTO role, compensation documents, performance review

23     documents.  They are intending to use it and have offered it as

24     evidence in every other context.  They just don't want it come

25     in in this document.

1          MR. GAGE:  Can I offer a suggestion to solve it?

2          MS. GREENE:  So there's no relevancy objection.

3          THE COURT:  I don't know, Mr. Gage, because I think we

4    have a suggestion coming straight from your objection:  "Should

5    the Court admit the summary into evidence, defendant

6    respectfully requests that the underlying document also be

7    admitted and the jury be given a cautionary instruction to

8    carefully examine whether the chart is an accurate reflection

9    of that underlying document."  I'm going to hold you to that.

10         MR. GAGE:  Sorry.  Are you ruling that this is

11   admissible, then?  That's the only question.

12         THE COURT:  No, I'm going to — so what I'm going to

13   do is allow Ms. Greene to use the underlying document.

14         MS. GREENE:  In which case I don't think there's any

15   instruction that's necessary.

16         THE COURT:  I agree, but I'll hear from Mr. Gage on

17   that.  You seem to have — somebody on your team reviewed the

18   underlying document and made this proposal.

19         MR. GAGE:  Understood, your Honor.  I just haven't

20   looked at that underlying document, so —

21         THE COURT:  Somebody has.  I don't mind if you —

22         MR. GAGE:  That's fine.

23         THE COURT:  If you want to take a moment to look at

24   the underlying document before it goes up on the screen, we can

25   give you that time.

1          MR. GAGE:  I would like to just see the underlying

2     document before it goes up on the screen.

3          MS. GREENE:  I would just suggest we mark it as 113A

4     for the purposes of identification, the underlying document.

5          THE COURT:  All right.  So, Mr. Gage, let us know when

6     you're ready.

7          MS. GREENE:  OK.  Thank you, your Honor.

8          THE COURT:  Thank you.

9          (Continued on next page)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

 1              (In open court; jurors present) e

 2              MS. GREENE:  OK.  Just for the parties' use right now,

 3     if we could bring up the underlying document for 113.

 4              Mr. Gage, is there more you need to do in terms of

 5     reviewing it?

 6              OK.  May I publish to the jury?

 7              THE COURT:  You may.

 8     BY MS. GREENE:

 9     Q.  OK.  Mr. Grannis, you're seeing an Excel spreadsheet of a

10     dataset that was produced by Google, and do you see the —— the

11     first row where it includes the headers?

12     A.  I do.

13     Q.  And the individuals listed here —— Ulku Rowe, Ben Wilson,

14     Evren Eryurek, Nick Harteau, Breslow, and J. Donaldson —— with

15     the exception of Mr. Breslow, these were direct reports of

16     yours, correct?

17     A.  Yes.

18     Q.  And if you look at the bottom, this tab we're on, 2017.

19     A.  That's what I was looking at when you asked me the

20     question.

21              MS. GREENE:  If we can go up, we can scan to the right

22     of the document, please, Mr. Yang, slowly scanning over.  And

23     if you could keep going a bit, and if we could pause there.

24     Q.  We see the Q3 ratings.  Do you see that, column V, the

25     2017?

1    A.  I do.

2    Q.  Q3 ratings?

3    A.  I do.

4    Q.  Because it's a spreadsheet, it's difficult maybe to

5    remember which one of these goes with which person, but you see

6    that two of your direct reports received consistently meets

7    expectations, correct?

8    A.  Yes, from what I remember of column 1 as it panned over,

9    yes, I think that's right.

10   Q.  And Ms. Rowe was not one of those, right?  She's one of the

11   ones that received exceeds expectations?

12   A.  If she was line 1 or 4 —— 2 or 4, yes.

13   Q.  OK.  Ms. Rowe is line 2.

14   A.  Yes.

15   Q.  I'm going to write that down so I remember it too.

16          Thank you.  Thank you, Mr. Yang.

17          If we move over and we keep moving to the right,

18   there's information about the model salary, the proposed

19   salary, correct?

20          I'd like us to go now all the way over to the right of

21   the document.  Keep going.  We're looking for the notes —— I'm

22   sorry.  Can you go back a little bit.  And maybe the easiest

23   way to do this is to do a search for the word "potential" so we

24   can find the right entry.  Thank you.

25          OK.  So this is a note, if we can hold it right there,

1    from Monday, November 20.  If we go way back, you were the

2    person associated with this.  I want to draw your attention to

3    where it says "Ulku has rapidly demonstrated L10-plus

4    potential."  Do you see that?

5    A.  I do.

6    Q.  Do you recall noting that in 2017 that Ulku has rapidly

7    demonstrated L10-plus potential?

8    A.  That sounds like something I would have said.

9    Q.  And you believed that to be the case, correct?

10    A.  Yeah.

11        MS. GREENE:  OK.  We can take that document down.

12    Q.  Now, in late 2017 Ms. Rowe raised concerns to you and

13    Ms. Lawrence about her level, correct?

14    A.  I don't remember.  I mean, 2017 — like in terms of placing

15    it as a timeline, I do know that she did express the concern.

16    I'm just not 100 percent sure of the exact timeline.  I

17    apologize.

18    Q.  Before she moved into Mr. Shaukat's organization, she had

19    raised a concern with you and Ms. Lawrence that she was

20    underleveled at 8, correct?

21    A.  She expressed a concern about her level, yes.

22    Q.  And you knew that she had learned that there were men in

23    her group that were leveled at 9?

24    A.  Yeah, as I mentioned earlier, it was a pretty transparent

25    group.

1    Q.  And she was frustrated about that, correct?

2    A.  Yes.

3    Q.  And do you recall Ms. Lawrence saying to her that there's

4    no process to revisiting level?

5    A.  I don't remember ── I don't remember a conversation like

6    that.

7    Q.  OK.  Let's look at Plaintiff's Exhibit 13.  I don't believe

8    there's an objection to this one.

9         Do you recognize Plaintiff's Exhibit 13 as an exchange

10   between you and Ms. Lawrence and between Ms. Lawrence and

11   Ms. Rowe?

12   A.  Yes.

13   Q.  In the bottom half is Ms. Rowe raising a concern about her

14   level, correct?

15   A.  Correct.

16   Q.  And Ms. Lawrence's response ── if we can call that out,

17   Mr. Yang ── "Unfortunately, as I relayed to you before the

18   holidays, there is no process to revisit leveling decisions

19   after hire."

20        Do you know whether that was a true statement?

21   A.  Which part?

22   Q.  That there is no process to revisit leveling decisions

23   after hire?

24   A.  At that time I have no idea if that was true or not.

25   Q.  Do you know whether there's a process to revisit leveling?

1   A.  I've never —— I've never seen it, so I can't say that it

2   exists or it doesn't exist.

3   Q.  Did you do anything to find out whether there was, in fact,

4   a process to revisit leveling?

5   A.  I was given the guidance from HR that, you know —— that,

6   you know, there was nothing —— I mean, it's written right here,

7   "no process to revisit leveling," so ——

8   Q.  It said, "I did review your concerns with Will before the

9   break."  In fact, had Ms. Lawrence reviewed with you before the

10  break the concerns Ms. Rowe had raised about her level?

11  A.  Yes.

12  Q.  And what had you said to Ms. Lawrence then?

13  A.  I probably would have said something like, you know,

14  forward focus, is there anything we can do, things like that.

15  I just would have asked a lot of questions.

16          MS. GREENE:  OK.  You can take that callout down, and

17  if you can pull up now Mr. Grannis' response.

18  Q.  Did you have a conversation with Ms. Rowe where you said,

19  "The focus should be on getting to L9 by doing great

20  work versus revisiting level"?

21  A.  That sounds about right.

22  Q.  Is there a process to revisit leveling of one of your

23  reports, an L9, if once they were in the role you realized, you

24  know what, they're not exceeding expectations, they're not

25  doing as well as I thought they should do; let's make them an

1   L8?  Is that something you've done with respect to your OCTO

2   team?

3   A.  I don't think we've —— I don't think we've downgraded

4   anybody.

5   Q.  Do you know whether Ms. Lawrence shared with employee

6   relations Ms. Rowe's concerns in 2017 or January 2018?

7   A.  I wouldn't know firsthand what happened between Melissa and

8   ER.

9   Q.  And I think you said that you did not raise any concerns

10  with ER about this either, correct?

11  A.  I didn't personally raise the concern with ER.

12  Q.  Did anyone in human resources ever interview you in

13  connection with Ms. Rowe's leveling concerns prior to 2019,

14  late 2019?

15          MR. GAGE:  Objection.  Asked and answered, I think.

16          MS. GREENE:  No.

17          THE COURT:  Overruled.

18  A.  I don't know.  I don't remember the time.

19  Q.  Let me ask you a different question.

20  A.  Sure.

21  Q.  Prior to Ms. Rowe filing this lawsuit, were you ever

22  contacted or interviewed by anyone in HR or employee relations

23  about the leveling decision for Ms. Rowe?

24  A.  Sorry.  I'm just thinking.

25          I don't —— I don't recall a specific instance.

NADHRow5                          Grannis - Direct

1    Q.  You recall whether Kevin Lucas — do you know who Kevin

2    Lucas is?

3    A.  I think he was in HR, and I don't know if he was in, like,

4    comp or if he was, like, someone related to Melissa's team, but

5    somewhere in there.

6    Q.  Did you ever have a conversation with Mr. Lucas about

7    Ms. Rowe's level?

8    A.  I don't remember six years ago.  I don't recall.

9    Q.  Now, you knew in December 2017 that Mr. Shaukat was looking

10   to hire a VP of financial services, correct?

11   A.  I was aware that the verticals were standing up and that he

12   was looking for a leader.

13          MS. GREENE:  OK.  I'm going to ask you to put a

14   document up again just for the witness and the Court, and we're

15   going to put up P27.

16          Is there any objection to this document?

17          MR. GAGE:  Just checking.  No.

18          MS. GREENE:  OK.  We can go ahead and publish this,

19   then, to the jury.

20          THE COURT:  Yes, you may.

21          MS. GREENE:  OK.  If we can — this is the first page

22   of — Mr. Yang, if you can flip to the second page.

23   Q.  In a moment we'll rotate the view, but do you recognize

24   this as a text exchange between you and Ms. Rowe?

25   A.  Yes.

1          MS. GREENE:  Are we able to rotate the view?  If not,

2     we're all going to be sitting sideways.  OK.  There we go.

3     Thank you, Mr. Yang.

4          THE WITNESS:  Thank you.

5     Q.   OK.  And this, if we remember, back from the early 2018

6     time frame, correct?  It's June 13, 2018.  I'm representing

7     that from the —— I'm sorry, June 14, 2018, from the first page.

8     I'm just telling you that's the ——

9     A.   There's no timestamp on this, so I don't know precisely.

10    Q.   Right.  And you're the column on the left here in this

11    exchange, correct?

12    A.   That's me, yes.

13    Q.   And you're discussing the VP financial services role with

14    Ms. Rowe, correct?

15    A.   Yes.

16    Q.   You wrote:  "I think the fact that he put in an email that

17    you'd be considered formally is an opportunity for you to earn

18    the spot, and it is unheard of in Google to go up a level,

19    never mind two, for an internal transfer."

20          What were you communicating in that text?  What were

21    you intending to communicate in that text?

22    A.   Positivity.  I think the fact that she got an opportunity,

23    she got the email, was fantastic.

24    Q.   And down below, you said:  "You are awesome, Ulku.  To have

25    a shot at VP after only being in Google for a year and some is

1   a big vote of support.  I recommend stepping out of yourself

2   for a moment and thinking about whether this is a negotiation

3   now or time to crush two other obviously inferior candidates."

