NAIHRow1

1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x

3   ULKU ROWE,

4               Plaintiff,

5          v.                              19 Civ. 8655 (JHR)

6   GOOGLE LLC,

7               Defendant.                 Trial

8   ------------------------------x
                                           New York, N.Y.
9                                          October 18, 2023
                                           8:50 a.m.
10
    Before:
11
                    HON. JENNIFER H. REARDEN,
12
                                           District Judge
13                                         -and a jury-

14                        APPEARANCES

15  OUTTEN & GOLDEN, LLP
         Attorneys for Plaintiff
16  BY:  CARA E. GREENE
         GREGORY S. CHIARELLO
17       SHIRA Z. GELFAND

18  PAUL HASTINGS LLP
         Attorneys for Defendant
19  BY:  KENNETH W. GAGE
         SARA B. TOMEZSKO
20
    Also Present:  Vincent Yang, Paralegal (Outten & Golden)
21                 Andrew Velazquez, Google Rep.
                   Jean Gutierrez, Paralegal (Paul Hastings)
22

23

24

25

NAIHRow1

1          (Trial resumed; jury not present)

2          THE COURT:  I wanted to cover a couple of housekeeping

3  items.  And thank you so much for the letter yesterday.  It was

4  very helpful.  I have rulings for you this morning.  I think

5  that will streamline things.

6          So based on letter No. 1 from you all yesterday, which

7  included information about the anticipated schedule, I wanted

8  to say something to the jury this morning about our trajectory

9  over the balance of the week.  My understanding is that

10  Ms. Rowe anticipates resting at either the end of the day today

11  or tomorrow morning, and Google anticipates resting tomorrow

12  afternoon.

13          MS. GREENE:  That's correct, your Honor.

14          MR. GAGE:  That's correct.

15          THE COURT:  So with that in mind, I plan to tell the

16  jurors that the presentation of evidence is expected to end

17  sometime tomorrow afternoon, and that we, therefore, project

18  that the case will go to them on Friday.

19          Does that sound right?

20          MR. GAGE:  It does, your Honor.

21          THE COURT:  I don't think I can be any more specific

22  with them than that right now, so that's what I'll do when they

23  come in.

24          Another housekeeping item, Google, I understand after

25  plaintiff rests, you intend to make a motion for directed

NAIHRow1

1  verdict.  So the way I like to handle that is if Ms. Rowe rests

2  at the end of the day today, so like around 4:30, I will excuse

3  the jury and then hear argument and issue my ruling, but if

4  plaintiff does not rest until, say, early tomorrow morning or

5  at some other time that's not at the end of the day, to avoid

6  taking up the time of the jury and any witnesses, I will just

7  ask you for a top-line argument in the moment, and then we'll

8  have fuller argument at the end of the day after the jurors

9  have been excused.

10          MR. GAGE:  Understood, your Honor.

11          THE COURT:  All right.  One other thought that I had,

12  just thinking about how to save you all transaction costs and

13  save everybody's time, if you want to during breaks eat in

14  here, that is fine with me.  I've seen a few of you in the

15  cafeteria.  Even to walk there and back, it takes time.  So I

16  don't know what you've been doing about food, but if you're

17  bringing it in, it doesn't seem like you're covering all needs

18  for the whole day.  If you want to bring in food and eat in the

19  courtroom during breaks —— actually, Ms. Williams —— I didn't

20  ask Ms. Williams —— is that OK?  Does that run afoul?

21          THE DEPUTY CLERK:  That is fine, as long as they don't

22  spill anything on the carpet.

23          MR. GAGE:  I will behave.

24          THE COURT:  There might be a corollary.

25          THE DEPUTY CLERK:  And clean up behind yourselves,

NAIHRow1

1    please.

2            MS. GREENE:  Of course.

3            THE COURT:  So the evidentiary disputes, I'm about to

4    turn to those now.

5            DX 38 is the 2020 engineering-wide leveling guide.

6    Plaintiff's objections are overruled.  The exhibit will be

7    admitted.  I will now briefly explain the basis for my ruling.

8            During Mr. Grannis' examination last week, he was

9    questioned about PX 8.  He established that OCTO referred

10   technical directors to the generic engineering leveling guide.

11   Further, Mr. Wilson, when deposed, testified that DX 38 was

12   "substantially the same" as the guide referred to in PX 8.  I

13   see that defendants stated in its summary judgment reply brief

14   that there was "no evidence that anyone consulted the 2020

15   engineering-wide leveling guide in connection with hiring any

16   technical directors in OCTO.  Based on the date alone, it could

17   not have been used in hiring plaintiff as an L8 technical

18   director in 2017." However, that statement does not neutralize

19   the probative value of the document as it is relevant to the

20   distinction in responsibilities between L8 and L9 at the time

21   Ms. Rowe made her complaint.

22           I'm going to hold on PX 122 through 128 for the time

23   being, as there are a few questions I have about that category

24   before issuing my ruling.

25           I will turn next to the Burdis designations.

NAIHRow1

1    Plaintiff's objections are overruled.  Those designations will

2    be admitted.  Whether Ms. Burdis thought that she was

3    personally accused of wrongdoing by Ms. Rowe is relevant to

4    Ms. Burdis' credibility and the weight of her testimony.

5    Accordingly, this designation is not substantially outweighed

6    by a danger of confusing the issues or misleading the jury

7    under Rule 403.

8            Next I'm going to simultaneously address Mr. Wilson's

9    and Mr. Eryurek's deposition designations, as those disputes

10   are driven by similar arguments and concerns.  In brief,

11   neither Mr. Wilson nor Mr. Eryurek was a decision-maker with

12   respect to Ms. Rowe's hire, but both have firsthand knowledge

13   of the work she performed in OCTO.  Therefore, although their

14   testimony regarding Ms. Rowe's qualifications for her role is

15   not relevant, their testimony about the actual work she

16   performed is relevant.

17           With that in mind, beginning with Mr. Wilson's

18   designations, 77, lines 10 through 19, will not be admitted

19   because the designation concerns Mr. Wilson's knowledge and

20   opinions of Ms. Rowe's background and qualifications.

21           94, line 7, through 95, line 18, will be admitted

22   because the designation relates to Mr. Wilson's knowledge of

23   Ms. Rowe's actual work.

24           97, line 17, through 98, line 9, will not be admitted

25   because Mr. Wilson's conversations with Mr. Eryurek about

NAIHRow1

1  leveling are not relevant to plaintiff's leveling decision or

2  her work.

3          167:21 through 168:67 will be admitted because the

4  designation relates to Mr. Wilson's knowledge of Ms. Rowe's

5  actual work.

6          171:20 through 172:2 will be admitted because the

7  designation relates to Mr. Wilson's knowledge of Ms. Rowe's

8  actually work.

9          Now turning to Mr. Eryurek's designations.  64:2

10  through 65:10 will not be admitted because the designation

11  concerns Mr. Eryurek's knowledge and opinions of Ms. Rowe's

12  background and qualifications.

13          66:5 through 17 will be admitted because the

14  designation relates to Mr. Eryurek's knowledge of Ms. Rowe's

15  actual work.

16          And 67:4 through 14 will be admitted for the same

17  reason, and I note that this does not constitute hearsay

18  because Mr. Eryurek is not relaying another individual's

19  statement.

20          Now I want to address ——

21          MR. GAGE:  I just want to make sure I heard you.  67:4

22  through 14 is admitted?

23          THE COURT:  Yes.

24          MR. GAGE:  OK.

25          THE COURT:  So Mr. Wilson's and Mr. Eryurek's

NAIHRow1

1    testimony with respect to their subsequent roles, Google argues

2    that its designations are meant to inform the jury "when the

3    witness transferred to a different role."  However, none of the

4    relevant designations seem to go to that.  They don't include a

5    transfer date, so how will the jury know from Mr. Wilson's and

6    Mr. Eryurek's testimony when they transferred to another role?

7         MR. GAGE:  Your Honor, it will be unclear, but we want

8    the jury to know that they moved out of OCTO, if I can add,

9    your Honor, in part because of testimony we anticipate may be

10   offered by plaintiff's damages expert in her deposition.  When

11   we did discovery, she talked about the reliance on compensation

12   information for these L9s for an extended period of time, and

13   we want the jury to know that he left OCTO.  If he were here

14   live, we'd get a date, but he's not, and so we're stuck with

15   what's in the transcript.

16        MS. GREENE:  Your Honor, both of these individuals

17   moved from OCTO to Mr. Shaukat's organization.  Mr. Shaukat was

18   here.  They could have asked him about what happened once they

19   were in Mr. Shaukat's organization, but it's confusing to the

20   jury and not probative of the issues here, when they had the

21   opportunity to question the witness who was in a position to

22   answer and was live here in court.

23        THE COURT:  All right.  Just a moment.  I'm looking at

24   this again.

25        I agree with plaintiff on this.  Any probative value

NAIHRow1

1    here is substantially outweighed by a danger of confusing the

2    issues for the jury.

3              I'm now going to turn back to PX 122 through 128.

4              I have a question, first, about what is in and what is

5    out here in terms of what you're asking for a ruling on.  So

6    the header includes 122 through 128, but plaintiff apparently

7    only seeks to publish portions of performance evaluations for

8    Ms. Rowe and her comparators, Plaintiff's Exhibit 123 through

9    127.

10             MS. GREENE:  Your Honor, I believe 122 is

11   Mr. Breslow's packet.

12             THE COURT:  Yes, that's correct, and 128 is

13   Mr. Wilson's.

14             MS. GREENE:  I'm sorry, your Honor, what was the

15   question?

16             THE COURT:  So in the header you say 122 through 128,

17   but then the text says that you only seek to publish portions

18   of 123 through 127.

19             MS. GREENE:  Your Honor, those documents are all in

20   because of our prior stipulation that documents to which there

21   are no objections have been deemed admitted into evidence.

22   It's only the portions that will be shown to the jury today

23   that we would ask for an instruction to be given.

24             THE COURT:  Why are you only seeking a limiting

25   instruction on this now?  You didn't do it in the joint

NAIHRow1

1      pretrial order or any other prior point.

2                  MS. GREENE:  Your Honor, we've actually given this

3      some consideration over the night, and we're willing to

4      withdraw our request for an instruction.

5                  THE COURT:  Very good.  All right.  So that just

6      leaves the discovery dispute raised at the end of the letter

7      and —

8                  MR. GAGE:  May I respond, your Honor, since I didn't

9      have an opportunity to respond in the letter?

10                  THE COURT:  Yes, you may.  Yes, you may.

11                  MR. GAGE:  Thank you, your Honor.

12                  I would note that we got this request from opposing

13      counsel at almost 3 o'clock yesterday afternoon, and I was

14      otherwise occupied before the letter was finalized.  So that's

15      my apologies for taking time.

16                  THE COURT:  No, no, that's all right.

17                  MR. GAGE:  Your Honor, here's the background.

18      Ms. Rowe filed her second amended complaint in February of 2021

19      after motion practice.  Judge Gorenstein, in his decision

20      allowing plaintiff to amend her complaint, expressly prohibited

21      further discovery on this claim other than Google was allowed

22      to take some additional deposition time with Ms. Rowe about

23      that.

24                  We then, as we were approaching our first trial date,

25      so last November as we were approaching our January trial date,

NAIHRow1

1    we produced the documents that have been identified and I

2    believe admitted into evidence as D74, D76, D77, and D78.

3    We've produced those pursuant to our obligation under

4    Rule 26(a)(3)(A).  Ms. Rowe had 14 days to object to our

5    production.  She subsequently filed a motion *in limine* to

6    preclude us from using those documents saying that the

7    production was untimely.  The Court denied that motion.  Judge

8    Schofield denied that motion saying that plaintiff's not been

9    prejudiced by the timeliness or not of the production of those

10   documents, and then fast-forward yesterday afternoon at 2:43,

11   they're asking us to do more discovery after Judge Gorenstein

12   told them they didn't get any additional discovery.

          So, your Honor, candidly, we haven't had time nor

14   should we have to do this additional discovery.

15        THE COURT:  All right.  Go ahead.

16        MS. GREENE:  Your Honor, this is not additional

17   discovery.  This is discovery that they were obligated to

18   produce as part of their supplementation.  We wouldn't have

19   known that there were additional documents like those four

20   exhibits that they sought to admit but for Mr. Vardaman's

21   testimony here at trial that these documents did exist.  So

22   Google was the one who was aware of their existence, not us.

23   It was their obligation to supplement.  They did not.  At this

24   point there's been testimony about the documents —— they've

25   brought them into court —— and the relevance, and we should be

NAIHRow1

1   entitled to the remainder of those documents, not the ones that

2   they cherry-picked.

3           THE COURT:  All right.  Let me just clarify something,

4   and then I want to bring in the jury.  I'm not going to rule on

5   this right now, this one.  I want to think about it and read

6   what you argued.

7           So Mr. Vardaman in his deposition, he said that he

8   "didn't know" whether he made any documentation with respect to

9   Ms. Rowe asking to be considered for the role in Kirsten's

10  organization.  He also represented that he did not recall

11  "anything in writing regarding Ms. Rowe that he communicated to

12  Kirsten," though he did "recall that it was much more ad hoc."

13          At trial Mr. Vardaman testified that he prepared these

14  documents to kind of keep this running so that if he got a call

15  from Kliphouse, he could provide her the most relevant

16  information, updated information.  That's the transcript at

17  663.  He also stated that the document consisted of high-level

18  distilled notes.

19          I want to know, please, what discovery request would

20  these documents have fallen under?  You don't have to tell me

21  now, but I'd like to know.

22          MS. GREENE:  Your Honor, we will let you know that.

23          THE COURT:  All right.

24          MS. GREENE:  May I just raise one more thing ——

25          THE COURT:  Yes.

NAIHRow1

1              MS. GREENE:  —— before the jury comes in?

2              With respect to Mr. Wilson and Mr. Eryurek, they're

3    not here.  Their video deposition testimony was corrupted, and

4    so we will be using readers for those testimonies.  And I

5    assume your Honor would like to instruct the jury or give them

6    some clarification that the readers are not Mr. Wilson and

7    Mr. Eryurek themselves.

8              THE COURT:  OK.  Have you both —— have you talked

9    about this?

10             MS. GREENE:  We have.

11             THE COURT:  All right.  That's fine.

12             MR. GAGE:  And one last thing before the jury comes

13   in, your Honor, and this relates to —— I think you said you

14   were going to think about 122 through 128.  I believe an issue

15   may come up in Mr. Grannis' remaining testimony.  We believe,

16   and we alerted counsel last night to this position, that those

17   documents, other than Ms. Rowe's performance review, are beyond

18   the scope of the cross-examination of Mr. Grannis.

19             So to the extent plaintiff's counsel plans to put

20   these other documents, these other performance reviews, in

21   front of Mr. Grannis, we wanted to alert your Honor that that's

22   beyond the scope of his cross.  Never asked him about those

23   other documents.  Ms. Rowe's was the only one I asked him

24   about, and I just didn't want this to pop up in the first five

25   minutes with the jury in the room, your Honor.

NAIHRow1

|    |    |
|----|----|
| 1  | THE COURT:  OK.  One moment. |
| 2  | Actually, 122 through 128, I did not say I was going |
| 3  | to think about it.  Ms. Greene said she withdrew the objection. |
| 4  | MR. GAGE:  Oh, I'm sorry. |
| 5  | THE COURT:  OK. |
| 6  | MS. GREENE:  This is a slightly different issue, |
| 7  | though, your Honor. |
| 8  | THE COURT:  Yes, I understand.  I just wanted to |
| 9  | clarify that. |
| 10 | So what is your position on the other performance |
| 11 | reviews? |
| 12 | MS. GREENE:  Your Honor, any testimony that I seek |
| 13 | from Mr. Grannis will be very much connected to his questioning |
| 14 | yesterday —— or Friday by Mr. Gage.  So I would request that |
| 15 | your Honor wait until I lay the foundation and establish how it |
| 16 | is responsive to the questions that he was asked before making |
| 17 | any sort of decision. |
| 18 | THE COURT:  All right.  I think what we're going to |
| 19 | have to do on this, because I didn't anticipate this, I didn't |
| 20 | look at this, I didn't look back at this testimony, so, |
| 21 | Mr. Gage, you're going to have to object in the moment. |
| 22 | MR. GAGE:  OK. |
| 23 | THE COURT:  And unfortunately, we might have to have a |
| 24 | sidebar for you to go through with me what was said on Friday |
| 25 | and compare it to what Ms. Greene is trying to ask now. |

NAIHRow1

1                   MR. GAGE:  OK.

2                   THE COURT:  All right.  Ms. Williams —

3                   MS. TOMEZSKO:  I just wanted to make sure, to make

4       Ms. Gutierrez and Mr. Yang's lives easier, the specific

5       objections that your Honor ruled on this morning, I just want

6       to make clear the objections to Mr. Wilson's testimony at 75:2

7       to 76:6 was the ruling that it is irrelevant and not going to

8       come in, does that apply to both that designation and 152:7 to

9       20?

10                  THE COURT:  I'm sorry.  I'm trying to find that now in

11      my notes.

12                  MS. TOMEZSKO:  It's page 8 in the letter, your Honor,

13      at the top in that chart.

14                  THE COURT:  Did I give a ruling on those?

15                  MS. TOMEZSKO:  I wasn't sure, which is why I was

16      seeking clarification, your Honor.

17                  MS. GREENE:  Your Honor, we did find it in the

18      transcript.

19                  MS. TOMEZSKO:  That is ruled.  And 153:7 through 20 as

20      well?

21                  MS. GREENE:  I'm sorry.  I may have misspoke.  I don't

22      think there was a ruling on it.

23                  THE COURT:  All right.  So on those, 75:2 through 76:6

24      and 153:7 to 20, plaintiff's objection is sustained, and those

25      are not coming in.

NAIHRow1

1          MS. TOMEZSKO:  And one more on page 10.  This is

2     Mr. Eryurek's deposition testimony.  It's the 108:10 to 110:4

3     and 112:6 through 21.

4          THE COURT:  The same ruling.

5          MS. TOMEZSKO:  OK.  Thank you for the clarification.

6          MS. GREENE:  Your Honor.

7          THE COURT:  Yes.

8          MS. GREENE:  We anticipate the order this morning to

9     be Mr. Grannis, Mr. Harteau, and the readings of Mr. Eryurek

10    and Mr. Wilson.  We may need a short minute to just update

11    their transcripts to eliminate the portions that your Honor's

12    ruled on this morning.

13         THE COURT:  I understand.

14         MS. GREENE:  I just wanted to alert the Court to that.

15         THE COURT:  How much time do you think that's going to

16    take, Ms. Gutierrez?

17         MS. GUTIERREZ:  It's not going to take much time for

18    me.  They've got to adjust the copy.  I don't know.

19         THE COURT:  Right, we're having readers, right, right.

20    We'll have to time a break such that you can do that before

21    Eryurek and Wilson, right?

22         MS. GREENE:  OK.  That would be perfect.  I expect

23    that will work fine.

24         THE COURT:  Somebody say something to clue me in, like

25    this would be a good time to take a break related to that

NAIHRow1

1    issue, something like that.

2                MS. GREENE:  All right.

3                THE COURT:  All right.  Ms. Williams, the third time

4    is the charm.

5                MR. GAGE:  Your Honor, should we put the witness on

6    the stand?

7                THE COURT:  Yes, please.

8                (Continued on next page)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

NAIHRow1

1            (Jury present)

2            THE COURT:  Good morning, everyone.  Please be seated.

3            Mr. Grannis.

4            Members of the jury, good morning.  I wanted to let

5    you know that the latest thinking is that Ms. Rowe anticipates

6    resting at either the end of the day today or early tomorrow

7    morning.  Google anticipates resting tomorrow afternoon.  After

8    that, there are two other components.  One is closing arguments

9    and one is the jury charge where I will be instructing you as

10   you prepare to head into deliberations.

11           Taking all that into account, we now expect that the

12   case will be submitted to you on Friday, and I wanted to let

13   you know that now for planning purposes.  And you will, please,

14   let Ms. Williams know anything you need from the Court to help

15   you with any work issues or anything else if we could be

16   helpful.

17           JUROR:  Will deliberations go into next week, then?

18           THE COURT:  I suppose that's possible.  I'm not going

19   to say anything about how long or short you should deliberate,

20   and you shouldn't read into anything that I say to mean —— to

21   have any meaning with respect to how long or short you should

22   deliberate.  It's just depends on how the process unfolds once

23   you start deliberating.

24           All right.  Mr. Grannis, I remind you that you're

25   still under oath.  OK.

 1  WILLIAM GRANNIS, resumed.

 2  CONTINUED REDIRECT EXAMINATION

 3  BY MS. GREENE:

 4  Q.  Good morning, Mr. Grannis.

 5  A.  Good morning.

 6  Q.  I know it's been some number of days, but do you remember

 7  on Friday being asked some questions by Mr. Gage about the

 8  leveling distinctions between Levels 8 and 9 as they existed in

 9  2016 and 2017?

10  A.  Generally remember that.

11  Q.  And Mr. Gage asked you about engineering leveling guides

12  that existed, correct?

13  A.  Correct.

14  Q.  And Mr. Gage asked you whether there existed engineering

15  guidance on distinctions between Level 8 and 9.  Do you recall

16  that?

17  A.  I don't recall that exact wording, but generally speaking,

18  that sounds about right.

19  Q.  Do you remember him showing you D38, the engineering

20  leveling guide, to refresh your recollection?

21  A.  Yes.

22  Q.  This is a yes-or-no question.  Were you provided with any

23  leveling guide to assist you in the hiring process during the

24  2016 and 2017 time period?

25  A.  Yes.

NAIHRow1                        Grannis – Redirect

Q.  Your testimony is in 2016 and 2017, you were provided with

a leveling guide to assist you?

A.  Yes.

        MS. GREENE:  OK.  Can we go to his deposition

transcript, line 48 — I mean page 48, excuse me, line 16

through 19.

        (Video played)

Q.  That was your testimony at deposition, correct?

A.  It was, because the technical director didn't have any

leveling guidance but engineering did.

Q.  My question to you was any leveling guide.  I asked you if

you received a leveling guide.  You said no.  You didn't say an

engineering leveling guide but not a technical director guide,

correct?  That wasn't your testimony that we just heard?

A.  Well, you asked me about technical director just before you

asked me question, so that's why I answered no, we didn't have

one.

Q.  Now, in any event, the engineering-wide leveling guide

doesn't represent the specific expectations for technical

directors, correct?

A.  Correct, it was generalized engineering guidance.

Q.  And you would agree that ladders for job families are more

descriptive in terms of requirements than the general

engineering leveling guide, correct?

A.  Correct.

NAIHRow1                    Grannis - Redirect

1    Q.  The only leveling guide that exists for OCTO is the

2    technical solutions consultant leveling ladder, correct?

3    A.  That's correct.  Today that's correct, yes.

4    Q.  Let's look at Exhibit D63.

5           Now, this is the leveling guide for the technical

6    solutions consultant ladder, correct?

7           And if we can maybe zoom in a little bit, Mr. Yang.

8    A.  Thank you.

9    Q.  Do you recognize this document?

10   A.  Yes.

11   Q.  And I want you to look up in the left-hand corner.  You're

12   listed as one of the reviewers, correct?

13   A.  I am.

14   Q.  OK.  If we can go to — and do you recall reviewing this

15   document?

16   A.  I do, and it was never fully approved.

17   Q.  Let's go to the last page in the document.

18          So it looks like the rewrite process kicked off in

19   October of 2017, correct?

20   A.  Yeah, that sounds about right.

21   Q.  So up until that point in time, OCTO did not have a

22   leveling guide for technical directors that was specific to

23   OCTO, correct?

24   A.  Correct.

25   Q.  The version that we're looking at here is as of

1    August 2018, thereabouts?

2    A.  Yes.

3          MS. GREENE:  If we can go back to the first page.  I'm

4    sorry, the second page, actually.  Third page, my mistake,

5    Mr. Yang.

6    Q.  OK.  If we can look at the bottom, the L8/principal for

7    technical director solutions consultant, was this written to

8    reflect at that time in 2018 the role and responsibilities for

9    L8 technical solutions consultants?

10   A.  Yes.

11   Q.  There's no Level 9 on this technical solutions consultant

12   ladder, correct?

13   A.  Not on this one, no.

14   Q.  Prior to 2018, even though this document didn't exist, did

15   the technical directors in OCTO still need to meet this

16   criteria to be an L8 or above?

17   A.  I don't understand how to answer the question because if

18   the document doesn't exist before then, then there's no way

19   that we would be able to use it as a reference for people that

20   were being hired.

21   Q.  My question is whether the information reflected in here is

22   —— those criterias, even if they weren't written down, were

23   still criterias that you expected the L8 directors to meet as

24   of 2016/2017?

25   A.  Well, our job description was really what we expected

1    people to meet, and the reason for that is because this

2    document is actually an amalgamation of technical solution

3    consultant inputs from across Google.  And at the time when we

4    were creating OCTO, the technical director role was actually

5    very different than what you might find in an L8 or L9

6    technical solutions consultant in another part of Google.

7            We had an organization called gTech, and they were

8    largely like a support organization, and that was very

9    different from what we were trying to do.  But because they had

10   a blend of technical skills and also customer management, that

11   was used as a partial foundation.  So this document doesn't

12   represent OCTO per se.  It only represents kind of a broad

13   technical solutions consultant purview.

14   Q.  Wasn't this document in fact edited in 2018 to update it

15   for OCTO?

16   A.  No, not just for OCTO, and that's why it was never fully

17   approved.  If you look on the first page, this SVP who's in

18   charge of final approval never actually checked the block and

19   never actually approved this.  This was published by a person

20   named —— I know this document very well because I reviewed it

21   —— Marcelo Peterson, who at the time was an L6, L7 and took it

22   upon himself to try to like amalgamate all the different

23   versions of technical solution consultants —— oh, I'm sorry.

24           He was trying to be helpful because this job family

25   was being used in multiple ways across Google, and so just like

NAIHRow1                    Grannis - Redirect

1    the — it was in a way very similar to the engineering-wide

2    guidance that we talked about earlier in that it was more of a

3    generic document to cover, like, a bunch of different potential

4    flavors of technical solutions consultant, but when it came to

5    interviewing and when it came to the requirements of the job,

6    we used the job description and we used the panel questions.

7    This wasn't used a rubric, for example, for OCTO as a

8    constraining rubric.

9    Q.  So your testimony is there has never been a rubric that's

10   been adopted for OCTO?

11   A.  No, there is now.

12   Q.  OK.  When did that go into place?

13   A.  I would — I would have to see the date of the document to

14   be very accurate.  I would want to be very accurate on that

15   answer.

16   Q.  Sometime after 2018, though, correct?

17   A.  After 2018, yes.

18           MS. GREENE:  Now, if we can go ahead and pull up D38.

19   I wanted to take a look at the top and call out the "People Ops

20   verified," the very top of this document.

21   Q.  So this document's for 2020, correct?

22   A.  Appears so, yes.

23   Q.  And so this is not a document that you would have reviewed

24   in 2016 or 2017, correct?

25   A.  Not necessarily.  This reference could be that if people

1    were trying to — it's unusual to have a stamp at the top of

2    something like that for — that would say like official

3    documentation for 2020 perf.  So this was probably pulled from

4    a file that was used for people going through performance

5    reviews in the year 2020.  I can't tell you whether this

6    existed before then or not, but that's why that stamp probably

7    exists at the top.

8    Q.  Mr. Grannis, do you recall giving testimony on Friday that

9    you didn't know what distinguished an L8 from a L9.  You were

10   still figuring it out — yes, still figuring it out, and you

11   weren't provided with any sort of leveling guide, correct?  And

12   you said there was no leveling guide for that position in

13   engineering?

14   A.  For TSC there was no leveling guide.  For OCTO there was no

15   leveling guide at that time, correct.

16   Q.  Let me ask you a very specific yes-or-no question.

17   A.  OK.

18   Q.  Can you say with certainty, sitting here today, that you

19   reviewed an engineering-wide leveling guide at the time you

20   were making your recommendations for leveling the OCTOs?

21   A.  No, I can't with certainty.

22   Q.  Now, you gave some testimony about distinguish — what

23   distinguishes Level 8 from Level 9s.  You recall that?

24   A.  Yes.

25   Q.  The questions were related to this document, correct,

1   Mr. Gage showed you this document and asked if it refreshed

2   your recollection about distinctions that existed in 2016 and

3   2017.  Do you recall that?

4   A.  I don't recall the exact sequence of events, sorry.

5   Q.  So when he asked you those questions about distinctions

6   between Level 8 and Level 9 and he used this document to

7   refresh your recollection, were you speaking about distinctions

8   that you knew existed as of 2016 and 2017, or were you just

9   basing it on what you saw in 2020 documents?

10  A.  I don't recall exactly what I would have been thinking at

11  the time when I answered that question.

12  Q.  Well, you testified last week that you did not compare

13  Ms. Rowe against any other candidates when making leveling

14  recommendations, correct?

15  A.  That's correct, the leveling recommendations were provided

16  by four independent processes.  So none of those would have

17  been a compare and contrast.

18  Q.  So you weren't comparing and contrasting 8 and 9

19  distinctions when you were considering what level to recommend

20  Ms. Rowe for, correct?

21  A.  Incorrect.  You asked me if I was comparing her to other

22  candidates, and I said no.  But I did, and all of the

23  interviewers did, think about leveling, from the recruiter who

24  established the initial leveling hypothesis to the hiring panel

25  who verified or didn't verify it to me who had to look for

1   inconsistencies to the two SVPs who also reviewed for

2   consistency.

3   Q.  Sitting here today, do you know what the people before you

4   relied on or looked at or considered when making their leveling

5   recommendations?

6   A.  Before me?  I don't ——

7   Q.  The recruiter, the other people that looked at it before it

8   got to you, do you know what they were considering or how

9   they're evaluating things?

10  A.  They were using their experience, something which I relied

11  on.

12  Q.  And so is it your testimony today that those distinctions

13  between Level 8 and Level 9 that you described after having

14  your memory refreshed by D38 were the things you were

15  considering when leveling Ms. Rowe, is that your testimony here

16  today?

17  A.  When we were —— when we were looking at Ms. Rowe and where

18  she might be leveled, again, we were focusing on the job

19  description and the extent to which a candidate would be able

20  to do the job and the level of impact that they would have

21  immediately.  None of those things are actually in the

22  engineering-wide leveling guidance.  Those were all developed

23  as part of developing the OCTO role and then the judgment used

24  by, again, those four different parts of the process.

25  Q.  Let's go to your deposition at page 68, line 20, through

NAIHRow1                         Grannis - Redirect

1    69, line 18.

2              MR. GAGE:  Objection, your Honor.  I don't think this

3    is — this is proper use of a deposition.

4              THE COURT:  I'm not —

5              MR. GAGE:  I know you can't see it.

6              THE COURT:  I'm not sure what she's —

7              MS. GREENE:  It impeaches the testimony he just gave

8    about what he was considering with respect to leveling

9    Ms. Rowe.

10             MR. GAGE:  I disagree that it's inconsistent, your

11   Honor.  We can show you the transcript.

12             THE COURT:  I need to take a look, because you know

13   the testimony and I don't.

14             MR. CHIARELLO:  Your Honor, we have a copy I can hand

15   up.

16             THE COURT:  OK.  Thank you.

17             THE COURT:  What is the citation again?

18             MS. GREENE:  Page 68 line 20, through 69:18.

19             THE COURT:  68, line 20 through 69?

20             MS. GREENE:  18.

21             THE COURT:  You can use it, Ms. Greene.

22             MS. GREENE:  Please go ahead.  Thank you, Mr. Yang.

23             (Video played)

24             MS. GREENE:  We may pause it because it doesn't seem

25   to be playing, and I'll just read your testimony, if that's OK.

NAIHRow1                        Grannis – Redirect

1   "Q.  So the question is, what was the basis for your

2   recommendation that she be hired as a Level 8?

3   "A.  After reviewing this packet and again trying to, you know,

4   work backwards in time, a couple of things stand out.  On the

5   —— on the pros, clear industry knowledge; ability to tie use

6   cases, which is the term for, you know, specific type of

7   problem in engineering that needs to be solved and the ability

8   to put that in context in the industry in which she was —— had

9   the most experience, which was financial services; and strong

10  communicator, which would likely indicate strong communication

11  skills and strong ability to convey complex ideas to customers.

12         "On the con side, some flags around depth of

13  experience, technical ability, and no clear demonstrated large

14  migration to cloud, although started some preliminary

15  activities at JPMorgan.

16         "So those were all factors I would have considered in

17  the leveling recommendation."

18         That was your testimony, correct?

19  A.  Correct.

20  Q.  In fact, Mr. Grannis, you can't recall whether you even

21  considered recommending Ms. Rowe for a Level 9, can you?

22  A.  I would find it highly unlikely that I did.  It was a very

23  consistent packet from the recruiter to the interview panel to

24  my review to the SVPs who reviewed it.  No one flagged that it

25  was inconsistent.

NAIHRow1                    Grannis - Redirect

1  Q.  So at no point did you consider, hey, I should look at her

2  in the context of what a Level 9 looks like and see if she fits

3  within that context?  You didn't do that, did you?

4  A.  Probably not.

5  Q.  Mr. Gage asked you the reasons for why you hired the

6  Level 9 men as Level 9s.  Do you recall that?

7  A.  Yes.

8  Q.  And when Mr. Gage asked you about why you hired Ben Wilson

9  and Jonathan Donaldson as a Level 9, you pointed to the rubric.

10  But to be clear, there was no rubric in OCTO, and you can't say

11  with certainty that you reviewed the engineering leveling guide

12  either, correct?

13  A.  We're using different words.  So leveling guide,

14  maybe/maybe not; but rubric, absolutely.  In fact, the rubric

15  is what you just walked me through in the testimony which gave

16  us factors why Ms. Rowe would be an 8.

17  Q.  But your testimony was in the context of those distinctions

18  you'd made between Levels 8 and Level 9 using the engineering

19  leveling guide.  That was your testimony on Friday, correct?

20  A.  No, it was the rubric as displayed by the job description

21  and the categories of work, which you, I think, refreshed me of

22  while using video on Friday.

23  Q.  Let me ask you this while I look:  You told Mr. Gage that

24  you hired the men at L9 for the reasons you outlined, but you

25  also said, when I questioned you, that you didn't make the

1    hiring and leveling decisions.  You just made recommendations,

2    and you didn't know who made the leveling decision.

3            So which is it, did you make the decision or did

4    somebody else?

5    A.  So I provided input.  At Google, hiring managers, unlike

6    almost any company I have ever worked in in the past, hiring

7    managers don't have the authority to hire unilaterally.  They

8    don't have the authority to level unilaterally.  They don't

9    have the authority to determine comp.  Managers in this case

10   are really one input into a very long process, the four steps

11   which I've outlined a number of times.  So the leveling

12   guidance and the leveling result would have been as a result of

13   those four different steps.

14   Q.  Let's talk about performance.  You testified on Friday that

15   there was and still is a difference in OCTO in performance

16   expectations between an L8 and L9.  Do you remember that

17   testimony?

18   A.  That's just not in OCTO, yes, but any organization would

19   have different expectations and between L8 and L9.

20   Q.  Back in 2017, can you say with certainty that you

21   communicated to the technical directors at L8 and L9 that they

22   were being held to different performance standards?

23   A.  I would never have an occasion to actually have that

24   conversation because when we hold people to expectations in

25   performance, we set their goals independently and individually.

NAIHRow1                      Grannis - Redirect

1   Q.  So ——

2   A.  I would never huddle my team together and say:  OK, 8s and,

3   OK, 9s, you've got different expectations.  This is going

4   harder for you, 9s; it's going to be easier for you, 8s.  I

5   never would have had that conversation.

6   Q.  In fact, members of their team didn't even know what their

7   levels were, correct?

8   A.  That's quite possible.

9   Q.  And so if they didn't know what their levels were, how

10  could they have performed to an engineering leveling guide that

11  outlines what they're supposed to be achieving?

12  A.  Because they all had managers who were setting expectations

13  based on the knowledge of their levels.

14  Q.  Well, you were that manager, correct?

15  A.  I was the manager for quite a while for most of OCTO, yes.

16  Q.  And did you provide them with anything in writing that

17  explained their performance expectations either at Level 8 or

18  Level 9?

19  A.  I gave them all performance expectations, absolutely, and

20  documented repeatedly.

21  Q.  Where did you document for them what your performance

22  expectations were for them based on their level?

23  A.  It was never —— it was never caveated by a level.  Imagine

24  how —— that would be such a terrible management approach to

25  actually bring somebody in and say:  Well, here's your level,

1    and I want to go ahead and have a discussion about your level

2    and all those expectations, because, one, they're brand new.  I

3    had more experience than they did.  So a lot of what I was

4    trying to do was to coach them and to set expectations that

5    were appropriate for their level, but we would —— like, we

6    would never repeatedly talk about levels in performance

7    reviews.

8    Q.  I'm talking about the expectations.  Did you put anything

9    in writing?

