NAJVROW1

```
1    UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
2    ------------------------------x

3    ULKU ROWE,

4                   Plaintiff,

5              v.                              19 Civ. 8655 (JHR)

6    GOOGLE LLC,

7                   Defendant.                 Trial

8    ------------------------------x
                                               New York, N.Y.
9                                              October 19, 2023
                                               8:57 a.m.
10
     Before:
11
                        HON. JENNIFER H. REARDEN,
12
                                               District Judge
13                                             -and a jury-

14                          APPEARANCES

15   OUTTEN & GOLDEN, LLP
          Attorneys for Plaintiff
16   BY:  CARA E. GREENE
          GREGORY S. CHIARELLO
17        SHIRA Z. GELFAND

18   PAUL HASTINGS LLP
          Attorneys for Defendant
19   BY:  KENNETH W. GAGE
          SARA B. TOMEZSKO
20
     Also Present:  Vincent Yang, Paralegal (Outten & Golden)
21                  Andrew Velazquez, Google Rep.
                    Jean Gutierrez, Paralegal (Paul Hastings)
22

23

24

25
```

NAJVROW1

1           (Trial resumed; jury not present)

2           THE COURT:  Good morning.  Please be seated.

3           I just want to tackle a couple of housekeeping items

4      and then I'll rule on the discovery issue.

5           So we have jurors asking for help with employers

6      wanting letters.  We have a juror who has travel plans next

7      week.  We're starting to have juror issues.  I'm just letting

8      you know.

9           Somebody mentioned yesterday wanting to do a summation

10     of an hour and 15 minutes or something like that.  To me, in

11     this case, that seems long.  It's your case, but I think the

12     most important thing is to get the case to the jury as quickly

13     as possible tomorrow so that they have sufficient time to

14     deliberate and hopefully reach a verdict tomorrow.

15          Ms. Williams, are you going to be discussing with them

16     that they will have lunch served tomorrow?

17          THE DEPUTY CLERK:  Yeah.

18          THE COURT:  Okay.  I think yesterday I started talking

19     about developing a list of exhibits for the jury.  I think it

20     should be -- it will be an agreed list by number of admitted

21     exhibits and a neutral description of each, you know, A's email

22     to B dated C., and a witness list.  And then my idea will be

23     we'll give a witness list and an exhibit list and a full set of

24     charges to each juror as a care package on their way into the

25     jury room.

NAJVROW1

1            Stipulations of fact.  Have we had two of those or

2    just one?

3            MR. GAGE:  I think it's just the one you read

4    yesterday, your Honor.

5            THE COURT:  Okay.  I would give that to the jury,

6    unless you prefer not to.  But you can let me know.

7            MR. GAGE:  Our view is that it's -- sorry for not

8    standing, Judge.

9            THE COURT:  That's all right.

10            MR. GAGE:  Is that you read it into the record.  It's

11    no different than testimony that's in the record.

12            THE COURT:  Right.  So if they want it, they could ask

13    for that.  All right.

14            All right.  I'm now going to rule on plaintiff's

15    application to compel the supplemental production of any

16    additional status reports relating to the VP financial services

17    sales position beyond the four reports that have already been

18    admitted into evidence, that is, D-74, D-76, D-77, and D-78.

19            Defendant produced D-74, 76, 77, and 78 on November

20    11th, 2022, nearly one year ago.  Plaintiff was well aware of

21    those documents.  Indeed, on November 21st, 2022, she moved *in*

22    *limine* to exclude all evidence concerning consideration of

23    candidates for the vice president financial services role other

24    than Ms. Rowe, including D-74, 76, 77, and 78.  See ECF No. 42.

25            Plaintiff now suggests that documents may be missing

NAJVROW1

because the conversation in which Mr. Vardaman told Ms. Rowe
that she "wasn't going to be considered because she wasn't a
good fit," occurred within just one week of February 21st,
2020, when the latest of the four status reports, D-74, was
created.  Plaintiff also contrasts Mr. Vardaman's deposition
testimony that he did not create updates for Ms. Kliphouse
related to the FSVL role, and that whatever he may have created
was "much more *ad hoc*" with his trial testimony that he created
these status reports and updated them continuously to keep
track of the VP financial services sales search in preparation
for his meetings with Ms. Kliphouse.

          However, the temporal relationship between D-74, 76,
77, and 78, all of which were created between late January and
February 21, 2020, and Ms. Rowe's and Mr. Vardaman's
conversation in late February 2020, is not new information.
Accordingly, the Court fails to see why plaintiff waited until
trial to raise this issue, let alone why she delayed four days
after Mr. Vardaman had testified.  Plaintiff's application is
therefore denied.

          Are we ready to bring the jury in?

          Is the witness ready?

          MR. GAGE:  He's just out in the hall, but yes.

          THE COURT:  We weren't going to start till 9:15, but
we might as well start now, right?

          MR. GAGE:  It's fine by us, your Honor.

1          THE COURT:  Okay.  Let's get the witness and then,

2    Ms. Williams, you could bring the jury in.

3          (Jury present)

4          THE COURT:  Good morning.  Please be seated.

5          Mr. Humez, I remind you that you are still under oath.

6          MR. GAGE:  May I proceed, your Honor?

7          THE COURT:  You may.

8    CHRIS HUMEZ,

9       called as a witness by the Defendant,

10      having been previously duly sworn, testified as follows:

11   DIRECT EXAMINATION (continued)

12   BY MR. GAGE:

13   Q.  Good morning, Mr. Humez.

14   A.  Good morning.

15   Q.  Yesterday we talked a bit about your preparation of

16   Ms. Rowe's starting pay package.  Do you remember that?

17   A.  Yes.

18   Q.  Did you also prepare starting pay packages for the other

19   technical directors in OCTO who were hired in 2017/2018?

20   A.  I did, yes.

21   Q.  And did you use exactly the same approach to preparing

22   those packets and offers that you've used for Ms. Rowe's?

23   A.  Yes, same process.

24   Q.  Now, were all of the other technical director starting pay

25   packages as high relative to the market reference point as

1    Ms. Rowe's?

2    A.   No, they were not.

3    Q.   Were they lower?

4    A.   They were -- yeah, they were lower, much lower in some

5    cases.

6    Q.   And again, to the best of your recollection, what was

7    Ms. Rowe's relative to the market reference point?

8    A.   My recollection is that it was 98 percent of the MRP, or

9    market reference point, which is quite high.

10   Q.   Now, Mr. Humez, if -- at Google, if an employee moves into

11   a different job code, does Google pay them for the job they are

12   now performing in the new job code or the job they used to

13   perform?

14   A.   It's based on the job that you're performing during that

15   year, yeah.

16   Q.   Okay.  There's been a lot of testimony about Level 8/Level

17   9 technical directors.  Do Level 9 technical directors in the

18   office of the CTO always make more than Level 8 technical

19   directors?

20   A.   No, not in all cases.

21   Q.   Does it depend upon how they perform against expectations?

22   A.   Yeah.  Our pay philosophy centers around pay for

23   performance.

24   Q.   Now, before we finished yesterday, you described the annual

25   compensation review process.  Now, after managers rate employee

1    performance and those ratings that they do are put into the

2    system, what happens next?

3    A.   In terms of the annual pay process?

4    Q.   In terms of the process, exactly.

5    A.   So for each element of compensation, we'll use a standard

6    calculation to arrive at a modeled amount.  So to take the

7    bonus, for example, it would be their on-target bonus, which is

8    the base salary, times 30 percent, in the case of a Level 8.

9    There would be a multiplier that's attached to each performance

10   rating that they received throughout the past year.  And that

11   would essentially be the modeled amount for a bonus, to use an

12   example.

13          Then, as we go through the comp planning process, we

14   allocate a portion of the budget for discretionary adjustments

15   by managers.  So they can take into account things that just

16   can't really be baked into a performance rating.  So maybe it's

17   the trajectory of their performance throughout the year being

18   higher or lower or other things that really can't be, you know,

19   into kind of like a -- just a distinct performance rating.  So

20   they can make adjustments based on all of those things.

21   Q.   I'd like to show you and ladies and gentlemen of the jury a

22   document that the jury has already seen, it's P-113.  And once

23   this pops up, you'll see there's a lot of information in it.

24   Files with some data.

25          And this reflects, as you can see, data regarding

1    particular employees.

2              MR. GAGE:  And if you could just stop for a second,

3    Jean, as you're going across.

4    Q.  Do you see the column headings, Mr. Humez?

5    A.  I do.

6    Q.  Okay.  And if you look at column AA, what would that data

7    reflect?

8    A.  That would reflect in the calculation that I mentioned the

9    kind of algorithmic or modeled amount that factors in their

10   performance ratings.

11   Q.  Okay.  And is that calculated without regard to whether

12   someone is a man or a woman?

13   A.  That's correct.

14   Q.  Now, if we could go over to the right to proposed salary.

15             What does the proposed salary field reflect?

16   A.  That reflects the final salary planned amount.  So it would

17   be the model amount factoring in any discretionary adjustments

18   from the manager or the management chain.

19   Q.  Okay.

20             MR. GAGE:  Jean, you can take this down.

21   Q.  Now, once Google finalizes its compensation decisions, how

22   does the company notify employees of their pay for the upcoming

23   year?

24   A.  At Google we have a tool that's connected to gComp, which

25   is our comp planning tool, and it's called Prosper.  So it's a

1  tool that releases the compensation letters to employees.  And

2  managers would use that tool to release the letter and then

3  have the conversation explaining the award to them.

4  Q.  And are those colloquially referred to at Google as the

5  prosper letters?

6  A.  The prosper letters, yeah.

7          MR. GAGE:  Your Honor, if I may, I'd just like to move

8  the stand over here.

9          THE COURT:  Any objection?

10         MS. GREENE:  I'm not sure for what purpose, but no

11 objection at the moment.

12         MR. GAGE:  I am going to just write some information

13 as the witness is testifying on here from his testimony and

14 from some exhibits, your Honor.

15         THE COURT:  Okay.  I'm looking at Ms. Greene.  Do you

16 want to wait to see what he writes?

17         MS. GREENE:  Yes.  I mean, to the extent it's a

18 demonstrative, it's not the right time.  But it will depend.

19         MR. GAGE:  I'd like to show the witness Exhibit P-134.

20         And Jean, if we could go to the December 2017 prosper

21 letter.  Sorry, your Honor, some technical issues.

22         Got it, Jean?  We have a hard copy?

23         This is P-134.  May I hand it up to the witness, your

24 Honor?

25         THE COURT:  You may.

NAJVROW1                      Humez - Direct

1    BY MR. GAGE:

2    Q.  Now, Mr. Humez, is the first page of P-134 -- first and

3    second pages of this document, is this a December 2017 prosper

4    letter for Ms. Rowe?

5    A.  Yes, it is.

6    Q.  And what does that say her 2018 total compensation award

7    was?

8    A.  The total was 471,000.

9    Q.  $471,000.

10         And what was in her December 2020 prosper letter, what

11   was her total award?

12   A.  It was 786,000.

13   Q.  I'm sorry, you said seven --

14   A.  786.

15   Q.  786.

16         And her December 2021 prosper letter, what was the

17   amount?

18   A.  It was 870,000.

19   Q.  And her March 2023, what was the amount?

20   A.  It was 940,667.

21   Q.  940,000?

22   A.  Yes.

23   Q.  Okay.

24         MS. GREENE:  Your Honor, may we have a sidebar with

25   respect to the document?

1          THE COURT:  Yes.

2          (At sidebar)

3          THE COURT:  Go ahead, Ms. Greene.

4          MS. GREENE:  This is the first time we've received any

5     notice of Mr. Gage's intent to do this.  It's functioning as a

6     demonstrative.  We had an agreement that demonstratives would

7     be exchanged in advance.  He certainly could have included this

8     information on a demonstrative that he provided.  He did not.

9     This would be fair game in closing arguments.  But for the time

10    being, under these circumstances, it's not appropriate and is

11    contrary to the parties' agreement.

12         MR. GAGE:  Your Honor, it's not a demonstrative.  I

13    had plenty of trials where I've had the witness write the

14    numbers.  I could ask Mr. Humez to write the numbers as he

15    testifies so the jury can see it.  It's not a demonstrative

16    exhibit.

17         MS. GREENE:  The documents themselves are the evidence

18    which is before the jury.  To the extent he's writing it, it's

19    not evidence of itself; so it's a demonstrative functioning as

20    a demonstrative.

21         MR. GAGE:  Just like opening statements, closing

22    arguments, lawyers say a lot of things.  I'm just trying to

23    help the jury organize the information.

24         MS. GREENE:  You could do it in closing arguments.

25    The agreement between the parties was that there would not be

NAJVROW1                          Humez - Direct

 1  demonstratives during openings.  Any demonstratives used during

 2  course of trial would be exchanged ahead of time.

 3          THE COURT:  What's your position on the witness

 4  writing it?

 5          MS. GREENE:  Again, it's not evidence, so I'm not sure

 6  what the function -- the document is there that he's referring

 7  to.  It serves to confuse the jury.  I suppose the document,

 8  the witness writing it is --

 9          THE COURT:  You can mark it as an exhibit.

10          MS. GREENE:  I don't think it should be an exhibit.

11  We have the documents.  He's reading from the documents.  The

12  documents are the evidence, not anybody's writings, and that's

13  where we're confusing the jury.

14          MR. GAGE:  This is not a demonstrative.  It's not

15  confusing the jury.  It's just helping them see --

16          THE COURT:  Well, it's not evidence.

17          MR. GAGE:  Agreed.  I agree it's not evidence.  But

18  what we say is not evidence either.

19          THE COURT:  Is this up on the screen now or are we

20  just working with a hard copy?

21          MR. GAGE:  We're working with a hard copy with the

22  witness.  Let me just ask.

23          THE COURT:  Okay.  Let's put the document on the

24  screen and no more with the billboard.

25          MR. GAGE:  Okay.

1    (In open court)

2    MR. GAGE:  Let's just go back and make sure we had

3    2020.  December 2020, we've finished that.

4    I'd like to go now to P-1 -- let's -- now that we have

5    the exhibit, let's let the jury see what this is.

6    BY MR. GAGE:

7    Q.  So this is P-134.  Is this the document you were just

8    looking at in hard copy --

9    A.  Yeah.

10   Q.  -- Mr. Humez?

11   Okay.  This is the December 2017 prosper letter.

12   What's the 295 number reflect?

13   A.  The new base salary.

14   Q.  And then the next number down reflects what?

15   A.  The annual cash bonus.

16   Q.  And is that a function of performance?

17   A.  It is.

18   Q.  And the next number, what is that?

19   A.  The equity refresh grant.

20   Q.  Okay.  And then if we go to the next page, does it provide

21   the total?

22   A.  It does.

23   Q.  Is this the total compensation to Ms. Rowe for 2018;

24   correct?

25   A.  Awarded in 2018.

1    Q.  Awarded in 2018.

2            MR. GAGE:  I'd like to, Jean, if we could, go to

3    P-132.

4            THE COURT:  Ms. Tomezsko, could we clear the billboard

5    out of the way, please, and put it back where it came from.

6            That's all right.

7    Q.  P-132.  Is this Mr. Harteau's prosper letter or letters?

8    A.  Yes.

9            MR. GAGE:  And if we could start with the December

10   2017 prosper letter.  If we go to the second page -- I'm sorry,

11   it's on the first page.  It's a shorter letter.

12   Q.  What was Mr. Harteau's total compensation award for 2018?

13   A.  395,000.

14           MR. GAGE:  Now, Jean, if we could go to P-130.

15   Q.  This is Mr. Donaldson's prosper letter for December 2017.

16           What was his total award for 2018?

17   A.  402,000.

18   Q.  And that's -- if you remember the number, that's about

19   $69,000 less than Ms. Rowe's; correct?

20   A.  From recollection, yeah.

21   Q.  And Mr. Harteau's was about 70-some thousand dollars less

22   than Ms. Rowe's; correct?

23   A.  Correct.

24           MR. GAGE:  Now, I'd like to go to Mr. Wilson, P-136,

25   Jean.

NAJVROW1                     Humez - Direct

1   Q.  Mr. Wilson's prosper letter, focusing here on the December

2   2017 prosper letter.  What was Mr. Wilson's total compensation

3   award for 2018?

4   A.  452,000.

5   Q.  That's almost $20,000 less than Ms. Rowe's; correct?

6   A.  Correct.

7          MR. GAGE:  Now, I'd like to go, Jean, if we could, to

8   P-136 -- or, I'm sorry, this is P-136, Mr. Wilson's prosper

9   letter, December 2020, if you could page through.  Next page.

10  December 2020.  And then if we could go to the second page.

11  Q.  What was Mr. Wilson's total compensation award for 2021?

12  A.  668,800.

13  Q.  And I believe you testified that Ms. Rowe's for that same

14  year was $786,000.  So this is nearly $120,000 less than

15  Ms. Rowe's pay for the same year; correct?

16  A.  That's correct.

17         MR. GAGE:  Now, I'd like to go to P-135, and I'd like

18  to go to the December 2021 prosper letter.

19  Q.  December 2021 for Paul Strong.  If we can go to the second

20  page.  What was Mr. Strong's total compensation award for 2022?

21  A.  718,000.

22  Q.  And Ms. Rowe's for that same year, I think you testified,

23  was $870,000?

24  A.  Correct.

25  Q.  So Mr. Strong's was substantially less for that year;

1  correct?

2  A.  Correct.

3  Q.  Now, I'd like to go to Mr. Strong, same exhibit,

4  Mr. Strong's March 2023 prosper letter.  And Mr. Humez, was the

5  March 2023 prosper letter the most recent prosper letter that

6  was issued by Google?

7  A.  It is, yes.

8  Q.  Okay.  And this is for 2023 compensation?

9  A.  Correct.

10 Q.  If we could go to the second page of Mr. Strong's.

11         And what was his total award?

12 A.  $754,033.

13 Q.  And you testified earlier that Ms. Rowe's compensation for

14 2023 was 940,000, so that's nearly $190,000 less than Ms. Rowe

15 will earn in 2023; correct?

16 A.  That's correct.

17 Q.  And these differences in compensation, are they

18 attributable to differences in job performance?

19 A.  Yes, they would be, yeah.

20         MR. GAGE:  No further questions, your Honor.

21 CROSS-EXAMINATION

22 BY MS. GREENE:

23 Q.  Mr. Humez, just a few questions.

24         You testified earlier about differences in between L8

25 and L9 compensation; correct?

NAJVROW1                          Humez - Cross

1    A.  Say that again, sorry.

2    Q.  You testified to differences between how L8s and L9s are

3    paid; correct?

4    A.  Correct.

5    Q.  And so an L8, you talked about -- what was the M starting

6    phrase?

7    A.  Sorry, yeah, the market reference point.

8    Q.  The market reference point.

9              So at a Level 9, where Ms. Rowe was at in terms of

10   market reference point, 98 percent, where would that have put

11   her in the market reference point on L9s?

12   A.  I don't know that offhand.

13   Q.  Well, the range for L9s was larger and higher than the

14   range for L8s; correct?

15   A.  The earning potential, the range would be higher; but they

16   would overlap; at the high end of L8 could be into L9.

17   Q.  Since Ms. Rowe was at 98 percent of the market rate, would

18   that limit her potential increases going forward as an L8?

19   A.  It would be a function of performance.  So there's no --

20   there's no salary caps in place at Google.  So if someone were

21   to be continuing to perform strongly, they could still be

22   eligible for increases.

23   Q.  She would remain in the L8 category and not move into the

24   L9 category; correct?

25   A.  Well, the ranges, like I said, overlap.  So, yeah, they

NAJVROW1                        Humez - Cross

1    could continue to be paid more and be paid into the L9 range.

2    Q.  And you talked about how bonuses are set to performance in

3    some respects; correct?  So if someone receives an "exceeds

4    expectation," how does that relate to their target bonus?

5    A.  In terms of the --

6    Q.  If someone's target bonus is 30 percent and they receive an

7    "exceeds expectation," how do those things relate to each

8    other?

9    A.  So within each performance rating we have a multiplier that

10   is applied on top of that based on the rating.  So as the

11   ratings get higher, the multiplier on top of the target bonus

12   is increasing.

13   Q.  Okay.  And so, for instance, Mr. Donaldson, who received a

14   "consistently meets expectation," would receive a smaller

15   multiplier against their target bonus than Ms. Rowe, who

16   received an "exceeds expectation"; correct?

17   A.  The multiplier would be lower, yes.

18   Q.  So a multiplier on 40 percent would be higher than a

19   multiplier on 30 percent target; correct?

20   A.  The multiplier itself would be the same by level.  And so

21   the actual model bonus amount would, I guess, depend on what

22   each of their salaries were.

23   Q.  So salary impacts what the potential bonus is based on

24   target; correct?  So if your bonus or your salary is 295, it's

25   30 percent of 295; correct?

NAJVROW1                          Humez - Cross

1    A.  That would be the on-target bonus in that case, yeah.

2    Q.  And if you receive a multiplier for that, it's a multiplier

3    on the 30 percent of the 295; correct?

4    A.  That's correct, yeah.

5    Q.  And that's different than a salary of 325, with a bonus

6    target of 40 percent, if she were to receive "exceeds

7    expectations" where she'd have that multiplier; correct?

8    A.  I'm sorry, could you --

9    Q.  Sure.  Someone would be paid more if they had a higher

10   starting salary, a higher bonus target, and a higher

11   performance rating; correct?

12   A.  That's correct, yeah.

13   Q.  I want to talk specifically about 2017 just for a moment.

14           There was a change with respect to equity refreshes in

15   that year; correct?

16   A.  Yeah.  That year we had a company-wide change in policy, so

17   that if you're hired in that calendar year, you weren't modeled

18   for a refresh award if you were "a Noogler" or a new hire.

19   Q.  Right.  For instance, Mr. Harteau, who came in April of

20   2017, was not eligible for an equity refresh for 2017; correct?

21   A.  They would have been eligible.  They wouldn't have been in

22   that case modeled for an amount, but the manager would have had

23   the opportunity to use discretion to give them an award.

24   Q.  And so that was an operation of a function or that was the

25   function of when someone came in and it had no reflection with

NAJVROW1                    Humez - Redirect

1    respect to their performance or the application of an

2    algorithm?

3    A.  It was just the nature of when they joined.

4    Q.  Okay.  I just want to take a look very quickly at P-5.

5              MS. GREENE:  If we could, Mr. Yang.

6              We were looking at this earlier.  And can we go to the

7    November 15th email, I think it's page 4 or 5 of this document.

8    Keep going.  Oh, no, that page exactly.  Can you pull out that

9    email from Mr. Humez to Jenny.

10   Q.  It says:  Given we're aiming for Ulku to start in December,

11   which is prior to her cash bonus payment and equity vesting in

12   January, we've included both a sign-on bonus and second equity

13   grant to address any Y1 cash flow gap.

14             So certain components of her offer letter were in

15   recognition of what she was leaving by way of cash bonus and

16   equity vesting at J.P. Morgan Chase; correct?

17   A.  Yeah.  Our approach is to look at annual cash flows and to

18   make sure that our offer is compelling so they are not worse

19   off at the onset.

20             MS. GREENE:  No further questions.

21             MR. GAGE:  Just a couple, your Honor.

22             If we could, Jean, put up Plaintiff's Exhibit 34,

23   Ms. Rowe's prosper letter, on the screen.  134.

24   REDIRECT EXAMINATION

25   BY MR. GAGE:

1  Q.  Mr. Humez, you were just asked about a 2017 change in

2  Google's policy about equity refreshes.  In that year, did

3  Google decide that Nooglers would not receive equity refreshes?

4  A.  Yeah, that's correct.

5  Q.  And what's a Noogler?

6  A.  It's a new hire at Google; so anybody hired within that

7  same calendar year.

8  Q.  And so Ms. Rowe was hired in 2017.  So under that policy,

9  she would not get an equity refresh; correct?

10 A.  Correct.

11 Q.  Does the fact that one is shown here on P-134 indicate that

12 an exception to that policy was made for her?

