NAKHRow1

1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x

3   ULKU ROWE,

4                  Plaintiff,

5           v.                          19 Civ. 8655 (JHR)

6   GOOGLE LLC,

7                  Defendant.           Trial

8   ------------------------------x
                                        New York, N.Y.
9                                       October 20, 2023
                                        8:30 a.m.
10
    Before:
11
                      HON. JENNIFER H. REARDEN,
12
                                        District Judge
13                                      -and a jury-

14                      APPEARANCES

15  OUTTEN & GOLDEN, LLP
          Attorneys for Plaintiff
16  BY:   CARA E. GREENE
          GREGORY S. CHIARELLO
17        SHIRA Z. GELFAND

18  PAUL HASTINGS LLP
          Attorneys for Defendant
19  BY:   KENNETH W. GAGE
          SARA B. TOMEZSKO
20
    Also Present:  Vincent Yang, Paralegal (Outten & Golden)
21                 Andrew Velazquez, Google Rep.
                   Jean Gutierrez, Paralegal (Paul Hastings)
22

23

24

25

NAKHRow1

1                    (Trial resumed; jury not present)

2                    THE COURT:  We want to talk about jury charges?

3                    MR. GAGE:  Sure.

4                    THE COURT:  All right.

5                    MR. GAGE:  Seems timely.

6                    THE COURT:  Well, are there's a few issues this

7     morning, but I think we have time.

8                    MR. CHIARELLO:  Your Honor, would you like us to lead,

9     or did you want to direct us?

10                   THE COURT:  No, tell me ── why don't you start us off,

11    plaintiff.

12                   MR. CHIARELLO:  OK.  There's, I think, just a couple

13    small things that had caught our attention.  On page 12 of the

14    charge, there's a reference to the New York State Human Rights

15    Law, which is not a law under consideration.

16                   THE COURT:  Oh, whoops.

17                   MR. CHIARELLO:  Paragraph that begins "Finally,

18    Ms. Rowe brings two claims of retaliation."

19                   THE COURT:  Oh, yes.  OK.

20                   MR. CHIARELLO:  I think that would be the New York

21    Labor Law.

22                   THE COURT:  Yes.  You know what, I'm going to try to

23    keep up with you, Mr. Chiarello.  One second.

24                   OK.  Go ahead.

25                   MR. CHIARELLO:  OK.  On page 14, the first element of

NAKHRow1

1    the labor law claim, wages, the Court's definition of wages

2    that it includes all forms of compensation, including salary,

3    bonuses, stock, profit sharing, commissions, expense accounts

4    is a little more elaborate than the definition in 191, and I

5    think the concern we have is that it might suggest to the jury

6    that for compensation to be —— for wages to be comparable or

7    for there to be a wage difference, the jury needs to look at

8    things that are maybe beyond what they're looking at here.  And

9    I think what the concern is the initial hiring grant, right,

10   whether that's going to influence.  But I think on the issue of

11   wages, they should consider all compensation, and I don't think

12   that we need all the specific definitions of what that could

13   be.

14           THE COURT:  All right.  Google, do you have a view on

15   that?  We're on page 14, and we're just talking about the term

16   "wages" and how it's defined.  And Mr. Chiarello is suggesting

17   that I just cut it off after "all forms of compensation" and

18   not risk distracting or confusing the jury with profit sharing,

19   and so on.

20           MR. CHIARELLO:  I think, your Honor, what we're asking

21   for the definition of wages that is in 190(1), the earnings for

22   an employee for labor or services rendered.

23           THE COURT:  So you want me to substitute that?

24           MR. CHIARELLO:  Yeah.

25           THE COURT:  Tell me that again, and then we'll read it

NAKHRow1

1    to Mr. Gage.  "The term wages includes"?

2              MR. CHIARELLO:  "Earnings of an employee for labor or

3    services rendered."

4              MR. GAGE:  And you're reading right from the statute,

5    I gather?

6              MR. CHIARELLO:  Yes.

7              MR. GAGE:  Seems familiar.

8              THE COURT:  So we're cutting "all forms of

9    compensation" and everything from that point to the end of that

10   sentence that —— the way I had it, correct, through "expense

11   accounts"?

12             MR. CHIARELLO:  Correct, your Honor.

13             THE COURT:  OK.

14             MR. GAGE:  So it's just the sentence ends at the word

15   "compensation"?

16             THE COURT:  No.  So now, Mr. Gage, we're going to

17   have, at Mr. Chiarello's suggestion, "For these purposes, the

18   term wages includes earnings of an employee for labor or

19   services rendered."

20             It includes or consists of?

21             MR. CHIARELLO:  I would say "consists of."

22             THE COURT:  OK.

23             MR. GAGE:  What does the statute say?

24             MR. CHIARELLO:  It just says "wages means."  Uses the

25   words "means the earnings of an employee for labor or services

NAKHRow1

1    rendered."

2              THE COURT:  Then why don't we put that?

3              MR. GAGE:  Why don't we just do that?

4              THE COURT:  "For these purposes, wages means."

5              MR. GAGE:  "Earnings."

6              THE COURT:  Yes.  "Of an employee for labor or

7    services rendered," period.  Good?  OK.

8              MR. CHIARELLO:  I think the only other issue we had,

9    your Honor, was the bottom of page 15, the definition of

10   responsibility.

11             THE COURT:  Yes.

12             MR. CHIARELLO:  I think we take issue with —— I think

13   it's describing to the jury what it should take into account,

14   but that's a question for the jury in terms of comparing

15   whether or not there were equivalent levels of responsibility.

16   So what had stood out to us was that "including whether

17   Ms. Rowe and Nicholas Harteau and/or Stuart Breslow were

18   equally expected to direct the work of others or to represent

19   Google in dealing with clients or others."  Those may be things

20   that the jury considers, but we're concerned that that's going

21   to focus them as the only thing, particularly where there

22   wasn't really a lot of testimony about directing work of others

23   as being something that we were focusing on for comparison.

24             THE COURT:  Do you see where we are, Mr. Gage?

25             MR. GAGE:  On page 16?

NAKHRow1

| | |
|---|---|
| 1 | THE COURT:  Yes.  It starts on the bottom of page 15, |
| 2 | "you should also take into account such things."  And |
| 3 | Mr. Chiarello is suggesting, I believe, that we cut that off |
| 4 | after "such things as the level of authority delegated to |
| 5 | Ms. Rowe as compared to Nicholas Harteau and Stuart Breslow," |
| 6 | period, right, Mr. Chiarello, and skip the including? |
| 7 | MR. GAGE:  I want him to confirm that's what he's |
| 8 | asking. |
| 9 | THE COURT:  Yes, me too.  Me too. |
| 10 | MR. CHIARELLO:  I'm just rereading it, your Honor, and |
| 11 | I just also want to get a quick look at what we. . . |
| 12 | I think the entire sentence, your Honor. |
| 13 | THE COURT:  So that means that we would —— we're just |
| 14 | now, Mr. Gage, trying to —— I'm trying to nail down |
| 15 | Mr. Chiarello's request, all right, and then we'll figure out |
| 16 | what we're going to do. |
| 17 | So, Mr. Chiarello, you're proposing that we keep the |
| 18 | first sentence under romanette iii, responsibility, right, |
| 19 | "consider the degree of accountability expected by Google," and |
| 20 | so on, through "to perform the job duties."  Then we would |
| 21 | delete the second sentence, and I guess we would delete the |
| 22 | "finally" sentence also? |
| 23 | MR. CHIARELLO:  Yes. |
| 24 | MR. GAGE:  Just to be clear, we disagree. |
| 25 | THE COURT:  Yes, I figured.  I just want to —— |

NAKHRow1

1          MR. GAGE:  I mean, there's clearly evidence in the

2     record that Mr. Harteau had responsibility for directing the

3     work of others.  So there's absolutely evidence in the record

4     to support that.  I think that the way your Honor has it

5     written is appropriate.  I don't think it's confusing, and I

6     think it's all fair game.

7          THE COURT:  I do —— I will say that this paragraph

8     comes directly from other instructions in other employment

9     discrimination cases in this district.

10         MR. CHIARELLO:  I think, your Honor, if we're going to

11    consider that language, then we need sort of either a

12    counterbalance.  I think the other concern, or the other side

13    of that concern is, you know, the law that occasional or

14    sporadic performance of an activity which may require a

15    different skill, effort, and responsibility is not alone

16    sufficient to justify a finding that two jobs are not equal.

17         THE COURT:  What if we substituted "may" for "should"?

18    Does that help, "you may also take into account"?

19         MR. GAGE:  We can live with that.  I'd prefer

20    "should," but we can live with "may."

21         MR. CHIARELLO:  I think we would ask for the language

22    that qualifies that whatever we're discussing in terms of

23    potential specifics, whether it's management or responsibility,

24    that the jury understands that occasional or sporadic

25    performance does not alone sufficiently —— or let alone justify

NAKHRow1

1   a finding that two jobs are not equal.

2            THE COURT:  Well, is there basis in the law for that?

3            MR. CHIARELLO:  *William v. Morrison & Foerster*.  I'll

4   get you the citation for that.

5            THE COURT:  All right.  You're going to have to give

6   me the language again, just so I can think about it.

7            MR. CHIARELLO:  Sure.

8            MR. GAGE:  My suggestion on that, your Honor, if

9   you're going to add that, I would think that it belongs in the

10  earlier paragraph under two, the second element, because that

11  qualification, I think that counsel is suggesting, could apply

12  to effort as well, can apply to skill.

13           MR. CHIARELLO:  The language is "skill, effort, and

14  responsibility," so — and responsibility is the third thing,

15  so I think after all three of those is when it would make

16  sense.  I mean, your Honor, I think if we were to include it in

17  the sentence before Section 3 where you say "remain mindful

18  that skill, effort, and responsibility constitute separate

19  tests," it could go before that.

20           MR. GAGE:  I guess my point is that the qualifier

21  "occasional" refers to something the person is doing, not just

22  one of these three things here.  So I would suggest putting it

23  either at the top —

24           THE COURT:  I was thinking about the top, yes.

25           Mr. Chiarello, can you read to me, please, the

NAKHRow1

1   language you want me to add so that I can figure it out.

2           MR. CHIARELLO:  Yes, your Honor:  "The occasional or

3   sporadic performance of an activity which may require different

4   skill, effort, and responsibility" ——

5           THE COURT:  Hang on, hang on.  "May require different

6   skill, effort, or responsibility," yes.

7           MR. CHIARELLO:  "Is not alone sufficient."

8           THE COURT:  Yes.

9           MR. CHIARELLO:  "To justify a finding that two jobs

10   are not equal."  And the citation for *William v. Morrison*

11   *& Foerster* is 2021 U.S. Dist. LEXIS 141869.

12           THE COURT:  Is that a quote that you just gave me?

13           MR. CHIARELLO:  It is.  Endeavoring to find the

14   pincite for you, your Honor.  I think it's at 51 to 52.

15           THE COURT:  OK.

16           MR. GAGE:  Your Honor.

17           THE COURT:  Yes.

18           MR. GAGE:  Could you just read back what you wrote and

19   where you wrote it?

20           THE COURT:  Yes.  I just wrote it on a piece of paper

21   for now, but I think —— OK.  Let me read it.

22           "The occasional or sporadic performance of an activity

23   which may require different skill, effort, or responsibility is

24   not alone sufficient to justify a finding that two jobs are not

25   equal."

NAKHRow1

1        MR. GAGE:  Your Honor, if I could ——

2        MR. CHIARELLO:  "Not substantially equal," but yes.

3        THE COURT:  "Not substantially equal"?  All right.

4        MR. GAGE:  I think I found a good place for it, your

5   Honor.

6        THE COURT:  OK.  I think I have too.  Let's see.  You

7   go.

8        MR. GAGE:  See how good I am at guessing?

9        Your Honor, on page 14, I would put it right after the

10  sentence that ends with "may be disregarded," because it's a

11  similar concept.

12       THE COURT:  Oh, on 14.  One second.

13       MR. GAGE:  Right before the words "on the other hand."

14       THE COURT:  Oh.  That does seem to fit there,

15  Mr. Chiarello.

16       MR. CHIARELLO:  I think our preference would be to

17  have it with the language that's creating the issue, but to

18  have it in the charge anyplace is better than not having it.

19  So we ——

20       THE COURT:  What about this?  What if we put it ——

21  we'll put it there because we're talking about substantially

22  equal in that paragraph, so it does seem to fit there.  But I

23  could break this out into its own paragraph, and then we could

24  put the other —— "on the other hand" down again and indent

25  that ——

NAKHRow1

1            MR. CHIARELLO:  OK.

2            THE COURT:  —— so that the paragraph doesn't get too

3       long and it's easier to follow.  All right.  Let me put it

4       there.

5            MR. GAGE:  So I'm clear, so then what is now one

6       paragraph at the bottom of 14 will become three or two?

7            THE COURT:  I think —— let me see how it looks when I

8       type it in.

9            MR. GAGE:  OK.  But the placement is the same?

10           THE COURT:  Yes.  Yes.

11           MR. GAGE:  Except adding room for a breath?

12           THE COURT:  That's right.

13           MR. GAGE:  If that's all it is, we don't have a

14      particular preference, your Honor.

15           THE COURT:  So I now have —— well, we now have in the

16      Section 2, four paragraphs, small paragraphs, but they're more

17      or less commensurate in length.  So we have the "in determining

18      whether work" paragraph and that ends with "may be

19      disregarded."

20           Then we have "The occasional or sporadic performance

21      of an activity which may require different skill, effort, or

22      responsibility is not alone sufficient to justify a finding

23      that two jobs are not substantially equal."

24           Then we have "On the other hand, work is not

25      considered substantially equal" going through "two jobs that is

NAKHRow1

1    important."

2              And then, finally, that paragraph that "as I just

3    noted."

4              I think that works.

5              MR. CHIARELLO:  We're in agreement, your Honor.

6    Wondering if the "on the other hand" ——

7              THE COURT:  Oh, that doesn't —— you're right.  OK.

8    Why don't we just strike that.

9              MR. CHIARELLO:  I think we're still on the same hand

10   at this point.

11             THE COURT:  OK.

12             MR. GAGE:  So what words did we just strike?

13             THE COURT:  The "on the other hand, work is not

14   consider substantially equal," I don't think we really need it.

15   So we're taking out "on the other hand," and we're starting

16   that paragraph with "work is not considered."

17             MR. GAGE:  I thought we were striking the whole

18   sentence.

19             THE COURT:  No.

20             MR. GAGE:  Just those four words.

21             THE COURT:  OK.  Anything else from plaintiff?

22             MR. CHIARELLO:  No, your Honor.

23             THE COURT:  OK.  Google?

24             MR. GAGE:  Just a couple of items, Judge.  The first

25   one, your Honor, it appears in a couple of places on page 12,

NAKHRow1

1  and I'll identify the others, but the words in the paragraph

2  that begins the words "First, Ms. Rowe claims."

3          THE COURT:  Yes.

4          MR. GAGE:  We should strike "substantially similar" at

5  the end of that.  The reason for that, your Honor, is that that

6  language didn't appear in the statute until after the period of

7  time which plaintiff is comparing herself to Mr. Harteau and

8  Mr. Breslow, and that's why it's the substantially equal

9  standard.

10          THE COURT:  Substantially equal or equal?

11          MR. GAGE:  Well, the statute says "equal," but I

12  believe the case law has put the gloss on it as substantially

13  equal.  But what we're suggesting is that the words "or

14  substantially similar" should be stricken.  And it would be

15  there, and it appears on 13 in the paragraph that begins "to

16  prevail on" two lines below that.

17          THE COURT:  I mean, I want to hear from plaintiff,

18  but —

19          MR. GAGE:  Can I tell you the other locations for it?

20          THE COURT:  Before we go through all the locations, I

21  think let's just talk about it.

22          Both sides in your summary judgment motions, you

23  argued under equal and substantially similar, and Judge

24  Schofield said:

25          "To prevail on her NYEPL claim, Rowe must  demonstrate

NAKHRow1

1   that Google failed to pay her equally to a man in the same

2   geographic area for (a) equal work on a job the performance of

3   which requires equal skill, effort, and responsibility and

4   which is performed under similar working conditions, or (b)

5   substantially similar work when viewed as a composite of skill,

6   effort, and responsibility and performed under similar working

7   conditions."

8           That's already in the case.

9           MR. GAGE:  Well, your Honor, on summary judgment, we

10  argued both standards because we didn't know what opposing

11  counsel was going to argue.  When we submitted our proposed

12  charges, I believe both parties proposed charges only

13  referenced the substantially equal standard.

14          THE COURT:  No, both parties referenced all different.

15  Equal, substantially equal, substantially similar.

16          MR. GAGE:  I don't think we referenced ──

17          THE COURT:  No, as between the two of you now, but

18  both sides referenced more than just one.

19          MR. GAGE:  Well, the word "substantially" has

20  routinely been coupled with the word "equal" prior to the 2019

21  amendment.  The October 2019 amendment is where the legislature

22  adopted the alternative, that is, the similar as opposed to

23  just equal and the leveling decision here, those decisions that

24  are being challenged, Mr. Harteau left before the statute was

25  amended.  And so it's our position that those words should not

NAKHRow1

 1   be charged to the jury and that the jury should evaluate this

 2   case under the pre-amendment statute.  And, again, the word

 3   "substantially equal" appears and did appear previously in the

 4   case law.

 5            THE COURT:  So the whole case, you're saying, should

 6   be evaluated ⎯

 7            MR. GAGE:  Yes, that's our position.

 8            THE COURT:  And you're saying "equal or substantially

 9   equal"?

10            MR. GAGE:  The statute says "equal" and

11   historically ⎯

12            THE COURT:  That's how it's defined.

13            MR. GAGE:  ⎯ in giving charges the courts have

14   interpreted it as substantially equal.

15            THE COURT:  OK.

16            MR. GAGE:  And that plays into the other language you

17   amended, we amended, a few minutes ago about the occasional

18   use, so on and so forth.

19            THE COURT:  All right.  Plaintiff, what's your

20   position?

21            MS. GREENE:  Just one moment, your Honor.

22            THE COURT:  Yes.  By the way, did we resolve "should"

23   versus "may" on ⎯ going back to page ⎯

24            MR. GAGE:  I thought we did.  I don't remember what

25   page it was.

NAKHRow1

1                    THE COURT:  I think that was 16.

2                    MS. TOMEZSKO:  I thought it was the bottom of 15, your

3      Honor.

4                    THE COURT:  Now I'm doing track changes.

5                    MR. GAGE:  Romanette iii, the third line of romanette

6      iii, "you may also take into account."

7                    MR. CHIARELLO:  I thought we had agreed on "may."  I

8      guess your understanding was it was "may," and I think "may"

9      would be our preference.  You're talking about the first

10     sentence under responsibility?

11                   THE COURT:  Yes.  So in deciding whether the jobs

12     involve substantially equal responsibilities, "you should" or

13     "you may" in that first sentence?

14                   MR. CHIARELLO:  You may.

15                   THE COURT:  OK.  And then second sentence, "you may

16     also take into account," right?

17                   MR. CHIARELLO:  Correct.

18                   THE COURT:  Is there another one?  Yes.  Finally, you

19     may consider the consequences to Google.

20                   OK.  Ms. Greene.

21                   MS. GREENE:  A few things.  One, as you noted, Judge

22     Schofield's decision is the law of the case.  There's some

23     related issues here.  One is that the law provides that

24     predecessors and successors can serve as comparators for

25     purposes of the Equal Pay Law.  We had included in our

NAKHRow1

1   instructions language that Ms. Rowe need not show that she and

2   Mr. Harteau and Mr. Breslow were comparators during the same

3   time period.  It is enough for her to meet her burden of proof

4   if Ms. Rowe proved by a preponderance of the evidence that they

5   were comparators under the law I've described, even if the time

6   period in which they were performing that work did not overlap.

7          The defendant in the course of this trial has taken

8   the position Ms. Rowe's later work, the work that she performed

9   under Ms. Florissi, is somehow relevant to the inquiry of

10   whether she's performing work equal to that work that she

11   performed as to other Level 8s or perhaps even Mr. Harteau,

12   Mr. Breslow.  In that case it's happening now, that comparison,

13   as to the work she's performing now, and it's the

14   "substantially similar" language that should apply.  So that

15   would be our position, that the "substantially similar"

16   language is the correct language here.

17          THE COURT:  But you're saying throughout the case or

18   only for a limited part?

19          MS. GREENE:  Throughout the case, your Honor.

20          MR. GAGE:  Your Honor.

21          THE COURT:  Yes.

22          MR. GAGE:  Well, I'll wait.

23          THE COURT:  No, go ahead.

24          MR. GAGE:  I'm looking at plaintiff's proposed charge,

25   which is, I think, document 273.  And it says:  "To determine

NAKHRow1

1    whether Ms. Rowe has proven that her work and the work of

2    Mr. Harteau and/or Mr. Breslow were equal for purposes of the

3    law, you must compare the jobs," then it continues:  "Equal

4    does not mean identical and job titles are not determinative."

5            And so plaintiff's counsel used that language.  As to

6    Judge Schofield's decision, I don't think it's law of the case

7    on this legal question.  Judge Schofield just said there's a

8    question of fact under the labor law, and we argued in the

9    summary judgment motion we didn't know which provision

10   plaintiff's counsel was going to argue.  I don't — I don't

11   have our brief committed to memory, but I do believe that we

12   made the point in our briefing that it would be improper to

13   hold an employer to a standard that didn't exist at the time it

14   was acting.  And that's the challenge here, that up until

15   October of 2019, it was not unlawful for an employer to pay a

16   man and a woman differently if their work was only

17   substantially similar.  It had to be substantially equal up

18   until October.

19           And so that's the issue, that's the core of the issue

20   here, and we think that because they are pointing to a leveling

21   decision that was make in 2016 and 2017, they're pointing to

22   compensation decisions or initial comp decision compared to the

23   initial comp decision of Mr. Breslow and Mr. Harteau, and based

24   upon how the evidence demonstrates the comp is determined at

25   Google, it's algorithmic, it's formulaic every year.  It's a

NAKHRow1

1    function of the performance rating, an algorithm, and level.

2    So if the level was not tainted, if you will, by

3    discrimination, that certainly is a nondiscriminatory factor,

4    and if they can't prove that Ms. Rowe was doing substantially

5    equal work to those two individuals, she can't succeed.

6            MS. GREENE:  Your Honor, if I may respond?

7            THE COURT:  Yes.

8            MS. GREENE:  Those are all arguments that opposing

9    counsel may make to the jury.  They don't belong in a jury

10   charge.  I think what we — what we could agree to is the

11   inclusion of the "substantially equal" language instead of

12   "substantially similar," but there does need to be that

13   explanation for the jury that Ms. Rowe need not show that she

14   and Mr. Harteau and/or Mr. Breslow were comparators during this

15   same time period and that that language that is on page 35 of

16   the — of the joint submission, which was plaintiff's charge on

17   this case.

18           THE COURT:  Wait.  The joint submission?

19           MR. CHIARELLO:  I'm looking now at ECF No. 273,

20   document 273, the joint charge that the parties submitted.

21           THE COURT:  OK.

22           MR. CHIARELLO:  On page 35 was plaintiff's submission

23   on the Equal Pay Law charge, and it is the second paragraph

24   from the bottom on page 35 of that document.

25           THE COURT:  I think 35 is the defendant's submission.

NAKHRow1

1   Are you sure you're looking at the right ——

2            MS. GREENE:  You know, your Honor, you're right, in

3   which case it definitely should be ——

4            MR. GAGE:  Your Honor, I agree.

5            MS. GREENE:  My point being that that language about

6   the comparators ——

7            THE COURT:  You're talking about the "substantially

8   similar" language on page 35?  I just ——

9            MS. GREENE:  No, your Honor, I'm sorry.  It's also on

10  page 32, which is where it's in plaintiff's.  I think this is

11  one where there was some differences in how the concept was

12  agreed by the parties.  Plaintiff's language on page 32 is:

13  "It is enough to find liability if Ms. Rowe proves by a

14  preponderance of the evidence that she performed work and that

15  Mr. Harteau and/or Mr. Breslow performed work equal for

16  purposes of the Equal Pay Law at any time for which Mr. Harteau

17  and Mr. Breslow were paid more, even if the time period in

18  which they were performing the work did not overlap."

19            THE COURT:  OK.

20            MS. GREENE:  So we can agree to the "substantially

21  equal" as opposed to "substantially similar" provided that

22  there's some explanation to the jury about how to deal with the

23  time issue and the fact that she's stating a claim now for work

24  that relates back to work that Mr. Harteau, Mr. Breslow

25  performed in a different time period.

NAKHRow1

```
1            THE COURT:  OK.  So are you saying that you would be

2     comfortable with "equal" or "substantially equal" or just

3     "equal" given that equal is defined as substantially equal?

4            MS. GREENE:  I think "substantially equal" given both

5     the law of the case and defendant's own proposed charges on

6     this.

7            THE COURT:  Well, defendant's proposed charge says

8     "substantially similar."

9            So, Mr. Gage, where are you now?

10           MR. GAGE:  I'm right here, your Honor.  What page are

11    you looking at, your Honor?

12           THE COURT:  Pages 34 to 35, your proposed charge:  "In

13    evaluating whether the work performed was substantially similar

14    to work performed by comparable male employees, you should

15    consider whether the work being compared required similar

16    skill, effort, and responsibility."

17           MR. GAGE:  We believe it should be equal, your Honor.

18           By the way, we don't contest the separate proposition

19    that counsel was referring to earlier.  A plaintiff can refer

20    to a comparator at a different point in time.

21           THE COURT:  OK.

22           MR. GAGE:  We don't contest that proposition.

23           THE COURT:  So we're going to put that in, but why

24    don't we do go with "equal" because Ms. Greene says she's fine

25    with this.  Why don't we go with "equal or substantially
```

NAKHRow1

1    equal."  Is everyone good with that?

2              MR. GAGE:  That's fine.

3              MS. GREENE:  Yes.

4              THE COURT:  All right.  So now you just have to help

5    me find all the spots in here where I need to make that change.

6              And then, Ms. Greene, we're going to add in "need not

7    show comparators during the same time period."

8              MR. GAGE:  I think the first one I have is on 13, your

9    Honor.  It's the paragraph under B, second paragraph begins "to

10   prevail on," and it's two lines below that.

11             THE COURT:  Yes, I see it.  Yes.

12             MR. GAGE:  I think the next one ——

13             THE COURT:  Wait, wait, wait.  We have to do this in

14   real time because there's no other time.

15             "In the same geographic area for work which required

16   equal or substantially equal skill."

17             MR. GAGE:  Correct.

18             THE COURT:  Is that what we're doing, Ms. Greene?

19             MS. GREENE:  Yes.

20             THE COURT:  OK.  "Substantially equal skill, effort

21   and responsibility."

22             All right.  Next.

23             MR. GAGE:  The next one is in the paragraph that

24   begins with the word "second," so it's ——

25             THE COURT:  "Equal or substantially equal."  Got it.

NAKHRow1

1    OK.

2              MR. GAGE:  Then if your Honor's reading the headings,

3    then it would be heading No. 2.

4              THE COURT:  Yes, I got it.  Ms. Rowe must prove that

5    her work was equal or substantially equal.

6              MR. GAGE:  Yes.  And then the last sentence of that

7    paragraph has it correct.

8              THE COURT:  The last sentence of that paragraph?

9              MR. GAGE:  Yeah.

10             THE COURT:  Yes.

11             MR. GAGE:  It already says that.

12             THE COURT:  OK.

13             MR. GAGE:  The next paragraph, I believe, is all

14   substantially equal.

15             THE COURT:  OK.

16             MR. GAGE:  And then I think that's it.  Yeah, that

17   appears to be it, your Honor.

18             THE COURT:  All right.  Plaintiff, do you see any

19   other spots where this edit needs to be made?

20             MR. CHIARELLO:  We don't see any others, your Honor.

21             THE COURT:  There might be.  One moment.

22             MR. GAGE:  Let me know when you're ——

23             THE COURT:  Yes, just a second.

24             OK.  Header III, substantive charges, about four lines

25   down, the paragraph that begins "first," it says, "Nicholas

NAKHRow1

1   Harteau and Stuart Breslow who she argues perform equal or

2   substantially equal work to her," yes?

3         MR. GAGE:  Yes.  Yeah.

4         THE COURT:  Now I think that's it.  Oh, wait.  Yes,

5   that's it now.

6         Now we have to add plaintiff's —— Ms. Greene, can you

7   read me that language.  First I'm just going to note it, and

8   then we're going to figure out where it goes.

9         MS. GREENE:  The language from ——

10        THE COURT:  Is it, "It is enough to find liability if

11  Ms. Rowe proves by a preponderance of the evidence that she

12  performed work and that Mr. Harteau and/or Mr. Breslow

13  performed work equal for purposes of the Equal Pay Law at any

14  time for which Mr. Harteau and/or Mr. Breslow were paid more

15  even if the time period in which they were performing that work

16  did not overlap"?

