# Exhibit A

NAAHRowVD1

```
 1   UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
 2   ------------------------------x

 3   ULKU ROWE,

 4                   Plaintiff,

 5            v.                          19 Civ. 8655 (JHR)

 6   GOOGLE LLC,

 7                   Defendant.           Trial

 8   ------------------------------x
                                         New York, N.Y.
 9                                       October 10, 2023
                                         11:05 a.m.
10
     Before:
11
                      HON. JENNIFER H. REARDEN,
12
                                         District Judge
13
                             APPEARANCES
14
     OUTTEN & GOLDEN, LLP
15        Attorneys for Plaintiff
     BY:  CARA E. GREENE
16        GREGORY S. CHIARELLO
          SHIRA Z. GELFAND
17
     PAUL HASTINGS LLP
18        Attorneys for Defendant
     BY:  KENNETH W. GAGE
19        SARA B. TOMEZSKO

20   Also Present:  Vincent Yang, Paralegal (Outten & Golden)
                    Andrew Velazquez, Google Rep.
21                  Jean Gutierrez, Paralegal (Paul Hastings)

22

23

24

25
```

1    case.  If you are excused, please do not consider that any

2    reflection on you personally.  This is all part of our system

3    of justice which is intended to provide all parties with a fair

4    and impartial jury.  You will done your duty by your presence

5    and your readiness to serve if chosen.

6           It is very important that when responding to my

7    questions you not say in open court anything about the parties

8    in this case or about any other matter that might affect the

9    open-mindedness and fairness of the other prospective jurors.

10   If there are any matters that you feel should be disclosed to

11   me that might influence the other jurors or any matters of a

12   sensitive nature, you should ask to approach the bench to

13   discuss them.

14          Some of you may have heard of what are called

15   alternate jurors.  There are no alternate jurors in civil cases

16   in federal court.  As I previously noted, we will be selecting

17   eight of you to serve as jurors in this case.  All eight jurors

18   who are chosen will participate in the jury's deliberations.

19          So that you can understand the reasons for the

20   questions I'm going to ask you shortly, I will now tell you

21   briefly about this case.  I want you to understand that nothing

22   I'm about to say in my description of this case is evidence.

23   The evidence that you will consider, if selected as a juror,

24   will only come from the trial testimony of witnesses, from the

25   reading of depositions, and from exhibits that are admitted

NAAHRowVD1

1     into evidence.

2             As I have explained, this is a civil case.  It is

3     entitled Ulku Rowe v. Google LLC.  There is one plaintiff,

4     Ms. Rowe, and one defendant, Google LLC, or Google for short.

5             The case involves several claims by Ms. Rowe against

6     Google.  Ms. Rowe claims that Google violated New York's equal

7     pay law by failing to pay her the same as men performing

8     substantially similar work to her.  Ms. Rowe also claims Google

9     discriminated against her on account of her gender by under

10    leveling her at hire, paying her less than comparable men,

11    refusing to consider her for the role of financial services

12    vertical lead, and generally treating her less well because of

13    her gender.  And Ms. Rowe claims that Google retaliated against

14    her for raising concerns about discrimination and unequal pay

15    practices by refusing to consider her for two positions:

16    financial services vertical lead in 2018 and vice president

17    financial services/sales in 2020 and/or otherwise engaged in

18    retaliatory conduct against her.

19            The defendant Google denies these claims.  It contends

20    that at all times it treated Ms. Rowe in accordance with the

21    law.  Specifically, Google asserts that under the New York City

22    Human Rights Law, it treated Ms. Rowe no differently than

23    similarly situated male employees and that all of its actions

24    towards Ms. Rowe were motivated only by legitimate business

25    reasons.

NAAHRowVD1

1          Google asserts that under New York Labor Law

2    Section 194, or, as referred to a moment ago, New York's equal

3    pay law, Ms. Rowe was paid what she was lawfully owed, and any

4    difference in compensation between her and male employees

5    performing equal work was based on lawful factors other than

6    gender.

7          This is a civil case and not a criminal case, and no

8    one will go to prison as a result of the verdict in this case.

9    Ms. Rowe is seeking monetary damages from Google to which she

10   claims to be entitled under sate state and city law, including

11   back pay, liquidated damages, compensatory damages, and

12   punitive damages.  That money would come from the defendant

13   Google.

14         During the course of trial, each side will present

15   evidence to support its claims or defenses.  I will instruct

16   you as to the law to be applied, and in accordance with those

17   instructions, you will ultimately be asked to decide whether

18   the claims asserted by each party in this case are supported by

19   the overall weight of the evidence presented during trial.

20         I will now tell you a little bit more about our

21   schedule, although I will return to that topic later with the

22   jurors who end up getting selected.

23         Today we will potentially go until 5 p.m., depending

24   on how things play out.  Starting tomorrow and for every

25   subsequent day of trial, the jury will sit between 9:30 a.m.

NABHRow1

```
 1   UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
 2   ------------------------------x

 3   ULKU ROWE,

 4              Plaintiff,

 5         v.                          19 Civ. 8655 (JHR)

 6   GOOGLE LLC,

 7              Defendant.             Trial

 8   ------------------------------x
                                      New York, N.Y.
 9                                    October 11, 2023
                                      8:45 a.m.
10
     Before:
11
                      HON. JENNIFER H. REARDEN,
12
                                      District Judge
13                                    -and a jury-

14                       APPEARANCES

15   OUTTEN & GOLDEN, LLP
          Attorneys for Plaintiff
16   BY:  CARA E. GREENE
          GREGORY S. CHIARELLO
17        SHIRA Z. GELFAND

18   PAUL HASTINGS LLP
          Attorneys for Defendant
19   BY:  KENNETH W. GAGE
          SARA B. TOMEZSKO
20
     Also Present:  Vincent Yang, Paralegal (Outten & Golden)
21                  Andrew Velazquez, Google Rep.
                    Jean Gutierrez, Paralegal (Paul Hastings)
22

23

24

25
```

1  recruiter.

2  Q.  Who was the recruiter?

3  A.  Jennifer Burdis.

4  Q.  And what conversation did you have with Ms. Burdis about

5  your level?

6  A.  So I was coming in as a managing director from JPMorgan and

7  a CTO, you know, kind of coming from the highest level of the

8  corporate hierarchy.  So I asked her if Level 8 was

9  appropriate.  I wasn't familiar, you know, with the leveling at

10  Google at all.  And she said everyone that's hired into this

11  role is coming up as a Level 8.

12  Q.  So was it your understanding that the technical directors

13  in OCTO at that time were all functioning as Level 8?

14  A.  Yes.

15  Q.  Was OCTO at that time just the nine technical directors

16  that were hired at that time?

17  A.  No, there were some other more junior people with, you

18  know, less scope and responsibility, mostly ex-Googlers or

19  enlisting Googlers, but those of us that were coming in were

20  coming in as directors.

21  Q.  Ms. Rowe, can we agree when we talk about technical

22  directors in your testimony as I'm examining you that we're

23  referring to the director-level technical directors and not the

24  more junior folks you just described?

25  A.  Yes.

NABHRow1                         Rowe – Direct

1   Q.  Now, did Google hire other technical directors after that

2   group you were hired with?

3   A.  Yes.  After we came in, there was a pause, and they did

4   hire other batches of —— or cohorts of technical directors.

5   Q.  Who were the technical directors that were hired with and

6   that came in around the same time as you?

7   A.  The first one to come in was Evren Eryurek, and then the

8   last one to come ins with Nick Harteau.  And in between it was

9   Benjamin Wilson, Scott —— Jonathan Donaldson, Paul Strong,

10  Scott Penberthy, Brian Steikes, myself, and Jennifer Bennett.

11  Q.  Ms. Rowe, can you describe generally what your job entailed

12  on a day-to-day basis as a technical director in OCTO.

13  A.  Yes.  It was a new role and a very senior role.  A lot of

14  the work we did was very self-directed, and our work spanned

15  three pillars.  You know, it was about customer work, it was

16  about engineering and product work, and thought leadership.

17  Q.  Was the customer work described sometimes as customer

18  engagement?

19  A.  Yes.

20  Q.  So what was your understanding of what customer engagement

21  meant in OCTO?

22  A.  Customer engagement meant working with Google's cloud

23  customers, or mostly potential customers, to build, you know,

24  trusted relationships with them so that they understood our

25  products and they knew how to use our products, our Google

NABHRow1                          Rowe - Direct

1   Cloud products, to use them to make their own businesses

2   better.

3   Q.  Can you give us an example of what your work in customer

4   engagement looked like.

5   A.  These were — you know, Google was early in the financial

6   services industry when I started.  So a lot of our early work

7   with our customers was about building credibility with them and

8   educating them on what Google Cloud meant.  So it was about,

9   you know, telling them about our products, telling them what we

10  have to offer.  And some of the early work there was — you

11  know, kind of spanned three different things, you know, with

12  the customers.  One of them was, you know, building a strategy

13  for — for the industry that I was working in.  And that meant,

14  because we were new, you know, we really wanted to go after the

15  financial services customers.  We wanted to be credible.  We

16  wanted them to sign and buy our product, but we really didn't

17  have a strategy to go after it.

18          So I started with putting together a group of people

19  to meet on a regular basis to start putting together that

20  strategy, you know, what are we going to do?  How are we going

21  to prioritize things?  So we had people from our account teams,

22  our sales teams.  We had people from our engineering teams,

23  from our marketing teams, from our public policy teams, you

24  know, everybody that had a piece of this to come together to

25  figure out, you know, how do we really address this market?  So

NABHRow1                        Rowe – Direct

1   it was a lot of strategy work.

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

 1    BY MR. CHIARELLO:

 2    Q.  And what about beyond strategy?

 3    A.  So beyond strategy was the actual customer engagement, you

 4    know, really working with the customers.

 5           In the early days, you know, in financial services, a

 6    lot of our customers' questions were around security,

 7    compliance, and whether Google Cloud was enterprise-ready.

 8    People kind of knew Cloud as the search engine, they knew

 9    Google Ads.  But in the clouds business, we really didn't have

10    that credibility in those days.  So it was really working with

11    them to help them understand both what we had to offer in terms

12    of security and compliance offerings, but also our enterprise

13    readiness.

14    Q.  Was there anything else?

15    A.  Yes.  There was also the work that I did around regulatory

16    engagement.  And this was important because financial services

17    is a very heavily regulated industry.  It's really important

18    that if you're going to do a technical change of like this size

19    and this complexity, it's really important with the financial

20    regulators to understand what the product has to offer so they

21    can regulate the space and they can tell the financial

22    institutions whether it's okay or not to adopt a technical

23    change of this size.

24           So I started working very closely with our public

25    policy team to put together an engagement program with the

1    financial regulators.  And we started reaching out and meeting

2    with the financial regulators across the globe.  You know, this

3    meant, you know, I went and talked to the Federal Reserve

4    Board, I talked to the SEC, the Securities and Exchange

5    Commission, the FDIC, Federal Depository Insurance Corp., CFTC.

6    You name it, every financial regulator in the U.S.

7            I also did this in Europe with institutions like the

8    European Central Bank, the European Banking Association, the

9    regulators in the UK, the FCA and the PRA.  Did the same thing

10   in Asia, including Australia.

11           I also traveled to Washington, D.C. to meet with

12   Congress people.  I met with congressmen that were

13   representatives in the house of -- in the house committee of

14   financial services, congressmen that were part of the AI task

15   force in the Congress.  I also met with the Federal Reserve

16   Board in Washington, D.C., including with the vice chair,

17   Governor Brainard herself.

18   Q.  Okay.  And all the work you just described in customer

19   engagement, was that focused on financial services customers

20   specifically?

21   A.  Yes.

22   Q.  Was every technical director in OCTO focused on an industry

23   like financial services?

24   A.  No, there were others that were more horizontally focused

25   or product-focused as well.

NABVROW2                      Rowe - Direct

1   Q.  Why did Google have some people focus on industries?

2            MS. TOMEZSKO:  Objection.  Lacks foundation.

3            THE COURT:  State your basis again.

4            MS. TOMEZSKO:  Your Honor, I said lacks foundation.

5   He was asking what Google understood.  We don't know if

6   Ms. Rowe understood what Google expected or what they

7   understood.

8            MR. CHIARELLO:  I can revise the question, your Honor.

9            THE COURT:  Sustained.

10  BY MR. CHIARELLO:

11  Q.  What did you understand to be the reason why Google focused

12  on industries?

13  A.  Industries are very important because they hold a lot of

14  financial potential.  You know, if Google Cloud can break into

15  an industry and, you know, start doing sales in that space,

16  that could, you know, mean a lot of revenue for Google Cloud.

17  Q.  And how did the financial services industry compare to some

18  of the other industries Google was looking at in terms of

19  potential revenue?

20  A.  Financial services industry is the number one priority

21  industry for Google Cloud.  You know, there is a term, total

22  addressable market, kind of is a measure of how much an

23  industry spends on technology, into technology services.  Each

24  year financial services spends about $650 billion on

25  technology.  The next largest is about $250 billion with

1   healthcare.  You know, financial services technology spend is

2   bigger than every other industry combined.

3   Q.  Ms. Rowe, you mentioned another aspect of your work in OCTO

4   was working with engineering.  Can you just describe generally

5   what that pillar is.

6   A.  Yes.  So it's really important for our products, if we're

7   going to -- if we're going to sell them to our customers in the

8   financial services space, that our products satisfy the needs

9   of the financial industry.  So that meant working very closely

10  with the product and engineering teams so that they understood,

11  you know, what needs to be built into those products.

12  Q.  Can you give us an example of some of the work you

13  specifically did with the product and engineering teams?

14  A.  For example, in financial services, it's a very

15  document-heavy industry.  You know, if anyone has opened a bank

16  account or applied for a mortgage, there's a lot of documents,

17  there's a lot of paper documents.  So I worked very closely

18  with our engineering teams on document digitization, how can we

19  do this in a way so that we can take the paper out of the

20  financial services workflows.

21          I also worked very closely with our data center team.

22  Because in financial services, it's really important where your

23  data is kept.  This is important for, like, both backup-type

24  purposes, you know, where do I keep my primary data if

25  something happens to it; there's a flood, there's an

1    earthquake, there's a war, where does the backup data sit?  And

2    these are things very heavily regulated.  And also there's

3    privacy concerns around where your data is located.  So I

4    worked very closely with them so that the data centers

5    understood some of the needs of the financial services

6    customers.

7            I also worked very closely with our storage teams.

8    They are on something called a bitemporal data, and that really

9    refers to when you do a transaction in financial services, you

10   need to know the exact time that that transaction has been

11   made.  But later, if there's a change to that data, you need to

12   also be able to understand at what time it was made and as of

13   what time that transaction was captured.  Because it is really

14   important, especially, you know -- you know, one, you need to

15   keep track of, you know, all the changes that have happened;

16   but also it's very important from our regulatory reporting

17   perspectives.  But those are some examples.

18   Q.  And in those examples, that was work that involved you

19   working directly with the engineering teams?

20   A.  Yes.  Absolutely.

21   Q.  Ms. Rowe, can you tell us what thought leadership is as it

22   related to your work in OCTO.

23   A.  Thought leadership was all about creating credibility in

24   the market for Google Cloud.  You know, in the early days,

25   people didn't even know that we had a cloud business.  That

enterprise readiness, which means, like, does Google Cloud get

our business, do they get what we're trying to do?  Are they

just a search engine or can they really provide these

complicated complex technology products to us as an enterprise?

So thought leadership was really about, you know,

getting out there and doing speaking engagements and writing

about it, you know, talking at industry events all about, like,

getting our customers in the markets to understand, you know,

what Google Cloud has to offer in this space.

Q.  And can you give the jury some examples of some of the work

you did in OCTO related to thought leadership.

A.  Yes.  So I was a very regular speaker in Google Cloud's

most important events, like Google Cloud Next and Google Cloud

Summits.

I was a regular keynote speaker, very sought after by

Google, to come and speak and keynote these events all over the

world.  In my first two years, I think I traveled 15 countries,

went to 30 cities, just giving keynotes in various parts of the

world, you know, putting my credibility on stage to talk about

Google Cloud's product.

I also got a chance to speak on very small, very

curated events.  Google had these things called leader's

circle, which were invitation-only events for just the C-suite

customers, where they come in and we had a chance to talk to

them one-on-one about what they had to offer.  So I was a

1    regular speaker in those events as well.

2              I also spoke very regularly at industry events,

3    financial services industry events.  The largest events in

4    financial services industry are things like the Sibos event,

5    the Money 2020, the Forbes, Fortune, regular keynote speaker in

6    those events.  And many of these events I spoke to had

7    audiences of like a few thousand to 10,000 people in

8    attendance.

9              I also spoke a lot at our customers' events.  So, you

10   know, our customers like J.P. Morgan Chase or Goldman Sachs or

11   Chicago Mercantile Exchange, they would invite me to come talk

12   at their events to their customers, their investors at times

13   about the cloud and what technology has to offer.

14             I also wrote profusely about the cloud.  I wrote white

15   papers, I wrote blog posts.  I also did regular briefings with

16   press.  I was featured in *New York Times*, *Business Insider*,

17   *Harvard Business Review*.  I also regularly gave briefings to

18   industry analysts themselves.

19             And I remember one event in 2019.  This was our

20   biggest event, Google Cloud's biggest event in Europe, in

21   Paris.  This was our Google Cloud Summit.  And I think we had

22   about 5,000 people in attendance.  I was asked to do all four

23   keynotes of the event.  The only other, you know, keynote

24   speaker on stage with me was Thomas Kurian, Google Cloud's CEO.

25             I was just so much sought after that I was turning

1    down so many more engagements than I could possibly do.

2    Q.  You used the word "keynote" a number of times.  Can you

3    just define what a keynote is for the jury.

4    A.  A keynote is usually the most important speech of either

5    like a daylong or a multi-day event.  It usually happens really

6    right at the beginning and it's highlighted as the keynote.

7    It's the main attraction.

8    Q.  And did you have an understanding as to how the public

9    speaking you were doing would benefit Google?

10   A.  Yes.  It was all about building market credibility.  You

11   know, as part of our business development exercise, you know,

12   getting the market to know and understand what we had to offer.

13   So it was a very integral part of us addressing the industry.

14   Q.  Ms. Rowe, did Will Grannis ever give you performance

15   reviews?

16   A.  Yes.

17   Q.  And how often would that occur?

18   A.  About twice a year.

19   Q.  And what feedback did Mr. Grannis provide in those reviews?

20   A.  Always stellar.  My reviews were always glowing.  I got

21   "exceeds expectations" on every single one of them.

22   Q.  And "exceeds expectations" is a rating?

23   A.  Yes.

24   Q.  Did he ever give you constructive feedback?

25   A.  Yes.  You know, constructive feedback is part of Google's

1    process.

2    Q.  Did Mr. Grannis ever tell you that you were

3    underperforming?

4    A.  No, never.

5    Q.  Did he ever tell you that you were not meeting the

6    expectations of the role?

7    A.  No.

8    Q.  Ms. Rowe, when did you learn that not everyone you had been

9    hired with was a Level 8?

10   A.  That was in the summer of 2017, my first year there.

11   Q.  What did you learn in the summer of 2017?

12   A.  Ben and Evren, we were having a casual conversation, and

13   they told me they were Level 9s.

14   Q.  When you say Ben and Evren, is that Ben Wilson and Evren

15   Eryurek?

16   A.  Yes, Ben Wilson and Evren Eryurek.

17   Q.  What was your reaction learning that Mr. Wilson and

18   Mr. Eryurek were leveled at Level 9?

19   A.  I was surprised and I was very disappointed.

20   Q.  And have you since come to learn that there were other

21   individuals leveled at Level 9 in that group?

22   A.  Yes.

23   Q.  And who were those individuals?

24   A.  Other than Ben and Evren, Nick Harteau, Jonathan Donaldson,

25   and Paul Strong had also been leveled at 9.

1    Q.  Looking at the technical director group that you were hired

2    with, the other individuals that you mentioned, were you able

3    to observe their work?

4    A.  Yes, routinely.  You know, we worked very closely together.

5    Q.  And of those you observed, whose work was most similar to

6    yours?

7    A.  Those of us that focused on industries, you know, because

8    we each had our -- and those were Evren Eryurek, he was

9    focusing on healthcare; Benjamin Wilson, he was focusing on

10   energy; Nick was our start-up person; Jen Bennett was focusing

11   on manufacturing.

12   Q.  And what about the other technical directors in OCTO, did

13   you have an opportunity to observe what they were doing?

14   A.  Yes.  You know, we were doing very similar things.  You

15   know, we all worked across those three pillars that I

16   mentioned:  Customer engagement, engineering, thought

17   leadership.  We collaborated a lot.  We compared notes.  We

18   were in meetings together.  You know, we covered each other's

19   customers.  I got a chance to observe their work a lot, just

20   not as much as the industry people that I worked very closely

21   with.

22   Q.  Ms. Rowe, can you give the jury a sense of how your work

23   compared to that of the industry focused technical directors

24   you mentioned, Mr. Eryurek, Mr. Wilson, Mr. Harteau, and

25   Ms. Bennett?

1    A.  We worked very closely because all of us were focusing on

2    these industries.  So we were comparing notes on how to address

3    the industries, you know, what kind of strategy should we do,

4    while obviously trying to build this cohort of people in

5    financial services to come up with things like strategy.  Evren

6    was doing exactly the same thing in healthcare; Ben was doing

7    the same thing in energy.  We were, you know, covering our

8    customers.

9         There were a lot of issues that also cut across

10   industries that were important, like financial services

11   regulated, so it was healthcare and energy.  So we were working

12   very closely together both, you know, comparing notes, but like

13   addressing -- addressing big problems in our industries and

14   doing thought leadership in the various industries and so on.

15   Q.  Ms. Rowe, specifically, can you tell us how your work

16   compared to Mr. Harteau's?

17   A.  Yeah.  Nick and I were both based in New York, so we had a

18   lot of chance to collaborate.  We were talking about how to

19   address the industries that we were in.  We were talking and

20   comparing notes on how to accelerate the adoption of Google

21   Cloud, you know, what are the various creative things that we

22   can do, partnerships, you know, product acceleration.  So we

23   shared ideas and exchanged thoughts very frequently together,

24   you know, we covered for our customers.

25        And also, you know, I traveled quite a bit.  And

1    everywhere I'd go, I tried to meet the largest customers in

2    those regions.  And one of those places I traveled quite

3    frequently was Stockholm, and our biggest customer there is

4    Spotify.  And Nick had come from Spotify to Google, so he was

5    always gracious enough to brief me on Spotify before I met

6    them, you know, on one of these business trips.

7    Q.  Ms. Rowe, did you have an opportunity to present, to speak

8    publicly with any of the OCTO Level 9s?

9    A.  Yes, I did.  I spoke quite frequently, as we have

10   discussed.  On some of these speaking engagements I would do it

11   with other L9s, especially the events that covered multiple

12   industries.  For example, Gartner is -- the Gartner symposium

13   every year covers multiple industries.  So I'd go along with

14   other L9 technical directors.  We also did a lot of industry

15   analyst engagements together speaking about, you know, Google

16   Cloud's progress in each of our industries.

17   Q.  And did any of the OCTO Level 9s ever come to you for

18   advice?

