UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

ULKU ROWE,                                          Case No. 1:19-cv-08655-JHR

                            Plaintiff,

            v.

GOOGLE LLC,

                            Defendant.

---

**MEMORANDUM OF LAW IN SUPPORT OF
DEFENDANT GOOGLE LLC'S RENEWED MOTION
FOR JUDGMENT AS A MATTER OF LAW**

# TABLE OF CONTENTS

**Page**

I.      INTRODUCTION ........................................................................................... 1

II.     THE VERDICT AND THE EVIDENCE ........................................................ 2

    A.      The Jury's Finding That Rowe Failed to Prove a Violation of the NYLL and That She Was Entitled to Back Pay Under NYLL or NYCHRL is Well-supported by the Evidence and Must Be Respected. ..................................... 3

        1.      Rowe Failed to Prove She Was Improperly Leveled. ................................ 4

        2.      Rowe Failed to Prove That Google Denied Her the FSVL Role Because of Her Gender. ...................................................... 6

        3.      Rowe Failed to Prove That Google Denied Her the VP-FSS Role Because of Her Gender. ....................................................... 7

        4.      Rowe Failed to Prove That Google Paid Her Less Because of Her Gender or that It Paid Her in Violation of the NYLL. .............................. 8

        5.      Rowe Failed to Prove that Google Denied Her Any Positions Because She Complained of Gender Discrimination. ............................... 9

        6.      Rowe Failed to Prove that Google Denied Her the VP-FSS Role Because She Engaged in Protected Conduct Under the NYLL. .............. 10

    B.      The Jury's Narrow Finding that Google Otherwise Discriminated and Retaliated Against Rowe Is Unsupported by Evidence. ........................................ 11

        1.      There is No Evidence that Rowe Was Intentionally Excluded from Meetings, Team Off-sites, or Email Distribution Lists Because of Gender. ................................................................. 12

        2.      There Is No Evidence that Rowe's Return to OCTO Was Retaliatory. ............................................................... 14

        3.      There Is No Evidence that Google's Consideration of Rowe for the FSVL Role Was Discriminatory or Retaliatory. ..................................... 15

        4.      There Is No Evidence that Google's Consideration of Rowe for the VP-FSS Role Was Retaliatory or Discriminatory. .................................. 18

III.    LEGAL STANDARD ................................................................................. 20

IV.     ARGUMENT .............................................................................................. 20

    A.      This Court's Ruling on Google's Rule 50(a) Motion and the Verdict. .............. 20

    B.      Rowe's NYCHRL Discrimination Claims Fail. .................................................. 21

        1.      There Is No Evidence to Support a Judgment Based on Rowe's Alleged Exclusion from Meetings, Team Off-sites, or Email Distribution Lists. ................................................... 22

2.    There Is No Evidence to Support a Judgment Based Upon Alleged Unfair Treatment of Rowe During the FSVL Role Search Process. ....... 23

3.    There Is No Evidence to Support a Judgment Based Upon Alleged Unfair Treatment of Rowe During the VP-FSS Role Search Process. .................................................................................... 24

C.    Rowe's NYCHRL Retaliation Claims Fail. ........................................................... 24

1.    There Is No Evidence to Support a Judgment Based Upon Rowe's Return to OCTO in March 2019. ............................................................. 25

2.    There Is No Evidence to Support a Judgment Based Upon Alleged Unfair Treatment of Rowe During the FSVL Role Search Process. ....... 26

3.    There Is No Evidence to Support a Judgment Based Upon Alleged Unfair Treatment of Rowe During the VP-FSS Role Search Process. .................................................................................... 26

V.    CONCLUSION ..................................................................................................... 27

## <u>TABLE OF AUTHORITIES</u>

**Cases**                                                                                  **Page(s)**

*Estate of Airday v. City of New York*,
   No. 14-cv-8065, 2022 WL 1265940 (S.D.N.Y. Apr. 28, 2022) .........................................20, 25

*Anderson v. N.Y.C. Health & Hosp. Corp.*,
   No. 16-cv-1051, 2023 WL 2574197 (S.D.N.Y. Mar. 20, 2023).............................................20

*Atlantic & Gulf Stevedores, Inc. v. Ellerman Lines, Ltd.*,
   369 U.S. 355 (1962)..............................................................................................................21

*Auwood v. Harry Brandt Booking Office, Inc.*,
   850 F.2d 884 (2d Cir. 1988)..................................................................................................21

*Cangemi v. U.S.*,
   13 F.4th 115 (2d Cir. 2021) ..................................................................................................20

*Chenette v. Kenneth Cole Prods., Inc.*,
   345 F. App'x 615 (2d Cir. 2009) .................................................................................6, 23, 24

*Dawson v. Bumble & Bumble*,
   398 F.3d 211 (2d Cir. 2005)....................................................................................................6

*Doctor's Assocs., Inc. v. Weible*,
   92 F.3d 108 (2d Cir. 1996)....................................................................................................20

*Fitchett v. City of New York*,
   No. 18-cv-8144, 2021 WL 964972 (S.D.N.Y. Mar. 15, 2021)..............................................27

*Fox v. Starbucks Corp.*,
   No. 19-cv-4650, 2021 WL 4155029 (S.D.N.Y. Sept. 13, 2019), *aff'd*, 2023
   WL 407493 (2d Cir. Jan. 26, 2023) ......................................................................................27

*Gallick v. Baltimore & Ohio R.R.*,
   372 U.S. 108 (1963)................................................................................................................2

*Gordon v. Cnty. of Rockland*,
   110 F.3d 886 (2d Cir. 1997)..................................................................................................20

*Holt v. KMI-Continental, Inc.*,
   95 F.3d 123 (2d Cir. 1996)......................................................................................................6

*Johnson v. L'Oréal USA*,
   No. 18-cv-9786, 2021 WL 4482167 (S.D.N.Y. Sept. 30, 2021) ...........................................22

*Khwaja v. Jobs to Move Am.*,
   No. 19-cv-7070, 2022 WL 19410313 (S.D.N.Y. Oct. 22, 2022), *adopted*, 2023
   WL 2734420 (S.D.N.Y. Mar. 31, 2023) ...............................................................21, 22, 23, 24

*LeeHim v. N.Y.C. Dep't of Educ.*,
   No. 17-cv-3838, 2017 WL 5634128 (S.D.N.Y. Nov. 21, 2017)............................................22

*Maynard v. Montefiore Med. Ctr.*,
   No. 18-cv-8877, 2021 WL 396700 (S.D.N.Y. Feb. 4, 2021) ...................................................26

*McGuire v. Russell Miller, Inc.*,
   1 F.3d 1306 (2d Cir. 1993)........................................................................................................2

*McWhite v. N.Y.C. Hous. Auth.*,
   No. 05-cv-0991, 2008 WL 1699446 (E.D.N.Y. Apr. 10, 2008)........................................25, 26

*Mooney v. City of New York*,
   No. 18-cv-328, 2019 WL 4392961 (S.D.N.Y. Sept. 13, 2019) ..............................................25

*Turner v. NYU Hosps. Ctr.*,
   784 F. Supp. 2d 266 (S.D.N.Y. 2011), *aff'd*, 470 F. App'x 20 (2d Cir. 2012).................23, 24

*Urquhart v. Metro. Transp. Auth.*,
   975 F. Supp. 2d 320 (S.D.N.Y. 2013).....................................................................................27

*White v. Manhattan & Bronx Surface Transit Operating Auth.*,
   No. 18-cv-3627, 2022 WL 4227289 (S.D.N.Y. Sept. 13, 2022) .............................................24

## I.    INTRODUCTION

The question presented on this motion is whether there is sufficient evidence to support *any* judgment for Rowe. There is not.

