UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

ULKU ROWE,                                                  Case No. 1:19-cv-08655-JHR

                Plaintiff,

      v.

GOOGLE LLC,

                Defendant.

---

**MEMORANDUM OF LAW IN SUPPORT OF
DEFENDANT GOOGLE LLC'S MOTION FOR REMITTITUR
OF PUNITIVE DAMAGES**

# TABLE OF CONTENTS

**Page**

I.      INTRODUCTION ................................................................................................ 1

II.     STATEMENT OF EVIDENCE ......................................................................... 2

    A.      Google Maintains and Enforces A Fulsome Anti-Discrimination Policy. ............ 2

    B.      Google Responded to Rowe's 2017 Concerns Fairly and In-line with Google Policy ............................................................................................... 5

    C.      Rowe Raised Her Concerns Again in 2018, with No New Information, and Google Reviewed Them a Second Time. ............................................. 6

    D.      During the Second Investigation Into Her Concerns, Rowe Complained to Shaukat and Others To Secure a Final Interview for the FSVL Role.................. 8

    E.      Google Investigated Rowe's Concerns a Third Time after She Filed Her Lawsuit. ................................................................................................ 9

    F.      The Recruiter for the FSVL Role and VP-FSS Role Represented Rowe in the Best Possible Light ......................................................................... 11

    G.      Rowe Remains Gainfully Employed at Google in Grannis' Chain of Command. .......................................................................................... 13

III.    ARGUMENT ...................................................................................................... 14

    A.      The Standard for Punitive Damages Under the NYCHRL Is High. ................. 14

    B.      The Punitive Damages Award Is Excessive and Should Be Reduced................ 15

        1.      Google's Conduct Towards Rowe Was Not Reprehensible ................... 16

        2.      Plaintiff Cannot Offer Contrary Evidence of Reprehensible Conduct ............................................................................................ 20

        3.      The Ratio of Rowe's Punitive Damages Award to Her Compensatory Damages Is Excessive and Unconstitutional. .................. 21

        4.      Rowe's Punitive Damages Award Vastly Exceeds the Maximum Civil Penalty Authorized by the NYCHRL. ........................................ 22

IV.     CONCLUSION .................................................................................................. 23

## **TABLE OF AUTHORITIES**

**Cases**                                                                                                  **Page(s)**

*Allam v. Meyers*,
   906 F. Supp. 2d 274 (S.D.N.Y. 2012).........................................................................22

*Bouveng v. NYG Cap. LLC*,
   175 F. Supp. 3d 280 (S.D.N.Y. 2016).......................................................................22

*Chauca v. Abraham*,
   30 N.Y.3d 325 (2017) .........................................................................................1, 14

*Duarte v. St. Barnabas Hosp.*,
   341 F. Supp. 3d 306 (S.D.N.Y. 2018)............................................................. *passim*

*Kim v. Dial Serv. Int'l*,
   No. 96-cv-3327, 1997 WL 458783 (S.D.N.Y. Aug. 11, 1997), *aff'd*, 159 F.3d
   1347 (2d Cir. 1998)...................................................................................................22

*Koch v. Greenberg*,
   14 F. Supp. 3d 247 (S.D.N.Y. 2014), *aff'd*, 626 F. App'x 335 (2d Cir. 2015).......................22

*MacMillan v. Millennium Broadway Hotel*,
   873 F. Supp. 2d 546 (S.D.N.Y. 2012).........................................................16, 19, 23

*Pierce v. City of New York*,
   293 F. Supp. 3d 306 (E.D.N.Y. 2017), *aff'd*, 805 F. App'x 70 (2d Cir. 2020)...................21

*Ravina v. Columbia Univ.*,
   No. 16-cv-2137, 2019 WL 1450449 (S.D.N.Y. Mar. 31, 2019)...............................15

*Ryan v. Cnty. of Nassau*,
   No. 12-cv-5343, 2018 WL 354684 (E.D.N.Y. Jan. 10, 2018)..................................21

*Saleh v. Pretty Girl, Inc.*,
   No. 09-cv-1769, 2022 WL 4078150 (E.D.N.Y. Sept. 6, 2022) ...............................22

*Shukla v. Sharma*,
   No. 07-cv-2972, 2012 WL 481796 (E.D.N.Y. Feb. 14, 2012) .................................22

*State Farm Mut. Auto. Ins. Co. v. Campbell*,
   538 U.S. 408 (2003)..................................................................................................20

*Thomas v. iStar Fin., Inc.*,
   652 F.3d 141 (2d Cir. 2010)......................................................................................21

*Turley v. ISG Lackawanna, Inc.*,
   774 F.3d 140 (2d Cir. 2014)......................................................................................22

*Urquhart v. Metro. Transp. Auth.*,
   975 F. Supp. 2d 320 (S.D.N.Y. 2013)..........................................................................20

*Watson v. E.S. Sutton, Inc.*,
   No. 02-cv-2739, 2005 WL 2170659 (S.D.N.Y. Sept. 6, 2005), *aff'd*, 225 F.
   App'x 3 (2d Cir. 2006)....................................................................................19, 20

*Webber v. Dash*,
   607 F. Supp. 3d 407 (S.D.N.Y. 2022)............................................................................15

**Other Authorities**

Fed. R. Civ. P. 59(e) ...........................................................................................................15

N.Y.C. Admin. Code. § 8-107(3)(d)–(e) ...........................................................................14

N.Y.C. Admin. Code § 8-126(a)....................................................................................2, 23

## I.   INTRODUCTION

Defendant Google LLC ("Google") disagreed with Plaintiff Ulku Rowe over her level at hire, and whether she was the most qualified candidate for the Financial Services Vertical Lead role ("FSVL Role") and/or the Vice President Financial Services Sales role ("VP-FSS Role"). The evidence showed—and the jury's decision to award no back pay damages confirms—that Rowe failed to prove Google paid her unlawfully, that she failed to prove she was unlawfully leveled upon hire, and that she failed to prove she was unlawfully denied a Vice President position, all of which would have entitled her to back pay damages.

The evidence also conclusively established that each time Rowe raised concerns about her alleged under-leveling and its impact on her candidacy for the FSVL Role, Google promptly investigated those concerns as outlined in the company's anti-discrimination policy. Each time, like the jury did at trial, experienced Employee Relations ("ER") investigators found no evidence to substantiate her concerns. Indeed, after she hired counsel and threatened to sue Google, her manager expressly told her that he supported her right to pursue her claims.

