# Exhibit A

NAAVROW1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------x

ULKU ROWE,

                    Plaintiff,

              v.                              19 Civ. 8655 (JHR)

GOOGLE LLC,

                    Defendant.                Trial

------------------------------x

                                              New York, N.Y.
                                              October 10, 2023
                                              10:15 a.m.

Before:

                    HON. JENNIFER H. REARDEN,

                                              District Judge
                                              -and a jury-

                              APPEARANCES

OUTTEN & GOLDEN, LLP
      Attorneys for Plaintiff
BY:   CARA E. GREENE
      GREGORY S. CHIARELLO
      SHIRA Z. GELFAND

PAUL HASTINGS LLP
      Attorneys for Defendant
BY:   KENNETH W. GAGE
      SARA B. TOMEZSKO

Also Present:  Vincent Yang, Paralegal (Outten & Golden)
               Andrew Velazquez, Google Rep.
               Jean Gutierrez, Paralegal (Paul Hastings)

NAAHRow2                                    Rowe - Direct

1     meaning, you're running and maintaining and buying all of

2     these.

3           With the cloud, cloud service providers like Amazon

4     Web Services, Microsoft Azure, and Google Cloud, the cloud

5     service providers now provide those services over the internet.

6     So you kind of just go use however much technology that you

7     need and just pay for as much as you use over the Internet.

8           And if I were to make an analogy, it's kind of like

9     the Industrial Revolution.  It used to be that factories, you

10    know, to power their factories, they used to have power

11    generators in house.  These were like steam engines that were

12    coal operated.  They used to produce electricity to, like, run

13    the factories.  Then what happened was the central power grids

14    came along, and they started producing electricity centrally.

15    So the factories no longer had to run their own setup, but they

16    could just connect to the power grid to get their electricity.

17    So cloud's kind of doing that with technology today just like

18    the power grids did that with electricity in the past.

19    Q.  So when we're talking about cloud, this is not the cloud

20    like I store my photos on on my phone and stuff like that?

21    A.  No.  When we talk about the cloud for the enterprise, it's

22    a lot more complex and expansive.

23    Q.  You used the term "enterprise."  Can you just define that

24    for us.

25    A.  "Enterprise" means just companies that have great size,

NAAHRow2                          Rowe - Direct

1   scale, complexity.  Kind of like JPMorgan Chase.

2   Q.  How long has the cloud been around?

3   A.  Cloud is relatively new in the technical advancements.  The

4   public cloud really started when AWS, Amazon Web Services,

5   started offering their services in 2006.  The enterprise

6   adoption, you know, started happening later in the 2010s, in

7   that time.  When I was at JPMorgan, really the only credible

8   cloud provider in financial services was AWS.  Google Cloud

9   came, you know, much later.

10  Q.  So it's fair to say that when Google got into the cloud, as

11  we're talking about in this enterprise level, it was fairly

12  late in the game?

13  A.  Yes.

14  Q.  Now, as of late 2016 when you were hired at Google, how

15  much technology and financial services experience did you have

16  at that point?

17  A.  So that was about 23 years — 23 years.

18  Q.  And at that time how much familiarity with the cloud did

19  you have?

20  A.  A fair amount.

21  Q.  What experience did you have with cloud before you joined

22  Google?

23  A.  Cloud is a pretty transformative technology in terms of

24  technical advancement, so I've been following it pretty closely

25  ever since it showed up in the horizon.  When I came into

NAAHRow2                          Rowe - Direct

1   JPMorgan, the enterprise adoption was beginning to happen in

2   certain industries, so we started looking at it more seriously.

3   But a technical change of this size requires a lot of planning,

4   requires due diligence and understanding.  And so, you know, we

5   spent a lot of time doing that.  And at JPMorgan I was also

6   sitting at JPMorgan's cloud strategy council.  This is a

7   council that looks at how should we think about using the

8   cloud, you know, how should we go about migrating our own

9   systems to it.

10          At JPMorgan I was also advising JPMorgan's COO, the

11  chief operating officer, the number two person after Jamie

12  Dimon, JPMorgan's CEO, on the cloud.  And I was also working on

13  migrating our own systems into the cloud, you know, the credit

14  risk systems that I was responsible for.

15  Q.  So of the time you joined Google, how many years of

16  experience would you say that you had with the cloud?

17  A.  So a few years I think leading up to 2015, and then the

18  actual hands-on experience migrating the systems after that.

19  Q.  Let's go back to your hiring for a minute.  When you were

20  recruited for the technical director role, did you interview

21  for that position?

22  A.  Yes.

23  Q.  Who did you interview with?

24  A.  Will Grannis and Brian Stevens and a few others.

25  Q.  Remind us who Brian Stevens is.

NAAHRow2                          Rowe - Direct

1   A.   Brian was the CTO of Google Cloud.

2   Q.   And who is Will Grannis?

3   A.   Will Grannis was the hiring manager and also my first boss.

4   And Will reported to Brian.

5   Q.   Do you remember what was discussed in your interviews?

6   A.   Yeah.  We talked about my experience building these large,

7   you know, complex IT platforms in financial services.  We

8   talked about my experience working with business customers and

9   clients and understanding their needs and how to translate into

10  technology that satisfies those needs.  And we also talked

11  about the applicability of cloud for financial services.

12  Q.   Now, at the end of 2016 when you interviewed with Google,

13  were you qualified to be a technical director?

14             MS. TOMEZSKO:  Objection.

15             THE COURT:  Sustained.

16  Q.   Ms. Rowe, in your view at the time that you were hired at

17  Google, were you qualified for that position?

18  A.   Yes.

19  Q.   And what did you understand your qualifications were for

20  the job?

21  A.   We talked about my cloud experience, but in addition, at

22  this point now I was a CTO at JPMorgan Chase, one of the

23  largest financial institutions in the world.  I had 23 years of

24  hands-on technical experience building these large global

25  systems.  And, you know, with cloud experience, that was

1  probably more than anyone else in the financial services at

2  that point.  And I had experience managing very large teams.

3  You know, my team was about 1,000 people, direct and indirect.

4  I had a lot of experience engaging the C-suites, and I also at

5  this point was well-known as a very credible industry leader in

6  financial services technology.

7          THE COURT:  Mr. Chiarello, excuse me, I just want to

8  note that I do intend to release the jury promptly at 5:00.  It

9  is now 4:47, and I'm going to need about five minutes with them

10  before they leave the room just to provide some final

11  instructions for the day.  Just wanted to give you a heads-up.

12          MR. CHIARELLO:  I appreciate that, your Honor.  I was

13  momentarily going to do a time check with my colleagues anyway.

14  I think I have a few more questions, and then we can break.

15          THE COURT:  That's fine.  Thank you.

16          MR. CHIARELLO:  Thank you, your Honor.

17  BY MR. CHIARELLO:

18  Q.  Ms. Rowe, did you have any expectations upon your hire

19  regarding your advancement at Google?

20  A.  I did.  Based on conversations with Will and Brian, when we

21  were talking about the role, one of the things they said was,

22  you know, they were building this new team of very senior

23  hires.  We're all going to be on the same team, but when and if

24  Google Cloud does verticalize, I would be the obvious person to

25  lead that vertical.

NAAHRow2                          Rowe - Direct

1    Q.  When we talk about a vertical, what is does a vertical or

2    verticalization means in this context?

3    A.  Vertical means an industry.  So it means having —— building

4    a team for that team focusing on that industry with the

5    resources, with the remit to set strategy.  So just addressing

6    that industry as a whole.

7    Q.  At the time you were hired at Google was there a financial

8    services vertical lead?

9    A.  No.

10               MR. CHIARELLO:  We can stop here, your Honor, if

11   that's OK.

12               THE COURT:  Absolutely.

13               (Witness excused)

14               THE COURT:  All right.  Members of the jury, as a

15   reminder, please do not discuss this case with one another or

16   with anyone else.  Do not communicate about the case in person,

17   by email, by Twitter, by Facebook, by any means.  And keep an

18   open mind until you have heard all the evidence in this case.

19               Tomorrow we will begin with testimony at 9:30 a.m.  In

20   order to ensure that this trial runs as smoothly and

21   efficiently as possible, something that will benefit all of you

22   as well as the parties, it is crucial that we begin on time,

23   and we cannot start until all of you are here.  To ensure that

24   we start on time, I'm going to ask you to arrive no later than

25   9:15, and ideally even earlier.  As I mentioned, I have

NABHRow1

```
 1   UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
 2   ------------------------------x

 3   ULKU ROWE,

 4                  Plaintiff,

 5            v.                              19 Civ. 8655 (JHR)

 6   GOOGLE LLC,

 7                  Defendant.               Trial

 8   ------------------------------x
                                             New York, N.Y.
 9                                           October 11, 2023
                                             8:45 a.m.
10
     Before:
11
                        HON. JENNIFER H. REARDEN,
12
                                             District Judge
13                                           -and a jury-

14                            APPEARANCES

15   OUTTEN & GOLDEN, LLP
          Attorneys for Plaintiff
16   BY:  CARA E. GREENE
          GREGORY S. CHIARELLO
17        SHIRA Z. GELFAND

18   PAUL HASTINGS LLP
          Attorneys for Defendant
19   BY:  KENNETH W. GAGE
          SARA B. TOMEZSKO
20
     Also Present:  Vincent Yang, Paralegal (Outten & Golden)
21                  Andrew Velazquez, Google Rep.
                    Jean Gutierrez, Paralegal (Paul Hastings)
22

23

24

25
```

1    A.   Some.  Some modest, but, you know, it's mostly stayed flat.

2    Q.   Ms. Rowe, when did you officially begin working at Google?

3    A.   I started March of 2017.

4           MR. CHIARELLO:  Mr. Yang, can we put up Plaintiff's 6.

5    Q.   Ms. Rowe, what are we looking at here?

6    A.   This was my social media post on the first day I started at

7    Google.

8    Q.   How did you feel on that day?

9    A.   You can tell from my face, you know, I was happy.  I was

10   excited.  I felt, you know, very optimistic.

11   Q.   Ms. Rowe, were you the only technical director hired at

12   that time?

13   A.   No.  This was a new group that Google was setting up with

14   some very senior people, and I was hired along with eight other

15   people.

16   Q.   At the time you were hired, were you given a level?

17   A.   Yes.  I learned that I was a Level 8.

18   Q.   What are levels at Google?

19   A.   Levels are a way of determining, like, where you are in the

20   corporate hierarchy.

21   Q.   When did you learn what your level was?

22   A.   So it wasn't discussed early on.  It wasn't in the job

23   description.  It didn't come up during the interview process.

24   It wasn't in the offer letter.  I don't remember exactly how I

25   learned, but it might have been through a conversation with the

NABHRow1                        Rowe - Direct

1   recruiter.

2   Q.   Who was the recruiter?

3   A.   Jennifer Burdis.

4   Q.   And what conversation did you have with Ms. Burdis about

5   your level?

6   A.   So I was coming in as a managing director from JPMorgan and

7   a CTO, you know, kind of coming from the highest level of the

8   corporate hierarchy.  So I asked her if Level 8 was

9   appropriate.  I wasn't familiar, you know, with the leveling at

10  Google at all.  And she said everyone that's hired into this

11  role is coming up as a Level 8.

12  Q.   So was it your understanding that the technical directors

13  in OCTO at that time were all functioning as Level 8?

14  A.   Yes.

15  Q.   Was OCTO at that time just the nine technical directors

16  that were hired at that time?

17  A.   No, there were some other more junior people with, you

18  know, less scope and responsibility, mostly ex-Googlers or

19  enlisting Googlers, but those of us that were coming in were

20  coming in as directors.

21  Q.   Ms. Rowe, can we agree when we talk about technical

22  directors in your testimony as I'm examining you that we're

23  referring to the director-level technical directors and not the

24  more junior folks you just described?

25  A.   Yes.

1   Q.  Now, did Google hire other technical directors after that

2   group you were hired with?

3   A.  Yes.  After we came in, there was a pause, and they did

4   hire other batches of —— or cohorts of technical directors.

5   Q.  Who were the technical directors that were hired with and

6   that came in around the same time as you?

7   A.  The first one to come in was Evren Eryurek, and then the

8   last one to come ins with Nick Harteau.  And in between it was

9   Benjamin Wilson, Scott —— Jonathan Donaldson, Paul Strong,

10  Scott Penberthy, Brian Steikes, myself, and Jennifer Bennett.

11  Q.  Ms. Rowe, can you describe generally what your job entailed

12  on a day-to-day basis as a technical director in OCTO.

13  A.  Yes.  It was a new role and a very senior role.  A lot of

14  the work we did was very self-directed, and our work spanned

15  three pillars.  You know, it was about customer work, it was

16  about engineering and product work, and thought leadership.

17  Q.  Was the customer work described sometimes as customer

18  engagement?

19  A.  Yes.

20  Q.  So what was your understanding of what customer engagement

21  meant in OCTO?

22  A.  Customer engagement meant working with Google's cloud

23  customers, or mostly potential customers, to build, you know,

24  trusted relationships with them so that they understood our

25  products and they knew how to use our products, our Google

1    down so many more engagements than I could possibly do.

2    Q.  You used the word "keynote" a number of times.  Can you

3    just define what a keynote is for the jury.

4    A.  A keynote is usually the most important speech of either

5    like a daylong or a multi-day event.  It usually happens really

6    right at the beginning and it's highlighted as the keynote.

7    It's the main attraction.

8    Q.  And did you have an understanding as to how the public

9    speaking you were doing would benefit Google?

10   A.  Yes.  It was all about building market credibility.  You

11   know, as part of our business development exercise, you know,

12   getting the market to know and understand what we had to offer.

13   So it was a very integral part of us addressing the industry.

14   Q.  Ms. Rowe, did Will Grannis ever give you performance

15   reviews?

16   A.  Yes.

17   Q.  And how often would that occur?

18   A.  About twice a year.

19   Q.  And what feedback did Mr. Grannis provide in those reviews?

20   A.  Always stellar.  My reviews were always glowing.  I got

21   "exceeds expectations" on every single one of them.

22   Q.  And "exceeds expectations" is a rating?

23   A.  Yes.

24   Q.  Did he ever give you constructive feedback?

25   A.  Yes.  You know, constructive feedback is part of Google's

NABVROW2                        Rowe – Direct

1   process.

2   Q.  Did Mr. Grannis ever tell you that you were

3   underperforming?

4   A.  No, never.

5   Q.  Did he ever tell you that you were not meeting the

6   expectations of the role?

7   A.  No.

8   Q.  Ms. Rowe, when did you learn that not everyone you had been

9   hired with was a Level 8?

10  A.  That was in the summer of 2017, my first year there.

11  Q.  What did you learn in the summer of 2017?

12  A.  Ben and Evren, we were having a casual conversation, and

13  they told me they were Level 9s.

14  Q.  When you say Ben and Evren, is that Ben Wilson and Evren

15  Eryurek?

16  A.  Yes, Ben Wilson and Evren Eryurek.

17  Q.  What was your reaction learning that Mr. Wilson and

18  Mr. Eryurek were leveled at Level 9?

19  A.  I was surprised and I was very disappointed.

20  Q.  And have you since come to learn that there were other

21  individuals leveled at Level 9 in that group?

22  A.  Yes.

23  Q.  And who were those individuals?

24  A.  Other than Ben and Evren, Nick Harteau, Jonathan Donaldson,

25  and Paul Strong had also been leveled at 9.

1   Q.  Looking at the technical director group that you were hired

2   with, the other individuals that you mentioned, were you able

3   to observe their work?

4   A.  Yes, routinely.  You know, we worked very closely together.

5   Q.  And of those you observed, whose work was most similar to

6   yours?

7   A.  Those of us that focused on industries, you know, because

8   we each had our -- and those were Evren Eryurek, he was

9   focusing on healthcare; Benjamin Wilson, he was focusing on

10  energy; Nick was our start-up person; Jen Bennett was focusing

11  on manufacturing.

12  Q.  And what about the other technical directors in OCTO, did

13  you have an opportunity to observe what they were doing?

14  A.  Yes.  You know, we were doing very similar things.  You

15  know, we all worked across those three pillars that I

16  mentioned:  Customer engagement, engineering, thought

17  leadership.  We collaborated a lot.  We compared notes.  We

18  were in meetings together.  You know, we covered each other's

19  customers.  I got a chance to observe their work a lot, just

20  not as much as the industry people that I worked very closely

21  with.

22  Q.  Ms. Rowe, can you give the jury a sense of how your work

23  compared to that of the industry focused technical directors

24  you mentioned, Mr. Eryurek, Mr. Wilson, Mr. Harteau, and

25  Ms. Bennett?

NABVROW2                    Rowe - Direct

1    the next level.  You know, if you're in Level 9, it's going to

2    be much easier to get to Level 10.

3    Q.  Ms. Rowe, did you speak to anyone after learning that

4    Mr. Eryurek and Mr. Wilson were leveled as Level 9?

5    A.  Yes, I talked to Will Grannis.

6    Q.  And what did you discuss with Mr. Grannis with respect to

7    what you had learned about Mr. Eryurek and Mr. Wilson?

8    A.  So I told him, you know, about my concerns that, you know,

9    when I was being hired, you know, that I had raised this --

10   this issue with Jen, that I was coming in as level -- as a

11   managing director, as a CTO from JPMorgan, and I was told that

12   everyone was coming in as a Level 8.  And I had come in and

13   found out that some of the men had come in as a Level 9.  And I

14   asked for his help in correcting that because I believed, like,

15   the L9 men had, you know, the same qualifications, if not

16   lesser qualifications than me.

17   Q.  And did Mr. Grannis say anything to you?

18   A.  He told me that I should speak to Melissa Lawrence.

19   Q.  Who is Melissa Lawrence?

20   A.  Melissa Lawrence is the HR person that supports OCTO.

21   Q.  Did you speak with Melissa Lawrence?

22   A.  I did.

23   Q.  Before we talk about that, at the time you reached out to

24   Ms. Lawrence, when was that?

25   A.  That was about -- that was December, I think, of 2017.

1   Q.  And at the time you spoke with Ms. Lawrence, did you

2   believe that your gender had anything to do with Google's

3   decision to level you at Level 8?

4   A.  I did.  You know, I was told everyone was coming in as

5   Level 8.  And I had come in and found, you know, some of the

6   men were brought in as Level 9s, when we had very, very similar

7   qualifications.

8   Q.  And did you share that belief with anyone at that time?

9   A.  Not at that time.  You know, bringing up gender is a risky

10  topic.  You know, I just -- I was really focused on getting the

11  issues sorted, resolved, and I wanted to just move on.

12  Q.  Now, when you did speak with Ms. Lawrence, what did you and

13  she talk about?

14  A.  We talked about a few things.  You know, we discussed my

15  leveling concerns.  We talked about an equity refresh issue.

16  We also talked about, you know, earlier in the year, Will and I

17  had a discussion.  You know, Will was thinking about taking all

18  the industry-focused technical directors in OCTO and putting

19  them into a group, and he wanted me to run the group.  And that

20  hadn't, you know, materialized.  I mentioned that.

21          And I also mentioned one more topic.  I can't remember

22  the topic.

23          MR. CHIARELLO:  Mr. Yang, can you put up Plaintiff's

24  11 just for the witness.

25  Q.  Does Plaintiff's 11 refresh your recollection as to

1    anything else that you might have discussed with Ms. Lawrence?

2    A.   Yes.   I had heard that Tariq Shaukat was hiring some VPs

3    for industries.   And, you know, during my initial hiring

4    discussions, you know, Will and Brian -- you know, we had

5    conversations that, you know, if and when Google Cloud does

6    verticalize, that -- you know, that I would be the obvious

7    person with the, you know, best qualifications for the role.

8    So now that I heard that Tariq was hiring these VPs for

9    industries, I asked Melissa if she knew anything about that.

10   Q.   And this conversation with Mr. Grannis that you just

11   referenced, is this the same conversation that you had

12   testified about previously that occurred when you were hired

13   about the vertical lead process?

14   A.   Yes.

15   Q.   You also mentioned that there was a conversation -- let me

16   step back.

17          You mentioned that you had said to Ms. Lawrence that

18   there was a conversation with Mr. Grannis about leading the

19   industry leads in OCTO.   Can you just tell us what your

20   understanding of that was from speaking to Mr. Grannis?

21   A.   So he was thinking about putting all the industry-focused

22   people, so people like Ben, who was leading healthcare, Evren

23   who was leading energy, Jen from manufacturing, and others,

24   just into that industry group and have me as the lead for the

25   group, the others reporting to me.

NABVROW2                        Rowe - Direct

1   asked him, you know, how would the process be.

2          He said, I need to have two external candidates

3   already vetted before I can introduce you into the process.

4          I asked him how long it's going to take.  He said it

5   might take six months.

6   Q.  Okay.  Now, this VP of financial services role, did you

7   understand this to be the vertical lead role you had discussed

8   with Will Grannis at the time you were hired?

9   A.  Yes.

10  Q.  This conversation in June with Mr. Shaukat, how much time

11  did you spend talking about the vertical lead role?

12  A.  Very little.  Five minutes, ten minutes tops.  The whole

13  conversation was 30 minutes, so --

14  Q.  Okay.  Had you ever spoken to Mr. Shaukat prior to the June

15  conversation?

16  A.  I think I had just one conversation with him before, maybe

17  in like February that year, just a meet-and-greet saying hi,

18  you know, just senior people getting to know each other.

19  Q.  Ms. Rowe, I want to talk a little bit about your time

20  working with Mr. Shaukat.  I think you said a moment ago

21  Mr. Shaukat in June had said he didn't know much about you.  In

22  the time you reported to him, did he ever reach out to you to

23  set up a meeting to get to know you better?

24  A.  No, he did not.

25  Q.  Did he ever ask you about your background?

1   A.  No.

2   Q.  Did he ever ask you about your prior work experience?

3   A.  No.

4   Q.  Did he ever ask you what work you had been doing in OCTO

5   before joining his organization?

6   A.  No.

7   Q.  Did he ever reach out to you to schedule meetings, like

8   one-on-ones?

9   A.  No.  And I tried to schedule meetings with him.  You know,

10  I reached out to him many times directly through my admin,

11  through his admin.  The first time after the June meeting that

12  we had a one-on-one was in September.  And the entire time, you

13  know, the ten months that I reported to him, we had maybe like

14  three one-on-ones together.

15  Q.  And in the time you -- how long were you in Mr. Shaukat's

16  organization?

17  A.  Ten months.

18  Q.  In that time, how much interaction did you have with him?

19  A.  Very little.

20  Q.  Were you able to speak with him in team meetings, group

21  meetings?

22  A.  I had a lot of difficulty getting on a staff meeting.  I

23  couldn't get on it for a long time.  Once I got on it, at least

24  one time I got dropped off the meetings.  And he didn't include

25  me in customer meetings or strategy meetings or any type of

1    meetings.

2    Q.  Now, in your observation, is that how Mr. Shaukat

3    interacted with everyone?

