**IN THE UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF NEW YORK**

|  |  |
|---|---|
| ULKU ROWE,<br><br>                     Plaintiff,<br><br>     v.<br><br>GOOGLE LLC,<br><br>                     Defendant. | Civil Action No. 19-cv-08655 (JHR)<br><br>**<u>Oral Argument Requested</u>** |

**MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF'S OPPOSITION TO
<u>GOOGLE'S MOTION FOR REMITTITUR OF PUNITIVE DAMAGES</u>**

## <u>TABLE OF CONTENTS</u>

Preliminary Statement.................................................................................................. 1

Statement of Facts....................................................................................................... 1

Legal Standard ............................................................................................................ 1

Argument ..................................................................................................................... 2

      I.    Google's Proffered Standards for Reviewing Ms. Rowe's Punitive Damages Award are Exaggerated or Incorrect ................................................................. 2

      II.   The Facts and Circumstances of This Case Fully Support the Jury's Punitive Damages Award................................................................................... 7

            A.    The Facts and Circumstances of the Case Well Warrant a $1 Million Punitive Damages Award ............................................................ 8

            B.    Google's Pleas for Leniency Reveal Why Significant Punitive Damages are Necessary ................................................................. 13

            C.    Google's Caselaw Does Not Support Its Position .................................... 15

      III.  The Relationship Between Punitive and Non-Punitive Damages Does Not Warrant a Reduction ................................................................................ 17

      IV.  Google's Comparison to the NYCHRL's Civil Damages Provision is Misplaced ...................................................................................................... 20

Conclusion ................................................................................................................. 21

## **TABLE OF AUTHORITIES**

**CASES**                                                                                                       **PAGE(S)**

*Allam v. Meyers*,
    906 F. Supp. 2d 274 (S.D.N.Y. 2012) .................................................................. 16

*In re Alphabet Shareholder*,
    2020 Cal. Super. LEXIS 1493 (Super. Ct. Santa Clara Cty. 2019)........................ 10

*Antoine v. Brooklyn Maids 26, Inc.*,
    489 F. Supp. 3d 68 (E.D.N.Y. 2020) ................................................................ 4, 20

*Bernhard v. Google, Inc.*,
    2023 NY Slip Op 31221(U) (Sup. Ct. New York Cty. 2020) .............................. 10

*BMW of North America v. Gore*,
    517 U.S. 559 (1996) ...................................................................... *passim*

*Bouveng v. NYG Capital LLC*,
    175 F. Supp. 3d 280 (S.D.N.Y. 2016) ............................................................ 15-16

*Brady v. Wal-Mart Stores, Inc.*,
    531 F.3d 127 (2d Cir. 2008) ................................................................................ 5

*Brink's, Inc. v. City of New York*,
    546 F. Supp. 403 (S.D.N.Y. 1982) ...................................................................... 13

*Chauca v Abraham*,
    30 N.Y.3d 325 (2017) ........................................................................................... 2

*Chauca v. Abraham*,
    89 N.E.3d 475 (N.Y. 2017) ............................................................................. 3, 4

*Chilvers v. New York Magazine Co.*,
    114 Misc. 2d 996, 453 N.Y.S.2d 153 (N.Y. Sup. Ct. 1982) ................................ 13

*Collins v. Cohen Pontani Lieberman & Pavane*,
    2008 U.S. Dist. LEXIS 58047 (S.D.N.Y. July 30, 2008) ...................................... 14

*Cooper v. Upstairs, Downstairs of New York, Inc.*,
    2021 U.S. Dist. LEXIS 59679 (S.D.N.Y. Mar. 29, 2021) .................................... 20

*Diggs v. Oscar De La Renta, LLC*,
    94 N.Y.S.3d 574 (App. Div. 2019) ...................................................................... 19

*Duarte v. St. Barnabas Hospital*,
    341 F. Supp. 3d 306 (S.D.N.Y. 2018) .......................................................... *passim*

*Ellis v. Google, Inc.*,
    Case No. CGC-17-561299, 2017 Cal. Super. LEXIS 2694 (2017)........................ 10

*Gorzynski v. JetBlue Airways Corp.*,
    596 F.3d 93 (2d Cir. 2010) ................................................................................ 14

*Greenbaum v. Svenska Handelsbanken*,
    67 F. Supp. 2d 228 (S.D.N.Y. 1999) .............................................................. 16, 17

*Haggan v. Google, LLC*,
    2023 NY Slip Op 33877(U) (Sup. Ct. King Cty. 2022) ...................................... 10

*Kim v. Dial Service International*,
    1997 U.S. Dist. LEXIS 12544 (S.D.N.Y. Aug. 11, 1997) .................................... 16

*Kolstad v. American Dental Association*,
    527 U.S. 526 (1999) .......................................................................................... 4

*Lee v. Edwards*,
    101 F.3d 805 (2d Cir. 1996) ............................................................................. 12

*MacMillan v. Millenium Broadway Hotel*,
    873 F. Supp. 2d 546 (S.D.N.Y. 2012) ............................................................... 16

*Marfia v. T.C. Ziraat Bankasi*,
    903 F. Supp. 463 (S.D.N.Y. 1995) .................................................................... 12

*McIntyre v. Manhattan Ford, Lincoln-Mercury, Inc.*,
    256 A.D.2d 269, 682 N.Y.S.2d 167 (App. Div. 1st Dept. 1998) ......................... 17

*Mihalik v. Credit Agricole Cheuvreux North America, Inc.*,
    715 F.3d 102 (2d Cir. 2013) ............................................................................... 5

*Mugavero v. Arms Acres, Inc.*,
    680 F. Supp. 2d 544 (S.D.N.Y. 2010) ................................................................. 2

*New York City Transit Authority v. State Division of Human Rights*,
    78 N.Y.2d 207 (1991) ......................................................................................... 5

*Pacific Mutual Life Insurance Co. v. Haslip*,
    499 U.S. 1 (1991) ............................................................................................. 18

*Ravina v. Columbia University*,
    2019 U.S. Dist. LEXIS 56556 (S.D.N.Y. Mar. 31, 2019) ............................... 6, 15

*Rosenberg, Minc & Armstrong v. Mallilo & Grossman*,
    798 N.Y.S.2d 322 (N.Y. Sup. Ct. 2005) ............................................................ 19

*Saleh v. Pretty Girl, Inc., No. 09 Civ. 1769*,
    2022 U.S. Dist. LEXIS 160952 (E.D.N.Y. Sept. 6, 2022) .................................. 16

*Salemi v. Gloria's Tribeca Inc.*,
    982 N.Y.S.2d 458 (App. Div. 1st Dept. 2014) .................................................... 17

