# Exhibit A

NAAVROW1

1  UNITED STATES DISTRICT COURT
   SOUTHERN DISTRICT OF NEW YORK
2  ------------------------------x

3  ULKU ROWE,

4              Plaintiff,

5         v.                          19 Civ. 8655 (JHR)

6  GOOGLE LLC,

7              Defendant.             Trial

8  ------------------------------x
                                      New York, N.Y.
9                                     October 10, 2023
                                      10:15 a.m.
10
   Before:
11
                    HON. JENNIFER H. REARDEN,
12
                                      District Judge
13                                    -and a jury-

14                        APPEARANCES

15 OUTTEN & GOLDEN, LLP
        Attorneys for Plaintiff
16 BY:  CARA E. GREENE
        GREGORY S. CHIARELLO
17      SHIRA Z. GELFAND

18 PAUL HASTINGS LLP
        Attorneys for Defendant
19 BY:  KENNETH W. GAGE
        SARA B. TOMEZSKO
20
   Also Present:  Vincent Yang, Paralegal (Outten & Golden)
21                Andrew Velazquez, Google Rep.
                  Jean Gutierrez, Paralegal (Paul Hastings)
22

23

24

25

NAAHRow2                        Opening - Mr. Chiarello

1   You may hear that she expected Google to give her two different

2   vice president level jobs, both of which were different from,

3   were not the same job, were different from the job she was

4   doing in OCTO.  And the evidence will show that Google

5   legitimately believed that others were better qualified, that

6   they had more cloud experience, that they had built cloud

7   products.

8           Now, this case is about expectations in a second way

9   too.  You will hear evidence regarding Google's expectations of

10  the technical directors.  Google expected these senior

11  engineers to be self-starters, to initiate action, to lead, and

12  to drive innovation.  And that's one of the really special

13  things about OCTO, and you'll hear that.  You'll hear it from

14  Brian Stevens.  You'll hear from Will Grannis.  OCTO is an

15  engine to drive innovation.  Let's get back to levels in a

16  minute.

17          The evidence will show that, yes, higher level means

18  higher expectations, and that means potentially higher pay.

19  For example, you will hear that an L9 is eligible for a cash

20  bonus of 40 percent, target cash bonus of 40 percent of base

21  pay, and that a Level 8 is eligible for a cash bonus that is

22  30 percent of base pay.  Why is that?  It's because Google

23  holds a Level 9 to higher expectations.  It expects that Level

24  9s will do more, have greater impact, drive more innovation

25  than a Level 8.

1           Now, finally, this case is about performance.  The

2   last thing on the screen is performance.  The evidence will

3   show that Google is a performance-based culture, particularly

4   when it comes to pay.  Ms. Rowe's pay comes in three parts:

5   There's a base salary, a cash bonus, and a stock award.  And

6   the evidence will show that Google each year algorithmically

7   determines each one of these items.  So what they earn in total

8   compensation is a function of how they perform, their

9   performance, against the expectations for the role, what did

10  they do.  People who do more, get paid more.  People who do

11  less, get paid less.

12          And the evidence will show —— you will see this

13  evidence —— that in some years Google did pay some technical

14  directors in OCTO more than it paid Ms. Rowe, but you are also

15  going to see that in some years Google paid Ms. Rowe more than

16  it paid Level 9 technical directors in OCTO.  Why is that?  You

17  will see in the evidence that these differences relate to how

18  each of these people performed.  How they perform against

19  expectations is what drives pay.  And you will see in the

20  evidence that the variation in pay, up and down, in total

21  compensation are because of employee performance and not

22  because of sex.

23          I said your time is precious, and it is.  So now I'm

24  just going to ask you for a favor.  I want you to keep these

25  three things in mind:

NAAHRow2                         Opening - Mr. Chiarello

1           Equal opportunity.  Was she given equal opportunity?

2           What were Google's expectations of her and the other

3    technical directors?

4           And what was her performance and what was their

5    performance relative to those expectations?

6           And I want you to keep these three things in mind as

7    you consider Ms. Rowe's now seven-year really good career at

8    Google and think carefully about why Google made the various

9    decisions it made about her relative to the qualifications and

10   experience of the people that she was competing with for the

11   two jobs that she sought, what her performance was against

12   expectations relative to the technical directors that she and

13   Mr. Chiarello promised you that she's doing exactly the same

14   work.  I want you to listen carefully to the evidence and see

15   whether all of Mr. Chiarello's promises come true.

16          Now, I said I would be brief, so thank you for your

17   time.

18          THE COURT:  Is the plaintiff ready to call her first

19   witness?

20          MR. CHIARELLO:  We are, your Honor.  We call Ulku

21   Rowe.

22   ULKU ROWE,

23        the plaintiff, called as a witness on her own behalf,

24        having been duly sworn, testified as follows:

25          MR. CHIARELLO:  Your Honor, may I examine?

NABHRow1

1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x

3   ULKU ROWE,

4                   Plaintiff,

5           v.                              19 Civ. 8655 (JHR)

6   GOOGLE LLC,

7                   Defendant.              Trial

8   ------------------------------x

                                           New York, N.Y.
9                                          October 11, 2023
                                           8:45 a.m.
10

11  Before:

12                  HON. JENNIFER H. REARDEN,

                                           District Judge
13                                         -and a jury-

14                          APPEARANCES

15  OUTTEN & GOLDEN, LLP
        Attorneys for Plaintiff
16  BY:   CARA E. GREENE
          GREGORY S. CHIARELLO
17        SHIRA Z. GELFAND

18  PAUL HASTINGS LLP
        Attorneys for Defendant
19  BY:   KENNETH W. GAGE
          SARA B. TOMEZSKO
20

21  Also Present:  Vincent Yang, Paralegal (Outten & Golden)
                   Andrew Velazquez, Google Rep.
                   Jean Gutierrez, Paralegal (Paul Hastings)
22

23

24

25

NABHRow1

1    whether they're consistent with the statements that are made
2    here in court.  And a witness is free to say, no, I didn't say
3    that; no, that's not true.  But we should be able to question
4    and the jury should be able to look at the business record and
5    draw their own conclusions.
6            THE COURT:  Anything else, Mr. Gage?
7            MR. GAGE:  Just a couple of points.  I would like to
8    take a look at the cases that they've cited if we can, your
9    Honor.  I'll do that quickly and maybe during the break.
10           THE COURT:  I'm not going to ⸺ we need to do more
11   thinking and more reading now.  I'm not ruling on this in the
12   next 15 minutes.  I'm sorry.  Who did you say this was going to
13   come up with?  Mr. ⸺
14           MS. GREENE:  Mr. Shaukat.
15           THE COURT:  You said yesterday that you have ⸺
16   there's about two-and-a-half more hours with Ms. Rowe, right?
17   So we're going to have at least one other break.
18           MR. GAGE:  And he's ⸺ I think, your Honor, after
19   lunch is when, because we'll have cross-examination of the
20   plaintiff.
21           THE COURT:  All right.  I'm sorry.  You were going to
22   take a look at the cases, you said?
23           MR. GAGE:  I'd like to take a look at the cases.
24   Again, I want to clarify.  These notes were not vetted by any
25   of the people that they want to cross-examine.

NABHRow1

1          THE COURT:  All right.  Anything else?

2          MR. GAGE:  Just one other issue, your Honor.  I just

3     want to raise that I don't know for sure whether it will become

4     an issue during Ms. Rowe's testimony, but it might, and I say

5     that because of something Mr. Chiarello said during his open

6     statement.

7          One of the exhibits that is in dispute relates to a

8     leveling decision affecting a woman named Jen Bennett in the

9     office of the CTO.

10         THE COURT:  Bennett?

11         MR. GAGE:  Bennett, exactly.

12         OK.  We believe that plaintiff's counsel — because

13    Mr. Chiarello mentioned her in his opening, we believe that

14    they're going to try to force Google to litigate the decision

15    to level Ms. Bennett.  We believe this is inadmissible.  We

16    have an objection to that which need not be resolved, I don't

17    think, until Mr. Grannis testifies, and he won't be here until

18    tomorrow.  But I want to make sure that Ms. Rowe is not

19    permitted to testify about it because she's not a competent

20    witness.  She was not involved in anything to do with the

21    decision to hire Ms. Bennett or the decision to level her.

22         And, your Honor, I am very concerned.  I don't want

23    them presenting evidence through Ms. Rowe about Ms. Bennett,

24    consistent with counsel's opening statement, in effect then

25    forcing us to have to litigate the issue of Jen Bennett's

NABHRow1

1    leveling decision, which we don't think we should have to.

2    But, again, she's not a competent witness to speak to anything

3    about Ms. Bennett, so I don't think she should be permitted to

4    testify about that.

5        THE COURT:  Ms. Greene, is that your plan, to ask

6    Ms. Rowe about Ms. Bennett, or Mr. Chiarello?

7        MS. GREENE:  Your Honor, the issue with Ms. Bennett is

8    that she was a coworker, and just as we're discussing the other

9    coworkers and their levels and what their leveling were and

10   when they learned about each other's levels, there's no

11   difference with respect to Ms. Bennett than there is to

12   Mr. Eryurek or Mr. Penberthy.  She was part of the group of

13   nine that were hired together.  She's the only other woman.

14   And so those —— that testimony as to when she learned

15   Ms. Bennett's level, the circumstances in which she learned

16   Ms. Bennett's level, and what other people knew about

17   Ms. Bennett's level is relevant in the same way that all of

18   those comparators' levels are relevant.  As the only other

19   woman, the —— Google's treatment towards her more generally is

20   relevant, and that will be a part of the testimony of other

21   witnesses.  It is certainly testimony in a bias case, a gender

22   bias case, that an employee can talk about how other people in

23   the immediate group reporting to the same manager were also

24   treated.

25       THE COURT:  Mr. Gage.

NABHRow1

1          MR. GAGE:  Your Honor, whether or when Ms. Rowe

2     learned about Ms. Bennett's level is completely irrelevant to

3     this case.  It has nothing to do with the validity of the

4     leveling decision at all.

5          Second of all, she's not the only other woman in the

6     office of the CTO.  And so, again, what plaintiff's counsel is

7     trying to do is force Google to litigate cases that are not

8     before this jury, and we shouldn't have to.  And the fact that

9     Ms. Rowe happened to learn other people's level, that's

10    irrelevant to the issues before the jury.  She wasn't involved

11    in any of those leveling decisions.  There's nothing wrong with

12    her testifying that, you know, she learned that she was an

13    8 and there were some men that were a 9.  That's the core of

14    this case, but then for her to go on and testify about levels

15    of other people, it's unfairly prejudicial to Google, and it

16    has, we say, no probative value.  But to the extent that it has

17    any probative value, it's outweighed by the prejudice of then

18    forcing Google to have to litigate that decision.

19         THE COURT:  All right.  When were you planning to

20    bring this up with Ms. Rowe?

21         MR. CHIARELLO:  First off, your Honor, she's going to

22    have testimony —— well, let me take a step back.

23         To the extent Mr. Gage is concerned that Ms. Rowe's

24    going to testify about a hiring decision concerning

25    Ms. Bennett, that's not going to be a part of her testimony.

NABHRow1

1    She's going to testify about the group that she was hired with

2    that we talked about in our opening.  Nine individuals, seven

3    men, two women, that is the group that we're looking at for

4    comparison, so she's going to talk about all of those people.

5            THE COURT:  All right.  I think that Ms. Rowe is

6    litigating her own lack of promotion, not anything having to do

7    with Ms. Bennett, and I find that any probative value bringing

8    up Ms. Bennett and testifying about her is substantially

9    outweighed by the risk of confusing the issues.  So that will

10   not be raised with Ms. Rowe.

11           MR. CHIARELLO:  Your Honor, can I then clarify?

12           THE COURT:  Are you going to keep arguing this after I

13   just gave me my ruling?  I don't think you are.

14           MR. CHIARELLO:  I have a question related to other

15   evidence based on that ruling.  I understand your Honor's

16   ruling.  Does that mean other individuals besides Ms. Rowe and

17   the five she's comparing herself to are also not going to be

18   admissible?

19           THE COURT:  What other —— this case has been going on

20   for four years, and you had motion *in limine* practice in front

21   of Judge Schofield where she considered certain other people

22   and the extent to which evidence about them could come in.  Are

23   you now talking about other people?

24           MS. GREENE:  Your Honor, this issue was —— defendant

25   had a chance to bring it up in motions *in limine*.  They did

NABHRow1

1      not.  The question is not a complaint or other leveling

2      decisions.  The question is who is the cohort that was hired

3      with Ms. Rowe and where did they place them on the leveling

4      scale?  They certainly are focusing very much on the 9s, as are

5      we.  They're also trying to inject all of the Level 8s.  To

6      exclude the one woman who was also in that role and leveled as

7      a Level 7 gives unfair weight to defendant's evidence, or

8      purported evidence, in support of their defense without

9      allowing plaintiff the opportunity to rebut that defense by

10     pointing to a leveling decision in the same group.  And, again,

11     it also goes to the issue of transparency and business

12     necessity.

13           THE COURT:  Why can't this be brought up with the

14     people who are responsible for hiring and promotion?  Why does

15     this have to be brought up with Ms. Rowe?

16           MS. GREENE:  It should and will be brought up with the

17     people responsible for the decision, and I think that was what

18     Mr. Chiarello was asking for clarification on.

19           With respect to Ms. Rowe, it's only relevant to when

20     she learned when people were hired, and that goes to the issue

21     of transparency and it also goes to the issue of what she was

22     told at the time she was hired.  She was told that everyone was

23     being brought in at a Level 8.  At some point she learned that

24     that was not the case, and that is part of the fact pattern

25     here.  So when she learned that Ms. Bennett was not a Level 8

NABHRow1

1  and when she learned that Mr. Wilson and Mr. Eryurek were not

2  Level 8s is all relevant to whether Google was transparent and

3  genuine in what it said to her or whether there was the

4  operation of bias or something else taking place at that time.

5        THE COURT:  All right.  Well, this is a little bit

6  complicated to decide in the next seven minutes or so.

7        Go ahead, Mr. Gage.

8        MR. GAGE:  Yeah, I just wanted to say just that, your

9  Honor.  I would prefer that if we get to Ms. Rowe's testimony,

10  your Honor's ruled on that part of this, and we just address

11  this issue with respect to the other witnesses as they come.

12        But I just want to note we did make that argument in

13  our motion *in limine*, and plaintiff's counsel, for the vast

14  majority of this case, has insisted that the only comparators

15  the jurors should hear about are the Level 9s.  So your Honor

16  is right in remembering this motion practice and Judge

17  Schofield's ruling, but you're correct, we can address this

18  later.

19        THE COURT:  This seems to me something I might need

20  writing on, and I don't know how we're going to do that because

21  you're talking about a witness who's already on the stand, and

22  you're looking for resolution right away.  I mean, I just

23  don't —

24        MR. GAGE:  I thought your Honor had already ruled with

25  respect to Ms. Rowe.

NABHRow1

1          THE COURT:  Right, but then we segued from Bennett to

2    other people.  I do think that this can be brought up with the

3    people who were responsible for hiring and promotion and that

4    doesn't seem to be in dispute, correct?

5          MR. GAGE:  Well, it is a dispute as to an exhibit that

6    I think Mr. Grannis would be asked about tomorrow.  But it's a

7    single exhibit, and I think it's something easy enough for us

8    to address either later today during a break or tomorrow

9    morning during a break.

10         THE COURT:  Look, all I can say right now is Ms. Rowe

11   is not going to testify about Ms. Bennett, and as for the rest

12   of it, it will have to await decision till we have time to

13   think about it and read about it.  And she's going to be done

14   this morning.  I don't know what you think we're going to do.

15   I can't —

16         MR. GAGE:  I —

17         THE COURT:  This should have been litigated before,

18   and it sounds like it was in part.

19         MR. GAGE:  All due respect, your Honor, I think it

20   was, and our objections were stated in the final pretrial

21   order.  So the issue has been joined and, again, doesn't

22   pertain to Ms. Rowe.  She'll be on the stand, I think, until

23   right after lunch.  And Mr. Shaukat was not involved in these

24   decisions, so he's not a witness that — I don't expect they'll

25   ask him about it because he wasn't involved.

NABHRow1

1          THE COURT:  All right.  Why don't you tell me,

2     Ms. Greene or Mr. Chiarello, give me again the names of the

3     people or the group that you want discussed.

4          MS. GREENE:  Your Honor, this will come up in the

5     testimony of Mr. Grannis, Mr. Stevens, Mr. Wilson, and I

6     believe Mr. Eryurek.  And with respect to Ms. Rowe, we, your

7     Honor, would be prepared to present an offer of proof with

8     respect to what her testimony would be as to Jen Bennett.

9          I'm sorry, were you asking for the group of nine

10    that ——

11         THE COURT:  Well, it's helpful to know the witnesses,

12    but, yes, I'm trying to get the parameters of the group you

13    want.

14         MS. GREENE:  Sure.

15         THE COURT:  You mentioned Bennett by name, but who are

16    the others?

17         MS. GREENE:  So, your Honor, Mr. Grannis has testified

18    that there was an initial —— my word not his —— cohort of eight

19    to nine individuals who were hired at the beginning when he did

20    not have a clear sense of what differentiated a Level 8 from a

21    Level 9.  That cohort consists of Evren Eryurek, Jonathan

22    Donaldson, Paul Strong, Nick Harteau, Ben Wilson, Scott

23    Penberthy, Brian Steikes, Ulku Rowe, and Jennifer Bennett.

24         THE COURT:  All right.  I think that's all we can do

25    for now.  We'll see everybody back here in ten minutes.

NABHRow1

1          MR. CHIARELLO:  Your Honor, can I ask for a quick

2     clarification of your ruling?

3          THE COURT:  Yes.

4          MR. CHIARELLO:  I understand the ruling with respect

5     to Ms. Rowe's testimony.  Is she permitted to identify the

6     individuals that Ms. Greene just gave you as the people she was

7     hired with without discussing anything further, in other words,

8     saying these are the other eight individuals?

9          THE COURT:  The people she was hired with meaning

10    what?

11         MR. CHIARELLO:  Meaning the other eight individuals

12    that Ms. Greene just identified for the Court.

13         THE COURT:  No, but I mean what do you mean by "hired

14    with"?  They were all hired at the same time or ——

15         MR. CHIARELLO:  Correct, as Ms. Greene —— Mr. Grannis

16    said there was an initial cohort of hires, and those are the

17    nine individuals that Ms. Greene just read off to you.  So she

18    was just placing herself within that and identifying for the

19    jury who the other eight are.  Are we able to do that?

20         THE COURT:  One second.

21         Mr. Gage.

22         MR. GAGE:  Let me clarify.  This is an arbitrarily

23    defined cohort that plaintiff's counsel has arbitrarily

24    defined.  Mr. Grannis will testify that he began hiring people

25    in 2016 and then he hired people continuously through the end

NABHRow1

```
 1  of '16, through '17.  And he did not testify that there was
 2  some arbitrary cohort that they just identified, and so it was
 3  a continuous series of hires.  And so that's a completely
 4  arbitrary distinction that they're making, that there was nine
 5  and not seven and not 12 and not —— there was an arbitrary
 6  cutoff, and Mr. Grannis won't say there was.
 7           THE COURT:  Why can't she say —— she can be asked ——
 8  sorry, I did not write it down —— do you know Mr. Donaldson?
 9  Yes, I do.
10           Do you know —— when was Mr. Donaldson hired?  He was
11  hired in 2017.
12           What about Steikes?
13           MR. GAGE:  I have no problem, your Honor, saying he
14  was hired, she was hired, but she should not be permitted to
15  say anything about Ms. Bennett's leveling.  And she could
16  certainly —— yes, I don't have a problem with her saying these
17  people were hired around the same time as her.
18           THE COURT:  Or she knows the dates.
19           MR. GAGE:  Or if she knows the dates.
20           THE COURT:  She could say the dates.
21           MR. GAGE:  If she knows the dates yes, your Honor.
22  I'd be surprised if she did, but if she does, she can testify
23  as to the dates they were hired.
24           THE COURT:  Ms. Greene.
25           MS. GREENE:  Your Honor, opposing counsel is
```

NABHRow1

1  attempting to litigate this case and be a finder of fact of

2  what's important for the jury to consider and what's not and

3  what the evidence will show and what it won't.  Plaintiff, in

4  order to be able to meet her burden of proof, needs to be able

5  to put on her case for the jury to draw conclusions around was

6  it a group of nine, was it a group of eight, was it much

7  broader, what were the decisions made around the time she was

8  hired, was she leveled appropriately or not as compared to the

9  broader group that was hired around her?  This is all the crux

10  of this case, and Mr. Gage's representations as to what the

11  evidence is is really for the jury to decide.

12      And so, your Honor, I would ask that plaintiff be able

13  to put their case forward in a way that will allow the jury to

14  draw those conclusions.  It's like a puzzle, right?  Any one

15  piece by itself doesn't show the picture.  It's only when you

16  put those pieces together that the picture becomes evident.  We

17  need to have our pieces to be able to put the puzzle together,

18  your Honor.

19      THE COURT:  What more do you want to be able to say

20  besides if she knows these people and when they were hired?

21      MS. GREENE:  So that's with respect to Ms. Rowe.  The

22  only other thing Ms. Rowe would have testified to —— and if I

23  may offer an offer of proof on this —— is that she learned

24  Ms. Bennett was a Level 7 when she asked about whether

25  Ms. Bennett was going to a conference where she would be

NABHRow1

1   attending, if they could have a drink together.  And it was for

2   attendees at Level 8 and above, and Ms. Bennett said, I'm not

3   invited.  I'm not a Level 8, and that was the first time

4   Ms. Rowe had learned in the course of her employment that

5   Ms. Bennett, who worked alongside of her, who worked alongside

6   Mr. Wilson, who worked alongside Mr. Eryurek, was not a

7   Level 8.  That is the testimony that Ms. Rowe would present.

8          As to other witnesses, they will testify generally

9   about when they learned what their levels were, what the other

10  levels were.  This goes to business necessity and the business

11  necessity defense and whether it's job related, and the

12  argument being if witnesses don't even know their own level,

13  how is it a necessary component of the job that they're doing?

14  So this all becomes relevant testimony as to that particular

15  defense, as well as the establishment of bias in terms of how

16  levels were allocated across the group.

