# EXHIBIT 20

NAAVROW1

```
1    UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
2    ------------------------------x

3    ULKU ROWE,

4                    Plaintiff,

5              v.                          19 Civ. 8655 (JHR)

6    GOOGLE LLC,

7                    Defendant.            Trial

8    ------------------------------x
                                          New York, N.Y.
9                                         October 10, 2023
                                          10:15 a.m.
10
     Before:
11
                         HON. JENNIFER H. REARDEN,
12
                                          District Judge
13                                         -and a jury-

14                          APPEARANCES

15   OUTTEN & GOLDEN, LLP
          Attorneys for Plaintiff
16   BY:  CARA E. GREENE
          GREGORY S. CHIARELLO
17        SHIRA Z. GELFAND

18   PAUL HASTINGS LLP
          Attorneys for Defendant
19   BY:  KENNETH W. GAGE
          SARA B. TOMEZSKO
20
     Also Present:  Vincent Yang, Paralegal (Outten & Golden)
21                  Andrew Velazquez, Google Rep.
                    Jean Gutierrez, Paralegal (Paul Hastings)
22

23

24

25
```

THE DEPUTY CLERK:  He should have asked me first.
There's wirings that could be pulled.  That's fine.

MR. CHIARELLO:  This is as far as I'm going to take
it.

THE COURT:  Okay.

MR. CHIARELLO:  Thank you.  And thank you in advance
for your service in this case.

Consider with me what it would feel like to have your
worth, your value, determined not by your ability or your
intellect or your experience, but by the simple fact of being a
woman.  This case is about Ulku Rowe, a Google employee who
experienced exactly that, who Google paid less than men who
were performing the exact same job as her.  Google undervalued
Ms. Rowe at her hire in 2017, and paid her a pay grade called a
level that was lower than the level given to five men who were
hired to do the exact same job, even though she had greater
qualifications than some of those men.

This case is also about how, in 2018, Google similarly
undervalued Ms. Rowe when she applied for a promotion to a role
to which Google had said she was the obvious fit; and how,
instead, it just tapped a man on the shoulder and gave him that
job, even though he was less qualified than Ms. Rowe.

This case is also about how Google then retaliated
against Ms. Rowe for speaking up about her mistreatment by
denying her promotion and advancement opportunities, and by

1    only one.  Most of the technical directors got this.  A lot of

2    sign-on bonuses among all the technical directors.  So when you

3    strip that away, when you compare apples to apples, the actual

4    annual compensation between each of these individuals, between

5    the Level 9 men and Ms. Rowe, you'll see that they earn much

6    more than she did.

7              So as I mentioned, this is a case about unequal pay.

8    As you listen to the evidence, think about how similar

9    Mr. Harteau and Ms. Rowe's work was to each other, whether

10   Google had any business need to be hiring five men at a Level 9

11   and Ms. Rowe at a Level 8.  Because this case is also about

12   gender discrimination.  Think about whether Ms. Rowe's gender

13   impacted at all the decision to level her as a Level 8 rather

14   than a Level 9.

15             I've given you the background.  Now let me tell you

16   about how Google's leveling decisions impacted Ms. Rowe

17   throughout her career until this day.

18             You're going to hear how in late 2017, after learning

19   some of her colleagues had been leveled at Level 9, Ms. Rowe

20   spoke to human resources.  She wanted to know why that was.

21   What HR told her was, Sorry, there isn't a process to revisit

22   your level.  If you want to correct your level, you need to get

23   a promotion.  But, in fact, there was a process to correct it.

24   HR didn't trigger that process.

25             You'll also see how Ms. Rowe applied for a new role

1  very key qualifications that Ms. Piazza did not.  Foremost,

2  Ms. Rowe was familiar with the product.  In addition to her

3  long career leading up to joining Google, she had already been

4  in the role for three years focusing on cloud products for

5  financial institutions, the exact role that they brought in

6  Ms. Piazza for.  Ms. Piazza didn't have cloud experience at

7  all.  Ms. Rowe had worked across multiple financial

8  institutions in her career, knew the industry.  Ms. Piazza had

9  been at one bank her entire career, and it's a critical

10  distinction when we're talking about industry recognition.

11  Ms. Piazza also didn't have any sales experience, the very

12  thing Google claims is key to the role and why Ms. Rowe didn't

13  get the job, wasn't even considered for the job.

