UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| ULKU ROWE, | |
| Plaintiff, | |
| -v.- | |
| GOOGLE LLC, | |
| Defendant. | |

19 Civ. 8655 (JHR)

OPINION & ORDER

JENNIFER H. REARDEN, District Judge:

Plaintiff Ulku Rowe brought this action against Google LLC ("Google"), now her former

employer, alleging sex discrimination and retaliation in violation of sections 194 and 215 of the

New York Labor Law (the "NYLL"), respectively, and gender discrimination and retaliation in

violation of the New York City Human Rights Law (the "NYCHRL"), N.Y.C. Admin. Code §§

8-101 *et seq*.[1]  On October 20, 2023, following a seven-day trial, the jury returned a verdict for

Google on the NYLL section 194 claim and for Rowe on (i) the NYLL section 215 (retaliation)

claim, (ii) the NYCHRL retaliation claim, and (iii) the NYCHRL gender discrimination claim.

*See* ECF No. 340 (Verdict).  The jury awarded Rowe $0 in back pay, $150,000 in

"[c]ompensatory [d]amages [u]nder [the] New York City Human Rights Law," and $1,000,000

in "[p]unitive [d]amages [u]nder [the] New York City Human Rights Law."  *See id.* at 3.

Before the Court are the parties' post-verdict motions: Google's renewed motion for

judgment as a matter of law, ECF No. 368; Google's motion for remittitur of punitive damages,

ECF No. 370; Rowe's motion for permanent injunction, instatement, and other post-judgment

relief, ECF No. 364; and Rowe's motion for attorneys' fees and costs, ECF No. 361.  Having

considered the trial record, the parties' memoranda of law, and oral argument on these motions,

---

[1] This case was originally assigned to the Honorable Lorna G. Schofield and reassigned to this
Court in 2023.  *See* ECF No. 295.

*see* ECF No. 401 (Oral Arg. Tr.), the Court hereby denies Google's renewed motion for judgment as a matter of law; grants Google's motion for remittitur to the extent of reducing the punitive damages award to $250,000; denies Rowe's motion for permanent injunction, instatement, and other post-judgment relief and awards post-judgment interest at the federal rate pursuant to 28 U.S.C. § 1961; and grants Rowe's motion for attorneys' fees and costs, with the reasonable amounts of such fees and costs to be determined by Magistrate Judge Jennifer E. Willis at inquest.

## I.    BACKGROUND

"A précis of the evidence the jury heard, the arguments [Google] made in support of its mid-trial Rule 50(a) motion, and the jury's verdict, follows." *Arcos v. New Sch. Univ.*, No. 14 Civ. 2678 (KPF), 2017 WL 3868495, at *1 (S.D.N.Y. Aug. 31, 2017). The summary below "sets forth only those facts necessary to contextualize the rulings on the parties' post-verdict motions." *City of Almaty, Kazakhstan v. Sater*, No. 19 Civ. 2645 (JGK), 2025 WL 218838, at *1 (S.D.N.Y. Jan 1, 2015).

### A.  Evidence At Trial

#### 1.  Google Hires Rowe

Rowe was hired as a technical director in the Office of the Chief Technology Officer at Google Cloud ("OCTO") in December 2016. Trial Transcript (Tr.) 73:3-8 (Rowe – Direct). As part of the recruiting process, Rowe interviewed with Brian Stevens, then the Chief Technology Officer of Google Cloud, and Will Grannis, who reported to Stevens and would serve as Rowe's supervisor. *Id.* at 76:23-77:4. During the interviews, Rowe discussed, *inter alia*, her "experience building these large . . . complex IT platforms in financial services," her "experience working with business customers and clients," and "the applicability of cloud for financial services." *Id.* at 77:5-11. Rowe's qualifications for the role included her "cloud experience," her experience as

"a CTO at JPMorgan Chase," and "23 years of hands-on technical experience building these large global systems"—which was "probably more than anyone else in . . . financial services at that point"—as well as her "experience managing very large teams," "engaging the c-suites," and the fact that she was "well-known as a very credible industry leader in financial services technology." *Id.* at 77:19-78:6.

At Google, "[l]evels are a way of determining . . . where you are in the corporate hierarchy." Tr. 121:18-19 (Rowe - Direct). When Rowe was hired, she was designated a "Level 8." *Id.* at 121:16-17. Leveling "wasn't in the job description," "didn't come up during the interview process," and "wasn't in the offer letter." *Id.* at 121:21-25. Rowe understood "that the technical directors in OCTO at that time were all functioning as Level 8," *id.* at 122:12-14, and she testified that she and the other technical directors "were doing very similar things" and "collaborated a lot." *Id.* at 135:1-21. In the summer of 2017, however, Rowe learned that five male technical directors had been hired at Level 9. *Id.* at 134:11-25. At times, the Level 9 technical directors went to Rowe "for advice," to "consult with [her] on strategy," and "to cover accounts for them." *Id.* at 137:17-25, 138:7-9; 138:19-139:5. Rowe believed that she "was just as qualified, if not more qualified in certain aspects," than the Level 9 men. *Id.* at 142:14-143:9. Although "there wasn't a difference" between Level 8 and Level 9 technical directors "[i]n terms of the job that [they] did on a day-to-day basis," Rowe testified that "there was a lot of difference in terms of compensation and . . . opportunities for career advancement." *Id.* at 143:10-16.

### 2. Rowe Raises Concerns About Leveling To Human Resources

In late 2017, Rowe shared with her supervisor, Will Grannis, her "concerns that . . . when [she] was being hired . . . [she] was told that everyone was coming in as a Level 8 . . . and [that she had since] found out that some of the men had come in as a Level 9." Tr. 144:6-16 (Rowe – Direct). Rowe "asked for his help in correcting that because [she] believed . . . the L9 men had .

. . the same qualifications, if not lesser qualifications than" she did. *Id.* at 144:13-16. Grannis told Rowe to speak to Melissa Lawrence, who was "the HR person that support[ed] OCTO." *Id.* at 144:17-20.

Rowe reached out to Lawrence in "December . . . of 2017." Tr. 144:23-25 (Rowe – Direct). Rowe "discussed [her] leveling concerns" with Lawrence, *id.* at 145:1-20, and subsequently "follow[ed] up with an email," *id.* at 147:8-9; Plaintiff's Exhibit (PX) 13. Lawrence replied that "there [wa]s no process to revisit leveling decisions after hire. The only way to address concerns with level [wa]s to seek promotion via the Tech process." Tr. 148:1-9 (Rowe – Direct); PX 13. In her communications with Lawrence, Rowe did not share her "belie[f] that [her] gender had anything to do with Google's decision to hire [her] at a Level 8," because she believed that "gender [wa]s a risky topic." *Id.* at 145:1-11.

According to Grannis, "[a]t L9, someone's a world class expert in a topic . . . for example, an L9 might figure out a completely different way to do [cloud] storage." Tr. 839:19-840:3 (Grannis – Cross). Grannis further testified that a Level 8 employee would not have "created or done these things of distinction yet . . . they wouldn't be recognized as a world class expert." *Id.* at 840:9-15.

### 3. Rowe Begins Reporting To Shaukat

About six months later, in June 2018, Rowe and two other OCTO technical directors began reporting to Tariq Shaukat, the head of the Global Alliances Industry Partnership team within Google Cloud. Tr. 148:15-149:2 (Rowe – Direct); 407:18-24 (Shaukat – Cross). Although Rowe's new role was called "Global Clients Technical Lead," Shaukat "told [Rowe] that it would be the same job that [she] was doing in OCTO, just reporting to him." Tr. 149:3-10 (Rowe – Direct). That same month, Rowe informed Shaukat she had "heard that there was an open position for VP of [F]inancial [S]ervices, and that [she was] interested in that position." *Id.*

at 149:15-21.  Rowe testified that Shaukat "sound[ed] discouraging" but "told [her] he was open to considering [her]" for the role.  *Id.* at 149:22-25.  According to Rowe, this conversation was "definitely not" an interview, given that Shaukat "didn't ask [her] any questions."  *Id.* at 153:14-23.  They "mostly talked about the fact that he would consider [her]," and it was "a five, ten-minute conversation."  *Id.*

On June 22, 2018, Shaukat e-mailed Diane Greene, the CEO of Google Cloud, that "Ulku is very interested.  I don't think she is likely right, but I told her I would formally interview her for the role."  Tr. 309:24-310:3 (Shaukat – Direct); PX 150.  Shaukat testified that, at that time, he preferred two other women for the VP of Financial Services position: Ranjana Clark and Diana Leyfield.  Tr. 468:21-24 (Shaukat – Cross).

During "the ten months that [Rowe] reported to [Shaukat], [they] had maybe . . . three one-on-ones together," even though she "reached out to him many times."  Tr. 151:7-19 (Rowe – Direct).  Rowe further testified that she "had a lot of difficulty getting on a staff meeting," that Shaukat "didn't include [her] in customer meetings or strategy meetings or any type of meetings," and that she "wasn't being included in the email correspondence either."  *Id.* at 151:20-152:1, 152:20-24.  In Rowe's view, Shaukat "had a very different relationship with [her] male peers," with whom he would "talk," "hang out," and "have meetings."  *Id.* at 152:2-11.  One of those peers was Stuart Breslow, "a new joiner hired by [Shaukat] to focus on compliance."  *Id.* at 152:12-19.  "Shaukat's treatment" made Rowe "feel pretty terrible" because he was "completely ignoring [her]."  *Id.* at 153:2-5.  Shaukat testified that his "general policy . . . was not to hold standing one-on-ones with most of [his] direct reports" but that he "met with [Rowe] when she asked for the time."  Tr. 323:9-19 (Shaukat – Direct).

### 4. Rowe Pursues VP Of Financial Services Role

On July 12, 2018, Rowe had a "short videoconference" with Stuart Vardaman, "the internal recruiter supporting [Shaukat's] organization," to discuss the "position [of] VP of [F]inancial [S]ervices." Tr. 154:18-155:1 (Rowe – Direct). After the videoconference, Vardaman sent Rowe a draft job description of the VP of Financial Services role. *See* PX 31. Rowe testified that she was qualified for the role based on the job description. Tr. 155:22-157:18. She further testified that "[a] VP role is a Level 10 role," but, based on her communications with Melissa Lawrence, "even if [she] were to be promoted to the VP level role, [her] level would stay at that Level 8." *Id.* at 157:23-159:1; PX 26.

Rowe interviewed for the VP of Financial Services position with four Google executives in August 2018. Tr. 160:1-18 (Rowe – Direct). She testified that "the interview process felt weird" because at Google, they "usually follow a rubric," the interviewers "have a set of questions that they follow," they "take notes when they're talking to you," and "it's a pretty well-defined process." *Id.* at 160:8-9, 162:10-19. But Rowe's interviews "felt very perfunctory": she did not observe any interviewers taking notes, using a rubric, or working off a list of questions. *Id.* at 162:10 – 163:11.