4            Who were those two other candidates?  Did you know?

5   A.  I didn't know who they were.  I just assumed they'd be

6   inferior because I was a big fan of Ulku.  Still am.

7            MS. GREENE:  OK.  We can take that document down.

8   Thank you.

9   Q.  Do you recall telling people that if we're going to get

10  serious about financial services, Ulku is the type of person

11  who could really help us in that vertical?

12  A.  That sounds like something I'd say, yeah.

13  Q.  You were enthusiastic about her candidacy for the vice

14  president role, weren't you?

15  A.  I was.

16  Q.  As far as you are aware, does Google have any sort of

17  requirement that there be any certain number or any other

18  external candidates when hiring for a position?

19  A.  I'm not aware of any particular, like, metric or rule.

20  Q.  You're familiar with Google's hiring processes, right?

21  A.  I am.

22  Q.  And one part of that can include getting feedback from

23  Googlers who have worked with that person, correct?

24  A.  Yes.

25  Q.  No one contacted you for your opinion or experience in

1  connection with Ms. Rowe's consideration for the VP of

2  financial services role, did they?

3  A.  I don't recall being an internal reference for her, no.

4  Q.  And other than Brian Stevens, nobody else asked for your

5  opinion about Ms. Rowe, correct, and her candidacy for the VP

6  position?

7  A.  Not that I recall.

8  Q.  You did discuss Ms. Rowe for the VP position with

9  Mr. Stevens, correct?

10  A.  I probably would have, yeah, as my boss, yeah.

11  Q.  And do you recall Mr. Stevens being supportive of Ms. Rowe

12  for that position?

13  A.  I don't really recall any particular reaction.

14  Q.  Mr. Shaukat definitely didn't talk to you about Ms. Rowe

15  and her candidacy, correct?

16  A.  Not that I recall.

17  Q.  Ms. Rowe raised a concern to you that Mr. Shaukat wasn't

18  meeting with her, correct?

19  A.  She did.

20  Q.  And that she was concerned about the lack of meetings and

21  the infrequency of Mr. Shaukat meeting with her?

22  A.  Yeah.  You're referring to the time where she was already

23  on the team, correct?

24  Q.  Correct, after she had moved to Mr. Shaukat's team.

25  A.  Yeah, yes.

1   Q.   She raised those concerns with you?

2   A.   Yes.

3   Q.   Do you recall in — are you aware that in 2019 Google

4   undertook a leveling equity analysis?

5   A.   I don't remember exactly when it was, but there was

6   definitely — there was definitely analysis done.

7   Q.   And what did you understand the leveling equity analysis to

8   be?

9   A.   Just looking for inconsistencies and trying to make sure

10  that we rectified it using data.

11  Q.   And there was an acknowledgment that that was necessary

12  because leveling impacts pay, correct?

13  A.   Well, I don't — I wasn't part of deciding.  I wasn't that

14  senior.  I wasn't part of deciding why we decided to do it, but

15  I would assume that if we're doing it, it's because we want to

16  get it right.

17       MS. GREENE:  And I want you to, just for the witness,

18  put in Exhibit P73.  And if we can call out the company

19  announcement section.  Exactly, that portion of this.

20  Q.   Do you recognize this company announcement, or do you

21  recognize this as a company announcement?

22  A.   I recognize it as a company announcement.

23  Q.   And do you have any reason to think it was published on

24  March 4, 2019?

25  A.   No.

1    Q.  And is that around the time period that you recall Google

2    undertaking a leveling equity analysis?

3    A.  Yeah, looks like, from the article, they've run one every

4    year since 2012.

5         MS. GREENE:  We'd like to move this into evidence.

6    Are there any objections?

7         MR. GAGE:  There was never an objection to this, your

8    Honor.

9         THE COURT:  It's admitted.

10        (Plaintiff's Exhibit 73 received in evidence)

11        MS. GREENE:  Excellent.  Can we show and publish it to

12   the jury, please.

13        I want you, Mr. Yang, if you would, please, pull out

14   the section at the bottom that begins with "our pay equity

15   analysis."

16   BY MS. GREENE:

17   Q.  It says:  "Our pay equity analysis ensures that

18   compensation is fair for employees in the same job at the same

19   level, location, and performance, but we know that's only part

20   of the story, because leveling, performance ratings, and

21   promotion impact pay.  This year we are undertaking a

22   comprehensive review of these processes to make sure the

23   outcomes are fair and equitable for all employees."

24        Do you recall hearing, in sum or substance, about this

25   statement with respect to the analysis Google was doing?

NADHRow5                        Grannis – Direct

1   A.  I mean, I don't remember, like, you know, this particular

2   announcement, but this certainly — this announcement is

3   familiar.  So now, you know, seeing this, sure.

4   Q.  Do you know whether in 2019 any sort of leveling analysis,

5   equity analysis, was done within OCTO?

6   A.  I don't recall.  I don't think so.  That data would be

7   available to anyone because it would be in a centralized

8   system, so it wouldn't necessarily need to be OCTO-specific.

9            (Continued on next page)

1  BY MS. GREENE:

2  Q.  Do you know whether at any point in time anyone at Google

3  in connection with their job has done an equity analysis for

4  leveling in OCTO?

5  A.  I don't have firsthand knowledge, but it wouldn't surprise

6  me if they did.

7  Q.  Are you currently the lead of OCTO now?

8  A.  I am.  I've been the lead of OCTO since the beginning.

9  Q.  Well, are you now -- what is your current title?

10  A.  Sure.  I'm the chief technical officer, Google Cloud.

11  Q.  You replaced Brian Stevens; correct?

12  A.  Not right away.  So he departed in 20, I think, 19.  And

13  then for a period of time, I still managed the team, but I

14  wasn't the official CTO or replacement for Brian.  It was about

15  two years later that I was promoted and then CTO.

16  Q.  Is there anyone in OCTO who's more senior than you?

17  A.  No.

18  Q.  So would you know if they were doing an equity pay --

19  sorry, a leveling equity analysis in your group?

20  A.  Maybe.  I mean, they are under no obligation to tell me if

21  they do.

22  Q.  Nobody's told you that they have?

23  A.  No.

24  Q.  And has there ever been any changes to levels, people's

25  levels within OCTO that was dictated by somebody outside of

NADVROW6                    Grannis - Cross

1    OCTO, legal department or the HR department or ER department?

2    Did anyone ever tell you, you need to change this person's

3    level?

4    A.  Not that I recall.

5              MS. GREENE:  No further questions.

6              You can take that document down, please.

7              MR. GAGE:  Your Honor, just so I can plan, when did

8    you plan to take a break, so I can plan what to ask.

9              THE COURT:  I think that an hour and a half puts us at

10   about 3:20.  So 15 minutes.

11             MR. GAGE:  Okay.  Terrific.

12   CROSS-EXAMINATION

13   BY MR. GAGE:

14   Q.  Good afternoon, Mr. Grannis.

15   A.  Good afternoon.

16   Q.  A couple of items I want to cover before the break.

17             Do you remember earlier Ms. Greene asked you a

18   question about the particular group of technical directors

19   hired in the beginning, and she asked you whether these

20   candidates were hired -- whether the candidates hired into this

21   role needed to have a similar skill set, and then you gave an

22   answer, and then she played something from your deposition?

23   Remember that?

24   A.  I do.

25   Q.  Okay.  And when you answered the question in court, I think

1    you said no.  And then she played an excerpt from your

2    deposition where you said yes.  She asked you more questions

3    than that in your deposition, didn't she?

4    A.  She did.

5    Q.  Okay.

6    A.  I can also -- from a skills perspective, it's a -- it's an

7    odd construct because we're trying to build a team that

8    actually has very different, like, background experience and so

9    also come with different skills.  But in the hiring process we

10   have standardized areas that we look for.  And there's skills

11   and leadership, Googliness, GCA, role-related knowledge.  Those

12   are similar.

13           So it's a complex question because, you know, are you

14   looking for similar skills?  Yes and no.  We're looking for

15   dissimilar skills on the way in when we're recruiting, and then

16   the hiring process evaluates them on a standard rubric.

17           MR. GAGE:  Your Honor, I would like to play a more

18   complete clip from Mr. Grannis's deposition, including the

19   question that Ms. Greene played, and the following question and

20   answer.

21           MS. GREENE:  Objection.  He can ask -- I'm sorry, I

22   won't speak.  Objection.

23           MR. GAGE:  Counsel tried to show that he testified

24   inconsistent with what he testified to at trial.  And I believe

25   I'm allowed to show that his deposition testimony was

1    consistent with his trial testimony.

2               THE COURT:  The objection is overruled.

3               MS. GREENE:  What is the page?

4               MR. GAGE:  It is the excerpt that you identified, page

5    50, line 18, and you stopped on line 23 on page 50.  I want to

6    play the rest of page 50 and page 51 through line 10.

7               May we play it, your Honor?

8               THE COURT:  You may.

9               (Video played)

10              MR. GAGE:  Thank you.

11   BY MR. GAGE:

12   Q.  The next point I'd like to ask you about, Mr. Grannis,

13   Ms. Greene asked you some questions about a concern that

14   Ms. Rowe raised about her level with you and Ms. Lawrence.  Do

15   you remember that line of questioning?

16   A.  Yes.

17   Q.  Okay.  Did you believe at that point in time that there was

18   any reason to change Ms. Rowe's level?

19   A.  No.

20   Q.  You were -- different topic.  You were asked about an

21   Exhibit P-27, which looked like a chat between you and

22   Ms. Rowe, do you remember that?

23   A.  Yes.

24   Q.  We all had to turn our heads sideways for.

25              You didn't know who any of the other candidates were

1  for the financial services vertical lead role, right?

2  A.  No, I just assumed she would be a top candidate.

3  Q.  And in fact, the reason that you referred to two candidates

4  was because she told you that she knew there were two external

5  candidates, right?

6             MS. GREENE:  Objection.

7             THE COURT:  Sustained.

8  Q.  What led you to believe there were two external candidates?

9  A.  Because I had a conversation and it was shared that there

10  were other candidates.

11  Q.  Was that conversation with Ms. Rowe?

12  A.  Yes.

13  Q.  Now, were you at all involved in the process of defining

14  that role, the financial services vertical lead role in Tariq

15  Shaukat's organization?

16  A.  No.

17  Q.  Were you at all familiar with the thinking about the scope

18  of responsibility for that role?

19  A.  No.

20  Q.  Switch to a different topic.

21             Ms. Greene asked you a number of questions about

22  whether Ms. Rowe ever came to you expressing concern that Tariq

23  Shaukat wasn't meeting with her.  Do you remember those

24  questions?

25  A.  Yes.

NADVROW6                         Grannis - Cross

1   Q.  Did Ms. Rowe ever tell you what specific direction she was

2   looking for from Mr. Shaukat?

3   A.  No.

4   Q.  Did you get an impression one way or the other whether she

5   was looking for direction from Mr. Shaukat?

6   A.  No.

7   Q.  Was Ms. Rowe as a technical director in OCTO at the time

8   who was transitioning over to Mr. Shaukat's organization, was

9   she an independent contributor -- individual contributor?

10  A.  Yes.

11  Q.  And was she expected to act independently?

12  A.  Yeah, that's the hallmark of executive hires, is they act

13  independently, exercise judgment, so yes.

14  Q.  Okay.  Another preliminary question:  Towards the end of

15  her examination, Ms. Greene asked you whether you were ever

16  aware of any leveling analysis of the employees in OCTO.  Would

17  you necessarily be told if one was done?