10   A.  Expectations are in performance reviews.

11   Q.  That's the only place they are, in the performance reviews?

12   A.  That's where we set it.  So their objectives, they're in

13   black and white, so people know when they're meeting them or

14   not.

15   Q.  We looked at Ms. Rowe's performance review, correct, for

16   2017 Q3?

17   A.  Yes, we looked at entries from her performance review.

18          MS. GREENE:  And let's go ahead and pull that up, if

19   we could.  That's Exhibit 126.

20   Q.  I just want to ask you a few questions.  This is what you

21   would see as the manager, correct, a performance review?

22   A.  Yes.

23   Q.  And so there may be notes and things on here that are

24   visible to you that are not visible to the employee, correct?

25   A.  That's correct.

NAIHRow1                         Grannis - Redirect

1    Q.  If we can turn to the next page.  This is for 2017 Q3.  You

2    see in the upper right-hand corner where she received exceeds

3    expectations.

4              If we can go to the next page.

5              Is there anything on this page where you are outlining

6    what your expectations are for her?

7    A.  These are results.  These aren't the expectations pages.

8    Q.  OK.  Let's go to the next page.

9              Is there anything on here that outlines what the

10   performance expectations are?

11   A.  Again, this is a results page.

12   Q.  And your comment under the results page on what she should

13   do really well and should continue doing is "Ulku is excellent

14   at driving authentic thought leadership into one-and-one and

15   one-to-many engagements.  She's established herself as the

16   voice of Google's FSI efforts and has uplifted Google's

17   credibility in this vertical considerably."

18             That was what you noted, correct?

19   A.  Correct.

20   Q.  Who is Leonard Law?

21   A.  He was product manager for the financial services vertical.

22   Q.  And a product manager is also an engineering role, correct?

23   A.  Correct.

24   Q.  OK.  Let's go to the next page.

25             Anything on here that outlines the performance

1   expectations?

2   A.  Again, this is a results page.

3   Q.  OK.  Let's go to the next page.

4           Anything on here that outlines performance

5   expectations?

6   A.  No, this is peer feedback form.

7   Q.  OK.  If we can go to the next page.

8           Nothing here too, right?

9   A.  Right.  These are all results forms.

10  Q.  OK.  If we can go to the next page.

11          This is just starting all over with another version.

12  So was there something in there that outlined the performance

13  expectations?

14  A.  Not in the results pages, no.

15  Q.  Where would it be?

16  A.  It would be in individual expectations developed between

17  each one of the team and myself along the three categories of

18  one to one, one to many, and engineering contributions, and

19  that rubric, you can see it show up in the results page.

20  Q.  You had criticism of Ms. Rowe about her work with product

21  managing and engineering collaboration, correct?

22  A.  Correct, it was an opportunity for improvement.

23  Q.  Other technical directors at Level 9 struggled to gain

24  traction with engineering teams too, correct?

25  A.  Correct.

1    Q.  That wasn't unique to Ms. Rowe, correct?

2    A.  It's difficult for all of the team all the time.

3    Q.  And you had other performance criticisms of the L9 men too,

4    correct?

5    A.  I did.

6    Q.  I want you to look at P87 now.

7              MR. GAGE:  I'm sorry, what was it again?

8              MS. GREENE:  P87.

9    Q.  Now, these are the calibration notes from the Q3 2017

10   performance cycle.  They're maintained by Melissa Lawrence.

11   Was she your HR person at that time?

12   A.  She was.

13   Q.  And there was a calibration meeting in which you

14   participated where your direct reports were discussed?

15   A.  Yes.  We always had calibration meetings to discuss direct

16   reports.

17   Q.  At the top it outlines a percentage, 60 percent one-to-one,

18   10 percent one-to-many, 30 percent product/eng collaboration.

19   Was that the weighting given to these three pillars?

20   A.  Yes, that was the rubric we were describing earlier.

21             MS. GREENE:  OK.  If we can go to the third page and

22   call out the comments for Ms. Rowe at the top.

23   Q.  You wrote:  "Model for sales team.  Mentor and coach to

24   Leonard Law.  Fantastic hire.  Can move fluidly between tech

25   and business for FS.  Regulatory work pushes over to exceed.

NAIHRow1                              Grannis - Redirect

1    Sincere thought leader.  More of a known quality to PM and Eng.

2    Understands platform level."

3              Those were your notes with respect to Ms. Rowe during

4    that time period, correct?

5    A.  It might have been mine, but the calibration session

6    doesn't just include me.  So it could have been a number of

7    people providing that input.

8    Q.  That was the feedback for Ms. Rowe that was captured,

9    correct?

10   A.  That's what was in the document, yes.

11              (Continued on next page)

NAIVROW2                          Grannis - Redirect

1            MS. GREENE:  Okay.  Let's go to the second page.  If

2     we can look and call out the section that begins with Paul and

3     goes to Ben and goes to Paul.  Up a little bit further,

4     Mr. Yang.  Beginning with Ben's and going down to Paul's.

5     Q.  These are four of the Level 9s in OCTO; correct?

6     A.  Yes.

7     Q.  And so there's feedback there for Ben where he needs to dig

8     in and have more impact and that he's the least technical;

9     correct?

10    A.  Correct.

11    Q.  And Mr. Evren, Mr. Eryurek, needs to focus more on his CTO

12    persona; correct?

13    A.  Correct.

14    Q.  Jonathan was changed from exceeds expectation to

15    consistently meets; correct?

16    A.  Appears so.

17    Q.  And that's because he was not as active on a one-on-one?

18    A.  I can't speak to if that was the factor or not, but

19    possibly.

20    Q.  Feedback from Mr.  -- for Paul, could he identify a passion

21    point, end point to focus on.  That was the end; correct?

22    A.  Correct.

23            MS. GREENE:  Now, we can take that down, thank you.

24    Q.  I'm going to go back to Ms. Rowe's performance evaluation.

25            You saw all of the comments that others gave about

1    Ms. Rowe; correct?

2    A.   You mean like the feedback from that prior form?

3    Q.   Yes.

4    A.   Yes.

5    Q.   And so that influenced your impression of Ms. Rowe's

6    performance?

7    A.   Certainly I would have taken it into account.  Peer

8    feedbacks are a critical part of the process.

9           MS. GREENE:  So let's go to page 18 of document 126.

10   I'm sorry, page 16.  And if we can call out the feedback on the

11   bottom part of that document, just beginning with Ulku Rowe.

12   I'm sorry, that whole section there, Mr. Yang.

13   Q.   This is feedback from peers and yourself with respect to

14   Ms. Rowe for the Q 2018 -- Q1 2018 cycle; correct?

15   A.   I think so.  The highlighted section is -- I can't see the

16   date, but I'll take your word for it.

17   Q.   You know that Ulku was one of Cloud's most credible and

18   authentic representatives of the market; correct?

19   A.   Correct.

20   Q.   Okay.  Let's go on to page 37.

21           Now, this is from 2019 Q1, where she also received

22   exceeds expectations; correct?

23   A.   It's not on this page, but probably.  I think she's had

24   that every time.

25   Q.   Okay.

1              MS. GREENE:  Can we pull out the comments beginning

2     with Albert Sanders and going through Xabier.

3     Q.  So Mr. Sanders notes that she's a subject matter expert on

4     whom the Cloud public policy team relies for engagement.  She's

5     a critical partner.  She effective leveraged her industry

6     relationships and substitute expertise to not just unlock sales

7     opportunity, but also influence the broader environment.  And

8     that will pay dividends for the business going forward.

9              That's what Mr. Sanders said; correct?

10    A.  Correct.

11    Q.  If we look at Ms. Kibria.  Ulku can communicate difficult

12    concepts simply.  In that way she is a unicorn to those of us

13    in the policy world who need to help regulators and

14    policymakers understand issues that are far outside what they

15    know.  And then she gives some examples; correct?

16    A.  Correct.

17    Q.  Ed Morris said:  She's an ambassador for Google Cloud to

18    the financial services industry; correct?

19    A.  Correct.

20    Q.  Let's look at Leonard Law's comments.  He writes that she's

21    an incredible asset to the team that marries deep technical

22    expertise industry experience and Googliness, not easy to find

23    in financial services, into a single package.  The result is an

24    incredible Googler who is equally comfortable talking about

25    marquee customers up to C-level with regulators, public

1    officials.  And, of course, internally she simultaneously

2    conveys a vision of innovation, business transformation with

3    our customers, but keeps it balanced against the critical core

4    requirements that we have internally to fulfill our

5    aspirations.  She is a delight to work with and an inspiration

6    for our customers.

7            You would agree that's glowing feedback; correct?

8    A.  Yeah, that's very nice feedback.

9            MS. GREENE:  Let's look at page 71.  And if we can

10   pull out the feedback starting with Will Grannis, and going

11   back to Rumesh Vemuri.

12   Q.  You write:  Ulku is maybe the most effective Google

13   spokesperson to the financial services industry.

14           And that bolding "the most effective," that was your

15   bolding; correct?

16   A.  It was.

17   Q.  Including all critical constituencies, customers, partners,

18   press, media, regulators, governments.  The demand she gets for

19   her time in this capacity is overwhelming and speaks directly

20   to her credibility and acumen, blend of technical and business.

21           That was your feedback; correct?

22   A.  Correct.

23   Q.  Ms. Wilson's feedback is glowing as well; correct?

24   A.  Let me read it.

25           Yes, it's also very positive.

NAIVROW2                          Grannis - Redirect

Q.   Let's look at Mr. Bhat's.  He says:  It's incredibly

difficult to bring deep industry knowledge blended with

technical depth and focus on business outcomes.  Ulku makes it

look easy.  She has played a critical role for multiple key

North American financial services accounts, not only providing

thought leadership externally, but taking the time to follow

through with the internal teams and deliver on the vision.

        Recently, she helped the Goldman Sachs team plan and

execute on an executive briefing that led to the start of a

partnership to build a consolidated transaction ledger on

Google Cloud, first of its kind for financial services.  While

most could have stopped there, Ulku has continued to engage

with the team, bringing in a wealth of company-wide resources

to the table in effort to help a successful deployment.  She is

a true asset to the OCTO team and is highly valued by mine.

        Again, that's glowing; correct?

A.   That's very positive, yes.

Q.   And let's look at the final, Ms. Vemuri's or Mr. Vemuri's

testimony:  Ulku has been a fantastic partner on Deutsche Bank.

Ulku engaged while the train was fully in motion; and after the

departure of Tais O'Dwyer, with no questions asked, Ulku took

control of the co-development work stream and used her

expertise to drive the cash flow forecasting asset as a service

use cases.  These were critical to building further trust with

Deutsche Bank.  Not only did she find the functional and

1  technical use cases, she also took ownership of the trust with

2  the customer Paul Maley.  Fantastic work.

3          And if we go to the next page and go down to your

4  comment.  One of the things you said was that there were

5  promising emerging themes and collaborative innovation

6  opportunities for increasing impact with engineering; correct?

7  A.  Correct.

8          MS. GREENE:  Let's look finally at 22, page 91.  And

9  if we can pull out that bottom section.

10  Q.  You again have positive feedback for Ms. Rowe; correct?

11  A.  Correct.

12  Q.  And Behnaz Kibria says:  Ulku continues to be, in my

13  estimation, the single best representative for Google in the

14  financial services regulatory space.  Regulators ask for her by

15  name, including FINRA, usually an evangelist for AWS, extending

16  an invitation for Google to participate in a Cloud conference

17  in New York City.

18          I've had similar experiences with IIF, AIR, and an

19  alphabet soup of institutions, agencies, and policymakers who

20  find her relatable, accessible, but undeniably brilliant in

21  explaining technology issues.  Kudos to Ulku for carrying

22  forward this critical work.

23          That was his testimony; correct?

24  A.  Her testimony, but yes.

25  Q.  Her.

1          Now, digital fragmentation, was that an engineering

2     project?

3     A.  It was envisioned to be, but it was never adopted by

4     engineering.

5     Q.  And what about the multi-cloud working group, did that

6     relate to engineering?

7     A.  That did relate to product strategy, yes.

8          MS. GREENE:  Okay.  Let's turn to the next page, if we

9     can.  Look down at the bottom and call out Paul Strong's

10    comments.

11    Q.  Paul wrote:  Ulku brings great insight and perspective to

12    our work together on the digital fragmentation emerging theme

13    and the multi-cloud working group.  Her contributions on

14    multi-cloud have been particularly helpful balancing our

15    tendency to look at it from an operational perspective with

16    that of the developer.

17         That was Mr. Strong, the L9's feedback for her in

18    2022; correct?

19    A.  I don't have the date on here, but if you say it's 2022,

20    then I believe you.

21         MS. GREENE:  No further questions.

22         MR. GAGE:  Just a few questions, your Honor.

23    RECROSS EXAMINATION

24    BY MR. GAGE:

25    Q.  Mr. Grannis, earlier this morning when we first got

1   started, Ms. Greene asked you some questions about the TSC

2   leveling guide, and then she showed a part of your deposition

3   transcript, remember that?

4   A.  Yes.

5   Q.  And do you remember saying to her that she asked you

6   another question right before that in your deposition?

7   A.  Yes.

8          MR. GAGE:  Your Honor, could we play the full portion

9   of that?  If Mr. Yang could play page 48, line 10, through line

10  19. I could read it, your Honor, and make this quicker, if

11  you'd prefer.

12         (Video played)

13  BY MR. GAGE:

14  Q.  Mr. Grannis, could you explain to the ladies and gentlemen

15  of the jury why you referred to your earlier answer in the

16  deposition as an explanation for what was not an inconsistency?

17  A.  Because of the frame of mind was it was for TSC for OCTO

18  specifically, you know, was there any guide, was there any

19  leveling guide, and there wasn't.  But there was an engineering

20  guide.

21  Q.  Okay.  Next question.

22         Ms. Greene also asked you about a document,

23  Defendant's Exhibit 38, the engineering-wide leveling guide.

24  Do you remember those questions?

25  A.  Yes.

NAIVROW2                    Grannis - Recross

1    Q.  And do you remember she asked you whether you could say

2    with certainty whether six or seven years ago you reviewed that

3    engineering leveling guide when you were leveling the technical

4    directors, and you said no, you could not say with certainty

5    that you did?

6           At the time you were making those leveling

7    assessments, were you generally familiar with the engineering

8    leveling guide?

9    A.  Yes.

10          MS. GREENE:  Objection.

11          THE COURT:  Overruled.

12   A.  Yes.

13          MR. GAGE:  I'd like the witness to take a look at

14   P-87.

15   Q.  This was the document that counsel just had up.  Remember

16   Ms. Greene asked you some questions about the calibration

17   notes.

18   A.  Yes.

19   Q.  Could you explain to the ladies and gentlemen of the jury

20   what the reference at the top is to 60 percent one to one, ten

21   percent one to many, and 30 percent product Eng collab?

22   A.  Yeah.  So think about the role as having 100 percent would

23   be like all the things you're expected to do in the role.  And

24   what we really wanted to do is you want to emphasize certain

25   areas more than others.

1      So 60 percent one to one means 60 percent, roughly, of

2  the role would have been engaging directly with customers,

3  getting them to consider Google Cloud.

4      One to many ten percent of the role, a small part of

5  the role, but an important part, so we designated it, was one

6  to many.  So this would have been forums, like external

7  speaking engagements, working with broad audiences, anything

8  that wasn't just limited to one customer.  Think of this as

9  like broadly evangelism.

10      And then the 30 percent product and Eng collaboration,

11  we really wanted to make sure -- three times more at this point

12  than one to many, it was really important for us to make sure

13  that we were making a lasting impact on the engineering

14  roadmap, because we're a product company.  So advancing the

15  product roadmap was really, really important to us.  So that's

16  why that was rated at 30 percent.

17  Q.  There's no date on this document, is there?  There's no

18  year on the document?

19  A.  There is no year on the document.

20  Q.  Did those percentages change over time?

21  A.  They did.

22  Q.  How?

23  A.  Well, because at this point in time, we had -- this is

24  what --

25  Q.  Not dated.

A.  Yeah.  So between 2016/2017, when we first started the

office of OCTO, we had what I would call a broader kind of

responsibilities across customer impact areas.  Because there

weren't any other senior technical people that were also really

good customers; we didn't have, like, a big business

development staff or the rest.  So that's why that number was

so high, 60 percent one to one, because we needed to cover

ground for the sales team and the go-to-market team, because

they didn't have senior people that had technical skills at the

time.

          Today, those ratios look very different.  In fact,

it's roughly 70 percent engineering today; because over time,

the sales team has hired really, really senior people who have

technical expertise, and our business developers are now much

more senior and more technical.  So our niche, kind of as it

was envisioned in the beginning, but we had to cover these

other areas, the niche that we really cover is really, really

in-depth engineering nuanced understanding and guidance for the

CEO, for our product teams, and then actually embedding our

projects into the product roadmap.

Q.  Just a couple more questions on this P-87.

          It's unclear whose comments are reflected in the

document, is that fair to say?

A.  Yes.  And calibration is a multi -- there are multiple

people in calibration sessions, so there is no attribution to

NAIVROW2                    Grannis - Recross

1    who said what by design, to protect and be able to have an

2    objective set of inputs from a wide variety of people.

3    Q.  And so the notes that Ms. Greene was reading from were not

4    necessarily things you said; is that correct?

5    A.  Correct.

6            MR. GAGE:  We can take this down.

7    Q.  Just a few more questions.

8            You were asked a number of questions about feedback

9    contained in Ms. Rowe's performance review.

10           Did you always give Ms. Rowe credit for her

11   communications abilities?

12   A.  Absolutely.

13   Q.  And the comments that Ms. Greene read from repeatedly were

14   mostly from people in marketing, communication, and sales; is

15   that correct?

16   A.  Yes.  Of all the people she listed, only one was a product

17   manager.

18   Q.  And were any of those comments that Ms. Greene read

19   comments concerning Ms. Rowe's engineering contributions in

20   OCTO?

21   A.  There were a few that were laterally.  So some of the

22   description around projects like a multi-cloud forum, which

23   would have been like an internal brainstorming group.  There

24   was also feedback from Leonard Law, who was in the financial

25   product area at the time back in 2017, so this is a while ago.

NAIVROW2                        Grannis - Recross

1           But there were no -- there's no feedback from

2      directors of engineering, VPs of engineering, directors of

3      product management, VPs of product management.  And those would

4      have been more of our peers.

5      Q.  Okay.  Now, would it be fair to say that Ms. Rowe's success

6      in communications is a primary reason why she received a three

7      out of five and exceeds expectations?

8      A.  Yeah.  I mean, I just -- I guess the rough math would be if

9      60 percent was sales and 10 percent was, you know, broad

10     marketing events, that's about 70 percent of the job.  And so a

11     three out of five is roughly about a 70 percent or even could

12     have been even a little lower, but was definitely given credit

13     for the impact that she was having in those two categories.

14     Q.  To the best of your recollection, since Ms. Rowe has been

15     at Google, has she received steady increases in her

16     compensation over time?

17     A.  I would have to look at it, but probably.  Exceeds

18     expectations generally leads to a small incremental improvement

19     over time.

20     Q.  Just one last question.  Ms. Greene asked you about a

21     comment in the performance review where you referenced some

22     promising emerging themes that Ms. Rowe was working on.  Do you

23     remember that?

24     A.  Yes.

25     Q.  Did Ms. Rowe ever follow through on those projects?

1    A.  No.  In fact, both those projects never really went

2    anywhere.

3              MR. GAGE:  No further questions, your Honor.

4              MS. GREENE:  None from me, your Honor.

5              THE COURT:  Okay.  Mr. Grannis, you're excused.

6              THE WITNESS:  Thank you.

7              (Witness excused)

8              MR. CHIARELLO:  Your Honor, may we bring in the next

9    witness?

10             THE COURT:  Oh, yes.  I thought you were doing that.

11             MR. CHIARELLO:  Our next witness is Nicholas Harteau.

12             THE COURT:  Yes.  Thank you.

13    NICHOLAS HARTEAU,

14        called as a witness by the Plaintiff,

15        having been duly sworn, testified as follows:

16   DIRECT EXAMINATION

17   BY MR. CHIARELLO:

18   Q.  Good morning, Mr. Harteau.

19   A.  Good morning.

20   Q.  Do you know the plaintiff in this case, Ulku Rowe?

21   A.  I do.

22   Q.  And how do you know her?

23   A.  She and I worked together at Google for a time.

24   Q.  And when you worked together, were you both in Google's New

25   York City office?

1   A.  We were, yes.

2   Q.  Mr. Harteau, were you subpoenaed to testify here today?

3   A.  I was, yes.

4   Q.  And you've previously submitted a sworn statement in this

5   case; is that correct?

6   A.  That is correct.

7   Q.  Before we talk about Google, I just want to talk briefly

8   about your experience prior to Google.

9           You were employed at Spotify before you joined Google;

10  is that correct?

11  A.  Yeah, that's correct.

12  Q.  Approximately how many years were you employed there?

13  A.  I believe about six years.

14  Q.  And at Spotify, you had an opportunity to work with some

15  folks at Google; is that right?

16  A.  I did, yes.

17  Q.  Was Brian Stevens somebody that you worked with?

18  A.  Yes.  We met.  I wouldn't say we did a lot of work

19  together, but we certainly met.

20  Q.  When you were at Spotify, what title did you have?

21  A.  Vice president of engineering.

22  Q.  And to whom did you report?

23  A.  The CTO, Oskar Stal.

24  Q.  Were you responsible for managing employees while you were

25  there?

1   A.  I was.

2   Q.  And just approximately how many employees were you

3   responsible for?

4   A.  At peak, probably around 300.

5   Q.  Now, is it correct you were hired as a technical director

6   in the office of the CTO at Google?

7   A.  Yeah, that's correct.

8   Q.  Was that a director level role within Google?

9   A.  That's my understanding, yeah.

10  Q.  And when were you hired?

11  A.  Sorry.  I'm bad with dates, but let me do a little math.

12          It would have been six years ago, six plus years ago.

13  So that would be 2017?

14  Q.  If I said April of 2017, would that sound correct?

15  A.  That sounds correct to me.

16  Q.  And did you start immediately?

17  A.  I took -- I had intended to take some time off after

18  leaving Spotify.  And Google preferred that I start my

19  employment at Google and then take a leave of absence.  So I

20  think I started technically and then took about three months

21  off work.

22  Q.  Okay.  Now, the compensation package, the hiring package

23  that Google gave you, did it include any payments or equity to

24  account for compensation you were forfeiting by joining Google?

25  A.  I can't say if it was directly compensating for equity, but

NAIVROW2                    Harteau - Direct

1    certainly there was a big equity portion of my compensation.

2    Q.  And did you understand that any of the compensation you

3    received was to offset anything you might be losing by leaving

4    Spotify and joining Google?

5    A.  I would maybe put it a little bit differently.  Like,

6    Google needed to make a competitive offer that was comparable

7    with my compensation and opportunity at Spotify, and they put

8    together a comparable offer.

9    Q.  Okay.  Now, am I correct that you didn't spend your entire

10   career at Google in OCTO?

11   A.  That's correct.

12   Q.  And around September of 2018, you moved into a different

13   role in software engineering; is that right?

14   A.  I couldn't speak to that date, but that sounds about right.

15   But yes, I moved from the office of the CTO into managing an

16   engineering team at Google.

17   Q.  And you left Google in May of 2020 or thereabouts?

18   A.  That sounds right to me.

19   Q.  Okay.  Feel free to correct me.  I'm just trying to move

20   through this bit of your background.

21   A.  I trust your notes.

22   Q.  Now, when you joined Google, did Google assign you a level?

23   A.  They did.  I think they assign all incoming employees a

24   level.

25   Q.  What level was that?

1   A.  Level 9.

2   Q.  When did you learn that you had been leveled as a Level 9?

3   A.  I don't recall specifically, but I'm sure that it came up

4   in the hiring process.

5   Q.  Now, did Google's decision to level you as a Level 9 in any

6   way impact your decision to accept the offer at Google?

7   A.  I wouldn't say so.  You know, going into Google, I didn't

8   really have an appreciation for the criticality or weight

9   placed on levels; that was just a piece of information that was

10  part of being hired.

11  Q.  If you had been told you would have been brought in as a

12  Level 8, would you still accept the job?

13  A.  I suspect I would have, but it's hard to say in retrospect.

14  Q.  Did anyone at Google explain to you why you had been

15  leveled as a Level 9?

16  A.  I don't remember any specific conversation about that.

17  Q.  Let's talk a little bit about the technical director role

18  itself.  What were the responsibilities of a technical director

19  in OCTO?

20  A.  So folks in the office of the CTO, we sort of split our

21  time in a couple of ways, one of which was representing Google

22  publicly.  So that would be speaking at conferences, that would

23  be engaging with key customers and prospects, that would be

24  sort of outbound communication.  Some of that was -- another

25  category of work was working internally within Google, like

1   within -- with Google engineering teams to try to bring more

2   of, like, a customer focus and empathy for customers to those

3   teams, like really be the conduit of what they need and to

4   those engineering teams.

5   Q.  And was there also a component that related to work with

6   customers?

7   A.  Yeah.  I had lumped that in with outbound work; but yes,

8   engaging directly with key customers and key prospects to

9   troubleshoot their Cloud experience in various ways.

10  Q.  Have you ever heard the work you described, meaning the

11  general description of your work described as three pillars or

12  three pillars used in association with that?

13  A.  Yes.  Absolutely.

14  Q.  Now, during your time as a technical director in OCTO, did

15  you have occasion to collaborate with other technical

16  directors?

17  A.  Occasionally.

18  Q.  And did that include Ms. Rowe?

19  A.  I don't think Ulku and I ever directly worked with each

20  other on a project.

21  Q.  In terms of your collaboration with other technical

22  directors, how did that take place?

23  A.  Yeah, I'm not sure if there's a general statement to be

24  made there.  But, you know, as an example, there were folks

25  that we hired into OCTO where we both worked together on a

NAIVROW2                    Harteau - Direct

1   specific customer.  I remember working with one of the other

2   office of the CTO members on Fitbit, for example.  And, you

3   know, we both brought different perspectives and strengths to

4   the conversation, but it was a collaboration.

5   Q.  And did technical directors within OCTO ever cover for each

6   other on other customer accounts?

7   A.  I'm sure we did in the course of normal stuff, business.

8   Q.  And technical directors had group meetings together?

9   A.  We did.  I mean, we operated as a team.  We had normal team

10  meetings, we reported status on our projects, we talked about,

11  you know, what was next in the queue, what the opportunities

12  were.

13  Q.  Mr. Harteau, is it correct that in August of 2018, you

14  started to manage a small team of technical directors within

15  OCTO?

16  A.  I couldn't speak to that specific date, but I did

17  transition into leading a team within OCTO.

18  Q.  And that was a group of around four to six technical

19  directors?

20  A.  It was a group of around four to six people.  Some were

21  technical directors, others had different roles and

22  classifications within Google.

23  Q.  Was Brian Steikes one of those technical directors?

24  A.  I believe Brian Steikes was one, yes.

25  Q.  And were you still performing your other technical director

1   functions, the three pillars we talked about while you were

2   managing that group?

3   A.  I was, yes.

4   Q.  Mr. Harteau, who were the other director-level technical

5   directors working in OCTO when you joined?

6   A.  I'm not sure I can produce an accurate list, but I

7   certainly remember working with Ben Wilson, Evren, Jonathan

8   Donaldson, and Ulku was there when I joined, as I remember.

9   Q.  And the individuals that you recall, did you know what

10  their level was?

11  A.  I didn't.

12  Q.  Did you have any belief as to what their level was?

13              MS. TOMEZSKO:  Objection.  Relevance.

14              THE COURT:  Sustained.

15  Q.  Well, did you know one way or the other what level they

16  were, whether Level 8 or Level 9?

17              MS. TOMEZSKO:  Objection.  Asked and answered.

18              THE COURT:  I'll allow it.

19  A.  I honestly don't recall.  In Google culture, like, there is

20  a lot of discussion of levels.  And I wouldn't -- it wouldn't

21  surprise me that I learned that over the course of the water

22  cooler conversation.  But I don't have any specific memory of

23  that now.

24  Q.  Okay.  Let's talk about Ms. Rowe a little bit.

25              Did you and Ms. Rowe have occasion to work together in

1    any capacity?

2    A.  I don't think we worked together directly.  The places

3    where I remember spending time with Ulku were there were

4    conferences that we both attended and spoke out and normal team

5    collaboration.  You know, we went to the same meetings, we

6    talked about the same stuff.

7         I think Ulku and I probably talked a little bit more

8    than some of the other folks, as we were the two -- two folks

9    stationed in New York City.

10   Q.  And did you have an opportunity to observe the work that

11   she did separate from that?

12   A.  I would say I observed some of her work.  I don't think it

13   was exhaustive, but certainly some.

14   Q.  From what you were able to observe on a day-to-day basis,

15   how did her work compare with yours?

16   A.  Similar.  You know, we were doing the same sort of work in

17   the same sort of circumstances.

18   Q.  You and Ms. Rowe both worked with customers?

19   A.  Correct.

20   Q.  And you and Ms. Rowe both worked with engineering and

21   project management teams?

22   A.  Correct.

23   Q.  And both of you engaged in thought leadership on behalf of

24   Google?

25   A.  Correct.

1    Q.  Both of you did public speaking?

2    A.  Yes.

3    Q.  Based on your interactions and your observations of

4    Ms. Rowe, how knowledgeable was she with respect to Cloud and

5    its relationship to financial services?

6    A.  She seemed quite knowledgeable.  I am not an expert in that

7    myself, so, you know, I wouldn't be the authority on that.  But

8    she seemed as knowledgeable as the rest of us were and our

9    specialties.

10   Q.  Mr. Harteau, part of the technical director role was to

11   work with and gain support from the engineering teams; is that

12   correct?

13   A.  That's correct.

14   Q.  And in your observation, how successful were the technical

15   directors with whom you worked in getting the engineering teams

16   invested in their projects?

17   A.  I think that was one of the harder parts of the job.  And I

18   think we all struggled with that -- that aspect of it.

19   Q.  Would you say that's a struggle that all the technical

20   directors shared?

21          MS. TOMEZSKO:  Objection.  Foundation.

22          THE COURT:  Can you rephrase please.

23   Q.  In your observation, was that an issue that all the

24   technical directors you observed had?

25   A.  Can you ask that again?  Sorry.

1   Q.  Among the technical directors with whom you worked, was

2   there anyone that did not struggle to gain traction with the

3   engineering teams?

4   A.  In my observation, I think we -- you know, we all struggled

5   with that at various times.  You know, it was -- it was a tough

6   part of the job.

7   Q.  Did you have a good working relationship with Ms. Rowe?

8   A.  I did.

9   Q.  Did she treat you with respect?

10  A.  She did.

11  Q.  Did she ever talk down to you?

12  A.  Not at all.

13  Q.  Did you ever find her to be abrasive?

14  A.  No.

15  Q.  Ever find her to be cantankerous?

16  A.  No.  That might be one cantankerous person to another, but

17  no.

18  Q.  Ever find her to be bristly?

19  A.  No.

20  Q.  How about egocentric?

21  A.  No.

22  Q.  From your vantage, from your observation, how did Ms. Rowe

23  treat others within OCTO?

24  A.  Like colleagues, like peers, with respect.

25  Q.  While you were at Google, Mr. Harteau, did you know what

1    Ms. Rowe's level was?

2    A.   Not to my recollection.

3    Q.   While you were working with her, did you have an assumption

4    about what her level was?

5           MS. TOMEZSKO:   Objection.

6           THE COURT:   Sustained.

7    Q.   Did you at some point learn what Ms. Rowe's level was?

8    A.   I did.

9    Q.   When did you learn that?

10   A.   I believe when I -- when I gave the written statement.

11   Q.   And that was in connection with this lawsuit; correct?

12   A.   Correct.

13   Q.   What was your reaction upon learning that Ms. Rowe was a

14   Level 8?

15          MS. TOMEZSKO:   Objection.

16          THE COURT:   Sustained.

17          MR. CHIARELLO:   Nothing further.

18   CROSS-EXAMINATION

19   BY MS. TOMEZSKO:

20   Q.   Good morning, Mr. Harteau.

21   A.   Good morning.

22   Q.   You were asked at the beginning of your testimony whether

23   you were subpoenaed to appear here today.  Do you recall that?

24   A.   I do.

25   Q.   Who subpoenaed you, if you know?

1    A.  I don't.

2    Q.  Okay.  Are you aware whether Google was the one who issued

3    you a subpoena?

4    A.  I think you're asking about mechanisms of the court that I

5    don't fully understand.  I got a subpoena; I showed up.

6    Q.  Totally fair.

7           Now, the declaration, the statement that you had

8    referenced earlier, who drafted that declaration?

9    A.  That was -- so when I was asked for the statement, I

10   engaged counsel and asked my counsel to work -- work with

11   Ms. Rowe's counsel on a statement.

12   Q.  Did you, yourself, set pen to paper and draft that

13   declaration?

14   A.  I don't recall.  Probably not.  I think I got a draft.

15   Q.  Now, I'd just like to talk about your pre-Google background

16   for a little bit.

17          I think you had testified that you worked at Spotify

18   prior to coming to Google; is that right?

19   A.  Yeah, that's correct.

20   Q.  Prior to that, would it be fair to say that you've held a

21   series of engineering leadership roles since about 1998?

22   A.  That sounds correct.

23   Q.  I'd like to actually take a look at your resume, if we can,

24   and that is Plaintiff's 118.

25          MS. TOMEZSKO:  If you could pull that up, please,

NAIVROW2                    Harteau - Cross

1   Jean.  Go ahead.  Okay.  Here we go.

2   Q.  Mr. Harteau, do you recognize this document?

3   A.  Yeah, that looks -- looks like my resume.

4   Q.  Would you like to see the second page of it just to be

5   sure?  I want you to make sure --

6   A.  No, no, that's fine.

7   Q.  Okay.  Now, are you aware if this is the resume that you

8   had submitted to Google in connection with your candidacy for

9   the technical director role in OCTO?

10  A.  I was not aware, but makes sense to me.

11  Q.  Does this look like your resume from approximately the time

12  that you were speaking with Google about joining in the OCTO

13  role?

14  A.  It does, yes.

15  Q.  I'd like to just quickly look at the "About Me" section at

16  the top here.  I'll make it a little bit bigger for you -- or,

17  rather, Jean will.

18          MS. TOMEZSKO:  Thank you, Jean.

19  Q.  Now, here in the second sentence it says:  I have

20  successfully led through periods of hyper-growth, critical

21  pivots, and cultural change.  Do you see that?

22  A.  I do.  I do.

23  Q.  I'm sorry, I couldn't hear you.

24  A.  Sorry.

25  Q.  No problem.

NAIVROW2                         Harteau - Cross

1          Are there examples in your resume that you could point

2     to where you've led a company through a period of hyper-growth,

3     critical pivots, or cultural change?

4     A.   Sure.  I mean, I think the most relevant experience there

5     is from Spotify.  You know, I joined at a time when Spotify was

6     quite -- quite young; it had just launched in the U.S. and was

7     beginning to both grow in the U.S. and, like, do a global

8     expansion.  And, you know, I owned some parts of the platform

9     that were pretty key to that effort, and we really had a lot of

10    work to do to scale that up.

11    Q.   Is Spotify the only instance in your resume where you

12    demonstrated success leading a company through periods of

13    hyper-growth?

14    A.   Interesting.  I think there are -- there's probably one

15    other example.  I worked at an internet service provider for a

16    while that, you know, there was a big boom-and-bust cycle in

17    the ISP industry.  This was in the days of, like, DSL versus

18    cable modems versus dial-up, for those of us that are old

19    enough to remember.  But we did a lot of big expansion there

20    and a lot of big contraction actually, so --

21    Q.   Did you lead that project?  I think that was at CoreComm,

22    do I have that right?

23    A.   That's correct.  I led an aspect of that project.  But

24    certainly there were aspects of both skill in the platform and

25    skill in the team.

NAIVROW2                    Harteau - Cross

Q.  Now, focusing on your experience at Spotify, I just want to
look at that portion of your resume.  And if you look at the
bottom of the second paragraph here, it says:  Currently I'm
spearheading a move of Spotify's service back end and data
platform from on-premises data centers into Google Cloud
Platform, which you can learn about here and here.

        Do you see that?

A.  I do.

Q.  The "here and here" appear underlined.  Are those
hyperlinks out to external documents, if you recall?

A.  I don't recall.  I would be very curious to see where those
links lead.  I haven't looked at this document in a long time.

Q.  Were there articles that existed, articles and blog posts
where you describe Spotify's work migrating to the Google Cloud
Platform while you were there?

A.  There were, yes.

Q.  Would it be fair to assume whether the "here" and the
"here" that you see hyperlinked there might have linked to one
of those publicly available articles?

A.  It would be fair to assume.

Q.  Now, were you heavily involved in the decision to choose
Google Cloud Platform over other service providers while you
were at Spotify?