13 A.  Yeah.  It would mean that discretion was used by her

14 management chain to provide her award, even though one wasn't

15 modeled for.

16          MR. GAGE:  That's it, your Honor.

17          No further questions.

18          THE COURT:  Okay.  Thank you.

19          Mr. Humez, you are excused.  Thank you.

20          (Witness excused)

21          THE COURT:  Is your next witness ready?

22          MS. TOMEZSKO:  Yes.

23          I understand she's at the courthouse.  We're just

24 seeing if she's right outside.

25          And we intend to call Krista Callaghan.

 1    KRISTA CALLAGHAN,

 2         called as a witness by the Defendant,

 3         having been duly sworn, testified as follows:

 4              MS. TOMEZSKO:  May I proceed, your Honor?

 5              THE COURT:  You may.

 6    DIRECT EXAMINATION

 7    BY MS. TOMEZSKO:

 8    Q.  Good morning, Ms. Callaghan.

 9    A.  Good morning.

10    Q.  Can you briefly describe for the jury your background and

11    your roles that you've held at Google.

12    A.  Yes.  I can start with what I do now.

13              For the last three years, I've been doing human

14    resources.  So my title is head of market HR for the central

15    region.  And what that means is I take care of the

16    people-related issues for the Google offices in the middle of

17    the U.S.; and then I manage the people who do that job for the

18    eastern U.S. and for the western U.S.

19              Prior to that, for my first six years at Google, I was

20    in the executive recruiting team and held many different —

21    maybe all the different — roles in that organization.  Started

22    as a sourcing recruiter.  Started managing sourcing recruiting

23    teams.  And for my last few years in executive recruiting,

24    managed the global operations team.

25    Q.  And what role did you hold in the 2016 to 2018 time frame?

1   A.   A few.  I think I managed a sourcing team, so people who

2   find candidates.  And then I managed a recruiting team.  And

3   during those management roles, I would chip in and do hands-on

4   recruiting, if it was needed.  And then I think towards the end

5   of the time period you mentioned is when I transitioned to more

6   of an operations role.

7   Q.   In the 2016/2017 time frame, were you working on hiring a

8   number of individuals into a function within Google Cloud

9   called the office of the CTO?

10  A.   Yes.

11  Q.   Can you briefly explain what your role in that hiring

12  process was.

13  A.   Yeah.  So we called a recruiting process a search when

14  you're trying to fill an individual role.  At the beginning, I

15  was helping find candidates and, you know, doing some light

16  assessment.  I was one of the more senior people on the

17  execution team, so just kind of diving into the actual

18  interviews when I needed to.

19        I think, I don't remember, after a few months of doing

20  that, I started managing the sourcing and then the recruiting

21  team.  So I was still involved in the project, but I wasn't as

22  hands-on and just handled, like, escalations or if there were

23  questions that came up.  But I still went to the meetings and

24  was involved, I think, for a good nine months a year.

25  Q.   Are you familiar with the plaintiff in this case, Ulku

1   Rowe?

2   A.  I know her name and I've spoken with her a couple times on

3   the phone during the process.

4   Q.  You said a couple times on the phone.  Can you describe the

5   first time that you spoke with Ms. Rowe to the best of your

6   recollection.

7   A.  Yes.  I managed recruiting teams for a long time.  So she

8   was referred to me as a really talented person from a recruiter

9   in New York City, Ed McGeady, who was a very good recruiter and

10  very diligent.

11          She wasn't right for the role.  He was working on, but

12  he had heard -- we knew each other really well.  And he asked

13  if I was working on anything.  I told him.  And we thought

14  maybe the OCTO world can be cool for her.  And so I did a

15  really light assessment call with her.

16          Normally, I'll go really deep and just try to

17  understand every piece of the former job they've had.  And this

18  was a little lighter, given that she had already been through

19  that process for a different role.  So that was my first

20  interaction with her.

21          Should I go into detail on that?

22  Q.  Well, actually, I'd like to -- we will in a second, but I

23  just want to ground us in a document.

24          Did you also exchange emails with Ms. Rowe during the

25  process as well?

1   A.  Yeah, I'm sure we did, to set up the call.  I didn't have a

2   scheduler working for me or anything like that.  So -- and I

3   had to have -- yes, I'm sure we exchanged emails.

4   Q.  I'd like to show you what's been marked as Defendant's

5   Exhibit 47 in this case.

6         MS. TOMEZSKO:  Jean, can you please pull that up.

7   Q.  Ms. Callaghan, feel free to take a look at this document.

8   And we could page through it, if you'd like to familiarize

9   yourself.  Pardon me.  And you know, as you look at it, my

10  question is going to be whether you recognize this document.

11  A.  Yeah, I do remember this.

12  Q.  And is this an email exchange between you and Ms. Rowe in

13  the August 2016 time frame?

14  A.  Yes.

15  Q.  And if you could tell from this document at what stage in

16  the process was Ms. Rowe in the August 2016 time frame?

17  A.  Essentially, the gatekeeping piece of it, we didn't want

18  to -- is she -- does she meet the minimum requirements to go

19  forward into the process, so we don't waste anyone's time.

20        MS. TOMEZSKO:  I'd like to just make a little bit

21  bigger the email on Thursday, August 25th, 2016, Jean, if we

22  could focus in on that.

23  Q.  Ms. Callaghan, does that reflect some of the substance of

24  the first conversation that you had with Ms. Rowe?

25  A.  Yes, it does.  When we initially do the phone screen,

1    that's what you call it, candidates are selling themselves.

2    They want to get into the process.  And it takes a long time to

3    peel back the layers and figure out if they meet the minimum

4    requirements, and cloud expertise was a minimum requirement.

5           And I remember being on the phone and being grateful,

6    because she volunteered a couple times, like, I'm not a cloud

7    expert, you know, I have -- I've seen it, I've been involved in

8    pieces of it, but I'm not that.  And I was like, This is great.

9    This just saved me 45 minutes of time.

10          So we went through and, you know, there was -- she's

11   very talented, very articulate, and had a lot of other things

12   that would be good for Google.

13          So I just wanted to be clear with Will, the hiring

14   manager at the time, like, this is someone that's really great,

15   but doesn't have the expertise, admittedly doesn't have that,

16   do you want to go forward?  And so I think that's what I was

17   just saying back to her before we went -- you know, before we

18   took the next step.

19   Q.  Your reference to Will there, is that Will Grannis?

20   A.  Yes.

21   Q.  And he was the hiring manager for the role that you were

22   looking to fill and Ms. Rowe was interested in?

23   A.  Correct.

24   Q.  When you told him that Ms. Rowe had told you that she was

25   not a cloud expert, what was his reaction?

A.  He was happy to meet her.  You know, there's a term good

for Google.  And he was happy to meet her for that.  And if she

was going to be somewhere else in the organization, that would

be somebody we just want to get in.

      And then he was also happy to meet her to like just

think more broadly about the role and whether there could be

some value provided by someone with her specific experience,

although a little bit different than some of the more

center-of-the-bull's-eye candidates.

Q.  You reference center of the bull's-eye there.  Can you

explain a little bit what you mean by that?

A.  Yeah.  There's minimum requirements, you have to meet the

minimum requirements to go forward; and then there's preferred

requirements.  And those are nice to have.  But you usually

want those two.

      If they don't have minimum requirements, they are

outside of the center of the bull's-eye, we don't want to waste

anyone's time if they are not going to be able to do the job.

And cloud experience was a minimum requirement.  So it was part

of the center of the bull's-eye, and she didn't have that or

said she didn't have that.  So I needed to make sure Will was

okay with that before we took up anyone's time.

Q.  And I think you mentioned that Will Grannis had agreed to

meet with her because of the many things that you had said:

She was talented, she was articulate.

1          Was that approach that Will showed there, was that

2     typical of his general approach as a hiring manager?

3     A.  Yeah.  Yes.  We ended up asking him to speak on panels of

4     how to be like a good hiring manager leader because of that.

5     That was, like not typical, because it's a lot of time to

6     invest in getting to know someone, and you don't want to bring

7     someone into the process and then waste their time and get them

8     frustrated with Google.

9          So it was a time he took to meet lots of different

10    types of best athletes who could fit into his org, other pieces

11    of the org.  But he also did a good job following up and making

12    people feel like that was a good use of their time, even if

13    they weren't ready for the job.

14    Q.  After you had this conversation with Mr. Grannis, did

15    Ms. Rowe go through interviews for the technical director role

16    in OCTO?

17    A.  Yeah.

18    Q.  Do you know whether those interviews were in person?

19    A.  So I'm sure she had in-person interviews.  The first

20    interview is usually a phone screen, but I'm not sure exactly

21    like the milestones of how she met people and when she met

22    people precisely.  But yeah, she ended up working here; she

23    definitely went through in-person interviews.

24    Q.  And did you continue to communicate with her throughout the

25    process as she was going through interviews and throughout the

1    rest of the search?

2    A.  I did -- not consistently.  I did the gate -- you know, the

3    phone screen, the light phone screen, because I had the

4    background that was from Ed McGeady.  And then there was an

5    escalation call, I think, later on that I did.

6    Q.  What is an escalation call?

7    A.  It's just when someone wants -- you know, there's

8    something, there's a bump in the road and the recruiter just

9    asks me to do the call.  In this specific instance, the

10   perception was that the pieces of the interview process were

11   going too slow.  And this is pretty common, it sometimes can be

12   slow.

13   Q.  Whose perception was it that the pieces of the interview

14   process were going too slow?

15   A.  Ulku Rowe, the candidate at that time.

16   Q.  And did you have a conversation with Ms. Rowe about that?

17   A.  I did.

18   Q.  Can you describe that conversation please.

19   A.  Yeah.  Again, this is like -- this was not an uncommon

20   conversation; this was just context, because it's important.

21        The process is consensus-driven, and it depends on

22   getting everyone's schedule lined up.  And they're super senior

23   people.  We don't want people to come back multiple times

24   on-site.  So it just can take a long time and it can be

25   frustrating.  And people may not understand why.  So these

1   calls are -- again, I don't know how many I've done, over 100.

2   But it's basically saying we take a long time because we're

3   consensus-driven; we don't want one person to make this

4   decision.

5           The recruiter, I don't -- just escalated and said, We

6   have a candidate, Ulku Rowe.  She's not happy with the pace of

7   the process.  And so I did that call.  And it was just that.

8   She just was not happy it was taking a long time.  She let me

9   know that in no uncertain terms; and that she didn't feel like

10  she was being taken seriously as a candidate in the process.  I

11  think she was getting ready to go on a trip, I don't know if it

12  was personal or business.  She was going to -- she wasn't

13  exactly sure where she wanted to go forward.  But she said a

14  couple times, I don't feel like I'm being taken seriously.  And

15  she was -- she came across as very annoyed, very irritated with

16  the process.

17  Q.  In your opinion, being involved in the search, was she

18  being taken seriously?

19  A.  Yeah.  Yes.  I shouldn't say very much so, because I don't

20  know the precise timing, but it was not -- there were not long

21  periods of time between the milestones at the time I did the

22  call.  Because I did refer back to make sure -- you know,

23  sometimes there's -- you know, something happens and then you

24  just have to explain that to the candidate.  Someone dies or

25  someone, like -- someone has to take some time off and that's

NAJVROW1                         Callaghan - Direct

1    the reason.  But there was no -- there was no timing issue.

2    Q.  The concern that she was raising that it was taking a long

3    time in the process, was that a common concern that you heard

4    from candidates?

5    A.  Yeah.  All the time.

6    Q.  Was your conversation with Ms. Rowe, would you describe

7    that as a typical conversation that you have with candidates

8    who raise that concern?

9    A.  It was more -- it came across to me as more irritated and

10   upset than I was used to.  I remember it.  I've done hundreds

11   of these phone calls, and that one sticks out in my mind.  So I

12   was surprised with that piece of it.  So that was what I

13   remember.

14   Q.  After that conversation with Ms. Rowe, did Google extend

15   her an offer for the technical director role in OCTO?

16   A.  Yeah.  At that point I wasn't hands-on, but yes.

17   Q.  If I could represent to you that her offer -- her offer

18   letter is dated December 9th, 2016.  And earlier we looked at

19   the email where you were exchanging with Ms. Rowe, and that was

20   August 2016.  Is that time frame, August 2016 to December 2016,

21   in your experience, in line with the typical length of time it

22   takes for -- to complete a search process for a senior role at

23   Google?

24   A.  Yeah.  Especially for a newly built function.  Like, you

25   don't want to hire two people who have overlapping skill sets.

1    That's not a bad time frame period.  But for a function that's

2    being built from the ground up and you really want to be

3    careful, that's pretty good.

4    Q.  Thank you.  Thank you, Ms. Callaghan.

5            I have no further questions.

6    CROSS-EXAMINATION

7    BY MR. CHIARELLO:

8    Q.  Good morning, Ms. Callaghan.

9    A.  Good morning.

10   Q.  I just want to go back to a question Ms. Tomezsko was

11   asking you a moment ago about your conversations with Ms. Rowe

12   around the timing of the process.

13           Would it be fair to say that someone, a candidate

14   following up about the timing of their candidacy, would

15   indicate interest in the position?

16   A.  I've seen it both ways.

17   Q.  I want to talk a little bit about the initial conversation

18   you had with Ms. Rowe that you testified and you said it was --

19   you had characterized it as a really light assessment; is that

20   correct?

21   A.  Mm-hmm.

22   Q.  At that point Ms. Rowe didn't know very much about this

23   role; correct?

24   A.  She had the job description.  She had an overview that was

25   part of the call.  She knew as much as anyone else did about

NAJVROW1                     Callaghan - Cross

1  that role.

2  Q.  Okay.  But at that point she hadn't, for example, been

3  interviewed by Mr. Grannis?

4  A.  That's right.

5  Q.  And based on the light assessment you had with her, I think

6  you characterized her as not center of bull's-eye as a

7  candidate, but she then went on to interview with Mr. Grannis

8  and the rest of the hiring panel; correct?

9  A.  She characterized herself as not having cloud expertise,

10  which was center of the bull's-eye.  So that really did come

11  from her.  And then yes, she did go on to meet Will Grannis.

12  Q.  I understand.

13          And she also interviewed with -- I'm forgetting off

14  the top of my head, but there are other individuals that she

15  interviewed with; correct?

16  A.  I'm not -- I wasn't close to the scheduling or the

17  interview panel, the recruiter who was on my team was.  But

18  yeah, I mean, that's always -- you meet -- in an interview

19  panel, once you get to a certain point in the process.

20  Q.  And she was ultimately hired as technical director;

21  correct?

22  A.  Mm-hmm.

23  Q.  Were there other candidates that were not cloud experts

24  that you brought to Mr. Grannis's attention?

25  A.  For the recruiting process, I don't know.  For me

NAJVROW1

1    personally, no.

2    Q.  And is it possible that Ms. Rowe was just being modest when

3    she said she was not a cloud expert?

4             MS. TOMEZSKO:  Objection.  Calls for speculation.

5             THE COURT:  Sustained.

6             MR. CHIARELLO:  Nothing further.

7             MS. TOMEZSKO:  Judge, just 30 seconds, please.

8             No further questions for the witness, your Honor.

9             (Witness excused)

10            MR. GAGE:  Might have a security issue, Judge.  I

11   shouldn't put it that way.  Might still be in security.  Your

12   Honor, we hadn't anticipated starting a little earlier like we

13   did.  He was going to be here at 10.

14            THE COURT:  All right.  So you think he'll be upstairs

15   in the next five minutes?

16            MR. GAGE:  I expect he will be up here very shortly.

17            THE COURT:  Okay.

18            MR. GAGE:  She's punctual.  I just didn't expect to

19   start 15 minutes before we did this morning.

20            THE COURT:  Fair enough.

21            So what do people want to do?

22            If it's only five minutes, we should probably just sit

23   here, right, and not all go in different directions.

24            JUROR:  Agreed.

25            MR. GAGE:  I was going to say.

NAJVROW1

1            THE COURT:  There we go.  All right.  Done.

2            (Continued on next page)

1           MR. GAGE:  He should be here shortly, your Honor.  I

2     think the marshals are looking through his bags, and

3     Mr. Velazquez is going to tell me as soon as they're done.  But

4     he should be up here shortly.  I apologize.

5           THE COURT:  And the rest of your lineup?

6           MR. GAGE:  We will have them.

7           MS. TOMEZSKO:  I've been in contact with them and

8     said, please, if you're not already here, please get here.

9           THE COURT:  OK.

10          MR. GAGE:  And they're all nearby, so I think it's

11    just a function of the marshals right now.

12          THE COURT:  OK.

13    BRIAN STEVENS,

14         called as a witness by the Defendant,

15         having been duly sworn, testified as follows:

16          MR. GAGE:  Your Honor, thank you and everyone for your

17    patience.

18          THE COURT:  All right.  Very good.

19    DIRECT EXAMINATION

20    BY MR. GAGE:

21    Q.  Good morning, Mr. Stevens.

22    A.  Good morning.

23    Q.  Could you just very briefly tell the ladies and gentlemen

24    of the jury your educational and work background before you

25    arrived at Google.

1    A.  Education post-high school, I had a bachelor of science in

2    computer science and then worked for about a year and a half

3    and then was sent back to get a master's of computer

4    technology.

5    Q.  OK.

6    A.  Yeah, sorry.

7    Q.  And then did you start working?

8    A.  I did.  I started working at a company called Digital

9    Equipment Corporation based out of Massachusetts.

10   Q.  And if I could just pause that.  And what did you do for

11   that company?

12   A.  I started as a programmer, software developer.

13   Q.  Then after working as a software developer, what did you do

14   next?

15   A.  Beyond that company?

16   Q.  Sure.

17   A.  Well, I mean, that — I was there 13 years, so over the

18   course of 13 years, took on more responsibility, project lead

19   in various things, and then — and then in 2000, little startup

20   from 1999 to 2001, and then working on technology for

21   enterprise.  And then a company recruited me called Red Hat,

22   and then I went there and I joined as an individual

23   contributor, but then about six months in, I ended up running

24   all of engineering for them.

25   Q.  OK.  I just want to go back.  You used a phrase "technology

1  for enterprise."  Can you explain in layperson's language —

2  A.  Sure.

3  Q.  — what that means, technology for enterprise?

4  A.  Pretty much my whole career has been focused in this one

5  area, so it's really — just about every company, you know,

6  around the world uses software and computers in some fashion to

7  run their business, and so I was always focused on building all

8  the software layers that run on — run the computer hardware

9  for them.

10  Q.  What is or was Red Hat when you were there?

11  A.  Red Hat was — it's called open source, so the software's

12  freely available.  You can see inside the code.  And what they

13  did was they built an operating system for — for enterprise

14  use.  Everybody knows about Windows, but less people know about

15  Linux.  It's really an alternative to Windows that companies

16  would use to run just about every piece of workload.

17  Q.  And what was the highest position that you held at Red Hat?

18  A.  At the time I left, I was the executive vice president of

19  worldwide engineering and chief technology officer.

20  Q.  What did it mean to be the chief technology officer of Red

21  Hat?

22  A.  Ironically, the CTO wasn't really a prescribed role.  It

23  was really just something I was already doing.  They just put

24  the title on me at one point.  Typically what a chief

25  technology officer does is they develop the technical strategy

1    for the company, you know, what products you're going to build,

2    the attributes of those products, probably involved if you're

3    going to do acquisitions, etc.  Sometimes, like in my case,

4    you're running all of the engineering as well, but not always.

5    Q.  While you were at Red Hat, did you get recruited for

6    positions outside of Red Hat?

7    A.  Certainly.

8    Q.  Where, before you joined Google, were you recruited from —

9    who else recruited you from Red Hat?

10   A.  I think the only one that I took an interview for was a

11   company called VMware.

12   Q.  OK.  You said VMware?

13   A.  Correct.

14   Q.  Can you tell the ladies and gentlemen of the jury, what is

15   VMware?

16   A.  So what VMware did was actually pretty magical.  So, say —

17   you know, we talked about technology all of the companies are

18   running.  You know, they buy hardware and their servers.  So

19   the challenge with that is that back then, before VMware, a

20   server was dedicated for a particular application or a task.

21   And what VMware did was they pioneered how you could actually

22   split up that one physical computer and run many applications

23   on top of it.

24   Q.  And was that technology foundational to what we know as

25   cloud computing?

NAJHRow2                          Stevens - Direct

1    A.  It is.  It's like the underpinnings of cloud computing.

2    It's actually called virtualization, which I imagine what "V"

3    the VMware was for.

4    Q.  That's what the "V" was for?

5    A.  I assume.

6    Q.  And so would it be fair to say that VMware was a cloud

7    computing company?

8    A.  Yes, certainly.

9    Q.  You were recruited by VMware, but you didn't take that job.

10   Why not?

11   A.  Why not?  Well, I was recruited back to —— you know, I had

12   said yes, right, so —— and it didn't entail a move, so it was

13   exciting.  But I realized, you know, that I was less interested

14   in the technology path that was their future.  They'd already

15   really achieved what they were going to achieve, and I was

16   really interested in taking the technology to the next level.

17   And I was recruited back to Red Hat by the CEO and the board,

18   so I decided to stay.

19   Q.  How did you end up at Google?

20   A.  Probably six months after I had said no and decided to

21   stay, I had a gentleman named Urs Hölzle.

22   Q.  Can you say the name again.

23   A.  Urs Hölzle.

24   Q.  User Hölzle?

25   A.  Sure.  So he —— by way of recruiter, he was very active, so

1   he called me up, and we started up having conversations about a

2   role at Google.

3   Q.   What can you give us a time frame, a year, when this

4   happened?

5   A.   Yes.  I want to say it was around January of 2014,

6   something very, very early in 2014.

7   Q.   And at the time what did you understand Mr. Hölzle's role

8   at Google to be?

9   A.   Urs is pretty famous in the technology landscape because he

10  came in, and he was the first VP of engineering at Google.  He

11  was the eighth employee, and so he ran everything, really

12  everything technology, from building the data centers, where

13  the data centers were going to be, power cooling, you name it,

14  and all the software.  So really was everything foundational.

15  And the role he was offering me was to lead product for cloud

16  Q.   Did you take that job?

17  A.   I did.

18  Q.   When approximately did you start at Google?

19  A.   Not till, I want to say, September, October later that

20  year, yeah.

21  Q.   2014, did you say?

22  A.   Yeah.  Yes, same year.

23  Q.   And what did it mean to be the head of product —— well,

24  withdrawn.  Let me ask you a different question.

25          Were you hired into Google cloud?

NAJHRow2                          Stevens - Direct

1    A.  I was hired into Google Cloud, yes.

2    Q.  And so what did it mean to be the head of product for

3    Google Cloud?

4    A.  Sure.  So this was 2014, and it was pretty early for Google

5    in the cloud arena.  There were actually —— it was actually a

6    very small business inside of Google.  So the role would have

7    been defining exactly what Google was going to do in Google

8    Cloud, what all the products and services would be for their

9    customers.

10   Q.  And to whom did you report when you first joined Google

11   Cloud?

12   A.  To Urs Hölzle.

13   Q.  At some point did you start reporting to someone else?

14   A.  I did.

15   Q.  Who did you report to next?

16   A.  To Diane Greene.

17   Q.  And who was Diane Greene at the time you started reporting

18   to her?

19   A.  Yeah.  She —— she was formerly the CEO of VMware,

20   ironically, and the founder, and she was on the board of Google

21   —— of Google at the time.  I had already known her.  And then

22   she had decided to take a role not just as a board member but

23   to come in and be the —— to be the CEO of Google Cloud.

24   Q.  And approximately when did you start reporting to Diane

25   Greene?

1    A.  Oh, jeez, my memory's not that good.  We would — she and I

2    would meet every month even when she was a board member because

3    she had such an active interest in the cloud, what we were

4    doing around cloud.  Then she actually came in full time, late

5    end of 2015, maybe, something like that, early 2016, yeah.