17        MS. GREENE:  That's right.  But again, with our edit

18  it should be "equal" or "substantially equal."

19        THE COURT:  Yes, yes.

20        MS. GREENE:  But that is the language.

21        THE COURT:  So where it says "she performed work that

22  Mr. Harteau and/or Mr. Breslow performed work equal," we're

23  going to add "or substantially equal" in that spot.

24        MR. GAGE:  And now we're looking for a location for

25  it.

NAKHRow1

1             THE COURT:  Now we're looking for a location to park

2     that.

3             MR. GAGE:  If I may, Judge, somewhere in two, I think,

4     is where it probably belongs.

5             THE COURT:  In two?

6             MR. GAGE:  At the end of the first paragraph.

7             THE COURT:  The second element?

8             MR. GAGE:  Yeah, maybe at the end of that paragraph.

9             THE COURT:  Let's see.  I think, by the way, that

10    header still says "substantially similar."  I'm changing that

11    as well, the header for two.

12            Now, the new paragraph, the "occasional or sporadic

13    performance of an activity" paragraph, proposed by

14    Mr. Chiarello further fleshes out substantially equal, and then

15    so does the fourth paragraph.  What about at the end of that

16    section before romanette i skill?

17            MR. GAGE:  So right before "I will now tell you"?

18            THE COURT:  Oh, yes, I see what you're saying.

19            MR. GAGE:  Maybe another paragraph —— well, no, that

20    doesn't work.  How about at the very end of the second element,

21    right before the third element after "remain mindful that"?

22            THE COURT:  I think it could go there.

23            Are you, Ms. Greene, pondering a spot for that

24    language?

25            MS. GREENE:  I'm just looking at that spot, yes, your

NAKHRow1

1    Honor.

2                THE COURT:  OK.

3                MS. GREENE:  I think that Mr. Gage's proposal, right

4    before the beginning of the third element, is a good place for

5    it.

6                THE COURT:  OK.  So I will make that its own

7    paragraph, yes.

8                MS. GREENE:  Yes.

9                THE COURT:  OK.

10               (Continued on next page)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

NAKVROW1

1          THE COURT:  There might be a glitch in this sentence,

2     so you'll tell me.

3          It is enough to find liability if Ms. Rowe proves by a

4     preponderance of the evidence that she performed work that

5     Mr. Harteau and/or Mr. Breslow performed equal or substantially

6     equal for purposes of the New York Labor Law — at any time —

7     for which Mr. Harteau and/or Mr. Breslow were paid more, even

8     if the time period in which they were performing that work did

9     not overlap.

10         MS. GREENE:  I think, your Honor, I'm looking at the

11    screen, it maybe should read — and I apologize for sitting down

12    while I'm looking at the screen.

13         THE COURT:  No, no, please.

14         MS. GREENE:  It is enough to find liability if

15    Ms. Rowe proves by a preponderance of the evidence that she

16    performed equal or substantially equal work to Mr. Harteau or

17    Mr. Breslow for purposes of the New York Labor Law.

18         THE COURT:  Wait a second.

19         She performed equal or substantially equal work

20    that -- what was after that?

21         MS. GREENE:  I'm trying to read from the screen.  It's

22    a little different.

23         THE COURT:  This is what got me, too, because reading

24    from LiveNote --

25         MR. CHIARELLO:  I think Ms. Greene is suggesting

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

 1   flipping the language that it's --

 2            THE COURT:  I think what you're saying, proves by a

 3   preponderance of the evidence that she performed equal or

 4   substantially equal work to that performed by Mr. Harteau

 5   and/or Mr. Breslow for purposes of the New York Labor Law.

 6            MS. GREENE:  I think the issue is that we're looking

 7   for that second part about the timing.

 8            THE COURT:  That's in there.  That's in there.

 9            So when you get past this glitch, performed for

10   purposes of the New York Labor Law — at any time — for which

11   Mr. Harteau and/or Mr. Breslow were paid more, even if the time

12   period in which they were performing that work did not overlap.

13   That's really what you're going after.

14            MS. GREENE:  Right.  Yes, your Honor.

15            THE COURT:  All right.  We still need to fix this

16   first part:  It is enough to find liability if Ms. Rowe proves

17   by a preponderance of the evidence that -- Ms. Greene, you said

18   she performed equal or substantially equal work.  Is it

19   compared to Mr. Harteau and/or Mr. Breslow for purposes of the

20   New York Labor Law?

21            MR. CHIARELLO:  Performed work equal or substantially

22   equal to.

23            THE COURT:  That of?

24            MR. GAGE:  How about "that performed by"?

25            THE COURT:  Okay.

NAKVROW1

1          Proves by a preponderance of the evidence that she

2    performed work equal or substantially equal to that performed

3    by Mr. Harteau and/or Mr. Breslow for purposes of the New York

4    Labor Law.  Then we go on into the time period.

5          Okay.  So I'll read the whole thing again.  I think

6    it's fixed now.

7          It is enough to find liability if Ms. Rowe proves by a

8    preponderance of the evidence that she performed work equal or

9    substantially equal to that performed by Mr. Harteau and/or

10   Mr. Breslow for purposes of the New York Labor Law — at any

11   time — for which Mr. Harteau and/or Mr. Breslow were paid more,

12   even if the time period in which they were performing that work

13   did not overlap.

14         MR. GAGE:  Sorry to be a spoiler, Judge.  Can I

15   suggest one change?

16         THE COURT:  I have another change, too.

17         The purposes of the New York Labor Law is misplaced; I

18   think it's confusing where it is.  But tell me what your --

19         MR. GAGE:  You used the word "liability."  I would

20   suggest that we substitute the second element for liability,

21   because it's not liability, it's just this would be her proving

22   the second element of the claim.

23         THE COURT:  Which we said was equal or substantially

24   equal.

25         MR. GAGE:  Correct.

NAKVROW1

1          THE COURT:  Okay.

2          MR. GAGE:  And then there's the third element and

3   defense before you get to the liability questions.

4          THE COURT:  Okay.  I also think that "for purposes of

5   the New York Labor Law" should be moved up because it's a

6   distraction where it is in the middle there.

7          This is what I -- I think we should go with:

8          For purposes of the New York Labor Law, it is enough

9   to find the second element if Ms. Rowe proves by a

10  preponderance of the evidence that she performed work equal or

11  substantially equal to that performed by Mr. Harteau and/or

12  Mr. Breslow — at any time — for which Mr. Harteau and/or

13  Mr. Breslow were paid more, even if the time period in which

14  they were performing that work did not overlap.

15         Or wait, wait, wait.  Going back to the beginning.

16  For purposes of the second element of the New York Labor Law.

17         MS. GREENE:  Yes, your Honor.

18         THE COURT:  Okay.

19         For purposes of the second element of the New York

20  Labor Law, it is enough to find -- no, that doesn't work.  I

21  actually don't think that works because then we have to rewrite

22  the whole sentence.  Unless we say:  It is enough for Ms. Rowe

23  to prove by a preponderance of the evidence, can we do that.

24  Yeah, that's it.

25         Okay.  For purposes of the second element of the New

NAKVROW1

1    York Labor Law, it is enough for Ms. Rowe to prove by a

2    preponderance of the evidence that she performed work equal or

3    substantially equal to that performed by Mr. Harteau and/or

4    Mr. Breslow — at any time — for which Mr. Harteau and/or

5    Mr. Breslow were paid more, even if the time period in which

6    they were performing that work did not overlap.

7             I think that's good.  Does everybody agree?  Okay.

8             MR. CHIARELLO:  Yes.

9             THE COURT:  Okay.  Do you have another one?

10            MR. GAGE:  I do, your Honor.

11            In the affirmative defense, first paragraph of the

12   affirmative defense.

13            THE COURT:  Yes.

14            MR. GAGE:  The first sentence:  Based on a *bona fide*

15   factor other than sex, such as education, training, and

16   experience.  And I believe those are the words in the statute.

17            THE COURT:  I was just going to ask that question.  I

18   think that's right.

19            MR. GAGE:  I'm quite certain, that's why I wrote them

20   down.

21            THE COURT:  Okay.

22            MR. CHIARELLO:  We don't have any issue with that,

23   your Honor.

24            THE COURT:  Okay.

25            So now it's going to say on the third line there:

NAKVROW1

1    "The evidence that Ms. Rowe was paid less based on a *bona fide*

2    factor other than sex, such as education, training, and

3    experience, and that the factor was both job-related and

4    consistent with business necessity."

5            MR. GAGE:  My next suggestion, your Honor, is at the

6    end of that paragraph we would request that you put the

7    language that also appears in the next charge, and that's the

8    language that says:  "In making this determination, however,

9    you may not second-guess Google's business judgment.  In other

10    words, you may not find a violation simply because you disagree

11    with the business decision that Google made."

12            THE COURT:  That comes out of the law.

13            MS. GREENE:  I don't believe it does with respect to

14    the equal pay law.

15            THE COURT:  Okay.

16            MS. GREENE:  That's something that relates to the

17    discrimination law; but the equal pay law is actually just the

18    opposite.  They may have had a business justification decision;

19    you can second-guess it if they've not met the affirmative

20    defense.

21            I think it's actually necessary here to include

22    language contrary to what Mr. Gage has suggested; and that is

23    that Google must prove the *bona fide* factor was the actual

24    reason.  The wage decision was made at the time the decision

25    was made and not simply a possible or hypothetical reason or an

NAKVROW1

1    after-the-fact creation.  And that's from page 33 of the joint

2    proposed charge.  It's not about business judgment, it's about

3    whether they've established a defense under the law as to what

4    was driving the decision at the time the decision was made.

5            MR. GAGE:  I think counsel is confusing two things.

6            I appreciate that we need to prove that it was

7    based -- that's the word *"bona fide*."  We have to prove that it

8    was based on a *bona fide* factor, so I agree with that

9    proposition.

10           But I don't believe that the New York state

11   legislature intended for a jury to second-guess a business

12   judgment if the jury finds that it is a *bona fide* factor, not

13   sex, that is job-related and consistent with business

14   necessity.  Just because a jury might decide to do it

15   differently, so long as it's a *bona fide* factor and that it was

16   actually -- it was a factor in the decision-making, I don't

17   disagree with that proposition.  But I don't think that the

18   jury is entitled to just say, Ah, we'd do it differently.

19           THE COURT:  All right.  Well, I know that the language

20   about business judgment is in the law.  Somebody needs to find

21   where exactly it is and which claim or claims.

22           MR. GAGE:  It appears in the last two sentences of the

23   paragraph on my paper copy, it's page 18.  Paragraph begins:

24   "In determining whether Google discriminated against."

25           THE COURT:  Are you talking about what I circulated

NAKVROW1

1    or --

2            MR. GAGE:  Yes, yes, I'm sorry, yes, it's the one that

3    you -- it says:  "In making this determination."

4            THE COURT:  Okay.  So that's in the discrimination

5    claim under city law section.  But I thought you were trying to

6    add it to the affirmative defense to the labor law claim.

7            MR. GAGE:  Precisely.

8            THE COURT:  Okay.

9            MS. GREENE:  And there's not support for that in the

10   statute nor -- unless I'm -- Mr. Gage will correct me if I'm

11   wrong, in the case law either.  It's a different statute.  It's

12   a different consideration.  It's a different law.  It's a much

13   higher standard for defendants to meet here.  And in adding

14   that sort of language will confuse the jury in what is an

15   otherwise very clear instruction.

16           THE COURT:  I mean, it already says *bona fide*,

17   Mr. Gage.  If you could show me a case where the court put

18   together *bona fide* with this additional language that you want

19   about business judgment, but I don't think that that's how it

20   comes out in the case law.  I think Ms. Greene is right on that

21   one.

22           MR. GAGE:  Well, your Honor, I will concede.  I'm not

23   aware of any case law on this, but I also think that it belongs

24   there and it's not taken care of with the words *bona fide*.

25   *"Bona fide"* means genuine.  Was it genuine; was it actual.

NAKVROW1

```
 1              But I don't think the New York state legislature
 2     intended to -- provided the jury finds that we have proved by a
 3     preponderance of the evidence that it's a genuine business need
 4     that bears a manifest relationship to the job or demonstrable
 5     relationship to successful performance, that a jury should be
 6     entitled to say, Yeah, you proved that, but we would do it
 7     differently.  And that's the business judgment rule.
 8              THE COURT:  I think what you're asking for is
 9     redundant.  It already uses the words "genuine business need."
10     I don't think that goes there.
11              MR. GAGE:  You're the judge.  I understand.
12              THE COURT:  You're pitching and yes, okay.  I think it
13     does belong where it is on page 18.
14              MR. GAGE:  Oh, I agree it belongs in the
15     discrimination claim.  But we're just making the request that
16     it also be added to the labor law claim, but I understand if
17     your Honor is not going to do it.
18              THE COURT:  Okay.
19              MR. GAGE:  I just take exception to that.
20              THE COURT:  All right.  Ms. Greene, you were rattling
21     off some language about actual reason, not hypothetical reason.
22     Are you seeing that in this charge or in --
23              MS. GREENE:  It is not in this charge.  But we would
24     suggest that there should be language noting that the -- it has
25     to be the decision -- the actual reason at the time the
```

NAKVROW1

1  decision was made; it can't be an after-the-fact explanation.

2  And that is based in the case law recently decided in the *Rizo*

3  *v. Yovino* case at the Ninth Circuit, which has been widely

4  cited since for purposes of equal pay claims.  And the idea

5  again is that the jury needs to understand it's not what Google

6  says now is the business reason, it's what Google was deciding

7  at the time, what the reason was at the time the decision was

8  made and whether they've established that or not.

9            MR. GAGE:  Your Honor, now we're talking about *bona*

10  *fide*.  That's what genuine is.  So it's already covered with

11  the phrase *"bona fide"*; it's covered with the word "genuine."

12  If it's not genuine -- or if it is genuine, that means we've

13  established that it is the genuine reason for the difference,

14  not after the fact, but that's what genuine is.  So I think

15  it's already covered by that.

16            THE COURT:  I just want to make sure I understand,

17  Ms. Greene.  Where were you suggesting that that be added?

18            MS. GREENE:  At the end of that paragraph, in

19  addition --

20            THE COURT:  I'm sorry, which paragraph?

21            MS. GREENE:  It is the paragraph that we were looking

22  at on page 16 under affirmative defense for affirmative

23  defense.

24            THE COURT:  I'm not going to change that paragraph.

25  I'm not taking either of these suggestions.  I think "genuine

NAKVROW1

1    business" and *"bona fide"* cover both of your concerns.

2              All right.  Anything else?

3              MR. GAGE:  I'm just looking quickly.  I don't think

4    I've got anything else on the charge, but I did have a request

5    on the verdict form, your Honor.

6              THE COURT:  Okay.

7              MR. GAGE:  It's the first question.  We would ask that

8    after Breslow, we add the words "for performing substantially

9    equal work."

10             THE COURT:  So we're looking at liability, New York

11   Labor Law Section 194, the first question there?

12             MR. GAGE:  Correct.

13             THE COURT:  And you're proposing:  Prove by a

14   preponderance of the evidence that defendant Google paid

15   Ms. Rowe less than Nicholas Harteau or Stuart Breslow for

16   performing substantially equal work.

17             MR. GAGE:  Yes.

18             MS. GREENE:  Your Honor, we would object.

19             The whole purpose of the jury charge is to instruct

20   the jury as to what a violation of New York Labor Law Section

21   194 is.  Inserting additional elements or issues into the

22   charge confuses the jury and it is misleading and suggesting

23   that there's something there that's in addition to what your

24   Honor included in the charge describing what a violation of the

25   law is.

NAKVROW1

1          MR. GAGE:  I don't think it's adding anything, your

2     Honor.  We're not just saying who wins.  And it is absolutely

3     an essential element of the claim.  And I think the question

4     without it could lead the jury to ignore that foundational

5     element of the plaintiff's claim.

6          THE COURT:  Let me just think for a second.

7          They're going to understand that when they're looking

8     at the verdict form that all of this is defined and explained

9     in the charge.  That's the whole point of it.  So we're not

10    going to import into the verdict form what we have in the

11    charge.  I think we've already been over substantially equal

12    work many times in the charge.

13         Here, having taken into account those definitions and

14    explanations, they are going to give us their decision.  I

15    think it's going to be confusing to import that language here.

16         All right.  Is there anything else?

17         MR. GAGE:  I know your Honor already made your

18    decision, but we'll just note for the record our request to put

19    the discrimination claim first, but I just want to note --

20         THE COURT:  Yes.  And I will note for the record that

21    when you submitted your proposed verdict form, you put it the

22    way I have it here.

23         MR. GAGE:  Your Honor, I recognize that.  But we made

24    the request in light of the way the evidence came in.  That is

25    the only reason we changed our position.

1          But I understand your Honor's decision.

2          THE COURT:  Anything else?

3          MR. GAGE:  Nothing else, your Honor.

4          THE COURT:  Ms. Greene?

5          MS. GREENE:  Will your Honor be providing us with a

6   copy now of the new charge?

7          THE COURT:  Yes.  Do you need that for your closings?

8          MS. GREENE:  We do, your Honor.  We would just ask for

9   a few minutes to be able to make sure our closings are

10  consistent with the charge.

11         THE COURT:  Yes.  We'll accept the changes and make

12  the copies and so on with this now and then we will hand them

13  out.

14         I guess, Ms. Williams, we're going to have to

15  apologize to the jury because we had them come in early and now

16  they're waiting.

17         How much time -- Jacob, can you help me with this now?

18         Okay.  Is 15 minutes good?

19         MS. GREENE:  Your Honor, I don't think I need more

20  than ten minutes.  I don't know about Mr. Gage, but --

21         THE COURT:  Okay.

22         MR. GAGE:  That's fine, your Honor.

23         THE COURT:  All right.  So -- well, it's 9:37.  I

24  think we should say 9:50.  Let's give you a full ten minutes.

25         And I have a question:  You're using demonstratives?

NAKVROW1

1          MS. GREENE:  Your Honor, we're using a Power Point for

2     the closing, which includes demonstratives.  It will be done

3     through the electronic system.

4          THE COURT:  Okay.  Are there any objections to -- what

5     about you, Mr. Gage or Ms. Tomezsko?

6          MR. GAGE:  We have a Power Point, and then we have

7     some blowups of demonstratives that have been exchanged

8     previously.

9          THE COURT:  Okay.  Are there any objections?

10         MS. GREENE:  Yes.  The demonstratives that were

11    exchanged previously were objected to to the extent they were

12    not supported by evidence that was actually entered into the

13    record.  And I believe that Mr. Gage's demonstratives relied on

14    Ms. Ostrofe's report and information in that report which did

15    not come into the record.

16         MR. GAGE:  Apologize for interrupting, but I don't

17    plan on using that one.

18         THE COURT:  Okay.  Good.

19         MR. GAGE:  I have one that is not based on information

20    from Ms. Ostrofe's report, it's based on exhibits that have

21    been admitted into evidence.

22         MS. GREENE:  Okay.  Then that would solve the issue.

23         MR. GAGE:  I should have clarified.

24         MS. GREENE:  Otherwise, the parties agree that it

25    wasn't necessary to exchange the demonstratives for closing

NAKVROW1

1    based on the assumption that both sides would only use

2    demonstratives that were grounded in the record.  And so I

3    think -- I know ours are, and I expect the same from

4    defendants.  I don't anticipate any objections in the course of

5    the closing arguments.

6              THE COURT:  Okay.  As long as you're pretty sure,

7    because it's not going to be good for either of you to have

8    objections during closings.

9              Okay.  We'll hope that it works out the way you think.

10             MS. GREENE:  Your Honor, I do have one question.

11             THE COURT:  Yes.

12             MS. GREENE:  Are we, for closing arguments, permitted

13   to leave the podium or do we need to stay at the podium?

14             THE COURT:  I'm fine with you leaving -- Ms. Williams,

15   are there wires over there?

16             THE DEPUTY CLERK:  That's fine.  Just don't move my

17   podium so much.

18             MS. GREENE:  We won't.

19             THE COURT:  I am having a LiveNote issue.

20             THE DEPUTY CLERK:  I'll get you connected.

21             THE COURT:  Okay.  Thank you.

22             (Recess)

23             (Jury present)

24             THE COURT:  Good morning, everybody.

25             Members of the jury, you are now going to hear

1    summations or closing arguments from counsel for the parties.

2            Ms. Greene.

3            MS. GREENE:   Thank you.

4            Ladies and gentlemen, where would we be if Ms. Rowe

5    were a man?  Would we be here today?  Would we be here today if

6    Ms. Rowe hadn't complained?

7            Just yesterday you've heard firsthand from Kirsten

8    Kliphouse about how Stuart Vardaman failed for weeks to tell

9    her about how Ms. Rowe was interested in the position for vice

10   president financial services sales.  He didn't tell her about

11   her qualifications.

12           Now, as Ms. Kliphouse is recruiter, Mr. Vardaman had a

13   particular role in screening applicants.  He decided who went

14   before Ms. Kliphouse and who didn't.  And he sat on Ms. Rowe's

15   application for weeks.  By the time he even mentioned

16   Ms. Rowe's name to her, the ship had sailed.  Ms. Kliphouse had

17   moved on to another candidate because there was urgency to fill

18   that role.

19           It wasn't just an oversight.  Mr. Vardaman, only days

20   before Ms. Rowe had contacted him, had been interviewed by

21   employee relations about this lawsuit.  And Mr. Vardaman had

22   told employee relations that Ms. Rowe was abrasive and

23   cantankerous and bristly.  Now, by the way, Mr. Grannis had

24   told you words like "abrasive" are gendered words, the words

25   that are used about women to put them down.

1          The timing of Mr. Vardaman's ER interview and the

2     timing of his rejection of Ms. Rowe as a candidate is not a

3     coincidence.  Let's just look quickly at a timeline.

4          Okay.  We saw the calendar; we see the calendar here.

5          We know that Mr. Vardaman was interviewed by ER on

6     January 22nd and January 29th.  A few days later, on January

7     4th –– or February 4th, Ms. Rowe has coffee with Ms. Kliphouse

8     and is told about the position.  She follows up the next day.

9     Mr. Vardaman doesn't raise Ms. Rowe in his weekly updates with

10    Ms. Kliphouse.  Ms. Rowe follows up again.  Mr. Vardaman

11    doesn't mention her.  She follows up a third time, and finally

12    he puts her on the list of people to discuss.  Just a few days

13    later, he tells her she's not getting the role; she's not going

14    to be considered.

15         Again, that's not a coincidence.  There's a word for

16    this.  It's retaliation.

17         Now, you know the story, how Ms. Rowe's story ends.

18    But let's talk about everything that came before, about the way

19    Google treated Ms. Rowe less well when it hired her; how it

20    leveled her lower than the men; how it paid her less than her

21    male colleagues in New York doing the same work; how

22    Mr. Shaukat dismissed her and ignored her, while giving full

23    access to Mr. Breslow, who he ultimately tapped for the

24    financial services vertical lead position.

25         Now, don't worry, it's been six days.  There's been

NAKVROW1                    Summation - Ms. Greene

1   almost 20 witnesses, more than 100 documents.  I'm not going to

2   go through all of them.  I'm not going to make you do that.

3   You've heard it.  You've heard the story yourselves.  But I do

4   want to answer a few questions you may have and I want to draw

5   a few connections for you.

6          First, I want to say a few words about the burden of

7   proof in this case.  As the judge told you at the beginning and

8   as she's going to repeat in her instructions, the relevant

9   burden of proof here is a preponderance of the evidence.

10  Plaintiff has the burden of proof to show by a preponderance of

11  the evidence that Google violated the equal pay law and the New

12  York City Human Rights Law.

13         So what does the preponderance of the evidence mean?

14  Well, the judge will tell you that it means a fact is more

15  likely true than not.  Now, there are a few different analogies

16  that might help us imagine it.

17         One example is that of a scale.  If you add a feather

18  to one side of the scale, that slight tip is a preponderance of

19  the evidence.  Another example, I'm standing up straight.  If I

20  lean, however slightly, that's a preponderance of the evidence.

21  Football season, for those of you who are sports fans, here's

22  another analogy:  The 50 yard line is the middle in the

23  football field.  If you move that football even just a

24  millimeter over the 50 yard line, that's a preponderance of the

25  evidence.

1          If you look at the evidence during this trial and find

2     that it weighs, however slightly, in plaintiff's favor, you

3     should render a verdict on her behalf.  And the evidence here

4     supports a verdict in Ms. Row's favor.

5          Now, there's another thing that we should talk about

6     before we get into the claims in this case, and that's about

7     credibility.  As a jury, it's your job to decide who to

8     believe.

9          And throughout this trial and throughout Mrs. Rowe's

10    employment, Google's managers, its recruiters, human resources,

11    they've played fast and loose with the facts.  How do we know

12    that?  How do we know they didn't tell the truth?  How do we

13    know they didn't tell Ulku the truth, Ms. Rowe?  We know

14    because that's what the evidence shows.

15         They told her they were all coming in as Level 8s.

16    That wasn't true.  They told her there was no process to

17    revisit leveling.  That wasn't true.  Mr. Shaukat promised her

18    that she would be given fair consideration for the financial

19    services vertical lead at the same time he was telling

20    Ms. Greene that she wasn't right for the role.

21         Mr. Shaukat led her to believe that she was still in

22    the running for weeks, for months.  He had her go through that

23    process of trying to schedule an interview with Ms. Greene,

24    even though he knew he wasn't going to give her the job.  That

25    was duplicitous.

1          And Google's witnesses repeatedly contradicted each

2    other in this trial and even their own prior testimony.

3    Mr. Shaukat said he got his feedback from Mr. Vardaman for the

4    financial services vertical lead.  Mr. Vardaman said he didn't

5    document any feedback and he couldn't remember ever sharing any

6    feedback with Mr. Shaukat.

7          Mr. Stevens was adamant that there was a leveling

8    guide in OCTO in 2016 and 2017.  Mr. Grannis was just as

9    certain that there was no leveling guide for OCTO during that

10   time period.

11         Mr. Shaukat first insisted that he did not decide that

12   Mr. Breslow was going to get the position until after he met

13   with Ms. Rowe.  But at his deposition, he said that he had

14   decided in October or November, before he met with her in

15   December, that he had made the decision Mr. Breslow was going

16   to get the job.

17         Mr. Stevens, sitting here in court yesterday, suddenly

18   remembered with great clarity what factors supported a hire at

19   Level 9 instead of a Level 8, something he had denied knowledge

20   of three years ago when I took his deposition.

21         And think about what Google hasn't shown you in this

22   case and who you haven't heard from.  You haven't heard from

23   any technical directors at Level 8 who were hired at the same

24   time as Ms. Rowe.  Google didn't bring any of them in here to

25   say, Hey, actually our rules are different from that of a Level

1    9.  It was different.

2           You haven't heard from any of the men who interviewed

3    Ms. Rowe for the financial services vertical lead position.

4    And you haven't seen their feedback, the feedback that

5    Mr. Vardaman said by ping, that he didn't save the history,

6    history wasn't on, there's no record of that.  Mr. Vardaman

7    said he was chasing it for months.  You didn't see that

8    feedback.

9           You haven't seen a leveling guide from the time

10   Ms. Rowe and the Level 9 men were hired.  You haven't seen

11   anything in writing about why Ms. Rowe wasn't a Level 9.  You

12   haven't seen any performance criticisms.  The best they could

13   do was to point to a single section of a performance review

14   where they asked, What can this person do better?  That's a

15   question that was asked of all technical directors.

16          But you didn't see any emails criticizing her

17   performance.  You didn't see any records of feedback sessions

18   or any negative feedback from customers or a performance

19   improvement plan.  And that's not surprising, because they

20   rated her "exceeds expectations" in every single performance

21   cycle.

22          They did bring in her current boss to suggest that she

23   isn't performing now.  But you know what that's about.

24   Ms. Florissi had a support check-in with Ms. Rowe after

25   speaking with legal counsel about this case, who told her to

1    keep a record.  But even then, Ms. Rowe was rated "significant

2    impact" and was paid above target on her bonus.  This is not

3    about Ms. Rowe's performance.  She performed.  It's Google

4    that's not credible.

5           Unlike Google, Ms. Rowe's story hasn't changed over

6    time.  She's told the same story and it's straightforward.  You

7    heard her testify at hiring that all technical directors she

8    was told were being brought in as Level 9 -- or a Level 8.  But

9    then she learned that some of her male peers were brought in as

10   a Level 9.  That's exactly what she said to Ms. Lawrence and

11   Mr. Grannis in December of 2017 and in January of 2018; that's

12   what she said in August and October and November of 2018;

13   that's what she said when filing this lawsuit; and that's what

14   she said on the stand.  Her testimony has been consistent.

15          And here's the ringer:  When Ms. Rowe pointed out to

16   Mr. Grannis and Ms. Lawrence in late 2017 what she'd been told,

17   nobody contradicted her.  Mr. Grannis didn't come back,

18   Ms. Lawrence didn't come back and say, Wait a second.

19   Actually, nobody told you that.  Where'd that come from?

20   That's the first we're hearing that.

21          Nobody contradicted her at that time.

22          Instead, what HR, Melissa Lawrence, told her was that

23   there was no way to revisit leveling and the best way to get to

24   a Level 9 was through promotion.  Ms. Lawrence wasn't

25   interested in helping her in fixing the problem; she was just

NAKVROW1                    Summation - Ms. Greene

1    looking to protect the company.