19   A.  Yes.  They would regularly consult me on various topics.

20   You know, for example, regulation.  You know, in financial

21   services, we were doing all this regulatory outreach to get the

22   regulators to understand our businesses.  Healthcare was also

23   regulated.  Energy is also regulated.  So they would routinely

24   ask my thoughts about, you know, how I was going about the

25   engagement in financial services.

1           There was also, you know, things that cut across our

2     industries, as I mentioned.  For example, mainframe workloads.

3     Main frames are very heavily used in financial services.

4     They'd ask my thoughts on how we were addressing it in

5     financial services, how can you modernize those workloads using

6     the cloud.

7     Q.  And did any of the OCTO Level 9s ever consult with you on

8     strategy?

9     A.  Yes.  You know, in addition to, you know, our strategies

10    for the industries that we were focusing on, you know, there

11    were other things that we would strategize on, like what are

12    some common problems that's across our industries.  We talked

13    about document digitization.  I talked about that financial

14    services being very paper heavy, while the other industries

15    that are very paper heavy, healthcare, the customer records

16    being faxed, there's just so much paperwork there.  They would

17    consult together; we would figure out how to address some of

18    these problems that are common to many industries.

19    Q.  And did any of the OCTO Level 9s ever ask you to cover

20    accounts for them?

21    A.  Yes, regularly.  You know, I was traveling extensively,

22    both, you know, to meet customers, to meet product and

23    engineering teams and, you know, to do thought leadership.  And

24    every time I went to one of these cities, I would make -- I

25    would make sure, like, I'd meet the customers of other OCTOs

1    that were covered by other OCTOs.  For example, I remember a

2    couple of them.  I was meeting Iron Mountain that Ben was

3    covering.  And I also met with Amadeus, which is a travel

4    company in Europe, travel infrastructure company.  And I was

5    doing that for Paul.

6    Q.  Ms. Rowe, two of the men that you were hired with were

7    Scott Penberthy and Brian Steikes; is that correct?

8    A.  That's correct.

9    Q.  And did you come to learn their level at some point?

10   A.  Yes.

11   Q.  What level were they?

12   A.  They were Level 8.

13   Q.  How did your qualifications, to your understanding, compare

14   to Mr. Penberthy's and Mr. Steikes'?

15            MS. TOMEZSKO:  Objection.  Lacks foundation.

16            THE COURT:  Sustained.  Rephrase.

17   Q.  Ms. Rowe, do you have an understanding of what

18   Mr. Penberthy's qualifications were for the technical director

19   role?

20   A.  Yes.

21   Q.  How would -- and you have an understanding of your own

22   qualifications for the role?

23   A.  I do.

24   Q.  How did your qualifications compare with Mr. Penberthy's,

25   as you understand it?

1              MS. TOMEZSKO:  Objection.  She hasn't stated the basis

2    of her knowledge.  She says she knows, but I think the jury is

3    entitled to know how she knows, if she does.

4              THE COURT:  Sustained.

5    Q.  Ms. Rowe, how were you aware of Mr. -- what Mr. Penberthy's

6    qualifications were?

7    A.  Both from conversations with himself and also from his

8    hiring package.

9    Q.  What kind of information is in his hiring package?

10   A.  Like his resume.

11   Q.  So based on what you know about Mr. Penberthy, how did your

12   qualifications compare with his?

13   A.  I was more qualified than Scott Penberthy.  Scott is a

14   great colleague, I like working with him, I have a lot of

15   respect for him.  But, you know, one, I came from the financial

16   services industry, the number one target for Google Cloud.

17   Scott came from PWC, an accounting firm that's not even in the

18   target list for Google Cloud.

19              I came in as a CTO with deep technical background

20   actually building these large-scale systems, have hands-on

21   experience with both creating systems and the cloud.  Scott

22   came in as a consultant.  Consultants, I think, are great

23   advisors, but they don't do the actual work.

24              So by having this like hands-on experience myself put

25   me in a position with our customers that I can speak to them

1    from a place of experience and having been in their shoes

2    before.

3            I had experienced managing very large teams, up to

4    1,000 people, direct and indirect.  Scott didn't have that

5    experience.

6            In terms of cloud migration, I had experience, you

7    know, migrating some of the most complex, largest scale

8    technology setups in financial services.  Scott's cloud

9    migration experience was related to office applications.  So

10   migrating things like, you know, Excel and Power Point into

11   things like Google Docs and Google Sheets.  And there is, you

12   know, an order of magnitude of complexity in those two tasks.

13   Q.  Ms. Rowe, do you have an understanding of what Mr. Steikes'

14   qualifications were to be technical director in OCTO?

15   A.  I do.

16   Q.  And what is your basis for that understanding?

17   A.  From conversations, as well as, you know, his resume.

18   Q.  And to your understanding, how do your qualifications

19   compare with Mr. Steikes'?

20   A.  So I have one -- you know, two advanced -- I have an

21   advanced degree, two degrees in computer science.  Brian didn't

22   have an advanced degree.  I came with deep industry experience.

23   Brian didn't have that.  Brian didn't have any CTO experience.

24   Brian didn't have any cloud experience.  And Brian only managed

25   teams of up to 30 people.

1    Q.  Now, Ms. Rowe, did you have an understanding of the

2    qualifications for the five men who had been leveled at Level 9

3    in OCTO?

4    A.  Yes.

5    Q.  And what is your basis for your knowledge and understanding

6    of the qualifications of those five individuals?

7    A.  My general knowledge of their background, as well as their

8    CVs, the hiring packages that were used as part of their hire.

9    Q.  And did you ever speak with any of them about their prior

10   work?

11   A.  Yes.

12   Q.  Before joining Google?

13   A.  Yeah.  Absolutely.  Yeah.

14   Q.  Ms. Rowe, how did your qualifications compare to the Level

15   9 men?

16   A.  With respect to the Level 9 men, I believe that I was just

17   as qualified, if not more qualified in certain aspects.  I had

18   come in as a CTO from J.P. Morgan Chase, and Ben and Evren came

19   as CTOs from enterprise companies.  Nick and Jonathan didn't

20   have a CTO title.  Paul was called a field CTO, but that's a

21   very different thing than a traditional CTO that has hands-on

22   work.

23          In terms of our, you know, degrees, I had -- I had

24   both an undergrad and a grad degree in computer science and

25   computer engineering.  Some of the L9 men, you know, did have

1  advanced degrees, but none of them were in computer science.

2  They were in other fields.

3           I had experience, you know, managing very large teams,

4  so did Ben and Evren.  But Jonathan and Nick and Paul had

5  managed smaller teams.  I had come in from financial services,

6  the number one target industry, you know, with the total

7  addressable market that's bigger than any other industry.  I

8  had also hands-on cloud experience.  And Ben and Evren and Nick

9  had that experience; Jonathan and Paul did not.

10 Q.  What do you understand to be the difference between Level 8

11 and Level 9 technical directors in OCTO?

12 A.  In terms of the job that we did on a day-to-day basis,

13 there wasn't a difference.  We were all doing the same thing,

14 same kind of things.  But, you know, there was a lot of

15 difference in terms of compensation and, you know,

16 opportunities for career advancement.

17 Q.  When you say difference in compensation, can you give the

18 jury a sense of an order of magnitude in the difference between

19 a Level 8 and a Level 9.

20 A.  It's different for every person, but hundreds of thousands

21 of dollars.

22 Q.  And what is the difference between Level 8 and Level 9

23 technical directors in OCTO in terms of career advancement

24 opportunities?

25 A.  You know, whatever level you're in, it's easier to get to

1    the next level.  You know, if you're in Level 9, it's going to

2    be much easier to get to Level 10.

3    Q.  Ms. Rowe, did you speak to anyone after learning that

4    Mr. Eryurek and Mr. Wilson were leveled as Level 9?

5    A.  Yes, I talked to Will Grannis.

6    Q.  And what did you discuss with Mr. Grannis with respect to

7    what you had learned about Mr. Eryurek and Mr. Wilson?

8    A.  So I told him, you know, about my concerns that, you know,

9    when I was being hired, you know, that I had raised this --

10   this issue with Jen, that I was coming in as level -- as a

11   managing director, as a CTO from JPMorgan, and I was told that

12   everyone was coming in as a Level 8.  And I had come in and

13   found out that some of the men had come in as a Level 9.  And I

14   asked for his help in correcting that because I believed, like,

15   the L9 men had, you know, the same qualifications, if not

16   lesser qualifications than me.

17   Q.  And did Mr. Grannis say anything to you?

18   A.  He told me that I should speak to Melissa Lawrence.

19   Q.  Who is Melissa Lawrence?

20   A.  Melissa Lawrence is the HR person that supports OCTO.

21   Q.  Did you speak with Melissa Lawrence?

22   A.  I did.

23   Q.  Before we talk about that, at the time you reached out to

24   Ms. Lawrence, when was that?

25   A.  That was about -- that was December, I think, of 2017.

1   Q.  And at the time you spoke with Ms. Lawrence, did you

2   believe that your gender had anything to do with Google's

3   decision to level you at Level 8?

4   A.  I did.  You know, I was told everyone was coming in as

5   Level 8.  And I had come in and found, you know, some of the

6   men were brought in as Level 9s, when we had very, very similar

7   qualifications.

8   Q.  And did you share that belief with anyone at that time?

9   A.  Not at that time.  You know, bringing up gender is a risky

10  topic.  You know, I just -- I was really focused on getting the

11  issues sorted, resolved, and I wanted to just move on.

12  Q.  Now, when you did speak with Ms. Lawrence, what did you and

13  she talk about?

14  A.  We talked about a few things.  You know, we discussed my

15  leveling concerns.  We talked about an equity refresh issue.

16  We also talked about, you know, earlier in the year, Will and I

17  had a discussion.  You know, Will was thinking about taking all

18  the industry-focused technical directors in OCTO and putting

19  them into a group, and he wanted me to run the group.  And that

20  hadn't, you know, materialized.  I mentioned that.

21          And I also mentioned one more topic.  I can't remember

22  the topic.

23          MR. CHIARELLO:  Mr. Yang, can you put up Plaintiff's

24  11 just for the witness.

25  Q.  Does Plaintiff's 11 refresh your recollection as to

1   background, and I told her I'd be interested.

2   Q.  Did you discuss anything with her about your background?

3   A.  No.

4   Q.  Now, the portion of this conversation around the VP of

5   sales role, how long did that last, approximately?

6   A.  That was very short.  Like, just she mentioned that there

7   was a role, that she was looking more broadly than just the

8   sales background, and she just —— you know, just told me to

9   reach out to the recruiter for next steps.  So very short.

10  Q.  Had you ever spoken with Ms. Kliphouse before that time?

11  A.  No.  This was our first conversation.

12  Q.  In that conversation did she ask you anything about your

13  qualifications?

14  A.  No.

15  Q.  Did she ask you anything about your background?

16  A.  No.

17  Q.  Did you discuss with specificity the qualifications for the

18  role?

19  A.  No.

20  Q.  Did you apply for this role, the VP of sales position?

21  A.  I did.  I did.

22  Q.  How did you apply?

23  A.  I did reach out to the recruiter.

24  Q.  And who is the recruiter?

25  A.  Stuart Vardaman.

1    Q.  Did Mr. Vardaman send you a job description?

2    A.  Yes.

3           MR. CHIARELLO:  Mr. Yang, can you please put up

4    Plaintiff's 101.  And, Mr. Yang, if you could please just cycle

5    through it for the witness.

6    Q.  Ms. Rowe, is this the job description that Mr. Vardaman

7    sent to you along with the cover email attaching it?

8    A.  Yes.

9    Q.  Let's take a look at the first page, the cover email.

10          Now, Mr. Vardaman writes to you, this is February 4 of

11   2020.  With respect to the role, he writes:  "It sounds like

12   she and Rob are open to 'thinking differently' about this role,

13   so it is not necessarily a prerequisite that someone has

14   carried a sales revenue number."

15          Is that consistent with the conversation that you had

16   with Ms. Kliphouse during the meeting you described?

17   A.  Yes.

18   Q.  Take a look at the description itself.  Ms. Rowe, what was

19   your understanding of the functions of what the financial

20   services industry leader role would be?

21   A.  So this would be a role, you know, setting strategy for the

22   sales organization.  It would be, you know, focusing on the big

23   customers in the financial services space, doing like leading

24   the growing market function.

25   Q.  Ms. Rowe, do you have an opinion about whether you're

1    qualified for this role?

2    A.   Yes.

3    Q.   What is your opinion?

4    A.   I think I was uniquely qualified.

5    Q.   Why do you believe that?

6    A.   You know, at this point I've been at Google for three

7    years, and sales is all about knowing the products, getting the

8    customers to understand the products, and being in that sales

9    cycle, building the credibility in the market, doing business

10   development.  I've been doing this at Google for three years,

11   and at this point I was a recognized leader in the industry.  I

12   was serving on the board of —— on the technical advisory group

13   of New York Fed.  At this point Google had also appointed me to

14   the advisory group for Capital G.  Capital G is Google's

15   private equity arm.  So Google actually uses Google's own money

16   to do investments of $50 million and above into technology

17   companies.  So they had invited me to the board to advise them

18   on what companies to invest, you know, Google's dollars in the

19   financial services space.  And so for me, I thought I was

20   uniquely qualified.

21   Q.   Well, let's take a look at the actual qualifications.

22         Mr. Yang, can you start with the bottom of 60561.

23   And, Mr. Yang, can you just call out the bottom of that so we

24   can see it better.  Perfect.

25         Now, Ms. Rowe, at this point in time, how many years

1   of experience did you have in financial services?

2   A.   So this was 2020.  I had 26 years of experience.

3   Q.   And how many years of experience did you have as an

4   executive?

5   A.   Two decades.

6   Q.   And in what way did you have proven success managing a

7   sales/business development organization to meet and exceed

8   revenue goals?

9   A.   So I didn't have the traditional sales background.  You

10  know, I never ran a sales team with a quota.  But at Google,

11  you know, the role that I've been doing was spanning across

12  engineering and sales, and I had been working with our most

13  important customers as their adviser, helping them understand

14  our products.  I've been part of sales pitches, and I've been

15  part of the sales process in a really big way to close with

16  some of our largest financial services customers.  So while I

17  didn't have the traditional sales background, I was very much a

18  big part of the sales cycle, and I had a very deep

19  understanding of how that process worked and how to execute it

20  in that process.

21  Q.   And in what ways did you have experience with information

22  technology and computer systems that support enterprise goals,

23  including exposure to cloud technologies and machine learning?

24  A.   I mean, I've been doing this — this has been my entire

25  career, building information technology systems.  And exposure

1    to cloud technologies and machine learning, I'd been working at

2    Google for three years.

3    Q.  And in what way did you have established actionable

4    executive/C-suite relationships?

5    A.  At this point I had a very large network of C-suite

6    relationships, both from places I worked prior to the Google,

7    from places like Bank of America, UBS, and JPMorgan Chase, and

8    also during my time at Google working with, you know, Google

9    Cloud's customers.

10   Q.  And in what way do you believe you had a sterling

11   reputation within the financial services sector?

12   A.  I was advising President Williams on financial technology

13   issues.  I was sitting on Capital G's board.  Google was, you

14   know, having me speak at their most important events, talking

15   to their most important customers.

16         MR. CHIARELLO:  Mr. Yang, we can take that down, and

17   can you please put up Plaintiff's 106.

18   Q.  Ms. Rowe, what is Plaintiff's 106?

19   A.  This is me pinging Stuart Vardaman on a status update for

20   the next step for my candidacy for the role.

21   Q.  It looks like as of the most recent email on February 25

22   you had scheduled a time to speak with Mr. Vardaman, correct?

23   A.  Correct.

24   Q.  Did you actually speak with Mr. Vardaman?

25   A.  Yes.

NABHRow3                         Rowe - Direct

1    Q.   When did that call occur?

2    A.   Shortly after when it was scheduled.

3    Q.   What did Mr. Vardaman tell you in that conversation?

4    A.   He told me that I wasn't going to be considered because I

5    wasn't a good fit.

6    Q.   And did you say anything to him?

7    A.   I asked him —— I asked him what that was based on, and he

8    told me it was based on the two-hour interview I had with

9    Kirsten.

10   Q.   When did you have a two-hour interview with Ms. Kliphouse?

11   A.   I did not have a two-hour interview with Ms. Kliphouse.

12   Q.   Had you ever met with Ms. Kliphouse beyond the coffee

13   meeting that you described earlier?

14   A.   No.

15   Q.   In that meeting how long had you discussed the role?

16   A.   It was very short.  Ten minutes, maybe.

17   Q.   Did you understand that short meeting with Ms. Kliphouse to

18   be an interview for the role?

19   A.   No, definitely not.

20   Q.   Now, Ms. Rowe, are you aware of who —— whether anyone

21   ultimately received the financial services sales role?

22   A.   Yes.  It went to Yolande Piazza.

23   Q.   And are you familiar with Ms. Piazza's background,

24   qualifications for the role?

25   A.   Yes.

1    Q.  How are you familiar with her background and qualifications

2    for the role?

3    A.  From talking to her, from industry, and also from her

4    hiring packet.

5    Q.  So on that basis, how would you compare your qualifications

6    for the sales role to Ms. Piazza's?

7    A.  I think that, first and foremost, you know, I was at Google

8    for three years doing, you know, this role, engaging with

9    customers, influencing the industry, building the market for

10   financial services so our customers understood who we are, what

11   we have to offer, what our products had to offer.  You know,

12   all the thought leadership I had done in that space, all the

13   regulatory outreach I had done in that space, and all the

14   customer work I had done in that space.  This was now three

15   years.  I had that.  Yolanda, she was coming from the outside.

16        In terms of our qualifications, I had two degrees in

17   computer science, undergrad and grad.  Ms. Piazza didn't have

18   any degrees.  I was coming in as a CTO that had vast amounts of

19   experience building technology systems at a global scale, large

20   distributed complex systems.  Having done that, you know,

21   allows me to work with our customers in a way that I understand

22   what they're going through.  They can talk to me as someone

23   who's been in their shoes.  I had — you know, I had a lot of

24   experience doing that.

25        Third, I had worked in three different financial

1   institutions before I came to Google.  I worked at UBS.  I

2   worked at Bank of America.  I worked at JPMorgan Chase.  You

3   know, these are some of the largest financial institutions in

4   the world, JPMorgan being the number one, Bank of America being

5   number two in the world outside of China.  Having worked at

6   these institutions gave me a very varied understanding of the

7   kinds of things, the businesses in financial services.  It

8   spanned everything from retail banking, corporate investment

9   banking, from exchanges, and I kind of got to observe and live

10  and breathe and work on this very different parts of financial

11  services.  Ms. Piazza worked for Citibank for 30 years.

12  Citibank, while they're on every street corner, we see them,

13  it's predominantly a retail bank.  Their presence in other

14  parts is a lot smaller and their international footprint is

15  also significantly smaller compared to some of the institutions

16  that I've worked in.

17          And you know, when it came to, you know, cloud

18  experience, I had a lot of that.  Ms. Piazza did not.  And

19  having worked at these financial institutions and having worked

20  at Google Cloud with our customers, I had built a very large

21  network of C-suite relationships.

22  Q.  Ms. Rowe, it's 2023, I think, what have you been doing at

23  Google since 2020, since the time you learned you would not

24  receive the sales role?

25  A.  I'm still in OCTO.  I am still focusing on financial

1    services, although over time, you know, my role has diminished,

2    and they started bringing people like Ms. Piazza.  My

3    contributions are now diluted, not — not what they used to be.

4    Q.  Are you still a technical director?

5    A.  I am.

6    Q.  And what have your performance evaluations been since the

7    time that you moved back to OCTO?

8    A.  It's always been "exceeds expectations."  In 2022, Google

9    changed the way they did ratings.  Until then it was always

10   "exceeds expectations."

11   Q.  To what degree are you focusing on financial services?

12   A.  I'm still focusing on financial services.

13   Q.  Do you still report to Will Grannis?

14   A.  No.  I've been layered.  Last year, in 2022, Will decided

15   to introduce regional managers.  I raised my hand for

16   the East Coast regional manager role.  I was passed over, and

17   Patricia Florissi was given that role, and now she sits between

18   me and Will.

19   Q.  And how long had Ms. Florissi been working in OCTO at the

20   time Mr. Grannis made her your manager?

21   A.  She was hired in 2020, so she had been at Google for two

22   years.

23   Q.  In the time that Ms. Florissi become your manager, any

24   notable successes in your work?

25   A.  Yes.  Yes, many.

1    Q.  Can you share a few with us.

2    A.   Yes.  Last year, in 2022, I was nominated to the technology

3    advisory group of the CFTC.  The CFTC is the main regulatory

4    body for derivatives trading, so things like futures, options,

5    swaps, including cryptocurrencies.

6         And when AI started taking off, you know, it became ——

7    ChatGPT came along.  Everyone started talking about AI and what

8    a great impact it's going to have on humanity.  I started

9    focusing on the responsible use of AI.  So I've been doing that

10   this year, really focusing on how do you assess the risks of AI

11   and how do you do it in a responsible way.

12        Last year we also signed one of our biggest deals in

13   financial services with Goldman Sachs, multi-hundred million

14   dollars, multiyear deal.  And yeah, many others.

15        (Continued on next page)

16

17

18

19

20

21

22

23

24

25

NABVROW4                       Rowe - Direct

1   BY MR. CHIARELLO:

2   Q.  Have you received any promotions since 2020?

3   A.  No, I have not.  On the contrary, I've been layered.

4   Q.  And since bringing this lawsuit, has Mr. Grannis discussed

5   with you having you undertake any leadership roles?

6   A.  No, he did not.

7   Q.  Are you still a Level 8?

8   A.  I am.

9   Q.  What role is Mr. Penberthy today?

10  A.  He's a Level 9.

11  Q.  Ms. Rowe, you continue to be a Google employee; correct?

12  A.  Correct.

13  Q.  What has it been like to continue working at Google while

14  pursuing this lawsuit?

15  A.  There is this thing that -- this lawsuit.  And I go to work

16  every day pretending it doesn't exist, but it's there.

17  Everyone knows it.  Everyone just ignores it.  And I do my

18  best.

19          I talk to my customers.  I go do these thought

20  leadership events.  But it's there.  It's there every day.  I

21  carry the burden of it every day.  I know my relationships with

22  my coworkers, I used to have great relationships with Will, all

23  the OCTO people.  Now people don't want to talk to me anymore.

24  They're afraid.  You know, I go to team off-sites, I'm usually

25  sitting by myself.  Like people are afraid.

1         I miss those work relationships.  And my career is

2    completely stalled.  My peers blow past me.  They're getting

3    promoted and I'm here exactly where I was.

4    Q.  There's tissues on your left.

5    A.  Thank you.

6    Q.  How has the pursuit of your claims impacted your view of

7    yourself?

8    A.  You showed me that photo, my social media.  I was so happy

9    and optimistic when I started at Google.  Now I have so much

10   self-doubt, like, I don't know where to go from here anymore.

11   I don't know what the future holds.  It's really hurt my

12   self-confidence.  I'm sorry.  Yeah.