The core of Rowe's Second Amended Complaint is the allegation that Google hired her at a lower level and therefore paid her less than men, in violation of the New York Labor Law ("NYLL") and New York City Human Rights Law ("NYCHRL"). When she informed Google that she believed she was under-leveled and under-paid, she alleged, Google disagreed with her *and* retaliated against her by, among other things, refusing to place her in more senior, better-paying positions. Finally, she alleged that Google otherwise mistreated her because she is a woman and because she asserted that she was under-leveled and underpaid, in violation of the law. Rowe sought back pay, liquidated damages, emotional distress damages, and punitive damages. These claims were submitted to the jury in a special verdict form of 13 questions, 9 of which the jury answered. Some questions were answered against Rowe and some were answered for her.

The jury explicitly found *against* Rowe on the NYLL claim and *against* Rowe on her claims for back pay. (ECF 340 at I.A.1. and II.A.7.) Read together with the Court's clear instructions regarding what Rowe needed to prove to recover back pay, these findings mean that Rowe failed to prove that she was paid less than men, under-leveled, or that she was denied better paying positions, in violation of the NYLL or NYCHRL. Those findings are well-supported in the record. Significantly, as described in Section IV.A below, the Seventh Amendment to the U.S. Constitution precludes entry of a judgment that disregards those findings.

Therefore, the evidence at trial does not support a $1.15M judgment for Rowe on any of the allegations in the Second Amended Complaint. Accordingly, Google respectfully renews its motion for judgment as a matter of law under Federal Rule of Civil Procedure 50(b) on all claims.

1

## II.     THE VERDICT AND THE EVIDENCE[1]

The Court provided the jury with a special verdict form to record its findings as to Rowe's claims. (Trial Tr. 1461:25-1462:1.)[2] Rowe failed to prove much of her case, according to the jury's answers to two questions on the special verdict form. Her potential judgment therefore rests on a narrow set of claims from her Second Amended Complaint.

"A district court has a duty to reconcile the jury's answers on a special verdict form with any reasonable theory consistent with the evidence, and to attempt to harmonize the answers if possible under a fair reading of those answers." *McGuire v. Russell Miller, Inc.*, 1 F.3d 1306, 1311 (2d Cir. 1993) (citing *Gallick v. Baltimore & Ohio R.R.*, 372 U.S. 108, 119 (1963)). The verdict is mixed but easily reconciled.

The jury found that Rowe *failed to prove* that (i) Google paid her less than men in violation of the NYLL, or (ii) she was entitled to any back pay under either the NYLL or NYCHRL. The jury found that Rowe *proved* that Google otherwise (a) "on at least one occasion treated her less well, at least in part, because of her gender" in violation of the NYCHRL, and (b) retaliated against her "on at least one occasion" in violation of NYCHRL and/or NYLL. The jury awarded Rowe $150,000 for emotional distress and $1 million for punitive damages. (ECF No. 340.)

The only fair and proper reading of the special verdict form is that the damages relate only to the following allegations from the Second Amended Complaint:

---

[1] Concurrently with this filing, and for the Court's convenience, Google is providing Your Honor with a courtesy copy of all trial exhibits and trial testimony excerpts cited herein, via electronic mail. All exhibits cited herein were admitted at trial. (*See* ECF No. 343-6.)

[2] Google requested that the jury be asked in a special verdict form whether Rowe proved that Google discriminated against her "a. in setting her level[,] … b. in setting her compensation[,] … c. in failing to consider her for, or denying her, the Financial Services Vertical Lead role …[, and] d. in any other terms and conditions of her employment." (ECF No. 271 at 6; Trial Tr. 1129:2–15.) Rowe did not ask for any special findings. (ECF No. 271 at 2.) The Court's special verdict form did not reflect Google's proposed questions.

- That Tariq Shaukat intentionally excluded Rowe, "but not her male colleagues," from meetings, email distribution lists, and team off-sites, because of her gender, (ECF No. 108 ¶ 34);

- That Rowe was forced to move back to OCTO in March 2019 because she complained of gender discrimination, (*id.* at ¶ 46); and

- That Rowe was unfairly treated during her candidacy for the Financial Services Vertical Lead ("FSVL") Role and/or Vice President-Financial Services Sales ("VP-FSS") Role, either because of her gender (in violation of the NYCHRL), or because she complained of gender discrimination (in violation of the NYCHRL) or pay disparity (in violation of the NYLL). (*Id.* at ¶¶ 41–42, 54–61.)

For the reasons set forth below, the jury's findings against Rowe as reflected on the special verdict form are supported in the evidence, but the jury's findings in her favor are not.

### A. The Jury's Finding That Rowe Failed to Prove a Violation of the NYLL and That She Was Entitled to Back Pay Under NYLL or NYCHRL is Well-supported by the Evidence and Must Be Respected.

The Court instructed the jury on the elements of Rowe's NYLL claim, including specifically how to decide whether Rowe had met her burden to prove that Google paid her less than Nicholas Harteau or Stuart Breslow in violation of that statute. (Trial Tr. 1439:15–1444:12.) The Court also instructed the jury, more generally, to award Rowe back pay if she proved by a preponderance of the evidence that: (a) she "was paid less than men performing equal work under [the NYLL]"; (b) "because [Rowe] is a woman, Google paid her less and denied her positions that would have entitled her to greater compensation, in violation of the [NYCHRL]"; or (c) "because [Rowe] made protected complaints, Google denied her positions that would have entitled her to greater compensation." (*Id*. at 1452:11–18.) According to the special verdict form, Rowe failed to

3

prove any of these things. (ECF No. 340. at I.A.1. and II.A.7.) Therefore, no judgment may be predicated on these claims.

### 1. *Rowe Failed to Prove She Was Improperly Leveled.*

The foundation of Rowe's claim of unlawful pay was her allegation that Google made her a Level 8 ("L8") Technical Director when similarly qualified men were made Level 9 ("L9") and paid more as a result. (ECF No. 108 ¶ 26; Trial Tr. 46:5–8.) Rowe testified in support of her claim that she and L9 Technical Directors performed the same work but the L9s received "hundreds of thousands of dollars" more in pay. (Trial Tr. 143:10–21.) The evidence, and the verdict against Rowe on the NYLL claim and an award of no back pay, therefore, demonstrate that Google lawfully hired Rowe as a L8 Technical Director.

The evidence regarding the leveling decision was uncontradicted and unimpeached. William Grannis testified that "[a]t L9, someone's a world class expert in a topic . . . for example, an L9 might figure out a completely different way to do [cloud] storage." (Trial Tr. 839:19–840:3.) "We would expect someone coming in at L9," Grannis continued, "to be a pace-setter for the organization[.]" (*Id*. 845:6–7.) "A Level 8," conversely, has not "created or done these things of distinction yet . . . they wouldn't be recognized as a world class expert." (*Id*. 840:9–15.) Google's Engineering-Wide Leveling Guide memorialized these differences. (D38.) The hiring packets for the L9 Technical Directors were consistent with this.  (D23–D25; D27–D28; Trial Tr. 859:17–866:11.)