If the Court grants Google's concurrently-filed motion for judgment as a matter of law, this motion is moot. If judgment is not entered in Google's favor, however, the outsized punitive damages award should be vacated or reduced. None of the evidence in this record warrants an award of punitive damages, which are reserved for "discrimination with willful or wanton negligence, or recklessness, or a 'conscious disregard of the rights of others or conduct so reckless as to amount to such disregard.'" *Chauca v. Abraham*, 30 N.Y.3d 325, 334 (2017).

Should the Court conclude an award of punitive damages is appropriate (a conclusion with which Google respectfully disagrees), the record certainly does not support an award nearly seven times the $150,000 compensatory damage award for garden-variety emotional distress, the only other amount awarded to Rowe.

1

An award of $1 million in punitive damages under the New York City Human Rights Law ("NYCHRL") is unwarranted and excessive under every applicable metric. *First*, Google's actual conduct towards Rowe was benign, and there was no indicia of conduct that rises to the level of reprehensibility justifying such an award, such as physical violence or threats, discriminatory epithets by decision-makers, or a failure to escalate or investigate Rowe's workplace concerns. *Second*, the punitive-to-compensatory damages ratio in this case is nearly 7:1, which is constitutionally improper. The maximum appropriate ratio is to 4:1, and courts routinely apply a 2:1 or even 1:1 ratio on similar evidentiary records where the only other amounts awarded are for intangibles like emotional distress. *Third*, the punitive damages award here is four times the maximum civil penalty authorized by the NYCHRL of $250,000—a penalty reserved solely for those cases (unlike this one) that involve "willful, wanton or malicious acts." N.Y.C. Admin. Code § 8-126(a).

For these reasons, Google respectfully moves pursuant to Fed. R. Civ. P. 59(e) for remittitur of the excessive punitive damages award to zero, or at most, a 2:1 ratio between compensatory and punitive damages. The requested relief is consistent with well-established case law, and necessary to prevent a miscarriage of justice.

## II.    STATEMENT OF EVIDENCE

For the sake of efficiency, Google incorporates by reference Section II of its concurrently-filed Renewed Motion for Judgement as a Matter of Law pursuant to Fed. R. Civ. P. 50(b) ("Rule 50(b) Motion"), which describes at greater length Google's fair and equitable treatment of Rowe. Google provides the following recitation of evidence specific to the request for remittitur of punitive damages.

### A.    Google Maintains and Enforces A Fulsome Anti-Discrimination Policy.

Google is committed to creating an environment free from discrimination and retaliation,

as the undisputed evidence at trial showed. The company's Policy on harassment, discrimination, retaliation, standards of conduct, and workplace concerns (the "Anti-Discrimination Policy") was one of Rowe's own exhibits, and it states in relevant part:

> At Google we are committed to providing a positive environment where everyone can be a successful contributor. To that end, each of us should expect, and has a responsibility to uphold, a workplace and culture that are free of harassment, discrimination, misconduct, abusive conduct, and retaliation. […] Employees who are found to have violated this policy are subject to discipline, including but not limited to: coaching, training, a verbal warning, a written warning, impact to performance ratings, impact to compensation, or termination of employment. […] Each Googler has an obligation to comply with this policy and is expected to foster a workplace culture that is free of harassment, discrimination, abusive conduct and retaliation.

(P99 at GOOG-ROWE-00030107–09.)[1] Google also strictly prohibits retaliation "for raising a concern about a violation of a policy or law or participating in an investigation relating to a violation of policy or law." (*Id.* at GOOG-ROWE-00030109; Trial Transcript ("Trial Tr.") 1020:14–25.) The Anti-Discrimination Policy expressly applies to all employees, but managers have additional responsibility "to create, uphold, and promote a safe, respectful, and inclusive work environment." (P99 at GOOG-ROWE-00030109.) Failure to do so may result in disciplinary action if managers "engage in, ignore, or in any way condone, conduct that violates this policy." (*Id.*) Managers like William Grannis receive anti-bias and anti-discrimination training consistent with the policy. (Trial Tr. 755:9–14.)

The Anti-Discrimination Policy provides at least four ways for an employee to raise a workplace concern:

> There are multiple ways in which a Googler can raise or escalate a concern about improper conduct under this policy, including the

---

[1] Concurrently with this filing, and for the Court's convenience, Google is providing Your Honor with a courtesy copy of all trial exhibits and trial testimony excerpts cited herein, via electronic mail. All exhibits cited herein were admitted at trial. (*See* ECF No. 343-6.)

following:

- You may talk to your manager, someone else in your reporting chain, or any other manager outside of your reporting chain;

- Any Human Resources People Partner or Consultant[;]

- The Respect@ team[;]

- Our Compliance Helpline (complaints can be made anonymously to the Compliance Helpline)[.]

[…] Information about how to raise or escalate a concern can also be found at go/myconcerns.

Concerns may be communicated either orally or in writing (here). Please provide as much information as possible about your concern. Having more detailed information allows us to address your concern as comprehensively, effectively and quickly as possible—and we really do want to address your concerns.

(P99 at GOOG-ROWE-00030109; *see also* Trial Tr. 1019:18-1020:12.) The team assigned to handle a workplace concern depends on the nature of the complaint. (P99 at GOOG-ROWE-00030110.) ER is responsible for investigating potential violations of the Anti-Discrimination Policy. (*Id.*; Trial Tr. 1021:5–8, 1042:21–1043:7.) Where there is no allegation of unlawful conduct based on a protected status, concerns are handled by the relevant manager and Human Resources ("HR"). (P99 at GOOG-ROWE-00030110; Trial Tr. 1044:13–1045:14.)

Google's ER team follows a fulsome process for investigating workplace concerns. Common steps taken include speaking to the complainant; taking notes of interviews; speaking to "any individual(s) against whom the concerns are being raised, as well as people who may have witnessed the events at issue related to [the] concern, had similar experiences or who may have relevant information"; and reviewing documents and data for additional context. (P99 at GOOG-ROWE-00030110.) The ER team "treats [its] inquiries as confidentially as possible, only disclosing information on a need to know basis." (*Id.*) In most—but not all—circumstances,

someone follows up with the complainant at the conclusion of the investigation to communicate the outcome. (*Id.* at GOOG-ROWE-00030111.) Complainants can identify actions they would like ER to take during the investigation or to make the complainant more comfortable while ER investigates the concern. (*Id.*) If a complainant prefers that ER refrain from contacting them during the investigation, ER respects that decision and attempts to conduct as fulsome and thorough an investigation as possible without the complainant's cooperation. (*Id.*; Trial Tr. 1061:4–17.)