4    A.  No, no.  He had a very different relationship with my male

5    peers.  He would talk to them, he would hang out with them.

6              And I was sharing an admin with one of my New York

7    peers, and so I knew that he would come to New York.  And, you

8    know, they would, you know, have meetings together.  And I

9    would -- I didn't even know he was in New York; he wouldn't

10   even say hi to me if I hadn't heard secondhand that he was in

11   town.

12   Q.  The New York peer that you shared an admin with, who is

13   that?

14   A.  That was Stuart Breslow.

15   Q.  And what was Mr. Breslow's role in Mr. Shaukat's

16   organization?

17   A.  Mr. Breslow was a new joiner hired by Tariq to focus on

18   compliance.  And he was doing a small project on anti-money

19   laundering.

20   Q.  Did Mr. Shaukat at least keep you involved by email even if

21   he wasn't meeting with you?

22   A.  No.  I had, again, a lot of difficulty getting on his staff

23   email lists.  And I wasn't being included in the email

24   correspondence either.

25   Q.  Did he ever email you about work business?

1    role, my level would stay at that Level 8.

2    Q.  Now, taking a look at your response to Ms. Lawrence above

3    that.

4          MR. CHIARELLO:  Mr. Yang, if you can just call that

5    out.  Thank you.

6    Q.  You write to her:  I do find it troubling that all the

7    external candidates to date have been considered for the VP

8    role and I would not be.  I know the two finalists to date, and

9    I firmly believe I am more qualified and bring more to the

10   table than both of them.

11         You said that you were more qualified than the two

12   external candidates.  Who were you referring to?

13   A.  I was referring to Ranjanna Clark and Tais Dwyer.

14   Q.  And what's your basis for saying that you were more

15   qualified than both of them?

16   A.  Most importantly, I knew my own qualifications.  You know,

17   I knew that I had been at Google, I had been kind of doing

18   this -- this role for the last, you know, over -- over a year,

19   close to a year and a half at this point.  And, you know, I met

20   every qualification in the job description.

21         And I knew that Ranjanna Clark, her experience, she

22   only had a banking background, like no technology background.

23   She was a banker.  And I knew that Tais Dwyer, she came more

24   from a program management background, and she was actually

25   subsequently hired to a Level 7 role under Stuart Breslow.

1   Q.  Now, Ms. Rowe, did Google interview for the financial

2   services vertical lead role?

3   A.  Yes.

4   Q.  And when was that?

5   A.  That was in August of 2018.

6   Q.  So a couple months after you had first expressed interest?

7   A.  Yes.

8   Q.  Can you describe for us the interview process.

9   A.  The interview process felt weird.  It didn't feel right.

10  Q.  Before we get into that, can you describe what the

11  actual --

12  A.  What the process?  Okay, yeah.

13          So I had an interview with Sebastien Marotte, who was

14  the head of sales, VP of sales for Europe.  And then I had

15  three more interviews on Monday with three other people:

16  Darryl Willis, I believe is the name, who was the VP of energy;

17  Vats, who was leading up strategy for Tariq; and Jason Martin,

18  who was the VP of professional services.

19  Q.  Okay.  Let's talk about the interview with Mr. Marotte.

20          Do you remember when in August that took place?

21  A.  Very early in August, maybe August 2nd or thereabouts.

22  Q.  And tell us about the interview with Mr. Marotte.

23  A.  So we had a 30-minutes videoconference scheduled.  When I

24  logged into the videoconference, Sebastien said, Why are we

25  meeting today?  He didn't even know it was an interview.  I had

1    to tell him that he was there to interview me for the VP of

2    financial services role.  And Sebastien and I had worked

3    together pretty closely.  He said that, like, you and I know

4    each other, so we kind of had a friendly chat for 30 minutes.

5    And that was -- that was -- that was the totality of the

6    interview.

7              THE COURT:  Mr. Chiarello, I'm just going to interject

8    briefly with a note about scheduling.

9              So it's 10:52 right now, and we have our mid-morning

10   break at 11.  So just for your planning purposes and for the

11   sake of the jury, we have about eight minutes left until we're

12   going to take a brief break.

13             MR. CHIARELLO:  Okay.  When I finish this section, if

14   you think that's a good time, or I'll use the time however your

15   Honor wishes.

16             THE COURT:  I'm also mindful that we started about ten

17   minutes late today, through no fault of the jury and with

18   apologies to the jury.  If you are coming to a point that's

19   around 11 that's a good place to stop, let me know.  We can do

20   it a couple minutes before or after, I think that's fine.

21             MR. CHIARELLO:  Okay.  I appreciate that, your Honor.

22   BY MR. CHIARELLO:

23   Q.  You told us about the interview with Mr. Marotte.

24             Ms. Rowe, can you tell us about the interview with the

25   three other individuals?  Just first, do you remember the date

NABHRow3                        Rowe - Direct

1    A.  I did.

2    Q.  When was that?

3    A.  That was January of 2019.

4    Q.  And who did you retain?

5    A.  Cara Greene with Outten & Golden.

6    Q.  What caused you to retain legal counsel?

7    A.  At that point I had tried really hard and I wasn't going

8    anywhere.  So I thought I needed some help.

9    Q.  And what happened after you retained legal counsel?

10   A.  My counsel reached out to Google to try to reach a

11   resolution.

12   Q.  Were they successful?

13   A.  No.

14   Q.  What did you do next to address your concerns?

15   A.  We filed a lawsuit in September of 2019.

16   Q.  I want to look ahead just a little bit to 2000 —— early

17   2020.  At that time did you receive any recognitions or

18   nominations?

19   A.  Yes.

20   Q.  What recognitions did you receive?

21   A.  At that point I think I was —— one, nominated or

22   short-listed for the CTO of the year award by Women in IT, and

23   I was one of the five on the short list.

24   Q.  And what are —— I guess what are the Women in IT awards,

25   what is that?

1    A.  Those are, you know, the —— those are awards that both

2    celebrate and recognize women in technology leadership that are

3    doing great work.

4    Q.  Now, around that time did you express interest in another

5    role at Google?

6    A.  I did.

7    Q.  What role was that?

8    A.  That was the VP of sales for financial services.

9    Q.  How did you learn that Google was looking to fill that

10   role?

11   A.  It was in a casual meeting with Kirsten Kliphouse, who was

12   the hiring manager.

13   Q.  So tell us about your conversation with Kirsten Kliphouse.

14   A.  So Kirsten was relatively new to Google, so I reached out

15   to her for a meet and greet to kind of say hi, introduce

16   myself.  And Kirsten and I met actually outside of the office

17   at a coffee shop and kind of just talked about each other, just

18   getting to know each other, the kind of stuff that you talk

19   when you're first meeting a person.

20   Q.  Anything else you discussed with her?

21   A.  Yes.  During this conversation, she mentioned that she was

22   looking for a VP of sales for financial services.  She

23   mentioned she didn't really have luck with people with

24   traditional sales backgrounds, so she was looking more broadly

25   with people that are —— that are different than just the sales

1   background, and I told her I'd be interested.

2   Q.  Did you discuss anything with her about your background?

3   A.  No.

4   Q.  Now, the portion of this conversation around the VP of

5   sales role, how long did that last, approximately?

6   A.  That was very short.  Like, just she mentioned that there

7   was a role, that she was looking more broadly than just the

8   sales background, and she just —— you know, just told me to

9   reach out to the recruiter for next steps.  So very short.

10  Q.  Had you ever spoken with Ms. Kliphouse before that time?

11  A.  No.  This was our first conversation.

12  Q.  In that conversation did she ask you anything about your

13  qualifications?

14  A.  No.

15  Q.  Did she ask you anything about your background?

16  A.  No.

17  Q.  Did you discuss with specificity the qualifications for the

18  role?

19  A.  No.

20  Q.  Did you apply for this role, the VP of sales position?

21  A.  I did.  I did.

22  Q.  How did you apply?

23  A.  I did reach out to the recruiter.

24  Q.  And who is the recruiter?

25  A.  Stuart Vardaman.

1    to cloud technologies and machine learning, I'd been working at

2    Google for three years.

3    Q.  And in what way did you have established actionable

4    executive/C-suite relationships?

5    A.  At this point I had a very large network of C-suite

6    relationships, both from places I worked prior to the Google,

7    from places like Bank of America, UBS, and JPMorgan Chase, and

8    also during my time at Google working with, you know, Google

9    Cloud's customers.

10   Q.  And in what way do you believe you had a sterling

11   reputation within the financial services sector?

12   A.  I was advising President Williams on financial technology

13   issues.  I was sitting on Capital G's board.  Google was, you

14   know, having me speak at their most important events, talking

15   to their most important customers.

16            MR. CHIARELLO:  Mr. Yang, we can take that down, and

17   can you please put up Plaintiff's 106.

18   Q.  Ms. Rowe, what is Plaintiff's 106?

19   A.  This is me pinging Stuart Vardaman on a status update for

20   the next step for my candidacy for the role.

21   Q.  It looks like as of the most recent email on February 25

22   you had scheduled a time to speak with Mr. Vardaman, correct?

23   A.  Correct.

24   Q.  Did you actually speak with Mr. Vardaman?

25   A.  Yes.

NABHRow3                        Rowe – Direct

1   Q.  When did that call occur?

2   A.  Shortly after when it was scheduled.

3   Q.  What did Mr. Vardaman tell you in that conversation?

4   A.  He told me that I wasn't going to be considered because I

5   wasn't a good fit.

6   Q.  And did you say anything to him?

7   A.  I asked him —— I asked him what that was based on, and he

8   told me it was based on the two-hour interview I had with

9   Kirsten.

10  Q.  When did you have a two-hour interview with Ms. Kliphouse?

11  A.  I did not have a two-hour interview with Ms. Kliphouse.

12  Q.  Had you ever met with Ms. Kliphouse beyond the coffee

13  meeting that you described earlier?

14  A.  No.

15  Q.  In that meeting how long had you discussed the role?

16  A.  It was very short.  Ten minutes, maybe.

17  Q.  Did you understand that short meeting with Ms. Kliphouse to

18  be an interview for the role?

19  A.  No, definitely not.

20  Q.  Now, Ms. Rowe, are you aware of who —— whether anyone

21  ultimately received the financial services sales role?

22  A.  Yes.  It went to Yolande Piazza.

23  Q.  And are you familiar with Ms. Piazza's background,

24  qualifications for the role?

25  A.  Yes.

NABHRow3                           Rowe - Direct

1  Q.  How are you familiar with her background and qualifications

2  for the role?

3  A.  From talking to her, from industry, and also from her

4  hiring packet.

5  Q.  So on that basis, how would you compare your qualifications

6  for the sales role to Ms. Piazza's?

7  A.  I think that, first and foremost, you know, I was at Google

8  for three years doing, you know, this role, engaging with

9  customers, influencing the industry, building the market for

10  financial services so our customers understood who we are, what

11  we have to offer, what our products had to offer.  You know,

12  all the thought leadership I had done in that space, all the

13  regulatory outreach I had done in that space, and all the

14  customer work I had done in that space.  This was now three

15  years.  I had that.  Yolanda, she was coming from the outside.

16          In terms of our qualifications, I had two degrees in

17  computer science, undergrad and grad.  Ms. Piazza didn't have

18  any degrees.  I was coming in as a CTO that had vast amounts of

19  experience building technology systems at a global scale, large

20  distributed complex systems.  Having done that, you know,

21  allows me to work with our customers in a way that I understand

22  what they're going through.  They can talk to me as someone

23  who's been in their shoes.  I had —— you know, I had a lot of

24  experience doing that.

25          Third, I had worked in three different financial

1    institutions before I came to Google.  I worked at UBS.  I

2    worked at Bank of America.  I worked at JPMorgan Chase.  You

3    know, these are some of the largest financial institutions in

4    the world, JPMorgan being the number one, Bank of America being

5    number two in the world outside of China.  Having worked at

6    these institutions gave me a very varied understanding of the

7    kinds of things, the businesses in financial services.  It

8    spanned everything from retail banking, corporate investment

9    banking, from exchanges, and I kind of got to observe and live

10   and breathe and work on this very different parts of financial

11   services.  Ms. Piazza worked for Citibank for 30 years.

12   Citibank, while they're on every street corner, we see them,

13   it's predominantly a retail bank.  Their presence in other

14   parts is a lot smaller and their international footprint is

15   also significantly smaller compared to some of the institutions

16   that I've worked in.

17           And you know, when it came to, you know, cloud

18   experience, I had a lot of that.  Ms. Piazza did not.  And

19   having worked at these financial institutions and having worked

20   at Google Cloud with our customers, I had built a very large

21   network of C-suite relationships.

22   Q.  Ms. Rowe, it's 2023, I think, what have you been doing at

23   Google since 2020, since the time you learned you would not

24   receive the sales role?

25   A.  I'm still in OCTO.  I am still focusing on financial

services, although over time, you know, my role has diminished,

and they started bringing people like Ms. Piazza.  My

contributions are now diluted, not — not what they used to be.

Q.  Are you still a technical director?

A.  I am.

Q.  And what have your performance evaluations been since the

time that you moved back to OCTO?

A.  It's always been "exceeds expectations."  In 2022, Google

changed the way they did ratings.  Until then it was always

"exceeds expectations."

Q.  To what degree are you focusing on financial services?

A.  I'm still focusing on financial services.

Q.  Do you still report to Will Grannis?

A.  No.  I've been layered.  Last year, in 2022, Will decided

to introduce regional managers.  I raised my hand for

the East Coast regional manager role.  I was passed over, and

Patricia Florissi was given that role, and now she sits between

me and Will.

Q.  And how long had Ms. Florissi been working in OCTO at the

time Mr. Grannis made her your manager?

A.  She was hired in 2020, so she had been at Google for two

years.

Q.  In the time that Ms. Florissi become your manager, any

notable successes in your work?

A.  Yes.  Yes, many.

1   correct?

2   A.  I was the final interview, so I did two roles in the

3   search.  I was the —— what I call the gatekeeper interview,

4   which is somebody unknown to Google or unknown to the

5   organization, I was the screener to make sure it was worth ——

6   it was calibrated for the role, and then for the very end

7   finalists, I would have typically interviewed.  Because Ulku is

8   internal and Brian had essentially asked for her to be in

9   consideration, I didn't feel the need for the gatekeeper

10  interview.  We put her straight into the full interview panel

11  that all the other candidates got.

12  Q.  And you never did the end interview either, correct?

13  A.  She was never in the top two of the people we were

14  considering for the role, so no.

15  Q.  You never did anything to learn what qualifications

16  Ms. Rowe had for the VP of financial services role, did you?

17  A.  I did not look at her résumé, if that's what you mean, no.

18  Q.  Well, did you do anything to learn what her experience was

19  beyond that she'd worked at JPMorgan Chase generally?

20  A.  I did not, no.

21  Q.  So you didn't know that she had a B.S. and an M.S. in

22  computer science and engineering, did you?

23  A.  I assumed as much because she got the job in OCTO, but I

24  didn't verify it, no.

25  Q.  And you didn't know that by that point in time, she had

NABHRow7                         Shaukat - Direct

1  almost 25 years of experience in the financial services and

2  technology industry, did you?

3  A.   Again, the role of being a member of the office of the CTO

4  at Google Cloud is a prestigious role, so I assume a certain

5  level of technical experience and gravitas.  We don't hire

6  people with five years of experience into that team.  So I did

7  know that she was experienced in the financial services world.

8  Q.   Was it because the exact number of years of experience

9  really wasn't relevant to how somebody performed their job at

10  that high level?

11 A.   We did not give the most senior jobs to the most tenured

12 people, so no.  At some point you look at the impact that

13 people are having, not at the number of years of experience

14 that they have.

15 Q.   You had no idea how old Ms. Rowe was, correct?

16 A.   I did not, no.

17 Q.   So you didn't know that she's approximately the same age as

18 you, correct?

19 A.   No.

20         MR. GAGE:  Objection to relevance, your Honor.

21         THE COURT:  I'm not seeing the relevance either.  Are

22 you moving on now from that?

23         MS. GREENE:  That's the only question that I asked,

24 your Honor.

25 Q.   You didn't know that Ms. Rowe had worked in both the United

1   States and Europe, correct?

2   A.  I did not, no.

3   Q.  And you didn't know what her experience was managing large

4   teams, did you?

5   A.  I did not.

6   Q.  You didn't know what other financial institutions she had

7   worked for besides JPMorgan Chase, correct?

8   A.  At — at this moment in time, in 2018, you're asking?

9   Q.  Correct.

10  A.  No, I did not.

11  Q.  In fact, throughout 2018 into 2019, you didn't know either,

12  did you?

13  A.  That's probably true.  At some point I learned, but I think

14  maybe when she was bringing it up towards the end of the

15  process, but I don't — for most of the 2018, I did not know.

16  Q.  So you didn't have a lot of depth of experience or depth

17  about Ms. Rowe's experience outside of Google, correct?

18  A.  Correct.

19  Q.  You didn't know that she'd been a senior executive at Bank

20  of America, correct?

21  A.  Correct.

22  Q.  Bank of America was one of Google's top ten targets for

23  financial services, correct?

24  A.  Yes.

25  Q.  And you didn't know what her relationships were with the

1          MS. TOMEZSKO:  To the extent he said it.

2          MR. GAGE:  To the extent he said it.  But I'm highly

3    confident that it was not the number of years of experience

4    that she had.  So counsel's argument is shifting here.  That is

5    not —— she can ask him why he didn't think she was right for

6    the role.  I'm going to.

7          MS. GREENE:  Your Honor, I'm just mindful of the

8    clock, and I'd —— rather than have Mr. Gage testify, I'd like

9    to continue to question the witness, and I'll skip over the ——

10         THE COURT:  You already have drawn out a lot in this

11   regard, including all the points you're telling me you wanted

12   to make.  We know what his different jobs were and the

13   background.  We know how long he was there.  We know ——

14         MS. GREENE:  Right.  That's why I'm suggesting I'm

15   prepared to just move on.

16         THE COURT:  Yes, let's do that.  No more.  Thank you.

17         (Continued on next page)

NABHRow7                     Shaukat - Direct

1              (In open court; jurors present)

2     BY MS. GREENE:

3     Q.  Mr. Shaukat, we discussed that Ms. Rowe was a Level 8 and

4     that you had represented to her that that would not be a

5     barrier to her receiving fair consideration for the VP-level

6     position, is that what your testimony has been?

7     A.  Yes.

8     Q.  And you also did not believe that the number of years of

9     experience that Ms. Rowe had was a barrier to her consideration

10    for the VP-level role either, correct?

11    A.  Correct.

12    Q.  And that's because you understand that at Google leveling

13    decisions are based on the scope of the role and the level max

14    to that, correct?

15    A.  That's at least one of the considerations for it, yes.

16    Q.  And you've explained that when leveling, Google first

17    determines what is the scope of the role and then tries to find

18    somebody who can perform that role, correct?

19    A.  Yes.

20    Q.  So as an example, if a role was scoped as a Level 7 and

21    someone was qualified to perform the role and was hired to do

22    so, they would come in as a Level 7 without respect to the

23    actual number of years they had been working, correct?

24    A.  Correct.

25    Q.  And there are plenty of people that come in —— with many,

1   many years of experience who come in as lower level managers,

2   and there are people with relatively little experience compared

3   to the average person who come in as a higher level, right?

4          MR. GAGE:  Objection, your Honor.  Objection.

5   Relevance to the comparison to the average person.

6          THE COURT:  I'll allow it.

7   A.  Could you repeat the question, please.

8   Q.  Have you said before, in explaining how the leveling system

9   works at Google, that there's plenty of people who come in with

10  many, many years of experience, who come in as managers, and

11  that we get relatively little experience —— and we get people

12  with relatively little experience compared to the average

13  person who would come in at a higher level, and it's much more

14  about what is the role scoped for and do we believe this person

15  could perform that role?

16  A.  That's right.

17  Q.  And that's true whether someone's at a Level 5 or a role is

18  a Level 5 role or a Level 7 role or a Level 9 role or a Level

19  10 role, correct?

20  A.  I believe so.  I wasn't involved with leveling at any of

21  those lower levels, but the only involvement I had was at

22  promotion cycles, and that's how it works for promotion cycles

23  for directors and vice presidents.

24  Q.  With respect to the Level 10 vice president role you were

25  considering the question is someone capable of performing that

1   role at a Level 10, and if they were, they'd come in at a Level

2   10, correct?

3   A.  If the role is scoped at that level and we thought that the

4   person could fulfill the scope at that level, yes.  You'd

5   mentioned Dominik Wee earlier.  We had originally scoped that

6   role that he came into as a Level 10.  We thought that he

7   wasn't quite ready for the full scope of the role, so we

8   de-scoped it and brought him in as a Level 9.  So it was a

9   little more interactive than just we had a role, and we looked

10  for someone to fill it.

11  Q.  Now, Mr. Wilson and Mr. Eryurek also came into your

12  organization at the same time Ms. Rowe did, correct?

13  A.  There were three other people, so the two of them and

14  Mr. Kember as well.

15  Q.  And Mr. Kember was more junior than Ms. Rowe and Mr. Wilson

16  and Mr. Eryurek, correct?

17  A.  The title they gave him was technical director, the same

18  as.  In terms of his level, I believe it was an L5 or an L6 at

19  the time, but he was in the same group, my understanding was,

20  as a peer.  He was always represented to me as a peer to Evren,

21  Ben, and Ulku.

22  Q.  And you understood that Mr. Wilson and Mr. Eryurek had been

23  performing a role similar to Ms. Rowe's when they were all in

24  OCTO, correct?

25  A.  They all — all three of the individuals I mentioned were,

1    yes.  So we moved all four of them in.

2    Q.  And all three —— Mr. Wilson, Mr. Eryurek, and Ms. Rowe ——

3    were being brought into your organization to continue with the

4    same role they had had in OCTO, correct?

5    A.  Yes, although I'm not sure why you're not including

6    Mr. Kember who was the fourth of the people who came over from

7    OCTO.  So all four of them came over to do the same role.

8    Q.  Right.  But Mr. Kember was not a Level 8 or Level 9

9    director, correct?

10   A.  He was not, but he was in the same role and we brought him

11   into the same role.

12   Q.  But not at the same level, correct?

13   A.  Not at the same level, correct.

14   Q.  So we talked about earlier that you knew Ms. Rowe was a

15   Level 8 and you also learned that Mr. Wilson and Mr. Eryurek

16   were Level 9s, correct?

17   A.  At the time in which they —— I didn't know beforehand.  As

18   they were slated to move into my organization, I was briefed on

19   all the people and their levels, yes.

20   Q.  But you couldn't say what the differences were between

21   Ms. Rowe and Mr. Wilson and Mr. Eryurek, could you?

22   A.  No.  And as I mentioned, that is generally true for all of

23   the people in my organization.  I look at the scope of impact

24   they have, not the level that they have.