*Shukla v. Sharma*,
  2012 U.S. Dist. LEXIS 18392 (E.D.N.Y. Feb. 14, 2012) ..................................................... 16

*TVT Records v. Island Def Jam Music Group*,
  257 F. Supp. 2d 737 (S.D.N.Y. 2003) ........................................................................... 12-13

*TXO Production Corp. v. Alliance Resources Corp.*,
  509 U.S. 443 (1993) ....................................................................................................... 6, 18

*Vasbinder v. Scott*,
  976 F.2d 118 (2d Cir. 1992) .................................................................................................. 12

*Watson v. E.S. Sutton, Inc.*,
  2005 U.S. Dist. LEXIS 31578 (S.D.N.Y. Sep. 6, 2005) ..................................................... 16

## STATUTES

N.Y.C. Admin. Code § 8-101 ..................................................................................................... 3

N.Y.C. Admin. Code § 8-126 ................................................................................................... 20

N.Y.C. Admin. Code § 8-127 .............................................................................................. 20, 21

N.Y.C. Admin. Code § 8-404 ................................................................................................... 21

N.Y.C. Admin. Code § 8-502 ................................................................................................... 20

N.Y.C. Local L. § 35 (2016) ..................................................................................................... 3

N.Y.C. Local L. § 85 (2005) ..................................................................................................... 3

## RULES

Fed. R. Evid. 201 ..................................................................................................................... 11

## OTHER AUTHORITIES

2018 Google Walkouts, https://en.wikipedia.org/wiki/2018_Google_walkouts (last visited Dec.
  13, 2023) ...............................................................................................................................10

Alphabet Announces Fourth Quarter and Fiscal Year 2022 Results, Securities Exchange
  Commission,https://www.sec.gov/Archives/edgar/data/1652044/000165204423000013/goog
  exhibit991q42022.htm (last visited Dec. 13, 2023).............................................................12

Alphabet Inc., Stock Analysis, https://stockanalysis.com/stocks/googl/employees/ (last visited
  Dec. 13, 2023).......................................................................................................................12

Beth Wang, *Google Must Pay Female Executive $1 Million for Gender Bias (1)*, Bloomberg Law
  (Oct. 20, 2023), https://news.bloomberglaw.com/litigation/google-must-pay-female-
  executive-1-million-for-gender-bias .....................................................................................11

Caitlin Harrington, *This Woman Exec Beat Google in Court—and Hopes Others Follow*, Wired
  (Oct. 24, 2023), https://www.wired.com/story/this-woman-exec-beat-google-in-court-and-
  hopes-others-follow/ .............................................................................................................11

Cheyenne MacDonald, *Google ordered to pay $1 million to female exec who sued over gender discrimination*, Engadget (Oct. 22, 2023), https://www.engadget.com/google-ordered-to-pay-1-million-to-female-exec-who-sued-over-pay-discrimination-214702002.html....................11

Craig Gurian, *A Return to Eyes on the Prize: Litigating Under the Restored New York City Human Rights Law*, 33 Fordham Urb. L.J. 255 (2006) ........................................................... 3

Ellen Thomas, *Jury finds Google retaliated against a female cloud director when she complained the company paid her less than male peers*, Business Insider (Oct. 23, 2023), https://www.businessinsider.com/google-loses-gender-bias-trial-ulku-rowe-2023-10 ..........11

*GOOGLE: a Reflection of Culture, Leader, and Management*, International Journal of Corporate Social Responsibility (2017), https://jcsr.springeropen.com/articles/10.1186/s40991-017-0021-0 (last visited Dec. 13, 2023)....................................................................................12

Leah Shepherd, *Google Loses Gender Discrimination Trial*, SHRM (Oct. 25, 2023) https://www.shrm.org/resourcesandtools/legal-and-compliance/employment-law/pages/google-sex-discrimination-case.aspx#:~:text=%22We%20disagree%20with%20the%20jury's,clear%20policy%2C%22%20Mencini%20said............................................................................... 11

Melissa Fitzgerald, *Google Loses $1 Million Over Discrimination Case*, Channelnews (Oct. 23, 2023), https://www.channelnews.com.au/google-loses-1-million-over-gender-bias-case-against-former-exec/ ...........................................................................................................11

*Reverse Engineering Google's Innovation Machine*, Harvard Business Review Magazine (Apr. 2008), https://hbr.org/2008/04/reverse-engineering-googles-innovation-machine (last visited Dec. 13, 2023)....................................................................................................................12

Wes Davis, *Google owes executive $1 million after losing gender bias lawsuit*, The Verge (Oct 21, 2023), https://www.theverge.com/2023/10/21/23926501/google-cloud-lawsuit-ulku-rowe-verdict ......................................................................................................................11

*Why Startups Should Look to Google, not Facebook, as a Role Model*, VentureBeat (Sept. 2013), https://venturebeat.com/entrepreneur/why-startups-should-look-to-google-not-facebook-as-a-role-model/ (last visited Dec. 13, 2023).................................................................................12

## PRELIMINARY STATEMENT

Remittitur of the jury's punitive damages award is improper. In support of its motion, Defendant Google LLC ("Google") seeks to rehash evidence already considered and rejected by the jury. Furthermore, Google's legal analysis relies on questionable precedent that is factually dissimilar from this case, on which the jury rendered a unanimous verdict in favor of Plaintiff ("Plaintiff" or "Ms. Rowe"). Among other faults, Google's analysis fails to pay sufficient deference to the liberal, remedial mandate of the New York City Human Rights Law ("NYCHRL") on which Ms. Rowe's punitive damages award is based.

Reviewing the punitive damages award under the correct legal standards, particularly in light of Google's reprehensible failure to take responsibility at any point over the past seven years, choosing instead to behave in a deceitful manner designed to circumvent the law, there is no doubt that the jury's reasoned punitive damages award should remain undisturbed.

## STATEMENT OF FACTS

Plaintiff refers the Court to its Memorandum of Law in Opposition to Google's Renewed Motion for Judgment as a Matter of Law (filed concurrently), her Memorandum of Law in Support of Plaintiff's Motion for Instatement, Permanent Injunction, and Other Post Judgment Relief (ECF No. 365 ("Instatement MOL")), and the facts cited to throughout this Memorandum as factual context for her opposition.

## LEGAL STANDARD

The Court's determination of whether a punitive damages award falls within the permissible bounds is an inquiry into reasonableness under the circumstances, looking at whether the punitive damages award is "grossly out of proportion to the severity of the offense." *BMW of N. Am. v. Gore*, 517 U.S. 559, 576 (1996). The analysis furthermore must be guided by the New York City interests the punitive damages award is designed to serve. *Id.* at 568. "Only in

'breathtaking' cases . . . is remittitur appropriate." *Mugavero v. Arms Acres, Inc.*, 680 F. Supp. 2d 544, 589 (S.D.N.Y. 2010) (citations omitted).