17         MR. GAGE:  Again, your Honor, Ms. Rowe is not

18  competent to speak to a leveling decision.  We have no problem

19  with her testifying as to when certain people were hired if

20  counsel wants to have her articulate their argument for this

21  arbitrary group of people, but it's plaintiff's counsel who's

22  trying to, you know, rein in the evidence, because Mr. Grannis

23  did not define an arbitrary cohort of nine people in his

24  deposition.

25         So, again, we have no problem with her saying these

NABHRow1

```
 1    people were hired, I worked with them, but she should not be

 2    allowed to testify about Ms. Bennett's leveling.

 3              THE COURT:  Was this your plan to go right to this at

 4    9:30 this morning, or do we have a little more time?  Because

 5    we need to go back to the case law.

 6              MR. CHIARELLO:  I anticipate we'll get to it fairly

 7    quickly into her testimony this morning.

 8              THE COURT:  I mean, then we're going to have to delay?

 9              MR. CHIARELLO:  Your Honor, give me one second.  Let

10    me see if there's a way to push this out.

11              THE COURT:  OK.

12              MR. CHIARELLO:  Your Honor, as I understand what

13    Mr. Gage just said, if we're able to identify these

14    individuals, I think for this morning that's fine, and the

15    issue of whether or not the brief offer of proof that

16    Ms. Greene gave can be something Ms. Rowe can testify to, that

17    can happen later in her testimony after we break this morning.

18              THE COURT:  All right.  I think that takes care of

19    this for now.

20              Ms. Williams, why don't we not bring the jury in until

21    9:35, just because it's 9:28 right now.

22              THE DEPUTY CLERK:  OK, Judge.

23              THE COURT:  All right.

24              (Recess)

25              THE COURT:  Please be seated.
```

NABHRow1

1          All right.  Ms. Williams, are you going to bring in

2     the jury?

3          THE DEPUTY CLERK:  Yes, Judge.

4          THE COURT:  OK.

5          (Continued on next page)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

NABHRow1                      Rowe – Direct

1   A.   Some.   Some modest, but, you know, it's mostly stayed flat.

2   Q.   Ms. Rowe, when did you officially begin working at Google?

3   A.   I started March of 2017.

4        MR. CHIARELLO:   Mr. Yang, can we put up Plaintiff's 6.

5   Q.   Ms. Rowe, what are we looking at here?

6   A.   This was my social media post on the first day I started at

7   Google.

8   Q.   How did you feel on that day?

9   A.   You can tell from my face, you know, I was happy.   I was

10  excited.   I felt, you know, very optimistic.

11  Q.   Ms. Rowe, were you the only technical director hired at

12  that time?

13  A.   No.   This was a new group that Google was setting up with

14  some very senior people, and I was hired along with eight other

15  people.

16  Q.   At the time you were hired, were you given a level?

17  A.   Yes.   I learned that I was a Level 8.

18  Q.   What are levels at Google?

19  A.   Levels are a way of determining, like, where you are in the

20  corporate hierarchy.

21  Q.   When did you learn what your level was?

22  A.   So it wasn't discussed early on.   It wasn't in the job

23  description.   It didn't come up during the interview process.

24  It wasn't in the offer letter.   I don't remember exactly how I

25  learned, but it might have been through a conversation with the

1    recruiter.

2    Q.   Who was the recruiter?

3    A.   Jennifer Burdis.

4    Q.   And what conversation did you have with Ms. Burdis about

5    your level?

6    A.   So I was coming in as a managing director from JPMorgan and

7    a CTO, you know, kind of coming from the highest level of the

8    corporate hierarchy.  So I asked her if Level 8 was

9    appropriate.  I wasn't familiar, you know, with the leveling at

10   Google at all.  And she said everyone that's hired into this

11   role is coming up as a Level 8.

12   Q.   So was it your understanding that the technical directors

13   in OCTO at that time were all functioning as Level 8?

14   A.   Yes.

15   Q.   Was OCTO at that time just the nine technical directors

16   that were hired at that time?

17   A.   No, there were some other more junior people with, you

18   know, less scope and responsibility, mostly ex-Googlers or

19   enlisting Googlers, but those of us that were coming in were

20   coming in as directors.

21   Q.   Ms. Rowe, can we agree when we talk about technical

22   directors in your testimony as I'm examining you that we're

23   referring to the director-level technical directors and not the

24   more junior folks you just described?

25   A.   Yes.

NABHRow1                          Rowe – Direct

1    Q.  Now, did Google hire other technical directors after that

2    group you were hired with?

3    A.  Yes.  After we came in, there was a pause, and they did

4    hire other batches of —— or cohorts of technical directors.

5    Q.  Who were the technical directors that were hired with and

6    that came in around the same time as you?

7    A.  The first one to come in was Evren Eryurek, and then the

8    last one to come ins with Nick Harteau.  And in between it was

9    Benjamin Wilson, Scott —— Jonathan Donaldson, Paul Strong,

10   Scott Penberthy, Brian Steikes, myself, and Jennifer Bennett.

11   Q.  Ms. Rowe, can you describe generally what your job entailed

12   on a day-to-day basis as a technical director in OCTO.

13   A.  Yes.  It was a new role and a very senior role.  A lot of

14   the work we did was very self-directed, and our work spanned

15   three pillars.  You know, it was about customer work, it was

16   about engineering and product work, and thought leadership.

17   Q.  Was the customer work described sometimes as customer

18   engagement?

19   A.  Yes.

20   Q.  So what was your understanding of what customer engagement

21   meant in OCTO?

22   A.  Customer engagement meant working with Google's cloud

23   customers, or mostly potential customers, to build, you know,

24   trusted relationships with them so that they understood our

25   products and they knew how to use our products, our Google

1    down so many more engagements than I could possibly do.

2    Q.  You used the word "keynote" a number of times.  Can you

3    just define what a keynote is for the jury.

4    A.  A keynote is usually the most important speech of either

5    like a daylong or a multi-day event.  It usually happens really

6    right at the beginning and it's highlighted as the keynote.

7    It's the main attraction.

8    Q.  And did you have an understanding as to how the public

9    speaking you were doing would benefit Google?

10   A.  Yes.  It was all about building market credibility.  You

11   know, as part of our business development exercise, you know,

12   getting the market to know and understand what we had to offer.

13   So it was a very integral part of us addressing the industry.

14   Q.  Ms. Rowe, did Will Grannis ever give you performance

15   reviews?

16   A.  Yes.

17   Q.  And how often would that occur?

18   A.  About twice a year.

19   Q.  And what feedback did Mr. Grannis provide in those reviews?

20   A.  Always stellar.  My reviews were always glowing.  I got

21   "exceeds expectations" on every single one of them.

22   Q.  And "exceeds expectations" is a rating?

23   A.  Yes.

24   Q.  Did he ever give you constructive feedback?

25   A.  Yes.  You know, constructive feedback is part of Google's

1   process.

2   Q.   Did Mr. Grannis ever tell you that you were

3   underperforming?

4   A.   No, never.

5   Q.   Did he ever tell you that you were not meeting the

6   expectations of the role?

7   A.   No.

8   Q.   Ms. Rowe, when did you learn that not everyone you had been

9   hired with was a Level 8?

10   A.   That was in the summer of 2017, my first year there.

11   Q.   What did you learn in the summer of 2017?

12   A.   Ben and Evren, we were having a casual conversation, and

13   they told me they were Level 9s.

14   Q.   When you say Ben and Evren, is that Ben Wilson and Evren

15   Eryurek?

16   A.   Yes, Ben Wilson and Evren Eryurek.

17   Q.   What was your reaction learning that Mr. Wilson and

18   Mr. Eryurek were leveled at Level 9?

19   A.   I was surprised and I was very disappointed.

20   Q.   And have you since come to learn that there were other

21   individuals leveled at Level 9 in that group?

22   A.   Yes.

23   Q.   And who were those individuals?

24   A.   Other than Ben and Evren, Nick Harteau, Jonathan Donaldson,

25   and Paul Strong had also been leveled at 9.

NABVROW2                         Rowe - Direct

1    Q.  Looking at the technical director group that you were hired

2    with, the other individuals that you mentioned, were you able

3    to observe their work?

4    A.  Yes, routinely.  You know, we worked very closely together.

5    Q.  And of those you observed, whose work was most similar to

6    yours?

7    A.  Those of us that focused on industries, you know, because

8    we each had our -- and those were Evren Eryurek, he was

9    focusing on healthcare; Benjamin Wilson, he was focusing on

10   energy; Nick was our start-up person; Jen Bennett was focusing

11   on manufacturing.

12   Q.  And what about the other technical directors in OCTO, did

13   you have an opportunity to observe what they were doing?

14   A.  Yes.  You know, we were doing very similar things.  You

15   know, we all worked across those three pillars that I

16   mentioned:  Customer engagement, engineering, thought

17   leadership.  We collaborated a lot.  We compared notes.  We

18   were in meetings together.  You know, we covered each other's

19   customers.  I got a chance to observe their work a lot, just

20   not as much as the industry people that I worked very closely

21   with.

22   Q.  Ms. Rowe, can you give the jury a sense of how your work

23   compared to that of the industry focused technical directors

24   you mentioned, Mr. Eryurek, Mr. Wilson, Mr. Harteau, and

25   Ms. Bennett?

1    asked him, you know, how would the process be.

2              He said, I need to have two external candidates

3    already vetted before I can introduce you into the process.

4              I asked him how long it's going to take.  He said it

5    might take six months.

6    Q.  Okay.  Now, this VP of financial services role, did you

7    understand this to be the vertical lead role you had discussed

8    with Will Grannis at the time you were hired?

9    A.  Yes.

10   Q.  This conversation in June with Mr. Shaukat, how much time

11   did you spend talking about the vertical lead role?

12   A.  Very little.  Five minutes, ten minutes tops.  The whole

13   conversation was 30 minutes, so --

14   Q.  Okay.  Had you ever spoken to Mr. Shaukat prior to the June

15   conversation?

16   A.  I think I had just one conversation with him before, maybe

17   in like February that year, just a meet-and-greet saying hi,

18   you know, just senior people getting to know each other.

19   Q.  Ms. Rowe, I want to talk a little bit about your time

20   working with Mr. Shaukat.  I think you said a moment ago

21   Mr. Shaukat in June had said he didn't know much about you.  In

22   the time you reported to him, did he ever reach out to you to

23   set up a meeting to get to know you better?

24   A.  No, he did not.

25   Q.  Did he ever ask you about your background?

1    A.  No.

2    Q.  Did he ever ask you about your prior work experience?

3    A.  No.

4    Q.  Did he ever ask you what work you had been doing in OCTO

5    before joining his organization?

6    A.  No.

7    Q.  Did he ever reach out to you to schedule meetings, like

8    one-on-ones?

9    A.  No.  And I tried to schedule meetings with him.  You know,

10   I reached out to him many times directly through my admin,

11   through his admin.  The first time after the June meeting that

12   we had a one-on-one was in September.  And the entire time, you

13   know, the ten months that I reported to him, we had maybe like

14   three one-on-ones together.

15   Q.  And in the time you -- how long were you in Mr. Shaukat's

16   organization?

17   A.  Ten months.

18   Q.  In that time, how much interaction did you have with him?

19   A.  Very little.

20   Q.  Were you able to speak with him in team meetings, group

21   meetings?

22   A.  I had a lot of difficulty getting on a staff meeting.  I

23   couldn't get on it for a long time.  Once I got on it, at least

24   one time I got dropped off the meetings.  And he didn't include

25   me in customer meetings or strategy meetings or any type of

NABVROW2                          Rowe - Direct

1   meetings.

2   Q.  Now, in your observation, is that how Mr. Shaukat

3   interacted with everyone?

4   A.  No, no.  He had a very different relationship with my male

5   peers.  He would talk to them, he would hang out with them.

6         And I was sharing an admin with one of my New York

7   peers, and so I knew that he would come to New York.  And, you

8   know, they would, you know, have meetings together.  And I

9   would -- I didn't even know he was in New York; he wouldn't

10  even say hi to me if I hadn't heard secondhand that he was in

11  town.

12  Q.  The New York peer that you shared an admin with, who is

13  that?

14  A.  That was Stuart Breslow.

15  Q.  And what was Mr. Breslow's role in Mr. Shaukat's

16  organization?

17  A.  Mr. Breslow was a new joiner hired by Tariq to focus on

18  compliance.  And he was doing a small project on anti-money

19  laundering.

20  Q.  Did Mr. Shaukat at least keep you involved by email even if

21  he wasn't meeting with you?

22  A.  No.  I had, again, a lot of difficulty getting on his staff

23  email lists.  And I wasn't being included in the email

24  correspondence either.

25  Q.  Did he ever email you about work business?

1    A.  No.  Maybe once.  No.

2    Q.  How did Mr. Shaukat's treatment of you make you feel?

3    A.  Terrible.  I mean, just terrible.  You join a new team, and

4    your supervisor's completely ignoring you.  It made me feel

5    pretty terrible.

6    Q.  Ms. Rowe, let's go back to the financial services vertical

7    lead role that you had discussed with Mr. Shaukat.

8            How did you first become aware of that role?

9    A.  Mostly word-of-mouth.  People were talking about it.

10   Q.  Do you need a second?

11   A.  Mostly word-of-mouth.  People were just talking about it.

12   People in OCTO, people in the sales teams.  It was a pretty

13   well-known office conversation.

14   Q.  Now, Ms. Rowe, the conversation you had with Mr. Shaukat in

15   June, did you understand that to be a job interview for the

16   vertical lead role?

17   A.  No, definitely not.

18   Q.  Why not?

19   A.  Well, first of all, it was like a five, ten-minute

20   conversation.  It didn't have any of the things that would

21   happen at an interview.  You know, he didn't ask me any

22   questions.  He didn't -- you know, we mostly talked about the

23   fact that he would consider me, not anything beyond that.

24   Q.  Did Mr. Shaukat ever interview for the role?

25   A.  He did not.

1    institutions before I came to Google.  I worked at UBS.  I

2    worked at Bank of America.  I worked at JPMorgan Chase.  You

3    know, these are some of the largest financial institutions in

4    the world, JPMorgan being the number one, Bank of America being

5    number two in the world outside of China.  Having worked at

6    these institutions gave me a very varied understanding of the

7    kinds of things, the businesses in financial services.  It

8    spanned everything from retail banking, corporate investment

9    banking, from exchanges, and I kind of got to observe and live

10   and breathe and work on this very different parts of financial

11   services.  Ms. Piazza worked for Citibank for 30 years.

12   Citibank, while they're on every street corner, we see them,

13   it's predominantly a retail bank.  Their presence in other

14   parts is a lot smaller and their international footprint is

15   also significantly smaller compared to some of the institutions

16   that I've worked in.

17        And you know, when it came to, you know, cloud

18   experience, I had a lot of that.  Ms. Piazza did not.  And

19   having worked at these financial institutions and having worked

20   at Google Cloud with our customers, I had built a very large

21   network of C-suite relationships.

22   Q.  Ms. Rowe, it's 2023, I think, what have you been doing at

23   Google since 2020, since the time you learned you would not

24   receive the sales role?

25   A.  I'm still in OCTO.  I am still focusing on financial

1    services, although over time, you know, my role has diminished,

2    and they started bringing people like Ms. Piazza.  My

3    contributions are now diluted, not — not what they used to be.

4    Q.  Are you still a technical director?

5    A.  I am.

6    Q.  And what have your performance evaluations been since the

7    time that you moved back to OCTO?

8    A.  It's always been "exceeds expectations."  In 2022, Google

9    changed the way they did ratings.  Until then it was always

10   "exceeds expectations."

11   Q.  To what degree are you focusing on financial services?

12   A.  I'm still focusing on financial services.

13   Q.  Do you still report to Will Grannis?

14   A.  No.  I've been layered.  Last year, in 2022, Will decided

15   to introduce regional managers.  I raised my hand for

16   the East Coast regional manager role.  I was passed over, and

17   Patricia Florissi was given that role, and now she sits between

18   me and Will.

19   Q.  And how long had Ms. Florissi been working in OCTO at the

20   time Mr. Grannis made her your manager?

21   A.  She was hired in 2020, so she had been at Google for two

22   years.

23   Q.  In the time that Ms. Florissi become your manager, any

24   notable successes in your work?

25   A.  Yes.  Yes, many.

NABHRow3                    Rowe – Direct

1  Q.  Can you share a few with us.

2  A.  Yes.  Last year, in 2022, I was nominated to the technology

3  advisory group of the CFTC.  The CFTC is the main regulatory

4  body for derivatives trading, so things like futures, options,

5  swaps, including cryptocurrencies.

6         And when AI started taking off, you know, it became ——

7  ChatGPT came along.  Everyone started talking about AI and what

8  a great impact it's going to have on humanity.  I started

9  focusing on the responsible use of AI.  So I've been doing that

10 this year, really focusing on how do you assess the risks of AI

11 and how do you do it in a responsible way.

12        Last year we also signed one of our biggest deals in

13 financial services with Goldman Sachs, multi-hundred million

14 dollars, multiyear deal.  And yeah, many others.

15                 (Continued on next page)

16

17

18

19

20

21

22

23

24

25

NABVROW4                         Rowe - Direct

1          I miss those work relationships.  And my career is

2     completely stalled.  My peers blow past me.  They're getting

3     promoted and I'm here exactly where I was.

4     Q.  There's tissues on your left.

5     A.  Thank you.

6     Q.  How has the pursuit of your claims impacted your view of

7     yourself?

8     A.  You showed me that photo, my social media.  I was so happy

9     and optimistic when I started at Google.  Now I have so much

10    self-doubt, like, I don't know where to go from here anymore.

11    I don't know what the future holds.  It's really hurt my

12    self-confidence.  I'm sorry.  Yeah.

13    Q.  Because I also want to ask you how your experiences at

14    Google has impacted you in your personal life.

15    A.  This thing, it colors everything in my life.  My

16    relationship with my friends and my husband, my family, it's

17    been this cloud that's like hanging over us.

18          It's been four years since I filed the lawsuit.  Since

19    then, my oldest is in college now.  My younger one is in high

20    school.  It's like their best years that I could have spent

21    with them has been in the shadow of this.  I'm not getting

22    those days back.

23    Q.  Let me ask you, Ms. Rowe, is there a reason that you've

24    stayed at Google?

25    A.  Yes.  You know, I never meant to leave Google.  I wanted to

NABVROW4                         Rowe - Direct

1    stay and make it right.  That is why I tried so hard to make it

2    right.  I'm sorry.

3    Q.  Take your time.

4    A.  You know, why should I leave?  Why should it be me that

5    leaves, when it's them that did all this.  Even if I wanted to

6    leave, I used to get calls from recruiters, I don't get calls

7    from recruiters anymore.  I just -- I don't know if I --

8    Q.  Take a breath.

9    A.  Yes.  I'm okay.  I'm okay.

10   Q.  If it's helpful, I'm almost done.

11   A.  Okay.

12   Q.  Ms. Rowe, did you ever discuss your claims with Will

13   Grannis?

14   A.  He brought them up.

15   Q.  And can you tell us about the conversation you had with

16   Mr. Grannis about your claims?

17   A.  This was April, shortly after I moved in OCTO.

18   Q.  I'm sorry, April of what year?

19   A.  Sorry?

20   Q.  I'm sorry.  April of what year?

21   A.  Shortly after I moved back, so that was 2019.  I moved back

22   to OCTO.  And I think it was April.  We were having Google

23   Cloud Next, our biggest customer meeting in San Francisco.  We

24   were all at a bar because, you know, Will put together a team

25   meeting for all the OCTOs that were there for the event.  And

NABVROW4                          Rowe - Cross

1    he approached me and later, kind of late at the event, we

2    approached me and he said, you know, that he'd been approached

3    by Google's counsel about the lawsuit.  He asked me how he

4    could help and whether I wanted to stay at Google.

5              I said, Yes, you know, of course I want to stay at

6    Google.

7              He asked me things like how much time I have and --

8    and then he said to me, he said, You don't know how much

9    respect people have for you.  You don't know, like, how many

10   people look up to you.  Said to me that if it was his own

11   daughters that were going through what I was going through, he

12   would tell them to do exactly what I'm doing.  That's what he

13   told me.

14             MR. CHIARELLO:  No further questions.

15             MS. TOMEZSKO:  Would you like to begin now?

16             THE COURT:  Yes, please.  We'll go now until 12:45, at

17   which point we'll take a lunch break.

18             JUROR:  Excuse me.  Pen.

19             THE DEPUTY CLERK:  A pen?

20             MS. TOMEZSKO:  May I question the witness, your Honor?

21             THE COURT:  You may.

22   CROSS-EXAMINATION

23   BY MS. TOMEZSKO:

24   Q.  Good afternoon, Ms. Rowe.

25   A.  Good afternoon.

1   Q.  Now, I think you just testified that you had spoken with

2   Will Grannis, and I think you said April 2019?

3   A.  Yes.

4   Q.  And that was about your -- he said, as I understand your

5   testimony, that he had been contacted about your lawsuit?

6   A.  Yes.

7   Q.  Against Google?

8   A.  Sorry, it was -- yeah.

9   Q.  You filed a lawsuit in September of 2019; is that right?

10  A.  So sorry.  It was about the -- the lawyers had approached

11  him because I had retained lawyers in January.

12  Q.  And earlier, I believe you said your compensation has

13  remained relatively flat at Google; is that right?

14  A.  I had some increases.

15  Q.  And do you recall the testimony from Mr. Chiarello

16  yesterday that you are earning about approximately $750,000; is

17  that right?

18          MR. CHIARELLO:  Objection.

19          She characterized my testimony.

20  Q.  Was there a reference yesterday to the compensation you

21  were making at Google; correct?

22  A.  Can you ask the question again?  Sorry.

23  Q.  Let me just jump to the point, Ms. Rowe.

24  A.  Yes.

25  Q.  How much did Google pay you last year?

1    correct?

2    A.  I was the final interview, so I did two roles in the

3    search.  I was the —— what I call the gatekeeper interview,

4    which is somebody unknown to Google or unknown to the

5    organization, I was the screener to make sure it was worth ——

6    it was calibrated for the role, and then for the very end

7    finalists, I would have typically interviewed.  Because Ulku is

8    internal and Brian had essentially asked for her to be in

9    consideration, I didn't feel the need for the gatekeeper

10   interview.  We put her straight into the full interview panel

11   that all the other candidates got.

12   Q.  And you never did the end interview either, correct?

13   A.  She was never in the top two of the people we were

14   considering for the role, so no.

15   Q.  You never did anything to learn what qualifications

16   Ms. Rowe had for the VP of financial services role, did you?

17   A.  I did not look at her résumé, if that's what you mean, no.

18   Q.  Well, did you do anything to learn what her experience was

19   beyond that she'd worked at JPMorgan Chase generally?