14         So the evidence will show it was far from a foregone

15  conclusion that Ms. Piazza would have gotten the job over

16  Ms. Rowe had Ms. Rowe been given a fair shot in the first

17  place.  But of course, Ms. Rowe never gave —— I'm sorry, of

18  course, Google never gave Ms. Rowe a fair shot.

19         These pieces: Ms. Rowe's underleveling at hire

20  compared to the male technical directors; her underpayment

21  compared to men doing the same work, Mr. Harteau and

22  Mr. Breslow; her treatment as a woman in the leveling process

23  for the financial services vertical lead just generally; and

24  how Google treated Ms. Rowe after she complained of

25  discrimination are what this case is about.  Of course, it is

1   about the consequences to Ms. Rowe, the millions of dollars in

2   lost compensation, the stymied career progression while being

3   trapped at Google, and the impact on her personally.

4          Look, you as the jury, you're the ones that get to

5   hear this case and right this wrong.  After you've heard the

6   evidence, after you've heard Judge Rearden's instructions, I

7   trust that you'll return a verdict in Ms. Rowe's favor,

8   awarding her fair and just compensation.

9          Thank you.

10         THE COURT:  Mr. Gage.

11         MR. GAGE:  Thank you, Judge Rearden.

12         Ladies and gentlemen, on behalf of Google and my

13   colleagues, Sara and Andrew and Jean, I really want to thank

14   you for giving of your time to help us decide this case.

15         We have a dispute, Ms. Rowe and Google, and I know you

16   didn't really have a choice.  You have to be here.  I recognize

17   that, but I sincerely appreciate you taking this case

18   seriously.  I sincerely appreciate you taking to heart what

19   Judge Rearden told you earlier about how what I say, what

20   Mr. Chiarello says is not evidence.  I want you to remember

21   that.

22         Now, your time is precious, and so I'm going to be

23   brief.  This case is about three things, and I want you ——

24   because I can't write it on a piece of paper, I want you to

25   look at those screens in front of you and I want you to imagine

NADHRow1

```
 1   UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
 2   ------------------------------x

 3   ULKU ROWE,

 4              Plaintiff,

 5         v.                            19 Civ. 8655 (JHR)

 6   GOOGLE LLC,

 7              Defendant.               Trial

 8   ------------------------------x
                                        New York, N.Y.
 9                                      October 13, 2023
                                        9:30 a.m.
10
     Before:
11
                    HON. JENNIFER H. REARDEN,
12
                                        District Judge
13                                       -and a jury-

14                      APPEARANCES

15   OUTTEN & GOLDEN, LLP
          Attorneys for Plaintiff
16   BY:  CARA E. GREENE
          GREGORY S. CHIARELLO
17        SHIRA Z. GELFAND

18   PAUL HASTINGS LLP
          Attorneys for Defendant
19   BY:  KENNETH W. GAGE
          SARA B. TOMEZSKO
20
     Also Present:  Vincent Yang, Paralegal (Outten & Golden)
21                  Andrew Velazquez, Google Rep.
                    Jean Gutierrez, Paralegal (Paul Hastings)
22

23

24

25
```

December 12, 2022, and at the same time, it bears noting,

adding at least four other exhibits over that time period.

As a result of these circumstances, defendant was

unable to subject Ms. Bennett herself, as well as other

potential trial witnesses, to adversarial testing on the issues

surrounding Ms. Bennett, nor to make targeted discovery

requests that it may have otherwise made.  Nor did defendant

have an opportunity to address and brief these issues at

summary judgment or at any other stage before trial.

I find plaintiff's arguments to the contrary, such as

its reliance on a fleeting unclear reference to "Jen"

unavailing.  To spring an evidently key part of

plaintiff's case on defendant in the thick of trial would be

unduly prejudicial.  For this reason, courts will not

countenance the eleventh-hour assertion of new key arguments

and facts at trial.  I cite here as an example,

*Busher v. Barry*, 2019 WL 6895281 (S.D.N.Y. Dec. 18, 2019), in

which the Court cited other cases for the proposition that

courts will not endorse "a party without explanation for the

delay springing new facts and legal theories on the eve of

trial."

I cite also to *Balogun v. Board of Regents of the*

*University of Wisconsin System* in which the Court determined

that plaintiff's "undeveloped argument is too little too late.