On August 28, 2018, "about three weeks" after Rowe's interviews, Tr. 166:17-19 (Rowe – Direct), Rowe sent an email to Melissa Lawrence and Kevin Lucas, "the HR person supporting [Shaukat's] team." *Id.* at 165:11-17; PX 42. In that email, Rowe "reiterate[d] [her] concerns that [she] was hired as a Level 8, the men were hired as a Level 9 with very similar qualifications, and that now [she] felt like that legacy was following her," meaning that she "wasn't getting . . . consideration for the [VP of Financial Services] role because of the way that [she] was . . . . hired initially." *Id.* at 165:21-166:16. Rowe further testified that, "[a]t this point, [she] felt like the

6

reason that [she] was being treated differently was because [she] was a woman." *Id.* at 166:20-167:3.

Rowe next communicated with Shaukat about her candidacy for the VP of Financial Services position during a one-on-one meeting around mid-September 2018. Tr. 168:5-8 (Rowe – Direct). At that meeting, Rowe told Shaukat "about [her] concerns getting integrated into his team," that she "wasn't in staff meetings," and that she "was having trouble, difficulty, getting on his email list." *Id.* at 168:9-14. Rowe also "asked for a status update on . . . [her] progression . . . for the VP of Financial Services Role." *Id.* Shaukat told Rowe that "the next step would be for [her] to meet with Diane [Greene, the CEO of Google Cloud]." *Id.* at 168:15-18.

**5.   Rowe Raises Leveling Concerns To Shaukat And Greene**

On November 7, 2018, because "the interview with [Greene] . . . wasn't getting scheduled," Rowe emailed Shaukat and Greene to "reiterate [her] interest" in the VP of Financial Services role." Tr. 170:4-12 (Rowe – Direct); PX 54. Rowe wrote, in pertinent part:

> I'm concerned that certain decisions made in connection with my initial hiring are impeding me in this process, and I want to make sure that you know the full context. Shortly after I joined Google, I discovered that I was hired in at a more junior level than my male peers (an issue I raised with HR and HR is actively investigating). I see that the external candidates, some of whom are far less qualified than me, are being considered as VP candidates. I believe I am the most qualified person for the position and hope that I will be given due consideration, notwithstanding my current lower level.

PX 54. This was "the first time [Shaukat] ever learned that Rowe thought her level may relate to her gender." Tr. 402:16-24 (Shaukat - Cross).

Two days after Rowe emailed Shaukat and Greene, April Beaupain, a member of the Employee Relations team at Google, informed Rowe that Employee Relations "had looked into [Rowe's] allegations, and they found them to be unfounded" because "the L9 men . . . either had

7

more years of experience than [Rowe] or they came from tech companies." Tr. 170:17-25 (Rowe – Direct). In short, Employee Relations "didn't think gender had anything to do with it." *Id.* In a follow-up email to Rowe, Beaupain wrote that Employee Relations "did not find gender influenced [Rowe's] leveling decision," "that [her] years and/or type of work experience were consistent with the average years of work experience for those hired as L8 directors," and that "male peers with both fewer years and more years of work experience [were] also hired as L8 directors." *Id.* at 171:18-172:4; PX 60. As Rowe testified, "in [Rowe and Beaupain's] meeting, [Beaupain] talked about L9 men, how they had more years of experience or they came from tech companies, whereas in [the follow-up] email [Beaupain] was only talking about the L8 people." *Id.* at 172:5-11.

### 6. Rowe Returns To OCTO

In December 2018, Shaukat told Rowe that "they [we]re pausing the hiring on the financial services lead role because Diane Greene was stepping down as CEO," that "when they . . . resume[d] . . . they were going to look for a more sales-oriented person," and that Rowe "was too technical." Tr. 172:16-23 (Rowe – Direct). At that point, Rowe understood that she "was no longer a candidate" for VP of Financial Services. *Id.* at 172:24-173:2. "Very shortly after [her] conversation with [Shaukat]," Rowe learned that Stuart Breslow (the "new joiner hired by [Shaukat] to focus on compliance," *id.* at 152:12-19) had secured the position. *Id.* at 173:10-12. Rowe testified that her work and Breslow's "had a lot of similarities," but Breslow "was focusing mostly on compliance, and he was also doing a small project on anti-money laundering." *Id.* at 173:16-174:6. While Breslow "had been at Google less than six months doing a very nontechnical role," Rowe "had been at Google almost two years . . . knew [the] product . . . knew [the] customers . . . was doing thought leadership . . . [and] had market

8

credibility." *Id*. at 175:6-12.  In Rowe's view, she "met every qualification" for the VP of Financial Services position, whereas "Mr. Breslow didn't."  *Id*. at 175:11-12.

Rowe next spoke with Shaukat in March 2019.  Tr. 183:12-18 (Rowe – Direct).  During that conversation, Shaukat "told [Rowe] that [she] had three options": (1) "stay in this organization but work for Stuart Breslow in a small project on anti-money laundering"; (2) "go back to OCTO . . . [but] not do any work on financial services"; or (3) "find another job at Google."  *Id.* at 183:19-184:6.  At trial, Shaukat characterized the first option as "an expansion of the scope that [Rowe] had in OCTO . . . [given that she would have] the option of building the team."  Tr. 473:7-16 (Shaukat – Cross).  The second option was "the opportunity to be an [individual contributor], to let someone else build the team and not take on managerial responsibilities."  *Id.* at 473:17-19.  The third option was for Shaukat to "essentially help her if she found another role inside Google that she preferred by . . . offering the budget for her role so that someone else could . . . offer her a position."  *Id.* at 473:20-25.  Rowe chose the second option, "mov[ing] back to OCTO," Tr. 184:7-8 (Rowe – Direct), and Shaukat provided the "head count" for her to do so, Tr. 473:20-24 (Shaukat – Direct).  Shaukat testified that he "had not previously done" that for anyone else, given that headcount "was probably the scarcest commodity at Google."  *Id*. at 474:1-24.

Shaukat also testified that "industry-specific work had to be done on [his] team," and that in deciding to return to OCTO, Rowe therefore "had to choose a focus area that was not industry-specific."  Tr. 475:2-9 (Shaukat – Direct).  The focus area Rowe chose, hybrid cloud, "was one of the major strategic growth paths for the business at the time" and thus not a "punishment" for Rowe.  *Id.* at 475:10-17.  Even though Rowe "was told not to do anything" related to financial services, after she returned to OCTO, she "kept getting [financial services-related] requests from

the account teams, the public policy team . . . the marketing teams, and the engineering teams . . . even [from] Stuart Breslow." Tr. 184:16-22 (Rowe – Direct).

Rowe retained counsel in January 2019, who "reached out to Google to try to reach a resolution." Tr. 185:2-13 (Rowe – Direct). She filed this lawsuit in September 2019. *Id.* at 185:14-15.

### 7. Rowe Seeks VP Of Financial Services – Sales Role

In "early 2020," Tr. 1260:11-14 (Kliphouse – Direct), Rowe had "a casual meeting with Kirsten Kliphouse, who was the hiring manager" for the VP of Financial Services – Sales ("VP-FSS") role. Tr. 186:9-12 (Rowe – Direct). Rowe and Kliphouse met "at a coffee shop," and their conversation was generally about "just getting to know each other, the kind of stuff that you talk [about] when you're first meeting a person." *Id.* at 186:13-19 (Rowe – Direct). Rowe testified that, during that meeting, Kliphouse "mentioned" that she "didn't really have luck with people with traditional sales backgrounds, so she was looking more broadly" for the VP-FSS role, and Rowe informed Kliphouse that she would "be interested." *Id.* at 186:20-187:1. The portion of the conversation about that position was "very short," and Kliphouse told Rowe to "reach out to the recruiter for next steps." *Id.* at 187:4-9. They did not discuss Rowe's qualifications, and Kliphouse did not inquire about Rowe's background. *Id*. at 187:12-19. Kliphouse testified that, "in passing[,] at the end of the conversation, [Rowe] mentioned that she had some issues with Google." Tr. 1262:8-15 (Kliphouse – Direct). Kliphouse "didn't know what [tha]t was about," *id.*, and she did not ask any questions, *id.* at 1262:16-21.

On February 4, 2020, Rowe reached out to the internal recruiter, Stuart Vardaman, about the VP-FSS role.[2] Tr. 187:22-25 (Rowe – Direct); PX 101. On February 4, 2020, Vardaman

---

[2] Vardaman had previously served as the HR hiring partner for the Vice President of Financial Services role. *See* Tr. 580:2-4 (Vardaman – Direct).

emailed Rowe that Kliphouse was "open to 'thinking differently' about this role, so it [wa]s not necessarily a prerequisite that someone ha[d] carried a sales revenue number." Tr. 188:9-16 (Rowe – Direct). Vardaman also provided the job description. *See* PX 101. Rowe testified that she was "uniquely qualified" for the position because, among other things, she had "been at Google for three years" and "was a recognized leader in the industry." Tr. 189:3-20 (Rowe – Direct); *see also id.* at 189:21-191:15. On or about February 25, 2020, Vardaman informed Rowe that she "wasn't going to be considered because [she] wasn't a good fit . . . based on the two-hour interview [Rowe] had with [Kliphouse]." *Id.* at 192:6-9. Rowe denied that she ever had "a two-hour interview" with Kliphouse, explaining that she had never met with Kliphouse beyond their "very short" meeting in early 2020, which was "definitely not" an interview for the role. *Id.* at 192:12-19.

Ultimately, Google hired Yolande Piazza for the VP-FSS role. Tr. 192:20-22 (Rowe – Direct). Rowe testified that she was more qualified than Piazza because (1) she had been "at Google for three years" performing "thought leadership," "regulatory outreach," and "customer work," whereas Piazza "was coming from the outside," *id.* at 193:7-15; (2) Rowe "had two degrees in computer science" and "vast amounts of experience building technology systems at a global scale," while Piazza "didn't have any degrees," *id.* at 193:16-24; (3) Rowe "had worked in three different financial institutions before [she] came to Google," whereas Piazza had "worked for Citibank for 30 years," *id.* at 193:25-194:16; and (4) Rowe "had a lot of" cloud experience and "a very large network of C-suite relationships," and Piazza "did not," *id.* at 194:17-21. Kliphouse testified, however, that she considered Piazza "a very seasoned [and] very senior leader who had been in the industry of financial services for a long time," was "well-versed in management, in leadership, in technology, being at the executive table and being able to make very senior decisions within the financial services." Tr. 1258:18-1259:7 (Kliphouse – Direct).

With respect to Rowe, Kliphouse "hadn't heard about her" before Grannis asked her to have a "networking meet and greet" with Rowe, as a "favor" to him. *Id.* at 1260:15-22; 1266:23-1267:4.