18  A.  No.

19  Q.  And why do you say that?

20  A.  I think about it in two ways.  One, the data is there, so

21  that if someone wanted to run an analysis, they wouldn't need

22  to tell me that they were going to run an analysis.  And

23  secondly, the organization might think it's better for, you

24  know, the leader of a group who's undergoing analysis not to

25  know that there's an analysis going on.

NADVROW6                          Grannis - Cross

1    Q.   Why is that?

2    A.   Just because it's very reasonable before you have any

3    conclusion, you know, I think if someone was to tell me they

4    are running an analysis for whatever reason on my team, it

5    would immediately cause concern.  And I think before the data

6    was available, you try not to cause people concern.

7    Q.   Now, I'd like to take a step back, Mr. Grannis, and ask you

8    some questions about your background.

9         Where did you go to college?

10   A.   I went to West Point undergrad, and Penn grad school.

11   Q.   Okay.  You went to West Point.  Did you serve after that?

12   A.   I did.  I served for five years on active duty, and then

13   two and a half years on active reserve.

14   Q.   And after your military service, what did you do next in

15   your career?

16   A.   I went to a small company, and I was like employee number

17   9.  And I was the head of product for the satellite transceiver

18   that we were building for the U.S. military and commercial

19   customers.

20   Q.   Okay.  And how long were you with that company?

21   A.   With that company for about a year and a half.  And we had

22   rapid growth.  Stock was in a pretty good place.  My wife

23   wanted to go back west to Seattle, where both my daughters were

24   born and she was from.  So I went and picked up with Boeing.

25   Q.   That company that you were with, what was it called?

NADVROW6                          Grannis - Cross

A.   Comtech Mobile Datacom.

Q.   And you indicated how large it was when you started there.
How large was it when you left?

A.   Well, we had, like, roughly ten or 11 people when we
started; ended up with probably over 150, 160 in the year and a
half.

          We created a thing called blue force tracking, which
basically allowed anybody in the military at the vehicle level
or the individual level to know where people were based on
complex satellite communications.  And the reason that was so
important is because we were at war.  And knowing where, you
know, the truck to the left and the truck to the right or the
person to the left or the person to the right was was critical
in avoiding potential fratricide.  So we displaced a huge
incumbent; it was a pretty big success.

Q.   What, if any, involvement did you have in the development
of that product?

A.   I was the head of product.  So everything from, you know,
technical design, there was a digital -- the core of the
intellectual property was a digital signal processor that sits
inside a housing.  And based on modulating the energy, like
timing the energy, you can give it properties, signal
properties.  And so we modified it so that the signal
properties would be less detectable by adversaries, but also
have enough information in them so that it would convey

location data.  That was the whole positioning, anti-fratricide

capability.

         But I also did things like test pressure seals with a

high-pressure hose out in the front yard of a house to make

sure that when we deployed them to troops, that the top didn't

pop off and stuff, so -- every job.  Every job.

Q.  And what other jobs did you have -- after that start-up,

what did you do at Boeing, and then just bring us up to the

point before you joined Google.

A.  Okay.  So at Boeing, because my wife wanted to make the

move really quickly, you know, I had to find a job that was

available.  So I went and started in the research and

technology division at Boeing.

         Fun fact:  I was a Level 2 engineer when I started,

which is just above intern; but for me, I didn't care, one,

because just had a really great success with a start-up; but,

two, it was about the family.  So I figured, you know, I'd be

able to kind of pull myself up through the org if I did a good

job.

         So started as a level 2.  And within a few years, I

had created some programs that generated about a billion

dollars in revenue, so I got pretty rapidly promoted through

the org.

         The next job after that was leading all of our defense

and intelligence business in North America, which is about a

NADVROW6                    Grannis - Cross

billion and a half in revenue, complex products for many, many

customers.  And then the CEO made me the lead for kind of an

incubating technology organization that we had, it was called

Phantom Works.  And what Phantom Works did is in the advanced

research and development arm of Boeing.

          And what we did there was cutting-edge stealth

technologies, high-performance computing, machine learning,

cyber security.  So pretty much anything in ones and zeros was

my responsibility at the time that I decided to leave Boeing.

          After that, I decided to start my own company because

I had observed a phenomenon happening while I was at Boeing, a

problem.  Weapons of mass destruction, the supply chain.  I was

trying to figure out if we could, using open-source data,

figure out where the supply chain for weapons of mass

destruction might be originating and kind of happening in the

world.

          So I bootstrapped the company.  I quit my job, which

my wife to this day still says freaks her out.  Two young

girls.  But I was just really on fire about this idea.  And so

I started a company, got a couple of laptops, and shared office

space and went to work.  And created a company that, in the end

that we sold, we proved that you could use open-source

technology, unsupervised machine learning, streaming analytics

to actually detect the beginnings of the supply chain for

weapons of mass destruction movement, which is very scary.

NADVROW6                         Grannis - Cross

1            And after that I went to be the CTO of a company

2     called L3, which is a diversified electronics manufacturer, as

3     well as cyber security, data analytics, machine learning.  And

4     there, my responsibility was everything; product roadmap,

5     success with customers.

6            And it was there that my data science team and I were

7     working on a problem taking all of the media events that occur

8     every day, and trying to figure out if you could -- this was

9     like 2013.  We were trying to figure out if we could look at

10    media events happening every day and see if -- and determine

11    sentiment from those media events, kind of figure out which way

12    the sentiment of certain, like, news and media was leaning.  So

13    this was pretty cutting-edge stuff in 2013.

14           And my lead data scientist, Amanda, who I still

15    remember today, she came to me one day and said, We can do it,

16    but it's going to cost us $4 million.  I said, That's not going

17    to work.  Try again.

18           And she went and found a company, a technology called

19    BigQuery, which at the time was actually Google.  So Google had

20    taken this analytics engine that existed internally, and they

21    were about to put it external.  And they had shared it so that

22    you could just drag data and get analysis for pennies, where it

23    would have cost you millions of dollars.  And as soon as I

24    experienced that, I knew I had to be part of Google.

25    Q.  That brings us up to Google.

1    A.   That brings us up to Google.

2    Q.   I'm going to stop you there.

3              MR. GAGE:  Judge, is now the time you want to take the

4    break?

5              THE COURT:  Yes.  Thank you.

6              All right.  So members of the jury, we're going to

7    take our mid-afternoon break now with refreshments.  Please

8    remember not to talk to each other about the case, don't speak

9    to anybody else about the case or communicate in any way with

10   anyone else about the case.  Do not do any research.

11             And we'll see you back here at 3:35.

12             (Jury not present)

13             THE COURT:  Hold on one minute, everybody, after

14   Mr. Grannis exits.

15             (Witness not present)

16             THE COURT:  Two quick things.

17             One, when I ruled earlier on P-17, I believe I said

18   that any probative value -- you may sit down.  Any probative

19   value of that document was outweighed by the risk of unfair

20   prejudice to Google.  My decision is that any probative value

21   of that document is substantially outweighed by the risk of

22   unfair prejudice to Google.

23             I also want to say that we are having too many

24   sidebars in here and they are too long and it needs to stop.

25   One thing that has happened at several sidebars is that the

1  parties — sometimes before I've had a chance to say anything —

2  are coming up with solutions amongst themselves.

3          After today, we're not back here until Wednesday.  I

4  am directing you to figure out which exhibits each party

5  intends to use from here in this trial, and meet and confer

6  about any exhibits as to which there are pending objections,

7  and figure out if you can come up with a solution.

8          All right.  That's all for now.  I'll see you at 3:35.

9          MR. GAGE:  Understood, your Honor.

10          Your Honor, can we just ask how late are we going to

11  go today?

12          MR. GAGE:  I'm anticipating I will certainly finish

13  with Mr. Grannis.

14          THE COURT:  How much more do you have with him?

15          MR. GAGE:  Forty-five minutes.

16          THE COURT:  Forty-five minutes.

17          Okay.  Well, that probably takes us to the end of the

18  day, right?

19          MR. GAGE:  Okay.  I was just wanted to know how late.

20          THE COURT:  I think so, because if we start again at

21  3:35 and we do 45 minutes, we're not going to start -- this is

22  what Ms. Greene raised with me yesterday.  Are we going to cut

23  it a little bit short as opposed to starting somebody else and

24  then leaving in the middle.  Is that -- Ms. Greene, you're

25  looking --

NADVROW6                    Grannis - Cross

1              MS. GREENE:  Well, your Honor, we've had a witness

2        waiting outside all day.  And I understand we're not going to

3        be able to get to him.  He waited outside all day yesterday

4        too.

5              THE COURT:  Who is it?

6              MS. GREENE:  Nick Harteau.

7              THE COURT:  All right.

8              MR. GAGE:  That's happened to a lot of --

9              MR. CHIARELLO:  Is it fair to release him?

10             THE COURT:  I mean, do you want -- we could go -- what

11       did I say, 3:35?  So we could go with him -- you're going to do

12       45 minutes.  Want to do 20 minutes or 25 minutes with him?

13             MR. GAGE:  That assumes that they've got no redirect,

14       I just want to point that out in the calculation.

15             THE COURT:  Well, he'd have to come back.

16             MR. CHIARELLO:  Then I guess the answer is just to

17       wait and see where we are and how much time we have left.

18             MR. GAGE:  It occurred to us, your Honor, I remember

19       when we picked the jury, I think you told them through the

20       18th.  Just raising the question whether or not and when -- you

21       might want to let them know that it looks like we're going to

22       the 19th.  Hopefully, we don't lose anybody; but it's something

23       to put on the radar screen.

24             MS. GREENE:  Your Honor, given where we are and given

25       that even if we start Mr. Harteau he'd have to come back on

NADVROW6                    Grannis - Cross

1   Wednesday, can we ask to release him?

2            THE COURT:  Yes.

3            MS. GREENE:  We're going to do that then.  Thank you.

4            (Recess)

5            (Jury present)

6            MR. GAGE:  May I proceed, your Honor?

7            THE COURT:  You may.

8   BY MR. GAGE:

9   Q.  Mr. Grannis, if you work at Google, does one need to be

10  comfortable with ambiguity?

11  A.  Yes.

12  Q.  When you were first hired, the day you started, did you

13  actually take the job you applied for?

14  A.  No.  Three times in the recruiting process I was told that

15  the job that I was interested in no longer existed.  And even

16  the day I showed up, I found out that I was going to be doing

17  something a little bit different than I was planning to do.

18  Q.  Once you finally started, what were you doing?

19  A.  Sure.  So I was the first, kind of, product-oriented hire

20  into what was then called Google for Work.  So the way --

21  Google Cloud didn't exist as an entity at that time.  We had

22  kind of an overlay on top of our product that was really just

23  focused on selling Google product to enterprises, companies.

24  And so they had never put a product person, and that's what I'd

25  been doing my whole career is building things.  They never put

1    a product person in the middle of that or it was normally more

2    associated with the go-to-market functions, like sales

3    marketing.

4            And what they wanted me to do was take our products,

5    figure out how they are combined, and solve really hard

6    customer problems.  For example, like gaming.  Problem in

7    gaming is that sometimes it's hard to track -- at that time, in

8    2015-ish, it's hard to track a player's journey through a

9    mobile game and provide them, you know, like, opportunities to,

10   you know, like, buy more diamonds or buy more jewels.  These

11   things -- these companies were trying to figure out how to

12   advance their product.

13           And so my job was to take all of the products that

14   Google had and try to rationalize them down into these kind of

15   combinations of products that would allow a gaming company to

16   do high-performance analytics on the fly like in a mobile game.

17   Q.  Did there come a point early in your career at Google when

18   you were asked to do something different than that?