A.  I was.  I was not the decision-maker, but I certainly
prepared the recommendation.

NAIVROW2                    Harteau - Cross

1   Q.  Was your recommendation given any significant weight?

2   A.  I think it was the primary weight.

3   Q.  And now at the time, Google Cloud was a relative newcomer

4   to the cloud computing space; is that right?

5   A.  Relatively, yes.

6   Q.  And Spotify was one of the first companies to really go all

7   in on the enterprise adoption of Google Cloud Platform at the

8   time, is that fair?

9   A.  Could you state that again?

10  Q.  Sure.  At the time when you were at Spotify, was Spotify

11  one of the first companies to go all in on a full-scale

12  enterprise adoption of Google Cloud Platform?

13  A.  It was certainly part of a small group of early adopters.

14  Q.  Okay.  So Spotify was among that small group?

15  A.  Spotify was among that small group, yes.

16          THE COURT:  Ms. Tomezsko, excuse me.  In about ten

17  minutes I'm going to give the jury a break.

18          MS. TOMEZSKO:  Thank you, your Honor.  I will try, if

19  I can, to wrap it before that the best I can.

20  Q.  So I think we said that Spotify was among the small group

21  of early adopters, right?

22  A.  Correct.

23  Q.  You were leading the efforts — or rather spearheading the

24  move of Spotify to the cloud?

25  A.  Yes, I think that's -- I think that's accurate.

NAIVROW2                    Harteau - Cross

1   Q.  Now, in your opinion, would that make you one of a small

2   number of senior technical leaders who had actually worked on

3   an enterprise migration of a company to Google Cloud Platform

4   at the time?

5   A.  Yes.

6   Q.  I think earlier you said that during your time at Spotify,

7   you had an occasion to interact with Brian Stevens; is that

8   correct?

9   A.  I did, yes.

10  Q.  Okay.  Brian Stevens is the chief technology officer of

11  Google Cloud?

12  A.  I believe he was at the time.

13  Q.  Did you, while you were still at Spotify, actually

14  participate in Google Cloud's annual conference with Brian

15  Stevens to speak about the partnership between Google Cloud

16  Platform and Spotify?

17  A.  I did, yes.

18  Q.  Now, at some point you left Spotify to join Google Cloud in

19  the office of CTO; correct?

20  A.  Correct.

21  Q.  And if I refer to OCTO, can we agree that that's the office

22  of the CTO at Google?

23  A.  Absolutely.

24  Q.  Okay.  Because of your work at Spotify with the Google

25  Cloud Platform, by the time you joined OCTO, were you familiar

NAIVROW2                    Harteau - Cross

1   with some of the flagship products that Google offers, such as

2   BigQuery?

3   A.  Yes, I was quite familiar with the platform.

4   Q.  I'd like to look at one of your early performance reviews

5   at Google.

6        MS. TOMEZSKO:  Let's pull up P-125, Jean, please.

7   Q.  Mr. Harteau, do you recognize this as your first quarter

8   2018 performance review?  If I could help you out, the date is

9   in the top right-hand corner.

10  A.  Yeah.  Yes, that sounds right to me.  Been a long time

11  since I've seen this document.

12  Q.  Of course.

13       Now, if you can recall, were performance reviews --

14  they took place twice a year at Google; is that right?

15  A.  I don't recall.  That has changed over the years as well.

16  I couldn't tell you.

17  Q.  Okay.  So this -- but Q1 2018, is that fair to say that it

18  represented, at least the beginning of the year in 2018, your

19  work for OCTO?

20  A.  I suspect that's right.

21  Q.  Do you know if it also includes time that you spent and the

22  work that you did in the latter part of 2017?

23  A.  I can't say for sure.

24       MS. TOMEZSKO:  So let's look at -- I'd like to look at

25  the bottom of this page where it says peer assessments.  If we

NAIVROW2                     Harteau - Cross

1    could just make that a bit bigger, particularly the assessment

2    by Will Grannis.

3    Q.  And now Will Grannis was your manager when you had joined

4    OCTO; is that right?

5    A.  That's correct.

6    Q.  And this says, if I'm reading this correctly:  Nic's

7    engagements are very high-value.  His credibility and firsthand

8    experience are invaluable to leaders of enterprises

9    contemplating a move to Google Cloud.  Do you see that?

10   A.  I do.

11   Q.  Do you agree with that statement?

12   A.  It's a nice compliment.  I will take Will at his word.

13   Q.  Fair enough.

14            Now, let's, if we can, go to the next page.  I'd like

15   to focus on the section number three, PM and Eng.  We'll just

16   make that a little bit bigger.  PM and Eng, are those

17   shorthands for something?

18   A.  They are product management and engineering.

19   Q.  I think we've talked about three core pillars of the role

20   in OCTO.  Is PM and engineering one of those core pillars?

21   A.  Engagement with the product and engineering teams within

22   Google was one of those pillars, yes.

23   Q.  Got it.

24            Now, just looking at the content here, it says:

25   Summary of my contribution.  Given the wording, can we assume

NAIVROW2                    Harteau - Cross

1  that these are the contributions that you wrote into the

2  performance assessment process?

3  A.  That sounds accurate.

4  Q.  And the first one says:  Wrote white paper for Twitter on

5  GCLB certificate handling.  Do you see that?

6  A.  I do.

7  Q.  "GCLB," would that stand for Google Cloud Load Balancing?

8  A.  That sounds correct.

9  Q.  And you wrote here:  It's a complex topic with lots of

10  code-spelunking; is that right?

11  A.  That looks like what I wrote.

12  Q.  Can you explain what code-spelunking means?

13  A.  I would have used that to refer to, like, looking through

14  the actual code base for that service to understand how it

15  works.

16  Q.  Now, the load balancing, was this also one of the problems

17  that Spotify had to solve for while you were there, say if

18  there was an unexpected spike in demand when a new artist

19  dropped an album?

20  A.  The answer to that is a little complicated.  We did have

21  load balancing problems.  We did not at the time use the GCLB

22  architecture.

23  Q.  Dealing with those problems with load balancing, were you

24  able to use your experience in that and translate to something

25  you were doing for Google Cloud once you joined OCTO?

NAIVROW2                        Harteau - Cross

1    A.  Sorry, I didn't quite understand the question.

2    Q.  Dealing with the load balancing, the issues that you just

3    described, did you take your experience in that, were you able

4    to translate it to something that you were doing in OCTO once

5    you joined?

6    A.  It's possible, yeah.

7    Q.  It says:  Wrote a white paper for Twitter.  The white paper

8    that you authored, is that an example of something that's

9    referred to as an artifact at Google?

10   A.  That would be considered an artifact, yeah.

11   Q.  And was it your practice to create these artifacts to

12   demonstrate the work that you were doing at Google while you

13   were there?

14   A.  I think it was -- I think that there were some asks for

15   artifacts as part of the office of the CTO role.

16   Q.  And underneath that it says you led the data migration arm

17   of Fulcrum.  Do you see that?

18   A.  I do.

19   Q.  Was Project Fulcrum a cross-functional effort in Cloud that

20   was focused on hybrid Cloud?

21   A.  I have to say, I don't remember what Fulcrum was.

22   Q.  Do you remember leading a data migration effort while you

23   were in OCTO?

24   A.  I have to say, it was a long time ago.  I don't remember

25   what that was or what it was about.

1  Q.  Do you have any reason to doubt that this accurately

2  represents what you wrote at the time you were doing -- when

3  you completed the self-assessment here?

4  A.  No, I have no reason to think it's inaccurate.

5          MS. TOMEZSKO:  Probably a good time to break in the

6  questioning, if that's okay, your Honor.

7          THE COURT:  How much more do you think you have?

8          MS. TOMEZSKO:  Ten minutes maybe.

9          THE COURT:  What about plaintiff?

10          MR. CHIARELLO:  I might have one minute of redirect.

11          MS. TOMEZSKO:  I can keep going if that's what your

12  Honor prefers.

13          THE COURT:  We've been going for an hour and a half

14  now.  Hearing from both of you, I think we should take the

15  break now.

16          MS. TOMEZSKO:  Sure.

17          THE COURT:  All right.  So it's now 10:39.  We'll

18  resume at 10:55.  And while you're out of the box, please

19  remember not to speak with each other or anyone else about the

20  case, and please do not do any research about the case.

21          Thank you.

22          (Jury not present)

23          THE COURT:  Okay.  Mr. Harteau, you may step down now.

24          THE WITNESS:  Thank you.

25          THE COURT:  Thank you.    (Recess)

1               (Jury present)

2               THE COURT:  Please be seated.

3               Mr. Harteau, you are still under oath.

4               THE WITNESS:  Yes.  Yes, ma'am.

5               MS. TOMEZSKO:  May I proceed your Honor?

6               THE COURT:  You may.

7     BY MS. TOMEZSKO:

8     Q.  Now, just picking up where we left off, Mr. Harteau, we

9     were looking at your performance review for the first quarter

10    of 2018, and we were looking at this PM and engineering

11    section.

12              I just want to go to the section underneath that but

13    first ask you, did you, when you were in OCTO, have the

14    opportunity to work with engineering and product management

15    leaders in Google?

16    A.  I did.

17              MS. TOMEZSKO:  Could we go to, under peer assessment,

18    Will Grannis' comment here.  I'll just make it a bit bigger.

19    Q.  And here he writes:  "Nic's decision to focus on a

20    specific, high potential engineering project (Teradata

21    migration) will pay large dividends and is already earning him

22    the respect of key eng and product leadership."

23              Do you see that?

24    A.  I do.

25    Q.  Do you agree with that statement?

NAIHRow3                      Harteau – Cross

1    A.  It's —— you know, it's not my words.  It's not the words I

2    would use, but I think it was an impactful project.

3    Q.  Now, at the same time you were also building and managing a

4    team within OCTO, is that right?  This is, again first quarter

5    2018?

6    A.  I think that's —— I'm confused about the timelines there.

7    I don't know if this period would have covered the time that I

8    was managing the team within OCTO or not.

9    Q.  Sure.  Let's flip to the next page.  This is the next page

10   of your review.

11           I'd like to focus on No. 4, team.  If we can make that

12   a bit larger.

13           Now, here under your name it says role and identifies

14   you as a manager, is that right?

15   A.  That's correct.

16   Q.  Under summary of my contribution, again, this is your input

17   into the performance assessment process?

18   A.  Correct.

19   Q.  And it says, "Kicked off OCTO-Eng team."  What was the

20   OCTO-Eng team?

21   A.  That was the group that I was managing within OCTO.

22   Q.  Underneath that it says, "Worked on building relationships

23   and development plans with your directs."

24           Does that refer to direct reports, the use of the word

25   "directs" there?

NAIHRow3                     Harteau - Cross

1   A.  Yes.

2   Q.  If we could go on to the next page of your performance

3   review, what we see here says, "People manager review.  Manager

4   review results."

5          Do you see that?

6   A.  I do.

7   Q.  This indicates that you had 11 direct reports, nine of whom

8   responded to this manager review survey.  Do you see that?

9   A.  I do.

10  Q.  Later on in your same performance review, I'd like to go to

11  some feedback you received from one of your direct reports.

12         Jean, if we could go to the next page.  Let's see if

13  it's on here.  Actually, the Bates stamp, Jean, I think it is

14  53809.  Here we go.  I want to focus on — oh, there it is.

15  Thank you, Jean.

16         This says under open text questions for the manager

17  survey review:  "I also appreciate his decision to spend months

18  in Sunnyvale (though he's based in New York City), sensing he

19  needed to accelerate his own relationships with cloud

20  engineering to better advocate for and support his team.  This

21  decision has had a profound impact on his effectiveness as a

22  team leader."

23         Do you see that?

24  A.  I do.

25  Q.  Is it accurate that during this time you had spent months

1    working out of California?

2    A.   There was a period after I joined where I rented a spot in

3    California, yeah.

4    Q.   In your observations as a manager of the team, would you

5    agree that your presence in California did have an impact on

6    your effectiveness as a team leader?

7    A.   I would state that a different way.  I think my presence in

8    California allowed me to develop relationships with product and

9    engineering leaders.  I don't think it affected my ability to

10   lead the team that I had.

11   Q.   Just very briefly I want to look at your next review, and

12   this would be the third quarter of 2018.  I'll just pull up the

13   cover page of that and just show you what it is we're talking

14   about.

15        So this is your Q3 2018 performance review.  So the

16   latter half of 2018, does that ring a bell?

17   A.   Yeah.

18   Q.   On, I think it is, the next page, under "other" here, if we

19   could just look at the top, says:  "Focus on recruiting for

20   OCTO, including landing Joel Minton (L8 TSC) for the team."

21        Do you see that?

22   A.   I do.

23   Q.   And L8 TSC there, does that refer to a Level 8 technical

24   director in OCTO?

25   A.   I'm not sure.  I don't recognize the TSC, but it certainly

1    refers to an L8 in OCTO.

2    Q.  Do you recall Joel Minton?

3    A.  I do.

4    Q.  Was he a technical director in OCTO?

5    A.  I believe so.

6    Q.  And you were responsible for recruiting him and landing

7    him.  Does that mean hiring him and bringing him onto the team?

8    A.  That's correct.

9    Q.  And now when you took on the people management

10   responsibilities that we were just talking about, you didn't

11   receive a promotion, did you?

12   A.  Not to my recollection.

13   Q.  It was just additional responsibilities you had in addition

14   to your individual contributor role in OCTO?

15   A.  I think there was less pressure put on me for the

16   individual contributions, but the work was largely the same.

17   Q.  Less pressure, does that mean because you were balancing it

18   with your people management responsibilities?

19   A.  Correct.

20   Q.  Again, I believe you testified —— at some point I think we

21   had established it was around September 2018 —— that you had

22   left OCTO and joined a different team within Google?

23   A.  I can't speak to the date, but I did transition to a

24   different role at Google.

25   Q.  And was that a different job than what you were doing in

1    OCTO previously?

2    A.  Yeah, it was a pretty significantly different job.

3           MS. TOMEZSKO:  Thank you, Mr. Harteau.  I have no

4    further questions.

5    REDIRECT EXAMINATION

6    BY MR. CHIARELLO:

7    Q.  Mr. Harteau, I want to just talk very briefly about your

8    2018 Q1 performance that Ms. Tomezsko showed you a few minutes

9    ago.

10          Now, your rating for that evaluation was consistently

11   meets expectations, is that right?

12   A.  That looks correct.

13   Q.  And that's 2 out of 5?

14   A.  3 out of 5.  2 out of 5?

15          MR. CHIARELLO:  Well, can we put up, Mr. Yang,

16   Plaintiff's 125.  If we could look at the first page of that.

17   I guess maybe the second page.  There we go.

18   A.  2 out of 5 it is, yeah.

19   Q.  And in connection with this review, do you remember whether

20   Mr. Grannis gave you any constructive feedback?

21   A.  I don't recall.

22   Q.  Do you recall whether Mr. Grannis gave you feedback here or

23   elsewhere to develop your relationships with engineering?

24   A.  I'm sure that he would have, but I don't specifically

25   recall those conversations.

NAIHRow3                          Harteau - Redirect

1              MR. CHIARELLO:  Mr. Yang, can we go to page 15, and I

2      just want to call out the first bullet under provide highlights

3      from the past six months.

4      Q.  There's feedback here:  "I would like to see Nic build

5      strong ties with cloud engineering/PM leadership so he can use

6      that relationship to build bridges and feedback loops between

7      their teams and his.  I would like to see more direct formal

8      cross-team collaboration between the teams to the point that

9      they can consider us an extension of their own team."

10              Do you recall receiving that feedback from

11     Mr. Grannis?

12     A.  I don't recall, but I certainly would have in the course of

13     that review.

14              MR. CHIARELLO:  And, Mr. Yang, can we look at page 17,

15     just the top line.

16     Q.  Looks like you also noted that a goal of yours was to

17     improve relationship with key engineering partners?

18     A.  That looks correct.

19              MR. CHIARELLO:  I have no further questions.

20              MS. TOMEZSKO:  I don't have any further questions for

21     the witness.

22              THE COURT:  Mr. Harteau, you are excused.  Thank you.

23              (Witness excused)

24              THE COURT:  Are we moving to the Eryurek and Wilson?

25              MS. GREENE:  Yes, first Mr. Wilson's and then

NAIHRow3                        "Wilson"

1   Mr. Eryurek's.

2          THE COURT:  All right.  Would you like me now to

3   briefly explain the ——

4          MS. GREENE:  Please, your Honor.

5          THE COURT:  So, members of the jury, you are now going

6   to hear testimony first from a Mr. Wilson and then from a

7   Mr. Eryurek.  And due to a technical issue, you are not going

8   to be seeing and hearing the testimony by video.  The testimony

9   is going to be read to you, and we just want to clarify that

10  the readers are not the witnesses themselves.

11         Go ahead.

12         MS. GELFAND:  (Reading)

13  "Q.  I want to go through some of your background.  What is

14  your highest level of education?

15  "A.  Master's.

16  "Q.  When did you receive the master's?

17  "A.  2000, I believe.  Don't quote me on the date.  I believe

18  roughly 2—, 2000.

19  "Q.  And from where did you receive your master's?

20  "A.  Lindenwood University.

21  "Q.  What was your master's in?

22  "A.  It was an MBA.

23  "Q.  When did you receive your undergraduate degree?

24  "A.  1991.

25  "Q.  From where?

NAIHRow3                          "Wilson"

1    "A.  Arizona State University.

2    "Q.  And in what field?

3    "A.  It was called —— materials management is the official

4    degree that was given.

5    "Q.  And explain to me what materials management details.

6    What's that?

7    "A.  When someone asks me that question, I say it's a degree in

8    manufacturing.  So I would manage manufacturing plants, and so

9    forth, operations management.  So operations management is

10   probably the easiest thing.  So all of what goes along with

11   operations management as well.

12   "Q.  Do you have any other certifications or technical

13   training?

14   "A.  Yes.  I've received them.  I've not kept them current.

15   "Q.  Do you have any —— have you had any training with respect

16   to technical engineering or computer science programming?

17   "A.  Yes.

18   "Q.  What training have you received in those areas?

19   "A.  I went to —— they called it IBM programming school in the

20   very early '90s.  So I was trained in SAP.  I was trained in

21   SEBOL.  I was trained in AWS, Oracle databases.  The training

22   that I went to, I'm not sure if I could list them all.

23   "Q.  Do you consider yourself to be a computer engineer?

24   "A.  Frame what you think an engineer is.

25   "Q.  What do you understand a computer engineer to be?

NAIHRow3                          "Wilson"

1    "A.  A computer engineer is somebody who architects how the

2    technical infrastructure and also the technical software

3    infrastructure should be built and designed for scalability,

4    usability, and globally across the world.

5    "Q.  Do ——

6    "A.  That's the definition that I consider myself as.

7    "Q.  OK.  And so looking at your résumé, we're going to look at

8    Defendant's Exhibit 28.  The first professional job you list on

9    this résumé is Ernst & Young in 1995.  Do you see that?

10   "A.  I'm trying to get there.  Yes.

11   "Q.  Is that the first professional position that you held

12   following graduation from college?

13   "A.  No.

14   "Q.  Then how many jobs did you hold prior —— how many

15   professional jobs did you hold prior to the job as Ernst &

16   Young?

17   "A.  One.

18   "Q.  And what was that?

19   "A.  I was a systems analyst working on space stations, space

20   shuttle programs.

21   "Q.  Where —— who was the employer?

22   "A.  IBM in Houston, Texas.

23   "Q.  And did that job involve computer engineering or related

24   skills?

25   "A.  Yes.

NAIHRow3                        "Wilson"

1   "Q.  And how long were you in that position?

2   "A.  From '91 to '95.

3   "Q.  And does your résumé accurately reflect your work at

4   Ernst & Young?

5   "A.  Yes.

6   "Q.  Was that that a technical role?

7   "A.  Yes.

8   "Q.  OK.  And moving to the entry from 1997 through 2005, it

9   says 'IBM/PricewaterhouseCoopers.'  Were those both your

10  employers?

11  A.  PricewaterhouseCoopers Consulting was acquired by IBM.  I

12  don't recall the year.

13  "Q.  Did you manage a group?

14  "A.  Yes.

15  "Q.  How many people were in the group that you managed?

16  "A.  Define 'managed.'

17  "Q.  How many people directly reported to you?

18  "A.  I'm unsure how to answer that question because I was in a

19  professional services role, and this included many different

20  organizations.  And I — if you mean directly inside of IBM,

21  it's roughly 50 people.  I — very hard to answer that question

22  because it was a — it depends on which time frame we're

23  speaking about.

24  "Q.  Over how many people did you have managerial

25  responsibility either directly or indirectly?

NAIHRow3                        "Wilson"

1   "A.  At its height, more than 700.

2   "Q.  Does that include teams that were directly managed through

3   other organizations, other organizational units?

4   "A.  Correct.

5   "Q.  So you might be supervising or managing a project that

6   involves people from other teams?

7   "A.  Correct.

8   "Q.  OK.  You went to Siemens Energy in 2005, is that correct?

9   "A.  Yes.  It was Siemens Power Generation at that moment.

10  "Q.  OK.  And was that a predecessor, an affiliate, a

11  subsidiary of Siemens Energy?

12  "A.  It was a division of Siemens.

13  "Q.  How large was the division?

14  "A.  In terms of?

15  "Q.  In terms of the number of people.

16  "A.  I —— factually speaking, Siemens Energy had roughly 65 ——

17  65,000 employees in 180 countries.  That's factually correct.

18  I believe that was at 2011.  Prior to that, it was something

19  less because the Siemens Group combined two organizations

20  together.  I don't recall exactly how many it was.  It was

21  above 25,000, less than 65,000.

22  "Q.  Well, what I'm trying to understand is, with respect to

23  the information that's there, 35 billion in sales, 65,000

24  employees in 180 countries, was that for your division or for

25  Siemens as a whole?

NAIHRow3                         "Wilson"

1   "A.  It was the division.

2   Q.  And you have your title here as CIO and business

3   transformation executive.  Do you see that?

4   "A.  Yes.

5   "Q.  How long were you in that role?

6   "A.  About three years.

7   "Q.  What role did you have prior to being in that role?

8   "A.  I don't recall what the title was.

9   "Q.  With respect to your title, were you a CIO executive or

10  were you the CIO?

11  "A.  Can you rephrase the question?

12  "Q.  Sure.  I'm trying to understand when you say "CIO," were

13  you the chief information officer for Siemens Energy or were

14  you an executive in the chief information office?

15  "A.  So I was CIO of Siemens Power Generation, and I reported

16  directly to the CEO.  Eventually we combined it into an

17  umbrella organization called Siemens Energy where I was still

18  CIO of Siemens Power Generation and reported to the CEO.

19  "Q.  And what team or what unit did you manage?

20  "A.  IT.

21  "Q.  How many people were in the IT group?

22  "A.  I don't have a specific number.  More than 1,000.

23  "Q.  And then you went to BG Group, is that correct?

24  "A.  Yes.

25  "Q.  What kind of company is BG Group?

NAIHRow3                          "Wilson"

1    "A.  It's an oil and gas exploration company.

2    "Q.  And you were the CIO and head of Google IT in that role?

3    "A.  For the Americas.

4    Q.  And did you oversee the IT group in that role?

5    "A.  A part of the IT group.  There was a global CIO that I

6    reported to.

7    "Q.  And how large was the team you managed?

8    "A.  I don't recall.

9    "Q.  At the time that you worked for BG Group, was BG Group's

10   technology cloud based?

11   "A.  No.

12   "Q.  And I'm forgetting what the opposite of cloud based is.

13   "A.  Oh, you can say data center.

14   "Q.  Data center.  OK.

15          "And after BG Group, you went to GE Oil & Gas, is that

16   correct?

17   "A.  Correct.

18   "Q.  And in what role did you join GE Oil & Gas?

19   "A.  Chief technology officer.

20   "Q.  Were you the sole chief technology officer of GE Oil &

21   Gas, or were there other chief technology officers as well?

22   "A.  I was chief technology officer.  I had people who used

23   that term, the —— the —— the word chief technology officer of,

24   like, operations, and so forth, who worked for me.

25   "Q.  And to whom did you report?

NAIHRow3                          "Wilson"

1    "A.   I reported to the CIO.

2    "Q.   And how large was the team that you managed?

3    "A.   Contractors and employees, more than 1,000.

4    "Q.   Do you know how many employees?

5    "A.   More than 500.  I — I — I would have to go look at the

6    notes to know the exact number.

7    "Q.   And at the time you were working for GE, was the

8    technology cloud based?

9    "A.   No.

10   "Q.   In any of the roles that you had held prior to Google, in

11   any of those roles, was the technology cloud based?

12   "A.   So at GE, I brought GE to the cloud.  So we were not cloud

13   based when we started.  We were when we — we were done.

14   "Q.   And —

15   "A.   Same thing as P2.  They were not cloud based.  I brought

16   them to be.

17          "I'll repeat the entire answer again for clarity.

18          "At GE they were not cloud based.  They were data

19   center based.  I brought them to cloud.  That was my job.  When

20   I moved to P2 Energy Solutions, they were also data center

21   based, and I moved them to cloud.

22   "Q.   Did you complete the transformation from data center to

23   cloud while at GE?

24   "A.   Define "complete."

25   "Q.   Were there still aspects of GE Oil & Gas that were data

NAIHRow3                          "Wilson"

1   center based?

2   "A.   Yes.

3   "Q.   And from GE did you move to Google?

4   "A.   No.

5   "Q.   Where did you go next?

6   "A.   P2 Energy Solutions.

7   "Q.   And why did you leave GE?

8   "A.   I was approached by the CEO of P2 Energy Solutions to

9   become their CTO.  It seemed to be an attractive opportunity

10  from a career and learning perspective.

11  "Q.   And how long did you work for P2 Energy Solutions?

12  "A.   Roughly one year.

13  "Q.   Why did you leave P2 Energy Solutions?

14  "A.   Will Grannis and Brian Stevens called and said, Would you

15  like to work in the office of the CTO at Google?  For me as an

16  individual who —— never thought I'd have the opportunity to

17  work for Google.

18  "Q.   Had you known Mr. Grannis and Mr. Stevens before they

19  called you?

20  "A.   No.

21  "Q.   Do you know how the recruiting organization found you?

22  "A.   I've done several presentations for AWS where I was seen

23  quite often, and one of the recruiters saw it and called me.

24  "Q.   When you say that you've 'done several presentations for

25  AWS,' what do you mean by that?

NAIHRow3                          "Wilson"

1   "A.  They had a conference and ask me to speak, and it was

2   recorded and it was recorded online, and people were able to

3   see it.

4   "Q.  But 'they,' you mean AWS had a conference?

5   "A.  Yes.

6   "Q.  OK.  Focusing on that position, then, how did the

7   recruiter describe the position to you?

8   "A.  I really don't recall.  I mean — well, no, bullet points

9   I do recall.  Individual contributor role, focused on helping

10  customers adopt cloud in the oil and gas field, and also

11  helping to build Google Cloud as a global cloud provider —

12  those were the three bullet points that I recall specifically.

13  "Q.  Did the recruiter describe it as an engineering role?

14  "A.  I'm — in certain aspects, yes.

15  "Q.  Do you recall what the recruiter said with respect to it

16  being an engineering role?

17  "A.  Architecting solutions for customers.

18  "Q.  Other than the three bullets you described earlier, do you

19  recall anything else with respect to what was described to you

20  regarding the role?

21  "A.  Yes. Get your hands dirty and build interesting things for

22  health customers, leverage AI and machine learning to help

23  customers drive value.  That was kind of the context.

24  "Q.  Who described those aspects to you?

25  "A.  I — I believe all four interviewers did.

NAIHRow3                        "Wilson"

1   "Q.  Was your oil and gas industry experience something that

2   was considered as well as —— or discussed?  Was your oil and

3   gas industry experience something that was discussed?

4   "A.  Yes.  In terms of how you went after an outcome and using

5   technology to go do it.

6   "Q.  In oil and gas at the time you joined Google, who were the

7   major industry players in oil and gas?

8   "A.  ExxonMobil, Chevron, ConocoPhillips, and Saudi Aramco.  I

9   mean there's a lot of people.  There's a lot of organizations.

10  "Q.  Let me reframe.  Did you know personally any of the

11  C-suite executives at Exxon?

12  "A.  I'd have to —— they don't —— they don't refer to

13  themselves as C-suite at Exxon.  They don't have a chief

14  information officer, chief technology officer.  They don't have

15  the title segments.

16  "Q.  Putting aside the titles, the functional equivalent of

17  C-suites, did you know the people who are in those roles even

18  if they didn't have those titles?

19  "A.  Define 'know.'

20  "Q.  Have a personal relationship, they knew who you were, you

21  knew who they were, you discussed or had conversations

22  beforehand?

23  "A.  In those terms, yes.

24  "Q.  How well did you know them?

25  "A.  I provided advice, provided advice to them in technology

NAIHRow3                          "Wilson"

1  on — maybe once a year.  It was a casual — I would describe

2  it as a casual business relationship.  They knew me through my

3  presentations that I had done in the industry.

4  "Q.  And what role were you in during the time you were

5  providing casual advice to them?

6  "A.  GE Oil & Gas, the CTO of oil and gas.

7  "Q.  And what was the ——

8  "A.  I'm sorry, and also the CTO of P2 and also the —— my

9  current role as —— my current role inside Google.

10  "Q.  OK.  Before you got to Google is what I'm focusing on.

11  What was the context in which you had those discussions?

12  "A.  They were trying to figure out cloud, and they were asking

13  for advice and counsel on what they should think about.

14  "Q.  Mr. Wilson, with respect to your professional background,

15  what do you recall discussing with the recruiter about your

16  professional background?

17  "A.  My experience with AWS and moving to —— moving GE to the

18  cloud.  Specifically, we had notoriety of moving a thousand

19  apps into AWS and reducing costs by more than 50 percent, and

20  this was the specific thing that she had mentioned on why she

21  wanted to call me.

22  "Q.  Do you recall anything else you discussed with the

23  recruiter regarding you are professional background?

24  "A.  I'm sorry, yes, I —— I —— yes.  So my experience in oil

25  and gas, my experience in technology in general, and then my

NAIHRow3                      "Wilson"

1   expertise from a technical perspective.

2   "Q.  What do you recall discussing with the recruiter with

3   respect to your technological background?

4   "A.  Like what did it —— what did it mean to be CTO of GE Oil &

5   Gas and what were my responsibilities and how did I make

6   decisions from a technical perspective.  I think migration was

7   another big piece, like how do we migrate applications into the

8   cloud.  These are the sorts of things they asked about.

9   "Q.  I'm asking what you recall discussing with the

10  interviewers about your professional background.

11  "A.  I —— again, I —— it was about migration to the cloud.  It

12  was about technical experience.  It was about failure

13  scenarios.  It was also like how do you work with senior

14  executives and what were your kind of modes of communication in

15  explaining values to executives, how do you get volume —— I'm

16  sorry, I'll speak more slowly.

17          "How did we migrate to the cloud?  How did we get

18  senior executives to agree to migrate to the cloud?  Also how

19  did we train and gain enough knowledge about these new

20  technologies?  What was our approach, and how did we work with

21  our partners to go and ensure we had the right training for our

22  staff and ourselves?

23  "Q.  Anything else you recall discussing in the interview

24  process regarding your professional background?

25  "A.  Yes. Besides the big organizations I've managed,

1    complexity that I've managed, something that does stand out

2    that I should say is complexity within terms of people, number

3    of products, and technologies I used, number of locations that

4    that technology was used like globally.  What stood out was

5    that I actually was running technology in Africa, in frontier

6    countries.  So that was our interesting point of discussion,

7    because many oil and gas companies were there doing

8    exploration, and then the complexity associated with

9    stakeholders, not only internal but also external stakeholders

10   like consulting companies, outsourcing companies, and so forth,

11   how you manage those relationships.

12   "Q.  OK.  We're going to put up Plaintiff's Exhibit 3.  Do you

13   recognize this document?

14   "A.  No.

15   "Q.  OK.  Now I'm going to ask you to do the same thing again,

16   just read through this, and then I'm going to ask you whether

17   you're familiar with the content, even if you're not familiar

18   with this document.

19   "A.  OK.

20        "OK.  I am familiar with the words on this document,

21   yes.

22   "Q.  With respect to the responsibilities of the role as

23   described in this document, was it generally consistent with

24   the role you performed once you started in OCTO?

25   "A.  No.

NAIHRow3                              "Wilson"

1    "Q.  In what way was it different?

2    "A.  This focused — this — I interpret these words in the way

3    they're written to be very customer focused, where you're

4    interacting with customers.  There is also an aspect M&A

5    banking, mergers and acquisitions.  There was also a

6    responsibility around building new products which is not

7    reflected in this.

8    "Q.  Did you join the office of the CTO when you joined Google?

9    "A.  Yes.

10   "Q.  Who did you consider as your peers in OCTO?

11   "A.  Ev- — everyone.

12   "Q.  Did you know the levels of the other technical solutions

13   consultants on Will Grannis' team?

14   "A.  In the beginning, no, but eventually, yes.

15   "Q.  At the beginning did you know Evren's level?

16   "A.  No.

17   "Q.  At the beginning did you know Ms. Rowe's level?

18   "A.  No.

19   "Q.  How did you come to know their levels?

20   "A.  Casual conversation.

21   "Q.  Do you recall how long you had been working together when

22   you learned Ms. Rowe's level?

23   "A.  Oh, I'd say about a year.

24   "Q.  Do you recall how long you had been working together when

25   you learned Mr. Eryurek's level?

NAIHRow3                          "Wilson"

1    "A.  About a year.

2    "Q.  Are you familiar with the term 'verticals' as that term is

3    used as Google?

4    "A.  Yes.

5    "Q.  And what was discussed with respect to verticals at the

6    time you were going through the interview process?

7    "A.  They needed industry expertise, and that's why they asked

8    me industry expertise questions.

9    "Q.  And was anything communicated to you with respect to what

10   your responsibilities would be within the verticals?

11   "A.  To help customers in that vertical within oil and gas to

12   adopt cloud.

13   "Q.  Have you heard the term "verticalization"?

14   "A.  Yes.

15   "Q.  And what did you understand that term to mean as it was

16   used in Google?

17   "A.  Internally or externally?

18   "Q.  Internally.

19   "A.  Creating a go-to market strategy that directly pointed at

20   a specific vertical like oil and gas to be able to penetrate

21   that market in an effective way and provide solutions that are

22   tailored to that industry's vertical's specific needs.

23   "Q.  Was verticalization something that was discussed during

24   the time you were interviewing for the position at Google?

25   "A.  No, not in those terms.

NAIHRow3                          "Wilson"

1   "Q.  Was anything discussed with respect to Google's future

2   plans to verticalize?

3   "A.  No.

4   "Q.  Was anything discussed with respect to what role you might

5   play in the future of the vertical?

6   "A.  No.

7   "Q.  Did you have an expectation that if Google verticalized in

8   the energy space, you might be considered for the head of the

9   energy vertical?

10  "A.  No, I don't recall anyone saying something like that.

11  "Q.  Even if those words weren't used, did you have an

12  understanding about that?

13  "A.  No intent, no.

14  "Q.  At some point in time, did you learn that Google was

15  verticalizing in the energy space?

16  "A.  Well, yes, as far as that was in the energy vertical.

17  "Q.  How did you learn that they were verticalizing?

18  "A.  It was not at one moment.  It was over time.  That

19  culminated in a meeting that said that myself and other people

20  who are industry experts were going to move into the

21  verticalized industries.

22  "Q.  Was Darryl Willis appointed as the vice president for

23  energy?

24  "A.  Yes.

25  "Q.  And so he became the head of that vertical, is that right?

NAIHRow3                          "Wilson"

1   "A.   Correct.

2   "Q.   Were you upset that you weren't considered for the

3   position?

4   "A.   Yes, I was disappointed.

5   "Q.   Did you know that the position was being considered prior

6   to learning that the position had already been filled?

7   "A.   Yes.  Yes, I was aware.

8   "Q.   Do you know whether you were considered at all for the

9   position?

10  "A.   That's completely unclear to me.

11  "Q.   Did you discuss either your consideration or lack of

12  consideration for that role with anyone?

13  "A.   Yes.

14  "Q.   With whom did you discuss it?

15  "A.   Both Will Grannis and Tariq.

16  "Q.   What did you discuss with Will Grannis?

17  "A.   Was there an opportunity for me to have that role in

18  leading that vertical.

19  "Q.   When was that conversation?

20  "A.   I don't recall.

21  "Q.   Was it before or after Darryl was announced as the new

22  head?

23  "A.   Before.

24  "Q.   And what did Mr. Grannis say to you?

25  "A.   I — I — I can't remember precisely.

NAIHRow3                              "Wilson"

1    "Q.  Do you remember anything about what he said to you?

2    "A.  He said it was not likely I'd become the head of the

3    vertical, as they were looking for another persona of a person

4    than who I was.  Also that Tariq was a different leader than ——

5    than others, and he had his ideas of who he wants in that role.