6    Q.  I want to fast-forward.  And so does that mean you were

7    part of her leadership team?

8    A.  Yeah, very much so.

9    Q.  I want to move forward to an acronym that the jury's very

10   familiar with, and that is OCTO.

11   A.  Oh, jeez.

12   Q.  Were you involved in the conception of OCTO?

13   A.  Yes, certainly.

14   Q.  How was OCTO conceived, if I can use that word?

15   A.  It really was — so if I can go back to Red Hat, as the two

16   responsibilities I had was to run all of engineering and to be

17   the CTO.  And what was really effective there is we hired

18   really talented technologist in the CTO office, but instead of

19   them building product, they were much more outbound, working

20   with customers and helping customers understand.  So the

21   proposal that I had for Google in its early days would be to do

22   a similar thing.

23   Q.  And would those technologists only work with customers?

24   A.  No, they would — they would have — you — you have to

25   have some responsibilities inside and some engagement inside

1    with engineering or else you'd be not very effective.

2    Q.  Did Google ultimately decide to create an office of CTO?

3    A.  We did.

4    Q.  And did you identify someone to help build that office?

5    A.  I did.

6    Q.  Who did you identify?

7    A.  Gentleman named Will Grannis.

8    Q.  Now, do you know who Tariq Shaukat is?

9    A.  Certainly.

10   Q.  Was he also on Diane Greene's leadership team?

11   A.  He was.

12   Q.  The ladies and gentlemen of the jury have heard about him

13   creating an organization within Google Cloud called Global

14   Alliances and Industry Partnerships.  Is that familiar?  Do you

15   remember that?

16   A.  I don't recall the exact name of it, but I trust that that

17   was the name.

18   Q.  Do you remember that Diane Greene asked him to create a new

19   organization in late '17 early '18?

20   A.  Yeah, I was part of that conversation with her, sure.

21   Q.  A moment ago we were talking about OCTO.  Did you have an

22   understanding of what Mr. Shaukat's organization was going to

23   do?

24   A.  Generally speaking.

25   Q.  How was the organization he was supposed to create

NAJHRow2                          Stevens – Direct

1   different than OCTO?

2   A.  Oh, how was it different?  Well, OCTO was, you know,

3   assemble strong technologists that have a really great pedigree

4   and then have them work with customers, right, because often

5   salespeople need really strong technologists to help customers.

6   It's a big — it's a big move for a customer just to take

7   advantage of cloud.  It's not an easy transition, and so the

8   strong technologists actually help them and enable them in that

9   decision process.

10          So what — what Tariq would have been doing was to —

11  you know, really on the sales side and bring together a whole

12  go-to-market motion.  So you'd want to bring together the

13  sales, marketing capability, probably contract and pricing.

14  You almost create a mini company inside of a company that was

15  focused on certain industries.

16  Q.  I want to take a step back.

17          At this point in time, we're now 2018, January of

18  2018, you were still — were you still the chief technology

19  officer of Google Cloud?

20  A.  Yeah, I was.

21  Q.  And did you at that point in time in your career have

22  experience working with financial services institutions?

23  A.  Yeah, extensively.

24  Q.  Can you describe your experience with financial services

25  institutions in the technology area.

NAJHRow2                       Stevens - Direct

1   A.   Right.  Sure.  I would always call myself a weirdo engineer

2   from the early days.

3   Q.   I'm sorry, a what?

4   A.   A weird engineer.  A lot of software developers are really

5   passionate working on technology.  The moment I was out of

6   school, I wanted to know what was the purpose, and the best

7   purpose is to be customer-facing.  So it's just something I

8   enjoyed, and it helped you build better solutions.  So this

9   goes back to even pre-Red Hat and then certainly Red Hat.

10          Often there's an adage that — well, financial

11  services is an interesting industry because they try to be the

12  first to take advantage of new innovation, like what you're

13  seeing in artificial intelligence now.  So they really track

14  new things happening, try to take advantage of new technology

15  so they can be the first to market and have competitive

16  advantage.  So Red Hat very much used that and worked very

17  closely with CTOs and CIOs of financial services companies

18  bringing Linux to them in that case.  So many, many times in

19  London and, you know, New York, we're just kind of like the

20  cornerstone of financial services.

21  Q.   Can you give us some examples of some of the financial

22  services institutions that you collaborated with in that way.

23  A.   A lot of the popular investment banks, some that are no

24  longer:  The Lehmans, the Credit Suisses, Barclays, Goldman,

25  Morgan Stanley, JPMorgan, yeah, HSBC.

NAJHRow2                     Stevens - Direct

1   Q.  Prior to the time that Ms. Rowe joined OCTO, had you ever

2   come across her in your dealings with JPMorgan Chase?

3   A.  No, we hadn't met.

4   Q.  Did you know of her prior to her coming into OCTO?

5   A.  No, I did not.

6   Q.  Now I'd like to move on to a different topic, Mr. Stevens.

7   There's been a lot of testimony about levels at Google.

8   Ms. Rowe has testified that levels at Google are where you are

9   in the hierarchy.  Would you agree with that?

10  A.  I wouldn't think about it that way.  I just don't think

11  about it that way.  I suppose you're more senior as you go up

12  levels, so you are more senior.

13  Q.  How do you think about levels at Google?

14  A.  I think about like it's really kind of ── if you ── you

15  you levels, but they're job descriptions, right?  And if you

16  don't have levels, then what you would have is you wouldn't be

17  able to calibrate people.  You wouldn't be able to pay them

18  fairly and consistently with their peers.  Then ── so that

19  part's really hard and important.

20          But the second thing is, you know, people often want

21  ── some people are fine doing the exact same job for their

22  entire career, but other people want to know how to advance.

23  So the descriptions of the levels really explain, you know,

24  what they have to get stronger at, exhibit if they have

25  aspirations to get to the next level.

1    Q.  Do levels at Google define what Google's expectations are

2    of the employee?

3    A.  Yes, certainly.  You're calibrated —— your performance is

4    measured against your level.

5             MR. GAGE:  I'd like to go to D26.

6             And, your Honor, may I hand the witness a paper copy

7    of the document just so he can more easily look at it?

8             THE COURT:  Is it not available on the screen or ——

9             MR. GAGE:  It is available on the screen, but I ——

10   just for his eyesight, your Honor, it would be easier for him

11   to look at a paper copy.

12            THE COURT:  Ms. Greene?

13            MS. GREENE:  No objection.

14            THE COURT:  OK.

15   BY MR. GAGE:

16   Q.  Mr. Stevens, I'd just ask you to just take a moment, if you

17   could, and page through D26.  And my first question is, were

18   you involved in Ms. Rowe's hiring into OCTO?

19   A.  I was.

20   Q.  What do you recall about Ms. Rowe's experience and

21   background as she presented to OCTO?

22   A.  From here she was very —— very involved, sounds like, in a

23   leadership role in the credit risk department for JPMorgan

24   Chase.

25   Q.  OK.  Did you interview Ms. Rowe?

NAJHRow2                        Stevens - Direct

1    A.  I did.

2    Q.  Does this hiring packet include your interview

3    recommendation and notes?

4    A.  Yeah, as soon as I find it, I'm sure it would.  OK.  There

5    you go.

6    Q.  Did you like Ms. Rowe?

7    A.  I did.

8    Q.  Did you think that she would be a good addition to OCTO?

9    A.  I did.

10   Q.  You wrote here in your notes, "Likely not one to drive CxO

11   relationships, but she can certainly pair off as needed.

12   Strong blend of LOB and IT makes her a great add."

13            What does "CxO" refer to?

14   A.  The CxO, the way I would have meant it here would have been

15   chief information officer, chief technology officer, chief

16   executive officer, that kind of thing.

17   Q.  And why did you think she was likely not one to drive CxO

18   relationships?

19   A.  Her — at the time of joining OCTO, you know, just why I

20   would have written that, her breadth seemed more limited.  She

21   clearly has strong technology experience, and she used the

22   technology to solve the credit risk at the bank.  But like the

23   — the level of, like, CxO, you have to cover every piece of

24   technology across cloud.  So there's hundreds and hundreds and

25   hundreds of products just in one cloud offering.  It's not a

1   single product.  And then a level of depth as well and as well

2   as describing —— it was really hard for Google because Amazon

3   created this category of cloud, and so they led it and started,

4   you know, five-plus years before anybody else did.  So every

5   conversation has to be not just why cloud but why Google,

6   right?  So —— and you're differentiating why you're better, and

7   she just wouldn't have had that —— you know, at the bank she

8   wouldn't have had that experience coming into Google.

9   Q.  Ms. Rowe was hired as a Level 8 and not a Level 9.  Why was

10  she not hired as a Level 9?

11  A.  Well, the Level 9s just are further down the path of a

12  deeper experience of the technology landscape that make up

13  clouds.  Not just building applications on top of cloud, but

14  actually all of the technologies that go into creating all the

15  cloud infrastructure, so a really rich understanding of

16  everything engineering was working on to build cloud.  And the

17  Level 9s had come into Google really having already mastered

18  that in various ways.

19  Q.  Was that something that you thought Ms. Rowe could aspire

20  to?

21  A.  Oh, certainly.

22  Q.  Why?  Why did you think she could aspire to that?

23  A.  She was smart, and she —— you know, just like the JP job,

24  it's all about —— it's all about, like, what technology would

25  you use to solve a problem?  And so she exhibited that within

credit risk.  She was able to manage a team to do that, so

there's no reason why she couldn't learn all of the areas of

cloud, including to go deeper in technology, certainly.

Q.  Ms. Rowe has testified in this case that in the course of

her discussions with you during the hiring process, that you

spoke to her about verticalization.  First of all, do you know

what the term "verticalization" means?

A.  I know how I would think about the word verticalization.

But I don't know if there's a great definition.

Q.  How would you think of the term "verticalization"?

A.  It's really how I talked about it before with Tariq's role.

Typically, many companies decide to verticalize and many don't,

because often what you get with verticalization, you get

competing sales teams.  So if sales teams are covering New York

City and there happens to be financial services in that

example, which sales rep gets to manage it?  It can create a

lot of issues.

        So companies that verticalize are really, like, well

along in their business, and they're creating subgroups that

can focus more intensely.  So verticalization to me is creating

kind of a specialty sales and marketing team that can

understand that one particular industry even better and go

deeper on that.

Q.  In late 2016, early 2017, was Google Cloud at a place where

verticalization made sense?

1  A.  It was Diane's decision, and I certainly supported it

2  because we definitely were, you know —— definitely scaling at

3  that point in time.  It was very small in 2014, but around that

4  time I think we were getting into the billions.

5  Q.  When you were speaking to Ms. Rowe, interviewing her for

6  the job, did you talk to her about verticalization and how that

7  might affect her career?

8  A.  I actually didn't because I'm not a big fan of verticals.

9  I think they can cause a lot of friction and certainly hard to

10 navigate.  So it's certainly would not have been something I

11 would have talked about, especially at that point in time.

12 Q.  So is it your testimony that you would not have told her

13 that she would be ideal to lead the vertical?

14        MS. GREENE:  Objection.

15        THE COURT:  Overruled.

16 A.  No, I wouldn't have had that conversation of verticals.  At

17 that time it wouldn't even have been a concept even on the list

18 of things I would be thinking about.

19        MR. GAGE:  Your Honor, I'd like to hand the witness

20 another exhibit, go to D25.

21        THE COURT:  All right.

22 Q.  Mr. Stevens, do you know Nic Harteau?

23 A.  I do.

24 Q.  Before he came to Google, did you know Nic Harteau?

25 A.  I had met him, yes.

NAJHRow2                        Stevens - Direct

1  Q.  How had you met Nic Harteau prior to him joining Google?

2  A.  So Nic worked at Spotify, which probably most people have

3  heard of, and they were just beginning evaluating using Google.

4  They hadn't really moved much to cloud yet.  And they were

5  evaluating Google as their cloud provider, so I met him in

6  those conversations.

7  Q.  Did Spotify eventually come to Google Cloud?

8  A.  They did.

9  Q.  Were you at all involved in that process?

10  A.  Deeply.

11  Q.  As that was happening, did you have interactions with

12  Mr. Harteau?

13  A.  Yeah, many, many, many hours, yes.

14  Q.  Did you have the opportunity to engage in substantive

15  technical discussions with Mr. Harteau?

16  A.  Yeah, very much so.

17  Q.  Whiteboarding sessions?

18  A.  Yes.

19  Q.  And what was your understanding of Mr. Harteau's role at

20  Spotify during that process?

21  A.  As I ⸺ as I recall, he was the vice president of

22  engineering.  So it was the whole team that would have ⸺ would

23  have done the ⸺ that ran their existing IT infrastructure,

24  which a lot of it was in their own data centers.  So that whole

25  team that was building Spotify as we know it but also would

1   have been responsible for doing the migration to Google Cloud.

2   Q.  By the way in case folks might not know, what does

3   whiteboarding mean?

4   A.  It's grabbing that whiteboard over there, old school using

5   pens and drawing pictures and technology stacks.  It's just ——

6   you can't do that virtually.  There's nothing better than a

7   whiteboard to do this kind of thing.

8   Q.  And if we look at the —— under the word "assessments" here

9   on the first page of D25, it says, "Statement of support from

10  Brian Stevens."  Is this something that you wrote?

11  A.  Yeah, appears that way.

12  Q.  It indicates that you "strongly support Nic Harteau for

13  hire as an L9 in the office of the CTO.  One of the strongest

14  packets I've seen."

15          Can you explain why Nic Harteau was hired as a

16  Level 9?

17  A.  His depth of understanding technology wasn't just at the

18  top level, it was all the way down.  So, like, in the

19  discussions we would have, we would go very deep into not just

20  the products in Google Cloud but the attributes of those.  And

21  moreover, he didn't depend on his team to do that, he directly

22  knew the knowledge and was driving those decisions for Spotify.

23          Then he came with, like, the second bonus.  He had

24  already seen the movie before because he'd already migrated

25  this massive application that preexisted and made all the

1    choices of how they were going to integrate and run that on a

2    cloud.  And so with that, there's zero learning curve.  You can

3    put him in front of a customer immediately, and he could

4    explain every Google Cloud service as well as help guide that

5    customer with choices they would need to make.

6    Q.  Based upon what you knew about Mr. Harteau's experience and

7    background, did you believe you could expect more from him than

8    you could expect from Ms. Rowe?

9    A.  Yeah, certainly.

10   Q.  And what more could you expect from Mr. Harteau that you

11   would not be able to expect from Ms. Rowe?

12   A.  On day one you mean?

13   Q.  Yeah.

14   A.  OK.  Yeah, he just had the full —— like I said, he would be

15   able to activate customers immediately.  You could throw him in

16   with any customer that was considering a migration, and he

17   would explain not just the benefits but how they'd actually go

18   about that.  He just, frankly, wouldn't have needed any

19   training whatsoever.

20   Q.  Would he have needed any training in Google Cloud platform?

21   A.  No, no.

22   Q.  After Mr. Harteau started working in OCTO, did you work on

23   any projects with him?

24   A.  I did.

25   Q.  OK.  Can you just describe some projects that you worked

NAJHRow2                        Stevens - Direct

1   with Mr. Harteau on.

2   A.   Yeah, sure.  The one — well, one — the first one came out

3   of — because, believe it or not with Spotify, we were actually

4   going to be more expensive for them than a competitor, than

5   Amazon.  So the first technical collaboration we did, we

6   created a new type of virtual computer instance that was kind

7   of sized right for their needs, and that was that business

8   technical implementation that made us more cost-efficient for

9   — for Spotify, and that's why we won the deal.

10           And then second was it's really hard for customers,

11  just like I said before, to migrate.  It's really — sometimes

12  it costs them more to actually migrate to cloud than it saves

13  them.  And so what we were — what I had conceptualized with

14  Diane's staff was a particular engineering project that would

15  allow them to migrate from their existing — kind of where they

16  store their data and onto the cloud more easily.  So it was

17  both a business value of that but then a technical

18  implementation of that to make it very easy for customers to

19  do.

20  Q.   And Nic Harteau worked on those projects with you?

21  A.   He did.  He did.

22  Q.   Did Ms. Rowe ever work on similar projects with you?

23  A.   With me directly?  No, not with me directly like that.

24  Q.   And why did Ms. Rowe not work on those two projects?

25  A.   Why did she not?  Well, you know, quite frankly, like, she

1    just worked less with the engineering teams, you know, at

2    Google, and we — the types of work that we were going to be

3    doing wouldn't be something that we at CTO built on top.  It

4    would have been something that you go and work with the

5    engineers that were actually building our cloud, and you would

6    go whiteboard with them and talking about what you needed them

7    to build, right?  So he had that — that's kind of who Nic was.

8    He was really immersed in working with the engineering teams.

9             MR. GAGE:  Your Honor, may I approach the witness with

10   another?

11            THE COURT:  Yes.

12            MR. GAGE:  This is D27.

13   Q.  Mr. Stevens, who is Paul Strong?

14   A.  Paul Strong was also somebody that we hired into OCTO.

15   Q.  Prior to him being recruited to OCTO, did you know of him?

16   A.  I had met him at least once, yes.

17   Q.  And how had you met him?

18   A.  Back when I was saying that I was interviewing at VMware,

19   he was — I probably met four or five people during that

20   process, and Paul was one of them.

21   Q.  And what was he doing at VMware at the time?

22   A.  He was — I don't know — I don't recall his exact title.

23   It's in here.  But what he was — is back to VMware, it was

24   what I had talked about, like, migrating is hard, and so what

25   he would do was he was deeply technical across VMware's

products, and then he would work with for the field.  For the

field means he's working and supporting sales.  He liked not

just working on engineering but actually helping customers

adopt the technology, so he was the CTO of the field

organization for VMware.

Q.  OK.  At the time he was being recruited to Google, did you

have an understanding of what his trajectory at VMware was

likely to be?

A.  I did.  I did, yes.

Q.  And what did you understand?

A.  Well, it came through conversations because, remember, I

had taken the job offer to join them as CTO, but I knew —— part

of the reason I refused, I wasn't really interested in being a

CTO.  I had been there, done that at Red Hat.  And so the plan

for me with the CEO and CEO of EMC would be I would become the

CEO of VMware and then the CEO of VMware would become the CEO

of EMC, and Paul Strong was somebody I would mentor to be the

CTO of VMware during that process.

Q.  And you interviewed Mr. Strong for the OCTO position,

correct?

A.  Yes.

          MR. GAGE:  Can we go to, Jean —— thank you.  If we

could go to Mr. Stevens' interview.

Q.  You write:  "I'm supportive of hire.  He's considered the

emerging CTO for VMware.  We should start him in the CTO

NAJHRow2                          Stevens - Direct

1    office, but we may find we need to tweak the role around him

2    once we better understand his strengths."

3          What did you mean by that statement, we may need to

4    tweak the role around him?

5    A.  I was just stunned by the people that we could recruit into

6    individual contributor roles inside of the CTO office at

7    Google, quite honestly, because there's people like Paul, like

8    look what he'd already done, right, managed a large

9    organization, going to the heir apparent for the CTO of VMware.

10   I'm always nervous about not landing somebody at the

11   organization.  How do you keep him happy and how do you give

12   them a career path and what the future is?

13         So my apprehension with Paul would be he'd outgrow us,

14   he'd outgrow the role really quickly, and we wouldn't have

15   something else to offer him.  The tweak is what could we do to

16   give him more responsibilities so that he, one, would have an

17   opportunity to make an even bigger impact than contributor

18   could.

19   Q.  Why was Mr. Strong hired as an L9?

20   A.  Oh my gosh, for all the things I just said.  He's —— again,

21   no learning curve.  Like, the —— you know, because just the

22   technologies that VMware had already built, his understanding

23   of them, public spokesperson, you know, with —— with customers

24   on why VMware and, etc.  And not only that, he was —— he

25   actually took —— there's this thing called cloud native.  And

1  he actually was one of the first people that I's seen ever,

2  like, speaking about this, kind of this next generation thing

3  that people really hadn't even implemented yet.

4          So he was really far ahead, and customers really

5  looked at him as kind of a whisperer, if you will, about where

6  technology was going, and that was exactly, you know, what we

7  wanted in the CTO office.

8  Q.  I'd like to move to D24.

9          Your Honor, if I could?

10          THE COURT:  Yes.

11 Q.  Mr. Stevens, who is Jonathan Donaldson?

12 A.  He was a member of OCTO.

13 Q.  Did you know of Mr. Donaldson before he joined OCTO?

14 A.  I did.

15 Q.  And how did you know of Mr. Donaldson before he joined

16 OCTO?

17 A.  Because when he was at Intel, I would —— I would have

18 worked with him when I was at Red Hat.

19 Q.  Why was Mr. Donaldson hired as an L9?

20 A.  Oh, just a super-senior technologist.  I mean, not just his

21 work at Intel, the work that I had seen him at Intel, but a lot

22 of the work even prior to Intel that he did.  The VCE was ——

23 the V was VMware, the C was Cisco, and the E was EMC.  So the

24 VCE company was bringing together these three companies and

25 building a product offering out of it.  So in many ways VCE was

NAJHRow2                     Stevens - Direct

```
 1   the original cloud.  They just didn't call it cloud back then,
 2   and he led engineering for that effort.
 3   Q.  Now, was it just the number of years of experience he had?
 4   A.  Number — number of years doesn't really matter for
 5   anything.
 6   Q.  What does matter?
 7   A.  Well, you can spend all your time not learning, right, or
 8   you can spend all your time enjoying and doing the same thing.
 9   There's nothing wrong with any of those.  Everybody has
10   different — so I actually on resumes, ten years sometimes can
11   work against you, right, because I actually prefer to see
12   people that, for the roles that we're hiring in, like, get out
13   of their comfort zone and take a new mission.  Don't get
14   complacent.  Go learn a new thing.  Solve a new problem.  So
15   what I liked about him is he did have those chapters, but it
16   wasn't purely just the amount of years, it was what he did in
17   those times.
18   Q.  Like to ask you about somebody else.  Do you know who Scott
19   Penberthy is?
20   A.  I do.
21           MR. GAGE:  May I approach?
22           THE COURT:  Yes, you may.
23   Q.  D44.  Was Scott Penberthy hired into OCTO?
24   A.  He was.
25   Q.  Are you familiar with Scott Penberthy's background?
```

NAJHRow2                          Stevens – Direct

1    A.  I am.

2    Q.  Ms. Rowe has testified in this trial that she was better

3    qualified than Scott Penberthy.  Do you agree with that

4    statement?

5    A.  That she was better qualified?  I couldn't say she was

6    better qualified, no.  Scott was amazingly strong, right?

7    Ulku's amazingly strong, but Scott was amazingly strong as

8    well.  I wouldn't say ── they're very different.

9    Q.  How was Mr. Penberthy very strong?

10   A.  Just mind if I refresh my memory a little bit?

11          Yeah.  Like, Scott, obviously, like, his background,

12   you know, is schooling at MIT and doing the formal, which I

13   think is great, but there's great paths that you can be very

14   successful without that formal training.  So the schooling

15   isn't the only thing.  But, like, when I ── it's funny, when I

16   look at résumés like this, I always look, like I said, at what

17   they've done through their years.  And one of the things that

18   stood out the most to me was his work at IBM, believe it or

19   not.