2            Now, you may be asking yourselves, why are we spending

3    so much time talking about leveling?  What's the significance?

4    Why does it matter?  Well, leveling matters for a few reasons.

5            First of all, it's about discrimination.  If Google

6    leveled Ms. Rowe lower, at least in part because of her gender,

7    that's discrimination.  Put another way, if Google leveled men

8    higher at least in part because of they were men, that's

9    discrimination.  And we'll talk more about discrimination in a

10   minute.

11           Level also matters for the equal pay claim.  Google is

12   going to argue that it had a nondiscriminatory reason for

13   paying Ms. Rowe less than her male peers, Mr. Harteau and

14   Mr. Breslow.  They are going to say it was their level.  But

15   listen to the charge the judge is going to give you on the

16   affirmative defense for the equal pay law claim.  Google has

17   the burden to prove that the level was the *bona fide* reason.

18   That is the real reason, the reason at the time it made the

19   decision, the reason it paid Ms. Rowe less and that level was

20   both related to the job and consistent with business necessity.

21   Google has the burden on that defense.

22           We know that level wasn't job-related.  How?  Well, it

23   had no bearing on how the job was actually performed.  After

24   all, you heard from Ms. Rowe and Mr. Harteau and Mr. Wilson and

25   Mr. Eryurek that she and the Level 9 men were all performing

1   the same job.  And that level had nothing to do with how they

2   performed the job.  It wasn't job-related.

3           We also know that it wasn't necessary to the business.

4   How could it be necessary when the technical directors

5   themselves were not even aware of their levels?  How could it

6   be necessary if Nick Harteau told you, as he did on the stand,

7   that he would have still come if he was a Level 8?  The level

8   wasn't necessary.

9           The leveling also matters for something called

10  pretext.  Pretext is when they say one thing, but it's to cover

11  up something else.  Google is being untruthful about the

12  leveling process and its reasons for leveling the men at 9 and

13  Ms. Rowe at 8.  And from that you can draw an inference that

14  Google is covering up its real reason:  Discrimination.

15          Google has offered lots and lots of reasons for why it

16  leveled Ms. Rowe as an 8 and the men as a 9, and why it kept

17  them at those levels over time.  But the reasons don't hold up.

18          It can't be about education.  Ms. Rowe was the only

19  one of the six to have a double degree in computer science and

20  engineering.  Two of the L9 men did not have any post-high

21  school degrees at all.  It can't be about years of experience.

22  You heard Mr. Stevens yesterday say unequivocally that years of

23  experience doesn't matter for anything.  And almost every other

24  witness told you the same thing.  So even though that's what

25  Mr. Lucas looked at when he investigated in August of 2017 or

NAKVROW1                    Summation - Ms. Greene

1    2018, when Ms. Rowe complained about leveling, we know that's

2    not what Google made the decision based on.  It wasn't about

3    years of experience.  It wasn't about education.

4            Can't be about management experience.  Ms. Rowe

5    managed larger teams than some of the men, over 1,000 of direct

6    and indirect reports.

7            It can't be about credibility in the industry.  Will

8    Grannis said she had high credibility when it came to matters

9    pertaining to financial services and she was an expert in

10   financial services.  He raved in her review:  Ulku is excellent

11   at driving authentic thought leadership into one to one and one

12   to many engagements.  She's established herself as the voice of

13   Google's FSI efforts and has uplifted Google's credibility in

14   this vertical considerably.  So it wasn't about credibility.

15           And it can't be about technical experience.  Ms. Rowe

16   had been a CTO and had built entire technological systems for

17   one of the largest banks in the world.

18           It can't be about being a world class expert.

19   Mr. Grannis said she was an expert in financial services

20   technology and that's why he hired her.

21           It can't be about being a curious problem solver, as

22   Mr. Grannis said.  Ms. Rowe was widely praised for her thought

23   leadership and problem solving for the challenge of using cloud

24   in a highly regulated space.

25           It can't be about cloud experience.  She'd had years

NAKVROW1                    Summation - Ms. Greene

1  of cloud experience.  She was in the process of migrating J.P.

2  Morgan Chase to the cloud.

3          It can't be about real world experience.  She had been

4  in the shoes of the customer.  She had been the customer.  She

5  could talk to them in a way that came from her real world

6  experience.

7          It can't be about C-suite relationships.  She had the

8  relationships.  That's why Google put her in the leadership

9  circle events with the industry's top executives.

10          It can't be about influencing the market.  She was

11  viewed as one of the very best when it came to one to one and

12  one to many.  She was a sought-after speaker.  She gave the

13  keynote addresses to thousands of people.  It wasn't about

14  influencing the market.

15          It wasn't about performance, we talked about earlier.

16  Exceeds expectations.

17          And it can't be about a leveling guide.

18          So let's talk about the leveling guide for a minute.

19          Was there a leveling guide in 2016 and 2017?  Brian

20  Stevens again says yes, there was a leveling guide.  Will

21  Grannis says there wasn't a leveling guide for OCTO.  Kevin

22  Lucas couldn't say with confidence whether there was a leveling

23  guide.  Jenny Burdis couldn't recall any document that outlined

24  what made someone a Level 8 technical director versus a Level 9

25  technical director.

NAKVROW1                    Summation - Ms. Greene

1           Now, Melissa Lawrence and Mr. Grannis both pointed to

2     an engineering-wide leveling guide.  And that guide was from

3     2020.  And there's a few reasons -- there's a few problems with

4     that.

5           First of all, it's 2020, right; it's four -- three

6     years after the decision was made.  Google says there was a

7     similar leveling guide in 2016 or 2017, but you didn't see

8     that.  They didn't show that to you.

9           Two, when you actually look at the engineering-wide

10    leveling guide from 2020, and you compare it to that TSC

11    ladder, you're going to see a lot of similarities.  The Level 9

12    in the engineering-wide leveling guide looks a whole lot like

13    the Level 8 in the TSC guide.

14          Complexity and scope on several complex projects and

15    fully commit to its success.  Identical Level 8 entry, almost

16    to the word.  Leadership and influence, both influencing the

17    function, business, and/or industry.  Organizational impact.

18          When you look at the two documents closely, it shows

19    in OCTO Level 8s and Level 9s were both performing Level 9

20    work.

21          So if it's not about education or years of experience

22    or credibility in the industry or technical experience or

23    C-suite experience or influencing the market or performance or

24    leveling guide, what is it about?  It's about gender.  She's a

25    woman.

NAKVROW1                    Summation - Ms. Greene

1          Make no mistake, Google discriminated against Ms. Rowe

2     because of her gender.  It discriminated against her in big

3     ways:  Paying her less, leveling her lower, denying her

4     promotion.  It discriminated against her in other ways too:

5     Excluding her from email lists, not giving her the same access

6     and attention as male colleagues.  In each instance, Google

7     treated Ms. Rowe less well because of her gender.

8          How do we know that Google's treatment of Ms. Rowe was

9     about gender?  Well, the judge will instruct you on different

10    ways to identify gender discrimination.

11         To start with, there's the overall absence of women in

12    OCTO.  There were five Level 9 technical directors, there were

13    five men and zero women.  As of June 2018, there were 16

14    technical directors at least at Levels 8 and 9; there were 15

15    men, one woman, Ms. Rowe.  There were seven interviewers for

16    the technical director role, seven men.  There were four

17    interviewers for the financial services vertical lead position,

18    four men.  Numbers like that don't happen by chance.  Remember

19    Tariq Shaukat told you, he said that he and Google had a

20    problem with diversity when it came to women.  And he wasn't

21    lying.

22         We can also look at the language or conduct of Google

23    managers and see if it reveals a bias against women or a

24    preference for men.

25         Here's a good example of that:  Remember how

1    Mr. Grannis spoke so glowingly of the work that the men did;

2    their credentials, their *bona fides*.  Imagine for a moment that

3    he spoke about Ms. Grannis -- Ms. Rowe's credentials with that

4    same enthusiasm.  She had more than two decades of experience

5    at the cutting edge of technology in financial services, and

6    was the CTO of J.P. Morgan's credit risk.  When two of the

7    largest banks in the world were hit with risk management crises

8    resulting in billions of dollars at risk, they looked to her to

9    design the next generation of risk management systems.

10         She brought deep credibility in the financial services

11   to Google.  And financial services was the largest enterprise

12   that Google was targeting.  She was a sought-after speaker and

13   spoke at conferences around the world on technology and

14   financial services to audiences of thousands.  Financial

15   regulators around the world asked for her by name.  And she had

16   deep relationships with the C-suite at the most important

17   financial institutions.

18         It's what it might have sounded like.

19         We don't have to imagine what Mr. Grannis speaking

20   about Ms. Rowe with passion would sound like though.  We have

21   the record.  At the time the events were going on, he did speak

22   about Ms. Rowe in the same glowing terms:

23         She's one of the mode credible and authentic

24   representatives to the market.  She has obvious and strong

25   people management abilities.  We should find a way for her to

NAKVROW1                    Summation - Ms. Greene

1   transition to a more impactful manager role versus primarily

2   IC.

3           Let's talk about that for a minute.  If you remember,

4   that's exactly what they were going to do, they were going to

5   make a vertical group and they were going to put Ms. Rowe at

6   the head of that group.  And that meant Mr. Wilson and

7   Mr. Eryurek, both Level 9s, would be reporting to her, a Level

8   8.  But Mr. Grannis said everyone agreed she was best for the

9   role.

10          She's excellent at driving authentic thought

11  leadership.  She's established herself as the voice of Google's

12  FSI efforts.  She's customer-focused and is always looking for

13  ways to reduce Google complexity.  Ulku is maybe the most

14  effective Google spokesperson to the financial services

15  industry short of Ruth Porat, including all critical

16  constituencies.  The demand she gets for her time in this

17  capacity is overwhelming and speaks directly to her credibility

18  and acumen blend of technical and business.

19          That was the glowing way that Mr. Grannis spoke about

20  Ms. Rowe.  And he wasn't the only one.

21          If you look her -- and I know this is small; I know

22  it's hard to read.  You can see it all in Exhibit 126.  The

23  point is time and time and time and time and time and time and

24  time and time and time and time and time and time and time and

25  time again, people spoke about her effusively.  You look

1  through that performance review, those years of performance,

2  it's person after person gushing about Ms. Rowe.  And the

3  negative is missing.

4       And here's how Google described Ms. Rowe in her

5  official bio:  At the forefront of Google's cloud and machine

6  learning capabilities she built technology platforms for

7  trading and analytics, middle and back office, risk management

8  and finance.  She's driven business transformation through

9  technical innovation, and leadership has always been her focus.

10 That's Google's bio for her.

11      The effusive way that Mr. Grannis talked about the L9

12 men, and the mediocre way he spoke about Ms. Rowe and her

13 engineering skills and otherwise, the lack of enthusiasm he

14 showed for Ms. Rowe when describing the same sorts of things is

15 evidence of gender bias.

16      Mr. Stevens' words and actions also evidence gender

17 bias.  Remember how he spoke about how he knew Nick Harteau

18 from Spotify, and he knew Paul Strong from VMware, and he knew

19 Jonathan Donaldson from Red Hat.  There's a phrase for that.

20 It's the old boys network.  And Ms. Rowe wasn't in the old boys

21 network.

22      Now, Google has tried to imply that Ms. Rowe was

23 entitled or whiney.  But examine the gender bias that's baked

24 into that.  Why is it whiney to ask for fair consideration and

25 fair compensation?  Why is it entitlement to point out that

NAKVROW1                      Summation - Ms. Greene

1    you're the best person for the job when it's objectively true?

2    Why is it that Mr. Grannis and Mr. Stevens and Mr. Breslow can

3    come in here and blow their own horns about how great they are

4    and all the amazing things they've done; but when Ms. Rowe

5    points out her superior qualifications, she is overly

6    self-oriented and not Googly and egotistical.  That was a

7    thrive entry that Mr. Vardaman made about her.

8           Another way we can tell it's about gender bias is by

9    looking at whether Google treated Ms. Rowe less well than

10   similarly situated men.  And the obvious example is that Google

11   paid men more.  And you also don't have to look any further

12   than Stuart Breslow to see differential treatment.  Mr. Shaukat

13   gave Mr. Breslow an open line of communication.  Mr. Breslow

14   told you that he spoke with Mr. Shaukat frequently.  He had

15   standing calls with him.  He had dinner with him, lunch; they

16   met together in New York and California.  Mr. Shaukat made

17   himself available to Mr. Breslow anytime he needed.

18          Meanwhile, Ms. Rowe kept begging to be added to the

19   email list, three months it took them.  She kept begging to be

20   added to team meetings.  After she joined his team, it took

21   Mr. Shaukat three months before he met with her one-on-one.

22          And we can also tell it's gender by looking at whether

23   Google's explanations for its actions were credible or not.

24   And we talked about why it wasn't credible, why it wasn't

25   truthful.  They've changed their stories so many times about

NAKVROW1                    Summation - Ms. Greene

1   why she's a Level 8 and they're a Level 9 that they can't even

2   keep the stories straight amongst themselves anymore.  It's

3   just some of the evidence; you've heard six days of it.  But it

4   makes clear that gender is at least a part of the story.

5       Now, you may wonder, does gender matter for the equal

6   pay law?  And the answer is no, it doesn't.  Again, the judge

7   is going to give you a charge and I want you to listen to it

8   carefully.  But the thing that distinguishes the equal pay law

9   is that you don't have to show any sort of discriminatory

10  intent.

11      She must prove — we must prove — by a preponderance of

12  the evidence that there was unequal pay for work requiring

13  substantially equal skill, effort, and responsibility.  Listen

14  carefully to the instructions the judge gives you on the equal

15  pay law.  It's long and it's nuanced.  And there are some

16  important nuances.  So I want you to listen carefully for that.

17      For one thing, the equal pay law is about the job, not

18  the person performing the job.  And there's no legitimate

19  dispute that Ms. Rowe and Mr. Harteau were performing equal

20  work.  After all, it was the same job.  The testimony,

21  including Ms. Rowe's, Mr. Harteau's, Mr. Wilson's,

22  Mr. Eryurek's, Ms. Burdis's, and even Mr. Grannis's at times,

23  make clear that they were all hired to do the same job and they

24  all did the same job.  There's also the job description, the

25  interview questions, they were all the same.

NAKVROW1                    Summation - Ms. Greene

1           Now, Google might try to tell you that the fact that
2    Mr. Harteau took on some management responsibilities later in
3    2018 matters.  But it didn't materially change the job he was
4    performing.  Mr. Lucas told you how Google doesn't -- does
5    really distinguish between individual contributors and people
6    managers when it comes to performance and pay.  And of course,
7    Mr. Harteau testified that he was still performing the
8    technical director role.  So listen what the judge tells you
9    about how jobs can be different but still be equal.  Equal
10   doesn't mean identical.  There can be slight variances.  And
11   then in this job there were slight variances.  But at the core,
12   the job was the same.
13           Now, Ms. Rowe and Mr. Breslow were performing the same
14   job as well, and that one might not be as obvious.  But when
15   you measure it by the skill, effort, and responsibility of
16   their relative jobs, you'll see that it aligns with the
17   instruction you're given.  Remember how Mr. Breslow described
18   his job.  Go back and look at that, and you'll see it sounds a
19   lot like the technical director role Ms. Rowe was performing.
20           When it comes to equal pay, this did not happen by
21   accident.  Google has known since at least 2017, when Ms. Rowe
22   raised this issue, that she was being paid less for the same
23   job.  It didn't do anything in 2017.  It didn't do anything in
24   2018, when she brought it up to HR and ER.  It didn't do
25   anything in 2019, when she filed her complaint.  And it hasn't

1    done anything in the four years since.  Google's decision not

2    to pay Ms. Rowe the same as her Level 9 comparators is

3    intentional.  It's willful.

4         Now, make no mistake, Ms. Rowe was paid less than her

5    male comparators, both those in New York City and those outside

6    of.  First of all, you heard from Mr. Humez, Level 8s have a

7    lower salary range and a lower bonus target.  And as a result

8    of Google's algorithmic approach to equity, it also meant Level

9    8s receive less equity.  And that was Ms. Rowe's experience.

10        So let's look at the numbers together.  We're going to

11   look at 2017.  We're going to look at Ms. Rowe, Mr. Eryurek,

12   Mr. Harteau, Mr. Wilson.  Why those three?  Mr. Harteau was

13   with her in New York City; Mr. Wilson and Mr. Eryurek were the

14   other two with the vertical lead specialization, the two that

15   she would have been supervising.  Their salaries were higher.

16   Their bonuses were higher.

17        Now, Mr. Harteau, if you remember, explained he was on

18   a leave for a period of that time and his bonus was prorated.

19   But when you annualize it, what he would have received as a

20   bonus for the full year, it's greater than Ms. Rowe's.

21        In 2018, salary, all higher than Ms. Rowe.  Actual

22   bonus paid, all higher than Ms. Rowe.  Equity, all higher than

23   Ms. Rowe.

24        Now, equity is a bit confusing, so I want to point out

25   a few things.  In 2017, how people were treated for equity

1   purposes was based on how long they'd been at Google for that

2   year, because the system changed.  And so you can't really draw

3   a comparison between those who came in in 2016 or at the very

4   beginning of 2017, like Ms. Rowe, and those who came in later,

5   like Mr. Harteau, Mr. Wilson.

6          The sign-on equity, we also heard why they got sign-on

7   bonuses and equity; it was for what they were leaving behind.

8   Ms. Rowe explained that, Mr. Harteau explained that, Mr. Wilson

9   explained that, Mr. Eryurek explained that.  The one exception

10  is Mr. Breslow, who was given $4 million in sign-on equity,

11  even though he wasn't leaving a thing behind.

12         And you heard from Ms. Ostrofe, our expert, that the

13  amount of pay Ms. Rowe has lost over the years as a result of

14  being underpaid compared to Mr. Harteau is $1,968,853, almost

15  $2 million over time.  The judge will explain to you why you

16  can use Mr. Harteau as a comparator for purposes of the equal

17  pay law even though he's no longer there.  The law allows you

18  to look at predecessors and successors in the role when

19  calculating equal pay.

20         Now, there's one part of the story we haven't talked

21  about much and I just want to touch on it quickly, and that's

22  the financial services vertical lead position, the one under

23  Mr. Shaukat.

24         We talked about it a minute ago, how Mr. Shaukat told

25  Ms. Rowe he was going to give her fair consideration while

writing her off from the start; and how his writing Ms. Rowe

off was completely contrary to how he treated Mr. Breslow, and

that's gender discrimination.

         And we know that the initial discriminatory leveling

decision was a legacy that followed Ms. Rowe; it was a shackle.

There was no way for her to move from a Level 8 to a Level 10.

You heard testimony yesterday that they'd never seen someone

make that move.  That leveling decision had implications that

were ongoing and still are ongoing for Ms. Rowe.  And there's a

phrase for that, too, it's the glass ceiling.  We hear about

it, but this is what it looks like in practice.  There's only

so high Ms. Rowe can go as a woman in the organization because

of her level.

         But there's another part of that story and it's also

about retaliation.  Let's just look at the timing of things.

         Ms. Rowe met with Mr. Shaukat in June of 2018.  She

interviewed on August 2nd and August 8th.  Mr. Vardaman began

seeking feedback.  Each of those purple dots is a moment when

he sought feedback or was chasing feedback, he noted.  All

those little dots, that's every time someone got an email

asking them to submit feedback.

         Now, on August 28th, Ms. Rowe raised her concern of

discrimination about under-leveling compared to male peers and

it affecting her candidacy, and Mr. Shaukat told you he knew

about that.

1           Three days later, Mr. Vardaman updated his weekly

2      notes to say:  It doesn't sound like she is viable for the VP

3      position, the VP role.  Three days after she made her

4      complaint.

5           November 7th, she raises another concern, this time to

6      Mr. Shaukat and Ms. Greene.  The same month:  How do we message

7      to Ulku that she's not getting the role?  Vardaman is

8      requesting feedback from interviewers on Ms. Rowe, who was a

9      candidate.  The "was," before they got the feedback from all

10     those purple dots.  And of course, on December 5th, Mr. Shaukat

11     told Ms. Rowe:  To be blunt, you won't be getting the role.

12          That's retaliation, folks.

13          And the damage Google had caused to Ms. Rowe is not

14     theoretical.  You heard from Ms. Ostrofe testifying about the

15     damages Ms. Rowe has encountered.  The damages from her equal

16     pay claim, the damages from not receiving the FSL role, the

17     damages for not getting the role that went to Yolande Piazza,

18     the damages when combined.

19          And you also heard Ms. Rowe describe the impact this

20     has had on her emotional well-being, her psyche, her

21     relationships.  How do you put a number on that?  Well, the law

22     provides some guidance for us.  And so we ask that you would

23     award 300,000 to her in compensatory damages for that damage to

24     her emotional well-being, her psyche, her relationships.

25          And then there's the question of punitive damages.  As

NAKVROW1                    Summation - Mr. Gage

1    the judge will explain, punitive damages are awarded to punish

2    a defendant and set an example in order to defer the defendant

3    and others from committing similar acts in the future.

4          Just because Google's discrimination was sometimes

5    subtle doesn't make it any less reprehensible.  Subtle

6    discrimination is sometimes the easiest to get away with and

7    the hardest to prove because it operates in the shadows.  And

8    that's why deterrence is so important.

9          Punitive damages send a message that this kind of

10   discrimination will not be tolerated.  Companies need to know —

11   Google needs to know — that they will be held accountable.  And

12   today we are asking that you, the jury, hold Google

13   accountable.  Thank you.

14         MR. GAGE:  One moment, your Honor.

15         Ladies and gentlemen, thank you.  You've all been

16   incredibly patient.  You've been very attentive.  I think some

17   of you may have more notes than we have.

18         Pretty soon the case will be yours.  Sara, Andrew, and

19   Jean and I, we've tried to be efficient in presenting our case,

20   but we ask you to indulge us just a little bit longer so we can

21   respond to Ms. Greene.

22         This case is really about one central question:  Why

23   did Google do what it did?  Why did Google make Ms. Rowe a

24   Level 8 technical director?  Why did it not give her the

25   financial services vertical lead role?  Why did it not give her

1    the vice president financial services sales role?  And why did

2    Google pay her what it did?

3            Now, she claims that Google acted illegally in all of

4    those respects.  The evidence does not show that.  The evidence

5    shows that Google did all of these things for legitimate

6    business reasons.  And Sara and I are going to tell you why we

7    think the evidence shows that.

8            Now, I want you to think carefully about the burden of

9    proof.  Judge Rearden will instruct you on the law and she will

10   tell you what "proof by a preponderance of the evidence" means.

11   And I agree with Ms. Greene, it means that something has been

12   proved to be more likely than not.

13           For example, Ms. Rowe bears the burden of proving that

14   it's more likely than not that Google set her level because of

15   her gender; that it decided not to give her the financial

16   services vertical lead role because of her gender.  It's about

17   whose evidence is more persuasive.

18           Now, Ms. Greene showed you a picture of a scale.  And

19   I like that picture.  It had a feather on one side.  And I

20   would agree with Ms. Greene that the plaintiff's proof in this

21   case has the weight of a feather.  But what her image doesn't

22   show is that in the course of a trial — you've sat here

23   patiently listening to all of the evidence — Google has

24   evidence on the other side of that scale.  And I submit to you

25   there was a lot of evidence on the other side of that scale.

1   And we know what happens if the feather is over here and you

2   put the evidence on the other side, the feather goes up.

3          Now, I want to remind you of some of the things that

4   Mr. Chiarello promised that they would prove.  For example,

5   they said they would prove that the simple fact of being a

6   woman determined Ms. Rowe's worth at Google.  He said they

7   would prove that Ms. Rowe had greater qualifications than Level

8   9 technical directors, as well as preferred candidates for the

9   vice president sales role she pursued.  He said that they would

10  prove that Ms. Rowe has been sidelined at Google, and that we

11  would try to disparage her.

12         He said they would prove that the financial services

13  vertical lead role and the vice president financial services

14  sales role, quote, were very similar to the engineering job

15  that she had in OCTO.  He even promised you that they would

16  prove to you that Tariq Shaukat and Stuart Breslow had steak

17  dinners all the time.  And then we learned that Mr. Breslow

18  hasn't eaten meat in 20 years.

19         They promised you that Ms. Rowe was told that everyone

20  came in at a Level 8.  She wasn't.  It wasn't true.  There were

21  a lot of 8s and a small handful of 9s.  They also promised that

22  they would prove to you that when she was hired, given an offer

23  in 2016, that she was also promised jobs that didn't exist.

24         These were some bold promises, and I submit they kept

25  none of them.

1          Now, credibility is a central issue in this case, I

2     submit.  And Ms. Tomezsko is going to talk a little bit about

3     that.

4          MS. TOMEZSKO:  Thank you, Jean.

5          Thank you, members of the jury.

6          Now, only you as members of the jury can decide the

7     credibility in this case, the appropriate weight to give the

8     evidence.  That's your job and we thank you for performing that

9     job.

10         We've heard a lot of testimony from Ms. Rowe, some of

11    it about what people allegedly told her, said to her when she

12    was hired; some of it about what people said or did not say in

13    meetings and in interviews.  But most of it was an expression

14    of Ms. Rowe's opinions as to her own qualifications relative to

15    others.  And so if I may, I'd like to offer some things for you

16    to think about as you weigh the evidence and the testimony in

17    this case.

18         Now, I expect Judge Rearden will tell you that one

19    factor you can consider when assessing credibility is the

20    consistency or lack of consistency with other credible evidence

21    or testimony.  And in many cases, Ms. Rowe's testimony is

22    inconsistent with the evidence.  This is evidence and documents

23    that were created at the time of the challenged decisions, and

24    Ms. Rowe's own words and representations when those events took

25    place.

1          So let's start with her background.

2          Ms. Rowe has testified repeatedly that J.P. Morgan

3    hired her as the global head and CTO of credit risk systems.

4    Ms. Greene told you that just a few moments ago as well, that

5    Ms. Rowe was the CTO of J.P. Morgan Chase.

6          But let's take a look at her resume.  It says that she

7    was a managing director.  It does not say that she was the

8    chief technology officer of J.P. Morgan.  And I don't point

9    that out to disparage Ms. Rowe's credentials or her

10   professional accomplishments.  Being a managing director is

11   impressive, but it does not say — and she did not represent to

12   Google when she was putting herself up for this role — that she

13   was a chief technology officer.

14          (Continued on next page)

15

16

17

18

19

20

21

22

23

24

25

NAKHRow3                          Summation – Ms. Tomezsko

1          MS. TOMEZSKO:  And it's also not what she told Google

2     in 2015 when she interviewed for an engineering director role

3     that she ultimately did not get, and you might remember that

4     testimony from very briefly on one of the first days of trial.

5          When asked by one of her interviewers for this role to

6     tell — tell me about a technical problem that escalated to

7     your level and what did you do to deal with it?  This is how

8     Ms. Rowe responded, under B:

9          "She told me about an internal customer in another

10    business unit that had difficulty accessing an application.

11    That issue was escalated up to the CTO who then brought it to

12    Ms. Rowe's attention."

13         Right here Ms. Rowe is identifying the CTO as someone

14    other than herself.

15         Now, this Court will also instruct you to consider a

16    witness' motive or intent on the outcome of this case, and I

17    want you to keep that in mind when you evaluate Ms. Rowe's

18    testimony about her cloud experience, particularly relative to

19    the other candidates for the technical director role in OCTO.

20         Now, you heard Ms. Rowe testify and you heard

21    Ms. Greene say that she had actual hands-on experience

22    migrating systems to the cloud since 2015, but that's not on

23    her résumé either.  In fact, the word "cloud" does not appear

24    once on her résumé, and that's not entirely surprising given

25    that she told Krista Callaghan in August 2016, that she was not

1    a cloud expert.

2            Now, at the time Ms. Rowe is being candid, trying to

3    set Google's expectations, and Ms. Callaghan appreciated that.

4    There's nothing wrong with that.  But it does beg the question:

5    What is more credible, the statements that Ms. Rowe made to

6    Google in 2016 when she had no incentive or motive to inflate

7    her qualifications, or the statements that she made here at

8    trial?

9            Ms. Rowe also alleges that she was excluded from an

10   unspecified number of meetings with Mr. Shaukat, was not

11   invited to his biweekly staff meetings, but you saw the invite

12   for that staff meeting from her own calendar.  She claims that

13   she was not invited to Mr. Shaukat's off-site meetings.  You

14   saw an email from Ms. Rowe to Mr. Shaukat stating that she

15   attended that off-site and that she enjoyed herself.  I ask

16   that you consider this when you're weighing the credibility of

17   the testimony and the evidence today.