13   Q.  Because I also want to ask you how your experiences at

14   Google has impacted you in your personal life.

15   A.  This thing, it colors everything in my life.  My

16   relationship with my friends and my husband, my family, it's

17   been this cloud that's like hanging over us.

18         It's been four years since I filed the lawsuit.  Since

19   then, my oldest is in college now.  My younger one is in high

20   school.  It's like their best years that I could have spent

21   with them has been in the shadow of this.  I'm not getting

22   those days back.

23   Q.  Let me ask you, Ms. Rowe, is there a reason that you've

24   stayed at Google?

25   A.  Yes.  You know, I never meant to leave Google.  I wanted to

1   stay and make it right.  That is why I tried so hard to make it

2   right.  I'm sorry.

3   Q.  Take your time.

4   A.  You know, why should I leave?  Why should it be me that

5   leaves, when it's them that did all this.  Even if I wanted to

6   leave, I used to get calls from recruiters, I don't get calls

7   from recruiters anymore.  I just -- I don't know if I --

8   Q.  Take a breath.

9   A.  Yes.  I'm okay.  I'm okay.

10  Q.  If it's helpful, I'm almost done.

11  A.  Okay.

12  Q.  Ms. Rowe, did you ever discuss your claims with Will

13  Grannis?

14  A.  He brought them up.

15  Q.  And can you tell us about the conversation you had with

16  Mr. Grannis about your claims?

17  A.  This was April, shortly after I moved in OCTO.

18  Q.  I'm sorry, April of what year?

19  A.  Sorry?

20  Q.  I'm sorry.  April of what year?

21  A.  Shortly after I moved back, so that was 2019.  I moved back

22  to OCTO.  And I think it was April.  We were having Google

23  Cloud Next, our biggest customer meeting in San Francisco.  We

24  were all at a bar because, you know, Will put together a team

25  meeting for all the OCTOs that were there for the event.  And

1   he approached me and later, kind of late at the event, he

2   approached me and he said, you know, that he'd been approached

3   by Google's counsel about the lawsuit.  He asked me how he

4   could help and whether I wanted to stay at Google.

5           I said, Yes, you know, of course I want to stay at

6   Google.

7           He asked me things like how much time I have and --

8   and then he said to me, he said, You don't know how much

9   respect people have for you.  You don't know, like, how many

10  people look up to you.  Said to me that if it was his own

11  daughters that were going through what I was going through, he

12  would tell them to do exactly what I'm doing.  That's what he

13  told me.

14          MR. CHIARELLO:  No further questions.

15          MS. TOMEZSKO:  Would you like to begin now?

16          THE COURT:  Yes, please.  We'll go now until 12:45, at

17  which point we'll take a lunch break.

18          JUROR:  Excuse me.  Pen.

19          THE DEPUTY CLERK:  A pen?

20          MS. TOMEZSKO:  May I question the witness, your Honor?

21          THE COURT:  You may.

22  CROSS-EXAMINATION

23  BY MS. TOMEZSKO:

24  Q.  Good afternoon, Ms. Rowe.

25  A.  Good afternoon.

1    many years of experience who come in as lower level managers,

2    and there are people with relatively little experience compared

3    to the average person who come in as a higher level, right?

4            MR. GAGE:  Objection, your Honor.  Objection.

5    Relevance to the comparison to the average person.

6            THE COURT:  I'll allow it.

7    A.  Could you repeat the question, please.

8    Q.  Have you said before, in explaining how the leveling system

9    works at Google, that there's plenty of people who come in with

10   many, many years of experience, who come in as managers, and

11   that we get relatively little experience —— and we get people

12   with relatively little experience compared to the average

13   person who would come in at a higher level, and it's much more

14   about what is the role scoped for and do we believe this person

15   could perform that role?

16   A.  That's right.

17   Q.  And that's true whether someone's at a Level 5 or a role is

18   a Level 5 role or a Level 7 role or a Level 9 role or a Level

19   10 role, correct?

20   A.  I believe so.  I wasn't involved with leveling at any of

21   those lower levels, but the only involvement I had was at

22   promotion cycles, and that's how it works for promotion cycles

23   for directors and vice presidents.

24   Q.  With respect to the Level 10 vice president role you were

25   considering the question is someone capable of performing that

1  role at a Level 10, and if they were, they'd come in at a Level

2  10, correct?

3  A.  If the role is scoped at that level and we thought that the

4  person could fulfill the scope at that level, yes.  You'd

5  mentioned Dominik Wee earlier.  We had originally scoped that

6  role that he came into as a Level 10.  We thought that he

7  wasn't quite ready for the full scope of the role, so we

8  de-scoped it and brought him in as a Level 9.  So it was a

9  little more interactive than just we had a role, and we looked

10  for someone to fill it.

11  Q.  Now, Mr. Wilson and Mr. Eryurek also came into your

12  organization at the same time Ms. Rowe did, correct?

13  A.  There were three other people, so the two of them and

14  Mr. Kember as well.

15  Q.  And Mr. Kember was more junior than Ms. Rowe and Mr. Wilson

16  and Mr. Eryurek, correct?

17  A.  The title they gave him was technical director, the same

18  as.  In terms of his level, I believe it was an L5 or an L6 at

19  the time, but he was in the same group, my understanding was,

20  as a peer.  He was always represented to me as a peer to Evren,

21  Ben, and Ulku.

22  Q.  And you understood that Mr. Wilson and Mr. Eryurek had been

23  performing a role similar to Ms. Rowe's when they were all in

24  OCTO, correct?

25  A.  They all — all three of the individuals I mentioned were,

NABHRow7                          Shaukat - Direct

1   yes.  So we moved all four of them in.

2   Q.  And all three —— Mr. Wilson, Mr. Eryurek, and Ms. Rowe ——

3   were being brought into your organization to continue with the

4   same role they had had in OCTO, correct?

5   A.  Yes, although I'm not sure why you're not including

6   Mr. Kember who was the fourth of the people who came over from

7   OCTO.  So all four of them came over to do the same role.

8   Q.  Right.  But Mr. Kember was not a Level 8 or Level 9

9   director, correct?

10  A.  He was not, but he was in the same role and we brought him

11  into the same role.

12  Q.  But not at the same level, correct?

13  A.  Not at the same level, correct.

14  Q.  So we talked about earlier that you knew Ms. Rowe was a

15  Level 8 and you also learned that Mr. Wilson and Mr. Eryurek

16  were Level 9s, correct?

17  A.  At the time in which they —— I didn't know beforehand.  As

18  they were slated to move into my organization, I was briefed on

19  all the people and their levels, yes.

20  Q.  But you couldn't say what the differences were between

21  Ms. Rowe and Mr. Wilson and Mr. Eryurek, could you?

22  A.  No.  And as I mentioned, that is generally true for all of

23  the people in my organization.  I look at the scope of impact

24  they have, not the level that they have.

25  Q.  Now, you mentioned Dominik Wee and Anil Jain earlier.  You

1   considered them to be peers of Ms. Rowe, correct?

2   A.  I did in different roles.  So, I mean, they were global

3   client directors as opposed to —— in one case, Anil Jain was a

4   global director.  Dominik, I believe, was an industry lead.

5   And Ulku was a global client technical lead.  So they were

6   different roles, but I considered them all to be roughly the

7   same level.

8   Q.  So between the global client lead and the global technical

9   leads, there was Mr. Eryurek, Mr. Wilson, Ms. Rowe, Mr. Jain,

10  Mr. Wee, correct?

11  A.  And Mr. Kember again.

12  Q.  OK.  Of the director levels, the men were all Level 9s and

13  Ms. Rowe row was a Level 8, correct?

14  A.  Yes, although I think it's selective to say that because,

15  as I mentioned, Mr. Kember performed the same role with the

16  same reporting structure, and he was a level 6.

17  Q.  Do you think Mr. Kember should have been a Level 9?  Was he

18  performing at the Level 9 level?

19  A.  He was —— again, when he moved into my organization, I

20  didn't have that much experience with him.  He was in the same

21  role, and he moved into the same role.  We did end up promoting

22  him to, I believe, L7 or considering him, and then he left the

23  company.

24  Q.  Now, Ms. Rowe reported directly to you during the time she

25  was in your organization, correct?

NACVROW1

```
1    UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
2    ------------------------------x

3    ULKU ROWE,

4                   Plaintiff,

5              v.                            19 Civ. 8655 (JHR)

6    GOOGLE LLC,

7                   Defendant.               Trial

8    ------------------------------x
                                             New York, N.Y.
9                                            October 12, 2023
                                             9:10 a.m.
10
     Before:
11
                      HON. JENNIFER H. REARDEN,
12
                                             District Judge
13                                           -and a jury-

14                           APPEARANCES

15   OUTTEN & GOLDEN, LLP
          Attorneys for Plaintiff
16   BY:  CARA E. GREENE
          GREGORY S. CHIARELLO
17        SHIRA Z. GELFAND

18   PAUL HASTINGS LLP
          Attorneys for Defendant
19   BY:  KENNETH W. GAGE
          SARA B. TOMEZSKO
20
     Also Present:  Vincent Yang, Paralegal (Outten & Golden)
21                  Andrew Velazquez, Google Rep.
                    Jean Gutierrez, Paralegal (Paul Hastings)
22

23

24

25
```

1   would eventually report to somebody who were in my staff

2   meeting.  I made a decision in October, for what I thought was

3   the good of the organization to be able to show to Thomas that

4   we were not ── that we were running a disciplined organization,

5   to put Stuart in as a span breaker to help me reduce the number

6   of direct reports and to make it look like it was a coherent,

7   lack of a better word, organization.

8           What was implied yesterday was that I then shut down

9   the searches for Ranjana Clark or Diana Layfield, which was not

10  true.  We assumed that this would be a very temporary

11  appointment as interim, and Diana Layfield was still somebody

12  that we were planning to hire.  We only reversed that decision

13  later on in December.  I believe November/December after I met

14  Thomas, and that's when we decided that the Stuart interim

15  appointment would go on longer than we had initially said.

16          So I got confused between the span breaker versus the

17  other.  In my mind, those are two separate appointments,

18  essentially.

19  Q.  OK.  So before you told Ms. Rowe that she was not getting

20  the job, you had decided that Mr. Breslow was going to perform

21  it on an interim basis, correct?

22  A.  Until I had gotten an opportunity to meet with Thomas

23  Kurian, yes.

24  Q.  And you didn't tell Ms. Rowe that, correct?

25  A.  Correct.

1    Q.   Then after, you decided to make it more permanent, correct?

2    A.   After Thomas said he was not willing to invest in financial

3    services beyond financial crimes until further review, and that

4    review would happen in January or February of 2019 at that

5    point, and so at that time I decided it would be unfair to

6    Ms. Layfield to offer her the job given so much uncertainty and

7    to extend Stuart into the interim lead for a longer period of

8    time.

9    Q.   How long was he the interim lead?

10   A.   To my knowledge, until he left Google, which would have

11   been in 2020, because as, in fact, the strategy evolved, we

12   ended up focusing purely on financial crimes and financial

13   services during that time period.

14   Q.   Google was still doing work elsewhere on financial

15   services, weren't they?

16   A.   Google had sales efforts in financial services, yes.

17   Q.   And so that was still work that was necessary, in fact,

18   important to business development with respect to financial

19   services, correct?

20   A.   Yes.  But it's important to understand the nature of my

21   team, and my team is not a sales team.  So we were not involved

22   with that work typically.

23   Q.   Did you tell Ms. Breslow —— I'm sorry, Ms. Rowe, at the

24   time that you told her she wasn't going to get the job was

25   because you wanted to focus on someone who had more business

1  development?  Was that the reason you gave her?

2  A.  I don't believe I gave her that reason, no.

3  Q.  Let's look at Plaintiff's 67.

4       Do you recognize this document?

5  A.  I do.

6  Q.  I want to draw your attention to that first paragraph where

7  you said "I told Ulku the following."

8  A.  Uh-huh.

9  Q.  And you say:  "I think in finserv we will likely be looking

10  for someone with more sales and business development

11  orientation."

12       That's what you told her in that meeting, correct?

13  A.  That's what this says, likely in the future, as the

14  strategy evolved, that that's what we would be looking for,

15  yes.

16  Q.  That's what you said to Ms. Rowe and documented here,

17  correct?

18  A.  Yes.

19       MS. GREENE:  No further questions.

20       MR. GAGE:  Just briefly, your Honor, a couple of

21  points.

22       THE COURT:  Yes.

23  RECROSS EXAMINATION

24  BY MR. GAGE:

25  Q.  Almost done, Mr. Shaukat.

1    supportive of her interviewing for the lead role."

2              That's what you told Mr. Martin, correct?

3    A.  That is correct.

4    Q.  And then it says:  "Please assess the leadership VP level

5    and GCA competencies.  If you'd like to review a list of

6    questions, please see here."

7              Do you see that?

8    A.  I do.

9    Q.  Do you know whether Mr. Martin in fact did assess the

10   leadership and GCA competencies?

11   A.  That was his focus areas.

12   Q.  Do you know whether he reviewed a list of questions before

13   interviewing Ms. Rowe?

14   A.  I do not know if he clicked on that link.  He was an

15   experienced interviewer.

16   Q.  My question is do you know whether he in fact and in

17   preparation for Ms. Rowe's interview assessed those competences

18   or looked at a list of interview questions?

19             MS. TOMEZSKO:  Objection.  Asked and answered.

20             THE COURT:  I'll allow it.  Overruled.

21   A.  You're asking me if I had personal knowledge of a separate

22   human being going through that list of questions.  The answer

23   is no.  No, ma'am.

24             MS. GREENE:  OK.  Let's take that down, and let's go

25   now to the section on Ulku Rowe and call that out, please.

1   Q.  It says:  "Impression:  Executive poise, confident (but not

2   ego-driven) forthright with a quick operating cadence."

3          You wrote that, correct?

4   A.  I did.

5   Q.  And then "RRK," what does that stand for?

6   A.  It's role-related knowledge is what it stands for.

7   Q.  And under concerns you noted "no major concerns are noted,"

8   correct?

9   A.  That is correct.

10         MS. GREENE:  Let's take down that document.

11  Q.  Then, Mr. Vardaman, did you send the same sort of email to

12  each of Ms. Rowe's interviewers?

13  A.  Yes.

14  Q.  Now, in Ms. Rowe's case, none of the four interviewers

15  provided feedback into the gHire system, isn't that right?

16  A.  We'd sometimes receive feedback outside of gHire, but it

17  was not entered, to my knowledge, in the gHire system, correct.

18  Q.  So I just want to make sure it's clear.  It's a yes-or-no

19  question.  You know that none of the four interviewers provided

20  feedback into the gHire systems for Ms. Rowe, correct?

21  A.  I don't recall them having entered it the last time I saw

22  the system.

23  Q.  And you yourself did not make any notes, written notes or

24  typed notes, of any informal feedback you may have received

25  from interviewers, correct?

NACHRow6                          Vardaman - Direct

1    A.  I believe that's correct.

2    Q.  And you yourself did not do anything to document any

3    internal feedback you may have received, correct?

4    A.  That is correct.

5    Q.  And you didn't share any informal feedback you may have

6    received with Mr. Shaukat, isn't that right?

7    A.  I — I don't recall.  I don't think so.

8    Q.  And Mr. Shaukat didn't share with you any feedback that he

9    may have reviewed, correct?

10   A.  No.

11   Q.  No, that's not correct, or no, he didn't share that with

12   you?

13   A.  Sorry.  No, I don't recall him sharing that with me.

14   Q.  Did anybody tell you that they thought Ms. Rowe was

15   abrasive?

16   A.  No.

17   Q.  Did anyone tell you that they thought Ms. Rowe was

18   cantankerous?

19   A.  No.

20   Q.  Did anyone tell you that they thought Ms. Rowe was not

21   Googly?

22   A.  No.

23   Q.  Did anyone express to you that they had ego concerns about

24   Ms. Rowe?

25   A.  No, not that I recall.

NACHRow6                     Vardaman - Direct

1    Q.  Do you believe Ms. Rowe to be self-oriented?

2    A.  Not that I recall.

3    Q.  Did anyone communicate to you that they thought Ms. Rowe

4    was self-oriented?

5    A.  No, not that I recall.

6    Q.  And had Mr. Shaukat ever told you that he had gotten that

7    sort of feedback about Ms. Rowe?

8    A.  No, he wouldn't have shared something like that with me.

9    Q.  Let's look at Plaintiff's Exhibit 111.

10            Now, you're familiar with the Thrive system at Google,

11   correct?

12   A.  Yes, ma'am, I am.

13   Q.  And Thrive is another system that recruiters use at Google,

14   is that right?

15   A.  That is correct.

16            MS. GREENE:  Now, if we can go to the second page ——

17   actually, if you could go back to the first page, Mr. Yang.

18   Q.  You see where it says "related to" and then it says

19   "candidate information for Ulku Rowe"?  Do you see that?

20   A.  Yes, yes.

21   Q.  So this is a Thrive printout related to Ms. Rowe, is that

22   right?

23   A.  That is correct.

24            MS. GREENE:  Let's go to the second page of this

25   document, and if we can call out the financial services

1  vertical lead.

2  Q.   This is the vertical lead position for which you were the

3  recruiter, correct?

4  A.   That is correct.

5  Q.   And on January 7, 2019, the status moved to rejected due to

6  panel Googliness, correct?

7  A.   That is what it says.

8  Q.   And it says — has the following note:  "Across the board,

9  Ulku was viewed as overly self-oriented.  Recruiter expressed

10 she was not qualified for the role in addition to ego concerns.

11 The decision was made to run her through the full panel

12 anyway."

13          Do you see that?

14 A.   I do see that.

15 Q.   And that's what you wrote in Thrive on January 7, 2019,

16 correct?

17 A.   I believe I said I did not recall writing this.  Given that

18 my name is next to it, it's leading me to believe that I did

19 write that, and this is not my best work.

20 Q.   Now, this — if we can take that down for a second,

21 Mr. Yang.

22          This shows all of the positions for which Ms. Rowe has

23 been considered at Google, correct?

24 A.   Up until the date it was run, that is correct.

25 Q.   So any recruiter in the future would be able to look at

1   this and see the notes from her prior interactions with other

2   roles at Google, correct?

3   A.  Not any recruiter.  A very limited number of executive

4   recruiters.  They would have access to it, but whether or not

5   they were involved in process would come down to the hiring

6   manager, the decision-maker, for a given requisition.

7   Q.  One of the purposes of this document was to create a record

8   of past consideration for roles so that in the future someone

9   would be able to look back on it, correct?

10  A.  That is correct.

11  Q.  Now, you understood that Ms. Rowe was not ready for the

12  VP-level role, but a decision was made to run her through the

13  process anyway, correct?

14  A.  At which point in time?

15  Q.  At the time she was put into the process, there was an

16  understanding that she wasn't VP ready, but they were still

17  going to run her through the process, correct?

18  A.  I recall that being my perspective.

19  Q.  Now, as a side note, you were involved in recruiting

20  Mr. Breslow too, weren't you?

21  A.  For a separate and distinct search, yes.

22  Q.  So Mr. Breslow was not recruited for the financial services

23  vertical lead position, correct?

24  A.  It was a managing director of compliance role, as I recall,

25  that is correct.

NACHRow6                    Vardaman - Direct

1   Q.  And that's a different position altogether?

2   A.  It is.

3   Q.  And Mr. Breslow was never interviewed in connection with

4   the financial services vertical lead role, correct?

5   A.  I can't speak to whether he was ever interviewed.  He did

6   not come through my process for this role at this juncture.

7   This role, again, was ultimately canceled.

8   Q.  Now, on January 22, 2020, you were interviewed by Google's

9   employee relations team in connection with Ms. Rowe's lawsuit,

10  correct?

11  A.  I had no idea what I was interviewing with ER for at the

12  time.  Looking back on it, yeah, I guess that's a fair

13  statement.

14  Q.  Well, you do recall speaking with employee relations in

15  January — January 22, 2020, correct?

16  A.  I recall it being early in 2020, yes, ma'am.

17  Q.  And the focus of those conversations were centered on

18  Ms. Rowe, correct?

19  A.  They were on a wide variety of topics, as I recall.

20  Q.  You were interviewed again a week later on January 29,

21  2020, correct?

22  A.  I think the second meeting was also in January, perhaps

23  early February.

24  Q.  And although you may not have known at the outset of the

25  meeting that it was about Ms. Rowe, the content of the

1    Q.  And you didn't make any notes of the alleged pings when

2    they came in, correct?

3    A.  That is correct.  When I receive feedback like that ——

4    again, it's not unusual to receive feedback outside the system

5    —— we direct our panel members to go to gHire and put it in the

6    system.

7    Q.  You didn't note in any of your weekly update charts to

8    Mr. Shaukat that you had gotten feedback from panelists via

9    ping, correct?

10   A.  I don't recall.

11   Q.  And you didn't tell him exactly what the feedback was that

12   you got either, correct?

13   A.  Like in a live conversation?

14   Q.  Well, you shared and you testified earlier that you didn't

15   share with Mr. Shaukat any feedback that you received.  Is that

16   still your testimony?

17   A.  I believe I said I didn't recall.

18   Q.  But more than a year later after those pings you say came

19   through, you were telling ER about the negative feedback that

20   you'd supposedly gotten from panelists via ping, right?

21   A.  I was telling them what I recalled from —— from those

22   pings, correct.

23           MS. GREENE:  If we can go to page 15, and if we can

24   pull out the first full bullet, "does anything stand out to

25   you"

NACHRow6                      Vardaman - Direct

1   Q.  So here, at the end of the interview, your second

2   interview, you were asked a general question:  "Does anything

3   stand out to you about financial services lead process that was

4   out of the ordinary or a flag, so to speak?"  You said:  "It

5   wasn't out of the ordinary.  I think he treats people well."

6         Talking about Mr. Shaukat there?

7   A.  Yes, I would have.

8   Q.  And you say:  "I recall by the time Ulku met with me, she

9   was bristly with me."

10        Is that what you told ER in response to their question

11  about whether anything else stood out for you?

12  A.  I believe that I said and I testified that I didn't recall,

13  again, using a word, that word or the previous words that

14  you've highlighted.  I was trying to convey that I felt

15  disrespected as a result of meeting with Ulku.

16  Q.  Did you note that anywhere besides in your conversation

17  with ER?

18  A.  Again, that's someone taking notes and synthesizing what

19  I'm saying.  And no, everything that I tried to document was

20  for the benefit of candidates.  I think you see that in the

21  prep note to panel members.

22  Q.  So, to be clear, when you felt disrespected by Ms. Rowe,

23  you didn't document that anywhere, correct?

24  A.  I don't — I don't recall.

25  Q.  You didn't make a complaint to HR, did you?

1    A.   Feeling disrespected, I don't believe, is protected, a

2    feeling.

3    Q.   You didn't tell Mr. Shaukat that you felt disrespected by

4    Ms. Rowe, did you?

5    A.   Again, I was trying to position Ms. Rowe in the best

6    possible light so that, as she went through panels, she had the

7    best possible chance to show up in the best possible way that

8    only she could do.

9    Q.   So did the fact that you felt disrespected by Ms. Rowe play

10   any part in how you considered Ms. Rowe's candidacy for the

11   financial services vertical lead position?