Rowe's principal comparator, Nicholas Harteau, especially stood out. Harteau had "led the overall infrastructure and operations org[anization] for Spotify for several years," and had "detailed technical expertise" across several relevant areas, including cloud technology. (P118 at GOOG-ROWE-00056324.R; Burdis Dep. 75:13–77:6.) He was "a top voice in the market for

4

public cloud adoption at scale, and ha[d] extremely high credibility in the engineering community outside and inside of Google . . . ." (P118 at GOOG-ROWE-00056329.R).

A comparison of Rowe's hiring packet with those of the L9 Technical Directors further supports this conclusion. Rowe "didn't come off as the most technical of the candidates"; it was "unclear whether she's a trusted advisor to the CxO"; one interviewer was not "blown away"; (P119 at GOOG-ROWE-00019105.R, 00019112.R, 00019114.R.) Rowe herself admitted in August 2016 during the hiring process that she was "not a cloud expert . . . ." (D47.) Grannis agreed, testifying that Rowe "wasn't a world recognized expert," and that he "wouldn't have known about her as a candidate if it wasn't for recruiting letting us know" about her. (Trial Tr. 855:1–3.) Rowe's experience and qualifications were much more in line with other L8 Technical Directors, such as Scott Penberthy. (*Id*. at 851:5–852:2.)

The jury also learned of Google's Candidate Evaluation Strat Ops ("CESO") group, a "capstone of the hiring process" that thoroughly assesses every employment offer Google extends. (*Id*. at 552:15–24.) CESO examines, in particular, leveling and compensation. (*Id*.) One of its express functions is to ensure that leveling is fair and equitable. (*Id*. at 552:25–553:3.) This institutional safeguard supported the jury's finding, too. It is no surprise, then, that Rowe admitted to Employee Relations investigator April Beaupain, during Google's 2018 investigation of Rowe's internal complaint of under-leveling, that other than the gender differences among the Technical Directors "she couldn't think of anything that indicated [her level] was based on gender." (*Id.* at 1051:4–1052:2.)

The only evidence Rowe offered in response to these undisputed facts was her own subjective opinion regarding her qualifications relative to L9 Technical Directors. This is plainly insufficient to support a judgment in her favor; indeed, courts routinely hold it insufficient to avoid

summary judgment. *See Chenette v. Kenneth Cole Prods., Inc.*, 345 F. App'x 615, 619 (2d Cir. 2009) ("a plaintiff's 'merely subjective assessment' of her own qualifications" for a position "cannot defeat evidence that other individuals were more qualified"); *Dawson v. Bumble & Bumble*, 398 F.3d 211, 224 (2d Cir. 2005) ("merely subjective assessment of [plaintiff's] chances for promotion does not create an issue of fact as to whether Bumble & Bumble's failure to promote [plaintiff] was motivated by discriminatory intent."); *Holt v. KMI-Continental, Inc.*, 95 F.3d 123, 129–30 (2d Cir. 1996) (in response to evidence showing experience of others, plaintiff "attempts to show pretext by asserting her personal belief that she was the most qualified person for the various positions[,]" which is insufficient to avoid summary judgment).

> 2. *Rowe Failed to Prove That Google Denied Her the FSVL Role Because of Her Gender.*

The evidence supports the jury's finding that Google did not deny Rowe the FSVL Role because of her gender.

Shaukat did not plan to consider any of the individuals who transferred from the Office of the Chief Technology Officer ("OCTO") (men or women) for vertical lead roles in his organization. (Trial Tr. 436:16–439:3.) He preferred two other female candidates, Ranjana Clark and Diana Leyfield, for the FSVL Role. (*Id*. at 468:21–24, 605:3–4.) He testified that Clark "was an . . . extraordinarily qualified [and] experienced candidate in the financial services world." (*Id*. at 444:22–25.) Clark was "the head of . . . transaction banking at . . . one of the largest banks in the world." (*Id*. at 445:1–2.) She had also held "senior roles reporting to the CEO of Western Union, PayPal, [and] Wachovia Bank," and "had been on the list . . . this year, of the 30 or 50 most powerful women in banking as well." (*Id*. at 445:4–7.) Leyfield, Shaukat's other preferred candidate, "had run and very successfully built a large payments business for Google starting in

India and then in a number of other countries." (*Id*. at 466:21–467:4.) Prior to that, "she was a CEO of a large bank in Africa . . . ." (*Id*. at 467:5–6.)

Shaukat had legitimate "reservations," though, about Rowe's candidacy. (*Id*. at 468:13–15.) The interview feedback he received on Rowe was that she "was very strong technically [but] didn't demonstrate an understanding or a vision for what she should do with the industry." (*Id*. at 344:5–7.) There were doubts regarding whether Rowe "had the access to the C-level executives" the FSVL Role required, and "whether she had the business vision to chart the entire organization on the business, marketing, and technical side." (*Id*. at 343:4–8.)

On the cusp of offering the FSVL Role to Leyfield, Shaukat halted the hiring process "because of some of the organizational changes inside Google," namely, Diane Greene's departure and replacement by Thomas Kurian. (*Id*. at 470:21–472:7.)

      3.    *Rowe Failed to Prove That Google Denied Her the VP-FSS Role Because of Her Gender.*

The evidence supports the jury's finding that Google did not deny Rowe the VP-FSS Role because of her gender.

The successful candidate, Yolande Piazza, is also female. (Trial Tr. 1258:18–23.) Kirsten Kliphouse considered Piazza "a very seasoned [and] very senior leader who had been in the industry of financial services for a long time." (*Id*.) Piazza was "well versed in management, in leadership, in technology, being at the executive table and being able to make very senior decisions within the financial services." (*Id*. at 1258:23–1259:1.) She was also "qualified as . . . [a] financial services expert given her roles [and] her background within Citi[bank]." (*Id*. at 1259:1–3.)

Rowe, on the other hand, did not impress Kliphouse as someone that could fulfill the VP-FSS Role. (*Id*. at 1261:23–1262:1.) In fact, despite Rowe's self-assessment as an authority in the industry who "spoke very regularly at . . . financial services industry events," (*id*. at 132:2–8),

Kliphouse had never heard of Rowe before Grannis asked her to meet with Rowe as a favor to him. (*Id*. at 1260:15–22, 1266:23–1267:4.)

        4.       *Rowe Failed to Prove That Google Paid Her Less Because of Her Gender or that It Paid Her in Violation of the NYLL.*

The evidence supports the jury's finding that Google has not paid Rowe less because of her gender.

Rowe performed different work than that of her two identified comparators, Harteau and Breslow. According to the former Chief Technology Officer of Google Cloud, Brian Stevens, Harteau had a "depth of understanding technology" that allowed him to go "very deep into . . . the products in Google Cloud . . . ." (Trial Tr. 1197:17–20.) Rowe was still learning the platform at the time. (*Id*. at 215:23–216:1.) For example, Harteau worked alongside Stevens to "create[] a new type of virtual computer instance . . . that made [Google Cloud] more cost-efficient" for Spotify, which is "why [Google] won [the Spotify] deal." (*Id*. at 1199:6–9.) Harteau also worked with Stevens to conceptualize "a particular engineering project that would allow [customers] to . . . store their data . . . onto the cloud more easily." (*Id*. at 1199:13–16.) Rowe, on the other hand, "just worked less with the engineering teams," so could not add the value to Google Cloud that Harteau did. (*Id*. at 1200:1–8.)