If ER substantiates a violation of the Anti-Discrimination Policy, appropriate action will be taken, up to and including termination. (P99 at GOOG-ROWE-00030109.) The jury heard evidence of one instance in which ER substantiated an unrelated complaint of unfair leveling. (Trial Tr. 1065:6–1066:13.) While ER concluded that the leveling decision was not motivated by gender or any other protected status, investigators concluded that the complainant was performing work at a higher level. (*Id.*) In that instance, ER recommended appropriate corrective action to rectify the situation for the complainant and approximately ten others in the same position, both male and female. (*Id.*)

The Anti-Discrimination Policy Rowe introduced at trial was in effect during her employment, including during the timeframe when she raised complaints of alleged gender discrimination. (Trial Tr. 1019:6–17, 1056:25–1057:8.)

**B.     Google Responded to Rowe's 2017 Concerns Fairly and In-line with Google Policy.**

Rowe testified that in or around December 2017, she spoke with her HR representative, Melissa Lawrence, about a variety of topics, including (1) Rowe's disagreement with her level and her belief that her background and experience were commensurate with a Level 9 ("L9"); and (2) her frustration with a company-wide change to the equity policy that made Rowe and other 2017

hires ineligible for an equity refresh grant that year.[2] (Trial Tr. 144:21–145:22; P11.) Rowe consciously chose not to assert a complaint of gender bias. (Trial Tr. 145:1–11, 252:23–253:3, 1239:25–1240:17.) As such, it was appropriate for Lawrence to handle Rowe's concern herself, without escalating it to ER. (P99 at GOOG-ROWE-00030110.) Had Rowe complained of potential gender discrimination, Lawrence would have "looped in our [E]mployee [R]elations team," who are "required to be involved if there are possible issues of harassment, discrimination, and retaliation" consistent with the Anti-Discrimination Policy (Trial Tr. 1240:18–24; P99 at GOOG-ROWE-00030110.)

Lawrence spoke with Grannis, Rowe's hiring manager, about her concern. (Trial Tr. 1244:12–1245:7.) Grannis was "emphatic" that Rowe had been correctly leveled as a Level 8 ("L8"). (*Id.*)[3] Lawrence investigated if there was a process for revisiting a hiring decision or re-leveling an employee in the manner Rowe wanted. (*Id.*) There was not; all of the HR and staffing colleagues Lawrence consulted confirmed there was no such process. (*Id.*) On January 10, 2018, Lawrence responded in writing to Rowe's concerns. (*Id.* at 1245:11–17; P13.)

### C.   Rowe Raised Her Concerns Again in 2018, with No New Information, and Google Reviewed Them a Second Time.

On August 28, 2018, Rowe sent an email to Lawrence reiterating the same disagreement over her level, this time stating she should have been hired not as an L9, but as a Vice President. (P43; Trial Tr. 532:12–25.) She specifically referenced her level compared to her "male peers." (P43.) Rowe also sent her email to Kevin Lucas, the HR employee supporting the organization led

---

[2] Despite the change to the equity plan, Grannis made an exception for Rowe and awarded her an equity grant that year. (Trial Tr. 236:12–237:7.)

[3] As explained more fully in the Rule 50(b) Motion, the contemporaneous statement of support in Rowe's hiring packet is evidence that she was leveled appropriately for legitimate business reasons, as does a comparison of her education and experience with men hired at L8. (Rule 50(b) Motion at Section II.A.1; P119; P88.) The jury agreed with Grannis and Google that Rowe was properly leveled by not awarding Rowe any back pay. (*Id.*; ECF No. 340 at II.A.7.)

by Rowe's then-current supervisor, Tariq Shaukat. (*Id.*; 348:25–349:1.)

Within twenty minutes, Lawrence emailed Lucas to confirm whether Google could re-level Rowe outside of the promotion process. (P43; Trial Tr. 553:24–555:2.) Thirteen minutes later, Lucas asked Lawrence for the "thread" or email from her earlier review of Rowe's concern, and took steps to collect additional, relevant data. (P43.) Lucas was "concerned" and wanted to better understand "the kind of scope and significance of it all." (Trial Tr. 553:24–555:2.) "It's a concern that someone is raising," Lucas testified, "so we always take them seriously. So for me it was important to, like, get the process started as quickly as possible." (*Id.* at 555:3–6.) Within three hours of receiving Rowe's complaint, Lucas had pulled from gHire, Google's internal applicant tracking system, data on the education and experience of Rowe's male peers. (*Id.* at 534:8–9; P43; P88.)

Lucas's review of the data confirmed that Rowe was "generally aligned with other L8s given experience and education," the same conclusion Lawrence had reached in 2017. (P43.) Nevertheless, Lucas escalated the concern to ER investigator April Beaupain given Rowe's reference to her "male peers." (*Id.*; Trial Tr. 555:7–556:1.) Beaupain is an experienced ER professional with over four years of experience conducting investigations at Google, and a background as an FBI special agent and assistant district attorney in New York County. (Trial Tr. 1040:20–1041:15.)

Beaupain conducted an investigation even though Lawrence had previously reviewed Rowe's concerns. (Trial Tr. 1047:10–12, 1049:2–17; P44.) Beaupain first worked with an analyst to confirm that the data Lucas had pulled was accurate. (Trial Tr. 1035:25–1036:6.) She spoke to Lucas to better understand the concern and reviewed relevant communications provided by HR. (*Id.* at 1031:1–1032:7.)

Beaupain next interviewed Rowe, who told Beaupain that "all her male comparators are coming in at an L9." (*Id.* at 1049:18–1050:6.) That was not true. Rowe was aware that many of her male peers had been hired at L8, the same level as Rowe. (P88; P42; Trial Tr. 253:14–20, 255:12–22.) But Beaupain still interviewed Rowe to learn whether there was "anyone else or anything else [she] might need to look into at that time." (Trial Tr. 1050:7–24.) Rowe admitted to Beaupain that other than the fact that she was a woman and the employees hired at L9 were men, "she couldn't think of anything that indicated [her level] was based on gender." (*Id.* at 1051:4–1052:2.)