25   Q.  Now, you mentioned Dominik Wee and Anil Jain earlier.  You

1   Q.  And if we go to the last page, it's dated Friday,

2   September 7, correct?

3   A.  Yes.

4           MS. GREENE:  OK.  You can take that down.

5   Q.  Now, you don't recall having a conversation — I'm talking

6   about a conversation in person or over VC or on the telephone,

7   an actual conversation — with Jason or Sebastien or Darryl or

8   Vats, any of the four of them, where they directly shared with

9   you feedback about their interview with Ms. Rowe, correct?

10  A.  Apart from the email that I mentioned with Sebastien, I

11  don't recall a conversation with any of them.  Normal practice

12  would have been for them to debrief with the recruiter, so

13  Stuart Vardaman in this case.

14  Q.  And you don't recall any of them sending you a Google

15  Hangout message with feedback either, correct?

16  A.  Correct, that's right.

17  Q.  Let's look at P-149.  You'd referenced an email you got

18  from Sebastien Marotte.

19  A.  Yes.

20  Q.  Is this the email you were referencing?

21  A.  Yes, I think it is.

22          MS. GREENE:  OK.  If we, Mr. Yang, call out that

23  message at 1:06 p.m. starting with "hi, Tariq."

24  Q.  This is the feedback that Mr. Marotte gave to you, correct?

25  A.  Correct.

1    Q.  He said, "I found her very solid on the technical part but

2    not that strong on the business side."  That was his feedback?

3    A.  Correct.

4    Q.  But he put a caveat in there, right, that it was only 30

5    minutes.  That's what the "mn" is?

6    A.  Yes.

7    Q.  His meeting with her was only 30 minutes, correct?

8    A.  According to this note, yes.

9    Q.  And he never sent you more detailed notes than this,

10   correct?

11   A.  Not that I remember, no.  But, again, the normal practice

12   would have been to debrief with Stuart Vardaman, not with

13   myself.

14   Q.  So any other feedback apart from this email that you may

15   have heard would have come indirectly from Stuart Vardaman, is

16   that your testimony?

17   A.  If indirectly — by indirectly you mean that it would have

18   come them to Stuart to me, yes, that's correct.

19   Q.  But you can't recall whether Mr. Vardaman ever shared with

20   you specifically what each panelist said about Ms. Rowe,

21   correct?

22   A.  No, I — Stuart did debrief me on the feedback that he did

23   receive in these weekly meetings that we talked about.  I can't

24   tell you that he said Vats said this and Jason said this and

25   Darryl said this, but he did share whatever feedback he

1  received.  It would be his normal practice to share that

2  feedback.

3  Q.  Do you recall Vardaman telling you there was no negative

4  feedback about Ms. Rowe?

5  A.  I don't recall that, no.

6  Q.  Do you recall him saying there was only positive feedback

7  on the technical side?

8  A.  Again, I don't recall that, no.

9  Q.  Did he tell you that some of the panelists liked Ms. Rowe

10  as a candidate?

11  A.  I mean, we all liked Ms. Rowe in general, and I think we

12  thought she was strong on the technical side.  That wasn't in

13  huge amount of dispute.

14  Q.  You don't know how Mr. Vardaman got any feedback with

15  respect to Ms. Rowe, do you?

16  A.  I don't know how he got any feedback.  I don't know how he

17  got feedback, no.

18  Q.  In fact, Mr. Vardaman repeatedly told you that he was

19  chasing — that was his word — chasing feedback from

20  everybody, correct?

21  A.  Yes.  But I would characterize 30 percent of Stuart's job

22  on every search is chasing feedback.  It wasn't an unusual

23  thing for him to be doing, unfortunately.

24  Q.  But if he's chasing feedback, that implies that there's not

25  the feedback yet, correct?

1   A.  No, no.  Sorry, that's very different.  When he says he's

2   chasing feedback, he's chasing people formally recording it in

3   the system, not that he's chasing the feedback itself.  That's

4   the way that we talked about it was in order to make an offer

5   on anybody, the packet, as we called it, needed to be complete.

6   That meant that all of the holes that you're mentioning now

7   needed to be filled in before you could submit something to the

8   hiring committee.

9           So Stuart —— so we made it a practice to try and

10  always have the feedback there so you weren't chasing at the

11  end.  So when Stuart says he's chasing the feedback, typically

12  that would be he's chasing, you know, the gaps that you were

13  highlighting here of people not entering their notes into the

14  system.

15  Q.  Well, Mr. Vardaman never told you that any of the panelists

16  had told him that Ms. Rowe was too junior for the role,

17  correct?

18  A.  He never told me that any of the panelists said she was too

19  junior.  I don't know that anybody said she was too junior in

20  those words, yes.

21  Q.  And no one ever told you that they thought she was too

22  junior for the role, correct?

23          MR. GAGE:  Objection.  Asked and answered.

24          THE COURT:  Sustained.

25          MS. GREENE:  Well, let me rephrase that because it was

1    that there was any other expectation.  It wasn't a coffee and

2    how do you do; it was a meeting about that job.

3    Q.  On December 5th, you told Ms. Rowe that she was not going

4    to get the head of financial services position; correct?

5    A.  I believe that was the date, yes.  It was early December.

6    Q.  You told her that you were pausing the search?

7    A.  Yes.

8    Q.  You told her you weren't putting anyone in the position;

9    correct?

10   A.  We had just had a CEO change the week before.  And so at

11   that moment in time we had paused the search.  We had a

12   finalist we had been prepared to make an offer to, and we

13   paused making that offer.

14   Q.  You did not tell her you were putting Stuart Breslow in the

15   head of financial services position, did you?

16   A.  I was not at that time putting Stuart Breslow in as the

17   interim head of the financial services vertical.  That decision

18   was made later.  As I mentioned, the week before Diane Greene

19   left Google or announced that she was leaving Google, and

20   Thomas Kurian came in as CEO, all priorities for the company

21   were influx at that time.  Thomas, as the new CEO, had the

22   right to make a different decision.  So when we said "pause"

23   here, the intention was to pick up in January and offer to

24   Diana Layfield the job of head of financial services.

25             THE COURT:  Ms. Greene, I intend to adjourn for the

1    day in four minutes.

2              MS. GREENE:  I just have a few questions on this

3    subject and I think we'll be done with this topic.

4    Q.  You actually had decided to put Mr. Breslow in that

5    position in October/early November; correct?

6    A.  That is false.

7    Q.  Well, you made the decision to put Mr. Breslow in before

8    you communicated it to Ms. Rowe that she was not getting the

9    position; correct?

10   A.  That is false, as I just stated.

11             As I stated, Diana Layfield — and there is emails to

12   this effect — was the selected candidate.  We paused the

13   search.  I communicated to Diana Layfield that we would be

14   likely reopening the position in Q1 once Thomas, the new CEO,

15   had made his decision.  When Thomas -- that he was going to

16   fund it.  When Thomas decided to keep it paused, I put in an

17   interim head of financial services until Thomas made a final

18   determination.

19             MS. GREENE:  Okay.  We're going to play two quick

20   clips, and then we'll be done.

21             Can we look at 239, page 239, line 11, through 240, 8.

22   240, line 8.  239, 11 to 240, 8.

23             Okay.  If you can go ahead and play that.

24             (Video played)

25             MS. GREENE:  Okay.  And then if we can go to page 240,

NABVROW8                          Shaukat - Direct

1    line 24, through 241, line 11.

2              (Video played)

3    BY MS. GREENE:

4    Q.  That was your testimony at deposition; correct?

5    A.  Correct.

6              MS. GREENE:  This is a good time to break.

7              THE COURT:  Members of the jury, it is 4:45 p.m., so

8    we'll break for the day.  Thank you so much for your attention.

9    It's been another long day and we are all grateful.

10             Please be sure to arrive on time tomorrow, as you did

11   today, so that we can try to stay on schedule.  Breakfast will

12   again be provided beginning by 8 a.m. at the latest.  Whether

13   you avail yourself of breakfast or not, please be here and

14   ready to go at 9:15 a.m.

15             Please remember my continuing instructions.  Keep an

16   open mind until all the evidence is in.  Don't reach any

17   conclusions.  Please do not talk about this case at all, not

18   with one another or anyone else, including any inquiring minds

19   at home.  Please remember also not to look at or listen to

20   anything relating to this case.  Do not consult any social

21   media, do not go to any websites or use the internet, anything

22   like that.

23             You can bring your notepads to the jury room and leave

24   them in there, please, overnight.  Thank you.

25             Have a wonderful evening and a safe trip home.

NACVROW1

```
 1   UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
 2   ------------------------------x

 3   ULKU ROWE,

 4                   Plaintiff,

 5             v.                             19 Civ. 8655 (JHR)

 6   GOOGLE LLC,

 7                   Defendant.               Trial

 8   ------------------------------x
                                             New York, N.Y.
 9                                           October 12, 2023
                                             9:10 a.m.
10
     Before:
11
                       HON. JENNIFER H. REARDEN,
12
                                             District Judge
13                                           –and a jury–

14                            APPEARANCES

15   OUTTEN & GOLDEN, LLP
          Attorneys for Plaintiff
16   BY:  CARA E. GREENE
          GREGORY S. CHIARELLO
17        SHIRA Z. GELFAND

18   PAUL HASTINGS LLP
          Attorneys for Defendant
19   BY:  KENNETH W. GAGE
          SARA B. TOMEZSKO
20
     Also Present:  Vincent Yang, Paralegal (Outten & Golden)
21                  Andrew Velazquez, Google Rep.
                    Jean Gutierrez, Paralegal (Paul Hastings)
22

23

24

25
```

1   mentioned, Ulku's technical qualifications.

2   Q.  Well, let's talk more about the qualifications that you

3   covered with Mr. Gage today.  I want you to look at

4   Plaintiff's 14.

5            Is there an objection to this document?

6            (Counsel confer)

7            MS. TOMEZSKO:  No objection.

8            MS. GREENE:  OK.  We can go ahead and put that up.

9   Q.  This is an email between you and Mr. Stevens from February

10  of 2018, correct?

11  A.  February 2018, yes.

12  Q.  In the bottom email there's a discussion about the 2018 S&P

13  Global Leadership Forum?

14  A.  Correct.

15  Q.  And it's a small group of curated panelists, correct?

16  A.  Correct.

17  Q.  And you reached out to Brian Stevens, correct?

18  A.  Looks like it, yes.

19  Q.  And Brian said, "Could always offer to Ulku or someone else

20  in OCTO," and you answered, "Yes.  Who do you think would be

21  best?  Ulku?"

22           That was your question, correct?

23  A.  Yes.

24  Q.  And Mr. Stevens said, "Ulku, if we feel they must have FSI

25  cred, so start with her."

1          What is FSI cred?

2     A.   Credibility in financial services.

3     Q.   Do you know if Ms. Rowe did participate in that S&P global

4     leadership summit?

5     A.   I don't recall.

6     Q.   Let's look at another document that we looked at yesterday

7     for a different purpose related to your testimony today.  Let's

8     pull up P16.

9          Now, you mentioned that one of the problems with

10    people coming from OCTO is that they didn't have deep C-level

11    relationships.  Do you recall giving that testimony earlier?

12    A.   Yes.  I don't think I framed it that way, but yes.

13    Q.   And you, I think, testified yesterday that you didn't

14    actually know the nature or extent of Ms. Rowe's C-level

15    relationships, correct?

16    A.   Correct.

17    Q.   In this document, though, when Mr. Stevens, the CTO, was

18    asking you to consider Ms. Rowe for the position, he

19    specifically called out, if we can look at the bottom, "She has

20    great respect from Cx level at the banks."

21         So you did have some knowledge about the deep level of

22    respect that she had from the C-suite, correct?

23    A.   No, I had one line from Brian Stevens suggesting it, but,

24    again, I had an absence of evidence from other sources to that

25    effect.

1   Q.  And you didn't do anything to fill that absence, correct?

2   A.  I didn't see a need to, no.

3   Q.  Because you'd already decided she wasn't right for the

4   role, correct?

5   A.  She had not come in with the other —— this was not a

6   résumé.  This was a do you have a vision?  What would you do?

7   You've been in here for a couple of years.  You know, let's

8   hear what you have to say.  And she did not, as I said, blow me

9   away with that.

10  Q.  Well, you talked earlier about Mr. Breslow being

11  recommended by Ruth Porat, correct?

12  A.  Yeah.  She was an internal reference, which is different

13  than recommended by, but yes.

14  Q.  OK.  Mr. Stevens actually recommended Ms. Rowe for this

15  role, correct?

16  A.  He asked me to consider her for this role, yes.

17  Q.  He said she's really calibrated and has the right

18  connections, correct?

19  A.  That was his opinion, yes.

20  Q.  You mentioned Carrie Tharp?

21  A.  Carrie Tharp.

22  Q.  Yeah.  She was actually hired in August of 2019, correct?

23  A.  I don't recall the date that she was hired.

24  Q.  And that was after Ms. Rowe had obtained legal counsel and

25  approached Google about her concerns, isn't that right?

1  A.  I don't know when Ms. Rowe got legal counsel or approached

2  Google.

3  Q.  Were you given a litigation hold at that time?

4  A.  I got, as I mentioned, a lot of litigation holds.  I don't

5  recall if I got one specifically for this or not.

6  Q.  Given your involvement in the case, would you expect you

7  would have gotten a litigation hold at that time?

8          MR. GAGE:  Object.

9          THE COURT:  Sustained.

10  Q.  Let me ask you a different question.

11          How long do interviews for a high-level VP role

12  typically last?

13  A.  Thirty to 45 minutes would be typical.

14  Q.  You were asked if you had any reason to believe that those

15  interviews were not typical, correct?

16  A.  I don't remember that, but I don't believe they were

17  atypical.

18  Q.  Did Sebastien Marotte's email saying it was only 30

19  minutes, that caveat, suggest to you that maybe it wasn't the

20  fulsome interview that would be necessary for him to reach a

21  conclusion as to Ms. Rowe's qualifications?

22  A.  No.  As I just mentioned, 30 to 45 minutes would not be

23  atypical.  I think that he said that he was open to other

24  people, like, getting to a different conclusion, which is

25  different.

1    Q.  Is it typical for interviewers to not in any form or

2    fashion give any feedback into the gHire system?

3    A.  Unfortunately, it was.  Yes, it was not the most easy to

4    use system, and people tended to fill it out only when an offer

5    was about to be made or their cases were being closed out.

6    Q.  Is it typical not to send any written communications about

7    the review on a candidate?

8    A.  Honestly, you'd have to ask recruiting.  I got most of my

9    feedback through recruiting, and I don't know if that was

10   verbal or written typically.

11   Q.  Do you know whether Diane Layfield had gHire feedback?

12   A.  I don't recall if she did or not.

13   Q.  Do you know if Ranjana Clark had gHire feedback?

14   A.  Again, I don't recall if she did or not.

15   Q.  Do you know if Tais Dwyer had it?

16   A.  Tais O'Dwyer?  No, I don't know if she had it either.

17   Q.  You understood that as of November 7, that Ms. Rowe was

18   raising a complaint of gender bias, correct?

19   A.  Through that email, yes.

20   Q.  And that was before you decided to have Mr. Breslow take on

21   the interim role, correct?

22   A.  As we established, I think, yesterday, I had started

23   considering putting in Stuart in October/November of that year,

24   and then I officially announced it in January subsequent to

25   that, yeah.

NACHRow4                          Shaukat - Redirect

1   Q.  When we've heard two different versions of that story?

2   A.  Yes, I can explain, if you would like me to explain, the

3   different versions of that.

4   Q.  You want to — no, I mean, I think the jury heard for

5   themselves your absolutely contradictory testimony on a very

6   straightforward question.

7   A.  It was, unfortunately, not a straightforward —

8           THE COURT:  Ms. Greene.

9   A.  So I can explain, if you would like, the apparent

10  contradiction that is not, in fact, a contradiction.  I'm happy

11  to do so.

12          THE COURT:  I think you've opened the door to that

13  now.

14  Q.  Sure.  Please explain.

15  A.  So as we just heard, in October I found out that Diane

16  Greene was leaving Google; Thomas Kurian was coming into

17  Google.  At the time in my staff meeting, I had 25 people

18  reporting in to me or coming in to my staff meeting.  One of

19  the things that we had to do was clean up my direct reports.

20  So that did not mean that we were appointing anyone officially.

21  It was what we call a span breaker.

22          So as a part of my direct report line in here, I also

23  in financial services had Leonard Law, who is our product

24  manager for financial services, as an example, attending my

25  staff meetings at this time.  So there were numerous people who

1    would eventually report to somebody who were in my staff

2    meeting.  I made a decision in October, for what I thought was

3    the good of the organization to be able to show to Thomas that

4    we were not —— that we were running a disciplined organization,

5    to put Stuart in as a span breaker to help me reduce the number

6    of direct reports and to make it look like it was a coherent,

7    lack of a better word, organization.

8             What was implied yesterday was that I then shut down

9    the searches for Ranjana Clark or Diana Layfield, which was not

10   true.  We assumed that this would be a very temporary

11   appointment as interim, and Diana Layfield was still somebody

12   that we were planning to hire.  We only reversed that decision

13   later on in December.  I believe November/December after I met

14   Thomas, and that's when we decided that the Stuart interim

15   appointment would go on longer than we had initially said.

16            So I got confused between the span breaker versus the

17   other.  In my mind, those are two separate appointments,

18   essentially.

19   Q.  OK.  So before you told Ms. Rowe that she was not getting

20   the job, you had decided that Mr. Breslow was going to perform

21   it on an interim basis, correct?

22   A.  Until I had gotten an opportunity to meet with Thomas

23   Kurian, yes.

24   Q.  And you didn't tell Ms. Rowe that, correct?

25   A.  Correct.

NACVROW5                        Lucas - Direct

1  Q.  And you are a plus Kevin, is that you?

2  A.  Yes, plus me.

3  Q.  And Ms. Rowe was raising a concern with being leveled at

4  Level 8 and later learning that her male peers were all hired

5  at Level 9; correct?

6  A.  That's how she outlined it in the note, yes.

7  Q.  Okay.  Let's turn to the first page on this document and

8  start at the bottom email at 4:49 p.m.

9        Ms. Lawrence wrote to you:  Hey, I don't know of any

10  way to address this.  It is true that some of the OCTO folks

11  were hired in as L9, but they had much more experience than she

12  did.  When I talked to Will, he was unequivocal that we hired

13  her in the right level.

14        Do you see that?

15  A.  I do.

16        MS. GREENE:  And if you can take that down.

17  Q.  Then you asked if she could send you the thread confirming

18  the levels, right?

19  A.  Yes.

20  Q.  Okay.  Let's look at the next email, the 7:42 p.m. email.

21        So you say:  I pulled TSC L8/9 hires in OCTO since

22  2016, and then pulled approximate years of experience and

23  education from gHire.  Data is here.  Do you see that?

24  A.  Yes, I do.

25  Q.  So explain to me what you did as you've described it here.

1    A.  So we have an internal reporting tool that you can identify

2    people who were hired into a specific organization or reporting

3    hierarchy within a specific time stamp, if you will.  And you

4    can narrow that down by job family, in this example, TSC Level

5    8 and 9.  So that's what I did.

6          So I pulled the short list of people who fulfilled

7    those kind of attributes and then migrated over to gHire, which

8    is our internal applicant tracking system whereby we process

9    all hiring and transfers across Google, and went person by

10   person to loosely see the significance of the complaint.

11   Q.  Okay.  You worked in HR, not ER; correct?

12   A.  Correct.

13   Q.  So your job did not entail undertaking investigations into

14   complaints; correct?

15   A.  That is correct.

16   Q.  Did you ask anyone before you did this data analysis if

17   years of experience and education were something that had been

18   considered in leveling at the time the leveling decisions were

19   made?

20   A.  I don't recall specifically asking anyone.

21   Q.  Did you do anything to look at whether years of experience

22   and education were factors that were used at the time the

23   leveling decisions were made?

24   A.  No, I generally went on what I had seen to be true in my

25   experience at Google.

1   Q.  And, in fact, your prior testimony was that you have no

2   knowledge that number of years was a factor used to determine

3   level for the technical directors in OCTO; correct?

4   A.  I don't recall that testimony; but if you're reading it, my

5   assumption is it's true.

6   Q.  Well, sitting here today, do you know if that's true, that

7   number of years was not a factor that was considered in

8   leveling in OCTO?

9   A.  I can't speak specifically to OCTO.  So when I step back

10  about our hiring process more broadly, years of experience is

11  an input that forms an initial level recommendation that

12  ultimately is a decision.  It just determines essentially the

13  hiring rubrics for which someone is assessed.

14  Q.  And do you know if that process you just described was used

15  in OCTO during the time that Ms. Rowe was being hired?

16  A.  It has been part of our staffing process across Google

17  since I joined the organization ten years ago.

18  Q.  Okay.  But my question is do you have knowledge that it

19  was, in fact, used with Ms. Rowe at the time she was hired?

20  A.  No direct knowledge.

21  Q.  Now, let's look at the data that you pooled, and that's

22  going to be Plaintiff's Exhibit 88.

23          MS. GREENE:  Can you pull out for us, Mr. Yang, the

24  column's name through hire date.  Maybe make it a little bit

25  bigger for everybody.

1          MS. TOMEZSKO:  Objection.

2   Q.  In terms of years of hire?

3          THE COURT:  Sustained.

4   Q.  Ms. Rowe had the same number, 19, as Nicholas Harteau,

5   under the column years at hire; correct?

6   A.  Correct.

7   Q.  And Mr. Grannis had 18 years at hire; correct?

8   A.  That is correct.

9   Q.  And what is the "experience in" column?

10  A.  The experience -- so if I remember correctly, I think the

11  experience in was simply post college or school; so kind of a

12  totality of experience.  So almost the difference between

13  domain experience versus overall working experience.

14  Q.  Did you do anything to verify whether those numbers were

15  correct?

16  A.  No.

17  Q.  Okay.  If we look at education, Paul Strong, B.S. in

18  physics; correct?

19  A.  Sorry.  Yes.

20  Q.  And none of the men who are listed as Level 9s have

21  computer engineering degrees; correct?

22  A.  Computer engineering.

23  Q.  Or computer science.

24  A.  Not based on this data, the translatable.

25  Q.  Okay.  Do you know if Nicholas Harteau had any degrees?

NACVROW5                    Lucas – Direct

1   A.  I'm not familiar with Nick specifically.

2   Q.  And Jonathan Donaldson had not received his master's, but

3   was six hours short; correct?

4   A.  That's what it appeared, yeah.

5   Q.  And Paul Strong only had a bachelor's; is that correct?

6   A.  As far as I can tell.

7   Q.  And Ms. Rowe had a B.S. and M.S. in computer science;

8   correct?

9   A.  That's what I see, yeah.

10  Q.  So do you know if this analysis you did in any way follows

11  any sort of established investigative process for someone who's

12  raised a concern about their level?

13  A.  No, which is why I didn't lead the investigation; I passed

14  it to our employee relations team who manages that process.

15  Q.  Do you know if this information was shared with Ms. Rowe

16  that she was leveled the same by years of experience and

17  education as these other people so she was not under-leveled?