Here, the circumstances of this case warrant a punitive damages award that will fulfill the NYCHRL's goals of punishment and deterrence. "Punitive damages are intended not only to punish the tortfeasor but also to deter future reprehensible conduct." *Chauca v Abraham*, 30 N.Y.3d 325, 331 (2017) (quotations and citations omitted). Indeed, deterrence is a key function of punitive damages under the NYCHRL. *Id.* at 334 ("Furthermore, subjecting NYCHRL defendants to punitive damages under this [more lenient] standard encourages nondiscriminatory behavior and the development and application of appropriate employment criteria."). The jury's punitive damages award falls well within the bounds of acceptable punitive damages awards in New York, and is necessary to fulfill the NYCHRL's goals of punishment and deterrence.

## ARGUMENT

### I. Google's Proffered Standards for Reviewing Ms. Rowe's Punitive Damages Award are Exaggerated or Incorrect.

Google asks this Court to review the jury's punitive damages award using an improper standard of review that is higher than that required by New York courts and the NYCHRL and inconsistent with New York's interests. In doing so, it relies on non-binding (and arguably wrongly decided) district court interpretations of state law under factually distinct circumstances. Among other shortcomings, Google's legal analysis fails to give due deference to the fact that liability here was imposed not just under New York state law, but under the NYCHRL, which requires a different, more lenient, analysis in all regards.

The United States Supreme Court has been clear that even when assessing the constitutionality of a punitive damages award, the standard is state specific and must be assessed through the lens of the state interest at issue. *See Gore*, 517 U.S. 559 at 568 ("the federal

excessiveness inquiry appropriately begins with an identification of the state interests that a punitive award is designed to serve"). Accordingly, as required by the NYCHRL, any review of the jury's punitive damages award must be made in keeping with the NYCHRL's intended remedial purpose, which has been repeatedly acknowledged to be broader than federal and even other state goals.

New York City enacted the NYCHRL for the specific purpose of "eliminat[ing] and prevent[ing] discrimination from playing <u>any</u> role in actions relating to employment . . . and to take other actions against prejudice, intolerance, bigotry, discrimination, sexual harassment, and bias-related violence or harassment." N.Y.C. Administrative Code § 8-101 (emphasis added). As initially enacted, the NYCHRL was intended to have a broad effect. *See* Craig Gurian, *A Return to Eyes on the Prize: Litigating Under the Restored New York City Human Rights Law*, 33 Fordham Urb. L.J. 255, 256 (2006). Nevertheless, trial courts frequently have construed the NYCHRL too narrowly, leading to numerous legislative and judicial clarifications as to the uniquely broad purpose and intentions of the statute. *See, e.g.,* Local Civil Rights Restoration Act of 2005 ("Restoration Act"), N.Y.C. Local L. § 85 (2005); Local Civil Rights Restoration Act of 2016 (Restoration Act Amendments"), N.Y.C. Local L. § 35 (2016); *Chauca v. Abraham*, 89 N.E.3d 475, 483 (N.Y. 2017) ("Despite clear instructions, courts interpreting the NYCHRL failed to construct it liberally and independently, instead importing narrowing constructions of [T]itle VII and the Executive Law") (Wilson, J. dissenting).

The broad remedial goals of the NYCHRL apply to all provisions of the statute, including its provision for punitive damages in private lawsuits. *See id.,* at 480 ("*all provisions* of the NYCHRL must be construed broadly in favor of discrimination plaintiffs") (emphasis added internal quotation omitted). This principle is reflected, in part, in the lower bar set by New York

courts for awarding punitive damages; under the NYCHRL, the standard for assessing punitive damages is "whether the wrongdoer has engaged in discrimination with willful or wanton negligence, or recklessness, or a 'conscious disregard of the rights of others or conduct so reckless as to amount to such disregard.'" *Id.* at 481. This standard stands in sharp contrast to the standard for punitive damages under Title VII, for which a plaintiff must demonstrate that their employer "engaged in intentional discrimination and has done so 'with malice or with reckless indifference to the federally protected rights of an aggrieved individual.'" *Kolstad v. ADA*, 527 U.S. 526, 529-30 (1999).

Punitive damages awarded pursuant to a violation of the NYCHRL are intended to "deter future reprehensible conduct" in addition to serving as punishment for wrongdoing. *See Chauca*, 89 N.E.3d at 487. And notably, the NYCHRL "imposes no limit on the amount of punitive damages a court may award." *Antoine v. Brooklyn Maids 26, Inc*., 489 F. Supp. 3d 68, 101 (E.D.N.Y. 2020).

The U.S. Supreme Court has outlined several factors a reviewing court <u>may</u> consider when reviewing a punitive damages award: "[1] the degree of reprehensibility of the conduct; [2] the disparity between the harm or potential harm suffered by [the plaintiff] and [her] punitive damages award; and [3] the difference between this remedy and the civil penalties authorized or imposed in comparable cases. *Gore*, 517 U.S. at 575. These factors must be considered against state law standards – here, the remedial mandate of the NYCHRL. *Id.* at 568 ("States necessarily have considerable flexibility in determining the level of punitive damages that they will allow in different classes of cases and in any particular case.").

The New York State Court of Appeals, in reviewing damages awards by the New York State Division of Human Rights, laid out the following guideposts for reviewing whether a

damages award is excessive: "[1] relief was reasonably related to the wrongdoing, [2] whether the award was supported by evidence before the Commissioner, and [3] how it compared with other awards for similar injuries." *N.Y.C. Transit Auth. v. State Div. of Human Rights*, 78 N.Y.2d 207, 219 (1991). The Second Circuit has acknowledged that this is a lesser standard than the "deviates materially" standard, and should apply to review of damages awards in New York, at least with respect to New York State Human Rights Law Violations. *See Brady v. Wal-Mart Stores, Inc.*, 531 F.3d 127, 138 (2d Cir. 2008) (applying more lenient *Transit Authority* standard to review of compensatory damages New York State Human Rights Law). Given the broad remedial nature of the NYCHRL and that this statute must be liberally construed, it is reasonable to conclude that awards under the NYCHRL must be given even greater deference than those awarded under the state law.