20   A.  I did not, no.

21   Q.  So you didn't know that she had a B.S. and an M.S. in

22   computer science and engineering, did you?

23   A.  I assumed as much because she got the job in OCTO, but I

24   didn't verify it, no.

25   Q.  And you didn't know that by that point in time, she had

1    almost 25 years of experience in the financial services and

2    technology industry, did you?

3    A.   Again, the role of being a member of the office of the CTO

4    at Google Cloud is a prestigious role, so I assume a certain

5    level of technical experience and gravitas.  We don't hire

6    people with five years of experience into that team.  So I did

7    know that she was experienced in the financial services world.

8    Q.   Was it because the exact number of years of experience

9    really wasn't relevant to how somebody performed their job at

10   that high level?

11   A.   We did not give the most senior jobs to the most tenured

12   people, so no.  At some point you look at the impact that

13   people are having, not at the number of years of experience

14   that they have.

15   Q.   You had no idea how old Ms. Rowe was, correct?

16   A.   I did not, no.

17   Q.   So you didn't know that she's approximately the same age as

18   you, correct?

19   A.   No.

20            MR. GAGE:  Objection to relevance, your Honor.

21            THE COURT:  I'm not seeing the relevance either.  Are

22   you moving on now from that?

23            MS. GREENE:  That's the only question that I asked,

24   your Honor.

25   Q.   You didn't know that Ms. Rowe had worked in both the United

1    States and Europe, correct?

2    A.  I did not, no.

3    Q.  And you didn't know what her experience was managing large

4    teams, did you?

5    A.  I did not.

6    Q.  You didn't know what other financial institutions she had

7    worked for besides JPMorgan Chase, correct?

8    A.  At ⸺ at this moment in time, in 2018, you're asking?

9    Q.  Correct.

10   A.  No, I did not.

11   Q.  In fact, throughout 2018 into 2019, you didn't know either,

12   did you?

13   A.  That's probably true.  At some point I learned, but I think

14   maybe when she was bringing it up towards the end of the

15   process, but I don't ⸺ for most of the 2018, I did not know.

16   Q.  So you didn't have a lot of depth of experience or depth

17   about Ms. Rowe's experience outside of Google, correct?

18   A.  Correct.

19   Q.  You didn't know that she'd been a senior executive at Bank

20   of America, correct?

21   A.  Correct.

22   Q.  Bank of America was one of Google's top ten targets for

23   financial services, correct?

24   A.  Yes.

25   Q.  And you didn't know what her relationships were with the

1              MS. TOMEZSKO:  To the extent he said it.

2              MR. GAGE:  To the extent he said it.  But I'm highly

3      confident that it was not the number of years of experience

4      that she had.  So counsel's argument is shifting here.  That is

5      not ⸺ she can ask him why he didn't think she was right for

6      the role.  I'm going to.

7              MS. GREENE:  Your Honor, I'm just mindful of the

8      clock, and I'd ⸺ rather than have Mr. Gage testify, I'd like

9      to continue to question the witness, and I'll skip over the ⸺

10             THE COURT:  You already have drawn out a lot in this

11     regard, including all the points you're telling me you wanted

12     to make.  We know what his different jobs were and the

13     background.  We know how long he was there.  We know ⸺

14             MS. GREENE:  Right.  That's why I'm suggesting I'm

15     prepared to just move on.

16             THE COURT:  Yes, let's do that.  No more.  Thank you.

17             (Continued on next page)

1              (In open court; jurors present)

2      BY MS. GREENE:

3      Q.  Mr. Shaukat, we discussed that Ms. Rowe was a Level 8 and

4      that you had represented to her that that would not be a

5      barrier to her receiving fair consideration for the VP-level

6      position, is that what your testimony has been?

7      A.  Yes.

8      Q.  And you also did not believe that the number of years of

9      experience that Ms. Rowe had was a barrier to her consideration

10     for the VP-level role either, correct?

11     A.  Correct.

12     Q.  And that's because you understand that at Google leveling

13     decisions are based on the scope of the role and the level max

14     to that, correct?

15     A.  That's at least one of the considerations for it, yes.

16     Q.  And you've explained that when leveling, Google first

17     determines what is the scope of the role and then tries to find

18     somebody who can perform that role, correct?

19     A.  Yes.

20     Q.  So as an example, if a role was scoped as a Level 7 and

21     someone was qualified to perform the role and was hired to do

22     so, they would come in as a Level 7 without respect to the

23     actual number of years they had been working, correct?

24     A.  Correct.

25     Q.  And there are plenty of people that come in —— with many,

1    many years of experience who come in as lower level managers,

2    and there are people with relatively little experience compared

3    to the average person who come in as a higher level, right?

4            MR. GAGE:  Objection, your Honor.  Objection.

5    Relevance to the comparison to the average person.

6            THE COURT:  I'll allow it.

7    A.  Could you repeat the question, please.

8    Q.  Have you said before, in explaining how the leveling system

9    works at Google, that there's plenty of people who come in with

10   many, many years of experience, who come in as managers, and

11   that we get relatively little experience —— and we get people

12   with relatively little experience compared to the average

13   person who would come in at a higher level, and it's much more

14   about what is the role scoped for and do we believe this person

15   could perform that role?

16   A.  That's right.

17   Q.  And that's true whether someone's at a Level 5 or a role is

18   a Level 5 role or a Level 7 role or a Level 9 role or a Level

19   10 role, correct?

20   A.  I believe so.  I wasn't involved with leveling at any of

21   those lower levels, but the only involvement I had was at

22   promotion cycles, and that's how it works for promotion cycles

23   for directors and vice presidents.

24   Q.  With respect to the Level 10 vice president role you were

25   considering the question is someone capable of performing that

1   role at a Level 10, and if they were, they'd come in at a Level

2   10, correct?

3   A.   If the role is scoped at that level and we thought that the

4   person could fulfill the scope at that level, yes.  You'd

5   mentioned Dominik Wee earlier.  We had originally scoped that

6   role that he came into as a Level 10.  We thought that he

7   wasn't quite ready for the full scope of the role, so we

8   de-scoped it and brought him in as a Level 9.  So it was a

9   little more interactive than just we had a role, and we looked

10  for someone to fill it.

11  Q.   Now, Mr. Wilson and Mr. Eryurek also came into your

12  organization at the same time Ms. Rowe did, correct?

13  A.   There were three other people, so the two of them and

14  Mr. Kember as well.

15  Q.   And Mr. Kember was more junior than Ms. Rowe and Mr. Wilson

16  and Mr. Eryurek, correct?

17  A.   The title they gave him was technical director, the same

18  as.  In terms of his level, I believe it was an L5 or an L6 at

19  the time, but he was in the same group, my understanding was,

20  as a peer.  He was always represented to me as a peer to Evren,

21  Ben, and Ulku.

22  Q.   And you understood that Mr. Wilson and Mr. Eryurek had been

23  performing a role similar to Ms. Rowe's when they were all in

24  OCTO, correct?

25  A.   They all — all three of the individuals I mentioned were,

1   yes.  So we moved all four of them in.

2   Q.  And all three —— Mr. Wilson, Mr. Eryurek, and Ms. Rowe ——

3   were being brought into your organization to continue with the

4   same role they had had in OCTO, correct?

5   A.  Yes, although I'm not sure why you're not including

6   Mr. Kember who was the fourth of the people who came over from

7   OCTO.  So all four of them came over to do the same role.

8   Q.  Right.  But Mr. Kember was not a Level 8 or Level 9

9   director, correct?

10  A.  He was not, but he was in the same role and we brought him

11  into the same role.

12  Q.  But not at the same level, correct?

13  A.  Not at the same level, correct.

14  Q.  So we talked about earlier that you knew Ms. Rowe was a

15  Level 8 and you also learned that Mr. Wilson and Mr. Eryurek

16  were Level 9s, correct?

17  A.  At the time in which they —— I didn't know beforehand.  As

18  they were slated to move into my organization, I was briefed on

19  all the people and their levels, yes.

20  Q.  But you couldn't say what the differences were between

21  Ms. Rowe and Mr. Wilson and Mr. Eryurek, could you?

22  A.  No.  And as I mentioned, that is generally true for all of

23  the people in my organization.  I look at the scope of impact

24  they have, not the level that they have.

25  Q.  Now, you mentioned Dominik Wee and Anil Jain earlier.  You

NACVROW1

1  UNITED STATES DISTRICT COURT
   SOUTHERN DISTRICT OF NEW YORK
2  ------------------------------x

3  ULKU ROWE,

4              Plaintiff,

5         v.                        19 Civ. 8655 (JHR)

6  GOOGLE LLC,

7              Defendant.           Trial

8  ------------------------------x
                                    New York, N.Y.
9                                   October 12, 2023
                                    9:10 a.m.
10
   Before:
11
                 HON. JENNIFER H. REARDEN,
12
                                    District Judge
13                                  -and a jury-

14                 APPEARANCES

15 OUTTEN & GOLDEN, LLP
        Attorneys for Plaintiff
16 BY:  CARA E. GREENE
        GREGORY S. CHIARELLO
17      SHIRA Z. GELFAND

18 PAUL HASTINGS LLP
        Attorneys for Defendant
19 BY:  KENNETH W. GAGE
        SARA B. TOMEZSKO
20
   Also Present:  Vincent Yang, Paralegal (Outten & Golden)
21                 Andrew Velazquez, Google Rep.
                   Jean Gutierrez, Paralegal (Paul Hastings)
22

23

24

25

NACVROW1

1     the stand yesterday, and they had the opportunity to ask her

2     about the content of it, just as I did with Mr. Shaukat and

3     asked him about the content of statements to ER.  In fact, they

4     did ask her specifically about that phrase, whether she could

5     think of anything that indicates gender played a role in her

6     hiring process.  And so that's already been asked and answered,

7     and they should not have another opportunity -- I am not

8     opposed to them offering the document in that unredacted form

9     for their own purposes, but I am opposed to them recalling

10    Ms. Rowe to the stand to examine her on something they had the

11    opportunity to ask her about in their cross-examination.

12           MR. GAGE:  We're not going to ask for that.

13           THE COURT:  Okay.  I have to make a decision on 57,

14    and you --

15           MR. GAGE:  Your Honor, if I may.

16           THE COURT:  Yes.

17           MR. GAGE:  Since you're letting 108 in, we will

18    withdraw our objection to 57.

19           THE COURT:  All right.

20           MR. GAGE:  In light of your Honor's ruling on 108.

21           THE COURT:  All right.  Well, that simplifies it.

22           So then both come in.

23           Now, where are we on the testimony though?  You're not

24    asking to recall her.

25           MR. GAGE:  No.

NACVROW1

1              THE COURT:  Okay.

2              MR. GAGE:  No.

3              THE COURT:  All right.

4              MR. GAGE:  We asked all the questions we cared to ask.

5              THE COURT:  Okay.  So these two documents, now we have

6      resolution.

7              Let me go to the proposed offer of proof regarding

8      Bennett.  I have some questions about that.

9              First of all, setting aside for the moment competency

10     and relevance, which I have questions about as well, don't we

11     have a hearsay problem here, Ms. Greene, with what Ms. Bennett

12     told Ms. Rowe?

13             MS. GREENE:  I'm sorry, your Honor, I'm just going to

14     that section of the letter.

15             THE COURT:  All right.  It's on page 7 of 9, in fact.

16             MS. GREENE:  It is not hearsay because it's relevant

17     to Ms. Rowe's understanding about the relative levels of her

18     peers and the effect on the listener, not as to the truth of

19     the matter asserted.

20             THE COURT:  Why is her understanding relevant to her

21     claims?

22             MS. GREENE:  Your Honor, her understanding as to the

23     relative leveling and qualifications of her peers is what gives

24     rise to these claims.

25             THE COURT:  So you're not -- let me see if you said

NACVROW1

1    this.  It sounds like what you just said is that you're not

2    offering it for the truth; is that correct?

3          MS. GREENE:  Correct.  So we're offering it for the

4    circumstances in which she learned, but, more importantly, the

5    impact on the listener.  Ms. Rowe was surprised to learn of

6    that fact.

7          THE COURT:  Why are the circumstances in which she

8    learned important or relevant?

9          MS. GREENE:  It's just the context for what she

10    learned that caused that impact.  So the fact that she learned

11    there was a Google women's leadership summit in California for

12    all eight women at Google, the fact that she assumed

13    Ms. Bennett would be in attendance and that they would have a

14    meet-up, the only portion of that that's hearsay is what

15    Ms. Bennett said, that she told Ms. Rowe that she was an L7

16    and, therefore, was not invited to the event.  That's the only

17    portion of that that could arguably be considered hearsay.  And

18    for that portion, it's being offered for the effect on the

19    listener that Ms. Rowe was surprised and the knowledge that

20    Ms. Rowe believed for purposes of assessing her legal claims.

21          THE COURT:  Hang on, Mr. Gage.

22          So evidence of discrimination against other employees

23    is -- may be relevant to proving discrimination if that's

24    established.  But you didn't list Bennett as a witness.  And

25    you seem to want the jury to draw an inference of

NACVROW1

1    discrimination from this.  But Ms. Rowe does not have personal

2    knowledge that Bennett's leveling resulted from discrimination.

3              We are going to have an HR person on the stand, right?

4              MS. GREENE:  At least one, yes.

5              MR. GAGE:  A couple of them, your Honor.

6              THE COURT:  I mean, the HR person may have personal

7    knowledge of Bennett's leveling.

8              MS. GREENE:  Your Honor, we do have the hiring

9    manager, who -- Mr. Grannis, who also can testify as to the

10   circumstances of Ms. Bennett's leveling.  This goes to support

11   Ms. Rowe's conclusion that gender was what was driving the

12   decision-making process.

13             THE COURT:  But we have no information of what drove

14   the leveling decision on Ms. Bennett.

15             MS. GREENE:  Because that evidence has not yet come

16   in.

17             THE COURT:  All right.  So this is -- when is

18   Mr. Grannis taking the stand?

19             MS. GREENE:  I believe he's scheduled to take the

20   stand later this afternoon.

21             THE COURT:  All right.  We'll make a decision on this

22   before he takes the stand.

23             MS. GREENE:  Okay.

24             THE COURT:  Did you want to say anything else?

25             MR. GAGE:  If I could just respond briefly just for

NACVROW1

1      the record, your Honor.

2                  THE COURT:  Yes.

3                  MR. GAGE:  First, there is no relevance exception to

4      the hearsay rule.  And there's clearly hearsay --

5                  THE COURT:  But she's not offering it for the truth,

6      she says.

7                  MR. GAGE:  Well, I frankly disagree.  But let's accept

8      for the sake of argument that she's not.  It is unduly and

9      unfairly prejudicial to Google.  And the relevance is minimal,

10     if any, here, because it is going to essentially cause Google

11     to have to go down the rabbit hole of defending the leveling

12     decision for someone who's not a plaintiff in this case.  This

13     is a single-plaintiff case, not a class case, and, you know, it

14     has no bearing on whether Ms. Rowe was improperly leveled.  And

15     so it shouldn't come in.

16                 THE COURT:  So you dispute that evidence of

17     discrimination against other employees would be relevant?

18                 MR. GAGE:  I absolutely dispute that this evidence

19     they're proffering is relevant.  I don't think this is evidence

20     of discrimination against another person, and I think the case

21     law is clear that in some circumstances it may be relevant.

22     But this isn't proof of discrimination against another person.

23     This is -- this proffer here -- first of all, it contains

24     hearsay.  So, you know, I don't think, you know, this proffer

25     suggests or shows there's discrimination.  The fact that

NACVROW1

1    someone was a 7 and not an 8, or a 6 and not a 7, does not

2    prove discrimination.

3              THE COURT:  Yes.  But are you objecting also to any

4    testimony that might come in?  So you're also objecting to

5    questions to Mr. Grannis about Ms. Bennett.

6              MR. GAGE:  Absolutely.

7              THE COURT:  Okay.  Well, all right.  We're going to

8    have to -- I'll get back to you on that.

9              MS. GREENE:  May I quickly make a revision to the

10   offer of proof?

11             THE COURT:  Yes.

12             MS. GREENE:  I think it's very possible for us to

13   remove Ms. Bennett's statement and preserve the purpose of the

14   statement, which was Ms. Rowe's knowledge and the effect that

15   it had on her, without including Ms. Bennett's out-of-court

16   statement, if that would resolve the issue.

17             With respect to this particular piece, I would just

18   note Ms. Bennett's name is going to come up on documents and

19   testimony throughout this case.  And it's going to support a

20   pattern that allows an inference of discrimination to be drawn

21   in Ms. Rowe's favor.  And so this is just one piece again of

22   the broader puzzle in the broader picture that supports what

23   Ms. Rowe alleges with respect to gender bias.

24             THE COURT:  You want to say Ms. Rowe knows

25   Ms. Bennett's level was a 7.  And then the jury is what, they

NACVROW1

1    are going to -- you think that that's appropriate for them to

2    draw an inference that that was based on discrimination?

3            MS. GREENE:  Your Honor, Ms. Rowe learned that she was

4    a 7.  That informed her decision about whether bias was

5    operating.  When the jury is able to see the documents

6    surrounding Ms. Bennett's leveling decision, the players

7    involved, who were the same decision-makers with respect to

8    Ms. Rowe, what Ms. Burdis, the recruiter, said about it, what

9    Mr. Wilson, Mr. Eryurek said about Ms. Bennett, it's going to

10   tell a very similar story to what Ms. Bennett -- I mean

11   Ms. Rowe alleges was the discrimination that she encountered.

12           THE COURT:  Just a second.

13           So it sounds like Bennett is coming up all over the

14   place.  Are we going to -- no?

15           MR. GAGE:  I disagree.  It all hinges on your Honor's

16   ruling, frankly.  I don't believe the plaintiff has alleged

17   this is a pattern or practice case.  And it's clear that, you

18   know, plaintiff wants to get Bennett's name in here at every

19   possible opportunity, in part because Mr. Chiarello went out on

20   a limb in his opening statement and mentioned her name.

21           And how another person was leveled, particularly

22   Ms. Bennett, is not at all relevant.  Frankly, plaintiff has

23   all along insisted the only people who the jury should hear

24   about are the five L9s.

25           THE COURT:  All right.  Well, I also am not convinced

NACVROW1

1    that the plaintiff -- that I can accept the plaintiff's own

2    testimony regarding other employees alleged discrimination as

3    competent evidence.  So I have to still think about that.

4           But it would be helpful to know how many -- which

5    witnesses -- this is going to bear on my ruling and whether we

6    have -- if you could point out to me if there are other

7    exhibits where there's an objection having to do with

8    Ms. Bennett, that would be helpful.  You don't have to do it

9    immediately, I just need --

10          MS. GREENE:  Yes, your Honor.

11          THE COURT:  Thank you.

12          Turning to the joint limiting instruction, Mr. Gage

13   and Ms. Tomezsko, I wasn't sure -- oh, I'm sorry, you offered

14   your own.

15          MR. GAGE:  Yes.

16          THE COURT:  Okay.  Can anyone hand me the page where

17   you offered your --

18          MR. GAGE:  I guess 29.

19          THE COURT:  Okay.  While we do that, I'm going to ask

20   you about the severance agreement, Mr. Shaukat's separation

21   agreement.

22          Okay.  So Ms. Greene, that agreement is dated July

23   2020, right?  That's three years ago.  So what does that have

24   to do with what he's saying now?

25          MS. GREENE:  So that was in July 2020, shortly after

NACVROW1

1    Ms. Rowe filed her lawsuit.  And Google was on notice of her

2    lawsuit and Mr. Shaukat's involvement in that.  There was a

3    unilateral offer to pay him $2.75 million as he left for

4    another job.  And the agreement included a favorable

5    cooperation provision related to litigation that applied to

6    this lawsuit.  And so it absolutely goes to the motivation and

7    bias of a witness.  In other circumstances, maybe not; but in

8    these unique circumstances where it was entered after the

9    initiation of litigation, where the consideration was

10   unilaterally offered and where it was done in exchange for a

11   cooperation provision related to this litigation --

12         THE COURT:  Where is that?  I'm looking at the

13   agreement.

14         MS. GREENE:  Your Honor, let me pull up the agreement

15   itself.

16         MS. TOMEZSKO:  Your Honor, may I hand up the hard

17   copy?

18         THE COURT:  Yes, please.

19         MS. GREENE:  The paragraph, the relevant paragraph, is

20   No. 5 in Exhibit 148.  And importantly, it requires the

21   cooperation with Google and explicitly excludes Mr. Shaukat

22   from talking to anyone but Google, unless legally compelled to

23   do so.  So it's a lockup, in addition to a cooperation

24   provision.  They're paying him, in addition to the

25   consideration of 2.775 million for this agreement, they are

1   the law to the jury when he said the law doesn't require equal

2   pay, it only requires equal opportunity.  That's not the case.

3   The law requires equal opportunity —— I'm sorry, equal pay when

4   it's established that two people in two different categories

5   that are protected by the law are being paid differently for

6   substantially similar work.  How Ms. Rowe is performing as

7   compared to Level 9s or Level 8s in 2023 is not relevant to

8   whether Ms. Rowe is still performing the same job that she was

9   performing back in 2017, in 2018 when the pay disparity

10  manifested.

11          THE COURT:  All right.  At this point Ms. Florissi, if

12  she comes, would not be coming tomorrow, right?

13          MS. GREENE:  That's correct.

14          MR. GAGE:  I assume plaintiff's case will still be

15  continuing, your Honor.

16          But just to make the record clear, Ms. Florissi is not

17  —— we do not intend to call her to testify about Ms. Rowe's

18  compensation.  We are calling her to testify about what

19  Ms. Rowe has been doing during the time that Ms. Florissi has

20  supervised her.  It will be a continuation of testimony that

21  plaintiff's counsel has not disputed that Mr. Grannis is going

22  to give about the things that Ms. Rowe has been doing.  And

23  we've heard her testify about what she's been doing, and he's

24  also going to testify about things she hasn't been doing.  And

25  Ms. Florissi is just going to pick up as of that point when she

1    took over, which is a continuing period for which the plaintiff

2    is seeking damages.

3            Second, the defense under the fair pay law absolutely

4    contemplates this.  It absolutely contemplates this.  And this

5    testimony from Ms. Florissi and Mr. Grannis will absolutely

6    demonstrate the bona fide non-gender-related reasons that we

7    will be able to argue to the jury are absolutely consistent

8    with business necessity given what the Office of the Chief

9    Technology Officer at Google Cloud does.  And Ms. Rowe has not

10   been doing part of her job for a long time, and counsel just

11   doesn't want the jury to hear that.