Plaintiff could and have had developed its newly raised

NAIHRow1

1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x

3   ULKU ROWE,

4                   Plaintiff,

5            v.                                19 Civ. 8655 (JHR)

6   GOOGLE LLC,

7                   Defendant.                 Trial

8   ------------------------------x
                                               New York, N.Y.
9                                              October 18, 2023
                                               8:50 a.m.
10
    Before:
11
                        HON. JENNIFER H. REARDEN,
12
                                               District Judge
13                                             -and a jury-

14                          APPEARANCES

15  OUTTEN & GOLDEN, LLP
         Attorneys for Plaintiff
16  BY:  CARA E. GREENE
         GREGORY S. CHIARELLO
17       SHIRA Z. GELFAND

18  PAUL HASTINGS LLP
         Attorneys for Defendant
19  BY:  KENNETH W. GAGE
         SARA B. TOMEZSKO
20
    Also Present:  Vincent Yang, Paralegal (Outten & Golden)
21                 Andrew Velazquez, Google Rep.
                   Jean Gutierrez, Paralegal (Paul Hastings)
22

23

24

25

1   of 2017 until the end of the year.

2   Q.  And Google did not prorate Ms. Rowe's bonus for that year,

3   correct?  You didn't see anything suggesting that in your

4   documents?

5   A.  That I'm not sure.

6   Q.  What did you calculate Ms. Rowe's damages on the unequal

7   pay claim as related to Mr. Harteau to be?

8   A.  Oh, that — that amount is $1,968,853.  For the court

9   reporter, it's 1,968,853.

10  Q.  And does that include interest?

11  A.  No, it does not include, in New York, prejudgment interest

12  of 9 percent per year compounded annually, simple interest.

13  Q.  OK.  And you also calculated Ms. Rowe's damages related to

14  discrimination and retaliation, correct?

15  A.  Correct.

16  Q.  And did you calculate damages relating to her not being

17  selected for the financial services vertical lead position?

18  A.  Yes, I did.

19  Q.  And that was the position that Stuart Breslow ultimately

20  filled, correct?

21  A.  Correct.

22  Q.  Can you tell us how you calculated the damages for the

23  financial services vertical lead discrimination and retaliation

24  claim?

25  A.  Yes.  Stuart Breslow assumed that position in — on

NAIHRow5                        Ostrofe - Direct

1   December 10, 2018.  So I calculated damages between what

2   Mr. Breslow earned in that position from December 10, 2018, up

3   until the date of trial, which —— or the former date of trial,

4   which was August 14, 2023.

5   Q.  And did you make any adjustments for Mr. Breslow's

6   compensation after he departed Google?

7   A.  I did the same thing with him that I did with Mr. Harteau.

8   He also left Google in 2020, although we know what he would

9   have earned had he completed the 2020 year there.  So for ——

10  again, for the years of 2021, 2022, and 2023, I just used

11  Mr. Breslow's compensation from the 2020 year, kept it flat,

12  and carried it forward.

13  Q.  And what components of compensation were you including when

14  you calculated damages for Ms. Rowe related to Mr. Harteau or

15  related to Mr. Breslow?

16  A.  That would be base salary, annual bonus, and equity

17  refresher grants that were granted annually.

18  Q.  What did you calculate Ms. Rowe's damages on the financial

19  services vertical lead position to be?

20  A.  That would be $687,507.  Yes, 678,507.

21  Q.  You were also asked to calculate Ms. Rowe's losses relating

22  to Google's retaliatory failure to consider her for the VP

23  financial services sales role, correct?

24  A.  Correct.

25  Q.  And that was the position that Yolande Piazza ultimately

NAIHRow5                    Ostrofe – Direct

1  filled, correct?

2  A.  Correct.

3  Q.  Can you tell us how you calculated the damages for that

4  claim.

5  A.  OK.  Ms. Piazza's in the position on June 22, 2020.  So I

6  calculated the difference between what she received in salary,

7  annual bonus, and equity grants, and I think because she was in

8  sales, she received a small spot bonus as well, and what

9  Ms. Rowe received in annual salary, bonus, and equity refresher

10  grants.

11  Q.  So what did you calculate Ms. Rowe's damages on the VP

12  financial services sales role to be?

13  A.  That will be $5,735,276.  For the court reporter that would

14  be 5,735,276.

15  Q.  And that's without interest?

16  A.  Correct.

17  Q.  Have you calculated the value of Ms. Rowe's claims if she

18  prevails on both the equal pay claims related to Mr. Harteau

19  and the failure to promote claim related to Ms. Piazza?