### 8.   Rowe's Role At Google Is "Diminished"

Rowe testified that, since learning in February 2020 that she would not "be considered" for the VP-FSS position, Tr. 192:6-9 (Rowe – Direct), her "role [at Google] . . . diminished." *Id.* at 194:25-195:3. At that time, Rowe remained a technical director focusing on financial services, her performance had consistently been evaluated as "exceed[ing] expectations," and she had experienced some "notable successes" in her work. *Id.* at 195:4-10; 195:23-196:14. But she had not received any promotions since 2020 and was still a Level 8. *Id.* at 197:2-8. Rowe testified that her colleagues at Google were "afraid" of her and didn't "want to talk to [her] anymore" because of the lawsuit, and that her "career [wa]s completely stalled." *Id.* at 197:15-198:3. She also testified that pursuing her claims had "really hurt [her] self-confidence," and that her experiences at Google had been "this cloud that's hanging over" her family. *Id.* at 198:13-22.

## B.  Google's Motion For Judgment As A Matter Of Law

Google moved mid-trial, pursuant to Federal Rule of Civil Procedure 50(a), for judgment as a matter of law. Tr. 1095:21-1099:12 (Rule 50(a) Argument). First, Google addressed Rowe's NYCHRL and NYLL section 215 retaliation claims, arguing that Rowe had not "established a *prima facie* case of protected activity" because her "entire belief that there was something wrong with her leveling [wa]s because she thinks she's as qualified as other people." *Id.* at 1096:13-25. According to Google, "that's not enough," because "[t]he law is clear she need[ed] to prove that she had a subjectively and objectively reasonable belief that there was illegal conduct going on." *Id.* at 1096:14-20. Next, Google argued that "there [wa]s no

evidence in the record whatsoever that her alleged protected activity was in any way a factor . . . in any of the [actions] she claims were retaliatory." *Id.* at 1097:1-4. Google asserted that Rowe did not "get[] the financial services vertical lead role" because "from the very beginning, Mr. Shaukat was not . . . as impressed by her as he was by other candidates," "his opinion was consistent," and "his opinion was the reason why she didn't get the job." *Id.* at 1097:6-7. According to Google, "there [was] no evidence to suggest that [Shaukat's] learning that [Rowe] had concerns about her leveling had anything to do with that decision." *Id.* at 1097:12-14. As for the VP-FSS job, Google contended that "Kliphouse made the decision not to consider Ms. Rowe further after she had spent time with her over coffee" because Kliphouse "had a preferred candidate . . . and she didn't want to take any further time considering other candidates." *Id.* at 1097:15-24.

With respect to Rowe's NYCHRL gender discrimination claim, Google contended that "there [was] no evidence . . . that gender played any role whatsoever in the leveling [decision]" or "in Mr. Shaukat's decision about the financial services vertical lead role." *Id.* at 1098:9-16. Regarding her NYLL section 194 claim, Google argued that Rowe could not establish a prima facie case because "the evidence clearly shows Ms. Rowe was doing something different[] than Mr. Breslow . . . and Mr. Harteau." *Id.* at 1098:17-22. In the absence of evidence that gender bias "tainted" the leveling decision, level was "a bona fide factor, other than sex," that justified the pay differential between Rowe and her comparators. *Id.* at 1098:23-1099:7.

Google also argued that punitive damages are not warranted because "there is absolutely no evidence to support the claim of willfulness or reckless disregard for [Rowe's] rights." *Id.* at 1099:8-11.

After hearing Rowe's argument, *see* Tr. 1120:12-1125:4, the Court ruled that, "on the record that has developed, there is sufficient evidence on which a jury could return a plaintiff's

13

verdict." Tr. 1126:7-9 (Rule 50(a) Ruling). Beginning with the NYLL section 194 claim, the Court held that there was "evidence from which the jury could find that Ms. Rowe and Mr. Harteau were doing equal work" because they "were hired for the same role." *Id.* at 1126:11-18. In that connection, the Court noted Mr. Harteau's testimony that "his and Ms. Rowe's work was 'similar.'" *Id.* at 1126:11-19; *see* Tr. 941:14-17 (Harteau – Direct) ("Q: From what you were able to observe on a day-to-day basis, how did her work compare with yours? A. Similar. You know, we were doing the same sort of work in the same sort of circumstances."). With respect to the retaliation claims, the Court concluded that Vardaman's comment in an internal report that it "sounds like [Rowe] . . . is not viable for the [Vice President of Financial Services] role"—"just days" after "Rowe made a complaint to Melissa Lawrence expressing concern that men had been leveled at Level 9"—could support a verdict for Rowe. *Id.* at 1126:20-1127:6. In addition, "[w]ith respect to the [VP-FSS] position, a jury might find noteworthy the temporal proximity" between Rowe "fil[ing] her complaint in this court in September 2019, and several months later, in February 2020, [another applicant,] Ms. Piazza[,] was hired for the sales role"—particularly given "that it was Mr. Vardaman acting as internal recruiter for both this position and the earlier FSVL role." *Id.* at 1127:7-12. Regarding the NYCHRL gender discrimination claim, the Court determined that "a jury could find that Ms. Rowe was similarly situated to Mr. Harteau . . . but was treated less well, including because of her pay." *Id.* at 1127:16-19; *compare* Defendant's Exhibit ("DX") 100 (Harteau Pay Data) *with* DX 98 (Rowe Pay Data); *see also* Defendant's Demonstrative Exhibits A-B. As to willfulness, the Court ruled that "[t]he jury could find that Google knew . . . Ms. Rowe was performing equal work to her alleged male comparators yet was being paid less" because "Ms. Rowe made an internal complaint that she was paid less and she filed a lawsuit . . . and [Google] continued paying her less." *Id.* at 1127:23-1128:8.

## C.  Jury Verdict

Following the close of evidence and the parties' summations, the Court charged the jury on each of Rowe's claims and the available remedies.  Tr. 1439:15-1444:12 (NYLL section 194); 1444:13-1446:24 (NYCHRL gender discrimination); 1446:25-1450:23 (NYCHRL and NYLL section 215 retaliation); 1452:24-1454:21 (back pay); 1454:22-1455:17 (compensatory damages); 1455:18-1457:21 (punitive damages); and 1457:22-1458:11 (nominal damages).

The jury rendered its verdict on October 20, 2023.  Verdict.  First, the jury found that Rowe had not proved "by a preponderance of the evidence" that Google "paid Ms. Rowe less than Nicholas Harteau or Stuart Breslow in violation of [NYLL section] 194."  *Id.* at 1.  On the NYCHRL gender discrimination claim, the jury found that Rowe had "established by a preponderance of the evidence" that Google had "on at least one occasion treated her less well, at least in part, because of her gender."  *Id.* at 2.  The jury further found that Rowe had "established by a preponderance of [the] evidence" that Google had, "on at least one occasion[,] retaliated against her in violation of" both the NYCHRL and NYLL section 215.  *Id.* at 2.  With respect to damages, the jury determined that Rowe had proven "that she suffered an[] injury or . . . actual damages as a result of [Google's] unlawful conduct."  *Id.*  The jury awarded $0 in back pay; $150,000 in compensatory damages "for emotional distress, pain and suffering, or mental anguish" under the NYCHRL; and $1,000,000 in punitive damages under the NYCHRL.  *Id.* at 2-3.

The Court entered judgment in accordance with the jury's verdict on October 27, 2023. ECF No. 342.

## II.    RENEWED MOTION FOR JUDGMENT AS A MATTER OF LAW

### A.  Legal Standard

The Court may grant judgment as a matter of law only if it finds that "a reasonable jury would not have a legally sufficient evidentiary basis to find for the [nonmoving] party." Fed. R. Civ. P. 50(a)(1). In deciding a motion for judgment as a matter of law renewed post-trial, "[t]he court must consider the evidence in the light most favorable to the non-movant and 'give that party the benefit of all reasonable inferences that the jury might have drawn in his favor from the evidence.'" *SEC v. Ginder*, 752 F.3d 569, 574 (2d Cir. 2014) (quoting *Jones v. Town of East Haven*, 691 F.3d 72, 80 (2d Cir. 2012)).

The movant's burden is "particularly heavy" when the "jury has deliberated in the case and actually returned its verdict." *Cross v. N.Y.C. Trans. Auth.*, 417 F.3d 241, 248 (2d Cir. 2005). A renewed motion for judgment as a matter of law "may only be granted if there exists such a complete absence of evidence supporting the verdict that the jury's findings could only have been the result of sheer surmise and conjecture, or the evidence in favor of the movant is so overwhelming that reasonable and fair-minded [persons] could not arrive at a verdict against [it]." *Wiercinski v. Mangia 57, Inc.*, 787 F.3d 106, 112 (2d Cir. 2015) (alterations in original) (quoting *Brady v. Wal-Mart Stores, Inc.*, 531 F.3d 127, 133 (2d Cir. 2008)). "The court cannot assess the weight of conflicting evidence, pass on the credibility of the witnesses, or substitute its judgment for that of the jury" and "must disregard all evidence favorable to the moving party that the jury is not required to believe." *Tolbert v. Queens Coll.*, 242 F.3d 58, 70 (2d Cir. 2001); *see also ING Glob. v. United Parcel Serv. Oasis Supply Corp.*, 757 F.3d 92, 97 (2d Cir. 2014) (same).

Importantly, a "post-trial Rule 50(b) motion for judgment as a matter of law is properly made only if a Rule 50(a) motion for judgment as a matter of law [was] made before submission

of the case to the jury." *Bracey v. Bd. of Educ. of City of Bridgeport*, 368 F.3d 108, 117 (2d Cir. 2004).  On the Rule 50(a) motion, the moving party "must [have] specif[ied] the judgment sought and the law and facts that entitle the movant to the judgment."  Fed. R. Civ. P. 50(a)(2). "[T]he specificity requirement is obligatory."  *Lore v. City of Syracuse*, 670 F.3d 127, 152 (2d Cir. 2012) (citation omitted).  The initial motion for judgment as a matter of law "must [have] at least identif[ied] the specific element that the defendant contends is insufficiently supported." *Tolbert*, 242 F.3d at 76.  "The ultimate question," however, "is whether the motion, either of itself or in the context of the ensuing colloquy, was sufficiently specific to alert the opposing party to the supposed deficiencies in her proof."  *Galdieri-Ambrosini v. Nat'l Realty & Dev. Corp.*, 136 F.3d 276, 287 (2d Cir. 1998); *see also Samuels v. Air Transp. Loc. 504*, 992 F.2d 12, 14 (2d Cir. 1993) ("[T]he rule gives the party against whom the motion for [JMOL] is made notice of defects in its proof so that it can cure them before the case goes to the jury.").

## B.  Discussion

### 1.  The Court May Consider All Arguments Raised In Google's Rule 50(b) Motion

The Court first analyzes whether Google's Rule 50(a) motion for judgment as a matter of law "was sufficiently specific to alert the opposing party to the supposed deficiencies in her proof."  *Galdieri-Ambrosini,* 136 F.3d at 287.

By way of background, Rowe rested her case mid-afternoon.  Due to timing issues relating to the jury and a witness for Google, the Court directed Google to present an "elevator pitch of the Rule 50 motion."  Tr. 1095:21-22 (Rule 50(a) Argument); *see also* Tr. 1092:2-1093:25 (sidebar conversation regarding "practical timing question[s]," in which the Court noted that it would "hear the top-line arguments" if Google made its motion that day).  During Google's argument, the Court further instructed counsel, in light of increasing time constraints,

17

to "go to a higher level" of argument, in lieu of something more "fulsome." Tr. 1098:1-6 (Rule 50(a) Argument).