19   A.  Yes.

20   Q.  And when approximately was that?

21   A.  It was about a year into my time.

22   Q.  And who approached you?

23   A.  I got a ping from Brian Stevens.

24   Q.  And what was Brian Stevens' position at the company at the

25   time?

NADVROW6                          Grannis - Cross

1   A.  He was head of product management.

2   Q.  And what did Mr. Stevens ask you -- what did he ask you to

3   do?

4   A.  He didn't ask me to do anything.  He pinged me and he said,

5   Hey, I need your opinion on something.

6           And I said okay.

7           And he said, a couple of -- the leadership has decided

8   we're going to stand up, kind of a -- we're thinking about

9   standing up -- I don't think he was as definitive saying we've

10  decided, but we're thinking about standing up a CTO function to

11  bridge -- because at that time, when you start working with big

12  companies, they have really senior people in technology, and

13  they want to deal with somebody very senior on the other end.

14  And Google had always been kind of like we put our engineers,

15  our frontline engineers, in front of some very senior

16  customers.  So they dazzled them with technology, but they

17  didn't really understand, you know, the pain points that those

18  companies were going through.

19          And they said, Hey, we're going to build a function

20  like this, what do you think?

21          And I said, It's going to be a disaster.

22  Q.  I want you to help us with a definition.  We've heard the

23  phrase CT -- acronym "CTO," chief technology officer.  Can you

24  just briefly describe to the jury what chief technology officer

25  means in the context you're speaking of?

NADVROW6                    Grannis - Cross

A.   Sure.  And it actually goes to -- I guess I kind of left a
cliffhanger there of, like, why, you know, I said a disaster.
It's because Google didn't have CTO.  CTOs in my parlance
outside of Google, they were the senior-most technical person
reporting to a CEO that had total authority, accountability for
all the technical decisions and all the budget decisions
related to technology in an organization.

         And I thought that it was going to be very, very
difficult to convince Google, you know, to do that.  And so
that's why, you know, my initial reaction to Brian was, We have
to be ready to commit, you know, very senior level resources
that the customer would immediately recognize as peers.  But
those peers were the CTO of a company, like a D person
reporting to a CEO.

Q.   Did you at some point agree to take on that role of
starting the office of the CTO?

A.   Yes.

Q.   Okay.  And when you agreed to do that, at the time you
agreed to do that, what level were you?

A.   8.

Q.   And when you agreed to do that, you started building the
office of the CTO, did you get a promotion?

A.   No.

Q.   Did you get a raise because you took on those
responsibilities?

NADVROW6                          Grannis - Cross

1    A.  No.

2    Q.  Did you just start building?

3    A.  Yes.

4    Q.  Now, I'd like to talk a little bit about the job of

5    technical director.  I think you testified earlier that it was

6    primarily an engineering job.  What do you mean by that, that

7    it's primarily an engineering request job?

8    A.  Well, because it's in the engineering hierarchy.  There are

9    other CTO organizations in other companies, but they are in the

10   sales function.  And their primary -- having been in quite a

11   few big companies and around this for a while, organizations,

12   they take on the shape of where they're -- like, where they

13   report to.

14        So reporting into engineering meant we had to be

15   really on the cutting edge of research and development cloud,

16   very technical things.  Whereas, if we were in the sales org,

17   like many, many CTO offices in the industry at that time, we'd

18   have more sales objective functions.  So like help close a

19   deal, go drive top of the funnel, so like interest in the

20   platform.  But we purposefully made a decision to put it in

21   engineering because we thought that was most credible for

22   Google.

23   Q.  Ms. Greene asked you a lot of questions around the early

24   stages when you were hiring technical directors and around

25   decisions about Level 8s and Level 9s.  During that period of

NADVROW6                          Grannis - Cross

1    time in 2016 and 2017, did you turn to or rely on any existing

2    structures in the engineering organization to distinguish

3    between Level 8s and Level 9s?

4    A.  Unfortunately, there really wasn't a proxy for this.  And

5    also, there were so few L9s and L8s just in Google in general

6    at that time.

7            I think, coming from, like, big enterprise like

8    Boeing, we had a lot of VPs and we had a lot of, like,

9    directors.  At Google, we had hardly any.  It was very rare to

10   run into a VP or even a director at that time, which made

11   our -- like, this function so, like, interesting, but also

12   needed to be, you know, defined and put down on paper.

13   Q.  I'd like to show you a document — and this is just to show

14   the witness — D-38.

15           MR. GAGE:  This is not evidence, your Honor.  I just

16   want to ask the witness some questions about it.

17   Q.  Mr. Grannis, first, not specifically about this document,

18   but at the time, were there engineering leveling guides at

19   Google?

20   A.  Yes.

21   Q.  And did the engineering leveling guides that existed at the

22   time provide any direction as to distinctions between a Level

23   7, a Level 8/a Level 8 and a Level 9 in terms of what was

24   expected?

25   A.  It provided distinction.  So there was, I think, up to a 7

1    and.  Then there was an 8 plus.

2    Q.  Okay.  I want to again just show you this document and draw

3    attention, Jean, if you would, to the bottom half of -- I think

4    it's the second page.  If you could make that a little bigger.

5         Take a look at that, Mr. Grannis.  Does that refresh

6    your recollection -- we can go back to the first page of this,

7    Jean.  Does that refresh your recollection as to whether there

8    existed some engineering guidance on that?

9    A.  It does.

10             MS. GREENE:  Objection.

11             THE COURT:  What's the objection?

12             MS. GREENE:  Deals with the date of the document and

13   the question that was asked.

14             MR. GAGE:  Your Honor, I just asked if it refreshed

15   his recollection.

16             THE COURT:  What time period are you asking him about?

17             MR. GAGE:  I just asked if it refreshed his

18   recollection.  I'm actually going to move to a different

19   document, a plaintiff's exhibit, next.

20             THE COURT:  I'm not quite sure I am getting the

21   objection.

22             MS. GREENE:  If he's moving on, then --

23             THE COURT:  Okay.

24             MR. GAGE:  Now you can take this down.

25             I'd like to put Plaintiff's Exhibit 8 up.  And Jean,

1   if you could expand, if you remember the same section that

2   Ms. Greene expanded.  Yes.  That's exactly it.

3   BY MR. GAGE:

4   Q.  Do you see -- you looked at this document earlier,

5   Mr. Grannis?

6   A.  Yes.

7   Q.  It's an email from Melissa Lawrence to people on your team,

8   including Ms. Rowe; correct?

9   A.  Correct.

10  Q.  And does this document refer to engineering leveling guide?

11  A.  It does.

12  Q.  Okay.

13          MR. GAGE:  You can take that down.

14  Q.  And to the extent the other document refreshed your

15  recollection, what are some of the distinctions between -- in

16  the engineering space at Google, 2016/2017, what are some of

17  the distinctions between an L8 and an L9?

18  A.  Well, an L8 generally -- well, it's probably easier to go

19  in reverse.  So L9 -- at L9, someone's a world class expert in

20  a topic.  So this could be -- you know, in the engineering

21  world it would be, you know, networking or high-performance

22  computing or AI.  There's someone that everybody would know who

23  that is.  People like that had -- were primary explorers of the

24  frontier of that technology at Google.  So not only were they

25  experts, but they were also really pushing the frontiers of

NADVROW6                         Grannis - Cross

1    what was possible.

2              So for example, an L9 might figure out a completely

3    different way to do storage.  So instead of, like, a little

4    spindle that moves on those disks sometimes, like actually like

5    reducing the amount of spindle travel in a disk to save energy

6    and wear on a disk that might make storage last longer and be

7    less expensive.  Very, very nuanced, deep, technical topics

8    like that.

9              A Level 8 would be someone who's probably recognized

10   like -- like in like a -- like a localized way, you know.

11   They're probably not -- they're probably not -- you know, they

12   haven't created or done these things of distinction yet, but

13   they've got really great, kind of, underlying skills, and

14   definitely the potential to be a 9.  But they wouldn't be

15   recognized as a world class expert.  Maybe they are an expert

16   in like an industry or in their own company or in a small

17   group.

18   Q.  Okay.

19             MR. GAGE:  Can we put up, Jean, Plaintiff's Exhibit 3.

20   Q.  Can you take a look at this, Mr. Grannis.

21             Do you recognize this document?

22   A.  Yes.

23   Q.  This document, it says:  Our ideal candidate is creative,

24   curious, and a diligent problem solver.

25             Why were you looking for people like that?

NADVROW6                        Grannis - Cross

A.  Because we were really forging a path that was new.

              Google is a company filled with incredibly talented
engineers and all other functions.  And so to try to put
together a team that was going to be able to succeed in an
environment like that, where everybody was already so highly
qualified, means that we were going to have to show up as,
like, you know, with our customers and our internal
collaborators.

              What are the biggest problems you're solving?  What
are the things that you're running into?  How can we go and
create some code to try to figure out how to solve those things
in new ways?

              So it wasn't just about what someone knew at the time
they showed up.  It was really were they willing and were they
ready to learn a lot more.  And were they willing to be
influenced and impacted by the people they dealt with.  Because
remember, we're also constructing a team where nobody -- we
were trying not to have overlap in skills and background.  So
if we had person A, and they were background in networking, we
wanted person B that had a background in processor design; and
then we wanted C, who might be a security expert.

              So we're also assembling a dissimilar team.  So for
the team to function, they had to also collaborate; they had to
be really interested in collaboration.

Q.  Got it.

NADVROW6                         Grannis - Cross

1             Now, I think below that, it says:  As a technical

2   director, your days may include private whiteboarding sessions,

3   public evangelism, deep dives with internal engineering teams

4   on key use cases for a given launch, and/or leading across

5   Google technical working teams through critical engagement with

6   a global brand CIO.  How much are technical directors expected

7   to roll up their sleeves and actually code and do the

8   engineering work?

9   A.  Significant amount.  And it's gotten even -- over time, it

10  increased even more.  It was already a pillar at the beginning.

11            So you can see words like "private whiteboarding

12  sessions with a Fortune 500 CTO."  That puts a pretty high bar

13  on someone to be able to independently -- imagine you close the

14  door, and with you is a world expert in something, right, the

15  CTO of this organization.  And you had to be able to go

16  toe-to-toe with them on a range of technical topics,

17  engineering topics, culture topics.  I mean, it is a really

18  difficult thing to do.

19            And you also see here, like, deep dives with internal

20  engineering teams.  You know, over time, we also evolve not

21  just from, like in 2016, the use cases, but, you know, over

22  time, creating code has also been really, really important to

23  this group.  Because nobody likes someone who just shows up and

24  pontificates for a while.  Like, at some point, please show me

25  what you're talking about.  Give me an artifact.

NADVROW6                    Grannis - Cross

1   Q.  Got it.

2   A.  And so that really drove in what we've learned, even since

3   2016, is how important, you know, those artifacts are to

4   success.

5   Q.  As the chief technology officer, do you still write code?

6   A.  I do.  It's not good, and I wouldn't put it into production

7   at Google.  But I do.  I mean, I've done everything from try to

8   learn how to down-sample machine learning models from -- you

9   know, like one that would run in a data center, down to one

10  that would run on, like, a badge reader.  So you don't have any

11  memory, you don't have any frameworks; you literally have to

12  figure out how to hack this model from one place to another.

13  Q.  Got it.

14       MR. GAGE:  You can take that down, Jean.

15  Q.  You were asked some questions about the hiring process by

16  Ms. Greene.  Specifically, you were asked around -- questions

17  around who actually makes the leveling decision.  And you

18  testified that the recruiter starts with a hypothesis.

19       What happens after that initial hypothesis is posed

20  about a candidate, the hypothesis is this candidate is an 8.