6    And he looked at myself as a technical person who should stay

7    technical rather than going and leading the vertical.  That's

8    the best of my recollection.

9    "Q.  Was Ms. Rowe the one who had experience in financial

10   services?

11   "A.  Yes.

12   "Q.  Was she operating as the person in OCTO with

13   responsibilities as to the financial services vertical?

14   "A.  Yes.

15   "Q.  And so was she essentially sort of your corollary for

16   financial services?

17   "A.  Yes.

18   "Q.  Did Mr. Eryurek have any particular vertical experience in

19   any particular vertical, I should say?

20   "A.  Yes.  He was the CTO of the GE medical.  So he was in the

21   medical vertical, as I was CTO of GE Oil & Gas.

22   "Q.  And so was he your corollary with respect to the medical

23   vertical?

24   "A.  Yes.

25   "Q.  Were there any other individuals in OCTO who had those

NAIHRow3                          "Wilson"

1    similar types of responsibilities with respect to a vertical

2    besides you, Ms. Rowe, and Mr. Eryurek?

3    "A.  I can't remember his name.  I apologize.  You must have

4    it.

5    "Q.  Jeff Kember?

6    "A.  Yes, Jeff Kember.

7    "Q.  We're going to put up Plaintiff's Exhibit 144.

8            "Did you receive a sign-on bonus of $75,000, is that

9    right?

10   "A.  Yes.

11   "Q.  That's $75,000, was it representative of anything in

12   particular?

13   "A.  I think giving up some of the optionality I had back in

14   P2, I think that was what that was supposed to represent.

15   "Q.  OK.  And under equity compensation, it says you will be

16   granted 3,000 restricted stock units.  Do you see that?

17   "A.  Uh-huh.

18   "Q.  Were you granted those 3,000 stock units?

19   "A.  Yes.

20   "Q.  And the time you were hired, was the value of those stock

21   units approximately $2.5 million?

22   "A.  I do not know.  I would have to go and look and do the

23   math.

24   "Q.  Do you recall whether you had an understanding about what

25   those stock units were worth?

NAIHRow3                          "Wilson"

1    "A.  Of course I did the math.  I just don't recall what ——

2    what the stock price was at that moment.

3    "Q.  If I told you that the stock price at the time was

4    somewhere in the vicinity of $845 a share, would that sound

5    about right to you?

6    "A.  Yes, it does.

7    "Q.  And do you know where the share price is right now?

8    "A.  1,750, somewhere around there.

9    "Q.  And were the shares that you were granted representative

10   of anything?

11   "A.  So it was never meant —— it was never discussed in those

12   terms.

13   "Q.  What was discussed with you with respect to the equity

14   award?

15   "A.  I was giving up a percentage of P2 Energy Solutions, and I

16   was looking for a —— something similar inside Google which

17   would be issued.  And in the conversation, this is the —— this

18   is the number they proposed, and it's the number I accepted.

19   The numbers never changed.

20   "Q.  What was your level at the time of hire?

21   "A.  L9.

22   "Q.  When did you first learn what your level would be?

23   "A.  Two or three months in.  I didn't —— and there was no

24   level on this document.  I —— when I joined, I had no questions

25   about level.  I just knew I had a job.  And at some point

NAIHRow3                          "Wilson"

1  knowing what level you were was important for the career

2  ladder.  So you had to know whether you were an 8 or 9, so I

3  had to go and find that out.

4  "Q.  So you had already started to work at Google when you

5  learned what your level was?

6  "A.  Correct.

7  "Q.  And who did you ask what your level was?

8  "A.  I didn't.  I went and looked it up in Workday.

9            "And I'm so sorry.  I continue not to speak clearly.

10  I will do better.  Thank you.

11  "Q.  And at that point in time, you learned you were an L9?

12  "A.  Correct.

13  "Q.  And so is it true that you did not ask to be a L9?

14  "A.  I'm not sure how to answer.  I never asked the question:

15  Please can you make me an L9?  I never asked that questions.

16  "Q.  Have you ever asked any questions prior to joining Google

17  with respect to what your ladder would be or should be?

18  "A.  No.  I did not understand the ladder concept, and I did

19  not understand that concept until probably nine months in.

20  "Q.  At any point in time, did anyone tell you what factors or

21  criteria the company had considered in deciding what your level

22  would be at the time of hire?

23  "A.  My understanding was they were looking for people who

24  understood cloud, understood how to migrate customers to the

25  cloud, understood technology well, and could speak to

NAIHRow3                        "Wilson"

1   executives and other customers.  That's what I understood they
2   were looking for.
3   "Q.  Did anyone explain to you specifically with respect to
4   what level you would be what factors or criteria beyond that
5   they were considering?
6   "A.  No.
7   "Q.  Did anyone at any point in time tell you that your level
8   was dictated by your years of industry experience?
9   "A.  No.
10  "Q.  At any point in time in describing for you what
11  experience, etc., needed to be in the office of the CTO, did
12  anyone mention to you levels?
13  "A.  Never.  Levels —— levels were never discussed.
14  "Q.  During the time that you were in the office of the CTO,
15  did you ever work with Ms. Rowe?
16  "A.  Yes.
17  "Q.  In what capacity did you have a chance to work with her?
18  "A.  Just things on, like, presentations, and so forth.  If I
19  was giving a presentation, I would look for her advice on,
20  like, what she's presented.  She was a prolific presenter on
21  behalf of Google.  I was not.  So I looked to her on kind of
22  like what she presented on and how she did it and what were the
23  things Google was looking for for us to present on.
24  "Q.  What was your understanding of what Ms. Rowe's role was at
25  the time when you were both in the CTO?

NAIHRow3                          "Wilson"

1    "A.   Same as mine but for the financial vertical.

2    "Q.   What was your understanding of her background?

3    "A.   A deep financial services background working with C-level

4    executives, go and build out financial products customers would

5    use.

6    "Q.   Do you know how many years of financial services industry

7    experience she had?

8    "A.   No.

9    "Q.   Was that something that was kind of a topic of discussion

10   in OCTO, the number of years of experience that people had?

11   "A.   Not as far as I knew.

12   "Q.   During the time when you had the opportunity to interact

13   with Ms. Rowe, did you find her to be professional?

14   "A.   Yes.

15   "Q.   Did you find her to be knowledgeable?

16   "A.   Yes.

17   "Q.   Did you find her to be knowledgeable with respect to

18   financial services?

19   "A.   Yes.

20   "Q.   Did you find her knowledgeable with respect to

21   engineering?

22   "A.   Yes.

23   "Q.   Did you find her knowledgeable with respect to project

24   management?

25   "A.   Yes.

NAIHRow3                              "Wilson"

1   "Q.  Did you personally have any criticisms of her performance?

2   "A.  No.

3   "Q.  Did you ever hear anyone else express any criticisms of

4   her performance?

5   "A.  No.

6   "Q.  Now, you had mentioned earlier you had a discussion with

7   her about leveling at some point in time, is that correct?

8   "A.  I'm not sure if I said that earlier, but, yes, at one

9   point in time, she and I had had a discussion around what

10  levels we were.  Yes, that is correct.

11  "Q.  Did you tell her that you were a Level 9?

12  "A.  Yes, I did.

13  "Q.  Did she seem surprised to hear that?

14  "A.  Yeah.  I know her well enough to know that she was

15  surprised, yes.

16  "Q.  Did she say anything to you about that, about you being a

17  Level 9?

18  "A.  Yes.  She asked why I would be a Level 9 and she would be

19  a Level 8.

20  "Q.  Do you recall what you said?

21  "A.  I — I was not involved in the hiring process, so I really

22  don't know.  I also recall I said something to the effect that

23  I'd been a CTO of a $5 billion software company and that I've

24  had some very kind of deep experiences in cloud.  I said having

25  had the CTO title seems to matter something inside Google for

NAIHRow3                          "Wilson"

1    some reason.

2    "Q.  Anything else you recall?

3    "A.  I'm thinking.  Yeah, I think those were the things that I

4    said, and I said that I think those were the things that they

5    valued because it's a very technical culture at Google.  And

6    being the lead technical person for large organizations was

7    meaningful.

8    "Q.  At the time you said that, did you know whether those were

9    the reasons why you were a Level 9 versus a Level 8?

10   "A.  I — I still don't know today.

11   "Q.  And do you know what the — what were the reasons Google

12   — what Google's reasons were for making Ms. Rowe a Level 8?

13   "A.  No.

14   "Q.  We're going to look at Plaintiff's Exhibit 8.

15           "Do you recognize this document?

16   "A.  No.

17   "Q.  Do you see yourself as a recipient on this email?

18   "A.  Oh, yeah, I do.

19   "Q.  OK.  And we're going to look at Exhibit — Defendant's

20   Exhibit 38.

21           "Have you seen this or a similar document to this

22   before?

23   "A.  Yes.

24   "Q.  And what do you recognize this document to be?

25   "A.  This is the latest kind of eng doc on expectations

NAIHRow3                              "Wilson"

1   depending on levels.  It's a leveling guide that allows you to

2   understand how you should be seen from a —— an expectations

3   perspective.

4   "Q.  So in that email, Ms. Lawrence is referencing the eng

5   leveling guide as a version of this.  Did you understand the

6   version of this to be what she is referencing?

7   "A.  To be clear, this is the 2020 version.  There were other

8   versions that were newer.  I believe that this —— looking at

9   this doc that I'm familiar with is —— it appears to be

10  substantially the same.

11  "Q.  How long were you in your role OCTO?

12  "A.  They probably have a better record than I did.  Eighteen,

13  20 months.

14  "Q.  And again, just for purposes of the record, during the

15  time that you were in OCTO, did you have the same role for the

16  entirety of that time?

17  "A.  Yes.

18  "Q.  And what were your day-to-day responsibilities in that

19  position?

20  "A.  Go help customers adopt cloud, go help partners adopt

21  cloud.

22          "I am so sorry.  Go and help customers adopt cloud; go

23  and help partners adopt cloud; at Google Cloud, figure out what

24  new products need to be built; and for about three months I

25  worked on M&A work, M&A being mergers and acquisitions.

NAIHRow3                         "Wilson"

1   "Q.  Have you ever heard your role in OCTO described as having

2   three pillars?

3   A.  Well, tell me the pillars, and I might be able to tell you.

4   I — I — I think yes.  I — I don't really recall what the

5   pillars were.  Like, one is service to the customers, of

6   course.  One is building new products, which is — was

7   something else that kind of came up, but — I recall three

8   pillars, but I don't recall their names.

9   "Q.  OK. Was one customer-related work?

10  "A.  Yes.

11  "Q.  Was one influencing the platform and product?

12  "A.  Yes, that was the second one I mentioned.

13  "Q.  And was one speaking and evangelism?

14  "A.  Yes.

15  "Q.  Did the role require or involve engaging with other teams

16  across Google?

17  "A.  Yes.

18  "Q.  Was that true of all the technical directors in OCTO?

19  "A.  Yes.

20  "Q.  What were the other teams with which you would engage?

21  "A.  So technical account management, customer engineers,

22  product managers, product engineering support.  I mean, a lot

23  of the rest of Google Cloud.

24  "Q.  And were the other technical directors in OCTO engaging

25  with those same sort of teams?

NAIHRow3                          "Wilson"

1    "A.  The ones I associated with and I knew their work, yes.

2    "Q.  And the ones you associated and knew their work, those are

3    the ones you've mentioned in previous answers?

4    "A.  Yes.  I mean, Christopher, Jonathan, Jen, Paul — yeah,

5    all — all of those.  Evren, Ulku, yes.

6    "Q.  With respect to leveling, did you know the reasons for

7    anyone's levels in OCTO?

8    "A.  No.

9    "Q.  Did there come a time where you met with Mr. Shaukat

10   regarding the move?

11   "A.  Eventually, there was a meeting with Tariq, yes.

12   "Q.  And who was in the meeting with Tariq?

13   "A.  I — I — I just don't recall.  It was not a — it was a

14   little bit of a hastily put together meeting, so I just don't

15   recall all the details around it.

16   "Q.  And what do you recall being said in that meeting?

17   "A.  Our roles hadn't really changed, and, you know, the

18   expectation we were — were going to continue to go work with

19   our customers and, you know, nothing — almost like nothing

20   changed is kind of the way I walked away from the meeting.

21   "Q.  Were you told that your titles would be changing?

22   "A.  There was some mention of a new — of a new title.  There

23   was no — you know, in Google there is the technical solutions

24   consultant titles, but the titles that they had — and I just

25   don't recall exactly what they were — were new, but they were

NAIHRow3                        "Wilson"

1    not, like, documented in HR systems as far as I could tell.

2    "Q.  All right.  Were you told the title of global client

3    technical lead?

4    "A.  It was something of that nature.  The —— the name changed

5    I think a couple of times, but I think that was the final one

6    of the global technical leads.

7    "Q.  So it was your understanding that there was overlap

8    between technical solutions and global client technical lead?

9    "A.  Yes.

10   "Q.  Did you have any understanding as to what distinguished

11   those roles from each other?

12   "A.  It was not clear to me.

13   "Q.  All right.  Was there any discussion with Mr. Shaukat

14   about the differences between the global client lead and the

15   global client technical lead?

16   "A.  I did not personally have a conversation with him about

17   that.

18   "Q.  Did anyone ever explain to you what the difference was

19   between those roles?

20   "A.  Yes.  Darryl Willis tried to explain the difference, but I

21   was left with the impression he was confused also.

22   "Q.  Do you recall what Mr. Willis told you?

23   "A.  Since he and I were senior people in the organization, our

24   thought was that we were just going to say yes, sir, a little

25   bit overlapping.  But our goal is to go serve the customer, and

NAIHRow3                              "Wilson"

1  so we should work together and find a way to go serve the

2  customers with each one of our capabilities and do that to the

3  best of our ability.  That was what we settled on, not a

4  specific set of role of who does what.

5  "Q.  What is the context in which you would discuss Ms. Rowe

6  with other people?

7  "A.  A big financial services customer is doing something that

8  she's working on and she needed help kind of solving a problem,

9  or we were working on something complicated and a financial

10  services customer had solved that problem, we would talk.  She

11  would do a presentation; people would talk about that.  I have

12  a —— a personal relationship with her as a friend, so —— there

13  were other people who did too, so sometimes it was on the

14  personal side.

15  "Q.  From what you observed, did Ms. Rowe have good

16  relationships with other people at Google?

17  "A.  The people I knew generally liked her.  I mean, I can't

18  speak for every single person.  I don't know what they thought.

19  "Q.  At some point in time, did you learn that Ms. Rowe had

20  raised concerns that she was leveled below her male peers?

21  "A.  She had stated that to me.

22  "Q.  Sure.  Really, I'm asking, has Ms. Rowe's behavior for the

23  worst as far as you've observed it since she filed the lawsuit?

24  "A.  No.  In all my interactions with her personally and

25  professionally, she's been a professional, very professional

NAIHRow3                          "Wilson"

 1 | person, yes.

 2 |           MS. GELFAND:  No further questions.

 3 |           THE COURT:  Thank you, Ms. Gelfand.

 4 |           Move to Mr. Eryurek now.

 5 |           MS. GREENE:  Yes.

 6 |           THE COURT:  OK.

 7 |           MS. GREENE:  And, your Honor, it might be helpful to

 8 | clarify for the jury that that was both plaintiff and

 9 | defendant's designations.

10 |           THE COURT:  Yes, thank you.

11 |           Is that going to be true with Mr. Eryurek as well?

12 |           MS. GREENE:  It is.  Both sides have designated

13 | portions of his deposition, but Ms. Gelfand will be reading for

14 | all purposes.

15 |           THE COURT:  So you're going to hear now from a reader

16 | who's going to read Mr. Eryurek's deposition testimony to you.

17 | It is not Mr. Eryurek himself.

18 |           MS. GUTIERREZ:  Just two minutes, your Honor.

19 |           THE COURT:  Yes.

20 |           MS. GELFAND:  (Reading)

21 | "Q.  Good morning, Mr. Eryurek.  When did you join Google?

22 | "A.  Towards the end of 2015, like third quarter.

23 | "Q.  OK.  And what is your highest level of education?

24 | "A.  Ph.D.

25 | "Q.  And when did you receive that Ph.D.?

NAIHRow3                        "Wilson"

1    "A.   1994.

2    "Q.   And that was in nuclear engineering, is that correct?

3    "A.   Correct.

4    "Q.   And is nuclear engineering the same or different than

5    computer engineering?

6    "A.   You would have to do a lot of computer, but it's

7    different.

8    "Q.   OK.  But it involves computations?

9    "A.   Yeah.

10   "Q.   And technology as well?

11   "A.   Yes.

12   "Q.   And do you have a master's degree?

13   "A.   Yes.

14   "Q.   And in what field do you have a master's degree in?

15   "A.   Both from nuclear engineering departments.  I was one of

16   the first artificial intelligence students in the applied

17   process and control industry.  I was one of the first

18   artificial intelligent students in the domain, and my master's

19   and Ph.D. are applied in the process control part of the

20   industry, not really the nuclear side of the industry even

21   though it is for nuclear engineering.

22   "Q.   So do I hear you saying that your master's was focused on

23   artificial intelligence?

24   "A.   Yes.

25   "Q.   And access work?

NAIHRow3                              "Wilson"

1    "A.   Yep, yes.

2    "Q.   During the period of time that you were pursuing your

3    Ph.D., were you employed?

4    "A.   Graduate student.

5    "Q.   What was your first post-graduate job?

6    "A.   Emerson Process Control.

7    "Q.   And when was that?

8    "A.   1994.

9    "Q.   What was your position at Emerson Process Management?

10   What position did you start in?

11   "A.   I started as senior engineer.

12   "Q.   And what was the last position you held at Emerson?

13   "A.   Director.  I was the director of technology.

14   "Q.   And what did the director of technology role entail?

15   "A.   I was responsible for strategies and for developments and

16   group of engineers and product managers that drove that

17   strategy and product development efforts.

18   "Q.   Product development efforts?

19   A.   Yes, which we now call it IOT.  Emerson was ahead of its

20   game, and I was part of that innovative team that changed the

21   analog technologies and switched it to digital technologies.

22   "Q.   What was the size of the team that you oversaw?

23   "A.   Probably —— I'm trying to remember exactly in —— in teams,

24   like 20, 30 directs, and then I had a lot of influential —— as

25   a senior leader of the division, I had a lot of influential

NAIHRow3                         "Wilson"

1   roles in the metrics organization on all of the divisions

2   because plant web was the strategy.  So it involved a lot of

3   the divisions.  I had a lot of indirect relationships,

4   influences.

5   "Q.  Why did you leave Emerson?

6   "A.  I was focused on technology for most of my career.  I

7   wanted to learn more about running a business and GE was able

8   to convince me to take a GM role, and although it had a lot of

9   technology in it, it was also a business that I could run.  And

10   it was a turnaround job fixing up a product platform and

11   growing it, and so forth.

12   "Q.  And that was in GE Transportation, is that right?

13   "A.  I started in GE Transportation, correct.

14   "Q.  And what was the size of the team that you oversaw in GE

15   Transportation?

16   "A.  Hundreds.  Hundreds of people in multiple places, global

17   teams.  India, China, the rest of North America, UK, Italy.

18   "Q.  And what was the next position you held at GE?

19   "A.  Then I was brought in as the chief technology officer for

20   the health care IT business units, which at the time, I think,

21   like 1 1/2 billion.  And soon after that I became the senior VP

22   and CTO of all the GE HealthCare software, which was

23   $20 billion units of GE, and I had a very large team,

24   2,000-some-odd people.

25   "Q.  And is GE HealthCare a division or business unit of GE?

NAIHRow3                        "Wilson"

1    "A.   Yes.

2    "Q.   What did the role of chief technology officer in GE

3    HealthCare involve?

4    "A.   I was the last single-most responsible person for all

5    digital technologies of GE HealthCare and all its products,

6    from diagnostic imaging to hospital EMRs.

7    "Q.   Prior to joining Google, had you worked with or been

8    involved with Google Cloud in any way?

9    "A.   No, only evaluation as a cloud partner.

10   "Q.   Did GE or any of your other employers use Google Cloud ——

11   "A.   No.

12   "Q.   —— as a provider?

13   "A.   No.

14   "Q.   How did it come to be that you left GE?

15   "A.   I had, if you look at my career, 12 years in each company.

16   And after building a strong team and large team and achieving

17   what we had achieved as a team, because if you look at still,

18   health care is the most profitable division of GE, and it was

19   time for some change and maybe better work-life balance.  And

20   when Google approached me, how can you say no to Google?  I

21   became a cool dad overnight.

22   "Q.   At the time they reached out to you, did they indicate

23   that the role in OCTO was a director-level role?

24   "A.   Yes.

25   "Q.   Did they say what the level itself would be?

NAIHRow3                          "Wilson"

1   "A.   No.  I learned in my first days, but I didn't really care.

2   "Q.   OK.  Other than the recruiter, do you recall anyone else

3   that you spoke with in the recruitment process?

4   "A.   Yes.  I talked to Will.

5   "Q.   And are you referring to Will Grannis?

6   "A.   Yes.

7   "Q.   How many times did you talk to Will in the recruiter's

8   office?

9   "A.   A few times.  Not too many.

10  "Q.   Did Mr. Grannis share anything with you about what the

11  role would entail or what the responsibilities of the role

12  would be?

13  "A.   He was very forthcoming, and I had to be very comfortable

14  with ambiguity.  That was the greatest insight he could have

15  shared with me.

16  "Q.   At the time they were recruiting you, did they have any

17  technical directors in OCTO?

18  "A.   No, I was it.

19  "Q.   Were you the first to be hired into that role?

20  "A.   Yes, externally.

21  "Q.   Was there any discussion around how your experience in the

22  health care industry was relevant to the role?

23  "A.   Not specifically.  Not specifically.  I wasn't going to be

24  hired into health care only.  I was hired into the role because

25  of my very senior background that establishes instant

NAIHRow3                              "Wilson"

1    credibility with customers.

2    "Q.  What do you recall discussing in the recruitment process

3    related to your background?

4    A.  Kind of walking through what I did, how I did it, how I

5    interacted with people, my IQ and EQ.

6    "Q.  Anything else you recall being discussed with respect to

7    your background?

8    "A.  That it was impressive to them and that I would be the

9    most-experienced enterprise technical director CTO.  And at the

10   time we didn't have any expertise from enterprises, so I was

11   bringing quite a bit of that from various verticals.

12   "Q.  OK.  We're going to look at Exhibit P3.

13          "Looking at this job description, at some point in

14   time after you joined, does this accurately reflect the role

15   that you were going to play?

16   "A.  Can you clarify this?

17   "Q.  Sure.  Let's focus on the end of 2016.

18          "As of the end of 2016, was this an accurate

19   description of what the role looked like at this period in

20   time?

21   "A.  Yes.

22   "Q.  Do you know whether there was a different job description

23   for people who were being hired at Level 8 as compared to

24   Level 9?

25   "A.  Not that I know of.

NAIHRow3                        "Wilson"

1   "Q.  In the staff meetings, was there any discussion of the

2   distinction between directors at Level 8 versus directors at

3   Level 9?

4   "A.  No.

5   "Q.  Do you know what ladder you were on as a technical

6   director in the office of the CTO?

7   "A.  It had its own ladder, TSC or something.

8   "Q.  Is that technical solutions consultant?

9   "A.  Something like that.

10  "Q.  Do you know whether Google hired other technical solutions

11  consultants in OCTO?

12  "A.  Yes.

13  "Q.  And who were the other — I'm going to say TSCs — who

14  were the other TSCs in OCTO during the time period you were

15  there?

16  "A.  Everyone was in that ladder.

17  "Q.  Who were the other director-level individuals in OCTO on

18  the TSC ladder during the time period you were there?

19  "A.  So everybody had technical director titles to — to my

20  knowledge, and that would include myself, Ben, Ulku — whole

21  bunch of others — Brian and Jeff, Jonathan, quite a few.  I

22  mean, the team was big when I — when I left the team.

23  "Q.  Did it include Nic Harteau?

24  "A.  Nic was one of the latest hires that we had, yes.  I was

25  there, and then we almost — I simultaneously left at about the

NAIHRow3                          "Wilson"

1  same time.

2  "Q.  What about Paul Strong?

3  "A.  Yes, he was there too.

4  "Q.  And by —

5  "A.  And he is there.

6  "Q.  And by Jonathan, were you referring to Jonathan Donaldson?

7  "A.  Yes.

8  "Q.  And does Ben refer to Ben Wilson?

9  "A.  Yes.

10 "Q.  Who did you report to in your position as technical

11 director?

12 "A.  Will.

13 "Q.  And that's Will Grannis?

14 "A.  Yes.

15 "Q.  Did you have, I think you mentioned earlier, staff

16 meetings or team meetings with Will Grannis?

17 "A.  Yes.

18 "Q.  Who else participated in those team meetings with you?

19 "A.  Everyone.

20 "Q.  All the other technical directors?

21 "A.  The entire OCTO team.  We were very inclusive.

22 "Q.  Going back to your other prior experience, in what roles

23 did you work in cloud-based technology?

24 "A.  In GE HealthCare, I was the cloud's champion for the

25 health care industry, and I had to put solutions on both

NAIHRow3                           "Wilson"

1   issues.  And in my last releases of what we call GE Health

2   Cloud, it was on AWS, and so I used both of them.

3   "Q.  So how many years of experience had you had with

4   cloud-based technology at the time you joined Google?

5   "A.  As an evangelist, probably eight years or so easily.  And

6   I had managed and deployed my solutions, either on my own cloud

7   data centers or somebody else's cloud data centers.  So

8   hands-on experience goes back to my GE Transportation days, so

9   from 2005 to now.

10  "Q.  OK.  So going back to the discussion of your role in OCTO,

11  who did you consider to be your peers in OCTO?

12  "A.  Everyone was a peer.

13  "Q.  With respect to — let me ask you this:  Who amongst the

14  other people in OCTO were performing similar roles to what you

15  were?

16  "A.  Just about everyone.

17  "Q.  Does that include Ms. Rowe?

18  "A.  Yes.

19  "Q.  With respect to the other technical directors in OCTO,

20  would directors collaborate with each other?

21  "A.  Yes.

22  "Q.  In what ways?

23  "A.  Sometimes I needed help, they would come in.  Sometimes

24  they had deeper knowledge in some specific area like

25  networking, and I would call Brian, and what have you.

NAIHRow3                          "Wilson"

1    "Q.  Would directors ever fill in for each other on speaking

2    engagements?

3    "A.  Constantly.

4    "Q.  What about with respect to client engagements?  Would one

5    director ever assist another director with a client engagement

6    or substitute for a director for a client engagement?

7    "A.  All the time.

8    "Q.  At the time the other technical directors were hired, do

9    you know the levels of the other technical directors?

10   "A.  No.

11   "Q.  Did you participate in the hiring process for other

12   technical directors?

13   "A.  Only as an interviewer.

14   "Q.  With respect to any of the people you interviewed, were

15   you asked to evaluate whether they should be hired as a Level 8

16   or a Level 9?

17   "A.  No.

18   "Q.  Did you evaluate whether they should be hired as a Level 8

19   or a Level 9?

20   "A.  No.

21   "Q.  Was that something you were thinking about at all at the

22   time ──

23   "A.  No.

24   "Q.  ── that you were interviewing them?

25   "A.  No.

NAIHRow3                          "Wilson"

1    "Q.  Were you provided any criteria with which to evaluate

2    whether they should be a Level 8 or a Level 9?

3    "A.  No.

4    "Q.  Were you provided with any factors to consider in the

5    interview process to allow anyone else to evaluate whether they

6    should be a Level 8 or a Level 9?

7    "A.  No.

8    "Q.  With respect to the other technical directors, did you

9    know any of their levels?

10   "A.  Not unless if they volunteered, and I never asked.

11   "Q.  So during the time you were in OCTO, you did not know the

12   levels of most of the other technical directors?

13   "A.  No, I didn't, and I didn't care.

14   "Q.  Are you familiar with the term 'verticals'?

15   "A.  Oh, yes.

16   "Q.  As that term is used as Google?

17   "A.  Yes.

18   "Q.  What do you understand 'verticals' to mean?

19   "A.  Industry verticals.

20   "Q.  And at the time you were being recruited, were there any

21   discussions around what your role would look like with respect

22   to the verticals?

23   "A.  No.

24   "Q.  Was there any talk about verticalization at that time?

25   "A.  No.

NAIHRow3                          "Wilson"

1    "Q.  Among the directors, the technical directors, were there

2    certain technical directors who were recognized as having sort

3    of an expertise in particular verticals?

4    "A.  It was very clear to them that I had health care

5    backgrounds, not to mention my process control in

6    transportation, but from the focus area, health care was there,

7    finance, retails, oil and gas, media.

8    "Q.  And who were the technical — who was the technical

9    director with expertise in finance?

10   "A.  Ulku.  She was hired with that background.  But, again, I

11   had a lot of bank customers that I brought into Google Cloud.

12   I've done that too.

13   "Q.  OK.  We're going to look at Plaintiff's Exhibit 139.

14          "Do you recognize this document?

15   "A.  That is my job offer, right?

16   "Q.  Yes.  And if you turn to the final page of this document,

17   is this the job offer that you executed?

18   "A.  Seems like it.

19   "Q.  OK.  And looking back at your sign-on bonus, did you

20   receive a one-time cash payment of $265,000?

21   "A.  Yes.

22   "Q.  Do you know how Google determined the amount of your cash

23   sign-on bonus?

24   "A.  Yes.

25   "Q.  How?

NAIHRow3                          "Wilson"

1    "A.  Because I was leaving a lot of money.  If you look at the

2    timing, I think it was October, right, going back to — and I

3    would be leaving quite a bit of my bonus behind, and this was

4    their way of helping me meet that cash flow gap.

5    "Q.  Did they explain anything else to you with respect to how

6    they arrived at that number?

7    "A.  No.

8    "Q.  Looking at the equity compensation piece of this, it says

9    you will be granted two equity awards of restricted stock

10   units.  The first award will be a grant of 4,100 GSU.  Do you

11   see that?

12   "A.  Yes.

13   "Q.  Do you recall what the Google stock value was at the time

14   this grant was made?

15   "A.  Seven, $800.

16   "Q.  Do you recall what this award translated to in value at

17   the time it was awarded?

18   "A.  The amount of money closely — 'closely' being the

19   operative word — that I would leave behind at GE.

20   "Q.  Do you remember if it was more or less than what you were

21   leaving behind?

22   "A.  I — I think I left more behind, but I don't exactly

23   remember the amounts.  You know, I — I felt good enough with

24   the offers and what I was getting into.  At that moment it was

25   an easy decision for me to make mentally.

NAIHRow3                         "Wilson"

1   "Q.  And there's also a second grant award in an aggregate

2   amount equal to $450,000.  Do you see that?

3   "A.  Yes.

4   "Q.  Do you know how that amount was determined?

5   "A.  Because they — they realized how much money I was leaving

6   behind, and so that was sort of their attempts to help me out.

7   "Q.  Just so we're clear, you never requested a particular

8   level, correct?

9   "A.  No.

10  "Q.  At the time you were being hired, nobody told you what the

11  levels of the other technical directors might be, correct?

12  "A.  No.

13  "Q.  In the office of the CTO, did you ever work with Ulku

14  Rowe?

15  "A.  Yes.

16  "Q.  In what capacity did you have an opportunity to work with

17  her?

18  "A.  In external events, joint presentations, analyst events

19  that we presented, and sometimes I pulled her into an executive

20  briefing that I could use her help.  Sometimes she pulled me

21  into some meetings that she could help me out — I could help

22  her out.

23  "Q.  I know some of these are very obvious questions, but,

24  again, we have to get it for the record.

25          "What was your understanding of Ms. Rowe's role at the

NAIHRow3                          "Wilson"

1  time?

2  "A.  She was a technical director in the office of the CTO.

3  "Q.  So she was in the same role that you were in?

4  "A.  Yes.  We were all in the same role.

5  "Q.  Did you at some point in time learn what her educational

6  background was?

7  A.  During our personal conversations, we would chitchat, you

8  know, which schools we went, our families, and so forth.

9  Casual.

10  "Q.  What did you understand about her educational background?

11  "A.  That in — in — that — not in too many specific details

12  that, you know, she understood the domain, technical domain

13  that we were in, and that she had worked in the IT world of

14  fintech, and she understood how it works and how banks are

15  structured and how they operate, and so forth.

16  "Q.  Did you know that she had a bachelor's and a master's in

17  computer-related technology?

18  "A.  I believe she told me, but I don't remember exactly where

19  she got it, and so forth.

20  "Q.  In your work with her, did you find her to be

21  professional?

22  "A.  Very.

23  "Q.  Did you find her to be knowledgeable?

24  "A.  Yes.

25  "Q.  Was she knowledgeable with respect to financial services?

NAIHRow3                         "Wilson"

1    "A.   Yes.

2              (Continued on next page)

NAIVROW4                        "Eryurek"

1   "Q.  Did you find her to be knowledgeable with respect to

2   technology?

3   "A.  Yes.

4   "Q.  Did you find her to be knowledgeable with respect to

5   project management?

6   "A.  I didn't have enough exposure to her project management

7   skills.

8   "Q.  Did you find her to be effective in her role?

9   "A.  Yes.

10  "Q.  Did you, yourself, have any criticisms of her performance?

11  "A.  No, but I wasn't her manager to criticize either, so --

12  "Q.  Did you ever hear anyone else express criticisms of her

13  performance?

14  "A.  No.

15  "Q.  Did you know her level?

16  "A.  Not until very late when she disclosed it to me.

17  "Q.  Did she seem upset that she was an L8?

18  "A.  No.

19  "Q.  Did you have any role in determining what her level was?

20  "A.  None.

21  "Q.  Did you ever discuss with anyone the reasons for what her

22  level was?

23  "A.  No.

24  "Q.  I think you said that you could see why was the phrase you

25  used, why she was an L8?

NAIVROW4                        "Eryurek"

1    "A.   Yes.  Compared to my years of experience, what I've done

2    and so forth, I'm sure she knew how senior I was from about the

3    conversation, so --

4    "Q.   But that was just your --

5    "A.   Personal, personal engagements with her as a friend.

6    "Q.   Right.  And that was just your opinion about why that

7    might be?  You didn't know that to be the reason for why those

8    levels were different?

9    "A.   Yes.

10   "Q.   Correct?

11   "A.   Yes.

12   "Q.   Okay.  At some point in time while you were in OCTO, did

13   you learn that Will Grannis was considering a reorganization of

14   the groups or the people that reported to him?

15   "A.   Yes.

16   "Q.   And did you hear anything about a creation of a vertical

17   group underneath him?

18   "A.   Yes.

19   "Q.   And did you hear that they had identified Ms. Rowe as a

20   potential leader of that group?

21   "A.   Yes.

22   "Q.   And what was discussed with you about that or what did you

23   hear?

24   "A.   That they were contemplating should we do it this way and

25   that and so forth.

NAIVROW4                          "Eryurek"

1   "Q.  Anything you recall about Ms. Rowe in particular being

2   discussed in connection with the creation of that vertical

3   group?

4   "A.  No.

5   "Q.  Did you have any concerns about having Ms. Rowe as the

6   head of that group?

7   "A.  No.

8   "Q.  At that point in time, did you know what her level was?

9   "A.  No, I don't believe so.

10  "Q.  In your role in OCTO, what were your day-to-day

11  responsibilities?  Let's focus on the 2017 time frame.

12  "A.  We had some preliminary customers in various verticals,

13  and I sponsored a few large ones, including Walmart, Bank of

14  Canada, and a few healthcare programs.  And I also helped GCP's

15  kind of horizontal capabilities that they really needed some

16  help on PM leadership.  And I was also helping on the data

17  analytic side a little bit, which was a -- which ended up being

18  my area of focus.

19  "Q.  Did you ever hear anyone describe your position in OCTO as

20  having three pillars?

21  "A.  Three pillars.  Can you explain what the three pillars

22  are?

23  "Q.  Yes.  The first is customer work, the second is

24  influencing the platform and the product, and the third is

25  speaking and evangelism.

NAIVROW4                          "Eryurek"

1    "A.   Yeah.   Yes, that's essentially what we did.

2    "Q.   Okay.   At any point in time, did you move into Tariq

3    Shaukat's organization?

4    "A.   Very briefly, yes.

5    "Q.   And when did you learn that you were leaving OCTO?

6    "A.   I think it was 2018.   Again, like the dates always blur in

7    my head, but I was on -- going on a vacation, I think, in the

8    summer that this was going to happen.   You know, we had heard

9    about it, but we didn't know how.   And actually I made it very

10   clear that I wouldn't and -- but I wasn't given an opportunity

11   to even opt out or anything.   So this happened.   But I had

12   something else going on already.   So it happens.

13   "Q.   How long did you actually function under Mr. Shaukat or in

14   his organization?

15   "A.   Don't know exactly, but weeks.

16   "Q.   Had Ms. Rowe expressed anything to you with respect to

17   Mr. Shaukat's treatment of her?

18   "A.   Yes.

19   "Q.   What did she express to you?