20   Q.  Why is that?

21   A.  Just because to become a vice president at IBM, you know ──

22   and there's a difference between vice presidents that are in

23   sales organizations and vice presidents that are in engineering

24   organizations.  And sales the VPs, you often have to have that

25   for the title to have the conversation with customers, so

NAJHRow2                        Stevens – Direct

```
 1   they're leveled differently.  But the vice president of
 2   engineering at IBM is very significant.  Still is to this day.
 3   It just means you have —— like, not only do you have, like,
 4   deep technology roots and skills, but you can actually lead a
 5   team that actually is building the products, so yeah.
 6          THE COURT:  Mr. Gage, I'd like to give the jury a
 7   break in about ten minutes.
 8          MR. GAGE:  Oh, OK.  Great.  Thanks.  Saw you looking
 9   at me, Judge.  Thought that's where you were going with that.
10   Q.  Do you know Brian Steikes?
11   A.  I do.
12   Q.  Who is Brian Steikes?
13   A.  Member —— was a member of OCTO.  I don't know if he's still
14   there or not.
15   Q.  Was Mr. Steikes hired as Level 8 technical director?
16   A.  I believe so.
17   Q.  By the way, was Mr. Penberthy hired as a Level 8 technical
18   director?
19   A.  Yes, yes.
20   Q.  Ms. Rowe testified in the trial that she was better
21   qualified than Mr. Steikes.  Would you agree with that?
22   A.  In —— it would have to be in what capacity, right?  There
23   are things that Ulku's amazing at, you know, that Brian
24   wouldn't have been, and there's things that Brian was amazing
25   at that Ulku would not have been.
```

NAJHRow2                          Stevens - Direct

1   Q.  Why did OCTO hire people with different qualifications like

2   that?

3   A.  Swiss Army knife is a bad example, but like you ⸺ what I

4   was trying to assemble and kind of the mission was to have

5   people with different skill sets, right, and different domain

6   expertise.  And with that, any type of customer that you found,

7   you know, you could deploy members of the CTO office, right, to

8   help them, whether that was in the data space or now the AI

9   space or the compute space or the networking space.  And so it

10  was ⸺ what we didn't need was 50 people that all look exactly

11  the same, right?  You wanted people that actually had diversity

12  within the group, technically and from a business perspective.

13  Q.  I'd like to pivot away from OCTO and pivot to Mr. Shaukat's

14  organization.  I think you said earlier he was ⸺ well, let me

15  ask you this:  Was he a peer of yours on Diane Greene's team?

16  A.  Yeah, I interviewed him when he was coming in, and then I

17  was his peer.

18  Q.  When he was creating this industry partnership, this

19  vertical organization, did you participate in interviews of

20  people that he was looking to hire?

21  A.  At least some of them, yeah.  I don't know if I ⸺ I don't

22  think I interviewed everybody.

23          MR. GAGE:  Your Honor, may I approach with?

24          THE COURT:  Yes.

25          MR. GAGE:  I'd like to go to P115.

NAJHRow2                         Stevens - Direct

1   Q.  Was Stuart Breslow one of the people that you interviewed

2   for a position on Mr. Shaukat's team?

3   A.  Yeah, he was.

4   Q.  What did you understand about the role for which you were

5   interviewing Mr. Breslow?

6   A.  If I may, so it's very hard —— so financial services and

7   health care are very regulated by the government industries,

8   and in many cases the regulators, the government regulators are

9   very specific on not just the regulations but how the

10  technology has to look to meet those regulations, and that was

11  why it was really difficult for regulated companies like

12  financial services to migrate to cloud, because they wouldn't

13  pass the regulatory scrutiny.

14          So one of the things that we wanted to do in Google

15  Cloud was to understand those regulations better, be able to

16  work with regulators, be able to work with banks on how they

17  could meet the regulations even though the technology stack

18  they would be using would be very different.

19  Q.  And I'd like to go to the page on this exhibit that

20  reflects your interview, if you could flip to that page.  I

21  believe it's on the screen.

22  A.  Faster on the screen.

23  Q.  You have it?

24  A.  On the screen I see it.  I don't see my comments, but I

25  see ——

1   Q.  And if we go to the next page, we can see your comments.

2   A.  OK.

3   Q.  Did you believe Mr. Breslow was qualified for the role that

4   you understood he was interviewing for?

5   A.  Yeah, I did.

6   Q.  You wrote "more than qualified."  How was he more than

7   qualified, in your opinion?

8   A.  Because he understood everything about —— not just

9   everything about regulatory, he understood the bank at the

10  highest level, at the executive level on regulatory.  He was

11  that senior.  And then it also meant that he had —— he would

12  have had relationships with basically all the regulators

13  globally.  He already would have had those, and that was

14  exactly what we needed.

15  Q.  Now if we could look down to the bottom, see where it says

16  "Interview notes?"  See where it says:  "How did we get

17  connected?  Via recruiter.  He was involved in McKenzie

18  proposal to Google on how to work with regulators."

19          Was that something that you were also involved with?

20  A.  I don't recall seeing that report, no.

21  Q.  OK.  Could we go down to the bottom where it says

22  "Questions."  You wrote:  "Questions didn't really apply all

23  that well because he's much more senior, and he went off

24  script."

25          What does that reflect?

1  A.  You can see, like, all the questions.  I don't know if you

2  — you all see the same things I see, see the questions I was

3  intending to ask.

4          MR. GAGE:  Will you show the questions at the top.

5  A.  Like I always — yeah, that's how I get my thoughts.  We

6  didn't get — it was just — he was just a level above that,

7  you know, like the level of detail on it.  And, yeah, I don't

8  recall the exact conversation.  I remember exactly where I was

9  sitting when I met him in New York, but I don't recall the ——

10         MR. GAGE:  You can take that down, Jean.

11 Q.  Mr. Stevens, is the work that Ms. Rowe was performing in

12 OCTO the same as the work you understood Mr. Breslow was being

13 hired to do?

14 A.  No, he would have been —— no.  I mean, he was focused on

15 the regulation side.

16 Q.  Now, at some point did you understand that four of the

17 technical directors in OCTO were moving over to Mr. Shaukat's

18 organization?

19 A.  I did.

20 Q.  And do you recall how that decision came about?

21 A.  Diane Greene, our CEO, our boss, we were bringing in

22 another person to lead sales besides Tariq, somebody that had

23 already been at Google.  We were starting to scale revenue.

24 And so Tariq was much more of a relationship person with

25 customers, like really interested in what they were doing, but

NAJHRow2                          Stevens – Direct

1   to scale, that doesn't work.  You know, you have to be able to

2   work with thousands and thousands.  So we were bringing in

3   somebody that could run sales.

4              So with that, it created a new opportunity of how to

5   deploy Tariq, and so the —— Diane's idea was to do that

6   verticalization thing you were talking about under Tariq with

7   him still reporting to her.  So as I was saying before, when

8   you do that, you want to bring in all the assets across all the

9   different types of roles underneath that.  And so Diane was

10  very explicit —— wasn't first time she had done that.  She was

11  very explicit on the —— if we had, like, people that had

12  industry experience on the technology side in the CTO office,

13  that they should be in that group.

14  Q.  And did that group include Ms. Rowe?

15  A.  Yeah, it did.

16  Q.  And Jeff Kember?

17  A.  It did.

18  Q.  And Evren Eryurek?

19  A.  Yes.

20  Q.  And Ben Wilson?

21  A.  Yes.

22  Q.  And what was your understanding of what work they were

23  expected to perform in Mr. Shaukat's organization?

24  A.  It would have been the same role.  And you'd find that odd,

25  like, well, then why would you do that?  You'd do it because

NAJHRow2                        Stevens - Direct

1    you can only have one boss.  So you couldn't have Will —— Will

2    Grannis working for me saying here's the focus and the

3    priorities and the accounts, you know, that OCTO is working on.

4    We had to —— like, now it's going to be Tariq.  Tariq was going

5    to be making —— was going to be calling the strategy of which

6    accounts and what the strategy was.  And so same role but new

7    boss, yeah.

8    Q.  And at the time that decision was made to move these folks

9    into Mr. Shaukat's organization, did you expect that any or all

10   of the four of them would be leading the verticals in

11   Mr. Shaukat's organization?

12   A.  That they would be leading the verticals?  I didn't really

13   know what he was looking for, for leading verticals, to be

14   honest.  I don't ever recall having a conversation with him

15   around here's how I'm going to build my organization.  Like,

16   here's the roles we're going to do.  We didn't have that

17   conversation.

18   Q.  At some point did you ask Mr. Shaukat to consider Ms. Rowe

19   for the financial services vertical lead role?

20   A.  Yeah, I did.

21   Q.  Why did you do that?

22   A.  Because she's really strong in financial services, and so

23   that's one.  She was going to be moving to his group anyway,

24   right, and so everybody should be considered.  I feel strongly

25   about that.

NAJHRow2                        Stevens - Direct

1   Q.  Did you also interview someone named Diana Layfield?

2   A.  Yeah, I did.

3           MR. GAGE:  Your Honor, may I pass up one more?

4           THE COURT:  Yes.

5           MR. GAGE:  Two minutes.

6   Q.  And, Mr. Stevens, who is Diana Layfield?

7           MR. CHIARELLO:  What's the witness looking at?

8           MR. GAGE:  I'm sorry, D70.  I'm sorry.

9           You can hold off, Jean.  I believe it's already in

10  evidence.

11          MR. CHIARELLO:  We just want to know.

12          MR. GAGE:  My apologies for not.

13          THE COURT:  Is Ms. Gutierrez putting it up?  I'd like

14  to see it.

15          MR. GAGE:  Yes.  I'm sorry, Judge.  Forgot.

16  A.  Do you want to ——

17  Q.  Yeah.  Did you interview her for the financial services

18  vertical lead role?

19  A.  Yeah.  This is bringing this back to me, yes.

20  Q.  And what was, at the time you interviewed her for the role,

21  your understanding of her background?

22  A.  She was elsewhere in Google, so she wasn't in cloud at the

23  time, but from the title, she was partnerships in Europe at the

24  vice president level.

25          MS. GREENE:  Your Honor, I believe this may be a

NAJHRow2                        Stevens - Direct

1    document subject to the limiting instruction.

2              MR. GAGE:  Is it?

3              MS. GREENE:  We can come back to it at the break.

4              THE COURT:  Maybe this is a good time for the break,

5    then.  Is that OK with you?

6              MR. GAGE:  That's fine, your Honor.

7              THE COURT:  All right.  So, members of the jury, it is

8    now 11 a.m.  We're going to take our midmorning comfort break.

9    See you back here at 11:15.  Please do not talk to each other,

10   anyone else about the case.  Please don't do any research about

11   the case.

12             Thank you.

13             (Jury excused)

14             (Continued on next page)

15

16

17

18

19

20

21

22

23

24

25

NAJHRow2

 1              (Jury not present)

 2              THE COURT:  OK.  Mr. Stevens, you may step down.  And

 3     if you wouldn't mind leaving the courtroom, I'd like to speak

 4     to the lawyers just for a moment.  Thank you.

 5              (Witness temporarily excused)

 6              THE COURT:  Everybody, please be seated.  I'm just

 7     looking for that limiting instruction, but we might have to do

 8     it a minute or two before the jury comes back in.

 9              MS. GREENE:  Your Honor ——

10              (Continued on next page)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          THE COURT:  Exhibit -- what was that exhibit again?

2          MR. GAGE:  This last one you mean?

3          THE COURT:  Yes.

4          MR. GAGE:  70, D-70.

5          THE COURT:  Exhibit D-70 is admitted only for its

6    effect on anyone who reviewed these materials, which are

7    hiring-related materials.  You may not consider them for their

8    truth, meaning you may not consider them as evidence that Diana

9    Leyfield actually had the qualifications for which role?

10         MR. GAGE:  Financial services vertical lead.

11         THE COURT:  Okay.  And then the rest.  You may give

12   this evidence such weight as you feel it deserves, etc.

13         Okay.  So we'll start with that.

14         All right.  Thank you.

15         (Recess)

16         (Jury present)

17         THE COURT:  Mr. Stevens, you are still under oath.

18         Go ahead, Mr. Gage.

19         MR. GAGE:  Thank you, your Honor.

20         THE COURT:  Oh, Mr. Gage, excuse me, this is --

21         MR. GAGE:  Oh, yes, yes.

22         THE COURT:  Let me just speak to the jury one moment.

23         So members of the jury, I'm now going to give you a

24   limiting instruction relating to the document that you're about

25   to see.  And it's a limiting instruction that I've given you

NAJVROW3                     Stevens - Direct

1    before, so it might sound familiar.

2            You are about to see Exhibit D-70.  Exhibit D-70 is

3    admitted only for its effect on anyone who reviewed these

4    materials, which are hiring-related materials.  You may not

5    consider them for their truth, meaning you may not consider

6    them as evidence that Diana Leyfield actually had the

7    qualifications for financial services vertical lead.  You may

8    give this evidence such weight as you feel it deserves, but

9    only for the limited purpose for which it has been offered and

10   for no other purpose.

11           Okay, Mr. Gage.

12           MR. GAGE:  Thank you, your Honor.

13           Jean, can we go to D-70.  And I believe it's page 7.

14   BY MR. GAGE:

15   Q.  Mr. Stevens, working with the hard copy, I want to go to

16   the page where it refers to your interview.  Do you see that?

17   A.  I do.

18   Q.  You wrote:  She had a solid understanding of cloud and

19   touched on some AI use cases.  But I most appreciated how I

20   could see her mind working the angle of business impact with

21   tech as the enabler.  Very smart and easy to interact with.

22           Is that something that you wrote?

23   A.  Yeah, appears to be.

24   Q.  Do you recall what Ms. Leyfield had been doing at Google at

25   this point in time?

NAJVROW3                    Stevens - Direct

1   A.  From what the resume says, I didn't -- she wouldn't have

2   been somebody I would have interacted with pretty much in my

3   role, yeah.

4   Q.  Now, if we look down at the bottom of this page of the

5   exhibit, see where it says "Interview Notes"?

6   A.  Yes, I do.

7   Q.  What exposure have you had to Cloud in your current role?

8   Would that have been a question that you would have talked to

9   her about?

10  A.  Yeah, the equal sign ones are my way of my own notes of

11  questions, yes.

12  Q.  And what follows the lines with an equal sign, what does

13  that reflect?

14  A.  That would have been the notes I was taking about her -- my

15  summary of what she told me in answer to that question.

16          MR. GAGE:  Okay.  And if we could just flip to the

17  next page, Jean.

18  Q.  Take a look at that.  Is that the same for this entire

19  page?

20  A.  Yeah, without the equal sign, sorry, or comments I was

21  taking as she was speaking, yes.

22  Q.  Okay.

23          MR. GAGE:  Your Honor, I have no further questions for

24  Mr. Stevens.

25          THE COURT:  Okay.

1    CROSS-EXAMINATION

2    BY MS. GREENE:

3    Q.  Hello, Mr. Stevens.

4    A.  Hi.

5    Q.  You were only indirectly involved in the decision as to

6    what levels the OCTO directors should come in at; correct?

7    A.  Indirectly?

8    Q.  Is that correct?

9    A.  It would have been proposed to me.  I would have -- I had

10   to approve it.

11   Q.  You had indirect involvement; correct?  You were not the

12   one making the decisions; it was recommended to you --

13   A.  I would have had to approve them, yes.

14   Q.  And at the time there was no ladder for this position;

15   correct?

16   A.  What is "this position"?

17   Q.  The technical director position, the technical solutions

18   consultant.

19   A.  No.  When I hired Will, the first thing we did was started

20   working on the ladders.

21   Q.  So is it your testimony at the time the technical directors

22   were hired in the first wave there was a ladder?

23   A.  Yeah, I certainly believe so, yes.

24   Q.  Did you ask if there was a ladder?

25   A.  It was the first thing that I had Will start working on and

1   actually, yup, we actually borrowed a ladder that was used for

2   the field consultants on the sales side.  We took that as a

3   starting point and then we modified it.

4   Q.  Did you look at the ladder in connection with the hiring of

5   Ms. Rowe and the L9 technical directors?

6   A.  I would have, and then HR would have as well, yeah.

7   Q.  Do you know whether the ladder went up to L9?

8   A.  I don't recall.

9   Q.  Do you recall what factors differentiated an L8 and L9 on

10  that ladder?

11  A.  Yeah, I would have.

12  Q.  What were the factors that differentiated them?

13  A.  Very much like how we just described the past candidates.

14  The Level 9 would have been somebody that just end-to-end

15  understands the full technology stack, the full breadth, the

16  applications, and why somebody would port the cloud and how

17  they would go about it.  Just the complete -- you're looking

18  for the complete package, right, of somebody that's probably

19  not needing any training.

20  Q.  Do you know what factors Mr. Grannis and HR considered with

21  respect to the leveling of these individuals?

22  A.  They would have used the factors that were in the

23  laddering.

24  Q.  And are you saying you know what the details of those

25  factors are, is that what you just --

NAJVROW3                         Stevens - Cross

1   A.  I don't recall the exact details, no.

2   Q.  Can we go to your deposition.  I want to look at 63,

3   beginning at line 7, through 21.

4            (Video played)

5   Q.  Mr. Stevens, was that your testimony about three years ago?

6   A.  Yeah.

7   Q.  Now, in interviewing Ms. Rowe, did you ask her about her

8   C-suite relationships?

9   A.  Yeah.  I don't recall the specific questions that I asked

10  her.  It would have been in the packet.

11  Q.  Did you ask her about her cloud experience?

12  A.  She didn't have any cloud experience.

13  Q.  Did you know that she had actually been on the cloud

14  strategy council at J.P. Morgan Chase?

15  A.  I did not.  I knew the person that led the CIO for all of

16  J.P. Morgan Chase, and that was the person that I actually had

17  met with and she was a part of that.

18  Q.  It's your testimony she was not part of that council?

19  A.  I don't know if she's part of a council.  I'm saying a

20  group of 30 people from J.P. Morgan Chase came and visited

21  Google Cloud and I presented to them at meetings with them and

22  she wasn't part of that.

23  Q.  When was that?

24  A.  Sometime during my early tenure there, before she was at

25  Google.  Probably would have been like 2015, 2016, something

NAJVROW3                          Stevens - Cross

1   like that.

2   Q.  Do you know whether Ms. Rowe was actually in the process

3   and leading the process to migrate J.P. Morgan Chase's risk

4   functions to the cloud at the time you interviewed her?

5   A.  No, I don't know that.

6   Q.  There were other L9s who didn't have cloud experience;

7   correct?

8   A.  Possibly.

9   Q.  Mr. Strong -- VMware was just one component of Cloud,

10  correct, one of the underpinnings of Cloud?

11  A.  No, that's not correct.  VMware built -- had their own

12  clouds.  So they are call vCloud Air.  So they actually sit out

13  and were competing with the Google's AWSs completely

14  end-to-end.

15  Q.  Actually, didn't VMware migrate to the cloud AWS in 2017?

16  A.  I spent a year working with the CEO of VMware.  And we were

17  porting that and we were building a VMware clouding experience

18  on top of GCP, and then later they ended up doing it with AWS.

19  Q.  Okay.  That's what you did with VMware; correct?

20  A.  That's right.  With the engineering team.

21  Q.  And during that time --

22  A.  I led that, yes.

23  Q.  -- Mr. Strong was a field CTO; correct?  He was not the

24  CTO?

25  A.  He was going to be the CTO; correct.

NAJVROW3                        Stevens - Cross

1    Q.  But he never actually became the CTO; correct?

2    A.  I'm not sure.  I think we hired him away before he could

3    have been.

4    Q.  Now, of the L9s and Ms. Ulku that you interviewed, you

5    actually -- she was tied for the highest score that you gave

6    any of the individuals; correct?

7    A.  If you say so.

8    Q.  Now, you talked about Mr. Breslow's work on regulatory

9    work.  And would you agree that regulatory work is critical and

10   crucial to achieving migration to Cloud for the financial

11   services industry?

12   A.  It's one small piece of friction that I can explain more if

13   you would like me to elaborate on what I mean by that.

14   Q.  So is your testimony that Mr. Breslow's role was a smaller

15   role because it was only one piece of the puzzle?

16   A.  No, I'm just saying it's a specific accomplishment that you

17   have to do to work with regulators to help them understand how

18   Cloud meets the regulatory requirements.  So I'm not trying to

19   dismiss it; I'm just saying it's a focus, it's a very focused

20   space.

21   Q.  And were you familiar with Ms. Rowe's work with regulators?

22   A.  At Google or prior?

23   Q.  At Google.

24   A.  Yeah, she -- if I recall, she joined several from OCTO when

25   they -- because I was trying to have -- you need to build

1  relationships with the regulators to help them understand why

2  Cloud works differently, yet it still can pass their regulatory

3  requirements.  So I think she was, along with some other people

4  in OCTO, have -- you know, Australia and other places, had

5  visited some of the regulators to explain -- explain that,

6  yeah.

7  Q.  Wasn't she actually leading those efforts for financial

8  service regulators?

9  A.  Could have been, but I don't know.

10 Q.  And financial service regulators actually requested her by

11 name; correct?

12 A.  I don't know.  If you say so.

13 Q.  You did not interview Ms. Rowe for the financial services

14 vertical lead position; correct?

15 A.  I don't believe so.

16 Q.  But you were supportive of her for that role; correct?

17 A.  I was supportive of her being considered.

18 Q.  Do you know why you weren't interviewed?

19 A.  I had already interviewed her.

20 Q.  You'd interviewed her for the OCTO role; correct?

21 A.  That's right.

22 Q.  But you didn't interview her for the financial services

23 vertical lead role; correct?

24 A.  No, I didn't interview her for that role.

25 Q.  And you were not asked to provide any feedback in

NAJVROW3                          Stevens - Cross

1   connection with that role either; correct?

2   A.  I could have had a conversation with Tariq, but I don't

3   recall.

4   Q.  Do you recall whether you were asked to provide a

5   reference?

6   A.  I think it was clear that I was a reference because I was

7   asking Tariq to consider her.

8   Q.  In interviewing Ms. Leyfield, you weren't doing any sort of

9   comparison of her to Ms. Rowe; correct?

10  A.  No, I wasn't.  They were -- yeah.

11  Q.  And I believe with Ms. Leyfield, your ultimate

12  recommendation was leaning higher; correct?

13  A.  That's right.

14  Q.  And above that is higher; is that right?

15  A.  That's right.

16  Q.  And then strong higher?

17  A.  That's right.

18  Q.  Is there something above strong higher?

19  A.  It's been a while for me.  But leaning higher often, just

20  for clarification, means you'll see -- like, you can see --

21  like, when I do leaning higher, leaning higher might mean

22  because you don't fully understand how they plan to use the

23  person.  So when I say leaning higher, I'll measure them on a

24  dimension that I understand, and then there might be some

25  unknowns that I don't know about that particular role.  And so

NAJVROW3                         Stevens - Redirect

1    I'll say leaning higher based on, you know, this other aspect.

2    Q.  You didn't do anything to document what your basis or

3    belief was for the levels that the men received, the L9 men

4    received at the time they were being hired, did you?

5    A.  I don't think I understand the question.

6            Can you restate it?

7    Q.  Did you do any sort of leveling justification or leveling

8    explanation for why those men should be brought in as an L9?

9    A.  Other than reviewing packets.  I mean, you look at the

10   people that interviewed them, you look at the referrals, you

11   look at what they've done.  It's the whole complete package

12   that you see, so I would have reviewed that.

13   Q.  But you weren't reviewing that against any sort of leveling

14   guide; correct?

15   A.  I believe we had a leveling guide for that.  You're saying

16   that maybe it didn't go to Level 9, but I don't recall that.

17   Q.  You were never interviewed by ER in connection with this

18   matter, were you?

19   A.  ER.

20   Q.  Employee relations.

21   A.  Related to this, no.

22           MS. GREENE:  No further questions.

23           MR. GAGE:  Just a few questions, Judge.

24   REDIRECT EXAMINATION

25   BY MR. GAGE:

NAJVROW3                    Stevens - Redirect

1    Q.  Mr. Stevens, the deposition that Ms. Greene played was

2    taken -- you gave your deposition in November of 2020; correct?

3    A.  Yup.

4    Q.  That was almost three years ago?

5    A.  Right.

6    Q.  At the time you gave your deposition, how long had you been

7    gone from Google?

8    A.  I want to say May of 2019, so close to a year and a half

9    probably.

10   Q.  Ms. Greene asked you some questions about a ladder and you

11   referenced a TSC ladder, I think you referenced.

12   A.  Right.

13   Q.  Did it take some time for Mr. Grannis to build out the

14   ladder for the technical director role?