18           And I'll offer you one more example for you to

19   consider, and that's Ms. Rowe's own statements about her

20   qualifications and the positions that she was allegedly

21   promised.  And these statements and these representations, they

22   have shifted over time, and I'll show you what I mean very

23   briefly.

24           In 2017, Ms. Rowe told Melissa Lawrence in human

25   resources that her qualifications and background were

NAKHRow3                    Summation - Ms. Tomezsko

1    consistent with a Level 9 technical director in OCTO.  Now,

2    I'll note two things here.  To be clear, Ms. Rowe testified

3    adamantly that she did not raise gender as an issue during this

4    meeting with Melissa Lawrence.  She herself testified to that

5    fact.

6           And I'll also note that although Ms. Rowe admitted she

7    was not a cloud expert and a Level 9 engineering employee, as

8    per the leveling guide which you've heard was substantially

9    similar in substance to the guide that you're seeing here, it

10   was attached in the performance email from Ms. Lawrence to

11   Ms. Rowe and other directors, that Level 9s are expected to be

12   world-class experts or Googlers, both inside and outside of

13   Google.  I'll note this was not reflected in the TSC letter

14   that Ms. Greene showed you at Exhibit D63.

15          But eight months later, when she's pursuing the

16   financial services vertical lead role, now her background and

17   experience suggest she should have been hired as a vice

18   president, the same level as Brian Stevens, the CTO of Google

19   Cloud her boss' boss.

20          Likewise, in late 2017 Ms. Rowe told Ms. Lawrence she

21   was told if and when Google Cloud verticalized, she would be

22   the obvious person for that role.  One year later, when she was

23   pursuing and trying to get a quicker interview with Diane

24   Greene, the CEO of Google Cloud, for the financial services

25   vertical lead role, now she writes that the financial services

NAKHRow3                    Summation - Ms. Tomezsko

1    vertical lead was actually the position that she was hired for.

2    Ms. Rowe's offer letter does not show she was hired for any

3    position other than technical director role.  It does not

4    indicate any business role outside of OCTO, and she admitted

5    that and agreed with that under oath.  Neither Will Grannis nor

6    Brian Stevens testified that they had promised her or intended

7    to hire her to lead a vertical organization within cloud

8    because none existed at the time.  They could not have promised

9    her a position that did not exist.

10            Now, the other witnesses in this trial, I submit to

11   you —— and you have to be the arbiter of this decision —— that

12   they were candid, forthcoming, sincere, and they were

13   authentic.  None of them exhibited hostility towards Ms. Rowe

14   while they sat on that stand over the last few days.  None of

15   them disparaged her, as Ms. Rowe's counsel predicted would

16   happen at the start of this trial.  That just did not happen.

17   They gave Ms. Rowe credit for the things that she does well,

18   and they applauded the value that she brings to Google Cloud

19   and they should.  They testified to instances of constructive

20   supportive feedback to Ms. Rowe over time.  And many of them ——

21   Mr. Stevens, Ms. Kliphouse, Mr. Shaukat, Mr. Breslow, and

22   Mr. Vardaman —— they all left Google.  None of them have any

23   reason to color their testimony or deviate from their honest

24   recollection of the facts here.

25            Now, opposing counsel would suggest that Mr. Vardaman

was hostile to Ms. Rowe because she was allegedly —— he was

allegedly aware that she complained about discrimination, but

you did not hear that in his testimony.  In fact, you've heard

the opposite.  And what you did hear was him candidly telling

you that the note in the Thrive system was not his best work.

He was up front and he was candid about that.

He sincerely felt dismissed by Ms. Rowe in their

initial conversation, a conversation that was not unlike a

conversation that she had had with Ms. Callaghan in 2016 before

she was even hired into Google.  Now, Mr. Vardaman credibly

testified that he was unaware that Ms. Rowe had raised any

concerns at any point prior to writing that note and prior to

speaking to employee relations.  He did not even think he had

been accused of any wrongdoing.  And as Mr. Gage mentioned,

this case largely revolves around witness credibility, and we

believe that the weight of the credible evidence and the

testimony suggests that you should find for Google on that

point.

MR. GAGE:  So let's talk about the evidence that

relates to why Ms. Rowe was hired as a Level 8 and not a

Level 9.

But I first want to talk about what levels are at

Google.  You heard uniform testimony with the exception of one

witness, and that was Ms. Rowe.  And what Ms. Rowe told you was

that levels at Google are where you are in the hierarchy, but

NAKHRow3                         Summation – Mr. Gage

1    that's not what levels are.  Levels define expectations.

2    Levels define the scope and the impact of what's expected of

3    the employee.  Level 9 employees are —— more is expected of

4    them than of Level 8 employees, and that's why they have

5    levels.

6          You heard Brian Stevens explain when I asked him

7    whether or not levels were where you are in the hierarchy, he

8    said that's not how we think of them.  And he described that

9    the purpose of levels, which is why you saw the document

10   Ms. Tomezsko just showed you that defines some of the

11   differences, it's so that it can be fair, so that it can be

12   transparent, so that employees know what to expect, so they

13   know what they need to do to get to the next level.

14         Now, again, remember Ms. Rowe had been interviewed for

15   a job in 2015, or early in 2016, a job that she didn't get, and

16   this was another engineering role at Google.  And here is one

17   of the comments from one of the interviews:  "There will be a

18   steep learning curve in technology."

19         That is not disparaging Ms. Rowe.  Again, she

20   acknowledged that she was not a cloud expert.  She had things

21   to learn.  In fact, I am pretty sure you heard Mr. Grannis say

22   that lots of people come to Google and come to OCTO with things

23   to learn.  They need to learn the platform.  You remember that

24   was one of the two things he tells everybody who joins.

25         Another comment:  "She doesn't naturally consider

resource bottlenecks, and her prior roles don't require her to

deep dive into architecture decisions.  She is confident,

however, that she can learn, and I believe her commitment

there."

You know who else you heard say that?  You heard

Mr. Grannis say that.  He believes in her.  He has supported

her, and he believes that she has the potential to grow to the

higher level.

But, again, before the beginning of the interviews for

the technical director role, she set expectations.  Remember at

the beginning of the case I said that's one of the things this

case is about, is expectations?  And when Ms. Rowe told the

recruiter, told Mr. Grannis, that she was not a cloud expert,

she wanted to set the expectations, what they could expect from

her, and Mr. Grannis appreciated that.  In fact, he

enthusiastically wanted to interview her because he thought her

background was interesting.

Now, she was hired.  I'm not pointing these out to

criticize her.  Counsel said we would disparage Ms. Rowe.  We

are not disparaging Ms. Rowe.  But a comment from when she was

hired into the technical director role, Brian Stevens, another

person who supported her, observed that she was likely not one

to drive CxO relationships, but that didn't preclude them from

hiring her.  It just was a sign that they didn't think they

could expect more higher level work, and they wanted to level

1    her fairly so she could perform.

2            Another comment:  "While she didn't come off as the

3    most technical of the candidates I've interviewed for a role in

4    OCTO, she was one of the strongest communicators, despite the

5    fact that we did the interview on GVC."

6            Everyone agrees Ms. Rowe is a terrific communicator.

7            Another comment:  "She is a bit more junior than other

8    candidates, which is the only reason for a slightly lower but

9    still very good rating."

10           The interviewer also observed that she has experience

11   mostly with one team and one part of an industry.  Again, we're

12   not criticizing her.  That experience was valuable to Google,

13   but her experience in risk technology was not across the full

14   breadth of technology used in financial services.

15           Mr. Stevens' statement of support for her hiring, he

16   believed she could make immediate impact at Level 8 and

17   therefore endorsed her hiring.

18           Now, as further proof that she was appropriately hired

19   as a Level 8, she came in, she needed to learn some of the

20   fundamentals.  Again, we're not criticizing her for that.  They

21   valued her then and value her now.

22           Now, there are a number of L9s who were hired, and

23   counsel says that Google hasn't explained why they were 9s.

24   Well, Google has explained why they're 9s.  There are

25   artifacts.  Ms. Florissi talked about artifacts.  Artifacts are

1   documents, things that were created at the time.

2        This is Mr. Stevens' statement of support for

3   Mr. Harteau, and you heard him explain it here on the witness

4   stand.  He explained why Mr. Harteau was uniquely situated.  He

5   knew the platform.  He knew Google Cloud platform.  He had

6   brought Spotify to it.  That is knowledge that Ms. Rowe didn't

7   have.  She doesn't dispute that.  And, again, it's not a

8   criticism of her.  It's just a fact.  They could expect more

9   from Mr. Harteau.

10        Paul Strong.  Similarly, Paul Strong was the emerging

11   CTO of VMware, and you heard from a number of witnesses that

12   VMware is a cloud computing company.  It's foundational

13   technology for cloud computing.  And this statement of support

14   from Mr. Grannis makes clear that they could expect more from

15   Mr. Strong.

16        Similarly with Mr. Wilson.  The two of them had been

17   CTOs.  They had actually been CTOs, chief technology officers,

18   people where the buck stops in the organization, the technology

19   decisions are made by the person at the top, the CTO.  And,

20   again, it's not a criticism of Ms. Rowe that she wasn't a CTO.

21   Wasn't even in her résumé.

22        Evren Eryurek, another one of the L9s.  He had been

23   leading technology for two different GE business units, health

24   care and energy.  He had significant experience with cloud,

25   migrating applications to the cloud.  He had a reputation.  He

NAKHRow3                        Summation - Mr. Gage

1    was bringing instant credibility to OCTO.

2           Jonathan Donaldson, you heard about foundational

3    technologies, Kubernetes, which was the Google product, and how

4    intimately he was involved in its development, and how he was

5    one of the founders of the cloud computing foundation.  Again,

6    it distinguished him from a significant number of L8s who were

7    hired.

8           Now, you heard a little about job codes.  I'll come

9    back to that in a minute.  But Mr. Humez told you that that's

10   how pay is determined.  A job code is tied to the job title and

11   the level, and it defines the expectations for the role.  And

12   they created an L9 distinguished technical solutions consultant

13   role because they had these five candidates who were so better

14   qualified than the many 8s they had hired.

15          And you remember the testimony about the immediate

16   impact Mr. Harteau had.  Mr. Stevens testified about how he was

17   the one who had already seen the movie before, unlike a lot of

18   the L8s, not just Ms. Rowe, Mr. Steikes, L8; Mr. Penberthy, a

19   L8 with a Ph.D. in artificial intelligence.  Just like

20   Ms. Rowe, those Level 8s, and many others, they had not seen

21   the movie before.

22          Similarly, you heard Mr. Stevens talk about Paul

23   Strong and how he was known in the industry.  Again, he had no

24   learning curve like a lot of the 8s.

25          Mr. Donaldson, he also talked about him and the

1  experience he had at Intel and other major technology

2  companies.

3          And Mr. Eryurek, similarly bringing instant

4  credibility to OCTO, that was clearly related to the job and

5  that was a necessity for OCTO, this new organization, for

6  Google Cloud that was trying to take on Amazon.  Here,

7  Mr. Grannis testified Evren immediately uplifts Google Cloud's

8  credibility in the health care and transportation sector.  He

9  uplifted cloud's credibility.

10          He talked about Mr. Wilson similarly, known in the

11  energy industry.  He led the first massive deployment of

12  enterprise applications to the competitor AWS Amazon.

13          Now, counsel says there were no rubrics.  Mr. Grannis

14  clearly testified this was a new job.  This was a new function.

15  They were building it.  They were borrowing from the TSC

16  ladder.  This was an engineering job.  They were borrowing from

17  the general engineering guide.  And as Ms. Tomezsko said,

18  Ms. Lawrence, the HR business partner, when the OCTO technical

19  directors wanted guidance on how to do their performance

20  reviews, she shared that document with them so they could see

21  what the expectations were.  Like Mr. Stevens said, it's fairer

22  that way.

23          I'd like to quickly go through and talk about why

24  Ms. Rowe did not get the financial services vertical lead role.

25          Now, first, remember, she was hired as an individual

1    contributor in OCTO in an engineering role.  A very important

2    role, a very senior role, but it was an individual contributor

3    role in engineering.  Mr. Stevens explained that this vertical

4    organization that Mr. Shaukat was forming was a commercial

5    organization.  It was a business.  It wasn't an engineering

6    organization.  Mr. Shaukat said the same thing.  These are

7    business units he was creating.  He didn't want someone who was

8    a technologist.  He wanted someone who was a businessperson who

9    knew technology.

10          Early in the year, early in 2018, he was interviewing

11   Ranjana Clark, again, a businessperson who knew technology, not

12   a technologist.  He saw Ms. Rowe as a technologist.  To him she

13   had instant credibility on the technology side, but he was

14   looking at Ranjana Clark, who was the head of a transaction

15   bank called MUFG, which is one of the largest banks in the

16   world.  She was the president of the Bay Area for them.  She

17   was leading a business unit.  That's what he was looking for.

18          Ms. Rowe's peers, you remember, four of the technical

19   directors were moved into Mr. Shaukat's organization.  And Ben

20   Wilson, he walked into Mr. Shaukat with a presentation for what

21   he would do, and he didn't get the vertical lead job.

22   Mr. Penberthy did the same thing.  Ms. Rowe had the very same

23   opportunity to do that, but she didn't do it, and she knew as

24   early as the end of the year in 2017 that he was looking for

25   people.  And so if she was interested, why didn't she go to

1    him?

2          Now, she met with him in February and she described it

3    as just senior people getting to know one another, and he

4    described it similarly.  These were meetings, get-to-know-you

5    meetings.  Jeff Kember and Ben Wilson approached those meetings

6    and took the initiative to make a presentation, to try to

7    impress him.  By May, through his interactions with Ms. Rowe,

8    he candidly wrote he wasn't blown away by her.  Again, he was

9    looking for a businessperson who knew technology, not a

10   technologist.  He's not criticizing her.  He was just looking

11   for something different, and he candidly said that in May.

12         She had an opportunity to change his impression.  In

13   June she was told that she's being transferred to his

14   organization.  She respectfully declined the role and said she

15   wanted the vice president role.

16         Now, they met, and when Ms. Rowe was asked by her

17   counsel how much time did you spend in a 30-minute meeting with

18   Mr. Shaukat talking about that job, she said very little, five

19   minutes, ten minutes tops.  Now, Ben Wilson and Jeff Kember

20   took the initiative, seized the opportunity, and tried to

21   impress him, but she didn't.  That was her choice.  She had the

22   opportunity.

23         Now, by July Mr. Shaukat is impressed by another

24   business-oriented candidate, Diana Layfield.  I would note,

25   another woman.  So now he's got two leading candidate, both of

1   whom are women, so clearly he's not biased against women.

2   Ms. Layfield had again run and very successfully built a large

3   business for Google.  She was an existing vice president.

4           Now, Ms. Rowe told you that her interviews were weird,

5   they were unstructured.  But we know because we have the email

6   that Mr. Vardaman sent to the interviewers that showed they

7   were given criteria to conduct these interviews, and then we

8   also know that after the interviews Ms. Rowe herself said she

9   had good conversations in those interviews.

10          So she described the interviews positively at the

11  time, but she conceded in her testimony that she did not

12  present a vision for the vertical, and the interview notes

13  confirm this, and she says she wasn't asked.  So I ask you to

14  ask yourself, whose responsibility was it?  She was trying to

15  get a vice president job.  Mr. Shaukat, who wasn't interviewing

16  Mr. Wilson, wasn't interviewing Mr. Kember, didn't put them

17  through the interview process, and his reaction to the comments

18  were when I see that type of feedback, there's a gap because

19  you expect someone to walk in with a perspective of what they

20  would do with the job, not I'll figure it out, trust me.

21          So she had an opportunity to impress him.  He expected

22  more.  He also got feedback from Mr. Marotte.  Again, solid on

23  the technical part, and Mr. Shaukat knew that.  But this

24  confirmed what he had doubts about, and that was her business

25  acumen.

NAKHRow3                        Summation - Mr. Gage

1              But still, even though she hadn't impressed him

2       despite the opportunities she had been given, he creates

3       another opportunity for her and asks Diane Greene to do him a

4       favor and see her, because he was willing to change his mind.

5       You heard him say Diane Greene has her own mind.

6              Now, by the summer, early fall, he was focusing on

7       Diana Layfield, and that never changed.  The other candidates

8       continued to impress.  And then by the time that Diane Greene

9       told him in October she was leaving and Mr. Kurian was taking

10      over, he had to stop, put a pause on everything.  Mr. Breslow

11      had been working on an anti-money laundering product.  It was

12      something that Mr. Shaukat knew Mr. Kurian was interested in

13      because he was coming from a company that had the only product

14      on the market.

15             So he asked Mr. Breslow, as an interim basis, to just

16      lead the team, small team of three people.  Now, mind you, he

17      had offered Ms. Rowe the opportunity to build a team back in

18      June when she first transferred into his organization.  She

19      didn't seize that.  Mr. Breslow was asked to take on this

20      responsibility.  He didn't get a promotion.  Think back, count

21      how many people you heard sit on the stand and say they got

22      additional responsibility, and they didn't get a promotion.

23      And then eventually Mr. Shaukat learned that Mr. Kurian was not

24      going to support his financial services vertical plan.  He told

25      Ms. Layfield:  Sorry, I'm not going to give you the job.

NAKHRow3                    Summation – Ms. Tomezsko

1          So now we'd like to talk about why she didn't get the

2     financial services sales role.

3          MS. TOMEZSKO:  I'll briefly recap some of the

4     testimony that you heard yesterday and on Friday, but this is

5     what the evidence shows.  And I implore you to actually go look

6     at the documents, look at the evidence, because the timeline is

7     clear.

8          Ms. Kliphouse in 2020 had an immediate need to fill

9     the financial services sales role in her organization, which

10    was a go-to-market organization.  It was not a technology

11    organization even though it sat within Google Cloud.  The man

12    that she had hired to perform the role was sidelined when he

13    joined.  He had a noncompete issue.  He could not immediately

14    fill the role which created an urgency, as you heard

15    Ms. Kliphouse say.  This was an area that they needed to get up

16    to speed.  They needed to come from behind the eightball.

17    There was a real need to have a leader in this space.

18         So what does Ms. Kliphouse do?  She goes out with ⸺

19    working with Mr. Vardaman, creates a job description, and I

20    urge you to look at that job description and the minimum

21    qualifications that are stated there.  She worked with

22    Mr. Vardaman to go out into market, to look for talent, and

23    indeed ⸺ and you will not see this on Ms. Greene's calendar

24    that she created ⸺ in January, on January 28 of 2020,

25    Mr. Vardaman connects with Yolande Piazza.  Yolande Piazza, who

1   you might recall was the preferred candidate that actually

2   ended up getting this role, here she is in the mix before

3   Ms. Kliphouse and Ms. Rowe met for coffee.

4           And if you look at her background, it speaks for

5   itself:  Three decades of experience at Citi fintech.  She was

6   progressing to an executive level of a $72 billion

7   organization, and she rolled out Citi's first mobile banking

8   application that supported $35 billion of portion of Citi's

9   business.

10          Now, on February 6, Ms. Kliphouse has a phone

11  interview with Ms. Piazza, and you heard her as she was sitting

12  on that stand yesterday tell you exactly why Ms. Piazza was the

13  candidate that she was looking for.  She was a seasoned, very

14  senior leader.  She had been in the industry for financial

15  services for a long time, well versed in management and

16  leadership and technology.  She sat at the executive table

17  where these senior decisions were being made.

18          Right after that, she writes her feedback, and it's

19  consistent with what you heard her say today, and this is from

20  three years ago.  There's no light between what she told you on

21  the stand she was looking for in a candidate and what she saw

22  in Yolande Piazza and what is recorded here.

23          Now, shortly after that, on February 19, another vice

24  president meets Yolande Piazza, has a similar reaction, gives

25  her a strong hire rating:  She has the technical acumen to work

1  closely with the FSI, financial services industry leadership

2  and Google engineering to help build the business cases and

3  design new industry solutions for the market.

4           Now, at this point, on February 21, 2020,

5  Ms. Kliphouse told you that she had a focus on her preferred

6  candidate, and the preferred candidate was Yolande Piazza.

7  Mr. Vardaman told you the same thing, and there were two people

8  that were a part of that conversation.  They both say the same

9  thing about what happened in that conversation.  They decided,

10  and Ms. Kliphouse directed Mr. Vardaman, to focus on the

11  preferred candidate, and that was Yolande Piazza.

12           I urge you to look at the testimony of Ms. Kliphouse

13  and Mr. Vardaman.  Again, it is consistent on this point.  I'll

14  remind you that Mr. Vardaman testified credibly that he is not

15  a decision-maker.  He's a steward of the process.

16  Ms. Kliphouse corroborated that.  She said she instructs him to

17  fulfill the searches as she sees fit because she is the

18  decision-maker, and she was the one that made the decision here

19  to focus on Yolande Piazza.

20           One thing I want to note about the February 14 time

21  frame, it's the week that begins February 10.  You've heard

22  some argument today about how Mr. Vardaman waited.  He sat on

23  Ms. Rowe's candidacy without raising it to Ms. Kliphouse.

24  Please check the emails.  What you'll see is that week both

25  Ms. Kliphouse and Ms. Rowe were out of the office.  That's the

NAKHRow3                          Summation - Ms. Tomezsko

1    reason he did not discuss Ms. Rowe with Ms. Kliphouse prior to

2    their next scheduled meeting.

3          And here you could see —— you don't have to trust the

4    witnesses.  It's here in the documents —— the focus was on

5    Yolande Piazza.  And then there's no surprise, then, that

6    Thomas Kurian, the CEO of Google Cloud, shortly thereafter

7    says:  "Hire her quickly.  She will not be on the market for

8    long."  The story resonates.  The story makes sense.

9          You've also heard that around the same time

10   Mr. Grannis created an opportunity for Ms. Rowe to meet with

11   Ms. Kliphouse.  Mr. Grannis, who supported Ms. Rowe, who

12   Ms. Rowe acknowledges supported her, gave her this opportunity

13   to meet with someone, a president with a go-to-market

14   organization within Google Cloud.  And during that meeting,

15   Ms. Kliphouse testified, and Ms. Rowe testified as well, they

16   discussed her background.  They discussed what she was doing at

17   Google Cloud.  They discussed the regulatory work which she was

18   doing, which was a large part of what Ms. Rowe was actually

19   doing at the time, but Ms. Kliphouse found that irrelevant to

20   the role.  That was in her testimony.

21         Ms. Rowe herself, when we played you the clip,

22   acknowledged that she had told Ms. Kliphouse about her C-level

23   networking contacts during that meeting and her financial

24   services expertise.  And indeed, the documents corroborate the

25   testimony that on February 21 there was a discussion about

1    Ms. Rowe.  Mr. Vardaman did not make a unilateral decision not

2    to present her to Ms. Kliphouse for consideration.  It's right

3    there in the documents, as is her background.

4         But you'll see in Ms. Kliphouse's testimony, when they

5    discussed her, precisely what I'm telling you here.  They

6    decide to focus on other candidates who they found to be very

7    qualified for the role.  There's nothing wrong with that.

8    There's nothing retaliatory about that because they pursued

9    another candidate that they found attractive and that they

10   wanted to hire into this role because they needed to fill the

11   role immediately.  They had identified her before Ms. Rowe and

12   Ms. Kliphouse had coffee together.

13        MR. GAGE:  So let's talk about why Ms. Rowe was paid

14   what she was paid.

15        Now, again, you heard Mr. Humez tell you how they set

16   starting pay.  It's tied to a job code which is specific to

17   level, and this was Ms. Rowe's job code.  You can see this on

18   P-119.  And he also told you about the market reference point.

19   You remember the MRP?  They set a market reference point for

20   the job.  It's not specific to a person.  It's set for the job,

21   and that's so they can be fair.  And they try to get people in

22   at 80 percent of the market reference point for starting pay.

23        And then he told you how target bonus and initial

24   equity work.  And again, yes, target bonus specific to a

25   Level 8 is 30 percent, and that is because there are lower

1    expectations for a Level 8 than there are for a Level 9.  And

2    initial equity is also similarly calculated based upon the job

3    code.  And he talked about how they go to use external market

4    benchmarking.  Again, this is all without regard to the person.

5    It's all without regard to whether it's a man or a woman.  It's

6    purely based on roles and responsibilities associated with the

7    job code.

8           Now, he explained for you how he calculated her

9    starting pay package, and there's been a lot of back and forth

10   in this trial about whether Ms. Rowe was giving something up.

11   And I think you heard her and her counsel say, well, she was

12   giving something up when she came to Google, others weren't.

13   But Mr. Humez explained that that's not the way they do it.

14   They calculate cash flows.  And so Ms. Rowe wasn't giving

15   something up when she left JPMorgan Chase.  What she was

16   talking about were stock awards she had received in prior years

17   that she was not going to realize, she was not going to

18   receive, unless she earned them.  They were not vested.  She

19   told you they were unvested.  And what that means is she needs

20   to work the next year at JPMorgan Chase to earn that next piece

21   of that vested stock award.

22          And so Mr. Humez explained that's how they did it.

23   They're estimating what Ms. Rowe's cash flow would be if she

24   worked at JPMorgan another year, another two years, another

25   three years, what she could reasonably expect to earn based

1    upon these prior awards that had not fully vested.

2          You also heard about Mr. Breslow's equity award at

3    Google, and he forfeited $2 million of it because, again,

4    similarly, it hadn't vested.

5          Now, I'd like to show you a demonstrative we have that

6    illustrates for you the starting pay packages of a group of

7    Level 8 and Level 9 technical directors in OCTO.  And

8    Ms. Rowe's bar is this one right here.  There's one bar higher

9    than hers, and that's Evren Eryurek, which means that her bar,

10   the value that Google placed on her as an entering employee,

11   was that high.  That means that it was higher than four of the

12   Level 9s.  It was higher than a whole bunch of Level 8s.

13         Google valued Ms. Rowe.  Does that look like sex

14   discrimination to you?  I don't think it is.

15         Now, Mr. Humez also told you that all of the other

16   technical directors who started around the same time, they had

17   lower market reference points.  Ms. Rowe's was about

18   98 percent; others were lower.  Again, that's specific to the

19   job code.  Each year Google adjusts her pay based upon her

20   performance against expectations.  That's what I talked about

21   on the first day of the trial.  Google sets expectations based

22   upon the job code, based upon the level, and she's measured

23   against them.

24         And you can take a look at these prosper letters,

25   P-134, 132, 130, 136, and so on, hers and the Level 9s, and if

1   you look at them, you will see there are years when she earns

2   more than some of the Level 9s.  And what means is they had

3   higher expectations, and they might not have met them.  And the

4   consequence is they fall further.

5        And Ms. Greene showed you a subset of those L9s in one

6   of her charts and their compensation to show that Ms. Rowe was

7   lower than them in those years, but she left two people out.

8   And that's because those are two people that she, in some

9   years, earned more than.  Level 9s do not always earn more than

10  Level 8s.  That's the point.

11       Annual earnings are a function of performance against

12  level-specific expectations, and in some years Ms. Rowe earned

13  more than them.

14       Now, again, she was evaluated against Level 8

15  standards.  And, yes, she absolutely got exceeds expectations,

16  and that was a middle rating.  And, yes, this question, "What's

17  one thing you plan to do to have more impact?" is one that

18  everybody has answered.  Google gives feedback to their

19  employees, and you will see if you look at these documents in

20  P-126, which is Ms. Rowe's performance evaluation, she gets

21  honest feedback, both positive and constructive.  And the

22  consistent theme that she's been told over and over and over

23  again by Mr. Grannis and now Ms. Florissi is that she needs to

24  have more engineering impact.  This is an engineering job.  And

25  over time the expectation in terms of public speaking has gone

1  down, you heard that from Ms. Florissi, because this is an

2  engineering job.

3         And I don't say that to criticize Ms. Rowe.  You heard

4  Mr. Grannis say on the stand she does a number of things

5  really, really well and they value her, but I think the number

6  he gave was he thinks that it's about 70 percent of the job

7  she's doing for a Level 8.  And what did he tell you?  He tells

8  people two things when they join OCTO:  Build your network and

9  learn the platform.  And Ms. Rowe has not done that.

10         So let's briefly talk about Nicholas Harteau and why

11  he was paid what he was paid.

12         Different job code.  He was doing different things.

13  You heard from Mr. Stevens that he immediately was involved in

14  engineering work.  He didn't have to learn like many other

15  people, Ms. Rowe and other Level 9s.  He was focused on

16  high-potential engineering products — projects, that were

17  going to pay large dividends.  This is immediately when he

18  walks in the door.

19         The other thing I would suggest you look at is who the

20  peer reviewers are for Ms. Rowe and Mr. Harteau.  And again,

21  this is not a criticism, but Mr. Harteau's peer reviewers are

22  product managers, OCTO technical directors, software engineers.

23  They're not people in marketing, sales, and business

24  development.  But that's who was offering peer reviews to

25  Ms. Rowe.  Again, not a criticism.  It's just constructive

1    feedback that there's more of the job that she needs to focus

2    on.  And Google could and did expect more from Mr. Harteau

3    because, unlike Ms. Rowe who was offered the opportunity to

4    build a team and didn't, Mr. Harteau did build a team, and he

5    did manage a team.