12   A.   Objectively, no, I don't think so.

13   Q.   Do you recall, when meeting with ER, referring to Ms. Rowe

14   as cantankerous?

15   A.   That's another one, no, I did not.  I do not recall.

16           MS. GREENE:  OK.  We can take this down.  Actually,

17   I'm sorry, Mr. Yang, if you can put that back up for one more

18   minute, and if we can go ahead back to the January 29 entry.

19   Q.   And if you can look on page 13, the section "So you were

20   involved in Stuart recruitment."  Do you see that?

21   A.   Yes, I do.

22           MS. GREENE:  OK.  Let's pull that out.

23   Q.   And this is discussing Stuart Breslow versus Ms. Rowe,

24   correct?

25   A.   I'm sorry.  Can you repeat that again.

1    Q.   The subject of discussion here with ER was about

2    Mr. Breslow and Ms. Rowe, correct?

3    A.   It looks like it was primarily about Mr. Breslow.

4              (Continued on next page)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1   BY MS. GREENE:

2   Q.  Okay.  And you told ER that Ms. Rowe's risk technology

3   group and not as broad as Stuart.  And then you said, coupled

4   with Ulku's cantankerous style further undermined her changes.

5   Is that supposed to be chances?

6   A.  I didn't take those notes.  You keep saying that I said

7   these things.  I don't recall using that word.  That was

8   someone else taking those notes.

9   Q.  Okay.  That's what ER wrote down in response to your

10  conversation with them; correct?

11  A.  I guess.

12          MS. GREENE:  Okay.  We can take that down, please.

13  Q.  Now, those notes we were just looking at were January 29th,

14  2022; correct?

15  A.  Was that the second date?

16  Q.  Yes.

17  A.  Okay.

18  Q.  You heard from Ms. Rowe less than a week after that

19  interview on February 4th, 2020; correct?

20  A.  I don't recall the specific dates.  Something tells me

21  you're about to show me something that will reinforce that

22  date.

23  Q.  Well, let's go to P-101.  And does this refresh your

24  recollection as to -- well, not refresh your recollection, but

25  do you see here that on February 1st, 2020, Ms. Rowe reached

1    out to you?

2    A.  February 4th, yes.  Yes, ma'am.

3    Q.  So this is less than a week after you just had your second

4    interview with ER about Ms. Rowe's consideration for the

5    financial services vertical lead position; correct?

6    A.  I believe you're drawing a line between two unrelated

7    events.

8    Q.  I'm simply asking about the timing.  This is less than a

9    week after the second of two interviews you had with ER;

10   correct?

11   A.  February 4th does strike me as later in time than January

12   29th.

13   Q.  Less than a week in time; correct?

14   A.  Correct.

15   Q.  And Ms. Rowe was reaching out about the VP financial

16   services sales position; correct?

17   A.  That is correct.

18   Q.  And you were the lead recruiter for that role; is that

19   right?

20   A.  That is correct.

21   Q.  And Kirsten Kliphouse was the hiring manager?

22   A.  She was indeed.

23   Q.  And in response to Ms. Rowe's request here, you sent her

24   the job description for that role; correct?

25   A.  Yes, I believe it was a draft at the time.

1  Q.  Now, you only had one conversation with Ms. Kliphouse about

2  Ms. Rowe; correct?

3  A.  I don't recall the specific number of conversations, I

4  really don't.

5  Q.  Well, do you recall having testified at your deposition

6  about a conversation you had with Ms. Kliphouse?

7  A.  I recall letting her know that Ulku is interested in the

8  role.  I do.

9  Q.  And do you recall saying that -- well, did you tell

10  Ms. Kliphouse that Ms. Rowe had contacted you?

11  A.  That probably came up by the time I was connecting -- and I

12  was connecting with Ms. Kliphouse regularly, or semi regularly.

13  I -- yes, at some point in time after Ulku reached out, I would

14  have surfaced that with the hiring manager, Ms. Kliphouse.

15  Q.  And Ms. Kliphouse confirmed that she and Ms. Rowe had had

16  coffee; isn't that right?

17  A.  As I recall, by the time I had reached out, Kirsten had

18  mentioned -- Ms. Kliphouse had mentioned that she had coffee

19  with Ulku; correct.

20  Q.  And as of the time of your deposition, that's the only

21  conversation you recalled having with Ms. Kliphouse about

22  Ms. Rowe; correct?

23  A.  I believe that's right.

24  Q.  Now, you had a call with Ms. Rowe eventually with respect

25  to this position; correct?

1    A.   Yes.

2    Q.   And that was later in February?

3    A.   Yes.

4    Q.   Now, in between the time that you sent Ms. Rowe the job

5    description and the videoconference you had with her -- was it

6    a videoconference?

7    A.   It was a videoconference.

8    Q.   You didn't do anything to find out about Ms. Rowe's

9    qualifications for this position; correct?

10   A.   That is correct.  I recall providing that testimony in the

11   deposition.

12   Q.   And you didn't do anything to find out about her

13   qualifications not just for this position, but at all; correct?

14   A.   It would have been relative to this specific position I was

15   working on.  No, I don't believe I had another conversation

16   with Ulku, no.  Ms. Rowe.

17   Q.   And you can't remember whether you even looked at her

18   LinkedIn profile between the time you sent her the financial

19   services sales -- VP sales financial services job description

20   and the time you told her she wasn't going to be considered;

21   isn't that right?

22   A.   As a matter of process, I am sure I looked at her LinkedIn

23   profile.  Ultimately, by the time I raised Ms. Rowe's candidacy

24   to Ms. Kliphouse, Ms. Kliphouse said they had met for coffee

25   and that she wanted me to focus on another candidate.

1   Q.  You didn't testify at your deposition about Ms. Kliphouse

2   telling you that she wanted to focus on another candidate, did

3   you?

4   A.  No, I did not.

5   Q.  So that's new testimony; correct?

6   A.  Yeah, I guess you can say that.

7   Q.  And do you recall me at your deposition asking you to tell

8   me everything about the conversation you had with

9   Ms. Kliphouse?

10  A.  Yes, ma'am.  "Everything" is quite big.

11  Q.  And do you recall me asking you at your deposition if you'd

12  had any other conversations about Ms. Rowe that you hadn't

13  testified to?  Do you recall me asking you that?

14  A.  I do.  I was quite nervous and ready to jump off the video.

15  Q.  Okay.  So you remember now today what you didn't remember

16  three years ago, when it was the same year in which this had

17  happened, is that what you're saying?

18  A.  Yes.

19  Q.  And when you were deposed in 2020, do you recall giving

20  testimony about whether you'd reviewed her LinkedIn profile?

21  A.  I don't recall.

22  Q.  So do you or do you not have a specific recollection of

23  even just looking at her LinkedIn profile before you had a

24  videoconference where you told her she wasn't going to be

25  considered?

1   A.  Again, as a matter of process, I would have looked at her

2   LinkedIn profile.  I do not have a specific recollection of

3   having done that for that search, no, ma'am.

4   Q.  Now, it would have been impossible for you to tell

5   Ms. Kliphouse anything about Ms. Rowe's qualifications or

6   experience or background or expertise or reputation or network

7   when you didn't know anything about those things yourself;

8   correct?

9   A.  I had assumed that Ms. Rowe was the best -- she was the

10  best possible person -- person, excuse me, to talk about her

11  background with the hiring manager.

12  Q.  Did you set up an interview for Ms. Rowe with

13  Ms. Kliphouse?

14  A.  No, I did not.

15  Q.  Did you set up a telephone conversation with Ms. Rowe and

16  Ms. Kliphouse?

17  A.  No, I did not.  Ms. Kliphouse, again, told me that she had

18  connected with Ulku over coffee.

19  Q.  Did she tell you how long that had lasted?

20  A.  I don't recall.

21  Q.  Did she tell you whether they discussed her qualifications?

22  A.  I don't recall.

23  Q.  But again, you weren't in a position to tell Ms. Kliphouse

24  anything because you didn't know anything about her

25  qualifications, experience, background, expertise, reputation,

1    network, anything; correct?

2    A.   When it comes to internal Googlers, my job is to take their

3    interest to the hiring manager and then go from there.

4    Q.   Do you recall testifying at your deposition that your basis

5    for determining that Ms. Rowe was not qualified to be

6    considered for the VP role was largely driven by her comparison

7    to external candidates?

8    A.   I believe so, yes.

9    Q.   You would agree, wouldn't you, that it would have been

10   impossible to do a fair comparison of Ms. Rowe to anyone if you

11   or Ms. Kliphouse did not know anything about Ms. Rowe's

12   experience or qualifications or background or expertise or

13   reputation or network; correct?

14   A.   I was told to focus on other candidates, and I did.

15             MS. GREENE:   No further questions.

16             THE COURT:   Ms. Williams, can we have some water for

17   the witness.

18   CROSS-EXAMINATION

19   BY MS. TOMEZSKO:

20   Q.   Good afternoon, Mr. Vardaman.

21   A.   Good afternoon.

22   Q.   Earlier Ms. Greene played some clips from your deposition.

23   Do you recall that?

24   A.   I do.

25   Q.   Is that your first time sitting for a deposition?

1    A.  It was.

2    Q.  And I think earlier you said you were nervous; is that

3    right?

4    A.  Very.

5    Q.  Are you nervous now?

6    A.  I am.

7    Q.  And you have mentioned previously that the trial date had

8    been moved, and the reason that you did not come was because

9    your kids were starting school; is that right?

10   A.  That's right.  I wasn't going to miss my kids' first week

11   of school.  And I saw that it moved.

12   Q.  Where do you live, Mr. Vardaman?

13   A.  Austin, Texas.

14   Q.  Would you have had to have traveled out of state to arrive

15   here during the first week of your kids' school?

16   A.  I would have, yes.

17   Q.  Are you still employed at Google?

18   A.  I am not.

19   Q.  When did you leave Google?

20   A.  It would have been January of 2022.

21   Q.  Earlier Ms. Greene played some testimony for you and asked

22   whether you knew anything about Ms. Rowe's background.  Do you

23   remember that testimony?

24   A.  I do.

25   Q.  Was that the only time Ms. Greene asked you that question

NADHRow1

1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x

3   ULKU ROWE,

4                   Plaintiff,

5             v.                          19 Civ. 8655 (JHR)

6   GOOGLE LLC,

7                   Defendant.            Trial

8   ------------------------------x
                                         New York, N.Y.
9                                        October 13, 2023
                                         9:30 a.m.
10
    Before:
11
                      HON. JENNIFER H. REARDEN,
12
                                         District Judge
13                                       –and a jury–

14                        APPEARANCES

15  OUTTEN & GOLDEN, LLP
         Attorneys for Plaintiff
16  BY:  CARA E. GREENE
         GREGORY S. CHIARELLO
17       SHIRA Z. GELFAND

18  PAUL HASTINGS LLP
         Attorneys for Defendant
19  BY:  KENNETH W. GAGE
         SARA B. TOMEZSKO
20
    Also Present:  Vincent Yang, Paralegal (Outten & Golden)
21                 Andrew Velazquez, Google Rep.
                   Jean Gutierrez, Paralegal (Paul Hastings)
22

23

24

25

NADVROW2                    Vardaman - Redirect

1   Q.  You don't call that out in this email though, do you?

2   A.  No, because she -- I believe I had already told her that it

3   was going to be a while.  And so my cadence in following up

4   with her, an external candidate, would be on probably a

5   three-to-four-week basis.

6   Q.  Just to be clear, you're saying it was your opinion she

7   wasn't viable, and that was based on a handful of short pings

8   that you received from some of the panelists; is that right?

9   A.  It's not my opinion.  Again, this is me trying to prompt

10  action.  And if you're asking if I took the information I

11  received via ping to formulate this exact sentence, then yes,

12  ma'am, that's a reasonable conclusion.

13  Q.  Well, Mr. Shaukat did decide that Ms. Rowe indeed was not

14  viable; correct?  That she was not a candidate going forward?

15  A.  I don't recall exactly when that was, but at some point I

16  recall Tariq mentioning -- Mr. Shaukat mentioning that he would

17  connect with Ms. Rowe.

18  Q.  And no additional feedback had come in before Mr. Shaukat

19  made that decision; correct?

20  A.  I recall Mr. Shaukat asking me to send an email to the

21  panel members to ask them to send email feedback to

22  Mr. Shaukat.

23  Q.  Mr. Shaukat didn't get any email feedback; correct?

24          MS. TOMEZSKO:  Objection.

25  Q.  Do you know whether Mr. Shaukat got any email feedback?

1            THE COURT:  I'll allow that.

2   A.   Sorry.

3   Q.   Do you know whether Mr. Shaukat got any email feedback?

4   A.   No, ma'am, I don't have access to Mr. Shaukat's email.

5   Q.   Let's take a moment to look at D-79.  And this is Yolande

6   Piazza's hiring packet?

7   A.   Yes, ma'am, that's what it looks like.

8   Q.   And what was her education status?

9   A.   As I recall, Ms. Piazza did not -- did not have an

10   undergraduate degree.

11   Q.   And so she obviously then didn't also have a graduate

12   degree; correct?

13   A.   I believe that's correct.

14   Q.   Okay.  And under work history, it notes that she spent 32

15   years progressing with the same company; correct?

16   A.   Yes, ma'am.

17   Q.   Let's go to the third page.

18            Do you see in the first full paragraph where it says:

19   "She will need support from a sales leader."

20            MS. GREENE:  If you can just highlight that line,

21   Vincent.

22   Q.   She will need support from a sales leader who comes from a

23   software sales background.

24            THE COURT:  Can you highlight that?

25   Q.   And we can certainly provide her with that resource.

1         Do you see that?

2    A.  Yes, I do.

3    Q.  Okay.  So Ms. Piazza didn't have a sales background;

4    correct?

5    A.  She was responsible for the sales organization in her job

6    as CEO of City Fintech, as I recall.

7    Q.  So she was going to have to get sales support from within

8    Google in order to be a candidate or considered for the role;

9    correct?

10   A.  It's not uncommon for an executive who joins Google to have

11   an area where they need additional support from the

12   organization.  As I recall, Ms. Kliphouse, given Yolande's

13   seniority and relationship, she was prepared to provide that to

14   her, yes, ma'am.

15         MS. GREENE:  Okay.  You can take that down.

16         THE WITNESS:  May I grab another water?

17         MS. GREENE:  Oh, please do.

18   Q.  I'm going to show you a document that is only for your

19   eyes; it's not to share with the jury at this time.

20   A.  And forgive me, the rules on this is that I can't read from

21   it but I can talk to it?

22   Q.  Correct.

23   A.  Okay.

24   Q.  I'm just going to ask you -- well, before we do that, do

25   you recall when Ms. Rowe reached out to you?  I think we saw

1  some emails earlier about the financial services sales role.

2  A.  I don't recall the specific date, no, ma'am.

3  Q.  Do you recall when you raised with Ms. Kliphouse Ms. Rowe's

4  candidacy?

5  A.  As I alluded to earlier, the *ad hoc* nature of working with

6  Ms. Kliphouse was -- it was just that, it was *ad hoc*; so I

7  can't say the exact date.

8  Q.  Would you ever initiate a meeting with her when a new

9  candidate arose?

10 A.  We tried to have a schedule whereby she thought and her

11 executive assistant thought that she had a reasonably good

12 chance of making the meeting.  If a customer meeting or

13 something else came up, an email from Thomas, it wasn't unusual

14 for that to get punted and to receive an email saying, Hey,

15 I'll call you later or something along those lines.

16 Q.  My question is a little different.  If in between your

17 conversations with Ms. Kliphouse you identified a new

18 candidate, someone that hadn't been discussed before, would you

19 raise that with her, Hey, we found this person outside or this

20 other, would you raise that with her proactively?

21 A.  Yes, that was part of providing the status on the search to

22 her.

23 Q.  Okay.  So as of February 5th, Ms. Rowe had raised with you

24 her interest in the role; correct?

25 A.  Again, the specific date — and I'm not looking at anything

1    possibility of Ms. Rowe's candidacy?

2               THE COURT:  Can you go back to the first page, please.

3    A.  If this document is two pages long, Ms. Rowe is not listed

4    on the document.  Am I allowed to say that?

5               MS. GREENE:  Actually, Mr. Yang, I believe there's

6    four pages.  Can we go through all four pages.

7               Okay.  So that's the totality of the document.

8    Q.  Had you, by February 7th, raised with Ms. Kliphouse the

9    fact that Ms. Rowe had asked to be considered for the role, had

10   raised her hand?

11   A.  She is not listed on this document.  That's all I can speak

12   to.

13   Q.  Okay.  Do you know whether as of February 14th, you had

14   alerted Ms. Kliphouse that Ms. Rowe was interested or might be

15   a prospect for the role?

16   A.  You're using specific dates, and I've said that I don't

17   recall the specific date.  I recall getting a live conversation

18   with Ms. Kliphouse where I mentioned Ms. Rowe, and that's how I

19   recall that she responded, that she had grabbed coffee with

20   Ms. Rowe.

21   Q.  If you had proactively alerted Ms. Kliphouse to Ms. Rowe's

22   candidacy, would it have shown up on the update list that you

23   created yourself?

24   A.  It depends on the last time that I updated this, taking

25   into account the other number of searches that I had open and

1   active at any given point in time.

2   Q.  So just to refresh your recollection, let's look at D-76.

3         MS. GREENE:  And if we can just slowly skim through

4   the document for the witness.

5         THE COURT:  This one you're also not going to read

6   from.

7         THE WITNESS:  Yes, ma'am.

8   Q.  Does that refresh your recollection as to whether as of

9   February 14th, you had raised with Ms. Kliphouse that Ms. Rowe

10  was either a prospect or a candidate for the position?

11  A.  I don't see her name on here.  It's possible there could be

12  another document that does have that.  I don't remember.

13  Q.  Now, Ms. Rowe had emailed you on February 10th, asking

14  about her candidacy; correct?

15  A.  I feel like you're going to show me something that's going

16  to reference February 10th; so again, on the outset, I don't

17  recall if it was February 10th.

18  Q.  Okay.  We've looked at P-106 before.  We can bring it up

19  again just to remind you of the dates here.

20  A.  Okay.

21        MS. GREENE:  Mr. Yang, can you bring up P-106.

22        And this is the email correspondence.  And if we can

23  go to the first page.  And we can go back in time to the first

24  email.  My apologies.

25  Q.  So February 4th, she reaches out.  February 5th, she

1   reaches out, you see.  February 10th, she's reached out to you;

2   correct?

3   A.  Yes, ma'am.

4   Q.  And you're not aware as of February 14th, having done

5   anything to let Ms. Kliphouse know that Ms. Rowe had been

6   reaching out and was interested and wanted to be considered for

7   the position; correct?

8   A.  No, I believe I said I don't recall when my conversation

9   with Ms. Kliphouse was.

10   Q.  Let's, if we can, go to -- well, let me ask you, do you

11   recall -- when was the first time that you alerted or even

12   thought to alert Ms. Kliphouse that Ms. Rowe was interested?

13         MS. TOMEZSKO:  Objection.  Asked and answered.

14         THE COURT:  Sustained.

15   Q.  Okay.  Let's turn to the first page of this document,

16   P-106.  So on February 20th, Ms. Rowe reaches out again to

17   check on updates; correct?

18   A.  February 20th.  Yes, yes, ma'am.

19   Q.  And you say:  Hi, Ulku.  Not yet.  We are trying to get on

20   Kirsten's calendar tomorrow.  Thank you.

21         Do you see that?

22   A.  I do.

23   Q.  Okay.  Now, do you recall if that caused you to do

24   something in terms of alerting Ms. Kliphouse that Ms. Rowe was

25   interested for the position?

NADVROW2                        Vardaman – Redirect

1   A.   It looks like we have a meeting, a scheduled meeting with

2   Kirsten the next day, February 21st.

3   Q.   And do you recall what you did in preparation for that

4   meeting?

5   A.   I may have updated a document.

6   Q.   Did you do anything with respect to identifying Ms. Rowe's

7   qualifications or her experience or talking with anyone

8   internally about Ms. Rowe or the work that she'd been doing?

9   Did you do anything of that nature?

10  A.   I believe I testified yesterday that I did not.

11                  (Continued on next page)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1   Q.  Now, was February 21 the first time you let Ms. Piazza know

2   that — I'm sorry, Ms. Kliphouse know that Ms. Rowe was

3   interested in the position?

4           MS. TOMEZSKO:  Objection.  Asked and answered.

5           THE COURT:  Sustained.

6   Q.  Do you recall whether February 21 was the date on which you

7   let Ms. Kliphouse know?

8           MS. TOMEZSKO:  Same objection.  Asked and answered.

9           THE COURT:  Sustained.

10  Q.  Let me show you a document to refresh your recollection,

11  D74, and this is just to refresh your own recollection.

12          Does this refresh your recollection as to whether on

13  February 25 you were alerting — I'm sorry, February 21 you

14  were alerting Ms. Kliphouse that Ms. Rowe had raised her hand

15  to be considered for the role?

16          MS. TOMEZSKO:  Same objection.  Asked and answered,

17  your Honor.

18          THE COURT:  I'll allow it now.

19  A.  I do see her name on this document, along with Tais

20  O'Dwyer.

21  Q.  How many other internal candidates were being considered at

22  that point in time?

23  A.  Is there another page?  It looks like that's a — OK.  It

24  looks like those two at that juncture.

25  Q.  That were being considered for the role?

1          MS. GREENE:  OK.  Well, we have not done it at this

2     point.  We would need, then, to go back to all of the other

3     documents that both parties have used and ——

4          MS. TOMEZSKO:  I'm certainly willing to stipulate to

5     that.  If you want to go through the documents, I will

6     absolutely stipulate to those that have been shown to the jury.

7          MS. GREENE:  Let's stipulate now that if it's shown to

8     the jury, it's moved into evidence.

9          MS. TOMEZSKO:  I'm willing to make that stipulation.

10          MS. GREENE:  OK.

11          THE COURT:  So it sounds like —— are you planning to

12     review it with Mr. Vardaman?

13          MS. TOMEZSKO:  Well, I would like to show the jury now

14     this document and just do a very brief redirect.

15          THE COURT:  So what we're going to do, you're going to

16     do a redirect, you'll indicate that you want to publish the

17     document, I assume you'll make your objection, I'll make my

18     ruling, and then we'll go from there.

19          MS. TOMEZSKO:  All right.

20          MS. GREENE:  Your Honor, if she's going to do it, I

21     may just bring it in now.

22          MS. TOMEZSKO:  OK.

23          THE COURT:  OK.

24          MS. TOMEZSKO:  I'd be fine with that.

25          THE COURT:  Let's do that.

1        (In open court; jurors present)

2   BY MS. GREENE:

3   Q.  Let's go ahead and look at D74.

4        Sir, these are your status reports, right?  This is

5   the status report you described?

6   A.  Yes, ma'am.

7   Q.  And the ones that you had looked at prior did not include

8   any mention of Ms. Rowe, correct?

9   A.  Nor of Tais O'Dwyer, as I recall.

10       MS. GREENE:  Is this published to the jury?  Let's go

11   ahead and publish this to the jury, please.  Now the jury has

12   it.