Nor was Rowe's work similar to Breslow's. Rowe's position was an engineering role. (*Id*. at 65:8–9, 129:3–11, 218:2–8.) Breslow is not an engineer, nor was he doing engineering work. (*Id*. at 699:20–700:11.) Breslow is a lawyer, whose work was focused on regulatory matters. (*Id*. at 702:24–703:4.)

5.   *Rowe Failed to Prove that Google Denied Her Any Positions Because She Complained of Gender Discrimination.*

The evidence supports the jury's finding that Google did not deny Rowe any positions because of protected activity under the NYCHRL.

Before a final decision was made about the FSVL role, Rowe twice expressed to Google her belief that Google's decision to set her level was gender-based. The evidence, however, shows that Shaukat preferred better-qualified female candidates before he even learned of her internal complaint in November 2018.

Rowe raised a concern to Melissa Lawrence on August 28, 2018 that she was hired into Google at L8, but her "male peers were all hired at Level 9," which she claimed was adversely affecting her candidacy for the FSVL Role. (P44). Then, on November 7, 2018, Rowe "reiterate[d] [her] strong interest" in the FSVL Role to Shaukat and Greene, because it was "taking a long time for HR to schedule the meeting with Diane [Greene]." (P55.) To apply pressure, Rowe suggested that she "was hired in at a more junior level than [her] male peers," and ascribed the state of her candidacy for the FSVL Role to her alleged under-leveling at hire on the basis of gender. (*Id.*)[3]

As early as May 2018—three months *before* Rowe first complained of gender discrimination—Shaukat expressed that he "wasn't blown away" by Rowe as a candidate for the FSVL Role. (P16.) In June 2018, Shaukat again expressed that Rowe was not "likely right" for the FSVL Role. (P150.) Instead, Shaukat's favored candidates were Clark and Leyfield. Shaukat was considering Clark for the role as early as March 2018. (Trial Tr. 444:6–17.) He was seriously considering Layfield beginning in July 2018. (P69.)

---

[3] As set forth in Google's motion for remittitur, filed concurrently with this motion, Google promptly and fully investigated all of Rowe's internal concerns of under-leveling, including a November 2017 complaint that was not gender-related.

Shaukat did not learn until Rowe's November 7, 2018 complaint that her leveling concerns were tied to gender. (Trial Tr. 402:17–24.) There is also no evidence that Vardaman, the internal recruiter for the role, was aware of Rowe's gender-related complaints until January 2020 at the earliest, when he spoke with Google Employee Relations ("ER") regarding Rowe's September 2019 lawsuit. (*Id*. at 557:16–19, 582:8–19, 1250:5–8.)

Kliphouse was not aware that Rowe had complained of gender discrimination at the time she had formed her strong preference for Piazza, the candidate she selected over Rowe and all others for the VP-FSS Role. (*Id*. at 1262:11–24.) The jury's decision not to award Rowe any back pay confirms that Google did not deny Rowe the VP-FSS Role because of her gender-related complaints.

> 6.   *Rowe Failed to Prove that Google Denied Her the VP-FSS Role Because She Engaged in Protected Conduct Under the NYLL.*

The evidence supports the jury's finding that Google did not deny Rowe the VP-FSS Role because of protected activity.

Rowe first asserted a NYLL retaliation claim in her Second Amended Complaint. (ECF No. 108 ¶¶ 90–93.) According to her motion for leave to amend that pleading, Rowe's NYLL retaliation claim was based on Google's alleged retaliation for "the filing of Plaintiff's initial Complaint . . . and Amended Complaint . . . ." (ECF No. 77 at 1.)

Rowe's sole protected conduct under the NYLL was initiating this lawsuit. (*Id*.; ECF No. 108 ¶¶ 48–61, 90–93.)  Google's failure to promote her to the VP-FSS Role is therefore the only allegedly retaliatory act at issue. (*See* ECF No. 77 at 1 (moving for leave to add NYLL retaliation

claim "flowing from Google's failure to consider Plaintiff for [the VP-FSS role], an event which transpired after the filing of Plaintiff's initial Complaint . . . and Amended Complaint . . . .").)

For the reasons described in Section II(A)(3), *supra*, Kliphouse chose Piazza for the VP-FSS Role because *she* was the most qualified candidate. At the time Kliphouse was hiring for the VP-FSS Role, she was *not aware* that Rowe had initiated this lawsuit. (Trial Tr. 1262:11–14.) Rowe mentioned only "in passing at the end of [their February 2020] conversation" that "she had some issues with Google," but Kliphouse "didn't know what it was about, and [Rowe] didn't offer any more than that." (*Id*.) Kliphouse did not inquire further; nor did she care to. (*Id*. at 1262:16–24.) She simply "left it alone." (*Id*. at 1262:24.)

**\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\***

In sum, the jury's verdict against Rowe on her NYLL claim and against her on the claims for back pay is well supported in the evidence. To respect the jury's conclusions, no judgment can be entered for Rowe on these claims.

### B.    The Jury's Narrow Finding that Google *Otherwise* Discriminated and Retaliated Against Rowe Is Unsupported by Evidence.

The jury found that on "at least one occasion," Google (a) "treated [Rowe] less well, at least in part, because of her gender"; (b) "retaliated against [Rowe] in violation of the [NYCHRL]; and (c) "retaliated against [Rowe] in violation of the [NYLL]." (ECF No. 340 at I(B)–(D).) Given the verdict against her as described above, the jury's finding for Rowe is necessarily narrow. None of these claims is supported by the evidence, however. Therefore, judgment should enter for Google and against Rowe on these claims, too.

1.      *There is No Evidence that Rowe Was Intentionally Excluded from Meetings, Team Off-sites, or Email Distribution Lists Because of Gender.*

There is no evidence that Rowe was intentionally excluded from meetings, team off-sites, or email distribution lists because of gender.

First, Rowe did not provide a single specific example of a meeting, off-site, or email distribution list from which she was excluded. (Trial Tr. 259:20–265:16.) Even crediting Rowe's vague testimony about unidentified missed meetings, emails and off-sites, there still is no evidence remotely suggesting that Shaukat was responsible for those things; nor is there evidence to suggest that others were treated differently or that Shaukat caused these things to happen *because of Rowe's gender*.

Rowe has been employed at Google for nearly seven years. The specific evidence of meetings, emails, and off-sites over the mere ten months that she reported to Shaukat reflects nothing untoward. In February 2018, for example, Shaukat suggested that his team invite Rowe to the 2018 S&P Global Leadership Summit. (P14.) Rowe spoke with Shaukat at a "meet-and-greet" in February 2018, among other "senior people getting to know each other." (Trial Tr. 150:14–18.) Rowe and Shaukat met again in May 2018 to discuss the FSVL Role in an "exploratory fashion." (P16.) The two spoke again on June 12, 2018, after which Rowe thanked Shaukat for "taking the time to share [his] vision" for the FSVL Role. (P21.) On July 1, 2018, Rowe told Shaukat she would request time on his calendar via his assistant. (P30.) Shaukat responded, "[s]ounds great – look forward to connecting." (*Id.*) The two had a one-on-one meeting in September. (Trial Tr. 168:5–14.) Rowe's own calendar reflects she was invited to Shaukat's biweekly staff meetings. (D60).