Despite this admission, Beaupain continued her investigation. She interviewed Jenny Burdis, the recruiter who worked with Grannis to hire Rowe and her alleged male peers, "to better understand kind of what the data meant, what practices or processes they would do to go through the leveling and to work with leadership to understand and assess levels." (*Id.* at 1052:3–14.) Burdis shared information about three of the five L9 employees, their backgrounds and experiences, and Beaupain found Burdis to be forthcoming, cooperative, and credible. (*Id.* at 1037:4–8, 1052:15–19, 1054:1–4.) Burdis explained that the type of experience (a technology industry background versus a financial services background like Rowe's) was a "very significant factor" in the leveling decision. (*Id.* at 1052:20–1053:7.) Beaupain took notes of her interviews with Burdis and Rowe, per the Anti-Discrimination Policy. (*Id.* at 1029:10–23.)

**D.    During the Second Investigation Into Her Concerns, Rowe Complained to Shaukat and Others To Secure a Final Interview for the FSVL Role.**

On November 7, 2018, during Beaupain's investigation, Rowe renewed her concern yet again, this time to her supervisor Shaukat and Diane Greene, "the person [Rowe] was supposed to interview with and … the final decision-maker on the [FSVL Role]." (P54; Trial Tr. 169:2–20.) When asked why she sent the email, Rowe admitted it was in part to secure the interview with

Greene: "Well, this was now in November. You know, I had first raised my hand for the position in June. I had the interviews in August. The ER meeting was in October, and I was, like, still being told the interview with Diane is getting scheduled. It wasn't getting scheduled. I was told in September it was going to get scheduled. It didn't. I was escalating." (Trial Tr. 169:2–170:10.)[4]

Shaukat immediately forwarded Rowe's email to HR, stating it "[w]ould be good to have data on whether [Rowe's] point on being brought in at a lower level is true." (P54; Trial Tr. 420:1–2.) Lucas was out of the office on vacation, but he responded quickly, advising that Beaupain was investigating the concerns raised in Rowe's email. (*Id.*; Trial Tr. 556:23–557:11.) Beaupain concluded that investigation a few days later, and did not find that gender played a role in Rowe's leveling at hire, or that her leveling was in any way unfair. (Trial Tr. at 1055:9–15.) Beaupain communicated her findings to Rowe on or around November 9, 2018, and followed up in writing several days later. (*Id.* at 171:7–17, 1054:5–1055:8; P60; P89.)[5]

### E.   Google Investigated Rowe's Concerns a Third Time after She Filed Her Lawsuit.

Rowe filed her lawsuit in September 2019. (Trial Tr. 185:14–15.) Her Complaint asserted the same concerns Google had previously investigated—namely, that she had been under-leveled on hire because of her gender—along with new claims that she had been denied the FSVL Role on the basis of her gender and protected activity under the New York Labor Law ("NYLL"), and

---

[4] Rowe was unaware that Shaukat had asked Greene to meet with Rowe as a personal favor to him. (Trial Tr. 360:6–13.) Stuart Vardaman and others had been working to schedule that interview since October. (P61 at GOOG-ROWE-00017627.) Because Greene was the Chief Executive Officer of Google Cloud, it was "exceptionally difficult" to get time on Greene's calendar. (Trial Tr. 605:12–13.)

[5] Rowe hired counsel in January 2019. (Trial Tr. 184:25–185:3.) Rowe's counsel then approached Google "to try to reach a resolution," but the parties did not reach one. (*Id.* at 185:9–13.) Upon learning of the legal action, Grannis "sought [Rowe] out" and "told her that OCTO was going to continue to be a safe place for her no matter what." (*Id.* at 874:2–10.) Grannis respected, and respects, Rowe's right to bring this lawsuit. (*Id.* at 874:11–12.)

that Shaukat had excluded her from meetings, emails, and off-sites because of her gender. (P145; *see also* ECF No. 1.)[6]

Google commenced a third investigation into Rowe's concerns per the Anti-Discrimination Policy, this one led by ER investigator Ashley Tessier. (Trial Tr. 1056:25–1057:8.) Tessier has substantial experience conducting investigations for Google since 2016. (*Id.* at 1060:5–17.) She was also trained as a lawyer and participated in a "very robust" set of trainings for the ER team on investigation best practices. (*Id.*)

Beginning in October 2019, Tessier and another ER investigator interviewed key witnesses involved in the complained-of events, including Lucas, Lawrence, Stuart Vardaman (the recruiter for the FSVL role, whom Tessier interviewed twice), Shaukat (the hiring manager for the FSVL role), and Grannis. (*Id.* at 343:4–8, 344:5–7, 468:13–24, 470:21–472:7, 571:24–572:5, 582:8–23, 839:19–840:3, 840:9–15, 845:6–7, 855:1–3, 859:17–866:11, 1058:2–10, 1058:2–1059:1, 1248:13–1249:13.)

Tessier tried to interview Rowe as well, but Rowe cut the interview short and simply referred ER to her filed Complaint. (*Id.* at 1060:22–1061:17.) Tessier respected Rowe's choice, but informed her that ER may be unable to conduct as thorough an investigation as a result. (*Id.*) Tessier did not share with Rowe the outcome of the investigation because Rowe asked not to be contacted by ER. (*Id.* at 1059:16–19.) Tessier's investigation—including her selection of interviewees and her documentation of the interviews—is entirely consistent with the Anti-Discrimination Policy. (P99 at GOOG-ROWE-00030110.)

ER was unable to substantiate Rowe's concerns and found no evidence that anyone had

---

[6] Rowe's protected activity under the NYLL is limited to the filing of her Complaint and, later, her Second Amended Complaint. (Rule 50(b) Motion at Section II.A.6.)

violated the Anti-Discrimination Policy. (Trial Tr. 1063:11–1064:5.) Even so, Tessier still coached Shaukat that he could have more effectively and directly communicated to Rowe that she was not the most qualified candidate for the FSVL role. (*Id.*) According to Tessier, Shaukat was receptive to the feedback. (*Id.*)

F.     **The Recruiter for the FSVL Role and VP-FSS Role Represented Rowe in the Best Possible Light.**

Vardaman was the internal recruiter for both the FSVL Role and the VP-FSS Role. (Trial Tr. 567:16–19.) He is not a decision-maker; rather, he takes direction from and facilitates the recruiting process for the hiring managers. (*Id.* at 602:2–603:13, 660:15–661:4, 662:9–15.) In 2018, Vardaman and Rowe had an initial conversation about Rowe's background so Vardaman could send a preparatory note to her interviewers for the FSVL Role. (*Id.* at 606:12-607:15.) During that conversation, Vardaman testified, "[he] was taken aback by feeling dismissed, that [he] was interrupted and largely disrespected, [he] felt, at the core of it being [his] level at Google relative to Ms. Rowe's." (*Id.* at 665:22–666:13.) Still, the evidence shows he treated her fairly.