18  Do you know if that was shared with her?

19  A.  I don't know.

20  Q.  Do you know if ER relied on the data that you pooled as

21  part of its investigation into Ms. Rowe's concern?

22  A.  I don't know.  You would need to ask our ER partner on

23  that.

24          MS. GREENE:  Okay.  You can take that down, Mr. Yang.

25  Q.  Okay.  I want to bring your attention to a document.  We're

1   not going to publish it to the jury at this time.  It's P-102.

2           Do you recognize this document?

3   A.  Yes, it appears like something that's posted on an internal

4   hiring site.

5   Q.  And do you recognize the substance and the content of this

6   document?

7   A.  Is there a way for me to make it bigger on my screen?

8   Apologies.

9   Q.  Sure.

10          MS. GREENE:  Vincent, can you call up the text of it,

11  please.

12  A.  Apologize.  Can you repeat the question again?

13  Q.  Sure.  Do you recognize the substance of this document?

14  A.  Generally, yeah.

15  Q.  Does this document accurately reflect Google's leveling

16  approach as it existed in 2016/2017?

17  A.  I don't know because there's not a date stamp on it.

18  Q.  I'm asking you that question specifically because we don't

19  have the version that existed in 2016 and 2017.  So I'm asking

20  you if this, as far as you remember, was the policy that was in

21  place during that time period?

22  A.  Can you give me a moment to read it all?

23  Q.  Please.  And I'm actually going to ask you specifically

24  about the section that says "do not," if you want to look

25  there.

1        (In open court; jurors present)

2   BY MS. GREENE:

3   Q.  Mr. Vardaman, I'm going to ask you a yes-or-no question.

4        Are you here because you feel the need to defend

5   actions that you yourself took in the course of Ms. Rowe's

6   employment?

7   A.  No.

8   Q.  Are you here because you believe that Ms. Rowe has accused

9   you wrongly of wrongdoing?

10  A.  No.

11  Q.  You're here simply to tell the truth?

12  A.  Correct.

13  Q.  And without telling us anything about anything more than

14  your own change of heart about testifying here in person, what

15  was your change of heart?  Why were you originally not going to

16  testify?  And, again, I don't want you to tell me anything that

17  precipitated it, but tell me just about your change of heart.

18  A.  Sure.  I was intended to — I was intending to show up in

19  person the entire time.  The court date moved around quite a

20  bit, as did my schedule for travel and all that.  The last time

21  I recall it was landing during my kid's first week of school,

22  and I wasn't going to miss that.

23  Q.  All right.  We'll see if we come back to that later.

24        Mr. Vardaman, in the course of your recruitment for

25  the financial services vertical lead position, you did not

1  discuss with Mr. Shaukat what Ms. Rowe's qualifications were,

2  correct?

3  A.  As a matter of process for internal Googlers, my job was to

4  raise candidacy to the hiring manager who made the decision to

5  include them in process or not.

6  Q.  OK.  So, yes-or-no question, is it correct that you did not

7  discuss with Mr. Shaukat what Ms. Rowe's qualifications were?

8  A.  Correct.

9  Q.  Is it correct that the extent of your knowledge about her

10  background was that she had worked at JPMorgan Chase?

11  A.  Incorrect.  We ended up spending time talking about her

12  background.

13  Q.  When?

14  A.  I'm sorry?

15  Q.  When?

16  A.  Over the course of ⸺ after I was asked to include her in

17  process, I recall we had a videoconference.

18  Q.  What did you know about her industry background?

19  A.  I walked through her background at a high level so that I

20  could ascertain enough information to send the prep note to the

21  panel members.  But, again, once the decision had been made to

22  include her into panel, that was my intention to deliver on

23  that to the decision-maker.

24  Q.  Mr. Vardaman, do you recall me deposing you in this case?

25  A.  Yes, I recall.

1    Q.  And you recall giving testimony under oath in that case?

2    A.  I do.

3    Q.  I'd like to now play for you a portion of that testimony.

4    A.  OK.

5    Q.  It's going to be page 42, line 5 through 14.

6            Once you have it, Mr. Yang, you can go ahead and play.

7            (Video played)

8            MS. GREENE:  You can stop it there.

9    Q.  Was that your testimony?

10   A.  That was, in fact, my testimony.

11   Q.  Did you give true testimony when you testified?

12   A.  I did.

13   Q.  Now, you didn't know what role Ms. Rowe had had at JPMorgan

14   Chase, correct?

15   A.  That's correct.

16   Q.  And you didn't know how many years she had worked in the

17   financial services industry, correct?

18   A.  That's correct.

19   Q.  You didn't know what her technological background was,

20   correct?

21   A.  Correct.

22   Q.  And you didn't know what advance degrees she held, correct?

23   A.  Correct.

24   Q.  You did not know what her experience was managing teams,

25   correct?

NACHRow6                        Vardaman - Direct

1    A.  That is correct.

2    Q.  And you did not speak with Brian Stevens about her

3    qualifications for the role, correct?

4    A.  No, I did not.

5    Q.  And you did not speak with Will Grannis about Ms. Rowe's

6    qualifications for the role, correct?

7    A.  That is correct.

8    Q.  In fact, you never learned what her qualifications were for

9    the financial services vertical lead role, isn't that right?

10   A.  As I mentioned earlier, the decision was made to involve

11   her in process, and that is my job, as steward of the process

12   for recruiting, to involve her in that process.

13   Q.  Let's go back to your deposition testimony, and we're going

14   to look at page 43:2 through 7.

15          Mr. Yang, if you could play that.

16          (Video played)

17          MS. GREENE:  And if we can play the answer.

18   Q.  I think we locked up, but was your answer to that question

19   no?

20   A.  Yes, it's right there.

21          (Video played)

22          MS. GREENE:  OK.  We can leave it, Mr. Yang.  Thank

23   you.  Sometimes technology is not our friend, even when we're

24   trying our best.

25   Q.  Was that truthful testimony when you gave it at your

1  deposition?

2  A.  Yes.

3  Q.  But that's different than what you just testified here

4  today, correct?

5  A.  As I recall, later on in the deposition, I provided

6  additional context.

7  Q.  My question was the testimony we just heard was different

8  than what you just said here in court about what you knew about

9  her qualifications, correct?

10 A.  That was my testimony, yes, ma'am.

11 Q.  OK.  Now, before the panel of interviews, you sent the

12 interviewers information about Ms. Rowe, correct?

13 A.  That is correct.

14 Q.  OK.  Let's look at Plaintiff's 37.

15        Do you recognize this as an email from you to Jason

16 Martin?

17 A.  I do.

18 Q.  And Mr. Martin was one of the individuals who interviewed

19 Ms. Rowe, correct?

20 A.  As I recall, yes.

21 Q.  And under context and competencies —— Mr. Yang, if you can

22 call those two bullet points out —— it says:  "Ulku was on

23 Brian Stevens' team before the reorg occurred that resulted in

24 some of the vertical OCTO folks transitioning to Tariq's

25 organization."  And then going on, it says:  "Brian Stevens is

1    Q.  It says:  "Impression:  Executive poise, confident (but not

2    ego-driven) forthright with a quick operating cadence."

3           You wrote that, correct?

4    A.  I did.

5    Q.  And then "RRK," what does that stand for?

6    A.  It's role-related knowledge is what it stands for.

7    Q.  And under concerns you noted "no major concerns are noted,"

8    correct?

9    A.  That is correct.

10          MS. GREENE:  Let's take down that document.

11   Q.  Then, Mr. Vardaman, did you send the same sort of email to

12   each of Ms. Rowe's interviewers?

13   A.  Yes.

14   Q.  Now, in Ms. Rowe's case, none of the four interviewers

15   provided feedback into the gHire system, isn't that right?

16   A.  We'd sometimes receive feedback outside of gHire, but it

17   was not entered, to my knowledge, in the gHire system, correct.

18   Q.  So I just want to make sure it's clear.  It's a yes-or-no

19   question.  You know that none of the four interviewers provided

20   feedback into the gHire systems for Ms. Rowe, correct?

21   A.  I don't recall them having entered it the last time I saw

22   the system.

23   Q.  And you yourself did not make any notes, written notes or

24   typed notes, of any informal feedback you may have received

25   from interviewers, correct?

NACHRow6                         Vardaman - Direct

1    A.  I believe that's correct.

2    Q.  And you yourself did not do anything to document any

3    internal feedback you may have received, correct?

4    A.  That is correct.

5    Q.  And you didn't share any informal feedback you may have

6    received with Mr. Shaukat, isn't that right?

7    A.  I — I don't recall.  I don't think so.

8    Q.  And Mr. Shaukat didn't share with you any feedback that he

9    may have reviewed, correct?

10   A.  No.

11   Q.  No, that's not correct, or no, he didn't share that with

12   you?

13   A.  Sorry.  No, I don't recall him sharing that with me.

14   Q.  Did anybody tell you that they thought Ms. Rowe was

15   abrasive?

16   A.  No.

17   Q.  Did anyone tell you that they thought Ms. Rowe was

18   cantankerous?

19   A.  No.

20   Q.  Did anyone tell you that they thought Ms. Rowe was not

21   Googly?

22   A.  No.

23   Q.  Did anyone express to you that they had ego concerns about

24   Ms. Rowe?

25   A.  No, not that I recall.

NACHRow6                          Vardaman - Direct

1    Q.  Do you believe Ms. Rowe to be self-oriented?

2    A.  Not that I recall.

3    Q.  Did anyone communicate to you that they thought Ms. Rowe

4    was self-oriented?

5    A.  No, not that I recall.

6    Q.  And had Mr. Shaukat ever told you that he had gotten that

7    sort of feedback about Ms. Rowe?

8    A.  No, he wouldn't have shared something like that with me.

9    Q.  Let's look at Plaintiff's Exhibit 111.

10          Now, you're familiar with the Thrive system at Google,

11   correct?

12   A.  Yes, ma'am, I am.

13   Q.  And Thrive is another system that recruiters use at Google,

14   is that right?

15   A.  That is correct.

16          MS. GREENE:  Now, if we can go to the second page ——

17   actually, if you could go back to the first page, Mr. Yang.

18   Q.  You see where it says "related to" and then it says

19   "candidate information for Ulku Rowe"?  Do you see that?

20   A.  Yes, yes.

21   Q.  So this is a Thrive printout related to Ms. Rowe, is that

22   right?

23   A.  That is correct.

24          MS. GREENE:  Let's go to the second page of this

25   document, and if we can call out the financial services

1   Q.   Now, you only had one conversation with Ms. Kliphouse about

2   Ms. Rowe; correct?

3   A.   I don't recall the specific number of conversations, I

4   really don't.

5   Q.   Well, do you recall having testified at your deposition

6   about a conversation you had with Ms. Kliphouse?

7   A.   I recall letting her know that Ulku is interested in the

8   role.  I do.

9   Q.   And do you recall saying that -- well, did you tell

10  Ms. Kliphouse that Ms. Rowe had contacted you?

11  A.   That probably came up by the time I was connecting -- and I

12  was connecting with Ms. Kliphouse regularly, or semi regularly.

13  I -- yes, at some point in time after Ulku reached out, I would

14  have surfaced that with the hiring manager, Ms. Kliphouse.

15  Q.   And Ms. Kliphouse confirmed that she and Ms. Rowe had had

16  coffee; isn't that right?

17  A.   As I recall, by the time I had reached out, Kirsten had

18  mentioned -- Ms. Kliphouse had mentioned that she had coffee

19  with Ulku; correct.

20  Q.   And as of the time of your deposition, that's the only

21  conversation you recalled having with Ms. Kliphouse about

22  Ms. Rowe; correct?

23  A.   I believe that's right.

24  Q.   Now, you had a call with Ms. Rowe eventually with respect

25  to this position; correct?

1    A.  Yes.

2    Q.  And that was later in February?

3    A.  Yes.

4    Q.  Now, in between the time that you sent Ms. Rowe the job

5    description and the videoconference you had with her -- was it

6    a videoconference?

7    A.  It was a videoconference.

8    Q.  You didn't do anything to find out about Ms. Rowe's

9    qualifications for this position; correct?

10   A.  That is correct.  I recall providing that testimony in the

11   deposition.

12   Q.  And you didn't do anything to find out about her

13   qualifications not just for this position, but at all; correct?

14   A.  It would have been relative to this specific position I was

15   working on.  No, I don't believe I had another conversation

16   with Ulku, no.  Ms. Rowe.

17   Q.  And you can't remember whether you even looked at her

18   LinkedIn profile between the time you sent her the financial

19   services sales -- VP sales financial services job description

20   and the time you told her she wasn't going to be considered;

21   isn't that right?

22   A.  As a matter of process, I am sure I looked at her LinkedIn

23   profile.  Ultimately, by the time I raised Ms. Rowe's candidacy

24   to Ms. Kliphouse, Ms. Kliphouse said they had met for coffee

25   and that she wanted me to focus on another candidate.

NACVROW7                        Vardaman - Direct

1   Q.   You didn't testify at your deposition about Ms. Kliphouse

2   telling you that she wanted to focus on another candidate, did

3   you?

4   A.   No, I did not.

5   Q.   So that's new testimony; correct?

6   A.   Yeah, I guess you can say that.

7   Q.   And do you recall me at your deposition asking you to tell

8   me everything about the conversation you had with

9   Ms. Kliphouse?

10  A.   Yes, ma'am.  "Everything" is quite big.

11  Q.   And do you recall me asking you at your deposition if you'd

12  had any other conversations about Ms. Rowe that you hadn't

13  testified to?  Do you recall me asking you that?

14  A.   I do.  I was quite nervous and ready to jump off the video.

15  Q.   Okay.  So you remember now today what you didn't remember

16  three years ago, when it was the same year in which this had

17  happened, is that what you're saying?

18  A.   Yes.

19  Q.   And when you were deposed in 2020, do you recall giving

20  testimony about whether you'd reviewed her LinkedIn profile?

21  A.   I don't recall.

22  Q.   So do you or do you not have a specific recollection of

23  even just looking at her LinkedIn profile before you had a

24  videoconference where you told her she wasn't going to be

25  considered?

1  A.  Again, as a matter of process, I would have looked at her

2  LinkedIn profile.  I do not have a specific recollection of

3  having done that for that search, no, ma'am.

4  Q.  Now, it would have been impossible for you to tell

5  Ms. Kliphouse anything about Ms. Rowe's qualifications or

6  experience or background or expertise or reputation or network

7  when you didn't know anything about those things yourself;

8  correct?

9  A.  I had assumed that Ms. Rowe was the best -- she was the

10  best possible person -- person, excuse me, to talk about her

11  background with the hiring manager.

12  Q.  Did you set up an interview for Ms. Rowe with

13  Ms. Kliphouse?

14  A.  No, I did not.

15  Q.  Did you set up a telephone conversation with Ms. Rowe and

16  Ms. Kliphouse?

17  A.  No, I did not.  Ms. Kliphouse, again, told me that she had

18  connected with Ulku over coffee.

19  Q.  Did she tell you how long that had lasted?

20  A.  I don't recall.

21  Q.  Did she tell you whether they discussed her qualifications?

22  A.  I don't recall.

23  Q.  But again, you weren't in a position to tell Ms. Kliphouse

24  anything because you didn't know anything about her

25  qualifications, experience, background, expertise, reputation,

NADHRow1

```
1    UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
2    ------------------------------x

3    ULKU ROWE,

4                    Plaintiff,

5            v.                              19 Civ. 8655 (JHR)

6    GOOGLE LLC,

7                    Defendant.              Trial

8    ------------------------------x
                                             New York, N.Y.
9                                            October 13, 2023
                                             9:30 a.m.
10
     Before:
11
                      HON. JENNIFER H. REARDEN,
12
                                             District Judge
13                                           -and a jury-

14                         APPEARANCES

15   OUTTEN & GOLDEN, LLP
          Attorneys for Plaintiff
16   BY:  CARA E. GREENE
          GREGORY S. CHIARELLO
17        SHIRA Z. GELFAND

18   PAUL HASTINGS LLP
          Attorneys for Defendant
19   BY:  KENNETH W. GAGE
          SARA B. TOMEZSKO
20
     Also Present:  Vincent Yang, Paralegal (Outten & Golden)
21                  Andrew Velazquez, Google Rep.
                    Jean Gutierrez, Paralegal (Paul Hastings)
22

23

24

25
```

NADVROW2                    Vardaman - Redirect

1    reaches out, you see.  February 10th, she's reached out to you;

2    correct?

3    A.  Yes, ma'am.

4    Q.  And you're not aware as of February 14th, having done

5    anything to let Ms. Kliphouse know that Ms. Rowe had been

6    reaching out and was interested and wanted to be considered for

7    the position; correct?

8    A.  No, I believe I said I don't recall when my conversation

9    with Ms. Kliphouse was.

10   Q.  Let's, if we can, go to -- well, let me ask you, do you

11   recall -- when was the first time that you alerted or even

12   thought to alert Ms. Kliphouse that Ms. Rowe was interested?

13            MS. TOMEZSKO:  Objection.  Asked and answered.

14            THE COURT:  Sustained.

15   Q.  Okay.  Let's turn to the first page of this document,

16   P-106.  So on February 20th, Ms. Rowe reaches out again to

17   check on updates; correct?

18   A.  February 20th.  Yes, yes, ma'am.

19   Q.  And you say:  Hi, Ulku.  Not yet.  We are trying to get on

20   Kirsten's calendar tomorrow.  Thank you.

21            Do you see that?

22   A.  I do.

23   Q.  Okay.  Now, do you recall if that caused you to do

24   something in terms of alerting Ms. Kliphouse that Ms. Rowe was

25   interested for the position?

1   A.   It looks like we have a meeting, a scheduled meeting with

2   Kirsten the next day, February 21st.

3   Q.   And do you recall what you did in preparation for that

4   meeting?

5   A.   I may have updated a document.

6   Q.   Did you do anything with respect to identifying Ms. Rowe's

7   qualifications or her experience or talking with anyone

8   internally about Ms. Rowe or the work that she'd been doing?

9   Did you do anything of that nature?

10  A.   I believe I testified yesterday that I did not.

11              (Continued on next page)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1  Q.  Now, was February 21 the first time you let Ms. Piazza know

2  that — I'm sorry, Ms. Kliphouse know that Ms. Rowe was

3  interested in the position?

4          MS. TOMEZSKO:  Objection.  Asked and answered.

5          THE COURT:  Sustained.

6  Q.  Do you recall whether February 21 was the date on which you

7  let Ms. Kliphouse know?

8          MS. TOMEZSKO:  Same objection.  Asked and answered.

9          THE COURT:  Sustained.

10  Q.  Let me show you a document to refresh your recollection,

11  D74, and this is just to refresh your own recollection.

12          Does this refresh your recollection as to whether on

13  February 25 you were alerting — I'm sorry, February 21 you

14  were alerting Ms. Kliphouse that Ms. Rowe had raised her hand

15  to be considered for the role?

16          MS. TOMEZSKO:  Same objection.  Asked and answered,

17  your Honor.

18          THE COURT:  I'll allow it now.

19  A.  I do see her name on this document, along with Tais

20  O'Dwyer.

21  Q.  How many other internal candidates were being considered at

22  that point in time?

23  A.  Is there another page?  It looks like that's a — OK.  It

24  looks like those two at that juncture.

25  Q.  That were being considered for the role?

1    A.  Yes.

2    Q.  Testimony was truthful?

3    A.  Yes.

4          MR. CHIARELLO:  Mr. Yang, can we play for the jury

5    72:20 to 73:8.

6          (Video played)

7          MR. CHIARELLO:  Thanks, Mr. Yang.

8    Q.  Mr. Breslow, did you understand that one of your

9    responsibilities was to identify cloud-related design,

10   development, or deployment friction points from the customer's

11   perspectives and to rally your teams to work through solutions?

12   A.  Sorry, could you repeat that.

13   Q.  Sure.  Did you understand that one of your responsibilities

14   as managing director of technology and policy was to identify

15   cloud-related design, development, or deployment friction

16   points from the customer's perspective and to rally your teams

17   to work through solutions?

18   A.  Yes.

19   Q.  Did you understand the function of your role that you were

20   expected to work closely with the product engineering teams in

21   GT and GPT?

22   A.  I'm sorry.  I didn't catch the two.  In what?  In G?

23   Q.  GT and GPT.

24   A.  I don't remember what those acronyms stand for.  Sorry.

25   Q.  OK.

1   A.   The answer's probably yes.  I just don't remember what

2   those acronyms are.

3   Q.   You don't have any reason to think that wasn't part of your

4   role?

5   A.   No, probably was.

6   Q.   And the role, as you understood it, also included doing

7   deep dives with internal engineering teams on key cases for a

8   given launch, correct?

9   A.   Yes.

10  Q.   In your role did you understand that your responsibility

11  included partnering closely with top global companies as their

12  most-trusted Google technical adviser?

13  A.   Absolutely.

14  Q.   Was part of your responsibility to tell the Google

15  innovation story and help translate it to actionable steps

16  global companies can take towards adoption of the cloud?

17  A.   Absolutely.

18  Q.   And did you understand one of your responsibilities to be

19  — to include public evangelism for emerging technologies and

20  speaking publicly on those issues?

21  A.   Absolutely.

22  Q.   Now, Tariq Shaukat was your manager while you were employed

23  at Google, correct?

24  A.   Correct.

25  Q.   And in your managing director of technology and policy

NADHRow3                          Breslow - Direct

 1  role, you met with Mr. Shaukat on a frequent basis, correct?
 2  A.  I think "frequent" is in the eye of the beholder, but, yes,
 3  we did meet a fair amount.
 4  Q.  And "frequent" is a word that you used in your deposition,
 5  correct?
 6  A.  If I did, I did.  Deposition was a couple years ago.
 7  Q.  And you had a standing call with Mr. Shaukat every week or
 8  every other week?
 9  A.  Correct.
10  Q.  And ——
11  A.  His name is pronounced Shaukat, not Shaukat.
12  Q.  OK.  I believe Mr. Shaukat used Shaukat, but appreciate the
13  clarification.
14          If Mr. Shaukat could not keep a call with you, he
15  would reschedule it relatively proximate to the scheduled time
16  you were supposed to speak, is that right?
17  A.  Depended, but generally, yes.
18  Q.  And he was available to you and would speak to you whenever
19  needed, correct?
20  A.  Yes.
21  Q.  He was always accessible to you?
22  A.  Yes.
23  Q.  And in addition to speaking with him, you also met with him
24  in New York or California approximately every month or so,
25  correct?

1    A.  No.  I'm assuming you mean in person in California or New

2    York ——

3    Q.  Yes.

4    A.  —— as opposed to a videoconference?

5    Q.  Correct.  You would meet with him in person in either

6    California or New York approximately every month to six weeks?

7    A.  No.

8         MR. CHIARELLO:  Mr. Yang, can we play for the jury

9    89:10 —— I'm sorry.  Just give me one second.  It's going to be

10   86:15 to 87:4.