More specifically, Ms. Rowe's punitive damages award must be reviewed in light of the uniquely broad punitive and deterrent purposes of the NYCHRL. In specific consideration of whether the punitive damages award furthers the NYCHRL's goal of deterrence, the Court should take its lead from New York's definition of deterrence as used in the NYCHRL. The Court should consider whether the award is "reasonably likely to deter" further illegal action "with a keen sense of workplace realities, of the fact that the 'chilling' effect of particular conduct is context-dependent, and of the fact that a *jury* is generally best suited to evaluate the impact" of the punitive damages award. *Cf. Mihalik v. Credit Agricole Cheuvreux N. Am., Inc.*, 715 F.3d 102, 112 (2d Cir. 2013) (emphasis added) (quoting *Williams v. N.Y.C. Hous. Auth.*, 872 N.Y.S.2d 27, 34 (1st Dep't 2009)).

The case law Google relies upon offers limited guidance and reveals that district courts have sometimes struggled to correctly apply to these principles as they relate to punitive

damages awards under the NYCHRL. Notably, Google incorrectly suggests Ms. Rowe's punitive damages award may be reduced if it "deviates materially from what would be reasonable compensation." Google's Memorandum of Law in Support of Remittitur of Punitive Damages ("Def. Br.") at 15, citing *Duarte v. St. Barnabas Hosp.*, 341 F. Supp. 3d 306, 319 (S.D.N.Y. 2018). Google further incorrectly argues that this standard is "less deferential to a jury verdict" than the federal "shocks the conscience" standard of review. *Id*. But such an interpretation is wholly inconsistent with the NYCHRL and cannot be correct for that reason alone. Moreover, another case cited by Google, *Ravina v. Columbia Univ.*, acknowledged that the "deviates materially" standard is derived from a state appellate standard for "money judgment[s] in [] action[s] in which [] itemized verdict[s] [are] required by rule forty-one hundred eleven" of the N.Y. C.P.L.R., applicable to malpractice and personal injury cases, and therefore would not be applicable to a NYCHRL verdict in which no itemized verdict was sought. See *Ravina v. Columbia Univ.*, No. 16 Civ, 2137, 2019 U.S. Dist. LEXIS 56556, at *32 (S.D.N.Y. Mar. 31, 2019).

While decisions by other courts may be helpful when reviewing punitive damages awards, they must be given appropriately limited weight, particularly where, like many of the cases Google cites, the decisions come from district courts that relied on federal interpretations of state law, predate *Chauca*, and/or are decisions that predate the 2005 Restoration Act or the 2016 Restoration Act Amendments. *See TXO Prod. Corp. v. Alliance Res. Corp.*, 509 U.S. 443, 457 (1993) ("[b]ecause no two cases are truly identical, meaningful comparisons of such awards are difficult to make," and "[a]s an analytical approach to assessing a particular award . . . we are skeptical"); *Gore*, 517 U.S. at 577 ("only state courts may authoritatively construe state statutes").

Thus, while factors like reprehensibility and proportionality are relevant concepts for evaluating Ms. Rowe's punitive damages award, they are merely guidelines, only to the extent they are useful to promoting the NYCHRL's broad remedial purpose, and should not be used as a justification for limiting her relief. Here, the jury's $1 million punitive damages award is more than reasonable, well within constitutional boundaries, and is justified by the facts and circumstances of this case.

## II.     The Facts and Circumstances of This Case Fully Support the Jury's Punitive Damages Award.

Google's unlawful conduct since 2017 fully justifies the jury's award of $1 million in punitive damages. Google's conduct is indeed sufficiently reprehensible to justify this award, particularly given Google's continued lack of accountability or responsibility for its illegal actions. Even following the verdict, Google's actions strongly suggest that even a $1 million punitive damages award will not fulfill the jury's intent to punish Google and deter similar conduct in the future.

Google incorrectly argues that the jury did not follow the Court's instructions on punitive damages, and that the evidence at trial did not support any punitive damages award (Def. Br. at 14). Google plainly remains in denial that it has broken the law in a very serious way. A jury of eight reviewed Google's mitigating evidence and rejected it, unanimously resolving the case in Ms. Rowe's favor on three of four claims. In doing so, the jury unequivocally found that Google did discriminate and did retaliate against Ms. Rowe. These are no longer open questions subject to debate or interpretation; verdict has been rendered, and it is final. Accordingly, Google's pleas for a different interpretation of the evidence are wasted paper.

## A.   The Facts and Circumstances of the Case Well Warrant a $1 Million Punitive Damages Award.

Here, Google's illegal conduct spanned nearly seven years and involved numerous bad

actors across multiple departments and a series of lies and misstatements to Ms. Rowe from

OCTO hiring managers, Tariq Shaukat, Stuart Vardaman, Human Resources, and Employee

Resources. Google hired Ms. Rowe using a highly subjective, undefined process, in

contravention to its own hiring policies, which required consistency and defined rubrics. *See,*

*e.g.,* Pl. Exs. P102B, P108 (Grannis), P119; Trial Tr. 736:21-23, 744:3-6).[1] Tariq Shaukat not

only treated Ms. Rowe dismissively on the basis of gender and tapped a man on the shoulder for

the role she sought but, along with HR, he lied to her about being considered for the FSVL role.

Specifically, the jury heard and saw evidence that Mr. Shaukat and Mr. Vardaman had

determined Ms. Rowe was not "viable" for the role before receiving feedback, yet continued to

lead her to believe she was receiving fair consideration. (Pl. Ex. 150, 62; Trial Tr. 151:7-152:1;

578:2-13710:7-23; 710:7-23). Even Google recognizes such actions can warrant substantial

punitive damages awards. *See Duarte*, 341 F. Supp. 3d at 329 ("repeated failures to address

complaints of discrimination, [and] deceit" constitute bases for substantial punitive damages

awards); *see also Gore*, 517 U.S. at 582 (higher punitive damages awards are appropriate where

"the injury is hard to detect").

In addition, Stuart Vardaman displayed clear animus towards Ms. Rowe following her

complaints, which he acted upon. (Pl. Exs. 64, 69, 106, 108 (*e.g.*, "abrasive," "bristly,"

"cantankerous"), 111 (Rowe lacked "Googleyness," was "overly self-oriented" and had "ego

---

[1] "Pl. Ex." and "Def. Ex." refer, respectively, to Plaintiff's and Defendant's trial exhibits, copies of which were previously provided to the Court. Plaintiff can provide additional courtesy copies of any exhibit cited in this brief at the request of the Court. Citations to the trial transcript are attached as Exhibit A to the Declaration of Gregory S. Chiarello.

concerns"); Trial Tr. 578:2-13, 572:9-574:16; 596:8-16, 685:5-10). Specifically, Google knew

from the Complaint that Ms. Rowe had challenged as discriminatory the FSVL promotion

decision in which Mr. Vardaman was involved. (ECF No. 108). It was also aware that Ms. Rowe

believed she had been retaliated against. Upon interviewing Mr. Vardaman in 2019 in connection

with the Complaint, Google should have taken sufficient steps to protect Ms. Rowe from further

retaliation. It did not. Furthermore, at no time after Ms. Rowe amended the Complaint to add the

retaliatory denial of the 2020 VPFS-Sales position did Google take corrective action against Mr.