12           THE COURT:  All right.  I'm going to move on now to

13   the Bennett issue.

14           So a court in evaluating a plaintiff's case of

15   discrimination may consider evidence of discrimination faced by

16   other employees at the company.  But that evidence of other

17   employees' discrimination typically, if not always, comes in

18   through those other employees' testimony; through the testimony

19   of relevant personnel, such as HR and those directly

20   responsible for hiring, promotion, and other such decisions;

21   and other individuals who are specially situated to speak to

22   those other employees' circumstances.

23           Do you have any authority in which the court allowed

24   the plaintiff's own testimony to come in regarding those other

25   employees' discrimination in order to support the

NACHRow4

1 plaintiff's discrimination claim?

2          MS. GREENE:  Your Honor, I've not looked into that for

3 the reason that what we've offered is not with respect to

4 discrimination Ms. Bennett has experience.  Ultimately, I think

5 the jury will be able to draw that inference.  Her limited

6 testimony is about when she found out Ms. Bennett was a Level 7

7 and the circumstances surrounding that.  Other witnesses, I

8 think you noted those responsible for hiring, promotion, and

9 other such decisions, are going to be asked about Ms. Bennett

10 and will be able to give testimony around Ms. Bennett's

11 treatment.  Other observers, other witnesses to Ms. Bennett's

12 testimony will be able to give treatment.  We're not asking for

13 Ms. Rowe to be able to testify that Jenn Bennett was

14 discriminated against.

15          THE COURT:  So why —— I know, Mr. Gage, just a moment.

16 We have to resolve the extent to which other witnesses are

17 going to be questioned about Bennett, but to the extent other

18 witnesses are questioned about her, why do you need that from

19 Ms. Rowe?

20          MS. GREENE:  Because it goes, your Honor, to

21 Ms. Rowe's understanding about what the leveling picture looked

22 like in OCTO.  There were five men at Level 9.  There were two

23 women in that group.  One was an 8, one was a 7.  It was

24 relevant to the assessment of, hmm, maybe gender has something

25 to do with this, and that's important testimony.  We've not

NACHRow4

1   been able to touch that testimony yet because of awaiting, you

2   know, the Court's decision on Jenn Bennett.

3           But it motivated Ms. Rowe in terms of her belief that

4   gender was a part of this, and that's — and what the

5   composition was of the group.  It's as straightforward as that.

6   And, again, we don't need to state specifically what

7   Ms. Bennett said to Ms. Rowe.  You know, that's the hearsay

8   concern that there was.  We're happy to take that out.  But,

9   again, in the context of an offer of proof, it's our offer of

10  proof as to what the circumstances would be and what

11  Ms. Bennett said and what Ms. Rowe understood as of that time.

12          THE COURT:  All right.  Mr. Gage.

13          MR. GAGE:  And I must confess, your Honor, I don't

14  remember specifically — we're looking at the transcript right

15  now — but I don't recall counsel ever making this proffer

16  before Ms. Rowe got off the stand.  Ms. Rowe is off the stand.

17  And so as trials work, if she puts on a rebuttal case, she can

18  only respond to evidence that Google presents in its case.  So

19  that's one issue.

20          Second issue is because Ms. Rowe's now off the stand,

21  we're really only talking about whether or not counsel can ask

22  other witnesses that she's calling about Jenn Bennett's

23  circumstances, and they clearly cannot offer any testimony

24  about what was in Ms. Rowe's head at any point in time, to the

25  extent that that's even relevant.

NACHRow4

1          THE COURT:  I don't think that's what Ms. Greene is

2     intending or hoping to do with the other witnesses, but go

3     ahead.

4          MR. GAGE:  But that's what I'm unsure of, your Honor.

5     Since Ms. Rowe is already off the stand and can't talk about

6     the effect that that email had on her, the listener, so now

7     we're talking about some other purpose.  And so counsel says

8     she's not offering it for the truth of the matter, and so now

9     I'm completely confused about what counsel is intending to do

10    with this exhibit that relates to Jenn Bennett with any of the

11    other witnesses that are called.

12         THE COURT:  All right.  Ms. Greene, why don't you tell

13    us.

14         MS. GREENE:  I'm not sure what the reference was to

15    the exhibit you were talking about, Mr. Gage.

16         MR. GAGE:  Reference to what?

17         MS. GREENE:  The exhibit that you're referencing.

18         MR. GAGE:  I thought we were talking about a document

19    that relates to a conversation that Ms. Rowe had with

20    Ms. Bennett and learning about ——

21         THE COURT:  We're talking about the offer of proof.

22         MS. GREENE:  Correct.

23         THE COURT:  Which you referenced.

24         MS. GREENE:  We have not waived because we brought the

25    issue up, and you were reserving judgment.

SOUTHERN DISTRICT REPORTERS

NACHRow4

1          MR. GAGE:  I guess, your Honor, I'm unclear what we're

2    talking about, then.

3          MS. GREENE:  We presented the offer of proof at the

4    appropriate time, and the Court was reserving judgment on that

5    issue, and so that's where we are at this moment in time.

6    We're not seeking to show Ms. Rowe any document and bring her

7    up.  We've offered an offer of proof in response to your

8    Honor's judgment on that issue.

9          THE COURT:  Was this raised for the first time

10   yesterday morning, yesterday morning before we brought the jury

11   in?

12         MS. GREENE:  Your Honor, the days have run together.

13   I would have to look back at the transcript.

14         THE COURT:  So you're representing that she was still

15   on the stand when this came up?

16         MS. GREENE:  Yes, your Honor.

17         MR. GAGE:  OK.  My apologies for that, your Honor.

18         THE COURT:  That's OK.

19         MS. GREENE:  That's why we offered an offer of proof,

20   because she was not permitted to testify as to that issue.

21         MR. GAGE:  I'm just unclear on what it is specifically

22   counsel wants to introduce into evidence.  Is it something

23   about Jenn Bennett's leveling, the underlying decision, or is

24   it something different?  I'm unclear on that.

25         MS. GREENE:  We've made an offer of proof.

NACHRow4

1          MR. GAGE:  I apologize.  I don't have it in front of

2     me.  Can you just tell me what it is.

3          THE COURT:  You know what, actually, you were going to

4     modify it anyway, Ms. Greene.

5          MS. GREENE:  Right.

6          THE COURT:  So why don't you do that so we can all see

7     where this currently stands.

8          And then I think the other issue is that Ms. Greene is

9     hoping to ask other witnesses about Jenn Bennett, correct?

10          MS. GREENE:  Yes, your Honor.

11          MR. GAGE:  So I assume, but I just don't ——

12          THE COURT:  But I don't think —— all right.  Rather

13     than speculate, I'm going to ask Ms. Greene to tell us what she

14     intends to question these other witnesses on relating to

15     Ms. Bennett.

16          MS. GREENE:  Your Honor, Ms. Bennett's leveling

17     packet, which relates to the testimony of Will Grannis and

18     Brian Stevens, who is a defense witness, who were the two

19     people involved in that leveling decision, there are things

20     said in that document and about her hiring that are indicia of

21     bias, bias by the decision-makers.  That is relevant and

22     probative to Ms. Rowe's establishing bias.

23          There are —— there's testimony from other witnesses

24     about their understanding and belief that Ms. Bennett was at

25     least a Level 8, if not higher.  And, again, it wasn't

1    transparent.  Nobody knew their roles.  But they believed her

2    to be performing that role.

3            There's reference in the investigative notes about

4    Ms. Bennett and the leveling decision relating to Ms. Bennett.

5    It's all over.  The fact that defense hasn't picked up on it in

6    the documents and the testimony of these witnesses, it's still

7    there, and it is —— it is powerful evidence that there was a

8    double standard that decision-makers applied with respect to

9    men and women.

10           MR. GAGE:  Your Honor, I am familiar with the

11   exhibits.  I know and it has always been an issue in the case,

12   which is why we're arguing it right now.

13           Clearly, Ms. Greene wants to litigate Google's

14   decision to level Jenn Bennett.  It's a different decision, and

15   there's nothing about that document that suggests bias.

16   Ms. Bennett was a manager-level employee at GE at the time she

17   came in, and they made a thoughtful decision about how to level

18   her.  And counsel is just trying to distract from the central

19   issues in this case, which are the leveling decisions of

20   Ms. Rowe.  And it is not relevant, and to the extent that it

21   has any relevance, it's unduly prejudicial and confusing for

22   the jury to put Google in a position of now having to go down a

23   rabbit hole of explaining yet another leveling decision and

24   taking more time in the course of this trial.  She was leveled

25   for perfectly legitimate nondiscriminatory reasons.

NACHRow4

1    THE COURT:  All right.  Ms. Greene, can we get that

2    list of all witnesses where this issue is arising and any

3    documents relating to Ms. Bennett.  I'm sure it's all in the

4    joint pretrial order, but if you could highlight for me any

5    documents that are in dispute where Ms. Bennett is raised.

6         Mr. Gage, are you saying that discrimination against

7    other employees, alleged discrimination, cannot be considered

8    as part of this case?

9         MR. GAGE:  There is no alleged discrimination ⸺

10        THE COURT:  Well, she's trying to ask about ⸺

11   Ms. Greene is trying to ask about the leveling decision on

12   Ms. Bennett because she suspects that ⸺ or she's trying to

13   show that discrimination was involved in setting her at a

14   Level 7.

15        MR. GAGE:  I don't think ⸺ I don't think it's

16   relevant, your Honor, and I think there's plenty of case law.

17   As I said earlier, there is case law that stands for the

18   general proposition that "me too" type of evidence may be

19   admissible.  It may be admissible.  But there isn't a

20   sufficient connection here.  There's never any suggestion by

21   anyone, except Ms. Rowe's counsel, that there was something

22   wrong with Ms. Bennett's leveling, not to mention, your Honor,

23   the plaintiff in this case has consistently taken the position

24   that the only comparators the jury should hear about are the

25   five Level 9s.

NACHRow4

```
 1          Plaintiff's counsel has consistently opposed Google's
 2    efforts to show people who were similarly situated to her, the
 3    Level 8s.  Counsel is, even I suspect, going to suggest there
 4    should be a limiting instruction about that, that, oh, you
 5    can't consider it for —— because counsel thinks it should all
 6    be about the 9s, and then they want to say, selectively, we
 7    want to also do this too.  It goes down another rabbit hole and
 8    unnecessarily continues the case on something that's not
 9    probative of the reasons why Ms. Rowe was Level 8.
10          THE COURT:  So, wait, there was no motion practice on
11    this, no motion in limine?
12          MS. GREENE:  There was not.  Your Honor, I want to
13    just point you to one exhibit ——
14          THE COURT:  Yes.
15          MS. GREENE:  —— that I think is just an example of the
16    probative value of this testimony.  This is Plaintiff's
17    Exhibit 17, and it's from Will Grannis to Melissa Lawrence, the
18    HR head.  Mr. Grannis, of course, being the hiring manager, he
19    says ——
20          THE COURT:  Wait just a moment.  I'm going to try to
21    read it with you.  17?
22          MS. GREENE:  Yes.
23          MS. TOMEZSKO:  May I approach, your Honor?
24          THE COURT:  Thank you.  You know what, I've now taken
25    so much of your stuff, Ms. Tomezsko, that I'm OK.  I'm just
```

1    going to look at it in a binder.

2              MS. TOMEZSKO:  We have lots of copies.  I don't mind.

3              THE COURT:  It's OK.  I've got it.

4              MS. GREENE:  We could also put it on the screen, your

5    Honor.

6              THE COURT:  You can do that.  Thank you.

7              MS. TOMEZSKO:  Trying to be helpful.

8              THE COURT:  Appreciate it.  I have your ── this motion

9    *in limine* decision to give back to you ──

10             MS. TOMEZSKO:  Thank you.

11             THE COURT:  ── when we actually break for lunch.

12             MS. GREENE:  As you can see, this is an email from

13   Will Grannis to Melissa Lawrence and he says:  "I agree.  I

14   also know that every woman who came to Google/OCTO (Jen" ──

15   being Jenn Bennett ── "Ulku) has told me that they feel like

16   they didn't fight hard enough for themselves.  So I'm torn."

17             Then he goes back and says:  "This is also the

18   number one area where women ask for my advice/mentoring,

19   respectfully fighting for what they think is fair comp."

20             This is the hiring manager grouping Ms. Rowe and Jenn

21   Bennett together about their feelings like they didn't fight

22   hard enough for themselves when they came in the door.  This is

23   just one document among many that is relevant and shows that

24   there was a difference with respect to the women that

25   Mr. Grannis was acknowledging, sentiments that Mr. Grannis was

NACHRow4

1    acknowledging.

2            There are other documents that really speak and show

3    to the circumstances around Ms. Bennett's de-leveling.  She was

4    actually interviewed for an 8/9 position, and they brought her

5    in as a Level 7.  There's lots of documents about it.  We'd

6    like to be able to test it, question the hiring managers about

7    it, because it was a significant change, and it's outside of

8    Google's practices to de-level someone like that.  It's

9    mentioned in the ER notes as an example.

10           This is —— again, this is probative testimony as to

11   whether Google was applying a double standard to the people it

12   was interviewing and hiring for that director-level role.

13           MR. GAGE:  Your Honor, a few responses.

14           THE COURT:  So this exhibit is one of the ones in

15   dispute because of the references to Bennett, is that right?

16           MR. GAGE:  Yes.

17           THE COURT:  OK.

18           MR. GAGE:  For a number of reasons here, but I'll

19   touch on a big one here.  First of all, this is hearsay.  This

20   is hearsay.  This is Mr. Grannis writing about what other

21   people have told him.  And second of all, there is absolutely

22   nothing in this document that suggests that Google ever did

23   anything wrong.  He's speaking to what someone else told him

24   that they thought about their own actions.  That's what this is

25   saying.

1          And Mr. Grannis, you'll see him testify.  He is an

2    incredibly supportive manager/mentor and he coaches people, so

3    on, so forth.  This does not speak to any suggestion of

4    discrimination, and it's plainly hearsay.  The jury shouldn't

5    hear that other women thought they should have fought harder

6    for compensation.  That's totally irrelevant and highly

7    prejudicial to Google's position here.

8          And second, your Honor, I want to go back to my point

9    about opposing counsel's continuing objections.  Judge

10   Schofield ruled that we can introduce evidence about the

11   credentials of Ms. Rowe's Level 8 peers, yet counsel persists

12   in their objections.  And I'm assuming I'm going to have to go

13   for a sidebar every time I want to ask a witness about the

14   credentials of Level 8s who were hired around the same time as

15   Ms. Rowe.  Yet they want to go down this rabbit hole which will

16   invite us to then also present testimony from our witnesses

17   about men whom Google considered for an 8 and then decided to

18   make a 7 or whom Google decided —— considered they should be a

19   7 and made them a 6 because Google wanted to set reasonable and

20   fair expectations for these folks based upon what Google

21   expected they could do.

22         And so "de-leveling" is counsel's term.  There was no

23   de-leveling here.  And this is a complete sideshow that would

24   simply allow plaintiff's counsel to just say, well, there's a

25   woman over there, there's a woman over there, and they're

NACHRow4

1    different, and that's not what this case is about.  It has

2    nothing to do with the leveling decision about Ms. Rowe which

3    focused on her qualifications relative to others who were hired

4    around the same time.

5            (Continued on next page)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

NACVROW5

1          THE COURT:  Okay.  So, Ms. Greene, you referred to

2    Ms. Bennett and Ms. Rowe as similarly situated.  How is that

3    defined in the case law?  How do courts evaluate that?  Does it

4    have to do with role, seniority, compensation, something else?

5          MS. GREENE:  With respect to the evidence of other

6    women supporting an inference of bias, it really looks to the

7    decision-maker, right.  Are these other women in the same group

8    who are subject to the same decision-makers?

9          Mr. Gage confuses two issues.  One is with respect to

10   who Ms. Rowe is comparing herself to for purposes of the equal

11   pay law.  This is discrimination, this is evidence of

12   discrimination to support an inference of bias for her

13   discrimination claim.  I think that Ms. Burdis, in the ER

14   notes, where she is asked about gender's role in leveling

15   points to Jen Bennett and says another female in that group --

16         THE COURT:  I'm sorry, which document is this?

17         MS. GREENE:  This is 57.  It's one of the documents we

18   looked at earlier today.  And we can put that up, as well.

19         And if we can go to the second page, and if we can

20   look to -- I'm sorry, the third page.  And if we can look to

21   the second bullet from the bottom, it says:  Another female in

22   that group was Jen Bennett and also got down-leveled — I'm

23   sorry, it wasn't de-leveled, it was down-leveled — because she

24   just didn't have the level of experience the others has and it

25   was very obvious.

1          Well, you can look at the gHire packet and see what

2     her levels of experience were.  You can read about the decision

3     to down-level her.  You can hear and will hear from other

4     witnesses testifying about the role that she was playing, what

5     they thought her level was given the impact that she was having

6     and the qualifications she brought to the role.  She was

7     down-leveled.

8          Ms. Rowe similarly came in with equal or better

9     qualifications, similar experience, was performing in the role

10    at the same level, and was down-leveled to an 8, as compared to

11    the men who were brought in as 9s.  It's the same fact pattern,

12    and it supports an inference of bias because of who's involved.

13         Who gets the benefit?  The men.  Who gets the higher

14    standard?  The women.

15         And in a group, a small group — and this hiring cohort

16    was 9 — the only two women were the ones that got that

17    treatment.  That is probative.  That is highly probative of the

18    existence of bias.

19         THE COURT:  Mr. Gage, what is your take on similarly

20    situated?

21         MR. GAGE:  Well, I don't think Ms. Bennett is

22    similarly situated, inasmuch as her years of experience, the

23    nature of her experience, the level of her experience is

24    different, less than, Ms. Rowe's, as well as significantly less

25    than others.

NACVROW5

1          I also want to point out, your Honor, that there is no

2    cohort.  At the time Mr. Eryurek, one of the first external

3    hire as an L9, was hired in OCTO, I believe they already about

4    20 people on the team.  So there is no cohort.

5          A cohort is the group of people around which

6    plaintiff's counsel wants to draw a circle for purposes of

7    presenting what they believe is the most convincing case to the

8    jury.  And so I don't think we should have to go down the

9    rabbit hole, because we will then have to talk about other men

10   beyond the men that plaintiff's counsel wants to talk about,

11   beyond the Level 8 men that we already are expecting to talk

12   about, to show that men who were similar to Ms. Bennett were

13   similarly hired as 7s; men who had -- who had similar

14   experience were even brought in at lower grades for other

15   reasons.

16         And so we're going to go down this rabbit hole where

17   the jury is going to be evaluating leveling decisions about a

18   few dozen people, when the only leveling decision that they are

19   supposed to be evaluating — and your Honor, I presume -- I

20   shouldn't presume, but I hope and expect that in the jury

21   charge to the jury, you're going to tell them their job is not

22   to second-guess the business judgment of Google, and the case

23   law is well-established for that.  The only leveling decision

24   that's at issue in this case is a leveling decision about

25   Ms. Rowe.  The jury can look at evidence of her comparators,

NACVROW5

1    appropriate comparators, to decide whether or not the

2    differences between them, these 9s and her, suggest gender

3    bias.

4         Counsel is now saying this is not about the fair pay

5    claim, it's about the New York City claim.  Great.  Ms. Bennett

6    didn't work in New York.  She worked in California.  So that's

7    yet another reason.  She's not even within the cohort that is

8    potentially at issue here.  The New York pay claim only allows

9    them to compare Ms. Rowe to Mr. Harteau, who worked in New

10   York.  Mr. Breslow worked in New York too.  Ms. Bennett didn't

11   even work in New York.

12        MS. GREENE:  Your Honor, there's so much to address

13   there.

14        THE COURT:  Hang on a second, Ms. Greene.

15        Mr. Gage, did you not say at some point that it was

16   for the jury to decide who Ms. Rowe's comparators are?

17        MR. GAGE:  No.  I don't believe I said it's for the

18   jury to decide, because that -- I think your Honor in the first

19   instance — and that's what we're arguing here — has to draw a

20   circle around it so there's not just this infinite flow of

21   potential comparators coming in here.

22        And so I don't think the jury gets to decide -- they

23   get to decide whether or not differences between Ms. Rowe and

24   the people about whom your Honor let's us introduce evidence,

25   whether those differences suggest that the way she was paid and

NACVROW5

1      the way she was treated was because of her sex as opposed to

2      those other differences.  That's what the jury gets to decide.

3      But your Honor, in the first instance, has to decide the

4      admissibility of whose information the jury gets to see to

5      decide whether or not those differences are indicative of

6      discrimination.

7              THE COURT:  All right.  Ms. Greene.

8              And then I think we're going to break.

9              MS. GREENE:  Mr. Gage is wrong; that the New York City

10     human rights law for purposes of establishing bias allow you to

11     look to comparators outside of the geographic range.  The New

12     York equal pay law has a geographic-specific requirement

13     because of the nature of that law.  But it is well-established

14     that similarly situated people for purposes of showing

15     behaviors or drawing inferences of bias don't have to be in the

16     same office.  They were working in the same group, they

17     reported to the same manager.

18             Mr. Gage wants to make decisions of fact, find

19     decisions of fact.  The jury is going to get to decide if

20     there's a cohort or not based on the evidence.  The jury is

21     going to decide is it this group of nine that we should be

22     looking at or is it a broader group.

23             We lost on a motion *in limine* about whether defendant

24     can present evidence on Level 8 comparators, Level 8s.  We lost

25     on that.  They get to bring in that evidence.  They are putting

NACVROW5

1     it into the record; we are maintaining our objections to it.

2     But it's a little disingenuous to say they have to do that.

3     They intend to do that; they intend to look at the Level 8s.

4            So to exclude Ms. Bennett from this group that we're

5     going to be looking at, where it's in the documents and people

6     are voluntarily mentioning her as someone else who, you know,

7     the circumstances around her leveling were raised an issue, it

8     was a question, notably, Ms. Bennett still works there.  They

9     could bring her in if they wanted.  So there's no -- you know,

10    if they want to bring her in as a rebuttal witness, they could.

11           But this testimony, these documents, should go before

12    the jury.  And the presumption is that relevant probative

13    testimony will go to the jury unless there's some material

14    prejudice and a reason to exclude it.  And the fact that

15    defendant doesn't like the evidence, the fact that they think

16    that there's some bias it creates, the law says all evidence

17    creates a bias, that's why it's in for the jury to determine

18    the validity of it and to draw inferences and to give weight to

19    it.