20  A.  Yes.

21  Q.  And what is that number?

22  A.  That would be $6,742,503.  So that's 6,742,503.

23  Q.  And, again, that's without interest?

24  A.  Correct.

25  Q.  Now, why is that number smaller than the combination of

NAIHRow7

1          THE COURT:  Yes.

2          MR. GAGE:  In light of the evidence, your Honor, we

3    would ask that the verdict form place the discrimination

4    claim first.  And I'm not trying to argue the point, but I just

5    want to make the suggestion that we are asking for is that, on

6    the verdict form, the jury first answer the question on the

7    discrimination claim.  And you will see our proposed verdict

8    form asks them to determine whether the plaintiff has proved by

9    a preponderance of the evidence that gender was a reason for

10   her level, because if they don't find that, if they don't find

11   that she proved that, it has implications for the New York

12   Labor Law claim inasmuch as it is, again, referring to Judge

13   Schofield's decision on summary judgment, a bona fide factor,

14   and we believe there's ample evidence of business necessity,

15   etc., etc.  So ——

16          THE COURT:  OK.  Ms. Greene.

17          MS. GREENE:  Yes, your Honor.  We would absolutely

18   oppose that because it's intended to conflate the two issues.

19   Equal Pay Law does not require any sort of gender motivation in

20   the decision, and by putting the gender claim first, it would

21   confuse the jury by suggesting that gender somehow is relevant

22   to the finding of an Equal Pay Law claim.  The affirmative

23   defense is an affirmative defense and should be treated

24   separately from the jury's finding of the *prima facie* case on

25   liability.

NAIHRow7

```
 1            MR. GAGE:  Your Honor, just if I can respond.  If we
 2   do it the way counsel is suggesting, I think there's a real
 3   risk that your Honor's going to have to face —— could face an
 4   inconsistent verdict, and that's the reason I'm suggesting that
 5   they answer the question about leveling on the discrimination
 6   claim first.  Because if the jury determines that Google did
 7   not set her level based on her gender in violation of the
 8   discrimination law, then, again, per Judge Schofield's ruling,
 9   if it wasn't a tainted variable, level —— we've already heard
10   some testimony from Mr. Humez that level is a determiner of
11   pay.  We know it's a determiner on bonus —— and so if the jury
12   determines that the plaintiff hasn't proved it was tainted,
13   then by definition we can rely on it on the fair pay claim, the
14   Section 194 claim on the affirmative defense.  And I worry that
15   if we do it the other way around and they say, no, she didn't
16   prove discrimination, but they also say, no, there's no bona
17   fide factor, your Honor might be faced with some
18   inconsistencies that we have to resolve at the end of trial.
19            MS. GREENE:  Your Honor, I would just note that
20   defendant bears the burden to prove that it's a
21   nondiscriminatory factor that is both business related —— or,
22   I'm sorry, job related and dictated by business necessity.  So
23   even if defendant is right that the jury were to find that
24   gender is not at play here, it doesn't mean that they've
25   automatically established their defense.  They still bear the
```

NAIHRow7

1  burden of showing that it was something other than gender and

2  it was job related and consistent with business necessity.

3          So, again, flipping those is intended to confuse the

4  jury and suggest that gender somehow in and of itself relates

5  to the underlying claim for the New York Equal Pay Law instead

6  of the affirmative defense, which is really where it belongs.

7          MR. GAGE:  It's not intended to confuse anything.

8  They're clearly different sections on the verdict form, and

9  they've got labels for them.  So it's not intended to confuse.

10          THE COURT:  OK.  I think I got it.

11          MR. GAGE:  Your question, your Honor, about tomorrow?

12          THE COURT:  Yes.

13          MR. GAGE:  We have —— counting Mr. Humez, who we've

14  already got started, we have a total of six witnesses.  And we

15  did get a time check from Ms. Williams.

16          THE COURT:  Oh, good.

17          MR. GAGE:  And collectively, the parties have 4.6

18  hours.  I'm not saying that because we intend to use them all,

19  Judge, but ——

20          THE COURT:  OK.

21          MR. GAGE:  And so if we start at 9:00, it looks to me

22  if we —— if your Honor takes the half-hour lunch and takes a

23  15-minute morning break, that we'll finish the evidence

24  sometime midafternoon is my best guess.