In its Rule 50(a) motion, Google plainly raised that "there [was] no evidence . . . that gender played any role whatsoever in the leveling [decision]" or "in Mr. Shaukat's decision about the financial services vertical lead role." Tr. 1098:9-16 (Rule 50(a) Argument). Accordingly, Google's Rule 50(a) motion "was sufficiently specific to alert the opposing party to the supposed deficiencies in her proof" with respect to those matters. *Galdieri-Ambrosini,* 136 F.3d at 287.

Rowe urges the Court to "disregard[]" Google's arguments that (1) "Ms. Rowe failed to prove her claim that Mr. Shaukat excluded her from meetings, off-sites, email distribution lists, and client meetings," ECF. No. 372 at 14, and that (2) "Ms. Rowe did not get the [Vice President of Financial Services] role due to negative feedback from her interviews," *id*. at 17, because those arguments "w[ere] not raised in" Google's mid-trial "Rule 50 motion," ECF No. 372 at 14. Rowe is correct that Google's oral motion did not expressly challenge the sufficiency of her evidence regarding exclusion from "meetings, team off-sites, or email distribution lists because of her gender," ECF No. 369 at 19, or raise that Shaukat had reservations about Rowe's candidacy due to "interview feedback," *id.* at 12. As to these issues, "on which [a] proper Rule 50 motion[] w[as] not made, JMOL may not properly be granted by the district court . . . unless that action is required in order to prevent manifest injustice." *Lore*, 670 F.3d at 153. Because the Court intervened in Google's presentation due to timing concerns, such that Google did not make a fulsome Rule 50(a) motion, the Court concludes that it is "required" to consider Google's argument regarding the meetings, team off-sites, and email distribution lists, as well as Rowe's interview feedback, "in order to prevent 'manifest injustice.'" *Id. See Gordon v. Cnty. of Rockland*, 110 F.3d 886, 887 n.2 (2d Cir. 1997) (rejecting argument that appellant failed to meet

18

Rule 50's specificity requirement where the district judge had "intervened" "[w]hile the [defendant] was . . . arguing . . . .")); *see also Wilson Sporting Goods v. David Geoffrey & Assocs.,* 904 F.2d 677, 683 (Fed. Cir. 1990) (rejecting argument that appellant failed to satisfy Rule 50's specificity requirement because "the court cut short counsel's statement, making clear . . . that the issue presented a jury question and that it wanted to move on . . . . It would be unfair to require counsel to have developed a statement of evidentiary shortcomings which the [judge] obviously did not want to hear.").[3]

The Court must next determine whether Google has either identified "a complete absence of evidence supporting the verdict," such that the jury must have based its verdict on "sheer surmise and conjecture," or shown that "the evidence in favor of the movant is so overwhelming that reasonable and fair minded [persons] could not arrive at a verdict against [it]." *Wiercinski,* 787 F.3d at 112 (quoting *Brady,* 531 F.3d at 133).

### 2.   The Jury's Liability Finding Is Not Inconsistent With The Damages Award

"A district court has a duty to reconcile the jury's answers on a special verdict form with any reasonable theory consistent with the evidence, and to attempt to harmonize the answers if possible under a fair reading of those answers." *McGuire v. Russell Miller, Inc.*, 1 F.3d 1306, 1311 (2d Cir. 1993) (citing *Gallick v. Baltimore & Ohio R.R.*, 372 U.S. 108, 119 (1963)).  "The court is not permitted to find as a fact a proposition that is contrary to a finding made by the

---

[3] "Moreover, both [Plaintiff] and the Court were well aware," *Gordon*, 110 F.3d at 887 n.2, of Google's arguments regarding Rowe's failure to prove (1) her alleged exclusion from "staff meetings, email distribution lists and strategy setting meetings for the financial services vertical," and (2) Shaukat's "rel[iance] on interview evaluations suggesting that Rowe lacked strategic vision" when he decided "not to hire her for the [Vice President of Financial Services] role." *See Rowe v. Google LLC*, No. 19 Civ. 8655 (LGS), 2022 WL 4467194, at *6 (S.D.N.Y. Sept. 26, 2022) (adjudicating the parties' cross motions for summary judgment).  These contentions served as two "bas[es] for [Google's] summary judgment motion," *Gordon*, 110 F.3d at 887 n.2, and also were addressed by various witnesses throughout trial.

jury." *Zellner v. Summerlin*, 494 F.3d 344, 371 (2d Cir. Jul. 20, 2007) (internal quotation marks omitted); *see, e.g., Smith v. Lightning Bolt Productions, Inc.*, 861 F.2d 363, 367 (2d Cir. 1988) (the court "cannot . . . substitute its judgment for that of the jury" (internal quotation marks omitted)).

Google emphasizes on this motion that "[t]he jury explicitly found *against* Rowe on the NYLL claim and *against* Rowe on her claims for back pay." ECF No. 369 at 6. According to Google, that verdict, "[r]ead together with the Court's clear instructions regarding what Rowe needed to prove to recover back pay . . . mean[s] that Rowe failed to prove" three allegations: "that she was paid less than men, under-leveled, [and] that she was denied better paying positions, in violation of the NYLL or NYCHRL." *Id.* Google is right that, in view of the jury's finding against Rowe on the NYLL section 194 claim, Rowe failed to prove "that Google paid her lower wages than a man in the same geographic area for work which required equal or substantially equal skill, effort, and responsibility, and which was performed under similar working conditions." Tr. 1440:3-9 (NYLL section 194 charge). But Google's position that the $0 back pay award implicitly means that "Rowe failed to prove that she was . . . under-leveled . . . in violation of the NYLL or NYCHRL," ECF No. 369 at 6, goes too far. The Court explained to the jury exactly what Rowe was required to prove by a preponderance of the evidence to establish each claim—and none of the claims upon which Rowe prevailed required proof that she suffered economic loss. *See* Tr. 1444:13-1446:24 (NYCHRL gender discrimination charge), 1446:25-1450:23 (NYCHRL and NYLL section 215 retaliation charge). *See Kornmann v. City of New York Bus. Integrity Comm'n*, No. 17 Civ. 2328 (BMC), 2022 WL 4096179, at *1, 7 (E.D.N.Y. Sept. 7, 2022) (denying defendant's motion for judgment as a matter of law where jury awarded plaintiff only $1.00 in damages but found defendant liable under the NYCHRL); *Demirovic v. Ortega*, No. 15 Civ. 327 (CLP), 2018 WL 1935981, at *8 (E.D.N.Y. April 24,

2018) (awarding punitive damages for NYLL section 215 claim, notwithstanding jury award of only $1.00 in nominal damages).  The lack of a back pay award, therefore, is not inconsistent with the jury's liability determination.  *See Tolbert*, 242 F.3d at 74 ("Even if the plaintiff fails to persuade the jury that the proven violation caused him an injury that is compensable, the defendant who committed the violation is not entitled to judgment as a matter of law.").

As detailed below, Google's own evidence at trial could support a finding that Rowe was improperly leveled and denied new positions without incurring economic harm.  Rowe was the second highest paid technical director, and her pay "was higher than four of the [L]evel 9s" and "a whole bunch of Level 8s."  Tr. 1404:5-12 (Google Summation).  In its closing argument, Google put it succinctly: "Level 9s do not always earn more than Level 8s.  That's the point." *Id*. at 1405:9-10.  Moreover, Google presented evidence—specifically, the testimony of Melissa Lawrence, who served as the human resources business partner for OCTO from 2017 to 2021, *see* Tr. 1229:17-20 (Lawrence – Direct)—that "if [Rowe] were selected for th[e] [VP-FSS] role . . . [she] would do it at [her] current level."  *Id*. at 1247:1-6.  Lawrence elaborated that, "at Google . . . if you're in role A and you take role B, even if role B is a different level, a higher level, you don't get re-leveled upon transfer.  You would take on the, say, Level 9 role or the VP role as a Level 8."  *Id.* at 1247:9-12.  As Rowe herself argues, on the basis of Lawrence's testimony, "the jury could have concluded that Ms. Rowe would have received the position if not for Google's retaliation, but she *initially* would perform the role at her current level and compensation."  ECF No. 372 at 25 (emphasis added).

Given this evidence, the jury's decision not to award back pay reflects a failure to prove that Rowe "suffered economic loss *as a result of* any claims she . . . put forth," Tr. 1452:5-6 (back pay charge) (emphasis added)—not a failure to prove the claims themselves.  *See, e.g. Gerstenbluth v. Credit Suisse Sec. (USA) LLC*, 728 F.3d 139, 143 n.6 (2d Cir. 2013) (explaining

21

that "[b]ack pay consists of wages lost between the plaintiff's wrongful termination and the entry of the court's judgment."); *Dodd v. City Univ. of New York*, 541 F. Supp. 3d 318, 324 (S.D.N.Y. 2021) (denying motion *in limine* to exclude evidence related to back pay because, "[i]f [plaintiff] prevails at trial, she *may* be entitled, as back pay, to the wages she would have received but for defendants' unlawful conduct" (emphasis added)).  Accordingly, the verdict against Rowe on the NYLL section 194 claim and the jury's determination that she is not entitled to back pay do not suggest an implicit conclusion by the jury that Rowe failed to prove (1) improper leveling by Google, or (2) retaliation against her for making protected complaints about her level.

### 3. Evidence In Support Of NYCHRL Gender Discrimination Claim

The Court instructed the jury that the NYCHRL "has been violated if you find by a preponderance of the evidence that gender played some role in Google's treatment of Ms. Rowe . . . If you find that Google treated Ms. Rowe less well, at least in part because of her gender, then she may succeed on this claim, even if you find that Google's conduct was also motivated by a lawful reason."  Tr. 1445:3-12 (NYCHRL charge).  The parties agree that "this Court properly instructed the jury" on the NYCHRL claim.  ECF No. 369 (Google's memorandum of law) at 27; ECF No. 372 at 9 (Rowe's memorandum of law, stating that "[t]he jury was charged with the proper standard under the NYCHRL.").

Google argues that Rowe's NYCHRL discrimination claim fails because there is (1) no evidence "that Shaukat intentionally excluded Rowe from meetings, team off-sites, or emails, or that others were treated differently," or that "he was motivated by gender discrimination," ECF No. 369 at 27; (2) no evidence of "unfair treatment of Rowe during the [Vice President of Financial Services] role search process," *id.* at 28; and (3) no evidence of "unfair treatment of Rowe during the VP-FSS role search process," *id.* at 29.  Whether Rowe proved any of those scenarios is beside the point.  The jury found that Rowe "established by a preponderance of the

22

evidence that [Google] ha[d] *on at least one occasion* treated her less well, at least in part, because of her gender."  Verdict at 2.