21  What happens after that?

22  A.  They interview.

23  Q.  And what does that process do to the hypothesis?

24  A.  It tests it.

25  Q.  How?

NADVROW6                    Grannis - Cross

1    A.  Because at that point now, you have a panel of people

2    ranging from, you know, very senior people, you know, above L9;

3    you'd have VPs in the panel, plus you'd have L8s and plus you'd

4    have L9s in the panel quite often.

5           And it was meant to bring out and really showcase,

6    honestly, the candidate's like best -- like where they were

7    going to make an impact and how deep that impact would be, and

8    also what kind of expectations we should have as a company.

9    Because if we hired them, we really wanted them to succeed as

10   well.  So it would go from that.

11          And then there was -- you know, I would look across

12   the panel in the interview and the results.  I would look for

13   consistency.  Is there something that doesn't match up?

14   Sometimes I would dig in and I would create these what they

15   call statement of support.  And a statement of support was me

16   saying, you know, This thing is consistent and I endorse; or

17   sometimes some things were -- they were like differences of

18   opinion or like little things that seemed incorrect.  So I'd

19   also put in evidence I collected to clear those concerns.  And

20   then we would send it to the review board.

21   Q.  Got it.

22          We'll come back to that in a little bit and some

23   specific statements of support.

24          I want to talk about the difference between L8s and

25   L9s in terms of expectations.

1            Was there a difference in OCTO in 2016/2017, and still

2      today, is there a difference in performance expectations

3      between an L8 and an L9?

4      A.   Absolutely.  An L9, we would expect that person, you know,

5      kind of -- you mentioned earlier leveling guidelines and other

6      things, general leveling guidelines.  We would expect someone

7      coming in at L9 to be a pace-setter for the organization;

8      someone who could move across any one of those three categories

9      at an expert level.

10           So they would have to have deep technical

11     understanding related to Cloud, related to things that were

12     germane to our business; they'd have to have deep industry

13     expertise or deep, like, customer expertise; and they'd have to

14     be great sharing our message or influencing the market

15     externally.  And those three things are extremely difficult to

16     find at any level, much less find somebody who's great at them

17     all at the beginning.

18     Q.   When you're evaluating the performance of an L9, are you

19     holding them to that higher bar?

20     A.   Absolutely.

21     Q.   And when you're evaluating someone who's an L8 in their

22     performance, are you holding them to a lower bar?

23     A.   Yes.

24     Q.   And if someone gets and an "exceeds expectations" as an L8,

25     is that the same as someone getting an "exceeds expectations"

1   as a Level 9?

2   A.  No.

3   Q.  We'll come back to that in a little bit.

4           I think you testified earlier that just being a Level

5   9 does not necessarily mean higher pay; is that right?

6   A.  Correct.

7   Q.  Does it mean that the person has the potential to earn

8   higher pay?

9   A.  Yes.

10  Q.  Do L9s always earn more than L8s in your organization?

11  A.  No.

12  Q.  When Ms. Greene asked you about a specific group of people

13  by name in that early phase of hiring, but after Mr. Eryurek,

14  were you hiring technical directors in OCTO continuously for a

15  period of time thereafter?

16  A.  Yes.  We were hiring -- we went from probably like 17, 18,

17  to about 30, you know.  But all of those, you know, like, one

18  at a time, one at a time, one at a time, but at a pretty fast

19  clip.  And then we continued to hire, but it's much less

20  frequent than it used to be in the early days.

21  Q.  Okay.  Did you continuously hire through 2017 into 2018?

22  A.  Yes.  We've hired people every year I've been at OCTO.

23  Q.  Who is Scott Penberthy?

24  A.  Scott Penberthy, he's a technical director in the office of

25  CTO.

NADVROW6                          Grannis — Cross

1    Q.   We'll take it a little bit at a time here.

2              When was Scott Penberthy hired into the office of the

3    CTO?

4    A.   It would be very early on, so it would be 2017 or 2018,

5    somewhere in that.

6              MR. GAGE:   I'd like to show the witness — just show

7    the witness — Exhibit D-44.

8              (Continued on next page)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

NADHRow7                    Grannis - Cross

1   BY MR. GAGE:

2   Q.  To the best of your recollection, was Mr. Penberthy hired

3   around the same time as Ms. Rowe?

4   A.  Yes.

5   Q.  And what do you recall about Mr. Penberthy's qualifications

6   when he came to OCTO?

7   A.  Well, first, just the depth of AI expertise.  He had a

8   Ph.D. in AI.  And also that he had worked as a technical

9   adviser to the CEO of IBM.  And the reason that's a really big

10  deal — so in the tech world, we had these roles called

11  technical adviser.  You could argue that OCTO is a form of a

12  technical adviser org.  And generally speaking, if you were at

13  one of the other big tech companies and you were a technical

14  advisor to the CEO, you'd be handpicked by the CEO to follow

15  them around for a year or two and advise them on any technical

16  matter that they were working on.  And then generally speaking,

17  when you leave the technical adviser role, you become the head

18  of a massive part of the organization.  So, for example, the

19  person who was the tech adviser to Jeff Bezos, Andy Jassy,

20  became the head of AWS.

21  Q.  One last quick question about Exhibit D44.  Is this the

22  hiring packet for Mr. Penberthy?

23  A.  It is.

24          MR. GAGE:  Your Honor, I would move the admission of

25  this document.

1              MS. GREENE:  Your Honor, I believe this is subject to

2      a limiting instruction.

3              THE COURT:  One moment.  This is the same limiting

4      instruction I gave this morning, correct?

5              MS. GREENE:  Yes, your Honor, I believe so.

6              MR. GAGE:  It's not offered for the truth, your Honor.

7              THE COURT:  I get that part, but, yes, relating to

8      hiring-related materials?

9              MR. GAGE:  Yes, exactly.

10             MS. GREENE:  Yes.

11             THE COURT:  So members of the jury, you are about to

12     see an exhibit marked Defendant's Exhibit 44, which consists of

13     hiring-related materials.  This evidence is admitted for a

14     limited purpose.  It is admitted only for its effect on anyone

15     who reviewed these materials.  You may not consider these

16     hiring-related materials for their truth; meaning, you may not

17     consider them as evidence that Mr. Penberthy ——

18             MR. GAGE:  Penberthy.

19             THE COURT:  —— Penberthy actually had the

20     qualifications reflected in these materials, for the financial

21     services vertical lead position ——

22             MS. GREENE:  Or technical director in OCTO.

23             THE COURT:  —— or for technical director in OCTO.  You

24     may give this evidence such weight as you feel it deserves, but

25     only for the limited purpose for which it has been offered.

1    You may not use this evidence for any other purpose.

2              (Defendant's Exhibit 44 received in evidence)

3              MR. GAGE:  Your Honor, I'm going to have some others

4    just like that.  Can your Honor just indicate that this

5    instruction will apply to those, too, so you don't have to say

6    it every time.

7              THE COURT:  It's two more?

8              MR. GAGE:  I think it's just a couple more, but I will

9    indicate which ones they are, if that's all right.

10             THE COURT:  They are also hiring-related materials?

11             MR. GAGE:  They're hiring-related materials,

12    absolutely.

13             THE COURT:  So this instruction also applies to two

14    exhibits coming soon.  Are they going to be the next two

15    exhibits?

16             MR. GAGE:  Yes, there are a —— it might not just be

17    two.  There might be a couple of others.

18             THE COURT:  OK.  I will ——

19             MR. GAGE:  I will alert you.

20             THE COURT:  OK.

21             MR. GAGE:  May we publish this to the jury?

22             THE COURT:  Yes, you may.

23    BY MR. GAGE:

24    Q.  Mr. Grannis, a few minutes ago you talked about a statement

25    of support, and you said that in your role in 2016, 2017, 2018,

NADHRow7                        Grannis - Cross

1    you would write a statement of support for a candidate in

2    support of their hiring, and that was also in connection with

3    the leveling.  Is that right?

4    A.  Yes.

5    Q.  And does this document, D44, contain your statement of

6    support for Mr. Penberthy at the bottom?

7         Can you just zoom in on that, Jean.

8    A.  It does.

9    Q.  OK.  I just have a couple other questions about

10   Mr. Penberthy.

11        You said that he worked at IBM.  Ms. Rowe testified

12   earlier in the trial that he came from PWC.  Did he come from

13   PWC as well?

14   A.  He also came from PWC.

15   Q.  And what was your understanding of the work that he had

16   done at PWC?

17   A.  Very much customer-facing engagements, client engagements,

18   and combined with the technical expertise.  That was a pillar

19   that we were looking for as well.  It was more of the

20   custom-facing pillar, that particular piece of experience.

21   Q.  And Ms. Rowe testified in the trial that she believed she

22   was more qualified than Mr. Penberthy for the technical

23   director role.  Do you agree with that?

24   A.  I don't.

25   Q.  And what level was Mr. Penberthy hired at?

1   A.  8.

2              MR. GAGE:  You can take that down, Jean.

3              Now I'd like to go to Exhibit D26.  Your Honor, this

4   is another hiring packet, Ms. Rowe's hiring packet, so same ——

5              THE COURT:  So this exhibit, D26, is also admitted

6   only for its effect on anyone who reviewed these materials,

7   which are hiring-related materials.  You may not consider them

8   for their truth; meaning, you may not consider them as evidence

9   that Ms. Rowe actually had the qualifications for the technical

10  director in the office of the CTO or OCTO.  You may give this

11  evidence such weight as you feel it deserves, but only for the

12  limited purpose for which it has been offered and for no other

13  purpose.

14             (Defendant's Exhibit 26 received in evidence)

15  BY MR. GAGE:

16  Q.  Mr. Grannis, do you recall how Ms. Rowe came into the

17  candidate pool, if you will, for OCTO?

18  A.  I do.

19  Q.  And how did she come into the candidate pool?

20  A.  Recruiting let me know that there was a candidate that

21  didn't get selected for another job in engineering but had a

22  background that might be really interesting to OCTO.

23  Q.  And what was interesting about her background to OCTO?

24  A.  A combination of financial services, which we had said we

25  were really looking for deep expertise in financial services,

1   and then also a technical background.

2                MR. GAGE:  And if we could just flip to the next page

3   of this exhibit, Jean.

4   Q.  Now on this screen here, Mr. Grannis, there are a bunch of

5   numbers on the left side and then there's a column with names

6   and titles.

7                And, Jean, if you can go back to the prior page so we

8   can see the top of that.  And it's all under the heading

9   "Interviews:  Technical director, Office of the" ⸺ there we

10  go.  Let's just leave that up right there.

11               Can you describe ⸺ let's start from the left and then

12  work across to the right.  What is the 3.2 then what's to the

13  right, what does that mean?

14  A.  Sure.  So when we interview candidates at this time we had

15  a scoring range, and it goes from 0 to 4, and 3.2 would have

16  indicated where that candidate fell on the scale according to

17  the interviewer.

18  Q.  And then what's next to the right of that?

19  A.  The interviewer's name, their role, and the number of

20  interviews they had conducted since being at Google.

21  Q.  And what is the number of interviews they'd conducted,

22  what's that relevant to?

23  A.  It's relevant to are they calibrated, have they seen

24  enough, you know, packets and candidates that we would have

25  high confidence in their ⸺ in the score that they're giving.

NADHRow7                          Grannis - Cross

1   Q.  So does that mean that interviews conducted by people who

2   had done more interviews are worth something different than

3   interviewers' opinions of people who had done fewer interviews?

4   A.  It was essentially a piece of data that we looked at,

5   especially if there was a disconnect in ratings.

6            MR. GAGE:  Jean, can you go to the statement of

7   support for Ms. Rowe and highlight that.