20   "A.   That she was frustrated, she wasn't getting any -- she

21   wasn't being included and that kind of stuff.

22   "Q.   Anything else you recall her expressing to you?

23   "A.   That she thought she should be considered for the role of

24   the vertical lead, and I encouraged her.

25   "Q.   Did you discuss Ms. Rowe's consideration for the vertical

1   lead portion with anyone other than Ms. Rowe?

2   "A.  I don't recall.  Maybe Ben, because we were very close.

3   The three of us were very close.

4   "Q.  Is there anything else you recall discussing with Ms. Rowe

5   with respect to the vertical lead role?

6   "A.  The application and interview process and so forth.

7   "Q.  Did she ever express that she felt she wasn't being given

8   fair consideration for the role?

9   "A.  Yes.

10  "Q.  What did she say with respect to that?

11  "A.  That to her knowledge, her being put through the interview

12  process was done not appropriately, if you will.  I don't know

13  what the right type words were, but she wasn't happy with it

14  and it only happened because she requested.

15  "Q.  Did she say anything else with respect to Mr. Shaukat and

16  her consideration for the lead role?

17  "A.  I believe we had a conversation that she had heard that

18  Tariq wants to bring VP-level person from into -- into the role

19  from outside, inside, I'm not sure where, but that was the

20  focus and that was it, I believe.

21  "Q.  What did you know about Nick Harteau's background?

22  "A.  That he was an engineering director at Spotify, which was

23  a customer of mine, and very good -- very capable guy.

24  "Q.  Do you know what his level was during the time he was in

25  OCTO?

1  "A.  No.

2  "Q.  Mr. Eryurek, have you heard the term 'senior director'

3  used in OCTO?

4  "A.  We never used it, no.

5  "Q.  So in your recollection, the term 'director' was the term

6  that was used in OCTO?

7  "A.  We all -- we all had technical directors business cards

8  and so forth.

9  "Q.  Did Ms. Rowe ever tell you in sum or substance, even if

10 she didn't use those exact words, that she thought she was

11 being treated differently as a woman?

12 "A.  No.

13 "Q.  From what you observed about the technical director role,

14 was it years of experience that was the most relevant or the

15 type of experience that was most relevant to the job?

16 "A.  Probably a combination of both.  And some had a lot more

17 years, and their roles were really big and broad and so forth.

18 Some others were maybe the types of the focus areas that they

19 had and what experience that they brought in.

20 "Q.  So, in other words, years of experience was not a

21 determining factor in how someone could perform as a technical

22 director?

23 "A.  Remember, I told you technical director was a title that

24 just about everyone used in the team; some with a lot less

25 experience and junior roles than I did, but they still called

1    themselves technical directors, which was fine for them because

2    that's sort of -- that helps excel communications of technical

3    directors and will do it.

4            And so years of experience mattered.  What you did,

5    where you did, how you did, for whom you did definitely

6    mattered.  But not everyone had that same kind of template

7    experience, because we all had technical director titles, but

8    we were different levels because of the experience that we had

9    in our pasts.  Some was driven by years, some was driven by

10   what we have accomplished in our prior lives.

11   "Q.  And is that something that was communicated to you or

12   something that you just --

13   "A.  By virtue of -- of -- by virtue of talking to people, you

14   sort of gather that.

15   "Q.  With respect to directors at L8 and above, did you have

16   any basis to know what their years of experience were and how

17   that related to their leveling?

18   "A.  Not really.

19   "Q.  Did it have any impact on what clients they worked on?

20   "A.  No.

21   "Q.  Did it have any impact on what external speaking

22   engagements they might work on?

23   "A.  Absolutely not.

24   "Q.  Did it have any impact on what internal products or

25   projects they might work on?

1    "A.  No.

2    "Q.  With respect again to the L8 and L9 directors, did the

3    years of experience impact their day-to-day work or the role in

4    any way?

5    "A.  I wouldn't have guessed so, no."

6              MS. GELFAND:  No further questions.

7              THE COURT:  Thank you.

8              MR. CHIARELLO:  Your Honor, our next witness is April

9    Beaupain.

10             THE COURT:  Okay.

11             Mr. Chiarello, I intend to give the jury a lunch break

12   at 12:30.

13             MR. CHIARELLO:  Okay.  Thank you, your Honor.

14    APRIL BEAUPAIN,

15         called as a witness by the Plaintiff,

16         having been duly sworn, testified as follows:

17   DIRECT EXAMINATION

18   BY MR. CHIARELLO:

19   Q.  Good afternoon, Ms. Beaupain.

20   A.  Good afternoon.

21   Q.  You are currently employed at Google?

22   A.  Yes.

23   Q.  And in 2018/2019, what was your role at Google?

24   A.  I was an employee relations partner.

25   Q.  And did you participate in an investigation in connection

1    with a complaint made by Ms. Rowe during the 2018/2019 time

2    period?

3    A.  Yes.

4    Q.  And what was your role with respect to that investigation?

5    A.  I was the primary investigator.

6          MR. CHIARELLO:  Mr. Yang, can you please put up

7    Plaintiff's 99.

8    Q.  The writing is a little small on this, but Ms. Beaupain, do

9    you recognize this document?

10   A.  I do.

11   Q.  Is it Google's policy on harassment, discrimination,

12   retaliation, standards of conduct, and workplace concerns for

13   U.S. and Latin-American employees?

14   A.  Yes.

15   Q.  Was this policy in effect at the time you investigated

16   Ms. Rowe's concerns in 2018?

17   A.  Yes, it was.

18         MR. CHIARELLO:  Mr. Yang, can we take a look at the

19   third page.  And can we call out the area around addressing

20   concerns.  Thank you.

21   Q.  Ms. Beaupain, this policy states there are multiple ways in

22   which a Googler can raise or escalate a concern about improper

23   conduct under this policy, including the following:

24         You may talk to your manager, someone else in your

25   reporting chain, or any other manager outside of your reporting

1    chain; any human resources people partner or consultant; the

2    respect@team; and the compliance help line.

3            It's correct that an employee could use any of those

4    methods to register a concern; is that correct?

5    A.  Based on what -- excuse me.  Based on what you're showing

6    me, what it says, yes.

7    Q.  And is it correct that those are ways that an employee

8    could raise a concern?

9    A.  They are.  I want to be thoughtful of at the time of -- in

10   2018, I can't recall whether, like, our compliance help line

11   was up and running; but yes, these are absolutely avenues that

12   someone can raise a concern.

13   Q.  Better clarification.

14           MR. CHIARELLO:  Mr. Yang, can we look above that at

15   the section that's marked "Retaliation."

16   Q.  And Ms. Beaupain, this is Google's policy prohibiting

17   retaliation against employees who raise workplace concerns;

18   correct?

19   A.  Yes.

20   Q.  And this policy would apply to employees who raise concerns

21   of gender discrimination?

22   A.  Yes.

23   Q.  And it would apply to employees who raise concerns of pay

24   disparity?

25   A.  Yes.

1              MR. CHIARELLO:  Mr. Yang, can we take a look at the

2    fourth page of this document.  And I want to call out the top

3    part of how a concern is handled.  Not just the header, the

4    first two paragraphs underneath that.

5    Q.  And while he's doing that, Ms. Beaupain, it was employee

6    relations' responsibility to investigate complaints of

7    discrimination; correct?

8    A.  Yes, that's correct.

9    Q.  Drawing your attention to the bottom paragraph,

10   Ms. Beaupain, it says:  We'll also gather information about the

11   issue.  To do that, we'll need to talk with you.  During the

12   meeting there will generally be two members of the

13   investigations team in the room, one person will be taking

14   notes.

15              This is with respect to the complainant, but was it

16   also employee relations' policy to have two individuals in the

17   room for any interview?

18   A.  Typically, that would be our approach.  There could be

19   one-off exceptions to that, so I don't want to say they

20   unilaterally apply, but that was definitely best practices to

21   have two of the employee relations members in an interview or

22   in a discussion, yes.

23   Q.  And was also the practice to have a person taking notes of

24   the interview?

25   A.  Yes.  I mean, again, there's always exceptions.  I don't

1   know if this was actually just being thoughtful of this

2   language.  I don't know when that was added as part of the

3   process or policy here.  I don't know if it was in effect.

4   This has changed and grown as Google has grown, so I can't say

5   for sure that this was in the process in 2018.  But that was

6   ER's practice where it made sense to have two individuals in

7   the interview when speaking with people.

8   Q.  Okay.  I just want to clarify.  I thought you had said this

9   policy was in effect in the 2018/2019 period?

10  A.  Thank you.  Let me clarify.

11          The policy was in effect.  Some of the details, how a

12  concern is handled, may have grown and changed as Google has

13  grown and our processes have grown.

14  Q.  But it was the practice during the time Ms. Rowe's

15  complaint was investigated; correct?

16  A.  Yes.  Typically, we would have two people when conducting

17  an interview.

18          MR. CHIARELLO:  Mr. Yang, you can take this down.

19          And can you please put up Plaintiff's 114.  And I

20  guess just scroll through it so the witness can take a look.

21  Q.  Ms. Beaupain, are you familiar with this document?

22  A.  Mildly familiar, yes.

23  Q.  It's a guide created by Google; is that correct?

24  A.  I believe so, yes.

25  Q.  And it's to assist employee relations when investigating

1    complaints?

2    A.  That's my understanding, yes.

3          MR. CHIARELLO:  Mr. Yang, can we take a look at the

4    fourth page of this document.

5    Q.  This page in the second column lists different types of

6    discrimination; correct?

7    A.  That's what it looks to be, yes.

8    Q.  And if we look at the second row from the bottom and where

9    that intersects with the fourth column examples.

10          MR. CHIARELLO:  If you could call that out, Mr. Yang.

11   Q.  These are examples of possible discrimination that Google

12   is highlighting; correct?

13   A.  Yes.

14   Q.  And one of those examples is offering women and men

15   different rates of pay or benefits for the same job; correct?

16   A.  Yes.

17          MR. CHIARELLO:  Mr. Yang, can we move on to page 6.

18   Q.  And on this page we're looking at categories of retaliation

19   or retribution; correct?

20   A.  Yes.

21   Q.  In the row that's labeled "Protected Activity," I want to

22   look at the examples of that row.

23          MR. CHIARELLO:  And Mr. Yang, can you, yes, call out

24   just the bottom portion there.

25   Q.  So in discussion of what an adverse impact could be, Google

1    identified as an example:  Can also mean being excluded from

2    opportunities that you otherwise wouldn't have been excluded

3    from, like meetings with clients and other important

4    stakeholders.  Correct?

5    A.  Yes.

6    Q.  The guide says.

7            And it also offers an additional example:  A manager

8    was found to have provided information to a hiring manager

9    about a Googler raising concerns, we assume in the attempt to

10   deter the hiring manager from hiring them.  The act of trying

11   to prevent someone from being hired would be adverse action,

12   even if there was no actual impact, i.e., person got hired

13   anyway.

14           Do you understand these both to be examples of things

15   Google would consider retaliation?

16   A.  They're provided in this as an example.  On their face,

17   that would look at the concern and understand kind of the --

18   what led to it, understand the motive.  But actually this is an

19   example that's called out if it was motivated for retaliatory

20   purposes.

21   Q.  Okay.  Ms. Beaupain, do you know whether the examples in

22   this guide are based on real situations encountered at Google?

23   A.  I can't speak to that.  I didn't create this doc, so I

24   can't speak to that.

25   Q.  Okay.

1           MR. CHIARELLO:  Mr. Yang, can we look at the eighth

2     page, please.

3     Q.  And this page deals with unfair treatment; correct?

4     A.  Yes.

5     Q.  Five rows down there's a row identified as unfair leveling

6     at hire.  Do you see that?

7     A.  I do.

8           MR. CHIARELLO:  And Mr. Yang, if you can call out the

9     two boxes.  Great.  I want to look at the box on the right.

10    Q.  So this is notes/regional nuances.  And it says:

11    Typically, these would be looked into by PPs/and PCs.  What are

12    PPs and PCs?

13    A.  It's what we refer to generally as human resources at

14    Google.  And they actually break it down into people partners

15    and people consultants.

16          So people partners are typically aligned to, like,

17    leaders and strategically work with them.  And people

18    consultants are typically involved with kind of the more

19    general concerns or general guidance for Googlers, like if they

20    need help with leave or performance questions.  So that's just

21    how it's broken out.

22    Q.  It goes on to state:  However, discrimination related to

23    level may not be substantiated, but we do find the level was

24    unfair or not in alignment with Google processes for job

25    ladder.  In that case, please note you substantiated "unfair

1   leveling at hire" and did not substantiate "discrimination —

2   Level."  Additionally, if there's a concerned re

3   discrimination, ER -- that's employee relations?  Ms. Beaupain,

4   "ER" is employee relations?

5   A.  Yes.  Sorry.  Thank you.

6   Q.  Okay.  Would look into it, and this category may be used if

7   discrimination related to level is not substantiated, but we do

8   find the level was unfair or not in alignment with Google

9   processes for job level.

10          Do you understand, Ms. Beaupain, if there is a finding

11  that there was an unfair leveling, whether or not it's related

12  to discrimination, that Google had a process to adjust or

13  correct the level?

14  A.  I'm making sure I understand the question.  Was there a

15  process in place if there was a finding of unfair leveling, is

16  that the question?

17  Q.  Yes.  So assuming employee relations does an investigation,

18  determines that there is leveling that was unfair, Google has a

19  process to correct that unfairness?

20  A.  I can't speak to the specific process that's in place, but

21  if we did during the course of our investigation find that

22  there was unfair leveling, that's my understanding is we would

23  take steps to help correct that.

24  Q.  I want to talk specifically about your role now in

25  Ms. Rowe's complaint.

1    THE COURT:  Mr. Chiarello, do you want to start that

2    now?  It's 12:26.  It sounds like it might be a segment.

3    MR. CHIARELLO:  It is a new area.

4    I'm happy to break here.

5    THE COURT:  I think that makes sense.

6    MR. CHIARELLO:  Okay.

7    THE COURT:  All right.  Now, Ms. Williams, we're going

8    to have some technical assistance during the lunch break,

9    right?  I just need to factor that into the amount of time

10   we're going to be out of here.

11   Members of the jury, let's break for lunch now and

12   return at five minutes after one.  And during the lunch break,

13   please do not speak to each other or anyone else about the

14   case.  Do not do any research on the case.  And please remember

15   to make use of the facilities in the jury room and not use the

16   public rest rooms where you might encounter lawyers, witnesses,

17   etc.

18   All right.

19   (Jury not present)

20   THE COURT:  You may step down now.  Thank you.

21   (Witness not present)

22   (Luncheon recess)

23   (Continued on next page)

24

25

```
1                    A F T E R N O O N   S E S S I O N

2                              1:10 P.M.

3               THE COURT:  Ms. Williams, let's bring in the jury

4    please.

5               (Jury present)

6               THE COURT:  Ms. Beaupain, I remind you that you're

7    still under oath.

8               THE WITNESS:  Yes, your Honor.

9    BY MR. CHIARELLO:

10   Q.  Ms. Beaupain, do you recall prior to the break we were

11   talking about Google's policies with respect to correcting

12   under-leveling at hire?

13   A.  Yes.

14              MR. CHIARELLO:  Mr. Yang, can you please put up

15   Plaintiff's 105.

16   Q.  Ms. Beaupain, if you can take a look at the first page.

17   And if you feel like you need to look further into this

18   document, let me know.

19   A.  Okay.

20   Q.  Ms. Beaupain, is this an example of a time in which

21   employee relations adjusted a female employee's level following

22   a complaint of under-leveling?

23   A.  So I don't recall this doc or if this is one that's

24   related, something I worked on based on what's discussed.  I do

25   see discussions about levels though.
```

1  Q.  And taking a look at this second bullet from the bottom,

2  there's a note:  We are adjusting to Level 7, backdating to

3  when blank started in KAE role.

4         So does that indicate to you that this individual's

5  level was adjusted and backdated to the time they started in

6  the role?

7  A.  Yes.

8  Q.  I want to talk a little bit about your role in the

9  investigation of Ms. Rowe's complaint.

10         MR. CHIARELLO:  Mr. Yang, can we put up Plaintiff's

11  57, please.

12  Q.  Ms. Beaupain, do you recognize these to be the interview

13  notes made in connection with the interviews around Ms. Rowe's

14  complaints --

15  A.  I do, yes.

16  Q.  -- in 2018?

17  A.  Yes, I do.

18  Q.  You're familiar with this document?

19  A.  Yes.

20  Q.  And to your knowledge, everything in this document is

21  accurate?

22  A.  Yes, it would be accurately reflecting the notes that were

23  taken at the time.

24  Q.  Is it correct that the only person you interviewed in

25  connection with that complaint besides Ms. Rowe was Jennifer

1   Burdis?

2   A.  Yes.

3   Q.  And you didn't interview any of the Level 9 men Ms. Rowe

4   was comparing herself to, right?

5   A.  I did not.

6   Q.  You didn't interview Will Grannis?

7   A.  I did not.

8   Q.  And you did not interview Brian Stevens?

9   A.  I did not.

10  Q.  In addition to the interview of Ms. Burdis, did you also

11  review data that Kevin Lucas had put together with respect to

12  degrees and years of experience for the individuals, the

13  technical directors in OCTO?

14  A.  Yes, I did.

15  Q.  And did you take any steps to verify with anyone whether

16  those two factors, meaning years of experience and degrees,

17  were actually used in the leveling decisions when Ms. Rowe was

18  hired?

19  A.  I spoke to Jenny Burdis, who is the recruiter in staffing,

20  to better understand the process and what had been taken into

21  consideration.

22  Q.  And did she tell you that years of experience and degrees

23  were the basis for the leveling decisions?

24  A.  Not in those words, no.  She explained they were

25  considerations and factors when determining level.

1   Q.  Okay.  Other than speaking with Ms. Burdis and reviewing

2   the data that Mr. Lucas provided, did you do anything else as

3   part of your investigation?

4   A.  I would have -- I spoke to, I believe, Kevin Lucas from HR

5   to better understand, kind of, steps he'd taken and what he'd

6   done.  I would have spoken to colleagues to make sure we are

7   coming from a consistent -- consistent front in what we do in

8   steps we take as far as an investigation.  Reviewed the data,

9   reviewed any relevant documentation or emails, spoken with

10  relevant people who would provide relevant information.

11  Q.  I'm sorry, did you finish?

12  A.  I think I did, yes.

13  Q.  When you say "reviewed relevant documentation or emails,"

14  what specifically are you referring to?

15  A.  In general, it would have been steps taken.  So if there's

16  emails that were, you know, related to the concern, HR provide

17  any additional background or emails, I would have reviewed

18  those.  Just kind of any relevant information that was provided

19  to us in connection to the concern raised.

20  Q.  And as you sit here today, can you think of any documents

21  or emails you reviewed besides the data that Mr. Lucas provided

22  as part of your investigation?

23  A.  I would have -- I believe there are some emails that HR

24  provided me kind of to show to understand the concerns that

25  were raised or any steps that were taken prior to it coming to

1   me.

2   Q.  I think you said you might have spoken with other

3   individuals.  Do you recall speaking with anyone other than

4   Ms. Burdis and Ms. Rowe as part of your investigation into this

5   complaint?

6   A.  I did speak to Kevin Lucas.  He was the individual in HR

7   who originally raised the concern.

8   Q.  Okay.

9          MR. CHIARELLO:  Mr. Yang, can we take a look at the

10  second page of Plaintiff's 57.  And I want to call out right in

11  the middle.  That's right.  You have it.

12  Q.  So there's a note here from your interview with Ms. Burdis

13  that says:  I feel at Google there's a ton of grey areas

14  between the levels anyway.  We take a lot of measures to make

15  sure the leveling is correct, many layers of review.  But there

16  will always be that tiny margin that's grey.

17          That's something that Ms. Burdis had said in the

18  interview to you; correct?

19  A.  I don't recall if those exact words were spoken, but they

20  reflect in the notes, so she would have said something to that

21  effect, yes.

22  Q.  And --

23          MR. CHIARELLO:  You can take that down, Mr. Yang.

24  Q.  In the notes --

25          MR. CHIARELLO:  I'm sorry, keep up that page,

1    Mr. Yang, but just not the call-out.

2    Q.   There's nothing in these notes that suggests Ms. Burdis

3    explained why Ms. Rowe had been leveled as a Level 8 as opposed

4    to a Level 9; correct?

5    A.   I'm not sure I understand the question.

6    Q.   Did Ms. Burdis provide you with an explanation as to why

7    Ms. Rowe had been leveled as a Level 8 and not a Level 9?

8    A.   We did -- we did discuss that during the interview, yes.

9    Q.   Can you point to where that is in the notes?

10   A.   We talked about the general levels.

11           So if I'm understanding you correctly, it's whether we

12   talked about Ms. Rowe, what kind of leveling in general.  But

13   we did discuss, kind of, the general number of years that a

14   director would have.  So I think she mentioned, like,

15   potentially 17 to 20 was like a general amount of years of

16   experience she would see when looking at directors.  I think it

17   was like 25 plus, typically, like -- excuse me, take a step

18   back.  Directors are L8 and L9 roles.

19           So for L8s, typically like 17 to 20 years -- 17 to 20

20   years or so.  Like 25-plus years would be like an L9.  And

21   those were not necessarily hard and fast, but those were

22   typically what would be seen for years of experience.

23           We talked about -- want to refresh my recollection?

24   We talked about, I think, conversation she had had with

25   Ms. Rowe about the leveling.

1        Does that answer your question?

2   Q.  Sure.

3        Is there anything in the notes that reflects

4   Ms. Burdis telling you that Ms. Rowe -- or that L9 men had a

5   stronger tech background versus her tech background?

6   A.  I seem to recall we talked about L9s; if individuals were

7   L8 versus L9, some of the factors that could be considered, not

8   only their years of experience, but like the type of

9   experience.  And I'm not quite remembering whether it was the

10  conversation with Jenny Burdis or the data that I reviewed in

11  making that connection, but I do remember that we discussed

12  that.

13       So for instance, someone might have years of

14  experience that were kind of general years of experience, that

15  we're playing into that L8 role.  But someone might have very

16  specific, like, technical experience or Google Cloud product

17  experience, and that might very specific translatable

18  experience.  That might be a consideration why they come in as

19  an L9 versus an L8.

20  Q.  Is there anything in these notes that reflects anything

21  around what Ms. Burdis understood to be Ms. Rowe's tech

22  background?

23  A.  I don't recall if it's in the notes.  I recall that like

24  these were discussions and we talked about these things.  I'm

25  happy to read through the notes specifically though, if you're

1    asking me to identify it in the page in front of me.

2    Q.  If it would be helpful, please feel free to take a look.

3    A.  Just to be clear, you're asking me if something was in the

4    notes doc.  I want to be clear I'm looking for what's in the

5    notes doc or what I remember, like, the discussion, the

6    investigation to be?

7    Q.  Well, let's start with what's in the notes.  Is there

8    anything reflected in the notes regarding a conversation with

9    Ms. Burdis about Ms. Rowe's tech background?

10   A.  She does refer to the banking background, that Ms. Rowe

11   came from a banking background.  So that was something that

12   referenced, and I recall that from the conversation.

13   Q.  Okay.  Is there anything in your conversations with

14   Ms. Burdis that is not recorded in this document with respect

15   to Ms. Rowe's tech background that you discussed?

16   A.  I do recall it coming up kind of the type of experience and

17   that being a factor in what might differentiate someone coming

18   in as an L8 versus L9.  And some of the considerations being,

19   kind of, a general experience, the background, versus

20   translatable skills.  So like the tech experience versus the

21   general experience or that Google Cloud product experience.

22   And I'm sorry, I can't remember whether it's in the notes, but

23   I do recall that being part of the investigation and part of

24   the findings.

25   Q.  Did you do any independent research into what Ms. Rowe's

1  qualifications were?

2  A.  Any independent research.  I reviewed the data that was

3  shared with us.  I worked with our analyst to ensure that data

4  was accurate, what was in the systems, not just relying on kind

5  of the data that HR pulled.  And I think that was reflected in

6  the data that I reviewed.

7          So it would be understanding that she came from a

8  financial background, might have focused on cloud or tech, but

9  it was a financial background.  But other than relying on the

10  data that was provided, speaking with an analyst on my team,

11  and then if it came up in conversation with Ms. Rowe, I don't

12  recall taking any additional steps during the investigation.

13  Q.  And all your conversations with Ms. Burdis on this matter

14  are reflected in these notes; correct?

15  A.  The date that I spoke with her is reflected in these notes.

16  These notes aren't meant to be verbatim; they are meant to help

17  the memory; they are meant to help kind of capture key or

18  material information.  But it wouldn't have captured, like,

19  everything in our conversation, if that's what you're asking.

20  Q.  Yeah.  So I'm just asking a separate question.  There are

21  no conversations beyond those identified in here that you had

22  with Ms. Burdis?

23  A.  I don't recall any.

24          MR. CHIARELLO:  Mr. Yang, let's look at page 3.

25  Q.  Ms. Beaupain, you're aware that there were five men that

1    had been leveled as Level 9 technical directors in OCTO;

2    correct?

3    A.  Yes.

4    Q.  And according to these notes, Ms. Burdis only discussed

5    three of those individuals with you:  Nick Harteau, Evren

6    Eryurek, and Jonathan Donaldson; correct?

7    A.  If that's what the notes reflect, that, like, would have

8    been the case, yes.

9    Q.  And that discussion you had with Ms. Burdis, she was doing

10   that mostly from memory?

11            MS. TOMEZSKO:  Objection.  Foundation.  And it's also

12   leading.

13            THE COURT:  I'll allow it.

14   A.  I can't -- I wasn't in person with Ms. Burdis, I don't

15   think.  If I recall, she was looking up something, I think

16   that's referenced in the notes earlier, that she's going into

17   the system and looking up -- I just don't recall what she was

18   looking up, but it had to do with the questions I was asking

19   her.  So it would have been based on memory and whatever else

20   she was looking at at the time.

21   Q.  Okay.  And with respect to Mr. Eryurek, there's a note

22   that:  I don't have access to his gHire, and I assume that

23   means Ms. Burdis did not have access to his gHire; correct?

24   A.  Can -- is that --

25   Q.  So the second black bullet is Evren Eryurek.  And three

1    bullets down from that there's a note that says:  I don't have

2    access to his gHire.

3    A.   Then yes, that's -- I would -- I would rely on what's

4    captured there.

5    Q.   And based on these notes, is it accurate to say that you

6    didn't discuss either Ben Wilson or Paul Strong with

7    Ms. Burdis?

8    A.   I don't recall.  If it's not in the notes, then I can't

9    recall.  This is five years ago.  I would rely on what's

10   captured in the notes.

11   Q.   And I just want to call out under Jonathan Donaldson, the

12   second bullet, there's a note:  Will Grannis SOS endorsed Level

13   9 hire, addressed the leaning higher recommendations in the

14   interview feedback.

15         Will didn't actually explain in detail why he

16   supported an L9 hire.  That is a note from your conversation

17   with Ms. Burdis; correct?

18   A.   Yes.

19         MR. CHIARELLO:  We can take that down.

20         And Mr. Yang, if you can put up Plaintiff's 89.

21   Q.   Ms. Beaupain, do you recognize this to be your talking

22   points drafted for your conversation with Ms. Rowe about the

23   outcome of the employee relations investigation?

24   A.   Yes.

25         (Continued on next page)

1    BY MR. CHIARELLO:

2    Q.  And these are the —— did you rely on this script when you

3    spoke to Ms. Rowe?

4    A.  Yes, I did.

5    Q.  I want to take a look at the seventh bullet down.  It's the

6    one that has some highlighting on it already.  It says:  "Tech

7    versus non-tech experience was the most heavily considered

8    factor when gauging L8 versus L9 for similar years of work

9    experience.  Is this appropriate to articulate in a closing if

10   pressed by Googler?"

11         My question is, were you asking to confirm because you

12   yourself did not know whether that was a factor Google was

13   relying on to distinguish Ms. Rowe from the Level 9 men?

14   A.  No.

15   Q.  No, that's not why you asked?

16   A.  No, that's not why that's referenced there, no.

17   Q.  What was the purpose of the question to ask is it

18   appropriate to articulate in closing if pressed by the Googler?

19   A.  This is a reminder to myself.  So when we're writing out

20   talking points, typically, we're going to have, if they're very

21   sensitive cases or for various reasons —— sorry, my voice is

22   going —— we'll capture questions there, things to flag to

23   ourself.  I remember this one in particular as well we were

24   working with counsel, and it was a sensitive matter, like ——

25   this one in particular based on the leveling, I just wanted to

1   make sure I was being consistent with how we typically close

2   out leveling questions.  And I wasn't sure whether —— like, how

3   much to go into detail-wise when closing out individuals.

4           So that was more of a flag to me to check with —— I

5   just don't remember if it was my lead at the time or legal just

6   to make sure how much detail to go into at the time.  That's

7   just a facet of how detailed to go into closing arguments ——

8   closing discussions with individuals that raise concerns.  We

9   want to provide very high level, address their concerns, but

10  not necessarily go into all the details of the entire

11  investigation.

12          THE COURT:  Get some water for the witness, please.

13          THE WITNESS:  Thank you.

14          MR. CHIARELLO:  I have nothing further.

15          THE WITNESS:  Thank you so much.

16  CROSS-EXAMINATION

17  BY MS. TOMEZSKO:

18  Q.  Good afternoon, Ms. Beaupain.

19  A.  Good afternoon.

20  Q.  Before we get into the substance of your investigation,

21  could you describe for the jury a little bit about your

22  background at Google and your background prior to joining

23  Google.

24  A.  Sure.  Happy to.

25          After college, I went to law school.  After that time,

1   I clerked for a year in New York/New Jersey then actually was

2   in Manhattan.  I was an assistant District Attorney for New

3   York County for three years.  After that I actually went into

4   the FBI, so I was a special agent for four years.  And then

5   after that I went into Google.  At Google I started out with a

6   team called the Global Investigations Team.  It's a different

7   team.  We looked into confidential information being leaked,

8   inappropriate access to our internal systems, things like that.

9   After roughly four years there, I then transitioned over to the

10  employee relations team, and I've been there ever since.

11  Q.  At the time you were investigating Ms. Rowe's concern,

12  approximately how many years of experience did you have

13  investigating concerns raised by employees at Google?

14  A.  It's 2018, and I started in '14, so in that four- to

15  five-year range.

16  Q.  And I just want to briefly pull up an exhibit that you were

17  shown by Mr. Chiarello, and that's Plaintiff's 105.  And I just

18  have two quick questions about this document, if we can pull

19  that up.

20          Ms. Beaupain, before today had you ever seen this

21  document before?

22  A.  I honestly don't know.  I could have.  Nothing coming to

23  light is making me remember this document, though.

24  Q.  Are you then aware of any of the circumstances that would

25  support any of the findings that you see in this document?

NAIHRow5                          Beaupain – Cross

1   A.   No.

2          MS. TOMEZSKO:  Take that down, please.

3   Q.  I also want to pull up another document that you saw, and

4   it's Plaintiff's 114.

5          Do you recall looking at this document earlier,

6   Ms. Beaupain?

7   A.  I do, yes.

8   Q.  I want to focus on the unfair treatment allegations box

9   that we see in the bottom right-hand corner there.

10          My question to you is if there were no — no

11   suggestions of gender discrimination in the leveling concern,

12   would you expect that the concern would be escalated to

13   employee relations?

14   A.  No.  No, we would only look into concerns where there was

15   concerns based on a protected class or based on our harassment,

16   discrimination, retaliation policy.  So unfair treatment, on

17   its face you would expect to be handled with the HR/people

18   consultants.

19          MS. TOMEZSKO:  We could take this document down.

20   Thank you.

21   Q.  And I just want to make the record clear on this point.  I

22   know we established what ER stands for, but can you explain

23   what employee relations is and what it does at Google.

24   A.  Sure.  The employee relations team, we actually have kind

25   of a number of different little smaller teams within it.  The

1    employee relations team, mainly the remit is to ensure that

2    Google is — if there's any concerns about policy violations,

3    like harassment, discrimination, retaliation, inappropriate

4    treatment, or misconduct based on a protected status, those are

5    kind of our main remits, ensuring that those types of policies

6    are followed, that practices are fair and consistent and

7    equitable.  That's kind of the larger remit, if you will.

8    Q.  Can you explain — well, is there a difference between

9    employee relations ER and human resources, HR, at Google?

10   A.  Yes, absolutely.  We both roll up to the same — it's

11   called the people operations.  So it's like the large kind of

12   organization, but we roll up through separate directors,

13   separate vice presidents, if I'm — if I'm remembering

14   correctly, but we're separate teams.  So we partner with them

15   in a lot of investigations in the sense of they might raise

16   concerns to us.  If there's concerns about protected status or

17   policy concerns, they come to us for guidance, but we're very

18   too distinct teams.

19   Q.  Is there any policy at Google that delineates which

20   concerns are typically investigated by employee relations and

21   which concerns are typically handled by human resources?

22   A.  There's guidance out there, and I just — I couldn't point

23   to it right now, but there is definitely documentation for each

24   team on, you know, what their remit is and what employee

25   relations' remit is that would give a sense of when they should

1    be taking matters and when we should be taking matters,

2    absolutely.

3            THE COURT:  Could we just clarify for the jury what

4    you mean by "remit."

5            THE WITNESS:  Oh, thank you.  Yes.  Remit is like what

6    are our roles and responsibilities, so what would be — what

7    would be expected of a role and responsibility for human

8    resources, what matters they look into, what matters they

9    address, kind of how they approach things, and in the employee

10   relations team, what our role and responsibilities are.

11           Does that clarify, your Honor?

12           THE COURT:  Thank you.

13   Q.  If we could just briefly pull up Plaintiff's 99, I think

14   you were shown this exhibit earlier as well.

15   A.  Yes.

16   Q.  Do you recognize this document?

17   A.  Yes, uh-huh.

18           MS. TOMEZSKO:  Could we turn to page 4 of the

19   document, please, under the heading "Who handles the concern,"

20   and let's make that a big bigger so we're not all straining our

21   eyes.  Perfect.

22   Q.  Ms. Beaupain, is this an example of such a policy that you

23   were referring to that defines the remit as you've explained

24   what that word means?

25   A.  Yes, exactly.  This delineates sort of the overarching

1    responsibilities of each team and what they would be

2    addressing.

3    Q.  So when it says, "Employee relations —— Violations of our

4    policies against harassment, discrimination, and retaliation,"

5    is that an example of something that employee relations would

6    look into?

7    A.  Yes, exactly.

8    Q.  And then, conversely, on the bottom where it says,

9    "HR/Manager —— Most other concerns, such as interpersonal

10   conflicts or challenges to performance ratings are typically

11   handled by the relevant manager or HR," is that an accurate

12   statement of your understanding of various remits that HR had

13   versus ER?

14   A.  Yes.

15          MS. TOMEZSKO:  We could take that document down,

16   please.  I want to pull up yet another document.

17   Plaintiff's 44, if we can.

18   Q.  Ms. Beaupain, do you recognize this document?

19   A.  Yes.

20   Q.  What is it?

21   A.  Sure.  This is an email that was between myself, Kevin

22   Lucas, who was an HR partner that I discussed earlier who

23   originally raised kind of the concerns for our team, and then I

24   also cc'd Janice Rumschlag, who was an analyst or was an

25   analyst at the time for the employee relations team.

NAIHRow5                        Beaupain - Cross

1  Q.  Is that the same analyst you referenced earlier when you

2  were describing how you conducted your investigation?

3  A.  Yes.

4  Q.  And if we could focus on the August 29, 2018, email at

5  12:29 p.m. from Kevin Lucas.

6          And he says:  "Below is the email from Ulku that we

7  discussed, and here is the rough data I pulled."

8          Can you explain what the context is for that

9  statement.

10 A.  Sure.  So when I spoke to Kevin Lucas, he was the one who

11 originally raised the concern about the ── Ms. Rowe's concerns

12 about leveling with regards to gender.  And so Kevin and I had

13 a conversation where he brought it up, and this is him then

14 sharing the additional information that we discussed live.

15         So the email, I'm assuming he's talking about the

16 email that Ulku had raised with her concerns.  He forwarded

17 that to me so I'd have that context and then also the data that

18 was discussed.  So Kevin pulled some data as far as to better

19 understand the concern with comparators, and then that's the

20 data I would have used when discussing with Janice, who was the

21 analyst, to make sure that the data was complete and what we

22 would expect to review during our investigation.

23 Q.  And I just want to establish just general Google practice

24 here.  We've seen a lot of documents that are underlined.

25 Specifically "here" has been underlined many times, and it

1    appears to be a hyperlink.

2              Is that typically how people share documents at Google

3    via email?

4    A.   It's a very common practice, yes.

5    Q.   And is this a link to a document that exists elsewhere but

6    might be accessible to the email recipient?

7    A.   Exactly, yes.

8              MS. TOMEZSKO:  Now we could take this document down.

9    Thank you, Jean.

10   Q.   After receiving that email from Mr. Lucas, did you begin an

11   investigation into Ms. Rowe's concerns?