15   A.  Possibly.

16   Q.  Whose decision was it to select the financial services

17   vertical lead?

18   A.  Tariq and probably Diane on top of that, yeah.

19   Q.  It wasn't your decision, was it?

20   A.  No.

21   Q.  Ms. Greene asked you why you didn't interview Ms. Rowe for

22   the financial services vertical lead position, and I think you

23   said you had already interviewed her, right?

24   A.  Right.

25   Q.  Was it common for someone like yourself not to interview

NAJVROW3                          Lawrence - Direct

1  someone a second time, even if they are being considered for

2  another role?

3  A.   I can't think of a time in my entire career where I've

4  interviewed somebody twice, even as they moved in different

5  roles.

6         MR. GAGE:  No further questions, your Honor.

7         THE COURT:  Okay.

8         MS. GREENE:  Nothing more.

9         THE COURT:  Okay.

10        Mr. Stevens, you're excused with our thanks.

11        (Witness excused)

12        MS. TOMEZSKO:  Your Honor, Google calls Melissa

13  Lawrence.

14   MELISSA LAWRENCE,

15      called as a witness by the Defendant,

16      having been duly sworn, testified as follows:

17        MS. TOMEZSKO:  May I proceed, your Honor?

18        THE COURT:  You may.

19  DIRECT EXAMINATION

20  BY MS. TOMEZSKO:

21  Q.   Good morning, Ms. Lawrence.

22  A.   Hello.

23        Just for everyone, I wear assistive hearing devices in

24  both ears.  So if everyone could speak up, I'd really

25  appreciate it.

NAJVROW3                        Lawrence - Direct

Q.   I will project.

A.   Thank you.

Q.   Can you briefly describe for the jury your background at Google and the various roles that you have held in your time there?

A.   Absolutely.  I joined Google in 2011.  The company that I was the HR director for was acquired by Google, a company called ITA Software.  I did HR for the acquired client group for about two years.  And then moved to the M&A HR team.  Was on the M&A HR team for about three years, mostly helping other companies that were being acquired navigate Google.

And in 2016, I moved to Google Cloud Platform, where I was an HR business partner primarily for two individuals:  Brad Calder, who led an engineering group for GCP; and a gentleman named Brian Stevens, who you just met previously, who led product management for Google Cloud Platform.  So I was the HR partner for those two gentlemen and then subsequently, the office of the CTO that Brian and a gentleman named Will Grannis and I cofounded in 2017, I think.  And then -- so I was with that group until about two -- it's been until October of 2021.

And at that time I switched and I became a chief of staff and left the HR profession.  And today I am the chief of staff for a group that's called ML Systems and Cloud AI, which essentially does all of the back-end ML infrastructure for Google Cloud Platform.

NAJVROW3                         Lawrence - Direct

1   Q.  Thank you, Ms. Lawrence.

2           Now, you had mentioned you were working with both

3   Brian Stevens and Will Grannis.  You said you were co-founder

4   of the office of the CTO; is that right?

5   A.  That is correct.

6   Q.  And is "OCTO" another term used to refer to the office of

7   the CTO as it existed in Google Cloud?

8   A.  Yes.  We most commonly refer to it as OCTO; correct.

9   Q.  Can you just give a very brief description of the kind of

10  team you were trying to build when you were a co-founder with

11  those two gentlemen for OCTO?

12  A.  We were trying to build a team that was as diverse as the

13  client base that we were aspiring to build at the time.  Google

14  Cloud Platform was very nascent in 2016/2017.  OCTO was really

15  founded to be what we call a bridge function, to be a bridge

16  between engineering and sales, and support our top customers

17  and be what we call trusted advisers to those top customers,

18  usually the CTO of those top customers.  So that was really the

19  vision of trying to bring people from all different backgrounds

20  and domain specialties into the office of the CTO to service

21  those top customers.

22  Q.  Do you recall who the first external hire into OCTO was?

23  A.  Yes.  His name was Evren, and I always screw up his last

24  name.  It's Eryurek, I think.

25  Q.  What do you recall about Mr. Eryurek and his candidacy for

NAJVROW3                        Lawrence - Direct

1    the technical director role in OCTO?

2    A.  I remember that Evren -- we were really excited about

3    Evren.  He had led a very large team at General Electric, I

4    believe.  And we really felt like he was like a great first

5    candidate for OCTO that had the customer-facing skills, but

6    also the deep technical background, which is really what we

7    were looking for.

8    Q.  I'd like to show you a document, and this has been marked

9    as Defendant's 42.

10             MS. TOMEZSKO:  Can you please pull that up, Jean.

11   Q.  Ms. Lawrence, do you recognize this document?

12   A.  I'm not sure I've ever seen it, but it is what we call a

13   hiring dossier for a candidate, yes.

14   Q.  And I'd like to direct your attention to the date on the

15   top upper left corner here.  There you go.

16   A.  Yeah.

17   Q.  Now, I think you said you had founded the OCTO function in

18   2017.  If Mr. Eryurek's packet is dated September 2016, does

19   that refresh your recollection as to when you were --

20   A.  Yes.  I wasn't sure.  It's been a long time.  I wasn't sure

21   if we founded it in 2016 or 2017, but this clarifies my memory.

22   Thank you.

23   Q.  Yup.

24             MS. TOMEZSKO:  Can we flip to the third page of this

25   document, Jean.

1    Q.  Ms. Lawrence, I'd like to direct your attention to an email

2    on the bottom -- or what appears to be an email dated Thursday,

3    September 22nd, 2016.  I'll make that bigger for you.

4    A.  Great.  That's magic.

5    Q.  Thank Jean.

6          Ms. Lawrence, do you recognize this as an email from

7    you on or around September 22nd, 2016?

8    A.  I don't remember it, but I recognize that it comes from me,

9    yes.

10   Q.  And it's entitled to "Hi Becky."  Do you know who Becky

11   would refer to there?

12   A.  Yes, so Becky Busick was the HR partner for Diane Greene.

13   So Diane Greene was Brian Steven's boss at the time and was the

14   CEO of Google Cloud.

15   Q.  If I could direct your attention to the second paragraph of

16   this communication.  It says:  Brian leveled him -- is the

17   "him" there referring to Mr. Eryurek?

18   A.  Yes.

19   Q.  Brian leveled him as an L9 and we are using the TSC ladder.

20   The only job code at L9 is a director code.  There is an L8 IC

21   principal, but no corresponding L9 IC code.  Do you see that?

22   A.  That's correct.  I see it.

23   Q.  What does "IC" refer to?

24   A.  IC refers to individual contributor.  All of the office of

25   the CTO technical directors that we were hiring were going to

NAJVROW3                      Lawrence - Direct

1    be individual contributors in the roles that they were playing

2    with OCTO.

3    Q.  And further down you say:  Can you please confirm that you

4    are okay with us using the director job code for an IC for now

5    and we will either, A, create an L9 IC code; or B, create a new

6    ladder.  Do you see that?

7    A.  Yes, I do.

8    Q.  What exactly were you referring to or asking Becky about

9    there?

10   A.  Yeah.  So the director title refers to someone who is

11   managing people.  So if we were hiring an individual

12   contributor, typically, we don't call these people directors;

13   we call them an L8 is a principal, in this case technical

14   solutions consultant; an L9 would be a distinguished technical

15   solutions consultant; and then an L10 would be a VP.

16          So what I'm asking Becky or -- I'm really telling

17   Becky, to be honest, but what I'm asking Becky is it would --

18   is it okay if we create an L9 IC job code, which we

19   subsequently did at some point.  And the job code distinguished

20   technical solutions engineer -- technical solutions consultant

21   was created.

22   Q.  And that job code that you created, does that refer --

23   correspond to a Level 9 technical director in OCTO?

24   A.  That is correct.

25   Q.  Do I hear you correctly that you created a new job code for

NAJVROW3                           Lawrence - Direct

1   Level 9 technical directors in OCTO?

2   A.  That is correct.  Yup.

3         MS. TOMEZSKO:  And we can take this down.

4   A.  I just want to clarify that the technical solution

5   consultant job family is used throughout Google; it's not

6   exclusively used in the office of the CTO.

7         There were discussions — the part B, create a new job

8   ladder, there were discussions about do we need a specific job

9   ladder for the office of the CTO or were the job

10  responsibilities substantially the same that we could use in

11  the existing job code, which was -- job family, which was

12  preferred by everyone at Google.  And so that's what we did is

13  we created a IC job code for L9 on the TSC ladder.

14  Q.  Got it.  Thank you for the clarification.

15  A.  Sure.

16        MS. TOMEZSKO:  If we could take that document down.

17        I'd like to now pull up Plaintiff's Exhibit 8, please.

18  Q.  Ms. Lawrence, take a look at this document.  My question is

19  going to be, do you recognize it?

20  A.  I do recognize it, yes.

21  Q.  And what is it?

22  A.  This is an email to the office of the CTO Googlers who were

23  going through the performance management cycle in the fall of

24  2017.

25  Q.  And the subject line that we see, "Re Preparing for Perf,"

1    what is "perf"?

2    A.   So perf is our performance management process.  At the time

3    of this email, which is 2017, we had a process by which

4    Googlers wrote a self-assessment.  Then we solicited -- they --

5    they, the Googlers, solicited peer feedback, three to five

6    peers.  And then a manager wrote an additional assessment after

7    the Googler wrote their assessment, and the peer feedback was

8    submitted.

9    Q.   And to be clear, when you refer to a Googler, is that a

10   Google employee?

11   A.   Yes, that is.  Sorry.

12   Q.   No apology necessary.

13        What was your intent or purpose in sending this

14   communication to the recipients on this email?

15   A.   Looking through, it says:  One of you asked, but for the

16   benefit of all.  That indicates to me -- I don't remember, but

17   that indicates to me that it was brought up in a team meeting

18   and I was following up.  And what I was doing was providing the

19   OCTOs on this email reference material for their

20   self-assessment so that they could use that -- that benchmark

21   to write their self-assessments.

22   Q.   The reference material that you just spoke about, how did

23   you select which reference material to send them?

24   A.   So backstory.  The technical solution consultant job family

25   is primarily used in the sales organization.  And the sales

NAJVROW3                     Lawrence - Direct

organization, instead of using role descriptions by level, they

typically use what they call GBO or global business

organization attributes.  And so there wasn't a lot of

documentation around what the expectations by level of a

technical solutions consultant at this time.

So what I was trying to do was provide other material

that would help the individuals write their self-assessment.

So I included the job description or part of the job

description that was pasted below, and I also used a general

engineering level guide that was general expectations for

anyone in an engineering job at the different levels.

Q.  And the technical director role in OCTO, as far as you

understood it, was that an engineering job?

A.  Yes.  In the way it was being performed in office of the

CTO, yes, it was.

Q.  And I'd like to direct your attention to the first

paragraph, the smaller text, if we could just make that a bit

bigger.  Thank you.

And you say:  For general leveling, this is the best

guide available for generic engineering.  "This," it appears to

be in a different color and underlined.  Is that a hyperlink?

A.  Yes, that is a hyperlink.

Q.  Do you recall what document that hyperlinked to?

A.  Yes.  It hyperlinked to a document that specified

expectations by level for general engineering roles.

1         MS. TOMEZSKO:  I'd like to pull up D-38, please.

2    Defendant's Exhibit 38.

3    Q.  Ms. Lawrence, is this a version of the engineering leveling

4    guide that you just referred to in your email?

5    A.  Yes, it is.  This is substantially the same as the document

6    that I shared in 2017.

7    Q.  And up top it says:  "People ops verified as official

8    documentation for 2020 perf."  Do you see that?

9    A.  Yes, I do.

10   Q.  Is it typical that a document like this would be stamped

11   with a verified official documentation with a year?

12   A.  Yes.  So in -- I don't know exactly when it started, but

13   2019/2020, Google implemented a self-service portal called My

14   Google.  And in the process of creating that self-service

15   portal, the people of team went through and verified documents

16   that were sort of official documents.

17        I don't know if any one of you have used Google

18   documents, but you can very easily create, you know, copies and

19   new versions.  So they wanted to create sort of what is the

20   canonical version of this engineering level guide.  So that's

21   what that indicates to me is that this was verified as a sort

22   of people ops or what they call HR at Google document for the

23   2020 perf cycle.

24   Q.  And I think you just testified that it was substantially

25   same as the one that you shared in the email that we were

1    looking at previously.  Did I get that right?

2    A.  That is correct.

3    Q.  Okay.  And when you say "substantially same," are you

4    referring to the substance of the document?

5    A.  Yeah.  I mean, I look through it -- my guess is that the

6    document is actually the same as the document I linked in 2017.

7    And it was just verified in 2020.  But from everything I

8    remember, it looks the same as the document that I share.

9           MS. TOMEZSKO:  I'd like to just quickly turn to the

10   second page of this document and focus on Level 8 and Level 9

11   at the bottom.  And unfortunately, it is broken up by one of

12   those stamps.

13   Q.  But Ms. Lawrence, is the substance of the expectations for

14   a Level 8 and a Level 9 here, is that substantially similar to

15   the expectations of a Level 8 and a Level 9 as you understood

16   them in the 2017 time frame?

17   A.  Yes, they are.

18   Q.  Is there a difference between the expectations of a Level 8

19   and a Level 9, at least as articulated in this document?

20   A.  Absolutely.  I mean, you know, when we look at level, we

21   think about, like, the scope of the work that's being done, the

22   impact, the span of the impact that the person is having.

23           And when you look at, like, L9, for example, it talks

24   about influencing a function or industry; whereas in terms of

25   L8, it has, you know, a different expectation.  They are both

1   very -- they are both executive level positions.  They are both

2   extremely hard to get, but they are substantially different

3   between -- there are substantial differences between L8 and L9.

4   Q.  Now, were Level 8 and Level 9 technical directors in OCTO,

5   was their performance assessed against the expectations that

6   you see here in this document?

7   A.  Yes.  In the 2017 time frame, all the documentation we had

8   was this general leveling guide, the GBO attributes, which were

9   more on the soft skill side.  Those were the two documents that

10  we had for expectations.

11  Q.  And I just want the record to be clear on this point.  Were

12  the Level 8 technical directors in OCTO assessed against the

13  expectations you see in the Level 8 row on this document?

14  A.  Yes, they were, in addition to the GBO attributes, which

15  had additional documentation.

16  Q.  And the Level 9 technical directors in OCTO, were they

17  assessed against the expectations that you see here in the row

18  for a Level 9, in addition to the GBO attributes?

19  A.  That is correct.

20  Q.  And this is what you communicated to the technical

21  directors in OCTO when you sent them that email that we were

22  just looking at?

23  A.  That is correct.

24          MS. TOMEZSKO:  We can take this document down.

25  Q.  Ms. Lawrence, do you recall there being a time in late

NAJVROW3                          Lawrence - Direct

```
1    2017, when Ms. Rowe came to you with some questions about her
2    level upon hire?
3    A.  I do remember that, yes.
4    Q.  What do you recall about that conversation?
5    A.  I recall that it was over videoconference.  She was in New
6    York here, and I was in Sunnyvale at the time, I believe.  And
7    we had a conversation that, in my memory, centered on two
8    things:  One, she wanted to understand if there was a process
9    to revisit her level -- the hiring decision on her level.  And
10   two, she wanted to express that she was unhappy with her
11   compensation and concern that it wouldn't maintain her current
12   standard of living.
13   Q.  Now, Ms. Rowe earlier testified in this trial that during
14   this conversation with you, she did not raise any concerns that
15   her gender played a role in her initial leveling upon hire.  Is
16   that consistent with your memory of this conversation?
17   A.  That is consistent with my memory, yes.
18   Q.  Had she raised gender concerns, would you have taken
19   additional steps at that point?
20   A.  Yes, I would have.
21   Q.  And what would you have done?
22   A.  I would have looped in our employee relations team.  They
23   are required to be involved if there are possible issues of
24   harassment, discrimination, and retaliation.
25   Q.  And I believe you also referenced she was, I think you
```

said, concerned about her compensation or you possibly phrased

it differently.  Did she say what in particular she was

concerned about?

A.  My memory is that she was concerned that the subsequent --

that her -- the subsequent years of her offer, meaning the

years after year one, there was a substantial dip in her

compensation because of how it was structured.  And she was

concerned about that.

Q.  Do you recall whether she raised any concerns about a

company-wide change that year in terms of the equity refresh

grants?

A.  I don't remember that.  But in preparing for this trial, I

did read the emails.  And that -- that came back to me, in that

they made a change for that compensation year, in that

Googlers, individuals who were hired in that year, were not

eligible for an equity refresh.

        Because Ulku was hired in an executive position, a

large portion of her compensation was equity compensation, and

so she was concerned about -- I believe she referred to it as

she wanted to be made whole, meaning she wanted her

compensation to be consistent with her year one compensation

and was concerned that these changes would impact that ability

to make her flat or whole.

Q.  The change that you just described with equity refresh

grant, can you just briefly tell the jury what an equity

NAJVROW3                        Lawrence - Direct

1    refresh grant is?

2    A.   Sure.  An equity refresh grant is part of our -- we have

3    sort of a three -- three -- there's three parts to our

4    compensation.  There's your base salary, there's a bonus that

5    is awarded backward-looking once a year, and there's an equity

6    refresh that is forward-looking that's mostly about -- it's

7    mostly about potential on -- of your ability to do your job.

8    And equity refreshes can vary from zero to quite high numbers,

9    mostly based on what the rating that you get in the performance

10   management cycle, meaning it's a -- it's a merit award.  It

11   is -- nothing is guaranteed.

12            THE COURT:  Why is it called a refresh?  Why is it a

13   refresh?

14            THE WITNESS:  It's a refresh because it's in addition

15   to the grant that you were given at hire.

16            THE COURT:  Thank you.

17   BY MS. TOMEZSKO:

18   Q.   So is this -- just to clarify the point, is this a second

19   grant then?

20   A.   It's a separate grant, yes.  If a Googler is performing at

21   or above expectations, at that time they could expect an equity

22   refresh once a year in the compensation cycle.

23   Q.   And now in 2017, there was a policy change that people who

24   were hired during a particular part of the year in 2017 would

25   not be eligible to be modeled for an equity refresh grant, do I

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

1  have that right?

2  A.  Yes.  That was a controversial decision at the time, and

3  certainly there was a lot of consternation about it.  But yes,

4  the decision was that they could be given equity, but they

5  would not be modeled for equity.

6         And what that means practically is if you're a manager

7  and you have two Googlers, one who doesn't get modeled for

8  equity and one that does, in order to give both of them equity,

9  you have to take from one person and give it to another.  And

10 so for the most part, the practice of managers who had Googlers

11 who were not modeled for compensation was to not -- not to give

12 them compensation -- not to give them equity in their

13 compensation.

14         (Continued on next page)

15

16

17

18

19

20

21

22

23

24

25

NAJHRow4                      Lawrence - Direct

1    BY MS. TOMEZSKO:

2    Q.  Now, you said you could get equity, but you wouldn't be

3    modeled for it.  Do you know whether Ms. Rowe got an equity

4    grant that year?

5    A.  I do think that she got an equity grant based on her

6    performance rating.

7    Q.  Do you know who would have made the decision to grant her

8    that equity that year?

9    A.  My memory is that the decision was —— it was a Google

10   Cloud-wide decision that was made by Diane Greene and her HR

11   partner, Becky Bucich.

12   Q.  Going back to the conversation that you had with Ms. Rowe

13   at the end of 2017 where she raised these issues to you, did

14   you do anything in response?

15   A.  Yeah, I certainly did.  I reached out to a couple of my HR

16   colleagues and I think one of my staffing colleagues.  It was a

17   long time ago, but I definitely remember reaching out and just

18   asking, have you ever —— have you ever re-leveled someone

19   post-hire?  Is there any process for re-leveling or revisiting

20   a hiring decision?  Everyone —— I sort of knew that there

21   wasn't, but I wanted to validate that my understanding was

22   accurate.  Google's a big company, so I just wanted to validate

23   that.  And everyone came back that there's no process to

24   revisit a hiring decision.

25           I also talked to Will Grannis, who was the manager of

1  the office of the CTO, and just talked to him about did he have

2  any — did he have any doubts?  Like, what was his — what was

3  his perspective?  I was not involved in the hiring decision, so

4  it was, you know, really him and the — the staffing leader at

5  the time that did the leveling.  And he was emphatic that she

6  was leveled correctly, and so that was the extent of my

7  investigation.

8  Q.  Did you communicate those results that you had found in

9  your investigation, did you communicate those to Ms. Rowe?

10 A.  I believe I did, yes.

11 Q.  Do you recall how close in time after you — you know, she

12 raised these concerns with you you communicated with her the

13 results of your investigation?

14 A.  I don't remember the date, but I — my understanding — my

15 memory is that I communicated before we went out on the

16 Christmas holiday.  So that would be somewhere between the time

17 that she and I met and mid-December.

18 Q.  I want to quickly look at another document, and that's

19 Plaintiff's Exhibit 26.

20      Can we pull that one up.

21      Ms. Lawrence, do you recognize this document?

22 A.  I do.

23 Q.  I'd like to just blow up the communication on June 14,

24 2018, at 11:25 a.m.

25      Ms. Lawrence, do you recall what it was you were

1  responding to here in this email?  If it helps, we can look at

2  the email immediately beneath this if it helps contextualize.

3  A.  Can I look at that?

4  Q.  Sure.

5       Jean, can you pull that up.

6  A.  OK.  Yes.

7  Q.  Now, going back to the June 14, 11:25 a.m., do you now have

8  a context to what you were responding to here?

9  A.  Yeah.  It looks like I was sending a note to Ulku.  It says

10  I saw her briefly virtually.  Maybe I saw her in a Team

11  meeting.  I offered to chat with her or we can connect next

12  week at the off-site.  That would have been an OCTO off-site

13  that was in the offing.  And I basically — you know, I just

14  was talking to her directly.  That she was being offered a —

15  or she was being offered a role in the — I think what's called

16  industries — industry solutions team that Tariq Shaukat was

17  running, and I just encouraged her to really, like, lean in

18  and, you know, take best — take best advantage of the role

19  that she was being given.

20  Q.  Now, at the bottom of this email, I just want to focus on a

21  sentence that says, "I do want to flag that if you were to be

22  selected for this role, you would do it at your current level.

23  We do not uplevel candidates when taking on a new role."

24       When you wrote "selected for this role," are you

25  referring to a particular role in Tariq Shaukat's organization?

NAJHRow4                          Lawrence - Direct

A.   Yes.  The best of my knowledge, Ulku wanted to be

considered for a VP role that would head up the financial

services vertical in Tariq's organization.  So when I'm saying

I want to flag that if you were selected for this role, that's

the role that I was referring to, and then I went on to say you

would do it at your current level.

Q.   Why is that?  Why would she do that role at her current

level?

A.   So at Google, if you — if you're in role A and you take

role B, even if role B is a different level, a higher level,

you don't get re-leveled upon transfer.  You would take on the,

say, Level 9 role or the VP role as a Level 8.

         And I go on to say that if you took on a role that had

increased scope, had a bigger — maybe had a bigger

organization or a bigger opportunity for impact, you could get

promoted for doing that role, but at that time there was no

sort of transfer with promotion or with level change.  You

would take the new role at your current level.

Q.   And would you be automatically promoted to a higher level

once you took the new role?

A.   To my knowledge, there's no such thing as an automatic

promotion.  You would still need to go through the technical

promotion process, but certainly having a role with the

increased scope and impact would make it easier for the

committee to approve a promotion.

1    Q.  One last document, Ms. Lawrence.

2              If we could quickly look at Plaintiff's Exhibit 43,

3    please.

4              Now, Ms. Lawrence, this is two pages of an email, so

5    let this sit up for a second and look at this one.

6              Do you recognize this document?

7    A.  I do, yes.

8    Q.  Is this —— Jean, can you go back to the second page.

9              This, what we're looking at here, is this an email

10   from Ms. Rowe to you and Kevin Lucas in and around August 28,

11   2018?