6          You also heard Mr. Stevens talk about technical work,

7    engineering work he did with Mr. Harteau when he came in the

8    door.  We asked him:  Did Ms. Rowe work on any projects like

9    that?  No, she didn't.  Again, she was a Level 8.  She had more

10   to learn than Mr. Harteau did.  It's not a criticism.  It's

11   just a fact.

12         So I just want to talk about how Google responded to

13   Ms. Rowe's concerns.  Now, the bottom line, Google disagrees

14   with Ms. Rowe about whether she was properly leveled.  She

15   thinks she wasn't.  Google thinks she was.  When she first

16   raised this, she didn't say it was related to sex.  Google

17   disagreed with her; told her you're properly leveled.

18         Then when she said she thought it was because of

19   gender, what did Google do in response?  It launched an

20   investigation.  Google did multiple investigations.  In fact,

21   you heard one of those investigations was done by someone who

22   was a former FBI agent.  Google took her concerns seriously.

23   And you have the notes from these interviews, and you can look

24   at those notes and you can see what Ms. Rowe said to the

25   investigator.  She said she had no reason to believe that this

NAKHRow3                    Summation - Mr. Gage

1    was because of gender.  All she was identifying is that five

2    people who were men were L9s.  She ignores the fact that there

3    were plenty of men who were L8s.

4         You heard her disparaging some of her colleagues and

5    saying she was better qualified than them, and what did you

6    hear Mr. Grannis and Mr. Stevens say?  They said they were

7    differently qualified.  And these were people who have Ph.D.s

8    in artificial intelligence.  These are people who also, like

9    Ms. Rowe, contribute uniquely.

10         And I completely disagree with Ms. Greene.  We don't

11   think Ms. Rowe is a whiner.  She's absolutely entitled to

12   pursue this lawsuit.  She's absolutely entitled to that.  You

13   heard Google's witnesses say they did not hold this against

14   her.  You heard from Ms. Rowe and Mr. Grannis that when he

15   heard about that she had raised concerns, he didn't really know

16   anything about them, but he went to her to say: Hey, OCTO's a

17   safe place.  We respect your rights.  You look at her pay since

18   she raised these concerns, her pay has gone up.  The only thing

19   that's happened is she hasn't gotten everything that she

20   wanted.

21         Now, she needs to prove that it's more likely than not

22   that her gender motivated Google's decisions.  The decision to

23   make her a Level 8 was undisputedly a reasonable assessment

24   that five individuals had superior qualifications to her and

25   many other men, and that's why they were 9s.  Brian Stevens and

NAKHRow3                    Summation - Ms. Tomezsko

1   Will Grannis both credibly told you, consistent with the hiring

2   packets, why the background and experience of those Level 9

3   technical directors brought additional value to Google.  You

4   didn't hear them disparage her one bit.

5        Now, similarly, the decision not to give Ms. Rowe the

6   financial services vertical lead role is a reasonable business

7   decision.  Mr. Shaukat thought other people were better from

8   the beginning, from the beginning.  Ms. Greene gave you a

9   timeline, but what she left off her timeline is the events

10  earlier in the year when Mr. Shaukat indicated he didn't think

11  she was right for the role, when he indicated he preferred

12  other women who were more business-oriented, less

13  technical-oriented, all of that preceded.  And despite having

14  been given multiple opportunities to impress him and to impress

15  others, she didn't change his views.

16        Finally, there's simply no credible evidence that

17  Mr. Shaukat ever intentionally left Ms. Rowe off emails, off

18  meetings, invites, and Ms. Tomezsko addressed that.

19        MS. TOMEZSKO:  One last point I want to make on the

20  New York Labor Law claim, it requires substantially equal work,

21  and that's a combination of skill, effort, and responsibility.

22  You're going to hear a jury charge that describes that law in

23  detail.  And I'll agree with Ms. Greene on the fact that it is

24  long and that you should pay attention to it.  But I want to

25  offer an analogy that I find, and maybe you will find, a bit

NAKHRow3                     Summation - Ms. Tomezsko

1    easier to understand.

2         Think about a baseball team.  You're building a

3    baseball team.  I'm not going to hazard a guess as to which

4    team this might be.  I don't want anyone to get upset.  The

5    World Series, I know they're coming up.  Let's not pick sides

6    here.  But baseball players do three things:  They field, they

7    bat, and they go to practice.  At a high level, they all do the

8    same thing.  Just like when you're looking at the technical

9    director role from a very high level, not delving into the

10   details, they all do the same thing too, it looks like.

11        But I urge you to look at the details.  Look at the

12   performance reviews, the ones that Ms. Rowe admits were her

13   opportunity to highlight her accomplishments and what she did

14   each year.  It was the same for the other technical directors.

15   So please look at them because what you'll find in the details

16   is that there is a difference in what they do.  It's like

17   comparing a shortstop to a right fielder to a pitcher to a

18   catcher.  They're all baseball players, but I think we can all

19   agree it's reasonable to pay a shortstop differently than you

20   pay a center fielder.  It's reasonable to say a catcher does a

21   different job than a third baseman.  It's just a fact, and it's

22   borne out in these performance reviews as well.

23        Now let's talk about the components of what

24   substantially equal work is.  The first one is skill.  Skill

25   you can take into account means training, experience.  These

NAKHRow3                    Summation - Ms. Tomezsko

1     are things that are literally mentioned and explained in the

2     leveling guide.  The difference between a Level 8 and a Level 9

3     differs in skill.  You could see it.  It's one of the

4     dimensions of leveling.

5             Let's talk about training.  You heard Mr. Stevens sit

6     on that stand and say that people like Nic Harteau who were

7     familiar with the Google Cloud platform before he even got to

8     Google because he had worked at Spotify on it, he was familiar

9     with BigQuery —— BigQuery, Ms. Rowe admits the flagship product

10    of the Google Cloud platform, he knew it coming in the door.

11    He said he was one of the only individuals at that time who had

12    led a large-scale enterprise migration of a company to the

13    Google Cloud platform.  That training, that experience that he

14    had, was invaluable.  It brought instant credibility not only

15    to Google Cloud platform but to Google.  When someone like Nic

16    Harteau, who has done this before —— and he admits it was in

17    articles, it was in blog posts, the relationship between

18    Spotify and Google Cloud was a big deal.  He stood up on stage

19    with Brian Stevens at Google Cloud Next, their annual

20    conference to talk about that in front of a bunch of people,

21    that brings instant credibility.  That's worth something.  That

22    training is worth something, and it elucidates the skill that's

23    necessary and the training that's necessary to perform the role

24    at a Level 9.

25             Now, Ms. Rowe, like others, admittedly did not have

1    Google Cloud platform experience, and that is fine.  But if you

2    look at what she's doing in the first six months, as reflected

3    in her performance reviews, she's taking training on the

4    platform, literally the training that Nic Harteau already had

5    coming into the door from day one, that he could leverage to

6    bring clients, to empathize with the customers who are

7    wondering not only why should I come to Google Cloud platform,

8    but how do I come to Google Cloud platform, he could tell them

9    because he did it.  Meanwhile, Ms. Rowe was taking training,

10   and it wasn't complete by the end of her first performance

11   review.  Again, that's fine.  Will Grannis says one of the two

12   things that you have to do in cloud is learn the platform, and

13   she was.  But it's not the same as the work that Nic Harteau

14   was doing.

15        You know what else was different about what Nic

16   Harteau was doing?  He was a people manager.  You saw in his

17   performance reviews he had 11 direct reports at the time.

18   Ms. Rowe never managed anyone at Google.  She was an individual

19   contributor the entire time.  And, again, that was a function

20   of the role.  That's the beautiful thing about OCTO.  Across

21   those three pillars you have the freedom, the self-direction,

22   as Ms. Rowe and Mr. Harteau described it, to do what you're

23   good at and leverage what you're good at.

24        We've heard a ton about Ms. Rowe's keynote speeches,

25   going out and meeting customers and shaping the market, and

NAKHRow3                     Summation - Ms. Tomezsko

1    that's why she's still here.  That's why Google values her.

2    She's good at that.  That's why she gets an "exceeds

3    expectations," 3 out of 5.  That's why, in the last round,

4    "significant impact."  That's why she's still at Google earning

5    nearly a million dollars a year, but that's different from what

6    you see in Nic Harteau's packet.

7           In that time frame that she compares herself to him,

8    before he left to go do a different role in a different part of

9    Google Cloud, which he said on that stand was a different role,

10   he's doing data migrations, he's migrating Teradata to

11   BigQuery, he's working on a project called Project Fulcrum.

12   And you could check.  There's other OCTOs, Level 9 OCTOs, that

13   are working on the same project, and they spend 95 percent of

14   their time on this project.  Check John Donaldson's performance

15   review around this time.  He says he spends 95 percent of his

16   time doing this heavy technology engineering project.  That's

17   not what's reflected in Ms. Rowe's performance reviews.  But,

18   again, that's the beauty of OCTO.  Across the three pillars,

19   you're all different sports players on a baseball team.  You're

20   all good at different things, but you're compensated for those

21   different things differently because they bring different value

22   to Google.

23          So I urge you, look at the evidence, look at what's

24   written down, look at what they wrote down themselves about

25   what they were doing and compare it.  It's different.  Unless

NAKHRow3                      Rebuttal - Ms. Greene

1   she could show that the work was substantially equal, she does

2   not pass go.

3         And she has to prove that she actually earned less in

4   those years, or in any year for —— than Mr. Harteau, than

5   Mr. Breslow.  Look at the prosper letters.  That wasn't true

6   every year.  Please look at the evidence when you —— and I know

7   you will.  I know you have been a very attentive jury, and I

8   thank you again for that.  But I urge you to go back, look at

9   the documents.  The documents are going to show exactly what

10  Google has argued here.

11        MR. GAGE:  One last thing I ask you.  The way this

12  works, Ms. Greene is about to get up, because the plaintiff

13  bears the burden of proof in this case.  They get the last

14  word.  And so as Ms. Greene gets up, I want you to think, for

15  every point she makes, what would Sara say or what would I say,

16  because, again, we know you know the evidence.

17        Thank you.  We hope you'll return a verdict in favor

18  of Google.

19        MS. GREENE:  I want to just address several points

20  that came out of Mr. Gage and Ms. Tomezsko's presentation.

21        First of all, this chart, you notice how much of it is

22  gray and orange?  Why did they put that up there?  Because they

23  want to conflate the issues.  The gray and the orange is from

24  the sign-on and the equity replacement.  You take that out, it

25  tells a very different story.

1        In fact, Google consistently conflates, misstates, and

2   cherry-picks the evidence here.  This is not a baseball analogy

3   of a baseball team.  If it were, it's cloud that would be the

4   baseball team.  OCTO are the catchers.  All playing the same

5   role, all doing the same thing, all coming with the same

6   background and experience.  Google Cloud may be a baseball

7   team, OCTO is not.

8        They conflate the evidence from the beginning through

9   the end.  Let's talk about the résumé they showed you and the

10  feedback they showed you.  That was from an entirely different

11  job that Ms. Rowe interviewed for a year earlier.  Look back at

12  119, the gHire packet.  And I don't know if we can bring up

13  some of these exhibits while I talk about them, but the gHire

14  packet that they showed you, that résumé was one she submitted

15  for a different position a year earlier.

16       We know how résumés work.  You tailor it for the job

17  you're doing.  They didn't ask her for a new résumé when she

18  was applying for a position in OCTO.  When she was applying and

19  giving a résumé for a position in OCTO, you highlight the CTO

20  experience because it's for the office of the CTO.  You

21  highlight the cloud experience.  She was applying at that time

22  for an engineering role.  They'd recruited her for an

23  engineering role.  She was highlighting different experience.

24       That feedback was not feedback.  They showed you a

25  score of 2.9 for a different job.  That's what they did.  If

1    you look at 119, that 2.9 score was a score for a different

2    job.  In fact, for this job, Brian Stevens rated her a 3.5.

3    That's the highest score he gave any of that group of technical

4    directors, the L9 men and Ms. Rowe.  Why did they show you an

5    old résumé?  Why did they show you a different job?  Because

6    they didn't want to deal with the actual evidence for this job.

7         They try to claim, bizarrely, that she wasn't a CTO.

8    Their own biography for her notes her CTO experience at

9    JPMorgan Chase.

10        They talk about that ⸺ they're not bringing in any

11   evidence of her cloud experience.  Ms. Callaghan noted that she

12   said she's not a cloud expert, not that she didn't have cloud

13   experience.  Some of the men hired into L9 legitimately did not

14   have cloud experience if you look at their hiring packet.

15        They say she was not a CTO, and then they say Paul

16   Strong was the emerging CTO.  What does that mean?  He wasn't

17   the CTO yet.  They're crediting a man for something he hasn't

18   done yet and ignoring what in fact the woman did.  That's an

19   example of gender bias.

20        They're saying Ms. Rowe in those interviews is more

21   junior than some of the other candidates when she has the same

22   experience, the same number of years, greater academic

23   credentials, and again has been performing a CTO job that some

24   of the men had not been performing.

25        Mr. Grannis at Ms. Rowe's interview talked with her

about verticalization.  He doesn't deny that.  If you look at

those interview notes, I think it's the interview notes with

ER.

            Is that 118?

            MR. CHIARELLO:  108.

            MS. GREENE:  108.  He admits that he talked about

verticalization with her at the interview, and he understood

how she would expect she could go on to do big things.

Mr. Grannis and Mr. Stevens recommended her for the financial

services vertical lead position.  They didn't recommend

Mr. Wilson.  They didn't recommend Mr. Kember.  Mr. Shaukat

agreed to interview Ms. Rowe.  He didn't even put Mr. Wilson

and Mr. Kember into the interview process.  And the time for

Ms. Rowe to make an impression about that position was in the

interviews, but they were short.  They were cut short.  They

showed you interview questions that Mr. Shaukat never reviewed

because he didn't look at the gHire packet for Ms. Rowe.  What

does that say?  Why are they misstating and misconstruing the

actual facts here?

            They say that levels are what define expectations, but

you heard testimony from the L9 men that they didn't tell them

the levels when they were hired necessarily, and some of them

didn't even know until they'd been performing the job for some

time what their level was.  If level was what defined

expectations, you'd think they'd tell them what their level was

NAKHRow3                          Rebuttal - Ms. Greene

1    that they were working against.

2             And the feedback that they did show you for this job

3    are things like "likely not to drive CxO relationships," even

4    though she'd been meeting with the C-suites at JPMorgan Chase,

5    even though she was part of the broader conversation and the

6    community of CTOs.  Men got the benefit of the doubt about what

7    they would do while Ms. Rowe's credentials for what she was

8    actually doing, what she had done, was ignored.  And again,

9    that's gender bias.

10             They say she needed to learn fundamentals, but you're

11   going to see the same sort of feedback for other candidates.

12             Mr. Stevens didn't even interview Mr. Harteau.  He

13   just went on what he knew.  That's the old boys' network I

14   talked about before.

15             And then they talk about the financial services

16   vertical lead role and how they were considering Diana

17   Layfield.  Look at the feedback for Diana Layfield.  There were

18   holes in her experience.  But most importantly, they had a

19   slate of candidates that were women for that position because

20   they had a problem with diversity, and what did they do when

21   that position needed to be filled and there was a woman

22   available?  They tapped a man, Mr. Breslow, a man who hadn't

23   interviewed for the position, a man who was an attorney, not a

24   technologist, a man who hadn't expressed an interest for the

25   position.  They put a man that was underqualified, less

NAKHRow3                    Rebuttal - Ms. Greene

1  qualified than Ms. Rowe, in that position when they had the

2  opportunity to put a woman in.  That's gender bias.

3          They talked about the engineering, put a lot of

4  emphasis on the engineering and Mr. Harteau and Mr. Donaldson's

5  engineering contributions, but those OCTO calibration notes

6  that we looked at from that time period — and I think that was

7  Exhibit 87 — showed that engineering was only 30 percent of

8  the job; 70 percent was that one to one and that one to many

9  where Ms. Rowe excelled.  And it's not surprising that Ms. Rowe

10 received exceeds expectations and some of the men only received

11 consistently meets expectations, because as to the role, she

12 was performing it at a high level.  So why are they saying now

13 that something else was the case?

14         Let's talk about the VP of financial services sales

15 role.  If there was an immediate pressing need, and we don't

16 doubt that there was, why didn't they tap the person who was

17 already doing that in Google?  You heard Mr. Grannis talk about

18 how he believed she was and is qualified for that type of role.

19 That was the one area where he spoke glowingly about her, her

20 sales, her business development.  This role, she was ready to

21 perform it.  She could perform it.  She'd been performing it.

22         But what happened?  Stuart Vardaman didn't share that

23 with Ms. Kliphouse.  Ms. Kliphouse had a meeting with her, and

24 she knew enough about Ms. Rowe to say you should talk to Stuart

25 Vardaman about this position, which Ms. Rowe promptly did.

NAKHRow3                    Rebuttal - Ms. Greene

1    Mr. Vardaman didn't put her name forward.  He didn't put her

2    qualifications forward.  And if you look at the timing of

3    Ms. Piazza's consideration, those interviews, it was after

4    Ms. Rowe had raised her hand.  She didn't get fair

5    consideration.  She didn't get fair consideration because six

6    days before she raised her hand, Mr. Vardaman had been

7    interviewed by ER for this case, and he knew it was about

8    Ms. Rowe and he knew it was about this case.

9            We saw the gHire packet for Ms. Piazza.  Why didn't we

10   see a gHire packet for Ms. Rowe for that position?  Why was she

11   not interviewed?  Why were her qualifications not represented?

12   Because she never got the chance.

13           There's just one other thing I want to note.  Ms. Rowe

14   told you about how, after I reached out to Google in this case,

15   she had a conversation with Mr. Grannis, and Mr. Grannis

16   acknowledged that he knew this was going on.  And he told

17   Ms. Rowe that if his two daughters were in the same position,

18   he would hope they would do the same thing Ms. Rowe is doing.

19   Look back at the testimony.  Mr. Grannis admitted that

20   conversation happened.  He never denied saying that.

21           Ms. Rowe is sitting here today holding Google

22   accountable for their actions, and we ask that you do the same.

23           Thank you.

24           THE COURT:  All right.  I'm going to give the members

25   of the jury a break now.  I think it would be about 15 minutes.

NAKHRow3                          Rebuttal – Ms. Greene

1   We need to assemble some paperwork to prepare for the next

2   phase.  We'll go through that phase, and then you will be ready

3   to retire into the jury room to have your lunch and deliberate.

4            So Ms. Williams will, of course, come get you when

5   we're ready.  I would estimate about 15 minutes.  Please don't

6   talk about the case yet, still, with each other, or anyone else

7   and don't do any research, and we'll see you back here soon.

8            Thank you.

9            (Jury excused)

10           (Continued on next page)

1          THE COURT:  Okay, Ms. Williams.  Could you please get

2     the jury.

3          THE DEPUTY CLERK:  Okay, Judge.

4          (Jury present)

5          THE COURT:  This portion of the proceeding is called

6     charging the jury.  And Ms. Williams is handing you a copy of

7     the charge.  I apologize I'm not going to be making eye contact

8     with you because I am going to be reading from the screen.  And

9     what I am going to be reading is what you also just got a copy

10    of.

11         Members of the jury, you have now heard all of the

12    evidence in the case, as well as the final arguments of the

13    parties.  We have reached the point where you are about to

14    undertake your final function as jurors.  You have paid careful

15    attention to the evidence and I am confident that you will act

16    together with fairness and impartiality to reach a just verdict

17    in this case.

18         My instructions to you today will be in four parts:

19         First, I will give you general instructions, including

20    instructions about your role as the jury.

21         Second, I will give you instructions concerning

22    evaluation of the evidence.

23         Third, I will describe the law to be applied to the

24    facts that you find to be established by the proof.

25         The fourth and final section of these instructions

NAKVROW4                          Charge

1    will relate to your deliberations.

2            Because my instructions cover many points, I have

3    given you a copy so that you may follow along.  In addition,

4    you may take your copy of the instructions with you for

5    reference during your deliberations.  You should not single out

6    any instruction as alone stating the law.  Instead, you should

7    consider my instructions as a whole when you retire to

8    deliberate in the jury room.

9            The plaintiff in this case is Ulku Rowe.  The

10   defendant is Google LLC, or Google for short.  All litigants,

11   including corporations, are equal under the law and are

12   entitled to a just verdict.  It would be improper for you to

13   allow any personal feelings that you might have about the

14   plaintiff, the defendant, or the nature of the claims to

15   influence you in any way.

16           My role as the judge presiding over this trial is to

17   instruct you as to the law.  It is your duty to accept these

18   instructions of law and to apply them to the facts as you

19   determine them.  With respect to legal matters, you must take

20   the law as I give it to you.  If any attorney has stated or

21   states a legal principle different from any that I state to you

22   in my instructions, it is my instructions that you must follow.

23   You must not substitute your own notions or opinions of what

24   the law is or ought to be.

25           As members of the jury, you are the sole and exclusive

1    judges of the facts.  You pass upon the evidence.  You

2    determine the credibility of the witnesses.  You resolve such

3    conflicts as there may be in the testimony.  You draw whatever

4    reasonable inferences you decide to draw from the facts as you

5    have determined them, and you determine the weight of the

6    evidence.

7            Although you are encouraged to use all of your life

8    experiences in analyzing testimony and reaching a fair verdict,

9    you may not communicate any personal or professional expertise

10   you might have or other facts not in evidence to the other

11   jurors during deliberations.  You must base your discussions

12   and decisions solely on the evidence presented to you during

13   the trial and that evidence alone.  You may not consider or

14   speculate on matters not in evidence or matters outside the

15   case.

16           At trial, it is the duty of an attorney to object when

17   the other side offers testimony or other evidence that the

18   attorney believes is not properly admissible.  You should draw

19   no inference from the fact that an attorney objected to any

20   evidence; nor should you draw any inference from the fact that

21   I might have sustained or overruled an objection.  Simply

22   because I have permitted certain evidence to be introduced does

23   not mean that I have decided on its significance.  That is for

24   you to decide.

25           More generally, do not draw any inference from any of

NAKVROW4                    Charge

1   my rulings.  The rulings I made during trial are no indication

2   of any view on my part.  You should not seek to find any such

3   view or opinion on my part, nor should you otherwise speculate

4   as to what I may think.

5           From time to time, the lawyers and I had conferences

6   out of your hearing known as sidebars.  These sidebars involved

7   procedural and other matters, and none of the events relating

8   to these conferences should enter into your deliberations at

9   all.

10          Finally, the personalities and the conduct of counsel

11  in the courtroom are not in any way at issue.  If you formed

12  opinions of any kind regarding any of the lawyers in the case,

13  favorable or unfavorable, whether you approved or disapproved

14  of their behavior as advocates, those opinions should not enter

15  into your deliberations.

16          You are to evaluate the evidence calmly and

17  objectively, without prejudice or sympathy.  You are to be

18  completely fair and impartial.  Your verdict must be based

19  solely on the evidence developed at this trial or the lack of

20  evidence.  The parties in this case are entitled to a trial

21  free from prejudice and bias.  Our judicial system cannot work

22  unless you reach your verdict through a fair and impartial

23  consideration of the evidence.

24          It would be improper for you to consider, in deciding

25  the facts of the case, any personal feelings you may have about

the race, national origin, sex, or age of any party or any

witness or any other such irrelevant factor.  This case should

be decided by you as an action between parties of equal

standing in the community and of equal worth.  As I previously

noted, all parties are entitled to the same fair trial at your

hands.  All parties stand equal before the law and are to be

dealt with as equals in this court.

You may rely only on the evidence that has been

introduced throughout the trial.

What is evidence?  The evidence in this case consists

only of the sworn testimony of the witnesses and the exhibits

that have been received in evidence.  I will describe a list of

examples of things that are not evidence.

A question by a lawyer is not to be considered by you

as evidence.  It is the witness's answers that are evidence,

not the questions.  At times, a lawyer may have incorporated

into a question a statement which assumed certain facts to be

true and asked the witness if the statement was true.  If the

witness denied the truth of a statement and if there is no

direct evidence in the record proving that assumed fact to be

true, then you may not consider it to be true simply because it

was contained in the lawyer's question.

Similarly, arguments by lawyers are not evidence

because the lawyers are not witnesses.  What they have said in

their opening and closing statements was intended to help you

NAKVROW4                     Charge

1    understand the evidence and to reach your verdict.  However, if

2    your recollection of the facts differs from the lawyers'

3    statements, it is your recollection which controls.

4            Statements that I may have made concerning the

5    evidence do not constitute evidence.  Similarly, at times I may

6    have admonished a witness or directed a witness to be

7    responsive to questions or to keep his or her voice up.  At

8    times, I may have asked a question myself.  Any questions that

9    I asked or instructions that I gave were intended only to

10   clarify the presentation of evidence and to bring out something

11   that I thought might be unclear.

12           You should draw no inference or conclusion of any

13   kind, favorable or unfavorable, with respect to any witness or

14   any party in the case by reason of any comment, question, or

15   instruction of mine.  Nor should you infer that I have any

16   views as to the credibility of any witness as to the weight of

17   the evidence or as to how you should decide any issue that is

18   before you.  That is entirely your role.

19           Testimony that has been stricken or excluded is not

20   evidence and it may not be considered by you in rendering your

21   verdict.  Anything you may have seen or heard outside the

22   courtroom is not evidence.

23           Now I will provide you with a list of some things that

24   you may consider as evidence.  As I have said, evidence may

25   come in several forms.

1          The sworn testimony of witnesses, regardless of who

2     called them, is evidence.  This is true of the witnesses'

3     answers on both direct and cross-examination.  However, if

4     certain testimony was received for a limited purpose, you must

5     follow the limiting instructions I have given.

6          The exhibits that were admitted during the trial are

7     evidence.  Exhibits marked for identification but not admitted

8     are not evidence; nor are materials brought forth only to

9     refresh a witness's recollection.

10          Prior testimony is evidence.  Such testimony, known as

11     depositions, as previously described, is produced through a

12     procedure where, prior to trial, the attorneys for one side may

13     question a witness or an adversary under oath.  This is part of

14     what is called pretrial discovery and each side is entitled to

15     take depositions.  To the extent I admitted excerpts of prior

16     testimony at trial, you may consider the prior testimony of a

17     witness according to the same standards you would use to

18     evaluate the testimony of a witness given at trial.

19          The attorneys in this case entered into a stipulation

20     agreeing to certain facts.  This means that there is no dispute

21     as to these facts, and these facts are established for purposes

22     of this case.  You must consider the agreed facts, along with

23     all of the other evidence presented, and give the agreed facts

24     such weight as you find appropriate.

25          Generally, as I told you in my initial instructions,

1    there are two types of evidence that you may consider in

2    reaching your verdict.  One type of evidence is direct

3    evidence.

4         Direct evidence is testimony by a witness about

5    something he or she knows by virtue of his or her own senses;

6    something he or she has seen, felt, touched, or heard.  For

7    example, if a witness testified that when she left her house

8    this morning it was raining, that would be direct evidence

9    about the weather.

10        Circumstantial evidence is evidence from which you may

11   infer the existence of certain facts.  To use the same example

12   I gave you at the start of trial, assume that when you came

13   into the courthouse this morning the sun was shining and it was

14   a nice day.  Assume that the courtroom blinds were drawn and

15   you could not look outside.  As you were sitting here, someone

16   walked in with an umbrella which was dripping wet.  Then, a few

17   minutes later, another person entered with a wet raincoat.  You

18   are not able to look outside of the courtroom, you cannot see

19   whether or not it is raining, and no one has testified that it

20   is raining, so you have no direct evidence of that fact.  But

21   on the combination of facts that I have asked you to assume, it

22   would be reasonable and logical for you to conclude that it had

23   been raining.

24        That is all there is to circumstantial evidence.  You

25   infer on the basis of reason and experience and common sense

from one established fact the existence or nonexistence of some

other fact.

Many facts such as a person's state of mind or

intentions are rarely susceptible of proof by direct evidence.

Usually, such facts are established by circumstantial evidence.

Where circumstantial evidence is presented, it is of no less

value than direct evidence, for it is a general rule that the

law makes no distinction between direct evidence and

circumstantial evidence.

Portions of certain of the exhibits received in

evidence have been redacted.  "Redacted" means that part of the

document was blacked out or removed.  The redactions have been

made at the Court's direction.  You are to concern yourself

only with the portions of the exhibits that have been admitted

into evidence, that is, the nonredacted portions.  You should

draw no adverse inference against either party as a result of

these redactions, nor should you speculate on what may have

been redacted.

You have had the opportunity to observe the witnesses.

It is now your job to decide how believable each witness was in

his or her testimony.  You are the sole judge of the

credibility of each witness and of the importance of his or her

testimony.

In making these judgments, you should carefully

scrutinize all of the testimony of each witness, the

NAKVROW4                    Charge

circumstances under which each witness testified, the

impression the witness made when testifying, and any other

matter in evidence that may help you decide the truth and the

importance of each witness's testimony.