13  Q.  So this is as of February 21, and this is the first time

14  Ms. Rowe has shown up on the list of potential candidates,

15  correct?

16  A.  Internal candidates, Ms. Rowe and Ms. O'Dwyer are both

17  listed here for the first time, I believe.

18  Q.  Let's go through the second and third pages now.

19       So the second page has one, two, three, four, five,

20  six — seven candidates?  And then the eight, nine, ten, 11, 12

21  — 13 other individuals are listed here beyond Ms. Rowe and

22  Ms. Dwyer, correct?

23  A.  If that's the last page, yes, ma'am.

24  Q.  And with respect to Ms. Piazza — let's go back to the

25  prior page — she was still in the interviewing stage, correct?

NADHRow3                          Vardaman - Redirect

1   A.  It looks like she's being scheduled with Rob Henslin,

2   Mr. Henslin

3   Q.  And Ms. Neely was still in the interview stage, correct?

4   A.  Yes.  Looks like she's being scheduled with Ms. Kennedy.

5   Q.  And Mr. Alam and Mr. Trevisani both were having meetings

6   with Kirsten, correct?

7   A.  Those are question marks.

8   Q.  Then there's others like Mr. O'Malley who —— there's still,

9   I assume, a conversation about whether to have interviews with

10  them and things, correct?

11  A.  That seemed to be what's represented here, yes, ma'am.

12  Q.  So it's fair to say that as of February 21, 2020, there was

13  no selected candidate for this role, correct?

14  A.  Yes.  It looks like there are candidates of focus, and that

15  would be indicated by them starting to meet other Google

16  executives.

17  Q.  But no decision had been made as to who would get this

18  role, correct?

19  A.  As to who would get the role, no, that would come later.

20          MS. GREENE:  You can take that down.

21  Q.  Did you tell employee relations that you had felt dismissed

22  and disrespected and talked down to by Ms. Rowe because of your

23  level?

24  A.  I believe that's what I was trying to impart to employee

25  relations.

NADHRow5

```
 1   in.
 2              Now, are you using deposition designations with
 3   Mr. Grannis?
 4              MR. GAGE:  I presume —— if he contradicts himself
 5   only, I assume.
 6              THE COURT:  Yes.
 7              MS. GREENE:  Thank you for answering for me, Mr. Gage.
 8              Your Honor, I would not be using depo designations
 9   that make reference to Ms. Bennett or the document.
10              THE COURT:  You cannot.
11              MS. GREENE:  Right.
12              THE COURT:  No deposition ——
13              MS. GREENE:  No, I won't.
14              THE COURT:  —— about this document.
15              MS. GREENE:  I'm not going to.  No, your Honor.  I
16   understand.
17              THE COURT:  All right.  Ms. Williams, can we bring the
18   jury in, please.
19              Yes, Mr. Grannis.
20              MR. GAGE:  He's right out in the hallway, so we'll get
21   him in.
22              THE COURT:  OK.
23              (Continued on next page)
24
25
```

1          (Jury present)

2     WILLIAM GRANNIS, resumed.

3     DIRECT EXAMINATION CONTINUED

4     BY MS. GREENE:

5     Q.   Hello again, Mr. Grannis.

6     A.   Hello.

7     Q.   We were talking about the levels of the men in OCTO before

8     the break.  Do you recall that and whether you had considered

9     leveling any of them as a Level 8?

10    A.   Yes, we were talking about that, yes.

11    Q.   Do you recall whether you considered hiring Ms. Rowe as a

12    Level 9?

13    A.   I don't.

14    Q.   Now, you knew at the time of hiring that L8 and L9 had

15    different compensation models, correct?

16    A.   Yes.

17    Q.   And you knew that the salary range for L9s was higher than

18    the salary range for L8s, correct?

19    A.   That's not exactly true.  There are —— there are bands and

20    they overlap somewhat.  I know this because I've been both an

21    L8 and an L9 at Google.  So they're not —— there's not, like,

22    one that's a progression to the other.  There's a certain band

23    at which they will overlap.  So there are L8s, for example,

24    that make more than L9s.

25    Q.   Correct.  But my question was the salary range was higher

1  for an L9?

2  A.   The top of the range.

3  Q.   Than L8?

4  A.   The top of the range, yes.

5  Q.   So L8 would hit a limit on the salary?

6  A.   Right.

7  Q.   While an L9 would have additional room on their salary,

8  correct?

9  A.   Correct, the band would extend further, yes.

10 Q.   And the target bonus for L9s you knew was higher for L8s,

11 correct?

12 A.   Yes.

13 Q.   And it's 40 percent for L9s, correct?

14 A.   That sounds right.

15 Q.   And 30 percent for L8s?

16 A.   That sounds right too.

17 Q.   And the target is keyed off of what the salary is, correct?

18 A.   Yes.

19 Q.   So if an L9 has a higher salary by virtue of being an L9,

20 the bonus target is not only larger, the overall effect of the

21 target is larger by virtue of the larger salary, correct?

22 A.   Correct.  They're multiplied by each other, yes.

23 Q.   And you also understand and knew at that time that it's

24 easier to move from an L9 to an L10 than it would be to move

25 from an L8 to an L10, correct?

NADHRow5                    Grannis - Direct

1    A.  I had about a year into Google.  I didn't really have much

2    context for movement across levels.  I mean, I was an L8, so I

3    didn't really have much context for, you know, what a 9 or even

4    a 10, like, the path to that would be internally.

5    Q.  During this time that you were hiring, you were promoted to

6    L9, correct?

7    A.  No.  I was — I was an 8.

8    Q.  When were you promoted to L9?

9    A.  Probably like a year-and-a-halfish after I started.

10   Q.  It wasn't in 2017?

11   A.  No.  If it was, it would have been, like, middle or late

12   '17, so right about the time I was hiring people more senior to

13   me.

14   Q.  You did not move from L8 to L10, correct?

15   A.  Correct.

16   Q.  Are you aware of a single instance when someone has moved

17   from an L8 to an L10?

18   A.  No.

19   Q.  You are aware of instances where people have moved from L9

20   to L10, correct?

21   A.  Absolutely.

22   Q.  Now, you considered Ms. Rowe to be overall qualified for

23   the OCTO technical director position because she had both a

24   technical background and a financial services background,

25   correct?

NADHRow5                        Grannis - Direct

1    A.  Correct.

2    Q.  And if you date back to her first job in fintech before she

3    got her master's, she had been in the financial services tech

4    industry for 22 years by the time you were considering her,

5    correct?

6    A.  I'd have to look at her résumé again.  I don't know it as

7    well as you do, but that sounds right.  She had very deep

8    experience in financial services.

9    Q.  And the time that someone worked before they received an

10   advance degree is time that Google would include in looking at

11   their overall years of experience, correct?

12   A.  Yeah, I would assume that all experience that was relevant

13   would be considered.

14   Q.  And you knew that while she was getting her master's, she

15   was working for the National Center for Supercomputing

16   Applications?

17   A.  I don't remember that now, but sounds right.

18   Q.  Do you know what the National Center for Supercomputing

19   Applications is?

20   A.  That is — I think it's a University of Illinois advance

21   computing center, if I recall right, but I don't know much of

22   the details.  I never worked there.

23   Q.  Well, you understood that working for the National Center

24   for Supercomputing Applications was a technology-related job,

25   correct?

1    Q.  And so you had a conversation with her about the future and

2    where she might go in Google, correct?

3    A.  Yeah, absolutely.  I had all sorts of hypotheticals about

4    where — because the whole function — OCTO's function was

5    designed to be kind of like a place where people who weren't,

6    like, steeped in one area of technology or business, they could

7    come, they could be with a peer group, they'd expand their

8    skill set, and then that would create optionality for them

9    either internally or externally.

10   Q.  And you told her that if Google were to stand up a

11   financial services vertical, she would be a strong candidate

12   for that, correct?

13   A.  I don't know if I'd word it exactly like that, but we

14   definitely had a conversation about — because with her

15   background and the business was obviously going to verticalize

16   at some point.  We just didn't know when.  It didn't exist at

17   the time when, sorry, Ms. Rowe was asking me the question.  So,

18   yeah, I mean, I figured, if the business was going to

19   verticalize at some point in the future, being in OCTO would

20   certainly be, you know, a wise move in my opinion.

21   Q.  And you told her that when Google did stand up a financial

22   services vertical, she had a lot of qualifications to compete

23   for the role, correct?

24   A.  Well, first, there were no plans when she and I had this

25   conversation about a financial services vertical.  This was

1  based on my experience knowing that as companies get bigger,

2  especially tech companies, when they get bigger, they go from

3  kind of generally selling to everybody and they specialize.  So

4  they would specialize and they would stand up a manufacturing,

5  probably stand up an energy, probably stand up a financial

6  services vertical, but I couldn't make any guarantee at that

7  time because we didn't have them.

8  Q.  So let me qualify that.  You told her that if and when

9  Google stood up a financial services vertical she had a lot of

10 qualifications to compete, correct?

11 A.  She would definitely have qualifications to compete.

12 Q.  And in fact, you told people that if we're going to get

13 serious about financial services, Ulku is the type of person

14 who could really help us in the vertical, correct?

15 A.  Absolutely.

16 Q.  And you believed that, correct?

17 A.  I still do.

18 Q.  And that's something you expressed to Ms. Rowe as well,

19 correct?

20 A.  Yes, absolutely.

21 Q.  Now, you reviewed Ms. Rowe in every performance cycle from

22 2017 through mid-2022, correct?

23 A.  That sounds about right.  I'd have to double-check because

24 she has a different manager that covered about an 18-month time

25 frame from now, so maybe mid-'20.  That sounds about right.

1  Q.  And you rated her as exceeds expectations in every year you

2  reviewed her, correct?

3  A.  Correct.

4  Q.  And with respect to the other technical directors at

5  Level 9, those men, they didn't all get exceeds expectations

6  while they were reporting to you, did they?

7  A.  No, they did not.

8  Q.  In fact, you were thinking about putting together a

9  vertical lead team in your group, and you wanted to make her

10  the head of that group, correct?

11  A.  Yeah, that was very early on.  We were thinking about, you

12  know, what would it look like if we actually kind of clustered

13  up — so stepping back, I had, like, a bunch of direct reports.

14  By this point I had like 30 direct reports, and my number one

15  priority is success of everybody that joins our team.  It's a

16  very unusual group.

17          So we were putting together plans for how we would

18  cluster the team together.  We were looking at options like,

19  well, should we cluster by product area, by product knowledge,

20  but that really didn't represent the full breadth of our team

21  because we also hired people like Ms. Rowe and, you know, you

22  mentioned a bunch of them earlier that also had, like, their

23  super-strength was more of like a vertical area.  And based on

24  what I had seen from Ulku so far, you know, leadership, great

25  impact with — you know, outside in the market with customers

 1   and at events and with public policy, I thought she'd make a

 2   great lead for —— if we had a vertical organization in OCTO,

 3   thought she'd make a great lead.

 4   Q.  And you talked about that with Melissa Lawrence, your HR

 5   head, right?

 6   A.  Oh, I'm sure I talked to her about that, yeah.

 7   Q.  And you talked to Ms. Rowe about it as well, correct?

 8   A.  Probably.

 9   Q.  And you talked to some of the men in the vertical spaces

10   about it as well, correct?

11   A.  Probably.

12   Q.  And Mr. Eryurek and Mr. Wilson were two of the men who

13   would have moved under Ms. Rowe in that verticals group,

14   correct?

15   A.  Correct.

16   Q.  And they were both L9s, correct?

17   A.  Correct.

18   Q.  And so that meant a L9 —— well, let me ask you this:  That

19   would have resulted in a level inversion, correct?

20   A.  Correct.

21   Q.  And what's an inversion in this context?

22   A.  An inversion is when someone that reports to you is at a

23   higher level than you.

24   Q.  So in this case, two of the L9 men would have been

25   reporting to Ms. Rowe as an L8, correct?

NADHRow5                    Grannis - Direct

1    A.   Yes.

2    Q.   But even with that inversion, you and others believed she

3    was the best person for the role of that group leader, correct?

4    A.   Absolutely.  I mean, I was inverted.  So, you know, I know

5    that an inversion doesn't necessarily dictate the outcome.

6    Certainly, she had demonstrated the leadership to be able to do

7    it.

8    Q.   Mr. Grannis, in connection with the performance review

9    process, did you participate in any sessions to calibrate

10   ratings across your — across your group?

11   A.   Yeah, calibration was conducted across the team every

12   performance review period.

13   Q.   And did Melissa Lawrence participate in those calibration

14   meetings with you?

15   A.   Just trying to think back.  Probably.

16   Q.   And do you recall her taking any notes in those meetings?

17   A.   We had to enter — I think we had to enter — this is a

18   while back.  We had to enter notes in, like, a system that we

19   had, a tool, on ratings and justification for ratings.  That's

20   what I remember.

21        MS. GREENE:  I want you to put up a document just for

22   the witness, not yet for the jury.

23        THE COURT:  Which document is this?

24        MS. GREENE:  Oh, I'm sorry.  That would be helpful.

25   Plaintiff's 87.

1    Q.  Mr. Grannis, do you recognize what type of document this

2    is?

3    A.  Looks like calibration notes.

4    Q.  I want you to look through it, and we'll slowly page.  I

5    want you to tell me if, as a combination of who's mentioned in

6    this document and any other information, you can place this in

7    time.

8    A.  Well, it says 9/29 at the top.

9    Q.  I want to see if we can place it in a year.

10            And, Mr. Yang, if you can scroll through it slowly.

11            And, Mr. Grannis, if you can look to help us place

12   what year this might have been.

13            THE COURT:  Mr. Grannis, just to caution you not to

14   read anything from the document out loud.

15            THE WITNESS:  Oh, sorry.

16            THE COURT:  OK.

17            THE WITNESS:  Apologize.

18            THE COURT:  I don't know that you did that, but I'm

19   just letting you know now not to.

20            THE WITNESS:  Thank you.  I appreciate that.

21            MS. GREENE:  And if you can go to the next page,

22   Mr. Yang.  OK.  If you can go back to the first page.

23   BY MS. GREENE:

24   Q.  Are you able to place this in the 2017 time frame?

25   A.  I don't know if this is 2017 or early 2018.

1    A.  I do.

2    Q.  Q3 ratings?

3    A.  I do.

4    Q.  Because it's a spreadsheet, it's difficult maybe to

5    remember which one of these goes with which person, but you see

6    that two of your direct reports received consistently meets

7    expectations, correct?

8    A.  Yes, from what I remember of column 1 as it panned over,

9    yes, I think that's right.

10   Q.  And Ms. Rowe was not one of those, right?  She's one of the

11   ones that received exceeds expectations?

12   A.  If she was line 1 or 4 —— 2 or 4, yes.

13   Q.  OK.  Ms. Rowe is line 2.

14   A.  Yes.

15   Q.  I'm going to write that down so I remember it too.

16           Thank you.  Thank you, Mr. Yang.

17           If we move over and we keep moving to the right,

18   there's information about the model salary, the proposed

19   salary, correct?

20           I'd like us to go now all the way over to the right of

21   the document.  Keep going.  We're looking for the notes —— I'm

22   sorry.  Can you go back a little bit.  And maybe the easiest

23   way to do this is to do a search for the word "potential" so we

24   can find the right entry.  Thank you.

25           OK.  So this is a note, if we can hold it right there,

1   from Monday, November 20.  If we go way back, you were the

2   person associated with this.  I want to draw your attention to

3   where it says "Ulku has rapidly demonstrated L10-plus

4   potential."  Do you see that?

5   A.  I do.

6   Q.  Do you recall noting that in 2017 that Ulku has rapidly

7   demonstrated L10-plus potential?

8   A.  That sounds like something I would have said.

9   Q.  And you believed that to be the case, correct?

10  A.  Yeah.

11         MS. GREENE:  OK.  We can take that document down.

12  Q.  Now, in late 2017 Ms. Rowe raised concerns to you and

13  Ms. Lawrence about her level, correct?

14  A.  I don't remember.  I mean, 2017 — like in terms of placing

15  it as a timeline, I do know that she did express the concern.

16  I'm just not 100 percent sure of the exact timeline.  I

17  apologize.

18  Q.  Before she moved into Mr. Shaukat's organization, she had

19  raised a concern with you and Ms. Lawrence that she was

20  underleveled at 8, correct?

21  A.  She expressed a concern about her level, yes.

22  Q.  And you knew that she had learned that there were men in

23  her group that were leveled at 9?

24  A.  Yeah, as I mentioned earlier, it was a pretty transparent

25  group.

1    Q.  And she was frustrated about that, correct?

2    A.  Yes.

3    Q.  And do you recall Ms. Lawrence saying to her that there's

4    no process to revisiting level?

5    A.  I don't remember ── I don't remember a conversation like

6    that.

7    Q.  OK.  Let's look at Plaintiff's Exhibit 13.  I don't believe

8    there's an objection to this one.

9            Do you recognize Plaintiff's Exhibit 13 as an exchange

10   between you and Ms. Lawrence and between Ms. Lawrence and

11   Ms. Rowe?

12   A.  Yes.

13   Q.  In the bottom half is Ms. Rowe raising a concern about her

14   level, correct?

15   A.  Correct.

16   Q.  And Ms. Lawrence's response ── if we can call that out,

17   Mr. Yang ── "Unfortunately, as I relayed to you before the

18   holidays, there is no process to revisit leveling decisions

19   after hire."

20           Do you know whether that was a true statement?

21   A.  Which part?

22   Q.  That there is no process to revisit leveling decisions

23   after hire?

24   A.  At that time I have no idea if that was true or not.

25   Q.  Do you know whether there's a process to revisit leveling?

NAIHRow1

1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x

3   ULKU ROWE,

4            Plaintiff,

5        v.                  19 Civ. 8655 (JHR)

6   GOOGLE LLC,

7            Defendant.        Trial

8   ------------------------------x
                        New York, N.Y.
9                        October 18, 2023
                        8:50 a.m.
10

11  Before:

12             HON. JENNIFER H. REARDEN,

                        District Judge
13                       -and a jury-

14                  APPEARANCES

15  OUTTEN & GOLDEN, LLP
       Attorneys for Plaintiff
16  BY:  CARA E. GREENE
       GREGORY S. CHIARELLO
17     SHIRA Z. GELFAND

18  PAUL HASTINGS LLP
       Attorneys for Defendant
19  BY:  KENNETH W. GAGE
       SARA B. TOMEZSKO
20

    Also Present:  Vincent Yang, Paralegal (Outten & Golden)
21               Andrew Velazquez, Google Rep.
               Jean Gutierrez, Paralegal (Paul Hastings)
22

23

24

25

NAIVROW2                      Harteau - Direct

A.  Level 9.

Q.  When did you learn that you had been leveled as a Level 9?

A.  I don't recall specifically, but I'm sure that it came up
in the hiring process.

Q.  Now, did Google's decision to level you as a Level 9 in any
way impact your decision to accept the offer at Google?

A.  I wouldn't say so.  You know, going into Google, I didn't
really have an appreciation for the criticality or weight
placed on levels; that was just a piece of information that was
part of being hired.

Q.  If you had been told you would have been brought in as a
Level 8, would you still accept the job?

A.  I suspect I would have, but it's hard to say in retrospect.

Q.  Did anyone at Google explain to you why you had been
leveled as a Level 9?

A.  I don't remember any specific conversation about that.

Q.  Let's talk a little bit about the technical director role
itself.  What were the responsibilities of a technical director
in OCTO?

A.  So folks in the office of the CTO, we sort of split our
time in a couple of ways, one of which was representing Google
publicly.  So that would be speaking at conferences, that would
be engaging with key customers and prospects, that would be
sort of outbound communication.  Some of that was -- another
category of work was working internally within Google, like

1    within -- with Google engineering teams to try to bring more

2    of, like, a customer focus and empathy for customers to those

3    teams, like really be the conduit of what they need and to

4    those engineering teams.

5    Q.  And was there also a component that related to work with

6    customers?

7    A.  Yeah.  I had lumped that in with outbound work; but yes,

8    engaging directly with key customers and key prospects to

9    troubleshoot their Cloud experience in various ways.

10   Q.  Have you ever heard the work you described, meaning the

11   general description of your work described as three pillars or

12   three pillars used in association with that?

13   A.  Yes.  Absolutely.

14   Q.  Now, during your time as a technical director in OCTO, did

15   you have occasion to collaborate with other technical

16   directors?

17   A.  Occasionally.

18   Q.  And did that include Ms. Rowe?

19   A.  I don't think Ulku and I ever directly worked with each

20   other on a project.

21   Q.  In terms of your collaboration with other technical

22   directors, how did that take place?

23   A.  Yeah, I'm not sure if there's a general statement to be

24   made there.  But, you know, as an example, there were folks

25   that we hired into OCTO where we both worked together on a

NAIVROW2                    Harteau - Direct

1    specific customer.  I remember working with one of the other

2    office of the CTO members on Fitbit, for example.  And, you

3    know, we both brought different perspectives and strengths to

4    the conversation, but it was a collaboration.

5    Q.  And did technical directors within OCTO ever cover for each

6    other on other customer accounts?

7    A.  I'm sure we did in the course of normal stuff, business.

8    Q.  And technical directors had group meetings together?

9    A.  We did.  I mean, we operated as a team.  We had normal team

10   meetings, we reported status on our projects, we talked about,

11   you know, what was next in the queue, what the opportunities

12   were.

13   Q.  Mr. Harteau, is it correct that in August of 2018, you

14   started to manage a small team of technical directors within

15   OCTO?

16   A.  I couldn't speak to that specific date, but I did

17   transition into leading a team within OCTO.

18   Q.  And that was a group of around four to six technical

19   directors?

20   A.  It was a group of around four to six people.  Some were

21   technical directors, others had different roles and

22   classifications within Google.

23   Q.  Was Brian Steikes one of those technical directors?

24   A.  I believe Brian Steikes was one, yes.

25   Q.  And were you still performing your other technical director

1   functions, the three pillars we talked about while you were

2   managing that group?

3   A.  I was, yes.

4   Q.  Mr. Harteau, who were the other director-level technical

5   directors working in OCTO when you joined?

6   A.  I'm not sure I can produce an accurate list, but I

7   certainly remember working with Ben Wilson, Evren, Jonathan

8   Donaldson, and Ulku was there when I joined, as I remember.

9   Q.  And the individuals that you recall, did you know what

10   their level was?

11   A.  I didn't.

12   Q.  Did you have any belief as to what their level was?

13             MS. TOMEZSKO:  Objection.  Relevance.

14             THE COURT:  Sustained.

15   Q.  Well, did you know one way or the other what level they

16   were, whether Level 8 or Level 9?

17             MS. TOMEZSKO:  Objection.  Asked and answered.

18             THE COURT:  I'll allow it.

19   A.  I honestly don't recall.  In Google culture, like, there is

20   a lot of discussion of levels.  And I wouldn't -- it wouldn't

21   surprise me that I learned that over the course of the water

22   cooler conversation.  But I don't have any specific memory of

23   that now.

24   Q.  Okay.  Let's talk about Ms. Rowe a little bit.

25             Did you and Ms. Rowe have occasion to work together in

1  any capacity?