Shaukat's "general policy . . . was not to hold standing one-on-ones with most of [his] direct reports," but he nevertheless "met with [Rowe] when she asked for the time," their schedules

permitting. (Trial Tr. 323:13–25.) "Sometimes it was a meeting, sometimes it was a phone call, sometimes it was a text message," but Shaukat "tried to make [him]self available" to all of his direct reports, including Rowe. (*Id*. at 324:3–7.)[4] There is no competent evidence to support Rowe's suggestion that Shaukat regularly met with Breslow "for steak." (*Id*. at 50:7.) "I'm a lacto-ovo-pesco vegetarian," Breslow told the jury, "I haven't had steak in 25 years." (*Id*. at 709:5–9.)

Nor was Rowe excluded from team off-sites. "I go to team off-sites," Rowe admitted to the jury. (*Id*. at 197:24.) In an October 2018 email, Rowe expressed to Shaukat that she had a "great couple of days at the offsite this week!" (D61.) Rowe also testified that she was invited to a critical meeting in January 2019 with Thomas Kurian, the Google Cloud CEO, to discuss the state of financial services in Shaukat's organization. (Trial Tr. 265:3–12.)

Finally, there is no evidence that Shaukat intentionally excluded Rowe from email distribution lists. To the contrary, as soon as Rowe alerted Shaukat that she was not on his email distribution list, Shaukat looped in his assistant to rectify the inadvertent exclusion. (P30.) Rowe's male colleagues were inadvertently excluded from email distribution lists, too, dispelling any notion that Rowe's exclusion was based on her gender. (D59.)

Even assuming Shaukat excluded Rowe from meetings, team off-sites, or email distribution lists, there is no evidence that he acted because of Rowe's gender. Shaukat has consistently supported the professional advancement of women at Google, including Rowe. Shaukat, for example, hired Carrie Tharpe as a L10 Vice President. (Trial Tr. 277:6–13.) In September 2019, when a Google communications officer informed Shaukat that the communications team was "media training Stuart [Breslow] . . . so we can start to use him with the press," Shaukat suggested

---

[4] In 2018, Shaukat had approximately twelve direct reports, but the "number varied considerably throughout the year." (Trial Tr. 274:16–20.)

that Tais O'Dwyer, a female, "would also be great for press in fin[ancial] serv[ices]." (P82.) Shaukat also went to great lengths to make sure that Rowe had a full and fair opportunity to demonstrate that she was the best qualified for the FSVL Role, including requesting an interview with Greene as a personal favor. (*See* Section II(B)(3), *infra*.) The only two other candidates for the FSVL Role who were able to schedule an interview with Greene—Leyfield and Clark—were both female. (*Id*.) That he preferred them over Rowe is hardly proof that he is biased against women.

There is no evidence to support a finding that Rowe was intentionally excluded from meetings, team off-sites, or email distribution lists because of her gender.

> ### 2.     *There Is No Evidence that Rowe's Return to OCTO Was Retaliatory.*

There was nothing retaliatory about Rowe's return to OCTO in March 2019; the evidence conclusively shows that it was her choice, that she was unhappy leaving OCTO the year earlier, and that she suffered no adverse consequences.

In March 2019, Shaukat discussed three options with Rowe: she could (1) take the Global Client Technical Lead role "with the option of building the team," *i.e.*, "an expansion of the scope that she had had in OCTO"; (2) be an individual contributor and "let someone else build the team and not take on managerial responsibilities"; or (3) with Shaukat's assistance, Rowe could "f[i]nd another role inside of Google that she preferred," for which Shaukat would personally provide the scarce currency of "head count." (Trial Tr. 473:7–25.) Under this last option, Shaukat would effectively provide the budget for the role of Rowe's choosing, something he "had not previously done for anyone else." (*Id*. at 474:1–24.) Shaukat placed only one condition on the third option: Rowe's role could not be industry-specific, because the industry-specific work "had to be done on

[his] team." (*Id*. at 475:2–6.) Rowe admitted that she was not aware of any other individuals reporting to Shaukat who were given these options. (*Id*. at 266:1–9.) None of this is disputed.

Rowe testified that *she chose* to return to OCTO. (*Id*. at 184:8.) She worked with Grannis to formulate a role: hybrid cloud. (*Id*. at 475:6–9.) This was not a form of punishment; to the contrary, hybrid cloud "was one of the major strategic growth paths for the business at the time," and Rowe would be occupying that role "either just before or just after [Google] launched a number of innovations in that area." (*Id*. at 475:10–16.) "[I]t was a critical focus area for [Google]." (*Id*. 475:16–17.)

Shaukat hoped Rowe's new and critical role in OCTO would make her happy. (*Id*. at 475:18–19.) This made sense: Rowe told the jury that when she initially joined Shaukat's team, she "wasn't happy to leave OCTO." (*Id*. at 267:10–13.) Upon her return to OCTO, none of her level, responsibilities, or compensation was adversely affected. (*Id*. at 267:16–23.)

There is no evidence suggesting that the move had anything to do with Rowe's protected activity. Nor is there any evidence suggesting that this treatment was somehow worse than Shaukat's treatment of others.

> 3. *There Is No Evidence that Google's Consideration of Rowe for the FSVL Role Was Discriminatory or Retaliatory.*

Despite the fact that she did not impress him and he preferred better-qualified candidates, Shaukat gave Rowe the opportunity to show that she was the best qualified for the FSVL Role. No evidence suggests that his treatment of her was unfair. No evidence suggests that his treatment of her was because of her gender or because she raised complaints of gender discrimination. Rowe's experience in the process was the same as all others who were considered. The only aspect of the process that did not go as expected for Rowe was the outcome, which the jury concluded was not unlawful. She was not treated less well than others.

Shaukat first discussed the FSVL Role with Rowe in early 2018 "in a very exploratory fashion." (P16.) He "wasn't blown away" by Rowe compared with "some of the [other] folks" he had "been talking to in this space." (*Id*.) Shaukat's view of Rowe's candidacy remained consistent: in June 2018, he told Greene, "I don't think [Rowe] is likely right" for the FSVL Role. (P150.) As noted above, he thought other *female* candidates were better. However, in part because he understood that she might leave Google if she was not given an opportunity for the FSVL Role, and because Brian Stevens asked him to consider her, Shaukat "commit[ed]" to give Rowe "a fair shot." (P25.)[5]

When Rowe formally expressed her interest in the role in June 2018, Shaukat did not require her "to go through the initial assessment phases." (*Id*.) Rowe appreciated the consideration, and acknowledged that the recruitment process would "take some time." (*Id*.) She understood the recruitment process would take approximately six months. (Trial Tr. 244:8–13.)

The process formally began the next month, in July, when Stuart Vardaman "schedul[ed] panel interviews" for her. (P69.) Not every candidate got even that far. (Trial Tr. 604:4–9 ("Q: Were there some [candidates] that did not even get interviews at all? A: That is correct.")) Every candidate who reached the interview stage underwent four interviews—including Rowe. (*Id*. at 604:10–18.)

Rowe's interviews took place in August, two months into a process she understood would take six. (P151.) Interviewers took notes, used rubrics, and asked formal questions, such as soliciting Rowe's vision of the financial services industry. (*Id*.; P149.) Not all of Rowe's interviewers observed formalities; some, for example, did not enter their feedback into the gHire

---

[5] In May 2018, Stevens expressly cautioned Shaukat that Rowe was "getting recruited away," so he should give Rowe "a swing at the bat" for the FSVL Role. (P16.)

system, but gave it directly to Vardaman "via ping." (Trial Tr. 653:16–19.) Interview feedback for Clark and Layfield was not always entered into gHire, either. (D70 and D71.) Afterwards, Rowe told Vardaman that she "had good conversations" with the interviewers. (P50.) Vardaman, too, testified that Rowe never indicated to him that she felt her interviews were "off" in any way. (Trial Tr. 653:13–15.) There was no evidence presented that Rowe's interviews were in any meaningful way different from any other candidate's interviews for the FSVL Role.