Vardaman never shared how Rowe made him feel with Shaukat, Rowe's four interviewers for the FSVL Role, or Kirsten Kliphouse, the hiring manager for the VP-FSS Role. (*Id.* at 667:8–19, 667:23–668:4, 669:1–14.) It played no part in how he considered Rowe's candidacy for any role at Google. (*Id.* at 591:9–12, 669:1–22.) Vardaman scheduled Rowe's interviews for the FSVL Role, scheduled Rowe to meet with Greene, and discussed Rowe with Kliphouse in connection with the VP-FSS Role. (*Id.* at 595:5–23, 596:22–25, 667:13–22, 669:1–8, 1264:24–1265:18.) He advocated for Rowe, making sure to "position Ms. Rowe in the best possible light so that, as she went through panels, she had the best possible chance to show up in the best possible way that

11

only she could do." (*Id.* at 591:3–12.)[7] He described Rowe in emails to her interviewers as having "executive poise, confident (but not ego-driven), forthright with a quick operating cadence." (*Id.* at 576:24–577:4; P35–37; P46–49.)

On January 7, 2019, Vardaman closed out Rowe's candidacy for the FSVL Role in Google's Thrive system. (Trial Tr. 579:10–15, 579:24-580:14.) Unlike gHire, Google's official applicant tracking system, Thrive is accessible only to "[a] very limited number of executive recruiters." (*Id.* at 534:6–9, 580:25-581:6.) The note in Thrive indicates, "Across the board, Ulku was viewed as overly self-oriented. Recruiter expressed she was not qualified for the role in addition to ego concerns. The decision was made to run her through the full panel anyway."[8] There is no evidence whatsoever that anyone involved in any decision with respect to Rowe reviewed or was aware of that note in Thrive.

Vardaman was unaware of Rowe's workplace concerns when he wrote the Thrive note. (*Id.* at 668:5–10.) That evidence is uncontroverted. (*Id.* at 557:16–19, 1248:2–12, 1250:2–12.) At no point during or immediately following his 2020 interviews with ER did Vardaman believe he had been accused of any unlawful conduct. (*Id.* at 668:23–25.)[9] Vardaman does not recall using

---

[7] Vardaman's testimony about his conversation with Rowe is consistent with testimony from recruiter Krista Callaghan. (Trial Tr. 1171:24–1173:16.) In 2016, Rowe complained to Callaghan that her initial recruiting process was taking too long, and she struck Callaghan as "more irritated and upset than I was used to." (*Id.* at 1174:2–13.) "I've done hundreds of these phone calls," Callaghan testified, "and that one sticks out in my mind. So I was surprised with that piece of it." (*Id.*) This was before Google even hired Rowe, and well before Rowe engaged in any arguable protected activity. (*Id.* at 121:2–3, 1166:7–1167:3.)

[8] Vardaman testified that he did not recall writing this entry in Thrive, but "[g]iven that [his] name is next to it, it's leading [him] to believe that [he] did write that, and this is not [his] best work." (Trial Tr. 580:15–19.)

[9] The email Vardaman received from ER to schedule his interviews in 2020 also states that the concern ER was investigating was not about him. (P100 at GOOG-ROWE-0056764.) At trial, Vardaman rejected the suggestion that he appeared at trial because he felt the need to defend his actions or because he had been accused of wrongdoing. (Trial Tr. 571:3–10.)

the specific words in ER's interview notes to describe Rowe, but in that confidential setting, "What [he] was trying to impart was that over the course of [his] meeting with [Rowe], [he] felt disrespected." (*Id.* at 586:7–16; *see also id.* at 590:8–15.) When Vardaman presented Rowe as a potential candidate for the VP-FSS Role to Kliphouse in February 2020, he did not mention his interviews with ER or allow them to impact the process in any way. (*Id.* at 669:1–22.)

> **G.   Rowe Remains Gainfully Employed at Google in Grannis' Chain of Command.**

Rowe remains employed at Google to this day. (Trial Tr. 197:11–12.) Grannis, her initial supervisor and hiring manager, is now her skip-level manager. (*Id.* at 195:13–18.) Rowe admits that Grannis has been supportive of her. (*Id.* at 273:13–15.) Indeed, after Rowe hired an attorney and threatened to sue Google in 2019, Grannis's support did not waiver. According to Rowe's own testimony:

> And [Grannis] approached me and later, kind of late at the event, he approached me and he said, you know, that he'd been approached by Google's counsel about the lawsuit. He asked me how he could help and whether I wanted to stay at Google. […] [A]nd then he said to me, he said, You don't know how much respect people have for you. You don't know, like, how many people look up to you. Said to me that if it was his own daughters that were going through what I was going trough, he would tell them to do exactly what I'm doing. That's what he told me.

(Trial Tr. 199:21–200:13; *see also id.* at 873:19–874:17 (Grannis testified that he sought Rowe out to tell her "that OCTO was going to continue to be a safe place for her no matter what," and that he still wants to see Rowe succeed at Google).) Google continued to give Rowe professional opportunities even after she filed her lawsuit. For example, in 2020, Google appointed Rowe to the advisory group for Capital G, Google's private equity arm. (*Id.* at 189:6–20.)

## III.   ARGUMENT

### A.   The Standard for Punitive Damages Under the NYCHRL Is High.

The Court properly instructed the jury on the standard required to award punitive damages

at trial:

> If you find that Ms. Rowe prevails on either of her claims of gender
> discrimination or retaliation, you may – but are not required to –
> award her punitive damages. […] Punitive damages may be awarded
> where a plaintiff proves by a preponderance of the evidence that the
> defendant's actions amounted to willful or wanton negligence or
> recklessness, or where there is a conscious disregard of the rights of
> others, or conduct so reckless as to amount to such disregard. Under
> this standard, a defendant need not know that it was violating the
> law and that plaintiff is not required to prove intentional or malicious
> conduct. […] Keep in mind that punitive damages are not intended
> to and may not be used to compensate a plaintiff for her injuries.
> Instead, the purpose of punitive damages is to punish a defendant
> and to deter similar conduct in the future. Any punitive damages
> award should be limited to the amount reasonably necessary to
> achieve the goals of punishment and deterrence. You may also
> consider whether Google has, one, established and complied with
> policies, programs, and procedures for the prevention and detection
> of discrimination by employees; and two, a record of no or relatively
> few prior incidents of discriminatory conduct by the specific
> offending employee. These factors may mitigate a punitive damage
> award, should you choose to impose one.