11        (Video played)

12        MR. CHIARELLO:  Thank you, Mr. Yang.

13   Q.  When you met with Mr. Shaukat person, you would meet for

14   meals, correct?  For breakfast, lunch, or dinner?

15   A.  We met once in New York for breakfast, once in New York for

16   lunch, and once in New York for dinner.  We didn't meet in

17   California for any of those meals.

18   Q.  And Mr. Shaukat initiated those meetings with you, correct?

19   A.  I don't recall whether he initiated them or I initiated

20   them.  They happened.

21        MR. CHIARELLO:  Mr. Yang, can we put up

22   Plaintiff's 72, please.

23   Q.  Mr. Breslow, this is an email exchange between you and

24   Mr. Shaukat between February 28, 2019, and March 1, 2019.

25        And, Mr. Yang, if we could take a look at the second

1  page.

2          In the email from you to Mr Shaukat —— if we can just

3  call out the top two lines there.

4  A.  I'm sorry, you're talking about the middle of the page or

5  sort of down the page?

6          MR. CHIARELLO:  Mr. Yang, it's the February 28 at 5 ——

7  7:57.

8  A.  OK.  Got it.

9  Q.  The first two lines there.

10  A.  Thank you.

11  Q.  And you write to Mr. Shaukat:  "Great catching up with you

12  over lunch yesterday.  If only there were more hours in the day

13  and we were in the same city, we could do it more often,"

14  correct?

15  A.  Correct.

16  Q.  That's what you wrote him?

17  A.  Yeah, I wrote that.

18          MR. CHIARELLO:  And, Mr. Yang, can we call out the

19  bottom two lines of that same email.

20  Q.  You write to Mr. Shaukat:  "Safe travels.  I'm assuming

21  you'll have high quality BBQ in KC and not froufrou steak

22  frites as you were subjected to in New York yesterday,"

23  correct?

24  A.  I wrote that, yes.

25  Q.  And is that the lunch you were catching up with him over

NADHRow3                          Breslow - Direct

1    that you referenced at the beginning of the email?

2    A.  I'm sorry.  I'm confused.  The first part was about the

3    lunch I referenced.  The second part, I don't know when ── I do

4    not recall that he had a steak at lunch.

5    Q.  So the froufrou steak frites you had with him was a

6    separate meal that you subjected him to the day prior?

7    A.  He might have had a meal with someone else.  I had one more

8    meal with him.  By the way, I'm a lacto-ovo-pesco vegetarian.

9    I haven't had steak in 25 years.

10   Q.  I see.  So your testimony is the steak frites you were

11   referring to is not a meal you had with him?

12   A.  He may have had that meal.  This was in 2019.  It's four

13   years later.  I don't recall him eating steak at lunch, but

14   maybe he had a steak at lunch.  Maybe he had a steak later in

15   the day with someone else.  I don't recall.

16          MR. CHIARELLO:  OK.  Mr. Yang, you can take that down.

17   Q.  Now, Mr. Breslow, in December of 2018, Mr. Shaukat made you

18   the head of financial ── head of the financial services

19   vertical, correct?

20   A.  I'm sorry, the time frame was what?  December of 2018, is

21   that what you said?

22   Q.  Yes.

23   A.  I don't recall the precise time, but in that time period.

24   Q.  And the responsibilities for the head of financial services

25   role included driving Google's business by developing product

1    solutions for cloud, correct?

2    A.   Correct.

3    Q.   And it also involved you working with engineering to

4    develop products related to financial services and to find ways

5    to bring financial services providers to Google Cloud?

6    A.   Yes.

7    Q.   Is that correct?

8         Mr. Breslow, you hadn't expected to be considered for

9    this role, correct?

10   A.   Yes.

11   Q.   And you never asked to be considered for the role, correct?

12   A.   Yes.

13   Q.   And no one interviewed you for the role, correct?

14   A.   Correct.

15   Q.   And you spoke to Mr. Shaukat and he just gave you the role,

16   correct?

17   A.   No.  He asked me —— he said to me that with the arrival of

18   a new CEO for Google Cloud, the role had been open for a while.

19   And it was a time when, as the organization might be in

20   transition, would I consider taking on that role while the

21   organization sorted itself out?  And so I said, if that's what

22   you think is an appropriate role for me, I'm happy to take it

23   on.

24        MR. CHIARELLO:  Nothing further.

25   CROSS-EXAMINATION

1  BY MR. GAGE:

2  Q.  Good morning, Mr. Breslow.  It is still morning for a few

3  more.

4          Mr. Breslow, you were shown a short while ago

5  Plaintiff's Exhibit 37, and we don't need to put it up on the

6  screen.  It was your offer letter.  Do you remember that?

7  A.  Correct.

8  Q.  You were asked about a stock award.  Do you remember that?

9  A.  Yes, I was.

10  Q.  Did that stock award vest over time?

11  A.  Yeah, it vested 1/48.  It was a four-year stock award, 1/48

12  each month for 48 months.

13  Q.  When you left Google, did you forfeit any of the stock that

14  you had been granted by Google?

15  A.  $2 million worth.

16  Q.  So you never saw the full value of that initial award,

17  correct?

18  A.  That would be correct.

19  Q.  I want to take a step back so the jury can understand a

20  little bit more about your background.

21          Where are you from, by the way?

22  A.  So I am a native New Yorker, born and bred in Queens.  Went

23  to Queens P.S. 26, J.H.S. 216, and the Bronx High School of

24  Science.

25  Q.  And what's your educational background?

NADVROW4                    Grannis - Direct

1   Q.  And in January, offers were made to Ben Wilson, Jen

2   Bennett, Brian Steikes, and Jonathan Donaldson.  Does that

3   sound about right?

4   A.  Yeah, sounds right.

5   Q.  And then Nick Harteau joined in early April 2017, is that

6   right?

7   A.  Yeah, sounds about right.

8   Q.  And all of those nine were hired into OCTO; correct?

9   A.  Yes.

10  Q.  And they were all hired using the same job description?

11  A.  Yes.

12  Q.  And that job with description and the role itself outlined

13  what's generally been referred to as three different pillars;

14  correct?

15  A.  That's correct, yeah.

16  Q.  For the record, what are those pillars?

17  A.  Sure.  The first pillar is customer impact, customer

18  expertise.  This really manifested mostly as vertical expertise

19  in the early going.

20          Second bucket was engineering expertise, so deep

21  technical expertise in a field, such as AI or infrastructure.

22          And then the third was the evangelism, sharing what we

23  know and what we learn with the broad audiences.

24  Q.  And together with evangelism, that also included thought

25  leadership as a third pillar; correct?

NADVROW4                     Grannis - Direct

1   A.  Yes, thought leadership, blogs, videos, conference

2   attendance, things like that.

3   Q.  Okay.  Now, all of the nine individuals that we just

4   discussed, they all reported to you; correct?

5   A.  Correct.

6   Q.  And they all had the same responsibilities?

7   A.  Generally, all three were -- all three buckets were part of

8   their job responsibilities, but we certainly had higher

9   expectations or expectations that were level appropriate.

10          Because at that time, I mean, when we got to about

11  April, May, June, a year in, we had 30 people in the team that

12  ranged from Level 5, 6, 7, 8, and 9.  So, of course, we would

13  have different expectations of Level 9 in terms of the impact

14  that they were able to create and their experience and

15  expertise than we would for a Level 6 or a 7 or Level 8.

16  Q.  Between Level 8 and Level 9, prior to April/May 2017, you

17  didn't really know what the difference was between those two,

18  right?  You were still sorting out that?

19  A.  Yeah.  What we had done is we had adopted -- it's a job

20  family.  It's like a description of work to be done in our HR

21  system; so like a software engineer has a job family, or a

22  salesperson has like a job family.  And it codifies their

23  responsibilities.

24          OCTO is an entirety new function.  So we were just

25  trying to figure out, candidly, how adopting a job family from

NADVROW4                    Grannis - Direct

1    one part of Google and bringing it over into engineering, how

2    that would even work.  And so, yeah, at the time that we were

3    hiring, we had not yet hired and observed people in action, you

4    know, over a long period of time, to be able to go back and

5    update that ladder or that job family very specifically.  So we

6    used one centralized role and then, based on experience,

7    expertise, likelihood to create, you know, impact across one or

8    multiple pillars, that's really what we were looking for in the

9    hiring process.

10   Q.  Okay.  So when you were hiring during that time frame, you

11   did not have a job ladder that had been adopted for OCTO;

12   correct?

13   A.  We had a job ladder, but it only had one entry, because

14   again, we didn't know -- we didn't have the context for, you

15   know, should we have five levels, should we have four, should

16   we have three, should we have two.

17   Q.  That was still being developed?

18   A.  Absolutely.

19   Q.  Now, I'm going to focus again on those nine people that

20   came in that time period.  They all had generally the same

21   skill sets; correct?

22   A.  That's not correct.

23   Q.  Well, didn't they all need to have similar skill sets to be

24   able to meet the three pillars?

25   A.  Well, I don't want to conflate job responsibilities and

1    skills and expertise that someone has coming in the door.

2    Because those can be two different things, and I'll give you an

3    example.

4         Scott Penberthy, he is a Ph.D. in computer science and

5    a deep AI expert, world expert in AI.

6         Let's see.  Ben Wilson came from the energy sector and

7    was a world expert in application migration; led the first

8    migration of many applications, I think, at GE, like hundreds

9    of applications at GE into the public cloud.  I think he's

10   still a reference for Amazon, as a matter of fact, which is

11   ironic.

12        So they all had these different backgrounds and

13   expertise.

14        And the composition of the team from the very

15   beginning, when we first envisioned it, was we would hire

16   people with a broad range of experience expertise, you know,

17   this kind of diverse skill set of we need people in AI, we need

18   people in networking, we need people in storage, we need people

19   who understand financial services, we need people who

20   understand energy, we need people who understand media and

21   telco.

22        So by definition, we were hiring people with

23   dissimilar backgrounds and expertise.  When they came to the

24   team, over time they were expected to perform across those

25   three pillars of impact.

1   Q.  Okay.  I'm going to ask you a yes-or-no question.

2   A.  Okay.

3   Q.  Each of the candidates that were hired into the role at

4   that time needed to have similar skill sets to be able to meet

5   those three pillars; correct?

6   A.  No.

7   Q.  Okay.  Let's go to your deposition.  Do you recall having

8   sat for your deposition --

9               (Indiscernible crosstalk)

10  A.  Recall sitting through a deposition, yes.

11              MS. GREENE:  Okay.  Let's go to 50, page 50, lines 18

12  through 23.  Page 50, lines 18 through 23.

13              And go ahead, Mr. Yang.

14              (Video played)

15  Q.  Okay.  There was an objection, but your answer there at

16  your deposition was yes; correct?

17  A.  That was, yeah.

18  Q.  And that was the testimony that you gave under oath at your

19  deposition?

20  A.  It was.

21  Q.  Now, you used the same interview questions with each of

22  those nine candidates during that time; correct?

23  A.  Yes.

24  Q.  And if we can, let's go to Plaintiff's Exhibit 93.  This is

25  the L8 assessment -- L8 plus assessment-based interview

1    questions that were used for the hiring of those technical

2    directors into OCTO; correct?

3    A.  Yes.  These would have been similar across all candidates.

4    Q.  Okay.

5          MS. GREENE:  And if we can just go to the next page,

6    as well, Mr. Yang.  And then to the final page for the jury.

7    Q.  So this included leadership questions, Googliness

8    questions, and GCA questions; correct?

9    A.  Correct.

10   Q.  And what is GCA?

11   A.  It's general cognitive ability.

12   Q.  Okay.  And so these types of questions, leadership,

13   Googliness, GCA, those are pretty standard for at the L8 plus

14   level; correct?  I mean, in other words, leadership,

15   Googliness, and GCA are something that's asked of all

16   senior-level candidates across Google; correct?

17   A.  They are the same categories.

18   Q.  Okay.  And if we go to the first page, this is L8 plus;

19   correct?  There weren't a separate set of questions for L8 and

20   a separate set of questions for L9?

21   A.  No.  L8 plus, I think at the time these would have been

22   relevant to L8, L9, that's why it has the plus after it.

23   Q.  Now, each of those nine were all hired for the same role;

24   correct?

25   A.  The technical director role, yeah.

1   Q.  And it's definitely true that everyone was being hired for

2   the same role, technical director solutions; correct?  Of those

3   nine?

4   A.  Of the people you mentioned, yes.  We did have different

5   roles.  We had some ops roles; we had, like, executive support,

6   things like that.

7   Q.  The technical director position, it was scoped for between

8   Level 8 and Level 9; correct?

9   A.  Correct.

10  Q.  And the job ladder that you were developing didn't go

11  beyond Level 8; correct?  At that time?

12  A.  At the time, correct.

13  Q.  And, in fact, at that time, again, the late 2016/early 2017

14  period, there was less definition in the job ladder at those

15  higher levels; correct?

16  A.  Yeah.  We'd been operating for a year-ish, so certainly

17  still learning; in fact, we still are.

18  Q.  Now, if it we can go to Plaintiff's Exhibit 8.  And this is

19  email that you're copied on from August 28th, 2017; correct?

20  A.  Yeah.

21  Q.  And it's from Melissa Lawrence, who was your HR lead in

22  OCTO for OCTO; correct?

23  A.  Yes.

24  Q.  And those names that are mentioned here, those were the

25  technical directors in OCTO; correct?

NADVROW4                        Grannis – Direct

1    A.   Yes.

2    Q.   Okay.  And if we can pull out Ms. Lawrence's email, "Hi

3    all," through her signature.

4           She says:  One of you asked, but for the benefit of

5    all, there is very little documented for L8 plus expectations

6    at Google for general leveling.  This is the best guide

7    available for generic engineering.

8           Was OCTO generic engineering?

9    A.   Yes.

10   Q.   Did it have an engineering component?

11   A.   Yes.

12   Q.   Was it limited to just an engineering component; correct?

13   A.   Well, we were in the engineering hierarchy, so that's what

14   these job families are tied to.  So like we have a sales

15   hierarchy, and there are job families that tie to a sales

16   hierarchy.  And there's an engineering hierarchy, and there are

17   job roles -- this was specifically actually taken -- this job

18   family originally existed in go-to-market, which is kind of

19   like sales and marketing.  And it was brought to engineering to

20   focus on engineering.  So it was primarily engineering.

21   Q.   OCTO had not adopted an engineering leveling guide or job

22   ladder for itself at that point in time; correct?

23   A.   Correct.

24           MS. GREENE:  Okay.  We can take that down.

25   Q.   You, yourself, in this time frame did not have a great

1   distinction between Levels 8 and 9; isn't that right?

2   A.  I don't know what you mean by I didn't have a great

3   distinction between them.

4   Q.  You really weren't sure what distinguished a Level 8 from a

5   Level 9 during this time frame; correct?

6   A.  We certainly had a hypothesis in that we were testing it

7   based on the candidates that we -- that we were interviewing.

8   So we had an initial sense of it and then we were testing it

9   all along.

10  Q.  Well, early on, during this time frame that we're talking

11  about, you didn't have a super strong sense of what

12  distinguished a Level 8 and a Level 9; correct?

13          MR. GAGE:  Objection.  Vague, your Honor.

14          THE COURT:  Sustained.

15  Q.  Mr. Grannis, do you recall being interviewed by employee

16  relations at Google in connection with this matter?

17  A.  Yes.  Maybe.  I think.  It's been a long -- it's been a

18  long time, so probably.

19  Q.  You're not sure if you were interviewed or not?

20  A.  By employee relations specifically related to this,

21  probably.

22  Q.  Do you recall meeting with Ashley Tessier and having two

23  people there and them taking notes?

24  A.  Oh, yeah, that sounds familiar, yeah.

25  Q.  That was "yeah"; correct?

of her level at the time, you said no assessment.

Do you also recall saying:  All of our hires in OCTO
early on in building the function didn't have a super strong
sense, didn't know Level 8s from 9s; didn't say we are only
going to hire 8s, etc., take a person's qualifications and
skills and run through the process, and then have a
recommendation on the other side.  Didn't have any preconceived
notions about level; had only been at Google at the time for
one year; didn't have a straight super-calibrated reference
frame.

Do you recall in sum or substance saying that to ER?
A.  I think it's absolutely fair to say that, because we had
not -- we hadn't hired a bunch of people; this was a brand-new
ladder.  It was a new function within engineering.  We
absolutely couldn't be super confident in all aspects.

But as we started hiring people, especially when we
were getting to that stage, I mean, we had already had 17, 18,
19, 20 people by the time we were hiring most of the external
candidates.  We definitely started to see -- we started to
learn a little bit more about what we were looking for.

So for example, when we first started, we didn't know
what the balance or how we would think about impact for someone
coming in.  Would they have more impact or the ability to
create, like, stronger impact early on if they were a little
more on the engineering side, or are they a little bit more on

1      the customer side.  We didn't know that.

2              But it certainly became clear, you know, six months,

3      five months, six months in, attributes that would make someone

4      more effective or less effective.

5      Q.  The people who joined you from internal -- internally in

6      Google, their levels were already preset; correct?

7      A.  Correct.

8      Q.  So you didn't make any leveling decisions around that

9      group; correct?

10     A.  Correct.

11     Q.  So the first group you were making leveling decisions about

12     were those eight or nine -- the nine folks we talked about,

13     Evren through Nick Harteau; correct?

14     A.  Correct.

15     Q.  And you'd never hired someone externally where you were

16     making the leveling decision up until that point in time.  And

17     at that point in time, you didn't know what distinguished a

18     Level 8 from a Level 9; correct?  You were still figuring it

19     out?

20     A.  We were still figuring it out.

21     Q.  And you weren't provided with any sort of leveling guide;

22     correct?

23     A.  There was no leveling guide for that position in

24     engineering.

25     Q.  And you weren't provided with any sort of metrics that

1   equated years of experience to a particular level; correct?

2   A.  We didn't have that, no.

3   Q.  And those first eight or nine people, you have less of a

4   sense of the differences between what would make one an 8 and a

5   9; correct?

6   A.  No, we were still figuring it out.

7   Q.  The additional expansion of the team from an external hire

8   perspective happened following additional budget being

9   allocated to the group; correct?

10  A.  Yeah.  Original plan was to have roughly 10 to 12; and it

11  was proving so in demand that we expanded it.  We had almost --

12  by August of that year we probably had 30, 32, 34 people,

13  something like that.

14  Q.  Okay.  So there was a first wave and then a second wave;

15  correct?

16  A.  Yeah.

17  Q.  And it was that first wave where you didn't have the

18  calibrated sense of the L8 and L9.  And by the time you started

19  with the second wave, you had a better sense; correct?

20  A.  Oh, I'm sorry.  I thought you meant -- by "wave," I thought

21  you meant like the internal versus external.  The first wave

22  was the internal hires; we hired 17 people in six months

23  internally.  The second wave I was thinking of is the external

24  hires.

25  Q.  But you already testified that those external hires, you

1  didn't have a strong sense at that time; correct?

2  A.  For the external hires, because all the other ones had come

3  through with their levels, yes, that's correct.

4  Q.  Now, your job in the hiring process was to ensure that the

5  candidates were qualified at the L8 plus level; correct?

6  A.  Correct.

7  Q.  You didn't make the final leveling decision, you just made

8  a recommendation; correct?

9  A.  I don't think -- I'm just trying to think back.  Like

10  discrete leveling recommendations -- my job was really to

11  confirm or if there was like an issue.

12      So let's say in the process of an interview, let's say

13  we were given someone who, hey, we think that this person

14  should be -- you know, this might be interviewing for L9.

15  Well, if someone is going to be interviewing for L9, we'd have

16  significant expectations around, you know, their expertise,

17  background, and what they'd be able to create in terms of

18  impact right away.

19      And so throughout the hiring process, you know, there

20  would be that kind of, like, set looking for those

21  expectations.  Of course, as you mentioned before, we were

22  still trying to figure it out.  But if someone was coming

23  through as an L8, we'd also have certain expectations.  We'd be

24  looking for their acumen along these dimensions that we thought

25  would match with an L8.

NAIHRow1

1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   -------------------------------x

3   ULKU ROWE,

4                   Plaintiff,

5            v.                              19 Civ. 8655 (JHR)

6   GOOGLE LLC,

7                   Defendant.               Trial

8   -------------------------------x
                                            New York, N.Y.
9                                           October 18, 2023
                                            8:50 a.m.
10
    Before:
11
                        HON. JENNIFER H. REARDEN,
12
                                            District Judge
13                                          -and a jury-

14                         APPEARANCES

15  OUTTEN & GOLDEN, LLP
         Attorneys for Plaintiff
16  BY:  CARA E. GREENE
         GREGORY S. CHIARELLO
17       SHIRA Z. GELFAND

18  PAUL HASTINGS LLP
         Attorneys for Defendant
19  BY:  KENNETH W. GAGE
         SARA B. TOMEZSKO
20
    Also Present:  Vincent Yang, Paralegal (Outten & Golden)
21                 Andrew Velazquez, Google Rep.
                   Jean Gutierrez, Paralegal (Paul Hastings)
22

23

24

25

1    functions, the three pillars we talked about while you were

2    managing that group?

3    A.  I was, yes.

4    Q.  Mr. Harteau, who were the other director-level technical

5    directors working in OCTO when you joined?

6    A.  I'm not sure I can produce an accurate list, but I

7    certainly remember working with Ben Wilson, Evren, Jonathan

8    Donaldson, and Ulku was there when I joined, as I remember.

9    Q.  And the individuals that you recall, did you know what

10   their level was?

11   A.  I didn't.

12   Q.  Did you have any belief as to what their level was?

13              MS. TOMEZSKO:  Objection.  Relevance.

14              THE COURT:  Sustained.

15   Q.  Well, did you know one way or the other what level they

16   were, whether Level 8 or Level 9?

17              MS. TOMEZSKO:  Objection.  Asked and answered.

18              THE COURT:  I'll allow it.

19   A.  I honestly don't recall.  In Google culture, like, there is

20   a lot of discussion of levels.  And I wouldn't -- it wouldn't

21   surprise me that I learned that over the course of the water

22   cooler conversation.  But I don't have any specific memory of

23   that now.

24   Q.  Okay.  Let's talk about Ms. Rowe a little bit.

25              Did you and Ms. Rowe have occasion to work together in

1   any capacity?

2   A.  I don't think we worked together directly.  The places

3   where I remember spending time with Ulku were there were

4   conferences that we both attended and spoke out and normal team

5   collaboration.  You know, we went to the same meetings, we

6   talked about the same stuff.

7          I think Ulku and I probably talked a little bit more

8   than some of the other folks, as we were the two -- two folks

9   stationed in New York City.

10  Q.  And did you have an opportunity to observe the work that

11  she did separate from that?

12  A.  I would say I observed some of her work.  I don't think it

13  was exhaustive, but certainly some.

14  Q.  From what you were able to observe on a day-to-day basis,

15  how did her work compare with yours?

16  A.  Similar.  You know, we were doing the same sort of work in

17  the same sort of circumstances.