Vardaman or remedial action for the benefit of Ms. Rowe. Rather, at trial Google attempted to

paint Mr. Vardaman as the one who had been wronged, in an effort to distance him from the very

specific negative comments he made to ER, a tactic the jury clearly saw through and rejected.

(Trial Tr. 586:5-591:15)

    That Ms. Rowe is still employed at Google only heightens the need to uphold the jury's

punitive damages award, as the potential for Google to continue to retaliate against her is

significant. (*See* ECF No. 365, Instatement MOL 14-19). The jury heard evidence that suggests

retaliation against Ms. Rowe is likely to continue. The jury held that Google denied Ms. Rowe

two positions – the Financial Services Vertical Lead role and the VPFS-Sales role – following

her complaints of discrimination. (*See* Pl. Exs. 11, 42, 45, 54, 108, 111; Trial Tr. 195:13-22). The

jury also heard evidence of Ms. Rowe's repeated efforts to correct her leveling through meetings

with her supervisors, Human Resources, and Employee Relations, which were met with

increasing hostility and an ever-changing list of excuses, even long after Ms. Rowe commenced

this lawsuit in 2019. After years of positive performance and receiving Exceeds Expectations

ratings, Ms. Rowe's current supervisor, after consultation with Google's lawyers, has begun

criticizing her performance, making the possibility of promotion even more remote. (*See*, *e.g.*,

Trial Tr. 1305:19-1306:13). All the while, Level 8 Technical Directors such as Jennifer Bennett

and Scott Penberthy – who did not lodge discrimination complaints – have seen their careers

advance, including through promotion to Level 9. (Trial Tr. 197:9-10).

     The need to send Google a message that will deter future illegal conduct also is critical in

light of the history of this case. On November 1, 2018, more than 20,000 employees walked out

of Google to protest Google's forced arbitration requirement and gender-based pay inequity, as

well as other related issues.[2] Ms. Rowe's case is not the only one against Google asserting

discriminatory and retaliation; Google had been subject to numerous lawsuits asserting gender

discrimination and retaliation, including two class actions concerning the same leveling concerns

Ms. Rowe raised in her suit. *See, e.g.*, *Ellis v. Google, Inc.*, Case No. CGC-17-561299, 2017 Cal.

Super. LEXIS 2694 (2017) (class action alleging Google violated California's Equal Pay Act);

*Haggan v. Google, LLC*, 2023 NY Slip Op 33877(U), ¶ 1 (Sup. Ct. King Cty. 2022) (class action

alleging Google discriminated on the basis of race and gender in its pay, leveling, performance

calibration, and promotion practices); *Bernhard v. Google, Inc.*, 2023 NY Slip Op 31221(U), ¶ 1

(Sup. Ct. New York Cty. 2020) (sexual harassment and retaliation); *see also In re Alphabet

S'holder*, 2020 Cal. Super. LEXIS 1493 (Super. Ct. Santa Clara Cty. 2019) (shareholder class

action alleging that Google committed misconduct in connection with multi-million-dollar

severance awards to male executives accused of assaulting female employees, amid a broader

culture of discrimination against women at the company). As the Court saw first-hand when

reviewing Plaintiff's proposed Exhibit 153, over a hundred women reached out to Ms. Rowe in

solidarity when they learned this case would be proceeding to trial. *See* Pl. Proposed Ex. 153.[3]

---

[2] *See* https://en.wikipedia.org/wiki/2018_Google_walkouts (last visited Dec. 13, 2023).

[3] Plaintiff maintains that evidence of Google's treatment of other women, including Jennifer
Bennett, the existence of the Google walkout as a motivating factor for Ms. Rowe's complaints,

All of these circumstances suggest that the issues Ms. Rowe raised in her lawsuit are not isolated, that Google requires significant motivation to comply with the law, and that a punitive damages award of *at least* a million dollars is necessary to meaningfully give the verdict deterrent effect.

Indeed, even in the face of a verdict of discrimination and retaliation and the prospect of a $1 million punitive damages award, Google continues to deny responsibility for its illegal treatment of Ms. Rowe. In no fewer than seven publications, Google has repeatedly and publicly denied any wrongdoing, stating: "We disagree with the jury's finding that Ms. Rowe was discriminated against on account of her gender or that she was retaliated against for raising concerns about her pay, level, and gender."[4]

---

and evidence of other women supporting Ms. Rowe, should have been properly considered by the jury. Had it considered the evidence, Plaintiff's punitive damages award, justifiably, may have been significantly higher. Nevertheless, the Court may now consider this evidence for purposes for examining the propriety of Ms. Rowe's punitive damages award. Fed. R. Evid. 201.

[4] *See*, *e.g.*, *See* Leah Shepherd, *Google Loses Gender Discrimination Trial*, SHRM (Oct. 25, 2023), https://www.shrm.org/resourcesandtools/legal-and-compliance/employment-law/pages/google-sex- discrimination-case.aspx#:~:text=%22We%20disagree%20with%20the%20jury's,clear%20policy%2C%22%20Mencini%20said.; Wes Davis, *Google owes executive $1 million after losing gender bias lawsuit*, The Verge (Oct 21, 2023, 2:05 PM), https://www.theverge.com/2023/10/21/23926501/google-cloud-lawsuit-ulku-rowe-verdict; Cheyenne MacDonald, *Google ordered to pay $1 million to female exec who sued over gender discrimination*, Engadget (Oct. 22, 2023), https://www.engadget.com/google-ordered-to-pay-1-million-to-female-exec-who-sued-over-pay-discrimination-214702002.html; Ellen Thomas, *Jury finds Google retaliated against a female cloud director when she complained the company paid her less than male peers*, Business Insider (Oct. 23, 2023, 10:15 AM), https://www.businessinsider.com/google-loses-gender-bias-trial-ulku-rowe-2023-10; Beth Wang, *Google Must Pay Female Executive $1 Million for Gender Bias (1)*, Bloomberg Law (Oct. 20, 2023, 8:25 PM), https://news.bloomberglaw.com/litigation/google-must-pay-female-executive-1-million-for-gender-bias; Melissa Fitzgerald, *Google Loses $1 Million Over Discrimination Case*, Channelnews (Oct. 23, 2023), https://www.channelnews.com.au/google-loses-1-million-over-gender-bias-case-against-former-exec/; *see also* Caitlin Harrington, *This Woman Exec Beat Google in Court—and Hopes Others Follow*, Wired (Oct. 24, 2023 3:42 PM), https://www.wired.com/story/this-woman-exec-beat-google-in-court-and-hopes-others-follow/