20           So, you know, it just -- I know that was long-winded,

21    but this is a very important issue.  And as your Honor

22    requested, we will outline for you, you know, the documents --

23           THE COURT:  Just a list.  I just want to know the

24    scope of the issue.  I know you're going to tell me that this

25    is in the joint pretrial order, and that may be.  No, it isn't?

1              MR. GAGE:  No, I was going to say I'm not going to say

2      that.  I've said that enough.

3              THE COURT:  Along with scores of other issues.  This

4      is a considerable issue to be coming up in the middle of trial,

5      the jurors missing work and what have you.

6              How long until we run headlong into this issue?

7              MR. GAGE:  Your Honor, just to be clear, they only

8      designated those exhibits at the last minute.  This is

9      something that --

10             THE COURT:  But when were they produced?

11             MR. GAGE:  Oh, everything was produced in discovery.

12             MS. GREENE:  2020.

13             MR. GAGE:  But we had a universe of designated

14     exhibits back in December when we were first scheduled for

15     trial.  And then we did motions *in limine*.  And then this was

16     brought up more recently.  I just wanted to make that clear.

17             And also, for the record, Google has absolutely no

18     problem with explaining Jen Bennett's leveling.  It was not

19     discriminatory.  There were perfectly good reasons.  The

20     question then becomes, then how many other people do we get to

21     present evidence about to show not only that Ms. Rowe was

22     fairly leveled, but also that Ms. Bennett was fairly leveled.

23     And that I just pose as a question for your Honor to consider

24     as you're evaluating this decision, because that's what we're

25     talking about.

NACVROW5

1    THE COURT:  Some of the same witnesses can address the

2    leveling decisions as to both of them; is that right?

3    MR. GAGE:  Some of them can.  But then there may be

4    additional documents that we want to show the jury.  And it

5    just unnecessarily prolongs the trial and confuses and

6    distracts the jury.

7    MS. GREENE:  Your Honor, every document, with the

8    exception of one, has been on the list from the first joint

9    pretrial order.  Every witness who will testify, whose

10   depositions were taken, have been on the list since the joint

11   pretrial order.

12       There is one document that was inadvertently missed on

13   the joint pretrial order, and it's Jen Bennett's gHire packet.

14   All of the other gHire packets for the L8s and L9s and people

15   hired during that time period were put in mostly by defendant

16   into the record.  Jen Bennett's wasn't.  We rectified that.

17   THE COURT:  When did you rectify that?

18   MR. GAGE:  On the eve of trial, your Honor.

19   THE COURT:  Okay.  Well, that's a big one to omit from

20   the joint pretrial order until the eve of trial.

21   MR. GAGE:  It's a huge one.

22   THE COURT:  That's why we're here doing this now, I

23   think.

24   MS. GREENE:  Your Honor?

25   THE COURT:  Yes.

NACVROW5

1          MS. GREENE:  That document was overlooked, but that

2     document doesn't determine the testimony.  Even without that

3     document, we could question Mr. Will Grannis and Mr. Brian

4     Stevens as to the issues and the circumstances around it.

5     Again, other people in their deposition, in the ER notes,

6     Mr. Grannis in his email communications have raised

7     Ms. Bennett.  They've long been on notice.  They could have

8     moved *in limine* to exclude any conversation around Ms. Bennett,

9     the other woman in the group.  And they didn't.

10          THE COURT:  All right.

11          MR. GAGE:  Was of the nature of this document, your

12     Honor, P-17, Mr. Grannis's email, the one that's hearsay, where

13     he's talking about what someone else told him about their

14     feelings, it was not.  These documents, we're not suggesting,

15     that they were trying to relitigate the leveling decision for

16     Ms. Jen Bennett.  They offered that exhibit, her hiring packet,

17     at the last minute, long after we had not only designated all

18     of our witnesses, but also arranged all the travel that we've

19     had to arrange for people to come to this trial.

20          This will be -- we'll be severely prejudiced if we

21     have to litigate that issue and identify all these other

22     comparators.  Now we've got to find comparators for Jen

23     Bennett, people who were hired at a 7, like her.  We'll find

24     them if we have to, but it's just going to unnecessarily

25     prolong the trial.

NACVROW5

```
 1              THE COURT:  All right.
 2              MS. GREENE:  I just wanted to make clear that the
 3    Plaintiff's Exhibit 17 is not just about what they told her.
 4    It is in the context of a conversation of another woman who was
 5    trying to negotiate her salary and who was running up against
 6    obstacles.
 7              MR. GAGE:  No.
 8              MS. GREENE:  Melissa Lawrence was saying, I don't want
 9    to be a Debbie-downer, but it concerns me.  There's much of a
10    disconnect and focus on comp.  You know this.  In the end, they
11    need to come for the opportunity, not the comp.
12              And Mr. Grannis's response is:  I agree.  But I also
13    know that every woman has told me they didn't fight hard enough
14    for themselves.  And they ask for my advice.
15              It's in the context of questions around how women who
16    are trying to negotiate for themselves are treated on their way
17    in.
18              THE COURT:  You're referring to Katia now?
19              MR. GAGE:  Yes, your Honor.
20              THE COURT:  You're not doing anything with Katia,
21    right?
22              MR. GAGE:  Well, that's what they are suggesting they
23    want to, your Honor.
24              MS. GREENE:  No, your Honor.
25              MR. GAGE:  That's yet another one.
```

NACVROW5

1              MS. GREENE:  No, we are not.

2              MR. GAGE:  But to that point, your Honor, Katia Walsh

3     in that email shows very clearly, was being brought in -- or

4     offered a Level 9 job.  She was offered a very generous package

5     of compensation, which she negotiated, google responded, they

6     put more money on the table.  But in the end, she decided to

7     reject the offer.

8              THE COURT:  I'm sorry, we are talking -- wait a

9     minute.

10             MR. GAGE:  This is Katia Walsh.  I'm not even

11    suggesting we want to go down that rabbit hole.

12             MS. GREENE:  We're not.

13             MR. GAGE:  I just want to be clear.  So counsel is

14    abandoning any effort to offer the evidence regarding Katia

15    Walsh?  Because if that's the case, I'll shut up and sit down.

16             MS. GREENE:  I've made clear the document that we are

17    offering and for what purpose we are offering it, your Honor.

18    I will provide you with a list.  Again, these are decisions --

19             THE COURT:  Witnesses and documents.

20             MS. GREENE:  Witnesses and documents.

21             These are the things for the jury to decide, what

22    these documents mean, what this testimony means, whether

23    there's any value at all in how one person was treated versus

24    another.  These are all questions of facts.  That's for the

25    jury to decide.  This is relevant and probative.  It's not

NACVROW5

1    being offered in a way that excludes it under the Federal Rules

2    of Evidence.  And again, the fact that they don't like it isn't

3    reason to keep it out.

4              But I will say no more and I will provide you with the

5    list.

6              THE COURT:  All right.  Thank you.

7              MR. GAGE:  Hearsay in these documents, it's --

8    anyways.

9              THE COURT:  When was the last time this group talked

10   about settlement?

11             MS. GREENE:  Your Honor, we mediated or had a

12   settlement conference before Judge Willis in March.  And that

13   was the last formal settlement discussions.  And any informal

14   discussions since that point in time have gone nowhere.

15             THE COURT:  All right.  Settlement should be

16   contemplated often is my view.

17             All right.  I'll see you at 1:45.

18             (Luncheon recess)

19             (Continued on next page)

20

21

22

23

24

25

NACVROW5

| | |
|---|---|
| 1 | A F T E R N O O N   S E S S I O N |
| 2 | 2:00 P.M., |
| 3 | THE COURT:  Ms. Williams, let's bring the jury right |
| 4 | in. |
| 5 | MS. GREENE:  Should we bring in the next witness, your |
| 6 | Honor? |
| 7 | THE COURT:  Who is it? |
| 8 | MS. GREENE:  Kevin Lucas. |
| 9 | We had to make some adjustments to the planned |
| 10 | schedule to fit in people's travel plans. |
| 11 | THE COURT:  Meaning you were planning to call someone |
| 12 | else next? |
| 13 | MS. GREENE:  Meaning I think this is different than |
| 14 | the order we may have indicated to you earlier today. |
| 15 | THE COURT:  Okay. |
| 16 | MR. GAGE:  We're just juggling schedules and counsel |
| 17 | are cooperating to get people -- |
| 18 | MS. GREENE:  Where they need to be and when. |
| 19 | MR. GAGE:  Where to be and when. |
| 20 | (Jury present) |
| 21 | THE COURT:  All right.  Are you ready to call your |
| 22 | next witness, Ms. Greene? |
| 23 | MS. GREENE:  Yes. |
| 24 | Plaintiff calls Kevin Lucas, please. |
| 25 | |

 1              (In open court; jurors present)

 2    BY MS. GREENE:

 3    Q.  Mr. Vardaman, I'm going to ask you a yes-or-no question.

 4              Are you here because you feel the need to defend

 5    actions that you yourself took in the course of Ms. Rowe's

 6    employment?

 7    A.  No.

 8    Q.  Are you here because you believe that Ms. Rowe has accused

 9    you wrongly of wrongdoing?

10    A.  No.

11    Q.  You're here simply to tell the truth?

12    A.  Correct.

13    Q.  And without telling us anything about anything more than

14    your own change of heart about testifying here in person, what

15    was your change of heart?  Why were you originally not going to

16    testify?  And, again, I don't want you to tell me anything that

17    precipitated it, but tell me just about your change of heart.

18    A.  Sure.  I was intended to — I was intending to show up in

19    person the entire time.  The court date moved around quite a

20    bit, as did my schedule for travel and all that.  The last time

21    I recall it was landing during my kid's first week of school,

22    and I wasn't going to miss that.

23    Q.  All right.  We'll see if we come back to that later.

24              Mr. Vardaman, in the course of your recruitment for

25    the financial services vertical lead position, you did not

1    discuss with Mr. Shaukat what Ms. Rowe's qualifications were,

2    correct?

3    A.   As a matter of process for internal Googlers, my job was to

4    raise candidacy to the hiring manager who made the decision to

5    include them in process or not.

6    Q.   OK.  So, yes-or-no question, is it correct that you did not

7    discuss with Mr. Shaukat what Ms. Rowe's qualifications were?

8    A.   Correct.

9    Q.   Is it correct that the extent of your knowledge about her

10   background was that she had worked at JPMorgan Chase?

11   A.   Incorrect.  We ended up spending time talking about her

12   background.

13   Q.   When?

14   A.   I'm sorry?

15   Q.   When?

16   A.   Over the course of —— after I was asked to include her in

17   process, I recall we had a videoconference.

18   Q.   What did you know about her industry background?

19   A.   I walked through her background at a high level so that I

20   could ascertain enough information to send the prep note to the

21   panel members.  But, again, once the decision had been made to

22   include her into panel, that was my intention to deliver on

23   that to the decision-maker.

24   Q.   Mr. Vardaman, do you recall me deposing you in this case?

25   A.   Yes, I recall.

1   Q.  And you recall giving testimony under oath in that case?

2   A.  I do.

3   Q.  I'd like to now play for you a portion of that testimony.

4   A.  OK.

5   Q.  It's going to be page 42, line 5 through 14.

6           Once you have it, Mr. Yang, you can go ahead and play.

7           (Video played)

8           MS. GREENE:  You can stop it there.

9   Q.  Was that your testimony?

10  A.  That was, in fact, my testimony.

11  Q.  Did you give true testimony when you testified?

12  A.  I did.

13  Q.  Now, you didn't know what role Ms. Rowe had had at JPMorgan

14  Chase, correct?

15  A.  That's correct.

16  Q.  And you didn't know how many years she had worked in the

17  financial services industry, correct?

18  A.  That's correct.

19  Q.  You didn't know what her technological background was,

20  correct?

21  A.  Correct.

22  Q.  And you didn't know what advance degrees she held, correct?

23  A.  Correct.

24  Q.  You did not know what her experience was managing teams,

25  correct?

1  A.  That is correct.

2  Q.  And you did not speak with Brian Stevens about her

3  qualifications for the role, correct?

4  A.  No, I did not.

5  Q.  And you did not speak with Will Grannis about Ms. Rowe's

6  qualifications for the role, correct?

7  A.  That is correct.

8  Q.  In fact, you never learned what her qualifications were for

9  the financial services vertical lead role, isn't that right?

10  A.  As I mentioned earlier, the decision was made to involve

11  her in process, and that is my job, as steward of the process

12  for recruiting, to involve her in that process.

13  Q.  Let's go back to your deposition testimony, and we're going

14  to look at page 43:2 through 7.

15          Mr. Yang, if you could play that.

16          (Video played)

17          MS. GREENE:  And if we can play the answer.

18  Q.  I think we locked up, but was your answer to that question

19  no?

20  A.  Yes, it's right there.

21          (Video played)

22          MS. GREENE:  OK.  We can leave it, Mr. Yang.  Thank

23  you.  Sometimes technology is not our friend, even when we're

24  trying our best.

25  Q.  Was that truthful testimony when you gave it at your

1   deposition?

2   A.  Yes.

3   Q.  But that's different than what you just testified here

4   today, correct?

5   A.  As I recall, later on in the deposition, I provided

6   additional context.

7   Q.  My question was the testimony we just heard was different

8   than what you just said here in court about what you knew about

9   her qualifications, correct?

10  A.  That was my testimony, yes, ma'am.

11  Q.  OK.  Now, before the panel of interviews, you sent the

12  interviewers information about Ms. Rowe, correct?

13  A.  That is correct.

14  Q.  OK.  Let's look at Plaintiff's 37.

15          Do you recognize this as an email from you to Jason

16  Martin?

17  A.  I do.

18  Q.  And Mr. Martin was one of the individuals who interviewed

19  Ms. Rowe, correct?

20  A.  As I recall, yes.

21  Q.  And under context and competencies —— Mr. Yang, if you can

22  call those two bullet points out —— it says:  "Ulku was on

23  Brian Stevens' team before the reorg occurred that resulted in

24  some of the vertical OCTO folks transitioning to Tariq's

25  organization."  And then going on, it says:  "Brian Stevens is

1   Q.  It says:  "Impression:  Executive poise, confident (but not

2   ego-driven) forthright with a quick operating cadence."

3            You wrote that, correct?

4   A.  I did.

5   Q.  And then "RRK," what does that stand for?

6   A.  It's role-related knowledge is what it stands for.

7   Q.  And under concerns you noted "no major concerns are noted,"

8   correct?

9   A.  That is correct.

10            MS. GREENE:  Let's take down that document.

11  Q.  Then, Mr. Vardaman, did you send the same sort of email to

12  each of Ms. Rowe's interviewers?

13  A.  Yes.

14  Q.  Now, in Ms. Rowe's case, none of the four interviewers

15  provided feedback into the gHire system, isn't that right?

16  A.  We'd sometimes receive feedback outside of gHire, but it

17  was not entered, to my knowledge, in the gHire system, correct.

18  Q.  So I just want to make sure it's clear.  It's a yes-or-no

19  question.  You know that none of the four interviewers provided

20  feedback into the gHire systems for Ms. Rowe, correct?

21  A.  I don't recall them having entered it the last time I saw

22  the system.

23  Q.  And you yourself did not make any notes, written notes or

24  typed notes, of any informal feedback you may have received

25  from interviewers, correct?

NACHRow6                         Vardaman - Direct

1   A.  I believe that's correct.

2   Q.  And you yourself did not do anything to document any

3   internal feedback you may have received, correct?

4   A.  That is correct.

5   Q.  And you didn't share any informal feedback you may have

6   received with Mr. Shaukat, isn't that right?

7   A.  I — I don't recall.  I don't think so.

8   Q.  And Mr. Shaukat didn't share with you any feedback that he

9   may have reviewed, correct?

10  A.  No.

11  Q.  No, that's not correct, or no, he didn't share that with

12  you?

13  A.  Sorry.  No, I don't recall him sharing that with me.

14  Q.  Did anybody tell you that they thought Ms. Rowe was

15  abrasive?

16  A.  No.

17  Q.  Did anyone tell you that they thought Ms. Rowe was

18  cantankerous?

19  A.  No.

20  Q.  Did anyone tell you that they thought Ms. Rowe was not

21  Googly?

22  A.  No.

23  Q.  Did anyone express to you that they had ego concerns about

24  Ms. Rowe?

25  A.  No, not that I recall.

1   Q.  Do you believe Ms. Rowe to be self-oriented?

2   A.  Not that I recall.

3   Q.  Did anyone communicate to you that they thought Ms. Rowe

4   was self-oriented?

5   A.  No, not that I recall.

6   Q.  And had Mr. Shaukat ever told you that he had gotten that

7   sort of feedback about Ms. Rowe?

8   A.  No, he wouldn't have shared something like that with me.

9   Q.  Let's look at Plaintiff's Exhibit 111.

10          Now, you're familiar with the Thrive system at Google,

11  correct?

12  A.  Yes, ma'am, I am.

13  Q.  And Thrive is another system that recruiters use at Google,

14  is that right?

15  A.  That is correct.

16          MS. GREENE:  Now, if we can go to the second page ——

17  actually, if you could go back to the first page, Mr. Yang.

18  Q.  You see where it says "related to" and then it says

19  "candidate information for Ulku Rowe"?  Do you see that?

20  A.  Yes, yes.

21  Q.  So this is a Thrive printout related to Ms. Rowe, is that

22  right?

23  A.  That is correct.

24          MS. GREENE:  Let's go to the second page of this

25  document, and if we can call out the financial services

1          (In open court; jurors present)

2          MS. GREENE:  OK.  If we can publish 108 to the jury,

3     please.  Now, if we can go to page 17 of this document.

4          Actually, I'm sorry, if we can go back to page 15 of

5     this document.

6     BY MS. GREENE:

7     Q.  And if you look at the bottom, it says:  "Meeting with

8     Stuart Vardaman January 22, 2020, 1 p.m. Pacific, via GVC,

9     Ashley lead, Jordan notes."

10         Do you see that?

11    A.  I do.

12    Q.  Were Ashley and Jordan the ER representatives with whom you

13    met on January 22, 2020?

14    A.  They must have been.

15    Q.  And do you recall Ms. Jordan taking notes of your meeting?

16    A.  Yeah, I recall someone taking notes.

17    Q.  OK.  Let's go now to page 17.

18         Do you see the section, the bullet, that second bullet

19    and its sub-bullets — can you call that out, Mr. Yang —

20    that's what you shared with ER on January 22, correct?

21    A.  That is the synthesis of the notetaker, what he wrote —

22    what he or she wrote down.

23    Q.  "It was shared with me that she was not senior enough,

24    didn't have the network, but we should put her through the full

25    process anyway," correct?

NACHRow6                        Vardaman - Direct

1    A.  I recall that being my personal thinking.

2    Q.  Well, shared with you, correct?

3    A.  That's what the notetaker took down, ma'am.  I can't speak

4    to that.

5    Q.  Let's go down to the fifth bullet, its sub-bullets, and

6    pull that out.

7            Now, that line "Ulku, by the time connected with her

8    struck me as a bit abrasive," that's what you told ER, correct?

9    A.  I believe I testified that I did not recall using that word

10   specifically.  What I was trying to impart was that over the

11   course of my meeting with Ulku, I felt disrespected, and

12   whatever notes or words the notetaker took down, again, I can't

13   speak to.

14   Q.  So you don't remember if you did or did not use the word

15   "abrasive"?

16   A.  No, I don't recall.

17   Q.  Now, if we can go down to the second to last bullet on this

18   page, you were asked if you remembered what the feedback from

19   the other interviews were, and you said:  "Not senior enough.

20   Expectation that she should have driven more value.  Everything

21   was pretty lackluster."

22           Is that what you told ER?

23   A.  Again, those were the notes that were taken down.  I think

24   what — where this came from was what I mentioned earlier about

25   sometimes feedback coming from outside the gHire system, and

1    that is what I was providing there, my recollection on it.

2    Q.  You were interviewed again on January 29, correct?

3    A.  Yeah, I think that's the date you mentioned earlier, yes,

4    ma'am.

5           MS. GREENE:  Now let's go to page 12 of this document,

6    if we could, please.

7    Q.  Just so I'm clear, before we do that, that feedback that

8    you said came into you through means other than gHire, again,

9    that wasn't actually written down or documented anywhere,

10   correct?

11   A.  I really don't recall.

12   Q.  Now, if we can look to the third bullet under the

13   January 29, 2020, meeting, you said you ended up — well, you

14   recall Tariq saying do a full panel, and we need everything in

15   the system.  Is that accurate?

16   A.  For every search we try to get everything in the system,

17   so. . .

18   Q.  But with respect to Ms. Rowe, is it accurate you said,

19   "Going through the emails with Peter, mentioned the panel

20   members, and then it is interesting because you recall Tariq

21   saying do a full panel and we need everything in the system"?

22          That's what you told ER, correct?

23   A.  In sum and substance, I suppose, but for every single

24   process that we run for every candidate, we really try to get

25   the feedback in the system.

1  Q.  And is it always interesting when you're asked to do that?

2  A.  I don't recall ——

3          MS. TOMEZSKO:  Objection.

4  A.  —— using the word.

5          THE COURT:  Sustained.

6  Q.  OK.  You then ended up spending three to four weeks chasing

7  folks for feedback.  Do you see that?

8  A.  Yes, I do.

9  Q.  Then you say:  "This came in from a ping.  History not

10  turned on.  Ulku is not ready, is junior, would have expected

11  more."

12          Now, what's a ping?

13  A.  It's Google's internal instant messaging platform.  We call

14  it ping, although it's called something else.

15  Q.  And you told ER that the history wasn't turned on for

16  pings, correct?

17  A.  That's correct.

18  Q.  And the significance of the history not being turned on is

19  that there would not be any record of any alleged pings,

20  correct?

21  A.  No.  I didn't have —— that's a setting that each user has,

22  and I didn't keep my history turned on.

23  Q.  So you had no way to go back to look at those pings to see

24  what they said, correct?

25  A.  That would be correct, yes, ma'am.

1   Q.   And you didn't make any notes of the alleged pings when

2   they came in, correct?

3   A.   That is correct.  When I receive feedback like that ——

4   again, it's not unusual to receive feedback outside the system

5   —— we direct our panel members to go to gHire and put it in the

6   system.

7   Q.   You didn't note in any of your weekly update charts to

8   Mr. Shaukat that you had gotten feedback from panelists via

9   ping, correct?