25          THE COURT:  OK.

NAJVROW1

```
 1   UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
 2   ------------------------------x

 3   ULKU ROWE,

 4                 Plaintiff,

 5          v.                              19 Civ. 8655 (JHR)

 6   GOOGLE LLC,

 7                 Defendant.               Trial

 8   ------------------------------x
                                           New York, N.Y.
 9                                         October 19, 2023
                                           8:57 a.m.
10
     Before:
11
                    HON. JENNIFER H. REARDEN,
12
                                           District Judge
13                                          -and a jury-

14                        APPEARANCES

15   OUTTEN & GOLDEN, LLP
          Attorneys for Plaintiff
16   BY:  CARA E. GREENE
          GREGORY S. CHIARELLO
17        SHIRA Z. GELFAND

18   PAUL HASTINGS LLP
          Attorneys for Defendant
19   BY:  KENNETH W. GAGE
          SARA B. TOMEZSKO
20
     Also Present:  Vincent Yang, Paralegal (Outten & Golden)
21                  Andrew Velazquez, Google Rep.
                    Jean Gutierrez, Paralegal (Paul Hastings)
22

23

24

25
```

NAJVROW1

1        Stipulations of fact.  Have we had two of those or

2   just one?

3        MR. GAGE:  I think it's just the one you read

4   yesterday, your Honor.

5        THE COURT:  Okay.  I would give that to the jury,

6   unless you prefer not to.  But you can let me know.

7        MR. GAGE:  Our view is that it's -- sorry for not

8   standing, Judge.

9        THE COURT:  That's all right.

10        MR. GAGE:  Is that you read it into the record.  It's

11   no different than testimony that's in the record.

12        THE COURT:  Right.  So if they want it, they could ask

13   for that.  All right.

14        All right.  I'm now going to rule on plaintiff's

15   application to compel the supplemental production of any

16   additional status reports relating to the VP financial services

17   sales position beyond the four reports that have already been

18   admitted into evidence, that is, D-74, D-76, D-77, and D-78.

19        Defendant produced D-74, 76, 77, and 78 on November

20   11th, 2022, nearly one year ago.  Plaintiff was well aware of

21   those documents.  Indeed, on November 21st, 2022, she moved *in*

22   *limine* to exclude all evidence concerning consideration of

23   candidates for the vice president financial services role other

24   than Ms. Rowe, including D-74, 76, 77, and 78.  See ECF No. 42.

25        Plaintiff now suggests that documents may be missing

NAJVROW1

because the conversation in which Mr. Vardaman told Ms. Rowe

that she "wasn't going to be considered because she wasn't a

good fit," occurred within just one week of February 21st,

2020, when the latest of the four status reports, D-74, was

created.  Plaintiff also contrasts Mr. Vardaman's deposition

testimony that he did not create updates for Ms. Kliphouse

related to the FSVL role, and that whatever he may have created

was "much more *ad hoc*" with his trial testimony that he created

these status reports and updated them continuously to keep

track of the VP financial services sales search in preparation

for his meetings with Ms. Kliphouse.

However, the temporal relationship between D-74, 76,

77, and 78, all of which were created between late January and

February 21, 2020, and Ms. Rowe's and Mr. Vardaman's

conversation in late February 2020, is not new information.

Accordingly, the Court fails to see why plaintiff waited until

trial to raise this issue, let alone why she delayed four days

after Mr. Vardaman had testified.  Plaintiff's application is

therefore denied.

Are we ready to bring the jury in?

Is the witness ready?

MR. GAGE:  He's just out in the hall, but yes.

THE COURT:  We weren't going to start till 9:15, but

we might as well start now, right?

MR. GAGE:  It's fine by us, your Honor.

NAKHRow1

```
 1   UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
 2   ------------------------------x

 3   ULKU ROWE,

 4                 Plaintiff,

 5          v.                              19 Civ. 8655 (JHR)

 6   GOOGLE LLC,

 7                 Defendant.               Trial

 8   ------------------------------x
                                            New York, N.Y.
 9                                          October 20, 2023
                                            8:30 a.m.
10
     Before:
11
                     HON. JENNIFER H. REARDEN,
12
                                            District Judge
13                                          -and a jury-

14                        APPEARANCES

15   OUTTEN & GOLDEN, LLP
          Attorneys for Plaintiff
16   BY:  CARA E. GREENE
          GREGORY S. CHIARELLO
17        SHIRA Z. GELFAND

18   PAUL HASTINGS LLP
          Attorneys for Defendant
19   BY:  KENNETH W. GAGE
          SARA B. TOMEZSKO
20
     Also Present:  Vincent Yang, Paralegal (Outten & Golden)
21                  Andrew Velazquez, Google Rep.
                    Jean Gutierrez, Paralegal (Paul Hastings)
22

23

24

25
```