Even assuming, without deciding, that Rowe failed to offer any evidence with respect to the foregoing examples of alleged differential treatment, the verdict could still be upheld based on Rowe's evidence that Google hired Rowe at Level 8, instead of Level 9, at least in part because of her gender.  Rowe presented ample evidence in that regard, including the following:

- Rowe testified that she, one other woman, and seven other men were hired in late 2016 to early 2017 for the Technical Director role and that she was told that "everyone that [was] hired into th[at] role [wa]s coming [in] as a Level 8," which she later learned was not true.  Tr. 122:4-11 (Rowe – Direct); *id.* at 134:8-13;

- Grannis, Rowe's supervisor in OCTO, testified that these individuals were all hired for the same role.  *See* Tr. 734:23-25 (Grannis – Direct) ("Q. Now, each of those nine were all hired for the same role; correct?  A. The technical director role, yeah."); and

- Three of Rowe's male comparators testified that, despite being Level 9s and Rowe being a Level 8, they all performed the same work.  *See, e.g.*, Tr. 941:16-17 (Harteau – Direct) ("We were doing the same sort of work in the same sort of circumstances."); Tr. 986:1 (Wilson – By Deposition Designation) (identifying Rowe's role as the "same as mine but for the financial vertical."); Tr. 1009:3-4 (Eryurek – By Deposition Designation) ("Q. So [Rowe] was in the same role that you were in?  A. Yes. We were all in the same role.").

Numerous exhibits admitted at trial further supported that Google hired Rowe at Level 8, instead of Level 9, at least in part because of her gender.  For example, the Technical Directors' hiring packets, Pl. Exs. 116-121, "showed that men were hired as a Level 9 despite not having

advanced degrees, not having managed large teams, and coming from industries less important than financial services," *see* ECF No. 372 at 10.  One candidate's packet stated that, "[f]or an L8, . . . I was hoping for more [p]resence and overall gravitas during the interview . . . he's not as strong as the other candidates I've interviewed for this role."  PX 120 at 11.  Google nevertheless hired that candidate as a Level 9.  *See, e.g.*, PX 88; Tr. 535:21 – 539:23 (Kevin Lucas – Direct) (discussing PX 88)*.*  In addition, in Rowe's hiring packet, Rowe was described as "more junior," and an interviewer questioned "whether [Rowe] is senior enough," PX 119, PX 118, notwithstanding that Rowe had at least as many years of experience as the men interviewed and hired by Google as Level 9s.  *See* PX 88 (listing the years of experience and levels of OCTO team members).

Considering the foregoing, the Court cannot conclude that "the jury's findings could only have been the result of sheer surmise and conjecture, or [that] the evidence in favor of [Google] [wa]s so overwhelming that reasonable and fair-minded [persons] could not arrive at a verdict against [it]."  *Okeke v. New York & Presbyterian Hosp.*, 275 F. Supp. 3d 470, 474 (S.D.N.Y. 2017) (quoting *Tepperwien v. Entergy Nuclear Operations, Inc.*, 663 F.3d 556, 567 (2d Cir. 2011)).

### 4.  Evidence In Support Of NYCHRL And NYLL Section 215 Retaliation Claims

The Court instructed the jury that:

> In order to find for Ms. Rowe on the[] [retaliation] claims under either [the NYCHRL] or [NYLL section 215], you must find that she proved each of the following four elements by a preponderance of the evidence:  First, Ms. Rowe engaged in a protected activity. Second, her employer, Google, was aware of the protected activity.  Third, Google engaged in what is commonly referred to as an adverse action, that is, conduct that could be reasonably expected to chill or deter someone from engaging in protected activity.  And fourth, there is a causal connection between the protected activity and the adverse action; that is, the complaints that were made were, at least in part, the reason why the adverse employment action took place.

Tr. 1447:15-1448:5 (NYCHRL retaliation and NYLL section 215 charge).  The parties agree that "the jury was charged with the proper standard for retaliation."  ECF No. 372 (Rowe's memorandum of law) at 18; ECF No. 369 (Google's memorandum of law, identifying the same four elements) at 29.

Google argues that Rowe presented "no evidence from which the jury could have reasonably concluded that Rowe proved the third and fourth elements of this claim."  ECF No. 369 at 29.  Rowe did offer evidence with respect to all four elements, however, from which the jury could have found that her complaints of under-leveling and lack of equal pay were, at least in part, the reason that Google did not promote her into the Vice President of Financial Services position or consider her for the VP-FSS role.

*Vice President of Financial Services Role*.  With respect to the first element, the jury heard that Rowe made two complaints.  First, on August 28, 2018, Rowe e-mailed a complaint to HR employees Melissa Lawrence and Kevin Lucas, "saying [that] she's in the process of interviewing for . . . the head of financial services role for Google Cloud and she's indeed raising . . . this issue . . . [that] she was hired in as an L8.  And . . . she referred to her male peers or referred to gender as part of the comparison."  Tr. 1248:17-25 (Lawrence – Direct).  Then, on November 7, 2018, Rowe emailed Shaukat and Greene and raised, in pertinent part, her concern that she "was hired in at a more junior level than [her] male peers (an issue [she had] raised with HR and HR is actively investigating)."  PX 54; Tr. 170:4-12 (Rowe – Direct).  As to the second element, Lucas testified at trial that, upon receiving Rowe's "concern," he "transferred it" to a member of the "[E]mployee [R]elations team" for investigation.  Tr. 555:4-14 (Lucas – Cross).

With respect to the third element (i.e., "adverse action," Tr. 1447:15-1448:5), on September 1, 2018, Vardaman, the recruiter, wrote in his weekly update that "it doesn't sound

25

like she is viable for the VP role." PX 69. He did so even though two interviewers "liked her," *id.*, and he had received no "additional ping feedback," Tr. 675:11-14 (Vardaman – Redirect). Further, on December 5, 2018, Shaukat told Rowe "that she was not going to get the [Vice President] of Financial Services position." Tr. 361:3-5 (Shaukat – Direct).

As to the fourth element (i.e., "a causal connection between the protected activity and the adverse action," Tr. 1447:15-1448:5), the temporal proximity between Rowe's complaint on August 28, 2018 and the adverse action by Vardaman on September 1, 2018, and between Rowe's complaint on November 7, 2018 and the adverse action by Shaukat on December 5, 2018, are circumstantial evidence of causation. *Ziparo v. CSX Transp., Inc.*, 160 F. 4th 314, 336 (2d Cir. 2025) ("[O]ur caselaw teaches that a period of several weeks to several months may establish the required causal relationship."). *See also, e.g.*, *Gorzynski v. JetBlue Airways Corp.*, 596 F.3d 93, 110 (2d Cir. 2010) ("[W]e have previously held that five months is not too long to find the causal relationship."); *Gorman-Bakos v. Cornell Co-op Extension of Schenectady Cnty.*, 252 F.3d 545, 555 (2d Cir. 2001) (finding that "temporal proximity is sufficient to support an allegation of a causal connection" where "about four months elapsed" between the protected activity and adverse action).

*VP-FSS Role*. Vardaman was interviewed by Employee Relations in connection with this lawsuit in January 2020. Tr. 582:14-16, 20-23 (Vardaman – Direct). The meeting notes reflect that Vardaman referred to Rowe as "abrasive," "cantankerous," and "bristly." PX 108. On February 4, 2020, Rowe had coffee with Kristen Kliphouse, then-Head of North America Sales, and learned about the VP-FSS Sales role. Tr. 186:9-12 (Rowe – Direct). Vardaman then met with Rowe on or about February 28, 2020 and told her that she "wasn't going to be considered because [she] wasn't a good fit" for the role. *Id.* at 192:3-5.

26

Although Vardaman testified at trial that he and Kliphouse "spen[t] time talking about [Rowe's] background," Tr. 572:9-574:16 (Vardaman – Direct), he was impeached by his deposition testimony that he did not know about Rowe's background or learn what her qualifications were "at any point in time." *Id.* at 571:23-575:5; Vardaman Dep. 42:5-14 ("Q. What did you know about her industry background?  A. I think that she was at JPM.  Yeah, that's pretty much it.  Q.  That's pretty much all you knew about her background?  A.  Correct.  Q.  Do you know what role she had at JPM?  A.  No; not that I recall."); 43:5-7 ("Q.  Okay.  I'm asking: At any point in time, did you learn what her qualifications were?  A.  No."); *see also* Tr. 596:4-21.  Vardaman also testified at trial that, "by the time I raised Ms. Rowe's candidacy to Ms. Kliphouse, Ms. Kliphouse said they had met for coffee and that she wanted me to focus on another candidate."  Tr. 596:22-25 (Vardaman – Direct).  But Vardaman acknowledged that, at his deposition years earlier, he "did not" testify to that fact.  *Id.* at 596:1-4.

In light of Vardaman's inconsistent explanations for Google's decision not to consider Rowe for the VP-FSS role, the jury was entitled to conclude that Vardaman was not credible. *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 147 (2000) ("Proof that the defendant's explanation is unworthy of credence is simply one form of circumstantial evidence that is probative of intentional discrimination"); *Bennett v. Health Mgmt. Sys., Inc.,* 92 A.D.3d 29, 41 (App. Div. 2011) ("[A] jury is entitled to infer from the evidence of falsity that the cover-up was a cover-up of discrimination").  Moreover, given Vardaman's repeated testimony that he "didn't do anything to find out about Ms. Rowe's qualifications for [the VP Financial Services Sales] position," Tr. 596:8-11 (Vardaman Direct); *see also* Tr. 685:6-10 (Vardaman – Redirect), and that Ms. Rowe had not submitted any materials, *see* PX 106, the jury was entitled to discredit Kliphouse's testimony that she and Vardaman had "talked through what the qualifications were [for the VP-FSS role] and [whether Rowe met the] qualifications," based upon "whatever was on

27

[Rowe's] submitted materials," Tr. 1265:8-1266:1 (Kliphouse – Direct).  *Reeves*, 530 U.S. at 147; *Bennett.,* 92 A.D.3d at 41 (App. Div. 2011).

## C.  Conclusion

For the reasons set forth above, Defendant's renewed motion for judgment as a matter of law is denied..

### III.    MOTION FOR REMITTITUR OF PUNITIVE DAMAGES

At the conclusion of trial, the jury awarded Rowe $1,000,000.00 in punitive damages. *See* Verdict at 3.  The Court now considers Google's motion for remittitur of that award, ECF No. 370.