8   Q.  Is this the statement of support that you wrote for

9   Ms. Rowe?

10  A.  It is.

11  Q.  And you wrote:  "Clear demonstration of readiness to make

12  an immediate impact as an L8.  I enthusiastically endorse the

13  hire recommendation."

14           Why did you believe Ms. Rowe was ready to make

15  immediate impact as an L8?

16  A.  Well, kind of the line before it.  I mean, financial

17  services, she was clearly, you know, very well steeped in

18  financial services.  It's a critical need for us, and she had

19  the foundation technically that we knew she would be able to

20  provide impact right away.

21  Q.  Based upon what you knew at the time, did you think she was

22  ready to make immediate impact as an L9 in OCTO?

23  A.  No.

24  Q.  Why not?

25  A.  Well, you know, using the rubric we talked about earlier,

1    one, wasn't a world-recognized expert, at least from what we

2    could see.  We wouldn't have known about her as a candidate if

3    it wasn't for recruiting letting us know.

4           Second, the job descriptions that are there mostly ——

5    and I'm just trying to recall the time —— are mostly internal

6    technical jobs.  So, you know, that means that in terms of

7    customer-facing or client-facing roles, compare and contrast,

8    you know, with the earlier —— like, some candidates come in

9    with a blend of deep technical expertise, but also they spent

10   time, like, on client engagements, customer engagements.  This

11   background, I think at the time it didn't demonstrate it

12   strongly there.

13          MR. GAGE:  I'd like to —— we can drop this, Jean, or

14   just that highlighted piece.  And if you could go to page 12

15   and highlight Brian Stevens' score and note.

16   Q.  Let's take a look at what Mr. Stevens wrote:  "Likely not

17   one to drive CxO relationships, but she can certainly pair off

18   as needed."

19          Was that an opinion you shared at the time about

20   Ms. Rowe?

21   A.  I certainly agreed with it because I didn't find it to be

22   inconsistent with the rest of the panel recommendations.  And

23   if you look on there, there's also a piece of data there that I

24   would look at, and you see the —— there's kind of a

25   distribution curve.

1   Q.  Let's just go to that.

2              Jean, can you highlight the bar graph above there.

3              Can you explain what that reflects, Mr. Grannis.

4   A.  Yeah, that's the distribution of scores for an interviewer.

5   And so another thing that I would look at is, is this

6   interviewer, you know —— like, do their scores all skew a

7   certain direction?  Where, in all the people they've

8   interviewed, would this score land?  It's kind of consistent.

9   And so you can see here that Brian —— Ulku's score landed kind

10  of in the center of a mass of distributions.  Wasn't at the

11  tail of either end, so not a negative, not an overly, you know,

12  positive.  And just the volume of interview scores means that

13  he was pretty well calibrated.  And you can see it kind of

14  forming up so that the —— that distribution also indicates his

15  experience in hiring.

16             MR. GAGE:  You could take that down, Jean.

17  Q.  A couple more questions about Ms. Rowe's hiring.

18             Did you offer Ms. Rowe any job other than technical

19  director in OCTO?

20  A.  No.  It's the only one we had.

21  Q.  Did you ever promise her that Google would give her any

22  other role in the future?

23  A.  No.

24  Q.  Were you in a position to promise her a vertical lead job?

25  A.  No.  They didn't exist.

1    Q.  Who is Brian Steikes?

2    A.  Brian Steikes, he's a technical director in OCTO.

3    Q.  Let me just pause you there.  Take one bit at a time.

4              And was he also hired around the same time as

5    Ms. Rowe?

6    A.  Would have been around the same time, yes.

7    Q.  And what do you recall about Mr. Steikes' background when

8    he came on board?

9    A.  Significant engineering expertise in networking.  He was a

10   fellow, I think, at HP, if I remember right.  I remember the

11   first conversation he and I had.  We went up to a whiteboard

12   and we started sketching out software-defined networks for

13   large enterprises.  And at the time we were trying to assemble

14   a team, and one of the deficiencies we had was a really strong

15   networking expert.  And being a fellow, I don't know if that

16   word means anything.

17   Q.  Yes, explain to the jury what a fellow is.

18   A.  Yeah.  A fellow is the highest distinction in a technical

19   role in a company.  So like at Google, Google fellows are

20   people who wrote the search index or people who, like, built

21   all the data center, you know, designs for our entire company.

22   They're very rare.  And so a fellow at HP would be a very, very

23   rare technical hire.

24   Q.  Was Mr. Steikes hired as a Level 8?

25   A.  He was.

1    Q.  Earlier in the trial Ms. Rowe testified that, based upon

2    her understanding of Mr. Steikes' qualifications, she was more

3    qualified to be a technical director in OCTO.  Do you agree

4    with that?

5    A.  I think it depends the lens you're using.

6    Q.  OK.  What do you mean by that?

7    A.  Well, from a financial services lens, industry lens, I

8    would agree that she had more expertise than Brian did and was

9    better able to shape financial services-type engagements and

10   progress.  From a technical perspective, from an engineering

11   perspective, I would disagree, and I would say that Brian had

12   much deeper technical experience, especially in networking,

13   than Ulku, or Ms. Rowe, sorry.

14   Q.  Is Michael Marano another person who was hired as a

15   Level 8?

16   A.  Yes.

17   Q.  Around the same time as Ms. Rowe?

18   A.  Yeah, I believe so.

19   Q.  Time frame.

20          What do you remember about Michael Marano?

21   A.  He was the head of engineering for a customer that had

22   platformed on Google Cloud, and so he had an in-depth

23   understanding of our platform at that time.  It was pretty

24   rare.  Unfortunately, we were pretty small at the time as a

25   business, and so it was rare to have someone who actually had

NADHRow7                    Grannis - Cross

1    engineering expertise of platforming on Google Cloud.  So he

2    brought knowledge of the gaming industry and he brought ——

3    which is what I think his company —— where his company was at,

4    and then he also brought deep expertise in our platform itself.

5           MR. GAGE:  I'd like to pivot to some of the L9s.  And

6    your Honor this is another similar exhibit with the same

7    instruction.

8           THE COURT:  OK.  So the exhibit you're about to see is

9    subject to the same instruction that I've given you now a few

10   times in the past few minutes.  These are hiring-related

11   materials that are not to be considered for the truth.

12          MR. GAGE:  D42.  We can publish it to the jury, your

13   Honor?

14          (Defendant's Exhibit 42 received in evidence)

15          THE COURT:  Yes, you may.

16   BY MR. GAGE:

17   Q.  Why did you hire Mr. Eryurek as a Level 9?

18   A.  A couple of things.  So, first, Ph.D. in engineering.  So

19   deep technical expertise, but also he had real-world experience

20   in, you know, scaled infrastructure for vertical, which was

21   health care at the time and GE HealthCare.  So the combination

22   of finding someone who has such deep technical expertise but

23   then also he had led the entire software engineering group for

24   GE HealthCare, which at the time was a massive business unit,

25   that combination was extremely rare.  Plus he brought to the

NADHRow7                    Grannis – Cross

1   table, you know, that —— the panel I think —— thinking back to

2   him, it was pretty clear that he was going to be able to

3   influence conversations at a very significant level, probably

4   even outside of health care, but for sure starting in health

5   care right away.

6           MR. GAGE:  Jean, if you could go to the statement of

7   support and just highlight Mr. Grannis' statement of support.

8   Q.   And in it you wrote:  "Evren immediately uplifts Google

9   Cloud's credibility in the health care and transportation

10  sector."

11          Was that a necessity at the time in Google Cloud's

12  formation?

13  A.   It was.  As I mentioned earlier, we were a little bit

14  smaller company, and people that we could hire that would

15  uplift our reputation was extremely important to the business.

16          THE COURT:  Excuse me, Jean.  Can you highlight the

17  line that was just read.

18          MS. GUTIERREZ:  I thought I did.  I'm sorry.

19          THE COURT:  That's OK.  I just want to make sure that

20  the jury is not confused.  Thank you.

21          MS. GUTIERREZ:  Sorry about that.

22          MR. GAGE:  Going to go to another one, your Honor.  We

23  can take this down.  D27, same instruction, your Honor?

24          THE COURT:  Same instruction.

25          MR. GAGE:  D27.

NADHRow7                          Grannis – Cross

1             (Defendant's Exhibit 27 received in evidence)

2      BY MR. GAGE:

3      Q.   Who is Paul Strong?

4      A.   Paul Strong is one of ——

5      Q.   Did you hire him into OCTO?

6      A.   I did.

7      Q.   As an L9?

8      A.   I did.

9      Q.   And why did you hire Paul Strong as an L9?

10     A.   He was acting CTO of the VMware, which is like the original

11     cloud company.  He was field CTO at VMware.  So not only was he

12     at the top in engineering, but he was also at the top from a

13     customer-facing standpoint.  And that combination's

14     extraordinarily rare.

15     Q.   Did he bring any particular credibility to Google Cloud?

16     A.   He brought a lot of credibility not just to Google Cloud, I

17     could argue Google.  He was routinely, for example, doing

18     keynotes right next to Werner Vogels, who's the CTO of AWS.  I

19     mean, he was at Sun.  He is at some of the formative companies,

20     engineering companies, in the Valley and had worked all the way

21     through the engineering hierarchy and was really VMware's face

22     to the market for at that time.  And, you know, VMware still is

23     a considerable cloud company.

24     Q.   Ms. Rowe testified to the jury that VMware's not a cloud

25     computing company.  Shall I take it that you disagree with

NADHRow7                       Grannis - Cross

1    that?

2    A.  I disagree with that.

3    Q.  Let's move on to Mr. Wilson.

4              If we can go to D28.  Same instruction?

5              THE COURT:  The same instruction.

6              (Defendant's Exhibit 28 received in evidence)

7    BY MR. GAGE:

8    Q.  Did you hire Ben Wilson as a Level 9 technical director?

9    A.  I did.

10   Q.  And why did you hire Mr. Wilson as a Level 9 technical

11   director?

12   A.  So, again, using the rubric, world expert in energy, oil,

13   and gas, and then also he led the first massive deployment of

14   enterprise applications to AWS Amazon, their cloud, and he was

15   actually the reference — his work was the reference case that

16   Amazon was using for credibility in the oil and gas market at

17   that time.  And so we didn't have anybody like that at Google

18   that had actually led hundreds of enterprise applications.

19   We're much more of like a kind of new age, you know, kind of

20   cool applications like Spotify or things like that at the time.

21   So Ben immediately upleveled our credibility, not just in oil

22   and gas but also just, you know, that we had people on our team

23   that had actually gone through the process, and it's not an

24   easy one, of bringing hundreds of applications to the cloud.

25             MR. GAGE:  Like to go to Mr. Donaldson.  Can you put

NADHRow7                        Grannis - Cross

1    up D24.

2              Again, your Honor, it's the same instruction.

3              THE COURT:  Subject to at same instruction.

4              (Defendant's Exhibit 24 received in evidence)

5    BY MR. GAGE:

6    Q.  Did you hire John Donaldson as an L9?

7    A.  I did.

8    Q.  Why did you hire John Donaldson as an L9.

9    A.  Again, going back to the rubric, from a tech perspective,

10   senior executive at Intel, leading all their data center group,

11   software define group, plus he helped launch and was on the

12   board of directors of the Cloud Native Computing Foundation.

13   What does that mean?  Cloud —— sometimes when you want to take

14   a technology and make it really popular, we will open source

15   it, but the problem with open source software is it needs a

16   place that will, like, look after it.  So the Cloud Native

17   Computing Foundation was the construct that was built to take

18   Kubernetes —— sorry, I know that's an unusual word ——

19   Kubernetes, which is a technology that allows us to make most

20   efficient use of a lot of computers and the applications that

21   are put onto those computers.