12   A.   Yes, I did.

13   Q.   Now, when ER receives a concern regarding leveling, what

14   specifically are you reviewing when you investigate?

15   A.   It depends case by case and what information we have and

16   what concerns are raised.  So in this instance, there was a

17   concern raised about the level at hire, and also comparators

18   were provided by Ms. Rowe.  So when we would look into it, we'd

19   want to not only look at the comparators that Ms. Rowe provided

20   but make sure we're comprehensive, so we'd look at other

21   comparators to get a sense of, you know, is there a concern

22   there, is the information reasonable on its face, and so we can

23   continue on our investigation.

24   Q.   Are you reviewing specifically with compliance with any

25   specific leveling practice at the time?  Is that part of your

1    review?

2    A.  Can you repeat the question, please.

3    Q.  Sure.  Are you reviewing for compliance with a specific

4    leveling practice at the time?  Is that what you're looking

5    into?

6    A.  Not necessarily, no.  We would want to understand.  We're

7    relying on Google to have practices and policies in place, and

8    so we're not necessarily going back and going through those

9    practices again.  That was conducted by Google, right?  It's a

10   team that does that and multiple teams.

11          What we're looking at is was it reasonable and

12   objectively fair on the practice that was done, and then is

13   there anything else leading us to believe that it was unfair or

14   based on a protected status?

15   Q.  And we're looking at your notes earlier from your

16   investigation ── or, rather, the notes that were taken during

17   your investigation.

18          Can we pull those up at Plaintiff's 57, please.

19   Thanks.  If we can flip to the back page.

20          Ms. Beaupain, the notes that begin where they say,

21   "Ulku Rowe ── 10/1/18.  ER April; Nerissa taking notes," do you

22   see that?

23   A.  Yes.

24   Q.  Do you see that reflects a meeting that you had with

25   Ms. Rowe as part of your investigation?

1    A.  Yes.

2    Q.  And towards the top I just want to pull out —— maybe it's

3    the fifth bullet point —— "raised concerns with Melissa quickly

4    after arriving."

5            What does that reflect?

6    A.  What I interpreted this to mean was that Ms. Rowe had

7    raised questions about her —— her level at hire or her concerns

8    of her leveling at hire early on in the process, and that was

9    consistent with what —— the information I had received from

10   Kevin Lucas as well.

11   Q.  The reference to Melissa there, did you understand that to

12   be Melissa Lawrence?

13   A.  That's what I understood it to be, yes.

14   Q.  And was it your understanding that Ms. Lawrence had

15   previously looked into the concerns that you just referenced

16   there?

17   A.  That was my understanding that —— yes.

18   Q.  And a little bit further down in these notes, there's a

19   reference to —— yeah, right there, Jean —— "Learned that all

20   her male comparators are coming in at an L9."

21           Do you see that?

22   A.  Yes.

23   Q.  Does this reflect notes taken about a statement made to you

24   by Ms. Rowe during the investigation?

25   A.  Yes.

1   Q.   What does L9 refer to there in this context?

2   A.   Sure, a Level 9.  So as I previously referenced, directors

3   at Google are considered like L8, or a Level 8, or L9, or a

4   Level 9.  So I was understanding that to be that the

5   counterparts were coming in, from her perspective, all at a

6   Level 9.

7   Q.   Now, at this point in the investigation, did you have

8   enough information or data to assess whether all male technical

9   directors in OCTO were, in fact, hired at Level 9?

10  A.   No.  Sorry, let me take a step back.

11         The investigation wasn't concluded at this point.  I

12  want to make sure we're looking at relevant information.  So I

13  had already seen the data that was showing the different

14  individuals that were hired, the levels that they had at hire,

15  but I wanted — still want to understand that in context of the

16  concerns Ms. Rowe raised and anyone else or anything else I

17  might need to look into at that time.

18  Q.   And the data you had received which explained, I think you

19  said, the levels of the people, this was the data that

20  Mr. Lucas had pulled?

21  A.   He had pulled.  I just want to be thoughtful.  I can't

22  recall — I know I worked with analysts, so I can't recall if

23  there was any additional information that was overlaid.  So we

24  wouldn't just be relying on HR pulling the data.

25  Q.   After you confirmed that the data was accurate from your

1   analysts, were you able to reach a conclusion as to whether all

2   male technical directors in OCTO were in fact hired at Level 9?

3   A.  Yes.  And I found that not to be the case.

4   Q.  I just want to focus at the very bottom of this particular

5   interview.  Generally, at the end of an interview with a

6   complainant, is it your practice to ask any wrap-up questions?

7   A.  Yes.

8   Q.  What kinds of wrap-up questions would you ask?

9   A.  Sure.  I want to make sure I'm kind of capturing or

10  summarizing the concerns that they're raising and so I'm not

11  missing anything, because when we're in — when we're

12  discussing with complainants, they're sharing their concerns.

13  They're coming in, and sometimes if it's all over the place, we

14  might go in one direction or the another, and so I would always

15  ask kind of that follow-up question.  So if it's a level —

16  leveling concern based on gender, something to the effect of,

17  you know, anything else you can share that leads you to believe

18  that this — that your concerns are based on gender?  Something

19  to that effect.

20  Q.  Did you ask something to that effect of Ms. Rowe in this

21  interview?

22  A.  Yes.

23  Q.  What was her response as reflected in these notes?

24  A.  The notes reflect that she couldn't think of anything that

25  indicated it was based on gender, obviously other than she's

1    raising a concern, providing some counterparts, but nothing

2    that leads her to believe that that was based on gender.

3    Q.  I believe earlier we spoke about or you and Mr. Chiarello

4    spoke about your interview with Jennie Burdis ——

5    A.  Yes.

6    Q.  —— as part of this investigation.  Why did you interview

7    Jennie Burdis?

8    A.  She was the recruiter who was hiring for the role, or at

9    least the most recent recruiter.  There might have been someone

10   else involved kind of early on in the process.  So when I had

11   this data, I wanted to better understand kind of what the data

12   meant, what practices or processes they would do to go through

13   the leveling and to work with leadership to understand and

14   assess levels.

15   Q.  Did you find Ms. Burdis to be forthcoming in your interview

16   with her?

17   A.  Yes.

18   Q.  Did you find her to be cooperative?

19   A.  Yes.

20   Q.  I just want to look —— we could stick on this page right

21   now.  It's right above your interview with Ms. Rowe, the last

22   bullet point:  "Key thing is that finance industry versus tech

23   industry."

24           Do you see that?

25   A.  Yes.

NAIHRow5                          Beaupain - Cross

1   Q.  What does this note reflect about your conversation with

2   Ms. Burdis?

3   A.  Sure.  Ultimately, when looking at the levels of experience

4   for why individuals came in at L8 versus L9, the type of

5   experience also played a very significant factor, and that was

6   the —— especially for Ms. Rowe who had a finance background,

7   that was the big factor was the type of experience as well.

8   Q.  Now, if we could flip to the page immediately preceding

9   this, the last dark bullet point there, it says, "Tell Ulku

10  everyone hired was coming in at L8."

11          Do you see that?

12  A.  Yes, uh-huh.

13  Q.  Is that a question that you asked Ms. Burdis in the course

14  of your interview?

15  A.  Yes.

16  Q.  What did she say?

17  A.  She said no.  There's more information provided, but she

18  indicated that was not what she told Ms. Rowe.

19  Q.  And the bullet point immediately below the one that we were

20  just looking at:  "Def didn't tell Ulku everyone was coming in

21  at L8, but might have told her that we were hiring a group of

22  directors, but that spans two levels."

23          To your best recollection, is that an accurate

24  statement of Ms. Burdis' response to your question?

25  A.  Yes.

1  Q.  During this interview, did you find Ms. Burdis to be

2  credible?

3  A.  Yes.  I had no reason to disbelieve her during the course

4  of the interview.

5  Q.  Now let's turn to the first page of these notes.  And we

6  see here it says, "Ulku Rowe — 11/9/2018."  Do you see that?

7  A.  Yes.

8  Q.  What does this reflect?

9  A.  That would have been the closing — closing conversation,

10  the closeout with Ms. Rowe on that date.

11  Q.  And during that closing conversation, did you share with

12  Ms. Rowe the findings of your investigation?

13  A.  I did.

14  Q.  There are several references here to talking points.  Do

15  you see that?

16  A.  Yes.

17  Q.  The talking points that are referenced there, are those the

18  talking points that were put up on the screen just a few

19  minutes ago?

20  A.  Yes, exactly.

21      MS. TOMEZSKO:  Could we just pull those up quickly,

22  Jean.  I think it's Plaintiff's 89.

23  Q.  Now, Ms. Beaupain, did you, to the best of your

24  recollection, actually communicate to Ms. Rowe all of the

25  talking points that you see on this page here?

1    A.  Yes.

2    Q.  And in particular, the one that was pulled out earlier,

3    tech versus non-tech experience was the most heavily considered

4    factor when gauging L8 versus L9, do you see that?

5    A.  Yes.

6    Q.  Do you recall whether you communicated that specific point

7    to Ms. Rowe in the meeting?

8    A.  Yes, I did, uh-huh.

9    Q.  Now, when you concluded your investigation, did you have

10   any reasonable basis to believe that gender played a role in

11   Ms. Rowe's leveling at hire?

12   A.  No.

13   Q.  Did you have any basis to believe that her leveling was in

14   any way unfair?

15   A.  No.

16           MS. TOMEZSKO:  No further questions.

17           MR. CHIARELLO:  No redirect, your Honor.

18           THE COURT:  OK.  Ms. Beaupain, you're excused.  Thank

19   you.

20           (Witness excused)

21           MR. CHIARELLO:  At this point, your Honor, we'd like

22   the Court to read the stipulation of undisputed fact to the

23   jury.

24           THE COURT:  Members of the jury, this is a stipulation

25   of uncontested fact that the parties have handed to me.  That

NAIHRow5                              Tessier – Direct

1   means that it is a fact on which the parties have agreed.

2           As of September 19, 2019, Google Cloud's senior

3   leadership was aware of plaintiff's filed complaint and the

4   allegations contained therein.

5           MR. CHIARELLO:  Thank you, your Honor.

6           Call Ashley Tessier.

7           THE COURT:  OK.

8           THE DEPUTY CLERK:  You could step forward.

9   ASHLEY ELIZABETH TESSIER,

10       called as a witness by the Plaintiff,

11       having been duly sworn, testified as follows:

12  DIRECT EXAMINATION

13  BY MR. CHIARELLO:

14  Q.  Good afternoon, Ms. Tessier.

15  A.  Good afternoon.

16  Q.  I'm going to endeavor to be brief.  We'll see how that

17  goes.

18          You are currently an employee relations director at

19  Google, is that right?

20  A.  Yes, I am.

21  Q.  And did you hold that role in late 2019 and 2020?

22  A.  I held the role.  My title changed to director in late

23  2021.  I was an employee relations manager at the time that you

24  just stated.

25  Q.  As an employee relations manager in the 2019/2020 time

1   frame, you conducted interviews in connection with this lawsuit

2   that Ms. Rowe filed, correct?

3   A.  I did.

4   Q.  And you did so in connection with Google's policy regarding

5   investigating complaints of discrimination, correct?

6   A.  More specifically, we have a policy against harassment,

7   discrimination, retaliation, and standards of conduct.  So I

8   was looking into it with respect to that policy.

9   Q.  And you interviewed witnesses or employees — individuals

10  in connection with that complaint, correct?

11  A.  I did.

12  Q.  Notes were prepared in connection with that complaint or

13  the interviews that were conducted?

14  A.  Notes were taken from the interviews conducted, yes.

15  Q.  And those notes were provided to Google's legal counsel, is

16  that correct?

17  A.  Yes.

18  Q.  It was important that those notes be accurate, correct?

19  A.  Yes.

20  Q.  And you would agree that both you and the other interviewer

21  took the responsibility to create accurate notes seriously?

22  A.  Of course.  Let me just clarify.  The notes are not a

23  verbatim transcript.  So they serve a purpose in the course of

24  the investigation, and we absolutely took that responsibility

25  seriously.

1    Q.  With that caveat.

2            Mr. Yang, could you please put up Plaintiff's 108.

3            I just have a few questions about this document.

4            Ms. Tessier, you recognize this to be the notes of the

5    interviews taken in connection with your investigation into

6    Ms. Rowe's lawsuit?

7    A.  Yes.

8    Q.  These are interviews that took place between October of

9    2019 and April of 2020, is that correct?

10   A.  That sounds right, yes.

11   Q.  And you conducted the interviews and somebody named Jordan

12   took notes, is that correct?

13   A.  That's right.

14   Q.  And what's Jordan's last name?

15   A.  Terry, T-e-r-r-y.

16   Q.  And he did so pursuant to Google's policy to take notes

17   during these interviews, correct?

18   A.  That's right.  There's no formal policy to that, but it's

19   our practice.

20   Q.  Now, this investigation — these investigation notes

21   reflect interviews with Ulku Rowe, Kevin Lucas, Melissa

22   Lawrence, Stuart Vardaman, Tariq Shaukat, and Will Grannis, is

23   that correct?

24   A.  That sounds right based on my recollection.  I'm just

25   looking at the first page, but I trust you that the notes

NAIHRow5                          Tessier - Direct

1    reflect all those interviews.

2    Q.  OK.  I'm sure Mr. Gage will correct me if I'm wrong on

3    that.

4              Is it fair to say that —— Ms. Tomezsko, pardon me.

5              Is it fair to say that everyone that was interviewed

6    in connection with the investigation is reflected in

7    Plaintiff's 108?

8    A.  If it's the complete set of notes, then yes.

9    Q.  So it's correct that you did not interview any of

10   Ms. Rowe's fellow technical directors about work they'd

11   performed?

12   A.  That's correct.

13   Q.  And you did not interview any of Ms. Rowe's technical

14   directors about her discrimination claims?

15   A.  That's correct.

16   Q.  Did you ever share the outcome of this investigation with

17   Ms. Rowe?

18   A.  I did not.  She asked not to be further contacted by our

19   department, so I respected that.

20   Q.  That's the reason you didn't share the outcome with her?

21   A.  That's right, and at the advice of counsel, which I won't

22   speak to.

23         MS. TOMEZSKO:  Objection.  Can I just ask the witness

24   not to reveal the contents of any discussion with counsel.

25         MR. CHIARELLO:  No further questions.

1    CROSS-EXAMINATION

2    BY MS. TOMEZSKO:

3    Q.  Good afternoon, Ms. Tessier.  How are you?

4    A.  Good afternoon.  Good.  Thanks.

5    Q.  Can you explain briefly for the jury your background at

6    Google and your experience conducting investigations at the

7    company.

8    A.  Certainly.  So I've been at Google for —— it will be eight

9    years in January.  During my tenure, I've been with the

10   employee relations group that entire time.  I'm a lawyer by

11   training, and I bring that experience to my role as an

12   investigator and now director at Google.

13          I also participate in various workplace investigation

14   trainings, and the like.  We have a very robust set of

15   trainings that our team takes to ensure that we're up-to-date

16   with the most recent and best practices in terms of

17   investigations work.

18   Q.  Now, a moment ago you had testified that Ms. Rowe asked not

19   to be contacted further by your department.  Do you recall that

20   testimony?

21   A.  Yes.

22   Q.  Can you explain a little bit more about that and what that

23   is about.

24   A.  Certainly.  So our practice when we —— when my team becomes

25   aware of employee concerns is to reach out to the person

1    raising the concern, in this case Ms. Rowe.  I took that step,

2    as the notes I was just shown reflect, and —— was that a knock?

3    Q.  I'm not sure.

4    A.  And I reached out to Ms. Rowe to ask her to speak with me

5    and my colleague Jordan so we could better understand her

6    concerns.  We did meet.  We had an hour meeting scheduled.

7    After about 25 minutes or so, Ms. Rowe said that she would like

8    to stop the meeting and didn't —— didn't wish to share anything

9    further.  She said that all information about her concerns

10   would be available through her complaint that she filed with

11   this court.

12          So we respect that decision.  It's —— it's up to the

13   person raising concerns if they wish to speak with us further.

14   My only caveat to Ms. Rowe is that we might be limited in our

15   ability to review her concerns if she didn't wish to cooperate

16   further, but I respected that she didn't wish to pursue any

17   further communications with me or my team.

18   Q.  A moment ago you testified that you had spoken with Stuart

19   Vardaman as part of this investigation, is that right?

20   A.  That's right.

21   Q.  What was your understanding of Mr. Vardaman's role in the

22   underlying events that you were investigating?

23   A.  Certainly.  So Ms. Rowe had raised the claim about whether

24   the fact that she didn't —— she wasn't selected for a head of

25   financial services role was on the basis of discrimination or

1     retaliation.  So the context in which I spoke with Mr. Vardaman

2     was he was the recruiter for that role, not the hiring manager,

3     not a decision-maker.  But I spoke to him to get context on the

4     interview process for that role in which Ms. Rowe took part.

5     Q.  Earlier in this trial, Mr. Vardaman testified that he does

6     not recall using the word "cantankerous" to describe Ms. Rowe.

7     Do you have a recollection of him using the word "cantankerous"

8     in any of your discussions with him?

9     A.  I — I don't.  I don't have a specific recollection.

10    Q.  If the word "cantankerous" appears in the notes, do you

11    have an explanation for why that might be?

12    A.  It may be — so my colleague Jordan was taking notes during

13    all of the interviews, including Stuart's.  It may be that

14    Jordan wrote down that word to summarize —

15              MR. CHIARELLO:  Objection, your Honor.  Speculation.

16              THE COURT:  Sustained.

17    Q.  Do you recall Mr. Vardaman describing Ms. Rowe as abrasive?

18    A.  Not specifically.  It's been four years now.

19    Q.  Do you recall Mr. Vardaman conveying any information that

20    may have been captured as abrasive in the interview notes?

21    A.  From what I recall of Stuart's statement, he was very

22    forthcoming about his experience with Ms. Rowe during that

23    interview process, and the impression he gave was that —

24    almost that she may have talked down to him as part of the

25    process or felt that the role should be hers based on

1   communications from prior years surrounding her hire, but I

2   don't remember the specific words you're asking me.

3   Q.  Did anything that Mr. Vardaman said in the process of his

4   interviews with you give you a basis to believe that he was

5   exhibiting signs of gender bias or gender discrimination?

6   A.  No, there was nothing to that effect.

7   Q.  Was there anything that gave you a reason to believe that

8   he might have been acting with a motive to retaliate against

9   Ms. Rowe?

10  A.  No, nothing to that effect.

11  Q.  Now, after the investigation concluded, did you have a

12  discussion outside of the investigative process with

13  Mr. Shaukat, Tariq Shaukat?

14  A.  I did.

15  Q.  Can you describe for the jury what the substance of that

16  communication was and what you talked about with Mr. Shaukat.

17  A.  Certainly.  So I met with Mr. Shaukat as Ms. Rowe's then ——

18  previous manager and the hiring manager for the role of head of

19  financial services.  After I concluded my investigation, I

20  concluded that there were no policy violations that took place

21  either by Mr. Shaukat or anyone else.  So I conveyed that to

22  him, and I also provided him some feedback in hindsight about

23  how he might have more effectively and directly communicated

24  with Ms. Rowe that she wasn't the most-qualified candidate for

25  that head of financial services role.

1    Q.  To the best of your recollection, how did Mr. Shaukat

2    receive that information that you gave him?

3    A.  He was very open to the feedback.  He acknowledged that

4    hindsight's always 20/20, and he appreciated the feedback and

5    would take it into account going forward.

6    Q.  I want to show you a document that was looked at earlier in

7    this trial.

8           I just want to pull up Plaintiff's 114, if we can,

9    Jean.

10          Ms. Tessier, do you recognize this document?

11   A.  I do.

12   Q.  What is it?

13   A.  This is —— it's a how-to guide to how to enter allegations

14   that my team investigates into an internal database called Case

15   360 where we manage our investigation records.

16   Q.  Now, in your experience as an ER professional, what might

17   you use this document for, if anything, in connection with your

18   investigation?

19   A.  Certainly.  So it's a reference guide at the point at which

20   I'm entering into our Case 360 tool that I've conducted an

21   investigation regarding certain allegations.  I might look to

22   this guide just for consistency in how to code that.  Think of

23   it as a coding guide.  I don't recall using it for Ms. Rowe's

24   investigation.

25   Q.  Now, do you consider this to be a formal statement of ER

NAIHRow5                          Tessier – Cross

1   policy?

2   A.  No, absolutely not.

3   Q.  And would you happen to know approximately when this

4   document was created?

5   A.  I — likely sometime end of 2018, early 2019 probably.

6           MS. TOMEZSKO:  We could take this down, Jean, and I

7   just want to show you what's been marked as Plaintiff's 105.

8   Q.  Ms. Tessier, I'm happy to scroll through this document to

9   see if you recognize this, but my question is going to be do

10  you recognize this document?

11  A.  I believe so, yes.

12  Q.  What is it?

13  A.  It looks like some form of notes from a different

14  investigation unrelated to Ms. Rowe's investigation.

15  Q.  Was it an investigation that you were involved in in any

16  way?

17  A.  I was not.  My team was.  I see reference to Jordan's name.

18  That's the same Jordan who investigated Ms. Rowe's matter with

19  me.  But I'm generally familiar with the matter, yes.

20  Q.  So you have an understanding of the concerns raised and the

21  outcome reached in this particular investigation?

22  A.  I do.

23  Q.  Can you explain to the jury what the concerns raised in

24  this investigation were and what the outcome was to the best of

25  your recollection.

1  A.  Yes.  This was a concern raised by a female employee that

2  she was underleveled at hire as a result of her gender.  My

3  understanding is that the investigators found that there was no

4  gender bias or any improper action taken on the basis of

5  gender.  However, they did find through the course of their

6  review that, given the nature of her work and her — the work

7  of her team, that she should have been changed to the next

8  level because she was doing work at that time of her concern

9  different from at the time of her hire.

10  Q.  You said her level should be changed.  Was her level the

11  only level that was changed as a result of this investigation?

12  A.  I don't believe so.  I believe we adjusted others, but I'm

13  not sure.

14  Q.  If there was an adjustment to other's levels, would it be

15  reflected in this document?

16  A.  I would think so.

17  Q.  Would this — going back to the Plaintiff's 114 that we

18  looked at, in this situation that you just described, would

19  this be one of an example of where you would use an unfair

20  leveling characterization when categorizing or coding the

21  complaint in Case 360?

22  A.  That sounds right to me.  That was what was substantiated

23  in this case.

24  Q.  Not done yet, Ms. Tessier, just one more question.

25          If we could pull that document back up, Jean, P105.  I

NAIHRow5                          Tessier – Cross

1   just want to highlight the second to last bullet point in the

2   first communication — or, sorry, the first entry that we see

3   here.

4            This is redacted.  "Mentions that there may have been

5   up to ten people impacted across KAEs and other client groups."

6            Does that statement refresh your recollection that

7   there were possibly up to ten other people who were impacted by

8   the concerns raised in this particular investigation?

9   A.  It does.  Thank you.

10  Q.  And would you happen to know whether all of those ten

11  individuals, if they were members of one particular gender or

12  were they members of both genders?

13  A.  Both genders.

14            MS. TOMEZSKO:  No further questions.

15            MR. CHIARELLO:  No redirect.

16            THE COURT:  Ms. Tessier, you're excused.

17            (Witness excused)

18            MS. GREENE:  Your Honor, we're now calling

19  Ms. Ostrofe, who is our remote witness.

20            THE COURT:  OK.  Members of the jury, we have a

21  witness who is going to testify by video.

22            THE DEPUTY CLERK:  Are you ready, plaintiff's counsel?

23            MS. GREENE:  It looks like the second camera is

24  trained on the tables instead of the questioner.

25            THE DEPUTY CLERK:  Instead of the —

1          MS. GREENE:  I'm sorry.

2          MR. GAGE:  It's pointing at you, all of us.

3          MS. GREENE:  Yes, I'm ready.

4          THE DEPUTY CLERK:  OK.  Ms. Ostrofe, that's how you

5     pronounce your last name, ma'am?

6          THE WITNESS:  Ostrofe will do.

7          THE DEPUTY CLERK:  Can you please raise your right

8     hand.

9     NORA OSTROFE,

10         called as a witness by the Plaintiff,

11         having been duly sworn, testified as follows:

12    DIRECT EXAMINATION

13    BY MS. GREENE:

14    Q.  Good afternoon, Ms. Ostrofe.

15    A.  It's still morning for me, but good afternoon to you.

16    Q.  Very good.  You are here today as an expert to offer an

17    opinion on Ms. Rowe's economic damages, is that right?

18    A.  That is correct.

19    Q.  And you have been retained by plaintiff's counsel, correct?

20    A.  Yes.

21    Q.  And you're being compensated for your time as an expert at

22    your typical hourly rate?

23    A.  That's correct.

24    Q.  What have you been asked by plaintiff's counsel to offer an

25    opinion on?

1   A.  I've been asked to calculate the economic damages to the

2   plaintiff, Ulku Rowe, as a result of alleged gender

3   discrimination, unequal pay, and retaliation.

4   Q.  And what makes you qualified to offer such an opinion?

5   A.  Well, I've been working as a forensics economist —— that's

6   an expert witness who testifies —— who calculates and testifies

7   to economic damages in court —— for 24 years.  I have a

8   bachelor's degree in economics from the University of

9   California, Los Angeles, and I have a master's degree in

10  business administration from St. Mary's College.  I'm a board

11  member and a member of a number of professional associations

12  associated with valuing damages and economics.

13  Q.  How many times have you served as an economic expert?

14  A.  I would say hundreds of times over the course of my 24-year

15  career in this field.

16  Q.  What documents did you review in this case to inform your

17  opinions?

18  A.  I reviewed what was called a compensation adjustment

19  letter, which is something that Google puts out every year and

20  tells an employee what they will be receiving in base salary,

21  bonus, and equity refresher grants.  I review pleadings,

22  depositions, declarations, and other —— Morgan Stanley's

23  statements which would reflect vesting schedules of equity

24  grants and other miscellaneous documents related to the case.

25  Q.  In total, do you recall how many documents you reviewed to

1  inform your testimony?

2  A.  Yes.  I have numbered 81 on the document list in my report.

3  Q.  Did you put together a report outlining your findings in

4  this case?

5  A.  I put together three reports.  My initial report was issued

6  on November 18, 2022.  Then I did a supplemental report which I

7  issued on January 27, 2023.  That included a new analysis, so

8  that I had two scenarios of damages.  And then I issued a third

9  supplemental report on June 19, 2023, and that was to update

10  the damages to the then-trial date of August 14, 2023.

11  Q.  OK.  You mentioned that one of the things you were asked to

12  do was to calculate Ms. Rowe's losses that related to her equal

13  pay claims, is that right?

14  A.  That's correct.

15  Q.  Can you tell us how you calculated the damages on her

16  unequal pay claim.

17  A.  Yes.  For this claim I compared Ms. Rowe's compensation to

18  that of Nicholas Harteau, who was a Level 9 also employee with

19  the office of the chief technology officer of Google Cloud in

20  New York.  And what I did was I looked at what Mr. Harteau had

21  received in salary, bonus, and equity refresher grants and what

22  Ms. Rowe had received and determined the difference between

23  what he was paid and what she was paid.  And the measure of

24  that difference is her damages.

25  Q.  Was there a broader question you were also considering with

1  respect to her damages as it related to where they came in at

2  the beginning?

3  A.  Yes.  It was if Ms. Harteau had been leveled and

4  compensated equivalently to Mr. Harteau, what would she have

5  received?

6  Q.  I think you may have said Ms. Harteau.  Did you mean

7  Ms. Rowe?

8  A.  I'm sorry, Ms. Rowe, yes.

9  Q.  Mr. Harteau left in 2020.  How did you account for him

10  leaving in your calculation of damages?

11  A.  Well, we know what he would have been paid to the end of

12  the year because we had his Google compensation adjustment

13  letter that referred to 2020, and then I held his earnings

14  constant.  So for 2021, 2022, and 2023, I used the —— his

15  elements of pay from the 2020 year for those periods.

16  Q.  Would you consider that to be a conservative approach?

17  A.  Well, typically, people would receive salary adjustments

18  upwards from year to year.  That would in turn affect their

19  bonus, which would generally be higher because it will be based

20  on the salary, and equity grants could vary from year to year.

21  But, yes, I think it is a conservative approach holding it

22  flat, because it's most likely that it would —— at least the

23  salary would have gone up annually.

24  Q.  Did Ms. Rowe's compensation stay flat between 2020 and

25  2023?

1    A.  No.  It increased so that the measure of damages each

2    succeeding year between what Ms. Rowe received and Mr. Harteau

3    received, the difference between their two compensations

4    narrowed a bit as time went on.

5    Q.  And that's because you took into account Ms. Rowe's

6    increases but didn't apply any sort of similar increases to ⎯

7          MR. GAGE:  Objection to the leading, your Honor.

8    Q.  ⎯ for Mr. Rowe ⎯ or Mr. Harteau, correct?

9          THE COURT:  Sustained.

10   Q.  OK.  Let me ask a different question.

11         Did you consider Ms. Rowe and Mr. Harteau's

12   compensation ⎯ or did you treat it equally with respect to

13   applying increases in compensation?

14   A.  Well, I held Mr. Harteau's compensation flat at the 2020

15   level for the ⎯ and that would be for the 2021, 2022, and 2023

16   years.  For those years for Ms. Rowe, I ⎯ I deducted what she

17   had actually received, and she did receive increases over those

18   years.

19   Q.  In calculating the compensation differential for Ms. Rowe

20   and Mr. Harteau, did you include their initial bonus and

21   signing equity awards?

22   A.  No, I did not.

23   Q.  Why not?

24   A.  The reason was because Google did very often, in order to

25   induce someone who was employed elsewhere, for instance,

1   Ms. Rowe was at JPMorgan Chase, those people might have

2   received equity grants.  And if you're an employee and you

3   receive equity grants, they vest.  So typically you get an

4   award of a certain number of shares of stock in the form of

5   restricted stock and options, and then they vest generally over

6   a three- or four-year period.  So if you leave employment, you

7   cease to vest, and you forfeit that equity.  You essentially

8   have to give it up.

9         So for people who have equity grants, for them to

10  leave a company and leave behind the equity they would have

11  vested in means that they leave money on the table.  And for

12  that reason, Google would acknowledge that and grant people

13  additional equity so that they would be made whole for what

14  they left behind at their former employer.

15        Now, this would all be just up front at hire.  It

16  wouldn't affect the ── their pay based on their level and job

17  going forward.

18  Q.  Did you make any adjustments to Mr. Harteau's bonus

19  compensation for his first year of employment?

20  A.  Yes.  I annualized it because Mr. Harteau was hired on

21  April 11, 2017, but he actually didn't come to work at Google

22  until mid-August.  So he really only worked four and a half to

23  five months.  So ── and for that reason, Google prorated his

24  bonus.  So I adjusted it to reflect what Ms. Rowe would have

25  received since she was working constantly at Google from March

1   of 2017 until the end of the year.

2   Q.  And Google did not prorate Ms. Rowe's bonus for that year,

3   correct?  You didn't see anything suggesting that in your

4   documents?

5   A.  That I'm not sure.

6   Q.  What did you calculate Ms. Rowe's damages on the unequal

7   pay claim as related to Mr. Harteau to be?

8   A.  Oh, that — that amount is $1,968,853.  For the court

9   reporter, it's 1,968,853.

10  Q.  And does that include interest?

11  A.  No, it does not include, in New York, prejudgment interest

12  of 9 percent per year compounded annually, simple interest.

13  Q.  OK.  And you also calculated Ms. Rowe's damages related to

14  discrimination and retaliation, correct?

15  A.  Correct.

16  Q.  And did you calculate damages relating to her not being

17  selected for the financial services vertical lead position?

18  A.  Yes, I did.

19  Q.  And that was the position that Stuart Breslow ultimately

20  filled, correct?

21  A.  Correct.

22  Q.  Can you tell us how you calculated the damages for the

23  financial services vertical lead discrimination and retaliation

24  claim?

25  A.  Yes.  Stuart Breslow assumed that position in — on

NAIHRow5                          Ostrofe – Direct

1   December 10, 2018.  So I calculated damages between what

2   Mr. Breslow earned in that position from December 10, 2018, up

3   until the date of trial, which —— or the former date of trial,

4   which was August 14, 2023.

5   Q.  And did you make any adjustments for Mr. Breslow's

6   compensation after he departed Google?

7   A.  I did the same thing with him that I did with Mr. Harteau.

8   He also left Google in 2020, although we know what he would

9   have earned had he completed the 2020 year there.  So for ——

10  again, for the years of 2021, 2022, and 2023, I just used

11  Mr. Breslow's compensation from the 2020 year, kept it flat,

12  and carried it forward.

13  Q.  And what components of compensation were you including when

14  you calculated damages for Ms. Rowe related to Mr. Harteau or

15  related to Mr. Breslow?

16  A.  That would be base salary, annual bonus, and equity

17  refresher grants that were granted annually.

18  Q.  What did you calculate Ms. Rowe's damages on the financial

19  services vertical lead position to be?

20  A.  That would be $687,507.  Yes, 678,507.

21  Q.  You were also asked to calculate Ms. Rowe's losses relating

22  to Google's retaliatory failure to consider her for the VP

23  financial services sales role, correct?

24  A.  Correct.

25  Q.  And that was the position that Yolande Piazza ultimately

1   filled, correct?

2   A.  Correct.

3   Q.  Can you tell us how you calculated the damages for that

4   claim.

5   A.  OK.  Ms. Piazza's in the position on June 22, 2020.  So I

6   calculated the difference between what she received in salary,

7   annual bonus, and equity grants, and I think because she was in

8   sales, she received a small spot bonus as well, and what

9   Ms. Rowe received in annual salary, bonus, and equity refresher

10  grants.

11  Q.  So what did you calculate Ms. Rowe's damages on the VP

12  financial services sales role to be?

13  A.  That will be $5,735,276.  For the court reporter that would

14  be 5,735,276.

15  Q.  And that's without interest?

16  A.  Correct.

17  Q.  Have you calculated the value of Ms. Rowe's claims if she

18  prevails on both the equal pay claims related to Mr. Harteau

19  and the failure to promote claim related to Ms. Piazza?

20  A.  Yes.

21  Q.  And what is that number?

22  A.  That would be $6,742,503.  So that's 6,742,503.

23  Q.  And, again, that's without interest?

24  A.  Correct.

25  Q.  Now, why is that number smaller than the combination of

NAIHRow5                        Ostrofe – Cross

1   what you told us were the damages for the Harteau equal pay

2   claim and the financial services VP claim?

3   A.  Well, I gave you the total for the comparison with

4   Mr. Harteau from March of 2017 through August 14, 2023.  If you

5   assume that she was going to be promoted to the VP of sales

6   financial services in June 22, 2020, we would only give her

7   Mr. Harteau's compensation to June 22, 2020, and then give her

8   Ms. Piazza's compensation from June 22, 2020, up until

9   August 14, 2023.

10              MS. GREENE:  OK.  No further questions, your Honor.

11              THE COURT:  OK.  Thank you.

12              MR. GAGE:  Just five minutes to make some adjustments,

13  Judge.

14              THE COURT:  You may.  Also, please keep in mind that

15  I'm going to be looking to give the jury a break around 2:40,

16  2:45.

17              MR. GAGE:  Got it.

18  CROSS-EXAMINATION

19  BY MR. GAGE:

20  Q.  Hello, Ms. Ostrofe.

21  A.  Good morning.  How are you, Mr. Gage?

22  Q.  I'm well.  How are you?  Good to see you.

23  A.  I'm pretty good.  We had an earthquake this morning, but I

24  didn't feel it.

25  Q.  Ms. Ostrofe, you have not been retained to offer any

1   opinions on the reasons for any pay differences amongst ——

2   between Ms. Rowe and her alleged comparators, correct?

3   A.  That is correct.

4   Q.  And you've not been asked to offer, nor have you offered,

5   any opinions as to whether there has been any pay

6   discrimination or violation of pay laws here, correct?

7   A.  That's correct.

8   Q.  Ms. Ostrofe, you yourself did not make any determinations

9   as to who is a proper comparator for Ms. Rowe, correct?

10  A.  Correct.

11  Q.  You are not offering any opinions regarding whether

12  Ms. Rowe and Mr. Harteau are similarly situated, correct?

13  A.  Correct.

14  Q.  In the course of your work that you —— actually, I want to

15  take a quick step back.

16          Ms. Greene asked you some questions about how Google

17  sets starting pay packages.  Do you remember your testimony on

18  that?

19  A.  Just now, yes.

20  Q.  Yes, just now, that's what I'm referring to.

21          You've never worked at Google, right?

22  A.  No.

23  Q.  So you actually have no basis for speaking to what Google's

24  intent is in setting starting pay packages, correct?

25  A.  Well, I did review the declaration of Chris Humez.

1          MR. GAGE:  Your Honor, I asked her a yes-or-no

2    question.