12   A.  I believe so, yes.

13   Q.  If you could just look at the substance of the document in

14   front of you, do you recall what it was that Ms. Rowe was

15   communicating to you and plussing in Kevin, Kevin Lucas, as an

16   FYI?

17   A.  So Kevin Lucas was Tariq —— I always get his name wrong ——

18   Shaukat's HR partner.  The email was to her current HR partner

19   and me, as her former HR partner with OCTO.  And what she's

20   saying is she's in the process of interviewing for that role

21   that I just referred to, the head of financial services role

22   for Google Cloud, and she's indeed raising that —— this issue

23   that I just talked about where she was hired in as an L8.  And

24   to my memory, this is the first time that she referred to her

25   male peers or referred to gender as part of the comparison.  So

1   that was —— that's sort of the bulk of the email.

2   Q.  Is it your understanding that there was any response to

3   this email from Ms. Rowe?

4         Let me clarify.  I don't mean an actual email

5   response.  Were there any steps taken to address this concern

6   raised by Ms. Rowe?

7   A.  Thanks for clarifying.

8         Yes, so Kevin Lucas, her current HR partner, took ——

9   took the steps.  When she used the term "male peers," that, as

10  an HR partner, is a flag as something you need to look into.

11  And so he —— he really was driving the process because I was

12  the former HR partner, and he looked into and, I believe,

13  partnered with employee relations at that point.

14  Q.  Now, quickly, I just want to focus on a sentence right in

15  the middle of this email.  It says, "I later learned that my

16  male peers were all hired at Level 9."

17        Do you see that?

18  A.  Yes.

19  Q.  Was that your understanding as well, that all Ms. Rowe's

20  male peers at this point had been hired at Level 9?

21  A.  No, that was —— it was not.  There were —— I don't remember

22  the exact numbers, but there were plenty of male peers that

23  were hired at at least L8 and maybe even at other levels.  I

24  don't think so.  I think primarily Googlers —— individuals that

25  were hired from the outside were hired in as Level 8.  We had

1   some transfers into OCTO that were L6 or L7.

2   Q.  And, Ms. Lawrence, do you know a gentleman by the name of

3   Stuart Vardaman?

4   A.  I don't know that name.

5   Q.  So is it fair to say, then, that you never had a

6   conversation with someone named Stuart Vardaman about

7   Ms. Rowe's concerns that she's raising here?

8   A.  No, I don't think so.

9   Q.  No, you don't think so that it's not true, or, no, you

10  don't think ——

11  A.  Oh, sorry.  To the best of my memory, I never had a

12  conversation with Stuart.

13  Q.  OK.  Thank you for the clarification.

14        I have no further questions.

15  A.  Oh, sorry.

16  CROSS-EXAMINATION

17  BY MS. GREENE:

18  Q.  Just a couple of quick questions for you.

19        The engineering leveling guide from 2020 that we

20  looked at ——

21  A.  Yep.

22  Q.  —— do you know, sitting here today, whether Mr. Grannis

23  reviewed any version of that in connection with doing his

24  performance evaluations in 2017?

25  A.  I can't say for certain, but I believe that we actually

1   pulled up the engineering level guide in the calibration

2   discussion with Brian Stevens and Will Grannis.  So whether he

3   looked at it or not, I can't say, but it was an artifact that

4   we use as part of the calibration process.

5   Q.  Do you know whether the technical directors at L8 or L9

6   were ever specifically told which of the L8/L9 —— or what they

7   were being evaluated against other than that email you sent

8   them?

9   A.  No, I can't say what went on in individual maybe one-on-one

10  conversations with their manager.

11  Q.  Do you know whether the technical managers all even knew

12  what their levels were?

13  A.  Yes, I think the —— in engineering, the level guides are

14  generally public.  It's different in sales or HR where people

15  don't usually know the levels, but it was pretty common

16  knowledge, in my understanding, in engineering.  And there's

17  actually a go link, go/eng levels, where you could look up what

18  someone's level was if they were in an engineering function.

19  Q.  You said she was unhappy with her compensation.  That was

20  one of the things that you talked about.  Is it considered not

21  Googly to fight for compensation?

22          MS. TOMEZSKO:  Objection.

23          THE COURT:  Overruled.

24          THE WITNESS:  May I answer?

25          THE COURT:  Yes.

NAJHRow4                    Lawrence - Cross

1   A.   OK.  No, I think — look, we don't work for free.  Like, we

2   are all paid.  And I think that Googlers are actually

3   encouraged to talk about compensation and any concerns that

4   they would have, primarily with their manager who makes those

5   compensation decisions, but it wouldn't be — I've had many

6   conversations about compensation with other Googlers in my time

7   in HR.

8   Q.   Two more questions.  When Ms. Rowe raised her concern to

9   you back in late 2017, early 2018, besides your HR colleagues

10  and Mr. Grannis, did you speak to anybody else at that time?

11  A.   No, I don't remember having any other conversations.

12  Q.   And with respect to promotion, if someone is promoted, do

13  they move up one level, or do you see situations where they're

14  promoted two levels at one moment in time?

15  A.   I have never seen anyone in my almost 13 years at Google

16  promoted more than one level.

17             MS. GREENE:  No further questions.

18             MS. TOMEZSKO:  I have no questions for the witness.

19             THE COURT:  OK.  Ms. Lawrence, you're excused.

20             THE WITNESS:  Thank you.

21             THE COURT:  Thank you.

22             (Witness excused)

23             MS. TOMEZSKO:  Your Honor, Google calls Kirsten

24  Kliphouse.

25             MR. GAGE:  Your Honor, may I ask, what time did you

NAJHRow4                              Kliphouse – Direct

1    plan to break for lunch?

2                 THE COURT:  I was thinking of 12:45, 12:50.

3                 MR. GAGE:  OK.

4    KIRSTEN MARIE KLIPHOUSE,

5         called as a witness by the Defendant,

6         having been duly sworn, testified as follows:

7                 MS. TOMEZSKO:  May I proceed, your Honor?

8                 THE COURT:  You may.

9    DIRECT EXAMINATION

10   BY MS. TOMEZSKO:

11   Q.  Good afternoon, Ms. Kliphouse.  I think it's afternoon.

12   Good afternoon, Ms. Kliphouse.

13              Can you explain for the jury, please, what your roles

14   that you held at Google, what those were and what they

15   entailed?

16   A.  Yes.  I was hired at Google to be the leader of our

17   go-to-market team, which included sales and partners and

18   marketing, etc., which was basically to build a sales

19   organization for Google cloud.  And I was hired in as a vice

20   president originally, and then I was promoted to the president

21   of the go-to-market organization.

22   Q.  Are you aware of what level corresponds to the title of

23   president within Google Cloud?

24   A.  I am aware, yes.

25   Q.  Can you tell us what level that is.

```
 1   A.  It's above a Level 10.  There's a category called "above a
 2   Level 10."
 3   Q.  Great.  And in the 2020 time frame in your role that you
 4   just described, were you hiring for a role on your team known
 5   as the vice president financial services sales role?
 6   A.  Yes, I was.
 7   Q.  I'd like to just quickly show you a document,
 8   Ms. Kliphouse, and that's Defendant's 75.
 9           Can we just pull that up, please.
10           Ms. Kliphouse, we could page through this document so
11   you could see its full contents, but my question to you is
12   going to be do you recognize this document?
13   A.  Yes, I do.
14   Q.  Can you describe what this document is.
15   A.  It's a document we put together to help with the sale of —
16   like in this case, the hiring manager like myself and a
17   recruiting leader, to be able to put together a description to
18   be able to go out to market and look at talent in the market so
19   you know what you're hiring against, basically.  So it's like a
20   job description with qualifications against it.
21   Q.  The content of this document, does it accurately reflect
22   the scope and the responsibilities of the role that you just
23   described you were trying to fill?
24   A.  Yes, it does.
25   Q.  Have you previously hired someone to fill this position on
```

1    your team prior to the 2020 time frame?

2    A.  Yes, I did.

3    Q.  Who did you hire to fill that position?

4    A.  I hired Phil Moyer.  He was hired in to be my vice

5    president of financial services at that time, which was an

6    industry/sales role.

7    Q.  Do you recall Mr. Moyer's background prior to coming to

8    Google?

9    A.  Yes.  Phil was hired — his background came — he was doing

10   a similar role at Amazon, running their sales organization,

11   leading the team, going — working with financial services

12   institutions.  So his job was to sell Amazon services to

13   financial services institutions, build the relationships, and

14   obviously sell to them.

15          Prior to that, running the organization, Phil actually

16   was the CEO of EDGAR Online, which is a leading firm that's

17   used for ID information for the SEC and other things.  He was

18   the CEO of that organization.  And previous to that, he had

19   multiple roles with venture firms, and he worked at Microsoft

20   previously and other companies.

21   Q.  Now, Ms. Kliphouse, if you had previously hired Mr. Moyer

22   to perform the vice president financial service sales role, why

23   was it you were looking for another person for that role in

24   2020?

25   A.  So I hired Phil into the role, and as he was coming,

1    onboarding into Google, he ended up having a dispute with

2    Amazon about his noncompete.  So he basically had to get

3    sidelined while that was being worked out with Amazon.  So the

4    role was basically left open until they could decide —— go

5    through their suit and decide what they were going to do.

6    Q.  Was there any particular urgency for you to fill this role

7    given Mr. Moyer's situation?

8    A.  So as we —— Phil was brought on originally to start that

9    role.  We, Google, was behind, I would say, in financial

10   services.  We were an up-and-comer.  We weren't, like, the

11   leading cloud provider.  We wanted to, obviously, have better

12   relationships with the large financial services companies, and

13   so we wanted to have a quick start into that market.  And

14   people that had kind of been there, done that, had the

15   relationships, and Phil fit that very well.

16           As the timeline went out with Amazon and the

17   negotiation was going back and forth, it just kept getting

18   extended, and so at that point there was a decision made that

19   we needed to absolutely hire in with urgency because we didn't

20   want to go a whole nother year, or how long it would take, we

21   weren't sure.  We wanted to hire in someone that had similar

22   qualifications and capabilities into that role to help us lead

23   Google's role in financial services.

24   Q.  And did you eventually hire someone into that role?

25   A.  I did.

1   Q.   Who did you hire into that role?

2   A.   I hired Yolande Piazza.

3   Q.   I'd like to show you another document, Ms. Kliphouse, and

4   this has been marked as Defendant's 79.

5          Jean, if we could pull that up.  I just want to flip

6   to the third page of this document.  And if we could make the

7   area around the three purple boxes — there we go.

8          MS. GREENE:  Your Honor, I believe this document, as

9   well as the other hiring packets that were reviewed previously

10  today, are all subject to the same limiting instruction.

11         MS. TOMEZSKO:  I would agree, your Honor.

12         THE COURT:  Are we going to see these in succession

13  now?

14         MS. TOMEZSKO:  This is the only hiring packet I intend

15  to ask Ms. Kliphouse about, so it's just this one.

16         THE COURT:  So you are — I don't see the exhibit

17  number.

18         MS. TOMEZSKO:  It is D79.

19         THE COURT:  So, members of the jury, you are about to

20  see Exhibit D79.  This again is a packet of hiring-related

21  materials, and you are not to consider them for their truth.

22  You may only consider them as evidence that the candidates ——

23  sorry.  You may not consider them as evidence that the

24  candidates actually had the qualifications for this position.

25  So you can give the evidence the weight you think it deserves,

1  but only for the limited purpose for which it has been offered,

2  which is its effect on anyone who reviewed the materials.

3          MS. TOMEZSKO:  Thank you, your Honor.

4  Q.  Ms. Kliphouse, I'd like to direct your attention to the

5  blowup on the screen right now.  Do you see your name here?

6  A.  Yes, I do.

7  Q.  And then next to it says "phone" and then next to that it

8  says "Feb 6, 2020."  Do you see that?

9  A.  Yes.

10 Q.  What does that indicate to you?

11 A.  So I had a conversation with Yolande on the phone on

12 February the 6th.

13 Q.  And I'd like to just look briefly at the bottom of this

14 page and blow up —— there you go.

15          Ms. Kliphouse, is this the —— are these your notes

16 about that conversation with Ms. Piazza on February 6?

17 A.  Yes, these are my discussion notes.

18 Q.  Can you briefly tell the jury your impressions of

19 Ms. Piazza after having that phone conversation with her on

20 February 6.

21 A.  Yes.  M y impression of Yolanda was that she was a very

22 seasoned or very senior leader who had been in the industry of

23 financial services for a long time.  She was very well versed

24 in management, in leadership, in technology, being at the

25 executive table and being able to make very senior decisions

1    within the financial services.  And she would be qualified as,

2    I would say, financial services expert given her roles within

3    her background within Citi.

4         She also carried very significant responsibilities

5    around developing solutions and using technology to map them to

6    client needs and carried very strong P&L, basically, financial

7    responsibility for her organization.

8    Q.  And are those reasons the basis for your recommendation of

9    strong hire for Yolande?

10   A.  Yes.  I ── based on the qualifications, I decided, what she

11   represented, she absolutely was a strong hire.

12   Q.  And in the course of that conversation, did she impress you

13   as someone that could fulfill the role of vice president

14   financial services sales?

15   A.  Yes, she did.

16   Q.  Now I want to turn to another document very briefly.  This

17   is Exhibit ── Defendant's 74, please.

18        Ms. Kliphouse, I'd like to just show you the date on

19   this document, or rather, the date updated, if you could.

20        So we're talking about the February 21, 2020, time

21   frame.  At this point in time, did you have a preferred

22   candidate for the role for vice president financial services

23   sales?

24   A.  Yes, I did.

25   Q.  And who was that?

1   A.  Yolande.

2   Q.  Did you at this point direct Stuart Vardaman —— let me back

3   up.

4           Who is Stuart Vardaman?

5   A.  So Stuart was my recruiting partner.  He would lead up

6   recruiting for my organization, and he had a team of recruiters

7   that helped us look at candidates to fill roles.

8   Q.  Did you direct him at this point in time to focus his

9   attention on the —— your preferred candidates for this role?

10  A.  Yes.

11  Q.  Now I want to quickly touch upon a conversation that

12  Ms. Rowe testified that she had with you in early 2020.

13          Did you meet with Ms. Rowe in early 2020?

14  A.  I did.

15  Q.  Why did you meet with her?

16  A.  I was asked by her boss at that time.  I think it was her

17  boss.  It was Will Grannis, who I had had regular —— he was a

18  peer of mine.  We had regular conversations, and he asked me if

19  she reached out, to have a conversation, kind of a meet and

20  greet-and-greet networking type of meeting.  And he was one

21  that put, you know, people together that were working in sort

22  of similar models.

23  Q.  Did you understand at that time that Ms. Rowe was working

24  on Mr. Grannis' team?

25  A.  I did.  He did tell me that.

1    Q.  And did you meet with Ms. Rowe?

2    A.  I did.

3    Q.  Where did you meet?

4    A.  Some coffee shop up near Sloan.  That's all I could

5    remember.  I don't remember the name.

6    Q.  Ms. Rowe testified earlier in this trial that it was about

7    a ten-minute conversation.  Is that consistent with your

8    recollection?

9         MS. GREENE:  Objection.  Inconsistent with the record.

10         THE COURT:  Just ask an open-ended question.

11   Q.  How long do you remember that meeting being?

12   A.  About 45 minutes.

13   Q.  During that meeting, did Ms. Rowe describe to you the work

14   that she was doing with regulators at the time?

15   A.  During that meeting, we had discussed a lot of different

16   things.  I had asked her about what she was working on, and she

17   said she was working with the regulators because I was ⸺ I

18   didn't know her, and I didn't know what she was doing in

19   financial services.  I had a financial services team, but I had

20   never heard of her.  So she offered up she was working in the

21   regulatory side, which was not the part of the business that my

22   team worked on.

23   Q.  During the course of that conversation, did she impress you

24   as someone that could fulfill the vice president financial

25   services sales role you were looking to fill?

1  A.  No, our conversation was not about the role I had open.

2  Q.  Did the role you had open ever come up in the conversation?

3  A.  At the end of the conversation, I had mentioned that I was

4  leading a financial services team and that there was a role

5  that was — I was looking for a leader in for a role and

6  encouraged her to work with my team, but I did not offer her a

7  role, no.

8  Q.  Is there anything else that you recall about the end of

9  that conversation, that meet-and-greet that you had with

10  Ms. Rowe?

11  A.  Well, in passing at the end of the conversation, she had

12  mentioned that she had some issues with Google, and I didn't

13  know what it was about, and she didn't offer any more than

14  that.  That was really the end of it, just sort of came out.

15  And I thought it was kind of unusual to say that, but...

16  Q.  Do I hear you correctly that she did not offer details

17  about what those issues were?

18  A.  No, we did not talk about that.  It was at the very end as

19  we were both kind of parting, and kind of left it there.

20  Q.  Did you ask any questions about what those issues were?

21  A.  No.

22  Q.  Did you care?

23  A.  No.  It wasn't relevant to what our meet-and-greet was

24  about or to anything I had going on, so I just left it alone.

25  Q.  Subsequent to that, that meet and greet that you just

NAJHRow4                    Kliphouse - Direct

1   described, did Ms. Rowe reach out to you after that to further

2   inquire about the financial services sales role on your team?

3   A.   No.

4   Q.   Now, earlier you had testified about Stuart Vardaman.  You

5   said he was your recruiting partner.  In your time working with

6   him, were you able to form an opinion as to his capabilities as

7   a recruiter working for you?

8   A.   Yes.  I worked with Stuart on several — Stuart and his

9   team on — in many different roles.  Typically, at the Level 10

10  or these more senior vice president-type roles, Stuart and I

11  would engage more directly versus working with his team on

12  them.  We developed a good working relationship.  He'd show me

13  the candidate.  We'd use a structured way to go through

14  candidates and qualifications for roles.  We worked a lot on

15  the job description so that when they were out there in the

16  market looking for candidates, internally or externally, we

17  could comb through them and compare them to a qualified job

18  description, otherwise the field was too big.

19        So we kept a pretty good — he did a very good job

20  keeping together what was the role, what were the

21  qualifications necessary, and then how did the candidate fit

22  against that.  And he actually would help us screen a lot of

23  the candidates up front to make sure they met those

24  qualifications.

25  Q.   In your estimation, was Mr. Vardaman a good recruiter?

NAJHRow4                     Kliphouse - Cross

1    A.  Yes.

2    Q.  And did he follow all the directions that you gave him with

3    respect to helping you fill these roles that were open on your

4    team?

5    A.  Yes.

6    Q.  And did he do so in this instance for the vice president

7    financial services sales role?

8    A.  Yes.

9           MS. TOMEZSKO:  Thank you, Ms. Kliphouse.  I have no

10   further questions.

11   CROSS-EXAMINATION

12   BY MS. GREENE:

13   Q.  Just a few, Ms. Kliphouse.

14          You testified just a minute ago that Ms. Rowe did not

15   reach out to you after that coffee meeting about the role.  Is

16   that your testimony?

17   A.  Yes.

18   Q.  Do you know if Ms. Rowe reached out to Stuart Vardaman?

19   A.  I don't know her conversations with Stuart, I don't.

20   Q.  You were shown that document dated February 21, I believe.

21   Do you know if Ms. Rowe had spoken with Mr. Vardaman prior to

22   February 21, 2020?

23   A.  I don't know of her conversations, no.

24   Q.  Did Mr. Vardaman share anything with you about Ms. Rowe's

25   qualifications?

A.  On the list of where all the candidates were, we did review

all of the candidates on there and how they mapped or didn't

map to the qualification list.  And we did talk about Ulku and

another candidate at that time that was also internal that was

on that list.  We talked about their qualifications and where

they would map to them or they were not as qualified as others

that we had on the list.

Q.  And that was information that Mr. Vardaman told you, that

she was not as qualified as other people on the list?

A.  No, no, he didn't say that.  We talked through what the

qualifications were and did the candidate meet these

qualifications we had.  And so in the instance specifically

around Ulku, we talked about what are the qualifications we

want?  C-level expertise, did they have the relationships?  Did

they have the ability to have executive communications with

them?  Did they have the outreach capabilities?  And we had

looked at that as being one of the main qualifications, so we

would have talked about that, yes.

Q.  And what information did you have about her qualifications

at that time?

A.  So I would have had whatever was on her submitted

materials.  It would have been done with her résumé or what had

been submitted to be on that list.

Q.  And do you know whether Mr. Vardaman asked her to submit

anything?

NAJHRow4                        Kliphouse - Cross

1   A.  I don't know what he asked her specifically, no.

2   Q.  And you didn't get any internal references related to

3   Ms. Rowe?  You didn't speak with Mr. Grannis about her

4   qualifications, for instance, did you?

5   A.  No, not about her qualifications for my role.  He asked me

6   to do a meet and greet with her specifically.  He did not ask

7   me to meet with her about any roles.

8   Q.  And that coffee meeting with Ms. Rowe, that was not an

9   interview for the position, correct?

10  A.  No, it was not an interview.  It was networking meet and

11  greet, can you do me a favor and meet with her?

12  Q.  Did you know what Ms. Rowe's level was within Google?

13  A.  I did not know explicitly her level, and I wouldn't know

14  that except I knew she was not a vice president.  But I

15  wouldn't know what specific level she would have been.  I

16  wouldn't have access to that.

17  Q.  And a vice president is what level?

18  A.  Vice presidents were Level 10s.

19  Q.  So you knew that she was a level below a 10?

20  A.  Something.

21  Q.  Is that right?

22  A.  Uh-huh.

23  Q.  So you didn't know anything about Ms. Rowe's C-suite

24  relationships, correct?

25  A.  Just from what we had talked about in the meet and greet

NAJHRow4                    Kliphouse - Cross

1    about where she was working, why I hadn't had any opportunity

2    — I hadn't heard about her on my team, and I thought I would

3    have because I was working with a lot of the largest financial

4    institutions.  And I asked her what was she working on, and she

5    gave me some instances of where she was doing work, and it

6    tended to be more on the federal side and the regulatory side.

7    It wasn't the large financial institutions that my team works,

8    and she gave me background things she was working on.

9    Q.  Did you know she had been a CTO at JPMorgan Chase?

10   A.  She did mention to me in the conversation we had that she

11   had worked at JPMorgan and, I think, one other company.

12   Q.  But, again, neither Mr. Vardaman nor you took any

13   additional steps to identify what her qualifications were

14   beyond what she told you in that meeting, correct?

15   A.  I don't know what — Stuart would have done the research in

16   that.  They typically did all the research that was necessary

17   to compare to the qualifications that we have.  I did not.  I

18   do not go out — I did not go out and search resumes.  I don't

19   search their LinkedIn.  That comes to me from the recruiting

20   team.

21            MS. GREENE:  No further questions.

22            MS. TOMEZSKO:  I have no further questions for the

23   witness, your Honor.

24            THE COURT:  OK.  Ms. Kliphouse, you're excused.  Thank

25   you.

NAJHRow4                          Kliphouse - Cross

1              (Witness excused)

2              THE COURT:  Does it make sense to pause now?

3              MR. GAGE:  I think so, your Honor.

4              THE COURT:  OK.  So based on my understanding of where

5    we are in Google's case, I think we can break now.  It is

6    12:37.  Let's come back here at 1:25.

7              So, members of the jury, please remember my frequently

8    reiterated cautions, which are not to speak to each other, not

9    to talk to anyone else about the case, not to do any research.

10   Please avail yourself of the facilities in the jury room, and

11   thank you so much for your attention today and throughout the

12   process.  All right.