How do you determine where the truth lies?  Everything

a witness said or did on the witness stand counts in your

determination.  How did the witness impress you?  Did he or she

appear to be frank, forthright, and candid?  Or was the witness

evasive and edgy, as if hiding something?  What was his or her

demeanor, that is, his or her carriage, behavior, bearing,

manner, and appearance while testifying?  Sometimes it is not

what a person says, but how he or she says it that moves us.

You should use all the tests for truthfulness that you

would use in determining matters of importance to you in your

everyday life.  You should consider any bias or hostility the

witness may have shown for or against any party, as well as any

interest the witness has in the outcome of the case.  You

should consider the opportunity the witness had to see, hear,

and know the things about which he or she testified, the

accuracy of his or her memory, his or her candor or lack of

candor, his or her intelligence, the reasonableness and

probability of his or her testimony and its consistency or lack

of consistency, and its corroboration or lack of corroboration

with other credible testimony.

In other words, what you must try to do in deciding

NAKVROW4                    Charge

1    credibility is to size a witness up in light of his or her

2    demeanor, the explanations given, and all of the other evidence

3    in the case.  Always remember that you should use your common

4    sense, your good judgment, and your everyday experiences in

5    life to make your credibility determinations.

6          If you find that any witness has willfully testified

7    falsely as to any material fact, that is, as to an important

8    matter, the law permits you to disregard the entire testimony

9    of that witness upon the principle that one who testifies

10   falsely about one material fact is likely to testify falsely

11   about everything.  However, you are not required to consider

12   such a witness as totally unbelievable.  You may accept so much

13   of the witness's testimony as you deem true and disregard what

14   you feel is false.  By the processes which I have just

15   described, you, as the sole judges of the facts, decide which

16   of the witnesses you will believe, what portion of each

17   witness's testimony you accept, and what weight you will give

18   to it.

19         On some occasions during this trial, witnesses were

20   asked to explain an apparent inconsistency between testimony

21   offered at this trial and previous statements made by the

22   witness.  It is for you to determine whether a prior statement

23   was inconsistent and, if so, how much, if any, weight to give

24   to an inconsistent statement in assessing the witness's

25   credibility at trial.

NAKVROW4                        Charge

1              In deciding whether to believe a witness, you should

2       take into account any evidence that shows that a witness may

3       benefit in some way from the outcome of the case, such as a

4       financial interest.  Likewise, you should specifically note any

5       evidence of hostility or affection that the witness may have

6       towards one of the parties.  You should also consider any other

7       interest or motive that the witness may have in cooperating

8       with a particular party.

9              In this case, the plaintiff, Ulku Rowe, testified

10      before you as a party to this action.  She is, by definition,

11      an interested witness.  An interested witness is not

12      necessarily less believable than a disinterested witness.  The

13      mere fact that a witness is interested in the outcome of the

14      case does not mean he or she has not told the truth.  It is for

15      you to decide from your observations and applying your common

16      sense and experience and all of the other considerations

17      mentioned whether the possible interest of any witness or of

18      any party has intentionally or otherwise colored or distorted

19      his or her testimony.  You are not required to believe an

20      interested witness; you may accept as much of his or her

21      testimony as you deem reliable, and reject as much as you deem

22      unworthy of acceptance.

23             Similarly, several nonparty witnesses who were or are

24      presently employed by the defendant, Google, have testified.

25      In the order in which they testified, these are:  Tariq

NAKVROW4                      Charge

Shaukat, Kevin Lucas, Stuart Vardaman, Stuart Breslow, William

Grannis, Nicholas Harteau, April Beaupain, Ashley Elizabeth

Tessier, Chris Humez, Krista Callaghan, Brian Stevens, Melissa

Lawrence, Kirsten Marie Kliphouse, and Patricia Florissi.

You may consider whether the testimony of these

witnesses was in any way influenced by the fact that they are

now or were previously employed by Google.

It is your duty to consider whether the witness has

permitted any such bias or interest to color his or her

testimony.  In short, if you find that a witness is biased, you

should view his or her testimony with caution, weigh it with

care, and subject it to close and searching scrutiny.

In this case, I have permitted an expert witness to

express her opinion about matters that are in issue.  That

witness is Nora Ostrofe, called by the plaintiff to offer an

opinion on Ms. Rowe's claimed economic damages.  A witness may

be permitted to testify to an opinion on those matters about

which she has special knowledge, skill, experience, and

training.  Such testimony is presented to you on the theory

that someone who is experienced and knowledgeable in the field

can assist you in understanding the evidence or in reaching an

independent decision on the facts.

In weighing this opinion testimony, you may consider

the witness's qualifications, her opinions, the reasons for

testifying, as well as all of the other considerations that

NAKVROW4                      Charge

1    ordinarily apply when you are deciding whether or not to

2    believe a witness's testimony.  You may give the opinion

3    testimony whatever weight, if any, you find it deserves in

4    light of all the evidence in this case.  You should not,

5    however, accept opinion testimony merely because I allowed the

6    witness to testify concerning her opinion; nor should you

7    substitute it for your own reason, judgment, and common sense.

8    The determination of the facts in this case rests solely with

9    you.

10            You have heard evidence during the trial that

11   witnesses had discussed the facts of the case and their

12   testimony with the lawyers before the witnesses appeared in

13   court.  Although you may consider that fact when you are

14   evaluating a witness's credibility, there is nothing either

15   unusual or improper about a witness meeting with lawyers before

16   testifying so that the witness can be made aware of the

17   subjects that he or she will be questioned about, focus on

18   those subjects, and have the opportunity to review relevant

19   exhibits before being questioned about them.  In fact, it would

20   be unusual for a lawyer to call a witness without such

21   consultation.  Again, the weight you give to the fact or the

22   nature of the witness's preparation for his or her testimony

23   and what inferences you draw from such preparation are matters

24   completely within your discretion.

25            The law does not require any party to call as

NAKVROW4                     Charge

1   witnesses all persons who may have been present at any time or

2   place involved in the case or who may appear to have some

3   knowledge of the matters in issue at this trial; nor does the

4   law require any party to produce as exhibits all papers and

5   things mentioned in the evidence in this case.  Each party has

6   had an equal opportunity or lack of opportunity to call any

7   witnesses.  Therefore, you should not draw any inferences or

8   reach any conclusions as to what any uncalled witnesses would

9   have testified to had they been called.  The absence of any

10  witnesses should not affect your judgment in any way.

11          Before I instruct you on the issues you must decide, I

12  want to define for you the standard under which you will decide

13  whether a particular party has met its burden of proof on a

14  particular issue.  The standard that applies in this case is

15  preponderance of the evidence.  The plaintiff, Ulku Rowe, has

16  the burden of proving all the elements of her claim by a

17  preponderance of the evidence.

18          What does a preponderance of the evidence mean?  To

19  establish a fact by a preponderance of the evidence means to

20  prove that the fact is more likely true than not.  A

21  preponderance of the evidence means the greater weight of the

22  evidence; it refers to the quality and persuasiveness of the

23  evidence, not the number of witnesses or documents.

24          In determining whether a claim has been proven by a

25  preponderance of the evidence, you may consider the relevant

testimony of all witnesses, regardless of who may have called

them, and all the relevant exhibits received in evidence,

regardless of who may have produced them.

If, after considering all of the testimony, you are

satisfied that the plaintiff, the party with the burden of

proof, has carried her burden on each essential point of her

claim, then you must find in her favor.

If, after such consideration you find that the

evidence produced by the plaintiff is outweighed by the

evidence against the plaintiff's position, or that the credible

evidence on a given issue is evenly divided between the

parties, that it is as equally probable that one side is right

as it is that the other side is right, then you must decide

that issue against the plaintiff.  The reason for this is that

the plaintiff, because she bears the burden of proof, must

prove more than simple equality of evidence; she must prove the

element by a preponderance of the evidence.  On the other hand,

the plaintiff need prove no more than a preponderance, so long

as you find that the scales tip, however slightly, in favor of

the plaintiff, that what she claims is more likely true than

not, then that element will have been proven by a preponderance

of the evidence.

Some of you may have heard of "proof beyond a

reasonable doubt," which is the proper standard of proof only

in a criminal trial.  That requirement does not apply to a

1  civil case such as this one, and you should put it out of your

2  mind.

3        I am now going to instruct you on the substantive law

4  to be applied to the claims in this lawsuit.  I want to

5  emphasize here that you should consider each claim separately.

6        This case involves four claims made by Ms. Rowe

7  against Google:

8        First, Ms. Rowe claims that Google violated Section

9  194 of the New York Labor Law by failing to pay her the same as

10 men, specifically, Nicholas Harteau and Stuart Breslow, who she

11 argues performed equal or substantially equal work to her.

12       Second, Ms. Rowe claims that Google discriminated

13 against her on account of her gender by under-leveling her at

14 hire, paying her less than comparable men, refusing to consider

15 her for the role of financial services vertical lead, and

16 generally treating her less well because of her gender, in

17 violation of the New York City Human Rights Law.

18       Finally, Ms. Rowe brings two claims of retaliation.

19 One under the New York Labor Law, and one under the New York

20 City Human Rights Law.  She alleges that in response to

21 concerns she raised about discrimination and unequal pay

22 practices, Google retaliated against her by refusing to

23 consider her for two positions:  The financial services

24 vertical lead position in 2018, and the vice president

25 financial services sales position in 2020, and/or otherwise

NAKVROW4                    Charge

1    engaged in retaliatory conduct against her.

2              Google denies these claims.  It contends that at all

3    times it treated Ms. Rowe in accordance with the law.

4    Specifically, Google asserts that under Section 194 of the New

5    York Labor Law, Ms. Rowe was paid what she was lawfully owed,

6    and that any difference in compensation between her and male

7    employees performing equal work was based on lawful job-related

8    factors other than gender.

9              Google asserts that under the New York City Human

10   Rights Law, it treated Ms. Rowe no differently than similarly

11   situated male employees, and that all of its actions towards

12   Ms. Rowe were motivated only by legitimate business reasons.

13             I will now give further instructions on each of these

14   claims.

15             Ms. Rowe brings a claim under Section 194 of the New

16   York Labor Law.  I will refer to this law as Labor Law Section

17   194.

18             As applicable here, Labor Law Section 194 prohibits

19   employers from paying men and women in the same establishment

20   different wages except under certain circumstances as I will

21   explain in more detail momentarily.

22             Labor Law Section 194 is a strict liability statute,

23   meaning that a plaintiff need not show that her employer

24   intentionally paid her less because she is a woman.  Both

25   parties bear a burden of proof on this claim.  First, Ms. Rowe

NAKVROW4                    Charge

1   bears a burden.  And if she satisfies that burden, Google bears

2   a burden of proof to avoid liability.

3          To prevail on this claim, Ms. Rowe must prove by a

4   preponderance of the evidence that Google paid her lower wages

5   than a man in the same geographic area for work which required

6   equal or substantially equal skill, effort, and responsibility,

7   and which was performed under similar working conditions.  For

8   purposes of this claim, Ms. Rowe alleges that Google paid her

9   less than Nicholas Harteau and Stuart Breslow.

10         For Ms. Rowe to prevail on her claim against Google,

11  she must prove each of the following elements by a

12  preponderance of the evidence:

13         First, Google paid Ms. Rowe lower wages than Nicholas

14  Harteau and/or Stuart Breslow.

15         Second, Ms. Rowe performed equal or substantially

16  equal work to Nicholas Harteau and/or Stuart Breslow on jobs

17  requiring equal skill, effort, and responsibility.

18         And third, those jobs were performed under similar

19  working conditions.

20         The first element that Ms. Rowe must prove is that

21  Google paid her lower wages than Nicholas Harteau and/or Stuart

22  Breslow.  For these purposes, "wages" means earnings of an

23  employee for labor or services rendered.  Fringe benefits are

24  also included in the comparison of wages, as are vacation and

25  holiday pay and overtime pay.

1           The second element that Ms. Rowe must prove is that

2    her work was equal or substantially equal to the work of

3    Nicholas Harteau and/or Stuart Breslow.  The word "equal" does

4    not mean identical; it means that the work Ms. Rowe performed

5    must have been substantially equal to the work performed by the

6    male employees to whom she asserts she should be compared.

7           In determining whether work was substantially equal,

8    you must compare the skill, effort, and responsibility required

9    of Ms. Rowe's job with the skill, effort, and responsibility

10   required of Nicholas Harteau and/or Stuart Breslow.

11   Insignificant, insubstantial or trivial differences in work

12   performed do not matter and may be disregarded.

13          The occasional or sporadic performance of an activity

14   which may require different skill, effort, or responsibility is

15   not alone sufficient to justify a finding that two jobs are not

16   substantially equal.  Work is not considered substantially

17   equal if material differences in skill, effort, or

18   responsibility exist.  Further, job classifications,

19   descriptions, or titles are not controlling.  It is the actual

20   work or performance requirements of the two jobs that is

21   important.

22          As I just noted, in evaluating whether the performance

23   requirements of the two jobs are substantially equal, you must

24   consider the skill, effort, and responsibility required for

25   these jobs.

1    I will now tell you what is meant by the terms "skill,
2    effort, and responsibility."

3    In deciding whether the jobs require substantially
4    equal skill, you should consider such factors as the level of
5    education, experience, training, and ability necessary to meet
6    the performance requirements of the respective jobs.  You are
7    to compare the jobs, not the employees.  Accordingly, the fact
8    that a male employee has a qualification that Ms. Rowe does not
9    have is relevant only if the particular qualification is
10   necessary or useful for performing the job.

11   In deciding whether the jobs require substantially
12   equal effort, you should consider the mental exertion needed to
13   perform the job.  Equal effort does not require people to use
14   effort in exactly the same way.  If there is no substantial
15   difference in the amount or degree of effort to do the jobs,
16   they require equal effort.  However, if the jobs of Nicholas
17   Harteau and/or Stuart Breslow require additional tasks that
18   consume a significant amount of extra time and effort that
19   would not be expected of Ms. Rowe, then the jobs do not require
20   substantially equal effort.

21   In deciding whether the jobs involve substantially
22   equal responsibility, you may consider the degree of
23   accountability expected by Google for a person filling the
24   jobs, as well as the amount of preparation required to perform
25   the job duties.  You may also take into account such things as

NAKVROW4                    Charge

the level of authority delegated to Ms. Rowe as compared to

Nicholas Harteau and Stuart Breslow, including whether Ms. Rowe

and Nicholas Harteau and/or Stuart Breslow were equally

expected to direct the work of others or to represent Google in

dealing with clients or others.  Finally, you may consider the

consequences to Google of effective performance in the

respective jobs.

          Remain mindful that skill, effort, and responsibility

constitutes separate tests, each of which must be met in order

for the equal pay requirement to apply.

          For purposes of the second element of the New York

Labor Law, it is enough for Ms. Rowe to prove by a

preponderance of the evidence that she performed work equal or

substantially equal to that performed by Mr. Harteau and/or

Mr. Breslow at any time for which Mr. Harteau and/or

Mr. Breslow were paid more, even if the time period in which

they were performing that work did not overlap.

          With respect to the third element of Ms. Rowe's claim,

you must find that the jobs are performed under similar working

conditions.  The conditions need only be similar; they need not

be identical or in the same location.

          In deciding whether the working conditions of the two

jobs are similar, you should consider the surroundings or the

environment in which the work is performed to which the

respective employees may be exposed.

1        If Ms. Rowe proves all three elements of her Labor Law

2   Section 194 claim, then she is entitled to recover on her claim

3   unless Google meets its burden of proving by a preponderance of

4   the evidence that Ms. Rowe was paid less based on a *bona fide*

5   factor other than sex, such as education, training, and

6   experience; and that the factor was both job-related and

7   consistent with business necessity.

8        To meet its burden of establishing business necessity,

9   Google must prove by a preponderance of the evidence that the

10  factor is based on a genuine business need and bears a manifest

11  relationship to the job or a demonstrable relationship to

12  successful performance of the jobs.

13       Separate from her Labor Law Section 194 claim,

14  Ms. Rowe brings a gender discrimination claim under the New

15  York City Human Rights Law which I will refer to as "the city

16  law."

17       Under the city law, it is against the law for an

18  employer to discriminate against an employee on the basis of

19  gender, including by paying an employee less on that basis or

20  by refusing to hire or promote that individual.  Stated more

21  broadly, the city law makes it unlawful for an employer to

22  treat an employee less well in any way, at least in part

23  because of that person's gender.

24       The question of whether Google is liable under the

25  city law is separate and distinct from the question of whether

NAKVROW4                    Charge

1    Google is liable under the labor law described a moment ago,

2    even though some conduct may be actionable under both laws.

3         The city law has been violated if you find by a

4    preponderance of the evidence that gender played some role in

5    Google's treatment of Ms. Rowe.  Ms. Rowe need not establish

6    that her gender was the sole consideration or even the most

7    important consideration motivating Google in any of those

8    circumstances.  Indeed, a number of factors may have

9    contributed to the company's actions.  If you find that Google

10   treated Ms. Rowe less well, at least in part because of her

11   gender, then she may succeed on this claim, even if you find

12   that Google's conduct was also motivated by a lawful reason.

13        Keep in mind, however, that the city law is not a

14   general civility code; thus, Google can still avoid liability

15   by proving by a preponderance of the evidence that the

16   complained of conduct at issue is nothing more than what a

17   reasonable person would consider petty slights or trivial

18   inconveniences.

19        In determining whether Google discriminated against

20   Ms. Rowe because of her gender, you may consider a variety of

21   factors, including whether the language or conduct of Google

22   managers reveals a bias against women or preference for men;

23   whether Google treated Ms. Rowe less well than similarly

24   situated men; whether Google's explanations for its actions

25   were credible or whether they are contradicted by fact or

NAKVROW4                        Charge

1    changed over time; or whether any of Google's witnesses were

2    untruthful either at trial or when speaking to Ms. Rowe.

3            In making this determination, however, you may not

4    second-guess Google's business judgment.  In other words, you

5    may not find discrimination simply because you think that a

6    business decision that Google made was incorrect or unwise or

7    because you disagree with the decision.

8            One note on similarly situated men:  While comparisons

9    may offer some evidence of discrimination, comparisons are not

10   the only way to prove discrimination.  I noted for you just now

11   a number of ways on which the parties agree that discrimination

12   may be proven.  However, to the extent you consider whether

13   Google treated similarly situated men differently than

14   Ms. Rowe, I will give you some guidelines.

15           Under the city law, for a plaintiff and a comparator

16   to be similarly situated, the plaintiff is not required to show

17   that both individuals' circumstances were identical; rather,

18   the fact-finder must examine the acts, context, and surrounding

19   circumstances of the plaintiff and her comparator to determine

20   whether the comparator is similarly situated such that you

21   believe a difference in their treatment could reasonably lead

22   to the conclusion that it was because of gender.  This is

23   different from the standard I explained for comparators under

24   the labor law.

25           Ms. Rowe also claims that Google retaliated against

NAKVROW4                     Charge

her for complaining about discrimination in the workplace.
Such retaliation is unlawful under the New York City Human
Rights Law, which I will again refer to as "the city law," as
well as the New York Labor Law, which I will refer to as "the
labor law."

        Specifically, under the city law, it is unlawful for
an employer to retaliate or discriminate in any manner against
any person because such person has raised reasonably and in
good faith concerns about discrimination.  Similarly, under the
labor law, it is unlawful for an employer to retaliate or
discriminate in any manner against any person because such
person has made a complaint to her employer that she reasonably
and in good faith believes the employer has violated the labor
law regarding unequal pay between women and men.

        In order to find for Ms. Rowe on these claims under
either of these statutes, you must find that she proved each of
the following four elements by a preponderance of the evidence:

        First, Ms. Rowe engaged in a protected activity.

        Second, her employer, Google, was aware of the
protected activity.

        Third, Google engaged in what is commonly referred to
as an adverse action, that is, conduct that could be reasonably
expected to chill or deter someone from engaging in protected
activity.

        And fourth, there is a causal connection between the

NAKVROW4                    Charge

1    protected activity and the adverse action; that is, the

2    complaints that were made were, at least in part, the reason

3    why the adverse employment action took place.  This framework

4    is common to retaliation claims under both the city law and the

5    labor law.

6            I will now address each of these elements in further

7    detail.

8            The first element that Ms. Rowe must prove is that she

9    engaged in a protected activity.  A plaintiff engages in a

10   protected activity when she complains about what she reasonably

11   and in good faith believes to be unlawful, discriminatory

12   employment practices.  To prove that her activities were

13   protected, Ms. Rowe need not establish that her claims of

14   discrimination were valid; however, she must show that she

15   expressed clear disapproval of Google's allegedly unlawful

16   conduct by communicating in substance that she thought the

17   conduct was wrong.

18           Ms. Rowe must also establish that she had a good-faith

19   reasonable belief at the time she complained of Google's

20   actions that those actions violated the antidiscrimination

21   laws.  If Ms. Rowe's concern was not raised in good faith, but

22   rather was raised in order to, for example, protect her job or

23   attempt to extract a benefit from Google, she has not satisfied

24   the good-faith requirement.

25           Ms. Rowe is also required to prove by a preponderance

NAKVROW4                    Charge

1     of the evidence that Google was aware that she had engaged in

2     protected activity.  After all, if Google did not know that she

3     had complained about discrimination, then logically it could

4     not have taken any adverse actions against her on account of

5     any protected activity she may have engaged in.

6          To satisfy this element, it is not necessary for

7     Ms. Rowe to prove that any specific actors or individuals knew

8     that she had complained; she need only demonstrate general

9     corporate knowledge by Google.

10          The third element that Ms. Rowe must prove by a

11    preponderance of the evidence is that Google engaged in an

12    adverse action, that is, conduct that would be reasonably

13    likely to deter a person from engaging in protected activity.

14    The retaliation complained of need not result in a materially

15    adverse change in the terms or conditions of the plaintiff's

16    employment.

17          In determining whether Ms. Rowe was subject to

18    retaliation, keep in mind your sense of workplace realities and

19    the fact that the chilling effect of particular conduct depends

20    on the context.  The totality of the circumstances must be

21    considered because the overall context in which the challenged

22    conduct occurs cannot be ignored.

23          It is of no consequence that the challenged conduct

24    may not have been severe or pervasive, because the challenged

25    conduct's severity and pervasiveness are only relevant to the

NAKVROW4                    Charge

1    issue of damages, not liability.  However, the defendant is not

2    liable if the plaintiff fails to prove that the challenged

3    conduct was caused at least in part by a retaliatory motive, or

4    if the defendant proves that the conduct was nothing more than

5    petty slights or trivial inconveniences.

6         Finally, Ms. Rowe must establish that the adverse

7    action or actions taken by Google was or were taken at least in

8    part because of Ms. Rowe's protected activity.  In other words,

9    she must establish that there was a causal connection between

10   the protected activity and the adverse actions.

11        To establish a causal connection, Ms. Rowe bears the

12   burden of proving by a preponderance of the evidence that

13   Google intentionally retaliated against her by taking one or

14   more adverse actions against her, and that retaliation was a

15   motivating factor in Google's decision to take the action or

16   actions that it did.

17        A motivating factor is a factor that made a difference

18   or played a part in a decision.  To be clear, that factor need

19   not be the sole consideration or even the most important

20   consideration motivating the adverse action or actions.  To

21   satisfy this element, Ms. Rowe can use indirect or

22   circumstantial evidence or she can introduce direct evidence of

23   retaliatory motive.

24        If you conclude that Ms. Rowe has met her burden of

25   proof by a preponderance of the evidence with respect to her

1    claims for unequal pay, gender discrimination, and/or

2    retaliation, then you must determine the damages, if any, to

3    which Ms. Rowe is entitled.  On the other hand, if you find for

4    Google on all claims, you will not consider the issue of

5    damages at all; you will simply report a verdict for Google on

6    all claims.

7            You should not infer that Ms. Rowe is entitled to

8    recover damages merely because I am instructing you on how to

9    calculate damages.  It is exclusively your function to

10   determine liability, and I am instructing you on damages only

11   so that you will have guidance should you decide that Ms. Rowe

12   prevails on any of her claims.

13           Damages must be based on evidence, not on speculation

14   or sympathy, and you may only award damages for those injuries

15   that Ms. Rowe actually suffered as a result of Google's

16   conduct.  It is the plaintiff, that is, Ms. Rowe, who bears the

17   burden of proving her damages by a preponderance of the

18   evidence.

19           In this case, you may consider awarding several

20   different types of damages:  Backpay, statutory damages under

21   New York Labor Law Section 194, compensatory damages, nominal

22   damages, and punitive damages.  Whether such damages are

23   actually to be awarded in this case and, if so, in what amount,

24   are for you, the jury, to decide in accordance with my

25   instructions.  If you make any award of damages, such award is

NAKVROW4                    Charge

1   not subject to federal income taxes and you should not consider

2   such taxes in determining the amount of damages, if any.  The

3   verdict form I will give you will assist you in recording the

4   determination, if any, that you make as to damages.

5        The economic loss plaintiff has suffered as a result

6   of any claims she has put forth is called "backpay."  Backpay

7   consists of the value not only of salary, but also of bonuses,

8   stock awards, and other forms of compensation and benefits that

9   Ms. Rowe would have received if not for Google's unlawful

10  conduct, if that is what you find.

11       Specifically, Ms. Rowe asserts that she was paid less

12  than men performing equal work under Labor Law Section 194.

13  She also asserts that because she is a woman, Google paid her

14  less and denied her positions that would have entitled her to

15  greater compensation, in violation of the city law.  She

16  further asserts that because she made protected complaints,

17  Google denied her positions that would have entitled her to

18  greater compensation.

19       Your job as the jury is to determine what damages, if

20  any, Ms. Rowe has proved by a preponderance of the evidence for

21  each claim.  Ms. Rowe is entitled to lost wages and benefits,

22  even if they are difficult to calculate.  Any uncertainty about

23  the amount of lost compensation to be awarded to Ms. Rowe

24  should be resolved in her favor.  That said, Ms. Rowe has the

25  burden of proving that she actually incurred a loss of backpay.

NAKVROW4                    Charge

1            If you find that Google violated Section 194 of the

2   labor law, Ms. Rowe is also entitled to certain statutory

3   damages, unless you find that Google acted in good faith.

4            Under the law, if you find for Ms. Rowe on liability,

5   it is Google's burden to demonstrate by a preponderance of the

6   evidence that it acted in good faith.

7            Good faith has two requirements:

8            First, Google must produce plain and substantial

9   evidence of at least an honest intention to ascertain what the

10  labor law requires and to comply with it.

11           Second, Google must demonstrate objectively reasonable

12  grounds for believing it was in compliance with the law.

13           Good faith requires more than ignorance of the

14  prevailing law or uncertainty about its development; it

15  requires an employer to take active steps to ascertain the

16  dictates of the statute and then move to comply with the law.

17  That a defendant did not purposely violate the statute is not

18  sufficient to establish that it acted in good faith; nor is

19  good faith demonstrated by conformity with industry-wide

20  practice.

21           If you find that Google violated the labor law, you

22  must also consider whether Google's actions were willful.

23  Willfulness is established if Google knew or showed a reckless

24  disregard for whether its unequal compensation of Rowe was

25  prohibited by law.  It is Ms. Rowe's burden to establish

NAKVROW4                    Charge

1    Google's willfulness by a preponderance of the evidence.

2              If you find that Ms. Rowe has proven by a

3    preponderance of the evidence that Google knew or showed a

4    reckless disregard for whether or not its payment of her

5    complied with the law, you will find that it acted willfully.

6    You may find that Google acted willfully even if you find that

7    Google did not act with an intent to violate the law.  This is

8    because willfulness can be shown where a defendant acts with

9    reckless disregard for the law.  However, if you find that

10   Google acted unreasonably, but not recklessly, in determining

11   its obligations as to how to pay Ms. Rowe, you must find that

12   its actions were not willful.

13             As you will see on the verdict sheet which I will

14   discuss more fully in a few moments, if you find that Google

15   violated Section 194 of the labor law, you must determine both

16   whether it acted in good faith and whether its violation of the

17   law was willful.  If you find that Google's conduct was

18   willful, you must also find that its conduct was not taken in

19   good faith.  By the same token though, if you find that

20   Google's conduct was in good faith, you cannot find that its

21   conduct was willful.

22             If you find that Ms. Rowe has established any of her

23   claims of gender discrimination or retaliation under the city

24   law, you may award her compensatory damages for injuries such

25   as emotional pain, suffering, inconvenience, mental anguish,

NAKVROW4                    Charge

1   humiliation, and loss of enjoyment of life.

2          Compensatory damages are an amount that will fairly

3   compensate the plaintiff for any injury she actually sustained

4   as a result of the defendant's conduct.  There is no

5   requirement that a claim of emotional distress be supported by

6   proof of expenses, lost earnings, or specifically measurable

7   damages.  No expert testimony is necessary to prove such harm.