2  A.  I don't think we worked together directly.  The places

3  where I remember spending time with Ulku were there were

4  conferences that we both attended and spoke out and normal team

5  collaboration.  You know, we went to the same meetings, we

6  talked about the same stuff.

7          I think Ulku and I probably talked a little bit more

8  than some of the other folks, as we were the two -- two folks

9  stationed in New York City.

10  Q.  And did you have an opportunity to observe the work that

11  she did separate from that?

12  A.  I would say I observed some of her work.  I don't think it

13  was exhaustive, but certainly some.

14  Q.  From what you were able to observe on a day-to-day basis,

15  how did her work compare with yours?

16  A.  Similar.  You know, we were doing the same sort of work in

17  the same sort of circumstances.

18  Q.  You and Ms. Rowe both worked with customers?

19  A.  Correct.

20  Q.  And you and Ms. Rowe both worked with engineering and

21  project management teams?

22  A.  Correct.

23  Q.  And both of you engaged in thought leadership on behalf of

24  Google?

25  A.  Correct.

1   Q.  Both of you did public speaking?

2   A.  Yes.

3   Q.  Based on your interactions and your observations of

4   Ms. Rowe, how knowledgeable was she with respect to Cloud and

5   its relationship to financial services?

6   A.  She seemed quite knowledgeable.  I am not an expert in that

7   myself, so, you know, I wouldn't be the authority on that.  But

8   she seemed as knowledgeable as the rest of us were and our

9   specialties.

10  Q.  Mr. Harteau, part of the technical director role was to

11  work with and gain support from the engineering teams; is that

12  correct?

13  A.  That's correct.

14  Q.  And in your observation, how successful were the technical

15  directors with whom you worked in getting the engineering teams

16  invested in their projects?

17  A.  I think that was one of the harder parts of the job.  And I

18  think we all struggled with that -- that aspect of it.

19  Q.  Would you say that's a struggle that all the technical

20  directors shared?

21          MS. TOMEZSKO:  Objection.  Foundation.

22          THE COURT:  Can you rephrase please.

23  Q.  In your observation, was that an issue that all the

24  technical directors you observed had?

25  A.  Can you ask that again?  Sorry.

1   Q.  Among the technical directors with whom you worked, was

2   there anyone that did not struggle to gain traction with the

3   engineering teams?

4   A.  In my observation, I think we -- you know, we all struggled

5   with that at various times.  You know, it was -- it was a tough

6   part of the job.

7   Q.  Did you have a good working relationship with Ms. Rowe?

8   A.  I did.

9   Q.  Did she treat you with respect?

10  A.  She did.

11  Q.  Did she ever talk down to you?

12  A.  Not at all.

13  Q.  Did you ever find her to be abrasive?

14  A.  No.

15  Q.  Ever find her to be cantankerous?

16  A.  No.  That might be one cantankerous person to another, but

17  no.

18  Q.  Ever find her to be bristly?

19  A.  No.

20  Q.  How about egocentric?

21  A.  No.

22  Q.  From your vantage, from your observation, how did Ms. Rowe

23  treat others within OCTO?

24  A.  Like colleagues, like peers, with respect.

25  Q.  While you were at Google, Mr. Harteau, did you know what

1   "A.   Correct.

2   "Q.   Were you upset that you weren't considered for the

3   position?

4   "A.   Yes, I was disappointed.

5   "Q.   Did you know that the position was being considered prior

6   to learning that the position had already been filled?

7   "A.   Yes.  Yes, I was aware.

8   "Q.   Do you know whether you were considered at all for the

9   position?

10  "A.   That's completely unclear to me.

11  "Q.   Did you discuss either your consideration or lack of

12  consideration for that role with anyone?

13  "A.   Yes.

14  "Q.   With whom did you discuss it?

15  "A.   Both Will Grannis and Tariq.

16  "Q.   What did you discuss with Will Grannis?

17  "A.   Was there an opportunity for me to have that role in

18  leading that vertical.

19  "Q.   When was that conversation?

20  "A.   I don't recall.

21  "Q.   Was it before or after Darryl was announced as the new

22  head?

23  "A.   Before.

24  "Q.   And what did Mr. Grannis say to you?

25  "A.   I — I — I can't remember precisely.

NAIHRow3                          "Wilson"

1    "Q.  Do you remember anything about what he said to you?

2    "A.  He said it was not likely I'd become the head of the

3    vertical, as they were looking for another persona of a person

4    than who I was.  Also that Tariq was a different leader than ——

5    than others, and he had his ideas of who he wants in that role.

6    And he looked at myself as a technical person who should stay

7    technical rather than going and leading the vertical.  That's

8    the best of my recollection.

9    "Q.  Was Ms. Rowe the one who had experience in financial

10   services?

11   "A.  Yes.

12   "Q.  Was she operating as the person in OCTO with

13   responsibilities as to the financial services vertical?

14   "A.  Yes.

15   "Q.  And so was she essentially sort of your corollary for

16   financial services?

17   "A.  Yes.

18   "Q.  Did Mr. Eryurek have any particular vertical experience in

19   any particular vertical, I should say?

20   "A.  Yes.  He was the CTO of the GE medical.  So he was in the

21   medical vertical, as I was CTO of GE Oil & Gas.

22   "Q.  And so was he your corollary with respect to the medical

23   vertical?

24   "A.  Yes.

25   "Q.  Were there any other individuals in OCTO who had those

NAIHRow3                          "Wilson"

1  similar types of responsibilities with respect to a vertical

2  besides you, Ms. Rowe, and Mr. Eryurek?

3  "A.  I can't remember his name.  I apologize.  You must have

4  it.

5  "Q.  Jeff Kember?

6  "A.  Yes, Jeff Kember.

7  "Q.  We're going to put up Plaintiff's Exhibit 144.

8          "Did you receive a sign-on bonus of $75,000, is that

9  right?

10  "A.  Yes.

11  "Q.  That's $75,000, was it representative of anything in

12  particular?

13  "A.  I think giving up some of the optionality I had back in

14  P2, I think that was what that was supposed to represent.

15  "Q.  OK.  And under equity compensation, it says you will be

16  granted 3,000 restricted stock units.  Do you see that?

17  "A.  Uh-huh.

18  "Q.  Were you granted those 3,000 stock units?

19  "A.  Yes.

20  "Q.  And the time you were hired, was the value of those stock

21  units approximately $2.5 million?

22  "A.  I do not know.  I would have to go and look and do the

23  math.

24  "Q.  Do you recall whether you had an understanding about what

25  those stock units were worth?

NAIHRow3                          "Wilson"

1   knowing what level you were was important for the career

2   ladder.  So you had to know whether you were an 8 or 9, so I

3   had to go and find that out.

4   "Q.  So you had already started to work at Google when you

5   learned what your level was?

6   "A.  Correct.

7   "Q.  And who did you ask what your level was?

8   "A.  I didn't.  I went and looked it up in Workday.

9           "And I'm so sorry.  I continue not to speak clearly.

10   I will do better.  Thank you.

11   "Q.  And at that point in time, you learned you were an L9?

12   "A.  Correct.

13   "Q.  And so is it true that you did not ask to be a L9?

14   "A.  I'm not sure how to answer.  I never asked the question:

15   Please can you make me an L9?  I never asked that questions.

16   "Q.  Have you ever asked any questions prior to joining Google

17   with respect to what your ladder would be or should be?

18   "A.  No.  I did not understand the ladder concept, and I did

19   not understand that concept until probably nine months in.

20   "Q.  At any point in time, did anyone tell you what factors or

21   criteria the company had considered in deciding what your level

22   would be at the time of hire?

23   "A.  My understanding was they were looking for people who

24   understood cloud, understood how to migrate customers to the

25   cloud, understood technology well, and could speak to

NAIHRow3                           "Wilson"

1  executives and other customers.  That's what I understood they

2  were looking for.

3  "Q.  Did anyone explain to you specifically with respect to

4  what level you would be what factors or criteria beyond that

5  they were considering?

6  "A.  No.

7  "Q.  Did anyone at any point in time tell you that your level

8  was dictated by your years of industry experience?

9  "A.  No.

10  "Q.  At any point in time in describing for you what

11  experience, etc., needed to be in the office of the CTO, did

12  anyone mention to you levels?

13  "A.  Never.  Levels — levels were never discussed.

14  "Q.  During the time that you were in the office of the CTO,

15  did you ever work with Ms. Rowe?

16  "A.  Yes.

17  "Q.  In what capacity did you have a chance to work with her?

18  "A.  Just things on, like, presentations, and so forth.  If I

19  was giving a presentation, I would look for her advice on,

20  like, what she's presented.  She was a prolific presenter on

21  behalf of Google.  I was not.  So I looked to her on kind of

22  like what she presented on and how she did it and what were the

23  things Google was looking for for us to present on.

24  "Q.  What was your understanding of what Ms. Rowe's role was at

25  the time when you were both in the CTO?

NAIHRow3                         "Wilson"

1    "A.   Same as mine but for the financial vertical.

2    "Q.   What was your understanding of her background?

3    "A.   A deep financial services background working with C-level

4    executives, go and build out financial products customers would

5    use.

6    "Q.   Do you know how many years of financial services industry

7    experience she had?

8    "A.   No.

9    "Q.   Was that something that was kind of a topic of discussion

10   in OCTO, the number of years of experience that people had?

11   "A.   Not as far as I knew.

12   "Q.   During the time when you had the opportunity to interact

13   with Ms. Rowe, did you find her to be professional?

14   "A.   Yes.

15   "Q.   Did you find her to be knowledgeable?

16   "A.   Yes.

17   "Q.   Did you find her to be knowledgeable with respect to

18   financial services?

19   "A.   Yes.

20   "Q.   Did you find her knowledgeable with respect to

21   engineering?

22   "A.   Yes.

23   "Q.   Did you find her knowledgeable with respect to project

24   management?

25   "A.   Yes.

NAIHRow3                          "Wilson"

1    "Q.  Did you personally have any criticisms of her performance?

2    "A.  No.

3    "Q.  Did you ever hear anyone else express any criticisms of

4    her performance?

5    "A.  No.

6    "Q.  Now, you had mentioned earlier you had a discussion with

7    her about leveling at some point in time, is that correct?

8    "A.  I'm not sure if I said that earlier, but, yes, at one

9    point in time, she and I had had a discussion around what

10   levels we were.  Yes, that is correct.

11   "Q.  Did you tell her that you were a Level 9?

12   "A.  Yes, I did.

13   "Q.  Did she seem surprised to hear that?

14   "A.  Yeah.  I know her well enough to know that she was

15   surprised, yes.

16   "Q.  Did she say anything to you about that, about you being a

17   Level 9?

18   "A.  Yes.  She asked why I would be a Level 9 and she would be

19   a Level 8.

20   "Q.  Do you recall what you said?

21   "A.  I —— I was not involved in the hiring process, so I really

22   don't know.  I also recall I said something to the effect that

23   I'd been a CTO of a $5 billion software company and that I've

24   had some very kind of deep experiences in cloud.  I said having

25   had the CTO title seems to matter something inside Google for

NAIHRow3                          "Wilson"

1   depending on levels.  It's a leveling guide that allows you to

2   understand how you should be seen from a —— an expectations

3   perspective.

4   "Q.  So in that email, Ms. Lawrence is referencing the eng

5   leveling guide as a version of this.  Did you understand the

6   version of this to be what she is referencing?

7   "A.  To be clear, this is the 2020 version.  There were other

8   versions that were newer.  I believe that this —— looking at

9   this doc that I'm familiar with is —— it appears to be

10  substantially the same.

11  "Q.  How long were you in your role OCTO?

12  "A.  They probably have a better record than I did.  Eighteen,

13  20 months.

14  "Q.  And again, just for purposes of the record, during the

15  time that you were in OCTO, did you have the same role for the

16  entirety of that time?

17  "A.  Yes.

18  "Q.  And what were your day-to-day responsibilities in that

19  position?

20  "A.  Go help customers adopt cloud, go help partners adopt

21  cloud.

22          "I am so sorry.  Go and help customers adopt cloud; go

23  and help partners adopt cloud; at Google Cloud, figure out what

24  new products need to be built; and for about three months I

25  worked on M&A work, M&A being mergers and acquisitions.

NAIHRow3                          "Wilson"

1   "Q.  Have you ever heard your role in OCTO described as having

2   three pillars?

3   A.  Well, tell me the pillars, and I might be able to tell you.

4   I — I — I think yes.  I — I don't really recall what the

5   pillars were.  Like, one is service to the customers, of

6   course.  One is building new products, which is — was

7   something else that kind of came up, but — I recall three

8   pillars, but I don't recall their names.

9   "Q.  OK. Was one customer-related work?

10  "A.  Yes.

11  "Q.  Was one influencing the platform and product?

12  "A.  Yes, that was the second one I mentioned.

13  "Q.  And was one speaking and evangelism?

14  "A.  Yes.

15  "Q.  Did the role require or involve engaging with other teams

16  across Google?

17  "A.  Yes.

18  "Q.  Was that true of all the technical directors in OCTO?

19  "A.  Yes.

20  "Q.  What were the other teams with which you would engage?

21  "A.  So technical account management, customer engineers,

22  product managers, product engineering support.  I mean, a lot

23  of the rest of Google Cloud.

24  "Q.  And were the other technical directors in OCTO engaging

25  with those same sort of teams?

NAIHRow3                          "Wilson"

1    "A.   The ones I associated with and I knew their work, yes.

2    "Q.   And the ones you associated and knew their work, those are

3    the ones you've mentioned in previous answers?

4    "A.   Yes.  I mean, Christopher, Jonathan, Jen, Paul —— yeah,

5    all —— all of those.  Evren, Ulku, yes.

6    "Q.   With respect to leveling, did you know the reasons for

7    anyone's levels in OCTO?

8    "A.   No.

9    "Q.   Did there come a time where you met with Mr. Shaukat

10   regarding the move?

11   "A.   Eventually, there was a meeting with Tariq, yes.

12   "Q.   And who was in the meeting with Tariq?

13   "A.   I —— I —— I just don't recall.  It was not a —— it was a

14   little bit of a hastily put together meeting, so I just don't

15   recall all the details around it.

16   "Q.   And what do you recall being said in that meeting?

17   "A.   Our roles hadn't really changed, and, you know, the

18   expectation we were —— were going to continue to go work with

19   our customers and, you know, nothing —— almost like nothing

20   changed is kind of the way I walked away from the meeting.

21   "Q.   Were you told that your titles would be changing?

22   "A.   There was some mention of a new —— of a new title.  There

23   was no —— you know, in Google there is the technical solutions

24   consultant titles, but the titles that they had —— and I just

25   don't recall exactly what they were —— were new, but they were

NAIHRow3                          "Wilson"

1  | same time.
2  | "Q.  What about Paul Strong?
3  | "A.  Yes, he was there too.
4  | "Q.  And by ——
5  | "A.  And he is there.
6  | "Q.  And by Jonathan, were you referring to Jonathan Donaldson?
7  | "A.  Yes.
8  | "Q.  And does Ben refer to Ben Wilson?
9  | "A.  Yes.
10 | "Q.  Who did you report to in your position as technical
11 | director?
12 | "A.  Will.
13 | "Q.  And that's Will Grannis?
14 | "A.  Yes.
15 | "Q.  Did you have, I think you mentioned earlier, staff
16 | meetings or team meetings with Will Grannis?
17 | "A.  Yes.
18 | "Q.  Who else participated in those team meetings with you?
19 | "A.  Everyone.
20 | "Q.  All the other technical directors?
21 | "A.  The entire OCTO team.  We were very inclusive.
22 | "Q.  Going back to your other prior experience, in what roles
23 | did you work in cloud-based technology?
24 | "A.  In GE HealthCare, I was the cloud's champion for the
25 | health care industry, and I had to put solutions on both

NAIHRow3                    "Wilson"

1  issues.  And in my last releases of what we call GE Health

2  Cloud, it was on AWS, and so I used both of them.

3  "Q.  So how many years of experience had you had with

4  cloud-based technology at the time you joined Google?

5  "A.  As an evangelist, probably eight years or so easily.  And

6  I had managed and deployed my solutions, either on my own cloud

7  data centers or somebody else's cloud data centers.  So

8  hands-on experience goes back to my GE Transportation days, so

9  from 2005 to now.

10  "Q.  OK.  So going back to the discussion of your role in OCTO,

11  who did you consider to be your peers in OCTO?

12  "A.  Everyone was a peer.

13  "Q.  With respect to —— let me ask you this:  Who amongst the

14  other people in OCTO were performing similar roles to what you

15  were?

16  "A.  Just about everyone.

17  "Q.  Does that include Ms. Rowe?

18  "A.  Yes.

19  "Q.  With respect to the other technical directors in OCTO,

20  would directors collaborate with each other?

21  "A.  Yes.

22  "Q.  In what ways?

23  "A.  Sometimes I needed help, they would come in.  Sometimes

24  they had deeper knowledge in some specific area like

25  networking, and I would call Brian, and what have you.

NAIHRow3                         "Wilson"

1   "Q.  Would directors ever fill in for each other on speaking

2   engagements?

3   "A.  Constantly.

4   "Q.  What about with respect to client engagements?  Would one

5   director ever assist another director with a client engagement

6   or substitute for a director for a client engagement?

7   "A.  All the time.

8   "Q.  At the time the other technical directors were hired, do

9   you know the levels of the other technical directors?

10  "A.  No.

11  "Q.  Did you participate in the hiring process for other

12  technical directors?

13  "A.  Only as an interviewer.

14  "Q.  With respect to any of the people you interviewed, were

15  you asked to evaluate whether they should be hired as a Level 8

16  or a Level 9?

17  "A.  No.

18  "Q.  Did you evaluate whether they should be hired as a Level 8

19  or a Level 9?

20  "A.  No.

21  "Q.  Was that something you were thinking about at all at the

22  time ——

23  "A.  No.

24  "Q.  —— that you were interviewing them?

25  "A.  No.

NAIHRow3                              "Wilson"

1    "Q.  Were you provided any criteria with which to evaluate

2    whether they should be a Level 8 or a Level 9?

3    "A.  No.

4    "Q.  Were you provided with any factors to consider in the

5    interview process to allow anyone else to evaluate whether they

6    should be a Level 8 or a Level 9?

7    "A.  No.

8    "Q.  With respect to the other technical directors, did you

9    know any of their levels?

10   "A.  Not unless if they volunteered, and I never asked.

11   "Q.  So during the time you were in OCTO, you did not know the

12   levels of most of the other technical directors?

13   "A.  No, I didn't, and I didn't care.

14   "Q.  Are you familiar with the term 'verticals'?

15   "A.  Oh, yes.

16   "Q.  As that term is used as Google?

17   "A.  Yes.

18   "Q.  What do you understand 'verticals' to mean?

19   "A.  Industry verticals.

20   "Q.  And at the time you were being recruited, were there any

21   discussions around what your role would look like with respect

22   to the verticals?

23   "A.  No.

24   "Q.  Was there any talk about verticalization at that time?

25   "A.  No.

NAIVROW4                          "Eryurek"

1    "A.  Yes.  Compared to my years of experience, what I've done

2    and so forth, I'm sure she knew how senior I was from about the

3    conversation, so --

4    "Q.  But that was just your --

5    "A.  Personal, personal engagements with her as a friend.

6    "Q.  Right.  And that was just your opinion about why that

7    might be?  You didn't know that to be the reason for why those

8    levels were different?

9    "A.  Yes.

10   "Q.  Correct?

11   "A.  Yes.

12   "Q.  Okay.  At some point in time while you were in OCTO, did

13   you learn that Will Grannis was considering a reorganization of

14   the groups or the people that reported to him?

15   "A.  Yes.

16   "Q.  And did you hear anything about a creation of a vertical

17   group underneath him?

18   "A.  Yes.

19   "Q.  And did you hear that they had identified Ms. Rowe as a

20   potential leader of that group?

21   "A.  Yes.

22   "Q.  And what was discussed with you about that or what did you

23   hear?

24   "A.  That they were contemplating should we do it this way and

25   that and so forth.

NAIVROW4                          "Eryurek"

1    "Q.  Anything you recall about Ms. Rowe in particular being

2    discussed in connection with the creation of that vertical

3    group?

4    "A.  No.

5    "Q.  Did you have any concerns about having Ms. Rowe as the

6    head of that group?

7    "A.  No.

8    "Q.  At that point in time, did you know what her level was?

9    "A.  No, I don't believe so.

10   "Q.  In your role in OCTO, what were your day-to-day

11   responsibilities?  Let's focus on the 2017 time frame.

12   "A.  We had some preliminary customers in various verticals,

13   and I sponsored a few large ones, including Walmart, Bank of

14   Canada, and a few healthcare programs.  And I also helped GCP's

15   kind of horizontal capabilities that they really needed some

16   help on PM leadership.  And I was also helping on the data

17   analytic side a little bit, which was a -- which ended up being

18   my area of focus.

19   "Q.  Did you ever hear anyone describe your position in OCTO as

20   having three pillars?

21   "A.  Three pillars.  Can you explain what the three pillars

22   are?

23   "Q.  Yes.  The first is customer work, the second is

24   influencing the platform and the product, and the third is

25   speaking and evangelism.

1    "A.   Yeah.  Yes, that's essentially what we did.

2    "Q.   Okay.  At any point in time, did you move into Tariq

3    Shaukat's organization?

4    "A.   Very briefly, yes.

5    "Q.   And when did you learn that you were leaving OCTO?

6    "A.   I think it was 2018.  Again, like the dates always blur in

7    my head, but I was on -- going on a vacation, I think, in the

8    summer that this was going to happen.  You know, we had heard

9    about it, but we didn't know how.  And actually I made it very

10   clear that I wouldn't and -- but I wasn't given an opportunity

11   to even opt out or anything.  So this happened.  But I had

12   something else going on already.  So it happens.

13   "Q.   How long did you actually function under Mr. Shaukat or in

14   his organization?

15   "A.   Don't know exactly, but weeks.

16   "Q.   Had Ms. Rowe expressed anything to you with respect to

17   Mr. Shaukat's treatment of her?

18   "A.   Yes.

19   "Q.   What did she express to you?

20   "A.   That she was frustrated, she wasn't getting any -- she

21   wasn't being included and that kind of stuff.

22   "Q.   Anything else you recall her expressing to you?

23   "A.   That she thought she should be considered for the role of

24   the vertical lead, and I encouraged her.

25   "Q.   Did you discuss Ms. Rowe's consideration for the vertical

NAIVROW4                         "Eryurek"

1   lead portion with anyone other than Ms. Rowe?

2   "A.  I don't recall.  Maybe Ben, because we were very close.

3   The three of us were very close.

4   "Q.  Is there anything else you recall discussing with Ms. Rowe

5   with respect to the vertical lead role?

6   "A.  The application and interview process and so forth.

7   "Q.  Did she ever express that she felt she wasn't being given

8   fair consideration for the role?

9   "A.  Yes.

10  "Q.  What did she say with respect to that?

11  "A.  That to her knowledge, her being put through the interview

12  process was done not appropriately, if you will.  I don't know

13  what the right type words were, but she wasn't happy with it

14  and it only happened because she requested.

15  "Q.  Did she say anything else with respect to Mr. Shaukat and

16  her consideration for the lead role?