Rowe's final step in the recruitment process was supposed to be an interview with Diane Greene. This was a rare opportunity: according to Shaukat, "[v]ery few people in the organization got to meet with Diane Greene." (*Id*. at 355:10–11.) Shaukat personally requested that Greene interview Rowe for the FSVL Role, because he "valued Ulku's technical capabilities . . . [and] what she had done in OCTO. And we were trying to retain her." (*Id*. at 353:20–25.) The only other FSVL candidates to receive a scheduled interview with Greene were Leyfield and Clark—both female. (*Id*. at 604:24–605:7.) Vardaman made great efforts to schedule Rowe's interview with Greene. It was "exceptionally difficult to get on [Greene's] calendar." (*Id*. at 605:12–13.) Nevertheless, Shaukat and Vardaman successfully scheduled Rowe's interview with Greene for December 13, 2018, (P69 at GOOG-ROWE-00017752.RR), consistent with the timeline Shaukat predicted. (P25.) The interview was canceled, though, only because Greene "was stepping out of the organization and wasn't going to be there anymore." (Trial Tr. 605:18–24.) Pending Greene's replacement by Kurian, Shaukat halted the FSVL recruitment process, in case Kurian "ha[d] a different view of strategy" for Google Cloud. (*Id*. at 470:17–472:1.)

There is no evidence to suggest that Rowe was treated less well than others, or that her gender or internal complaints of gender discrimination at all impacted her progression through the process.

4. *There Is No Evidence that Google's Consideration of Rowe for the VP-FSS Role Was Retaliatory or Discriminatory.*

Rowe first met Kirsten Kliphouse, then-President of North American Sales for Google Cloud, on February 3, 2020 over coffee. (Trial Tr. 1259:16–1261:5; P106). Kliphouse accepted the meeting at Grannis's request. (*Id*. at 1260:15–22.) There is no evidence that Grannis arranged a one-on-one meeting with Kliphouse for anyone else. During the meeting, Kliphouse mentioned that she was recruiting for the VP-FSS Role. (*Id*. at 186:20–22.)

Rowe took the opportunity to market herself for the role. According to Rowe, she described for Kliphouse her "expertise in financial services and [her] industry networking credibility . . . ."[6] As noted at Section II(A)(6), *supra*, Rowe made a vague reference to an issue with Google but never shared anything about her alleged protected activity. As described at Section II(A)(3), *supra*, Kliphouse already had a favored candidate for the VP-FSS Role, whom she rated a "strong hire" just three days after her coffee with Rowe. (D79.) Rowe did not impress Kliphouse in the same way. (*Id*.)

Vardaman provided the job description to Rowe at her request. (P106; D75.) Per the job description, the VP-FSS Role was designed for someone with "previous, demonstrable success leading sizeable technology sales teams that serve the financial services industry . . . ." (D75.) Among the necessary qualifications were "[p]roven success managing a sales/business development organization to meet and exceed revenue goals." (*Id*.) Rowe admitted at trial, though, that she had none of these qualifications: "Q: [Y]ou've never managed a sales team at all; is that right? A: Correct." (Trial Tr. 270:8–10.) "Q: . . . [and] you didn't demonstrate proven success

---

[6] At trial, Rowe denied making this statement to Kliphouse (Trial Tr. 268:20–22), but Google impeached Rowe's trial testimony with her deposition testimony. (*Id*. 269:2–22 (Rowe Dep. 344:18-345:8).) Regardless, the opportunity created for Rowe with Kliphouse is undeniable, and scarcely represents discriminatory or retaliatory treatment.

managing a sales business development organization to meet revenue goals, is that an accurate statement? A: Correct." (*Id*. at 270:17–20.)

Vardaman, for his part, merely facilitated the recruitment process at Kliphouse's direction. (*Id*. at 1264:2–5.) He did not opine on the qualifications of any particular candidate, especially internal ones: "When it comes to internal Googlers," Vardaman testified, "my job is to take their interest to the hiring manager and then go from there." (*Id*. at 598:23–599:3.) Kliphouse did, however, "talk[] through" Rowe's qualifications for the VP-FSS Role with Vardaman, raising questions such as: "C-level expertise, did [Rowe] have the relationships? Did [Rowe] have the ability to have executive communications with them? Did [she] have the outreach capabilities?" (*Id*. at 1264:24–1265:18.) At no time did Vardaman express to Kliphouse any reservations about Rowe's candidacy, mention that he had felt disrespected by Rowe in an earlier interaction that he had described to Google ER, or that he had even met with ER in connection with Google's investigation into Rowe's September 2019 complaint. (*Id*. at 669:1–14.)

Both Rowe and O'Dwyer—another internal candidate for the VP-FSS Role—appeared on Vardaman's recruitment status report as of February 21, 2020, (D74), just two weeks after Kliphouse had already rated Piazza a "strong hire." (D79.) Ultimately, Kliphouse retained her strong preference for Piazza, and asked Vardaman "to focus on [Piazza] and wind down other candidates." (*Id*. at 665:14–17.) There is no evidence that O'Dwyer, a female, complained of discrimination. Nevertheless, neither Rowe nor O'Dwyer were chosen for the VP-FSS Role, dispelling any notion that the manner in which Rowe was treated had anything to do with either her gender or protected conduct. There is no evidence suggesting that Rowe was treated any differently than anyone else, much less because of her protected activity.

## III.    LEGAL STANDARD

"A Rule 50(b) motion for judgment as a matter of law is decided according to the same standard as a motion for summary judgment under Rule 56(f)." *Anderson v. N.Y.C. Health & Hosp. Corp.*, No. 16-cv-1051, 2023 WL 2574197, at *1 (S.D.N.Y. Mar. 20, 2023). Even so, this Court is "by no means obligated to deny a Rule 50 motion simply because" it previously decided there were questions of fact for the jury. *Cangemi v. U.S.*, 13 F.4th 115, 140 (2d Cir. 2021) (affirming grant of Rule 50(b) motion notwithstanding prior denial of summary judgment). That is particularly so here, where the jury decided that Rowe failed to prove her core claims.

This Court may grant the Rule 50(b) motion if it "finds that a reasonable jury would not have a legally sufficient evidentiary basis to find for the [non-movant]." *Id.* at 136 (citation omitted). In assessing the motion, this Court must "credit evidence favorable to the moving party that is uncontradicted and unimpeached . . . ." *Estate of Airday v. City of New York*, No. 14-cv-8065, 2022 WL 1265940, at *3 (S.D.N.Y. Apr. 28, 2022) (granting Rule 50(b) motion).