(Trial Tr. 1455:18–1457:21.) *See also Chauca*, 30 N.Y.3d at 334; N.Y.C. Admin. Code. § 8-

107(3)(d)–(e). The jury evidently did not heed the Court's instructions on punitive damages,

because it failed to consider the significant evidence of Google's Anti-Discrimination Policy and

its enforcement, and there is no evidence in the record of the "willful or wanton negligence or

recklessness" sufficient to warrant such an award.

As an initial matter, the verdict begs the following question: if punitive damages are

intended to deter certain behavior, what, if anything, did Google do that must be deterred? Rowe

failed to prove that Google paid her unlawfully, or that it took *any* action that resulted in economic

harm to Rowe. The jury's award of no back pay forecloses any other conclusion. At most, suing

14

Google has resulted in nothing more than a garden-variety emotional distress award to Rowe. Notably, the jury decided that Google's conduct was only half as bad as Rowe's counsel suggested. (Trial Tr. 1377:19–24 (requesting $300,000 in emotional distress damages).) The punitive damages award here defies both well-established law and common sense.

### B.    The Punitive Damages Award Is Excessive and Should Be Reduced.

Federal Rule of Civil Procedure 59(e) authorizes a party to move "to alter or amend a judgment," including for remittitur of an excessive damages award. FED. R. CIV. P. 59(e). Remittitur "is the process by which a court compels a plaintiff to choose between reduction of an excessive verdict and a new trial" limited to the challenged award. *Webber v. Dash*, 607 F. Supp. 3d 407, 413 (S.D.N.Y. 2022) (remitting punitive damages award and requiring plaintiff to "accept either remittitur of its punitive damages award . . . or, alternatively, a new trial on punitive damages").

While a jury has some discretion in measuring damages, it may not "treat an injury as though it were a winning lottery ticket." *Duarte v. St. Barnabas Hosp.*, 341 F. Supp. 3d 306, 318 (S.D.N.Y. 2018). Thus, "there is an upper limit" to a damages award, "and whether that has been surpassed is . . . a question of law." *Ravina v. Columbia Univ.*, No. 16-cv-2137, 2019 WL 1450449, at *9 (S.D.N.Y. Mar. 31, 2019). Where, as here, the damages were awarded under the NYCHRL, the Court may reduce them if they "deviate[] materially from what would be reasonable compensation." *Duarte*, 341 F. Supp. 3d at 319 (citation omitted).

This standard "is less deferential to a jury verdict" than the "'shocks the conscience' standard generally applied by federal courts." *Id.* (remitting NYCHRL punitive damages award after applying "less deferential" standard). In determining whether a punitive damages award is excessive under the NYCHRL, courts consider "(1) the degree of reprehensibility of the [unlawful] conduct, (2) the ratio of punitive damages to compensatory damages, and (3) the difference

15

between this remedy and the civil penalties authorized or imposed in comparable cases." *Id*. at 328; *see also MacMillan v. Millennium Broadway Hotel*, 873 F. Supp. 2d 546, 564 (S.D.N.Y. 2012) (same).

        1.     *Google's Conduct Towards Rowe Was Not Reprehensible.*

Typical indicia of reprehensible conduct warranting punitive damages includes "violence or a threat of violence; physical injury; termination of employment that resulted in financial vulnerability; deceit; indifference or reckless disregard for the health or safety of others . . . discriminatory misconduct extending to employees other than" plaintiff and/or "repeated failures to address complaints of discrimination." *Duarte*, 341 F. Supp. 3d at 329–30 (citations omitted). There is no evidence of such conduct here.

As set forth in the Rule 50(b) Motion and above, Google's conduct towards Rowe was at all times appropriate, consistent with the law, and at times even preferential. Grannis hired Rowe and recommended she be leveled as an L8 despite her admission that she was "not a cloud expert." (Rule 50(b) Motion at Section II.A.1.) Her background and prior experience is consistent with men hired onto Grannis's team at L8. (*Id.*) The leveling recommendation was assessed by Google's Candidate Evaluation Strat Ops team to ensure that it was fair and equitable. (*Id.*)

Shaukat did not think Rowe (or anyone else from OCTO) was right for the Vice President roles in his organization, but he gave Rowe a chance to compete for the FSVL Role. (*Id.* at Sections II.A.2 and 5, and II.B.3.) She went through the same interview process as all other candidates who made it to that step, and Shaukat and Vardaman secured an interview for her with the Chief Executive Officer, Diane Greene. (*Id.*) Only two other candidates for the FSVL Role, both women, had that privilege. (*Id.*) Rowe arguably was not entitled to that interview given the mixed feedback from interviewers. (*Id.*) After she expressed displeasure at not getting the FSVL Role, Shaukat

gave her the opportunity to return to her prior position with no diminution in pay or level. (*Id.*) Shaukat did not extend this privilege to anyone else, and sacrificed headcount in the process. (*Id.*) At trial, Rowe failed to identify *any* meetings, off-sites, emails, or distribution lists from which Shaukat excluded her, much less offer evidence that she was excluded because of her gender or protected activity. (*Id.*) In fact, the evidence reflects only meetings that Rowe *did* attend, including 1:1 meetings, off-sites, and strategic meetings with leadership about the state of the financial service vertical in Google Cloud. (*Id.*)[10]

As for the VP-FSS role, Rowe only learned of the opening because Grannis asked the hiring manager, Kliphouse, to meet with her. (*Id.* at Sections II.A.3 and 5, and II.B.4.) That is also the only reason Kliphouse knew about Rowe, despite Rowe's self-serving testimony about her reputation within Google Cloud. (*Id.*) The two discussed her background during that meeting over coffee, and Kliphouse was not impressed. (*Id.*) Rowe admittedly lacked many of the qualifications for the role. (*Id.*) In any event, the successful candidate had been identified by recruiting *before* Rowe and Kliphouse met for coffee. (*Id.*) Kliphouse expressed a strong preference for that candidate just days after her meeting with Rowe—*before* Vardaman's first opportunity to speak with Kliphouse about Rowe's interest in the VP-FSS role. (*Id.*)