18  Q.  You and Ms. Rowe both worked with customers?

19  A.  Correct.

20  Q.  And you and Ms. Rowe both worked with engineering and

21  project management teams?

22  A.  Correct.

23  Q.  And both of you engaged in thought leadership on behalf of

24  Google?

25  A.  Correct.

NAIVROW2                    Harteau - Direct

1   Q.  Both of you did public speaking?

2   A.  Yes.

3   Q.  Based on your interactions and your observations of

4   Ms. Rowe, how knowledgeable was she with respect to Cloud and

5   its relationship to financial services?

6   A.  She seemed quite knowledgeable.  I am not an expert in that

7   myself, so, you know, I wouldn't be the authority on that.  But

8   she seemed as knowledgeable as the rest of us were and our

9   specialties.

10  Q.  Mr. Harteau, part of the technical director role was to

11  work with and gain support from the engineering teams; is that

12  correct?

13  A.  That's correct.

14  Q.  And in your observation, how successful were the technical

15  directors with whom you worked in getting the engineering teams

16  invested in their projects?

17  A.  I think that was one of the harder parts of the job.  And I

18  think we all struggled with that -- that aspect of it.

19  Q.  Would you say that's a struggle that all the technical

20  directors shared?

21          MS. TOMEZSKO:  Objection.  Foundation.

22          THE COURT:  Can you rephrase please.

23  Q.  In your observation, was that an issue that all the

24  technical directors you observed had?

25  A.  Can you ask that again?  Sorry.

1  executives and other customers.  That's what I understood they

2  were looking for.

3  "Q.  Did anyone explain to you specifically with respect to

4  what level you would be what factors or criteria beyond that

5  they were considering?

6  "A.  No.

7  "Q.  Did anyone at any point in time tell you that your level

8  was dictated by your years of industry experience?

9  "A.  No.

10  "Q.  At any point in time in describing for you what

11  experience, etc., needed to be in the office of the CTO, did

12  anyone mention to you levels?

13  "A.  Never.  Levels —— levels were never discussed.

14  "Q.  During the time that you were in the office of the CTO,

15  did you ever work with Ms. Rowe?

16  "A.  Yes.

17  "Q.  In what capacity did you have a chance to work with her?

18  "A.  Just things on, like, presentations, and so forth.  If I

19  was giving a presentation, I would look for her advice on,

20  like, what she's presented.  She was a prolific presenter on

21  behalf of Google.  I was not.  So I looked to her on kind of

22  like what she presented on and how she did it and what were the

23  things Google was looking for for us to present on.

24  "Q.  What was your understanding of what Ms. Rowe's role was at

25  the time when you were both in the CTO?

NAIHRow3                           "Wilson"

1    "A.   Same as mine but for the financial vertical.

2    "Q.   What was your understanding of her background?

3    "A.   A deep financial services background working with C-level

4    executives, go and build out financial products customers would

5    use.

6    "Q.   Do you know how many years of financial services industry

7    experience she had?

8    "A.   No.

9    "Q.   Was that something that was kind of a topic of discussion

10   in OCTO, the number of years of experience that people had?

11   "A.   Not as far as I knew.

12   "Q.   During the time when you had the opportunity to interact

13   with Ms. Rowe, did you find her to be professional?

14   "A.   Yes.

15   "Q.   Did you find her to be knowledgeable?

16   "A.   Yes.

17   "Q.   Did you find her to be knowledgeable with respect to

18   financial services?

19   "A.   Yes.

20   "Q.   Did you find her knowledgeable with respect to

21   engineering?

22   "A.   Yes.

23   "Q.   Did you find her knowledgeable with respect to project

24   management?

25   "A.   Yes.

NAIHRow3                              "Wilson"

1    "Q.  Did you personally have any criticisms of her performance?

2    "A.  No.

3    "Q.  Did you ever hear anyone else express any criticisms of

4    her performance?

5    "A.  No.

6    "Q.  Now, you had mentioned earlier you had a discussion with

7    her about leveling at some point in time, is that correct?

8    "A.  I'm not sure if I said that earlier, but, yes, at one

9    point in time, she and I had had a discussion around what

10   levels we were.  Yes, that is correct.

11   "Q.  Did you tell her that you were a Level 9?

12   "A.  Yes, I did.

13   "Q.  Did she seem surprised to hear that?

14   "A.  Yeah.  I know her well enough to know that she was

15   surprised, yes.

16   "Q.  Did she say anything to you about that, about you being a

17   Level 9?

18   "A.  Yes.  She asked why I would be a Level 9 and she would be

19   a Level 8.

20   "Q.  Do you recall what you said?

21   "A.  I —— I was not involved in the hiring process, so I really

22   don't know.  I also recall I said something to the effect that

23   I'd been a CTO of a $5 billion software company and that I've

24   had some very kind of deep experiences in cloud.  I said having

25   had the CTO title seems to matter something inside Google for

NAIHRow3                    "Wilson"

1    "Q.  And there's also a second grant award in an aggregate

2    amount equal to $450,000.  Do you see that?

3    "A.  Yes.

4    "Q.  Do you know how that amount was determined?

5    "A.  Because they — they realized how much money I was leaving

6    behind, and so that was sort of their attempts to help me out.

7    "Q.  Just so we're clear, you never requested a particular

8    level, correct?

9    "A.  No.

10   "Q.  At the time you were being hired, nobody told you what the

11   levels of the other technical directors might be, correct?

12   "A.  No.

13   "Q.  In the office of the CTO, did you ever work with Ulku

14   Rowe?

15   "A.  Yes.

16   "Q.  In what capacity did you have an opportunity to work with

17   her?

18   "A.  In external events, joint presentations, analyst events

19   that we presented, and sometimes I pulled her into an executive

20   briefing that I could use her help.  Sometimes she pulled me

21   into some meetings that she could help me out — I could help

22   her out.

23   "Q.  I know some of these are very obvious questions, but,

24   again, we have to get it for the record.

25        "What was your understanding of Ms. Rowe's role at the

1   time?

2   "A.  She was a technical director in the office of the CTO.

3   "Q.  So she was in the same role that you were in?

4   "A.  Yes.  We were all in the same role.

5   "Q.  Did you at some point in time learn what her educational

6   background was?

7   A.  During our personal conversations, we would chitchat, you

8   know, which schools we went, our families, and so forth.

9   Casual.

10  "Q.  What did you understand about her educational background?

11  "A.  That in — in — that — not in too many specific details

12  that, you know, she understood the domain, technical domain

13  that we were in, and that she had worked in the IT world of

14  fintech, and she understood how it works and how banks are

15  structured and how they operate, and so forth.

16  "Q.  Did you know that she had a bachelor's and a master's in

17  computer-related technology?

18  "A.  I believe she told me, but I don't remember exactly where

19  she got it, and so forth.

20  "Q.  In your work with her, did you find her to be

21  professional?

22  "A.  Very.

23  "Q.  Did you find her to be knowledgeable?

24  "A.  Yes.

25  "Q.  Was she knowledgeable with respect to financial services?

NAIHRow3                        "Wilson"

"A.   Yes.

            (Continued on next page)

NAIVROW4                              "Eryurek"

1    "A.  No.

2    "Q.  Mr. Eryurek, have you heard the term 'senior director'

3    used in OCTO?

4    "A.  We never used it, no.

5    "Q.  So in your recollection, the term 'director' was the term

6    that was used in OCTO?

7    "A.  We all -- we all had technical directors business cards

8    and so forth.

9    "Q.  Did Ms. Rowe ever tell you in sum or substance, even if

10   she didn't use those exact words, that she thought she was

11   being treated differently as a woman?

12   "A.  No.

13   "Q.  From what you observed about the technical director role,

14   was it years of experience that was the most relevant or the

15   type of experience that was most relevant to the job?

16   "A.  Probably a combination of both.  And some had a lot more

17   years, and their roles were really big and broad and so forth.

18   Some others were maybe the types of the focus areas that they

19   had and what experience that they brought in.

20   "Q.  So, in other words, years of experience was not a

21   determining factor in how someone could perform as a technical

22   director?

23   "A.  Remember, I told you technical director was a title that

24   just about everyone used in the team; some with a lot less

25   experience and junior roles than I did, but they still called

NAIVROW4                        "Eryurek"

1    themselves technical directors, which was fine for them because

2    that's sort of -- that helps excel communications of technical

3    directors and will do it.

4            And so years of experience mattered.  What you did,

5    where you did, how you did, for whom you did definitely

6    mattered.  But not everyone had that same kind of template

7    experience, because we all had technical director titles, but

8    we were different levels because of the experience that we had

9    in our pasts.  Some was driven by years, some was driven by

10   what we have accomplished in our prior lives.

11   "Q.  And is that something that was communicated to you or

12   something that you just --

13   "A.  By virtue of -- of -- by virtue of talking to people, you

14   sort of gather that.

15   "Q.  With respect to directors at L8 and above, did you have

16   any basis to know what their years of experience were and how

17   that related to their leveling?

18   "A.  Not really.

19   "Q.  Did it have any impact on what clients they worked on?

20   "A.  No.

21   "Q.  Did it have any impact on what external speaking

22   engagements they might work on?

23   "A.  Absolutely not.

24   "Q.  Did it have any impact on what internal products or

25   projects they might work on?

1    "A.  No.

2    "Q.  With respect again to the L8 and L9 directors, did the

3    years of experience impact their day-to-day work or the role in

4    any way?

5    "A.  I wouldn't have guessed so, no."

6              MS. GELFAND:  No further questions.

7              THE COURT:  Thank you.

8              MR. CHIARELLO:  Your Honor, our next witness is April

9    Beaupain.

10             THE COURT:  Okay.

11             Mr. Chiarello, I intend to give the jury a lunch break

12   at 12:30.

13             MR. CHIARELLO:  Okay.  Thank you, your Honor.

14    APRIL BEAUPAIN,

15        called as a witness by the Plaintiff,

16        having been duly sworn, testified as follows:

17   DIRECT EXAMINATION

18   BY MR. CHIARELLO:

19   Q.  Good afternoon, Ms. Beaupain.

20   A.  Good afternoon.

21   Q.  You are currently employed at Google?

22   A.  Yes.

23   Q.  And in 2018/2019, what was your role at Google?

24   A.  I was an employee relations partner.

25   Q.  And did you participate in an investigation in connection

1    chain; any human resources people partner or consultant; the

2    respect@team; and the compliance help line.

3              It's correct that an employee could use any of those

4    methods to register a concern; is that correct?

5    A.  Based on what -- excuse me.  Based on what you're showing

6    me, what it says, yes.

7    Q.  And is it correct that those are ways that an employee

8    could raise a concern?

9    A.  They are.  I want to be thoughtful of at the time of -- in

10   2018, I can't recall whether, like, our compliance help line

11   was up and running; but yes, these are absolutely avenues that

12   someone can raise a concern.

13   Q.  Better clarification.

14             MR. CHIARELLO:  Mr. Yang, can we look above that at

15   the section that's marked "Retaliation."

16   Q.  And Ms. Beaupain, this is Google's policy prohibiting

17   retaliation against employees who raise workplace concerns;

18   correct?

19   A.  Yes.

20   Q.  And this policy would apply to employees who raise concerns

21   of gender discrimination?

22   A.  Yes.

23   Q.  And it would apply to employees who raise concerns of pay

24   disparity?

25   A.  Yes.

1              MR. CHIARELLO:  Mr. Yang, can we take a look at the

2     fourth page of this document.  And I want to call out the top

3     part of how a concern is handled.  Not just the header, the

4     first two paragraphs underneath that.

5     Q.  And while he's doing that, Ms. Beaupain, it was employee

6     relations' responsibility to investigate complaints of

7     discrimination; correct?

8     A.  Yes, that's correct.

9     Q.  Drawing your attention to the bottom paragraph,

10    Ms. Beaupain, it says:  We'll also gather information about the

11    issue.  To do that, we'll need to talk with you.  During the

12    meeting there will generally be two members of the

13    investigations team in the room, one person will be taking

14    notes.

15              This is with respect to the complainant, but was it

16    also employee relations' policy to have two individuals in the

17    room for any interview?

18    A.  Typically, that would be our approach.  There could be

19    one-off exceptions to that, so I don't want to say they

20    unilaterally apply, but that was definitely best practices to

21    have two of the employee relations members in an interview or

22    in a discussion, yes.

23    Q.  And was also the practice to have a person taking notes of

24    the interview?

25    A.  Yes.  I mean, again, there's always exceptions.  I don't

NAIVROW4                          Beaupain - Direct

1    know if this was actually just being thoughtful of this

2    language.  I don't know when that was added as part of the

3    process or policy here.  I don't know if it was in effect.

4    This has changed and grown as Google has grown, so I can't say

5    for sure that this was in the process in 2018.  But that was

6    ER's practice where it made sense to have two individuals in

7    the interview when speaking with people.

8    Q.  Okay.  I just want to clarify.  I thought you had said this

9    policy was in effect in the 2018/2019 period?

10   A.  Thank you.  Let me clarify.

11          The policy was in effect.  Some of the details, how a

12   concern is handled, may have grown and changed as Google has

13   grown and our processes have grown.

14   Q.  But it was the practice during the time Ms. Rowe's

15   complaint was investigated; correct?

16   A.  Yes.  Typically, we would have two people when conducting

17   an interview.

18          MR. CHIARELLO:  Mr. Yang, you can take this down.

19          And can you please put up Plaintiff's 114.  And I

20   guess just scroll through it so the witness can take a look.

21   Q.  Ms. Beaupain, are you familiar with this document?

22   A.  Mildly familiar, yes.

23   Q.  It's a guide created by Google; is that correct?

24   A.  I believe so, yes.

25   Q.  And it's to assist employee relations when investigating

1    Q.  During this interview, did you find Ms. Burdis to be

2    credible?

3    A.  Yes.  I had no reason to disbelieve her during the course

4    of the interview.

5    Q.  Now let's turn to the first page of these notes.  And we

6    see here it says, "Ulku Rowe —— 11/9/2018."  Do you see that?

7    A.  Yes.

8    Q.  What does this reflect?

9    A.  That would have been the closing —— closing conversation,

10   the closeout with Ms. Rowe on that date.

11   Q.  And during that closing conversation, did you share with

12   Ms. Rowe the findings of your investigation?

13   A.  I did.

14   Q.  There are several references here to talking points.  Do

15   you see that?

16   A.  Yes.

17   Q.  The talking points that are referenced there, are those the

18   talking points that were put up on the screen just a few

19   minutes ago?

20   A.  Yes, exactly.

21        MS. TOMEZSKO:  Could we just pull those up quickly,

22   Jean.  I think it's Plaintiff's 89.

23   Q.  Now, Ms. Beaupain, did you, to the best of your

24   recollection, actually communicate to Ms. Rowe all of the

25   talking points that you see on this page here?

1    A.  Yes.

2    Q.  And in particular, the one that was pulled out earlier,

3    tech versus non-tech experience was the most heavily considered

4    factor when gauging L8 versus L9, do you see that?

5    A.  Yes.

6    Q.  Do you recall whether you communicated that specific point

7    to Ms. Rowe in the meeting?

8    A.  Yes, I did, uh-huh.

9    Q.  Now, when you concluded your investigation, did you have

10   any reasonable basis to believe that gender played a role in

11   Ms. Rowe's leveling at hire?

12   A.  No.

13   Q.  Did you have any basis to believe that her leveling was in

14   any way unfair?

15   A.  No.

16            MS. TOMEZSKO:  No further questions.

17            MR. CHIARELLO:  No redirect, your Honor.

18            THE COURT:  OK.  Ms. Beaupain, you're excused.  Thank

19   you.

20            (Witness excused)

21            MR. CHIARELLO:  At this point, your Honor, we'd like

22   the Court to read the stipulation of undisputed fact to the

23   jury.

24            THE COURT:  Members of the jury, this is a stipulation

25   of uncontested fact that the parties have handed to me.  That

NAIHRow5                              Tessier – Direct

1   means that it is a fact on which the parties have agreed.

2          As of September 19, 2019, Google Cloud's senior

3   leadership was aware of plaintiff's filed complaint and the

4   allegations contained therein.

5          MR. CHIARELLO:  Thank you, your Honor.

6          Call Ashley Tessier.

7          THE COURT:  OK.

8          THE DEPUTY CLERK:  You could step forward.

9   ASHLEY ELIZABETH TESSIER,

10        called as a witness by the Plaintiff,

11        having been duly sworn, testified as follows:

12  DIRECT EXAMINATION

13  BY MR. CHIARELLO:

14  Q.  Good afternoon, Ms. Tessier.

15  A.  Good afternoon.

16  Q.  I'm going to endeavor to be brief.  We'll see how that

17  goes.

18          You are currently an employee relations director at

19  Google, is that right?

20  A.  Yes, I am.

21  Q.  And did you hold that role in late 2019 and 2020?

22  A.  I held the role.  My title changed to director in late

23  2021.  I was an employee relations manager at the time that you

24  just stated.

25  Q.  As an employee relations manager in the 2019/2020 time

1  frame, you conducted interviews in connection with this lawsuit

2  that Ms. Rowe filed, correct?

3  A.  I did.

4  Q.  And you did so in connection with Google's policy regarding

5  investigating complaints of discrimination, correct?

6  A.  More specifically, we have a policy against harassment,

7  discrimination, retaliation, and standards of conduct.  So I

8  was looking into it with respect to that policy.

9  Q.  And you interviewed witnesses or employees — individuals

10  in connection with that complaint, correct?

11  A.  I did.

12  Q.  Notes were prepared in connection with that complaint or

13  the interviews that were conducted?

14  A.  Notes were taken from the interviews conducted, yes.

15  Q.  And those notes were provided to Google's legal counsel, is

16  that correct?

17  A.  Yes.

18  Q.  It was important that those notes be accurate, correct?

19  A.  Yes.

20  Q.  And you would agree that both you and the other interviewer

21  took the responsibility to create accurate notes seriously?

22  A.  Of course.  Let me just clarify.  The notes are not a

23  verbatim transcript.  So they serve a purpose in the course of

24  the investigation, and we absolutely took that responsibility

25  seriously.

NAIVROW6

1          THE COURT:  Okay.  That sounds like a good plan.

2          (In open court)

3          THE COURT:  Are we ready?

4          MS. GREENE:  Yes.  I'm sorry, we're ready.

5          THE COURT:  Okay.

6          MS. GREENE:  Ms. Gutierrez.

7          (Videotaped Deposition of Jennifer Burdis played)

8          MS. GREENE:  Your Honor, I would just ask that you

9     note, as you did with Mr. Eryurek and Mr. Wilson's deposition

10    testimony, that these reflect the deposition designations of

11    both defendant and plaintiff.

12         THE COURT:  Yes.  Members of the jury, please take

13    note of that.  Thank you.

14         All right.

15         MS. GREENE:  Your Honor, plaintiff rests her case at

16    this time.

17         THE COURT:  Okay.  Thank you, Ms. Greene.

18         All right.  Members of the jury, we are going to do

19    something now that we haven't done in any previous day, and

20    that is we're going to take another break.  Because plaintiff

21    has rested her case, and the lawyers need a few minutes to sort

22    of organize and plan their next steps.  So I anticipate that

23    you'll be out of the room about 20 to 25 minutes.

24         Does that sound right, counsel?

25         MR. GAGE:  25.

NAIVROW6

1           THE COURT:  Okay.  All right.

2           So, well, let's say we'll be back here at about 4:10

3    to 4:15.  Ms. Williams will come get you then.

4           And please do not talk to each other or anyone else

5    about the case.  And please don't do any research about the

6    case while you're on break.  Thank you.

7           (Jury not present)

8           THE COURT:  Okay.  You can be seated.

9           We're going to take a break too, right?

10          MR. GAGE:  Yes.  That's what I thought, your Honor.

11          THE COURT:  Okay.  That sounds right.  All right.

12          MS. GREENE:  Your Honor, what time do you want us

13   back?

14          THE COURT:  Can we do 15 minutes?  Okay.  So call it

15   4:05, with the goal of getting the jury back in here at 4:15,

16   and your witness will be ready.

17          MR. GAGE:  Yes, he should be here.  He may already be

18   here.

19          THE COURT:  Okay.  Very good.

20          (Recess)

21          THE COURT:  So, Mr. Gage, this is Google's elevator

22   pitch of the Rule 50 motion, right?  And then after we release

23   the jury, we'll hear more -- or we'll hear more from Ms. Greene

24   or Mr. Chiarello.

25          MR. GAGE:  I assumed the elevator pitch.  I didn't

NAIVROW6

1    realize you were going to, sort of, allow us to continue.

2              THE COURT:  If you like.  If you like.  I'm just

3    mindful of the jury.

4              MR. GAGE:  To be sure.

5              THE COURT:  Okay.

6              MR. GAGE:  To be sure.

7              And I appreciate your Honor letting me make a record

8    after they've rested and before we proceed.

9              THE COURT:  Yes, of course.

10             MR. GAGE:  May I, your Honor, start the elevator

11   pitch?

12             THE COURT:  Yes.

13             MR. GAGE:  Your Honor, the first claim I'd like to

14   talk about is Ms. Rowe's retaliation claim.  The law is clear

15   she needs to prove that she had a subjectively and objectively

16   reasonable belief that there was illegal conduct going on.  And

17   we respectfully submit that there is no evidence to suggest

18   that.  Ms. Rowe herself, her entire belief that there was

19   something wrong with her leveling is because she thinks she's

20   as qualified as other people.  And that's not enough.  And she

21   told -- we heard it today, the evidence shows clearly, she told

22   the investigator, Google's investigator, that she did not have

23   any reason to believe that gender played a role in her

24   leveling.  So first and foremost, we don't think that plaintiff

25   has established a *prima facie* case of protected activity.

1          Second, on the retaliation claim, there is no evidence

2    in the record whatsoever that her alleged protected activity

3    was in any way a factor — in any way a factor — in any of the

4    things that she claims were retaliatory.

5          And let's list them:

6          One, her not getting the financial services vertical

7    lead role.  The evidence consistently and undisputedly shows

8    that from the very beginning, Mr. Shaukat was not impressed --

9    as impressed by her as he was by other candidates.  It never

10   changed.  Despite the fact that she had multiple opportunities

11   to change his view, his opinion was consistent.  His opinion

12   was the reason why she didn't get the job.  And there's no

13   evidence to suggest that his learning that she had concerns

14   about her leveling had anything to do with that decision.

15         The retaliation claim relating to the vice president

16   for financial services sales job.  Similarly, the evidence is

17   undisputed that Ms. Kliphouse made the decision not to consider

18   Ms. Rowe further after she had spent time with her over coffee.

19   And the evidence is undisputed that she already had a preferred

20   candidate, a senior executive at Citigroup, and she didn't want

21   to take -- and the evidence is undisputed, Mr. Vardaman said

22   it, she didn't want to take any further time considering other

23   candidates.  So we believe there's no evidence of causation on

24   the retaliation claim.