It is also important for the Court to consider what Google is. Google is one of the largest tech companies in the world. For a company of its size with more than 180,000 employees,[5] and $283 <u>billion</u> in revenue in 2022,[6] $1 million in punitive damages is more than appropriate. *See Marfia v. T.C. Ziraat Bankasi*, 903 F. Supp. 463, 472 (S.D.N.Y. 1995) (upholding punitive damages award of $1 million against company with 40,000 employees). Moreover, the entire technology industry looks to Google as a behavioral example; what is acceptable for Google is acceptable for the industry.[7] This Court therefore can and should consider Google's size and place in the industry when reviewing the punitive damages award. *See Lee v. Edwards*, 101 F.3d 805, 813 (2d Cir. 1996) ("We recognize that one purpose of punitive damages is deterrence, and that deterrence is directly related to what people can afford to pay.") (citing *Vasbinder v. Scott*, 976 F.2d 118, 121 (2d Cir. 1992)); *TVT Records v. Island Def Jam Music Grp.*, 257 F. Supp. 2d 737, 745-46 (S.D.N.Y. 2003) ("It is well-settled, in fact, that evidence of a defendant's net worth

---

("Mencini says Google disagrees with the jury's finding that it discriminated and retaliated against Rowe. 'We prohibit retaliation in the workplace and publicly share our very clear policy,' Mencini wrote. She did not comment on whether Google plans to appeal.")

[5] https://stockanalysis.com/stocks/googl/employees/ (last visited Dec. 13, 2023).

[6] Alphabet Announces Fourth Quarter and Fiscal Year 2022 Results, Securities Exchange Commission, available at https://www.sec.gov/Archives/edgar/data/1652044/000165204423000013/googexhibit991q42022.htm (last visited Dec. 13, 2023)

[7] *See, e.g.*, *GOOGLE: a Reflection of Culture, Leader, and Management*, International Journal of Corporate Social Responsibility (2017), available at https://jcsr.springeropen.com/articles/10.1186/s40991-017-0021-0; *Why Startups Should Look to Google, not Facebook, as a Role Model*, VentureBeat (Sept. 2013), available at https://venturebeat.com/entrepreneur/why-startups-should-look-to-google-not-facebook-as-a-role-model/; *Reverse Engineering Google's Innovation Machine*, Harvard Business Review Magazine (Apr. 2008), available at https://hbr.org/2008/04/reverse-engineering-googles-innovation-machine (all links last visited Dec. 13, 2023).

is properly considered given the goals of punishment and deterrence served by punitive damages."); *Chilvers v. N.Y. Magazine Co.*, 114 Misc. 2d 996, 998, 453 N.Y.S.2d 153, 154 (N.Y. Sup. Ct. 1982) ("The relevancy of a defendant's wealth, on the issue of punitive damages, is to aid the jury in determining how large a judgment is needed to deter and punish the defendant."). A reduction of the punitive damages award will not only embolden Google further but also send a dangerous message industry-wide that discriminatory and retaliatory actions have minimal penalties. Such an outcome would undermine the deterrent purpose of punitive damages. *See Brink's, Inc. v. City of New York*, 546 F. Supp. 403, 413 (S.D.N.Y. 1982), *aff'd,* 717 F.2d 700 (2nd Cir. 1983) ("If the damage award is to serve its intended objective of punishment for wrongful conduct and deterrence against repetition of a like offense, it must be sufficient to 'smart' the offender which permits a consideration of the wealth of the malefactor.").

### B.     Google's Pleas for Leniency Reveal Why Significant Punitive Damages are Necessary

Google's request that the Court reach a different conclusion on the facts than that of the jury is without merit. Google's arguments that its conduct "was at all times appropriate," that Tariq Shaukat was somehow a hero for putting Ms. Rowe through the FSVL process with no intention of ever seriously considering her for the role, and that Google was justified in not considering Ms. Rowe for the VPFS-Sales role (Def. Br. 16-17), demonstrate unconscionability. The jury heard and considered all of Google's arguments and evidence on these issues, and rejected them. Astonishingly, Google maintains that the jury's verdict must reflect some kind of misunderstanding, and is in a state of denial. The punitive damages award reinforces to Google that what it did was wrong and a violation of the law.

Google also claims it maintained a "fulsome" anti-discrimination policy, warranting leniency here. (Def. Br. 2-5, 17). However, whether Google maintained an anti-discrimination

policy – revealing at most a bare minimum of effort to comply with the law – has little bearing

on the jury's punitive damages award, as the jury heard considerable evidence that it

discriminated and retaliated against Ms. Rowe notwithstanding the existence of Google's

antidiscrimination policy. This evidence, which is what the jury heard and accepted, supports a

punitive damages award. *See Gorzynski v. JetBlue Airways Corp.*, 596 F.3d 93, 108 (2d Cir.

2010) (company's "questionable" investigation into termination event was evidence of pretext);

*Collins v. Cohen Pontani Lieberman & Pavane*, No. 04 Civ. 8983, 2008 U.S. Dist. LEXIS

58047, at *35-36 (S.D.N.Y. July 30, 2008) (failure to investigate complaint evidence of pretext).

Specifically, Google's purported efforts to investigate Ms. Rowe's concerns lacked any

indicia that Google was at all concerned with reaching the correct result, rather than simply

burying the complaint. Google's first response to Ms. Rowe's leveling concerns was to lie to her

and tell her everyone had been leveled as Level 8, when that simply was not true. (Trial Tr.

122:4-11, 134:8-13). Human Resources ("HR")'s immediate reaction was "there is no process to

revisit level," even though that also was not true. (Pl. Exs. 13, 105, 114; Trial Tr. 1026:17-23).

HR then used a metric that had not actually been used – years of experience – to justify its

leveling decision, when Google's own data and policy were clear that years of experience were

not the factor relied on. (*Compare* Pl. Ex. 88 *with* Pl. Ex. 102 ("DO NOT: make leveling

recommendations based on factors outside of interview performance, such as . . . years of

experience"); Trial Tr. 304:8-14, 318:3-320:10, 743:25-744:2, 1017:15-18, 1204:3-5). Employee

Relations ("ER")'s involvement continued this pattern. April Beaupain spoke with only the

recruiter, and not anyone who was involved in the leveling decision or who actually performed

the role, in determining Ms. Rowe's concerns had no merit. (Pl. Ex. 57; Trial Tr. 1029:24-

1030:9). It was not until Ms. Rowe filed legal action that Google began to look at her concerns

more closely. Although interviews conducted in the course of the investigation supported Ms. Rowe's claims, and Will Grannis offered to help Ms. Rowe, Google did nothing but fight this case for *four more years*. (*see, e.g.,* P108 at GOOG-ROWE-00056990-56992; Trial Tr. 199:12-200:13). That Google thinks it should be rewarded for this behavior with a reduced punitive damages award only demonstrates the need for even stronger measures to correct Google's behavior.