10  A.   I don't recall.

11  Q.   And you didn't tell him exactly what the feedback was that

12  you got either, correct?

13  A.   Like in a live conversation?

14  Q.   Well, you shared and you testified earlier that you didn't

15  share with Mr. Shaukat any feedback that you received.  Is that

16  still your testimony?

17  A.   I believe I said I didn't recall.

18  Q.   But more than a year later after those pings you say came

19  through, you were telling ER about the negative feedback that

20  you'd supposedly gotten from panelists via ping, right?

21  A.   I was telling them what I recalled from —— from those

22  pings, correct.

23          MS. GREENE:  If we can go to page 15, and if we can

24  pull out the first full bullet, "does anything stand out to

25  you"

1   Q.  So here, at the end of the interview, your second

2   interview, you were asked a general question:  "Does anything

3   stand out to you about financial services lead process that was

4   out of the ordinary or a flag, so to speak?"  You said:  "It

5   wasn't out of the ordinary.  I think he treats people well."

6          Talking about Mr. Shaukat there?

7   A.  Yes, I would have.

8   Q.  And you say:  "I recall by the time Ulku met with me, she

9   was bristly with me."

10          Is that what you told ER in response to their question

11   about whether anything else stood out for you?

12   A.  I believe that I said and I testified that I didn't recall,

13   again, using a word, that word or the previous words that

14   you've highlighted.  I was trying to convey that I felt

15   disrespected as a result of meeting with Ulku.

16   Q.  Did you note that anywhere besides in your conversation

17   with ER?

18   A.  Again, that's someone taking notes and synthesizing what

19   I'm saying.  And no, everything that I tried to document was

20   for the benefit of candidates.  I think you see that in the

21   prep note to panel members.

22   Q.  So, to be clear, when you felt disrespected by Ms. Rowe,

23   you didn't document that anywhere, correct?

24   A.  I don't — I don't recall.

25   Q.  You didn't make a complaint to HR, did you?

1   A.  Feeling disrespected, I don't believe, is protected, a

2   feeling.

3   Q.  You didn't tell Mr. Shaukat that you felt disrespected by

4   Ms. Rowe, did you?

5   A.  Again, I was trying to position Ms. Rowe in the best

6   possible light so that, as she went through panels, she had the

7   best possible chance to show up in the best possible way that

8   only she could do.

9   Q.  So did the fact that you felt disrespected by Ms. Rowe play

10  any part in how you considered Ms. Rowe's candidacy for the

11  financial services vertical lead position?

12  A.  Objectively, no, I don't think so.

13  Q.  Do you recall, when meeting with ER, referring to Ms. Rowe

14  as cantankerous?

15  A.  That's another one, no, I did not.  I do not recall.

16          MS. GREENE:  OK.  We can take this down.  Actually,

17  I'm sorry, Mr. Yang, if you can put that back up for one more

18  minute, and if we can go ahead back to the January 29 entry.

19  Q.  And if you can look on page 13, the section "So you were

20  involved in Stuart recruitment."  Do you see that?

21  A.  Yes, I do.

22          MS. GREENE:  OK.  Let's pull that out.

23  Q.  And this is discussing Stuart Breslow versus Ms. Rowe,

24  correct?

25  A.  I'm sorry.  Can you repeat that again.

NACHRow6                            Vardaman - Direct

1    Q.   The subject of discussion here with ER was about

2    Mr. Breslow and Ms. Rowe, correct?

3    A.   It looks like it was primarily about Mr. Breslow.

4               (Continued on next page)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1   Q.  Now, you only had one conversation with Ms. Kliphouse about

2   Ms. Rowe; correct?

3   A.  I don't recall the specific number of conversations, I

4   really don't.

5   Q.  Well, do you recall having testified at your deposition

6   about a conversation you had with Ms. Kliphouse?

7   A.  I recall letting her know that Ulku is interested in the

8   role.  I do.

9   Q.  And do you recall saying that -- well, did you tell

10  Ms. Kliphouse that Ms. Rowe had contacted you?

11  A.  That probably came up by the time I was connecting -- and I

12  was connecting with Ms. Kliphouse regularly, or semi regularly.

13  I -- yes, at some point in time after Ulku reached out, I would

14  have surfaced that with the hiring manager, Ms. Kliphouse.

15  Q.  And Ms. Kliphouse confirmed that she and Ms. Rowe had had

16  coffee; isn't that right?

17  A.  As I recall, by the time I had reached out, Kirsten had

18  mentioned -- Ms. Kliphouse had mentioned that she had coffee

19  with Ulku; correct.

20  Q.  And as of the time of your deposition, that's the only

21  conversation you recalled having with Ms. Kliphouse about

22  Ms. Rowe; correct?

23  A.  I believe that's right.

24  Q.  Now, you had a call with Ms. Rowe eventually with respect

25  to this position; correct?

NACVROW7                        Vardaman - Direct

1   A.  Yes.

2   Q.  And that was later in February?

3   A.  Yes.

4   Q.  Now, in between the time that you sent Ms. Rowe the job

5   description and the videoconference you had with her -- was it

6   a videoconference?

7   A.  It was a videoconference.

8   Q.  You didn't do anything to find out about Ms. Rowe's

9   qualifications for this position; correct?

10  A.  That is correct.  I recall providing that testimony in the

11  deposition.

12  Q.  And you didn't do anything to find out about her

13  qualifications not just for this position, but at all; correct?

14  A.  It would have been relative to this specific position I was

15  working on.  No, I don't believe I had another conversation

16  with Ulku, no.  Ms. Rowe.

17  Q.  And you can't remember whether you even looked at her

18  LinkedIn profile between the time you sent her the financial

19  services sales -- VP sales financial services job description

20  and the time you told her she wasn't going to be considered;

21  isn't that right?

22  A.  As a matter of process, I am sure I looked at her LinkedIn

23  profile.  Ultimately, by the time I raised Ms. Rowe's candidacy

24  to Ms. Kliphouse, Ms. Kliphouse said they had met for coffee

25  and that she wanted me to focus on another candidate.

NACVROW7                          Vardaman - Direct

```
 1   Q.  You didn't testify at your deposition about Ms. Kliphouse
 2   telling you that she wanted to focus on another candidate, did
 3   you?
 4   A.  No, I did not.
 5   Q.  So that's new testimony; correct?
 6   A.  Yeah, I guess you can say that.
 7   Q.  And do you recall me at your deposition asking you to tell
 8   me everything about the conversation you had with
 9   Ms. Kliphouse?
10   A.  Yes, ma'am.  "Everything" is quite big.
11   Q.  And do you recall me asking you at your deposition if you'd
12   had any other conversations about Ms. Rowe that you hadn't
13   testified to?  Do you recall me asking you that?
14   A.  I do.  I was quite nervous and ready to jump off the video.
15   Q.  Okay.  So you remember now today what you didn't remember
16   three years ago, when it was the same year in which this had
17   happened, is that what you're saying?
18   A.  Yes.
19   Q.  And when you were deposed in 2020, do you recall giving
20   testimony about whether you'd reviewed her LinkedIn profile?
21   A.  I don't recall.
22   Q.  So do you or do you not have a specific recollection of
23   even just looking at her LinkedIn profile before you had a
24   videoconference where you told her she wasn't going to be
25   considered?
```

NADHRow1

```
 1    UNITED STATES DISTRICT COURT
      SOUTHERN DISTRICT OF NEW YORK
 2    ------------------------------x

 3    ULKU ROWE,

 4                    Plaintiff,

 5              v.                         19 Civ. 8655 (JHR)

 6    GOOGLE LLC,

 7                    Defendant.           Trial

 8    ------------------------------x
                                          New York, N.Y.
 9                                        October 13, 2023
                                          9:30 a.m.
10
      Before:
11
                      HON. JENNIFER H. REARDEN,
12
                                          District Judge
13                                        -and a jury-

14                           APPEARANCES

15    OUTTEN & GOLDEN, LLP
           Attorneys for Plaintiff
16    BY:  CARA E. GREENE
           GREGORY S. CHIARELLO
17         SHIRA Z. GELFAND

18    PAUL HASTINGS LLP
           Attorneys for Defendant
19    BY:  KENNETH W. GAGE
           SARA B. TOMEZSKO
20
      Also Present:  Vincent Yang, Paralegal (Outten & Golden)
21                    Andrew Velazquez, Google Rep.
                      Jean Gutierrez, Paralegal (Paul Hastings)
22

23

24

25
```

NADVROW2                     Vardaman - Redirect

1   reaches out, you see.  February 10th, she's reached out to you;
2   correct?
3   A.  Yes, ma'am.
4   Q.  And you're not aware as of February 14th, having done
5   anything to let Ms. Kliphouse know that Ms. Rowe had been
6   reaching out and was interested and wanted to be considered for
7   the position; correct?
8   A.  No, I believe I said I don't recall when my conversation
9   with Ms. Kliphouse was.
10  Q.  Let's, if we can, go to -- well, let me ask you, do you
11  recall -- when was the first time that you alerted or even
12  thought to alert Ms. Kliphouse that Ms. Rowe was interested?
13          MS. TOMEZSKO:  Objection.  Asked and answered.
14          THE COURT:  Sustained.
15  Q.  Okay.  Let's turn to the first page of this document,
16  P-106.  So on February 20th, Ms. Rowe reaches out again to
17  check on updates; correct?
18  A.  February 20th.  Yes, yes, ma'am.
19  Q.  And you say:  Hi, Ulku.  Not yet.  We are trying to get on
20  Kirsten's calendar tomorrow.  Thank you.
21          Do you see that?
22  A.  I do.
23  Q.  Okay.  Now, do you recall if that caused you to do
24  something in terms of alerting Ms. Kliphouse that Ms. Rowe was
25  interested for the position?

NADVROW2                          Vardaman - Redirect

1    A.  It looks like we have a meeting, a scheduled meeting with

2    Kirsten the next day, February 21st.

3    Q.  And do you recall what you did in preparation for that

4    meeting?

5    A.  I may have updated a document.

6    Q.  Did you do anything with respect to identifying Ms. Rowe's

7    qualifications or her experience or talking with anyone

8    internally about Ms. Rowe or the work that she'd been doing?

9    Did you do anything of that nature?

10   A.  I believe I testified yesterday that I did not.

11                (Continued on next page)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1   Q.  Now, was February 21 the first time you let Ms. Piazza know

2   that — I'm sorry, Ms. Kliphouse know that Ms. Rowe was

3   interested in the position?

4           MS. TOMEZSKO:  Objection.  Asked and answered.

5           THE COURT:  Sustained.

6   Q.  Do you recall whether February 21 was the date on which you

7   let Ms. Kliphouse know?

8           MS. TOMEZSKO:  Same objection.  Asked and answered.

9           THE COURT:  Sustained.

10  Q.  Let me show you a document to refresh your recollection,

11  D74, and this is just to refresh your own recollection.

12          Does this refresh your recollection as to whether on

13  February 25 you were alerting — I'm sorry, February 21 you

14  were alerting Ms. Kliphouse that Ms. Rowe had raised her hand

15  to be considered for the role?

16          MS. TOMEZSKO:  Same objection.  Asked and answered,

17  your Honor.

18          THE COURT:  I'll allow it now.

19  A.  I do see her name on this document, along with Tais

20  O'Dwyer.

21  Q.  How many other internal candidates were being considered at

22  that point in time?

23  A.  Is there another page?  It looks like that's a — OK.  It

24  looks like those two at that juncture.

25  Q.  That were being considered for the role?

1    that you referenced at the beginning of the email?

2    A.  I'm sorry.  I'm confused.  The first part was about the

3    lunch I referenced.  The second part, I don't know when —— I do

4    not recall that he had a steak at lunch.

5    Q.  So the froufrou steak frites you had with him was a

6    separate meal that you subjected him to the day prior?

7    A.  He might have had a meal with someone else.  I had one more

8    meal with him.  By the way, I'm a lacto-ovo-pesco vegetarian.

9    I haven't had steak in 25 years.

10   Q.  I see.  So your testimony is the steak frites you were

11   referring to is not a meal you had with him?

12   A.  He may have had that meal.  This was in 2019.  It's four

13   years later.  I don't recall him eating steak at lunch, but

14   maybe he had a steak at lunch.  Maybe he had a steak later in

15   the day with someone else.  I don't recall.

16         MR. CHIARELLO:  OK.  Mr. Yang, you can take that down.

17   Q.  Now, Mr. Breslow, in December of 2018, Mr. Shaukat made you

18   the head of financial —— head of the financial services

19   vertical, correct?

20   A.  I'm sorry, the time frame was what?  December of 2018, is

21   that what you said?

22   Q.  Yes.

23   A.  I don't recall the precise time, but in that time period.

24   Q.  And the responsibilities for the head of financial services

25   role included driving Google's business by developing product

1   solutions for cloud, correct?

2   A.  Correct.

3   Q.  And it also involved you working with engineering to

4   develop products related to financial services and to find ways

5   to bring financial services providers to Google Cloud?

6   A.  Yes.

7   Q.  Is that correct?

8         Mr. Breslow, you hadn't expected to be considered for

9   this role, correct?

10  A.  Yes.

11  Q.  And you never asked to be considered for the role, correct?

12  A.  Yes.

13  Q.  And no one interviewed you for the role, correct?

14  A.  Correct.

15  Q.  And you spoke to Mr. Shaukat and he just gave you the role,

16  correct?

17  A.  No.  He asked me —— he said to me that with the arrival of

18  a new CEO for Google Cloud, the role had been open for a while.

19  And it was a time when, as the organization might be in

20  transition, would I consider taking on that role while the

21  organization sorted itself out?  And so I said, if that's what

22  you think is an appropriate role for me, I'm happy to take it

23  on.

24        MR. CHIARELLO:  Nothing further.

25  CROSS-EXAMINATION

1   BY MR. GAGE:

2   Q.  Good morning, Mr. Breslow.  It is still morning for a few

3   more.

4          Mr. Breslow, you were shown a short while ago

5   Plaintiff's Exhibit 37, and we don't need to put it up on the

6   screen.  It was your offer letter.  Do you remember that?

7   A.  Correct.

8   Q.  You were asked about a stock award.  Do you remember that?

9   A.  Yes, I was.

10  Q.  Did that stock award vest over time?

11  A.  Yeah, it vested 1/48.  It was a four-year stock award, 1/48

12  each month for 48 months.

13  Q.  When you left Google, did you forfeit any of the stock that

14  you had been granted by Google?

15  A.  $2 million worth.

16  Q.  So you never saw the full value of that initial award,

17  correct?

18  A.  That would be correct.

19  Q.  I want to take a step back so the jury can understand a

20  little bit more about your background.

21          Where are you from, by the way?

22  A.  So I am a native New Yorker, born and bred in Queens.  Went

23  to Queens P.S. 26, J.H.S. 216, and the Bronx High School of

24  Science.

25  Q.  And what's your educational background?

1    Q.  And it's definitely true that everyone was being hired for

2    the same role, technical director solutions; correct?  Of those

3    nine?

4    A.  Of the people you mentioned, yes.  We did have different

5    roles.  We had some ops roles; we had, like, executive support,

6    things like that.

7    Q.  The technical director position, it was scoped for between

8    Level 8 and Level 9; correct?

9    A.  Correct.

10    Q.  And the job ladder that you were developing didn't go

11    beyond Level 8; correct?  At that time?

12    A.  At the time, correct.

13    Q.  And, in fact, at that time, again, the late 2016/early 2017

14    period, there was less definition in the job ladder at those

15    higher levels; correct?

16    A.  Yeah.  We'd been operating for a year-ish, so certainly

17    still learning; in fact, we still are.

18    Q.  Now, if it we can go to Plaintiff's Exhibit 8.  And this is

19    email that you're copied on from August 28th, 2017; correct?

20    A.  Yeah.

21    Q.  And it's from Melissa Lawrence, who was your HR lead in

22    OCTO for OCTO; correct?

23    A.  Yes.

24    Q.  And those names that are mentioned here, those were the

25    technical directors in OCTO; correct?

NADVROW4                    Grannis - Direct

1   A.   Yes.

2   Q.   Okay.  And if we can pull out Ms. Lawrence's email, "Hi

3   all," through her signature.

4          She says:  One of you asked, but for the benefit of

5   all, there is very little documented for L8 plus expectations

6   at Google for general leveling.  This is the best guide

7   available for generic engineering.

8          Was OCTO generic engineering?

9   A.   Yes.

10  Q.   Did it have an engineering component?

11  A.   Yes.

12  Q.   Was it limited to just an engineering component; correct?

13  A.   Well, we were in the engineering hierarchy, so that's what

14  these job families are tied to.  So like we have a sales

15  hierarchy, and there are job families that tie to a sales

16  hierarchy.  And there's an engineering hierarchy, and there are

17  job roles -- this was specifically actually taken -- this job

18  family originally existed in go-to-market, which is kind of

19  like sales and marketing.  And it was brought to engineering to

20  focus on engineering.  So it was primarily engineering.

21  Q.   OCTO had not adopted an engineering leveling guide or job

22  ladder for itself at that point in time; correct?

23  A.   Correct.

24          MS. GREENE:  Okay.  We can take that down.

25  Q.   You, yourself, in this time frame did not have a great

NADVROW4                    Grannis - Direct

1    distinction between Levels 8 and 9; isn't that right?

2    A.  I don't know what you mean by I didn't have a great

3    distinction between them.

4    Q.  You really weren't sure what distinguished a Level 8 from a

5    Level 9 during this time frame; correct?

6    A.  We certainly had a hypothesis in that we were testing it

7    based on the candidates that we -- that we were interviewing.

8    So we had an initial sense of it and then we were testing it

9    all along.

10   Q.  Well, early on, during this time frame that we're talking

11   about, you didn't have a super strong sense of what

12   distinguished a Level 8 and a Level 9; correct?

13            MR. GAGE:  Objection.  Vague, your Honor.

14            THE COURT:  Sustained.

15   Q.  Mr. Grannis, do you recall being interviewed by employee

16   relations at Google in connection with this matter?

17   A.  Yes.  Maybe.  I think.  It's been a long -- it's been a

18   long time, so probably.

19   Q.  You're not sure if you were interviewed or not?

20   A.  By employee relations specifically related to this,

21   probably.

22   Q.  Do you recall meeting with Ashley Tessier and having two

23   people there and them taking notes?

24   A.  Oh, yeah, that sounds familiar, yeah.

25   Q.  That was "yeah"; correct?

NADVROW4                    Grannis - Direct

1    of her level at the time, you said no assessment.

2           Do you also recall saying:  All of our hires in OCTO

3    early on in building the function didn't have a super strong

4    sense, didn't know Level 8s from 9s; didn't say we are only

5    going to hire 8s, etc., take a person's qualifications and

6    skills and run through the process, and then have a

7    recommendation on the other side.  Didn't have any preconceived

8    notions about level; had only been at Google at the time for

9    one year; didn't have a straight super-calibrated reference

10   frame.

11          Do you recall in sum or substance saying that to ER?

12   A.  I think it's absolutely fair to say that, because we had

13   not -- we hadn't hired a bunch of people; this was a brand-new

14   ladder.  It was a new function within engineering.  We

15   absolutely couldn't be super confident in all aspects.

16          But as we started hiring people, especially when we

17   were getting to that stage, I mean, we had already had 17, 18,

18   19, 20 people by the time we were hiring most of the external

19   candidates.  We definitely started to see -- we started to

20   learn a little bit more about what we were looking for.

21          So for example, when we first started, we didn't know

22   what the balance or how we would think about impact for someone

23   coming in.  Would they have more impact or the ability to

24   create, like, stronger impact early on if they were a little

25   more on the engineering side, or are they a little bit more on

NADVROW4                    Grannis – Direct

1    the customer side.  We didn't know that.

2              But it certainly became clear, you know, six months,

3    five months, six months in, attributes that would make someone

4    more effective or less effective.

5    Q.  The people who joined you from internal -- internally in

6    Google, their levels were already preset; correct?

7    A.  Correct.

8    Q.  So you didn't make any leveling decisions around that

9    group; correct?

10   A.  Correct.

11   Q.  So the first group you were making leveling decisions about

12   were those eight or nine -- the nine folks we talked about,

13   Evren through Nick Harteau; correct?

14   A.  Correct.

15   Q.  And you'd never hired someone externally where you were

16   making the leveling decision up until that point in time.  And

17   at that point in time, you didn't know what distinguished a

18   Level 8 from a Level 9; correct?  You were still figuring it

19   out?

20   A.  We were still figuring it out.

21   Q.  And you weren't provided with any sort of leveling guide;

22   correct?

23   A.  There was no leveling guide for that position in

24   engineering.

25   Q.  And you weren't provided with any sort of metrics that

NADVROW4                    Grannis - Direct

1   equated years of experience to a particular level; correct?

2   A.  We didn't have that, no.

3   Q.  And those first eight or nine people, you have less of a

4   sense of the differences between what would make one an 8 and a

5   9; correct?

6   A.  No, we were still figuring it out.

7   Q.  The additional expansion of the team from an external hire

8   perspective happened following additional budget being

9   allocated to the group; correct?

10  A.  Yeah.  Original plan was to have roughly 10 to 12; and it

11  was proving so in demand that we expanded it.  We had almost --

12  by August of that year we probably had 30, 32, 34 people,

13  something like that.

14  Q.  Okay.  So there was a first wave and then a second wave;

15  correct?

16  A.  Yeah.

17  Q.  And it was that first wave where you didn't have the

18  calibrated sense of the L8 and L9.  And by the time you started

19  with the second wave, you had a better sense; correct?

20  A.  Oh, I'm sorry.  I thought you meant -- by "wave," I thought

21  you meant like the internal versus external.  The first wave

22  was the internal hires; we hired 17 people in six months

23  internally.  The second wave I was thinking of is the external

24  hires.

25  Q.  But you already testified that those external hires, you

NADVROW4                          Grannis - Direct

1   didn't have a strong sense at that time; correct?

2   A.  For the external hires, because all the other ones had come

3   through with their levels, yes, that's correct.

4   Q.  Now, your job in the hiring process was to ensure that the

5   candidates were qualified at the L8 plus level; correct?

6   A.  Correct.

7   Q.  You didn't make the final leveling decision, you just made

8   a recommendation; correct?

9   A.  I don't think -- I'm just trying to think back.  Like

10  discrete leveling recommendations -- my job was really to

11  confirm or if there was like an issue.

12         So let's say in the process of an interview, let's say

13  we were given someone who, hey, we think that this person

14  should be -- you know, this might be interviewing for L9.