1          Three days later, Mr. Vardaman updated his weekly
2    notes to say:  It doesn't sound like she is viable for the VP
3    position, the VP role.  Three days after she made her
4    complaint.
5          November 7th, she raises another concern, this time to
6    Mr. Shaukat and Ms. Greene.  The same month:  How do we message
7    to Ulku that she's not getting the role?  Vardaman is
8    requesting feedback from interviewers on Ms. Rowe, who was a
9    candidate.  The "was," before they got the feedback from all
10   those purple dots.  And of course, on December 5th, Mr. Shaukat
11   told Ms. Rowe:  To be blunt, you won't be getting the role.
12          That's retaliation, folks.
13          And the damage Google had caused to Ms. Rowe is not
14   theoretical.  You heard from Ms. Ostrofe testifying about the
15   damages Ms. Rowe has encountered.  The damages from her equal
16   pay claim, the damages from not receiving the FSL role, the
17   damages for not getting the role that went to Yolande Piazza,
18   the damages when combined.
19          And you also heard Ms. Rowe describe the impact this
20   has had on her emotional well-being, her psyche, her
21   relationships.  How do you put a number on that?  Well, the law
22   provides some guidance for us.  And so we ask that you would
23   award 300,000 to her in compensatory damages for that damage to
24   her emotional well-being, her psyche, her relationships.
25          And then there's the question of punitive damages.  As

 1   the judge will explain, punitive damages are awarded to punish

 2   a defendant and set an example in order to defer the defendant

 3   and others from committing similar acts in the future.

 4         Just because Google's discrimination was sometimes

 5   subtle doesn't make it any less reprehensible.  Subtle

 6   discrimination is sometimes the easiest to get away with and

 7   the hardest to prove because it operates in the shadows.  And

 8   that's why deterrence is so important.

 9         Punitive damages send a message that this kind of

10   discrimination will not be tolerated.  Companies need to know —

11   Google needs to know — that they will be held accountable.  And

12   today we are asking that you, the jury, hold Google

13   accountable.  Thank you.

14         MR. GAGE:  One moment, your Honor.

15         Ladies and gentlemen, thank you.  You've all been

16   incredibly patient.  You've been very attentive.  I think some

17   of you may have more notes than we have.

18         Pretty soon the case will be yours.  Sara, Andrew, and

19   Jean and I, we've tried to be efficient in presenting our case,

20   but we ask you to indulge us just a little bit longer so we can

21   respond to Ms. Greene.

22         This case is really about one central question:  Why

23   did Google do what it did?  Why did Google make Ms. Rowe a

24   Level 8 technical director?  Why did it not give her the

25   financial services vertical lead role?  Why did it not give her

NAKVROW4                    Charge

1    not subject to federal income taxes and you should not consider

2    such taxes in determining the amount of damages, if any.  The

3    verdict form I will give you will assist you in recording the

4    determination, if any, that you make as to damages.

5         The economic loss plaintiff has suffered as a result

6    of any claims she has put forth is called "backpay."  Backpay

7    consists of the value not only of salary, but also of bonuses,

8    stock awards, and other forms of compensation and benefits that

9    Ms. Rowe would have received if not for Google's unlawful

10   conduct, if that is what you find.

11        Specifically, Ms. Rowe asserts that she was paid less

12   than men performing equal work under Labor Law Section 194.

13   She also asserts that because she is a woman, Google paid her

14   less and denied her positions that would have entitled her to

15   greater compensation, in violation of the city law.  She

16   further asserts that because she made protected complaints,

17   Google denied her positions that would have entitled her to

18   greater compensation.

19        Your job as the jury is to determine what damages, if

20   any, Ms. Rowe has proved by a preponderance of the evidence for

21   each claim.  Ms. Rowe is entitled to lost wages and benefits,

22   even if they are difficult to calculate.  Any uncertainty about

23   the amount of lost compensation to be awarded to Ms. Rowe

24   should be resolved in her favor.  That said, Ms. Rowe has the

25   burden of proving that she actually incurred a loss of backpay.