## A.  Legal Standard

Pursuant to Rule 59(e), a party may move "to alter or amend a judgment," including for remittitur of an excessive damages award.  Fed. R. Civ. P. 59(e).  "Under the NYCHRL, 'a plaintiff is entitled to punitive damages where the wrongdoer's actions amount to willful or wanton negligence, or recklessness, or where there is a conscious disregard of the rights of others or conduct so reckless as to amount to such disregard.'"  *Duarte v. St. Barnabas Hosp.*, 341 F. Supp. 3d 306, 325 (S.D.N.Y. 2018) (quoting *Chauca v. Abraham*, 30 N.Y.3d 325, 89 N.E.3d 475, 477 (N.Y. 2017)).  This standard "represent[s] the lowest threshold, and the least stringent form, for the state of mind required to impose punitive damages."  *Casmento v. Volmar Constr., Inc.*, No. 20 Civ. 00944 (LJL), 2022 WL 15773966, at *10 (S.D.N.Y. Oct. 28, 2022) (quoting *Chauca*, 89 N.E.3d at 481)).  However, "[t]he New York Court of Appeals has expressly rejected the idea that 'a punitive damages charge is automatic on a finding of liability' under the NYCHRL, instead 'requiring an appropriate showing of heightened culpability for [an award of] punitive damages.'"  *Edelman v. N.Y.U. Langone Health Sys.*, 141 F.4th 28, 43 (2d Cir. 2025)

28

(quoting *Chauca*, 89 N.E.3d at 481). "Such conduct requires 'a high degree of moral

culpability.'" *Id*. (quoting *Home Ins. Co. v Am. Home Prods. Corp*., 75 N.Y.2d 196, 551

N.Y.S.2d 481, 550 N.E.2d 930, 934 (N.Y. 1990)).

"[A] court may remit a punitive damages award when the award 'shocks the judicial

conscience or amounts to a miscarriage of justice.'" *Qorrolli v. Metro. Dental*, No. 18 Civ. 6836

(DLC), 2022 WL 17689836, at *10 (S.D.N.Y. Dec. 15, 2022), *aff'd* 124 F.4th 115 (2d Cir. 2024)

(quoting *Jennings v. Yurkiw*, 18 F.4th 383, 389 (2d Cir. 2021) (citation omitted)). "To determine

whether an award is excessive, a court may compare it to damages awarded in similar cases." *Id.*

(citing *Jennings*, 18 F.4th at 393-94). "Additionally, review of a punitive damages award is

informed by three 'guideposts': '(1) degree of reprehensibility of the defendant's conduct, (2)

relationship of the punitive damages to the compensatory damages, and (3) criminal and civil

penalties imposed by the state's law for the misconduct in question.'" *Id.* (quoting *Jennings*, 18

F.4th at 390); *see also BMW of N. Am., Inc. v. Gore*, 517 U.S. 559, 574-84 (1996) (describing the

factors referenced by *Jennings* as "guideposts").

## B. Discussion

The jury found that Google "should be subjected to punitive damages" under the

NYCHRL in the amount of $1,000,000—more than 6.66 times the amount of compensatory

damages it awarded (i.e., $150,000), and notwithstanding the $0 it awarded in back pay. Verdict

at 3. Application of each of the aforementioned guideposts, as well as a "compar[ison] . . . to

damages awarded in similar cases," *Qorrolli*, 2022 WL 17689836, at *10, show that this award

was "excessive." *Id.*

"First, the conduct at issue is not so reprehensible as to justify a $[1],000,000 award."

*Qorrolli*, 2022 WL 17689836, at *10. Reprehensibility is "'perhaps the most important'

consideration in assessing the reasonableness of an award of punitive damages." *Jennings*, 18

29

F.4th at 390 (quoting *BMW of N. Am., Inc.*, 517 U.S. at 575).  To determine reprehensibility, courts consider whether:

> the harm caused was physical as opposed to economic; the tortious conduct evinced an indifference to or a reckless disregard of the health or safety of others; the target of the conduct had financial vulnerability; the conduct involved repeated actions or was an isolated incident; and the harm was the result of intentional malice, trickery, or deceit, or mere accident.

*State Farm Mut. Auto Ins. Co. v. Campbell*, 538 U.S. 408, 419 (2003).  "The existence of any one of these factors weighing in favor of a plaintiff may not be sufficient to sustain a punitive damages award."  *Id.*

As Google emphasizes, reprehensible conduct generally involves "violence," "deceit," or "intentional malice."  *Jennings*, 18 F.4th at 390; ECF No. 371 at 20.  Here, "[t]here is no evidence of violence or threats of violence; no evidence of inappropriate epithets by decision-makers; and no evidence that Google ignored or failed to investigate [Rowe]'s claims."  ECF No. 371 at 22.  Instead, Google presented evidence that "[e]very single time Rowe raised a workplace concern . . . Google promptly and diligently investigated."  *Id.* at 21, 5-8, 9-11 (summarizing evidence relating to Google's investigations of Rowe's workplace concerns).

Rowe counters that (1) Google hired Rowe "using a highly subjective, undefined process, in contravention to its own hiring policies"; (2) Shaukat treated Rowe "dismissively based on her gender" and "lied to her about being considered for the [Vice President of Financial Services] role"; and (3) Vardaman "displayed clear animus toward [Rowe] following her complaints," such as by referring to her as "abrasive," "bristly," and "cantankerous."  ECF No. 374 at 14 (citing PX 64, 69, 106, 108, 111 and Tr. 578:2-13 (Vardaman – Direct), *id.* at 572:9-574:16; *id.* at 596:8-16, Tr. 685:5-10 (Vardaman – Redirect)).  While the evidence at trial "support[s] a finding of a violation of the NYCHRL, a defendant must do more than just violate the NYCHRL to face liability for punitive damages."  *Ahmad v. New York Univ.*, No. 22 Civ. 1248 (JLR), 2025

WL 3022862, at *16-17 (S.D.N.Y. Oct. 29, 2025), *vacated in part*, 2026 WL 234594, at *2 (S.D.N.Y. Jan. 29, 2026) (district court granting partial vacatur of its judgment as to individual defendants upon joint motion of the parties to "facilitate settlement [and] provid[e] much-needed closure to all parties"). The evidence here does not support a finding that Google violated Rowe's rights with such a "high degree of moral culpability." *Edelman*, 141 F.4th at 43 (affirming remittitur of punitive damages notwithstanding evidence that a defendant called plaintiff a "bitch" during a rant against her). *See also Ahmad*, 2025 WL 3022862 at *17 (remitting punitive damages despite "testimony that [d]efendants had knowledge of the relevant law and NYU's policies that prohibited disability discrimination" and that "NYU employees were unresponsive to [plaintiff's] calls, raised their voices at times, and internally complained [about plaintiff]").

"Second, the ratio between the compensatory and punitive damages award is unreasonably high." *Qorrolli*, 2022 WL 17689836, at *11 (remitting punitive damages in light of 1:3.5 ratio of compensatory damages to punitive damages). Here, the jury awarded in punitive damages more than 6.66 times the $150,000 awarded in compensatory damages. Although "there is no rigid upper limit on a ratio of punitive damages to compensatory damages," *Johnson v. Nextel Comm'ns Inc.*, 780 F.3d 128, 149 (2d Cir. 2015), even "a four-to-one ratio of punitive to compensatory damages is close to the line of constitutional impropriety." *Duarte*, 341 F. Supp. 3d at 331; *Thomas v. iStar Fin., Inc.*, 652 F.3d 141, 149 (2d Cir. 2010) (same). And even a four-to-one ratio must be justified by a "constellation of intentional misbehaver," "extensive misconduct directed at escaping liability," or "a particularly egregious act" that "has resulted in only a small amount of economic damages." *Jennings*, 18 F.4th at 391-92. No such conduct was demonstrated here. Particularly given the jury's finding that Rowe was not entitled to back pay, the 6.66-to-1 ratio "is not only excessive, but constitutionally suspect." *Qorrolli*, 2022 WL

31

17689836, at *11 (rejecting 3.5-to-1 ratio of punitive to compensatory damages where compensatory damages were based on "emotional distress").  "A lower ratio is 'particularly' appropriate 'where the underlying compensation is, as it is in this case, for intangible—and therefore immeasurable—emotional damages,' because '[i]mposing extensive punitive damages on top of such an award stacks one attempt to monetize highly offensive behavior, which effort is necessarily to some extent visceral, upon another.'"  *Duarte*, 341 F. Supp. 3d at 331-332 (quoting *Turley v. ISG Lackawanna, Inc.*, 774 F. 3d 140, 165-66 (2d Cir. 2014)).  "In such circumstances, 'a roughly [two-to-one] ratio of punitive damages to what, by its nature, is necessarily a largely arbitrary compensatory award, constitutes the maximum allowable . . . .'"  *Id.* (quoting *Turley*, 774 F.3d at 166).

Third, the "civil or criminal penalties that could be imposed for comparable misconduct" do not justify a $1,000,000 punitive damages award.  *Id.* (citing *Jennings*, 18 F.4th at 392).  Rowe "does not argue that any of the conduct described could be charged criminally."  *Id.*  And the maximum civil penalty of $250,000 authorized by the NYCHRL is a fraction of the punitive damages awarded here.  *See* N.Y.C. Admin. Code § 8–126(a) (authorizing civil penalty of $250,000), *Ravina v. Columbia Univ.,* No. 16 Civ. 2137 (RA), 2019 WL 1450449, at *14 (S.D.N.Y. Mar. 31, 2019) ("The punitive damages award in this case [$500,000] is twice th[e] amount [authorized by statute, $250,000], suggesting that the award was excessive.").

Fourth, "a comparison to similar cases shows that the jury's punitive damages award was excessive."  *Qorrolli*, 2022 WL 17689836 at *11.  Employment discrimination "[c]ases upholding punitive damage awards of $200,000 or more generally involve discriminatory or retaliatory termination resulting in severe financial vulnerability to plaintiff, repeated incidents of misconduct over a significant period of time, repeated failures to address complaints of discrimination, and/or deceit."  *Duarte*, 341 F. Supp. 3d at 329; *see also MacMillan*, 873 F.

32

Supp. 2d at 566 (collecting cases).  In NYCHRL discrimination and retaliation cases involving

no evidence of violence, "courts have frequently remitted punitive damages awards to within a

range of approximately $25,000 to $250,000," *see Ravina*, 2019 WL 1450449 at \*14 (collecting

cases), or denied punitive damages altogether, *see Ahmad*, 2025 WL 3022862 at \*17; *Qorrolli*,

2022 WL 17689836 at \*11.

## C.  Conclusion

"Having considered the degree of reprehensibility of [Google's] conduct . . . the punitive

awards granted in similar cases, the ratio of punitive to compensatory damages, and the

maximum civil penalty authorized by the NYCHRL," the Court concludes that the $1,000,000

punitive damages award to Rowe was "excessive."  *Ravina*, 2019 WL 1450449, at \*15.  "An

award of $250,000, reflecting the maximum civil city law penalty, 'would be maximally

sufficient to serve the retributive and deterrent purposes of civil penalties without violating due

process principles.'"  *Id.* (*quoting Thomas v. iStar Fin. Inc.*, 508 F. Supp. 2d 252, 264 (S.D.N.Y.

2007)); N.Y.C. Admin. Code § 8-126 (imposing "a civil penalty of not more than $125,000"

where "a person had engaged in an unlawful discriminatory practice" and "a civil penalty of not

more than $250,000" where "an unlawful discriminatory practice was the result of [a] willful,

wanton or malicious act").  "[Google's] motion for a new trial concerning punitive damages will

be granted unless [Rowe] agrees to a remittitur reducing the punitive damage award" from

$1,000,000 to $250,000.  *Duarte*, 341 F. Supp. 3d at 333; *see also Ravina*, 2019 WL 1450449, at

\*18 (ordering that plaintiff "inform the court in writing whether she will accept the reduced

damages award[] . . . If she does not, the Court will grant [defendant] a new trial on the sole issue

of damages."); *MacMillan v. Millennium Broadway Hotel*, 873 F. Supp. 2d 546, 56 (S.D.N.Y.