22             It was one of our most —— two biggest breakthrough

23   technologies in Google at the time, and he led the formation

24   and was on the board of directors of the foundation that

25   actually oversaw Kubernetes.  He was at the forefront of cloud

1   native computing as well.

2            MR. GAGE:  I'd like to pivot to Nicholas Harteau, and

3   we can put up P118, which is the plaintiff's exhibit, your

4   Honor.

5   Q.  Mr. Harteau, did you hire Nicholas Harteau as an L9?

6   A.  I did.

7   Q.  Why did you hire Nicholas Harteau as an L9?

8   A.  Consistent panel feedback.  And, again, going to

9   qualifications, he was the head of engineering at Spotify for

10  their entire deployment moving to Google Cloud, and Spotify at

11  the time was becoming one of our largest customers.  So not

12  only did he have an understanding of that market of kind of the

13  new apps and how to put them into the cloud and a senior exec

14  role at one of our top customers, but also he brought immediate

15  credibility.  Hiring someone like Nick to OCTO made OCTO

16  immediately relevant.  It made Google Cloud immediately

17  relevant because you have to ask yourself the question, why

18  would someone who is leading engineering at one of the top

19  companies in the world choose to join Google and Google Cloud

20  at the time?

21  Q.  I'd like to talk briefly about the work Mr. Harteau did

22  after he joined.  Can you describe some of the work he did when

23  he joined OCTO.

24  A.  Sure.  It was a lot.  So, first and foremost, he helped us

25  gain credibility and share knowledge and lessons learned with a

NADHRow7                         Grannis - Cross

1    lot of companies that were considering Google at the time.  So

2    he would go and interact with others CTOs on our behalf and

3    help shape that.

4         He helped put — bring together communities of

5    engineers.  Because he's an engineer in his DNA, he would do

6    things like — small example but probably important is he

7    established a Slack channel.  So Slack is this app that you can

8    communicate with people in an engineering org.  And he created

9    a Slack channel and invited a bunch of his peers, these were

10   CTOs, heads of engineering from other companies like Stripe,

11   Shopify, really, really high-end engineering companies, and he

12   would invite them into this community to participate.

13        And what was really, really important about that is

14   that the engineering DNA of our team was really, really

15   critical.  And Nick, because of where he came from and because

16   of his experience, he intuitively knew that the engineers of

17   top companies would respond better to this kind of informal

18   mechanism of advising them.  So he called it cloud therapy and

19   invited the CTOs into this Slack channel, and then we were able

20   to influence through direct interactions in the moment with

21   CTOs of some of the top companies in the world.

22   Q.  When he first joined OCTO, did he build any teams

23   internally?

24   A.  So he — he did, and he also — I mean, in addition to

25   building teams internally, he built collaborations with the

1   engineering groups that were absolutely critical to our success

2   because he understood where our gaps were in the product.  So

3   he could immediately gather teams not only in OCTO but outside

4   of OCTO, and engineering teams listened immediately to what he

5   had to say.  He wielded enormous influence internally.

6   Q.  How was his work in OCTO different than the work Ms. Rowe

7   did?

8   A.  Much more towards the kind of comprehensive engineering

9   platform and much more of CTOs across really any industry.

10  Ms. Rowe was mostly focused on financial services and, at the

11  time, the financial services product area.

12  Q.  Earlier you were asked some questions about a statement

13  that you had made that Ms. Rowe had early on demonstrated

14  L10-plus potential.  Did she, and has she ever done anything

15  that you are aware of to realize the potential you identified?

16  A.  The lens matters.  So from an engineering perspective, no.

17  From a sales/marketing/public policy ability to shape, you

18  know, like, financial services, I still think that she has

19  demonstrated some significant impact in those areas in

20  particular.

21  Q.  Is OCTO a sales function?

22  A.  It is not.

23  Q.  Is Ms. Rowe expected to make engineering contributions in

24  OCTO?

25  A.  She is.

1           MR. GAGE:  Your Honor, what time were you going to let

2     the jury go?

3           THE COURT:  I was hoping for 4:35.

4           MR. GAGE:  OK.  I don't expect that I'm going to

5     finish, your Honor.  Let me just keep going.

6           I'd like to go to P126, and I don't believe there's an

7     objection to this, is there, counsel?  It's plaintiff's

8     exhibit, so there is no objection.

9           Can we go, Jean, to Q3 of 2017 on page 17932.  If you

10    could call out that box.

11    BY MR. GAGE:

12    Q.  Now, you're asked in this to identify something that

13    Ms. Rowe does well.

14          Right there, Jean.  Yes.

15          Driving authentic thought leadership, that was her

16    strength, right?

17    A.  Yes.

18    Q.  You were also in this document asked to identify things

19    that Ms. Rowe could do to have more impact, correct?

20    A.  Correct.

21          MR. GAGE:  Jean, can you go down to the next one at

22    the top there.

23    Q.  So this is Q3 of 2017.  Were you giving Ms. Rowe direction

24    and indicating that she needed to make more engineering impact

25    in OCTO?

1    A.   Yeah.   This was really the first nudge in that direction,

2    because if you take the last feedback around success in the

3    one-to-one and one-to-many and then the words that were added

4    here which now includes project eng, I was just making sure

5    that she kept that on her radar as a place she needed to create

6    some more impact.

7    Q.   What is one-to-one and one-to-many?

8    A.   One-to-one is — was, like, our shorthand with meeting with

9    customers.   So she was very — she was already demonstrating

10   really great acumen in opening the doors to customers that

11   maybe wouldn't have considered us before.   One-to-many is our

12   shorthand for, like, events, marketing events, public forums,

13   things like that.

14            MR. GAGE:   Jean, if you could flip to the bottom of

15   page 82730.

16   Q.   We're now at Q3 of 2020.

17            No, at the bottom.

18            See at the bottom it says, "What's the one thing to do

19   to have more impact?"   And your name is at the bottom, you see

20   that, Mr. Grannis?

21            If we flip to the next page and highlight the comment

22   at the top.

23            Now, this is in 2020.   What were you suggesting to

24   Ms. Rowe that she needed to do?

25   A.   The product strategy pillar, that refers to that product

NADHRow7                    Grannis – Cross

1   and eng pillar of our work, needed to strengthen them.

2   Q.  And why did she need to strengthen on that?

3   A.  Because she wasn't creating as much impact as would be

4   expected in the role.

5   Q.  And are you talking about the expectations of a Level 8 or

6   a Level 9?

7   A.  A Level 8.

8   Q.  Now, you rated Ms. Rowe as exceeds expectations.  Are there

9   two higher scores she could have achieved if she had done more?

10  A.  Yes, on that rubric there were two higher scores.  That

11  sits in the middle.  It's a 3 out of 5.

12  Q.  What are the next two scores above that, if you recall?

13  A.  At the time I think it was strongly exceeds expectations,

14  and then there was one that was just —— I don't remember the

15  exact name for it, but it was basically transformational

16  impact.

17  Q.  Did Ms. Rowe ever achieve those higher ratings?

18  A.  No.

19        MR. GAGE:  Jean, could you go to the page 79128 and

20  highlight at the bottom.

21  Q.  Now we're talking Q3 of 2020 where it says at the bottom,

22  "Why not higher?  Why not lower?"  Were you asked to explain

23  why she did not get a higher or lower rating?

24  A.  Yes.

25  Q.  Why did she not get a higher rating on that?

1  A.  Here it says "Sponsorship of complex CI."  "CI" is

2  shorthand or an acronym for collaborative innovation projects.

3  These are our engineering projects that we do hand in hand with

4  customers.  So at this point, you know, no ongoing consistent

5  strong sponsorship of a project like that.  "No collaborative

6  innovation stories," meaning a success story to date.  And then

7  "no progress or even updates on the themes," these emerging

8  themes are kind of forward-looking engineering hypotheses that

9  we create in the team and then test.  At that point she had not

10  really progressed or made many updates even on the ones that

11  she owned.

12  Q.  Has Ms. Rowe made any significant engineering contributions

13  in OCTO?

14  A.  No.

15  Q.  In all of her time in OCTO, she's not made any significant

16  engineering contributions?

17  A.  I mean, not as defined by this pillar.

18  Q.  OK.

19  A.  You know, you could — you could say from a customer

20  standpoint and from a one-to-many standpoint, she has

21  definitely demonstrated thought leadership and taken very

22  complex technical topics and made them approachable to both

23  customers and broad audiences.

24  Q.  But isn't an L8 technical director at OCTO expected to make

25  engineering contributions?

NADHRow7                      Grannis - Cross

1    A.  Yes.

2    Q.  If Ms. Rowe had made significant engineering contributions,

3    could she have potentially received higher ratings as an L8?

4                MS. GREENE:  Objection.

5                THE COURT:  Overruled.

6    A.  Absolutely.

7    Q.  The L9s that we talked about, the L9 technical directors

8    that you hired in 2016 and 2017, over time have each of them

9    made engineering contributions in OCTO?

10   A.  I'd have to look at, like —— I'd have to look at each name

11   and then think about the projects, but generally, I'd say yes.

12   Q.  And when you rated the L9s —— you were asked some questions

13   about your ratings of L9s.  If an L9 got a rating below exceeds

14   expectations, does that mean they are not performing as well as

15   Ms. Rowe?

16   A.  No, that's a rubric —— that's how they're performing to

17   their level.

18   Q.  What do you mean that's how they're performing to their

19   level?

20   A.  Because the ratings take into account the level that you're

21   at.  So we talked about this earlier where you would have

22   expectations for an L9 that are different from an L8.

23   Q.  Now, Ms. Rowe testified that she's still focusing her

24   attention on financial services.  Is she supposed to be

25   focusing all her attention on financial services?

1   A.  No.

2   Q.  Now, she testified that she was layered in 2022 and passed

3   over for a manager role and that Ms. Florissi sits between her

4   and you.  Was Ms. Rowe fairly considered for that role?

5   A.  Yes.

6   Q.  And why did you give that role to Ms. Florissi instead of

7   Ms. Rowe?

8   A.  Because the panel determined that Ms. Florissi would make

9   the better manager.

10  Q.  When Ms. Florissi was given that manager responsibility,

11  was she promoted as a result of the decision?

12  A.  No.

13  Q.  Did she get any extra work?

14  A.  She got a lot of extra work.

15  Q.  But she wasn't promoted?

16  A.  No.

17  Q.  Ms. Rowe testified about her work on a Goldman Sachs deal.

18  Has she been involved in a deal with Goldman Sachs?

19  A.  In the early days she was actually one of the keys to the

20  relationship.  We didn't have a relationship there, so she

21  definitely helped open up the relationship.

22  Q.  Did that change over time, that is, her involvement in the

23  project?

24  A.  Yes, for sure.  So roughly 2018-ish people from our team

25  like Solomon, Matt, even Brian Stevens, were all seen as more,

1   like, consistent interfaces.  We had this thing in Google at

2   the time in Google Cloud, we had a thing called a ramp wire.

3   So there's a win wire.  So think about the sequence of a

4   relationship with a business.  You can win the business, but

5   then in cloud you have to keep earning their business so

6   they'll spend on cloud.  It's a consumption-based business.

7   So what that means is and where I'm going is we'd have

8   these things called ramp wires, and the ramp wire was the sales

9   team celebrating the efforts of people that were really crucial

10  to a specific deal.  And in 2018 the ramp wire, for example,

11  included three people from our team and not Ms. Rowe.  Even

12  today, as an active customer of ours, we're doing very, very

13  complex failover, kind of multi-region database work, and other

14  people from the team are leading that work hand in hand with

15  the customer.