3          THE COURT:  Why don't you just answer yes or no.

4    A.  Could you repeat the question?  Do I know what Google's

5    intent is starting ——

6    Q.  Ms. Ostrofe, let me ask you a different question.

7          You've never worked in the compensation department of

8    Google, correct?

9    A.  No.

10   Q.  In fact, it's your understanding that a gentleman named

11   Chris Humez does work in compensation at Google, correct?

12   A.  I'm not sure of his exact title.  I know that my impression

13   is that he worked in human resources.  Whether or not he works

14   in the compensation department, I'm not sure.

15   Q.  Certainly someone who works in human resources at Google

16   would be in a better position to speak about why Google makes

17   decisions about starting pay packages than you, right?

18   A.  Well, I'm only going by —— my understanding came from the

19   declaration of Chris Humez.

20         MR. GAGE:  Your Honor, I'd ask her not to speak about

21   a hearsay document and the content of a hearsay document.

22         THE COURT:  I'm not familiar with the document.  I

23   would just say that ——

24         MR. GAGE:  I'll move on.  I'll move on, your Honor.

25   I'll move on to another topic.

1          THE COURT:  Let's try to ask the questions that elicit

2     the testimony you're looking for.

3          And, Ms. Ostrofe, if you would try to respond

4     consistent with the question that's posed to you.  Thank you.

5          THE WITNESS:  Understood.

6     BY MR. GAGE:

7     Q.  Ms. Ostrofe, you said that it's your understanding that

8     Stuart Breslow assumed the role of financial services vertical

9     lead, correct?

10    A.  Correct.

11    Q.  And your understanding comes from what plaintiff's counsel

12    has told you, correct?

13    A.  Well, I've read a number of documents and pleadings and

14    depositions, so it's not exclusively from that because there

15    were documents that I was given from discovery that touched on

16    these issues.

17          (Continued on next page)

18

19

20

21

22

23

24

25

1    BY MR. GAGE:

2    Q.  And you've read Ms. Rowe's complaint; correct?

3    A.  Correct.

4    Q.  You also -- I think you testified to the jury today that

5    you reviewed data from Google regarding compensation of

6    Ms. Rowe and other technical directors; correct?

7    A.  Correct.

8    Q.  And across the group of five L9 technical directors,

9    compensation between 2017 and 2023 went up and down year over

10   year for some of them; correct?

11   A.  Well, base salary never went down; base salary would either

12   increase or, in a few instances, it remained flat.  Bonuses

13   could vary and equity grants could vary.

14   Q.  So Ms. Ostrofe, across the group of five L9 technical

15   directors, total compensation between 2017 and 2023 went up and

16   down year over year for some of them; correct?

17   A.  It could vary, yes.

18   Q.  And you also saw that Ms. Rowe's compensation went up every

19   year, her total compensation; correct?

20   A.  I'd have to look at it year to year.  My impression is that

21   although I think there might have been one year where things --

22   some things remained flat.  Maybe not all of the elements.

23   Q.  In preparing your opinions in this matter, you created for

24   yourself tables that reflect annual total compensation paid by

25   Google to Ms. Rowe and these other technical directors;

1   correct?

2   A.   Correct.

3   Q.   And according to your report, in 2018, the total

4   compensation for Ms. Rowe and each of her L9 comparators placed

5   Ms. Rowe as the third highest of six of them; correct?

6            MS. GREENE:   Objection.

7            THE COURT:   Give me a word or two.

8            MS. GREENE:   Scope and hearsay.

9            THE COURT:   Let's talk.

10            (Continued on next page)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1           (At sidebar)

2           THE COURT:  Go ahead.

3           MS. GREENE:  Yes.  Her report has not been offered

4    into evidence here.  I did not ask her questions about her

5    report.  It's not the proper scope of cross-examination.  It's

6    our witness, not theirs.

7           THE COURT:  Go ahead, Mr. Gage.

8           MR. GAGE:  She's offered testimony about pay

9    differentials, pay differentials over a period of time.  And I

10   think I should be entitled to explore what the annual component

11   parts of that are.  Because those annual component parts show

12   that in some years Ms. Rowe made more than comparators.  So she

13   gives a total number for all, but doesn't in her own

14   calculations show that some years Ms. Rowe made more than

15   others.  That undermines their case.

16          THE COURT:  Ms. Greene.

17          MS. GREENE:  They did not -- again, the report is not

18   in.  They can ask about the underlying documents, they can show

19   her underlying documents that are in evidence.  They chose not

20   to have their own expert.  They did not offer their own expert

21   for purposes of rebuttal or offering their own opinion.  And so

22   having made that decision, they can't now try to go back into a

23   document that's not in evidence and that was not the subject of

24   examination and dig into it.

25          THE COURT:  The objection is sustained.

1              (In open court)

2    BY MR. GAGE:

3    Q.  Ms. Ostrofe, you've given some testimony about an overall

4    differential in pay that you believe existed between

5    Mr. Harteau and Ms. Rowe; correct?

6    A.  Correct.

7    Q.  Isn't it true that in your own calculations from the data

8    you were provided, you concluded that in some years Ms. Rowe

9    earned more than Mr. Harteau?

10   A.  Strictly speaking, she earned more in the 2018 year, but

11   that is again because of --

12   Q.  Yes-or-no question.

13   A.  Yes.

14   Q.  And Mr. Harteau also left OCTO before he left Google and

15   moved into another department at Google; correct?

16   A.  That is correct.

17   Q.  And yet you continued to use his Google compensation earned

18   outside of OCTO as a basis for your estimate of alleged

19   economic harm; correct?

20   A.  That's correct.

21   Q.  Even though he was working in a job that was very different

22   than the job that Ms. Rowe was performing; correct?

23   A.  I don't know the degree of difference between the job he

24   was performing and the job that Ms. Rowe was performing after

25   he left OCTO.

1   Q.  We can rely on Mr. Harteau for that; correct?

2   A.  I suppose.

3   Q.  You have done absolutely no work whatsoever to evaluate how

4   Ms. Rowe was compensated relative to Level 8 technical

5   directors; correct?

6   A.  That's correct.

7   Q.  And you did not consider compensation paid to L8 technical

8   directors in OCTO other than Ms. Rowe to be relevant to your

9   calculations; correct?

10  A.  No.  Because the allegation of unequal pay is that when she

11  was hired and she should have been hired as a Level 9.  So the

12  Level 8 comparators are therefore -- the Level 8 -- the Level 8

13  employees are, therefore, irrelevant to her claim.

14  Q.  Right.  But you don't know anything about what the Level 8

15  technical directors were doing; correct?

16  A.  In some situations I did.

17  Q.  Assuming that Ms. Rowe's performance -- withdrawn.

18          MR. GAGE:  Your Honor, could we take our break early

19  so I can shorten up the rest of my examination?

20          THE COURT:  We can, yes.

21          All right.  Members of the jury, it is now 2:40.  We

22  will return at 2:55 p.m.  Please do not speak with each other

23  or anyone else about the case during the break.  Please do not

24  do any research.  And we'll see you in 15 minutes.  Thank you.

25          (Jury not present)

1           (Recess)

2           THE COURT:  Ms. Williams, if you could please get the

3  jury right away.

4           THE DEPUTY CLERK:  Okay.

5           (Jury present)

6           MR. GAGE:  May I proceed, your Honor?

7           THE COURT:  You may.

8  BY MR. GAGE:

9  Q.  Just a few more questions for you, Ms. Ostrofe.

10          As far as you know, Ms. Rowe was evaluated as a Level

11  8 employee; correct?

12  A.  I think we went over this in my deposition.  She was --

13  Q.  It's a yes-or-no question.  It's just a yes-or-no question,

14  Ms. Ostrofe.

15  A.  As I said in my deposition, I don't know -- I know she was

16  a Level 8 employee when she was evaluated.  I don't know what

17  was in the mind of her evaluator when she was evaluating.

18  Q.  Correct.  And you also do not know whether level impacts

19  Google's expectations of employees, right?

20  A.  That's correct.

21  Q.  And in fact, you are assuming in your estimate that her

22  performance would have been evaluated similarly as a Level 9,

23  as it actually was as a Level 8; correct?

24  A.  Well, in the scenarios, which I don't think --

25  Q.  Can you answer the question, Ms. Ostrofe?

1   A.   I did two sets of analyses.  So in one set --

2   Q.   It's a yes-or-no question, Ms. Ostrofe.  You've only

3   testified as to one.

4   A.   Okay.  Why don't you --

5   Q.   I'll state the question again.

6   A.   Yes.  Restate the question, please.

7   Q.   Ms. Ostrofe, you are assuming that Ms. Rowe's performance

8   would have been evaluated similarly as a Level 9 as it actually

9   was as a Level 8; correct?

10  A.   In the -- in the -- in the numbers that I presented, no.

11  Because I have -- I had just used what her comparators actually

12  were paid versus what she was paid.

13  Q.   And what consideration are you talking about?

14  A.   Nicholas Harteau, Stuart Breslow, and Yolande Piazza.

15  Q.   And Nicholas Harteau was a Level 9, right?

16  A.   He was.

17  Q.   So you are assuming that Ms. Rowe's performance would have

18  been evaluated similarly as Mr. Harteau's was, as a Level 9, as

19  Ms. Rowe's performance actually was reviewed as a Level 8;

20  correct?

21  A.   I'm assuming that she would have had performance similar to

22  what Mr. Harteau did as a Level 9, yes.  Does that answer your

23  question?

24  Q.   You are assuming that her performance would have been

25  evaluated the same as a Level 9 as it actually was as a Level

1   8, right?

2   A.  I don't know that I am making that assumption, and

3   perhaps --

4            MR. GAGE:  Your Honor, I'd like to play a clip from

5   her deposition, if I could, for impeachment purposes.

6            This is clip 66, please.

7            THE COURT:  Go ahead.

8            MS. GREENE:  What's the page number?

9            MR. GAGE:  I'm sorry.  It's deposition page 146, line

10  13, through line 20.

11  A.  Is this the June 27th deposition or the November 18th

12  deposition?

13  Q.  Page 146.  Pages are continuous.

14  A.  Oh, okay.

15           MR. GAGE:  Can we play the clip please, your Honor?

16           THE COURT:  Yes, you may.

17           MR. GAGE:  Apologies for the technical difficulties,

18  your Honor.  Challenge with the remote testimony.

19           MS. GUTIERREZ:  One more time.

20           THE WITNESS:  I think, Mr. Gage, we're talking

21  about --

22           THE COURT:  There's no question pending right now.

23           Just hold on a moment please.

24           All right.  Are you ready, Ms. Gutierrez?

25           MS. GUTIERREZ:  Yes.

1           (Video played)

2           MR. GAGE:  No further questions, your Honor.

3           THE COURT:  Thank you.

4           MS. GREENE:  I just have two questions of redirect.

5           THE COURT:  All right.

6     REDIRECT EXAMINATION

7     BY MS. GREENE:

8     Q.  Ms. Ostrofe, you were asked questions about your

9     consideration of Mr. Harteau's compensation after he left OCTO

10    and moved into another role at Google.  Do you recall that?

11    A.  Yes.

12    Q.  Did Mr. Harteau's level change when he moved into the other

13    position?

14    A.  My understanding is that it did not.

15    Q.  And from what you reviewed, did his salary -- was it

16    changed outside of the ordinary compensation consideration

17    periods?

18          MR. GAGE:  Objection, your Honor.  No foundation for

19    her to speak to what's ordinary.

20          MS. GREENE:  Okay.  I'll ask a different question.

21          THE COURT:  Sustained.

22    Q.  Did Mr. Harteau's salary change when he moved out of OCTO

23    and into his other role?

24    A.  He was not given a different salary when he moved into his

25    other role.

NAIVROW6                         Ostrofe – Recross

1  Q.  Did his target bonus change when he moved into the other

2  role?

3  A.  No.  He remained at a Level 9, and that would dictate --

4  his bonus percentage would be 40 percent of the previous year's

5  salary, that was his target bonus.

6  Q.  So his compensation structure was the same in both the OCTO

7  role and the other role, is that your testimony?

8  A.  That's correct.

9          MS. GREENE:  No further questions.

10          MR. GAGE:  Just a couple, your Honor.

11  RECROSS EXAMINATION

12  BY MR. GAGE:

13  Q.  Ms. Ostrofe, Mr. Harteau's target bonus was just that,

14  right, it was a target; correct?

15  A.  Correct.

16  Q.  And so you did your calculations based upon money actually

17  paid to Mr. Harteau, right?

18  A.  That's correct.

19  Q.  And the money actually paid to Mr. Harteau was a function

20  of the job he did and his performance; correct?

21  A.  Correct.

22  Q.  And therefore, after he moved out of OCTO, his earnings

23  were earnings for a job different than the job Ms. Rowe was

24  performing; correct?

25  A.  Well, again, I don't know the degree of difference between

NAIVROW6

1   Mr. Rowe's and Mr. Harteau's job.

2   Q.  I didn't ask you the degree of difference.  It was a

3   different job as far as you understand; correct?

4   A.  It was not an OCTO, yes.

5         MR. GAGE:  No further questions, Judge.

6         MS. GREENE:  Nothing further.

7         THE COURT:  Okay.  Ms. Ostrofe, you are excused.

8         Thank you.

9         THE WITNESS:  Thank you.

10         (Witness excused)

11         MS. GREENE:  Your Honor, our next witness is appearing

12   by video deposition, and that is Jennifer Burdis.  So I believe

13   we're done with the Microsoft Teams.

14         THE COURT:  Okay.  Very good.

15         MR. GAGE:  Your Honor, might we just have a brief

16   sidebar on an issue before the next witness?  It's a practical

17   question I have for you.

18         THE COURT:  Yes.

19         (Continued on next page)

20

21

22

23

24

25

```
 1              (At sidebar)

 2              MR. GAGE:  Just a practical timing question, your

 3    Honor.  I believe this video runs about 30-some minutes.

 4              THE COURT:  Okay.

 5              MR. GAGE:  I was going to ask -- or I will ask, I was

 6    going to ask your Honor if we could have 15 minutes to organize

 7    our thoughts for our motion before we present our motion.  And

 8    if I'm looking at the clock correctly, that will get us close

 9    to 4 o'clock.

10              THE COURT:  To 4 o'clock, right.

11              MR. GAGE:  And this morning we talked about the risk

12    of plaintiff's case spilling into Thursday.  We know that's not

13    going to happen now.

14              THE COURT:  Right.  This is your last witness?

15              MS. GREENE:  This is our last witness.

16              MR. GAGE:  It's their last witness.  So will we end

17    the day with our motion, and we'll just put our witness on in

18    the morning.

19              THE COURT:  Who's your witness?

20              MR. GAGE:  Mr. Humez, a comp analyst.

21              THE COURT:  How long is he?

22              MR. GAGE:  He'll definitely carry over.  I think

23    between direct and cross, I expect he'll probably be an hour.

24    And our whole case, I expect, will be over by — if we start --

25    were we going to start at 9 tomorrow?
```

NAIVROW6

1          THE COURT:  I was going to raise some of this with you

2     during the break, but I wasn't sure the witness was -- I

3     thought she could hear us, so --

4          MR. GAGE:  I just want to raise it practically now.

5          THE COURT:  Which is fine.

6          I mean, I don't mind keeping the jury to 4:45.  I want

7     to make sure that the case goes to them as soon as possible.

8          So let's say if we do a half hour now, let's call it

9     3:40, okay, for this video.  Then you want 15 minutes, so five

10    of four.  Then you're going to --

11         MR. GAGE:  Make our motion.

12         THE COURT:  Right.  But at that point I'm going to

13    hear the top-line arguments.

14         MR. GAGE:  Yes.

15         THE COURT:  That would be less, like a few minutes.

16    And then I think we should get started on your next witness and

17    do that till quarter of five.

18         MR. GAGE:  Okay.  I just want to know, because when we

19    talked about it this morning, he's not here, that's why I

20    raised it now.

21         THE COURT:  Where is he?

22         MR. GAGE:  He's close by.

23         THE COURT:  Okay.  I understand.  That's fine.

24         MR. GAGE:  We'll have him, then we'll have him come

25    over.  That's really all I wanted to sort out.

1          THE COURT:  Okay.  That sounds like a good plan.

2          (In open court)

3          THE COURT:  Are we ready?

4          MS. GREENE:  Yes.  I'm sorry, we're ready.

5          THE COURT:  Okay.

6          MS. GREENE:  Ms. Gutierrez.

7          (Videotaped Deposition of Jennifer Burdis played)

8          MS. GREENE:  Your Honor, I would just ask that you

9     note, as you did with Mr. Eryurek and Mr. Wilson's deposition

10    testimony, that these reflect the deposition designations of

11    both defendant and plaintiff.

12         THE COURT:  Yes.  Members of the jury, please take

13    note of that.  Thank you.

14         All right.

15         MS. GREENE:  Your Honor, plaintiff rests her case at

16    this time.

17         THE COURT:  Okay.  Thank you, Ms. Greene.

18         All right.  Members of the jury, we are going to do

19    something now that we haven't done in any previous day, and

20    that is we're going to take another break.  Because plaintiff

21    has rested her case, and the lawyers need a few minutes to sort

22    of organize and plan their next steps.  So I anticipate that

23    you'll be out of the room about 20 to 25 minutes.

24         Does that sound right, counsel?

25         MR. GAGE:  25.

NAIVROW6

1            THE COURT:  Okay.  All right.

2            So, well, let's say we'll be back here at about 4:10

3      to 4:15.  Ms. Williams will come get you then.

4            And please do not talk to each other or anyone else

5      about the case.  And please don't do any research about the

6      case while you're on break.  Thank you.

7            (Jury not present)

8            THE COURT:  Okay.  You can be seated.

9            We're going to take a break too, right?

10            MR. GAGE:  Yes.  That's what I thought, your Honor.

11            THE COURT:  Okay.  That sounds right.  All right.

12            MS. GREENE:  Your Honor, what time do you want us

13      back?

14            THE COURT:  Can we do 15 minutes?  Okay.  So call it

15      4:05, with the goal of getting the jury back in here at 4:15,

16      and your witness will be ready.

17            MR. GAGE:  Yes, he should be here.  He may already be

18      here.

19            THE COURT:  Okay.  Very good.

20            (Recess)

21            THE COURT:  So, Mr. Gage, this is Google's elevator

22      pitch of the Rule 50 motion, right?  And then after we release

23      the jury, we'll hear more -- or we'll hear more from Ms. Greene

24      or Mr. Chiarello.

25            MR. GAGE:  I assumed the elevator pitch.  I didn't

1    realize you were going to, sort of, allow us to continue.

2              THE COURT:  If you like.  If you like.  I'm just

3    mindful of the jury.

4              MR. GAGE:  To be sure.

5              THE COURT:  Okay.

6              MR. GAGE:  To be sure.

7              And I appreciate your Honor letting me make a record

8    after they've rested and before we proceed.

9              THE COURT:  Yes, of course.

10             MR. GAGE:  May I, your Honor, start the elevator

11   pitch?

12             THE COURT:  Yes.

13             MR. GAGE:  Your Honor, the first claim I'd like to

14   talk about is Ms. Rowe's retaliation claim.  The law is clear

15   she needs to prove that she had a subjectively and objectively

16   reasonable belief that there was illegal conduct going on.  And

17   we respectfully submit that there is no evidence to suggest

18   that.  Ms. Rowe herself, her entire belief that there was

19   something wrong with her leveling is because she thinks she's

20   as qualified as other people.  And that's not enough.  And she

21   told -- we heard it today, the evidence shows clearly, she told

22   the investigator, Google's investigator, that she did not have

23   any reason to believe that gender played a role in her

24   leveling.  So first and foremost, we don't think that plaintiff

25   has established a *prima facie* case of protected activity.

1              Second, on the retaliation claim, there is no evidence

2    in the record whatsoever that her alleged protected activity

3    was in any way a factor — in any way a factor — in any of the

4    things that she claims were retaliatory.

5              And let's list them:

6              One, her not getting the financial services vertical

7    lead role.  The evidence consistently and undisputedly shows

8    that from the very beginning, Mr. Shaukat was not impressed --

9    as impressed by her as he was by other candidates.  It never

10   changed.  Despite the fact that she had multiple opportunities

11   to change his view, his opinion was consistent.  His opinion

12   was the reason why she didn't get the job.  And there's no

13   evidence to suggest that his learning that she had concerns

14   about her leveling had anything to do with that decision.

15             The retaliation claim relating to the vice president

16   for financial services sales job.  Similarly, the evidence is

17   undisputed that Ms. Kliphouse made the decision not to consider

18   Ms. Rowe further after she had spent time with her over coffee.

19   And the evidence is undisputed that she already had a preferred

20   candidate, a senior executive at Citigroup, and she didn't want

21   to take -- and the evidence is undisputed, Mr. Vardaman said

22   it, she didn't want to take any further time considering other

23   candidates.  So we believe there's no evidence of causation on

24   the retaliation claim.

25             THE COURT:  Mr. Gage, let me stop you one second.

1          From here, I don't want you to do an argument that's

2      this fulsome and then not hear from Ms. Greene or Mr. Chiarello

3      until after.  So I think you should go to a higher level now.

4          MR. GAGE:  Okay.

5          THE COURT:  Let's do that.

6          We also have the jury waiting.

7          MR. GAGE:  I'm sorry.  I was trying to keep it at a

8      high level, Judge, not high enough apparently.  I'll be quick.

9          On the discrimination claim, your Honor, same thing

10     about the leveling.  We don't think there's any evidence

11     whatsoever that gender played any role whatsoever in the

12     leveling.  There is no discrimination claim on the vice

13     president financial services sales job, that's only a

14     retaliation claim.  And again, similarly, there's no evidence

15     that gender played a role in Mr. Shaukat's decision about the

16     financial services vertical lead role.

17         Your Honor, on the Labor Law 194 claim, first and

18     foremost, we believe the evidence clearly shows Ms. Rowe was

19     doing something differently than Mr. Breslow.  Hers was an

20     engineering job, his wasn't.  The evidence we've heard between

21     Ms. Rowe and Mr. Harteau clearly shows he was doing different

22     work than her, so she can't establish that *prima facie* case.

23         At the second level of the analysis, your Honor, we

24     believe that level is a *bona fide* factor, other than sex.  And

25     if the plaintiff cannot prove — which we don't think she has —

NAIVROW6

1    that gender played a role in leveling, as a matter of law, your

2    Honor, and as a matter of law of the case, level is a *bona fide*

3    factor other than sex.  And for that, your Honor, I refer to

4    Judge Schofield's decision denying the plaintiff's motion for

5    summary judgment.  Judge Schofield said that if level is not

6    tainted by bias, gender bias, that would be a basis for finding

7    in Google's favor in this case.

8            Finally, your Honor, last part of my pitch, there is

9    absolutely no evidence to support the claim of willfulness or

10   reckless disregard for Ms. Rowe's rights.  And since your Honor

11   wanted me to keep it high level, I will stop there.

12           THE COURT:  Okay.  Thank you.

13           So we will pick up with that that after the witness is

14   out of the box and the jury has been released for the day.

15           Why don't we bring in the witness now.

16           (Jury present)

17    CHRIS HUMEZ,

18       called as a witness by the Defendant,

19       having been duly sworn, testified as follows:

20           THE COURT:  Mr. Gage, just for planning purposes, I

21   intend to release the jury at 4:45.

22           MR. GAGE:  Got it.

23           THE COURT:  Thank you.

24           MR. GAGE:  I will plan accordingly, Judge.

25   DIRECT EXAMINATION

1   BY MR. GAGE:

2   Q.  Good afternoon, Mr. Humez.

3   A.  Good afternoon.

4   Q.  What do you do for a living?

5   A.  I'm a compensation manager at Google.

6   Q.  And can you explain to the ladies and gentlemen of the jury

7   what a compensation manager does at Google?

8   A.  We make sure that the company follows the company's

9   compensation philosophy as approved by the board, which is to

10  reward and retain talent at the company.

11  Q.  Before we get into the meat of it, could you describe for

12  the jury your background before you came to Google, your

13  professional background?

14  A.  Professional background?  Yup.

15          Right after -- you know, after university, I did an HR

16  rotational program for the first two years.  And then I went on

17  to do executive compensation at a financial services firm.  And

18  then that was the job immediately preceding joining Google.

19  Yeah.

20  Q.  And what financial services firm were you working at before

21  you joined Google?

22  A.  Goldman Sachs.

23  Q.  Are you familiar with how compensation is structured in the

24  financial services industry in New York?

25  A.  Yes, I am.

1   Q.  And what years were you working at Goldman Sachs?

2   A.  Between 2014 and 2016.

3   Q.  And can you describe your general understanding of how

4   compensation is structured in the financial services industry.

5          MS. GREENE:  Objection.  Relevance.

6          THE COURT:  I'll allow it.

7   Q.  You can go ahead, Mr. Humez.

8   A.  Yeah.  So compensation in general is structured in the

9   financial services industry with a base salary; so you get that

10  guaranteed element of compensation.  And then total bonus.  So

11  in financial services, it will be -- the total bonus will be

12  split between a portion paid in cash immediately, and then

13  typically the remaining part of the bonus will be granted in

14  equity that will vest over some time period, which will depend

15  on the firm, how long that will be.

16  Q.  And in your experience working in the financial services

17  sector in New York, are bonuses guaranteed?

18  A.  No, no.  They are typically 100 percent discretionary.

19  They can be fairly volatile year over year, depending on the

20  performance of the firm.

21  Q.  And in your experience in the financial services industry,

22  are there even target bonuses that are a function of or

23  percentage of base pay?

24  A.  No, that's not common in the industry.

25  Q.  When did you join Google?

1   A.  August 2016.

2   Q.  August of 2016?

3        And can you describe first what the components of

4   compensation are at Google for director-level employees.

5   A.  For director-level employees, it will consist of a base

6   salary.  So there's typically three elements of pay.  So it's

7   base salary, cash bonus.  And for an L8 director at the

8   company, the target bonus is related to the level.  So for a

9   Level 8, it's 30 percent target of base salary.

10        And then the other element to pay is what we call

11   equity refresh, so annual equity or stock awards.

12   Q.  How, in your experience, are cash bonuses different at

13   Google than they are in the financial services industry?

14   A.  I would say it's much more structured in that there is a

15   target bonus.  Like I said, it's -- for directors L8 at Google,

16   it's a 30 percent target.  At a financial services firm, it

17   could vary widely year to year based on the firm's performance.

18   So it's much more discretionary.  And at Google, I would say

19   the actual bonus that you receive is much more formulaic or

20   algorithmic, in that it will vary based on your actual

21   performance rating.  And so it's much more, like I said,

22   formulaic based on performance.

23   Q.  Okay.  I want to take a step back.

24        So compensation at Google for directors is base pay,

25   cash bonus, and equity; correct?  Those are the three

1  components?

2  A.  Yeah.  Correct.

3  Q.  What is a job code at Google?

4  A.  It's the definition of somebody's role and responsibility.

5  So it's essentially the combination of the role that you're

6  performing and the level that you're in.

7  Q.  And when Google is setting starting pay for someone that's

8  hired — and we'll come to Ms. Rowe in a minute, but I just want

9  to speak generally about how this is set — how does Google

10 determine base pay for a starting pay package?

11 A.  So for base salary for every single role that we have at

12 the company, so based on the job code and the location, we do

13 essentially annual benchmarking.  So we want to make sure based

14 on the external market that we're competitive for similar roles

15 in similar locations.  So we set on the base salary what's

16 called a market reference point.  So that's essentially the

17 target salary pay point for that role.

18         So for new-hire compensation, our goal is as much as

19 possible to bring people in at the kind of starting point for

20 that role so that, going forward, their increases can be more

21 determined based on their performance.

22 Q.  And can we refer to market reference point as MRP?  Is that

23 how it's referred to at Google?

24 A.  Yeah.

25 Q.  So MRP is specific to job code, and job code is specific to

1  the job title and level; correct?

2  A.  That's correct.

3  Q.  Okay.  And when you're putting together an offer, speaking

4  just about base pay, is there a particular percentage of MRP

5  that you're usually shooting for?

6  A.  Yeah, that's the starting percent of MRP.  Really the

7  minimum that we would ever offer somebody is 80 percent of MRP.

8  Q.  Okay.  And just for simple math, if MRP is $100,000, does

9  that mean that you would start somewhere between 80 and 100 in

10  your calculation?

11  A.  Yeah, that's correct.

12  Q.  Okay.  And is that first number that you come up with just

13  specific to the job code and the geography?

14  A.  Yes.  Yeah.

15  Q.  So if a hiring manager wants to hire someone, all you need

16  to know is the job code and the geography to come up with that

17  number, is that fair to say?

18  A.  Yeah, that's correct.

19  Q.  So you don't know if the candidate is a man or a woman, is

20  that fair to say?

21  A.  No, by design, we don't.

22  Q.  Now, let's talk about bonus for a second.  And I think

23  you've probably already answered this, but I want to make sure

24  it's clear.  How is bonus determined or bonus -- if someone is

25  hired as a Level 8, what is their bonus eligibility, cash

1    bonus?

2    A.   It's -- the target is 30 percent of their base salary.   And

3    then the actual bonus that they would receive would be

4    dependent on their performance ratings throughout the year.

5    Q.   Okay.   And what is the target for a Level 9 director?

6    A.   Forty percent of base salary rather than 30 for an L8.

7    Q.   And is an L9 director's bonus, ultimate bonus that she or

8    he receives, a function of their performance as well?

9    A.   That's correct.

10   Q.   Could you explain to us how an initial equity -- we're

11   still talking about coming up with a starting pay package for

12   someone.   Does it sometimes include an equity award?

13   A.   Yes.

14   Q.   And how do you go about determining what a starting pay

15   package equity award might be?

16   A.   It follows a very similar process as determining the MRP or

17   market reference point.   So we go through this external market,

18   benchmarking, and we have a new-hire equity guideline that we

19   set for every single job code in every single location that

20   we're operating in.

21   Q.   And is that likewise done without regard to the identity of

22   the candidate?

23   A.   It's purely based on the roles and responsibilities.

24   Q.   Earlier you used the term -- you said it was determined

25   algorithmically.   Can you explain to the jury what you meant by

1   the use of that word?

2   A.   Yeah.  So when we go through annual compensation planning,

3   we -- it follows basically an equation where, you know, take --

4   if we take bonus for an example, they have their target cash

5   opportunity.  So for an L8, for example, 30 percent of their

6   base salary, that's their target bonus.  And then based on

7   their performance ratings throughout the year, there's a

8   multiplier that we have that are tied to each rating.  And then

9   based off of that, and there's some proration factors, so if

10   they only worked half the year, it would take that into account

11   as well.  And then that simple equation renders the modeled

12   bonus that they would have received.

13        And then on top of that, there is the opportunity for

14   a manager to exercise some discretion or make adjustments to

15   the model amount.

16   Q.   And so again, is the modeled amount without regard to

17   whether the person is a man or a woman?

18   A.   Correct.

19   Q.   It has nothing to do with how the amount is determined;

20   correct?

21   A.   It's based on the performance rating.

22   Q.   And the performance rating is determined by whom?

23   A.   In part by the direct manager.

24   Q.   Okay.  Does Google evaluate pay on an annual basis once

25   someone started?  Let me ask the question.  So we'll get to

NAIVROW6                              Humez – Direct

1    Ms. Rowe in a minute.  But once someone is hired at Google,

2    does Google on an annual basis re-evaluate their pay?

3    A.  Yes.

4             (Continued on next page)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

NAIHRow7                          Humez – Direct

1    BY MR. GAGE:

2    Q.  Can you explain how Google reevaluates a Googler's pay, an

3    employee's pay, on an annual basis?

4    A.  Yeah.  So on an annual basis, we go through what's called

5    annual compensation planning, or we use what we call the gComp

6    tool, which is our comp planning tool.  And they'll go through

7    this process, and essentially, you know, they'll have modeled

8    amounts based on their performance ratings throughout the year.

9    So their performance rating will be a direct input to how much

10   their salary increases each year, what their ultimate bonus is

11   that they receive, and ultimately, again, the equity award that

12   they may be granted.

13   Q.  And is all of that done algorithmically?

14   A.  Yeah.

15   Q.  Were you involved in the —— in formulating Ms. Rowe's

16   starting pay package when she was hired at Google?

17   A.  Yes, I was.

18   Q.  And what was —— describe for the jury what your role was in

19   that process.

20   A.  I was the one who actually crafted the offer for Ms. Rowe.

21   So the process itself was, you know, gathering, at the time,

22   her current compensation and putting together an offer that's

23   —— that's compelling so that she would be enticed to join

24   Google.

25   Q.  You said you gathered information.  Who did you gather

1    information from?

2    A.  It was through the recruiter.  So the recruiter had —— we

3    have essentially like a standard intake form that gathers the

4    details of their current pay, and so I interacted with the

5    recruiter to gather that information.

6    Q.  And did there ever come a point in time when you actually

7    spoke with Ms. Rowe?

8    A.  Yes.  Later on in the process, I did.

9    Q.  And what prompted the conversation between you and

10   Ms. Rowe?

11   A.  There were just several questions.  You know, from the

12   recruiter's perspective, questions and concerns around, you

13   know, the differences of how financial services firms, and

14   specifically JPMorgan, approaches pay and, to be honest, the

15   drastic differences between how Google approaches pay and sort

16   of —— especially because I've been in both the financial

17   services industry and going to Google was in the position to

18   answer some of those questions and, you know, help, yeah,

19   understand the differences there.

20   Q.  And whose concerns were they?

21   A.  Ms. Rowe's.

22   Q.  So do I understand correctly that you got on a GVC, a

23   Google videoconference, with her to discuss her concerns?

24   A.  I believe it was just a phone call.

25   Q.  Just a phone call.

1    OK.  And can you describe that conversation.

2  A.  Yeah, it was mostly, like I said, just answering questions

3  on, you know, Google's overall compensation philosophy, how

4  increases are determined each year, how it works in terms of

5  how bonuses are awarded, how equity awards might be awarded

6  going forward because, like I said, it is very different from

7  — from previous experience in financial services.  So it was

8  mostly questions understanding the differing philosophies and

9  structure.

10 Q.  Based upon your participation in that conversation and your

11 observations, did you feel that you allayed any concerns she

12 had?

13 A.  I thought I did, yeah.

14      MR. GAGE:  OK.  I'd like to show the witness

15 Plaintiff's Exhibit 5, and we can — I believe we can show the

16 jury.  This is a plaintiff's exhibit.  I think it's already

17 admitted into evidence, your Honor.

18      THE COURT:  OK.

19      MR. GAGE:  If we could, Jean, just slowly flip through

20 this and give Mr. Humez an opportunity to look.  This is a

21 lengthy exhibit.

22 Q.  And while you're looking through it, Mr. Humez, my ultimate

23 question is do you recognize this document?

24 A.  I do.

25 Q.  Just tell us, what is this document, Plaintiff's Exhibit 5?

NAIHRow7                          Humez – Direct

1  A.  Yeah.  It's the email correspondence between myself and

2  Ms. Rowe's recruiter.

3  Q.  Does this reflect the back and forth over the information

4  that you needed?

5  A.  Yeah, that's exactly correct.

6          MR. GAGE:  I'd like to turn to page 2 of this exhibit.

7  And, Jean, if you could just highlight both of those charts at

8  the top.  Let's make those big enough so everybody can see

9  them.

10  Q.  Now, first, Mr. Humez, at a high level, what are these two

11  charts supposed to depict?

12  A.  It's supposed to depict —— on the top, it's an estimate,

13  projection, of Ms. Rowe's current pay at JPMorgan at the time,

14  and then the bottom is a modeling against that, those numbers

15  of the offer, the Google offer.  So our approach generally is

16  to look at things on an annual cash flow basis.  So cash flow

17  meaning the sum of base, bonus, and equity that would be

18  received each year.  And our goal really is, you know,

19  generally to be over four years, where possible, 10 to

20  15 percent above their current pay.

21  Q.  So did I hear you correctly that you're trying to estimate

22  an amount that they would receive each year going into the

23  future that's more than they're currently making?

24  A.  Yeah.

25  Q.  So I'd like to break down this first chart at the top.  You

1  said the top table is your numbers —— well, is that reflective

2  of the numbers that you arrived at based on the information you

3  received from Ms. Rowe?

4  A.  Yes, that's correct.

5  Q.  Let's focus just on year one.  What does the 350 represent?

6  A.  Ms. Rowe's base salary at the time.

7  Q.  And the number right below that, 361, what does that

8  represent?

9  A.  That represents the last actual cash bonus that she

10  received at JPMorgan.

11  Q.  And so this document, we don't need to flip back.  I can

12  tell you this email exchange is dated December of 2016.  So the

13  361 was her bonus paid for what?

14  A.  It was for —— it was her bonus paid in January of 2016 for

15  performance in 2015.

16      MS. GREENE:  Objection, your Honor, I just want to

17  note the date of the document is incorrect.

18      THE COURT:  Mr. Gage will now go back to that page,

19  please, and let's take a look at the date on the top.