13             (Jury excused)

14             (Continued on next page)

15

16

17

18

19

20

21

22

23

24

25

NAJHRow4

```
 1              (Jury not present)

 2              THE COURT:  You could sit down.

 3          I don't have anything for you unless you have

 4   something for me.  We have one more witness, right?  One more.

 5   OK.

 6              MS. GREENE:  Your Honor, I have one thing.

 7              THE COURT:  Yes.

 8              MS. GREENE:  There were some hiring packets shown

 9   earlier today for which the instruction was not given.

10              THE COURT:  OK.

11              MS. GREENE:  I would propose that on the jury exhibit

12   list that we're putting together, that we asterisk those

13   documents that are subject to a limiting instruction and

14   include the limiting instruction for the jury.

15              THE COURT:  That makes sense to me.

16          What do you think, Ms. Tomezsko or Mr. Gage?

17              MS. TOMEZSKO:  Yeah, I agree, your Honor.  I think

18   that makes sense.

19              THE COURT:  OK.

20              MS. TOMEZSKO:  Just one thing before we break.  I just

21   would like to note for the record Ms. Greene had objected that

22   I was mischaracterizing the testimony.  I just want to make

23   clear that on 192 of Ms. Rowe's direct examination, she did

24   indeed testify that the meeting with Kirsten Kliphouse was

25   "very short.  Ten minutes maybe."  I just wanted that reflected
```

NAJHRow4

1    in the record.

2              THE COURT:  All right.  Very good.  See you all at

3    1:25.

4              (Lunch recess)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

NAJVROW5

1                      A F T E R N O O N   S E S S I O N

2                              1:25 P.M.

3              THE COURT:  Hello.

4              Would you like to bring in the witness.

5              MS. TOMEZSKO:  Just one thing, your Honor, before we

6        begin.

7              Ms. Greene and I, she graciously pulled me aside after

8        the break, and we reviewed the record together.  And what it

9        says is that the -- Had you ever met with Ms. Kliphouse beyond

10       the coffee meeting that you described earlier?

11             No.

12             In that meeting, how long did you discuss the role?

13             It was very short, ten minutes maybe.

14             So I just wanted that record to be clear and thank

15       Ms. Greene for pointing that out.

16             THE COURT:  Okay.  So I'm sorry, how is that different

17       from what you told me right before the lunch break?

18             MS. GREENE:  The issue, your Honor, is not the -- the

19       question related to how long the entire meeting lasted, and it

20       was characterized as ten minutes.  The testimony was that

21       portion of the conversation was ten minutes, and it was -- I

22       think it was just an understandable mistake in reading the

23       record.  And Ms. Tomezsko and I had a chance to review the

24       record together and clarify together.  So we just wanted to

25       make sure it was clear for everybody.

1          THE COURT:  Okay.  Thank you for that.

2          All right.  Would you like to bring the witness in and

3    then we'll get the jury.

4              (Jury present)

5          THE COURT:  Okay.  You may be seated.  Thank you.

6              Remain standing for your oath.

7     PATRICIA FLORISSI,

8          called as a witness by the Defendant,

9          having been duly sworn, testified as follows:

10         MR. GAGE:  May I proceed, your Honor?

11         THE COURT:  You may.

12   DIRECT EXAMINATION

13   BY MR. GAGE:

14   Q.  Good afternoon, Ms. Florissi.

15   A.  Good afternoon.

16   Q.  Are you nervous?

17   A.  This is my first time.

18   Q.  You've never done this before?

19   A.  Never.

20   Q.  I'd just like the ladies and gentlemen of the jury to learn

21   a little bit about you.

22             Where are you originally from?

23   A.  I was born and raised in Brazil.

24   Q.  And do you have any graduate degrees?

25   A.  Yes, I do.  After finishing high school, I pursued a

1   bachelor's degree in computer science at the Federal University

2   in my state.  And that's one of the top two universities in the

3   country.

4   Q.  And did you pursue your education beyond that?

5   A.  Yes, I did.  The Federal University, you typically engage

6   with research and engage with research right from the

7   beginning, and got a lot of scholarships.  And I decided to

8   pursue a master's degree in computer science, also at the

9   university.  And I got a scholarship for that.

10  Q.  Do you also have a Ph.D.?

11  A.  Yes, I do.  During undergrad, I started dating a classmate.

12  We got married.  We decided that both of us wanted to do a

13  Ph.D.  We applied, and we're very blessed that Columbia

14  University accepted both of us.  Both of us also got a

15  scholarship from the Brazilian government, four years of

16  tuition and stipend at Columbia.

17  Q.  So you have a Ph.D. from Columbia University in what field?

18  A.  In computer science.  The Ph.D. though took six years, so

19  the last two years we got a scholarship from Columbia.

20  Q.  Okay.  And do you have any other master's degrees?

21  A.  Yes, I do.  Maybe ten years after graduated, I worked for

22  EMC, a large technology company.  And I was offered a

23  scholarship to pursue an executive MBA at a school of my

24  choice.

25  Q.  And where did you get that?

1    A.  At the Stern Business School at NYU, at New York University

2    here.

3    Q.  Are you currently employed at Google?

4    A.  Yes, I am.

5    Q.  Okay.  Could you tell the ladies and gentlemen of the jury

6    what job you held just prior to coming to Google?

7    A.  Prior to Google, I worked for 23 years for Staff Tap, that

8    was acquired by EMC, it was acquired by Dell Technologies.  And

9    the last ten years I was the global CTO, chief technology

10   officer, for sales at EMC, which became Dell EMC, and became

11   Dell Technologies.

12   Q.  Okay.  What job were you hired to do at Google?

13   A.  To become a technical director in the office of the CTO at

14   Google Cloud.  There was a position open in Manhattan in the

15   Chelsea office.

16   Q.  Okay.  And what level are you?

17   A.  Level 8.

18   Q.  Now, when did you join the office of the CTO?

19   A.  May 4th, 2020.

20   Q.  Now, I want to ask you about an acronym that I think has

21   been mentioned in the trial.  What are OKRs?

22   A.  Objectives and key results.

23   Q.  Okay.  And does -- since you've been at Google, does OCTO

24   set OKRs periodically?

25   A.  Absolutely.  Every year at the beginning of the year there

1    are OKRs.  Sometimes they don't change, but sometimes they do

2    change with respect to the prior year.

3    Q.  Okay.  So you joined in May of 2020.  Were there already

4    OKRs for 2020?

5    A.  Correct.

6    Q.  Were new OKRs set in the beginning of 2021?

7    A.  Yes, there were.

8    Q.  And can you tell us what those OKRs were for 2021?

9    A.  To the best of my recollection, there were four OKRs, and

10   OKRs also were split in like a percentage --

11           MS. GREENE:  Objection, your Honor.  This is outside

12   the scope.

13           MR. GAGE:  Your Honor, she's my witness, and this

14   is -- well, should we have a sidebar?

15           THE COURT:  I think we should, yes.

16           (Continued on next page)

17

18

19

20

21

22

23

24

25

1           (At sidebar)

2           THE COURT:  Go ahead.

3           MS. GREENE:  Your Honor's order was that Ms. Florissi

4    may only be questioned regarding the nature of plaintiff's work

5    and performance under Ms. Florissi's management from April 2022

6    to the present.  So obviously background information that he

7    asked her, but at this point asking her about OKRs for 2021,

8    which is a year in which she was not managing Ms. Rowe and has

9    nothing to do with Ms. Rowe's performance during that year is

10   outside the scope.

11          THE COURT:  Are you going to establish that those are

12   the same OKRs in place in 2022?

13          MR. GAGE:  What I'm going to establish, your Honor, is

14   that most of them were the same, and that this establishes the

15   witness's understanding of what is expected of a technical

16   director.  And then she becomes a manager, and then she's

17   applying those understandings in her evaluation of Ms. Rowe.

18          THE COURT:  She's going to apply these understandings.

19          MR. GAGE:  To her evaluation of --

20          THE COURT:  When she --

21          MR. GAGE:  I'm getting to it quickly.

22          THE COURT:  Okay.

23          MR. GAGE:  To her evaluation of Ms. Rowe starting in

24   May of 2022.

25          THE COURT:  Okay.  I'll allow it.

1              MR. GAGE:  I'm going to get to it pretty quickly.

2              THE COURT:  Okay.

3              (Continued on next page)

1           (In open court)

2   BY MR. GAGE:

3   Q.  Ms. Florissi, could you explain what the OKRs for OCTO were

4   in 2021?

5   A.  2021, number one, pathfinding.  This is the idea of each

6   OCTO office of the CTO team member, technical director finds a

7   technology, a field of expertise, and leads with that idea

8   influencing technology, the engineering and product management

9   team to change the roadmap, to change the direction the company

10  would be going.  So it's a direct influencing engineering and

11  product manager about 70 percent of the time.

12          Then there was collaborative innovation.  That's

13  talking to customers 20 percent of the time.  Ten percent of

14  the time in market-shaping; this is presentations, keep posting

15  in blogs, influencing.  And another one that is -- doesn't have

16  a percentage, but it's being a great teammate.

17  Q.  And were OKRs established for 2022 as well?

18  A.  Yeah.  In -- yes.

19  Q.  Well, take it one piece at a time.

20          And how, if at all, did the OKRs change for 2022 from

21  the prior year?

22  A.  The market-shaping was no longer included in the OKR.  So

23  we were encouraged to focus less on extent of presentations and

24  influencing in the market, and really focus on pathfinding,

25  engineering, influencing the technology direction.

1   Q.   Now, in early 2022, did you take on people management

2   responsibilities?

3   A.   Yes, I did.

4   Q.   And did you apply for that?

5   A.   Yes, I did.

6   Q.   Were you interviewed for that?

7   A.   Yes, I was.

8   Q.   And once you were selected to lead a team, did you get

9   promoted?

10  A.   No.

11  Q.   Did you get a raise?

12  A.   No.

13  Q.   And is Ms. Rowe a member of your team?

14  A.   Yes, she is.

15  Q.   Do you have regular meetings with your team?

16  A.   Yes, I do.

17  Q.   What's the purpose of those regular meetings?

18  A.   We have -- we meet once a week for one hour.  And the main

19  purpose is to do cross-pollination.  And what that means is

20  that each team member talks about the projects that they are

21  working on.  The approach that they are taking, the customers

22  that they are talking to, the engineers, the product managers,

23  what are the holdouts that they are facing.  And typically, all

24  the members have ideas of different approaches that they have

25  tried, and that really helps evolve the progress of the

NAJVROW5                    Florissi - Direct

1   projects that they are working on, the initiatives that they

2   are working on.

3   Q.  You also -- excuse me.  Do you also have regular one-on-one

4   meetings with each member of your team?

5   A.  Yes, I do.  I have weekly half-hour meetings with the

6   teams.  It's small teams, so I can have them once a week.

7   Q.  What's the purpose of these one-on-one meetings?

8   A.  Mainly to do a deep dive on the projects that they are

9   working on.  When will you have the team meeting is more --

10  it's less time, it's more conversational, it's more

11  collaboration.  Now we are going in, following up on the

12  process and the projects each one of them has.

13  Q.  Do members of your team, and do you yourself each year set

14  expectations for yourself for the coming year?

15  A.  Yes, we do.  We set our expectations.

16  Q.  And did Ms. Rowe set expectations for herself in 2022?

17  A.  Yes, she did.

18  Q.  And what can you tell us about those expectations that she

19  set for herself in 2022?

20  A.  She set expectation to work on the climate risk analytics

21  project for about 40 percent of her time; to work on emerging

22  theme, it's called an ET, emerging theme for another 20 percent

23  of her time, to the best of my recollection; to work with the

24  customers in the financial sector for another maybe 20 percent,

25  let's say; and for 20 percent to work on -- she leads the

1   women's chapter, is a group of women in New York and she leads

2   that.

3   Q.  You mentioned -- used the term "emerging theme."  What was,

4   in 2022, Ms. Rowe's emerging theme?

5   A.  I believe the regional title was trusted AI or safe AI.  I

6   don't remember what was the original now, safe AI or trusted

7   AI.  We got to know it as a trusted AI.

8   Q.  Okay.  And what did you understand this idea to be?

9   A.  It was actually -- it is an interesting idea.  The idea is

10  that to show intelligence like AI, like any new technology,

11  brings risks.  And risks need to be understood and mitigated to

12  accelerate adoption.

13          So show intelligence today faces a huge hurdle because

14  at the same time that it brings innovation, at the same time it

15  has risks.  Some of them are known, some of them are unknown,

16  and they need to be mitigated.  And the idea was to use a blend

17  of technology and humans to help address, identify, raise

18  awareness and mitigate some of the risks in AI and make AI more

19  safe, more trusted.

20  Q.  Does Google have -- does Google Cloud have a process for

21  approving of emerging themes?

22  A.  Yeah.  It's the office of the CTO is not Google Cloud.  So

23  within the office of the CTO, there is a process for those

24  emerging themes.  It used to be twice a year, now is once a

25  year, where every technical director, every OCTO member that is

1   a technical director is encouraged to propose emerging themes

2   and go to what is called, like, pitch session.

3          In this pitch session, some of the OCTO members act as

4   the committee to do a peer review.  Everything is very much

5   based on peer review.  So there is the committee and each team

6   member expresses the idea.  We encourage to write a short

7   paper, two, three-page on the idea.  And we pitch.  And then

8   the committee decides, typically between three or four of those

9   ideas, to move forward.  And then there is a length process of

10  reviews and evolution of the idea.  And they are automatically

11  presented, the select ones, to TK, or Thomas Kurian, which

12  is -- who is the CEO of Google Cloud.

13  Q.  Did Ms. Rowe pitch her idea to this pitch committee?

14  A.  Yes, she did.

15  Q.  And what was the committee's response?

16  A.  The committee response was that this is an interesting

17  idea, which I completely agree is an interesting idea.  There

18  were questions about how to actually bring this to fruition

19  from a technology perspective.

20         And the committee actually said there is a lucky

21  coincidence here, because the topic of responsible AI, of

22  trusted AI, is one of, let's say, areas of focus or imperatives

23  that Google Cloud as a whole and Google at large wants to focus

24  on.  So there is interest on this topic.  And the

25  recommendation was not to go through the normal process with

1    the emerging theme, but to blend that in with other existing

2    efforts to go even faster.

3    Q.  And what did you expect Ms. Rowe to do with this idea from

4    that point forward?

5    A.  Leadership.  To capitalize on the momentum.  This is a very

6    good coincidence.  That is an idea that is also, let's say, a

7    priority for the company, and to lead with it.

8    Q.  And what do you mean when you say to lead with it?

9    A.  Pathfinding.  Is about -- which is one of the OKRs.  Is

10   about working on the idea, collaborating with others not only

11   within the office of the CTO, but across Google Cloud and

12   across Google.  Google has also responsible AI teams,

13   responsible AI organizations or units that are focusing on

14   that.  Carving out pilots, proof of concepts, experiments that

15   can be done.  And also connecting with customers that are

16   willing to go and take the idea for test-drive, as we call it,

17   to experiment together in collaboration with us.

18   Q.  By November of 2022, had you seen any progress from

19   Ms. Rowe on this project?

20   A.  At that point we didn't have what is called artifacts at

21   Google.

22   Q.  Hold on one -- okay.

23        Can you tell us what you mean by "artifacts"?

24   A.  Other than the original paper for the pitch, there were no

25   other documents, write-ups, running notes of meetings, slides,

1    thought leadership materialized in any document that can be

2    used as broader collaboration, that can be discussed.

3    Q.  Okay.  Now, when was the committee meeting?

4    A.  September, late September, I believe.

5    Q.  Okay.  So by November, you had not seen artifacts.

6         Were you concerned?

7    A.  I -- I was concerned.

8    Q.  Okay.  And did you have a discussion with Ms. Rowe about

9    this?

10   A.  Yes, we had what is called a support check-in.

11   Q.  Okay.  And can you tell the ladies and gentlemen of the

12   jury what a support check-in is?

13   A.  A support check-in is a conversation that managers can have

14   with team members to point out areas of development.  These are

15   areas that we believe that more progress can be made.

16   Q.  And did you have a meeting with Ms. Rowe?

17   A.  Yes, I did.

18   Q.  What did you tell her in this meeting?

19   A.  We talked about three points:  The fact that the emerging

20   theme, there was an expectation -- I expected more at that

21   point; that there was this opportunity to be harvested, to be

22   cultivated, nurtured and then harvested; there was an

23   opportunity for leadership on this trusted AI.  There was this

24   momentum.  I talked about the fact there was another OCTO

25   member working on responsible AI; and that I felt that there

1  was an intersection, I had already mentioned that like a month

2  before, that it is OCTO was working on that.

3       The other point was on the climate risk analytics that

4  was 40 percent of her time.  And at that point that there were

5  no artifacts, no documents, no running notes that expressed her

6  contributions on the climate risk analytics.  The documents

7  that existed didn't have her name as a reviewer, as a

8  contributor, as an author.

9       And the third point was that I expected her to attend

10 more of the team meetings.

11 Q.  Had she not been attending team meetings?

12 A.  Not as regularly, so not as often as the other team

13 members.

14 Q.  Now, you used a term "OCTOs."  Are you referring to

15 technical directors?

16 A.  Yes.  I'm sorry, every time that I refer to an OCTO, I

17 refer typically to a technical director.

18 Q.  Okay.  So you had this conversation with Ms. Rowe in

19 November.  How did she respond?

20 A.  She listened.  And actually, in January, when I came after

21 the Christmas holidays, I was very pleased that there was a

22 document by -- by her, by Ms. Rowe, authored by her on the

23 topic of trusted AI.

24 Q.  Now, I'd like to show you a document that's already in

25 evidence.  This is Exhibit P-126.  I'd like to go to the last

NAJVROW5                          Florissi - Direct

1   page of this document.

2              Now, we'll focus on particular sections here, but if

3   you'll just take a look at this, and I know the print is small.

4   Do you recognize this document?

5   A.  Yes, I do.

6   Q.  What is this?

7   A.  This is a grad review or performance review.  So based on

8   the performance of the team member over the year of 2022, in

9   early 2023, we write an assessment and we give a rating for the

10  performance of the team member.

11  Q.  And did you prepare this page here for Ms. Rowe?

12  A.  Yes, I did.

13  Q.  Okay.  Did you actually deliver this to her?

14  A.  Yes, I did.

15  Q.  Okay.  And what month was this in 2023?

16  A.  I believe it's February or March.  I'm not so sure exactly

17  the month.

18  Q.  Okay.  And I'd like to just highlight the top where

19  Ms. Rowe's name is and title.  It says:  Ulku Rowe L8 director.

20             Is it your understanding Ms. Rowe is a Level 8?

21  A.  Yes, yes.

22  Q.  Same level as you?

23  A.  Same level as me.

24             MR. GAGE:  You can drop that, Jean.

25             Now, can you highlight, Jean, the section for delivery

 1  and those four bullet points there.

 2  Q.  I'd just like to ask you a couple of -- a few questions

 3  about this.

 4         The first line says that Ms. Rowe was nominated to

 5  represent Google on the Commodity Futures Trading Commission

 6  Technology Advisory Committee.  Which of the OKRs does this

 7  relate to?

 8  A.  I would say a great team member, a great Googler that has

 9  demonstrated expertise in a particular area, and it has been

10  nominated to represent Google in that trading committee.

11  Q.  It's a good thing, right?

12  A.  It is a great thing.

13  Q.  It's a great thing.  Yes.  Thank you.

14         But is it -- does it fall under the pathfinding OKR?

15  A.  It doesn't fall directly into the pathfinding OKR.  Maybe

16  some ideas of participating in that trading commission could

17  become emerging themes, could become feedback for the

18  engineering, could become projects at this point.

19  Q.  Okay.  And as far as you know, has any of her work with

20  this CFTC Technology Advisory Committee resulted in any of

21  those things that you just mentioned?

22  A.  Not that I am aware of at this point.

23  Q.  Okay.  Now, the second bullet point says that Ms. Rowe

24  advises strategic customers such as advising Goldman Sachs on

25  their CTL, consolidated trade ledger, adoption of Spanner by

1   all business in capital markets as a trading platform,

2   replacing their dependency on SecDB.  That was a mouthful.

3          Can you tell us what is a consolidated trade ledger?

4   A.  I am not as deep into the concept, but I believe it's the

5   idea that you have -- you can think of a ledger as a

6   spreadsheet.  And the idea is how you consolidate trading.  And

7   the idea here would be to use a technology that Google has as a

8   database called Spanner, highly scalable, highly efficient, as

9   the medium to store, represent, transact the consolidated

10  traded ledger.

11  Q.  Okay.  Ms. Rowe --

12         MR. GAGE:  You can take off the highlighting, Jean.

13  Q.  Ms. Rowe testified concerning a recent Goldman Sachs deal.

14         Are you familiar with Google signing a recent big deal

15  with Goldman Sachs?

16  A.  Yes, I am familiar.  It's what we call, like, a new commit.

17  Basically, they signed up to -- they committed to spend more on

18  Google Cloud.

19  Q.  And was Ms. Rowe the only person responsible for that?

20  A.  No.  There is always a large team in these large

21  committees.  We got an email that had several names, maybe 20

22  names, in the email.

23  Q.  The next bullet down, if we could go to -- Ulku advised the

24  climate risk analytics project.

25         You had mentioned that a short while ago.  What's your

1    understanding of Ms. Rowe's contribution to the climate risk

2    analytics project?

3    A.   That she edifies the team.  At that point, I didn't have

4    any artifact.  But during the process of performance review, a

5    manager can issue what is called a manager request feedback,

6    MRF.  And this is a process where not only the team member, but

7    also the manager can reach out electronically to other members

8    of Google and ask for feedback.

9          Have you collaborated with this person in this

10   project?  What is your feedback?

11         Ulku had suggested — and I thought it was a great idea

12   — to reach out to another OCTO colleague who leads the climate

13   risk project.  It could say is he's emerging theme, even though

14   it didn't go through the whole process.  But it's the area that

15   he is leading.  This is the project that he is leading, the

16   initiative that he is leading.

17         So I reached out to Jeff.  And Jeff wrote a paragraph

18   that -- a very nice paragraph saying that Ulku had indeed

19   participated in the meetings and she had influenced the

20   direction of the project in a positive way.

21   Q.   And who is leading that project, the climate risk analytics

22   project?

23   A.   It's another OCTO technical director.

24   Q.   And what's that person's name?

25   A.   Jeff Sternberg.

NAJVROW5                        Florissi - Direct

Q.   Okay.  Now, you indicated that you gave Ms. Rowe this

review in or about February or March of 2023.  And I see down

towards the bottom the rating is significant impact.  Where is

significant impact on the rating scale?

A.   It's three.  So it goes from one to five, and it's three.

Q.   Okay.  So it's right in the middle?

A.   Right in the middle.

Q.   Now, you earlier described that in November of 2022, you

had concerns and you had a support check-in with Ms. Rowe about

her progress and her performance.  How did you go from

believing that, to giving her a three out of five, a

significant impact, in February or March?

A.   Number one, the climate risk where she had expectation to

spend 40 percent of the time with the MRF, the managed review

feedback.  I had at least a paragraph from another OCTO lead --

even though I didn't have any artifact, I had a paragraph from

another OCTO lead that she had influenced the direction.  And

you could ask, does that cover 40 percent of the time?  I gave

her the benefit of the doubt and I said I will consider

significant impact here on the emerging theme.

         I saw that the document she had created in January,

which reflected some thoughts on trusted AI, was a response to

the conversation we had had in November.  And I took that as

a -- in good faith and I said, you know, I -- I am going to be

generous and I'm going to give a significant impact and we are

NAJVROW5                          Florissi - Direct

1    going to move forward.

2    Q.  Okay.  I'd like to show you another document, and this is

3    Plaintiff's Exhibit 134.

4               MR. GAGE:  And this is the last two pages, Jean.

5    Q.  At the time you delivered Ms. Rowe's performance review,

6    did you also tell --

7               MS. GREENE:  Objection, your Honor.

8               Outside the scope.

9               THE COURT:  We're going to have to have a

10   conversation.

11              (Continued on next page)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1              (At sidebar)

2              THE COURT:  What I allowed is questions regarding the

3       nature of plaintiff's work and her performance and

4       Ms. Florissi's management.  I am struggling to she see how her

5       performance review doesn't come in.  Is that your objection?