8   And you may rest your findings solely on Ms. Rowe's testimony.

9          No evidence of the monetary value of such intangible

10  things as pain and suffering has been or need be introduced

11  into evidence.  There is no exact standard for fixing the

12  compensation to be awarded for these elements of damage.

13  Rather, you may issue an award of monetary damages based on the

14  emotional harm you determine the plaintiff to have suffered

15  based on the evidence presented and based on your best

16  judgment.  Any award you make should be fair in light of the

17  evidence presented at the trial.

18          If you find that Ms. Rowe prevails on either of her

19  claims of gender discrimination or retaliation, you may — but

20  are not required to — award her punitive damages.  Punitive

21  damages are intended to protect the community and to be an

22  expression of the jury's indignation at a defendant's

23  misconduct.  There is no exact rule by which to determine the

24  amount of punitive damages; it is up to the jury to decide what

25  amount is sufficient to punish the defendant.

1          The fact that I am instructing you on punitive damages

2     is not any indication of my view as to what your verdict should

3     be or on whether punitive damages should be awarded.

4          Punitive damages may be awarded where a plaintiff

5     proves by a preponderance of the evidence that the defendant's

6     actions amounted to willful or wanton negligence or

7     recklessness, or where there is a conscious disregard of the

8     rights of others, or conduct so reckless as to amount to such

9     disregard.  Under this standard, a defendant need not know that

10    it was violating the law and that plaintiff is not required to

11    prove intentional or malicious conduct.

12         Where an employee engages in discrimination with

13    willful or wanton negligence, recklessness, or a conscious

14    disregard of her rights under city law, the employer may be

15    held liable for punitive damages where the offending employee

16    exercised managerial or supervisory responsibility, the

17    employer knew of the offending employee's discriminatory

18    conduct, and acquiesced in it and failed to take immediate and

19    appropriate corrective action; or the employer should have

20    known of the offending employee's unlawful discriminatory

21    conduct, but failed to exercise reasonable diligence to prevent

22    it.

23         In calculating a punitive damages award, you should

24    consider, among other things, the, number one, nature and

25    reprehensibility of Google's conduct, including the character

NAKVROW4                    Charge

of the wrongdoing and Google's awareness of what harm the

conduct caused or was likely to cause; two, the amount of time

Google engaged in the conduct; and three, Google's financial

condition and the impact your punitive damages award will have

on Google.

If you award punitive damages, you may consider

Google's net worth and the impact of paying that award.

Keep in mind that punitive damages are not intended to

and may not be used to compensate a plaintiff for her injuries.

Instead, the purpose of punitive damages is to punish a

defendant and to deter similar conduct in the future.  Any

punitive damages award should be limited to the amount

reasonably necessary to achieve the goals of punishment and

deterrence.

You may also consider whether Google has, one,

established and complied with policies, programs, and

procedures for the prevention and detection of discrimination

by employees; and two, a record of no or relatively few prior

incidents of discriminatory conduct by the specific offending

employee.  These factors may mitigate a punitive damages award,

should you choose to impose one.

If you find in favor of Ms. Rowe, but you find that

she has not shown any injury or any actual damages to warrant

an award of backpay, compensatory damages, or punitive damages,

then you must return an award of nominal damages of no more

NAKVROW4                    Charge

1   than one dollar.  Nominal damages must be awarded when a

2   defendant has deprived a plaintiff of a right, but the

3   plaintiff has suffered no actual damages of monetary value as a

4   natural consequence of that deprivation.  The mere fact that a

5   deprivation occurred is an injury to the person entitled to

6   enjoy that right, even when no actual damages flow from the

7   deprivation.

8         Therefore, if you find that Google violated the law,

9   but that Ms. Rowe has suffered no injury as a result of

10  Google's conduct other than the fact of a violation, you must

11  award her nominal damages of no more than one dollar.

12        Members of the jury, that almost completes my

13  instructions to you.  You are about to go into the jury room to

14  begin your deliberations.  The exhibits received in evidence

15  will be accessible to you upon request.  If during your

16  deliberations you want to see a hard copy of any of the

17  exhibits, you may request that they be brought into the jury

18  room.  If you want any of the testimony provided to you, you

19  may also request that.  Please remember that it is not always

20  easy to locate what you might want; so be as specific as you

21  possibly can in requesting exhibits or portions of the

22  testimony.  If you want any further explanation of the law as I

23  have explained it to you, you may also request that.

24        You can take your copy of these instructions back with

25  you to the jury room when you deliberate.  To assist you in

NAKVROW4                    Charge

1    your deliberations, I will be providing you a list of the

2    exhibits, a list of the witnesses who testified, a verdict form

3    which I have referred to and which I will discuss further in a

4    moment, and a copy of these instructions.  There is one of each

5    of these items for each juror.

6           It is very important that you not communicate with

7    anyone outside the jury room about your deliberations or about

8    anything regarding this case.  There is only one exception to

9    this rule:  If it becomes necessary during your deliberations

10   to communicate with me, to request exhibits or testimony or to

11   request clarification on the law, you should send a note to me

12   in writing, signed by your foreperson, and given to one of the

13   marshals or my deputy, Ms. Williams.

14          No member of the jury should ever attempt to

15   communicate with me except by a signed writing; and I will

16   never communicate with a member of the jury on any subject

17   touching on the merits of the case other than in writing or

18   orally here in open court.

19          If you send any notes to me, do not disclose how the

20   jury stands numerically or otherwise on any issue until after a

21   unanimous verdict is reached.

22          Some of you have taken notes periodically throughout

23   this trial.  I want to emphasize to you as you are about to

24   begin your deliberations that notes are simply an aid to

25   memory.  Notes that any of you may have made may not be given

1    any greater weight or influence than the recollections or

2    impressions of other jurors, whether from notes or memory with

3    respect to the evidence presented or what conclusions, if any,

4    should be drawn from such evidence.  All jurors' recollections

5    are equal.

6          Any difference between a juror's recollection and

7    another juror's notes should be settled by asking to have the

8    transcript read back, for this is the court record rather than

9    any juror's notes upon which the jury must base its

10   determination of the facts and its verdict.

11         For Ms. Rowe to prevail on the questions that you must

12   answer, she must sustain her burden of proof as I have

13   explained it to you.  If you find Ms. Rowe has succeeded as to

14   any of her claims against Google, you must return a verdict in

15   her favor on that claim.  If you find that she has not

16   succeeded on a particular claim, then your verdict must be for

17   Google on that claim.

18         Your verdict on each question must be unanimous.  Each

19   juror is entitled to his or her opinion, but you are required

20   to exchange views with your fellow jurors.  This is the very

21   essence of jury deliberation; it is your duty to discuss the

22   evidence.  If you have a point of view and, after reasoning

23   with other jurors, it appears that your own judgment is open to

24   question, then of course you should not hesitate in yielding

25   your original point of view if you are convinced that the

1    opposite point of view is really one that satisfies your

2    judgment and conscience.  You are not to give up a point of

3    view, however, that you conscientiously believe in simply

4    because you are outnumbered or outweighed.  You should vote

5    with the others only if you are convinced on the facts and the

6    evidence and the law that is the correct way to decide the

7    case.

8            You are not to discuss the case until all jurors are

9    present.  Five or six jurors together is only a gathering of

10   individuals.  Only when all eight jurors are present do you

11   constitute a jury, and only then may you deliberate.

12           The first thing you should do when you retire to

13   deliberate is take a vote to select one of you to sit as your

14   foreperson, and then send out a note indicating whom you have

15   chosen.  The foreperson does not have any more power or

16   authority than any other juror, and his or her vote or opinion

17   does not count for any more than any other juror's vote or

18   opinion.  The foreperson is merely your spokesperson to the

19   Court.

20           The foreperson will send out any notes.  And when the

21   jury has reached a verdict, he or she will notify the marshal

22   that the jury has reached a verdict.  Then, when you come into

23   open court, the foreperson will be asked to state what the

24   verdict is.

25           I have prepared a special verdict form for you to use

NAKVROW4                    Charge

1   in recording your decision as to each of Ms. Rowe's claims.

2   Please use that form to report your verdict.

3          You should answer every question except where the

4   verdict form indicates otherwise.  After you have reached a

5   verdict, the foreperson should fill in the verdict sheet.  The

6   jurors should sign and date it, and then the foreperson should

7   give a note to the marshal outside your door stating that you

8   have reached a verdict.  Do not specify what the verdict is in

9   your note.

10         I will stress that each of you must be in agreement

11  with the verdict that is announced in court.  Once your verdict

12  is announced by your foreperson in open court and officially

13  recorded, it cannot ordinarily be revoked.

14         Members of the jury, that concludes my instructions to

15  you.  I will ask you to remain seated while I confer with the

16  attorneys to see if there are any additional instructions that

17  they would like me to give to you or if there is anything I may

18  not have covered in my previous instructions to you.  In this

19  regard, I ask you not to discuss the case while seated in the

20  jury box because the case has not yet been formally submitted

21  to you.

22         Okay, counsel, should we have a sidebar?

23         (At sidebar)

24         THE COURT:  Anything?

25         MS. GREENE:  Your Honor, note one, and I apologize, I

NAKVROW4                    Charge

didn't see it earlier, but under the New York City Human Rights

Law, as interpreted by the court in *Chen-Oster v. Goldman*

*Sachs*, there is no magic language, that's the court's language,

in required to state a complaint.  And so that instruction was

in our original charge.  And we ask that the jury be instructed

that there is no magic language that's required to state a

complaint of discrimination.

MR. GAGE:  I don't think it's required.  I think it

should have been raised earlier.  But I don't think the law

requires it.

THE COURT:  I agree.  But I'm not opposed to -- can

you send that language to Ms. Williams or send it to my

chambers so I can pull it from there.

MS. GREENE:  Yes.

THE COURT:  I have a question for you all.  In

language that we added this morning, when I read it, I spotted

that there is one adjective and one adverb.  Why don't we fix

that.

MR. GAGE:  Sure.

THE COURT:  There was also a Stuart misspelled.  For

good measure, we can fix that.  And there were two B's in one

spot.

MS. GREENE:  I think there was -- maybe it's what

you're referring to, it's not just as to them, it's as to their

job, responsibility required Ms. Rowe's job, the skill, effort,

NAKVROW4

1  and responsibility required Nicholas Harteau and/or Stuart

2  Breslow's job.

3          THE COURT:  We did not change this one this morning,

4  but I can put that in now.  Do you want me to read that over to

5  them or --

6          MS. GREENE:  Do you see that it's meant to be job

7  against job, not job against person.

8          THE COURT:  Okay.  So when you email chambers, put

9  that in there too.  I'll know to read that.

10          I thought I heard one more thing.  I'll find it.

11  This.  Oh, I think this is okay.  Actually, it was just that

12  we -- this could have had a second "that," but it doesn't, but

13  I think it's -- I think that's okay.

14          MR. GAGE:  That's fine.

15          THE COURT:  All right.  So what we'll do is I will --

16  the two things you're going to send and make copies I will say

17  to them, right.  Then I will ask them when they go to the jury

18  room to have their lunch that they leave the charge on their

19  chairs and we'll swap out and make sure these changes are

20  incorporated.

21          MS. GREENE:  Okay.

22          THE COURT:  Okay.  Thanks.

23          (In open court)

24          THE COURT:  All right.  Ms. Williams, are you ready to

25  administer the oath to the marshal?

NAKVROW4

1          THE DEPUTY CLERK:  Yes, Judge.

2          (Marshal sworn)

3          THE COURT:  Members of the jury, if you would please

4   leave the document that each of you is holding right now.  When

5   you get up to leave the room, please leave it on your chair.

6   And we are going to give you a package of materials shortly,

7   including a charge.  All right?

8          You may now begin your deliberations.

9          Are we doing this now with what you're sending?

10         MS. GREENE:  I think we should.

11         THE COURT:  Okay.  Is it there?  Okay.

12         Excuse me, members of the jury.  We have two more

13   points to make to you before you go to the jury room.

14         MS. GREENE:  Your Honor, it's been sent.

15         Your Honor, may we have a sidebar?

16         (At sidebar)

17         MS. GREENE:  I was going to say, because there seems

18   to be some delay, I might suggest we dismiss the jury and

19   separately send in the instructions to your Honor.

20         THE COURT:  I agree with that.  So I'll leave it --

21   I'll read these two, then we'll dismiss them, and we'll make

22   the changes, the minor changes in track.  We'll send them to

23   you all.

24         MR. GAGE:  You're going to leave these two, did you

25   say?

NAKVROW4

1          THE COURT:  That was the request, that I was going to

2     read these two before they leave.

3          MR. GAGE:  Again, we don't think the first one is

4     necessary, your Honor.  Now it's drawing special attention to

5     something that I suspect doesn't want drawn special attention

6     to.  This could have been raised this morning.

7          THE COURT:  Can I see it?

8          MR. GAGE:  Yes.  I don't know why this wasn't raised

9     earlier.  Now they're drawing special attention to something.

10          THE COURT:  You know, I do think that that is a fair

11     point, that now we're going to draw very special attention.

12     We'll put it in, but I'm not going to read it to them.  Also,

13     this second one was just missing the word, we're not going to

14     read that either; we'll just put it in.

15          MS. GREENE:  That's fine.  Thank you, your Honor.

16          THE COURT:  All right.

17          (In open court)

18          THE COURT:  You may now begin your deliberations.

19          Thank you for your patience.

20          (At 1:37 p.m., the jury retired to deliberate)

21          THE COURT:  Ms. Williams is going to take the exhibit

22     list and the witness list in to the jurors, okay?  Everybody is

23     nodding their head.  And we will follow up with the charge.

24          Please be seated.  So we'll just run quick changes to

25     the charge as discussed, and we'll send them to you from

NAKVROW4

```
 1    chambers' email so you can eyeball them and track and then

 2    we'll make the necessary copies.

 3              MR. GAGE:  Sure.

 4              MS. GREENE:  Your Honor, may I just --

 5              THE COURT:  Yes.

 6              MS. GREENE:  -- maybe request that when the jury

 7    instruction is sent in, that you note that it is an updated

 8    charge.

 9              THE COURT:  Yes.

10              MS. GREENE:  Without noting what has been updated and

11    drawing special attention.

12              THE COURT:  Yes, I will do that.

13              MS. GREENE:  Thank you.

14              THE COURT:  Okay.

15              (Recess pending verdict)

16              THE COURT:  So the jury sent out a note dated today,

17    10/20/2023; time, 1:47 p.m. noted on the envelope.

18              Okay.  I will hand it to you all to review yourselves

19    in a moment, but I'll just read it into the record.

20              It says:  Foreperson:  Ogbonnaya Chilaka, Juror No. 8.

21              Now, we should mark this as court exhibit -- I think

22    we can mark it Court Exhibit 1, right?

23              THE DEPUTY CLERK:  Yes, Judge.

24              THE COURT:  All right.  Ms. Williams, will you show

25    this to counsel, please.
```

NAKVROW4

1          That's it.  All right.  See you all whenever.

2          (Recess pending verdict)

3          THE COURT:  Please be seated.  Should we hear about

4     the note?  We just got another note.

5          MR. GAGE:  Sure.

6          THE COURT:  It says 2:47 p.m. on it, but since it's

7     2:39, I'm not sure what that means.  Dated 10/20/2023.

8          Jury request:  Trial transcript, if possible;

9     deposition transcripts; exhibit notebook.

10          Ms. Williams, will you show counsel, please, and then

11     we can decide how to address that.

12          MR. GAGE:  Seems they didn't pay close attention to

13     your suggestion that they be as specific as possible.

14          THE COURT:  Yes.  Well, you still have that sharpie,

15     Mr. Gage, that you wanted to use to redact the transcript if it

16     was requested, portions of the transcript?

17          MR. GAGE:  I don't remember using the sharpie for

18     that.  I had other purposes, Judge.

19          THE COURT:  You can sit down.

20          Shall we bring them and -- I mean, we can't give them

21     the entire trial transcript; we'd have to redact all the

22     sidebars and all the objections and sustained and whatnot.  Oh,

23     my gosh, are you -- I just got a note for you about waiting for

24     the court reporter.

25          THE DEPUTY CLERK:  No, she's here.

NAKVROW4

1              THE COURT:  Okay.  So that's delayed.

2              Okay.  Thank you.

3              MR. GAGE:  On that last point, your Honor, the

4    objection was sustained.  There wouldn't be an answer, I don't

5    think.

6              THE COURT:  No, but if they see the question --

7              MR. GAGE:  I see.

8              THE COURT:  I'm worried about that.

9              MR. GAGE:  I see.

10             MS. GREENE:  Your Honor, there's another issue, and

11   that is with respect to any depositions that were played by

12   video, I don't believe those were captured by the court

13   reporter.

14             THE COURT:  I think that's right.

15             MS. GREENE:  I might suggest that the answer is that

16   the jury needs to be specific with their requests.

17             MR. GAGE:  I would agree with that.  Maybe refer them

18   back to your instruction where you suggested that they be as

19   specific as possible in what they are looking for.

20             MS. GREENE:  We do obviously have the exhibits, so we

21   could send them the exhibits, but state with respect to any

22   testimonial evidence they'll have to ask it to be read to them

23   or specificity in what they need.

24             THE COURT:  Okay.  I suppose they could -- if they are

25   more specific about the depositions, they could re-watch some

NAKVROW4

1    of the depositions, if it's narrowed down, right?

2              MS. GREENE:  Yes, your Honor.

3              THE COURT:  Okay.  All right.

4              So before we bring them in, why don't we -- I think I

5    was summoned before we got a note.  So is that right or no?

6              MR. GAGE:  I wouldn't characterize us as summoning

7    your Honor, but --

8              THE COURT:  Okay.  Well, I heard that you rang.

9              MR. GAGE:  We were looking for you.  And it's on the

10   magic words language.

11             THE COURT:  I figured.

12             What page is that, does anyone know?

13             MR. GAGE:  It is, hold on, 20, on the redline.  It's

14   20 on the redline.

15             THE COURT:  Okay.  Let me just get there.  Okay.

16             MR. GAGE:  Again, we've got two issues with this, your

17   Honor.  This should have been raised before.  We think it's in

18   response to arguments that were made in closing arguments that

19   plaintiff's counsel is asking for this.  And it doesn't, as I

20   think it should, specify opposed gender discrimination.  I

21   think the word -- at a minimum, the word "gender" should be

22   before the word "discrimination" in both places, and the ending

23   of the sentence that says "thought the conduct was wrong," I

24   don't think that's proper either.  It should be "thought the

25   conduct violated the law" or "in violation of the law,"

NAKVROW4

1    something like that.

2            As your Honor probably recalls, the plaintiff very

3    clearly testified that she did not make a gender claim or

4    complaint or concern at the end of 2020 or 2017.  That was very

5    clear.  And I surmise that what plaintiff is trying to do is

6    push the point back in time and create a little ambiguity

7    around what's protected conduct.  And they asked for this

8    before the charge conference; your Honor didn't include it.

9    They didn't say anything.  And only after closing arguments did

10   they decide they want this inserted.

11           THE COURT:  Okay.  So hang on, Ms. Greene.

12           MS. GREENE:  For the record, this wasn't our original

13   charge.  We were not able to read and fully digest the Court's

14   charge in the time allotted.  When the Court was reading the

15   charge, we noticed that the language was missing and wanted to

16   request it consistent with the law and to make sure that we had

17   raised it with the Court.  I have no objections to the proposed

18   edits that Mr. Gage has made.

19           THE COURT:  All right.  Well, Mr. Gage, if we make

20   your proposed edits, does that cure your objection or are you

21   going to be objecting anyway?

22           MR. GAGE:  If those words are added, your Honor, and

23   your Honor is not going to highlight it, the edit to this,

24   you're just going to give them a clean copy, that's fine.

25           THE COURT:  Okay.  So let me just read it to make sure

1    we're all on the same page.

2           To have made a complaint, Ms. Rowe need not use any

3    magic words.  Ms. Rowe has opposed gender discrimination and/or

4    unequal pay practices if you find that she expressed clear

5    disapproval of the discrimination and/or unequal pay practice

6    by communicating in sum or substance that she thought the

7    conduct violated the law.

8           MR. GAGE:  Throw the word "gender" in before the

9    second discrimination.

10          THE COURT:  Oh, yes, yes, yes.  Okay.

11          MR. GAGE:  Then we're good --

12          THE COURT:  Okay.

13          MR. GAGE:  -- from our side.

14          THE COURT:  Okay.  So Jacob, I'm going to -- not to do

15   sausage making, but, you know, here, I'm going to send this to

16   you.  And if you could proceed with -- okay?  And then,

17   Ms. Williams, when we have eight clean copies, if you would

18   give them to the marshal and ask him to let the jurors know

19   that this is an updated version of the charge.

20          THE DEPUTY CLERK:  Okay.

21          THE COURT:  Okay.  You can hang on.  We're going to

22   bring them in now.

23          All right.  I think we should bring the jury in.

24          Where is the note?  Maybe she has it again.  She has

25   it.  I see it.

1          MR. GAGE:  I can't specifically remember, but I

2     thought we gave it back.

3          THE COURT:  All right.  Ms. Williams, we're going to

4     mark the second note Court Exhibit 2.  And when you come back

5     with them, if you hand it to me so I can have it in front of me

6     when I speak with them.

7          THE DEPUTY CLERK:  Okay.

8          THE COURT:  You can get them now.

9          THE DEPUTY CLERK:  The CSO.  I can't go in anymore

10    once you send them in.  He's got to bring them out.

11         THE COURT:  Okay.

12         (Jury present)

13         THE COURT:  We have received both of your notes.

14    Thank you.  And we wanted to bring you in to address your

15    second note requesting the trial transcript, the deposition

16    transcripts, and an exhibit notebook.

17         I'm going to start with the exhibit notebook.

18         Are you asking for copies of all of the exhibits

19    admitted into evidence at trial?  Okay.  We will take care of

20    that promptly for you.

21         The trial transcript and the deposition transcripts,

22    is it possible to be a little more specific about any areas

23    that you're -- we collectively want to provide you with

24    whatever you want, but there are some complications with

25    providing the entire trial transcript and all of the deposition

NAKVROW4

```
 1    transcripts.  So we wanted to see if you prefer to confer

 2    amongst yourselves and send out another note, we could go that

 3    way.

 4              Okay.  Thank you.

 5              (Jury not present)

 6              THE COURT:  Busy afternoon so far.

 7              All right.  I'm going to step down now.  Everybody is

 8    okay with us coming back here with eight clean copies of the

 9    revised charge as agreed, and Ms. Williams will hand those

10    copies to the marshal to deliver to the jurors.

11              MR. GAGE:  Yes.

12              MS. GREENE:  Yes, your Honor.

13              THE COURT:  Very good.

14              (Recess pending verdict)

15              THE COURT:  Please have a seat.

16              All right.  We have a note dated 10/20/2023, 2:58 p.m.

17              Okay.  It says:  Number one, judge's instructions.

18              Do they have that now?

19              THE DEPUTY CLERK:  Yeah.

20              THE COURT:  Okay.  Number two, Stuart Vardaman's

21    deposition transcript; and then in parentheses, portion

22    admitted into evidence.

23              Number three, Stuart Breslow's deposition transcript.

24              Now, do you have paper copies of these transcripts?

25              MS. GREENE:  Your Honor, I believe the deposition
```

NAKVROW4

1   transcripts went back today.  We could play the videos, if they

2   came into the courtroom, of those portions of their

3   depositions.

4            THE COURT:  That's probably easier anyway, because you

5   only played what was admitted into evidence so we don't have to

6   deal with redacting and all that.

7            Do you remember how long each of those -- well, wait a

8   second.  These witnesses both testified live.

9            MS. GREENE:  Yes, your Honor.  I believe they are

10  referring to the portions of their deposition that were played

11  in conjunction with their testimony.

12           THE COURT:  Okay.  Ms. Williams, we'll mark this Court

13  Exhibit 3.  I'll hand it to you in a moment.  Actually, why

14  don't I hand it to you now.  You can show the lawyers.

15           MS. GREENE:  Your Honor, we do have the record of

16  which portions of their deposition were included as part of the

17  record.

18           THE COURT:  Okay.

19           MS. GREENE:  So we are able to bring that up.

20           THE COURT:  Okay.  With those two, it must have just

21  been for impeachment purposes.

22           MR. GAGE:  I would think so.  I don't know any other

23  purpose that they would have been played.

24           THE COURT:  To be short then.

25           MR. GAGE:  As I recall, the line and page number

NAKVROW4

1    should be in the actual transcript.

2            THE COURT:  Okay.

3            MR. GAGE:  I'm actually looking right now.

4            Breslow and Vardaman, right?

5            MS. GREENE:  I have the record.

6            MR. GAGE:  We should search for --

7            MS. GREENE:  Well, it's of the deposition transcripts.

8    For Stuart Vardaman, it was 42, lines 5 through 14; 43, lines 2

9    through 7; and trial transcript page 573 and 574.

10           With respect to Mr. Breslow, it was trial transcript

11   page 704; deposition transcript 72, line 20, through 73, line

12   8.; and trial transcript 707; deposition transcript 86, 15,

13   through 87, 4.

14           MR. GAGE:  What were the trial transcript pages again?

15           MS. GREENE:  With respect to Mr. Vardaman, I believe

16   it was trial transcript 573 and 574.  With respect to

17   Mr. Breslow, line 704 -- or page 704 and page 707.

18           MR. GAGE:  Sorry, your Honor.

19           Bring the jury in and we'll play those --

20           THE COURT:  Are you ready to do that?

21           MR. GAGE:  I don't have the video.  I've located the

22   transcript where it's referenced, but I don't have the video.

23           MS. GREENE:  I believe Mr. Yang is ready to play

24   those; that is correct?  Yes.  Mr. Yang is ready to play those

25   clips for the jury.

NAKVROW4

1          THE COURT:  Okay.  So let's bring them in then.

2          What order -- they asked for -- number two in the note

3    is Stuart Vardaman's deposition transcript, and then number

4    three is Stuart Breslow's, so we'll play them in that sequence.

5          MS. GREENE:  That's also the sequence in which they

6    are in the record.

7          THE COURT:  Right.

8          (Jury present)

9          THE COURT:  We have received and reviewed your note

10   bearing the time 2:58 p.m. today.  And it lists three requested

11   items.  You now, I understand, have a copy of my -- have copies

12   of my instructions, that was the first item.

13          The second item was Stuart Vardaman's deposition

14   transcript, the portion admitted into evidence.  And the third

15   was Stuart Breslow's deposition transcript.

16          We have the portions of those that have been admitted

17   into evidence, we have them on video.  So we brought you back

18   into the courtroom so that you can watch them again.  We do not

19   have paper copies of those transcripts.

20          All right.  Mr. Yang.

21          (Video played)

22          THE COURT:  Is that the only portion?  No, there's one

23   more.

24          MS. GREENE:  Apparently, your Honor, the answer "no"

25   is not in the video clip, although it's on the transcript.

NAKVROW4

1          THE COURT:  I see it highlighted in yellow.  I assume

2    everybody with a screen in front of them sees it highlighted in

3    yellow.  Okay.

4          (Video played)

5          MS. GREENE:  The last line was that "we met up," your

6    Honor.

7          THE COURT:  Okay.  Is that the last clip of

8    Mr. Breslow's --

9          MS. GREENE:  I believe so, your Honor.

10         THE COURT:  Okay.  All right.  Thank you.

11         (Jury not present)

12         (Recess pending verdict)

13         THE COURT:  Please be seated.

14         Okay.  We have a note with a date on it 10/20/2023.

15   And the time, 4:14 p.m., indicated on the envelope.

16         Okay.  At the top the note says:  P-109.  That must be

17   Plaintiff's Exhibit 109.

18         Number one:  Who authored/drafted plaintiff's profile?

19         Number two:  Does the profile amount to an admission

20   by defendants that Ms. Rowe was a CTO at J.P. Morgan Chase?

21         We will mark this Court Exhibit 4 and I will hand it

22   to counsel.

23         MS. GREENE:  Your Honor, with respect to the first

24   question, it's not in evidence.  And what is in evidence is

25   Ms. Rowe's testimony about this document.  And so I would

NAKVROW4

1   suggest that beyond that is not -- is not information, other

2   than pointing the Court -- or pointing the jury to Ms. Rowe's

3   testimony on this.

4           THE COURT:  How did we see this though?  We definitely

5   saw it.

6           MS. GREENE:  We did see it.

7           THE COURT:  Was that today?

8           MS. GREENE:  We've seen it in the record and Ms. Rowe

9   testified to it; it came in through her testimony.

10          THE COURT:  But it was never shown to the jury?

11          MS. GREENE:  No, it was shown to the jury.  And I

12  believe there's maybe testimony in Ms. Rowe's testimony direct

13  that relates to who authored this document.  And so I think we

14  need to look to her testimony as the only record evidence with

15  respect to that.

16          THE COURT:  Okay.  Mr. Gage, then we have to deal with

17  the legal question as well.

18          MR. GAGE:  Did you say 108 or 109?

19          THE COURT:  109.  I'm going to hand this to you.

20          MS. GREENE:  Your Honor, I have the record.  It's on

21  page 182 of the trial transcript:

22          "Ms. Rowe, what is Plaintiff's 109?