17  "A.  I believe we had a conversation that she had heard that

18  Tariq wants to bring VP-level person from into -- into the role

19  from outside, inside, I'm not sure where, but that was the

20  focus and that was it, I believe.

21  "Q.  What did you know about Nick Harteau's background?

22  "A.  That he was an engineering director at Spotify, which was

23  a customer of mine, and very good -- very capable guy.

24  "Q.  Do you know what his level was during the time he was in

25  OCTO?

NAJVROW1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------x

ULKU ROWE,

                    Plaintiff,

            v.                              19 Civ. 8655 (JHR)

GOOGLE LLC,

                    Defendant.              Trial

------------------------------x

                                            New York, N.Y.
                                            October 19, 2023
                                            8:57 a.m.

Before:

                    HON. JENNIFER H. REARDEN,

                                            District Judge
                                            -and a jury-

                            APPEARANCES

OUTTEN & GOLDEN, LLP
     Attorneys for Plaintiff
BY:  CARA E. GREENE
     GREGORY S. CHIARELLO
     SHIRA Z. GELFAND

PAUL HASTINGS LLP
     Attorneys for Defendant
BY:  KENNETH W. GAGE
     SARA B. TOMEZSKO

Also Present:  Vincent Yang, Paralegal (Outten & Golden)
               Andrew Velazquez, Google Rep.
               Jean Gutierrez, Paralegal (Paul Hastings)

NAJVROW1

because the conversation in which Mr. Vardaman told Ms. Rowe
that she "wasn't going to be considered because she wasn't a
good fit," occurred within just one week of February 21st,
2020, when the latest of the four status reports, D-74, was
created.  Plaintiff also contrasts Mr. Vardaman's deposition
testimony that he did not create updates for Ms. Kliphouse
related to the FSVL role, and that whatever he may have created
was "much more *ad hoc*" with his trial testimony that he created
these status reports and updated them continuously to keep
track of the VP financial services sales search in preparation
for his meetings with Ms. Kliphouse.

However, the temporal relationship between D-74, 76,
77, and 78, all of which were created between late January and
February 21, 2020, and Ms. Rowe's and Mr. Vardaman's
conversation in late February 2020, is not new information.
Accordingly, the Court fails to see why plaintiff waited until
trial to raise this issue, let alone why she delayed four days
after Mr. Vardaman had testified.  Plaintiff's application is
therefore denied.

Are we ready to bring the jury in?

Is the witness ready?

MR. GAGE:  He's just out in the hall, but yes.

THE COURT:  We weren't going to start till 9:15, but
we might as well start now, right?

MR. GAGE:  It's fine by us, your Honor.

NAJVROW1                         Humez – Direct

```
 1              THE COURT:  Okay.  Let's get the witness and then,
 2     Ms. Williams, you could bring the jury in.
 3              (Jury present)
 4              THE COURT:  Good morning.  Please be seated.
 5              Mr. Humez, I remind you that you are still under oath.
 6              MR. GAGE:  May I proceed, your Honor?
 7              THE COURT:  You may.
 8      CHRIS HUMEZ,
 9          called as a witness by the Defendant,
10          having been previously duly sworn, testified as follows:
11     DIRECT EXAMINATION (continued)
12     BY MR. GAGE:
13     Q.  Good morning, Mr. Humez.
14     A.  Good morning.
15     Q.  Yesterday we talked a bit about your preparation of
16     Ms. Rowe's starting pay package.  Do you remember that?
17     A.  Yes.
18     Q.  Did you also prepare starting pay packages for the other
19     technical directors in OCTO who were hired in 2017/2018?
20     A.  I did, yes.
21     Q.  And did you use exactly the same approach to preparing
22     those packets and offers that you've used for Ms. Rowe's?
23     A.  Yes, same process.
24     Q.  Now, were all of the other technical director starting pay
25     packages as high relative to the market reference point as
```

NAJVROW1                          Humez - Direct

1    Ms. Rowe's?

2    A.   No, they were not.

3    Q.   Were they lower?

4    A.   They were -- yeah, they were lower, much lower in some

5    cases.

6    Q.   And again, to the best of your recollection, what was

7    Ms. Rowe's relative to the market reference point?

8    A.   My recollection is that it was 98 percent of the MRP, or

9    market reference point, which is quite high.

10   Q.   Now, Mr. Humez, if -- at Google, if an employee moves into

11   a different job code, does Google pay them for the job they are

12   now performing in the new job code or the job they used to

13   perform?

14   A.   It's based on the job that you're performing during that

15   year, yeah.

16   Q.   Okay.  There's been a lot of testimony about Level 8/Level

17   9 technical directors.  Do Level 9 technical directors in the

18   office of the CTO always make more than Level 8 technical

19   directors?

20   A.   No, not in all cases.

21   Q.   Does it depend upon how they perform against expectations?

22   A.   Yeah.  Our pay philosophy centers around pay for

23   performance.

24   Q.   Now, before we finished yesterday, you described the annual

25   compensation review process.  Now, after managers rate employee

1    performance and those ratings that they do are put into the

2    system, what happens next?

3    A.   In terms of the annual pay process?

4    Q.   In terms of the process, exactly.

5    A.   So for each element of compensation, we'll use a standard

6    calculation to arrive at a modeled amount.  So to take the

7    bonus, for example, it would be their on-target bonus, which is

8    the base salary, times 30 percent, in the case of a Level 8.

9    There would be a multiplier that's attached to each performance

10   rating that they received throughout the past year.  And that

11   would essentially be the modeled amount for a bonus, to use an

12   example.

13          Then, as we go through the comp planning process, we

14   allocate a portion of the budget for discretionary adjustments

15   by managers.  So they can take into account things that just

16   can't really be baked into a performance rating.  So maybe it's

17   the trajectory of their performance throughout the year being

18   higher or lower or other things that really can't be, you know,

19   into kind of like a –– just a distinct performance rating.  So

20   they can make adjustments based on all of those things.

21   Q.   I'd like to show you and ladies and gentlemen of the jury a

22   document that the jury has already seen, it's P-113.  And once

23   this pops up, you'll see there's a lot of information in it.

24   Files with some data.

25          And this reflects, as you can see, data regarding

NAJVROW1                          Humez - Direct

1   particular employees.

2            MR. GAGE:  And if you could just stop for a second,

3   Jean, as you're going across.

4   Q.  Do you see the column headings, Mr. Humez?

5   A.  I do.

6   Q.  Okay.  And if you look at column AA, what would that data

7   reflect?

8   A.  That would reflect in the calculation that I mentioned the

9   kind of algorithmic or modeled amount that factors in their

10  performance ratings.

11  Q.  Okay.  And is that calculated without regard to whether

12  someone is a man or a woman?

13  A.  That's correct.

14  Q.  Now, if we could go over to the right to proposed salary.

15           What does the proposed salary field reflect?

16  A.  That reflects the final salary planned amount.  So it would

17  be the model amount factoring in any discretionary adjustments

18  from the manager or the management chain.

19  Q.  Okay.

20           MR. GAGE:  Jean, you can take this down.

21  Q.  Now, once Google finalizes its compensation decisions, how

22  does the company notify employees of their pay for the upcoming

23  year?

24  A.  At Google we have a tool that's connected to gComp, which

25  is our comp planning tool, and it's called Prosper.  So it's a

NAJVROW1                        Humez – Direct

1    tool that releases the compensation letters to employees.  And

2    managers would use that tool to release the letter and then

3    have the conversation explaining the award to them.

4    Q.  And are those colloquially referred to at Google as the

5    prosper letters?

6    A.  The prosper letters, yeah.

7              MR. GAGE:  Your Honor, if I may, I'd just like to move

8    the stand over here.

9              THE COURT:  Any objection?

10             MS. GREENE:  I'm not sure for what purpose, but no

11   objection at the moment.

12             MR. GAGE:  I am going to just write some information

13   as the witness is testifying on here from his testimony and

14   from some exhibits, your Honor.

15             THE COURT:  Okay.  I'm looking at Ms. Greene.  Do you

16   want to wait to see what he writes?

17             MS. GREENE:  Yes.  I mean, to the extent it's a

18   demonstrative, it's not the right time.  But it will depend.

19             MR. GAGE:  I'd like to show the witness Exhibit P-134.

20             And Jean, if we could go to the December 2017 prosper

21   letter.  Sorry, your Honor, some technical issues.

22             Got it, Jean?  We have a hard copy?

23             This is P-134.  May I hand it up to the witness, your

24   Honor?

25             THE COURT:  You may.

1  BY MR. GAGE:

2  Q.  Now, Mr. Humez, is the first page of P-134 -- first and

3  second pages of this document, is this a December 2017 prosper

4  letter for Ms. Rowe?

5  A.  Yes, it is.

6  Q.  And what does that say her 2018 total compensation award

7  was?

8  A.  The total was 471,000.

9  Q.  $471,000.

10       And what was in her December 2020 prosper letter, what

11  was her total award?

12  A.  It was 786,000.

13  Q.  I'm sorry, you said seven --

14  A.  786.

15  Q.  786.

16       And her December 2021 prosper letter, what was the

17  amount?

18  A.  It was 870,000.

19  Q.  And her March 2023, what was the amount?

20  A.  It was 940,667.

21  Q.  940,000?

22  A.  Yes.

23  Q.  Okay.

24       MS. GREENE:  Your Honor, may we have a sidebar with

25  respect to the document?

1          THE COURT:  Yes.

2          (At sidebar)

3          THE COURT:  Go ahead, Ms. Greene.

4          MS. GREENE:  This is the first time we've received any

5    notice of Mr. Gage's intent to do this.  It's functioning as a

6    demonstrative.  We had an agreement that demonstratives would

7    be exchanged in advance.  He certainly could have included this

8    information on a demonstrative that he provided.  He did not.

9    This would be fair game in closing arguments.  But for the time

10   being, under these circumstances, it's not appropriate and is

11   contrary to the parties' agreement.

12         MR. GAGE:  Your Honor, it's not a demonstrative.  I

13   had plenty of trials where I've had the witness write the

14   numbers.  I could ask Mr. Humez to write the numbers as he

15   testifies so the jury can see it.  It's not a demonstrative

16   exhibit.

17         MS. GREENE:  The documents themselves are the evidence

18   which is before the jury.  To the extent he's writing it, it's

19   not evidence of itself; so it's a demonstrative functioning as

20   a demonstrative.

21         MR. GAGE:  Just like opening statements, closing

22   arguments, lawyers say a lot of things.  I'm just trying to

23   help the jury organize the information.

24         MS. GREENE:  You could do it in closing arguments.

25   The agreement between the parties was that there would not be

1   demonstratives during openings.  Any demonstratives used during

2   course of trial would be exchanged ahead of time.

3         THE COURT:  What's your position on the witness

4   writing it?

5         MS. GREENE:  Again, it's not evidence, so I'm not sure

6   what the function -- the document is there that he's referring

7   to.  It serves to confuse the jury.  I suppose the document,

8   the witness writing it is --

9         THE COURT:  You can mark it as an exhibit.

10        MS. GREENE:  I don't think it should be an exhibit.

11   We have the documents.  He's reading from the documents.  The

12   documents are the evidence, not anybody's writings, and that's

13   where we're confusing the jury.

14        MR. GAGE:  This is not a demonstrative.  It's not

15   confusing the jury.  It's just helping them see --

16        THE COURT:  Well, it's not evidence.

17        MR. GAGE:  Agreed.  I agree it's not evidence.  But

18   what we say is not evidence either.

19        THE COURT:  Is this up on the screen now or are we

20   just working with a hard copy?

21        MR. GAGE:  We're working with a hard copy with the

22   witness.  Let me just ask.

23        THE COURT:  Okay.  Let's put the document on the

24   screen and no more with the billboard.

25        MR. GAGE:  Okay.

1          (In open court)

2          MR. GAGE:  Let's just go back and make sure we had

3   2020.  December 2020, we've finished that.

4          I'd like to go now to P-1 -- let's -- now that we have

5   the exhibit, let's let the jury see what this is.

6   BY MR. GAGE:

7   Q.  So this is P-134.  Is this the document you were just

8   looking at in hard copy --

9   A.  Yeah.

10  Q.  -- Mr. Humez?

11         Okay.  This is the December 2017 prosper letter.

12         What's the 295 number reflect?

13  A.  The new base salary.

14  Q.  And then the next number down reflects what?

15  A.  The annual cash bonus.

16  Q.  And is that a function of performance?

17  A.  It is.

18  Q.  And the next number, what is that?

19  A.  The equity refresh grant.

20  Q.  Okay.  And then if we go to the next page, does it provide

21  the total?

22  A.  It does.

23  Q.  Is this the total compensation to Ms. Rowe for 2018;

24  correct?

25  A.  Awarded in 2018.

1   Q.  Awarded in 2018.

2            MR. GAGE:  I'd like to, Jean, if we could, go to

3   P-132.

4            THE COURT:  Ms. Tomezsko, could we clear the billboard

5   out of the way, please, and put it back where it came from.

6            That's all right.

7   Q.  P-132.  Is this Mr. Harteau's prosper letter or letters?

8   A.  Yes.

9            MR. GAGE:  And if we could start with the December

10  2017 prosper letter.  If we go to the second page -- I'm sorry,

11  it's on the first page.  It's a shorter letter.

12  Q.  What was Mr. Harteau's total compensation award for 2018?

13  A.  395,000.

14           MR. GAGE:  Now, Jean, if we could go to P-130.

15  Q.  This is Mr. Donaldson's prosper letter for December 2017.

16           What was his total award for 2018?

17  A.  402,000.

18  Q.  And that's -- if you remember the number, that's about

19  $69,000 less than Ms. Rowe's; correct?

20  A.  From recollection, yeah.

21  Q.  And Mr. Harteau's was about 70-some thousand dollars less

22  than Ms. Rowe's; correct?

23  A.  Correct.

24           MR. GAGE:  Now, I'd like to go to Mr. Wilson, P-136,

25  Jean.

NAJVROW1                       Humez - Direct

1    Q.  Mr. Wilson's prosper letter, focusing here on the December

2    2017 prosper letter.  What was Mr. Wilson's total compensation

3    award for 2018?

4    A.  452,000.

5    Q.  That's almost $20,000 less than Ms. Rowe's; correct?

6    A.  Correct.

7              MR. GAGE:  Now, I'd like to go, Jean, if we could, to

8    P-136 -- or, I'm sorry, this is P-136, Mr. Wilson's prosper

9    letter, December 2020, if you could page through.  Next page.

10   December 2020.  And then if we could go to the second page.

11   Q.  What was Mr. Wilson's total compensation award for 2021?

12   A.  668,800.

13   Q.  And I believe you testified that Ms. Rowe's for that same

14   year was $786,000.  So this is nearly $120,000 less than

15   Ms. Rowe's pay for the same year; correct?

16   A.  That's correct.

17             MR. GAGE:  Now, I'd like to go to P-135, and I'd like

18   to go to the December 2021 prosper letter.

19   Q.  December 2021 for Paul Strong.  If we can go to the second

20   page.  What was Mr. Strong's total compensation award for 2022?

21   A.  718,000.

22   Q.  And Ms. Rowe's for that same year, I think you testified,

23   was $870,000?

24   A.  Correct.

25   Q.  So Mr. Strong's was substantially less for that year;

NAJVROW1                    Humez - Cross

1    correct?

2    A.  Correct.

3    Q.  Now, I'd like to go to Mr. Strong, same exhibit,

4    Mr. Strong's March 2023 prosper letter.  And Mr. Humez, was the

5    March 2023 prosper letter the most recent prosper letter that

6    was issued by Google?

7    A.  It is, yes.

8    Q.  Okay.  And this is for 2023 compensation?

9    A.  Correct.

10   Q.  If we could go to the second page of Mr. Strong's.

11          And what was his total award?

12   A.  $754,033.

13   Q.  And you testified earlier that Ms. Rowe's compensation for

14   2023 was 940,000, so that's nearly $190,000 less than Ms. Rowe

15   will earn in 2023; correct?

16   A.  That's correct.

17   Q.  And these differences in compensation, are they

18   attributable to differences in job performance?

19   A.  Yes, they would be, yeah.

20          MR. GAGE:  No further questions, your Honor.

21   CROSS-EXAMINATION

22   BY MS. GREENE:

23   Q.  Mr. Humez, just a few questions.

24          You testified earlier about differences in between L8

25   and L9 compensation; correct?

1    A.  Say that again, sorry.

2    Q.  You testified to differences between how L8s and L9s are

3    paid; correct?

4    A.  Correct.

5    Q.  And so an L8, you talked about -- what was the M starting

6    phrase?

7    A.  Sorry, yeah, the market reference point.

8    Q.  The market reference point.

9              So at a Level 9, where Ms. Rowe was at in terms of

10   market reference point, 98 percent, where would that have put

11   her in the market reference point on L9s?

12   A.  I don't know that offhand.

13   Q.  Well, the range for L9s was larger and higher than the

14   range for L8s; correct?

15   A.  The earning potential, the range would be higher; but they

16   would overlap; at the high end of L8 could be into L9.

17   Q.  Since Ms. Rowe was at 98 percent of the market rate, would

18   that limit her potential increases going forward as an L8?

19   A.  It would be a function of performance.  So there's no --

20   there's no salary caps in place at Google.  So if someone were

21   to be continuing to perform strongly, they could still be

22   eligible for increases.

23   Q.  She would remain in the L8 category and not move into the

24   L9 category; correct?

25   A.  Well, the ranges, like I said, overlap.  So, yeah, they

1   A.  I don't know what he asked her specifically, no.

2   Q.  And you didn't get any internal references related to

3   Ms. Rowe?  You didn't speak with Mr. Grannis about her

4   qualifications, for instance, did you?

5   A.  No, not about her qualifications for my role.  He asked me

6   to do a meet and greet with her specifically.  He did not ask

7   me to meet with her about any roles.

8   Q.  And that coffee meeting with Ms. Rowe, that was not an

9   interview for the position, correct?

10  A.  No, it was not an interview.  It was networking meet and

11  greet, can you do me a favor and meet with her?

12  Q.  Did you know what Ms. Rowe's level was within Google?

13  A.  I did not know explicitly her level, and I wouldn't know

14  that except I knew she was not a vice president.  But I

15  wouldn't know what specific level she would have been.  I

16  wouldn't have access to that.

17  Q.  And a vice president is what level?

18  A.  Vice presidents were Level 10s.

19  Q.  So you knew that she was a level below a 10?

20  A.  Something.

21  Q.  Is that right?

22  A.  Uh-huh.

23  Q.  So you didn't know anything about Ms. Rowe's C-suite

24  relationships, correct?

25  A.  Just from what we had talked about in the meet and greet

NAJHRow4                    Kliphouse – Cross

1    about where she was working, why I hadn't had any opportunity

2    — I hadn't heard about her on my team, and I thought I would

3    have because I was working with a lot of the largest financial

4    institutions.  And I asked her what was she working on, and she

5    gave me some instances of where she was doing work, and it

6    tended to be more on the federal side and the regulatory side.

7    It wasn't the large financial institutions that my team works,

8    and she gave me background things she was working on.

9    Q.  Did you know she had been a CTO at JPMorgan Chase?

10   A.  She did mention to me in the conversation we had that she

11   had worked at JPMorgan and, I think, one other company.

12   Q.  But, again, neither Mr. Vardaman nor you took any

13   additional steps to identify what her qualifications were

14   beyond what she told you in that meeting, correct?

15   A.  I don't know what — Stuart would have done the research in

16   that.  They typically did all the research that was necessary

17   to compare to the qualifications that we have.  I did not.  I

18   do not go out — I did not go out and search resumes.  I don't

19   search their LinkedIn.  That comes to me from the recruiting

20   team.

21           MS. GREENE:  No further questions.

22           MS. TOMEZSKO:  I have no further questions for the

23   witness, your Honor.

24           THE COURT:  OK.  Ms. Kliphouse, you're excused.  Thank

25   you.

NAJHRow4                          Kliphouse – Cross

1                (Witness excused)

2                THE COURT:  Does it make sense to pause now?

3                MR. GAGE:  I think so, your Honor.

4                THE COURT:  OK.  So based on my understanding of where

5     we are in Google's case, I think we can break now.  It is

6     12:37.  Let's come back here at 1:25.

7                So, members of the jury, please remember my frequently

8     reiterated cautions, which are not to speak to each other, not

9     to talk to anyone else about the case, not to do any research.

10    Please avail yourself of the facilities in the jury room, and

11    thank you so much for your attention today and throughout the

12    process.  All right.

13               (Jury excused)

14               (Continued on next page)

15

16

17

18

19

20

21

22

23

24

25

NAJVROW5                    Florissi - Direct

1    to see your agreement.

2            MR. GAGE:  Which document, your Honor?

3            THE COURT:  Weren't you about to put up a document?

4            MR. GAGE:  No.  I said I'm not going to put up a

5    document.  I'm not going to put up a document.

6            MS. GREENE:  Your Honor, I would have moved *in limine*

7    or before, having not had a representation from Mr. Gage that

8    we were not going to go there.

9            MR. GAGE:  Had you told me --

10           THE COURT:  The scope of where you weren't going to go

11   is what's important here.

12           MR. GAGE:  Absolutely.

13           MS. GREENE:  It's the leave.

14           MR. GAGE:  It's the medical leave.

15           MS. GREENE:  It's six weeks is also part of her

16   medical leave, whether it's the benefit period or not.

17           MR. GAGE:  I had no reason to know that and I still

18   have no reason to know that.

19           MS. GREENE:  But you know it because I'm telling you.

20           MR. GAGE:  I know she applied for medical leave.

21           MS. GREENE:  And so under the disability laws, under

22   Google's policies, the fact that the benefits started at a

23   certain point doesn't mean that the time before it also does

24   not --

25           MR. GAGE:  I don't want to waste the jury's time.  I

1    will move on.

2                (In open court)

3    BY MR. GAGE:

4    Q.  Ms. Florissi, I've got some different questions for you.

5                In the entire time that you have been managing

6    Ms. Rowe, have you expected anything of Ms. Rowe that is not

7    expected of others on your team?

8    A.  No, I have not.

9    Q.  Ms. Florissi, have you in any way treated Ms. Rowe more

10   harshly because of this lawsuit?

11   A.  Not at all.  If anything, I have been very careful and very

12   understanding.

13               MR. GAGE:  No further questions, your Honor.

14   CROSS-EXAMINATION

15   BY MS. GREENE:

16   Q.  Hello, Ms. Florissi.

17   A.  Good afternoon.

18   Q.  I just have a few questions for you.

19               You first learned about this lawsuit in April 2022;

20   correct?

21   A.  Correct.

22   Q.  And sometime before the check-in meeting you had with

23   Ms. Rowe, you met with internal counsel at Google about her

24   case; correct?

25   A.  Not about her case, about the fact that I thought she

1    needed a support check-in.

2    Q.  And that was -- you had to handle it carefully because of

3    her case; correct?

4    A.  Correct.

5    Q.  And you made very -- you made sure to have careful

6    documentation because of Ms. Rowe's lawsuit; correct?

7    A.  Not only because of her lawsuit.  When you give a support

8    check-in, you have to collect information to make sure that all

9    the process is followed.