## IV.    ARGUMENT

### A.    This Court's Ruling on Google's Rule 50(a) Motion and the Verdict.

On October 18, 2023, Google moved for judgment as a matter of law pursuant to Rule 50(a) of the Federal Rules of Civil Procedure.[7] The Court denied Google's Rule 50(a) motion, holding that "on the record that ha[d] developed … there [wa]s sufficient evidence" to support a

---

[7] Prior to Google's Rule 50(a) motion, this Court instructed Google to provide its "elevator pitch of the Rule 50 motion," and then during counsel's oral motion instructed Google to "go to a higher level." (Trial Tr. 1095:21–22, 1098:1–3; *see also* 1128:9–15.) Google should not be strictly held to Rule 50(b)'s specificity requirement, as a result. *See Gordon v. Cnty. of Rockland*, 110 F.3d 886, 887 n.2 (2d Cir. 1997) (rejecting argument that Rule 50(b) movant failed specificity requirement under these circumstances); *see also Doctor's Assocs., Inc. v. Weible*, 92 F.3d 108, 113–14 (2d Cir. 1996) (declining to "woodenly apply" specificity requirement only "to attain an unwarranted triumph of form over substance").

verdict for Rowe on her claims that (i) she and Harteau were doing equal work; (ii) she was denied the FSVL Role; (iii) she was denied the VP-FSS Role; and (iv) she was treated less well than L9 Technical Directors, including on pay. (Trial Tr. 1126:7–1127:21.) Google presented its case on October 18 and 19, and the jury returned a verdict on October 20, 2023.

The answers on the special verdict form reflect a verdict against Rowe on her core claims, the very claims this Court referenced when denying Google's Rule 50(a) motion. (*Id*. at 1126:7–1127:21.) The jury found that she failed to prove: (a) under the NYLL, that Google paid Rowe less than men performing equal work; (b) under the NYCHRL, that Google paid Rowe less or denied her any positions because of her gender; and (c) under both the NYLL and the NYCHRL, that Google denied Rowe any positions because she engaged in protected conduct. (*See* Section II.A, *supra*, regarding the Court's instruction to the jury to award back pay to Rowe if she had met her burden to prove any of these things). "[P]roper deference to the parties' Seventh Amendment rights to a jury trial precludes entry of a judgment that disregards" these findings. *Auwood v. Harry Brandt Booking Office, Inc.*, 850 F.2d 884, 890–91 (2d Cir. 1988) (citing *Atlantic & Gulf Stevedores, Inc. v. Ellerman Lines, Ltd.*, 369 U.S. 355, 364 (1962)).

What remains of Rowe's case is a smattering of secondary claims relating to missed emails, meetings and off-sites, an alleged forced transfer, and unspecified unfair treatment. There is neither factual support in the record nor legal support for these claims. Therefore, judgment should enter for Google.

### B. Rowe's NYCHRL Discrimination Claims Fail.

Even under the NYCHRL, Rowe was required to prove at trial that Google's conduct towards her was motivated, at least in part, by her gender. *Khwaja v. Jobs to Move Am.*, No. 19-cv-7070, 2022 WL 19410313, at *13 (S.D.N.Y. Oct. 22, 2022) (granting summary judgment on

21

NYCHRL discrimination claim, because plaintiff "adduced no evidence that he was treated less well because of his gender"), *adopted*, 2023 WL 2734420 (S.D.N.Y. Mar. 31, 2023); *see also Johnson v. L'Oréal USA*, No. 18-cv-9786, 2021 WL 4482167, at *18 (S.D.N.Y. Sept. 30, 2021) (to prevail on NYCHRL discrimination claim, plaintiff must show that her employer had "a discriminatory *intent*") (emphasis added).

Accordingly, this Court properly instructed the jury that it could only find for Rowe on her NYCHRL claims if there was evidence that Google treated Rowe "less well in any way, at least in part *because of* [her] gender." (Trial Tr. 1444:22–23 (emphasis added).) There was no evidence, though, from which the jury could have reasonably inferred that she was treated less well or that there was any discriminatory intent.

### 1. There Is No Evidence to Support a Judgment Based on Rowe's Alleged Exclusion from Meetings, Team Off-sites, or Email Distribution Lists.

There is no evidence that Shaukat intentionally excluded Rowe from meetings, team off-sites, or emails, or that others were treated differently. (*See* Section II(B)(1), *supra*.) Even if there were, there is no evidence that he was motivated by gender discrimination. To the contrary, Shaukat has consistently supported the professional advancement of women at Google, including Rowe herself. *Id*.; *see Khwaja*, 2022 WL 19410313, at *13 (employer was entitled to judgment as a matter of law under NYCHRL, because plaintiff "adduced no evidence" of gender discrimination).

Moreover, these alleged exclusions do not rise beyond the level of petty slights, even under the more liberal NYCHRL standard. *See LeeHim v. N.Y.C. Dep't of Educ.*, No. 17-cv-3838, 2017 WL 5634128, at *5, *9 (S.D.N.Y. Nov. 21, 2017) (dismissing NYCHRL discrimination claim, where plaintiff alleged she was "excluded from 'core work,' 'communication streams,' and 'meetings,'" because it was "clear as a matter of law 'that the conduct complained of consists of

nothing more than what a reasonable victim of discrimination would consider petty slights and trivial inconveniences'"). Rowe was not treated less well than men by Shaukat (or anyone else).

> 2. *There Is No Evidence to Support a Judgment Based Upon Alleged Unfair Treatment of Rowe During the FSVL Role Search Process.*

Rowe was treated fairly, and the same or better than others, at every step of the FSVL Role search process. Shaukat preferred other candidates, but went out of the way to create a fair (and in some ways better) opportunity for Rowe in the process. Despite his preference for other candidates, Shaukat—with Vardaman's assistance—shepherded Rowe through the process, conferring favorable treatment on her whenever possible. Rowe, for example, skipped "the initial assessment phases." (P25.) At Shaukat's request, and at Vardaman's great effort, Rowe even calendared an interview with Greene—a rare opportunity that "very few people" got. (Trial Tr. 355:10–11.) In short, there was nothing more Google could have done in furtherance of Rowe's candidacy, short of handing her the position.[8] Again, Rowe failed to adduce any evidence that she was treated less well than others, or evidence of discriminatory intent. *See Khwaja*, 2022 WL 19410313, at *13.

Nor can Rowe create an inference of discrimination by relying on her own subjective view of her qualifications versus those of her competitors for the FSVL Role. *See Chenette*, 345 F. App'x at 619 ("a plaintiff's 'merely subjective assessment' of her own qualifications" for a position "cannot defeat evidence that other individuals were more qualified"). To create such an inference, Rowe's qualifications would have to be "so superior to the credentials of the person selected for the job that no reasonable person, in the exercise of impartial judgment, could have chosen the candidate over the plaintiff for the job in question." *Turner v. NYU Hosps. Ctr.*, 784 F. Supp. 2d 266, 279 (S.D.N.Y. 2011) (granting summary judgment on NYCHRL failure-to-promote

---

[8] In fact, Rowe admits she finally asked Shaukat to just "give" her the FSVL Role. (Trial Tr. 251:18-20.)

claim, where plaintiff failed to proffer evidence to support this proposition), *aff'd*, 470 F. App'x 20 (2d Cir. 2012). Rowe has not done so here, either with respect to Leyfield, Clark, or Breslow.