Every single time Rowe raised a workplace concern—often the same concern she had raised and Google had addressed previously—Google promptly and diligently investigated. (Sections II.B, II.C, and II.E, *supra*.) Each time, experienced HR or ER professionals handled the concern by following the process outlined in Google's robust Anti-Discrimination Policy. (*Id.*) That Rowe disagreed with the outcome each time does not change that fact. Rowe argued at trial

---

[10] Shaukat consistently treated Rowe fairly and at times even preferentially. For example, in 2019, Shaukat recommended that Rowe represent Google on the Federal Reserve Bank of New York's FinTech Advisory Committee. (Trial Tr. 484:13-485:1.)

that Google failed to change her level or her pay when she complained (Trial Tr. 1362:5–7), but the Anti-Discrimination Policy does not require remedial action for an unsubstantiated complaint. In other instances, when ER concludes there *is* indicia of unfair leveling or the like, Google takes appropriate remedial action. (Section II.A, *supra*.) It simply was unwarranted here, and the jury agreed.

Rowe is not in a financially vulnerable position as a result of Google's conduct. To the contrary, Rowe remains employed and was paid nearly one million dollars in 2022. (Trial Tr. 201:25-202:4; *see also* Section II.G, *supra*.) Grannis remains supportive of her and her right to pursue these claims. (Section II.G, *supra*.) There is no evidence of violence or threats of violence; no evidence of inappropriate epithets by decision-makers; and no evidence that Google ignored or failed to investigate her concerns.

The conduct here is far less egregious than in other discrimination cases where courts nonetheless granted remittitur of an excessive punitive damages award. In *Duarte*, for example, the jury awarded a hearing-disabled plaintiff $750,000 in punitive damages under the NYCHRL, where the plaintiff's supervisor "repeatedly referred to [her] as 'deaf,' and . . . did so in a manner that was calculated to be demeaning and humiliating to her." 341 F. Supp. 3d at 330. The supervisor "also suggested at staff meetings that Plaintiff was exaggerating her hearing disability, stating repeatedly that Plaintiff could hear when it was convenient for her to hear." *Id*. Management also "ignored Plaintiff's repeated complaints" about "discriminatory misconduct," and "failed to investigate" them. *Id*.

Despite this genuinely reprehensible conduct, the court reduced the punitive damages award from $750,000 to $125,000, because "there was no evidence of violence or a threat of violence; physical injury; termination of employment that resulted in financial vulnerability;

deceit; indifference or reckless disregard for the health or safety of others; or discriminatory misconduct extending to employees other than [the plaintiff]." *Id*.

*MacMillan* is also instructive. 873 F. Supp. 2d 546. There, a Black employee's manager hung a voodoo doll with "a black face and pink lips" on the side of a bulletin board in the office "with a noose around its neck." *Id*. at 552. "[T]he manner in which the doll was displayed evoked a lynching," a witness testified. *Id*. A supervisor told the plaintiff that the doll represented the plaintiff, who was, understandably, "'very upset' about the display" and complained internally, as did other employees. *Id*. at 552–53. Separately, the plaintiff overheard a colleague "repeatedly use the word 'n***er'" throughout the workplace. *Id*. at 553.

Nevertheless, the court granted remittitur of the jury's $1 million punitive damages award under the NYCHRL, reducing it to $100,000. *Id*. at 569. Even in light of the employer's undoubtedly reprehensible conduct, there was no evidence of "physical injury to [the plaintiff]," nor any evidence of "an indifference to or reckless disregard for the health or safety of others." *Id*. at 566. The employer's conduct was "by no means as reprehensible as that in many other employment discrimination cases," such as those involving "discriminatory or retaliatory termination resulting in severe financial vulnerability to plaintiff, repeated incidents of misconduct over a significant period of time, repeated failures to address complaints of discrimination, and/or deceit." *Id*.; *see also Watson v. E.S. Sutton, Inc.*, No. 02-cv-2739, 2005 WL 2170659, at *17 (S.D.N.Y. Sept. 6, 2005) (remitting $2.5 million punitive damages award to $717,000 under the NYCHRL, even where plaintiff, "a single mother, was terminated for speaking up" about discriminatory behavior, "and as a result was left with no income; she had to scramble to support herself and her child. [The employer] responded to [plaintiff's] accusations by firing her, then filing indisputably dishonest affidavits, and finally accusing [plaintiff] (falsely) of having

committed a federal crime"), *aff'd*, 225 F. App'x 3 (2d Cir. 2006).

It is precisely so here. This record also warrants a reduction of the punitive damages award for lack of evidence of sufficiently reprehensible conduct.

### 2. *Plaintiff Cannot Offer Contrary Evidence of Reprehensible Conduct.*

Google expects Rowe to argue that Vardaman's conduct, specifically, his note in Thrive, evidences willful or wanton disregard of Rowe's rights. The Thrive note, however, cannot support a finding of punitive damages as a matter of law.

Vardaman was undisputedly unaware that Rowe had expressed disagreement with her level in late 2017 or complained of potential gender discrimination in 2018. (*See* Section II.F, *supra*.) The note was created months before Rowe filed her initial Complaint and over a year before she expressed interest in the VP-FSS Role. (*Id*.) The necessary causal connection between Rowe's protected activity and the Thrive note, therefore, is utterly lacking. *See Urquhart v. Metro. Transp. Auth.*, 975 F. Supp. 2d 320, 340 (S.D.N.Y. 2013) (granting summary judgment on NYCHRL retaliation claim, because supervisor "was not aware" of plaintiff's complaint until after the adverse employment action occurred). Per this Court's jury instructions, "the purpose of punitive damages is to punish a defendant *and to deter similar conduct*" (Trial Tr. 1457:10–11 (emphasis added)), so naturally, if the Thrive note was not retaliatory, it cannot serve as the basis for a punitive damages award. *See State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408, 422 (2003) (conduct "independent from the acts upon which liability was premised, may not serve as the basis for punitive damages").

To the extent that the jury relied on improper references to Jen Bennett and her level as evidence of a pattern of discrimination in leveling (Trial Tr. 748:5–16), that reliance is contrary to the Court's instruction that "this case is about Ms. Rowe and not about any other individuals at

Google," and the Court's exclusion of evidence of Bennett's hiring and level as prejudicial to Google. (*Id.* at 104:5–10; 754:2-4.) Were it so, Google would be entitled to a new trial on this basis alone. *See Ryan v. Cnty. of Nassau*, No. 12-cv-5343, 2018 WL 354684, at *10 (E.D.N.Y. Jan. 10, 2018) (granting motion for new trial, where jury "did not follow the Court's instructions" regarding damages awards); *Pierce v. City of New York*, 293 F. Supp. 3d 306, 316 (E.D.N.Y. 2017) (to the extent plaintiff's counsel engaged in conduct such as presenting excluded evidence to the jury, "a new trial will cure those defects"), *aff'd*, 805 F. App'x 70 (2d Cir. 2020).