25         THE COURT:  Mr. Gage, let me stop you one second.

1          From here, I don't want you to do an argument that's

2    this fulsome and then not hear from Ms. Greene or Mr. Chiarello

3    until after.  So I think you should go to a higher level now.

4          MR. GAGE:  Okay.

5          THE COURT:  Let's do that.

6          We also have the jury waiting.

7          MR. GAGE:  I'm sorry.  I was trying to keep it at a

8    high level, Judge, not high enough apparently.  I'll be quick.

9          On the discrimination claim, your Honor, same thing

10   about the leveling.  We don't think there's any evidence

11   whatsoever that gender played any role whatsoever in the

12   leveling.  There is no discrimination claim on the vice

13   president financial services sales job, that's only a

14   retaliation claim.  And again, similarly, there's no evidence

15   that gender played a role in Mr. Shaukat's decision about the

16   financial services vertical lead role.

17         Your Honor, on the Labor Law 194 claim, first and

18   foremost, we believe the evidence clearly shows Ms. Rowe was

19   doing something differently than Mr. Breslow.  Hers was an

20   engineering job, his wasn't.  The evidence we've heard between

21   Ms. Rowe and Mr. Harteau clearly shows he was doing different

22   work than her, so she can't establish that *prima facie* case.

23         At the second level of the analysis, your Honor, we

24   believe that level is a *bona fide* factor, other than sex.  And

25   if the plaintiff cannot prove — which we don't think she has —

NAIVROW6

1    that gender played a role in leveling, as a matter of law, your

2    Honor, and as a matter of law of the case, level is a *bona fide*

3    factor other than sex.  And for that, your Honor, I refer to

4    Judge Schofield's decision denying the plaintiff's motion for

5    summary judgment.  Judge Schofield said that if level is not

6    tainted by bias, gender bias, that would be a basis for finding

7    in Google's favor in this case.

8            Finally, your Honor, last part of my pitch, there is

9    absolutely no evidence to support the claim of willfulness or

10   reckless disregard for Ms. Rowe's rights.  And since your Honor

11   wanted me to keep it high level, I will stop there.

12           THE COURT:  Okay.  Thank you.

13           So we will pick up with that that after the witness is

14   out of the box and the jury has been released for the day.

15           Why don't we bring in the witness now.

16           (Jury present)

17    CHRIS HUMEZ,

18       called as a witness by the Defendant,

19       having been duly sworn, testified as follows:

20           THE COURT:  Mr. Gage, just for planning purposes, I

21   intend to release the jury at 4:45.

22           MR. GAGE:  Got it.

23           THE COURT:  Thank you.

24           MR. GAGE:  I will plan accordingly, Judge.

25    DIRECT EXAMINATION

1   it should be obvious, but there's ample evidence with respect

2   to gender bias and motivation.  Ms. Rowe has testified as the

3   only woman in the technical director Level 8 and Level 9, and

4   the differential treatment itself is enough by which a jury

5   could determine that gender played a role.

6          A jury could also look at the reasons asserted by

7   defendant for the differentiation between the two, and if the

8   jury finds that's pretextual, that it's not really the reason,

9   the jury can draw an inference of unlawful motivation,

10  discriminatory motivation.  And so those are just two of the

11  means by which a jury could find gender bias to exist.

12         The standard, again, under the New York City Human

13  Rights Law for issuing a summary judgment or directed verdict

14  in defendant's favor is much more in favor of the employee.

15  There has to be no way by which a jury could conclude that ——

16  that gender played a role, and here —— and the decisions ——

17  and, your Honor, I could find it for you.  I don't have it.

18  It's in —— or another decision that's critical to this, but the

19  decisions make clear that it is a much lower standard, and it's

20  whether gender played any role in the plaintiff being treated

21  less well.

22         So there's two important distinctions, one is whether

23  it played any role —— not a significant role, not the primary

24  role, any role.  And the standard for adverse action is less

25  well, were they just treated in any way less well, and that's

NAIHRow7

1   sufficient to state a claim for discrimination under the New

2   York City Human Rights Law.

3           So, again, for those reasons we respectfully request

4   that the Court deny defendant's motion.

5           THE COURT:  OK.  I am now going to need a couple of

6   minutes so, I don't think it's long enough that you'll want to

7   leave the courtroom, but I'll be back shortly.  Thank you.

8           (Recess)

9           THE COURT:  Please sit down.

10          The defense has moved, as is proper at this stage of

11  the case, under Rule 50 for a judgment on the grounds that

12  there is not sufficient evidence on which a jury could find in

13  Ms. Rowe's favor on her claims of equal pay, gender

14  discrimination, and retaliation, as well as on the question of

15  willfulness.  I'm first going to address Ms. Rowe's claims and

16  then take up willfulness in regard to damages.

17          Furthermore, in resolving a Rule 50 motion, all

18  evidence is to be construed in the light most favorable to the

19  plaintiff as the nonmoving party, and all reasonable inferences

20  shall be drawn in favor of the plaintiff as the nonmoving

21  party.  The ruling that I am about to make needs to be read in

22  that spirit.  I am not resolving the case here.  I am simply

23  resolving a Rule 50 motion.

24          I am denying the Rule 50 motion and letting the case

25  go to the jury.  I have paid careful attention to the evidence

1 in this case and have greatly benefited from the work of

2 counsel on both sides.  I will start with this.

3      I have no doubt that a jury could find for the defense

4 in this case.  There is certainly an evidentiary basis for

5 that.  However, the issue here is not whether a jury could find

6 for the defense, it is whether the jury could find for

7 plaintiff.  My view is that, on the record that has developed,

8 there is sufficient evidence on which a jury could return a

9 plaintiff's verdict.  I'm going to start with the Section 194

10 claim.

11      There is evidence from which the jury could find that

12 Ms. Rowe and Mr. Harteau were doing equal work.  For one thing,

13 evidence has been adduced establishing that Ms. Rowe and

14 Mr. Harteau were hired for the same role, that is, technical

15 director in OCTO.  Not only that, but Mr. Harteau himself

16 testified that his and Ms. Rowe's work was "similar."

17 Specifically, they "were doing the same sort of work in the

18 same sort of circumstances."  And I'm citing here to page 839,

19 lines 3 through 4, of the transcript.

20      I likewise find that a jury could find that Google

21 retaliated against Ms. Rowe.  I'm going to start by addressing

22 Ms. Rowe's efforts to obtain the FSVL role.

23      Among other things, on August 28, 2018, Ms. Rowe made

24 a complaint to Melissa Lawrence expressing concern that men had

25 been leveled at Level 9, specifically noting that "I was told

NAIHRow7

1   that everyone hired for the role was being hired at a Level 8.

2   I later learned that my male peers were hired at Level 9," and

3   this is reflected in PX 42.  Then just days later, Mr. Vardaman

4   wrote in an internal report "sounds like she," meaning

5   Ms. Rowe, "is not viable for the role."  I'm citing to, among

6   other things, PX 69 at page 97.

7          With respect to the VP sales position, a jury might

8   find noteworthy the temporal proximity between Ms. Rowe's

9   complaint and the alleged retaliatory action.  Ms. Rowe filed

10  her complaint in this court in September 2019, and several

11  months later, in February 2020, Ms. Piazza was hired for the

12  sales role.  Furthermore, the fact that it was Mr. Vardaman

13  acting as the internal recruiter for both this position and the

14  earlier FSVL role is a link that the jury might choose to

15  credit.

16         In regard to Ms. Rowe's gender discrimination claim, I

17  conclude that a jury could find that Ms. Rowe was similarly

18  situated to Mr. Harteau among other male L9 colleagues but was

19  treated less well, including because of her pay.

20         In sum, I conclude that there is sufficient evidence

21  to go to the jury on the claims just addressed.  We will see

22  which way they ultimately come out.

23         As to the question of willfulness, in regards to

24  damages, I likewise find that there is sufficient evidence to

25  submit this question to the jury.  The jury could find that

NAIHRow7

1   Google knew that Ms. Rowe was performing equal work to her

2   alleged male comparators yet was being paid less.

3   Specifically, Ms. Rowe made an internal complaint that she was

4   paid less and she filed a lawsuit, such that a jury could find

5   that, despite Google's knowledge of both that internal

6   complaint and court complaint, they continued paying her less.

7   At the very least, a jury could find that Google was reckless

8   in that regard.  So damages will go to the jury to decide.

9           I therefore deny the Rule 50 motion.  In the event of

10  a plaintiff's verdict, defendant may submit a post-verdict

11  motion at that point.  Everyone will then be able to proceed

12  with the benefit of time and reflection, the opportunity to

13  carefully examine the transcript and evidence, the ability to

14  advance applicable authorities and fleshed out arguments, and

15  so forth.

16          Now I think we should talk about tomorrow.  So

17  tomorrow we will have —— we will convene in here at 8:30 a.m.,

18  and we will have a charging conference.  We are going to be

19  working overnight on the charges, and we will send them to you

20  from chambers email before the charging conference so that you

21  can review them.

22          What are you thinking about time at this point for

23  tomorrow in terms of the presentation of evidence?

24          MR. GAGE:  Could I just raise one question in the

25  charging conference —— or rather, make a point?

NAIHRow7

1          THE COURT:  Yes.

2          MR. GAGE:  In light of the evidence, your Honor, we

3   would ask that the verdict form place the discrimination

4   claim first.  And I'm not trying to argue the point, but I just

5   want to make the suggestion that we are asking for is that, on

6   the verdict form, the jury first answer the question on the

7   discrimination claim.  And you will see our proposed verdict

8   form asks them to determine whether the plaintiff has proved by

9   a preponderance of the evidence that gender was a reason for

10  her level, because if they don't find that, if they don't find

11  that she proved that, it has implications for the New York

12  Labor Law claim inasmuch as it is, again, referring to Judge

13  Schofield's decision on summary judgment, a bona fide factor,

14  and we believe there's ample evidence of business necessity,

15  etc., etc.  So ——

16         THE COURT:  OK.  Ms. Greene.

17         MS. GREENE:  Yes, your Honor.  We would absolutely

18  oppose that because it's intended to conflate the two issues.

19  Equal Pay Law does not require any sort of gender motivation in

20  the decision, and by putting the gender claim first, it would

21  confuse the jury by suggesting that gender somehow is relevant

22  to the finding of an Equal Pay Law claim.  The affirmative

23  defense is an affirmative defense and should be treated

24  separately from the jury's finding of the *prima facie* case on

25  liability.

NAJVROW1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------x

ULKU ROWE,

              Plaintiff,

        v.                                19 Civ. 8655 (JHR)

GOOGLE LLC,

             Defendant.                Trial

------------------------------x

                               New York, N.Y.
                               October 19, 2023
                               8:57 a.m.

Before:

            HON. JENNIFER H. REARDEN,

                               District Judge
                               -and a jury-

                    APPEARANCES

OUTTEN & GOLDEN, LLP
     Attorneys for Plaintiff
BY:  CARA E. GREENE
     GREGORY S. CHIARELLO
     SHIRA Z. GELFAND

PAUL HASTINGS LLP
     Attorneys for Defendant
BY:  KENNETH W. GAGE
     SARA B. TOMEZSKO

Also Present:  Vincent Yang, Paralegal (Outten & Golden)
              Andrew Velazquez, Google Rep.
              Jean Gutierrez, Paralegal (Paul Hastings)

1    he actually was one of the first people that I's seen ever,

2    like, speaking about this, kind of this next generation thing

3    that people really hadn't even implemented yet.

4           So he was really far ahead, and customers really

5    looked at him as kind of a whisperer, if you will, about where

6    technology was going, and that was exactly, you know, what we

7    wanted in the CTO office.

8    Q.  I'd like to move to D24.

9           Your Honor, if I could?

10          THE COURT:  Yes.

11   Q.  Mr. Stevens, who is Jonathan Donaldson?

12   A.  He was a member of OCTO.

13   Q.  Did you know of Mr. Donaldson before he joined OCTO?

14   A.  I did.

15   Q.  And how did you know of Mr. Donaldson before he joined

16   OCTO?

17   A.  Because when he was at Intel, I would — I would have

18   worked with him when I was at Red Hat.

19   Q.  Why was Mr. Donaldson hired as an L9?

20   A.  Oh, just a super-senior technologist.  I mean, not just his

21   work at Intel, the work that I had seen him at Intel, but a lot

22   of the work even prior to Intel that he did.  The VCE was ——

23   the V was VMware, the C was Cisco, and the E was EMC.  So the

24   VCE company was bringing together these three companies and

25   building a product offering out of it.  So in many ways VCE was

1      the original cloud.  They just didn't call it cloud back then,

2      and he led engineering for that effort.

3      Q.  Now, was it just the number of years of experience he had?

4      A.  Number — number of years doesn't really matter for

5      anything.

6      Q.  What does matter?

7      A.  Well, you can spend all your time not learning, right, or

8      you can spend all your time enjoying and doing the same thing.

9      There's nothing wrong with any of those.  Everybody has

10     different — so I actually on resumes, ten years sometimes can

11     work against you, right, because I actually prefer to see

12     people that, for the roles that we're hiring in, like, get out

13     of their comfort zone and take a new mission.  Don't get

14     complacent.  Go learn a new thing.  Solve a new problem.  So

15     what I liked about him is he did have those chapters, but it

16     wasn't purely just the amount of years, it was what he did in

17     those times.

18     Q.  Like to ask you about somebody else.  Do you know who Scott

19     Penberthy is?

20     A.  I do.

21             MR. GAGE:  May I approach?

22             THE COURT:  Yes, you may.

23     Q.  D44.  Was Scott Penberthy hired into OCTO?

24     A.  He was.

25     Q.  Are you familiar with Scott Penberthy's background?

1    A.  I am.

2    Q.  Ms. Rowe has testified in this trial that she was better

3    qualified than Scott Penberthy.  Do you agree with that

4    statement?

5    A.  That she was better qualified?  I couldn't say she was

6    better qualified, no.  Scott was amazingly strong, right?

7    Ulku's amazingly strong, but Scott was amazingly strong as

8    well.  I wouldn't say — they're very different.

9    Q.  How was Mr. Penberthy very strong?

10   A.  Just mind if I refresh my memory a little bit?

11          Yeah.  Like, Scott, obviously, like, his background,

12   you know, is schooling at MIT and doing the formal, which I

13   think is great, but there's great paths that you can be very

14   successful without that formal training.  So the schooling

15   isn't the only thing.  But, like, when I — it's funny, when I

16   look at résumés like this, I always look, like I said, at what

17   they've done through their years.  And one of the things that

18   stood out the most to me was his work at IBM, believe it or

19   not.

20   Q.  Why is that?

21   A.  Just because to become a vice president at IBM, you know —

22   and there's a difference between vice presidents that are in

23   sales organizations and vice presidents that are in engineering

24   organizations.  And sales the VPs, you often have to have that

25   for the title to have the conversation with customers, so

1    connection with that role either; correct?

2    A.  I could have had a conversation with Tariq, but I don't

3    recall.

4    Q.  Do you recall whether you were asked to provide a

5    reference?

6    A.  I think it was clear that I was a reference because I was

7    asking Tariq to consider her.

8    Q.  In interviewing Ms. Leyfield, you weren't doing any sort of

9    comparison of her to Ms. Rowe; correct?

10   A.  No, I wasn't.  They were -- yeah.

11   Q.  And I believe with Ms. Leyfield, your ultimate

12   recommendation was leaning higher; correct?

13   A.  That's right.

14   Q.  And above that is higher; is that right?

15   A.  That's right.

16   Q.  And then strong higher?

17   A.  That's right.

18   Q.  Is there something above strong higher?

19   A.  It's been a while for me.  But leaning higher often, just

20   for clarification, means you'll see -- like, you can see --

21   like, when I do leaning higher, leaning higher might mean

22   because you don't fully understand how they plan to use the

23   person.  So when I say leaning higher, I'll measure them on a

24   dimension that I understand, and then there might be some

25   unknowns that I don't know about that particular role.  And so

1    I'll say leaning higher based on, you know, this other aspect.

2    Q.  You didn't do anything to document what your basis or

3    belief was for the levels that the men received, the L9 men

4    received at the time they were being hired, did you?

5    A.  I don't think I understand the question.

6            Can you restate it?

7    Q.  Did you do any sort of leveling justification or leveling

8    explanation for why those men should be brought in as an L9?

9    A.  Other than reviewing packets.  I mean, you look at the

10   people that interviewed them, you look at the referrals, you

11   look at what they've done.  It's the whole complete package

12   that you see, so I would have reviewed that.

13   Q.  But you weren't reviewing that against any sort of leveling

14   guide; correct?

15   A.  I believe we had a leveling guide for that.  You're saying

16   that maybe it didn't go to Level 9, but I don't recall that.

17   Q.  You were never interviewed by ER in connection with this

18   matter, were you?

19   A.  ER.

20   Q.  Employee relations.

21   A.  Related to this, no.

22           MS. GREENE:  No further questions.

23           MR. GAGE:  Just a few questions, Judge.

24   REDIRECT EXAMINATION

25   BY MR. GAGE:

1   Q.  Mr. Stevens, the deposition that Ms. Greene played was

2   taken -- you gave your deposition in November of 2020; correct?

3   A.  Yup.

4   Q.  That was almost three years ago?

5   A.  Right.

6   Q.  At the time you gave your deposition, how long had you been

7   gone from Google?

8   A.  I want to say May of 2019, so close to a year and a half

9   probably.

10  Q.  Ms. Greene asked you some questions about a ladder and you

11  referenced a TSC ladder, I think you referenced.

12  A.  Right.

13  Q.  Did it take some time for Mr. Grannis to build out the

14  ladder for the technical director role?

15  A.  Possibly.

16  Q.  Whose decision was it to select the financial services

17  vertical lead?

18  A.  Tariq and probably Diane on top of that, yeah.

19  Q.  It wasn't your decision, was it?

20  A.  No.

21  Q.  Ms. Greene asked you why you didn't interview Ms. Rowe for

22  the financial services vertical lead position, and I think you

23  said you had already interviewed her, right?

24  A.  Right.

25  Q.  Was it common for someone like yourself not to interview

1    responding to here in this email?  If it helps, we can look at

2    the email immediately beneath this if it helps contextualize.

3    A.  Can I look at that?

4    Q.  Sure.

5           Jean, can you pull that up.

6    A.  OK.  Yes.

7    Q.  Now, going back to the June 14, 11:25 a.m., do you now have

8    a context to what you were responding to here?

9    A.  Yeah.  It looks like I was sending a note to Ulku.  It says

10   I saw her briefly virtually.  Maybe I saw her in a Team

11   meeting.  I offered to chat with her or we can connect next

12   week at the off-site.  That would have been an OCTO off-site

13   that was in the offing.  And I basically — you know, I just

14   was talking to her directly.  That she was being offered a —

15   or she was being offered a role in the — I think what's called

16   industries — industry solutions team that Tariq Shaukat was

17   running, and I just encouraged her to really, like, lean in

18   and, you know, take best — take best advantage of the role

19   that she was being given.

20   Q.  Now, at the bottom of this email, I just want to focus on a

21   sentence that says, "I do want to flag that if you were to be

22   selected for this role, you would do it at your current level.

23   We do not uplevel candidates when taking on a new role."

24          When you wrote "selected for this role," are you

25   referring to a particular role in Tariq Shaukat's organization?

1   A.  Yes.  The best of my knowledge, Ulku wanted to be

2   considered for a VP role that would head up the financial

3   services vertical in Tariq's organization.  So when I'm saying

4   I want to flag that if you were selected for this role, that's

5   the role that I was referring to, and then I went on to say you

6   would do it at your current level.

7   Q.  Why is that?  Why would she do that role at her current

8   level?

9   A.  So at Google, if you —— if you're in role A and you take

10  role B, even if role B is a different level, a higher level,

11  you don't get re-leveled upon transfer.  You would take on the,

12  say, Level 9 role or the VP role as a Level 8.

13        And I go on to say that if you took on a role that had

14  increased scope, had a bigger —— maybe had a bigger

15  organization or a bigger opportunity for impact, you could get

16  promoted for doing that role, but at that time there was no

17  sort of transfer with promotion or with level change.  You

18  would take the new role at your current level.

19  Q.  And would you be automatically promoted to a higher level

20  once you took the new role?

21  A.  To my knowledge, there's no such thing as an automatic

22  promotion.  You would still need to go through the technical

23  promotion process, but certainly having a role with the

24  increased scope and impact would make it easier for the

25  committee to approve a promotion.

1    Q.  One last document, Ms. Lawrence.

2              If we could quickly look at Plaintiff's Exhibit 43,

3    please.

4              Now, Ms. Lawrence, this is two pages of an email, so

5    let this sit up for a second and look at this one.

6              Do you recognize this document?

7    A.  I do, yes.

8    Q.  Is this ── Jean, can you go back to the second page.

9              This, what we're looking at here, is this an email

10   from Ms. Rowe to you and Kevin Lucas in and around August 28,

11   2018?

12   A.  I believe so, yes.

13   Q.  If you could just look at the substance of the document in

14   front of you, do you recall what it was that Ms. Rowe was

15   communicating to you and plussing in Kevin, Kevin Lucas, as an

16   FYI?

17   A.  So Kevin Lucas was Tariq ── I always get his name wrong ──

18   Shaukat's HR partner.  The email was to her current HR partner

19   and me, as her former HR partner with OCTO.  And what she's

20   saying is she's in the process of interviewing for that role

21   that I just referred to, the head of financial services role

22   for Google Cloud, and she's indeed raising that ── this issue

23   that I just talked about where she was hired in as an L8.  And

24   to my memory, this is the first time that she referred to her

25   male peers or referred to gender as part of the comparison.  So

1    Q.  And did you meet with Ms. Rowe?

2    A.  I did.

3    Q.  Where did you meet?

4    A.  Some coffee shop up near Sloan.  That's all I could

5    remember.  I don't remember the name.

6    Q.  Ms. Rowe testified earlier in this trial that it was about

7    a ten-minute conversation.  Is that consistent with your

8    recollection?

9            MS. GREENE:  Objection.  Inconsistent with the record.

10           THE COURT:  Just ask an open-ended question.

11   Q.  How long do you remember that meeting being?

12   A.  About 45 minutes.

13   Q.  During that meeting, did Ms. Rowe describe to you the work

14   that she was doing with regulators at the time?

15   A.  During that meeting, we had discussed a lot of different

16   things.  I had asked her about what she was working on, and she

17   said she was working with the regulators because I was — I

18   didn't know her, and I didn't know what she was doing in

19   financial services.  I had a financial services team, but I had

20   never heard of her.  So she offered up she was working in the

21   regulatory side, which was not the part of the business that my

22   team worked on.

23   Q.  During the course of that conversation, did she impress you

24   as someone that could fulfill the vice president financial

25   services sales role you were looking to fill?

1   A.   No, our conversation was not about the role I had open.

2   Q.   Did the role you had open ever come up in the conversation?

3   A.   At the end of the conversation, I had mentioned that I was

4   leading a financial services team and that there was a role

5   that was ── I was looking for a leader in for a role and

6   encouraged her to work with my team, but I did not offer her a

7   role, no.