### C.      Google's Caselaw Does Not Support Its Position.

Google points to several dissimilar cases in which punitive damages awards were reduced to support its argument that Ms. Rowe's punitive damages award also should be reduced. But highlighting a court's treatment of factually different cases offers this Court little meaningful guidance. Those decisions, which primarily focused on the egregious actions of a single actor whom the employer subsequently fired, gave little consideration to the deterrent effect of a punitive damages award, as the single "bad actor" had been dispatched. Ms. Rowe's case presents a very different scenario. She is still employed, and Google has demonstrated no indication that it will behave differently in the future or that it even recognizes that it has been found liable for gender discrimination and retaliation. Google's cases, mostly older district court decisions with dissimilar fact patterns and/or considering non-NYCHRL claims, are inapposite. *See, e.g.*, *Ravina*, 2019 U.S. Dist. LEXIS 56556, *45-49 (non-egregious fact pattern with a single bad actor, where jury did not find underlying discrimination or harassment, but only retaliation, based on comparison to pre-*Chauca* and pre-2016 Restoration Act Amendments district court decisions); *Duarte*, 341 F. Supp. 3d at 325-333 (single bad actor harassment; based on comparison to pre-*Chauca* and pre-2016 Restoration Act Amendments district court decisions and without analysis of the proper standard under the NYCHRL); *Bouveng v. NYG Cap. LLC*, 175 F. Supp. 3d 280, 288-89, 346, 350 (S.D.N.Y. 2016) (pre-*Chauca*; harassment and

defamation with single bad actor; permitting punitive damages awards of $1 million against employer, $1.5 million against second corporate defendant, and $1.5 million against individual defendant); *Allam v. Meyers*, 906 F. Supp. 2d 274, 280, 291, 294 (S.D.N.Y. 2012) (domestic violence IIED claim under heightened standard); *MacMillan v. Millenium Broadway Hotel*, 873 F. Supp. 2d 546, 552-53, 563 (S.D.N.Y. 2012) (review under pre-*Chauca* standards and incorrectly holding NYCRHL did not require different standard); *Watson v. E.S. Sutton, Inc.*, No. 02 Civ. 2739, 2005 U.S. Dist. LEXIS 31578, at *12, 52 (S.D.N.Y. Sep. 6, 2005) (pre-*Chauca*; single bad actor who made a single comment to plaintiff); *Kim v. Dial Serv. Int'l*, No. 96 Civ. 3327, 1997 U.S. Dist. LEXIS 12544, at *2, 16, 45 (S.D.N.Y. Aug. 11, 1997) (pre-*Chauca* and Restoration Act; single act of wrongful conduct –termination – offered "very little repetition of the misconduct."); *Saleh v. Pretty Girl, Inc.*, No. 09 Civ. 1769, 2022 U.S. Dist. LEXIS 160952, at *8-9, 69, 77 (E.D.N.Y. Sept. 6, 2022) (§ 1981 hostile environment claim with no NYCHRL claim asserted; single bad actor); *Shukla v. Sharma*, No. 07 Civ. 2972, 2012 U.S. Dist. LEXIS 18392, at *2, 44, 47 (E.D.N.Y. Feb. 14, 2012) (forced labor, trafficking and libel claim, under different punitive damage standard, where punitive damages award would cause financial ruin).

Rather, this case is more like *Greenbaum v. Svenska Handelsbanken (SNY)*, 67 F. Supp. 2d 228 (S.D.N.Y. 1999) (Sotomayor, J., sitting by designation), which involved gender discrimination and retaliation against a recognized strong performer who complained of discrimination. Similar to this case, over a period of six years SNY denied Greenbaum promotion on multiple occasions, transferred her into a department with open gender-based hostility, became upset after she spoke up about her experience, and retaliated against her subsequently by, *inter alia*, further denying her promotion. *Greenbaum*, 67 F. Supp. 2d at 238-245. In upholding the $1.25 million punitive damages award ($2.3 million in 2023 dollars), the

Court noted that the "unexceptional and paradigmatic" nature of the discrimination, of which SNY should have known and prevented; that, while not violent, SNY's actions were deceitful with regard to why plaintiff was denied promotions and ultimately fired; and that SNY, a large bank, had the ability to pay the punitive damages award. *Id.* at 262-72. All of these considerations apply with similar force here.

The *Greenbaum* court concluded by stating that it "has grave doubts as to whether the purposes of deterrence would be served adequately by an award that is much smaller than $1.25 million in the present circumstances." *Id.* at 272.[8] New York's state courts have upheld punitive damages awards of similar magnitude under the NYCHRL, even for employers much smaller than Google. *See, e.g.*, *Salemi v. Gloria's Tribeca Inc.*, 982 N.Y.S.2d 458, 459-60 (App. Div. 1st Dept. 2014) (upholding award of $1.2 million in punitive damages where plaintiff was discriminated against based on her religion and sexual orientation and retaliated against for objecting to such treatment); *McIntyre v. Manhattan Ford, Lincoln-Mercury, Inc.*, 256 A.D.2d 269, 271, 682 N.Y.S.2d 167, 169 (App. Div. 1st Dept. 1998) ($1.5 million punitive damages award appropriate in light "egregiousness of defendant's misconduct and the wealth of defendant's corporate parent," where plaintiff prevailed on three claims, including harassment and retaliation). Ms. Rowe's punitive damages award should be likewise upheld.

## III.    The Relationship Between Punitive and Non-Punitive Damages Does Not Warrant a Reduction.

Google brazenly argues that no conduct occurred that need be deterred because the jury did not award Ms. Rowe back pay (Def. Br. 14). This argument makes clear that Google only

---

[8] Notably, *Duarte* on which Google relies so heavily, acknowledges *Greenbaum*, a case factually quite similar to this case, as being an example of conduct "far more reprehensible" and therefore warranting the punitive damages imposed. *Duarte*, 341 F. Supp. 3d at 331 n.16.

recognizes wrongdoing and punishment when translated into dollars and cents. Google's persistent and obstinate view towards its culpability in this case and its legal obligations to its employees under the NYCRHL is justification alone to uphold the jury's award.[9] In any case, contrary to Google's arguments about proportionality, whether and how much in damages the jury awarded Ms. Rowe separate from the punitive damages award has little if any bearing on whether that award is reasonable, especially as a punitive damages award under the NYCHRL. The U.S. Supreme Court has repeatedly rejected the imposition of the bright line limitation on punitive damages based on the ratio between punitive and compensatory/economic damages that Google seeks to impose here (Def. Br. 21-22). *Pac. Mut. Life Ins. Co. v. Haslip*, 499 U.S. 1, 18 (1991) ("We need not, and indeed we cannot, draw a mathematical bright line between the constitutionally acceptable and the constitutionally unacceptable that would fit every case"; affirming approximately $1 million punitive damages award that was in excess of 4:1 ratio and more the 25 times the combined damages rendered against all other defendants); *see Txo Prod. Corp. v. All. Res. Corp.*, 509 U.S. 443, 453 (1993) (upholding $10 million punitive damages award even though jury awarded only $19,000 in compensatory damages).