15  Well, if someone is going to be interviewing for L9, we'd have

16  significant expectations around, you know, their expertise,

17  background, and what they'd be able to create in terms of

18  impact right away.

19         And so throughout the hiring process, you know, there

20  would be that kind of, like, set looking for those

21  expectations.  Of course, as you mentioned before, we were

22  still trying to figure it out.  But if someone was coming

23  through as an L8, we'd also have certain expectations.  We'd be

24  looking for their acumen along these dimensions that we thought

25  would match with an L8.

NAIHRow1

```
1    UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
2    ------------------------------x

3    ULKU ROWE,

4              Plaintiff,

5         v.                              19 Civ. 8655 (JHR)

6    GOOGLE LLC,

7              Defendant.                 Trial

8    ------------------------------x
                                          New York, N.Y.
9                                         October 18, 2023
                                          8:50 a.m.
10
     Before:
11
                    HON. JENNIFER H. REARDEN,
12
                                          District Judge
13                                        -and a jury-

14                        APPEARANCES

15   OUTTEN & GOLDEN, LLP
          Attorneys for Plaintiff
16   BY:  CARA E. GREENE
          GREGORY S. CHIARELLO
17        SHIRA Z. GELFAND

18   PAUL HASTINGS LLP
          Attorneys for Defendant
19   BY:  KENNETH W. GAGE
          SARA B. TOMEZSKO
20
     Also Present:  Vincent Yang, Paralegal (Outten & Golden)
21                  Andrew Velazquez, Google Rep.
                    Jean Gutierrez, Paralegal (Paul Hastings)
22

23

24

25
```

1   "A.  No.

2   "Q.  Mr. Eryurek, have you heard the term 'senior director'

3   used in OCTO?

4   "A.  We never used it, no.

5   "Q.  So in your recollection, the term 'director' was the term

6   that was used in OCTO?

7   "A.  We all -- we all had technical directors business cards

8   and so forth.

9   "Q.  Did Ms. Rowe ever tell you in sum or substance, even if

10  she didn't use those exact words, that she thought she was

11  being treated differently as a woman?

12  "A.  No.

13  "Q.  From what you observed about the technical director role,

14  was it years of experience that was the most relevant or the

15  type of experience that was most relevant to the job?

16  "A.  Probably a combination of both.  And some had a lot more

17  years, and their roles were really big and broad and so forth.

18  Some others were maybe the types of the focus areas that they

19  had and what experience that they brought in.

20  "Q.  So, in other words, years of experience was not a

21  determining factor in how someone could perform as a technical

22  director?

23  "A.  Remember, I told you technical director was a title that

24  just about everyone used in the team; some with a lot less

25  experience and junior roles than I did, but they still called

NAIVROW4                    "Eryurek"

1    themselves technical directors, which was fine for them because

2    that's sort of -- that helps excel communications of technical

3    directors and will do it.

4          And so years of experience mattered.  What you did,

5    where you did, how you did, for whom you did definitely

6    mattered.  But not everyone had that same kind of template

7    experience, because we all had technical director titles, but

8    we were different levels because of the experience that we had

9    in our pasts.  Some was driven by years, some was driven by

10   what we have accomplished in our prior lives.

11   "Q.  And is that something that was communicated to you or

12   something that you just --

13   "A.  By virtue of -- of -- by virtue of talking to people, you

14   sort of gather that.

15   "Q.  With respect to directors at L8 and above, did you have

16   any basis to know what their years of experience were and how

17   that related to their leveling?

18   "A.  Not really.

19   "Q.  Did it have any impact on what clients they worked on?

20   "A.  No.

21   "Q.  Did it have any impact on what external speaking

22   engagements they might work on?

23   "A.  Absolutely not.

24   "Q.  Did it have any impact on what internal products or

25   projects they might work on?

1  "A.  No.

2  "Q.  With respect again to the L8 and L9 directors, did the

3  years of experience impact their day-to-day work or the role in

4  any way?

5  "A.  I wouldn't have guessed so, no."

6          MS. GELFAND:  No further questions.

7          THE COURT:  Thank you.

8          MR. CHIARELLO:  Your Honor, our next witness is April

9  Beaupain.

10          THE COURT:  Okay.

11          Mr. Chiarello, I intend to give the jury a lunch break

12  at 12:30.

13          MR. CHIARELLO:  Okay.  Thank you, your Honor.

14   APRIL BEAUPAIN,

15      called as a witness by the Plaintiff,

16      having been duly sworn, testified as follows:

17  DIRECT EXAMINATION

18  BY MR. CHIARELLO:

19  Q.  Good afternoon, Ms. Beaupain.

20  A.  Good afternoon.

21  Q.  You are currently employed at Google?

22  A.  Yes.

23  Q.  And in 2018/2019, what was your role at Google?

24  A.  I was an employee relations partner.

25  Q.  And did you participate in an investigation in connection

1        MR. CHIARELLO:  Mr. Yang, can we look at the eighth

2   page, please.

3   Q.  And this page deals with unfair treatment; correct?

4   A.  Yes.

5   Q.  Five rows down there's a row identified as unfair leveling

6   at hire.  Do you see that?

7   A.  I do.

8        MR. CHIARELLO:  And Mr. Yang, if you can call out the

9   two boxes.  Great.  I want to look at the box on the right.

10  Q.  So this is notes/regional nuances.  And it says:

11  Typically, these would be looked into by PPs/and PCs.  What are

12  PPs and PCs?

13  A.  It's what we refer to generally as human resources at

14  Google.  And they actually break it down into people partners

15  and people consultants.

16       So people partners are typically aligned to, like,

17  leaders and strategically work with them.  And people

18  consultants are typically involved with kind of the more

19  general concerns or general guidance for Googlers, like if they

20  need help with leave or performance questions.  So that's just

21  how it's broken out.

22  Q.  It goes on to state:  However, discrimination related to

23  level may not be substantiated, but we do find the level was

24  unfair or not in alignment with Google processes for job

25  ladder.  In that case, please note you substantiated "unfair

1   leveling at hire" and did not substantiate "discrimination —

2   Level."  Additionally, if there's a concerned re

3   discrimination, ER -- that's employee relations?  Ms. Beaupain,

4   "ER" is employee relations?

5   A.  Yes.  Sorry.  Thank you.

6   Q.  Okay.  Would look into it, and this category may be used if

7   discrimination related to level is not substantiated, but we do

8   find the level was unfair or not in alignment with Google

9   processes for job level.

10          Do you understand, Ms. Beaupain, if there is a finding

11   that there was an unfair leveling, whether or not it's related

12   to discrimination, that Google had a process to adjust or

13   correct the level?

14   A.  I'm making sure I understand the question.  Was there a

15   process in place if there was a finding of unfair leveling, is

16   that the question?

17   Q.  Yes.  So assuming employee relations does an investigation,

18   determines that there is leveling that was unfair, Google has a

19   process to correct that unfairness?

20   A.  I can't speak to the specific process that's in place, but

21   if we did during the course of our investigation find that

22   there was unfair leveling, that's my understanding is we would

23   take steps to help correct that.

24   Q.  I want to talk specifically about your role now in

25   Ms. Rowe's complaint.

1           THE COURT:  Mr. Chiarello, do you want to start that

2      now?  It's 12:26.  It sounds like it might be a segment.

3           MR. CHIARELLO:  It is a new area.

4           I'm happy to break here.

5           THE COURT:  I think that makes sense.

6           MR. CHIARELLO:  Okay.

7           THE COURT:  All right.  Now, Ms. Williams, we're going

8      to have some technical assistance during the lunch break,

9      right?  I just need to factor that into the amount of time

10     we're going to be out of here.

11          Members of the jury, let's break for lunch now and

12     return at five minutes after one.  And during the lunch break,

13     please do not speak to each other or anyone else about the

14     case.  Do not do any research on the case.  And please remember

15     to make use of the facilities in the jury room and not use the

16     public rest rooms where you might encounter lawyers, witnesses,

17     etc.

18          All right.

19          (Jury not present)

20          THE COURT:  You may step down now.  Thank you.

21          (Witness not present)

22          (Luncheon recess)

23          (Continued on next page)

24

25

1    A F T E R N O O N   S E S S I O N

2                        1:10 P.M.

3         THE COURT:  Ms. Williams, let's bring in the jury

4    please.

5         (Jury present)

6         THE COURT:  Ms. Beaupain, I remind you that you're

7    still under oath.

8         THE WITNESS:  Yes, your Honor.

9    BY MR. CHIARELLO:

10   Q.  Ms. Beaupain, do you recall prior to the break we were

11   talking about Google's policies with respect to correcting

12   under-leveling at hire?

13   A.  Yes.

14        MR. CHIARELLO:  Mr. Yang, can you please put up

15   Plaintiff's 105.

16   Q.  Ms. Beaupain, if you can take a look at the first page.

17   And if you feel like you need to look further into this

18   document, let me know.

19   A.  Okay.

20   Q.  Ms. Beaupain, is this an example of a time in which

21   employee relations adjusted a female employee's level following

22   a complaint of under-leveling?

23   A.  So I don't recall this doc or if this is one that's

24   related, something I worked on based on what's discussed.  I do

25   see discussions about levels though.

1   Q.  And taking a look at this second bullet from the bottom,

2   there's a note:  We are adjusting to Level 7, backdating to

3   when blank started in KAE role.

4           So does that indicate to you that this individual's

5   level was adjusted and backdated to the time they started in

6   the role?

7   A.  Yes.

8   Q.  I want to talk a little bit about your role in the

9   investigation of Ms. Rowe's complaint.

10          MR. CHIARELLO:  Mr. Yang, can we put up Plaintiff's

11   57, please.

12   Q.  Ms. Beaupain, do you recognize these to be the interview

13   notes made in connection with the interviews around Ms. Rowe's

14   complaints --

15   A.  I do, yes.

16   Q.  -- in 2018?

17   A.  Yes, I do.

18   Q.  You're familiar with this document?

19   A.  Yes.

20   Q.  And to your knowledge, everything in this document is

21   accurate?

22   A.  Yes, it would be accurately reflecting the notes that were

23   taken at the time.

24   Q.  Is it correct that the only person you interviewed in

25   connection with that complaint besides Ms. Rowe was Jennifer

1    Burdis?

2    A.  Yes.

3    Q.  And you didn't interview any of the Level 9 men Ms. Rowe

4    was comparing herself to, right?

5    A.  I did not.

6    Q.  You didn't interview Will Grannis?

7    A.  I did not.

8    Q.  And you did not interview Brian Stevens?

9    A.  I did not.

10   Q.  In addition to the interview of Ms. Burdis, did you also

11   review data that Kevin Lucas had put together with respect to

12   degrees and years of experience for the individuals, the

13   technical directors in OCTO?

14   A.  Yes, I did.

15   Q.  And did you take any steps to verify with anyone whether

16   those two factors, meaning years of experience and degrees,

17   were actually used in the leveling decisions when Ms. Rowe was

18   hired?

19   A.  I spoke to Jenny Burdis, who is the recruiter in staffing,

20   to better understand the process and what had been taken into

21   consideration.

22   Q.  And did she tell you that years of experience and degrees

23   were the basis for the leveling decisions?

24   A.  Not in those words, no.  She explained they were

25   considerations and factors when determining level.

1   Q.  Okay.  Other than speaking with Ms. Burdis and reviewing

2   the data that Mr. Lucas provided, did you do anything else as

3   part of your investigation?

4   A.  I would have -- I spoke to, I believe, Kevin Lucas from HR

5   to better understand, kind of, steps he'd taken and what he'd

6   done.  I would have spoken to colleagues to make sure we are

7   coming from a consistent -- consistent front in what we do in

8   steps we take as far as an investigation.  Reviewed the data,

9   reviewed any relevant documentation or emails, spoken with

10  relevant people who would provide relevant information.

11  Q.  I'm sorry, did you finish?

12  A.  I think I did, yes.

13  Q.  When you say "reviewed relevant documentation or emails,"

14  what specifically are you referring to?

15  A.  In general, it would have been steps taken.  So if there's

16  emails that were, you know, related to the concern, HR provide

17  any additional background or emails, I would have reviewed

18  those.  Just kind of any relevant information that was provided

19  to us in connection to the concern raised.

20  Q.  And as you sit here today, can you think of any documents

21  or emails you reviewed besides the data that Mr. Lucas provided

22  as part of your investigation?

23  A.  I would have -- I believe there are some emails that HR

24  provided me kind of to show to understand the concerns that

25  were raised or any steps that were taken prior to it coming to

NAJVROW1

1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x

3   ULKU ROWE,

4                    Plaintiff,

5            v.                              19 Civ. 8655 (JHR)

6   GOOGLE LLC,

7                    Defendant.              Trial

8   ------------------------------x
                                            New York, N.Y.
9                                           October 19, 2023
                                            8:57 a.m.
10
    Before:
11
                        HON. JENNIFER H. REARDEN,
12
                                            District Judge
13                                          -and a jury-

14                         APPEARANCES

15  OUTTEN & GOLDEN, LLP
         Attorneys for Plaintiff
16  BY:  CARA E. GREENE
         GREGORY S. CHIARELLO
17       SHIRA Z. GELFAND

18  PAUL HASTINGS LLP
         Attorneys for Defendant
19  BY:  KENNETH W. GAGE
         SARA B. TOMEZSKO
20
    Also Present:  Vincent Yang, Paralegal (Outten & Golden)
21                 Andrew Velazquez, Google Rep.
                   Jean Gutierrez, Paralegal (Paul Hastings)
22

23

24

25

NAJVROW1

1    because the conversation in which Mr. Vardaman told Ms. Rowe

2    that she "wasn't going to be considered because she wasn't a

3    good fit," occurred within just one week of February 21st,

4    2020, when the latest of the four status reports, D-74, was

5    created.  Plaintiff also contrasts Mr. Vardaman's deposition

6    testimony that he did not create updates for Ms. Kliphouse

7    related to the FSVL role, and that whatever he may have created

8    was "much more *ad hoc*" with his trial testimony that he created

9    these status reports and updated them continuously to keep

10    track of the VP financial services sales search in preparation

11    for his meetings with Ms. Kliphouse.

12            However, the temporal relationship between D-74, 76,

13    77, and 78, all of which were created between late January and

14    February 21, 2020, and Ms. Rowe's and Mr. Vardaman's

15    conversation in late February 2020, is not new information.

16    Accordingly, the Court fails to see why plaintiff waited until

17    trial to raise this issue, let alone why she delayed four days

18    after Mr. Vardaman had testified.  Plaintiff's application is

19    therefore denied.

20            Are we ready to bring the jury in?

21            Is the witness ready?

22            MR. GAGE:  He's just out in the hall, but yes.

23            THE COURT:  We weren't going to start till 9:15, but

24    we might as well start now, right?

25            MR. GAGE:  It's fine by us, your Honor.

NAJVROW1                         Humez – Direct

1           THE COURT:  Okay.  Let's get the witness and then,

2    Ms. Williams, you could bring the jury in.

3           (Jury present)

4           THE COURT:  Good morning.  Please be seated.

5           Mr. Humez, I remind you that you are still under oath.

6           MR. GAGE:  May I proceed, your Honor?

7           THE COURT:  You may.

8    CHRIS HUMEZ,

9       called as a witness by the Defendant,

10      having been previously duly sworn, testified as follows:

11   DIRECT EXAMINATION (continued)

12   BY MR. GAGE:

13   Q.  Good morning, Mr. Humez.

14   A.  Good morning.

15   Q.  Yesterday we talked a bit about your preparation of

16   Ms. Rowe's starting pay package.  Do you remember that?

17   A.  Yes.

18   Q.  Did you also prepare starting pay packages for the other

19   technical directors in OCTO who were hired in 2017/2018?

20   A.  I did, yes.

21   Q.  And did you use exactly the same approach to preparing

22   those packets and offers that you've used for Ms. Rowe's?

23   A.  Yes, same process.

24   Q.  Now, were all of the other technical director starting pay

25   packages as high relative to the market reference point as

NAJVROW1                      Humez - Direct

1  Ms. Rowe's?

2  A.  No, they were not.

3  Q.  Were they lower?

4  A.  They were -- yeah, they were lower, much lower in some

5  cases.

6  Q.  And again, to the best of your recollection, what was

7  Ms. Rowe's relative to the market reference point?

8  A.  My recollection is that it was 98 percent of the MRP, or

9  market reference point, which is quite high.

10  Q.  Now, Mr. Humez, if -- at Google, if an employee moves into

11  a different job code, does Google pay them for the job they are

12  now performing in the new job code or the job they used to

13  perform?

14  A.  It's based on the job that you're performing during that

15  year, yeah.

16  Q.  Okay.  There's been a lot of testimony about Level 8/Level

17  9 technical directors.  Do Level 9 technical directors in the

18  office of the CTO always make more than Level 8 technical

19  directors?

20  A.  No, not in all cases.

21  Q.  Does it depend upon how they perform against expectations?

22  A.  Yeah.  Our pay philosophy centers around pay for

23  performance.

24  Q.  Now, before we finished yesterday, you described the annual

25  compensation review process.  Now, after managers rate employee

1    performance and those ratings that they do are put into the

2    system, what happens next?

3    A.   In terms of the annual pay process?

4    Q.   In terms of the process, exactly.

5    A.   So for each element of compensation, we'll use a standard

6    calculation to arrive at a modeled amount.  So to take the

7    bonus, for example, it would be their on-target bonus, which is

8    the base salary, times 30 percent, in the case of a Level 8.

9    There would be a multiplier that's attached to each performance

10   rating that they received throughout the past year.  And that

11   would essentially be the modeled amount for a bonus, to use an

12   example.

13        Then, as we go through the comp planning process, we

14   allocate a portion of the budget for discretionary adjustments

15   by managers.  So they can take into account things that just

16   can't really be baked into a performance rating.  So maybe it's

17   the trajectory of their performance throughout the year being

18   higher or lower or other things that really can't be, you know,

19   into kind of like a -- just a distinct performance rating.  So

20   they can make adjustments based on all of those things.

21   Q.   I'd like to show you and ladies and gentlemen of the jury a

22   document that the jury has already seen, it's P-113.  And once

23   this pops up, you'll see there's a lot of information in it.

24   Files with some data.

25        And this reflects, as you can see, data regarding

1   particular employees.

2        MR. GAGE:  And if you could just stop for a second,

3   Jean, as you're going across.

4   Q.  Do you see the column headings, Mr. Humez?

5   A.  I do.

6   Q.  Okay.  And if you look at column AA, what would that data

7   reflect?

8   A.  That would reflect in the calculation that I mentioned the

9   kind of algorithmic or modeled amount that factors in their

10  performance ratings.

11  Q.  Okay.  And is that calculated without regard to whether

12  someone is a man or a woman?

13  A.  That's correct.

14  Q.  Now, if we could go over to the right to proposed salary.

15       What does the proposed salary field reflect?

16  A.  That reflects the final salary planned amount.  So it would

17  be the model amount factoring in any discretionary adjustments

18  from the manager or the management chain.

19  Q.  Okay.

20       MR. GAGE:  Jean, you can take this down.

21  Q.  Now, once Google finalizes its compensation decisions, how

22  does the company notify employees of their pay for the upcoming

23  year?

24  A.  At Google we have a tool that's connected to gComp, which

25  is our comp planning tool, and it's called Prosper.  So it's a

NAJVROW1                          Humez - Direct

1  tool that releases the compensation letters to employees.  And

2  managers would use that tool to release the letter and then

3  have the conversation explaining the award to them.

4  Q.  And are those colloquially referred to at Google as the

5  prosper letters?

6  A.  The prosper letters, yeah.

7           MR. GAGE:  Your Honor, if I may, I'd just like to move

8  the stand over here.

9           THE COURT:  Any objection?

10          MS. GREENE:  I'm not sure for what purpose, but no

11  objection at the moment.

12          MR. GAGE:  I am going to just write some information

13  as the witness is testifying on here from his testimony and

14  from some exhibits, your Honor.

15          THE COURT:  Okay.  I'm looking at Ms. Greene.  Do you

16  want to wait to see what he writes?

17          MS. GREENE:  Yes.  I mean, to the extent it's a

18  demonstrative, it's not the right time.  But it will depend.

19          MR. GAGE:  I'd like to show the witness Exhibit P-134.

20          And Jean, if we could go to the December 2017 prosper

21  letter.  Sorry, your Honor, some technical issues.

22          Got it, Jean?  We have a hard copy?

23          This is P-134.  May I hand it up to the witness, your

24  Honor?

25          THE COURT:  You may.

1   BY MR. GAGE:

2   Q.  Now, Mr. Humez, is the first page of P-134 -- first and

3   second pages of this document, is this a December 2017 prosper

4   letter for Ms. Rowe?

5   A.  Yes, it is.

6   Q.  And what does that say her 2018 total compensation award

7   was?

8   A.  The total was 471,000.

9   Q.  $471,000.

10           And what was in her December 2020 prosper letter, what

11   was her total award?

12   A.  It was 786,000.

13   Q.  I'm sorry, you said seven --

14   A.  786.

15   Q.  786.

16           And her December 2021 prosper letter, what was the

17   amount?

18   A.  It was 870,000.

19   Q.  And her March 2023, what was the amount?

20   A.  It was 940,667.

21   Q.  940,000?

22   A.  Yes.

23   Q.  Okay.

24           MS. GREENE:  Your Honor, may we have a sidebar with

25   respect to the document?

1              THE COURT:  Yes.

2              (At sidebar)

3              THE COURT:  Go ahead, Ms. Greene.

4              MS. GREENE:  This is the first time we've received any

5     notice of Mr. Gage's intent to do this.  It's functioning as a

6     demonstrative.  We had an agreement that demonstratives would

7     be exchanged in advance.  He certainly could have included this

8     information on a demonstrative that he provided.  He did not.

9     This would be fair game in closing arguments.  But for the time

10    being, under these circumstances, it's not appropriate and is

11    contrary to the parties' agreement.

12             MR. GAGE:  Your Honor, it's not a demonstrative.  I

13    had plenty of trials where I've had the witness write the

14    numbers.  I could ask Mr. Humez to write the numbers as he

15    testifies so the jury can see it.  It's not a demonstrative

16    exhibit.

17             MS. GREENE:  The documents themselves are the evidence

18    which is before the jury.  To the extent he's writing it, it's

19    not evidence of itself; so it's a demonstrative functioning as

20    a demonstrative.

21             MR. GAGE:  Just like opening statements, closing

22    arguments, lawyers say a lot of things.  I'm just trying to

23    help the jury organize the information.