2012) (similar).

33

## IV.    MOTION FOR EQUITABLE RELIEF

Following trial, Rowe moved pursuant to Rules 57 and 59 for the following statutory and equitable relief: (1) "an order instating [Rowe] to Level 9" and "an order instating [Rowe] to the 2020 Vice President, Financial Services – Sales position, or front pay in lieu of instatement"; (2) "a declaration that Google's actions violated the NYLL and NYCHRL"; (3) "a permanent injunction barring Google from further violations of the NYLL and the NYCHRL against [Rowe]"; (4) "an order directing Google to provide such monetary amounts necessary to offset tax consequences to [Rowe] caused by the jury's award of compensatory and punitive damages"; and (5) "pre- and post- judgment interest."  ECF No. 365 at 8.

### A.  Instatement

The Court first addresses Rowe's motion for instatement, or, in the alternative, front pay. Rowe seeks "[i]nstatement to Level 9," "instate[ment] to the [VP-FSS] position at the VP level (10) and compensation," or, "[t]o the extent the Court finds that instatement to the [VP-FSS] position is infeasible . . . front pay to compensate Ms. Rowe for future lost earnings."[4]  ECF No. 365 at 14-19.  Rowe argues that "the make-whole relief of the statute anticipates that it will be one or the other"—instatement or front pay.  ECF No. 401 (Oral Arg. Tr.) at 36:14-19. Otherwise, "it wouldn't make [Rowe] whole for the discrimination and retaliation the jury found Google liable for." *Id.*  As expressed at oral argument, Google's position is that Rowe "is fundamentally asking that the [C]ourt give her more than what the jury said she proved." *Id.* at 48:12-17.  And in any case, according to Google, "the work that's being done [at OCTO] has dramatically changed," such that "it just would be impracticable to put her back in that environment and have to find something for her to do." *Id.*

---

[4] Rowe acknowledges that, "[i]f the Court orders instatement to the [VP-FSS] role at Level 10, then [her] request to instatement at Level 9 is moot."  ECF No. 369 at 16 n.4.

Case 1:19-cv-08655-JHR    Document 411    Filed 04/03/26    Page 35 of 44

The Second Circuit, among others, "ha[s] repeatedly emphasized the importance of equitable relief in employment cases." *Reiter v. MTA N.Y. City Transit Auth.*, 457 F.3d 224, 230 (2d Cir. 2006) (citing, *inter alia*, *Brooks v. Travelers Ins. Co.,* 297 F.3d 167, 170 (2d Cir. 2002) (noting that, "[u]nder Title VII, the first choice is to reinstate the plaintiff at the original employer")). Reinstatement "accomplishes the dual goals of providing make-whole relief for a prevailing plaintiff and deterring future unlawful conduct." *Reiter*, 297 F.3d at 230. "These factors underpin the overarching preference in employment discrimination cases for reinstatement." *Id.* at 230 (citing *NLRB v. Thalbo Corp.,* 171 F.3d 102, 110 (2d Cir. 1999) ("[T]he responsibility of a court that finds a [Title VII] violation is to fashion equitable relief to make the claimant whole.")).

"An award of front pay is an alternative to reinstatement where reinstatement is 'inappropriate,' such as where there is animosity between an employer and an employee or where there is no longer a position available at the time of judgment." *Bergerson v. N.Y. State Office of Mental Health*, 652 F.3d 277, 287-88 (2d Cir. 2011) (internal citations and quotation marks omitted). "An award of front pay is discretionary, and if a district court makes a non-erroneous 'specific finding' that a plaintiff has already been made whole, no abuse of discretion can be found in denying front pay." *Bergerson*, 652 F.3d at 288 (citing *Saulpaugh v. Monroe Cnty. Hosp.,* 4 F.3d 134, 145 (2d Cir. 1993)).

"The Court concludes that neither reinstatement nor front-pay is appropriate under the circumstances of this case, as the totality of the award both makes [Rowe] whole and serves the prophylactic purpose of awards in employment discrimination cases." *Wat Bey v. City of New York*, No. 99 Civ. 03873 (AJN), 2013 WL 12082743 at *28 (S.D.N.Y. Sept. 4, 2013); *see Albermarle Paper Co. v. Moody*, 422 U.S. 405, 416-19 (1975) (describing that purpose as (1) "achiev[ing] equality of employment opportunities" and (2) "mak[ing] persons whole for injuries

35

suffered on account of unlawful employment discrimination"). For the harm that the jury determined Rowe had suffered, which was notably *non-economic*, *see* Verdict at 2 (awarding $0 in back pay), she will receive a substantial monetary recovery, including $150,000 in compensatory damages and $250,000 in punitive damages, as well as post-judgment interest, *see infra* Section IV.E.

"In addition to the already substantial monetary award, other factors weigh against granting . . . equitable relief." *Wat Bey*, 2013 WL 12082743 at *28. As an initial matter, given that Rowe has never previously held the positions she now seeks, instating her at Level 9 or in the VP-FSS position is likely to "inappropriately involve the Court" in Google's human resources decisions. *Honadle v. Univ. of Vermont & State Agric. Coll.*, 56 F. Supp. 2d 419, 424 (D. Vt. 1999) (denying request for plaintiff's instatement to tenured position, where granting request would involve the Court in the University of Vermont's tenure decisions). Beyond that, "reinstatement may be denied . . . where the[] employer-employee relationship may have been irreparably damaged." *Zakre v. Noddeutsche Landesbank Girozentrale*, 541 F. Supp. 2d 555, 570 (S.D.N.Y. 2008) (denying reinstatement where the "litigation ha[d] been ongoing for over six years"). Rowe and Google have spent several years litigating this case, not to mention more recent proceedings before the EEOC concerning both the "corporate restructuring" that rendered Rowe "no longer employed by Google," ECF No. 396, and "her last performance review," Oral Arg. Tr. 3:4-14. "[G]iven the damaged relationship between the parties," the Court concludes that instatement "is not feasible." *Zakre*, 541 F. Supp. 2d at 570. *See Greenbaum v. Svenska Handelsbanken*, 979 F. Supp. 973, 987 (S.D.N.Y. 1997) (denying reinstatement where "there [wa]s clearly too much animosity between the parties for [instatement] to be appropriate.").

In light of the awards of compensatory and punitive damages, the fact that Rowe seeks *instatement* to a position that she has not previously held, as well as the damaged relationship

between the parties, "the Court concludes that [Rowe] [is] not entitled to reinstatement or front pay." *Wat Bey*, 2013 WL 12082743, at *28.

## B. Declaratory Relief

Rowe seeks a declaratory judgment that "Google's actions violated the NYLL and NYCHRL," ECF No. 365 at 8, because "Google continues to act," "even in the face of a verdict," "as if it did not violate the law"—including by publicly stating that it "disagree[s] with the jury's finding." ECF No. 385 at 13. Rowe argues that, "in addition to any potential retaliation claim available to [Rowe] should Google retaliate [against her in the future]," a declaratory judgment would create an "additional incentive for Google to follow the law." ECF No. 365 at 25.

The Declaratory Judgment Act provides as follows:

> In a case of actual controversy within its jurisdiction . . . any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought. Any such declaration shall have the force and effect of a final judgment or decree and shall be reviewable as such.

28 U.S.C. § 2201(a). "In other words, the statute requires (1) an actual controversy within the Court's jurisdiction; (2) a pleading requesting a declaratory judgment; and (3) an interested party seeking a declaration." *Lindsey v. Butler*, 647 F. Supp. 3d 128, 143 (S.D.N.Y. Dec. 22, 2022) (denying declaratory judgment after jury verdict). To establish an "actual controversy," "a plaintiff must demonstrate that (1) he or she has suffered an injury; (2) the injury is traceable to the defendants' conduct; and (3) a federal court decision is likely to redress the injury." *Id*. (quoting *Rolle v. Girardi*, 689 F. App'x 64, 65 (2d Cir. 2017)).

Google rejoins that, *inter alia*, that the declaration Rowe seeks would "serve[] no useful purpose," *Koch v. Rodenstock*, No. 06 Civ. 6586 (BSJ) (DF), 2012 WL 5844187, at *12

(S.D.N.Y. May 9, 2012), given the jury's verdict for Rowe on her NYCHRL discrimination claim and her NYCHRL and NYLL section 215 retaliation claims. *See* ECF No. 376 at 19-20. In other words, Google seems to argue that no "actual controversy" remains. *Lindsey*, 647 F. Supp. 3d at 143. The Court agrees. "[A] plaintiff cannot rely on past injury to satisfy the injury requirement [of establishing an actual case or controversy] but must show a likelihood that he or she will be injured in the future." *Id.* Rowe "is no longer employed by" Google, ECF No. 396, and has not "suggested a likelihood of being harmed by [Google ] in a similar manner in the future," *Lindsey*, 647 F. Supp. 3d at 144, despite having an opportunity to raise such arguments.[5] Moreover, Rowe "points to no case where a litigant has successfully obtained declaratory judgment merely for the purpose of restating what a jury has already determined." *Lindsey*, 647 F. Supp. 3d at 144. Thus, Rowe's request for declaratory judgment is denied.

## C. Injunctive Relief

"A party seeking an injunction bears the burden of proving that the 'relief is needed' because 'there exists some cognizable danger of recurrent violations.'" *Wat Bey*, 2013 WL 12082743, at *30. As discussed *supra*, Rowe "is no longer employed by Google." ECF No. 396. Accordingly, there is no risk of such violations. *See Ravina,* 2019 WL 1450449, at *17 (denying request for injunctive relief under the NYCHRL where plaintiff and alleged wrongdoer "no longer work[ed] together"). In any event, the requested injunction would only require

---

[5] "Both parties in their post-trial motion papers relied on the fact that Rowe, at the time [of filing], remained employed by Google." ECF No. 396. As of at least December 27, 2024, however, Rowe was "no longer employed by Google." *Id*. The Court directed the parties to be prepared to address at oral argument Rowe's "departure from Google and the impact of that development on the motions." *See* ECF No. 400. At argument, although the Court asked the parties to "talk first about [Rowe's] departure from Google," Oral Arg. Tr. 2:25-3:2, neither party addressed the extent to which Rowe's departure eliminated the likelihood of future harm absent a declaratory judgment. *See generally* Oral Arg. Tr. Nor did either party seek leave to file supplemental briefing with respect to this issue.

Google to comply with the NYLL and the NYCHRL, which it is already obligated to do.  *See Wat Bey*, 2013 WL 12082743, at *31 (denying request to "enjoin [d]efendants from discriminating against employees because of their Islamic religion" as that conduct was "already prohibited by law").  Accordingly, Rowe's motion for a permanent injunction is denied.