16  Q.   Is that because Ms. Rowe's been pushed out of the work?

17  A.   Absolutely not.

18  Q.   OK.  Just a couple more questions.

19  Ms. Rowe testified about a conversation that she says

20  that she had with you after she returned to OCTO from

21  Mr. Shaukat's organization, and she said that —— she testified

22  that you approached her because the lawyers for Google told you

23  about her concerns and suggested that you agree to support her.

24  Do you have a recollection of any conversation like

25  that?

1    A.  We definitely had a conversation like that, and ——

2    Q.  What do you recall about that conversation?

3    A.  What I recall is (1) I was made aware that Ulku had voiced

4    some concerns.  I don't know what those concerns were.  That

5    was part of the confidential process.  And the first thought I

6    had was she's probably going to be pretty —— she's obviously

7    upset if she's got concerns, and so she would probably also be

8    worried about, like, her place.  So I sought her out, and I

9    told her that OCTO was going to continue to be a safe place for

10   her no matter what.

11   Q.  Did you and do you respect her right to bring this lawsuit?

12   A.  Absolutely.

13   Q.  Have you allowed her leveling concerns or this lawsuit to

14   affect any of the decisions you've made about her?

15   A.  Absolutely not.

16   Q.  Do you want to see Ms. Rowe succeed at Google?

17   A.  Absolutely.

18   Q.  Mr. Grannis, when you hire people into OCTO, do you tell

19   them two things they need to do to succeed?

20   A.  I do.

21   Q.  What do you tell them they need to do to succeed?

22   A.  Build your network inside of Google, learn the platform.

23   Q.  If Ms. Rowe focused on those two things that you've told

24   every OCTO hire they need to do to succeed, do you think that

25   she would be doing even better at Google than she has?

1          MS. GREENE:  Objection.

2          THE COURT:  Sustained.

3   Q.  Mr. Grannis, in your opinion, having managed Ms. Rowe for a

4   number of years, has she focused on those two things?

5   A.  No.

6          MR. GAGE:  No further questions, your Honor.

7          THE COURT:  All right.  Members of the jury, I wanted

8   to just cover two things with you before I release you.  One is

9   that you might recall that the first day you were here, which

10  was Tuesday, the 10th, I told you that the trial would likely

11  conclude on or about Wednesday, October 18.  We now think it is

12  more likely than not that the trial will not conclude until

13  Thursday, the 19th, and I wanted to let you know that now to

14  hopefully help you plan.

15          In addition, we're not going to see each other now for

16  several days.  I do want to emphasize that you must not discuss

17  this case with one another or anyone else.  Do not communicate

18  about the case in person, by email, by Twitter, by Facebook, by

19  any means.  Keep an open mind until you have heard all of the

20  evidence in the case.

21          And with that, I wish you a good weekend.

22          (Jury excused)

23          (Continued on next page)

24

25

NADHRow7

```
 1              (Jury not present)

 2              THE COURT:  All right.  Mr. Grannis, you may step

 3   down.

 4              (Witness temporarily excused)

 5              THE COURT:  You may all be seated.  I just want to go

 6   over a couple of things.

 7              First of all, when Ms. Williams returns, I want to ask

 8   her to give you a report on time.

 9              Second, I believe at a sidebar today Ms. Greene and

10   Ms. Tomezsko were talking about a stipulation relating to

11   exhibits.  Is that correct?

12              MS. TOMEZSKO:  Yes, your Honor.

13              THE COURT:  And what exactly was that again?

14              MS. TOMEZSKO:  In addition to the stipulation that we

15   handed up at the beginning, we have agreed that all of the

16   exhibits that have been published to the jury are deemed

17   admitted.

18              THE COURT:  So you'll give that to me on Wednesday?

19              MS. TOMEZSKO:  Oh, absolutely, your Honor.

20              THE COURT:  One other request, which is that —— I told

21   you at the beginning of the last break that I'm directing you

22   to meet and confer and try to narrow the list of documents

23   and/or deposition designations as to which there are pending

24   objections.  I also want you to file a joint letter by 5 p.m.

25   on Tuesday updating the Court on the outcome of that
```

NADHRow7

1   meet-and-confer and identifying any objections that have been
2   resolved.
3          Do you want to wait for Ms. Williams to return so you
4   can get a report on time?
5          MR. GAGE:  I would like that.
6          THE COURT:  OK.  I figured.
7          MR. GAGE:  And I have a question, your Honor.
8          THE COURT:  Yes.
9          MR. GAGE:  I have two questions, actually.  One,
10  unless counsel tells us something surprising, that they don't
11  have any redirect for Mr. Grannis, I would ask that he be able
12  to do that remotely like the plaintiff's witness will be doing
13  because he's traveling back to ——
14         THE COURT:  Where does he live?
15         MR. GAGE:  He lives in Texas.
16         MS. TOMEZSKO:  Austin, Texas.
17         MR. GAGE:  He lives in Texas now, so he's traveling
18  back to Texas.  So I presume that we can do the same thing with
19  him.  I can't imagine that counsel has a ton of redirect, and
20  for him to fly across the country for a few minutes of
21  redirect, I'd just ask that we can do it that way.
22         THE COURT:  Looking at Ms. Greene, I'm not sure that
23  she agrees.
24         MS. GREENE:  Your Honor, I don't agree.  I have quite
25  a bit of redirect given the extensive nature of Mr. Gage's

1   questioning.  And for a witness who has been in person, for me

2   to not have that opportunity and for the jury to have the

3   opportunity to see that redirect in person would be highly

4   prejudicial.  I think any witness should either be one or the

5   other, and it shouldn't be divided for the jury.

6          MR. GAGE:  Seems to me, your Honor, if their witness

7   can testify remotely ——

8          THE COURT:  Yes, but their witness is going to testify

9   fully remotely.  I agree with Ms. Greene, and Mr. Grannis will

10  have to come back.

11         MR. GAGE:  The next question, your Honor, is you ruled

12  once that Ms. Florissi can testify, but then the plaintiff

13  raised the issue again.  And we originally —— we just need to

14  schedule it.

15         THE COURT:  I understand.  We will get that.  When

16  would she come if she's going to come?

17         MR. GAGE:  Currently, we're planning on —— we were

18  hoping to finish on the 18th ——

19         THE COURT:  Yes.

20         MR. GAGE:  —— with their case and our case, and so

21  we'd have to fit her in then.

22         THE COURT:  I'm mindful that you need an order on that

23  application, and we will get it to you by Monday, for sure.

24         MR. GAGE:  OK.

25         MS. GREENE:  Your Honor, I have one thing, and that is

1   with respect to Mr. Vardaman.

2            THE COURT:  Yes.

3            MS. GREENE:  Despite what I think was a very

4   streamlined questioning of him, his testimony did go over by 48

5   minutes what his deposition testimony would have been, just for

6   plaintiff's designations.  I'm not speaking for defendant's

7   designations at all.  And your Honor had indicated that if it

8   did go over and was longer than the deposition testimony, that

9   we could request an extension of our overall time by that

10   overage.  So I would request that plaintiff's time would be

11   extended by 48 minutes —— I'm sorry, 46 minutes exactly.

12            MR. GAGE:  And defendant's ——

13            THE COURT:  Just one second.

14            Ms. Williams, would you mind tallying up time while we

15   talk so you can give counsel a report.

16            THE DEPUTY CLERK:  I've got it for you, Judge.

17            THE COURT:  Just a moment.

18            All right.  Mr. Gage, go ahead.

19            MR. GAGE:  I'm just asking if what's good for the

20   goose is good for the gander, that's all I was asking.  If they

21   get an additional 48 minutes because he was here live, then we

22   should get an additional 48 minutes because he was here live,

23   and he was live here for both of us.

24            THE COURT:  Where did he come from, by the way?

25            MR. GAGE:  Texas.  He came four days ago, and we just

NADHRow7

1   kept pushing him, but yes.

2          THE COURT:  I will think about it and get back to you.

3   I will say that, based on what I've seen so far in three days

4   of trial plus a little bit in terms of presentation of

5   evidence, I am surprised that you're asking me for additional

6   time.  I have already heard some of the same things over and

7   over.  I don't think the jury really wants to sit through that

8   much more.  But I am going to think about it and get back to

9   you.

10          All right.  Go ahead, Ms. Williams.

11          THE DEPUTY CLERK:  Total use of time today for

12   plaintiff's counsel was 146 minutes, which is a total of 537

13   minutes used so far, with a balance of 183 minutes.

14          Defense counsel used 123 minutes, which is a total of

15   347 minutes so far and have a balance of 873 minutes.

16          THE COURT:  All right.  Well, I will see you after the

17   break.  I hope you all do actually get something of a break.

18          MS. GREENE:  Your Honor, I'm sorry.

19          THE COURT:  Yes.

20          MS. GREENE:  Just one thing.  Will the courtroom be

21   available on Tuesday to prepare the technology for any remote

22   witness on Wednesday?

23          THE COURT:  Any remote witness?  Are we actually doing

24   that or ——

25          MS. GREENE:  Yeah, I thought that was the agreement.

NADHRow7

1        THE COURT:  I thought so, too, but you said "any," so

2   I want to make sure we're not ——

3        MR. GAGE:  I thought we changed your mind, Judge.  I

4   was hoping.

5        MS. GREENE:  For the remote witness on Wednesday, just

6   to make sure the technology is set up.

7        THE COURT:  That's fine with me.

8        Ms. Williams?

9        THE DEPUTY CLERK:  I will be here and I will make the

10  arrangements with William again.

11       MS. GREENE:  Thank you.

12       THE DEPUTY CLERK:  I'll open up the courtroom, and you

13  can come in.

14       MS. GUTIERREZ:  Is there a particular time you would

15  like?

16       THE DEPUTY CLERK:  No, the courtroom is available all

17  day.  Your stuff will be here.  I'm going to be here all day.

18  Just call me or email me when you're in the building.  I'll

19  come up and open the courtroom.

20            (Discussion off the record)

21       MS. TOMEZSKO:  Just standing.

22       MR. GAGE:  Waiting for you stand up, Judge.

23       THE DEPUTY CLERK:  All rise.

24            (Adjourned to October 18, 2023, at 9:00 a.m.)

25

```
1                    INDEX OF EXAMINATION

2  Examination  of:                         Page

3   STUART VARDAMAN

4  Cross By Ms. Tomezsko . . . . . . . . . . . 652

5  Redirect By Ms. Greene . . . . . . . . . . 670

6  STUART BRESLOW

7  Direct By Mr. Chiarello . . . . . . . . . 698

8  Cross By Mr. Gage . . . . . . . . . . . . 711

9  Redirect By Mr. Chiarello . . . . . . . . 724

10   WILLIAM GRANNIS

11  Direct By Ms. Greene . . . . . . . . . . . 726

12  Continued Direct By Ms. Greene . . . . . . 773

13  Cross By Mr. Gage . . . . . . . . . . . . 819

14                   PLAINTIFF EXHIBITS

15  Exhibit No.                           Received

16   73  . . . . . . . . . . . . . . . . . . 816

17                   DEFENDANT EXHIBITS

18  Exhibit No.                           Received

19   71  . . . . . . . . . . . . . . . . . . 658

20   70  . . . . . . . . . . . . . . . . . . 660

21   79  . . . . . . . . . . . . . . . . . . 662

22   44  . . . . . . . . . . . . . . . . . . 850

23   26  . . . . . . . . . . . . . . . . . . 852

24   42  . . . . . . . . . . . . . . . . . . 859

25   27  . . . . . . . . . . . . . . . . . . 861
```

28 . . . . . . . . . . . . . . . . . . 862

24 . . . . . . . . . . . . . . . . . . 863