20      MR. GAGE:  Did I misstate?  December '16,

21  December 2016.  Did I not say 2016?  I'm sorry.

22      THE COURT:  Which document are you looking at?

23      MR. GAGE:  P5.  P5, email sent December 2016.  If I

24  misspoke, I apologize.  I thought I ——

25      MS. GREENE:  My apologies.  I couldn't tell from the

1    document which page of this document you were on and which of

2    the charts.  I understand now you are correct.  It's

3    December 16.

4              THE COURT:  December 2016?

5              MS. GREENE:  Correct.

6    BY MR. GAGE:

7    Q.  So just to come back to what we were talking about, so the

8    361, is that 361,000?

9    A.  Yeah, 361.

10   Q.  So is it —— was it your understanding that Ms. Rowe had

11   received, in or about January of 2016, $361,000 from JPMorgan

12   Chase for her performance in 2015, is that what you said?

13   A.  That was my understanding, yeah.

14   Q.  Now, based on your understanding of how the financial

15   services industry works, was she guaranteed to receive a

16   $361,000 bonus for her work in 2016?

17   A.  No, it wouldn't be guaranteed.  It would be, yeah,

18   discretionary.  It could have been, yeah, higher or lower.

19   Q.  Higher or lower.

20             OK.  So why did you put 361 in there?

21   A.  Because there is —— there is no target bonus, so we did not

22   want to assume that she would receive no bonus.

23   Q.  OK.

24   A.  So we assumed the last actual.

25   Q.  And then the number right below the 361, 711, is that just

NAIHRow7                        Humez – Direct

1   a total of top two numbers?

2   A.  Yes, that's correct.

3   Q.  So what's the 253 in year one in your chart on the top?

4   What does that represent?

5   A.  That's 253,000 — so it's the value of equity that would be

6   vesting in that upcoming first year based on prior equity

7   awards.  So equity awards that were granted in previous years,

8   that would have then started to vest in that — that first

9   year.

10  Q.  So are you projecting that in, if she had stayed at

11  JPMorgan Chase, January of 2017, she would have actually vested

12  in $253,000 of JPMorgan equity?

13  A.  That's correct.

14  Q.  That had been granted in prior years?

15  A.  In prior years.

16  Q.  So is the $963,000 number your estimate of what you thought

17  her cash flow would be for 2017 at JPMorgan?

18  A.  Correct.  But it was an estimate because the bonus was —

19  was not known at that time.

20  Q.  OK.  So now let's go down to the chart at the bottom.

21  Staying in the column for year one, how did you arrive at

22  $290,000 for the base salary?

23  A.  So it was as — it was as high relative to MRP as we were

24  comfortable going.  It was quite high.  I believe, from

25  recollection, it was 98 percent of MRP, so — so, yeah, quite

1  high in the range.  And so we wanted to stretch as high as we

2  could to, you know, recognize the fact that it would be a

3  decrease from the current base salary.

4  Q.  The 87,000, what's that?  Where's that come from?

5  A.  That would just be 30 percent of the 290,000.

6  Q.  And then the next number, 250,000, what's that?

7  A.  That's a one-time cash sign-on bonus that we'd be paying

8  immediately after starting.

9  Q.  So then where it says 627, that's the total of the numbers

10  above it, right?  So that's the total cash that the starting

11  offer you put together would put in Ms. Rowe's pocket in 2017,

12  is that right?

13  A.  Correct.

14  Q.  Then let's go to the next number down, 416.  What is that?

15  A.  416 is the annual vesting value of a four-year grant that

16  we'd be giving.  So it would be 2,200, what we call, Google

17  stock units, so stock units.  So it's the annual vesting value

18  of the 1.662 million that you'll see all the way to the right

19  of that.

20  Q.  So the 2,200 GSUs, that's a number of units and not

21  dollars, right?

22  A.  Yeah, a number of units.

23  Q.  Of stock units?

24  A.  Right.  And at the time, based on the stock price, were

25  value at, yeah, 1.662 million.

1  Q.  And then the next number just below that, 550, what's that?

2  A.  That is a second equity grant.  So it's quite, I would say,

3  abnormal to give a second grant.  Typically, the structure of

4  our offer is just a four-year grant.  So this is just a second

5  grant that we were granting Ms. Rowe that would vest just over

6  the first year.

7  Q.  So what was the total amount that the offer you put

8  together was estimated to put in Ms. Rowe's pocket in year one,

9  2017, if she joined Google?

10  A.  It was estimated at the 1.593 million.

11  Q.  As a function of your estimate of her JPMorgan pay, that

12  was what percent?

13  A.  65 percent higher.

14  Q.  65 percent higher.

15      In your experience as a comp professional at Google,

16  was that a generous offer?

17  A.  It was, yeah.

18  Q.  Is it more generous than most?

19  A.  Yeah, more generous than most.

20  Q.  And why — you put this together.  Why was such a generous

21  offer put together for Ms. Rowe?

22  A.  I mean, it reflected the — you know, how — how much we

23  wanted to bring her on board, and it was also reflective of the

24  differing — the differing comp structures between both Google

25  and JPMorgan.

1    MR. GAGE:  Now I'd like to just quickly go to year

2  two.  We will not go through all years, Judge, but I do want to

3  quickly go through year two.  And I'm mindful of my time.

4  Q.  Year two in the top chart, Mr. Humez, you've got 979.  Is

5  that an estimate of what, based on the information you had, you

6  thought she would earn from JPMorgan in 2018?

7  A.  That is correct.

8  Q.  You were assuming a constant bonus, constant equity,

9  roughly constant equity for her?

10  A.  Yeah, the value of equity that would have been vesting in

11  that year.

12  Q.  OK.  But now we go to the bottom and Google cash flows year

13  two.  We go all the way to the bottom, and the number's a lot

14  smaller.  Why is that?  It's a lot smaller than it was in year

15  one.  Why is that?

16  A.  Because in year one we had a one-time cash sign-on bonus

17  and the special equity grant that vested over just the first

18  year.

19  Q.  Now I see in the row that says "New hire equity," there's

20  the number 416, and that's the same number that's to the left

21  and to the right and to the right.  Is that part of the

22  2,200 GSUs that were granted her when she started?

23  A.  Correct, yeah.

24  Q.  What happened?  Why would she get those in the second year?

25  A.  Because the 2,200 GSUs just vest evenly, so 25 percent in

1    each year over four years.

2    Q.  Is that the same thing in year three and year four there?

3    A.  Yeah.

4    Q.  And as a director in Google, once Ms. Rowe joined, was she

5    eligible to receive additional equity awards in years one,

6    years two, years three, and year four in the future?

7    A.  Yes.

8    Q.  And does your Google cash flows chart here project anything

9    for those additional awards?

10   A.  No, it does not.

11   Q.  Does this projection you have for four years show an

12   estimate that she would earn more at Google than she earned at

13   JPMorgan?

14   A.  Yes, it does.

15          MR. GAGE:  Your Honor, I appreciate ── just one last

16   question, then I'll pause.

17   Q.  Mr. Humez, was anything in this offer intended to replace

18   something at JPMorgan?

19   A.  No, it was not intended to specifically replace anything.

20   It was intended to have higher annual cash flows over the

21   four-year period.

22          MR. GAGE:  Your Honor, I understand you want to take a

23   break now.

24          THE COURT:  Yes.

25          All right.  Members of the jury, we're going to stop

1    now for today.  Please remember while you're gone overnight,

2    don't talk to anybody about the case, don't talk to each other,

3    don't do any research.

4              And tomorrow, if you could please be here by 9 a.m.,

5    we'll start with testimony at 9:15.

6              (Jury excused)

7              (Continued on next page)

1            (Jury not present)

2            THE COURT:  You may step down now.  We'll see you in

3   the morning.

4            THE WITNESS:  Thank you.

5            THE COURT:  All right.

6            (Witness temporarily excused)

7            THE COURT:  You can be seated.

8            All right.  Ms. Greene, Mr. Chiarello.

9            MS. GREENE:  Yes, your Honor.  This is my opportunity

10  to respond to ——

11           THE COURT:  This is.

12           MS. GREENE:  OK, your Honor.  Just generally, first

13  point to note is that as the moving party —— or as the

14  nonmoving party in this case, all inferences in terms of the

15  evidence must be construed in our favor.  There is plenty of

16  evidence by which a jury could determine that each of the

17  elements of our claim have been met.

18           Speaking, first, to retaliation —— before I do that,

19  your Honor, I want to note that these are claims that are

20  brought under the New York State Equal Pay Law Section 194 and

21  the New York City Human Rights Law, and those are very, very

22  different statutes than the federal laws in terms of proof, in

23  terms of burdens, in terms of defenses.  And so the

24  subjectively and objectively reasonable belief standard is not

25  the correct standard.

1   Here, Mr. Shaukat understood that Ms. Rowe was raising

2 a complaint of bias.  ER understood that she was raising a

3 complaint of bias.  They investigated it.  That's enough to

4 constitute protected activity under the law, and the jury

5 should be able to hear that evidence.

6   With respect to — and with respect to the document

7 that Mr. Gage has alluded to, that document itself points out

8 gender differences with respect to the men who were leveled as

9 9 and no women leveled as 9.  And in testimony, Ms. Beaupain

10 was asked about the general question being, Is there anything

11 else?  And Ms. Rowe answered that she was not aware of anything

12 suggestive of gender beyond what she'd already testified and

13 beyond what she'd already said to Ms. Beaupain in that review.

14   Again, in any event, they understood it to be a

15 complaint of discrimination, and the adverse action that they

16 then took is contrary to the law.  Temporal proximity itself is

17 enough to establish causation.  Here, we're talking about a

18 matter of days in between the protected activity and the

19 adverse action.  Ms. Rowe's complaint on August 28; September 1

20 when Mr. Vardaman noted that she's no longer viable.  We have

21 her complaint on November 7.  We have just a few weeks later

22 where she was a candidate with respect to the financial

23 services vertical — I'm sorry, the VP financial services sales

24 role.  It was six days between Mr. Vardaman's interview with ER

25 and where he was asked about Ms. Rowe's claims and her

NAIHRow7

1    reach-out about this and then his subsequent denial to put her

2    into the —— into consideration.  We've not heard from

3    Ms. Kliphouse, as defendant said.  We've not heard any

4    testimony from Ms. Kliphouse as to a nondiscriminatory reason

5    for those actions, and there's plenty from which a jury can

6    infer that Mr. Vardaman was motivated by bias in terms of how

7    he handled Ms. Rowe's consideration.

8            With respect to the equal pay claim, there is evidence

9    by which a jury could determine that Ms. Rowe was performing

10   equal work as that's defined under New York Labor Law

11   Section 194, both with respect to Mr. Breslow and Mr. Harteau.

12   Mr. Breslow testified as to the —— the job that he was

13   performing, what it entailed, what it involved.  It's very

14   similar to how Ms. Rowe described her job, and especially

15   during the time period when they were both working in financial

16   services.  It's enough for a jury to consider whether that

17   standard is met under the New York Labor Law.

18           With respect to the affirmative defense, Mr. Gage is

19   just wrong.  It's not enough to show a bona fide factor other

20   than sex to establish the defense.  New York Labor Law requires

21   something more.  It requires that it be job related and

22   consistent with business necessity.  And in fact, the Second

23   Circuit just issued a decision yesterday on this very issue,

24   the case is *Eisenhower v. The Culinary Institute of America*,

25   No. 21-2919-CV.  An issue there was whether the affirmative

NAIHRow7

defense standard is the same under the Equal Pay Act and the
Equal Pay Law, and the Second Circuit overturned the summary
judgment decision in defendant's favor, remanded back to the
district court for the correct application of the affirmative
defense in that, unlike the EPA, the EPL requires that it be
job related and consistent with business necessity, and that's
because the law was amended in 2016 to make that distinction.

THE WITNESS:  With respect to evidence willfulness or
reckless disregard of rights, again, there's evidence that's
been presented to the jury that Ms. Rowe repeatedly raised
concerns and that her concerns were dismissed and weren't
remedied.  And that's —— that is sufficient to meet the
standards by which liquidated damages are assessed under the
New York Labor Law and punitive damages, which are assessed on
the lower standard under the Court of Appeals decision *Chauca*,
which established the punitive damages standard for the New
York City Human Rights Law and noted that it's a lower
threshold than what exists under Title VII.

Under those lower thresholds for willfulness and
reckless disregard of rights, there's evidence by which a jury
could determine that we've met that criteria, and it should be
for the jury to decide at this point.  So we would respectfully
request that the Court deny defendant's motion for a directed
verdict.

Oh, I'm sorry, your Honor, just one other thing.  And

NAIHRow7

1    it should be obvious, but there's ample evidence with respect

2    to gender bias and motivation.  Ms. Rowe has testified as the

3    only woman in the technical director Level 8 and Level 9, and

4    the differential treatment itself is enough by which a jury

5    could determine that gender played a role.

6            A jury could also look at the reasons asserted by

7    defendant for the differentiation between the two, and if the

8    jury finds that's pretextual, that it's not really the reason,

9    the jury can draw an inference of unlawful motivation,

10   discriminatory motivation.  And so those are just two of the

11   means by which a jury could find gender bias to exist.

12           The standard, again, under the New York City Human

13   Rights Law for issuing a summary judgment or directed verdict

14   in defendant's favor is much more in favor of the employee.

15   There has to be no way by which a jury could conclude that ——

16   that gender played a role, and here —— and the decisions ——

17   and, your Honor, I could find it for you.  I don't have it.

18   It's in —— or another decision that's critical to this, but the

19   decisions make clear that it is a much lower standard, and it's

20   whether gender played any role in the plaintiff being treated

21   less well.

22           So there's two important distinctions, one is whether

23   it played any role —— not a significant role, not the primary

24   role, any role.  And the standard for adverse action is less

25   well, were they just treated in any way less well, and that's

NAIHRow7

1    sufficient to state a claim for discrimination under the New

2    York City Human Rights Law.

3        So, again, for those reasons we respectfully request

4    that the Court deny defendant's motion.

5        THE COURT:  OK.  I am now going to need a couple of

6    minutes so, I don't think it's long enough that you'll want to

7    leave the courtroom, but I'll be back shortly.  Thank you.

8        (Recess)

9        THE COURT:  Please sit down.

10        The defense has moved, as is proper at this stage of

11    the case, under Rule 50 for a judgment on the grounds that

12    there is not sufficient evidence on which a jury could find in

13    Ms. Rowe's favor on her claims of equal pay, gender

14    discrimination, and retaliation, as well as on the question of

15    willfulness.  I'm first going to address Ms. Rowe's claims and

16    then take up willfulness in regard to damages.

17        Furthermore, in resolving a Rule 50 motion, all

18    evidence is to be construed in the light most favorable to the

19    plaintiff as the nonmoving party, and all reasonable inferences

20    shall be drawn in favor of the plaintiff as the nonmoving

21    party.  The ruling that I am about to make needs to be read in

22    that spirit.  I am not resolving the case here.  I am simply

23    resolving a Rule 50 motion.

24        I am denying the Rule 50 motion and letting the case

25    go to the jury.  I have paid careful attention to the evidence

NAIHRow7

1    in this case and have greatly benefited from the work of

2    counsel on both sides.  I will start with this.

3             I have no doubt that a jury could find for the defense

4    in this case.  There is certainly an evidentiary basis for

5    that.  However, the issue here is not whether a jury could find

6    for the defense, it is whether the jury could find for

7    plaintiff.  My view is that, on the record that has developed,

8    there is sufficient evidence on which a jury could return a

9    plaintiff's verdict.  I'm going to start with the Section 194

10   claim.

11            There is evidence from which the jury could find that

12   Ms. Rowe and Mr. Harteau were doing equal work.  For one thing,

13   evidence has been adduced establishing that Ms. Rowe and

14   Mr. Harteau were hired for the same role, that is, technical

15   director in OCTO.  Not only that, but Mr. Harteau himself

16   testified that his and Ms. Rowe's work was "similar."

17   Specifically, they "were doing the same sort of work in the

18   same sort of circumstances."  And I'm citing here to page 839,

19   lines 3 through 4, of the transcript.

20            I likewise find that a jury could find that Google

21   retaliated against Ms. Rowe.  I'm going to start by addressing

22   Ms. Rowe's efforts to obtain the FSVL role.

23            Among other things, on August 28, 2018, Ms. Rowe made

24   a complaint to Melissa Lawrence expressing concern that men had

25   been leveled at Level 9, specifically noting that "I was told

NAIHRow7

1    that everyone hired for the role was being hired at a Level 8.

2    I later learned that my male peers were hired at Level 9," and

3    this is reflected in PX 42.  Then just days later, Mr. Vardaman

4    wrote in an internal report "sounds like she," meaning

5    Ms. Rowe, "is not viable for the role."  I'm citing to, among

6    other things, PX 69 at page 97.

7            With respect to the VP sales position, a jury might

8    find noteworthy the temporal proximity between Ms. Rowe's

9    complaint and the alleged retaliatory action.  Ms. Rowe filed

10   her complaint in this court in September 2019, and several

11   months later, in February 2020, Ms. Piazza was hired for the

12   sales role.  Furthermore, the fact that it was Mr. Vardaman

13   acting as the internal recruiter for both this position and the

14   earlier FSVL role is a link that the jury might choose to

15   credit.

16           In regard to Ms. Rowe's gender discrimination claim, I

17   conclude that a jury could find that Ms. Rowe was similarly

18   situated to Mr. Harteau among other male L9 colleagues but was

19   treated less well, including because of her pay.

20           In sum, I conclude that there is sufficient evidence

21   to go to the jury on the claims just addressed.  We will see

22   which way they ultimately come out.

23           As to the question of willfulness, in regards to

24   damages, I likewise find that there is sufficient evidence to

25   submit this question to the jury.  The jury could find that

NAIHRow7

1    Google knew that Ms. Rowe was performing equal work to her

2    alleged male comparators yet was being paid less.

3    Specifically, Ms. Rowe made an internal complaint that she was

4    paid less and she filed a lawsuit, such that a jury could find

5    that, despite Google's knowledge of both that internal

6    complaint and court complaint, they continued paying her less.

7    At the very least, a jury could find that Google was reckless

8    in that regard.  So damages will go to the jury to decide.

9         I therefore deny the Rule 50 motion.  In the event of

10   a plaintiff's verdict, defendant may submit a post-verdict

11   motion at that point.  Everyone will then be able to proceed

12   with the benefit of time and reflection, the opportunity to

13   carefully examine the transcript and evidence, the ability to

14   advance applicable authorities and fleshed out arguments, and

15   so forth.

16        Now I think we should talk about tomorrow.  So

17   tomorrow we will have — we will convene in here at 8:30 a.m.,

18   and we will have a charging conference.  We are going to be

19   working overnight on the charges, and we will send them to you

20   from chambers email before the charging conference so that you

21   can review them.

22        What are you thinking about time at this point for

23   tomorrow in terms of the presentation of evidence?

24        MR. GAGE:  Could I just raise one question in the

25   charging conference — or rather, make a point?

NAIHRow7

 1              THE COURT:  Yes.

 2              MR. GAGE:  In light of the evidence, your Honor, we

 3      would ask that the verdict form place the discrimination

 4      claim first.  And I'm not trying to argue the point, but I just

 5      want to make the suggestion that we are asking for is that, on

 6      the verdict form, the jury first answer the question on the

 7      discrimination claim.  And you will see our proposed verdict

 8      form asks them to determine whether the plaintiff has proved by

 9      a preponderance of the evidence that gender was a reason for

10      her level, because if they don't find that, if they don't find

11      that she proved that, it has implications for the New York

12      Labor Law claim inasmuch as it is, again, referring to Judge

13      Schofield's decision on summary judgment, a bona fide factor,

14      and we believe there's ample evidence of business necessity,

15      etc., etc.  So ——

16              THE COURT:  OK.  Ms. Greene.

17              MS. GREENE:  Yes, your Honor.  We would absolutely

18      oppose that because it's intended to conflate the two issues.

19      Equal Pay Law does not require any sort of gender motivation in

20      the decision, and by putting the gender claim first, it would

21      confuse the jury by suggesting that gender somehow is relevant

22      to the finding of an Equal Pay Law claim.  The affirmative

23      defense is an affirmative defense and should be treated

24      separately from the jury's finding of the *prima facie* case on

25      liability.

NAIHRow7

1          MR. GAGE:  Your Honor, just if I can respond.  If we

2     do it the way counsel is suggesting, I think there's a real

3     risk that your Honor's going to have to face —— could face an

4     inconsistent verdict, and that's the reason I'm suggesting that

5     they answer the question about leveling on the discrimination

6     claim first.  Because if the jury determines that Google did

7     not set her level based on her gender in violation of the

8     discrimination law, then, again, per Judge Schofield's ruling,

9     if it wasn't a tainted variable, level —— we've already heard

10     some testimony from Mr. Humez that level is a determiner of

11     pay.  We know it's a determiner on bonus —— and so if the jury

12     determines that the plaintiff hasn't proved it was tainted,

13     then by definition we can rely on it on the fair pay claim, the

14     Section 194 claim on the affirmative defense.  And I worry that

15     if we do it the other way around and they say, no, she didn't

16     prove discrimination, but they also say, no, there's no bona

17     fide factor, your Honor might be faced with some

18     inconsistencies that we have to resolve at the end of trial.

19          MS. GREENE:  Your Honor, I would just note that

20     defendant bears the burden to prove that it's a

21     nondiscriminatory factor that is both business related —— or,

22     I'm sorry, job related and dictated by business necessity.  So

23     even if defendant is right that the jury were to find that

24     gender is not at play here, it doesn't mean that they've

25     automatically established their defense.  They still bear the

NAIHRow7

1    burden of showing that it was something other than gender and

2    it was job related and consistent with business necessity.

3          So, again, flipping those is intended to confuse the

4    jury and suggest that gender somehow in and of itself relates

5    to the underlying claim for the New York Equal Pay Law instead

6    of the affirmative defense, which is really where it belongs.

7          MR. GAGE:  It's not intended to confuse anything.

8    They're clearly different sections on the verdict form, and

9    they've got labels for them.  So it's not intended to confuse.

10          THE COURT:  OK.  I think I got it.

11          MR. GAGE:  Your question, your Honor, about tomorrow?

12          THE COURT:  Yes.

13          MR. GAGE:  We have — counting Mr. Humez, who we've

14    already got started, we have a total of six witnesses.  And we

15    did get a time check from Ms. Williams.

16          THE COURT:  Oh, good.

17          MR. GAGE:  And collectively, the parties have 4.6

18    hours.  I'm not saying that because we intend to use them all,

19    Judge, but —

20          THE COURT:  OK.

21          MR. GAGE:  And so if we start at 9:00, it looks to me

22    if we — if your Honor takes the half-hour lunch and takes a

23    15-minute morning break, that we'll finish the evidence

24    sometime midafternoon is my best guess.

25          THE COURT:  OK.

1              MR. GAGE:  Depending upon, you know, the breaks and

2    everything like that, but that's my best guess.

3              THE COURT:  OK.  Thank you.

4              So let me say something about summations.  Summations

5    are either both going to be tomorrow or they're both going to

6    be Friday morning.  I'm not having the defense, OK, summation

7    tomorrow and then an overnight and then a plaintiff summation

8    on Friday morning.  So keep that in mind as we go through the

9    day.

10             I have thoughts about additional items that it would

11   be helpful for counsel to prepare.  I think you should prepare

12   a list of exhibits for the jury —— and you can confer with each

13   other on format and whatnot —— and a list of witnesses.  And

14   you might as well get started on making sets of exhibits, three

15   of each, in case they ask, so we'll have them ready to go into

16   the jury.

17             In terms of testimony, if they ask for testimony, I

18   assume somebody is going to have the capability of doing

19   redactions here on a laptop in the courtroom, is that correct?

20             MR. GAGE:  Redactions, your Honor?

21             THE COURT:  Yes.  Well, they could ask for testimony

22   on a particular topic, and you and the plaintiff will have to

23   figure out if you can agree on what's responsive to that.  If

24   you can't, I'll be a referee.  And the sidebars will have to be

25   redacted and objectionable questions that were sustained, the

NAIHRow7

1   objectionable question —— questions and the —— my ruling would

2   be redacted because that's not evidence, and it would be

3   confusing for that to go to the jury.

4          MR. GAGE:  So in my past experience, your Honor, if ——

5   we would go through a process.  Jury has a question, what about

6   Bob say about X?  Counsel will confer.  We'll come up with we

7   think it's on these pages.  And in my experience, we would have

8   the jury come back in, and the court reporter would read those

9   pages, and we would just not read if there was a sidebar or

10  anything like that.  That's what I thought.

11         THE COURT:  How does the plaintiff feel about that?

12  The problem is it could be —— depending on what they ask, it

13  could be quite lengthy.

14         MR. GAGE:  No, no, I recognize that, but there's no

15  way of predicting.

16         THE COURT:  OK.  Ms. Greene.

17         MS. GREENE:  Your Honor, I would agree that for short

18  testimony that's probably the easiest way to handle it.

19  Certainly, there are other ways.  And we have copies of the

20  transcripts, and, you know, there's —— if nothing else, there's

21  the old-school method of cutting and paste using a Sharpie

22  where needed.  So we will be prepared with those tools

23  available to us for lengthier testimonies where we may need to

24  cut out portions or redact portions.  I think that will

25  probably be easier than trying to do it electronically and then

NAIHRow7

1    printing off something for the jury.

2                THE COURT:  OK.  That's fine with me.

3                What else?

4                MS. GREENE:  Your Honor, you had asked us this morning

5    about our request that Google supplement its production ——

6                THE COURT:  Yes.

7                MS. GREENE:  —— related to those documents and which

8    of our document requests it's responsive to.

9                THE COURT:  Yes.

10               MS. GREENE:  It's responsive to three of our requests,

11   and the first is 36:  All documents supporting defendant's

12   affirmative defense that defendant's employment decisions,

13   including all hiring, compensation, and promotion decisions,

14   were based on legitimate and nondiscriminatory factors

15   unrelated to plaintiff's protected characteristics.  So those

16   documents go to Ms. Piazza's selection over Ms. Rowe and their

17   affirmative defense on that front.

18               The next is document request No. 39:  All documents

19   supporting defendant's affirmative defense that, assuming

20   defendant committed the acts or omissions alleged in the

21   amended complaint for discriminatory or retaliatory motives,

22   such acts or omissions would have been taken in any event for

23   legitimate nondiscriminatory, nonretaliatory reasons.  I think

24   it's squarely within that one.

25               And then finally, 47, which is the general all

NAIHRow7

1   documents concerning plaintiff's claims or defendant's defenses

2   of which defendant is aware that have not been provided in

3   response to the requests above.  Now, defendant is aware of

4   these documents because it produced a subset of them.  They've

5   done nothing to establish that there's any undue burden or

6   harassment in supplementing their production at this time.  So

7   we would ask those documents be supplemented in time for

8   Ms. Kliphouse's testimony tomorrow.

9           THE COURT:  When is Ms. Kliphouse tomorrow?

10          MR. GAGE:  I'm sorry, what was the question?

11          THE COURT:  When is Ms. Kliphouse going on?

12          MR. GAGE:  Tomorrow.

13          MS. TOMEZSKO:  We anticipate she's one of ── second to

14   last witness.

15          THE COURT:  OK.

16          MR. GAGE:  Sometime afternoon.

17          May I respond, your Honor ──

18          THE COURT:  Sure.

19          MR. GAGE:  ── to the absurd suggestion that we've

20   produced a subset?

21          Your Honor, as far as I know, we've produced the

22   documents that exist.  Judge Gorenstein ── first of all, these

23   discovery requests that counsel is talking about are discovery

24   requests that were propounded under a different pleading that

25   did not even include this claim.  When Judge Gorenstein allowed

NAIHRow7

1    them to amend, Judge Gorenstein specifically told them they

2    couldn't take any discovery.

3            We have produced documents.  We've satisfied our

4    Rule 26 obligation.  And, your Honor, as far as I know, we've

5    produced all of those documents, these — what are we calling

6    them status — status reports, and I have no reason to believe

7    that there are others.  But, again, like I said this morning, I

8    got this request at 2 o'clock yesterday afternoon, and if

9    counsel hasn't noticed, I'm in the middle of a trial, and so I

10   haven't had time to go do discovery.  But I have no reason to

11   believe there are others, and this is an outrageous request at

12   the last second that has no basis.

13           THE COURT:  OK.  I got it.

14           Go ahead.

15           MS. GREENE:  I would just note, your Honor, that we

16   are here because they brought these documents in with

17   Mr. Vardaman, and Mr. Vardaman testified that these were

18   records he was creating on a regular basis.  So there's at

19   least a basis for Google to go back and check whether there are

20   other documents like this that are responsive and relate to

21   this affirmative defense they've asserted that they would have

22   hired Ms. Piazza anyway and that they did not consider her

23   because Ms. Piazza was already the person they decided on.

24           So, you know, I — at a minimum, they should be

25   required to check whether such documents exists, and it

NAIHRow7

1    shouldn't be burdensome to do so because they know where the

2    other documents were saved.  Mr. Vardaman was the custodian.

3    This should not be a heavy lift.

4            THE COURT:  One second, Mr. Gage.

5            Is this, the one shown to Mr. Vardaman, is this the

6    only one of this document that has been produced?

7            MR. GAGE:  We provided them a number of them.  I don't

8    know what your Honor's looking at, but we provided a number of

9    them.  We didn't spring them on them.  Counsel had these almost

10   a year ago.  Counsel complained that they didn't have them

11   earlier.  Counsel filed a motion *in limine*.  This is —— and

12   counsel has —— until 2:40 yesterday afternoon, despite the fact

13   that counsel had these documents since last November and

14   Mr. Vardaman testified that it was ad hoc and there's no basis

15   to think that there are any others in existence.  This is a

16   belated request that is just intended to harass —— counsel has

17   no reason to believe that any others exist, and I don't have

18   any reason to believe any others exist.  Your Honor, we looked

19   for documents.  We produced documents.  I don't know why we're

20   still talking about discovery when Judge Gorenstein said she

21   couldn't have any.

22           MS. GREENE:  Your Honor, we're not asking for new

23   discovery.  We're asking that they honor their obligations to

24   supplement discovery.  Documents were produced for, I believe,

25   February 1 —— sorry, January 2, February 5, February 14,

NAIHRow7

February 21.  Now, between the 21st and the 28th is when he had

the conversation with Ms. Rowe, and there's nothing after the

21st.

          Now, again, until Mr. Vardaman came on the stand and

gave his testimony as to how these documents were created ——

remember, these were produced two years after we deposed him in

this matter.  It was his testimony talking about the nature and

creation of these documents which were being —— I think trying

to be used as business records and testifying about how that

related to the consideration.  It's not on us, it's on them to

supplement pursuant to their Federal Rules of Civil Procedure

26 obligations.  That doesn't end at trial.  That doesn't end

at any point in time.  That's ongoing in nature.  And we are in

trial, and they have brought those —— those documents and that

testimony into dispute.  And again, at a minimum, they should

come back and represent to the Court if there are no other

documents after February 21.

          MR. GAGE:  Your Honor, counsel has no reason to think

there are any others.  Mr. Vardaman testified that he did these

on an ad hoc basis.  Counsel had Mr. Vardaman's testimony last

Friday.  They've known about these documents for nearly 12

months.  They've never asked for anything.  They waited until

2:40 yesterday afternoon to raise this issue.

          I should also add, your Honor, that after this trial,

original trial date got kicked —— you may remember this because

NAIHRow7

1   of the dispute over Ms. Florissi —— counsel specifically came

2   to us and asked us to supplement additional discovery.  None of

3   it related to this.  They didn't ask us to go back and look for

4   more.  They wanted documents regarding performance reviews.

5   They wanted compensation information.  And, again, we have no

6   reason to believe anything else exists.

7        This is a baseless accusation.  We have honored our

8   obligations.  We satisfied our Rule 26 obligations, and they

9   just waited till the last minute to create this issue.

10        THE COURT:  I want you to, each of you, send me your

11   authorities that you're relying on in taking your respective

12   positions, and you can tell me what format you want to do that

13   in and what time you want to send it.

14        MS. GREENE:  Your Honor, I have one other question.

15        THE COURT:  Yes.

16        MS. GREENE:  And that is with respect to —— two

17   related questions.  One is with respect to the allocation of

18   time for closing arguments.

19        THE COURT:  Yes.

20        MS. GREENE:  And the second is as to order.  It would

21   be plaintiff's preference, as the one who bears the burden,

22   that she go first and be able to reserve rebuttal time out of

23   her total allotment.  And that's the way I've done it in many

24   other cases, so we would hope your Honor would agree with that.

25        In terms of how much time we would seek, we would seek

NAIHRow7

1   an hour and 15 minutes in total time.

2              THE COURT:  All right.  Mr. Gage, go ahead.

3              MR. GAGE:  I guess I'll be shocked, Judge, but I'll

4   agree with counsel.  I have no problem with them reserving some

5   time, and an hour and 15 minutes seems fine, your Honor.

6   Ms. Tomezsko and I will be doing Google's closing together, so

7   we'll know how to allocate our time.  If you're going to give

8   us an hour 15, whatever your Honor ——

9              THE COURT:  I actually decided that I am not going to

10  impose time limits on summations.  I would just ask that you be

11  as efficient as possible and don't waste time.  And, of course,

12  it's in everyone's interests, I think, that the case go to the

13  jury as quickly as possible now.

14              (Continued on next page)

15

16

17

18

19

20

21

22

23

24

25

NAIVROW8

1            MR. GAGE:  So your Honor, in light of everything we've

2      discussed, we're having a charge conference tomorrow, and we

3      anticipate the proof to go till mid afternoon.  Should we plan

4      on all closing arguments being Friday morning, just because --

5      in fairness to the plaintiff, I wouldn't want us to get to the

6      4:30 or so break and them having reserved time for rebuttal and

7      then getting squeezed.

8            THE COURT:  I think that's probably what we're going

9      to have to do.  Because the jury -- I asked them to come to be

10     here by 9, to start at 9:15.  I mean, we could go to 5

11     tomorrow, but that's probably not going to solve the problem.

12     We could start earlier than usual on Friday morning, although I

13     don't know, Ms. Williams, how -- we may have jurors who have,

14     you know, childcare issues and whatnot and can't get here

15     earlier than a particular time.  But I think that's probably

16     what we're going to have to do.

17            MR. GAGE:  Okay.  So we'll plan on it for Friday,

18     closings for Friday?

19            THE COURT:  Ms. Greene, is that okay with you?

20            MS. GREENE:  Yes, your Honor, that's fine.

21            And I would propose that with respect to the

22     supplemental discovery issue, that the parties submit their

23     letters by about 9 o'clock.

24            THE COURT:  Why don't you do --

25            MS. GREENE:  We worked cooperatively last time.  It

NAIVROW8

1   was beyond the time your Honor asked, but we agreed amongst

2   ourselves to try to get it as promptly as we could, as we ran

3   into difficulties meeting that time deadline.  I'd ask that we

4   be allowed to do the same.

5          THE COURT:  Yes, of course.  That's fine.

6          Actually having solicited your feedback on format,

7   I've now decided that I want you to do a joint letter.  So

8   you'll do that and send it to me as close to 9 as you can.

9          My chambers, since we're working on the charges, we

10  don't have time to do your research for you on this issue, so

11  we would appreciate having your authorities laid out in a

12  submission.

13         All right.  Anything else?

14         MS. GREENE:  No, your Honor.

15         MR. GAGE:  Nothing.

16         THE COURT:  Okay.  Very good.

17         (Adjourned to October 19, 2023 at 8:30 o'clock a.m.)

18

19

20

21

22

23

24

25

```
 1                        INDEX OF EXAMINATION

 2    Examination  of:                            Page

 3    WILLIAM GRANNIS

 4    Redirect By Ms. Greene . . . . . . . . . . 901

 5    Recross By Mr. Gage  . . . . . . . . . . . 926

 6     NICHOLAS HARTEAU

 7    Direct By Mr. Chiarello  . . . . . . . . . 933

 8    Cross By Ms. Tomezsko  . . . . . . . . . . 944

 9    Redirect By Mr. Chiarello  . . . . . . . . 961

10     APRIL BEAUPAIN

11    Direct By Mr. Chiarello  . . . . . . . . . .1018

12    Cross By Ms. Tomezsko  . . . . . . . . . . .1040

13    ASHLEY ELIZABETH TESSIER

14    Direct By Mr. Chiarello  . . . . . . . . . .1056

15    Cross By Ms. Tomezsko  . . . . . . . . . . .1060

16    NORA OSTROFE

17    Direct By Ms. Greene . . . . . . . . . . . .1068

18    Cross By Mr. Gage  . . . . . . . . . . . . .1077

19    Redirect By Ms. Greene . . . . . . . . . . .1089

20    Recross By Mr. Gage  . . . . . . . . . . . .1090

21     CHRIS HUMEZ

22    Direct By Mr. Gage . . . . . . . . . . . . .1100

23

24

25
```