6              MS. GREENE:  No.  The document that went on the

7       screen, I believe, was compensation information, which is

8       clearly outside of your Honor's ruling, which said that

9       plaintiff's conversation is not --

10             THE COURT:  That is correct.

11             MR. GAGE:  Well, it was delivered to her as a result

12      of the evaluation of her performance.  This is a pay case.  The

13      reason she got paid what she was paid were the performance

14      rating that she received, that's the reason your Honor allowed

15      her to testify.

16             THE COURT:  Okay.  But I did say she may not be called

17      to testify about plaintiff's compensation.  You're not going to

18      ask her any questions about the compensation.

19             MS. GREENE:  Your Honor, though he's not established

20      that she had anything to do with setting the compensation and

21      he's now showing the document to the witness.  That is squarely

22      within what your Honor ruled he may not ask her about.  He can

23      ask her about her performance score.  He's asked her about her

24      performance score.  He could ask her what her understanding is

25      as to how the performance score impacts compensation.  But

1   going beyond that into her actual compensation is exactly what

2   your Honor prohibited in your ruling.  And he flagrantly

3   disregarded that, put up a compensation document.

4          MR. GAGE:  A, the document is already in evidence, the

5   jury has seen it already.  B, I have absolutely made the

6   connection between the two things.  Mr. Humez testified that

7   the compensation is algorithmically determined based upon the

8   performance rating given by -- I'll move on, your Honor.  I was

9   not intending to flout your Honor's order.  I thought this was

10  connected.  I frankly hadn't looked at your Honor's order in a

11  few days.

12         THE COURT:  I have it right here on my phone.

13         MR. GAGE:  I noticed that.  I will move on.

14         THE COURT:  Check it once, check it twice.

15         MR. GAGE:  I will move on.

16         MS. GREENE:  Thank you.

17         (Continued on next page)

18

19

20

21

22

23

24

25

1          (In open court)

2    BY MR. GAGE:

3    Q.  Ms. Florissi, I want to fast forward to the end of June.

4          Did you have a conversation, another conversation,

5    with Ms. Rowe at the end of June concerning her performance?

6    A.  Yes, we had the check-in.  It was not just with Mrs. Rowe.

7    I had check-in conversation with every single team member of

8    the team individually.

9    Q.  Okay.  At the end of June?

10   A.  Yeah, it's at the end of the second quarter of the year.

11   Q.  Okay.  Can you describe for the ladies and gentlemen of the

12   jury what you said to Ms. Rowe at that check-in at the end of

13   June?

14   A.  At the end of June, we go through each one of the

15   expectations for the year that were set out by Mrs. Rowe.

16         So for 2023, one of her expectations that she defined

17   was to evolve on the trusted AI theme.  One expectation, of

18   course, was to evolve the idea, to select a couple of customers

19   where she was going to put a proposal together on topics to

20   discuss around trusted AI, and the engage -- select and

21   potential engage with those customers on collaborative

22   innovation, on testing the ideas, on creating pilots,

23   experimenting, asking questions, discussing strategy, to

24   validate the idea or aspects of the idea.

25   Q.  And had she done that, to your knowledge, by the end of

1   June?

2   A.   Not at that moment.  There was one customer, Lloyds, that

3   she had a call with them, and they were not at the point that

4   they were ready to test the, let's say, concepts or they didn't

5   have the time or focus or priority at that time to discuss

6   that.

7   Q.   What did you expect Ms. Rowe would be doing?

8   A.   At that point, given that the idea had started, let's say,

9   in September, to have additional artifacts, additional

10  documents, additional thought leadership, additional running

11  notes by meeting with other Googlers, other employees at

12  Google, other members of Google, not only Google Cloud, not

13  only within the office of the CTO, not only at Google Cloud,

14  but at Google at large on the topic.

15  Q.   And at that point, how many artifacts, how many documents

16  had you seen from Ms. Rowe regarding her emerging theme idea?

17  A.    In addition to the document that I received in January,

18  there was another document that Mrs. Rowe -- or Google actually

19  collaborated with another OCTO member, the OCTO member that I

20  had mentioned before that was working on responsible AI.  And

21  it was a very nice collaboration partnership between the two of

22  them, and they created another document in February.

23  Q.   After this check-in that you had with Ms. Rowe at the end

24  of June, did you have a team meeting scheduled for the

25  following week?

1   A.  The following week was, I believe, 4th of July.  So we had

2   a meeting the week after.

3   Q.  Okay.  And did Ms. Rowe attend that meeting?

4   A.  No.  I received an email, I believe it was early that

5   morning, that -- from Ulku saying that she was not feeling

6   well; that she probably wouldn't come Tuesday and Wednesday.

7   Q.  And when was -- what was the next you heard from Ms. Rowe?

8           MS. GREENE:  Objection.

9           Your Honor, may I have a sidebar?

10           (Continued on next page)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1        (At sidebar)

2            MS. GREENE:  Ms. Rowe is out on a medical leave, an

3    approved medical leave related to short-term disability

4    benefits.  Ms. Rowe knows that Mr. Gage knows this.  We

5    discussed ahead of time it's a protected leave.  She had to go

6    out unexpectedly and has been out since.

7            I had Mr. Gage's assurances that he was not going to

8    bring this up at trial for, one, it's protected under other

9    laws like the FMLA and the New York City Human Rights Law

10   regarding disabilities.  And so I'm very concerned, because the

11   next things that happened after this was Ms. Rowe giving

12   notification that she was going to be out.

13           And I wanted to get to it before the testimony came in

14   because this is -- this is very sensitive medical information.

15   He's aware of the nature and the reason for her absence; and

16   it's not something that should be brought into issue in this

17   case.  And if it were, it could rise to a separate legal claim.

18   But mostly, I'm just -- it's not an issue and I have his

19   assurances that it's not going to come up and I want to make

20   sure that's the case.

21           THE COURT:  All right.  Mr. Gage.

22           MR. GAGE:  Two things in response.

23           I'm absolutely not going to ask about any protected

24   medical leave.  If you want, your Honor, to get to the precise

25   dates, but Ms. Rowe did not ask for a medical leave until, I

1    believe it was, August.  I am simply -- I'm asking the witness

2    about a communication that she received from Ms. Rowe that has

3    absolutely nothing to do with the medical leave.

4            THE COURT:  Okay.  How are you going to ensure that --

5            MR. GAGE:  The witness knows -- she -- first of all,

6    I'm sorry for interrupting, your Honor.  But the witness knows

7    absolutely nothing about any protected medical information.

8            THE COURT:  She must know that Ms. Rowe is out on

9    leave though.

10           MR. GAGE:  She knows that in August she received

11   another communication from Ms. Rowe -- or from the benefits

12   department saying she had applied to be out of work.  I'm not

13   going anywhere near that.  (Indiscernible) anywhere not to go

14   near that.

15           THE COURT:  She does.

16           MR. GAGE:  Let me finish.

17           I am going nowhere near that, your Honor.  There are

18   things that Ms. Rowe wrote in this email that speak to how she

19   sees her job and how she sees what she needs to be doing.  And

20   I am almost done with my questioning.  I am not going beyond

21   that point in time, going nowhere near August, because I'm

22   not -- I don't plan on asking anything about medical leave.

23           MS. GREENE:  Two points of clarification:

24           One, I don't believe there's been any documents marked

25   with respect to Ms. Florissi, and I'm not sure what

1    communications you're referring to.  Is it an exhibit that

2    you're intending to show?

3            MR. GAGE:  I don't have an exhibit.  I'm asking her

4    about her memory.

5            MS. GREENE:  But prior to Ms. Rowe's leave, she was

6    absent for six weeks.  That then was the basis for that, so

7    that time period where she let her know that I'm going out, I'm

8    not -- I'm going to be out is also part of what precipitated

9    that protective leave, and that's the part that she shouldn't

10   be asked about.  Because ultimately it was established that it

11   was part of a medical leave due to a disability.  And it's not

12   something -- so I just want to make sure he's not going there

13   because --

14           MR. GAGE:  I just said I'm not going there.

15           THE COURT:  Okay.  But you're going to have to -- and

16   you can even say this, you're going to have to narrowly focus

17   her on this couple of days --

18           MR. GAGE:  I am, your Honor.

19           THE COURT:  -- or have the exhibit or whatever.

20   Because you need to make sure that she doesn't start going down

21   that road herself.

22           MR. GAGE:  She is absolutely not going down that path.

23           THE COURT:  Okay.

24           MR. GAGE:  Here's what counsel doesn't want the jury

25   to hear, your Honor.  I'll tell you what the witness is going

1   to say.  She's going to say that Ms. Rowe told her, I'm taking

2   the next six weeks off.  I'm not working on anything urgent.

3           And I'm going to ask her whether she was I working on

4   anything urgent.  And she's going to talk about the urgency of

5   the various projects, and then move on to a different topic.

6           THE COURT:  If that's what she said at the time,

7   that's fair game.

8           MR. GAGE:  That's absolutely what she said at the

9   time.

10          MS. GREENE:  Your Honor, she was going out, she was

11  not under obligation to --

12          THE COURT:  Why did she say that?

13          MS. GREENE:  Because she was going out on leave.

14          MR. GAGE:  She did not mention anything, your Honor.

15          MS. GREENE:  She wasn't required to mention that she

16  was going out.

17          MR. GAGE:  Let me explain the timeline.

18          MS. GREENE:  In order to defend herself, she's going

19  to have to come in now and establish why she went -- in June

20  why she went out on leave and the supporting documents that

21  came in later.  My client, in order to rebut what is testimony

22  about her leaving work unexpectedly is going to have to defend

23  herself by bringing in her medical records, which is not at

24  issue in this case and which is exactly what Mr. Gage told me

25  he was not going to ask her about.

1          MR. GAGE:  And I'm not.  This is the timing.  We were

2     scheduled to start trial in August.  She was taking six weeks

3     off right leading up to the trial.  She said absolutely nothing

4     about a medical leave.

5          After your Honor continued the trial for October, she

6     didn't come back to work.  And then sometime, I believe it was,

7     in August, after you continued the trial, she applied for

8     medical leave.  There's a clear marker as to when she applied

9     for a medical leave.  She did not apply for a medical leave.

10    This is a communication that is directly relevant to how

11    Ms. Rowe sees her job, and it's absolutely relevant.  It

12    doesn't require her -- she could take the stand and explain why

13    she doesn't think it's urgent.

14         THE COURT:  Do you have your agreement in writing?

15         MS. GREENE:  There's an email exchange and I will find

16    it.  I will just note that Google does not require

17    documentation for a six-week leave.  But for my client to come

18    up and have to be able to say that it was on recommendation

19    from her doctor that she took time off because of -- I'm very

20    upset that I even have to put this on the record.

21         THE COURT:  We're not going there.

22         MS. GREENE:  That is outside of what this case is

23    about, and it makes an improper inference.  It's highly

24    prejudicial to my client.  It's harassment, when he knows the

25    outcome.

1          MR. GAGE:  That is nonsense.  That is absolute

2   nonsense.  That is absolute nonsense.

3          THE COURT:  Okay.  Two issues:  One, I'm not familiar

4   with the document, so I have to go look at it.  Two, I want to

5   see her agreement.  Three, I'm not sure what we're going to do

6   with the witness and the jury while we sort this out.  It's

7   going to take a few minutes.

8          MR. GAGE:  How about if I just change my question.  I

9   don't want to waste the jury's time on this.  How about if I

10   just ask, did Ms. Rowe say anything to you to indicate whether

11   she thought she had an urgent project?

12          THE COURT:  I think that works.

13          MR. GAGE:  How about that?

14          I am absolutely not going --

15          MS. GREENE:  As long as the witness --

16          MR. GAGE:  Honestly.

17          MS. GREENE:  If that's what you're asking, I don't

18   care.  I just want to make sure the witness doesn't expound and

19   talk about the circumstances.

20          THE COURT:  If she starts doing that, I'm going to cut

21   her off.

22          MR. GAGE:  No, let me tell you.  First of all, she

23   doesn't know about this conversation, so I don't know

24   whether -- but if I ask that direct question, it certainly

25   minimizes it.

1          I have zero reason to believe that the six weeks she

2     took off had anything to do with her medical leave.  You asked

3     me not to go there.  I agreed not to go there.  And I

4     understood that she applied for medical leave in August, and

5     she's out until whatever, November or something like that.

6     That's all I know.  I don't know anything about the health

7     information.  I was going nowhere near that.

8          MS. GREENE:  Okay.  Well, that's why I'm saying if

9     you're asking her for whether Ms. Rowe communicated there was

10    anything urgent, I mean, it's hard to divorce that from the

11    context in which that came up.  It was Ms. Rowe's --

12         MR. GAGE:  She can testify about that.

13         MS. GREENE:  Ms. Rowe is going to have to say I had to

14    unexpectedly go out on a leave.  And so I communicated to her

15    to say, I'm unexpectedly going out on a leave.  There's nothing

16    urgent.  Ms. Florissi asked her to provide an update, a status

17    update, which she did.

18         MR. GAGE:  That's not what the witness is going to

19    say.

20         MS. GREENE:  That's what the document says.  But to

21    establish all of this is going into an area that's irrelevant

22    to this.

23         MR. GAGE:  It's absolutely relevant.

24         MS. GREENE:  Not as to her performance, as to her --

25         THE COURT:  I need to look at the document and I want

NAJVROW5                    Florissi - Direct

1   to see your agreement.

2            MR. GAGE:  Which document, your Honor?

3            THE COURT:  Weren't you about to put up a document?

4            MR. GAGE:  No.  I said I'm not going to put up a

5   document.  I'm not going to put up a document.

6            MS. GREENE:  Your Honor, I would have moved *in limine*

7   or before, having not had a representation from Mr. Gage that

8   we were not going to go there.

9            MR. GAGE:  Had you told me --

10           THE COURT:  The scope of where you weren't going to go

11   is what's important here.

12           MR. GAGE:  Absolutely.

13           MS. GREENE:  It's the leave.

14           MR. GAGE:  It's the medical leave.

15           MS. GREENE:  It's six weeks is also part of her

16   medical leave, whether it's the benefit period or not.

17           MR. GAGE:  I had no reason to know that and I still

18   have no reason to know that.

19           MS. GREENE:  But you know it because I'm telling you.

20           MR. GAGE:  I know she applied for medical leave.

21           MS. GREENE:  And so under the disability laws, under

22   Google's policies, the fact that the benefits started at a

23   certain point doesn't mean that the time before it also does

24   not --

25           MR. GAGE:  I don't want to waste the jury's time.  I

 1  will move on.

 2              (In open court)

 3  BY MR. GAGE:

 4  Q.  Ms. Florissi, I've got some different questions for you.

 5              In the entire time that you have been managing

 6  Ms. Rowe, have you expected anything of Ms. Rowe that is not

 7  expected of others on your team?

 8  A.  No, I have not.

 9  Q.  Ms. Florissi, have you in any way treated Ms. Rowe more

10  harshly because of this lawsuit?

11  A.  Not at all.  If anything, I have been very careful and very

12  understanding.

13              MR. GAGE:  No further questions, your Honor.

14  CROSS-EXAMINATION

15  BY MS. GREENE:

16  Q.  Hello, Ms. Florissi.

17  A.  Good afternoon.

18  Q.  I just have a few questions for you.

19              You first learned about this lawsuit in April 2022;

20  correct?

21  A.  Correct.

22  Q.  And sometime before the check-in meeting you had with

23  Ms. Rowe, you met with internal counsel at Google about her

24  case; correct?

25  A.  Not about her case, about the fact that I thought she

1    needed a support check-in.

2    Q.  And that was -- you had to handle it carefully because of

3    her case; correct?

4    A.  Correct.

5    Q.  And you made very -- you made sure to have careful

6    documentation because of Ms. Rowe's lawsuit; correct?

7    A.  Not only because of her lawsuit.  When you give a support

8    check-in, you have to collect information to make sure that all

9    the process is followed.

10   Q.  Now, prior to that support check-in meeting, you had never

11   told Ms. Rowe that you wanted the "artifacts"; correct?

12   A.  I never -- correct.  At the Level 8 technical director in

13   the office of the CTO is expected to produce artifacts.

14   Q.  Do you know whether Ms. Rowe wasn't producing artifacts or

15   was it just that you hadn't seen them?

16   A.  If she produced the artifacts, she never shared them with

17   me.

18   Q.  But prior to that check-in, you had never told her that you

19   wanted or expected her to share them with you; correct?

20   A.  I didn't think I have to; correct.

21   Q.  Now, the technical director role, you were asked about the

22   OKRs.  The OKRs have been set each year, but the technical

23   director position is still the technical director position;

24   correct?

25   A.  To the best of my understanding is a technical director

1  position to deliver against the OKRs.  Google has OKRs at every

2  level:  At the company level, at the business product areas

3  level, at the business level.  And they are set every year.  So

4  everybody within their role perform or execute, focus their

5  activities to deliver against those OKRs.

6  Q.  And technical directors are expected to be self-directed in

7  their role at the Level 8 and above; correct?

8  A.  Correct.

9  Q.  After you asked Ms. Rowe for artifacts, she provided them

10  to you; correct?

11  A.  She provided two artifacts.  One, which is the paper on the

12  trusted AI; and the other one in February with another OCTO

13  member also on the same topic.

14  Q.  Now, that trusted AI paper, do you recall how many pages

15  that was?

16  A.  Maybe around 30 pages or so, to the best of my recollection

17  here.

18  Q.  Right.  So 30 pages.  And that would have -- in order to be

19  able to write and produce a paper of 30 pages, it would have

20  required quite a bit of research, background, investigation;

21  correct?

22  A.  Correct.  However, the paper that was produced in February,

23  it was in partnership with another OCTO member that had already

24  been working on -- on the area as well.

25  Q.  And who was that other partner, that other OCTO director?

1   A.  Latta Suzuki.

2   Q.  And did you speak with Ms. Suzuki about what Ms. Rowe's

3   contributions to that paper were?

4   A.  No, I did not.

5   Q.  Ms. Rowe received the same performance rating as you for

6   2021; correct?

7   A.  That's correct.

8   Q.  And in fact, about -- this was a redesign of Google's

9   performance systems; correct?

10  A.  Correct.

11  Q.  And what percentage of Googlers at least in OCTO fell

12  within the same category you were in?

13  A.  I don't know for sure, but a greater majority, I would say.

14  The greater majority falls in the middle.

15  Q.  So Ms. Rowe's performance then is consistent with the

16  performance of most of the technical directors in OCTO,

17  correct, including yourself?

18  A.  Correct.

19          MS. GREENE:  No further questions.

20          MR. GAGE:  Just a couple questions, Judge.

21          THE COURT:  Okay.

22  REDIRECT EXAMINATION

23  BY MR. GAGE:

24  Q.  Ms. Florissi, since you've been a manager in OCTO, have you

25  explicitly told other members of your team that they need to

1    produce artifacts?

2    A.  Not until after the support check-in that I had with

3    Mrs. Rowe.  Then I started adding to the team meeting notes

4    that, Hey, just a reminder that we expect to see artifacts,

5    even though I had many artifacts from everyone.

6    Q.  I'm sorry, you said you had many artifacts from everyone?

7    A.  Yes, many.

8    Q.  What was the volume of artifacts you had from other members

9    of your team relative to the two you've gotten from Ms. Rowe?

10   A.  We are very, very, I would say, productive team from that

11   perspective.  That, I don't know, at least four or five a month

12   that I get from others, that are also very active documents,

13   like running notes, that is a custom that every time you attend

14   a meeting or you have a meeting with a customer or a meeting

15   with other engineers, we are very active in taking notes, so

16   there are plenty.

17   Q.  Has anyone ever specifically told you, you need to create

18   artifacts?

19   A.  Never.

20   Q.  Do you still do it?

21   A.  I -- I -- every single day.

22   Q.  Thank you.  No other questions, your Honor.

23            MS. GREENE:  No questions.

24            THE COURT:  Ms. Florissi, you are excused.

25            THE WITNESS:  Thank you.

NAJVROW5

1          THE COURT:  Thank you.

2          (Witness excused)

3          THE COURT:  Mr. Gage?

4          MR. GAGE:  Your Honor, Google rests its case.

5          THE COURT:  All right.  All right.  And we are going

6     with the plan that we're going to segue to tomorrow morning;

7     correct, with --

8          MS. GREENE:  Correct, your Honor.

9          THE COURT:  Okay.  So members of the jury, you are

10    excused for the day.  You will come back tomorrow morning and

11    you will -- you'll hear closing arguments by both sides.  Then

12    I will charge you, which means I will give you additional

13    instructions for you to keep in mind while you deliberate.  And

14    then you will -- the case will go to you and you will

15    deliberate.  So we are finally at that point.

16         I would ask that you not speak with anyone while

17    you're away from here about the case, not each other, not

18    anyone else.  Please don't do any research about the case.

19         Also, today I have noticed several of you diligently

20    taking notes.  So I just want to remind you those notes must

21    stay in the jury room overnight; you may not take them with

22    you.  If you would come back -- come back at -- be here at 8:45

23    tomorrow, to begin at 9.  That would be great.  And that's all.

24         (Jury not present)

25         (Continued on next page)

NAJHRow6

| | |
|---|---|
| 1 | THE COURT:  So we will have the charging conference |
| 2 | early in the morning tomorrow.  What did I just tell them, come |
| 3 | at — |
| 4 | MR. GAGE:  Come at 8:45. |
| 5 | THE COURT:  To begin at 9:00.  Why don't we convene in |
| 6 | here at 8:15.  You will get the drafts, obviously, before then |
| 7 | to review. |
| 8 | Yes, Ms. Greene. |
| 9 | MS. GREENE:  I was just going to ask if we'll get the |
| 10 | drafts this evening. |
| 11 | THE COURT:  I don't know.  The thing is that overnight |
| 12 | the last two nights we were tied up with applications and |
| 13 | objections that needed to be resolved, so we are not where I |
| 14 | thought we might be at this point with the charges.  So we're |
| 15 | working on them as quickly as we can. |
| 16 | MS. GREENE:  Understood. |
| 17 | THE COURT:  No more applications coming? |
| 18 | MS. TOMEZSKO:  Not on our end. |
| 19 | MS. GREENE:  Not from us, your Honor. |
| 20 | MR. GAGE:  Just a question. |
| 21 | THE COURT:  Yes. |
| 22 | MR. GAGE:  Will it also include the verdict form that |
| 23 | your Honor proposed? |
| 24 | THE COURT:  Yes, it will. |
| 25 | All right.  I guess that's it for now, and I hope you |

NAJHRow6

1    enjoy the additional time today.  I'll see you in the morning.

2              (Adjourned to October 20, 2023, at 8:15 a.m.)

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                    INDEX OF EXAMINATION

2     Examination of:                          Page

3      CHRIS HUMEZ

4     Direct By Mr. Gage . . . . . . . . . . . . . .1148

5     Cross By Ms. Greene  . . . . . . . . . . . .1159

6     Redirect By Mr. Gage . . . . . . . . . . . .1163

7      KRISTA CALLAGHAN

8     Direct By Ms. Tomezsko . . . . . . . . . .1165

9     Cross By Mr. Chiarello . . . . . . . . . . .1175

10    BRIAN STEVENS

11    Direct By Mr. Gage . . . . . . . . . . . . . .1179

12    Cross By Ms. Greene  . . . . . . . . . . . .1219

13    Redirect By Mr. Gage . . . . . . . . . . . .1226

14     MELISSA LAWRENCE

15    Direct By Ms. Tomezsko . . . . . . . . . .1228

16    Cross By Ms. Greene  . . . . . . . . . . . .1250

17    KIRSTEN MARIE KLIPHOUSE

18    Direct By Ms. Tomezsko . . . . . . . . . .1253

19    Cross By Ms. Greene  . . . . . . . . . . . .1264

20     PATRICIA FLORISSI

21    Direct By Mr. Gage . . . . . . . . . . . . . .1272

22    Cross By Ms. Greene  . . . . . . . . . . . .1305

23    Redirect By Mr. Gage . . . . . . . . . . . .1308

24

25