23  "A.  This was my speaker's bio in 2019.

24  "Q.  By whom was it prepared?

25  "A.  By Google's ER and marketing teams -- I'm sorry, PR and

NAKVROW4

1    marketing teams.

2    "Q.  And it notes that you're at the forefront of Google's

3    cloud and machine learning capabilities and enables the

4    financial services industry to take advantage of Google's

5    technology, to field their digital transformation; correct?

6    "A.  Correct.

7    "Q.  This is something Google published; correct?

8    "A.  Correct."

9            THE COURT:  Okay.  Google, did you cross Ms. Rowe on

10   this?

11           MR. GAGE:  I don't believe so.  I think that's the

12   only testimony.  I don't see it anywhere else here, Judge.

13           THE COURT:  So what do you want to do about the legal

14   question?

15           MR. GAGE:  I'm sorry, the question.

16           THE COURT:  I don't have it in front of me now.

17           MR. GAGE:  Greg, can I see the note?

18           Shall I hand it back up, your Honor?

19           THE COURT:  Sure.

20           THE DEPUTY CLERK:  Thank you.

21           MR. GAGE:  Your Honor, I think -- so I don't think it

22   is an admission, because it is the purported statement about

23   what her role was at J.P. Morgan Chase.  And there's no

24   evidence to indicate one way or the other as to whether the

25   author of this was competent to speak to her role at J.P.

NAKVROW4

Morgan Chase in the past.  So it's not a statement about what
she was doing at Google; it's a PR statement.  And so I don't
think it's an admission.

THE COURT:  Go ahead, Ms. Greene.

MS. GREENE:  Your Honor, I would suggest that we read
the testimony on this to the jury and note that the jury may
draw an inference from this as to Google's -- I don't have the
note.

MR. GAGE:  I don't have the note.

THE COURT:  Here.  Whatever inference it sees fit,
right?

MS. GREENE:  Right.  That the jury may draw an
inference as it sees fit from the evidence, including that it
is an admission, we would add.

MR. GAGE:  Your Honor, Ms. Tomezsko is reminding me
that in the summary judgment record, I believe there's a
declaration that Ms. Rowe drafted that.

MS. TOMEZSKO:  To be more specific, your Honor, in the
motion for summary judgment, we submitted a declaration
describing the metadata attached to the document.  And I could
pull it up now, but I am fairly certain that the public record
indicates that the metadata reflects that Ms. Rowe is the
author of the document or, at the very least, the custodian, I
apologize.

MS. GREENE:  Your Honor, it's not in evidence.  And in

1      this case the jury instructions are clear that the evidence in

2      this case is what the jury heard and what was admitted at

3      trial.  Defense counsel had an opportunity to cross Ms. Rowe on

4      this document.  They did not.

5              Custodian is not the same as who authored the

6      document.  And there's the testimony on that, that's what

7      should be read to the jury in response to their question.

8              And then again, they can -- I will amend my prior to

9      say just that the jury can draw whatever inferences from that

10     it chooses to do so, but that's according to both the

11     instructions and the evidentiary standards, that's what

12     controls here.

13             MR. GAGE:  Your Honor, I agree, the record is the

14     record.  I'm not contesting that.  But I don't think the jury

15     should be told anything one way or the other beyond it's

16     evidence like all other evidence, and they should consider it

17     like other testimony, like other exhibits.  And we're not

18     steering them one way or the other.  We could read this

19     testimony to them and say that's the answer.

20             THE COURT:  I think that's pretty much what Ms. Greene

21     is saying, which is then we would read the testimony to them

22     and then we would say it's up to them to make of that whatever

23     they make of it.  We would say -- I think we would use the word

24     inference though, because it -- it matches my instructions.  We

25     could tell them they could give it whatever weight they wish.

NAKVROW4

1      MR. GAGE:  I would prefer that than "inference."  I

2 think "inference" suggests something different than they can

3 give it whatever weight they choose, just like any other piece

4 of evidence.

5      THE COURT:  All right.  Before we bring them in, I was

6 going to come here anyone because I'm mindful that this is

7 around the time they leave every day, and I was going to tell

8 them that if they wish to continue working and they unanimously

9 decide to stay late, to continue working, that we can

10 accommodate that.  How do people feel about that?

11      MR. GAGE:  Fine, your Honor.  Whatever they want to do

12 is fine with us.

13      MS. GREENE:  Your Honor, two things.

14      One is that we have no objection to staying if the

15 jury wants to deliberate.  The other is that instead of giving

16 the jury an instruction that they can put whatever weight that

17 they want on it, we would suggest that your Honor point the

18 jury to your instructions on how to weigh and evaluate

19 evidence.

20      THE COURT:  Let me open that.

21      MS. GREENE:  I believe this is Section 2 in your

22 Honor's jury charge.

23      MR. GAGE:  We would be fine with that, your Honor,

24 your Honor referring them back to the instructions that you

25 already gave them.  I wouldn't suggest rereading them, but --

NAKVROW4

1    because they have it in paper copy, right?

2              THE COURT:  They do.  One minute.

3              MS. GREENE:  Your Honor, I apologize.

4              I might point your Honor instead to 1D, role of the

5    jury, in which the instructions says, as members of the jury,

6    you are the sole and exclusive judge of the facts.  You pass

7    upon the evidence, you determine the credibility of the

8    witnesses, you resolve such conflicts as there may be in

9    testimony.  You draw whatever reasonable inferences you decide

10   to draw from the facts as you have determined them, and you

11   determine the weight of the evidence.  And that, again, is

12   Section 1D of the charge in this case.

13             THE COURT:  All right.  I think that covers both

14   inference, which you're interested in, and weight, which

15   Mr. Gage is interested in.  I think that's a good way to go.

16             Now, would you -- what is your view as to whether I

17   should read those four or five sentences to the jury or just

18   point them back to Section D at the beginning?  It's Roman

19   numeral ID.

20             MS. GREENE:  Given the Question No. 1, which was who

21   authored/drafted plaintiff's profile, I think we need to point

22   them to that portion of the trial transcript that answers the

23   question that they've asked.

24             THE COURT:  Yes.  For sure on that.  I'm talking about

25   the second question.

NAKVROW4

1           MS. GREENE:  Oh, I'm sorry.  I would suggest your

2     Honor read that first paragraph of ID.

3           THE COURT:  Okay.  And I'll let them know where I'm

4     reading from.

5           Mr. Gage?

6           MR. GAGE:  If you're reading the first paragraph, why

7     not just read all of D.

8           THE COURT:  Sure.  I'll read all of D.  That's fine.

9           I think that the court reporter should read the

10    testimony on this.

11          MR. GAGE:  Yes.  Agreed.

12          THE COURT:  So could you say again for Ms. Martin --

13          MR. GAGE:  Page 182.

14          MR. CHIARELLO:  182, 7 to 17.

15          THE COURT:  Okay.  But you know what, we can't do it

16    yet because -- so when we're ready, is that okay, if I'll

17    remind you that we're going to 182, 7 to 17.

18          Did anyone see objections in there?

19          MR. CHIARELLO:  There are not, your Honor.

20          MR. GAGE:  No.

21          THE COURT:  Okay.

22          MR. GAGE:  We're happy to provide it to the court

23    reporter.  Happy to let her borrow it, your Honor.

24          Show counsel.

25          MS. GUTIERREZ:  I've got a paper copy.

NAKVROW4

1             MR. GAGE:  Paper copy we can hand up, your Honor.

2             THE COURT:  Sure.  Okay.  I will let you know when so

3       that you can continue transcribing in the meantime.

4             All right.  I'm going to deal with their note first

5       and then talk to them about.

6             MS. GREENE:  May I pass this up?

7             THE COURT:  Yes.  About departure time.  All right.

8             Ms. Williams, if you would ask the officer to have the

9       jury come in.

10             (Jury present)

11             THE COURT:  We have reviewed your note from 4:14 p.m.

12             And in response to your first question, which is:  Who

13       authored/drafted plaintiff's profile on Plaintiff's Exhibit

14       109.  The court reporter is going to read back to you some

15       testimony from Ms. Rowe that relates to that profile.

16             (Record read)

17             THE COURT:  You also wrote down a second question here

18       which was:  Does the profile amount to an admission by

19       defendant that Ms. Rowe was a CTO at J.P. Morgan Chase?

20             In response to that question, I am going to read a

21       passage from my instructions to you earlier this afternoon.

22       And I will let you know that this is the section entitled "Role

23       of the Jury," and it is in the I, General Instructions.  It's

24       letter D, Role of the Jury.  I'm going to read this to you now:

25             As members of the jury, you are the sole and exclusive

NAKVROW4

 1    judges of the facts.  You pass upon the evidence.  You

 2    determine the credibility of the witnesses.  You resolve such

 3    conflicts as there may be in the testimony; you draw whatever

 4    reasonable inferences you decide to draw from the facts as you

 5    have determined them; and you determine the weight of the

 6    evidence.  Although you are encouraged to use all of your life

 7    experiences in analyzing testimony and reaching a fair verdict,

 8    you may not communicate any personal or professional expertise

 9    you might have or other facts not in evidence to the other

10    jurors during deliberations.  You must base your discussions

11    and decisions solely on the evidence presented to you during

12    the trial, and that evidence alone.  You may not consider or

13    speculate on matters not in evidence or matters outside the

14    case.

15            With that, I would like to turn to another matter,

16    which has to do with the fact that it's 4:43 p.m., and you all

17    are accustomed to leaving at or around this time during the

18    trial, that's been our -- that's been the custom.

19            I wanted to let you know that if you decide to

20    continue deliberating past this time or past 5 p.m., you would

21    have to unanimously agree that that's something that you would

22    want to do; and if that is the case, the Court can accommodate

23    some additional work beyond 5 p.m.  But you would -- you'd have

24    to let us know.  You could go back into the jury room and

25    discuss that and see if there's unanimous agreement to work

NAKVROW4

1    past 5.  And then send us a note and let us know how you would

2    like to proceed.  If not, we could resume on Monday.

3           Okay.

4           (Jury not present)

5           THE COURT:  Anything else for right now?

6           MS. GREENE:  None from plaintiff, your Honor.

7           THE COURT:  I think we'll probably hear from them

8    pretty soon.  All right.  Thank you.

9           (Recess pending verdict)

10          THE COURT:  Okay.  This is note number 5, I believe,

11    Ms. Williams, so we're going to mark this Court Exhibit 5,

12    dated 10/20/2023; time, 4:48 p.m.

13          The note says:  Jury will deliberate till 7 p.m.

14          And I will now hand this to Ms. Williams to show

15    counsel.

16          I did want to remind the group that the juror I

17    mentioned the other day, that there is a juror who has travel

18    plans starting next week, and it's the juror who, when I gave

19    them an update the other day on the schedule and mentioned that

20    the case might go to them on Friday, it's the juror who raised

21    her hand and said is it possible that this might go beyond

22    Friday.  So I don't think she's going to be available after

23    today.

24          All right.  I think we are all caught up.

25          All right.

NAKVROW4

```
 1              (Recess pending verdict)

 2              THE COURT:  I'm opening juror note no. 6 --

 3              THE DEPUTY CLERK:  Be seated.

 4              THE COURT:  -- bearing today's date.  And time

 5     recorded on the envelope is 6:02 p.m.

 6              The note reads as follows:

 7              Jury seems to have reached a deadlock.  It doesn't

 8     seem like there will be a consensus with more time on any of

 9     the verdict questions.

10              I need to give them an instruction, but I need to go

11     out and come back in a moment.  This is going to be marked

12     Court Exhibit 6.

13              THE DEPUTY CLERK:  Yes, Judge.

14              THE COURT:  And Ms. Williams, if you would please let

15     the lawyers review.

16              THE DEPUTY CLERK:  Yes, Judge.

17              (Recess)

18              THE COURT:  Please be seated.

19              So obviously this jury has not been out for very long,

20     maybe five hours and a little bit.  I'd like to hear from each

21     side what -- how you would like to proceed from here, and then

22     I have an idea myself.

23              So Ms. Greene, Mr. Chiarello?

24              MR. CHIARELLO:  Your Honor, we agree that five hours

25     or so is not a long time to be deliberating.  And I guess our
```

NAKVROW4

1    position would be to instruct the jury to continue

2    deliberating.

3              THE COURT:  Mr. Gage, Ms. Tomezsko?

4              MR. GAGE:  I generally agree.  I'm certainly -- they

5    have not been deliberating very long.  Given that it's 25

6    minutes to 7, I have some concerns about pushing them.

7              THE COURT:  Tonight you mean?

8              MR. GAGE:  The better course might be to say come back

9    on Monday.

10             THE COURT:  All right.  Or I could give them the

11   instruction and then explore with them whether they prefer to

12   continue for another 20 minutes or so or just come back on

13   Monday.

14             All right.  So I wrote something that just says:  We

15   appreciate how hard you've been working.  I must, however,

16   instruct you to continue to deliberate.  You have been

17   deliberating for less than a day.

18             And then I could remind them of the instruction --

19   there's a duty to deliberate instruction in the charge.  It's

20   not -- it's not exactly meant for this scenario.  I'm going to

21   look at it.  I think there is language encouraging them to

22   exchange views and keep an open mind, but it's not really about

23   pressing on, if you think you're a deadlock.

24             MR. GAGE:  Right.

25             MS. GREENE:  Your Honor, we agree with that course of

NAKVROW4

```
 1    action.  A typical Allen instruction does encourage the
 2    minority to -- or each side, each juror, to keep an open mind
 3    and be persuadable.  And so we would agree with giving them an
 4    instruction to continue to deliberate, to point them to
 5    instruction VD.  And beyond that, we leave it to the Court's
 6    discretion whether to send them back this evening or whether to
 7    dismiss them until Monday.
 8              MR. GAGE:  So the suggestion on the table, your Honor,
 9    is rereading D, is that the suggestion on the table?
10              THE COURT:  Yes, that's part of it.  But I think --
11    well, the first part was that I instruct you to continue
12    deliberating.  And then I'm at five -- oh, that's A, wait, D.
13    Okay.  Shall I read the entirety of D to them?  Maybe the
14    second paragraph.
15              MR. GAGE:  I think the second paragraph.
16              THE COURT:  Okay.  Okay.  Just the second paragraph,
17    it looks like, is the right --
18              MS. GREENE:  We agree, your Honor.
19              THE COURT:  All right.  Just one more minute.
20              All right.  Ms. Williams, could you please ask the
21    officer to let the jury know that we're ready for them.
22              (Jury present)
23              THE COURT:  Members of the jury, thank you for your
24    note.  You have been very attentive and diligent.  We
25    appreciate that you are working hard.
```

NAKVROW4

1            I must instruct you to continue to deliberate at this

2     point.  You have been deliberating for less than a day.  And I

3     remind you of my instruction in Section VD of the jury charge,

4     which is duty to deliberate/unanimous verdict.  I'm going to

5     read a portion of that to you now and, of course, you have a

6     copy of it in the jury room for your reference.

7            Your verdict on each question must be unanimous.  Each

8     juror is entitled to his or her opinion, but you are required

9     to exchange views with your fellow jurors.  This is the very

10    essence of jury deliberation.  It is your duty to discuss the

11    evidence.

12            If you have a point of view, and after reasoning with

13    other jurors, it appears that your own judgment is open to

14    question, then of course you should not hesitate in yielding

15    your original point of view if you are convinced that the

16    opposite point of view is really one that satisfies your

17    judgment and conscience.

18            You are not to give up a point of view, however, that

19    you conscientiously believe in simply because you are

20    outnumbered or outweighed.  You should vote with the others

21    only if you are convinced on the evidence, the facts, and the

22    law.  That is the correct way to decide the case.

23            And now we have a question for you, which is — and you

24    can confer and let us know — would you prefer to continue

25    deliberating now for the next 15 or 20 minutes or would you

NAKVROW4

1  prefer at this point to exit the courthouse and come back on

2  Monday?  If you wish to speak privately about that, you may do

3  that.  It should be a unanimous decision and we'll wait for a

4  note from you.

5          JUROR:  I believe we have the deliberation internally.

6  But we have two issues.  One person has childcare issues that

7  need to be addressed as soon as possible, and another juror has

8  travel plans this evening.  We're trying our best to try to

9  reach --

10          THE COURT:  We appreciate that.

11          The childcare issue, is that an issue relating to

12  tonight or is it more generally?  It's tonight?

13          JUROR:  Yes.

14          THE COURT:  So then we're not going to have unanimous

15  agreement to press on tonight; correct?  So then we should let

16  everybody go.

17          JUROR:  Seven o'clock.  Your Honor, we'll respectfully

18  stay till 7.

19          THE COURT:  All right.  Very good.

20          And then, Ms. Lane -- so you all have decided that

21  you're going to forge ahead until 7 p.m.  And then depending on

22  what happens at 7 p.m., Ms. Lane, you should perhaps come back

23  here and we'll discuss with you your situation.

24          JUROR:  At 7 o'clock.

25          THE COURT:  Yes.

NAKVROW4

1           JUROR:  Okay.

2           THE COURT:  That's it.

3           (Jury not present)

4           THE COURT:  Officer, could you shut the door to the

5   jury room?

6           Okay.  Anything else now?

7           Ms. Lane is -- I think we're going to have to let her

8   go, but, you know, that will leave us with seven, which is

9   still okay.

10          All right.  I'll see you, I assume, in about 15

11  minutes.

12          (Recess pending verdict)

13          THE COURT:  Okay, Ms. Williams.  You said, I believe,

14  the jury wants to come back in?

15          THE DEPUTY CLERK:  Yes.  Juror No. 5 and 3 wants to

16  talk with you.  So do you want to talk to them -- talk to just

17  the jury as a whole or do you want to --

18          THE COURT:  I think that we should address no. 5,

19  that's Ms. Lane, individually.  And then I don't know what no.

20  3 -- I never heard anything about no. 3, but I think we should

21  talk with her individually and I think everybody else can go,

22  right?  Does that sound --

23          MS. GREENE:  We don't know what the issues are where

24  the jury is on this.

25          THE COURT:  You want me to bring them all back in?

NAKVROW4

1          MS. GREENE:  I think we should need to hear from the

2     foreperson as to what the status is.

3          THE COURT:  Okay.  All right.

4          Ms. Williams, why don't you bring them -- ask the

5     officer to bring them all back in and we'll go from there.  I

6     think we should be open about what they might want to say or

7     not say.  I don't want to press them for any kind of an update.

8          Ms. Williams is saying that their message to us is,

9     Wait, wait, wait.  We're coming to a decision.

10          Do you get the feeling we should wait here or --

11          THE DEPUTY CLERK:  I try not to ask too many

12     questions.

13          THE COURT:  What is your sense?

14          THE DEPUTY CLERK:  Right.  I'm not sure what the wait

15     decision means.

16          THE COURT:  All right.

17          THE DEPUTY CLERK:  So what would you like me to find

18     out?

19          THE COURT:  I think we should respect their request.

20          Everybody can sit down.

21          Okay.  We have received a note.  This is note no. 7

22     from the jury today.  On the envelope it says 10/20/2023, 7:18

23     p.m.

24          The note says:  We have reached a unanimous verdict.

25          Ms. Williams, would you please mark this Court Exhibit

NAKVROW4

7.   The verdict form is also included in the envelope.  Why
don't we bring the jury in and we'll take the verdict.

            (Jury present)

            THE COURT:  Ms. Williams, will you please take the
roll.

            THE DEPUTY CLERK:  When I call your jury number,
please answer "present."

            Juror No. 1, Dimitri, last name F-E-D-O-R-O-V.

            JUROR:  Present.

            THE DEPUTY CLERK:  Juror No. 2, Victoria A. Young,
Y-O-U-N-G?

            JUROR:  Present.

            THE DEPUTY CLERK:  Juror No. 3, Ariana M. Rivera,
R-I-V-E-R-A?

            JUROR:  Present.

            THE DEPUTY CLERK:  Juror No. 4, Ms. Katherine M.
Soderquist, S-O-D-E-R-Q-U-I-S-T?

            JUROR:  Present.

            THE DEPUTY CLERK:  Juror No. 5, Carol, last name
A-X-E-L-O-W-I-T-Z, hyphen Lane?

            JUROR:  Present.

            THE DEPUTY CLERK:  Juror No. 6, Fatima J. Flores,
F-L-O-R-E-S?

            JUROR:  Present.

            THE DEPUTY CLERK:  Juror No. 7, Michael A. Zarkower,

NAKVROW4

```
 1    Z-A-R-K-O-W-E-R?

 2              JUROR:  Present.

 3              THE DEPUTY CLERK:  Juror No. 8, O-G-B-O-N-N-A-Y-A,

 4    middle initial O, last name C-H-I-L-A-K-A?

 5              JUROR:  Present.

 6              THE DEPUTY CLERK:  Thank you.

 7              THE COURT:  All jurors are present.

 8              Mr. Foreperson, I understand the jury has reached a

 9    verdict.  We received your note.  Is that correct?

10              FOREPERSON:  Yes, it is.

11              THE COURT:  Okay.  The envelope that you sent out

12    included the note as well as the verdict form.  I am just going

13    to inspect the form for regularity, and then my deputy,

14    Ms. Williams, is going to return it to you, okay.

15              Okay.  It is dated 10/20/2023.  It is signed by the

16    foreperson.

17              Ms. Williams, is it supposed to be signed by all of

18    the jurors?  There's only a line on here for the foreperson.

19              THE DEPUTY CLERK:  No, just the foreperson.

20              THE COURT:  Okay.  So you could please return this now

21    to the foreperson.

22              Okay.  Mr. Foreperson, if you would please rise.

23              As to question 1, has plaintiff Ulku Rowe proved by a

24    preponderance of the evidence that defendant Google paid

25    Ms. Rowe less than Nicholas Harteau or Stuart Breslow, in
```

NAKVROW4

```
 1        violation of New York Labor Law Section 194?

 2                   Yes or no as to Nicholas Harteau?

 3                   FOREPERSON:  No.

 4                   THE COURT:  Yes or no as to Stuart Breslow?

 5                   FOREPERSON:  No.

 6                   THE COURT:  Question 2:  Has defendant Google proved

 7        by a preponderance of the evidence that the differential in pay

 8        between Ms. Rowe and Mr. Harteau or Mr. Breslow was the result

 9        of a bona fide factor other than sex which was job-related and

10        justified by business necessity?

11                   Yes or no as to Nicholas Harteau?

12                   FOREPERSON:  We did not answer either because the form

13        instruction was to proceed to question 3.

14                   THE COURT:  Okay.  Just one moment.

15                   It says on the form:  If your answer is no to both

16        persons in question 1, proceed to question 3 without answering

17        question 2.  So I'll now proceed to question 3.

18                   Has plaintiff Ulku Rowe established by a preponderance

19        of the evidence that defendant Google has, on at least one

20        occasion, treated her less well at least in part because of her

21        gender?

22                   FOREPERSON:  Yes.

23                   THE COURT:  Has plaintiff Ulku Rowe established by a

24        preponderance of the evidence that defendant Google has, on at

25        least one occasion, retaliated against her, in violation of the
```

1    New York City Human Rights Law?

2            FOREPERSON:  Yes.

3            THE COURT:  Has plaintiff Ulku Rowe established by a

4    preponderance of evidence that defendant Google has, on at

5    least one occasion, retaliated against her, in violation of the

6    New York Equal Pay Law?

7            FOREPERSON:  Yes.

8            THE COURT:  Okay.  Question 6:  Has plaintiff Ulku

9    Rowe proven by a preponderance of the evidence that she

10   suffered any injury or any actual damages as a result of

11   Google's unlawful conduct?

12           FOREPERSON:  Yes.

13           THE COURT:  What amount of backpay — this is question

14   7 — do you find that plaintiff Ulku Rowe has proved by a

15   preponderance of the evidence?

16           FOREPERSON:  Zero dollars.

17           THE COURT:  Of the amount awarded in question 7, how

18   much, if any, is attributable to damages incurred in connection

19   with answering yes to Section 1A?

20           FOREPERSON:  May I have a moment, your Honor?

21           THE COURT:  Yes.

22           MR. GAGE:  Your Honor --

23           THE COURT:  Yes, I know.

24           FOREPERSON:  We skipped questions 8, 9 and 10.

25           THE COURT:  Okay.  One moment.

NAKVROW4

1          Okay.  The foreperson has said that they skipped

2    questions 8, 9, and 10, which seems to make sense given that

3    the answer to no. 7 was zero dollars.

4          All right.  I am now going to question 11.

5          Okay.  If you answered yes to question 3 or question

6    4, state the amount of noneconomic damages that you award to

7    the plaintiff, if any, for emotional distress, pain and

8    suffering, or mental anguish.

9          FOREPERSON:  $150,000.

10          THE COURT:  If you answered yes to question 3 or

11    question 4, do you find that defendant Google should be

12    subjected to punitive damages under the New York City Human

13    Rights Law?

14          FOREPERSON:  Yes.

15          THE COURT:  Question 13:  If you answered yes to

16    question 12, state the amount of punitive damages, if any, that

17    you award to plaintiff.

18          FOREPERSON:  $1 million.

19          THE COURT:  All right.

20          Ms. Williams, would you kindly poll the jury, please.

21          THE DEPUTY CLERK:  Juror No. 1, is that your answer?

22          JUROR:  Yes.

23          THE DEPUTY CLERK:  Juror No. 2, is that your answer?

24          JUROR:  Yes.

25          THE DEPUTY CLERK:  Juror No. 3, is that your answer?

NAKVROW4

```
 1              JUROR:  Yes.

 2              THE DEPUTY CLERK:  Juror No. 4, is that your answer?

 3              JUROR:  Yes.

 4              THE DEPUTY CLERK:  Juror No. 5, is that your answer?

 5              JUROR:  Yes.

 6              THE DEPUTY CLERK:  Juror No. 6, is that your answer?

 7              JUROR:  Yes.

 8              THE DEPUTY CLERK:  Juror No. 7, is that your answer?

 9              JUROR:  Yes.

10              THE DEPUTY CLERK:  Juror No. 8, is that your answer?

11              JUROR:  Yes.

12              THE COURT:  Thank you.

13         I will take the verdict forms and we will mark them as

14    court exhibits to be docketed along with the other jury notes.

15         Do you want to hold on to that, because we're going to

16    mark it as a court exhibit and put it with the other jury

17    notes.

18         Members of the jury, I'm not going to comment on your

19    verdict, but I do want to say a few things to you.

20         First, you are released from your obligation not to

21    discuss the case.  You can now freely discuss the case with

22    whomever you'd like to discuss it with.  Having said that, I

23    have two requests:  If someone asks to discuss the case with

24    you and you do not wish to do so, you can feel free to say no,

25    you do not want to discuss the case.  If you do choose to
```

NAKVROW4

1    discuss the case, please respect the confidentiality of the

2    jury deliberation process and what went on in that jury room.

3    In other words, to the extent that you do decide to discuss the

4    case with others, please discuss only your own views.

5            The other thing I wanted to say is this:  We were very

6    conscious of how dedicated you were to this process, including

7    the diligence with which you listened to the testimony, your

8    punctuality each day, the fact that you kept your breaks short,

9    and the list goes on.  You were always ready to have the trial

10   proceed and be heard efficiently before you, and you have our

11   deep gratitude for that.

12           I hope that you found your jury service to be

13   meaningful and that you have seen just how important jury

14   service is.  So again, I thank you on behalf of the parties and

15   on behalf of the United States District Court for the Southern

16   District of New York for your service.

17           Understanding that it is 7:30 on a rainy Friday night,

18   what I'm going to say now, please hear it with that in mind,

19   and that is that I'm going to let you go back into the jury

20   room, of course, to gather your things.  If you're willing to

21   wait a couple of minutes, you don't have to, but I would like

22   to come back to thank you personally for the work that you've

23   done and shake your hands and to answer any questions you might

24   have about jury service generally.

25           I will not talk to you about your verdict or the

1    substance of the case.  But I would be interested to hear your

2    thoughts about the jury duty process and if there are any ways

3    that we can improve it and generally just to say thank you.  So

4    if you're willing to wait a couple of minutes, I would like to

5    say hello.  If that is not something you are able to do or want

6    to do, then you are, of course, free to leave.

7            And with that, you are excused.

8            (Jury discharged)

9            THE COURT:  We do not need to speak any further

10   tonight if this group would also like to exit the courthouse at

11   this point after this long day.  If you want to tell me now

12   whether you anticipate bringing any post-trial motions, I'm

13   happy to hear that.  If you want to get back to me by, say,

14   Tuesday with proposed briefing schedules, we could do it that

15   way.

16           MR. GAGE:  If we could have till Tuesday, your Honor,

17   to get back with proposals.

18           THE COURT:  Yes, of course.  Well, thank you very much

19   to this group, too.  You're all very passionate advocates,

20   which I admire.  And you have all been passionate advocates in

21   this case on behalf of your respective sides, which makes it a

22   better exercise for the Court.

23           So appreciate that and I wish you all the best.  And

24   most immediately, I wish you all some rest.

25           (Trial concluded)