10   Q.  Now, prior to that support check-in meeting, you had never

11   told Ms. Rowe that you wanted the "artifacts"; correct?

12   A.  I never -- correct.  At the Level 8 technical director in

13   the office of the CTO is expected to produce artifacts.

14   Q.  Do you know whether Ms. Rowe wasn't producing artifacts or

15   was it just that you hadn't seen them?

16   A.  If she produced the artifacts, she never shared them with

17   me.

18   Q.  But prior to that check-in, you had never told her that you

19   wanted or expected her to share them with you; correct?

20   A.  I didn't think I have to; correct.

21   Q.  Now, the technical director role, you were asked about the

22   OKRs.  The OKRs have been set each year, but the technical

23   director position is still the technical director position;

24   correct?

25   A.  To the best of my understanding is a technical director

1  position to deliver against the OKRs.  Google has OKRs at every

2  level:  At the company level, at the business product areas

3  level, at the business level.  And they are set every year.  So

4  everybody within their role perform or execute, focus their

5  activities to deliver against those OKRs.

6  Q.  And technical directors are expected to be self-directed in

7  their role at the Level 8 and above; correct?

8  A.  Correct.

9  Q.  After you asked Ms. Rowe for artifacts, she provided them

10 to you; correct?

11 A.  She provided two artifacts.  One, which is the paper on the

12 trusted AI; and the other one in February with another OCTO

13 member also on the same topic.

14 Q.  Now, that trusted AI paper, do you recall how many pages

15 that was?

16 A.  Maybe around 30 pages or so, to the best of my recollection

17 here.

18 Q.  Right.  So 30 pages.  And that would have -- in order to be

19 able to write and produce a paper of 30 pages, it would have

20 required quite a bit of research, background, investigation;

21 correct?

22 A.  Correct.  However, the paper that was produced in February,

23 it was in partnership with another OCTO member that had already

24 been working on -- on the area as well.

25 Q.  And who was that other partner, that other OCTO director?

NAKHRow1

```
1    UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
2    ------------------------------x

3    ULKU ROWE,

4                 Plaintiff,

5            v.                          19 Civ. 8655 (JHR)

6    GOOGLE LLC,

7                 Defendant.             Trial

8    ------------------------------x
                                         New York, N.Y.
9                                        October 20, 2023
                                         8:30 a.m.
10   Before:

11                  HON. JENNIFER H. REARDEN,

12                                       District Judge
13                                       -and a jury-

14                         APPEARANCES

15   OUTTEN & GOLDEN, LLP
          Attorneys for Plaintiff
16   BY:  CARA E. GREENE
          GREGORY S. CHIARELLO
17        SHIRA Z. GELFAND

18   PAUL HASTINGS LLP
          Attorneys for Defendant
19   BY:  KENNETH W. GAGE
          SARA B. TOMEZSKO
20
     Also Present:  Vincent Yang, Paralegal (Outten & Golden)
21                  Andrew Velazquez, Google Rep.
                    Jean Gutierrez, Paralegal (Paul Hastings)
22

23

24

25
```

NAKHRow3                    Summation - Ms. Tomezsko

1    reason he did not discuss Ms. Rowe with Ms. Kliphouse prior to

2    their next scheduled meeting.

3            And here you could see —— you don't have to trust the

4    witnesses.  It's here in the documents —— the focus was on

5    Yolande Piazza.  And then there's no surprise, then, that

6    Thomas Kurian, the CEO of Google Cloud, shortly thereafter

7    says:  "Hire her quickly.  She will not be on the market for

8    long."  The story resonates.  The story makes sense.

9            You've also heard that around the same time

10   Mr. Grannis created an opportunity for Ms. Rowe to meet with

11   Ms. Kliphouse.  Mr. Grannis, who supported Ms. Rowe, who

12   Ms. Rowe acknowledges supported her, gave her this opportunity

13   to meet with someone, a president with a go-to-market

14   organization within Google Cloud.  And during that meeting,

15   Ms. Kliphouse testified, and Ms. Rowe testified as well, they

16   discussed her background.  They discussed what she was doing at

17   Google Cloud.  They discussed the regulatory work which she was

18   doing, which was a large part of what Ms. Rowe was actually

19   doing at the time, but Ms. Kliphouse found that irrelevant to

20   the role.  That was in her testimony.

21           Ms. Rowe herself, when we played you the clip,

22   acknowledged that she had told Ms. Kliphouse about her C-level

23   networking contacts during that meeting and her financial

24   services expertise.  And indeed, the documents corroborate the

25   testimony that on February 21 there was a discussion about

1    Ms. Rowe.  Mr. Vardaman did not make a unilateral decision not

2    to present her to Ms. Kliphouse for consideration.  It's right

3    there in the documents, as is her background.

4            But you'll see in Ms. Kliphouse's testimony, when they

5    discussed her, precisely what I'm telling you here.  They

6    decide to focus on other candidates who they found to be very

7    qualified for the role.  There's nothing wrong with that.

8    There's nothing retaliatory about that because they pursued

9    another candidate that they found attractive and that they

10   wanted to hire into this role because they needed to fill the

11   role immediately.  They had identified her before Ms. Rowe and

12   Ms. Kliphouse had coffee together.

13           MR. GAGE:  So let's talk about why Ms. Rowe was paid

14   what she was paid.

15           Now, again, you heard Mr. Humez tell you how they set

16   starting pay.  It's tied to a job code which is specific to

17   level, and this was Ms. Rowe's job code.  You can see this on

18   P-119.  And he also told you about the market reference point.

19   You remember the MRP?  They set a market reference point for

20   the job.  It's not specific to a person.  It's set for the job,

21   and that's so they can be fair.  And they try to get people in

22   at 80 percent of the market reference point for starting pay.

23           And then he told you how target bonus and initial

24   equity work.  And again, yes, target bonus specific to a

25   Level 8 is 30 percent, and that is because there are lower

1    expectations for a Level 8 than there are for a Level 9.  And

2    initial equity is also similarly calculated based upon the job

3    code.  And he talked about how they go to use external market

4    benchmarking.  Again, this is all without regard to the person.

5    It's all without regard to whether it's a man or a woman.  It's

6    purely based on roles and responsibilities associated with the

7    job code.

8           Now, he explained for you how he calculated her

9    starting pay package, and there's been a lot of back and forth

10   in this trial about whether Ms. Rowe was giving something up.

11   And I think you heard her and her counsel say, well, she was

12   giving something up when she came to Google, others weren't.

13   But Mr. Humez explained that that's not the way they do it.

14   They calculate cash flows.  And so Ms. Rowe wasn't giving

15   something up when she left JPMorgan Chase.  What she was

16   talking about were stock awards she had received in prior years

17   that she was not going to realize, she was not going to

18   receive, unless she earned them.  They were not vested.  She

19   told you they were unvested.  And what that means is she needs

20   to work the next year at JPMorgan Chase to earn that next piece

21   of that vested stock award.

22          And so Mr. Humez explained that's how they did it.

23   They're estimating what Ms. Rowe's cash flow would be if she

24   worked at JPMorgan another year, another two years, another

25   three years, what she could reasonably expect to earn based

1   upon these prior awards that had not fully vested.

2            You also heard about Mr. Breslow's equity award at

3   Google, and he forfeited $2 million of it because, again,

4   similarly, it hadn't vested.

5            Now, I'd like to show you a demonstrative we have that

6   illustrates for you the starting pay packages of a group of

7   Level 8 and Level 9 technical directors in OCTO.  And

8   Ms. Rowe's bar is this one right here.  There's one bar higher

9   than hers, and that's Evren Eryurek, which means that her bar,

10  the value that Google placed on her as an entering employee,

11  was that high.  That means that it was higher than four of the

12  Level 9s.  It was higher than a whole bunch of Level 8s.

13           Google valued Ms. Rowe.  Does that look like sex

14  discrimination to you?  I don't think it is.

15           Now, Mr. Humez also told you that all of the other

16  technical directors who started around the same time, they had

17  lower market reference points.  Ms. Rowe's was about

18  98 percent; others were lower.  Again, that's specific to the

19  job code. Each year Google adjusts her pay based upon her

20  performance against expectations.  That's what I talked about

21  on the first day of the trial.  Google sets expectations based

22  upon the job code, based upon the level, and she's measured

23  against them.

24           And you can take a look at these prosper letters,

25  P-134, 132, 130, 136, and so on, hers and the Level 9s, and if

1   you look at them, you will see there are years when she earns

2   more than some of the Level 9s.  And what means is they had

3   higher expectations, and they might not have met them.  And the

4   consequence is they fall further.

5            And Ms. Greene showed you a subset of those L9s in one

6   of her charts and their compensation to show that Ms. Rowe was

7   lower than them in those years, but she left two people out.

8   And that's because those are two people that she, in some

9   years, earned more than.  Level 9s do not always earn more than

10  Level 8s.  That's the point.

11           Annual earnings are a function of performance against

12  level-specific expectations, and in some years Ms. Rowe earned

13  more than them.

14           Now, again, she was evaluated against Level 8

15  standards.  And, yes, she absolutely got exceeds expectations,

16  and that was a middle rating.  And, yes, this question, "What's

17  one thing you plan to do to have more impact?" is one that

18  everybody has answered.  Google gives feedback to their

19  employees, and you will see if you look at these documents in

20  P-126, which is Ms. Rowe's performance evaluation, she gets

21  honest feedback, both positive and constructive.  And the

22  consistent theme that she's been told over and over and over

23  again by Mr. Grannis and now Ms. Florissi is that she needs to

24  have more engineering impact.  This is an engineering job.  And

25  over time the expectation in terms of public speaking has gone

1    down, you heard that from Ms. Florissi, because this is an

2    engineering job.

3         And I don't say that to criticize Ms. Rowe.  You heard

4    Mr. Grannis say on the stand she does a number of things

5    really, really well and they value her, but I think the number

6    he gave was he thinks that it's about 70 percent of the job

7    she's doing for a Level 8.  And what did he tell you?  He tells

8    people two things when they join OCTO:  Build your network and

9    learn the platform.  And Ms. Rowe has not done that.

10        So let's briefly talk about Nicholas Harteau and why

11   he was paid what he was paid.

12        Different job code.  He was doing different things.

13   You heard from Mr. Stevens that he immediately was involved in

14   engineering work.  He didn't have to learn like many other

15   people, Ms. Rowe and other Level 9s.  He was focused on

16   high-potential engineering products — projects, that were

17   going to pay large dividends.  This is immediately when he

18   walks in the door.

19        The other thing I would suggest you look at is who the

20   peer reviewers are for Ms. Rowe and Mr. Harteau.  And again,

21   this is not a criticism, but Mr. Harteau's peer reviewers are

22   product managers, OCTO technical directors, software engineers.

23   They're not people in marketing, sales, and business

24   development.  But that's who was offering peer reviews to

25   Ms. Rowe.  Again, not a criticism.  It's just constructive

1  feedback that there's more of the job that she needs to focus

2  on.  And Google could and did expect more from Mr. Harteau

3  because, unlike Ms. Rowe who was offered the opportunity to

4  build a team and didn't, Mr. Harteau did build a team, and he

5  did manage a team.

6          You also heard Mr. Stevens talk about technical work,

7  engineering work he did with Mr. Harteau when he came in the

8  door.  We asked him:  Did Ms. Rowe work on any projects like

9  that?  No, she didn't.  Again, she was a Level 8.  She had more

10  to learn than Mr. Harteau did.  It's not a criticism.  It's

11  just a fact.

12          So I just want to talk about how Google responded to

13  Ms. Rowe's concerns.  Now, the bottom line, Google disagrees

14  with Ms. Rowe about whether she was properly leveled.  She

15  thinks she wasn't.  Google thinks she was.  When she first

16  raised this, she didn't say it was related to sex.  Google

17  disagreed with her; told her you're properly leveled.

18          Then when she said she thought it was because of

19  gender, what did Google do in response?  It launched an

20  investigation.  Google did multiple investigations.  In fact,

21  you heard one of those investigations was done by someone who

22  was a former FBI agent.  Google took her concerns seriously.

23  And you have the notes from these interviews, and you can look

24  at those notes and you can see what Ms. Rowe said to the

25  investigator.  She said she had no reason to believe that this

 1    was because of gender.  All she was identifying is that five

 2    people who were men were L9s.  She ignores the fact that there

 3    were plenty of men who were L8s.

 4           You heard her disparaging some of her colleagues and

 5    saying she was better qualified than them, and what did you

 6    hear Mr. Grannis and Mr. Stevens say?  They said they were

 7    differently qualified.  And these were people who have Ph.D.s

 8    in artificial intelligence.  These are people who also, like

 9    Ms. Rowe, contribute uniquely.

10           And I completely disagree with Ms. Greene.  We don't

11    think Ms. Rowe is a whiner.  She's absolutely entitled to

12    pursue this lawsuit.  She's absolutely entitled to that.  You

13    heard Google's witnesses say they did not hold this against

14    her.  You heard from Ms. Rowe and Mr. Grannis that when he

15    heard about that she had raised concerns, he didn't really know

16    anything about them, but he went to her to say:  Hey, OCTO's a

17    safe place.  We respect your rights.  You look at her pay since

18    she raised these concerns, her pay has gone up.  The only thing

19    that's happened is she hasn't gotten everything that she

20    wanted.

21           Now, she needs to prove that it's more likely than not

22    that her gender motivated Google's decisions.  The decision to

23    make her a Level 8 was undisputedly a reasonable assessment

24    that five individuals had superior qualifications to her and

25    many other men, and that's why they were 9s.  Brian Stevens and

1    issue of damages, not liability.  However, the defendant is not

2    liable if the plaintiff fails to prove that the challenged

3    conduct was caused at least in part by a retaliatory motive, or

4    if the defendant proves that the conduct was nothing more than

5    petty slights or trivial inconveniences.

6            Finally, Ms. Rowe must establish that the adverse

7    action or actions taken by Google was or were taken at least in

8    part because of Ms. Rowe's protected activity.  In other words,

9    she must establish that there was a causal connection between

10   the protected activity and the adverse actions.

11           To establish a causal connection, Ms. Rowe bears the

12   burden of proving by a preponderance of the evidence that

13   Google intentionally retaliated against her by taking one or

14   more adverse actions against her, and that retaliation was a

15   motivating factor in Google's decision to take the action or

16   actions that it did.

17           A motivating factor is a factor that made a difference

18   or played a part in a decision.  To be clear, that factor need

19   not be the sole consideration or even the most important

20   consideration motivating the adverse action or actions.  To

21   satisfy this element, Ms. Rowe can use indirect or

22   circumstantial evidence or she can introduce direct evidence of

23   retaliatory motive.

24           If you conclude that Ms. Rowe has met her burden of

25   proof by a preponderance of the evidence with respect to her

1   claims for unequal pay, gender discrimination, and/or

2   retaliation, then you must determine the damages, if any, to

3   which Ms. Rowe is entitled.  On the other hand, if you find for

4   Google on all claims, you will not consider the issue of

5   damages at all; you will simply report a verdict for Google on

6   all claims.

7         You should not infer that Ms. Rowe is entitled to

8   recover damages merely because I am instructing you on how to

9   calculate damages.  It is exclusively your function to

10  determine liability, and I am instructing you on damages only

11  so that you will have guidance should you decide that Ms. Rowe

12  prevails on any of her claims.

13        Damages must be based on evidence, not on speculation

14  or sympathy, and you may only award damages for those injuries

15  that Ms. Rowe actually suffered as a result of Google's

16  conduct.  It is the plaintiff, that is, Ms. Rowe, who bears the

17  burden of proving her damages by a preponderance of the

18  evidence.

19        In this case, you may consider awarding several

20  different types of damages:  Backpay, statutory damages under

21  New York Labor Law Section 194, compensatory damages, nominal

22  damages, and punitive damages.  Whether such damages are

23  actually to be awarded in this case and, if so, in what amount,

24  are for you, the jury, to decide in accordance with my

25  instructions.  If you make any award of damages, such award is

1   not subject to federal income taxes and you should not consider

2   such taxes in determining the amount of damages, if any.  The

3   verdict form I will give you will assist you in recording the

4   determination, if any, that you make as to damages.

5          The economic loss plaintiff has suffered as a result

6   of any claims she has put forth is called "backpay."  Backpay

7   consists of the value not only of salary, but also of bonuses,

8   stock awards, and other forms of compensation and benefits that

9   Ms. Rowe would have received if not for Google's unlawful

10  conduct, if that is what you find.

11         Specifically, Ms. Rowe asserts that she was paid less

12  than men performing equal work under Labor Law Section 194.

13  She also asserts that because she is a woman, Google paid her

14  less and denied her positions that would have entitled her to

15  greater compensation, in violation of the city law.  She

16  further asserts that because she made protected complaints,

17  Google denied her positions that would have entitled her to

18  greater compensation.

19         Your job as the jury is to determine what damages, if

20  any, Ms. Rowe has proved by a preponderance of the evidence for

21  each claim.  Ms. Rowe is entitled to lost wages and benefits,

22  even if they are difficult to calculate.  Any uncertainty about

23  the amount of lost compensation to be awarded to Ms. Rowe

24  should be resolved in her favor.  That said, Ms. Rowe has the

25  burden of proving that she actually incurred a loss of backpay.

NAKVROW4                         Charge

1           If you find that Google violated Section 194 of the

2      labor law, Ms. Rowe is also entitled to certain statutory

3      damages, unless you find that Google acted in good faith.

4           Under the law, if you find for Ms. Rowe on liability,

5      it is Google's burden to demonstrate by a preponderance of the

6      evidence that it acted in good faith.

7           Good faith has two requirements:

8           First, Google must produce plain and substantial

9      evidence of at least an honest intention to ascertain what the

10     labor law requires and to comply with it.

11          Second, Google must demonstrate objectively reasonable

12     grounds for believing it was in compliance with the law.

13          Good faith requires more than ignorance of the

14     prevailing law or uncertainty about its development; it

15     requires an employer to take active steps to ascertain the

16     dictates of the statute and then move to comply with the law.

17     That a defendant did not purposely violate the statute is not

18     sufficient to establish that it acted in good faith; nor is

19     good faith demonstrated by conformity with industry-wide

20     practice.

21          If you find that Google violated the labor law, you

22     must also consider whether Google's actions were willful.

23     Willfulness is established if Google knew or showed a reckless

24     disregard for whether its unequal compensation of Rowe was

25     prohibited by law.  It is Ms. Rowe's burden to establish

1    Google's willfulness by a preponderance of the evidence.

2           If you find that Ms. Rowe has proven by a

3    preponderance of the evidence that Google knew or showed a

4    reckless disregard for whether or not its payment of her

5    complied with the law, you will find that it acted willfully.

6    You may find that Google acted willfully even if you find that

7    Google did not act with an intent to violate the law.  This is

8    because willfulness can be shown where a defendant acts with

9    reckless disregard for the law.  However, if you find that

10   Google acted unreasonably, but not recklessly, in determining

11   its obligations as to how to pay Ms. Rowe, you must find that

12   its actions were not willful.

13          As you will see on the verdict sheet which I will

14   discuss more fully in a few moments, if you find that Google

15   violated Section 194 of the labor law, you must determine both

16   whether it acted in good faith and whether its violation of the

17   law was willful.  If you find that Google's conduct was

18   willful, you must also find that its conduct was not taken in

19   good faith.  By the same token though, if you find that

20   Google's conduct was in good faith, you cannot find that its

21   conduct was willful.

22          If you find that Ms. Rowe has established any of her

23   claims of gender discrimination or retaliation under the city

24   law, you may award her compensatory damages for injuries such

25   as emotional pain, suffering, inconvenience, mental anguish,

NAKVROW4                      Charge

1    humiliation, and loss of enjoyment of life.

2              Compensatory damages are an amount that will fairly

3    compensate the plaintiff for any injury she actually sustained

4    as a result of the defendant's conduct.  There is no

5    requirement that a claim of emotional distress be supported by

6    proof of expenses, lost earnings, or specifically measurable

7    damages.  No expert testimony is necessary to prove such harm.

8    And you may rest your findings solely on Ms. Rowe's testimony.

9              No evidence of the monetary value of such intangible

10   things as pain and suffering has been or need be introduced

11   into evidence.  There is no exact standard for fixing the

12   compensation to be awarded for these elements of damage.

13   Rather, you may issue an award of monetary damages based on the

14   emotional harm you determine the plaintiff to have suffered

15   based on the evidence presented and based on your best

16   judgment.  Any award you make should be fair in light of the

17   evidence presented at the trial.

18             If you find that Ms. Rowe prevails on either of her

19   claims of gender discrimination or retaliation, you may — but

20   are not required to — award her punitive damages.  Punitive

21   damages are intended to protect the community and to be an

22   expression of the jury's indignation at a defendant's

23   misconduct.  There is no exact rule by which to determine the

24   amount of punitive damages; it is up to the jury to decide what

25   amount is sufficient to punish the defendant.

NAKVROW4                    Charge

1              The fact that I am instructing you on punitive damages

2      is not any indication of my view as to what your verdict should

3      be or on whether punitive damages should be awarded.

4              Punitive damages may be awarded where a plaintiff

5      proves by a preponderance of the evidence that the defendant's

6      actions amounted to willful or wanton negligence or

7      recklessness, or where there is a conscious disregard of the

8      rights of others, or conduct so reckless as to amount to such

9      disregard.  Under this standard, a defendant need not know that

10     it was violating the law and that plaintiff is not required to

11     prove intentional or malicious conduct.

12             Where an employee engages in discrimination with

13     willful or wanton negligence, recklessness, or a conscious

14     disregard of her rights under city law, the employer may be

15     held liable for punitive damages where the offending employee

16     exercised managerial or supervisory responsibility, the

17     employer knew of the offending employee's discriminatory

18     conduct, and acquiesced in it and failed to take immediate and

19     appropriate corrective action; or the employer should have

20     known of the offending employee's unlawful discriminatory

21     conduct, but failed to exercise reasonable diligence to prevent

22     it.

23             In calculating a punitive damages award, you should

24     consider, among other things, the, number one, nature and

25     reprehensibility of Google's conduct, including the character

1   of the wrongdoing and Google's awareness of what harm the

2   conduct caused or was likely to cause; two, the amount of time

3   Google engaged in the conduct; and three, Google's financial

4   condition and the impact your punitive damages award will have

5   on Google.

6          If you award punitive damages, you may consider

7   Google's net worth and the impact of paying that award.

8          Keep in mind that punitive damages are not intended to

9   and may not be used to compensate a plaintiff for her injuries.

10  Instead, the purpose of punitive damages is to punish a

11  defendant and to deter similar conduct in the future.  Any

12  punitive damages award should be limited to the amount

13  reasonably necessary to achieve the goals of punishment and

14  deterrence.

15         You may also consider whether Google has, one,

16  established and complied with policies, programs, and

17  procedures for the prevention and detection of discrimination

18  by employees; and two, a record of no or relatively few prior

19  incidents of discriminatory conduct by the specific offending

20  employee.  These factors may mitigate a punitive damages award,

21  should you choose to impose one.

22         If you find in favor of Ms. Rowe, but you find that

23  she has not shown any injury or any actual damages to warrant

24  an award of backpay, compensatory damages, or punitive damages,

25  then you must return an award of nominal damages of no more