        3.      *There Is No Evidence to Support a Judgment Based Upon Alleged Unfair Treatment of Rowe During the VP-FSS Role Search Process.*

Rowe had an opportunity to impress Kliphouse with her credentials for the VP-FSS Role, but could not, because she did not have the necessary qualifications. (D75; Trial Tr. 270:8–20.) Vardaman, too, remained appropriately neutral, expressing no views on Rowe's candidacy. (Trial Tr. 669:1–14.) Kliphouse simply preferred Piazza, who is also female, because of her superior qualifications. (*Id.* at 1258:18–23; D79.) Rowe failed to adduce any evidence of discriminatory intent in the application process, or even identify a single male candidate who received better treatment than she did. *See Khwaja*, 2022 WL 19410313, at \*13; *Chenette*, 345 F. App'x at 619 ("a plaintiff's 'merely subjective assessment' of her own qualifications" for a position "cannot defeat evidence that other individuals were more qualified"); *Turner*, 784 F. Supp. 2d at 279 (plaintiff failed to proffer evidence that he was "so superior" to the chosen candidate that "no reasonable person . . . could have chosen" plaintiff's competitor, absent discrimination).

**C.    Rowe's NYCHRL Retaliation Claims Fail.**

To prevail on her NYCHRL retaliation claim, Rowe was required to prove that (1) she engaged in protected activity, (2) Google was aware of that activity, (3) she experienced conduct "that was 'reasonably likely to deter a person from engaging in protected activity,'" and (4) a causal connection exists between her protected activity and the allegedly retaliatory act. *White v. Manhattan & Bronx Surface Transit Operating Auth.*, No. 18-cv-3627, 2022 WL 4227289, at \*7 (S.D.N.Y. Sept. 13, 2022). There was no evidence from which the jury could have reasonably concluded that Rowe proved the third and fourth elements of this claim.

1.   *There Is No Evidence to Support a Judgment Based Upon Rowe's Return to OCTO in March 2019.*

Rowe's retaliation claim based on her return to OCTO fails, because Shaukat's conduct was not reasonably likely to (nor did it actually) deter Rowe from engaging in protected activity. Upon her *voluntary* return to OCTO, neither her level, responsibilities, nor compensation was adversely affected. (Trial Tr. 267:16–23.) There was therefore no deterrent against Rowe engaging in protected activity. *See Mooney v. City of New York*, No. 18-cv-328, 2019 WL 4392961, at *9 (S.D.N.Y. Sept. 13, 2019) (granting summary judgment on NYCHRL retaliation claim, because employer's conduct was "not reasonably likely to deter an employee from taking action opposing discrimination").

Rowe filed *this lawsuit* in September 2019. By definition, Shaukat's conduct *did not* deter her from engaging in protected conduct. *See McWhite v. N.Y.C. Hous. Auth.*, No. 05-cv-0991, 2008 WL 1699446, at *13 (E.D.N.Y. Apr. 10, 2008) (granting summary judgment on NYCHRL retaliation claim where complained-of conduct "did not deter plaintiff: she [subsequently] filed her EEOC charge"; thus, plaintiff "cannot assert a prima facie case of retaliation").

Nor is there any evidence that Shaukat's presentation of three options to Rowe, one of which was to return to OCTO, was motivated by retaliatory animus. His sole motivation was finding an appropriate place for Rowe within Google that would make her "happy," after Breslow's interim placement in the FSVL Role. (Trial Tr. 473:7–11.) This evidence regarding Shaukat's state of mind is uncontradicted, and must therefore be credited. *See Estate of Airday*, 2022 WL 1265940, at *5 (on Rule 50(b) motion, the court must "credit evidence favorable to the moving party that is uncontradicted and unimpeached").

2. *There Is No Evidence to Support a Judgment Based Upon Alleged Unfair Treatment of Rowe During the FSVL Role Search Process.*

There is no evidence that Rowe suffered any adverse treatment during the FSVL Role search process. To the contrary, because of Shaukat and Vardaman's efforts, Rowe was one of the finalists for the FSVL Role. (*See* Section II(B)(3), *supra*.)

Nevertheless, even assuming Rowe suffered a perceived slight during the recruitment process, there is no causal nexus to Rowe's November 2018 complaint. Long before, Shaukat had a clear preference for other candidates. (*Id*.) He did not learn until Rowe's November 7, 2018 complaint that her leveling concerns were tied to gender. (Trial Tr. 402:17–24.) Under these circumstances, there was no retaliatory causation as a matter of law. *See Maynard v. Montefiore Med. Ctr.*, No. 18-cv-8877, 2021 WL 396700, at *11 (S.D.N.Y. Feb. 4, 2021) (granting summary judgment on NYCHRL retaliation claim, because "an adverse employment action cannot serve as the basis for a retaliation claim if the action was set in motion before a plaintiff engaged in protected activity").

Also, Google's conduct towards Rowe during her candidacy for the FSVL Role *did not* deter her subsequent protected conduct in September 2019 when she initiated this lawsuit. For this reason, too, there was no retaliation against Rowe as a matter of law. *McWhite*, 2008 WL 1699446, at *13.

3. *There Is No Evidence to Support a Judgment Based Upon Alleged Unfair Treatment of Rowe During the VP-FSS Role Search Process.*

There is similarly no evidence that Rowe suffered any adverse treatment during the VP-FSS Role search process, much less something that was reasonably likely to deter someone from engaging in protected activity. (*See* Section II(B)(4), *supra*.) Even assuming there was such action, which there was not, there is no causal nexus to Rowe's internal complaints of gender-based under-

leveling, because Kliphouse was not even aware of those complaints. (Trial Tr. 1262:11–24.) *See Urquhart v. Metro. Transp. Auth.*, 975 F. Supp. 2d 320, 340 (S.D.N.Y. 2013) (granting summary judgment on NYCHRL retaliation claim, because supervisor "was not aware" of plaintiff's complaint until after the adverse employment action occurred). Kliphouse was not even aware of Rowe's September 2019 lawsuit, negating any inference of retaliatory causation. (Trial Tr. 1262:11–24.) *See Fox v. Starbucks Corp.*, No. 19-cv-4650, 2021 WL 4155029, at *5 (S.D.N.Y. Sept. 13, 2019) (to prevail on NYLL retaliation claim, plaintiff must show, *inter alia*, that her "participation in protected activity [was] known to the defendant"), *aff'd*, 2023 WL 407493 (2d Cir. Jan. 26, 2023).

Even assuming *arguendo* that Kliphouse knew of Rowe's gender-related complaints, there is no evidence that any of Kliphouse's conduct towards Rowe was retaliatory. Rowe had an opportunity to present her background and qualifications after learning about the role  during their February 2020 meeting, was not impressed with her qualifications for the VP-FSS Role, and thereafter moved forward with Piazza, her favored candidate. Rowe proffers nothing but her own unsupported speculation to suggest Kliphouse was motivated by retaliatory animus. *See Fitchett v. City of New York*, No. 18-cv-8144, 2021 WL 964972, at *21 (S.D.N.Y. Mar. 15, 2021) (granting summary judgment on NYCHRL claim, because "the record does not supply a non-speculative basis for [a discriminatory] inference").

## V.    CONCLUSION

For the foregoing reasons, Google respectfully requests judgment as a matter of law under Federal Rule of Civil Procedure 50(b) on all claims in the Second Amended Complaint.

Dated: New York, New York
        November 22, 2023

PAUL HASTINGS LLP

_____

Kenneth W. Gage
Sara B. Tomezsko
Kaveh Dabashi
200 Park Avenue
New York, NY 10166
(212) 318-6000
kennethgage@paulhastings.com
saratomezsko@paulhastings.com
kavehdabashi@paulhastings.com

*Counsel for Defendant Google LLC*

28