Finally, Google also anticipates Rowe will argue that there was evidence of a pattern of discriminatory conduct by Shaukat, referencing an alleged "problem with diversity" in his organization in 2018. (*See* Trial Tr. 274:9–17.) As Shaukat explained, however, he had just inherited a team at that time, and "one of our objectives was to improve the diversity on the team [he] inherited." (*Id.*) There is simply no evidence that Shaukat engaged in prior misconduct: if there was a lack of senior women on his team when he inherited it in early 2018, this was not the case by the end of the year. (*Id.*)

> 3.   *The Ratio of Rowe's Punitive Damages Award to Her Compensatory Damages Is Excessive and Unconstitutional.*

The jury awarded Rowe $1 million in punitive damages, and just $150,000 in emotional distress damages. (ECF 340.)  It declined to award Rowe any other damages. (*Id.*) The punitive damages award is nearly seven times greater than Rowe's compensatory damage award, and is therefore unconstitutional.

Under the NYCHRL, "a four-to-one ratio of punitive to compensatory damages is close to the line of constitutional impropriety." *Duarte*, 341 F. Supp. 3d at 331; *Thomas v. iStar Fin., Inc.*, 652 F.3d 141, 149 (2d Cir. 2010) (same). In cases where the only other amount awarded is for "intangible—and therefore immensurable—emotional damages," a lower ratio of 1:1 or 2:1

between punitive and compensatory damages is appropriate, because "imposing extensive punitive damages on top of such an award stacks one attempt to monetize highly offensive behavior, which effort is necessarily to some extent visceral, upon another." *Duarte*, 341 F. Supp. 3d at 332 (quoting *Turley v. ISG Lackawanna, Inc.*, 774 F.3d 140, 165 (2d Cir. 2014)).

Well-established law requires the Court to reduce the punitive damages award to an amount equal to or, at most, double the $150,000 compensatory damages award. *See, e.g., id.* (reducing $750,000 punitive damages award under NYCHRL to an amount equal to compensatory damages of $125,000); *Bouveng v. NYG Cap. LLC*, 175 F. Supp. 3d 280, 350 (S.D.N.Y. 2016) (reducing punitive to compensatory damages award ratio to 1:1 on defamation claims); *Shukla v. Sharma*, No. 07-cv-2972, 2012 WL 481796, at *15 (E.D.N.Y. Feb. 14, 2012) (remitting punitive damages award in forced labor and trafficking case from 2.5:1 to 1:1 ratio); *Allam v. Meyers*, 906 F. Supp. 2d 274, 294 (S.D.N.Y. 2012) (reducing punitive damages award to equal emotional distress award in case involving assault, battery, and domestic violence); *Kim v. Dial Serv. Int'l*, No. 96-cv-3327, 1997 WL 458783, at *16 (S.D.N.Y. Aug. 11, 1997) (reducing punitive damages award to establish a 1:1 ratio with compensatory damages in race discrimination case), *aff'd*, 159 F.3d 1347 (2d Cir. 1998); *Saleh v. Pretty Girl, Inc.*, No. 09-cv-1769, 2022 WL 4078150, at *29 (E.D.N.Y. Sept. 6, 2022) (reducing punitive damages awards against two defendants to bring the punitive-to-compensatory damages ratio "from 6:1 to 2:1" in discrimination claim); *Koch v. Greenberg*, 14 F. Supp. 3d 247, 279 (S.D.N.Y. 2014) (reducing punitive damages award to establish 2:1 ratio with compensatory damages in fraud claim), *aff'd*, 626 F. App'x 335 (2d Cir. 2015).

4. *Rowe's Punitive Damages Award Vastly Exceeds the Maximum Civil Penalty Authorized by the NYCHRL.*

The sizeable difference between Rowe's $1 million punitive damages award and the maximum civil penalty of $250,000 authorized by the NYCHRL also weighs in favor of remittitur.

In *Duarte*, for example, the court granted remittitur of a $750,000 punitive damages award, reducing it to $125,000, in part because "the civil penalty amount under the NYCHRL suggests that the $750,000 punitive damages award here is excessive." 341 F. Supp. 3d at 333 (citing N.Y.C. Admin. Code § 8-126(a)); *MacMillan*, 873 F. Supp. 2d at 568 (remitting punitive damages award that was four times the maximum civil penalty under the NYCHRL).

Here, the jury awarded Rowe a punitive damages award that *quadruples* the NYCHRL's maximum civil penalty. This, by definition, is excessive. *See Duarte*, 341 F. Supp. 3d at 333; *MacMillan*, 873 F. Supp. 2d at 568. Moreover, the NYCHRL's maximum civil penalty is reserved solely for those cases involving "willful, wanton or malicious act[s]." N.Y.C. Admin. Code § 8-126(a). Here, there is no evidence that Rowe suffered anything of the sort. This Court should therefore reduce Rowe's punitive damages award accordingly.

As the foregoing analysis shows, each of the factors the Court should consider on remittitur counsels in favor of reducing the punitive damages award. Google respectfully requests the Court apply a ratio of no more than 2:1 between punitive and compensatory damages (resulting in a remitted punitive damages award of $300,000). Google also respectfully submits that a ratio of 1:1 (resulting in a remitted punitive damages award of $150,000) is well within the Court's power and consistent with the evidentiary record in this case.

## IV.    CONCLUSION

For the foregoing reasons, Google respectfully moves to vacate the punitive damages award or remit the award to, at most, a 2:1 ratio to compensatory damages, and give Rowe the choice of accepting that lower amount or a new trial on the issue of punitive damages.

Dated: New York, New York
       November 22, 2023

PAUL HASTINGS LLP

Kenneth W. Gage
Sara B. Tomezsko
Kaveh Dabashi
200 Park Avenue
New York, NY 10166
(212) 318-6000
kennethgage@paulhastings.com
saratomezsko@paulhastings.com
kavehdabashi@paulhastings.com

*Attorneys for Defendant Google LLC*