8   Q.   Is there anything else that you recall about the end of

9   that conversation, that meet-and-greet that you had with

10  Ms. Rowe?

11  A.   Well, in passing at the end of the conversation, she had

12  mentioned that she had some issues with Google, and I didn't

13  know what it was about, and she didn't offer any more than

14  that.  That was really the end of it, just sort of came out.

15  And I thought it was kind of unusual to say that, but...

16  Q.   Do I hear you correctly that she did not offer details

17  about what those issues were?

18  A.   No, we did not talk about that.  It was at the very end as

19  we were both kind of parting, and kind of left it there.

20  Q.   Did you ask any questions about what those issues were?

21  A.   No.

22  Q.   Did you care?

23  A.   No.  It wasn't relevant to what our meet-and-greet was

24  about or to anything I had going on, so I just left it alone.

25  Q.   Subsequent to that, that meet and greet that you just

1    described, did Ms. Rowe reach out to you after that to further

2    inquire about the financial services sales role on your team?

3    A.  No.

4    Q.  Now, earlier you had testified about Stuart Vardaman.  You

5    said he was your recruiting partner.  In your time working with

6    him, were you able to form an opinion as to his capabilities as

7    a recruiter working for you?

8    A.  Yes.  I worked with Stuart on several —— Stuart and his

9    team on —— in many different roles.  Typically, at the Level 10

10   or these more senior vice president-type roles, Stuart and I

11   would engage more directly versus working with his team on

12   them.  We developed a good working relationship.  He'd show me

13   the candidate.  We'd use a structured way to go through

14   candidates and qualifications for roles.  We worked a lot on

15   the job description so that when they were out there in the

16   market looking for candidates, internally or externally, we

17   could comb through them and compare them to a qualified job

18   description, otherwise the field was too big.

19         So we kept a pretty good —— he did a very good job

20   keeping together what was the role, what were the

21   qualifications necessary, and then how did the candidate fit

22   against that.  And he actually would help us screen a lot of

23   the candidates up front to make sure they met those

24   qualifications.

25   Q.  In your estimation, was Mr. Vardaman a good recruiter?

1    A.  Yes.

2    Q.  And did he follow all the directions that you gave him with

3    respect to helping you fill these roles that were open on your

4    team?

5    A.  Yes.

6    Q.  And did he do so in this instance for the vice president

7    financial services sales role?

8    A.  Yes.

9           MS. TOMEZSKO:  Thank you, Ms. Kliphouse.  I have no

10   further questions.

11   CROSS-EXAMINATION

12   BY MS. GREENE:

13   Q.  Just a few, Ms. Kliphouse.

14          You testified just a minute ago that Ms. Rowe did not

15   reach out to you after that coffee meeting about the role.  Is

16   that your testimony?

17   A.  Yes.

18   Q.  Do you know if Ms. Rowe reached out to Stuart Vardaman?

19   A.  I don't know her conversations with Stuart, I don't.

20   Q.  You were shown that document dated February 21, I believe.

21   Do you know if Ms. Rowe had spoken with Mr. Vardaman prior to

22   February 21, 2020?

23   A.  I don't know of her conversations, no.

24   Q.  Did Mr. Vardaman share anything with you about Ms. Rowe's

25   qualifications?

NAJHRow4                        Kliphouse - Cross

1    A.  On the list of where all the candidates were, we did review

2    all of the candidates on there and how they mapped or didn't

3    map to the qualification list.  And we did talk about Ulku and

4    another candidate at that time that was also internal that was

5    on that list.  We talked about their qualifications and where

6    they would map to them or they were not as qualified as others

7    that we had on the list.

8    Q.  And that was information that Mr. Vardaman told you, that

9    she was not as qualified as other people on the list?

10   A.  No, no, he didn't say that.  We talked through what the

11   qualifications were and did the candidate meet these

12   qualifications we had.  And so in the instance specifically

13   around Ulku, we talked about what are the qualifications we

14   want?  C-level expertise, did they have the relationships?  Did

15   they have the ability to have executive communications with

16   them?  Did they have the outreach capabilities?  And we had

17   looked at that as being one of the main qualifications, so we

18   would have talked about that, yes.

19   Q.  And what information did you have about her qualifications

20   at that time?

21   A.  So I would have had whatever was on her submitted

22   materials.  It would have been done with her résumé or what had

23   been submitted to be on that list.

24   Q.  And do you know whether Mr. Vardaman asked her to submit

25   anything?

1    A.  I don't know what he asked her specifically, no.

2    Q.  And you didn't get any internal references related to

3    Ms. Rowe?  You didn't speak with Mr. Grannis about her

4    qualifications, for instance, did you?

5    A.  No, not about her qualifications for my role.  He asked me

6    to do a meet and greet with her specifically.  He did not ask

7    me to meet with her about any roles.

8    Q.  And that coffee meeting with Ms. Rowe, that was not an

9    interview for the position, correct?

10   A.  No, it was not an interview.  It was networking meet and

11   greet, can you do me a favor and meet with her?

12   Q.  Did you know what Ms. Rowe's level was within Google?

13   A.  I did not know explicitly her level, and I wouldn't know

14   that except I knew she was not a vice president.  But I

15   wouldn't know what specific level she would have been.  I

16   wouldn't have access to that.

17   Q.  And a vice president is what level?

18   A.  Vice presidents were Level 10s.

19   Q.  So you knew that she was a level below a 10?

20   A.  Something.

21   Q.  Is that right?

22   A.  Uh-huh.

23   Q.  So you didn't know anything about Ms. Rowe's C-suite

24   relationships, correct?

25   A.  Just from what we had talked about in the meet and greet

NAKHRow1

```
1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x

3   ULKU ROWE,

4                 Plaintiff,

5          v.                                19 Civ. 8655 (JHR)

6   GOOGLE LLC,

7                 Defendant.                 Trial

8   ------------------------------x
                                             New York, N.Y.
9                                            October 20, 2023
                                             8:30 a.m.
10
    Before:
11
                     HON. JENNIFER H. REARDEN,
12
                                             District Judge
13                                             -and a jury-

14                          APPEARANCES

15  OUTTEN & GOLDEN, LLP
         Attorneys for Plaintiff
16  BY:  CARA E. GREENE
         GREGORY S. CHIARELLO
17       SHIRA Z. GELFAND

18  PAUL HASTINGS LLP
         Attorneys for Defendant
19  BY:  KENNETH W. GAGE
         SARA B. TOMEZSKO
20
    Also Present:  Vincent Yang, Paralegal (Outten & Golden)
21                 Andrew Velazquez, Google Rep.
                   Jean Gutierrez, Paralegal (Paul Hastings)
22

23

24

25
```

1    expectations for a Level 8 than there are for a Level 9.  And

2    initial equity is also similarly calculated based upon the job

3    code.  And he talked about how they go to use external market

4    benchmarking.  Again, this is all without regard to the person.

5    It's all without regard to whether it's a man or a woman.  It's

6    purely based on roles and responsibilities associated with the

7    job code.

8            Now, he explained for you how he calculated her

9    starting pay package, and there's been a lot of back and forth

10   in this trial about whether Ms. Rowe was giving something up.

11   And I think you heard her and her counsel say, well, she was

12   giving something up when she came to Google, others weren't.

13   But Mr. Humez explained that that's not the way they do it.

14   They calculate cash flows.  And so Ms. Rowe wasn't giving

15   something up when she left JPMorgan Chase.  What she was

16   talking about were stock awards she had received in prior years

17   that she was not going to realize, she was not going to

18   receive, unless she earned them.  They were not vested.  She

19   told you they were unvested.  And what that means is she needs

20   to work the next year at JPMorgan Chase to earn that next piece

21   of that vested stock award.

22           And so Mr. Humez explained that's how they did it.

23   They're estimating what Ms. Rowe's cash flow would be if she

24   worked at JPMorgan another year, another two years, another

25   three years, what she could reasonably expect to earn based

1   upon these prior awards that had not fully vested.

2          You also heard about Mr. Breslow's equity award at

3   Google, and he forfeited $2 million of it because, again,

4   similarly, it hadn't vested.

5          Now, I'd like to show you a demonstrative we have that

6   illustrates for you the starting pay packages of a group of

7   Level 8 and Level 9 technical directors in OCTO.  And

8   Ms. Rowe's bar is this one right here.  There's one bar higher

9   than hers, and that's Evren Eryurek, which means that her bar,

10  the value that Google placed on her as an entering employee,

11  was that high.  That means that it was higher than four of the

12  Level 9s.  It was higher than a whole bunch of Level 8s.

13         Google valued Ms. Rowe.  Does that look like sex

14  discrimination to you?  I don't think it is.

15         Now, Mr. Humez also told you that all of the other

16  technical directors who started around the same time, they had

17  lower market reference points.  Ms. Rowe's was about

18  98 percent; others were lower.  Again, that's specific to the

19  job code. Each year Google adjusts her pay based upon her

20  performance against expectations.  That's what I talked about

21  on the first day of the trial.  Google sets expectations based

22  upon the job code, based upon the level, and she's measured

23  against them.

24         And you can take a look at these prosper letters,

25  P-134, 132, 130, 136, and so on, hers and the Level 9s, and if

1    you look at them, you will see there are years when she earns

2    more than some of the Level 9s.  And what means is they had

3    higher expectations, and they might not have met them.  And the

4    consequence is they fall further.

5              And Ms. Greene showed you a subset of those L9s in one

6    of her charts and their compensation to show that Ms. Rowe was

7    lower than them in those years, but she left two people out.

8    And that's because those are two people that she, in some

9    years, earned more than.  Level 9s do not always earn more than

10   Level 8s.  That's the point.

11             Annual earnings are a function of performance against

12   level-specific expectations, and in some years Ms. Rowe earned

13   more than them.

14             Now, again, she was evaluated against Level 8

15   standards.  And, yes, she absolutely got exceeds expectations,

16   and that was a middle rating.  And, yes, this question, "What's

17   one thing you plan to do to have more impact?" is one that

18   everybody has answered.  Google gives feedback to their

19   employees, and you will see if you look at these documents in

20   P-126, which is Ms. Rowe's performance evaluation, she gets

21   honest feedback, both positive and constructive.  And the

22   consistent theme that she's been told over and over and over

23   again by Mr. Grannis and now Ms. Florissi is that she needs to

24   have more engineering impact.  This is an engineering job.  And

25   over time the expectation in terms of public speaking has gone

testimony of all witnesses, regardless of who may have called

them, and all the relevant exhibits received in evidence,

regardless of who may have produced them.

If, after considering all of the testimony, you are

satisfied that the plaintiff, the party with the burden of

proof, has carried her burden on each essential point of her

claim, then you must find in her favor.

If, after such consideration you find that the

evidence produced by the plaintiff is outweighed by the

evidence against the plaintiff's position, or that the credible

evidence on a given issue is evenly divided between the

parties, that it is as equally probable that one side is right

as it is that the other side is right, then you must decide

that issue against the plaintiff.  The reason for this is that

the plaintiff, because she bears the burden of proof, must

prove more than simple equality of evidence; she must prove the

element by a preponderance of the evidence.  On the other hand,

the plaintiff need prove no more than a preponderance, so long

as you find that the scales tip, however slightly, in favor of

the plaintiff, that what she claims is more likely true than

not, then that element will have been proven by a preponderance

of the evidence.

Some of you may have heard of "proof beyond a

reasonable doubt," which is the proper standard of proof only

in a criminal trial.  That requirement does not apply to a

NAKVROW4                      Charge

1    civil case such as this one, and you should put it out of your

2    mind.

3           I am now going to instruct you on the substantive law

4    to be applied to the claims in this lawsuit.  I want to

5    emphasize here that you should consider each claim separately.

6           This case involves four claims made by Ms. Rowe

7    against Google:

8           First, Ms. Rowe claims that Google violated Section

9    194 of the New York Labor Law by failing to pay her the same as

10   men, specifically, Nicholas Harteau and Stuart Breslow, who she

11   argues performed equal or substantially equal work to her.

12          Second, Ms. Rowe claims that Google discriminated

13   against her on account of her gender by under-leveling her at

14   hire, paying her less than comparable men, refusing to consider

15   her for the role of financial services vertical lead, and

16   generally treating her less well because of her gender, in

17   violation of the New York City Human Rights Law.

18          Finally, Ms. Rowe brings two claims of retaliation.

19   One under the New York Labor Law, and one under the New York

20   City Human Rights Law.  She alleges that in response to

21   concerns she raised about discrimination and unequal pay

22   practices, Google retaliated against her by refusing to

23   consider her for two positions:  The financial services

24   vertical lead position in 2018, and the vice president

25   financial services sales position in 2020, and/or otherwise

1    engaged in retaliatory conduct against her.

2            Google denies these claims.  It contends that at all

3    times it treated Ms. Rowe in accordance with the law.

4    Specifically, Google asserts that under Section 194 of the New

5    York Labor Law, Ms. Rowe was paid what she was lawfully owed,

6    and that any difference in compensation between her and male

7    employees performing equal work was based on lawful job-related

8    factors other than gender.

9            Google asserts that under the New York City Human

10   Rights Law, it treated Ms. Rowe no differently than similarly

11   situated male employees, and that all of its actions towards

12   Ms. Rowe were motivated only by legitimate business reasons.

13           I will now give further instructions on each of these

14   claims.

15           Ms. Rowe brings a claim under Section 194 of the New

16   York Labor Law.  I will refer to this law as Labor Law Section

17   194.

18           As applicable here, Labor Law Section 194 prohibits

19   employers from paying men and women in the same establishment

20   different wages except under certain circumstances as I will

21   explain in more detail momentarily.

22           Labor Law Section 194 is a strict liability statute,

23   meaning that a plaintiff need not show that her employer

24   intentionally paid her less because she is a woman.  Both

25   parties bear a burden of proof on this claim.  First, Ms. Rowe

NAKVROW4                    Charge

1          If Ms. Rowe proves all three elements of her Labor Law

2     Section 194 claim, then she is entitled to recover on her claim

3     unless Google meets its burden of proving by a preponderance of

4     the evidence that Ms. Rowe was paid less based on a *bona fide*

5     factor other than sex, such as education, training, and

6     experience; and that the factor was both job-related and

7     consistent with business necessity.

8          To meet its burden of establishing business necessity,

9     Google must prove by a preponderance of the evidence that the

10     factor is based on a genuine business need and bears a manifest

11     relationship to the job or a demonstrable relationship to

12     successful performance of the jobs.

13          Separate from her Labor Law Section 194 claim,

14     Ms. Rowe brings a gender discrimination claim under the New

15     York City Human Rights Law which I will refer to as "the city

16     law."

17          Under the city law, it is against the law for an

18     employer to discriminate against an employee on the basis of

19     gender, including by paying an employee less on that basis or

20     by refusing to hire or promote that individual.  Stated more

21     broadly, the city law makes it unlawful for an employer to

22     treat an employee less well in any way, at least in part

23     because of that person's gender.

24          The question of whether Google is liable under the

25     city law is separate and distinct from the question of whether

Google is liable under the labor law described a moment ago,

even though some conduct may be actionable under both laws.

The city law has been violated if you find by a

preponderance of the evidence that gender played some role in

Google's treatment of Ms. Rowe.  Ms. Rowe need not establish

that her gender was the sole consideration or even the most

important consideration motivating Google in any of those

circumstances.  Indeed, a number of factors may have

contributed to the company's actions.  If you find that Google

treated Ms. Rowe less well, at least in part because of her

gender, then she may succeed on this claim, even if you find

that Google's conduct was also motivated by a lawful reason.

Keep in mind, however, that the city law is not a

general civility code; thus, Google can still avoid liability

by proving by a preponderance of the evidence that the

complained of conduct at issue is nothing more than what a

reasonable person would consider petty slights or trivial

inconveniences.

In determining whether Google discriminated against

Ms. Rowe because of her gender, you may consider a variety of

factors, including whether the language or conduct of Google

managers reveals a bias against women or preference for men;

whether Google treated Ms. Rowe less well than similarly

situated men; whether Google's explanations for its actions

were credible or whether they are contradicted by fact or

NAKVROW4                         Charge

1    changed over time; or whether any of Google's witnesses were

2    untruthful either at trial or when speaking to Ms. Rowe.

3              In making this determination, however, you may not

4    second-guess Google's business judgment.  In other words, you

5    may not find discrimination simply because you think that a

6    business decision that Google made was incorrect or unwise or

7    because you disagree with the decision.

8              One note on similarly situated men:  While comparisons

9    may offer some evidence of discrimination, comparisons are not

10   the only way to prove discrimination.  I noted for you just now

11   a number of ways on which the parties agree that discrimination

12   may be proven.  However, to the extent you consider whether

13   Google treated similarly situated men differently than

14   Ms. Rowe, I will give you some guidelines.

15             Under the city law, for a plaintiff and a comparator

16   to be similarly situated, the plaintiff is not required to show

17   that both individuals' circumstances were identical; rather,

18   the fact-finder must examine the acts, context, and surrounding

19   circumstances of the plaintiff and her comparator to determine

20   whether the comparator is similarly situated such that you

21   believe a difference in their treatment could reasonably lead

22   to the conclusion that it was because of gender.  This is

23   different from the standard I explained for comparators under

24   the labor law.

25             Ms. Rowe also claims that Google retaliated against

her for complaining about discrimination in the workplace.
Such retaliation is unlawful under the New York City Human
Rights Law, which I will again refer to as "the city law," as
well as the New York Labor Law, which I will refer to as "the
labor law."

Specifically, under the city law, it is unlawful for
an employer to retaliate or discriminate in any manner against
any person because such person has raised reasonably and in
good faith concerns about discrimination.  Similarly, under the
labor law, it is unlawful for an employer to retaliate or
discriminate in any manner against any person because such
person has made a complaint to her employer that she reasonably
and in good faith believes the employer has violated the labor
law regarding unequal pay between women and men.

In order to find for Ms. Rowe on these claims under
either of these statutes, you must find that she proved each of
the following four elements by a preponderance of the evidence:

First, Ms. Rowe engaged in a protected activity.

Second, her employer, Google, was aware of the
protected activity.

Third, Google engaged in what is commonly referred to
as an adverse action, that is, conduct that could be reasonably
expected to chill or deter someone from engaging in protected
activity.

And fourth, there is a causal connection between the

1    protected activity and the adverse action; that is, the

2    complaints that were made were, at least in part, the reason

3    why the adverse employment action took place.  This framework

4    is common to retaliation claims under both the city law and the

5    labor law.

6           I will now address each of these elements in further

7    detail.

8           The first element that Ms. Rowe must prove is that she

9    engaged in a protected activity.  A plaintiff engages in a

10   protected activity when she complains about what she reasonably

11   and in good faith believes to be unlawful, discriminatory

12   employment practices.  To prove that her activities were

13   protected, Ms. Rowe need not establish that her claims of

14   discrimination were valid; however, she must show that she

15   expressed clear disapproval of Google's allegedly unlawful

16   conduct by communicating in substance that she thought the

17   conduct was wrong.

18          Ms. Rowe must also establish that she had a good-faith

19   reasonable belief at the time she complained of Google's

20   actions that those actions violated the antidiscrimination

21   laws.  If Ms. Rowe's concern was not raised in good faith, but

22   rather was raised in order to, for example, protect her job or

23   attempt to extract a benefit from Google, she has not satisfied

24   the good-faith requirement.

25          Ms. Rowe is also required to prove by a preponderance

of the evidence that Google was aware that she had engaged in
protected activity.  After all, if Google did not know that she
had complained about discrimination, then logically it could
not have taken any adverse actions against her on account of
any protected activity she may have engaged in.

    To satisfy this element, it is not necessary for
Ms. Rowe to prove that any specific actors or individuals knew
that she had complained; she need only demonstrate general
corporate knowledge by Google.

    The third element that Ms. Rowe must prove by a
preponderance of the evidence is that Google engaged in an
adverse action, that is, conduct that would be reasonably
likely to deter a person from engaging in protected activity.
The retaliation complained of need not result in a materially
adverse change in the terms or conditions of the plaintiff's
employment.

    In determining whether Ms. Rowe was subject to
retaliation, keep in mind your sense of workplace realities and
the fact that the chilling effect of particular conduct depends
on the context.  The totality of the circumstances must be
considered because the overall context in which the challenged
conduct occurs cannot be ignored.

    It is of no consequence that the challenged conduct
may not have been severe or pervasive, because the challenged
conduct's severity and pervasiveness are only relevant to the

1    issue of damages, not liability.  However, the defendant is not

2    liable if the plaintiff fails to prove that the challenged

3    conduct was caused at least in part by a retaliatory motive, or

4    if the defendant proves that the conduct was nothing more than

5    petty slights or trivial inconveniences.

6           Finally, Ms. Rowe must establish that the adverse

7    action or actions taken by Google was or were taken at least in

8    part because of Ms. Rowe's protected activity.  In other words,

9    she must establish that there was a causal connection between

10   the protected activity and the adverse actions.

11          To establish a causal connection, Ms. Rowe bears the

12   burden of proving by a preponderance of the evidence that

13   Google intentionally retaliated against her by taking one or

14   more adverse actions against her, and that retaliation was a

15   motivating factor in Google's decision to take the action or

16   actions that it did.

17          A motivating factor is a factor that made a difference

18   or played a part in a decision.  To be clear, that factor need

19   not be the sole consideration or even the most important

20   consideration motivating the adverse action or actions.  To

21   satisfy this element, Ms. Rowe can use indirect or

22   circumstantial evidence or she can introduce direct evidence of

23   retaliatory motive.

24          If you conclude that Ms. Rowe has met her burden of

25   proof by a preponderance of the evidence with respect to her

NAKVROW4                    Charge

1    claims for unequal pay, gender discrimination, and/or

2    retaliation, then you must determine the damages, if any, to

3    which Ms. Rowe is entitled.  On the other hand, if you find for

4    Google on all claims, you will not consider the issue of

5    damages at all; you will simply report a verdict for Google on

6    all claims.

7         You should not infer that Ms. Rowe is entitled to

8    recover damages merely because I am instructing you on how to

9    calculate damages.  It is exclusively your function to

10   determine liability, and I am instructing you on damages only

11   so that you will have guidance should you decide that Ms. Rowe

12   prevails on any of her claims.

13        Damages must be based on evidence, not on speculation

14   or sympathy, and you may only award damages for those injuries

15   that Ms. Rowe actually suffered as a result of Google's

16   conduct.  It is the plaintiff, that is, Ms. Rowe, who bears the

17   burden of proving her damages by a preponderance of the

18   evidence.

19        In this case, you may consider awarding several

20   different types of damages:  Backpay, statutory damages under

21   New York Labor Law Section 194, compensatory damages, nominal

22   damages, and punitive damages.  Whether such damages are

23   actually to be awarded in this case and, if so, in what amount,

24   are for you, the jury, to decide in accordance with my

25   instructions.  If you make any award of damages, such award is