　　To the extent the Court looks to the relationship between Ms. Rowe's non-punitive and punitive damages for guidance in its review, it must do so by looking to New York courts for direction, and not to federal interpretations of state law, as Google has done in arguing its

---

[9] In the same breath, Google also incorrectly claims that, by not awarding back pay, the jury necessarily rejected Ms. Rowe's leveling claims. (Def. Br. 14). This interpretation, however, is supported only by Google's skewed and revisionist view of the trial evidence. Google ignores that it presented evidence and argued to the jury both in opening and closing that, even if Ms. Rowe had been under-leveled, such action resulted in no economic harm to her because she in fact earned more money than some Level 9 men. (Trial Tr. 63:12-22; 1404:5-12; *see generally*, 1148-1159, 1402-07; Defendant's Demonstrative A; ECF No. 365, Instatement MOL, at 8). Thus, Google's position is not credible and ignores its own trial theory (which much more reasonably accounts for why the jury did not award back pay to Ms. Rowe, yet found Google liable for discrimination and retaliation).

position. *See Gore*, 517 U.S. at 568. Specifically, New York courts recognize, consistent with U.S. Supreme Court precedent, an upward bound of 10:1, which courts have consistently applied, including to NYCHRL punitive damages awards. *See, e.g.*, *Diggs v. Oscar De La Renta, LLC*, 94 N.Y.S.3d 574, 577 (App. Div. 2019) (affirming jury award with 10:1 punitive damages ratio in employment discrimination case under NYSHRL and NYCHRL); *Rosenberg, Minc & Armstrong v. Mallilo & Grossman*, 798 N.Y.S.2d 322, 331 (N.Y. Sup. Ct. 2005) (upholding punitive damages award with 10:1 ratio to other damages). The ratio between Ms. Rowe's damages award – 6.67:1 – is well within both constitutional limits and awards upheld in state courts.

Nevertheless, Google goes so far as to argue for a remittitur to a ratio of 1:1 or 2:1 in relation to Ms. Rowe's compensatory damages award, on the basis that such a reduction is warranted where other damages awarded are "intangible – and therefore immeasurable – emotional damages." (Def. Br. 21-22; citing *Duarte*, 341 F. Supp. 3d at 332). Google argues that the jury awarded Ms. Rowe "just $150,000" in compensatory damages, and "declined to award [Ms.] Rowe any other damages." (Def. Br. 21). Google thus considers Ms. Rowe's non-punitive damages award to be insignificant. (Notably, Google does not challenge her compensatory damages entitlement or seek remittitur of that award.) The U.S. Supreme Court has been clear that, in circumstances where compensatory damages are comparatively low, larger punitive damages awards are well justified, hold that, "low awards of compensatory damages may properly support a higher ratio than high compensatory awards, if, for example, a particularly egregious act has resulted in only a small amount of economic damages." *Gore*, 517 U.S. at 582.

Indeed, an award of punitive damages under the NYCHRL is not contingent on the jury awarding any compensatory damages, calling into question the utility of a damages ratio in the

first instance. *Cooper v. Upstairs, Downstairs of N.Y., Inc.*, No. 18 Civ. 6426, 2021 U.S. Dist. LEXIS 59679, at *6 (S.D.N.Y. Mar. 29, 2021).

As detailed above, the circumstances in this case warrant the full punitive damages awarded by the jury which clearly fall into any bounds of proportionality required by New York courts and the constitution.

**IV.    Google's Comparison to the NYCHRL's Civil Damages Provision is Misplaced.**

Comparing Ms. Rowe's punitive damage award to the civil penalty available to the N.Y.C. Commission on Human Rights ("City Commission") also is inappropriate. Had the New York City Legislature intended to place any bounds on punitive or other damages, it would have done so. Instead, the NYCHRL is not subject to any damages cap. N.Y.C. Admin. Code § 8-502; *Antoine*, 489 F. Supp. 3d at 101. The City Commission is a city-funded agency with limited resources to pursue enforcement and other priorities within its budget, such as policy setting and employer education efforts. The New York City Legislature intentionally created a separate private right of action without limitations on damages to allow the private bar to pursue enforcement of the NYCHRL in New York's courts. In short, the civil penalties available to the Commission, who handles far fewer cases than New York courts, are not a helpful measure of what an appropriate punitive damages award would be in this case.

The civil penalty provisions of the statute supports this interpretation, and suggests that the purpose of the civil penalty available to the Commission is not to punish reprehensible conduct or deter future violations, but to "vindicate the public interest." N.Y.C. Admin Code § 8-126(a). Section 8-127 defines that term by describing the City's use civil penalties recovered. *Id.* § 8-127. For civil penalties recovered from private defendants, that money is put in the general fund of the City for, among other uses, the continued operation of the Commission. *Id.* § 8-127(a). For penalties assessed against City agencies, the penalty "shall be used solely to support

city agencies' anti-bias education programs, activities sponsored by city agencies that are designed to eradicate discrimination or to fund remedial programs that are necessary to address the city's liability for discriminatory acts or practices." *Id.* § 8-127(b). Neither purpose suggests the reason for the civil penalty is to operate as a substitute for punitive damages; that is, to punish and deter future violations. Rather, the NYCHRL discusses punitive damages as separate from civil penalties. *See id.* § 8-404 ("Nothing in this section shall be construed to preclude the city from recovering damages, including punitive damages, and other relief pursuant to section 8-402 in addition to civil penalties.").

## <u>CONCLUSION</u>

Based on the foregoing, the jury's reasoned punitive damages award of $1,000,000 is not excessive and should not be disturbed.

DATE:    December 13, 2023
         New York, New York

Respectfully submitted,

/s/ Gregory S. Chiarello
OUTTEN & GOLDEN LLP
Cara E. Greene
Gregory S. Chiarello
Shira Z. Gelfand
685 Third Avenue, 25th Floor
New York, New York 10017
Telephone: (212) 245-1000
Facsimile: (646) 509-2060

*Attorneys for Plaintiff*

21