24             MS. GREENE:  You could do it in closing arguments.

25    The agreement between the parties was that there would not be

1    demonstratives during openings.  Any demonstratives used during

2    course of trial would be exchanged ahead of time.

3             THE COURT:  What's your position on the witness

4    writing it?

5             MS. GREENE:  Again, it's not evidence, so I'm not sure

6    what the function -- the document is there that he's referring

7    to.  It serves to confuse the jury.  I suppose the document,

8    the witness writing it is --

9             THE COURT:  You can mark it as an exhibit.

10            MS. GREENE:  I don't think it should be an exhibit.

11   We have the documents.  He's reading from the documents.  The

12   documents are the evidence, not anybody's writings, and that's

13   where we're confusing the jury.

14            MR. GAGE:  This is not a demonstrative.  It's not

15   confusing the jury.  It's just helping them see --

16            THE COURT:  Well, it's not evidence.

17            MR. GAGE:  Agreed.  I agree it's not evidence.  But

18   what we say is not evidence either.

19            THE COURT:  Is this up on the screen now or are we

20   just working with a hard copy?

21            MR. GAGE:  We're working with a hard copy with the

22   witness.  Let me just ask.

23            THE COURT:  Okay.  Let's put the document on the

24   screen and no more with the billboard.

25            MR. GAGE:  Okay.

1           (In open court)

2           MR. GAGE:  Let's just go back and make sure we had

3    2020.  December 2020, we've finished that.

4           I'd like to go now to P-1 –– let's –– now that we have

5    the exhibit, let's let the jury see what this is.

6    BY MR. GAGE:

7    Q.  So this is P-134.  Is this the document you were just

8    looking at in hard copy ––

9    A.  Yeah.

10   Q.  –– Mr. Humez?

11          Okay.  This is the December 2017 prosper letter.

12          What's the 295 number reflect?

13   A.  The new base salary.

14   Q.  And then the next number down reflects what?

15   A.  The annual cash bonus.

16   Q.  And is that a function of performance?

17   A.  It is.

18   Q.  And the next number, what is that?

19   A.  The equity refresh grant.

20   Q.  Okay.  And then if we go to the next page, does it provide

21   the total?

22   A.  It does.

23   Q.  Is this the total compensation to Ms. Rowe for 2018;

24   correct?

25   A.  Awarded in 2018.

1  Q.  Awarded in 2018.

2          MR. GAGE:  I'd like to, Jean, if we could, go to

3  P-132.

4          THE COURT:  Ms. Tomezsko, could we clear the billboard

5  out of the way, please, and put it back where it came from.

6          That's all right.

7  Q.  P-132.  Is this Mr. Harteau's prosper letter or letters?

8  A.  Yes.

9          MR. GAGE:  And if we could start with the December

10 2017 prosper letter.  If we go to the second page -- I'm sorry,

11 it's on the first page.  It's a shorter letter.

12 Q.  What was Mr. Harteau's total compensation award for 2018?

13 A.  395,000.

14         MR. GAGE:  Now, Jean, if we could go to P-130.

15 Q.  This is Mr. Donaldson's prosper letter for December 2017.

16         What was his total award for 2018?

17 A.  402,000.

18 Q.  And that's -- if you remember the number, that's about

19 $69,000 less than Ms. Rowe's; correct?

20 A.  From recollection, yeah.

21 Q.  And Mr. Harteau's was about 70-some thousand dollars less

22 than Ms. Rowe's; correct?

23 A.  Correct.

24         MR. GAGE:  Now, I'd like to go to Mr. Wilson, P-136,

25 Jean.

1    Q.  Mr. Wilson's prosper letter, focusing here on the December

2    2017 prosper letter.  What was Mr. Wilson's total compensation

3    award for 2018?

4    A.  452,000.

5    Q.  That's almost $20,000 less than Ms. Rowe's; correct?

6    A.  Correct.

7             MR. GAGE:  Now, I'd like to go, Jean, if we could, to

8    P-136 -- or, I'm sorry, this is P-136, Mr. Wilson's prosper

9    letter, December 2020, if you could page through.  Next page.

10   December 2020.  And then if we could go to the second page.

11   Q.  What was Mr. Wilson's total compensation award for 2021?

12   A.  668,800.

13   Q.  And I believe you testified that Ms. Rowe's for that same

14   year was $786,000.  So this is nearly $120,000 less than

15   Ms. Rowe's pay for the same year; correct?

16   A.  That's correct.

17            MR. GAGE:  Now, I'd like to go to P-135, and I'd like

18   to go to the December 2021 prosper letter.

19   Q.  December 2021 for Paul Strong.  If we can go to the second

20   page.  What was Mr. Strong's total compensation award for 2022?

21   A.  718,000.

22   Q.  And Ms. Rowe's for that same year, I think you testified,

23   was $870,000?

24   A.  Correct.

25   Q.  So Mr. Strong's was substantially less for that year;

NAJVROW1                          Humez - Cross

1   correct?

2   A.  Correct.

3   Q.  Now, I'd like to go to Mr. Strong, same exhibit,

4   Mr. Strong's March 2023 prosper letter.  And Mr. Humez, was the

5   March 2023 prosper letter the most recent prosper letter that

6   was issued by Google?

7   A.  It is, yes.

8   Q.  Okay.  And this is for 2023 compensation?

9   A.  Correct.

10  Q.  If we could go to the second page of Mr. Strong's.

11          And what was his total award?

12  A.  $754,033.

13  Q.  And you testified earlier that Ms. Rowe's compensation for

14  2023 was 940,000, so that's nearly $190,000 less than Ms. Rowe

15  will earn in 2023; correct?

16  A.  That's correct.

17  Q.  And these differences in compensation, are they

18  attributable to differences in job performance?

19  A.  Yes, they would be, yeah.

20          MR. GAGE:  No further questions, your Honor.

21  CROSS-EXAMINATION

22  BY MS. GREENE:

23  Q.  Mr. Humez, just a few questions.

24          You testified earlier about differences in between L8

25  and L9 compensation; correct?

1   A.  Say that again, sorry.

2   Q.  You testified to differences between how L8s and L9s are

3   paid; correct?

4   A.  Correct.

5   Q.  And so an L8, you talked about -- what was the M starting

6   phrase?

7   A.  Sorry, yeah, the market reference point.

8   Q.  The market reference point.

9          So at a Level 9, where Ms. Rowe was at in terms of

10  market reference point, 98 percent, where would that have put

11  her in the market reference point on L9s?

12  A.  I don't know that offhand.

13  Q.  Well, the range for L9s was larger and higher than the

14  range for L8s; correct?

15  A.  The earning potential, the range would be higher; but they

16  would overlap; at the high end of L8 could be into L9.

17  Q.  Since Ms. Rowe was at 98 percent of the market rate, would

18  that limit her potential increases going forward as an L8?

19  A.  It would be a function of performance.  So there's no --

20  there's no salary caps in place at Google.  So if someone were

21  to be continuing to perform strongly, they could still be

22  eligible for increases.

23  Q.  She would remain in the L8 category and not move into the

24  L9 category; correct?

25  A.  Well, the ranges, like I said, overlap.  So, yeah, they

1    he actually was one of the first people that I's seen ever,

2    like, speaking about this, kind of this next generation thing

3    that people really hadn't even implemented yet.

4            So he was really far ahead, and customers really

5    looked at him as kind of a whisperer, if you will, about where

6    technology was going, and that was exactly, you know, what we

7    wanted in the CTO office.

8    Q.  I'd like to move to D24.

9            Your Honor, if I could?

10           THE COURT:  Yes.

11   Q.  Mr. Stevens, who is Jonathan Donaldson?

12   A.  He was a member of OCTO.

13   Q.  Did you know of Mr. Donaldson before he joined OCTO?

14   A.  I did.

15   Q.  And how did you know of Mr. Donaldson before he joined

16   OCTO?

17   A.  Because when he was at Intel, I would — I would have

18   worked with him when I was at Red Hat.

19   Q.  Why was Mr. Donaldson hired as an L9?

20   A.  Oh, just a super-senior technologist.  I mean, not just his

21   work at Intel, the work that I had seen him at Intel, but a lot

22   of the work even prior to Intel that he did.  The VCE was ——

23   the V was VMware, the C was Cisco, and the E was EMC.  So the

24   VCE company was bringing together these three companies and

25   building a product offering out of it.  So in many ways VCE was

1  the original cloud.  They just didn't call it cloud back then,

2  and he led engineering for that effort.

3  Q.  Now, was it just the number of years of experience he had?

4  A.  Number — number of years doesn't really matter for

5  anything.

6  Q.  What does matter?

7  A.  Well, you can spend all your time not learning, right, or

8  you can spend all your time enjoying and doing the same thing.

9  There's nothing wrong with any of those.  Everybody has

10 different — so I actually on resumes, ten years sometimes can

11 work against you, right, because I actually prefer to see

12 people that, for the roles that we're hiring in, like, get out

13 of their comfort zone and take a new mission.  Don't get

14 complacent.  Go learn a new thing.  Solve a new problem.  So

15 what I liked about him is he did have those chapters, but it

16 wasn't purely just the amount of years, it was what he did in

17 those times.

18 Q.  Like to ask you about somebody else.  Do you know who Scott

19 Penberthy is?

20 A.  I do.

21      MR. GAGE:  May I approach?

22      THE COURT:  Yes, you may.

23 Q.  D44.  Was Scott Penberthy hired into OCTO?

24 A.  He was.

25 Q.  Are you familiar with Scott Penberthy's background?

NAJHRow2                          Stevens – Direct

A.   I am.

Q.   Ms. Rowe has testified in this trial that she was better

qualified than Scott Penberthy.  Do you agree with that

statement?

A.   That she was better qualified?  I couldn't say she was

better qualified, no.  Scott was amazingly strong, right?

Ulku's amazingly strong, but Scott was amazingly strong as

well.  I wouldn't say — they're very different.

Q.   How was Mr. Penberthy very strong?

A.   Just mind if I refresh my memory a little bit?

         Yeah.  Like, Scott, obviously, like, his background,

you know, is schooling at MIT and doing the formal, which I

think is great, but there's great paths that you can be very

successful without that formal training.  So the schooling

isn't the only thing.  But, like, when I — it's funny, when I

look at résumés like this, I always look, like I said, at what

they've done through their years.  And one of the things that

stood out the most to me was his work at IBM, believe it or

not.

Q.   Why is that?

A.   Just because to become a vice president at IBM, you know —

and there's a difference between vice presidents that are in

sales organizations and vice presidents that are in engineering

organizations.  And sales the VPs, you often have to have that

for the title to have the conversation with customers, so

1    to see your agreement.

2              MR. GAGE:  Which document, your Honor?

3              THE COURT:  Weren't you about to put up a document?

4              MR. GAGE:  No.  I said I'm not going to put up a

5    document.  I'm not going to put up a document.

6              MS. GREENE:  Your Honor, I would have moved *in limine*

7    or before, having not had a representation from Mr. Gage that

8    we were not going to go there.

9              MR. GAGE:  Had you told me --

10             THE COURT:  The scope of where you weren't going to go

11   is what's important here.

12             MR. GAGE:  Absolutely.

13             MS. GREENE:  It's the leave.

14             MR. GAGE:  It's the medical leave.

15             MS. GREENE:  It's six weeks is also part of her

16   medical leave, whether it's the benefit period or not.

17             MR. GAGE:  I had no reason to know that and I still

18   have no reason to know that.

19             MS. GREENE:  But you know it because I'm telling you.

20             MR. GAGE:  I know she applied for medical leave.

21             MS. GREENE:  And so under the disability laws, under

22   Google's policies, the fact that the benefits started at a

23   certain point doesn't mean that the time before it also does

24   not --

25             MR. GAGE:  I don't want to waste the jury's time.  I

```
 1    will move on.
 2              (In open court)
 3    BY MR. GAGE:
 4    Q.  Ms. Florissi, I've got some different questions for you.
 5              In the entire time that you have been managing
 6    Ms. Rowe, have you expected anything of Ms. Rowe that is not
 7    expected of others on your team?
 8    A.  No, I have not.
 9    Q.  Ms. Florissi, have you in any way treated Ms. Rowe more
10    harshly because of this lawsuit?
11    A.  Not at all.  If anything, I have been very careful and very
12    understanding.
13              MR. GAGE:  No further questions, your Honor.
14    CROSS-EXAMINATION
15    BY MS. GREENE:
16    Q.  Hello, Ms. Florissi.
17    A.  Good afternoon.
18    Q.  I just have a few questions for you.
19              You first learned about this lawsuit in April 2022;
20    correct?
21    A.  Correct.
22    Q.  And sometime before the check-in meeting you had with
23    Ms. Rowe, you met with internal counsel at Google about her
24    case; correct?
25    A.  Not about her case, about the fact that I thought she
```

NAJVROW5                        Florissi - Cross

1    needed a support check-in.

2    Q.  And that was -- you had to handle it carefully because of

3    her case; correct?

4    A.  Correct.

5    Q.  And you made very -- you made sure to have careful

6    documentation because of Ms. Rowe's lawsuit; correct?

7    A.  Not only because of her lawsuit.  When you give a support

8    check-in, you have to collect information to make sure that all

9    the process is followed.

10   Q.  Now, prior to that support check-in meeting, you had never

11   told Ms. Rowe that you wanted the "artifacts"; correct?

12   A.  I never -- correct.  At the Level 8 technical director in

13   the office of the CTO is expected to produce artifacts.

14   Q.  Do you know whether Ms. Rowe wasn't producing artifacts or

15   was it just that you hadn't seen them?

16   A.  If she produced the artifacts, she never shared them with

17   me.

18   Q.  But prior to that check-in, you had never told her that you

19   wanted or expected her to share them with you; correct?

20   A.  I didn't think I have to; correct.

21   Q.  Now, the technical director role, you were asked about the

22   OKRs.  The OKRs have been set each year, but the technical

23   director position is still the technical director position;

24   correct?

25   A.  To the best of my understanding is a technical director

position to deliver against the OKRs.  Google has OKRs at every
level:  At the company level, at the business product areas
level, at the business level.  And they are set every year.  So
everybody within their role perform or execute, focus their
activities to deliver against those OKRs.

Q.  And technical directors are expected to be self-directed in
their role at the Level 8 and above; correct?

A.  Correct.

Q.  After you asked Ms. Rowe for artifacts, she provided them
to you; correct?

A.  She provided two artifacts.  One, which is the paper on the
trusted AI; and the other one in February with another OCTO
member also on the same topic.

Q.  Now, that trusted AI paper, do you recall how many pages
that was?

A.  Maybe around 30 pages or so, to the best of my recollection
here.

Q.  Right.  So 30 pages.  And that would have -- in order to be
able to write and produce a paper of 30 pages, it would have
required quite a bit of research, background, investigation;
correct?

A.  Correct.  However, the paper that was produced in February,
it was in partnership with another OCTO member that had already
been working on -- on the area as well.

Q.  And who was that other partner, that other OCTO director?

NAKHRow1

1    UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
2    ------------------------------x

3    ULKU ROWE,

4                    Plaintiff,

5           v.                                19 Civ. 8655 (JHR)

6    GOOGLE LLC,

7                    Defendant.               Trial

8    ------------------------------x
                                              New York, N.Y.
9                                             October 20, 2023
                                              8:30 a.m.
10
     Before:
11
                        HON. JENNIFER H. REARDEN,
12
                                              District Judge
13                                            -and a jury-

14                          APPEARANCES

15   OUTTEN & GOLDEN, LLP
          Attorneys for Plaintiff
16   BY:  CARA E. GREENE
          GREGORY S. CHIARELLO
17        SHIRA Z. GELFAND

18   PAUL HASTINGS LLP
          Attorneys for Defendant
19   BY:  KENNETH W. GAGE
          SARA B. TOMEZSKO
20
     Also Present:  Vincent Yang, Paralegal (Outten & Golden)
21                  Andrew Velazquez, Google Rep.
                    Jean Gutierrez, Paralegal (Paul Hastings)
22

23

24

25

1    reason he did not discuss Ms. Rowe with Ms. Kliphouse prior to

2    their next scheduled meeting.

3           And here you could see —— you don't have to trust the

4    witnesses.  It's here in the documents —— the focus was on

5    Yolande Piazza.  And then there's no surprise, then, that

6    Thomas Kurian, the CEO of Google Cloud, shortly thereafter

7    says:  "Hire her quickly.  She will not be on the market for

8    long."  The story resonates.  The story makes sense.

9           You've also heard that around the same time

10   Mr. Grannis created an opportunity for Ms. Rowe to meet with

11   Ms. Kliphouse.  Mr. Grannis, who supported Ms. Rowe, who

12   Ms. Rowe acknowledges supported her, gave her this opportunity

13   to meet with someone, a president with a go-to-market

14   organization within Google Cloud.  And during that meeting,

15   Ms. Kliphouse testified, and Ms. Rowe testified as well, they

16   discussed her background.  They discussed what she was doing at

17   Google Cloud.  They discussed the regulatory work which she was

18   doing, which was a large part of what Ms. Rowe was actually

19   doing at the time, but Ms. Kliphouse found that irrelevant to

20   the role.  That was in her testimony.

21          Ms. Rowe herself, when we played you the clip,

22   acknowledged that she had told Ms. Kliphouse about her C-level

23   networking contacts during that meeting and her financial

24   services expertise.  And indeed, the documents corroborate the

25   testimony that on February 21 there was a discussion about

1    Ms. Rowe.  Mr. Vardaman did not make a unilateral decision not

2    to present her to Ms. Kliphouse for consideration.  It's right

3    there in the documents, as is her background.

4           But you'll see in Ms. Kliphouse's testimony, when they

5    discussed her, precisely what I'm telling you here.  They

6    decide to focus on other candidates who they found to be very

7    qualified for the role.  There's nothing wrong with that.

8    There's nothing retaliatory about that because they pursued

9    another candidate that they found attractive and that they

10   wanted to hire into this role because they needed to fill the

11   role immediately.  They had identified her before Ms. Rowe and

12   Ms. Kliphouse had coffee together.

13          MR. GAGE:  So let's talk about why Ms. Rowe was paid

14   what she was paid.

15          Now, again, you heard Mr. Humez tell you how they set

16   starting pay.  It's tied to a job code which is specific to

17   level, and this was Ms. Rowe's job code.  You can see this on

18   P-119.  And he also told you about the market reference point.

19   You remember the MRP?  They set a market reference point for

20   the job.  It's not specific to a person.  It's set for the job,

21   and that's so they can be fair.  And they try to get people in

22   at 80 percent of the market reference point for starting pay.

23          And then he told you how target bonus and initial

24   equity work.  And again, yes, target bonus specific to a

25   Level 8 is 30 percent, and that is because there are lower

NAKHRow3                        Summation - Mr. Gage

1    expectations for a Level 8 than there are for a Level 9.  And

2    initial equity is also similarly calculated based upon the job

3    code.  And he talked about how they go to use external market

4    benchmarking.  Again, this is all without regard to the person.

5    It's all without regard to whether it's a man or a woman.  It's

6    purely based on roles and responsibilities associated with the

7    job code.

8            Now, he explained for you how he calculated her

9    starting pay package, and there's been a lot of back and forth

10   in this trial about whether Ms. Rowe was giving something up.

11   And I think you heard her and her counsel say, well, she was

12   giving something up when she came to Google, others weren't.

13   But Mr. Humez explained that that's not the way they do it.

14   They calculate cash flows.  And so Ms. Rowe wasn't giving

15   something up when she left JPMorgan Chase.  What she was

16   talking about were stock awards she had received in prior years

17   that she was not going to realize, she was not going to

18   receive, unless she earned them.  They were not vested.  She

19   told you they were unvested.  And what that means is she needs

20   to work the next year at JPMorgan Chase to earn that next piece

21   of that vested stock award.

22           And so Mr. Humez explained that's how they did it.

23   They're estimating what Ms. Rowe's cash flow would be if she

24   worked at JPMorgan another year, another two years, another

25   three years, what she could reasonably expect to earn based

1    upon these prior awards that had not fully vested.

2           You also heard about Mr. Breslow's equity award at

3    Google, and he forfeited $2 million of it because, again,

4    similarly, it hadn't vested.

5           Now, I'd like to show you a demonstrative we have that

6    illustrates for you the starting pay packages of a group of

7    Level 8 and Level 9 technical directors in OCTO.  And

8    Ms. Rowe's bar is this one right here.  There's one bar higher

9    than hers, and that's Evren Eryurek, which means that her bar,

10   the value that Google placed on her as an entering employee,

11   was that high.  That means that it was higher than four of the

12   Level 9s.  It was higher than a whole bunch of Level 8s.

13          Google valued Ms. Rowe.  Does that look like sex

14   discrimination to you?  I don't think it is.

15          Now, Mr. Humez also told you that all of the other

16   technical directors who started around the same time, they had

17   lower market reference points.  Ms. Rowe's was about

18   98 percent; others were lower.  Again, that's specific to the

19   job code.  Each year Google adjusts her pay based upon her

20   performance against expectations.  That's what I talked about

21   on the first day of the trial.  Google sets expectations based

22   upon the job code, based upon the level, and she's measured

23   against them.

24          And you can take a look at these prosper letters,

25   P-134, 132, 130, 136, and so on, hers and the Level 9s, and if

1    you look at them, you will see there are years when she earns

2    more than some of the Level 9s.  And what means is they had

3    higher expectations, and they might not have met them.  And the

4    consequence is they fall further.

5         And Ms. Greene showed you a subset of those L9s in one

6    of her charts and their compensation to show that Ms. Rowe was

7    lower than them in those years, but she left two people out.

8    And that's because those are two people that she, in some

9    years, earned more than.  Level 9s do not always earn more than

10   Level 8s.  That's the point.

11        Annual earnings are a function of performance against

12   level-specific expectations, and in some years Ms. Rowe earned

13   more than them.

14        Now, again, she was evaluated against Level 8

15   standards.  And, yes, she absolutely got exceeds expectations,

16   and that was a middle rating.  And, yes, this question, "What's

17   one thing you plan to do to have more impact?" is one that

18   everybody has answered.  Google gives feedback to their

19   employees, and you will see if you look at these documents in

20   P-126, which is Ms. Rowe's performance evaluation, she gets

21   honest feedback, both positive and constructive.  And the

22   consistent theme that she's been told over and over and over

23   again by Mr. Grannis and now Ms. Florissi is that she needs to

24   have more engineering impact.  This is an engineering job.  And

25   over time the expectation in terms of public speaking has gone