**D.  Tax Relief**

Pursuant to Rule 59(e), Rowe seeks "a gross-up on her damages to offset tax consequences not contemplated by the jury when making its [punitive and compensatory] damages award."  ECF No. 365 at 26.  Rule 59(e) authorizes a district court to "alter or amend [a] judgment to correct a clear error of law or prevent injustice."  *Nnebe v. Daus*, No. 06 Civ. 4991 (RJS), 2024 WL 4182600, at *3 (S.D.N.Y. Sept. 13, 2024) (Sullivan, J., by designation) (citing *Munafo v. Metro. Transp. Auth.*, 381 F.3d 99, 105 (2d Cir. 2004) (internal quotation marks omitted)).  "This type of 'reconsideration of a judgment after its entry is an extraordinary remedy which should be used sparingly.'"  *Id.* (quoting 11 Wright & Miller, Federal Practice & Procedure § 2810.1 (3d ed. 2024)).  Moreover, a party may not "obtain judgment as a matter of law under Rule 59(e) after failing to comply with the carefully crafted structure and standards of Rules 50 and 51."  *ING Glob.*, 757 F.3d at 96.  "Rule 51 requires parties to articulate and lodge their objections to jury charges before they are delivered so that 'the trial court [will have] an opportunity to cure any defects in the instructions before sending the jury to deliberate.'"  *Id.* (quoting *Jacques v. DiMarzio, Inc.*, 386 F.3d 192, 200 (2d Cir.2004)).  "Permitting a party out of compliance with Rules 50 and 51 to prevail under Rule 59(e) would render those Rules, which are basic to the conduct of federal trials, essentially superfluous."  *Id.* at 97.  Thus, "a party cannot obtain judgment as a matter of law under Rule 59(e) on grounds of an incorrect jury instruction if the party did not timely object to the jury charge before it was delivered, as required by Rule 51."  *Nnebe*, 2024 WL 4182600, at *3 (citing *ING Glob.*, 757 F.3d at 97).

The Court instructed the jury that it could "consider awarding several different types of damages: back pay, statutory damages under [NYLL section] 194, compensatory damages, nominal damages, and punitive damages," and, further, that if it "ma[d]e any award of damages, such award [wa]s not subject to federal income taxes and [the jury] should not consider such taxes in determining the amount of damages, if any."  Tr. 1451:19-1452:4 (Damages Charge). The Court's draft jury charge, which was provided to the parties to review prior to the charging conference, included that language.  *See* ECF No. 343-3.  Neither party objected during the charging conference, Tr. 1315:2-1350:6 (Charging Conference), or at any other time "before [the taxation instruction was] delivered."  *ING Glob.*, 757 F.3d at 96.[6]  Rowe now asserts, however, that this charge was inaccurate because "compensatory and punitive damages awards are not excludable from gross income" in discrimination suits, "and thus are subject to federal income tax obligations."  ECF No. 365 at 26 (citing 26 U.S.C. § 104 and Internal Revenue Service, Tax Implications of Settlements and Judgments, https://www.irs.gov/government-entities/tax-implications-of-settlements-and-judgments (last visited [April 1, 2026]) ("Discrimination suits for age, race, gender, religion, or disability can generate compensatory, contractual and punitive awards, none of which are excludible under IRC Section104(a)(2).")).

Because Rowe did not "articulate and lodge [her] objection[] to [the] jury charges before they [were] delivered," *ING Glob.*, 757 F.3d at 97, Rowe's motion "to modify both the compensatory and punitive damages awards to account for the federal taxes [Rowe] must pay on those awards," ECF No. 365 at 26, is denied.

---

[6] Incidentally, after the jury was charged, Rowe raised certain new objections to the charges during a sidebar with the Court, *see* Tr. 1462:22-1464:20 (Sidebar), but the instant objection to the instruction concerning taxation was not among them.

### E.  Interest

*Prejudgment Interest.*  An award of prejudgment interest is at the district court's

discretion.  *Gierlinger v. Gleason*, 160 F.3d 858, 873 (2d Cir. 1998).  "Discretionary awards of

prejudgment interest are proper when the awards are fair, equitable and necessary to compensate

the wronged party fully."  *Makinen v. City of New York*, No. 11 Civ. 7535 (ALC), 2016 WL

1451543, at *9 (S.D.N.Y. Apr. 12, 2016) (citing *Wickham Contracting Co. v. Local Union No. 3*,

955 F.2d 831, 833-34 (2d Cir. 1992)).  Rowe seeks prejudgment interest in the amount of

$89,210.96 on her compensatory damages award of $150,000.  ECF No. 365 at 27.  Numerous

courts "have declined to award prejudgment interest on compensatory damages, finding such an

award 'unnecessary to make the claimants whole.'"  *Id.* (quoting  *E.E.O.C. v. Everdry Mktg. &*

*Mgmt., Inc.*, 556 F. Supp. 2d 213, 224 (W.D.N.Y. 2008), *aff'd*, 348 F. App'x 677 (2d Cir.

2009));  *Kuper v. Empire Blue Cross & Blue Shield*, No. 99 Civ. 1190 (JSG) (MHD), 2003 WL

23350111, at *7 (S.D.N.Y. Dec. 18, 2003) (collecting cases), *report and recommendation*

*adopted*, 2004 WL 97685 (S.D.N.Y. Jan. 20, 2004).  Here**,** "because this Court has awarded

punitive damages in the maximum amount presumptively allowed by the Constitution, awarding

prejudgment interest is unnecessary to fully compensate plaintiffs, who have been made well

more than whole."  *Mori v. Saito*, No. 10 Civ. 6465 (KBF), 2014 WL 3812326, at *3 (S.D.N.Y.

Aug. 1, 2014) (denying prejudgment interest).  "[S]uch an award would be inequitable given

plaintiff['s] already substantial recovery, and it would be unnecessary to serve the remedial

purposes of the [NYCHRL], which are well served by the [compensatory and punitive damages]

awards."  *Id.*  Accordingly, Rowe's motion for prejudgment interest is denied.

*Post-Judgment Interest.*  Google concedes that post-judgment interest is mandatory with

respect to "any money judgment in a civil case recovered in a district court." 28 U.S.C. §

1961(a); *see* ECF No. 376 at 23 ("Google does not dispute that Rowe is entitled to post-judgment

interest."). Rowe argues that, because her "only claims were city and state law claims, interest should be calculated at the New York statutory 9% interest rate using the method approved for the Southern District of New York." ECF No. 365 at 29. Google correctly counters, however, that "New York State's 9% interest rate does not apply." ECF No. 376 at 23. In the Second Circuit, "federal district courts must apply the federal rate of post-judgment interest to judgments rendered in diversity actions." *Cappiello v. ICD Publications, Inc.*, 720 F.3d 109, 112 (2d Cir. 2013) (affirming district court's refusal to apply New York post-judgment 9% interest rate). District courts applying *Cappiello* in cases involving the exercise of supplemental jurisdiction over state law claims routinely "award[] post-judgment interest at the statutorily prescribed federal rate." *Khurana v. JMP USA, Inc.*, No. 14 Civ. 4448 (SIL), 2017 WL 1251102, at *17 (E.D.N.Y. Apr. 5, 2017) ("[A]lthough the Court has exercised supplemental jurisdiction over [plaintiff's] state-law claims [under the NYLL], any judgment awarded would, nevertheless, constitute a federal judgment"); *Castillo v. Isakov*, No. 22 Civ. 6888 (LJL) (GS), 2024 WL 5323851, at *15 (S.D.N.Y. Dec. 27, 2024) ("awarding [p]laintiffs post-judgment interest in an amount consistent with 28 U.S.C. § 1961" in connection with FLSA, NYLL, and NYCHRL claims), *report and recommendation adopted*, 2025 WL 89048 (S.D.N.Y. Jan. 14, 2025); *Emamian v. Rockefeller Univ.*, No. 7 Civ. 3919 (PGG), 2023 WL 4493498, at *26 (S.D.N.Y. July 11, 2023) (same). Accordingly, Rowe is entitled to post-judgment interest "at the statutorily prescribed federal rate." *Khurana*, 2017 WL 1251102, at *17.

## F. Conclusion

Rowe's motion is denied with respect to instatement, front pay, declaratory relief, injunctive relief, tax relief, and pre-judgment interest. Rowe is awarded post-judgment interest at the federal rate pursuant to 28 U.S.C. § 1961.

## V.    MOTION FOR ATTORNEYS' FEES

Rowe seeks an award of attorneys' fees in the amount of $4,458,313.75 and costs in the amount of $178,084.86.  ECF No. 362 at 29.  The NYCHRL provides that, in "any civil action . . . the court, in its discretion, may award the prevailing party reasonable attorney's fees, expert fees and other costs."  N.Y.C. Admin. Code § 8-502(g).  The NYLL similarly provides that, when an employer "retaliate[s] against any employee . . . because such employee has caused to be instituted . . . a proceeding under or related to this chapter, or . . . because such employee has otherwise exercised rights protected under this chapter," the Court has "jurisdiction to . . . to order all appropriate relief, including . . . costs and reasonable attorneys' fees."  N.Y. Lab. Law § 215(1)(a), (2)(a).  "Although [Rowe] lost on [some] of her claims and recovered just a fraction of the damages she sought, her limited success does not affect her status as a prevailing party." *Marchuk v. Faruqi & Faruqi LLP*, 104 F. Supp. 3d 363, 367 (S. D.N.Y. 2015) (citing *Farrar v. Hobby,* 506 U.S. 103, 114-15 (1992)) (granting motion for attorneys' fees where jury returned verdict in favor of plaintiff on NYCHRL claim and for defendant on remaining claims); *Ottoson v. SMBC Leasing and Finance, Inc.*, No. 13 Civ. 1521 (JPO), 2021 WL 839437, at *1 (S.D.N.Y. Mar. 5, 2021) (granting plaintiff's motion for attorneys' fees and observing that, "[w]hile this amount was only a fraction of what [plaintiff] sought, she is a prevailing party under the NYCHRL."); *Cooper v. Upstairs, Downstairs of New York, Inc.*, No. 18 Civ. 6426 (SHS), 2021 WL 1172477, at *3 (S.D.N.Y. May 29, 2021) (same).

Accordingly, the Court finds that Rowe is entitled to recover costs and reasonable attorneys' fees.  This motion is referred to Magistrate Judge Jennifer E. Willis for a determination regarding the appropriate amount of such costs and fees.

## VI.    CONCLUSION

For the foregoing reasons, Google's renewed motion for judgment as a matter of law is denied; Google's motion for remittitur is granted, to the extent of reducing the punitive damages award to $250,000; Rowe's motion for equitable relief is denied; and Rowe's motion for attorneys' fees and costs is granted, with the reasonable amounts of such fees and costs to be determined at inquest.

The Clerk of Court is directed to terminate ECF Nos. 361, 364, 368, and 370.

SO ORDERED.

Dated:  April 3, 2026
        New York, New York

_____
JENNIFER H. REARDEN
United States District Judge

44